**EXHIBIT INDEX**

**Deposition Objections and Counter Designations**

| Exhibit No. | Description |
|:---:|:---|
| 1 | Deposition Objections and Counter Designation Chart |
| 2 | Gamez, Robert |
| 3 | Gonzalez, Jonathan |
| 4 | Jensen, Shawn |
| 5 | Polson, Joshua |
| 6 | Rodriquez, Sonja |
| 7 | Smith, Jeremy (Oct. 13, 2021) |
| 8 | Smith, Jeremy (Oct. 18, 2021) |
| 9 | Verduzco, Christina |

# EXHIBIT 1

**Parsons' Objections to Shinn's Deposition Designations and Parson's Counter-Designations**

| Deponent Name | Date | Referenced Exhibit | Shinn Initial Designations | Parsons Objections | Parsons Counter-Designations | Shinn Objections to Parsons Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| **Gamez, Robert** | 2021-10-13 | | | | | | |
| | | | 4:4-20 | | | | |
| | | | 7:17-8:22 | | 8:23-9:10 | | |
| | | | 9:11-15 | | | | |
| | | | 9:21-11:19 | | 11:20-17:11 | | |
| | | | | | 17:22-18:18 | | |
| | | | | | 18:23-21:10 | | |
| | | | 21:17-22:1 | | | | |
| | | | 22:6-23:9 | | | | |
| | | | 23:17-20 | | | | |
| | | | 23:23-25:15 | | 25:16-26:14 | | |
| | | | 26:15-23 | | | | |
| | | | 28:3-5 | | 28:6-8 | | |
| | | | 28:9-29:6 | | 29:7-30:17 | | |
| | | | 30:18-32:1 | | 32:2-9 | | |
| | | | 32:15-19 | | | | |
| | | | | | 33:1-13 | | |
| | | | | | 33:25-34:20 | | |
| | | | 34:21-35:15 | | | | |
| | | | 35:25-38:25 | | 39:1-40:6 | | |
| | | | 40:14-44:25 | | 45:1-46:16 | | |

| Deponent Name | Date | Referenced Exhibit | Shinn Initial Designations | Parsons Objections | Parsons Counter-Designations | Shinn Objections to Parsons Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | | | 47:3-47:9 | | |
| | | | | | 48:20-50:10 | | |
| | | | | | 50:21-25 | | |
| | | | | | 51:4-51:9 | | |
| | | | 51:10-52:10 | | | | |
| | | | | | | | |
| **Gonzalez, Jonathan Scott** | 2021-10-26 | | | | | | |
| | | | 4:4-4:6 | Rule 601: Incompetent | | | |
| | | | 4:17-4:23 | Rule 601: Incompetent | | | |
| | | | 6:6-7:15 | Rule 601: Incompetent | | | |
| | | | 7:20-8:12 | Rule 601: Incompetent | | | |
| | | | 11:9-11:12 | Rule 601: Incompetent | | | |
| | | | 11:14-11:15 | Rule 601: Incompetent | | | |
| | | | 11:20-12:17 | Rule 601: Incompetent | | | |
| | | | 13:8-15:16 | | | | |
| | | | | | | | |

| Deponent Name | Date | Referenced Exhibit | Shinn Initial Designations | Parsons Objections | Parsons Counter-Designations | Shinn Objections to Parsons Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| **Jensen, Shawn** | 2021-10-15 | | | | | | |
| | | | 5:6-5:17 | | | | |
| | | | 9:10-14:20 | 14:12-14:20 Lack of Personal Knowledge | | | |
| | | | 15:17-21:12 | | | | |
| | | | 22:2-23:7 | 23:8-14 | | | |
| | | | 23:15-23 | | | | |
| | | | 25:9-27:4 | | | | |
| | | | 27:8-9 | | | | |
| | | | | | | | |
| **Polson, Joshua** | 2021-10-13 | | | | | | |
| | | | 5:4-14 | | | | |
| | | | 7:17-8:22 | | | | |
| | | | 14:14-15:8 | | 15:9-13 15:21-16:5 16:22-17:14 | | |
| | | | 30:1-31:8 | Vague as to timeframe (30:1-4) Mischaracterization of testimony (30:12-14) | 18:1-10 25:5-26:1 32:1-34:22 35:8-22 37:4-11 40:21-41:6 | | |
| | | | 42:21-43:13 | | 44:2-17 | | |
| | | | 43:17-44:1 | | 44:2-17 | | |

- 3 -

| Deponent Name | Date | Referenced Exhibit | Shinn Initial Designations | Parsons Objections | Parsons Counter-Designations | Shinn Objections to Parsons Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 45:2-46:21 | | 49:8-14 50:2-12 50:17-22 51:3-10 | | |
| | | | 55:24-56:20 | | 56:21-57:9 | | |
| | | | 57:23-58:8 | | 58:9-59:7 | | |
| | | | 64:14-64:18 | | | | |
| | | | | | | | |
| **Rodriguez, Sonja** | 2021-10-13 | | | | | | |
| | | | 5:4-14 | | | | |
| | | | 10:4-16 | | | | |
| | | | 15:8-16:15 | | | | |
| | | | 17:2-23 | | | | |
| | | | 20:2-21:7 | | | | |
| | | | 28:17-31:4 | | | | |
| | | | 31:14-19 | Multiple questions at once, vague as to the meaning of "attribute," foundation, objections noted at 31:20 | | | |
| | | | 31:22-12 | 31:22-32:5 Multiple questions at once, vague as to | | | |

| Deponent Name | Date | Referenced Exhibit | Shinn Initial Designations | Parsons Objections | Parsons Counter-Designations | Shinn Objections to Parsons Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | | the meaning of "attribute," foundation, objections noted at 31:20 | | | |
| | | | | | 32:20-33:16 | | |
| | | | 34:6-14 | Foundation, objection noted at 34:15 | | | |
| | | | 34:16-21 | Foundation, objection noted at 34:22 | | | |
| | | | 34:23-25 | Foundation, objection noted at 35:1 | | | |
| | | | 35:3-22 | 35:19-22 Compound, foundation, objection noted at 35:23 | | | |
| | | | 35:25-36:11 | 35:25-36:6 Compound, foundation, objection noted at 35:23 36:7-11 | | | |

| Deponent Name | Date | Referenced Exhibit | Shinn Initial Designations | Parsons Objections | Parsons Counter-Designations | Shinn Objections to Parsons Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | | Compound, objection noted at 36:12 | | | |
| | | | 36:13-16 | Compound, objection noted at 36:17 | | | |
| | | | 36:18 | Compound, objection noted at 36:17 | | | |
| | | | 37:9-13 | | | | |
| | | | 37:21-38:9 | | 38:10-39:25 | | |
| | | | | | 41:2-8 | | |
| | | | | | 43:12-44:1 | | |
| | | | 44:4-45:1 | 44:4-14 Rules 106, 1004. Should be considered together with 43:12-44:1 | | | |
| | | | 45:5-16 | 45:13-16 Rule 802, foundation, objection noted at 45:17 | | | |
| | | | 45:19-23 | Rule 802, foundation, | | | |

| Deponent Name | Date | Referenced Exhibit | Shinn Initial Designations | Parsons Objections | Parsons Counter-Designations | Shinn Objections to Parsons Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | | objection noted at 45:17 | | | |
| | | | 50:9-52:13 | 50:9-21 Rules 106, 1004. Should be considered together with 43:12-44:1 | | | |
| | | | 53:2-4 | | | | |
| | | | 54:5-7 | | | | |
| | | | | | | | |
| **Smith, Jeremy Scott** | 2021-10-13 Part 1 | | | | | | |
| | | | 4:9-5:21 | | | | |
| | | | 6:1-5 | | | | |
| | | | 7:17-21 | | | | |
| | | | 9:21-10:6 | | | | |
| | | | 15:4-16:12 | Rules 401; 403 as to 16:7-12 | | | |
| | | | | | | | |
| **Smith, Jeremy Scott** | 2021-10-18 Part 2 | | | | | | |
| | | | 5:5-9:13 | | 9:14-16 | | |
| | | | 9:17-10:22 | | 10:23-11:1 | | |
| | | | | | 14:3-15:16 | | |
| | | | 18:25-21:1 | | 21:2-21:11 | | |

| Deponent Name | Date | Referenced Exhibit | Shinn Initial Designations | Parsons Objections | Parsons Counter-Designations | Shinn Objections to Parsons Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 21:12-14 | Rules 401, 403 | | | |
| | | | 21:22-22:1 | Rules 401, 403 | | | |
| | | | 23:1-27:2 | Rules 401, 403 | | | |
| | | | 27:11-30:19 | Rule 106: Should be considered with 27:3-10 and 30:20-32:18 | 27:3-10 | | |
| | | | 36:20-37:25 | Rule 106: Should be considered with 34:2-36:19 | | | |
| | | | 40:25-41:23 | | | | |
| | | | | | | | |
| **Verduzco, Christina** | 2021-10-13 | | | | | | |
| | | | 5:4-6:14 | 5:17-6:14 Rule 401 | 12:10-17 | | |
| | | | 8:7-9:1 | | 13:18-14:9 | | |
| | | | 9:13-11:4 | | 20:12-21:20 | | |
| | | | 12:18-13:11 | | 25:9-13 | | |
| | | | 16:1-17:15 | | 38:10-39:18 | | |
| | | | 17:18-20:11 | 20:2-20:11 Rules 106, 1004. Should be considered together with 20:12-20:22 | 40:5-22 | | |

| Deponent Name | Date | Referenced Exhibit | Shinn Initial Designations | Parsons Objections | Parsons Counter-Designations | Shinn Objections to Parsons Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 22:2-23:1 | 22:24-23:1 Rule 401 | | | |
| | | | 23:7-24:4 | | | | |
| | | | 24:16-25:8 | | | | |
| | | | 25:14-27:17 | | | | |
| | | | 35:1-11 | | | | |

78204.0001\154198423.3

# EXHIBIT 2

1

```
 1                    UNITED STATES DISTRICT COURT

 2                         DISTRICT OF ARIZONA

 3

 4      -------------------------------------X
        Victor Parsons, et al., on
 5      behalf of themselves and all
        others similarly situated; and
 6      Arizona Center for Disability
        Law,
 7
                        Plaintiffs,
 8                                            Case No.:
        vs.                                   2:12-cv-00601-ROS
 9
        David Shinn, Director, Arizona
10      Department of Corrections; and
        Richard Pratt, Interim
11      Division Director, Division of
        Health Services, Arizona
12      Department of Corrections, in
        their official capacities,
13
                        Defendants.
14      -------------------------------------X

15
             REMOTE VIDEOCONFERENCE DEPOSITION OF ROBERT GAMEZ
16
                          Florence, Arizona
17                        October 13, 2021
                             1:00 p.m.
18

19      HUSEBY GLOBAL LITIGATION
        Arizona Registered Firm R1192
20      www.Huseby.com
        800-333-2082
21

22      REPORTED BY:
        LISA A. NANCE, RPR, CR (AZ)
23      Stenographic Registered Professional Reporter
        Arizona Certified Reporter Certificate No. 50349
24

25      Job No. 366681 B
```

2

1

2                                    INDEX

3

4    WITNESS:  ROBERT GAMEZ                              PAGE

5            Examination by Ms. Love                    4

6            Examination by Mr. Keenan                  --

7

8

9

10                                  EXHIBITS

11   NO.    DESCRIPTION                              MARKED

12   (None.)

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1              REMOTE VIDEOCONFERENCE DEPOSITION OF ROBERT GAMEZ

2    began at 1:00 p.m. on October 13, 2021, in Florence,

3    Arizona, remotely, before Lisa A. Nance, RPR, CR,

4    Certified Reporter, Arizona Certificate Number 50349, in

5    and for the State of Arizona, pursuant to Notice of

6    Deposition, stipulation of counsel, in compliance with

7    ACJA Section 7-206(J)(3)(b) and Rules of Civil Procedure.

8

9    APPEARANCES:

10   FOR PLAINTIFFS:
     AMERICAN CIVIL LIBERTIES UNION OF ARIZONA
11   BY:  MR. JARED G. KEENAN
     (Present Via Videoconference.)
12   P.O. Box 17148
     Phoenix, Arizona  85011
13   jkeenan@aclu.org

14

15

16   FOR DEFENDANTS:
     STRUCK LOVE BOJANOWSKI & ACEDO, PLC
17   BY:  MS. RACHEL LOVE
     (Present Via Videoconference.)
18   3100 West Ray Road, Suite 300
     Chandler, Arizona  85226
19   rlove@strucklove.com

20

21

22              The following proceedings were had:

23

24

25

4

Florence, Arizona
October 23, 2021
1:00 p.m.


ROBERT GAMEZ,

called as a witness herein, having been first duly sworn

by the Certified Court Reporter, remotely, was examined

and testified as follows:


EXAMINATION

BY MS. LOVE:

Q.   Good afternoon, Mr. Gamez.  My name is Rachel

Love, and I am an attorney for the defendants in the

Parsons case.  Today is the time set for your deposition.

Can you please state your full name, for the

record?

A.   Robert Rosco Gamez.

Q.   Mr. Gamez, do you, off the top of your head,

know your Arizona Department of Corrections

Rehabilitation and Release Inmate Number?

A.   131401.

Q.   And you were deposed in this case several years

ago; is that correct?

A.   Yes.

Q.   Okay.  And since that deposition that I think

was in about 2013, have you given any depositions in any

5

```
 1    other cases?
 2         A.   Yes.
 3         Q.   Do you remember what the case name was?
 4         A.   One case I know for sure is Gamez vs. United
 5    States.
 6         Q.   Was that the lawsuit you filed against the
 7    United States and persons at the Department of
 8    Corrections regarding legal access and your legal
 9    documents?
10         A.   Yes.
11         Q.   Did the Attorney General's Office take your
12    deposition?
13         A.   Yes.
14         Q.   Do you know what the status of that lawsuit is?
15         A.   It's currently pending in the Ninth Circuit
16    Court of Appeals.
17         Q.   Any other depositions besides that case that
18    you have done since your first deposition in the Parsons
19    case?
20         A.   Not sure.
21         Q.   Okay.  I know you probably remember the rules
22    of a deposition, but I'm going to go over them again.  So
23    because this is a little unusual situation where we're
24    doing it over video and we're not all together, I'm going
25    to try to talk really slow today and give you time to
```

 1    give your full answer before I ask you the next question,

 2    so the court reporter can get everything down.  Okay?

 3         A.   Okay.

 4         Q.   If at any time you can't hear my question or

 5    you don't understand my question, will you please tell

 6    me?

 7         A.   Yes.

 8         Q.   Because if you don't understand my question, I

 9    don't want you to try to guess what I'm thinking and

10    answer it, so just tell me you don't understand.  Okay?

11         A.   All right.

12         Q.   Also, this is not a guessing game, and I'm not

13    trying to make you guess or trick you in any way.  If you

14    simply don't know the answer to a question, you can tell

15    me that.  That's fine.  Or if you have to guess, let me

16    know that, because I don't want you to have to guess.

17    Okay?

18         A.   Okay.

19         Q.   If you need to take a break at any time, let me

20    know, and we'll take a break.  I just ask you answer the

21    question I have pending before you take a break.  Fair

22    enough?

23         A.   Yes.

24         Q.   And your attorney is sitting there next to you,

25    correct?  We just can't see him on the screen.

7

```
1          A.   Yes.

2          Q.   What did you do, if anything, to prepare for

3     today's deposition?

4          A.   I spoke to my attorney, briefly.

5          Q.   And was that today, before your deposition?

6          A.   Yes.

7          Q.   How long do you think that you met with your

8     attorney?

9          A.   Maybe 45 minutes.

10         Q.   Did you look at any documents to prepare for

11    today's deposition?

12         A.   No.

13         Q.   Are you currently taking any medications that

14    you think might affect your ability to give your

15    testimony today?

16         A.   No.

17         Q.   Are you currently taking any medication?

18         A.   Yes.

19         Q.   Do you know what those medications are?

20         A.   Wellbutrin and two other meds.

21         Q.   You don't know the name of the two other?

22         A.   No.

23         Q.   Do you know why you are taking the Wellbutrin?

24         A.   Severe depression.

25         Q.   The two other medications, do you know what you
```

8

1    are taking those medications for?

2        A.   One is for physical and the other one is for

3    severe depression, as well -- or I'm not sure, to be

4    honest with you.

5        Q.   The medication you are taking for physical,

6    what is the physical condition?

7        A.   Chronic pain.

8        Q.   Where do you have chronic pain at in your body?

9        A.   Everywhere.

10       Q.   Do you know if you have a diagnosis about the

11   reason for the chronic pain?

12       A.   I'm not sure.

13       Q.   As to the medications you are taking for severe

14   depression, do you know whether or not you have any

15   mental health diagnosis?

16       A.   I'm not sure.

17       Q.   Do you know whether or not the Department of

18   Corrections and their medical or mental health providers

19   have designated you as seriously mentally ill, or

20   sometimes we call it SMI?

21       A.   In the past, they have; but I was taken off,

22   after the settlement.

23       Q.   Do you mean the settlement in --

24       A.   I misspoke.  It was right after the settlement

25   happened, that's when, yes, they revoked my SMI status,

9

1   for no reason.

2       Q.   When you say "the settlement," do you mean the

3   settlement in this Parsons case?

4       A.   Yes.

5       Q.   Do you know how long after the settlement you

6   were taken off your SMI designation?

7       A.   No.

8       Q.   Did anybody ever tell you the reason why the

9   SMI designation was taken off?

10      A.   No.

11      Q.   And you are currently housed, right now, at the

12   Eyman Complex at SMU-I?

13      A.   Yes.

14      Q.   And do you know what your housing location is?

15      A.   It would be One Able Cell 43.

16          THE REPORTER:  Would you say that one more

17   time?

18          THE WITNESS:  One Able Cell 43.

19      Q.   BY MS. LOVE:  Is that "Cell 43"?

20      A.   Yes.

21      Q.   Do you have a cellmate?

22      A.   No.

23      Q.   How long have you been over at SMU-I?

24      A.   I think I got here in January.

25      Q.   January of 2021?

10

1          A.    2021, yep.

2          Q.    Since you have been at SMU-I, have you had a

3    cellmate at all?

4          A.    No.

5          Q.    Prior to SMU-I, which prison were you at?

6          A.    Lewis Complex in Buckeye, Rast Max.

7          Q.    Sir, your current classification, it's max

8    custody; right?

9          A.    Yes.

10         Q.    Do you know how long you have been at the max

11   custody classification?

12         A.    Since 2003.

13         Q.    Do you remember how long you were at Rast Max?

14         A.    I got to Rast Max in 2015, so --

15         Q.    When you were at Rast Max from 2015 to 2021,

16   did you ever have a cellmate?

17         A.    Yes.

18         Q.    For how long did you have a cellmate?

19         A.    Not that long.

20         Q.    Less than a year?

21         A.    Yes.

22         Q.    Less than six months?

23         A.    Yes.  Three months after -- I'm just -- I'm

24   speculating, but probably less than three months.  It

25   wasn't -- approximately.

1    Q.   Do you remember what your cellmate's name was?

2    A.   I had two cellmates.  One, I don't remember his

3 name.  The other one was Corona.

4    Q.   Do you know if there is any reason why you

5 haven't had a cellmate since that time back at Rast Max?

6    A.   I'm not sure, no.

7    Q.   Have you ever asked anybody at Lewis - Rast Max

8 or SMU-I why?

9    A.   No.

10    Q.   Do you prefer not to have a cellmate?  The

11 reason I ask that is some men prefer to have a cellmate

12 and some would rather just not have a cellmate.

13    A.   Just depends.

14    Q.   Have you ever put in a request to have a

15 cellmate?

16    A.   I think I have, but I'm not sure, to be honest.

17    Q.   Have you done that since January 2021 when you

18 have been at Eyman SMU-I?

19    A.   No.

20    Q.   I'm going to switch gears on you a little bit

21 now and ask you whether or not -- let's take the time

22 period since you've been at SMU-I, so that will be easy

23 just to focus on SMU-I.  Other than today, have you met

24 with any of your attorneys in the Parsons case?

25    A.   Yes.

1      Q.   How many times?

2      A.   Since I've been -- once.

3      Q.   Once?

4      A.   Yes.

5      Q.   Was that in person?

6      A.   Yes.

7      Q.   Do you know if it was during one of the tours

8  where your attorneys come and they tour SMU-I?

9      A.   Yes.

10     Q.   Since you have been there at SMU-I, have you

11 signed any written declarations for any of your

12 attorneys?

13     A.   No.

14     Q.   Since you've been at SMU-I, have you talked to

15 any of the experts that your attorneys have hired for

16 this case?

17     A.   Yes.

18     Q.   Do you remember who that was?

19     A.   Craig Haney, Craig Haney.

20     Q.   H-A-N-E-Y.

21          And did you meet with Dr. Haney in person there

22 at the facility?

23     A.   Yes.

24     Q.   Was that pretty recent, in the last month or

25 so?

1       A.   Yes.

2       Q.   Do you remember how long you met with him?

3       A.   Approximately 30 minutes.

4       Q.   Was that at your cell front, or were you able

5  to go out into a private conversation with him?

6       A.   Both.

7       Q.   Now, Dr. Haney has recently done a written

8  report in this case.   And because of this setup, I can't

9  hand that report to you.   But on page 89 of his report --

10  I'm telling this also for your lawyer -- page 89 of

11  Dr. Haney's report, at paragraph 149, Dr. Haney

12  summarizes some of the conversations that he had with

13  you.   And so what I'm going to do is I'm going to read a

14  couple sentences at a time about what Dr. Haney said

15  about talking to you and then ask you some follow-up

16  questions.   Okay?

17       A.   Okay.

18       Q.   Okay.   So Dr. Haney says, at paragraph 149 --

19  and I'm reading verbatim.   He says, "When I returned to

20  SMU-I in 2021, I reinterviewed Mr. Gamez, who is still in

21  the unit.   He said, simply, quote, 'I'm in SMU-I.   This

22  is as bad as it gets,' end quote.   He elaborated that,

23  quote, 'Every day I wake up and fight against the

24  depression and decide whether to live or not.'"

25            Do you remember saying some statements like

14

1    that to Dr. Haney when he interviewed you?

2         A.   Can you repeat the question, please?

3         Q.   Sure.

4              I just read those two sentences from his report

5    as to what Dr. Haney says you told him.  Does what he --

6    do you remember saying those words to him?

7         A.   That I would battle whether I want to wake up

8    or not?

9         Q.   Yes.

10             I'll read it again for you.  He says you told

11   him, "I'm in SMU-I.  It's as bad as it gets."  Then he

12   went on to say, "Every day I wake up and fight against

13   the depression and decide whether to live or not."

14        A.   That's true.

15        Q.   Okay.  I just want to ask you some more

16   questions about that.  My question is:  When you told

17   him, "I'm in SMU-I.  It's as bad as it gets," can you

18   explain for me what you meant by that?

19        A.   Extreme loneliness, depression.  I mean, it's

20   solitary confinement, so we're not leaving our cells.

21   It's just -- I'm not sure -- it's isolation.

22        Q.   So when you say "the loneliness," can you

23   describe what you mean by that?

24        A.   I mean, you are in a cell 24 hours a day.  It's

25   just -- you get lonely.  I mean, you don't talk to

15

1   nobody.  You got to deal with the verbal abuse, physical

2   abuse.  There is a lot of stuff that you have to deal

3   with that just makes your time extremely difficult.

4         Q.   When you say "verbal abuse," what do you mean

5   by that?

6         A.   Staff, sometimes some inmates.  I mean, it's

7   just not a good place.

8         Q.   Can you give me an example of verbal abuse by

9   staff that you've had?

10        A.   Sure.  Okay.  So maybe just a couple days ago,

11  I was escorted out of my cell.  The officer told me that

12  he was going to fuck me up.  He called me a pussy.  And

13  he told me if I didn't cuff up, that he would make my

14  life a lot more harder.  So I refused to cuff up.

15         Mental health personnel arrived at my cell

16  front.  I told her what the officer said.  She didn't

17  seem to care.  She was trying to escort me out to conduct

18  some type of, I guess, one-on-one.

19         I made sure the camera was there.  When I did

20  finally cuff up, after he told me not to cuff up because

21  he wanted to pepper spray me, it was just verbal abuse.

22  They pointed an assault rifle at me.  I was slammed

23  against the wall multiple times.  It was just physical

24  abuse, verbal abuse, and it just -- it gets frustrating.

25         You can't do nothing about it.  If you report

16

1   it -- these are supervisors.   These are supervisors

2   actually doing this.

3            I asked him to preserve the stationary

4   surveillance cameras.   They told me, "Fuck you."

5            There just ain't nothing you can do about it.

6   It gets lonely.

7       Q.   The incident you were telling me about with the

8   officer, when did that happen?

9       A.   Just a couple days ago, within the last week.

10   It's happened multiple times in the last week.

11       Q.   Can you tell me the correctional officer's

12   name?

13       A.   I asked him for his name.   He said, "It's your

14   daddy."   I asked for his badge number.   He said, "805,"

15   which is my classification, protective custody.   He

16   didn't give it to me.   I asked every officer that was

17   involved.   I asked them their name.   They kept repeating,

18   "It's your daddy.   Suck my dick."   And they were pointing

19   an assault rifle at me.

20       Q.   Other than the verbal, did you make any written

21   reports to complain about the incident?

22       A.   Other than to my attorney?

23       Q.   Yes.   Don't tell me anything about talking to

24   your attorney.

25            But besides your attorney, did you file a

17

1   grievance or do an inmate letter, anything to complain
2   about the incident?
3        A.   Who can I complain to?  Who is there to
4   complain to?  There is nobody to complain to.  The
5   administration?
6        Q.   You didn't feel you could make any report of
7   it?
8        A.   No.  It will just get worse.
9        Q.   Did the officer use OC spray on you during the
10   incident?
11        A.   No.
12        Q.   And you said a mental health lady came down and
13   talked to you, as well?
14        A.   Yes.  Her name was Thomas.  There was a camera
15   present on that.  I had a surveillance camera.  I tried
16   to preserve it.  I'm not sure if they are actually going
17   to preserve it or if there was a note written on it.  I'm
18   not sure how they go about retaining their records.  I
19   mean, all I can do is ask.  Whether they choose to
20   preserve it, whether they choose to document what they
21   are doing, I doubt it, but they might.
22        Q.   Were you injured during the incident?
23        A.   Was I injured?  Yes.
24        Q.   How were you injured?
25        A.   Physically.

18

```
1          Q.   What was the physical injury?

2          A.   They slammed my face up against a metal door

3     twice, kicked me.  I got bruises on my legs, got bruises

4     on my arms from them pulling the handcuffs.  That's

5     physical.  Mental is something else; so --

6          Q.   Did you put in an HNR or seek medical treatment

7     for the injuries?

8          A.   No.

9          Q.   Did you receive any disciplinary report --

10         A.   Yes.

11         Q.   -- for this incident?

12              Did you have to go to detention?

13         A.   I'm already in detention.

14         Q.   You are currently right now on detention

15     status?

16         A.   I'm not sure.  They have me in my cell, have me

17     in total isolation, if that's what you want to consider

18     detention, freezing temperature; so --

19         Q.   Do you know if there is an investigation

20     pending right now on your disciplinary report?

21              MR. KEENAN:  Objection:  Lack of knowledge.

22              THE WITNESS:  I'm not sure.

23         Q.   BY MS. LOVE:  You said that you have also been

24     physically abused by other inmates.  What do you mean by

25     that?
```

1          A.    I don't think I said that, but -- I mean, are

2    you talking about this incident, or are you talking about

3    through my time in DOC?

4          Q.    Let's just talk about since you've been in

5    SMU-I, January 2021.  Have you been physically abused by

6    any other inmates?

7          A.    No.  Almost did.

8          Q.    And when did that happen that you almost did?

9          A.    Maybe less than a week ago.  It was on Friday,

10   as a matter of fact.  It was last Friday.

11         Q.    What happened last Friday?

12         A.    I was going to class.  Two inmates took off

13   their cuffs in front of the COs to, I guess, jump me.

14   They didn't do that.  There was an ICS that was called.

15   The inmates were -- they both received disciplinary

16   reports for threatening, or inciting riots, or -- I'm not

17   sure, to be honest with you; but it was documented.

18         Q.    Do you know the names of those other inmates?

19         A.    No.

20         Q.    Had you had problems with those inmates before

21   last Friday?

22         A.    Other than them banging on my cell all night,

23   being disrespectful, yelling, and stuff like that, yes, I

24   did.

25         Q.    Are the other inmate cells next to yours?

20

1          A.    Yes.

2          Q.    So were they banging on the walls?

3          A.    Yes.

4          Q.    Were they saying anything to you when they were

5    banging on the walls?

6          A.    A whole bunch of things.

7          Q.    Do you remember what they were saying?

8          A.    They said a whole bunch of things.  I mean,

9    that's -- they were just being real disrespectful.

10         Q.    Okay.  So you said there was almost an issue

11   with you.  But did you -- did they assault you, or did

12   you fight with them last Friday?

13         A.    No.  What they did was we were getting cuffed

14   up to go to class.  And one of the inmates slipped his

15   cuffs, threatened me.  The other inmate also threatened

16   me.  And I guess they were scared, because they didn't

17   want me walking behind them, or something like that.

18   But, I mean, an ICS was called.  They received

19   disciplinary.  There was an SNL report written on it.

20              As far as me receiving any disciplinary, no, I

21   did not.

22         Q.    When you said that the other inmates threatened

23   you, did they say anything specific, like words to

24   threaten you?

25         A.    Yeah, that they were going to fuck me up, that

21

```
1    they were going to "jump me."  And that's -- I mean, as
2    far as specific, I can't remember right now.
3        Q.   You said that when this all happened last
4    Friday, you were on your way to class?
5        A.   Yes.
6        Q.   What class were you on your way to?
7        A.   I'm not sure.  Once a week they get us for a
8    class for an hour.  You don't really do nothing but sit
9    there.  I don't talk.  But other inmates, they sit and
10   talk amongst each other, and that's about it.
11       Q.   You don't know the name of the class?
12       A.   Yes.
13       Q.   Does a CO3 teach the class?
14       A.   Yes.
15       Q.   How long have you been going to this class?
16       A.   Since I got my step III or step II.
17       Q.   What is your current max custody step level?
18       A.   I'm max custody.
19       Q.   Yes.  But within max custody, are you aware
20   that you are then -- you are also in a step level?
21       A.   Yes.
22       Q.   Right now, do you know what your step level is?
23       A.   Step I.
24       Q.   At any time since you've been into SMU-I, have
25   you been any other step level than I?
```

1      A.   Yes.

2           MS. LOVE:   Okay.   I've just been told I need to

3      take just a short break.   I'm just going to mute for just

4      a second.

5           (Discussion off the record.)

6      Q.   BY MS. LOVE:   Let's start this way:   When you

7      first came to SMU-I, what was your step level?

8      A.   Zero.

9      Q.   Okay.

10     A.   It was -- I didn't have a step level.

11     Q.   Okay.   So then did you --

12          Since you've been at SMU-I, what other step

13     levels have you been?

14     A.   II and III.

15     Q.   Do you know why you are back down to a I?

16     A.   Because I got a write-up, I think.

17     Q.   A disciplinary write-up?

18     A.   Yes.

19     Q.   What kind of write-up did you get?

20     A.   Possession of a weapon.

21     Q.   Was that related to the incident last Friday?

22     A.   Should I answer this one?

23          I mean, can I speak to my attorney real quick?

24          MS. LOVE:   Yes.

25          (Discussion off the record.)

23

1      Q.   BY MS. LOVE:  When you were previously a step

2   II there at SMU-I, for how long were you a step II?

3      A.   Step II?  I'm not -- I think it was 30 days.

4      Q.   How long were you a step III?

5      A.   I'm not sure.  Maybe like four months, five

6   months.

7      Q.   And before last Friday, were you a step level

8   II or a step level III?

9      A.   I was a III.

10      Q.   Okay.  Now I want to go back.  We went off on a

11   different road.  I want to go back to what Dr. Haney was

12   saying that you talked about in his report.  And he said

13   that you told him, "Every day I wake up and fight against

14   the depression and decide whether to live or not."

15           Do you remember telling him that?

16      A.   Yes.

17      Q.   Are there days where you feel concerned that

18   you don't want to live and you tell either medical or

19   mental health or the correctional officers that you are

20   feeling really bad that day?

21           MR. KEENAN:  Objection:  Compound.

22      Q.   BY MS. LOVE:  You can go ahead and answer.

23      A.   Can you repeat your question again, please?

24      Q.   Yes.  I'll break it down.

25           When you have a day where you feel like you are

24

1    fighting against the depression and you have to decide

2    whether to live or not, if you are feeling like that, do

3    you tell somebody in mental health?

4        A.   No.

5        Q.   Do you tell anybody in medical?

6        A.   No.

7        Q.   Do you tell any of the correctional staff?

8        A.   No.

9        Q.   Is there a reason why you do not?

10       A.   Yes.

11       Q.   What is that reason?

12       A.   Because they'll place you on suicide watch,

13   where it's just -- you don't have nothing.  They take all

14   your property away from you.  You don't have no books.

15   They put you in a smock in freezing cold temperature, and

16   you are stuck there until -- I mean it doesn't make it

17   any better.  It actually gets worse than it was before,

18   so there is really no purpose.  That's the process.

19       Q.   Since you've been at SMU-I since January, have

20   you ever been placed on suicide watch?

21       A.   No.

22       Q.   Now let's take the last year.

23            (Discussion off the record.)

24       Q.   BY MS. LOVE:  The last year you were at Rast,

25   did you ever have to go on suicide watch?

25

1      A.    Yes.

2      Q.    Do you remember how many times?

3      A.    Within that last year, or from 2015 until

4   present?

5      Q.    No.  Let's just talk about the last year.

6      A.    Well, I got -- I got on SMU-I in January, so

7   that would place me at Rast Max -- something.

8            About the last two months I was at Rast or

9   talking about a year?

10     Q.    Yes.  The last year that you were at Rast.

11     A.    I'm not sure.  I know I was involved in a

12   couple stabbing incidents.  And they put me on a security

13   watch.  I'm not sure if you would, I guess, justify that.

14   And it's the same difference.  All they give you is a

15   smock.

16     Q.    Going back to Dr. Haney's report, he next says,

17   "Mr. Gamez said that even though he is still taking

18   psychotropic medications, quote, 'There is no real mental

19   health treatment in here,' end quote."

20           Do you recall telling Dr. Haney that?

21     A.    I don't remember, specifically, but it would be

22   something I would say.

23     Q.    And what do you mean by you do not believe

24   there is real mental health treatment there?  Is that

25   SMU-I?

26

1       A.   Other than medication, that's the only thing

2   that they give you is just medication.

3       Q.   Do remember the last time you saw anybody from

4   mental health?

5       A.   When I just seen that lady like a couple days

6   ago, when they called the ICS.   And she spoke to me for

7   like maybe a minute, and then that was it.

8       Q.   What about before that, before the ICS?   Last

9   time you saw anybody from mental health?

10      A.   They walked through -- sometimes they'll walk

11  through once a week, do like a little walk-through, ask

12  you if you are okay, if you have anything you want to

13  say, and that's it.   It's more like a paper-dressing type

14  thing.

15      Q.   When mental health comes through once a week,

16  do you mean they come to your cell front and ask you if

17  you are okay?

18      A.   Yes.

19      Q.   And since you've been there at SMU-I and mental

20  health comes to your cell and asks you how you are doing,

21  have you told them, "I'm not really feeling well," and

22  talked to them for more than a minute?

23      A.   No.

24      Q.   Have you ever told the mental health that are

25  coming by to your cell that you would like to come out

27

1    and talk to them more in a different setting, not just

2    your cell?

3        A.   Have I ever asked them?  I'm pretty sure I

4    have.

5        Q.   Do you remember what the response was?

6        A.   Sometimes they don't have enough security staff

7    to escort you out there; and sometimes they'll actually

8    come out and speak to you; so --

9        Q.   Do you remember, since being there at SMU-I, if

10   you have ever been able to come out of your cell and talk

11   to mental health somewhere else but your cell?

12       A.   Let me see.  No.

13       Q.   The next thing that Dr. Haney says, he says,

14   "He told me that they started him on groups about two

15   months ago, but the experience was not at all what he

16   expected or felt he needed.  He elaborated by saying,

17   'They take you to a room with a table, four or so guys.

18   And it's a CO3 who is the leader.  It is so meaningless.

19   I don't even know what it is called or what it's for.

20   But I go, because if I don't, they take your privileges

21   and reduce your step level.'"

22            Do you remember telling Dr. Haney about this?

23            MR. KEENAN:  Objection:  Calls for hearsay.

24            THE WITNESS:  Are you asking me if I said that

25   verbatim?  I'm not sure what --

1    Q.   BY MS. LOVE:  Not verbatim --

2    A.   Something like it, yes.

3    Q.   So a couple of months ago did you start going

4 to group class?

5    A.   Yes.

6    Q.   And was it not what you expected?

7    A.   There is -- there is really no sense there.

8 It's really a paper dressing.

9    Q.   I think you told me earlier today that some of

10 the inmates talk, but you don't really talk?

11    A.   Yes.

12    Q.   What kinds of things are talked about in that

13 group class?

14    A.   People just talk about their own personal, I

15 guess, their -- we just talk amongst themselves like

16 about whatever they are going to talk about.  I'm not

17 sure.  I don't talk.  But it's part of if there is any

18 type of treatment or any type of anything that --

19 anything that is positive as goes with mental health,

20 none of that goes on.

21    Q.   Have you gone back to that class since your

22 step level went back to one last week?

23    A.   No.

24    Q.   Do you know if you are going to be able to go

25 to that class anymore because your step level is back at

29

1    I?

2         A.   Probably not.  I'm not really sure, to be

3    honest with you.

4         Q.   How many other inmates are usually in the class

5    with you?

6         A.   Maybe four or five.

7         Q.   In his report, Dr. Haney next says, "He also

8    said that they are supposed to go to the outdoor yard,

9    but it is often canceled, and there are no jobs."

10        Can you remember talking to Dr. Haney about

11   cancellation of outdoor yard?

12        A.   Yes.

13        Q.   If you take the last month, how many times, if

14   you remember, was outdoor yard canceled?

15        A.   All of them.

16        Q.   In the last month, have you been offered to go

17   to recreation at any time?

18        A.   No.

19        Q.   Not one time has anybody asked you if you want

20   to go to recreation?

21        A.   Not one time.

22        Q.   Have you asked any correctional staff if you

23   can go to recreation, in the last month?

24        A.   Yes.

25        Q.   How many times?

30

1          A.    All of them.

2          Q.    What do you mean by "all of them"?

3          A.    Well, you only get rec once a week.   It's

4     usually on Friday when they come.   And it's usually --

5     I'll ask them if they are going to do rec.   And they

6     usually tell you whether you are going to go or not going

7     to go; and it's been no for probably the last two, three

8     months.

9          Q.    So in the past two or three months, it's only

10    offered for you to go to rec, if it's not canceled, on

11    Fridays?

12         A.    Yes.   But you have to initiate a conversation

13    and ask them.   They won't even ask you.   They'll just

14    let --

15         Q.    But in the last month, you haven't gone out to

16    rec at all?

17         A.    No.

18         Q.    Since you've been at SMU-I, have you gone out

19    to recreation at all?

20         A.    Yes.

21         Q.    Do you remember when the last time you went out

22    to recreation was?

23         A.    No.

24         Q.    Do you know how many times you've gone out to

25    recreation at SMU-I?

```
 1        A.   Let's see.  You are talking about the
 2   step-three, right, or talking about total?
 3        Q.   Total, all.
 4        A.   Probably about ten times.
 5             I've been here since January, so about ten
 6   times.
 7        Q.   And there are different kinds of recreation
 8   locations there at SMU-I; right?
 9        A.   Yes.
10        Q.   Can you tell me what all the different kinds of
11   recreation locations you've been out to in those ten
12   times?
13        A.   Yes.  Single cages, step-two cages, and
14   step-three cages.
15        Q.   What about -- I use the term "chute rec."
16        A.   What?
17        Q.   "Chute rec," C-H-U-T-E.
18             Do you know what that term means?
19        A.   Yes.
20        Q.   What does that mean, to you?
21        A.   You are talking about the enclosures that is
22   linked up with the 8,000 SMU-Is, separate from step II,
23   step III, and single-man cages that are together, right?
24   Are you talking about the enclosure that is directly next
25   to the pods?
```

32

1       Q.    Yes.

2       A.    Where you can't see nothing?

3       Q.    Yes.

4             Have you been out to chute rec since you've

5    been to SMU-I?

6       A.    No.

7       Q.    Have you been offered the opportunity to go out

8    to chute rec since you went to SMU-I?

9       A.    No.

10      Q.    Since you've been at SMU-I, has there been any

11   time where correctional staff ask you if you want to go

12   to rec but you tell them, "No, I don't want to go today"?

13            MR. KEENAN:  Objection:  Compound.

14            THE WITNESS:  Repeat your question, please.

15      Q.    BY MS. LOVE:  Since you have been at SMU-I, has

16   there been any time where correctional officers asked you

17   if you wanted to go to recreation but you said, "No, I

18   don't want to go"?

19      A.    I'm not sure.

20      Q.    Now, if we look at a big timeframe of since you

21   had your last deposition in this case, so that was about

22   2013, to now, have you ever had to go to enhanced

23   security?

24      A.    Enhanced?  Let's see.  I can't remember when

25   was the last time I was in enhanced security.

33

1          Q.   But since you've been incarcerated, have you

2     been in enhanced security, at any time?

3          A.   Yes.

4          Q.   How many times?

5          A.   Multiple.

6          Q.   More than five?

7          A.   No.

8          Q.   Okay.  Do you know what the longest amount of

9     time you spent was in enhanced?

10         A.   Maybe a year.

11         Q.   Do you remember if that was before 2012?

12         A.   It was probably around 2012, 2011, 2012, maybe

13    2013.  I'm not sure.

14         Q.   Since 2013, have you had to go to restrictive

15    status housing?

16         A.   I'm not even sure what that means, to be honest

17    with you.  We're already in restrictive.  What is

18    restrictive housing?

19         Q.   If you don't know, I don't want you to guess

20    about that.  It's a different designation called

21    restrictive housing.

22         A.   What does that consist of?

23         Q.   If you don't know whether or not you've been

24    there, then that's okay.

25              If we go back and think about the last year you

34

1    were at Lewis - Rast, so just focusing on the last year

2    at Lewis - Rast, do you remember what step level you were

3    at?

4         A.   Yes.

5         Q.   What was that?

6         A.   I didn't have a step level.

7         Q.   I'm sorry?

8         A.   I didn't have a step level.

9         Q.   So you were at Rast Max in maximum custody, but

10   you were not a step level I, II, or III?

11        A.   I know I didn't go to class, so they had me,

12   maybe, not on a step level.  Or I just -- I didn't go to

13   class.  I didn't go to no step class.  Didn't go to none

14   of that.  It was not because I didn't want to, but

15   because they didn't give me a step level.

16        Q.   In the last year you were at Rast, did you do

17   any classes in your cell where you study on your own?

18        A.   No.  Honestly, I don't know.  But for the most,

19   I don't think I ever did.  It's something I wasn't

20   offered.

21        Q.   Did you go to outside recreation while you were

22   at Lewis in the last year you were there?

23        A.   Are you talking about the step-two, step-three

24   enclosures, or are you talking about the single-man

25   enclosures?

1       Q.   Any of them.

2       A.   Yes.

3       Q.   Which ones?

4       A.   Step I.  Step I consists, I guess, like of what

5    they call single.  You go by yourself.  It's nobody in

6    there with you.  You go by yourself.

7       Q.   Is that an enclosure that is at the end of your

8    pod, or is it a sealed --

9       A.   It's not like the ones that you described

10   earlier, like SMU-I, just a bunch of cages next to each

11   other.

12      Q.   So it's an individual enclosure separated by

13   fence to just have one person, and then maybe in the next

14   one there is somebody next to you?

15      A.   Yes.

16      Q.   Do you remember, in that last year at Rast, how

17   often it was offered for you to go to that single-person

18   outdoor recreation?

19      A.   No.

20      Q.   Do you know why in that last year at Rast you

21   did not get offered the opportunity to go to any classes?

22           MR. KEENAN:  Objection:  Foundation, I guess.

23           Go ahead.

24           THE WITNESS:  What is your question, please?

25      Q.   BY MS. LOVE:  In that last year at Rast, you

1    told me you did not go to any classes outside of your

2    cell; right?

3         A.   Yes.

4         Q.   Did you -- did anybody ever offer you the

5    opportunity to go to classes outside your cell?

6         A.   No.

7         Q.   Did you ever ask any correctional personnel why

8    you weren't offered the opportunity to go to class

9    outside of your cell?

10        A.   Yes.

11        Q.   Who did you ask?

12        A.   CO3s, administration.

13        Q.   Did anybody ever tell you why?

14        A.   Yes.

15        Q.   What were you told?

16        A.   Because of my disciplinary history.

17        Q.   And did you have a disciplinary history in that

18   last year you were at Rast?

19        A.   Yes.

20        Q.   Were you found guilty of disciplinary reports

21   in that last year at Rast?

22        A.   Yes.

23        Q.   Do you remember how many?

24        A.   No.

25        Q.   Do you remember what any of them were for?

1      A.   Do you want me to -- I mean, I know there are

2   some stabbing incidences, manufacturing doors, weapons,

3   assault on staff, and -- just mainly, I think that may be

4   all of them.  I'm not sure, though.  But those are the

5   only ones that I could remember.

6      Q.   Do you know when the last time you've had a

7   classification review was?

8      A.   Yeah.  I had a classification review when I

9   first got to -- when I first got to SMU-I.  They tried to

10  send me back to general population, and I guess they

11  reclassed me as maximum custody.  Classification is by

12  administration.  They kept me here.

13     Q.   Did you appeal that classification review?

14     A.   Probably not.

15     Q.   When you said that, "They tried to send me back

16  to general population," what did you mean by that?

17     A.   I'm classified as protective segregation.  And

18  when I first left Lewis Complex, they tried to send me

19  back to general population, the population that I came

20  from.  But it got denied.

21     Q.   Did you want to go back to general population?

22     A.   No.  I didn't ask for it.  It's just something

23  that they initiated on their own.

24     Q.   When they initiated that on their own for you

25  to go back to general population, did you tell them that

1    you did not want to go?

2        A.   I told them that I wanted to speak to my

3    attorney.

4        Q.   So did they say, "We're going to send you back

5    to general population"?  And did you tell them that you

6    were not going to go back?

7        A.   It's not up to me.  It's not like something I

8    can say "yes, I want to go back," or "no, I don't want to

9    go back."  It's whatever they decide, that's what they

10   are going to decide.  So there is no point trying to

11   argue what they are already going to do.

12       Q.   Did you want to stay at SMU-I versus going back

13   to general population?

14       A.   No.  I mean, if I go back to general population

15   where -- where there is threats, like threats on a

16   person's life, like you can't go back to general

17   population and expect not to get physically assaulted or

18   killed.  It's just something unheard of.  You can't go

19   from being in protected custody, going back to general

20   population, knowing you are on multiple hit lists and you

21   are going to get killed.  I have to defend myself.

22       Q.   Do you know why you are in protective custody?

23       A.   Yes.  Multiple hit lists.

24       Q.   From security threat groups?

25       A.   Yes.

39

1      Q.   There at SMU-I, since you've been there, since

2   January, how often are you offered a shower a week?

3      A.   I've never even been to the shower, to be

4   honest with you.

5      Q.   So since January of 2021, you have never gone

6   out of your cell to the showers?

7      A.   And actually took a shower?  I mean, they

8   placed me in there before, but that was only to search my

9   house.

10          You asked if I wanted to go take a shower with

11   them?  Let's see.  Oh, maybe three times, at the most.

12      Q.   When correctional staff offer for you to come

13   out of your cell to go to the shower to shower, do you

14   tell them, "No.  I'd just rather stay in my cell"?

15      A.   The only time that they offer you a shower is

16   when you come back from step rec.  Like I said, that's

17   mainly Fridays when they do do that.  Sometimes I tell

18   them, "I'll take a shower or birdbath inside my cell,"

19   and I'd stay in my cell and not take a shower.  Usually

20   they will leave you in there long.  And that's what I'm

21   used to.  But -- other than that, no.

22      Q.   When you said -- I think you said, "Usually

23   they will leave you in there long."  What do you mean by

24   that?

25      A.   It usually means they'll leave you in there,

40

1    leave you inside the shower, and you are just stuck there

2    until they take you out.

3         Q.   For how long are you in the shower before they

4    take you out?

5         A.   It just depends.   Sometimes they'll come quick.

6    Sometimes they'll take hours.

7         Q.   What about the last year you were at Lewis -

8    Rast Max, did you go out of your cell to the showers?

9         A.   At Rast, yes.

10        Q.   How often per week would you leave your cell to

11   go take a shower when you were at Rast for that last

12   year?

13        A.   I'm not sure.

14        Q.   Okay.  Now back to SMU-I, since you've been

15   there in January, have you had any visitation with family

16   or friends?

17        A.   Yes.

18        Q.   When is the last time you did visitation?

19        A.   Last week.

20        Q.   And did you do that in person or did you do it

21   on the tablet?

22        A.   Which time?  Last week?

23        Q.   Yes, last week.

24        A.   Tablet.

25        Q.   Since you've been at SMU-I, how often do you do

1    visitation on the tablet?

2         A.   On the tablet?  Well, I've already got my

3    phase, phase two, and I only had one person visit; so --

4    it's not every week.  It's probably like every other

5    week.

6         Q.   Now that your step level is step level I, do

7    you know how often you get visitation?

8         A.   No.  Probably once a week, I think, but it

9    would only be through the tablet.  And when they take my

10   privileges away for a disciplinary write-up, they will

11   discontinue them.

12        Q.   What about phone calls from family or friends?

13   Can you do phone calls there at SMU-I?

14        A.   Can you?  Yes.

15        Q.   Do you?

16        A.   Hardly, no.  I mean, I've talked to my family

17   on the phone a couple times, but that's about it.

18        Q.   When you do the visitation on your tablet, do

19   you do that visitation with family?

20        A.   Yes.

21        Q.   Do you prefer to do the visitation with your

22   family on the tablet versus just doing a phone call?

23        A.   Yes.

24        Q.   Now, the tablet that you have, can you keep

25   that in your cell with you?

1      A.   We do get tablets inside our cell.  But are you

2   talking about having that same tablet or -- they give us

3   different tablets.  Tablets we have inside our cells, you

4   can't do visitation on them.

5      Q.   What kinds of things can you do on the tablet

6   that you have in your cell?

7      A.   Watch movies, send E messages, listen to music,

8   play games, and -- there are other things, too -- there

9   are other things you can do.

10      Q.   What kind of other things?

11      A.   Inmate letters, review podcasts, listen to

12   news, or the newspaper, and that's all I can remember.

13      Q.   When you said you can send E messages, who can

14   you send E messages to?

15      A.   People that are registered on your emailing

16   list.

17      Q.   Is that something that you do?

18      A.   Yes.

19      Q.   Since 2013-ish, when you had your deposition

20   taken last, have you ever been assigned an inmate job?

21      A.   2013?  Can you repeat your question again,

22   please?

23      Q.   Yes.  Taking the time of about 2013, when you

24   had your first deposition taken in this class -- in this

25   case -- sorry -- until we sit here today, have you ever

43

1    been assigned an inmate job?

2         A.   Yes, once.

3         Q.   Do you remember when that was?

4         A.   I want to say 2016, maybe.

5         Q.   What kind of job were you assigned?

6         A.   A porter job.

7         Q.   That's P-O-R-T-E-R.

8              And what did you do working as a porter?

9         A.   You just come out, sweep the pods, mop the

10   pods, clean the showers, and that's it, I think.

11        Q.   And did you have that job when you were at

12   Lewis - Rast Max?

13        A.   Yes.

14        Q.   Do you remember how long you had that job for?

15        A.   Two weeks.

16        Q.   Do you know why you only had the job for two

17   weeks?

18        A.   Yes.

19        Q.   Why is that?

20        A.   I assaulted staff.

21        Q.   And was that one of your disciplinary reports

22   that you were found guilty of?

23        A.   Yes.

24        Q.   How did you assault staff?

25        A.   I threw a liquid substance on them.  I threw

44

```
 1    hot water on them, because they were denying me access to
 2    my legal material.  They don't want to give me access to
 3    my legal material, and I did not know what else to do.
 4    They locked me back in my cell, and I got frustrated.
 5             Yeah, that's when they took my job.  They
 6    didn't want to give me access to my legal material.  I
 7    got into an altercation with them.  That's when they told
 8    me I lost my job.  Out of frustration, out of anger,
 9    that's when I threw the liquid substance on them.  And I
10    think that was it.
11         Q.   Between your last deposition in this case in
12    2013 and now, besides what you just told me about, have
13    you received any other disciplinary reports for
14    assaulting staff?
15         A.   Yes.
16         Q.   Do you know how many?
17         A.   No.
18         Q.   Do you know if it's more than five?
19         A.   No.
20         Q.   Since your last deposition in this case and
21    now, have you received disciplinary reports for
22    assaulting other inmates?
23         A.   Yes.
24         Q.   Do you know how many times?
25         A.   No.
```

45

1          Q.   In your personal opinion, do you think, as you
2     sit here today, you should have a different
3     classification other than maximum custody?
4          A.   Yes.
5          Q.   What classification do you think you should
6     have?
7          A.   I'm not sure about classification, but I think
8     we should be like -- I think we should be offered more
9     out-of-cell time, more programming.  I think they should
10    get rid of solitary confinement, period.  And I think
11    they should encourage interaction with people so they
12    don't feel just like you are losing your mind, or
13    something.  I think they should encourage more
14    interaction with people so they don't feel so violent.
15         Q.   Over there at SMU-I, does your CO3 come by once
16    a week and talk to you?
17         A.   Well, what do you mean by "talk to you"?
18    Talking about the class?
19         Q.   Anything, just come talk to you at your cell
20    front, ask you how things are going, do you have any
21    complaints?
22         A.   No.
23         Q.   How often do you see your CO3 there at SMU-I?
24         A.   Any time I make legal calls.  When I do a legal
25    call, he's the one that will facilitate it.  And other

46

1   than classes, that's two different things.

2        It's just not often.  I've seen him maybe --

3   maybe -- twice.

4        Q.   Since you've been there at SMU-I, have you had

5   any one-on-one meetings with your CO3?

6        A.   As far as what would be the purpose of it?

7        Q.   Just for anything where you are talking

8   face-to-face at your cell front or you go to his or her

9   office.

10        A.   The only time that I've communicated with them

11   was when they pulled me out for a legal call, or he just

12   happened to be in the pad and speaking to another inmate

13   and I'll call him up to my cell and ask him for an inmate

14   letter, or property issues.  That's just about it.  You

15   don't talk to him like -- you don't speak to him as far

16   as anything else goes.

17        Q.   Do you know what your CO3's name is at SMU-I?

18        A.   Smith.

19        Q.   When you were at Lewis - Rast for that last

20   year --

21        A.   Yes?

22        Q.   -- did you ever have any one-on-one meetings

23   with your CO3 over at Rast?

24        A.   I'm not sure.

25        Q.   Do you remember who your CO3 was over at Rast?

47

1        A.   Well, yeah.   I mean I've had multiple CO3s at

2    Rast Max.

3        Q.   Now back to SMU-I.   Since you've been there,

4    have you had any one-on-one meetings with any CO4s, for

5    any reason?

6        A.   I just barely met this lady yesterday, Daniels.

7    And the only reason I spoke to her was because she is the

8    one that facilitated the legal call with my attorneys.   I

9    spoke to her for maybe like two minutes, at the most.

10       Q.   Do you remember what you talked about with her?

11       A.   Yeah.   I told her that they trashed my cell and

12   confiscated a lot of my clothing items.   And I asked her

13   if she could help me get the clothing items back that was

14   retrieved from my cell in searches.

15       Q.   What did she say, if anything?

16       A.   She said she would help me.   She said she would

17   talk to my CO3.

18       Q.   What kind of clothing items were confiscated?

19       A.   Sweats, boxers, sweater, shorts, shirts, a

20   couple hygiene items.

21       Q.   As of today, what clothing items do you have in

22   your cell?

23       A.   I have all that.

24       Q.   So you got it all back?

25       A.   No.   During the process of -- I guess they are

48

1   in the process of trying to find out if they are going to

2   help me or not.

3           No, I did not get them back.  Those are only

4   some of the items they took from me.

5       Q.   So in your cell right now, do you have any

6   extra boxers?

7       A.   Boxers?

8       Q.   Boxers.

9       A.   Boxers?  Well, you get your state issue.  And I

10  don't think so.  They just confiscated a pair of boxers

11  from yesterday, said that they were altered; but they

12  weren't.  I think that was the second pair I had, or

13  maybe third pair, at the most.  But they didn't give it

14  to me.

15      Q.   So other than what you are wearing on your body

16  right now, what extra clothing, if any, do you have in

17  your cell?

18      A.   I have everything.  I have boxers, I have

19  socks, I have shirts.

20      Q.   One of the claims in this case for the subclass

21  about conditions of confinement is complaints about

22  lighting in your cell.

23           Do you, yourself, have any complaints about

24  lighting in your cell?

25      A.   Do I have complaints about the lighting?  What?

49

1          Q.    Yes.

2          A.    Yes.

3          Q.    What is your complaint?

4          A.    They stay on too long.

5          Q.    What do you mean by that?   How long do they

6     stay on?

7          A.    Sometimes they don't turn them off.   The

8     lighting stays on 24/7.   Sometimes they'll turn them off

9     but -- there is a difference between here and Rast Max.

10    At Rast Max, it's 24 hours.   Here, sometimes they'll turn

11    them off at 10:00 p.m. and turn them back on at 4:30 when

12    they do breakfast, and they'll leave them on.   So it just

13    depends.

14         Q.    There at SMU-I, during sleeping hours, for

15    instance, after 10:00 p.m., is there still a light on in

16    your cell?

17         A.    It just differs.   Yes.   Sometimes they'll turn

18    them off at 10:00.   Some days they won't turn them off,

19    period.   And sometimes they won't turn them off until a

20    couple hours after 10:00; so --

21         Q.    When the lights do get turned off in your cell,

22    do you have like a security nightlight in your cell?

23         A.    In SMU-I?

24         Q.    Yes.

25         A.    No.

50

1       Q.   What, then, is the difference between the

2   lighting in your cell at SMU-I compared to how it was at

3   Lewis - Rast Max?

4       A.   Rast Max, Rast Max, there was a security light

5   there, so they stay on 24/7.

6       Q.   Inside your cell the whole time?

7       A.   Yes.

8       Q.   But at Rast Max, did the lights go down and get

9   dimmer at night during sleeping hours, after 10:00?

10      A.   Usually, yes.  On suicide watch, they don't.

11      Q.   Other than what we've talked about so far,

12  which is about the last hour and a half, about not mental

13  healthcare but just your conditions of how you live in

14  SMU-I, are there any other complaints that you have

15  beside what we've talked about?

16      A.   Not that I can remember.

17      Q.   Regarding mental health treatment there at

18  SMU-I, is there anything that you wish was provided to

19  you more than what you get?

20      A.   Can you repeat your question, please?

21      Q.   Yes.  Let me say it this way:  I understand

22  from your testimony here today that you have complaints

23  about the mental healthcare provided to you there at

24  SMU-I.  So I am wondering, from you, how you wish it was

25  different.

51

```
 1              MR. KEENAN:  Objection:  Lack of knowledge;
 2     foundation.
 3              You can answer.
 4              THE WITNESS:  I guess what I would say is I
 5     really don't know what mental health consists of.  I've
 6     been in prison all my life.  So the mental health
 7     treatment they receive, I guess, in a proper facility, as
 8     opposed to prison, I wouldn't know.  I wouldn't know what
 9     mental healthcare really is.
10         Q.   BY MS. LOVE:  Okay.  How old are you?
11         A.   Forty-four.
12         Q.   And how old were you when you first went to
13     prison?
14         A.   A minor.
15         Q.   I'm sorry.  I didn't hear you.
16         A.   A minor.  I started off as a minor.
17         Q.   How old were you?
18         A.   Maybe 14.
19         Q.   From age 14 until now, have you gotten out of
20     prison for any amount of time?
21         A.   Yes.
22         Q.   How many times?
23         A.   Maybe five times.
24         Q.   How old were you when you came back in the last
25     time?
```

52

1        A.   I think I was 23 or 22, something like that.

2        Q.   And what is the conviction that you are

3    currently doing time for?

4        A.   I have three separate convictions, a few

5    different case numbers.

6        Q.   Do you know how much time you are doing right

7    now?

8        A.   Yes.

9        Q.   How much?

10        A.   Yes.  I think 150 years.

11        Q.   And what were the last three case convictions

12    you had, or what were they for?

13        A.   Attempted murder on police officers, carjack

14    and robbery, kidnapping.  That's a separate conviction.

15    And then attempted escape.

16        Q.   Which facility was there attempted escape from?

17        A.   Pima County.

18        Q.   Pima County?

19        A.   Yes.

20        Q.   Since you've been in the Arizona Department of

21    Corrections through the whole time you've been in and

22    out, have you ever been validated SEG?

23        A.   No.

24        Q.   Do you know if you are suspected SEG?

25        A.   Suspected, yes.

53

1      Q.   And of which SEG are you suspected of?

2      A.   I'm not sure.

3      Q.   And your protective custody status, is that

4   based on threats from other SEG members there in prison?

5      A.   Yes.

6      Q.   Give me a few moments.  I'm going to check my

7   notes to see if I missed anything.

8           I may have asked you this, but now I forget.

9   Between the time you did your first deposition in this

10  case in about 2013 until now, have you been at any other

11  prisons besides Lewis and SMU-I?

12     A.   SMU-II Central Unit.

13     Q.   Do you remember what years or timeframe you

14  were at SMU-II Central?

15     A.   You know what, I was in Central Unit -- I left

16  Central Unit in 2011.  Are you talking about 2013 after?

17  I guess it would just be Browning unit, SMU-I, and Rast

18  Max.

19          MS. LOVE:  Well, Mr. Gamez, those are all the

20  questions I have for you today.

21          THE WITNESS:  Thank you.

22          MR. KEENAN:  Thank you.

23          THE REPORTER:  Mr. Keenan, do you want to order

24  a copy of the transcript?

25          MR. KEENAN:  Yes.  Do you have my information?

54

1          THE REPORTER:  If you can give me your email

2   address?

3          MR. KEENAN:  JKEENAN@ACLUAZ.org.

4          (Whereupon, the deposition concluded at

5   approximately 2:42 p.m.)

6

7

8                        *   *   *   *   *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

55

```
 1   STATE OF ARIZONA        )
                             ) ss.
 2   COUNTY OF MARICOPA      )

 3          BE IT KNOWN that the foregoing proceedings were

 4   taken before me; that the witness before testifying was

 5   duly sworn by me to testify to the whole truth; that the

 6   foregoing pages are a full, true, and accurate transcript

 7   of the proceedings, all done to the best of my skill and

 8   ability; that the proceedings were taken down by me in

 9   shorthand and thereafter reduced to print under my

10   direction.

11          I CERTIFY that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14          [ ] Review and signature was requested.

15          [ ] Review and signature was waived.

16          [X] Review and signature was not required.

17          I CERTIFY that I have complied with the ethical

18   obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206

19   J(1)(g)(1) and (2).

20          Dated at Phoenix, Arizona, October 14, 2021.

21

22

23   _____
     LISA A. NANCE, RPR, CR
24   Certified Reporter; Arizona CR No. 50349

25               *    *    *    *    *    *    *
```

56

1

2          I CERTIFY that HUSEBY GLOBAL LITIGATION has
   complied with the ethical obligations set forth in ACJA

3   7-206 (J)(1)(g)(1) through (6).

4

5

6   _____

7   HUSEBY GLOBAL LITIGATION
   Arizona Registered Reporting Firm R1192
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 3

1

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF ARIZONA

3

   Victor Parsons, et al., on behalf   )
4  of themselves and all others        )
   similarly situated; and Arizona     )
5  Center for Disability Law,          )
                                       )
6             Plaintiffs,              )
                                       )
7  vs.                                 ) Case No.
                                       ) 2:12-cv-00601-ROS
8  David Shinn, Director, Arizona      )
   Department of Corrections; and      )
9  Richard Pratt, Interim Division     )
   Director, Division of Health        )
10 Services; Arizona Department of     )
   Corrections, in their official      )
11 capacities,                         )
                                       )
12            Defendants.              )
                                       )
13

14

15          DEPOSITION OF JONATHAN SCOTT GONZALEZ
              (Videoconference via Google Meets)

16

17                     Florence, Arizona
                      October 26, 2021
18                       2:18 p.m.

19

20

21

22

23

   REPORTED BY:
24 Kristy A. Ceton, RPR
   AZ Certified Court Reporter No. 50200

25

2

```
 1          DEPOSITION OF JONATHAN SCOTT GONZALEZ

 2   commenced at 2:18 p.m., on October 26, 2021,

 3   Videoconference via Google Meets at Florence,

 4   Arizona, before Kristy A. Ceton, RPR, Arizona

 5   Certified Court Reporter No. 50200.

 6

 7                       * * *

 8

 9   APPEARANCES:

10        For the Plaintiffs:

11             PERKINS COIE
               By:  Alisha Tarin-Herman
12             2901 North Central Avenue
               Suite 2000
13             Phoenix, Arizona 85012

14        For the Defendants:

15             STRUCK LOVE BOJANOWSKI & ACEDO, PLC
               By:  Tim Ray, Esq.
16             3100 West Ray Road
               Suite 300
17             Phoenix, Arizona 85226

18

19

20

21

22

23

24

25
```

3

1                    I N D E X

2

3    EXAMINATION BY                              PAGE

4

5    Ms. Cohen...................................    4

6

7

8

9

10   EXHIBITS              DESCRIPTION          PAGE

11              No exhibits were offered.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
1                              Florence, Arizona
                               October 26, 2021
2                              2:18 p.m.

3

4              JONATHAN SCOTT GONZALEZ,          Rule 601
                                                 4:4-6
5    called as a witness herein, having been first duly

6    sworn, was examined and testified as follows:

7

8                    EXAMINATION

9    BY MR. RAY:

10         Q.   My name is Tim Ray and I represent the

11   defendants.

12              Counsel, do you want to announce who you

13   are?

14              MS. TARIN-HERMAN:  Yes.  My name is

15   Alisha Tarin-Herman with Perkins Coie, and I

16   represent Jonathan Gonzalez and the named plaintiffs.

17         Q.   BY MR. RAY:  Okay.  Sir, can you state    Rule 601
                                                          4:17-23
18   your full name for the record, please?

19         A.   Jonathan Scott Gonzalez.

20         Q.   What is your date of birth?

21         A.   12/4/1987.

22         Q.   Okay.  And what is your ADCRR number?

23         A.   247947.

24         Q.   Have you ever had your deposition taken

25   before?
```

5

1          A.    No.

2          Q.    Okay.  Let me go over some of the ground

3    rules.  Obviously, this is a unique circumstance

4    where we have everybody on Google Meets, and so it

5    will be really important for you and I to try not to

6    talk over each other because we have the court

7    reporter in another location that is trying to record

8    everything that we say.

9               So it will be important to say yes or no.

10   No uh-huhs or huh-uhs.  Same with head shakes, a nod.

11   Do you understand that?

12         A.    Yes.

13         Q.    If there is a question that I ask that

14   you don't understand, please ask me to rephrase it

15   and I'll do my best to make it a little bit more

16   clear; is that fair?

17         A.    Yes.

18         Q.    If you answer a question, I am going to

19   assume that you understood the question; is that

20   fair?

21         A.    Yes.

22         Q.    Now, we are -- we can take a break at any

23   time you want.  I would just ask if there's a

24   question pending, that you would answer the question

25   and then take the break; is that okay?

6

```
1          A.   Yes.

2          Q.   Are you on any medications today that

3    would prevent you from giving truthful and honest

4    testimony?

5          A.   No.

6          Q.   What have you done to prepare for this        Rule 601
                                                               6:6-7:15
7    deposition today?

8          A.   Study research.

9          Q.   And what do you mean by "study research"?

10         A.   Confidential.

11         Q.   And what is the confidentiality based on?

12         A.   It's confidential.

13         Q.   I don't think I quite understand.  Is it

14   something that you did with your attorney, or is it

15   something you did separately?

16         A.   That's confidential.  I would rather not

17   -- who is representing that I'm speaking to at this

18   moment in time?

19              MS. TARIN-HERMAN:  The defendants.

20              THE WITNESS:  What is the attorney's

21   name?

22              MS. TARIN-HERMAN:  Tim Ray.

23              THE WITNESS:  Okay.  So, Tim, again, I'm

24   going to refrain from that question that you asked me

25   due to the fact that I practiced confidentiality at
```

[10/26/2021] Gonzalez, Jonathan Scott

7

1   this moment in time.

2          Q.   BY MR. RAY:  Well, this is my opportunity

3   to learn what you -- what your issues are and what

4   you've done to prepare, so it's something you have to

5   answer.

6          A.   I understand that.

7          Q.   And are you going to answer?

8          A.   It's confidential.

9          Q.   Why is it confidential?

10         A.   Again, I don't have my proper attorney

11   present at this moment in time.

12         Q.   You don't have your what?  I'm sorry.  I

13   didn't catch that.

14         A.   I do not have a proper attorney at this

15   moment in time.

16             MS. TARIN-HERMAN:  Can I -- can we take a

17   break for a moment?

18             MR. RAY:  Yes.

19             (A break was taken at 2:22 p.m.)

20         Q.   BY MR. RAY:  All right.  As I asked          Rule 601
                                                            7:20-8:12
21   before, what -- what kind of research did you do in

22   preparation for this deposition?

23         A.   Confidential.

24         Q.   And what is the basis of the

25   confidentiality?

8

```
 1           A.   Again, I'm going to refrain from
 2  answering that question.  Again, that also, too, is
 3  confidential at this point in time.
 4           Q.   I guess I'm not understanding why it's
 5  confidential, what the basis is.  Could you please
 6  explain it?
 7           A.   Again, I'm going to refrain from
 8  answering.  Again, due to the fact that I'm
 9  exercising my rights of confidentiality at this
10  moment in time, I refrain.  I'm going to refrain from
11  answering that question.
12                Continue.
13           Q.   Are there other -- are you going to
14  refrain from answering any of my questions today?
15           A.   No.
16           Q.   Okay.  So you're not going to tell me
17  what you did in preparation for this deposition?
18           A.   No.  That's confidential information.
19           Q.   Did you speak with your attorney in
20  preparation for this deposition?
21           A.   No.
22           Q.   Did you meet with him in person at all?
23           A.   No.
24           Q.   Have you met with -- with any of your
25  attorneys in the last six months --
```

```
1          A.    Yes.  Yes.  Yes.

2          Q.    And who did you meet with?

3          A.    At this moment in time -- I forgot the

4    name at this moment in time.  I met with a series of

5    representatives, more than a few within a six-month

6    period.

7          Q.    Okay.  And was this over the phone or in

8    person?

9          A.    Both.

10          Q.    And have you also corresponded with them

11    through letters?

12          A.    Yes.

13          Q.    And do you understand that your attorneys

14    have retained expert in this case?

15          A.    Yes.

16          Q.    Have you spoken with any of them?

17          A.    Excuse me?

18          Q.    Have you spoken with any of the experts?

19          A.    Yes.

20          Q.    And who -- whom have you spoken with?

21          A.    Again, I forget the names at this moment

22    in time.

23          Q.    Okay.  Was it a -- was it a male?

24          A.    Both male and female.

25          Q.    Okay.  Do you remember any other physical
```

10

1    characteristics of either of them -- of the experts

2    you spoke with?

3            A.   I'm going to refrain from that --

4    answering that question.

5            Q.   And why is that?

6            A.   Again, that's confidential information.

7            Q.   Okay.  Did you review any documents in

8    preparation for this deposition?

9            A.   Yes.

10           Q.   Okay.  And what did you review?

11           A.   The declaration.  I'll just say that one

12   at this moment in time.  The declaration.

13           Q.   And which declaration are you speaking

14   of?

15           A.   The first one that was appointed to me.

16   March -- I'll say March 12th, 2020.

17           Q.   And on March 12th, 2020, where were you

18   housed at that time?

19           A.   Kasson BMU.

20           Q.   Okay.  Did you review any other

21   documents?

22           A.   Yes.  But I'm going to be confidential at

23   the moment in time about the further documentations

24   that I researched and studied at this moment in time.

25           Q.   Okay.  And why is that?

1          A.   It's confidential information.

2          Q.   Okay.  Do you recall how long ago you

3     spoke with plaintiffs' experts?

4          A.   Let's see.  About a month.  I would say

5     about a month ago, a month and a half.

6          Q.   Okay.  And did they see you cell side or

7     were you pulled into a separate room?

8          A.   I was pulled into a confidential setting.

9          Q.   Okay.  And do you have an understanding          Rule 601

10    of what your role is in this case?                         11:9-12

11         A.   Yes.

12         Q.   And what is that role?

13              MS. TARIN-HERMAN:  Object to form.

14         Q.   BY MR. RAY:  Go ahead, sir.                      Rule 601

15         A.   Objection.                                       11:14-15

16              MS. TARIN-HERMAN:  You can answer.

17         Q.   BY MR. RAY:  Yeah.  Your attorney is just

18    making that for the record, but unless she tells you

19    not to answer, you need to answer the question.

20         A.   Again, I'm going to refrain from               Rule 601

21    answering that question, sir.  But again, objection.      11:20-12:17

22         Q.   So you -- you won't tell me what your

23    role is in this case?

24         A.   No.

25         Q.   Do you understand that you're a class

12

1   representative?

2        A.   Yes.

3        Q.   And what classes do you represent?

4        A.   Again, I'm going to refrain from

5   answering that question.

6        Q.   And why is that?

7        A.   Because I don't have a proper attorney at

8   this moment in time.  I feel like you're forcing me

9   to answer questions.

10       Q.   Is --

11       A.   You're forcing me to answer questions

12   that I refuse to answer.

13       Q.   It's my understanding, sir, that -- that

14   the attorney -- that there's an attorney in the -- on

15   the other side of the Plexiglass that represents you;

16   is that your understanding?

17       A.   No.  I don't trust my attorney.

18            MR. RAY:  Okay.  Let me take a break real

19   quick.  We're going to go off the record.

20            THE WITNESS:  Okay.  Thank you.

21          (A break was taken at 2:36 p.m.)

22       Q.   BY MR. RAY:  Can you -- Are you ready to

23   proceed?

24       A.   Yes.

25            MR. RAY:  Okay.  Let me -- if I could

1    have the court reporter read the last question and

2    answer.

3          (The record was read back, as requested.)

4               THE WITNESS:  Who are you speaking to at

5    this moment?

6               THE COURT REPORTER:  I'm speaking to Mr.

7    Ray.

8               THE WITNESS:  I'm going to need a

9    representative to -- I'm going to need a

10   representative to assist me to be competent to

11   continue this case to testify.

12        Q.   BY MR. RAY:  I'm sorry.  Can you repeat

13   that?

14        A.   At this moment in time -- Tim, right?

15   Your name is Tim -- Tim Ray, right?

16        Q.   Yes.

17        A.   Okay.  Tim Ray, right at this moment, I'm

18   incompetent, and I'm going to need a representative

19   to assist me to become competent in the near future

20   so that I can continue to testify in this case.

21        Q.   So are you a -- are you willing to

22   continue this deposition today?

23        A.   I'm incompetent at this time.  I don't

24   think I can continue.  I would like to continue when

25   I'm competent, but at this moment in time, I don't

14

1    believe I'm competent.

2         Q.   So that -- Let me just make sure I'm

3    clear.  So are you saying that you -- I just need to

4    know if you are wanting to discontinue this

5    deposition based on that information.

6         A.   No.  I request and demand that I can

7    continue this case when I'm competent.

8         Q.   Okay.

9         MS. TARIN-HERMAN:  Are you feeling like

10   you're having mental health issues at this moment?

11        THE WITNESS:  Yeah.  You know what, at

12   this moment in time, I believe I am due to the --

13   yeah.  Yes, I'm actually suffering from a mental

14   illness at this moment in time.  And, again, it's

15   caused me to be incompetent.  But again, I would like

16   to continue this case, but on behalf of my

17   incompetency again, I'm going to ask for a

18   representative at this moment in time.

19        But I'm not discontinuing the disposition

20   (sic) in the future.  I'm requesting that I have a

21   proper representative and a mental health attorney.

22   So that I can be competent in this case.  I'm

23   suffering from a mental illness.

24        MS. TARIN-HERMAN:  Tim, how would you

25   feel about rescheduling?

```
 1            MR. RAY:  I'm sorry.  Can you speak up?
 2   Sorry, Alisha.
 3            MS. TARIN-HERMAN:  How would you feel
 4   about rescheduling?
 5            MR. RAY:  I don't know.  We can -- let's
 6   go off the record real quick.
 7            (A break was taken at 3:38 p.m.)
 8            MR. RAY:  Okay.  Mr. Gonzalez, at this
 9   time, we're going to go ahead and suspend your
10   deposition based on your -- your recent claim of
11   mental incompetence and your prior refusals to answer
12   questions.  We're going to suspend it at this time.
13   We may depose you again, but for now, we're going to
14   stop it.  Is that all right?
15            THE WITNESS:  Thank you.  I appreciate
16   that.  You have a nice day.
17            THE COURT REPORTER:  Do you want me to
18   transcribe this?
19            MR. RAY:  Yes, please.
20            THE COURT REPORTER:  Alisha, did you want
21   a copy?
22            MS. TARIN-HERMAN:  Yes, please.
23   Although, I don't know that I do want one, but yes,
24   please.
25            (The proceedings concluded at 3:45 p.m.)
```

16

```
 1              I, JONATHAN SCOTT GONZALEZ, do hereby

 2     declare under penalty of perjury that I have read the

 3     foregoing transcript; that I have made any

 4     corrections as appear noted, in ink, initialed by me,

 5     or attached hereto; that my testimony as contained

 6     herein, as corrected, is true and correct,.

 7              EXECUTED this _____ day of _____,

 8     20__, at _____, _____,

 9                 (City)                    (State)

10

11     _____ I have made changes to my deposition.

12     _____ I have NOT made changes to my deposition.

13

14

15                    _____

16                    JONATHAN SCOTT GONZALEZ

17

18

19

20

21

22

23

24

25
```

17

1    ERRATA SHEET FOR THE TRANSCRIPT OF
      Case Name: Parsons v. Shinn
2    Dep Date:  10/26/2021
      Deponent:  Jonathan Scott Gonzalez

3

4               CORRECTIONS:

5    Page_____Line_____ Reason_____
      NOW READS:_____
6    SHOULD READ:_____

7    Page_____Line_____ Reason_____
      NOW READS:_____
8    SHOULD READ:_____

9    Page_____Line_____ Reason_____
      NOW READS:_____
10    SHOULD READ:_____

11    Page_____Line_____ Reason_____
      NOW READS:_____
12    SHOULD READ:_____

13    Page_____Line_____ Reason_____
      NOW READS:_____
14    SHOULD READ:_____

15    Page_____Line_____ Reason_____
      NOW READS:_____
16    SHOULD READ:_____

17    Page_____Line_____ Reason_____
      NOW READS:_____
18    SHOULD READ:_____

19    Page_____Line_____ Reason_____
      NOW READS:_____
20    SHOULD READ:_____

21    Page_____Line_____ Reason_____
      NOW READS:_____
22    SHOULD READ:_____

23

24             _____
              JONATHAN SCOTT GONZALEZ
25

18

                              CERTIFICATE

1

2

3              I, Kristy A. Ceton, Certified Court

4    Reporter for the State of Arizona, certify:

5                  That the foregoing proceedings were taken

6    by me; that I am authorized to administer an oath;

7    that the witness, before testifying, was duly sworn

8    by me to testify to the whole truth; that the

9    questions propounded by counsel and the answers of

10   the witness were taken down by me in shorthand and

11   thereafter reduced to print by computer-aided

12   transcription under my direction; that review and

13   signature was requested; that the foregoing pages are

14   a full, true, and accurate transcript of all

15   proceedings and testimony had upon the taking of said

16   proceedings, all to the best of my skill and ability.

17                  I FURTHER CERTIFY that I am in no way

18   related to nor employed by any of the parties hereto

19   nor am I in any way interested in the outcome hereof.

20                  DATED this 27th day of October, 2021.

21

22

23         _____
           Kristy A. Ceton
24         Certified Court Reporter No. 50200
           For the State of Arizona
25

# EXHIBIT 4

1

1                IN THE UNITED STATES DISTRICT COURT

2                       DISTRICT OF ARIZONA

3
    VICTOR PARSONS, et al., on    )
4   behalf of themselves and      )
    all others similarly          )
5   situated; and Arizona         )
    Center for Disability Law,    )
6                                 )
            Plaintiffs,           ) No.
7      vs.                        ) 2:12-c-v-00601-ROS
                                  )
8   DAVID SHINN, Director,        )
    Arizona Department of         )
9   Corrections; and RICHARD      )
    PRATT, Interim Division       )
10  Director, Division of         )
    Health Services, Arizona      )
11  Department of Corrections,    )
    in their official             )
12  capacity,                     )
                                  )
13          Defendants.           )

14

15                    REMOTE DEPOSITION OF

16                       SHAWN JENSEN

17

18                     October 15, 2021

19                        8:45 MST

20                    Chandler, Arizona

21

22

23

                      Rosanne P. Huebener
24
                    Certificate No. 50897
25

2

1    APPEARANCES OF COUNSEL

2

3

     On behalf of the Plaintiffs:

4

     ACLU OF ARIZONA
5    Jared Keenan, Esquire
     P.O. Box 17148
6    Phoenix, AZ  85011
     Jkeenan@acluaz.org

7

8

     On behalf of the Defendants:

9

     STRUCK LOVE JOJANOWSKI & ACEDO, PLC.
10   DANIEL P. STRUCK, ESQ.
     3100 West Ray Road, Suite 300
11   Chandler, AZ  8226
     Dstruck@strucklove.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    INDEX OF EXAMINATION

2

3    WITNESS:                              PAGE:

4
     SHAWN JENSEN
5
                        EXAMINATION
6

7
     By Mr. Struck                          4
8

9

10

11                        EXHIBITS

12   NO.                  DESCRIPTION              PAGE

13
                     No Exhibits Marked
14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1              DEPOSITION OF SHAWN JENSEN

 2                   October 15, 2021

 3

 4          THE REPORTER: "The attorneys participating

 5     in this deposition acknowledge that I am not

 6     physically present in the deposition room and

 7     that I will be reporting this deposition remotely.

 8     They further acknowledge that, in lieu of an oath

 9     administered in person, the witness will verbally

10     declare his testimony in this matter is under penalty

11     of perjury.  The parties and their counsel consent to

12     this arrangement and waive any objections to this

13     manner of reporting."

14          MR. STRUCK:  This is Dan Struck for

15     Defendants.

16          MR. KEENAN:  I am Jared Keenan for

17     Mr. Jensen.

18          MR. STRUCK:  Jared, you can hear me okay?

19          MR. KEENAN:  I can.

20          MR. STRUCK:  Jared, if anything occurs

21     that doesn't allow you to hear what's going on or

22     just, you know, let Mr. Jensen know so he can alert

23     me because I can't see you and I won't be able to

24     hear you.  I know there has been some problems on

25     some of these other depositions.  I don't anticipate
```

5

```
 1    this is going to take very long but if something

 2    comes up just let Mr. Jensen know so he can let me

 3    know so we can try and get it sorted out.

 4              MR. KEENAN:  Sure, and you can hear me?

 5              MR. STRUCK:  I can hear you fine.

 6                   SHAWN JENSEN,

 7    having been first duly sworn, testified as follows:

 8                    EXAMINATION

 9    BY MR. STRUCK:

10         Q.   Mr. Jensen, can you hear me okay?

11         A.   I can.

12         Q.   Mr. Jensen, my ma'am is Dan Struck, we

13    met several years ago.

14         A.   2012.

15         Q.   Have you had an opportunity to review

16    that deposition?

17         A.   No.

18         Q.   Have you had an opportunity to review any

19    documentation at all in preparation for this

20    deposition?

21         A.   No, just what was forwarded to me from

22    the court, that's it.

23         Q.   So you saw the Notice of Deposition and

24    that was good?

25         A.   And Judge Silver, that's it.
```

6

1          Q.   And have you had an opportunity to speak

2     to counsel about the deposition?

3          A.   Couple times, but nothing of any --

4          Q.   I don't need to know what, I'm not

5     entitled to know what --

6          A.   I know that.

7          Q.   You have spoken to counsel on two

8     occasions?

9          A.   Yeah, probably two or three.  Just

10    confirming receipt of the document and that I perused

11    it myself.  All 37 pages.

12         Q.   And what document are you referring to,

13    do you know?

14         A.   The court order from Judge Rosalyn

15    Silver, Jensen vs. Pratt.

16         Q.   Which court order, if you can remember?

17    She issues orders quite often, so I'm not sure which

18    order you are talking about?

19         A.   The court order to re-open the case.

20    That's it.  I think it went to all the main

21    plaintiffs.

22         Q.   Okay.  Have you had an opportunity to

23    speak to your counsel with respect to -- in

24    preparation of this deposition?

25         A.   No.

7

1      Q.   Is this the first time you met counsel

2  sitting next to you?

3      A.   No, he just advised me that this was to

4  happen.  I just got out of surgery yesterday and I

5  got a phone call that I was going to have this and

6  I'm less than 24 hours out of surgery.

7      Q.   Was that your first notice that the

8  deposition was taking place?

9      A.   Yes.

10     Q.   And that was yesterday?

11     A.   Yes, late afternoon.

12     Q.   How long did you speak to your attorney?

13     A.   Twenty, thirty minutes, maybe?

14     Q.   Have you -- in this case or at least in

15  the last month or so we have received an updated

16  Disclosure Statement from your attorneys, including

17  two paragraphs regarding what you are going to be

18  testifying to.  Have you had an opportunity to review

19  that?

20     A.   No, I have not.

21          MR. KEENAN:  Can I have a moment?

22          Sorry, thank you.

23  BY MR. STRUCK:

24     Q.   Now, just very briefly, because I know

25  you have gone through this drill before, you

8

1    understand that you are under oath?

2           A.   Yes, I do.

3           Q.   And that if you do not answer truthfully,

4    that you are under penalty of perjury?

5           A.   Yes.

6           Q.   And you understand that you need to wait

7    until I am done asking the question before you answer

8    so the court reporter can take down everything

9    accurately?

10          A.   Sure.

11          Q.   And if you also wait, we will give your

12   attorney an opportunity to object in the event he

13   believes he needs to object to preserve an objection

14   for the record, you understand that?

15          A.   Yes.

16          Q.   But unless your attorney instructs you

17   not to answer a question, based on privilege, and you

18   decide that you need to take that advice, you are to

19   answer the question if know the answer, you

20   understand that?

21          A.   Yes.

22          Q.   If I ask a question that you don't

23   understand, please let me know and I will try and

24   rephrase it, is that fair?

25          A.   Yes.

9

```
1              Q.   And if I ask you a question and you just

2    don't know the answer, just tell me you don't know,

3    okay?

4              A.   Okay.

5              Q.   And then you remember you have to answer

6    yes or no, uh-huh or uh-uh doesn't create a clear

7    record, we can't really tell what you meant, do you

8    understand that?

9              A.   Yes.

10             Q.   All right.

11                  Are you currently taking any medication?

12             A.   Yes.

13             Q.   What medication are you taking?

14             A.   Blood pressure, Lisinopril and Amiloride

15   or something of that nature, blood pressure, that's

16   it.

17             Q.   Are your taking any antibiotics?

18             A.   No.

19             Q.   You are not on any kind of mental health

20   psychotropic-type medication?

21             A.   No.

22             Q.   Is there any reason as you sit here today

23   that your answers won't be truthful?

24             A.   Do I have any reason to believe my

25   answers won't be truthful?
```

10

1          Q.   Is there any reason why you might have a

2    concern that you might not be able to provide

3    truthful answers today in terms of medication you are

4    taking, mental health issues, anything like that?

5          A.   No, I have no concern.

6          Q.   Now, you said you had surgery yesterday.

7    Tell me about that.

8          A.   Yeah.  About a one-year procedure to take

9    out and insert a -- what's it called, I believe they

10   call it a suprapubic and bypass the other process

11   that they used to do for years.  So we are now at

12   suprapubic status.

13         Q.   And you are referring to a catheter?

14         A.   Yes.

15         Q.   And how long have you been utilizing, had

16   to utilize this type of suprapubic catheter?

17         A.   Probably the last -- probably last three

18   years, maybe?  I'm not sure from the record.

19         Q.   That's fine.  I'm not going to hold you

20   to exact dates.  But you estimate you have been using

21   this -- had to utilize this type of catheter for the

22   last three years?

23         A.   I had to, yeah.

24         Q.   Now, what is the state of your PSA count?

25         A.   I don't know.

1    Q.   When was the last time you had a PSA?

2    A.   I'm sure a number of months ago and the

3  numbers were good.

4    Q.   Numbers were good?

5    A.   Yeah.

6    Q.   When was the last time you recall having

7  PSA numbers that were in a range to be of concern?

8    A.   I don't know the time frame on that.  I

9  know that they put me on chemo again.  So I don't

10  know the exact time frame, but they did put me on

11  chemo again.

12    Q.   So subsequent to the removal of your

13  prostate, your radical prostatectomy, you developed

14  cancer?

15    A.   Of course prior to having the supra --

16    Q.   And we went over a lot of that in your

17  last deposition and I won't ask you that again.  I'm

18  primarily concerned about any health issues you have

19  had in the last two years, because in our view that's

20  what's relevant in this case.  But I do want to know

21  what you understand with respect to any cancer coming

22  back after you had the radical prostatectomy.

23    A.   Let me tell you this, Mr. Struck.  The

24  cancer did not dissipate after I had the radical

25  prostatectomy, it was still a PSA number, that's why

1    we had to go to radiation and chemo, so that answers

2    your question.

3         Q.   And since you have had the radiation and

4    chemo, have your PSA numbers been at the acceptable

5    level?

6         A.   Yes.

7         Q.   With respect to the health care that you

8    are receiving in the Arizona Department of

9    Corrections, and I will tell you I have looked at

10   your records, it looks like to me most of your

11   requests relate to a request to have your catheter

12   changed, would you say that's accurate?

13        A.   Yes.

14        Q.   And you believe that at least since

15   Centurion is taking over that in terms of your

16   catheter maintenance and exchange that they have been

17   doing a good job with that?

18        A.   No.

19        Q.   And can you explain that, please?

20        A.   Because -- the reason we are in the

21   particular we are now because of the suprapubic, the

22   staffing did not now how to or better change the

23   catheter properly and that led to extensive damage

24   because they weren't getting the catheter in the

25   bladder, and so the scar tissue closed with the

13

1    bladder and they were using oversized catheters and

2    some staff members didn't know how to change a

3    catheter and it just went from bad to worse.  So

4    finally at the hospital the medical people at the

5    hospital, they made the decision, not Centurion, that

6    we need to go through the suprapubic because this

7    cannot continue at this pace.  So that's when they

8    made the decision for the suprapubic.  I was

9    reluctant at first because I didn't know what it was

10   and that's the only way I have had any kind of

11   medical progress.  But it's not been at the hands of

12   staff.  Because someone didn't know how to change it

13   properly.

14        Q.   And let me follow up and make sure I

15   understand.  Are you saying -- now Centurion came

16   aboard in July of 2019, all right?

17        A.   Okay.

18        Q.   Were the issues that you had with respect

19   to staff being unfamiliar or unable to, in your view

20   appropriately replace your prior catheter, was that

21   before, when Corizon was providing health care or was

22   that when Centurion was providing health care?

23        A.   Both.

24        Q.   So do you know -- I think you earlier

25   said you had the suprapubic catheter for about three

14

1    years.  Did you obtain the suprapubic catheter after

2    July of 2019?

3         A.   I would not know that.  It could have

4    been before.  I would not know.

5         Q.   So if what I'm telling you is correct

6    that Centurion didn't come on board till July of

7    2019, but you actually got your suprapubic catheter

8    prior to July of 2019, would you agree it wasn't

9    Centurion who was having the problem with your prior

10   catheter?

11        A.   Are you stating that as a fact?

12        Q.   I'm saying if you assume what I'm telling     Lack of Personal
                                                             Knowledge
13   you is true that Centurion did not -- was not awarded   14:12-20

14   the contract and did not begin providing health care

15   to you or any other of the named -- any other of the

16   Plaintiffs in this case until July of 2019, if you

17   received the suprapubic catheter prior to July of

18   2019 that would have been on Corizon's watch.

19        A.   Okay.  If that's the record, I would

20   agree with that.

21        Q.   Okay.  And so once you got the suprapubic

22   catheter, any of your concerns with respect to staff

23   ability to or inability to change your catheter

24   aren't really at issue, correct?  Do you understand

25   my question?

1          A.    One more time.

2          Q.    Sure.

3                Once you were diagnosed or there was a

4     recommendation from the hospital that you receive a

5     suprapubic catheter and you actually received it, the

6     issues with respect to staff not being able to change

7     your prior catheter, those were done with, once you

8     got the suprapubic catheter you don't have any issues

9     with respect to staff not changing the catheter

10     correctly because they don't actually do that?

11          A.    No, the hospital has to change the

12     Resolve, it's the Resolve.  The hospital has to

13     change that process, they cannot do it here.

14          Q.    Right.  That's something that's done with

15     -- is it with ultrasound?

16          A.    Yes, radiology.

17          Q.    And so since you got the suprapubic

18     catheter, what problems, in your view, what is

19     Centurion not done or -- let me start over again.

20                Since you received the suprapubic

21     catheter, do you have any concerns with respect to

22     the care that you have received from medical staff

23     regarding your catheter?

24          A.    Yes.

25          Q.    Okay, and what are those?

```
 1        A.   Well, it's called an conclusion,

 2   O-C-C-L-U-S-I-O-N, and at ten o'clock at night there

 3   is nobody here at ten o'clock at night and to have

 4   that blockage of an occlusion, they finally got me

 5   out of here at midnight and that was a Saturday

 6   night, so I had to wait fifteen hours having

 7   contractions, contractions, and at my age that's not

 8   good, I don't want to die of a stroke.  And then I

 9   had to wait till they brought a surgical team in on

10   Sunday from the outside at the hospital in order to

11   change the suprapubic catheter.  And that's the risk

12   is occlusions.

13        Q.   Do you remember when this occlusion

14   occurred?

15        A.   Very recent.  See, this is October.

16   Might be this year or last year.

17        Q.   Was it the end of last year?

18        A.   Could have been.

19        Q.   And let me make sure I understand.  You

20   started to have -- let me start over.

21             Mr. Jensen, when you had this occlusion,

22   what was happening to you?  You said something about

23   having some sort of cramps or, of some sort?

24        A.   Yeah, occlusion is the blockage and you

25   cannot get urine out and then it overflows, goes down
```

1   the surgical cut and you now you have a problem.  And

2   so that's what an occlusion is.  But the concern was

3   other things.

4          Q.   Okay.  And so I think you said that you

5   started to have an occlusion at ten o'clock at night,

6   you started noticing, did you start noticing urine

7   coming out of the surgical site?

8          A.   Drainage, yes?

9          Q.   And this was at ten o'clock at night on a

10  Saturday?

11         A.   Yes.

12         Q.   And you said something about them --

13  somebody -- somebody getting you to medical at

14  midnight?  Can you explain what you meant by that?

15         A.   Yes, the protocol is they have to bring

16  somebody over from central unit.  They bring them

17  over from central unit, okay to transfer, the

18  transfer takes off in the dead of night.  We left

19  here about midnight, got to the hospital, of course

20  nobody is there, no surgical team.  So I had the

21  contractions because you can't get any urine out, so

22  you have these contractions which raises the blood

23  pressure and the blood pressure at that time was 180

24  over 102, so we were very concerned about that, I'm

25  73-years old, I'm not a youngster.  So they had to

18

1   wait 13 hours to get a surgical team in from the

2   hospital staff to do the procedure, it was done on

3   Sunday.

4         Q.   Okay.  All right.  So, you started having

5   a problem at ten p.m. at night on a Saturday.

6   Somebody from medical at Central Unit came over to

7   the East Unit where you were warehoused?

8         A.   Yes.

9         Q.   And cleared you for transport to the

10  hospital, correct?

11        A.   Yes.

12        Q.   And that was that midnight?

13        A.   Yes.

14        Q.   And you were transported at that point

15  to, was it Mountain Vista Hospital?

16        A.   Mountain Vista.

17        Q.   And then once you got to Mountain Vista

18  you said you had to wait -- Mountain Vista didn't

19  have staff that could assist you, is that what the

20  problem was?

21        A.   No, there was no surgical team in

22  radiology, it's called interventional radiology,

23  there is no surgical team there, so I had to wait

24  overnight with these contractions and I was very

25  concerned of course about the blood pressure.

19

1          Q.   So when you were having these

2    contractions and your blood pressure was going up,

3    you were actually -- had been admitted already to

4    Mountain Vista Hospital?

5          A.   Yes.

6          Q.   And so do you remember about what time

7    you arrived at Mountain Vista?

8          A.   I do not.  It's about a -- if they push

9    it, it's about a 40-minute run.

10         Q.   So maybe some time around 1:00 a.m. or

11   so?

12         A.   Yeah, not that late.

13         Q.   Little earlier than that?

14         A.   Probably a little earlier, they pushed

15   it.

16         Q.   So they admitted you to Mountain Vista

17   Hospital and then had you to wait for the

18   appropriately-trained surgical staff to be able to

19   assist you?

20         A.   Yes, sir, yeah.

21         Q.   And about what time was that?

22         A.   It's in the record.  I know it wasn't

23   early, so might have been ten-ish or could have been

24   11-ish, but it wasn't early.  They had to come get

25   set up.

1    Q.   Ten or eleven in the morning?

2    A.   Could have been ten or nine.  I waited

3    quite a while.

4    Q.   So you had been waiting at Mountain Vista

5    Hospital for several hours before they were able to

6    perform surgery?

7    A.   Yes.

8    Q.   And has this happened on more than one

9    occasion?

10   A.   I have had this happen to me, occlusion

11   over the past, what, nine, ten years, various times,

12   the blockage of the catheter occurs and it's not

13   good.

14   Q.   And we discussed these occlusions at your

15   last deposition that we took approximately seven

16   years ago.  But I'm primarily interested in whether

17   or not you have had any other occlusions besides this

18   one that you are referring to in the last, say, two

19   years?

20   A.   I would honestly have to say no, because

21   the device is more advanced, that's why they went to

22   this model, it's called the Resolve, and it has more

23   ports and stuff so it's a more advanced device that

24   goes in and you are correct has to be done in

25   radiology.

21

1        Q.   Any other issues in the last two years,

2    Mr. Jensen, besides the occlusion that you had that

3    we just discussed in which you feel that you weren't

4    provided appropriate medical care?  And if you could

5    limit it to the last two years, that's what I'm

6    looking for.

7        A.   You are primarily dealing with Centurion,

8    I understand that.

9        Q.   Right.

10       A.   I understand that.  I can't answer that

11   without reviewing the records.  My wife would know,

12   but I don't.

13       Q.   Okay.  Do you keep a copy of your records

14   in your cell?

15       A.   Some.  My wife does.

16       Q.   Okay.

17            But as you sit here today, the only issue

18   with respect to, in your view, improper medical care

19   in the last two years was that situation involving

20   the occlusion that required you to be transported to

21   Mountain Vista, is that correct?

22       A.   You are just looking at two years.

23       Q.   Yes, sir, yes.

24       A.   I would not say yes to that.  I would

25   say, if you want me to tell you, I wouldn't say yes,

1    sir to that.

2         Q.   And that's what I'm asking you though is

3    what other issues in the last two years that have

4    occurred in which you believe you did not receive

5    appropriate medical care, besides what we discussed

6    with the occlusion.

7         A.   Let me give you one example.  You know I

8    think it would be Medical 101 because you have a

9    serious infection, and I have had many, many

10   infections over the years, and so instead of, you

11   know, like on the streets in the hospital when they

12   go to the added testing, here they go on the cheap,

13   you know, and I understand that.  So they do the dip.

14   And the dip may have a chart, let's try this

15   antibiotic.  So what they did to me, they did the dip

16   and they said well, whatever the number is we will do

17   this one.  Ran that for ten days.  No effect.  They

18   did another one.  No effect.  Same thing.  Another

19   antibiotic.  And I asked them repeatedly for a

20   culture, because I know it from the past, I need a

21   culture, and low and behold, I have the name of that

22   bacteria that was there that they found in the

23   culture and they had to send out special to get the

24   appropriate antibiotic to address that culture.  But

25   I went two or three weeks dealing with this thing

23

1   until I was adamant to press the issue further.  But

2   that's just one example and I can think of others but

3   I don't have the records.

4          Q.  Well, let me ask, when did this occur

5   when you had this infection and you felt that it took

6   too long to be diagnosed?

7          A.  It was in the last few months.

8          Q.  And do you remember who the provider was

9   that you were dealing with?

10         A.  I believe it was Igwe.

11         Q.  Sorry?

12         A.  I believe it was Igwe.

13         Q.  And can you spell that name?

14         A.  I-G-W-E.

15         Q.  And I think you said that they attempted

16  at least two different antibiotics before they sent

17  out for a culture, is that right?

18         A.  Uh-huh, yes, yes.

19         Q.  And the antibiotics were ten-day courses

20  so you went about 20 days with no relief?

21         A.  Could have been seven days, could have

22  been ten days, I'm not sure.  I don't have the

23  record.

24         Q.  But they tried two different antibiotics

25  that didn't work before they sent out the culture?

1      A.   Sure.

2      Q.   I'm sorry?

3      A.   Yes.  They tried that.

4      Q.   Okay, other than that occasion, can you

5   think of any other occasions in the last two years

6   besides what we have discussed in which you felt that

7   you received improper care, medical care?

8      A.   I just can't wing it like that.  My wife

9   would have that data and it would be in the record.

10      Q.   She's not testifying and you are, so I'm

11   just here to find out what you are going to say on

12   the stand.

13      A.   I understand that, but she's also a

14   licensed state investigator and she has that data, so

15   I will acquiesce to her.

16      Q.   Okay, well, as I said, she is not

17   testifying so what she knows --

18      A.   No, she's not.

19      Q.   So that's why I'm deposing you.

20           Do you know whether you have had more

21   than one urinary tract infection in the last year

22   that you believe was -- do you recall having more

23   than one urinary tract infection other than the one

24   that you discussed in the last year?

25      A.   That's good.  You have that.  I don't

1    remember one in the last year, we did do it ten

2    years, but go ahead and ask your question.

3         Q.   Yeah, well, the judge is concerned with

4    not what happened ten or fifteen or twenty years ago

5    with respect to health care, she --

6         A.   Well, that's why we are having to re-try

7    this case because we are back at the same ground.  So

8    go ahead and ask your questions.

9         Q.   Right.  I'm trying to find out what other

10   issues you have where you believe you received

11   improper care other than what we have discussed.  Do

12   you recall anything else?

13        A.   I don't.  Once I pass that information on

14   if I find out about it or something, I don't keep it

15   on hand in my quarters, I don't review it.  I don't.

16        Q.   Okay.  As you sit here today, I guess

17   since you had your catheter replaced yesterday, are

18   you feeling okay?

19        A.   Pretty good for day out, yes, I'm okay.

20        Q.   All right.  And how often do you believe

21   that you need to have that catheter replaced?

22        A.   Every three months.

23        Q.   Okay.  And is that something that you

24   have been told by a physician?

25        A.   Yes, and that's the established protocol

1    at this time.

2         Q.   Who established that protocol?

3         A.   Mountain Vista.

4         Q.   Do you remember the name of the physician

5    who said every three months?

6         A.   I don't, but I know they came and sat

7    down and talked to me about it because of the

8    problems with infections and occlusions,

9    historically, historically.  So, with that, I have

10   been there many, many, many times, so they know me

11   very well so they are the ones that wanted to do the

12   suprapubic and change this up a little bit so I can

13   get some relief.

14        Q.   Do you think it's improved since you went

15   to the suprapubic catheter?

16        A.   Yes, that would be fair to say.

17        Q.   Okay, besides the infection issue and the

18   delay with respect to the replacement of the

19   suprapubic catheter approximately a year ago, can you

20   think of any other medical issues or issues in which

21   you believe that you didn't receive the appropriate

22   medical care?

23        A.   I would have to look at the record.

24        Q.   Okay.  But as you sit here today --

25        A.   I can't answer that honestly.  I would

27

1   have to look at the record.

2          Q.   But as you sit here today, you can't

3   recall any --

4          A.   Not right off the top of my head, no.

5              MR. STRUCK:   I don't have any more

6   questions.   Do you want to read and sign?

7              MR. KEENAN:   Yeah.

8              MR. STRUCK:   All right.   Thank you very

9   much, Mr. Jensen.

10             (Deposition concluded at 9:35 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

28

1                          ERRATA SHEET

2

3          DECLARATION UNDER PENALTY OF PERJURY

4

5             I declare under penalty of perjury that I have

6     read the entire transcript of my Deposition taken in

7     the above-captioned matter or the same

8     has been read to me and the same is true and

9     accurate, save and except for changes and/or

10    corrections, if any, as indicated by me on the errata

11    sheet hereof, with the understanding that I offer

12    these changes as if still under oath.  Signed on the

13    _____ day of  _____, 2021.

14    _____

      SHAWN JENSEN
15

16

17

18

19

20

21

22

23

24

25

29

1              DEPOSITION ERRATA SHEET

2    _____

3    Page No.___Line No.___Change to:_____
     _____

4    _____

5    Page No.___Line No.___Change to:_____

6    _____

7    Page No.___Line No.___Change to:_____

8    _____

9    Page No.___Line No.___Change to:_____

10   _____

11   Page No.___Line No.___Change to:_____

12   _____

13   Page No.___Line No.___Change to:_____

14   _____

15   Page No.___Line No.___Change to:_____

16   _____

17   Page No.___Line No.___Change to:_____

18   _____

19   Page No.___Line No.___Change to:_____

20   _____

21   Page No.___Line No.___Change to:_____

22   _____

23   Page No.___Line No.___Change to:_____

24   SHAWN JENSEN

25   Signature:_____

30

1               DEPOSITION ERRATA SHEET

2

3    Page No.___Line No.___Change to:_____

4    _____

5    Page No.___Line No.___Change to:_____

6    _____

7    Page No.___Line No.___Change to:_____

8    _____

9    Page No.___Line No.___Change to:_____

10   _____

11   Page No.___Line No.___Change to:_____

12   _____

13   Page No.___Line No.___Change to:_____

14   _____

15   Page No.___Line No.___Change to:_____

16   _____

17   Page No.___Line No.___Change to:_____

18   _____

19   Page No.___Line No.___Change to:_____

20   _____

21   Page No.___Line No.___Change to:_____

22   _____

23   Page No.___Line No.___Change to:_____

24   SHAWN JENSEN

25   Signature:_____

31

1          CERTIFICATE OF REPORTER

2

3   STATE OF ARIZONA   )
                       )  Ss:
4   COUNTY OF MARICOPA )

5

6            I, Rosanne P. Huebener, a Certified

7   Reporter in the State of Arizona, do hereby certify

8   that the foregoing Deposition was taken before me in

9   the County of Maricopa, State of Arizona; that an

10  oath or affirmation was duly administered to the

11  witness, SHAWN JENSEN, pursuant to A.R.S. 41-324(B);

12  that the questions propounded to the witness and the

13  answers of the witness thereto were taken down by me

14  in shorthand and thereafter reduced to typewriting;

15  that the transcript is a full, true and accurate

16  record of the proceeding, all done to the best of my

17  skill and ability; and that the preparation,

18  production and distribution of the transcript and

19  copies of the transcript comply with the Arizona

20  Revised Statutes and ACJA 7-206(J)(1)(g)(1) and (2).

21           The witness herein, SHAWN JENSEN, has

22  reserved signature.

23           I FURTHER CERTIFY that I am in no way

24  related to any of the parties nor am I in any way

25  interested in the outcome hereof.

32

1          IN WITNESS WHEREOF, I have set my hand

2     in my hand in my office in the County of Maricopa,

3     State of Arizona, this 17th day of October, 2021.

4

5     _____

6     Rosanne P. Huebener, CRR

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 5

1

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF ARIZONA

3
                                          )
4      Victor Parsons, et al., on behalf)
       of themselves and all other        )
5      similarly situated; and Arizona  )  No. 2:12-cv-00601-ROS
       Center for Disability Law,          )
6                                          )
                   Plaintiffs,             )
7                                          )
          vs.                              )
8                                          )
       David Shinn, Director, Arizona      )
9      Department of Corrections; and      )
       Richard Pratt, Interim Division     )
10     Director, Division of Health        )
       Services, Arizona Department of     )
11     Corrections, in their official      )
       capacities,                         )
12                                         )
                   Defendants.             )
13

14

15

16             VIDEOCONFERENCE DEPOSITION OF

17                      JOSHUA POLSON

18                    OCTOBER 13, 2021

19                       2:00 P.M.

20

21                    BUCKEYE, ARIZONA

22

23
       REPORTED BY:
24     Sommer E. Greene, RPR, CRR
       Certified Court Reporter
25     Certificate No. 50622

                                                                          2

1     APPEARANCES:

2

3         For the Plaintiffs:

4                 PERKINS COIE
                  KELLY SOLDATI, ESQ.
5                 2901 North Central Avenue, Suite 2000
                  Phoenix, Arizona 85012
6                 602.351.8000

7

8         For the Defendants:

9                 STRUCK LOVE BOJANOWSKI & ACEDO, PLC
                  ASHLEE HESMAN, ESQ.
10                3100 West Ray Road, Suite 300
                  Chandler, Arizona 85226
11                480.420.1600
                  Ahesman@strucklove.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                    I N D E X

 2

 3      WITNESS: JOSHUA POLSON

 4

 5      EXAMINATION                          PAGE

 6

 7      MS. HESMAN.................................. 5

 8

 9                    *      *      *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                        INDEX TO EXHIBITS

2

3     EXHIBIT                                      MARKED

4

5                       NONE MARKED

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

```
 1                 BUCKEYE, ARIZONA;

 2            OCTOBER 13, 2021; 2:00 P.M.

 3

 4                 JOSHUA POLSON,

 5     called as a witness herein, having been first duly

 6     sworn by the Certified Reporter to speak the whole

 7     truth and nothing but the truth, was examined and

 8     testified as follows:

 9

10                   EXAMINATION

11     BY MS. HESMAN:

12          Q.   Please state your full name for the

13     record.

14          A.   Joshua Polson.

15          Q.   Please spell your last name for the court

16     reporter?

17          A.   P-o-l-s-o-n.

18          Q.   And, Mr. Polson, have you ever been

19     deposed before?

20          A.   Yes.

21          Q.   When?

22          A.   Back in like 2014 when they first started

23     this.

24          Q.   And when you say "they first started

25     this," are you referring to the Parsons versus Ryan
```

6

```
 1    case?
 2          A.   Yes, ma'am.
 3          Q.   Other than previously being deposed in
 4    this case, have you ever been deposed in any other
 5    matter?
 6          A.   No, ma'am.
 7          Q.   Okay.  I know you've been deposed before,
 8    but since it's been a little while, I will run
 9    through some ground rules.
10               My name is Ashlee Hesman, and I represent
11    the defendants in this case.  The case is now called
12    Parson versus Shinn, but it's the same case.
13               I'm going to be asking you a variety of
14    questions this afternoon, and the court reporter here
15    is taking down all of my questions and all of your
16    answers.  So it's important that you speak clearly
17    and slowly to make her job a lot easier.
18               And it's important that we don't speak
19    over one another, which is difficult to do in normal
20    conversation, particularly when we're on Zoom.  So I
21    will do my best to extend that courtesy to you as
22    well.  So let's just be cognisant of that.  Okay?
23          A.   Yes.
24          Q.   And because she's writing everything
25    down, it's important that you give a verbal response.
```

```
 1      So head nods and head shakes, she can't write that

 2      down.  Similarly, using things like "uh-huh" and

 3      "huh-uh," difficult to write down.  So if you could

 4      just verbally respond, again, it's going to make her

 5      job a lot easier.

 6              Do you understand that?

 7          A.   Yes.

 8          Q.   And you took an oath at the beginning of

 9      this deposition.  Correct?

10          A.   Yes.

11          Q.   And do you understand that that oath is

12      the same you would give if you were in a courtroom?

13          A.   Yes.

14          Q.   And it's an oath to tell the truth.  Do

15      you understand that?

16          A.   Yes.

17          Q.   Is there anything that's preventing you

18      from -- from providing truthful responses to my

19      questions today?

20          A.   I recently just had my medication.  It

21      probably hasn't kicked in yet.

22          Q.   Okay.  What medication?

23          A.   I'm on bupropion, which is a generic

24      brand for Wellbutrin, depression.  Not only does it

25      help with my depression, it helps me concentrate.
```

8

1       Q.   Okay.  So since it's going to help you

2   concentrate, is there anything about that medication

3   which you believe will prevent you from providing

4   truthful answers to my questions?

5       A.   Well, if it hasn't kicked in, then yes.

6       Q.   Okay.  So you're concerned that until

7   your medication kicks in, you won't be able to

8   provide truthful responses?

9       A.   I'll do the best I can.

10      Q.   When did you receive your medication?

11      A.   About a little less than an hour ago.

12      Q.   How long does it typically take to kick

13  in?

14      A.   I'm not too sure about that.

15      Q.   How long have you been on the medication?

16      A.   Man, way before I even came to prison.

17  Like over 20 years.

18      Q.   So if you've been on it for 20 years, you

19  have to know how long it takes to kick in.  Right?

20      A.   No.  I mean, it just happens.  It just

21  you comprehend things sometimes, and then you don't

22  sometimes.  Depression, it just happens.

23      Q.   Okay.  So --

24      A.   I'm not a doctor.  I can't say.

25      Q.   Let's do this.  If I ask a question and

9

```
1    you don't understand it, you can ask me to clarify my
2    question, and I'll rephrase it.  But if you answer
3    it, I'm going to assume you understood.  Is that
4    fair?
5         A.   Yes.
6         Q.   Okay.  Other than your medication, is
7    there anything else that's going to prevent you from
8    providing honest answers to my questions?
9         A.   I mean, I've had a stressful time.  I
10   don't know if stress is going to or not.
11        Q.   Okay.  Well, if you -- if you ever feel
12   that you're feeling a little stressed, why don't you
13   just go ahead and give me a heads-up, and we'll take
14   it question by question.
15             Is that fair?
16        A.   Uh-huh.
17        Q.   What did you do to prepare for your
18   deposition today?
19        A.   Talk to my attorney.
20        Q.   When did you talk to your attorney?
21        A.   Yesterday and recently today, a little
22   while ago.
23        Q.   When you talked to your attorney
24   yesterday, was it telephonically or in person?
25        A.   It was on the phone.
```

10

1        Q.   How long was the conversation?

2        A.   I don't know.  I wasn't checking my time.

3        Q.   Was it five hours?  Was it a half hour?

4        A.   It wasn't five hours.

5        Q.   More than a half hour?

6        A.   Yeah.

7        Q.   More than an hour?

8        A.   I don't know.

9        Q.   More than two hours?

10       A.   I don't know.

11       Q.   Okay.  So somewhere between two and five

12   hours.  Is that fair?

13       A.   Five hours is a little extensive, but

14   yeah.

15       Q.   Well, I wasn't the one who had the

16   conversation, so I'm just trying to gauge how long

17   you were on the phone with her.

18       A.   When you're in prison, you don't have

19   much like concept of time.

20       Q.   Okay.  So somewhere around two hours.  Is

21   that a fair estimate?

22       A.   Sure.

23       Q.   Okay.  And which attorney did you meet

24   with?  Is it the woman sitting next to you?

25       A.   Yes.

```
 1            Q.   And you met with her again this morning,
 2       you said?
 3            A.   Well, this afternoon, about 1:30.
 4            Q.   This afternoon?
 5            A.   Yeah.
 6            Q.   At about 1:30.  So you met with her for
 7       about an hour today.  Is that fair?
 8            A.   I guess, yeah.
 9            Q.   And did you review any documents to
10       prepare for your deposition?
11            A.   No.
12            Q.   Did you -- other than speaking with your
13       attorney, did you speak to anyone else regarding the
14       deposition?
15            A.   No.
16            Q.   Other than your conversation with her
17       yesterday and the conversation you had with her
18       today, in the last six months, have you spoken to any
19       of the plaintiffs' lawyers on this case?
20            A.   I don't understand.  Plaintiffs --
21            Q.   Sure.  So you're a plaintiff in this case
22       because you brought a lawsuit, and you have attorneys
23       that represent you.
24                 Do you understand that?
25            A.   Yeah.
```

12

1          Q.   Have you spoken to any of them in the

2     past six months other than the two instances we just

3     talked about?

4          A.   Only through mail.

5          Q.   Through mail?

6          A.   Huh-uh.

7          Q.   Have you signed any documents that they

8     provided you?

9          A.   Not that I'm aware of or recollect.

10         Q.   So you haven't met with them in person or

11    on the phone, it's all been through correspondence.

12    Right?

13         A.   I've had a couple legal calls a while

14    back ago.  I don't know exactly how long ago.

15         Q.   Okay.  Have you been interviewed by

16    anyone else other than your attorney in relation to

17    this case?

18         A.   Not that I'm aware of.

19         Q.   So there are several doctors who have

20    been retained by your lawyers.  They're called

21    experts.  Have you been interviewed by any of them?

22         A.   Not recently that I know of.

23         Q.   Have you ever been interviewed by them?

24         A.   Well, when we first started this class

25    action.

1       Q.   So more than -- more than two years ago?

2       A.   I couldn't tell you for sure.

3       Q.   But have you -- have you been interviewed

4   by them in the last six months?

5       A.   I couldn't tell you.  I -- my time -- my

6   concept of time isn't all that.  It's not very good.

7       Q.   Okay.  But you do recall being

8   interviewed by them, you just don't know when?

9       A.   Yeah, I just don't know the -- the date

10  or how long ago or how soon.

11      Q.   And do you recall their names?

12      A.   No.

13      Q.   Do you recall how long the interviews

14  last -- lasted?

15      A.   No.

16      Q.   What is your understanding of your role

17  in this case?

18      A.   My role in this case?

19      Q.   Yes.

20      A.   To tell you guys the truth about what

21  goes on in here in medical.

22      Q.   Okay.  Do you understand that you're a

23  class representative?

24      A.   Yes, I represent everybody.

25      Q.   Okay.  And by "everybody," who do you

14

1    mean?

2            A.    Inmates.

3            Q.    And do you represent certain subclasses

4    of this case?

5            A.    Yes, I suppose I do if I'm -- I'm named

6    in some of like the isolations and dental and stuff

7    like that.

8            Q.    Okay.

9            A.    So I suppose I would be.

10           Q.    Do you recall which subclasses other than

11   isolation and dental?

12           A.    Mental health, isolation, conditions of

13   confinement.  Those are the only ones I can name.

14           Q.    And you're currently at the Lewis

15   facility.  Is that correct?

16           A.    Yes.

17           Q.    On which unit?

18           A.    Buckley.

19           Q.    And that's not a max unit, is it?

20           A.    Not no more, no.

21           Q.    Currently today, it's not a max unit.  Is

22   that correct?

23           A.    No, huh-uh.  It's never been a max unit.

24   It's close custody.

25           Q.    And how long have you resided there?

 1        A.   Since 2017.

 2        Q.   So since 2017 you haven't resided in a

 3   max custody unit.  Correct?

 4        A.   No, I had a short stint in a CDU for

 5   three months.

 6        Q.   And when was that?

 7        A.   About a year ago, a year and a half ago

 8   almost.

 9        Q.   Okay.  So what I want to go to next is

10   can you kind of walk me through a typical week where

11   you're residing right now, a typical week, what kind

12   of program you're getting, what you're doing --

13        A.   There's no program.

14        Q.   Okay.  Let me finish my question.

15   Remember the rules we talked about earlier?  I'm

16   going to ask a question, you're going to let me

17   finish, and then you're going to answer so that the

18   court reporter doesn't get angry at both of us.

19   Okay?

20        A.   Yes.

21        Q.   So walk me through a typical week, what

22   kind of things you're doing to include programming,

23   medical visits, any jobs you have, any recreation,

24   anything like that just -- I don't need details, just

25   generally speaking what you're doing on a weekly

16

1    basis?

2                    MS. SOLDATI:   Object to form.   Compound.

3                    Go ahead.

4                    THE WITNESS:   It's the same.   I don't do

5    nothing but stay in my cell and go to eat.

6            Q.   BY MS. HESMAN:   Okay.   Staying in your

7    cell and going to eat?

8            A.   Yeah.

9            Q.   Are you seen by any medical providers?

10           A.   When you ask, if you're lucky.

11           Q.   Okay.   Are you being offered recreation?

12           A.   Yeah.

13           Q.   Do you go?

14           A.   No, I haven't gone in a while.

15           Q.   Why not?

16           A.   Because I'm getting short to go home, and

17   I'm trying to keep myself from getting in trouble or

18   have the potential of trouble.

19           Q.   And going to recreation causes you to get

20   into trouble?

21           A.   It could.

22           Q.   Okay.   Are you offered any kind of

23   programming?   And by programming, I mean groups,

24   individual therapy, education, anything like that?

25   Have you been offered that?

1      A.   No.

2      Q.   Have you asked for it?

3      A.   I see a psych like every three months.

4      Q.   Okay.  Well, let's put that in a separate

5  category about seeing a psychiatrist.  But as far as

6  programming, like any kind of group or counseling or

7  education, packets that you're receiving in your

8  cell, are you being offered anything like that?

9      A.   Not that I'm aware of, no.

10      Q.   Have you requested to be a part of any

11  programming?

12      A.   Yeah.

13      Q.   When?

14      A.   Probably like a year or less.

15      Q.   Okay.  And when did you make that

16  request?

17      A.   I said a year or less.  I don't -- I

18  don't know the exact date or...

19      Q.   Okay.  Who did you make that request to?

20  Are you referring to like an H&R, something you

21  submitted on the tablet?

22      A.   To a CO3, I guess.

23      Q.   Which CO3?

24      A.   Sobles (phonetic) or something like that.

25  I completed the class.

18

1          Q.   Okay.  So when you requested programming,

2     you were provided with programming?

3          A.   Yeah, just that one time.

4          Q.   And which class was it?

5          A.   I don't remember.

6          Q.   Do you receive table time?

7          A.   No.

8          Q.   Have you requested it?

9          A.   You don't get table time if you request

10    it around here.

11         Q.   Okay.  So my question was whether or not

12    you've requested table time.

13         A.   No.

14         Q.   How often are you permitted to come out

15    of your cell?

16         A.   Whenever they let you out.

17         Q.   And --

18         A.   That's rec and chow.

19         Q.   So your testimony is the only time you

20    come out of your cell is for recreation and to eat?

21         A.   Yeah.  And even sometimes we don't even

22    do that.  Sometimes we don't get that.

23         Q.   Okay.  But you did say you're offered

24    recreation, you just choose not to participate in it.

25    Correct?

19

1          A.   It's two different things.

2          Q.   Is that correct?

3          A.   No.  I have refused to go to rec.  We are

4    offered it; we're not always given it.  So we're not

5    always offered it.

6          Q.   And when --

7          A.   Sometimes we're short staffed in order to

8    offer rec or go to chow.

9          Q.   When was the last --

10         A.   So -- go ahead.

11         Q.   I'm sorry.  No, finish.

12         A.   So both answers are correct or the same.

13         Q.   When was the last time you were not

14   offered the rec?

15         A.   I don't even know.

16              MS. SOLDATI:  Object to the form.

17              MS. HESMAN:  What's wrong with the form?

18              MS. SOLDATI:  Can you clarify?  You're

19   asking a negative, when was the last time he was not

20   offered rec?

21              MS. HESMAN:  Right.  What's wrong with

22   the form?

23              MS. SOLDATI:  So like within the last ten

24   minutes, within the last 24 hours?  Can you just

25   clarify and specify a time period?  He was not

                                                                    20

1      offered rec within the last ten minutes.

2              MS. HESMAN:  Last time he was -- he

3      thinks he was supposed to have been offered rec and

4      he was not.

5              MS. SOLDATI:  Thank you.

6              THE WITNESS:  I mean, they just yell

7      "rec" when they come in to do chow on our rec days.

8      Sometimes we don't get rec.  It's just part of being

9      locked up, I guess.

10         Q.   BY MS. HESMAN:  When was the last time

11     that you believe you were entitled to rec and you

12     weren't offered it?

13         A.   Yesterday.

14         Q.   What time yesterday?

15         A.   No, yesterday we were offered it, but I

16     didn't go.

17         Q.   Okay.  My question's a little different.

18     I'm looking for the last time that you think you were

19     entitled to rec and it wasn't offered, not that you

20     didn't go?

21         A.   It happens so much around here, I don't

22     even know.

23         Q.   Can you answer that question, please?

24         A.   I said it happens so much around here, I

25     don't even know.  I can't tell you.

21

```
 1              Q.   When was the last time?

 2              A.   I couldn't tell you.

 3              Q.   Okay.  So I'm going to show you a

 4     document, and you let me know if you recognize it.

 5              A.   I can't even see that.

 6              MS. SOLDATI:  It's loading.

 7              Q.   BY MS. HESMAN:  And let me scroll down

 8     for you so you can see the title.  Do you see the

 9     title of that document?  It says plaintiffs' fourth

10     supplement to their initial trial disclosure

11     statement.

12              A.   No.  I can't see it.

13              Q.   You don't see that right here?

14              MS. SOLDATI:  It's very small.  Is there

15     any way to increase the size?

16              MS. HESMAN:  I don't think so,

17     unfortunately.

18              THE WITNESS:  Can I answer that question?

19              Q.   BY MS. HESMAN:  There we go.  How about

20     that?

21              MS. SOLDATI:  That's a little better.  Is

22     there any way to keep increasing?

23              MS. HESMAN:  It cuts it off if I

24     increase.

25              Q.   BY MS. HESMAN:  But do you see the title
```

22

1    of that document?

2            A.   No, my eyes are bad anyways.

3            Q.   Okay.  So the title says Plaintiffs'

4    Fourth Supplement to their initial trial disclosure

5    statement.  Have you ever seen a document with that

6    title?

7            A.   I don't recollect it.  I mean, I probably

8    have.  I've seen a lot of documents.

9            Q.   Okay.  But you just don't recall if

10   you've seen this one?

11           A.   Yeah, I don't recall.

12           Q.   Do you recall if you've seen a document

13   that -- that outlines what testimony you're going to

14   provide at trial?

15           A.   I don't remember.

16           Q.   You don't recall?

17           A.   No, I don't recall.  I don't remember.

18           Q.   So one of the purposes of -- of today is

19   for me to discover what -- what you're going to talk

20   about at trial.  So if you can go ahead and just tell

21   me what issues you're going to be providing testimony

22   on at trial?

23           A.   I don't know.

24           Q.   You don't know?

25                Okay.  Well, you're a plaintiff, and this

23

```
 1     is a class action lawsuit.  And to use your own

 2     words, you said that you represent everyone.  So as a

 3     class representative, you're going to provide

 4     testimony at trial, at least that's what your lawyers

 5     have indicated in this document, and I'm entitled to

 6     know what that testimony is.

 7               So anything that you can think of that

 8     you can tell me today that -- that you may be

 9     discussing at trial with respect to this case?

10          A.   The lack of mental health support.

11          Q.   Okay.  Let's talk about that.

12               What do you mean by "mental health

13     support"?

14          A.   Seeing a psych when you ask for one.

15          Q.   Okay.  And when was the last time you

16     asked to see a psych provider and were denied?

17          A.   It's not really -- they don't deny you.

18     They just bullshit you.

19          Q.   Okay.  When was the last time you

20     requested to see a psych provider and that request

21     was not -- was either denied or not fulfilled?

22          A.   When we request to officers, it doesn't

23     always happen.  Like if you need --

24          Q.   My question is a little different.  I'm

25     sorry.  I didn't mean to speak over you.
```

24

```
 1              But when was the last time you personally
 2    asked to see a psych provider and it didn't occur?
 3              A.   On paper or with an officer?
 4              Q.   Any time.
 5              A.   An officer, it's been about two weeks.
 6              Q.   And which officer did you make that
 7    request of?
 8              A.   I don't remember their name.
 9              Q.   What date?
10              A.   It was approximately two weeks ago.  I
11    don't --
12              Q.   Can you provide any times when you
13    verbally requested to see a psychiatrist either
14    through an officer or some other health care
15    professional and you were not provided with that
16    visit?
17              A.   Like an exact time and date?
18              Q.   Any -- any example.  Any time or date.
19              A.   I don't have an exact time or date, no.
20              Q.   Can you provide me the names of anyone
21    you've made these requests of?
22              A.   What do you mean?
23              Q.   Well, you say that you asked to see a
24    psychiatrist and those requests aren't fulfilled, so
25    I'm trying to determine who you're making these
```

```
1     requests of.
2             A.   Oh, to see Quals?
3             Q.   I'm sorry?
4             A.   Psych Associate Quals, to see her.
5             Q.   Oh, I'm sorry.  My question was
6     confusing.  I'm -- I'm trying to figure out who
7     you're asking, which COs or which medical
8     professionals, anyone you're asking, hey, I need to
9     see a psychiatrist, and you're saying you do that and
10    those requests aren't fulfilled.  So I'm trying to
11    figure out who are you making these requests of.
12            A.   I don't remember the officers' names.  I
13    don't keep track of them.
14            Q.   You don't --
15            A.   No, I don't keep track of the officers'
16    names.
17            Q.   Can you give me any dates or time frames
18    when you've made these requests?
19            A.   No.
20            Q.   You also mentioned --
21            A.   A couple weeks ago I told you that I made
22    a request, and it just went denied.  Like my mom's
23    been in and out of the hospital, and I've tried to
24    talk to a psych associate about it.  And they'll they
25    say, oh, yeah, we'll contact her, and then nothing
```

1    happens.

2            Q.   And the request from two weeks ago, you

3    said that was a verbal request that you made of an

4    officer.  Right?

5            A.   Correct.  Correct.

6            Q.   But you just don't recall that officer's

7    name?

8            A.   No, you don't really pay attention to an

9    officer's name when you're more worried about a

10   family member or your state of mind.

11           Q.   And where were you at when you made this

12   request?

13           A.   Here at Buckley.

14           Q.   Where?

15           A.   In a cell.

16           Q.   You were in your cell?

17           A.   Yeah, and on the way to chow.

18           Q.   So it was two requests?

19           A.   Yeah.  I made numerous -- you can make

20   numerous requests a day, and they'll just tell you

21   the same thing over and over.  Yeah, we're going to

22   contact her.  Yeah, we're going to contact her.

23           Q.   Okay.  And I'm not asking what could be

24   done or should be done.  I'm just asking for your

25   personal experience of when you made these requests.

27

```
1              And I think what I'm hearing is that two
2    weeks ago you made a request of an officer while you
3    were in your cell and on your way to chow.  Is that
4    right?
5         A.   Correct.
6         Q.   Was it the same officer?
7         A.   No.
8         Q.   Two different?
9         A.   Yeah.
10        Q.   What did they look like?
11        A.   One was female, and one was male.
12        Q.   Can you describe them?
13        A.   They were Mexican.  I don't know.
14        Q.   They were both Mexican?
15        A.   Yeah.
16        Q.   Any other examples that you can remember
17   of when you asked to verbally see a psychiatrist but
18   were --
19        A.   See, probably less than a year ago is the
20   last time I was on watch.  Maybe it was like eight,
21   nine, maybe like ten months ago or 11 months ago, I
22   went on a watch.
23              But prior to going on that watch, I tried
24   to talk to a psych associate numerous times.  I was
25   housed in 2 Able, cell 14 when that occurred.
```

```
 1      That's -- I can give you that.  That should be

 2      documented.

 3              Q.   Okay.  And when you say you tried to see

 4      a psych associate, were you asking her directly to be

 5      seen, or were you making that request of like an

 6      officer or something else?

 7              A.   With the officers again.

 8              Q.   Okay.  And did you --

 9              A.   And how they -- they just keep asking you

10      if you're suicidal or homicidal.  That's all they ask

11      you.  And if you don't answer them, they end up

12      putting you on a watch anyways.

13              Q.   Okay.  So I'm talking about -- let's go

14      back.  I'm talking about this experience you said

15      approximately ten months ago when you asked to see a

16      psych associate, you made that request of an officer?

17              A.   Yeah, it was probably more like a year

18      ago.  It was like October-ish.

19              Q.   In which --

20              A.   I asked an officer to -- it was a

21      graveyard officer, too.

22              Q.   Okay.

23              A.   You know, that I needed to do speak to a

24      psych.

25              Q.   And what was the officer's response?
```

1          A.   If I was homicidal or suicidal.

2          Q.   Any other response that you provided?

3          A.   I told him not at the moment, and then he

4     just wanted me to cuff up.

5          Q.   And can you describe that officer?

6          A.   Taller Mexican guy.  Last name is either

7     Hernandez or Martinez, or something like that.

8          Q.   So you do recall his last name?

9          A.   Something like that, yeah.  And then

10    there was another incident where I asked an

11    Officer Pasos, is his last name --

12         Q.   Okay.

13         A.   -- if he would give me my medication,

14    because I hadn't been given my medication all day.

15    And it ended up in an altercation with the officer

16    over my medication because he refused to call the

17    nurse.

18         Q.   And we'll get to medication.  I just want

19    to put a bow on this psychiatrist piece.

20              So other than the examples that you've

21    given me where you've asked for a psychiatrist and

22    weren't seen, any other examples for that narrow

23    issue that you can think of as you sit here today?

24         A.   Oh, there's multiple, but I don't

25    remember them all.

30

1          Q.   And with respect to making a written        Vague
                                                             30:1-4
2      request to see a psychiatrist, can you provide me any

3      examples when you've done that and you haven't been

4      seen?

5          A.   I recently put in H&R on my tablet asking

6      to -- to talk to someone in telemedicine to decrease

7      my medication, and they said they would schedule me.

8          Q.   Okay.  And we'll get to medications in a

9      sec.

10         A.   Well, that's psych.  That's what my

11     medication is.  That's the same thing.

12         Q.   Okay.  So this was an H&R that you          Mischaracterization
                                                            30:12-14
13     submitted on your tablet, and you said a couple weeks

14     ago?

15         A.   No, it was probably sooner than that.

16     Probably like a week.

17         Q.   More recent.  Okay.

18              And that was to a change in your

19     medication?

20         A.   Yes.

21         Q.   And you were told that you'd be

22     scheduled?

23         A.   Yeah.

24         Q.   Any other -- any other examples of

25     written requests to see psych that haven't been

1    fulfilled?

2          A.   There's multiple.

3          Q.   Can you give me --

4          A.   (Inaudible) after they don't answer or

5    don't respond or...

6          Q.   Any other examples you can provide me

7    though?

8          A.   No.

9          Q.   Okay.  So going back to -- to my original

10   question about your testimony at trial, you said that

11   you were going to talk about lack of psych -- lack of

12   seeing psych after being -- after a request is made.

13   What else with respect to mental health are you going

14   to testify to at trial?

15         A.   How many people are able to commit

16   suicide in this place.

17         Q.   So I'm interested in what your personal

18   experience has been and what you're going to testify

19   with respect to yourself individually.

20              So with respect to your mental health

21   treatment, other than not seeing a psychiatrist when

22   you put in a request, which we've talked about, what

23   else are you going to testify to at trial?

24         A.   Well, if I'm representing me and everyone

25   else, wouldn't that be relevant?

1      Q.    So that's not my question.   My question

2  is what are you going to testify to with respect to

3  your treatment?

4      A.    There is no treatment.

5      Q.    Is there any specifics you can give me

6  other than requesting to see a psychiatrist and it

7  not occurring?

8      A.    Maybe some coping skills in classes that

9  they should have and they don't have.

10     Q.    Okay.   Coping skills classes.

11     A.    DOTs done right.

12     Q.    And when have you requested a coping

13  skills class?

14     A.    Numbers of times in grievances that you

15  guys have on file.

16     Q.    When was the last time you requested a

17  coping skills class?

18     A.    I don't even know.   They don't have them

19  available.   So we don't even request them when they

20  don't have them available.

21     Q.    Can you think of just ballpark when the

22  last time you asked for the coping skills class?

23     A.    Probably like three months ago when I

24  seen the psychiatrist last.

25     Q.    And did you make that request of the

```
1    psychiatrist, or was this a written request you made?

2          A.   No, it was to her.  She writes them down.

3          Q.   And what was her response when you asked

4    her that?

5          A.   That they don't have those classes here.

6          Q.   And you said better management of DOT?

7          A.   Yeah.

8          Q.   Explain that to me a little bit.

9          A.   That's your direct therapy, like

10   medication and stuff.

11         Q.   So what's your personal experience with

12   that?

13         A.   It's garbage.

14         Q.   How so?

15         A.   They do it when they want.

16         Q.   Okay.  What --

17         A.   Within the last three months though -- or

18   last actually month, it's been -- it's been all

19   right.  We've had to go get it, but there's been like

20   weeks at a time that it's -- because when you have

21   like a time release, you're supposed to have

22   medication within a certain amount of time.

23              Well, they don't want to do meds like

24   they used to three times a day.  They only do it

25   twice.  So then they up your milligrams and give it
```

34

1    to you twice.  Well, it should be like six to eight

2    hours in between the DOTs.  And sometimes there's

3    more -- 12 hours, 20 hours.  It's ridiculous.  It's

4    like how are you supposed to --

5           Q.   So let me get some background so I make

6    sure we're both on the same page.  DOT, you're

7    talking about direct observation therapy, so like

8    a --

9           A.   Yes.

10          Q.   Swallow type of medication.  Correct?

11          A.   Yes.  Correct.

12          Q.   And which watch swallow medications are

13   you currently on?

14          A.   Bupropion and Keppra.

15          Q.   And is it your allegation that you should

16   be receiving those more frequently, less frequently?

17   What is -- what is your complaint with respect to

18   those -- to the administration of that medication?

19          A.   Well, it should be three times a day.

20          Q.   And how often are you receiving it?

21          A.   Twice a day.  On the streets, you take

22   your medication as prescribed three times a day.

23          Q.   Okay.  So --

24          A.   I was on the same medication on the

25   streets.

35

```
 1              Q.   So other than the lack of ability to see

 2     a psychiatrist -- psychiatry, the coping skills

 3     class, and the timing by which you receive your

 4     medication, anything else with respect to your mental

 5     health treatment that you're going to testify to at

 6     trial?

 7              A.   I couldn't think of anything right now.

 8              Q.   And what injuries do you attribute -- the

 9     list of mental health items that we've been

10     discussing, what injuries do you attribute to those?

11              A.   It's worsening my mental health.  I'm

12     more depressed more often, get -- get aggravated,

13     agitated.

14              Q.   Anything else?

15              A.   Memory's worse.  Concentration isn't

16     good.  Recollection isn't good.

17              Q.   And you attribute all of those injuries

18     to what?

19              A.   To the lack of treatment, therapy.

20              Q.   To the lack of the items that we just

21     discussed?

22              A.   Yeah.  All therapy, period.

23              Q.   Okay.  Well, now you're talking about

24     therapy.  That's not something you mentioned before,

25     so let's talk about that.
```

36

1        A.   It's the same thing -- it's the same

2   thing as going to classes.

3        Q.   Okay.

4        A.   Classes, coping skills, that's therapy

5   stuff.

6        Q.   Sure.  So you gave a specific example

7   about wanting a coping skills class.  But are you

8   going to testify with respect to any other therapy

9   that you think you require?

10       A.   Yeah, they were supposed to give me

11  therapy for my knee when I had surgery.  They didn't

12  do that.

13       Q.   So I'm just talking about mental health,

14  therapy in the mental health realm.

15       A.   No.

16       Q.   Anything with respect to that that you're

17  going to testify to at trial?

18       A.   Yeah, they don't give us classes or any

19  ways to cope with it besides medication.  That's what

20  I'm going to testify to.

21       Q.   Okay.  And the classes that -- you said

22  you did complete one class, you just didn't recall

23  the name of it.  Correct?

24       A.   It had nothing to do with mental health.

25       Q.   And the -- the mental health class that

```
 1    you want, it's called coping skills that you've been
 2    told they do not have.  Correct?
 3            A.   Yep.
 4            Q.   And I apologize if I asked this earlier,
 5    but have you asked to be provided any -- any classes
 6    or programming?
 7            A.   Yep.  They said they don't have the staff
 8    to do it.
 9            Q.   And when were you told that?
10            A.   Numerous times, recently, three months
11    ago.  It's -- it's a constant thing around here.
12            Q.   So let's talk about three months ago.
13    Who told you that three months ago?
14            A.   Psych associate Quals.
15            Q.   Psych associate Quals?
16            A.   Uh-huh.
17            Q.   Male or female?
18            A.   Female.
19            Q.   And she said that -- well, you tell me
20    what she said?
21            A.   This unit doesn't have that.
22            Q.   Anything else that she said?
23            A.   That I'd have to try to find ways
24    myself --
25            Q.   Anything else --
```

38

1        A.   -- to do the therapy.  No.

2        Q.   Okay.  Well, earlier you said that it was

3   due to staffing.  So where did you get the staffing

4   piece?

5        A.   From like officers, from the psych.  They

6   don't have the staffing in order to hold those

7   classes.

8        Q.   And which officer told you that?

9        A.   Man, a number of supervisors, a number

10  of -- all the officers will tell you that.

11       Q.   Can you give me some -- some names of

12  people who have told you that?

13       A.   Nah, not without fear of retaliation.

14       Q.   Okay.  So earlier you provided me with

15  names.  What has changed now that you believe you're

16  going to be retaliated?

17       A.   I didn't -- I didn't provide you with

18  names.  I gave you a guessing of two names.  Whether

19  or not that's really their names or not, I can't be

20  for sure.

21       Q.   You provided me the name of a psych

22  associate and three officers.

23       A.   Yeah.  She can't retaliate on me.  She's

24  not security.

25       Q.   Okay.  So earlier when I asked you if

1    there was anything that would prevent you from giving

2    honest and truthful testimony, are you changing that

3    response now to be that you fear you're going to be

4    retaliated against if you provide honest testimony?

5         A.   Has nothing to do with being honest.

6         Q.   But is that your testimony?

7         A.   Everything I've told you is honest.

8         Q.   But are you going to refuse to provide

9    answers to my questions because of --

10        A.   I'm going to refuse to give a name if I

11   have a name.

12        Q.   Are you going to refuse --

13        A.   If I don't know the name, then I can't

14   give it to you.

15        Q.   Are you going to refuse to answer any of

16   my questions based on a fear of retaliation?

17        A.   No.

18        Q.   So --

19        A.   I mean, yeah, yeah, I would.

20        Q.   And which questions are you going to

21   refuse on that basis?

22        A.   To give names of officers.

23        Q.   So earlier you said that you don't

24   remember the names.  So is it that you don't remember

25   the names, or that you --

40

1        A.    Some of them I don't.  Some of them I

2   don't.

3        Q.   I want to make the court reporter's job a

4   lot easier than it already is over a Zoom call.

5             So my question is whether you're not able

6   to recall the names or whether you're fearing

7   retaliation?

8        A.   It's both.

9        Q.   Okay.  For this particular officer who

10  you said -- told you that they don't have staffing to

11  run the programming you want, are you not providing

12  me a response because you don't know his name or

13  because you fear retaliation?

14       A.   Fear of retaliation.

15       Q.   What unit did this officer work on when

16  this comment was made?

17       A.   The unit I'm on.

18       Q.   The unit you're currently on?

19       A.   Yeah.  It's not only happened on this

20  unit.

21       Q.   About how many times -- is it -- how many

22  times do you allege that someone's told you they

23  can't provide you programming that you've requested

24  due to staffing?

25       A.   How many times?

41

1      Q.   Just approximately, yeah.

2      A.   Geez.  Like, man, like 15 or more.

3      Q.   And you can't provide the names of any of

4 those officers?

5      A.   Some I can't provide, and some I will not

6 because of retaliation -- fear of retaliation.

7      Q.   Why don't you differentiate the two for

8 me?

9      A.   What do you mean, "differentiate"?

10      Q.   I mean, if -- tell me which times --

11 because you're saying this happened 15 times.  Which

12 times are you refusing to provide a name because of

13 alleged retaliation, and which times you just do not

14 recall the name?

15      A.   Some of them are supervisors, and some of

16 them aren't.  Usually when they're not supervisors, I

17 don't pay attention.

18      Q.   Okay.

19      A.   If they're higher than a CO2, I don't pay

20 attention.

21      Q.   Okay.

22      A.   I mean, if they're a CO2, I don't pay

23 attention.  If they're higher than a CO2, like a

24 supervisor, CO3, sergeant, lieutenant, captain, then

25 I'm not going to give you their names --

42

1        Q.    Okay.

2        A.    -- in fear of retaliation.

3        Q.    Of the approximate 15 times when you say

4    this comment has been made, how many of those times

5    was it higher than a CO2 and therefore you're not

6    going to provide the name?

7        A.    Over half.

8        Q.    So over seven?

9        A.    Yeah.  I mean, it's been more than 15

10   times, but 15 times is an estimation.  So...

11       Q.    And the other seven, you just don't

12   recall the names?

13       A.    Yeah.

14       Q.    Okay.  Other than the lack of being able

15   to see a psychiatrist, the coping skills class,

16   classes in general, which we just talked about, the

17   issue with DOT, anything else that you're going to

18   testify to at trial with respect to your mental

19   health treatment?

20       A.    Not that I can think of as of now.

21       Q.    And I apologize if I asked you this

22   earlier.  When was the last time you saw a

23   psychiatric provider?

24       A.    A provider or associate?  There's a

25   difference around here, I guess.

```
1          Q.   Yeah, I understand the difference.  A
2    provider.
3          A.   Like somebody who gives me medication or
4    prescribes me medication?
5          Q.   Correct.  Someone who prescribes you
6    medication.  So either a psychiatrist or a
7    psychiatric mid-level, which includes a PA or a nurse
8    practitioner.
9          A.   All right.  Well, I don't know how to
10   exactly answer that question, but I can explain how
11   it works around here.  You see somebody on a
12   computer, like I am with you, who prescribes
13   medication.
14         Q.   Okay.
15         A.   It doesn't like come and see me in person
16   and evaluate me.
17         Q.   Sure.  So thank you for that
18   clarification, because my question includes
19   telepsych.
20              So when was the last time you saw a
21   psychiatric provider either telepsych or physically
22   in person?
23         A.   Ms. Quals is the only one I see in
24   person, and she's a psych associate.  I see her every
25   three months.  A doctor who prescribes medication, I
```

44

1    see every four months.

2              Q.   Okay.  So when was the last time you saw

3    a provider?

4              A.   Well, my medication expires in November.

5    So I should be seen four months ago.

6              Q.   So if -- if you've been on your

7    medication, I think you said for 20 years, and your

8    allegation is that you don't see a psychiatrist often

9    enough, how often are you alleging you should be

10   seeing a psychiatrist?

11             A.   A psychiatrist?  I don't know that.  I'm

12   not a doctor.  I can't say.

13             Q.   Sure.  But you told me that --

14             A.   I know it should be more often than every

15   four months, and it should be in person in order for

16   them to evaluate you or more regularly so they could

17   evaluate you better.

18             Q.   But my question is, if you've been on

19   these medications for 20 years and you're seeing them

20   in four-month intervals, why do you think you need to

21   be seen more frequently?

22             A.   Well, that speaks for itself.  If you're

23   only seeing them on a computer for every four months

24   and I've been on this medication for 20 years, what

25   else are they doing for me besides just giving me

1      medication?

2           Q.   Do you want to be on a different

3      medication?

4           A.   The medication works if it's prescribed

5      correctly or given often enough like it's supposed to

6      be three times a day.

7           Q.   So I'm just trying to understand what

8      your issue is.  Is your issue that you want to be on

9      different medication, or is your issue that the

10     timing --

11          A.   No.

12          Q.   -- of the medication should be more

13     frequent?

14          A.   If my issue was to be on a different

15     medication, I would have requested that.

16          Q.   So you don't want to be on different

17     medication?

18          A.   No.

19          Q.   So then why do you think you need to see

20     a psychiatrist more frequently?

21          A.   Because maybe he might need to evaluate

22     me to see if there's other problems.

23          Q.   Okay.  So it doesn't have to do with the

24     medication you're currently on.  Correct?

25          A.   No.

1      Q.   Are you going to provide any testimony

2   regarding conditions of confinement?

3      A.   Yeah.  I've spent a lot of time in

4   lockdown.

5      Q.   And what is your testimony going to be

6   with respect to conditions of confinement?

7      A.   I don't even know.  I haven't thought

8   about it.  I just know that it's terrible.

9      Q.   How so?

10     A.   And it -- it's for extensive amount of

11  time.  It shouldn't -- I mean, three years at a time

12  I've been locked down.  Nine years total.  This is

13  the longest I've ever been on a yard, four years,

14  throughout the 19 years I've done.

15     Q.   My question is a little more specific.

16  I'm wanting to know what you're going to testify to

17  at trial with respect to your conditions of

18  confinement.  And let's just limit it for the last

19  two years.

20     A.   Last two years I've been on a close

21  custody yard, not max.

22     Q.   And I understand that.  So are you going

23  to offer any testimony with respect to your

24  conditions of confinement on the close custody yard?

25     A.   Yeah.

47

1          Q.   And what is that?

2          A.   Probably.  There needs to be more

3     programming, more classes.

4          Q.   And are those the same type of

5     programming and classes we've already talked about?

6          A.   Mental health and regular, yeah.

7          Q.   Okay.

8          A.   Needs to be both.

9          Q.   Any other kinds of programming other than

10    what we've already talked about?

11         A.   More jobs.

12         Q.   Do you have a job right now?

13         A.   Nope.

14         Q.   Have you asked for one?

15         A.   Yep.

16         Q.   When?

17         A.   Within the last weeks.  I had a job

18    before I went to watch and came back and they won't

19    give me a job since.

20         Q.   What job did you have before you went on

21    watch?

22         A.   I was a shower porter.  I'm only allowed

23    to have a job inside the building because I have an

24    escape charge.

25         Q.   And since you've been off watch, you've

48

1    made a request to -- to have that -- to have that or

2    another job?

3            A.   Several -- several verbal requests to CO4

4    Cortez.

5            Q.   And that CO is someone who is on your

6    unit.   Right?

7            A.   Yeah, he's a WIP officer.

8            Q.   And what has his response been?

9            A.   I'll look into it.

10           Q.   Have you submitted any written requests

11   to have a job?

12           A.   No.   They don't -- they don't get no

13   written requests.

14           Q.   To the best of your understanding, is

15   there anything about your custody level or

16   disciplinary history that prevents you from having a

17   job?

18           A.   I mean, I'm sure they could make

19   something up.   I don't know.   I just told you just

20   because of my escape charge I can't have a job

21   outside of the building.

22           Q.   And when you say you have this porter job

23   before you went on watch, what date -- what watch

24   date are you referring to?

25           A.   The most recent.   I think it was like

49

1    October of last year, somewhere around this time last

2    year.

3            Q.    Okay.  But you haven't put in -- you

4    haven't put in a written request to have that back?

5            A.    No.  They said they were going to give me

6    one so I could get my time back, but it never

7    happened.

8            Q.    Anything else, any other testimony you're

9    going to offer with respect to conditions of

10    confinement?  And, again, I'm just limiting it to the

11    last two years.

12            A.    It's dirty in the CDUs.  They got people

13    sleeping on the floor.  That's my personal

14    experience.

15            Q.    Okay.  Let's break that down.

16            Did you ever sleep on the floor in CDU?

17            A.    Yep.

18            Q.    When?

19            A.    For a three-month span on my last staff

20    assault.

21            Q.    Was this the last CDU time that we talked

22    about earlier?

23            A.    Yes.

24            Q.    It was like about a three-month period, I

25    think you said?

50

```
 1         A.   Yes.
 2         Q.   And you say the cells are dirty.  Was
 3    your cell dirty?
 4         A.   Yes.
 5         Q.   How so?
 6         A.   Bugs coming underneath the door, beetles,
 7    spiders, crickets, roaches.
 8         Q.   Okay.  Other than bugs, any -- any other
 9    ways in which it was dirty?
10         A.   Yeah.  The toilets overflow all the time,
11    and you're sleeping two feet away from the toilet on
12    the floor.
13         Q.   Any other ways in which it was dirty?
14         A.   No.  I mean, I got asthma.  You could
15    pretty tell when it's pretty dirty when your asthma
16    starts acting up in that environment.
17         Q.   Anything else with respect to conditions
18    of confinement that we haven't already talked about?
19         A.   They leave you in the showers forever.
20         Q.   Okay.  What do you mean by that?
21         A.   If you go to the shower, you get left in
22    there for hours.
23         Q.   Okay.  And that has happened to you?
24         A.   Yes.  In CDUs and on the regular yards
25    and in max.
```

51

```
 1              Q.   But not in the yard you're currently in?

 2              A.   Yes, it has.

 3              Q.   And when did that occur?

 4              A.   Ever since they changed these doors.

 5              Q.   So when -- when was that?

 6              A.   It's been last like six months or so.

 7      They changed these doors to where they have to use a

 8      key to open the door instead of electronic doors.  So

 9      you get stuck in places for hours because they don't

10      have enough staff to man it.  Again, with the staff.

11              Q.   And who has told you that?

12              A.   Supervisors and officers that work our

13      floors.

14              Q.   And what are their names?

15              A.   Um, one of them's Diaz right now.

16              Q.   Anything else other than what we've

17      talked about with respect to conditions of

18      confinement?

19              A.   People stay in confinement max for too

20      long, long periods of time.

21              Q.   So I'm just -- I'm just talking about

22      your individual experience.

23              A.   That's my individual experience.

24              Q.   And I'm talking about the last two years.

25      My understanding is you've been in close proximity --
```

52

1          A.   Last two years I haven't been in max.

2          Q.   Let me just finish my question so the

3     court reporter doesn't get angry with us.

4               My understanding is that you've been in

5     close custody since 2017.  Correct?

6          A.   Correct.

7          Q.   Close custody isn't max custody.

8     Correct?

9          A.   No.

10         Q.   So we've covered conditions of

11    confinement.  We've covered mental health.  I believe

12    you've said that you are also a representative of the

13    dental subclass.

14              What are your dental issues?

15         A.   They won't do partials.  The partials

16    that they did for me don't fit.

17         Q.   And when did they do the partials?

18         A.   Years and years ago.  And every time I

19    request to have them redone, they say I'm too short

20    to the gate.

21         Q.   I'm sorry.  I missed the last piece?

22         A.   I've asked them to redo my partials so

23    they fit now, and they say, no, you're too close to

24    going home.

25         Q.   And when was the most recent time?

53

1          A.   They've said that within the last two

2     years several times.

3          Q.   And so your testimony is that the partial

4     doesn't fit correctly and you want it redone?

5          A.   No, it does not fit.  It does not.

6          Q.   Okay.  And you want it refitted.  Is that

7     correct?

8          A.   Correct.

9          Q.   And what injuries have you suffered as a

10    result of the partial not fitting correctly?

11         A.   I've choked on my food because I can't

12    eat with the partial in.  There was an ICS documented

13    not too long ago about me choking on my food.

14         Q.   Do you recall when that happened?

15         A.   No, but the supervisor that responded was

16    Pfeizer.

17         Q.   Okay.  Other than the partials, the issue

18    with the partial fitting, any other dental issues

19    that you have or that you're going to testify to at

20    trial?

21         A.   That my teeth were knocked out, and it

22    wasn't documented.

23         Q.   But with respect to dental care --

24         A.   That is dental.

25         Q.   So what are you alleging you should have

54

1    received?

2         A.   They should have received it saying that

3    my teeth were knocked out and forced out.  That's

4    what it should say.

5         Q.   Is there a specific treatment that you

6    believe you should have received as a result of that?

7    That's kind of what I'm getting at.

8         A.   They probably would have done my partials

9    or some kind of surgery, implants, or better dental

10   care considering the fact that they got knocked out.

11   Because when you force teeth out of somebody's mouth,

12   it tears gums and damages things.  And I know this

13   because my mom's a dentist.

14        Q.   So your teeth were knocked out how?

15        A.   My head was stomped by other inmates.

16        Q.   So an inmate --

17        A.   I was assaulted.

18        Q.   Okay.  And what dental care are you

19   alleging you should have received after that?

20        A.   X-rays, probably partials sooner.

21        Q.   What year did that occur?

22        A.   2008-ish, '7-ish.

23        Q.   So other than that incident and the

24   partials, anything else with respect to dental care?

25        A.   No.  All they want to do is pull teeth

55

1    when there's other things that could be done to save

2    teeth.

3              Q.   Anything else?

4              A.   No.

5              Q.   What about medical issues?  Are there any

6    medical issues that you're going to testify to at

7    trial?

8              A.   Considering I was on crutches for a year

9    before my surgery when they should have done surgery

10   on my right knee.  They eventually did do it, but I

11   had to grieve them in order to get them to do it,

12   force them to do it and gets lawyers involved with

13   this -- pertaining to this case.

14             Q.   And when was that?

15             A.   That occurred in 2000, like, 15, '16-ish,

16   around there.  I was in max custody at Rast max.  I

17   was on crutches for a year.  You shouldn't be on

18   crutches for that long.

19             Q.   Other than the knee surgery issue, any

20   other medical issues that you're going to testify

21   regarding at trial?

22             A.   Just asthma and broken bones.  Not

23   getting a breathing treatment when you need one.

24             Q.   So let's talk about the asthma treatment.

25                  You're alleging you should have received

56

1    breathing treatments?

2        A.   Yeah.  There's been times where I've

3    needed breathing treatments and they say there isn't

4    an order for one, we can't give you one.  But yet

5    you're clearly coughing and having a hard time

6    breathing.

7        Q.   And when was the last timing you asked

8    for a breathing treatment?

9        A.   The last time I've had a breathing

10   treatment was actually around the time that COVID

11   started.

12       Q.   And when was the last time you requested

13   one?

14       A.   Well, I requested one then, and they

15   wouldn't give it to me.  And I had to excessively use

16   my inhaler that you're not supposed to use, and it

17   took me like a week to finally get a breathing

18   treatment.  And the breathing treatment was ordered

19   for twice a day for three days, and only two of them

20   days I got breathing treatments.

21       Q.   So it seems like you requested it, I

22   think you said the beginning of COVID and you --

23       A.   Yes.

24       Q.   -- and you received it, you just

25   didn't -- you thought you should have received more

1    of it.  Is that accurate?

2              A.   The order that they put I should have

3    received.  When a doctor gives you and prescribes you

4    a breathing treatment or any medication for a certain

5    amount or for a certain milligram, you're supposed to

6    receive that.  Again, due to staffing, they couldn't

7    take me up there to get a breathing treatment.

8              Q.   And who told you that?

9              A.   Officers.

10             Q.   Which ones?

11             A.   I can't think of the officer's name.  But

12   the nurses was a Nurse Lidford, Horvath.

13             Q.   What was the last one?

14             A.   Horvath.

15             Q.   And that individual is a nurse or an

16   officer?

17             A.   Those are two nurses.  I don't remember

18   the officer's name.

19             Q.   And those nurses told you what?

20             A.   That they called for me.

21             Q.   About --

22             A.   The security has to escort us.

23             Q.   And this was for a breathing treatment

24   beginning of COVID, so --

25             A.   Yeah, around there.

1    Q.   -- March 2020-ish?

2    A.   Yeah, around there.

3    Q.   Since that time, have you requested a

4    breathing treatment?

5    A.   No.

6    Q.   Do you have an inhaler that you keep on

7    person?

8    A.   Yes.

9    Q.   Other than your asthma and the knee

10    issue, any other medical issues that you're going to

11    testify regarding at trial?

12    A.   Um, yeah.  They gave me heart pills that

13    I don't believe I need.

14    Q.   Anything else?

15    A.   No.  They don't take your heart -- your

16    blood pressure enough to evaluate if you need heart

17    pills or not.  They just give it to you if you have

18    high blood pressure one or two times.

19    Q.   So they're providing you with a

20    medication that you don't feel you need?

21    A.   I mean, I really don't know if I need it

22    or not.  And I don't think they do either if they

23    don't take your blood pressure regularly enough.

24    Like they take my blood pressure whenever I go to

25    medical, and they're like, oh, you got high blood

59

1     pressure.  That's like once out of a month.

2                 Usually when you evaluate somebody for

3     high blood pressure or heart problems, you would take

4     a blood pressure, you know, every other day or every

5     day for a week or something in order to evaluate that

6     they actually needed that.  Correct?  That's how it

7     goes on the streets.

8          Q.   So other than those three issues, any

9     other medical issues that you're going to testify

10    regarding at trial?

11         A.   No, not that I can remember or think of

12    at the moment.

13         Q.   So we've talked about a few things today.

14    And for any of the subjects that we've talked about,

15    is there anything else that has now come to your mind

16    after you've been sitting here with respect to mental

17    health or conditions or dental?

18         A.   No.  My mind's elsewhere, actually.

19         Q.   Okay.  Why do you say that?

20         A.   Just I have a lot of stressful situations

21    besides this.

22         Q.   Okay.  And is that preventing you from

23    being able to remember what you're going to --

24         A.   Yes.

25         Q.   -- provide what your experience has been?

60

1          A.   Yeah.  It does play on my memory or my

2     thought process a little.

3          Q.   So you were able to give me a lot of

4     information today.  Is there a reason why you were

5     able to give me that information but -- but not other

6     information?

7          A.   It's just stuff I remember or you

8     triggered by asking me.

9          Q.   What -- just in your own words, what are

10    you alleging that the Department of Corrections

11    and/or Centurion has done wrong with respect to this

12    case?

13         A.   It's just neglect.  They just don't care.

14    It's like being lazy.

15         Q.   Any other specifics that you can provide?

16         A.   No.  Care is having concern for a human

17    being is all the above.

18         Q.   And with respect to --

19         A.   You see somebody hurting or see somebody

20    in trouble, you're automatically going to want to

21    help them.  That's --

22         Q.   Other than what we've already talked

23    about, are you alleging that you've asked for help in

24    any fashion and been denied help?

25         A.   Say it again.  I don't understand.

61

1      Q.   So you said that they should provide help

2   when they see someone in need, and my question is,

3   have you ever requested help for anything and not

4   been provided with it?  Other than what we've already

5   talked about.

6      A.   Other than what we've already talked

7   about?

8      Q.   Yeah.

9      A.   Not that I can recollect.  But I'm pretty

10  sure if I sat around and thought more -- this has

11  been a lot of years since this has been going on, and

12  nothing's really been done.

13     Q.   What are you alleging should be done?

14     A.   Man, they just need to care about people.

15  That's it.  Have some human compassion and actually

16  help some of these people.

17     Q.   Any more specifics that you can provide?

18     A.   No.

19     Q.   And other than what we've already talked

20  about, what other injuries, other than what we've

21  already talked about, are you alleging that you've

22  suffered with respect to --

23     A.   I believe my knee could have been saved.

24  I don't believe I -- I don't think the surgery was

25  necessary.  I think the neglect of them letting it go

62

1    for as long as they did caused it to have to have a

2    surgery.

3             Q.   Other than the knee injury, any other

4    ways in which you've been injured?

5             A.   Just my mind isn't the same as it used to

6    be.

7             Q.   Anything else?

8             A.   It's not as quick.  It's not as witty.

9    It's not -- it's almost like dormant.

10            Q.   Anything else that you can think of?

11            A.   No.

12            Q.   Were you involved in an assault last

13   month?

14            A.   What's that got to do with anything?  An

15   assault?  No, not an assault.

16            Q.   Were you involved in --

17            A.   A mutual -- yes.

18            Q.   What happened?

19            A.   There's a difference.  An inmate kept on

20   pestering me and coming at me and verbally assaulting

21   me and getting closer in.

22                 To my space.  Twice I tried to diffuse

23   it.  It didn't happen.  So we got into an

24   altercation.

25            Q.   And have you ever assaulted staff?

63

1          A.   Have I ever assaulted staff?  I mean,

2    you'd have to be more specific on an assault on

3    staff.

4          Q.   Have you ever physically touched a staff

5    member.

6          A.   Yeah.

7          Q.   When?

8          A.   Numerous times.  The most recent one was

9    about a year ago, a year and a half ago.

10          Q.   Is it your understanding that you're

11    institutional behavior has -- will dictate what kind

12    of programming and privileges such as jobs that

13    you'll receive?

14          A.   No.

15          Q.   And going back to the document that I

16    have up here, I understand that it's small and

17    difficult to read.  I apologize.  But this -- like I

18    said earlier, this is a document that was prepared by

19    your lawyers that states what you're going to testify

20    to at trial.  And have you ever -- I believe you said

21    you've never reviewed this document?

22          A.   I don't recollect reviewing it.  Doesn't

23    mean I haven't or have.  I don't know.  I can't

24    really tell what it is.  I would have to read through

25    it, and then I could tell you.

64

```
 1              Q.   In the last couple weeks, have you
 2      reviewed any documents that outline what you're going
 3      to testify to at trial?
 4              A.   No, not in the last couple of weeks.
 5              Q.   In the last couple of months?
 6              A.   Maybe.
 7              Q.   And why do you say "maybe"?
 8              A.   Because I have received paperwork from
 9      the prison law office.
10              Q.   And you just don't recall if it was
11      regarding testimony you're going to provide?
12              A.   I don't even remember if I read it or
13      not.
14              Q.   Other than the H&R you said that you
15      recently submitted to see a psychiatrist and the
16      response was that you were scheduled, do you have any
17      pending H&Rs out currently?
18              A.   No.
19              Q.   Other than what we've talked about today,
20      is there anything -- anything else that you're going
21      to testify regarding at trial?
22              A.   Not that I can think of as of now.
23              Q.   Okay.  Thank you, Mr. Polson.  I don't
24      have any other questions.
25              A.   All right.
```

65

1          Q.   Your lawyer might have a few questions

2    for you though.

3               MS. SOLDATI:  Nothing from me.  We're all

4    set.

5               MS. HESMAN:  Okay.  Thank you very much.

6               (The deposition ended at 3:17 p.m.)

66

1                    CERTIFICATE OF REPORTER

2      STATE OF ARIZONA        )
                               )
3      COUNTY OF MARICOPA      )

4

5              I, Sommer E. Greene, a Certified
       Reporter in the State of Arizona, do hereby certify
6      that the foregoing deposition was taken before me in
       the County of Maricopa, State of Arizona; that an
7      oath or affirmation was duly administered to the
       witness, JOSHUA POLSON, pursuant to A.R.S. 41-324(B);
8      that the questions propounded to the witness and the
       answers of the witness thereto were taken down by me
9      in shorthand and thereafter reduced to typewriting;
       that the transcript is a full, true and accurate
10     record of the proceeding, all done to the best of my
       skill and ability; and that the preparation,
11     production and distribution of the transcript and
       copies of the transcript comply with the Arizona
12     Revised Statutes and ACJA 7-206(j)(1)(g)(1) and (2).
               The witness herein, JOSHUA POLSON, has
13     requested signature.

14             I FURTHER CERTIFY that I am in no way
       related to any of the parties nor am I in any way
15     interested in the outcome hereof.
               IN WITNESS WHEREOF, I have set my hand in my
16     office in the County of Maricopa, State of Arizona,
       this 15th of October, 2021.

17

18

19                      -------------------------------
                        Sommer E. Greene, RPR, CRR
20                      Certified Reporter 50622

21

22        /S/
       _____
23     For Huseby
       Registered Reporting Firm No. 1192
24

25

67

1    JOSHUA POLSON

2    TAKEN ON OCTOBER 13, 2021

3              DECLARATION UNDER PENALTY OF PERJURY

4

5              I declare under penalty of perjury that

6    I have read the entire transcript of my deposition

7    taken in the above-captioned matter or the same has

8    been read to me, and the same is true and accurate,

9    save and except for changes and/or corrections, if

10   any, as indicated by me on the DEPOSITION ERRATA

11   SHEET hereof, with the understanding that I offer

12   these changes as if still under oath.

13

14   Signed on the_____day

15   of _____20___.

16

17

18

19   _____

     JOSHUA POLSON
20

21

22

23

24

25

68

1                    DEPOSITION ERRATA SHEET

2

3      Page No.____Line No.____Change to:_____

4      _____

5      Page No.____Line No.____Change to:_____

6      _____

7      Page No.____Line No.____Change to:_____

8      _____

9      Page No.____Line No.____Change to:_____

10     _____

11     Page No.____Line No.____Change to:_____

12     _____

13     Page No.____Line No.____Change to:_____

14     _____

15     Page No.____Line No.____Change to:_____

16     _____

17     Page No.____Line No.____Change to:_____

18     _____

19     Page No.____Line No.____Change to:_____

20     _____

21     Page No.____Line No.____Change to:_____

22     _____

23     Page No.____Line No.____Change to:_____

24     JOSHUA POLSON

25     Signature:_____

1                    DEPOSITION ERRATA SHEET

2

3     Page No.____Line No.____Change to:_____

4     _____

5     Page No.____Line No.____Change to:_____

6     _____

7     Page No.____Line No.____Change to:_____

8     _____

9     Page No.____Line No.____Change to:_____

10    _____

11    Page No.____Line No.____Change to:_____

12    _____

13    Page No.____Line No.____Change to:_____

14    _____

15    Page No.____Line No.____Change to:_____

16    _____

17    Page No.____Line No.____Change to:_____

18    _____

19    Page No.____Line No.____Change to:_____

20    _____

21    Page No.____Line No.____Change to:_____

22    _____

23    Page No.____Line No.____Change to:_____

24    JOSHUA POLSON

25    Signature:_____

# EXHIBIT 6

1

1           UNITED STATES DISTRICT COURT

2               DISTRICT OF ARIZONA

3
                                    )
4   Victor Parsons, et al., on behalf)
    of themselves and all other      )
5   similarly situated; and Arizona  )  No. 2:12-cv-00601-ROS
    Center for Disability Law,       )
6                                    )
               Plaintiffs,           )
7                                    )
       vs.                           )
8                                    )
    David Shinn, Director, Arizona   )
9   Department of Corrections; and   )
    Richard Pratt, Interim Division  )
10  Director, Division of Health     )
    Services, Arizona Department of  )
11  Corrections, in their official   )
    capacities,                      )
12                                   )
               Defendants.           )

13

14

15

16         VIDEOCONFERENCE DEPOSITION OF

17              SONJA RODRIGUEZ

18              OCTOBER 13, 2021

19                9:00 A.M.

20

21

                GOODYEAR, ARIZONA
22

23

    REPORTED BY:
24  Sommer E. Greene, RPR, CRR
    Certified Court Reporter
25  Certificate No. 50622

2

1    APPEARANCES:

2

3        For the Plaintiffs:

4                PERKINS COIE
                 AUSTIN C. YOST
5                2901 North Central Avenue, Suite 2000
                 Phoenix, Arizona 85012
6                602.351.8000
                 Ayost@perkinscoie.com

7

8        For the Defendants:

9                STRUCK LOVE BOJANOWSKI & ACEDO, PLC
                 ASHLEE HESMAN, ESQ.
10               3100 West Ray Road, Suite 300
                 Chandler, Arizona 85226
11               480.420.1600
                 Ahesman@strucklove.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                        I N D E X

2

3      WITNESS: SONJA RODRIGUEZ

4

5      EXAMINATION                                PAGE

6

7      MS. HESMAN...................................... 5

8

9      MR. YOST...................................... 58
10                        *      *      *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    INDEX TO EXHIBITS

2

3      EXHIBIT                                MARKED

4

5    Exhibit 1   Plaintiffs' Fourth Supplement to    27
                 Initial Trial Disclosure Statement
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                5

1                    PHOENIX, ARIZONA;

2              OCTOBER 13, 2021; 9:00 A.M.

3

4                      SONJA RODRIGUEZ,

5      called as a witness herein, having been first duly

6      sworn by the Certified Reporter to speak the whole

7      truth and nothing but the truth, was examined and

8      testified as follows:

9

10                         EXAMINATION

11     BY MS. HESMAN:

12             Q.   Good morning.  Can you please state your

13     name for the record?

14             A.   Sonja Ann Rodriguez.

15             Q.   And spell your last name, please, for the

16     court reporter?

17             A.   R-o-d-r-i-g-u-e-z.

18             Q.   And, Ms. Rodriguez, my name is Ashlee

19     Hesman.  I represent the defendants in this case.

20     And today is the day for your deposition.

21                  My understanding is that you were

22     previously deposed in this case.  Is that Correct?

23             A.   Yes.

24             Q.   Other than being deposed in this case,

25     have you ever had your deposition taken?

6

1          A.    Yes.

2          Q.    When?

3          A.    2013?

4               MR. YOST:  Just answer --

5               THE WITNESS:  I don't remember.

6               MR. YOST:  -- the best of your ability.

7               THE WITNESS:  I don't remember.

8               MR. YOST:  I can't answer the questions

9     for you.

10          Q.    BY MS. HESMAN:  Let me just clarify.

11     Other than previously being deposed in this case, and

12     I believe that occurred some time around 2013, and

13     the deposition we're here today on, have you ever

14     been deposed previously?

15          A.    Yes.

16          Q.    When?

17          A.    I'm not sure what exact date.

18          Q.    Okay.  And some time in the last five

19     years?  Ten years?  Can you give me a range?

20          A.    I don't remember.

21          Q.    What was it in regards to?

22          A.    (Inaudible.)

23          Q.    I'm going to need you to speak up.  I

24     can't hear you.

25               MR. YOST:  Just answer to the best of

```
 1      your ability.  I can't --
 2                  THE WITNESS:  For the lawsuit with ACLU?
 3              Q.   BY MS. HESMAN:  This lawsuit or a
 4      different lawsuit?
 5              A.   The same thing.
 6              Q.   Okay.  And that goes back to my earlier
 7      question.  I understand you were deposed in 2013 for
 8      this case, and we're here again for this case.
 9                  Have you -- other than that time and this
10      time, have you ever been deposed?
11              A.   No.
12              Q.   Okay.  Have you ever testified at trial?
13              A.   No.
14              Q.   Or in any courtroom, provided any
15      testimony under oath?
16              A.   I don't understand the question.  What do
17      you mean?
18              Q.   Sure.  So have you ever given testimony
19      in a courtroom, whether at trial or a hearing?
20              A.   No.
21              Q.   You never testified in your criminal
22      case?
23              A.   Oh, in my case, yeah.
24              Q.   Okay.  Other than testifying in your
25      criminal case, have you ever provided testimony in a
```

8

1    courtroom?

2         A.   Yeah.

3         Q.   When?

4         A.   Um, I don't remember.

5         Q.   Okay.  What was it in regards to?

6         A.   My case when I came here.

7         Q.   Your criminal case?

8         A.   Yes.

9         Q.   Okay.  So I know you've been deposed

10   before, but since it's been some time, I just want to

11   go over a couple of ground rules.

12            I will be asking you questions, and the

13   court reporter is going to take down every question

14   that I ask and your answer to my question.

15            MR. YOST:  There's a jet flying over.

16            MS. HESMAN:  No problem.  I'll wait.

17        Q.   BY MS. HESMAN:  Okay.  Because of that,

18   it's really important that we don't speak over one

19   another.  And it's hard to do, particularly on a

20   video conference like this.  So if you could just

21   kind of pause after I ask my question to give the

22   court reporter time to listen to your answer, I would

23   appreciate that.  And I'll extend the same courtesy

24   to you.  It just makes her job a lot easier.

25            Also, because everything is being written

9

1      down, the court reporter can't take down things like

2      "uh-huh" or "huh-uh."  You need to actually verbalize

3      what your answer is.  Shakes of the head, nods of the

4      head, she can't write that down.  So it's important

5      to give yes/no verbal answers.  Do you understand

6      that?

7            A.   Yes.

8            Q.   And I know you've previously given a

9      deposition and testified in court.  Do you understand

10     that you are under oath here today just like you were

11     under oath if we were in a courtroom?  Do you

12     understand that?

13           A.   Yes.

14           Q.   Is there anything preventing you from

15     telling the truth today?

16           A.   No.

17           Q.   You're -- I'm just going to pause while

18     the plane...

19                Okay.  Is there anything that would --

20     that is going to prevent you from being able to

21     answer my questions today?

22           A.   No.

23           Q.   And I am -- if you don't understand

24     something that I'm asking, please, as you've done

25     previously already, ask me to clarify, and I'm happy

10

1     to do that.  But if you answer my question, can I

2     assume that you understood what I asked?

3              A.   Yes.

4              Q.   Are you on any medications that would

5     prevent you from giving truthful and honest testimony

6     today?

7              A.   No.

8              Q.   Are you on any medications?

9              A.   Yes.

10             Q.   Which medications?

11             A.   Abilify, I think Effexor, a muscle

12     relaxer.  That's it.

13             Q.   Okay.  But you've testified that those

14     medications aren't going to affect your ability to

15     answer my questions truthfully.  Correct?

16             A.   Correct.

17             Q.   What did you do to prepare for today's

18     deposition?

19             A.   Nothing.

20             Q.   Did you meet with your lawyer?

21             A.   I spoke with him yesterday.

22             Q.   Okay.  Other than speaking with him

23     yesterday, did you meet with him in person at any

24     time to prepare for this deposition?

25             A.   No.

1          Q.   Did you -- he's obviously in person there

2     with you today.   Correct?

3          A.   Yes.

4          Q.   Did you speak with him this morning about

5     the deposition?

6          A.   No.  He just came in, introduced himself,

7     and --

8          Q.   Okay.  And I don't want to know what you

9     talked about, because I'm not entitled to that

10    information.

11              My question is just whether you -- you

12    met with him in person today in preparation of this

13    deposition?

14         A.   Yes.

15         Q.   Okay.  So other than the phone call,

16    which I believe you said you had yesterday, and your

17    in-person meeting this morning, have you met with any

18    of your attorneys to prepare for this deposition?

19         A.   No.

20         Q.   How long did you meet with your attorney

21    yesterday?

22         A.   About 30 minutes.

23         Q.   And which attorney did you meet with?

24              MR. YOST:  She met with me, Ashley.

25              MS. HESMAN:  Okay.  I don't know who you

```
 1    are.  So --
 2                MR. YOST:  Austin Yost.
 3          Q.   BY MS. HESMAN:  Okay.  So you met with
 4    Austin Yost yesterday telephonically for about a half
 5    hour.
 6                What time was that phone call?
 7          A.   I don't remember.
 8          Q.   And you met with him this morning.  How
 9    long did you meet with him this morning?
10          A.   About 30 minutes.
11          Q.   Other than the telephonic meeting
12    yesterday and the in-person meeting today, have
13    you -- in the last six months, have you met with any
14    attorneys on this case?
15          A.   No.
16          Q.   None of the attorneys in this case have
17    come down to visit you.  Is that your testimony?
18          A.   They came and spoke with me about another
19    issue, but they didn't talk to me about this.
20          Q.   Okay.  And when was that?
21          A.   Not sure.
22          Q.   In the last six months?
23          A.   Yes.
24          Q.   In the last month?
25          A.   Not sure.  Maybe two, three months.  I
```

13

```
 1    don't know.

 2              Q.   Okay.  And who came down to meet with

 3    you?  Which attorney?

 4              A.   I don't remember her name.

 5              Q.   It was a female?

 6              A.   Yes.

 7              Q.   And you said that you met with her not --

 8    and it was not in relation to this case.  Is that

 9    your testimony?

10              A.   Correct.

11              Q.   What was it in relation to?

12              A.   Just issues that are going on.

13              Q.   Okay.  Did you -- did you sign any

14    documents, either during or after that meeting?

15              A.   No.

16              Q.   You've never signed a declaration or an

17    affidavit, you've never signed your name to anything

18    like that.  Is that correct?

19              A.   Correct.

20              Q.   When this female attorney came and met

21    with you about a couple months ago, did she bring --

22    did you review any documents during that meeting?

23              A.   No.

24              Q.   Was this meeting in person or telephonic?

25              A.   In person.
```

14

1          Q.   In preparation of this deposition, did

2     you review any documents?

3          A.   No.

4          Q.   Did you speak to anyone about this

5     deposition?

6          A.   Yes.

7          Q.   Who?

8               THE WITNESS:  What's your name again?

9          Q.   BY MS. HESMAN:  Other -- and I -- other

10    than your attorney.  I'm sorry.  That was unclear.

11              Other than speaking to your attorney,

12    have you spoke to anyone about this deposition?

13         A.   No.

14         Q.   You have not spoken to any of the named

15    plaintiffs about this deposition?

16         A.   No.

17         Q.   In the last six months, have you spoken

18    to any of the named plaintiffs or anyone else about

19    this case?

20         A.   No.

21         Q.   And you're aware that this case has been

22    set for trial to begin on November 1st?

23         A.   Yes.

24         Q.   And will you be testifying at trial?

25         A.   Yes.

15

1         Q.   Let me just back up.

2              You said that you didn't review any

3    documents to prepare for today's deposition.   So you

4    haven't reviewed any expert reports.   Does that sound

5    familiar to you?

6         A.   Can you repeat that again?

7         Q.   Sure.

8              Have you reviewed any reports from any

9    of -- of your experts, of plaintiffs' experts in this

10   case?

11        A.   No.

12        Q.   Have you spoken to any of the plaintiffs'

13   experts in this case?

14        A.   No.

15        Q.   None of the plaintiffs' experts

16   interviewed you.   Is that your testimony?

17        A.   I'm not understanding.   Plaintiff.   What

18   do you mean by "plaintiff"?

19        Q.   Sure.

20              So you're a plaintiff in this lawsuit

21   because you brought the lawsuit.

22        A.   Okay.

23        Q.   As part of this litigation, you're -- you

24   have retained experts, doctors, and other individuals

25   who are going to come in and offer an opinion with

16

1    respect to medical care and conditions of

2    confinement.

3                My question is whether any of those

4    people have come and interviewed you about this case?

5         A.   No.

6         Q.   And do you have an understanding of what

7    your role is in this case?

8         A.   No.

9         Q.   Do you understand that you're a class

10   representative?

11        A.   Yes.

12        Q.   Which classes do you represent?

13        A.   Mental health.

14        Q.   Okay.  Anything else?

15        A.   No.

16        Q.   Other than mental health, are there any

17   other issues -- and putting mental health aside, are

18   there any other issues or subject matter that you're

19   going to testify regarding at trial?

20        A.   Can you repeat that again?

21        Q.   Sure.

22             Other than your mental health issues,

23   which we'll talk about later, are there any other

24   issues or categories of information that you're going

25   to testify regarding at trial?

17

1      A.   No.

2      Q.   Where are you currently housed?

3      A.   San Pedro unit at Perryville.

4      Q.   How long have you been housed there?

5      A.   Going on a year.

6      Q.   And my understanding is that in

7  November -- November of 2020, you were reclassified

8  from minimum to medium custody.  Is that right?

9      A.   Yes.

10      Q.   And why did that reclassification occur?

11      A.   I guess good behavior.  They just

12  classified me and told me I was coming here, and my

13  score dropped.

14      Q.   What behavior are you referring to?

15      A.   Just programming and not getting

16  disciplinary and whatnot.

17      Q.   Okay.  So but do you know why you went

18  from minimum custody to medium, which is a higher

19  classification?

20      A.   Um, I went from medium to minimum.  I'm

21  at minimum.

22      Q.   Okay.  You're currently minimum?

23      A.   Yes.

24      Q.   And would you agree that the San Pedro

25  unit is not a max custody unit?

18

1          A.   Yes.

2          Q.   Would you agree that the San Pedro unit

3    is not a detention unit?

4          A.   Yes.

5          Q.   When was the last time you were in a

6    detention unit?

7          A.   I don't remember.

8          Q.   In the last year?

9          A.   Can you explain --

10         Q.   Sure.

11         A.   -- or repeat?  What do you mean by

12   "detention"?  Because detention, lockdown is like a

13   max yard, and disciplinary lockdown detention?

14         Q.   Yes.  That's what I'm referring to.  I'm

15   referring to a yard in which you were confined to

16   yourself for more than 22 hours a day.  When was the

17   last time you were housed under those circumstances?

18         A.   I don't remember.  It's been a while.

19         Q.   More than a year?

20         A.   Not sure.

21         Q.   If you can just walk me through any given

22   typical week while you're on the San Pedro unit,

23   explain to me what kind of various programming,

24   recreation.  Walk me through what a typical week for

25   you looks like.

19

```
 1          A.   For me?

 2          Q.   Yes.

 3          A.   For myself?

 4               I just completed a program, RSS.  They do

 5     have programs here, other programs, but I've taken

 6     them like three or four times already, so I don't

 7     feel I need to take them a third or fourth time.  I

 8     work, so --

 9          Q.   And what's your job?

10               Sorry to interrupt you.  What's your job?

11          A.   Yard crew.

12          Q.   And how often are you -- are you going to

13     your job?

14          A.   Well, I go every day, but I just got a

15     no-work duty status because I hurt my shoulder.

16          Q.   Before -- but before you hurt your

17     shoulder and not withstanding the shoulder injury,

18     you were going to work every day?

19          A.   Yes.

20          Q.   Are you going to recreation every day?

21          A.   Yeah.

22          Q.   And other than the RSS program, I believe

23     you testified that you've completed a variety of

24     other programs while at the department.  Is that

25     correct?
```

1        A.   Yes.

2             Q.   Is there anything else that you're doing

3     on a weekly basis other than your job, the

4     programming, and recreation, anything else that

5     you're doing in a typical week?

6             A.   I see the psychiatric that prescribes

7     medication.  I also see the psychologist that does

8     the counseling for mental health.

9             Q.   So each week you're being seen by

10    psychiatry and psychology.  Correct?

11            A.   No.  No.

12            Q.   Okay.  Explain how that's incorrect.

13            A.   I see her once a month, sometimes twice a

14    month.

15            Q.   And sorry to interrupt, but when you say

16    "her," are you referring to psychiatry or psychology?

17            A.   Psychiatry.  And I seen the psychiatric

18    that prescribes the medication, lately has been every

19    month or so.

20            Q.   So every month you're seeing psychiatry.

21    Those are individuals who prescribe medication.  And

22    also every month you're seeing psychology for some

23    kind of counseling.  Do I have that right?

24            A.   Yes.

25            Q.   Sometimes are you seeing psychology or

21

1    psychiatry even more frequently than that?

2         A.   Yes.

3         Q.   Sometimes are you seeing them weekly?

4         A.   No.

5         Q.   But sometimes you're seeing them more

6    than just once a month.  Right?

7         A.   Correct.

8         Q.   Other than seeing psychiatry, psychology,

9    going to your job, programming, recreation, anything

10   else that you're doing in a typical week currently?

11        A.   No.

12        Q.   I want to talk a little bit about you

13   said that you are a member of the mental health

14   subclass and that you're going to testify at trial.

15   Do you recall that?

16        A.   Correct.

17        Q.   With respect to mental health, what are

18   you going to testify to at trial?

19        A.   I can't speak on that.

20        Q.   Okay.  Well, you're a plaintiff, and

21   you've told me that you're going to be testifying at

22   trial, so I want to know -- this is my opportunity to

23   learn what you're going to say.  So if you can -- can

24   you give me some subject matter that you're going to

25   talk about or some particular issues?

1        A.   Just conditions.

2        Q.   Conditions of what?

3        A.   Conditions and issues that I have with

4    mental health.

5        Q.   Okay.  And what are those conditions and

6    issues?

7        A.   Just the -- just the medication that I've

8    been on, all the medications that I've been on all

9    have side effects.  I've been on them several times,

10   different -- different medications.  And the

11   treatment that we -- SMI women get here on this unit

12   and on crews, just that's basically it.

13       Q.   Okay.  Other than the treatment that you

14   receive as an SMI designee and the medications that

15   you've been on and the side effects of those

16   medications, is there anything else that you're going

17   to testify regarding at trial?

18       A.   Just those issues.

19       Q.   Just those two issues?  Is that a yes?

20            MR. YOST:  Object to form.

21            THE WITNESS:  (No oral response.)

22       Q.   BY MS. HESMAN:  Just those two issues?

23            MR. YOST:  Object to form.

24            MS. HESMAN:  What's wrong with the form?

25            MR. YOST:  You're mischaracterizing her

1    testimony.

2              MS. HESMAN:  I'm asking her if she's only

3    going to testify regarding those two issues.

4         Q.  BY MS. HESMAN:  And your answer is?

5              MR. YOST:  Objection to form.

6         Q.  BY MS. HESMAN:  Ms. Rodriguez, and I

7    didn't mention this at the beginning, but even if

8    your attorney objects, the court reporter will note

9    that objection, but you still have to answer the

10   question.

11             So my question is whether just those two

12   issues regarding medication and the side effects and

13   the conditions that you have encountered as a result

14   of being SMI, if those are the only two issues you're

15   going to testify regarding at trial?

16             MR. YOST:  Objection.  Form.

17             THE WITNESS:  No, there's --

18        Q.  BY MS. HESMAN:  What was your answer?

19        A.  There's other -- there's other issues

20   that I will be speaking on.

21        Q.  And what are those issues?

22        A.  Just the conditions of when you go on

23   suicide watch, the conditions in there on watch.

24   Just things like that.

25        Q.  Okay.  Other than the conditions on

24

1   watch, the medication side effects, and the treatment

2   as an SMI designee, is there anything else you're

3   going to testify to at trial?

4          A.   Just the treatment of the officers, the

5   lack of information that they've been given of how to

6   treat an inmate that is SMI.  And there's just

7   several others that I will speak on.

8          Q.   Okay.  What are the others?

9          A.   Well, I haven't got -- been able to talk

10  to my attorney to give him all the rest of the -- the

11  issues and from past that -- of the lawsuit that

12  we've talked about.

13         Q.   Okay.  And I'm not interested in what --

14  what your attorney thinks or wants.

15              My question is, what are your issues, and

16  what are you going to testify to at trial?  That

17  doesn't require consultation with your attorney.  I

18  want to know what issues you have.

19              And so far you've talked about conditions

20  on suicide watch, medication side effects, treatment

21  as an SMI designee, and officers' lack of training on

22  how to deal or interact with SMI detainees.

23              Other than that list, is there anything

24  else you're going to testify regarding at trial?

25         A.   No.

25

1            Q.    "No"?

2            A.    No.

3            Q.    And I'm going to attempt to show you a

4     document.   I've never used Google Meets for a

5     deposition before, so we'll see how it goes.  But I'm

6     going to attempt to drop it into this chat box.

7                  Are you able to see that, Ms. Rodriguez?

8            A.    No.

9            Q.    Okay.

10                 MR. YOST:  I'm trying to -- just one sec.

11    I don't see anything in the chat box.

12                 MS. HESMAN:  Okay.  Let me try it a

13    different way.

14                 Okay.  I don't want to waste your time,

15    so I will just -- I will read it to you, and I'll

16    shoot a quick message to our IT department to see if

17    they can help me out.  So just one moment.

18                 MR. YOST:  Okay.  I see it.

19           Q.    BY MS. HESMAN:  Are you able to see that

20    Ms. Rodriguez?

21           A.    I can't see it, but it's there.

22           Q.    Okay.

23                 MR. YOST:  Can you see it on this screen

24    over here?

25                 THE WITNESS:  I didn't bring my glasses,

1    but --

2              MR. YOST:  She doesn't have her glasses.

3    But --

4         Q.   BY MS. HESMAN:  All right.  Can you see

5    the document, Ms. Rodriguez?

6         A.   I can see the document, but it's really

7    small on the screen.

8         Q.   Okay.  Let me see if I can make it a

9    little larger.  Is that any better, or is it still

10   pretty small?

11        A.   Pretty small on the screen.

12        Q.   Okay.  I know it's pretty small, but do

13   you at least recognize the front page of this

14   document?

15        A.   Yes.

16        Q.   Can you read it?

17        A.   Yes.

18        Q.   The title of it is:  Plaintiffs' fourth

19   supplement to their initial trial disclosure

20   statement.

21             Do you see that?

22        A.   Yes.

23        Q.   Have you ever seen this document before?

24        A.   Yes.

25        Q.   When have you seen this?

27

1          A.    I have a copy.

2          Q.    Okay.  When did you receive a copy?

3          A.    When the lawsuit started and it -- when

4      it was over.

5          Q.    Okay.  This is a little different.  This

6      is a new document that we -- we received in the last

7      week or so.  And this is a document that discloses

8      what you're going to testify to at trial.  So with

9      that in mind, I'll reask the question.

10         A.    Okay.

11         Q.    Have you ever seen this document that

12     talks about what you're going to testify to at trial?

13         A.    No, ma'am.

14         Q.    Okay.  Then let me just scroll down.

15               MS. HESMAN:  And just for the record,

16     this will be marked as Exhibit 1.

17               (Deposition Exhibit 1 was marked for

18     identification.)

19         Q.    BY MS. HESMAN:  So I'm on page 4 of

20     Exhibit 1, Ms. Rodriguez.  Do you see your name

21     there?

22         A.    Yes.

23         Q.    Can you read the bold?  Or if you can't,

24     I can read that to you.

25         A.    Um, I can't read it.

28

1          Q.   Okay.  So it talks about how you are a

2     named plaintiff, and your original class claims are

3     detailed in the complaint.  It goes on to talk about

4     your psychotic and mood symptoms, your acts of

5     self-harm and suicide attempts.  And then it says

6     that you're going to testify regarding the failure of

7     providers to prescribe medication that does not cause

8     negative side effects.

9               And I believe that's what you told me

10    earlier, that you're going to testify to.  Right?

11         A.   Yes.

12         Q.   So -- but you never -- you've never seen

13    this document, your attorneys didn't -- didn't show

14    you this or review this with you before -- before

15    submission.  Is that right?

16         A.   Yes.

17         Q.   What medication are you alleging is

18    causing what you call negative side effects?

19         A.   There's several, ma'am, that I've been

20    on.

21         Q.   And what are they?

22         A.   I don't remember the names of them.

23         Q.   Okay.  So at trial, are you going to

24    testify to specific medications, or are you just

25    going to say that there are general medications that

[10/13/2021] Rodriguez, Sonia

1    cause you side effects?

2            A.   All the medication that I've taken that

3    have given me side effects.

4            Q.   So your testimony is all medication that

5    you've taken while at the department have caused you

6    negative side effects.  Is that right?

7            A.   Have caused me side effects, yes.

8            Q.   Okay.  Do you characterize them as

9    negative side effects, or are you just saying that

10   these medications come with side effects?

11           A.   Can you repeat that again?

12           Q.   Sure.

13                Most medications come with side effects,

14   okay?  So my question is whether in your opinion

15   these side effects are negative side effects, or are

16   you just going to testify that you were on medication

17   and that you experienced some side effects?

18           MR. YOST:  Objection.  Form.

19           Q.   BY MS. HESMAN:  You can still answer the

20   question, please.

21           A.   Can you explain to me in a different way?

22           Q.   Sure.

23           A.   Because I'm not understanding what you're

24   trying to say, because, yeah --

25           Q.   Sure.

1          So what -- what negative side -- what

2    side effects are you alleging you have experienced as

3    a result of medications?

4          A.   In all the medications that I've taken,

5    which are basically all, most of them for my

6    condition, they've all had side effects.  So they're

7    all different.

8          Q.   Okay.  What are they?

9          A.   What are they?

10         Q.   Yes.

11         A.   There's a lot of different side effects

12   that you get from different medications.  I can't say

13   all the side effects that each medication gives me,

14   because it's been a while since I've been on all

15   those medications.

16         Q.   Okay.  Let's narrow it down.

17              In the last two years, what medications

18   are you alleging have caused side effects?

19         A.   Like I said, I've been on several

20   medications, and they've all given me different side

21   effects.

22         Q.   Okay.  Can you give -- can you name any

23   of the side effects?

24         A.   Some have given me shaking, stiff

25   muscles, moving of the jaw, clenching the teeth.

31

1    There's just a whole bunch of side effects that you

2    get from all different medications, so I can't just

3    say these side effects for one -- for all

4    medications.  They're all different.

5            Q.   Okay.  And do you disagree with -- or

6    strike that.

7                 Do you attribute the side effects to the

8    taking of the medication, or are you attributing that

9    to -- to the department or to defendants in some way?

10               MR. YOST:  Objection.  Form.

11               THE WITNESS:  (No oral response.)

12           Q.   BY MS. HESMAN:  You can still answer,

13   please.

14           A.   Can you repeat the question?

15           Q.   Sure.

16               What are you alleging that defendants          Compound
                                                                Vague
17   did?  And by "defendants," I mean the Department of

18   Corrections.  How did the Department of Corrections

19   attribute to these side effects?

20               MR. YOST:  Objection.  Form.  Foundation.

21               THE WITNESS:  (No oral response.)

22           Q.   BY MS. HESMAN:  You can still answer,        Compound
                                                              Vague
23   please.                                                  Foundation
                                                              31:22-32:5
24           A.   Well, the department, I'm in their

25   custody, and they are the ones that have the contract

[10/13/2021] Rodriguez, Sonia

32

```
 1    with the people that come in that give us this
 2    medications.  And the medication obviously -- I don't
 3    know, they're just -- they're not up to date.
 4    They're not -- they just -- they have a lot of side
 5    effects in them.
 6          Q.   So is it your recommendation that you
 7    should be on a different medication?
 8          A.   Well, if we get new medications, sure.  I
 9    mean, I -- like I said, I've been on all the
10    medications the whole -- going on 13 years that I've
11    been in prison, and I've been on every medication
12    there is for my mental health issues.
13          Q.   I understand that.  But I'm -- is there
14    an echo?
15               COURT REPORTER:  I'm hearing an echo when
16    you speak, Ashlee.
17          Q.   BY MS. HESMAN:  Okay.  Ms. Rodriguez, can
18    you hear me okay?
19          A.   Yes.
20          Q.   Okay.  And so my question is, you know,
21    you have sued the Department of Corrections.  And
22    your allegation is that your medications are causing
23    you side effects.  So my question is, how or why is
24    that the defendant's fault in your own words?
25          A.   If I was on the streets and I took -- I
```

33

1    went to see a psychologist like I've seen out there

2    before, and I've had counseling and I've been on

3    medication, and the medication out there is not the

4    same as the medication in here.

5          Q.   How so?

6          A.   I -- I'm sure you're aware of the

7    medication that we get here is outdated.

8          Q.   Okay.  What medication are you alleging

9    that you received and -- that is outdated?

10         A.   All of them, that for my issues -- for my

11   mental health issues.

12         Q.   So your testimony is all the medication

13   that you're currently receiving is what you call

14   outdated?

15         A.   Well, I mean, I don't know a better or

16   proper word to say for it, but, yeah.

17         Q.   Okay.  And as a result of -- of the

18   medication being outdated, you're suffering side

19   effects.  That's your testimony?

20         A.   I'm suffering many things, ma'am.

21         Q.   Okay.  So -- but you can't give me the

22   name of any particular medication?

23         A.   Like I said, I've been on a lot of

24   medication over the past 13 years that I've been in

25   prison, and I've been on all of them.

34

```
1              Q.    Okay.  What medication are you alleging
2       that you should be on?
3                    MR. YOST:  Objection.  Form.  Foundation.
4              Q.  BY MS. HESMAN:  You still have to answer,
5       please.
6              A.   So can you ask me that question again?        Foundation
                                                                  34:6-14
7              Q.   Sure.
8                    You testified that the medication you
9       received on the outside is different than what you're
10      receiving now at the department, because the
11      department uses outdated medications.
12                   My question to you is, what medication
13      then are you alleging you should be receiving at the
14      department?
15                   MR. YOST:  Objection.  Form.  Foundation.
16                   THE WITNESS:  I don't know how to answer     Foundation
                                                                  34:16-21
17      that.
18             Q.   BY MS. HESMAN:  Okay.  Is there a
19      particular medication that you were receiving on the
20      outside that you think you should be receiving
21      now that worked for you --
22                   MR. YOST:  Objection.
23             Q.   BY MS. HESMAN:  -- that worked for you on     Foundation
                                                                  34:23-25
24      the outside that you would like to receive now?  Is
25      there any particular medication?
```

[10/13/2021] Rodriguez, Sonia

35

1                    MR. YOST:  Objection.  Form.  Foundation.

2                    THE WITNESS:  (No oral response.)

3              Q.   BY MS. HESMAN:  Please answer.                    Compound
                                                                      Foundation
                                                                      35:3-22
4              A.   That if -- can you say that again?

5              Q.   Sure.

6                    Is there any medication that you were

7    receiving on the outside that you would like to be

8    receiving now?

9              A.   Well, not just for me, but for everybody.

10   I mean, are you going to give everybody the same

11   medication that they've taken out on the streets in

12   here?

13             Q.   I'm not interested in other people today,

14   Ms. Rodriguez.  I'm interested in you.  And you

15   testified that on the outside you received

16   medications that seem to work, and that the

17   medication you're receiving now doesn't work because

18   it's outdated.

19             My question is, is there any particular

20   medication that you think you should be receiving or

21   that you want to be receiving while at the

22   department?

23                   MR. YOST:  Objection.  Form.  Foundation.

24        Q.   BY MS. HESMAN:  Please answer.

25             A.   Yes, I would like to take a medication          Compound
                                                                    Foundation
                                                                    35:25-36:6

36

```
 1    that I've taken out in -- on the street -- in the

 2    free world, on the streets, that I've taken

 3    previously that have helped me.

 4         Q.   Which --

 5         A.   It's been a long time, so I don't

 6    remember the name of the medication I was taking.

 7         Q.   And with respect to side effects, you        Compound
                                                             36:7-11
 8    talked about shaking and stiff muscles.

 9              Isn't it true that you were suffering

10    from those conditions before -- before your

11    incarceration at the department?

12              MR. YOST:  Objection.  Form.  Foundation.

13              THE WITNESS:  I don't remember.              Compound
                                                             36:13-16
14         Q.   BY MS. HESMAN:  You don't recall ever

15    reporting that you suffered from those conditions

16    before your incarceration?

17              MR. YOST:  Objection.  Form.

18              THE WITNESS:  I don't remember.              Compound
                                                             36:18
19         Q.   BY MS. HESMAN:  When I showed you

20    Exhibit 1, it also mentioned that providers are

21    failing to provide -- or, yeah, providers are failing

22    to prescribe you with medications that do not cause

23    side effects, and that you're going to testify about

24    that at trial.

25              Which providers are you going to testify
```

37

1   failed to provide you with such medications?

2           A.   I've seen lots of providers, and some of

3   them I've never seen more -- more than twice, so I

4   don't know.

5           Q.   So there's no particular provider who you

6   can identify to me here today that failed to

7   prescribe you with this medication?

8           A.   Can you repeat that again?

9           Q.   Sure.

10              Is there any particular provider you can

11  identify here today who you allege failed to provide

12  you with medication that did not cause side effects?

13          A.   I don't know.

14          Q.   So is the answer no?

15              MR. YOST:  Objection.  Form.

16              THE WITNESS:  (No oral response.)

17          Q.   BY MS. HESMAN:  Is your answer no?

18              MR. YOST:  Objection.  Form.

19          Q.   BY MS. HESMAN:  You still answer even if

20  he's objecting.

21          A.   So you're -- can you repeat that again?

22          Q.   Sure.

23              I asked you if you can identify any

24  providers who failed to provide you with medication

25  that did not cause side effects, and your answer was

38

1    "I don't know."  Is that correct?

2           A.   Correct.  Because there's several that

3    I've seen over -- more than several that I've seen

4    over the period of time I've been in prison.

5           Q.   So you can't give me one of their names?

6           A.   I don't remember their names, ma'am.

7           Q.   Can you give me their -- their title?

8           A.   They're psychiatric, mental health that

9    prescribes medication.

10          Q.   So psychiatrist or some kind of

11   psychiatric provider.  Is that right?

12          A.   Yes.

13          Q.   Are you currently experiencing any of the

14   side effects you listed off for me earlier?

15          A.   Yes.

16          Q.   Which ones?

17          A.   Just the shaking, like the grinding of

18   the teeth.

19          Q.   The disclosure statement, Exhibit 1, that

20   I previously showed you, states that you're also

21   going to testify regarding conditions at the

22   behavioral health unit.

23               If you can explain to me what -- what

24   conditions were you going to testify to with respect

25   to the behavioral health unit?

39

1          A.   The conditions that are in the -- where

2     we go on suicide watch, is what you're trying to say?

3          Q.   I don't know what -- what is meant by

4     "behavioral health unit."  That's a word your lawyers

5     used.  But they are saying that that's what you're

6     going to testify to, that you're going to testify to

7     conditions at the behavioral health unit.  Do you

8     know what that means?

9          A.   Well, people use a lot of different names

10    here for the suicide watch that we go on.

11         Q.   So what conditions are you going to

12    testify regarding?

13         A.   There's -- there's many conditions for

14    myself and for what I've seen, not only the cells

15    being dirty with feces in them, not only -- I had

16    seen several psych counselors while on suicide watch,

17    and I had attempted suicide twice while still on

18    suicide watch.

19         Q.   Okay.  Let's -- let's take that one by

20    one.

21              So you said on suicide watch, there were

22    dirty cells with feces.  When did you observe that?

23         A.   It's been a while since I been on suicide

24    watch, so back when I was, they -- they were like

25    that.

                                                                    40

1            Q.   And what year was that?

2            A.   Oh, I don't remember.

3            Q.   Was it before 2019?

4            A.   I don't remember.

5            Q.   Was it before 2021?

6            A.   I don't remember, ma'am.

7            Q.   You don't remember the last time you were

8    on suicide watch?

9            A.   Oh, it's been a while since I've been on

10   suicide watch.

11           Q.   Okay.  When was the last time you were on

12   suicide watch?

13           A.   I don't remember.

14           Q.   And which cell at which unit was the

15   dirty cell with feces?

16                MR. YOST:  Objection.  Form.

17                THE WITNESS:  I don't remember.

18           Q.   BY MS. HESMAN:  And did you just observe

19   that the one time, or is your testimony that you

20   observed that several times?

21           A.   Several times.

22           Q.   Okay.  When were those?  What dates were

23   those?

24           A.   I don't remember.

25           Q.   Which cells were those?

41

```
 1          A.   I don't remember.
 2          Q.   Did you complain about the conditions of
 3   those cells to any department staff member?
 4          A.   Yes.
 5          Q.   Who?
 6          A.   I don't remember the officers because
 7   there's different officers.   But I did tell them, and
 8   they didn't care.
 9          Q.   And when did you make that complaint?
10          A.   I don't remember.
11          Q.   Was it verbal or written?
12          A.   Verbal.
13          Q.   Did you ever file a complaint regarding
14   that?
15          A.   No, ma'am.
16          Q.   Other than the dirty cell with feces, any
17   other conditions that you're going to testify
18   regarding?
19          A.   No.  Well, there's other stuff besides
20   the medication.  Just the conditions and whatnot that
21   I experienced.
22          Q.   Okay.  And today's my -- my time to learn
23   about what your experience has been.  You told me
24   that there were dirty cells with feces.  Any other
25   conditions that you're -- you've experienced and
```

42

1  you're going to testify to at trial?

2          A.   I don't remember -- I just -- I haven't

3  thought about everything, because it -- there's a lot

4  of issues, so I just --

5          Q.   But nothing else that you can think of as

6  you sit here today.  Is that right?

7          A.   Correct.

8          Q.   You also mentioned that the way in which

9  officers treat inmates who are designated as SMI,

10  that that's something you're going to talk about.  Is

11  that right?

12          A.   Correct.

13          Q.   And explain to me what you mean by that?

14          A.   A lot of inmates -- like, for instance,

15  here on this unit, since I've been on this unit for

16  this year, a lot of the inmates that are SMIs have

17  been given tickets.

18              They don't -- they're not made to shower.

19  They're just thrown in a cell, and they are not

20  stable on medication obviously.  They're wandering

21  around lost just -- there's just a lot of stuff.

22  They've been given tickets and taken off the yard --

23  off the unit because they don't want to deal with

24  them.  So just -- just them laughing at the inmates

25  that are SMI, and it just -- there's just a lot of

43

```
1    stuff that's been going on.
2         Q.   Okay.  And my question is more directed
3    to you personally and individually.
4              What have you experienced as an SMI
5    designee, and what are you going to testify that the
6    officer has done with respect to you?
7         A.   Well, there's -- there's stuff that's
8    gone on, but I can't remember right now or recall.
9         Q.   Okay.  As you sit here today, there are
10   no examples that you can provide me.  Correct?
11        A.   Correct.
12        Q.   And, Ms. Rodriguez, isn't it true that
13   the medication that you allege caused the side
14   effects you listed for me was a medication called
15   Haldol?
16        A.   That was one of them I was on.
17        Q.   And isn't it true that you haven't been
18   on that medication since 2018?
19        A.   I don't remember how long it's been, but
20   I refuse to take that medication again because the
21   stiff muscles and what it did to me, the side
22   effects, to cause me to have to sleep on a mat on the
23   floor.  And an officer and my bunkie have to take
24   care of -- take care of me because I couldn't move or
25   do anything, and the officers wouldn't do anything
```

44

1    about it.

2            MS. HESMAN:  Okay.  Move to strike as

3    nonresponsive.

4            Q.  BY MS. HESMAN:  My question's a little          Rules 106
                                                                and 1004
5    bit more specific.                                         44:4-14

6               Isn't it true that the last time you were

7    prescribed Haldol was in November of 2018?  Is that

8    correct?

9            A.  I don't remember.

10           Q.  Are you currently prescribed Haldol?

11           A.  Can you repeat that?

12           Q.  Do you -- are you currently prescribed

13    Haldol?

14           A.  No.

15           Q.  Ms. Rodriguez, is it your opinion that

16    you currently require inpatient treatment?

17           A.  Could you repeat that again?  Like what

18    do you mean by "inpatient"?

19           Q.  Sure.  By "inpatient," I mean inpatient

20    treatment at the mental health unit at Perryville.

21    There's inpatient treatment at Phoenix, and there's

22    inpatient treatments for women at Perryville.  You're

23    currently not in inpatient treatment, but my --

24           A.  No.

25           Q.  -- question is, do you think you require

45

1    inpatient treatment?

2            MR. YOST:  Objection.  Form.  Foundation.

3        Q.   BY MS. HESMAN:  You can still answer,

4    please.

5        A.   There are times when I do need inpatient          Rule 803
                                                                 Foundation
6    treatment due to my medication not working.                45:13-16

7        Q.   And when was the last time you believe

8    you required inpatient treatment?

9        A.   I don't remember.

10       Q.   Isn't it true that you have not been on

11   the inpatient -- in the inpatient unit since 2016?

12       A.   I don't remember.

13       Q.   Do you recall that the reason you were

14   transferred out of inpatient treatment is because the

15   providers found you were mentally stable?  Do you

16   recall that?

17           MR. YOST:  Objection.  Form.  Foundation.

18           THE WITNESS:  (No oral response.)

19       Q.   BY MS. HESMAN:  Still have to answer.          Rule 802
                                                             Foundation
20       A.   No.                                            45:19-23

21       Q.   No, that didn't happen, or, no, you don't

22   recall?

23       A.   No, I don't recall.

24       Q.   And other than (inaudible.)

25           Other than the side effects of

46

1    medication, I believe you testified that there are

2    no -- you're not going to testify with respect to any

3    other mental health related issues, just the side

4    effects for your medication.  Is that correct?

5            MR. YOST:  Objection to form.

6        Q.   BY MS. HESMAN:  You still have to answer,

7    please.

8        A.   Can you repeat the question again?

9        Q.   Sure.

10            Earlier I asked you what you're going to

11   testify regarding -- with respect to mental health

12   claims, not about the conditions, setting that aside.

13   But with respect to your mental health treatment, I

14   asked you what you're going to testify regarding, and

15   you said the side effects that you experienced as a

16   result of medications.  Correct?

17       A.   Several issues, ma'am.

18       Q.   Okay.  What are the other issues other

19   than medication side effects?

20       A.   What we've been talking about.

21       Q.   Other than what we've talked about.  I

22   understand the conditions are kind of a separate

23   animal.  But with respect to mental health, the only

24   thing we've talked about are the side effects for

25   your medications.

47

```
 1              Is there anything else that you're going
 2    to testify regarding at trial with respect to mental
 3    health treatment?
 4         A.   Like I said, all the issues of my mental
 5    health and the mental health conditions and whatnot.
 6    I'm going to talk --
 7         Q.   I'm sorry.
 8         A.   -- about all of it.
 9         Q.   Other than the conditions -- I understand
10    that you have some issues with respect to a dirty
11    cell on mental health watch.  I understand that.  But
12    with respect to the actual provision of mental health
13    treatment, other than the side effects of medication,
14    is there anything else you're going to testify
15    regarding?
16              MR. YOST:  Objection.  Form.
17         Q.   BY MS. HESMAN:  Ms. Rodriguez, you still
18    need to answer.
19         A.   I've already said what I was going to
20    speak on, so I don't know why you're asking me about
21    just one specific thing.  I'm not understanding that.
22         Q.   Sure.  And I'm not trying to be
23    confusing, and I apologize if I'm being confusing.
24    But I'm just trying to figure out what you're going
25    to testify to at trial.  And with respect to mental
```

48

```
 1     health treatment, the only thing we've talked about

 2     today is side effects on medication.

 3               So is there anything else with respect to

 4     mental health treatment that you're going to testify

 5     on?

 6               MR. YOST:  Objection.  Form.

 7               THE WITNESS:  There's several stuff I'm

 8     going to speak on about mental health.

 9          Q.   BY MS. HESMAN:  And what is it?  What are

10     those things?

11          A.   I've already answered your questions to

12     all those questions that you've asked me.

13          Q.   I understand that.  But the only thing

14     you've told me with respect to mental health

15     treatment is side effects on medication.  Is there

16     anything else that you're going to testify regarding,

17     other than what we've already talked about, other

18     than what we've already talked about, is there

19     anything we haven't talked about that you're going to

20     testify regarding?

21               MR. YOST:  Objection.  Form.

22               THE WITNESS:  (No oral response.)

23          Q.   BY MS. HESMAN:  Still answer, please.

24          A.   I don't know how to answer that question.

25     I mean, it's confusing to me.
```

49

```
 1              Q.   Okay.  What other issues do you have

 2      related to your mental health treatment that you

 3      haven't already told me?  I'm just trying to make

 4      sure I have a complete picture of your experience.

 5      And we've talked about several things.

 6              But other than what we've talked about,

 7      is there any -- any other issues that you have with

 8      respect to your mental health treatment, or have we

 9      covered them all?

10              A.   I'm sure there's more.  But what you've

11      asked me, I've answered.

12              Q.   So what I don't want to happen is we get

13      to trial and there are new allegations.  I'm trying

14      to figure out as you sit here today what your

15      allegations are.

16              So is there anything else that you can

17      tell me with respect to your mental health treatment

18      that we haven't talked about already?

19              A.   No.

20              Q.   Okay.  Earlier you mentioned that you see

21      a psychiatrist and a psychologist at least on a

22      monthly basis, sometimes more.  Is that right?

23              A.   Yes.

24              Q.   Do you have any issues with respect to --

25      well, strike that.
```

1          MR. YOST:  Ashlee, could we please take a

2    break?

3          MS. HESMAN:  Sure.  How long do you need?

4          THE WITNESS:  I have to use the bathroom.

5          MS. HESMAN:  Okay.  Ten minutes?

6          MR. YOST:  Ten minutes would be perfect

7    for us.

8          (A recess was held off the record.)

9          Q.  BY MS. HESMAN:  Ms. Rodriguez, you              Rules 106
                                                               and 1004
10   testified about refusing some medications.  Do you       50:9-21

11   recall that?

12         A.  Yes, I have.

13         Q.  How many times would you estimate that

14   you've refused medication in the last two years?

15         A.  I don't remember.

16         Q.  Does 283 times sound about right?

17         A.  I just -- I don't remember, so I don't

18   know.  I can't say yes or no.

19         Q.  Do you think you frequently refuse

20   medications?

21         A.  Yes.

22         Q.  Do you have any complaints about the

23   frequency by which you're seen by psychiatry?

24         A.  What do you mean?

25         Q.  Sure.

```
 1              Do you think that you should be being
 2   seen by psychiatry more frequently than you are?
 3        A.   Is that the one that prescribes the
 4   medication?
 5        Q.   Yes.
 6        A.   I shouldn't see them frequently, no, but
 7   there -- there's -- once you're on medication and
 8   you're stable, then they see you like every so many
 9   months, yeah.
10        Q.   Were you --
11        A.   Just to check up.
12        Q.   So you don't think you should be being
13   seen more often than you are by psychiatry?
14        A.   I'm not understanding the question.
15        Q.   I'm just asking if you think you should
16   be seen more often by psychiatry.  You told me that
17   you see them once a month, sometimes more.  But do
18   you think you should be being seen more often than
19   you are by psychiatry?
20        A.   That prescribes the medication, right?
21        Q.   Yes.
22        A.   Um, I don't know how to answer that,
23   because once you get on medication and then you check
24   to see if it -- if it works for you or whatnot, then
25   they see you every so many months.  I don't know -- I
```

52

1    don't know exactly how long once -- so I wouldn't

2    know.

3         Q.   But you don't -- you don't believe you

4    should be being seen more by psychiatry?

5         A.   What do you mean by "more," because --

6         Q.   More often.

7              Do you think that you should be being

8    seen more often than the once a month?

9         A.   Like I said, I should -- there is a --

10   when you're on medication and -- and you're on it and

11   you're stable, then they see you however long it

12   takes for them to see you again.  I wouldn't know if

13   I should be seen more often or not.  I mean --

14        Q.   Okay.  So it doesn't -- I'm not hearing

15   that you have any complaints with respect to how

16   often you're seen.

17             MR. YOST:  Objection.

18        Q.   BY MS. HESMAN:  That you testified with

19   how often you're being seen.  Is that correct?

20             MR. YOST:  Objection.  Form.

21             THE WITNESS:  I'm being seen -- however

22   long -- however as many times -- I am being seen is

23   because of the medication, yeah, but, I mean, I don't

24   know if there's a specific how -- what -- how long

25   that I -- or that I should be privileged to see them

53

```
 1    all the time or whatnot, no.
 2         Q.   BY MS. HESMAN:  And isn't it true that
 3    you just saw a psychiatric provider on October 7th?
 4         A.   Correct.
 5         Q.   And we just took about a ten-minute
 6    break.  Did you talk to your lawyer on the break?
 7         A.   Yeah.
 8         Q.   For how long?
 9         A.   Just like a minute or so.  I mean, I
10    don't know.  It wasn't even that long, because I just
11    went to the bathroom and came -- came in here and
12    talked for just a second and came in here.
13         Q.   Did you look at any documents on the
14    break?
15         A.   No, ma'am.
16         Q.   And I may have asked you this already, so
17    I apologize if I'm repeating myself.  But it's true
18    that you haven't been on suicide watch since November
19    of 2018.  Does that sound right?
20         A.   I don't remember.
21         Q.   Do you have any reason to dispute that
22    November 2018 date?
23         A.   I don't remember.
24         Q.   And I believe I also asked you the last
25    time you were in like a maximum custody setting or a
```

54

```
1      detention setting where you were confined in your
2      cell for more than 22 hours a day.  Do you recall
3      that time when you were in that kind of housing?
4            A.    I don't remember.
5            Q.    Have you ever filed a grievance in the
6      last two years about your mental health treatment?
7            A.    No, ma'am.
8            Q.    Other than what we've already talked
9      about, is there anything that you claim the
10     department or Centurion should be doing with respect
11     to your mental health care that they are not doing?
12           A.    No.
13           Q.    Do you allege that you've suffered any
14     injuries as a result of the allegations that we've
15     talked about here today?
16           A.    In the past, I have.
17           Q.    Okay.  When?
18           A.    I don't remember.
19           Q.    What injury are you alleging that you
20     suffered?
21           A.    Um, due to the medication.  Is that what
22     you're asking or -- or --
23           Q.    So I'm just asking in general, whether
24     it's the medication issue we talked about or the
25     dirty cell issue that we talked about, anything that
```

1    we've talked about today, are you -- do you attribute

2    any injury to those things?  Do you think you

3    suffered --

4           A.   Yes.

5           Q.   Okay.

6           A.   Yes.

7           Q.   And what is that injury?

8           A.   There's many.  I don't know how to put it

9    in words, but just mentally, physically, I've

10   suffered a lot.

11          Q.   Okay.  Can you give me some examples of

12   that?

13          A.   It was just traumatizing.

14          Q.   And what was traumatizing?

15          A.   The things that I have to go through.

16          Q.   Such as?

17          A.   What I've explained before.

18          Q.   So what we've talked about is the -- the

19   dirty cell and the medication, the side effects from

20   the medication.  Is that what you're referring to,

21   those two things?

22          A.   Basically everything that I've spoken

23   about.

24          Q.   Anything else that we haven't spoken

25   about today that you -- that you allege some kind of

```
 1   injury from?
 2        A.   No.
 3        Q.   And you testified that there's nothing
 4   you think that the department or Centurion should be
 5   doing that they aren't doing.  My next question's a
 6   little bit different.
 7             Is there anything that the department or
 8   Centurion is doing with respect to your mental health
 9   care that you don't think they should be doing?
10             MR. YOST:  Objection.  Foundation.
11             THE WITNESS:  Can you repeat that?  I'm
12   not understanding.
13        Q.   BY MS. HESMAN:  Sure.  Let me give you an
14   example of what I'm trying to get at.
15             So the department is -- you're being seen
16   by psychiatry once a month.  You are receiving a
17   variety of medications.  You have a job.  Things like
18   that.  Those are things that Centurion and the
19   department are doing.
20             My question is, is there anything that
21   they're doing that you think they shouldn't be doing
22   that would help your mental health treatment?
23             MR. YOST:  Objection.  Form.  Foundation.
24             THE WITNESS:  I'm not understanding.
25   What do you mean, that they shouldn't be doing?
```

57

1          Q.   BY MS. HESMAN:  Yeah.  So, for example,

2     and this is just an example, if you don't think you

3     should have a job and you think having a job is

4     affecting your mental health treatment, that would be

5     something that they're doing that you don't think

6     they should be doing.

7               So is there any kind of -- anything that

8     they're doing, whether it's giving you a certain kind

9     of medication or allowing you a certain type of

10    programming that you think they should not be doing?

11              MR. YOST:  Objection.  Form.  Foundation.

12              THE WITNESS:  I don't know how to answer

13    that question.  I mean, I'm not understanding it.

14         Q.   BY MS. HESMAN:  Okay.  Other than what

15    we've talked about today, are there any other

16    allegations, complaints, or issues that you're going

17    to testify to at trial?

18         A.   I'm not -- I don't know.

19         Q.   Okay.  But this is my opportunity to

20    learn what your trial testimony is going to be.  So

21    other than what we've talked about today, is there

22    anything else, any other condition, problem that you

23    have with your mental health treatment, anything --

24    we've talked about a few things, but anything that we

25    haven't talked about that you're going to testify to

58

```
 1    at trial?
 2            A.   There's nothing else.
 3            Q.   Okay.  Okay.  I have no further
 4    questions.  Your lawyer may have a few questions for
 5    you.
 6            MR. YOST:  Do you mind if we take a
 7    five-minute break?
 8            MS. HESMAN:  Sure.
 9            MR. YOST:  Great.
10
11                      EXAMINATION
12    BY MR. YOST:
13            Q.   Thanks for your time this morning,
14    Ms. Rodriguez.  I just have a couple of questions for
15    you.
16            Toward the end of your testimony, you
17    were asked questions about things that the Department
18    of Corrections or Centurion are not doing, and there
19    were questions about whether there were things that
20    you thought they should be doing.
21            You remember that, those questions?
22       A.   Yes.
23       Q.   You're not a doctor.  Right?
24       A.   Right.
25       Q.   If a doctor were to testify about your
```

59

1    medical care and had recommendations about things

2    that the Arizona Department of Corrections or

3    Centurion -- strike that.

4              If a doctor were to testify that the

5    Department of Corrections or Centurion are not doing

6    things that they should be doing to improve your

7    health care, would you defer to their expertise?

8         A.   Yes.

9         Q.   You were also asked questions about

10   things that -- whether there are things that the

11   Department of Corrections or Centurion are doing that

12   you think they should not be doing.  Do you remember

13   those questions?

14        A.   Yes.

15        Q.   You're not a doctor.  Right?

16        A.   No.

17        Q.   If a doctor were to testify that there

18   are things that the Department of Corrections or

19   Centurion are doing and opine that there are things

20   that they should be doing for your health care, do

21   you defer to their expertise?

22        A.   Yes.

23              MR. YOST:  That's all the questions I

24   have.

25              MS. HESMAN:  I have nothing further.

60

1    MR. YOST:  We'll read and sign.

2    (The deposition ended at 10:45 A.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

61

1                    CERTIFICATE OF REPORTER

2      STATE OF ARIZONA       )
                              )
3      COUNTY OF MARICOPA     )

4

5              I, Sommer E. Greene, a Certified
       Reporter in the State of Arizona, do hereby certify
6      that the foregoing deposition was taken before me in
       the County of Maricopa, State of Arizona; that an
7      oath or affirmation was duly administered to the
       witness, SONJA RODRIGUEZ, pursuant to A.R.S.
8      41-324(B); that the questions propounded to the
       witness and the answers of the witness thereto were
9      taken down by me in shorthand and thereafter reduced
       to typewriting; that the transcript is a full, true
10     and accurate record of the proceeding, all done to
       the best of my skill and ability; and that the
11     preparation, production and distribution of the
       transcript and copies of the transcript comply with
12     the Arizona Revised Statutes and ACJA
       7-206(j)(1)(g)(1) and (2).
13              The witness herein, SONJA RODRIGUEZ, has
       requested signature.
14              I FURTHER CERTIFY that I am in no way
       related to any of the parties nor am I in any way
15     interested in the outcome hereof.
                IN WITNESS WHEREOF, I have set my hand in my
16     office in the County of Maricopa, State of Arizona,
       this 15th of October, 2021.
17

18

19                    -------------------------------
                      Sommer E. Greene, RPR, CRR
20                    Certified Reporter 50622

21

22                    /S/

23     _____
       For Huseby
24     Registered Reporting Firm No. R1024

25

62

1    SONJA RODRIGUEZ

2    TAKEN ON OCTOBER 13, 2021

3

4              DECLARATION UNDER PENALTY OF PERJURY

5                   I declare under penalty of perjury that

6    I have read the entire transcript of my deposition

7    taken in the above-captioned matter or the same has

8    been read to me, and the same is true and accurate,

9    save and except for changes and/or corrections, if

10   any, as indicated by me on the DEPOSITION ERRATA

11   SHEET hereof, with the understanding that I offer

12   these changes as if still under oath.

13

14   Signed on the_____day

15   of _____20__.

16

17

18

19   _____

     SONJA RODRIGUEZ
20

21

22

23

24

25

63

1                    DEPOSITION ERRATA SHEET

2

3      Page No.____Line No.____Change to:_____

4      _____

5      Page No.____Line No.____Change to:_____

6      _____

7      Page No.____Line No.____Change to:_____

8      _____

9      Page No.____Line No.____Change to:_____

10     _____

11     Page No.____Line No.____Change to:_____

12     _____

13     Page No.____Line No.____Change to:_____

14     _____

15     Page No.____Line No.____Change to:_____

16     _____

17     Page No.____Line No.____Change to:_____

18     _____

19     Page No.____Line No.____Change to:_____

20     _____

21     Page No.____Line No.____Change to:_____

22     _____

23     Page No.____Line No.____Change to:_____

24     SONJA RODRIGUEZ

25     Signature:_____

64

1                    DEPOSITION ERRATA SHEET

2

3       Page No.____Line No.____Change to:_____

4       _____

5       Page No.____Line No.____Change to:_____

6       _____

7       Page No.____Line No.____Change to:_____

8       _____

9       Page No.____Line No.____Change to:_____

10      _____

11      Page No.____Line No.____Change to:_____

12      _____

13      Page No.____Line No.____Change to:_____

14      _____

15      Page No.____Line No.____Change to:_____

16      _____

17      Page No.____Line No.____Change to:_____

18      _____

19      Page No.____Line No.____Change to:_____

20      _____

21      Page No.____Line No.____Change to:_____

22      _____

23      Page No.____Line No.____Change to:_____

24      SONJA RODRIGUEZ

25      Signature:_____

# EXHIBIT 7

1

1        UNITED STATES DISTRICT COURT

2            DISTRICT OF ARIZONA

3

4     -------------------------------------X
      Victor Parsons, et al., on
5     behalf of themselves and all
      others similarly situated; and
6     Arizona Center for Disability
      Law,
7
                      Plaintiffs,
8                                        Case No.:
      vs.                                2:12-cv-00601-ROS
9
      David Shinn, Director, Arizona
10    Department of Corrections; and
      Richard Pratt, Interim
11    Division Director, Division of
      Health Services, Arizona
12    Department of Corrections, in
      their official capacities,
13
                      Defendants.
14    -------------------------------------X

15
         REMOTE VIDEOCONFERENCE DEPOSITION OF JEREMY SCOTT SMITH
16
                      Buckeye, Arizona
17                    October 13, 2021
                        9:00 a.m.
18

19    HUSEBY GLOBAL LITIGATION
      Arizona Registered Firm R1192
20    www.Huseby.com
      800-333-2082
21

22    REPORTED BY:
      LISA A. NANCE, RPR, CR (AZ)
23    Stenographic Registered Professional Reporter
      Arizona Certified Reporter Certificate No. 50349
24

25    Job No. 366681 A

2

1

2                              INDEX

3

4   WITNESS:  JEREMY SCOTT SMITH                    PAGE

5           Examination by Ms. Love                4

6           Examination by Ms. Soldati             --

7

8

9

10                            EXHIBITS

11  NO.    DESCRIPTION                         MARKED

12  (None.)

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1      REMOTE VIDEOCONFERENCE DEPOSITION OF JEREMY SCOTT SMITH

2   began at 9:00 a.m. on October 13, 2021, in Buckeye,

3   Arizona, remotely, before Lisa A. Nance, RPR, CR,

4   Certified Reporter, Arizona Certificate Number 50349, in

5   and for the State of Arizona, pursuant to Notice of

6   Deposition, stipulation of counsel, in compliance with

7   ACJA Section 7-206(J)(3)(b) and Rules of Civil Procedure.

8

9   APPEARANCES:

10  FOR PLAINTIFFS:
    PERKINS COIE
11  BY:  MS. KELLY SOLDATI
    (Present Via Videoconference.)
12  2901 North Central Avenue, Suite 200
    Phoenix, Arizona  85012-2788
13  ksoldati@perkinscoie.com

14

15

16  FOR DEFENDANTS:
    STRUCK LOVE BOJANOWSKI & ACEDO, PLC
17  BY:  MS. RACHEL LOVE
    (Present Via Videoconference.)
18  3100 West Ray Road, Suite 300
    Chandler, Arizona  85226
19  rlove@strucklove.com

20

21

22              The following proceedings were had:

23

24

25

4

```
 1                               Buckeye, Arizona
                                 October 13, 2021
 2                               9:00 a.m.

 3

 4                   JEREMY SCOTT SMITH,

 5    called as a witness herein, having been first duly sworn

 6    by the Certified Court Reporter, remotely, was examined

 7    and testified as follows:

 8

 9                        EXAMINATION

10    BY MS. LOVE:

11        Q.   Sir, will you please state your name for the

12    record?

13        A.   Jeremy Scott Smith.

14        Q.   What is your Arizona Department of Corrections

15    Rehabilitation and Release Number?

16        A.   12943.

17        Q.   And, sir, you have been deposed in this case

18    before, several years back; is that correct?

19        A.   Yes.

20        Q.   And since that time when you were deposed in

21    this case, have you been deposed in any other cases?

22        A.   No.

23        Q.   And since the time you were first deposed in

24    this Parsons litigation, have you filed any other

25    lawsuits against the Department of Corrections?
```

5

1        A.    Yes.

2        Q.    And how many?

3        A.    I believe one.  I have no idea.  I know there

4   was one, but there might have been two.  I'm not sure.

5        Q.    Short and simple, can you tell me what those

6   two lawsuits were about?

7        A.    I don't even remember.  It was a long time ago.

8   I believe it was medical.

9        Q.    Were those lawsuits filed by you in Federal

10  Court?

11       A.    Yes.

12       Q.    Are they still going on or were they dismissed?

13       A.    No, they are not still going on.

14       Q.    Did the Court dismiss the lawsuits?

15       A.    Yes.

16       Q.    Are you on any medications today that you

17  believe would affect your ability to give testimony in

18  this case?

19       A.    No.

20       Q.    Are you currently taking any medications?

21       A.    Yes.

22       Q.    And I think what is going to be best is I'm

23  going to talk super slow, because of a little feedback;

24  and if you can do the same, maybe that will help us.

25       A.    Okay.

6

1        Q.   Do you know what medications you are currently

2   taking?

3        A.   Yes.

4        Q.   What are they?

5        A.   Gabapentin, Keppra, Vistaril, cholesterol.

6             MS. LOVE:  Is there an officer anywhere close?

7   I'm just wondering if we can get him a little closer to

8   the computer.

9             MS. SOLDATI:  I will check.

10             Is there any way we can move or have him

11   closer?

12             PRISON GUARD:  No.  The only thing is the

13   volume.

14             MS. LOVE:  And there is still a little

15   feedback.  I was wondering if at least Mr. Smith could be

16   closer.

17             PRISON GUARD:  There is no way to get him

18   closer.  The seat is bolted to the floor.  We can try on

19   speakerphone, see if that's better than computer, try

20   speakerphone while still on video?

21             MS. LOVE:  Yes, let's do that.

22             PRISON GUARD:  What is the number?

23             (Discussion off the record.)

24             MS. LOVE:  This is our last attempt here,

25   everybody.

7

```
 1              MS. SOLDATI:  Okay.  I think we got it.

 2              MS. LOVE:  All right.  Back on the record.

 3              Okay.  Now, just for the record, we've now

 4    switched to conference call due to technical issues, and

 5    we're still running the video on the Teams.  So we'll try

 6    to go from here.

 7              And thank you, everybody, for your patience.  I

 8    just want to say that.

 9              Mr. Smith, we're going to get you out of here

10    pretty quick, because I have another thing to do.  So I'm

11    going to have to be off here in about an hour and a half.

12              THE WITNESS:  Okay.

13        Q.   BY MS. LOVE:  I think where we left off is I

14    was asking you if you are currently taking any

15    medications, and I believe you said, "Yes."

16        A.   Yes.

17        Q.   What medications are you currently taking?

18        A.   I take 300 milligrams of gabapentin, twice a

19    day.  Twice a day I take Keppra, 500 milligrams.  And

20    then I take something called Vistaril, and I have a

21    cholesterol medication, as well.

22              MS. LOVE:  Can you move the phone a little

23    closer to him?

24              There we go.

25              I'm going to go through with you, sir, just
```

8

1   through the rules of a deposition, real quick.  I'm sure

2   you remember, but I'll be quick about it.

3         Today, as I ask you questions, as you know,

4   it's kind of hard for us, so I might keep asking you to

5   speak up.  But if at any time you don't understand a

6   question I'm asking you, please just let me know and I'll

7   try to rephrase it in a way that you understand.  Fair

8   enough?

9         A.   Yes.

10         Q.   And if you answer the question, then I will

11   assume you understood it.  Even if you are in the middle

12   of an answer and think "I don't think I understand the

13   question or don't know what the question is," just let me

14   know and I'll rephrase it.

15         A.   Okay.

16         Q.   I don't want you to guess.  Sometimes, maybe,

17   if you have an estimate, we'll go with that.  But I don't

18   want you to guess.  Just tell me if the answer requires

19   you to guess.  Okay?

20         A.   Okay.

21         Q.   What have you done to prepare for today's

22   deposition?

23         A.   Nothing at all.  Nothing.

24         Q.   And without telling me anything you've ever

25   talked about, did you meet with any of your lawyers prior

1    to today's deposition?

2         A.   Yes, right before the deposition.

3         Q.   And do you know how long you met for?

4         A.   Excuse me?

5         Q.   Do you know how long you met for?

6         A.   I don't.  I don't know.

7         Q.   If we -- let's just take the last six months as

8    a timeframe.  In the last six months, have you met with

9    any of your attorneys in this case in person?

10        A.   Yes.

11        Q.   How many times?

12        A.   Including today, twice.

13        Q.   Do you remember when, prior to today, the last

14   time you met with one of your attorneys was?

15        A.   Last Wednesday or Thursday, one of the two.  It

16   was last week sometime.

17        Q.   In the last six months, again, taking that as a

18   time period, have you signed any declarations for your

19   attorneys in this case?

20        A.   No.

21        Q.   And you understand, sir, that you are a named

22   plaintiff in this class action lawsuit; correct?

23        A.   Yes.

24        Q.   And that was the same back when the lawsuit was

25   filed in 2012?

10

1       A.   Yes.

2       Q.   Do you have any understanding as to whether you

3  are serving as a class representative for any of the

4  classes certified in this action?

5       A.   I don't remember which class or -- hold on.  I

6  believe mental health and isolation is a class.

7       Q.   Do you recall if you have ever talked to any of

8  the experts who are helping out plaintiffs in this case?

9  And I'm going all the way back to 2012.

10      A.   I believe so.  I don't know who, but I believe

11  so, yes.

12      Q.   Do you remember if it was the same person or if

13  there were multiples?

14      A.   I believe there were multiple people.

15      Q.   Do you recall whether or not back in 2013 you

16  were interviewed by one of the plaintiffs' experts whose

17  name is Dr. Craig Haney?  And he's a psychologist.

18      A.   I remember the name, yes.  I don't remember

19  when or -- yeah.  I don't remember exactly when I heard

20  that name; but --

21      Q.   And do you remember whether or not back in 2013

22  you were interviewed by another one of plaintiffs'

23  experts named Dr. Pablo Stewart, who is a psychiatrist?

24      A.   I don't remember that one, no.

25      Q.   Do you know or remember whether or not this

11

1    year, in 2021, whether you spoke to plaintiffs' expert

2    named Dr. Craig Haney, who is a psychologist?

3         A.   There was a Craig that I talked to last week,

4    when they did a tour, but I don't know if that's the same

5    one.

6         Q.   Dr. Haney, Dr. Craig Haney, who is an expert

7    for the plaintiffs side in this case, he recently issued

8    a report.  And in his report, he summarized an interview

9    with you.  And because of these circumstances, and I'm

10   not here, I can't show the report to you, but I'm going

11   to read to you a few, or several, of the sentences that

12   he put in his report.  And I just want to ask you some

13   follow-up questions about what he put in his report.

14        A.   Okay.

15        Q.   Okay.  And what he says -- and just for your

16   lawyer's benefit for later, so she can look at what I'm

17   talking about, on page 97 of his report, paragraph 160 --

18   and I'm reading directly from the report.  Dr. Haney

19   says, "In 2021 I relocated and reinterviewed

20   Mr. Smith" -- and Mr. Smith, to him, is you, Jeremy Smith

21   -- "in a Raft Max Custody Unit 3A1 in the Lewis Complex.

22   He told me that he had been released from the ADC in 2017

23   but returned in 2019."

24             Do you remember telling Dr. Haney this

25   information about being released in 2017 but returning in

1    2019?

2        A.   Yes.  I actually do, now.  He came to my cell

3    last week, and I did tell him that.

4        Q.   And that is a true statement, that you were

5    released for about two years and then returned to the

6    custody of the department?

7        A.   Yes.

8        Q.   He also says, in the next sentence, "When I

9    asked him about the changes in programming and mental

10   healthcare since my 2013 interview, he recalled that

11   things had gotten, quote, 'A little better, at first, in

12   2015,' end quote.  But then he said, 'It was as if prison

13   officials just gave up,'" end quote.

14            Do you remember saying something along those

15   lines to Dr. Haney?

16       A.   I said exactly that, yes.

17       Q.   And I just want to follow up and learn a little

18   bit more about that statement from you.  And so could you

19   tell me what you meant by "that things had been better at

20   first in 2015, but then it was as if prison officials

21   just gave up"?

22       A.   Okay.  In 2015, it seemed like medical people

23   here, and they were actually trying to change it,

24   actually do something.  They were seeing you when they

25   were supposed to.  They were doing what they were

1    supposed to.  They were examining you --

2              Sorry.  They just sprayed somebody.

3              Oh.

4      Q.    Okay.  If it gets to you don't want to continue

5    on, based on the circumstances, then we may have to just

6    end the deposition and reschedule.

7              MS. LOVE:  Are you good?

8              MS. SOLDATI:  Yes.

9              THE WITNESS:  I'm fine.

10             So, yeah.  Now it's like they don't --

11             PRISON GUARD:  I don't want to open the door.

12   Are you guys okay?

13             MS. SOLDATI:  Yeah, we're okay.

14             THE WITNESS:  When I say they gave up, like

15   they are totally reactive now, passive medical with

16   prison staff.  Nothing is proactive.  Like we don't even,

17   in the unit I'm in right now, like they don't even have a

18   medical provider assigned to this unit.  We don't even

19   have a provider right now.  They're like, "We'll get

20   somebody to fill in when we need to."  And my back

21   problems, they haven't done anything.

22             They just don't care.  They gave up.  That's

23   what I mean.  They don't care.  They gave up.  Like good

24   luck seeing a medical provider.  Those people, nurses,

25   like in a day or two; but after that, you are on your

14

1    own.

2              I get medical advice through my mom and have to

3    have my mom up call them up here to check with them on

4    stuff.  I had a blood result.  They came back.  They were

5    all jacked up last week.  It showed my liver, like,

6    something was wrong with my liver.  No one told me.  I

7    was talking about it.  They gave me a copy of my blood

8    results and said, "Oh, we can't go over it with you.  And

9    don't have a provider to do it.  So figure it out on your

10   own."

11             So I had to do it with the email system with my

12   mom.  Had her call up here.  And finally they pulled me

13   out and talked to me about it.  That was it.

14        Q.   BY MS. LOVE:  How long was it between the time

15   you received a copy of your lab results and someone came

16   and talked to you about what the lab results were?

17        A.   I believe -- I would be guessing on this one --

18   but I believe it's somewhere around three weeks.  And

19   that was only because my mom was calling up here

20   complaining and leaving messages on a regular basis.

21        Q.   Do you know who she was leaving messages with?

22        A.   The chief of nursing, the head of nursing.

23   She's also in charge of friends and family.  I think her

24   name is J. Mendoza, but I'm not sure.  I know she was

25   trying to get ahold of her, but she was on vacation at

15

 1    some point.  And she was trying to get ahold of another

 2    person she talked to, other people; but I don't know who

 3    those people were.

 4        Q.   Let me just back up for background, too.          Rules 401 and
                                                                  403
 5             You are currently incarcerated at Arizona         16:7-12

 6    Prison Complex Lewis; correct?

 7        A.   Yes, I am.

 8        Q.   And you are assigned to the Raft Unit?

 9        A.   I'm assigned to Raft Max Unit, yes.

10        Q.   You are obviously classified as maximum

11    custody?

12        A.   Yes, I am.

13        Q.   What is your housing location?

14        A.   3A1 Cell 9.

15        Q.   Do you have a cellmate?

16        A.   Not at this time, no.

17        Q.   When is the last time you had a cellmate?

18        A.   When I was on the closed side, which was May of

19    2020.

20        Q.   Okay.  So then in May of 2020 you were

21    classified as closed custody; is that correct?

22        A.   That is correct.

23        Q.   And then since going, and classification

24    changed to max custody, in May 2020, you have not had a

25    cellmate?

1    A.   I have not had a cellmate -- I've not had a

2    cellmate since from my custody level was not changed,

3    until about five weeks ago, to max custody.  I've been in

4    level four still since May of last year.  I've just been

5    housed at Raft Max.  They just now placed me as max

6    custody about a month ago, a little over a month.

7    Q.   Do you know the reason why your classification

8    was changed to max custody?

9    A.   There is an investigation on that.  I'm under

10   investigation, so I can't really answer that question.

11   Q.   So the investigation is not complete?

12   A.   Not that I know of.

13   Q.   Okay.  So we'll go back to what you were

14   telling me about the changes from 2015 to now.  As to

15   specifically focusing on mental healthcare --

16   A.   Yes.

17   Q.   -- can you tell me, just to the level of detail

18   that you can, what you feel are the differences between

19   delivery of mental healthcare to you in 2015 versus now?

20   A.   Yeah.  Like in 2015, like at first, they were

21   trying to give us mental health programming, like doing

22   one-on-one counseling, group therapies, stuff like that.

23   Now, not so much.  They'll come give you, maybe, if you

24   are lucky, in-cell programming, meaning they give you a

25   pamphlet for anger management and tell you to do it in

1    your cell by yourself.

2            Those are hard to come by, now, too.  But they

3    will not do one-on-one -- they'll do -- let me change

4    that.  They'll do one-on-one, but it will be at your cell

5    front.  Every other inmate can hear your conversation.

6            (Extreme coughing by Mr. Smith and Ms.

7    Soldati.)

8            MS. LOVE:  Are you all okay to go?  I don't

9    want you to suffer and go through this.

10           THE WITNESS:  It's just getting to us now.

11           MS. LOVE:  Well, I think what we're going to

12   have to do under these circumstances is end the

13   deposition.  And we'll have to reschedule.  And maybe we

14   can just all do it telephonically so we don't have to go

15   through this again.

16           We'll contact you all on the plaintiff side,

17   okay?

18           We're going to end, for the record.  Because of

19   an ICS by somebody else and somebody using chemical

20   agents, we're stopping the deposition.

21           MS. SOLDATI:  Thank you.

22           MS. LOVE:  Thank you.

23           (Whereupon, the deposition concluded at

24   approximately 10:38 a.m.)

25                           *   *   *   *

18

```
 1   STATE OF ARIZONA        )
                             ) ss.
 2   COUNTY OF MARICOPA      )

 3          BE IT KNOWN that the foregoing proceedings were

 4   taken before me; that the witness before testifying was

 5   duly sworn by me to testify to the whole truth; that the

 6   foregoing pages are a full, true, and accurate transcript

 7   of the proceedings, all done to the best of my skill and

 8   ability; that the proceedings were taken down by me in

 9   shorthand and thereafter reduced to print under my

10   direction.

11          I CERTIFY that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14          [ ] Review and signature was requested.

15          [ ] Review and signature was waived.

16          [X] Review and signature was not required.

17          I CERTIFY that I have complied with the ethical

18   obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206

19   J(1)(g)(1) and (2).

20          Dated at Phoenix, Arizona, October 14, 2021.

21

22

23   _____
     LISA A. NANCE, RPR, CR
24   Certified Reporter; Arizona CR No. 50349

25              *    *    *    *    *    *    *
```

19

1

2          I CERTIFY that HUSEBY GLOBAL LITIGATION has
   complied with the ethical obligations set forth in ACJA

3   7-206 (J)(1)(g)(1) through (6).

4

5

6   _____

7   HUSEBY GLOBAL LITIGATION
   Arizona Registered Reporting Firm R1192

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 8

1

1                   UNITED STATES DISTRICT COURT

2                      DISTRICT OF ARIZONA

3
                                       )
4                                      )
        Victor Parsons, et al., on behalf)
5        of themselves and all other   )  No. 2:12-cv-00601-ROS
        similarly situated; and Arizona )
6        Center for Disability Law,     )
                                        )
7                   Plaintiffs,         )
                                        )
8           vs.                         )
                                        )
9        David Shinn, Director, Arizona )
         Department of Corrections; and )
10       Richard Pratt, Interim Division)
         Director, Division of Health   )
11       Services, Arizona Department of )
         Corrections, in their official )
12       capacities,                    )
                                        )
13                  Defendants.

14

15

16              VIDEOCONFERENCE DEPOSITION OF

17                     JEREMY SMITH

18                   OCTOBER 18, 2021

19                      9:00 A.M.

20

21

22                   BUCKEYE, ARIZONA

23

        REPORTED BY:
24       Sommer E. Greene, RPR, CRR
         Certified Court Reporter
25       Certificate No. 50622

2

```
1    APPEARANCES:

2

3        For the Plaintiffs:

4                PERKINS COIE
                 KELLY SOLDATI, ESQ.
5                2901 North Central Avenue, Suite 2000
                 Phoenix, Arizona 85012
6                602.351.8000
                 Ksoldati@perkinscoie.com
7

8        For the Defendants:

9                STRUCK LOVE BOJANOWSKI & ACEDO, PLC
                 ASHLEE HESMAN, ESQ.
10               3100 West Ray Road, Suite 300
                 Chandler, Arizona 85226
11               480.420.1600
                 Ahesman@strucklove.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                         I N D E X

2

3      WITNESS: JEREMY SMITH

4

5      EXAMINATION                                   PAGE

6

7    MS. HESMAN....................................5

8    MS. SOLDATI................................. 42

9

10                    *      *      *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    INDEX TO EXHIBITS

2

3     EXHIBIT                                    MARKED

4

5                     NONE MARKED

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    BUCKEYE, ARIZONA;

2              OCTOBER 18, 2021; 9:00 A.M.

3

4

5                    JEREMY SMITH,

6     called as a witness herein, having been first duly

7     sworn by the Certified Reporter to speak the whole

8     truth and nothing but the truth, was examined and

9     testified as follows:

10

11                    EXAMINATION

12    BY MS. HESMAN:

13         Q.  And, sir, will you please state your full

14    name for the record.

15         A.  Jeremy Smith.

16         Q.  Okay, Mr. Smith, obviously we're

17    continuing on the deposition from the other day.  And

18    so do you remember the instructions that we talked

19    about on how to do the deposition as far as answering

20    questions and if you don't understand my question,

21    you'll let me know, et cetera?

22         A.  Yes.

23         Q.  Okay.  We're just going to kind of jump

24    in from where we left off the last time.  So jumping

25    into that, we did wait a little bit to have your

6

1      medications brought in so that you could take your

2      medications before we started.  Is that correct?

3             A.   Yes.

4             Q.   And what medications did you just take?

5             A.   300 milligrams of Gabapentin and 500

6      milligrams of Keppra.

7             Q.   What was the second one?

8             A.   Keppra, K-e-p-r-a (sic).

9             Q.   And do you have any understanding

10     yourself as to what condition you are being

11     prescribed Gabapentin for?

12            A.   Yes.

13            Q.   What is that?

14            A.   Two different reasons.  One is for

15     neuropathy in my elbow and my right wrist.  And the

16     other one is for back pain.

17            Q.   Okay.  And what about the Keppra, do you

18     have any understanding as to what diag- -- what

19     condition you are taking Keppra for?

20            A.   Yes.  That's -- same thing, Keppra is an

21     enhancer.  It enhances.  It's like a combination or

22     enhancer, whatever, that goes along with Gabapentin.

23            Q.   And are you currently taking any other

24     medications besides the two we just talked about?

25            A.   Yes.  At night, I take Lipitor,

1    cholesterol medication; and Vistaril, which is a

2    psych medication.

3        Q.   And do you have any understanding of any

4    mental health diagnosis for which you're taking the

5    Vistaril?

6        A.   I was told anxiety and to help me sleep.

7        Q.   And do you indeed suffer from symptoms of

8    anxiety?

9        A.   Yes, I do.

10       Q.   Can you describe for me what symptoms of

11   anxiety you suffer from?

12       A.   I walk probably about four miles a day in

13   my cell, like pacing back and forth.  I can't get --

14   I have so many thoughts that run through my head

15   sometimes, it drives me crazy.  I have a hard time

16   sleeping, stuff like that.  Restless legs.

17       Q.   How long have you been taking the

18   Vistaril for?

19       A.   I actually don't know the answer to that.

20       Q.   Do you think that the Vistaril helps at

21   all with your symptoms of anxiety?

22       A.   No.

23       Q.   Have you let any of the mental health

24   providers know that you don't think that the Vistaril

25   is helping you with your symptoms of your anxiety?

1        A.   Yes, I believe so.

2        Q.   Have you been provided any response in

3   conjunction with advising that you do not believe the

4   Vistaril is helping your symptoms of anxiety?

5        A.   I didn't -- I didn't understand that.

6        Q.   Okay.  I believe you said that you

7   thought that you had let mental health providers know

8   that you did not believe that the Vistaril is helping

9   your symptoms of anxiety.  Did I understand that

10  correct?

11       A.   Yes.

12       Q.   First of all, do you know when you

13  advised mental health that you do not believe that

14  the Vistaril is helping with your symptoms?

15       A.   I -- I do not.

16       Q.   Do you know whether or not you were

17  provided with any response, whether verbal or

18  written, as to your advising them that you do not

19  believe the Vistaril's helping you with symptoms of

20  anxiety?

21       A.   Yeah, they -- yes, it was a -- it was a

22  psych and they -- for some reason, they thought it

23  would be better to lower the dose and try that.  That

24  was done a couple months ago, I think.

25       Q.   Do you believe that lowering the dose of

9

1    the Vistaril has helped at all with your symptoms?

2          A.   No.

3          Q.   Do you believe that you felt better on

4    the higher dose of the Vistaril or the lower dose?

5          A.   As far as my anxiety goes, the higher

6    dose probably was better, but the -- the side effects

7    were a lot worse.

8          Q.   What kind of side effects did you

9    experience with the higher dose of Vistaril?

10         A.   Like when I wake up, I can't seem to get

11   going.  It takes me hours to get, like, my head

12   straight and get energy to do anything because it

13   makes me lethargic, I guess, is the best answer.

14         Q.   When is the last time that you saw

15   anybody from mental health face-to-face?

16         A.   I do not remember.

17         Q.   If you take the last two weeks, do you

18   know whether or not any mental health providers have

19   come to your cell front and asked you, you know, How

20   you doing?

21         A.   There was -- I believe it was a nurse

22   that came to my door, probably some time in the last

23   two weeks, and asked me if I wanted to talk to psych

24   and --

25         Q.   And -- and did you say yes or no, whether

1    you wanted to talk to psych?

2          A.   At that time, I said no.

3          Q.   Is there any particular reason why you

4    said no, that you didn't want to talk to psych at

5    that time?

6          A.   No.  The last two weeks, my -- well,

7    number one, my sleep schedule is kind of weird where

8    I stay up all night and I sleep most of the day.  So,

9    you know, sometimes, if they wake me up and they're

10   telling me to go right then, I don't feel like going,

11   I'm not going to go.

12              Also, I've been going through some family

13   stuff.  Like my grandmother's in hospice right now,

14   so I just haven't really felt, like, talking in the

15   last couple weeks.

16         Q.   If you take the last six months, have you

17   gone out of your cell and had a one-on-one encounter

18   with any mental health people outside of your cell?

19         A.   In the last six months?  Once that --

20   once, I believe.  That was talking to some guy on a

21   computer, like a tele-visit, or something like that.

22   I don't know.

23         Q.   Does anybody from mental health come by,

24   at least to your cell front, and ask you how you're

25   doing with any sort of regular frequency?

1        A.    No.

2        Q.    I want to read to you, since it's hard

3    for you to -- I understand because you're restrained

4    to the table there -- to see if I even tried to show

5    you a document.  So I'm going to read to you from the

6    disclosure, the witness disclosure that your

7    attorneys have provided to us and then I want to ask

8    you some questions.

9             First of all, before I ask that, have you

10   been shown -- and I'm not talking about anything

11   you've talked to your attorneys about, but have you

12   been shown any written documents as to what

13   plaintiffs have disclosed that you may testify at

14   trial about, a written disclosure?

15       A.    Not -- no.

16       Q.    All right.  So I'm going to read -- first

17   I'm going to read the paragraph to you and then I'm

18   going to ask you some questions about it.  Okay?

19       A.    Okay.

20       Q.    Your attorneys have disclosed the

21   following as to what you may testify about at trial.

22            And it says, "Mr. Smith is a named

23   plaintiff in this matter and his original class

24   representative claims from 2012 are detailed in

25   plaintiff's complaint," and there's a reference to

                                                              12

1     document number 1, paragraphs 13, 28, 74, 80, 90, 95,

2     and 96.

3              "The Court appointed him a class

4     representative and a subclass representative," and

5     then it references document 372 at 23.

6              Goes on to say," Defendants deposed

7     Mr. Smith on August 20th of 2013.  Since then,

8     Mr. Smith has been assigned a variety of different

9     mental health diagnosis and prescribed powerful

10    medications until July 2021, where a psych associate

11    concluded after a five-minute cell front visit that

12    Mr. Smith does not suffer from a mental health

13    disorder.

14             "Mr. Smith can testify regarding

15    deficiencies in his mental health care and the

16    conditions of confinement at Lewis Rast, Max,

17    including frequent cancellations of out-of-cell

18    time."

19             Have -- prior to today, have you been

20    advised that that is what your attorneys expect that

21    you will testify about if called to testify at trial?

22        A.   I do not.

23        Q.   Okay.  Then I want to go back and I just

24    want to ask you some questions, then, whether you may

25    have information; you may not.

13

```
 1              But I want to focus in first on the
 2     following sentence where your attorney said that
 3     you're going to testify, if called at trial, that,
 4     "Mr. Smith has been assigned a variety of different
 5     mental health diagnosis and prescribed powerful
 6     medications until July 2021 where a psych associate
 7     concluded, after a five-minute cell front visit, that
 8     Mr. Smith does not suffer from a mental health
 9     disorder."
10              So focusing in on that sentence, is it
11     true that in July of 2021, a psych associate
12     concluded after a five-minute cell front visit that
13     you do not suffer from a mental health disorder?
14          A.   (No oral response.)
15          Q.   If you know.
16          A.   I do not have access to my medical
17     records, so I don't know that.  I know a psych
18     associate probably did talk -- yeah, in July, I was
19     visited by a psych associate.  I think that's who it
20     was, it was somebody from psych.  But as far as --
21     I'm confused by the little things.  If you're
22     talking -- I don't know.
23          Q.   As you sit here today and taking, you
24     know, the year 2021, as our context of time, has
25     anybody from mental health told you that you do not
```

14

1   suffer from a mental health disorder?

2       A.   Mental health don't tell me anything.

3       Q.   Okay.  Then next I want to focus on where

4   the disclosure says that, "Mr. Smith can testify

5   regarding deficiencies in his mental health care."

6           Can you tell me what you believe to be

7   deficiencies in the mental health care provided to

8   you, if any?

9       A.   Abso- -- absolutely.  You -- do you want

10  me to describe them?

11      Q.   Yes, please.

12      A.   Okay.  So prior to my arrest in 20- -- I

13  only suffered from some kind of like bipolar, I've

14  been told.  And prior to coming back in 2019, it was

15  when I was on the streets, I had been in -- the last

16  six months, end of 2018 and beginning of 2019, I was

17  in a mental hospital four or five different times for

18  several days, the longest being ten days.  And that's

19  all I was told.  You know, you -- you suffer --

20          Like, you know, after the ten days I was

21  there, you suffer from bipolar with psychotic

22  features and general -- general anxiety disorder, to

23  the point where my panic attacks were putting me in

24  the hospital.  But I was supposed to be evaluated at

25  SMI.

15

1          I was referred to La Frontera and Terros

2     and they wanted to do a bunch of stuff like EMB,

3     light therapy and other stuff.  And then the

4     medication regimen to take -- unfortunately, I was

5     arrested for violation of probation and came back to

6     prison.

7              Since I've been in prison, I've asked for

8     help.  I told them what medications I was getting

9     that seemed to be working on the streets.  I was told

10    we're not allowed those medications here.  I asked to

11    be evaluated as SMI several times and I've been told

12    several times, just wait until you get out, you get

13    out soon, just wait until you get out, that it's

14    easier to be diagnosed or labeled SMI on the streets

15    than it is in here.

16              I -- I can't get no help.  The most that

17    I get is them coming to my cell front to ask me if

18    I'm suicidal or homicidal, which I'm not.  I'm not --

19    I'm not suicidal, I'm not homicidal.  So after that,

20    okay, well then, you are fine, we don't need to talk

21    to you.

22              They only care if I'm real -- they only

23    care if I'm going to kill myself or somebody else and

24    that's it.

25         Q.   Okay.

1          A.   Like I said, I've asked for programs --

2     I've asked for programs, I've asked for help.  I've

3     done it through H&Rs, I've done it through verbal --

4     verbally and I can't get nowhere.

5          Q.   Okay.  Let me stop you there and I want

6     to follow-up with some of the things that you told

7     me.

8               You said that when you were out of

9     custody in 2018 to 2019, you believe that you went to

10    a mental hospital four or five times.  Did I

11    understand that correctly?

12         A.   Yes, four or five times.

13         Q.   Was that in Arizona?

14         A.   Yes.

15         Q.   Do you remember which hospitals you went

16    to, hospital or hospitals?

17         A.   Yes.  One was Haven Behavioral Health

18    over off of -- in Phoenix somewhere off of 7th Avenue

19    or 7th Street.  I was in Community Bridges, the

20    intake program, three times while they were trying to

21    find a hospital for me there.  I was in Riaz, it's

22    called, which is in Peoria, Riaz, R-i-a-z, in Peoria

23    once.  And then I believe that's it.

24         Q.   For those occasions that you just told me

25    and the places that you went, were those voluntary

17

1    admissions or had a court ordered you to go to any of

2    those hospitals?

3         A.   My probation officer advised me maybe I

4    should go and see about getting some help in one of

5    those places.  And Haven, there was originally -- it

6    was voluntary -- voluntary at first because I was

7    there before my probation.

8              Are you still there?

9         Q.   Yes.  Sorry, I was clicking.  I need to

10   click out of some things.  Go ahead.  I heard you.

11        A.   Okay.  And then a couple of days into it,

12   I was told it would be involuntary if I tried to

13   check myself out.

14        Q.   And was that the place where you spent

15   the most amount of time, the roughly ten days, I

16   believe you said?

17        A.   Yes.  That was at -- that is called

18   Haven.

19        Q.   What medications were you on when you

20   were out of custody in 2018 to 2019 that you said

21   that once you were back in the Department of

22   Corrections, they said that you couldn't have those

23   medications?

24        A.   That's probably -- it was Xanax.  Another

25   one was Wellbutrin.  And there was another one, I

1    can't remember the name of the other one, some kind

2    of antipsychotic, but I do not remember the name of

3    it.

4         Q.   Do you remember the name of the mental

5    health person that you talked to about that these

6    three medications helped you when you were out of

7    custody but were told that you couldn't have them

8    there in prison?

9         A.   I don't know.  It was whoever did the

10   initial intake on me in SMU-1 in Florence when I came

11   back in March of 2019.  It was a female.  That's all

12   I remember.

13        Q.   Since then, having that conversation with

14   the female person, have you submitted any written

15   H&Rs asking to be put back on any of those

16   medications that you were taking when you were out of

17   custody?

18        A.   No.  I've been told by -- actually,

19   there's another one I talked to named -- psych -- I

20   don't know if she's a psych associate.  Either a

21   psych nurse or a psych associate Ruiz, R-u-i-z, and

22   she's here.  And that's not something DOC gives.

23   That's all I was told.  So I just kind of said that's

24   it, you know.

25             Q.   Since coming back to DOC in 2019, have

19

1   you taken any other mental health medications besides

2   the Vistaril?

3          A.   Oh, yeah.  The one -- the one -- I -- I

4   think there is a couple, but the one that I remember

5   the most, because it messed me up the most, was

6   something called Effexor.  But I do not know how to

7   spell that.  They had me on Effexor.  I don't even

8   remember how long.  Probably a year, a little more

9   than a year.

10              They kept increasing my doses and they

11  just said -- it just jacked me up, so I -- I told

12  them -- I requested them to stop giving it to me.

13         Q.   And in what way -- using your

14  terminology, in what way did it "jack you up"?

15         A.   So I have anxiety as it is.  It seemed to

16  increase my anxiety tenfold.  Like, um, I would say,

17  like, towards then I was noticing I'd be gritting my

18  teeth and locking my jaw for no reason.  That's not

19  something I do.  For no reason I'd be doing that.

20              And -- yeah, I couldn't even think

21  straight.  Like I said, it took my anxiety and

22  increased it tenfold.  That's all that I can

23  really -- that's the best way I can explain it.

24         Q.   And you advised mental health that you

25  were having these side effects.  Correct?

20

1          A.   That's correct, yes.

2          Q.   And then were you switched to a different

3   medication?

4          A.   No, I wasn't given anything.  I wasn't

5   given anything for -- for a while after that.  And

6   then -- then they eventually gave me Vistaril.

7          Q.   So for a certain period of time, were you

8   just not on any medications for the anxiety?

9          A.   Yes.

10          Q.   Was it a situation where the prescription

11   for Effexor stopped and you just weren't on any, or

12   was it a situation where you just decided, hey, I'm

13   not going to take the Effexor?

14          A.   I -- I requested them to take me off the

15   Effexor because of what it's doing to me.  And

16   they -- I can't remember which psych it was, but it

17   was a psych that does the meds that said that that

18   was probably my best option, that maybe I should try

19   not taking anything for a while and see how that

20   goes.

21          Q.   Do you know how much or do you have any

22   recollection of how much time passed from when you

23   stopped taking the Effexor and then you started

24   taking the Vistaril?

25          A.   I don't.  I can't remember.  Somewhere in

21

1    between three and six months, maybe.

2         Q.   And when you were out in the community,

3    before returning to prison in 2019, had you ever

4    received a designation of SMI or seriously mentally

5    ill while in the community?

6         A.   So when I was in Haven, they set up an

7    appointment -- the first appointment for me to be

8    evaluated for that, but I was unable to make an

9    appointment because I was arrested and came back to

10   prison.  But, yes, Haven is the one that -- that they

11   wanted me to be evaluated as SMI.

12        Q.   And you returned to prison in 2019 as a          Rules 401 and 403
                                                                 21:12-14
13   result of a parole violation.  Is that correct?

14        A.   Probation violation, yes.

15        Q.   And what was the probation violation?

16        A.   What was it for?

17        Q.   Yes.

18        A.   There was a couple on there.  I think the

19   one I was convicted of was not -- leaving -- not

20   checking in at appropriate time or something like

21   that.

22        Q.   How long were you -- total time, if you          Rules 401 and 403
                                                                 21:22-22:1
23   know, how long were you out of custody before you

24   returned back in 2019?

25        A.   Almost two years.  I guess somewhere

1    between 19 and 24 months.

2           Q.   And during the two years that you were

3    out of custody, were you working at all at any point

4    in time?

5           A.   Yes.

6           Q.   What kind of job did you have or jobs?

7           A.   When I first got out, I was working as an

8    oil and lube technician at Cobblestone -- it's a car

9    wash, but they've got an oil and lube department --

10   while I was going to school at AAI.  And then it

11   wasn't -- it wasn't enough money, so I started doing

12   construction again.  Concrete, commercial concrete,

13   formsetters.

14          Q.   And what were you studying at AAI?

15          A.   To be a mechanic.

16          Q.   Did you complete your studies at AAI

17   while you were out of custody?

18          A.   I did not.

19          Q.   How close did you get?

20          A.   Halfway through, maybe.  So six months

21   into a one-year program.

22          Q.   And did I remember it correctly, did you

23   say it was March of 2019 when you returned to

24   custody?

25          A.   Yes.

23

1          Q.   And when you returned to the Department

Rules 401 and 403
23:1-27:2

2     of Corrections in March of 2019, what was your

3     initial classification, if you know?

4          A.   Um, I would assume it would be a max -- I

5     was put in max custody at SMU in Florence while the

6     gang task force had to do a memo on me to make sure I

7     had no contact or reengage in gang activity while I

8     was on the streets.

9               So I had to sit in SMU for three months

10    waiting for them to be done, which it was done and

11    verified that I did not reengage in anything like

12    that and then I was transferred to a close custody

13    yard.

14         Q.   When you went to close custody, was that

15    at Lewis?

16         A.   Yes.

17         Q.   And from -- and correct me if I'm wrong,

18    because I could be wrong, but in looking at your

19    records, your institutional records from prior, you

20    know, when you were -- prior to you getting out in

21    about 2017, prior to 2017, you went through the STG

22    debrief process over at Browning.  Is that correct?

23         A.   Yes, that's correct.

24         Q.   And what STG group had you been validated

25    as part of?

[10/18/2021] Smith, Jeremy Scott (day 2-compl...

1         A.   Aryan Brotherhood.

2         Q.   And when you had gone through the debrief

3    process, prior to 2017, is my understanding correct

4    that you started at Browning, you did the debrief

5    process and then you went to SMU-1.  Is that correct?

6         A.   Yes, I went -- yeah, Browning, I

7    initiated the debriefing.  I debriefed and then -- or

8    renounced, and then went to SMU until I passed

9    polygraph test.  Once I did that, I was approved as a

10   debriefer.

11        Q.   Did you stay at SMU-1, or did you go to

12   Lewis prior to your release in 2017?

13        A.   I was back and forth from SMU in Lewis

14   probably three different times, between that time

15   period of when I renounced and when I got out, which

16   would be between 2009 and 2017.

17        Q.   When you were released from custody in

18   2017, do you remember what your classification was

19   when you were released?  Were you still max or were

20   you close custody by that time?

21        A.   I was close custody.

22        Q.   So then when you returned back in 2019,

23   you were at SMU for about three months and then you

24   transferred to Lewis Rast.  Correct?

25        A.   Yes.

25

1          Q.   And -- and you went to close custody.

2    Correct?

3          A.   Yes.

4          Q.   And then, is my understanding correct

5    that recently in the last several months, you have

6    been reclassified back to max custody?

7          A.   Yeah.  Approximately six weeks ago.

8          Q.   And do you know why you were reclassified

9    back to max custody about six weeks ago?

10         A.   Um, I can't -- I know why, I just can't

11   really talk about that because of an ongoing

12   investigation.

13         Q.   Okay.  And I understand that.

14              But can -- without saying what the

15   investigation is for, was it a result of a

16   disciplinary violation -- at least an alleged

17   disciplinary violation for which you're under

18   investigation right now?

19         A.   Yes.

20         Q.   Do you know what your step level is there

21   in max custody out at Lewis Rast where you're at

22   right now?

23         A.   I do not.

24         Q.   Are you aware that there is a step-level

25   program within the max custody classification where

1    you could be a step level 1, 2, or 3 with different

2    privileges associated with each step?

3         A.   Yes, I am.

4         Q.   Have you ever asked any of the

5    correctional personnel out there at Rast what your

6    step level is?

7         A.   No, I have not.

8         Q.   Do you have any interest in knowing what

9    your step level is?

10        A.   I do not.

11        Q.   Why is that?

12        A.   I -- I go home next year, so I'm more

13   of -- I don't want anything to do with any other

14   inmates, so I keep to myself.  I stay away from

15   everybody.  I don't leave my cell.  I stay in my

16   cell, I don't go to rec, I shower inside my cell.

17   The only time I leave my cell is for medical.

18        Q.   And is that because you don't want to

19   ever be in a situation that would compromise being

20   released in 2022?

21        A.   Yes.  I mean, I don't -- yeah, I don't --

22   I don't want to put myself in a situation where I get

23   into a fight or something or something stupid that's

24   going to push my date back further than it is right

25   now.  I'm also trying to get good time, so to do

27

1    that, I have to follow the rules.  And best thing for

2    me to do is just to stay away from everybody.

3          Q.   Are you doing any programming as far as,

4    like, in your cell, any workbook programs or anything

5    like that?

6          A.   I'm trying to.  I've been trying to get

7    in-cell programming for a couple months for mental

8    health.  They keep telling me they're going to bring

9    me something, but they never do.  I'm waiting on

10   that.

11         Q.   Do you know what kind of programming          Rule 106
                                                              27:11-30:19
12   might be available to you mental health-wise that you

13   could do in your cell?

14         A.   I don't know.  I completed most of them

15   for the in-cell programmings.  I don't know what's

16   left.  I think depression or stress, something like

17   that.  That's all there's left for me to do.  They

18   only have so many programs that you can do.

19         Q.   Since you have been back in custody since

20   March of 2019, have you completed any programming?

21         A.   Mental health programming?

22         Q.   Yes.

23         A.   Yes.

24         Q.   And do you remember which ones?

25         A.   Anger management, PTSD, inside out, and

1    there's -- there's other ones, I just can't remember

2    which ones they are.

3        Q.   Were all of those that you just listed

4    for me programs that you did self study in your cell,

5    or were they group programmings where you came out

6    and went to a group?

7        A.   They were all in-cell.

8        Q.   Do you remember when it was that you made

9    the request to mental health to see if you could do

10   some more in-cell programming before you are released

11   in 2022?

12       A.   Over the last three months -- over the

13   last three months, I've requested it on the -- on

14   the -- the tablet, through the H&R system probably

15   three times.  I requested it on actual paper with HR

16   a couple of times and whenever I've actually seen

17   like a psych associate or something passing by, I

18   requested it.

19       Q.   So you are able to submit H&Rs through

20   the tablet that you have in your cell?

21       A.   Yes, I am.

22       Q.   Did you ever receive any response to your

23   H&Rs that you submitted through the tablet asking to

24   do mental health programming in your cell?

25       A.   Yes.  It always responds back, "You are

1    on nurse's line."

2            Q.   Nurse's line?

3            A.   Yes.

4            Q.   Have you then been called out for nurse's

5    line?

6            A.   No, they don't -- they don't really call

7    us out for nurse's line.  They come to our cell for

8    nurse's line a majority of the time.

9            Q.   Has anyone then come to your cell for

10   nurse's line and discussed in-cell mental health

11   programming with you further?

12           A.   Yes.  Two weeks ago was the last time.

13   And she told me she would bring it back the following

14   week.  I still have not received them.

15           Q.   Have you submitted any H&Rs, whether

16   written or submitted from your tablet, since then

17   saying, Hey, I'm following up, where's my

18   programming?

19           A.   No.  Reason being is, I was told not to

20   do H&Rs for in-cell programming through the tablet by

21   that lady.  She told me any time you do an H&R, you

22   requesting in-cell programming, we're going to come

23   talk to you because we're going to think you're

24   suicidal or something else, so just start putting it

25   on inmate letters and sending us inmate letters

30

1    through the regular mail.

2         Q.   Have you submitted any inmate letters in

3    follow-up requesting programming?

4         A.   No.  I was going to give it another week

5    and then do that.

6         Q.   I'm going to go back in time on you a

7    little bit again.  Do you remember when you were

8    released from the Department in 2017, you were max

9    custody.  Right?

10        A.   No.

11        Q.   Okay.  So before your release in 2017,

12   had you progressed to close custody?

13        A.   Yes, that was about two weeks before I

14   was released.  I was -- I made it to close custody.

15        Q.   Okay.  So then prior to getting to close

16   custody before your release in 2017, had you gone

17   through the step levels 1, 2, and 3, and progressed

18   through steps 1, 2 and 3 in max custody?

19        A.   Yes, I had.

20        Q.   As far as that disclosure that I read to

21   you towards the beginning of your deposition

22   regarding what your lawyers believe you might testify

23   to if called at trial, they also stated that you

24   would testify regarding your conditions of

25   confinement at Lewis Rast Max including frequent

1    cancellations of out-of-cell time.

2              Is that testimony that you believe you

3    would give if called to testify at trial about

4    cancellations of out-of-cell time?

5         A.   Yes, the cancellations of my provider,

6    like medical provider, and also the fact that like

7    one of the things I would like to do through psych is

8    one-on-ones or some kind of like group therapy.  But

9    we are not allowed to do that because they don't --

10   they want to do everything at the cell front where

11   everybody can hear your business.  So I would have to

12   really say that at trial.

13        Q.   Have you made any verbal or written

14   request to mental health to be able to come out of

15   your cell and do some one-on-one therapy with mental

16   health?

17        A.   Yes.  I -- I ask them all the time.  Like

18   usually when the psych associate or somebody will

19   come talk to me, can we do this somewhere else, they

20   say no, that they can't pull me out or talk to me

21   anywhere else.  That's -- that's it.  Even when they

22   come do medication reviews, they do it at the cell

23   front.

24        Q.   Have you asked why they say they can't

25   pull you out for one-on-one?

32

1        A.   They say resources.  That's all they

2    said, is resources.  They don't have staff to pull us

3    out.

4        Q.   I believe you also said with regards to

5    cancellations, that you would testify regarding

6    cancellations of medical providers.  Did I hear that

7    right?

8        A.   Yes.  The medical provider in general.

9        Q.   And can you explain what you mean by

10   that?

11       A.   Like, the dental thing, it's always

12   getting rescheduled or something like that.  Because

13   they're limited on staff, I guess, for dental people.

14   Medical is the same way.  So you could be scheduled

15   to see the provider and you -- you won't go because

16   staff has other stuff to do or they don't have time

17   or they don't -- at this time, they don't even have a

18   provider, so that's what I mean.

19       Q.   So since your return to custody in March

20   of 2019, how many dental appointments have been

21   scheduled for you but cancelled.  Do you know?

22       A.   I -- I don't know.

23       Q.   Do you have any estimate?  More than

24   five, less than five?

25       A.   Probably less than five over the last

33

1    year.  I've only been keeping track over the last

2    year, so less than five.

3         Q.   What were the dental appointments for

4    that were cancelled, do you know?

5         A.   I'm getting work done, so I could have a

6    bottom partial right there.  So like a bridge.  I'm

7    trying to get that before I get out because I know

8    when I get out -- missing my bottom tooth.  That's

9    what it's for.

10        Q.   Let's take the last year as a time

11   period.  Have you had appointments with a medical

12   provider scheduled and they've been cancelled?

13        A.   That's what I've been told.  I don't have

14   like access to the actual scheduling, but I've been

15   told like hey, now it's cancelled for whatever

16   reason, staff shortage, stuff like that.

17        Q.   Do you know or do you remember who was

18   the person who told you about the cancel -- a

19   provider appointment was cancelled?

20        A.   It would be -- I don't know specifically,

21   it would be one of the medical officers though.

22   Wallace or -- Wallace is the only one I could think

23   of.  Wallace or Bobo, one of those two.

24        Q.   Do you remember what the medical

25   appointments were for that were cancelled?

34

1          A.   I do -- I do not.

2          Q.   When is the last time that you saw

3     anybody for -- from medical for any conditions

4     related to your physical?  Not your mental health,

5     but physical health?

6          A.   I seen Provider Coronado probably a month

7     ago, maybe a little bit more than a month.  Yeah,

8     probably about six weeks ago, maybe.

9          Q.   What was that for?

10          A.   That was -- that was because my family

11     had called up here complaining about them not --

12     about there was some stuff wrong with my blood -- my

13     blood lab results.  There were some concerns and I

14     was having some issues with my back and they -- they

15     weren't planning on seeing me until my next chronic

16     care in March.

17               So my family was calling up there

18     complaining to the friends and family people of the

19     complex and then that's why Coronado pulled me out,

20     was to go over my lab results, and to order more

21     x-rays because the wrong x-rays had been ordered for

22     my back three weeks prior to that.  They did the

23     wrong ones.  So that's why.

24          Q.   Do you recall what the -- what your lab

25     results were?

35

1          A.   My -- my cholesterol, my triglycerides

2     were twice -- over twice what they were supposed to

3     be, which is alarming because the fact I'm on

4     cholesterol medication, so they shouldn't be that

5     high.

6               My liver -- something was wrong with my

7     liver enzymes, they were too high.

8               And then, um, the biggest thing was the

9     dead tissue, called necro inflate, had to deal with

10    the dead tissue in your liver, was three times the

11    level that it should have been -- three times the

12    higher level that -- than that -- higher than the

13    level accepted.  And I don't have liver problems, I

14    don't have any problems like that.  So there's

15    concern.  And then something with my red blood cells.

16         Q.   And do you remember when it was that you

17    received the lab results?

18         A.   I don't -- I don't remember -- I don't

19    remember exactly when, no.  It was -- I requested it

20    through the labs lady to have my results since no one

21    was telling me anything.  The nurse brought me the

22    results the day after I requested it on the tablet,

23    but told me that she could not go over the results

24    with me.  She was unqualified.

25               And that's when I started complaining

1    through H&Rs on the tablet and to my family.  Because

2    it shows you on the results, you know, if there's

3    something abnormal and there's abnormal stuff on

4    there, but nobody was telling me anything.  Some time

5    in August or September.

6            Q.   Did someone ultimately meet with you to

7    sit down and go and talk to you about your lab --

8    what your lab results were versus you just reading

9    what they were?

10           A.   Eventually.  Eventually, they did.

11           Q.   Do you remember when that was?

12           A.   Some -- some time between four or six

13   weeks ago, Provider Coronado pulled me out to go over

14   the results because she had been ordered by somebody

15   at the complex, I guess, to do so.

16           Q.   As a result of the lab results, have you

17   received any medication changes or changes in

18   treatment or anything like that?

19           A.   No.  No.

20           Q.   And you said you're on -- you go to the        Rule 106
                                                                 36:20-37:25
21   chronic care clinic.  Is that correct?

22           A.   Yes.

23           Q.   For what condition are you part of the

24   chronic care clinic, if you know?

25           A.   My neuropathy, my issues with my back,

                    [10/18/2021] Smith, Jeremy Scott (day 2-compl...

1    the high cholesterol, and then the hepatitis C.

2         Q.   And do you receive any treatment for

3    hepatitis C?

4         A.   No.  I've had it for over 20 years from

5    tattoos.  It hasn't affected me at all.  I'm like a

6    stage -- it's at a stage zero.  Like even when they

7    test my blood, it doesn't even show up anymore

8    because the viral load is so low that it doesn't even

9    show up.

10        Q.   Is the back pain that you suffer from, is

11   that a result of an injury that you received prior to

12   being in prison?

13        A.   I don't know.  I -- I don't know.

14        Q.   How long have you been treated for back

15   pain?

16        A.   It really started affecting me when I was

17   out.  I started getting treated in 2018, probably.

18   Yeah, 2018, by my primary care on the street.

19        Q.   What about the neuropathy, is -- what is

20   that the result of, if you know?

21        A.   I've had 15 boxer fractures in my -- my

22   hand.

23        Q.   Are those fractures prior to being

24   incarcerated or during incarceration?

25        A.   Prior.

38

1          Q.   I'm going to jump around a little bit now

2     on you.

3               Going back to, you told me earlier today

4     that you do not go to outdoor recreation.  Is that

5     correct?

6          A.   Yes.

7          Q.   Are you -- do the correctional officers

8     offer you recreation every week?

9          A.   Sometimes they do, sometimes they don't.

10         Q.   In the past, if we look at the past seven

11    days, just going the past week, how many times have

12    you been offered recreation?  Understanding that you

13    don't want to go, but how many times was it offered?

14         A.   One.  Once.

15         Q.   Do you exercise in your cell?

16         A.   I -- I do usually.  Mainly it's just my

17    back has been messed up, so I haven't really been

18    able to.

19         Q.   And the reason I ask is, do you remember

20    being deposed in 2013?

21         A.   Yes.

22         Q.   And --

23         A.   I do exercise and I still do exercise a

24    lot.  I just haven't been able to lately, just the

25    last month, because of my back.

1          Q.   Okay.  Okay.  Because I'll tell you, I

2     was reading through that and you had quite an

3     exercise regimen, you know, back then that you did in

4     your cell.  So I understand now that, from what

5     you're telling me, is that your back's been bothering

6     you, so you haven't been able to exercise as much in

7     your cell.  Is that fair?

8          A.   Yes.

9          Q.   With regards to the disclosure that we

10     just talked about that your attorneys wrote that you

11     would testify regarding conditions of confinement at

12     trial, is there any other conditions of confinement

13     other than what we've talked about here today, that

14     you would testify about at trial?

15          A.   Yes.  You want me to --

16          Q.   Yes, please.

17          A.   Okay.  The fact that -- that no one cares

18     anymore.  I -- I think I said it last time, it's like

19     DOC's just completely quit the main thing.  It's like

20     they -- they don't care; no one really cares anymore;

21     they don't care what happens.

22               I don't know if you read the violence

23     reports that comes from this unit or how much stuff

24     actually goes on here, it's crazy, and it's a lot of

25     the housing, the gang problem.  There's been three

```
 1    prison gangs started in this unit in the last two
 2    years that are just allowed to run rampant and do
 3    whatever they want.  They -- they don't have control
 4    anymore because they don't -- that -- that's what I
 5    would testify to.
 6             Q.   As to gang activity that you just told me
 7    about, you've been able to keep yourself out of any
 8    of that, though, right?
 9             A.   That's correct.  I'm not involved in any
10    of -- any of that stuff.
11             Q.   Any other specific conditions of
12    confinement that you would testify about if you were
13    called to testify before the judge at trial?
14             A.   Level of corruption.  Just the fact that
15    the corruption is out of control and it's a lot of
16    the housing.  Like, I mean, we haven't had contact
17    visits since -- since March of 2020, and yet there's
18    more -- more drugs down here and more drugs --
19    more -- more of a drug problem in here than there
20    ever has been over the last year.  And I think that
21    staff is corrupt and they're obviously the ones
22    bringing the drugs in.  It's just covered up.
23             Q.   Are you --
24             A.   So...
25             Q.   Are you able to do any visits with
```

1    friends or family on the tablet?

2          A.   Am I allowed to do it?

3          Q.   Yes.

4          A.   I e-mail from -- I e-mail my family a

5    lot.  I -- I don't use the visit -- you're allowed to

6    visit on the tablet, though, if that's what you're

7    asking.  Yes, you're allowed to visit on the tablet.

8          Q.   But you communicate with your family

9    mostly through e-mail?

10         A.   Through e-mails and phone -- yeah, phone

11   calls.

12         Q.   How often do you do phone calls with your

13   family?

14         A.   Um, once a week.

15         Q.   And you don't have a cellmate right now.

16   Is that correct?

17         A.   Not at this point, no.

18         Q.   Have you had a cellmate at all since you

19   returned to custody in March of 2019?

20         A.   Yeah, I had a cellmate in SMU.  And I had

21   a cellmate when I was on the close custody yard, but

22   I have not had a cellmate since May of last year, May

23   of 2020.

24         Q.   Any other complaints regarding conditions

25   of confinement that we haven't talked about already

42

```
 1    today?
 2           A.   That's about it.
 3           Q.   Okay, sir, that's all the questions that
 4    I have for you.  Your attorney might have questions.
 5    I'm not sure.
 6           A.   Okay.
 7              MS. SOLDATI:  Just a few.
 8
 9
10                    EXAMINATION
11    BY MS. SOLDATI:
12           Q.   In terms of your confinement in 2019, has
13    any provider here asked you for your medical records
14    from a medical provider when you were out?
15           A.   No.  He's offering my medical records.  I
16    have all of my medical records and all my mental
17    health records and I asked them to please review
18    them.  I'm not lying.  I want you to see this and
19    they refuse to look at it.  They don't want to see
20    it.  They said they will come to their own
21    conclusions for medical and mental health.
22           Q.   And I'm sorry if you already answered,
23    but -- but what's your understanding of your
24    diagnosis from the psych providers here, your mental
25    health right now?
```

43

1          A.   I don't -- I don't know.  They won't --

2     they never tell me anything.

3          Q.   Have you asked them to provide you with

4     any information?

5          A.   I asked them to be reviewed as SMI.  I've

6     asked them what, you know -- what -- I would like to

7     be evaluated and seen and -- and -- and I tell them,

8     you know, the bipolar or the psychotic features, they

9     never -- never say anything, they never told me

10    anything.  I've requested my labs to be evaluated

11    several times and they never did.

12               MS. SOLDATI:  Okay.  That's all the

13    questions I have.

14               MS. HESMAN:  I don't have any follow-up.

15    Thank you for your time today, sir.

16               THE WITNESS:  Yes, thank you.

17               (The deposition ended at 10:26 a.m.)

18

19

20

21

22

23

24

25

44

1                    CERTIFICATE OF REPORTER

2    STATE OF ARIZONA        )
                             )
3    COUNTY OF MARICOPA      )

4

5            I, Sommer E. Greene, a Certified
     Reporter in the State of Arizona, do hereby certify
6    that the foregoing deposition was taken before me in
     the County of Maricopa, State of Arizona; that an
7    oath or affirmation was duly administered to the
     witness, JEREMY SMITH, pursuant to A.R.S. 41-324(B);
8    that the questions propounded to the witness and the
     answers of the witness thereto were taken down by me
9    in shorthand and thereafter reduced to typewriting;
     that the transcript is a full, true and accurate
10   record of the proceeding, all done to the best of my
     skill and ability; and that the preparation,
11   production and distribution of the transcript and
     copies of the transcript comply with the Arizona
12   Revised Statutes and ACJA 7-206(j)(1)(g)(1) and (2).
             The witness herein, JEREMY SMITH, has
13   requested signature.
             I FURTHER CERTIFY that I am in no way
14   related to any of the parties nor am I in any way
     interested in the outcome hereof.
15           IN WITNESS WHEREOF, I have set my hand in my
     office in the County of Maricopa, State of Arizona,
16   this 21st of October, 2021.

17

18

                      -------------------------------
19                    Sommer E. Greene, RPR, CRR
                      Certified Reporter 50622
20

21

22

23

24

25

45

1

2              DECLARATION UNDER PENALTY OF PERJURY

3                    I declare under penalty of perjury that

4      I have read the entire transcript of my deposition

5      taken in the above-captioned matter or the same has

6      been read to me, and the same is true and accurate,

7      save and except for changes and/or corrections, if

8      any, as indicated by me on the DEPOSITION ERRATA

9      SHEET hereof, with the understanding that I offer

10     these changes as if still under oath.

11

12     Signed on the_____day

13     of _____20__.

14

15

16

17     _____
       JEREMY SMITH
18

19

20

21

22

23

24

25

46

```
 1              DEPOSITION ERRATA SHEET

 2

 3    Page No.____Line No.____Change to:_____

 4    _____

 5    Page No.____Line No.____Change to:_____

 6    _____

 7    Page No.____Line No.____Change to:_____

 8    _____

 9    Page No.____Line No.____Change to:_____

10    _____

11    Page No.____Line No.____Change to:_____

12    _____

13    Page No.____Line No.____Change to:_____

14    _____

15    Page No.____Line No.____Change to:_____

16    _____

17    Page No.____Line No.____Change to:_____

18    _____

19    Page No.____Line No.____Change to:_____

20    _____

21    Page No.____Line No.____Change to:_____

22    _____

23    Page No.____Line No.____Change to:_____

24    JEREMY SMITH

25    Signature:_____
```

47

1              DEPOSITION ERRATA SHEET

2

3    Page No.____Line No.____Change to:_____

4    _____

5    Page No.____Line No.____Change to:_____

6    _____

7    Page No.____Line No.____Change to:_____

8    _____

9    Page No.____Line No.____Change to:_____

10   _____

11   Page No.____Line No.____Change to:_____

12   _____

13   Page No.____Line No.____Change to:_____

14   _____

15   Page No.____Line No.____Change to:_____

16   _____

17   Page No.____Line No.____Change to:_____

18   _____

19   Page No.____Line No.____Change to:_____

20   _____

21   Page No.____Line No.____Change to:_____

22   _____

23   Page No.____Line No.____Change to:_____

24   JEREMY SMITH

25   Signature:_____

# EXHIBIT 9

1

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF ARIZONA

3
                                        )
4    Victor Parsons, et al., on behalf)
     of themselves and all other      )
5    similarly situated; and Arizona  )  No. 2:12-cv-00601-ROS
     Center for Disability Law,        )
6                                       )
               Plaintiffs,              )
7                                       )
       vs.                              )
8                                       )
     David Shinn, Director, Arizona    )
9    Department of Corrections; and    )
     Richard Pratt, Interim Division   )
10   Director, Division of Health      )
     Services, Arizona Department of   )
11   Corrections, in their official    )
     capacities,                        )
12                                      )
               Defendants.              )
13

14

15

16             VIDEOCONFERENCE DEPOSITION OF

17                  CHRISTINA VERDUZCO

18                   OCTOBER 13, 2021

19                     11:30 A.M.

20

21
                   GOODYEAR, ARIZONA
22

23
        REPORTED BY:
24      Sommer E. Greene, RPR, CRR
        Certified Court Reporter
25      Certificate No. 50622

2

1    APPEARANCES:

2

3        For the Plaintiffs:

4                PERKINS COIE
                 AUSTIN C. YOST
5                2901 North Central Avenue, Suite 2000
                 Phoenix, Arizona 85012
6                602.351.8000
                 Ayost@perkinscoie.com

7

8        For the Defendants:

9
                 STRUCK LOVE BOJANOWSKI & ACEDO, PLC
10               ASHLEE HESMAN, ESQ.
                 3100 West Ray Road, Suite 300
11               Chandler, Arizona 85226
                 480.420.1600
12               Ahesman@strucklove.com

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                            I N D E X

2

3     WITNESS: CHRISTINA VERDUZCO

4

5     EXAMINATION                                    PAGE

6

7       MS. HESMAN.................................... 5

8

9                        *      *      *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          INDEX TO EXHIBITS

2

3     EXHIBIT                                        MARKED

4

5                         NONE MARKED

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

```
 1                    PHOENIX, ARIZONA;

 2                 OCTOBER 13, 2021; 11:30 A.M.

 3

 4                    CHRISTINA VERDUZCO,

 5      called as a witness herein, having been first duly sworn

 6      by the Certified Reporter to speak the whole truth and

 7      nothing but the truth, was examined and testified as

 8      follows:

 9

10                         EXAMINATION

11   BY MS. HESMAN:

12        Q.    Good morning, Ms. Verduzco.  My name is Ashlee

13      Hesman, and I represent the defendants in this case.

14               Can you please state your name for the

15      record?

16        A.    Christina A. Verduzco is my name.

17        Q.    And can you spell your last name for the court        Rule 401
                                                                      5:17-6:14
18      reporter, please?

19        A.    V-, as in Victor, e-r-d-, as in dog, u-z-c-o.

20        Q.    Thank you.

21               And I know that you have had your deposition

22      taken before in this case a few years ago.  Is that

23      correct?

24        A.    I don't believe so.

25        Q.    You never had a deposition like this?
```

[10/13/2021] Verduzco, Christina

6

1      A.     I don't believe.

2      Q.     Okay.

3      A.     Not on -- I'm not too sure.  I -- I've never

4  had a on camera thing and a deposition.  I -- I'm not too

5  sure of...

6      Q.     Yeah.  It's a little different now, but back in

7  about 2013, lawyers from the Department of Corrections

8  came down and asked you questions.  There was a court

9  reporter.  And you were on -- you were videoed.

10          Do you recall that?

11     A.     No.

12     Q.     Okay.  Do you recall ever having your

13 deposition taken before?

14     A.     No.

15     Q.     Have you ever testified in a courtroom?

16     A.     For what?

17     Q.     For anything.

18     A.     Testify on -- on stand?

19     Q.     Correct.  Provided testimony in the court, in a

20 courtroom.

21     A.     (No oral response.)

22     Q.     No?

23     A.     No.  When I was -- no.

24     Q.     Okay.  And let me just go over a couple rules

25 of the deposition.  Make things a little easier --

7

1        A.    Deposition is what?  I'm sorry, ma'am.  But

2    deposition is what?

3        Q.    So let me just -- let me go over the rules.

4    The point of today is I'm going to be asking you some

5    questions about this case.  The court reporter is here,

6    and she's going to write down every question that I ask

7    and your answer to my questions.  So to make sure she can

8    understand everyone, it's a lot more difficult when we're

9    here on video, try and just pause after I ask my question

10   to give her time to write it down, and I'll do the same

11   for you so that she can hear us very well.

12             And it's important that we don't talk over

13   each other so that she can get a good, clean record.

14             And at the end of this deposition, she's

15   going to type everything up, and it's going to go into a

16   little booklet called a transcript.  Okay?

17       A.    Uh-huh.

18       Q.    Because she's writing everything down, you have

19   to answer verbally.  So you have to actually speak your

20   answers.  Don't shake your head or nod your head, because

21   she -- she can't write that down.

22             And it's also important to actually speak

23   your answers instead of saying things like "huh-uh" and

24   "uh-huh."  That's just harder for her to write down.

25   Okay?

8

```
 1              Do you understand that?

 2      A.    Yes.

 3      Q.    And the oath that you just took, do you

 4  understand that that's the same oath you would take just

 5  as if you were in a courtroom?  Do you understand that?

 6      A.    (No oral response.)

 7      Q.    I think we lost her.  I'll repeat my question.

 8  Sorry.  We had some connectivity issues.

 9              Do you understand that the oath that you

10  just took is the same oath you would take if you were in

11  a courtroom?

12      A.    Yes.

13      Q.    The oath to tell the truth?

14      A.    And --

15      Q.    Do you understand what that means?

16      A.    Understand what what means?

17      Q.    The oath that you took with the court reporter,

18  that you swore to tell the truth, do you understand what

19  that oath means?

20      A.    To tell the truth, the whole truth, and nothing

21  but the truth --

22      Q.    Okay.  And so you understand --

23      A.    -- so help me God.

24      Q.    You understand that you're under oath today.

25  Correct?
```

[10/13/2021] Verduzco, Christina

```
 1        A.    Yes.

 2        Q.    Okay.  Is there anything --

 3        A.    I can put my hand on a Bible.

 4        Q.    Okay.  I understand that, but you took an oath

 5   today, and I'm hearing that you understand what it means.

 6   Okay?  Is that correct?

 7             MR. YOST:  We can't hear you, Ashlee.  Okay.

 8   We can hear you now, I think.  Sorry.  You cut out.

 9             MS. HESMAN:  That's okay.  I think there's a

10   bit of a connectivity issue because you guys a moving a

11   little slow, but I'll try and -- we'll try and work

12   through it.

13        Q.    BY MS. HESMAN:  Ms. Verduzco, is there anything

14   today that would prevent you from giving honest

15   testimony?

16        A.    No.

17        Q.    Are you on any medications?

18        A.    What do you mean?

19        Q.    Are you taking any medications today?

20        A.    I do take medications.  I am prescribed

21   medication every day.

22        Q.    And have you taken it --

23        A.    I took my medication today.

24        Q.    Okay.  Is that medication going to prevent you

25   from giving honest and truthful testimony?
```

1     A.    I told you I'm going to tell you the honest

2  truth.

3     Q.    Okay.  And your medication's not going to

4  prevent you from doing that.  Is that correct?

5     A.    I just told you I was going to tell you the

6  truth.

7     Q.    Okay.  And your medications aren't going to

8  prevent from you doing that.  Correct?

9     A.    (No oral response.)

10     Q.    Did you hear my question?

11     A.    May I ask why you ask me the same question over

12  again when I told you I am going to answer honestly.

13     Q.    Okay.  And your medications aren't going to

14  prevent that.  Correct?

15     A.    I --

16     Q.    It's just a yes-or-no answer.  I just need to

17  confirm that your medications aren't going to prevent you

18  from giving honest testimony.

19     A.    I asked you why do you keep asking me the same

20  question over again?

21     Q.    Because I need an answer.  I need a yes or no

22  to that question.

23     A.    To what question?

24     Q.    Whether your medications are going to affect

25  your ability to give truthful responses.  And I think

1    your answer is no, but I just need to make sure I'm

2    understanding that correctly.

3         A.    My medication is not going to interfere with me

4    answering you honestly.

5         Q.    Perfect.  Thank you.

6              So I'm -- if you don't understand my

7    question or you need me to clarify, just let me know, and

8    I'm happy to do that.  But if you answer the question,

9    I'm going to assume that you understood it.

10        A.    Everything you've asked -- everything you've

11   asked me, I've answered honestly.  But if you keep

12   reframing the question over and over again and I give you

13   the same answer, I refuse to answer the same question

14   over and over again honestly.  If I give you an answer

15   once, it is honest.  I'm not going to answer the same

16   question over and over again.

17        Q.    Okay.  So my question --

18              MR. YOST:  Could we have a five-minute

19   break?

20              THE WITNESS:  May I have a break, please?

21              MS. HESMAN:  Sure.

22              MR. YOST:  Okay.  Thank you.

23              (A recess was held off the record.)

24        Q.    BY MS. HESMAN:  And, Ms. Verduzco, my last

25   question was more about kind of the rules of the

12

1    deposition.  If you don't understand my question or you

2    need clarification, please feel free to ask me to do so.

3    But if you answer my question, I'm going to assume you

4    understood it.  Is that fair?

5         A.    Yes.  What is deposition again?

6         Q.    I -- I'm going to ask the questions.  You can

7    talk to your lawyer about what all this means.  But I'm

8    just here to ask you questions about the case.  Okay?

9         A.    Okay.  Go on.

10        Q.    So before the deposition today, did you meet

11   with -- with your lawyer to prepare?

12        A.    I met with my lawyer.

13        Q.    Did you meet with him before today or just

14   today?

15        A.    I met with him today.  I met him today --

16        Q.    Did you speak --

17        A.    -- for the first time.

18        Q.    Okay.  Did you speak to any of your lawyers on

19   the phone in preparation of this deposition?

20        A.    My lawyers?  I didn't know I had lawyers.

21        Q.    Did you speak to anyone regarding this case

22   either yesterday or the day before?

23        A.    Yes, I spoke to someone yesterday.

24        Q.    Who?

25        A.    I don't know his name.

13

1      Q.    Was he a lawyer on this case?

2      A.    Yes.

3      Q.    Okay.

4      A.    I believe so.

5      Q.    And how long did you speak to him for?

6      A.    I don't know, about -- about 20 minutes.

7      Q.    Okay.  And then you met with a lawyer today

8   before the deposition.  Right?

9      A.    Yes.

10      Q.    And how long did that meeting last?

11      A.    20 minutes.

12      Q.    Okay.  Did you look at any documents before the

13   deposition today?

14      A.    What was that?

15      Q.    Did you look at any documents before the

16   deposition today?

17      A.    No.

18      Q.    Other than yesterday and today when you met

19   with your lawyer, have -- in the last six months, have

20   you met with any other lawyers on this case?

21      A.    Yes.

22      Q.    And who?  Who are they?

23      A.    (No oral response.)

24      Q.    Sorry.  You broke up, so I couldn't hear you.

25   Can you repeat your answer?  Your video was frozen.  Do

1    you want me to reask the question?

2        A.    Oh.   Are you talking to me?

3        Q.    Yes.

4        A.    What was that?

5        Q.    My question is, you said that you had met with

6    other lawyers in the last six months.   Right?

7        A.    Yes.   Yes.

8        Q.    Do you remember their names?

9        A.    I don't.

10       Q.    Did you sign any documents during your meetings

11   with them?

12       A.    No.

13       Q.    Were you shown any documents during your

14   meetings with them?

15       A.    Um, yes.

16       Q.    What documents were you shown?

17       A.    It was a paper that I was involved in the case,

18   the Parsons versus Ryan case.

19       Q.    Do you know what -- what the paper said or what

20   was on the paper?

21       A.    No.

22       Q.    But you weren't asked to sign anything at any

23   of those meetings?

24       A.    Just that I was -- I was going to be seen by a

25   lawyer.

15

1        Q.     Okay.

2        A.     And that was, um, about it.

3        Q.     Do you recall meeting with anyone else

4    regarding this case?

5        A.     What do you mean?  I don't understand.

6        Q.     Sure.

7               So, for example, there are expert witnesses

8    in this case.  They're doctors that are serving as

9    experts.

10              Do you recall meeting with any -- any expert

11   doctors?

12       A.     No.

13       Q.     Do you recall reviewing any documents that were

14   prepared by these expert doctors?

15       A.     I wasn't seen by any expert doctors.

16       Q.     But did you review any documents that -- that

17   were prepared by them?

18       A.     I wasn't seen by any expert doctors, so --

19       Q.     But did --

20       A.     -- there was -- I didn't --

21       Q.     I didn't ask that.  My question is, did you

22   look at any pieces of paper that were prepared by these

23   expert doctors?

24       A.     I didn't see no paperwork.  I didn't see no

25   expert doctors.

1    Q.    Okay.  And do you understand that you're a

2    plaintiff in the Parsons versus Shinn case?

3    A.    What is that?  Shinn?

4    Q.    Shinn is the new director of the Department of

5    Corrections.  So the case used to be called Parsons

6    versus Ryan.  Now it's Parsons versus Shinn.  It's the

7    same case.

8              But are you aware that you're a plaintiff in

9    this case?

10    A.    No.  I didn't even know what a plaintiff is.

11    Q.    Okay.  Are you aware that you're a class

12    representative in this case?

13    A.    I don't even know what that is.

14    Q.    So then I assume that you don't know which

15    classes you represent.  Is that accurate?

16    A.    I don't understand you.

17    Q.    Do you know which classes you represent?

18    A.    No.

19    Q.    And you're currently housed in the Lumley unit

20    at Perryville.  Is that right?

21    A.    Yes.

22    Q.    And my understanding is that the unit you're

23    housed in is a residential treatment unit.  Is that

24    right?

25    A.    What does that mean, residential treatment

1    unit?

2         Q.    Do you have -- does that term mean anything to

3    you?  Is that your understanding of where you're housed,

4    or do you not know what that means?

5         A.    I do not know what that means.

6         Q.    Okay.

7         A.    Residential treatment unit, it's just a part of

8    Lumley.  It's still Lumley.  Residential treatment

9    center.

10        Q.    Okay.  And how long have you been at Lumley?

11        A.    What do you mean?

12        Q.    How long have you been housed at the Lumley

13   unit?

14        A.    I've been there this last time a month and two

15   weeks probably.

16        Q.    Okay.

17        A.    A month and -- yeah.

18        Q.    And my next question, can you kind of walk me

19   through what a typical week looks like for you?  So what

20   I'm interested in knowing is what kind of doctors you're

21   typically seeing, what kind of program you're receiving,

22   anything like that if you can just walk me through that?

23        A.    Starting from Monday through Sunday?

24        Q.    Yeah, just a typical -- just a typical week.

25        A.    Monday -- Monday, I wake up at 3:00 o'clock in

18

1    the morning.  Monday -- we have class at 9:30.  We take

2    medication at -- I don't know what you want to hear.  I'm

3    sorry.

4        Q.   That's okay.  I don't -- I don't need all the

5    details, because that's difficult to remember.  I'm just

6    looking for generally if you can tell me the types of

7    classes you're in and the types of doctors generally.

8        A.   We have class every day at 9:00 to 10:30,

9    Monday through Friday.  Ms. Alaca, that's the psych

10   teacher, it's psychological, psycho -- psycho,

11   psychoeducation, something like that.  That's -- Monday

12   and Wednesday, she's teaching out of a book, and she

13   copies the books and we get the books.  And we read about

14   three pages, and we answer questions.  We go around each

15   group, and we talk about it.

16             Some -- some girls have really exquisite

17   answers and -- but I understand them.  I do my best, and

18   I answer questions.  And that's Monday and Wednesday.

19   She gives us homework, and she gives us candy for

20   answering -- doing our homework.

21             And Tuesday and Thursdays we talk to another

22   teacher who -- we just do colorings and do fun things

23   with her.  We just do games and talk to her.  She is a

24   CO3.  I forgot her name.  I just got there, so I've only

25   done like four or five groups with her, a couple groups.

19

1        And -- and then Fridays we do another

2    (inaudible.)

3        MR. YOST:  Can you hear her?

4    Q.   BY MS. HESMAN:  You froze for a second.  The

5    last thing I heard was on Fridays you do, and then it

6    broke out.  So I'm sorry.  Can you repeat that?  What do

7    you do on Fridays?

8    A.   Okay.  Friday is another lady.  The last couple

9    of days, we watched a movie.  And then on the last two

10   days -- or, no, on the last day I went to her class, we

11   did a board, and we glued stickers on the wall, like a

12   fun board, welcome to our group, and then we put

13   inspirational stuff on the wall.

14        And it's just a fun gathering.  And all of

15   us girls in the -- in the class get along together pretty

16   well, and we're a good group together.  There's really no

17   problems in that group, and it's called LMHU.

18        And a girl just graduated.  Sorry.  I'm

19   carrying on.

20        But we have meds at 8:30 usually.  Everybody

21   takes out and goes to meds.  But we have one class a day,

22   and that's at LMHU.  And that's pretty much it.  We have

23   breakfast at 4:00 o'clock.  So...

24   Q.   Okay.  Other than the education and

25   programming, which I think you just described, are you

20

1    getting any recreation or anything like that?

2        A.    The recreation is at 4:30, 5:00 o'clock in the

3    morning for two hours, hour and a half, and it really

4    sucks for a lot of us because it's so cold out there

5    right now.  They're trying to change the rec time.  Some

6    of the girls are trying to convince the officers to

7    change it.

8                   But we go eat breakfast and then go to rec.

9    And on the weekends we go to rec first and then go to

10   breakfast early, early in the morning.  So it's really

11   hard for us.

12               We come back at 6:45 and have to take

13   showers.  So that really sucks for a lot of us because

14   it's freezing cold.  And -- and we have to wash our own

15   clothes in our sink, sink or toilet.  And that we do.

16   And it really sucks because they used to a long, long

17   time ago, I mean, years ago, pick up our laundry, but

18   then they would switch clothes with other people, open up

19   our bags and take out our clothes and put other clothes

20   in it.  And they would --

21       Q.    Okay.

22       A.    -- take the clothes --

23       Q.    Let me stop you there, because I think we're

24   getting sidetracked.

25               So other than the programming and the

21

1    recreation, can you kind of describe in a typical week or

2    month what kind of doctors you're seeing?

3        A.    Well, I haven't seen doctors here.  I've seen

4    Alaca.  I haven't seen any mental health or

5    psychiatrists.  I don't know what they're called,

6    psychiatrists, you know, for medication.  But I've -- you

7    can write H and Rs on your tablet, H and R health and

8    request forms, and put inmate letters on your tablet, but

9    I've also put in inmate request forms and health -- H and

10   Rs -- H and Rs in a box to see the nurse, and they've

11   addressed me to see the doctor.  But I haven't seen no

12   psych doctors.  I've only seen Alaca.

13       Q.    Okay.

14       A.    And she's talked to me -- she's talked to me

15   and given me advice, and I've asked to be put back on my

16   Prolixin shot which they took me off of.

17       Q.    Okay.

18       A.    And --

19       Q.    Okay.

20       A.    And they haven't seen me yet.

21       Q.    Okay.  So I'm going to show you a document, and

22   let me know what -- if you've ever seen this document.

23   Can you see that, Ms. Verduzco?

24       A.    Yes.

25       Q.    Have you ever seen this before?

22

1        A.    I've seen things similar, but I don't --

2        Q.    So let me tell you what this is.  This is a

3   document that was prepared by your lawyers that says what

4   you're going to talk about at trial.  So have you ever

5   seen anything like that before?

6        A.    No, I've seen -- no.  What I'm going to talk

7   about at trial, no.

8        Q.    Okay.

9        A.    I've seen papers similar, but not -- no.

10       Q.    Okay.  Let me scroll down to your section.  And

11  before I do so, what is it that you're going to testify

12  to at trial?  Can you -- can you give me an idea?

13       A.    No.

14       Q.    Okay.  Do you -- because your lawyers have

15  listed you as a witness and said that you're going to

16  testify at the November trial.  Were you aware of that?

17       A.    As a witness, witness to what?  No, they

18  haven't.

19       Q.    Okay.  They are -- they have listed you as a

20  witness to talk about mental health conditions.  Are

21  there any mental health conditions that -- or allegations

22  or issues that you're having?

23       A.    That -- oh, okay, okay, okay.

24       Q.    Can -- can you hear me, Ms. Verduzco?          Rule 401
                                                              22:24-23
25       A.    I think I need a break.                        :1

[10/13/2021] Verduzco, Christina

```
1                    Tell her to shut up.
2                    MR. YOST:  Can we take a five-minute break?
3                    MS. HESMAN:  Sure.
4                    (A recess was held off the record.)
5         Q.    BY MS. HESMAN:  Ms. Verduzco, can you hear me?
6         A.    Yes.
7         Q.    Okay.  So I believe my last question was
8    regarding what your testimony will be at trial.
9         A.    Yes.
10        Q.    And what will your testimony be at trial?
11        A.    That I was -- that I was used as a test subject
12   in here.  That's what I believe.
13        Q.    Okay.  Do you have any allegations issued or
14   complaints with respect to your mental health treatment?
15        A.    I'm not too sure what that means.
16        Q.    So do you disagree or do you have any problems
17   with your mental health treatment?
18        A.    At this moment?
19        Q.    Yes.
20        A.    I don't know.
21        Q.    Is there anything that you disagree with or
22   that you think should be being done differently?
23        A.    (No oral response.)
24        Q.    Do you understand my question?
25        A.    I can't --
```

24

1    Q.   I'm sorry.  Go ahead.

2    A.   I can't say because I'm not fully functioning

3    right now, you know.  I just -- there's just so much

4    going on right now.  I don't -- I don't know.

5    Q.   Okay.  Well, I need to know what it is that

6    you're going to testify to at trial.  So if you have any

7    issues with your mental health treatment, I need to know

8    about that now.

9            So is there any specific allegations or

10   complaints that you have, things that you think should be

11   being done differently?  Now is the time for me to know

12   those things.

13           MR. YOST:  Ashlee, you cut out in your last

14   question.  Do you mind repeating it?

15           MS. HESMAN:  Sure.

16   Q.   BY MS. HESMAN:  I was just saying that now is

17   the time for me to find out what you're going to testify

18   to at trial.  So if there are issues or complaints or

19   allegations that you have regarding the treatment you're

20   receiving, I need to know what your problems are.

21   A.   I'm actually doing pretty good right now.  I'm

22   not healed, but from -- may I just say I've been locked

23   up 19 years, and these last -- these last six months have

24   been an experience where I have overcome a lot.  And ever

25   since they moved me to LMHU, I -- I've changed a lot.

[10/13/2021] Verduzco, Christina

25

1    And I'm not stable but pretty much -- I've gained a lot

2    of knowledge, and I'm almost on my feet.

3              I talk to my mom and grandfather every

4    morning.  I'm -- I'm doing fine.  These last 16 to 18

5    years, I've gone through a lot of therapy, if that's what

6    you could call it.  It's been a really tough 18 years.

7              My first many, many years in prison were

8    really, really tough on me.

9        Q.    So --

10       A.    I went from eating shit, smearing shit on the

11   walls, hitting officers, beating up myself, getting beat

12   up by the cops, assaulting inmates and staff.  It's been

13   a really tough time for me.

14       Q.    It seems like what you're saying is the last

15   six months you feel the most stable mentally -- mentally

16   than you have your entire time at the department?

17       A.    Yes.

18       Q.    And do you attribute that to the programming

19   and education and treatment you're receiving?

20       A.    Oh, it's been really, really tough, yes.  It's

21   been a real mind-breaker.  And speaking in front of

22   people, I can't do.  I -- I can, but it's really hard.

23   That's when my sickness comes out when I'm in front of

24   people, and I end up talking to myself.  And it's just

25   amazing how I talk to people.

1      I mean, I make no sense.  I'm sorry.
2  Forgive me.
3      Q.   No, you're making sense to me.  And I'm sorry
4  that you're having to talk in public and it's awkward
5  over a video.  I understand that.  I don't like doing it
6  either.  So I'm going to try and be as brief as I can.
7          But it sounds like what you're saying is
8  that you're currently satisfied with the treatment you're
9  receiving, and that over the last six months, you've
10 improved.  Is that accurate?
11         MR. YOST:  Ashlee, hold on.  You cut out in
12 the middle of your question.  Do you mind repeating it?
13         MS. HESMAN:  Sure.
14     Q.   BY MS. HESMAN:  It sounds like what you're
15 saying is that you've improved in the last six months,
16 and that you're in the best place mentally than you have
17 been.  Is that an accurate statement?
18     A.   Yes.  In the last 19 years, yes.
19     Q.   Okay.  So with respect to the treatment you're
20 receiving right now, do you have any complaints or
21 disagreements with it?
22     A.   Um, what kind of treatment would you say --
23 would you be talking about?
24     Q.   Sure.  So any kind of treatment, whether it's
25 medication or the type of doctors you're seeing or the

27

1    type of programming that you're receiving, do you have

2    any disagreement or complaints with respect to what

3    you're receiving now?

4         A.   (No oral response.)

5         Q.   Did you hear that okay?

6         A.   What's wrong?  Shit.

7         Q.   Did you understand my question, Ms. Verduzco?

8         A.   I'm in a trance.  Hold on.  You're not --

9              MR. YOST:  Can we take a five-minute break?

10             MS. HESMAN:  Sure.

11             (A recess was held off the record.)

12        Q.   BY MS. HESMAN:  Okay.  Ms. Verduzco, I think

13   before we had the break, I was just asking if you had any

14   complaints or issues with the treatment you're receiving

15   right now?

16        A.   The only complaints I have is people don't

17   believe as much as I believe.

18        Q.   Okay.  Anything more specific or other than

19   that, any complaints that you have with respect to your

20   mental health treatment?

21        A.   I don't -- well, I'm taking all my medication,

22   so I don't know what I'm taking.

23        Q.   Okay.  So it seems to me that you don't have

24   any complaints with respect to your mental health

25   treatment.  Is that an accurate statement?

```
 1              MR. YOST:  Objection.  Form.

 2              THE WITNESS:  (No oral response.)

 3      Q.    BY MS. HESMAN:  Can you hear me, Ms. Verduzco?

 4      A.    If officers have anything --

 5              (A recess was held off the record.)

 6      Q.    BY MS. HESMAN:  Can you hear me okay?

 7      A.    (No oral response.)

 8              MS. HESMAN:  I think her microphone is

 9   muted.

10      Q.    BY MS. HESMAN:  Okay.  I apologize,

11   Ms. Verduzco.  I couldn't hear you because your camera

12   was on mute, and I think you were in the middle of an

13   answer to my question about complaints you have about

14   your health care.  So if you wouldn't mind repeating

15   that, I just couldn't hear you.

16      A.    Mental health care, does that deal with my

17   entire imprisonment, the dealing with the officers, too,

18   how they're treating me?

19      Q.    Sure.  Any complaints that you have, that's

20   what I'm interested in knowing, yes.

21      A.    Um, (inaudible) apparent reason?

22      Q.    I'm sorry.  Ms. Verduzco, your video cut out,

23   and I couldn't hear you.  Can you start over?

24      A.    Hello?

25      Q.    Yes, I can hear you now.  Go ahead and start
```

1   your response over.  I just couldn't hear you.

2        A.    Um, I think the officer should -- if you asked

3   them a question, they should answer you, not get violent

4   or aggressive.  Or I don't know the word, not aggressive.

5   They should answer you instead of yelling at you or

6   giving you a ticket for asking a question, because that

7   happened to me the other day with one particular officer.

8             And that makes -- especially SMI inmates,

9   get frustrated.  Sometimes they don't know how to act and

10  they stutter, and the officer will get snappy with them.

11  And they're like, get away or, like, go sit down now.

12            And they're like, but, but I'm trying to go

13  this way.

14            And they're like a little -- I don't know

15  what apprehensive means.  I don't know, that just came to

16  my head.

17            For instance --

18       Q.    Go ahead.

19       A.    For instance, an officer told me to turn around

20  so she can pat search me, and I said, why?

21            And she goes, just turn around.

22            And I told her -- I told her I don't want

23  her hands all over me.

24            And she goes, just turn around.

25            And I went, why?

1          And I go, can you give me an answer, please?

2          And she goes, well, everybody is searching

3     for butts.

4          And I go, oh, okay, that's all you had to do

5     was give me an answer.

6          And I go, thank you.

7          And she goes, yeah, and I walked away.  And

8     she goes to my door and goes, you're advised.

9          And I go, for what?

10         She goes, write me up.

11         And I go -- I go -- she goes, oh, you could

12    grieve me.

13         And I got pissed off.  I was like, what?

14    And this is the third time she's done that to me.  And

15    I've only had a problem with her.

16    Q.    And what's her name?

17    A.    Maldanado.

18    Q.    And she's a CO?

19    A.    Yes.  And --

20    Q.    Okay.  Other than your issues with Maldanado,

21    the CO, are there -- I think we lost her.

22    A.    Hello?

23         MR. YOST:  We didn't hear any of your

24    question, Ashlee.

25    Q.    BY MS. HESMAN:  Okay.  Other than the issues

31

1    you have with that particular officer, are there any

2    other complaints or issues you have regarding your

3    conditions of confinement or your mental health care?

4        A.   My confinement in well -- confinement, being

5    locked up?

6        Q.   Yes.  Just how you're housed and the manner in

7    which you're housed, do you have any complaints regarding

8    that?

9        A.   Yes.  We have to -- all the SMI inmates on LMHU

10   have to wash their own clothes.  We don't get -- we have

11   net bags, but we don't have laundry coming down to pick

12   up our net bags full of dirty clothes.  We have to wash

13   our own clothes in our little, little sink.  We don't get

14   little soap -- bag of soap to wash our clothes in or

15   anything.

16            Other yards have laundry days where the

17   girls will come and pick up their laundry.  And we

18   don't -- in our unit, we don't have a washer or a dryer.

19   So we have to wash our own laundry.  And we don't know

20   how to dry it or anything else.  We have to make up lines

21   in our -- in our cells.  We tie a shoe string from the --

22   from the window to the -- the vent, a shoe string or a

23   ripped up sábana.  What is it called?  A sheet.  And we

24   hang up our clothes on that.

25       Q.   Okay.

32

1          A.     And some girl --

2          Q.     Other than the laundry issues and your issues

3     with that one CO, are there any other complaints you have

4     regarding conditions or your mental health treatment?

5          A.     For my mental health treatment?  No, the --

6     Ms. Alaca comes by -- this isn't an issue, but this is

7     good.  Ms. Alaca comes by and sees the people very

8     regularly.  And the CO -- the -- I haven't seen the --

9     no -- 45, building 45.  This was about two months ago.

10    Cadogen was -- at 45, they favor people there.  And it's

11    another mental health unit.  There's ward and 45.  They

12    really, really favor people there.  It's another mental

13    health ward and -- especially Cadogen.  I was doing very,

14    very good over there, and they kicked me out of there

15    and -- hello?

16         Q.     I can hear you.  Keep going.

17         A.     Okay.  My apologies.  Cadogen did everything he

18    could to get me out of there.  And they told me I had

19    lithium poisoning, and they took me to the hospital

20    because I was having -- I was throwing up for like

21    three -- off and on.  I was taking three lithiums.  The

22    doctor kept giving me -- hiring my lithium.  And they

23    took me to the hospital, and they said, oh, you don't

24    have lithium poisoning; we misdiagnosed you.

25              And I was like, okay.  And I went back.

33

1          They -- they said -- kept saying I

2     was lithium -- I had lithium poisoning, and then they

3     said I didn't have lithium poisoning.  And they took me

4     off a couple meds.

5          And they took me off my Prolixin shot.  I

6     want to be back on it because I started tripping again.

7     And tripping, I start hearing voices, and I start

8     hallucinating.  I still -- I have split personality

9     disorder, supposedly.  All these labels are not me.  But

10    they're just labels.  And schizoaffective.  And they just

11    come spur at the moment, and they then they go away.  And

12    I don't know what that is called.

13         I asked to be checked -- rechecked of my

14    diagnosis.  And they said, well, you have a little bit of

15    everything.  And it's been so long that you've been

16    diagnosed that is hard to tell what she -- what you

17    really are.  But anyways.

18         Q.    Okay.  So --

19         A.    The doctor --

20         Q.    Let me just back up a second.

21              So we have the one issue -- one issue with

22    the CO.  And then you talked about an injection that you

23    want to have.

24         A.    Prolixin.

25         Q.    Prolixin, yes.

34

1          And then you talked about some issues on

2    another unit where you no longer are.  Anything else that

3    you could think of?

4          A.    Well, thank God I'm not at the ward no more,

5    because people are cutting themselves and doing a lot of

6    harm there.  It is bad.

7          Q.    Okay.  Anything else that you're experiencing

8    right now?

9          A.    No, but, you know, that there was a lot of

10   people over there at the ward who were -- the officers

11   were really foul to the inmates.  They were cussing at

12   them.  And I'm telling you, they're -- these -- the

13   officers were -- okay, they take advantage of these

14   inmates because they're mentally ill.

15         Q.    Okay.  Anything else --

16         A.    And so did the --

17         Q.    -- specific to you?

18         A.    -- behind their backs.

19         Q.    Anything else specific to you?

20         A.    (No oral response.)

21         Q.    Did you hear that question?

22         A.    Yes, but I don't remember anybody's name.

23         Q.    Okay.  So any --

24         A.    Ramirez.  That's the only name I remember, is

25   Ramirez.

35

```
 1        Q.    Do you recall being seen by a mental health
 2    provider on September 28th?
 3        A.    No, I don't remember dates.
 4        Q.    Do you remember being seen by a mental health
 5    provider some time last month?
 6        A.    Mental health?
 7        Q.    Yes.
 8        A.    Maybe a lady here at Lumley.
 9        Q.    And do you recall refusing to continue with
10    that encounter because you said you didn't need it?
11        A.    No.
12        Q.    Okay.  Is there anything else that we haven't
13    talked about, complaints, issues, or allegations with
14    respect to your mental health care?
15              MR. YOST:  Ashlee, your question cut out.
16    Do you mind repeating it?
17              MS. HESMAN:  Sure.
18        Q.    BY MS. HESMAN:  Can you guys hear me okay?
19              MR. YOST:  Yes.
20        Q.    BY MS. HESMAN:  Is there anything else,
21    Ms. Verduzco, with respect to mental health treatment,
22    allegations, complaints, grievances that we haven't
23    talked about that you're going to talk about when you
24    testify at trial?
25        A.    (No oral response.)
```

36

1      Q.    Did you hear that question?

2      A.    (No oral response.)

3      Q.    Did you hear that question, Ms. Verduzco?

4      A.    Yes.

5      Q.    Okay.  Can you please answer that question?

6      A.    (No oral response.)

7      Q.    Do you need me to repeat it?

8      A.    Yes.

9      Q.    Is there any other issues, allegations,

10  complaints, or grievances that we haven't already talked

11  about today that you're going to testify about at trial?

12          MR. YOST:  We want to take a five-minute

13  break.

14          MS. HESMAN:  Yeah, there's a question

15  pending, though.  So if she could just answer the

16  question.

17      Q.    BY MS. HESMAN:  Can you please answer that

18  question, Ms. Verduzco?

19      A.    What -- what did you say?

20      Q.    My question is whether there are any other

21  allegations, complaints, or issues that you have that we

22  haven't already talked about today?

23      A.    Is this about Ramirez?

24      Q.    It's about anything that we haven't talked

25  about today.

1          We've talked about Ramirez.  But are there

2     any other issues that you're having with respect to your

3     detention at the Department of Corrections?

4          A.    No.

5          Q.    Okay.  I think your lawyer wants to take a

6     break.

7               (A recess was held off the record.)

8          Q.    BY MS. HESMAN:  Can you hear me, Ms. Verduzco?

9          A.    Yes.

10         Q.    Okay.  Just a couple more questions.  We talked

11    about the mental health piece, and now I want to ask if

12    there's any other allegations, grievances, or complaints,

13    issues that you have that we haven't already talked about

14    with respect to your conditions of confinement?

15         A.    No.  I don't know what that means.  What do you

16    mean?

17         Q.    So I just mean any issues that you have

18    regarding where you're housed and the manner in which

19    you're housed.  Do you have any -- anything that you're

20    going to testify at trial regarding that, that we haven't

21    already talked about?

22         A.    No.

23         Q.    Okay.  And --

24         A.    Well -- excuse me.

25         Q.    Sure.

38

1       A.      (No oral response.)

2       Q.      I'm sorry.  You guys had cut out.  As soon as

3   she said "excuse me," I didn't hear anything after that.

4   Would you mind repeating it, Ms. Verduzco?

5       A.      You said if there's any other grievances or --

6       Q.      So I -- I just mean any other complaints that

7   you have, however you want to phrase it.  Complaints,

8   issue, an allegation, any issues we haven't talked about?

9       A.      What do you mean?

10      Q.      I mean with respect to your confinement, is

11  there anything -- any other complaints that you have

12  other than what we've already talked about?

13      A.      No.

14      Q.      Okay.

15      A.      Oh, wait.  Hold on.  Yes.

16      Q.      Okay.  And what are those?

17      A.      The psych doctors back at where -- you know,

18  they've changed a lot of psych doctors, so I'm not too

19  sure if this is still going on since before.  But they

20  used to gossip about the inmates and their problems and

21  laugh about it.  They -- then the psych doctors and the

22  officers talk about what they've done, talk about their

23  charges.

24              And it's ridiculous, because us inmates will

25  hear them and see them on the computers looking at their

39

1   charges and talk about what they're doing on watches, and

2   there's supposed to be confidentiality.  And they're

3   sitting there watching us pass by, laughing at other

4   people while they're at rec, pointing or sitting there

5   gossiping.

6               And it is not fair for us, watching us, oh,

7   yeah, she went to watches, and she did this.  You know,

8   she's in here because of child molestation.  She was

9   smearing shit on the walls.  She ate shit.  You know?

10      Q.    Do you recall the names of any of those

11  providers or officers?

12      A.    No, I don't.  That's one thing I do not know.

13      Q.    Do you recall which unit this happened in?

14      A.    The ward and 45.

15      Q.    And when did this happen?

16      A.    Like around June and July.

17      Q.    Of this year?

18      A.    Yes.

19      Q.    Okay.  Other than that, anything else you can

20  think of?

21      A.    No.

22      Q.    In the disclosure statement that your lawyer

23  prepared, he states that you were told by a provider that

24  you were transferred out of the mental health program

25  because you had been in it for too long.  Does that

40

1      allegation sound familiar to you?

2                  MR. YOST:  Sorry.  We couldn't hear your

3      entire question.  Do you mind repeating it?

4                  MS. HESMAN:  Sure.

5          Q.    BY MS. HESMAN:  Has anyone ever told you that

6      you need to be transferred out of the mental health

7      program because you've been in it for too long?

8          A.    Yes.

9          Q.    Who told you that?

10         A.    Cadogen.

11         Q.    And is -- is Cadogen an officer or a medical

12     provider?

13         A.    Exactly what is a medical provider?

14         Q.    Sure.  So I'm just trying to determine if

15     Kadogin is an officer or if he's like a doctor that you

16     were seeing for medical reasons?

17         A.    He wasn't a pill provider, but he worked in

18     the -- as another, like, associate psych, the psych -- he

19     was like one of the head psych doctors.

20         Q.    Okay.  And when did he tell you this?

21         A.    Um, about four months ago.  Three or four

22     months ago.

23         Q.    And are you aware --

24         A.    And --

25         Q.    Go ahead.

41

1      A.    Sorry.  My apologies.

2            While I was at the ward, I was there too

3      long.  And that was about six months ago.  Six, seven,

4      maybe eight months ago that I needed to leave.

5      Q.    Okay.  Are you aware --

6      A.    I was --

7      Q.    Are you aware that you've never been taken off

8      the mental health program and that you're still in the

9      mental health program?  Did you know that?

10     A.    Yes.

11           MS. HESMAN:  I have no other questions.

12     Your lawyer might have some questions for you though,

13     okay?

14           (A discussion was held off the record.)

15           THE WITNESS:  Ashlee?

16           MS. HESMAN:  Yes.  I'm not sure if you heard

17     me, but I said I have no other questions.  But your

18     lawyer might have some questions.

19           THE WITNESS:  So does that mean -- may I

20     speak to you?

21           MS. HESMAN:  No, there's not a question

22     pending, but your lawyer might have some questions for

23     you.  And you can answer his questions.  Okay?

24           MR. YOST:  Could we take a five-minute

25     break?

42

1                    MS. HESMAN:  Sure.

2                    MR. YOST:  All right.

3                    (A recess was held off the record.)

4                    MR. YOST:  I have no -- I have no questions.

5          So unless you have any other questions, we'll just go

6          ahead and read and sign.

7                    MS. HESMAN:  Okay.  Thank you, Ms. Verduzco.

8                    THE WITNESS:  You're welcome.  Thank you.

9                    (The deposition ended at 12:48 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43

1                         CERTIFICATE OF REPORTER

2    STATE OF ARIZONA      )
                            )
3    COUNTY OF MARICOPA     )

4

5          I, Sommer E. Greene, a Certified Reporter in the
     State of Arizona, do hereby certify that the foregoing
6    deposition was taken before me in the County of Maricopa,
     State of Arizona; that an oath or affirmation was duly
7    administered to the witness, CHRISTINA VERDUZCO, pursuant
     to A.R.S. 41-324(B); that the questions propounded to the
8    witness and the answers of the witness thereto were taken
     down by me in shorthand and thereafter reduced to
9    typewriting; that the transcript is a full, true and
     accurate record of the proceeding, all done to the best
10   of my skill and ability; and that the preparation,
     production and distribution of the transcript and copies
11   of the transcript comply with the Arizona Revised
     Statutes and ACJA 7-206(j)(1)(g)(1) and (2).

12

13         The witness herein, CHRISTINA VERDUZCO, has
     requested signature.

14                  I FURTHER CERTIFY that I am in no way
     related to any of the parties nor am I in any way
15   interested in the outcome hereof.

16         IN WITNESS WHEREOF, I have set my hand in my
     office in the County of Maricopa, State of Arizona, this
17   15th of October, 2021.

18

19                       --------------------------------
20                       Sommer E. Greene, RPR, CRR
                         Certified Reporter 50622

21

22         /S/
     _____
23   For Huseby
     Registered Reporting Firm No. 1192

24

25

44

1    CHRISTINA VERDUZCO

2    TAKEN ON OCTOBER 13, 2021

3
                   DECLARATION UNDER PENALTY OF PERJURY
4

5                       I declare under penalty of perjury that I

6       have read the entire transcript of my deposition taken in

7       the above-captioned matter or the same has been read to

8       me, and the same is true and accurate, save and except

9       for changes and/or corrections, if any, as indicated by

10      me on the DEPOSITION ERRATA SHEET hereof, with the

11      understanding that I offer these changes as if still

12      under oath.

13

14   Signed on the_____day

15   of _____20___.

16

17

18

19   _____

     CHRISTINA VERDUZCO
20

21

22

23

24

25

45

```
 1                    DEPOSITION ERRATA SHEET

 2

 3    Page No.___Line No.___Change to:_____

 4    _____

 5    Page No.___Line No.___Change to:_____

 6    _____

 7    Page No.___Line No.___Change to:_____

 8    _____

 9    Page No.___Line No.___Change to:_____

10    _____

11    Page No.___Line No.___Change to:_____

12    _____

13    Page No.___Line No.___Change to:_____

14    _____

15    Page No.___Line No.___Change to:_____

16    _____

17    Page No.___Line No.___Change to:_____

18    _____

19    Page No.___Line No.___Change to:_____

20    _____

21    Page No.___Line No.___Change to:_____

22    _____

23    Page No.___Line No.___Change to:_____

24    CHRISTINA VERDUZCO

25    Signature:_____
```

46

```
 1                    DEPOSITION ERRATA SHEET

 2

 3    Page No.___Line No.___Change to:_____

 4    _____

 5    Page No.___Line No.___Change to:_____

 6    _____

 7    Page No.___Line No.___Change to:_____

 8    _____

 9    Page No.___Line No.___Change to:_____

10    _____

11    Page No.___Line No.___Change to:_____

12    _____

13    Page No.___Line No.___Change to:_____

14    _____

15    Page No.___Line No.___Change to:_____

16    _____

17    Page No.___Line No.___Change to:_____

18    _____

19    Page No.___Line No.___Change to:_____

20    _____

21    Page No.___Line No.___Change to:_____

22    _____

23    Page No.___Line No.___Change to:_____

24    CHRISTINA VERDUZCO

25    Signature:_____
```