**Index of Exhibits to**
**Defendants' Notice of Filing Objections to Plaintiffs' Deposition Designations**

| Exhibit | Description |
|---------|-------------|
| 1 | Deposition Transcript – Johnny Wu |
| 2 | Deposition Transcript – Wendy Orm [redacted/under seal] |
| 3 | Deposition Transcript – 30(b)(6) Centurion (W. Orm) |
| 4 | Deposition Transcript – 30(b)(6) Centurion (A. Carr) [redacted/under seal] |

# EXHIBIT 1

# In The Matter Of:

*Parsons vs.*

*Shinn*

---

*Johnny Wu, M.D. Centurion Chief Clinical Officer*

*November 04, 2021*

---

*Glennie Reporting Services, LLC*

*1555 East Orangewood Avenue*

*Phoenix, Arizona  85020*

*602.266.6535 Office     877.266.6535 Toll Free*

*www.glennie-reporting.com   office@glennie-reporting.com*

Original File 110421JW.txt

**Min-U-Script®**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) Case No. ) CV12-00601-PHX-ROS |
| David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

DEPOSITION OF JOHNNY WU, M.D.

CENTURION CHIEF CLINICAL OFFICER

Via Zoom Videoconference

Princeton, New Jersey
November 4, 2021; 9:00 a.m.

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona  85020

602.266.6535
www.glennie-reporting.com

Prepared by:
Janet Hauck, RPR
Arizona CR No. 50522

2

1                         I N D E X

2

3    Witness                                     Page

4    JOHNNY WU, M.D.

5         Examination by Ms. Norman:                4

6

7

8

9                     INDEX TO EXHIBIT

10   Description                                 Page

11   Exhibit 1        Report of Johnny Wu, M.D. -     18
                      CONFIDENTIAL
12

13

14              WITNESS INSTRUCTED NOT TO ANSWER

15                                      Page    Line

16                                       98       9
                                        109      22
17                                      110      11
                                        110      19
18                                      115      15
                                        116       4
19                                      117      24
                                        131      16
20

21

22

23

24

25

3

1                     DEPOSITION OF JOHNNY WU, M.D., was taken on

2      November 4, 2021, via Zoom videoconference, commencing at

3      9:00 a.m., before JANET HAUCK, RPR, a Certified Reporter,

4      Certificate No. 50522, for the State of Arizona.

5

6      VIDEOCONFERENCE APPEARANCES:

7      For Plaintiffs:

8               PRISON LAW OFFICE
                Sara L. Norman, Esq.
9               Rita Lomio, Esq.
                1917 Fifth Street
10              Berkeley, California  94710

11     For Defendants:

12              STRUCK LOVE BOJANOWSKI & ACEDO, PLC
                Anne M. Orcutt, Esq.
13              3100 West Ray Road, Suite 300
                Chandler, Arizona  85226
14
       For the Witness:
15
                BROENING OBERG WOODS & WILSON, P.C.
16              Sarah L. Barnes, Esq.
                2800 N. Central Avenue, Suite 1600
17              Phoenix, Arizona  85004

18

19

20

21

22

23

24

25

4

1      COURT REPORTER:  Before we proceed, I will

2  ask that counsel agree on the record that there is no

3  objection to this officer of the court administering a

4  binding oath to a witness not appearing personally before

5  me.

6      MS. NORMAN:  Yes.

7      MS. ORCUTT:  Agree.

8

9      JOHNNY WU, M.D.,

10  called as a witness herein having been first duly sworn by

11  the Certified Reporter to tell the whole truth and nothing

12  but the truth, was examined and testified as follows:

13

14      EXAMINATION

15  BY MS. NORMAN:

16      Q.   Dr. Wu, could you please state and spell your

17  full name for the record.

18      A.   Sure.  My name is Johnny Wu, J-O-H-N-N-Y, no

19  middle name, and then Wu, W-U.

20      Q.   Thank you.  As I said, my name is Sara Norman

21  and I am a lawyer for the plaintiffs in this case.  I'll

22  be taking your deposition today.

23      Have you ever been deposed before?

24      A.   Yes.

25      Q.   How many times?

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

9

1      Q.    Is there any reason you cannot give full and
2   honest testimony today?

3      A.    No.

4      Q.    Is there any medication you're taking that
5   would affect your testimony today?

6      A.    No.

7      Q.    Is there any reason why we can't go forward
8   today?

9      A.    No.

10     Q.    All right.  So could you state your current
11   employer and your title.

12     A.    My current employer is Centurion Health, and my
13   current title is executive vice president/chief clinical
14   officer.

15     Q.    How long have you been in that role with
16   Centurion?

17     A.    Is it possible for you guys to pull up my CV?
18   Because I don't have access to that.

19     Q.    I think it's an appendix to your report.

20     A.    Oh, I see.  Thank you.  So let's see.  When did
21   I become EVP?  So you wanted to know how long I had been
22   in that role?

23     Q.    Exactly.

24     A.    So almost six months.

25     Q.    Okay.  What was your position prior to becoming

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

10

1    chief clinical director; is that it?

2         A.    Chief clinical officer.  Prior to that I was in

3    the role of chief of clinical operations.

4         Q.    Okay.  And what's the difference between those

5    two roles?

6         A.    Basically, I am now part of the executive team

7    at the corporate office.

8         Q.    Okay.  Could you please describe your job

9    duties in your current role.

10        A.    So I oversee clinical operations at the

11   corporate side, and the chief medical officer, chief

12   psychiatric officer, as well as anything clinical, and

13   technology like telehealth, pharmacy, and startups all

14   fall under the clinical operations that I oversee.

15        Q.    Do you provide any direct patient care?

16        A.    As part of my job requirement with Centurion,

17   which is a subsidiary of Centene, I am required to do

18   community service and direct patient care in my community.

19   Unfortunately, I do not have any contracts here in

20   New Jersey.  I live in the Princeton, New Jersey area and,

21   thus, I actually volunteer working at a local county jail

22   providing inmate services to the inmate population there,

23   but it's not with Centurion.

24        Q.    So in your job at Centurion do you provide any

25   direct patient care?

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

1      A.     No.

2      Q.     In your job at Centurion do you regularly

3   review any patients' medical charts?

4      A.     Yes.

5      Q.     Under what circumstances do you do that?

6      A.     I review situations in regards to UM when there

7   may be issues, questions about how to go about determining

8   whether to move forward or to suggest alternative actions

9   for certain requests.

10     Q.     Can you tell us what you mean by UM?

11     A.     I'm sorry, yes.  UM is utilization management.

12  It is a division that handles off-site specialty requests.

13     Q.     So then is it fair to say that you review

14  patient charts when they come to your attention raising

15  some sort of question about the need for specialty care?

16     A.     Yeah.  It's not very often since there are many

17  other layers, but sometimes they may ask for my

18  suggestions or opinion, given my extent on working in the

19  industry for nearly 20 years.

20     Q.     How many times would you say that you've been

21  consulted in this capacity and reviewed a patient chart in

22  the last six months?

23     A.     In the last six months, not often.  I mean,

24  maybe two or three times.

25     Q.     Okay.  And have any of those times involved

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

13

1      Q.    Do you review any mortality reviews in your job

2   at Centurion?

3      A.    I do not.

4      Q.    As part of your responsibilities at Centurion,

5   do you analyze the adequacy of care at any prisons or

6   jails?

7      A.    Could you rephrase that again?  I'm sorry.  Can

8   you say it again?

9      Q.    So I asked, in your capacity in your job at

10  Centurion, do you analyze the quality of care at any

11  prisons and jails?

12                MS. ORCUTT:  Form.

13                THE WITNESS:  I would say yes.

14      Q.    BY MS. NORMAN:  Can you describe how you so?

15      A.    It's a team approach to reviewing things.  I

16  may be a participant.

17      Q.    So if some prison or jail system asks Centene

18  to do a review you might play a role in that review?

19      A.    Possible, yes.

20      Q.    And has that happened in your six months as

21  chief clinical officer?

22      A.    No.

23      Q.    And how about in your time as the chief of

24  clinical operations?  Has that happened?

25      A.    Yes.

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

21

1      A.    No.

2      Q.    Did you speak to any incarcerated people in

3  ADCRR in coming to the conclusions expressed in this

4  report?

5      A.    No.

6      Q.    Did you speak to any people formerly

7  incarcerated in ADCRR in coming to the conclusions you

8  expressed in this report?

9      A.    I don't believe so.

10      Q.    Did you review any documents in coming to the

11  conclusions expressed in this report?

12      A.    Just the NCCHC standards.

13      Q.    And I believe you also mentioned that you

14  reviewed Dr. Wilcox's report and Mr. Joy's report?

15      A.    Yes.

16      Q.    So other than those three documents,

17  Dr. Wilcox's report, Mr. Joy's report, and the NCCHC

18  standards, did you review any documents in coming to the

19  conclusions you expressed in the report?

20      A.    I believe I also reviewed the Pew website.

21      Q.    And that's Pew Charitable Trusts?

22      A.    Yes.

23      Q.    Okay.  And that was one of the attachments to

24  your report, right, a printout from a Pew report?

25      A.    Yes.

24

1              MS. BARNES:  Form.

2              MS. ORCUTT:  Form.

3              THE WITNESS:  There was a transitional

4   meeting, which I believe the Corizon medical director was

5   a part of that.

6       Q.   BY MS. NORMAN:  And what, if anything, did you

7   learn about the adequacy of care being delivered in the

8   Arizona state prison system at that meeting?

9              MS. BARNES:  Form; foundation.

10             MS. ORCUTT:  Join.

11             THE WITNESS:  I actually don't recall

12  specifically.  It's been awhile.

13      Q.   BY MS. NORMAN:  So did you have any impression

14  of the adequacy of care offered by Corizon in the Arizona

15  state prison system prior to Centurion taking over?

16             MS. BARNES:  Form.

17             MS. ORCUTT:  Form.

18             THE WITNESS:  I actually really was looking

19  forward to trying to, you know, show that we can deliver

20  good care at Centurion.  So I mean, what may have happened

21  in the past is the past, but I look forward to trying to

22  do as best we can for our patients.

23      Q.   BY MS. NORMAN:  And that is a lot of goal, but

24  I'm wondering whether you had any knowledge of concerns

25  over adequacy of care provided by Corizon prior to

Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

26

1      A.    Yes.

2      Q.    And then you go on to say that's including, but

3   not limited to -- and I'll talk about the first one --

4   offered opportunities to work with -- I'm sorry, I'm not

5   going to talk about the first one.  I'm going to talk

6   about the third one -- offered access to implement an MOUD

7   program to treat opioid use disorder.  Do you see where

8   that is in your report?

9      A.    Yes.

10     Q.    Okay.  And MOUD refers to medication for opiate

11   use disorder, right?

12     A.    Yes.

13     Q.    Okay.  And I think for ease I'm going to call

14   it MOUD.  Is that what you call it, Dr. Wu?

15     A.    Yes.

16     Q.    Do you consider yourself an authority on MOUD?

17              MS. ORCUTT:  Form.

18              THE WITNESS:  I feel I have the ability to

19   provide MOUD.

20     Q.    BY MS. NORMAN:  Do you consider yourself as

21   well versed in how MOUD functions in a correctional

22   environment?

23              MS. ORCUTT:  Form.

24              THE WITNESS:  Yes.

25     Q.    BY MS. NORMAN:  And have you championed the

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

27

1    adoption of MOUD in corrections?

2              MS. ORCUTT:  Form.

3              THE WITNESS:  Yes.

4         Q.    BY MS. NORMAN:  And in what ways have you

5    championed its adoption in corrections?

6         A.    In our other systems we actually do provide

7    MOUD, and I was actually involved prior to Centurion,

8    helped the New Jersey Department of Corrections be the

9    second state DOC system to implement MOUD.

10        Q.    Is MOUD effective?

11             MS. ORCUTT:  Form.

12             THE WITNESS:  Well, it is not 100 percent.

13   Nothing is ever 100 percent, but it's a better offering of

14   treatment than what we have done in the past.

15        Q.    BY MS. NORMAN:  What are the elements of an

16   effective MOUD program in a corrections system?

17             MS. BARNES:  Form and foundation.

18             MS. ORCUTT:  Join.

19             THE WITNESS:  It requires an integrative,

20   holistic approach to treating the individual patients.

21   You can't put everybody into one type of treatment.  A lot

22   of times people think treatment should be either just CBT

23   or maybe possibly Vivitrol.  And then some folks think

24   that you can't have one without the other, but you really

25   need to look at the individual in looking at where they're

1    going to go afterwards because you need to maintain the

2    linkages.   If you're going to start them on treatment you

3    need to make sure there's a proper exchange/handoff so

4    that they're successful, because unfortunately we do see

5    in the criminal justice system that the partnerships are a

6    challenge to maintain and folks unfortunately do not get

7    that proper handoff and they're no longer successful.

8    Reentry services are quite important to a successful MOUD

9    program.

10        Q.    BY MS. NORMAN:  So it sounds like you've

11   identified some elements of an effective MOUD program,

12   including CBT, which is cognitive behavioral therapy,

13   right?

14        A.    Yes.

15        Q.    So CBT, medication, and continuity of care,

16   would you consider those three things to be important

17   elements to an effective MOUD program?

18        A.    Yes.

19              MS. ORCUTT:  Form.

20        Q.    BY MS. NORMAN:  Are there any other elements of

21   an effective MOUD program that you would add to that list

22   to make it complete?

23              MS. BARNES:  Form.

24              MS. ORCUTT:  Join.

25              THE WITNESS:  I mean, I can't think of

## Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

29

1    anything at the moment, but there may be others that I

2    just can't trigger right now.

3        Q.   BY MS. NORMAN:  Understood.  That is fair

4    enough.

5                    Would you say that some training for

6    providers is also important to make a MOUD program

7    effective in a corrections system?

8                    MS. ORCUTT:  Form.

9                    THE WITNESS:  Yes, that is important, you

10   know, to be able to get education out there for the

11   providers and also the professional staff to have buy-in

12   and then, of course, working with the patients themselves.

13   So education for all is quite important.

14       Q.   BY MS. NORMAN:  Have you done any studies or

15   reviews of the efficacy of MOUD in a corrections system?

16                   MS. ORCUTT:  Form.

17                   THE WITNESS:  I am not currently involved

18   with any studies.  In the past I was prior to joining

19   Centurion.

20       Q.   BY MS. NORMAN:  Can you describe any studies or

21   reviews of efficacy of MOUD that you've done?

22       A.   I was involved, like I said, with the

23   New Jersey Department of Corrections and the Rutgers

24   Health where I was chief operating officer at the time.

25       Q.   Can you describe that review or study?

```
 1        A.    One that I volunteer at.

 2        Q.    Which one is that?

 3        A.    Somerset County Jail.

 4        Q.    In New Jersey?

 5        A.    Yes.

 6        Q.    Okay.  So the study that we're discussing, the

 7   harm reduction study that you believe is primarily county

 8   jail, is that something that you are involved with in your

 9   professional capacity at Centurion or in your volunteer

10   capacity?

11        A.    I'm sorry.  Can you repeat that question?

12        Q.    Right.  I'm just wondering, the study that

13   we're discussing involving harm reduction with MOUD at,

14   you believe, primarily county jail systems, is that

15   something that you're only involved with to the extent you

16   volunteer as a provider at county jails, or are you

17   involved in that in your professional capacity as chief

18   clinical officer at Centurion?

19        A.    In that study that is separate from Centurion.

20   However, I am a big believer of MOUD.  So I actually do

21   try to encourage others, including folks from other

22   organizations, to utilize MOUD.

23        Q.    And why is that?

24              MS. ORCUTT:  Form.

25              THE WITNESS:  I believe it's a chronic
```

Relevance, Rule 402; Incomplete, Rule 106

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

35

Relevance,
Rule 402

1   disease that needs to be managed.  You know, it's

2   unfortunate that the disease affects so many lives and

3   something needs to be done.  You know, I also don't like

4   to see overdose deaths.  And so this is one way of

5   reducing that.  I was very happy to come back to

6   New Jersey to be the COO at Rutgers Health to be able to

7   implement that for the New Jersey Department of

8   Corrections.

9        Q.    BY MS. NORMAN:  So does MOUD save lives?

10              MS. ORCUTT:  Form.

11              THE WITNESS:  Yes.

12       Q.    BY MS. NORMAN:  Thank you for that.  Let's go

13   back to the quote from your report.

14              So we were looking at page 1 of your report

15   where you talk about routinely meeting with ADCRR

16   leadership to discuss opportunities for continued

17   improvement and provide solutions.  And one of those

18   opportunities you mentioned was offering access to

19   implement an MOUD program to treat opioid use disorder,

20   correct?

21       A.    Yes.

22       Q.    Okay.  Can you tell me about what access you

23   offered, what those conversations consisted of?

24              MS. ORCUTT:  Form.

25              THE WITNESS:  I don't recall specifically.

1    Q.    Okay.  So when I say meetings, especially in
2  this day and age, I'm not talking about just in person.
3  Phone or video, any kind of ways people meet.
4           So my question is:  Understanding meetings
5  in a broad sense, which includes phone calls and video
6  conferences, when did the meeting or meetings that you're
7  referring to regarding MOUD in ADCRR take place?
8    A.    I don't recall specific time frames of when
9  these phone calls would occur, or Zoom, but I would say
10  that we probably discussed it during my last interaction
11  with Zoom with the medical director of ADCRR.
12    Q.    And when was that last interaction?
13    A.    I don't recall when that was.
14    Q.    Was it in the last six months?
15    A.    To be honest with you, I don't recall.  With
16  the age of COVID, it's hard to remember.
17    Q.    Fair enough.  Who was the medical director of
18  ADCRR that you discussed MOUD with?
19    A.    That would be Dr. Grant Phillips.
20    Q.    And do you recall how many times you discussed
21  MOUD with Dr. Phillips or other ADCRR personnel?
22    A.    Well, Dr. Phillips is a champion of MOUD.  So
23  we frequently talk whenever about this topic because we
24  both feel very strongly about it.  So we've talked about
25  it every time we interact pretty much, I believe.

38

1      Q.    And when was the last time you interacted with
2  him?

3      A.    Like I said, I don't recall the last time we've
4  actually spoken.

5      Q.    Okay.  And so as you say in your report, you've
6  had meetings to discuss opportunities for continued
7  improvement and provide solutions regarding MOUD.  And I'm
8  wondering what opportunities or solutions you've discussed
9  with Dr. Phillips.

10              MS. ORCUTT:   Form.

11              THE WITNESS:  Well, we've talked about
12  implementing a state-wide MOUD program that incorporated
13  buprenorphine.

14      Q.    BY MS. NORMAN:  And do you think that that
15  would be a good idea in ADCRR?

16              MS. ORCUTT:   Form.

17              THE WITNESS:  You're asking for my opinion?

18      Q.    BY MS. NORMAN:  Yes.

19      A.    Yes, that would be good.

20      Q.    Why?

21      A.    For one thing, the biggest thing would be harms
22  reduction.  I think it would reduce violence and I believe
23  it would be helpful to treating a chronic disease and
24  that, you know, folks, when they get released, hopefully
25  will continue to be treated, and therefore, would not

39

1   engage in activities that would land them back into the

2   correctional system.

3        Q.   So would you say that MOUD is a proven message

4   of reducing violence and death in corrections systems?

5              MS. ORCUTT:  Form; foundation.

6              MS. BARNES:  Form.

7              THE WITNESS:  It would be my opinion, but

8   again, like I said, the study that I was expecting to hear

9   about was never presented because the conference was

10  canceled.

11       Q.   BY MS. NORMAN:  Well, so you've described a lot

12  of ways in which you've been involved with MOUD in a range

13  of different systems over many years, and you described a

14  significant degree of expertise and strong opinions about

15  MOUD.

16             So I'm wondering, based on all of your

17  experience, all of your reading, all of your conversations

18  with other people in the field, whether, in your opinion,

19  MOUD is a proven means of reducing violence and death in

20  correctional systems?

21             MS. ORCUTT:  Form and foundation.

22             THE WITNESS:  Again, it is my firm belief,

23  yes.

24       Q.   BY MS. NORMAN:  What is your understanding

25  about the extent to which MOUD is currently taking place

## Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

40

1    in the Arizona state prison system?

2                    MS. ORCUTT:  Form; foundation.

3                    THE WITNESS:  I don't know the extent.  I

4    do not handle the day-to-day operations of the Arizona

5    system.

6        Q.    BY MS. NORMAN:  Do you know if any aspect of

7    MOUD is provided in ADCRR?

8                    MS. ORCUTT:  Form and foundation.

9                    THE WITNESS:  Well, I believe if, in the

10   rare instance of having individuals that are female and

11   pregnant that are required to be treated, that they would

12   be offered treatment with either methadone, possibly, or I

13   believe with buprenorphine.  But, again, I can't be sure,

14   but I believe they are offered some form of medication.

15       Q.    BY MS. NORMAN:  So other than pregnant women

16   who are on either methadone or buprenorphine, do you know

17   if any patient in the ADCRR is provided with any form of

18   MOUD?

19                   MS. ORCUTT:  Form and foundation.

20                   THE WITNESS:  I really don't know because

21   there could be folks who are on Vivitrol that I'm unaware

22   of or even be well on Vivitrol which, again, I would be

23   unaware of, but I do not know the day-to-day operations of

24   the system.

25       Q.    BY MS. NORMAN:  You talked in your report about

Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

41

1    the distinction between MOUD and MAT.  Can you explain
2    that?
3         A.    Yes.  So I was commenting about MAT where that
4    belief is that it is considered an adjunct.  So folks
5    still believe in trying to work through CBT or, you know,
6    other types of counseling as really the front line, first
7    line, and that only in rare instances you would offer them
8    medication, versus I believe MOUD is a much better
9    approach.
10                    For some folks, you know, they don't need
11   as much counseling or no counseling at all and they really
12   need to just be on medication.  Then there's the folks,
13   just for harms reduction, simply just need to be on
14   medication.  So that is the distinction between MAT and
15   MOUD, is that you don't necessarily need to try the others
16   before using medications.
17        Q.    That's interesting.  So I'm most familiar with
18   the California system where at this time more than 10,000
19   people are on what they call MAT, or medication-assisted
20   treatment.  And particularly during the pandemic, but also
21   prior to that, many people were not actually receiving
22   treatment other than the medications.
23                    So I'm just wondering whether it's your
24   understanding that some people talk about MAT to mean not
25   just therapy occasionally accompanied by medication, but

Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

42

1    medication occasionally accompanied by therapy.

2                    MS. BARNES:  Form and foundation.

3                    MS. ORCUTT:  Join.

4                    THE WITNESS:  Was there a question?  I'm

5    sorry.

6        Q.    BY MS. NORMAN:  It sounded to me like you

7    described MAT as therapy for substance use disorder

8    sometimes accompanied by medication.  Is that an accurate

9    characterization?

10                   MS. ORCUTT:  Form.

11                   THE WITNESS:  So most systems, when they

12   talk about MAT, they expect that the person needs to be in

13   some kind of cognitive behavioral or treatment program,

14   and then along the way they may be given medications,

15   versus MOUD, which is, you know, you just standalone.  If

16   that's what California is doing, that's great, but, you

17   know, a lot of systems require that the individual be in a

18   formalized addictions treatment program.

19       Q.    BY MS. NORMAN:  Understood.  Thank you.

20                   I want to go back to something that you

21   just said.  You were talking about how you were not

22   certain about whether anybody in ADCRR, other than

23   possibly some pregnant women, was currently on MOUD.  And

24   I thought I heard you say that you're not familiar with

25   the day-to-day operations of health care delivery in

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

46

1      A.    No.

2      Q.    And when was that RFP issued?

3            MS. ORCUTT:  Form and foundation.

4            THE WITNESS:  We're in now November.  So I

5      want to say maybe early October or possibly late

6      September.  I don't recall the exact time frame.

7      Q.    BY MS. NORMAN:  You said in your report -- and

8      I'm looking at Section 5E, which is on the fifth page, I

9      believe.  It's the first sentence under section E.  You

10     said that Centurion is currently meeting the standards and

11     needs of substance use disorder for the ADCRR population.

12     Do you see that?

13     A.    Yes.

14     Q.    What is the basis for that opinion?

15     A.    Well, in terms of meeting our contract

16     requirements we are doing what is asked of us.

17     Q.    So is that all you mean by that sentence,

18     simply that you're meeting the terms of your contract?

19     A.    I mean that, you know, is also in line with

20     what is going on in the community as well, is that, you

21     know, their focus is to be able to manage it through

22     addictions treatment programming, and that is still out

23     there as an acceptable standard in the community.

24     Q.    I see.  So do you see where you say in the

25     middle of that paragraph that Centurion is currently

47

```
1    meeting the standard of care for treatment of substance
2    abuse disorders?
3         A.    You said in the middle of E?
4         Q.    Yeah.  That first paragraph, a little more than
5    halfway down do you see where you said that Centurion is
6    currently meeting the standard of care for treatment of
7    substance use disorders?
8         A.    Okay.
9         Q.    So is it your opinion that Centurion is meeting
10   the standard of care for treatment of substance abuse
11   disorders in ADCRR?
12        A.    Meeting the standard, yes.
13        Q.    And you said in your report -- I'm going to
14   direct you to another part -- towards the end of that same
15   paragraph, second to last sentence:  Our current scope of
16   work for ADCRR does not include such services at this
17   time.  Do you see that?
18        A.    Yes.
19        Q.    What services are you referring to?
20        A.    MOUD.
21        Q.    Okay.  So Centurion is providing no MOUD in
22   ADCRR, correct?
23        A.    No, that's not correct.
24        Q.    Can you explain?  That sounds contradictory to
25   me that you said that our current scope of work does not
```

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

50

1    their systems.  And of course we continued to discuss

2    about if ADCRR is willing to look for a new product.

3        Q.     And why would eOMIS need to be updated?

4               MS. ORCUTT:  Form.

5               MS. BARNES:  Form and foundation.

6               THE WITNESS:  So eOMIS is an electronic

7    health record that, for some providers, is very difficult

8    to navigate and to provide, you know, very good

9    documentation and then to be able to get reports out from

10   those documentations.  There are other systems out there

11   that are much more user friendly to be able to have more

12   real-time analytics and data reporting to come out of it.

13       Q.     BY MS. NORMAN:  Is that a concern from the

14   perspective of patient care if providers have difficulty

15   navigating an electronic health care records system?

16               MS. ORCUTT:  Form.

17               THE WITNESS:  Sure.  It can be, you know,

18   an issue, yes.

19       Q.     BY MS. NORMAN:  Okay.  And why is that?

20       A.     Well, you know, for patients to have timely

21   access to having their records to be able to be part of

22   their treatment, to understand their treatment, and also

23   for providers to be able to communicate more coherently so

24   that there's less room for error.

25       Q.     Is it your understanding that eOMIS provides

Cumulative,
Rule 403

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

57

1          MS. ORCUTT:  Join.

2          THE WITNESS:  I mean, it's up to the

3   individual.  I mean, some may be able to feel comfortable

4   and navigate that with more ease than myself, but my

5   preference is that I would prefer a different electronic

6   health record.

7          MS. BARNES:  Sara, I'm sorry.  I was going

8   to say, we've been going about an hour and 15 minutes

9   here.  I was hoping we could get a short break so I could

10  use the restroom.

11          MS. NORMAN:  I can't say no to that.

12          (Recess from 10:16 a.m. to 10:27 a.m.)

13          MS. NORMAN:  Let's go back on the record.

14     Q.    BY MS. NORMAN:  Dr. Wu, I want to keep talking

15  about your report specifically on the first page, that

16  bottom paragraph, where you talk about how you routinely

17  meet with ADCRR leadership to discuss opportunities for

18  continued improvement and provide solutions.  And I want

19  specifically to talk about on the next page the category

20  of suggested transition to an automated medication

21  dispensing system.  Do you see that?

22     A.    Yes.

23     Q.    What is an automated medication dispensing

24  system?

25     A.    So nowadays there are machinery that can

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

58

1    actually package individual dosing to be able to be then

2    stored effectively and tracked.  So when it's administered

3    there's a digital account, a fingerprint of when that was

4    actually taken out of the system and administered.  It

5    helps with accounting for medications, you know.  A lot of

6    hospital systems have used something called Pyxis.  There

7    are other companies out there now similar to Pyxis that

8    would be something to be utilized in a correctional

9    environment.

10        Q.    Can you spell Pyxis?  "No" is an acceptable

11   answer here.

12        A.    No, I don't recall how it's spelled.

13        Q.    We'll let the court reporter guess on that one.

14              Why did you discuss transition to an

15   automated medication dispensing system with ADCRR?

16        A.    Well, in our other systems we have incorporated

17   such technology.  So it would be nice to see Arizona

18   utilize something similar.

19        Q.    And why would that be nice?

20        A.    I believe automation helps with tracking better

21   and for patient safety and control of, you know,

22   medications, just knowing where every pill went to.

23        Q.    Does it help to ensure accurate record keeping?

24        A.    It will certainly assist with that, yes.

25        Q.    Can automated medication dispensing systems

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

65

1   him as a colleague.  So, obviously, you know, my opinion

2   is, that yeah, he is a decent physician and, you know, he

3   was the former president of our association.

4          Q.     BY MS. NORMAN:  And are you referring to the

5   NCCHC?

6          A.     No.

7          Q.     Okay.  Which association are you talking about?

8          A.     Oh, the American College of Correctional

9   Physicians.  He was a past president.  In fact, he was the

10  one that presented me with my award of becoming a fellow

11  in the organization.

12         Q.     Got it.  So let's talk about the difference

13  between prison and jail correctional medical systems,

14  health care systems.

15                Under Section 5 in your report, under that

16  first paragraph at the top, the second sentence, do you

17  see where your report says that experience in and

18  circumstances regarding the delivery of health care in

19  prison systems is vastly different than the jail medical

20  care settings from which Dr. Wilcox's experience and

21  opinions stem?  Do you see that in your report?

22         A.     Yes.

23         Q.     How is the analysis of adequacy of medical care

24  different in jails than in prisons?

25         A.     Well, you know, in the jail system it's more

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

66

1   episodic care.  People are more transient.  There's a lot

2   of turnover.  Usually they're in the areas where it's

3   sparse to get medical services linkages to the community.

4   Usually there's a lot of county hospitals in jails so that

5   they had that ability to move people back and forth and

6   get clearance, versus a prison system is usually much

7   larger, people are there much longer.  There's the need

8   for chronic care disease management, which is very

9   limiting.  In a jail system they don't do much of that.

10  It's more, you know, just assessing it and treating

11  anything urgently that needs to be managed, versus in a

12  prison system there's a lot of longevity and you need to

13  continue to follow folks.  And usually prisons are in more

14  remote places and folks are usually a lot older and

15  require, you know, substantially more services.  So

16  there's a lot more specialty services that need to be

17  provided than in a county jail.

18       Q.    Okay.  So county jails do hold older patients

19  sometimes, though, right?

20       A.    Yes, they do.

21       Q.    And some people spend significant lengths of

22  time at county jails, right?

23                 MS. ORCUTT:  Form and foundation.

24                 MS. BARNES:  Foundation.

25                 THE WITNESS:  But that's not the norm.  I

73

1   information that I have.

2       Q.    BY MS. NORMAN:  So let's talk about some of the

3   specific rebuttals that you offer to Dr. Wilcox's report.

4   And I want to look at 5A, which is on the third page, I

5   think.

6       A.    Yes.

7       Q.    Before we do that, let me just go back and ask

8   a question about a prior topic.

