## INDEX OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 1 | Ashley Pelton, Ph.D. |
| 2 | John Seddon Wilson, Ph.D., CCHP-MH, CQHQ |
| 3 | Antonio Carr, M.D. **(FILED UNDER SEAL)** |
| 4 | Wendy Michelle Orm, M.D. **(FILED UNDER SEAL)** |
| 5 | Johnny Wu, M.D. |

# EXHIBIT 1

# In The Matter Of:

*Parsons vs.*
*Shinn*

---

*Ashley Pelton, Ph.D.*
*October 6, 2021*

---

*Glennie Reporting Services, LLC*
*1555 East Orangewood Avenue*
*Phoenix, Arizona  85020*
*602.266.6535 Office     877.266.6535 Toll Free*
*www.glennie-reporting.com    office@glennie-reporting.com*

Original File 100621AP.txt
**Min-U-Script®**

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

VICTOR PARSONS; SHAWN JENSEN;        )
STEPHEN SWARTZ;DUSTIN BRISLAN;       )
SONIA RODRIGUEZ; CHRISTINA           )
VERDUZCO; JACKIE THOMAS; JEREMY      )
SMITH; ROBERT GAMEZ; MARYANNE        )
CHISHOLM; DESIREE LICCI; JOSEPH      )
HEFNER; JOSHUA POLSON; and           )
CHARLOTTE WELLS, on behalf of        )
themselves and all others           )
similarly situated; and ARIZONA     )
CENTER FOR DISABILITY LAW,           )
                                     )
            Plaintiffs,              )
                                     )Case No.
v.                                   )CV 12-00601-PHX-ROS
                                     )
DAVID SHINN, DIRECTOR, ARIZONA       )
DEPARTMENT OF CORRECTIONS,           )
REHABILITATION AND REENTRY; and      )
LARRY GANN, ASSISTANT DIRECTOR,      )
MEDICAL SERVICES CONTRACT            )
MONITORING BUREAU, ARIZONA           )
DEPARTMENT OF CORRECTIONS,           )
REHABILITATION AND REENTRY, in       )
their official capacities,          )
                                     )
            Defendants.              )

DEPOSITION OF ASHLEY PELTON, Ph.D.

Via Zoom Videoconference
October 6, 2021
9:00 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue         Prepared by:
Phoenix, Arizona 85020              Robin L. B. Osterode
602.266.6535                        CSR, RPR
www.glennie-reporting.com           CA CSR No. 7750
                                    AZ CR No. 50695

2

```
 1                          I N D E X

 2   WITNESS                                            PAGE

 3   ASHLEY PELTON, Ph.D.

 4            Examination by Mr. Fathi                    6

 5

 6

 7

 8                    INDEX TO EXHIBITS

 9   Description                                        Page
```

```
10   Exhibit 1   Curriculum vitae of Ashley Pelton,      14
                 M.A.; 4 pages
11
     Exhibit 2   Defendants' First Supplemental          29
12               Pretrial Disclosure Statement;
                 12 pages
13
     Exhibit 3   Document entitled "Parsons Named        42
14               Plaintiffs"; 1 page

15   Exhibit 4   Document entitled "Suicides in ADC      53
                 Custody, January 1, 2019 - present";
16               1 page

17   Exhibit 5   Document entitled "Files Reviewed       62
                 by Pablo Stewart"; 4 pages
18
     Exhibit 6   Bates stamped documents               158
19               ADCRRM0000069 - ADCRRM0000077

20   Exhibit 7   Bates stamped documents               161
                 ADCRRM0000122 - ADCRRM0000132
21
     Exhibit 8   Bates stamped documents               168
22               ADCRRM0000170 - ADCRRM0000183

23   Exhibit 9   Bates stamped documents                84
                 ADCRRM0019588 - ADCRRM0019591
24
     Exhibit 10 (Not marked in this deposition.)        --
25
```

3

1    INDEX (Continued):

2                        INDEX TO EXHIBITS
     Description                                          Page

3
     Exhibit 11 Document entitled "Continuous            180
4               Quality Improvement (CQI) CQI
                Meeting Attendance Sheet," dated
5               December 10, 2020; 8 pages

6    Exhibit 12 Bates stamped documents                  185
                ADCRRM0018560 - ADCRRM0018568
7
     Exhibit 13 (Not marked in this deposition.)          --
8
     Exhibit 14 Bates stamped documents                  187
9               ADCRRM00056541 - ADCRRM00056587

10   Exhibit 15 Document entitled "ADC                    223
                Institutional Capacity Committed
11              Population"; 3 pages

12

13

14
                  INSTRUCTION NOT TO ANSWER
15
                        Page      Line
16
                         30        16
17                       31         3
                         31        12
18                       48         3

19

20

21

22

23

24

25

4

1              DEPOSITION OF ASHLEY PELTON, Ph.D.

2              The deposition of ASHLEY PELTON, Ph.D., via

3    Zoom Videoconference, was taken on October 6, 2021,

4    commencing at 9:00 a.m., at Phoenix, Arizona, before

5    ROBIN L. B. OSTERODE, RPR, CSR, California Shorthand

6    Reporter No. 7750 and Arizona Certified Reporter

7    No. 50695.

8

9    APPEARANCES:

10   For Plaintiffs:

11        ACLU NATIONAL PRISON PROJECT
          By: David C. Fathi
12        915 15th Street N.W., 7th Floor
          Washington, D.C. 20005
13        (202) 548-6603
          dfathi@aclu.org
14        (Videoconference appearance.)

15        ACLU NATIONAL PRISON PROJECT
          By: Corene Kendrick
16        39 Drumm Street
          San Francisco, California 94111
17        (202) 393-4930
          ckendrick@aclu.org
18        (Videoconference appearance.)

19   For Defendants:

20        STRUCK LOVE BOJANOWSKI & ACEDO, PLC
          By: Anne M. Orcutt
21        3100 West Ray Road, Suite 300
          Chandler, Arizona 85226
22        (480) 420-1616
          aorcutt@strucklove.com
23        (Videoconference appearance.)

24

25

5

1    APPEARANCES (Continued):

2    For Nonparty Centurion, LLC and Deponent:

3         BROENING OBERG WOODS & WILSON, P.C.
          By: Sarah L. Barnes
4         2800 North Central Avenue, Suite 1600
          Phoenix, Arizona 85004
5         (602) 271-7793
          slb@bowwlaw.com
6         (Videoconference appearance.)

7    Also Present:

8         Jessica Carns
          (Videoconference appearance.)
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:21-cv-01009-DRS Document 44-1 Filed 11/22/21 Page 9 of 299

```
 1              Who was your supervisor in that position?

 2      A.      Eddie Taylor.

 3      Q.      And what was Dr. Taylor's job title?

 4      A.      He was the clinical director at the time.

 5      Q.      Okay.  And I called him Dr. Taylor, did he have

 6   a doctoral degree?

 7      A.      He did.

 8      Q.      He was the clinical director at what facility?

 9      A.      At Phoenix Complex.

10      Q.      Okay.  And as a psychologist, between

11   approximately September of 2019 and June or July of 2020,

12   at what facilities did you provide services?

13      A.      I provided services at Phoenix Complex, and I

14   also assisted at Florence Complex.

15      Q.      Did you assist at Florence Complex for the

16   entire term of your job as a psychologist, or did that

17   occur only at certain times?

18      A.      It was primarily toward the end.

19      Q.      And why were you providing assistance at the

20   Florence Complex at that time?

21      A.      In order to assist the facility with their

22   responsibilities, because they needed assistance with

23   another psychologist, as well as the individual who is in

24   the current lead position was transitioning out of the

25   company.
```

**Ashley Pelton, Ph.D. - 10/06/2021**

23

1      Q.      When you said they needed assistance, is that

2   because a position was vacant at the Florence Complex?

3              MS. ORCUTT:   Form.

4              THE WITNESS:   I believe there was a vacancy for

5   a psychology associate.

6   BY MR. FATHI:

7      Q.      And was that -- were you filling that vacancy

8   on a temporary basis?

9      A.      I wasn't filling the vacancy.   I was assisting.

10     Q.      Let me ask it a different way.   The Florence

11  Complex had its own psychologists and psych associates

12  assigned.   Correct?

13     A.      Correct.

14     Q.      So why were you asked to also perform services

15  at the Florence Complex?

16     A.      I believe at the time there was a vacancy for

17  psychology associates, and they needed assistance with

18  completing tasks, such as suicide watches.

19     Q.      Okay.  What was your next position beginning, I

20  guess, in approximately June or July of 2020?

21     A.      I was the lead psychologist at Florence

22  Complex.

23     Q.      And what dates did you hold that position?

24     A.      That would have been, I believe it was June or

25  July of 2020, to approximately July of -- hold on, I need

Ashley Pelton, Ph.D. - 10/06/2021

27

1      A.      Periodically.

2      Q.      On an average week when you -- when you had

3   this clinical director position, how many hours in an

4   average week would you provide direct patient care to

5   people at the Phoenix facility?

6      A.      One or two, if that.  It was primarily

7   supervisory.

8      Q.      And when you had this position on an average

9   week, how many hours would you spend providing direct

10  patient care at the Perryville facility?

11     A.      One, if that.

12     Q.      Were there ever any weeks when you didn't

13  provide any direct patient care?

14     A.      Yes.

15     Q.      Did that happen frequently?

16     A.      Yes.

17     Q.      During your period -- your employment with the

18  Arizona Department of Corrections, regardless of whether

19  you were employed by Corizon or Centurion, have you ever

20  given expert testimony?

21     A.      No.

22     Q.      Have you ever provided a written declaration

23  for use in a court case?

24     A.      Not that I'm aware of.

25     Q.      Who has your old job as clinical director over

28

1   Perryville and Phoenix?

2        A.    We just hired someone who is starting in

3   October -- or October 11th.

4        Q.    And what's that person's name?

5        A.    Dr. Cessna.

6        Q.    Can you spell that please?

7        A.    I believe it's C-e-s-s-n-a.

8        Q.    Okay.  So was that position vacant from August

9   until October of this year?

10            MS. BARNES:  Foundation.

11            THE WITNESS:  I assisted with the role.

12   BY MR. FATHI:

13        Q.    Okay.  But we'll get to that, but was anybody

14   officially in that position of clinical director between

15   the time you left in August and Dr. Cessna's anticipated

16   start date in October of this year?

17            MS. BARNES:  Foundation.

18            MS. ORCUTT:  Lacks foundation.

19            THE WITNESS:  No.

20   BY MR. FATHI:

21        Q.    And when you say you assisted with the role,

22   tell me about that.

23        A.    Yes, so I assist with the Phoenix and

24   Perryville complexes in terms of providing the clinical

25   director responsibilities on an ongoing basis.

29

1      Q.      So is your position as regional mental health

2  director a full-time job?

3      A.      Yes, it is.

4      Q.      And is the position of clinical director over

5  Phoenix and Perryville a full-time job?

6      A.      Yes.

7      Q.      And you've been doing both of those jobs for

8  the last couple of months?

9              MS. ORCUTT:   Form.

10             THE WITNESS:   Yes.

11             MR. FATHI:   Could we have Exhibit 2, please.

12             (Marked for identification Exhibit 2.)

13  BY MR. FATHI:

14     Q.      Showing you Exhibit 2, Dr. Pelton, have you

15  seen this document before?

16     A.      I can't tell from just looking at that, I'm

17  sorry.

18     Q.      Well, this is a document in which the

19  defendants in this case tell us about who is going to

20  testify and what they're going to testify about, and you

21  are discussed at pages 11 and 12.  So let's go to pages

22  11 and 12, please.

23     A.      Okay.

24     Q.      And would you please read, beginning where it

25  starts with your name on page 11, and on to page 12.  And

**Ashley Pelton, Ph.D. - 10/06/2021**

98

```
 1              THE WITNESS:  That is correct.
 2    BY MR. FATHI:
 3        Q.    And is it required that their degree be from an
 4    accredited university, their master's degree?
 5              MS. ORCUTT:  Form and foundation.
 6              THE WITNESS:  I'll have to refer to the
 7    licensing department.
 8    BY MR. FATHI:
 9        Q.    So you don't know?
10              MS. ORCUTT:  Form.
11              THE WITNESS:  Correct.  I do not know.
12    BY MR. FATHI:
13        Q.    Are all mental health professionals or psych
14    associates working in the Arizona Department of
15    Corrections licensed?
16              MS. ORCUTT:  Form, foundation.
17              THE WITNESS:  I do not believe so, no.
18    BY MR. FATHI:
19        Q.    Why does the Arizona Department of
20    Corrections -- or let me rephrase that -- why does
21    Centurion employ mental health professionals or psych
22    associates who are not licensed?
23              MS. ORCUTT:  Form and foundation.
24              THE WITNESS:  Can you repeat the question?  I'm
25    not sure what you mean.
```

Cumulative, Rule 403
Not cumulative; question was not previously answered. Rule 403.

1        Q.      So those are things that a licensed psych

2    associate can do, but an unlicensed psych associate

3    cannot do.   Correct?

4              MS. ORCUTT:   Form, foundation.

5              THE WITNESS:   Currently, that is what the

6    responsibilities of only licensed staff perform right

7    now.

8    **BY MR. FATHI:**

9        **Q.      And unlicensed staff cannot perform those**

10   **duties.   Correct?**

11             **MS. ORCUTT:   Form, foundation.**

12             **THE WITNESS:   Technically, an unlicensed staff**

13   **member could complete a mental health intake in order --**

14   **and then have a licensed staff review it; however, we**

15   **prefer to have a licensed staff complete a mental health**

16   **intake.**

17   BY MR. FATHI:

18       Q.      What about checks of people who are on watch,

19   is that something that unlicensed psych associates can

20   do?

21             MS. ORCUTT:   Form, foundation.

22             THE WITNESS:   We do not have unlicensed staff

23   see individuals for mental health watch counseling

24   sessions.

25   BY MR. FATHI:

Cumulative,
Rule 403

Not cumulative;
question was not
previously
answered. Rule
403.

**Ashley Pelton, Ph.D. - 10/06/2021**

108

1      MS. ORCUTT:  Form, foundation.

2      THE WITNESS:  I do not know.

3  BY MR. FATHI:

4      Q.    Do they have any interaction with patients?

5      MS. ORCUTT:  Form, foundation.

6      THE WITNESS:  I do not know.

7      MR. FATHI:  All right.  Let's go back to

8  Exhibit 2, please.

9      Q.    Before we get back to Exhibit 2, Doctor, are

10  you familiar with the term "behavioral health tech"?

11      THE WITNESS:  (Inaudible.)

12      THE REPORTER:  I'm sorry, I didn't hear that.

13      THE WITNESS:  Yes.

14  BY MR. FATHI:

15      Q.    What are the job duties of a behavioral health

16  tech?

17      MS. ORCUTT:  Form.

18      THE WITNESS:  Typically, a behavioral health

19  tech at the facility will assist with segregation visits,

20  welfare checks, group therapy, and assisting the patient

21  in any other needs.

22  BY MR. FATHI:

23      Q.    So it sounds like they do interact with

24  patients?

25      A.    That is correct.

Cumulative,
Rule 403

Not cumulative;
questions were
not previously
answered. Rule
403.

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**Ashley Pelton, Ph.D. - 10/06/2021**

Cumulative,
Rule 403

Not cumulative;
questions were
not previously
answered. Rule
403.

1     Q.    And you said, "Assist with group therapy."  Are

2  they assisting someone else who is running the group or

3  are they running the group?

4         MS. ORCUTT:  Form.

5         THE WITNESS:  Primarily they run the groups.

6  BY MR. FATHI:

7     Q.    And what are the minimum requirements to be a

8  behavioral health tech?

9         MS. ORCUTT:  Form, foundation.

10        THE WITNESS:  I'm not sure of the exact

11  credentialing.

12  BY MR. FATHI:

13    Q.    Are behavioral health techs required to have

14  any kind of license?

15        MS. ORCUTT:  Form and foundation.

16        THE WITNESS:  Not to my knowledge.

17  BY MR. FATHI:

18    Q.    Not to your knowledge or you don't know?

19        MS. ORCUTT:  Form.

20        THE WITNESS:  I don't know.

21  BY MR. FATHI:

22    Q.    Did you get that, Ms. Court Reporter?

23        THE REPORTER:  "I don't know."

24        MR. FATHI:  Thank you.

25        Let's go back to Exhibit 2, please.

**Ashley Pelton, Ph.D. - 10/06/2021**

114

```
 1                Do you understand that, Doctor?
 2       A.     Yes.
 3       Q.     Okay.  So have you ever heard anyone other than
 4   your counsel express the view that current mental health
 5   staffing levels in the Arizona Department of Corrections
 6   are insufficient to meet the needs of the prisoner
 7   population, either systemwide or at a particular complex
 8   or unit?
 9                MS. ORCUTT:  Form.
10                THE WITNESS:  Can you rephrase the question?
11                MS. BARNES:  You want him to rephrase it or
12   repeat it?
13                THE WITNESS:  Try repeating it first.
14   BY MR. FATHI:
15       Q.     Okay.  My question is, have you ever heard
16   anyone express to you that current staffing levels for
17   mental health are insufficient to meet the needs of the
18   Arizona prison population, either systemwide or in a
19   particular unit or complex?
20                MS. ORCUTT:  Form.
21                THE WITNESS:  I don't know about the word
22   "insufficient," but we have had fewer than optimal staff
23   at certain sites.  Correct?
24   BY MR. FATHI:
25       Q.     Okay.  Tell me what sites those are.
```

Leading;
Vague as to
"insufficient"

Leading is
permissible
with adverse
witness, Rule
611. Question
is not "vague"
and witness was
able to answer.

**Ashley Pelton, Ph.D. - 10/06/2021**

115

**Vague**

Question is not "vague" and witness was able to answer.

1          MS. ORCUTT:  Form.

2          THE WITNESS:  There's been a period of time

3   more recently at Eyman that has been shorter staffed.

4   BY MR. FATHI:

5      Q.   And when you say "shorter staffed," break that

6   down for me, if you would.

7          MS. ORCUTT:  Form.

8          THE WITNESS:  I'm not sure of the specific

9   numbers, but I know we were not fully staffed for mental

10  health.

11  BY MR. FATHI:

12     Q.   And what period of time are we talking about

13  here?

14         MS. ORCUTT:  Form.

15         THE WITNESS:  I'm not sure of the specifics,

16  but probably the last three to four months.

17  BY MR. FATHI:

**Hearsay, Rule 802**

18     Q.   And continuing to the present time?

19     A.   No, I would say -- I would say that they're

20  closer to staffed, or getting there, I should say.

21     Q.   Well, I'm sorry, I'm not sure I understand.

22  Are you saying that Eyman Mental Health is not fully

23  staffed?

24         MS. ORCUTT:  Form.

25         THE WITNESS:  It is not currently fully

**Ashley Pelton, Ph.D. - 10/06/2021**

118

| | |
|---|---|
| 1 | Q.    So these are permanent positions? |
| 2 | A.    That is correct. |
| 3 | Q.    And what about the psychologist who is starting |
| 4 | in the near future? |
| 5 | A.    That would be a permanent position. |

Hearsay,
Rule 802

| | |
|---|---|
| 6 | Q.    Okay.  What other complexes are having -- I |
| 7 | forget the term you used -- but not optimal staff -- I |
| 8 | don't want to put words in your mouth, but you said |
| 9 | there's some sites, so where else besides Eyman? |
| 10 | MS. ORCUTT:  Form. |
| 11 | THE WITNESS:  Right now, it would just be |
| 12 | Eyman, but they're becoming more fully staffed. |
| 13 | BY MR. FATHI: |
| 14 | Q.    So getting back to my original question, have |
| 15 | you ever heard anyone besides your counsel express the |
| 16 | view that the current mental health staffing is |
| 17 | insufficient to meet the needs of the Arizona prison |
| 18 | population, either at a certain facility or unit or |
| 19 | systemwide?  Have you ever heard anyone express that |
| 20 | view? |
| 21 | MS. ORCUTT:  Form. |
| 22 | MS. BARNES:  Form. |
| 23 | THE WITNESS:  I don't know. |
| 24 | BY MR. FATHI: |
| 25 | Q.    I'm sorry, have you ever heard anyone express |

Ashley Pelton, Ph.D. - 10/06/2021

125

1    Q.    How much -- I'm sorry?

2    A.    Depending on the complex, it ranges from -- by

3    position, anywhere from, I believe, 3,000 to 20,000.

4    Q.    And that applies to all mental health staff?

5          MS. ORCUTT:  Form.

6          THE WITNESS:  It depends on the specific

7    position.

8    BY MR. FATHI:

9    Q.    So is it your testimony that any new mental

10   health staff person joining Centurion and ADC will

11   receive a signing bonus?

*Hearsay, Rule 802*

12         MS. ORCUTT:  Form.

13         THE WITNESS:  I'm not sure about all positions,

14   but the positions that are, at times, more challenging to

15   hire do have sign-on bonuses.

*Hearsay, Rule 802*

16   BY MR. FATHI:

17   Q.    And which positions are those?

18   A.    Psychology associate positions, psychiatrist

19   positions, I believe, and psychologists.

20   Q.    And so your testimony is that those positions

21   are currently eligible for signing bonuses of, I think

22   you said, between 3,000 and $20,000?

*Hearsay, Rule 802*

23         MS. ORCUTT:  Form.

24         THE WITNESS:  That is my understanding.

*Hearsay, Rule 802*

25   BY MR. FATHI:

**Ashley Pelton, Ph.D. - 10/06/2021**

126

1    Q.    And how sure are you about that?

2          MS. ORCUTT:  Form.

3          THE WITNESS:  I'm not as sure on the

4    psychiatrist piece, since I don't hire psychiatrists, but

5    in terms of psych associates, I'm sure about.

6    BY MR. FATHI:

7    Q.    And you said conversations -- you said there

8    have been conversations about needing more staff.  You've

9    talked about Eyman.  Have there been conversations about

10   needing more staff at other facilities?

11         MS. ORCUTT:  Form.

12   BY MR. FATHI:

13   Q.    And, again, I'm talking about mental health

14   staff.

15   A.    Mental health staff?

16   Q.    Yes.

17   A.    Yes.

18   Q.    Which facilities?

19   A.    In the more recent, Tucson staff.

20   Q.    Uh-huh.  Okay.  Tell me about Tucson.

21         MS. ORCUTT:  Form.

22         THE WITNESS:  There have been some individuals

23   out for medical reasons, therefore, needing additional

24   support.

25   BY MR. FATHI:

**Vague**

Question is not
"vague" and
witness was able
to answer.

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**Ashley Pelton, Ph.D. - 10/06/2021**

127

```
1        Q.     Uh-huh.  What positions were those people who
2   were out for medical reasons?
3               MS. ORCUTT:  Form, foundation.
4               THE WITNESS:  To my knowledge, behavioral
5   health techs and a psychologist.
6   BY MR. FATHI:
7        Q.     So a total of how many positions?
8               MS. ORCUTT:  Form.
9               THE WITNESS:  I'm aware of three.
10  BY MR. FATHI:
11       Q.     So one psychologist and two behavioral health
12  techs?
13              MS. ORCUTT:  Form.
14              THE WITNESS:  Those are three that I'm aware
15  of.
16  BY MR. FATHI:
17       Q.     And what was done to fill those positions?
18              MS. ORCUTT:  Form.
19              THE WITNESS:  We've had people from across the
20  state assist with those responsibilities that are needed
21  and go to the site.
22  BY MR. FATHI:
23       Q.     So those are people who already have jobs
24  working in mental health at other complexes going to
25  Tucson to assist; is that right?
```

**Ashley Pelton, Ph.D. - 10/06/2021**

128

1          MS. ORCUTT:   Form.

2          THE WITNESS:   That is correct, in terms of the

3   immediate need.

4   BY MR. FATHI:

5      Q.   Other complexes where there have been -- you've

6   heard discussions about needing more staff?

7          MS. ORCUTT:   Form.

8          THE WITNESS:   Potentially Perryville.   We've

9   had discussions about wanting more psychologists.

10   BY MR. FATHI:

11      Q.   Uh-huh.   And why do you want more psychologists

12   at Perryville?

13          MS. ORCUTT:   Form.

14          THE WITNESS:   To continue to work with our

15   mental health population.

16   BY MR. FATHI:

**Hearsay, Rule 802**

17      Q.   What would those additional psychologists do

18   that isn't being done now, if you were to get them?

19          MS. ORCUTT:   Form.

**Hearsay, Rule 802**

20          THE WITNESS:   I think just continue to improve

21   and, as always, just focus on individualized treatment

22   like we do.

23   BY MR. FATHI:

**Hearsay, Rule 802**

24      Q.   So what specific concrete tasks would be

25   getting done that aren't being done now, if you were to

**Ashley Pelton, Ph.D. - 10/06/2021**

129

**Hearsay, Rule 802**

1  get these additional psychologists?

2           MS. ORCUTT:  Form.

**Hearsay, Rule 802**

3           THE WITNESS:  I don't know that nothing is -- I

4  don't know that anything is not getting done.  It would

5  just be additional support.

6  BY MR. FATHI:

**Hearsay, Rule 802**

7      Q.     Do you believe that the current mental health

8  staffing levels are sufficient to meet the needs of the

9  Arizona prison population?

10          MS. ORCUTT:  Form, foundation.

**Hearsay, Rule 802**

11          THE WITNESS:  I think they're sufficient,

12  uh-huh.

13  BY MR. FATHI:

14     Q.     And how did you come to that conclusion?

15     A.     Just knowing the caseload across the state and

16  just discussion with the leads.

17     Q.     And that includes at the facilities you've

18  never visited.  Correct?

19          MS. ORCUTT:  Form.

20          THE WITNESS:  That would be including those,

21  yes, because I meet with them as well.

22  BY MR. FATHI:

23     Q.     Did you conduct any kind of staffing study?

24          MS. ORCUTT:  Form.

25          THE WITNESS:  I have not.

**Ashley Pelton, Ph.D. - 10/06/2021**

132

```
 1   BY MR. FATHI:

 2       Q.    And when was the time before that?

 3       A.    The previous Monday, I briefly reviewed them.

 4       Q.    And how many statewide vacancies in mental

 5   health staff were there when you reviewed this last

 6   Monday?

 7             MS. ORCUTT:  Form.

 8             THE WITNESS:  I'm not sure of the ac- -- the

 9   exact number.

10   BY MR. FATHI:

11       Q.    What is your role in the recruitment of mental

12   health staff?

13       A.     In terms of recruiting, I assist with

14   interviewing the psychologists.  I try to assist with any

15   mental health lead positions.  When I'm available, I meet

16   with the mental health leads, as needed, in terms of

17   discussing any interviews that were conducted.

18       Q.    When was the last time you participated in an

19   interview for a potential mental health staff member?

20       A.    I'd have to look at my schedule for specifics,

21   but I believe -- I interviewed some psychologists last

22   week.

23       Q.    So how many interviews did you sit in on last

24   week for psychologists?

25       A.    Again, without looking at my schedule, I
```

Hearsay,
Rule 802

**Ashley Pelton, Ph.D. - 10/06/2021**

133

Hearsay,
Rule 802

1    believe three.

2         Q.      And when was the last time before that that you

3    sat in on interviews for mental health staff?

4              MS. ORCUTT:  Form.

Hearsay,
Rule 802

5              THE WITNESS:  Without looking at my schedule

6    for specifics, I've sat in on psych associates and BHTs

7    within the last few weeks.

8    BY MR. FATHI:

Hearsay,
Rule 802

9         Q.      In addition to the three psychologists you

10   testified you sat in on last week?

11        A.      Correct.  So it would have been -- within the

12   last month, I know I've sat in on quite a few psych

13   associates and BHTs.

14        Q.    So how many hours in an average week do you

15   spend in interviewing prospective mental health staff?

16              MS. ORCUTT:  Form.

17              THE WITNESS:  It depends on the week.

18   BY MR. FATHI:

19        Q.    Well, I'm asking for an average week.

20        A.    An average depends on the applicants and the

21   number of applicants we get.  So I try to schedule --

22   especially since I do the psychologist positions, I try

23   to get them scheduled within the same week, depending on

24   the applicant's schedule.  As of right now, about maybe

25   one to two hours, at most.

**Ashley Pelton, Ph.D. - 10/06/2021**

134

1      Q.      Are there any weeks where you don't participate
2  in any interviews of prospective mental health staff?
3              MS. ORCUTT:   Form.
4              THE WITNESS:  I believe so.
5  BY MR. FATHI:
6      Q.      Are you aware, Doctor, that the Court has
7  entered various orders about the minimum duration of
8  mental health visits in this case?
9              MS. ORCUTT:   Form.
10             THE WITNESS:  Yes.
11  BY MR. FATHI:
12     Q.      Does Centurion or ADC currently have any policy
13  regarding the minimum duration of mental health
14  encounters?
15             MS. ORCUTT:   Form.
16             THE WITNESS:  Not sure if it's necessarily
17  written into policy, but we meet with everyone for
18  individual therapy for 30 minutes for individual
19  counseling, and then a minimum of 10 minutes for suicide
20  watch contacts.
21  BY MR. FATHI:
22     Q.      And you're saying you don't believe that's
23  written down anywhere?
24             MS. ORCUTT:   Form.
25             THE WITNESS:  I don't know that it's written in

**Ashley Pelton, Ph.D. - 10/06/2021**

1      an actual policy.

2   BY MR. FATHI:

3        Q.    And how are those minimum durations enforced?

4   How do you satisfy yourself that staff are abiding by

5   those minimum durations?

6               MS. ORCUTT:  Form.

7               THE WITNESS:  Our people who do scheduling and

8   complete the scheduling lists review.

9   BY MR. FATHI:

10       Q.    Review what?

11       A.    Review the charts to see whether or not people

12  were seen within 10 minutes or 30 minutes.  And then if

13  it's not seen within that time frame, we attempt, to the

14  best of our ability, to track if the refusal is entered

15  in the chart, so we do periodic chart reviews.

16       Q.    I see.

17             Has any staff member ever been subject to any

18  discipline or corrective action for not abiding by these

19  minimum durational requirements?

20             MS. ORCUTT:  Form, foundation.

21             THE WITNESS:  I'm not sure, just given that I'm

22  not included on every single write-up.

23  BY MR. FATHI:

24       Q.    Okay.  So your answer is you don't know?

25       A.    I don't know.

**Ashley Pelton, Ph.D. - 10/06/2021**

139

1          MS. BARNES:  And I would like to take -- I

2     would like to take a pause before your next question, and

3     I would like the court reporter to please read back her

4     answer prior to that, please.

5               (Record read.)

6          MS. BARNES:  Thank you.

7     BY MR. FATHI:

8          Q.     Dr. Pelton, in your view, is a three-minute

9     encounter sufficient to assess a patient's risk of

10    self-harm or suicide?

11              MS. ORCUTT:  Form.

12              THE WITNESS:  It's not optimal, but again, I

13    would say that you could obtain enough information to

14    support that they're not a current danger to themselves

15    or other people.

16    BY MR. FATHI:

17         Q.     In a three-minute encounter?

18         A.     Correct.

19         Q.     Dr. Pelton, in your view, is a one-minute

20    encounter sufficient to assess a patient's risk of

21    self-harm or suicide?

22              MS. ORCUTT:  Form.

23              THE WITNESS:  It's not going to be optimal, but

24    again, there's going to be situations where you could

25    make a definitive answer that they're going to be a

Calls for
speculation;
Vague

Question was
not "vague,"
and witness was
able to answer.
Question called
for witness's
professional
judgment, not
speculation.

**Calls for speculation; Vague**

Question was not "vague," and witness was able to answer. Question called for witness's professional judgment, not speculation.

1    danger to themselves and other people.

2    BY MR. FATHI:

3        Q.    In your view, is a one-minute encounter

4    sufficient to determine that a patient is not at risk of

5    self-harm or suicide?

6            MS. ORCUTT:   Form.

7            THE WITNESS:   Again, it's not going to be

8    optimal, but I do believe that there are situations that

9    within a one-minute encounter you could obtain enough

10   information to indicate that they're not currently a

11   danger to themselves or other people.

12   BY MR. FATHI:

13       Q.    In your opinion, is a 30-second encounter

14   sufficient to determine that a patient is not at risk of

15   self-harm or suicide?

16           MS. ORCUTT:   Form.

17           THE WITNESS:   Again, I'd have to know the

18   specifics on a situation.   Again, it's not going to be

19   optimal.

20   BY MR. FATHI:

21       Q.    I'm asking you is it ever -- in your view, is a

22   30-second encounter ever sufficient to determine that a

23   patient is not at risk of self-harm or suicide?

24           MS. ORCUTT:   Form.

25           THE WITNESS:   I'd have to know more specifics

Ashley Pelton, Ph.D. - 10/06/2021

141

**Calls for speculation; Vague**

Question was not "vague," and witness was able to answer. Question called for witness's professional judgment, not speculation.

**Relevance, Rule 402**

**Waste of time and cumulative, Rule 403**

Duration of mental health encounters is at issue. Rule 401, 402. Not cumulative; questions were not previously answered. Rule 403. Question called for witness's professional judgment, not speculation.

1     about the situation.

2   BY MR. FATHI:

3       Q.    So your testimony is that it could be

4   sufficient; is that right?

5           MS. ORCUTT:   Form.

6           THE WITNESS:   It could be, depending on the

7   situation.

8   BY MR. FATHI:

9       Q.    Okay.  Doctor, is a 15-second mental health

10  encounter sufficient to determine that a patient is not

11  at risk of self-harm or suicide?

12          MS. ORCUTT:   Form.

13          THE WITNESS:   I mean, I would -- I would say

14  that people need to meet with someone more than

15  15 seconds.

16  BY MR. FATHI:

17      Q.    Okay.  Could you answer my question?

18          MS. ORCUTT:   Form.  She did.

19          THE WITNESS:   I would say it's not optimal.

20  Everyone has different clinical judgment, but I would say

21  that they need to have -- they have clinical information

22  and base it on that clinical information.

23  BY MR. FATHI:

24      Q.    Is a 15-second encounter sufficient to

25  determine that a patient is not at risk of self-harm or

Relevance, Rule 402

Waste of time and cumulative, Rule 403
Duration of mental health encounters is at issue. Rule 401, 402. Not cumulative; questions were not previously answered. Rule 403. Question called for witness's professional judgment, not speculation.

1    suicide?

2              MS. ORCUTT:   Form.   Asked and answered.

3              THE WITNESS:   I would say it would depend on

4    the situation and what clinical information was given.

5    BY MR. FATHI:

6        Q.    So your testimony is there are circumstances

7    where a 15-second encounter could be sufficient to

8    determine that the patient is not at risk of self-harm or

9    suicide?

10             MS. ORCUTT:   Form.

11             THE WITNESS:   I would have to review the

12   situation and specifics to better understand what's going

13   on with the person.

14   BY MR. FATHI:

15       Q.    But your testimony is that 15 seconds could be

16   sufficient?

17             MS. ORCUTT:   Form.   Asked and answered.

18             THE WITNESS:   I think it's possible that that

19   could be, but again, without knowing specifics of the

20   situation.

21             MR. FATHI:  All right.   Can we go back to

22   Exhibit 2, please.   All right.   Page 12, please.

23       Q.    All right.   Starting on line 11, Doctor, it

24   says, "Dr. Pelton will also testify regarding continuous

25   improvements in the delivery of mental healthcare and

**Ashley Pelton, Ph.D. - 10/06/2021**

143

```
 1    programming to the ADCRR inmate population."

 2            Do you see that?

 3    A.    I do.

 4    Q.    What improvements are you going to be

 5    testifying about at the trial of this matter?

 6            MS. BARNES:  Form.

 7            MS. ORCUTT:  Form.

 8            THE WITNESS:  I'm not sure -- I don't know

 9    specifically.

10    BY MR. FATHI:

11    Q.    Can you tell me any of the improvements you're

12    going to be testifying to at the trial of this matter?

13            MS. ORCUTT:  Form.

14            THE WITNESS:  I don't necessarily know what I'm

15    going to specifically testify to, but I can say that

16    we're continuously improving our mental health

17    programming across the state.

18    BY MR. FATHI:

19    Q.    Okay.  How are you continuously improving

20    mental health programming across the state?

21    A.    I have people working with different mental

22    health programs that we specifically -- or have in place

23    right now, in terms of the specific group therapy that

24    we're providing, how we can continuously provide care for

25    those who need more assistance.  We're always looking to
```

Hearsay,
Rule 802

Ashley Pelton, Ph.D. - 10/06/2021

144

**Hearsay, Rule 802**

1    improve our inpatient programming in terms of the

2    evidence-based treatment that we provide in terms of our

3    process and making sure the incarcerated individuals have

4    the care that they need.

5        Q.    Uh-huh.  Okay.  The improvements in group

6    therapy, where would I find those written down?

7            MS. ORCUTT:  Form.

8            THE WITNESS:  Where would you find it written

9    down?

10   BY MR. FATHI:

11       Q.    Yeah.  Your testimony is that this is a -- I

12   think your testimony is that this is an effort currently

13   underway to improve group therapy, so where would the

14   plan for those improvements be written down?

15           MS. ORCUTT:  Form.

16           THE WITNESS:  They're not currently written

17   down.

18   BY MR. FATHI:

19       Q.    I see.  And your plans for the improvement of

20   inpatient programming, where would I find those written

21   down?

22           MS. ORCUTT:  Form.

23           THE WITNESS:  It's not written down.

24   BY MR. FATHI:

25       Q.    Is there any documentation at all about any of

Ashley Pelton, Ph.D. - 10/06/2021

1          THE WITNESS:  I don't know.

2    BY MR. FATHI:

3          Q.     When a person is on suicide watch or mental

4    health watch, are they ever let out of their cell for

5    recreation or exercise?

6               MS. ORCUTT:  Form.

7               THE WITNESS:  Yes.

8    BY MR. FATHI:

9          Q.     Is everyone on watch let out for recreation or

10   exercise or is it a case-by-case determination?

11              MS. ORCUTT:  Form.

12              MS. BARNES:  Foundation.

13              THE WITNESS:  So all of our -- we follow the

14   mental health watch guidelines set by ADCRR, so I'd have

15   to reference that in terms of who is allowed recreation,

16   and then we also, in addition to that, evaluate

17   individual needs in terms of if they're too much of a

18   danger to go to recreation or -- but we try our best to

19   make sure everyone is entitled to recreation.

20   BY MR. FATHI:

21         Q.     Okay.  But as I understand your testimony, some

22   people on watch get out for recreation, but some don't;

23   is that right?

24              MS. ORCUTT:  Form.

25              THE WITNESS:  I think that would be an accurate

Ashley Pelton, Ph.D. - 10/06/2021

147

1    statement.
2    BY MR. FATHI:
3         Q.    Okay.  So who decides?
4               MS. ORCUTT:  Form, foundation.
5               THE WITNESS:  First and foremost, it would go
6    off of the ADCRR watch guidelines.
7    BY MR. FATHI:
8         Q.    And is that a document that you're referring
9    to?
10        A.    Yes.
11        Q.    But concretely, if you're there in the watch
12   unit and Patient Smith is on watch, who decides if he
13   gets out for rec or doesn't get out for rec?  Is that a
14   mental health decision or is that a custody decision?
15              MS. ORCUTT:  Form, foundation.
16              THE WITNESS:  I would say overall it's a
17   combination of the two.  I would say that we work
18   together between mental health and the security staff in
19   terms of what's best for the incarcerated individual.
20   BY MR. FATHI:
21        Q.    And what if mental health and security staff
22   disagree?  Who decides?
23              MS. ORCUTT:  Form.
24              THE WITNESS:  I would say, at the end of the
25   day, ADCRR's our client, so we do the -- we go with what

**Ashley Pelton, Ph.D. - 10/06/2021**

1    they'd like to do.

2    BY MR. FATHI:

3        Q.    Okay.  So if Patient Smith is on watch and the

4    mental health person thinks he should get out for rec and

5    custody thinks he shouldn't, then he doesn't go out for

6    rec; is that right?

7              MS. BARNES:  Foundation.

8              MS. ORCUTT:  Form.

9              THE WITNESS:  I would have to say it depends on

10   the situation, so --

11   BY MR. FATHI:

12       Q.    I'm sorry, Doctor.  I thought you said that if

13   security and mental health disagree, that security made

14   the decision.  Did I misunderstand?

15             MS. ORCUTT:  Form.

16             THE WITNESS:  I mean, at the end of the day,

17   security is responsible for security and removing the

18   person from the cell.  So, yes, it's a combination, but

19   at the end of the day, yes, ADCRR would make the final

20   determination.

21   BY MR. FATHI:

22       Q.    Okay.  So if someone doesn't get out of their

23   watch cell for rec, do they ever get out of the cell at

24   all?

25             MS. ORCUTT:  Form.

**Ashley Pelton, Ph.D. - 10/06/2021**

152

1    Q.    I'm sorry, I thought that was your testimony.
2    Didn't you testify that some people on watch don't get
3    out for rec?  Correct?
4              MS. ORCUTT:  Form.
5              THE WITNESS:  There are certain situations for
6    individual days that they do not get out for rec.
7    BY MR. FATHI:
8    Q.    And you just testified that some people don't
9    get out for individual counseling.  Correct?
10             MS. ORCUTT:  Form.
11             THE WITNESS:  It's not going to be an absolute.
12   It will be situational based, so it's assessed daily.
13   BY MR. FATHI:
14   Q.    But there are some days that people on watch
15   don't get out of their cells for individual counseling.
16   Correct?
17   A.    Correct.
18   Q.    Is there any policy limiting how long a patient
19   can be continuously on watch?
20             MS. ORCUTT:  Form.
21             THE WITNESS:  Not to my knowledge, but we do
22   our best to get people off watch as soon as possible.
23   BY MR. FATHI:
24   Q.    Doctor, I'd really be grateful if you listen to
25   my questions and answer my question.  My question was, is

*Hearsay, Rule 802; Relevance, Rule 402*

*Incomplete, Rule 106; Asked and answered; Waste of time and cumulative, Rule 403*

**Ashley Pelton, Ph.D. - 10/06/2021**

Asked and answered; Waste of time and cumulative, Rule 403

"Incomplete" objection is meaningless; Defendants can counter-designate. Not cumulative; questions were not previously answered. Rule 403.

1  there a policy limiting how long a patient can be

2  continuously on watch?

3           MS. ORCUTT:   Form.

4           THE WITNESS:   Not to my knowledge.

5  BY MR. FATHI:

6      Q.    What's the longest you're aware of a patient

7  being continuously on watch?

8           MS. ORCUTT:   Form.

9           THE WITNESS:   Historically, I don't know.  I

10  know there's been people on watch for a long period of

11  time.

12  BY MR. FATHI:

13     Q.    How long?

14           MS. ORCUTT:   Form.

15           THE WITNESS:   I don't know of any specifics.

16  BY MR. FATHI:

17     Q.    I'm asking what's the longest that you're aware

18  of.

19           MS. ORCUTT:   Form.

20           THE WITNESS:   Again, I don't know the

21  specifics, but I know there's people that have been on

22  watch for months.

23  BY MR. FATHI:

24     Q.    Months?

25     A.    Uh-huh.

Ashley Pelton, Ph.D. - 10/06/2021

154

```
 1            MS. BARNES:  Is that a yes?  You can't say
 2    "uh-huh."
 3            THE WITNESS:  Oh, sorry.
 4            Yes, there's been people living on watch for
 5    months.
 6    BY MR. FATHI:
 7       Q.   Okay.  Are you ever aware of people on watch
 8    being not offered out-of-cell counseling because there
 9    weren't enough security staff?
10            MS. ORCUTT:  Form, foundation.
11            THE WITNESS:  I'm sorry.  I missed the last
12    part of the question.
13    BY MR. FATHI:
14       Q.   My question is, are you aware of it ever
15    happening that someone on watch was not offered
16    out-of-cell counseling because there wasn't sufficient
17    security staff to bring them out of the cell and
18    supervise them?
19            MS. ORCUTT:  Form, foundation.
20            THE WITNESS:  I believe I -- I believe there's
21    been situations.
22    BY MR. FATHI:
23       Q.   At what facilities are you aware of that
24    happening?
25            MS. ORCUTT:  Form.
```

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**Ashley Pelton, Ph.D. - 10/06/2021**

155

1            THE WITNESS:  I believe there was a situation

2    at Phoenix.

3    BY MR. FATHI:

4        Q.     Any other facilities?

5            MS. ORCUTT:  Form.

6            THE WITNESS:  I'm not aware of any specifics.

7    BY MR. FATHI:

8        Q.     How about generalities?

9            MS. ORCUTT:  Form.

10            THE WITNESS:  I can't think of even any

11   generalities that I can speak to.

12   BY MR. FATHI:

13        Q.     Are you aware of this ever happening at

14   Phoenix, where people on watch were not taken out for

15   counseling because there wasn't sufficient security staff

16   to escort them?

17            MS. ORCUTT:  Form.

18            THE WITNESS:  Yes, I believe there has been

19   some situations.

20   BY MR. FATHI:

21        Q.     Okay.  Any other facilities where you're aware

22   of this happening?

Hearsay, Rule 802

23            MS. ORCUTT:  Form.

24            THE WITNESS:  I can't think of any specific

25   cases.

Hearsay, Rule 802

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**Ashley Pelton, Ph.D. - 10/06/2021**

156

Cumulative, Rule 403

Not cumulative; questions were not previously answered. Rule 403.

1   BY MR. FATHI:

2       Q.      Doctor, what is a psychological autopsy?

3               MS. ORCUTT:   Form.

4               THE WITNESS:   A psychological autopsy is

5   essentially an evaluation after an individual has been

6   ruled a suicide.   It's essentially a re-creation of the

7   situation, the events that led up to the situation.

8   BY MR. FATHI:

9       Q.      The events that led up to the death by suicide?

10      A.      Correct.

11      Q.      And what is the purpose of a psychological

12  autopsy?

13              MS. ORCUTT:   Form.

14              THE WITNESS:   The purpose of the autopsy is

15  essentially to determine if there's any corrective action

16  that needs to take and any improvements that we can make

17  in terms of providing care.

18  BY MR. FATHI:

19      Q.      And does the psychological autopsy sometimes

20  have recommendations that are made?

21              MS. ORCUTT:   Form.

22              THE WITNESS:   Yes.

23  BY MR. FATHI:

24      Q.      And what is the purpose of those

25  recommendations?

Cumulative,
Rule 403

Not cumulative;
questions were
not previously
answered. Rule
403.

```
 1              MS. ORCUTT:  Form.
 2              THE WITNESS:  To review to see if there's
 3  anything that we can do better going forward, in terms of
 4  healthcare.
 5  BY MR. FATHI:
 6       Q.    When you were the -- at Phoenix, was your title
 7  clinical director or mental health director?
 8       A.    Clinical director.
 9       Q.    In that position, did you have any role in the
10  preparation of psych autopsies?
11              MS. ORCUTT:  Form.
12              THE WITNESS:  As the clinical director, no --
13  or rephrase the question.
14  BY MR. FATHI:
15       Q.    In your position as clinical director at
16  Phoenix, did you have any role in the preparation of
17  psych autopsies?
18       A.    As a psychologist, I completed a psychological
19  autopsy while in that position.
20       Q.    In your current position as mental health
21  director, do you have any role in the preparation of
22  psych autopsies?
23              MS. ORCUTT:  Form.
24              THE WITNESS:  I assist with the signing of
25  psychologists to complete the psych autopsy and I also
```

**Ashley Pelton, Ph.D. - 10/06/2021**

```
1    review it.
2              MR. FATHI:  All right.  Let's look at
3    Exhibit 6, please.
4              (Marked for identification Exhibit 6.)
5    BY MR. FATHI:
6         Q.    Doctor, showing you Exhibit 6, which is the
7    psychological autopsy of Patrick Pruitt, who died by
8    suicide on August 5th of 2020, have you seen this
9    document before?
10        A.    Yes.
11        Q.    And it says on the first page that you
12   completed this psych autopsy; is that accurate?
13        A.    Yes.
14        Q.    And did you do it on or about September 4th of
15   2020?
16        A.    Correct.
17        Q.    Tell me how you went about completing this
18   report.
19             MS. ORCUTT:  Form.
20             THE WITNESS:  I reviewed Mr. Pruitt's record, I
21   spoke to CIU, and I reviewed the detentional record as
22   well.
23             MR. FATHI:  Okay.  Can we go to page 76,
24   please, using the Bates number, and maybe blow it up a
25   little.  Okay.  Scroll up a little bit, please.  Sorry,
```

Foundation,
Rule 901

Incomplete,
Rule 106

Witness testified
that she created
the document.
Document has
been admitted
(Exhibit 381).
"Incomplete"
objection is
meaningless;
Defendants can
counter-
designate.

other direction. All right. Thank you.

Q. Doctor, do you see the section that says "Recommendations"?

A. Uh-huh, yes.

Q. Did you write those recommendations?

A. Yes.

Q. Okay. So the first recommendation is, "Reevaluate inmate's access to after-hours jobs without supervision."

Do you see that, Doctor?

A. Yes.

Q. What has been done to implement that recommendation?

MS. ORCUTT: Form.

MS. BARNES: Foundation.

THE WITNESS: I don't have access to that information, or I did not at the time.

BY MR. FATHI:

Q. Has anything been done to implement this recommendation?

MS. ORCUTT: Form, foundation.

THE WITNESS: I don't know.

BY MR. FATHI:

Q. The second recommendation is, "Additional access to substance abuse treatment." What has been done

Foundation; Lacks personal knowledge, Rule 602

Waste of time, Rule 403

Witness testified that she created the document. Witness's lack of knowledge is itself evidence. Not cumulative/ waste of time; questions were not previously answered. Rule 403.

**Ashley Pelton, Ph.D. - 10/06/2021**

160

Foundation;
Lacks
personal
knowledge,
Rule 602;

Waste of
time and
cumulative,
Rule 403

Witness testified
that she created
the document.
Witness's lack
of knowledge is
itself evidence.
Not cumulative;
questions were
not previously
answered. Rule
403.

1   to implement this recommendation?

2          MS. ORCUTT:   Form and foundation.

3          THE WITNESS:   I'm not sure of the specifics,

4   but I know that majority of our sites provided substance

5   abuse treatment through ADCRR.

6   BY MR. FATHI:

7      Q.    Well, the recommendation is additional access

8   to substance abuse treatment, so do incarcerated people

9   now have more access to substance abuse treatment than

10  they did as of the date of this report?

11         MS. ORCUTT:   Form, foundation.

12         THE WITNESS:   I don't know the specifics.

13  BY MR. FATHI:

14     Q.    Has anything been done to implement this

15  recommendation?

16         MS. ORCUTT:   Form, foundation.

17         THE WITNESS:   I don't know the specifics.

18  BY MR. FATHI:

19     Q.    I'm sorry.  I don't understand that answer.

20     A.    I -- I was not in -- I was not in this role as

21  the mental health director, so I don't have a clear

22  understanding of the substance abuse treatment that was

23  provided before Mr. Pruitt's being deceased and after.

24     Q.    Okay.  Well, tell me what has been done to

25  implement this recommendation number 2.

**Ashley Pelton, Ph.D. - 10/06/2021**

161

Foundation;
Lacks
personal
knowledge,
Rule 602

Waste of
time and
cumulative,
Rule 403

Witness testified
that she created
the document.
Witness's lack
of knowledge is
itself evidence.
Not cumulative;
questions were
not previously
answered. Rule
403.

1    MS. ORCUTT:   Form, foundation.   Asked and
2    answered.
3    THE WITNESS:   I don't know the specifics of
4    what has been done.
5    BY MR. FATHI:
6    Q.   Has anything been done to implement this
7    recommendation?
8    MS. ORCUTT:   Form, foundation.   Asked and
9    answered.
10   THE WITNESS:   I'm not sure about what has been
11   done.   I don't know the specifics.
12   BY MR. FATHI:
13   Q.   Do you know if anything has been done to
14   implement this recommendation?
15   MS. ORCUTT:   Form, foundation.   Asked and
16   answered.
17   THE WITNESS:   I'm not sure.   I don't know.
18   MR. FATHI:   Okay.   Exhibit 7, please.
19   (Marked for identification Exhibit 7.)
20   BY MR. FATHI:
21   Q.   Exhibit 7 is the psychological autopsy of David
22   Crawford, who died by suicide on May 31st, 2021.
23   Have you seen this document, Doctor?
24   A.   Yes.
25   Q.   All right.   Let's go to the last page, please.

Document has
been admitted
(Exhibit 218).

Foundation,
Rule 901
Incomplete,
Rule 106

Witness testified
that she reviewed
and signed the
document.
"Incomplete"
objection is
meaningless;
Defendants can
counter-designate.

Ashley Pelton, Ph.D. - 10/06/2021

162

1   And on the last page, this says that you reviewed this
2   report.  Correct, Doctor?
3        A.    That is correct.
4        Q.    Is that your signature?
5        A.    Yes, it is.
6        Q.    And you signed it on or about July 29th of this
7   year?
8        A.    Correct.
9        Q.    And what does your signature on this document
10  signify?
11             MS. ORCUTT:  Form.
12             THE WITNESS:  That I reviewed the document.
13  BY MR. FATHI:
14       Q.    All right.  So on the previous page, if we
15  scroll up, yes, under Section 6, "Recommendations," you
16  see there are three recommendations there, Doctor?
17       A.    Yes.
18       Q.    Do you agree with those recommendations?
19             MS. ORCUTT:  Form.
20             THE WITNESS:  Let me read them.  Hold on.
21             MS. ORCUTT:  Form and foundation.
22             THE WITNESS:  Okay.  Go ahead.  What's the
23  question?
24  BY MR. FATHI:
25       Q.    The question is, do you agree with these

**Ashley Pelton, Ph.D. - 10/06/2021**

163

1    recommendations?

2                    MS. ORCUTT:   Form.

3                    THE WITNESS:   Can you rephrase by "agree"?

4    BY MR. FATHI:

5        Q.    Let me ask it another way.   You reviewed this

6    report.   Right?

7        A.    Correct.

8        Q.    And your review included these recommendations?

9        A.    This is Dr. Leonard's psychological autopsy

10   recommendations.

11       Q.    You reviewed this report.   Correct?

12       A.    Correct.

13       Q.    And you signed this report.   Correct?

14       A.    Correct.

15       Q.    And you didn't indicate anywhere on this report

16   that you disagreed with those recommendations.   Correct?

17                   MS. ORCUTT:   Form.

18                   THE WITNESS:   I don't know that we write on

19   documents, but -- because this was Dr. Leonard's

20   recommendations.

21   BY MR. FATHI:

22       Q.    You didn't indicate anywhere on this document

23   that you disagree with those recommendations, did you?

24       A.    That is correct.

25       Q.    All right.   First recommendation, "Increase

**Ashley Pelton, Ph.D. - 10/06/2021**

164

1    psychoeducation, specifically understanding the cycles of

2    depression, where there may be times a patient may feel

3    good, whereas at times one can go into depressive

4    episodes."

5            What's been done to implement this

6    recommendation?

7            MS. ORCUTT:   Form, foundation.

8            THE WITNESS:   I don't have the exact

9    information in terms of what specifically is being done,

10   but we provide ongoing education to all of our staff with

11   regards to continuing to provide treatment around

12   depression.

13   BY MR. FATHI:

14       Q.     Uh-huh.  What's been done to implement this

15   recommendation?

16           MS. ORCUTT:   Form.  Asked and answered.

17           MS. BARNES:   (Inaudible.)

18           THE REPORTER:   I'm sorry, Ms. Barnes, did you

19   say something?

20           MS. BARNES:   I said "form" as well.

21           You can go ahead.

22           THE WITNESS:   Can you repeat the question?

23   BY MR. FATHI:

24       Q.     Let me try it another way.  The first

25   recommendation says, "Increased psychoeducation."

Foundation; Lacks personal knowledge, Rule 602

Witness testified that she reviewed and signed the document. Witness's lack of knowledge is itself evidence.

Ashley Pelton, Ph.D. - 10/06/2021

165

```
1                    Do you see that?
2        A.     Yes.
3        Q.     What has been done since the date of this
4   report to increase psychoeducation on the cycles of
5   depression?
6              MS. ORCUTT:  Form.
7              THE WITNESS:  We continue to try to increase
8   access to group therapy.
9   BY MR. FATHI:
10       Q.     Uh-huh.  So tell me the specific steps that
11  have been taken to increase psychoeducation, specifically
12  understanding the cycles of depression?
13             MS. ORCUTT:  Form.
14             THE WITNESS:  I would say that it's on an
15  individual basis with the patient.  It can't be
16  generalized to all individuals.  Therefore, continuing to
17  educate staff in terms of educating the individuals who
18  are going through depressive episodes.
19  BY MR. FATHI:
20       Q.     All right.  Let me ask this another way.  Going
21  back to the first page of Exhibit 7, the date of report
22  is June 30, 2021.  Correct?
23       A.     I'd have to go to the first page.
24       Q.     Oh, I'm sorry.  Let's scroll to the first page.
25             Okay.  Can you see the date of report,
```

6/30/2021?

A. Yes.

Q. Do you have any reason to believe that date is incorrect?

A. No.

Q. Okay. Let's go back to the recommendations. Okay. So tell me what has been done to increase psychoeducation, specifically understanding the cycles of depression, since this recommendation was made on June 30th, 2021?

MS. BARNES: Form. Asked and answered.

Go ahead.

THE WITNESS: I can't speak to the specifics of what has been done. Again, we continue to educate other clinicians and our psychiatric providers surrounding depression and the treatment of depression.

BY MR. FATHI:

Q. But your testimony is you're not aware of anything that's been done specifically in reference to this recommendation; is that correct?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: There's nothing, to my knowledge, about specifics.

BY MR. FATHI:

Q. Okay. Second recommendation. What has been

Foundation; Lacks personal knowledge, Rule 602

Asked and answered; Waste of time and cumulative, Rule 403

Witness testified that she reviewed and signed the document. Witness's lack of knowledge is itself evidence. Not cumulative; questions were not previously answered. Rule 403.

Foundation; Lacks personal knowledge, Rule 602

(see next page for response)

**Ashley Pelton, Ph.D. - 10/06/2021**

167

Foundation;
Lacks
personal
knowledge,
Rule 602

Witness testified
that she reviewed
and signed the
document.
Witness's lack of
knowledge is
itself evidence.

1   done to implement this recommendation?

2         MS. ORCUTT:   Form, foundation.

3         THE WITNESS:   This recommendation speaks

4   primarily to security and nursing, so I can't speak to

5   that.

6   BY MR. FATHI:

7     Q.   Uh-huh.   To your knowledge, has anything been

8   done to implement this recommendation?

9         MS. ORCUTT:   Form.

10        THE WITNESS:   I don't know.

11  BY MR. FATHI:

12    Q.   Third recommendation, "Increase psychoeducation

13  on relationship between mental health and chronic pain."

14  What's been done to implement this recommendation?

15        MS. ORCUTT:   Form.

16        THE WITNESS:   We speak, in terms with our

17  staff, about, again, providing care about mental health,

18  chronic pain, and making sure we evaluate all the risk

19  factors.

20  BY MR. FATHI:

Foundation;
Lacks
personal
knowledge,
Rule 602;
Waste of
time and
cumulative,
Rule 403

(see next page
for response)

21    Q.   Yeah.   Again, Doctor, my question is, what has

22  been done to implement this recommendation?   This is a

23  suicide -- or a psych autopsy, dated June 30th of this

24  year, and the recommendation is "Increase psychoeducation

25  on the relationship between mental health and chronic

**Ashley Pelton, Ph.D. - 10/06/2021**

168

Foundation;
Lacks
personal
knowledge,
Rule 602;
Waste of time
and
cumulative,
Rule 403

Witness testified
that she reviewed
and signed the
document.
Witness's lack of
knowledge is
itself evidence.
Not cumulative;
questions were
not previously
answered. Rule
403.

1    pain."  So my specific question is, what has been done to

2    implement this recommendation of increased

3    psychoeducation?

4            MS. BARNES:  Form.  Asked and answered.

5            THE WITNESS:  And I don't know of anything

6    specific.

7    BY MR. FATHI:

8        Q.    Okay.  Thank you.  Exhibit 8 --

9            MS. BARNES:  Give me one second.  I'd like to

10   just take a three-minute break.  I'm having a temperature

11   issue in this room.

12           MR. FATHI:  Okay.

13           MS. BARNES:  It's 12:41, we'll be back on by

14   12:45, so four minutes.

15           (Recessed from 12:41 p.m. until 12:46 p.m.)

Foundation,
Rule 901

Incomplete,
Rule 106

Complete
document has
been admitted
(Exhibit 391).

16           MR. FATHI:  All right.  Exhibit 8, please.

17           (Marked for identification Exhibit 8.)

18   BY MR. FATHI:

19       Q.    Dr. Pelton, this is the psychological autopsy

20   of Michael Ring, who died by suicide on June 9th, 2021.

21           Have you seen this document before?

22       A.    Yes.

23           MR. FATHI:  And can we go to the last page,

24   please.

25       Q.    And that is your signature.  Correct?

Ashley Pelton, Ph.D. - 10/06/2021

169

1     A.     Correct.

2     Q.     And that indicates that you reviewed this

3  psychological autopsy?

4     A.     Correct.

5            MR. FATHI:  All right.  Let's go back two

6  pages, please, and maybe -- yes, "Recommendations."

7  Try -- blow it up a little bit, if we can, please.

8     Q.     Now, there's a number of recommendations.  Do

9  you see -- do you see those, Dr. Pelton?

10     A.     Yes.  It's a little blurry.

11     Q.     Would you like it enlarged?

12     A.     Yeah, a little bit, if you can.  Thank you.

13     Q.     Okay.  So I'm going to ask first about the

14  question -- the paragraph that begins, "It is

15  recommended."

16            Do you see that?

17     A.     Yes.

18     Q.     So --

19     A.     Yes.

20     Q.     So this reads, "It is recommended that a

21  standardized, evidence-based risk assessment tool

22  designed for patrol violators be part of the mental

23  health intake process."

24            Do you see that?

25     A.     Yes.

**Ashley Pelton, Ph.D. - 10/06/2021**

170

1      Q.    What steps have you taken to implement this

2  recommendation?

3          MS. ORCUTT:  Form, foundation.

4          THE WITNESS:  All individuals who come in as a

5  parole violator are screened by mental health intake

6  process.

7  BY MR. FATHI:

8      Q.    The recommendation is that a standardized

9  evidence-based risk assessment tool designed for parole

10  violators be part of the mental health intake process,

11  and my question is, what steps have been taken to

12  implement this recommendation?

13          MS. ORCUTT:  Form.

14          THE WITNESS:  With regards to the

15  recommendation, on evidence-based risk assessment, there

16  is no -- evidence-based is oddly written.  Everyone does

17  have a risk assessment in terms of being assessed,

18  whether or not they're a danger to themselves or other

19  people.

20  BY MR. FATHI:

21      Q.    So is it a -- has a new standardized

22  evidence-based risk assessment tool designed for parole

23  violators been implemented since the date of this review?

24          MS. ORCUTT:  Form.

25          THE WITNESS:  No.

**Ashley Pelton, Ph.D. - 10/06/2021**

171

Hearsay,
Rule 802

```
 1   BY MR. FATHI:
 2        Q.    So what steps have been taken to implement this
 3   recommendation?
 4            MS. ORCUTT:  Form.
 5            THE WITNESS:  The -- what has been taken since
 6   then is reviewing the process of high-risk situations,
 7   including suicide for parole violators.  We evaluated
 8   whether or not we needed to change the steps for parole
 9   violators in terms of if -- in terms of risk or suicide
10   risk.
11   BY MR. FATHI:
12        Q.    Let me try this a different way.  The
13   recommendation is that a standardized evidence-based risk
14   assessment tool designed for parole violators be part of
15   the mental health intake process.
16            Do you see that?
17        A.    Yes.
18        Q.    And has that been done since the date of this
19   report?
20            MS. ORCUTT:  Form.  Asked and answered.
21            THE WITNESS:  So the recommendation was
22   reviewed, and we believed that our current process in
23   terms of risk assessment is adequate, in terms of there
24   is no evidence-based risk assessment, per se.
25   BY MR. FATHI:
```

**Ashley Pelton, Ph.D. - 10/06/2021**

1    Q.    Could you answer my question, please, Doctor?

2          MS. ORCUTT:  Form.

3          MS. BARNES:  David, she's -- she's answered it.

4          MR. FATHI:  No, she has not.

5          MS. BARNES:  Two different times.  Yes, she

6    has.

7          MR. FATHI:  No, she has not.  Let me ask it

8    again.

9    Q.    The recommendation is, "It is recommended that

10   a standardized evidence-based risk assessment tool

11   designed for parole violators be part of the mental

12   health intake process."

13         Do you see that, Doctor?

14   A.    Yes.

Hearsay, Rule 802; Incomplete, Rule 106

15   Q.    Has a new standardized evidence-based risk

16   assessment tool designed for parole violators been

17   implemented since the date of this report?

18         MS. ORCUTT:  Form.  Asked and answered.

19         THE WITNESS:  So as the -- per as Dr. Bailey,

20   who completed this, this is her recommendation, as a team

21   we decided and determined that that is not -- that is not

22   what we decided to go forth in terms of the risk

23   assessment.  There is no evidence-based risk assessment

24   that I'm aware of, and specifically for parole violators.

25   BY MR. FATHI:

173

```
 1        Q.     So the answer to my question is no?

 2               MS. BARNES:  She was still talking.  She was

 3   about to complete her sentence.

 4               THE WITNESS:  Therefore, we do not believe that

 5   we needed to increase or change the risk assessment

 6   process, as all individuals who are parole violators are

 7   assessed for risk.

 8   BY MR. FATHI:

 9        Q.     So this recommendation has not been

10   implemented?

11               MS. ORCUTT:  Form.  Asked and answered.

12               THE WITNESS:  The recommendation was addressed.

13   BY MR. FATHI:

14        Q.     Was it implemented?

15               MS. ORCUTT:  Form.  Asked and answered.

16               THE WITNESS:  So in terms of psychological

17   autopsies, the psychologist who completes the

18   psychological autopsy gives their recommendation, because

19   we want them to be partial and to not have any bias, in

20   terms of our thoughts or opinions as the mental health

21   leaders.  And so we review the recommendations and

22   determine how to proceed forward in terms of the best

23   patient care that we can provide.

24   BY MR. FATHI:

25        Q.     Doctor, I'm going to ask you again to ask my --
```

Hearsay, Rule 802; Incomplete, Rule 106

Hearsay, Rule 802; Incomplete, Rule 106

1    to answer my question.

2              Was this recommendation implemented, yes or no?

3              MS. ORCUTT:  Form.  Asked and answered.

4              THE WITNESS:  Again, there is no evidence-based

5    risk assessment tool, therefore, we continue to do the

6    intake process with the risk assessment that we already

7    have.

8    BY MR. FATHI:

9         Q.   Was this recommendation implemented, yes or no?

10             MS. ORCUTT:  Form.  Asked and answered.

11             THE WITNESS:  I guess it depends on your

12   definition of "implemented."

13   BY MR. FATHI:

14        Q.   Was a new risk assessment tool adopted in

15   response to this recommendation?

16        A.   There is no new risk assessment that was

17   invented.

18        Q.   Was a new risk assessment tool adopted in

19   response to this recommendation?

20             MS. ORCUTT:  Form.  Asked and answered.

21             THE WITNESS:  There is no new risk assessment

22   that has been adopted for specificity of parole

23   violators.

24   BY MR. FATHI:

25        Q.   Thank you, Doctor.

**Ashley Pelton, Ph.D. - 10/06/2021**

1          All right.  Let's scroll down to page 13,

2   please.

3          All right.  In the paragraph that begins

4   "Currently," it says the following, "It is recommended

5   that the Arizona Department of Corrections Rehabilitation

6   and Reentry consider partnering with other correctional

7   institutions, political bodies, and academic research

8   partners to facilitate prison-based research toward the

9   development of such a tool with peer review and

10  transparent knowledge translation."

11         Do you see that, Doctor?

12    A.    Yes.

13    Q.    What steps have been taken to implement this

14  recommendation?

15         MS. ORCUTT:  Form.

16         THE WITNESS:  None, to my knowledge.

17  Or -- hold on.  Let me read it again.

18         I don't believe that there's any research that

19  is currently undergoing.

20  BY MR. FATHI:

21    Q.    So no steps have been taken to implement this

22  recommendation?

23         MS. ORCUTT:  Form.  Asked and answered.

24         THE WITNESS:  There is no research projects

25  that are currently undergoing.

**Ashley Pelton, Ph.D. - 10/06/2021**

```
 1   BY MR. FATHI:
 2       Q.    So no steps have been taken to implement this
 3   recommendation?
 4              MS. ORCUTT:   Form.   Asked and answered.
 5              THE WITNESS:   In terms of developing a
 6   structured risk tool in relation to other correctional
 7   facilities, no, there's no research projects.
 8   BY MR. FATHI:
 9       Q.    Okay.   In the next paragraph, the paragraph
10   that begins "Older males," the final sentence reads, "It
11   is therefore recommended that institutional policy be
12   reviewed in light of this growing population.   This
13   refers to older male prisoners and recommendations be
14   sought and developed to address their potential unique
15   mental health needs."
16              Do you see that, Doctor?
17              MS. ORCUTT:   Form.
18              THE WITNESS:   Yes.
19   BY MR. FATHI:
20       Q.    What steps have been taken to implement this
21   recommendation?
22              MS. ORCUTT:   Form.
23              THE WITNESS:   I believe -- I would say that we
24   continually work with ADCRR in terms of our growing older
25   population and what we can do to provide adequate mental
```

**Ashley Pelton, Ph.D. - 10/06/2021**

189

1    Q.    So who were they?

2         MS. ORCUTT:  Form.

Complete document
has been admitted
(Exhibit 893).

3         THE WITNESS:  I don't know at this time because

4    that was several months ago.

Foundation,
Rule 901
Incomplete,
Rule 106

5         MR. FATHI:  All right.  Would you turn to

6    page 56571, please.

Foundation;
Lacks
personal
knowledge,
Rule 602

7    Q.    Doctor, at the top of this page, it refers to

8    an ICS response for self-harm while on continuous suicide

9    watch.  Was this an actual incident or was it a

10   simulation?

Questions are
about the
document, not
the underlying
incident.
Witness's lack
of knowledge
is itself
evidence.

11        MS. ORCUTT:  Form.

12        THE WITNESS:  I believe it was an actual

13   incident.

14   BY MR. FATHI:

15   Q.    Uh-huh.  Do you have any recollection of this

16   incident?

17        MS. ORCUTT:  Form.

18        THE WITNESS:  Let me read it real quick.

19        I'm not sure the specifics of the situation.

20   BY MR. FATHI:

21   Q.    Do you have any recollection of this incident

22   at all?

23        MS. ORCUTT:  Form.

24        THE WITNESS:  I'd have to review the record to

25   know who specifically this person was.

**Ashley Pelton, Ph.D. - 10/06/2021**

190

Foundation;
Lacks
personal
knowledge,
Rule 602

Questions are
about the
document, not
the underlying
incident.
Witness's lack
of knowledge
is itself
evidence.

1   BY MR. FATHI:

2       Q.      No, my question is, do you have any

3   recollection of this incident at all?

4           MS. ORCUTT:   Form.  Asked and answered.

5           THE WITNESS:  Are you referencing the incident

6   of the ICS?

7   BY MR. FATHI:

8       Q.      Yes.

9       A.      Again, I would have to review the record.  We

10  have a significant amount of ICS situations.

11      Q.      So this type of incident is not uncommon?

12          MS. ORCUTT:   Form.

13          THE WITNESS:  I won't say that it's common, but

14  it does happen.

15  BY MR. FATHI:

16      Q.      What is a continuous suicide watch, Doctor?

17          MS. ORCUTT:   Form.

18          THE WITNESS:  It is a suicide watch where the

19  person is determined to be a significant risk to

20  themselves or other people, specifically someone's

21  engaging in self-harm behavior or has a plan to commit

22  suicide.

23  BY MR. FATHI:

24      Q.      And how is a continuous suicide watch

25  implemented?  What's done with a person on continuous

Cumulative,
Rule 403

Not cumulative;
questions were
not previously
answered. Rule
403.

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

Cumulative, Rule 403

Not cumulative; questions were not previously answered. Rule 403.

Foundation; Lacks personal knowledge, Rule 602; Cumulative, Rule 403

Questions are about the document, not the underlying incident. Witness's lack of knowledge is itself evidence. Not cumulative; questions were not previously answered. Rule 403.

```
1    suicide watch?
2              MS. ORCUTT:  Form.
3              THE WITNESS:  I'm not sure I understand the
4    question.
5    BY MR. FATHI:
6        Q.    Is a person who is on a continuous suicide
7    watch supposed to be watched continuously?
8              MS. ORCUTT:  Form.
9              THE WITNESS:  That is correct.
10   BY MR. FATHI:
11       Q.    Uh-huh.  According to this document, this
12   patient who was on continuous suicide watch removed 10
13   staples from an abdominal wound and then swallowed the
14   staples.
15             Do you see that?
16       A.    Yes.
17       Q.    How was he able to do this while on a
18   continuous suicide watch?
19             MS. BARNES:  Form and foundation.
20             THE WITNESS:  I'd have to refer to the security
21   staff, as I was, number one, not there; and, number two,
22   I'm not responsible for that.
23   BY MR. FATHI:
24       Q.    Was there any investigation of this incident?
25             MS. ORCUTT:  Form.
```

**Ashley Pelton, Ph.D. - 10/06/2021**

192

<div style="color:red; border:1px solid red;">
Foundation;
Lacks
personal
knowledge,
Rule 602;
Cumulative,
Rule 403

Questions are
about the
document, not
the underlying
incident.
Witness's lack of
knowledge is
itself evidence.
Not cumulative;
questions were
not previously
answered. Rule
403.
</div>

1         MS. BARNES:  Form and foundation.

2         THE WITNESS:  I don't have access to that.  I

3 don't know.

4 BY MR. FATHI:

5    Q.   Did this incident cause you any concern about

6 whether continuous suicide watches were being carried out

7 in an effective way?

8         MS. ORCUTT:  Form.

9         THE WITNESS:  Yes.

10 BY MR. FATHI:

11    Q.   So what steps did you take in response to that

12 concern?

13         MS. ORCUTT:  Form.

14         THE WITNESS:  I can't speak to this specific

15 situation, but I have meetings with the deputy warden on

16 a regular basis, in terms of ensuring the best care that

17 we can for our incarcerated individuals and ensuring that

18 the constant suicide watches are being completed

19 correctly.

20 BY MR. FATHI:

21    Q.   Did you take any steps in response to this

22 particular incident to ensure that continuous suicide

23 watches were being carried out in an effective manner?

24         MS. ORCUTT:  Form.

25         THE WITNESS:  I can't speak to the specific

**Ashley Pelton, Ph.D. - 10/06/2021**

193

Foundation;
Lacks
personal
knowledge,
Rule 602
Questions are
about the
document, not
the underlying
incident.**

Vague;
Leading
Leading is
permissible
with adverse
witness, Rule
611. Question
is not "vague,"
and witness
was able to
answer.

** Witness's
lack of
knowledge is
itself evidence.

1  situation, but any time that I felt that the person -- or

2  if there's a situation where they were not being watched

3  on a continuous basis or were able to remove staples,

4  such as that, I have conversations with the deputy warden

5  or sergeant or lieutenant.

6  BY MR. FATHI:

7      Q.    Is this something that shouldn't have been able

8  to happen?

9           MS. ORCUTT:  Form.

10          THE WITNESS:  Can you rephrase the question?

11  BY MR. FATHI:

12     Q.    Did it concern you that somebody that was on a

13  continuous suicide watch was able to remove 10 staples

14  from an abdominal wound and swallow the staples?

15          MS. ORCUTT:  Form.

16          THE WITNESS:  Yes.

17  BY MR. FATHI:

18     Q.    I'm sorry?

19     A.    Yes.

20     Q.    Doctor, are you familiar with the term "SMI"?

21     A.    Yes.

22     Q.    What does it mean?

23     A.    "Seriously mentally ill."

24     Q.    Are you familiar with any policy that restricts

25  the placement of people with -- who are classified as SMI

Case 2:12-cv-00601-ROS   Document 4165-1   Filed 11/20/21   Page 69 of 299

```
 1    into maximum custody?

 2                MS. ORCUTT:  Form.

 3                THE WITNESS:  Anyone who is SMI, we evaluate

 4    them upon arrival for -- excuse me -- for placement in

 5    restrictive housing.  And if they have to be, if you

 6    will, in maximum custody, we provide them with additional

 7    therapy services.

 8    BY MR. FATHI:

 9        Q.    Uh-huh.  But people with SMI can be placed in

10    maximum custody.  Correct?

11                MS. ORCUTT:  Form.

12                THE WITNESS:  That is my understanding, yes.

13    BY MR. FATHI:

14        Q.    And what are the additional therapy services

15    you provide to people with SMI in max custody?

16                MS. ORCUTT:  Form.

17                THE WITNESS:  They receive three groups of

18    psychoeducation by BHT a week and three groups a week by

19    a psych associate -- or I'm -- I mean, I'm sorry, one

20    group a week, my apologies, and three psychoeducation

21    visits a week by a BHT.

22    BY MR. FATHI:

23        Q.    And is it your understanding that those groups

24    happen reliably at all of the max custody units?

25                MS. ORCUTT:  Form.
```

Case 2:12-cv-00601-ROS Document 4256-1 Filed 11/02/21 Page 70 of 299

```
 1    regular basis, three times a week or once a week, in all
 2    the max custody units?
 3              MS. ORCUTT:  Form.
 4              THE WITNESS:  So I want to clarify, the three
 5    and one, it's one group a week by BHT, one group a week
 6    by a psych associate, and then three psychoeducation
 7    welfare visits by a BHT.
 8    BY MR. FATHI:
 9       Q.    And my question is, are the groups occurring
10    regularly as scheduled in all of the max custody units?
11              MS. ORCUTT:  Form.
12              THE WITNESS:  To my knowledge.
13    BY MR. FATHI:
14       Q.    Yeah.  And how do you know that?
15       A.    I have meetings with my mental health leads
16    from those complexes.
17       Q.    Are you aware of any policy that restricts the
18    placement of someone with SMI in a detention unit?
19              MS. ORCUTT:  Form.
20              THE WITNESS:  I would have to reference and
21    review the policies, but to my knowledge, there's nothing
22    to indicate that they are unallow- -- or not allowed to
23    be in max custody.
24    BY MR. FATHI:
25       Q.    My question was about detention.  Are people
```

Ashley Pelton, Ph.D. - 10/06/2021

197

1   with SMI --

2       A.    I'm sorry, I missed the word.  Can you say it

3   again?

4       Q.    Are you aware of a policy that restricts the

5   placement of people with SMI in detention?

6             MS. ORCUTT:  Form.

7             THE WITNESS:  I would have to go back and

8   review the policy, but there's nothing that I'm aware of

9   that restricts them from being in detention.

10  BY MR. FATHI:

11      Q.    Are you aware of cases of people with SMI who

12  have been placed in detention?

13            MS. ORCUTT:  Form.

14            THE WITNESS:  Yes.

15  BY MR. FATHI:

16      Q.    Are you familiar with any policy restricting

17  the use of OC spray on people classified as SMI?

18            MS. ORCUTT:  Form.

19            THE WITNESS:  I can't speak to the use of OC

20  spray, as I am not one of the individuals who is allowed

21  to carry it.

22  BY MR. FATHI:

23      Q.    I'm simply asking, are you aware of any policy

24  that restricts the use of OC spray on people with SMI?

25            MS. ORCUTT:  Form.

**Ashley Pelton, Ph.D. - 10/06/2021**

200

1    addresses the use of OC spray on people who are taking

2    psychotropic medication?

3              MS. ORCUTT:  Form.

4              THE WITNESS:  I don't know about the specifics

5    on someone who is taking psychotropic medication, and I

6    would say the same thing in terms of OC spray in our

7    mentally ill patients.

8    BY MR. FATHI:

9        Q.    So you've never seen a written policy that

10   discusses that?

11             MS. ORCUTT:  Form.  Asked and answered.

12             THE WITNESS:  Again, I have not specifically

13   reviewed any policy recently.  I can't speak to whether

14   or not there is one.

15   BY MR. FATHI:

16       Q.    Doctor, are there are some psychotropic

17   medications that can make people more susceptible to heat

18   injury?

19             MS. ORCUTT:  Form, foundation.

20             MS. BARNES:  To what?

21             MR. FATHI:  Heat injury.

22             THE WITNESS:  I'd like to defer to psychiatry

23   to answer that question, as that is slightly outside of

24   my scope of practice.

25   BY MR. FATHI:

Foundation; Lacks personal knowledge, Rule 602

Witness's lack of knowledge is itself evidence. Witness was able to answer the question.

**Ashley Pelton, Ph.D. - 10/06/2021**

201

Foundation;
Lacks
personal
knowledge,
Rule 602

Witness's lack
of knowledge is
itself evidence.
Witness was able
to answer the
question.

1    Q.    So I'm entitled to the best of your knowledge.
2  If you simply don't know, that's fine, but I'd like you
3  to answer my question.
4    A.    I don't know the specifics, but I know there
5  are certain psychotropic medications that can be
6  detrimental in high temperatures.
7    Q.    Are you aware of any policy, either an ADC or
8  Centurion policy, that people taking psychotropic
9  medications have to be housed in areas with certain
10  temperatures?
11          MS. ORCUTT:  Form.
12          THE WITNESS:  What was the beginning of the
13  question?
14  BY MR. FATHI:
15    Q.    Are you aware of any policy, either an ADC
16  policy or Centurion policy, requiring people who are
17  taking psychotropic medications to be housed in areas
18  that are below a certain temperature because of the risk
19  of heat injury?
20    A.    Yes.
21    Q.    Okay.  Where is that policy written down?
22          MS. ORCUTT:  Form.
23          THE WITNESS:  I'm not sure of the specific
24  policy and where it's written.  I know that there is a
25  policy that indicates that there's a certain temperature

**Ashley Pelton, Ph.D. - 10/06/2021**

204

1    belief, separate and apart from any conversation with an

2    attorney, then you can answer that.

3              THE WITNESS:  Can you rephrase the question?

4    BY MR. FATHI:

5        Q.    Has anyone in Centurion leadership told you

6    that Centurion is required to continue complying with the

7    performance measures?

8              MS. ORCUTT:  Form.

9              THE WITNESS:  I don't know that anyone has said

10   that we're required.  We continue to meet those

11   standards.

12   BY MR. FATHI:

13       Q.    Has anyone in ADC leadership told you that

14   Centurion is required to continue to comply with those

15   performance measures?

16             MS. ORCUTT:  Form.

17             THE WITNESS:  I don't think so.

18             MR. FATHI:  Okay.  Let's take a five-minute

19   break.

20             (Recessed from 1:24 p.m. until 1:31 p.m.)

21   BY MR. FATHI:

22       Q.    Doctor, are you aware of any case in which OC

23   spray has been used on someone who is classified as SMI?

24       A.    Yes.

25       Q.    Are you aware of any case in which OC spray has

*Relevance, Rule 402; Waste of time, Rule 403*

Defendants' compliance/ noncompliance with the Stipulation is relevant. Doc. 3921, Rules 401, 402, 403.

**Ashley Pelton, Ph.D. - 10/06/2021**

205

1    been used on someone who is using psychotropic

2    medications?

3        A.    Yes.

4        Q.    Are you aware of any cases in which the mental

5    health groups for people in max custody was cancelled

6    because there wasn't sufficient custody staff?

7              MS. ORCUTT:  Form.

8              THE WITNESS:  Yes.

9    BY MR. FATHI:

10       Q.    What facilities has that happened at?

11             MS. ORCUTT:  Form.

12             THE WITNESS:  I believe there's been situations

13   at Florence, that they were unable to do group because

14   there was not staffing.

15   BY MR. FATHI:

16       Q.    Custody staffing?

17       A.    Correct.

18       Q.    Are you aware of that happening at any other

19   complex?

Hearsay, Rule 802

20             MS. ORCUTT:  Form.

21             THE WITNESS:  I don't think so.  Nothing

22   specific comes to mind.

Hearsay, Rule 802

23   BY MR. FATHI:

24       Q.    Are you aware of that ever happening at Eyman?

25             MS. ORCUTT:  Form.

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**Ashley Pelton, Ph.D. - 10/06/2021**

209

1   closed custody individuals who are still acute, but

2   subacute and have the ability to be around others more

3   frequently.  And George Unit is going to be our most

4   acute and typically houses max custody inmates.

5   BY MR. FATHI:

6       Q.    All right.  What about Quiet Unit?

7       A.    Quiet Unit is where we house our people who are

8   on suicide watch.

Foundation;
Lacks
personal
knowledge,
Rule 602

Witness's lack
of knowledge
is itself evidence.

9       Q.    Tell me about Baker Unit.

10      A.    Baker Unit, due to COVID, changed to housing

11  our COVID individuals.

12      Q.    And when did that happen?

13      A.    During COVID.

14      Q.    Yes.  No, I understand that, but when,

15  approximately, did it start to be used as a COVID unit?

16          MS. ORCUTT:  Form, foundation.

17          THE WITNESS:  I was not there at the time, so I

18  can't speak to the date.

19  BY MR. FATHI:

20      Q.    So is it your testimony that Baker Unit is

21  not -- is currently not functioning as a mental health

22  unit?

23          MS. ORCUTT:  Form.

24          THE WITNESS:  Correct.  We are currently

25  utilizing it for watches and ADCRR has determined that it

**Ashley Pelton, Ph.D. - 10/06/2021**

210

1   is going to be for intake and COVID isolation -- or COVID
2   quarantine.
3   BY MR. FATHI:
4       Q.    Okay.  But at one time, Baker was, in its
5   entirety, a mental health unit.  Correct?
6           MS. ORCUTT:  Form.
7           THE WITNESS:  Correct.
8   BY MR. FATHI:
9       Q.    But that's no longer the case?
10          MS. ORCUTT:  Form.
11          THE WITNESS:  Correct.
12  BY MR. FATHI:

Hearsay, Rule 802

13      Q.    Are there any mental health patients -- are
14  there any people in Baker Unit for mental health reasons
15  right now?
16          MS. ORCUTT:  Form.

Hearsay, Rule 802

17          THE WITNESS:  For individuals who are on mental
18  health watch.
19  BY MR. FATHI:
20      Q.    And how many of those would there be at a given
21  time?
22          MS. ORCUTT:  Form.
23          THE WITNESS:  It depends on the institution's
24  need for mental health watches at the time and if Quiet
25  is full.

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**Ashley Pelton, Ph.D. - 10/06/2021**

211

```
 1   BY MR. FATHI:
 2       Q.    If -- go ahead.  Sorry.
 3             When you were at Phoenix, typically how many
 4   people were typically on watch in Baker Unit?
 5             MS. ORCUTT:  Form.
 6             THE WITNESS:  It would vary anywhere from four
 7   to 15.
 8   BY MR. FATHI:
 9       Q.    Would it ever be less than four?
10             MS. ORCUTT:  Form.
11             THE WITNESS:  I think it's always possible,
12   yeah.  I don't know that it's -- I don't know the
13   numbers, but it's possible.
14   BY MR. FATHI:
15       Q.    Has there been more than 15?
16             MS. ORCUTT:  Form.
17             THE WITNESS:  Potentially.  I would have to
18   look at the numbers.
19   BY MR. FATHI:
20       Q.    So where are the patients who used to be in
21   Baker Unit for mental health purposes?  Where are they
22   now?
23             MS. ORCUTT:  Form.
24             THE WITNESS:  They're in either John, King,
25   Quiet, or Ida.
```

Hearsay, Rule 802

Hearsay, Rule 802

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**Ashley Pelton, Ph.D. - 10/06/2021**

216

1            THE WITNESS:  The custody then evaluates the

2    individual based on their security requirements and needs

3    and to determine whether or not the individual would be

4    appropriately placed there.

5    BY MR. FATHI:

6        Q.    So does custody have the power to prevent a

7    transfer that's been recommended by a mental health

8    staff?

9            MS. ORCUTT:  Form.

10            THE WITNESS:  Yes, but we then continue to try

11    to discuss the best needs of the patient and then

12    potentially figure out what that is.

13    BY MR. FATHI:

14        Q.    Right.  But my question is, it can happen that

15    the mental health staff wants to transfer this person to

16    Phoenix and custody staff can say no because of security

17    reasons; is that right?

18            MS. ORCUTT:  Form.

19            THE WITNESS:  That is correct.

20    BY MR. FATHI:

21        Q.    Okay.

22        A.    But we usually try to -- especially when it

23    comes to going to Phoenix, I would say security works

24    with us and I don't think that's ever been a situation

25    where we said that someone can't go to Phoenix for

Waste of time and cumulative, Rule 403

Transfer to higher levels of care is at issue. Rule 401, 402. Not cumulative; questions were not previously answered. Rule 403.

Hearsay, Rule 802; Incomplete, Rule 106

**Ashley Pelton, Ph.D. - 10/06/2021**

217

Hearsay,
Rule 802;
Incomplete,
Rule 106

1    security concerns.

2        Q.    So you don't remember it ever happening that

3    there was a transfer to Phoenix that was presented by

4    mental health staff but security said no?

5                MS. ORCUTT:  Form.

6                THE WITNESS:  Specifically to Phoenix, I can't

7    think of an example.

8    BY MR. FATHI:

9        Q.    How --

10       A.    I was going to say I'm not sure.  I can't say

11   it's never happened, but I can't think of an example.

12       Q.    How long does this whole process typically

13   take?

14               MS. ORCUTT:  Form.

15               THE WITNESS:  The --

16   BY MR. FATHI:

17       Q.    Let me be more specific.  From the time that

18   someone at Eyman says, "Let's transfer this person to

19   Phoenix," to the time they physically end up in Phoenix,

20   how long does that typically take?

21               MS. ORCUTT:  Form.

22               THE WITNESS:  It's going to -- we're going to

23   evaluate a couple different things:  If it's an immediate

24   concern and we do not believe that Eyman is able to house

25   them for -- due to not having adequate -- whatever it

**Ashley Pelton, Ph.D. - 10/06/2021**

218

1   might be, and need that inpatient care immediately, we

2   are able to move them the same day.

3   BY MR. FATHI:

4       Q.    Uh-huh.  Right.  But my question is, how long

5   does it typically take, an average case?

6                MS. ORCUTT:  Form.

7                THE WITNESS:  In a typical case, anywhere from

8   four days to a week.

9   BY MR. FATHI:

10      Q.    What's the longest that you're aware of it ever

11  taking?

12               MS. ORCUTT:  Form.

13               THE WITNESS:  The longest, a couple weeks, but

14  it's been -- what --

15  BY MR. FATHI:

16      Q.    Meaning two weeks?

17      A.    Meaning two weeks.  I can't think of any recent

18  examples where it's taken longer.

19      Q.    Can you think of any examples at all, recent or

20  not, where the process has taken more than two weeks?

21               MS. ORCUTT:  Form.

22               THE WITNESS:  I can't speak to the past in

23  the -- when it's taken longer.  I believe in the past

24  when we had COVID and COVID restrictions, it did take

25  longer.

**Ashley Pelton, Ph.D. - 10/06/2021**

219

BY MR. FATHI:

1

2    Q.    How long did it take under those circumstances?

3          MS. ORCUTT:  Form.

4          MS. BARNES:  Form, foundation.

5          THE WITNESS:  I'd have to review the specifics

6    but, again, we'd have to look at -- we had to look at

7    COVID testing and ensure the safety for all the medical

8    pieces of it.

9    BY MR. FATHI:

10   Q.    Yes, I'm simply asking, what's the longest you

11   remember it taking under COVID circumstances?

12   A.    I don't know.

13   Q.    Where is this process written down?

14         MS. ORCUTT:  Form.

15         THE WITNESS:  The process is written down in

16   the mental health tech manual.

17   BY MR. FATHI:

18   Q.    Are you aware of anyone ever being transferred

19   to Phoenix as a result of advocacy from the ACLU or other

20   counsel in the Parsons case?

21         MS. ORCUTT:  Form.

22         THE WITNESS:  You're asking specifically from

23   the ACLU?

24   BY MR. FATHI:

25   Q.    Or plaintiffs' counsel in the Parsons case, the

Relevance, Rule 402; Waste of time and cumulative, Rule 403; Rule 403; Court Order on Trial Day 4 re admission of Plaintiffs' Ex. 635

(see next page for response)

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**Ashley Pelton, Ph.D. - 10/06/2021**

220

Relevance, Rule 402; Waste of time and cumulative, Rule 403; Court Order on Trial Day 4 re admission of Plaintiffs' Ex. 635

Relevant to deliberate indifference. Rules 401, 402. Not cumulative; questions were not previously answered. Rule 403.

1    ACLU, The Prison Law Office, Arizona Center for

2    Disability Law?

3            MS. ORCUTT:  Form.

4            THE WITNESS:   I can't think of any examples,

5    no.

6    BY MR. FATHI:

7        Q.    So you can't think of an example where that's

8    happened?

9            MS. ORCUTT:  Form.

10           THE WITNESS:  No.  We look at everything based

11   on the individual needs in terms of who needs the

12   inpatient care.

13   BY MR. FATHI:

14       Q.    Did you work at all with Angela Fisher at the

15   Phoenix facility?

16           MS. ORCUTT:  Form.

17           THE WITNESS:  Are you referencing the mental

18   health employee?

19   BY MR. FATHI:

20       Q.    Yes.

21       A.    Yes, there was a brief time where I worked with

22   her.

23       Q.    Do you believe her to be a competent clinician?

24           MS. ORCUTT:  Form.

25           MS. BARNES:  Form and foundation.

**Ashley Pelton, Ph.D. - 10/06/2021**

221

```
 1              THE WITNESS:  I haven't worked with her in some
 2     time.  In what capacity are you asking?
 3     BY MR. FATHI:
 4         Q.   I'm asking, do you think she was competent at
 5     her job as a psych associate?
 6              MS. ORCUTT:  Form.
 7              THE WITNESS:  I do.
 8     BY MR. FATHI:
 9         Q.   Do you believe she's a truthful person?
10              MS. ORCUTT:  Form, foundation.
11              THE WITNESS:  I believe she says what she
12     believes is her truth, yeah.
13     BY MR. FATHI:
14         Q.   Do you believe she's a truthful person?
15              MS. ORCUTT:  Form.
16              MS. BARNES:  Form, foundation.
17              THE WITNESS:  Yes, I believe she speaks to what
18     she believes is true.
19     BY MR. FATHI:
20         Q.   If I wanted to know how many people had been
21     transferred to Phoenix in the last -- let's say in
22     September, how would I find that out?
23              MS. ORCUTT:  Form.
24              THE WITNESS:  I would not know.  I don't know
25     what was done previously before I took this role in terms
```

Foundation; Lacks personal knowledge, Rule 602

Witness's lack of knowledge is itself evidence.

**Ashley Pelton, Ph.D. - 10/06/2021**

222

**Foundation; Lacks personal knowledge, Rule 602**

Witness's lack of knowledge is itself evidence.

**Relevance, Rule 402; Incomplete, Rule 106; Waste of time and cumulative, Rule 403**

Transfer to higher levels of care is at issue. Rules 401, 402. Not cumulative; questions were not previously answered. Rule 403. "Incomplete objection is meaningless; Defendants can counter-designate.

1    of any recordkeeping.

2    BY MR. FATHI:

3        Q.    But you've been there since August, right, in

4    this role?

5        A.    Correct.

6        Q.    So if you wanted to know how many people had

7    been transferred into the Phoenix facility in September,

8    how would you find out?

9            MS. ORCUTT:    Form.

10           THE WITNESS:    We have an admissions log of

11   everyone who transfers in and out of every facility and

12   we keep record of --

13   BY MR. FATHI:

14       Q.    So you would just have to look at the log and

15   manually count; is that right?

16           MS. ORCUTT:    Form.

17           THE WITNESS:    Correct.

18           MR. FATHI:    Okay.

19           MS. ORCUTT:    David, how much longer do you

20   anticipate going?    Because I believe we've gone over our

21   four hours at this point.

22           MR. FATHI:    I don't think we've gone over four

23   hours of on-the-record time, but probably about 10 or 15

24   minutes.

25           MS. BARNES:    Robin, can you let us know how

**Ashley Pelton, Ph.D. - 10/06/2021**

226

1    numbers fluctuate significantly.  We have people going in

2    and out on a regular basis.

3    BY MR. FATHI:

4        Q.    Well, thank you very much, but my question is,

5    is it typical that these units are not full?

6              MS. BARNES:  Form.

7              MS. ORCUTT:  Form.  Asked and answered.

8              THE WITNESS:  Then I would say based on whether

9    or not they need to be an inpatient level of care, and in

10   addition to that, there are individuals who are unable to

11   house with other people, so in that case, we're unable to

12   put five people in a cell.  So, again, we individualize

13   our treatment to every incarcerated patient.

14   BY MR. FATHI:

15       Q.    Are there some people -- some patients who are

16   ineligible for transfer to the Phoenix facility because

17   of their security level or for some other reason?

18             MS. ORCUTT:  Form.

19             MS. BARNES:  Foundation.

20             THE WITNESS:  In terms of mental health, we do

21   not limit that.  I'd have to defer to ADCRR in terms of

22   their -- any security concerns.

23   BY MR. FATHI:

24       Q.    Can someone who is classified max custody be

25   transferred to the Flamenco unit?

Hearsay, Rule 802

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**Ashley Pelton, Ph.D. - 10/06/2021**

227

Hearsay,
Rule 802

1          MS. ORCUTT:  Form.

2          THE WITNESS:  Yes.

3   BY MR. FATHI:

4      Q.     Can someone who is max custody be transferred

5   to Aspen?

6          MS. ORCUTT:  Form.

7          THE WITNESS:  No.

8   BY MR. FATHI:

9      Q.     So how long were you the clinical director at

10  the Phoenix facility?

11         MS. ORCUTT:  Form.

12         THE WITNESS:  Approximately one year.

13  BY MR. FATHI:

14     Q.     And during that one year, did it ever occur

15  that the Phoenix -- sorry, the Flamenco unit was entirely

16  full?

17         MS. ORCUTT:  Form.

18         THE WITNESS:  I guess you'd have to define

19  "full."

20  BY MR. FATHI:

21     Q.     At capacity.

22     A.     Again, at capacity -- this is more based on

23  clinical need, and some individuals require to not be

24  housed with other people and so we take that into

25  consideration.

**Ashley Pelton, Ph.D. - 10/06/2021**

228

**Foundation; Lacks personal knowledge, Rule 602; Vague**

Question is not "vague," and witness was able to answer.

**Leading**

Leading is permissible with adverse witness, Rule 611.

1    Q.    You're not understanding my question.  Every
2  unit has a capacity.  It can hold up to so many people.
3  So did it ever happen during the year that you were
4  clinical director at Phoenix that Flamenco Unit was at
5  capacity?
6            MS. ORCUTT:  Form.
7            THE WITNESS:  Not that I'm aware of.  I'd have
8  to go back and review all the numbers.
9  BY MR. FATHI:
10    Q.    And is that because the determination was made
11  that there weren't people at other facilities who could
12  benefit from placement at Phoenix?
13            MS. BARNES:  Form.
14            MS. ORCUTT:  Form.
15            THE WITNESS:  So, again, we review everyone on
16  a regular basis in terms of being able to come into the
17  inpatient unit and level of need.
18  BY MR. FATHI:
19    Q.    So if there's empty beds in the inpatient unit,
20  that means you have determined that there aren't other
21  people that need to be in that unit; is that correct?
22            MS. ORCUTT:  Form.
23            THE WITNESS:  I would say that that's -- we --
24  as long as we know that there's no one that needs that
25  higher level of care -- if someone needs that higher

**Ashley Pelton, Ph.D. - 10/06/2021**

229

**Leading**
(see above)

1    level of care, we work to get them into Phoenix.

2              MR. FATHI:  All right.  Let me take just one

3    minute with co-counsel, but I think we're almost

4    finished.

5              All right.  Because Dr. Pelton has been

6    designated as an expert, we do reserve the right to

7    depose her as an expert after she submits her report on

8    October 22nd, but for now, we're finished.

9              And I thank you very much, Doctor.

10             MS. Orcutt:  Thank you, Dr. Pelton.

11             THE WITNESS:  Thank you.

12             MS. BARNES:  She will read and sign.

13             THE REPORTER:  Thank you.

14             MS. ORCUTT:  Thank you.

15             (Proceedings concluded at 1:57 p.m.)

16

17

18

19

20

21

22

23

24

25

230

1                          SIGNATURE PAGE

2

3          I, ASHLEY PELTON, Ph.D., a deponent exercising
   my right to read and sign my deposition taken on October
4  6, 2021, place my signature hereon and make the following
   changes on this _____day of_____, 2021.
5
            (IF THERE ARE NO CHANGES, WRITE "NONE.")
6

7                     _____

8                     ASHLEY PELTON, Ph.D.

9

10   PAGE      LINE      READS        CHANGE TO        REASON

11   _____     _____     _____

12   _____     _____     _____

13   _____     _____     _____

14   _____     _____     _____

15   _____     _____     _____

16   _____     _____     _____

17   _____     _____     _____

18   _____     _____     _____

19   _____     _____     _____

20   _____     _____     _____

21   _____     _____     _____

22   _____     _____     _____

23   _____     _____     _____

24   _____     _____     _____

25   _____     _____     _____

231

```
 1   STATE OF ARIZONA     )
     COUNTY OF MARICOPA   )
 2
             BE IT KNOWN that the foregoing proceedings
 3   were taken before me; that the witness before testifying
     was duly sworn by me to testify to the whole truth; that
 4   the foregoing pages are a full, true, and accurate record
     of the proceedings all done to the best of my skill and
 5   ability; that the proceedings were taken down by me in
     shorthand and thereafter reduced to print under my
 6   direction.

 7           [X] Review and signature was requested.

 8           [ ] Review and signature was waived.

 9           [ ] Review and signature not required.

10           I FURTHER CERTIFY that I have complied with
     the ethical obligations set forth in the ACJA 7-206(F)(3)
11   and ACJA 7-206(J)(1)(g)(1) and (2).  Dated at Phoenix,
     Arizona, this 17th day of October, 2021.

12

13

14

15   _____
             ROBIN L. B. OSTERODE, RPR
16           CA CSR No. 7750
             AZ CR No. 50695
17
             *    *    *    *    *
18           I CERTIFY that Glennie Reporting Services,
     LLC, has complied with the ethical obligations set forth
19   in ACJA 7-206(J)(1)(g)(1) through (6).

20

21

22

23   _____

24   GLENNIE REPORTING SERVICES, LLC
     Registered Reporting Firm
25   Arizona RRF No. R1035
```

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Victor Parsons; Shawn Jensen; | ) | |
| Stephen Swartz; Dustin Brislan; | ) | No. |
| Sonia Rodriguez; Christina | ) | CV 12-00601-PHX-ROS |
| Verduzco; Jackie Thomas; Jeremy | ) | |
| Smith; Robert Gamez; Maryanne | ) | |
| Chisholm; Desiree Licci; Joseph | ) | |
| Hefner; Joshua Polson; and | ) | |
| Charlotte Wells, on behalf of | ) | |
| themselves and all others similarly | ) | |
| situated; and Arizona Center for | ) | |
| Disability Law, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| David Shinn, Director, Arizona | ) | |
| Department of Corrections, | ) | |
| Rehabilitation and Reentry; and | ) | |
| Larry Gann, Assistant Director, | ) | |
| Medical Services Contract | ) | |
| Monitoring Bureau, Arizona | ) | |
| Department of Corrections, | ) | |
| Rehabilitation and Reentry, in | ) | |
| their official capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

DEPOSITION OF JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ
(via videoconference)

October 28, 2021
9:00 a.m.
Houston, Texas

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130

602.266.6535
www.glennie-reporting.com

Prepared by:
Jennifer Honn, RPR
Arizona CR No. 50885

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA


Victor Parsons; Shawn Jensen;        )
Stephen Swartz; Dustin Brislan;      ) No.
Sonia Rodriguez; Christina           ) CV 12-00601-PHX-ROS
Verduzco; Jackie Thomas; Jeremy      )
Smith; Robert Gamez; Maryanne        )
Chisholm; Desiree Licci; Joseph      )
Hefner; Joshua Polson; and           )
Charlotte Wells, on behalf of        )
themselves and all others similarly  )
situated; and Arizona Center for     )
Disability Law,                      )
                                     )
              Plaintiffs,            )
       vs.                           )
                                     )
David Shinn, Director, Arizona       )
Department of Corrections,           )
Rehabilitation and Reentry; and      )
Larry Gann, Assistant Director,      )
Medical Services Contract            )
Monitoring Bureau, Arizona           )
Department of Corrections,           )
Rehabilitation and Reentry, in       )
their official capacities,           )
                                     )
              Defendants.            )
_____)


    DEPOSITION OF JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ
                 (via videoconference)

                  October 28, 2021
                     9:00 a.m.
                  Houston, Texas




Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130
                              Prepared by:
602.266.6535                  Jennifer Honn, RPR
www.glennie-reporting.com     Arizona CR No. 50885

2

1                      I N D E X

2   WITNESS                                          PAGE

3   JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ

4        Examination by Mr. Fathi                     4

5

6

7

8                  INDEX TO EXHIBITS

9   Description                                      Page

10  Exhibit 1    Expert Report of John S. Wilson, PhD,    18
                 CCHP-MH, CPHQ
11               (13 pages)

12  Exhibit 2    ADCRR Inmate Assault, Self-Harm, &       64
                 Mortality Data
13               FY 2022 as of 9/30/2021
                 (4 pages)
14
    Exhibit 3    E-mail from Tom Dolan                   135
15               1/14/2020
                 Subject: Contract FTE v Recommended FTE
16               ADCRR00111128 -111131
                 (14 pages)
17
    Exhibit 4    (Not marked.)
18  Exhibit 5    (Not marked.)
    Exhibit 6    (Not marked.)
19
    Exhibit 7    Excerpt: Deposition of Stefanie         137
20               Platt, PsyG
                 (7 pages)
21
    Exhibit 8    Defendants' Third Supplemental Pretrial 116
22               Disclosure Statement

23  Exhibit 9    Mortality Review Committee Final Report  90
                 ADCRRM0026203 -26206
24
    Exhibit 10   Mortality Review Committee Final Report  96
25               ADCRR00000106 -109

3

1      DEPOSITION OF JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ
                    (via videoconference)
2

3           The deposition of JOHN SEDDON WILSON, PhD,

4   CCHP-MH, CPHQ was taken on October 28, 2021, commencing

5   at 9:00 a.m., via videoconference, the witness appearing

6   in Houston, Texas, before JENNIFER HONN, a Certified

7   Reporter, Certificate No. 50885, for the State of

8   Arizona.

9   APPEARANCES:

10  For Deponent:

11       BROENING OBERG WOODS & WILSON
         Sarah L. Barnes, Esq.
12       2800 North Central Avenue
         Suite 1600
13       Phoenix, Arizona 85004
         Slb@bowwlaw.com
14

    For Plaintiffs:
15
         ACLU NATIONAL PRISON PROJECT
16
         David C. Fathi, Esq.
17       915 15th Street N.W., 7th Floor
         Washington, D.C. 20005
18       Dfathi@aclu.org

19       Corene Kendrick, Esq.
         39 Drumm Street
20       San Francisco, California 94111
         Ckendrick@aclu.org
21
    For Defendant:
22
         STRUCK LOVE BOJANOWSKI & ACEDO, PLC
23       Ashlee B. Hesman, Esq.
         3100 West Ray Road
24       Suite 300
         Chandler, Arizona 85226
25       Ahesman@strucklove.com

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

4

1          JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ,

2     called as a witness herein, having been first duly sworn

3     by the Certified Reporter to speak the whole truth and

4     nothing but the truth, was examined and testified as

5     follows:

6

7                        EXAMINATION

8     BY MR. FATHI:

9          Q.    Would you state and spell your full name for the

10    record, please?

11         A.    S, as in Sam, Wilson.  That's not my middle

12    name; it's S-e-d-d-o-n.  The last name is spelled

13    W-i-l-s-o-n, and the first name is spelled J-o-h-n.

14         Q.    And have you ever been known by any other name?

15         A.    No.

16         Q.    Dr. Wilson, my name is David Fathi, and with my

17    colleagues I represent the plaintiff class in the Parsons

18    versus Shinn litigation.

19              Have you ever had your deposition taken before?

20         A.    No.

21         Q.    Well, then let me go over few of the -- the

22    ground rules.

23              Everything is being taken down by the court

24    reporter, and so as she said, that means that only one of

25    us can talk at a time.  So even though in everyday

Hearsay, Rule 802; Relevance, Rule 402

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

Case 2:12-cv-00601-ROS   Document 4255-1   Filed 11/27/21   Page 190 of 296

1   conversation we sometimes do talk over each other,

2   interrupt each other, please try not to do that here.

3          Try not to speak over me, and by the same token,

4   I will try not to speak over you.

5          You need to answer audibly and verbally.  The

6   court reporter can't take down nods of the head or shakes

7   of the head, uh-huh or huh-uh.  So please, again, give

8   audible and verbal responses.

9          The lawyers may make objections throughout the

10  deposition.  In most cases those are just for the record,

11  and you need to answer the question.  The only exception

12  is if the lawyer instructs you not to answer.

13         Who is representing you here today, Doctor?

14  A.   Sarah Barnes.

15  Q.   Okay.  I try to ask clear questions, but I don't

16  always succeed.  So if you don't understand a question

17  I'm asking, please let me know, and I will rephrase or

18  clarify.

19         If you need a break at any time, just let me

20  know.  The only rule is if there's a question pending,

21  you need to answer the pending question before we take a

22  break.

23         And, finally, even though we are all in our

24  respective locations, you are testifying today under

25  oath, under penalty of perjury, just as if you were

1    testifying in court.

2        A.    I understand.

3        Q.    Do you have any questions?

4        A.    Not at this time.

5        Q.    Is there any reason why you cannot give full and

6    truthful testimony today?

7        A.    No.

8        Q.    As I mentioned earlier, we are not all in the

9    same room as we used to be until recently.  So that has a

10   couple of implications, too.

11            First of all, I think you -- you said that you

12   are in Houston, Texas, today?

13       A.    That is correct.

14       Q.    Is anyone else in the room with you?

15       A.    No one is in the room with me.

16       Q.    If anyone else does come into the room, will you

17   please let me know?

18       A.    I will.

19       Q.    And are -- are you looking at anything other

20   than the Zoom screen right now?  Do you have documents?

21   Do you have another program open?  Do you have your

22   phone, e-mails, texts, anything of that nature?

23       A.    I was told not to, and I need to turn off a

24   screen that has my e-mail up.  So I'll do that now.  I

25   have two screens and now only have one, the Zoom.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

7

1          And the only other thing that I have in front of
2   me is my report and the printout of that.
3      Q.   That will actually make things more convenient.
4          So please don't -- while we are on the record
5   please don't consult anything else, e-mail, texts,
6   computer, no oaths -- well, I guess it would be difficult
7   for you to communicate with Ms. Barnes under the
8   circumstances.  But those things are fine at the break,
9   but not when we're on the record, okay?
10     A.   I understand.
11     Q.   All right.  So, again, please don't communicate
12  with -- with anyone else besides me while we are on the
13  record.  So no e-mail, texts, anything of that nature.
14  Okay?
15     A.   I understand.
16     Q.   Okay.  Doctor, did you review any documents to
17  prepare for this deposition today?
18     A.   Yes.
19     Q.   What did you review?
20     A.   I reviewed Dr. Stewart's report that was
21  submitted to the court.  Dr. Penn's report.  Mr. Joy's
22  report.  And I reviewed a portion of another report by
23  defendants' medical expert.  I apologize.  I've forgotten
24  his name.
25     Q.   Would that be Dr. Murray?

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

8

1      A.   Dr. Murray, yes.

2      Q.   All right.  Any other documents you reviewed to

3  prepare for this deposition?

4      A.   To prepare my report, I did review additional

5  documents.

6      Q.   All right.  We'll get to that in a little bit.

7  Okay?  Right now I'm just asking specifically to prepare

8  for this deposition.

9      A.   No other.

10      Q.   All right.  Did you review the report of

11  plaintiff's expert, Dr. Craig Haney?

12      A.   No.

13      Q.   And about how long did you spend reviewing those

14  documents in preparation for your deposition?

15      A.   Four to six hours.  Something like that.

16      Q.   Have you reviewed any of the depositions that

17  have been taken in this case?

18      A.   I have not.

19      Q.   Have you reviewed any medical records of Arizona

20  state prisoners?

21      A.   In preparation for today?

22      Q.   Correct.

23      A.   No.

24      Q.   Did you communicate with anyone to prepare for

25  this deposition?  And I'm defining that to include any

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

9

1    communication, phone, Zoom, e-mail, text, any

2    communication at all?

3        A.    I had several communications with Ms. Barnes as

4    well as with our associate general counsel, Ms. Mull.

5        Q.    Could you spell that last person's name, please?

6        A.    Last name is spelled M as in mother, u-l-l.

7        Q.    And her first name?

8        A.    Aynsley, A as in apple, Y as in yellow, N as in

9    no, S as in Sam, l-e-y.

10        Q.    All right.  Thank you.  Did you communicate with

11    anyone else in preparation for this deposition besides

12    Ms. Barnes and Ms. Mull?

13        A.    Part of those discussions included Dr. Johnny

14    Wu, who is our chief clinical officer for Centurion.

15        Q.    Anyone else?

16        A.    No.

17        Q.    All right.  Now I'm not asking you about the

18    substance of those conversations, but I would like you to

19    tell me approximately when they happened and

20    approximately how long they lasted?

21        A.    They have all taken place, I want to say, in the

22    last 10 days.  And that may even be too long.  I would

23    have to refresh my memory with my -- by reviewing my

24    calendar, which isn't available to me, to be certain.

25              And -- oh, I apologize.  I apologize.  I do

10

1   remember with Ms. Barnes, I had one additional

2   conversation with her and with the attorney for the DOC,

3   Dan --

4       Q.   Would that be Dan Struck?

5       A.   Dan Struck, yes.

6       Q.   All right.

7       A.   I apologize.

8       Q.   That's quite all right.  Anyone else that you

9   have communicated with in preparation for this

10  deposition?

11      A.   Not that I remember, no.

12      Q.   Okay.  And you think all of these communications

13  occurred within approximately the last 10 days?

14      A.   I do.

15      Q.   And how many separate communications were there?

16      A.   There have been two or three phone calls or Zoom

17  meetings and some back and forth e-mail.  So there might

18  have been half a dozen, maybe.

19      Q.   Okay.  And about, collectively about how long

20  did all of those Zooms and phone calls last?

21      A.   Perhaps two hours.

22      Q.   Two hours total?

23      A.   Yes, sir.

24      Q.   And was one or more of the lawyers that you've

25  mentioned participating in all of those phone --

1       A.    Yes.

2       Q.    -- and Zoom calls?

3       A.    Yes.

4       Q.    Again, just -- I -- you knew where I was going,

5  but try not to talk over me because that makes it hard

6  for the court reporter.  Okay?

7       A.    Yes.

8       Q.    All right.  And the e-mails, was one or more of

9  the lawyers we've discussed on each and every one of

10  those e-mails?

11       A.    Yes.

12       Q.    Are you familiar with Dr. Joseph Penn?

13       A.    I know who he is.

14       Q.    Who is he?

15       A.    Well, he is a correctional psychologist with

16  decades of experience.  I believe he has a leadership

17  role in the Texas Department of Corrections.  I know he

18  had a leadership role in NCCHC.  I've seen him give

19  presentations.

20            And I have participated in one meeting with him,

21  probably in the last year, in which clinical care was

22  discussed, unrelated to Arizona.  Just standards of

23  practice.

24       Q.    Has Centurion ever retained Dr. Penn or had any

25  other kind of financial relationship with him?

12

```
 1                 MS. HESMAN:  Form.  Foundation.

 2                 MS. BARNES:  Foundation.

 3                 THE WITNESS:  I'm sorry.  I missed what was

 4    said.

 5        Q.   (By Mr. Fathi) Has Centurion ever retained

 6    Dr. Penn or had any other kind of financial relationship

 7    with him?

 8                 MS. HESMAN:  Same objection.

 9                 MS. BARNES:  Same objection.  And you can

10    go ahead, Dr. Wilson.  We just have to preserve those

11    objections for the record.

12                 THE WITNESS:  Not to my knowledge.  I know

13    of no financial arrangement with him.

14        Q.   (By Mr. Fathi) So to your knowledge Centurion

15    has never hired Dr. Penn or compensated him in any way?

16        A.   That is correct.

17                 MS. BARNES:  Same objection.

18        Q.   (By Mr. Fathi) Have you ever had any

19    communication with Dr. Penn about this case?

20        A.   No.

21        Q.   Have you ever exchanged any documents with

22    Dr. Penn in connection with this case?

23        A.   No.

24        Q.   Do you have any plans to meet with Dr. Penn in

25    connection with this case?
```

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

1   A.   I do not.

Hearsay, Rule 802; Relevance, Rule 402

2   Q.   Doctor, do you hold any professional licenses?

3   A.   Yes.

4   Q.   And what are they?

5   A.   I'm licensed in the state of Virginia as a

6   clinical psychologist.   That's an active license.   I have

7   an inactive license in New York state as a psychologist.

8   Q.   And have you ever held any other professional

9   license in any state?

10   A.   Not a license, no.

11   Q.   When you say "not a license," were you thinking

12   of something else?

13   A.   I am certified as a correctional healthcare

14   professional with NCCHC and I also hold certification as

15   a professional -- professional in healthcare quality.

16   Q.   Okay.

17   A.   But not a license.

18   Q.   Thank you.   Have you ever been subject to

19   suspension or revocation of your license, a public or

20   private reprimand or any other form of professional

21   discipline by a licensing body?

22   A.   I have not.

23   Q.   Have you ever been convicted of a felony?

24   A.   I have not.

25   Q.   Have you ever testified in court?

14

1      A.   I have.

2      Q.   Tell me about that.  How many times?

3      A.   To the best of my recollection, two or three

4  times.

5      Q.   And when were those?

6      A.   To the best of my recollection, the most recent

7  was in 2005 or perhaps 2006.

8      Q.   All right.  Let's start with that one.  What was

9  that case about?

10     A.   That was a civil proceeding seeking judicial

11 authorization for involuntary treatment for a patient who

12 was suffering from schizophrenia.

13     Q.   Was that patient incarcerated?

14     A.   No.

15     Q.   And where was this?

16     A.   In Virginia.

17     Q.   And how did you come to testify about -- in this

18 proceeding?

19     A.   I was the treating psychologist.

20     Q.   All right.  What about the time before that?

21     A.   I -- I would have -- this would have been 1995,

22 and would -- I would have been a psychology intern with

23 the bureau of prisons.

24          And it was a judicial proceeding to determine

25 whether a patient met criteria of being found not guilty

15

1    by reason of insanity.  That patient was incarcerated.

2        Q.   And where -- where was this?

3        A.   The patient was incarcerated in North Carolina,

4    and the testimony, I believe, was in Richmond, Virginia.

5        Q.   Was the patient at the Butner facility?

6        A.   Yes.

7        Q.   And then you said two or three.  Was there a

8    time before the 1995?

9        A.   Well, no.  Not before.  But what I have recalled

10   while I've been talking is that, in fact, the state

11   psychiatric hospital that I worked in in Virginia had a

12   court on the premises that met three times a week for

13   their proceedings.  And I failed to recall that, so I

14   need to amend my initial answer.

15            And I -- I testified at most of those

16   proceedings as the treating psychologist for civil

17   commitment.  So that would have been three times a week

18   for a couple years.  During the time period of 1994 to

19   '6.

20       Q.   Okay.

21       A.   No, I apologize.  2004 to 2006.

22       Q.   Okay.  So with your recollection now, how many

23   times would you say you have testified in court?

24       A.   Well, that would have involved somewhere in the

25   neighborhood of two to four patients -- two or four

16

```
 1    cases, maybe -- maybe even six a week for a couple years.

 2            So I'd have to do the math by -- by hand to give

 3    you a calculation there.  But I think it's fair to

 4    characterize that as multiple dozens of times.

 5        Q.   Well, indeed, if it's six times a for two years

 6    that comes out to approximately 600.  So would it be fair

 7    to say hundreds?

 8        A.   Hundreds, yeah.

 9        Q.   Okay.  All right.  And in all of the cases that

10    you've discussed, did you testify as an expert witness or

11    a lay witness?

12            MS. HESMAN:  Form.  Foundation.

13            THE WITNESS:  So expert in the involuntary

14    treatment trial.  I believe the court didn't, because of

15    my internship status, did not find me to be an expert in

16    that ERI trial in Virginia.

17            And I apologize, I don't recall being

18    characterized one way or the other.  I certainly wasn't a

19    lay witness or a fact witness.  I was a treating provider

20    in the civil commitment hearings that I testified for.

21        Q.   Okay.  Thank you.

22            Other than the cases that you've just described,

23    have you ever filed a declaration or an affidavit in

24    court?

25            MS. HESMAN:  Form.  Foundation.
```

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

17

1          THE WITNESS:  Can I ask a clarifying

2   question?

3      Q.   (By Mr. Fathi) Of course.

4      A.   Would that involve -- would that include things

5   like power of attorney, durable power of attorney for my

6   parents or something like that?

7      Q.   I think it technically would, but I'm not really

8   interested in that.  I'm asking primarily about your

9   experience as a psychologist and your experience with

10  Centurion.

11          So with that clarification, other than the cases

12  that we've discussed, have you ever filed a declaration

13  or an affidavit in court?

14          MS. HESMAN:  Same objection.

15          THE WITNESS:  No, I have not.

16      Q.   (By Mr. Fathi) Have you ever been named as a

17  defendant in a lawsuit?

18      A.   Yes.

19      Q.   How many times?

20      A.   To my knowledge and recollection, once.

21      Q.   Tell me about that.

22      A.   This occurred while I was chief psychologist at

23  the Central New York Psychiatric Center in upstate New

24  York.  It was filed by an incarcerated patient.  And I

25  was named as a defendant as chief psychologist.

                                                                18

1        Q.   And when was that?

2        A.   Probably 2002 or 2003.

3        Q.   Was the case in state or federal court?

4        A.   I don't recall.

5        Q.   What was the name of the -- the plaintiff, the

6   person who filed the case?

7        A.   I don't recall.  I certainly remember the name

8   of the patient.

9        Q.   I'm sorry.  That's what I meant.  Who was the

10  patient involved?

11       A.   Am I permitted to disclose that?  This was a --

12  I guess I am.

13       Q.   If it was in a -- in a public court filing, then

14  it's no longer confidential.

15       A.   Okay.  Very good.  Archie Bristol,

16  B-r-i-s-t-o-l.

17       Q.   S-t-o --

18       A.   L.

19       Q.   Bristol, okay.  Thank you.

20            And to your recollection that's the only time

21  you've been named as a defendant in a lawsuit?

22       A.   Yes, sir.

23       Q.   Okay.  Let's look at Exhibit 1, please.

24            (Deposition Exhibit 1 was marked for

25  identification.)

19

 1       Q.    (By Mr. Fathi) Doctor, Exhibit 1 -- excuse me --
 2    is your report so you can look at it on the screen or the
 3    copy in front of you.
 4       A.    Very good.
 5       Q.    Pardon me.  Doctor, is Exhibit 1 your expert
 6    report in this case?
 7       A.    Yes.
 8       Q.    And at the end, there's a document that you've
 9    appended -- appended as Exhibit A.  Would you turn to
10    that, please?
11       A.    Yes.
12       Q.    And this is a one-page document.  Was this
13    intended to be a one-page document?
14       A.    Yes.
15       Q.    What is Exhibit A?
16       A.    This is a compressed, brief C.V. that captures
17    my essential and recent work experience, education and
18    recent publications and presentations.
19       Q.    Did you prepare this document?
20       A.    I did.
21       Q.    And when did you prepare it?
22       A.    I updated it in preparation for today's
23    deposition.  And I have kept a one-page C.V. relatively
24    up to date for some number of years.
25       Q.    So is it your testimony that a prior version of

20

1    this one-page document existed and then you updated it

2    for this deposition?

3        A.    Yes.

4        Q.    As of today, is this Exhibit A a complete and

5    accurate account of your educational and professional

6    background?

7        A.    Yes.

8        Q.    Is there anything that you would like to change

9    as we sit here today?

10       A.    There is nothing.  If there's questions about my

11   background I'd be glad to elaborate.

12       Q.    Will you turn to page 1 of your report, please?

13       A.    Yes.

14       Q.    Now, on page 1 in the third paragraph, you

15   write, "A short form of my curriculum vitae is attached

16   as Exhibit A."

17             Do you see that language?

18       A.    I do.

19       Q.    Do you have another, longer version of your

20   C.V.?

21       A.    Not that is current.

22       Q.    So why did you not attach the longer version of

23   your C.V.?

24       A.    Because it's not -- it hadn't been updated in

25   years.  It would take a lot of time for me to update

21

1    that.

2        Q.   What kind of information is included in the

3    longer version of your C.V. that is not in the short

4    version that is Exhibit A?

5        A.   It would include many more workshops and

6    presentations or training that I've done over the years.

7        Q.   Anything else?

8        A.   No.

9        Q.   All right.  Back to Exhibit A, please.  Do we

10   need it on the -- okay.  There it is.

11           At the bottom of this document, there's a

12   heading, "Most Recent Presentations and Workshops."  Do

13   you see that?

14       A.   I do.

15       Q.   And the oldest entry here is August of 2020.  Do

16   you see that?

17       A.   I do.

18       Q.   Is this a complete list of all the presentations

19   and workshops you've done since August of 2020?

20               MS. BARNES:  Form.

21               THE WITNESS:  There is one workshop that's

22   coming up at the upcoming NCCHC conference that I failed

23   to list here.

24       Q.   (By Mr. Fathi) Okay.  But that hadn't happened

25   yet?

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

22

1      A.    No.

2      Q.    Other than that, is this a complete account of

3    all your workshops and presentations since August of

4    2020?

5      A.    I gave an additional training in the summer of

6    2021 on suicide risk assessment and prevention in

7    corrections to the Georgia Department of Corrections.

8    And I apologize; that's missing.

9      Q.    Anything else missing?  Any other presentations

10   and workshops you've given since August 2020 that are not

11   listed here?

12     A.    To be certain of my answer, I would really have

13   to check my records.

14     Q.    But as you sit here today, can you recall any

15   other presentations and workshops since August of 2020

16   that are not listed here?

17     A.    There are additional staff training sessions

18   that I have done around the country, but I don't

19   typically list those on my C.V.

20     Q.    If we looked at your longer version of your C.V.

21   they wouldn't appear on that document?

22     A.    No.

23     Q.    And why did you not list the Georgia workshop on

24   this document?

25     A.    It was a failure of time and memory.

23

1      Q.    You have a Ph.D. in clinical psychology, is that
2   right?
3      A.    Yes, sir.
4      Q.    And in the course of earning that degree, did
5   you write a dissertation?
6      A.    I did.
7      Q.    What was the topic?
8      A.    The topic was on schizotypy or -- and the
9   relationship between past vulnerability and attentional
10  functioning, the function of attention, and the function
11  of interpersonal attachment.
12     Q.    Okay.  Back to your -- back to your resume,
13  please.  Doctor, on your resume under "Recent
14  Publications," you list seven publications.  Do you see
15  that?
16     A.    I do.
17     Q.    Are these all the publications you have authored
18  in the last 10 years?
19     A.    They are.
20     Q.    So there are no other publications in the last
21  10 years that are not listed here; correct?
22     A.    Correct.
23     Q.    Do you have any other publications in process?
24     A.    I do.
25     Q.    Could you tell me about them?

24

1      A.   I have an additional paper that's under review

2   with colleagues that continues the work on suicide

3   prevention.  And that has been submitted and it's under

4   review.

5           And then there is a final paper that's in

6   preparation on the same topic.

7      Q.   Any other publications that you currently have

8   in process?

9      A.   No, sir.

10     Q.   Of the seven publications listed on your C.V.,

11  how many were published in peer-reviewed journals?

12     A.   Four.

13     Q.   And which ones are those?

14     A.   They are Boren, Folk, et al.

15     Q.   Okay.

16     A.   Disabato, Folk, et al.; Folk, Disabato, et al.,

17  and Folk, Loya, et al.

18     Q.   Okay.  According to your resume you have been

19  vice president of behavioral health services for

20  Centurion since 2020.  Is that correct?

21     A.   Yes.

22     Q.   And what month did you start that position?

23     A.   April.

24     Q.   April of 2020?

25     A.   Yes.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

25

1    Q.    And before that you were vice president of

2    clinical development from 2014 to 2020.   Is that right?

3    A.    Yes.

4    Q.    In that position, did you have any involvement

with the Arizona contract?

     A.    I helped develop Centurion's proposals for two

cycles of RFP.

8    Q.    I'm sorry.   Just a minute, Doctor.   I'm hearing

9    some extraneous noise.   Do we know what that is?

10   A.    I heard it, too.

11             MS. BARNES:   I'm not sure what you heard.

12   I didn't hear anything.   There's somebody that's a little

13   bit loud outside my office.   Do you hear talking?

14             THE WITNESS:   Yes.

15             MS. BARNES:   Hold on one second.

16             Yet another Zoom going on next door.

17   Sorry.   The world of Zoom.

18             MR. FATHI:   Thank you.

19   Q.    (By Mr. Fathi) Doctor, just so the record is

20   clear, I'm going to re-ask my question.   As VP of

21   clinical development, did you have any involvement with

22   the Arizona contract?

23   A.    Yes.

24   Q.    And what was that involvement?

25   A.    I helped develop the proposals that Centurion

**Relevance, Rule 402**
Witness's involvement with AZ contract is relevant. Rule 401, 402

**Relevance, Rule 402**
See below.

**Cumulative, Rule 403**
See below.

**Cumulative, Rule 403**
See below.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

26

Relevance,
Rule 402

Foundation,
Rule 602

Witness's
involvement
with
AZ contract is
relevant. Rule
401, 402. Not
cumulative;
questions
were
not previously
answered.
Rule
403. Witness
was
able to answer
the questions.
Rule 602.

1   submitted in response to two requests for proposals from

2   the Department of Corrections.

3       Q.   And when -- when were those proposals submitted?

4       A.   I would have to refresh my memory by looking at

5   documents.  But to the best of my -- sitting here today,

6   2016, 2018.

7       Q.   And was the 2018 proposal the one that led to

8   Centurion beginning the contract on July 1, 2019?

9       A.   Yes.

10      Q.   What was your role in developing that proposal?

11      A.   I assisted with technical language to address

12  the clinical requirements that were laid out in the

13  requests for proposals.

14           Is that a clear answer?

15      Q.   Yes.  Was there anything else?

16      A.   My recollection is that with the first proposal

17  that was not successful, I had involvement with staffing

18  proposal considerations.

19      Q.   Thank you.  Did you have any involvement with

20  staffing considerations in the 2018 or 2019 proposal?

21      A.   Again, I would have -- have to refresh my memory

22  by looking at documents, but my memory is that the 2018

23  or '19 RFP may have laid out for us what staffing needed

24  to be provided.

25           The DOC may have actually mandated that.  And if

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

27

Relevance,
Rule 402

Foundation,
Rule 602

Witness's
involvement
with
AZ contract
is
relevant.
Rule 401,
402
Witness was
able to
answer
the
questions.
Rule 602.

1    that memory's correct, and I -- I can't be sure, then any

2    discussions that I had around Centurion staffing would

3    have been limited to the implications of that mandated

4    staffing for clinical care and considerations for a

5    regional office leadership staffing.

6         Q.   Do you have any recollection of those

7    discussions as you sit here today?

8         A.   I'm fairly confident they had discussions around

9    the regional office staffing.  There may have been a

10   number of positions that were considered or felt to be

11   needed and added.  But I don't have specific memories.

12        Q.   And who were those discussions with?

13        A.   They would have been with senior members of our

14   operations team and our business development team.

15        Q.   And what are the names of those people?

16        A.   Rebecca Leuthy.  Do you want me to spell?

17        Q.   I think the court reporter would appreciate it.

18        A.   L-e-u-t-h-y.  Robert May.  Rock Welch.  Julie

19   Buehler, spelled B-e-u-h-l-e-r.

20             And there may have been other participants in

21   those discussions, but those would have been the four key

22   folks.

23        Q.   Was Steve Wheeler involved?

24             MS. BARNES:  Form and foundation.

25             THE WITNESS:  Your question is was Steve

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

28

Relevance,
Rule 402

Foundation,
Rule 602

Hearsay,
Rule 802

Witness's
involvement
with
AZ contract is
relevant. Rule
401, 402
Witness was
able to answer
the questions.
Rule 602.
Rule 801(d)(2)
non-hearsay
statement of
opposing party/
agent.

1  Wheeler involved in discussions around staffing the

2  regional office?

3      Q.    (By Mr. Fathi) Correct.

4            MS. BARNES:  Same objection.

5            THE WITNESS:  I apologize.  I don't have a

6  memory one way or the other.  It is possible.

7      Q.    (By Mr. Fathi) And tell me about the substance

8  of these discussions around staffing a regional office?

9      A.    I wish I could.  I apologize.  My -- my

10  challenge is that during that time period, I had multiple

11  discussions about multiple projects.  And it is very

12  difficult three years later to recall specifics about a

13  specific proposal.

14         I believe the gist in Arizona had to do with

15  ensuring that we had enough regional resources to manage

16  the complex requirements of the contract.

17         And specifically around the contract monitoring

18  that was required with the hundreds of performance

19  measures.  The -- I think there may have been questions

20  around information, there we go, information technology

21  and the need for interfaces that enabled automated

22  reporting to occur.

23         And just adequate oversight management of

24  service delivery in complexes.

25         So I am reconstructing all of that based on

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

29

Relevance,
Rule 402

Foundation,
Rule 602

Witness's
involvement with
AZ contract is
relevant. Rule
401,402.

Witness was
able to answer
the questions.
Rule 602.

Relevance,
Rule 402

Witness's
involvement
with
AZ contract is
relevant. Rule
401, 402

1    probabilities.   I don't have specific memory of specific

2    content.

3        Q.    Other than what we've discussed, did you have

4    any role in discussions around staffing for the 2018

5    Arizona proposal?

6        A.    Not that I can recall.

7        Q.    Does your current position as VP of behavioral

8    health involve providing direct patient care to

9    incarcerated people?

10       A.    No.

11       Q.    Does your current position involve reviewing the

12   healthcare records of incarcerated people?

13       A.    To a limited degree.

14       Q.    Tell me about how your current position involves

15   reviewing the healthcare records of incarcerated people.

16       A.    There are two ways in which it may.

17             One is if I'm called upon to participate in a

18   quality review process potentially for examining our

19   readiness for NCCHC accreditation or adherence to

20   national standards.

21             And the other is if I'm called to assist in

22   providing patient-specific consultation for a difficult,

23   challenging patient where staff are scratching their

24   heads and don't -- don't know how to make further

25   progress with a patient.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

30

Relevance,
Rule 402

Foundation,
Rule 602

Witness's
involvement
with AZ
contract
is relevant.
Witness was
able to
answer
the
questions.
Rule 602.

1    Q.    When was the last time you reviewed the medical

2    record of a person incarcerated in Arizona?

3    A.    May I consult my report?

4    Q.    Of course.

5    A.    After reviewing my report, I believe the last

6    time that I reviewed patient care records in Arizona was

7    earlier this year, as part of a team that was preparing

8    the Yuma complex for NCCHC accreditation.

9         I would have to review my calendar to give you a

10   month or a date.

11   Q.    Can you give me a season?  Winter, spring?

12   A.    The spring.

13   Q.    So perhaps March, April?

14   A.    Yeah.

15   Q.    So I take it you have not reviewed any Arizona

16   patient records in connection with this litigation?

17   A.    I have not.

18   Q.    Did your -- I'm sorry.  About how many hours in

19   an average week would you say you spend reviewing Arizona

20   patient records?

21   A.    I think the average would be zero.

Relevance,
Rule 402

Witness's
involvement with
AZ contract is
relevant. Rule
401, 402

22   Q.    Did your prior position at Centurion as VP of

23   clinical development involve providing direct patient

24   care to incarcerated people?

25   A.    It did not.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

31

Relevance, Rule 402

Witness's involvement with AZ contract is relevant. Rule 401, 402

1    Q.    Did it involve the review of medical records of

2    incarcerated people?

3    A.    Yes.

4    Q.    And please tell me about that.

5    A.    It was, again, occasional.   And either involved

6    quality improvement reviews, accreditation readiness.   Or

7    very rarely, but occasionally, once a year or so,

8    consultation of patient-specific treatment concerns.

Relevance, Rule 402

Witness's involvement with AZ contract is relevant. Rule 401, 402

9    Q.    Doctor, when was the last time you had a job

10   that involved providing correct -- excuse me -- direct

11   patient care?

12   A.    2006.

13   Q.    And was that when you were at Southwestern

14   Virginia Mental Health Institute?

15   A.    It was.

16   Q.    Have you ever had a job that involved on a

17   routine basis providing direct patient care to

18   incarcerated people?

19   A.    I have.

20   Q.    And when was that?

21   A.    That was at Central New York Psychiatric Center,

22   which is a state hospital operated by the Office of

23   Mental Health, but it only treats incarcerated patients.

24   Q.    And what time period was that?

25   A.    Approximately 2002, 2004.   I'll have to look at

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

32

Relevance, Rule 402

Waste of Time, Rule 403

Witness's involvement with AZ contract is relevant. Rule 401, 402

Not cumulative; questions were not previously answered. Rule 403

1    that.

2    Q.   And since that position, have you had a job that

3    involved on a regular basis providing direct patient care

4    to incarcerated people?

5    A.   No.  Primarily I've been working

6    administratively.

7    Q.   Doctor, in what city and state do you reside?

8    A.   I reside in Houston, Texas.

9    Q.   And in what city and state is your office?

10    A.   Our corporate office is in Vienna, Virginia.  I

11    work from home.

12    Q.   I see.  As do many of us right now.  So you work

13    from your home in Houston?

14    A.   I do.

Relevance, Rule 402

Waste of Time, Rule 403

Witness's personal knowledge of AZ prisons and AZ contract is relevant. Rule 401, 402, 403.

Not cumulative; questions were not previously answered. Rule 403

15    Q.   When was the last time you were inside an

16    Arizona prison?

17    A.   It was either March 2021 when I helped provide

18    consultation and training at Florence and Tucson, or a

19    little later at Yuma with the NCCHC survey prep review.

20    Q.   Okay.  So just so I understand, your testimony

21    is that you were at -- you were inside the Florence

22    and -- I'm sorry, which --

23    A.   Tucson.

24    Q.   And Tucson prisons in March of 2021.  And also

25    inside the Yuma prison possibly a little bit later than

Relevance, Rule 402

Waste of Time, Rule 403

Witness's involvement with AZ contract is relevant. Rule 401, 402, 403.

Relevance, Rule 402

Waste of Time, Rule 403

Witness's personal knowledge of AZ prisons and AZ contract is relevant. Rule 401, 402, 403.

Relevance, Rule 402,

Waste of Time, Rule 403

Witness's personal knowledge of AZ prisons and AZ contract is relevant. Rule 401, 402, 403

1   that?

2       A.   Either earlier or later, but it was 2021.

3       Q.   Okay.

4       A.   First half.

5       Q.   About the same time?

6       A.   Yeah.

7       Q.   Okay.  When was the last time you were

8   physically in the state of Arizona?

9       A.   For work?

10      Q.   For -- yes, let's start with that.

11      A.   It would have been on one of those visits that I

12  just indicated.

13      Q.   Okay.  Are you the direct supervisor of any

14  Centurion employees who work in Arizona?

15      A.   No.

16      Q.   In an average week about how much of your time

17  do you spend on the Arizona contract?

18      A.   I'd like to answer that differently.

19      Q.   All right.

20      A.   Because asking for an average washes out the

21  variability, which can be very substantial.

22           Some weeks I spend no time at all with my

23  attention on Arizona.  And there have been other weeks

24  when most of my time, 90 percent has been focused on

25  Arizona.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

34

Relevance,
Rule 402

Waste of
Time, Rule
403

Witness's personal
knowledge of
AZ prisons and
AZ contract is
relevant. Rule
401, 402, 403

1    So most weeks in the last year I have not been

2  focused on Arizona.

3    Q.   Since let's say the middle of July of this year,

4  give me an average, or, if you prefer, give me a range of

5  how much time per week you spent on the Arizona contract.

6          MS. BARNES:   Form.

7          THE WITNESS:   Perhaps one.

8    Q.   (By Mr. Fathi) I'm sorry, say again, please.

9    A.   I'm sorry.   Perhaps one to two hours a week on

10 average.

11   Q.   And you say on page 1 of your report that -- I'm

12 sorry.  Why don't we bring it up so everyone can see.

13        So, Doctor, on page 1 of your report in the

14 penultimate paragraph you say that, "Centurion has

15 correctional healthcare programs in 13 state correction

16 systems and four county detention systems across the

17 United States."

18        Is that correct?

19   A.   It's 13 or 14, yeah.   It is correct.

20   Q.   And according to your report, you are

21 responsible for providing clinical consultation, guidance

22 and leadership across all of those programs; correct?

23   A.   Yes.

24   Q.   While we're here let's go up to the previous

25 paragraph.   And in the final sentence of that paragraph,

35

1    you say, "I have not been compensated for the preparation
2    of this report other than my regular salary."
3            Do you see that, Doctor?
4    A.   I do see that.
5    Q.   And that is correct?
6    A.   Absolutely correct.
7    Q.   Has Centurion been compensated in any way for
8    this report or for your work in connection with this
9    case?
10           MS. BARNES:  Form and foundation.
11           MS. HESMAN:  Form.  Foundation.
12           THE WITNESS:  Not to my knowledge.
13   Q.   (By Mr. Fathi) Okay.  Have you ever personally
14   spoken to an incarcerated person in Arizona?
15   A.   Yes.
16   Q.   When was the last time that happened?
17   A.   It would have either been at Tucson or Yuma.
18   Q.   So in March of 2021?
19   A.   Yes.
20   Q.   And when was the last time before that that you
21   personally spoke to a person incarcerated in Arizona?
22   A.   There was not a prior time.
23   Q.   So that was the only time?
24   A.   Yes.
25   Q.   Okay.  So as we've discussed, Doctor, Exhibit 1

Relevance,
Rule 402

Waste of
Time, Rule
403

Witness's personal
knowledge of
AZ prisons and
AZ contract is
relevant. Rule
401, 402, 403.

36

1   is -- is your report.  Did you write this report?

2        A.    I did.

3        Q.    Did you write it in its entirety?

4        A.    Yes.

5        Q.    So no one else drafted any part of it?

6        A.    There -- there was a frame for the report that I

7   was given.  But the specific wording is mine.

8        Q.    And what did that frame look like?

9        A.    It -- it structured the order, and I did receive

10  some specific wording changes from counsel.  But

11  essentially I was asked to address my current role and

12  responsibilities.  It's the Roman numerals that you see

13  in front of you.

14       Q.    So was the frame, was it sort of an outline?

15       A.    Yes.

16       Q.    And about how -- how much text was that?  One

17  page, two pages?

18                 MS. BARNES:  Objection.

19                 MS. HESMAN:  Objection.

20                 MS. BARNES:  I'm going to interject here,

21  David.  This is delving into an area that you're not

22  entitled to.  You're not entitled to anything related to

23  the drafts of these reports.  And the questions are going

24  in that direction so I'm going to ask you to move along.

25       Q.    (By Mr. Fathi) Doctor, about how long was the

1    frame that you were given?

2              MS. BARNES:  Same objection.  I'm going to

3    instruct him not to answer.

4        Q.   (By Mr. Fathi) And, Doctor, who gave you that

5    frame?

6              MS. BARNES:  Same objection and same

7    instruction.

8        Q.   (By Mr. Fathi) Doctor, who gave you the specific

9    wording changes that you referred to?

10             MS. BARNES:  Again, same instruction.

11   You're not entitled to that information.  Not only under

12   the rule related to the expert report drafts, but you're

13   also now encroaching into the attorney work product

14   privilege, so I'm going to instruct him not to answer.

15       Q.   (By Mr. Fathi) Doctor, when did you write this

16   report?

17       A.   I completed the report on Wednesday late last

18   week.  And I started thinking about it and -- and writing

19   notes perhaps a week earlier.  Pretty much as soon as I

20   knew that a report was going to be required.

21       Q.   And I'm sorry, when was this, approximately?

22       A.   Approximately -- approximately a week before I

23   finished it.

24       Q.   So this would have been in early to mid October;

25   is that right?

38

1      A.   I would say mid October.

2      Q.   How many hours did you spend writing on this

3   report from start to finish?

4      A.   I would have to guess.  I apologize.  But it's

5   probably 20 to 30 hours.

6      Q.   And what documents did you review in order to

7   write this report?

8      A.   I reviewed the expert reports that I mentioned

9   at the top of my deposition.  And I reviewed a log of

10   self-injury that Centurion of Arizona maintains, was sent

11   to me.  And I reviewed Arizona DOC statistical reports

12   for self-injury and average daily population month over

13   month.

14      Q.   Any other documents that you reviewed to write

15   this report?

16      A.   Not to my recollection.

17      Q.   You mentioned a Centurion self-injury log.  Is

18   that something that is kept in the ordinary course of

19   business?

20      A.   To my knowledge, yes.

21      Q.   So that's something that Centurion has been

22   keeping in Arizona since it assumed the contract in 2019?

23           MS. HESMAN:  Form.  foundation.

24           THE WITNESS:  My understanding is that it

25   goes -- it is July 2020, not in July 2019.  And I do not

39

```
 1   know why.
 2       Q.   (By Mr. Fathi) Okay.  So as far as you know that
 3   document has been maintained in Arizona only since July
 4   of 2020?
 5            MS. HESMAN:  Same objection.
 6            THE WITNESS:  The log that I reviewed was
 7   started in 2020 and wasn't in -- that particular log was
 8   not in existence, my understanding was prior.
 9       Q.   (By Mr. Fathi) Prior to July of 2020?
10       A.   Correct.
11       Q.   Doctor, who did you speak to in order to write
12   this report?
13            MS. BARNES:  Form.
14            THE WITNESS:  Besides counsel?
15       Q.   (By Mr. Fathi) Yes.
16       A.   In seeking Centurion data on self-injury, I did
17   speak with an individual from our regional office.  First
18   name is Janine, and she was able to provide this log.
19       Q.   And when you say the regional office, is that
20   the regional office in Arizona?
21       A.   Yes.
22       Q.   Okay.  Whom else did you speak to in order to
23   write this report?
24            MS. BARNES:  Form.  Asked and answered.
25            THE WITNESS:  I had no other substantive
```

1   discussions outside of counsel in preparing the report.

2   I may have alerted Dr. Wu on my progress on my report,

3   but --

4       Q.    (By Mr. Fathi) But what?

5       A.    That would have been in passing, and -- approach

6   wasn't discussed.

7       Q.    Would Janine's last name be Gahris, G-a-h-r-i-s?

8       A.    Yes.  It would.

9       Q.    Okay.  Doctor, let me go back to a topic we

10  discussed a moment ago.  You testified that you were in

11  Arizona prisons in approximately March and April of this

12  year; is that right?

13      A.    Yes.

14      Q.    Were those the only times you've ever been

15  inside an Arizona prison?

16      A.    No.

17      Q.    When was the last time before March or April of

18  this year that you were in an Arizona prison?

19      A.    As part of the -- I'm going to say 2016

20  procurement cycle, I toured all of them, all the corridor

21  complexes.

22      Q.    Any other time you've ever been inside an

23  Arizona prison?

24      A.    Not to my recollection.

25      Q.    Okay.  Let's look at page 2 of your report,

Relevance,
Rule 402

Cumulative,
Rule 403

Witness's personal
knowledge of
AZ prisons and
AZ contract is
relevant. Rule
401, 402, 403
Not cumulative;
questions were
not previously
answered.
Rule 403

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

41

1    please.

2         Doctor, on page 2 of your report, in the

3    penultimate paragraph, four lines down you refer to,

4    "In-cell self-study programming for incarcerated

5    patients."

6         Do you see that language?  I'm sorry?

7    A.   I do.

8    Q.   All right.  Is it your testimony that this

9    constitutes mental health treatment?

10        MS. HESMAN:  Form.  Foundation.

11        THE WITNESS:  It is a component of mental

12   health treatment.  It certainly does not constitute the

13   entire spectrum of mental health treatment.

14   Q.   (By Mr. Fathi) All right.  And in the final

15   paragraph on -- starting on the first line, you refer to,

16   "Written patient" -- "Written patient education

17   handouts."

18        Do you see that language, Doctor?

19   A.   I do.

20   Q.   Is it your testimony that written patient

21   education handouts constitute mental health treatment?

22   A.   I would have the same answer in that it's a

23   component.  And I'd like to elaborate if I may.

24   Q.   Please.

25   A.   It's not a substitute for face-to-face

**Incomplete, Rule 106**

**Hearsay, Rule 802**

"Incomplete" objection is meaningless. Defendants can counter-designate. Rule 801(d)(2) non-hearsay statement of opposing party/agent.

**Incomplete, Rule 106**

**Hearsay, Rule 802**

"Incomplete" objection is meaningless. Defendants can counter-designate. Rule 801(d)(2) non-hearsay statement of opposing party/agent.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

42

Incomplete, Rule 106

"Incomplete" objection is meaningless. Defendants can counter-designate.

Hearsay, Rule 802

1    encounters.   There are many incarcerated individuals who

2    need education and pointers on managing stress.   They may

3    not have a psychiatric disorder.

4            So these patient education handouts are intended

5    to be appropriate for general population patients --

6    inmates as well as patients who are receiving ongoing

7    care and might need or want a little extra

8    psycho-education --

9        Q.   All right.

10       A.   -- supplement.   Not -- not core.

11       Q.   Okay.   At the top of page 3, in the paragraph

12   numbered 1, you write, "During 2020, our behavioral

13   health leadership in Arizona began to recognize

14   challenges in the use of clinical restraints, and in

15   particular the need for psychiatric providers to engage

16   in enhanced scrutiny and management of restraint

17   practices."

18           Do you see that language, Doctor?

19       A.   I do.

20       Q.   Who is the behavioral health leadership you're

21   referring to?

22       A.   Dr. Anthony Carr, who was -- is the statewide

23   psychiatric director.   And Dr. Stefanie Platt, who is the

24   former behavioral health director state-wide for

25   Centurion in Arizona.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

43

1    Q.    And why was there a need for psychiatric

2  providers to engage in enhanced scrutiny and management

3  of restraint practices?

4    A.    In Arizona, unlike any other DOCs that I'm

5  familiar with, the department had promulgated a policy

6  that permitted psychologists to take -- order people in

7  and order people out of clinical restraints.

8          And Dr. Carr, Dr. Platt, and myself, were

9  concerned that because the -- because use of restraints

10  carries with it significant medical risks up to and

11  including mortality, inadvertent death, it was not

12  appropriate for professionals who are not medically

13  trained to be making those decisions about placing

14  patients in or taking them out of clinical restraints.

15          We all agreed that psychiatric providers needed

16  to be involved in these cases.

17    Q.    Under the policy or practice that you're

18  describing, was there anyone else besides psychologists

19  who could put people in or take people out of restraints?

20    A.    Yes.    And I need to clarify my language, and I

21  apologize for that.

22          So the placement of somebody in clinical

23  restraints, the physical placement, typically is done by

24  correctional officers.

25          And it is possible to place somebody in clinical

Hearsay,
Rule 802

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

44

Hearsay,
Rule 802

1   restraints in an emergency to prevent further harm and

2   then obtain an order for those clinical restraints on an

3   emergent, immediate basis.

4          The -- the issue that I meant to articulate is

5   that order was -- was permitted to be written, authorized

6   by psychologists in Arizona.  And as well as

7   psychiatrists.

8          And our -- our effort was to limit the

9   authorization of the restraint use to psychiatry.

10      Q.   Okay.  So under this policy and practice that

11  you're describing, were there any other categories

12  besides psychiatrists and psychologists who were

13  authorized to authorize the placement of someone in

14  restraints?

15      A.   No.  Not to my knowledge.

16      Q.   So RNs were not so authorized?

17      A.   Again, RNs, or even master's that were mental

18  health professionals to my knowledge might say we've got

19  to get a patient into restraints, but then the next step

20  would be to obtain sort of immediate retroactive

21  authorization for that.

22          So it's possible that some other staff would

23  initiate the restraint application, but the

24  authorization, to my knowledge, was limited to

25  psychiatric and psychology staff professionals.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

45

1    Q.   And what was the impetus for reviewing these

2  restraint policies and practices?

3    A.   It was -- it was twofold.

4      I was very surprised to learn of this because

5  it's -- it's unusual.  And once -- once I learned of it,

6  and it really was Dr. Platt and Carr reaching out and

7  consulting, they were concerned that restraints might be

8  overused, and that patients might be maintained in

9  clinical restraints not only too frequently, but too

10  long, for too long of a duration.  So that was one

11  concern.

12      We want to use clinical restraints as a last

13  resort, very rarely, only when necessary and all other

14  alternatives have been determined to be ineffective or

15  not feasible.

16      And then the other is that we really wanted our

17  restraint practice to meet the community standards, in

18  particular the Arizona Department of Health Services

19  standards and the Arizona code.

20      So we had to bring our practice in alignment

21  with community standards, and we also wanted to decrease

22  the use of restraints.

23    Q.   Were there any adverse patient outcomes as a

24  result of this practice and policy?

25        MS. HESMAN:  Form.  Foundation.

Foundation, Rule 602

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

46

**Foundation, Rule 602**

Witness's lack of knowledge is itself evidence. Rule 602.

1    THE WITNESS:  I don't know the answer to

2  that.  I asked that same question and was informed that

3  there were near misses.  To my knowledge there have been

4  no deaths or serious medical injuries while in

5  restraints, but my knowledge is limited.

6          That was our concern, however.  We wanted

7  to avoid adverse outcomes.  We wanted to avoid

8  unnecessary uses of force.  We wanted to avoid intrusive,

9  restrictive interventions if we could avoid them.  We

10  wanted to preserve patient dignity and autonomy.

11    Q.    (By Mr. Fathi) Tell me about the near misses.

12    A.    I can't.

13          MS. BARNES:  Form and foundation.

14          THE WITNESS:  I didn't get details.

15    Q.    (By Mr. Fathi) At any point was the length of

16  time that people spent in restraints tracked?

17          MS. HESMAN:  Form.  Foundation.

18          THE WITNESS:  I do not know the answer to

19  that.

20    Q.    (By Mr. Fathi) At any time, was there a review

21  of who was ordering restraints to see if certain

22  practitioners were overusing them?

23          MS. HESMAN:  Form.  Foundation.

24          THE WITNESS:  I can answer definitively not

25  by me.  Whether Dr. Carr and Dr. Platt reviewed

**Relevance, Rule 403**

**Foundation, Rule 602**

Treatment of persons with mental illness is relevant. Rule 401, 402, 403. Witness's lack of knowledge is itself evidence. Rule 602.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

47

**Relevance, Rule 402**

**Incomplete, Rule 106**

**Knowledge, Rule 602**

Treatment of persons with mental illness is relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence. Rule 602. "Incomplete" objection is meaningless; Defendants can counter-designate.

1   individual instances or patterns of instances and had

2   consultations with professionals, I can't answer.

3       Q.    (By Mr. Fathi) But you, yourself, didn't request

4   that information?

5       A.    Correct.

6       Q.    Now, a little bit further down in the same

7   paragraph you wrote --

8       A.    Oh, I'm sorry, that's not correct.  During the

9   course of preparing for -- preparing this report, I did

10  request that data.  And I was told that they don't have

11  it.

12      Q.    Okay.  But your preparation of this report in

13  October of this year was the first time you had requested

14  that data?

15      A.    That's correct.

16      Q.    And from whom did you request that data?

17      A.    From Janine.

18      Q.    So back to page 3 of your report, Doctor, the

19  paragraph numbered 1, about the middle of the page you

20  write that, "Clinical operations reviewed current

21  practices and policies within the state of Arizona,

22  compared these with Arizona State Code and Arizona

23  Department of Health Services requirements, federal

24  requirements, and national standards in the community."

25          Do you see that language, Doctor?

**Incomplete, Rule 106**

**Hearsay, Rule 802**

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

48

**Hearsay, Rule 802**

**Foundation, Rule 602**

Rule 801(d)(2) non-hearsay statement of opposing party/agent. Witness was able to answer. Rule 602.

1    A.    I do.

2    Q.    Was the use of restraints in the Arizona

3  Department of Corrections in the time period that you

4  were talking about, 2020, compliant with the Arizona

5  State Code?

6              MS. HESMAN:   Form.   Foundation.

7              THE WITNESS:   No.

8    Q.    (By Mr. Fathi) I'm sorry.   What was your answer?

9    A.    No.

10    Q.    In what way was it not compliant?

11    A.    My recollection is that the Arizona State Code

12  required reviews at a certain time interval or cadence

13  which I believe was two hours.   And the Department's

14  technical manual permitted a longer time period between

15  patient reviews.

16              And I also believe that -- I'm not certain of

17  this, but I also believe that the use of psychologists

18  for the authorization of the order and discontinuation of

19  the order was not consistent with Arizona State Code.

20  I'm not certain of that, but those are the two

21  independent memories I have right now.

**Hearsay, Rule 802**

22    Q.    Was the use of restraints in the Arizona

23  Department of Corrections consistent with Arizona

24  Department of Health Services requirements?

25              MS. HESMAN:   Form and foundation.

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

49

1    MS. BARNES:  Form and foundation.

Hearsay,
Rule 802

2    THE WITNESS:  To my knowledge, yes.  Again,

3    as I've already indicated, I didn't specifically review

4    restraint episodes, patient health records, or the

5    duration of restraints for purposes of this project.

6    Q.    (By Mr. Fathi) Was the use of restraints in the

7    Arizona Department of Corrections in this time period

8    consistent with federal requirements?

9    MS. HESMAN:  Form.  Foundation.

10   THE WITNESS:  I would have to review to

11   answer that question.

12   Q.    (By Mr. Fathi) What would you need to review?

13   A.    I'd need to go back and review the federal CMS

14   requirements and compare them to the technical manual and

15   see how they line up.

16   Q.    And was the use of restraints in Arizona prisons

17   at this time consistent with national standards of the

18   community?

19   MS. HESMAN:  Form.  Foundation.

20   THE WITNESS:  Again, national standards

21   would not permit psychologists or nonmedically trained

22   mental health professionals to order release from or

23   placement in restraints.

24   MR. FATHI:  Okay.  We've been going for a

25   bit.  Why don't we take a break for the sake of everyone

1    but especially our court reporter.  Is five minutes

2    enough or do people need longer?

3              MS. BARNES:  Seven minutes, to 10:30.

4              (Recess from 10:23 a.m. to 10:34 a.m.)

5    Q.    (By Mr. Fathi) Doctor, page 3 of your report,

6    still in paragraph 1, you write that, "Three

7    Arizona-specific, webinar-based staff trainings were

8    developed and delivered to Centurion behavioral health

9    staff in December 2020."

10             Do you see that language?

11   A.    I do.

12   Q.    Doctor, you're a little faint.

13   A.    I apologize.  I do see that language.

14   Q.    You're still very faint.  Is there -- have you

15   done something different?

16             MS. BARNES:  I can hear him fine.

17             THE WITNESS:  I haven't done anything

18   different.

19   Q.    (By Mr. Fathi) Ah, tech failure on my end.  Very

20   sorry.

21             All right.

22             Who conducted those trainings?

23             MS. BARNES:  Form.  Foundation.

24             THE WITNESS:  Two members of the clinical

25   operations team, myself, and Brenda Fields, who is a

**Incomplete, Rule 106**

**Hearsay, Rule 802**

"Incomplete" objection is meaningless; Defendants can counter-designate.  Rule 801(d)(2) non-hearsay statement of opposing party/agent.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

1   registered nurse with extensive expertise in nurse

2   monitoring of clinical restraints.

3              And in addition, I partnered with Dr. Platt

4   in the deescalation role which I had developed, but she

5   was one of the presenters of those slides.

6       Q.   (By Mr. Fathi) All right.  So there were a total

7   of five presenters?

8       A.   Three.  Brenda Fields, John Wilson, and Stefanie

9   Platt.

10      Q.   All right.  And Ms. Fields is an RN; correct?

11      A.   Correct.

12      Q.   Were the three trainings identical, or was it a

13  series of three trainings?

14      A.   Series of three.

15      Q.   So were all Centurion behavioral health

16  employees in Arizona required to attend all three

17  trainings?

18      A.   No.  And I want to elaborate on why that was the

19  case.

20      Q.   Please.

21      A.   Those -- those trainings were developed and

22  recorded so that the Arizona leadership could then

23  provide the training to their psychiatric and psychology

24  staff and presumably others.

25              But clinical ops developed the training,

1    presented it to the small group of Centurion of Arizona

2    behavioral health leaders who then took that training and

3    used it.

4        Q.    Okay.    So who if anyone was required to attend

5    this training?

**Foundation, Rule 602**
Witness was able to answer.

6        .

                 MS. HESMAN:    Foundation.

7                THE WITNESS:    I don't know if there was a

8    requirement for the initial training sessions.    We had

9    several behavioral health leaders attend.

10       Q.    (By Mr. Fathi) How many Centurion of Arizona

11   employees have received this training?

12               MS. HESMAN:    Foundation.

13               THE WITNESS:    I'm sorry.    Did you hear me?

14   I don't know the answer to that question.

**Hearsay, Rule 802**

15       Q.    (By Mr. Fathi) How long did the trainings last?

16               MS. HESMAN:    Foundation.

**Hearsay, Rule 802**

17               THE WITNESS:    Roughly an hour and a half

18   each.

19       Q.    (By Mr. Fathi) So three sessions of an hour and

20   a half each.

21       A.    Yes.

22       Q.    Was there a test at the end of the training?

23       A.    I don't recall.

**Hearsay, Rule 802**

24       Q.    Were there written training materials?

25       A.    Yes.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

53

1      Q.   Who prepared the written training materials?

2            MS. HESMAN:  Foundation.

3            THE WITNESS:  Brenda Fields and myself.

4      Q.  (By Mr. Fathi) If I wanted to know how many

5 Centurion of Arizona behavioral health employees have

6 taken this training, what documentation would I ask for?

7            MS. BARNES:  Form and foundation.

8            THE WITNESS:  There should be attendance

9 records maintained in the regional office in Arizona by

10 Centurion.

11     Q.  (By Mr. Fathi) Do you know that those records

12 exist?

13           MS. HESMAN:  Foundation.

14           THE WITNESS:  I do not know one way or the

15 other.

16     Q.  (By Mr. Fathi) Have you ever requested those

17 records?

18     A.  No.

19     Q.  All right.  Was the policy allowing

20 psychologists to authorize placement in restraints ever

21 formally changed?

22           MS. HESMAN:  Form.  Foundation.

23           THE WITNESS:  I did ask about that.  My

24 recollection is I had a conversation with Dr. Platt.  And

25 that policy was changed, the language was changed, but

> **Hearsay, Rule 802**
>
> **Foundation, Rule 602**
>
> Rule 801(d)(2) non-hearsay statement of opposing party/ agent. Witness was able to answer. Rule 602.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

54

**Hearsay, Rule 802**

**Foundation, Rule 602**
Rule 801(d)(2) non-hearsay statement of opposing party/agent. Witness was able to answer. Rule 602.

**Relevance, Rule 402**

**Foundation, Rule 602**
Treatment of persons with mental illness is relevant. Rule 401, 402. Witness was able to answer. Rule 602.

**Relevance, Rule 402**
Treatment of persons with mental illness is relevant. Rule 401, 402.

**Relevance, Rule 402**

**Foundation, Rule 602**
Treatment of persons with mental illness is relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence. Rule 602.

1  that at the time of our conversation, the new language
2  had not yet been implemented or approved.
3           And therefore that Centurion was going to
4  proceed as if the new language had been approved and
5  ensure that psychiatry was involved with each restraint
6  episode.
7           And I do remember Dr. Carr telling me that
8  he's ensuring that that takes place.
9      Q.   (By Mr. Fathi) When was your conversation with
10 Dr. Platt?
11     A.   I don't recall.
12     Q.   Was it in 2021?
13     A.   Probably.
14     Q.   Was it in the first or second half of 2021?
15     A.   It would have been before July.
16     Q.   All right.  And when you say that the new
17 language had not yet been approved, do you mean approved
18 by the Arizona Department of Corrections?
19     A.   Yes.
20     Q.   As we sit here today, has that new language been
21 approved?
22           MS. HESMAN:  Foundation.
23     Q.   (By Mr. Fathi) I'm sorry?
24     A.   I don't know.
25     Q.   All right.  All right, Doctor, going back to

55

1    your report on page 3, the paragraph numbered 2, you

2    write, "Also in 2020, the need for additional training

3    and tools in treating patients with a recurrent

4    self-injury was identified as part of our Arizona

5    program's efforts to reduce the frequency and severity of

6    patient self-injury."

7                 Do you see that language, Doctor?

8        A.    Yes.

9        Q.    Who identified that need for additional training

10   and tools?

11                MS. HESMAN:   Foundation.

12                THE WITNESS:   Dr. Platt.

13       Q.    (By Mr. Fathi) And what was the basis for

14   concluding that there was such a need for additional

15   training and tools?

16                MS. HESMAN:   Foundation.

17                THE WITNESS:   As is the case in other

18   programs, other DOC correctional systems, there were

19   elevated frequencies of self-injury with some patients

20   requiring multiple medical interventions.

21                And there were limited options for

22   effective treatment.  So the identification of the need

23   for additional training and tools was appropriate.  I

24   just want to clarify it's not unique to Arizona,

25   unfortunately.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

56

Hearsay,
Rule 802

1    Q.    (By Mr. Fathi) All right.   And further down in

2    that same paragraph, you write that clinical operations,

3    "concluded that provision of two full-time behavioral

4    specialists dedicated solely to the treatment of patients

5    with recurrent self-injury would enable us to reduce

6    overall morbidity and potential mortality among the

7    select patient population by at least 50 percent."

8         Do you see that language?

9    A.   Yes.

10   Q.   Have those two full-time behavioral specialists

11   been hired as we sit here today?

12   A.    To my knowledge, no.

Hearsay,
Rule 802

13   Q.   And you write, "Despite our best efforts, we

14   were unable to identify any potential candidates in the

15   state."

16        Do you see that language, Doctor?

17   A.   I do.

18   Q.    What did your best efforts consist of?

19        MS. BARNES:   Form and foundation.

20        THE WITNESS:   I want to clarify the word

21   "our" in that sentence.   I was not involved in the

22   recruitment for these positions.   I did help identify the

23   key indicators, requirements for the job.   And I've

24   helped develop the job descriptions.

25        The recruiting efforts are not something

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

57

1    that I can speak to.

2       Q.   (By Mr. Fathi) All right.  So when you say,

3    "despite our best efforts," you're not able to tell me

4    what those best efforts consisted of?

5       A.   That's correct.  Because those best -- that word

6    "our" really belongs to the Centurion of Arizona team.

Hearsay,
Rule 802

7       Q.   And you say that you are unable to identify any

8    potential candidates in the state.  Did you look outside

9    the state?

10          MS. BARNES:  Form and foundation.

Hearsay,
Rule 802

11          THE WITNESS:  My knowledge of our

12   recruiting efforts is sufficient for me to answer that

13   when we have openings, we will try to resource throughout

14   the country, not just within the state.

15          So our recruiting department does things

16   like look at mental health professionals who've graduated

17   from Arizona-based higher level -- higher -- institutions

18   of higher education and might have a desire to come back.

19   Or who were previously licensed in Arizona or may be

20   currently licensed in Arizona and see if we can find.

21          It will -- my belief is that our recruiting

22   department did everything they could to find these

23   positions and weren't able to.

24       Q.   (By Mr. Fathi) But you're not able to tell me

25   what they did; correct?

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

58

1    A.   I'm not able to tell you specifically what they

2    did, that's correct.

3    Q.   What were the requirements for these positions,

4    the qualifications required?

5    A.   So to my knowledge, my memory, we wanted

6    master's level, independently licensed with training or

7    certification in functional assessment, behavioral

8    functional assessment.

9    Q.   And what was the salary offered for these

10   positions?

11             MS. BARNES:  Form and foundation.

12             THE WITNESS:  I don't know.

13   Q.   (By Mr. Fathi) When initial efforts were

14   unsuccessful did you try raising the salary?

15             MS. BARNES:  Same objection.

16             THE WITNESS:  I don't know.

17   Q.   (By Mr. Fathi) Did you try offering a signing

18   bonus?

19             MS. BARNES:  Same objections.

20             THE WITNESS:  I don't know.

21   Q.   (By Mr. Fathi) Back to page 3 of your report.

22   In the final paragraph, you write, "In March 2021, our

23   Clinical Operations behavioral health team provided four

24   training sessions to our Arizona behavioral health staff

25   on," and then it lists a number of topics.

**Foundation, Rule 602**
Witness's was able to answer.

**Incomplete, Rule 106**

**Hearsay, Rule 802**

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

59

1           Do you see that language?

2      A.   I do.

3      Q.   Was that training live or by video?

4      A.   That was live.

5      Q.   Who conducted the training?

6      A.   I did, Dr. Joel Andrade did, and our program

7  manager from our Pennsylvania DOC program, Jennifer

8  Sheptock, did.

9      Q.   And what are the qualifications of those other

10 two people?

11     A.   Dr. Joel Andrade is a doctoral psych -- not

12 psychologist -- social worker with 20 to 25 years of

13 experience in correctional behavioral health servies and

14 a national expert in that area.

15          And Jennifer Sheptock has managed state-wide

16 behavioral health programs as well as juvenile

17 correctional settings where she trained in functional

18 assessment.

19     Q.   And were these four identical sessions or was it

20 a series of four different sessions?

21     A.   A series of four different sessions.

22     Q.   And were all Centurion behavioral health staff

23 in Arizona required to attend this training?

24          MS. HESMAN:   Foundation.

25          THE WITNESS:   No.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

60

1    Q.    (By Mr. Fathi) How many Centurion behavioral
2  health staff in Arizona attended this training?
3              MS. HESMAN:   Foundation.
4              THE WITNESS:   We provided the four sessions
5  twice.  Once at Florence, and once in Tucson.  And the
6  behavioral health staff who were on site in Florence
7  completed that training, and the behavioral health staff
8  in Tucson completed that series of trainings.
9              It was typically three to five
10  participants.  These were intimate, intensive roundtable
11  trainings.  There were written materials, slides.
12    Q.    (By Mr. Fathi) Are there behavioral health
13  staff -- were there behavioral health staff working at
14  Florence at that time who did not attend the training?
15              MS. BARNES:   Foundation.
16              THE WITNESS:   I don't know.  I suspect
17  health technicians we wouldn't have included.
18    Q.    (By Mr. Fathi) But was the training mandatory
19  for any category of behavioral health staff?
20              MS. HESMAN:   Foundation.
21              THE WITNESS:   No.
22    Q.    (By Mr. Fathi) And same question at Tucson, were
23  there mental health staff then working at Tucson who did
24  not participate in this training?
25              MS. HESMAN:   Foundation.

**Relevance, Rule 402**

**Foundation, Rule 602**

Training and qualifications of mental health staff are relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

61

Foundation,
Rule 602

Witness's lack
of knowledge is
itself evidence.

1        THE WITNESS:  I don't know.  I don't

2    recall.

3        Q.   (By Mr. Fathi) Was the training offered at any

4    prisons other than Florence and Tucson?

5        MS. BARNES:  You cut out there, Doctor.

6        THE WITNESS:  Okay.  Not by clinical

7    operations.

8        Q.   (By Mr. Fathi) Was the training offered by

9    anyone at other prisons besides Florence and Tucson?

10        A.   I don't know, but I want to elaborate on why I

11    said it that way.

12             Clinical operations develops training to support

13    and empower our regional leadership to then take that

14    training and the initiatives and carry them forward.  So

15    it's possible that there was -- that the training was

16    carried out at other complexes.

17        Q.   Do you have any reason to believe that it was?

18        A.   I don't have any data to make an opinion one way

19    or the other.

20        Q.   In terms of the training that you personally

21    participated in, why was the decision made to offer it

22    only at Florence and Tucson?

23        A.   We focused on those two institutions because we

24    provided the training in the context of also providing

25    patient-specific consultation to bring the training and

**Foundation, Rule 6002** Witness was able to answer.

1    the consultation together, and take the principles of the

2    training and apply them to a clinical case.

3          And there was a case at Florence and a case at

4    Tucson that Dr. Platt had identified as needing

5    behavioral interventions, behavioral change

6    interventions.  So that's why those two locations were

7    selected.

8      Q.    And what were the names of those patients?

9            MS. HESMAN:  Foundation.

10           THE WITNESS:  I don't recall.

**Incomplete, Rule 106**

**Hearsay, Rule 802**

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

11     Q.    (By Mr. Fathi) Let's look at page 4 of your

12    report, please.

13           And in the final paragraph of page 4, you use

14    the term "suicide spectrum behaviors."  Do you see that,

15    Doctor?

16     A.    Yes.

17     Q.    What's the definition of that term?

18     A.    That is a term that I'm using to encompass

19    everything from suicidal ideation and statements to

20    self-injury to suicide attempts to death by suicide.

21     Q.    So it includes -- it can include statements

22    without any self-harm or attempt at self-harm?

23     A.    I believe that's part of my -- yes.

24     Q.    And is that definition written down anywhere?

25     A.    No.

63

1      Q.   Is "suicide spectrum behavior" a term that's
2   used by ADCRR?
3      A.   No.
4      Q.   Is it a term that's used by Centurion?
5      A.   Yes.  And now I have to correct some testimony
6   just a moment ago.
7           It's -- it's a term that may be included in some
8   of our policies and treatment guidelines.
9      Q.   And when you say "our," you mean Centurion's?
10     A.   I do.
11     Q.   So is the term "suicide spectrum behaviors"
12  defined in any of these Centurion documents?
13     A.   Yes.  I -- I believe so.  I'd have to check to
14  be sure.
15     Q.   Is this a term that you devised yourself?
16     A.   Yes.
17     Q.   And when did you devise this term?
18     A.   I don't recall precisely.  It would be in the
19  last two years.  And the effort here is to ensure that we
20  don't dismiss, minimize, exclude, or negate any kind of
21  self-injury or suicide risk.
22          It's to be as inclusive as possible so that
23  suicide prevention efforts can be as comprehensive as
24  possible.  That's the intent.
25     Q.   Okay.  Let's look at Exhibit 2, please.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

64

**Hearsay, Rule 802**

**Exhibit Foundation**

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. Witness was able to answer.

1          (Deposition Exhibit 2 was marked for

2   identification.)

3       Q.     (By Mr. Fathi) Doctor, Exhibit 2 is a document

4   created on a monthly basis by ADCRR titled "Inmate

5   Assault, Self-Harm, and Mortality Data."

6             Do you see that?

7       A.     I do.

8       Q.     Are you generally familiar with this document?

9       A.     I am.

10      Q.     Did you rely on this document in writing your

11   report?

12             MS. BARNES:    If you need to see more pages

13   in it, Dr. Wilson, just ask them to scroll down.

14             THE WITNESS:    Can you scroll to the final

15   page, please?

16             Yes, I did rely on this document.

17      Q.     (By Mr. Fathi) All right.    At the top of page 4,

18   it points out that, "ADCRR has adopted a new method of

19   counting acts of inmate self-harm as of July 28."

20             Do you see that, Doctor?

21      A.     I do.

22      Q.     Were you aware of that?

23      A.     Yes.

24      Q.     So ADC classifies self-harm behavior as either

25   self-injurious behavior or suicide attempt.    Do you see

**Hearsay, Rule 802**

**Exhibit Foundation**

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. Witness testified he relied on this document. Rule 703.

**Incomplete, Rule 106**

**Hearsay, Rule 802**

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

```
 1    that, Doctor?
 2        A.    Yes.
 3        Q.    And how does that taxonomy map onto your term
 4    "suicide spectrum behavior"?
 5        A.    My taxonomy, if you want to call it that,
 6    includes both.
 7        Q.    But as I understand your testimony a moment ago,
 8    your term is broader because it can include suicidal
 9    statements unaccompanied by any self-injurious behavior;
10    correct?
11        A.    It could be, yes, correct.
12        Q.    All right.  Let's look at -- back to your
13    report.  Let's look at the graph on page 5 that's titled
14    Graph 1.
15              So Graph 1 is titled "Total Suicidal Spectrum
16    Behaviors"; correct?
17        A.    It is.
18        Q.    And who created this graph, Doctor?
19        A.    I did.
20        Q.    Was anyone else involved?
21        A.    No.
22        Q.    What's the source of the data that is portrayed
23    in this graph?
24        A.    You just showed Exhibit 2 as one example of the
25    data I used.
```

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

66

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

1   Q.   So if I wanted to see your underlying data I

2   would look at Exhibit 2 and other monthly versions of

3   that report?

4   A.   You would.

5   Q.   Did you rely on any other data to create

6   Graph 1?

7   A.   No.

8   Q.   All right.  Now, is it your testimony that the

9   Arizona Department of Corrections Rehabilitation and

10  Reentry also tracks suicidal statements?

11  A.   No.

12  Q.   Okay.  Then how are you able to come up with

13  numbers for total suicide spectrum behaviors relying on

14  ADCRR sources that don't track suicidal statements?

15  A.   Point taken.  The graphs don't include suicidal

16  ideation that I generated.

17  Q.   Okay.

18  A.   And therefore they're inconsistent with the

19  definition I just gave you.

20  Q.   Okay.

21  A.   The graph --

22  Q.   Go ahead.

Hearsay, Rule 802

23  A.   The graphs include self-injurious behavior,

24  suicide attempts, and suicides, deaths by suicide listed

25  here on this table that we're looking at right now.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

67

**Hearsay, Rule 802**

1    And so, for instance, in July of 2021, the

2  Department listed 154 incidents total in that purple

3  column on the far right.   That's the number I used.

**Foundation, Rule 602**

Witness was able to answer.

4    Q.   I see.  To your knowledge does anyone track

5  suicidal statements among ADCRR prisoners?

6         MS. HESMAN:   Form.  Foundation.

7         THE WITNESS:   Not to my knowledge.

8    Q.   (By Mr. Fathi) So Centurion doesn't track that?

9    A.   Correct.

**Incomplete, Rule 106**

**Hearsay, Rule 802**

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

10    Q.   All right.   Let's look at the graph on page 6

11  titled "Graph 2:   Rate of Suicide Spectrum Behaviors Per

12  100,000 Individuals."

13         Do you see that, Doctor?

14    A.   I do.

15    Q.   And, again, who created this graph?

16    A.   I did.

17    Q.   Was anyone else involved?

18    A.   No.

**Hearsay, Rule 802**

19    Q.   And what's the source of the data for this

20  graph?

21    A.   The source of this data are the -- what I

22  caption as suicide spectrum behaviors, minus suicidal

23  ideation from Exhibit 2, and other instances of -- other

24  monthly instances of that report.

25         As well as the month-to-month reports that the

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

68

**Hearsay, Rule 802**

1    DOC posts to their website showing average ADP, so

2    average population.

3        Q.    All right.   And what does the purple line mean

4    in this graph, Doctor?

5        A.    The purple line is an approximate trend line

6    that shows an overall decrease in the rate of suicide

7    spectrum.

8        Q.    And who drew -- who drew that trend line,

9    Doctor?

10       A.    That was generated by an Excel function.

11       Q.    What's the name of the Excel function?

12       A.    It's a polynomial trend line.

13       Q.    Is that the name of the function in Excel?

14       A.    Yep.

15       Q.    And is your answer the same for all of the

16   purple lines that appear in the graphs of your report?

17       A.    Yes.

**Incomplete, Rule 106**

**Hearsay, Rule 802**

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

18       Q.    Okay.   Let's look at page 7.   There are four

19   graphs on page 7.   Doctor, same question.   Who created

20   these graphs?

21       A.    I did.

22       Q.    And was anyone else involved?

23       A.    No.

**Hearsay, Rule 802**

24       Q.    And the source of the data is the same as for

25   the others?

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

69

1    A.    Yes.

2    Q.    All right.  And --

3    A.    I apologize.

4    Q.    Go ahead.

Hearsay, Rule 802

5    A.    No, that's not correct.  The source of the

6    graphs were -- Graph 3 and 4 is the same.

7    Q.    The same as you've previously described?

8    A.    That's correct.

9    Q.    What is the source of the information for

10   Graphs 5 and 6?

11   A.    This is the self-injurious behavior log that

12   Janine sent me.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate

13   Q.    Okay.  And let's look at page 8.  There are

14   three graphs on page 8.  Who created these graphs?

15   A.    I did.

16   Q.    And was anyone else involved?

17   A.    No.

18   Q.    And what's the source of the data in these

19   graphs?

20   A.    The self -- self-injurious log that I received

21   from Janine.

22   Q.    And that includes restraint episodes?

23   A.    It does.  For -- but only for patients who

24   engaged in self-injury.

25   Q.    Doctor, why did you not state the source of your

**Incomplete, Rule 106**

**Hearsay, Rule 802**

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate

1    data for any of these graphs?

2        A.    Can we please scroll up?

3        Q.    Yes.

4                MS. BARNES:    What page do you want to be on

5    the screen, Dr. Wilson?

6                THE WITNESS:    Well, on page 4, you're

7    there, that final paragraph.

8                I do indicate that the self-injury suicide

9    attempts and deaths by suicide data are published to the

10   Department's website each month.

11               So I failed to indicate which specific

12   report holds those data, but I did indicate that it came

13   from the DOC.

14               I apologize for not being complete there.

15       Q.    (By Mr. Fathi)  Okay.  And going to Graphs 5

16   and 6 --

17       A.    Yes.

18       Q.    -- why did you not state the sources -- the

19   source for your data there?

20       A.    Please give me a minute.

21               So, again, I apologize for the omission, but the

22   first paragraph that's shown on the screen right now, the

23   second -- third sentence, final sentence there,

24   "Centurion's Arizona program has tracked both metrics for

25   patients who engaged in self-injury since July 2020."

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

71

Incomplete,
Rule 106

Hearsay,
Rule 802

Rule 801(d)
(2) non-
hearsay
statement of
opposing
party/agent.
"Incomplete"
objection is
meaningless;
Defendants
can counter-
designate

1    I did not identify it as a self-injurious

2  behavior log, but that was my attempt to identify the

3  source.

4    Q.   Okay.   And going to the three graphs on page 8.

5  Why did you not identify the source for these data?

6    A.   I have to reconstruct the omission, but I had

7  intended to indicate that this came from Centurion of

8  Arizona through the self-injurious log.

9         And the average number per month and the average

10  rate of restraints per 100,000 are recalculations of

11  essentially the same data.   But I apologize.   It did come

12  from the self-injurious behavior log.

13    Q.   Okay.   But it doesn't say that in your report;

14  correct?

15    A.   It doesn't.

16    Q.   Okay.

17         MS. BARNES:   David, can we take a break

18  here and now, or just in a minute or two when you have a

19  good moment to break?   We've been going now almost two

20  hours and I'm sorry, but I actually need another restroom

21  break.

22         MR. FATHI:   Okay.   I -- I just have a

23  couple more questions about this.

24         MS. BARNES:   That's fine.

25         MR. FATHI:   All right.

72

1     Q.   (By Mr. Fathi) Doctor, I think you testified

2   that looking at the three charts on page 8 that they only

3   include people who are on the self-injury log.  Is that

4   correct?

5     A.   That is correct.

6     Q.   So if someone was restrained but did not appear

7   on the self-injury log, they wouldn't appear -- they

8   wouldn't be taken into account in this chart; correct?

9     A.   That's correct.

10     Q.   So how do we know how many people have been

11   subject to restraints who have not appeared on the

12   self-injury log?

13     A.   You cannot tell that from my report, and I think

14   if you go to page 7 at the bottom of my report, you will

15   see that only, about the restraints associated with

16   patient self-harm, that final paragraph.

17     Q.   Okay.  But my question is how many patients are

18   subject to restraints in ADCRR who do not appear in the

19   self-harm log?

20     A.   I do not know the answer.

21     Q.   Okay.

22          MR. FATHI:  Let's take a break.  How long

23   do you want, Sarah?

24          MS. BARNES:  Just five or six minutes.

25          MR. FATHI:  Okay.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

73

1          (Recess from 11:11 a.m. to 11:19 a.m.)

2     Q.    (By Mr. Fathi) Doctor, are you familiar with the

3    term "nonzero axis deception"?

4     A.    Could you repeat that?

5     Q.    Sure.   Are you familiar with the term "nonzero

6    axis deception"?

7     A.    No.

8     Q.    Okay.   What that refers to, Doctor, is the

9    practice of in a bar graph as, of the type that you have

10   in your report, starting the Y or the vertical axis at a

11   value higher than zero in order to make the difference

12   between the various bars appear larger than it actually

13   is.

14          So let's look at Graph 5 in your report on

15   page 7.   And there, Doctor, you started the vertical axis

16   at 9 rather than zero; correct?

17    A.    Correct.

18    Q.    And if you'd started it at zero the difference

19   between the two bars would appear much smaller than it

20   does in this graph; correct?

21          MS. BARNES:   Form.

22          MS. HESMAN:   Form.

23          MS. BARNES:   Foundation.

24          THE WITNESS:   The difference would still

25   be 2.

Relevance,
Rule 402

Foundation,
Rule 602

Witness's
reliability/
inaccuracy/bias
is relevant.
Rule 401, 402.
Witness was
able to answer
the questions.

Incomplete,
Rule 106

Hearsay,
Rule 802

Foundation,
Rule 602

Argument

Witness was
able to answer
the questions.
Rule 801(d)(2)
non-hearsay
statement of
opposing
party/agent.
"Incomplete"
objection is
meaningless;
Defendants
can counter-
designate.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

74

Incomplete,
Rule 106

Hearsay,
Rule 802

Foundation,
Rule 602

Witness was
able to answer
the questions.
Rule 801(d)(2)
non-hearsay
statement of
opposing party/
agent.
"Incomplete"
objection is
meaningless;
Defendants can
counter-
designate.

Hearsay,
Rule 802

1    Q.    (By Mr. Fathi) Yes, but looking -- but the

2    relative size of the two bars would be much closer than

3    it is in this graph; correct?

4              MS. HESMAN:   Form.

5              THE WITNESS:   I guess, yes.

6    Q.    (By Mr. Fathi) Okay.   And similarly in Graph 6

7    you started the vertical axis at 25 rather than zero;

8    correct?

9    A.    Yes.

10   Q.    Okay.   And if you'd started the vertical axis at

11   zero, the two bars would look much more similar, wouldn't

12   they?

13             MS. HESMAN:   Form.

14             MS. BARNES:   Form.

15             THE WITNESS:   Their height would be closer

16   together, but the absolute numerical difference would

17   remain unchanged.

18   Q.    (By Mr. Fathi) But the size difference between

19   the two bars would be significantly smaller, wouldn't it?

20             MS. BARNES:   Form.

21             MS. HESMAN:   Form.

22             THE WITNESS:   The size difference would be

23   smaller.

24   Q.    (By Mr. Fathi) All right.   Let's look at

25   Graph 6 -- I'm sorry, that was Graph 6.   Let's look at

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

75

Hearsay,
Rule 802

1    the three graphs on page 8.

2                So here, too, Doctor, you started the vertical

3    axis at 5.6, 16 and 2.6 rather than zero; correct?

4         A.    Yes.

5         Q.    And why did you do that?

6         A.    Excel did it for me.   I want to -- I appreciate

7    the term that you've educated me on, but I want to

8    emphasize that in no way am I trying to exaggerate the

9    change here.

10               I built these graphs very rapidly.   The entire

11   report was due in a short period of time.   And there

12   were -- there were late hours spent on it.

13        Q.    Okay.   Let's look at Graph 1, shall we, on

14   page 5.   Okay.   So here you did start the vertical axis

15   at zero; correct?

16        A.    Yes.

17        Q.    And Graph 2 on page 6?

18        A.    Yes.

19        Q.    Could we scroll -- yes.

20               Graph 2 you also started the vertical axis at

21   zero; correct?

22        A.    Yes.

23        Q.    So my question is why on these other graphs that

24   we've just reviewed did you not start the vertical axis

25   at zero?

Hearsay, Rule 802

1    A.    I didn't take the time to force Excel to set it

2    to zero.

3    Q.    Is it your testimony that you didn't notice that

4    Excel had set it at something other than zero?

5              MS. BARNES:  Form.

Hearsay, Rule 802

6              THE WITNESS:  Yes.

7    Q.    (By Mr. Fathi) Did you proofread this report,

8    Doctor?

9              MS. BARNES:  Form.

10             THE WITNESS:  Yes.

11   Q.    (By Mr. Fathi) Did someone tell you to start the

12   vertical axis at a value higher than zero?

13   A.    No.

14             MS. BARNES:  Form and foundation.  And

15   again to the extent your question asks for communications

16   that he's described to you as only having occurred with

17   counsel, you are encroaching on the attorney-client

18   privilege, and I'm going to instruct him not to answer

19   if -- if he has a positive answer to that.

20   Q.    (By Mr. Fathi) All right.  Let's look at page 5

21   again, Doctor.  Now, on page 5 of your report you cite

22   some population figures from ADCRR.  Do you see that?

23   A.    I do.

24   Q.    Sorry.  Going back to the last question about

25   setting the vertical axis at a value other than zero, did

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

77

1  anyone other than your attorney tell you to do that?

2          MS. BARNES:  Form.  And, again, let me

3  clarify my instruction.  My instruction to you,

4  Dr. Wilson, is if someone -- if your answer is positive,

5  if someone told you that -- that you should set this at

6  zero and that someone is an attorney, do not answer.

7          If your answer is that no one told you

8  that, then you can say no one told me that.

9          THE WITNESS:  No one instructed me on how

10  to set the axes.  Never any discussion about the minimum

11  value for any of these axes.  I -- I took what Excel gave

12  me automatically and put it into the report.

13     Q.   (By Mr. Fathi) Okay.  All right.  Back to page 5

14  where you give some population statistics.  Do you see

15  those, Doctor?

16     A.   I do.

17     Q.   Are those statistics for the entire ADCRR

18  incarcerated population?

19     A.   They are.

20     Q.   And are you aware that Arizona has about seven

21  and a half thousand prisoners in private prisons?

22     A.   I am.

23     Q.   But Centurion doesn't provide care for those in

24  the private prisons; correct?

25     A.   That is correct.

Incomplete,
Rule 106

Hearsay,
Rule 802

Rule 801(d)(2)
non-hearsay
statement of
opposing party/
agent.
"Incomplete"
objection is
meaningless;
Defendants can
counter-
designate.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

78

Incomplete,
Rule 106

Hearsay,
Rule 802

Foundation,
Rule 602

Rule 801(d)(2)
non-hearsay
statement of
opposing
party/agent.
"Incomplete"
objection is
meaningless;
Defendants
can counter-
designate.
Witness was
able to answer
the questions.

1    Q.    So what are the analogous figures for the ten

2    state-run prisons at which Centurion does provide care?

3    A.    I would have to check, but based on what you've

4    just said, they're 7,000 less than what I show here.

5    Q.    Still on page 5, Graph 1, obviously these --

6    this graph portrays certain figures, and each bar

7    represents a -- a total number of suicide spectrum

8    behaviors; correct?

9    A.    Correct.

10    Q.    Do those numbers include the private prisons or

11    only the state-run prisons where Centurion provides care?

12    A.    My understanding of the published statistics is

13    that they include the private prison beds, too.

14    Q.    Okay.  So that means that these figures that you

15    have put in your Graph 1 include the private prisons as

16    well; correct?

17    A.    Yes.

18    Q.    Okay.  Graph 2 on page 6.  Same question.  Do

19    these numbers also include the private prisons?

20    A.    Yes.

21    Q.    Is your answer the same for all of the graphs in

22    your report?

23    A.    No.

24    Q.    All right.  Let's go through them all, then.

25    Next page, please.

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**Incomplete, Rule 106**

**Hearsay, Rule 802**

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

1    Graphs 3 and 4, are these -- do these numbers

2    include the private prisons or only the state-run

3    prisons?

4        A.    All of them.    Both private and public, yeah,

5    state-run.

6        Q.    And Graphs 5 and 6, do these figures include the

7    private prisons?

8        A.    No.

9        Q.    And how can you tell that, Doctor?

10       A.    Because Graphs 5 and 6 come from the

11   self-injurious behavior log that Centurion tracks, that

12   Centurion maintains.    And because we don't provide

13   services in the private prisons, it would not include any

14   emergency room runs for self-injury or suicide attempts

15   from those private prisons.

16       Q.    Okay.    But when you were calculating the rate

17   per 100,000, what was the denominator you used?    Did you

18   use the number, the entire prisoner population including

19   the private prisons, or did you include only the people

20   incarcerated at the state-run prisons?

21       A.    I used the entire population.

22       Q.    I see.    Let's look at page 8, please.    Same

23   question for the three graphs on page 8.    Do these

24   include all of the prisons including the private prisons,

25   or just the state-run prison?

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

1    A.    Just the state.

2    Q.    I see.  And, again, in the middle graph when

3  you're calculating a rate per 100,000, did you use as a

4  denominator the entire prison population including the

5  private prisons or just the state-run prisons?

6    A.    The entire population.

7    Q.    Okay.  And that would tend to understate the

8  rate of restraint, wouldn't it?

9            MS. HESMAN:  Form.  Foundation.

10           THE WITNESS:  Mathematically, yes.

11    Q.    (By Mr. Fathi) All right.  Back to page 6,

12  please.  Now, you say here about -- in about the middle

13  of page 6 that talking about average number of suicide

14  spectrum behaviors per month, there has been a 47 percent

15  reduction in incidents.  Do you see that?

16    A.    Yes.

17    Q.    Did you calculate that percentage, Doctor?

18    A.    I did.

19    Q.    Can you tell me how you did it?

20    A.    Yep, I can.  This statement goes with Graph 3,

21  and in Graph 3, I show that on average there were 212

22  incidents of self-injury and suicide or attempted suicide

23  in the second half of 2019, and 112 in the first nine

24  months of 2012 -- 2021.  Pardon me.

25    Q.    And that's how you came up with the 47 percent?

**Incomplete, Rule 106**

**Hearsay, Rule 802**

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

A.    Yep.

Q.    And I think you testified that you're using numbers from the entire system including the private prisons; correct?

A.    I am.

Q.    What is the percentage change looking only at the ten facilities where Centurion provides care?

A.    The DOC doesn't report that.  I don't know the answer.

Q.    Okay.  All right.  Back to page 6, please.

A.    May I clarify?

Q.    Please.

A.    My understanding is that if an incarcerated individual is engaged in self-injury or suicide attempt, they're going to be moved to a state-run complex.

And my other clarification is that the way the department reports self-injury suicide attempts and completed suicide does include those private prisons.

So if there are episodes of suicide attempts, completed suicides or self-injury at the private prisons, they -- they should be wrapped up in these numbers and included in them in order to have a complete picture.

Q.    Okay.  Back to page 6, please.

Now, Doctor, when you calculated this 47 percent reduction in incidents you're counting different months

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

1    in 2019 and 2021; correct?

2         A.    Correct.

3         Q.    So you're comparing July through December 2019

4    to January through September 2021; correct?

5         A.    That's correct.

6         Q.    And you're making that same comparison in

7    Graphs 3 and 4; right?

8         A.    Right.

9         Q.    And in Graphs 5 and 6 and the three graphs on

10   page 8, you're again comparing different months.  This

11   time it's July through December of 2020 and January

12   through September of 2021.  Is that correct?

13        A.    That's right.

14        Q.    And that is a potential confounding variable,

15   isn't it?

16             MS. HESMAN:  Form.  Foundation.

17             THE WITNESS:  Yes.

18        Q.    (By Mr. Fathi) Back to page 6, please.  So at

19   the bottom of the first paragraph, you -- you describe a

20   38 percent reduction using the rate of suicide spectrum

21   behaviors per 100,000 population; correct?

22        A.    Correct.

23        Q.    And did you calculate that percentage?

24        A.    I did.

25        Q.    Sorry?

Incomplete,
Rule 106

Hearsay,
Rule 802

Rule 801(d)(2)
non-hearsay
statement of
opposing
party/agent.
"Incomplete"
objection is
meaningless;
Defendants
can counter-
designate.

1    A.    Yes.

2    Q.    Okay.  And could you tell me how you did that,

3    please?

4    A.    In the same way that I calculated the 47 percent

5    reduction in incidents.  This one goes to Graph 4, and it

6    compares the second half of 2019 with the first nine

7    months of 2021.

8    Q.    And I assume from your previous testimony that

9    these numbers were calculated using the entire ADC

10   population including the private prisons; correct?

11   A.    Correct.  Yes.

12   Q.    And what are the analogous numbers for just the

13   ten state-run prisons at which Centurion provides care?

14   A.    I don't know.

15   Q.    Okay.  Let's go back to Exhibit 2, please.

16        Okay.  Could you explain to me -- let me back

17   up.

18        I gather from your testimony that this document

19   or other monthly iterations of this document is the

20   primary source for the information in the graphs in your

21   report; correct?

22   A.    Yes.

23   Q.    Okay.  Walk me through how you get from this ADC

24   document, Exhibit 2, to the numbers in your report?

25   A.    I used this table to pull out the total number

84

```
 1   of -- on the right-hand side.  So let's look at July, for

 2   example.  154 incidents.  And these data include ADCRR

 3   and contract beds.  That's what they're reporting.

 4       Q.   Okay.  So show me -- show me where these numbers

 5   in Exhibit 2 appear in your report.

 6       A.   Okay.

 7       Q.   Not all of them.  Just give me an example.

 8       A.   Okay.  So if we could go to Graph 1 in my

 9   report, you'll see in July of 2021 I list 154 incidents.

10   In August, 129; and in September, 86.  And those numbers

11   should be identical to the Exhibit 2.

12       Q.   I see.  Okay.  Thank you.

13            So, Doctor, your report talks a fair bit about

14   suicide spectrum behaviors, but as far as I can tell you

15   don't discuss actual completed suicides.  Is that right?

16       A.   I believe that's correct.

17       Q.   And why is that?

18       A.   I apologize.  It isn't quite correct.  On the

19   bottom of page 6 --

20       Q.   I'm sorry, can you indicate what you're

21   referring to?

22       A.   Yes.  "Deaths by suicide remain a significant

23   concern for any correctional health provider."

24            So I did mention that death by suicide is a

25   concern.
```

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

85

Relevance, Rule 402

Confusion, Rule 403

Incomplete, Rule 106

Hearsay, Rule 802

See box to right

Hearsay, Rule 802

Hearsay, Rule 802

Witness's bias/ selective presentation of evidence is relevant. Rule 401, 402. Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

1    Q.    Okay.  Let me ask a different question.  You --
2  your report discusses extensively numbers of suicide
3  spectrum behaviors and rates of suicide spectrum
4  behaviors and changes in those numbers of rates over
5  time.
6          But there is no analogous discussion of actual
7  completed suicides; is that correct?
8    A.    There's no analogous discussion, that's correct
9    Q.    And why is that?
10         MS. HESMAN:  Form.  Foundation.
11         THE WITNESS:  My effort was to show overall
12  trends.  I had limited time to develop all of these data.
13  And suicide -- deaths by suicide unfortunately tend to
14  be -- well, fortunately tend to be small numbers, but
15  unfortunately tend to vary somewhat unpredictably over
16  time.
17         And therefore most of the experts who look
18  at completed suicides are now recommending using
19  five-year time blocks to calculate rate of suicide or
20  completed suicide.
21         Because Centurion has only been present
22  since 2019, I wasn't sure that I could use data for
23  completed suicides in the same way I could use for the
24  self-injurious behavior and suicide attempts to give a
25  clear picture of trends over time.

**Hearsay, Rule 802**

1          It's just -- it's a -- it's a horrible,

2    horrible thing, but it is fortunately a -- a rare event.

3    And so statistically it's very difficult to compare one

4    year to the next.

5          Q.   (By Mr. Fathi) Who are the experts that say that

6    you should look at suicides in five-year increments?

7          A.   I used to -- Dr. Ray Patterson is one individual

8    who has opined that.  The Bureau of Justice statistics

9    earlier this month produced a new report that uses

10   five-year increments, and I think that's the reason why.

11         Q.   But the Bureau of Justice statistics reports

12   suicides year by year in that specific report, does it

13   not?

14         A.   I'm not -- I'd have to look at it again.

15         Q.   Okay.  We'll get it -- we'll get it at the

16   break, and we'll take a look.

17              Let's look at Exhibit 2, please.  And at the

18   bottom of page 4, "Inmate Deaths by Year and Cause."

19              Do you see the numbers for suicides, Doctor?

20         A.   I do.

21         Q.   And according to this document, in fiscal year

22   '21, which ended on June 30, 2021, there were ten

23   suicides.  Do you see that?

24         A.   I do.

25         Q.   And that was up from six the previous year;

Case 2:12-cv-00601-ROS Document 4286-1 Filed 12/27/21 Page 180 of 299
John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

87

1    correct?

2        A.   I see that.

3        Q.   And that ten suicides in fiscal year '21 was the
4    highest number since fiscal year '11.  Do you see that?

5        A.   I do.

6        Q.   And the overall prison population was
7    substantially higher in fiscal year '11; correct?

8        A.   Yes.

9        Q.   Do you have any hypothesis as to why last year
10   had the highest suicides since 2011?

11            MS. HESMAN:   Form.  Foundation.

12            THE WITNESS:   I do.

13       Q.   (By Mr. Fathi) And what's that?

14       A.   The rise in deaths by suicide has been
15   experienced in multiple correctional systems, and my
16   hypothesis is that the pandemic has interfered with
17   patient movement, with ability to get out of cell, with
18   staffing shortages, and with the delivery of -- the
19   ability to deliver care.

20            Everyone has been strained, from correctional
21   officers to healthcare staff to incarcerated inmates.
22   And this level of -- this increase in suicide, I think,
23   likely reflects all of that.

24       Q.   So you mentioned staffing shortages.  Do you
25   believe that shortages of mental health staff may be

**Relevance, Rule 402**

**Confusion, Rule 403**

**Incomplete, Rule 106**

Suicides in ADCRR are relevant.  Rule 401, 402.  "Incomplete" objection is meaningless; Defendants can counter-designate.

**Relevance, Rule 402**

**Waste of Time, Rule 403**

**Foundation, Rule 602**

Suicides in ADCRR are relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence.

1  contributing to this increase in -- in suicides?

2          MS. HESMAN:  Form.  Foundation.

3          THE WITNESS:  What you suggest of course is

4  theoretically possible.  But I don't know what the

5  staffing shortages are, if there are, for mental health

6  in -- in the department right now.

7      Q.   (By Mr. Fathi) I'm sorry, did you just say

8  you're not familiar with the state of mental health

9  staffing in the Arizona Department of Corrections?

10     A.   I don't specifically know what the vacancies

11  are, that is correct.

12     Q.   All right.  Do you believe that mental health

13  staff shortages in the Arizona Department of Corrections

14  may be a contributing factor to the increase in suicides

15  last year?

16          MS. HESMAN:  Form.  Foundation.

17          THE WITNESS:  Without knowing what those

18  shortages are and their impact on service delivery, I

19  really can't speculate.

20     Q.   (By Mr. Fathi) Are you familiar with what the

21  staffing shortages were at any point in fiscal year '21?

22  In other words, July 1, 2020, to June 30, 2021?

23     A.   I would have to review my records.  So I have no

24  specific recollection right now of what those shortages

25  may or may not have been.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

89

Hearsay,
Rule 802

1   Q.   Have you done any research or analysis into why

2   suicides in Arizona went up in fiscal year 2021?

3   A.   I have not.

4   Q.   Has anyone in Centurion?

5        MS. HESMAN:  Form.  Foundation.

6        MS. BARNES:  Foundation.

Hearsay,
Rule 802

7        THE WITNESS:  Under Centurion policy and

8   NCCHC standard, every suicide is reviewed and

9   psychological autopsies are developed with a goal of

10  looking at the underlying causes, and what led the

11  individual to take his or her life.

12        And my belief is that those -- that

13  exercise was done in each of these cases.

14  Q.   (By Mr. Fathi) No, I understand that, and we'll

15  get to that in a moment.  But my question was -- was a

16  little bit different.

17        My question was has anyone at Centurion done any

18  kind of research or analysis into why in the aggregate

19  suicides went up in Arizona in fiscal year 2021?

20        MS. HESMAN:  Form.  Foundation.

21        MS. BARNES:  Form.  Foundation.

22        THE WITNESS:  I don't know the answer.

23  Q.   (By Mr. Fathi) Is that something that would be

24  useful to know?

25        MS. HESMAN:  Form.  Foundation.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

90

1          MS. BARNES:  Form and foundation.

2          THE WITNESS:  Yes.

3     Q.    (By Mr. Fathi) Doctor, you mentioned mortality

4   reviews a moment ago.  Do you as a matter of course

5   review mortality reviews from the Arizona Department of

6   Corrections?

7     A.    I do not.

8     Q.    Do you as a matter of course review

9   psychological autopsies from the Arizona Department of

10   Corrections?

11     A.    I do not.

12     Q.    Okay.  Let's look at Exhibit 9, please.

13          (Deposition Exhibit 9 was marked for

14   identification.)

15     Q.    (By Mr. Fathi) Doctor, have you seen Exhibit 9

16   before?

17     A.    I do not believe so.

18     Q.    This is an Arizona Department of Corrections

19   Mortality Review Committee Final Report about a man who

20   died by suicide on January 28, 2021.  Do you have any

21   familiarity at all with this person or his suicide?

22     A.    No.

23     Q.    Now, January 28, 2021, was after the beginning

24   of the self-harm initiative that you described earlier;

25   correct?

*Relevance, Rule 402*

*Foundation, Rule 602*

*Hearsay, Rule 802*

*Exhibit Foundation*
Suicides in ADCRR are relevant.  Rule 401, 402. Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/ agent. Exhibit has been admitted (Exh. 256).

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

91

Relevance,
Rule 402

Foundation,
Rule 602

Incomplete,
Rule 106

Hearsay,
Rule 802

Exhibit
Foundation

Suicides in
ADCRR are
relevant. Rule
401, 402.
Witness was
able to answer
the questions.
Rule 801(d)(2)
non-hearsay
statement of
opposing party/
agent.
"Incomplete"
objection is
meaningless;
Defendants can
counter-
designate.
Exhibit has
been admitted
(Exh. 256).

1    A.    January 28, 2021 -- yes, I think so.

2    Q.    Okay.  Let's look at page 2.  So at the top of

3  page 2, Doctor, the second item asks, "Was sufficient

4  care offered/provided regarding mental health issues?"

5         And the box is checked, "No."  Do you see that?

6    A.    I do see that.

7    Q.    And then a little bit further down under

8  "Contributing Cause Analysis," the box is checked for,

9  "Failure to recognize symptoms or signs, and delay in

10  access to care."

11        Do you see that?

12    A.    I do.

13    Q.    Page 3, please.  And at the bottom under

14  "General Critique," the boxes are checked for "Diagnosis

15  not timely," and "Treatment not timely."

16        Do you see that, Doctor?

17    A.    Yes.

18    Q.    And finally the reviewer concludes that his

19  death was, and the box is checked for, "Possibly

20  avoidable."  Do you see that?

21    A.    I do.

22    Q.    And I think your testimony is you haven't seen

23  this document before today; correct?

24    A.    Correct.

25    Q.    Now that you've seen this document, does this

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

92

**Relevance, Rule 402**

**Incomplete, Rule 106**

**Foundation, Rule 602**

Suicides in ADCRR are relevant. Rule 401, 402. Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate.

1  have any effect on your opinion regarding the adequacy of

2  suicide and self-harm prevention in ADC?

3              MS. BARNES:   Form.

4              MS. HESMAN:   Form.   Foundation.

5              THE WITNESS:   It's obviously a very

6  concerning conclusion.

7      Q.   (By Mr. Fathi) Does it have any effect on your

8  opinion regarding the adequacy of suicide and self-harm

9  prevention in the Arizona Department of Corrections?

10             MS. HESMAN:   Same objection.

11             MS. BARNES:   Form.

12             THE WITNESS:   Give me a minute to think how

13  to answer that.

14      Q.   (By Mr. Fathi) Of course.

15      A.   Let me start by saying that I haven't evaluated

16  the adequacy of suicide prevention efforts in Arizona.

17             So for purposes of my report, I looked at broad

18  trends of outcomes that looked positive.   I think within

19  broad trends it will always be possible to find

20  exceptions.   And unfortunately when there are exceptions

21  as appears to have been concluded here, there are adverse

22  outcomes.

23      Q.   Is it your testimony that the broad trends of

24  completed suicides was positive?

25             MS. HESMAN:   Form.

Relevance,
Rule 402

Incomplete,
Rule 106

Foundation,
Rule 602

Cumulative,
Rule 403

Suicides in
ADCRR are
relevant. Rule
401, 402.
Witness was
able to answer
the questions.
Incomplete"
objection is
meaningless;
Defendants can
counter-
designate. Not
cumulative;
questions were
not previously
answered.

1    THE WITNESS:  Broad trends of self-injury

2  and suicide attempts going down is in the right

3  direction.

4            The elevation of number of suicides that

5  we've just talked about is obviously not positive.

6    Q.   (By Mr. Fathi) Does the information in this

7  document have any effect on your opinion regarding the

8  adequacy of suicide and self-harm provision in the

9  Arizona Department of Corrections?

10           MS. HESMAN:  Form.  Foundation.  Asked and

11  answered.

12           MS. BARNES:  Form.

13           THE WITNESS:  I want to spend a little bit

14  of time looking at the document if I may before I answer.

15    Q.   (By Mr. Fathi) Please take your time, Doctor.

16  If you need it scrolled, just please say so.

17    A.   Yes.  Please, may I see the prior page?  Thank

18  you.  Let me pause here for a moment.  And I know we

19  reviewed it before, but if you don't mind, just scroll

20  all the way up.  Okay.  Thank you.  I'd like to look at

21  the summary.

22           Okay.  Would you please repeat the question so

23  I --

24    Q.   Sure.  Does the information you have just

25  learned from reviewing this document have any effect on

Relevance,
Rule 402

Incomplete,
Rule 106

Foundation,
Rule 602

Cumulative,
Rule 403

Exhibit
Foundation

Suicides in
ADCRR are
relevant.
Rule 401,
402.
Witness was
able to
answer the
questions.
"Incomplete"
objection is
meaningless;
Defendants
can counter-
designate.
Not
cumulative;
questions
were not
previously
answered.
Exhibit has
been admitted
(Exh. 256).

1 your opinion regarding the adequacy of suicide and

2 self-harm prevention in the Arizona Department of

3 Corrections?

4              MS. HESMAN:   Objection.

5              MS. BARNES:   Foundation.

6              THE WITNESS:   Because I haven't evaluated

7 the suicide prevention efforts in Arizona, I don't

8 actually have an opinion that this data can modify.

9              It does look like a health needs request

10 was submitted and the patient was not seen and died

11 shortly thereafter.

12              So in that regard, based on the limited

13 piece of information I've got in front of me, I -- I

14 agree that there -- I agree with the findings

15 that there -- if you can scroll down, let me not testify

16 to something that's not in there -- that there -- there

17 was a lack of timely diagnosis and treatment.

18      Q.   (By Mr. Fathi) Okay.  So just to be clear,

19 you're not going to testify at the trial of this case --

20 I'm sorry, you're not going to offer any opinion at the

21 trial of this case on the adequacy of suicide and

22 self-harm prevention in Arizona prisons; correct?

23              MS. BARNES:   Form.

24              MS. HESMAN:   Form.

25              THE WITNESS:   I don't know what my

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

95

Relevance,
Rule 402

Incomplete,
Rule 106

Foundation,
Rule 602

Argument

Suicides in
ADCRR are
relevant.  Rule
401, 402.
Witness was
able to answer
the questions.
"Incomplete"
objection is
meaningless;
Defendants can
counter-
designate.

Argument

1    testimony at trial will be.  And based on this

2    deposition, I will -- I may find time to review suicide

3    prevention efforts in more detail.  So I may have an

4    opinion at trial.

5         Q.    (By Mr. Fathi) Well, Doctor, it doesn't work

6    that way.

7         A.    Oh.

8         Q.    The purpose of this proceeding is for us to find

9    out what your testimony is going to be at trial, and I

10   believe you just said you don't have an opinion on the

11   adequacy of suicide and self-harm prevention in the

12   Arizona Department of Corrections.

13        So if I heard that wrong, please let me know,

14   but I think that's what you just said.

15             MS. BARNES:  Form.

16             THE WITNESS:  So I did just say that, and

17   let me amend that and clarify it just a little bit.

18             Based on the data that I reviewed, it looks

19   like concerted efforts have been made to reduce

20   self-injury and suicide attempts.

21             It also looks like we had a spike in

22   completed suicides.  That's a mixed picture.  But the

23   spike in completed suicides does not eradicate the

24   reduction in other types of self-injury.

25             And I think it's a fair inference that

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

96

Relevance,
Rule 402

Incomplete,
Rule 106

Foundation,
Rule 602

1   those trends that I mapped out based on Department data

2   reflect positive -- the effect of a positive -- a

3   positive effect -- a positive outcome on the efforts

4   being made in Arizona.

5           Is it adequate?  I'd need a definition for

6   adequate.  One suicide's too many.  It's a tragedy.

Suicides in
ADCRR are
relevant. Rule
401, 402.
Witness was
able to answer
the questions.
"Incomplete"
objection is
meaningless;
Defendants can
counter-
designate.

7           MS. HESMAN:  David, can you let us know

8   when a good time to break for lunch is?  I only need

9   about 30 minutes, but I don't know what other people's

10  thoughts are on that.

11          MR. FATHI:  All right.  Give me another

12  couple minutes to -- to finish up this line of

13  questioning.

14          MS. HESMAN:  Okay.

15          MS. BARNES:  Let me just ask one last

16  question before you do that.  Do you have an idea of how

17  long you're going to have if we take a 30-minute break,

18  how much more after that you're going to have.

19          MR. FATHI:  Probably, you know, always hard

20  to say because it depends on the answers, but probably

21  between an hour and an hour and a half.

22          MS. BARNES:  Okay.

23      Q.   (By Mr. Fathi) Okay.  Let's look at Exhibit 10,

24  please.

25          (Deposition Exhibit 10 was marked for

1    identification.)

2        Q.   (By Mr. Fathi) Doctor, Exhibit 10 is a mortality

3    review for a man who died by suicide in Arizona on

4    April 15 of 2021.

5            Have you seen this document before?

6        A.   No.

7        Q.   And the date of his death was after the

8    beginning of the self-harm initiative that you have

9    described; correct?

10       A.   Correct.

11       Q.   All right.  Let's go down to page 2, please.

12   And you'll see, Doctor, at the top of page 2 where the

13   question is posed, "Was sufficient care offered/provided

14   regarding mental health issues?"

15           And the box is checked, "No."  Do you see that?

16       A.   Yes.  I see that.

17       Q.   And under "Contributing Cause Analysis," the

18   boxes are checked for, "Failure to recognize symptoms or

19   signs," and "Failure to follow clinical guidelines."

20           Do you see that?

21       A.   Yes.

22       Q.   And let's go to page 3, please, under "General

23   Criteria," the box is checked for, "Level of care

24   inappropriate for the severity of illness."  Do you see

25   that?

1      A.    I do.

2      Q.    And the reviewer concludes that this death was

3    possibly avoidable.  Do you see that?

4      A.    I do.

5      Q.    So does the information you just learned from

6    this document have any effect on your opinion regarding

7    the adequacy of suicide and self-harm prevention in the

8    Arizona Department of Corrections?

9            MS. HESMAN:  Form.  Foundation.

10           MS. BARNES:  Form and foundation.

11           THE WITNESS:  I'm -- I'm really struggling

12   with this line of questioning, and I apologize for that.

13           The reason I'm struggling is this is the

14   first time I've seen these cases.  It's the first time

15   I'm looking at the fact patterns.

16           And how these particular cases reflect on

17   overall suicide prevention efforts and the quality of

18   mental health care is -- it's difficult for me to assess

19   that in this context right now.

20           So I really need more time to look at these

21   data and find out more about the suicide prevention

22   program before I can answer adequately.

23     Q.    (By Mr. Fathi) Did you review any completed

24   suicides in order to prepare your report?

25     A.    No.

**Relevance, Rule 402**

Witness's bias/ selective review of evidence is relevant.  Rule 401, 402.

1      Q.   Why not?

2             MS. BARNES:  Form and foundation.  And,

3   again, David, you are encroaching in the area of

4   attorney-client privileged communications.  So I'm going

5   to instruct the witness not to answer.

6             MR. FATHI:  The question was why not.  I

7   was not asking about any communications, attorney-client

8   or otherwise.

9             MS. BARNES:  To the extent your answer

10  would -- would involve attorney-client communications,

11  Dr. Wilson, I'm going to tell you not to answer and you

12  can let the record reflect that you're not going to

13  answer.

14     Q.   (By Mr. Fathi) Doctor, why did you not look at

15  any completed suicides in order to prepare your report?

16            MS. BARNES:  The same instruction.

17            So if -- in other words, Dr. Wilson, if

18  your answer would at all involve communications with

19  counsel, then you just simply say, "I cannot answer that

20  question."

21            THE WITNESS:  I cannot answer that

22  question.

23            MR. FATHI:  Thank you very much, Doctor.

24            THE WITNESS:  Thank you for the

25  instruction.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

100

**Incomplete, Rule 106**

**Hearsay, Rule 802**

**Exhibit Foundation**

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate. Exhibit has been admitted (Exh. 403).

1    Q.    (By Mr. Fathi) Let's look at page 3 of this

2   document again.   Doctor, do you see the heading "Mental

3   Health Concerns"?

4    A.    Yes.

5    Q.    And it says, "There was no suicide risk

6   assessment conducted upon placement or removal from

7   watch."

8         Do you see that?

9    A.    Yes.

10    Q.    Is that something that could be impacted by a

11   lack of mental health staff?

12         MS. HESMAN:   Form.   Foundation.

13         MS. BARNES:   Form.   Foundation.

14         THE WITNESS:   Yes.

15    Q.    (By Mr. Fathi) Item 2, "There was no crisis

16   treatment plan developed within one business day of

17   placement on watch (there was no plan developed for the

18   entirety of his watch)."

19         Doctor, is that something that could be affected

20   by a shortage of mental health staff?

21         MS. BARNES:   Form and foundation.

22         THE WITNESS:   My answer is yes.

23    Q.    (By Mr. Fathi) Item 3, "There is no indication

24   that safety was reliably reestablished prior to

25   discontinuing watch (in fact, the patient's mental status

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

101

**Incomplete, Rule 106**

**Foundation, Rule 602**

**Hearsay, Rule 802**

**Exhibit Foundation**

Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate. Exhibit has been admitted (Exh. 403).

1    was significantly worse at the time of discontinuing

2    watch than when it was started)."

3         Doctor, is that something that could be affected

4    by a shortage of mental health staff?

5              MS. HESMAN:  Form.

6              MS. BARNES:  Form and foundation.

7              THE WITNESS:  Potentially, yes.

8    Q.   (By Mr. Fathi) And No. 4, "There is no

9    indication that multiple disciplinary consultation was

10   conducted prior to discontinuing the watch."

11        Is that something that could be affected by a

12   shortage of mental health staff?

13             MS. HESMAN:  Form and foundation.

14             MS. BARNES:  Same objections.

15             THE WITNESS:  Yes.

16   Q.   (By Mr. Fathi) And if we scroll up to page 1, we

17   see that this -- this suicide occurred at the Eyman

18   complex.  Do you see that, Doctor?

19   A.   Yes.

20   Q.   And that was one of the complexes where the

21   suicide self-harm prevention training was -- was not

22   conducted; is that correct?

23   A.   That is correct.

24             MR. FATHI:  Okay.  If people want to take a

25   lunch break this is good time.  How long do you need?

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

102

1          MS. BARNES:  It's 12:08.  Do you want to

2   come back to at 12:40, 32 minutes?

3          MR. FATHI:  Okay.  See you then.

4          (Recess from 12:08 p.m. to 12:43 p.m.)

5     Q.   (By Mr. Fathi) All right.  Let's go back to your

6   report, Dr. Wilson, page 8.  And I want to ask you about

7   your commentary regarding opinions of Dr. Stewart.

8          Now, in that first paragraph you say that you

9   are qualified to address some of Dr. Stewart's opinions;

10  correct?

11    A.   I do.

12    Q.   Do you believe that you are qualified to address

13  all of the opinions set forth in his report?

14    A.   No.

15    Q.   Do you believe that you are qualified to address

16  any of the opinions in his report beyond the ones that

17  you discuss in this -- in your report?

18    A.   I would have to review all of his opinions again

19  and -- to answer that.

20    Q.   Okay.  But the only ones about which you're

21  planning to testify are the ones set forth in your

22  report; correct?

23    A.   Again, I don't know what I will be asked about

24  or called to testify about if I am called.  The opinions

25  that I offer in my report are ones that I'm prepared to

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

103

1     testify on.

2         Q.   All right.  And you're not going to offer any

3     opinions that are not set forth in your report; correct?

4                MS. BARNES:  Form.

5                THE WITNESS:  I don't know what I'll

6     testify to.

7         Q.   (By Mr. Fathi) Well, Doctor, as I said earlier

8     the whole purpose of providing an expert report, and this

9     proceeding today is to allow us to know what your

10     testimony is going to be at trial.

11         So if you're planning to testify about any other

12     of Dr. Stewart's opinions beyond the ones that you've

13     explicitly mentioned in your report, you need to tell me

14     that now.

15         A.   Okay.

16                MS. BARNES:  Again, with respect -- this

17     witness is in a unique situation, David, because he's

18     listed as an expert witness who's provided this report,

19     and a fact witness.

20         So if you are asking him for purposes of

21     his expert opinion in this report is he going to offer

22     any expert opinions outside of what is encompassed in his

23     report, then he can answer that.

Relevance, Rule 402

24         Q.   (By Mr. Fathi) All right.  Doctor, are you going

25     to offer any expert opinions beyond what is in your

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

104

Relevance,
Rule 402

Incomplete,
Rule 106

Witness's
intended
testimony at
trial is
relevant. Rule
401, 402.
"Incomplete"
objection is
meaningless;
Defendants
can counter-
designate.

1    report?

2        A.    No.

3        Q.    Okay.   Thank you.

4        So just to be clear, you are -- you are not a

5    medical doctor; correct?

6        A.    Correct.

7        Q.    You are not a psychiatrist?

8        A.    Correct.

9        Q.    You're not licensed to prescribe medication?

10       A.    Correct.

11       Q.    Have you ever clinically supervised a

12   psychiatrist?

13       A.    Clinically, no.

14       Q.    Have you ever clinically supervised a nurse

15   practitioner?

16       A.    No.

17       Q.    All right.   Let's talk about your opinion on

18   page 8 regarding nurse practitioners.

19       So I gather that you agree with Dr. Stewart that

20   the patients in ADCRR are extraordinarily complex;

21   correct?

22            MS. HESMAN:   Form.

23            THE WITNESS:   I do.

24       Q.   (By Mr. Fathi) I'm sorry, what was that?

25       A.   I do.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

105

1    Q.   All right.  Will you agree with me that

2    psychiatrists have more years of professional training

3    than psychiatric nurse practitioners?

4              MS. BARNES:  Form.

5              THE WITNESS:  Yes.

6              MS. BARNES:  Foundation.

7              THE WITNESS:  Yes.

8    Q.   (By Mr. Fathi) I'm sorry.  I didn't hear your

9    answer, Doctor.

10   A.   Yes.

11   Q.   Will you agree that there are some patients who

12   should be seen by a psychiatrist rather than or in

13   addition to a nurse practitioner?

14             MS. HESMAN:  Form.  Foundation.

15             THE WITNESS:  That's theoretically

16   possible.

17   Q.   (By Mr. Fathi) Okay.  Let's talk about your

18   opinions on dediagnosing.  Oh, I'm sorry, let me go back

19   to page 9, paragraph B, where you talk about

20   Dr. Stewart's report or opinions on mental health groups.

21   Do you see that?

22   A.   Yes.  I do.

23   Q.   So you, as I understand it, you agree with

24   Dr. Stewart that all behavioral health groups should be

25   coordinated by licensed behavioral health professionals;

**Incomplete, Rule 106**

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

106

Incomplete, Rule 106

"Incomplete" objection is meaningless; Defendants can counter-designate.

1    correct?

2         A.    Correct.

3         Q.    And you also agree that behavioral health groups

4    that are psychotherapeutic in nature, including those

5    focused on behavioral skills building, need to be

6    delivered by licensed behavioral health professionals,

7    correct?

8         A.    Correct.

9         Q.    All right.  Now let's talk about dediagnosing.

10         So I gather you agree that erroneously removing

11    a diagnosis of a serious and persistent mental illness

12    like schizophrenia, like bipolar disorder, can put the

13    patient at risk?

14              MS. HESMAN:    Form.  Foundation.

15              THE WITNESS:    In -- in theory, I completely

16    agree that any erroneous diagnosis, addition or removal,

17    can put the patient at risk.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

18         Q.    (By Mr. Fathi) Right.  Well, I'm -- I'm looking

19    at the last sentence of the penultimate paragraph on

20    page 9 where you say, "Removing that flag can present

21    risks if the patient's treatment needs are no longer

22    being met."

23         Do you stand by that statement?

24         A.    I do.

Hearsay, Rule 802

25    Q.    Okay.  Let's look at page 10.  At the end of the

Hearsay,
Rule 802

1    first paragraph, the carryover paragraph at the top of

2    page 10, you write, "Removing a mood disorder diagnosis

3    and replacing it with a personality disorder diagnosis

4    may be up diagnosing when measured in terms of the amount

5    of behavioral health resources the patient's treatment

6    may take."

7              Do you see that, Doctor?

8        A.   I do.

9        Q.   Okay.  And what's your basis for that statement?

10       A.   My clinical experience is that if a patient

11   suffers from a mood disorder, the disordered mood can be

12   adequately addressed with supportive psychotherapy and

13   psycho -- psychotropic medication.

14             And while that may not be straightforward, it

15   often is.  Whereas individuals who suffer from severe and

16   complex personality disorders are some of the toughest

17   patients to manage and treat safely.

18             And they do require very extensive resources,

19   not only -- it's not only may they benefit from

20   psychotropic medication, but they most often need

21   long-term and extensive cognitive behavioral treatment.

22       Q.   Okay.  Doctor, are you familiar with any study

23   that shows that removing a mood diagnosis and replacing

24   it with a personality disorder diagnosis generally

25   results in the patient's treatment consuming more

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

108

1    behavioral health resources?

2                    MS. HESMAN:   Form.

3                    THE WITNESS:   I'm not familiar with the

4    study.

**Hearsay, Rule 802**

5        Q.    (By Mr. Fathi)  Okay.   Are you familiar with the

6    stipulation or the settlement agreement in this -- this

7    litigation?

8        A.    In broad stokes, I am.

9        Q.    Okay.   Are you aware that there are some

10   obligations under the settlement agreement that apply

11   only to patients who are designated as seriously mentally

12   ill?

13                   MS. HESMAN:   Form.

**Hearsay, Rule 802**

14                   THE WITNESS:   Yes.   I think I remember

15   that.

16       Q.    (By Mr. Fathi) And are you aware that if a

17   patient's SMI designation is removed, he or she is no

18   longer entitled to be provided those services?

19                   MS. HESMAN:   Form.

**Hearsay, Rule 802**

20                   THE WITNESS:   I think I understand your

21   question, but I want to frame my answer.   Regardless Of

22   the stipulation agreement, my position is that patients

23   are entitled to the care that they need to address their

24   serious treatment needs.

25                   So whether or not a patient has a flag or a

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

109

**Hearsay, Rule 802**

1  diagnosis of serious mental illness, I believe the

2  patient is entitled to the care that is required to meet

3  the patient's needs.

4          I believe what you're asking is when -- and

5  let me just make sure I understand the question.  When a

6  SMI or serious mental diagnosis is removed, certain

7  requirements under the stipulation for treatment no

8  longer apply.  Is that what you were asking me?

9      Q.   Yes.  My question is, are you aware of that

10  fact?

11     A.   I am aware of that fact.

**Relevance, Rule 402**

**Foundation, Rule 602**

Data underlying the witness's testimony is relevant.  Rule 401, 402.  Witness was able to answer the questions.

12     Q.   Okay.  Dr. Stewart identified 14 patients as

13  possible examples of dediagnosing.  Did you review any of

14  those patients' records?

15     A.   No.

16     Q.   So you have no opinion as to whether in those

17  particular cases dediagnosis had taken place?

18     A.   Correct.

**Incomplete, Rule 106**

**Hearsay, Rule 802**

Rule 801(d)(2) non-hearsay statement of opposing party/ agent.  "Incomplete" objection is meaningless; Defendants can counter-designate.

19     Q.   Okay.  On page 10, you respond to the opinions

20  of Robert Joy.  Do you see that?

21     A.   I do.

22     Q.   And in the last sentence of the penultimate

23  paragraph you write, "From July 2019 when Centurion

24  assumed responsibility for healthcare with ADCRR and

25  September 2021, an average of 28 percent of the

**Incomplete, 106**

**Hearsay, Rule 802**

**Foundation, Rule 602**

Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

1    population has been identified on any given month as

2    requiring ongoing mental health services."

3         Do you see that?

4    A.   Yes.

5    Q.   And then the next sentence you write, "There has

6    only been small variation in this proportion from month

7    to month during this time period (range 27 to

8    29 percent)."

9         Do you see that?

10   A.   Yes.

11   Q.   And what is the source -- what is your source

12   for those statistics?

13   A.   It is in the second-to-last paragraph and it's

14   the second sentence.  The Department publishes monthly

15   at-a-glance reports.

16   Q.   So that is your source for these statistics?

17   A.   That is correct.

18   Q.   And when you talk about patients requiring

19   ongoing mental health services, what -- what's the

20   definition of that term that you're using?

21   A.   I believe that is the language used in the

22   at-a-glance reports.

23   Q.   Okay.  But my question is what's the definition?

24   A.   My understanding of that definition is that this

25   is a -- a patient who's on the mental health caseload and

**Incomplete, Rule 106**

**Foundation, Rule 602**

Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate.

1  requires ongoing treatment, including a treatment plan.

2      Q.   And when those percentages that we're

3  discussing, were those calculated using the entire ADC

4  prisoner population including the private prisons or only

5  the ten state-run prison locations?

6      A.   I would have to review, but my recollection is

7  the entire.

8      Q.   Okay.  So what are the analogous percentages if

9  you look only at the state-run prisons?

10     A.   I don't know.

11     Q.   Doctor, are you aware that the private prisons

12 don't accept patients with ongoing mental health needs?

13             MS. HESMAN:  Form.

14             THE WITNESS:  Now that you've asked that

15 question, I believe that's correct.

16     Q.   (By Mr. Fathi) Okay.  So if you were looking

17 only at the population of the ten state-run prisons, the

18 percentage of patients with mental health needs would be

19 higher than the figures we've just discussed; correct?

20             MS. HESMAN:  Form.  Foundation.

21             THE WITNESS:  So in this case -- in this

22 case I took the percentages -- I took the data directly

23 from the Department as they report it.

24             And given the condition that you just

25 reminded me of, that the private prisons don't accept

**Incomplete, Rule 106**

**Foundation, Rule 602**
Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate.

**Argument**

1   patients who require ongoing mental healthcare, the
2   percentages may -- well, let me start over.
3           I'm -- I'm telling you what the Department
4   reports.  I don't -- I did not do calculations.  And if
5   there's a different or better way to present those
6   statistics, I think that that's outside of the scope of
7   my report.
8      Q.    (By Mr. Fathi) Well, this is your report, and
9   I'm asking you about the statistics you used.
10          So as I understand it, you believe that this
11  28 percent figure is calculated using the entire state
12  prison system including the private prisons; is that
13  right?
14     A.    That's my belief.
15     Q.    Okay.

**Argument**

**Speculation**

16     A.    But I'd have to double check.
17     Q.    Okay.  So let's just assume that's true.  Then
18  if you calculated the analogous figure using only the ten
19  state-run prisons, the percentage would be higher, would
20  it not?

**Compound**

**Argument**

Questions were not compound or argumentative and did not call for speculation.

21             MS. HESMAN:  Form.  Foundation.
22             THE WITNESS:  Yes.
23     Q.    (By Mr. Fathi) And the percentage would be
24  higher because the numerator, the number of people with
25  mental health needs, would be the same.  And the

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

113

**Incomplete, Rule 602**
"Incomplete" objection is meaningless; Defendants can counter-designate.

**Relevance, Rule 402**

**Cumulative, Rule 403**

**Foundation, Rule 602**

Data underlying the witness's testimony is relevant. Rule 401, 402. Witness was able to answer the questions. Not cumulative; questions were not previously answered.

**Incomplete, Rule 106**

**Hearsay, Rule 802**
Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

```
 1   denominator would be smaller by about seven and a half
 2   thousand; correct?
 3                 MS. BARNES:  Form.
 4                 THE WITNESS:  Correct.
 5        Q.   (By Mr. Fathi) Okay.  So to recap, you don't
 6   know what the percentage would be if we were looking just
 7   at the ten state-run prisons?
 8                 MS. BARNES:  Form.
 9                 THE WITNESS:  Sitting here today, I would
10   need to review the at-a-glance reports to ensure I answer
11   that correctly.  If you want me to do so, I will be happy
12   to.
13        Q.   (By Mr. Fathi) Okay.  But my question is,
14   sitting here today, you don't know what the percentage of
15   patients with ongoing mental health needs is, looking
16   just at the ten state-run prisons?
17        A.   Sure.  I don't.
18        Q.   Okay.  Now, also on page 10 of your report, it
19   says -- this is the second line of the final paragraph --
20   "The overall proportion of incarcerated individuals who
21   are identified as requiring mental healthcare is
22   consistent with proportions found in other state
23   correctional settings."  Do you see that?
24        A.   I do.
25        Q.   What's your source for that statement?
```

Incomplete,
Rule 106

Foundation,
Rule 602

Witness was
able to
answer the
questions.
"Incomplete"
objection is
meaningless;
Defendants
can counter-
designate.

1      A.    My experience working for my company and

2   multiple reviews in other programs.

3      Q.    So what -- when you make this comparison here,

4   what states to what states are you comparing to Arizona?

5      A.    Florida, Georgia, Massachusetts, Tennessee.

6      Q.    Any others?

7      A.    Those are the ones that came immediately to

8   mind.  I may have looked at Maryland.

9      Q.    What's the overall proportion of incarcerated

10  individuals who are identified as requiring mental

11  healthcare in the Florida prison system?

12     A.    I don't recall.

13     Q.    What is it in Georgia?

14     A.    Somewhere around 20 or 21 percent, last time I

15  looked.

16     Q.    What is it in Massachusetts?

17     A.    My understanding is that it's about 25 percent.

18     Q.    And what's that understanding based on?

19     A.    Last -- last look at statistics, which was a

20  while ago.

21     Q.    How long ago was that?

22     A.    I reviewed a report earlier this year from --

23  I'm not sure the date exactly, but mid 2015, somewhere in

24  that range.

25     Q.    Okay.  So just so I'm clear, you're not --

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

Relevance,
Rule 402

Cumulative,
Rule 403

Foundation,
Rule 602

Argument
Data underlying
the witness's
testimony is
relevant. Rule
401, 402.
Witness was
able to answer
the questions.
Not cumulative;
questions were
not previously
answered.
Questions were
not
argumentative.

Hearsay,
Rule 802;
Incomplete,
Rule 106

1  you're not able to cite any published data for this

2  statement; is that correct?

3          MS. BARNES:  Form.

4          THE WITNESS:  I could go gather that and

5  present it to you.  Many correctional systems do -- do

6  present those.

7      Q.   (By Mr. Fathi) Okay.  But when you wrote this

8  statement that the overall proportion of incarcerated

9  individuals who are identified as requiring mental

10  healthcare is consistent with proportions found in other

11  state correctional settings, you were just basing that on

12  your own personal experience; correct?

13      A.   That is correct.

14      Q.   Okay.  And you also state on page 10, "In other

15  state correctional programs, patients receiving ongoing

16  mental healthcare typically represent between 20 and

17  25 percent of the entire incarcerated population, and

18  some 5 percent to 8 percent of the entire population are

19  classified as seriously mentally ill."

20          What's your source for those statistics?

21      A.   It's, again, my personal experience with other

22  programs.

23      Q.   Okay.  So, again, you weren't looking at any

24  published data when you wrote those figures?

25      A.   No.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

116

Hearsay,
Rule 802;
Incomplete,
Rule 106

1      Q.    And to what states are you comparing Arizona

2   when you make this statement?

3      A.    The same states I mentioned in the caseload.

4      Q.    Okay.  Florida, Georgia, Massachusetts,

5   Tennessee and Maryland; correct?

6      A.    Correct.

7      Q.    Do you have any sense how Arizona compares to

8   the other 44 states on these -- on these metrics?

9      A.    No.

10      Q.    Let's look at Exhibit 8, please.

11          (Deposition Exhibit 8 was marked for

12   identification.)

13      Q.    (By Mr. Fathi) Let's look at pages 21 and 22.

14   Doctor, Exhibit 8 is a document in which the defendants

15   tell us about who will testify in this case and what --

16   and on what subjects.

17          And you were discussed at pages 21 and 22.  So

18   would you please read that to yourself and then we'll

19   discuss.

20      A.    I will.  Can we scroll just little bit to the

21   end of that?  I've consumed the expectation, the

22   language.

23      Q.    Okay.  Doctor, have you seen this document

24   before?

25      A.    It was forwarded to me.

1      Q.   When did you first see this document?

2      A.   A week or two ago.

3      Q.   Is this an accurate statement of what your

4  testimony will be in this case?

5                MS. HESMAN:  Form.  Foundation.

6                MS. BARNES:  Yeah, David, this is a

7  deposition that you sought for in connection with his

8  expert report.

9                There's only one sentence in this listing

10  and description of his testimony that pertains to the

11  expert report, so if you want to limit it to that, that

12  would be great.

13                But he is not here to testify as a fact

14  witness, and we're not prepared to answer questions in

15  that regard because that's not what this deposition was

16  noticed for.

17                MR. FATHI:  No, I'm entitled to ask him

18  about his testimony at the trial of this case.

19                MS. BARNES:  No, you're not, because this

20  is an expert deposition.  And it is specifically tied to

21  his expert report.

22                You did not notice a deposition for his

23  fact -- where he was listed as a fact witness or the

24  topics that his fact witness testimony would pertain to.

25                So you're limited to asking him about the

118

```
 1   expert opinion, and the stuff that's in the expert
 2   opinion is what he's going to testify to in that
 3   capacity.
 4        Q.   (By Mr. Fathi) Doctor -- I'm sorry?
 5               MS. BARNES:  What was that, Ashlee?
 6               MS. HESMAN:  We join in that objection.
 7        Q.   (By Mr. Fathi) Doctor, is this a complete
 8   statement of what your testimony is going to be in this
 9   case?
10               MS. BARNES:  And, again, I'm going to
11   instruct the witness not to ask -- answer, David.  You
12   did not notice this as a fact witness deposition.
13               You noticed this as an expert deposition
14   based on the expert report which is one sentence of this.
15   He will also testify pursuant to 26(a)(2)(b) and
16   26(a)(2)(c).  And your questions of him in this
17   deposition need to be limited to his expert opinion.
18               MR. FATHI:  That's not correct.
19               MS. BARNES:  Why is it not correct?
20               MR. FATHI:  I'm not going to argue with
21   you.  Are you instructing the witness not to answer?
22               MS. BARNES:  I'm asking you to give me a
23   reason why it's not correct.  If you want us to try to
24   work it out and see if we can work it out, you need to
25   give me a reason why I'm incorrect.
```

119

```
 1              You didn't notice a fact witness
 2    deposition.  You have noticed other fact witness
 3    depositions and 30(b)(6) depositions.  That's not what
 4    this deposition was noticed for.  It was noticed
 5    pertaining to his expert report only.
 6              MR. FATHI:  These are the subjects on which
 7    he is -- he is disclosed as a witness, and we're entitled
 8    to ask him about that.  Are you instructing him not to
 9    answer?
10              MS. BARNES:  You're not entitled to ask him
11    that in a deposition that was noticed pursuant to the
12    expert report only.
13              If you had noticed it and said that you
14    were going to notice it to depose him as a fact witness
15    and as an expert witness, then that would be a different
16    story.  But that deadline came and went and you did not,
17    and you've only noticed his deposition as an expert.
18              So this testimony, the testimony that
19    you're going to seek from him in this deposition needs to
20    be limited to the expert report.
21              MR. FATHI:  Okay.  I'm going to ask my
22    questions, and you can instruct him not answer if you
23    want to do that.
24       Q.   (By Mr. Fathi) Doctor, is this an accurate
25    statement of what your testimony will be at the trial of
```

120

```
 1   this case?
 2              MS. BARNES:  And to the extent that you can
 3   answer that with respect to your expert opinion only and
 4   not the other list -- listing of various topics regarding
 5   fact witness testimony, you can answer that.
 6              THE WITNESS:  With respect to my expert
 7   opinion and report, this is accurate.
 8   Q.   (By Mr. Fathi) Is this a complete statement of
 9   what your testimony will be at the trial of this case?
10              MS. BARNES:  And to the extent that -- to
11   the extent that you can answer that with respect to your
12   expert report, in other words, is your expert report what
13   you're going to testify to regarding your expert opinion,
14   then you can answer that.
15              If he's -- that's my instruction.
16              MR. FATHI:  Okay.  So would you please
17   clearly instruct him not to answer because when we go to
18   the judge I want -- I want a clear -- I don't want any
19   ambiguity.  If you're instructing him not to answer, I
20   want you to say that.
21              MS. BARNES:  Well, I'm asking you to give
22   me a reason why you think you're entitled to ask him
23   about his fact witness testimony at trial in this
24   deposition.
25              MR. FATHI:  Because this is all part of
```

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

1   his -- his disclosed testimony that we're entitled to ask

2   about.  Well, Sarah, we're not going to agree, okay?

3   There's no point in arguing.

4           But if you're going to instruct him not to

5   answer, I want that clearly on the record for when we go

6   to the judge.  So will you please instruct him not to

7   answer if that is in fact, in fact, your instruction?

8           MS. BARNES:  Dr. Wilson, to the extent that

9   you could answer about this listing right here, No. 6, as

10  it pertains to your expert opinion you can answer the

11  question.

12          MR. FATHI:  And you're otherwise

13  instructing him not to answer.  Is that correct?

14          MS. BARNES:  You need to make your question

15  more clear, which is making it difficult for me to give

16  the instruction clearly.

17          If you want to ask him is this listing of

18  testimony going to be what you're going to testify to at

19  trial as a fact witness, then say that.

20          MR. FATHI:  Sarah, you can't have it both

21  ways.  If you're instructing him not to answer, you need

22  to do that clearly on the record so we can get a -- seek

23  a ruling from the court.

24          MS. BARNES:  So are you going to go to the

25  judge right now?  Let's get the judge, then.  I mean, is

1    that what you're saying you're going to do?

2              MR. FATHI:  May or may not do it right now,

3    but we may do it later.  We need a clear record.

4              MS. BARNES:  I want to take a two-minute

5    recess before I respond to you.

6              MR. FATHI:  Okay.  Two minutes is fine.

7              MS. BARNES:  We'll take a break.

8              (Recess from 1:12 p.m. to 1:15 p.m.)

9              MS. BARNES:  So coming back, my -- my

10   position is going to be that I object to the questions,

11   fact witness -- fact -- sorry, can't talk -- fact

12   discovery has come and gone.  Those deadlines have come

13   and gone.  You did not notice the deposition to talk to

14   him about any potential fact testimony he might give.

15              With that objection, and reserving the

16   right to pursue that further at trial if necessary, you

17   can ask the witness the question.  If he can answer it,

18   he'll answer it.

19              MR. FATHI:  Okay.  Thank you.

20       Q.    (By Mr. Fathi) All right.  Doctor, going back to

21   Exhibit 8 -- can we have it on the screen?

22              So, Doctor, Exhibit 8 says that you're expected

23   to testify regarding how Centurion determined the

24   staffing levels needed for the ADCRR contract.

25              Do you see that?

Relevance,
Rule 402

Hearsay,
Rule 802

Health care staffing
is relevant.  Rule
401, 402.  Rule
801(d)(2) non-
hearsay statement of
opposing party/
agent.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

123

**Relevance, Rule 402**

**Foundation, Rule 602**

**Incomplete, Rule 106**

Health care staffing is relevant. Rule 401, 402. Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate.

1    A.    I do.

2    Q.    And what is your testimony going to be on that

3    subject?

4              MS. HESMAN:    Form.    Foundation.

5              MS. BARNES:    Same objection.

6              THE WITNESS:    I don't know.    I haven't

7    prepared for trial.    I have already mentioned in this

8    deposition that my recollection is that the staffing was

9    provided to us in the most recent RFP.

**Relevance, Rule 402**

**Foundation, Rule 602**

**Incomplete, Rule 106**

See below.

10    Q.    (By Mr. Fathi) Do you know how Centurion

11    determined the staffing levels needed for the ADCRR

12    contract?

13              MS. HESMAN:    Form.    Foundation.

14              THE WITNESS:    I'm not sure I do now.

**Relevance, Rule 402**

**Hearsay, Rule 802**

**Foundation, Rule 602**

**Incomplete, Rule 106**

Health care staffing is relevant Rule 401, 402. Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

15    Q.    (By Mr. Fathi) Okay.    So next it says that you

16    are going to testify about changes Centurion has made to

17    staffing during the contract.

18              Do you see that?

19    A.    I do.

20    Q.    And what is your testimony going to be on that

21    topic?

22              MS. HESMAN:    Form.    Foundation.

23              MS. BARNES:    Form and foundation.

24              THE WITNESS:    In fact, I'm not qualified to

25    testify on that topic.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

124

Relevance, Rule 402

Hearsay, Rule 802

Foundation, Rule 602

Incomplete, Rule 106

See below

1    Q.    (By Mr. Fathi) Okay.  So next it says you will

2    testify about a comparison of Centurion staffing levels

3    in Arizona versus staffing levels in other states.  What

4    is your testimony going to be on that topic?

5              MS. HESMAN:  Form.  Foundation.

6              MS. BARNES:  Foundation.

7              THE WITNESS:  I don't know.

Relevance, Rule 402

Foundation, Rule 602

See below

8    Q.    (By Mr. Fathi) Well, tell me what you know about

9    Centurion staffing levels in Arizona versus staff levels

10   in other states.

11             MS. HESMAN:  Same objection.

12             THE WITNESS:  I have not taken the time to

13   do a direct comparison.

Relevance, Rule 402

Hearsay, Rule 802

Foundation, Rule 602

Incomplete, Rule 106

Health care staffing is relevant.  Rule 401, 402. Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/ agent.

"Incomplete" objection is meaningless; Defendants can counter-designate.

14   Q.    (By Mr. Fathi) Next it says you're going to

15   testify regarding Centurion's recruiting, hiring,

16   credentialing, training, retention and compensation

17   policies and practices for mental health staff.  Do you

18   see that?

19   A.    I do.

20   Q.    Tell me what your testimony is going to be on

21   that subject.

22             MS. HESMAN:  Form.  Foundation.

23             MS. BARNES:  Form and foundation.

24             THE WITNESS:  To the extent that I'm

25   qualified to testify on credentialing and training, I

Relevance,
Rule 402

Hearsay,
Rule 802

Foundation,
Rule 602

Incomplete,
Rule 106

Health care staffing is relevant. Rule 401, 402. Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

1    don't know what my testimony will be.  I'm not the best

2    witness for recruiting and hiring and compensation

3    policies.

4        Q.    (By Mr. Fathi) Next it says that you are also

5    expected to testify regarding contract monitoring and

6    compliance activities.  Do you see that?

7        A.    I do.

8        Q.    And what is going to be the substance of your

9    testimony on those topics?

10               MS. HESMAN:  Form.  Foundation.

11               MS. BARNES:  Same objections.

12               THE WITNESS:  The substance of any

13   testimony that I provide will be consistent with what

14   I've described today in my deposition.

15       Q.    (By Mr. Fathi) So on the subjects of contract

16   monitoring and compliance activities, are you going to

17   testify to any information beyond what you've already

18   testified to today?

19               MS. HESMAN:  Form.  Foundation.

20               MS. BARNES:  Form and foundation.

21               THE WITNESS:  I don't know.

22       Q.    (By Mr. Fathi) Well, again, Doctor, you need

23   to -- you need to tell me what your testimony is going to

24   be.  So if you're going to testify on these topics beyond

25   what you've already said today, I'm asking you what your

 1    testimony is going to be.

 2              MS. BARNES:  And that's absolutely not

 3    correct, and you're going to make me return to my

 4    original objection and instruct him not answer if you're

 5    going to take that approach, David.

 6              He absolutely does not have to tell you

 7    what he's going to testify to at trial as a fact witness.

 8    That is absolutely incorrect, and I don't appreciate you

 9    instructing my witness to what is contrary to the rules.

10              He can tell you whether or not he's going

11    to testify to anything else as an expert beyond what is

12    contained in his expert opinion, but he does not have to

13    tell you as a fact witness what he's going to testify to

14    at trial.  That is incorrect.

15              MR. FATHI:  Sarah, what's -- what's the

16    authority for your position?

17              MS. BARNES:  No witness has to tell you

18    what their testimony at trial is going to be.  Certainly

19    not one that wasn't noticed for a deposition regarding

20    their fact testimony.

21              But more importantly, you are not entitled

22    to have someone tell you what their testimony at trial is

23    going to be.  If you would like to find out what a

24    witness knows about a particular topic for which they

25    have been listed as a potential fact witness, then you

127

1    can ask them that.

2              But he's not obligated to tell you what

3    he's going to testify to at trial.  He probably has no

4    idea what he's going to testify to at trial.

5              MR. FATHI:  And I ask again what's the

6    authority for your position, Sarah?

7              MS. BARNES:  Common sense.  And the fact

8    that you can't provide me anything that tells us that

9    you're entitled to have a witness tell you what they're

10   going to testify to at trial.

11             A person who has not prepared for trial

12   who's going to be discussed -- have their testimony

13   discussed with them with counsel, it's all work product

14   and attorney-client privilege.  And they don't have to

15   say here's my testimony at trial.

16             All you're entitled to learn in a

17   deposition is -- Rule 30, really, is my framework and my

18   authority in this, is that you can find out what they

19   know.

20             If you're going to ask him about what he

21   knows about these topics, so be it.  But don't instruct

22   my witness that he has to tell what his fact witness

23   testimony will be at trial.

24             MR. FATHI:  Sarah, you could be excused for

25   being ignorant of this because you're not counsel on the

128

1    case, but there is an order in this case ordering the

2    parties to disclose the substance of their witness

3    testimony.  So we are, in fact, entitled to ask about --

4                MS. HESMAN:  And, David, I'm just going to

5    interject here.  The time has come and gone for that.

6    Fact discovery is closed, and you've wasted the last 15

7    minutes on -- on issues that you failed to -- you failed

8    to notice a fact witness deposition of this witness.  So

9    why are we wasting time on this when this is an expert

10   deposition?

11               MR. FATHI:  I think if you'll look back on

12   the last few minutes I haven't been the one talking, so

13   if anyone's wasting time, it's not me.

14               MS. HESMAN:  I disagree.  But why don't you

15   just move on because this is not what the purpose of the

16   deposition is.

17               MR. FATHI:  Yeah, you're not the judge of

18   that, Ashlee.  So --

19               MS. HESMAN:  Again, the judge is, and the

20   judge has said you get expert depositions right now.

21   You're not conducting an expert deposition, and you have

22   not given any authority to support your -- your claim

23   that you're entitled to conduct discovery depositions

24   right now.  So if you have that --

25               MR. FATHI:  The onus is on the person

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

129

1    attempting to terminate a deposition or the person

2    instructing a witness not to answer to provide --

3              MS. HESMAN:  So you don't have that.  Okay.

4              MS. BARNES:  Again, you're misstating the

5    law, and maybe it's because you don't -- well, I'll leave

6    that alone.  You are misstating the law.

7              You are required to limit your conduct in

8    the deposition and your questioning of a witness to the

9    relevant matters in that deposition.

10             And this deposition is an expert

11   deposition, and the questions need to be limited to that

12   report and then of course his professional background,

13   et cetera, that go towards him being qualified to give

14   that expert report.

15             You are not now, especially after the time

16   has passed, allowed to press him on what his fact witness

17   testimony will be.  The topics are there, you've been

18   provided those, you didn't depose him in that regard.  So

19   I agree that you need to move on.

20             MR. FATHI:  Well, I certainly appreciate

21   the legal instruction from both of you, but are you both

22   finished?  Are you finished, Sarah?

23             MS. BARNES:  I'm not talking.

24             MR. FATHI:  Are you finished, Ashlee?

25             MS. HESMAN:  I am finished.  Thank you so

1    much.

2              MR. FATHI:  You're most welcome.

3    Q.    (By Mr. Fathi) Doctor, what is your testimony

4    going to be at trial regarding contract monitoring and

5    compliance activities?

6              MS. HESMAN:  Form.  Foundation.

7              MS. BARNES:  Form and foundation.  Asked

8    and answered.  You can go ahead and answer it one more

9    time, Dr. Wilson.

10             THE WITNESS:  I don't know.

11   Q.    (By Mr. Fathi) What is your testimony at trial

12   going to be regarding supervision and peer reviews of

13   mental health staff?

14             MS. HESMAN:  Form.  Foundation.

15             MS. BARNES:  Same.

16             THE WITNESS:  I don't know.

17   Q.    (By Mr. Fathi) Okay.  Tell me about your

18   involvement in peer reviews of mental health staff in

19   Arizona.

20             MS. HESMAN:  Form.  Foundation.

21             THE WITNESS:  I've had no involvement in

22   peer reviews.

23   Q.    (By Mr. Fathi) And it says you're going to,

24   "Testify regarding statistical data relating to the

25   provision of the mental healthcare to ADCRR inmates."

**Relevance, Rule 402**

**Foundation, Rule 602**

**Incomplete, Rule 106**

Qualifications of mental health staff are relevant.  Rule 401, 402. Witness's lack of knowledge is itself evidence. "Incomplete" objection is meaningless; Defendants can counter-designate.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

131

```
1            Do you see that?

2      A.   I do.

3      Q.   What statistical data will you be discussing?

4            MS. HESMAN:  Form.  Foundation.

5            MS. BARNES:  Form.  Foundation.

6            THE WITNESS:  I don't know.

7            MS. HESMAN:  He responded, David.

8            THE WITNESS:  I'm sorry.  I don't know.

9      Q.   (By Mr. Fathi) Tell me what kinds of statistical

10     data regarding the Arizona contract you track as a

11     regular part of your job?

12           MS. HESMAN:  Form.  Foundation.

13           THE WITNESS:  I don't track statistical

14     data as part -- a routine part of my job.

15     Q.    (By Mr. Fathi) And it also says that you're

16     going to testify regarding, "continuous improvements in

17     the delivery of mental healthcare and programming to the

18     ADCRR inmate population."  Do you see that?

19     A.    Yes.  I do.

20     Q.    And what are the continuous improvements to

21     which you're going to be testifying?

22           MS. HESMAN:  Form.  Foundation.

23           MS. BARNES:  Same objections.

24           THE WITNESS:  I don't know, except I think

25     I showed some improvement in my report, discussed some
```

Relevance, Rule 402

Foundation, Rule 602

See below.

Relevance, Rule 402

Hearsay, Rule 802

Foundation, Rule 602

Incomplete, Rule 106

Delivery of mental healthcare and programming are relevant.  Rule 401, 402.  Witness's lack of knowledge is itself evidence. Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

Relevance,
Rule 402

Foundation,
Rule 602

Incomplete,
Rule 106

Delivery of
mental
healthcare
and
programming
are relevant.
Rule 401, 402.
Witness's lack
of knowledge
is itself
evidence.
"Incomplete"
objection is
meaningless;
Defendants
can counter-
designate.

1    improvement in the delivery of mental healthcare at least

2    in terms of the broad trends in self-injury and suicide

3    attempts.

4        Q.    (By Mr. Fathi) Other than that are you aware of

5    any other continuous improvements in the delivery of

6    mental healthcare and programming to the ADCRR inmate

7    population?

8                MS. HESMAN:  Form.  Foundation.

9                MS. BARNES:  Same objection.

10               THE WITNESS:  My -- go ahead.

11               MS. BARNES:  Sorry.  I said "same

12   objection."  Go ahead.

13               THE WITNESS:  My understanding is that

14   there have been improvements in the metrics used under

15   this stipulation agreement, but I would have to refresh

16   myself regarding those to be able to say anything

17   specifically.

18       Q.    (By Mr. Fathi) Well, tell me about those

19   improvements in the metrics under the stipulation.

20               MS. HESMAN:  Same objection.

21               THE WITNESS:  At this time, I can't.

22   Because I did not review those statistics to prepare for

23   this deposition or prepare my report.

24       Q.    (By Mr. Fathi) Do you review those statistics as

25   a regular part of your -- your work?

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

133

Relevance,
Rule 402

Hearsay,
Rule 802

Foundation,
Rule 602

Incomplete,
Rule 106

Delivery of
mental
healthcare and
programming
are relevant.
Rule 401, 402.
Witness's lack
of knowledge
is itself
evidence.
Rule 801(d)(2)
non-hearsay
statement of
opposing
party/agent.
"Incomplete"
objection is
meaningless;
Defendants
can counter-
designate.

1          MS. HESMAN:  Same objection.

2          THE WITNESS:  No.

3     Q.   (By Mr. Fathi) And it also says that you're

4  going to testify regarding your opinion that the mental

5  healthcare and programming delivered to ADCRR inmates

6  meets or exceeds community standards of care.

7          Do you see that?

8     A.   I do see that.

9     Q.   Is that going to be your testimony?

10         MS. HESMAN:  Same objections.

11         MS. BARNES:  Form and foundation.

12         THE WITNESS:  I don't know, but I would say

13  I think my testimony today has been clear that I haven't

14  reviewed mental healthcare and programming as part of my

15  preparation for the deposition today or my report.

16    Q.   (By Mr. Fathi) As we sit here today, is it your

17  opinion that the mental healthcare and programming

18  delivered to ADCRR inmates meets or exceeds community

19  standards of care?

20         MS. HESMAN:  Same objection.

21         THE WITNESS:  As we sit here today, I don't

22  have an opinion.

23    Q.   (By Mr. Fathi) If you were trying to form an

24  opinion, what would be the community standard of care

25  that you would apply?

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

134

Relevance,
Rule 402

Hearsay,
Rule 802

Foundation,
Rule 602

Incomplete,
Rule 106

Delivery of
mental
healthcare and
programming
are relevant.
Rule 401, 402.
Witness's lack
of knowledge is
itself evidence.
Rule 801(d)(2)
non-hearsay
statement of
opposing party/
agent.
"Incomplete"
objection is
meaningless;
Defendants
can counter-
designate.

1        MS. HESMAN:  Form.  Foundation.

2        THE WITNESS:  The kinds of things that I

3  would look at would be adherence to NCCHC, backlogs if

4  they exist, and quality of mental healthcare and

5  documentation by record review.

6     Q.  (By Mr. Fathi) And which of those things have

7  you reviewed since, say, July of this year?

8     A.  None of those things.

9     Q.  All right.  It also says that you will testify

10  regarding your opinion that the mental healthcare and

11  programming delivered to ADCRR inmates meets or exceeds

12  constitutional requirements.

13       Is that going to be your testimony?

14        MS. HESMAN:  Form.  Foundation.

15        MS. BARNES:  Form and foundation.

16        THE WITNESS:  I don't know.

17     Q.  (By Mr. Fathi) As we sit here today, is it your

18  opinion that the mental healthcare and programming

19  delivered to ADCRR inmates meets or exceeds

20  constitutional requirements?

21        MS. HESMAN:  Form.  Foundation.

22        MS. BARNES:  Form and foundation.

23        THE WITNESS:  I didn't develop an opinion.

24     Q.  (By Mr. Fathi) So you have no opinion on that?

25        MS. BARNES:  Same objection.

Relevance,
Rule 402

Foundation,
Rule 602

Incomplete,
Rule 106

Delivery of mental healthcare and programming are relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence. "Incomplete" objection is meaningless; Defendants can counter-designate.

1          (Reporter clarification.)

2          THE WITNESS:  I believe I said I don't have

3   an opinion.

4      Q.    (By Mr. Fathi) Doctor, do you have any legal

5   training?

6      A.    I worked as a legal assistant before I went to

7   graduate school.

8      Q.    Anything beyond that?

9      A.    No.

10          MR. FATHI:  Let's take a five-minute break.

11          (Recess from 1:32 p.m. to 1:39 p.m.)

12          MR. FATHI:  Let's look at Exhibit 3,

13   please.

14          (Deposition Exhibit 3 was marked for

15   identification.)

16      Q.    (By Mr. Fathi) Doctor, Exhibit 3 is a

17   January 14, 2020, e-mail from Tom Dolan to a number of

18   people.  First, who is Tom Dolan?

19      A.    He is the vice president of operations for

20   Centurion of Arizona.

21      Q.    Doctor, have you seen this e-mail before?

22      A.    No.

23      Q.    So Mr. Dolan writes, "Prior to Parson v Shinn

24   mediation, Richard asked us to review the staffing matrix

25   and submit a staffing proposal without budget

136

```
 1   constraints.  Attached is the proposal."
 2           Do you see that?
 3       A.   I do see it.
 4       Q.   And then if you scroll -- let's scroll down.
 5   What follows is a spreadsheet that has five columns, the
 6   name of the position, Contract FTE, Recommended FTE, FTE
 7   Variance, and then notes.  Do you see that?
 8       A.   I see part of it.  Yes, I do.
 9       Q.   Are you missing -- you just need to scroll --
10       A.   I got it.  I got it now.
11       Q.   Okay.  I'm just going to be asking you about one
12   item on this -- this spreadsheet, but if you'd like to
13   look at it in detail, that's fine.  What's your
14   preference?
15       A.   Please go ahead.
16       Q.   I'm sorry?
17       A.   Please go ahead.
18       Q.   Okay.  So, Doctor, have you seen this
19   spreadsheet before?
20       A.   No.
21       Q.   Okay.  Could you scroll down to the bottom,
22   please.
23           So if we look at the three columns, Contract FTE
24   is -- that's better, thank you -- 1052.75; Recommended
25   FTE is 1214.25; and FTE variance is 161.50.  Do you see
```

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

137

```
 1   that?
 2        A.   I do.
 3        Q.   Okay.  Were you aware that in January of 2020
 4   Centurion recommended adding 161 and a half FTE
 5   healthcare staff?
 6                MS. HESMAN:  Form.  Foundation.
 7                THE WITNESS:  I was not.
 8        Q.   (By Mr. Fathi) All right.  Let's look at
 9   Exhibit 7, please.
10                (Deposition Exhibit 7 was marked for
11   identification.)
12        Q.   (By Mr. Fathi) Doctor, Exhibit 7 is the excerpts
13   from the deposition of Stefanie Platt taken in this case.
14   I know you mentioned her earlier today, but who is
15   Stefanie Platt?
16        A.   She was the former statewide mental health
17   director for Centurion in Arizona.
18        Q.   And when did she leave that position,
19   approximately?
20                MS. HESMAN:  Foundation.
21                THE WITNESS:  I'm going to guess mid year,
22   so June, July, August time frame.
23        Q.   (By Mr. Fathi) Of 2021?
24        A.   Of 2021.
25        Q.   Okay.  Let's scroll down to page 17, please.
```

1    And, Doctor, if you need this blown up or scrolled, just

2    let us know.

3        A.    Thank you.

4        Q.    So starting on page 17, and -- page 17 at line

5    11 and going through page 18, line 18, Ms. -- excuse

6    me -- Dr. Platt talks about her reasons for leaving

7    Centurion.  Would you read that yourself, Doctor, and

8    then we will discuss?

9        A.    I've read it.

10       Q.    So you see that Dr. Platt says that she left

11   because she felt as though she didn't have the resources,

12   support or communication that she needed to do her job in

13   the manner which she saw fit?

14       A.    I do see that.

15       Q.    And further down on page 18 you see that

16   Dr. Platt said, "We had a strong issue with needing more

17   staff to fulfill the obligations within the court order

18   as well as provide the care that we wanted to."

19           Do you see that, Doctor?

20       A.    I do.

21       Q.    Were you aware that Dr. Platt had given this

22   testimony?

23       A.    No.

24       Q.    Let's go to page 23, please.  And at page 23

25   starting on line 20 and then going through page 27, line

1  9, Dr. Platt discusses staffing.

2          So, again, will you please read this silently,

3  and then we'll discuss.

4      A.   How far did you want me to go?

5      Q.   27, line 9, please.

6      A.   Page 27, line 9, okay.

7          Okay.  If we can scroll further.  If you could

8  scroll down for me?  Thank you.

9          Okay.  Now I need to scroll up, please.  Thank

10  you.

11          Okay.  So, I apologize, you told me to read

12  through one line.  Which line?

13      Q.   27, line 9, if you would.

14      A.   Okay.  I'm there.

15      Q.   All right.  Doctor, are you familiar with the

16  court's order in this case setting forth presumptive

17  minimum durations for mental health encounters of either

18  10 or 30 minutes?

19              MS. BARNES:  Form.

20              THE WITNESS:  I am familiar with -- with

21  hearing about those durations, yes.

22      Q.   (By Mr. Fathi) Okay.  Could we go back to the

23  exhibit, please.

24          So on pages -- sorry, let's go back to pages 23

25  and 24, please.

140

```
1              So, Doctor, again, if you need to scroll or
2     anything, just let us know.  But on pages 23 and 24
3     Dr. Platt testifies about a study that was carried out to
4     see if there was sufficient mental health staff to meet
5     those durational requirements.  Do you recall reading
6     that?
7         A.   Yes, I do.
8         Q.   And then on page 25 at line 15, he testifies,
9     "There is not enough staff to be able to see the patients
10    specifically as indicated for those periods of time."
11             Do you see that?
12        A.   I do.
13        Q.   And then on page 26 at line 9, Dr. Platt is
14    asked, "Would the mental health staff tell you that their
15    caseloads were too large for them to manage?"
16             And she testified, "Some would."  Do you see
17    that?
18        A.   I do.
19        Q.   And then down at the bottom of page 26
20    continuing on to page 27, Dr. Platt was asked, "So did
21    you ever hear anybody who worked with you at the regional
22    headquarters express their opinion that there was not
23    enough mental health staff?"
24             And Dr. Platt testified, "Yes."
25             And she was asked, "And who was that?"
```

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

1          And she answered, "Every individual on our
2     regional mental health team."
3          And she was asked, "Including Dr. Carr?"  And
4     she answered, "Yes."
5          Dr. Wilson were you aware that Dr. Platt had
6     given this testimony?
7     A.   No.
8     Q.   Were you aware of any of the underlying facts
9     about which she testified?
10               MS. BARNES:  Form.  Foundation.
11               MS. HESMAN:  Same objection.
12     Q.   (By Mr. Fathi) Let me ask a more specific
13     question.
14     A.   Yeah.
15     Q.   Were you aware that a study had been carried out
16     that determined there was not sufficient mental health
17     staff to meet the 10 and 30-minute requirements?
18               MS. HESMAN:  Form.  Foundation.
19               MS. BARNES:  Foundation.
20               THE WITNESS:  I apologize for speaking too
21     soon.  No, I was not.
22     Q.   (By Mr. Fathi) Were you aware that everyone on
23     the regional mental health team had expressed the view
24     that there was not enough mental health staff?
25               MS. HESMAN:  Form.  Foundation.

Relevance,
Rule 402

Foundation,
Rule 602

Adequacy of
mental health
staffing is
relevant.
Rule 401,
402.
Witness's
lack of
knowledge is
itself
evidence.

**Relevance, Rule 402**

**Foundation, Rule 602**

Adequacy of mental health staffing is relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence.

1          MS. BARNES:  Form.  Foundation.

2          THE WITNESS:  No.

3     Q.   (By Mr. Fathi) Were you aware that some mental

4    health staff would tell -- had said that their caseloads

5    were too large for them to manage?

6          MS. HESMAN:  Form.  Foundation.

7          MS. BARNES:  Form.  Foundation.

8          THE WITNESS:  No.

9     Q.   (By Mr. Fathi) All right.  Let's go to page 45,

10   please.  Excuse me, starting on page 44.

11         MS. BARNES:  So I'm going to -- I'm going

12   to interject here again, much to your dismay, I'm sure.

13         But what I am trying to figure out is what

14   your line of questioning right now about this deposition

15   transcript has to do with Dr. Wilson's expert opinion and

16   his expert report.

17         All you're doing is reading into the record

18   testimony from this witness, a fact witness, and then

19   you're asking him if he was aware of these things.

20   That's it.  There's no -- this line of questioning

21   doesn't have anything to do with his expert opinion.

22         MR. FATHI:  I would first note that

23   speaking objections are disfavored and improper.

24         Dr. Wilson is expected to testify regarding

25   his opinion that the mental healthcare -- that -- excuse

1   me, his opinion that the mental healthcare and

2   programming delivered to ADCRR inmates meets or exceeds

3   community standards of care and constitutional

4   requirements.

5            So this is -- his knowledge of these events

6   or lack of knowledge is absolutely relevant to his

7   opinion on -- on that question.

8            MS. BARNES:  And, again, what you're now

9   going, continuing to go down the line of is fact witness

10  testimony and fact discovery that has closed.  You did

11  not notice this deposition for that purpose.  And the

12  rules do require that you limit your questioning in a

13  deposition to the relevant matters that pertain to that

14  notice of deposition.  That notice of deposition is

15  regarding his expert opinion and his expert report.

16           So you just reading into these, reading in

17  her testimony and asking him if he's aware of it, and

18  then finding out what he's going to say about that at

19  trial, which he's already told you he doesn't know, and

20  which I've already said is an inappropriate line of

21  questioning for this deposition, is -- is harassing and a

22  waste of everybody's time.

23           MR. FATHI:  I repeat --

24           MS. BARNES:  This is an expert deposition.

25           MR. FATHI:  I repeat, speaking objections

144

1   are disfavored and improper.

2             MS. BARNES:  I can make my record that you

3   are not complying with the rule, and abusing what this

4   deposition is supposed to be about under the rule.  And

5   you're not allowed to do that.

6             And so I can make my record about that.

7   And ask you to move on before I do have to again instruct

8   him not to answer, because you're spending time on

9   something that this deposition was not noticed to

10  address.  And that your deadline to do so has passed.

11            MR. FATHI:  Exhibit 8 is defendant's third

12  supplement pretrial disclosure statement.  And in that

13  statement, it says, "Dr. Wilson is expected to testify

14  regarding his opinion that the mental healthcare and

15  programming delivered to ADCRR inmates meets or exceeds

16  community standards of care and constitutional

17  requirements."

18            That is an expert opinion.  And I'm

19  inquire -- I am entitled to inquire about what

20  information he did or did not have when he formed that

21  expert opinion.

22            MS. BARNES:  That is not an expert opinion.

23  That is a question that is a topic that is listed under

24  his fact witness potential testimony, which you've now

25  asked him if he's going to talk about that and he's

1   answered that.

2              More importantly, the next sentence then

3   does say that he's going to testify as an expert

4   consistent with his report.

5              You now have that report.  And that topic

6   is not included in his report.  So you are limited to

7   talking about the topics that he discusses in his expert

8   report.

9              MR. FATHI:  And he discusses in his expert

10  report staffing when he directly responds to the

11  recommendations of Mr. Joy on pages 10 and 11 of his

12  report.  And so I'm entitled to ask him about staffing.

13             Now, I'm not going to argue with you

14  anymore, Sarah.  If you want to instruct him not to

15  answer, you can do that.  But if not, I would ask you to

16  please stop with the speaking objections.

17             MS. BARNES:  It's not a speaking objection.

18  I'm making a record that I believe that you are violating

19  the rule in how you're conducting this deposition.

20             So I'm going to ask that you move along

21  swiftly to things that pertain to his expert opinion to

22  wrap this up.  That -- that is my final position on it.

23       Q.   (By Mr. Fathi) Doctor, would you look at page

24  44, please?

25       A.   Yes.

146

1     Q.   All right.  Would you please read Dr. Platt's

2   testimony from page 44, line 1, to page 45, line 6.

3          Are you finished?  I'm sorry.  I thought you

4   indicated you were.  Please take your time.

5     A.   How far do you want me to go?

6     Q.   45, line 6.

7     A.   Okay.  I have finished reading those lines.

8     Q.   All right.  So on page 44, Dr. Platt is asked

9   about vacancies among psych associates at the Eyman

10  prison.  Do you say that -- see that?

11    A.   I do see that.

12    Q.   And she's asked, "What was the root cause of

13  these vacancies?

14         Correct?

15    A.   Correct.

16    Q.   And she testifies, "In my opinion the same as I

17  discussed before, a lot of feeling overworked and

18  undervalued and unhappy with the work environment."

19         Do you see that?

20    A.   I do.

21    Q.   You do see that?

22    A.   Yes.

23    Q.   All right.  And she was asked, "And was this low

24  staffing for this position a barrier to providing care to

25  patients at Eyman?"

1    And she answers, "Yes." Do you see that?

2    A.    Yes. I do.

3    Q.    And continuing on to page 45, she's asked, "Were

4    you aware of clinical encounters being canceled due to

5    lack of psych associate staff?"

6    Do you see that?

7    A.    I do.

8    Q.    And she answered, "I was aware of routine

9    encounters, a few, by the very end that had been

10   canceled, yes."

11   Do you see that?

12   A.    I do.

13   Q.    Were you aware that Dr. Platt had given this

14   testimony?

15   A.    No.

16   Q.    Were you aware of the underlying facts discussed

17   in this testimony?

18           MS. HESMAN:  Form.  Foundation.

19           MS. BARNES:  Form and foundation.

20           THE WITNESS:  No.

21   Q.    (By Mr. Fathi) When you wrote your response to

22   Mr. Joy's report, did you take into account vacancies

23   that existed among mental health staff?

24           MS. HESMAN:  Form.

25           THE WITNESS:  No.

Incomplete, Rule 106

"Incomplete" objection is meaningless; Defendants can counter-designate.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

148

1    Q.   (By Mr. Fathi) Just give me a moment.

2         Dr. Wilson, does this sworn testimony by

3    Dr. Platt have any effect on your opinion about the

4    adequacy of mental healthcare and programming in the

5    Arizona Department of Corrections?

6              MS. HESMAN:  Form.  Foundation.

7              MS. BARNES:  Form.

8              THE WITNESS:  At this time I was not asked

9    to develop an opinion about the adequacy.  So I can't

10   answer that.

11   Q.   (By Mr. Fathi) If you are asked to develop an

12   opinion about the adequacy of mental healthcare in the

13   Arizona Department of Corrections, will this sworn

14   testimony by Dr. Platt be relevant as you form that

15   opinion?

16             MS. HESMAN:  Form.  Foundation.

17             MS. BARNES:  Form.

18             THE WITNESS:  That sworn testimony should

19   be taken into account, yes.

20   Q.   (By Mr. Fathi) Doctor, we spoke earlier about

21   the increase in suicides recently in the department.

22   Could vacancies in custody staff be a contributing factor

23   to that increase?

24             MS. HESMAN:  Form.  Foundation.

25             THE WITNESS:  Theoretically, absolutely,

Foundation Rule 602

Incomplete, Rule 106
Suicides in ADCRR are relevant. Rule 401, 402. Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

149

1  yes.

2      Q.   (By Mr. Fathi) Do you know what the current

3  vacancy rate among custody staff at the Eyman prison is?

4              MS. HESMAN:  Form.

5              MS. BARNES:  You froze there, Dr. Wilson.

6              THE WITNESS:  I'm sorry.  Am I unfrozen?

7              I do not know what the current vacancy rate

8  is for correctional officers at the Eyman complex.

9              MR. FATHI:  All right.  Doctor, those are

10  all my questions.  Thank you very much.  I wish this

11  could have been a more congenial experience, but that is

12  obviously not entirely under my control.  I thank you for

13  your time and patience.

14              MS. BARNES:  Ashlee, do you have any

15  questions?

16              MS. HESMAN:  I don't.

17              (Deposition concluded at 2:00 p.m.)

18

19

20

21

22

23

24

25

150

1                         SIGNATURE PAGE

2          I, JOHN SEDDON WILSON, a deponent exercising my
   right to read and sign my deposition taken on October 28,
3  2021, place my signature hereon and make the following
   changes on this _____ day of _____,2021.
4
       (IF THERE ARE NO CHANGES, WRITE "NONE.")
5

6
                             _____
                             JOHN SEDDON WILSON
7

8  PAGE   LINE   READS          CHANGE TO          REASON

9  _____  _____  _____

10 _____  _____  _____

11 _____  _____  _____

12 _____  _____  _____

13 _____  _____  _____

14 _____  _____  _____

15 _____  _____  _____

16 _____  _____  _____

17 _____  _____  _____

18 _____  _____  _____

19 _____  _____  _____

20 _____  _____  _____

21 _____  _____  _____

22 _____  _____  _____

23 _____  _____  _____

24 _____  _____  _____

25 _____  _____  _____

151

1    STATE OF ARIZONA    )
                         )
2    COUNTY OF MARICOPA  )

3              BE IT KNOWN that I took the foregoing
     deposition pursuant to Notice; that the witness was duly
4    sworn by me; and that said transcript is a full, true,
     and accurate record of the proceedings; that the
5    proceedings were taken down by me in shorthand and
     thereafter reduced to print under my direction; that I
6    have acted in compliance with ACJA 7-206.

7              I CERTIFY that I am in no way related to
     any of the parties hereto nor am I in any way interested
8    in the outcome hereof.

9              Pursuant to request, notification was
     provided that the deposition is available for review and
10   signature.

11             Dated this 29th day of October, 2021.

12

13

14                          _____
                            Jennifer Honn
                            Certified Reporter
15                          Arizona CR No. 50885

16

17             I CERTIFY that GLENNIE REPORTING SERVICES,
     LLC, has complied with the ethical obligations set forth
18   in ACJA 7-206.

19

20

21

22

23   _____
24   GLENNIE REPORTING SERVICES, LLC
     Registered Reporting Firm
25   Arizona RRF No. R1035

# EXHIBIT 3

# FILED UNDER SEAL

# EXHIBIT 4

# FILED UNDER SEAL

# EXHIBIT 5

# In The Matter Of:

*Parsons vs.*
*Shinn*

---

*Johnny Wu, M.D. Centurion Chief Clinical Officer*
*November 04, 2021*

---

*Glennie Reporting Services, LLC*
*1555 East Orangewood Avenue*
*Phoenix, Arizona  85020*
*602.266.6535 Office     877.266.6535 Toll Free*
*www.glennie-reporting.com   office@glennie-reporting.com*

Original File 110421JW.txt
**Min-U-Script®**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) Case No. ) CV12-00601-PHX-ROS |
| David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

DEPOSITION OF JOHNNY WU, M.D.

CENTURION CHIEF CLINICAL OFFICER

Via Zoom Videoconference

Princeton, New Jersey
November 4, 2021; 9:00 a.m.

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona  85020

602.266.6535
www.glennie-reporting.com

Prepared by:
Janet Hauck, RPR
Arizona CR No. 50522

2

1                              I N D E X

2

3    Witness                                        Page

4    JOHNNY WU, M.D.

5         Examination by Ms. Norman:                  4

6

7

8

9                       INDEX TO EXHIBIT

10   Description                                    Page

11   Exhibit 1        Report of Johnny Wu, M.D. -     18
                      CONFIDENTIAL
12

13

14             WITNESS INSTRUCTED NOT TO ANSWER

15                                     Page    Line

16                                      98       9
                                        109      22
17                                      110      11
                                        110      19
18                                      115      15
                                        116       4
19                                      117      24
                                        131      16
20

21

22

23

24

25

3

1                    DEPOSITION OF JOHNNY WU, M.D., was taken on

2   November 4, 2021, via Zoom videoconference, commencing at

3   9:00 a.m., before JANET HAUCK, RPR, a Certified Reporter,

4   Certificate No. 50522, for the State of Arizona.

5

6   VIDEOCONFERENCE APPEARANCES:

7   For Plaintiffs:

8            PRISON LAW OFFICE
             Sara L. Norman, Esq.
9            Rita Lomio, Esq.
             1917 Fifth Street
10           Berkeley, California  94710

11  For Defendants:

12           STRUCK LOVE BOJANOWSKI & ACEDO, PLC
             Anne M. Orcutt, Esq.
13           3100 West Ray Road, Suite 300
             Chandler, Arizona  85226
14
    For the Witness:
15
             BROENING OBERG WOODS & WILSON, P.C.
16           Sarah L. Barnes, Esq.
             2800 N. Central Avenue, Suite 1600
17           Phoenix, Arizona  85004

18

19

20

21

22

23

24

25

Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

4

1              COURT REPORTER:  Before we proceed, I will

2     ask that counsel agree on the record that there is no

3     objection to this officer of the court administering a

4     binding oath to a witness not appearing personally before

5     me.

6              MS. NORMAN:  Yes.

7              MS. ORCUTT:  Agree.

8

9                   JOHNNY WU, M.D.,

10    called as a witness herein having been first duly sworn by

11    the Certified Reporter to tell the whole truth and nothing

12    but the truth, was examined and testified as follows:

13

14                   EXAMINATION

15    BY MS. NORMAN:

16        Q.   Dr. Wu, could you please state and spell your

17    full name for the record.

18        A.   Sure.  My name is Johnny Wu, J-O-H-N-N-Y, no

19    middle name, and then Wu, W-U.

20        Q.   Thank you.  As I said, my name is Sara Norman

21    and I am a lawyer for the plaintiffs in this case.  I'll

22    be taking your deposition today.

23             Have you ever been deposed before?

24        A.   Yes.

25        Q.   How many times?

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

9

1      Q.      Is there any reason you cannot give full and
2  honest testimony today?
3      A.      No.
4      Q.      Is there any medication you're taking that
5  would affect your testimony today?
6      A.      No.
7      Q.      Is there any reason why we can't go forward
8  today?
9      A.      No.
10      Q.      All right.  So could you state your current
11  employer and your title.
12      A.      My current employer is Centurion Health, and my
13  current title is executive vice president/chief clinical
14  officer.
15      Q.      How long have you been in that role with
16  Centurion?
17      A.      Is it possible for you guys to pull up my CV?
18  Because I don't have access to that.
19      Q.      I think it's an appendix to your report.
20      A.      Oh, I see.  Thank you.  So let's see.  When did
21  I become EVP?  So you wanted to know how long I had been
22  in that role?
23      Q.      Exactly.
24      A.      So almost six months.
25      Q.      Okay.  What was your position prior to becoming

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

10

1    chief clinical director; is that it?

2         A.    Chief clinical officer.  Prior to that I was in

3    the role of chief of clinical operations.

4         Q.    Okay.  And what's the difference between those

5    two roles?

6         A.    Basically, I am now part of the executive team

7    at the corporate office.

8         Q.    Okay.  Could you please describe your job

9    duties in your current role.

10        A.    So I oversee clinical operations at the

11   corporate side, and the chief medical officer, chief

12   psychiatric officer, as well as anything clinical, and

13   technology like telehealth, pharmacy, and startups all

14   fall under the clinical operations that I oversee.

15        Q.    Do you provide any direct patient care?

16        A.    As part of my job requirement with Centurion,

17   which is a subsidiary of Centene, I am required to do

18   community service and direct patient care in my community.

19   Unfortunately, I do not have any contracts here in

20   New Jersey.  I live in the Princeton, New Jersey area and,

21   thus, I actually volunteer working at a local county jail

22   providing inmate services to the inmate population there,

23   but it's not with Centurion.

24        Q.    So in your job at Centurion do you provide any

25   direct patient care?

Hearsay,
Rule 802

### Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

11

1        A.      No.

2        Q.      In your job at Centurion do you regularly

3    review any patients' medical charts?

4        A.      Yes.

Hearsay, Rule 802

5        Q.      Under what circumstances do you do that?

6        A.      I review situations in regards to UM when there

7    may be issues, questions about how to go about determining

8    whether to move forward or to suggest alternative actions

9    for certain requests.

10       Q.      Can you tell us what you mean by UM?

11       A.      I'm sorry, yes.  UM is utilization management.

12   It is a division that handles off-site specialty requests.

13       Q.      So then is it fair to say that you review

14   patient charts when they come to your attention raising

15   some sort of question about the need for specialty care?

16       A.      Yeah.  It's not very often since there are many

17   other layers, but sometimes they may ask for my

18   suggestions or opinion, given my extent on working in the

19   industry for nearly 20 years.

20       Q.      How many times would you say that you've been

21   consulted in this capacity and reviewed a patient chart in

22   the last six months?

23       A.      In the last six months, not often.  I mean,

24   maybe two or three times.

25       Q.      Okay.  And have any of those times involved

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

13

1       Q.    Do you review any mortality reviews in your job

2   at Centurion?

3       A.    I do not.

4       Q.    As part of your responsibilities at Centurion,

5   do you analyze the adequacy of care at any prisons or

6   jails?

7       A.    Could you rephrase that again?  I'm sorry.  Can

8   you say it again?

Hearsay,
Rule 802

9       Q.    So I asked, in your capacity in your job at

10  Centurion, do you analyze the quality of care at any

11  prisons and jails?

12            MS. ORCUTT:  Form.

13            THE WITNESS:  I would say yes.

14       Q.   BY MS. NORMAN:  Can you describe how you so?

15       A.    It's a team approach to reviewing things.  I

16  may be a participant.

17       Q.    So if some prison or jail system asks Centene

18  to do a review you might play a role in that review?

19       A.    Possible, yes.

20       Q.    And has that happened in your six months as

21  chief clinical officer?

22       A.    No.

23       Q.    And how about in your time as the chief of

24  clinical operations?  Has that happened?

25       A.    Yes.

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

21

1       A.      No.

2       Q.      Did you speak to any incarcerated people in

3   ADCRR in coming to the conclusions expressed in this

4   report?

5       A.      No.

6       Q.      Did you speak to any people formerly

7   incarcerated in ADCRR in coming to the conclusions you

8   expressed in this report?

9       A.      I don't believe so.

Hearsay,
Rule 802

10      Q.      Did you review any documents in coming to the

11  conclusions expressed in this report?

12      A.      Just the NCCHC standards.

13      Q.      And I believe you also mentioned that you

14  reviewed Dr. Wilcox's report and Mr. Joy's report?

15      A.      Yes.

16      Q.      So other than those three documents,

17  Dr. Wilcox's report, Mr. Joy's report, and the NCCHC

18  standards, did you review any documents in coming to the

19  conclusions you expressed in the report?

20      A.      I believe I also reviewed the Pew website.

21      Q.      And that's Pew Charitable Trusts?

22      A.      Yes.

23      Q.      Okay.  And that was one of the attachments to

24  your report, right, a printout from a Pew report?

25      A.      Yes.

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

24

1          MS. BARNES:  Form.

2          MS. ORCUTT:  Form.

3          THE WITNESS:  There was a transitional

4    meeting, which I believe the Corizon medical director was

5    a part of that.

6      Q.   BY MS. NORMAN:  And what, if anything, did you

7    learn about the adequacy of care being delivered in the

8    Arizona state prison system at that meeting?

9          MS. BARNES:  Form; foundation.

10         MS. ORCUTT:  Join.

11         THE WITNESS:  I actually don't recall

12   specifically.  It's been awhile.

13      Q.   BY MS. NORMAN:  So did you have any impression

14   of the adequacy of care offered by Corizon in the Arizona

15   state prison system prior to Centurion taking over?

16         MS. BARNES:  Form.

17         MS. ORCUTT:  Form.

18         THE WITNESS:  I actually really was looking

19   forward to trying to, you know, show that we can deliver

20   good care at Centurion.  So I mean, what may have happened

21   in the past is the past, but I look forward to trying to

22   do as best we can for our patients.

23      Q.   BY MS. NORMAN:  And that is a lot of goal, but

24   I'm wondering whether you had any knowledge of concerns

25   over adequacy of care provided by Corizon prior to

Hearsay, Rule 802

Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

26

1    A.    Yes.

2    Q.    And then you go on to say that's including, but

3  not limited to -- and I'll talk about the first one --

4  offered opportunities to work with -- I'm sorry, I'm not

5  going to talk about the first one.  I'm going to talk

6  about the third one -- offered access to implement an MOUD

7  program to treat opioid use disorder.  Do you see where

8  that is in your report?

9    A.    Yes.

10   Q.    Okay.  And MOUD refers to medication for opiate

11  use disorder, right?

12   A.    Yes.

13   Q.    Okay.  And I think for ease I'm going to call

14  it MOUD.  Is that what you call it, Dr. Wu?

15   A.    Yes.

16   Q.    Do you consider yourself an authority on MOUD?

17           MS. ORCUTT:  Form.

18           THE WITNESS:  I feel I have the ability to

19  provide MOUD.

20   Q.    BY MS. NORMAN:  Do you consider yourself as

21  well versed in how MOUD functions in a correctional

22  environment?

23           MS. ORCUTT:  Form.

24           THE WITNESS:  Yes.

25   Q.    BY MS. NORMAN:  And have you championed the

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

27

1   adoption of MOUD in corrections?

2           MS. ORCUTT:   Form.

3           THE WITNESS:   Yes.

4       Q.    BY MS. NORMAN:   And in what ways have you

5   championed its adoption in corrections?

6       A.    In our other systems we actually do provide

7   MOUD, and I was actually involved prior to Centurion,

8   helped the New Jersey Department of Corrections be the

9   second state DOC system to implement MOUD.

10      Q.    Is MOUD effective?

11          MS. ORCUTT:  Form.

12          THE WITNESS:  Well, it is not 100 percent.

13  Nothing is ever 100 percent, but it's a better offering of

14  treatment than what we have done in the past.

Hearsay,
Rule 802

15      Q.    BY MS. NORMAN:   What are the elements of an

16  effective MOUD program in a corrections system?

17          MS. BARNES:  Form and foundation.

18          MS. ORCUTT:  Join.

19          THE WITNESS:   It requires an integrative,

20  holistic approach to treating the individual patients.

21  You can't put everybody into one type of treatment.   A lot

22  of times people think treatment should be either just CBT

23  or maybe possibly Vivitrol.   And then some folks think

24  that you can't have one without the other, but you really

25  need to look at the individual in looking at where they're

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

28

Hearsay,
Rule 802

1   going to go afterwards because you need to maintain the

2   linkages.   If you're going to start them on treatment you

3   need to make sure there's a proper exchange/handoff so

4   that they're successful, because unfortunately we do see

5   in the criminal justice system that the partnerships are a

6   challenge to maintain and folks unfortunately do not get

7   that proper handoff and they're no longer successful.

8   Reentry services are quite important to a successful MOUD

9   program.

10        Q.     BY MS. NORMAN:  So it sounds like you've

11   identified some elements of an effective MOUD program,

12   including CBT, which is cognitive behavioral therapy,

13   right?

14        A.     Yes.

15        Q.     So CBT, medication, and continuity of care,

16   would you consider those three things to be important

17   elements to an effective MOUD program?

18        A.     Yes.

19             MS. ORCUTT:  Form.

20        Q.   BY MS. NORMAN:  Are there any other elements of

21   an effective MOUD program that you would add to that list

22   to make it complete?

23             MS. BARNES:  Form.

24             MS. ORCUTT:  Join.

25             THE WITNESS:  I mean, I can't think of

29

1   anything at the moment, but there may be others that I
2   just can't trigger right now.
3        Q.   BY MS. NORMAN:  Understood.  That is fair
4   enough.
5                  Would you say that some training for
6   providers is also important to make a MOUD program
7   effective in a corrections system?
8                  MS. ORCUTT:  Form.
9                  THE WITNESS:  Yes, that is important, you
10  know, to be able to get education out there for the
11  providers and also the professional staff to have buy-in
12  and then, of course, working with the patients themselves.
13  So education for all is quite important.
14       Q.   BY MS. NORMAN:  Have you done any studies or
15  reviews of the efficacy of MOUD in a corrections system?
16                 MS. ORCUTT:  Form.
17                 THE WITNESS:  I am not currently involved
18  with any studies.  In the past I was prior to joining
19  Centurion.
20       Q.   BY MS. NORMAN:  Can you describe any studies or
21  reviews of efficacy of MOUD that you've done?
22       A.   I was involved, like I said, with the
23  New Jersey Department of Corrections and the Rutgers
24  Health where I was chief operating officer at the time.
25       Q.   Can you describe that review or study?

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

34

1        A.      One that I volunteer at.

2        Q.      Which one is that?

3        A.      Somerset County Jail.

4        Q.      In New Jersey?

5        A.      Yes.

6        Q.      Okay.  So the study that we're discussing, the

7   harm reduction study that you believe is primarily county

8   jail, is that something that you are involved with in your

9   professional capacity at Centurion or in your volunteer

10  capacity?

11       A.      I'm sorry.  Can you repeat that question?

12       Q.      Right.  I'm just wondering, the study that

13  we're discussing involving harm reduction with MOUD at,

14  you believe, primarily county jail systems, is that

15  something that you're only involved with to the extent you

16  volunteer as a provider at county jails, or are you

17  involved in that in your professional capacity as chief

18  clinical officer at Centurion?

19       A.      In that study that is separate from Centurion.

20  However, I am a big believer of MOUD.  So I actually do

21  try to encourage others, including folks from other

22  organizations, to utilize MOUD.

23       Q.      And why is that?

24               MS. ORCUTT:  Form.

25               THE WITNESS:  I believe it's a chronic

Relevance,
Rule 402;
Incomplete,
Rule 106
Treatment of
chronic disease
is at issue. Rule
401.
"Incomplete"
objection is
meaningless:
Defendants can
counter-
designate

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

35

**Relevance, Rule 402**
Treatment of chronic disease is at issue. Rule 401.

1    disease that needs to be managed.  You know, it's

2    unfortunate that the disease affects so many lives and

3    something needs to be done.  You know, I also don't like

4    to see overdose deaths.  And so this is one way of

5    reducing that.  I was very happy to come back to

6    New Jersey to be the COO at Rutgers Health to be able to

7    implement that for the New Jersey Department of

8    Corrections.

9         Q.    BY MS. NORMAN:  So does MOUD save lives?

10              MS. ORCUTT:  Form.

11              THE WITNESS:  Yes.

12        Q.    BY MS. NORMAN:  Thank you for that.  Let's go

13   back to the quote from your report.

14              So we were looking at page 1 of your report

15   where you talk about routinely meeting with ADCRR

16   leadership to discuss opportunities for continued

17   improvement and provide solutions.  And one of those

18   opportunities you mentioned was offering access to

19   implement an MOUD program to treat opioid use disorder,

20   correct?

21        A.    Yes.

22        Q.    Okay.  Can you tell me about what access you

23   offered, what those conversations consisted of?

24              MS. ORCUTT:  Form.

25              THE WITNESS:  I don't recall specifically.

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

37

1          Q.     Okay.   So when I say meetings, especially in

2    this day and age, I'm not talking about just in person.

3    Phone or video, any kind of ways people meet.

4                  So my question is:   Understanding meetings

5    in a broad sense, which includes phone calls and video

6    conferences, when did the meeting or meetings that you're

7    referring to regarding MOUD in ADCRR take place?

8          A.    I don't recall specific time frames of when

9    these phone calls would occur, or Zoom, but I would say

10   that we probably discussed it during my last interaction

11   with Zoom with the medical director of ADCRR.

12         Q.    And when was that last interaction?

13         A.    I don't recall when that was.

14         Q.    Was it in the last six months?

15         A.    To be honest with you, I don't recall.   With

16   the age of COVID, it's hard to remember.

Hearsay,
Rule 802

17         Q.    Fair enough.   Who was the medical director of

18   ADCRR that you discussed MOUD with?

19         A.    That would be Dr. Grant Phillips.

20         Q.    And do you recall how many times you discussed

21   MOUD with Dr. Phillips or other ADCRR personnel?

22         A.    Well, Dr. Phillips is a champion of MOUD.   So

23   we frequently talk whenever about this topic because we

24   both feel very strongly about it.   So we've talked about

25   it every time we interact pretty much, I believe.

### Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

38

1    Q.    And when was the last time you interacted with

2  him?

3    A.    Like I said, I don't recall the last time we've

4  actually spoken.

5    Q.    Okay.  And so as you say in your report, you've

6  had meetings to discuss opportunities for continued

7  improvement and provide solutions regarding MOUD.  And I'm

8  wondering what opportunities or solutions you've discussed

9  with Dr. Phillips.

10              MS. ORCUTT:  Form.

11              THE WITNESS:  Well, we've talked about

12  implementing a state-wide MOUD program that incorporated

13  buprenorphine.

14    Q.    BY MS. NORMAN:  And do you think that that

15  would be a good idea in ADCRR?

16              MS. ORCUTT:  Form.

17              THE WITNESS:  You're asking for my opinion?

18    Q.    BY MS. NORMAN:  Yes.

19    A.    Yes, that would be good.

20    Q.    Why?

21    A.    For one thing, the biggest thing would be harms

22  reduction.  I think it would reduce violence and I believe

23  it would be helpful to treating a chronic disease and

24  that, you know, folks, when they get released, hopefully

25  will continue to be treated, and therefore, would not

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

39

1   engage in activities that would land them back into the

2   correctional system.

3        Q.    So would you say that MOUD is a proven message

4   of reducing violence and death in corrections systems?

5                    MS. ORCUTT:  Form; foundation.

6                    MS. BARNES:  Form.

7                    THE WITNESS:  It would be my opinion, but

8   again, like I said, the study that I was expecting to hear

9   about was never presented because the conference was

10  canceled.

11       Q.    BY MS. NORMAN:  Well, so you've described a lot

12  of ways in which you've been involved with MOUD in a range

13  of different systems over many years, and you described a

14  significant degree of expertise and strong opinions about

15  MOUD.

16                   So I'm wondering, based on all of your

17  experience, all of your reading, all of your conversations

18  with other people in the field, whether, in your opinion,

19  MOUD is a proven means of reducing violence and death in

20  correctional systems?

21                   MS. ORCUTT:  Form and foundation.

22                   THE WITNESS:  Again, it is my firm belief,

23  yes.

24       Q.    BY MS. NORMAN:  What is your understanding

25  about the extent to which MOUD is currently taking place

Hearsay,
Rule 802

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

40

Hearsay,
Rule 802

1    in the Arizona state prison system?

2                    MS. ORCUTT:  Form; foundation.

3                    THE WITNESS:  I don't know the extent.  I

4    do not handle the day-to-day operations of the Arizona

5    system.

6         Q.    BY MS. NORMAN:  Do you know if any aspect of

7    MOUD is provided in ADCRR?

8                    MS. ORCUTT:  Form and foundation.

9                    THE WITNESS:  Well, I believe if, in the

10   rare instance of having individuals that are female and

11   pregnant that are required to be treated, that they would

12   be offered treatment with either methadone, possibly, or I

13   believe with buprenorphine.  But, again, I can't be sure,

14   but I believe they are offered some form of medication.

15        Q.    BY MS. NORMAN:  So other than pregnant women

16   who are on either methadone or buprenorphine, do you know

17   if any patient in the ADCRR is provided with any form of

18   MOUD?

19                   MS. ORCUTT:  Form and foundation.

20                   THE WITNESS:  I really don't know because

21   there could be folks who are on Vivitrol that I'm unaware

22   of or even be well on Vivitrol which, again, I would be

23   unaware of, but I do not know the day-to-day operations of

24   the system.

Hearsay,
Rule 802

25        Q.    BY MS. NORMAN:  You talked in your report about

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

41

Hearsay,
Rule 802

1    the distinction between MOUD and MAT.  Can you explain

2    that?

3         A.    Yes.  So I was commenting about MAT where that

4    belief is that it is considered an adjunct.  So folks

5    still believe in trying to work through CBT or, you know,

6    other types of counseling as really the front line, first

7    line, and that only in rare instances you would offer them

8    medication, versus I believe MOUD is a much better

9    approach.

10                   For some folks, you know, they don't need

11   as much counseling or no counseling at all and they really

12   need to just be on medication.  Then there's the folks,

13   just for harms reduction, simply just need to be on

14   medication.  So that is the distinction between MAT and

15   MOUD, is that you don't necessarily need to try the others

16   before using medications.

17        Q.    That's interesting.  So I'm most familiar with

18   the California system where at this time more than 10,000

19   people are on what they call MAT, or medication-assisted

20   treatment.  And particularly during the pandemic, but also

21   prior to that, many people were not actually receiving

22   treatment other than the medications.

23                   So I'm just wondering whether it's your

24   understanding that some people talk about MAT to mean not

25   just therapy occasionally accompanied by medication, but

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

42

1    medication occasionally accompanied by therapy.

2                    MS. BARNES:  Form and foundation.

3                    MS. ORCUTT:  Join.

4                    THE WITNESS:  Was there a question?  I'm

5    sorry.

Hearsay,
Rule 802

6        Q.    BY MS. NORMAN:  It sounded to me like you

7    described MAT as therapy for substance use disorder

8    sometimes accompanied by medication.  Is that an accurate

9    characterization?

10                   MS. ORCUTT:  Form.

11                   THE WITNESS:  So most systems, when they

12   talk about MAT, they expect that the person needs to be in

13   some kind of cognitive behavioral or treatment program,

14   and then along the way they may be given medications,

15   versus MOUD, which is, you know, you just standalone.  If

16   that's what California is doing, that's great, but, you

17   know, a lot of systems require that the individual be in a

18   formalized addictions treatment program.

19       Q.    BY MS. NORMAN:  Understood.  Thank you.

20                   I want to go back to something that you

21   just said.  You were talking about how you were not

22   certain about whether anybody in ADCRR, other than

23   possibly some pregnant women, was currently on MOUD.  And

24   I thought I heard you say that you're not familiar with

25   the day-to-day operations of health care delivery in

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

46

1       A.     No.

2       Q.     And when was that RFP issued?

3              MS. ORCUTT:  Form and foundation.

4              THE WITNESS:  We're in now November.  So I

5    want to say maybe early October or possibly late

6    September.  I don't recall the exact time frame.

7       Q.     BY MS. NORMAN:  You said in your report -- and

8    I'm looking at Section 5E, which is on the fifth page, I

9    believe.  It's the first sentence under section E.  You

10   said that Centurion is currently meeting the standards and

11   needs of substance use disorder for the ADCRR population.

12   Do you see that?

13      A.     Yes.

14      Q.     What is the basis for that opinion?

15      A.     Well, in terms of meeting our contract

16   requirements we are doing what is asked of us.

17      Q.     So is that all you mean by that sentence,

18   simply that you're meeting the terms of your contract?

19      A.     I mean that, you know, is also in line with

20   what is going on in the community as well, is that, you

21   know, their focus is to be able to manage it through

22   addictions treatment programming, and that is still out

23   there as an acceptable standard in the community.

24      Q.     I see.  So do you see where you say in the

25   middle of that paragraph that Centurion is currently

*Foundation, Rule 602 (see 39:24-40:5); Hearsay, Rule 802*

Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

47

1      meeting the standard of care for treatment of substance

2      abuse disorders?

3          A.    You said in the middle of E?

4          Q.    Yeah.  That first paragraph, a little more than

5      halfway down do you see where you said that Centurion is

6      currently meeting the standard of care for treatment of

7      substance use disorders?

8          A.    Okay.

9          Q.    So is it your opinion that Centurion is meeting

10     the standard of care for treatment of substance abuse

11     disorders in ADCRR?

12         A.    Meeting the standard, yes.

13         Q.    And you said in your report -- I'm going to

14     direct you to another part -- towards the end of that same

15     paragraph, second to last sentence:  Our current scope of

16     work for ADCRR does not include such services at this

17     time.  Do you see that?

18         A.    Yes.

19         Q.    What services are you referring to?

20         A.    MOUD.

21         Q.    Okay.  So Centurion is providing no MOUD in

22     ADCRR, correct?

23         A.    No, that's not correct.

24         Q.    Can you explain?  That sounds contradictory to

25     me that you said that our current scope of work does not

Foundation,
Rule 602
(see
39:24-40:5);
Hearsay,
Rule 802

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

50

1    their systems.  And of course we continued to discuss

2    about if ADCRR is willing to look for a new product.

3        Q.    And why would eOMIS need to be updated?

4              MS. ORCUTT:   Form.

5              MS. BARNES:  Form and foundation.

6              THE WITNESS:   So eOMIS is an electronic

7    health record that, for some providers, is very difficult

8    to navigate and to provide, you know, very good

9    documentation and then to be able to get reports out from

10   those documentations.  There are other systems out there

11   that are much more user friendly to be able to have more

12   real-time analytics and data reporting to come out of it.

13       Q.    BY MS. NORMAN:  Is that a concern from the

14   perspective of patient care if providers have difficulty

15   navigating an electronic health care records system?

16             MS. ORCUTT:   Form.

17             THE WITNESS:   Sure.  It can be, you know,

18   an issue, yes.

19       Q.    BY MS. NORMAN:  Okay.  And why is that?

20       A.    Well, you know, for patients to have timely

21   access to having their records to be able to be part of

22   their treatment, to understand their treatment, and also

23   for providers to be able to communicate more coherently so

24   that there's less room for error.

25       Q.    Is it your understanding that eOMIS provides

**Cumulative, Rule 403** Not cumulative; no other excerpt addresses the same matter. Rule 403.

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

57

1          MS. ORCUTT:  Join.

2          THE WITNESS:  I mean, it's up to the

3   individual.  I mean, some may be able to feel comfortable

4   and navigate that with more ease than myself, but my

5   preference is that I would prefer a different electronic

6   health record.

7          MS. BARNES:  Sara, I'm sorry.  I was going

8   to say, we've been going about an hour and 15 minutes

9   here.  I was hoping we could get a short break so I could

10  use the restroom.

11         MS. NORMAN:  I can't say no to that.

12         (Recess from 10:16 a.m. to 10:27 a.m.)

13         MS. NORMAN:  Let's go back on the record.

14     Q.    BY MS. NORMAN:  Dr. Wu, I want to keep talking

15  about your report specifically on the first page, that

16  bottom paragraph, where you talk about how you routinely

17  meet with ADCRR leadership to discuss opportunities for

18  continued improvement and provide solutions.  And I want

19  specifically to talk about on the next page the category

20  of suggested transition to an automated medication

21  dispensing system.  Do you see that?

22     A.    Yes.

23     Q.    What is an automated medication dispensing

24  system?

25     A.    So nowadays there are machinery that can

Hearsay,
Rule 802

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

58

Hearsay,
Rule 802

1    actually package individual dosing to be able to be then

2    stored effectively and tracked.  So when it's administered

3    there's a digital account, a fingerprint of when that was

4    actually taken out of the system and administered.  It

5    helps with accounting for medications, you know.  A lot of

6    hospital systems have used something called Pyxis.  There

7    are other companies out there now similar to Pyxis that

8    would be something to be utilized in a correctional

9    environment.

10         Q.    Can you spell Pyxis?  "No" is an acceptable

11   answer here.

12         A.    No, I don't recall how it's spelled.

13         Q.    We'll let the court reporter guess on that one.

Hearsay,
Rule 802

14               Why did you discuss transition to an

15   automated medication dispensing system with ADCRR?

16         A.    Well, in our other systems we have incorporated

17   such technology.  So it would be nice to see Arizona

18   utilize something similar.

19         Q.    And why would that be nice?

20         A.    I believe automation helps with tracking better

21   and for patient safety and control of, you know,

22   medications, just knowing where every pill went to.

23         Q.    Does it help to ensure accurate record keeping?

24         A.    It will certainly assist with that, yes.

25         Q.    Can automated medication dispensing systems

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

65

1   him as a colleague.  So, obviously, you know, my opinion

2   is, that yeah, he is a decent physician and, you know, he

3   was the former president of our association.

4        Q.    BY MS. NORMAN:  And are you referring to the

5   NCCHC?

6        A.    No.

7        Q.    Okay.  Which association are you talking about?

8        A.    Oh, the American College of Correctional

9   Physicians.  He was a past president.  In fact, he was the

10  one that presented me with my award of becoming a fellow

11  in the organization.

12       Q.    Got it.  So let's talk about the difference

13  between prison and jail correctional medical systems,

14  health care systems.

Hearsay, Rule 802

15            Under Section 5 in your report, under that

16  first paragraph at the top, the second sentence, do you

17  see where your report says that experience in and

18  circumstances regarding the delivery of health care in

19  prison systems is vastly different than the jail medical

20  care settings from which Dr. Wilcox's experience and

21  opinions stem?  Do you see that in your report?

22       A.    Yes.

23       Q.    How is the analysis of adequacy of medical care

24  different in jails than in prisons?

25       A.    Well, you know, in the jail system it's more

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

66

Hearsay,
Rule 802

1   episodic care.  People are more transient.  There's a lot

2   of turnover.  Usually they're in the areas where it's

3   sparse to get medical services linkages to the community.

4   Usually there's a lot of county hospitals in jails so that

5   they had that ability to move people back and forth and

6   get clearance, versus a prison system is usually much

7   larger, people are there much longer.  There's the need

8   for chronic care disease management, which is very

9   limiting.  In a jail system they don't do much of that.

10  It's more, you know, just assessing it and treating

11  anything urgently that needs to be managed, versus in a

12  prison system there's a lot of longevity and you need to

13  continue to follow folks.  And usually prisons are in more

14  remote places and folks are usually a lot older and

15  require, you know, substantially more services.  So

16  there's a lot more specialty services that need to be

17  provided than in a county jail.

18       Q.    Okay.  So county jails do hold older patients

19  sometimes, though, right?

20       A.    Yes, they do.

21       Q.    And some people spend significant lengths of

22  time at county jails, right?

23               MS. ORCUTT:  Form and foundation.

24               MS. BARNES:  Foundation.

25               THE WITNESS:  But that's not the norm.  I

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

73

1   information that I have.

2       Q.    BY MS. NORMAN:  So let's talk about some of the

3   specific rebuttals that you offer to Dr. Wilcox's report.

4   And I want to look at 5A, which is on the third page, I

5   think.

6       A.    Yes.

7       Q.    Before we do that, let me just go back and ask

8   a question about a prior topic.

9                 Is the standard of care for health care

10  delivery for a jail system different than the standard of

11  care for health care delivery in a prison system?

12              MS. ORCUTT:  Form and foundation.

13              THE WITNESS:  No.  I mean, everyone should

14  be deserving of, you know, standard of care irregardless

15  of their environment.

16      Q.    BY MS. NORMAN:  Okay.  Now let's talk about

17  nurses, section 5A of your report.

Hearsay,
Rule 802

18              So you say in your heading to section A

19  that Dr. Wilcox opines that nurses are routinely working

20  outside the scope of their licenses, acting as providers

21  guided only by NETs, and prevent patients with serious

22  medical conditions, that they're not qualified to treat

23  from being seen by a provider because they fail to make

24  the necessary referrals.  Do you see where you say that in

25  your report?

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

74

Hearsay,
Rule 802

Foundation,
Rule 602
(75:20-76:1
8,
106:17-25);
Hearsay,
Rule 802

1      A.      Yes.

2      Q.      And what does NET stand for?

3      A.      I forgot what it stands for, but he was the one

4    that used that term.  I'm used to calling it nurse

5    protocol.

6      Q.      Let me throw a phrase out there.  I believe it

7    stands for nursing encounter tools.  Does that sound

8    right?

9      A.      Yes.

10     Q.      Okay.  So speaking generally with that

11   statement that I just read out, with that understanding of

12   what NET means, do you disagree with Dr. Wilcox's findings

13   in this area?

14             MS. ORCUTT:  Form.

15             THE WITNESS:  Yes, I disagree.

16     Q.      BY MS. NORMAN:  And what is the basis for your

17   disagreement?

18     A.      The fact that he is overly broad in saying that

19   nurses are practicing out of their scope.  I mean, that

20   would be illegal.  You know, we have processes in place to

21   make sure that we meet state regulations and licensure and

22   that all our providers are practicing to the extent of

23   their scope and nothing more above that.  Otherwise, we

24   would be doing something that would be illegal.

25     Q.      What is the extent of your personal knowledge

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

75

(same as above)

1    about the processes in place to ensure that nurses

2    practice within the scope of their licenses in ADCRR?

3              MS. ORCUTT:  Form.

Hearsay, Rule 802

4              THE WITNESS:  So it's my understanding that

5    we have a process in place of credentialing any new

6    employee, particularly nurses.  There's a credentialing

7    committee that reviews their occupation making sure that

8    their licenses are without any kind of encumbrance and

9    they have ongoing skills assessments and reviews with them

10   to ensure ongoing that there's nothing that would prohibit

11   them from continuing to be providing care.  I believe the

12   frequency is annually.  So if something were to happen

13   where the nursing board, you know, put something into

14   effect, that the credentialing committee would review that

15   and make a determination whether the person would still be

16   able to continue to provide services.

17             So that is what we have in place to ensure

18   patient safety and making sure folks are practicing

19   appropriately.

20        Q.    BY MS. NORMAN:  So you've described policies

21   with regards to credentialing, right, to making sure that

22   nurses are appropriately credentialed and those

23   credentials remain up to date; is that right?

24        A.    Yes.

25        Q.    Are there any other policies that you're aware

1    of in place in ADCRR to ensure that nurses practice within

2    the scope of their license?

3                    MS. ORCUTT:  Form and foundation.

4                    THE WITNESS:  I don't know if there's

5    anything additional.

6        Q.    BY MS. NORMAN:  Do you have personal knowledge

7    of any of the actual practices in ADCRR, as opposed to

8    policies, by nurses?

9        A.    No.

10                    MS. ORCUTT:  Form.

11       Q.    BY MS. NORMAN:  Have you done any studies of

12   nursing care in ADCRR?

13                    MS. ORCUTT:  Form.

14                    THE WITNESS:  No.

15       Q.    BY MS. NORMAN:  Have you reviewed any studies

16   of nursing care in ADCRR?

17                    MS. ORCUTT:  Form.

18                    THE WITNESS:  No.

19       Q.    BY MS. NORMAN:  Let's talk about physician

20   assistants, which is 5B on the same page.

21                    So you note in the heading of Section 5B

22   that Dr. Wilcox opines that physician assistants are not

23   adequately supervised.  Do you see that?

24       A.    Yes.

25       Q.    Do you disagree with his opinion?

Foundation,
Rule 602
(79:21-22,
80:2-18);
Hearsay,
Rule 802

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

77

Foundation,
Rule 602
(79:21-22,
80:2-18);
Hearsay,
Rule 802

1       A.      I disagree with his opinion.

2       Q.      And what's the basis of your disagreement?

3       A.      You know, again, going back to, like, nursing,

4  our staff are reviewed to make sure that they're properly

5  credentialed and that they work within their scope.  Our

6  ratios of P.A.s, of the physician assistants that he

7  refers to, you know, is not out of the norm.  If anything,

8  it's actually below what the statute actually allows for.

9  Because I have actually reviewed -- saying that he said

10 something about ratio 7 to 1, and when I actually looked

11 more closely and looked at our credentialing roster, we

12 were not close to that at all, and the state allows for a

13 ratio of 6 to 1.

14      Q.      Are there any other bases of your disagreement

15 with Dr. Wilcox's opinion that physician assistants are

16 not actually supervised other than what you've just

17 described?

18      A.      Yes, because there are physicians on site, and

19 if they're not on site there's always another level that

20 they have access to as resources.  So, you know, when the

21 need arises or if they have concerns, the physician

22 extenders can certainly reach out to the physicians,

23 whether it be at this facility or another facility or go

24 up to Dr. Orm or anybody else for further assistance and

25 management recommendations.

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

79

1  assistants to have every document reviewed and cosigned by

2  a physician, which, you know, then kind of then detracts

3  from the benefits of having a physician assistant.

4             So Arizona does not have that requirement,

5  I believe, but I could be wrong.  But in that case it

6  would be required for the physician to review every case,

7  whether it be a simple, you know, cold or a complex case.

8  Every case would have to be reviewed by a physician.  But,

9  you know, in those systems I think that prohibits a lot of

10 physicians wanting to be able to practice and they seek

11 other employment.

12       Q.    BY MS. NORMAN:   I'm wondering about whether you

13 have any knowledge yourself of any system in ADCRR under

14 which mid-level providers are systematically supervised

15 without having to ask for help?

16       A.    So there should be huddles going on at the

17 facility level with their medical directors and

18 physicians.   Also in terms of utilization management when

19 they request for certain services there may be a review

20 done at that time by a physician of that type of request.

21 So there may be other things as well.   I do not work on

22 the day-to-day operations.   I mean, it depends on the

23 relationship that's built at the facility.   I mean,

24 there's a lot of trust of teamwork that that should be

25 occurring at the facility level to providing a holistic

Foundation, Rule 602 (79:21-22, 80:2-18); Hearsay, Rule 802

Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

80

Same as above

1      approach to treating a patient.

2           Q.    So you're not familiar with day-to-day

3      operations in ADCRR with regard to physician assistant

4      supervision?

5                      MS. ORCUTT:  Form.

6                      THE WITNESS:  I am not, no.

7           Q.    BY MS. NORMAN:  And is your answer the same for

8      mid-levels generally?  You're not aware of day-to-day

9      operations with regard to supervision of mid-levels in

10     ADCRR?

11                     MS. ORCUTT:  Form.

12                     THE WITNESS:  Yes.

13          Q.    BY MS. NORMAN:  Just to be clear for the

14     record, I'll rephrase that question.

15                     You would agree that you're not aware of

16     day-to-day operations with regard to supervision of

17     mid-levels in the ADCRR, correct?

18          A.    Yes.

19          Q.    Thank you for bearing with me on that.

20                     Have you done any studies of physician

21     assistant supervision in ADCRR?

22                     MS. ORCUTT:  Form.

23                     THE WITNESS:  No.

24          Q.    BY MS. NORMAN:  Have you reviewed any studies

25     of physician assistant supervision in ADCRR?

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

82

1    review that's being done.

2        Q.   BY MS. NORMAN:  Have you done any studies of

3    the adequacy of medical care provided by mid-level

4    practitioners in ADCRR?

5                    MS. BARNES:  Form and foundation.

6                    THE WITNESS:  I don't know.  I don't think

7    so.

8        Q.   BY MS. NORMAN:  Have you reviewed any studies

9    of the adequacy of medical care provided by mid-level

10   practitioners in ADCRR?

11                   MS. BARNES:  Form and foundation.

12                   MS. ORCUTT:  Join.

13                   THE WITNESS:  No.

14       Q.   BY MS. NORMAN:  What can you tell me about the

15   training of mid-level practitioners in ADCRR?  What is

16   their training?

17                   MS. BARNES:  Form and foundation.

18                   MS. ORCUTT:  Join.

19                   THE WITNESS:  So basically, you know, in

20   the credentialing process we look at their training and

21   whatever additional subspecialties that they have and

22   making sure that it's appropriate.  You know, the schools

23   need to be accredited that they come from.  And some have

24   gone on to do other specialties.  So if they have other

25   specialties, that would be recorded in the credentialing

*Hearsay, Rule 802*

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

83

Hearsay,
Rule 802

1    file of the individual.

2         Q.    BY MS. NORMAN:  So when you say in your

3    report -- and let me tell you where.  This is on Section

4    5C, and there's a single paragraph in section C, and I'm

5    looking at the very last sentence of that paragraph where

6    you say:  The use of these providers in our system is

7    appropriate and they are appropriately trained.  Do you

8    see that?

9         A.    Yes, I see that, the last sentence.  Okay.

10        Q.    Okay.  And you can take a minute to make sure

11   of your answer to this question, but -- well, you can do

12   that with any question.

13              You said, "the use of these providers."

14   You're talking about mid-level providers there, right?

15        A.    Yes.

Hearsay,
Rule 802

16        Q.    Okay.  So what is the basis for your statement

17   that the use of mid-level providers in your system is

18   appropriate and they are appropriately trained?

19        A.    Primary care is the vast majority of services

20   that are being provided, and mid-levels are certainly

21   qualified to provide that type of service.

22        Q.    Okay.  But you're not familiar with any of the

23   day-to-day operations regarding how mid-levels are

24   supervised, right?

25        A.    I do not handle the day to day.  Yes, that's

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

84

Hearsay,
Rule 802

1    correct.

2         Q.    Okay.   So do you have any personal knowledge on

3    which you're basing the statement that mid-level providers

4    in your system -- the use of mid-level providers is

5    appropriate?

6                   MS. ORCUTT:   Form.

7                   THE WITNESS:   Yes, because I'm involved

8    with the credentialing committee.   So as being a member of

9    the credentialing committee we review new applicants for

10   jobs and making sure that they have the appropriate

11   training and certifications, if needed, for certain tasks.

12   So when we hire someone they meet all those qualifications

13   to practice in that particular jurisdiction.

14        Q.    BY MS. NORMAN:   Is it your opinion that if

15   someone is properly credentialed they necessarily always

16   provide adequate care?

17                   MS. ORCUTT:   Form.

18                   THE WITNESS:   I can't answer that.

19        Q.    BY MS. NORMAN:   Do you mean that's not your

20   opinion, or you can't provide an answer to that?

21        A.    I don't know the day-to-day operations.   I can

22   tell you that on day one when they're reviewed and hired

23   that they meet at that point in time, yes.   But after

24   that, you know, things can change.   People can develop

25   issues.   Everyone is human.   Things can happen.   But at

90

1   entire -- all the information.

2       Q.    BY MS. NORMAN:  Wouldn't you expect essential

3   patient treatment information to be entered into that

4   patient's medical chart?

5                 MS. ORCUTT:  Form.

6                 THE WITNESS:  Can you repeat that question?

7   Because I'm not quite understanding.

8       Q.    BY MS. NORMAN:  Is it your expectation as a

9   provider that important medical information about patients

10  is entered into their medical charts?

11                MS. ORCUTT:  Form.

12                THE WITNESS:  Yes.  Best practice is that,

13  you know, there's clarity and the appropriate information

14  that's documented.

15      Q.    BY MS. NORMAN:  And is that standard of care?

16                MS. ORCUTT:  Form.

17                THE WITNESS:  That's the standard of care,

18  yes.

19      Q.    BY MS. NORMAN:  Okay.  And that's especially

20  important that important medical information about

21  patients be documented in their health care records when

22  they're being cared for by a team as opposed to a single

23  provider, right?

24                MS. ORCUTT:  Form.

25                THE WITNESS:  Yes, there should be

Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

91

1    documentation.

2        Q.    BY MS. NORMAN:   And it's particularly important

3    when different providers are providing care for a patient

4    so that they understand what the other providers are

5    doing, right?

6                    MS. ORCUTT:   Form.

7                    THE WITNESS:   That is the intent.

8        Q.    BY MS. NORMAN:   Would you be concerned with a

9    system where responsibility for complex patients was

10   disbursed among a legion of different R.N.s and N.P.s with

11   minimal or no physician-level oversight?

12                    MS. ORCUTT:   Form.

13                    MS. BARNES:   Form.

14                    THE WITNESS:   So without knowing more

15   information, you know, from just that limited information,

16   it would cause me to have some concern.   But, again, I

17   need the full context of that situation.

18       Q.    BY MS. NORMAN:   Understood.   But based on that

19   limited information, a system where responsibility for

20   complex patients was disbursed among a legion of different

21   R.N.s and N.P.s with minimum or no provider-level

22   oversight, you said that that situation would cause you

23   some concerns.   And my question is:   What concerns are

24   those?

25                    MS. BARNES:   Form.

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

103

1          MS. ORCUTT:  Form and foundation.

2          THE WITNESS:  It's subjective because it's

3    based on his experiences and what his environment is.

4      Q.    BY MS. NORMAN:  Did you express that concern in

5    your report?

6      A.    I have to go through my report to see if I

7    shared that, but --

8      Q.    Why don't you do that?  It's only 5 1/2 pages.

9    We can wait.

Foundation,
Rule 602
(76:6-18,
79:21-22,
80:2-18,
106:17-25);
Hearsay,
Rule 802

10          So to be clear, as you review the report,

11    what I'm looking for is a complete answer to the question

12    of:  What criticisms of Dr. Wilcox's methodology have you

13    provided in your report?  So take your time.

14      A.    So based on reviewing my report, in terms of

15    methodology, it seems like my concern is he's cherry

16    picking certain things and not looking at the whole entire

17    system.  I really firmly believe that people are doing the

18    right thing, for the most part.  And, of course, there are

19    mistakes that do happen, but to say that nurses are

20    working out of scope, I mean, to me, he's looking at the

21    one-offs but not looking at the system as whole.  Same

22    thing with him talking about physician assistants not

23    adequately supervised.  I mean, there are times when there

24    may be delays in reaching the physician and the provider

25    needs to be able to make emergency decisions on things.

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

104

Foundation,
Rule 602
(76:6-18,
79:21-22,
80:2-18,
106:17-25);
Hearsay,
Rule 802

1    So I would not consider that not adequately supervised.

2                    Again, everything is subjective, but I'm

3    talking about his methodology of one-offs with respect to

4    nurses and P.A.s practicing out of their scope.

5        Q.    And what, if anything, did you do after reading

6    Dr. Wilcox's report to verify any of the facts that he set

7    forth in his report?

8                    MS. BARNES:  Form.

9                    MS. ORCUTT:  Form; asked and answered.

10                   THE WITNESS:  I don't remember.

11       Q.   BY MS. NORMAN:  You didn't do anything, did

12   you?  It was two weeks ago.

13                   MS. BARNES:  Form.

14                   MS. ORCUTT:  Form.

15                   THE WITNESS:  Again, I said I don't

16   remember.

17       Q.   BY MS. NORMAN:  Okay.  Is it cherry picking, as

18   you've described it, to review all mortality reviews of

19   every death in the system for the last two years?  Is that

20   cherry picking?

21                   MS. ORCUTT:  Form; foundation.

22                   MS. BARNES:  Form; foundation.

23                   THE WITNESS:  I can't answer that because I

24   do not know what these mortality reviews are or are about.

25       Q.   BY MS. NORMAN:  So you don't have any knowledge

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

105

1    of what's contained in the mortality reviews of patients

2    who have died in the Arizona prison system, do you?

3                    MS. ORCUTT:  Form.

4                    THE WITNESS:  I do not.

5         Q.    BY MS. NORMAN:  Okay.  So you talked about

6    concerns about cherry picking.  So I'm wondering if you

7    would agree that, when evaluating a health care delivery

8    system, it's generally not as helpful to examine the care

9    for healthy people as it is to look at the treatment of

10   sick patients that require coordination and communication

11   and judgment on the part of health care providers?

12                   MS. ORCUTT:  Form and foundation.

13                   MS. BARNES:  Form.

14                   THE WITNESS:  I don't understand the

15   question.  Can you rephrase that?

Hearsay,
Rule 802

16        Q.    BY MS. NORMAN:  Would you agree that, when

17   evaluating a health care delivery system, it's generally

18   not as helpful to examine the care for healthy people as

19   it is to look at the treatment of sick patients with

20   conditions that require significant treatment?

21                   MS. BARNES:  Form.

22                   MS. ORCUTT:  Foundation.

23                   THE WITNESS:  I think it's important to

24   look at the whole system.  And if you want quality

25   improvements as a CQI you focus on where your outlier

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

106

**Hearsay, Rule 802**

1    issues are.  So yes, there should be some focus to the

2    more high risk individuals.  But still, overall, if you

3    want to talk about community standard and adequacy of

4    care, you have to look at the whole, including the healthy

5    populations.

6          Q.   BY MS. NORMAN:  So you have no opinion on the

7    current adequacy of the medication administration system

8    in ADCRR because you don't know how it operates on a

9    day-to-day basis, right?

10                MS. ORCUTT:  Form.

11                THE WITNESS:  I don't know the day-to-day

12    operations, no.

13          Q.   BY MS. NORMAN:  So you have no opinion on the

14    adequacy of the system as it currently operates in ADCRR?

15                MS. ORCUTT:  Form.

16                THE WITNESS:  Yeah, I have no opinion.

17          Q.   BY MS. NORMAN:  Okay.  And you have no opinion

18    on the quality of care currently provided by nurses in

19    ADCRR because you're not familiar with the day-to-day

20    operations of nursing care in the system; isn't that

21    right?

22                MS. ORCUTT:  Form.

23                MS. BARNES:  Form.

24                THE WITNESS:  Yeah, I am not aware of the

25    nursing systems.  I'm sorry.  What was the question again?

Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021

108

1      A.    Yes.

2      Q.    Do you agree that the capacity to identify

3  errors and fix them is central to the performance of any

4  health care system?

5                    MS. ORCUTT:   Form.

6                    MS. BARNES:   Form.

7                    THE WITNESS:   Yes.   And that would be an

8  important component of any health system that they need to

9  look at themselves and find ways to improve.

10     Q.    BY MS. NORMAN:   And one of those ways that

11 health care systems have to identify errors and fix them

12 would be through mortality reviews, correct?

13                   MS. BARNES:   Form.

14                   MS. ORCUTT:   Form; also outside the scope

15 of this expert report.

16                   MS. BARNES:   You've already asked him that

17 question, and I instructed him not to answer.

18                   MS. NORMAN:   Okay.   We're going to avoid

19 the dangerous question.

20                   MS. BARNES:   You're avoiding that question

21 because it's not within the scope of his expert report

22 which is what the parameters of this deposition are.

23                   MS. NORMAN:   Well, it's calculated to lead

24 to the discovery of admissible evidence, but yes.

25     Q.    BY MS. NORMAN:   Dr. Wu, have you ever been to

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

126

1        A.    I may have sitting with the -- name is

2   Dr. Jordan.  I may have done some stuff because I think he

3   wanted to learn how to use True Care.  And I don't know if

4   there's a chart up when we were working with the harsh

5   environment consult.

Hearsay,
Rule 802

6        Q.    What is True Care?

7        A.    True Care is an application a health insurance

8   plan uses that's proprietary to track a request for

9   specialty services.

10       Q.    So on that trip to Yuma did you review any

11  patient charts for substantive patient care matters

12  outside of looking at electronic processes?

13       A.    No.  It was more the training for them to know

14  how to use the application.

Hearsay,
Rule 802

15       Q.    Got it.  And what was the purpose of that trip

16  to Yuma?

17       A.    To also look at our pilot with the harsh

18  environment consult.

19       Q.    Can you describe what you mean by that?

20       A.    So because of COVID and the challenges of

21  providing care, we decided that we would try to put in

22  these kiosks in the units for patients to be able to

23  access health services instead of being escorted across

24  the compound to the medical clinic.  So it would be easier

25  to do that interaction by having kind of a tablet that's

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

127

Hearsay, Rule 802

1   built to withstand high stresses in the unit.  And so

2   patients could just walk up in their housing units through

3   it and have scheduled appointments with the providers.

4        Q.    But it would be remote with the providers so

5   that it would be sort of tele-med on a tablet?

6        A.    Yes.  It's a type of telehealth services but

7   the provider was still on the compound.

8        Q.    So the purpose of your trip to Yuma was to

9   explore the feasibility of that program?

10       A.    Correct, because we wanted to try to find

11  innovative ways to be able to provide services in the age

12  of COVID, and we thought this would be a good solution.

13  So it seemed to be very well received by custody and the

14  patients.

15       Q.    Were there any other purposes of your trip?

16       A.    Just to meet and greet with providers and to

17  assist with whatever they may need with preparing for

18  NCCHC accreditation.

19       Q.    All right.  So I count that as the sixth trip

20  that you listed chronologically.  Were there any other

21  trips to ASPC that you haven't described?

22       A.    I don't think so because I know -- regrettably,

23  I don't have the time to be able to hit every facility.  I

24  like meeting the providers and being in the facilities,

25  but unfortunately, I was not able to hit every facility.

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

137

1    medical care in ADCRR.  It also seems to me that you said

2    clearly that you're too high level of an executive.

3    You're not familiar with day-to-day operations of medical

4    care in ADCRR.

5             So my question to you is:  Are you

6    rendering any opinion as to whether the day-to-day

7    practice of medical care in ADCRR is constitutionally

8    adequate?

9             MS. ORCUTT:  Form.

10            MS. BARNES:  Same objections; same

11   instruction.

12            THE WITNESS:  I mean, again, as I stated, I

13   don't know every day, you know, the day-to-day operations.

14   You know, every day is a different day.  You can have good

15   days, you can have bad days.  But from where I stand

16   overall, as a collective, I would opine that, yeah, we are

17   providing, you know, adequate and appropriate services.

18        Q.   BY MS. NORMAN:  And you render that opinion

19   based on your knowledge of the policies, correct?

20        A.   Yes, but also, if I can also add, you know,

21   when you asked about me looking at charts and the

22   frequency, although I don't know if it can be properly,

23   but, you know, the frequency, you know, I can't really pin

24   down, but, you know, there are times when I actually will

25   go in there and look at a chart when asked to -- for

Foundation,
Rule 602
(76:6-18,
79:21-22,
80:2-18,
106:17-25,
137:12-13);
Hearsay,
Rule 802

**Johnny Wu, M.D. Centurion Chief Clinical Officer - 11/04/2021**

138

Same as above

1    instance, I do recall, and I forgot to point that out, is

2    that just looking at specialty consult requests and

3    utilization management and making sure that ATPs,

4    alternative treatment plans that have been recommended

5    were appropriate.  So that was something that I had

6    recently done.

7         Q.    We talked about that.  You mentioned reviewing

8    charts several times when asked to look into utilization

9    management.  I understand.  So back to me trying to

10   understand what your opinions are.

11              So are you telling me that you rendered an

12   opinion regarding the constitutional adequacy of

13   day-to-day medical care in ADCRR?

14              MS. ORCUTT:  Form.

15              MS. BARNES:  Same objections and same

16   instruction.  And I think that he has answered your

17   question a few different times.  So asked and answered.

18              But if you can answer again, Dr. Wu, please

19   do.  And if you need to refer to your opinion, you can do

20   that.

21              THE WITNESS:  And I will say that, yes, I'm

22   opining based on my report of the areas that I've been

23   asked to opine on.

24              MS. NORMAN:  All right.  I don't have any

25   more questions.

141

1   STATE OF ARIZONA      )
                          )
2   COUNTY OF MARICOPA    )

3          BE IT KNOWN that I took the foregoing deposition
    pursuant to Notice; that the witness was duly sworn by
4   me; and that said transcript is a full, true, and
    accurate record of the proceedings; that the proceedings
5   were taken down by me in shorthand and thereafter reduced
    to print under my direction; that I have acted in
6   compliance with ACJA 7-206.

7          I CERTIFY that I am in no way related to any of
    the parties hereto nor am I in any way interested in the
8   outcome hereof.

9          Pursuant to request, notification was provided
    that the deposition is available for review and
10  signature.

11         Dated this 7th day of November, 2021.

12

13

14                        _____
                          Janet Hauck, RPR
15                        Certified Reporter
                          Arizona CR No. 50522

16

17         I CERTIFY that GLENNIE REPORTING SERVICES, LLC,
    has complied with the ethical obligations set forth in
18  ACJA 7-206.

19

20

21

22  _____
23  GLENNIE REPORTING SERVICES, LLC
    Registered Reporting Firm
24  Arizona RRF No. R1035

25