# EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 1 | Ashley Pelton, PhD |
| 2 | John Wilson, PhD |
| 3 | Antonio Carr, MD (filed under seal) |
| 4 | Wendy Orm, MD (filed under seal) |
| 5 | Johnny Wu, MD |

# EXHIBIT 1

**In The Matter Of:**

*Parsons vs.*

*Shinn*

---

*Ashley Pelton, Ph.D.*

*October 6, 2021*

---

*Glennie Reporting Services, LLC*

*1555 East Orangewood Avenue*

*Phoenix, Arizona 85020*

*602.266.6535 Office 877.266.6535 Toll Free*

*www.glennie-reporting.com office@glennie-reporting.com*

Original File 100621AP.txt

Min-U-Script®

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

VICTOR PARSONS; SHAWN JENSEN; STEPHEN SWARTZ;DUSTIN BRISLAN; SONIA RODRIGUEZ; CHRISTINA VERDUZCO; JACKIE THOMAS; JEREMY SMITH; ROBERT GAMEZ; MARYANNE CHISHOLM; DESIREE LICCI; JOSEPH HEFNER; JOSHUA POLSON; and CHARLOTTE WELLS, on behalf of themselves and all others similarly situated; and ARIZONA CENTER FOR DISABILITY LAW,

Plaintiffs,

v.

DAVID SHINN, DIRECTOR, ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION AND REENTRY; and LARRY GANN, ASSISTANT DIRECTOR, MEDICAL SERVICES CONTRACT MONITORING BUREAU, ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION AND REENTRY, in their official capacities,

Defendants.

Case No. CV 12-00601-PHX-ROS

DEPOSITION OF ASHLEY PELTON, Ph.D.

Via Zoom Videoconference
October 6, 2021
9:00 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020
602.266.6535
www.glennie-reporting.com

Prepared by:
Robin L. B. Osterode
CSR, RPR
CA CSR No. 7750
AZ CR No. 50695

I N D E X

| WITNESS | PAGE |
|---|---|
| ASHLEY PELTON, Ph.D. | |
| Examination by Mr. Fathi | 6 |

INDEX TO EXHIBITS

| Description | | Page |
|---|---|---|
| Exhibit 1 | Curriculum vitae of Ashley Pelton, M.A.; 4 pages | 14 |
| Exhibit 2 | Defendants' First Supplemental Pretrial Disclosure Statement; 12 pages | 29 |
| Exhibit 3 | Document entitled "Parsons Named Plaintiffs"; 1 page | 42 |
| Exhibit 4 | Document entitled "Suicides in ADC Custody, January 1, 2019 - present"; 1 page | 53 |
| Exhibit 5 | Document entitled "Files Reviewed by Pablo Stewart"; 4 pages | 62 |
| Exhibit 6 | Bates stamped documents ADCRRM0000069 - ADCRRM0000077 | 158 |
| Exhibit 7 | Bates stamped documents ADCRRM0000122 - ADCRRM0000132 | 161 |
| Exhibit 8 | Bates stamped documents ADCRRM0000170 - ADCRRM0000183 | 168 |
| Exhibit 9 | Bates stamped documents ADCRRM0019588 - ADCRRM0019591 | 84 |
| Exhibit 10 | (Not marked in this deposition.) | -- |

INDEX (Continued):

INDEX TO EXHIBITS

| Description | | Page |
|---|---|---|
| Exhibit 11 | Document entitled "Continuous Quality Improvement (CQI) CQI Meeting Attendance Sheet," dated December 10, 2020; 8 pages | 180 |
| Exhibit 12 | Bates stamped documents ADCRRM0018560 - ADCRRM0018568 | 185 |
| Exhibit 13 | (Not marked in this deposition.) | -- |
| Exhibit 14 | Bates stamped documents ADCRRM00056541 - ADCRRM00056587 | 187 |
| Exhibit 15 | Document entitled "ADC Institutional Capacity Committed Population"; 3 pages | 223 |

INSTRUCTION NOT TO ANSWER

| Page | Line |
|---|---|
| 30 | 16 |
| 31 | 3 |
| 31 | 12 |
| 48 | 3 |

DEPOSITION OF ASHLEY PELTON, Ph.D.

The deposition of ASHLEY PELTON, Ph.D., via Zoom Videoconference, was taken on October 6, 2021, commencing at 9:00 a.m., at Phoenix, Arizona, before ROBIN L. B. OSTERODE, RPR, CSR, California Shorthand Reporter No. 7750 and Arizona Certified Reporter No. 50695.

APPEARANCES:

For Plaintiffs:

ACLU NATIONAL PRISON PROJECT
By: David C. Fathi
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
(202) 548-6603
dfathi@aclu.org
(Videoconference appearance.)

ACLU NATIONAL PRISON PROJECT
By: Corene Kendrick
39 Drumm Street
San Francisco, California 94111
(202) 393-4930
ckendrick@aclu.org
(Videoconference appearance.)

For Defendants:

STRUCK LOVE BOJANOWSKI & ACEDO, PLC
By: Anne M. Orcutt
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
(480) 420-1616
aorcutt@strucklove.com
(Videoconference appearance.)

APPEARANCES (Continued):

For Nonparty Centurion, LLC and Deponent:

BROENING OBERG WOODS & WILSON, P.C.
By: Sarah L. Barnes
2800 North Central Avenue, Suite 1600
Phoenix, Arizona 85004
(602) 271-7793
slb@bowwlaw.com
(Videoconference appearance.)

Also Present:

Jessica Carns
(Videoconference appearance.)

Who was your supervisor in that position?
A. Eddie Taylor.
Q. And what was Dr. Taylor's job title?
A. He was the clinical director at the time.
Q. Okay. And I called him Dr. Taylor, did he have a doctoral degree?
A. He did.
Q. He was the clinical director at what facility?
A. At Phoenix Complex.
Q. Okay. And as a psychologist, between approximately September of 2019 and June or July of 2020, at what facilities did you provide services?
A. I provided services at Phoenix Complex, and I also assisted at Florence Complex.
Q. Did you assist at Florence Complex for the entire term of your job as a psychologist, or did that occur only at certain times?
A. It was primarily toward the end.
Q. And why were you providing assistance at the Florence Complex at that time?
A. In order to assist the facility with their responsibilities, because they needed assistance with another psychologist, as well as the individual who is in the current lead position was transitioning out of the company.

Q. When you said they needed assistance, is that because a position was vacant at the Florence Complex?
MS. ORCUTT: Form.
THE WITNESS: I believe there was a vacancy for a psychology associate.
BY MR. FATHI:
Q. And was that -- were you filling that vacancy on a temporary basis?
A. I wasn't filling the vacancy. I was assisting.
Q. Let me ask it a different way. The Florence Complex had its own psychologists and psych associates assigned. Correct?
A. Correct.
Q. So why were you asked to also perform services at the Florence Complex?
A. I believe at the time there was a vacancy for psychology associates, and they needed assistance with completing tasks, such as suicide watches.
Q. Okay. What was your next position beginning, I guess, in approximately June or July of 2020?
A. I was the lead psychologist at Florence Complex.
Q. And what dates did you hold that position?
A. That would have been, I believe it was June or July of 2020, to approximately July of -- hold on, I need

A. Periodically.

Q. On an average week when you -- when you had this clinical director position, how many hours in an average week would you provide direct patient care to people at the Phoenix facility?

A. One or two, if that. It was primarily supervisory.

Q. And when you had this position on an average week, how many hours would you spend providing direct patient care at the Perryville facility?

A. One, if that.

Q. Were there ever any weeks when you didn't provide any direct patient care?

A. Yes.

Q. Did that happen frequently?

A. Yes.

Q. During your period -- your employment with the Arizona Department of Corrections, regardless of whether you were employed by Corizon or Centurion, have you ever given expert testimony?

A. No.

Q. Have you ever provided a written declaration for use in a court case?

A. Not that I'm aware of.

Q. Who has your old job as clinical director over

Perryville and Phoenix?

A. We just hired someone who is starting in October -- or October 11th.

Q. And what's that person's name?

A. Dr. Cessna.

Q. Can you spell that please?

A. I believe it's C-e-s-s-n-a.

Q. Okay. So was that position vacant from August until October of this year?

MS. BARNES: Foundation.

THE WITNESS: I assisted with the role.

BY MR. FATHI:

Q. Okay. But we'll get to that, but was anybody officially in that position of clinical director between the time you left in August and Dr. Cessna's anticipated start date in October of this year?

MS. BARNES: Foundation.

MS. ORCUTT: Lacks foundation.

THE WITNESS: No.

BY MR. FATHI:

Q. And when you say you assisted with the role, tell me about that.

A. Yes, so I assist with the Phoenix and Perryville complexes in terms of providing the clinical director responsibilities on an ongoing basis.

Q. So is your position as regional mental health director a full-time job?

A. Yes, it is.

Q. And is the position of clinical director over Phoenix and Perryville a full-time job?

A. Yes.

Q. And you've been doing both of those jobs for the last couple of months?

MS. ORCUTT: Form.

THE WITNESS: Yes.

MR. FATHI: Could we have Exhibit 2, please.

(Marked for identification Exhibit 2.)

BY MR. FATHI:

Q. Showing you Exhibit 2, Dr. Pelton, have you seen this document before?

A. I can't tell from just looking at that, I'm sorry.

Q. Well, this is a document in which the defendants in this case tell us about who is going to testify and what they're going to testify about, and you are discussed at pages 11 and 12. So let's go to pages 11 and 12, please.

A. Okay.

Q. And would you please read, beginning where it starts with your name on page 11, and on to page 12. And

THE WITNESS: That is correct.

BY MR. FATHI:

Q. And is it required that their degree be from an accredited university, their master's degree?

MS. ORCUTT: Form and foundation.

THE WITNESS: I'll have to refer to the licensing department.

BY MR. FATHI:

Q. So you don't know?

MS. ORCUTT: Form.

THE WITNESS: Correct. I do not know.

BY MR. FATHI:

Q. Are all mental health professionals or psych associates working in the Arizona Department of Corrections licensed?

MS. ORCUTT: Form, foundation.

THE WITNESS: I do not believe so, no.

Cumulative, Rule 403

Not cumulative; question was not previously answered. Rule 403.

Defendants' Reply: Cumulative of testimony from other witnesses

BY MR. FATHI:

Q. Why does the Arizona Department of Corrections -- or let me rephrase that -- why does Centurion employ mental health professionals or psych associates who are not licensed?

MS. ORCUTT: Form and foundation.

THE WITNESS: Can you repeat the question? I'm not sure what you mean.

Q. So those are things that a licensed psych associate can do, but an unlicensed psych associate cannot do. Correct?

MS. ORCUTT: Form, foundation.

THE WITNESS: Currently, that is what the responsibilities of only licensed staff perform right now.

Cumulative, Rule 403

Not cumulative; question was not previously answered. Rule 403.

Defendants' Reply: Cumulative of testimony from other witnesses

BY MR. FATHI:

Q. And unlicensed staff cannot perform those duties. Correct?

MS. ORCUTT: Form, foundation.

THE WITNESS: Technically, an unlicensed staff member could complete a mental health intake in order -- and then have a licensed staff review it; however, we prefer to have a licensed staff complete a mental health intake.

BY MR. FATHI:

Q. What about checks of people who are on watch, is that something that unlicensed psych associates can do?

MS. ORCUTT: Form, foundation.

THE WITNESS: We do not have unlicensed staff see individuals for mental health watch counseling sessions.

BY MR. FATHI:

MS. ORCUTT: Form, foundation.

THE WITNESS: I do not know.

BY MR. FATHI:

Q. Do they have any interaction with patients?

MS. ORCUTT: Form, foundation.

THE WITNESS: I do not know.

MR. FATHI: All right. Let's go back to Exhibit 2, please.

Q. Before we get back to Exhibit 2, Doctor, are you familiar with the term "behavioral health tech"?

THE WITNESS: (Inaudible.)

THE REPORTER: I'm sorry, I didn't hear that.

THE WITNESS: Yes.

BY MR. FATHI:

Q. What are the job duties of a behavioral health tech?

MS. ORCUTT: Form.

THE WITNESS: Typically, a behavioral health tech at the facility will assist with segregation visits, welfare checks, group therapy, and assisting the patient in any other needs.

BY MR. FATHI:

Q. So it sounds like they do interact with patients?

A. That is correct.

Cumulative, Rule 403

Not cumulative; questions were not previously answered. Rule 403.

Defendants' Reply: Cumulative of testimony from other witnesses

Cumulative, Rule 403

Not cumulative; questions were not previously answered. Rule 403.

Defendants' Reply: Cumulative of testimony from other witnesses, Rule 403.

Q. And you said, "Assist with group therapy." Are they assisting someone else who is running the group or are they running the group?

MS. ORCUTT: Form.

THE WITNESS: Primarily they run the groups.

BY MR. FATHI:

Q. And what are the minimum requirements to be a behavioral health tech?

MS. ORCUTT: Form, foundation.

THE WITNESS: I'm not sure of the exact credentialing.

BY MR. FATHI:

Q. Are behavioral health techs required to have any kind of license?

MS. ORCUTT: Form and foundation.

THE WITNESS: Not to my knowledge.

BY MR. FATHI:

Q. Not to your knowledge or you don't know?

MS. ORCUTT: Form.

THE WITNESS: I don't know.

BY MR. FATHI:

Q. Did you get that, Ms. Court Reporter?

THE REPORTER: "I don't know."

MR. FATHI: Thank you.

Let's go back to Exhibit 2, please.

Do you understand that, Doctor?

A. Yes.

Q. Okay. So have you ever heard anyone other than your counsel express the view that current mental health staffing levels in the Arizona Department of Corrections are insufficient to meet the needs of the prisoner population, either systemwide or at a particular complex or unit?

MS. ORCUTT: Form.

THE WITNESS: Can you rephrase the question?

MS. BARNES: You want him to rephrase it or repeat it?

THE WITNESS: Try repeating it first.

BY MR. FATHI:

Q. Okay. My question is, have you ever heard anyone express to you that current staffing levels for mental health are insufficient to meet the needs of the Arizona prison population, either systemwide or in a particular unit or complex?

MS. ORCUTT: Form.

THE WITNESS: I don't know about the word "insufficient," but we have had fewer than optimal staff at certain sites. Correct?

BY MR. FATHI:

Q. Okay. Tell me what sites those are.

Leading; Vague as to "insufficient"

Leading is permissible with adverse witness, Rule 611. Question is not "vague" and witness was able to answer.

Defendants' Reply: Witness's answer makes clear that she considered the term to be vague

MS. ORCUTT: Form.

THE WITNESS: There's been a period of time more recently at Eyman that has been shorter staffed.

BY MR. FATHI:

Q. And when you say "shorter staffed," break that down for me, if you would.

MS. ORCUTT: Form.

THE WITNESS: I'm not sure of the specific numbers, but I know we were not fully staffed for mental health.

BY MR. FATHI:

Q. And what period of time are we talking about here?

MS. ORCUTT: Form.

THE WITNESS: I'm not sure of the specifics, but probably the last three to four months.

BY MR. FATHI:

Q. And continuing to the present time?

A. No, I would say -- I would say that they're closer to staffed, or getting there, I should say.

Q. Well, I'm sorry, I'm not sure I understand. Are you saying that Eyman Mental Health is not fully staffed?

MS. ORCUTT: Form.

THE WITNESS: It is not currently fully

Vague

Question is not "vague" and witness was able to answer.

Defendants' Reply: The test of vagueness is not whether the witness was able to answer but whether the question and answer are clear to the finder of fact

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6)

Q. So these are permanent positions?

A. That is correct.

Q. And what about the psychologist who is starting in the near future?

A. That would be a permanent position.

Q. Okay. What other complexes are having -- I forget the term you used -- but not optimal staff -- I don't want to put words in your mouth, but you said there's some sites, so where else besides Eyman?

MS. ORCUTT: Form.

THE WITNESS: Right now, it would just be Eyman, but they're becoming more fully staffed.

BY MR. FATHI:

Q. So getting back to my original question, have you ever heard anyone besides your counsel express the view that the current mental health staffing is insufficient to meet the needs of the Arizona prison population, either at a certain facility or unit or systemwide? Have you ever heard anyone express that view?

MS. ORCUTT: Form.

MS. BARNES: Form.

THE WITNESS: I don't know.

BY MR. FATHI:

Q. I'm sorry, have you ever heard anyone express

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6)

Q. How much -- I'm sorry?
A. Depending on the complex, it ranges from -- by position, anywhere from, I believe, 3,000 to 20,000.
Q. And that applies to all mental health staff?
MS. ORCUTT: Form.
THE WITNESS: It depends on the specific position.
BY MR. FATHI:
Q. So is it your testimony that any new mental health staff person joining Centurion and ADC will receive a signing bonus?
MS. ORCUTT: Form.
THE WITNESS: I'm not sure about all positions, but the positions that are, at times, more challenging to hire do have sign-on bonuses.
BY MR. FATHI:
Q. And which positions are those?
A. Psychology associate positions, psychiatrist positions, I believe, and psychologists.
Q. And so your testimony is that those positions are currently eligible for signing bonuses of, I think you said, between 3,000 and $20,000?
MS. ORCUTT: Form.
THE WITNESS: That is my understanding.
BY MR. FATHI:

Hearsay, Rule 802

Hearsay, Rule 802

Hearsay, Rule 802

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6)

Q. And how sure are you about that?

MS. ORCUTT: Form.

THE WITNESS: I'm not as sure on the psychiatrist piece, since I don't hire psychiatrists, but in terms of psych associates, I'm sure about.

BY MR. FATHI:

Q. And you said conversations -- you said there have been conversations about needing more staff. You've talked about Eyman. Have there been conversations about needing more staff at other facilities?

MS. ORCUTT: Form.

BY MR. FATHI:

Q. And, again, I'm talking about mental health staff.

A. Mental health staff?

Q. Yes.

A. Yes.

Q. Which facilities?

A. In the more recent, Tucson staff.

Q. Uh-huh. Okay. Tell me about Tucson.

MS. ORCUTT: Form.

THE WITNESS: There have been some individuals out for medical reasons, therefore, needing additional support.

BY MR. FATHI:

Vague

Question is not "vague" and witness was able to answer.

Defendants' Reply: vague as to "needing more staff"; the test is not whether the witness was able to answer but whether the questions and answers are clear to the finder of fact

Q. Uh-huh. What positions were those people who were out for medical reasons?

MS. ORCUTT: Form, foundation.

THE WITNESS: To my knowledge, behavioral health techs and a psychologist.

BY MR. FATHI:

Q. So a total of how many positions?

MS. ORCUTT: Form.

THE WITNESS: I'm aware of three.

BY MR. FATHI:

Q. So one psychologist and two behavioral health techs?

MS. ORCUTT: Form.

THE WITNESS: Those are three that I'm aware of.

BY MR. FATHI:

Q. And what was done to fill those positions?

MS. ORCUTT: Form.

THE WITNESS: We've had people from across the state assist with those responsibilities that are needed and go to the site.

BY MR. FATHI:

Q. So those are people who already have jobs working in mental health at other complexes going to Tucson to assist; is that right?

MS. ORCUTT: Form.

THE WITNESS: That is correct, in terms of the immediate need.

BY MR. FATHI:

Q. Other complexes where there have been -- you've heard discussions about needing more staff?

MS. ORCUTT: Form.

THE WITNESS: Potentially Perryville. We've had discussions about wanting more psychologists.

BY MR. FATHI:

Q. Uh-huh. And why do you want more psychologists at Perryville?

MS. ORCUTT: Form.

THE WITNESS: To continue to work with our mental health population.

BY MR. FATHI:

Hearsay, Rule 802

Q. What would those additional psychologists do that isn't being done now, if you were to get them?

MS. ORCUTT: Form.

Hearsay, Rule 802

THE WITNESS: I think just continue to improve and, as always, just focus on individualized treatment like we do.

BY MR. FATHI:

Hearsay, Rule 802

Q. So what specific concrete tasks would be getting done that aren't being done now, if you were to

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6)

Hearsay, Rule 802

Hearsay, Rule 802

Hearsay, Rule 802

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6)

get these additional psychologists?

MS. ORCUTT: Form.

THE WITNESS: I don't know that nothing is -- I don't know that anything is not getting done. It would just be additional support.

BY MR. FATHI:

Q. Do you believe that the current mental health staffing levels are sufficient to meet the needs of the Arizona prison population?

MS. ORCUTT: Form, foundation.

THE WITNESS: I think they're sufficient, uh-huh.

BY MR. FATHI:

Q. And how did you come to that conclusion?

A. Just knowing the caseload across the state and just discussion with the leads.

Q. And that includes at the facilities you've never visited. Correct?

MS. ORCUTT: Form.

THE WITNESS: That would be including those, yes, because I meet with them as well.

BY MR. FATHI:

Q. Did you conduct any kind of staffing study?

MS. ORCUTT: Form.

THE WITNESS: I have not.

BY MR. FATHI:

Q. And when was the time before that?

A. The previous Monday, I briefly reviewed them.

Q. And how many statewide vacancies in mental health staff were there when you reviewed this last Monday?

MS. ORCUTT: Form.

THE WITNESS: I'm not sure of the ac- -- the exact number.

BY MR. FATHI:

Q. What is your role in the recruitment of mental health staff?

A. In terms of recruiting, I assist with interviewing the psychologists. I try to assist with any mental health lead positions. When I'm available, I meet with the mental health leads, as needed, in terms of discussing any interviews that were conducted.

Hearsay, Rule 802

Q. When was the last time you participated in an interview for a potential mental health staff member?

A. I'd have to look at my schedule for specifics, but I believe -- I interviewed some psychologists last week.

Q. So how many interviews did you sit in on last week for psychologists?

A. Again, without looking at my schedule, I

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial

Hearsay, Rule 802

Hearsay, Rule 802

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial

believe three.

Q. And when was the last time before that that you sat in on interviews for mental health staff?

MS. ORCUTT: Form.

THE WITNESS: Without looking at my schedule for specifics, I've sat in on psych associates and BHTs within the last few weeks.

BY MR. FATHI:

Q. In addition to the three psychologists you testified you sat in on last week?

A. Correct. So it would have been -- within the last month, I know I've sat in on quite a few psych associates and BHTs.

Q. So how many hours in an average week do you spend in interviewing prospective mental health staff?

MS. ORCUTT: Form.

THE WITNESS: It depends on the week.

BY MR. FATHI:

Q. Well, I'm asking for an average week.

A. An average depends on the applicants and the number of applicants we get. So I try to schedule -- especially since I do the psychologist positions, I try to get them scheduled within the same week, depending on the applicant's schedule. As of right now, about maybe one to two hours, at most.

Q. Are there any weeks where you don't participate in any interviews of prospective mental health staff?

MS. ORCUTT: Form.

THE WITNESS: I believe so.

BY MR. FATHI:

Q. Are you aware, Doctor, that the Court has entered various orders about the minimum duration of mental health visits in this case?

MS. ORCUTT: Form.

THE WITNESS: Yes.

BY MR. FATHI:

Q. Does Centurion or ADC currently have any policy regarding the minimum duration of mental health encounters?

MS. ORCUTT: Form.

THE WITNESS: Not sure if it's necessarily written into policy, but we meet with everyone for individual therapy for 30 minutes for individual counseling, and then a minimum of 10 minutes for suicide watch contacts.

BY MR. FATHI:

Q. And you're saying you don't believe that's written down anywhere?

MS. ORCUTT: Form.

THE WITNESS: I don't know that it's written in

Case 2:12-cv-00601-ROS Document 4198-1 Filed 10/29/21 Page 79 of 204

an actual policy.

BY MR. FATHI:

Q. And how are those minimum durations enforced? How do you satisfy yourself that staff are abiding by those minimum durations?

MS. ORCUTT: Form.

THE WITNESS: Our people who do scheduling and complete the scheduling lists review.

BY MR. FATHI:

Q. Review what?

A. Review the charts to see whether or not people were seen within 10 minutes or 30 minutes. And then if it's not seen within that time frame, we attempt, to the best of our ability, to track if the refusal is entered in the chart, so we do periodic chart reviews.

Q. I see.

Has any staff member ever been subject to any discipline or corrective action for not abiding by these minimum durational requirements?

MS. ORCUTT: Form, foundation.

THE WITNESS: I'm not sure, just given that I'm not included on every single write-up.

BY MR. FATHI:

Q. Okay. So your answer is you don't know?

A. I don't know.

MS. BARNES: And I would like to take -- I would like to take a pause before your next question, and I would like the court reporter to please read back her answer prior to that, please.

(Record read.)

MS. BARNES: Thank you.

BY MR. FATHI:

Q. Dr. Pelton, in your view, is a three-minute encounter sufficient to assess a patient's risk of self-harm or suicide?

MS. ORCUTT: Form.

THE WITNESS: It's not optimal, but again, I would say that you could obtain enough information to support that they're not a current danger to themselves or other people.

BY MR. FATHI:

Q. In a three-minute encounter?

A. Correct.

Q. Dr. Pelton, in your view, is a one-minute encounter sufficient to assess a patient's risk of self-harm or suicide?

MS. ORCUTT: Form.

THE WITNESS: It's not going to be optimal, but again, there's going to be situations where you could make a definitive answer that they're going to be a

Calls for speculation; Vague

Question was not "vague," and witness was able to answer. Question called for witness's professional judgment, not speculation.

Defendants' Reply: Vague as to "encounter" and "sufficient to assess"; the test is not whether the witness answered, but whether the questions and answers are clear to the fact finder; presents a hypothetical that calls for speculation.

Calls for speculation; Vague

Question was not "vague," and witness was able to answer. Question called for witness's professional judgment, not speculation.

Defendants' Reply: Vague as to "encounter" and "sufficient to assess"; the test is not whether the witness answered, but whether the questions and answers are clear to the fact finder; presents a hypothetical that calls for speculation.

danger to themselves and other people.

BY MR. FATHI:

Q. In your view, is a one-minute encounter sufficient to determine that a patient is not at risk of self-harm or suicide?

MS. ORCUTT: Form.

THE WITNESS: Again, it's not going to be optimal, but I do believe that there are situations that within a one-minute encounter you could obtain enough information to indicate that they're not currently a danger to themselves or other people.

BY MR. FATHI:

Q. In your opinion, is a 30-second encounter sufficient to determine that a patient is not at risk of self-harm or suicide?

MS. ORCUTT: Form.

THE WITNESS: Again, I'd have to know the specifics on a situation. Again, it's not going to be optimal.

BY MR. FATHI:

Q. I'm asking you is it ever -- in your view, is a 30-second encounter ever sufficient to determine that a patient is not at risk of self-harm or suicide?

MS. ORCUTT: Form.

THE WITNESS: I'd have to know more specifics

Calls for speculation; Vague

Question was not "vague," and witness was able to answer. Question called for witness's professional judgment, not speculation.

Defendants' Reply: Vague as to "encounter" and "sufficient to assess"; the test is not whether the witness answered, but whether the questions and answers are clear to the fact finder; presents a hypothetical that calls for speculation.

Relevance, Rule 402

Waste of time and cumulative, Rule 403

Duration of mental health encounters is at issue. Rule 401, 402. Not cumulative; questions were not previously answered. Rule 403. Question called for witness's professional judgment, not speculation.

about the situation.

BY MR. FATHI:

Q. So your testimony is that it could be sufficient; is that right?

MS. ORCUTT: Form.

THE WITNESS: It could be, depending on the situation.

BY MR. FATHI:

Q. Okay. Doctor, is a 15-second mental health encounter sufficient to determine that a patient is not at risk of self-harm or suicide?

MS. ORCUTT: Form.

THE WITNESS: I mean, I would -- I would say that people need to meet with someone more than 15 seconds.

BY MR. FATHI:

Q. Okay. Could you answer my question?

MS. ORCUTT: Form. She did.

THE WITNESS: I would say it's not optimal. Everyone has different clinical judgment, but I would say that they need to have -- they have clinical information and base it on that clinical information.

BY MR. FATHI:

Q. Is a 15-second encounter sufficient to determine that a patient is not at risk of self-harm or

Defendants' Reply: Cumulative and waste of time in that question was asked and answered five times at 141:9-15, 141:17-22, 141:24-142:4, 142:6-13, and 142:15-20. Presents a hypothetical that does not make any fact of consequence more or less likely to be true, Rule 402.

Relevance, Rule 402

Waste of time and cumulative, Rule 403

Duration of mental health encounters is at issue. Rule 401, 402. Not cumulative; questions were not previously answered. Rule 403. Question called for witness's professional judgment, not speculation.

suicide?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: I would say it would depend on the situation and what clinical information was given.

BY MR. FATHI:

Q. So your testimony is there are circumstances where a 15-second encounter could be sufficient to determine that the patient is not at risk of self-harm or suicide?

MS. ORCUTT: Form.

THE WITNESS: I would have to review the situation and specifics to better understand what's going on with the person.

BY MR. FATHI:

Q. But your testimony is that 15 seconds could be sufficient?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: I think it's possible that that could be, but again, without knowing specifics of the situation.

MR. FATHI: All right. Can we go back to Exhibit 2, please. All right. Page 12, please.

Q. All right. Starting on line 11, Doctor, it says, "Dr. Pelton will also testify regarding continuous improvements in the delivery of mental healthcare and

Defendants' Reply: Cumulative and waste of time in that question was asked and answered five times at 141:9-15, 141:17-22, 141:24-142:4, 142:6-13, and 142:15-20. Presents a hypothetical that does not make any fact of consequence more or less likely to be true, Rule 402.

programming to the ADCRR inmate population."

Do you see that?

A. I do.

Q. What improvements are you going to be testifying about at the trial of this matter?

MS. BARNES: Form.

MS. ORCUTT: Form.

THE WITNESS: I'm not sure -- I don't know specifically.

BY MR. FATHI:

Q. Can you tell me any of the improvements you're going to be testifying to at the trial of this matter?

MS. ORCUTT: Form.

THE WITNESS: I don't necessarily know what I'm going to specifically testify to, but I can say that we're continuously improving our mental health programming across the state.

BY MR. FATHI:

Hearsay, Rule 802

Q. Okay. How are you continuously improving mental health programming across the state?

A. I have people working with different mental health programs that we specifically -- or have in place right now, in terms of the specific group therapy that we're providing, how we can continuously provide care for those who need more assistance. We're always looking to

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial

Hearsay, Rule 802

improve our inpatient programming in terms of the evidence-based treatment that we provide in terms of our process and making sure the incarcerated individuals have the care that they need.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial

Q. Uh-huh. Okay. The improvements in group therapy, where would I find those written down?

MS. ORCUTT: Form.

THE WITNESS: Where would you find it written down?

BY MR. FATHI:

Q. Yeah. Your testimony is that this is a -- I think your testimony is that this is an effort currently underway to improve group therapy, so where would the plan for those improvements be written down?

MS. ORCUTT: Form.

THE WITNESS: They're not currently written down.

BY MR. FATHI:

Q. I see. And your plans for the improvement of inpatient programming, where would I find those written down?

MS. ORCUTT: Form.

THE WITNESS: It's not written down.

BY MR. FATHI:

Q. Is there any documentation at all about any of

THE WITNESS: I don't know.

BY MR. FATHI:

Q. When a person is on suicide watch or mental health watch, are they ever let out of their cell for recreation or exercise?

MS. ORCUTT: Form.

THE WITNESS: Yes.

BY MR. FATHI:

Q. Is everyone on watch let out for recreation or exercise or is it a case-by-case determination?

MS. ORCUTT: Form.

MS. BARNES: Foundation.

THE WITNESS: So all of our -- we follow the mental health watch guidelines set by ADCRR, so I'd have to reference that in terms of who is allowed recreation, and then we also, in addition to that, evaluate individual needs in terms of if they're too much of a danger to go to recreation or -- but we try our best to make sure everyone is entitled to recreation.

BY MR. FATHI:

Q. Okay. But as I understand your testimony, some people on watch get out for recreation, but some don't; is that right?

MS. ORCUTT: Form.

THE WITNESS: I think that would be an accurate

statement.

BY MR. FATHI:

Q. Okay. So who decides?

MS. ORCUTT: Form, foundation.

THE WITNESS: First and foremost, it would go off of the ADCRR watch guidelines.

BY MR. FATHI:

Q. And is that a document that you're referring to?

A. Yes.

Q. But concretely, if you're there in the watch unit and Patient Smith is on watch, who decides if he gets out for rec or doesn't get out for rec? Is that a mental health decision or is that a custody decision?

MS. ORCUTT: Form, foundation.

THE WITNESS: I would say overall it's a combination of the two. I would say that we work together between mental health and the security staff in terms of what's best for the incarcerated individual.

BY MR. FATHI:

Q. And what if mental health and security staff disagree? Who decides?

MS. ORCUTT: Form.

THE WITNESS: I would say, at the end of the day, ADCRR's our client, so we do the -- we go with what

they'd like to do.

BY MR. FATHI:

Q. Okay. So if Patient Smith is on watch and the mental health person thinks he should get out for rec and custody thinks he shouldn't, then he doesn't go out for rec; is that right?

MS. BARNES: Foundation.

MS. ORCUTT: Form.

THE WITNESS: I would have to say it depends on the situation, so --

BY MR. FATHI:

Q. I'm sorry, Doctor. I thought you said that if security and mental health disagree, that security made the decision. Did I misunderstand?

MS. ORCUTT: Form.

THE WITNESS: I mean, at the end of the day, security is responsible for security and removing the person from the cell. So, yes, it's a combination, but at the end of the day, yes, ADCRR would make the final determination.

BY MR. FATHI:

Q. Okay. So if someone doesn't get out of their watch cell for rec, do they ever get out of the cell at all?

MS. ORCUTT: Form.

Q. I'm sorry, I thought that was your testimony. Didn't you testify that some people on watch don't get out for rec? Correct?

MS. ORCUTT: Form.

THE WITNESS: There are certain situations for individual days that they do not get out for rec.

BY MR. FATHI:

Q. And you just testified that some people don't get out for individual counseling. Correct?

MS. ORCUTT: Form.

THE WITNESS: It's not going to be an absolute. It will be situational based, so it's assessed daily.

BY MR. FATHI:

Q. But there are some days that people on watch don't get out of their cells for individual counseling. Correct?

A. Correct.

Q. Is there any policy limiting how long a patient can be continuously on watch?

MS. ORCUTT: Form.

THE WITNESS: Not to my knowledge, but we do our best to get people off watch as soon as possible.

BY MR. FATHI:

Q. Doctor, I'd really be grateful if you listen to my questions and answer my question. My question was, is

Hearsay, Rule 802; Relevance, Rule 402

Incomplete, Rule 106; Asked and answered; Waste of time and cumulative, Rule 403

Defendants' Reply: Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Relevant to Plaintiffs' claim regarding duration of watches.

Asked and answered; Waste of time and cumulative, Rule 403

"Incomplete" objection is meaningless; Defendants can counter-designate. Not cumulative; questions were not previously answered. Rule 403.

Defendants' Reply: Defendants counter-designated 152:18-22. Cumulative of trial testimony from other witnesses, Rule 403.

there a policy limiting how long a patient can be continuously on watch?

MS. ORCUTT: Form.

THE WITNESS: Not to my knowledge.

BY MR. FATHI:

Q. What's the longest you're aware of a patient being continuously on watch?

MS. ORCUTT: Form.

THE WITNESS: Historically, I don't know. I know there's been people on watch for a long period of time.

BY MR. FATHI:

Q. How long?

MS. ORCUTT: Form.

THE WITNESS: I don't know of any specifics.

BY MR. FATHI:

Q. I'm asking what's the longest that you're aware of.

MS. ORCUTT: Form.

THE WITNESS: Again, I don't know the specifics, but I know there's people that have been on watch for months.

BY MR. FATHI:

Q. Months?

A. Uh-huh.

MS. BARNES: Is that a yes? You can't say "uh-huh."

THE WITNESS: Oh, sorry.

Yes, there's been people living on watch for months.

BY MR. FATHI:

Q. Okay. Are you ever aware of people on watch being not offered out-of-cell counseling because there weren't enough security staff?

MS. ORCUTT: Form, foundation.

THE WITNESS: I'm sorry. I missed the last part of the question.