9               Is the standard of care for health care

10  delivery for a jail system different than the standard of

11  care for health care delivery in a prison system?

12              MS. ORCUTT:  Form and foundation.

13              THE WITNESS:  No.  I mean, everyone should

14  be deserving of, you know, standard of care irregardless

15  of their environment.

16      Q.    BY MS. NORMAN:  Okay.  Now let's talk about

17  nurses, section 5A of your report.

18              So you say in your heading to section A

19  that Dr. Wilcox opines that nurses are routinely working

20  outside the scope of their licenses, acting as providers

21  guided only by NETs, and prevent patients with serious

22  medical conditions, that they're not qualified to treat

23  from being seen by a provider because they fail to make

24  the necessary referrals.  Do you see where you say that in

25  your report?

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

74

1        A.    Yes.

2        Q.    And what does NET stand for?

3        A.    I forgot what it stands for, but he was the one

4   that used that term.  I'm used to calling it nurse

5   protocol.

6        Q.    Let me throw a phrase out there.  I believe it

7   stands for nursing encounter tools.  Does that sound

8   right?

9        A.    Yes.

10       Q.    Okay.  So speaking generally with that

11  statement that I just read out, with that understanding of

12  what NET means, do you disagree with Dr. Wilcox's findings

13  in this area?

14            MS. ORCUTT:  Form.

15            THE WITNESS:  Yes, I disagree.

16       Q.    BY MS. NORMAN:  And what is the basis for your

17  disagreement?

18       A.    The fact that he is overly broad in saying that

19  nurses are practicing out of their scope.  I mean, that

20  would be illegal.  You know, we have processes in place to

21  make sure that we meet state regulations and licensure and

22  that all our providers are practicing to the extent of

23  their scope and nothing more above that.  Otherwise, we

24  would be doing something that would be illegal.

25       Q.    What is the extent of your personal knowledge

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

75

1    about the processes in place to ensure that nurses

2    practice within the scope of their licenses in ADCRR?

3                    MS. ORCUTT:  Form.

4                    THE WITNESS:  So it's my understanding that

5    we have a process in place of credentialing any new

6    employee, particularly nurses.  There's a credentialing

7    committee that reviews their occupation making sure that

8    their licenses are without any kind of encumbrance and

9    they have ongoing skills assessments and reviews with them

10   to ensure ongoing that there's nothing that would prohibit

11   them from continuing to be providing care.  I believe the

12   frequency is annually.  So if something were to happen

13   where the nursing board, you know, put something into

14   effect, that the credentialing committee would review that

15   and make a determination whether the person would still be

16   able to continue to provide services.

17                    So that is what we have in place to ensure

18   patient safety and making sure folks are practicing

19   appropriately.

20        Q.    BY MS. NORMAN:  So you've described policies

21   with regards to credentialing, right, to making sure that

22   nurses are appropriately credentialed and those

23   credentials remain up to date; is that right?

24        A.    Yes.

25        Q.    Are there any other policies that you're aware

76

1    of in place in ADCRR to ensure that nurses practice within

2    the scope of their license?

3                    MS. ORCUTT:  Form and foundation.

4                    THE WITNESS:  I don't know if there's

5    anything additional.

6        Q.    BY MS. NORMAN:  Do you have personal knowledge

7    of any of the actual practices in ADCRR, as opposed to

8    policies, by nurses?

9        A.    No.

10                   MS. ORCUTT:  Form.

11       Q.    BY MS. NORMAN:  Have you done any studies of

12   nursing care in ADCRR?

13                   MS. ORCUTT:  Form.

14                   THE WITNESS:  No.

15       Q.    BY MS. NORMAN:  Have you reviewed any studies

16   of nursing care in ADCRR?

17                   MS. ORCUTT:  Form.

18                   THE WITNESS:  No.

19       Q.    BY MS. NORMAN:  Let's talk about physician

20   assistants, which is 5B on the same page.

21                   So you note in the heading of Section 5B

22   that Dr. Wilcox opines that physician assistants are not

23   adequately supervised.  Do you see that?

24       A.    Yes.

25       Q.    Do you disagree with his opinion?

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

77

1          A.     I disagree with his opinion.

2          Q.     And what's the basis of your disagreement?

3          A.     You know, again, going back to, like, nursing,

4     our staff are reviewed to make sure that they're properly

5     credentialed and that they work within their scope.  Our

6     ratios of P.A.s, of the physician assistants that he

7     refers to, you know, is not out of the norm.  If anything,

8     it's actually below what the statute actually allows for.

9     Because I have actually reviewed -- saying that he said

10    something about ratio 7 to 1, and when I actually looked

11    more closely and looked at our credentialing roster, we

12    were not close to that at all, and the state allows for a

13    ratio of 6 to 1.

14         Q.     Are there any other bases of your disagreement

15    with Dr. Wilcox's opinion that physician assistants are

16    not actually supervised other than what you've just

17    described?

18         A.     Yes, because there are physicians on site, and

19    if they're not on site there's always another level that

20    they have access to as resources.  So, you know, when the

21    need arises or if they have concerns, the physician

22    extenders can certainly reach out to the physicians,

23    whether it be at this facility or another facility or go

24    up to Dr. Orm or anybody else for further assistance and

25    management recommendations.

79

1    assistants to have every document reviewed and cosigned by

2    a physician, which, you know, then kind of then detracts

3    from the benefits of having a physician assistant.

4                    So Arizona does not have that requirement,

5    I believe, but I could be wrong.  But in that case it

6    would be required for the physician to review every case,

7    whether it be a simple, you know, cold or a complex case.

8    Every case would have to be reviewed by a physician.  But,

9    you know, in those systems I think that prohibits a lot of

10   physicians wanting to be able to practice and they seek

11   other employment.

12        Q.    BY MS. NORMAN:   I'm wondering about whether you

13   have any knowledge yourself of any system in ADCRR under

14   which mid-level providers are systematically supervised

15   without having to ask for help?

16        A.    So there should be huddles going on at the

17   facility level with their medical directors and

18   physicians.  Also in terms of utilization management when

19   they request for certain services there may be a review

20   done at that time by a physician of that type of request.

21   So there may be other things as well.  I do not work on

22   the day-to-day operations.  I mean, it depends on the

23   relationship that's built at the facility.  I mean,

24   there's a lot of trust of teamwork that that should be

25   occurring at the facility level to providing a holistic

80

1   approach to treating a patient.

2       Q.    So you're not familiar with day-to-day

3   operations in ADCRR with regard to physician assistant

4   supervision?

5               MS. ORCUTT:  Form.

6               THE WITNESS:  I am not, no.

7       Q.    BY MS. NORMAN:  And is your answer the same for

8   mid-levels generally?  You're not aware of day-to-day

9   operations with regard to supervision of mid-levels in

10  ADCRR?

11              MS. ORCUTT:  Form.

12              THE WITNESS:  Yes.

13      Q.    BY MS. NORMAN:  Just to be clear for the

14  record, I'll rephrase that question.

15              You would agree that you're not aware of

16  day-to-day operations with regard to supervision of

17  mid-levels in the ADCRR, correct?

18      A.    Yes.

19      Q.    Thank you for bearing with me on that.

20              Have you done any studies of physician

21  assistant supervision in ADCRR?

22              MS. ORCUTT:  Form.

23              THE WITNESS:  No.

24      Q.    BY MS. NORMAN:  Have you reviewed any studies

25  of physician assistant supervision in ADCRR?

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

82

1   review that's being done.

2        Q.   BY MS. NORMAN:  Have you done any studies of

3   the adequacy of medical care provided by mid-level

4   practitioners in ADCRR?

5                  MS. BARNES:  Form and foundation.

6                  THE WITNESS:  I don't know.  I don't think

7   so.

8        Q.   BY MS. NORMAN:  Have you reviewed any studies

9   of the adequacy of medical care provided by mid-level

10  practitioners in ADCRR?

11                 MS. BARNES:  Form and foundation.

12                 MS. ORCUTT:  Join.

13                 THE WITNESS:  No.

14       Q.   BY MS. NORMAN:  What can you tell me about the

15  training of mid-level practitioners in ADCRR?  What is

16  their training?

17                 MS. BARNES:  Form and foundation.

18                 MS. ORCUTT:  Join.

19                 THE WITNESS:  So basically, you know, in

20  the credentialing process we look at their training and

21  whatever additional subspecialties that they have and

22  making sure that it's appropriate.  You know, the schools

23  need to be accredited that they come from.  And some have

24  gone on to do other specialties.  So if they have other

25  specialties, that would be recorded in the credentialing

83

1   file of the individual.

2        Q.    BY MS. NORMAN:  So when you say in your

3   report -- and let me tell you where.  This is on Section

4   5C, and there's a single paragraph in section C, and I'm

5   looking at the very last sentence of that paragraph where

6   you say:  The use of these providers in our system is

7   appropriate and they are appropriately trained.  Do you

8   see that?

9        A.    Yes, I see that, the last sentence.  Okay.

10       Q.    Okay.  And you can take a minute to make sure

11  of your answer to this question, but -- well, you can do

12  that with any question.

13             You said, "the use of these providers."

14  You're talking about mid-level providers there, right?

15       A.    Yes.

16       Q.    Okay.  So what is the basis for your statement

17  that the use of mid-level providers in your system is

18  appropriate and they are appropriately trained?

19       A.    Primary care is the vast majority of services

20  that are being provided, and mid-levels are certainly

21  qualified to provide that type of service.

22       Q.    Okay.  But you're not familiar with any of the

23  day-to-day operations regarding how mid-levels are

24  supervised, right?

25       A.    I do not handle the day to day.  Yes, that's

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

84

1    correct.

2         Q.    Okay.  So do you have any personal knowledge on

3    which you're basing the statement that mid-level providers

4    in your system -- the use of mid-level providers is

5    appropriate?

6                   MS. ORCUTT:  Form.

7                   THE WITNESS:  Yes, because I'm involved

8    with the credentialing committee.  So as being a member of

9    the credentialing committee we review new applicants for

10   jobs and making sure that they have the appropriate

11   training and certifications, if needed, for certain tasks.

12   So when we hire someone they meet all those qualifications

13   to practice in that particular jurisdiction.

14        Q.    BY MS. NORMAN:  Is it your opinion that if

15   someone is properly credentialed they necessarily always

16   provide adequate care?

17                   MS. ORCUTT:  Form.

18                   THE WITNESS:  I can't answer that.

19        Q.    BY MS. NORMAN:  Do you mean that's not your

20   opinion, or you can't provide an answer to that?

21        A.    I don't know the day-to-day operations.  I can

22   tell you that on day one when they're reviewed and hired

23   that they meet at that point in time, yes.  But after

24   that, you know, things can change.  People can develop

25   issues.  Everyone is human.  Things can happen.  But at

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

90

1    entire -- all the information.

2         Q.    BY MS. NORMAN:  Wouldn't you expect essential

3    patient treatment information to be entered into that

4    patient's medical chart?

5                   MS. ORCUTT:  Form.

6                   THE WITNESS:  Can you repeat that question?

7    Because I'm not quite understanding.

8         Q.    BY MS. NORMAN:  Is it your expectation as a

9    provider that important medical information about patients

10   is entered into their medical charts?

11                  MS. ORCUTT:  Form.

12                  THE WITNESS:  Yes.  Best practice is that,

13   you know, there's clarity and the appropriate information

14   that's documented.

15        Q.    BY MS. NORMAN:  And is that standard of care?

16                  MS. ORCUTT:  Form.

17                  THE WITNESS:  That's the standard of care,

18   yes.

19        Q.    BY MS. NORMAN:  Okay.  And that's especially

20   important that important medical information about

21   patients be documented in their health care records when

22   they're being cared for by a team as opposed to a single

23   provider, right?

24                  MS. ORCUTT:  Form.

25                  THE WITNESS:  Yes, there should be

91

1    documentation.

2        Q.    BY MS. NORMAN:   And it's particularly important

3    when different providers are providing care for a patient

4    so that they understand what the other providers are

5    doing, right?

6                    MS. ORCUTT:   Form.

7                    THE WITNESS:   That is the intent.

8        Q.    BY MS. NORMAN:  Would you be concerned with a

9    system where responsibility for complex patients was

10   disbursed among a legion of different R.N.s and N.P.s with

11   minimal or no physician-level oversight?

12                   MS. ORCUTT:   Form.

13                   MS. BARNES:   Form.

14                   THE WITNESS:   So without knowing more

15   information, you know, from just that limited information,

16   it would cause me to have some concern.   But, again, I

17   need the full context of that situation.

18       Q.    BY MS. NORMAN:   Understood.   But based on that

19   limited information, a system where responsibility for

20   complex patients was disbursed among a legion of different

21   R.N.s and N.P.s with minimum or no provider-level

22   oversight, you said that that situation would cause you

23   some concerns.   And my question is:   What concerns are

24   those?

25                   MS. BARNES:   Form.

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

103

1    MS. ORCUTT:  Form and foundation.

2    THE WITNESS:  It's subjective because it's

3    based on his experiences and what his environment is.

4    Q.   BY MS. NORMAN:  Did you express that concern in

5    your report?

6    A.   I have to go through my report to see if I

7    shared that, but --

8    Q.   Why don't you do that?  It's only 5 1/2 pages.

9    We can wait.

10    So to be clear, as you review the report,

11    what I'm looking for is a complete answer to the question

12    of:  What criticisms of Dr. Wilcox's methodology have you

13    provided in your report?  So take your time.

14    A.   So based on reviewing my report, in terms of

15    methodology, it seems like my concern is he's cherry

16    picking certain things and not looking at the whole entire

17    system.  I really firmly believe that people are doing the

18    right thing, for the most part.  And, of course, there are

19    mistakes that do happen, but to say that nurses are

20    working out of scope, I mean, to me, he's looking at the

21    one-offs but not looking at the system as whole.  Same

22    thing with him talking about physician assistants not

23    adequately supervised.  I mean, there are times when there

24    may be delays in reaching the physician and the provider

25    needs to be able to make emergency decisions on things.

104

1   So I would not consider that not adequately supervised.

2                    Again, everything is subjective, but I'm

3   talking about his methodology of one-offs with respect to

4   nurses and P.A.s practicing out of their scope.

5        Q.   And what, if anything, did you do after reading

6   Dr. Wilcox's report to verify any of the facts that he set

7   forth in his report?

8                    MS. BARNES:  Form.

9                    MS. ORCUTT:  Form; asked and answered.

10                   THE WITNESS:  I don't remember.

11       Q.   BY MS. NORMAN:  You didn't do anything, did

12   you?  It was two weeks ago.

13                   MS. BARNES:  Form.

14                   MS. ORCUTT:  Form.

15                   THE WITNESS:  Again, I said I don't

16   remember.

17       Q.   BY MS. NORMAN:  Okay.  Is it cherry picking, as

18   you've described it, to review all mortality reviews of

19   every death in the system for the last two years?  Is that

20   cherry picking?

21                   MS. ORCUTT:  Form; foundation.

22                   MS. BARNES:  Form; foundation.

23                   THE WITNESS:  I can't answer that because I

24   do not know what these mortality reviews are or are about.

25       Q.   BY MS. NORMAN:  So you don't have any knowledge

## Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

1    of what's contained in the mortality reviews of patients

2    who have died in the Arizona prison system, do you?

3              MS. ORCUTT:  Form.

4              THE WITNESS:  I do not.

5         Q.   BY MS. NORMAN:  Okay.  So you talked about

6    concerns about cherry picking.  So I'm wondering if you

7    would agree that, when evaluating a health care delivery

8    system, it's generally not as helpful to examine the care

9    for healthy people as it is to look at the treatment of

10   sick patients that require coordination and communication

11   and judgment on the part of health care providers?

12             MS. ORCUTT:  Form and foundation.

13             MS. BARNES:  Form.

14             THE WITNESS:  I don't understand the

15   question.  Can you rephrase that?

16        Q.   BY MS. NORMAN:  Would you agree that, when

17   evaluating a health care delivery system, it's generally

18   not as helpful to examine the care for healthy people as

19   it is to look at the treatment of sick patients with

20   conditions that require significant treatment?

21             MS. BARNES:  Form.

22             MS. ORCUTT:  Foundation.

23             THE WITNESS:  I think it's important to

24   look at the whole system.  And if you want quality

25   improvements as a CQI you focus on where your outlier

1   issues are.  So yes, there should be some focus to the

2   more high risk individuals.  But still, overall, if you

3   want to talk about community standard and adequacy of

4   care, you have to look at the whole, including the healthy

5   populations.

6        Q.   BY MS. NORMAN:  So you have no opinion on the

7   current adequacy of the medication administration system

8   in ADCRR because you don't know how it operates on a

9   day-to-day basis, right?

10             MS. ORCUTT:  Form.

11             THE WITNESS:  I don't know the day-to-day

12   operations, no.

13        Q.   BY MS. NORMAN:  So you have no opinion on the

14   adequacy of the system as it currently operates in ADCRR?

15             MS. ORCUTT:  Form.

16             THE WITNESS:  Yeah, I have no opinion.

17        Q.   BY MS. NORMAN:  Okay.  And you have no opinion

18   on the quality of care currently provided by nurses in

19   ADCRR because you're not familiar with the day-to-day

20   operations of nursing care in the system; isn't that

21   right?

22             MS. ORCUTT:  Form.

23             MS. BARNES:  Form.

24             THE WITNESS:  Yeah, I am not aware of the

25   nursing systems.  I'm sorry.  What was the question again?

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

108

1      A.     Yes.

2      Q.     Do you agree that the capacity to identify

3   errors and fix them is central to the performance of any

4   health care system?

5                 MS. ORCUTT:   Form.

6                 MS. BARNES:   Form.

7                 THE WITNESS:   Yes.   And that would be an

8   important component of any health system that they need to

9   look at themselves and find ways to improve.

10     Q.     BY MS. NORMAN:   And one of those ways that

11  health care systems have to identify errors and fix them

12  would be through mortality reviews, correct?

13                MS. BARNES:   Form.

14                MS. ORCUTT:   Form; also outside the scope

15  of this expert report.

16                MS. BARNES:   You've already asked him that

17  question, and I instructed him not to answer.

18                MS. NORMAN:   Okay.   We're going to avoid

19  the dangerous question.

20                MS. BARNES:   You're avoiding that question

21  because it's not within the scope of his expert report

22  which is what the parameters of this deposition are.

23                MS. NORMAN:   Well, it's calculated to lead

24  to the discovery of admissible evidence, but yes.

25     Q.     BY MS. NORMAN:   Dr. Wu, have you ever been to

126

1      A.    I may have sitting with the -- name is

2   Dr. Jordan.  I may have done some stuff because I think he

3   wanted to learn how to use True Care.  And I don't know if

4   there's a chart up when we were working with the harsh

5   environment consult.

6      Q.     What is True Care?

7      A.     True Care is an application a health insurance

8   plan uses that's proprietary to track a request for

9   specialty services.

10     Q.    So on that trip to Yuma did you review any

11  patient charts for substantive patient care matters

12  outside of looking at electronic processes?

13     A.    No.  It was more the training for them to know

14  how to use the application.

15     Q.     Got it.  And what was the purpose of that trip

16  to Yuma?

17     A.     To also look at our pilot with the harsh

18  environment consult.

19     Q.     Can you describe what you mean by that?

20     A.     So because of COVID and the challenges of

21  providing care, we decided that we would try to put in

22  these kiosks in the units for patients to be able to

23  access health services instead of being escorted across

24  the compound to the medical clinic.  So it would be easier

25  to do that interaction by having kind of a tablet that's

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

1  built to withstand high stresses in the unit.  And so

2  patients could just walk up in their housing units through

3  it and have scheduled appointments with the providers.

4       Q.     But it would be remote with the providers so

5  that it would be sort of tele-med on a tablet?

6       A.     Yes.  It's a type of telehealth services but

7  the provider was still on the compound.

8       Q.     So the purpose of your trip to Yuma was to

9  explore the feasibility of that program?

10      A.     Correct, because we wanted to try to find

11  innovative ways to be able to provide services in the age

12  of COVID, and we thought this would be a good solution.

13  So it seemed to be very well received by custody and the

14  patients.

15      Q.     Were there any other purposes of your trip?

16      A.     Just to meet and greet with providers and to

17  assist with whatever they may need with preparing for

18  NCCHC accreditation.

19      Q.     All right.  So I count that as the sixth trip

20  that you listed chronologically.  Were there any other

21  trips to ASPC that you haven't described?

22      A.     I don't think so because I know -- regrettably,

23  I don't have the time to be able to hit every facility.  I

24  like meeting the providers and being in the facilities,

25  but unfortunately, I was not able to hit every facility.

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

137

1   medical care in ADCRR.  It also seems to me that you said

2   clearly that you're too high level of an executive.

3   You're not familiar with day-to-day operations of medical

4   care in ADCRR.

5                    So my question to you is:  Are you

6   rendering any opinion as to whether the day-to-day

7   practice of medical care in ADCRR is constitutionally

8   adequate?

9                    MS. ORCUTT:  Form.

10                   MS. BARNES:  Same objections; same

11   instruction.

12                   THE WITNESS:  I mean, again, as I stated, I

13   don't know every day, you know, the day-to-day operations.

14   You know, every day is a different day.  You can have good

15   days, you can have bad days.  But from where I stand

16   overall, as a collective, I would opine that, yeah, we are

17   providing, you know, adequate and appropriate services.

18        Q.    BY MS. NORMAN:  And you render that opinion

19   based on your knowledge of the policies, correct?

20        A.    Yes, but also, if I can also add, you know,

21   when you asked about me looking at charts and the

22   frequency, although I don't know if it can be properly,

23   but, you know, the frequency, you know, I can't really pin

24   down, but, you know, there are times when I actually will

25   go in there and look at a chart when asked to -- for

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

138

1    instance, I do recall, and I forgot to point that out, is
2    that just looking at specialty consult requests and
3    utilization management and making sure that ATPs,
4    alternative treatment plans that have been recommended
5    were appropriate.  So that was something that I had
6    recently done.
7         Q.    We talked about that.  You mentioned reviewing
8    charts several times when asked to look into utilization
9    management.  I understand.  So back to me trying to
10   understand what your opinions are.
11                    So are you telling me that you rendered an
12   opinion regarding the constitutional adequacy of
13   day-to-day medical care in ADCRR?
14                    MS. ORCUTT:  Form.
15                    MS. BARNES:  Same objections and same
16   instruction.  And I think that he has answered your
17   question a few different times.  So asked and answered.
18                    But if you can answer again, Dr. Wu, please
19   do.  And if you need to refer to your opinion, you can do
20   that.
21                    THE WITNESS:  And I will say that, yes, I'm
22   opining based on my report of the areas that I've been
23   asked to opine on.
24                    MS. NORMAN:  All right.  I don't have any
25   more questions.

141

1  STATE OF ARIZONA      )
                          )
2  COUNTY OF MARICOPA    )

3          BE IT KNOWN that I took the foregoing deposition
   pursuant to Notice; that the witness was duly sworn by
4  me; and that said transcript is a full, true, and
   accurate record of the proceedings; that the proceedings
5  were taken down by me in shorthand and thereafter reduced
   to print under my direction; that I have acted in
6  compliance with ACJA 7-206.

7          I CERTIFY that I am in no way related to any of
   the parties hereto nor am I in any way interested in the
8  outcome hereof.

9          Pursuant to request, notification was provided
   that the deposition is available for review and
10 signature.

11         Dated this 7th day of November, 2021.

12

13                         _____
14                         Janet Hauck, RPR
                           Certified Reporter
15                         Arizona CR No. 50522

16

17         I CERTIFY that GLENNIE REPORTING SERVICES, LLC,
   has complied with the ethical obligations set forth in
18 ACJA 7-206.

19

20

21

22 _____
23 GLENNIE REPORTING SERVICES, LLC
   Registered Reporting Firm
24 Arizona RRF No. R1035

25

# EXHIBIT 2

# (REDACTED)

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> vs. <br><br> David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities, <br><br> Defendants. | ) <br> ) No. <br> ) CV 12-00601-PHX-ROS <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

DEPOSITION OF WENDY MICHELLE ORM, M.D.
(via videoconference)

October 13, 2021
9:01 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130

602.266.6535
www.glennie-reporting.com

Prepared by:
Jennifer Honn, RPR
Arizona CR No. 50885

2

1                              I N D E X

2    WITNESS                                              PAGE

3    WENDY MICHELLE ORM, M.D.

4         Examination by Ms. Hardy                         7

5

6

7

8                        INDEX TO EXHIBITS

9    Description                                          Page

10   Exhibit 1    Curriculum Vitae                         13
                  Wendy M. Orm, M.D.
11
     Exhibit 2    Arizona Department of Corrections        19
12                Rehabilitation & Reentry
                  Medical Services Technical Manual
13                Appendix E, Sec. 2.0 Nursing
                  Encounter Tools (NETs) Symptom and
14                Intervention Guide
                  (4 pages)
15
     Exhibit 3    Performance Measure 44 chart             39
16                January 2021-July 2021

17   Exhibit 4    Arizona Department of Corrections        49
                  Rehabilitation & Reentry
18                Medical Services Technical Manual
                  Appendix C, Sec. 2.0 Clinical Practice
19                Guidelines for Evaluation and
                  Treatment for Viral Hepatitis C
20                (9 pages)

21   Exhibit 5    Arizona Department of Corrections        72
                  Rehabilitation & Reentry
22                Medical Services Technical Manual
                  Chapter 7, Sec. 2.0 Outside
23                (Specialty) Care and Clinics
                  (3 pages)
24
     Exhibit 6    Performance Measure 50 chart             76
25                January 2021-July 2021

**Glennie Reporting Services, LLC**
**602.266.6535   www.glennie-reporting.com**

3

1                    INDEX TO EXHIBITS  (continued)

2   Description                                              Page

3   Exhibit 7    Condensed Health Services Encounter          84
                 (Confidential Information - Pursuant to
4                Protective Order.)
                 (2 pages)
5
    Exhibit 8    Arizona Department of Corrections            87
6                Rehabilitation & Reentry
                 Medical Services Technical Manual
7                Chapter 7, Sec. 9.0
                 Medical Classification Scores
8                (1 page)

9   Exhibit 9    Arizona Department of Corrections           113
                 Rehabilitation & Reentry
10               Medical Services Technical Manual
                 Chapter 1, Sec. 5.0 Quality
11               Improvement of Health Services
                 (3 pages)
12
    Exhibit 10   Rehabilitation & Reentry                    117
13               Medical Services Technical Manual
                 Chapter 1, Sec. 5.1 Peer Review
14               of Professional Activities
                 (2 pages)
15
    Exhibit 11   Mortality Review Committee Final Report      134
16               ADCM1651463 -1651466
                 (Confidential Information - Pursuant to
17               Protective Order.)

18  Exhibit 12   Mortality Review Committee Final Report      145
                 ADCM1608411 -1608420
19               (Confidential Information - Pursuant to
                 Protective Order.)
20
    Exhibit 13   Mortality Review Committee Final Report      168
21               ADCRR00000098 -00000101
                 (Confidential Information - Pursuant to
22               Protective Order.)

23  Exhibit 14   Mortality Review Committee Final Report      178
                 ADCRR00088329 -00088332
24               (Confidential Information - Pursuant to
                 Protective Order.)
25

4

1          PORTIONS OF TRANSCRIPT MARKED CONFIDENTIAL

2                        Pages 84-86
                         Pages 95-99
3                        Pages 134-163
                         Pages 167-183
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1              DEPOSITION OF WENDY MICHELLE ORM, M.D.
2                       (via videoconference)

3          The deposition of WENDY MICHELLE ORM, M.D., was

4    taken on October 13, 2021, commencing at 9:01 a.m., via

5    videoconference, the witness appearing in at the law

6    offices of BROENING OBERG WOODS & WILSON, 2800 North

7    Central Avenue, Suite 1600, Phoenix, Arizona, before

8    JENNIFER HONN, a Certified Reporter, Certificate No.

9    50885, for the State of Arizona.

10

11   APPEARANCES:

12   For Deponent:

13        BROENING OBERG WOODS & WILSON
          Sarah L. Barnes, Esq.
14        2800 North Central Avenue
          Suite 1600
15        Phoenix, Arizona 85004
          Slb@bowwlaw.com
16
     For Plaintiffs:
17
          PRISON LAW OFFICE
18        Alison Hardy, Esq.
          Sara Norman, Esq.
19        Rita K. Lomio, Esq.
          Donald Specter, Esq.
20        1917 Fifth Street
          Berkeley, California 94710
21        ahardy@prisonlaw.com
          snorman@prisonlaw.com
22        rlomio@prisonlaw.com
          Dspecter@prisonlaw.com
23

24

25

6

1    APPEARANCES: (continued)

2        PERKINS COIE LLP
         Kathryn E. Boughton, Esq.
3        2901 North Central Avenue
         Suite 2000
4        Phoenix, Arizona 85012
         Kboughton@perkinscoie.com
5
     For Defendant:
6
         STRUCK LOVE BOJANOWSKI & ACEDO, PLC
7        Anne M. Orcutt, Esq.
         3100 West Ray Road
8        Suite 300
         Chandler, Arizona 85226
9        aorcutt@strucklove.com

10                        * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Wendy Michelle Orm, M.D. - 10/13/2021

11

1    Q.   Any medications you're taking that would affect

2    your testimony in any way?

3    A.   No.

4    Q.   And is there any reason you can't go forward

5    today?

6    A.   No.  No reason.

7    Q.   Thank you.  Dr. Orm, who is your current

8    employer?

9    A.   Centurion.

10   Q.   And what is your title?

11   A.   I am Statewide Medical Director for Arizona.

12   Q.   Are you a director for any other states?

13   A.   No.

14   Q.   And can you describe your duties as statewide

15   medical director?

16   A.   Oversee the delivery of medical care to all of

17   the inmates at the state prisons, the 10 state prisons in

18   Arizona.

19   Q.   And who do you report to?

20   A.   I report to Dr. Wu and Dr. May.

21   Q.   And can you spell Dr. Wu for the record?

22   A.   W-u.

23   Q.   And Dr. May?

24   A.   M-a-y.

25   Q.   And I understand you started to work for

Wendy Michelle Orm, M.D. - 10/13/2021

12

1   Centurion in May of 2019; is that correct?

2       A.   Yes.

3       Q.   And as part of your duties, do you review

4   medical charts?

5       A.   Yes.

6       Q.   And under what circumstances do you do that?

7       A.   For patient care questions from all of my

8   providers.  To help manage those cases and help guide my

9   medical providers and nurses across the state.

10      Q.   Do you provide direct patient care?

11      A.   No.

12      Q.   And you also review medical records for

13  mortality reviews; is that correct?

14      A.   Mortality -- mortality reviews and for

15  inquiries, any kind of inquiry.

16      Q.   Who reports to you, Dr. Orm?

17      A.   I have a quality assurance person and a pharmacy

18  team and all of my medical providers and therapists.

19      Q.   Who is the quality assurance director?

20      A.   Wendy Larson.

21      Q.   And when you say all of your medical providers,

22  do all of the medical providers in the state report

23  directly to you?

24      A.   No.  They have a site medical director.

25      Q.   And do the site medical directors report

Wendy Michelle Orm, M.D. - 10/13/2021

13

1   directly to you?

2        A.    They report directly to their facility health

3   administrator and to me.

4        Q.    And the facility health administrator is

5   generally not a clinician; is that correct?