BY MR. FATHI:

Q. My question is, are you aware of it ever happening that someone on watch was not offered out-of-cell counseling because there wasn't sufficient security staff to bring them out of the cell and supervise them?

MS. ORCUTT: Form, foundation.

THE WITNESS: I believe I -- I believe there's been situations.

BY MR. FATHI:

Q. At what facilities are you aware of that happening?

MS. ORCUTT: Form.

THE WITNESS: I believe there was a situation at Phoenix.

BY MR. FATHI:

Q. Any other facilities?

MS. ORCUTT: Form.

THE WITNESS: I'm not aware of any specifics.

BY MR. FATHI:

Q. How about generalities?

MS. ORCUTT: Form.

THE WITNESS: I can't think of even any generalities that I can speak to.

BY MR. FATHI:

Q. Are you aware of this ever happening at Phoenix, where people on watch were not taken out for counseling because there wasn't sufficient security staff to escort them?

MS. ORCUTT: Form.

THE WITNESS: Yes, I believe there has been some situations.

BY MR. FATHI:

Q. Okay. Any other facilities where you're aware of this happening?

MS. ORCUTT: Form.

THE WITNESS: I can't think of any specific cases.

Hearsay, Rule 802

Hearsay, Rule 802

Defendants' Reply: Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6)

Cumulative, Rule 403

Not cumulative; questions were not previously answered. Rule 403.

BY MR. FATHI:
Q. Doctor, what is a psychological autopsy?
MS. ORCUTT: Form.
THE WITNESS: A psychological autopsy is essentially an evaluation after an individual has been ruled a suicide. It's essentially a re-creation of the situation, the events that led up to the situation.
BY MR. FATHI:
Q. The events that led up to the death by suicide
A. Correct.
Q. And what is the purpose of a psychological autopsy?
MS. ORCUTT: Form.
THE WITNESS: The purpose of the autopsy is essentially to determine if there's any corrective actio that needs to take and any improvements that we can make in terms of providing care.
BY MR. FATHI:
Q. And does the psychological autopsy sometimes have recommendations that are made?
MS. ORCUTT: Form.
THE WITNESS: Yes.
BY MR. FATHI:
Q. And what is the purpose of those recommendations?

Defendants' Reply: Cumulative of trial testimony of other witnesses, Rule 403.

Cumulative, Rule 403

Not cumulative; questions were not previously answered. Rule 403.

Defendants' Reply: Cumulative of trial testimony of other witnesses, Rule 403.

MS. ORCUTT: Form.

THE WITNESS: To review to see if there's anything that we can do better going forward, in terms of healthcare.

BY MR. FATHI:

Q. When you were the -- at Phoenix, was your title clinical director or mental health director?

A. Clinical director.

Q. In that position, did you have any role in the preparation of psych autopsies?

MS. ORCUTT: Form.

THE WITNESS: As the clinical director, no -- or rephrase the question.

BY MR. FATHI:

Q. In your position as clinical director at Phoenix, did you have any role in the preparation of psych autopsies?

A. As a psychologist, I completed a psychological autopsy while in that position.

Q. In your current position as mental health director, do you have any role in the preparation of psych autopsies?

MS. ORCUTT: Form.

THE WITNESS: I assist with the signing of psychologists to complete the psych autopsy and I also

review it.

MR. FATHI: All right. Let's look at Exhibit 6, please.

(Marked for identification Exhibit 6.)

BY MR. FATHI:

Q. Doctor, showing you Exhibit 6, which is the psychological autopsy of Patrick Pruitt, who died by suicide on August 5th of 2020, have you seen this document before?

A. Yes.

Q. And it says on the first page that you completed this psych autopsy; is that accurate?

A. Yes.

Q. And did you do it on or about September 4th of 2020?

A. Correct.

Q. Tell me how you went about completing this report.

MS. ORCUTT: Form.

THE WITNESS: I reviewed Mr. Pruitt's record, I spoke to CIU, and I reviewed the detentional record as well.

MR. FATHI: Okay. Can we go to page 76, please, using the Bates number, and maybe blow it up a little. Okay. Scroll up a little bit, please. Sorry,

Foundation, Rule 901

Incomplete, Rule 106

Witness testified that she created the document. Document has been admitted (Exhibit 381). "Incomplete" objection is meaningless; Defendants can counter-designate.

other direction. All right. Thank you.

Q. Doctor, do you see the section that says "Recommendations"?

A. Uh-huh, yes.

Q. Did you write those recommendations?

A. Yes.

Q. Okay. So the first recommendation is, "Reevaluate inmate's access to after-hours jobs without supervision."

Do you see that, Doctor?

A. Yes.

Q. What has been done to implement that recommendation?

MS. ORCUTT: Form.

MS. BARNES: Foundation.

THE WITNESS: I don't have access to that information, or I did not at the time.

BY MR. FATHI:

Q. Has anything been done to implement this recommendation?

MS. ORCUTT: Form, foundation.

THE WITNESS: I don't know.

BY MR. FATHI:

Q. The second recommendation is, "Additional access to substance abuse treatment." What has been done

Foundation; Lacks personal knowledge, Rule 602

Waste of time, Rule 403

Witness testified that she created the document. Witness's lack of knowledge is itself evidence. Not cumulative/ waste of time; questions were not previously answered. Rule 403.

Defendants' Reply: Witness lacks knowledge of implementation of recommendations that would have occurred after she created the document, Rule 602. Cumulative and waste of time in that it was previously asked/ answered at 159:12-17, Rule 403.

Foundation; Lacks personal knowledge, Rule 602;

Waste of time and cumulative, Rule 403

Witness testified that she created the document. Witness's lack of knowledge is itself evidence. Not cumulative; questions were not previously answered. Rule 403.

to implement this recommendation?

MS. ORCUTT: Form and foundation.

THE WITNESS: I'm not sure of the specifics, but I know that majority of our sites provided substance abuse treatment through ADCRR.

BY MR. FATHI:

Q. Well, the recommendation is additional access to substance abuse treatment, so do incarcerated people now have more access to substance abuse treatment than they did as of the date of this report?

MS. ORCUTT: Form, foundation.

THE WITNESS: I don't know the specifics.

BY MR. FATHI:

Q. Has anything been done to implement this recommendation?

MS. ORCUTT: Form, foundation.

THE WITNESS: I don't know the specifics.

BY MR. FATHI:

Q. I'm sorry. I don't understand that answer.

A. I -- I was not in -- I was not in this role as the mental health director, so I don't have a clear understanding of the substance abuse treatment that was provided before Mr. Pruitt's being deceased and after.

Q. Okay. Well, tell me what has been done to implement this recommendation number 2.

Defendants' Reply: Witness lacks knowledge of implementation of recommendations that would have occurred after she created the document and of the prior status of substance abuse treatment, Rule 602. Cumulative and waste of time in that her knowledge of recommendations was asked/ answered at 159:12-17; 160:3-5, 12, 17; 160:24-161-4; 161:6-11, 13-17, Rule 403.

Foundation; Lacks personal knowledge, Rule 602

Waste of time and cumulative, Rule 403

Witness testified that she created the document. Witness's lack of knowledge is itself evidence. Not cumulative; questions were not previously answered. Rule 403.

Defendants' Reply: Witness lacks knowledge of implementation of recommendations that would have occurred after she created the document, Rule 602. Cumulative and waste of time in that her knowledge of recommendations was asked/ answered at 159:12-17; 160:3-5, 12, 17; 160:24-161-4; 161:6-11, 13-17, Rule 403.

MS. ORCUTT: Form, foundation. Asked and answered.

THE WITNESS: I don't know the specifics of what has been done.

BY MR. FATHI:

Q. Has anything been done to implement this recommendation?

MS. ORCUTT: Form, foundation. Asked and answered.

THE WITNESS: I'm not sure about what has been done. I don't know the specifics.

BY MR. FATHI:

Q. Do you know if anything has been done to implement this recommendation?

MS. ORCUTT: Form, foundation. Asked and answered.

THE WITNESS: I'm not sure. I don't know.

MR. FATHI: Okay. Exhibit 7, please.

(Marked for identification Exhibit 7.)

Document has been admitted (Exhibit 218).

BY MR. FATHI:

Foundation, Rule 901 Incomplete, Rule 106

Witness testified that she reviewed and signed the document. "Incomplete" objection is meaningless; Defendants can counter-designate.

Q. Exhibit 7 is the psychological autopsy of David Crawford, who died by suicide on May 31st, 2021.

Have you seen this document, Doctor?

A. Yes.

Q. All right. Let's go to the last page, please.

And on the last page, this says that you reviewed this report. Correct, Doctor?

A. That is correct.

Q. Is that your signature?

A. Yes, it is.

Q. And you signed it on or about July 29th of this year?

A. Correct.

Q. And what does your signature on this document signify?

MS. ORCUTT: Form.

THE WITNESS: That I reviewed the document.

BY MR. FATHI:

Q. All right. So on the previous page, if we scroll up, yes, under Section 6, "Recommendations," you see there are three recommendations there, Doctor?

A. Yes.

Q. Do you agree with those recommendations?

MS. ORCUTT: Form.

THE WITNESS: Let me read them. Hold on.

MS. ORCUTT: Form and foundation.

THE WITNESS: Okay. Go ahead. What's the question?

BY MR. FATHI:

Q. The question is, do you agree with these

recommendations?

MS. ORCUTT: Form.

THE WITNESS: Can you rephrase by "agree"?

BY MR. FATHI:

Q. Let me ask it another way. You reviewed this report. Right?

A. Correct.

Q. And your review included these recommendations?

A. This is Dr. Leonard's psychological autopsy recommendations.

Q. You reviewed this report. Correct?

A. Correct.

Q. And you signed this report. Correct?

A. Correct.

Q. And you didn't indicate anywhere on this report that you disagreed with those recommendations. Correct?

MS. ORCUTT: Form.

THE WITNESS: I don't know that we write on documents, but -- because this was Dr. Leonard's recommendations.

BY MR. FATHI:

Q. You didn't indicate anywhere on this document that you disagree with those recommendations, did you?

A. That is correct.

Q. All right. First recommendation, "Increase

psychoeducation, specifically understanding the cycles of depression, where there may be times a patient may feel good, whereas at times one can go into depressive episodes."

What's been done to implement this recommendation?

MS. ORCUTT: Form, foundation.

THE WITNESS: I don't have the exact information in terms of what specifically is being done but we provide ongoing education to all of our staff with regards to continuing to provide treatment around depression.

BY MR. FATHI:

Q. Uh-huh. What's been done to implement this recommendation?

MS. ORCUTT: Form. Asked and answered.

MS. BARNES: (Inaudible.)

THE REPORTER: I'm sorry, Ms. Barnes, did you say something?

MS. BARNES: I said "form" as well.

You can go ahead.

THE WITNESS: Can you repeat the question?

BY MR. FATHI:

Q. Let me try it another way. The first recommendation says, "Increased psychoeducation."

Foundation; Lacks personal knowledge, Rule 602

Witness testified that she reviewed and signed the document. Witness's lack of knowledge is itself evidence.

Defendants' Reply: Witness lacks knowledge of implementation of recommendations that would have occurred after she created the document, Rule 602.

Do you see that?

A. Yes.

Q. What has been done since the date of this report to increase psychoeducation on the cycles of depression?

MS. ORCUTT: Form.

THE WITNESS: We continue to try to increase access to group therapy.

BY MR. FATHI:

Q. Uh-huh. So tell me the specific steps that have been taken to increase psychoeducation, specifically understanding the cycles of depression?

MS. ORCUTT: Form.

THE WITNESS: I would say that it's on an individual basis with the patient. It can't be generalized to all individuals. Therefore, continuing to educate staff in terms of educating the individuals who are going through depressive episodes.

BY MR. FATHI:

Q. All right. Let me ask this another way. Going back to the first page of Exhibit 7, the date of report is June 30, 2021. Correct?

A. I'd have to go to the first page.

Q. Oh, I'm sorry. Let's scroll to the first page. Okay. Can you see the date of report,

6/30/2021?

A. Yes.

Q. Do you have any reason to believe that date is incorrect?

A. No.

Q. Okay. Let's go back to the recommendations. Okay. So tell me what has been done to increase psychoeducation, specifically understanding the cycles of depression, since this recommendation was made on June 30th, 2021?

MS. BARNES: Form. Asked and answered.

Go ahead.

THE WITNESS: I can't speak to the specifics of what has been done. Again, we continue to educate other clinicians and our psychiatric providers surrounding depression and the treatment of depression.

BY MR. FATHI:

Q. But your testimony is you're not aware of anything that's been done specifically in reference to this recommendation; is that correct?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: There's nothing, to my knowledge, about specifics.

BY MR. FATHI:

Q. Okay. Second recommendation. What has been

Foundation; Lacks personal knowledge, Rule 602

Asked and answered; Waste of time and cumulative, Rule 403

Witness testified that she reviewed and signed the document. Witness's lack of knowledge is itself evidence. Not cumulative; questions were not previously answered. Rule 403.

Defendants' Reply: Witness lacks knowledge of implementation of recommendations that would have occurred after she created the document, Rule 602. Cumulative and waste of time in that it was asked and answered at 163:25-164:12; 165:3-8, 10-18, Rule 403.

Foundation; Lacks personal knowledge, Rule 602

(see next page for response)

Foundation; Lacks personal knowledge, Rule 602

Witness testified that she reviewed and signed the document. Witness's lack of knowledge is itself evidence.

Witness lacks knowledge of implementation of recommendations that would have occurred after she created the document and of items that pertain to security and nursing, Rule 602.

done to implement this recommendation?

MS. ORCUTT: Form, foundation.

THE WITNESS: This recommendation speaks primarily to security and nursing, so I can't speak to that.

BY MR. FATHI:

Q. Uh-huh. To your knowledge, has anything been done to implement this recommendation?

MS. ORCUTT: Form.

THE WITNESS: I don't know.

BY MR. FATHI:

Q. Third recommendation, "Increase psychoeducation on relationship between mental health and chronic pain." What's been done to implement this recommendation?

MS. ORCUTT: Form.

THE WITNESS: We speak, in terms with our staff, about, again, providing care about mental health, chronic pain, and making sure we evaluate all the risk factors.

BY MR. FATHI:

Q. Yeah. Again, Doctor, my question is, what has been done to implement this recommendation? This is a suicide -- or a psych autopsy, dated June 30th of this year, and the recommendation is "Increase psychoeducation on the relationship between mental health and chronic

Foundation; Lacks personal knowledge, Rule 602; Waste of time and cumulative, Rule 403

(see next page for response)

Defendants' Reply: Witness lacks personal knowledge of implementation of recommendations that would have occurred after she created the document, Rule 602.

Foundation; Lacks personal knowledge, Rule 602; Waste of time and cumulative, Rule 403

Witness testified that she reviewed and signed the document. Witness's lack of knowledge is itself evidence. Not cumulative; questions were not previously answered. Rule 403.

Defendants' Reply: Witness lacks personal knowledge of implementation of recommendations that would have occurred after she created the document, Rule 602. Cumulative and waste of time in that it was previously asked and answered at 167:12-19, Rule 403.

pain." So my specific question is, what has been done to implement this recommendation of increased psychoeducation?

MS. BARNES: Form. Asked and answered.

THE WITNESS: And I don't know of anything specific.

BY MR. FATHI:

Q. Okay. Thank you. Exhibit 8 --

MS. BARNES: Give me one second. I'd like to just take a three-minute break. I'm having a temperature issue in this room.

MR. FATHI: Okay.

MS. BARNES: It's 12:41, we'll be back on by 12:45, so four minutes.

(Recessed from 12:41 p.m. until 12:46 p.m.)

Foundation, Rule 901

Incomplete, Rule 106

Complete document has been admitted (Exhibit 391).

MR. FATHI: All right. Exhibit 8, please.

(Marked for identification Exhibit 8.)

BY MR. FATHI:

Q. Dr. Pelton, this is the psychological autopsy of Michael Ring, who died by suicide on June 9th, 2021.

Have you seen this document before?

A. Yes.

MR. FATHI: And can we go to the last page, please.

Q. And that is your signature. Correct?

A. Correct.
Q. And that indicates that you reviewed this psychological autopsy?
A. Correct.
MR. FATHI: All right. Let's go back two pages, please, and maybe -- yes, "Recommendations." Try -- blow it up a little bit, if we can, please.
Q. Now, there's a number of recommendations. Do you see -- do you see those, Dr. Pelton?
A. Yes. It's a little blurry.
Q. Would you like it enlarged?
A. Yeah, a little bit, if you can. Thank you.
Q. Okay. So I'm going to ask first about the question -- the paragraph that begins, "It is recommended."
Do you see that?
A. Yes.
Q. So --
A. Yes.
Q. So this reads, "It is recommended that a standardized, evidence-based risk assessment tool designed for patrol violators be part of the mental health intake process."
Do you see that?
A. Yes.

Q. What steps have you taken to implement this recommendation?

MS. ORCUTT: Form, foundation.

THE WITNESS: All individuals who come in as a parole violator are screened by mental health intake process.

BY MR. FATHI:

Q. The recommendation is that a standardized evidence-based risk assessment tool designed for parole violators be part of the mental health intake process, and my question is, what steps have been taken to implement this recommendation?

MS. ORCUTT: Form.

THE WITNESS: With regards to the recommendation, on evidence-based risk assessment, there is no -- evidence-based is oddly written. Everyone does have a risk assessment in terms of being assessed, whether or not they're a danger to themselves or other people.

BY MR. FATHI:

Q. So is it a -- has a new standardized evidence-based risk assessment tool designed for parole violators been implemented since the date of this review?

MS. ORCUTT: Form.

THE WITNESS: No.

Hearsay, Rule 802

BY MR. FATHI:

Q. So what steps have been taken to implement this recommendation?

MS. ORCUTT: Form.

THE WITNESS: The -- what has been taken since then is reviewing the process of high-risk situations, including suicide for parole violators. We evaluated whether or not we needed to change the steps for parole violators in terms of if -- in terms of risk or suicide risk.

BY MR. FATHI:

Q. Let me try this a different way. The recommendation is that a standardized evidence-based risk assessment tool designed for parole violators be part of the mental health intake process.

Do you see that?

A. Yes.

Q. And has that been done since the date of this report?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: So the recommendation was reviewed, and we believed that our current process in terms of risk assessment is adequate, in terms of there is no evidence-based risk assessment, per se.

BY MR. FATHI:

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. Could you answer my question, please, Doctor?

MS. ORCUTT: Form.

MS. BARNES: David, she's -- she's answered it.

MR. FATHI: No, she has not.

MS. BARNES: Two different times. Yes, she has.

MR. FATHI: No, she has not. Let me ask it again.

Q. The recommendation is, "It is recommended that a standardized evidence-based risk assessment tool designed for parole violators be part of the mental health intake process."

Do you see that, Doctor?

A. Yes.

Q. Has a new standardized evidence-based risk assessment tool designed for parole violators been implemented since the date of this report?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: So as the -- per as Dr. Bailey, who completed this, this is her recommendation, as a team we decided and determined that that is not -- that is not what we decided to go forth in terms of the risk assessment. There is no evidence-based risk assessment that I'm aware of, and specifically for parole violators.

BY MR. FATHI:

Hearsay, Rule 802; Incomplete, Rule 106

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial. Designated testimony completes Plaintiffs' designation at 175:1-176:7.

Q. So the answer to my question is no?

MS. BARNES: She was still talking. She was about to complete her sentence.

THE WITNESS: Therefore, we do not believe that we needed to increase or change the risk assessment process, as all individuals who are parole violators are assessed for risk.

BY MR. FATHI:

Q. So this recommendation has not been implemented?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: The recommendation was addressed.

BY MR. FATHI:

Q. Was it implemented?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: So in terms of psychological autopsies, the psychologist who completes the psychological autopsy gives their recommendation, because we want them to be partial and to not have any bias, in terms of our thoughts or opinions as the mental health leaders. And so we review the recommendations and determine how to proceed forward in terms of the best patient care that we can provide.

BY MR. FATHI:

Q. Doctor, I'm going to ask you again to ask my --

Hearsay, Rule 802; Incomplete, Rule 106

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial. Designated testimony completes Plaintiffs' designation at 175:1-176:7.

Hearsay, Rule 802; Incomplete, Rule 106

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial. Designated testimony completes Plaintiffs' designation at 175:1-176:7.

to answer my question.

Was this recommendation implemented, yes or no?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: Again, there is no evidence-based risk assessment tool, therefore, we continue to do the intake process with the risk assessment that we already have.

BY MR. FATHI:

Q. Was this recommendation implemented, yes or no?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: I guess it depends on your definition of "implemented."

BY MR. FATHI:

Q. Was a new risk assessment tool adopted in response to this recommendation?

A. There is no new risk assessment that was invented.

Q. Was a new risk assessment tool adopted in response to this recommendation?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: There is no new risk assessment that has been adopted for specificity of parole violators.

BY MR. FATHI:

Q. Thank you, Doctor.

All right. Let's scroll down to page 13, please.

All right. In the paragraph that begins "Currently," it says the following, "It is recommended that the Arizona Department of Corrections Rehabilitation and Reentry consider partnering with other correctional institutions, political bodies, and academic research partners to facilitate prison-based research toward the development of such a tool with peer review and transparent knowledge translation."

Do you see that, Doctor?

A. Yes.

Q. What steps have been taken to implement this recommendation?

MS. ORCUTT: Form.

THE WITNESS: None, to my knowledge. Or -- hold on. Let me read it again.

I don't believe that there's any research that is currently undergoing.

BY MR. FATHI:

Q. So no steps have been taken to implement this recommendation?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: There is no research projects that are currently undergoing.

BY MR. FATHI:

Q. So no steps have been taken to implement this recommendation?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: In terms of developing a structured risk tool in relation to other correctional facilities, no, there's no research projects.

BY MR. FATHI:

Q. Okay. In the next paragraph, the paragraph that begins "Older males," the final sentence reads, "It is therefore recommended that institutional policy be reviewed in light of this growing population. This refers to older male prisoners and recommendations be sought and developed to address their potential unique mental health needs."

Do you see that, Doctor?

MS. ORCUTT: Form.

THE WITNESS: Yes.

BY MR. FATHI:

Q. What steps have been taken to implement this recommendation?

MS. ORCUTT: Form.

THE WITNESS: I believe -- I would say that we continually work with ADCRR in terms of our growing older population and what we can do to provide adequate mental

Q. So who were they?

MS. ORCUTT: Form.

THE WITNESS: I don't know at this time because that was several months ago.

MR. FATHI: All right. Would you turn to page 56571, please.

Q. Doctor, at the top of this page, it refers to an ICS response for self-harm while on continuous suicide watch. Was this an actual incident or was it a simulation?

MS. ORCUTT: Form.

THE WITNESS: I believe it was an actual incident.

BY MR. FATHI:

Q. Uh-huh. Do you have any recollection of this incident?

MS. ORCUTT: Form.

THE WITNESS: Let me read it real quick. I'm not sure the specifics of the situation.

BY MR. FATHI:

Q. Do you have any recollection of this incident at all?

MS. ORCUTT: Form.

THE WITNESS: I'd have to review the record to know who specifically this person was.

Complete document has been admitted (Exhibit 893).

Foundation, Rule 901 Incomplete, Rule 106

Foundation; Lacks personal knowledge, Rule 602

Questions are about the document, not the underlying incident. Witness's lack of knowledge is itself evidence.

Defendants' Reply: Questions are about whether the incident was a simulation and whether she recalls the incident, not about the document, and the witness lacks personal knowledge of the incident, Rule 602.

Foundation; Lacks personal knowledge, Rule 602

Questions are about the document, not the underlying incident. Witness's lack of knowledge is itself evidence.

Defendants' Reply: Questions are about whether the incident was a simulation and whether she recalls the incident, not about the document, and the witness lacks personal knowledge of the incident, Rule 602.

BY MR. FATHI:

Q. No, my question is, do you have any recollection of this incident at all?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: Are you referencing the incident of the ICS?

BY MR. FATHI:

Q. Yes.

A. Again, I would have to review the record. We have a significant amount of ICS situations.

Q. So this type of incident is not uncommon?

MS. ORCUTT: Form.

THE WITNESS: I won't say that it's common, but it does happen.

BY MR. FATHI:

Cumulative, Rule 403

Not cumulative; questions were not previously answered. Rule 403.

Defendants' Reply: Cumulative of trial testimony of other witnesses, Rule 403.

Q. What is a continuous suicide watch, Doctor?

MS. ORCUTT: Form.

THE WITNESS: It is a suicide watch where the person is determined to be a significant risk to themselves or other people, specifically someone's engaging in self-harm behavior or has a plan to commit suicide.

BY MR. FATHI:

Q. And how is a continuous suicide watch implemented? What's done with a person on continuous

Cumulative, Rule 403

Not cumulative; questions were not previously answered. Rule 403.

Defendants' Reply: Cumulative of trial testimony of other witnesses, Rule 403.

suicide watch?

MS. ORCUTT: Form.

THE WITNESS: I'm not sure I understand the question.

BY MR. FATHI:

Q. Is a person who is on a continuous suicide watch supposed to be watched continuously?

MS. ORCUTT: Form.

THE WITNESS: That is correct.

BY MR. FATHI:

Foundation; Lacks personal knowledge, Rule 602; Cumulative, Rule 403

Questions are about the document, not the underlying incident. Witness's lack of knowledge is itself evidence. Not cumulative; questions were not previously answered. Rule 403.

Defendants' Reply: Questions are about the incident and whether it was later investigated, not about the document, and the witness lacks personal knowledge of the incident/ investigation, Rule 602.

Q. Uh-huh. According to this document, this patient who was on continuous suicide watch removed 10 staples from an abdominal wound and then swallowed the staples.

Do you see that?

A. Yes.

Q. How was he able to do this while on a continuous suicide watch?

MS. BARNES: Form and foundation.

THE WITNESS: I'd have to refer to the security staff, as I was, number one, not there; and, number two, I'm not responsible for that.

BY MR. FATHI:

Q. Was there any investigation of this incident?

MS. ORCUTT: Form.

Foundation; Lacks personal knowledge, Rule 602; Cumulative, Rule 403

Questions are about the document, not the underlying incident. Witness's lack of knowledge is itself evidence. Not cumulative; questions were not previously answered. Rule 403.

Defendants' Reply: Questions are about the incident and whether it was later investigated, not about the document, and the witness lacks personal knowledge of the incident/ investigation, Rule 602.

MS. BARNES: Form and foundation.

THE WITNESS: I don't have access to that. I don't know.

BY MR. FATHI:

Q. Did this incident cause you any concern about whether continuous suicide watches were being carried out in an effective way?

MS. ORCUTT: Form.

THE WITNESS: Yes.

BY MR. FATHI:

Q. So what steps did you take in response to that concern?

MS. ORCUTT: Form.

THE WITNESS: I can't speak to this specific situation, but I have meetings with the deputy warden on a regular basis, in terms of ensuring the best care that we can for our incarcerated individuals and ensuring that the constant suicide watches are being completed correctly.

BY MR. FATHI:

Q. Did you take any steps in response to this particular incident to ensure that continuous suicide watches were being carried out in an effective manner?

MS. ORCUTT: Form.

THE WITNESS: I can't speak to the specific

Foundation; Lacks personal knowledge, Rule 602

Questions are about the document, not the underlying incident.**

Vague; Leading

Leading is permissible with adverse witness, Rule 611. Question is not "vague," and witness was able to answer.

** Witness's lack of knowledge is itself evidence.

situation, but any time that I felt that the person -- or if there's a situation where they were not being watched on a continuous basis or were able to remove staples, such as that, I have conversations with the deputy warden or sergeant or lieutenant.

BY MR. FATHI:

Q. Is this something that shouldn't have been able to happen?

MS. ORCUTT: Form.

THE WITNESS: Can you rephrase the question?

BY MR. FATHI:

Q. Did it concern you that somebody that was on a continuous suicide watch was able to remove 10 staples from an abdominal wound and swallow the staples?

MS. ORCUTT: Form.

THE WITNESS: Yes.

BY MR. FATHI:

Q. I'm sorry?

A. Yes.

Q. Doctor, are you familiar with the term "SMI"?

A. Yes.

Q. What does it mean?

A. "Seriously mentally ill."

Q. Are you familiar with any policy that restricts the placement of people with -- who are classified as SMI

Defendants' Reply: Questions are about the incident and whether she took any steps following it, not about the document, and the witness lacks personal knowledge of the incident, Rule 602.

Leading questions are not automatically permissible with a witness associated with an adverse party, Rule 611. Vague as to "something that shouldn't have been able to happen" and "concern."

into maximum custody?

MS. ORCUTT: Form.

THE WITNESS: Anyone who is SMI, we evaluate them upon arrival for -- excuse me -- for placement in restrictive housing. And if they have to be, if you will, in maximum custody, we provide them with additional therapy services.

BY MR. FATHI:

Q. Uh-huh. But people with SMI can be placed in maximum custody. Correct?

MS. ORCUTT: Form.

THE WITNESS: That is my understanding, yes.

BY MR. FATHI:

Q. And what are the additional therapy services you provide to people with SMI in max custody?

MS. ORCUTT: Form.

THE WITNESS: They receive three groups of psychoeducation by BHT a week and three groups a week by a psych associate -- or I'm -- I mean, I'm sorry, one group a week, my apologies, and three psychoeducation visits a week by a BHT.

BY MR. FATHI:

Q. And is it your understanding that those groups happen reliably at all of the max custody units?

MS. ORCUTT: Form.

regular basis, three times a week or once a week, in all the max custody units?

MS. ORCUTT: Form.

THE WITNESS: So I want to clarify, the three and one, it's one group a week by BHT, one group a week by a psych associate, and then three psychoeducation welfare visits by a BHT.

BY MR. FATHI:

Q. And my question is, are the groups occurring regularly as scheduled in all of the max custody units?

MS. ORCUTT: Form.

THE WITNESS: To my knowledge.

BY MR. FATHI:

Q. Yeah. And how do you know that?

A. I have meetings with my mental health leads from those complexes.

Q. Are you aware of any policy that restricts the placement of someone with SMI in a detention unit?

MS. ORCUTT: Form.

THE WITNESS: I would have to reference and review the policies, but to my knowledge, there's nothing to indicate that they are unallow- -- or not allowed to be in max custody.

BY MR. FATHI:

Q. My question was about detention. Are people

with SMI --

A. I'm sorry, I missed the word. Can you say it again?

Q. Are you aware of a policy that restricts the placement of people with SMI in detention?

MS. ORCUTT: Form.

THE WITNESS: I would have to go back and review the policy, but there's nothing that I'm aware of that restricts them from being in detention.

BY MR. FATHI:

Q. Are you aware of cases of people with SMI who have been placed in detention?

MS. ORCUTT: Form.

THE WITNESS: Yes.

BY MR. FATHI:

Q. Are you familiar with any policy restricting the use of OC spray on people classified as SMI?

MS. ORCUTT: Form.

THE WITNESS: I can't speak to the use of OC spray, as I am not one of the individuals who is allowed to carry it.

BY MR. FATHI:

Q. I'm simply asking, are you aware of any policy that restricts the use of OC spray on people with SMI?

MS. ORCUTT: Form.

addresses the use of OC spray on people who are taking psychotropic medication?

MS. ORCUTT: Form.

THE WITNESS: I don't know about the specifics on someone who is taking psychotropic medication, and I would say the same thing in terms of OC spray in our mentally ill patients.

BY MR. FATHI:

Q. So you've never seen a written policy that discusses that?

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: Again, I have not specifically reviewed any policy recently. I can't speak to whether or not there is one.

BY MR. FATHI:

Q. Doctor, are there are some psychotropic medications that can make people more susceptible to heat injury?

MS. ORCUTT: Form, foundation.

MS. BARNES: To what?

MR. FATHI: Heat injury.

THE WITNESS: I'd like to defer to psychiatry to answer that question, as that is slightly outside of my scope of practice.

BY MR. FATHI:

Foundation; Lacks personal knowledge, Rule 602

Witness's lack of knowledge is itself evidence. Witness was able to answer the question.

Defendants' Reply: The witness is a licensed psychologist, and prescription of medication is outside her scope of practice, Rule 602.

Foundation; Lacks personal knowledge, Rule 602

Witness's lack of knowledge is itself evidence. Witness was able to answer the question.

Defendants' Reply: The witness is a licensed psychologist, and prescription of medication is outside her scope of practice, Rule 602.

Q. So I'm entitled to the best of your knowledge. If you simply don't know, that's fine, but I'd like you to answer my question.

A. I don't know the specifics, but I know there are certain psychotropic medications that can be detrimental in high temperatures.

Q. Are you aware of any policy, either an ADC or Centurion policy, that people taking psychotropic medications have to be housed in areas with certain temperatures?

MS. ORCUTT: Form.

THE WITNESS: What was the beginning of the question?

BY MR. FATHI:

Q. Are you aware of any policy, either an ADC policy or Centurion policy, requiring people who are taking psychotropic medications to be housed in areas that are below a certain temperature because of the risk of heat injury?

A. Yes.

Q. Okay. Where is that policy written down?

MS. ORCUTT: Form.

THE WITNESS: I'm not sure of the specific policy and where it's written. I know that there is a policy that indicates that there's a certain temperature

belief, separate and apart from any conversation with an attorney, then you can answer that.

THE WITNESS: Can you rephrase the question?

BY MR. FATHI:

Q. Has anyone in Centurion leadership told you that Centurion is required to continue complying with the performance measures?

MS. ORCUTT: Form.

THE WITNESS: I don't know that anyone has said that we're required. We continue to meet those standards.

BY MR. FATHI:

Q. Has anyone in ADC leadership told you that Centurion is required to continue to comply with those performance measures?

MS. ORCUTT: Form.

THE WITNESS: I don't think so.

MR. FATHI: Okay. Let's take a five-minute break.

(Recessed from 1:24 p.m. until 1:31 p.m.)

BY MR. FATHI:

Q. Doctor, are you aware of any case in which OC spray has been used on someone who is classified as SMI?

A. Yes.

Q. Are you aware of any case in which OC spray has

Relevance, Rule 402; Waste of time, Rule 403

Defendants' compliance/ noncompliance with the Stipulation is relevant. Doc. 3921, Rules 401, 402, 403.

Defendants' Reply: the Stipulation is no longer in effect, and compliance with it as of July 16, 2021 is not relevant. Doc. 3921.

been used on someone who is using psychotropic medications?

A. Yes.

Q. Are you aware of any cases in which the mental health groups for people in max custody was cancelled because there wasn't sufficient custody staff?

MS. ORCUTT: Form.

THE WITNESS: Yes.

BY MR. FATHI:

Q. What facilities has that happened at?

MS. ORCUTT: Form.

THE WITNESS: I believe there's been situations at Florence, that they were unable to do group because there was not staffing.

BY MR. FATHI:

Q. Custody staffing?

A. Correct.

Hearsay, Rule 802

Q. Are you aware of that happening at any other complex?

MS. ORCUTT: Form.

Hearsay, Rule 802

THE WITNESS: I don't think so. Nothing specific comes to mind.

BY MR. FATHI:

Q. Are you aware of that ever happening at Eyman

MS. ORCUTT: Form.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

closed custody individuals who are still acute, but subacute and have the ability to be around others more frequently. And George Unit is going to be our most acute and typically houses max custody inmates.

BY MR. FATHI:

Q. All right. What about Quiet Unit?

A. Quiet Unit is where we house our people who are on suicide watch.

Q. Tell me about Baker Unit.

A. Baker Unit, due to COVID, changed to housing our COVID individuals.

Q. And when did that happen?

A. During COVID.

Q. Yes. No, I understand that, but when, approximately, did it start to be used as a COVID unit?

MS. ORCUTT: Form, foundation.

THE WITNESS: I was not there at the time, so I can't speak to the date.

BY MR. FATHI:

Q. So is it your testimony that Baker Unit is not -- is currently not functioning as a mental health unit?

MS. ORCUTT: Form.

THE WITNESS: Correct. We are currently utilizing it for watches and ADCRR has determined that it

Foundation; Lacks personal knowledge, Rule 602

Witness's lack of knowledge is itself evidence.