6        A.    It can be.

7        Q.    How many of your facility health administrators

8   are physicians?

9        A.    None are physicians.

10       Q.    How many are nurse practitioners or physician

11   assistants?

12       A.    No PAs or nurse practitioners at this time.

13       Q.    We have your CV that was provided to us

14   yesterday, and I've provided that to the court reporter

15   and I'd like to mark that as Exhibit 1 to the deposition,

16   please.

17            (Deposition Exhibit 1 was marked for

18   identification.)

19       Q.    (By Ms. Hardy) Since we only have four hours

20   today, normally I would go through your resume, but I

21   appreciate that you sent it, and I understand that you

22   are board certified as a family practitioner; is that

23   correct?

24       A.    Correct.

25       Q.    Thank you.  Have you held any other roles at

Relevance,
Rule 402

Wendy Michelle Orm, M.D. - 10/13/2021

16

1    procedures that are outlined anywhere other than the

2    director's orders and the medical technical -- medical

3    services technical manual?

4                MS. BARNES:  Just to clarify before she

5    answers that, Alison, you're calling them director's

6    orders and they're department orders.

7                MS. HARDY:  Oh, thank you.  Thank you.  I

8    meant department orders.  Sorry about that.

9        Q.   (By Ms. Hardy) Are there -- I'll rephrase the

10   question.

11               Are there policies and procedures that are

12   regarding the delivery of health care in the ADCRR

13   prisons other than those that are found in the department

14   orders and the medical services technical manual?

15       A.   Not that I'm aware of.

16       Q.   Okay.  Thank you.

17               First I'd like to talk about sick call.  Under

18   ADCRR's policies, incarcerated people can request medical

19   care by request -- by submitting a health needs request

20   or an HNR.  Is that right?

21       A.   Correct.

22       Q.   And can you tell me more about this process?

23   For example, who collects these forms?

24       A.   The person collecting the forms can be a

25   different person designated at each site.

Wendy Michelle Orm, M.D. - 10/13/2021

19

```
 1              MS. HARDY:  Huh.  Rats.
 2              MS. BARNES:  And it will not open at all.
 3              MS. ORCUTT:  It's prompting to save it, but
 4    not open it.
 5              MS. HARDY:  Okay.  Darn.  Then I will open
 6    up my screen sharing.
 7              (Deposition Exhibit 2 was marked for
 8    identification.)
 9         Q.   (By Ms. Hardy) So can you see the document that
10    I put in now, Sarah?
11              MS. BARNES:  We can see it.
12              MS. ORCUTT:  Yes.
13         Q.   (By Ms. Hardy) So this will be marked as
14    Exhibit 2.  This is Appendix E, Section 2 from the
15    medical services technical manual, and it's entitled
16    Nursing Encounter Tools, Symptom and Intervention Guide.
17    Correct?
18         A.   Correct.
19         Q.   Dr. Orm, I'm sorry, can you see it from where
20    you are?
21         A.   Yes.
22         Q.   Okay.  And this is a table that lists symptoms
23    and corresponding recommended interventions; correct?
24         A.   Correct.
25         Q.   And do you know what types or classification of
```

Wendy Michelle Orm, M.D. - 10/13/2021

20

1    nurses use these NETs?

2              MS. BARNES:  Form.

3              THE WITNESS:  No.  I'm not a regional

4    nursing director.  I do not know.

5        Q.    (By Ms. Hardy) Okay.  Do you know how nurses

6    generally are expected to follow this guide?

7              MS. BARNES:  Form.

8              THE WITNESS:  No.  I'm not involved in

9    their training.

10       Q.    (By Ms. Hardy) You can see on the form that on

11   the left it says "Primary Symptoms," then it says "NETs,

12   Titles and Intervention"; correct?

13       A.    Correct.

14       Q.    And in the "Intervention" column, it says, in

15   some cases there are medications, and in other cases --

16   other cases it says "No OTC, notify provider"; correct?

17       A.    Correct.

18       Q.    Do you know what that means?

19       A.    That means that there are no over-the-counter

20   alternative treatments that the nurse is able to

21   recommend or dispense to the patient from the -- store,

22   and the provider must be notified.

23       Q.    Does this mean that the nurse must schedule a --

24   an appointment with the provider for the patient?

25       A.    No, I believe that means the nurse can notify

Relevance,
Rule 402;
Lacks personal
knowledge,
Rule 602

Wendy Michelle Orm, M.D. - 10/13/2021

21

1    the provider and get additional orders if needed.

2         Q.    And if you read through these four pages, there

3    are no interventions that require a scheduled appointment

4    with the provider; is that correct?

5         A.    No.    That would be determined by either the

6    nurse or the provider notified.

7         Q.    My understanding is that the nurse encounter

8    tools are actually embedded in the health record itself;

9    correct?

10               MS. BARNES:   Form.

11               THE WITNESS:   Yes.

12        Q.    (By Ms. Hardy) And it's up to the nurse to

13   select a NET from a dropdown menu in the health record;

14   is that right?

15        A.    I believe so.

16               MS. BARNES:   Could you just repeat, the

17   select a what?

18               MS. HARDY:   A NET.   A nurse encounter tool.

19               MS. BARNES:   Thank you.

20        Q.    (By Ms. Hardy) From the dropdown menu.   And if a

21   nurse puts certain symptoms into the health record, does

22   a relevant NET automatically pop up, or is it up to the

23   nurse to choose the NET?

24               MS. ORCUTT:   Form.

25               THE WITNESS:   The nurse must select the

Wendy Michelle Orm, M.D. - 10/13/2021

22

1    NET.

2        Q.    (By Ms. Hardy) And if a patient presents with

3    symptoms for which there is no NET, what does the -- what

4    is the nurse expected to do in that situation?

5                MS. ORCUTT:   Form.

6                THE WITNESS:   The nurse would write a

7    typical note that's not structured by a NET.

8        Q.    (By Ms. Hardy) When are nurses expected to

9    schedule patients to see a provider?

10               MS. ORCUTT:   Form.

11               THE WITNESS:   I can't -- that's too broad

12   to answer.

13       Q.    (By Ms. Hardy) What are nurses -- in what

14   situations would you expect a nurse to refer a patient to

15   a provider?

16               MS. ORCUTT:   Form.

17               THE WITNESS:   My list will not be

18   exclusive, you know, the extent off the top of my head.

19               If a nurse sees a patient that has vital

20   signs that are unstable or does not feel comfortable with

21   the clinical presentation of the patient, the nurse can

22   refer to the provider.

23               If the nurse or nurses have seen a patient

24   for an HNR complaint multiple times, they may refer that

25   to a provider line if the patient is not improving given

Wendy Michelle Orm, M.D. - 10/13/2021

23

1    the conservative measures that are in the NET.

2        Q.    (By Ms. Hardy) And where are those expectations

3    reflected in writing?

4        A.    I do not know.

5        Q.    Do you know how those expectations are

6    communicated to the nurses?

7                MS. ORCUTT:  Form.

8                THE WITNESS:  Nurses are educated

9    continually.  When hired they go through new employee

10   orientation and they are taught the process for our

11   system.

12       Q.    (By Ms. Hardy) If a nurse decides a patient

13   needs to see a provider, what do they do to make that

14   happen?

15               MS. ORCUTT:  Form.

16               THE WITNESS:  I believe they schedule a

17   provider line appointment.  If urgent they may call for

18   the provider to see the patient.

19       Q.    (By Ms. Hardy) Does Centurion have a process for

20   reviewing nurse sick call encounters to evaluate whether

21   the nurse chose the correct NET?

22               MS. ORCUTT:  Form.

23               THE WITNESS:  That's a compound question.

24   Can you split that up?

25       Q.    (By Ms. Hardy) Does Centurion have a process for

Relevance, Rule 402; Lacks personal knowledge, Rule 602

Wendy Michelle Orm, M.D. - 10/13/2021

26

1   primary care provider appointment?

2              MS. ORCUTT:  Form.

3              THE WITNESS:  Can you rephrase the

4   question?

5        Q.    (By Ms. Hardy) Does Centurion maintain

6   statistics or data about the proportion of people who see

7   the RN for a sick call appointment who then proceed to a

8   primary care provider appointment for that sick call

9   slip?

10             MS. ORCUTT:  Form.

11             THE WITNESS:  There is extensive tracking

12  of HNRs, but I do not know if that is split into how many

13  go to a provider.

14       Q.    (By Ms. Hardy) Okay.  When I say "provider," do

15  you understand that to mean a physician, a physician's

16  assistant, or a nurse practitioner?

17       A.    Yes.

18       Q.    Is there a written requirement in the medical

19  services technical manual that requires that patients be

20  seen with any particular frequency by their medical

21  provider?

22             MS. ORCUTT:  Form.

23             THE WITNESS:  In any setting?

24       Q.    (By Ms. Hardy) Any patient.

25       A.    Any patient?  It varies -- it varies by setting

Relevance,
Rule 402;
Lacks
personal
knowledge,
Rule 602

Wendy Michelle Orm, M.D. - 10/13/2021

27

1    as to what the -- the requirements would be.

2        Q.   So for patients who are in the general

3    population, is there any written requirement outlining

4    how frequently they should be seen by a provider?

5                    MS. ORCUTT:  Form.

6                    THE WITNESS:  It depends on their medical

7    condition.

8        Q.    (By Ms. Hardy) If those patients are not in a

9    chronic care program, is there any requirement that they

10   be seen with any particular frequency?

11                   MS. ORCUTT:  Form.

12                   THE WITNESS:  It is up to the medical

13   provider.

Relevance,
Rule 402

14       Q.    (By Ms. Hardy) When a patient has an appointment

15   with a medical provider, is -- does Centurion

16   differentiate between whether a patient should be seen by

17   a physician, a nurse practitioner, or a physician's

18   assistant?

19                   MS. ORCUTT:  Form.

20                   THE WITNESS:  No.

21       Q.    (By Ms. Hardy) Do -- midlevel primary care

22   providers include physician assistants and nurse

23   practitioners; is that correct?

24                   MS. ORCUTT:  Form.

25                   THE WITNESS:  Do you hear an echo?

Wendy Michelle Orm, M.D. - 10/13/2021

29

1    Q.    (By Ms. Hardy) And midlevel providers have less

2    training than physicians; is that right?

3    A.    That is correct.

4    Q.    Are there certain patients in the ADCRR who are

5    supposed to be seen only by physicians?

6              MS. ORCUTT:   Form.

7              THE WITNESS:   No.

8    Q.    (By Ms. Hardy) Is there a requirement that nurse

9    practitioners and physician assistants working as

10   providers review their complex cases with a physician?

11             MS. ORCUTT:   Form.

12             THE WITNESS:   Yes.

13   Q.    (By Ms. Hardy) Excuse me.  I didn't hear your

14   answer.

15   A.    Yes.

16             MS. BARNES:   I'm sorry, it's just

17   difficult, as you know when we're doing this on Zoom,

18   especially when the screen share is up.  So just -- just

19   try to pause.

20             THE WITNESS:   I'm not pausing long enough.

21   Okay.

22             MS. BARNES:   Just try to pause just a tiny

23   bit longer.

24             MS. HARDY:   I'm going to take down the

25   screen share right now.  Sorry.

Wendy Michelle Orm, M.D. - 10/13/2021

30

1                    MS. BARNES:  Thank you.

2                    THE WITNESS:  I can see her face and know

3          she raised her hand, but I can't hear her.

4                    MS. BARNES:  It's still up, Alison.  There

5          you go.  There you go.

6          Q.    (By Ms. Hardy) Sorry.  I'm of the older

7          generation and still learning this stuff.  Sorry.

8                    Okay.  So you said that there is a requirement

9          that nurse practitioners and physician assistants who are

10         working as providers review their complex cases with a

11         physician?

12                   MS. ORCUTT:  Form.

13                   THE WITNESS:  So when she says "form" --

14                   MS. BARNES:  You're always going to answer

15         the question unless I say stop, don't answer the

16         question.

17                   THE WITNESS:  Okay.

18                   MS. BARNES:  She just has to get that

19         objection on the record, so as soon as you hear that or

20         there's a pause and nothing is said, then you go ahead.

21                   THE WITNESS:  Okay.  There is an

22         expectation that midlevel providers will review their

23         complex cases with their site medical director or their

24         regional medical director, which is me.

25         Q.    (By Ms. Hardy) And how is that expectation

Wendy Michelle Orm, M.D. - 10/13/2021

31

1   communicated to the midlevel providers?

2       A.   Upon hire, upon annual review, upon case review,

3   at every provider meeting.

4       Q.   And where is that -- that principle or that

5   guidance reflected in writing?

6               MS. ORCUTT:  Form.

7               THE WITNESS:  Probably in meeting minutes.

8       Q.   (By Ms. Hardy) And what meeting minutes are

9   those?

10      A.   Maybe provider meeting minutes for specific

11  sites.

12      Q.   Does Centurion have guidelines or protocols

13  about how mid levels are to be supervised?

14              MS. ORCUTT:  Form.  Foundation.

15              THE WITNESS:  We follow whatever the State

16  of Arizona dictates.

17      Q.   (By Ms. Hardy) Do you know what those

18  requirements are?

19      A.   In Arizona, nurse practitioners do not require

20  direct supervision and are allowed to practice

21  independently.

22              In the state of Arizona, physician assistants

23  need a physician supervisor.

24      Q.   And are there written supervision agreements for

25  the physician assistants?

```
1                    MS. ORCUTT:  Form.
2                    THE WITNESS:  Yes.   It's required for their
3  licensure.
4       Q.    (By Ms. Hardy) And where are those agreements
5  maintained?
6                    MS. ORCUTT:  Form.  Foundation.
7                    MS. BARNES:  That's all.  I am just
8  pointing out the box.
9                    THE WITNESS:  I'll learn.  I'll learn.
10                   They are maintained by the physician
11 assistant and submitted to the State entity that governs
12 them.
13      Q.    (By Ms. Hardy) Typically who is the supervisor
14 for the physician assistant?
15      A.    Usually it's the site medical director that they
16 are working with.
17      Q.    And does the site medical director also maintain
18 a copy of the written agreement?
19      A.    I don't know.
20      Q.    The agreement would be for the supervising
21 physician to supervise the physician assistant; correct?
22                   MS. ORCUTT:  Form.
23                   THE WITNESS:  Correct.
24      Q.    (By Ms. Hardy) Do you know what is the content
25 of those written agreements for physician assistants?
```

Wendy Michelle Orm, M.D. - 10/13/2021

33

1            MS. ORCUTT:  Form.

2            THE WITNESS:  I have been a supervisor for

3    PAs, but I do not have memorized what is on that

4    agreement form.

5        Q.    (By Ms. Hardy) Do you know if Centurion has form

6    agreement forms for those situations, or are those

7    written up individually for each physician and physician

8    assistant relationship?

9            MS. ORCUTT:  Form and foundation.

10           THE WITNESS:  Those are standard forms used

11   in the state for physician assistants.  So it comes from

12   the State board.

13       Q.    (By Ms. Hardy) Do you know how many, roughly,

14   physician assistants Centurion employs in the ADCRR?

15           MS. ORCUTT:  Form.

16           THE WITNESS:  Less than five.

17           I'll go slower.  I'm trying to go --

18           MS. BARNES:  That's all right.  We'll get

19   it.

20       Q.    (By Ms. Hardy) When Centurion has a primary care

21   provider position that is vacant, how does Centurion

22   decide whether to fill it with a physician, physician

23   assistant, or nurse practitioner?

24           MS. ORCUTT:  Form and foundation.

25           THE WITNESS:  That is dictated by the

Wendy Michelle Orm, M.D. - 10/13/2021

34

1   staffing matrix in our contract.

2        Q.    (By Ms. Hardy) Does the contract specify how

3   many physicians Centurion will provide --

4             MS. ORCUTT:  Form.

5        Q.   (By Ms. Hardy) -- in ADCRR?

6        A.   Yes.

7        Q.   And what's the total number of staff physicians

8   allocated in the contract?

9             MS. ORCUTT:  Foundation.

10            THE WITNESS:  I do not have that memorized.

11       Q.   (By Ms. Hardy) Is the total number of staff

12   physicians required in the Centurion contract less than

13   10?

14            MS. ORCUTT:  Foundation.

15            THE WITNESS:  No.

16       Q.   (By Ms. Hardy) Providers are required to review

17   and act on hospital recommendations for patients

18   returning from inpatient hospital stays or emergency

19   transports with discharge recommendations from the

20   hospital within 24 hours; is that right?

21            MS. ORCUTT:  Form.

22            THE WITNESS:  Correct.

23       Q.   (By Ms. Hardy) And as medical director for this

24   program, why is it important that these hospital

25   discharge recommendations be reviewed and acted upon by a

Cumulative,
Rule 403

Wendy Michelle Orm, M.D. - 10/13/2021

35

1   medical provider within 24 hours?

2              MS. ORCUTT:   Form.

3              THE WITNESS:   It is important because often

4   the patient is released from the hospital with new

5   medications or different medications, different treatment

6   recommendations, and follow-up recommendations.

7        Q.   (By Ms. Hardy) So essentially what you're saying

8   is that for purposes of continuity of care, when a

9   patient returns from a hospital, it's important to have

10  that care reviewed so that it can be continued at the

11  prison; is that right?

12       A.   Yes.

13       Q.   And as medical director, do you think it's

14  acceptable for 15 percent of your patients to return from

15  the hospital and not have their hospital discharge

16  recommendations reviewed by a provider within 24 hours?

17             MS. ORCUTT:   Form.

18             THE WITNESS:   I believe every effort is

19  made to have physicians review those records within 24

20  hours.  And you will find in the nursing notes that

21  usually there is a conversation reviewing those

22  recommendations and deciding on orders over the phone.

23       Q.   (By Ms. Hardy) Okay.  My question was as the

24  medical director, do you think it is acceptable for

25  15 percent of your patients to return from the hospital

*Seeks expert testimony, Rule 701*

Wendy Michelle Orm, M.D. - 10/13/2021

36

Seeks expert testimony, Rule 701

1    and not have their hospital discharge recommendations

2    reviewed by a provider within 24 hours?

3              MS. ORCUTT:  Form.

4              THE WITNESS:  I would need you to define

5    return from the hospital before I render an opinion,

6    because some patients go to the hospital for a CT scan

7    and they do not have any additional orders when they

8    return.

9         Q.   (By Ms. Hardy) Fair enough.  So do you think

10   it -- it is acceptable for 15 percent of your patients to

11   return from the hospital after a hospital admission and

12   not have their hospital discharge recommendations

13   reviewed by a provider within 24 hours?

14             MS. ORCUTT:  Form.

15             THE WITNESS:  That would not -- that would

16   not be acceptable if that were the case.  I do not

17   believe that to be the case.

18        Q.   (By Ms. Hardy) You're aware that the parties in

19   this case previously entered into a stipulation; correct?

20        A.   Correct.

21        Q.   And there were a number of metrics called

22   performance measures relating to provision of medical

23   care in the ADCRR; correct?

24        A.   Correct.

25        Q.   And are you aware that one of the performance

1    Q.    (By Ms. Hardy) And do you discuss the apparent

2    discrepancy between what the CGAR data says for, for

3    example, Eyman and Tucson with your perceptions that the

4    discharge summaries are reviewed timely?

5              MS. ORCUTT:  Form?

6              THE WITNESS:  Yes.

7    Q.    (By Ms. Hardy) Why do you think there is a

8    difference between those two perceptions of compliance?

9              MS. ORCUTT:  Form.

10             THE WITNESS:  Because a majority of our

11   compliance team's time is spent reviewing those

12   identified deficiencies and formulating rebuttals because

13   they find that the data is not correct.

14   Q.    (By Ms. Hardy) And what is the root of that

15   invalid data, in your opinion?

16             MS. ORCUTT:  Form.

17             MS. BARNES:  Foundation.

18             THE WITNESS:  I don't know.  It must be the

19   way it is monitored, and that does fluctuate.

20   Q.    (By Ms. Hardy) Okay.  I'm going to move on to

21   the hepatitis C policy for Centurion.  And I'm going

22   to -- well, I'm -- first ask, there are new treatment

23   guidelines for hepatitis C in the ADCRR; is that correct?

24             MS. ORCUTT:  Form.

25             THE WITNESS:  Correct.

Wendy Michelle Orm, M.D. - 10/13/2021

45

1    Q.    (By Ms. Hardy) And these treatment policies were
2    signed off on -- in the medical services technical manual
3    on August 24, 2021; is that right?
4                MS. ORCUTT:  Foundation.
5                THE WITNESS:  I don't know what date ADCRR
6    signed their policy.
7    Q.    (By Ms. Hardy) When do you think that the hep C
8    treatment guidelines were initiated, the new ones in
9    ADCRR?
10               MS. ORCUTT:  Form.
11               THE WITNESS:  I initiated those guidelines
12   back in the fall of 2019.
13   Q.    (By Ms. Hardy) Okay.  I'm going to bring up, I'm
14   going to share screen again.  And I'd like to make this
15   Exhibit 4.  This policy, and I'd like to make this the
16   next in line, Appendix C, Section 2, Clinical Practice
17   Guidelines for the Prevention and Treatment of Viral
18   Hepatitis C.
19               And do you recognize this document, Dr. Orm?
20   A.    Yes.
21   Q.    Is this the policy that has been promulgated in
22   the ADCRR for the treatment of hepatitis C?
23   A.    Most recently, yes.
24   Q.    And is it your --
25               MS. BARNES:  Hold on one second.

Wendy Michelle Orm, M.D. - 10/13/2021

47

1  question.  When we initially talked about sick call slips

2  and HNRs, you said that those are collected by either

3  ADCRR personnel or medical and then they are reviewed,

4  there is a paper review of those HNRs; correct?

5                    MS. ORCUTT:  Form.

6                    THE WITNESS:  Now that there is an

7  electronic HNR, that may not be collected by anybody on

8  paper.

9        Q.    (By Ms. Hardy) Okay.  Who does that initial

10 review of either the HNR, the digital HNR or the paper

11 HNR?

12                   MS. ORCUTT:  Form.

13                   THE WITNESS:   A medical staff member.

14       Q.    (By Ms. Hardy) And what would be the job --

15 what -- what type of medical staff member would be

16 reviewing that?  Would that be a medical assistant, a

17 nurse?  Who reviews that?

18                   MS. ORCUTT:  Form.  Foundation.

19                   THE WITNESS:  That is -- there's a rule.

20 I'm not sure.

21       Q.    (By Ms. Hardy) You don't know who reviews the --

22       A.    No.

23       Q.    Okay.  And then circling back to our last

24 conversation about the reviewing discharge summaries for

25 people who are returning from a higher level of care,

Wendy Michelle Orm, M.D. - 10/13/2021

49

1      Q.    Okay.  I'm going to go on to hepatitis C, and
2  I'm going to pull up the correct hepatitis C new policy.
3  Put that into screen sharing.  There's my family again.
4  There we go.
5             (Deposition Exhibit 4 was marked for
6  identification.)
7      Q.    (By Ms. Hardy) And this is the one that says
8  Hepatitis C Clinical Practice Guidelines for the
9  Evaluation and Treatment for Viral Hepatitis C, effective
10  date 8-24-21.  Is that correct?
11      A.    Correct.
12             MS. BARNES:  Are you marking this
13  Exhibit 4?  I'm sorry, Alison.
14             MS. HARDY:  Yes, can we mark this
15  Exhibit 4, not the one that I incorrectly sent you.
16             And Ms. Honn, I will send you this after
17  the deposition.
18      Q.    (By Ms. Hardy) And I believe you said that this
19  new policy has actually been in place for quite some
20  time.  What was your testimony on that, Dr. Orm?
21             MS. ORCUTT:  Form.
22             THE WITNESS:  No, this is the updated most
23  recent policy from ADCRR.
24      Q.    (By Ms. Hardy) And when was this one initiated?
25             MS. ORCUTT:  Form.

Wendy Michelle Orm, M.D. - 10/13/2021

50

1      Q.    (By Ms. Hardy) When was this policy initiated,

2  Dr. Barnes -- Dr. Orm?

3      A.    Effective date 8-24-21.

4      Q.    Okay.  Can you summarize the changes that have

5  been initiated under this new policy?

6            MS. ORCUTT:  Form.

7            THE WITNESS:  I cannot summarize the

8  changes.  I don't have memorized the old policy.  And

9  it's been revised a few times in several years.

10           But I can tell you this version of the

11 policy brings the guidelines up to community standards.

12     Q.    (By Ms. Hardy) Okay.  Who is screened for the

13 HCV antibody on intake?

14     A.    Everybody.

15     Q.    And that's what the policy requires?

16     A.    I'm not sure if the policy requires that, but

17 that is our intake process.

18     Q.    Okay.  And for the people who are currently in

19 the ADCRR, who is screened?

20           MS. ORCUTT:  Form.  Foundation.

21           THE WITNESS:  Any time a medical provider

22 wants to repeat screening, that would be performed on a

23 known hepatitis C negative person who could then have

24 contracted hepatitis C.  It can also be performed any

25 time a patient requests.

Wendy Michelle Orm, M.D. - 10/13/2021

51

1  Q.   (By Ms. Hardy) Under the new treatment

2  guidelines, are providers expected to provide hepatitis C

3  care, or are you creating hepatitis C champions at each

4  prison?  Can you explain how that's rolling out?

5            MS. ORCUTT:  Form.

6            THE WITNESS:  Hepatitis C is treated just

7  like any other chronic disease, and it is managed by

8  medical providers.

9  Q.   (By Ms. Hardy) Do the changes in this policy

10  impact the workload for primary care providers?

11            MS. ORCUTT:  Form.  Foundation.

12            THE WITNESS:  We have been practicing the

13  community standard since the fall of 2019, so this policy

14  has not changed our workload.

15  Q.   (By Ms. Hardy) When you say you've been

16  following the community standard since 2019, can you tell

17  me what the community standard since 2019 has been for

18  the treatment of people with HCV, chronic HCV?

19            MS. ORCUTT:  Form.

20            THE WITNESS:  It's been -- it's been what

21  is reflected in this updated policy.

22  Q.   (By Ms. Hardy) I'm confused.  You updated this

23  policy in 2021.  And are you saying that this policy that

24  was updated in '21 -- 2021 is the policy that was

25  consistent with community standards in 2019?

Wendy Michelle Orm, M.D. - 10/13/2021

52

1          MS. ORCUTT:  Form.

2          THE WITNESS:  I did not update this policy.

3   This is the ADCRR policy.  I did --

4          MS. BARNES:  If you let her finish I think

5   she'll clear it up for you.

6          THE WITNESS:  I'll clear it up for you.  In

7   2019 when we implemented our hepatitis C program, it

8   became apparent that the ADCRR had a policy that needed

9   updating.  And we worked with the ADCRR to bring the care

10  to community standards which is reflected in this revised

11  policy.

12          In 2019, we were able to do that knowing

13  that there is at times a delay and it takes some time for

14  them to update their policies.

15  Q.     (By Ms. Hardy) Are you saying that in 2019,

16  Centurion had its own HCV policy that you were following

17  and you were -- and it took two years before ADCRR's

18  written policy reflected the actual practice?

19          MS. ORCUTT:  Form.

20          THE WITNESS:  I am saying that we -- we

21  worked with ADCRR and were allowed to follow the

22  community guidelines for hepatitis C that were up to date

23  while waiting for the ADCRR to bring their policy in

24  writing up to standard to match our process.

25  Q.     (By Ms. Hardy) And what were the community

Wendy Michelle Orm, M.D. - 10/13/2021

53

1    standard guidelines in 2019 for the treatment of HCV?

2                    MS. ORCUTT:  Form.

3                    THE WITNESS:  The American Association of

4    Liver Disease and the Infectious Disease Society of

5    America together have created guidelines that do guide

6    the screening, diagnosis, treatment, and ongoing

7    management of patients with hepatitis C.

8        Q.    (By Ms. Hardy) And when did the American

9    Association of Liver Disease and the Infectious Disease

10   Society promulgate those guidelines; do you know?

11                   MS. ORCUTT:  Form.

12                   THE WITNESS:  They've been revised several

13   times for many years.  I don't know when their guidelines

14   first began.  If you look down on this document, you may

15   see reference, and that will tell you the reference for

16   this particular policy.  There you go.

17       Q.    (By Ms. Hardy) Looks like it's

18   bophcvguidelines.org, is that the --

19       A.    Yes.

20       Q.    -- guidelines that you're referring to?

21       A.    Yes.

22       Q.    And did that -- did those guidelines involve

23   providing direct active antiviral prescriptions for

24   people who have hepatitis C?

25                   MS. ORCUTT:  Form.  Foundation.

Wendy Michelle Orm, M.D. - 10/13/2021

54

1          THE WITNESS:   Yes.

2          Q.    (By Ms. Hardy) And for whom did those guidelines

3    recommend providing that treatment?

4          A.    Those guidelines have changed over the past five

5    years multiple times.  So initially they were involving a

6    prioritization strategy.   And now that DAA treatment has

7    become more readily available, the -- the stratifying of

8    patient risk is involved.

9          Q.    Can you explain that?

10          A.    The goal -- the goal in the community is to

11    treat all patients with hepatitis C.  That is also our

12    goal.

13          Q.    Dr. Phillips testified that there are

14    approximately 8,000 people in ADCRR custody who have

15    chronic hepatitis C.  Is that consistent with your

16    understanding?

17                MS. ORCUTT:  Form.

18                THE WITNESS:  No.  No.  When they pull that

19    report, they pull anywhere from five to seven different

20    versions of hepatitis C diagnosis that are in eOMIS.  So

21    there can be duplicates there.

22                I would say that it is most likely around

23    6,000 to 8,000, but we cannot be sure.

24          Q.    (By Ms. Hardy) And this new policy creates three

25    tiers of priority groups; is that right?

Incomplete, Rule 106;

Lacks personal knowledge, Rule 602

Wendy Michelle Orm, M.D. - 10/13/2021

55

```
1              MS. ORCUTT:  Form.
2              THE WITNESS:  I believe so.
3       Q.   (By Ms. Hardy) Can you explain how the tiered
4  system works?
5       A.    If you pull up that area of the policy for
6  reference, there's the priority levels.
7            So this policy is still using priority levels,
8  and first priority for treatment are those patients with
9  the most severe disease who have yet to be treated.
10           That is fibrosis stage F-4, or cirrhosis.  Or
11  anyone with hepatitis C and a co-infection with hepatitis
12  B or HIV.
13      Q.   And how many people in the ADCRR fall into
14  priority level 1?
15             MS. ORCUTT:  Form.  Foundation.
16             THE WITNESS:  The remaining -- the
17  remaining patients that fall into priority level 1 are
18  about 600, 650.
19      Q.   (By Ms. Hardy) And how many new patients are you
20  enrolling in DAA treatment each month?
21      A.    For the last year of June -- sorry.  July 1,
22  2020, through June 30, 2021, the average number was about
23  45 patients starting treatment per month.
24           This year after July 1, we are averaging 66
25  patients starting on treatment per month.
```

Wendy Michelle Orm, M.D. - 10/13/2021

56

1    Q.    So do -- do you have a date by which you believe
2    you will have offered treatment to all priority 1's?
3    A.    By the end of this year is our goal.
4    Q.    If you have 600 to 650 left, and there are three
5    months left in this year, are you -- when you say year,
6    can you describe what year you mean?
7              MS. ORCUTT:   Form.
8              THE WITNESS:   This year would be July 1
9    2021, through June 30, 2022.
10   Q.    (By Ms. Hardy) I see.   And then when you
11   complete that first priority level, will you begin on
12   priority level 2?
13   A.    We are already treating patients in priority
14   level 2, and some patients down in priority level 3.
15   Q.    So you said you have 600 to 650 people who are
16   in priority level 1, but you are also treating priority
17   level 2 and level 3.
18         How many priority level 2 people have you
19   been -- have you started treatment on?
20   A.    I don't have those numbers.   But our priority
21   from November of 2019 has been to target our treatment
22   efforts prioritizing F-3 and above, which does dip into
23   priority level 2.
24         So of the almost 1,000 patients that we have
25   treated since the beginning of our contract, the majority

Wendy Michelle Orm, M.D. - 10/13/2021

57

1     of those are fibrosis stage 3 and 4.