Defendants' Reply: Witness testified that she lacks personal knowledge of this event as required for her to testify regarding it, Rule 602.

is going to be for intake and COVID isolation -- or COVID quarantine.

BY MR. FATHI:

Q. Okay. But at one time, Baker was, in its entirety, a mental health unit. Correct?

MS. ORCUTT: Form.

THE WITNESS: Correct.

BY MR. FATHI:

Q. But that's no longer the case?

MS. ORCUTT: Form.

THE WITNESS: Correct.

BY MR. FATHI:

Q. Are there any mental health patients -- are there any people in Baker Unit for mental health reasons right now?

MS. ORCUTT: Form.

THE WITNESS: For individuals who are on mental health watch.

BY MR. FATHI:

Q. And how many of those would there be at a given time?

MS. ORCUTT: Form.

THE WITNESS: It depends on the institution's need for mental health watches at the time and if Quiet is full.

Hearsay, Rule 802

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

BY MR. FATHI:

Q. If -- go ahead. Sorry.

When you were at Phoenix, typically how many people were typically on watch in Baker Unit?

MS. ORCUTT: Form.

THE WITNESS: It would vary anywhere from four to 15.

BY MR. FATHI:

Q. Would it ever be less than four?

MS. ORCUTT: Form.

THE WITNESS: I think it's always possible, yeah. I don't know that it's -- I don't know the numbers, but it's possible.

BY MR. FATHI:

Q. Has there been more than 15?

MS. ORCUTT: Form.

THE WITNESS: Potentially. I would have to look at the numbers.

BY MR. FATHI:

Q. So where are the patients who used to be in Baker Unit for mental health purposes? Where are they now?

MS. ORCUTT: Form.

THE WITNESS: They're in either John, King, Quiet, or Ida.

Hearsay, Rule 802

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

THE WITNESS: The custody then evaluates the individual based on their security requirements and needs and to determine whether or not the individual would be appropriately placed there.

BY MR. FATHI:

Q. So does custody have the power to prevent a transfer that's been recommended by a mental health staff?

MS. ORCUTT: Form.

THE WITNESS: Yes, but we then continue to try to discuss the best needs of the patient and then potentially figure out what that is.

BY MR. FATHI:

Q. Right. But my question is, it can happen that the mental health staff wants to transfer this person to Phoenix and custody staff can say no because of security reasons; is that right?

MS. ORCUTT: Form.

THE WITNESS: That is correct.

BY MR. FATHI:

Q. Okay.

A. But we usually try to -- especially when it comes to going to Phoenix, I would say security works with us and I don't think that's ever been a situation where we said that someone can't go to Phoenix for

Waste of time and cumulative, Rule 403

Transfer to higher levels of care is at issue. Rule 401, 402. Not cumulative; questions were not previously answered. Rule 403.

Defendants' Reply: Cumulative of trial testimony from other witnesses.

Hearsay, Rule 802; Incomplete, Rule 106

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Testimony is complete as designated.

Hearsay, Rule 802; Incomplete, Rule 106

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

security concerns.

Q. So you don't remember it ever happening that there was a transfer to Phoenix that was presented by mental health staff but security said no?

MS. ORCUTT: Form.

THE WITNESS: Specifically to Phoenix, I can't think of an example.

BY MR. FATHI:

Q. How --

A. I was going to say I'm not sure. I can't say it's never happened, but I can't think of an example.

Q. How long does this whole process typically take?

MS. ORCUTT: Form.

THE WITNESS: The --

BY MR. FATHI:

Q. Let me be more specific. From the time that someone at Eyman says, "Let's transfer this person to Phoenix," to the time they physically end up in Phoenix, how long does that typically take?

MS. ORCUTT: Form.

THE WITNESS: It's going to -- we're going to evaluate a couple different things: If it's an immediate concern and we do not believe that Eyman is able to house them for -- due to not having adequate -- whatever it

might be, and need that inpatient care immediately, we are able to move them the same day.

BY MR. FATHI:

Q. Uh-huh. Right. But my question is, how long does it typically take, an average case?

MS. ORCUTT: Form.

THE WITNESS: In a typical case, anywhere from four days to a week.

BY MR. FATHI:

Q. What's the longest that you're aware of it ever taking?

MS. ORCUTT: Form.

THE WITNESS: The longest, a couple weeks, but it's been -- what --

BY MR. FATHI:

Q. Meaning two weeks?

A. Meaning two weeks. I can't think of any recent examples where it's taken longer.

Q. Can you think of any examples at all, recent or not, where the process has taken more than two weeks?

MS. ORCUTT: Form.

THE WITNESS: I can't speak to the past in the -- when it's taken longer. I believe in the past when we had COVID and COVID restrictions, it did take longer.

BY MR. FATHI:

Q. How long did it take under those circumstances?

MS. ORCUTT: Form.

MS. BARNES: Form, foundation.

THE WITNESS: I'd have to review the specifics but, again, we'd have to look at -- we had to look at COVID testing and ensure the safety for all the medical pieces of it.

BY MR. FATHI:

Q. Yes, I'm simply asking, what's the longest you remember it taking under COVID circumstances?

A. I don't know.

Q. Where is this process written down?

MS. ORCUTT: Form.

THE WITNESS: The process is written down in the mental health tech manual.

BY MR. FATHI:

Q. Are you aware of anyone ever being transferred to Phoenix as a result of advocacy from the ACLU or other counsel in the Parsons case?

MS. ORCUTT: Form.

THE WITNESS: You're asking specifically from the ACLU?

BY MR. FATHI:

Q. Or plaintiffs' counsel in the Parsons case, the

Relevance, Rule 402; Waste of time and cumulative, Rule 403; Rule 403; Court Order on Trial Day 4 re admission of Plaintiffs' Ex. 635

(see next page for response)

Relevance, Rule 402; Waste of time and cumulative, Rule 403; Court Order on Trial Day 4 re admission of Plaintiffs' Ex. 635

ACLU, The Prison Law Office, Arizona Center for Disability Law?

MS. ORCUTT: Form.

THE WITNESS: I can't think of any examples, no.

Relevant to deliberate indifference. Rules 401, 402. Not cumulative; questions were not previously answered. Rule 403.

BY MR. FATHI:

Q. So you can't think of an example where that's happened?

MS. ORCUTT: Form.

THE WITNESS: No. We look at everything based on the individual needs in terms of who needs the inpatient care.

Defendants' Reply: Whether a person was transferred to inpatient care based on correspondence from counsel is not evidence of deliberate indifference. Cumulative of trial testimony from other witnesses.

BY MR. FATHI:

Q. Did you work at all with Angela Fisher at the Phoenix facility?

MS. ORCUTT: Form.

THE WITNESS: Are you referencing the mental health employee?

BY MR. FATHI:

Q. Yes.

A. Yes, there was a brief time where I worked with her.

Q. Do you believe her to be a competent clinician?

MS. ORCUTT: Form.

MS. BARNES: Form and foundation.

THE WITNESS: I haven't worked with her in some time. In what capacity are you asking?

BY MR. FATHI:

Q. I'm asking, do you think she was competent at her job as a psych associate?

MS. ORCUTT: Form.

THE WITNESS: I do.

BY MR. FATHI:

Q. Do you believe she's a truthful person?

MS. ORCUTT: Form, foundation.

THE WITNESS: I believe she says what she believes is her truth, yeah.

BY MR. FATHI:

Q. Do you believe she's a truthful person?

MS. ORCUTT: Form.

MS. BARNES: Form, foundation.

THE WITNESS: Yes, I believe she speaks to what she believes is true.

BY MR. FATHI:

Q. If I wanted to know how many people had been transferred to Phoenix in the last -- let's say in September, how would I find that out?

MS. ORCUTT: Form.

THE WITNESS: I would not know. I don't know what was done previously before I took this role in terms

Foundation; Lacks personal knowledge, Rule 602

Witness's lack of knowledge is itself evidence.

Defendants' Reply: Witness testified that she does not have personal knowledge as required for her to testify on this matter, Rule 602.

Foundation; Lacks personal knowledge, Rule 602

Witness's lack of knowledge is itself evidence.

Defendants' Reply: Witness testified that she does not have personal knowledge as required for her to testify on this matter, Rule 602.

Incomplete, Rule 106; Waste of time and cumulative, Rule 403

Transfer to higher levels of care is at issue. Rules 401, 402. Not cumulative; questions were not previously answered. Rule 403. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Cumulative of trial testimony of other witnesses.

of any recordkeeping.

BY MR. FATHI:

Q. But you've been there since August, right, in this role?

A. Correct.

Q. So if you wanted to know how many people had been transferred into the Phoenix facility in September, how would you find out?

MS. ORCUTT: Form.

THE WITNESS: We have an admissions log of everyone who transfers in and out of every facility and we keep record of --

BY MR. FATHI:

Q. So you would just have to look at the log and manually count; is that right?

MS. ORCUTT: Form.

THE WITNESS: Correct.

MR. FATHI: Okay.

MS. ORCUTT: David, how much longer do you anticipate going? Because I believe we've gone over our four hours at this point.

MR. FATHI: I don't think we've gone over four hours of on-the-record time, but probably about 10 or 15 minutes.

MS. BARNES: Robin, can you let us know how

numbers fluctuate significantly. We have people going in and out on a regular basis.

BY MR. FATHI:

Q. Well, thank you very much, but my question is, is it typical that these units are not full?

MS. BARNES: Form.

MS. ORCUTT: Form. Asked and answered.

THE WITNESS: Then I would say based on whether or not they need to be an inpatient level of care, and in addition to that, there are individuals who are unable to house with other people, so in that case, we're unable to put five people in a cell. So, again, we individualize our treatment to every incarcerated patient.

BY MR. FATHI:

Q. Are there some people -- some patients who are ineligible for transfer to the Phoenix facility because of their security level or for some other reason?

MS. ORCUTT: Form.

MS. BARNES: Foundation.

THE WITNESS: In terms of mental health, we do not limit that. I'd have to defer to ADCRR in terms of their -- any security concerns.

BY MR. FATHI:

Q. Can someone who is classified max custody be transferred to the Flamenco unit?

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because she did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

MS. ORCUTT: Form.

THE WITNESS: Yes.

BY MR. FATHI:

Q. Can someone who is max custody be transferred to Aspen?

MS. ORCUTT: Form.

THE WITNESS: No.

BY MR. FATHI:

Q. So how long were you the clinical director at the Phoenix facility?

MS. ORCUTT: Form.

THE WITNESS: Approximately one year.

BY MR. FATHI:

Q. And during that one year, did it ever occur that the Phoenix -- sorry, the Flamenco unit was entirely full?

MS. ORCUTT: Form.

THE WITNESS: I guess you'd have to define "full."

BY MR. FATHI:

Q. At capacity.

A. Again, at capacity -- this is more based on clinical need, and some individuals require to not be housed with other people and so we take that into consideration.

Foundation; Lacks personal knowledge, Rule 602; Vague

Question is not "vague," and witness was able to answer.

Defendants' Reply: Witness lacks personal knowledge as to the numbers as required to testify regarding this matter, Rule 602.Vague as to "at capacity."

Q. You're not understanding my question. Every unit has a capacity. It can hold up to so many people. So did it ever happen during the year that you were clinical director at Phoenix that Flamenco Unit was at capacity?

MS. ORCUTT: Form.

THE WITNESS: Not that I'm aware of. I'd have to go back and review all the numbers.

BY MR. FATHI:

Leading

Leading is permissible with adverse witness, Rule 611.

Defendants' Reply: leading questions are not automatically permitted with a witness associated with an adverse party.

Q. And is that because the determination was made that there weren't people at other facilities who could benefit from placement at Phoenix?

MS. BARNES: Form.

MS. ORCUTT: Form.

THE WITNESS: So, again, we review everyone on a regular basis in terms of being able to come into the inpatient unit and level of need.

BY MR. FATHI:

Q. So if there's empty beds in the inpatient unit, that means you have determined that there aren't other people that need to be in that unit; is that correct?

MS. ORCUTT: Form.

THE WITNESS: I would say that that's -- we -- as long as we know that there's no one that needs that higher level of care -- if someone needs that higher

Leading (see above)

Defendants' Reply: see above.

level of care, we work to get them into Phoenix.

MR. FATHI: All right. Let me take just one minute with co-counsel, but I think we're almost finished.

All right. Because Dr. Pelton has been designated as an expert, we do reserve the right to depose her as an expert after she submits her report on October 22nd, but for now, we're finished.

And I thank you very much, Doctor.

MS. Orcutt: Thank you, Dr. Pelton.

THE WITNESS: Thank you.

MS. BARNES: She will read and sign.

THE REPORTER: Thank you.

MS. ORCUTT: Thank you.

(Proceedings concluded at 1:57 p.m.)

SIGNATURE PAGE

I, ASHLEY PELTON, Ph.D., a deponent exercising my right to read and sign my deposition taken on October 6, 2021, place my signature hereon and make the following changes on this _________day of____________________, 2021.

(IF THERE ARE NO CHANGES, WRITE "NONE.")

_________________________

ASHLEY PELTON, Ph.D.

| PAGE | LINE | READS | CHANGE TO | REASON |
|---|---|---|---|---|
| _____ | _____ | | | |
| _____ | _____ | | | |
| _____ | _____ | | | |
| _____ | _____ | | | |
| _____ | _____ | | | |
| _____ | _____ | | | |
| _____ | _____ | | | |
| _____ | _____ | | | |
| _____ | _____ | | | |
| _____ | _____ | | | |
| _____ | _____ | | | |
| _____ | _____ | | | |
| _____ | _____ | | | |
| _____ | _____ | | | |
| _____ | _____ | | | |

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

[X] Review and signature was requested.

[ ] Review and signature was waived.

[ ] Review and signature not required.

I FURTHER CERTIFY that I have complied with the ethical obligations set forth in the ACJA 7-206(F)(3) and ACJA 7-206(J)(1)(g)(1) and (2). Dated at Phoenix, Arizona, this 17th day of October, 2021.

ROBIN L. B. OSTERODE, RPR
CA CSR No. 7750
AZ CR No. 50695

* * * * *

I CERTIFY that Glennie Reporting Services, LLC, has complied with the ethical obligations set forth in ACJA 7-206(J)(1)(g)(1) through (6).

GLENNIE REPORTING SERVICES, LLC
Registered Reporting Firm
Arizona RRF No. R1035

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

vs.

David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities,

Defendants.

No. CV 12-00601-PHX-ROS

DEPOSITION OF JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ
(via videoconference)

October 28, 2021
9:00 a.m.
Houston, Texas

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130

602.266.6535
www.glennie-reporting.com

Prepared by:
Jennifer Honn, RPR
Arizona CR No. 50885

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

vs.

David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities,

Defendants.

No. CV 12-00601-PHX-ROS

DEPOSITION OF JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ
(via videoconference)

October 28, 2021
9:00 a.m.
Houston, Texas

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130

602.266.6535
www.glennie-reporting.com

Prepared by:
Jennifer Honn, RPR
Arizona CR No. 50885

# I N D E X

| WITNESS | PAGE |
|---|---|
| JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ | |
| Examination by Mr. Fathi | 4 |

## INDEX TO EXHIBITS

| Description | | Page |
|---|---|---|
| Exhibit 1 | Expert Report of John S. Wilson, PhD, CCHP-MH, CPHQ (13 pages) | 18 |
| Exhibit 2 | ADCRR Inmate Assault, Self-Harm, & Mortality Data FY 2022 as of 9/30/2021 (4 pages) | 64 |
| Exhibit 3 | E-mail from Tom Dolan 1/14/2020 Subject: Contract FTE v Recommended FTE ADCRR00111128 -111131 (14 pages) | 135 |
| Exhibit 4 | (Not marked.) | |
| Exhibit 5 | (Not marked.) | |
| Exhibit 6 | (Not marked.) | |
| Exhibit 7 | Excerpt: Deposition of Stefanie Platt, PsyG (7 pages) | 137 |
| Exhibit 8 | Defendants' Third Supplemental Pretrial Disclosure Statement | 116 |
| Exhibit 9 | Mortality Review Committee Final Report ADCRRM0026203 -26206 | 90 |
| Exhibit 10 | Mortality Review Committee Final Report ADCRR00000106 -109 | 96 |

DEPOSITION OF JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ
(via videoconference)

The deposition of JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ was taken on October 28, 2021, commencing at 9:00 a.m., via videoconference, the witness appearing in Houston, Texas, before JENNIFER HONN, a Certified Reporter, Certificate No. 50885, for the State of Arizona.

APPEARANCES:

For Deponent:

BROENING OBERG WOODS & WILSON
Sarah L. Barnes, Esq.
2800 North Central Avenue
Suite 1600
Phoenix, Arizona 85004
Slb@bowwlaw.com

For Plaintiffs:

ACLU NATIONAL PRISON PROJECT

David C. Fathi, Esq.
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Dfathi@aclu.org

Corene Kendrick, Esq.
39 Drumm Street
San Francisco, California 94111
Ckendrick@aclu.org

For Defendant:

STRUCK LOVE BOJANOWSKI & ACEDO, PLC
Ashlee B. Hesman, Esq.
3100 West Ray Road
Suite 300
Chandler, Arizona 85226
Ahesman@strucklove.com

JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ, called as a witness herein, having been first duly sworn by the Certified Reporter to speak the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. FATHI:

Hearsay, Rule 802; Relevance, Rule 402

Q. Would you state and spell your full name for the record, please?

A. S, as in Sam, Wilson. That's not my middle name; it's S-e-d-d-o-n. The last name is spelled W-i-l-s-o-n, and the first name is spelled J-o-h-n.

Q. And have you ever been known by any other name?

A. No.

Q. Dr. Wilson, my name is David Fathi, and with my colleagues I represent the plaintiff class in the Parsons versus Shinn litigation.

Have you ever had your deposition taken before?

A. No.

Q. Well, then let me go over few of the -- the ground rules.

Everything is being taken down by the court reporter, and so as she said, that means that only one of us can talk at a time. So even though in everyday

conversation we sometimes do talk over each other, interrupt each other, please try not to do that here.

Try not to speak over me, and by the same token, I will try not to speak over you.

You need to answer audibly and verbally. The court reporter can't take down nods of the head or shakes of the head, uh-huh or huh-uh. So please, again, give audible and verbal responses.

The lawyers may make objections throughout the deposition. In most cases those are just for the record, and you need to answer the question. The only exception is if the lawyer instructs you not to answer.

Who is representing you here today, Doctor?

A. Sarah Barnes.

Q. Okay. I try to ask clear questions, but I don't always succeed. So if you don't understand a question I'm asking, please let me know, and I will rephrase or clarify.

If you need a break at any time, just let me know. The only rule is if there's a question pending, you need to answer the pending question before we take a break.

And, finally, even though we are all in our respective locations, you are testifying today under oath, under penalty of perjury, just as if you were

testifying in court.

A. I understand.

Q. Do you have any questions?

A. Not at this time.

Q. Is there any reason why you cannot give full and truthful testimony today?

A. No.

Q. As I mentioned earlier, we are not all in the same room as we used to be until recently. So that has a couple of implications, too.

First of all, I think you -- you said that you are in Houston, Texas, today?

A. That is correct.

Q. Is anyone else in the room with you?

A. No one is in the room with me.

Q. If anyone else does come into the room, will you please let me know?

A. I will.

Q. And are -- are you looking at anything other than the Zoom screen right now? Do you have documents? Do you have another program open? Do you have your phone, e-mails, texts, anything of that nature?

A. I was told not to, and I need to turn off a screen that has my e-mail up. So I'll do that now. I have two screens and now only have one, the Zoom.

And the only other thing that I have in front of me is my report and the printout of that.

Q. That will actually make things more convenient.

So please don't -- while we are on the record please don't consult anything else, e-mail, texts, computer, no oaths -- well, I guess it would be difficult for you to communicate with Ms. Barnes under the circumstances. But those things are fine at the break, but not when we're on the record, okay?

A. I understand.

Q. All right. So, again, please don't communicate with -- with anyone else besides me while we are on the record. So no e-mail, texts, anything of that nature. Okay?

A. I understand.

Q. Okay. Doctor, did you review any documents to prepare for this deposition today?

A. Yes.

Q. What did you review?

A. I reviewed Dr. Stewart's report that was submitted to the court. Dr. Penn's report. Mr. Joy's report. And I reviewed a portion of another report by defendants' medical expert. I apologize. I've forgotten his name.

Q. Would that be Dr. Murray?

A. Dr. Murray, yes.

Q. All right. Any other documents you reviewed to prepare for this deposition?

A. To prepare my report, I did review additional documents.

Q. All right. We'll get to that in a little bit. Okay? Right now I'm just asking specifically to prepare for this deposition.

A. No other.

Q. All right. Did you review the report of plaintiff's expert, Dr. Craig Haney?

A. No.

Q. And about how long did you spend reviewing those documents in preparation for your deposition?

A. Four to six hours. Something like that.

Q. Have you reviewed any of the depositions that have been taken in this case?

A. I have not.

Q. Have you reviewed any medical records of Arizona state prisoners?

A. In preparation for today?

Q. Correct.

A. No.

Q. Did you communicate with anyone to prepare for this deposition? And I'm defining that to include any

communication, phone, Zoom, e-mail, text, any communication at all?

A. I had several communications with Ms. Barnes as well as with our associate general counsel, Ms. Mull.

Q. Could you spell that last person's name, please?

A. Last name is spelled M as in mother, u-l-l.

Q. And her first name?

A. Aynsley, A as in apple, Y as in yellow, N as in no, S as in Sam, l-e-y.

Q. All right. Thank you. Did you communicate with anyone else in preparation for this deposition besides Ms. Barnes and Ms. Mull?

A. Part of those discussions included Dr. Johnny Wu, who is our chief clinical officer for Centurion.

Q. Anyone else?

A. No.

Q. All right. Now I'm not asking you about the substance of those conversations, but I would like you to tell me approximately when they happened and approximately how long they lasted?

A. They have all taken place, I want to say, in the last 10 days. And that may even be too long. I would have to refresh my memory with my -- by reviewing my calendar, which isn't available to me, to be certain.

And -- oh, I apologize. I apologize. I do

remember with Ms. Barnes, I had one additional conversation with her and with the attorney for the DOC, Dan --

Q. Would that be Dan Struck?

A. Dan Struck, yes.

Q. All right.

A. I apologize.

Q. That's quite all right. Anyone else that you have communicated with in preparation for this deposition?

A. Not that I remember, no.

Q. Okay. And you think all of these communications occurred within approximately the last 10 days?

A. I do.

Q. And how many separate communications were there?

A. There have been two or three phone calls or Zoom meetings and some back and forth e-mail. So there might have been half a dozen, maybe.

Q. Okay. And about, collectively about how long did all of those Zooms and phone calls last?

A. Perhaps two hours.

Q. Two hours total?

A. Yes, sir.

Q. And was one or more of the lawyers that you've mentioned participating in all of those phone --

A. Yes.

Q. -- and Zoom calls?

A. Yes.

Q. Again, just -- I -- you knew where I was going, but try not to talk over me because that makes it hard for the court reporter. Okay?

A. Yes.

Q. All right. And the e-mails, was one or more of the lawyers we've discussed on each and every one of those e-mails?

A. Yes.

Q. Are you familiar with Dr. Joseph Penn?

A. I know who he is.

Q. Who is he?

A. Well, he is a correctional psychologist with decades of experience. I believe he has a leadership role in the Texas Department of Corrections. I know he had a leadership role in NCCHC. I've seen him give presentations.

And I have participated in one meeting with him, probably in the last year, in which clinical care was discussed, unrelated to Arizona. Just standards of practice.

Q. Has Centurion ever retained Dr. Penn or had any other kind of financial relationship with him?

MS. HESMAN: Form. Foundation.

MS. BARNES: Foundation.

THE WITNESS: I'm sorry. I missed what was said.

Q. (By Mr. Fathi) Has Centurion ever retained Dr. Penn or had any other kind of financial relationship with him?

MS. HESMAN: Same objection.

MS. BARNES: Same objection. And you can go ahead, Dr. Wilson. We just have to preserve those objections for the record.

THE WITNESS: Not to my knowledge. I know of no financial arrangement with him.

Q. (By Mr. Fathi) So to your knowledge Centurion has never hired Dr. Penn or compensated him in any way?

A. That is correct.

MS. BARNES: Same objection.

Q. (By Mr. Fathi) Have you ever had any communication with Dr. Penn about this case?

A. No.

Q. Have you ever exchanged any documents with Dr. Penn in connection with this case?

A. No.

Q. Do you have any plans to meet with Dr. Penn in connection with this case?

Hearsay, Rule 802; Relevance, Rule 402

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial. Relevant to establish the witness's qualifications, Rule 402.

A. I do not.
Q. Doctor, do you hold any professional licenses?
A. Yes.
Q. And what are they?
A. I'm licensed in the state of Virginia as a clinical psychologist. That's an active license. I have an inactive license in New York state as a psychologist.
Q. And have you ever held any other professional license in any state?
A. Not a license, no.
Q. When you say "not a license," were you thinking of something else?
A. I am certified as a correctional healthcare professional with NCCHC and I also hold certification as a professional -- professional in healthcare quality.
Q. Okay.
A. But not a license.
Q. Thank you. Have you ever been subject to suspension or revocation of your license, a public or private reprimand or any other form of professional discipline by a licensing body?
A. I have not.
Q. Have you ever been convicted of a felony?
A. I have not.
Q. Have you ever testified in court?

A. I have.
Q. Tell me about that. How many times?
A. To the best of my recollection, two or three times.
Q. And when were those?
A. To the best of my recollection, the most recent was in 2005 or perhaps 2006.
Q. All right. Let's start with that one. What was that case about?
A. That was a civil proceeding seeking judicial authorization for involuntary treatment for a patient who was suffering from schizophrenia.
Q. Was that patient incarcerated?
A. No.
Q. And where was this?
A. In Virginia.
Q. And how did you come to testify about -- in this proceeding?
A. I was the treating psychologist.
Q. All right. What about the time before that?
A. I -- I would have -- this would have been 1995, and would -- I would have been a psychology intern with the bureau of prisons.
And it was a judicial proceeding to determine whether a patient met criteria of being found not guilty

by reason of insanity. That patient was incarcerated.

Q. And where -- where was this?

A. The patient was incarcerated in North Carolina, and the testimony, I believe, was in Richmond, Virginia.

Q. Was the patient at the Butner facility?

A. Yes.

Q. And then you said two or three. Was there a time before the 1995?

A. Well, no. Not before. But what I have recalled while I've been talking is that, in fact, the state psychiatric hospital that I worked in in Virginia had a court on the premises that met three times a week for their proceedings. And I failed to recall that, so I need to amend my initial answer.

And I -- I testified at most of those proceedings as the treating psychologist for civil commitment. So that would have been three times a week for a couple years. During the time period of 1994 to '6.

Q. Okay.

A. No, I apologize. 2004 to 2006.

Q. Okay. So with your recollection now, how many times would you say you have testified in court?

A. Well, that would have involved somewhere in the neighborhood of two to four patients -- two or four

cases, maybe -- maybe even six a week for a couple years.

So I'd have to do the math by -- by hand to give you a calculation there. But I think it's fair to characterize that as multiple dozens of times.

Q. Well, indeed, if it's six times a for two years that comes out to approximately 600. So would it be fair to say hundreds?

A. Hundreds, yeah.

Q. Okay. All right. And in all of the cases that you've discussed, did you testify as an expert witness or a lay witness?

MS. HESMAN: Form. Foundation.

THE WITNESS: So expert in the involuntary treatment trial. I believe the court didn't, because of my internship status, did not find me to be an expert in that ERI trial in Virginia.

And I apologize, I don't recall being characterized one way or the other. I certainly wasn't a lay witness or a fact witness. I was a treating provider in the civil commitment hearings that I testified for.

Q. Okay. Thank you.

Other than the cases that you've just described, have you ever filed a declaration or an affidavit in court?

MS. HESMAN: Form. Foundation.

THE WITNESS: Can I ask a clarifying question?

Q. (By Mr. Fathi) Of course.

A. Would that involve -- would that include things like power of attorney, durable power of attorney for my parents or something like that?

Q. I think it technically would, but I'm not really interested in that. I'm asking primarily about your experience as a psychologist and your experience with Centurion.

So with that clarification, other than the cases that we've discussed, have you ever filed a declaration or an affidavit in court?

MS. HESMAN: Same objection.

THE WITNESS: No, I have not.

Q. (By Mr. Fathi) Have you ever been named as a defendant in a lawsuit?

A. Yes.

Q. How many times?

A. To my knowledge and recollection, once.

Q. Tell me about that.

A. This occurred while I was chief psychologist at the Central New York Psychiatric Center in upstate New York. It was filed by an incarcerated patient. And I was named as a defendant as chief psychologist.

Q. And when was that?
A. Probably 2002 or 2003.
Q. Was the case in state or federal court?
A. I don't recall.
Q. What was the name of the -- the plaintiff, the person who filed the case?
A. I don't recall. I certainly remember the name of the patient.
Q. I'm sorry. That's what I meant. Who was the patient involved?
A. Am I permitted to disclose that? This was a -- I guess I am.
Q. If it was in a -- in a public court filing, then it's no longer confidential.
A. Okay. Very good. Archie Bristol, B-r-i-s-t-o-l.
Q. S-t-o --
A. L.
Q. Bristol, okay. Thank you.
And to your recollection that's the only time you've been named as a defendant in a lawsuit?
A. Yes, sir.
Q. Okay. Let's look at Exhibit 1, please.
(Deposition Exhibit 1 was marked for identification.)

Q. (By Mr. Fathi) Doctor, Exhibit 1 -- excuse me -- is your report so you can look at it on the screen or the copy in front of you.
A. Very good.
Q. Pardon me. Doctor, is Exhibit 1 your expert report in this case?
A. Yes.
Q. And at the end, there's a document that you've appended -- appended as Exhibit A. Would you turn to that, please?
A. Yes.
Q. And this is a one-page document. Was this intended to be a one-page document?
A. Yes.
Q. What is Exhibit A?
A. This is a compressed, brief C.V. that captures my essential and recent work experience, education and recent publications and presentations.
Q. Did you prepare this document?
A. I did.
Q. And when did you prepare it?
A. I updated it in preparation for today's deposition. And I have kept a one-page C.V. relatively up to date for some number of years.
Q. So is it your testimony that a prior version of

this one-page document existed and then you updated it for this deposition?

A. Yes.

Q. As of today, is this Exhibit A a complete and accurate account of your educational and professional background?

A. Yes.

Q. Is there anything that you would like to change as we sit here today?

A. There is nothing. If there's questions about my background I'd be glad to elaborate.

Q. Will you turn to page 1 of your report, please?

A. Yes.

Q. Now, on page 1 in the third paragraph, you write, "A short form of my curriculum vitae is attached as Exhibit A."

Do you see that language?

A. I do.

Q. Do you have another, longer version of your C.V.?

A. Not that is current.

Q. So why did you not attach the longer version of your C.V.?

A. Because it's not -- it hadn't been updated in years. It would take a lot of time for me to update

that.

Q. What kind of information is included in the longer version of your C.V. that is not in the short version that is Exhibit A?

A. It would include many more workshops and presentations or training that I've done over the years.

Q. Anything else?

A. No.

Q. All right. Back to Exhibit A, please. Do we need it on the -- okay. There it is.

At the bottom of this document, there's a heading, "Most Recent Presentations and Workshops." Do you see that?

A. I do.

Q. And the oldest entry here is August of 2020. Do you see that?

A. I do.

Q. Is this a complete list of all the presentations and workshops you've done since August of 2020?

MS. BARNES: Form.

THE WITNESS: There is one workshop that's coming up at the upcoming NCCHC conference that I failed to list here.

Q. (By Mr. Fathi) Okay. But that hadn't happened yet?

A. No.

Q. Other than that, is this a complete account of all your workshops and presentations since August of 2020?

A. I gave an additional training in the summer of 2021 on suicide risk assessment and prevention in corrections to the Georgia Department of Corrections. And I apologize; that's missing.

Q. Anything else missing? Any other presentations and workshops you've given since August 2020 that are not listed here?

A. To be certain of my answer, I would really have to check my records.

Q. But as you sit here today, can you recall any other presentations and workshops since August of 2020 that are not listed here?

A. There are additional staff training sessions that I have done around the country, but I don't typically list those on my C.V.

Q. If we looked at your longer version of your C.V. they wouldn't appear on that document?

A. No.

Q. And why did you not list the Georgia workshop on this document?

A. It was a failure of time and memory.

Q. You have a Ph.D. in clinical psychology, is that right?

A. Yes, sir.

Q. And in the course of earning that degree, did you write a dissertation?

A. I did.

Q. What was the topic?

A. The topic was on schizotypy or -- and the relationship between past vulnerability and attentional functioning, the function of attention, and the function of interpersonal attachment.

Q. Okay. Back to your -- back to your resume, please. Doctor, on your resume under "Recent Publications," you list seven publications. Do you see that?

A. I do.

Q. Are these all the publications you have authored in the last 10 years?

A. They are.

Q. So there are no other publications in the last 10 years that are not listed here; correct?

A. Correct.

Q. Do you have any other publications in process?

A. I do.

Q. Could you tell me about them?

A. I have an additional paper that's under review with colleagues that continues the work on suicide prevention. And that has been submitted and it's under review.

And then there is a final paper that's in preparation on the same topic.

Q. Any other publications that you currently have in process?

A. No, sir.

Q. Of the seven publications listed on your C.V., how many were published in peer-reviewed journals?

A. Four.

Q. And which ones are those?

A. They are Boren, Folk, et al.

Q. Okay.

A. Disabato, Folk, et al.; Folk, Disabato, et al., and Folk, Loya, et al.

Q. Okay. According to your resume you have been vice president of behavioral health services for Centurion since 2020. Is that correct?

A. Yes.

Q. And what month did you start that position?

A. April.

Q. April of 2020?

A. Yes.

Relevance, Rule 402
Witness's involvement with AZ contract is relevant. Rule 401, 402

Defendants' Reply: Witness's involvement prior to Centurion being awarded the contract is not relevant to any fact of consequence, Rule 402.

Q. And before that you were vice president of clinical development from 2014 to 2020. Is that right?
A. Yes.
Q. In that position, did you have any involvement with the Arizona contract?
A. I helped develop Centurion's proposals for two cycles of RFP.
Q. I'm sorry. Just a minute, Doctor. I'm hearing some extraneous noise. Do we know what that is?
A. I heard it, too.
MS. BARNES: I'm not sure what you heard. I didn't hear anything. There's somebody that's a little bit loud outside my office. Do you hear talking?
THE WITNESS: Yes.
MS. BARNES: Hold on one second.
Yet another Zoom going on next door. Sorry. The world of Zoom.
MR. FATHI: Thank you.
Q. (By Mr. Fathi) Doctor, just so the record is clear, I'm going to re-ask my question. As VP of clinical development, did you have any involvement with the Arizona contract?
A. Yes.
Q. And what was that involvement?
A. I helped develop the proposals that Centurion

Relevance, Rule 402
See below.

Cumulative, Rule 403
See below.

Cumulative, Rule 403
See below.

Relevance, Rule 402

Foundation, Rule 602

Witness's involvement with AZ contract is relevant. Rule 401, 402. Not cumulative; questions were not previously answered. Rule 403. Witness was able to answer the questions. Rule 602.

Defendants' Reply: Witness's actions prior to the award of the contract to Centurion are not relevant to any fact of consequence, Rule 402. Cumulative of testimony at 25:1-7. Witness lacks recall of the timing of the prior RFP process as required to testify regarding the matter, Rule 602.

submitted in response to two requests for proposals from the Department of Corrections.

Q. And when -- when were those proposals submitted?

A. I would have to refresh my memory by looking at documents. But to the best of my -- sitting here today, 2016, 2018.

Q. And was the 2018 proposal the one that led to Centurion beginning the contract on July 1, 2019?

A. Yes.

Q. What was your role in developing that proposal?

A. I assisted with technical language to address the clinical requirements that were laid out in the requests for proposals.

Is that a clear answer?

Q. Yes. Was there anything else?

A. My recollection is that with the first proposal that was not successful, I had involvement with staffing proposal considerations.