2         Q.   Do you know how many fibrosis stage 3 patients

3     you currently have who have not yet been treated?

4         A.   I do not.

5         Q.   So you've testified that you have roughly 6,000

6     to 8,000 patients who have chronic hepatitis C; is that

7     correct?

8              MS. ORCUTT:  Form.

9              THE WITNESS:  Or who have had a positive

10    antibody that population can spontaneously clear.  So

11    that diagnosis may stay on the chart.  It may also stay

12    on the record once they're treated and free of hepatitis

13    C.  So that number is a rough number.

14        Q.   (By Ms. Hardy) Approximately how many people

15    would you estimate qualify for treatment for hepatitis C

16    in ADCRR?

17             MS. ORCUTT:  Form.  Foundation.

18             THE WITNESS:  I don't have my statistics in

19    front of me, but I do know that we inherited

20    approximately 1500 stage F-3/F-4.  We have treated now

21    over 700 of those with 650 remaining.  And of those 650,

22    more than 500 of those F-3/F-4s remaining are in the

23    stages of workup to determine treatment.

24        Q.   (By Ms. Hardy) Do you know the total number of

25    people -- can you estimate the total number of people

Wendy Michelle Orm, M.D. - 10/13/2021

59

1    Q.    And then while they are on DAA, they have to be

2    monitored; correct?

3              MS. ORCUTT:  Form.

4              THE WITNESS:  Correct.

5    Q.    (By Ms. Hardy) And following their treatment,

6    they have to be monitored as well; correct?

7              MS. ORCUTT:  Form.

8              THE WITNESS:  Correct.

9    Q.    (By Ms. Hardy) Has this commitment to treating

10   people with the hepatitis C virus increased the workload

11   for your primary care providers?

12             MS. ORCUTT:  Form.

13             THE WITNESS:  Yes, it has.

14   Q.    (By Ms. Hardy) And has that required hiring

15   additional primary care providers?

16             MS. ORCUTT:  Form.

17             THE WITNESS:  No, it has not.

18   Q.    (By Ms. Hardy) And can you explain why that is?

19   A.    Because hepatitis C is a chronic care condition

20   and has always been, prior to our contract, a chronic

21   care condition.

22             And so it's still followed in chronic care

23   clinic by our medical providers who are now very

24   involved, gladly involved in actual treatment instead of

25   just monitoring as they were before.

Wendy Michelle Orm, M.D. - 10/13/2021

60

1      Q.    The federal program of 340-B, has dramatically

2    reduced the cost of the DAA treatment; is that correct?

3              MS. ORCUTT:  Form.  Foundation.

4              THE WITNESS:  Correct.

5      Q.    (By Ms. Hardy) And what is the cost currently to

6    put a patient on DAA treatment, do you know?

7              MS. ORCUTT:  Form.

8              THE WITNESS:  No, I do not.

9      Q.    (By Ms. Hardy) You said the goal is to treat all

10   patients in ADCRR who have chronic HCV; is that correct?

11             MS. ORCUTT:  Form.

12             THE WITNESS:  That is correct.

13     Q.    (By Ms. Hardy) And do you have a timeline for

14   completing that project?

15     A.    My only timeline is to get through the remaining

16   600-plus F-3/F-4s in this next year.

17     Q.    Thank you.  Some -- I'm moving on now.  Some

18   people in the ADCRR custody misuse controlled substances.

19   Is that right?

20             MS. ORCUTT:  Form.  Foundation.

21             THE WITNESS:  That is correct.

22     Q.    (By Ms. Hardy) And you know that as a physician

23   because, for example, you've -- your physicians are

24   treating abscesses that might be related to IV drug use;

25   is that right?

Relevance,
Rule 402

Wendy Michelle Orm, M.D. - 10/13/2021

61

Relevance,
Rule 402

1          MS. ORCUTT:  Form.

2          THE WITNESS:  I know this because patients

3    admitted, because patients test positive on drug screens,

4    because drugs are found on a site, because there are drug

5    overdoses that still occur, and because of the fact that

6    we have very low, but some cases of hepatitis C

7    reinfection.

8          Q.   (By Ms. Hardy) And what treatment does Centurion

9    provide for people who have substance use disorder?

10         MS. ORCUTT:  Form.  Foundation.

11         THE WITNESS:   The current treatment is

12   mainly mental health counseling and programming.

Relevance,
Rule 402;
Incomplete,
Rule 106

13         Q.   (By Ms. Hardy) So Centurion does not provide

14   people with substance use disorder medication-assisted

15   therapy; is that correct?

16         MS. ORCUTT:  Form.  Foundation.

17         THE WITNESS:  Centurion and ADCRR continue

18   patients who are on methadone or Suboxone when they come

19   in to intake, and then they are tapered off for their

20   relatively long sentence.  So it is not something

21   continued beyond the -- the initial intake process.

22         Q.   (By Ms. Hardy) And the one exception to that is

23   for people who are pregnant when they come in and are on

24   methadone; is that correct?

25         MS. ORCUTT:  Form.

Wendy Michelle Orm, M.D. - 10/13/2021

62

Relevance,
Rule 402;
Incomplete,
Rule 106

1          THE WITNESS:  That is correct.

2     Q.    (By Ms. Hardy) Moving on.  Some patients in the

3  ADCRR are not fluent in English; is that correct?

4     A.    Correct.

5     Q.    Do you know how many patients in ADCRR are not

6  fluent in English?

7          MS. ORCUTT:  Form.

8          THE WITNESS:  I do not know that number.

9     Q.    (By Ms. Hardy) Do you know how many patients in

10  ADCRR custody are deaf and use sign language?

11         MS. ORCUTT:  Form.

12         THE WITNESS:  I do not know that number off

13  the top of my head.

14    Q.    (By Ms. Hardy) Does Centurion assess whether a

15  patient is fluent -- fluent in English during the intake

16  process or at any point during the health care process?

17         MS. ORCUTT:  Form.

18         THE WITNESS:  Patient -- part of -- part of

19  intake process is assessing primary language.  That is

20  done by ADCRR and Centurion with -- using various

21  modalities.

22    Q.    (By Ms. Hardy) And do you know what the process

23  that Centurion uses to assess language?

24    A.    I think that is outlined in department orders

25  and MSTM, and that is what we follow.  So there is

Wendy Michelle Orm, M.D. - 10/13/2021

63

1   signage, there is orientation packets.

2              And then the intake individual does meet with

3   nursing providers, dental, mental health.  And along that

4   vigorous process it is ascertained what their primary

5   language is, and in our electronic medical record the

6   necessity for an interpreter is a hard stop.  So that

7   must be addressed at -- at the visit.

8      Q.   When you say it's a hard stop, could you explain

9   what that means?

10     A.   That means that the person in the record cannot

11  proceed any further until they answer the question of

12  whether a patient needs interpreter services or not.

13     Q.   And -- and I think I've already sort of asked

14  this.  I'm not quite getting what I was hoping to find.

15          Do you know how your medical providers and

16  nurses assess the language proficiency of the person that

17  they are treating?

18              MS. ORCUTT:  Form.

19              THE WITNESS:  I think they have visuals.

20  There are posters that they can help communicate should a

21  patient indicate that they need interpreter services.

22  And for the majority of intakes, they're coming from a

23  county jail where that has already been ascertained as

24  well.

25              So there are various ways for them to

Wendy Michelle Orm, M.D. - 10/13/2021

65

1   policy directing your health care staff to conduct a

2   language assessment during the intake process?

3           MS. ORCUTT:  Form.

4           THE WITNESS:  I do believe there is

5   department orders and chapters in the MSTM.  I do believe

6   there is policies that -- multiple policies that involve

7   assessing language and interpreter services.

8       Q.   (By Ms. Hardy) And do you think that those

9   policies explain how the assessment should be done?

10          MS. ORCUTT:  Form.

11          THE WITNESS:   I think that training on-site

12  either by Centurion in new employee orientation, or by

13  DOC, I think that training continues.  I am not sure.

14      Q.   (By Ms. Hardy) As the medical director for

15  Centurion, you agree that it's necessary for patients to

16  be able to communicate effectively with their health care

17  staff during health care encounters; right?

18          MS. ORCUTT:  Form.

19          THE WITNESS:  Yes.

20          MS. BARNES:  And, Alison, you're -- you're

21  trailing off a little on your questions, making it

22  difficult to hear.

23          MS. HARDY:  Okay.

24      Q.   (By Ms. Hardy) Does Centurion require

25  interpretation services to be made available during

*(Margin note, lines 14–19:)* Seeks expert testimony, Rule 701

Wendy Michelle Orm, M.D. - 10/13/2021

66

1   patients' encounters with their health care staff?

2            MS. ORCUTT:  Form.

3            THE WITNESS:  Yes.

4       Q.   (By Ms. Hardy) And is the requirement that

5   interpretation services be made available to patients in

6   any of the ADCRR policies and procedures?

7            MS. ORCUTT:  Form.  Foundation.

8            THE WITNESS:  I believe they do.  I'm not

9   familiar word for word with the department orders or the

10  MSTM wording.

11      Q.   (By Ms. Hardy) When a clinician is going to see

12  a patient that needs interpretation services, how do they

13  know that the patient requires these services?

14           MS. ORCUTT:  Form.

15           THE WITNESS:  It is either already known

16  from intake and it's designated.  And it may also be

17  designated in the ADCRR system, which is not the

18  electronic medical record, so that officers are also

19  aware.

20           And then there are, like I mentioned, a

21  hard stop for interpreter services as a main question

22  before a provider or a nurse can continue with an

23  encounter on the electronic medical record.

24      Q.   (By Ms. Hardy) And what are clinician options

25  when they're treating a patient who's not fluent in

Wendy Michelle Orm, M.D. - 10/13/2021

67

1    English?

2            MS. ORCUTT:  Form.

3            THE WITNESS:  Their options are to use the

4    interpreter line that we have made available in all

5    settings.

6    Q.   (By Ms. Hardy) And is that a language line

7    that's available by telephone?

8    A.   By telephone or any platform that has audio

9    including a computer screen if we need sign language

10   interpretation and a visual communication cue.

11   Q.   Is there a screen platform available in every

12   clinic exam room?

13           MS. ORCUTT:  Form.  Foundation.

14           THE WITNESS:  I believe so.

15   Q.   (By Ms. Hardy) And how do you know that?

16   A.   Because we have computers in every medical exam

17   room.

18   Q.   And how would a clinician be charting if their

19   screen were being used for a interpreter?

20           MS. ORCUTT:  Form.

21           THE WITNESS:  I can only answer if it were

22   me, and that would be good old paper and pen so that my

23   screen can be used to communicate with the patient.  And

24   some computers, you can split screen.

25           And some of the medical clinics have

Wendy Michelle Orm, M.D. - 10/13/2021

68

1   telemedicine platforms and we can use that computer

2   screen for interpretation while we have another computer

3   screen up for the electronic record.

4       Q.   (By Ms. Hardy) Do you know what proportion of

5   clinical exam rooms that you have have that telemed

6   capacity?

7       A.   I do not.

8       Q.   Have -- are you aware of any surveys or

9   assessments have been -- that have been done to determine

10  the effectiveness of using the language line for patient

11  encounters?

12          MS. ORCUTT:  Form and foundation.

13          THE WITNESS:  I am not aware.

14      Q.   (By Ms. Hardy) If the health care staff person

15  speaks the language that the patient speaks, can the

16  health care staff person speak to the person directly and

17  not use the language line?

18          MS. ORCUTT:  Form.

19          THE WITNESS:  For any formal documented

20  visit, we prefer they use the language line.

21      Q.   (By Ms. Hardy) So is it your testimony that

22  clinicians are not supposed to conduct their visits in

23  any language other than English with the use of the

24  language line?

25          MS. ORCUTT:  Form.

Relevance,
Rule 402;
Lacks
personal
knowledge,
Rule 602

Wendy Michelle Orm, M.D. - 10/13/2021

69

1          THE WITNESS:  Absolutely not.  Especially

2    with Spanish, if a patient and a provider are fluent in

3    Spanish, they can communicate in Spanish.

4          We prefer that for documented medical

5    encounters that there is use of a language line so that

6    there is no misinterpretation from the patient.  So that

7    is advised.

8          Q.    (By Ms. Hardy) If the provider chooses to speak

9    to the person in their native language or the language

10   that both of them speak, is that noted anywhere in the

11   health record?

12         A.    Yes.  Usually what I see is the patient if they

13   needed interpretive services, that the provider or the

14   nurse will -- will mention that they are -- they're also

15   speaking in the patient's language.

16         Q.    So that would be somewhere in the SOAP note?

17         A.    I believe so.  I have seen it.

18         Q.    Do you know if there's a policy that requires

19   the notation that the visit was conducted in a language

20   other than English?

21              MS. ORCUTT:  Form.

22              THE WITNESS:  I am not sure if the

23   department order or MSTM has something specific to that.

24         Q.    (By Ms. Hardy) Do you know if Centurion conducts

25   any proficiency testing to ensure that people who do

Relevance,
Rule 402

Wendy Michelle Orm, M.D. - 10/13/2021

70

Relevance,
Rule 402

1  occasionally use a language other than English to conduct

2  their visits to ensure that their language proficiency is

3  adequate?

4           MS. ORCUTT:  Form.  Foundation.

5           THE WITNESS:  We do not certify our staff

6  in interpretation.  So the preference is that they use an

7  interpreter line.

8      Q.   (By Ms. Hardy) How is interpretation provided

9  for people who are deaf or hard of hearing?

10     A.   We can use the interpreter line.  And if they

11  have hearing impairment that affects the ability for

12  either DOC staff or medical staff to communicate with the

13  patient, then we have them evaluated by the audiology

14  group and we fit them with hearing aids so they can

15  absolutely hear what the officers, DOC staff, and medical

16  staff are saying.

17           So we make every effort to -- to give them the

18  ability to hear and communicate.

19     Q.   So your testimony is that for people who are

20  deaf or hard of hearing, the communication strategy is to

21  ensure that they have hearing aids.  Is that correct?

22           MS. ORCUTT:  Form.

23           THE WITNESS:  Yes.

24     Q.   (By Ms. Hardy) Do you have people who are

25  American sign language proficient patients who prefer to

Wendy Michelle Orm, M.D. - 10/13/2021

71

1    communicate by American sign language?

2        A.    There are a few in custody that have -- have

3    stated that they prefer to speak using sign language.

4        Q.    And does the -- does Centurion accommodate those

5    patients?

6        A.    Yes.

7        Q.    How do you accommodate those patients?

8        A.    I explained before our interpreter services line

9    has the ability to interpret using sign language and the

10   use of computer screen, so that it is a visual

11   conversation with the interpreter.

12       Q.    And so your testimony is that whenever a person

13   who communicates via sign language is seen by the medical

14   staff that the medical staff uses their computer screen

15   to communicate with them through the language line?

16       A.    Yes.

17       Q.    Do you know whether that actually works in

18   practice?

19               MS. ORCUTT:   Form.

20               THE WITNESS:   In my practice, in history,

21   or in this practice?

22       Q.    (By Ms. Hardy) In the ADCRR with the patients

23   who are deaf or hard of hearing.

24       A.    Yes.

25       Q.    How do you know that?

Wendy Michelle Orm, M.D. - 10/13/2021

72

1      A.    That's what I am told, that our interpreter line
2   is the best they have had, and that it allows them to
3   have access to multiple languages, including sign
4   language.
5      Q.    And you are satisfied that you are providing the
6   level of interpretation necessary for people who are deaf
7   or hard of hearing?
8      A.    Better than I had in my community practice, yes.
9      Q.    And you are satisfied with the level that
10  Centurion provides?
11             MS. ORCUTT:  Form.
12             THE WITNESS:  Better than I saw in the
13  community, yes.
14     Q.    (By Ms. Hardy) That's a different answer.  Are
15  you personally satisfied that Centurion provides an
16  adequate level of interpretation for people who are deaf
17  or hard of hearing in the ADCRR?
18             MS. ORCUTT:  Form.  Asked and answered.
19             THE WITNESS:  Yes.
20     Q.    (By Ms. Hardy) Okay.  I'd like to move on to
21  specialty care.  I'm not sure why that came back.
22             For specialty care, I'm going to pull up the
23  policy and share my screen.  So this is, I believe,
24  Exhibit 5.
25             (Deposition Exhibit 5 was marked for

Wendy Michelle Orm, M.D. - 10/13/2021

74

1    than this particular process?

2                MS. ORCUTT:  Form.  Foundation.

3                THE WITNESS:  Not that I'm aware of.

4        Q.    (By Ms. Hardy) Okay.  Thanks.  So when a patient

5    needs to go to the -- to a specialist, it would be the

6    patient's primary care provider who initiates that

7    process; is that correct?

8                MS. ORCUTT:  Form.

9                THE WITNESS:  It can be any provider.

10       Q.    (By Ms. Hardy) So, okay.  So a provider working

11   for Centurion would refer the patient to specialty care;

12   correct?

13       A.    Correct.

14       Q.    And that request is submitted through the

15   electronic health record; correct?

16       A.    Correct.

17       Q.    And what guidelines do providers have to help

18   them decide whether a referral is appropriate?

19                MS. ORCUTT:  Form.

20                THE WITNESS:  That is -- that question is

21   very broad.  Can you be more specific?

22       Q.    (By Ms. Hardy) Well, I believe in the medical

23   services technical manual there are some protocols for

24   different diseases and those would suggest when to order

25   a specialty request; is that right?

Wendy Michelle Orm, M.D. - 10/13/2021

78

1    That would surprise me.

2         Q.    (By Ms. Hardy) And what do you base that

3    belief -- on what do you base the belief that this data

4    is not correct?

5                   MS. BARNES:  Form.

6                   THE WITNESS:  Because -- can you roll back

7    up so I can see the time frame?

8         Q.    (By Ms. Hardy) This is January 2021 through July

9    2021.

10        A.    Okay.  Because I'm not aware -- so that's back

11   six -- three months, four months from now.  I'm not aware

12   of a -- a problem in specialty services scheduling at

13   this time.

14                This goes back a year -- so I can't -- I can't

15   correlate that to any other data or what was going on at

16   the time.  So I would have to see more information.

17        Q.    Okay.  Thank you.  We've been going for another

18   hour.  Would you like to take a break now for a few

19   minutes or would you like to carry on?

20                   MS. BARNES:  Your call.

21                   THE WITNESS:  I'm fine.

22                   MS. BARNES:  We're fine to go unless

23   somebody else wants to take a break.

24                   MS. HARDY:  Ms. Honn, are you doing okay?

25                   THE REPORTER:  (Nodding.)

Wendy Michelle Orm, M.D. - 10/13/2021

79

1          MS. HARDY:  Okay.  Then we'll go ahead.

Relevance,
Rule 402

2      Q.    (By Ms. Hardy) The next issue I'd like to cover

3  is COVID-19.  And do you agree with the Centers for

4  Disease Control recommendation that staff at correctional

5  and detention facilities get vaccinated against COVID?

6          MS. ORCUTT:  Form.

7          THE WITNESS:  I agree.

8      Q.    (By Ms. Hardy) And has Centurion required its

9  staff who work in the prisons to be vaccinated against

10  COVID-19?

11      A.    That is not a mandate, but we have required

12  reporting for vaccination status.

13      Q.    So your staff is required to tell you whether or

14  not they have taken the vaccination; is that correct?

15      A.    They are.

16      Q.    And are there testing requirements for Centurion

17  staff?

18      A.    Yes, there are.

19      Q.    And can you describe what those testing

20  requirements are?

21      A.    Testing is available weekly for all Centurion

22  staff at the site.  It is point of care testing.  Those

23  who have not declared a vaccination status or provided

24  vaccination information will be tested weekly.

Relevance,
Rule 402

25      Q.    You said for those who have not provided

Wendy Michelle Orm, M.D. - 10/13/2021

80

Relevance,
Rule 402

1   information about their vaccination status.  So perhaps I

2   misheard.  I thought you had said that people are

3   required to report their vaccination status to you if

4   they work for Centurion.

5            MS. ORCUTT:  Form.

6            THE WITNESS:  They have -- we do not force

7   reporting of vaccination status.  We have requested

8   reporting of vaccination status.  Those who choose not to

9   report or remain unvaccinated have weekly testing to be

10  able to continue to work or to travel site to site.

11       Q.   (By Ms. Hardy) And are you satisfied with that

12  measure as a safety measure during the COVID-19 pandemic?

13            MS. ORCUTT:  Form.

14            THE WITNESS:  Yes.

15       Q.   (By Ms. Hardy) You are satisfied that that

16  protects patients from being exposed to COVID-19 if the

17  staff were unvaccinated or tested weekly?

18            MS. ORCUTT:  Form.

19            THE WITNESS:  Yes.

20       Q.   (By Ms. Hardy) Are Centurion staff required to

21  wear a face mask in the prison?

22            MS. ORCUTT:  Form.

23            THE WITNESS:  Yes.

24       Q.   (By Ms. Hardy) And how is that enforced?

25            MS. ORCUTT:  Form.

Wendy Michelle Orm, M.D. - 10/13/2021

81

1          THE WITNESS:  The same way it is enforced

2     in the community, and it is by upper level and peers

3     reminding everyone, everyone on site, to continue to

4     follow masking protocols.

5          Q.    (By Ms. Hardy) And if people fail to follow

6     masking protocols, is there a process for addressing

7     that?

8               MS. ORCUTT:  Form.

9               THE WITNESS:  It would be treated as any

10    other employee behavioral process.  And no different than

11    that.  And we have not had to deal with that problem yet.

12         Q.    (By Ms. Hardy) Thank you.  Moving on.  If a

13    patient requires a health care appliance or an assistive

14    device, does Centurion have a system in place for

15    patients to submit these requests?

16              MS. ORCUTT:  Form.

17              THE WITNESS:  Yes.

18         Q.    (By Ms. Hardy) And how do patients know that?

19    Do you know how that's communicated to the patients?

20         A.    From the very beginning when patient enters

21    through intake they're given an orientation book and

22    information on how to request health services.  And

23    requesting an assistive device or health care appliance

24    is a medical needs request.

25         Q.    And who decides whether a patient will be given

Wendy Michelle Orm, M.D. - 10/13/2021

82

1    a health care appliance or an assistive device?

2                 MS. ORCUTT:  Form.

3                 THE WITNESS:  Initially it is the medical

4    provider assessing the patient.  Ultimately, some devices

5    are approved by DOC.

6       Q.   (By Ms. Hardy) And have the providers been given

7    any written guidelines to when it is appropriate to order

8    an assistive device or appliance?

9                 MS. ORCUTT:  Form.

10                THE WITNESS:  Not that I'm aware of as

11   those are standard medical care guidelines in the

12   community and in the practice of medicine.

13      Q.   (By Ms. Hardy) So you don't think that the

14   providers have been given any particularized training in

15   ADCRR about when to approve an appliance; is that

16   correct?

17                MS. ORCUTT:  Form.

18                THE WITNESS:  Not when to approve an

19   appliance because that's a medical decision.  And ADCRR

20   would not dictate that.

21                But I do believe that providers are given

22   training in their DOC training on what kinds of medical

23   appliances are appropriate for what settings and what

24   would need to be approved by DOC higher level.

25      Q.   (By Ms. Hardy) And do you believe that there's

Relevance,
Rule 402;
Incomplete,
Rule 106

1    any specialized training given to providers about how to
2    assess a patient to determine whether or not an assistive
3    device or appliance is medically necessary?
4              MS. ORCUTT:  Form.
5              THE WITNESS:  Yes.  Part of medical
6    training involves the ability to provide a functional
7    assessment of a patient.  And any provider who is feeling
8    like they need help in how to do a functional assessment,
9    it would be the either peers or site medical director or
10   myself could give education and help with that or any
11   other kind of exam.
12        Q.   (By Ms. Hardy) Okay.  I'd like to introduce an
13   exhibit now that is a note from a patient's health
14   record.  And so I'm going to make this a confidential
15   portion of the deposition, please.
16              (The following portion of the transcript
17   was designated confidential.)
18                    *  *  *  *  *
19
20
21
22
23
24
25

Wendy Michelle Orm, M.D. - 10/13/2021

91

1           It's a group effort to make sure that the mental
2    health scores and the medical scores fit the patient.
3        Q.    So -- that's interesting.  I hadn't realized
4    that custody or the nurses could also have input.  Would
5    custody or the nurses have the authority to change the
6    medical classification score?
7               MS. ORCUTT:  Form.
8               THE WITNESS:  I do not believe so, but I'm
9    not sure.
10       Q.    (By Ms. Hardy) Okay.  And do you believe that
11   people generally have accurate medical classification
12   scores that are appropriate for their condition based on
13   your experience of being in the system?
14              MS. ORCUTT:  Form.  Foundation.
15              THE WITNESS:  Yes, I do.
16       Q.    (By Ms. Hardy) And you base that on?
17              MS. BARNES:  Form.
18              THE WITNESS:  I base that on my observation
19   and especially all of my review of charts.  I see medical
20   and mental health scores consistently, and I also see
21   instances where if it needs adjustment, it is -- it is
22   very easy to make the suggestion and have somebody
23   actually pay attention and make that change in doing
24   assessment.
25              So that's something that -- that is freely

Wendy Michelle Orm, M.D. - 10/13/2021

92

1    talked about and the intention is always to have the

2    correct scoring for our patients.

3        Q.   (By Ms. Hardy) And you said that the medical

4    classification score is used for housing decisions; is

5    that right?

6                MS. ORCUTT:  Form.

7                THE WITNESS:  It can be.

8        Q.   (By Ms. Hardy) Do you know what else medical

9    classification system is used for?

10               MS. ORCUTT:  Form.

11               THE WITNESS:  I do not.

12       Q.   (By Ms. Hardy) Do you --

13       A.   Go ahead.

14       Q.   I'm sorry.  I interrupted you.

15       A.   In my world, it's medical.  So for me, it really

16   does make me look at what the additional needs may be of

17   a patient and make sure that where they are currently

18   housed, that we can meet that level of need based on

19   staffing, based on housing, all of that.  That's the only

20   way I look at it.  If it's used other ways, I'm not

21   aware.

22       Q.   So you don't, for example, know the total number

23   of M-5s in the system currently?

24       A.   No, ma'am.

25       Q.   And you don't base any staffing decisions in the

*Relevance, Rule 402; Lacks personal knowledge, Rule 602*

Wendy Michelle Orm, M.D. - 10/13/2021

93

Relevance,
Rule 402

1   aggregate on how many people are in each medical

2   classification; is that correct?

3              MS. ORCUTT:   Form.   Foundation.

4        THE WITNESS:   No.

5              MS. HARDY:   Okay.   I'd like to stop for a

6   minute now, so five-minute break.

7              MS. BARNES:   Let's go with more like seven

8   minutes.

9              MS. HARDY:   Seven-minute break, okay.

10             (Recess from 11:15 a.m. to 11:27 a.m.)

11             MS. HARDY:   Okay.   Thank you.   Sarah, were

12  you able to figure out things on your end?

13             MS. BARNES:   Okay.   So we're back on?

14             MS. HARDY:   Yes, we are back on.

15             MS. BARNES:   Okay.   So with respect to the

16  Exhibit 7 that you want to discuss and keep it

17  confidential in the deposition, I'm fine with you asking

18  the questions.

19             However, I may have an instruction for my

20  client which I'll make if necessary and/or -- well, and

21  I'll just reserve my right to object to use of this in

22  the other proceeding just so that I'm preserving the

23  objection out of abundance of caution.

24             MS. HARDY:   Okay.   Thank you.   Sorry, I'm

25  going to go off just one second.   I misplaced something.

1      Q.    (By Ms. Hardy) And for the record this is a note

2    from August 16, 2021, for Mr. [redacted], his number is

3    [redacted] and he is a patient who lives at ASPC Florence.

4            And I know we previously discussed that

5    Ms. Barnes is definitely familiar with Mr. [redacted].

6            Dr. Orm, are you familiar with Mr. [redacted]?

7              MS. ORCUTT:  Form.

8              MS. BARNES:  And my instruction to my

9    client is to the extent you can answer that question --

10   strike that.

11             Please answer that question only to the

12   extent you can without referring to any discussion with

13   your attorneys.

14             THE WITNESS:  I'm not familiar.

15      Q.    (By Ms. Hardy) Okay.  Mr. [redacted] is a

16   paraplegic who requested a special needs order for

17   sliding board and shoes in August.  And this note is from

18   the visit where that was reviewed.

19             The provider's signature is Natalya Weigel, and

20   I believe that it says somewhere that she is a nurse

21   practitioner.  Yes, she is a nurse practitioner.

22             Are you familiar with NP Weigel?

23             MS. ORCUTT:  Form.

24             THE WITNESS:  Yes.

25      Q.    (By Ms. Hardy) Okay.  And the note says under

1   that in this chart there are physical therapy notes and

2   other notes that describe his functional capacity.  This

3   is out of context.

4       Q.    (By Ms. Hardy) Would you expect that the

5   provider would refer to those notes when denying a

6   request for appliances?

7              MS. ORCUTT:  Form.

8              THE WITNESS:   I see approvals for things

9   here.  Wheelchair, egg crate mattress.  The only thing

10  that I see that is not approved at this particular moment

11  was shoes and a slide.

12      Q.    (By Ms. Hardy) Right.  Do you see any reference

13  to an assessment that was done to determine whether or

14  not a slide and shoes would be appropriate for him?

15             MS. ORCUTT:  Form.

16             MS. BARNES:  Form and foundation.

17             THE WITNESS:  I see in the subjective that

18  the provider is describing his functional ability and the

19  patient actually agreeing with some things he does not

20  need.

21      Q.    (By Ms. Hardy) Do you see any assessment of

22  whether or not shoes would be appropriate for him other

23  than to say that he doesn't walk?