Q. Thank you. Did you have any involvement with staffing considerations in the 2018 or 2019 proposal?

A. Again, I would have -- have to refresh my memory by looking at documents, but my memory is that the 2018 or '19 RFP may have laid out for us what staffing needed to be provided.

The DOC may have actually mandated that. And if

Relevance, Rule 402

Foundation, Rule 602

Witness's involvement with AZ contract is relevant. Rule 401, 402 Witness was able to answer the questions. Rule 602.

Defendants' Reply: Witness testified that he does not recall these discussions as required to testify regarding them, Rule 602. Witness is speculating due to his lack of recall, and such speculation does not make any fact of consequence more or less probable, Rule 401, 402.

that memory's correct, and I -- I can't be sure, then any discussions that I had around Centurion staffing would have been limited to the implications of that mandated staffing for clinical care and considerations for a regional office leadership staffing.

Q. Do you have any recollection of those discussions as you sit here today?

A. I'm fairly confident they had discussions around the regional office staffing. There may have been a number of positions that were considered or felt to be needed and added. But I don't have specific memories.

Q. And who were those discussions with?

A. They would have been with senior members of our operations team and our business development team.

Q. And what are the names of those people?

A. Rebecca Leuthy. Do you want me to spell?

Q. I think the court reporter would appreciate it.

A. L-e-u-t-h-y. Robert May. Rock Welch. Julie Buehler, spelled B-e-u-h-l-e-r.

And there may have been other participants in those discussions, but those would have been the four key folks.

Q. Was Steve Wheeler involved?

MS. BARNES: Form and foundation.

THE WITNESS: Your question is was Steve

Relevance, Rule 402

Foundation, Rule 602

Hearsay, Rule 802

Witness's involvement with AZ contract is relevant. Rule 401, 402 Witness was able to answer the questions. Rule 602. Rule 801(d)(2) non-hearsay statement of opposing party/ agent.

Defendants' Reply: Witness testified that he does not recall these discussions as required to testify regarding them, Rule 602. Witness is speculating due to his lack of recall, and such speculation does not make any fact of consequence more or less probable, Rule 401, 402. Rule 801(d)(2) does not apply here because Centurion is not an opposing party and was not an agent of ADCRR at the time of these purported discussions, Rule 801(d)(2)(D).

Wheeler involved in discussions around staffing the regional office?

Q. (By Mr. Fathi) Correct.

MS. BARNES: Same objection.

THE WITNESS: I apologize. I don't have a memory one way or the other. It is possible.

Q. (By Mr. Fathi) And tell me about the substance of these discussions around staffing a regional office?

A. I wish I could. I apologize. My -- my challenge is that during that time period, I had multiple discussions about multiple projects. And it is very difficult three years later to recall specifics about a specific proposal.

I believe the gist in Arizona had to do with ensuring that we had enough regional resources to manage the complex requirements of the contract.

And specifically around the contract monitoring that was required with the hundreds of performance measures. The -- I think there may have been questions around information, there we go, information technology and the need for interfaces that enabled automated reporting to occur.

And just adequate oversight management of service delivery in complexes.

So I am reconstructing all of that based on

Relevance, Rule 402

Foundation, Rule 602

Witness's involvement with AZ contract is relevant. Rule 401,402. Witness was able to answer the questions. Rule 602.

Defendants' Reply: Witness does not have recall as required to testify regarding this matter, Rule 602. Witness is speculating due to to his lack of recall, and such speculation does not make any fact of consequence more or less probable. Rule 401, 402.

Relevance, Rule 402

Witness's involvement with AZ contract is relevant. Rule 401, 402

Defendants' Reply: Witness was designated as an expert to testify regarding a specific subset of topics, none of which required review of individual inmate healthcare records, making this line of questioning irrelevant, Rule 401, 402.

probabilities. I don't have specific memory of specific content.

Q. Other than what we've discussed, did you have any role in discussions around staffing for the 2018 Arizona proposal?

A. Not that I can recall.

Q. Does your current position as VP of behavioral health involve providing direct patient care to incarcerated people?

A. No.

Q. Does your current position involve reviewing the healthcare records of incarcerated people?

A. To a limited degree.

Q. Tell me about how your current position involves reviewing the healthcare records of incarcerated people.

A. There are two ways in which it may.

One is if I'm called upon to participate in a quality review process potentially for examining our readiness for NCCHC accreditation or adherence to national standards.

And the other is if I'm called to assist in providing patient-specific consultation for a difficult, challenging patient where staff are scratching their heads and don't -- don't know how to make further progress with a patient.

Relevance, Rule 402

Foundation, Rule 602

Witness's involvement with AZ contract is relevant. Witness was able to answer the questions. Rule 602.

Defendants' Reply: Witness was designated as an expert to testify regarding a specific subset of topics, none of which required review of individual inmate healthcare records, making this line of questioning irrelevant, Rule 401, 402. Witness lacks recall of specifics regarding his review of inmate records, as required to testify regarding this matter, Rule 602.

Q. When was the last time you reviewed the medical record of a person incarcerated in Arizona?

A. May I consult my report?

Q. Of course.

A. After reviewing my report, I believe the last time that I reviewed patient care records in Arizona was earlier this year, as part of a team that was preparing the Yuma complex for NCCHC accreditation.

I would have to review my calendar to give you a month or a date.

Q. Can you give me a season? Winter, spring?

A. The spring.

Q. So perhaps March, April?

A. Yeah.

Q. So I take it you have not reviewed any Arizona patient records in connection with this litigation?

A. I have not.

Q. Did your -- I'm sorry. About how many hours in an average week would you say you spend reviewing Arizona patient records?

A. I think the average would be zero.

Relevance, Rule 402

Witness's involvement with AZ contract is relevant. Rule 401, 402

Defendants' Reply: Witness was designated as an expert to testify regarding a specific subset of topics, none of which relate to his provision of direct patient care to inmates, making this line of questioning irrelevant, Rule 401, 402.

Q. Did your prior position at Centurion as VP of clinical development involve providing direct patient care to incarcerated people?

A. It did not.

Relevance, Rule 402

Witness's involvement with AZ contract is relevant. Rule 401, 402

Defendants' Reply: Witness was designated as an expert to testify regarding a specific subset of topics, none of which required review of individual inmate healthcare records, making this line of questioning irrelevant, Rule 401. 402.

Q. Did it involve the review of medical records of incarcerated people?

A. Yes.

Q. And please tell me about that.

A. It was, again, occasional. And either involved quality improvement reviews, accreditation readiness. Or very rarely, but occasionally, once a year or so, consultation of patient-specific treatment concerns.

Relevance, Rule 402

Witness's involvement with AZ contract is relevant. Rule 401, 402

Defendants' Reply: Witness was designated as an expert to testify regarding a specific subset of topics, none of which relate to direct patient care, making this line of questioning irrelevant, Rule 401, 402.

Q. Doctor, when was the last time you had a job that involved providing correct -- excuse me -- direct patient care?

A. 2006.

Q. And was that when you were at Southwestern Virginia Mental Health Institute?

A. It was.

Q. Have you ever had a job that involved on a routine basis providing direct patient care to incarcerated people?

A. I have.

Q. And when was that?

A. That was at Central New York Psychiatric Center, which is a state hospital operated by the Office of Mental Health, but it only treats incarcerated patients.

Q. And what time period was that?

A. Approximately 2002, 2004. I'll have to look at

Relevance, Rule 402

Waste of Time, Rule 403

Witness's involvement with AZ contract is relevant. Rule 401, 402 Not cumulative; questions were not previously answered. Rule 403

Defendants' Reply: Witness was designated as an expert to testify regarding a specific subset of topics, none of which relate to direct patient care, making this line of questioning irrelevant, Rule 401, 402. Defendants did not object on the basis of cumulative testimony.

that.

Q. And since that position, have you had a job that involved on a regular basis providing direct patient care to incarcerated people?

A. No. Primarily I've been working administratively.

Q. Doctor, in what city and state do you reside?

A. I reside in Houston, Texas.

Q. And in what city and state is your office?

A. Our corporate office is in Vienna, Virginia. I work from home.

Q. I see. As do many of us right now. So you work from your home in Houston?

A. I do.

Relevance, Rule 402

Waste of Time, Rule 403

Witness's personal knowledge of AZ prisons and AZ contract is relevant. Rule 401, 402, 403. Not cumulative; questions were not previously answered. Rule 403

Defendants' Reply: Witness was designated as an expert to testify regarding a specific subset of topics, none of which relate to his tours of ADCRR facilities, making this line of questioning irrelevant, Rule 401, 402. Defendants did not object on the basis of cumulative testimony.

Q. When was the last time you were inside an Arizona prison?

A. It was either March 2021 when I helped provide consultation and training at Florence and Tucson, or a little later at Yuma with the NCCHC survey prep review.

Q. Okay. So just so I understand, your testimony is that you were at -- you were inside the Florence and -- I'm sorry, which --

A. Tucson.

Q. And Tucson prisons in March of 2021. And also inside the Yuma prison possibly a little bit later than

Relevance, Rule 402

Waste of Time, Rule 403

Witness's involvement with AZ contract is relevant. Rule 401, 402, 403.

Relevance, Rule 402

Waste of Time, Rule 403

Witness's personal knowledge of AZ prisons and AZ contract is relevant. Rule 401, 402, 403.

Relevance, Rule 402,

Waste of Time, Rule 403

Witness's personal knowledge of AZ prisons and AZ contract is relevant. Rule 401, 402, 403

Defendants' Reply: Witness was designated as an expert to testify regarding a specific subset of topics, none of which relate to his tours of ADCRR facilities, making this line of questioning irrelevant, Rule 401, 402.

Defendants' Reply: Witness was designated as an expert to testify regarding a specific subset of high-level topics, making this line of questioning irrelevant, Rule 401, 402.

that?

A. Either earlier or later, but it was 2021.

Q. Okay.

A. First half.

Q. About the same time?

A. Yeah.

Q. Okay. When was the last time you were physically in the state of Arizona?

A. For work?

Q. For -- yes, let's start with that.

A. It would have been on one of those visits that I just indicated.

Q. Okay. Are you the direct supervisor of any Centurion employees who work in Arizona?

A. No.

Q. In an average week about how much of your time do you spend on the Arizona contract?

A. I'd like to answer that differently.

Q. All right.

A. Because asking for an average washes out the variability, which can be very substantial.

Some weeks I spend no time at all with my attention on Arizona. And there have been other weeks when most of my time, 90 percent has been focused on Arizona.

Relevance, Rule 402

Waste of Time, Rule 403

Witness's personal knowledge of AZ prisons and AZ contract is relevant. Rule 401, 402, 403

Defendants' Reply: Witness was designated as an expert to testify regarding a specific subset of high-level topics, making this line of questioning irrelevant, Rule 401, 402.

So most weeks in the last year I have not been focused on Arizona.

Q. Since let's say the middle of July of this year, give me an average, or, if you prefer, give me a range of how much time per week you spent on the Arizona contract.

MS. BARNES: Form.

THE WITNESS: Perhaps one.

Q. (By Mr. Fathi) I'm sorry, say again, please.

A. I'm sorry. Perhaps one to two hours a week on average.

Q. And you say on page 1 of your report that -- I'm sorry. Why don't we bring it up so everyone can see.

So, Doctor, on page 1 of your report in the penultimate paragraph you say that, "Centurion has correctional healthcare programs in 13 state correction systems and four county detention systems across the United States."

Is that correct?

A. It's 13 or 14, yeah. It is correct.

Q. And according to your report, you are responsible for providing clinical consultation, guidance and leadership across all of those programs; correct?

A. Yes.

Q. While we're here let's go up to the previous paragraph. And in the final sentence of that paragraph,

you say, "I have not been compensated for the preparation of this report other than my regular salary."

Do you see that, Doctor?

A. I do see that.

Q. And that is correct?

A. Absolutely correct.

Q. Has Centurion been compensated in any way for this report or for your work in connection with this case?

MS. BARNES: Form and foundation.

MS. HESMAN: Form. Foundation.

THE WITNESS: Not to my knowledge.

Q. (By Mr. Fathi) Okay. Have you ever personally spoken to an incarcerated person in Arizona?

A. Yes.

Q. When was the last time that happened?

A. It would have either been at Tucson or Yuma.

Q. So in March of 2021?

A. Yes.

Q. And when was the last time before that that you personally spoke to a person incarcerated in Arizona?

A. There was not a prior time.

Q. So that was the only time?

A. Yes.

Q. Okay. So as we've discussed, Doctor, Exhibit 1

Relevance, Rule 402

Waste of Time, Rule 403

Witness's personal knowledge of AZ prisons and AZ contract is relevant. Rule 401, 402, 403.

Defendants' Reply: Witness was designated as an expert to testify regarding a specific subset of high-level topics, none of which require him to have had conversations with individual inmates, making this line of questioning irrelevant, Rule 401, 402.

is -- is your report. Did you write this report?

A. I did.

Q. Did you write it in its entirety?

A. Yes.

Q. So no one else drafted any part of it?

A. There -- there was a frame for the report that I was given. But the specific wording is mine.

Q. And what did that frame look like?

A. It -- it structured the order, and I did receive some specific wording changes from counsel. But essentially I was asked to address my current role and responsibilities. It's the Roman numerals that you see in front of you.

Q. So was the frame, was it sort of an outline?

A. Yes.

Q. And about how -- how much text was that? One page, two pages?

MS. BARNES: Objection.

MS. HESMAN: Objection.

MS. BARNES: I'm going to interject here, David. This is delving into an area that you're not entitled to. You're not entitled to anything related to the drafts of these reports. And the questions are going in that direction so I'm going to ask you to move along.

Q. (By Mr. Fathi) Doctor, about how long was the

frame that you were given?

MS. BARNES: Same objection. I'm going to instruct him not to answer.

Q. (By Mr. Fathi) And, Doctor, who gave you that frame?

MS. BARNES: Same objection and same instruction.

Q. (By Mr. Fathi) Doctor, who gave you the specific wording changes that you referred to?

MS. BARNES: Again, same instruction. You're not entitled to that information. Not only under the rule related to the expert report drafts, but you're also now encroaching into the attorney work product privilege, so I'm going to instruct him not to answer.

Q. (By Mr. Fathi) Doctor, when did you write this report?

A. I completed the report on Wednesday late last week. And I started thinking about it and -- and writing notes perhaps a week earlier. Pretty much as soon as I knew that a report was going to be required.

Q. And I'm sorry, when was this, approximately?

A. Approximately -- approximately a week before I finished it.

Q. So this would have been in early to mid October; is that right?

A. I would say mid October.

Q. How many hours did you spend writing on this report from start to finish?

A. I would have to guess. I apologize. But it's probably 20 to 30 hours.

Q. And what documents did you review in order to write this report?

A. I reviewed the expert reports that I mentioned at the top of my deposition. And I reviewed a log of self-injury that Centurion of Arizona maintains, was sent to me. And I reviewed Arizona DOC statistical reports for self-injury and average daily population month over month.

Q. Any other documents that you reviewed to write this report?

A. Not to my recollection.

Q. You mentioned a Centurion self-injury log. Is that something that is kept in the ordinary course of business?

A. To my knowledge, yes.

Q. So that's something that Centurion has been keeping in Arizona since it assumed the contract in 2019?

MS. HESMAN: Form. foundation.

THE WITNESS: My understanding is that it goes -- it is July 2020, not in July 2019. And I do not

 know why.

Q. (By Mr. Fathi) Okay. So as far as you know that document has been maintained in Arizona only since July of 2020?

MS. HESMAN: Same objection.

THE WITNESS: The log that I reviewed was started in 2020 and wasn't in -- that particular log was not in existence, my understanding was prior.

Q. (By Mr. Fathi) Prior to July of 2020?

A. Correct.

Q. Doctor, who did you speak to in order to write this report?

MS. BARNES: Form.

THE WITNESS: Besides counsel?

Q. (By Mr. Fathi) Yes.

A. In seeking Centurion data on self-injury, I did speak with an individual from our regional office. First name is Janine, and she was able to provide this log.

Q. And when you say the regional office, is that the regional office in Arizona?

A. Yes.

Q. Okay. Whom else did you speak to in order to write this report?

MS. BARNES: Form. Asked and answered.

THE WITNESS: I had no other substantive

discussions outside of counsel in preparing the report. I may have alerted Dr. Wu on my progress on my report, but --

Q. (By Mr. Fathi) But what?

A. That would have been in passing, and -- approach wasn't discussed.

Q. Would Janine's last name be Gahris, G-a-h-r-i-s?

A. Yes. It would.

Q. Okay. Doctor, let me go back to a topic we discussed a moment ago. You testified that you were in Arizona prisons in approximately March and April of this year; is that right?

A. Yes.

Q. Were those the only times you've ever been inside an Arizona prison?

A. No.

Q. When was the last time before March or April of this year that you were in an Arizona prison?

A. As part of the -- I'm going to say 2016 procurement cycle, I toured all of them, all the corridor complexes.

Q. Any other time you've ever been inside an Arizona prison?

A. Not to my recollection.

Q. Okay. Let's look at page 2 of your report,

Relevance, Rule 402

Cumulative, Rule 403

Witness's personal knowledge of AZ prisons and AZ contract is relevant. Rule 401, 402, 403 Not cumulative; questions were not previously answered. Rule 403

Defendants' Reply: Witness was designated as an expert to testify regarding a specific subset of topics, none of which relate to his tours of ADCRR facilities, making this line of questioning irrelevant, Rule 401, 402. Defendants did not object on the basis of cumulative testimony.

Incomplete, Rule 106

Hearsay, Rule 802

"Incomplete" objection is meaningless. Defendants can counter-designate. Rule 801(d)(2) non-hearsay statement of opposing party/agent.

Defendants' Reply: Incomplete because Plaintiffs have not included Dr. Wilson's report.

please.

Doctor, on page 2 of your report, in the penultimate paragraph, four lines down you refer to, "In-cell self-study programming for incarcerated patients."

Do you see that language? I'm sorry?

A. I do.

Q. All right. Is it your testimony that this constitutes mental health treatment?

MS. HESMAN: Form. Foundation.

THE WITNESS: It is a component of mental health treatment. It certainly does not constitute the entire spectrum of mental health treatment.

Q. (By Mr. Fathi) All right. And in the final paragraph on -- starting on the first line, you refer to, "Written patient" -- "Written patient education handouts."

Do you see that language, Doctor?

A. I do.

Q. Is it your testimony that written patient education handouts constitute mental health treatment?

A. I would have the same answer in that it's a component. And I'd like to elaborate if I may.

Q. Please.

A. It's not a substitute for face-to-face

Incomplete, Rule 106

Hearsay, Rule 802

"Incomplete" objection is meaningless. Defendants can counter-designate. Rule 801(d)(2) non-hearsay statement of opposing party/agent.

Defendants' Reply: Incomplete because Plaintiffs have not included Dr. Wilson's report.

Incomplete, Rule 106

"Incomplete" objection is meaningless. Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs have not included Dr. Wilson's report.

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

encounters. There are many incarcerated individuals who need education and pointers on managing stress. They may not have a psychiatric disorder.

So these patient education handouts are intended to be appropriate for general population patients -- inmates as well as patients who are receiving ongoing care and might need or want a little extra psycho-education --

Q. All right.

A. -- supplement. Not -- not core.

Q. Okay. At the top of page 3, in the paragraph numbered 1, you write, "During 2020, our behavioral health leadership in Arizona began to recognize challenges in the use of clinical restraints, and in particular the need for psychiatric providers to engage in enhanced scrutiny and management of restraint practices."

Do you see that language, Doctor?

A. I do.

Q. Who is the behavioral health leadership you're referring to?

A. Dr. Anthony Carr, who was -- is the statewide psychiatric director. And Dr. Stefanie Platt, who is the former behavioral health director state-wide for Centurion in Arizona.

Q. And why was there a need for psychiatric providers to engage in enhanced scrutiny and management of restraint practices?

A. In Arizona, unlike any other DOCs that I'm familiar with, the department had promulgated a policy that permitted psychologists to take -- order people in and order people out of clinical restraints.

And Dr. Carr, Dr. Platt, and myself, were concerned that because the -- because use of restraints carries with it significant medical risks up to and including mortality, inadvertent death, it was not appropriate for professionals who are not medically trained to be making those decisions about placing patients in or taking them out of clinical restraints.

We all agreed that psychiatric providers needed to be involved in these cases.

Q. Under the policy or practice that you're describing, was there anyone else besides psychologists who could put people in or take people out of restraints?

A. Yes. And I need to clarify my language, and I apologize for that.

So the placement of somebody in clinical restraints, the physical placement, typically is done by correctional officers.

And it is possible to place somebody in clinical

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

restraints in an emergency to prevent further harm and then obtain an order for those clinical restraints on an emergent, immediate basis.

The -- the issue that I meant to articulate is that order was -- was permitted to be written, authorized by psychologists in Arizona. And as well as psychiatrists.

And our -- our effort was to limit the authorization of the restraint use to psychiatry.

Q. Okay. So under this policy and practice that you're describing, were there any other categories besides psychiatrists and psychologists who were authorized to authorize the placement of someone in restraints?

A. No. Not to my knowledge.

Q. So RNs were not so authorized?

A. Again, RNs, or even master's that were mental health professionals to my knowledge might say we've got to get a patient into restraints, but then the next step would be to obtain sort of immediate retroactive authorization for that.

So it's possible that some other staff would initiate the restraint application, but the authorization, to my knowledge, was limited to psychiatric and psychology staff professionals.

Q. And what was the impetus for reviewing these restraint policies and practices?

A. It was -- it was twofold.

I was very surprised to learn of this because it's -- it's unusual. And once -- once I learned of it, and it really was Dr. Platt and Carr reaching out and consulting, they were concerned that restraints might be overused, and that patients might be maintained in clinical restraints not only too frequently, but too long, for too long of a duration. So that was one concern.

We want to use clinical restraints as a last resort, very rarely, only when necessary and all other alternatives have been determined to be ineffective or not feasible.

And then the other is that we really wanted our restraint practice to meet the community standards, in particular the Arizona Department of Health Services standards and the Arizona code.

So we had to bring our practice in alignment with community standards, and we also wanted to decrease the use of restraints.

Foundation, Rule 602

Q. Were there any adverse patient outcomes as a result of this practice and policy?

MS. HESMAN: Form. Foundation.

Foundation, Rule 602
Witness's lack of knowledge is itself evidence. Rule 602.

Defendants' Reply: Witness testified that he lacks personal knowledge as required to testify on this matter, Rule 602.

THE WITNESS: I don't know the answer to that. I asked that same question and was informed that there were near misses. To my knowledge there have been no deaths or serious medical injuries while in restraints, but my knowledge is limited.

That was our concern, however. We wanted to avoid adverse outcomes. We wanted to avoid unnecessary uses of force. We wanted to avoid intrusive, restrictive interventions if we could avoid them. We wanted to preserve patient dignity and autonomy.

Q. (By Mr. Fathi) Tell me about the near misses.

A. I can't.

MS. BARNES: Form and foundation.

THE WITNESS: I didn't get details.

Relevance, Rule 403

Foundation, Rule 602

Treatment of persons with mental illness is relevant. Rule 401, 402, 403. Witness's lack of knowledge is itself evidence. Rule 602.

Defendants' Reply: Witness testified that he does not have personal knowledge regarding tracking of length of use of restraints as required to testify about the matter, Rule 602. Because he lacks knowledge, the designated testimony does not make any fact of consequence more or less likely, Rule 401, 402.

Q. (By Mr. Fathi) At any point was the length of time that people spent in restraints tracked?

MS. HESMAN: Form. Foundation.

THE WITNESS: I do not know the answer to that.

Q. (By Mr. Fathi) At any time, was there a review of who was ordering restraints to see if certain practitioners were overusing them?

MS. HESMAN: Form. Foundation.

THE WITNESS: I can answer definitively not by me. Whether Dr. Carr and Dr. Platt reviewed

Relevance, Rule 402

Incomplete, Rule 106

Knowledge, Rule 602

Treatment of persons with mental illness is relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence. Rule 602. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include Dr. Wilson's report. Witness testified that he does not have personal knowledge regarding tracking of length of use of restraints as required to testify about the matter, Rule 602. Because he lacks knowledge, the designated testimony does not make any fact of consequence more or less likely, Rule 401, 402.

individual instances or patterns of instances and had consultations with professionals, I can't answer.

Q. (By Mr. Fathi) But you, yourself, didn't request that information?

A. Correct.

Q. Now, a little bit further down in the same paragraph you wrote --

A. Oh, I'm sorry, that's not correct. During the course of preparing for -- preparing this report, I did request that data. And I was told that they don't have it.

Q. Okay. But your preparation of this report in October of this year was the first time you had requested that data?

A. That's correct.

Q. And from whom did you request that data?

A. From Janine.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Q. So back to page 3 of your report, Doctor, the paragraph numbered 1, about the middle of the page you write that, "Clinical operations reviewed current practices and policies within the state of Arizona, compared these with Arizona State Code and Arizona Department of Health Services requirements, federal requirements, and national standards in the community."

Do you see that language, Doctor?

Defendants' Reply: Incomplete because Plaintiffs did not include Dr. Wilson's report.

Hearsay, Rule 802

Foundation, Rule 602

Rule 801(d)(2) non-hearsay statement of opposing party/agent. Witness was able to answer. Rule 602.

Defendants' Reply: Witness testified that he was not certain regarding use of psychologists to authorize/ discontinue use of restraints, Rule 602.

A. I do.

Q. Was the use of restraints in the Arizona Department of Corrections in the time period that you were talking about, 2020, compliant with the Arizona State Code?

MS. HESMAN: Form. Foundation.

THE WITNESS: No.

Q. (By Mr. Fathi) I'm sorry. What was your answer?

A. No.

Q. In what way was it not compliant?

A. My recollection is that the Arizona State Code required reviews at a certain time interval or cadence which I believe was two hours. And the Department's technical manual permitted a longer time period between patient reviews.

And I also believe that -- I'm not certain of this, but I also believe that the use of psychologists for the authorization of the order and discontinuation of the order was not consistent with Arizona State Code. I'm not certain of that, but those are the two independent memories I have right now.

Hearsay, Rule 802

Q. Was the use of restraints in the Arizona Department of Corrections consistent with Arizona Department of Health Services requirements?

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

MS. HESMAN: Form and foundation.

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

MS. BARNES: Form and foundation.

THE WITNESS: To my knowledge, yes. Again, as I've already indicated, I didn't specifically review restraint episodes, patient health records, or the duration of restraints for purposes of this project.

Q. (By Mr. Fathi) Was the use of restraints in the Arizona Department of Corrections in this time period consistent with federal requirements?

MS. HESMAN: Form. Foundation.

THE WITNESS: I would have to review to answer that question.

Q. (By Mr. Fathi) What would you need to review?

A. I'd need to go back and review the federal CMS requirements and compare them to the technical manual and see how they line up.

Q. And was the use of restraints in Arizona prisons at this time consistent with national standards of the community?

MS. HESMAN: Form. Foundation.

THE WITNESS: Again, national standards would not permit psychologists or nonmedically trained mental health professionals to order release from or placement in restraints.

MR. FATHI: Okay. We've been going for a bit. Why don't we take a break for the sake of everyone

but especially our court reporter. Is five minutes enough or do people need longer?

MS. BARNES: Seven minutes, to 10:30.

(Recess from 10:23 a.m. to 10:34 a.m.)

Q. (By Mr. Fathi) Doctor, page 3 of your report, still in paragraph 1, you write that, "Three Arizona-specific, webinar-based staff trainings were developed and delivered to Centurion behavioral health staff in December 2020."

Do you see that language?

A. I do.

Q. Doctor, you're a little faint.

A. I apologize. I do see that language.

Q. You're still very faint. Is there -- have you done something different?

MS. BARNES: I can hear him fine.

THE WITNESS: I haven't done anything different.

Q. (By Mr. Fathi) Ah, tech failure on my end. Very sorry.

All right.

Who conducted those trainings?

MS. BARNES: Form. Foundation.

THE WITNESS: Two members of the clinical operations team, myself, and Brenda Fields, who is a

Incomplete, Rule 106

Hearsay, Rule 802

"Incomplete" objection is meaningless; Defendants can counter-designate. Rule 801(d)(2) non-hearsay statement of opposing party/agent.

Defendants' Reply: Incomplete because Plaintiffs did not include Dr. Wilson's report.

registered nurse with extensive expertise in nurse monitoring of clinical restraints.

And in addition, I partnered with Dr. Platt in the deescalation role which I had developed, but she was one of the presenters of those slides.

Q. (By Mr. Fathi) All right. So there were a total of five presenters?

A. Three. Brenda Fields, John Wilson, and Stefanie Platt.

Q. All right. And Ms. Fields is an RN; correct?

A. Correct.

Q. Were the three trainings identical, or was it a series of three trainings?

A. Series of three.

Q. So were all Centurion behavioral health employees in Arizona required to attend all three trainings?

A. No. And I want to elaborate on why that was the case.

Q. Please.

A. Those -- those trainings were developed and recorded so that the Arizona leadership could then provide the training to their psychiatric and psychology staff and presumably others.

But clinical ops developed the training,

presented it to the small group of Centurion of Arizona behavioral health leaders who then took that training and used it.

Q. Okay. So who if anyone was required to attend this training?

MS. HESMAN: Foundation.

THE WITNESS: I don't know if there was a requirement for the initial training sessions. We had several behavioral health leaders attend.

Q. (By Mr. Fathi) How many Centurion of Arizona employees have received this training?

MS. HESMAN: Foundation.

THE WITNESS: I'm sorry. Did you hear me? I don't know the answer to that question.

Q. (By Mr. Fathi) How long did the trainings last?

MS. HESMAN: Foundation.

THE WITNESS: Roughly an hour and a half each.

Q. (By Mr. Fathi) So three sessions of an hour and a half each?

A. Yes.

Q. Was there a test at the end of the training?

A. I don't recall.

Q. Were there written training materials?

A. Yes.

Foundation, Rule 602
Witness was able to answer.

Defendants' Reply: Witness testified that he does not know whether the training was required, as required to testify regarding this matter, Rule 602.

Hearsay, Rule 802

Hearsay, Rule 802

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. Who prepared the written training materials?

MS. HESMAN: Foundation.

THE WITNESS: Brenda Fields and myself.

Q. (By Mr. Fathi) If I wanted to know how many Centurion of Arizona behavioral health employees have taken this training, what documentation would I ask for?

MS. BARNES: Form and foundation.

THE WITNESS: There should be attendance records maintained in the regional office in Arizona by Centurion.

Q. (By Mr. Fathi) Do you know that those records exist?

MS. HESMAN: Foundation.

THE WITNESS: I do not know one way or the other.

Q. (By Mr. Fathi) Have you ever requested those records?

A. No.

Q. All right. Was the policy allowing psychologists to authorize placement in restraints ever formally changed?

MS. HESMAN: Form. Foundation.

THE WITNESS: I did ask about that. My recollection is I had a conversation with Dr. Platt. And that policy was changed, the language was changed, but

Hearsay, Rule 802

Foundation, Rule 602

Rule 801(d)(2) non-hearsay statement of opposing party/agent. Witness was able to answer. Rule 602.

Defendants' Reply: Witness testified that he does not know whether the policy was formally changed as required to testify regarding the matter, Rule 602.

Hearsay, Rule 802

Foundation, Rule 602

Rule 801(d)(2) non-hearsay statement of opposing party/agent. Witness was able to answer. Rule 602.

that at the time of our conversation, the new language had not yet been implemented or approved.

And therefore that Centurion was going to proceed as if the new language had been approved and ensure that psychiatry was involved with each restraint episode.

And I do remember Dr. Carr telling me that he's ensuring that that takes place.

Defendants' Reply: Witness testified that he does not have personal knowledge of whether the policy was changed as required to testify regarding the matter, Rule 602. When a conversation took place with Dr. Platt is not relevant to a fact of consequence, Rule 401, 402.

Relevance, Rule 402

Foundation, Rule 602

Treatment of persons with mental illness is relevant. Rule 401, 402. Witness was able to answer. Rule 602.

Q. (By Mr. Fathi) When was your conversation with Dr. Platt?

A. I don't recall.

Q. Was it in 2021?

A. Probably.

Q. Was it in the first or second half of 2021?

A. It would have been before July.

Relevance, Rule 402

Treatment of persons with mental illness is relevant. Rule 401, 402.

Q. All right. And when you say that the new language had not yet been approved, do you mean approve by the Arizona Department of Corrections?

A. Yes.

Relevance, Rule 402

Foundation, Rule 602

Treatment of persons with mental illness is relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence. Rule 602.

Q. As we sit here today, has that new language be approved?

MS. HESMAN: Foundation.

Q. (By Mr. Fathi) I'm sorry?

A. I don't know.

Q. All right. All right, Doctor, going back to

your report on page 3, the paragraph numbered 2, you write, "Also in 2020, the need for additional training and tools in treating patients with a recurrent self-injury was identified as part of our Arizona program's efforts to reduce the frequency and severity of patient self-injury."

Do you see that language, Doctor?

A. Yes.

Q. Who identified that need for additional training and tools?

MS. HESMAN: Foundation.

THE WITNESS: Dr. Platt.

Q. (By Mr. Fathi) And what was the basis for concluding that there was such a need for additional training and tools?

MS. HESMAN: Foundation.

THE WITNESS: As is the case in other programs, other DOC correctional systems, there were elevated frequencies of self-injury with some patients requiring multiple medical interventions.

And there were limited options for effective treatment. So the identification of the need for additional training and tools was appropriate. I just want to clarify it's not unique to Arizona, unfortunately.

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. (By Mr. Fathi) All right. And further down in that same paragraph, you write that clinical operations, "concluded that provision of two full-time behavioral specialists dedicated solely to the treatment of patients with recurrent self-injury would enable us to reduce overall morbidity and potential mortality among the select patient population by at least 50 percent."

Do you see that language?

A. Yes.

Q. Have those two full-time behavioral specialists been hired as we sit here today?

A. To my knowledge, no.

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. And you write, "Despite our best efforts, we were unable to identify any potential candidates in the state."

Do you see that language, Doctor?

A. I do.

Q. What did your best efforts consist of?

MS. BARNES: Form and foundation.

THE WITNESS: I want to clarify the word "our" in that sentence. I was not involved in the recruitment for these positions. I did help identify the key indicators, requirements for the job. And I've helped develop the job descriptions.

The recruiting efforts are not something

that I can speak to.

Q. (By Mr. Fathi) All right. So when you say, "despite our best efforts," you're not able to tell me what those best efforts consisted of?

A. That's correct. Because those best -- that word "our" really belongs to the Centurion of Arizona team.

Hearsay, Rule 802

Q. And you say that you are unable to identify any potential candidates in the state. Did you look outside the state?

MS. BARNES: Form and foundation.

Hearsay, Rule 802

THE WITNESS: My knowledge of our recruiting efforts is sufficient for me to answer that when we have openings, we will try to resource throughout the country, not just within the state.

So our recruiting department does things like look at mental health professionals who've graduated from Arizona-based higher level -- higher -- institutions of higher education and might have a desire to come back. Or who were previously licensed in Arizona or may be currently licensed in Arizona and see if we can find.

It will -- my belief is that our recruiting department did everything they could to find these positions and weren't able to.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. (By Mr. Fathi) But you're not able to tell me what they did; correct?

A. I'm not able to tell you specifically what they did, that's correct.

Q. What were the requirements for these positions, the qualifications required?

A. So to my knowledge, my memory, we wanted master's level, independently licensed with training or certification in functional assessment, behavioral functional assessment.

Q. And what was the salary offered for these positions?

MS. BARNES: Form and foundation.

THE WITNESS: I don't know.

Q. (By Mr. Fathi) When initial efforts were unsuccessful did you try raising the salary?

MS. BARNES: Same objection.

THE WITNESS: I don't know.

Q. (By Mr. Fathi) Did you try offering a signing bonus?

MS. BARNES: Same objections.

THE WITNESS: I don't know.

Q. (By Mr. Fathi) Back to page 3 of your report. In the final paragraph, you write, "In March 2021, our Clinical Operations behavioral health team provided four training sessions to our Arizona behavioral health staff on," and then it lists a number of topics.