24             MS. BARNES:  Form and foundation.

25             MS. ORCUTT:  Form.

Wendy Michelle Orm, M.D. - 10/13/2021

99

1          THE WITNESS:   He's paraplegic, wheelchair
2   bound, and does not walk.
3       Q.   (By Ms. Hardy) And so you would use that as a
4   basis to say that he does not require shoes?
5       A.   No.   He does not require medical shoes.
6          MS. BARNES:   Form and foundation to the
7   last question.
8       Q.   (By Ms. Hardy) I see.
9       A.   All inmates have shoes.
10      Q.   (By Ms. Hardy) I see.   Thank you.   Okay.
11          (End of confidential portion of transcript
12   designated as confidential.)
13                  * * * * *
14
15
16
17
18
19
20
21
22
23
24
25

Wendy Michelle Orm, M.D. - 10/13/2021

100

```
 1      Q.   (By Ms. Hardy) I want to circle back.  We're off
 2   of the -- stop sharing.  We're off of the confidential
 3   portion of the deposition currently.
 4           I do want to just circle back and do some --
 5   summing up.
 6           Going back to access to care for people who
 7   submit HNRs and they're seen by a nurse.  Are you
 8   satisfied that the Centurion RNs are using the nurse
 9   encounter tools effectively when they see patients?
10           MS. ORCUTT:  Form and foundation.
11           THE WITNESS:  Yes.
12      Q.   (By Ms. Hardy) And you are satisfied -- are you
13   satisfied that the nurses are appropriately determining
14   when and whether to refer patients to the provider line?
15           MS. ORCUTT:  Form.
16           THE WITNESS:  Yes.
17      Q.   (By Ms. Hardy) And the basis for those
18   determinations is?
19           MS. ORCUTT:  Form.
20           THE WITNESS:  My overall observation of the
21   care provided at the sites to our inmates.
22      Q.   (By Ms. Hardy) And what observation
23   opportunities do you have at the sites?
24           MS. ORCUTT:  Form.
25           THE WITNESS:  Chart review, physical
```

Wendy Michelle Orm, M.D. - 10/13/2021

101

1  observation, audit reviews.  I'm sure there's more I

2  can't think of.

3      Q.   (By Ms. Hardy) Have you done studies to

4  determine whether or not the Centurion RNs are using the

5  NETs effectively, i.e., choosing the correct NETs and

6  properly completing them to -- to support that opinion?

7              MS. ORCUTT:  Form.

8              THE WITNESS:  I have not completed a study.

9      Q.   (By Ms. Hardy) Have you done any -- well, has

10 Centurion completed any studies to determine whether or

11 not RNs are using NETs effectively and completing them

12 appropriately?

13             MS. ORCUTT:  Form.

14             THE WITNESS:  I am not aware.

15             MS. BARNES:  Foundation to the last

16 question.

17     Q.   (By Ms. Hardy) And have you completed any

18 studies to determine whether or not RNs are appropriately

19 referring patients on to the provider line on -- on a

20 consistent basis?

21             MS. ORCUTT:  Form.

22             THE WITNESS:  I am not aware of a study.

23     Q.   (By Ms. Hardy) What are you basing your opinion

24 that nurses -- what are you basing your opinion on that

25 nurses appropriately refer their patients to the provider

Relevance, Rule 402; Lacks personal knowledge, Rule 602

Relevance, Rule 402; Lacks personal knowledge, Rule 602

Wendy Michelle Orm, M.D. - 10/13/2021

102

1    line when necessary?

2                    MS. ORCUTT:  Form.

3                    THE WITNESS:  My knowledge of the care

4    provided at the site and review of thousands of records,

5    and in -- in being involved at my level at any problem

6    cases, that would come to my attention if there was

7    problem with referral or lack of referral.

8        Q.    (By Ms. Hardy) And it has not come to your

9    attention that there is a problem with referring people

10   from the nurse line to the provider line?

11                   MS. ORCUTT:  Form.

12                   THE WITNESS:  No.  In fact, providers have

13   helped the nurses with nurse line and just stepped down

14   to see patients to help the nurses.

15       Q.    (By Ms. Hardy) Okay.  So it's -- it's your

16   opinion that the nurses appropriately refer people to the

17   provider line when it's medically appropriate?

18       A.    Yes.

19       Q.    But you don't have any studies to show that?

20                   MS. ORCUTT:  Form.

21                   THE WITNESS:  I'm not aware of any studies.

22   I have not performed a study myself.

23       Q.    (By Ms. Hardy) And is it your opinion that the

24   mid level providers in the -- working for Centurion are

25   adequately supervised by physicians?

Relevance,
Rule 402;
Cumulative,
Rule 403

Glennie Reporting Services, LLC
602.266.6535  www.glennie-reporting.com

Wendy Michelle Orm, M.D. - 10/13/2021

103

1          MS. ORCUTT:  Form.

2          THE WITNESS:  Yes.

3     Q.    (By Ms. Hardy) And you base that opinion on

4  what?

5          MS. BARNES:  Form.

6          THE WITNESS:  I base that opinion on the

7  structure that we have for practice at the site level.

8          There is a physician, site medical director

9  overseeing and available to the mid level providers,

10  reviewing records, acting as an attending physician to

11  guide and educate.  And they also have me to reach to

12  also as an attending physician.

13     Q.    (By Ms. Hardy) And how much time do the site

14  medical directors spend supervising the mid level

15  providers who work at their prisons?

16          MS. ORCUTT:  Form and foundation.

17          THE WITNESS:  It will vary per site.  As

18  you know, every site is very different in the volume, the

19  acuity, and the types of services provided.  And so site

20  medical directors would spend varying amounts of time in

21  supervision.

22          The time they spend overseeing the care of

23  the inmates at their site is the majority of their job

24  description.

25     Q.    (By Ms. Hardy) And you said that you are

Wendy Michelle Orm, M.D. - 10/13/2021

104

1    satisfied that the mid levels are appropriately

2    supervised based on your review of chart reviews; is that

3    right?

4                    MS. ORCUTT:  Form.

5                    THE WITNESS:  Chart reviews, peer reviews,

6    all types of information that will come to me that

7    involves patient care.

8        Q.    (By Ms. Hardy) And how do you determine which

9    charts to review?

10                   MS. ORCUTT:  Form.

11                   THE WITNESS:  Charts are reviewed by me.

12   If there is a clinical question about the care or

13   management, if there is a pharmacy question, if there is

14   a inquiry about that patient, if there is a PLO or a

15   grievance that reaches my level, if there is a court

16   request or a medical review request, or if anybody says,

17   hey, Dr. Orm, can you take a look at this case and guide

18   us or make a decision, it can be any reason that I would

19   be looking at cases.

20       Q.    (By Ms. Hardy) So you review chart -- review

21   charts if someone raises the chart up to your attention;

22   is that right?

23                   MS. ORCUTT:  Form.

24                   THE WITNESS:  Or if I want to.

25       Q.    (By Ms. Hardy) So do you have a systemic or

Wendy Michelle Orm, M.D. - 10/13/2021

105

1    systematic process for reviewing charts each month that
2    is in addition to the charts that are elevated to you?
3                MS. ORCUTT:  Form.
4                THE WITNESS:  Yes, I do.  And that comes
5    mainly from my compliance group.  If there are -- are
6    things that maybe scored low but they are finding that
7    the care was delivered, they want me to take a look.
8                And also I look at charts -- we are -- we
9    have an ongoing peer review process and I will look into
10   charts to get a sense for particular providers, if it's a
11   provider where I have not kind of dived in to see their
12   charting recently.  So to keep myself aware of practice
13   patterns for the providers in the -- in the state.
14        Q.   (By Ms. Hardy) So what is your system for
15   reviewing provider charts?  Do you review the charts for
16   every provider on a periodic basis?
17        A.   No.  That is a peer review process, and I do not
18   do the entire process myself.
19        Q.   So do you personally have a systematic process
20   for reviewing certain charts apart from the charts that
21   are raised for your -- to your attention?
22                MS. ORCUTT:  Form.
23                THE WITNESS:  No systematic process.
24        Q.   (By Ms. Hardy) Okay.  And for all the charts
25   that you have reviewed, do you have -- do you keep track

Relevance,
Rule 402

Wendy Michelle Orm, M.D. - 10/13/2021

106

Relevance, Rule 402

1    of how many charts in which you thought there was a

2    nursing failure to review -- to send someone on to the

3    provider?

4                MS. ORCUTT:  Form.

5                THE WITNESS:  No.

6        Q.    (By Ms. Hardy) And for all of the charts that

7    you have reviewed, did you specifically track how -- in

8    how many you thought the nurses' use of the nursing

9    encounter tool was inappropriate?

10               MS. ORCUTT:  Form.

11               THE WITNESS:  No.

12       Q.    (By Ms. Hardy) And do you believe that the mid

13   levels appropriately seek out guidance from the

14   physicians in complex cases?

15               MS. ORCUTT:  Form.

16               THE WITNESS:  Yes, I do.  And even in

17   noncomplex cases.

18       Q.    (By Ms. Hardy) And can you tell me the basis for

19   that opinion?

20               MS. BARNES:  Form.

21               THE WITNESS:  The basis for a mid level

22   seeking out help from -- can you please rephrase the

23   question?

24       Q.    (By Ms. Hardy) Do you believe that the mid level

25   providers appropriately seek review from a physician in

Wendy Michelle Orm, M.D. - 10/13/2021

107

1   their complex medical cases?

2            MS. ORCUTT:  Form.

3            THE WITNESS:  The answer is yes.

4       Q.   (By Ms. Hardy) And what do you base that opinion

5   on?

6       A.   My site medical director reports of supervision

7   of care at the site level.

8       Q.   So your opinion is based on what you are told by

9   the people at the prisons?

10      A.   And what I see in actual practice from the care

11  that is delivered across the state.

12      Q.   And how do you -- how are you familiar with the

13  care that's provided across the state by the mid levels

14  who are providing care to complex patients?

15           MS. ORCUTT:  Form.

16           MS. BARNES:  Form.

17           THE WITNESS:  With all of the charts that I

18  review for various reasons, and all of the care that I

19  see, that is how I base my assumption.

20      Q.   (By Ms. Hardy) And do you review charts

21  specifically to determine whether or not the mid levels

22  are providing an appropriate level of care for their

23  training?

24           MS. ORCUTT:  Form.

25           THE WITNESS:  That specific goal in chart

**Wendy Michelle Orm, M.D. - 10/13/2021**

108

1    review would -- would fall under peer review.

2         Q.    (By Ms. Hardy) So it is not something that you

3    review?

4              MS. ORCUTT:  Form.

5              THE WITNESS:  I do not go into charts

6    specifically to find cases where a mid level would refer

7    to their site medical director.  That would be in 30,000

8    inmates very difficult to determine which cases to be

9    looking at for that particular goal.

10        Q.    (By Ms. Hardy) So the primary basis for your

11   opinion that mid levels are consulting with physicians in

12   complex cases at an appropriate level is based on what

13   the medical directors from the prisons have told you; is

14   that correct?

15             MS. ORCUTT:  Form.

16             MS. BARNES:  Form.

17             THE WITNESS:  And the fact that as an

18   attending physician, they reach out to me as well and we

19   always discuss cases.  And I can see that the appropriate

20   discussions are occurring at the site levels and that

21   people are collaborating and reaching out for guidance

22   and help with complex cases.

23        Q.    But you have no studies on that point; is that

24   correct?

25             MS. ORCUTT:  Form.

Relevance,
Rule 402;
Cumulative,
Rule 403

**Wendy Michelle Orm, M.D. - 10/13/2021**

109

Relevance,
Rule 402;
Cumulative,
Rule 403

1          MS. BARNES:  Form.  Foundation.

2          THE WITNESS:  How would you set that study

3     up?  I -- I'm at a loss.

4       Q.   (By Ms. Hardy) Okay.  And it's your opinion

5     that -- well, what is your opinion about the degree to

6     which Centurion is complying with providing routine

7     specialty appointments within 60 days and urgent

8     specialty appointments within 30 days?

9          MS. ORCUTT:  Form and foundation.

10          THE WITNESS:  With the pandemic numbers in

11     the community dropping finally, I believe it is better

12     than ever in the duration of the contract so far.

13       Q.   (By Ms. Hardy) So your testimony is that

14     Centurion is doing a -- an acceptable job in getting

15     people who are referred to specialty care on an urgent

16     basis to that specialty consultant within 30 days?

17          MS. ORCUTT:  Form.

18          THE WITNESS:  You initially said "routine"

19     and now you said "urgent."

20       Q.   (By Ms. Hardy) Okay.  I'm sorry.  What I meant

21     was is it your testimony that Centurion is doing an

22     acceptable job getting people who are referred to a

23     specialist on an urgent basis within 30 days of the

24     referral?

25       A.   Yes.

1    MS. ORCUTT:  Form.

2    Q.    (By Ms. Hardy) And your basis for that opinion

3    is?

4    MS. BARNES:  Form.

5    THE WITNESS:    Review of utilization

6    management statistics.

7    Q.    (By Ms. Hardy) And what do those statistics say

8    about referrals on an urgent basis to specialty

9    consultants?

10    MS. ORCUTT:  Form.

11    THE WITNESS:  That is an item that is

12    tracked and trended and anything that is outlying or

13    delayed will be seen.

14    Q.    (By Ms. Hardy) And you have -- you have data

15    showing overall for the system how many of the urgent

16    referrals were seen within 30 days?

17    MS. ORCUTT:  Form.

18    THE WITNESS:  Our compliance department and

19    UM department tracks that continuously and I believe that

20    data is provided on a monthly basis already.

21    Q.    (By Ms. Hardy) And what is the overall state

22    percentage for delivering urgent consults within 30 days

23    of referral?

24    MS. ORCUTT:  Form and foundation.

25    THE WITNESS:  I don't have that off the top

Wendy Michelle Orm, M.D. - 10/13/2021

112

1   know how much time there's been?

2                    THE REPORTER:  We're at two hours and 26

3   minutes.

4                    MS. HARDY:  It's now 11:52.  I have an hour

5   and 34 minutes left for this.  So, and you've got another

6   deposition -- continuation starting at two o'clockish.

7   However you want to do this is fine.  I just need in the

8   next two hours to get an hour and 34 minutes in.  So, you

9   know, we can do it as it, you know, works out.

10                    MS. BARNES:  Absolutely.  Let's just take

11  another five minutes tops right now for us to make that

12  determination on our end what we want to do from a food

13  standpoint and then we'll jump right back on and push

14  ahead with yours.

15                    MS. HARDY:  Okay.  Sounds good.  Five

16  minutes off.

17                    MS. BARNES:  11:58 we'll be back.

18                    MS. HARDY:  That's fine.

19                    (Recess from 11:53 a.m. to 12:00 p.m.)

20      Q.   (By Ms. Hardy) Thank you.  So we're going to

21  start up on quality assurance, which you've been

22  mentioning sort of along the way.  And I'm going to start

23  off with Chapter 1, section -- oops, sorry.

24           So the -- centurion runs a continuous quality

25  improvement program; right?

Wendy Michelle Orm, M.D. - 10/13/2021

113

1      A.    Correct.

2      Q.    And that process is outlined in Chapter 1,

3 Section 5 of the medical services technical manual that I

4 have posted up here on the screen.   Is that right?

5      A.    Correct.

6             MS. BARNES:   Which is Exhibit 9.

7             MS. HARDY:   This is Exhibit 9, yes.   Thank

8 you.

9             (Deposition Exhibit 9 was marked for

10 identification.)

11     Q.    (By Ms. Hardy) And that process is outlined

12 here.   Are there any other policies that describe the QI

13 program that you use at ADCRR?

14             MS. ORCUTT:   Form.

15             THE WITNESS:   Centurion is a very large

16 nationwide company, and so there are continuous quality

17 improvement activities that roll up through Centurion

18 nationwide.

19     Q.    (By Ms. Hardy) That are separate from this CQI

20 process?

21     A.    Yes.

22     Q.    Okay.  And where are those described?

23             MS. ORCUTT:   Form.   Foundation.

24             THE WITNESS:   Those would be in the

25 Centurion policies for the company.

Wendy Michelle Orm, M.D. - 10/13/2021

114

1    Q.    (By Ms. Hardy) Are those in any way different
2    from the CQI?  Do they require you to do things
3    differently from the way the CQI policies and procedures
4    are written?
5              MS. ORCUTT:  Form.  Foundation.
6              THE WITNESS:  No.  They're just -- they're
7    more broad, and they exceed what is listed here.
8    Q.    (By Ms. Hardy) Okay.  So there's a CQI committee
9    at each prison; is that right?
10   A.    That is correct.
11   Q.    And those committees meet monthly; is that
12   right?
13   A.    That's right.
14   Q.    And the site medical director is involved with
15   that CQI committee; is that right?
16   A.    Yes.
17   Q.    And does the site medical director perform chart
18   reviews on a monthly basis for the CQI committee?
19             MS. ORCUTT:  Form.  Foundation.
20             THE WITNESS:  I know if there is a
21   mortality, the site medical director will be involved in
22   chart reviews for that.  I'm not aware of -- I'm not
23   aware of the site medical director at that level.  I'm
24   not aware of how many charts they would review per month
25   outside of mortality.

Wendy Michelle Orm, M.D. - 10/13/2021

116

1    review; is that right?

2        A.    No.

3        Q.    Do you know whether the results of those chart

4    reviews are shared with the clinician whose charts were

5    reviewed?

6              MS. ORCUTT:   Form.

7              THE WITNESS:   I am not sure at site level

8    how that information is given back other than to show in

9    the CQI minutes.

10       Q.    (By Ms. Hardy) Okay.   And Procedure 3.0 -- I'm

11   sorry -- 5.0 states, "The health services contractor will

12   forward a copy of each complex CQI meeting minutes to the

13   MSMV as required by the contract."  Right?

14       A.    Yes.

15       Q.    And what is the MSMV?

16       A.    The -- the monitoring bureau.

17       Q.    Medical services monitoring bureau?

18       A.    Yes.

19       Q.    And what is your role in the CQI process?

20       A.    For this process at the site level, I am not

21   directly involved unless invited.

22       Q.    And how often are you invited to participate?

23       A.    To almost all of them.  I cannot attend them

24   all.

25       Q.    How many do you attend each month, do you think?

Relevance,
Rule 402

**Wendy Michelle Orm, M.D. - 10/13/2021**

117

Relevance, Rule 402

1    A.    Lately, zero.

2    Q.    Okay.   And we'll go next to peer review, which

3    is Exhibit 10, I believe.

4              (Deposition Exhibit 10 was marked for

5    identification.)

6    Q.    (By Ms. Hardy) So Exhibit 10 is Chapter 1,

7    Section 5.1 of the medical services technical manual.

8    And this addresses "Peer Review of Professional

9    Activities."

10             Are there any other policies, written policies,

11   that govern peer review in ADCRR for Centurion?

12             MS. ORCUTT:   Form and foundation.

13             THE WITNESS:   Not that I'm aware of.

14   Q.    (By Ms. Hardy) Okay.   Procedure 1.0 provides

15   that, "The clinical performance of the facility's direct

16   care clinicians and RNs and LPNs, LVNs are reviewed at

17   least annually."

18             Does that mean that every clinician, RN, LPN,

19   and LVN is reviewed at least once a year?

20   A.    Yes.

21   Q.    And who does that review?

22   A.    It is peer review.

23   Q.    Can you unpack that?

24   A.    That means peer to peer.   So similar license to

25   similar license.

Wendy Michelle Orm, M.D. - 10/13/2021

118

1    Q.   So the LVN, LPNs are reviewing each other's

2    records, the RNs are reviewing each other's records.  The

3    providers are reviewing each other's records; is that

4    correct?

5    A.   I can only speak for the medical providers, and

6    that is correct.

7    Q.   So you don't know whether the nurses are doing

8    the peer review for each other?

9    A.   I know that nurses are doing peer review, and I

10   don't know how they assign, if it's within the same site,

11   different sites.  I'm not sure how the nurses assign

12   their peer reviews because I'm not involved in that

13   process.

14   Q.   How do the physicians -- I'm sorry, the

15   providers, which would be physicians and the mid levels,

16   assign their peer reviews?

17   A.   That is assigned usually within the site where

18   like licenses, if that is the month for certain providers

19   to be reviewed, they would be reviewed by a similar

20   licensed peer.  Or if there is not a similar licensed

21   peer, then some other peer from another site would step

22   in and perform that peer review.

23   Q.   And how many -- well, what is involved with the

24   review itself?

25   A.   You would have to refer to the actual peer

Wendy Michelle Orm, M.D. - 10/13/2021

119

1    review form and process to see the content.

2        Q.    Okay.  Is that part of this policy?  I don't

3    think so.

**Relevance, Rule 402; Lacks personal knowledge, Rule 602**

4        A.    I'm not sure.

5        Q.    Do you know how many charts are reviewed?

6        A.    Not off the top of my head.  It's embedded in

7    the review form.

8        Q.    And that's done once per year?

9        A.    Yes.

10       Q.    Is there anything reviewed besides charts for

11   that person?

12       A.    Yes.  It's a full and complete form, and all of

13   the criteria and items that are reviewed are embedded in

14   that review form.

**Relevance, Rule 402; Lacks personal knowledge, Rule 602**

15       Q.    Does it include looking at grievances that were

16   related to that staff person?

17            MS. ORCUTT:  Form.

18            THE WITNESS:  Not that I'm aware of.

19       Q.    (By Ms. Hardy) Does it involve interviewing

20   coworkers of the person who was -- who is being reviewed?

21            MS. ORCUTT:  Form.

22            THE WITNESS:  Not that I'm aware of.  I

23   would have to see the form.

24       Q.    (By Ms. Hardy) And what happens with these

25   reviews?  Are they written up?

Wendy Michelle Orm, M.D. - 10/13/2021

120

1    A.    Yes.

2    Q.    And where do those writeups go?

3              MS. ORCUTT:  Form.  Foundation.

4              THE WITNESS:  Most likely in the personnel

5    file and kept on site.  The signature attestation page

6    after face-to-face review goes to the monitoring bureau.

7    Q.    (By Ms. Hardy) So the reviews are provided to

8    the person who is being reviewed?

9    A.    Yes.

10   Q.    And is there anyone who reviews all of the

11   review writeups for each site?

12             MS. ORCUTT:  Form and foundation.

13             THE WITNESS:  I think those go through

14   multiple people including compliance.  And so it

15   definitely would be the site medical director, probably

16   the facility health administrator, and then on up.  So --

17   and ultimately monitoring bureau as well.

18   Q.    (By Ms. Hardy) And do you believe that this

19   policy is consistently followed at all of the sites -- at

20   all of the prison sites?

21             MS. ORCUTT:  Form.

22             THE WITNESS:  Yes.  We maintain compliance

23   with provider peer review consistently.

24   Q.    (By Ms. Hardy) And how do you know that that is

25   being done?

Wendy Michelle Orm, M.D. - 10/13/2021

121

1          MS. ORCUTT:  Form.

2          THE WITNESS:  If we're having a problem

3   with peer review compliance, then it is mine to solve

4   that problem.  It's done compliant.

5      Q.    (By Ms. Hardy) So how do you know that people

6   have done these peer reviews consistently with this

7   process?

8      A.    Because the compliance department has to have a

9   completed peer review in order to submit that to the

10  monitoring bureau in the month that the peer review is

11  due, and we have not been out of compliance, to my

12  knowledge.

13     Q.  I see.  Thank you.  This policy also discusses

14  local reviews in part 2.0.  And I didn't quite understand

15  what the local reviews, how they were different from the

16  peer reviews.  Can you explain that?

17     A.  I have -- do not know what local reviews are.

18     Q.  It says, "The contract vendor, complex medical

19  director shall review the health record activity entries

20  for all medical care providers at the complex.  The

21  contract vendor complex medical director will do the

22  same," blah, blah, blah.

23          So it sounds like that is not a peer review,

24  that's a review by the boss.  Is that right?

25          MS. ORCUTT:  Form.

Wendy Michelle Orm, M.D. - 10/13/2021

122

1           THE WITNESS:  That sounds like a
2     statistical roll up review to me, but I'm not sure.
3        Q.   (By Ms. Hardy) Okay.  So you're not really
4     familiar with the local review process; is that right?
5        A.   No.
6        Q.   Okay.  I believe the policy also says that peer
7     review may be done upon the request of certain people.
8     Do you know how many peer review were done on that basis
9     in 2020?
10           MS. ORCUTT:  Form.
11           THE WITNESS:  I do not.
12        Q.   (By Ms. Hardy) And do you have any role in the
13     peer review process at the prison complexes?
14           MS. ORCUTT:  Form.
15           THE WITNESS:  Other than ensuring
16     compliance and helping assign peer review cases from site
17     to site, other than that, I do not have direct
18     involvement.
19        Q.   (By Ms. Hardy) Okay.  And you're confident that
20     the peer review process is functioning as it should?
21           MS. ORCUTT:  Form.
22           THE WITNESS:  For medical providers, yes.
23        Q.   (By Ms. Hardy) What about for nurses?
24           MS. ORCUTT:  Form.
25           THE WITNESS:  I am not aware of any

*Relevance, Rule 402* (margin annotation, lines 12-18)

Wendy Michelle Orm, M.D. - 10/13/2021

123

1    information regarding the nurse peer review process.

2        Q.    (By Ms. Hardy) And who reviews the nurse peer

3    review process?

4        A.    It would be my counterpart over nursing.

5        Q.    So you are the medical director for Centurion

6    but the nursing director does not report to you?

7        A.    No.  We're collaborative.

8        Q.    I see.  So your authority is over providers, not

9    over nurses?

10              MS. ORCUTT:  Form.

11              THE WITNESS:  Correct.

12       Q.    (By Ms. Hardy) And not other ancillary,

13   pharmacy.  Are you over pharmacy?

14       A.    Yes.

15       Q.    So pharmacy reports to you, and the site medical

16   directors report to you.  Does dental report to you?

17       A.    No.

18       Q.    Okay.  And does mental health report to you?

19       A.    No.

20       Q.    Okay.  This is a -- I'm going to review a

21   document with you that is marked "Confidential" from the

22   defendant that we received.  It's called a "Vendor

23   Performance Report," so I'm putting us into confidential

24   part of the deposition.

25              MS. BARNES:  And you're marking this as

Relevance,
Rule 402

1    technical manual.

2            Do you follow the medical services technical

3    manual mortality review policies at Centurion, Dr. Orm?

4        A.    Yes.  We do.

5                MS. ORCUTT:  Form.

6        Q.    (By Ms. Hardy) Are there any other written

7    policies and procedures that govern how you do death

8    reviews in the ADCRR?

9                MS. ORCUTT:  Form.

10               THE WITNESS:  No.

11       Q.    (By Ms. Hardy) So under that procedure the first

12   review is conducted within three days of death; is that

13   right?

14       A.    Yes.

15       Q.    And it's conducted by the complex mortality

16   review committee; right?

17       A.    Yes.

18               (Discussion off the record.)

19               MS. HARDY:  Yes, we are off confidential.

20   Sorry.

21       Q.    (By Ms. Hardy) Okay.  And each prison has a

22   complex mortality review committee; right?

23       A.    Yes.

24       Q.    And how many -- who serves on that committee?

25               MS. ORCUTT:  Form.  Foundation.

Wendy Michelle Orm, M.D. - 10/13/2021

126

1          THE WITNESS:  I believe the site medical

2  director, the facility health administrator, the director

3  of nursing, and I believe the warden or a designee and

4  others.  I'm not sure which others.

5      Q.     (By Ms. Hardy) And are those findings of the

6  initial review, are they documented in writing?

7      A.     Yes.

8      Q.     And what's that document called?

9      A.     I believe it's called "Mortality First Review."

10     Q.     And what happens with those findings?

11          MS. ORCUTT:  Form.

12          THE WITNESS:   They are submitted to the

13  monitoring bureau.

14     Q.     (By Ms. Hardy) Okay.

15     A.     They also are submitted at the CQI, the next

16  month's CQI committee meeting.

17     Q.     At that prison; right?

18     A.     Yes.

19     Q.     Okay.  And do those findings come up to you at

20  that point?  Do you see them?

21          MS. ORCUTT:  Form.

22          THE WITNESS:  Yes, I can.

23     Q.     (By Ms. Hardy) But do you regularly see the

24  first review documents?

25          MS. ORCUTT:  Form.

Wendy Michelle Orm, M.D. - 10/13/2021

127

1          THE WITNESS:  Regularly, yes.

2      Q.    (By Ms. Hardy) You do?  Okay.  And if an autopsy

3   report isn't available when the first review is

4   conducted, the CRMC -- or sorry, CMRC, which is the

5   complex mortality review committee, conducts a second

6   review; is that right?

7          MS. ORCUTT:  Form.

8          THE WITNESS:  Can you rephrase that

9   question?

10     Q.    (By Ms. Hardy) When the first review is done at

11  three days, if there is no autopsy available, isn't it

12  the practice to do a second review when the autopsy

13  becomes available?

14         MS. ORCUTT:  Form.

15         THE WITNESS:  Yes.  According to the

16  process and the policy, once the medical examiner report

17  is received by ADCRR, it is forwarded to the site and the

18  site has a certain time frame to conduct a second

19  mortality review.

20     Q.    (By Ms. Hardy) Okay.  And deaths are also

21  reviewed by the joint mortality review committee; is that

22  right?

23     A.    Yes.

24     Q.    And who is a member of -- who is a party to the

25  joint mortality review committee?

1      A.    That is a brand-new addition to the MSTM, and it

2   is basically a group convened within 30 days of the date

3   of death that involves myself or a designee,

4   Dr. Phillips, who is the ADCRR monitoring bureau medical

5   director, the site medical director or a designee, and

6   then the facility health administrator, any other

7   designated staff members, medical staff members that were

8   involved in the care of the patient.

9           It can also have an ADON.  It can have a DOC

10  person like the warden or a designee.  There's no -- I

11  have not seen the process in writing yet.  That is very

12  new.

13          But it's more multidisciplinary.  And that is

14  conducted within 30 days.  The majority of time so far,

15  that would be without the ME report.

16      Q.    Okay.  And when did that joint mortality review

17  committee process begin; do you know?

18      A.    We are in October.  I think August.  Do you have

19  date on the policy you're looking at that you can't show?

20      Q.    No, I can't even open it in my --

21      A.    I think it's August was the very first one.  In

22  fact, I'm pretty certain it's August --

23      Q.    Okay.

24      A.    -- of 2021.

25      Q.    Okay.  And then there's a final independent

Wendy Michelle Orm, M.D. - 10/13/2021

129

1    clinical review; is that right?

2        A.    Yes.

3        Q.    And you seem to have signed almost all of the

4    mortality reviews that I saw.  So you were the final --

5    are you the final signature that goes on the mortality

6    review reports?

7                MS. ORCUTT:  Form.

8                THE WITNESS:  No.

9        Q.    (By Ms. Hardy) Who is the final signature?

10       A.    It appears to me that the final signature is the

11   monitoring bureau -- whatever Larry Gann's title is, or

12   Richard Pratt's title was.  I don't know the title by

13   heart.  Deputy director of the monitoring bureau.

14       Q.    And does your signature on the report signify

15   that you endorse the report?

16               MS. ORCUTT:  Form.

17               THE WITNESS:  Yes.

18       Q.    (By Ms. Hardy) So you stand by the findings of

19   the mortality reviews?

20               MS. BARNES:  Form.

21               MS. ORCUTT:  Form.

22               THE WITNESS:  Yes.

23       Q.    (By Ms. Hardy) Okay.  Thank you.  And what do

24   you base your -- what work goes into your review of the

25   case?  Do you look at the health record itself and --

Incomplete, Rule 106; Confusing, Rule 403

Wendy Michelle Orm, M.D. - 10/13/2021

131

1    before?

2              MS. HARDY:  No, that was just the mortality

3    review exhibit from MSTM.  I don't need to enter it.  We

4    went over the elements of the mortality review policy and

5    procedure.

6              MS. BARNES:  Okay.  I understand that, but

7    mortality reviews was going to be 12, and you couldn't

8    get it to open.  But before that, you had said that you

9    were marking as Exhibit 11, which is where you would be

10   anyway.