Foundation, Rule 602

Witness's was able to answer.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include Dr. Wilson's report.

Do you see that language?

A. I do.

Q. Was that training live or by video?

A. That was live.

Q. Who conducted the training?

A. I did, Dr. Joel Andrade did, and our program manager from our Pennsylvania DOC program, Jennifer Sheptock, did.

Q. And what are the qualifications of those other two people?

A. Dr. Joel Andrade is a doctoral psych -- not psychologist -- social worker with 20 to 25 years of experience in correctional behavioral health services and a national expert in that area.

And Jennifer Sheptock has managed state-wide behavioral health programs as well as juvenile correctional settings where she trained in functional assessment.

Q. And were these four identical sessions or was it a series of four different sessions?

A. A series of four different sessions.

Q. And were all Centurion behavioral health staff in Arizona required to attend this training?

MS. HESMAN: Foundation.

THE WITNESS: No.

Q. (By Mr. Fathi) How many Centurion behavioral health staff in Arizona attended this training?

MS. HESMAN: Foundation.

THE WITNESS: We provided the four sessions twice. Once at Florence, and once in Tucson. And the behavioral health staff who were on site in Florence completed that training, and the behavioral health staff in Tucson completed that series of trainings.

It was typically three to five participants. These were intimate, intensive roundtable trainings. There were written materials, slides.

Q. (By Mr. Fathi) Are there behavioral health staff -- were there behavioral health staff working at Florence at that time who did not attend the training?

MS. BARNES: Foundation.

THE WITNESS: I don't know. I suspect health technicians we wouldn't have included.

Q. (By Mr. Fathi) But was the training mandatory for any category of behavioral health staff?

MS. HESMAN: Foundation.

THE WITNESS: No.

Q. (By Mr. Fathi) And same question at Tucson, were there mental health staff then working at Tucson who did not participate in this training?

MS. HESMAN: Foundation.

Relevance, Rule 402

Foundation, Rule 602

Training and qualifications of mental health staff are relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence.

Defendants' Reply: Witness testified that he lacks personal knowledge regarding mental health staff that did not attend the training as required to testify regarding the matter, Rule 602. Because he lacks foundation, the designated testimony does not make any fact of consequence more or less probable, Rule 401, 402.

Foundation, Rule 602

Witness's lack of knowledge is itself evidence.

Defendants' Reply: Witness testified that he lacks personal knowledge regarding whether training was offered at other prisons as required to testify regarding the matter, Rule 602.

THE WITNESS: I don't know. I don't recall.

Q. (By Mr. Fathi) Was the training offered at any prisons other than Florence and Tucson?

MS. BARNES: You cut out there, Doctor.

THE WITNESS: Okay. Not by clinical operations.

Q. (By Mr. Fathi) Was the training offered by anyone at other prisons besides Florence and Tucson?

A. I don't know, but I want to elaborate on why I said it that way.

Clinical operations develops training to support and empower our regional leadership to then take that training and the initiatives and carry them forward. So it's possible that there was -- that the training was carried out at other complexes.

Q. Do you have any reason to believe that it was?

A. I don't have any data to make an opinion one way or the other.

Q. In terms of the training that you personally participated in, why was the decision made to offer it only at Florence and Tucson?

A. We focused on those two institutions because we provided the training in the context of also providing patient-specific consultation to bring the training and

Foundation, Rule 6002
Witness was able to answer.

Defendants' Reply: Witness testified that he lacks personal knowledge regarding whether training was offered at other prisons as required to testify regarding the matter, Rule 602.

the consultation together, and take the principles of the training and apply them to a clinical case.

And there was a case at Florence and a case at Tucson that Dr. Platt had identified as needing behavioral interventions, behavioral change interventions. So that's why those two locations were selected.

Q. And what were the names of those patients?

MS. HESMAN: Foundation.

THE WITNESS: I don't recall.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. “Incomplete” objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include Dr. Wilson's report.

Q. (By Mr. Fathi) Let's look at page 4 of your report, please.

And in the final paragraph of page 4, you use the term "suicide spectrum behaviors." Do you see that, Doctor?

A. Yes.

Q. What's the definition of that term?

A. That is a term that I'm using to encompass everything from suicidal ideation and statements to self-injury to suicide attempts to death by suicide.

Q. So it includes -- it can include statements without any self-harm or attempt at self-harm?

A. I believe that's part of my -- yes.

Q. And is that definition written down anywhere?

A. No.

Q. Is "suicide spectrum behavior" a term that's used by ADCRR?

A. No.

Q. Is it a term that's used by Centurion?

A. Yes. And now I have to correct some testimony just a moment ago.

It's -- it's a term that may be included in some of our policies and treatment guidelines.

Q. And when you say "our," you mean Centurion's?

A. I do.

Q. So is the term "suicide spectrum behaviors" defined in any of these Centurion documents?

A. Yes. I -- I believe so. I'd have to check to be sure.

Q. Is this a term that you devised yourself?

A. Yes.

Q. And when did you devise this term?

A. I don't recall precisely. It would be in the last two years. And the effort here is to ensure that we don't dismiss, minimize, exclude, or negate any kind of self-injury or suicide risk.

It's to be as inclusive as possible so that suicide prevention efforts can be as comprehensive as possible. That's the intent.

Q. Okay. Let's look at Exhibit 2, please.

Hearsay, Rule 802

Exhibit Foundation

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. Witness was able to answer.

Defendants' Reply: Plaintiffs have not included the exhibit and have accordingly not laid appropriate foundation for the testimony regarding it.

(Deposition Exhibit 2 was marked for identification.)

Q. (By Mr. Fathi) Doctor, Exhibit 2 is a document created on a monthly basis by ADCRR titled "Inmate Assault, Self-Harm, and Mortality Data."

Do you see that?

A. I do.

Q. Are you generally familiar with this document?

A. I am.

Q. Did you rely on this document in writing your report?

MS. BARNES: If you need to see more pages in it, Dr. Wilson, just ask them to scroll down.

THE WITNESS: Can you scroll to the final page, please?

Yes, I did rely on this document.

Q. (By Mr. Fathi) All right. At the top of page 4, it points out that, "ADCRR has adopted a new method of counting acts of inmate self-harm as of July 28."

Do you see that, Doctor?

A. I do.

Q. Were you aware of that?

A. Yes.

Q. So ADC classifies self-harm behavior as either self-injurious behavior or suicide attempt. Do you see

Hearsay, Rule 802

Exhibit Foundation

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. Witness testified he relied on this document. Rule 703.

Defendants' Reply: Plaintiffs have not included the exhibit and accordingly haven't laid foundation for testimony regarding it.

that, Doctor?

A. Yes.

Q. And how does that taxonomy map onto your term "suicide spectrum behavior"?

A. My taxonomy, if you want to call it that, includes both.

Q. But as I understand your testimony a moment ago, your term is broader because it can include suicidal statements unaccompanied by any self-injurious behavior; correct?

A. It could be, yes, correct.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs have not included Dr. Wilson's report or the graph therein.

Q. All right. Let's look at -- back to your report. Let's look at the graph on page 5 that's titled Graph 1.

So Graph 1 is titled "Total Suicidal Spectrum Behaviors"; correct?

A. It is.

Q. And who created this graph, Doctor?

A. I did.

Q. Was anyone else involved?

A. No.

Q. What's the source of the data that is portrayed in this graph?

A. You just showed Exhibit 2 as one example of the data I used.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs have not included Dr. Wilson's report.

Q. So if I wanted to see your underlying data I would look at Exhibit 2 and other monthly versions of that report?

A. You would.

Q. Did you rely on any other data to create Graph 1?

A. No.

Q. All right. Now, is it your testimony that the Arizona Department of Corrections Rehabilitation and Reentry also tracks suicidal statements?

A. No.

Q. Okay. Then how are you able to come up with numbers for total suicide spectrum behaviors relying on ADCRR sources that don't track suicidal statements?

A. Point taken. The graphs don't include suicidal ideation that I generated.

Q. Okay.

A. And therefore they're inconsistent with the definition I just gave you.

Q. Okay.

A. The graph --

Q. Go ahead.

A. The graphs include self-injurious behavior, suicide attempts, and suicides, deaths by suicide listed here on this table that we're looking at right now.

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

And so, for instance, in July of 2021, the Department listed 154 incidents total in that purple column on the far right. That's the number I used.

Foundation, Rule 602

Witness was able to answer.

Defendants' Reply: Witness testified that he lacks personal knowledge, Rule 602.

Q. I see. To your knowledge does anyone track suicidal statements among ADCRR prisoners?

MS. HESMAN: Form. Foundation.

THE WITNESS: Not to my knowledge.

Q. (By Mr. Fathi) So Centurion doesn't track that?

A. Correct.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs have not included Dr. Wilson's report.

Q. All right. Let's look at the graph on page 6 titled "Graph 2: Rate of Suicide Spectrum Behaviors Per 100,000 Individuals."

Do you see that, Doctor?

A. I do.

Q. And, again, who created this graph?

A. I did.

Q. Was anyone else involved?

A. No.

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. And what's the source of the data for this graph?

A. The source of this data are the -- what I caption as suicide spectrum behaviors, minus suicidal ideation from Exhibit 2, and other instances of -- other monthly instances of that report.

As well as the month-to-month reports that the

Case 2:12-cv-00601-ROS Document 4256-1 Filed 12/08/21 Page 163 of 304

Hearsay, Rule 802

DOC posts to their website showing average ADP, so average population.

Q. All right. And what does the purple line mean in this graph, Doctor?

A. The purple line is an approximate trend line that shows an overall decrease in the rate of suicide spectrum.

Q. And who drew -- who drew that trend line, Doctor?

A. That was generated by an Excel function.

Q. What's the name of the Excel function?

A. It's a polynomial trend line.

Q. Is that the name of the function in Excel?

A. Yep.

Q. And is your answer the same for all of the purple lines that appear in the graphs of your report?

A. Yes.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Q. Okay. Let's look at page 7. There are four graphs on page 7. Doctor, same question. Who created these graphs?

A. I did.

Q. And was anyone else involved?

A. No.

Defendants' Reply: Incomplete because Plaintiffs have not included the report.

Hearsay, Rule 802

Q. And the source of the data is the same as for the others?

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

A. Yes.

Q. All right. And --

A. I apologize.

Q. Go ahead.

A. No, that's not correct. The source of the graphs were -- Graph 3 and 4 is the same.

Q. The same as you've previously described?

A. That's correct.

Q. What is the source of the information for Graphs 5 and 6?

A. This is the self-injurious behavior log that Janine sent me.

Q. Okay. And let's look at page 8. There are three graphs on page 8. Who created these graphs?

A. I did.

Q. And was anyone else involved?

A. No.

Q. And what's the source of the data in these graphs?

A. The self -- self-injurious log that I received from Janine.

Q. And that includes restraint episodes?

A. It does. For -- but only for patients who engaged in self-injury.

Q. Doctor, why did you not state the source of your

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

data for any of these graphs?

A. Can we please scroll up?

Q. Yes.

MS. BARNES: What page do you want to be on the screen, Dr. Wilson?

THE WITNESS: Well, on page 4, you're there, that final paragraph.

I do indicate that the self-injury suicide attempts and deaths by suicide data are published to the Department's website each month.

So I failed to indicate which specific report holds those data, but I did indicate that it came from the DOC.

I apologize for not being complete there.

Q. (By Mr. Fathi) Okay. And going to Graphs 5 and 6 --

A. Yes.

Q. -- why did you not state the sources -- the source for your data there?

A. Please give me a minute.

So, again, I apologize for the omission, but the first paragraph that's shown on the screen right now, the second -- third sentence, final sentence there, "Centurion's Arizona program has tracked both metrics for patients who engaged in self-injury since July 2020."

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

I did not identify it as a self-injurious behavior log, but that was my attempt to identify the source.

Q. Okay. And going to the three graphs on page 8. Why did you not identify the source for these data?

A. I have to reconstruct the omission, but I had intended to indicate that this came from Centurion of Arizona through the self-injurious log.

And the average number per month and the average rate of restraints per 100,000 are recalculations of essentially the same data. But I apologize. It did come from the self-injurious behavior log.

Q. Okay. But it doesn't say that in your report; correct?

A. It doesn't.

Q. Okay.

MS. BARNES: David, can we take a break here and now, or just in a minute or two when you have a good moment to break? We've been going now almost two hours and I'm sorry, but I actually need another restroom break.

MR. FATHI: Okay. I -- I just have a couple more questions about this.

MS. BARNES: That's fine.

MR. FATHI: All right.

Q. (By Mr. Fathi) Doctor, I think you testified that looking at the three charts on page 8 that they only include people who are on the self-injury log. Is that correct?

A. That is correct.

Q. So if someone was restrained but did not appear on the self-injury log, they wouldn't appear -- they wouldn't be taken into account in this chart; correct?

A. That's correct.

Q. So how do we know how many people have been subject to restraints who have not appeared on the self-injury log?

A. You cannot tell that from my report, and I think if you go to page 7 at the bottom of my report, you will see that only, about the restraints associated with patient self-harm, that final paragraph.

Q. Okay. But my question is how many patients are subject to restraints in ADCRR who do not appear in the self-harm log?

A. I do not know the answer.

Q. Okay.

MR. FATHI: Let's take a break. How long do you want, Sarah?

MS. BARNES: Just five or six minutes.

MR. FATHI: Okay.

(Recess from 11:11 a.m. to 11:19 a.m.)

Q. (By Mr. Fathi) Doctor, are you familiar with the term "nonzero axis deception"?

A. Could you repeat that?

Q. Sure. Are you familiar with the term "nonzero axis deception"?

A. No.

Q. Okay. What that refers to, Doctor, is the practice of in a bar graph as, of the type that you have in your report, starting the Y or the vertical axis at a value higher than zero in order to make the difference between the various bars appear larger than it actually is.

So let's look at Graph 5 in your report on page 7. And there, Doctor, you started the vertical axis at 9 rather than zero; correct?

A. Correct.

Q. And if you'd started it at zero the difference between the two bars would appear much smaller than it does in this graph; correct?

MS. BARNES: Form.

MS. HESMAN: Form.

MS. BARNES: Foundation.

THE WITNESS: The difference would still be 2.

Relevance, Rule 402

Foundation, Rule 602

Witness's reliability/ inaccuracy/bias is relevant. Rule 401, 402. Witness was able to answer the questions.

Defendants' Reply: Witness testified he was not familiar with the concept, Rule 602, and counsel's comments regarding it are not relevant, Rule 401, 402.

Incomplete, Rule 106

Hearsay, Rule 802

Foundation, Rule 602

Argument

Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the report. Witness testified that he is not familiar with the concept, Rule 602. Line of questioning is argumentative, and counsel is testifying.

Incomplete, Rule 106

Hearsay, Rule 802

Foundation, Rule 602

Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiff did not include the report. Witness testified that he was not familiar with the concept, Rule 602.

Q. (By Mr. Fathi) Yes, but looking -- but the relative size of the two bars would be much closer than it is in this graph; correct?

MS. HESMAN: Form.

THE WITNESS: I guess, yes.

Q. (By Mr. Fathi) Okay. And similarly in Graph 6 you started the vertical axis at 25 rather than zero; correct?

A. Yes.

Q. Okay. And if you'd started the vertical axis at zero, the two bars would look much more similar, wouldn't they?

MS. HESMAN: Form.

MS. BARNES: Form.

THE WITNESS: Their height would be closer together, but the absolute numerical difference would remain unchanged.

Q. (By Mr. Fathi) But the size difference between the two bars would be significantly smaller, wouldn't it?

MS. BARNES: Form.

MS. HESMAN: Form.

THE WITNESS: The size difference would be smaller.

Hearsay, Rule 802

Q. (By Mr. Fathi) All right. Let's look at Graph 6 -- I'm sorry, that was Graph 6. Let's look at

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

the three graphs on page 8.

So here, too, Doctor, you started the vertical axis at 5.6, 16 and 2.6 rather than zero; correct?

A. Yes.

Q. And why did you do that?

A. Excel did it for me. I want to -- I appreciate the term that you've educated me on, but I want to emphasize that in no way am I trying to exaggerate the change here.

I built these graphs very rapidly. The entire report was due in a short period of time. And there were -- there were late hours spent on it.

Q. Okay. Let's look at Graph 1, shall we, on page 5. Okay. So here you did start the vertical axis at zero; correct?

A. Yes.

Q. And Graph 2 on page 6?

A. Yes.

Q. Could we scroll -- yes.

Graph 2 you also started the vertical axis at zero; correct?

A. Yes.

Q. So my question is why on these other graphs that we've just reviewed did you not start the vertical axis at zero?

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

A. I didn't take the time to force Excel to set it to zero.

Q. Is it your testimony that you didn't notice that Excel had set it at something other than zero?

MS. BARNES: Form.

THE WITNESS: Yes.

Q. (By Mr. Fathi) Did you proofread this report, Doctor?

MS. BARNES: Form.

THE WITNESS: Yes.

Q. (By Mr. Fathi) Did someone tell you to start the vertical axis at a value higher than zero?

A. No.

MS. BARNES: Form and foundation. And again to the extent your question asks for communications that he's described to you as only having occurred with counsel, you are encroaching on the attorney-client privilege, and I'm going to instruct him not to answer if -- if he has a positive answer to that.

Q. (By Mr. Fathi) All right. Let's look at page 5 again, Doctor. Now, on page 5 of your report you cite some population figures from ADCRR. Do you see that?

A. I do.

Q. Sorry. Going back to the last question about setting the vertical axis at a value other than zero, did

anyone other than your attorney tell you to do that?

MS. BARNES: Form. And, again, let me clarify my instruction. My instruction to you, Dr. Wilson, is if someone -- if your answer is positive, if someone told you that -- that you should set this at zero and that someone is an attorney, do not answer.

If your answer is that no one told you that, then you can say no one told me that.

THE WITNESS: No one instructed me on how to set the axes. Never any discussion about the minimum value for any of these axes. I -- I took what Excel gave me automatically and put it into the report.

Q. (By Mr. Fathi) Okay. All right. Back to page 5 where you give some population statistics. Do you see those, Doctor?

A. I do.

Q. Are those statistics for the entire ADCRR incarcerated population?

A. They are.

Q. And are you aware that Arizona has about seven and a half thousand prisoners in private prisons?

A. I am.

Q. But Centurion doesn't provide care for those in the private prisons; correct?

A. That is correct.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

Incomplete, Rule 106

Hearsay, Rule 802

Foundation, Rule 602

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate. Witness was able to answer the questions.

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

Q. So what are the analogous figures for the ten state-run prisons at which Centurion does provide care?
A. I would have to check, but based on what you've just said, they're 7,000 less than what I show here.
Q. Still on page 5, Graph 1, obviously these -- this graph portrays certain figures, and each bar represents a -- a total number of suicide spectrum behaviors; correct?
A. Correct.
Q. Do those numbers include the private prisons or only the state-run prisons where Centurion provides care?
A. My understanding of the published statistics is that they include the private prison beds, too.
Q. Okay. So that means that these figures that you have put in your Graph 1 include the private prisons as well; correct?
A. Yes.
Q. Okay. Graph 2 on page 6. Same question. Do these numbers also include the private prisons?
A. Yes.
Q. Is your answer the same for all of the graphs in your report?
A. No.
Q. All right. Let's go through them all, then. Next page, please.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

Graphs 3 and 4, are these -- do these numbers include the private prisons or only the state-run prisons?

A. All of them. Both private and public, yeah, state-run.

Q. And Graphs 5 and 6, do these figures include the private prisons?

A. No.

Q. And how can you tell that, Doctor?

A. Because Graphs 5 and 6 come from the self-injurious behavior log that Centurion tracks, that Centurion maintains. And because we don't provide services in the private prisons, it would not include any emergency room runs for self-injury or suicide attempts from those private prisons.

Q. Okay. But when you were calculating the rate per 100,000, what was the denominator you used? Did you use the number, the entire prisoner population including the private prisons, or did you include only the people incarcerated at the state-run prisons?

A. I used the entire population.

Q. I see. Let's look at page 8, please. Same question for the three graphs on page 8. Do these include all of the prisons including the private prisons, or just the state-run prison?

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

A. Just the state.

Q. I see. And, again, in the middle graph when you're calculating a rate per 100,000, did you use as a denominator the entire prison population including the private prisons or just the state-run prisons?

A. The entire population.

Q. Okay. And that would tend to understate the rate of restraint, wouldn't it?

MS. HESMAN: Form. Foundation.

THE WITNESS: Mathematically, yes.

Q. (By Mr. Fathi) All right. Back to page 6, please. Now, you say here about -- in about the middle of page 6 that talking about average number of suicide spectrum behaviors per month, there has been a 47 percent reduction in incidents. Do you see that?

A. Yes.

Q. Did you calculate that percentage, Doctor?

A. I did.

Q. Can you tell me how you did it?

A. Yep, I can. This statement goes with Graph 3, and in Graph 3, I show that on average there were 212 incidents of self-injury and suicide or attempted suicide in the second half of 2019, and 112 in the first nine months of 2012 -- 2021. Pardon me.

Q. And that's how you came up with the 47 percent?

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

A. Yep.

Q. And I think you testified that you're using numbers from the entire system including the private prisons; correct?

A. I am.

Q. What is the percentage change looking only at the ten facilities where Centurion provides care?

A. The DOC doesn't report that. I don't know the answer.

Q. Okay. All right. Back to page 6, please.

A. May I clarify?

Q. Please.

A. My understanding is that if an incarcerated individual is engaged in self-injury or suicide attempt, they're going to be moved to a state-run complex.

And my other clarification is that the way the department reports self-injury suicide attempts and completed suicide does include those private prisons.

So if there are episodes of suicide attempts, completed suicides or self-injury at the private prisons, they -- they should be wrapped up in these numbers and included in them in order to have a complete picture.

Q. Okay. Back to page 6, please.

Now, Doctor, when you calculated this 47 percent reduction in incidents you're counting different months

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

in 2019 and 2021; correct?

A. Correct.

Q. So you're comparing July through December 2019 to January through September 2021; correct?

A. That's correct.

Q. And you're making that same comparison in Graphs 3 and 4; right?

A. Right.

Q. And in Graphs 5 and 6 and the three graphs on page 8, you're again comparing different months. This time it's July through December of 2020 and January through September of 2021. Is that correct?

A. That's right.

Q. And that is a potential confounding variable, isn't it?

MS. HESMAN: Form. Foundation.

THE WITNESS: Yes.

Q. (By Mr. Fathi) Back to page 6, please. So at the bottom of the first paragraph, you -- you describe a 38 percent reduction using the rate of suicide spectrum behaviors per 100,000 population; correct?

A. Correct.

Q. And did you calculate that percentage?

A. I did.

Q. Sorry?

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

A. Yes.

Q. Okay. And could you tell me how you did that, please?

A. In the same way that I calculated the 47 percent reduction in incidents. This one goes to Graph 4, and it compares the second half of 2019 with the first nine months of 2021.

Q. And I assume from your previous testimony that these numbers were calculated using the entire ADC population including the private prisons; correct?

A. Correct. Yes.

Q. And what are the analogous numbers for just the ten state-run prisons at which Centurion provides care?

A. I don't know.

Q. Okay. Let's go back to Exhibit 2, please.

Okay. Could you explain to me -- let me back up.

I gather from your testimony that this document or other monthly iterations of this document is the primary source for the information in the graphs in your report; correct?

A. Yes.

Q. Okay. Walk me through how you get from this ADC document, Exhibit 2, to the numbers in your report?

A. I used this table to pull out the total number

of -- on the right-hand side. So let's look at July, for example. 154 incidents. And these data include ADCRR and contract beds. That's what they're reporting.

Q. Okay. So show me -- show me where these numbers in Exhibit 2 appear in your report.

A. Okay.

Q. Not all of them. Just give me an example.

A. Okay. So if we could go to Graph 1 in my report, you'll see in July of 2021 I list 154 incidents. In August, 129; and in September, 86. And those numbers should be identical to the Exhibit 2.

Q. I see. Okay. Thank you.

So, Doctor, your report talks a fair bit about suicide spectrum behaviors, but as far as I can tell you don't discuss actual completed suicides. Is that right?

A. I believe that's correct.

Q. And why is that?

A. I apologize. It isn't quite correct. On the bottom of page 6 --

Q. I'm sorry, can you indicate what you're referring to?

A. Yes. "Deaths by suicide remain a significant concern for any correctional health provider."

So I did mention that death by suicide is a concern.

Defendants' Reply: Incomplete because Plaintiffs have not included the report. Testimony regarding data on completed suicides lacks relevance for the reasons stated in the witness's testimony below.

Relevance, Rule 402

Confusion, Rule 403

Incomplete, Rule 106

Hearsay, Rule 802

See box to right

Q. Okay. Let me ask a different question. You -- your report discusses extensively numbers of suicide spectrum behaviors and rates of suicide spectrum behaviors and changes in those numbers of rates over time.

But there is no analogous discussion of actual completed suicides; is that correct?

A. There's no analogous discussion, that's correct.

Witness's bias/ selective presentation of evidence is relevant. Rule 401, 402. Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Hearsay, Rule 802

Q. And why is that?

MS. HESMAN: Form. Foundation.

Hearsay, Rule 802

THE WITNESS: My effort was to show overall trends. I had limited time to develop all of these data. And suicide -- deaths by suicide unfortunately tend to be -- well, fortunately tend to be small numbers, but unfortunately tend to vary somewhat unpredictably over time.

And therefore most of the experts who look at completed suicides are now recommending using five-year time blocks to calculate rate of suicide or completed suicide.

Because Centurion has only been present since 2019, I wasn't sure that I could use data for completed suicides in the same way I could use for the self-injurious behavior and suicide attempts to give a clear picture of trends over time.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

It's just -- it's a -- it's a horrible, horrible thing, but it is fortunately a -- a rare event. And so statistically it's very difficult to compare one year to the next.

Q. (By Mr. Fathi) Who are the experts that say that you should look at suicides in five-year increments?

A. I used to -- Dr. Ray Patterson is one individual who has opined that. The Bureau of Justice statistics earlier this month produced a new report that uses five-year increments, and I think that's the reason why.

Q. But the Bureau of Justice statistics reports suicides year by year in that specific report, does it not?

A. I'm not -- I'd have to look at it again.

Q. Okay. We'll get it -- we'll get it at the break, and we'll take a look.

Let's look at Exhibit 2, please. And at the bottom of page 4, "Inmate Deaths by Year and Cause."

Do you see the numbers for suicides, Doctor?

A. I do.

Q. And according to this document, in fiscal year '21, which ended on June 30, 2021, there were ten suicides. Do you see that?

A. I do.

Q. And that was up from six the previous year;

correct?

A. I see that.

Q. And that ten suicides in fiscal year '21 was the highest number since fiscal year '11. Do you see that?

A. I do.

Q. And the overall prison population was substantially higher in fiscal year '11; correct?

A. Yes.

Q. Do you have any hypothesis as to why last year had the highest suicides since 2011?

MS. HESMAN: Form. Foundation.

THE WITNESS: I do.

Q. (By Mr. Fathi) And what's that?

A. The rise in deaths by suicide has been experienced in multiple correctional systems, and my hypothesis is that the pandemic has interfered with patient movement, with ability to get out of cell, with staffing shortages, and with the delivery of -- the ability to deliver care.

Everyone has been strained, from correctional officers to healthcare staff to incarcerated inmates. And this level of -- this increase in suicide, I think, likely reflects all of that.

Q. So you mentioned staffing shortages. Do you believe that shortages of mental health staff may be

Relevance, Rule 402

Confusion, Rule 403

Incomplete, Rule 106

Suicides in ADCRR are relevant. Rule 401, 402. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the report. Suicide data from prior to Centurion's assumption of the contract is not relevant to Plaintiffs' claims for prospective injunctive relief.

Relevance, Rule 402

Waste of Time, Rule 403

Foundation, Rule 602

Suicides in ADCRR are relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence.

Defendants' Reply: Witness testified that he lacks personal knowledge regarding current vacancies, Rule 602. Witness is speculating due to his lack of knowledge and such speculation does not make a fact of consequence more or less probable, Rule 401, 402.

contributing to this increase in -- in suicides?

MS. HESMAN: Form. Foundation.

THE WITNESS: What you suggest of course is theoretically possible. But I don't know what the staffing shortages are, if there are, for mental health in -- in the department right now.

Q. (By Mr. Fathi) I'm sorry, did you just say you're not familiar with the state of mental health staffing in the Arizona Department of Corrections?

A. I don't specifically know what the vacancies are, that is correct.

Q. All right. Do you believe that mental health staff shortages in the Arizona Department of Corrections may be a contributing factor to the increase in suicides last year?

MS. HESMAN: Form. Foundation.

THE WITNESS: Without knowing what those shortages are and their impact on service delivery, I really can't speculate.

Q. (By Mr. Fathi) Are you familiar with what the staffing shortages were at any point in fiscal year '21? In other words, July 1, 2020, to June 30, 2021?

A. I would have to review my records. So I have no specific recollection right now of what those shortages may or may not have been.

Hearsay, Rule 802

Q. Have you done any research or analysis into why suicides in Arizona went up in fiscal year 2021?
A. I have not.
Q. Has anyone in Centurion?
MS. HESMAN: Form. Foundation.
MS. BARNES: Foundation.

Hearsay, Rule 802

THE WITNESS: Under Centurion policy and NCCHC standard, every suicide is reviewed and psychological autopsies are developed with a goal of looking at the underlying causes, and what led the individual to take his or her life.
And my belief is that those -- that exercise was done in each of these cases.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. (By Mr. Fathi) No, I understand that, and we'll get to that in a moment. But my question was -- was a little bit different.
My question was has anyone at Centurion done any kind of research or analysis into why in the aggregate suicides went up in Arizona in fiscal year 2021?
MS. HESMAN: Form. Foundation.
MS. BARNES: Form. Foundation.
THE WITNESS: I don't know the answer.
Q. (By Mr. Fathi) Is that something that would be useful to know?
MS. HESMAN: Form. Foundation.

MS. BARNES: Form and foundation.
THE WITNESS: Yes.
Q. (By Mr. Fathi) Doctor, you mentioned mortality reviews a moment ago. Do you as a matter of course review mortality reviews from the Arizona Department of Corrections?
A. I do not.
Q. Do you as a matter of course review psychological autopsies from the Arizona Department of Corrections?
A. I do not.
Q. Okay. Let's look at Exhibit 9, please.
(Deposition Exhibit 9 was marked for identification.)
Q. (By Mr. Fathi) Doctor, have you seen Exhibit 9 before?
A. I do not believe so.
Q. This is an Arizona Department of Corrections Mortality Review Committee Final Report about a man who died by suicide on January 28, 2021. Do you have any familiarity at all with this person or his suicide?
A. No.
Q. Now, January 28, 2021, was after the beginning of the self-harm initiative that you described earlier; correct?

Relevance, Rule 402

Foundation, Rule 602

Hearsay, Rule 802

Exhibit Foundation

Suicides in ADCRR are relevant. Rule 401, 402. Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/ agent. Exhibit has been admitted (Exh. 256).

Defendants' Reply: Witness testified that he has never seen the document and lacks personal of the inmate or the event, Rule 602. The witness's testimony regarding this event is speculative and does not make a fact of consequence more or less probable, Rule 401, 402.

Relevance, Rule 402

Foundation, Rule 602

Incomplete, Rule 106

Hearsay, Rule 802

Exhibit Foundation

Suicides in ADCRR are relevant. Rule 401, 402. Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate. Exhibit has been admitted (Exh. 256).

A. January 28, 2021 -- yes, I think so.

Q. Okay. Let's look at page 2. So at the top of page 2, Doctor, the second item asks, "Was sufficient care offered/provided regarding mental health issues?"

And the box is checked, "No." Do you see that?

A. I do see that.

Q. And then a little bit further down under "Contributing Cause Analysis," the box is checked for, "Failure to recognize symptoms or signs, and delay in access to care."

Do you see that?

A. I do.

Q. Page 3, please. And at the bottom under "General Critique," the boxes are checked for "Diagnosis not timely," and "Treatment not timely."

Do you see that, Doctor?

A. Yes.

Q. And finally the reviewer concludes that his death was, and the box is checked for, "Possibly avoidable." Do you see that?

A. I do.

Q. And I think your testimony is you haven't seen this document before today; correct?

A. Correct.

Q. Now that you've seen this document, does this

Defendants' Reply: Witness testified that he has never seen the document and lacks personal of the inmate or the event, Rule 602. The witness's testimony regarding this event is speculative and does not make a fact of consequence more or less probable, Rule 401, 402.

Relevance, Rule 402

Incomplete, Rule 106

Foundation, Rule 602

Suicides in ADCRR are relevant. Rule 401, 402. Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate.

have any effect on your opinion regarding the adequacy of suicide and self-harm prevention in ADC?

MS. BARNES: Form.

MS. HESMAN: Form. Foundation.

THE WITNESS: It's obviously a very concerning conclusion.

Q. (By Mr. Fathi) Does it have any effect on your opinion regarding the adequacy of suicide and self-harm prevention in the Arizona Department of Corrections?

MS. HESMAN: Same objection.

MS. BARNES: Form.

THE WITNESS: Give me a minute to think how to answer that.

Q. (By Mr. Fathi) Of course.

A. Let me start by saying that I haven't evaluated the adequacy of suicide prevention efforts in Arizona.

So for purposes of my report, I looked at broad trends of outcomes that looked positive. I think within broad trends it will always be possible to find exceptions. And unfortunately when there are exceptions as appears to have been concluded here, there are adverse outcomes.

Q. Is it your testimony that the broad trends of completed suicides was positive?

MS. HESMAN: Form.

Defendants' Reply: Witness testified that he has never seen the document and lacks personal of the inmate or the event, Rule 602. The witness's testimony regarding this event is speculative and does not make a fact of consequence more or less probable, Rule 401, 402.

Relevance, Rule 402

Incomplete, Rule 106

Foundation, Rule 602

THE WITNESS: Broad trends of self-injury and suicide attempts going down is in the right direction.

The elevation of number of suicides that we've just talked about is obviously not positive.

Q. (By Mr. Fathi) Does the information in this document have any effect on your opinion regarding the adequacy of suicide and self-harm provision in the Arizona Department of Corrections?

Defendants' Reply: Witness testified that he has never seen the document and lacks personal of the inmate or the event, Rule 602. The witness's testimony regarding this event is speculative and does not make a fact of consequence more or less probable, Rule 401, 402.

Cumulative, Rule 403

Suicides in ADCRR are relevant. Rule 401, 402. Witness was able to answer the questions. Incomplete" objection is meaningless; Defendants can counter-designate. Not cumulative; questions were not previously answered.

MS. HESMAN: Form. Foundation. Asked and answered.

MS. BARNES: Form.

THE WITNESS: I want to spend a little bit of time looking at the document if I may before I answer.

Defendants' Reply: Previously asked and answered at 92:7-22, Rule 403.

Q. (By Mr. Fathi) Please take your time, Doctor. If you need it scrolled, just please say so.

A. Yes. Please, may I see the prior page? Thank you. Let me pause here for a moment. And I know we reviewed it before, but if you don't mind, just scroll all the way up. Okay. Thank you. I'd like to look at the summary.

Okay. Would you please repeat the question so I --

Q. Sure. Does the information you have just learned from reviewing this document have any effect on

Relevance, Rule 402

Incomplete, Rule 106

Foundation, Rule 602

Cumulative, Rule 403

Exhibit Foundation

Suicides in ADCRR are relevant. Rule 401, 402. Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate. Not cumulative; questions were not previously answered. Exhibit has been admitted (Exh. 256).

your opinion regarding the adequacy of suicide and self-harm prevention in the Arizona Department of Corrections?

MS. HESMAN: Objection.

MS. BARNES: Foundation.

THE WITNESS: Because I haven't evaluated the suicide prevention efforts in Arizona, I don't actually have an opinion that this data can modify.

It does look like a health needs request was submitted and the patient was not seen and died shortly thereafter.

So in that regard, based on the limited piece of information I've got in front of me, I -- I agree that there -- I agree with the findings that there -- if you can scroll down, let me not testify to something that's not in there -- that there -- there was a lack of timely diagnosis and treatment.