11             MS. HARDY:  Yeah.  I'm giving up on that

12   one.  I don't think that I'm going to be able to use the

13   Excel spreadsheet anyway.

14             MS. BARNES:  So what you do now will be

15   Exhibit 11, then.

16             MS. HARDY:  Okay.  What we're on to now is

17   Exhibit 11.  Thank you.

18        Q.   (By Ms. Hardy) Appreciate that.  So before we

19   get to that I just want to nail down for the record, you

20   did not review any medical charts about named plaintiffs

21   in this case in preparation for this deposition; is that

22   right?

23             MS. ORCUTT:  Form.

24             THE WITNESS:  No, I did not.

25             MS. HARDY:  Okay.  Thank you.

Relevance,
Rule 402

Wendy Michelle Orm, M.D. - 10/13/2021

132

1          MS. BARNES:  And one other thing, Alison,
2     that -- that she would like to come back and answer a
3     question that she misunderstood by you about your asking
4     her if she endorsed the mortality reviews which bear her
5     signature.
6          Q.   (By Ms. Hardy) Okay.  I -- my -- my question,
7     then, is when you sign off on the medical mortality
8     reviews, what does your signature mean?
9          A.   It means that I participated and that the final
10    review was conducted.  That's my endorsement as a
11    signature.
12          I oftentimes agree with the findings and
13    recommendations, but sometimes there's more discussion
14    and -- and sometimes I do not agree with the ultimate
15    recommendations.
16          Q.   And does your disagreement with the ultimate
17    recommendations get recorded anywhere?
18          MS. ORCUTT:  Form.
19          MS. BARNES:  You have to answer if you know
20    or not.
21          THE WITNESS:  No.  Not -- not to my
22    knowledge.
23          Q.   (By Ms. Hardy) Okay.
24          A.   They may occur -- they may in the discussion
25    portion of that form, and then recommendations would be

Relevance,
Rule 402;
Lacks
personal
knowledge,
Rule 602

Wendy Michelle Orm, M.D. - 10/13/2021

133

Relevance, Rule 402; Lacks personal knowledge, Rule 602

1    made after that discussion.

2         Q.    So the recommendations that are found in the

3    mortality reviews, are those the final recommendations or

4    are you saying that there are subsequent recommendations

5    made about a case that may be entered for a review that

6    are not reflected in the mortality review report?

7              MS. ORCUTT:   Form.

8              THE WITNESS:   No.   Those are the final

9    recommendations.

10        Q.    (By Ms. Hardy) Okay.   We'll start off sharing

11   screen.   I'm going to bring up the mortality review for

12   ███████ ██████.

13             MS. BARNES:   And this is the part that's

14   confidential; correct?

15             MS. HARDY:   Correct.

16             (The following portion of the transcript

17   was designated confidential.)

18                  *  *  *  *  *

19

20

21

22

23

24

25

Wendy Michelle Orm, M.D. - 10/13/2021

139

1              MS. ORCUTT:  Form.

2              THE WITNESS:  If there are recommendations

3      then a CAP would have been created.

4          Q.   (By Ms. Hardy) Okay.  So the recommendations are

5      on the final page, Sara.  So that's not the final page.

6      There we go, at the top.

7              So there were three recommendations here.  "It

8      is absolutely imperative that the medical record reflect

9      the patient's current condition, and in the event of

10     death be complete and properly filed and labeled.  Also,

11     practitioners and staff must record pertinent information

12     into the record and tell the story."  That's

13     recommendation 1.

14              Recommendation 2 --

15              MS. BARNES:  Wait, Alison.  Wait, Alison,

16     before you continue reading, I can see it fine but

17     Dr. Orm looks like she --

18              THE WITNESS:  I can see it.

19              MS. BARNES:  Okay.  I just wanted to make

20     sure she could see it.

21          Q.   (By Ms. Hardy) Okay.  Recommendation 2 is

22     "Patients over the age of 55 should have an annual

23     physical exam."

24              And 3 is, "Analgesia must be appropriate and

25     given in the appropriate setting.  This did not happen in

Incomplete, Rule 106; Confusing, Rule 403

Wendy Michelle Orm, M.D. - 10/13/2021

140

Incomplete,
Rule 106;
Confusing, Rule
403

1    this case."

2           So it's your testimony that for each of those

3    recommendations a CAP would be written?  Is that right?

4                MS. ORCUTT:  Form.

5                THE WITNESS:  If the recommendation is --

6    is actionable, then a CAP will be written.  At this early

7    date in the contract, oftentimes if it's improved, but

8    the recommendations were sometimes not -- not worded in

9    such a way that it was clear what action should be taken.

10           So the site would take those and turn them

11    into a CAP in answer to their interpretation of that

12    recommendation, however it's written.

13    Q.    (By Ms. Hardy) So the site medical director

14    would then be charged with figuring out whether a

15    recommendation was actionable or not actionable?  Who

16    would decide that?

17                MS. ORCUTT:  Form.

18                THE WITNESS:  The CQI committee will

19    convene after the final report is available, and they

20    will discuss the case in a final format and the findings

21    and then the recommendations, and then what is monitored

22    by the monitoring bureau is that a CAP is written based

23    on recommendations in this form.

24    Q.    (By Ms. Hardy) Do you monitor personally whether

25    or not the recommendations that are made are converted

Wendy Michelle Orm, M.D. - 10/13/2021

141

1   into a CAP and implemented?

2                MS. ORCUTT:  Form.

3                THE WITNESS:  No.  That is monitored by the

4   monitoring bureau, and that is reported up to the CQI.

5       Q.   (By Ms. Hardy) So you don't ever see this, what

6   happens with these recommendations personally?

7                MS. ORCUTT:  Form.

8                THE WITNESS:  Yes.  I see them in the CQI

9   minutes.

10      Q.   (By Ms. Hardy) And what is your role in

11  reviewing the CQI minutes?

12      A.   That is just it.  Reviewing CQI minutes.

13      Q.   So do you track whether recommendations that you

14  know were made in mortality review are then processed

15  through the CQI minutes and resolved in a CAP?

16               MS. ORCUTT:  Form.

17               THE WITNESS:  That is not my role.  So I

18  can -- I do not personally track any CAPs or mortality or

19  CQI.  Those are reported and monitored by the monitoring

20  bureau.  And those are also tracked through compliance

21  and quality.

22      Q.   (By Ms. Hardy) So you personally don't know

23  whether the nurses and providers who failed to provide

24  analgesia -- analgesics to Mr. ▓▓▓ were actually

25  retrained or had any kind of action taken in -- in their

Wendy Michelle Orm, M.D. - 10/13/2021

156

1       Q.   Okay.  And then on 12-26, the provider made an

2   urgent referral to hematology and oncology; correct?

3               MS. ORCUTT:  Form and foundation.

4               MS. BARNES:  Form and foundation.

5       Q.   (By Ms. Hardy) That's what's written here;

6   right?

7       A.   Correct.

8       Q.   Okay.  And on the next page, the chronology

9   states that on 12-7-20 that "Urgent hematology-oncology

10  referral was cancelled"; is that correct?  Is that what

11  it says?

12              MS. ORCUTT:  Form.

13              THE WITNESS:  Yes.

14      Q.   (By Ms. Hardy) And the reasoning -- scroll down,

15  Sara.  I'm sorry.  Yeah, right.  Right there.  At the top

16  of the page it says, "1-28 cancelled, patient is DNR."

17              What does DNR mean?

18      A.   Do not resuscitate.

19      Q.   And so it appears that the referral to

20  hematology for palliative care was denied because the

21  patient has DNR --

22              MS. ORCUTT:  Form.

23              THE WITNESS:  I don't see a denial.  I

24  don't see a denial.

25      Q.   (By Ms. Hardy) Scroll down further.  "1-28

Relevance,
Rule 402;
Confusing,
Rule 403;
Incomplete,
Rule 106

Wendy Michelle Orm, M.D. - 10/13/2021

157

Relevance,
Rule 402;
Confusing,
Rule 403;
Incomplete,
Rule 106

1    canceled.  Patient is DNR."

2              MS. BARNES:  We can't see what you're

3    talking about.

4       Q.   (By Ms. Hardy) At the top.

5              MS. BARNES:  I apologize.

6              THE WITNESS:  That's not a denial.  A

7    cancellation can be for multiple reasons.  It could be

8    patient initiated, so that's not a denial.

9       Q.   (By Ms. Hardy) The reasoning stated is "Patient

10   is DNR."  Is that reason to deny a -- or to cancel an

11   appointment for palliative care if a patient has a DNR?

12      A.   No.

13             MS. ORCUTT:  Form.

14             THE WITNESS:  It's if the patient says I

15   don't want anything more done, I'm not going to go.  I

16   don't want it.

17             But you are out of context here, so without

18   the record, I can't fill in what's really happening with

19   this patient and what conversations are occurring.

20      Q.   (By Ms. Hardy) Okay.  On page 2 of the -- at the

21   top of the page of this.  Could you go back up to page 2,

22   Sara?

23             "It was determined that this was a preventable

24   death that either could have been delayed or prevented

25   with more timely intervention."  You have no recollection

Wendy Michelle Orm, M.D. - 10/13/2021

164

1              (Recess from 1:20 p.m. to 1:40 p.m.)

2      Q.   (By Ms. Hardy) So we've got -- Mr. ██████ is

3   still up.  Dr. Orm, I wanted to follow up with you.  You

4   had said that don't always agree with the recommendations

5   in the -- in the mortality review reports; is that right?

6              MS. ORCUTT:  Form.

7              THE WITNESS:  Correct.

8      Q.   (By Ms. Hardy) Do you ever disagree with the

9   conclusion about whether or not the death could have been

10  prevented or delayed with more timely intervention?

11             MS. ORCUTT:  Form.

12             THE WITNESS:  Can you repeat that question?

13     Q.   (By Ms. Hardy) When you sign off on a death --

14  on a mortality review, are there cases in which you

15  disagree with the mortality review's conclusion that the

16  patient's death could have been prevented or delayed with

17  more timely intervention?

18             MS. ORCUTT:  Form.

19             THE WITNESS:  Sometimes.

20     Q.   (By Ms. Hardy) How often would you say you

21  disagree with the mortality review's conclusion that a

22  death could have been prevented or delayed by more timely

23  intervention?

24             MS. ORCUTT:  Form.

25             THE WITNESS:  Probably less than five

Relevance, Rule 402; Seeks expert opinion, Rule 701

**Wendy Michelle Orm, M.D. - 10/13/2021**

165

Relevance, Rule 402; Seeks expert opinion, Rule 701

1    percent.

2        Q.    (By Ms. Hardy) Do you know how many you sign off

3    on in a year?

4        A.    No.

5        Q.    You said you sign off on virtually all of the

6    mortality reviews; is that correct?

7        A.    If I'm involved, yes.

8        Q.    What mortality reviews would you not be involved

9    with?

10       A.    The ones I don't sign.

11       Q.    Is it your role to sign off on the mortality

12   reviews?

13              MS. ORCUTT:  Form.

14              THE WITNESS:  If I'm part of the review.

15       Q.    (By Ms. Hardy) Under what circumstances would

16   you not be part of the review for a mortality review?

17       A.    If I took vacation and was not available at the

18   time of the review.

19       Q.    I see.  So they don't wait until you're

20   available to hold the mortality reviews?

21       A.    No.  It has to be completed within 10 days of

22   receipt of the medical examiner's report or the DOC will

23   fail that measure.

24       Q.    And when you are on vacation or unavailable, who

25   sits in for -- on your behalf?

Wendy Michelle Orm, M.D. - 10/13/2021

167

1          Q.    (By Ms. Hardy) I see.  Okay.  So turning back to

2     Mr. ▮▮▮▮▮▮'s case, Sara, could you bring that one up?

3     Sara Norman.

4                    (Discussion off the record.)

5                    MS. HARDY:  No, it's not.  But now we're

6     confidential again.

7          Q.    (By Ms. Hardy) And turning to the second page of

8     the mortality review, Dr. Orm, you see at the top it says

9     that, "The report concluded that more timely intervention

10     could have prevented or delayed this case."  Right?

11          A.    Yes.

12          Q.    Okay.  Do you disagree with that conclusion?

13          A.    No.

14          Q.    Okay.  And then under the "Contributing Cause

15     Analysis," the boxes are checked for, "Failure to

16     recognize symptoms or signs," "Delay in access in care,"

17     "Failure of provider to provide communication," "Failure

18     to provide standard of care or to follow standard of

19     care," "Failure to follow up, identify abnormal test

20     results," and "Failure of provider to assume

21     responsibility for patient."

22                    Do you disagree with any of those conclusions?

23                    MS. ORCUTT:  Form.

24                    THE WITNESS:  In the context that those

25     contributing causes span years prior to our -- our

Relevance, Rule 402; Incomplete, Rule 106; Seeks expert opinion, Rule 701

Wendy Michelle Orm, M.D. - 10/13/2021

168

Relevance,
Rule 402;
Incomplete,
Rule 106;
Seeks expert
opinion, Rule
701

1   presence in the contract, then I agree.

2       Q.    (By Ms. Hardy) Okay.  To be clear, Mr. ████

3   died in March of 2020, so was in the care of Centurion

4   for nine months.  Is that correct?

5       A.    Correct.

6       Q.    Thank you.  I would like to go on to the

7   mortality review for Mr. ████.  Sara.  And we've pulled

8   up -- not yet.

9              MS. NORMAN:  I'm sorry.  It's taking a

10  while to load.

11             MS. HARDY:  Okay.

12      Q.    (By Ms. Hardy) For the record this is the

13  mortality review report for ████ ████, spelled ████,

14  and the Bates number is ADCRR 00000098 to ADCRR 00000101.

15             And let's flip to the very end of this, the last

16  page.

17             (Deposition Exhibit 13 was marked for

18  identification.)

19      Q.    (By Ms. Hardy) Scroll to the bottom, and that's

20  your signature; right, Dr. Orm?

21      A.    Correct.

22      Q.    Okay.  And back to the front page.  So Mr. ████

23  died on 4-23-21, he was 60 years old at the time of his

24  death, and he was incarcerated at ASPC Lewis.  Is that

25  right?

Wendy Michelle Orm, M.D. - 10/13/2021

171

1    A.    Correct.

2    Q.    So that's both the dosage and the frequency were

3    increased on that date; right?

4            MS. BARNES:  Form and foundation.

5            THE WITNESS:   Correct.

6    Q.    (By Ms. Hardy) Okay.  And refer to page 3,

7    please.

8    A.    Can you stay on this page for a minute?

9    Q.    Sure.  What would you like to say?

10   A.    I just want to read so I can familiarize myself

11   with the case we're talking about.

12   Q.    Sure.

13   A.    If this is all I have to go by, is this

14   paragraph?

15   Q.    Yes.  Go ahead and read.  Let me know when

16   you're done.

17   A.    Okay.

18   Q.    Okay.  So on to page 3, Sara.  So under

19   Discussion it states, "Indomethacin"-- at the end --

20   "Indomethacin is considered to be a potent NSAID that can

21   cause GI bleeding and renal problems.  Given this

22   patient's risk factors NSAIDS should be administered

23   cautiously and with informed consent."  Right?

24   A.    Correct.

25   Q.    That's what it says; right?  And then on the

Relevance, Rule 402; Incomplete, Rule 106; Seeks expert opinion, Rule 701

Wendy Michelle Orm, M.D. - 10/13/2021

172

Relevance,
Rule 402;
Incomplete,
Rule 106;
Seeks expert
opinion, Rule
701

1   next page, Sara.  And one of the recommendations is that,

2   "Patient started on chronic NSAIDs, should have a 30- to

3   45-day follow up after any new medication start or dosing

4   change."  Right?

5       A.    Correct.

6       Q.    With Mr. ▇▇▇▇'s HCV, using a potent NSAID was

7   risky, wasn't it?

8            MS. ORCUTT:  Form and foundation.

9            THE WITNESS:  Using any NSAID including a

10  non NSAID like Tylenol would be risky in a liver patient.

11      Q.    (By Ms. Hardy) Okay.  Would you consider it to

12  be acceptable to start him on a NSAID and not see him for

13  six weeks given his hepatitis diagnosis?

14           MS. ORCUTT:  Form and foundation.

15           THE WITNESS:  He was already chronically on

16  NSAID treatment prior to that.

17      Q.    (By Ms. Hardy) Okay.  So the recommendation is,

18  "Patients started on chronic NSAIDs should have a 30- to

19  45-day follow up after any new medication start or dosing

20  change."

21           I'm wrestling with whether that recommendation

22  would have helped Mr. ▇▇▇▇ here.

23           MS. ORCUTT:  Form.

24           THE WITNESS:  That's hard to say.  He was

25  on chronic NSAIDs for it looks like years.  And so it's

Wendy Michelle Orm, M.D. - 10/13/2021

173

1    hard to say if what's being recommended here is that

2    since there was dosing change should he be followed up in

3    30 to 45 days versus his normal follow up.

4            But I believe he died within the month

5    after that change.  I'm not sure if that would have made

6    a difference.  But that's speculation.

7        Q.    (By Ms. Hardy) Okay.  Does Centurion have any

8    written policies that require a follow up after starting

9    chronic NSAIDs?

10            MS. ORCUTT:  Form and foundation.

11            THE WITNESS:  The policy and procedure or

12   care guidelines for clinical conditions would not be

13   specific to NSAIDs.  They would be specific to the

14   condition we're trying to treat.

15       Q.    (By Ms. Hardy) So I'm trying to understand how

16   does that recommendation get translated into a CAP?

17       A.    Good question.  I'm not sure how they translated

18   this recommendation into a CAP.

19       Q.    Okay.  Let's go back to page 1, please.  Scroll

20   down.

21            So it says that on 4-12, he was -- "presented

22   with abdominal symptoms."  It's right there in the

23   middle.  "He was seen by provider on 4-12 for the same

24   symptoms," which was abdominal pain.

25            "Abdomen was noted to be distended and soft on

Relevance, Rule 402

Lacks personal knowledge, Rule 602

186

1    STATE OF ARIZONA    )
                         )
2    COUNTY OF MARICOPA )

3            BE IT KNOWN that I took the foregoing
     deposition pursuant to Notice; that the witness was duly
4    sworn by me; and that said transcript is a full, true,
     and accurate record of the proceedings; that the
5    proceedings were taken down by me in shorthand and
     thereafter reduced to print under my direction; that I
6    have acted in compliance with ACJA 7-206.

7            I CERTIFY that I am in no way related to
     any of the parties hereto nor am I in any way interested
8    in the outcome hereof.

9            Pursuant to request, notification was
     provided that the deposition is available for review and
10   signature.

11           Dated this 18th day of October, 2021.

12

13

14           Jennifer Honn
             Certified Reporter
15           Arizona CR No. 50885

16

17           I CERTIFY that GLENNIE REPORTING SERVICES,
     LLC, has complied with the ethical obligations set forth
18   in ACJA 7-206.

19

20

21

22

23

24   GLENNIE REPORTING SERVICES, LLC
     Registered Reporting Firm
25   Arizona RRF No. R1035

# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;                )
Stephen Swartz; Dustin Brislan;              ) No.
Sonia Rodriguez; Christina                   ) CV 12-00601-PHX-ROS
Verduzco; Jackie Thomas; Jeremy              )
Smith; Robert Gamez; Maryanne                )
Chisholm; Desiree Licci; Joseph              )
Hefner; Joshua Polson; and                   )
Charlotte Wells, on behalf of                )
themselves and all others similarly )
situated; and Arizona Center for             )
Disability Law,                              )
                                             )
            Plaintiffs,                      )
      vs.                                    )
                                             )
David Shinn, Director, Arizona               )
Department of Corrections,                   )
Rehabilitation and Reentry; and              )
Larry Gann, Assistant Director,              )
Medical Services Contract                    )
Monitoring Bureau, Arizona                   )
Department of Corrections,                   )
Rehabilitation and Reentry, in               )
their official capacities,                   )
                                             )
            Defendants.                      )
                                             )

DEPOSITION OF 30(b)(6) CENTURION
(Wendy Michelle Orm, M.D.)
(via videoconference)

October 13, 2021
2:19 p.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130

602.266.6535                Prepared by:
www.glennie-reporting.com   Jennifer Honn, RPR
                            Arizona CR No. 50885

2

1                          I N D E X

2    WITNESS                                        PAGE

3    WENDY MICHELLE ORM, M.D.

4        Examination by Ms. Boughton                 5

5

6

7

8                    INDEX TO EXHIBITS

9    Description                                    Page

10   Exhibit 1    Amended Notice of 30(b)(6) Deposition     8
                  (9 pages)
11
     Exhibit 2    E-mail RE: Centurion Subpoena            14
12                PLTFS002790 -2796

13   Exhibit 3    Curriculum Vitae - Wendy M. Orm, M.D.    15
                  (9 pages)
14
     Exhibit 4    Centurion Contract Scope of Work         21
15                PLTFS002213 -2789

16   Exhibit 5    Tab 9 Additional Materials               21
                  PLTFS002806 -3373
17
     Exhibit 6    Spreadsheet                              28
18                ADCRR00137140

19   Exhibit 7    Contract Change Order/Amendment          57
                  PLTFS002187 -2208
20
     Exhibit 8    Spreadsheet                              59
21                ADCRR00069938

22

23

24

25

3

1                   DEPOSITION OF 30(b)(6) CENTURION
                          (Wendy Michelle Orm, M.D.)
2                          (via videoconference)

3

4           The deposition of DEPOSITION OF 30(b)(6)

CENTURION (Wendy Michelle Orm, M.D.) was taken on
5
October 13, 2021, commencing at 2:19 p.m., via
6
videoconference, the witness appearing in at the law
7
offices of BROENING OBERG WOODS & WILSON, 2800 North
8
Central Avenue, Suite 1600, Phoenix, Arizona, before
9
JENNIFER HONN, a Certified Reporter, Certificate No.
10
50885, for the State of Arizona.
11

12
     APPEARANCES:
13
     For Deponent:
14
          BROENING OBERG WOODS & WILSON
15        Sarah L. Barnes, Esq.
          2800 North Central Avenue
16        Suite 1600
          Phoenix, Arizona 85004
17        Slb@bowwlaw.com

18   For Plaintiffs:

19        PRISON LAW OFFICE
          Alison Hardy, Esq.
20        1917 Fifth Street
          Berkeley, California 94710
21        ahardy@prisonlaw.com

22        PERKINS COIE LLP
          Kathryn E. Boughton, Esq.
23        2901 North Central Avenue
          Suite 2000
24        Phoenix, Arizona 85012
          Kboughton@perkinscoie.com
25

4

1    APPEARANCES: (continued)

2    For Defendant:

3        STRUCK LOVE BOJANOWSKI & ACEDO, PLC
         Anne M. Orcutt, Esq.
4        3100 West Ray Road
         Suite 300
5        Chandler, Arizona 85226
         aorcutt@strucklove.com
6

7                        *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

5

1                     WENDY MICHELLE ORM, M.D.
2    called as a witness herein, having been first duly sworn
3    by the Certified Reporter to speak the whole truth and
4    nothing but the truth, was examined and testified as
5    follows:
6
7                           EXAMINATION
8    BY MS. BOUGHTON:
9        Q.    (By Ms. Boughton) Good afternoon.  My name is
10   Kathryn Boughton, and I'm with Perkins Coie.
11               MS. BARNES:  Volume?
12               MS. BOUGHTON:  Oh.  Is that better?
13               MS. BARNES:  Better.
14       Q.    (By Ms. Boughton) Okay.  I'll just speak up a
15   bit.  My name is Kathryn Boughton, and I'm with Perkins
16   Coie.  I'll be taking the 30(b)(6) portion of your
17   deposition today.
18               Can you please restate your name for the record?
19       A.    Wendy Michelle Orm.
20       Q.    Thank you.  And I just want to go over that you
21   understood the ground rules for your individual
22   deposition?
23       A.    Yes.
24       Q.    Okay.  And can we have an understanding that
25   those same rules apply here?

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

7

1  you from providing truthful and reliable testimony today?

2       A.   No.

3       Q.   Can we agree that if I say "ADC," I am referring

4  to the Arizona Department of Corrections Rehabilitation

5  and Reentry?

6       A.   Yes.

7       Q.   Okay.   Thank you.   If I say "prison" or

8  "facility" or "complex," I'm referring to an Arizona

9  state prison complex for which Centurion of Arizona

10 provides healthcare services, okay?

11      A.   Okay.

12      Q.   And if I intend to reference a specific facility

13 I will specify the location.   Okay?

14      A.   Okay.

15      Q.   Okay.   Great.

16           Can you please restate your position?

17      A.   I am the Statewide Medical Director for Arizona

18 under Centurion.

19      Q.   And you've worked with Centurion since 2019; is

20 that correct?

21      A.   Correct.

22      Q.   Okay.   Do you understand that you have been

23 designated as a deponent under Rule 30(b)(6) today?

24      A.   Yes.

25      Q.   And do you understand what that means?

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

11

1    Q.   In total approximately how much time have you
2    spent preparing for this deposition?

3    A.   Maybe an hour.

4    Q.   Next we're just going to briefly go through the
5    topics that you have been designated to testify on and
6    confirm what you're prepared to testify about.  Okay?

7    A.   Okay.

8    Q.   So topic 4 is, "How policies and procedures and
9    community healthcare standards impact specific types and
10   quantities of healthcare staff across the 10 ASPC's under
11   the Centurion contract."  Are you prepared to testify
12   regarding Topic 4?

13            MS. BARNES:  Answer the best you can.

14            THE WITNESS:  Yes.

15   Q.   (By Ms. Boughton) And are you the person most
16   knowledgeable about Topic 4 today?

17            MS. BARNES:  Form and foundation.

18            MS. ORCUTT:  Form.

19            THE WITNESS:  Am I the most knowledgeable
20   in all of Centurion about this?

21   Q.   (By Ms. Boughton) Correct.

22            MS. BARNES:  Form and foundation.

23            MS. ORCUTT:  Same.

24            THE WITNESS:  I think it depends on how the
25   questions are asked and what information you're looking

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

12

1    for.

2                    I can't tell based on how that is worded

3    whether I'm the ultimate best person to speak to the

4    topic of policies and procedures and community healthcare

5    standards impacting types and quantities of healthcare

6    staff across all 10 sites.  I'm not sure.

7        Q.    (By Ms. Boughton) Okay.  Is there a person at

8    Centurion that you believe may be more knowledgeable?

9                    MS. BARNES:  Form and foundation.

10                   MS. ORCUTT:  Form.

11                   THE WITNESS:  I would have to have more of

12   a definition of what you're looking for in Topic 4 to be

13   able to answer that question.

14       Q.    (By Ms. Boughton) Okay.  Let's move on to Topic

15   5.  Topic 5 is, "How policies and procedures and

16   community healthcare standards impact the levels of

17   healthcare staff across the 10 ASPC's under the Centurion

18   contract."

19                   Are you prepared to testify regarding Topic 5?

20       A.    Yes.

21       Q.    Topic 7 is, "Policies and procedures related to

22   the recruitment and retention of healthcare staff at the

23   10 ASPC's under the Centurion contract" -- oh, pardon me,

24   "at the 10 ASPC's."

25                   Are you prepared to testify regarding Topic 7?

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

13

1           MS. BARNES:  I just -- I just want to
2   interject here to make it clear, Kathryn, that we
3   provided you a limited portion of that topic for which
4   we're designating Dr. Orm.
5           So if you could clarify your question to
6   include that limitation, I'd appreciate it.
7           THE WITNESS:  And can you scroll your
8   screen so I can actually read it as you do?  Thank you.
9           MS. BOUGHTON:  Is it on your screen now?
10          MS. BARNES:  Yes.
11          THE WITNESS:  Yes.
12      Q.  (By Ms. Boughton) Great.  We will go through
13   those limitations next.  Pardon me.  Did you answer?  Are
14   you -- are you prepared to testify regarding Topic 7?
15      A.  Yes.
16      Q.  Topic 8 is, "Licensure requirements of each
17   classification of healthcare and mental healthcare
18   staff."
19          Are you prepared to testify regarding Topic 8
20   with respect to health care licensure?
21      A.  Yes.
22      Q.  But not mental health care staff; correct?
23      A.  Correct.
24      Q.  And just to clarify, as your counsel mentioned,
25   I understand that you have not been designated as a

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

15

1   Exhibit 3.

2                   (Deposition Exhibit 3 was marked for

3   identification.)

4        Q.   (By Ms. Boughton) Dr. Orm, do you recognize this

5   document?

6        A.   Yes.

7        Q.   Did you draft it?

8        A.   Yes.

9        Q.   And can you identify it?

10       A.   That is my CV.

11       Q.   Is everything on here accurate?

12       A.   Yes.

13       Q.   Great.   Can you please describe to me the job

14   duties of your current role at Centurion?

15       A.   My job duty is to oversee the delivery of

16   medical care to all inmates in the 10 state prisons in

17   Arizona.

18       Q.   Does your position require your participation in

19   the development of Centurion policies and procedure?

20            MS. BARNES:   Form and foundation.

21            MS. ORCUTT:   Same.

22            THE WITNESS:   Yes, it does.

23       Q.   (By Ms. Boughton) And does your position involve

24   physician -- pardon me -- physician recruitment and

25   retention?

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

16

1    A.   Yes.  It does.

2    Q.   Thank you.  And I understand from your fact

3  deposition earlier today that you report to Dr. Wu and

4  Dr. May; is that correct?

5    A.   Yes.

6    Q.   Approximately how many people report to you?

7    A.   I -- I don't know.

8    Q.   Okay.

9    A.   I would have to look at our flow chart to see.

10    Q.   Rough number?  No?

11         MS. ORCUTT:  Form.

12         THE WITNESS:  Probably 20.

13    Q.   (By Ms. Boughton) And prior to Centurion you

14  were employed with the Estrella Women's Jail; is that

15  correct?

16    A.   Yes.

17    Q.   And other than your current role at Centurion

18  and your past role at the Estrella Women's Jail, you have

19  no other positions in the correctional health care field;

20  correct?

21    A.   Correct.

22    Q.   In your current position who do you interact

23  with at ADC most often?

24    A.   At this time, I interact with Dr. Phillips most

25  commonly.

**30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021**

17

1    Q.    And how often are you in communication with

2    Dr. Phillips, approximately?

3    A.    Nearly daily.

4    Q.    Thank you.  So ADC has contracted with Centurion

5    to provide health care services to its 10 state prison

6    complexes; correct?

7    A.    Correct.

8    Q.    And can you generally explain the interplay

9    between Centurion and ADC in determining staffing

10   facilities?

11           MS. ORCUTT:  Form and foundation.

12           MS. BARNES:  Can you repeat that, Kathryn?

13   I didn't hear it.

14   Q.    (By Ms. Boughton) Generally can you explain the

15   interplay between Centurion and ADC in determining the

16   staffing at the prison complexes?

17           MS. ORCUTT:  Form.

18           THE WITNESS:  I can't.

19   Q.    (By Ms. Boughton) So can you say -- pardon me --

20   how does Centurion determine the amount of staff needed

21   at a given complex?

22           MS. ORCUTT:  Form and foundation.

23           THE WITNESS:  That -- that was

24   predetermined prior to the start of contract.

25   Q.    (By Ms. Boughton) Did Centurion provide any

Incomplete,
Rule 106;

Relevance,
Rule 402;
Lacks
personal
knowledge,
Rule 602

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

18

Incomplete,
Rule 106;
Relevance,
Rule 402;
Lacks personal
knowledge,
Rule 602

1    information to assist in those determinations?

2              MS. ORCUTT:  Form.

3              THE WITNESS:  I do not know.

4         Q.   (By Ms. Boughton) Since being awarded the

5    contract, does Centurion provide ADC information to

6    assist in the determination of staffing?