Q. (By Mr. Fathi) Okay. So just to be clear, you're not going to testify at the trial of this case -- I'm sorry, you're not going to offer any opinion at the trial of this case on the adequacy of suicide and self-harm prevention in Arizona prisons; correct?

MS. BARNES: Form.

MS. HESMAN: Form.

THE WITNESS: I don't know what my

Defendants' Reply: Witness testified that he has never seen the document and lacks personal of the inmate or the event, Rule 602. The witness's testimony regarding this event is speculative and does not make a fact of consequence more or less probable, Rule 401, 402. Previously asked and answered at 92:7-22.

Relevance, Rule 402

Incomplete, Rule 106

Foundation, Rule 602

Argument

Suicides in ADCRR are relevant. Rule 401, 402. Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate.

Argument

testimony at trial will be. And based on this deposition, I will -- I may find time to review suicide prevention efforts in more detail. So I may have an opinion at trial.

Q. (By Mr. Fathi) Well, Doctor, it doesn't work that way.

A. Oh.

Q. The purpose of this proceeding is for us to find out what your testimony is going to be at trial, and I believe you just said you don't have an opinion on the adequacy of suicide and self-harm prevention in the Arizona Department of Corrections.

So if I heard that wrong, please let me know, but I think that's what you just said.

MS. BARNES: Form.

THE WITNESS: So I did just say that, and let me amend that and clarify it just a little bit.

Based on the data that I reviewed, it looks like concerted efforts have been made to reduce self-injury and suicide attempts.

It also looks like we had a spike in completed suicides. That's a mixed picture. But the spike in completed suicides does not eradicate the reduction in other types of self-injury.

And I think it's a fair inference that

Defendants' Reply: Witness testified that he has never seen the document and lacks personal of the inmate or the event, Rule 602. The witness's testimony regarding this event is speculative and does not make a fact of consequence more or less probable, Rule 401, 402. Counsel's commentary regarding what is appropriate trial testimony is argumentative and lacks relevance. Testimony regarding what the witness will testify to at trial is not relevant.

Relevance, Rule 402

Incomplete, Rule 106

Foundation, Rule 602

those trends that I mapped out based on Department data reflect positive -- the effect of a positive -- a positive effect -- a positive outcome on the efforts being made in Arizona.

Is it adequate? I'd need a definition for adequate. One suicide's too many. It's a tragedy.

Defendants' Reply: Incomplete because Plaintiffs did not include the report. Witness testified that he has never seen the document and lacks personal of the inmate or the event, Rule 602. The witness's testimony regarding this event is speculative and does not make a fact of consequence more or less probable, Rule 401, 402.

Suicides in ADCRR are relevant. Rule 401, 402. Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate.

MS. HESMAN: David, can you let us know when a good time to break for lunch is? I only need about 30 minutes, but I don't know what other people's thoughts are on that.

MR. FATHI: All right. Give me another couple minutes to -- to finish up this line of questioning.

MS. HESMAN: Okay.

MS. BARNES: Let me just ask one last question before you do that. Do you have an idea of how long you're going to have if we take a 30-minute break, how much more after that you're going to have.

MR. FATHI: Probably, you know, always hard to say because it depends on the answers, but probably between an hour and an hour and a half.

MS. BARNES: Okay.

Q. (By Mr. Fathi) Okay. Let's look at Exhibit 10, please.

(Deposition Exhibit 10 was marked for

identification.)

Q. (By Mr. Fathi) Doctor, Exhibit 10 is a mortality review for a man who died by suicide in Arizona on April 15 of 2021.

Have you seen this document before?

A. No.

Q. And the date of his death was after the beginning of the self-harm initiative that you have described; correct?

A. Correct.

Q. All right. Let's go down to page 2, please. And you'll see, Doctor, at the top of page 2 where the question is posed, "Was sufficient care offered/provided regarding mental health issues?"

And the box is checked, "No." Do you see that?

A. Yes. I see that.

Q. And under "Contributing Cause Analysis," the boxes are checked for, "Failure to recognize symptoms or signs," and "Failure to follow clinical guidelines."

Do you see that?

A. Yes.

Q. And let's go to page 3, please, under "General Criteria," the box is checked for, "Level of care inappropriate for the severity of illness." Do you see that?

A. I do.

Q. And the reviewer concludes that this death was possibly avoidable. Do you see that?

A. I do.

Q. So does the information you just learned from this document have any effect on your opinion regarding the adequacy of suicide and self-harm prevention in the Arizona Department of Corrections?

MS. HESMAN: Form. Foundation.

MS. BARNES: Form and foundation.

THE WITNESS: I'm -- I'm really struggling with this line of questioning, and I apologize for that.

The reason I'm struggling is this is the first time I've seen these cases. It's the first time I'm looking at the fact patterns.

And how these particular cases reflect on overall suicide prevention efforts and the quality of mental health care is -- it's difficult for me to assess that in this context right now.

So I really need more time to look at these data and find out more about the suicide prevention program before I can answer adequately.

Q. (By Mr. Fathi) Did you review any completed suicides in order to prepare your report?

A. No.

Relevance, Rule 402

Witness's bias/ selective review of evidence is relevant. Rule 401, 402.

Q. Why not?

MS. BARNES: Form and foundation. And, again, David, you are encroaching in the area of attorney-client privileged communications. So I'm going to instruct the witness not to answer.

MR. FATHI: The question was why not. I was not asking about any communications, attorney-client or otherwise.

MS. BARNES: To the extent your answer would -- would involve attorney-client communications, Dr. Wilson, I'm going to tell you not to answer and you can let the record reflect that you're not going to answer.

Q. (By Mr. Fathi) Doctor, why did you not look at any completed suicides in order to prepare your report?

MS. BARNES: The same instruction.

So if -- in other words, Dr. Wilson, if your answer would at all involve communications with counsel, then you just simply say, "I cannot answer that question."

THE WITNESS: I cannot answer that question.

MR. FATHI: Thank you very much, Doctor.

THE WITNESS: Thank you for the instruction.

Incomplete, Rule 106

Hearsay, Rule 802

Exhibit Foundation

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate. Exhibit has been admitted (Exh. 403).

Defendants' Reply: Witness testified that he has never seen the document and lacks personal of the inmate or the event.

Q. (By Mr. Fathi) Let's look at page 3 of this document again. Doctor, do you see the heading "Mental Health Concerns"?

A. Yes.

Q. And it says, "There was no suicide risk assessment conducted upon placement or removal from watch."

Do you see that?

A. Yes.

Q. Is that something that could be impacted by a lack of mental health staff?

MS. HESMAN: Form. Foundation.

MS. BARNES: Form. Foundation.

THE WITNESS: Yes.

Q. (By Mr. Fathi) Item 2, "There was no crisis treatment plan developed within one business day of placement on watch (there was no plan developed for the entirety of his watch)."

Doctor, is that something that could be affected by a shortage of mental health staff?

MS. BARNES: Form and foundation.

THE WITNESS: My answer is yes.

Q. (By Mr. Fathi) Item 3, "There is no indication that safety was reliably reestablished prior to discontinuing watch (in fact, the patient's mental status

Incomplete, Rule 106

Foundation, Rule 602

Hearsay, Rule 802

Exhibit Foundation

Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate. Exhibit has been admitted (Exh. 403).

was significantly worse at the time of discontinuing watch than when it was started)."

Doctor, is that something that could be affected by a shortage of mental health staff?

MS. HESMAN: Form.

MS. BARNES: Form and foundation.

THE WITNESS: Potentially, yes.

Q. (By Mr. Fathi) And No. 4, "There is no indication that multiple disciplinary consultation was conducted prior to discontinuing the watch."

Is that something that could be affected by a shortage of mental health staff?

MS. HESMAN: Form and foundation.

MS. BARNES: Same objections.

THE WITNESS: Yes.

Defendants' Reply: Witness testified that he has never seen the document and lacks personal of the inmate or the event, Rule 602. The witness's testimony regarding this event is speculative and does not make a fact of consequence more or less probable, Rule 401, 402.

Q. (By Mr. Fathi) And if we scroll up to page 1, we see that this -- this suicide occurred at the Eyman complex. Do you see that, Doctor?

A. Yes.

Q. And that was one of the complexes where the suicide self-harm prevention training was -- was not conducted; is that correct?

A. That is correct.

MR. FATHI: Okay. If people want to take a lunch break this is good time. How long do you need?

MS. BARNES: It's 12:08. Do you want to come back to at 12:40, 32 minutes?

MR. FATHI: Okay. See you then.

(Recess from 12:08 p.m. to 12:43 p.m.)

Q. (By Mr. Fathi) All right. Let's go back to your report, Dr. Wilson, page 8. And I want to ask you about your commentary regarding opinions of Dr. Stewart.

Now, in that first paragraph you say that you are qualified to address some of Dr. Stewart's opinions; correct?

A. I do.

Q. Do you believe that you are qualified to address all of the opinions set forth in his report?

A. No.

Q. Do you believe that you are qualified to address any of the opinions in his report beyond the ones that you discuss in this -- in your report?

A. I would have to review all of his opinions again and -- to answer that.

Q. Okay. But the only ones about which you're planning to testify are the ones set forth in your report; correct?

A. Again, I don't know what I will be asked about or called to testify about if I am called. The opinions that I offer in my report are ones that I'm prepared to

testify on.

Q. All right. And you're not going to offer any opinions that are not set forth in your report; correct?

MS. BARNES: Form.

THE WITNESS: I don't know what I'll testify to.

Q. (By Mr. Fathi) Well, Doctor, as I said earlier the whole purpose of providing an expert report, and this proceeding today is to allow us to know what your testimony is going to be at trial.

So if you're planning to testify about any other of Dr. Stewart's opinions beyond the ones that you've explicitly mentioned in your report, you need to tell me that now.

A. Okay.

MS. BARNES: Again, with respect -- this witness is in a unique situation, David, because he's listed as an expert witness who's provided this report, and a fact witness.

So if you are asking him for purposes of his expert opinion in this report is he going to offer any expert opinions outside of what is encompassed in his report, then he can answer that.

Relevance, Rule 402

Q. (By Mr. Fathi) All right. Doctor, are you going to offer any expert opinions beyond what is in your

Relevance, Rule 402

Incomplete, Rule 106

Witness's intended testimony at trial is relevant. Rule 401, 402. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Witness's anticipated testimony at trial does not make a fact of consequence more or less probable, Rule 401, 402.

report?

A. No.

Q. Okay. Thank you.

So just to be clear, you are -- you are not a medical doctor; correct?

A. Correct.

Q. You are not a psychiatrist?

A. Correct.

Q. You're not licensed to prescribe medication?

A. Correct.

Q. Have you ever clinically supervised a psychiatrist?

A. Clinically, no.

Q. Have you ever clinically supervised a nurse practitioner?

A. No.

Q. All right. Let's talk about your opinion on page 8 regarding nurse practitioners.

So I gather that you agree with Dr. Stewart that the patients in ADCRR are extraordinarily complex; correct?

MS. HESMAN: Form.

THE WITNESS: I do.

Q. (By Mr. Fathi) I'm sorry, what was that?

A. I do.

Q. All right. Will you agree with me that psychiatrists have more years of professional training than psychiatric nurse practitioners?

MS. BARNES: Form.

THE WITNESS: Yes.

MS. BARNES: Foundation.

THE WITNESS: Yes.

Q. (By Mr. Fathi) I'm sorry. I didn't hear your answer, Doctor.

A. Yes.

Q. Will you agree that there are some patients who should be seen by a psychiatrist rather than or in addition to a nurse practitioner?

MS. HESMAN: Form. Foundation.

THE WITNESS: That's theoretically possible.

Q. (By Mr. Fathi) Okay. Let's talk about your opinions on dediagnosing. Oh, I'm sorry, let me go back to page 9, paragraph B, where you talk about Dr. Stewart's report or opinions on mental health groups. Do you see that?

A. Yes. I do.

Incomplete, Rule 106

Q. So you, as I understand it, you agree with Dr. Stewart that all behavioral health groups should be coordinated by licensed behavioral health professionals;

Incomplete, Rule 106

"Incomplete" objection is meaningless; Defendants can counter-designate.

correct?

A. Correct.

Q. And you also agree that behavioral health groups that are psychotherapeutic in nature, including those focused on behavioral skills building, need to be delivered by licensed behavioral health professionals, correct?

A. Correct.

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

Q. All right. Now let's talk about dediagnosing. So I gather you agree that erroneously removing a diagnosis of a serious and persistent mental illness like schizophrenia, like bipolar disorder, can put the patient at risk?

MS. HESMAN: Form. Foundation.

THE WITNESS: In -- in theory, I completely agree that any erroneous diagnosis, addition or removal, can put the patient at risk.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

Q. (By Mr. Fathi) Right. Well, I'm -- I'm looking at the last sentence of the penultimate paragraph on page 9 where you say, "Removing that flag can present risks if the patient's treatment needs are no longer being met."

Do you stand by that statement?

A. I do.

Hearsay, Rule 802

Q. Okay. Let's look at page 10. At the end of the

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

first paragraph, the carryover paragraph at the top of page 10, you write, "Removing a mood disorder diagnosis and replacing it with a personality disorder diagnosis may be up diagnosing when measured in terms of the amount of behavioral health resources the patient's treatment may take."

Do you see that, Doctor?

A. I do.

Q. Okay. And what's your basis for that statement?

A. My clinical experience is that if a patient suffers from a mood disorder, the disordered mood can be adequately addressed with supportive psychotherapy and psycho -- psychotropic medication.

And while that may not be straightforward, it often is. Whereas individuals who suffer from severe and complex personality disorders are some of the toughest patients to manage and treat safely.

And they do require very extensive resources, not only -- it's not only may they benefit from psychotropic medication, but they most often need long-term and extensive cognitive behavioral treatment.

Q. Okay. Doctor, are you familiar with any study that shows that removing a mood diagnosis and replacing it with a personality disorder diagnosis generally results in the patient's treatment consuming more

behavioral health resources?

MS. HESMAN: Form.

THE WITNESS: I'm not familiar with the study.

Hearsay, Rule 802

Q. (By Mr. Fathi) Okay. Are you familiar with the stipulation or the settlement agreement in this -- this litigation?

A. In broad stokes, I am.

Q. Okay. Are you aware that there are some obligations under the settlement agreement that apply only to patients who are designated as seriously mentally ill?

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

MS. HESMAN: Form.

Hearsay, Rule 802

THE WITNESS: Yes. I think I remember that.

Q. (By Mr. Fathi) And are you aware that if a patient's SMI designation is removed, he or she is no longer entitled to be provided those services?

MS. HESMAN: Form.

Hearsay, Rule 802

THE WITNESS: I think I understand your question, but I want to frame my answer. Regardless Of the stipulation agreement, my position is that patients are entitled to the care that they need to address their serious treatment needs.

So whether or not a patient has a flag or a

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

diagnosis of serious mental illness, I believe the patient is entitled to the care that is required to meet the patient's needs.

I believe what you're asking is when -- and let me just make sure I understand the question. When a SMI or serious mental diagnosis is removed, certain requirements under the stipulation for treatment no longer apply. Is that what you were asking me?

Q. Yes. My question is, are you aware of that fact?

A. I am aware of that fact.

Relevance, Rule 402

Foundation, Rule 602

Data underlying the witness's testimony is relevant. Rule 401, 402. Witness was able to answer the questions.

Defendants' Reply: Witness testified that he did not review the records, Rule 602. Testimony that he has no opinion regarding individual cases does not make a fact of consequence more or less probable, Rule 401, 402.

Q. Okay. Dr. Stewart identified 14 patients as possible examples of dediagnosing. Did you review any of those patients' records?

A. No.

Q. So you have no opinion as to whether in those particular cases dediagnosis had taken place?

A. Correct.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

Q. Okay. On page 10, you respond to the opinions of Robert Joy. Do you see that?

A. I do.

Q. And in the last sentence of the penultimate paragraph you write, "From July 2019 when Centurion assumed responsibility for healthcare with ADCRR and September 2021, an average of 28 percent of the

Incomplete, 106

Hearsay, Rule 802

Foundation, Rule 602

Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the report.

population has been identified on any given month as requiring ongoing mental health services."

Do you see that?

A. Yes.

Q. And then the next sentence you write, "There has only been small variation in this proportion from month to month during this time period (range 27 to 29 percent)."

Do you see that?

A. Yes.

Q. And what is the source -- what is your source for those statistics?

A. It is in the second-to-last paragraph and it's the second sentence. The Department publishes monthly at-a-glance reports.

Q. So that is your source for these statistics?

A. That is correct.

Q. And when you talk about patients requiring ongoing mental health services, what -- what's the definition of that term that you're using?

A. I believe that is the language used in the at-a-glance reports.

Q. Okay. But my question is what's the definition?

A. My understanding of that definition is that this is a -- a patient who's on the mental health caseload and

Incomplete, Rule 106

Foundation, Rule 602

Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the expert report. Witness testified that he lacks personal knowledge regarding specifics of data regarding state-run versus private prisons, Rule 602.

requires ongoing treatment, including a treatment plan.

Q. And when those percentages that we're discussing, were those calculated using the entire ADC prisoner population including the private prisons or only the ten state-run prison locations?

A. I would have to review, but my recollection is the entire.

Q. Okay. So what are the analogous percentages if you look only at the state-run prisons?

A. I don't know.

Q. Doctor, are you aware that the private prisons don't accept patients with ongoing mental health needs?

MS. HESMAN: Form.

THE WITNESS: Now that you've asked that question, I believe that's correct.

Q. (By Mr. Fathi) Okay. So if you were looking only at the population of the ten state-run prisons, the percentage of patients with mental health needs would be higher than the figures we've just discussed; correct?

MS. HESMAN: Form. Foundation.

THE WITNESS: So in this case -- in this case I took the percentages -- I took the data directly from the Department as they report it.

And given the condition that you just reminded me of, that the private prisons don't accept

Incomplete, Rule 106

Foundation, Rule 602

Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate.

Argument

patients who require ongoing mental healthcare, the percentages may -- well, let me start over.

I'm -- I'm telling you what the Department reports. I don't -- I did not do calculations. And if there's a different or better way to present those statistics, I think that that's outside of the scope of my report.

Q. (By Mr. Fathi) Well, this is your report, and I'm asking you about the statistics you used.

So as I understand it, you believe that this 28 percent figure is calculated using the entire state prison system including the private prisons; is that right?

A. That's my belief.

Q. Okay.

A. But I'd have to double check.

Q. Okay. So let's just assume that's true. The[n] if you calculated the analogous figure using only the state-run prisons, the percentage would be higher, wou[ld] it not?

MS. HESMAN: Form. Foundation.

THE WITNESS: Yes.

Q. (By Mr. Fathi) And the percentage would be higher because the numerator, the number of people wit[h] mental health needs, would be the same. And the

Argument

Speculation

Compound

Argument

Questions were not compound or argumentative and did not call for speculation.

Defendants' Reply: Incomplete because Plaintiffs did not include the expert report. Witness testified that he lacks personal knowledge regarding specifics of data regarding state-run versus private prisons, Rule 602, and line of questioning calls for speculation. Counsel's commentary regarding the report is argumentative.

denominator would be smaller by about seven and a half thousand; correct?

MS. BARNES: Form.

THE WITNESS: Correct.

Q. (By Mr. Fathi) Okay. So to recap, you don't know what the percentage would be if we were looking just at the ten state-run prisons?

MS. BARNES: Form.

THE WITNESS: Sitting here today, I would need to review the at-a-glance reports to ensure I answer that correctly. If you want me to do so, I will be happy to.

Q. (By Mr. Fathi) Okay. But my question is, sitting here today, you don't know what the percentage of patients with ongoing mental health needs is, looking just at the ten state-run prisons?

A. Sure. I don't.

Q. Okay. Now, also on page 10 of your report, it says -- this is the second line of the final paragraph -- "The overall proportion of incarcerated individuals who are identified as requiring mental healthcare is consistent with proportions found in other state correctional settings." Do you see that?

A. I do.

Q. What's your source for that statement?

Incomplete, Rule 602

"Incomplete" objection is meaningless; Defendants can counter-designate.

Relevance, Rule 402

Cumulative, Rule 403

Foundation, Rule 602

Data underlying the witness's testimony is relevant. Rule 401, 402. Witness was able to answer the questions. Not cumulative; questions were not previously answered.

Defendants' Reply: Witness testified that he does not have personal knowledge regarding whether ADCRR reports contain only data on state-run prisons, Rule 602. This testimony does not make a fact of consequence more or less probable, Rule 401, 402. Lines 13-17 are cumulative of lines 5-12.

Incomplete, Rule 106

Hearsay, Rule 802

Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the expert report.

Incomplete, Rule 106

Foundation, Rule 602

Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the expert report. Witness testified that he lacks recall of data regarding Florida inmates.

A. My experience working for my company and multiple reviews in other programs.

Q. So what -- when you make this comparison here, what states to what states are you comparing to Arizona?

A. Florida, Georgia, Massachusetts, Tennessee.

Q. Any others?

A. Those are the ones that came immediately to mind. I may have looked at Maryland.

Q. What's the overall proportion of incarcerated individuals who are identified as requiring mental healthcare in the Florida prison system?

A. I don't recall.

Q. What is it in Georgia?

A. Somewhere around 20 or 21 percent, last time I looked.

Q. What is it in Massachusetts?

A. My understanding is that it's about 25 percent.

Q. And what's that understanding based on?

A. Last -- last look at statistics, which was a while ago.

Q. How long ago was that?

A. I reviewed a report earlier this year from -- I'm not sure the date exactly, but mid 2015, somewhere in that range.

Q. Okay. So just so I'm clear, you're not --

Relevance, Rule 402

Cumulative, Rule 403

Foundation, Rule 602

Argument

Data underlying the witness's testimony is relevant. Rule 401, 402. Witness was able to answer the questions. Not cumulative; questions were not previously answered. Questions were not argumentative.

you're not able to cite any published data for this statement; is that correct?

MS. BARNES: Form.

THE WITNESS: I could go gather that and present it to you. Many correctional systems do -- do present those.

Q. (By Mr. Fathi) Okay. But when you wrote this statement that the overall proportion of incarcerated individuals who are identified as requiring mental healthcare is consistent with proportions found in other state correctional settings, you were just basing that on your own personal experience; correct?

A. That is correct.

Q. Okay. And you also state on page 10, "In other state correctional programs, patients receiving ongoing mental healthcare typically represent between 20 and 25 percent of the entire incarcerated population, and some 5 percent to 8 percent of the entire population are classified as seriously mentally ill."

What's your source for those statistics?

A. It's, again, my personal experience with other programs.

Q. Okay. So, again, you weren't looking at any published data when you wrote those figures?

A. No.

Defendants' Reply: Witness may properly base his opinion on his personal experience in other states; whether he has access to published data does not make any fact of consequence more or less probable, Rule 402. Counsel's question at lines 7-12 is argumentative.

Hearsay, Rule 802; Incomplete, Rule 106

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Testimony is complete as designated.

Hearsay, Rule 802; Incomplete, Rule 106

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Testimony is complete as designated.

Q. And to what states are you comparing Arizona when you make this statement?

A. The same states I mentioned in the caseload.

Q. Okay. Florida, Georgia, Massachusetts, Tennessee and Maryland; correct?

A. Correct.

Q. Do you have any sense how Arizona compares to the other 44 states on these -- on these metrics?

A. No.

Q. Let's look at Exhibit 8, please.

(Deposition Exhibit 8 was marked for identification.)

Q. (By Mr. Fathi) Let's look at pages 21 and 22. Doctor, Exhibit 8 is a document in which the defendants tell us about who will testify in this case and what -- and on what subjects.

And you were discussed at pages 21 and 22. So would you please read that to yourself and then we'll discuss.

A. I will. Can we scroll just little bit to the end of that? I've consumed the expectation, the language.

Q. Okay. Doctor, have you seen this document before?

A. It was forwarded to me.

Q. When did you first see this document?
A. A week or two ago.
Q. Is this an accurate statement of what your testimony will be in this case?
MS. HESMAN: Form. Foundation.
MS. BARNES: Yeah, David, this is a deposition that you sought for in connection with his expert report.
There's only one sentence in this listing and description of his testimony that pertains to the expert report, so if you want to limit it to that, that would be great.
But he is not here to testify as a fact witness, and we're not prepared to answer questions in that regard because that's not what this deposition was noticed for.
MR. FATHI: No, I'm entitled to ask him about his testimony at the trial of this case.
MS. BARNES: No, you're not, because this is an expert deposition. And it is specifically tied to his expert report.
You did not notice a deposition for his fact -- where he was listed as a fact witness or the topics that his fact witness testimony would pertain to.
So you're limited to asking him about the

expert opinion, and the stuff that's in the expert opinion is what he's going to testify to in that capacity.

Q. (By Mr. Fathi) Doctor -- I'm sorry?

MS. BARNES: What was that, Ashlee?

MS. HESMAN: We join in that objection.

Q. (By Mr. Fathi) Doctor, is this a complete statement of what your testimony is going to be in this case?

MS. BARNES: And, again, I'm going to instruct the witness not to ask -- answer, David. You did not notice this as a fact witness deposition.

You noticed this as an expert deposition based on the expert report which is one sentence of this. He will also testify pursuant to 26(a)(2)(b) and 26(a)(2)(c). And your questions of him in this deposition need to be limited to his expert opinion.

MR. FATHI: That's not correct.

MS. BARNES: Why is it not correct?

MR. FATHI: I'm not going to argue with you. Are you instructing the witness not to answer?

MS. BARNES: I'm asking you to give me a reason why it's not correct. If you want us to try to work it out and see if we can work it out, you need to give me a reason why I'm incorrect.

 You didn't notice a fact witness deposition. You have noticed other fact witness depositions and 30(b)(6) depositions. That's not what this deposition was noticed for. It was noticed pertaining to his expert report only.

MR. FATHI: These are the subjects on which he is -- he is disclosed as a witness, and we're entitled to ask him about that. Are you instructing him not to answer?

MS. BARNES: You're not entitled to ask him that in a deposition that was noticed pursuant to the expert report only.

If you had noticed it and said that you were going to notice it to depose him as a fact witness and as an expert witness, then that would be a different story. But that deadline came and went and you did not, and you've only noticed his deposition as an expert.

So this testimony, the testimony that you're going to seek from him in this deposition needs to be limited to the expert report.

MR. FATHI: Okay. I'm going to ask my questions, and you can instruct him not answer if you want to do that.

Q. (By Mr. Fathi) Doctor, is this an accurate statement of what your testimony will be at the trial of

this case?

MS. BARNES: And to the extent that you can answer that with respect to your expert opinion only and not the other list -- listing of various topics regarding fact witness testimony, you can answer that.

THE WITNESS: With respect to my expert opinion and report, this is accurate.

Q. (By Mr. Fathi) Is this a complete statement of what your testimony will be at the trial of this case?

MS. BARNES: And to the extent that -- to the extent that you can answer that with respect to your expert report, in other words, is your expert report what you're going to testify to regarding your expert opinion, then you can answer that.

If he's -- that's my instruction.

MR. FATHI: Okay. So would you please clearly instruct him not to answer because when we go to the judge I want -- I want a clear -- I don't want any ambiguity. If you're instructing him not to answer, I want you to say that.

MS. BARNES: Well, I'm asking you to give me a reason why you think you're entitled to ask him about his fact witness testimony at trial in this deposition.

MR. FATHI: Because this is all part of

 his -- his disclosed testimony that we're entitled to ask about. Well, Sarah, we're not going to agree, okay? There's no point in arguing.

But if you're going to instruct him not to answer, I want that clearly on the record for when we go to the judge. So will you please instruct him not to answer if that is in fact, in fact, your instruction?

MS. BARNES: Dr. Wilson, to the extent that you could answer about this listing right here, No. 6, as it pertains to your expert opinion you can answer the question.

MR. FATHI: And you're otherwise instructing him not to answer. Is that correct?

MS. BARNES: You need to make your question more clear, which is making it difficult for me to give the instruction clearly.

If you want to ask him is this listing of testimony going to be what you're going to testify to at trial as a fact witness, then say that.

MR. FATHI: Sarah, you can't have it both ways. If you're instructing him not to answer, you need to do that clearly on the record so we can get a -- seek a ruling from the court.

MS. BARNES: So are you going to go to the judge right now? Let's get the judge, then. I mean, is

that what you're saying you're going to do?

MR. FATHI: May or may not do it right now, but we may do it later. We need a clear record.

MS. BARNES: I want to take a two-minute recess before I respond to you.

MR. FATHI: Okay. Two minutes is fine.

MS. BARNES: We'll take a break.

(Recess from 1:12 p.m. to 1:15 p.m.)

MS. BARNES: So coming back, my -- my position is going to be that I object to the questions, fact witness -- fact -- sorry, can't talk -- fact discovery has come and gone. Those deadlines have come and gone. You did not notice the deposition to talk to him about any potential fact testimony he might give.

With that objection, and reserving the right to pursue that further at trial if necessary, you can ask the witness the question. If he can answer it, he'll answer it.

MR. FATHI: Okay. Thank you.

Q. (By Mr. Fathi) All right. Doctor, going back to Exhibit 8 -- can we have it on the screen?

So, Doctor, Exhibit 8 says that you're expected to testify regarding how Centurion determined the staffing levels needed for the ADCRR contract.

Do you see that?

Relevance, Rule 402

Hearsay, Rule 802

Health care staffing is relevant. Rule 401, 402. Rule 801(d)(2) non-hearsay statement of opposing party/ agent.

Defendants' Reply: Testimony regarding the contents of Defendants' disclosure statement as to Dr. Wilson's anticipated testimony does not make a fact of consequence more or less probable, Rule 401, 402.

Relevance, Rule 402

Foundation, Rule 602

Incomplete, Rule 106

Health care staffing is relevant. Rule 401, 402. Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate.

A. I do.

Q. And what is your testimony going to be on that subject?

MS. HESMAN: Form. Foundation.

MS. BARNES: Same objection.

THE WITNESS: I don't know. I haven't prepared for trial. I have already mentioned in this deposition that my recollection is that the staffing was provided to us in the most recent RFP.

Relevance, Rule 402

Foundation, Rule 602

Incomplete, Rule 106

See below.

Q. (By Mr. Fathi) Do you know how Centurion determined the staffing levels needed for the ADCRR contract?

MS. HESMAN: Form. Foundation.

THE WITNESS: I'm not sure I do now.

Relevance, Rule 402

Hearsay, Rule 802

Foundation, Rule 602

Incomplete, Rule 106

Health care staffing is relevant. Rule 401, 402. Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Q. (By Mr. Fathi) Okay. So next it says that you are going to testify about changes Centurion has made to staffing during the contract.

Do you see that?

A. I do.

Q. And what is your testimony going to be on that topic?

MS. HESMAN: Form. Foundation.

MS. BARNES: Form and foundation.

THE WITNESS: In fact, I'm not qualified to testify on that topic.

Defendants' Reply: Testimony regarding the contents of Defendants' disclosure statement as to Dr. Wilson's anticipated testimony does not make a fact of consequence more or less probable, Rule 401, 402. Incomplete because Plaintiffs did not include the disclosure statement. Witness testified that he is unsure whether staffing was provided by ADCRR and is not qualified to testify regarding changes to staffing levels over the course of the contract, Rule 602.

Relevance, Rule 402

Hearsay, Rule 802

Foundation, Rule 602

Incomplete, Rule 106

See below

Q. (By Mr. Fathi) Okay. So next it says you will testify about a comparison of Centurion staffing levels in Arizona versus staffing levels in other states. What is your testimony going to be on that topic?

MS. HESMAN: Form. Foundation.

MS. BARNES: Foundation.

THE WITNESS: I don't know.

Relevance, Rule 402

Foundation, Rule 602

See below

Q. (By Mr. Fathi) Well, tell me what you know about Centurion staffing levels in Arizona versus staff levels in other states.

MS. HESMAN: Same objection.

THE WITNESS: I have not taken the time to do a direct comparison.

Relevance, Rule 402

Hearsay, Rule 802

Foundation, Rule 602

Incomplete, Rule 106

Health care staffing is relevant. Rule 401, 402. Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Q. (By Mr. Fathi) Next it says you're going to testify regarding Centurion's recruiting, hiring, credentialing, training, retention and compensation policies and practices for mental health staff. Do you see that?

A. I do.

Q. Tell me what your testimony is going to be on that subject.

MS. HESMAN: Form. Foundation.

MS. BARNES: Form and foundation.

THE WITNESS: To the extent that I'm qualified to testify on credentialing and training, I

Defendants' Reply: Testimony regarding the contents of Defendants' disclosure statement as to Dr. Wilson's anticipated testimony does not make a fact of consequence more or less probable, Rule 401, 402. Incomplete because Plaintiffs did not include the disclosure statement. Witness testified that he does not have personal knowledge of staffing levels in Arizona versus other states and may not be qualified to testify regarding credentialing and training, Rule 602.

Relevance, Rule 402

Hearsay, Rule 802

Foundation, Rule 602

Incomplete, Rule 106

Health care staffing is relevant. Rule 401, 402. Witness was able to answer the questions. Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

don't know what my testimony will be. I'm not the best witness for recruiting and hiring and compensation policies.

Q. (By Mr. Fathi) Next it says that you are also expected to testify regarding contract monitoring and compliance activities. Do you see that?

A. I do.

Q. And what is going to be the substance of your testimony on those topics?

MS. HESMAN: Form. Foundation.

MS. BARNES: Same objections.

THE WITNESS: The substance of any testimony that I provide will be consistent with what I've described today in my deposition.

Q. (By Mr. Fathi) So on the subjects of contract monitoring and compliance activities, are you going to testify to any information beyond what you've already testified to today?

MS. HESMAN: Form. Foundation.

MS. BARNES: Form and foundation.

THE WITNESS: I don't know.

Q. (By Mr. Fathi) Well, again, Doctor, you need to -- you need to tell me what your testimony is going to be. So if you're going to testify on these topics beyond what you've already said today, I'm asking you what your

Defendants' Reply: Testimony regarding the contents of Defendants' disclosure statement as to Dr. Wilson's anticipated testimony does not make a fact of consequence more or less probable, Rule 401, 402. Incomplete because Plaintiffs did not include the disclosure statement.

 testimony is going to be.

MS. BARNES: And that's absolutely not correct, and you're going to make me return to my original objection and instruct him not answer if you're going to take that approach, David.

He absolutely does not have to tell you what he's going to testify to at trial as a fact witness. That is absolutely incorrect, and I don't appreciate you instructing my witness to what is contrary to the rules.

He can tell you whether or not he's going to testify to anything else as an expert beyond what is contained in his expert opinion, but he does not have to tell you as a fact witness what he's going to testify to at trial. That is incorrect.

MR. FATHI: Sarah, what's -- what's the authority for your position?

MS. BARNES: No witness has to tell you what their testimony at trial is going to be. Certainly not one that wasn't noticed for a deposition regarding their fact testimony.

But more importantly, you are not entitled to have someone tell you what their testimony at trial is going to be. If you would like to find out what a witness knows about a particular topic for which they have been listed as a potential fact witness, then you

can ask them that.

But he's not obligated to tell you what he's going to testify to at trial. He probably has no idea what he's going to testify to at trial.

MR. FATHI: And I ask again what's the authority for your position, Sarah?

MS. BARNES: Common sense. And the fact that you can't provide me anything that tells us that you're entitled to have a witness tell you what they're going to testify to at trial.

A person who has not prepared for trial who's going to be discussed -- have their testimony discussed with them with counsel, it's all work product and attorney-client privilege. And they don't have to say here's my testimony at trial.

All you're entitled to learn in a deposition is -- Rule 30, really, is my framework and my authority in this, is that you can find out what they know.

If you're going to ask him about what he knows about these topics, so be it. But don't instruct my witness that he has to tell what his fact witness testimony will be at trial.

MR. FATHI: Sarah, you could be excused for being ignorant of this because you're not counsel on the

case, but there is an order in this case ordering the parties to disclose the substance of their witness testimony. So we are, in fact, entitled to ask about --

MS. HESMAN: And, David, I'm just going to interject here. The time has come and gone for that. Fact discovery is closed, and you've wasted the last 15 minutes on -- on issues that you failed to -- you failed to notice a fact witness deposition of this witness. So why are we wasting time on this when this is an expert deposition?