7              MS. ORCUTT:  Form.

8              THE WITNESS:  Centurion provides staffing

9    metrics continually to ADCRR.

10        Q.   (By Ms. Boughton) And what are those metrics?

11        A.   Just hours worked, FTEs filled.  I'm not sure.

12   I'm not involved in that piece.

13        Q.   Do you know who is involved in that process?

14             MS. BARNES:  Foundation.

15             THE WITNESS:  I think our compliance

16   department provides those statistics on a regular basis.

Incomplete,
Rule 106;
Cumulative,
Rule 403

17        Q.   (By Ms. Boughton) Do you know what

18   considerations go into determining the amount, the number

19   of staff needed for a complex?

20             MS. ORCUTT:  Form and foundation.

21             THE WITNESS:  Again, that was predetermined

22   prior to the start of the contract.

23        Q.   (By Ms. Boughton) And since being awarded the

24   contract, does Centurion provide inputs or guidance to

25   ADC about staffing levels?

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

19

1          MS. ORCUTT:  Form.

2          MS. BARNES:  Form.

3          THE WITNESS:  Yes, I believe they provide

4  information on a continual basis.

5     Q.   (By Ms. Boughton) And do you know -- and what --

6  what information do they provide?

7          MS. ORCUTT:  Form and foundation.

8          THE WITNESS:  I believe they provide

9  staffing levels, par levels, hours worked, all of those

10  staffing metrics.  I'm not familiar with them.  I'm not

11  involved in that reporting.

12     Q.   (By Ms. Boughton) Are there any Centurion

13  policies and procedures regarding determining health care

14  staff positions -- pardon me, determining which health

15  care staff positions each facility needs?

16          MS. ORCUTT:  Form.

17          THE WITNESS:  No.  We are bound to what was

18  determined and dictated to us at the start of the

19  contract.

20     Q.   (By Ms. Boughton) So other than the contract

21  there are no Centurion policies or procedures regarding

22  the amount of health care staff at a given facility?

23          MS. ORCUTT:  Form.

24          THE WITNESS:  No.  The contract states we

25  will follow the -- the dictated matrix that was provided

Cumulative,
Rule 403

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

20

1    at the start of the contract.

2           Q.    (By Ms. Boughton) Let's go ahead.  I'm going to

3    mark -- Dr. Orm, do you recognize the document on your

4    screen?

5           A.    No.

6           Q.    No.  Okay.  What does it appear to be to you?

7                 MS. BARNES:  Form.

8                 MS. ORCUTT:  Form.  Foundation.

9                 THE WITNESS:  I'm not sure what this is.

10          Q.    (By Ms. Boughton) That is the tab of another --

11   let's try this.

12                Do you recognize this document?

13          A.    That looks like part of the RFP or contract.

14          Q.    Correct.  And if I told you that this RFP had

15   several tabs and attachments, would that -- would that be

16   accurate with your understanding of how the RFP was put

17   together?

18                MS. ORCUTT:  Form and foundation.

19                MS. BARNES:  Form and foundation.  And

20   Kathryn, I'm not really sure what I'm following how this

21   fits into the topics, the aspects of the topics for which

22   we said that Dr. Orm is to testify, because she -- that's

23   not a part of the topics that she's designated for.  So

24   I'm not really following.

25                MS. BOUGHTON:  So this is a question about

Cumulative, Rule 403

**30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021**

23

1          MS. BARNES:  Form and foundation.

2          THE WITNESS:  If -- if you define what this

3    chart is, I may have seen it in a different format.  But

4    I'm not familiar with what this is.

5          Q.    (By Ms. Boughton) Okay.

6          A.    Is this a staffing matrix?

7          Q.    This is included in the staffing amendment tab

8    to Centurion's RFP proposal.  There are multiple of these

9    for each facility.  And so I'm -- I'm hoping to get your

10   clarification on Centurion's creation and assignment of

11   staff at each facility, and specifically the policies and

12   procedures that shape those determinations.

13         A.    Those were already dictated to us.  So I'm not

14   sure if this tab is following what was already dictated

15   it would be.  Or if this is what Centurion proposed as

16   best practice.  I'm not sure what the context is of that

17   tab.

18         Q.    So it's your testimony that you weren't -- do

19   not know if Centurion provided ADC with specific

20   proposals for each facility under the contract?

21         A.    I'm not sure.

22         Q.    And do you know who might be sure at Centurion?

23         A.    Well --

24               MS. BARNES:  Form and foundation.

25               THE WITNESS:  You may need to go to

Relevance,
Rule 402;
Waste of time,
Rule 403;
Lacks
personal
knowledge,
Rule 602

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

24

Relevance,
Rule 402;
Waste of time,
Rule 403

1   Centurion corporate, because this was all determined

2   before we started the contract and were hired.

3       Q.   (By Ms. Boughton) And did you talk to anyone at

4   Centurion corporate before today's deposition?

5       A.   No.

6       Q.   Okay.  Go back to Exhibit 4.  This again is the

7   request for proposal and response to ADC's request for

8   proposal.

9            And we're going to go to page 468, which is

10  Bates stamped 2680.  Do you see this paragraph right

11  here, Dr. Orm, "In order to meet the performance

12  measures" -- "performance measure requirements and other

13  obligations under the Parsons stipulation agreement,

14  Centurion has looked critically at each outcome

15  measurement and staffing requirement.

16           "Based on this review, we concur that the ASPC

17  staffing found in Exhibit 24 will meet the requirements

18  of the stipulation."

19           Did I read that correctly?

20      A.   Yes.

21      Q.   Do you know what information was considered in

22  that review?

23      A.   I do not.

24      Q.   Do you know what that review is referencing?

25      A.   I do not.

Case 2:12-cv-00601-ROS   Document 4231-1   Filed 12/15/21   Page 180 of 234
Case 2:12-cv-00601-ROS   Document 4146-1   Filed 11/07/21   Page 343 of 1314

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

25

Relevance,
Rule 402; Lacks
personal
knowledge,
Rule 602

1      Q.    Do you know if there are any Centurion policies

2    and procedures that would have been consulted and/or

3    reviewed to determine whether staffing is adequate?

4      A.    I do not.

5      Q.    Do you see right here, I'm going to highlight

6    this, hopefully this isn't distracting, right here where

7    this says, "Our improved understanding of the units

8    within the complexes as a result of the site visits, our

9    appreciation for the information that the department has

10   provided, and our recognition of the increases in the RFP

11   suggested staffing plan have caused us to be comfortable

12   with the ASPC staffing plan as promulgated by the ADC in

13   Exhibit 24, as opposed to the much higher staffing

14   pattern we proposed in 2016."

15          Did I read that correctly?

16     A.    Correct.

17     Q.    Do you know what information led to Centurion's

18   improved understanding affecting staffing analysis?

19              MS. ORCUTT:  Form.

20              THE WITNESS:  I do not.

21     Q.    (By Ms. Boughton) Do you know who would at

22   Centurion?

23     A.    From 2016 on, I don't know.

24              MS. BARNES:  And Kathryn, I can -- I really

25   can try to, like, streamline this because, again, the

**30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021**

27

1    staffing analysis.

2              We have covered that.

3              MS. BARNES:  I appreciate that, and so I

4    guess just following up on that just, again, I'm just

5    trying to make sure that you understand what she's here

6    for so that we don't, you know, waste your time talking

7    to her about things she doesn't have any idea about.

8              She can talk in general about how maybe

9    some of these things impact the health care staff

10   providers at the facilities in general.  She just doesn't

11   have information about how that was all structured and

12   created to begin with.  That's all I wanted to be clear

13   about.

14             MS. BOUGHTON:  Understood.  Understood.  I

15   just want to clarify what Dr. Orm does have knowledge of

16   in terms of what analytical inputs go into staffing,

17   including the policies and procedures and requirements

18   for a physician and other medical staff.

19        Q.   (By Ms. Boughton) So, Dr. Orm, do you -- to your

20   knowledge are there any analytic assumptions used to

21   determine staff -- determine staffing levels for each

22   health care staff classification?

23             MS. ORCUTT:  Form and foundation.

24             THE WITNESS:  Not that I'm aware of.  I'm

25   not sure.

Relevance,
Rule 402;
Lacks
personal
knowledge,
Rule 602

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

28

Relevance, Rule 402; Cumulative, Rule 403; Lacks personal knowledge, Rule 602

1    Q.    (By Ms. Boughton) Okay.  Do you know how

2  Centurion, for example, determines that Complex A needs

3  seven physicians and six RNs, and Complex B needs three

4  physicians and 10 RNs?

5    A.    As I said, that was predetermined before the

6  start of the contract.  So I have -- I have no knowledge

7  as to how -- what analytics they used or how they came

8  to -- to that decision.

Cumulative, Rule 403

9    Q.    So it's your testimony today that the specific

10  levels of -- pardon me.  The specific allocations of

11  health care roles were predetermined under the contract?

12    A.    To my understanding, yes.

13          MS. BOUGHTON:  Brought up on the screen

14  what we'll mark Exhibit 6.

15          (Deposition Exhibit 6 was marked for

16  identification.)

17    Q.    (By Ms. Boughton) Dr. Orm, have you seen this

18  document before?

19    A.    I'm not familiar with that document.

20    Q.    What does it appear to be to you?

21          MS. BARNES:  Form.

22          MS. ORCUTT:  Same.

23          THE WITNESS:  It looks like FTE variance,

24  hired versus contractual, just based on the headings of

25  the table.

1     Q.    (By Ms. Boughton) Do you know if Centurion

2  creates and manages this document for ADC?

3              MS. BARNES:  Form.

4              THE WITNESS:  I don't know where this

5  document came from.

6     Q.    (By Ms. Boughton) So you've never seen this

7  document before?

8     A.    Not in this format, no.

9     Q.    Do you know if Centurion provides ADC with data

10  about variances?  Pardon me, data --

11     A.    They provide continuous staffing data to the

12  ADC, continuously.

13     Q.    Continuously.  How frequently would you say?

14  Daily --

15     A.    I don't know if it's daily, weekly, or monthly,

16  but it's part of the reporting structure already in

17  place.

18     Q.    And who would be responsible for that reporting?

19     A.    It would be Centurion reporting to the

20  monitoring bureau or ADCRR.

21     Q.    Do you know specifically who at Centurion?

22     A.    The compliance department.

23     Q.    Now, you testified earlier that the health care

24  staffing levels were set under the ADC contract; correct?

25     A.    Correct.

30

1      Q.   Now, the way I read this chart, which I

2   understand you haven't seen, so just wanted to clarify

3   it.  So, for example, if we take this line, 64, see, it

4   says, "Behavioral health tech."  And then there are four

5   contracted FTEs and seven hired FTEs.  Is that -- is that

6   your understanding of this chart?

7                   MS. BARNES:  Form.  Foundation.

8                   MS. ORCUTT:  Same.

9                   THE WITNESS:  That appears to be what this

10  chart is showing.

11     Q.   (By Ms. Boughton) Okay.  The way that I'm

12  reading this chart is that there are seven behavioral

13  health techs, but the contract requires four.

14                  Is it your knowledge that Centurion can hire

15  over the ADC contract levels?

16                  MS. ORCUTT:  Form.

17                  THE WITNESS:  Centurion has hired over the

18  contracted levels.

19     Q.   (By Ms. Boughton) And when does Centurion hire

20  over contracted FTEs?

21     A.   In various instances where we feel that we need

22  more staff to improve access and quality of care, or

23  provide certain services or programming that we have

24  created that may not even exist prior to the contract.

25                  My example would be a team of physical

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

31

1    therapists to provide on-site physical therapy for our

2    patients is nowhere in the contract or the matrix.

3            So that is something Centurion added and created

4    for improvement of access to care and quality care.

5        Q.    And who at Centurion determines if additional

6    positions over the contract should be hired?

7        A.    The operations -- chief operational officer of

8    Centurion.

9        Q.    Do you know how those decisions are made?

10       A.    I'm not understanding your question.

11       Q.    Are those decisions based on community health

12   standards or Centurion's internal policies and

13   procedures?

14               MS. ORCUTT:   Form.

15               MS. BARNES:   Form.

16               THE WITNESS:   I would say those decisions

17   are based on what's best for the patient care.

18       Q.    (By Ms. Boughton) And then I'm going to go ahead

19   and go to this tab right here.   "All staff," that is

20   quite small.   I don't know if you can see that.

21           Can I just have you briefly confirm these

22   acronyms for me, if you're are familiar with them?   FT?

23       A.    Full time.

24       Q.    LOC?

25       A.    I don't know.

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

32

1    Q.    PRN?

2    A.    As needed.

3    Q.    PTE?

4    A.    Part time employee.

5    Q.    And PTN?

6    A.    I don't know.

7    Q.    Thank you.  How does Centurion recruit health

8  care providers?

9    A.    That's such a broad question.  Can you rephrase

10  that into a more specific request?

11    Q.    Can you -- what policies and procedures relate

12  to Centurion's recruitment efforts?

13            MS. ORCUTT:  Form.

14            THE WITNESS:  Medical providers.  The

15  recruitment team is -- is very robust.  I've never seen

16  anything quite as robust as Centurion's recruitment team.

17            And the -- the ways that they advertise and

18  recruit are spanning snail mail, e-mail blasts, LinkedIn,

19  social media, advertisements, professional conferences,

20  sponsorships.  They're -- they're everywhere.  And so

21  that -- that is the solicitation out to the communities

22  for advertising job openings.

23    Q.    (By Ms. Boughton) And how are licensure

24  requirements considered in your recruitment efforts?

25            MS. ORCUTT:  Form.

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

33

1          THE WITNESS:   Actually, our credentialing
2    process is pretty strict.   So licensure, of course, for
3    the level of -- of provider.
4          So medical licensure for medical
5    physicians, NP licensure, PA licensure.   And then they go
6    through a credentialing process.   The National
7    Practitioner Data Bank and the board of that state is
8    searched for any issues or complaints.
9          That provider has to meet background check
10   criteria for the ADCRR, which I've heard is very strict,
11   more so than other departments of correction.
12          And so after passing all the background
13   checks, all the licensing and credentialing requirements,
14   and having all of the certifications like life support,
15   CPR, then they're able to be hired.
16      Q.   (By Ms. Boughton) I'm going to bring back up
17   Exhibit 5.
18          Dr. Orm, have you seen this document before?
19      A.   No.
20      Q.   Okay.  Do you know if Centurion provides
21   recruiting reports to ADC?
22      A.   I do not know.
23      Q.   Do you know who at Centurion would know?
24      A.   Maybe -- maybe compliance, who provides most of
25   the reports.

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

34

1      Q.    Did you speak to anyone in recruiting before

2   today's deposition?

3      A.    No.

4      Q.    Does Centurion have any specific policies or

5   procedures that it utilizes to retain staff?

6      A.    Retention of staff is actually part of more the

7   national and the state level recruiting and human

8   resources departments.

9           So things that help retain medical providers are

10  actual structure, scheduling, staffing, feedback, the

11  peer review process, providing education and resources

12  for practice that are unmatched in the community.

13          Those are all-encompassing that help with

14  retention for our staff, medical staff.

15     Q.    Is the amount of staffing a consideration in

16  employee satisfaction and thus retention?

17              MS. ORCUTT:  Form.

18              THE WITNESS:  I would assume it is, but I

19  don't have hard data to show that.

20     Q.    (By Ms. Boughton) Do you often receive

21  complaints about staff working overtime?

22              MS. ORCUTT:  Form.

23              THE WITNESS:  No.

24              MS. BARNES:  Can I just ask sort of a

25  favor, I guess, Kathryn.  When you continue to say

**30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021**

38

1   again, I really do think I'm going to have to be making

2   these numerous, unnecessary objections, Kathryn.

3            All I've asked that I think is totally

4   reasonably, based on our designation of this witness, is

5   that you change your question just for her to remove the

6   reference to "staff" and change it to "provider."

7            Because she's only here to testify about

8   medical provider aspects of health care staff. We have

9   two other people that will talk about the rest of them.

10           So if you don't do that, then I've got to

11  do these objections every single question. All I'm

12  asking you to do is limit which portion of the staff

13  you're asking her about because that's the only portion

14  of the staff that she's here to testify about.

15           MS. BOUGHTON:  That has been noted on the

16  record. I believe the question was pending. Can you

17  answer it?

18           MS. BARNES:  Form and foundation.

19           MS. ORCUTT:  Same.

20           THE WITNESS:  Can you repeat that question

21  for me?

22       Q.   (By Ms. Boughton) Is Centurion having any

23  problems filling health care staff positions?

24           MS. BARNES:  Form and foundation.

25           MS. ORCUTT:  Same.

Incomplete, Rule 106

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

39

Incomplete, Rule 106

1      THE WITNESS:  In the remote areas of the

2    state, it can be more difficult than in the central or

3    more populated areas of the state.

4      Q.    (By Ms. Boughton) And is Centurion having any

5    problem filling provider positions at ADC?

6      A.    No.

7      Q.    Have you observed any problems that could be

8    resolved in whole -- whole or in part with more

9    providers?

10            MS. ORCUTT:  Form.

11            MS. BARNES:  I -- I didn't hear the

12   question.  You cut off at the end.

13     Q.    (By Ms. Boughton) Have you observed any problems

14   that you feel could be resolved with the addition of more

15   providers at an ADC facility?

16            MS. ORCUTT:  Form.

17            THE WITNESS:  No.  The answer is not always

18   more providers, so I would say no.

19            MS. BOUGHTON:  We've been going for just

20   under an hour.  How about we take a quick five-minute

21   break?

22            MS. BARNES:  If we can stick to five

23   minutes, that would be great.

24            MS. BOUGHTON:  3:02.  We'll do 3:07.  Thank

25   you.

1              (Recess from 3:03 p.m. to 3:12 p.m.)

2      Q.    (By Ms. Boughton) Dr. Orm, can you define who is

3  considered a provider under ADC's contract?

4      A.    Medical provider is an MD, a DO, physician, a

5  nurse practitioner, or a physician assistant.

6      Q.    Okay.  And is it Centurion's role to determine

7  who to hire in these positions?

8      A.    Yes.

9      Q.    And earlier we spoke about that Centurion has

10  the authority to hire over contract levels if it wants;

11  correct?

12     A.    Correct.

13     Q.    So Centurion could determine -- strike that.

14           Centurion could decide to hire additional

15  providers at a facility; correct?

16     A.    Centurion has decided to hire additional

17  providers at facilities.

18     Q.    So it has that authority?

19     A.    Yes.

20     Q.    And if ADC increased the staffing levels under

21  the contract, Centurion would provide -- or would comply

22  with that; correct?

23     A.    Yes.

24     Q.    If ADC requested that Centurion hire a

25  particular provider, Centurion would comply with that?

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

41

1          MS. BARNES:  Form and foundation.

2          MS. ORCUTT:  Same.

3          THE WITNESS:  I'm not sure what you mean.

4    A particular person by name?

5       Q.    (By Ms. Boughton) No.  Apologies.  If ADC

6    requested that Centurion hire, you know, six additional

7    NPs, would Centurion comply with that?

8          MS. BARNES:  Form and foundation.

9          MS. ORCUTT:  Same.

10          THE WITNESS:  I can't answer that.  That

11   would be negotiated and discussed and decided at an

12   operational level that I'm not involved in.

13       Q.    (By Ms. Boughton) Okay.  So earlier when you

14   said that Centurion has decided to hire providers over

15   the contract level at specific facilities, can you

16   explain when Centurion takes that action and what factors

17   go into that decision?

18          MS. ORCUTT:  Form.

19          THE WITNESS:  I think based on the

20   fluctuation in facility census, volume, acuity, services

21   that are provided at each facility, and programs that are

22   added that need additional support.

23       Q.    (By Ms. Boughton) Do you know if those

24   determinations are assessed on an as-needed basis?

25       A.    I do not know when they are assessed.

1   don't know what went into the development of the matrix.

2       Q.   Does the level of care required by an inmate

3   impact staffing allocation?

4               MS. ORCUTT:  Form.

5               THE WITNESS:  Can you -- can you rephrase

6   that and be more specific?

7       Q.   (By Ms. Boughton) Sure.  Does the acuity of an

8   inmate's condition or the severity of their condition or

9   need for level of care, does that have an impact on how

10  Centurion allocates staff to a facility?

11              MS. ORCUTT:  Form.

12              THE WITNESS:   If you look at the staffing

13  matrix, I think you will see that facilities that have

14  higher acuity either of medical patients, being an

15  infirmary or a skilled nursing unit or a higher acuity of

16  mental health patients like a behavioral unit, you will

17  see that allocation of staff accordingly.

18      Q.   (By Ms. Boughton) Does it impact the number of

19  staff assigned to a facility?

20              MS. BARNES:  Form.  Asked and answered.

21              THE WITNESS:  Asked and answered.  Same

22  answer.  If you look at the matrix facilities that have

23  higher acuity or special programming, you may see

24  allocation of staff accordingly for that level of acuity

25  and that extra programming.

**30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021**

51

1  determine whether that extra volume, extra acuity, gets

2  you more staff.

3              My -- my hunch is, yes, because those tend

4  to be our larger sites that have more staff already.  But

5  I'm not sure exactly what you're asking.

6       Q.   (By Ms. Boughton) Okay.   Do medical

7  classifications used by ADC, that is the M-1 to M-5

8  classification, do those affect staffing allocations?

9       A.   No.

10       Q.   Okay.   So if Centurion assessed that an inmate

11  needed a higher level of care and moved them up the

12  M classification, that would not be considered a change

13  in the staffing analysis?

14              MS. BARNES:  Form and foundation.

15              MS. ORCUTT:  Same.

16              THE WITNESS:  No.   That would -- that

17  would -- that would equal a move of that individual to an

18  appropriate housing unit that housed that level of

19  medical necessity, and those units would be staffed for

20  that acuity.

21       Q.   (By Ms. Boughton) Does security classification

22  of inmates impact staffing for providers?

23       A.   No.

24       Q.   No?

25       A.   No.

Incomplete, Rule 106

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

52

Relevance,
Rule 402;
Confusing, Rule
403

1       Q.    Is this documented in any security policies or

2    procedures?

3       A.    Is what documented?

4       Q.    What impacts staffing, whether security

5    classifications or the medical classifications we just

6    discussed?

7               MS. ORCUTT:   Form.

8               MS. BARNES:   Form.  Foundation.

9               THE WITNESS:   We wouldn't be referred to

10   any Centurion policies and procedures.  It's the ADCRR

11   that we would be -- so you need to refer to the ADCRR

12   MSTM, the technical manual, or orders that define that

13   for you.

14      Q.    (By Ms. Boughton) So other than the ADCRR

15   policies there are no separate Centurion policies on that

16   point?

17      A.    Based on security levels and staffing, no.

18      Q.    Does the age of a -- does the age of inmates at

19   given a facility impact staffing?

20      A.    No.

21               MS. BARNES:   Form and foundation.

22               MS. ORCUTT:   Same.

23               THE WITNESS:   No.

24      Q.    (By Ms. Boughton) So we've talked about medical

25   classification, age, the number of inmates, acuity of

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

53

1  care needed.   Are there any other characteristics or

2  demographics relating to inmates that impact staffing?

3              MS. BARNES:  Form and foundation.

4              MS. ORCUTT:  Same.

5              THE WITNESS:  No.  Again, the things you're

6  describing dictate where we safely house patients.  And

7  patients who have acuity levels or ADL needs or higher

8  M scores for medical, would be housed in places that can

9  accommodate those needs.

10             Those places tend to be infirmaries or

11 skilled nursing units or ADL housing where there's

12 already additional staff allocated for that level of

13 care.

14     Q.   (By Ms. Boughton) And who allocated that

15 additional staff for that level of care?

16     A.   That's part of the matrix.

17             MS. BARNES:  Form and foundation.  Just try

18 to pause.

19             THE WITNESS:  Okay.

20             MS. BARNES:  Form and foundation.  Asked

21 and answered, repeatedly.  Go ahead and answer it a last

22 time.

23             THE WITNESS:  That is -- that is already

24 part of the staffing matrix.

25     Q.   (By Ms. Boughton) And does Centurion provide

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

56

1    for each facility is known on a day-to-day basis.

2         Q.    (By Ms. Boughton) Okay.  Is Centurion's position

3    that ADC facilities are adequately staffed?

4                   MS. ORCUTT:  Form.  Foundation.

5                   THE WITNESS:  Can you repeat that question?

6         Q.    (By Ms. Boughton) Is it Centurion's position

7    that ADC facilities are adequately staffed?

8         A.    Over all the state, since we have hired I think

9    almost 90 positions over the matrix, I would say we

10   believe that we have the facilities adequately staffed.

11        Q.    How are the licensure requirements for each

12   classification of providers determined?

13                  MS. ORCUTT:  Form.

14                  THE WITNESS:  I believe I already answered

15   that question, that as providers are hired, they must

16   have licensure and certifications.  They must go through

17   credentialing process.  So that's the licensure and

18   certification for medical providers.

19        Q.    (By Ms. Boughton) And who sets the licensure

20   requirements?

21                  MS. ORCUTT:  Form.

22                  THE WITNESS:  Centurion credentialing

23   committee and the State of Arizona.

24        Q.    (By Ms. Boughton) I believe the next exhibit

25   sequentially would be Exhibit 6.

**30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021**

68

Cumulative,
Rule 403

1          MS. BARNES:  If you don't understand the

2     question, let her ask it again.

3          THE WITNESS:  Okay.

4     Q.    (By Ms. Boughton) To clarify, your testimony is

5     that the staffing level, its requirements for providers

6     were set prior to Centurion's being awarded the contract?

7          MS. BARNES:  Form.

8          MS. ORCUTT:  Same.

9          MS. BARNES:  Foundation.

10          THE WITNESS:  Whatever contract was decided

11     on included those staffing levels.

12     Q.    (By Ms. Boughton) And did Centurion play a role

13     in determining those levels?

14          MS. BARNES:  Form and foundation.

15          THE WITNESS:  I'm sure that was negotiated

16     prior to deciding and agreeing on a contract.

17     Q.    (By Ms. Boughton) Okay.  Thank you.  A few final

18     questions, Dr. Orm.

19          Are activity technicians medical providers?

20          MS. ORCUTT:  Form.

21          THE WITNESS:  Are what?  Can you repeat?

22     Q.    (By Ms. Boughton) Activity technicians?

23     A.    I don't know what those are.

24     Q.    Okay.  Activity therapists?

25     A.    I don't know what those are.

72

1    STATE OF ARIZONA    )
                         )
2    COUNTY OF MARICOPA  )

3              BE IT KNOWN that I took the foregoing
     deposition pursuant to Notice; that the witness was duly
4    sworn by me; and that said transcript is a full, true,
     and accurate record of the proceedings; that the
5    proceedings were taken down by me in shorthand and
     thereafter reduced to print under my direction; that I
6    have acted in compliance with ACJA 7-206.

7              I CERTIFY that I am in no way related to
     any of the parties hereto nor am I in any way interested
8    in the outcome hereof.

9              Pursuant to request, notification was
     provided that the deposition is available for review and
10   signature.

11             Dated this 18th day of October, 2021.

12

13

14                         Jennifer Honn
                           Certified Reporter
15                         Arizona CR No. 50885

16

17             I CERTIFY that GLENNIE REPORTING SERVICES,
     LLC, has complied with the ethical obligations set forth
18   in ACJA 7-206.

19

20

21

22

23

24   GLENNIE REPORTING SERVICES, LLC
     Registered Reporting Firm
25   Arizona RRF No. R1035

**EXHIBIT 4**

**(REDACTED)**

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

VICTOR PARSONS; SHAWN JENSEN;      )
STEPHEN SWARTZ; DUSTIN BRISLAN;    )
SONIA RODRIGUEZ; CHRISTINA         )
VERDUZCO; JACKIE THOMAS; JEREMY    )
SMITH; ROBERT GAMEZ; MARYANNE      )
CHISHOLM; DESIREE LICCI; JOSEPH    )
HEFNER; JOSHUA POLSON; and         )
CHARLOTTE WELLS, on behalf of      )
themselves and all others         )
similarly situated; and ARIZONA    )
CENTER FOR DISABILITY LAW,         )
                                   )
               Plaintiffs,         )
                                   ) Case No.
v.                                 ) CV 12-00601-PHX-ROS
                                   )
DAVID SHINN, DIRECTOR, ARIZONA     )
DEPARTMENT OF CORRECTIONS,         )
REHABILITATION AND REENTRY; and    )
LARRY GANN, ASSISTANT DIRECTOR,    )
MEDICAL SERVICES CONTRACT          )
MONITORING BUREAU, ARIZONA         )
DEPARTMENT OF CORRECTIONS,         )
REHABILITATION AND REENTRY, in     )
their official capacities,         )
                                   )
               Defendants.         )

30(b)(6) DEPOSITION OF CENTURION OF ARIZONA, LLC
(ANTONIO CARR, M.D. AND THOMAS RUSSELL DOLAN)
Volume 2 - (Pages 73 - 216)
Via Zoom Videoconference
October 19, 2021
9:00 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020            Prepared by:
602.266.6535                      Robin L. B. Osterode
www.glennie-reporting.com         CSR, RPR
                                  CA CSR No. 7750
                                  AZ CR No. 50695

74

1                                 I N D E X

2    WITNESS                                                    PAGE

3    CENTURION OF ARIZONA, LLC
     (ANTONIO CARR, M.D.)
4

5               Examination by Ms. Colby                        78

6    WITNESS                                                    PAGE

7    CENTURION OF ARIZONA, LLC
     (THOMAS RUSSELL DOLAN)
8

9               Examination by Ms. Colby                        131

10

11

12                        INDEX TO EXHIBITS

13   Description                                              Page

14   Exhibit 1   Amended Subpoena to Testify at                81
                 a Deposition in a Civil Action;
15               6 pages

16   Exhibit 2   Curriculum vitae of Antonio Carr,             84
                 M.D.; 3 pages
17

18   Exhibit 3   Curriculum vitae of Tom Dolan;               142
                 5 pages

19   Exhibit 4   Bates stamped documents                      151
                 PLTFS002213 - PLTFS002789
20

21   Exhibit 5   Document entitled "Staffing                  154
                 Plan"; 1 page

22   Exhibit 7   Excel spreadsheet entitled "Staffing         162
                 Variances - Hired FTE vs. Contract
23               FTE"; 11 pages

24   Exhibit 8   Bates stamped documents                      165
                 PLTFS002187 - PLTFS002208

25

75

1   INDEX (Continued):

2

3   **INDEX TO EXHIBITS**

Description                                                    Page

4   Exhibit 9   Bates stamped documents                     173
                ADCRR00110925 - ADCRR00110926
5               (Confidential)

6   Exhibit 10  Bates stamped documents                     115
                ADCRR00078068 - ADCRR00078074
7               (Confidential)

8   Exhibit 11  Excel spreadsheet with header               125
                "Site/Unit" on first page; 6 pages
9
    Exhibit 12  Bates stamped documents                     110
10              ADCRR00070635 - ADCRR00070645
                (Confidential)
11
    Exhibit 13  Bates stamped documents                     111
12              ADCRR00074732 - ADCRR00074736
                (Confidential)
13
    Exhibit 15  Bates stamped documents                     204
14              ADCRR00021949 - ADCRR00021976
                (Confidential)
15
    Exhibit 16  Bates stamped document PLTFS001698          207
16
    Exhibit 17  Bates stamped documents                     208
17              ADCRR00078885 - ADCRR00078887
                (Confidential)
18
    Exhibit 18  Bates stamped documents                     210
19              ADCRR00074864 - ADCRR00074865
                (Confidential)

20

21

22

23

24

25

76

1   INDEX (Continued):

2

3                    INSTRUCTION NOT TO ANSWER

4                         Page      Line

5                         120         7

6

7

8           PORTIONS OF TRANSCRIPT MARKED CONFIDENTIAL

9                         Pages

10                        111-120
                          174-179
11                        196-199
                          205-206
12                        209-212

13

14

15

16

17

18

19

20

21

22

23

24

25

77

1              DEPOSITION OF CENTURION OF ARIZONA, LLC

2              The deposition of CENTURION OF ARIZONA, LLC,

3    Volume 2, (ANTONIO CARR, M.D. AND THOMAS RUSSELL DOLAN),

4    via Zoom Videoconference, was taken on October 19, 2021,

5    commencing at 9:00 a.m., at Phoenix, Arizona, before

6    ROBIN L. B. OSTERODE, RPR, CSR, California Shorthand

7    Reporter No. 7750 and Arizona Certified Reporter

8    No. 50695.

9    APPEARANCES:

10   For Plaintiffs:

11           PERKINS COIE, LLP
             By: Mikaela Colby
12           2901 North Central Avenue, Suite 2000
             Phoenix, Arizona 85012
13           (602) 351-8000
             mcolby@perkinscoie.com
14           (Videoconference appearance.)