MR. FATHI: I think if you'll look back on the last few minutes I haven't been the one talking, so if anyone's wasting time, it's not me.

MS. HESMAN: I disagree. But why don't you just move on because this is not what the purpose of the deposition is.

MR. FATHI: Yeah, you're not the judge of that, Ashlee. So --

MS. HESMAN: Again, the judge is, and the judge has said you get expert depositions right now. You're not conducting an expert deposition, and you have not given any authority to support your -- your claim that you're entitled to conduct discovery depositions right now. So if you have that --

MR. FATHI: The onus is on the person

 attempting to terminate a deposition or the person instructing a witness not to answer to provide --

MS. HESMAN: So you don't have that. Okay.

MS. BARNES: Again, you're misstating the law, and maybe it's because you don't -- well, I'll leave that alone. You are misstating the law.

You are required to limit your conduct in the deposition and your questioning of a witness to the relevant matters in that deposition.

And this deposition is an expert deposition, and the questions need to be limited to that report and then of course his professional background, et cetera, that go towards him being qualified to give that expert report.

You are not now, especially after the time has passed, allowed to press him on what his fact witness testimony will be. The topics are there, you've been provided those, you didn't depose him in that regard. So I agree that you need to move on.

MR. FATHI: Well, I certainly appreciate the legal instruction from both of you, but are you both finished? Are you finished, Sarah?

MS. BARNES: I'm not talking.

MR. FATHI: Are you finished, Ashlee?

MS. HESMAN: I am finished. Thank you so

much.

MR. FATHI: You're most welcome.

Q. (By Mr. Fathi) Doctor, what is your testimony going to be at trial regarding contract monitoring and compliance activities?

MS. HESMAN: Form. Foundation.

MS. BARNES: Form and foundation. Asked and answered. You can go ahead and answer it one more time, Dr. Wilson.

THE WITNESS: I don't know.

Q. (By Mr. Fathi) What is your testimony at trial going to be regarding supervision and peer reviews of mental health staff?

MS. HESMAN: Form. Foundation.

MS. BARNES: Same.

THE WITNESS: I don't know.

Q. (By Mr. Fathi) Okay. Tell me about your involvement in peer reviews of mental health staff in Arizona.

MS. HESMAN: Form. Foundation.

THE WITNESS: I've had no involvement in peer reviews.

Q. (By Mr. Fathi) And it says you're going to, "Testify regarding statistical data relating to the provision of the mental healthcare to ADCRR inmates."

Relevance, Rule 402

Foundation, Rule 602

Incomplete, Rule 106

Qualifications of mental health staff are relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Testimony regarding the contents of Defendants' disclosure statement as to Dr. Wilson's anticipated testimony does not make a fact of consequence more or less probable, Rule 401, 402. Incomplete because Plaintiffs did not include the disclosure statement. Witness testified that he has no involvement in peer reviews, Rule 602.

Do you see that?

A. I do.

Q. What statistical data will you be discussing?

MS. HESMAN: Form. Foundation.

MS. BARNES: Form. Foundation.

THE WITNESS: I don't know.

MS. HESMAN: He responded, David.

THE WITNESS: I'm sorry. I don't know.

Q. (By Mr. Fathi) Tell me what kinds of statistical data regarding the Arizona contract you track as a regular part of your job?

MS. HESMAN: Form. Foundation.

THE WITNESS: I don't track statistical data as part -- a routine part of my job.

Q. (By Mr. Fathi) And it also says that you're going to testify regarding, "continuous improvements in the delivery of mental healthcare and programming to the ADCRR inmate population." Do you see that?

A. Yes. I do.

Q. And what are the continuous improvements to which you're going to be testifying?

MS. HESMAN: Form. Foundation.

MS. BARNES: Same objections.

THE WITNESS: I don't know, except I think I showed some improvement in my report, discussed some

Relevance, Rule 402

Foundation, Rule 602

See below.

Relevance, Rule 402

Hearsay, Rule 802

Foundation, Rule 602

Incomplete, Rule 106

Delivery of mental healthcare and programming are relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence. Rule 801(d)(2) non-hearsay statement of opposing party/ agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Testimony regarding the contents of Defendants' disclosure statement as to Dr. Wilson's anticipated testimony does not make a fact of consequence more or less probable, Rule 401, 402. Incomplete because Plaintiffs did not include the disclosure statement. Witness testified that he does not routinely track statistical data, Rule 602.

Relevance, Rule 402

Foundation, Rule 602

Incomplete, Rule 106

Delivery of mental healthcare and programming are relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence. "Incomplete" objection is meaningless; Defendants can counter-designate.

improvement in the delivery of mental healthcare at least in terms of the broad trends in self-injury and suicide attempts.

Q. (By Mr. Fathi) Other than that are you aware of any other continuous improvements in the delivery of mental healthcare and programming to the ADCRR inmate population?

MS. HESMAN: Form. Foundation.

MS. BARNES: Same objection.

THE WITNESS: My -- go ahead.

MS. BARNES: Sorry. I said "same objection." Go ahead.

THE WITNESS: My understanding is that there have been improvements in the metrics used under this stipulation agreement, but I would have to refresh myself regarding those to be able to say anything specifically.

Q. (By Mr. Fathi) Well, tell me about those improvements in the metrics under the stipulation.

MS. HESMAN: Same objection.

THE WITNESS: At this time, I can't. Because I did not review those statistics to prepare for this deposition or prepare my report.

Q. (By Mr. Fathi) Do you review those statistics as a regular part of your -- your work?

Defendants' Reply: Testimony regarding the contents of Defendants' disclosure statement as to Dr. Wilson's anticipated testimony does not make a fact of consequence more or less probable, Rule 401, 402. Incomplete because Plaintiffs did not include the disclosure statement. Witness testified that he does not have recall of metrics under the Stipulation, Rule 602.

Relevance, Rule 402

Hearsay, Rule 802

Foundation, Rule 602

Incomplete, Rule 106

Delivery of mental healthcare and programming are relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence. Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

MS. HESMAN: Same objection.

THE WITNESS: No.

Q. (By Mr. Fathi) And it also says that you're going to testify regarding your opinion that the mental healthcare and programming delivered to ADCRR inmates meets or exceeds community standards of care.

Do you see that?

A. I do see that.

Q. Is that going to be your testimony?

MS. HESMAN: Same objections.

MS. BARNES: Form and foundation.

THE WITNESS: I don't know, but I would say I think my testimony today has been clear that I haven't reviewed mental healthcare and programming as part of my preparation for the deposition today or my report.

Q. (By Mr. Fathi) As we sit here today, is it your opinion that the mental healthcare and programming delivered to ADCRR inmates meets or exceeds community standards of care?

MS. HESMAN: Same objection.

THE WITNESS: As we sit here today, I don't have an opinion.

Q. (By Mr. Fathi) If you were trying to form an opinion, what would be the community standard of care that you would apply?

Defendants' Reply: Testimony regarding the contents of Defendants' disclosure statement as to Dr. Wilson's anticipated testimony does not make a fact of consequence more or less probable, Rule 401, 402. Incomplete because Plaintiffs did not include the disclosure statement. Witness testified that he did not review individual healthcare and programming, Rule 602.

Relevance, Rule 402

Hearsay, Rule 802

Foundation, Rule 602

Incomplete, Rule 106

Delivery of mental healthcare and programming are relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence. Rule 801(d)(2) non-hearsay statement of opposing party/agent. "Incomplete" objection is meaningless; Defendants can counter-designate.

MS. HESMAN: Form. Foundation.

THE WITNESS: The kinds of things that I would look at would be adherence to NCCHC, backlogs if they exist, and quality of mental healthcare and documentation by record review.

Q. (By Mr. Fathi) And which of those things have you reviewed since, say, July of this year?

A. None of those things.

Q. All right. It also says that you will testify regarding your opinion that the mental healthcare and programming delivered to ADCRR inmates meets or exceeds constitutional requirements.

Is that going to be your testimony?

MS. HESMAN: Form. Foundation.

MS. BARNES: Form and foundation.

THE WITNESS: I don't know.

Q. (By Mr. Fathi) As we sit here today, is it your opinion that the mental healthcare and programming delivered to ADCRR inmates meets or exceeds constitutional requirements?

MS. HESMAN: Form. Foundation.

MS. BARNES: Form and foundation.

THE WITNESS: I didn't develop an opinion.

Q. (By Mr. Fathi) So you have no opinion on that?

MS. BARNES: Same objection.

Defendants' Reply: Testimony regarding the contents of Defendants' disclosure statement as to Dr. Wilson's anticipated testimony does not make a fact of consequence more or less probable, Rule 401, 402. Incomplete because Plaintiffs did not include the disclosure statement. Witness testified that he did not review adherence to NCCHC, data on potential backlogs, or individual records, Rule 602.

Relevance, Rule 402

Foundation, Rule 602

Incomplete, Rule 106

Delivery of mental healthcare and programming are relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence. "Incomplete" objection is meaningless; Defendants can counter-designate.

(Reporter clarification.)

THE WITNESS: I believe I said I don't have an opinion.

Q. (By Mr. Fathi) Doctor, do you have any legal training?

A. I worked as a legal assistant before I went to graduate school.

Q. Anything beyond that?

A. No.

MR. FATHI: Let's take a five-minute break.

(Recess from 1:32 p.m. to 1:39 p.m.)

MR. FATHI: Let's look at Exhibit 3, please.

(Deposition Exhibit 3 was marked for identification.)

Q. (By Mr. Fathi) Doctor, Exhibit 3 is a January 14, 2020, e-mail from Tom Dolan to a number of people. First, who is Tom Dolan?

A. He is the vice president of operations for Centurion of Arizona.

Q. Doctor, have you seen this e-mail before?

A. No.

Q. So Mr. Dolan writes, "Prior to Parson v Shinn mediation, Richard asked us to review the staffing matrix and submit a staffing proposal without budget

Defendants' Reply: Testimony regarding the contents of Defendants' disclosure statement as to Dr. Wilson's anticipated testimony does not make a fact of consequence more or less probable, Rule 401, 402. Incomplete because Plaintiffs did not include the disclosure statement. Witness testified that he has not reviewed applicable documents or formed an opinion as to this item, Rule 602.

constraints. Attached is the proposal."

Do you see that?

A. I do see it.

Q. And then if you scroll -- let's scroll down. What follows is a spreadsheet that has five columns, the name of the position, Contract FTE, Recommended FTE, FTE Variance, and then notes. Do you see that?

A. I see part of it. Yes, I do.

Q. Are you missing -- you just need to scroll --

A. I got it. I got it now.

Q. Okay. I'm just going to be asking you about one item on this -- this spreadsheet, but if you'd like to look at it in detail, that's fine. What's your preference?

A. Please go ahead.

Q. I'm sorry?

A. Please go ahead.

Q. Okay. So, Doctor, have you seen this spreadsheet before?

A. No.

Q. Okay. Could you scroll down to the bottom, please.

So if we look at the three columns, Contract FTE is -- that's better, thank you -- 1052.75; Recommended FTE is 1214.25; and FTE variance is 161.50. Do you see

that?

A. I do.

Q. Okay. Were you aware that in January of 2020 Centurion recommended adding 161 and a half FTE healthcare staff?

MS. HESMAN: Form. Foundation.

THE WITNESS: I was not.

Q. (By Mr. Fathi) All right. Let's look at Exhibit 7, please.

(Deposition Exhibit 7 was marked for identification.)

Q. (By Mr. Fathi) Doctor, Exhibit 7 is the excerpts from the deposition of Stefanie Platt taken in this case. I know you mentioned her earlier today, but who is Stefanie Platt?

A. She was the former statewide mental health director for Centurion in Arizona.

Q. And when did she leave that position, approximately?

MS. HESMAN: Foundation.

THE WITNESS: I'm going to guess mid year, so June, July, August time frame.

Q. (By Mr. Fathi) Of 2021?

A. Of 2021.

Q. Okay. Let's scroll down to page 17, please.

And, Doctor, if you need this blown up or scrolled, just let us know.

A. Thank you.

Q. So starting on page 17, and -- page 17 at line 11 and going through page 18, line 18, Ms. -- excuse me -- Dr. Platt talks about her reasons for leaving Centurion. Would you read that yourself, Doctor, and then we will discuss?

A. I've read it.

Q. So you see that Dr. Platt says that she left because she felt as though she didn't have the resources, support or communication that she needed to do her job in the manner which she saw fit?

A. I do see that.

Q. And further down on page 18 you see that Dr. Platt said, "We had a strong issue with needing more staff to fulfill the obligations within the court order as well as provide the care that we wanted to."

Do you see that, Doctor?

A. I do.

Q. Were you aware that Dr. Platt had given this testimony?

A. No.

Q. Let's go to page 23, please. And at page 23 starting on line 20 and then going through page 27, line

9, Dr. Platt discusses staffing.

So, again, will you please read this silently, and then we'll discuss.

A. How far did you want me to go?

Q. 27, line 9, please.

A. Page 27, line 9, okay.

Okay. If we can scroll further. If you could scroll down for me? Thank you.

Okay. Now I need to scroll up, please. Thank you.

Okay. So, I apologize, you told me to read through one line. Which line?

Q. 27, line 9, if you would.

A. Okay. I'm there.

Q. All right. Doctor, are you familiar with the court's order in this case setting forth presumptive minimum durations for mental health encounters of either 10 or 30 minutes?

MS. BARNES: Form.

THE WITNESS: I am familiar with -- with hearing about those durations, yes.

Q. (By Mr. Fathi) Okay. Could we go back to the exhibit, please.

So on pages -- sorry, let's go back to pages 23 and 24, please.

So, Doctor, again, if you need to scroll or anything, just let us know. But on pages 23 and 24 Dr. Platt testifies about a study that was carried out to see if there was sufficient mental health staff to meet those durational requirements. Do you recall reading that?

A. Yes, I do.

Q. And then on page 25 at line 15, he testifies, "There is not enough staff to be able to see the patients specifically as indicated for those periods of time."

Do you see that?

A. I do.

Q. And then on page 26 at line 9, Dr. Platt is asked, "Would the mental health staff tell you that their caseloads were too large for them to manage?"

And she testified, "Some would." Do you see that?

A. I do.

Q. And then down at the bottom of page 26 continuing on to page 27, Dr. Platt was asked, "So did you ever hear anybody who worked with you at the regional headquarters express their opinion that there was not enough mental health staff?"

And Dr. Platt testified, "Yes."

And she was asked, "And who was that?"

And she answered, "Every individual on our regional mental health team."

And she was asked, "Including Dr. Carr?" And she answered, "Yes."

Dr. Wilson were you aware that Dr. Platt had given this testimony?

A. No.

Q. Were you aware of any of the underlying facts about which she testified?

MS. BARNES: Form. Foundation.

MS. HESMAN: Same objection.

Q. (By Mr. Fathi) Let me ask a more specific question.

A. Yeah.

Q. Were you aware that a study had been carried out that determined there was not sufficient mental health staff to meet the 10 and 30-minute requirements?

MS. HESMAN: Form. Foundation.

MS. BARNES: Foundation.

THE WITNESS: I apologize for speaking too soon. No, I was not.

Q. (By Mr. Fathi) Were you aware that everyone on the regional mental health team had expressed the view that there was not enough mental health staff?

MS. HESMAN: Form. Foundation.

Relevance, Rule 402

Foundation, Rule 602

Adequacy of mental health staffing is relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence.

Defendants' Reply: Witness testified that he lacks personal knowledge of such a study or that members of the regional mental health team had expressed a view regarding staffing, Rule 602. Witness's testimony regarding his lack of knowledge on these topics does not make a fact of consequence more or less probable, Rule 401, 402.

Relevance, Rule 402

Foundation, Rule 602

Adequacy of mental health staffing is relevant. Rule 401, 402. Witness's lack of knowledge is itself evidence.

MS. BARNES: Form. Foundation.

THE WITNESS: No.

Q. (By Mr. Fathi) Were you aware that some mental health staff would tell -- had said that their caseloads were too large for them to manage?

MS. HESMAN: Form. Foundation.

MS. BARNES: Form. Foundation.

THE WITNESS: No.

Q. (By Mr. Fathi) All right. Let's go to page 45, please. Excuse me, starting on page 44.

MS. BARNES: So I'm going to -- I'm going to interject here again, much to your dismay, I'm sure.

But what I am trying to figure out is what your line of questioning right now about this deposition transcript has to do with Dr. Wilson's expert opinion and his expert report.

All you're doing is reading into the record testimony from this witness, a fact witness, and then you're asking him if he was aware of these things. That's it. There's no -- this line of questioning doesn't have anything to do with his expert opinion.

MR. FATHI: I would first note that speaking objections are disfavored and improper.

Dr. Wilson is expected to testify regarding his opinion that the mental healthcare -- that -- excuse

Defendants' Reply: Witness testified that he lacks personal knowledge that members of the regional mental health team had expressed a view regarding staffing or that mental health staff said their caseloads were not manageable, Rule 602. Witness's testimony regarding his lack of knowledge on these topics does not make a fact of consequence more or less probable, Rule 401, 402.

me, his opinion that the mental healthcare and programming delivered to ADCRR inmates meets or exceeds community standards of care and constitutional requirements.

So this is -- his knowledge of these events or lack of knowledge is absolutely relevant to his opinion on -- on that question.

MS. BARNES: And, again, what you're now going, continuing to go down the line of is fact witness testimony and fact discovery that has closed. You did not notice this deposition for that purpose. And the rules do require that you limit your questioning in a deposition to the relevant matters that pertain to that notice of deposition. That notice of deposition is regarding his expert opinion and his expert report.

So you just reading into these, reading in her testimony and asking him if he's aware of it, and then finding out what he's going to say about that at trial, which he's already told you he doesn't know, and which I've already said is an inappropriate line of questioning for this deposition, is -- is harassing and a waste of everybody's time.

MR. FATHI: I repeat --

MS. BARNES: This is an expert deposition.

MR. FATHI: I repeat, speaking objections

are disfavored and improper.

MS. BARNES: I can make my record that you are not complying with the rule, and abusing what this deposition is supposed to be about under the rule. And you're not allowed to do that.

And so I can make my record about that. And ask you to move on before I do have to again instruct him not to answer, because you're spending time on something that this deposition was not noticed to address. And that your deadline to do so has passed.

MR. FATHI: Exhibit 8 is defendant's third supplement pretrial disclosure statement. And in that statement, it says, "Dr. Wilson is expected to testify regarding his opinion that the mental healthcare and programming delivered to ADCRR inmates meets or exceeds community standards of care and constitutional requirements."

That is an expert opinion. And I'm inquire -- I am entitled to inquire about what information he did or did not have when he formed that expert opinion.

MS. BARNES: That is not an expert opinion. That is a question that is a topic that is listed under his fact witness potential testimony, which you've now asked him if he's going to talk about that and he's

answered that.

More importantly, the next sentence then does say that he's going to testify as an expert consistent with his report.

You now have that report. And that topic is not included in his report. So you are limited to talking about the topics that he discusses in his expert report.

MR. FATHI: And he discusses in his expert report staffing when he directly responds to the recommendations of Mr. Joy on pages 10 and 11 of his report. And so I'm entitled to ask him about staffing.

Now, I'm not going to argue with you anymore, Sarah. If you want to instruct him not to answer, you can do that. But if not, I would ask you to please stop with the speaking objections.

MS. BARNES: It's not a speaking objection. I'm making a record that I believe that you are violating the rule in how you're conducting this deposition.

So I'm going to ask that you move along swiftly to things that pertain to his expert opinion to wrap this up. That -- that is my final position on it.

Q. (By Mr. Fathi) Doctor, would you look at page 44, please?

A. Yes.

 Q. All right. Would you please read Dr. Platt's testimony from page 44, line 1, to page 45, line 6.

Are you finished? I'm sorry. I thought you indicated you were. Please take your time.

A. How far do you want me to go?

Q. 45, line 6.

A. Okay. I have finished reading those lines.

Q. All right. So on page 44, Dr. Platt is asked about vacancies among psych associates at the Eyman prison. Do you say that -- see that?

A. I do see that.

Q. And she's asked, "What was the root cause of these vacancies?

Correct?

A. Correct.

Q. And she testifies, "In my opinion the same as I discussed before, a lot of feeling overworked and undervalued and unhappy with the work environment."

Do you see that?

A. I do.

Q. You do see that?

A. Yes.

Q. All right. And she was asked, "And was this low staffing for this position a barrier to providing care to patients at Eyman?"

And she answers, "Yes." Do you see that?

A. Yes. I do.

Q. And continuing on to page 45, she's asked, "Were you aware of clinical encounters being canceled due to lack of psych associate staff?"

Do you see that?

A. I do.

Q. And she answered, "I was aware of routine encounters, a few, by the very end that had been canceled, yes."

Do you see that?

A. I do.

Q. Were you aware that Dr. Platt had given this testimony?

A. No.

Q. Were you aware of the underlying facts discussed in this testimony?

MS. HESMAN: Form. Foundation.

MS. BARNES: Form and foundation.

THE WITNESS: No.

Q. (By Mr. Fathi) When you wrote your response to Mr. Joy's report, did you take into account vacancies that existed among mental health staff?

MS. HESMAN: Form.

THE WITNESS: No.

Incomplete, Rule 106

"Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs did not include the expert report.

Q. (By Mr. Fathi) Just give me a moment.

Dr. Wilson, does this sworn testimony by Dr. Platt have any effect on your opinion about the adequacy of mental healthcare and programming in the Arizona Department of Corrections?

MS. HESMAN: Form. Foundation.

MS. BARNES: Form.

THE WITNESS: At this time I was not asked to develop an opinion about the adequacy. So I can't answer that.

Q. (By Mr. Fathi) If you are asked to develop an opinion about the adequacy of mental healthcare in the Arizona Department of Corrections, will this sworn testimony by Dr. Platt be relevant as you form that opinion?

MS. HESMAN: Form. Foundation.

MS. BARNES: Form.

THE WITNESS: That sworn testimony should be taken into account, yes.

Q. (By Mr. Fathi) Doctor, we spoke earlier about the increase in suicides recently in the department. Could vacancies in custody staff be a contributing factor to that increase?

MS. HESMAN: Form. Foundation.

THE WITNESS: Theoretically, absolutely,

Foundation Rule 602

Incomplete, Rule 106

Suicides in ADCRR are relevant. Rule 401, 402. Witness was able to answer the questions. "Incomplete" objection is meaningless; Defendants can counter-designate.

Defendants' Reply: Incomplete because Plaintiffs have not designated the complete answer to this question, and his later testimony at 149:2-8 makes it clear that he lacks adequate foundation to answer, Rule 602.

yes.

Q. (By Mr. Fathi) Do you know what the current vacancy rate among custody staff at the Eyman prison is?

MS. HESMAN: Form.

MS. BARNES: You froze there, Dr. Wilson.

THE WITNESS: I'm sorry. Am I unfrozen?

I do not know what the current vacancy rate is for correctional officers at the Eyman complex.

MR. FATHI: All right. Doctor, those are all my questions. Thank you very much. I wish this could have been a more congenial experience, but that is obviously not entirely under my control. I thank you for your time and patience.

MS. BARNES: Ashlee, do you have any questions?

MS. HESMAN: I don't.

(Deposition concluded at 2:00 p.m.)

SIGNATURE PAGE

I, JOHN SEDDON WILSON, a deponent exercising my right to read and sign my deposition taken on October 28, 2021, place my signature hereon and make the following changes on this ________ day of ______________,2021.

(IF THERE ARE NO CHANGES, WRITE "NONE.")

______________________________
JOHN SEDDON WILSON

| PAGE | LINE | READS | CHANGE TO | REASON |
|---|---|---|---|---|
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |
| _____ | _____ | _________________________ | | |

STATE OF ARIZONA )
)
COUNTY OF MARICOPA )

BE IT KNOWN that I took the foregoing deposition pursuant to Notice; that the witness was duly sworn by me; and that said transcript is a full, true, and accurate record of the proceedings; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have acted in compliance with ACJA 7-206.

I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

Pursuant to request, notification was provided that the deposition is available for review and signature.

Dated this 29th day of October, 2021.

Jennifer Honn
Certified Reporter
Arizona CR No. 50885

I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has complied with the ethical obligations set forth in ACJA 7-206.

GLENNIE REPORTING SERVICES, LLC
Registered Reporting Firm
Arizona RRF No. R1035

# EXHIBIT 3

# [Filed Under Seal]

# EXHIBIT 4

# [Filed Under Seal]

# EXHIBIT 5

**In The Matter Of:**

*Parsons vs.*

*Shinn*

---

*Johnny Wu, M.D. Centurion Chief Clinical Officer*

*November 04, 2021*

---

*Glennie Reporting Services, LLC*

*1555 East Orangewood Avenue*

*Phoenix, Arizona 85020*

*602.266.6535 Office 877.266.6535 Toll Free*

*www.glennie-reporting.com office@glennie-reporting.com*

Original File 110421JW.txt

**Min-U-Script®**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

v.

David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities,

Defendants.

Case No. CV12-00601-PHX-ROS

DEPOSITION OF JOHNNY WU, M.D.

CENTURION CHIEF CLINICAL OFFICER

Via Zoom Videoconference

Princeton, New Jersey
November 4, 2021; 9:00 a.m.

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020

602.266.6535
www.glennie-reporting.com

Prepared by:
Janet Hauck, RPR
Arizona CR No. 50522

# I N D E X

| Witness | Page |
|---|---|
| JOHNNY WU, M.D. | |
| Examination by Ms. Norman: | 4 |

## INDEX TO EXHIBIT

| Description | | Page |
|---|---|---|
| Exhibit 1 | Report of Johnny Wu, M.D. - CONFIDENTIAL | 18 |

## WITNESS INSTRUCTED NOT TO ANSWER

| Page | Line |
|---|---|
| 98 | 9 |
| 109 | 22 |
| 110 | 11 |
| 110 | 19 |
| 115 | 15 |
| 116 | 4 |
| 117 | 24 |
| 131 | 16 |

DEPOSITION OF JOHNNY WU, M.D., was taken on November 4, 2021, via Zoom videoconference, commencing at 9:00 a.m., before JANET HAUCK, RPR, a Certified Reporter, Certificate No. 50522, for the State of Arizona.

VIDEOCONFERENCE APPEARANCES:

For Plaintiffs:

PRISON LAW OFFICE
Sara L. Norman, Esq.
Rita Lomio, Esq.
1917 Fifth Street
Berkeley, California 94710

For Defendants:

STRUCK LOVE BOJANOWSKI & ACEDO, PLC
Anne M. Orcutt, Esq.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

For the Witness:

BROENING OBERG WOODS & WILSON, P.C.
Sarah L. Barnes, Esq.
2800 N. Central Avenue, Suite 1600
Phoenix, Arizona 85004

COURT REPORTER: Before we proceed, I will ask that counsel agree on the record that there is no objection to this officer of the court administering a binding oath to a witness not appearing personally before me.

MS. NORMAN: Yes.

MS. ORCUTT: Agree.

JOHNNY WU, M.D.,

called as a witness herein having been first duly sworn by the Certified Reporter to tell the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. NORMAN:

Q. Dr. Wu, could you please state and spell your full name for the record.

A. Sure. My name is Johnny Wu, J-O-H-N-N-Y, no middle name, and then Wu, W-U.

Q. Thank you. As I said, my name is Sara Norman and I am a lawyer for the plaintiffs in this case. I'll be taking your deposition today.

Have you ever been deposed before?

A. Yes.

Q. How many times?

Q. Is there any reason you cannot give full and honest testimony today?

A. No.

Q. Is there any medication you're taking that would affect your testimony today?

A. No.

Q. Is there any reason why we can't go forward today?

A. No.

Q. All right. So could you state your current employer and your title.

A. My current employer is Centurion Health, and my current title is executive vice president/chief clinical officer.

Q. How long have you been in that role with Centurion?

A. Is it possible for you guys to pull up my CV? Because I don't have access to that.

Q. I think it's an appendix to your report.

A. Oh, I see. Thank you. So let's see. When did I become EVP? So you wanted to know how long I had been in that role?

Q. Exactly.

A. So almost six months.

Q. Okay. What was your position prior to becoming

chief clinical director; is that it?

A. Chief clinical officer. Prior to that I was in the role of chief of clinical operations.

Q. Okay. And what's the difference between those two roles?

A. Basically, I am now part of the executive team at the corporate office.

Q. Okay. Could you please describe your job duties in your current role.

A. So I oversee clinical operations at the corporate side, and the chief medical officer, chief psychiatric officer, as well as anything clinical, and technology like telehealth, pharmacy, and startups all fall under the clinical operations that I oversee.

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. Do you provide any direct patient care?

A. As part of my job requirement with Centurion, which is a subsidiary of Centene, I am required to do community service and direct patient care in my community. Unfortunately, I do not have any contracts here in New Jersey. I live in the Princeton, New Jersey area and, thus, I actually volunteer working at a local county jail providing inmate services to the inmate population there, but it's not with Centurion.

Q. So in your job at Centurion do you provide any direct patient care?

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

A. No.

Q. In your job at Centurion do you regularly review any patients' medical charts?

A. Yes.

Q. Under what circumstances do you do that?

A. I review situations in regards to UM when there may be issues, questions about how to go about determining whether to move forward or to suggest alternative actions for certain requests.

Q. Can you tell us what you mean by UM?

A. I'm sorry, yes. UM is utilization management. It is a division that handles off-site specialty requests.

Q. So then is it fair to say that you review patient charts when they come to your attention raising some sort of question about the need for specialty care?

A. Yeah. It's not very often since there are many other layers, but sometimes they may ask for my suggestions or opinion, given my extent on working in the industry for nearly 20 years.

Q. How many times would you say that you've been consulted in this capacity and reviewed a patient chart in the last six months?

A. In the last six months, not often. I mean, maybe two or three times.

Q. Okay. And have any of those times involved

Q. Do you review any mortality reviews in your job at Centurion?

A. I do not.

Q. As part of your responsibilities at Centurion, do you analyze the adequacy of care at any prisons or jails?

A. Could you rephrase that again? I'm sorry. Can you say it again?

Q. So I asked, in your capacity in your job at Centurion, do you analyze the quality of care at any prisons and jails?

MS. ORCUTT: Form.

THE WITNESS: I would say yes.

Q. BY MS. NORMAN: Can you describe how you so?

A. It's a team approach to reviewing things. I may be a participant.

Q. So if some prison or jail system asks Centene to do a review you might play a role in that review?

A. Possible, yes.

Q. And has that happened in your six months as chief clinical officer?

A. No.

Q. And how about in your time as the chief of clinical operations? Has that happened?

A. Yes.

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

A. No.

Q. Did you speak to any incarcerated people in ADCRR in coming to the conclusions expressed in this report?

A. No.

Q. Did you speak to any people formerly incarcerated in ADCRR in coming to the conclusions you expressed in this report?

A. I don't believe so.

Hearsay, Rule 802

Q. Did you review any documents in coming to the conclusions expressed in this report?

A. Just the NCCHC standards.

Q. And I believe you also mentioned that you reviewed Dr. Wilcox's report and Mr. Joy's report?

A. Yes.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. So other than those three documents, Dr. Wilcox's report, Mr. Joy's report, and the NCCHC standards, did you review any documents in coming to the conclusions you expressed in the report?

A. I believe I also reviewed the Pew website.

Q. And that's Pew Charitable Trusts?

A. Yes.

Q. Okay. And that was one of the attachments to your report, right, a printout from a Pew report?

A. Yes.

MS. BARNES: Form.

MS. ORCUTT: Form.

THE WITNESS: There was a transitional meeting, which I believe the Corizon medical director was a part of that.

Q. BY MS. NORMAN: And what, if anything, did you learn about the adequacy of care being delivered in the Arizona state prison system at that meeting?

MS. BARNES: Form; foundation.

MS. ORCUTT: Join.

THE WITNESS: I actually don't recall specifically. It's been awhile.

Q. BY MS. NORMAN: So did you have any impression of the adequacy of care offered by Corizon in the Arizona state prison system prior to Centurion taking over?

MS. BARNES: Form.

MS. ORCUTT: Form.

THE WITNESS: I actually really was looking forward to trying to, you know, show that we can deliver good care at Centurion. So I mean, what may have happened in the past is the past, but I look forward to trying to do as best we can for our patients.

Q. BY MS. NORMAN: And that is a lot of goal, but I'm wondering whether you had any knowledge of concerns over adequacy of care provided by Corizon prior to

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a) (6).

A. Yes.

Q. And then you go on to say that's including, but not limited to -- and I'll talk about the first one -- offered opportunities to work with -- I'm sorry, I'm not going to talk about the first one. I'm going to talk about the third one -- offered access to implement an MOUD program to treat opioid use disorder. Do you see where that is in your report?

A. Yes.

Q. Okay. And MOUD refers to medication for opiate use disorder, right?

A. Yes.

Q. Okay. And I think for ease I'm going to call it MOUD. Is that what you call it, Dr. Wu?

A. Yes.

Q. Do you consider yourself an authority on MOUD?

MS. ORCUTT: Form.

THE WITNESS: I feel I have the ability to provide MOUD.

Q. BY MS. NORMAN: Do you consider yourself as well versed in how MOUD functions in a correctional environment?

MS. ORCUTT: Form.

THE WITNESS: Yes.

Q. BY MS. NORMAN: And have you championed the

adoption of MOUD in corrections?

MS. ORCUTT: Form.

THE WITNESS: Yes.

Q. BY MS. NORMAN: And in what ways have you championed its adoption in corrections?

A. In our other systems we actually do provide MOUD, and I was actually involved prior to Centurion, helped the New Jersey Department of Corrections be the second state DOC system to implement MOUD.

Q. Is MOUD effective?

MS. ORCUTT: Form.

THE WITNESS: Well, it is not 100 percent. Nothing is ever 100 percent, but it's a better offering of treatment than what we have done in the past.

Hearsay, Rule 802

Q. BY MS. NORMAN: What are the elements of an effective MOUD program in a corrections system?

MS. BARNES: Form and foundation.

MS. ORCUTT: Join.

THE WITNESS: It requires an integrative, holistic approach to treating the individual patients. You can't put everybody into one type of treatment. A lot of times people think treatment should be either just CBT or maybe possibly Vivitrol. And then some folks think that you can't have one without the other, but you really need to look at the individual in looking at where they're

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

going to go afterwards because you need to maintain the linkages. If you're going to start them on treatment you need to make sure there's a proper exchange/handoff so that they're successful, because unfortunately we do see in the criminal justice system that the partnerships are a challenge to maintain and folks unfortunately do not get that proper handoff and they're no longer successful. Reentry services are quite important to a successful MOUD program.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. BY MS. NORMAN: So it sounds like you've identified some elements of an effective MOUD program, including CBT, which is cognitive behavioral therapy, right?

A. Yes.

Q. So CBT, medication, and continuity of care, would you consider those three things to be important elements to an effective MOUD program?

A. Yes.

MS. ORCUTT: Form.

Q. BY MS. NORMAN: Are there any other elements of an effective MOUD program that you would add to that list to make it complete?

MS. BARNES: Form.

MS. ORCUTT: Join.

THE WITNESS: I mean, I can't think of

anything at the moment, but there may be others that I just can't trigger right now.

Q. BY MS. NORMAN: Understood. That is fair enough.

Would you say that some training for providers is also important to make a MOUD program effective in a corrections system?

MS. ORCUTT: Form.

THE WITNESS: Yes, that is important, you know, to be able to get education out there for the providers and also the professional staff to have buy-in and then, of course, working with the patients themselves. So education for all is quite important.

Q. BY MS. NORMAN: Have you done any studies or reviews of the efficacy of MOUD in a corrections system?

MS. ORCUTT: Form.

THE WITNESS: I am not currently involved with any studies. In the past I was prior to joining Centurion.

Q. BY MS. NORMAN: Can you describe any studies or reviews of efficacy of MOUD that you've done?

A. I was involved, like I said, with the New Jersey Department of Corrections and the Rutgers Health where I was chief operating officer at the time.