15   For Defendants:

16           STRUCK LOVE BOJANOWSKI & ACEDO, PLC
             By: Timothy J. Bojanowski
17           3100 West Ray Road, Suite 300
             Chandler, Arizona 85226
18           (480) 420-1616
             tbojanowski@strucklove.com
19           EPercevecz@strucklove.com
             (Videoconference appearance.)
20
     For Deponent:
21
             BROENING OBERG WOODS & WILSON
22           By: Sarah L. Barnes
             2800 N. Central Ave, Suite 1600
23           Phoenix Arizona 85004
             (602) 271-7793
24           slb@bowwlaw.com
             (Videoconference appearance.)
25

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

78

```
 1            THE REPORTER:  Before we proceed, I will ask
 2    counsel to agree on the record that there is no objection
 3    to this officer of the court administering a binding oath
 4    to a witness not appearing personally before me.
 5            Please state your agreement on the record.
 6            MR. BOJANOWSKI:  No objection.
 7            MS. BARNES:  No objection.
 8            MS. COLBY:  No objection.
 9
10                    ANTONIO CARR, M.D.,
11    called as a witness herein, having been first duly sworn
12    by the Certified Reporter to speak the whole truth and
13    nothing but the truth, was examined and testified as
14    follows:
15
16            E X A M I N A T I O N
17    BY MS. COLBY:
18       Q.    Hello, my name is Mikaela Colby.  I'm with
19    Perkins Coie.  I'm one of the attorneys for the prison
20    plaintiffs in Parsons v. Shinn; that's the case you've
21    been called for this deposition.
22            Can you please state your full name for the
23    record.
24       A.    Antonio Carr.
25       Q.    And can I call you "Dr. Carr"?
```

**30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021**

81

1       Q.     Okay.  If you need to answer, we'll just step

2   out to take a break.

3       A.     Okay.

4       Q.     When I refer to "ADC," do we have an

5   understanding that I'm referring to the Arizona

6   Department of Corrections, Rehabilitation, and Reentry?

7       A.     Yes.

8       Q.     And when I refer to "prisons" or "facilities,"

9   can we have an understanding I'm referring to the 10

10  Arizona State Prison complexes?

11      A.     Yes.

12             MS. COLBY:  Okay.  I'm going to mark this as

13  Exhibit 1.

14             (Marked for identification Exhibit 1.)

15  BY MS. COLBY:

16      Q.     Can you see this on the screen?

17      A.     Yes.

18      Q.     And do you recognize this document?  This is

19  the subpoena for Centurion that called you to testify

20  here today.

21      A.     Yes.

22      Q.     And are you here on behalf of Centurion, not

23  yourself as an individual?

24      A.     Yes.

25      Q.     Here is a caption Attachment A, and this lists

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) - Vol. II - 10/19/2021

82

```
1    the topics that Centurion is to testify about today.  I
2    understand that you're only designated for two topics
3    today; is that correct?
4        A.    Yes.
5        Q.    So I'm just going to go through the two topics
6    that you've been designated for and confirm whether
7    you're prepared to testify on that topic.  Topic 7 is
8    "The policies and procedures related to the recruitment
9    and retention of healthcare staff at the 10 ASPCs."
10             Are you the person at Centurion with the most
11   knowledge concerning this document?
12             MS. BARNES:  Form.
13             THE WITNESS:  I have knowledge.  I cannot say
14   that I'm the most knowledgeable, depending on what you
15   ask.  I do have knowledge of policies and procedures
16   related to recruitment and retention of healthcare staff
17   at the 10 ASPC facilities.
18   BY MS. COLBY:
19       Q.    Do you know of anyone who would be more
20   knowledgeable?
21       A.    No, I do not.
22       Q.    Are you prepared to testify to this topic
23   today?
24       A.    Yes.
25       Q.    And Topic 8 is the type of licensure
```

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

83

1    requirements for each classification of healthcare and

2    mental care staff.  Are you prepared to testify regarding

3    Topic 8?

4        A.    To the best of my ability, yes.

5        Q.    Are you the person at Centurion with the most

6    knowledge concerning this topic?

7             MS. BARNES:  Form.

8             THE WITNESS:  I am.

9             MS. BARNES:  Form.

10            Go ahead.

11            THE WITNESS:  I have knowledge.  I can't say

12   I'm the most knowledgeable.  Depending on your questions,

13   I can answer or participate with this discussion.

14   BY MS. COLBY:

15       Q.    Okay.  Are there any other topics that you've

16   been designated to testify to today or are these the only

17   two?

18       A.    Those are the only two.

19       Q.    Okay.  Did you do anything to prepare for this

20   deposition to testify on behalf of Centurion?

21       A.    Yes.

22       Q.    What did you do?

23       A.    I reviewed some of my notes.  As the statewide

24   psychiatric director, I am continually involved with

25   various conversations, meetings, and I take various notes

1  throughout the week.  And so knowing those two topics, I

2  just reviewed notes I may have taken about recruitment

3  and licensure, as well as some counsel with the lawyer.

4      Q.    Did you meet with anyone else?

5      A.    No.

6      Q.    When did you first hear of the Parsons lawsuit

7  that we're here about today?

8      A.    When I first started employment with Corizon

9  Health in 2017.

10     Q.    Did you review any of the pleadings or filings

11 in this case?

12     A.    No.

13     Q.    Did you have any role in collecting documents

14 to be produced in this litigation?

15     A.    No.

16     Q.    What is your current job title at Centurion?

17     A.    Statewide Psychiatric Director or Regional

18 Psychiatric Director.

19           MS. COLBY:  I'm going to mark this as

20 Exhibit 2.

21           (Marked for identification Exhibit 2.)

22 BY MS. COLBY:

23     Q.    Can you see this on the screen?

24     A.    I can.

25     Q.    And what is this document?

85

1      A.      That is my CV.

2      Q.      And is everything on here accurate?  This was

3  provided to me by your counsel.

4             MS. BARNES:  Just a note for the record,

5  Mikaela, that we -- when I received it, we had it

6  redacted at the top just to remove his personal contact

7  information, right below his name.

8             MS. COLBY:  Okay.  Thank you.

9             THE WITNESS:  Yes, the content is correct, to

10  the best of my ability.

11  BY MS. COLBY:

12     Q.      And it says here that you formerly worked for

13  Corizon; that's correct?

14     A.      Correct.

15     Q.      And why did you leave Corizon in 2019?

16     A.      That is when Centurion was awarded the

17  contract, and I continued employment through Centurion.

18     Q.      Okay.  Will you describe the duties of your

19  current job?

20     A.      Can you repeat the question, please?

21     Q.      Yes.  Will you describe to me the duties of

22  your current job?

23     A.      First and foremost, patient care as a

24  psychiatrist.  I have to be willing and able to

25  participate with patient care at all levels, whether it

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) - Vol. II - 10/19/2021

86

1    is hands-on direct care, providing supervision to

2    mid-levels or psychiatric nurse practitioners, providing

3    clinical supervision to psychiatrists, overseeing the

4    mental health program from the medical and clinical

5    aspect, as well as the psychology and clinical aspect.  I

6    work very closely with the mental health director,

7    statewide director in making sure we're able to

8    accomplish the goals for our program.

9            I collaborate with medical pharmacy, nursing.

10   I assist with leadership over the entire program with Tom

11   Dolan, the two directors of operations.

12       Q.    Do you --

13       A.    Excuse me?

14       Q.    I'm sorry.

15       A.    I was going to say I also oversee portions of

16   the formulary/non-formulary process.  I attend meetings

17   with ADCRR, the monitoring bureau, as it pertains to

18   morbidity and mortality.  I do the peer reviews for all

19   the psychiatric providers.  And I also assist HR in

20   managing any performance or unprofessional conduct that

21   may take place at the work site.  I'm sure I'm leaving

22   out some things, but I think that's the general gist of

23   what I do.

24       Q.    And so you directly see patients?

25       A.    Yes.

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

87

1      Q.      And do you oversee the staff, the mental health

2   staff?

3      A.      Yes, in collaboration with the mental health

4   director.   I primarily supervise the clinicians, the

5   physicians, and the nurse practitioners that provide

6   direct care to patients.   I also provide guidance to

7   other leadership -- leader positions in our department to

8   make sure we're all moving in the same direction, so yes.

9      Q.      Do you oversee the mental health staffing

10   levels?

11      A.      When you say "oversee," define that, please.

12      Q.      Do you determine -- do you help make sure that

13   the mental health staff is adequately staffed?

14      A.      Yes, I'm involved in conversations, meetings,

15   planning, to resolve any vacancies, at the various mental

16   health levels, that would include BHTs, psych associates,

17   nurse practitioners, as well as psychiatrists and

18   psychologists.

19      Q.      Does your position require your participation

20   in the development of any Centurion policies or

21   procedures?

22              MS. BARNES:  Form.

23              THE WITNESS:  Can you repeat the question,

24   please?

25   BY MS. COLBY:

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

90

1   Centurion leadership and we work on a plan to provide the

2   care that we need for our patients.

3   BY MS. COLBY:

4        Q.     Who provides you the staffing matrix?

5        A.     That would be regional leadership,

6   administrative leadership.

7        Q.     The Centurion regional administrative

8   leadership?

9        A.     Correct.

10       Q.     And so Centurion creates the matrix, not ADC?

11              MS. BARNES:  Form and foundation.

12              THE WITNESS:  What's that now?  Can you repeat

13   the question?

14   BY MS. COLBY:

15       Q.     So who creates the matrix, is that Centurion?

16              MS. BARNES:  Form and foundation.

17              THE WITNESS:  To my knowledge, no, I'm just

18   given the matrix.  I can't speak to who created the

19   matrix and the numbers.

20   BY MS. COLBY:

21       Q.     Okay.  We're going to jump into Topic 7.  How

22   does Centurion recruit healthcare providers?

23       A.     Can you be more specific?

24       Q.     So Centurion, you said, hires the healthcare

25   staff.  Correct?

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

91

1      A.      Correct.

2      Q.      How do they do so?

3              MS. BARNES:  Form and foundation.

4              THE WITNESS:  As it pertains to mental health

5      staff particularly, psychiatrists, psychiatric nurse

6      practitioners, psychologists, Ph.D.s, and psychology

7      associates, it all starts with recruitment.  So at least

8      twice a week we have recruitment meetings, we identify

9      the variances, we identify the need, we come up with a

10     particular strategic plan to hire for that need, whether

11     it is having mailers, having meet-and-greets.  Before

12     COVID we actually would host meet-and-greets somewhere in

13     the local community.  We would contact different schools

14     in the area, staffing agencies.  We would really

15     have -- what's that?

16             MS. BARNES:  He's still talking.

17             MS. COLBY:  Sorry.

18             MS. BARNES:  Go ahead.

19             THE WITNESS:  Okay.  We would just be creative

20     in hiring staff for those positions.  We would have

21     on-site interviews where we would bring people in.  We

22     would give a site tour.  We would bring them to the

23     regional office.  Again, have a meet-and-greet and add

24     that personal touch to it, which we think we've been

25     successful at doing from a mental health perspective.

92

1             MS. BARNES:  And I just want to pause really

2    quickly.  Dr. Carr, if you could try to slow down just

3    slightly in your answers, only because the court

4    reporter -- and I can see her nodding, she's in agreement

5    with my request -- because she's trying to take down

6    everything.

7             THE WITNESS:  Gotcha.  Okay.

8             MS. BARNES:  Just slightly.

9             THE REPORTER:  Thank you.

10   BY MS. COLBY:

11       Q.    What policies relate to Centurion recruitment

12   of mental healthcare staff?

13            MS. BARNES:  Form and foundation.

14            THE WITNESS:  I can't answer that.

15   BY MS. COLBY:

16       Q.    Do you -- so when you're recruiting mental

17   healthcare staff, do you relate to any policies -- do you

18   refer to any policies?

19       A.    It's a team effort.  And so when we're

20   recruiting, we rely on, credentially at the corporate

21   level, the recruiting team to give us eligible

22   candidates.  So they will do the initial screening.  They

23   pass the initial screening portion.  And then their CV

24   would be forwarded to us to schedule an interview and do

25   more of the hands-on approach with each eligible

1    candidate.

2         Q.    How are position demands considered?

3              MS. BARNES:  Form, foundation.

4              THE WITNESS:  Can you clarify the question,

5    please?

6    BY MS. COLBY:

7         Q.    How do you consider what staff each facility

8    needs in terms of mental healthcare staff?

9         A.    Again, I have to go back to the matrix.

10   Whatever the contract, we were allotted staff members,

11   and we try to meet that requirement.

12        Q.    Do you consider anything else besides the

13   matrix?

14        A.    Yes, of course.  Clinical need.  We will look

15   at various data points when we provide care, whether that

16   is the volume of health needs requests, whether that's

17   the number of ICSs, the number of recommended follow-up

18   by each individual clinician, mid-levels, particularly,

19   and psychiatrists have been encouraged to have patients

20   come back to the clinic.  Once that's clinically

21   indicated, not necessarily following a guideline that

22   have been set forth by the CGARs.  And so we're really

23   trying to meet the patient need.

24              And if that need is more than what we have been

25   allotted, that is where we try to flex staff, have PRN

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

94

1    staff come in and help, or we work with regional

2    leadership to hire additional staff.  So we look at the

3    clinical acuity, the volume of services that are needed,

4    and we pivot our team to meet that demand.

5            We just don't settle for the minimum.  We

6    really try to provide care based on what the patients

7    need.  So that, in combination with the matrix, is really

8    an integral part.  It's a combination of things.  It's

9    just not a hard, fast number that may be listed in a

10   contract or a matrix.  We apply clinical parameters to,

11   again, meet the needs of the patient.

12       Q.    So Centurion has the ability to hire above the

13   contract matrix?

14       A.    Yes.  And I will also add to that, it's just

15   not hire above, we have providers who are willing to work

16   extra.  We allow them to work extra as well.  So it's not

17   always hiring additional members.  We have providers who

18   are willing to help more, and that helps, because they're

19   familiar with the clientele, the population, so it aids

20   continuity of care.  We have to remember those things

21   when we are hiring as well, because we lose a little bit

22   of that clinical knowledge.

23       Q.    And then is Centurion allowed to amend the

24   contract with ADC?

25            MS. BARNES:  Form and foundation.

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

95

1          THE WITNESS:  I can't speak to that.

2    BY MS. COLBY:

3       Q.      If you determine that the mental healthcare

4    staffing levels are insufficient, as you stated, then

5    what do you do to remedy that?

6          MS. BARNES:  Form and foundation.

7          THE WITNESS:  I will meet with Centurion

8    leadership and give them the clinical facts and the risks

9    and benefits if we need to provide this care, and thus

10   far, I've been supported 100 percent in meeting that

11   need.

12   BY MS. COLBY:

13      Q.      And so what does Centurion leadership do.  Do

14   they just hire more staff?  Do they inform ADC?

15      A.      We work directly, and they pretty much give me

16   the green light to provide the clinical service.  Whether

17   that is to get a team of providers to go on-site, get a

18   team of providers to provide telehealth services.  They

19   support my decision in getting the increased number of

20   staff at that location.

21          And if the increased number of staff is

22   something that needs to be long term, then we go back to

23   the table to figure out how to make that happen.

24   Sometimes healthcare is cycles.  And so we have to

25   provide staff to get through that increased need, for

1    whatever reason.   As services begin to decline, ready to

2    pull back some of those resources and utilize them

3    elsewhere.

4              So it's not always a constant.   So we do have

5    that flexibility of either moving staff around, hiring

6    new staff to meet the needs of the patient, but that need

7    may not always be there.   So I don't want to give the

8    impression that we just simply hire new staff and that

9    staff is there.   No, we have a lot of different variables

10   of things we're able to do to meet the needs of the

11   patients.

12             So Centurion leadership at the regional level

13   supports me in meeting the need of the patients, whether

14   it's hiring new staff, whether it is moving staff around

15   to meet the need, or allowing providers to work extra

16   hours to meet the needs of the patients.

17             MS. BARNES:   One more reminder to try to slow

18   down a little bit.   I'm a fast talker as well, so I get

19   it.

20             THE WITNESS:   Sorry about that, Robin.

21             THE REPORTER:   That's okay.   Thanks.

22   BY MS. COLBY:

23        Q.   Do you need ADC approval to hire more staff?

24        A.   I can't answer that.

25        Q.   Who can answer that?

1           MR. BOJANOWSKI:  Form and foundation.

2           MS. BARNES:  Foundation.

3           THE WITNESS:  I have no knowledge of who can

4    amend or if they can amend or who they speak to to make

5    that happen.

6    BY MS. COLBY:

7        Q.    But you said you go to Centurion leadership and

8    they support you in hiring more staff or moving staff

9    around, you don't know if they need ADC approval?

10       A.    I don't have those conversations with the

11   leadership.  My focus is just, again, patient care and

12   doing what's best for the patient.  And someone handles

13   it from there once I get the green light.

14       Q.    Are the positions of recruiter currently

15   filled?

16           MS. BARNES:  Form and foundation.

17           THE WITNESS:  Can you repeat the question,

18   please?

19   BY MS. COLBY:

20       Q.    Are you familiar with Centurion recruiter

21   positions?

22       A.    Somewhat.

23       Q.    What policies does Centurion use to maintain

24   healthcare staff?

25           MS. BARNES:  Form and foundation.

1    support for staff, but there are things that providers

2    can do that may lead to termination.

3    BY MS. COLBY:

4       Q.    And are those policies written down?

5       A.    Policies to assist with managing performance?

6       Q.    Yes.

7       A.    Yes.

8       Q.    Do you ever receive complaints about mental

9    healthcare staffing?

10       MS. BARNES:  Form.

11       THE WITNESS:  I have received a complaint in

12    the past.

13    BY MS. COLBY:

14       Q.    What was that complaint?

15       A.    That an ASPC complex was insufficiently

16    staffed.

17       Q.    And who sent you that complaint?

18       A.    ADCRR.

19       Q.    What did you do when you received this?

20       A.    Forwarded the information to regional

21    leadership, immediately met with mental health

22    leadership.  That would consist of the regional psych

23    associates, the regional mental health director, regional

24    BHT, and we sat down and addressed the issue.

25       Q.    How did you address it?

103

1    Q.    What are the areas that you could use

2    additional support?

3    A.    Some of our outpatient settings, particularly

4    where we have a higher demand for service, higher acuity,

5    more complexity of care, some of those routinely

6    throughout the course of a year, some of those services

7    would definitely benefit from additional supports, and

8    that's where we're able to, again, flex staff to cover

9    that.  But, again, as we look at the data historically,

10   we have some areas that could use additional support.

11   Q.    Do you track whether healthcare staff is on

12   duty?

13   A.    I didn't hear the question, can you repeat,

14   please?

15   Q.    Yes.   Do you track whether healthcare staff is

16   on duty?

17   A.    Yes.

18   Q.    How do you do that?

19         MS. BARNES:   Form.

20         THE WITNESS:   We -- our department has a data

21   team and we track schedules.   We have a data team that

22   makes the schedule for each provider.   I believe we have

23   34, 35 providers, as far as nurse practitioners and

24   psychiatrists.   And so we know who is pretty much where

25   and what patients they're seeing, how often they're

1    seeing their patients.   So on a daily basis we know where

2    the providers are and what they're doing.

3    BY MS. COLBY:

4        Q.    Is there a notification if staff doesn't check

5    in as being on duty during a shift?

6        A.    Yes.

7        Q.    What do you do if you receive that

8    notification?

9        A.    Usually we are aware of the situation, whether

10   it's PDO, someone, you know, has an illness and the

11   providers are pretty responsible in contacting the mental

12   health lead, the facility health administrator, or myself

13   whenever they're not going to be in the office, but at a

14   time when that does not occur, I will personally call the

15   provider.

16           I have access to their personal numbers.  I

17   will call and make sure they're okay and healthy,

18   especially considering the pandemic.  We have had some

19   losses, unfortunately, and some very sick staff.  So

20   that's our first concern, is to reach out and make sure

21   they're okay.

22       Q.    Do mental healthcare staff ever work overtime?

23       A.    Yes.

24       Q.    Do you ever receive complaints from the staff

25   about overtime?

1      A.     No, I have not received any complaints directly

2   from staff.

3      Q.     Is there a process where they can submit any

4   grievances about overtime?

5      A.     Yes.

6      Q.     And who would receive those grievances?

7             MS. BARNES:  Form and foundation.

8             THE WITNESS:  Typically, to my knowledge, they

9   would, again, work with site leadership, whether that is

10  the mental health lead who is responsible for approving

11  schedules or BHT, psych associates, and contact the

12  facility health administrator.  And if that doesn't get

13  resolved, they would contact HR and/or the mental health

14  director.

15  BY MS. COLBY:

16     Q.     If a facility was having staffing vacancies

17  where they couldn't cover shifts, who would the facility

18  notify?

19     A.     The facility health administrator.

20     Q.     And what would the facility health

21  administrator do?

22            MS. BARNES:  Form and foundation.

23            THE WITNESS:  I can't speak to how they would

24  address that concern.

25  BY MS. COLBY:

**30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) - Vol. II - 10/19/2021**

106

1    Q.    Has anyone who works for ADC said to you

2    verbally or in writing that they think changes need to be

3    made to the staffing levels?

4    A.    No.

5    Q.    What about anyone at Centurion?

6    A.    No.

7    Q.    Have you heard that from any of the mental

8    healthcare staff?

9    A.    Yes.

10    Q.    What have you heard?

11    A.    Again, as a statewide psychiatric director, I

12    would like to believe that I'm pretty hands-on, whether

13    I'm in Yuma, Lewis Complex, Tucson Complex.  Staff, you

14    know, we have a pretty open relationship, so they share

15    their thoughts, they try to be creative, and help us

16    provide a comprehensive program.  And so it's not

17    uncommon for a mental health nurse or a psychology

18    associate to say, "Hey, Carr, I think we need more

19    staff."  Realistically, some of the things they are

20    wanting assistance with maybe time management, maybe

21    helping with prioritization.

22         That does not always mean that we just go out

23    and hire staff, because someone mentions "Hey, we need

24    more staff."  So in passing staff will make those

25    comments, but we'll sit down and talk about it and

**Hearsay without an exception, Rule 802**

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

107

Hearsay without an exception, Rule 802; incomplete, Rule 106

1    realistically look at the data to determine, yeah, we

2    need more troops on the ground, so to speak.

3        Q.    Have you heard those comments at all the

4    facilities or only some of them?

5        A.    I can't recall if it's been all.  It's

6    generally here or there, especially when we have our team

7    meetings and we talk about how staff is doing, staff

8    morale.  And, again, it's usually something that's

9    brought up, "we need more staff," and again, we'll break

10   that down.

11            But I can't recall if it's every facility that

12   I've been to.  I know, for example, Phoenix, things are

13   good at Phoenix right now.  The census of the inpatient

14   unit is low, so no one is really concerned about -- well,

15   I shouldn't say no one -- the site providers are doing

16   well, and so they have the support that they need.

17       Q.    You said earlier that you attend meetings with

18   ADC as a part of your job.  Correct?

19       A.    Correct.

20       Q.    Do you discuss staffing levels at those

21   meetings?

22       A.    No.

23       Q.    Do you discuss staffing allocations in

24   different facilities at those meetings?

25            MS. BARNES:  Can you repeat that question?  I

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

108

1   didn't hear that.

2   BY MS. COLBY:

3       Q.      Do you discuss staffing allocations at those

4   meetings to the different facilities?

5               MS. BARNES:   Form.

6               THE WITNESS:   I've been at this for two years,

7   so to the best of my rec- -- as I recall, I've had

8   conversations about some of the vacancies that we've had

9   for one or two years.   Like in Yuma, we did fill,

10  recently, the psychologist position at Yuma.   But prior

11  to then, we'd have conversations with ADCRR about what

12  are our efforts to fill that position, is there anything

13  more that ADCRR can do to help us fill those positions.

14              So that's really the nature of my conversations

15  with ADCRR, in terms of, "Hey, look, what are you doing

16  to fill these positions?   Do you need any additional

17  support to fill these positions?   Send us information

18  about what you're doing."

19              And sometimes they share information, "Hey,

20  look, I have a colleague that's a professor at Glendale

21  Community College or ASU, they have interns that are

22  looking for positions."   So we really collaborate to fill

23  these positions.

24  BY MS. COLBY:

25      Q.      So ADC helps you frequently with recruitment?

**30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -**
**Vol. II - 10/19/2021**

109

```
 1              MR. BOJANOWSKI:  Form.
 2              THE WITNESS:  It's a collaborative effort.
 3   When you say "frequently," it's not every day or every
 4   week we're having these discussions, but they show an
 5   interest in helping us retain and recruit staff.
 6   BY MS. COLBY:
 7      Q.   Aside from what you just mentioned with the
 8   interns, is there anything specifically that ADC does to
 9   help with recruitment?
10              MR. BOJANOWSKI:  Form, foundation.
11              THE WITNESS:  I -- I think their involvement
12   and support, it's help, right, it's asking the questions,
13   "What can we do?"  "What are we doing?"  I think it's
14   helpful.  That's all I have to say.
15   BY MS. COLBY:
16      Q.   Is Centurion having any problems filling mental
17   healthcare staffing positions?
18      A.   No.
19      Q.   Is it Centurion's position that all the
20   facilities are adequately staffed?
21              MS. BARNES:  Form, foundation.
22              THE WITNESS:  Repeat the question, please.
23   BY MS. COLBY:
24      Q.   Is it Centurion's position that all the
25   facilities are adequately staffed in terms of mental
```

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

110

1    healthcare staffing?

2           MS. BARNES:   Same objections.

3           THE WITNESS:   Yes.

4           MS. COLBY:   I'm going to mark this as

5    Exhibit 12.

6           (Marked for identification Exhibit 12.)

7           (The following testimony is Confidential

8        Information Pursuant to the Protective Order.)

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

1          So we have to be creative in addressing those

2     barriers, like using telehealth, working with on-site

3     leadership, to get the resources so we could utilize

4     telehealth, in Yuma particularly, as the psychologist.

5          Q.     Okay.   In this top e-mail, this is Bates

6     stamped 74732, Dr. Stallcup says, "I reached out to the

7     mental health director to see if you utilize registry

8     contract staff to fill mental health vacancies or not.   I

9     know they're used in other settings and can be a

10    lifesaver.   I know of several agencies that do a pretty

11    good job providing qualified mental health staff to fill

12    vacancies in correctional settings."

13          You testified earlier that you did use staffing

14    agencies to fill mental health vacancies.   Correct?

15          A.     Correct.

16          Q.     Which agencies do you use?

17          A.     I can't answer that.   I work with recruiting

18    and they present applicants.

19          Q.     And just to be clear, you testified earlier

20    that you believe that all of the facilities are

21    adequately staffed with mental healthcare staff?

22          A.     No.   You asked -- I think you asked the

23    question twice, and it really depends on the clinical

24    service that we're providing.   And so I did also admit

25    that some of our outpatient clinics could use additional

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) - Vol. II - 10/19/2021

115

1    supports.   In general, yes, but there are specific areas

2    of our care that we could use additional supports, again,

3    depending on the complexity of care.

4                Healthcare isn't a stagnant entity.   I mean, we

5    have to be flexible.   And at times we need more staff.

6    It does not mean we need more staff all the time.   We

7    have to be able to pivot and change things based on the

8    patients' needs.

9                MS. COLBY:   I'm going to mark one more exhibit

10   as Exhibit 10.   And if you can see, this is Bates stamped

11   78072.

12                (Marked for identification Exhibit 10.)

13   BY MS. COLBY:

14       Q.    I will give you a chance to read this bottom

15   e-mail.  Just let me know when you want me to move down.

16       A.    Okay.

17             Okay.

18       Q.    Do you recognize this e-mail?

19       A.    No.

20       Q.    This is an e-mail from Richard Watts.  Do you

21   know who that is?

22       A.    Yes.

23       Q.    And he's discussing inmate ███████  ███████.

24   Do you know who that is?

25       A.    Yes.

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

118

1    involved in supervising nursing performance.

2          Q.     Okay.  So then here on Bates stamped 78070 this

3    is your reply, and you say here, "Barriers to care,

4    collaboration, education, training, and communication

5    need to be addressed in order to implement a solid care

6    plan."

7                 Do any of those barriers to care relate to

8    increasing mental healthcare staffing?

9                 MS. BARNES:  Form.

10                MR. BOJANOWSKI:  Join.

11                THE WITNESS:  Repeat the question, please.

12   BY MS. COLBY:

13         Q.     So here you're discussing barriers to care

14   based on this incident.  Do any of those barriers to care

15   include increasing mental healthcare staffing?

16                MS. BARNES:  Form.

17                MR. BOJANOWSKI:  Join.

18                THE WITNESS:  Can you rephrase the question or

19   ask it in a different way?  I don't understand what

20   you're asking.

21   BY MS. COLBY:

22         Q.     Do you think that incidents such as this one in

23   this e-mail could be remedied by increasing mental

24   healthcare staffing?

25         A.     No.

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) - Vol. II - 10/19/2021

119

1      Q.      Why not?

2              MS. BARNES:   Form.

3              THE WITNESS:   Without -- I mean, we have to

4      discuss the particular details of this patient's care.

5      And, in general, and so without getting into those

6      details, I can't answer that question.   Those details

7      really aren't relevant to whether or not staffing is the

8      reason why we had barriers.   Because, as I mentioned

9      collaboration -- if you go back up to what I had

10     mentioned, please.   Where was it?

11     BY MS. COLBY:

12     Q.      Here.

13     A.      Yeah, so collaboration, education, training,

14     has really nothing to do with additional staff being

15     on-site.   So the collaboration, education, training, and

16     communication was pretty much targeted toward the staff

17     that were on-site.   Identified some things we need to do

18     to improve and to prevent a situation like this from

19     happening.   So having additional staff is not going to

20     change those things I had mentioned.

21     Q.      Do you know if there was any additional

22     education or training done after this incident?

23             MS. BARNES:   And I'm going to interject again

24     here, Mikaela.   This is specific questions about

25     particular training or discipline of a nurse that he's