Q. Can you describe that review or study?

A. One that I volunteer at.

Q. Which one is that?

A. Somerset County Jail.

Q. In New Jersey?

A. Yes.

Q. Okay. So the study that we're discussing, the harm reduction study that you believe is primarily county jail, is that something that you are involved with in your professional capacity at Centurion or in your volunteer capacity?

A. I'm sorry. Can you repeat that question?

Q. Right. I'm just wondering, the study that we're discussing involving harm reduction with MOUD at, you believe, primarily county jail systems, is that something that you're only involved with to the extent you volunteer as a provider at county jails, or are you involved in that in your professional capacity as chief clinical officer at Centurion?

A. In that study that is separate from Centurion. However, I am a big believer of MOUD. So I actually do try to encourage others, including folks from other organizations, to utilize MOUD.

Q. And why is that?

MS. ORCUTT: Form.

THE WITNESS: I believe it's a chronic

Relevance, Rule 402; Incomplete, Rule 106
Treatment of chronic disease is at issue. Rule 401. "Incomplete" objection is meaningless: Defendants can counter-designate

Defendants' Reply: Incomplete in that Plaintiffs failed to designate the question or beginning of the answer, Rule 106. Witness's commentary regarding other organizations is not relevant to Plaintiffs' claims in this litigation, Rule 402.

Relevance, Rule 402
Treatment of chronic disease is at issue. Rule 401.

disease that needs to be managed. You know, it's unfortunate that the disease affects so many lives and something needs to be done. You know, I also don't like to see overdose deaths. And so this is one way of reducing that. I was very happy to come back to New Jersey to be the COO at Rutgers Health to be able to implement that for the New Jersey Department of Corrections.

Q. BY MS. NORMAN: So does MOUD save lives?

MS. ORCUTT: Form.

THE WITNESS: Yes.

Defendants' Reply: Witness's commentary regarding other organizations is not relevant to Plaintiffs' claims in this litigation, Rule 402.

Q. BY MS. NORMAN: Thank you for that. Let's go back to the quote from your report.

So we were looking at page 1 of your report where you talk about routinely meeting with ADCRR leadership to discuss opportunities for continued improvement and provide solutions. And one of those opportunities you mentioned was offering access to implement an MOUD program to treat opioid use disorder, correct?

A. Yes.

Q. Okay. Can you tell me about what access you offered, what those conversations consisted of?

MS. ORCUTT: Form.

THE WITNESS: I don't recall specifically.

Q. Okay. So when I say meetings, especially in this day and age, I'm not talking about just in person. Phone or video, any kind of ways people meet.

So my question is: Understanding meetings in a broad sense, which includes phone calls and video conferences, when did the meeting or meetings that you're referring to regarding MOUD in ADCRR take place?

A. I don't recall specific time frames of when these phone calls would occur, or Zoom, but I would say that we probably discussed it during my last interaction with Zoom with the medical director of ADCRR.

Q. And when was that last interaction?

A. I don't recall when that was.

Q. Was it in the last six months?

A. To be honest with you, I don't recall. With the age of COVID, it's hard to remember.

Hearsay, Rule 802

Q. Fair enough. Who was the medical director of ADCRR that you discussed MOUD with?

A. That would be Dr. Grant Phillips.

Q. And do you recall how many times you discussed MOUD with Dr. Phillips or other ADCRR personnel?

A. Well, Dr. Phillips is a champion of MOUD. So we frequently talk whenever about this topic because we both feel very strongly about it. So we've talked about it every time we interact pretty much, I believe.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. And when was the last time you interacted with him?

A. Like I said, I don't recall the last time we've actually spoken.

Q. Okay. And so as you say in your report, you've had meetings to discuss opportunities for continued improvement and provide solutions regarding MOUD. And I'm wondering what opportunities or solutions you've discussed with Dr. Phillips.

MS. ORCUTT: Form.

THE WITNESS: Well, we've talked about implementing a state-wide MOUD program that incorporated buprenorphine.

Q. BY MS. NORMAN: And do you think that that would be a good idea in ADCRR?

MS. ORCUTT: Form.

THE WITNESS: You're asking for my opinion?

Q. BY MS. NORMAN: Yes.

A. Yes, that would be good.

Q. Why?

A. For one thing, the biggest thing would be harms reduction. I think it would reduce violence and I believe it would be helpful to treating a chronic disease and that, you know, folks, when they get released, hopefully will continue to be treated, and therefore, would not

engage in activities that would land them back into the correctional system.

Q. So would you say that MOUD is a proven message of reducing violence and death in corrections systems?

MS. ORCUTT: Form; foundation.

MS. BARNES: Form.

THE WITNESS: It would be my opinion, but again, like I said, the study that I was expecting to hear about was never presented because the conference was canceled.

Q. BY MS. NORMAN: Well, so you've described a lot of ways in which you've been involved with MOUD in a range of different systems over many years, and you described a significant degree of expertise and strong opinions about MOUD.

So I'm wondering, based on all of your experience, all of your reading, all of your conversations with other people in the field, whether, in your opinion, MOUD is a proven means of reducing violence and death in correctional systems?

MS. ORCUTT: Form and foundation.

THE WITNESS: Again, it is my firm belief, yes.

Q. BY MS. NORMAN: What is your understanding about the extent to which MOUD is currently taking place

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

in the Arizona state prison system?

MS. ORCUTT: Form; foundation.

THE WITNESS: I don't know the extent. I do not handle the day-to-day operations of the Arizona system.

Q. BY MS. NORMAN: Do you know if any aspect of MOUD is provided in ADCRR?

MS. ORCUTT: Form and foundation.

THE WITNESS: Well, I believe if, in the rare instance of having individuals that are female and pregnant that are required to be treated, that they would be offered treatment with either methadone, possibly, or I believe with buprenorphine. But, again, I can't be sure, but I believe they are offered some form of medication.

Q. BY MS. NORMAN: So other than pregnant women who are on either methadone or buprenorphine, do you know if any patient in the ADCRR is provided with any form of MOUD?

MS. ORCUTT: Form and foundation.

THE WITNESS: I really don't know because there could be folks who are on Vivitrol that I'm unaware of or even be well on Vivitrol which, again, I would be unaware of, but I do not know the day-to-day operations of the system.

Hearsay, Rule 802

Q. BY MS. NORMAN: You talked in your report about

dmissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

the distinction between MOUD and MAT. Can you explain that?

A. Yes. So I was commenting about MAT where that belief is that it is considered an adjunct. So folks still believe in trying to work through CBT or, you know, other types of counseling as really the front line, first line, and that only in rare instances you would offer them medication, versus I believe MOUD is a much better approach.

For some folks, you know, they don't need as much counseling or no counseling at all and they really need to just be on medication. Then there's the folks, just for harms reduction, simply just need to be on medication. So that is the distinction between MAT and MOUD, is that you don't necessarily need to try the others before using medications.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. That's interesting. So I'm most familiar with the California system where at this time more than 10,000 people are on what they call MAT, or medication-assisted treatment. And particularly during the pandemic, but also prior to that, many people were not actually receiving treatment other than the medications.

So I'm just wondering whether it's your understanding that some people talk about MAT to mean not just therapy occasionally accompanied by medication, but

medication occasionally accompanied by therapy.

MS. BARNES: Form and foundation.

MS. ORCUTT: Join.

THE WITNESS: Was there a question? I'm sorry.

Hearsay, Rule 802

Q. BY MS. NORMAN: It sounded to me like you described MAT as therapy for substance use disorder sometimes accompanied by medication. Is that an accurate characterization?

MS. ORCUTT: Form.

THE WITNESS: So most systems, when they talk about MAT, they expect that the person needs to be in some kind of cognitive behavioral or treatment program, and then along the way they may be given medications, versus MOUD, which is, you know, you just standalone. If that's what California is doing, that's great, but, you know, a lot of systems require that the individual be in a formalized addictions treatment program.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. BY MS. NORMAN: Understood. Thank you.

I want to go back to something that you just said. You were talking about how you were not certain about whether anybody in ADCRR, other than possibly some pregnant women, was currently on MOUD. And I thought I heard you say that you're not familiar with the day-to-day operations of health care delivery in

A. No.

Q. And when was that RFP issued?

MS. ORCUTT: Form and foundation.

THE WITNESS: We're in now November. So I want to say maybe early October or possibly late September. I don't recall the exact time frame.

Q. BY MS. NORMAN: You said in your report -- and I'm looking at Section 5E, which is on the fifth page, I believe. It's the first sentence under section E. You said that Centurion is currently meeting the standards and needs of substance use disorder for the ADCRR population. Do you see that?

A. Yes.

Q. What is the basis for that opinion?

A. Well, in terms of meeting our contract requirements we are doing what is asked of us.

Q. So is that all you mean by that sentence, simply that you're meeting the terms of your contract?

A. I mean that, you know, is also in line with what is going on in the community as well, is that, you know, their focus is to be able to manage it through addictions treatment programming, and that is still out there as an acceptable standard in the community.

Q. I see. So do you see where you say in the middle of that paragraph that Centurion is currently

Foundation, Rule 602 (see 39:24-40:5); Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Witness testified that he does not know what MAT is being done at ADCRR, but this answer relates to substance abuse programming, which is distinct from medication.

meeting the standard of care for treatment of substance abuse disorders?

A. You said in the middle of E?

Q. Yeah. That first paragraph, a little more than halfway down do you see where you said that Centurion is currently meeting the standard of care for treatment of substance use disorders?

A. Okay.

Foundation, Rule 602 (see 39:24-40:5); Hearsay, Rule 802

Q. So is it your opinion that Centurion is meeting the standard of care for treatment of substance abuse disorders in ADCRR?

A. Meeting the standard, yes.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Witness testified that he does not know what MAT is being done at ADCRR, but this answer relates to substance abuse programming, which is distinct from medication.

Q. And you said in your report -- I'm going to direct you to another part -- towards the end of that same paragraph, second to last sentence: Our current scope of work for ADCRR does not include such services at this time. Do you see that?

A. Yes.

Q. What services are you referring to?

A. MOUD.

Q. Okay. So Centurion is providing no MOUD in ADCRR, correct?

A. No, that's not correct.

Q. Can you explain? That sounds contradictory to me that you said that our current scope of work does not

their systems. And of course we continued to discuss about if ADCRR is willing to look for a new product.

Q. And why would eOMIS need to be updated?

MS. ORCUTT: Form.

MS. BARNES: Form and foundation.

THE WITNESS: So eOMIS is an electronic health record that, for some providers, is very difficult to navigate and to provide, you know, very good documentation and then to be able to get reports out from those documentations. There are other systems out there that are much more user friendly to be able to have more real-time analytics and data reporting to come out of it.

Q. BY MS. NORMAN: Is that a concern from the perspective of patient care if providers have difficulty navigating an electronic health care records system?

MS. ORCUTT: Form.

THE WITNESS: Sure. It can be, you know, an issue, yes.

Q. BY MS. NORMAN: Okay. And why is that?

A. Well, you know, for patients to have timely access to having their records to be able to be part of their treatment, to understand their treatment, and also for providers to be able to communicate more coherently so that there's less room for error.

Q. Is it your understanding that eOMIS provides

Cumulative, Rule 403

Not cumulative; no other excerpt addresses the same matter. Rule 403.

Defendants' Reply: Cumulative of trial testimony of other witnesses.

MS. ORCUTT: Join.

THE WITNESS: I mean, it's up to the individual. I mean, some may be able to feel comfortable and navigate that with more ease than myself, but my preference is that I would prefer a different electronic health record.

MS. BARNES: Sara, I'm sorry. I was going to say, we've been going about an hour and 15 minutes here. I was hoping we could get a short break so I could use the restroom.

MS. NORMAN: I can't say no to that.

(Recess from 10:16 a.m. to 10:27 a.m.)

MS. NORMAN: Let's go back on the record.

Q. BY MS. NORMAN: Dr. Wu, I want to keep talking about your report specifically on the first page, that bottom paragraph, where you talk about how you routinely meet with ADCRR leadership to discuss opportunities for continued improvement and provide solutions. And I want specifically to talk about on the next page the category of suggested transition to an automated medication dispensing system. Do you see that?

A. Yes.

Q. What is an automated medication dispensing system?

A. So nowadays there are machinery that can

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

actually package individual dosing to be able to be then stored effectively and tracked. So when it's administered there's a digital account, a fingerprint of when that was actually taken out of the system and administered. It helps with accounting for medications, you know. A lot of hospital systems have used something called Pyxis. There are other companies out there now similar to Pyxis that would be something to be utilized in a correctional environment.

Q. Can you spell Pyxis? "No" is an acceptable answer here.

A. No, I don't recall how it's spelled.

Q. We'll let the court reporter guess on that one. Why did you discuss transition to an automated medication dispensing system with ADCRR?

Hearsay, Rule 802

A. Well, in our other systems we have incorporated such technology. So it would be nice to see Arizona utilize something similar.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. And why would that be nice?

A. I believe automation helps with tracking better and for patient safety and control of, you know, medications, just knowing where every pill went to.

Q. Does it help to ensure accurate record keeping?

A. It will certainly assist with that, yes.

Q. Can automated medication dispensing systems

him as a colleague. So, obviously, you know, my opinion is, that yeah, he is a decent physician and, you know, he was the former president of our association.

Q. BY MS. NORMAN: And are you referring to the NCCHC?

A. No.

Q. Okay. Which association are you talking about?

A. Oh, the American College of Correctional Physicians. He was a past president. In fact, he was the one that presented me with my award of becoming a fellow in the organization.

Q. Got it. So let's talk about the difference between prison and jail correctional medical systems, health care systems.

Hearsay, Rule 802

Under Section 5 in your report, under that first paragraph at the top, the second sentence, do you see where your report says that experience in and circumstances regarding the delivery of health care in prison systems is vastly different than the jail medical care settings from which Dr. Wilcox's experience and opinions stem? Do you see that in your report?

A. Yes.

Q. How is the analysis of adequacy of medical care different in jails than in prisons?

A. Well, you know, in the jail system it's more

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

episodic care. People are more transient. There's a lot of turnover. Usually they're in the areas where it's sparse to get medical services linkages to the community. Usually there's a lot of county hospitals in jails so that they had that ability to move people back and forth and get clearance, versus a prison system is usually much larger, people are there much longer. There's the need for chronic care disease management, which is very limiting. In a jail system they don't do much of that. It's more, you know, just assessing it and treating anything urgently that needs to be managed, versus in a prison system there's a lot of longevity and you need to continue to follow folks. And usually prisons are in more remote places and folks are usually a lot older and require, you know, substantially more services. So there's a lot more specialty services that need to be provided than in a county jail.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. Okay. So county jails do hold older patients sometimes, though, right?

A. Yes, they do.

Q. And some people spend significant lengths of time at county jails, right?

MS. ORCUTT: Form and foundation.

MS. BARNES: Foundation.

THE WITNESS: But that's not the norm. I

information that I have.

Q. BY MS. NORMAN: So let's talk about some of the specific rebuttals that you offer to Dr. Wilcox's report. And I want to look at 5A, which is on the third page, I think.

A. Yes.

Q. Before we do that, let me just go back and ask a question about a prior topic.

Is the standard of care for health care delivery for a jail system different than the standard of care for health care delivery in a prison system?

MS. ORCUTT: Form and foundation.

THE WITNESS: No. I mean, everyone should be deserving of, you know, standard of care irregardless of their environment.

Q. BY MS. NORMAN: Okay. Now let's talk about nurses, section 5A of your report.

So you say in your heading to section A that Dr. Wilcox opines that nurses are routinely working outside the scope of their licenses, acting as providers guided only by NETs, and prevent patients with serious medical conditions, that they're not qualified to treat from being seen by a provider because they fail to make the necessary referrals. Do you see where you say that in your report?

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

A. Yes.

Q. And what does NET stand for?

A. I forgot what it stands for, but he was the one that used that term. I'm used to calling it nurse protocol.

Q. Let me throw a phrase out there. I believe it stands for nursing encounter tools. Does that sound right?

A. Yes.

Foundation, Rule 602 (75:20-76:18, 106:17-25); Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Witness has adequate foundation to testify regarding scope of practice of nurses based on his personal experience in correctional medicine, Rule 602, 702, 703.

Q. Okay. So speaking generally with that statement that I just read out, with that understanding of what NET means, do you disagree with Dr. Wilcox's findings in this area?

MS. ORCUTT: Form.

THE WITNESS: Yes, I disagree.

Q. BY MS. NORMAN: And what is the basis for your disagreement?

A. The fact that he is overly broad in saying that nurses are practicing out of their scope. I mean, that would be illegal. You know, we have processes in place to make sure that we meet state regulations and licensure and that all our providers are practicing to the extent of their scope and nothing more above that. Otherwise, we would be doing something that would be illegal.

Q. What is the extent of your personal knowledge

(same as above)

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Witness has adequate foundation to testify regarding scope of practice of nurses based on his personal experience in correctional medicine, Rule 602, 702, 703.

about the processes in place to ensure that nurses practice within the scope of their licenses in ADCRR?

MS. ORCUTT: Form.

THE WITNESS: So it's my understanding that we have a process in place of credentialing any new employee, particularly nurses. There's a credentialing committee that reviews their occupation making sure that their licenses are without any kind of encumbrance and they have ongoing skills assessments and reviews with them to ensure ongoing that there's nothing that would prohibit them from continuing to be providing care. I believe the frequency is annually. So if something were to happen where the nursing board, you know, put something into effect, that the credentialing committee would review that and make a determination whether the person would still be able to continue to provide services.

So that is what we have in place to ensure patient safety and making sure folks are practicing appropriately.

Q. BY MS. NORMAN: So you've described policies with regards to credentialing, right, to making sure that nurses are appropriately credentialed and those credentials remain up to date; is that right?

A. Yes.

Q. Are there any other policies that you're aware

of in place in ADCRR to ensure that nurses practice within the scope of their license?

MS. ORCUTT: Form and foundation.

THE WITNESS: I don't know if there's anything additional.

Q. BY MS. NORMAN: Do you have personal knowledge of any of the actual practices in ADCRR, as opposed to policies, by nurses?

A. No.

MS. ORCUTT: Form.

Q. BY MS. NORMAN: Have you done any studies of nursing care in ADCRR?

MS. ORCUTT: Form.

THE WITNESS: No.

Q. BY MS. NORMAN: Have you reviewed any studies of nursing care in ADCRR?

MS. ORCUTT: Form.

THE WITNESS: No.

Q. BY MS. NORMAN: Let's talk about physician assistants, which is 5B on the same page.

So you note in the heading of Section 5B that Dr. Wilcox opines that physician assistants are not adequately supervised. Do you see that?

A. Yes.

Q. Do you disagree with his opinion?

Foundation, Rule 602 (79:21-22, 80:2-18); Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Witness has adequate foundation to testify regarding supervision of physician assistants based on his personal experience in correctional medicine, Rule 602, 702, 703.

Foundation, Rule 602 (79:21-22, 80:2-18); Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Witness has adequate foundation to testify regarding supervision of physician assistants based on his personal experience in correctional medicine, Rule 602, 702, 703.

A. I disagree with his opinion.

Q. And what's the basis of your disagreement?

A. You know, again, going back to, like, nursing, our staff are reviewed to make sure that they're properly credentialed and that they work within their scope. Our ratios of P.A.s, of the physician assistants that he refers to, you know, is not out of the norm. If anything, it's actually below what the statute actually allows for. Because I have actually reviewed -- saying that he said something about ratio 7 to 1, and when I actually looked more closely and looked at our credentialing roster, we were not close to that at all, and the state allows for a ratio of 6 to 1.

Q. Are there any other bases of your disagreement with Dr. Wilcox's opinion that physician assistants are not actually supervised other than what you've just described?

A. Yes, because there are physicians on site, and if they're not on site there's always another level that they have access to as resources. So, you know, when the need arises or if they have concerns, the physician extenders can certainly reach out to the physicians, whether it be at this facility or another facility or go up to Dr. Orm or anybody else for further assistance and management recommendations.

assistants to have every document reviewed and cosigned by a physician, which, you know, then kind of then detracts from the benefits of having a physician assistant.

So Arizona does not have that requirement, I believe, but I could be wrong. But in that case it would be required for the physician to review every case, whether it be a simple, you know, cold or a complex case. Every case would have to be reviewed by a physician. But, you know, in those systems I think that prohibits a lot of physicians wanting to be able to practice and they seek other employment.

Foundation, Rule 602 (79:21-22, 80:2-18); Hearsay, Rule 802

Q. BY MS. NORMAN: I'm wondering about whether you have any knowledge yourself of any system in ADCRR under which mid-level providers are systematically supervised without having to ask for help?

A. So there should be huddles going on at the facility level with their medical directors and physicians. Also in terms of utilization management when they request for certain services there may be a review done at that time by a physician of that type of request. So there may be other things as well. I do not work on the day-to-day operations. I mean, it depends on the relationship that's built at the facility. I mean, there's a lot of trust of teamwork that that should be occurring at the facility level to providing a holistic

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Witness has adequate foundation to testify regarding supervision of mid-level providers based on his personal experience in correctional medicine, Rule 602, 702, 703.

Same as above

See above

approach to treating a patient.

Q. So you're not familiar with day-to-day operations in ADCRR with regard to physician assistant supervision?

MS. ORCUTT: Form.

THE WITNESS: I am not, no.

Q. BY MS. NORMAN: And is your answer the same for mid-levels generally? You're not aware of day-to-day operations with regard to supervision of mid-levels in ADCRR?

MS. ORCUTT: Form.

THE WITNESS: Yes.

Q. BY MS. NORMAN: Just to be clear for the record, I'll rephrase that question.

You would agree that you're not aware of day-to-day operations with regard to supervision of mid-levels in the ADCRR, correct?

A. Yes.

Q. Thank you for bearing with me on that.

Have you done any studies of physician assistant supervision in ADCRR?

MS. ORCUTT: Form.

THE WITNESS: No.

Q. BY MS. NORMAN: Have you reviewed any studies of physician assistant supervision in ADCRR?

review that's being done.

Q. BY MS. NORMAN: Have you done any studies of the adequacy of medical care provided by mid-level practitioners in ADCRR?

MS. BARNES: Form and foundation.

THE WITNESS: I don't know. I don't think so.

Q. BY MS. NORMAN: Have you reviewed any studies of the adequacy of medical care provided by mid-level practitioners in ADCRR?

MS. BARNES: Form and foundation.

MS. ORCUTT: Join.

THE WITNESS: No.

Hearsay, Rule 802

Q. BY MS. NORMAN: What can you tell me about the training of mid-level practitioners in ADCRR? What is their training?

MS. BARNES: Form and foundation.

MS. ORCUTT: Join.

THE WITNESS: So basically, you know, in the credentialing process we look at their training and whatever additional subspecialties that they have and making sure that it's appropriate. You know, the schools need to be accredited that they come from. And some have gone on to do other specialties. So if they have other specialties, that would be recorded in the credentialing

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

file of the individual.

Q. BY MS. NORMAN: So when you say in your report -- and let me tell you where. This is on Section 5C, and there's a single paragraph in section C, and I'm looking at the very last sentence of that paragraph where you say: The use of these providers in our system is appropriate and they are appropriately trained. Do you see that?

A. Yes, I see that, the last sentence. Okay.

Q. Okay. And you can take a minute to make sure of your answer to this question, but -- well, you can do that with any question.

You said, "the use of these providers." You're talking about mid-level providers there, right?

A. Yes.

Hearsay, Rule 802

Q. Okay. So what is the basis for your statement that the use of mid-level providers in your system is appropriate and they are appropriately trained?

A. Primary care is the vast majority of services that are being provided, and mid-levels are certainly qualified to provide that type of service.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. Okay. But you're not familiar with any of the day-to-day operations regarding how mid-levels are supervised, right?

A. I do not handle the day to day. Yes, that's

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

correct.

Q. Okay. So do you have any personal knowledge on which you're basing the statement that mid-level providers in your system -- the use of mid-level providers is appropriate?

MS. ORCUTT: Form.

THE WITNESS: Yes, because I'm involved with the credentialing committee. So as being a member of the credentialing committee we review new applicants for jobs and making sure that they have the appropriate training and certifications, if needed, for certain tasks. So when we hire someone they meet all those qualifications to practice in that particular jurisdiction.

Q. BY MS. NORMAN: Is it your opinion that if someone is properly credentialed they necessarily always provide adequate care?

MS. ORCUTT: Form.

THE WITNESS: I can't answer that.

Q. BY MS. NORMAN: Do you mean that's not your opinion, or you can't provide an answer to that?

A. I don't know the day-to-day operations. I can tell you that on day one when they're reviewed and hired that they meet at that point in time, yes. But after that, you know, things can change. People can develop issues. Everyone is human. Things can happen. But at

entire -- all the information.

Q. BY MS. NORMAN: Wouldn't you expect essential patient treatment information to be entered into that patient's medical chart?

MS. ORCUTT: Form.

THE WITNESS: Can you repeat that question? Because I'm not quite understanding.

Q. BY MS. NORMAN: Is it your expectation as a provider that important medical information about patients is entered into their medical charts?

MS. ORCUTT: Form.

THE WITNESS: Yes. Best practice is that, you know, there's clarity and the appropriate information that's documented.

Q. BY MS. NORMAN: And is that standard of care?

MS. ORCUTT: Form.

THE WITNESS: That's the standard of care, yes.

Q. BY MS. NORMAN: Okay. And that's especially important that important medical information about patients be documented in their health care records when they're being cared for by a team as opposed to a single provider, right?

MS. ORCUTT: Form.

THE WITNESS: Yes, there should be

documentation.

Q. BY MS. NORMAN: And it's particularly important when different providers are providing care for a patient so that they understand what the other providers are doing, right?

MS. ORCUTT: Form.

THE WITNESS: That is the intent.

Q. BY MS. NORMAN: Would you be concerned with a system where responsibility for complex patients was disbursed among a legion of different R.N.s and N.P.s with minimal or no physician-level oversight?

MS. ORCUTT: Form.

MS. BARNES: Form.

THE WITNESS: So without knowing more information, you know, from just that limited information, it would cause me to have some concern. But, again, I need the full context of that situation.

Q. BY MS. NORMAN: Understood. But based on that limited information, a system where responsibility for complex patients was disbursed among a legion of different R.N.s and N.P.s with minimum or no provider-level oversight, you said that that situation would cause you some concerns. And my question is: What concerns are those?

MS. BARNES: Form.

MS. ORCUTT: Form and foundation.

THE WITNESS: It's subjective because it's based on his experiences and what his environment is.

Q. BY MS. NORMAN: Did you express that concern in your report?

A. I have to go through my report to see if I shared that, but --

Q. Why don't you do that? It's only 5 1/2 pages. We can wait.

So to be clear, as you review the report, what I'm looking for is a complete answer to the question of: What criticisms of Dr. Wilcox's methodology have you provided in your report? So take your time.

A. So based on reviewing my report, in terms of methodology, it seems like my concern is he's cherry picking certain things and not looking at the whole entire system. I really firmly believe that people are doing the right thing, for the most part. And, of course, there are mistakes that do happen, but to say that nurses are working out of scope, I mean, to me, he's looking at the one-offs but not looking at the system as whole. Same thing with him talking about physician assistants not adequately supervised. I mean, there are times when there may be delays in reaching the physician and the provider needs to be able to make emergency decisions on things.

Foundation, Rule 602 (76:6-18, 79:21-22, 80:2-18, 106:17-25); Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Witness has adequate foundation to testify regarding scope of practice and supervision based on his personal knowledge of correctional medicine, Rule 602, 702, 703.

Foundation, Rule 602 (76:6-18, 79:21-22, 80:2-18, 106:17-25); Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Witness has adequate foundation to testify regarding scope of practice and supervision based on his personal knowledge of correctional medicine, Rule 602, 702, 703.

So I would not consider that not adequately supervised.

Again, everything is subjective, but I'm talking about his methodology of one-offs with respect to nurses and P.A.s practicing out of their scope.

Q. And what, if anything, did you do after reading Dr. Wilcox's report to verify any of the facts that he set forth in his report?

MS. BARNES: Form.

MS. ORCUTT: Form; asked and answered.

THE WITNESS: I don't remember.

Q. BY MS. NORMAN: You didn't do anything, did you? It was two weeks ago.

MS. BARNES: Form.

MS. ORCUTT: Form.

THE WITNESS: Again, I said I don't remember.

Q. BY MS. NORMAN: Okay. Is it cherry picking, as you've described it, to review all mortality reviews of every death in the system for the last two years? Is that cherry picking?

MS. ORCUTT: Form; foundation.

MS. BARNES: Form; foundation.

THE WITNESS: I can't answer that because I do not know what these mortality reviews are or are about.

Q. BY MS. NORMAN: So you don't have any knowledge

of what's contained in the mortality reviews of patients who have died in the Arizona prison system, do you?

MS. ORCUTT: Form.

THE WITNESS: I do not.

Q. BY MS. NORMAN: Okay. So you talked about concerns about cherry picking. So I'm wondering if you would agree that, when evaluating a health care delivery system, it's generally not as helpful to examine the care for healthy people as it is to look at the treatment of sick patients that require coordination and communication and judgment on the part of health care providers?

MS. ORCUTT: Form and foundation.

MS. BARNES: Form.

THE WITNESS: I don't understand the question. Can you rephrase that?

Q. BY MS. NORMAN: Would you agree that, when evaluating a health care delivery system, it's generally not as helpful to examine the care for healthy people as it is to look at the treatment of sick patients with conditions that require significant treatment?

MS. BARNES: Form.

MS. ORCUTT: Foundation.

THE WITNESS: I think it's important to look at the whole system. And if you want quality improvements as a CQI you focus on where your outlier

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

issues are. So yes, there should be some focus to the more high risk individuals. But still, overall, if you want to talk about community standard and adequacy of care, you have to look at the whole, including the healthy populations.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. BY MS. NORMAN: So you have no opinion on the current adequacy of the medication administration system in ADCRR because you don't know how it operates on a day-to-day basis, right?

MS. ORCUTT: Form.

THE WITNESS: I don't know the day-to-day operations, no.

Q. BY MS. NORMAN: So you have no opinion on the adequacy of the system as it currently operates in ADCRR?

MS. ORCUTT: Form.

THE WITNESS: Yeah, I have no opinion.

Q. BY MS. NORMAN: Okay. And you have no opinion on the quality of care currently provided by nurses in ADCRR because you're not familiar with the day-to-day operations of nursing care in the system; isn't that right?

MS. ORCUTT: Form.

MS. BARNES: Form.

THE WITNESS: Yeah, I am not aware of the nursing systems. I'm sorry. What was the question again?

A. Yes.

Q. Do you agree that the capacity to identify errors and fix them is central to the performance of any health care system?

MS. ORCUTT: Form.

MS. BARNES: Form.

THE WITNESS: Yes. And that would be an important component of any health system that they need to look at themselves and find ways to improve.

Q. BY MS. NORMAN: And one of those ways that health care systems have to identify errors and fix them would be through mortality reviews, correct?

MS. BARNES: Form.

MS. ORCUTT: Form; also outside the scope of this expert report.

MS. BARNES: You've already asked him that question, and I instructed him not to answer.

MS. NORMAN: Okay. We're going to avoid the dangerous question.

MS. BARNES: You're avoiding that question because it's not within the scope of his expert report which is what the parameters of this deposition are.

MS. NORMAN: Well, it's calculated to lead to the discovery of admissible evidence, but yes.

Q. BY MS. NORMAN: Dr. Wu, have you ever been to

A. I may have sitting with the -- name is Dr. Jordan. I may have done some stuff because I think he wanted to learn how to use True Care. And I don't know if there's a chart up when we were working with the harsh environment consult.

Q. What is True Care?

A. True Care is an application a health insurance plan uses that's proprietary to track a request for specialty services.

Q. So on that trip to Yuma did you review any patient charts for substantive patient care matters outside of looking at electronic processes?

A. No. It was more the training for them to know how to use the application.

Q. Got it. And what was the purpose of that trip to Yuma?

A. To also look at our pilot with the harsh environment consult.

Q. Can you describe what you mean by that?

A. So because of COVID and the challenges of providing care, we decided that we would try to put in these kiosks in the units for patients to be able to access health services instead of being escorted across the compound to the medical clinic. So it would be easier to do that interaction by having kind of a tablet that's

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Hearsay, Rule 802

built to withstand high stresses in the unit. And so patients could just walk up in their housing units through it and have scheduled appointments with the providers.

Q. But it would be remote with the providers so that it would be sort of tele-med on a tablet?

A. Yes. It's a type of telehealth services but the provider was still on the compound.

Q. So the purpose of your trip to Yuma was to explore the feasibility of that program?

A. Correct, because we wanted to try to find innovative ways to be able to provide services in the age of COVID, and we thought this would be a good solution. So it seemed to be very well received by custody and the patients.

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6).

Q. Were there any other purposes of your trip?

A. Just to meet and greet with providers and to assist with whatever they may need with preparing for NCCHC accreditation.

Q. All right. So I count that as the sixth trip that you listed chronologically. Were there any other trips to ASPC that you haven't described?

A. I don't think so because I know -- regrettably, I don't have the time to be able to hit every facility. I like meeting the providers and being in the facilities, but unfortunately, I was not able to hit every facility.

medical care in ADCRR. It also seems to me that you said clearly that you're too high level of an executive. You're not familiar with day-to-day operations of medical care in ADCRR.

So my question to you is: Are you rendering any opinion as to whether the day-to-day practice of medical care in ADCRR is constitutionally adequate?

MS. ORCUTT: Form.

MS. BARNES: Same objections; same instruction.

THE WITNESS: I mean, again, as I stated, I don't know every day, you know, the day-to-day operations. You know, every day is a different day. You can have good days, you can have bad days. But from where I stand overall, as a collective, I would opine that, yeah, we are providing, you know, adequate and appropriate services.

Q. BY MS. NORMAN: And you render that opinion based on your knowledge of the policies, correct?

A. Yes, but also, if I can also add, you know, when you asked about me looking at charts and the frequency, although I don't know if it can be properly, but, you know, the frequency, you know, I can't really pin down, but, you know, there are times when I actually will go in there and look at a chart when asked to -- for

Foundation, Rule 602 (76:6-18, 79:21-22, 80:2-18, 106:17-25, 137:12-13); Hearsay, Rule 802

Admissible pursuant to Rule 804(b)(1) and FRCP 32(a) because witness is being treated as "unavailable" because he did not testify at trial; also should be permitted in fairness to complete Plaintiffs' designated testimony, Rule 106, FRCP 32(a)(6). Witness has adequate foundation to testify based on his personal experience in correctional medicine and high-level knowledge of the ADCRR system, Rule 602, 702, 703.

Same as above

instance, I do recall, and I forgot to point that out, is that just looking at specialty consult requests and utilization management and making sure that ATPs, alternative treatment plans that have been recommended were appropriate. So that was something that I had recently done.

See above

Q. We talked about that. You mentioned reviewing charts several times when asked to look into utilization management. I understand. So back to me trying to understand what your opinions are.

So are you telling me that you rendered an opinion regarding the constitutional adequacy of day-to-day medical care in ADCRR?

MS. ORCUTT: Form.

MS. BARNES: Same objections and same instruction. And I think that he has answered your question a few different times. So asked and answered.

But if you can answer again, Dr. Wu, please do. And if you need to refer to your opinion, you can do that.

THE WITNESS: And I will say that, yes, I'm opining based on my report of the areas that I've been asked to opine on.

MS. NORMAN: All right. I don't have any more questions.

STATE OF ARIZONA )
)
COUNTY OF MARICOPA )

BE IT KNOWN that I took the foregoing deposition pursuant to Notice; that the witness was duly sworn by me; and that said transcript is a full, true, and accurate record of the proceedings; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have acted in compliance with ACJA 7-206.

I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

Pursuant to request, notification was provided that the deposition is available for review and signature.

Dated this 7th day of November, 2021.

Janet Hauck, RPR
Certified Reporter
Arizona CR No. 50522

I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has complied with the ethical obligations set forth in ACJA 7-206.

GLENNIE REPORTING SERVICES, LLC
Registered Reporting Firm
Arizona RRF No. R1035