Victoria Lopez (Bar No. 330042)*
Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: vlopez@acluaz.org
          jkeenan@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(d)

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>        Plaintiffs,<br><br>    v.<br><br>David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities,<br><br>        Defendants. | No. CV 12-00601-PHX-ROS<br><br>**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

# TABLE OF CONTENTS

**Page**

FINDINGS OF FACT ................................................................................. 1

I.  INTRODUCTION ............................................................................... 1

    A.  Procedural Background ................................................................. 1

    B.  Parties ...................................................................................... 2

II.  ISOLATION ..................................................................................... 3

    A.  Background ............................................................................... 3

    B.  Expert Testimony and Evidence Regarding Defendants' Use of Isolation ........................................................................... 5

    C.  Summary of the Findings Related to Defendants' Use of Isolation ............ 11

    D.  Correctional Industry Standards .................................................. 12

    E.  The Adverse Psychological Effects of Isolation and the Exacerbating Effects of Isolation on Mental Illness ........................ 15

        1.  Solitary Confinement of People with Mental Illness, Including Those with Serious Mental Illness .................................... 24

        2.  Solitary Confinement of Children .......................................... 27

    F.  Conditions of Isolation in ADCRR ............................................... 29

        1.  Physical Conditions of ADCRR Isolation Units That Place Incarcerated People at Risk of Harm ................................ 29

            (a)  Light and Ventilation ............................................. 30

            (b)  Adequate Living Space ......................................... 36

            (c)  Excessive Heat .................................................... 38

            (d)  Sanitary and Safe Environmental Conditions ............. 39

        2.  Inadequate Out-of-Cell Time ................................................ 56

            (a)  Out-of-Cell Time in Maximum Custody Units ............ 56

            (b)  Out-of-Cell Time in Detention and Close Management Units ................................................ 59

            (c)  There Is Even Less Out-of-Cell Time than Suggested by the Tracking Forms and Individual Records, as Many "Refusals" Appear to Be Denials of Out-of-Cell Time ........ 62

        3.  Inadequate Nutrition in ADCRR Isolation Units ....................... 75

4.    Defendants Do Not Adequately Supervise People in Isolation Units, Placing Them at Risk................................................. 80

5.    Inappropriate Uses of Force on Mentally Ill People Engaging in Self-Harm ........................................................................... 86

G.   ADCRR Policies Pertaining to Isolation .................................... 95

1.    Department Order (DO) 801: Inmate Classification...................... 95

2.    DO 812: Inmate Maximum Custody Management and Incentive System ........................................................................................ 99

3.    DO 804: Inmate Behavior Control .................................... 101

4.    DO 813: Close Management ............................................. 102

5.    DO 807: Inmate Suicide Prevention, Mental Health Watches, and Progressive Mental Health Restraints ...................................... 103

(a)    Behavioral Management Unit .............................. 104

H.   ADCRR's Excessive Use of Solitary Confinement ................... 104

1.    Defendants Hold Large Numbers of People in Solitary Confinement ............................................................................. 104

(a)    Defendants Place and Keep People in Isolation for Reasons that Have No Penological Justification ................ 105

(b)    Defendants Routinely Overclassify People Through the Use of Overrides, Resulting in Excessive and Unnecessary Isolation ...................................... 107

(c)    Defendants Place People Who Need Protection into Isolation ........................................................... 111

(d)    Defendants Keep People in Isolation Even When Defendants Acknowledge There Is No Reason to Do So .... 114

2.    Defendants Keep People in Isolation for Extremely Long Periods ....................................................................................... 115

(a)    ADCRR Has Failed to Implement the Maximum Custody Step Program in a Way That Would Allow People to Progress .......................................................... 117

(b)    Defendants Keep People in Detention for Long Periods ..... 121

3.    ADCRR Places People with Serious Mental Illness into Isolation. 123

4.    ADCRR Places Children into Isolation........................................... 125

I.    Extreme Social Isolation and Harsh Conditions Put All Incarcerated Persons in ADCRR Isolation Units at Risk of Harm ................................ 127

J.    Conclusion .......................................................................................... 131

III.   MENTAL HEALTH CARE ............................................................................ 132

A.    Background ......................................................................................... 132

B.    Evidence Regarding Mental Health Care Considered by the Court .......... 133

C.    Summary of the Findings Related to Mental Health Care ........................ 141

D.    Chronic Shortages of Qualified Mental Health and Custody Staff Contribute to Serious and Systemic Deficiencies in the Delivery of Mental Health Care ............................................................................. 142

E.    Timely Mental Health Screening and Referrals ....................................... 150

F.    Inadequate Treatment Plans and Failure to Coordinate Care.................... 155

G.    Access to Ongoing and Comprehensive Mental Health and Therapeutic Care ...................................................................................................... 161

        1.    There is inadequate access to or provision of therapeutic treatment. ..................................................................................... 164

        2.    Group mental health care is frequently cancelled and inadequate.. 167

H.    Brief, Non-Confidential, and Superficial Contacts With Mental Health Staff ..................................................................................................... 169

I.    Access to Psychiatric Medication ......................................................... 177

        1.    Inadequate formulary for psychotropic medications ..................... 180

        2.    ADCRR's medication distribution practices puts mentally ill people at risk of harm....................................................................... 181

        3.    Defendants fail to properly monitor patients for medication side effects or for continuing mental health symptoms. ......................... 183

J.    Mentally Ill People Remain Profoundly Symptomatic For Long Periods of Time ................................................................................................. 188

K.    Access to Inpatient Mental Health Care.................................................. 191

L.    Treatment of Suicidal / Self-Harming People .......................................... 196

IV.   MEDICAL / PHYSICAL HEALTH CARE ...................................................... 208

A.    Background ......................................................................................... 208

155617523.3

B. People Incarcerated in Arizona Prisons Have Serious Medical Needs ...... 212

C. People Needlessly Suffer and Die in ADCRR Custody Due to Long-Standing Systemic Deficiencies in Defendants' Medical Care System ..... 212

  1. Prison nurses fail to provide adequate care and act as a barrier for patients seeking access to treatment .......................................... 213

     (a) The nurse line is a barrier to timely health care as nurses exceed the scope of their license and prevent patients from seeing providers ............................................................. 213

     (b) Nurses perform inadequate assessments. ............................. 216

     (c) Nurses do not have adequate clinic space to treat patients. . 218

     (d) Nursing appointments are not timely. ................................. 220

  2. Prisons Have Too Few Physicians and Many Primary Care Providers Deliver Inadequate Care .................................................... 222

     (a) Defendants rely heavily on mid-level providers who do not have the necessary skills to treat complex patients........ 223

     (b) Providers do not develop and test differential diagnoses..... 225

     (c) Providers fail to adequately manage their chronic care and complex cases.................................................................. 230

     (d) Providers fail to follow-up on significantly abnormal diagnostic test results. .......................................................... 231

     (e) Providers fail to obtain hospital records and review and act on them. .......................................................................... 233

     (f) Providers fail to provide adequate pain medication to those who need it................................................................... 236

     (g) Providers delay treatment for patients with hepatitis C....... 238

     (h) Providers fail to treat Substance Use Disorder with community-standard, evidence-based treatment.................. 240

     (i) Providers fail to offer or follow up on necessary health screenings based on age, medical history, and gender......... 243

  3. Patients Cannot See Specialists When Medically Necessary. ........ 244

     (a) Providers fail to recognize when patients require specialty care........................................................................ 245

     (b) Specialty care is not provided in a timely manner............. 245

-iv-

155617523.3

(c)     Providers fail to timely review and act on recommendations from specialists. ....................................... 250

4.     Defendants Fail to Provide People with Disabilities with Medically Necessary Care, Supplies, and Equipment. .................. 251

V.     SYSTEMIC DEFICIENCIES THAT AFFECT ALL HEALTH CARE ............. 252

A.     ADCRR Fails to Consistently Provide Patients Essential Medications..... 252

B.     Medical Records Are Incomplete, Inaccurate, and Difficult to Review .... 256

1.     ADCRR's electronic system is a barrier to care because it makes it very difficult for health care staff to review and compare critical information. ........................................... 257

2.     Medical records are incomplete and contain inaccurate information. ...................................................................... 258

3.     Current health problems and conditions are not accurately documented. .............................................................. 259

4.     Medical scores do not reflect patients' conditions. ......................... 260

5.     People in ADCRR custody are wrongly barred from knowing their own health care information. .................................................. 261

C.     Defendants' Failure to Provide Adequate Language Interpretation in Health Care Encounters to Prisoners Not Fluent in English Puts Them at Substantial Risk of Serious Harm ........................................ 264

1.     Defendants do not properly identify which class members require language interpretation and do not consistently provide interpretation during health care encounters .................................. 265

2.     Defendants continue to permit unqualified staff to conduct encounters in non-English languages. ............................................. 272

3.     Defendants lack an accurate way to monitor whether language interpretation was provided. ............................................. 274

4.     Defendants' proffered evidence regarding language interpretation is not credible or reliable .......................................... 276

D.     Widespread, Ongoing Deficiencies in Health Care and Custody Staffing Put Class Members at Substantial Risk of Serious Harm ........... 279

1.     Medical staff shortages adversely affect patient care. .................... 279

2.     Mental health staffing shortages adversely affect patient care. ....... 283

3.     Correctional staff shortages adversely affect patient care. ............. 288

155617523.3

4. ADCRR's health care contract and spending fail to meet patients' needs. ................................................................ 289

5. The only staffing model presented to the Court shows increased numbers of health care staff are needed. ......................... 292

VI. DEFENDANTS LACK THE CAPACITY FOR QUALITY REVIEW AND SELF-CORRECTION ........................................................ 298

A. Defendants' Mortality Review and Psychological Autopsy Process Fails to Identify and Correct Medical and Mental Health Treatment Errors .................................................................................. 298

B. Defendants' Corrective Action Plan System Under the Stipulation Has Failed to Significantly Improve Care ................................ 303

C. Defendants Have Consistently Failed to Even Recognize, Let Alone Attempt to Correct, Serious Problems with the Administration of Solitary Confinement ................................................................ 304

D. Defendants Have No Capacity to Improve Clearly Deficient Levels of Custody and Health Care Staffing ........................................... 306

E. Defendants' Evidence Regarding NCCHC Accreditation Does Not Rebut the Credible and Reliable Evidence of Serious Deficiencies in ADCRR's Health Care System ................................................. 308

VII. CONCLUSION .................................................................... 311

A. Defendants' State of Mind ............................................... 311

1. Years of litigation establish longstanding constitutional deficiencies ............................................................. 311

2. Evidence at trial establishes Defendants' knowledge of the violations of constitutional rights. ................................. 316

3. Defendants willfully ignore the grave risk of injury and death to class members ..................................................... 320

B. Defendants' Failure to Take Reasonable Steps to Address Deficiencies .. 323

CONCLUSIONS OF LAW .................................................... 325

I. THE EIGHTH AMENDMENT ANALYSIS FOR PROSPECTIVE RELIEF..... 325

II. THE MINIMAL REQUIREMENTS OF A PRISON HEALTH CARE SYSTEM ............................................................................. 329

A. Serious Medical or Mental Health Need ................................ 332

B. Adequate Numbers and Types of Qualified Health Care Staff.......... 333

C. Health Care Records ........................................................ 335

D. Timely Access to Competent and Minimally Adequate Care ................... 335

E. Language Interpretation in Health Care Encounters ....................... 337

F. Access to Necessary Medications ....................................... 339

G. Access to Medical Supplies, Appliances, and Assistive Devices ........... 341

H. Chronic Disease Management ............................................. 343

I. Access to Specialty Care and Diagnostic Procedures ..................... 343

J. Responses to Emergencies ............................................... 348

K. Mental Health Care .................................................... 348

    1. Prevention of Suicide and Self-Harm ............................. 351

    2. Access to Inpatient Mental Health Care .......................... 352

    3. Uses of Force on People with Severe Mental Illness .............. 353

L. Trade Group Accreditation Is Not Constitutional Compliance ............. 354

III. THE LEGAL STANDARD REGARDING THE USE OF ISOLATION ......... 356

A. Out-of-Cell Time ...................................................... 360

B. Interference with Sleep or Constant Illumination ..................... 361

C. Adequate Nutrition .................................................... 362

D. Length of Time in Isolation ........................................... 363

E. Arbitrary and Automatic Placement in Isolation ....................... 364

F. The Use of Isolation on People with Mental Illness ................... 366

G. The Use of Isolation on Children ...................................... 369

IV. THE LEGAL STANDARD REGARDING REMEDY ....................... 375

A. Legal Standard to Appoint a Receiver ................................. 377

B. The Court Has the Power to Supersede or Rescind State Laws ............ 378

# FINDINGS OF FACT

## I.     INTRODUCTION

### A.     Procedural Background

1.     In 2012, this class action was brought against the Arizona Department of Corrections (now referred to as the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR")) seeking injunctive relief on behalf of the people incarcerated in the ten state-run prisons, regarding inadequate medical, mental health, and dental care, as well as conditions of extreme deprivation in isolation units. *See generally* Doc. 1.

2.     After two and a half years of litigation before this Court and the Ninth Circuit, and arms' length negotiations, the parties entered into a class-wide settlement agreement in October 2014 referred to as the Stipulation, to resolve the claims in the case. *See generally* Docs. 1185, 1185-1. After receiving written and oral comments on the settlement agreement, the Court approved the Stipulation in February 2015 as fair, reasonable, and adequate under Rule 23 of the Federal Rules of Civil Procedure. Doc. 1458.

3.     The Stipulation contained health care and isolation provisions to be assessed against specified performance measures. With respect to health care, 103 performance measures were to be assessed and reported monthly at each of the ten prison complexes, with the goal of addressing the deficiencies. *See generally* Doc. 1185 at 3. The Stipulation provided that the parties were to agree to a protocol for assessing compliance with each health care performance measure and, if the parties failed to agree, the matter would be submitted for mediation or resolution by the Court. *Id.* Finally, the monitoring and reporting of Defendants' performance of health care provisions would end if they achieved and maintained specified thresholds: 75% compliance the first 12 months, 80% the second 12 months, and 85% thereafter. *Id.* at 4.

4.     The Stipulation also included performance measures related to conditions in isolation units with similar 75%, 80%, and 85% thresholds. Doc. 1185 at 6-7.

5. The Court's July 2021 Order traced the long history of monitoring and enforcement motions filed by Plaintiffs, and the numerous enforcement and contempt orders entered by the Court. *See Jensen v. Pratt*, No. CV-12-00601-PHX-ROS, 2021 WL 3828502 at *2-*14 (D. Ariz. July 16, 2021) [Doc. 3921 at 3-27]; *see also infra* Part VII ¶¶ 989-1034.

6. The Court found in its July 2021 Order that "[t]here is overwhelming undisputed evidence Plaintiffs have been deprived of many of the core benefits of the Stipulation." Doc. 3921 at 30.

> Defendants never approached their obligations under the Stipulation with the required level of commitment. Almost immediately after the Stipulation went into effect, Defendants began depriving Plaintiffs of the benefits they were entitled. More than six years later, Plaintiffs still wait. Defendants' past conduct shows they had no problem with depriving Plaintiffs of the benefits of the Stipulation and Defendants' behavior undoubtedly will not end.

*Id.* at 31.

7. In its July 2021 Order, the Court rescinded its approval of the Stipulation, and set the case for a three-week trial to begin on November 1, 2021. *Id.* at 37.

8. The Court held 15 days of trial between November 1 and December 9, 2021. Twenty-six (26) witnesses testified in total, including six incarcerated people, and seven expert witnesses. The expert witnesses submitted much of their testimony in writing five days prior to their live appearance at trial. Tens of thousands of pages of exhibits, as well as numerous photographs and videos of Defendants' prisons, were admitted into evidence and considered by the Court.

9. The Court ordered the parties to provide post-trial written briefing, which the Court has considered.

**B. Parties**

10. Plaintiffs in this case are a class of all persons who now or in the future will be subjected to the medical, mental health, and dental policies and practices of Defendants' Arizona state prisons. *Parsons v. Ryan*, 289 F.R.D. 513, 525 (D. Ariz. 2013),

-2-

*aff'd Parsons v. Ryan* ("*Parsons I*"), 754 F.3d 657 (9th Cir. 2014). The Court certified a subclass of all persons "who are now, or will in the future be, subjected by [Defendants] to isolation, defined as confinement in a cell for 22 hours or more each day," the "Isolation Subclass." *Id.* Plaintiff Arizona Center for Disability Law is designated as Arizona's authorized protection and advocacy organization for people with mental illness or disabilities. *See* 42 U.S.C. §§ 10801, *et seq.*; 10805(a)(1).

11.    Defendant David Shinn is the Director of ADCRR, and is responsible for all operations of the department, and managing all employees of ADCRR. He is legally responsible for the provision of health care to people in ADCRR's custody. A.R.S. § 31-201.01(D) (2021); *West v. Atkins*, 487 U.S. 42, 56 (1988).

12.    Defendant Larry Gann is the Deputy Director of ADCRR, Medical Services Contracting Monitoring Bureau.

13.    After the filing of this case in March 2012, pursuant to a 2009 Legislative budget reconciliation bill that amended existing state law (A.R.S. § 41-1608 (2021), *amended* 2009 Ariz. Legis. Serv. Sp. Sess. Ch. 6 (H.B. 2010)), the delivery of health care has been provided by a series of private contractors. In the past decade, Defendants have contracted with three different corporations: Wexford (July 2012-Jan. 2014); Corizon (Jan. 2014-June 2019), and Centurion (July 2019-present). Defendants' health care vendors have not been named parties in this litigation, but serve as agents of Defendants.

## II.    ISOLATION

### A.    Background

14.    Defendants maintain multiple categories of housing units in which people are isolated, warehoused in cells for 22 or more hours per day. Maximum Custody, Detention, Close Management, Mental Health Watch—all are solitary confinement.[1]

15.    The conditions in ADCRR's solitary confinement units are extreme. The cells are stark and cramped, particularly when housing two people. They lack natural light

---

[1] As used herein, "solitary confinement" refers to a person being confined to a cell for 22 or more hours per day.

155617523.3

and adequate ventilation. They are filthy and infested with pests, a situation exacerbated by ADCRR's failure to timely collect garbage from the cells. During the summer, temperatures in the cells can reach 95 degrees before anyone takes any steps to bring down the temperature.

16. The food is inadequate. People in solitary confinement in ADCRR are fed just twice a day, according to stated practice. In reality, many people do not even get that.

17. People in solitary confinement receive very little out-of-cell time. What little is scheduled is often cancelled, and staff finds ways to deny out-of-cell time, calling it a "refusal."

18. Compounding these inhumane conditions is Defendants' crisis in custody staffing levels, especially at the prisons that incarcerate the highest numbers of people classified as maximum custody, close management, and detention. The staffing shortages lead to cancellations of out-of-cell time and inadequate supervision, both of which increase the risks to people in solitary confinement.

19. About one-tenth of the entire population of ADCRR is in solitary confinement at any given time.[2] This is more than almost any other state that reports how many people are in solitary confinement in its prisons. ADCRR does not have any policies limiting who can go into solitary confinement, resulting in the placement of children and

---

[2] Defendants offered no evidence of the total number of people who are in solitary confinement in ADCRR. Plaintiffs' experts calculated the total number in solitary confinement on a given day, reaching slightly different conclusions. *See* Haney WT, Doc. 4120 ¶ 111 n.104 (3,048 of 27,809, or 11%); Horn WT, Doc. 4130 ¶ 331 n.245 (9.6%). Regardless of which of these percentages is considered, Arizona keeps an extraordinary number of people in solitary confinement. *See* Ex. 3530 at ADCRR00231471, ADCRR00231475 (showing that the average percentage of people kept in solitary confinement as reported by 39 states was 3.8%, and that only one of the 39 states reported a percentage higher than 9.6%). (The study in which this was reported was based on self-reports by correctional agencies. ADCRR minimized the number of people in isolation by (1) counting only those people in Maximum Custody, as opposed to all people in isolation, and (2) dividing the number of people in Maximum Custody by the number of people in state-run *and* private prisons. *See* Ex. 3530 at ADCRR00231475. These ways of calculating the percent of people in isolation were both counter to the instruction from the surveyors. *Id.* at ADCRR00231470-471.) As a result, and in light of the extraordinary level of solitary confinement that Plaintiffs' experts calculated, the Court relies herein on the most conservative estimate, 9.6%.

people with serious mental illness into prolonged isolation. In ADCRR, people who are serving the first two years of a life sentence are automatically kept in maximum custody regardless of their behavior or their risk or classification scores. As correctional systems around the country limit their use of solitary confinement, ADCRR has continued to place people into its extremely harsh solitary confinement units, without adequate or ongoing consideration of whether such punishment is justified. Once in solitary confinement in ADCRR, people may not find their way out again for years or even decades.

      **B.**     **Expert Testimony and Evidence Regarding Defendants' Use of Isolation**

20.    Plaintiffs' correctional expert Martin Horn has worked in corrections for over forty years. Written Testimony of Martin Horn ("Horn WT"), Doc. 4130 ¶¶ 6-8.

21.    After serving for several years as a parole officer, Mr. Horn became the Assistant to the Commissioner of the New York State Department of Correctional Services from 1978 to 1980; and from 1980 to 1984 was the Assistant Commissioner of the same Department. Horn WT, Doc. 4130 ¶¶ 6-8 and Ex. 6. Mr. Horn then ran a prison in New York for a year, and then served as the Director of Parole Operations and the Executive Director of the New York State Division of Parole for a total of ten years. *Id.*

22.    Mr. Horn served as Pennsylvania's Secretary of Corrections from 1995 through 2001. Trial Testimony of Martin Horn ("Horn TT") at 1474:3-10. He was the Commissioner of Corrections overseeing the City of New York Department of Corrections, and the Commissioner of Parole for New York City from 2002 through 2009. *Id.* at 1335:12-1337:14.

23.    Mr. Horn earned a Masters of the Arts in Criminal Justice from John Jay College of Criminal Justice in 1974. Horn WT, Doc. 4130 ¶ 5. He worked as an assistant professor of criminal justice at the State University College in Utica, New York from 1975 to 1977. *Id.* ¶ 6. From 2009 through 2020, Mr. Horn was a distinguished lecturer at John Jay College of Criminal Justice, teaching courses in corrections administration, sentencing policy, and criminal justice policy. Horn TT at 1335:20-25. During that period, he also served as the Executive Director of the New York State Sentencing Commission, a

position to which he was appointed by the Chief Judge in the State of New York. *Id*. at 1335:25-1334:4.

24. Mr. Horn has been offered as an expert to testify in approximately 12 trials, and has been found to be qualified to testify as an expert in each of those trials. Horn TT at 1347:3-15.[3] The methodology that Mr. Horn used to reach his opinions in this case is substantially similar to the methodology he has used in other cases in which he has been qualified as an expert and testified. *Id*. at 1347:16-19.

25. Mr. Horn conducted inspections of ASPC-Lewis and ASPC-Eyman, inspecting Maximum Custody units, detention units, and one Close Management unit. In several of these units he inspected the areas where people are held on suicide watch. Horn TT at 1348:12-18; Horn WT, Doc. 4130 ¶ 78. Mr. Horn reviewed thousands of pages of policies, reports, logs, and institutional files, and numerous use of force videos. Horn WT, Doc. 4130-1 at Ex. 1.

26. Mr. Horn spoke with approximately 60 incarcerated people during his inspection tours in ADCRR. Horn TT at 1343:17-22. He testified that he does not take the complaints of incarcerated people at face value, but, over the course of his decades in corrections he has learned that when he hears of a problem from people in different housing units, different buildings, different prisons, and then documents corroborate the problem's existence, the statements are more likely to be true. *Id.* at 1343:24-1344:19. This is what occurred during his inspections and document review in this case. *Id.*

27. Craig Haney, Ph.D., J.D., is a Distinguished Professor of Psychology at the University of California, Santa Cruz, and a University of California Presidential Chair. He has also served at UC Santa Cruz as Director of the Legal Studies Program; Chair of the Department of Psychology; Chair of the Department of Sociology; and Director of the

---

[3] Mr. Horn's testimony was limited in a case against a county and the provider of medical care in its jail. *See* Ex. 5638. He was not permitted to testify against the medical provider. *Id*. He was, however, permitted to testify, and did in fact testify against the county. *See Bornstein v. Cnty. of Monmouth, et al.*, Doc. 291, No. 11-cv-5336 (AET), (D. N.J. Feb. 25, 2015), Trial Testimony of Martin Horn, available at https://ecf.njd.uscourts.gov/doc1/11919636004.

Graduate Program in Social Psychology. He holds a bachelor's degree in psychology from the University of Pennsylvania, and an M.A. and Ph.D. in psychology and a J.D. from Stanford University. He has been the recipient of a number of scholarships, fellowships, and other academic awards. Written Testimony of Craig Haney ("Haney WT"), Doc. 4120 ¶ 1; Trial Testimony of Craig Haney ("Haney TT") at 718:17-719:17.

28.     Dr. Haney has served as a consultant to numerous governmental, law enforcement, and scientific agencies and organizations, including the California Department of Corrections, various California county sheriff's departments, various California Legislative Select Committees, the National Science Foundation, the National Academy of Sciences, the American Association for the Advancement of Science, the United States Department of Justice, and the United States Department of Homeland Security. He has testified before the United States Senate about solitary confinement. He has published numerous scholarly articles and book chapters on topics including the psychological effects of incarceration and the nature and consequences of solitary confinement. He has published three sole-authored books, and co-authored a fourth. Haney WT, Doc. 4120 ¶¶ 2, 4; Haney TT at 727:1-728:4; *see also* Doc. 4120-1 at 3-46 (Dr. Haney's CV).

29.     Dr. Haney has studied the psychological effects of incarceration, including the effects of solitary confinement, since 1971, when he was one of the principal researchers in what came to be known as the "Stanford Prison Experiment." In the course of that work, he has toured and inspected maximum security state prisons and related facilities in 29 states; maximum security federal prisons including the ADX facility in Florence, Colorado and federal death row in Terre Haute, Indiana; and prisons in other countries. He has published articles on solitary confinement in peer-reviewed journals, and authored a book published by the American Psychological Association that deals in part with solitary confinement. Haney WT, Doc. 4120 ¶¶ 5, 6; Haney TT at 719:18-722:12, 725:7-726:25, 728:20-730:2.

155617523.3

30.     Dr. Haney has been qualified and has testified as an expert in numerous United States District Courts and state courts. His research, writing, and testimony has been cited by state courts, United States District Courts, United States Courts of Appeals, and the United States Supreme Court. Haney WT, Doc. 4120 ¶ 7.

31.     Dr. Haney has served as an expert consultant to Plaintiffs in this case since 2012. In that role he has toured and inspected ADCRR facilities in 2013, 2014, 2016, and 2021; interviewed persons incarcerated in those facilities; and reviewed documents provided by ADCRR. He has filed three previous declarations in this case that pertain to solitary confinement in ADCRR (Doc. 240-1, Ex. E; Docs. 1104-8 and 1104-9 (Ex. 17); Doc. 1104-10 (Ex. 18)). Haney WT, Doc. 4120 ¶¶ 8, 9, 11; Haney TT at 749:15-750:22.

32.     Most recently, in September 2021, Dr. Haney conducted inspections at Eyman-Browning Unit; Eyman-SMU I; Lewis Rast, Morey, Stiner, Sunrise (minors) and Barchey Units; and detention and mental health units within these facilities. During these inspection tours, he personally interviewed approximately 75 incarcerated persons. Many of these incarcerated persons were chosen randomly and interviewed cell-front in the course of inspecting the various housing units. Where possible, Dr. Haney also interviewed persons he had interviewed on past visits to ADCRR facilities, to assess their opinions about whether and how ADCRR conditions, policies, and practices had changed since the entry of the Stipulation. Dr. Haney was also able to request that particular incarcerated persons be brought out of their cells, so that he could conduct interviews at greater length and more confidentially than was possible in the housing units. He also requested access to the medical and mental health records of the incarcerated persons he interviewed, which he was able to review after his inspection tours. Finally, Dr. Haney also reviewed additional ADCRR and Centurion documents, including rules, regulations, and procedures, mortality reports, and psychological autopsies. Haney WT, Doc. 4120 ¶¶ 11-14; *see also id.* ¶¶ 144-179 (summary of Dr. Haney's 2021 interviews with persons previously interviewed in 2013); Doc. 4120-1 at 50-59 (Appendix C—medical records and other documents relied upon by Dr. Haney), 60-61(Appendix D (filed under seal)—

persons interviewed by Dr. Haney in 2021), 61-69 (Appendix E—summary of Dr. Haney's 2013 interviews), 70-91 (Appendix F—summary of Dr. Haney's interviews with persons interviewed only in 2021); Haney TT at 752:5-753:25; 763:16-764:10, 769:15-774:6, 994:22-995:2.

33. The methodology Dr. Haney has used to reach his opinions in this case is reliable and is customarily used among experts in his field. Haney TT at 791:20-792:10.

34. During his interviews with people incarcerated in ADCRR isolation units in September 2021, Dr. Haney found a remarkable amount of consistency in what he was told by incarcerated people in different housing units who did not appear to know each other. People described the severity of the conditions and the level of deprivation they were experiencing. Many of them distinguished between what they had been told or read they were supposed to be getting and what they were actually receiving—describing, for example, cancellations of out-of-cell time, or being denied access to the larger exercise yard. Doc. 4120 ¶¶ 149, 157; Haney TT at 774:7-775:14, 791:1-19, 803:13-804:14, 868:23-869:14, 871:1-9.

35. Dr. Haney heard consistent accounts of the lack of activity, recreation, out-of-cell time, programming, and education, as well as restrictions on visiting. There was a consistent theme among those interviewed that, with the exception of the availability of tablets for some incarcerated people, nothing had changed for the better—in fact, the opposite was true. Incarcerated people Dr. Haney had interviewed in 2013 consistently told him that they were spending much more time confined to their cells and experiencing worse conditions in 2021 than they had in 2013—for example, less out-of-cell time, less access to the exercise yard, or poorer mental health care. Many incarcerated people expressed concern about whether they could continue to tolerate the conditions under which they were confined. Some were on the verge of being released from prison, and expressed real concern about their ability to survive in the community, given their lack of access to of programming, treatment, and education while incarcerated. Haney TT at 779:23-782:12, 789:23-791:19, 825:17-827:2.

155617523.3

36.     The qualifications of Dr. Joseph Penn, Defendants' psychiatric expert, are discussed further below at ¶¶ 376-383. In addition to opining on mental health care, he gave some testimony regarding solitary confinement. However, the Court does not find Dr. Penn to be a reliable or credible witness on issues relating to solitary confinement. He has never published an article on solitary or isolated confinement, nor has he ever conducted a systematic study on the use of isolation in any prison system. Trial Testimony of Joseph Penn ("Penn TT") at 3273:19-3274:14. In his written and oral testimony, Dr. Penn criticized Dr. Haney, repeatedly stating that the articles written or cited by Dr. Haney in Dr. Haney's report were not peer-reviewed and that there were substantive problems with them, but then acknowledged on cross-examination that he did not know if that was true, and that he had not read the articles. Written Testimony of Joseph Penn ("Penn WT"), Doc. 4172 ¶¶ 238-240; Penn TT at 3054:17-24, 3280:13-3281:11, 3286:16-3287:5, 3287:24-3288:21, 3289:7-3291:24, 3314:11-3315:24, 3291:21-24.

37.     Further, Dr. Penn is an extreme outlier on the risk of harm from solitary confinement. He disagrees with the position taken by the National Commission on Correctional Health Care ("NCCHC") that solitary confinement lasting longer than 15 days "is cruel, inhumane, and degrading treatment, and harmful to an individual's health," and that people with mental illness should not be placed into solitary confinement of any duration. Penn TT at 3062:25-3063:2, 3327:10-3328:6, 3329:18-3330:23; Ex. 2216 at 6. Notably, Dr. Penn served as the board chair of the NCCHC until very recently, and considers it to be the "Rolls Royce" of correctional mental health care, except on the matter of the psychological and physical harms of solitary confinement. Penn TT at 3062:25-3063:2, 3324:16-3325:20, 3326:4-3327:9,   3327:10-3328:6, 3329:18-3330:23, 3344:21-3345:17, 3346:9-3348:13. He further disagrees with the position statements of the American Psychiatric Association on solitary confinement of children (Ex. 2218)[4] and people with mental illness (Ex. 2214), the position statement of the American Public

---

[4] Dr. Penn is listed as an author of this position statement. Ex. 2218.

155617523.3

Health Association on solitary confinement (Ex. 2215), and the American Psychological Association on solitary confinement of children. Penn TT at 3324:16-3325:20, 3346:9-3348:13.

38. Finally, the mental health care and use of isolation in the Texas juvenile prison system, whose mental health care Dr. Penn oversees, (Penn TT at 3058:16-20), is presently the subject of a U.S. Department of Justice investigation of "systemic violations of the rights of young people" to "examine whether Texas provides children confined in these facilities reasonable protection from physical and sexual abuse by staff and other residents, excessive use of chemical restraints[,] excessive use of isolation[, and] whether Texas provides adequate mental health care." *See* Ex. 2201 at 1.

39. Unlike Plaintiffs, Defendants did not proffer any correctional expert testimony regarding the conditions in or use of solitary confinement in ADCRR.

40. In addition to these three experts, the Court also heard testimony on conditions of solitary confinement from numerous fact witnesses, including ADCRR employees (Warden Jeffrey Van Winkle, Deputy Warden Travis Scott, Deputy Warden Lori Stickley, and Deputy Warden Anthony Coleman), Named Plaintiffs (Dustin Brislan and Jason Johnson), and one additional Isolation Subclass Member (Rahim Muhammad).

**C.** **Summary of the Findings Related to Defendants' Use of Isolation**

41. Defendants put the Isolation Subclass[5] at substantial risk of serious harm due to the nature, quantity, and duration of solitary confinement in ADCRR. Solitary confinement, in general, carries a significant risk of harm; as practiced in ADCRR, the risk is unacceptable.

42. The conditions in isolation in ADCRR are harsh, severe, and inconsistent with what the profession believes is the appropriate standard of care. Horn TT at 1341:19-21. According to Dr. Haney, ADCRR's solitary confinement units are among the most

---

[5] The Isolation Subclass consists of "all prisoners who are now, or will in the future be, subjected by the ADC[RR] to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in certain housing units." *Parsons I*, 754 F.3d at 672.

severe and depriving that he has encountered among the approximately 25 state prison systems he has studied. Haney TT at 768:1-769:14.

43.     Reasons for this include the physical plant of the units, the deprivation of social contact, the minimal out-of-cell time, the lack of educational and other programming, and inadequate nutrition. Conditions in the Detention Units are particularly grim, described by Mr. Horn at some of the most dire that he has observed in his decades of work in corrections. Horn TT at 1461:15-1462:25.

44.     Further, Defendants place a very large number of people into solitary confinement and keep them there for extremely long periods—often with little or no penological justification for keeping them in isolation.

45.     Finally, and contrary to correctional industry standards, Defendants place the people who are the most vulnerable to the harms of solitary confinement—people with serious mental illness and children—into isolation for long periods.

46.     "All of these things together collectively make this a very harsh, very severe system." Haney TT at 769:13-14; *see also* Haney WT, Doc. 4120 ¶¶ 110, 188; Haney TT at 768:1-769:14, 1012:24-1015:23.

**D.     Correctional Industry Standards**

47.     It is well established in the correctional profession and under the law that incarcerated people must be afforded safe and healthful living conditions, kept safe from each other and from wrongful use of force by staff, receive necessary medical and mental health care, be protected from communicable disease, and be given adequate opportunity to exercise and to provide for their own personal hygiene. Horn WT, Doc. 4130 ¶ 12; Horn TT at 1338:16-1339:1.

48.     Current thinking in the corrections profession about the use of solitary confinement acknowledges the severe physical and mental hardships that incarcerated people endure during extreme social isolation, and the lack of a penological justification for automatic and long-term solitary confinement. Horn WT, Doc. 4130 ¶ 13.

155617523.3

49. The corrections profession recognizes there are basic human welfare considerations and health and safety concerns that every prison system and facility must meet. The provision for basic physical and mental health needs applies irrespective of the nature of the facility, or the length of stay. Persons who enter a prison should be safe from dangers such as fire, communicable disease, mental deterioration, physical or mental harm or injury from others, and be treated in a manner consistent with their dignity as human beings. Incarcerated people should be provided access to natural light, fresh air, exercise, and adequate time outside of their cell. Prisons need to have policies, procedures, and practices designed to identify people at risk of suicide or self-harm, and to protect them from harm. Horn WT, Doc. 4130 ¶ 19.

50. The best expression of these professional expectations is contained in the published Standards of the American Correctional Association ("ACA"). The purpose of these standards is to promote professional management of correctional agencies. The standards establish clear goals and objectives critical to the provision of a humane correctional confinement. Horn WT, Doc. 4130 ¶¶ 18, 20; Horn TT at 1339:8-1340:10. According to the ACA:

- Restrictive housing of incarcerated people should be conducted in a just, humane, and constitutional manner;

- Restrictive housing of incarcerated people should be used only when no alternative disposition would be adequate to control the incarcerated person's behavior or sufficient to alter the findings of objective classification review factors;

- Correctional authorities must give due consideration to the special needs of incarcerated people when placing them in restrictive housing;

- Restrictive housing should only be used in circumstances where no other available form of housing will accomplish the required levels of safety and stability;

- Incarcerated people in restrictive housing should receive periodic classification reviews leading to meaningful outcomes;

- Incarcerated people in restrictive housing should be provided with appropriate and timely medical and mental health care, provided exercise opportunities and the ability to maintain proper levels of personal hygiene; and

155617523.3

- Staff assigned to work in restrictive housing should receive specialized training that reflects the challenges associated with this type of assignment.

Horn WT, Doc. 4130 ¶ 24.[6]

51. Numerous organizations of correctional professionals and correctional health professionals have stated their opposition to long-term solitary confinement, particularly of seriously mentally ill persons and children. The ACA standards limit the placement of an incarcerated person into restrictive housing "to those circumstances that pose a direct threat to the safety of persons or a clear threat to the safe and secure operations of the facility." Horn WT, Doc. 4130 ¶ 27.

52. According to the NCCHC, "[p]rolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health." Ex. 2216 at 6.

53. According to the Association of State Correctional Administrators ("ASCA"),[7] restrictive housing should be used parsimoniously, and when used, care must be taken to ensure that the incarcerated person's well-being is safeguarded and that the person continues to have access to good medical care, mental health care, and exercise. Horn TT at 1338:16-1340:10. Restrictive housing should be used only where there are no alternatives. Horn TT at 1339:13-1340:10. Additionally, there should be "a meaningful process and periodic review of assignments to restrictive housing." Horn WT, Doc. 4130 ¶ 49.

54. A number of jurisdictions across the United States are moving toward severely restricting or ending the use of long-term solitary confinement based on the scientific findings and outcomes summarized herein. For example, in 2017, Colorado, led

---

[6] The ACA and other professional organizations discussed herein do not establish constitutional standards. However, as explained by Mr. Horn, these principles set out what the accepted standards of the correctional profession are with regard to restrictive housing. Horn TT at 1340:15-22.

[7] ASCA is a professional organization made up of the heads of correction agencies of the 50 states and the U.S. Territories, and also the heads of correctional systems of several large cities. Horn TT at 1338:3-11. ASCA has recently changed its name to the Correctional Leaders Association ("CLA"). *See* Horn WT, Doc. 4130 ¶ 23.

155617523.3

by the director of its Department of Corrections, barred the use of isolation in its prisons other than for serious disciplinary infractions, and limited the length of stay to no longer than 15 days. Haney WT, Doc. 4120 ¶ 63. In 2019, New Jersey passed a law prohibiting use of solitary confinement in prisons and jails statewide for more than 20 consecutive days, or more than 30 days during a 60-day period. New Jersey also prohibited use of solitary confinement for persons with serious mental illness. *Id.* Also in 2019, the Washington State Department of Corrections joined a number of states that have entered into a partnership with the Vera Institute of Justice to reduce the use of restrictive housing through its Safe Alternatives to Segregation program. *Id.* New York State enacted legislation prohibiting prisons and jails statewide from holding persons in solitary confinement for more than 15 consecutive days, and disallowing solitary confinement completely for persons under 22 or over 54 years of age, those who are pregnant, persons with disabilities, and persons with serious mental illness.[8] *Id.* ¶ 63; *see also id.* ¶ 181; Haney TT at 749:2-14 (noting that the in addition to the states listed above, the States of North Dakota, Oregon, and Ohio "have taken steps to reduce the number of people in solitary confinement and/or to impose significant limitations on the amount of time that people are permitted to be in solitary confinement"). The States of Maine, Connecticut, and Pennsylvania have also limited the use of isolation in recent years. Horn TT at 1341:5-10. Arizona, in contrast to the prevailing trends, has not taken any of these steps. Haney WT, Doc. 4120 ¶ 181.

### E. The Adverse Psychological Effects of Isolation and the Exacerbating Effects of Isolation on Mental Illness

55. "Solitary confinement" (or "isolated confinement;" the terms are interchangeable) refers to conditions of extreme (but not total) isolation from others, where incarcerated persons are denied meaningful contact with other human beings.

---

[8] The New York law, the "Humane Alternatives to Long-Term Solitary Confinement" Act, is effective as of March 16, 2022. S. 2836, § 14, *available at* https://www.nysenate.gov/legislation/bills/2021/s2836; Haney TT at 998:21-999:13.

Haney WT, Doc. 4120 ¶ 23. In this case, it has been defined as "confinement in a cell for 22 hours or more each day." *Parsons I*, 754 F.3d at 672 (alterations omitted). The essence of solitary confinement is the deprivation of normal, meaningful human social contact, accompanied by limitations on movement, out-of-cell time, programming, and other normal daily activities. Haney TT at 722:13-723:24.

56.     A person with a cellmate may still be subjected to solitary or isolated confinement; indeed, double-celling can exacerbate, rather than mitigate, the psychological impacts of isolation. Incarcerated people who are double-celled in solitary confinement are subject not only to the ordinary deprivations of solitary confinement, but also to whatever extraordinary accommodations they must make in order to spend virtually all of their time—eating, sleeping, defecating—in a small cell with another person. This constant, forced, inescapable, and unremitting contact with another person in such a small and enclosed space soon becomes intolerable, and people often report that double-celling worsens, rather than ameliorates, the most negative aspects of isolated confinement. Haney WT, Doc. 4120 ¶¶ 24, 112, 162; Haney TT at 723:25-725:1.

57.     People need meaningful human contact. Haney WT, Doc. 4120 ¶¶ 26, 106, 143, 148; Ex. 2216 at 1. Custody officers will occasionally look through a small window or shine a light through a grate to see if an incarcerated person is still "living, breathing flesh," or briefly open the "trap" or "hole" on a cell door to pass a sack lunch. *See* Trial Testimony of Travis Scott ("Scott TT") at 1100:10-15. This is not meaningful human contact.

58.     Research on the effects of solitary confinement dates back to the 19th century. The Supreme Court, describing solitary confinement more than a century ago, recognized that "[a] considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who withstood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."

*In re Medley*, 134 U.S. 160, 168 (1890). Extreme isolation is also associated with substantial psychological trauma, including anxiety, headaches, troubled sleep, or lethargy, heart palpitations, obsessive ruminations, confusion, irrational anger, withdrawal, violent fantasies, hallucinations, perceptual distortions, and emotional flatness. Horn WT, Doc. 4130 ¶ 16.

59.    The research on the effects of solitary confinement demonstrates that it is painful; people who are exposed to it suffer. It can also be harmful and damaging. In extreme cases, because of the desperation and despondency they experience, people in solitary confinement engage in acts of self-harm and suicide. There are also long-term consequences of solitary confinement that affect people both psychologically and physically, including changes in mortality rates. Haney TT at 730:3-731:3, 996:22-997:25.

60.    While every person held in solitary confinement may not ultimately suffer lasting psychological harm, all such persons are at risk of harm, including risk of suicide. The longer the exposure to solitary confinement, the greater the risk. With the exception of certain vulnerable populations, such as children and persons with serious mental illness, who are very likely to be harmed, it is impossible to determine in advance who will ultimately be harmed by solitary confinement. Haney WT, Doc. 4120 ¶ 43-44; Haney TT at 855:16-858:6.

61.    Since this case was filed in 2012, the scientific findings on the harmful effects of solitary confinement have become more consistent and more robust, and the scientific consensus on those effects has become broader and deeper. For example, a 2020 publication found clinically significant symptoms in sizable numbers of persons held under isolated conditions, and prevalence rates for serious mental illness and self-harming behavior in solitary confinement that were approximately twice as high as among persons in the general population. A 2020 synthesis of a number of independently conducted studies found that "solitary confinement was associated with an increase in adverse psychological effects, self-harm, and mortality, especially by suicide." Haney WT, Doc. 4120 ¶ 57; *see also id.* ¶¶ 53-57, 181; Haney TT at 737:22-738:23.

62.     These findings are widely accepted, and reflect a global scientific consensus that has developed over a period of decades and has accelerated in recent years. With the exception of a few outliers, virtually all studies of solitary confinement published in peer-reviewed journals show adverse psychological effects resulting from isolated confinement. These findings are consistent with a much larger body of literature on the harmful effects of social isolation generally—hundreds of studies demonstrating that human beings are "wired to connect," and need social contact and social interaction for their mental and physical health. Solitary confinement in prisons represents a much harsher form of isolation, involving greater levels of deprivation than are typically studied in the world at large. Haney TT at 731:4-732:23, 820:11-822:3; Haney WT, Doc. 4120 ¶¶ 15-16, 26-27, 181.

63.     Plaintiffs' mental health expert Dr. Pablo Stewart testified that isolated confinement in a cell for 22 or more hours per day with limited or no social or human interaction or environmental stimulation "can be profoundly damaging to mental health even for prisoners with no known mental illness." Written Testimony of Pablo Stewart, M.D. ("Stewart WT"), Doc. 4109 ¶ 201.[9] The risks are sufficiently grave that the NCCHC has taken the position that "[p]rolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health." *See* Ex. 2216 at 5; Haney WT, Doc. 4120 ¶ 61; Haney TT at 747:8-748:25.

64.     The scientific consensus on the harms of solitary confinement is reflected in policy statements issued by a number of medical and mental health organizations calling for restrictions on the use of solitary confinement, discussed below. Haney TT at 737:22-738:23.

65.     In 2013, the American Public Health Association issued a statement in which it detailed the public-health harms posed by solitary confinement and urged correctional authorities to "[e]liminate solitary confinement as a means of punishing

---

[9] Dr. Stewart's qualifications are set forth at paragraphs Part III, ¶¶ 369-272, *infra*.

prisoners and to develop alternative disciplinary sanctions and processes that accommodate prisoners with serious mental illnesses and chronic illnesses;" and to "[e]liminate solitary confinement as a means of managing security threats except in the most extreme cases when no less restrictive option is available to mitigate a serious, current, and ongoing threat to safety." Ex. 2215 at 3; Haney WT, Doc. 4120 ¶ 60; Haney TT at 743:20-746:2.

66.     Scientific research documents a number of reactions that typically occur in people held in solitary confinement. Perhaps the most common is depression and despondency; this is particularly likely to occur when the person's stay in solitary confinement is indeterminate and there is not an obvious and manageable pathway out of solitary. Haney TT at 732:24-733:13.

67.     Anxiety is also common among people held in solitary confinement. People report feeling unpredictably and inexplicably anxious, nervous, and on edge. Sometimes people who have been in solitary confinement report that their anxiety is aggravated when they are around others, because they have been forced to accommodate to the absence of other people. This discomfort in the presence of others sometimes persists long after the person has been released from solitary confinement. Haney TT at 733:14-25.

68.     People in solitary confinement also become angry and irritable in response to the deprivation of normal social contact and the other deprivations they suffer. This anger can sometimes manifest itself in aggression and explosive behavior. Haney TT at 734:1-5.

69.     Other reactions documented in persons subject to solitary confinement include appetite and sleep disturbances, panic, rage, loss of control, paranoia, cognitive dysfunction, hallucinations, self-mutilation, and suicidal ideation and behavior. Haney WT, Doc. 4120 ¶¶ 28-30.

70.     The painfulness and damaging potential of extreme forms of solitary confinement is underscored by its use in so-called "brainwashing" and certain forms of torture. In fact, many negative effects of solitary confinement are analogous to the acute

155617523.3

reactions suffered by torture and trauma victims, including post-traumatic stress disorder. Haney WT, Doc. 4120 ¶ 32.

71.     The prevalence of these negative psychological symptoms among people in solitary confinement is often very high. In one study conducted at the Security Housing Unit of California's Pelican Bay State Prison—a facility operationally and architecturally highly consistent with Arizona's SMU-I—Dr. Haney found that every symptom of psychological distress measured but one was suffered by more than half of the persons interviewed; some were suffered by two-thirds or more, and others by nearly everyone. Well over half of the people reported a constellation of symptoms—headaches, trembling, sweaty palms, and heart palpitations—that is commonly associated with hypertension. Sizable minorities reported symptoms that are typically only associated with more extreme forms of psychopathology—hallucinations, perceptual distortions, and thoughts of suicide. Haney WT, Doc. 4120 ¶¶ 33-34.

72.     Solitary confinement can also undermine a person's social identity, destabilize his or her sense of self, and in some cases ultimately destroy his or her ability to function in free society. Social connections with others provide people with a sense of identity and who they are in the world. Deprived of this contact, people in solitary confinement report that their sense of identity and sense of self become destabilized. They begin to lose contact with reality around them. They sometimes report that they are not sure they exist anymore, because they do not have any meaningful interactions with other people. In extreme cases, this kind of disorientation and destabilization can lead to more serious mental health problems, including self-harm and suicide. One of the most robust findings in the study of solitary confinement is that suicides are more prevalent in solitary confinement than anywhere else in the prison system. Haney WT, Doc. 4120 ¶¶ 31, 35-36; Haney TT at 734:6-735:8. Indeed, more than 60 percent of the deaths by suicide in ADCRR custody between January 1, 2014 and September 8, 2021 occurred while the person was incarcerated in some form of isolation, although people in isolation make up

approximately one-tenth of the ADCRR population. Haney WT, Doc. 4120 ¶ 114; Horn WT, Doc. 4130 ¶ 331 n.245; *see also supra* n.2.

73. Although the core component of solitary confinement is social deprivation, persons in solitary confinement are typically subjected to extremely high levels of repressive control, enforced idleness and inactivity, reduced environmental stimulation, and a number of physical restrictions and deprivations that collectively exacerbate their psychological distress and can create even more lasting negative consequences. Indeed, most of the things that penologists have long known are beneficial to incarcerated persons—such as increased participation in institutional programming, visits with persons from outside the prison, physical exercise—are either functionally denied to people in isolation or permitted on a greatly restricted basis. These additional deprivations add to the psychological harms of solitary confinement. Haney WT, Doc. 4120 ¶¶ 40-42.

74. Solitary confinement is a socially pathological environment that forces long-term inhabitants to adapt to the absence of meaningful contact with other humans. People have no choice but to develop socially pathological adaptations to cope with their largely asocial world, and the impossibility of relying on social support or the routine feedback that comes from normal contact with other human beings. Haney WT, Doc. 4120 ¶ 37.

75. While these adaptations may be "functional," and perhaps even necessary, under the extreme circumstances of solitary confinement, certain kinds of short-term survival strategies can result in people experiencing even more pain and harm later. Incarcerated persons may develop extreme habits, tics, tendencies, perspectives, and beliefs that, while perhaps functional in solitary confinement, are acutely dysfunctional in the social world they are expected to re-enter. Haney WT, Doc. 4120 ¶¶ 38-39. For example, an individual Mr. Horn interviewed ADCRR reported that he had been released in February 2021 after spending 10 years in solitary confinement. Horn WT, Doc. 4130 ¶ 321. Once on the streets he found he was uncomfortable with people around, and he ended up back in prison in just three months. *Id.*

76. The detrimental effects of solitary confinement occur after as little as two days, and the risk increases the longer an individual is subjected to deprivation. Horn WT, Doc. 4130 ¶ 14. Solitary confinement leads to physical harm, including self-mutilation and suicide; persons exposed to solitary confinement had about seven times higher risk of being in a self-harm cohort. *Id.* ¶ 15, Arizona's statistics exceed that. *Id.*; *see also* Haney WT, Doc. 4120 ¶ 115. It is estimated that roughly half of prison suicides nationwide occur in solitary confinement. It is not unusual for incarcerated people in solitary confinement to swallow razors, smash their heads into walls, compulsively cut their flesh, and try to hang themselves. Horn WT, Doc. 4130 ¶ 15.

77. The administrative reason for which a person is held in solitary confinement has no bearing whatsoever on the harm they suffer. The impact of solitary confinement derives from the nature and amount of the deprivation. The impact on the individual is the same regardless of whether, for example, they are in solitary confinement for classification reasons or for disciplinary reasons. Haney TT at 855:7-15, 1006:4-13.

78. The harmful effects of solitary confinement can persist even after release. Some people who have been in solitary confinement have a very difficult time reintegrating into the community and social world. People who have been in solitary confinement experience post-traumatic stress disorder at higher rates, and one study shows that people who have been in solitary confinement have higher death rates after their release from prison than those who have not been in solitary. Haney WT, Doc. 4120 ¶¶ 58, 59; Haney TT at 735:9-736:11.

79. A recent survey of both modern studies of incarcerated people, and studies of extreme isolation in other contexts, found wide-ranging consensus on "deterioration in the ability to think and reason, perceptual distortions, gross disturbances in feeling states, and vivid imagery in the form of hallucinations and delusions." Lasting effects of solitary confinement, which continue after release from solitary, include "persistent symptoms of post-traumatic stress (such as flashbacks, chronic hyper vigilance, and a pervasive sense of hopelessness)." Senator John McCain, a former prisoner of war, described solitary

-22-

confinement as "an awful thing" that "crushes your spirit and weakens your resistance more effectively than any other form of mistreatment." Horn WT, Doc. 4130 ¶ 17.

80. The adverse effects of solitary confinement can be extreme and irreversible, including the loss of psychological stability, significantly impaired mental functioning, the inability to function in social settings and personal relationships, self-mutilation and self-harm, and death. Haney WT, Doc. 4120 ¶ 189.

81. Dr. Penn relies for his opinions about the impact of isolation on mental health on a single study conducted in the Colorado Department of Corrections, which he asserts is the only study that "provides established scientific methodology and rigorous research." Penn WT, Doc. 4172 ¶ 242. In his direct testimony, he asserted that this study was conducted by academic researchers, but then, on cross-examination, admitted that the primary researcher was an employee of the Colorado Department of Corrections, the correctional agency that was the subject of the study. Penn TT at 3297:1-3299:5, 3300:2-16, 3303:4-12, 3303:21-25. Moreover, Dr. Penn was unable to answer basic questions about the study, and was unaware that one of the researchers had described the selection of participants as "haphazard." Penn TT at 3297:1-3299:5, 3300:2-16, 3303:4-12, 3303:21-25. Dr. Penn criticized Dr. Haney for not having referred to or discussed the Colorado study in his written testimony. Penn TT at 3291:25-3292:4. But Dr. Haney did cite to an article he wrote that analyzes the methodological problems of the Colorado study at length, which Dr. Penn admits he has read. Haney WT, Doc. 4120 ¶ 53 n.41; Ex. 2405 at 369-370, 375-398; Penn TT at 3294:17-3296:25. Notably, after the completion of this study, the Colorado Department of Corrections implemented a 15-day limit on the use of isolation. Penn TT at 3304:1-5.

82. The Court finds that solitary confinement as practiced in ADCRR creates a substantial risk of serious harm to Isolation Subclass members, and denies them the minimal civilized measure of life's necessities.

155617523.3

**1.  Solitary Confinement of People with Mental Illness, Including Those with Serious Mental Illness**

83.    The scientific consensus is that people with mental illness are more vulnerable to the pain and stresses of solitary confinement, and more likely to experience its negative effects. Their mental illness can worsen in this environment, and they are at greater risk of harm because of their psychological vulnerability. Haney WT, Doc. 4120 ¶¶ 18, 45; Haney TT at 736:25-737:11. The risks posed by solitary confinement to people who are mentally ill are so great that the NCCHC has taken the position that no person with mental illness should be placed into solitary confinement *at all*. Doc. 4120 ¶ 61; Ex. 2216 at 5; Haney TT at 747:8-748:25. Many other organizations have similarly recognized the risk of harm from solitary confinement for people who are mentally ill. Even Dr. Penn agrees that isolation can be harmful to persons with mental illness. Penn TT at 3282:17-3283:19.

84.    In 2012, the American Psychiatric Association issued a Position Statement on Segregation of Prisoners with Mental Illness:

> Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space an adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for the individuals.

Ex. 2214; Haney WT, Doc. 4120 ¶ 50; Haney TT at 739:1-741:8; *see also* Horn WT, Doc. 4130 ¶ 25.

85.    In 2013, the Society of Correctional Physicians issued a position statement similarly acknowledging "that prolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment," and

155617523.3

recommended against holding these incarcerated persons in segregated housing for more than four weeks. Haney WT, Doc. 4120 ¶ 60.[10]

86.     In 2016, the National Alliance on Mental Illness issued a statement "oppos[ing] the use of solitary confinement and equivalent forms of extended administrative segregation for persons with mental health conditions." Haney WT, Doc. 4120 ¶ 61.[11]

87.     In 2017, the American Psychological Association acknowledged that solitary confinement was associated with heightened risk of self-mutilation and suicidality, a range of adverse psychological symptoms such as anxiety, depression, sleep disturbance, paranoia and aggression, as well as the exacerbation of pre-existing mental illness and trauma-related symptoms. Haney WT, Doc. 4120 ¶ 60; Ex. 2217 at 1; Haney TT at 746:3-747:6.

88.     The American Public Health Association has exhorted correctional authorities to "[e]xclude from solitary confinement prisoners with serious mental illnesses." Ex. 2215 at 3; Haney WT, Doc. 4120 ¶ 60; Haney TT at 743:20-746:2.

89.     Leaders in the corrections profession also recognize that prolonged solitary confinement creates or exacerbates mental illness. Short-term restrictive housing may sometimes be necessary to separate the most violent people, those who pose a risk to themselves or others. But where restrictive housing is over-utilized, it causes substantial harm to incarcerated people and provides little if any benefit in terms of security of the correctional institution. Horn WT, Doc. 4130 ¶ 13.

90.     People with mental illness are at increased risk of harm from solitary confinement for multiple reasons. First, mentally ill persons are generally more sensitive and reactive to psychological stressors and emotional pain. The harshness and severe

---

[10] Society of Correctional Physicians, 2013 Position Statement, Restricted Housing of Mentally Ill Inmates. available at https://accpmed.org/restricted_housing_of_mentally.php
[11] Available at https://www.nami.org/Advocacy/Policy-Priorities/Stopping-Harmful-Practices/Solitary-Confinement

155617523.3

deprivation of solitary confinement is the antithesis of the kind of benign and socially supportive atmosphere that mental health clinicians seek to create for their patients. Mentally ill persons are more likely to deteriorate when they are subjected to the stress of solitary confinement. Haney WT, Doc. 4120 ¶ 46.

91.     Second, solitary confinement deprives people with mental illness of social contact and social interaction, which play a critically important role in maintaining psychological equilibrium. People in isolation have few, if any, opportunities to receive social feedback about their feelings and beliefs, which may become increasingly untethered from reality. Thus, for example, a person prone to psychotic breaks, deprived of the stabilizing influence of social feedback that grounds his sense of reality, may suffer more in solitary confinement. In extreme cases, solitary confinement becomes so painful that people create their own reality—living in a world of fantasy rather than the intolerable environment that surrounds them. Haney WT, Doc. 4120 ¶¶ 47-49.

92.     Finally, many of the negative psychological effects of isolation are very similar, if not identical, to certain symptoms of mental illness. Thus, the effects of solitary confinement can compound an already mentally ill person's outward manifestation of symptoms as well as their internal experience of their disorder. For example, the mood swings that some people report experiencing in solitary confinement would be expected to amplify the pre-existing emotional instability that people with bipolar disorder suffer. Haney WT, Doc. 4120 ¶ 49.

93.     Due to the well-documented effects of solitary on people with mental illness, their incarceration in isolation units endangers them and their risk of harm increases with the length of time spent in isolation. This risk of harm is compounded by the limited access to mental health care. *See generally infra* Part III.

94.     A subset of those with mental illness are those with "serious mental illness." "Serious mental illness," as defined by U.S. correctional systems typically includes psychotic disorders such as schizophrenia and schizoaffective disorder; major depression; and bipolar disorder. Some systems include additional disorders, such as certain anxiety

155617523.3

disorders and posttraumatic stress disorder. There is typically an additional requirement of functional impairment, in addition to a qualifying diagnosis. Haney TT at 764:24-765:21. ADCRR's definition of "serious mental illness" requires both a qualifying diagnosis and "severe functional impairment as the result of the mental illness." Doc. 1185-1 at 47. ADCRR classifies some patients as suffering from serious mental illness, or "SMI."[12] When applicable, this designation appears in the patient's ADCRR medical record. Haney WT, Doc. 4120 ¶¶ 67-69; Haney TT at 765:22-766:9.

95.     Dr. Stewart testified that "[f]or those with serious mental illness, such as psychotic disorders and major mood disorders, [solitary confinement] can be devastating, leading to severe deterioration in mental health, self-harm, or suicide." Stewart WT, Doc. 4109 ¶ 201. The placement of people with serious mental illness into solitary confinement is highly problematic for two distinct reasons. First, people may be placed into isolation for behaviors that are driven by their mental illness. Horn TT at 1358:7-14. Second, as discussed above, people with mental illness are at greater risk of harm from isolation. Horn TT at 1358: 7-22.

96.     The Court finds that ADCRR's solitary confinement of people with mental illness creates a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

### 2.    Solitary Confinement of Children

97.     Similarly, children (persons under the age of 18) are more susceptible to the damaging effects of solitary confinement. Their personalities are developing, and to the extent that that development is negatively affected, the consequences will be greater for children than it would be for adults subjected to the same stresses of solitary confinement. Haney WT, Doc. 4120 ¶ 21; Haney TT at 737:12-21. Furthermore, the vast majority of incarcerated youth—whether in adult or juvenile facilities—have already experienced a

---

[12] As discussed below at Part III ¶¶ 526-528, ADCRR classifies a relatively small number of people as SMI, as compared to other state correctional systems.

great deal of adverse childhood experiences, and solitary confinement compounds the trauma to these children. Haney WT, Doc. 4120 ¶ 21.

98.     The American Public Health Association has taken the position that correctional authorities should "[e]xclude juveniles from solitary confinement regardless of whether they are held in adult or juvenile facilities." Ex. 2215; Haney WT, Doc. 4120 ¶ 60; Haney TT at 743:20-746:2.

99.     In 2017, the American Psychological Association recognized the risk of harm from the solitary confinement of children, stating: "Every year, thousands of prisoners under the age of 18 are placed in solitary confinement. Juvenile solitary confinement is associated with serious consequences for mental and physical health, and APA supports efforts to eliminate the practice" (footnotes omitted). Haney WT, Doc. 4120 ¶ 60; Ex. 2217; Haney TT at 746:3-747:6.

100.     In 2018, the American Psychiatric Association issued its "Position Statement on Solitary Confinement (Restricted Housing) of Juveniles:"

> Solitary confinement of juveniles (also referred to as restrictive housing or segregation), with rare exceptions, should be avoided due to the potential for harm to the juveniles. Juveniles (persons under 18 years of age) are at particular risk of potential psychiatric consequences of prolonged solitary confinement, including depression, anxiety, and self-harm. In the rare case that a juvenile must be placed in solitary confinement, meaningful access to mental health care, medical care, education, and recreation should be provided in order to minimize the potential for psychological harm. Solitary confinement should never be used for punitive purposes.

Ex. 2218. Dr. Penn is listed as an author of this Position Statement. Ex. 2218; Haney TT at 742:5-743:19.

101.     The widely accepted fact that isolation is even more dangerous for children than for adults is the reason why a number of professional medical and mental health, legal, human rights, and other organizations call for the drastic reduction or outright elimination in the use of solitary confinement with juveniles. Many jurisdictions across the United States have laws that prohibit or greatly restrict the use of isolation on youth;

-28-

for example, current California law significantly limits the use of solitary or solitary-like confinement for juveniles to durations of no longer than four hours. Haney WT, Doc. 4120 ¶ 21.

102.    The Court finds that ADCRR's solitary confinement of children creates a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

### F.    Conditions of Isolation in ADCRR

103.    As detailed below, the conditions in isolation in ADCRR are harsh, severe, and inconsistent with what the correctional profession believes is the appropriate standard of care. Horn TT at 1341:19-21.

104.    Reasons for this include the physical plant of the units; the deprivation of social contact; the amount of out-of-cell time provided; the lack of educational and other programming; the fact that people are placed in solitary confinement for reasons having little or nothing to do with their in-prison behavior; the fact that people whom the prison system itself has identified as seriously mentally ill are placed in truly severe isolating conditions; the fact that children are held in solitary confinement; and the fact that many people spend very long periods time—sometimes many years—in solitary confinement. Haney WT, Doc. 4120 ¶¶ 110, 188; Haney TT at 768:1-769:14, 1012:24-1015:23.

### 1.    Physical Conditions of ADCRR Isolation Units That Place Incarcerated People at Risk of Harm

105.    People in segregation should have, at a minimum, access to natural light; control of light in their cells; basic sanitary and safe environmental conditions including adequate space, ventilation and temperature; adequate nutrition; adequate medical and mental health services; and reading materials.[13] Horn WT, Doc. 4130 ¶ 26. As discussed below, in ADCRR, they do not.

---

[13] While the distribution of tablets was noted to be a recent improvement, people must have money to be able to use many of the tablet functions. Trial Testimony of Lori ("Stickley TT") at 1994:23-1995:10 (Deputy Warden Stickley reporting that people can send emails on the tablet if they have money), 2086:21-2087:4 (sending an email requires

1    106.   Dr. Haney inspected Eyman-SMU-1 and Eyman-Browning Units on

2    July 23-25, 2013, and again on September 13-14, 2021. The conditions he observed in

3    2013 were extremely harsh and severe; they had not changed when he returned in 2021.

4    He testified that there were few, if any, changes in the physical condition of the units,

5    except that they appeared older and dirtier than before. Haney WT, Doc. 4120 ¶ 117.

6                    **(a)    Light and Ventilation**

7    107.   The stark conditions in ADCRR isolation units are further exacerbated by

8    the lighting. The isolation cells have 24-hour illumination. Dr. Haney saw many cells

9    where the persons living in the cell had covered up the light, demonstrating that the light

10   has a negative impact on them. Haney WT, Doc. 4120 ¶ 105; *see also* Haney WT,

11   Doc. 4120-1, Appendix F at 6 (C.M.).

12   108.   At the same time, the cells, particularly at Eyman-Browning and Eyman-

13   SMU I, are lacking in natural light. Horn WT, Doc. 4130 ¶ 240. The housing units at

14   Eyman-Browning, Eyman-SMU I, and Lewis-Rast all lack windows to the outside that

15   would allow any natural light directly into the cells. *See* Horn TT at 1350:13-16, 1352:4-

16   7; Horn WT, Doc. 4130-2 at ADCRR00158422.

17

18   three "stamps", each of which costs $.25); Trial Testimony of Abdul-Rahim Muhammad
     ("Muhammad TT") at 905:4-12 (Mr. Muhammad reported that that the radio was
19   available for free on the tablet, but that everything else required payment); Trial
     Testimony of David Shinn ("Shinn TT") at 2223:22-2224:10.
20        Additionally, while tablets can help alleviate idleness, "they do not substitute for
     the lack of meaningful human contact and interaction." Haney WT, Doc. 4120 ¶ 106.
21   There are also restrictions on who can access tablets, and they are not permitted in the
     maximum custody Behavioral Management Unit, a decision which Dr. Haney opined was
22   "profoundly counterintuitive," as it deprived a group with serious mental illness of the
     tablets. *Id.*; Horn WT, Doc. 4130 ¶ 257; Trial Testimony of Dustin Brislan ("Brislan TT")
23   at 1308:17-20; Shinn TT at 2223:16-21. People also do not have access to tablets in
     detention, or if they are on Loss of Privileges, or on mental health watch. Horn WT,
24   Doc. 4130 ¶¶ 257, 279; Trial Testimony of Anthony Coleman ("Coleman TT") at 2098:2-
     4, 8-10.
25        And of course, the fact that most of the functions on the tablets require payment to
     the telecommunications vendor is problematic, given how few of the people who are
26   incarcerated in isolation units can avail themselves of prison employment; and to the
     extent they may have a job, they normally earn a minimum wage of 10 to 15 cents per
27   hour. *See* Department Order 903 (Inmate Work Activities) (Eff. Dec. 3, 2021) *available at*
     https://corrections.az.gov/sites/default/files/policies/900/0903_120321.pdf,            at
28   Attachment A (Pay Scale).

155617523.3

109.     At Lewis-Rast, there are windows in the walls of the hallway in the housing pods, providing some natural light into the cells, but at Eyman-Browning and Eyman-SMU I, the only natural light is from opaque skylights in the ceiling of the units. Horn WT, Doc. 4130 ¶ 242; Doc. 4130-4 at ADCRR001458514 (lighting in interior cell at Eyman Browning), ADCRR00158516-17 (skylights at Eyman Browning); Doc. 4130-5 at ADCRR00158543-44 (skylights at Eyman Browning); Doc. 4130-7 at ADCRR00158597 (skylights at Eyman Browning); Horn TT at 1353:22-1354:1 (describing lighting in cell at Eyman Browning).

110.     Both the constant artificial illumination and the minimal natural light add to disorienting nature of the conditions in these units. Haney WT, Doc. 4120 ¶ 105; Haney TT at 882:7-15, 883:17-20. Mr. Muhammad testified that when he is on mental health watch, the constant artificial lighting makes him feel "insane" and keeps him from sleeping. Muhammad TT at 926:24-927:7.

111.     Additionally, the cell doors at ASPC-Eyman are steel doors with small round holes covered in plexiglass, making visibility into and out of the cell very difficult, as shown in the below photos. Horn WT, Doc. 4130 ¶¶ 225, 244.



155617523.3





155617523.3

Horn WT, Doc. 4130-4 at ADCRR00158519, ADCRR00158522, ADCRR00158527 (plexiglass cell fronts at Eyman Browning); Doc. 4130-5 at 15 [ADCRR00158542].[14]

112. This type of door substantially impedes natural light entering the cells, resulting in a dearth of natural light in the isolation cells at ADCRR facilities, as seen in the photo below showing lighting from the inside of an isolation cell. Horn WT, Doc. 4130 ¶ 244.



Horn WT, Doc. 4130-5 at ADCRR00158538 (interior cell lighting at Eyman Browning).

113. Mr. Muhammad testified that he was not able to control the lights in his cell at SMU-I, and described that the light went "from bright to almost pitch black," and that

---

[14] *See also* Horn WT, Doc. 4130-4 at ADCRR00158520 (plexiglass cell front at Eyman Browning); Horn WT, Doc. 4130-5 at ADCRR00158528-29, ADCRR00158541-42 (plexiglass cell fronts at Eyman Browning), ADCRR00158535 (plexiglass cell door from interior of cell at Eyman Browning), ADCRR00158536-37 (interior cell lighting at Eyman Browning); Horn WT, Doc. 4130-6 at ADCRR00158576-80 (runs of cells with doors covered in plexiglass at Eyman Browning); Horn WT, Doc. 4130-8 at ADCRR00158671 (similar plexiglass cell fronts at Eyman SMU-I).

1 | he had disrupted sleep patterns because of his mental health conditions. Muhammad TT at
2 | 902:19-903:8. While the cell lights were able to be turned on and off at Browning,
3 | Mr. Muhammad described the cell lighting there as "real dim and morbid" and that it
4 | made him feel depressed. *Id.* at 905:18-24.

5 |      114. The lighting conditions in the isolation cells contributed to the harsh
6 | conditions experienced by people living in those units, and people living in those cells
7 | complained to Dr. Haney about the illumination at night. Haney TT at 882:7-15, 17-20.
8 | He also described the lighting in the juvenile detention cells at the Sunrise Unit at ASPC-
9 | Lewis, which he noted do not have windows, and only have overhead fluorescent lighting,
10 | as shown in the below photos. Haney TT at 762:23-763:1.



Case 2:12-cv-00601-ROS Document 4120-2 Filed 10/30/21 Page 45 of 63

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00158764

155617523.3



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601
ADCRR00158767

Haney WT, Doc. 4120-2 at 45 [ADCRR00158764], 48 [ADCRR00158767].

115. Dr. Haney testified that the boys in those detention cells reported they had not been allowed outside of that artificially lit cell environment for recreation for nearly three weeks. Haney TT at 763:1-5.

116. While use of plexiglass coverings is not uncommon for people who throw bodily fluids, there were people with no history of throwing anything housed in such cells. Horn WT, Doc. 4130 ¶ 225. Mr. Horn's overall opinion of lighting in ADCRR's isolation cells is that people "in restrictive housing have access to natural light only indirectly through skylights in common areas or windows on facing walls. Most inmates cannot see a horizon." *Id.* ¶ 364. These cell doors covered in plexiglass impeded the flow of air to and from the cell, and are unlikely to have met the ACA standard of "circulation is at least 15 cubic feet of outside or recirculated filtered air per minute per occupant for cells/rooms." *Id.* ¶ 245.

117. The Court finds that the lighting and ventilation within the isolation units in ADCRR are inadequate. The Court further finds that the failure to ensure adequate and appropriate lighting and ventilation unreasonably subjects Isolation Subclass members to

155617523.3

a substantial risk of serious harm, and deprives them of the minimal civilized measure of life's necessities.

**(b)    Adequate Living Space**

118.    The industry standard for cells holding people in restrictive housing is "a minimum of 80-square feet and . . . 35-square feet of unencumbered space for the first occupant and 25-square feet of unencumbered space for each additional occupant." Horn WT, Doc. 4130 ¶ 223; Horn TT at 1535:9-1536:8. The two-person cells Mr. Horn observed at Lewis Rast and Stiner units, and at Eyman's Browning and SMU-I units during his September 2021 visits did not meet this standard. Many of the cells observed "held two inmates and were quite cramped," which is evident in the photo below. Horn WT, Doc. 4130 ¶ 234.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601
ADCRR00108092

Haney WT, Doc. 4120-1 at 99 [ADCRR00108092].

119.    Warden Van Winkle testified that he does not know the size of the unencumbered floor space of cells anywhere in the ADCRR (Trial Testimony of Jeffrey Van Winkle ("Van Winkle TT") at 2836:1-21), and Deputy Warden Scott confirmed that

155617523.3

there were 128 occupied double bunked cells at Eyman Browning unit at the time of his testimony. Scott TT at 1154:6.

120.    In these two-person cells, the occupants share a single stainless steel combination commode/sink and are in each other's presence when urinating or defecating, and the same commode/sink is used for drinking water and, in certain units, washing clothes and linens. Horn WT, Doc. 4130 ¶ 235.

121.    Mr. Horn testified that where there were two people living in a cell it contributed to harsh living conditions (Horn TT at 1533:17-22), and that there are safety concerns housing people in double cells in restrictive housing (*e.g.*, medical and psychiatric emergencies, fights) which are not adequately addressed by ADCRR's policy, or its performance under its policy, concerning health and safety checks. Horn WT, Doc. 4130 ¶¶ 275-276; *see also* Doc. 4130-5 at ADCRR00158554 (showing double bunk cell at Eyman Browning); Doc. 4130-8 at ADCRR00158640-42 (showing double bunk cell at Eyman Rynning Close Management Program); Haney WT, Doc. 4120-1 at 99 [ADCRR00108092] (showing occupied double cell). The poor air circulation in many of these cells due to plexiglass coverings exacerbates the living condition issues associated with double cells, as the people housed in the cells must live with each other's body odors. Horn WT, Doc. 4130 ¶ 237.

122.    Mr. Muhammad testified concerning the size of isolation cells and reported that being in a small cell for a long time made him feel "less than" and "like an animal," and he elaborated that it was "just so demoralizing, being in a cell that small. I can't even do a push-up in the cell." Muhammad TT at 906:20- 907:2.

123.    Additionally, Mr. Muhammad's experience with living in a double-celled environment with roommates in maximum custody reflected the problems raised by Dr. Haney. *See* Haney WT, Doc. 4120 ¶¶ 24, 112, 162; Haney TT at 723:25-725:1. Mr. Muhammad testified that "[roommates] don't work out for some reason. I mean, it's hard to be in small cell with another man, and you both got issues, especially if you both have mental health issues…Usually I'm by myself." Muhammad TT at 907:11-18.

-37-

124. Given that most incarcerated people held in isolation in the ADC spend 24 hours a day in their cells, four or more days a week, the lack of adequate space within the cell is important to consider when understanding the incarcerated person's living conditions. Horn WT, Doc. 4130 ¶ 239. Combined with the extraordinarily long hours people are confined to these cells, because of the infrequency of recreation and the frequent cancellation of recreation, the living conditions in these two-person cells are unacceptable. *Id.* ¶ 238.

125. The Court finds that in isolation units in ADCRR where people are housed two to a cell, the amount of space is inadequate. The Court further finds that the failure to provide adequate space unreasonably subjects Isolation Subclass members to a substantial risk of serious harm, and deprives them of the minimal civilized measure of life's necessities.

### (c) Excessive Heat

126. From May through October of each year, temperatures are to be taken at 11:00 and 15:00 every day in one cell on each tier on each pod in every wing or cluster. Scott TT at 1106:11-21, Stickley TT at 2023:14-25; Van Winkle TT at 2715:1-14; Ex. 1734 at ADCRR00220643; Ex. 1736 at ADCRR00220685; Ex. 1740 at ADCRR00220726. Staff are required to undertake heat mitigation efforts only if the temperature in a cell is over 95 degrees. Ex. 1734 at ADCRR00220644; Ex. 1736 at ADCRR00220686; Ex. 1740 at ADCRR00220726-220727; Scott TT at 1106:22-1107:6; Van Winkle TT at 2715:15- 2717:4. Further, there are no ADCRR policies relating specifically to the temperatures in housing units where people designated SMI or who take psychiatric medications are housed. Scott TT at 1107:12-15.

127. Defendants create temperature logs to record the temperatures.[15] Van Winkle TT at 2841:22-2842:16; Exs. 1461-1488. These temperature logs demonstrate that

---

[15] Policy requires that the taking of temperatures, time and location of these temperature checks must be recorded in the Correctional Service Journals. Ex. 1734 at ADCRR00220644; Ex. 1736 at ADCRR00220686; Ex. 1740 at ADCRR00220727; *see e.g.*, Ex. 1292 at ADCRR00128882 (reflecting temperature check). However, they rarely

temperatures in the cells rise to dangerous levels. *See* Part III, ¶ 518. Both Dr. Haney and Mr. Horn noted the high temperatures in the living units when they inspected the facilities in late September. Haney TT at 884:16-885:1; Horn WT, Doc. 4130 ¶ 246.

128. As discussed in ¶¶ 514-517, people who take certain psychotropic medications are more susceptible to injury or death from high temperatures. Penn TT at 3238:12-19. In addition to temperature, humidity is an important variable in how heat affects the body. *Id*. ADCRR's failure to protect those who are on psychotropic medications from heat-related injury adds to the grave risks of harm for people with mental illness in ADCRR's isolation units. Haney WT, Doc. 4120 ¶ 81.[16]

129. The Court finds that ADCRR does not adequately monitor the heat in isolation units in ADCRR, and does not take adequate steps to mitigate the risks from high temperatures. In particular, the Court finds that it is improper for Defendants to allow temperatures to rise above 85 degrees in cells without taking mitigation steps. The Court finds that the failure to adequately monitor and mitigate heat in the isolation units unreasonably subjects Isolation Subclass members to a substantial risk of serious harm or even death, and deprives them of the minimal civilized measure of life's necessities.

### (d) Sanitary and Safe Environmental Conditions

130. The general facility conditions in the majority of ADCRR isolation units contribute to the harsh and severe conditions experienced by people housed in isolation.

---

are, even as they record other things that are done at the times temperature checks are supposed to be done. Van Winkle TT at 2841:22-2842:16; *see, e.g.*, Ex. 1292 at ADCRR00128868, ADCRR00128905-128906, ADCRR00128914-128915; Ex. 1293 at ADCRR00130068-130069, ADCRR00130073-130074, ADCRR00130078-130079, ADCRR00130094-130095, ADCRR00130103, ADCRR00130126; Ex. 1295 at ADCRR00131628-131629, ADCRR00131640-131641, ADCRR00131651. Without the inclusion of the temperature checks in the logs, it is impossible to know when or if they are actually done each day.

[16] Despite Dr. Penn's acknowledgement that high temperatures and humidity can be particularly dangerous for people who take psychotropic medications, he did not review any temperature logs. Penn TT at 3241:1-3242:1. Nor did he observe the temperature checks, any temperature mitigation measures, or any staff training about heat reactions. *Id.* at 3239:12-19. Nonetheless, he opined that the temperature is adequately monitored, excessive heat is appropriately mitigated, and that staff receive training on reactions to heat. *Id.* at 3238:25-3239:11. The source of his knowledge of these matters is opaque. Therefore, Court does not find this opinion reliable.

155617523.3

Haney WT, Doc. 4120 ¶ 117. Eyman-SMU-1 and Eyman-Browning Units are extremely similar in physical structure. *Id.* ¶ 123. Both are very severe, dehumanizing environments that impose maximum deprivation on those confined there. The cells are a bare concrete box, with no windows to the outside; furnishings consist of a metal stool, shelf, toilet/sink unit, and either a single or a double slab for sleeping. *Id.* ¶ 124.

131. The doors to the cells have no windows but are made of perforated steel. Haney WT, Doc. 4120 ¶ 124. Some housing pods have an additional plastic shield covering the doors for "enhanced security." *Id.* People are confined in their cells for long periods of time, some days essentially around the clock. These units are, by any measure, very severe isolation units in terms of their architectural structure and operation. Haney TT at 754:1-755:15.

132. Eyman-SMU-1 and Eyman-Browning Units are older facilities in some degree of deterioration and disrepair, and suffer from poor sanitation. People in these units consistently report dirt and filth and inability to keep their living units clean, as well as infestation by roaches and other insects, and rodents. Haney TT at 754:22-755:7, 756:5-757:6. During his tour, Dr. Haney saw evidence of these sanitation problems; one person showed Dr. Haney a rodent he had captured. *Id.* at 756:22-23. Roaches and crickets were clearly visible on the floors and walls in many of the pods he visited. The photograph below depicts a peanut butter trap that people living in the unit had made to trap the roaches and keep them from crawling over them at night and infesting their food:

155617523.3



Haney WT, Doc. 4120 ¶ 118. The photograph below depicts perishables hung off the ground in order to keep them away from vermin.



155617523.3

1   Haney WT, Doc. 4120 ¶ 118.

2       133.   Dr. Haney noted that the conditions in SMU-I and Browning had not

3   changed since his initial inspection of those facilities in 2013, "except that they appeared

4   older and dirtier than before." Haney WT, Doc. 4120 ¶ 117. Expert testimony and

5   photographs from tours of the facilities show that the physical conditions and lack of

6   maintenance in ADCRR's isolation units generally create harsh and unsanitary living

7   conditions for the people housed in these units. Haney WT, Doc. 4120 ¶ 120. Dr. Haney

8   described the physical plant conditions at the Lewis Stiner Detention unit as "a very stark,

9   oppressive environment" (Haney TT at 759:20-21), and conditions at Lewis Rast as "stark

10  and largely barren cells" (Haney TT at 759:13-16), as depicted in the below photo.



CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601                    ADCRR00158748

27  Haney WT, Doc. 4120-2 at 29 [ADCRR00158748].

28

-42-

155617523.3

134. The problems included showers that were uniformly noted to be "moldy, with peeling paint, rust, and corrosion. Many were marked by an accumulation of soap scum." Horn WT, Doc. 4130 ¶ 248; *see also* Haney WT, Doc. 4120 ¶¶ 120-122; Haney TT at 757:23-758:17. Mr. Muhammad described the shower conditions in the locations he has lived in ADCRR custody as mostly unclean and unsanitary. Muhammad TT at 901:6-13 (at SMU-I: "You're locked in there for an hour. It smells like urine, defecation, and semen in the shower. They don't clean it. They don't give chemicals. Nothing. You've got to clean the shower yourself before you go in there."); *id.* at 926:8-10 (on mental health watch: "[T]he showers are the same situation. They're not clean"); Trial Testimony of Jason Johnson ("Johnson TT") at 1244:15-21 ("the showers are really disgusting, dirty"); Brislan TT at 1307:1-8 (showers at Florence-Kasson were "very dirty").

135. Showers are poorly maintained and not adequately cleaned, as shown in the below photos.



Haney WT, Doc. 4120-1 at 109 [ADCRR00108102].

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601





Horn WT, Doc. 4130-4 at 37-38 [ADCRR00158523-24].





-44-



Horn WT, Doc. 4130-6 at 4 [ADCRR00158567], 6-7 [ADCRR00158569-70].[17]

136. Some of the cells where people in isolation spend 22 or more hours per day also are in poor condition and maintenance, including commode sinks that do not operate as they should due to poor water pressure or lack of hot water. Horn WT, Doc. 4130 ¶ 249. One person hung a sign in their cell window notifying corrections staff the water in their sink was not working:

---

[17] *See also* Haney WT, Doc. 4120 ¶ 120; Horn WT, Doc. 4130-3 at 37-38 [ADCRR00158482-83] (shower at Lewis Stiner Detention), 41 [ADCRR00158486] (same); Horn WT, Doc. 4130-5 at 22-26 [ADCRR00158549-53] (showers at Eyman Browning); Horn WT, Doc. 4130-6 at 2 [ADCRR00158565] (shower at Eyman Browning); Horn WT, Doc. 4130-7 at 3 [ADCRR00158596] (shower at Eyman Browning), 8-16 [ADCRR00158601-09] (showers at Eyman-Rynning Detention), , 36-41 [ADCRR00158629-34] (same); Horn WT, Doc. 4130-8 at 1-3 [ADCRR00158635-37] (showers at Eyman Rynning Detention); Horn WT, Doc. 4130-8 at 10-13 [ADCRR00158644-47] (showers at Rynning Close Management Program), 31-32 [ADCRR00158665-66] (showers at Eyman SMU-I), 34-36 [ADCRR00158668-70] (same); Horn WT, Doc. 4130-9 at 31-34 [ADCRR00158706-09] (showers at Eyman SMU-I), 38-39 [ADCRR00158713-14] (same).

155617523.3



Horn WT, Doc. 4130-2 at 14 [ADCRR00158418].

137. The lack of regular access to cleaning supplies to sanitize cell interiors also results in many cells which are extremely dirty, including mold growing on air vents, the undersides of mattresses, and the walls, as depicted in the below cell at Eyman Browning. Horn WT, Doc. 4130 ¶ 251.





CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

Horn WT, Doc. 4130-5 at 12-13 [ADCRR00158539-40]. *See also* Horn WT, Doc. 4130-3 at 1 [ADCRR00158446] (clogged toilet at Lewis Rast); Doc. 4130-4 at 29 [ADCRR00158515] (rusted bed area at Eyman Browning); Doc. 4130-5 at 14-15 [ADCRR00158541-42] (dirty plexiglass cell front at Eyman Browning). Dr. Haney personally observed "mold on the walls, insects on the floors, a large puddle of musty-smelling and moldy water outside one person's cell that came from a leak inside, and a mouse that one incarcerated person had trapped in his cell." Haney WT, Doc. 4120 ¶ 121.

138.    Dr. Stewart observed a blood-splattered plexiglass cell door in Eyman Browning's newly-created Behavioral Management Unit (BMU) on September 8, 2021, as shown in the photos on the following pages.

//

//

//

//

//

-47-







Stewart WT, Doc. 4109-1 at 143-47 [ADCRR00137142-46].

       139.   The Court questioned Dr. Stewart as to how he was certain that this was blood (*see* Trial Testimony of Pablo Stewart, M.D. ("Stewart TT") at 523:13-524:3), but Eyman Browning Deputy Warden Scott subsequently confirmed that this cell was indeed covered in blood. Scott TT at 1174:24-1176:25. Deputy Warden Scott testified that the blood came from five people who had been transferred into the unit from Florence

Kasson's behavioral management unit the afternoon before Dr. Stewart's inspection visit and who self-harmed, injuring themselves severely. *Id.*; Ex. 4004 [ADCRR00229148].[18]

140. ADCRR does not provide sufficiently frequent trash pickup from cells, which results in infestations of insects and rodents. Johnson TT at 1245:2-21, 1247:1-9, 1247:15-1248:11. ADCRR fails to provide cleaning supplies to incarcerated persons to clean their own cells, resulting in infestation, disease, and unsanitary living conditions. *Id.* at 1249:9-1251:5; Brislan TT at 1306:1-13.

141. Insects and other pests are common in ADCRR isolation units, and flying insects, crickets, beetles, and cockroaches were observed during facility tours. Horn WT, Doc. 4130 ¶ 256. Insects were observed coming into the cell from where caulking in the sink/ commode was missing (*id.*), and in housing unit cell floors, walls, and in recreation enclosures. Haney WT, Doc. 4120 ¶ 119; Haney TT at 757:8-22. People living in isolation cells reported that they had not seen an exterminator for many months, and when they do come they only treat the showers and hallways and do not spray inside the cells. Horn WT, Doc. 4130 ¶ 256. Eyman Browning Unit's Deputy Warden Scott also testified that, until recently, when exterminators come to Browning they do not treat the cells. Scott TT at 686:2-4.

142. In the detention units, the Individual Inmate Detention Records include columns to document whether people received cleaning supplies for their cells and whether they were offered laundry and linen exchange. *See, e.g.*, Ex. 1694 at ADCRR00182993. In most detention units, most weeks, almost no one is offered cleaning supplies for their cells or laundry or linen exchanges. *See generally* Exs. 1695, 1696, 1697, 1699; *see also* Horn TT at 1458:9-1461:10; Van Winkle TT at 2850:8-2854:19. In the Yuma Detention Units, most people are offered cell cleaning supplies, but not laundry or linen exchange. Ex. 1700. At Eyman SMU I Complex Detention Unit, most people are

---

[18] Deputy Warden Scott's testimony contradicted the reports of the people living in the adjacent cells, who told Dr. Stewart that it was one person who had cut himself and had bled that much in the cell. Stewart WT, Doc. 4109 ¶ 205.

155617523.3

offered laundry and linen exchange, but few are offered cell cleaning supplies. *See generally* Ex. 1694; *see also* Stickley TT at 2053:22-2065:23. At Eyman Rynning Detention Unit, a small number of people are offered cell cleaning supplies or laundry or linen exchange. *See generally* Ex. 1695.

143. Moreover, as seen below, many people are not offered three showers a week, as required:

| Housing Unit | Week | Number of People in Detention | Number Offered Only 2 Showers | Number Offered Only 1 or No Shower | Exhibit No. | Bates Nos. (ADCRR00…) |
|---|---|---|---|---|---|---|
| Perryville Lumley | Aug. 9-15, 2021 | 7 | 3 | | 1699 | 189432-189458 |
| Perryville Lumley | Aug. 16-22, 2021 | 10 | 3 | | 1699 | 189460-189488 |
| Eyman SMU I | Feb. 15-21, 2021 | 125 | 47 | 65 | 1694 | 183335-183585 |
| Eyman SMU I | Sep. 13-19, 2021 | 154 | 13 | | 1694 | 184639-184955 |
| Lewis Morey | Feb. 8-14, 2021 | 85 | 50 | | 1697 | 186706-186874 |
| Lewis Morey | Jul. 12-18, 2021 | 57 | | | 1697 | 187702-187820 |
| Lewis Morey | Aug. 16-22, 2021 | 61 | 9 | 1 | 1697 | 188078-188206 |
| Lewis Morey | Sep. 13-19, 2021 | 62 | 58 | | 1697 | 188208-188364 |
| Lewis Bachman | Feb. 15-21, 2021 | 73 | 47 | 26 | 1697 | 186878-187029 |
| Lewis Bachman | Jul. 5-11, 2021 | 18 | | 18 | 1697 | 187822-187864 |
| Lewis Bachman | Jul. 12-18, 2021 | 47 | 19 | 28 | | 187866-187964 |
| Lewis Bachman | Sep. 6-12, 2021 | 60 | 50 | | 1697 | 188367-188495 |

*See also* Stickley TT at 2050:20-2065:23.

144. The concrete exercise pens available to incarcerated people at Eyman-SMU-1 and Eyman-Browning are barren and devoid of exercise equipment, and also suffer from insect infestations. People exercise alone in these pens. The concrete pens are approximately 11 feet by 24 feet and have solid concrete walls approximately 15 feet high with a covering of metal mesh over the top, so that the incarcerated person cannot see his

surroundings, and can see only a small sliver of sky. Because of the solid walls, there is no breeze, and the pens become extremely hot in the summer. *See, e.g.*, Ex. 1488 at August 2021 Tab, Rows 70-71 (showing temperatures over 100 degrees in the recreation areas). The photograph below depicts one of these pens at SMU-1, showing insects on the floor:



Case 2:12-cv-00601-ROS  Document 4120-1  Filed 10/30/21  Page 112 of 118

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601                ADCRR00108105

Haney WT, Doc. 4120 ¶¶ 119, 127; Haney TT at 754:17-21; 757:8-22. Most recreation is provided in the concrete pens. *See, e.g.*, Ex. 3602 at 52 [ADCRR00214423] (showing three of four recreations offers in the "A" location, the concrete pens).[19] There are also small outdoor exercise cages at some units. During the four days that Dr. Haney spent at the isolation units at Eyman and Lewis, he did not see anyone using them. Haney WT, Doc. 4120 ¶ 128; Haney TT at 787:14-788:21, 1005:9-21.

145. Lewis-Rast Max is a newer facility than Eyman SMU-1 and Eyman-Browning, and is not in as much disrepair. The architecture is different in some ways—for

---

[19] *See also* Ex. 3602 at ADCRR00214436, ADCRR00214450, ADCRR00214462, ADCRR00214478, ADCRR00214489, ADCRR00214499, ADCRR00214512, ADCRR00214522, ADCRR00214532, ADCRR00214547, ADCRR00214566, ADCRR00214581, ADCRR00214595, ADCRR00214610, ADCRR00214627, ADCRR00214639, ADCRR00214654, ADCRR00214666, ADCRR00214681.

155617523.3

example, the cell doors at Lewis-Rast Max are solid but have a window. The solid door makes it difficult to communicate with the person from outside the cell. Despite these minor differences, Lewis-Rast Max, like Eyman-SMU-1 and Eyman-Browning, is a very severe, stark, and depriving housing unit, and the levels of isolation and deprivation are essentially the same in the three units; one incarcerated person told Dr. Haney that Lewis-Rast Max is sometimes referred to as "SMU-3" because of these similarities. Like Eyman-SMU-I and Eyman-Browning, the cells at Lewis-Rast Max have no window to the outside. The photograph below depicts a typical cell in Lewis-Rast Max:



Haney WT, Doc. 4120 ¶ 132; Haney TT at 758:18-759:16.

146. Lewis-Stiner Detention Unit is a very stark, oppressive, depriving environment. Unlike even a typical maximum security prison unit, it has no day room or other common space; there is very little evidence of any activity taking place in the unit.

155617523.3

Some people are housed two to a cell. The solid cell doors, shown in the photograph below, make it difficult to communicate with those inside from outside the cell.



Case 2:12-cv-00601-ROS   Document 4120-2   Filed 10/30/21   Page 63 of 63

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00158782

ASPC-Lewis Stiner Detention Unit, Wing A

Haney WT, Doc. 4120 ¶ 133.

147.    The cells in the Stiner Detention Unit are also very stark, as shown in the photo below of an occupied cell in the unit:

-54-

155617523.3



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

Haney WT, Doc. 4120 ¶ 133.

148.    Dr. Haney attempted to interview the occupant of the cell shown in the photograph above, but he seemed to be profoundly mentally ill and was difficult to communicate with. His cell was in significant disarray. Haney WT, Doc. 4120 ¶ 133; Haney TT at 759:17-761:25.

149.    Dr. Haney was struck in both Rast-Max and Stiner Detention Units by the sheer level of deprivation and isolation to which the persons housed in those units are subjected. They are forced to endure some of the most extreme conditions and restrictions he has ever encountered in a long-term (i.e., longer than a few days) isolated housing unit. Haney WT, Doc. 4120 ¶ 141.

150.    Finally, padlocks or bolts on cell doors that prevent the cells from being opened by the control room officer were present in Eyman Rynning Detention Unit, Eyman SMU-I and Lewis Stiner Detention units, and are a fire and smoke hazard. Horn WT, Doc. 4130 ¶ 250. This is particularly dangerous in light of the staffing shortages that result in pods having no officers on the floor, or even in the control room, to call for

155617523.3

someone in the case of an emergency. *See, e.g.*, Stickley TT at 2015:9-12, 2017:6-2018:7, 2024:1-2030:20; Ex. 1217 at ADCRR00097769-70; Ex. 1293 at ADCRR00130151-52, ADCRR00130157-58. Additionally, Eyman SMU-I also lacked a hose closet and sprinkler system, which Mr. Horn opined posed a life safety hazard when combined with bolted or locked cell doors. Horn WT, Doc. 4130 ¶ 250. Incarcerated people report that grievances concerning conditions issues are either not responded to, or they perceive the system to be unresponsive to their concerns. *Id*. at ¶ 255.

151. The Court finds that Defendants fail to maintain sanitary and safe conditions in the isolation units at ADCRR. The Court further finds that the failure to maintain sanitary and safe conditions unreasonably subjects Isolation Subclass members to a substantial risk of serious harm or even death, and deprives them of the minimal civilized measure of life's necessities.

### 2. Inadequate Out-of-Cell Time

152. Out-of-cell time is very important. Scott TT at 1157:4-7. Getting people out of their cells to classes or recreation decreases tension, is good for the mental health of people in isolation, and makes the facility safer for everyone. Scott TT at 1157:11-19; Van Winkle TT at 2745:11-25

153. Despite Defendants' recognition of the value of out-of-cell time, very little is offered in ADCRR isolation units.

### (a) Out-of-Cell Time in Maximum Custody Units

154. As discussed below, people in Maximum Custody in ADCRR are supposed to receive at least three 2.5 or 3 hour blocks of recreation each week. Ex. 1318, DO 812, at Appendices B-F. At ASPC-Eyman Browning, policy provides for people at Step 3 in general population Maximum Custody to have time out of cell in the pods without restraints. Scott TT at 409:19-410:4; Ex. 1318, DO 812, at Appendix B. But shortages of correctional staff often lead to the cancellation of out-of-cell time. Shinn TT at 2202:22-2203:5; Haney WT, Doc. 4120 ¶¶ 95, 100; Exs. 1296-1303. If such out-of-cell time is

1  offered, it would be recorded on the Maximum Custody Daily Out-of-Cell-Time Tracking

2  forms. Scott TT at 410:7-9.

3      155.   People in Maximum Custody who are classified as seriously mentally ill

4  (SMI) are supposed to be offered unstructured out-of-cell time, often referred to as "table

5  time." Trial Testimony of Bobbie Pennington-Stallcup ("Stallcup TT") at 2572:10-15;

6  Van Winkle TT at 2679:19-2680:14. People at Steps 1 and 2 are chained to the tables in

7  the pods during table time. *Id.* at 2679:19-2680:14.

8      156.   All programming, classes, group education, SMI classes, and education

9  were cancelled at Eyman Browning from March 2020 through June 2021. Scott TT at

10  686:21-24. SMI table time was cancelled at Browning from March 2020 through March

11  2021. *Id.* at 686:25-687:2. All outside recreation was cancelled at Browning Unit from

12  March 2020 through June 2021, and recreation in the chute (the indoor enclosure within

13  the pod) was also sometimes cancelled, due to low staffing levels. *Id.* at 687:3-8.

14      157.   During this period most out-of-cell time was also cancelled at Eyman

15  SMU I. Ex. 1297 at ADCRR00053778-0054254; Ex. 1301 at ADCRR00055351-678. All

16  mental health groups and classes, CO-III classes, and SMI unstructured out-of-cell time

17  were cancelled at Florence Kasson, a mental health unit, from April 18, 2020 through

18  June 25, 2021. Van Winkle TT at 2802:15-2803:1.

19      158.   These cancellations of out-of-cell time started long before COVID-19, and

20  have continued in recent months. For example, in the first two months of 2020, before

21  COVID-19 affected operations, there were 53 cancellations at Eyman SMU I, most of

22  which were due to staffing shortages. Ex. 1297 at ADCRR0053602-53707. At Eyman

23  Browning, there were 37 days during the first two months of 2020 when classes or

24  recreation were cancelled, mostly due to staffing shortages. Ex. 1296 at ADCRR0052183-

25  52327. Throughout 2019 and the start of 2020, Defendants' reporting on out-of-cell time

26  shows that recreation time was often cancelled at each of the still existing Maximum

27  Custody units:

28

155617523.3

| Month | Facility | People offered fewer than 3 recreation blocks | Ex. 1980, FRE 1006 Summary Bates No. |
|---|---|---|---|
| January 2019 | Eyman Browning | 3 of 16 | PLTFS004974 |
| January 2019 | Lewis Rast | 8 of 20 | PLTFS004977 |
| July 2019 | Eyman SMU I | 1 of 11 | PLTFS004967 |
| October 2019 | Eyman Browning | 11 of 20 | PLTFS004962 |
| October 2019 | Eyman SMU I | 3 of 16 | PLTFS004963 |
| January 2020 | Eyman Browning | 12 of 20 | PLTFS004958 |
| January 2020 | Eyman SMU I | 3 of 14 | PLTFS004959 |
| January 2020 | Lewis Rast | 10 of 20 | PLTFS004961 |

*See also* Trial Testimony of Jessica Carns ("Carns TT") at 200:20-202:2 (explaining the process of calculating the offers of recreation in Ex. 1980).

159. Named Plaintiff Dustin Brislan testified that when he was at Florence Kasson prior to COVID, group therapy was sometimes cancelled due to lack of staff. Brislan TT at 1304:22-1305:4.

160. Cancellations continued after ADCRR "went back to normal operations [at the] end of June, [or] beginning of July" 2021. *See* Van Winkle TT at 2798:13-14. All SMI classes at Eyman Browning were canceled for July, August, and part of September 2021 due to the lack of staff. Scott TT at 1167:12-19. All programs offered to SMI patients at SMU-I whose records were reviewed in August 2021 were cancelled. Stickley TT at 2032:14-2038:16.

161. Much of the mental health programming in the mental health unit at Florence Kasson was cancelled in July and August 2021 due to low staffing. Van Winkle TT at 2828:7-15, 2831:21-2832:1, 2833:1-3.[20] In general, low staffing levels are the main

---

[20] *See also* Ex. 1687 at ADCRR00213371, ADCRR00213381, ADCRR00213395, ADCRR00213410, ADCRR00213427, ADCRR00213443, ADCRR00213460, ADCRR00213475, ADCRR00213492, ADCRR00213508, ADCRR00213522, ADCRR00213537, ADCRR00213551, ADCRR00213565, ADCRR00213583, ADCRR00213597, ADCRR00213611, ADCRR00213625, ADCRR00213639, ADCRR00213653, ADCRR00213667; Ex. 3606 at ADCRR00215045, ADCRR00215058, ADCRR00215071, ADCRR00215085, ADCRR00215099, ADCRR00215112, ADCRR00215131, ADCRR00215152, ADCRR00215166, ADCRR00215179, ADCRR00215192, ADCRR00215206, ADCRR00215220, ADCRR00215237, ADCRR00215250, ADCRR00215263, ADCRR00215276, ADCRR00215290, ADCRR00215306, ADCRR00215320, ADCRR00215333.

155617523.3

reason for cancellations of out-of-cell time. Stickley TT at 2019:10-12; Scott TT at 687:3-14, 693:23-695:17, 1167:9-19; Exs. 1296-1303.

162. Throughout the summer of 2021, at Florence Kasson, contrary to policy, people at Steps 2 and 3 were offered recreation only in the 10' x 10' recreation enclosures, depriving them of the opportunity for social interaction through having recreation in the larger, multi-person enclosures. Van Winkle TT at 2830:4-18.[21]

163. Recreation, programming and unstructured out-of-cell time were also cancelled at Lewis Rast Max in July 2021 due to low staffing. Coleman TT at 2103:20-2105:6, 2114:18-2115:1; Ex. 1303 at ADCRR00158893-95.

164. Named Plaintiff Jason Johnson testified that in the last five months before he testified, he was able to go out to recreation just one time at Eyman SMU I and that frequently classes are cancelled. Johnson TT at 1243:16-23, 1251:20−1253:9. As a person classified as SMI, Mr. Johnson is supposed to get table time, but it is not offered at ASPC-Eyman SMU I. *Id.* at 1243:24-1244:12, 1251:20−1253:9.

165. The Court finds that Defendants do not provide adequate out-of-cell time in Maximum Custody units, even according to Defendants' own policies. The Court further finds that the failure to provide adequate out-of-cell time unreasonably subjects class members to a substantial risk of serious harm, and deprives them of the minimal civilized measure of life's necessities.

       (b)    **Out-of-Cell Time in Detention and Close Management Units**

166. ADCRR offers even less out-of-cell time to people in Detention and Close Management than to people in Maximum Custody.

---

[21] *See also* Ex. 1687 at ADCRR00213395, ADCRR00213410, ADCRR00213427, ADCRR00213443, ADCRR00213460, ADCRR00213475, ADCRR00213492, ADCRR00213508, ADCRR00213551, ADCRR00213597, ADCRR00213611, ADCRR00213625, ADCRR00213639; Ex. 3606 at ADCRR00215099, ADCRR00215112, ADCRR00215131, ADCRR00215250, ADCRR00215263, ADCRR00215306, ADCRR00215320, ADCRR00215333.

155617523.3

167. First, according to policy, ADCRR gives people in detention just six hours per week of out-of-cell exercise (two hours, three times a week) and three showers, but no other out-of-cell time. Ex. 1312, DO 804, §1.2.6. There is no mental health programming in detention units. Stallcup TT at 2576:8-10.

168. ADCRR does not offer even the required six hours per week of out-of-cell time in many of its detention units, as shown in the chart below:[22]

| Housing Unit | Week | # People in Unit | People Offered No Rec | People Offered Rec 1 Time | People Offered Rec 2 Times | Ex. No. | Bates Nos. (ADCRR00…) |
|---|---|---|---|---|---|---|---|
| Lewis Morey | Feb. 8-14, 2021 | 85 | 41 | 10 | 29 | 1697 | 186706-186874 |
| Lewis Morey | Jul. 12-18, 2021 | 57 | 24 | 6 | 27 | 1697 | 187702-187820 |
| Lewis Morey | Aug. 16-22, 2021 | 61 | 7 | 45 | 7 | 1697 | 188078-188206 |
| Lewis Morey | Sep. 13-19, 2021 | 62 | | 25 | 34 | 1697 | 188208-188364 |
| Lewis Bachman | Feb. 15-21, 2021 | 73 | 26 | 26 | 20 | 1697 | 186878-187029 |
| Lewis Bachman | Jul. 5-11, 2021 | 18 | 3 | 15 | | 1697 | 187822-187864 |
| Lewis Bachman | Jul. 12-18, 2021 | 47 | | 27 | 20 | 1697 | 187866-187964 |
| Lewis Bachman | Sep. 6-12, 2021 | 60 | 1 | 31 | 19 | 1697 | 188367-188495 |
| Eyman SMU I | Feb. 15-21, 2021 | 125 | 13 | 65 | 47 | 1694 | 183335-183585 |
| Eyman SMU I | Sep. 13-19, 2021 | 154 | | 1 | 16 | 1694 | 184639-184955 |
| Perryville Lumley | Feb. 15-21, 2021 | 9 | | | 6 | 1699 | 189490-189514 |
| Perryville Lumley | Aug. 9-15, 2021 | 7 | | | 4 | 1699 | 189432-189458 |
| Perryville Lumley | Aug. 16-22, 2021 | 10 | | | 7 | 1699 | 189460-189488 |
| Florence Kasson | Feb. 15-21, 2021 | 49 | | 2 | 27 | 1696 | 186366-186468 |

[22] The Individual Inmate Detention Record, Form 804-3, is the only way ADCRR tracks out-of-cell time for people in detention. Stickley TT at 2045:3-21.

155617523.3

| Housing Unit | Week | # People in Unit | People Offered No Rec | People Offered Rec 1 Time | People Offered Rec 2 Times | Ex. No. | Bates Nos. (ADCRR00…) |
|---|---|---|---|---|---|---|---|
| Florence Kasson | Jul. 12-18, 2021 | 12 | | | 7 | 1696 | 186520-186546 |
| Eyman Rynning | Feb. 8-14, 2021 | 36 | | | 31 | 1695 | 185501-185597 |
| Yuma Cheyenne | Feb. 15-21, 2021 | 24 | | | 9 | 1700 | See n.[23] |
| Yuma Cheyenne | Jul. 12-18, 2021 | 34 | | | 17 | 1700 | See n.[24] |

*See also* Van Winkle TT at 2850:20-2854:19; Stickley TT at 2054:6-2055:15, 2056:14-22, 2059:10--2065:23, 2066:10-12.

169.   The policy regarding Close Management indicates that, unless otherwise indicated, conditions in Close Management are the same as in Detention. Horn WT, Doc. 4130 ¶ 75; Ex. 1319, DO 813, § 5.2.3. Under the policy, people in Close Management get six hours per week of outdoor exercise. Ex. 1319, DO 813, Attachment A. The policy sets out the "programs" that people in Close Management must complete, but for the first two of the three phases, all programming is "self-study," not out-of-cell time. *Id*., Attachment B. Moreover, out-of-cell time is not documented anywhere for people in Close Management, making it impossible to determine whether they are given the out-of-cell time required by policy. Horn WT, Doc. 4130 ¶ 153.

170.   The provision of recreation in three two-hour blocks means that even under the best of circumstances, the person will spend more than half of the days of the week continuously inside their cell. As described above, in practice, exercise is often canceled,

---

[23] At ASPC-Yuma Cheyenne, the weeks were produced interspersed with each other. For this unit, to make the chart legible, the Bates Numbers are provided in footnotes. For Yuma Cheyenne, February 15-21, 2021, the relevant Bates Numbers are: ADCRR00193084, 193088, 193092, 193096, 193100, 193104, 193108, 193112, 193116, 193120, 193126, 193130, 193134, 193746, 193750, 193754, 193758, 193762, 193766, 193770, 193774, 193778, 193783, 193786.

[24] ADCRR00191658, 193138, 193142, 193146, 193148, 193152, 193156, 193160, 193164, 193168, 193172, 193176, 193180, 193184, 193792, 193794, 193796, 193802, 193806, 193810, 193818, 193822, 193826, 193834, 193838, 194288, 194292, 194300, 194302, 194306, 194310, 194312, 194316, 194322.

-61-

leading to even longer periods of continuous in-cell confinement, and reducing exercise time to 3-4 hours per week. Even if the full six hours is provided, it is not sufficient to ameliorate the adverse effects that confinement in these harsh conditions has on persons with mental illness. Haney WT, Doc. 4120 ¶¶ 95, 96, 100.

171. The Court finds that Defendants do not provide adequate out-of-cell time in Detention units, even according to Defendants' own policies. The Court further finds that the failure to provide adequate out-of-cell time unreasonably subjects Isolation Subclass members to a substantial risk of serious harm, and deprives them of the minimal civilized measure of life's necessities.

**(c)    There Is Even Less Out-of-Cell Time than Suggested by the Tracking Forms and Individual Records, as Many "Refusals" Appear to Be Denials of Out-of-Cell Time**

172. At least as troubling as the limited offers of out-of-cell time is the extraordinary level of "refusals," and the substantial evidence that many if not most of these are not actual refusals, but rather denials of out-of-cell time.

173. ADCRR records reflect that incarcerated people refuse out-of-cell time at very high rates. Horn TT at 1417:16-1419:12. For example, according to the out-of-cell-time tracking sheets in the Maximum Custody Notebooks summarized in Ex. 1980, for nearly half of the months included in the summary, 80% or more of all recreation opportunities were listed as refusals:

| Month & Year | Housing Unit | Reported Rec Refusal Rate | Bates No. |
|---|---|---|---|
| January 2019 | Lewis Rast | 46% | PLTFS004977 |
| January 2019 | Florence Kasson | 80% | PLTFS004976 |
| January 2019 | Eyman SMU I | 73% | PLTFS004975 |
| January 2019 | Eyman Browning | 83% | PLTFS004974 |
| April 2019 | Lewis Rast | 38% | PLTFS004973 |
| April 2019 | Florence Kasson | 71% | PLTFS004972 |
| April 2019 | Eyman SMU I | 80% | PLTFS004971 |
| April 2019 | Eyman Browning | 84% | PLTFS004970 |
| July 2019 | Lewis Rast | 67% | PLTFS004969 |
| July 2019 | Florence Kasson | 58% | PLTFS004968 |
| July 2019 | Eyman SMU I | 83% | PLTFS004967 |

| Month & Year | Housing Unit | Reported Rec Refusal Rate | Bates No. |
|---|---|---|---|
| July 2019 | Eyman Browning | 80% | PLTFS004966 |
| October 2019 | Lewis Rast | 78% | PLTFS004965 |
| October 2019 | Florence Kasson | 63% | PLTFS004964 |
| October 2019 | Eyman SMU I | 86% | PLTFS004963 |
| October 2019 | Eyman Browning | 93% | PLTFS004962 |
| January 2020 | Lewis Rast | 68% | PLTFS004961 |
| January 2020 | Florence Kasson | 90% | PLTFS004960 |
| January 2020 | Eyman SMU I | 84% | PLTFS004959 |
| January 2020 | Eyman Browning | 62% | PLTFS004958 |
| April 2020 | Lewis Rast | 80% | PLTFS004957 |
| April 2020 | Florence Kasson | 87% | PLTFS004956 |
| April 2020 | Eyman SMU I | 95% | PLTFS004955 |
| April 2020 | Eyman Browning | 68% | PLTFS004954 |
| July 2020 | Lewis Rast | 64% | PLTFS004953 |
| July 2020 | Florence Kasson | 92% | PLTFS004952 |
| July 2020 | Eyman SMU I | 92% | PLTFS004951 |
| July 2020 | Eyman Browning | 61% | PLTFS004950 |
| October 2020 | Lewis Rast | 70% | PLTFS004949 |
| October 2020 | Florence Kasson | 73% | PLTFS004948 |
| October 2020 | Eyman SMU I | 90% | PLTFS004947 |
| October 2020 | Eyman Browning | 56% | PLTFS004946 |
| January 2021 | Lewis Rast | 80% | PLTFS004945 |
| January 2021 | Florence Kasson | 77% | PLTFS004944 |
| January 2021 | Eyman SMU I | 93% | PLTFS004943 |
| January 2021 | Eyman Browning | 46% | PLTFS004942 |
| April 2021 | Florence Kasson | 63% | PLTFS004941 |
| April 2021 | Eyman SMU I | 90% | PLTFS004940 |
| April 2021 | Eyman Browning | 29% | PLTFS004939 |

174.     There is also a very high rate of refusals of recreation in Detention. Horn TT at 1419:13-16. As noted above, in detention, people are supposed to be offered recreation three times per week. Ex. 1312, DO 804 § 1.2.6.5.

175.     At Eyman SMU I's Detention Unit, during the week of August 16-22, 2021, of the 151 people in the Detention Unit, three people went to recreation twice, eight went once; all other purported offers of recreation were "refused." Ex. 1694 at ADCRR00184327-638.

176. At Lewis Morey Detention Unit, during the same week in August 2021, of the 61 people in detention, 4 people went to recreation twice, 5 went once; all other purported offers of recreation were "refused." Ex. 1697 at ADCRR00188078-207.

177. That same week at Lewis Bachman Detention Unit, of the 56 people housed in that unit for that week in August 2021, Defendants' records show that 26 people were never offered recreation, 25 people were offered recreation once, and five were offered recreation two times; every single person who was offered recreation ostensibly refused it every time it was offered. Ex. 1697 at ADCRR00187966-188077.

178. At Eyman Rynning Detention Unit, during that week in August 2021, of the 18 people in detention, six people went to recreation twice, and five went to recreation once; all other offers were reported as being refused. Ex. 1695 at ADCRR00185933-185991.

179. The rate of refusals of recreation in Detention Units is extraordinary:

| Housing Unit | Week | People in Detention Unit | People Who Went to Rec at Least Once | % Who Went to Rec at Least Once | Ex. No. | Bates Nos. (ADCRR00…) |
|---|---|---|---|---|---|---|
| Eyman SMU I | Feb. 15-21, 2021 | 125 | 0 | 0% | 1694 | 183335-183585 |
| Eyman SMU I | Jul. 12-18, 2021 | 113 | 2 | 2% | 1694 | 184071-184319 |
| Eyman SMU I | Aug. 16-22, 2021 | 151 | 11 | 7% | 1694 | 184327-184638 |
| Eyman SMU I | Sep. 13-19, 2021 | 154 | 1 | 0.6% | 1694 | 184639-184955 |
| Yuma Dakota | Feb. 8-14, 2021 | 61 | 5 | 8% | 1700 | 190946-191084 |
| Yuma Dakota | Feb. 15-21, 2021 | 13 | 0 | 0% | 1700 | 191086, 191250-191280 |
| Yuma Dakota | Aug. 16-22, 2021 | 26 | 5 | 19% | 1700 | 195147-195249 |
| Yuma Dakota | Sep. 6-12, 2021 | 42 | 5 | 12% | 1700 | 195251-195307 |

155617523.3

| Housing Unit | Week | People in Detention Unit | People Who Went to Rec at Least Once | % Who Went to Rec at Least Once | Ex. No. | Bates Nos. (ADCRR00…) |
|---|---|---|---|---|---|---|
| Yuma Cheyenne | Feb. 8-14, 2021 | 25 | 0 | 0% | 1700 | See n.[25] |
| Yuma Cheyenne | Feb. 15-21, 2021 | 24 | 0 | 0% | 1700 | See n.[26] |
| Yuma Cheyenne | Jul. 5-11, 2021 | 33 | 4 | 12% | 1700 | See n.[27] |
| Yuma Cheyenne | Jul. 12-18, 2021 | 34 | 1 | 3% | 1700 | See n.[28] |
| Yuma Cheyenne | Sep. 6-12, 2021 | 25 | 5 | 20% | 1700 | See n.[29] |
| Yuma Cheyenne | Sep. 13-19, 2021 | 33 | 6 | 18% | 1700 | See n.[30] |
| Lewis Morey | Feb. 8-14, 2021 | 85 | 12 | 14% | 1697 | 186706-186874 |
| Lewis Morey | Jul. 12-18, 2021 | 57 | 3 | 5% | 1697 | 187702-187820 |
| Lewis Morey | Aug. 16-22, 2021 | 61 | 9 | 15% | 1697 | 188078-188206 |

---

[25] At ASPC-Yuma Cheyenne, the weeks were produced interspersed with each other. For this unit, to make the chart legible, the Bates Numbers are provided in footnotes. For Yuma Cheyenne, February 8-14, 2021, the relevant Bates Numbers are: ADCRR00193082, 193086, 193090, 193094, 193098, 193102, 193106, 193110, 193114, 193118, 193124, 193128, 193132, 193742, 193744, 193748, 193752, 193756, 193760, 193764, 193768, 193772, 193776, 193780, 193784.

[26] ADCRR00193084, 193088, 193092, 193096, 193100, 193104, 193108, 193112, 193116, 193120, 193126, 193130, 193134, 193746, 193750, 193754, 193758, 193762, 193766, 193770, 193774, 193778, 193783, 193786.

[27] ADCRR00193136, 193144, 193150, 193154, 193158, 193162, 193166, 193170, 193174, 193178, 193182, 193788, 193790, 193800, 193804, 193808, 193812, 193816, 193820, 193824, 193828, 193832, 193836, 194286, 194290, 194294, 194298, 194304, 194308, 194314, 194324, 194326, 195041.

[28] ADCRR00191658, 193138, 193142, 193146, 193148, 193152, 193156, 193160, 193164, 193168, 193172, 193176, 193180, 193184, 193792, 193794, 193796, 193802, 193806, 193810, 193818, 193822, 193826, 193834, 193838, 194288, 194292, 194300, 194302, 194306, 194310, 194312, 194316, 194322

[29] ADCRR00193186, 193190, 193192, 193196, 193210, 193216, 193234, 193844, 193852, 193854, 193858, 193862, 193866, 193874, 193878, 193882, 193886, 194330, 194338, 194364, 194368, 194372, 194374, 194378, 195258.

[30] ADCRR00192286, 193188, 193194, 193198, 193200, 193204, 193208, 193212, 193214, 193224, 193228, 193840, 193842, 193850, 193856, 193860, 193864, 193868, 193872, 193876, 193880, 193888, 194084, 194332, 194336, 194340, 194344, 194348, 194354, 194362, 194370, 194376, 194380.

-65-

155617523.3

| Housing Unit | Week | People in Detention Unit | People Who Went to Rec at Least Once | % Who Went to Rec at Least Once | Ex. No. | Bates Nos. (ADCRR00…) |
|---|---|---|---|---|---|---|
| Lewis Morey | Sep. 13-19, 2021 | 62 | 3 | 5% | 1697 | 188208-188364 |
| Lewis Bachman | Feb. 15-21, 2021 | 73 | 10 | 14% | 1697 | 186878-187029 |
| Lewis Bachman | Jul. 5-11, 2021 | 18 | 0 | 0% | 1697 | 187822-187864 |
| Lewis Bachman | Jul. 6-12, 2021 | 47 | 0 | 0% | 1697 | 187866-187964 |
| Lewis Bachman | Sep. 6-12, 2021 | 60 | 4 | 7% | 1697 | 188367-188495 |
| Florence Kasson | Jul. 12-18, 2021 | 12 | 1 | 8% | 1696 | 186520-186546 |

Some "refusals" of recreation noted by Defendants are accurate. Many persons in the Lewis Detention Units explained that they sometimes refuse recreation, due to ADCRR practices relating to recreation and the conditions of the recreation enclosures. Haney WT, Doc. 4120 ¶¶ 139-140. Some outdoor recreation areas at Rast consist of small cages, made of a tight metal wire mesh, including overhead, that is rusted in many places. Incarcerated people described the recreation enclosure as "another box" and discussed the indignity of having to be shackled and strip-searched in order to receive recreation. Signs on the wall at Lewis Rast confirmed the handcuffing and strip-searching requirements for going to recreation:



EVERY SINGLE INMATE ON THIS UNIT REGARDLESS OF STEP WILL BE HANDCUFFED AT ALL TIMES WHEN OUT OF THEIR CELLS.

Effective immediately, all step 3 inmates at Rast Max (3B5 included) will be handcuffed when they leave their cells. This includes recreation for step 3 inmates in both 3B5 and max custody with the exception of porters.

> ### *ATTENTION ALL*
>
> Beginning 06/01/2020, All Inmates and their Cells shall be in 704 Compliance before Inmates will be allowed to go to Recreation. Also, the Inmates will be awake and ready to exit the cell when the officers arrive. Failure to be in compliance, or failure to be ready to submit to the strip search or any unreasonable delay once the officer arrives will be considered a refusal of Recreation and will be documented on the DO812 forms as such.

Haney WT, Doc. 4120 ¶ 139 [ADCRR158725].

180. However, such a high rate of refusal raises a serious and very real concern that people are being discouraged from going to recreation. Horn WT, Doc. 4130 ¶ 191. Additional evidence supports such a conclusion.

181. For example, Named Plaintiff Jason Johnson testified that the documented refusals of recreation are not reliable. He credibly testified that he does refuse certain other types of out-of-cell time and explained the reasons for such refusals. Johnson TT at 1228:5-20, 1230:5-1232:12, 1248:21-1249:8, 1251:24-1252:15. But he was clear that he rarely refuses recreation. *Id.* at 1253:10-11, 1254:19-23. When shown a document purporting to show his refusal of recreation and occasions when he went to recreation, he did not waver in his testimony that the representations on the out-of-cell-time tracking

forms were false, despite being questioned at length on the issue. *Id.* at 1256:3-1264:22. The column entitled "Inmate Signature" on the out-of-cell-time tracking forms for Mr. Johnson did not include his signature, and he credibly testified that he was never asked to sign the form when he refused an out-of-cell activity. *Id.* at 1286:17-1289:24.

182.    Plaintiffs' expert Mr. Horn testified that numerous incarcerated people told him that they are recorded as refusing out-of-cell time when they do not, and that officers use every opportunity to deem something a refusal. For example, having a clothesline hanging up is considered a refusal. Horn TT at 1415:15-1417:15. Notably, the sign shown above at ¶ 179, corroborated the statements of the incarcerated people. Horn WT, Doc. 4130 ¶ 147; Ex. 2062. Deputy Warden Coleman also confirmed that a failure to comply with DO 704, which sets out, among other things, requirements for grooming and cleanliness and order in cells, is considered a "refusal." Coleman TT at 2127:17-19, 2129:4-7.

183.    Mr. Horn testified the reports from incarcerated people that staff look for ways to deem something a refusal is consistent with his experience in his decades in corrections. According to Mr. Horn, some correctional officers "look for ways to not have to take inmates outside to rec. They have to cuff them, they have to unlock the cell, they have to unlock the enclosure, they have to escort them, it often takes more than one officer." Horn TT at 1420:1-10.

184.    The strongest evidence that the reported refusals are not real refusals comes from Defendants' out-of-cell-time tracking forms themselves. The tracking forms include a column on the back relating to refusals, for the "Inmate Signature (if feasible) or If inmate refuses to sign, STAFF Signature & Badge (#1)". *See, e.g.*, Ex. 1187 at ADCRR000510043. Almost none of the out-of-cell-time tracking forms include the signature of the incarcerated person.[31] *See, e.g.,* Ex. 1187.[32]

---

[31] In February 2021, the Court ruled that "[a]bsent clear evidence of impracticality, [the second signature] requirement shall be followed." Doc. 3861 at 8.
[32] *See also* Ex. 1190; Ex. 1193; Ex. 1196; Ex. 1202; Ex. 1205;

-68-

185. When a person in Maximum Custody has an "extended pattern of refusals or changed behavior" with regard to refusals of out-of-cell time, a correctional supervisor is required to "go around and speak to those individuals and find out why they're refusing, to find out whether we needed to do any kind of intervention with mental health or whatever the case may be." Van Winkle TT at 2698:4-14; Ex. 3028 at 5. These conversations are supposed to be documented on the back of the out-of-cell-time tracking form. Van Winkle TT at 2698:15-18.

186. However, many of the out-of-cell-time tracking forms that reflect numerous refusals do not include any notes of such conversation. For example, Isolation Subclass Member J.J.,[33] who is classified as SMI, refused all but one out-of-cell-time opportunity during the period from August 1, 2020 through August 13, 2021—more than a year. Ex. 1193. None of the out-of-cell-time tracking forms indicate that anyone ever spoke to him about his reported refusals. *Id*. Isolation Subclass member D.Y., who is classified SMI, went to recreation just seven times from September 12, 2020 to February 12, 2021,

---

Ex. 3602 at ADCRR00214424, ADCRR00214437, ADCRR00214451, ADCRR00214463, ADCRR00214479, ADCRR00214490, ADCRR00214500, ADCRR00214513, ADCRR00214523, ADCRR00214533, ADCRR00214548, ADCRR00214567, ADCRR00214582, ADCRR00214596, ADCRR00214611, ADCRR00214628, ADCRR00214640, ADCRR00214655, ADCRR00214667, ADCRR00214682;

Ex. 3604 at ADCRR00214745, ADCRR00214772, ADCRR00214785, ADCRR00214796, ADCRR00214810, ADCRR00214820, ADCRR00214851, ADCRR00214861, ADCRR00214876, ADCRR00214891, ADCRR00214904, ADCRR00214917, ADCRR00214932, ADCRR00214945, ADCRR00214960, ADCRR00214975, ADCRR00214988;

Ex. 3606 at ADCRR00215059, ADCRR00215072, ADCRR00215086, ADCRR00215100, ADCRR00215113, ADCRR00215132, ADCRR00215153, ADCRR00215167, ADCRR00215180, ADCRR00215193, ADCRR00215207, ADCRR00215221, ADCRR00215238, ADCRR00215251, ADCRR00215264, ADCRR00215277, ADCRR00215307, ADCRR00215321, ADCRR00215334;

Ex. 3608 at ADCRR00215421, ADCRR00215431, ADCRR00215440, ADCRR00215456, ADCRR00215492, ADCRR00215504, ADCRR00215522, ADCRR00215541, ADCRR00215559, ADCRR00215596, ADCRR00215614, ADCRR00215635, ADCRR00215653.

[33] Plaintiffs use initials to identify the Isolation Subclass members discussed herein, other than the Named Plaintiffs and people who testified at trial, to protect their privacy.

-69-

and otherwise never left his cell. Ex. 1205 at ADCRR00051633-76. No one talked to him about the refusals. *Id.*.[34]

187.  Many of the individuals who are repeatedly refusing out-of-cell time and never being spoken to about it, are people ADCRR has classified as SMI. Ex. 1193; Ex. 1205; Ex. 3606 at ADCRR00215113, ADCRR00215153, ADCRR00215264; Ex. 3608 at ADCRR00215504, ADCRR00215522, ADCRR00215559, ADCRR00215596, ADCRR00215635, ADCRR00215653. Notably, refusal to engage in recreation is itself a sign that a person may be having mental health problems. Remaining inside an isolation cell around the clock, for an extended period of time, contributes to worsening mental health that can spiral into incidents of self-harm and other forms of deterioration or decompensation—including acting out behavior that can extend the person's stay in isolation. Haney WT, Doc. 4120 ¶ 140. Warden Van Winkle recognized that the refusals may indicate mental health problems, but the extraordinary refusal rates have continued for years. Van Winkle TT at 2698:22-2699:6; Ex. 1980; *see also* Doc. 3599 at 7-8; Doc. 3177-2 ¶¶ 2-3, Ex. 1; Doc. 3177-3 at 3-4, ¶¶ 5-7; Ex. 3; Doc. 1889; Doc. 1915.

188.  Even when there is a notation about a staff conversation with the incarcerated person about a pattern of refusals, the notes make clear that this is an exercise in box-checking, not an attempt to "find out why they're refusing, to find out whether we needed to do any kind of intervention with mental health or whatever the case may be." Van Winkle TT at 2698:4-14. For example, Isolation Subclass Member M.M., who is classified as SMI, went to recreation regularly in August 2020. Ex. 1202 at

---

[34] *See also* Ex. 1190;
Ex. 3602 at ADCRR00214437, ADCRR00214548, ADCRR00214596;
Ex. 3604 at ADCRR00214861, ADCRR00214876, ADCRR00214904, ADCRR00214917, ADCRR00214932, ADCRR00214945, ADCRR00214975, ADCRR00214988;
Ex. 3606 at ADCRR00215113, ADCRR00215153, ADCRR00215264;
Ex. 3608 at ADCRR00215421, ADCRR00215431, ADCRR00215440, ADCRR00215456, ADCRR00215504, ADCRR00215522, ADCRR00215559, ADCRR00215595, ADCRR00215635, ADCRR00215653.

-70-

ADCRR00050772, ADCRR00050774. He abruptly stopped near the end of August, 2020 and went to recreation only a couple times over the next eight months. *Id.* at ADCRR00050776-840. It was not until March 2021 that any of the out-of-cell-time tracking sheets show that anyone spoke to him about his refusals. *Id*. at ADCRR00050831. The notes say, in their entirety: "Asked I/M why he is refusing rec. I/M stated he had to study." Ex. 1202 at ADCRR00050831. Isolation Subclass member V.S., who is classified as SMI, reportedly refused all recreation and most other out-of-cell time from October 24, 2020 through August 6, 2021. Ex. 1199. There are notes on many of his out-of-cell-time tracking forms, but most of them consist of a statement that he has "no issues" or "no complaints" about the out-of-cell time being offered, or that he would "rather stay in his cell." *See, e.g.*, Ex. 1199 at ADCRR00051750, ADCRR00051752, ADCRR00051754, ADCRR00051806, ADCRR00051808.

189. Starting in July 2021, Defendants created a refusal log "to actually show that the supervisors were, in fact, having those conversations" about refusals with incarcerated people who refused out-of-cell activity. Van Winkle TT at 2698:19-21; Ex. 1686 at ADCRR00213069-71; Ex. 1687 at ADCRR00213365-69; Ex. 1688 at ADCRR00213992-4000. However, the refusal logs also demonstrate that this is a box-checking exercise only, and suggest that the logs do not reflect what is actually happening.

190. At Lewis Rast, the person filling in the logs indicated the time each conversation started, making it clear that some conversations lasted less than a minute, most lasted one or two minutes, and none lasted more than four minutes.[35] Ex. 1688 at ADCRR00213992-93; Ex. 3608 at ADCRR00215410-11. Although the stated purpose of these conversations is to determine whether there was a need for "any kind of intervention with mental health or whatever the case may be," (Van Winkle TT at 2698:4-14), many of

---

[35] The logs from the other facilities do not indicate precise starting times of the conversations. *See* Ex. 3606 at ADCRR00215041-215043 (reflecting dates and times of refusals, not of the conversations about the refusals); Ex. 3602 at ADCRR00214408-214409 (reflecting the week, but no dates or times); Ex. 3604 at ADCRR00214731-214732 (reflecting a date that appears to be the date of the conversations, but no times).

the logs reflect answers that could be indicators of mental health issues, particularly depression and sleep disruption (*see* Haney WT, Doc. 4120 ¶ 60; Ex. 2217; Haney TT at 746:3-747:6), but do not provide any additional information to allow anyone to reach any kind of conclusion about the mental health of the people responding:

- Leave me alone
- I'd rather be sleeping
- I want time alone
- Not feeling it this week
- Not feeling good
- Don't want to
- (won't talk with staff)
- Rather watch tv
- Wanted to sleep
- Didn't want to go
- Didn't want to go by himself

*See* Ex. 3602 at ADCRR00214408-214409; Ex. 3604 at ADCRR00214731-214732; Ex. 3606 at ADCRR00215041-215043; Ex. 3608 at ADCRR00215410-215411.

191. Additionally, many of the responses differ between what is stated on the out-of-cell-time tracking form and what is reported on the refusal log. For example, the out-of-cell-time tracking form for one person stated that he said he refused recreation because "I Don[']t like going out too that dirty cage" [sic]. Ex. 3602 at ADCRR00214533. The corresponding entry on the refusal log for this person for the same day says that his reason was: "I don't go to REC I only shower." *Id.* at ADCRR00214408. The out-of-cell-time tracking form for another person stated the reason given for not going to recreation was "Your white officers shouldn't be in here." *Id.* at ADCRR00214567. The refusal log entry for this person gives his reason as "Don't like the other Inmates." *Id.* at ADCRR00214409.

192. Also, the conversations and the refusal logs are often limited to one type of out-of-cell time, despite the refusals being reported for multiple types of out-of-cell time. For example, the out-of-cell-time tracking form for one person says "Claims that he just doesn't like table time." Ex. 3604 at ADCRR00214960. But the individual reportedly refused nearly all his offered recreation, not just table time. *Id.* at ADCRR00214959.

193. The out-of-cell-time tracking form for another person who reportedly refused all recreation, table time and programming states that the reason he gave was "If it's not big rec, I don't go" Ex. 3602 at ADCRR00214627-214628. The refusal log notes only that he refuses recreation, and is silent on the other kinds of out-of-cell time he refused. *Id.* at ADCRR00214409.

194. Finally, the people listed on the refusal logs and the people whose out-of-cell-time tracking forms indicate one of these conversations simply do not match up. For example, the refusal log for Eyman Browning in August 2021 includes an entry for a person who reportedly stated that he refused out-of-cell time because "[i]t [was] to hot/it [was] to cold" [sic]. Ex. 3602 at ADCRR00214408. But the out-of-cell-time tracking form for this individual includes no notation of this conversation. *Id.* at ADCRR00214436-37.

195. Conversely, the August 2021 refusal logs for Florence Kasson and Lewis Rast do not include numerous people for whom there is a notation of a conversation on the out-of-cell-time tracking form, several of which suggest there may be a mental health problem. *Compare* Ex. 3606 at ADCRR00215041-43 (refusal log) *with* Ex. 3606 at ADCRR00215072 ("I don't belong here, that's why I stay in my cell"), ADCRR00215086 ("I'm good, don't want to talk to Mental Health staff"), ADCRR00215179-180 (refused all out-of-cell time and stated "I'm good, I don't want to program"), ADCRR00215291 ("I'm waiting to go to the yard. Nothing else for me here."); *compare* Ex. 3608 at ADCRR00215410-215411 (refusal log) *with* Ex. 3608 at ADCRR00215541 (for person who reportedly refuses all out-of-cell time, "I/M does not want to program or be around other inmates."), ADCRR00215672 ("I/M does not want to be part of the SMI program").

155617523.3

196.    One of the only notes regarding a conversation that seems to recognize the relevance of mental health to the incarcerated person's refusals is from August 2021 at Florence Kasson Unit (which was a behavioral health unit prior to its closure in September 2021). The out-of-cell time tracking form for an individual classified as SMI reflects that he refuses all out-of-cell time. Ex. 3606 at ADCRR00215192. In the notes of the conversation, the staff member writes that this individual said that "[h]e doesn't want to go to class or groups. They don't do nothing for me." *Id.* at ADCRR00215193. The staff person then wrote that this individual "is a frequent self[-]harmer and on a Mental Health Watch." Ex. 3606 at ADCRR00215192-93. However, the entry on the refusal log says only "don't want to," omitting all indication that this individual who is refusing all out-of-cell time has serious, and apparently current, mental health needs. *Id.* at ADCRR00215041.

197.    The uniform, consistent lack of a signature in the designated column in these business records is evidence that incarcerated people are not being asked to sign when a refusal is documented, suggesting that the assertions of "refusals" on these forms are unreliable. The two secondary mechanisms that Defendants have recently created to show that Defendants are paying attention to refusals (the requirement that supervisory staff have conversations with people who are refusing frequently and the new refusal log) both fail to provide any additional assurance that refusals are reliably documented or that Defendants are addressing the extraordinary rate of refusals.

198.    In light of the totality of the evidence, the Court finds that a substantial number of the out-of-cell time "refusals" that are documented are not reliable evidence of authentic refusals, and the out-of-cell time that is being offered to incarcerated people should be assumed to be limited to the time that is documented as actually occurring.

199.    The Court finds that Defendants do not provide adequate out-of-cell time in ADCRR's solitary confinement units, even according to Defendants' own policies. The Court further finds that the failure to provide adequate out-of-cell time unreasonably

subjects Isolation Subclass members to a substantial risk of serious harm, and deprives them of the minimal civilized measure of life's necessities.

### 3.  Inadequate Nutrition in ADCRR Isolation Units

200.  People in ADCRR's isolation units consistently report that they are not provided adequate food. They receive a "mega sack", containing what is supposed to serve as both breakfast and lunch, at three or four in the morning, and dinner at around three in the afternoon. Stickley TT at 2042:19-22, 2051:19-2052:3; Van Winkle TT at 2719:4-7; Horn WT, Doc. 4130 ¶ 259. This is not consistent with general industry practice of providing incarcerated people three meals a day, including two hot meals, at regular mealtimes. Horn WT, Doc. 4130 ¶ 259.

201.  Incarcerated people consistently report that the food is insufficient and they remain hungry most of the time. Haney WT, Doc. 4120 ¶ 104; Horn WT, Doc. 4130 ¶ 259.

202.  Mr. Muhammad testified that he often has not had enough to eat, describing the meals in maximum custody as two meals per day, a sack breakfast and lunch consisting generally of three sandwiches and a cereal, and dinner "small tray with small portions" (with the exception of the inpatient unit at Phoenix). Muhammad TT at 903:9-24. He testified that he was unable to afford to buy food from the commissary to supplement his meals because he was being charged $4 for each Health Needs Request he submitted seeking mental health care and physical health care, reporting "all my money was going to me trying to get mental health help and medical help." *Id.* at 903:25-904:4. He also testified that he didn't get enough to eat on mental health watch, and that the meals consisted of pre-made sandwiches. *Id.* at 927:23-928:15.

203.  Additionally, meal delivery and documentation in detention units is inconsistent. Deputy Warden Stickley admitted that, according to ADCRR documentation, in detention at SMU I, there are many days when people do not receive dinner. Stickley TT at 2053:14-2066:6.

204.  In some Detention Units, some weeks, the Detention Records indicate that ADCRR is not providing adequate food to people in detention. Horn WT, Doc. 4130 ¶ 188; Exs. 1694-1697, 1699. Many detention records reflect that the person was not provided dinner. Horn WT, Doc. 4130 ¶ 193 (at SMU-I, approximately 1/5 of the Detention Records reviewed reflected the person was not given dinner on 4 days during the week)), ¶ 202 (at Yuma Cheyenne Detention, approximately half of the records reviewed show the person received two or fewer meals on multiple days), ¶ 205 (at Lewis Morey Detention in July 2021, most of the records reviewed showed three days when the person received just two meals, a few people had a day with just one meal, and one person had a day with no meals, a day with one meal, and two days with two meals), ¶ 212 (at Lewis Morey Detention in September 2021, the majority of people had four days during the week when they received just one meal, about a third of the people had three days when they received only one meal, and a few people had two days when they received only one meal), ¶ 216 (at Lewis Bachman Detention in July 2021, most of the record reviewed reflected few meals, including 25 of the records reflecting just 10-12 meals during the week, and the rest reflecting fewer than that, including one that reflects one meal during the week, and another reflecting just two meals), ¶ 220 (at Lewis Bachman Detention in September 2021, all the records reviewed reflected just one day where all three meals were provided; most reflect four days with just one meal and two days with no meals, a few reflect three days on which no meal was provided, and a fifth reflect one day when no meals were provided). The Individual Inmate Detention Records from the weeks of 2021 that were produced in this matter clearly show that many people in Detention Units do not receive three meals a day, even counting the "mega sack" as two meals:[36]

---

[36] The information below does not identify people receiving three meals in a day. Further, a single person may fall into multiple categories of missed meals. For example, during the week of August 16, 2021, several people at Lewis Morey each had one day with no meals and three days with one meal. Ex. 1697 at ADCRR00188078-188086.

a.     Lewis Morey (Ex. 1697):

- Week of February 8, 2021: of the 85 people in detention the entire week, 33 had three days without a meal, 52 had two days without a meal, 8 had two days with one meal, 57 had one day with one meal, 22 had two days with two meals, and 20 had one day with two meals (ADCRR00186706-186874)

- Week of July 12, 2021: of the 57 people in detention the entire week, 1 had one day without a meal, 3 had one day with one meal, 53 had three days with two meals, and 4 had two days with two meals (ADCRR00187702-187820)

- Week of August 16, 2021: of the 61 people in detention the entire week, 30 had one day without a meal, 11 had four days with just one meal, 26 had three days with one meal, 22 had two days with one meal, 1 had one day with one meal, 2 had two days with two meals, 30 had one day with two meals (ADCRR00188078-188206)

- Week of September 13, 2021: of the 79 people in detention the entire week, 25 had one day without a meal, 41 had four days with one meal, 18 had three days with one meal, 3 had two days with one meal, 5 had three days with two meals, 31 had two days with two meals, and 26 had one day with two meals (ADCRR00188208-188364)

b.     Lewis Bachman (Ex. 1697):

- Week of February 15, 2021: of the 73 people in detention the entire week, 26 had one day without a meal, 15 had three days with one meal, 48 had two days with one meal, 10 had one day with one meal, 28 had four days with two meals, and 45 had three days with two meals (ADCRR00186878-187029)

- Week of July 5, 2021: of the 18 people in detention the entire week, 1 had three days without a meal, 17 had 2 days without a meal, 4 had three days with one meal, 13 had two days with one meal, 1 had one day with one meal, 14 had three days with two meals, and 4 had two days with two meals (ADCRR00187822-187864)

- Week of July 12, 2021: of the 47 people in detention the entire week, 30 had 2 days without a meal, 17 had one day without a meal, 13 had three days with one meal, 30 had two days with one meal, 4 had one day with one meal, 20 had three days with two meals, 14 had two days with two meals, and 13 had one day with two meals (ADCRR00187866-187964)

- Week of September 6, 2021: of the 60 people in detention the entire week, all 60 had two days without a meal, 1 had three days with one meal, 59 had two days with one meal, 58 had three days with two meals, 1 had two days with two meals, and 1 had one day with two meals (ADCRR00188367-188495)

1        c.     Perryville Lumley (Ex. 1699):

- Week of February 15, 2021: of the 9 people in detention the entire week, 3 had no meals at all on two days, 6 had no meals on one day (ADCRR00189490-189514)

- Week of August 9, 2021: of the 7 people in detention the entire week, 1 had no meals at all on two days, 6 had no meals on one day (ADCRR00189432-189458)

- Week of August 16, 2021: of the 10 people in detention the entire week, 1 had no meals at all on three days, 6 had no meals on two days, and 3 had no meals on one day (ADCRR00189460-189488)

d.     Florence Kasson (Ex. 1696):

- Week of February 8, 2021: of the 38 people in detention the entire week, all 38 had one day with only one meal, 3 also had one day with two meals (ADCRR00186282-186364)

- Week of February 15, 2021: of the 49 people in detention the entire week, 5 had two days with only one meal, 29 had one day with only one meal, 30 had 2 days with two meals, and 19 had one day with two meals (ADCRR00186366-186468)

- Week of July 5, 2021: of the 19 people in detention the entire week, 1 had 3 days with no meals, 17 had two days with no meals, 1 had one day with one meal, 18 had one day with one meal, 19 had one day with two meals (ADCRR00186472-186518)

- Week of July 12, 2021: of the 12 people in detention the entire week, all 12 had one day with no meals, two days with one meal, and one day with 2 meals (ADCRR00186472-186518)

e.     Eyman SMU I (Ex. 1694):

- Week of February 15, 2021: of the 125 people in detention the entire week, 1 had five days with two meals, 25 had four days with two meals, 36 had two days with two meals, and 63 had one day with two meals (ADCRR00183335-183585)

- Week of August 16, 2021: of the 151 people in detention the entire week, 1 had two days with two meals, 18 had one day with 2 meals (ADCRR00184327-184638)

- Week of September 13, 2021: of the 154 people in detention the entire week, 10 had one day with only one meal, and 3 had one day with two meals (ADCRR00184639-184955)

f.     Yuma Dakota (Ex. 1700)

- Week of August 9, 2021: of the 30 people in detention the entire week, 25 had two days with two meals, 5 had one day with two meals (ADCRR00195049-195133)

- Week of August 16, 2021: of the 26 people in detention the entire week, 24 had one day with only one meal, 2 had two days with two meals, 24 had one day with two meals, 5 had one day with two meals (ADCRR00195147-195249)

- Week of September 6, 2021: of the 42 people in detention the entire week, 1 had one day with only one meal, 2 had six days with two meals, 27 had five days with two meals, 12 had four days with two meals, 1 had three days with two meals (ADCRR00195251-195307)

g. Yuma Cheyenne (Ex. 1700):

- Week of July 5, 2021: of the 33 people in detention the entire week, 4 had one day with one meal, 4 had three days with two meals, 27 had 2 days with 2 meals, 2 had one day with two meals (*see* n.[37])

- Week of August 9, 2021: of the 43 people in detention the entire week, 1 had one day with one meal, 2 had three days with two meals, 41 had two days with two meals (*see* n.[38])

- Week of August 16, 2021: of the 34 people in detention the entire week, all 34 had two days with two meals (*see* n.[39])

- Week of September 6, 2021: of the 25 people in detention the entire week, all 25 had two days with two meals (see n.[40])

- Week of September 13, 2021: of the 33 people in detention the entire week, 1 had one day with one meal, 32 had two days with two meals, and 1 had one day with two meals (*see* n.[41])

---

[37] At ASPC-Yuma Cheyenne, the weeks were produced interspersed with each other. For this unit, for legibility, the Bates Numbers are provided in footnotes. For Yuma Cheyenne, the week of July 5, 2021, the relevant Bates Numbers are: ADCRR00193136, 193144, 193150, 193154, 193158, 193162, 193166, 193170, 193174, 193178, 193182, 193788, 193790, 193800, 193804, 193808, 193812, 193816, 193820, 193824, 193828, 193832, 193836, 194286, 194290, 194294, 194298, 194304, 194308, 194314, 194324, 194326, 195041.

[38] ADCRR00193030, 193034, 193038, 193046, 193052, 193056, 193060, 193066, 193070, 193074, 193080, 193690, 193694, 193698, 193702, 193706, 193710, 193714, 193718, 193722, 193726, 193730, 193734, 193738, 194234, 194238, 194242, 194250, 194254, 194258, 194262, 194266, 194270, 194278, 194282, 194602, 194606, 194610, 195099, 195105, 195119, 195123, 195131.

[39] ADCRR00193032, 193036, 193040, 193044, 193048, 193050, 193054, 193062, 193064, 193068, 193072, 193076, 193078, 193692, 193700, 193708, 193712, 193720, 193732, 194244, 194248, 194260, 194264, 194268, 194272, 194276, 194280, 194600, 194604, 194608, 195215, 195229, 195235, 195247.

[40] ADCRR00193186, 193190, 193192, 193196, 193210, 193216, 193234, 193844, 193852, 193854, 193858, 193862, 193866, 193874, 193878, 193882, 193886, 194330, 194338, 194364, 194368, 194372, 194374, 194378, 195258.

[41] ADCRR00192286, 193188, 193194, 193198, 193200, 193204, 193208, 193212, 193214, 193224, 193228, 193840, 193842, 193850, 193856, 193860, 193864, 193868, 193872, 193876, 193880, 193888, 194084, 194332, 194336, 194340, 194344, 194348, 194354, 194362, 194370, 194376, 194380.

-79-

*See also*, Van Winkle TT at 2850:20-2854:19; Coleman TT at 2116:23-2117:12, 2118:2-14, 21-23, and 2122:20-23.

205.   The Court finds that Defendants do not provide adequate nutrition to the people housed in ADCRR's solitary confinement units, even according to Defendants' own policies. The Court further finds that the failure to provide adequate nutrition unreasonably subjects Isolation Subclass members to a substantial risk of serious harm, and deprives them of the minimal civilized measure of life's necessities.

### 4.   Defendants Do Not Adequately Supervise People in Isolation Units, Placing Them at Risk

206.   Lewis Rast, Eyman Browning, and Eyman SMU I are all designed in a linear fashion, which means that all the cell doors facing a single hallway on a top and bottom tier, as shown below:



Photograph of a solitary confinement pod at ASPC-Eyman SMU I

Horn WT, Doc. 4130-8 at ADCRR00158661.

155617523.3

207. The linear design of Lewis-Rast, Eyman-Browning, and Eyman-SMU I maximum custody units dramatically limits visibility into the cells from the control room, as shown in the photo below:



Photograph of view from a control room at ASPC-Eyman SMU I

Horn WT, Doc. 4130-9 at ADCRR00158689; Horn TT at 1350:5-1351:13, 1352:8-18, 1355:1-20, 1456:21-1457:19.

208. There are no call buttons in these cells. *Id.* at 1456:21-1457:19. Without being able to see into the cells from a control position, custody staff cannot know if a person in one of the cells is having a medical emergency. *Id.* at 1456:21-1457:19. A linear design magnifies the importance of regular security checks by officers on the floor. *Id.* at 1547:3-9. Similarly, no call buttons in cells increases the importance of floor officers' security checks. *Id.* at 1547:10-13

209. Security checks are important for many reasons: to make sure the incarcerated people have not escaped, to make sure they are not experiencing a medical emergency such as a heart attack, to make sure they are not in distress or attempting suicide, to make sure they are not fighting with their cellmate, if they are double-celled. It

155617523.3

is important to lay eyes on people sufficiently frequently that, if intervention is needed, it comes quickly enough to be effective. Horn TT at 1451:15-1452:23. In doing these checks, "you've got to see signs of life". *Id*. The practice throughout the country, and required under ACA standards, is that security checks should be done twice an hour. *Id*. at 1453:3-13.

210.    ADCRR policy states that security checks can be as infrequent as every 59 minutes. Horn TT at 1453:22-24; Ex. 1742 at ADCRR00220841; Ex. 1734 at ADCRR00220640; Ex. 1736 at ADCRR00220673; Ex. 1740 at ADCRR00220708. In the past, security checks were supposed to be done every 30 minutes, consistent with national standards. Stickley TT at 2021:7-19. However, because the existing correctional staff could not complete them every 30 minutes, the policy was changed to halve the number of security checks. *Id*. at 2021:4-2022:6. Director Shinn testified that he did not know how often security checks are required in ADCRR, although he recognized their importance. Shinn TT at 2218:25-2219:5, 2220:25-2221:7. Incarcerated people in ADCRR reported that these checks occur much more infrequently than every hour. Horn WT, Doc. 4130 ¶ 274.

211.    Policy requires that the beginning and ending of security checks be recorded in the Correctional Service Logs, though many of the logs do not include this information. Ex. 1742 at ADCRR00220844; Ex. 1734 at ADCRR00220642; Ex. 1740 at ADCRR00220706. Policy further provides an exception to this requirement "[i]n instances of extreme staffing shortages where housing units are being supervised by one staff member," rather than one staff member per cluster as required by policy. Ex. 1740 at ADCRR00220727; Ex. 1734 at ADCRR00220644; Ex. 1736 at ADCRR00220686. In these instances, the control room officer can record simply that a cluster or clusters were checked, the name of the officer conducting the check, and that all is secure. Ex. 1740 at ADCRR00220727; Ex. 1734 at ADCRR00220644; Ex. 1736 at ADCRR00220686. The Correctional Service Logs show that when officers do make "security checks" these are perfunctory and do not afford the officer time to look into each cell (especially those

-82-

covered in plexiglass) to determine the actual welfare of each incarcerated person. Horn WT, Doc. 4130 ¶ 271.

212.    Many of the log forms show that officers spent only a minute on each pod.[42] Horn WT, Doc. 4130 ¶ 271. Mr. Horn testified that the pattern was sufficiently repetitive to conclude, based on his experience, that it is a common practice. *Id.* For example:

- On July 6, 2019, at Browning Unit officers made their security checks on some pods in a minute or less
- Similarly, on July 12, 2019, security checks at Browning Unit were conducted in a minute on several pods
- On July 17, 2020, the same pattern of checks of entire pods in about a minute appears in the log for "A" pod and at Browning in 4 Baker on February 8, 2020
- The same is true in SMU 1 on July 10, 2021, in 3 Clusters A and D.

Horn WT, Doc. 4130 ¶ 271; *see also, e.g.*, Ex. 1292 at ADCRR00128868, ADCRR00128882, ADCRR00128895-128897, ADCRR00128914, ADCRR00130068, ADCRR00130071-130076, ADCRR00130078-130080, ADCRR00130084-130087.

213.    Further, it is difficult to see into many of the cells, particularly those with plexiglass over the cell front. Horn WT, Doc. 4130 ¶ 272. It is not possible to do such a check in one minute per pod, and probably not possible to do it in two minutes. Horn TT at 1453:25-1454:16.

214.    Doing security checks once an hour is insufficient. Horn TT at 1453:14-15. Doing security checks just once an hour puts the public and the incarcerated population at risk. Horn TT at 1455:6-8. Moreover, the failure to do effective security checks puts the public and the incarcerated people at risk. Horn TT at 1454:17-1455:5.

215.    Defendants also fail to adequately staff control rooms. A control room officer is a life safety and security support function. The person in the control room can see if there is an officer on the floor who gets into trouble, can open the doors to release people from their cells in case of fire or smoke emergency. Horn TT at 1455:10-1456:13;

---

[42] At Eyman-SMU I, the pods each have two tiers of four cells apiece. Stickley TT at 2082:16-19.

155617523.3

1  Scott TT at 691:22-25. A person who is in the control room for one maximum custody

2  cluster cannot see into any other cluster. Scott TT at 1112:24-1113:1; Stickley TT at

3  2030:18-19. But the evidence showed ADCRR has serious custodial staffing shortages.

4  As a result, one control room officer at Eyman may be overseeing two, three, four, or even

5  as many as six control rooms at a time. Scott TT at 1112:19-23, 1182:3-21; *see also id*. at

6  ADCRR00130076-130077 (one control room officer covering four clusters overnight July

7  10-11, 2021), ADCRR00130169-130173 (one control room officer covering four clusters

8  overnight July 15-16, 2021); Ex. 1295 at ADCRR00131611-131614 (one control room

9  officer covering two clusters).

10      216.   At SMU I, during the AM shift on July 14, 2021, one officer was staffing

11  the control rooms of four clusters, and three floor officers were working the same four

12  clusters. Stickley TT at 2024:3-2029:5. The security checks were done in about one

13  minute per pod, with approximately one minute between the times of security checks at

14  one end of the hall and security checks at the other end of the hall. *Id.* at 2024:3-2030:1,

15  2031:3-6. Several hours into the shift, the control room officer was replaced, after which

16  the single new officer also staffed the control room for all four clusters for the remainder

17  of the shift. Ex. 1293 at ADCRR00130151-130160.

18      217.   Similarly, many of the Information Reports regarding cancellations of out-

19  of-cell time indicate that a single control room officer is staffing an entire wing:

20

**Summary**

Summary

Shift started 34 down with 3 supervisors posted and 3 support staff posted. Cross leveled 1 to Rynning. Outside recreation cancelled. 1 B/C running normally. 1 A/D locked down, only 1 floor officer. Wing 2 locked down, only 1 control room. Wing 3 locked down, only 1 control room. Wing 4 locked down, only 1 control room. Only 1 yard officer. Will evaluate staffing levels again after Yuma staff arrives around 1000 hours. At 1000 got 5 over time staff, relieved a property officer to work property until they leave at 1400, have 2 control rooms on all 4 wings now and a 1 Dog floor officer. Showers will be offered to the inmates and pod time in wing 2.

24  Ex. 1297 at ADCRR00053817.

-84-

Summary

On 6/21/2020 at 0630 hours, SMU I started at 37 down. Eyman Complex advised that SMU I would be sending 3 cross levels .Outside recreation for Wing 2 (Able, Baker, Charlie or Dog) Pods 1-6, 1-Dog and Pod time for Close Custody was cancelled due to proper CDC guidelines. Inside recreation and showers were cancelled due to staffing. 2 medical lines are running. Shift started 40 down with a supervisor and a support service staff member posted, got to 38 down. Wings 2,3 and 4 only have 1 control room, and we are short 4 floor officers.

Ex. 1297 at ADCRR00053905.

Summary

Shift is 36 down with 4 cross leveled out and 2 support services staff posted. Shift starting with just 2 supervisors. Outside rec cancelled, inside rec and showers cancelled due to only 1 control room per wing, and wing 4 only has 3 floor officers. Losing 3 staff at 1400 to put shift 39 down. Health unit has 6 lines running.

Ex. 1297 at ADCRR00053950. Numerous Correctional Service Logs floor officers covering more than one housing cluster.[43] *See, e.g.*, Ex. 1292 at ADCRR00128868-128869 (one floor officer, one control room officer covering two clusters throughout a 12-hour day shift on July 10, 2021), ADCRR00128895-128899 (one floor officer, one control room officer covering two clusters throughout a 12-hour night shift on July 10-11, 2021), ADCRR00128913-128916 (one control room officer and, for at least half of the shift, one floor officer, covering two clusters throughout a 12-hour day shift on July 11, 2021); Ex. 1293 at ADCRR00130070-130072 (one control room officer and one floor officer covering two clusters), ADCRR00130169-130173 (one control room officer and three floor officers covering four clusters).

218. Thus, in addition to the cancellations of out-of-cell time, the long-term and severe shortage of correctional staff means that people housed in solitary confinement are not adequately supervised, putting them at risk that medical emergencies, suicide attempts, or fights will not be detected quickly enough to address them effectively.

219. The Court finds that Defendants do not adequately supervise the people housed in ADCRR's solitary confinement units, even according to Defendants' own policies. The Court further finds that the failure to adequately supervise people in solitary confinement units unreasonably subjects Isolation Subclass members to a substantial risk

---

[43] In some instances, staff changes during the shift, but does not result in a different number of people staffing posts.

of serious harm or even death, and deprives them of the minimal civilized measure of life's necessities.

### 5. Inappropriate Uses of Force on Mentally Ill People Engaging in Self-Harm

220. As detailed in ¶¶ 552-583, *infra*, Defendants fail to provide adequate mental health care to incarcerated people who are self-harming, expressing suicidality, or are experiencing other mental health crises.

221. Defendants have a practice of using force, generally pepper spray or pepperball guns, on people who are in a mental health crisis engaging in self-harm, people on mental health watch, and people on psychotropic medications, a practice that is expressly permitted by ADCRR policy.[44] Haney WT, Doc. 4120 ¶ 73. ADCRR does not track the amount of pepper spray used at any facility or by any officer. Shinn TT at 2224:14-2225:3. It also does not in any way track the use of pepper spray on people on mental health watch. Shinn TT at 2225:20-23.

222. As explained by Isolation Subclass Member Rahim Muhammad, being pepper sprayed is "painful, suffocating, like your lungs cringe. You can't breathe, and your face is on fire. Your whole body's on fire and it drips down your body into your private parts, and they burn." Muhammad TT at 929:12-17. He testified that he was pepper sprayed 48 times while on mental health watch between August 2020 and November 2021, due to self-harm attempts. *Id.* at 928:16-25. He reports that he self-harms in response to command auditory hallucinations telling him to do so. *Id.* at 929:1-2, 932:8-9, 15-17.

223. In addition to the pain caused by pepper spray, it is dangerous. People can die from being exposed to it. Penn TT at 3235:12-3236:4.

224. Dr. Stewart testified regarding the Defendants' practices related to uses of force on mentally ill patients, especially those who are on watch status, based upon his

---

[44] Pepper spray is also known as oleoresin capsicum spray, or OC spray.

clinical reviews and write-ups of multiple patients' files, interviews with incarcerated people, reviewing Defendants' documents regarding uses of force, and watching videos of uses of force. Stewart WT, Doc. 4109 ¶¶ 176-199; Stewart TT at 510:24-518:20. In his professional opinion, "it's abundantly clear that the use of OC spray is not an appropriate psychiatric intervention for an acutely mentally ill individual." Stewart TT at 516:4-9. While there may be "certain cases … where a person is in an acute situation, say making a noose or something in their cell and hanging, and the officer would have to spray them briefly to prevent them from self-harm," that instead "it is standard practice in correctional settings that I'm familiar with that prior to the use of a chemical agent," that

> if a patient is not complying with staff orders, first thing you do is call in a mental health person to try to address the needs of the person because it's often due to improperly treated mental illness. And I find if that is done, then it can significantly decrease the use of chemical agents.

Stewart TT at 511:3-6, 511:20-512:4. But in the videos Dr. Stewart reviewed, rather than contacting a "mental health provider to come talk to the individual before the chemical spray was used, the chemical spray was used first." *Id*. at 511:10-12.[45]

225. Dr. Stewart testified at length about his opinion as a psychiatrist and medical doctor who works in a correctional facility regarding the documented repeated uses of force against Mr. Muhammad. Dr. Stewart had planned to interview Mr. Muhammad during his visit to the Phoenix facility on September 23, 2021, because he had appeared dozens of times on Defendants' self-harm and suicide watch logs for the summer 2021 months, as well as on use-of-force logs during the summer, but upon arrival to Phoenix Dr. Stewart was told that Mr. Muhammad had been transferred to a different

---

[45] The Court finds that the opinions expressed by Defendants' expert Dr. Penn regarding the use of pepper spray and pepperball guns are not credible, as Dr. Penn's opinions on ADCRR's use of OC spray, set forth at paragraph 235 of his written testimony, are based solely upon his review of review of policies and procedures, and discussion with ADCRR and Centurion staff. Dr. Penn did not observe any training of correctional staff on use of force; he did not observe any training of health care staff on use of force; he did not review any training materials on use of force; he did not review any use-of-force packets; and he did not review any videos depicting use of force. Penn WT, Doc. 4172 ¶ 235; Penn TT at 3236:20-3238:11.

facility just hours earlier that very same morning. Stewart WT, Doc. 4109 ¶ 181. Mr. Muhammad was on mental health watch at the time of this transfer. Muhammad TT at 910:3-7. Dr. Stewart noted that Mr. Muhammad has been diagnosed with several serious mental illnesses, including schizophrenia and schizoaffective disorder. Stewart WT, Doc. 4109 ¶ 181.

226. Dr. Stewart watched videos of the December 16, 2020 and December 17, 2020 uses of force on Mr. Muhammad (Exs. 1049, 1055), which were also shown to the Court on November 4, 2021. Stewart WT, Doc. 4109 ¶ 182. Dr. Stewart noted that as a threshold matter, as of December 16, 2020, Mr. Muhammad had been continuously on watch since December 5, due to psychotic thoughts and voices telling him that he needed to hurt himself, yet his medical record shows that he had not yet been seen by a psychiatric provider about an adjustment of his medications to address the auditory command hallucinations, and he did not see a psychiatric provider until December 18, 2020. *Id.*

227. In the first video, Mr. Muhammad was clearly psychotic, and "his thoughts and actions were not based in reality." Stewart TT at 512:11-12. In the second video, "[h]e's responding to his psychotic delusions, banging his head against the cell wall." *Id.* at 513:4-6. In the second video of December 17, 2020, a custody officer argues with Mr. Muhammad after he was shot at close range by a pepperball gun, asserting that he is "choosing" to bang his head, that his actions were "behavioral," and that in the future the officer would ensure that Mr. Muhammad would be shot with the pepperball, or tased. The officer also tells Mr. Muhammad that he will not be transferred to Phoenix-Baker Unit's inpatient mental health unit. He was not taken to a shower and washed down until more than ten minutes after he was shot. Stewart WT, Doc. 4109 ¶ 188; Stewart TT at 513:4-13; Ex. 1055.

//

//

//

-88-



(Dec. 17, 2020 video, ADCRR00159245 at 0:00:59) – Stewart WT, Doc. 4109 ¶ 186; Ex. 1055.



(Dec. 17, 2020 video, ADCRR00159245 at 11:39, 11:53) – Stewart WT, Doc. 4109 ¶ 188; Ex. 1055.

228.   Dr. Stewart testified that, in his opinion,

> The treatment shown in these videos falls below the standard of care for several reasons. First is the apparent failure to involve mental health staff prior to using force on this patient with serious mental illness. These uses of force were apparently planned sufficiently in advance that they could be

155617523.3

video recorded; it is unclear why mental health staff were not asked to engage with Mr. Muhammad in an attempt to avoid using force. Unless an emergency requires immediate use of force, mental health staff should always be called and attempt to de-escalate the situation before force is used on a self-harming patient. Second, it is unclear why Mr. Muhammad was not immediately decontaminated following the December 16, 2020 use of force. Pepper spray in the eyes and nose can cause excruciating pain, and the failure to immediately decontaminate him, after he had ceased banging his head and was restrained, resulted in needless suffering. Third, it was highly inappropriate for a custody officer to argue with him after the December 17 use of force, and to threaten him with further use of force. Needless to say, a custody officer is not qualified to diagnose the patient, and determine that his self-harm is "behavioral" or a "choice," or decide whether he would be transferred to a mental health unit. It would have been appropriate for a mental health staff person (not a custody officer) to counsel Mr. Muhammad after the use of force, but it appears no mental health staff were present. Finally, it is very concerning that he was self-harming, and was subjected to the use of force, virtually every day for an entire week before he received any attention from a psychiatric provider. He had command hallucinations telling him to harm himself in order to save his daughter. This is a textbook case of severe psychosis requiring immediate administration of antipsychotic medication, to address the voices causing the self-harm. After emergency intervention and administration of antipsychotic medications to stop immediate command hallucinations, a psychiatric provider should have followed up very soon thereafter to re-evaluate his medication regimen.

Stewart WT, Doc. 4109 ¶ 189; *see also* Stewart TT at 513:14-23.

229. Dr. Stewart concluded that the uses of force and the mental health care (or lack thereof) that Mr. Muhammad received during this time period "falls far below the standard of care." Stewart WT, Doc. 4109 ¶ 190; *see also* Haney WT, Doc. 4120 ¶¶ 74-75.

230. Although Mr. Muhammad was on mental health watch at the time these videos were taken, in most of the videos there is no evidence that any mental health staff came to talk with him, despite his extensive mental health history, his placement on mental health watch, his unresponsiveness, apparent distress, and self-harming behavior. In one video in which a person who appears to be a mental health staff member does

1    arrive at Mr. Muhammad's cell, she leaves after twenty-two seconds. Haney WT,

2    Doc. 4120 ¶ 76.

3        231.    Throughout these videos, Mr. Muhammad is obviously in need of basic

4    mental health care to alleviate his distress, address his mental health symptoms, and de-

5    escalate a deteriorating situation. Instead, he is shot with pepper spray and a pepperball

6    gun in response to self-harm consisting of banging his head on his cell. Haney WT,

7    Doc. 4120 ¶ 77; *see also* Ex. 1049 (pepper spray); Ex. 1055 (pepperball gun); Exs. 4022,

8    4024, 4026, 4030, 4032, 4036, 4038, 4040, 4044, 4054.

9        232.    One post-use of force video shows Mr. Muhammad sitting with pepper

10   spray running down his back and chest, clearly still responding to some kind of internal

11   stimuli after the incident. Ex. 1105; Muhammad TT at 931:3-10. Of the incident when he

12   was shot with a pepperball gun, Mr. Muhammad testified that he was "hearing voices and

13   seeing things" at the time he was self-harming, and that "[correctional staff] wanted me to

14   stop self-harming. They thought maybe pepperballs would help. I don't know. They

15   weren't giving me no psychological evaluations." Muhammad TT at 932:4-7. He reported

16   that being shot with pepperballs is "agonizing." *Id.* at 932:12-14. Additionally, he has not

17   always been provided a decontamination shower after being pepper sprayed: "When I

18   want to take a shower after they spray me, they don't want to give me a shower. They

19   want to keep the mace on me to teach me a lesson." *Id.* at 926:11-15.

20       233.    Custody staff assigned to facilities or units designated for profoundly

21   mentally ill prisoners "must receive specialized training above and beyond whatever is

22   given to all officers, about how to interact with people with mental illness or

23   developmental disabilities." Stewart WT, Doc. 4109 ¶ 199. Dr. Stefanie Platt, whose job

24   as Centurion's Regional Mental Health Director prior to her resignation in July 2021

25   required her to assess the training needs of staff, also testified that specialized training

26   above and beyond the routine training given to all officers was necessary for custody staff

27   who interacted with people with mental illness and developmental disabilities. Trial

28   Testimony of Stephanie Platt ("Platt TT") at 1034:6-9, 1040:24-1041:7. But to her

knowledge, there is no such specialized training provided to the ADCRR correctional staff assigned to work with the mentally ill. Platt TT at 1061:15-24; *see also id.* at 1039:4-22, 1040:17-1041:2, 1091:19-1092:2.

234. Lack of appropriate training of custody staff was evident to Mr. Horn, who reviewed multiple videos of use of force. Mr. Horn opined that the officers and supervisors in those cases were ill-trained and ill-prepared to deal with the behaviors of incarcerated people, especially people with mental illness, other than through the use of chemical agents. Horn TT at 1421:14-24. While acknowledging it is important to intervene to stop self-harm, Mr. Horn also found in particular that the absence of any counseling or mental health staff prior to the use of force is concerning, especially when the person in question was apparently on a mental health watch. *Id.* at 1423:15-21, 1424:21-1425:14. Further, the use of the pepperball gun on Mr. Muhammad was an unnecessary escalation, (*id.* at 1425:15-16), and the custodial staff were not equipped to do anything but use force. *Id.* at 1424:14-16. Pepperball guns are a higher level of force than pepper spray; normal correctional practice is that they are used typically in situations such as disturbances or fights that involve multiple people, and not used on one person alone in a cell. Horn TT at 1427:13-1428:7.

235. According to Mr. Horn, if a person is actively about to kill himself and it can be stopped with OC or chemical agent spray, that may be the right thing to do. But based on Mr. Horn's decades in corrections, it did not appear that Mr. Muhammad was trying to kill himself. Horn TT at 1570:5-10.

236. Notably, although the purported concern about Mr. Muhammad hurting himself by banging his head was the justification given for repeatedly, routinely, pepper spraying him, he was not once, to the knowledge of Warden Van Winkle, ever sent offsite for stitches to his head, or to be checked by a neurologist for a possible concussion. Van Winkle TT at 2846:22-2848:17. Instead, custody officers just kept spraying him. *Id.* at 2737:23-2743:7.

155617523.3

237. As testified to by Mr. Horn, "someone should have stepped back and said: What are we doing with this guy? Why isn't there a better way to handle this fellow?" Horn TT at 1427:5-1429:6. If a person engages in self-harming behavior repeatedly, it is important to come up with a behavioral management plan, by working with mental health staff. Horn TT at 1570:5-10. But Warden Van Winkle testified that he thinks there is nothing wrong with a situation where, day after day, a person self-harms and the response, day after day, is the use of chemical agents. Van Winkle TT at 2844:23-2845:17.

238. When asked by the Court what he had done about Mr. Muhammad's ongoing self-harm, Warden Van Winkle asserted that Florence Kasson "didn't have him for a long period of time…We had him for maybe a month, month and a half, somewhere around in there. And then he was transferred to Phoenix complex." Van Winkle TT at 2858:1-2859:13.

239. The use of force packets, most of which were signed off by Warden Van Winkle, tell a different story. Mr. Muhammad was already at Florence Kasson in January 2021. Ex. 4002 at ADCRR00159727. While at Kasson, he was subjected to the use of force 22 times for self-harming between January 20, 2021 and July 13, 2021[46]—almost six months, much longer than the "month, month and a half" that Warden Van Winkle avowed to the court.[47] On all but two of these occasions, Mr. Muhammad was already on mental health watch at the time. *Id.*

---

[46] Ex. 4002 at ADCRR00159727-44, ADCRR00159745-56, ADCRR00159757-72, ADCRR00159773-83, ADCRR00159784-93, ADCRR00159794-803, ADCRR00159804-13, ADCRR00159814-26, ADCRR00159827-37, ADCRR00159838-46, ADCRR001597847-57, ADCRR00159858-66, ADCRR00159867-77, ADCRR00159878-91, ADCRR00159892-904, ADCRR00159905-17, ADCRR00159918-27, ADCRR00159928-37, ADCRR00159938-46, ADCRR00159947-56, ADCRR00159957-66, ADCRR00159967-82.

[47] It should be noted that Warden Van Winkle was Defendant Shinn's designee to sit in court and observe proceedings. He was present for the testimony of Dr. Stewart, Dr. Haney, Mr. Horn, and Mr. Muhammad regarding the uses of force against Mr. Muhammad, and saw the same videos as the Court. Accordingly, it is unconvincing for Defendants to contend that he should not have expected to be asked about these uses of force against Mr. Muhammad.

155617523.3

240.    All told, it took a year of Mr. Muhammad self-harming, and being sprayed or shot in response, for him to be transferred to a higher level of mental health care at the Phoenix complex. Horn WT, Doc. 4130 ¶¶ 294-314; Van Winkle TT at 2855:5-2858:9; Muhammad TT at 907:21-908:18.

241.    Another example of the excessive use of force purportedly in response to self-harm is the case of Isolation Subclass member R.L., who was the subject of 14 uses of force just during the month of July 2021 while housed at Florence Kasson's residential mental health program. Horn WT, Doc. 4130 ¶ 293. The reason given for these uses of force was to stop him from self-harming. *Id.* ¶ 293. But a review of the videos demonstrates that Mr. L.'s conduct did not justify the use of force. Horn TT at 1431:22-1434:5; Exs. 4084, 4098, 4100, 4108. Mr. L., while on mental health watch, kicked the plexiglass front of his cell with the sole of his foot. Exs. 4084, 4098, 4100, 4108. Custody staff repeatedly pepper-sprayed him in response. Exs. 4084, 4098, 4100, 4108. There was no real risk of self-harm from his kicking the cell door with the sole of his foot, and thus no justification for the uses of force. Horn TT at 1431:22-1434:5. Moreover, most of the uses of force against the Mr. L. did not comply with ADCRR rules and regulations. *Id.* at 1434:9-24.

242.    Mr. L. was ultimately transferred from Kasson to a higher level of mental health care at the Phoenix inpatient complex. Van Winkle TT at 2845:21-2846:21. Warden Van Winkle did not know how many times Mr. L. was sprayed with pepper spray prior to his transfer. Van Winkle TT at 2845:21-2846:21.

243.    Despite the lack of justification and the failure to comply with ADCRR rules and regulations, Warden Van Winkle testified that he thought that all of the uses of force on Mr. L., like all of those on Mr. Muhammad, were appropriate. Van Winkle TT at 2735:18-2743:7.

244.    The Court finds that Defendants improperly and unjustifiably use force on people, including seriously mentally ill people, purportedly to prevent self-harm, sometimes in violation of Defendants' own policies. The Court further finds that these

uses of force unreasonably subject Isolation Subclass member to a substantial risk of serious harm or even death, and deprive them of the minimal civilized measure of life's necessities.

### G. ADCRR Policies Pertaining to Isolation

245. ADCRR has numerous policies relating to solitary confinement that are complex, convoluted, and difficult to understand. Horn TT at 1341:16-18. The complexity of these policies and procedures in turn makes them difficult for staff to follow. *Id*.

246. Relatedly, ADCRR has numerous statuses and categories that constitute solitary confinement. These include maximum custody, detention, close management, and mental health watch. The policies relating to each of these statuses is discussed below. However, whatever protections the policies may provide, written policies are irrelevant if they are not actually followed in practice. Haney TT at 1006:14-17.

#### 1. Department Order (DO) 801: Inmate Classification

247. Classification of incarcerated people, in general terms, is a process used to operate safe and secure prisons and jails by sorting incarcerated people according to vulnerability, escape risks, and the risks they pose to other people in the facility. It is a tool used to determine the least restrictive, least expensive way to incarcerate people. Horn TT at 1360:8-1361:7, 1362:15-1363:15.

248. The Classification policy for ADCRR is Department Order ("DO") 801. Ex. 1309, DO 801. ADCRR also has an "Objective Classification: Custody & Internal Risk Technical Manual" that sets out the classification process in detail. Ex. 1310, 801-TM-OPS. The ADCRR classification system is very complicated, dense, and difficult to follow. Horn TT at 1363:23-1364:6.

249. Classification includes two dimensions: custody level and internal risk level. Custody level refers to what sort of prison a person will be confined in, whereas internal risk relates to the types of work assignments or recreational activities the person can have within the prison. Horn TT at 1364: 1-1365:19.

250.    The ADCRR classification system takes the following factors into account when initially classifying people in ADCRR custody:

| Custody Criteria Factors – Initial Classification-Appendix |
| --- |
| 1. **Most Serious Current Offense** |
| 2. **Most Serious Prior/ Other offense** |
| 3. **Escape History (5 scoring levels)** |
| 4. **History Institutional Violence** |
| 5. **Gang Affiliation Status** |
| 6. **Current Age** |

Ex. 1310, 801-TM-OPS, § 801.04 and Appendix 3.

251.    At reclassification, in addition to these factors, "Major Program Completion" is considered. Ex. 1310, 801-TM-OPS, § 801.05 and Appendix 4. The same factors considered for the initial classification for custody level are considered for calculation of the internal risk. Ex. 1310, 801-TM-OPS, § 801.09 and Appendix 5.

252.    For custody level, a number of points is attached to each factor. Ex. 1310, 801-TM-OPS, §§ 801.04, 801.05 and Appendices 3-4; Shinn TT at 2207:3-6. The points are then totaled and translated to a scale from 1-5, where 1 is minimum custody and 5 is maximum custody. Horn TT at 1364:22-1365:5; Stickley TT at 1191:8-20; Ex. 1310, 801-TM-OPS, Appendices 3-4. The internal risk score is calculated the same way, though with a somewhat different 1-5 scale. Ex. 1310, 801-TM-OPS, Appendix 5. Prior offenses, escape history, and history of institutional violence are all subject to "aging," which means that as time passes since the particular incident, it counts for fewer points toward the classification score.[48] Ex. 1310, 801-TM-OPS, §§ 801.04.1.2a, 1.3, 1.4, 801.05.1.2a, 1.3, 1.4.

---

[48] For example, a disciplinary violation of the highest severity counts as 10 points toward the custody score during the first two years after it occurs. When nine years have passed, the same violation counts as 2 points toward the custody score. Ex. 1310, 801-TM-OPS § 801.04, Table 4.

1    253.   At the initial classification, a score of 38 or more points is a score indicating
2    Maximum Custody. Stickley TT at 1999: 5-7; Ex. 1310, 801-TM-OPS, Appendix 3. At
3    reclassification, the starting point for Maximum Custody is 62 points. Stickley TT at
4    2001:4-21; Ex. 1310, 801-TM-OPS, Appendix 4. An internal risk score of 49 or above is
5    considered an indicator of "Very High internal risk", generally requiring placement into
6    Maximum Custody. Stickley TT at 1999:18-23; Ex. 1310, 801-TM-OPS, Appendix 5.

7    254.   According to DO 801, Maximum Custody is for persons

> who represent the highest risk to the public and staff and
> require housing in a single cell or double cell environment.
> These inmates have limited work opportunities within the
> secure perimeter and require frequent monitoring. These
> inmates require controlled movement within the institution.
> This custody level does not apply to female inmates or
> juveniles adjudicated as adults.

Ex. 1309, DO 801 § 2.3.1; Horn WT, Doc. 4130 ¶ 36.

255.   Every classification system has some ability to override the classification
scores, because the range of human behavior cannot be captured completely in a
classification system. Horn TT at 1365:23-1366:3. The idea of an override is that there
may be some factor in the person's history that is not addressed by the classification
scheme but is nonetheless important. Horn TT at 1366:4-6. Typically, one would expect to
see between five and fifteen percent of classification decisions being the result of
overrides and, in a properly functioning system, about half of the overrides would be
overrides to a higher security level and half would be overrides to a lower security level.
Horn TT at 1366:16-24. Overrides should not be based on factors that are already taken
into account by the classification system, as that distorts the system by double-counting
the same conduct, resulting in over-classification. Horn TT at 1366:25-1367:10.

256.   ADCRR has lists of reasons for discretionary and non-discretionary
overrides. Ex. 1310, 801-TM-OPS, §§ 801.06 and Appendices 3-5.; Ex. 1309, DO 801
§§ 3.3, 5.0; Shinn TT at 2207:15-19. The ADCRR override system allows for, even
requires, double-counting, resulting in over-classification. For example, the severity of the
current offense and the prior offenses are part of the calculation of the custody level score.

Horn TT at 1367:23-1368:15. There is also a non-discretionary override to maximum custody for people serving the first two years of a life sentence. Shinn TT at 2207:20-2208:4. But life sentences are likely to be imposed because of the severity of the current offense and any prior offenses, thereby double-counting these factors. Horn TT at 1369:5-13. Also, escape risk is part of the custody level calculation, but it is one of the stated bases for overrides. *Id.* at 1369:14-23. Similarly, institutional risk, which is defined in part as an "extensive history of institutional violence", is a stated basis for overrides, but the history of institutional violence is one of the factors considered in calculating the custody level. *Id.* at 1369:14-23; Ex. 1310, 801-TM-OPS, § 801.06.1.2.4.1 and Appendices 3-4.

257. Additionally, the Classification Manual provides that a person can be placed into maximum custody if "[t]he nature of the criminal offense committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others, for example, serious assaults against law enforcement, participation in organized criminal activity." Horn WT, Doc. 4130 ¶ 43; *see also* Shinn TT at 2210:7-14.

258. The Classification Manual also allows placement in Maximum Custody at the request of a Warden, Deputy Warden, or designee. Horn WT, Doc. 4130 ¶ 43; Ex. 1310, 801-TM-OPS, § 801.11.1.2.

259. Additionally, all men sentenced to life in prison, including sentences of natural life and 25-to-life, who have served less than two years are automatically classified as maximum custody, regardless of their classification scores. Horn WT, Doc. 4130 ¶ 37; Ex. 1309, DO 801 § 3.3.3; Ex. 1310, 801-TM-OPS, Appendices 3-4.

260. Once an incarcerated person has been classified to Maximum Custody, that classification is not reviewed until six months after the initial decision and may not be changed earlier. If not changed at the six-month review, subsequent reviews occur only annually thereafter, or every six months if the person is placed in maximum custody through an override. Horn WT, Doc. 4130 ¶ 45; Ex. 1309, DO 801 § 10.9; Scott TT at 415:10-16. An incarcerated person may thus meet the requirements for transfer to a Close

-98-

Custody housing unit in accordance with the Maximum Custody Management policy (discussed below), but not be reclassified for several months, remaining in Maximum Custody simply by virtue of the timing provisions regarding reclassification set out in DO 801 §10.9. Horn WT, Doc. 4130 ¶¶ 46-47; Ex. 1309, DO 801 § 10.9.

### 2. DO 812: Inmate Maximum Custody Management and Incentive System

261. DO 812 is the policy that governs many conditions in maximum custody units. Ex. 1318. DO 812 creates a 3-step incentive system for people in maximum custody. According to DO 812:

> Maximum Custody Management is a system that requires inmates in Maximum Custody to work through a program, utilizing a step incentive system, providing the opportunity to participate in jobs, programs, and other out of cell activities. Based on behavior and programming, inmates may progress from controlled based housing to open privilege based housing where movement outside a cell is without restraint equipment.

Ex. 1318, DO 812 § 1.0.

262. There are several different categories of maximum custody in ADCRR: General Population; Security Threat Group ("STG"), STG Step-down, Restricted Status Housing Program, Enhanced Management, and the Behavioral Management Unit. *See generally* Ex. 1318, DO 812. All constitute solitary confinement. Horn WT, Doc. 4130 ¶ 77.

263. According to DO 812, each person classified to maximum custody must move through three steps to earn their way out of maximum custody. *See* Ex. 1318, DO 812 §§ 2.4, 4.2, 5.0, and Attachments B-F. In most ADCRR maximum custody housing units, a person must spend a minimum of 30 days at Step 1 and 30 days at Step 2. *See* Ex. 1318, DO 812, Attachments B, C. In certain housing units, the periods are longer: the "Restricted Status Housing Program" requires at least 60 days at Step 2, and the "Enhanced Management" unit requires a minimum of 90 days at both Step 1 and Step 2. Ex. 1318, DO 812, Attachments D, F; Scott TT at 413:3-7. DO 812 provides that a person in any maximum custody unit other than Restricted Status Housing Program and

-99-

Enhanced Management can be considered for reclassification to close custody after 30 days at Step 3.[49] Ex. 1318, DO 812 § 5.5; Scott TT at 414:20-415:9.

264. However, that consideration for reclassification, as discussed above, occurs on a pre-set schedule unrelated to the Step Program. Horn WT, Doc. 4130 ¶¶ 46-47; Ex. 1309, DO 801 § 10.9. If a person is at Step 3 for more than 30 days at the time of their classification review and is not reclassified to close custody, they must wait another year (or 180 days if they are in maximum custody on an override) before being considered for reclassification again. Scott TT at 415:25-416:9.

265. To advance through the Steps, incarcerated people must be cooperative and respectful, and to advance to Step 3, they must complete or actively participate in all programs in their program plan. Scott TT at 407:4-9, 412:4-8, 413:8-11. Their step level can be reduced for disciplinaries, a refusal to program, or "poor behavior." Scott TT at 407:10-18, 411:18-412:3, 413:12-414:1.

266. DO 812 provides that a person's continuing assignment to maximum custody is based not only on the nature and level of threat to the safe and orderly operation of the facility, but also "program participation, rule compliance and the recommendation of the person(s) assigned to conduct the classification review." Ex. 1318, DO 812, Attachment A. Although the "Guiding Principles – Restrictive Housing" set out in DO 812 mostly mirror the Guiding Principles created by ASCA, this is a difference from the ASCA principles that broadens the bases for keeping people in maximum custody. Horn WT, Doc. 4130 ¶¶ 49-50.

267. The amount of recreation and various other privileges for each housing unit is set out in the appendices to DO 812. The policy calls for three 2.5 hour blocks of recreation each week in specified locations.[50] In some locations, there are also monthly

---

[49] People who are approved to be removed from Restricted Status Housing Program or Enhanced Management remain in maximum custody. Scott TT at 417:9-21.

[50] DO 812 includes a matrix that sets out the privileges for people housed in the mental health maximum custody unit at Florence-Kasson, which had a slightly different requirement: three 3-hour blocks. Ex. 1318 at 18. However, Florence-Kasson has been closed. Van Winkle TT at 2669:17-25.

requirements for a recreation block in a larger enclosure for people at Step 2 or 3. Ex. 1309, DO 812, Attachments B, C.

268. Out-of-cell time for people in maximum custody is tracked on the Maximum Custody Out-of-Cell-Time Tracking Form, often referred to simply as the "Out-of-cell-time form". Stickley TT at 2032:5-11.

### 3. DO 804: Inmate Behavior Control

269. DO 804, entitled Inmate Behavior Control, governs detention. Ex. 1312, DO 804. People can be placed into detention for numerous reasons, including:

- to ensure safe, secure, and orderly operation of the facility,
- Pending completion of an investigation,
- While determining eligibility for protective custody,
- For observation status to identify, minimize, and intervene in the possibility of self-destructive behaviors,
- Pending institutional review and classification placement such as pending transfer to a higher custody level,
- Pending revocation of parole or some other form of release, and
- To fulfill disciplinary sanctions.[51]

Ex. 1312, DO 804, §1.1.1; Stickley TT at 2039:7-2040:2.

270. As explained by Deputy Warden Stickley, when correctional staff is concerned that a person may self-harm, but mental health does not put that person on a mental health watch, correctional staff may put the person into detention. Stickley TT at 2040:12-2041:9. The policy does not provide for placement into detention for "Refusal to House." Stickley TT at 2041:10-12.

271. DO 804 requires that "Meals, including Medical or Religious Diets, [be] served during the standard meal hours and in the same quality as in general population." Stickley TT at 2042:1-22; Ex. 1312, DO 804, § 1.2.3.

---

[51] Despite the policy stating that people can be placed into detention "to fulfill disciplinary sanctions", ADCRR claims not to have disciplinary detention. Stickley TT at 2040:1-4, 2041:16-25.

272.    DO 804 also requires that ADCRR provide a clean environment to people in detention, including the opportunity to shower and shave at least three days per week, laundry service comparable to the service provided for people in general population. Ex. 1312, DO 804, § 1.2.6. DO 804 also requires that people in detention are offered the opportunity to exercise outside the cell for a minimum of two hours on three different days each week. Ex. 1312, DO 804, § 1.2.6.5.

273.    Out-of-cell time is tracked for people in detention on Form 804-3, the Individual Inmate Detention Record, also referred to as simply the Inmate Detention Record or IDR. Policy requires that the Inmate Detention Record reflects acceptance or refusal of a scheduled meal, shower times and exercise times. Ex. 1312, DO 804, § 1.4.2; Stickley TT at 2043:9-2044:8.

### 4.    DO 813: Close Management

274.    DO 813 governs conditions in close management. Horn WT, Doc. 4130 ¶ 74; Ex. 1319. The conditions in close management are the same as those in detention, other than any differences identified in DO 813.

275.    Close management is "designed for inmates who [engage in certain behaviors] and are considered as management problems, unable to live in general population yet not requiring Maximum Custody placement" and people who have been in Maximum Custody, have been reclassified to close custody, but whom someone has, nonetheless "deemed to require further structured supervision." Horn WT, Doc. 4130 ¶ 74; Coleman TT at 2136:1-14; Ex. 1319 DO 813, § 1.1.

276.    People who are not classified as Maximum Custody can be placed into Close Management for engaging in conduct that is already accounted for in the classification process, including conduct related to attempting to escape, disciplinaries including possession of contraband. Ex. 1319, DO 813, §§ 1.1.2, 1.1.3; *see also* Ex. 1310, 801-Tm-OPS, Appendices 3 and 4.

277.    Policy provides for six hours per week of outdoor exercise in Close Management. Ex. 1319, DO 813, Attachment A.

278.    There are three "Phases" of Close Management, though there is nothing in the policy that explains what is required to advance from one phase to the next, other than the completion of programs. *See generally* Ex. 1319, DO 813, Attachment B. People in Close Management are required to complete certain programs, all of which are "self-study" or "workbooks" in Phases 1 and 2. *Id.*

279.    There is no set schedule of reviews for advancement, other than an initial review within 15 days of placement. Ex. 1319, DO 813, §§ 3.5, 3.6.

280.    There is no form for tracking out-of-cell time for people in Close Management and no policy requiring it be tracked. *See generally* Ex. 1319, DO 813.

### 5.    DO 807: Inmate Suicide Prevention, Mental Health Watches, and Progressive Mental Health Restraints

281.    Mental Health Watch is governed by DO 807, entitled Inmate Suicide Prevention, Mental Health Watches, and Progressive Mental Health Restraints. *See* Ex. 1315, DO 807 §§ 7 and 8. According to policy, people on a mental health watch are to have showers, telephone privileges, recreation, and visitation unless a licensed mental health professional determines such activities to be contraindicated. Ex. 1315, DO 807 § 7.6; Horn WT, Doc. 4130 ¶ 154. If such determination were made, it would be documented on the Mental Health Watch Order by changing the pre-printed section of the order that sets out a person's privileges. Scott TT at 684:10-685:6

282.    The activities of a person on watch, including out-of-cell time, is recorded on the Observation Record, Form 1101-16, which is kept at the front of the cell for each person on watch. Horn WT, Doc. 4130 ¶ 154; Ex. 1315, DO 807 § 3.1.2. Mr. Horn testified that none of the Observation Records he reviewed while inspecting the prisons reflected that the people on watch were being allowed to have recreation. Horn WT, Doc. 4130 ¶ 154. Deputy Warden Scott testified that at Eyman-Browning, people on watch generally cannot be taken out for exercise due to the physical layout of the facility. Horn WT, Doc. 4130 ¶ 154; Scott TT at, 685:7-10.

(a)     **Behavioral Management Unit**

2      283.    ADCRR also has a Maximum Custody Behavior Management Unit ("BMU") at Eyman-Browning that opened in early September 2021, with the closure of the mental health unit at Florence-Kasson. Horn WT, Doc. 4130 ¶ 76; Scott TT at 1174:24-1176:25. Browning Deputy Warden Scott admitted that ADCRR does not have any written policies for the operation of this unit. Scott TT at 414:2-10.

**H.     ADCRR's Excessive Use of Solitary Confinement**

284.    Isolation is the confinement of a person to a cell for more than 22 hours per day on average. Horn TT at 1341:2-4, 1465:13-1466:5. Each of the classifications and statuses described above is isolation. Horn WT, Doc. 4130 ¶ 77.

285.    ADCRR does not administer isolation fairly or in compliance with its own policies. Horn TT at 1501:2-18, 1504:3-8, 1513:15-19. The way isolation is administered in ADCRR prisons undermines the legitimacy of the prison regime. Incarcerated people cooperate and follow the rules when they believe rules are fair and administered fairly. Prisons function when they are "firm, fair, and consistent." In ADCRR, they are firm, but not fair and consistent. Horn TT at 1462:14-1463:2. Overall, the amount, duration, and conditions in isolation do not make ADCRR prisons safer and may well make them less safe. Horn TT at 1462:1-6.

**1.     Defendants Hold Large Numbers of People in Solitary Confinement**

286.    Mr. Horn testified that there is a large number of people in isolation in Arizona. Horn TT at 1341:11-15.

287.    Taking into account the current population of max custody units, detention units, close management, and mental health watch units, the number of people in ADCRR custody subjected to isolated confinement is approximately 3,000. Haney WT, Doc. 4120 ¶ 111.

288.    ADCRR does not collect data on the average length of stay in isolated confinement. Dr. Haney has requested this data since 2013, and has been told that the data

155617523.3

are not calculated. Defendants have told the Court and Plaintiffs' counsel repeatedly that they have no way to track the average length of stay. Docs. 3701 at 1-2, 3755 at 1-3. Under ADCRR policy, there is no limit on the amount of time a person can be held in isolated confinement. Haney TT at 764:11-23, 1004:25-1005:8.

289.    As of September 30, 2021, at least 9.6 % of the ADCRR population was in housing units where people are confined to their cells 22 or more hours per day. Horn TT at 1610:1-1613:1. According to a survey of restricted housing conducted in 2019 by the Correctional Leaders Association (CLA) (the successor organization to ASCA), the average percentage of the prison population housed for at least 15 days in housing units where people are confined to their cells 22 or more hours per day in the 39 responding state prison jurisdictions was 3.8 %.[52] Horn TT at 1616:4-1617:7; Ex. 3530 at ADCRR00231474-76. Only one jurisdiction reported having a higher percent of its population in restrictive housing than Arizona's 9.6 %. Horn TT at 1617:8-21; Ex. 3530 at ADCRR00231474-76.

### (a)    Defendants Place and Keep People in Isolation for Reasons that Have No Penological Justification

290.    The breadth of reasons for which a person in ADCRR may be placed into isolation is one of the drivers of the high numbers of people in isolation. DO 801 allows for a wide variety of behaviors and conviction offenses to constitute grounds for placement in Maximum Custody and uses very broad language to describe the types of conduct and behaviors that may cause a person to be placed in isolation, and DO 813 broadens that range of behaviors even further. Horn WT, Doc. 4130 ¶ 81.

---

[52] To the extent that there is any question about how many of the people in ADCRR isolation units have been there for 15 days, that question is the result of Defendants' failure to track how long people stay in different types of isolation units. *See, e.g.*, Scott TT at 424:1-12, 685:11-17, 400:1-3, 1145:18-20; Stickley TT at 2089:5-25. A correctional system should know how long people are staying in different forms of isolation. Horn TT at 1613:25-1614:19. Nonetheless, Defendants' records show that in several of the detention units in the state, as of September 19, 2021, over half the people had been in detention for at least one month. *See infra*, ¶¶ 339-339.

155617523.3

291.    Additionally, the process for placing people into Maximum Custody and keeping them there exacerbates the problem. The Classification Technical Manual says, "Points shall not be the sole basis for determining an inmate's final custody level. Staff will make decisions for inmates as individuals in determining the appropriate custody level." Horn WT, Doc. 4130 ¶ 81; Ex. 1310, 801-TM-OPS, Statement entitled "Responsibility," p. 4 of 82. This creates a situation where individual judgments, unconstrained by substantive policy, dictate whether an incarcerated person is placed in isolation in Maximum Custody housing. Horn WT, Doc. 4130 ¶ 81. Defendant Shinn testified that people whose classification scores indicate medium or close custody can, nonetheless, be sent to Maximum Custody. Shinn TT at 2210:1-6. Significantly, he could not even estimate how many people in Maximum Custody have classification scores that would put them at a lower custody level. Shinn TT at 2212:15-25.

292.    A review of the maximum custody placement forms shows that the process is perfunctory and holds out a false promise to the incarcerated person. Horn TT at 1412:19-24. Department Order 812 states that the purpose of max custody is to provide a step program that allows an incarcerated person to progress from the highest custody level back to general population. Discussing the example of a man who has been in maximum custody *since 2012* despite not having a single disciplinary infraction for over nine years and having classification scores that should place him in medium custody, Mr. Horn described the classification review process as a "cruel hoax". Horn TT at 1403:3-1413:5.

293.    Although the classification decision is appealable according to policy, the appeal process appears entirely illusory. Horn WT, Doc. 4130 ¶ 81. One incarcerated person in Enhanced Supervision Housing (E-11) reported that he was told he had the right to appeal the Maximum Custody determination but that "it won't help," and that appeal was useless. *Id*. Most records of hearing for placement or continuation in Maximum

1  Custody state that the incarcerated person was not given a copy of the hearing findings or

2  the Notice of Appeal for Maximum Custody Placement.[53]

3      294.   The Court finds that ADCRR places people into solitary confinement and

4  keeps them there without any penological justification. The Court further finds that, by

5  doing so, Defendants unreasonably subject Isolation Subclass members to a substantial

6  risk of serious harm or even death, and deprive them of the minimal civilized measure of

7  life's necessities.

8              **(b)    Defendants Routinely Overclassify People Through the
                        Use of Overrides, Resulting in Excessive and Unnecessary
9                       Isolation**

10     295.   As discussed above, a person may be placed into maximum custody on an

11 override, which is a situation where their classification scores indicate they can be housed

12 at a lower custody level, but they are nonetheless classified as maximum custody. Scott

13 TT at 1178:22-1179:11. Defendants do not know how many people in maximum custody

14 are there because they are, as Deputy Warden Scott phrases it, "truly a max custody"—

15 that is, their classification scores indicate that they should be in maximum custody—and

16 how many are there due to overrides. *See*, Scott TT at 1180:25-1181:4; Shinn TT at

17 2212:15-25.

18     296.   In ADCRR, people who are serving the first two years of a life sentence are

19 automatically kept in maximum custody regardless of their classification scores. Scott TT

20 at 1179:17-1180:23. Notably, ADCRR has no such blanket requirement for people

21 sentenced to death. Ex. 1309, DO 801, § 3.3.1; Scott TT at 395:23-396:3, 406:7-15.

22 Regardless of their behavior and their performance in the Maximum Custody Step

23

24      [53] *See, e.g.*, Ex. 1189 at ADCRR00163363, ADCRR00163365, ADCRR00163367,
        ADCRR00163369,        ADCRR00163371,        ADCRR00163373;        Ex.     1192       at
25      ADCRR00163182,       ADCRR00163184,       ADCRR00163186,       ADCRR00163191,
        ADCRR00163192, ADCRR00163196, ADCRR00163200, ADCRR00163210; Ex. 1195
26      at    ADCRR00161664,    ADCRR00161666,    ADCRR00161668,    ADCRR00161670,
        ADCRR00161673,       ADCRR00161675,       ADCRR00161677,       ADCRR00161679,
27      ADCRR00161681, ADCRR00161683, ADCRR00161685. The person whose records are
        Ex. 1195 was given the Hearing Findings and the Notice of Appeal for in 2012, but not
28      since then. *See* Ex. 1195 at ADCRR00161689.

Program, people sentenced to life cannot be reclassified out of maximum custody for at least two years. Ex. 1309, DO 801 § 3.3.3; *see* Scott TT at 416:24-417:8; Coleman TT at 2110:1-20; Stickley TT at 2201:22-2203:2. This policy results in the over-classification and prolonged isolation of people who, according to ADCRR's own classification system, pose little threat to the security and functioning of the prisons.

297.　One example of over-classification is Isolation Subclass member S.C. Horn TT at 1382:16-1392:9. Mr. C. came into ADCRR custody with a life sentence in April 2019. Ex. 1188 at ADCRR00052089 (reflecting an initial classification date of April 24, 2019). His initial classification points were 16 and 14. Ex. 1189 at ADCRR00163359. With those points, according to the classification worksheets, he would be medium custody and moderate internal risk. Ex. 1310, 801-TM-OPS, Appendix 3, 5. But he was classified as maximum custody because he was at the beginning of a life sentence. Ex. 1189 at ADCRR00163358. At his next classification review, his points were 24 and 13, which, according to the classification worksheets, means that he was scoring as minimum custody and low internal risk.[54] Ex. 1189 at ADCRR00163374; Ex. 1310 at Appendix 4, 5. He had had no disciplinaries, was enrolled in programming, and was at Step 2 in the Step Level Matrix. Ex. 1189 at ADCRR00163374. The very same day, he was made a Step 3. Ex. 1223 at ADCM1641799. Nonetheless he was retained in Maximum Custody because he was at the start of a life sentence. Ex. 1189 at ADCRR00163373-163374. Six months later, he went through the reclassification process again. *Id.* at ADCRR00163372. His points were the same, he remained disciplinary-free, he was programming and had a job as a porter, but he was again retained in maximum custody because he was still in the first two years of his life sentence. *Id.* at ADCRR00163371-163372. His step level was not mentioned, but he remained at Step 3. Ex. 1223 at ADCM1641799. At his review six months later, it was again recognized that he was disciplinary-free, at Step 3, enrolled in programming, and performing at his job, and he was again kept in Maximum Custody

---

[54] The point cutoffs for each custody level are higher at the reclassifications than at the initial classification. *See* Ex. 1310, 801-TM-OPS, Appendix 3, 4.

because of being at the beginning of a life sentence. Ex. 1189 at ADCRR00163369-163370. Finally, in June 2021, 26 months after he was placed into maximum custody, he was approved for close custody—which was still a higher custody level than what his classification scores would indicate. *Id.* at ADCRR00163368. Nonetheless, he remained in Maximum Custody as of November 15, 2021. Horn TT at 1382:16-1392:9; Coleman TT at 2129:16-25.

298. Mr. C.'s record demonstrates very clearly the irrationality of the requirement that a person serving a life sentence spend the first two years in maximum custody solely on the basis of their sentence. Horn WT, Doc. 4130 ¶ 92. Mr. C. did not have any disciplinaries during his first two years of confinement. *Id*. He was able to reach Step 3 quickly and maintain it from October 2019 through at least June 2021. *Id*. According to DO 812, maintaining Step 3 requires consistent good behavior—not just avoiding disciplinaries, but also following all institutional rules and regulations, programming, maintaining "meets expectation" on work evaluations, consistently demonstrating positive social interaction skills, and demonstrating a good work ethic. *Id.*; Ex. 1318, DO 812, Attachment B. The records provided indicate there was no penological justification for keeping Mr. C. in maximum custody. Horn WT, Doc. 4130 ¶ 92.

299. Another example of over-classification is Isolation Subclass member S.M. Horn TT at 1392:16-1398:6. Mr. M. came into ADCRR custody in July 2019. Ex. 1191 at ADCRR00052085 (reflecting an initial classification date of July 31, 2019). His initial classification points were 10 and 7, which would result in medium custody and very low internal risk. Horn TT at 1393:6-12; Ex. 1192 at ADCRR00163197; Ex. 1310, 801-TM-OPS, Appendix 3, 5. He was nonetheless placed into Maximum Custody because he was beginning a life sentence. Ex. 1192 at ADCRR00163196-163197. Six months later, he had a second classification review, in which his points were calculated as 15 and 7, which would result in minimum custody and very low internal risk, according to the classification worksheet. Horn TT at 1394:6-17; Stickley TT at 2001:4-16; Ex. 1192 at ADCRR00163194, Ex. 1310 at Appendix 4, 5. He had had no disciplinaries and was at

Step 3. Stickley TT at 2002:5-12; Ex. 1192 at ADCRR00163194. But he was kept in maximum custody because he was still serving the first two years of a life sentence. Stickley TT at 2002:2-2003:7; Ex. 1192 at ADCRR00163193-94. Deputy Warden Stickley, one of the people involved in the classification decision, testified at deposition that she considered nothing other than the fact that he was still in the first two years of a life sentence. Stickley TT at 2002:20-2003:2. Mr. M. went through additional reviews with the same outcome until July 2021, when he was reclassified to close custody. Ex. 1192 at ADCRR00163186-91. At that time, he still had had no disciplinaries, and his scores were 15 and 7, indicating that he should be in minimum custody. *Id.* at ADCRR00163189. Unlike Mr. C., he was moved to a close custody unit. *Id.* at ADCRR00163215-3216; Horn TT at 1400:22-1402:5.

300. As with Mr. C., the record demonstrates clearly that there was no penological justification for Mr. M.'s placement in maximum custody for two years. Horn WT, Doc. 4130 ¶ 99. According to ADCRR, he is among the lowest risk people in ADCRR custody. *Id*. He had no disciplinary infractions. *Id*. He maintained a Step 3 for a year and a half. *Id*. Even now that he has been moved to close custody, he is still held in a far more restrictive setting than ADCRR's classification process or his behavior suggests that he warrants. *Id*.

301. Placing people into isolation for two years for no reason other than that they are at the beginning of a life sentence has no penological justification. Horn TT at 1399:20-23. To the contrary, people serving life sentences are often among the most well-behaved people in prisons. *Id.* at 1398:7-21. The mandatory two-years of isolation does not make prisons safer. *Id.* at 1399:24-1400:1. It is not a requirement in other systems. *Id.* at 1400:2-7. Placing people into isolation for two years simply because they are at the beginning of a life sentence places them at risk of harm for no reason. *Id.* at 1398:22-1399:19. Significantly, Defendant Shinn was unable to state the penological justification for this policy. Shinn TT at 2207:20-2209:3.

302.    As discussed above at ¶¶ 256-260, DO 801, Inmate Classification, sets out the policy regarding "overrides." According to DO 801, only a CO III, CO IV, Deputy Warden, or designee can initiate a custody override, based on the file review, interaction with the inmate, incident reports, and investigations. Ex. 1309, DO 801 § 5.1. But Defendants have created an override that appears nowhere in policy: the so-called OSB Hold. This is override initiated by the Offender Standards Bureau, also known as the Central Office. Coleman TT at 2101:22-2102:12.

303.    There appear to be no limits to how long a person may be held in Maximum Custody on an OSB Hold. *See* Coleman TT at 2102:13-17. Isolation Subclass member Rahim Muhammad testified that he was informed he was on an OSB Hold, and therefore remains in Maximum Custody, despite being classified as Close Custody in 2018. Muhammad TT at 894:15-895:8. Mr. Muhammad sought out information about what an OSB Hold is, but no information was provided. Muhammad TT at 895:9-897:14. Isolation Subclass member J.J., discussed below, is also kept in Maximum Custody on an OSB Hold, despite classification scores indicating medium custody and moderate internal risk, and not having had any disciplinaries since 2012. Ex. 1195 at ADCRR00161665-67; Ex. 1194 at ADCRR00052106.

304.    The Court finds that ADCRR places people into solitary confinement and keeps them there despite Defendants' own classification process demonstrating that they do not need to be in such a restrictive setting. The Court further finds that this practice unreasonably subjects Isolation Subclass members to a substantial risk of serious harm or even death, and deprives them of the minimal civilized measure of life's necessities.

### (c)    Defendants Place People Who Need Protection into Isolation

305.    In ADCRR, many people are placed in detention because they feel unsafe and express their fear. Horn WT, Doc. 4130 ¶ 82; Stickley TT at 1186:23-1187:9. Some people are placed in Detention for Refusal to House ("RTH"). Horn WT, Doc. 4130 ¶ 82; Haney TT at 766:14-767:25. Others are placed in Detention "Pending Protective

Custody." Ex. 1312, DO 804, § 1.1.1; *see, e.g.*, Ex. 1695 at ADCRR00185327. For example, one week in February 2021, in one detention housing cluster at ASPC-Eyman Rynning, over half the people in detention were there for either a Refusal to House or Pending Protective Custody.[55] Mr. Horn spoke with several incarcerated people in detention for a refusal to house whose request for different housing was based upon apparently genuine and reasonable safety concerns. Horn WT, Doc. 4130 ¶ 82.

306. Some of these people are designated as "refusal to house" because they have been assaulted, sometimes including sexual assault, and now refuse to house with their assailant. Dr. Haney encountered some people in this situation in the Lewis Stiner detention unit. Haney TT at 766:14-767:25.

307. The logic by which people are put in isolation due to their so-called "refusal to house" adds to the painfulness of the experience. Some are designated "refuse to house" because they have been assaulted and are asking ADCRR for protection. Instead of being treated as victims, and having their mental and physical safety ensured, they are placed in isolation and deprived of virtually every possible amenity that might otherwise make their lives bearable. Many of these persons appear to be among the most vulnerable in ADCRR custody, because of mental illness or otherwise, and among the least capable of enduring the extreme forms of isolation and deprivation to which they are subjected. Haney WT, Doc. 4120 ¶ 142.

308. Detention is, in all respects, Maximum Custody with even fewer privileges. Horn WT, Doc. 4130 ¶ 82; *see also* Stickley TT at 1191:5-20. Thus, people who ask for

---

[55] Ex. 1695 at ADCRR00185477, ADCRR00185485, ADCRR00185487, ADCRR00185491, ADCRR00185511, ADCRR00185513, ADCRR00185517, ADCRR00185519, ADCRR00185521, ADCRR00185523, ADCRR00185525, ADCRR00185527, ADCRR00185529, ADCRR00185531, ADCRR00185537, ADCRR00185543, ADCRR00185545, ADCRR00185547, ADCRR00185549. Each of these examples come from a single cluster (3A) of a single housing unit (ASPC-Eyman SMU I) during a single week (2/8/21-2/14/21). There were a total of 35 people in detention in that cluster that week. Ex. 1695 at ADCRR00185475-185478, ADCRR00185485-185549. The pages referenced above have either the box for "Pending Protective Custody" marked or the box "Disciplinary" marked and include the notation "RTH." It is worth reiterating that DO 804, which governs detention, does not allow for detention for Refusal to House. Ex. 1312, DO 804, §1.1.1; Stickley TT at 2039:7-2041:12.

protection are essentially punished. Horn WT, Doc. 4130 ¶ 82. People with a reasonable and sincere fear of being harmed should not be penalized by isolation. *Id*. This practice creates a chilling effect upon incarcerated people's willingness to tell prison officials about genuine threats to their safety. *Id*. This makes the prisons less safe rather than safer.

309. Once a person is actually approved for Protective Custody, they continue to be isolated. At ASPC-Lewis Rast, in November 2021, there were about 450 people in Protective Custody status who were housed in a Maximum Custody unit. Coleman TT at 2094:16-2095:8.

310. An example of a person being placed into Maximum Custody solely because he requested protection is Isolation Subclass member V.S. Mr. S. was placed into maximum custody because he requested protective custody. Stickley TT at 2068:5-2069:13. He was in and out of maximum custody from August 3, 2018 through at least September 8, 2021. *Id.* at 2005:14-16. The only documentation of hearings regarding placement into maximum custody in his file is a record from September 2020, when he was placed into maximum custody on a "facility override." *Id.* at 2004:7-2006:22; Ex. 1201 at ADCRR163221-163224. During this period, he was classified as close custody and medium custody. Stickley TT at 2007:10-22. He was nonetheless kept in maximum custody housing much of this time, and treated as though he was maximum custody. Stickley TT at 2007:23-2008:19; Ex. 1200 at ADCRR00052076-52077; *see generally* Ex. 1199.

311. The Court finds that ADCRR places people into solitary confinement and keeps them there solely because they seek protection from harm. The Court further finds that this practice unreasonably subjects Isolation Subclass members to a substantial risk of serious harm or even death, and deprives them of the minimal civilized measure of life's necessities.

-113-

155617523.3

| | |
|---|---|
| 1 | |
| 2 | **(d)    Defendants Keep People in Isolation Even When Defendants Acknowledge There Is No Reason to Do So** |

312.    Perhaps most disturbing is the large number of people who are in maximum custody despite ADCRR admitting that there is no reason at all for them to be there. Deputy Warden Stickley testified that as of November 5, 2021, there were 150 people in maximum custody at Eyman SMU I whom ADCRR had approved for removal from maximum custody. Stickley TT at 1198:20-1199:15. That is one-third of the entire maximum custody population at Eyman SMU I. *Id.* at 2089:5-22.

313.    Deputy Warden Scott testified that, as of one week before his testimony, there were 44 people in Eyman Browning whom ADCRR had approved for removal from Maximum Custody but who, nonetheless, remained in maximum custody. Scott TT at 1154:13-19.

314.    Deputy Warden Coleman testified that there are some people in Maximum Custody at Lewis Rast whom ADCRR had approved for removal from Maximum Custody, but he did not know the precise number. Coleman TT at 2136:15-2137:3.

315.    None of the Deputy Wardens knew how long these people had been waiting to be transferred out of Maximum Custody. Scott TT at 1178:3-7; Stickley TT at 1199:16-18; Coleman TT at 2137:4-11. Defendant Shinn does not know whether ADCRR tracks how long people languish in Maximum Custody after they have been approved for a lower custody placement. Shinn TT at 2213:16-18.

316.    Among the fourteen institutional files that Defendants produced for trial and that Mr. Horn reviewed, two were for people held in Maximum Custody even after ADCRR had determined that they did not need to be there. Isolation Subclass Member T.A. was approved for transfer to close custody in June 2020, but remained in maximum custody through at least July 23, 2021. Horn WT, Doc. 4130 ¶ 112; Horn TT at 1413:16-1414:5; Ex. 1196. Mr. A. was treated as though he was in maximum custody throughout the period he was purportedly in close custody. Horn WT, Doc. 4130 ¶ 113. ADCRR produced Maximum Custody Daily Out-of-Cell Time Tracking sheets for Mr. A. from

October 1, 2020 through July 23, 2021, showing that (a) they considered him maximum custody; and (b) he was restricted to his cell in the same manner as other people in maximum custody. *Id.* ADCRR also produced a screenshot of classification results for Mr. A. showing that he was reclassified to close custody in July 2020, but that he continued to have "Max Custody Step Reviews" every month through at least August 6, 2021. *Id.* Further, Mr. A. was given a disciplinary in May 2021 for refusing to give back the handcuffs that had been put on him. *Id.* But because Mr. A. was classified as close custody, under ADCRR policy he should not have been restrained to begin with. *Id.*; Horn TT at 1413:16-1414:5.

317.    Similarly, as discussed above, after Mr. C. completed the two years of compulsory isolation imposed solely as a result of his life sentence, he was reclassified to close custody in June 2021 but nevertheless remained in Maximum Custody as of November 15, 2021. Ex. 1189 at ADCRR00163368; Horn TT at 1382:16-1392:9; Coleman TT at 2135:7-14.

318.    The Court finds that Defendants keep people in solitary confinement even after ADCRR itself determines they do not warrant such restrictive settings. The Court further finds that this practice unreasonably subjects Isolation Subclass members to a substantial risk of serious harm or even death, and deprive them of the minimal civilized measure of life's necessities.

**2.    Defendants Keep People in Isolation for Extremely Long Periods**

319.    As noted above, the NCCHC defines "prolonged solitary confinement" as isolation for any period "greater than 15 consecutive days." Ex. 2216 at 5. The NCCHC describes such prolonged isolation as "cruel, inhumane, and degrading treatment, and harmful to an individual's health." Ex. 2216 at 5. But ADCRR keeps people in isolation for years or even decades. *See, e.g.*, Haney WT, Doc. 4120-1 at 76 (R.M reported he had been in solitary confinement for 14 years), 77 (J.B. reported he had been in solitary confinement since 1980 and had had no disciplinaries in more than 8 years), 78 (D.T. reported that most of his 30 years in prison had been spent in solitary confinement; I.R.

-115-

reported that he had been in isolation for about 10 years), 78-79 (J.B. reported that he had been in isolation for about 10 years).

320.    There are no limits on how long people may spend in isolation in Arizona. Scott TT at 422:4-12. ADCRR does not keep track of how long people spend in isolation. 424:1-12. The fact that ADCRR does not track the amount of time in isolation indicates that ADCRR is not managing its use of isolation. Horn TT at 1355:24-1357:5.

321.    But it is clear that many people incarcerated in ADCRR prisons spend years in isolation, despite having no serious disciplinaries for years on end. Reports from ACIS, Defendants' electronic records system, produced in September 2020, show that at that time, at ASPC-Eyman and ASPC-Florence, 146 people in Maximum Custody had been there since 2017 or earlier without any Class A or Class B disciplinaries.[56] *See* Ex. 1311, DO 803, Attachment A; Exs. 1220, 1221, 1222.[57] Twenty-two people at the two prisons had been in Maximum Custody for *over a decade* without a single Class A or Class B disciplinary. *See id*. Another 39 people remained in Maximum Custody despite not having had any Class A or Class B disciplinaries since 2016. *See id*.

322.    For example, Isolation Subclass member J.J. has been in Maximum Custody since 2012. Horn WT, Doc. 4130 ¶¶ 103-115; Horn TT at 1402:7-1412:17. In 2012, Mr. J. held a staff member hostage. Ex. 1195 at ADCRR00161676.[58] He has had no disciplinaries since that time. *Id.*; Ex. 1194 at ADCRR00052106. As of April 2018, his classification scores, which incorporate his disciplinary history, were 33 and 24, resulting

---

[56] Class A and B disciplinaries range from murder and aggravated assault to disobeying an order and refusing to submit to urinalysis testing. Ex. 1311, DO 803, Appendix A. Only Class A and B disciplinaries appear in the ACIS reports. *See generally* Exs. 1220-1223.

[57] The ACIS report regarding people in Maximum Custody at ASPC-Lewis included little data from prior to 2018. *See* Ex. 1223.

[58] The institutional file produced for Mr. J., which goes back to the 1990s, does not include any documentation of the incident, other than a single record of his being examined by medical and having a number of abrasions. Ex. 1195 at ADCRR00161701. Documentation of earlier disciplinaries are in the file. *See, e.g., id*. at ADCRR00161704, ADCRR00161709-10.

in a custody level of medium and a moderate internal risk score.[59] Ex. 1195 at ADCRR00161676. At the time, he was programming and had been at Step 3 for over a year. *Id.* By late 2020, he remained disciplinary-free, but had stopped programming, resulting in a step reduction to Step 1. *Id.* at ADCRR00161667. His classification score had dropped further, to 27 and 19, again indicating medium custody and moderate internal risk, but he was again kept in maximum custody. *Id.* at ADCRR00161666-161667.

323. Another Isolation Subclass member, Z.E., was in enhanced management for ten years without a disciplinary. Horn WT, Doc. 4130 ¶ 124; Horn TT at 1414:7-1415:5; Ex.1220 at ADCM1645360. He was moved from enhanced management to general population maximum custody on September 21, 2021, the day Mr. Horn inspected Eyman Browning. Horn TT at 1414:18-1415:6; Scott TT at 424:18-25.

324. The Court finds that Defendants unnecessarily keep people in solitary confinement for extraordinarily long times. The Court further finds that this practice unreasonably subjects Isolation Subclass members to a substantial risk of serious harm or even death, and deprives them of the minimal civilized measure of life's necessities.

(a) **ADCRR Has Failed to Implement the Maximum Custody Step Program in a Way That Would Allow People to Progress**

325. As discussed above, ADCRR created a three-step incentive program through which "[b]ased on behavior and programming, inmates may progress from controlled based housing to open privilege based housing where movement outside a cell is without restraint equipment." Ex. 1318, DO 812, § 1.0; Coleman TT at 2101:9-14. However, this incentive program fails to meet its purpose. People who are compliant with the rules of the program do not progress based on behavior and programming, and the reviews of such behavior and programming are so perfunctory as to be meaningless.

---

[59] Kidnapping/taking of a hostage is among the Disciplinary Violations listed in the highest severity group of infractions for both custody level and internal risk score. Ex. 1310, DO 801-TM-OPS, Appendix 1.

326.   Every person in Maximum Custody is supposed to have their step level reviewed every month. Ex. 1318, DO 812, § 3.1. According to Eyman-SMU I Deputy Warden Stickley, the program team reviews the person's behavior, disciplinaries, programming, cell cleanliness, showering habits, classroom conduct, and whether the person is productive or wasting time, weighing some of these factors more heavily than others. Stickley TT at 2009:4-2010:16. At SMU I, the monthly Step Level Review for the approximately 500 people in maximum custody are completed in 300 minutes per month or less—just over thirty seconds per review. *Id.* at 2009:4-2010:24. At ASPC-Eyman Browning, where 700 people are held in maximum custody, the reviews are completed in just 360 minutes per month—again, approximately thirty seconds per review. Scott TT at 421:13-422:3.

327.   The person being reviewed does not attend the Step Level Review. Scott TT at 418:16-17; Stickley TT at 2010:25-2011:2; Coleman TT at 2101:15-21. No one takes notes at a Step Level Review. Scott TT at 418:18-19. No forms are filled out. Scott TT at 418: 20-21; Stickley TT at 2011:3-5. Nor do institutional files include any documentation of the step level review process. Horn TT at 1413:6-11. The only documentation of the Step Level Review is in Defendants' electronic records system, ACIS. Stickley TT at 2011:6-7, 2014:12-14. There is a field in ACIS where information about the reasoning for decision in the Step Level Review process could be entered, but it often includes little or no information, frequently just "Step Review." Stickley TT at 2011:6-2014:11; *see, e.g.*, Ex. 1220 at ADCM1644976.

328.   Both Deputy Warden Scott and Deputy Warden Stickley disavowed any knowledge about whether incarcerated people are informed of the reasons why their step level changed or stagnated. Scott TT at 420:24-421:9; Stickley TT at 2014:19-2015:8. As explained by Isolation Subclass member Rahim Muhammad, the only information provided to the incarcerated person is the fact that the step changed. Muhammad TT at 898:19-899:2.

329.    Additionally, people who are SMI are punished in the Step Program Review by losing steps for actions that are directly related to their mental illness, as Named Plaintiff Brislan testified that he had personally experienced. Brislan TT at 1294:15-17, 1295:14-20, 1303:17-1304:2.

330.    Moreover, the evidence shows that the Step Program is a "cruel hoax." Horn TT at 1412:19-1413:5. This Court previously held that implementing the Step Program meant Defendants had to administer it in such a way that "compliant prisoners do, in fact, progress." Doc. 3861 at 2. But many persons become "stuck" in the maximum custody step program for long periods of time, and do not know if or when they will be let out of isolation, or what they can do to get released from isolation. Haney WT, Doc. 4120 ¶ 107. Deputy Warden Scott admitted that he does not know how long people spend in Maximum Custody or at any step. Scott TT at 424:1-14. To his knowledge, ADCRR does not track that information. Scott TT at 424:1-14.

331.    The evidence shows clearly that while some compliant people progress, others languish. According to Defendants' policy, once someone has been at Step 3 for 30 days without incident, they are eligible for consideration for release from isolation. To remain at Step 3, in addition to not having any Class A, B, or C disciplinaries at all, the incarcerated person must:

- Follow Rules and Regulations including Department Order #704, Inmate Regulations
- Participate in prescribed programs/classes/individual groups as per program plan (Attachment G)
- Maintain "meets expectation" on all work evaluations
- Consistently demonstrate positive social interaction skills
- Demonstrate good work ethic

Ex. 1318, DO 812, Attachment B.

155617523.3

332. Despite the exemplary behavior that people at Step 3 must display, many people spend much longer than the 30 days required by DO 812 at Step 3, and there is no policy requiring that they be informed of the reasons why they have not been moved out of isolation or out of one or another status in isolation. Haney WT, Doc. 4120 ¶ 107; *see also* Shinn TT at 2216:15-17. Deputy Warden Stickley testified that nearly two-thirds of the people who are classified as maximum custody at ASPC-Eyman SMU I are at Step 3. Stickley TT at 2089:5-25. She did not know how long any of them had been at Step 3. *Id.* at 2089:5-2090:6.

333. The ACIS reports produced by Defendants in September 2020 showed that as of September 1, 2020, at Eyman Browning, 23 people had been at Step 3 for over two years:

|  | Date entered Maximum Custody | Date Since Which the Person Has Continuously Been at Step 3, as of September 1, 2020 | Bates No. |
|---|---|---|---|
| 1 | 2008-07-10 | 2014-05-21 | ADCM1645887 |
| 2 | 2008-05-18 | 2014-05-21 | ADCM1645915 |
| 3 | 2008-05-18 | 2014-06-06 | ADCM1645006 |
| 4 | 2008-05-18 | 2014-06-14 | ADCM1645254 |
| 5 | 2011-05-27 | 2014-07-02 | ADCM1645920 |
| 6 | 2010-08-23 | 2015-09-04 | ADCM1645921 |
| 7 | 2010-05-26 | 2015-09-18 | ADCM1645280 |
| 8 | 2009-04-24 | 2015-10-13 | ADCM1645299 |
| 9 | 2008-10-28 | 2015-10-20 | ADCM1645255 |
| 10 | 2008-05-25 | 2016-05-31 | ADCM1645970 |
| 11 | 2008-05-18 | 2016-07-07 | ADCM1645122 |
| 12 | 2008-05-08 | 2016-09-13 | ADCM1645880 |
| 13 | 2008-05-18 | 2016-09-29 | ADCM1645968 |
| 14 | 2010-10-14 | 2016-10-14 | ADCM1645001 |
| 15 | 2008-06-01 | 2016-11-10 | ADCM1645966 |
| 16 | 2015-05-20 | 2016-11-16 | ADCM1645238 |
| 17 | 2007-11-21 | 2016-12-12 | ADCM1644999 |
| 18 | 2008-05-18 | 2017-03-28 | ADCM1645293 |
| 19 | 2008-05-25 | 2017-08-14 | ADCM1645306 |
| 20 | 2008-06-01 | 2017-09-18 | ADCM1645233 |
| 21 | 2010-10-13 | 2017-10-12 | ADCM1645094 |
| 22 | 2017-11-16 | 2018-04-16 | ADCM1645882 |
| 23 | 2009-06-19 | 2018-08-03 | ADCM1645923 |

Ex. 1220. Five people at Browning had been at Step 3 for over six years. *Id.*

155617523.3

334.    Moreover, Deputy Warden Stickley testified that, contrary to the plain language of DO 812, people in Maximum Custody "will not ever get to a lower custody level." Stickley TT at 1192:18-23. She testified that when the Step Matrix program started, people moved from more restrictive to less restrictive housing units, but that the process has changed, and people are moved out of maximum custody less frequently and less quickly. *Id*. at 1197:15-1198:19. Although DO 812 explicitly provides that people at Step 3 for 30 days can be considered for reclassification out of Maximum Custody, Deputy Warden Stickley testified that steps do not affect classification. Ex. 1318, DO 812, § 5.5; Stickley TT at 1199:19-22. The complete lack of consideration of step level in documents relating to maximum custody reviews confirms the disconnect between step levels and removal from Maximum Custody.

335.    The unpredictability about their fate, and their inability to influence it, increases the psychological pain of the experience and can lead to a sense of hopelessness among the people in these isolation units. ADCRR's lack of clarity with them about whether, how, and when people might be released from isolation increases the anxiety and trauma of being in isolation. Haney WT, Doc. 4120 ¶ 107.

336.    The Court finds that Defendants have created a system that, contrary to their own policies, does not allow people who are compliant with the rules to progress out of solitary confinement, and results in such people being held in solitary confinement for extended periods of time despite their good behavior. The Court further finds that this practice unreasonably subjects Isolation Subclass members to a substantial risk of serious harm or even death, and deprives them of the minimal civilized measure of life's necessities.

### (b)    Defendants Keep People in Detention for Long Periods

337.    Defendants do not keep track of how long they keep people in Detention, but the Individual Inmate Detention Records reflect that many people spend months on

155617523.3

1  end in Detention. For example, multiple people remained detention from at least February

2  2021 through August 2021.[60]

3     338.   At Eyman SMU I, the largest Detention Unit in the state, 91 of the 154

4  people in detention from September 13 through 19, 2021 had been in detention since for at

5  least a month. *See* Ex. 1694 at ADCRR00184327-184955. At Lewis Bachman, 45 of 62

6  people who were in detention from September 6 through 12, 2021 had been in detention

7  since for at least a month. *See* Ex. 1697 at ADCRR00187966-188495. At Lewis Morey,

8  the figure was 40 of 79. *See* Ex. 1697 at ADCRR00188078-188364. At Yuma Cheyenne,

9  it was 13 of 25.[61]

10    339.   Mr. Horn testified that he spoke with numerous incarcerated people who had

11  spent long periods in Detention. Horn TT at 1615:6-18. Notably, ADCRR DO 704

12  provides that when a person refuses to live in their assigned housing unit, that is "Refuses

13  to House," that person will not be moved to a different facility "for a minimum of six

14  months." Horn WT, Doc. 4130 ¶ 82; Ex. 1307 DO 704 § 10.2. Effectively, this means that

15  people remain in detention until they agree to go back to the place where they did not feel

16  safe, or for at least six months.

17

18  [60] *See, e.g.,* Ex. 1694 at ADCRR00183571, ADCRR00184289, ADCRR00184547
    (J.G.),     ADCRR00183541,     ADCRR00184083,     ADCRR00184331     (B.S.),
19  ADCRR00183451,  ADCRR00184163,  ADCRR00184387,  ADCRR00184697  (J.I.),
    ADCRR00183457,  ADCRR00184187,  ADCRR00184411,  ADCRR00184727  (M.S.);
    Ex. 1697   at   ADCRR00186826,   ADCRR00187732,   ADCRR00188114   (B.W.)
20  ADCRR00186778,  ADCRR00187762,  ADCRR00188152,  ADCRR00188318  (A.D.),
    ADCRR00186874,  ADCRR00187770,  ADCRR00188164  (J.T.)  ADCRR00186850,
21  ADCRR00187718,  ADCRR00188102,  ADCRR00188270  (D.L.),  ADCRR00186824,
    ADCRR00187734,  ADCRR00188116,  ADCRR00188296  (L.N.),  ADCRR00186726,
22  ADCRR00187720,  ADCRR00188104,  ADCRR00188274  (C.M.),  ADCRR00186854,
    ADCRR00187778,  ADCRR00188172  (H.M.)  ADCRR00186935,  ADCRR00187848,
23  ADCRR00188070,  ADCRR00188381  (E.S  ),  ADCRR00186882,  ADCRR00187920,
    ADCRR00188030,  ADCRR00188429  (F.S.),  ADCRR00186900,  ADCRR00187842,
24  ADCRR00188064,  ADCRR00188387  (A.A.),  ADCRR00186886,  ADCRR00187922,
    ADCRR00188032,  ADCRR00188425  (M.H.),  ADCRR00187025,  ADCRR00187852,
25  ADCRR00187960, ADCRR00188076, ADCRR00188415 (M.M.).
    [61] *See* Ex. 1700 at ADCRR00193032, ADCRR00193048, ADCRR00193072,
26  ADCRR00193076,     ADCRR00193712,     ADCRR00193732,     ADCRR00194248,
    ADCRR00194276,     ADCRR00194604,     ADCRR00195235,     ADCRR00192286,
27  ADCRR00193198,     ADCRR00193214,     ADCRR00193850,     ADCRR00193856,
    ADCRR00193860,     ADCRR00193864,     ADCRR00194084,     ADCRR00194332,
28  ADCRR00194340, ADCRR00194370, ADCRR00194376, ADCRR00194380.

-122-

340. The Court finds that Defendants keep people in the extraordinarily harsh conditions of Detention for extended periods. The Court further finds that this practice unreasonably subjects Isolation Subclass members to a substantial risk of serious harm or even death, and deprives them of the minimal civilized measure of life's necessities.

### 3. ADCRR Places People with Serious Mental Illness into Isolation

341. ADCRR has no policy excluding people with serious mental illness from isolation and no rule or policy requiring a face-to-face mental health evaluation of a person with serious mental illness before placement in isolated confinement, except in the two most restrictive housing units. Haney WT, Doc. 4120 ¶¶ 67-69; Haney TT at 765:22-766:9; Horn TT at 1358:2-6; Stallcup TT at 2571:6-2572:9; Scott TT at 422:16-23. ADCRR does not take any special procedures or precautions for people who are mentally ill when they are being placed into isolation. Scott TT at 423:22-25. There is no dispute that ADCRR places people with serious mental illness into isolation. Stickley TT at 2032:19-2038:16; Coleman TT at 2097:9-11; Van Winkle TT at 2674:20-2675:15.

342. Dr. Haney found a number of people designated as suffering serious mental illness in isolated confinement during his tours of ADCRR facilities. Haney WT, Doc. 4120 ¶ 67; Haney TT at 766:2-9. In addition to those formally designated as SMI by ADCRR, Dr. Haney encountered many persons in the isolation units who, while not so designated, nevertheless suffered from serious mental illnesses such as schizophrenia; had experienced psychiatric hospitalizations; or had experienced multiple stays on suicide watch while incarcerated. Haney WT, Doc. 4120 ¶ 67; Haney TT at 782:20-784:3, 995:3-996:17, 1011:1-1012:6. For example, Isolation Subclass member Rahim Muhammad, discussed *supra* at ¶¶ 110, 113, 122-23, 134, 202, 222, 225-32, 234-36, 238-40, 303, 328, has not been designated as SMI. Muhammad TT at 893:15-894:4. These people constitute a vulnerable and traumatized population. Haney WT, Doc. 4120 ¶ 72; Haney TT at 782:20-784:3, 1011:1-25.

343. Similarly, Dr. Stewart testified that the persons he observed during his September 2021 visits to four ADCRR prisons included people at all mental health/suicide

-123-

watch units, and many people at segregated units including maximum custody and detention units. Stewart WT, Doc. 4109 ¶¶ 8, 200. He testified that the people housed in "extreme conditions of isolation were often profoundly mentally ill and in a very precarious mental health condition. These people with mental illness are particularly vulnerable to the harsh, stressful, chaotic, and violent conditions that prevail in ADCRR today, especially in isolation, and are most at risk of self-harm and suicide." *Id*. ¶ 200.

344. And even Mr. Horn, who was focusing on correctional issues, not issues relating specifically to mental health, noted that there were people he saw in the maximum custody and detention units who were clearly mentally disturbed or who demonstrated unusual or bizarre behavior. Horn WT, Doc. 4130 ¶¶ 270, 277-78.

345. Further, Named Plaintiff Jason Johnson testified about the state of the cells of some of the mentally ill people in isolation at ASPC-Florence Kasson. He testified that, in his role as a porter, he was asked to clean cells of people who "just couldn't maintain themselves," and that "sometimes there would be feces, blood, piled up food. It was like sludge, nasty. And -- yeah, it was bad." Johnson TT at 1233:11-23. Mr. Johnson testified that correctional staff make fun of incarcerated people who are seriously mentally ill and find reasons to pepper spray them. *Id.* at 1238:18-1239:14. He testified that correctional staff try to "rile up" mentally ill incarcerated people and, once they get a reaction, spray them with large amounts of pepper spray. *Id.* at 1241:14-1242:4. Similarly, Named Plaintiff Brislan testified that when he was a porter in the mental health unit at Florence Kasson, he would see "feces and a lot of dirty stuff in the cells" that he would clean. Brislan TT at 1306:1-13.

346. People with serious mental illness should not be housed in isolation units as severe as those in ADCRR, regardless of the amount of out-of-cell time provided. People with serious mental health problems are suffering in these units and are at grave risk of harm. Haney WT, Doc. 4120 ¶ 72; Haney TT at 871:19-872:14, 873:24-874:14.

347. The Court finds that Defendants routinely and knowingly place people with serious mental illness into solitary confinement. The Court further finds that this practice

1    unreasonably subjects them to a substantial risk of serious harm or even death, and

2    deprives them of the minimal civilized measure of life's necessities.

3              **4.       ADCRR Places Children into Isolation**

4              348.    Arizona is an extreme outlier in incarcerating children (persons under the

5    age of 18) in adult prisons. In 2019, Arizona had the third-highest number of children in

6    adult prison among all 50 states. Haney WT, Doc. 4120 ¶ 20.

7              349.    ADCRR's isolation practices create a substantial and especially significant

8    risk of serious harm for children under the age of 18 who are exposed to them. Haney

9    WT, Doc. 4120 ¶ 21; Haney TT at 793:9-23.[62] Many U.S. jurisdictions have laws that

10   prohibit or greatly restrict the use of isolation on children. By contrast, ADCRR has no

11   rule or policy excluding children under the age of 18 from isolated confinement, and there

12   are children in isolated confinement in ADCRR. Haney WT, Doc. 4120 ¶ 21; Haney TT at

13   766:10-13.

14             350.    Lewis Sunrise Unit is where children who have been committed to ADCRR

15   are housed. *See* Ex. 1304. It includes a detention unit separate from the other housing

16   units. The detention unit cells have solid doors and no windows. When Dr. Haney visited

17   Lewis Sunrise, there were three boys who had been confined (in separate cells) in the

18   detention unit for nearly three weeks. Dr. Haney interviewed each of these boys, one of

19   whom was 16 years old, who told him that they had not been allowed to go outside for

20   recreation, and had been kept in their detention cells essentially around the clock for

21   nearly three weeks. Haney WT, Doc. 4120 ¶¶ 13, 135; Haney WT, Doc. 4120-1 at 87-89.

22   One of them told Dr. Haney he could not sleep; another said that all he could do was

23   sleep. Haney WT, Doc. 4120-1 at 88-89. There was no out-of-cell activity for them to

24   engage in. *Id*. One boy reported that he spent one week in a cell without a light. *Id*. at 89.

25

26             [62] The Court does not find any opinions expressed by Dr. Penn relating to
     ADCRR's use of solitary confinement for children to be reliable. On his September 2021
27   visit to ASPC-Lewis, Dr. Penn did not visit the Sunrise minors detention unit; he did not
     review unit logs from that unit; and he did not review any youth's central file. Penn TT at
28   3342:10-3343:5.

All the boys reported that the unit was dirty and infested with insects. *Id.* at 88-89. These are very severe conditions of confinement that pose an enormous risk to a young person's well-being, as shown in the photographs below:

 

Haney WT, Doc. 4120 ¶ 135; Haney TT at 762:1-763:15, 793:9-23.

351. Putting children in solitary confinement—particularly in the gratuitously harsh conditions that exist in the detention unit at Lewis Sunrise—is highly dangerous, and puts them at substantial risk of serious harm, including self-harm and suicide. Haney WT, Doc. 4120 ¶ 136. According to statistics from the U.S. Department of Justice, more than 60 percent of young people who die by suicide in carceral settings had a history of isolated confinement. *Id.* According to the DOJ report, "When placed in a cold and empty room by themselves, suicidal youth have little to focus on – except all of their reasons for being depressed and the various ways that they can attempt to kill themselves." Dr. Haney testified that ADCRR is "playing with fire" by continuing to hold children in solitary confinement. *Id.* ¶¶ 136-138. Further exacerbating this risk is the same lack of supervision

155617523.3

discussed above. One of the boys reported that there is supposed to be an officer on duty in the hallway at all times, but sometimes there is not one. Haney WT, Doc. 4120-1 at 88.

352. Dr. Haney is particularly concerned about the isolated confinement of children in ADCRR based upon his past experience in this case. In 2016, when he was touring the Perryville women's prison, multiple people told him of a young woman, then 17 years old, who was being kept in isolation and was suicidal. Dr. Haney asked to see her, but he was not permitted to do so. Subsequent review of her file confirmed that she had had multiple suicide attempts. In consultation with Dr. Haney, Plaintiffs' counsel wrote a letter to Defendants, expressing concern about the isolation of this young woman. She nevertheless remained in isolated confinement. When she turned 18, she was transferred to another isolation unit, and within weeks took her own life. This tragic case illustrates the fragility of children in this kind of environment; the profound effects of isolation, particularly upon people who are young and vulnerable; and the dangerousness of putting children at risk in these kinds of austere environments. Haney WT, Doc. 4120 ¶¶ 137-38; Haney TT at 796:2-798:14.

353. The Court finds that Defendants routinely and knowingly place children into solitary confinement. The Court further finds that this practice unreasonably subjects them to a substantial risk of serious harm or even death, and deprives them of the minimal civilized measure of life's necessities.

## I. Extreme Social Isolation and Harsh Conditions Put All Incarcerated Persons in ADCRR Isolation Units at Risk of Harm

354. The amount, duration, and conditions of isolation in ADCRR place people who are housed in isolation at risk of harm. Horn TT at 1463:3-7.

355. Notably, Mr. Horn testified that when he toured the isolation units, he saw that there were people asleep on their bunks with their blankets over their heads in the middle of the day. Horn TT at 1342:14-1343:16. He explained that this is a phenomenon he has seen throughout his career: people confined in isolation units "often shut down." *Id.* at 1343:3-16. Deputy Warden Stickley admitted that people "sitting around bored all

day with nothing to do" can lead to destructive behaviors or "can be mentally . . . discouraging." Stickley TT at 1195:5-14.

356. Among the most tragic consequences of the harm from solitary confinement is suicide. As noted below in ¶¶ 553-54, ADCRR had ten suicides in FY 2021. This is the highest number of suicides in ADCRR since FY 2011, when the overall prison population was significantly higher. Haney WT, Doc. 4120 ¶ 113; Stallcup TT at 2539:4-2540:18; Ex. 2148(a).

357. It is well established that solitary confinement increases the risk of suicide. Between January 1, 2014 and mid-September 2021, there were 54 completed suicides in ADCRR. Of those, 33 suicides, or more than 60% of the total, took place in isolation units, even though those units account for approximately 11% of the total ADCRR population. Haney WT, Doc. 4120 ¶ 114; Haney TT at 793:24-795:23, 858:7-24.

358. Dr. Stewart's testimony included his clinical review of the records of several people who died by suicide, where it appears that the harsh conditions of isolation exacerbated their mental distress:

- One patient died by suicide in 2020 at Perryville's Reception and Assessment Unit. Stewart WT, Doc. 4109-1 at 96-97. Dr. Stewart concluded the patient "did not have an adequate mental health intake screening or appropriate services offered for substance abuse. [The patient's] history is consistent with likely having poly-substance use disorder. [The patient's] death was within one month of her last drug use and prompt follow-up for substance-induced mood disorders did not occur." *Id*. at 96.

  The ADCRR psychological autopsy for this patient included a recommendation to not house newly-incarcerated people in "Reception and Assessment" alone for an extended period of time "due to unknown adjustment to the prison setting and *being locked down the majority of time*." Ex. 202 at ADCM1625359 (emphasis added). Dr. Stewart testified that the suicide "illustrates the deleterious effects of isolation units, especially for new arrivals to prison." Stewart WT, Doc. 4109-1 at 97.

- A patient died by suicide in 2020 at Eyman's SMU-I Complex Detention Unit. Stewart WT, Doc. 4109-1 at 98-100. According to the ADCRR psychological autopsy, the patient was housed in the detention unit because he had recently debriefed from his gang. The report indicates this left him "vulnerable to both members of that gang and members of other gangs." Ex. 406 at ADCM1618571-72. Motivation for suicide was cited as "combination of chronic pain, loss of identity with the gang

-128-

affiliation, *a sense of social isolation, change of environment, being locked-down, limited family contact*, experiencing chronic pain and his perception that he was being bullied." *Id.* at ADCM1618572 (emphasis added).

As part of the psychological autopsy, the psychologist conducting the review did a clinical interview of another incarcerated person who lived near the decedent in the detention unit. Ex. 406 at ADCM1618575-79. The neighbor reported that the patient was "an old friend" (*id.* at ADCM1618575), who "did not have any problems with others," but prior to his suicide the patient "was struggling because the officers were picking on him. They were calling him a rat and told him that he was going to get what he deserved. He was going through it." *Id.* at ADCM1618576. The neighbor also told the psychologist that prior to his suicide, the patient had exhibited signs of agitation and restlessness as "he was stuck in the cell and he was supposed to leave. He wanted to get where he was going so he could contact his family. … He was anxious." *Id.* at ADCM1618578.

Dr. Stewart stated that "[t]he psychological autopsy explains at length the high-risk features related to renouncing gang affiliation . . . Had he had formal mental health follow-up, he may have developed better rapport to share psychological distress and suicidal intentions. This may have been a missed opportunity to prevent the patient's suicide." Stewart WT, Doc. 4109-1 at 100.[63]

- A second person died by suicide in 2020 in Eyman's SMU-I Complex Detention Unit. Stewart WT, Doc. 4109 ¶ 204; Stewart WT, Doc. 4109-1 at 103-04. According to the ADCRR psychological autopsy, the patient had previously requested protective custody status, and was moved into Eyman Rynning's Complex Detention Unit. Then, about a week before his death, he was moved to SMU-I's Complex Detention Unit. Ex. 354 at ADCRR00000153.

The reviewer who wrote the ADCRR psychological autopsy noted that earlier in the evening before the decedent took his life,

> [v]ideo of the pod (no audio was available) shows that [the decedent] gave an officer who was walking the pod a piece of paper on the afternoon of his death that could have been a note; however, the officer who purportedly accepted the paper denies receiving anything from [the decedent]. That officer also reportedly switched posts with another officer without obtaining approval from the shift commander and is currently under investigation by the CIU (Criminal Investigations Unit). Thus, when [the decedent] was found hanging, it was a different officer who was completing cell front

---

[63] The consulting psychiatrist who reviewed this patient's medical chart for Defendants' expert Dr. Penn detailed that "[o]f note, ambulance team refused to go to [patient's] location 'due to their policy' and he was brought to medical on a gurney." Ex. 2262 at ADCRR00232590 (Patient 52). It is unclear if the delay in his being treated by the ambulance team because he was housed in a detention unit contributed to his death.

checks and not the officer who was seen accepting a piece of paper from [him].

An inmate who was housed in the same area after [the decedent] returned to his cell told a psychologist that [he] said at approximately 6 p.m., "I can't do this anymore." The inmate said he did not hear anything else from [the decedent] that night. The inmate also believes that [he] was likely hanging in his cell for quite some time because the officers did not walk the pod for at least 3.5 hours.

*Id.* at ADCRR00000153-54.

359. The psychologist who reviewed the record and wrote the ADCRR psychological autopsy concluded that this person's extended placement in isolation units after requesting protective custody was a likely contributory factor. She wrote that

His placement in detention and then in maximum custody after requesting protective segregation appeared to have increased his anxiety level and negatively affected his sleep and concentration. In retrospect, it appears he was having difficulty adjusting to a higher level of confinement. Although he had protective factors such as ongoing family communication and support as well as a high school diploma (education), these proved to be insufficient when [the patient] was placed in a maximum custody environment.

*Id*. at ADCRR0000155.

360. The reviewer recommended that

Inmates who are placed in a detention or maximum custody unit should be seen by the psychiatric provider every three months at a minimum if they are prescribed psychotropic medication to monitor their adjustment to a higher level of confinement and to adjust their medication accordingly.

*Id*. Dr. Stewart testified that he agreed with this statement and concluded that this suicide was potentially preventable. Stewart TT at 520:115. He noted that

Overall, this patient had significantly deficient psychiatric and counseling care in the weeks before his suicide. Most notably the prescribed medications were incorrectly dosed given the patient's symptoms. Also, the extent of the patient's psychosocial problems was not appreciated or addressed, especially given his placement in segregated housing. It is my opinion that the brief and superficial mental health encounters this patient received were a contributing factor to his death by suicide.

-130-

155617523.3

Stewart WT, Doc. 4109-1 at 104.[64]

361. The Court finds that the nature, conditions and duration of solitary confinement in ADCRR unreasonably subjects Isolation Subclass members to a substantial risk of serious harm or even death, and deprives them of the minimal civilized measure of life's necessities.

**J.    Conclusion**

362. The conditions that exist in ADCRR isolation units are conditions that decades of scientific research have shown can adversely affect virtually everyone exposed to them, regardless of whether they suffer from pre-existing mental illness. Haney WT, Doc. 4120 ¶¶ 99, 188.

363. ADCRR's isolation practices, and conditions in ADCRR isolation units, create a substantial risk of serious harm for all persons who are exposed to them. Haney WT, Doc. 4120 ¶¶ 17, 66, 99, 110; Haney TT at 792:11-17.

364. ADCRR's failure to categorically exclude from isolated confinement all persons who suffer from serious mental illness is at odds with sound correctional and mental health practice. ADCRR's isolation practices create a substantial and especially significant risk of serious harm for persons with serious mental illness who are exposed to them. This risk is not limited to those who have been formally designated by ADCRR as SMI, but extends to others who suffer from diagnosable mental illness and are receiving psychotropic medication. Haney WT, Doc. 4120 ¶¶ 19, 72, 99; Haney TT at 792:18-793:8.

---

[64] The consulting psychiatrist who reviewed this patient's medical chart for Defendants' expert Dr. Penn concluded that the patient had inadequate access to timely mental health care prior to his death, including, "Medications type / doses selected inconsistent with the dx listed," and "[i]ndividual counseling encounters in 2020: one in January, two in Feb, one in July and one in Aug. in July patient c/o [complained off] multiple stressors, Aug encounter was 10 minutes and the stressors were not revisited," and "[e]ncounters with prescriber only in Jan, Feb, and two in July. On Jul[y] 16, patient alluded to anxiety, depression, and hopelessness. Suicidal ideation not explored. Visit lasted 10 min, no medication changes, no follow up." Ex. 2262 at ADCRR00232606 (Patient 228).

365.   ADCRR's failure to categorically exclude children (persons under the age of 18) from isolated confinement is at odds with sound correctional and mental health practice, and places children held in isolation at a substantial risk of serious harm. Haney WT, Doc. 4120 ¶ 21.

366.   ADCRR's failure to devise and implement careful mental health monitoring policies for persons held in isolation units places all such persons at a substantial risk of serious harm. Haney WT, Doc. 4120 ¶ 189.

## III.   MENTAL HEALTH CARE

### A.   Background

367.   As in many other states, the provider of last resort and the largest provider of mental health care services in Arizona is its state prison system. It is undisputed that Defendants are legally responsible for caring for many of the most profoundly mentally ill people found in the State of Arizona, individuals who struggle with debilitating chronic psychiatric and psychological disorders, many of whom experienced great trauma and violence prior to their incarceration. Stewart TT at 469:2-6 ("[I]t's hard for me to express how significantly ill the individuals that I encountered are. They were among the most mentally ill individuals that I have seen throughout my 40 years of being a psychiatrist.").

368.   As the State has made a policy choice to incarcerate in its state prisons the many mentally ill people who in past eras would have been treated in mental hospitals or in the community, ADCRR is accordingly obligated under the U.S. Constitution to provide meaningful treatment and care to these people, and not simply warehouse them until the end of their sentences or deaths. In sum, this is a situation whereby the Arizona state prison system has an extensive demand and need for competent and complicated mental health care for the people incarcerated in its prisons; yet, at the same time, health care services have been outsourced to a series of private vendors who have competing interests of satisfying their shareholders. Stewart WT, Doc. 4109 ¶ 19; *see* Ex. 1860, Report to the Court in the Matter of *Parsons v. Ryan, et al.*, Marc F. Stern, MD, MPH, Federal Rule 706 Expert (Oct. 4, 2019) ("Stern Report"), Doc. 3379, at 104-108.

155617523.3

1        **B.    Evidence Regarding Mental Health Care Considered by the Court**

2        369.    Dr. Pablo Stewart, M.D., has been retained by Plaintiffs since 2012 to

3    provide expert opinions concerning the adequacy of the mental health care provided to

4    class members in ADCRR custody. Stewart WT, Doc. 4109.[65] He testified that ADCRR's

5    mental health system is inadequate to meet the serious mental health needs of the

6    population, and exposes them to an unreasonable risk of harm. Stewart TT at *passim*;

7    Stewart WT, Doc. 4109 ¶¶ 16-17, 33.

8        370.    For this trial, Dr. Stewart reviewed current ADCRR and Centurion policies,

9    procedures, and practices; reviewed numerous documents and class members' medical

10   charts; and conducted on-site inspections and class member interviews in September

11   2021, when he visited housing units where people classified SMI are incarcerated, any

12   units designated for people with mental health needs (regardless of classification), mental

13   health watch units, isolation units including maximum custody and detention units, and

14   interviewed class members incarcerated in these units. Stewart WT, Doc. 4109 ¶ 8. All

15   documents Dr. Stewart reviewed are listed in Exhibit 4 to his written declaration. *Id.* ¶ 15;

16   *see* Doc. 4109-1, Ex. 4.

17       371.    During his September 2021 visits, Dr. Stewart attempted to speak to

18   (1) people who appeared often on Defendants' self-harm and mental health watch logs as

19   persons with very long stays on suicide watch or frequent acts of self-harm, (2) class

20   members whom he has interviewed in the past, to determine how their mental health has

21   ───────────────

22       [65] Dr. Stewart is a board-certified psychiatrist who practices in clinical and forensic
     psychiatry, and currently is a clinical professor at the University of Hawai'i, and serves as
23   an attending psychiatrist at the Oahu Correctional Center, where he provides clinical care
     to jail detainees, and supervises psychiatry residents at the jail facility. Stewart WT,
24   Doc. 4109 ¶¶ 1-2; Stewart TT at 445:12-22. He has more than 40 years of extensive
     clinical, research, and academic experience in diagnosis, treatment, and community care
25   programs for persons with psychiatric disorders, and the management of patients in
     institutionalized populations with dual diagnoses, including psychotic disorders.
26       Dr. Stewart is the court-appointed monitor to the U.S. District Court for the Central
     District of Illinois in *Rasho v. Jeffreys*, a statewide injunctive class action case about
27   mental health care in the Illinois state prison system. Stewart WT, Doc. 4109 ¶¶ 3-6,
     Doc. 4109-1, Ex. 1; Stewart TT at 446:8-20; *see also Rasho v. Jeffreys*, Case No. 1:07-
28   CV-1298-MMM-JEH, Doc. 711-1 at 25-28 (Amended Settlement Agreement) (C.D. Ill.
     May 23, 2016).

progressed since their last meeting, and (3) monolingual Spanish speakers (based upon ADCRR's language interpretation logs, provided prior to his tours) who are on the mental health caseload. Stewart WT, Doc. 4109 ¶¶ 9, 92, 95, 104-111. The remaining people whom he interviewed were chosen by going to specialized mental health and isolation housing units and walking from cell to cell, to observe and speak with people. *Id.* ¶ 9. Dr. Stewart explained that his methodology is to focus on persons with the most serious mental health concerns or diagnoses, because these are the patients that a functioning correctional mental health care system should at a minimum prioritize. *Id.* at 10.[66]

---

[66] While Defendants tried to attack Dr. Stewart's methodology as not being "random" enough, their expert Dr. Penn asked Defendants' counsel to "randomly" select patients for his consulting psychiatrists to review their medical records for him, out of a pool of people with a mental health score of MH-3 or higher, because "I wanted anyone that was on the mental health caseload that had either an acute or chronic mental illness, or perhaps a serious mental illness; anyone on psychotropic meds; was either in a mental health treatment program, or alternatively was in—was housed in an inpatient setting. So that was MH-3, MH-4, MH-5s." Penn TT at 2964:8-16. When he visited ADCRR facilities, Dr. Penn visited the units where MH-4 and MH-5 patients live, because, he confirmed, it is important to know how the system treats the sickest patients. *Id.* at 3089:19-3090:14.

Defendants have a standardized scoring system for classifying incarcerated people according to their mental health needs, with MH-1 as the lowest level of need, and MH-5 as the highest. Ex. 3025 at ADCRR00138136-138141 (Mental Health Technical Manual "MHTM" Ch. 3 § 5.0); *see also* Stallcup TT at 2473-4:13-2477:3, 2477:10-2478:24.

- MH-1: Prisoners who have no history of mental health issues or receiving mental health treatment.
- MH-2: Prisoners who have received mental health treatment in the past but do not currently have any mental health needs, and have demonstrated behavioral and psychological stability for at least six months.
- MH-3: Outpatient Treatment. Patients who have current mental health needs that require outpatient treatment. There are five sub-codes to MH-3.
  - MH-3A: Patients in acute distress who may require substantial intervention in order to remain stable. All patients classified as seriously mentally ill ("SMI") are to be classified as MH-3A (unless admitted to a residential treatment or inpatient treatment program, and then classified as MH-4 or MH-5). Any patient under a Psychiatric Medication Review Board ("PMRB") order for involuntary administration of psychiatric medication are to be classified as MH-3A (unless admitted to a residential treatment or inpatient treatment program, and then classified as MH-4 or MH-5).
  - MH-3B: Patients who are generally stable but need regular interventions because they are receiving psychiatric and psychological services.
  - MH-3C: Patients who are stable, have adequate coping skills, and are able to manage their mental health symptoms through medication only, and who need infrequent intervention.
  - MH-3D: Patients who were recently taken off of psychotropic medications and need follow-up for six months thereafter to ensure stability over time.

155617523.3

372. Dr. Stewart included with his report detailed write-ups and summaries of all tour interviews and all clinical reviews of patients' medical records. Stewart WT, Doc. 4109 ¶¶ 11-12; *see* Doc. 4109-1, Ex. 2. He reviewed the medical records of 15 of the 23 patients in ADCRR custody who died by suicide from January 2019 to September 2021. Stewart WT, Doc. 4109 ¶ 13.

373. After each death by suicide of an incarcerated person, ADCRR is required to conduct a psychological autopsy designed to identify any causes that led to the patient's suicide, and whether the suicide was preventable. ADCRR staff must complete a psychological autopsy within 30 days of the person's death: Defendants provided 20 psychological autopsies, which Dr. Stewart reviewed. Stewart WT, Doc. 4109 ¶ 13.

374. In addition, under state law, ADCRR must complete a mortality review after any death in custody; these serve a similar function and should be completed within 10 days of ADCRR receiving the local county medical examiner's report. Ex. 1305 (Medical Services Technical Manual), Ch. 7, § 7.1, "Inmate Mortality." At the time of his review in September and October 2021, Defendants had provided 20 mortality reviews for patients who died by suicide since January 2019, all of which were entered into evidence. Dr. Stewart submitted with his written testimony an exhibit that included detailed write-ups and analysis of his review of these patients' medical records, the psychological autopsy reports, and the mortality review reports. *See* Stewart WT, Doc. 4109-1, Ex. 3.

375. Dr. Stewart's opinion is also based upon his extensive experience in this action, including the numerous reports and declarations that he has submitted in this case regarding mental health care, as well as his monitoring visits to the prisons in 2013, 2018,

---

    o MH-3E: Patients who recently arrived to ADCRR custody and are generally stable but may benefit from regular contacts with mental health clinicians, or patients participating only in outpatient group psychotherapy.
- MH-4: Residential Treatment. Patients who are admitted to a residential mental health program.
- MH-5: Inpatient Treatment. Patients who are admitted to the inpatient mental health treatment programs licensed by the Arizona Department of Health Services.

Ex. 3025 at ADCRR00138136-138141.

and 2019. Stewart WT, Doc. 4109 ¶¶ 7-8 & n.2, ¶ 15. The Court finds Dr. Stewart's methodology sound and his opinions credible and well supported by the facts in evidence.

376. Dr. Joseph Penn, Defendants' expert, evaluated ADCRR's mental health care by visiting six prisons for approximately three to four hours each. At each prison, he met with Centurion and prison staff, but did not speak to any incarcerated people.[67] His opinion was based upon these conversations, and reviews of policies and procedures, documents provided by Defendants, and a Microsoft Excel chart provided to him by Defendants' counsel that summarized file reviews done by four psychiatrists whom Dr. Penn selected to review files. Penn TT at 3094:6-15, 3098:19-3099:11; *see* Ex. 2262 at ADCRR00232580-614. He asked the psychiatrists to evaluate medical charts on one metric alone: "access to care," or timely access to care, and this required a yes or no answer. Penn TT at 2967:18-2968:1, 3099:26-3100:3. The reviewers looked at approximately 275 patients' medical records, but did not compare them with the ADCRR Mental Health Technical Manual's requirements; nor did they review any other documents, including mortality reviews and psychological autopsy reports. *Id.* at 3100:13-15, 3102:4-6. The Court concludes that Dr. Penn's methodology of focusing on only one metric in a binary method is of limited value when evaluating a nuanced and complex mental health system.

377. When Dr. Penn was deposed on October 26, 2021 (after the close of fact and expert discovery), he testified that, at that point in time, he had personally looked at only

---

[67] Dr. Penn could have met with class members had Defendants invited counsel for Plaintiffs to be present for such interviews, similar to Defendants' counsel being present for all conversations that Dr. Stewart had with Centurion or ADCRR employees. As Defendants chose not to allow Plaintiffs' counsel to be present for Dr. Penn's visits, it was impermissible for him to speak to represented class members outside the presence of Plaintiffs' counsel. *Cf. Coleman v. Brown*, 938 F. Supp. 2d. 955, 962-63, 968-69 n.20 (E.D. Cal. 2013) (sanctioning defense counsel and striking defendant prison systems' expert reports after defendants' counsel and experts improperly communicated with represented class members outside the presence of and without the consent of class counsel, and ordering that "it may be that possible ethics violations here are best left to be dealt with by the California Bar."). Had Defendants allowed Plaintiffs' counsel to be present for Dr. Penn's tours, he could have interviewed and met with class members, if the class members consented. The many deficiencies in his testimony and report that result from not speaking with any class members are therefore self-inflicted.

approximately 100 of these 275 files these psychiatrists had reviewed. Penn TT at 3092:23-3093:2. When he testified at trial on November 19, 2021 (over a month after the close of discovery), he asserted that he had personally reviewed all 275 medical charts in the interim. *Id*. at 3093:3-11. But he repeatedly testified that he did not make a single written note while reviewing any of the 275 charts, nor did he create any sort of written memorialization of the file reviews that he had done. *Id*. at 3093:9-19, 3127:25-3128:3. He was unable to specify which records he reviewed before or after the close of discovery, nor could he testify credibly about the mental health care provided to any of these patients; he was able to offer only conjecture and suppositions with no basis in the actual medical records. *See, e.g.*, *id*. at 3143:8-14 ("I would need to look at the chart because it's possible that the patient is not on medication…"), *id*. at 3127:19-24 ("They might have said the patient was adamant they didn't want this medicine […] Q: And was that in that patient's medical record? A: I don't recall."). Dr. Penn did not take any notes while reading mortality reviews of people who died by suicide; and did not provide any sort of written clinical review or analysis of patients' care prior to their suicides, or of the care of patients with serious mental health diagnoses. *Id*. at 3093:12-19, 3117:15-18.[68]

378. Instead, Dr. Penn asserted that he kept all of information from the medical files and mortality review reports "in [his] head." Penn TT at 3093:9-19; *id*. at 3117:17-18. Nonetheless, when pressed for details or his opinion on individual cases in his report or his consultants' review, or the unsupported assertions he made in his written declaration, he professed ignorance and an inability and lack of preparedness to testify,

---

[68] Indeed, the only reference in Dr. Penn's written testimony to mortality reviews was with regard to a single patient, and the entirety of his discussion was one sentence: "[Patient's] mortality review and psychological autopsy were reviewed and will not be repeated here." Doc. 4174 ¶ 253. His written testimony only mentions two of the 23 patients who died by suicide between January 1, 2019 and the time of trial—the ones whose deaths are discussed at Ex. 256 and Ex. 354. Penn TT at 3222:13-23; Haney WT, Doc. 4120 ¶ 114 (listing suicides in ADCRR).

155617523.3

1   except to opine (without any articulated basis) that care was adequate, or state that he

2   needed to review the file or relevant documents.[69]

3       379.    Dr. Penn also testified that of the 275 patients' records that his four

4   psychiatric consultants reviewed, and that he testified he reviewed, there was only a single

5   case where he thought there were some deficiencies in care. Penn TT at 2971:16-17 ("I

6   will acknowledge that there was a breakdown in one of the cases"); *see also id.* 3381:23-

7   25 (testifying that other than this single patient, he did not find any issues with respect to

8   the other 275 records that he reviewed); *id.* at 3398:2-3399:8 (in response to the Court's

9   questions, confirming again that he found no problems in mental health care other than in

10  this single case); *but see id.* at 3206:17-3209:7 (testifying that nevertheless this one

11  patient's treatment still met the standard of care).

12      380.    Dr. Penn testified that he read all of the mortality reviews detailed by

13  Dr. Stewart—including reports where ADCRR and Centurion reviewers had conceded

14  failures in care—but that he concluded, contrary to everyone else, that the mental health

15  care provided to the patients before their suicides was adequate.[70]

16      381.    Moreover, his four psychiatric consultants found deficiencies solely on the

17  "access to care" metric for at least 37 of the 275 patients reviewed, as well as finding

18

19          [69] *See, e.g., id.* at 3117:5-7 ("THE COURT: Do you recall what was said on the
    report? THE WITNESS: No, Your Honor, but I would be happy to review it…"), *id.* at
20  3123:22-3124:3 ("THE COURT: But would that have made a difference though for you to
    make your assessment to know the facts underlying this particular statement and this
21  inmate? THE WITNESS: Your Honor, I would be happy to look at the medical record
    again."); *id.* at 3125:15-16 ("If I had the opportunity to review the chart, I would be happy
22  to answer your question."); *id.* at 3177:4-6 ("[I]f you want to show me the document, I
    would be happy to try to answer your question."); *id.* at 3182:16-20 ("I was not aware of
23  that … [B]ut, no, I am not aware of that case. But I am happy to review it if I can try to
    help answer your question."); *id.* at 3189:5-9 ("THE COURT: Is there any way you can
24  determine that this individual can communicate in English? THE WITNESS: Not without
    reviewing the chart, Your Honor, or speaking to the patient, which I would be happy to
25  do."); *id.* at 3279:24-25 ("I'm not familiar with that journal. But I would be happy to read
    it[.]"); *id.* at 3298:22 ("If you have the quotation or citation, I'd be happy to look at it.").
26          [70] On cross-examination Dr. Penn admitted that he had *not* reviewed the
    psychological autopsy report for a person who died by suicide in 2020, prior to reaching
27  his conclusion that the mental health care the patient received prior to his death met the
    standard of care. Ex. 354; Penn TT at 3217:22-3218:12, 3220:9-11, 3220:18-3222:12. *See
28  also supra* ¶ 358.

deficiencies in at least 36 additional cases. For example, while perhaps the patient was seen in a timely manner (thus meeting this nebulous "access to care" metric), there were other deficiencies such as inappropriate or inadequate psychotropic medications for the patients' conditions, failure to monitor side effects of medication, poor recordkeeping and documentation, failure to provide language interpretation to non-English speakers, or delays in referral to psychiatry by clinicians. *See* Penn TT at 3098:19-3145:13; Ex. 2262 at ADCRR00232580-614 (reviewers' spreadsheet showing 37 patients listed with "no" under "Access to Care?" [Patients 1 (suicide), 6 (suicide), 11, 14, 16, 17 (suicide), 21/22 (same patient listed twice), 27, 28 (suicide), 29, 30, 34 (suicide), 38 (suicide), 49, 55, 56 (death after lithium toxicity), 61, 62, 72, 80, 81, 82, 87, 90 (suicide), 92, 95, 97, 118, 140, 147, 148, 151, 153, 158, 169, 228 (suicide), 258]; and 36 other patients listed with "yes" under "Access to Care?" but where other deficiencies in care were identified [Patients 7, 10, 12 (suicide), 13 (suicide), 32, 52 (suicide), 60, 86, 91, 94, 99, 102, 105, 115 (suicide), 119, 121, 125, 129, 131, 136, 145, 152, 155, 156, 157, 159, 160, 161, 163, 167, 168, 174, 235, 252, 258, 271]).[71]

382.    Dr. Penn appears to believe that so long as a patient did not die, the mental health care is adequate. "I reviewed all of these charts, I didn't find any of these patients to be – to have death or morbidity or mortality resulting, so there wasn't a bad outcome with these patients." Penn TT at 3133:11-14. "Your Honor, I reviewed all of these charts, and I don't recall this patient having an adverse patient outcome like a death or a suicide." *Id.* at 3139:15-17. It is puzzling that Dr. Penn testified that in "all of these charts" that *he* reviewed, that he didn't find death or morbidity, because his consultants reviewed 19

---

[71] On direct testimony Dr. Penn testified that for 33 of the 155 patients that Dr. Stewart had described, his consultants found "Access to Care" to be a problem; and of the 120 "random" files that Defendants' counsel selected for him there were "only problems with access to care in five of the files." Penn TT at 2970:8-12, 2970:22-2971:3. He did not explain why he disagreed with his chosen consultants with respect to any or all of these patients.

Dr. Penn also admitted that his "random sample" included patients who are classified MH-3D or MH-3E, and thus by definition are not prescribed medications. Penn TT at 3143:15-24.

deaths by suicide and a death with a contributing cause of lithium toxicity, out of the 275 files (Ex. 2262 at ADCRR00232486), and he testified that he reviewed all 275 files and all of the mortality reviews.[72] But in any event, death by suicide is not the sole metric by which to measure if a prison system's mental health care is adequate.[73]

383. Given the cumulative effect of Dr. Penn's conclusory and unreliable methodology, and his steadfast unwillingness to acknowledge even those shortcomings conceded by his own psychiatric consultants, Defendants, or their contractors, the Court concludes that Dr. Penn is not a credible witness in relation to his opinions regarding Defendants' provision of mental health care.[74]

384. In addition to these two experts, the Court also heard testimony that related to the delivery of mental health care in ADCRR prisons from Plaintiffs' expert Dr. Craig Haney; former Centurion of Arizona regional mental health director Dr. Stefanie Platt; Defendants Shinn and Gann; Dr. Bobbie Pennington-Stallcup, ADCRR's mental health program director; and four Named Plaintiffs and one additional class member (Dustin Brislan, Jason Johnson, Rahim Muhammad, Laura Redmond, and Ronald Slavin). Four ADCRR wardens and deputy wardens testified regarding mental health care provided in max custody, close management, detention, and mental health watch units at three prisons. Finally, Plaintiffs designated relevant deposition testimony from three people whom Defendants had previously disclosed as trial witnesses but who ultimately were not called to testify: Dr. John Wilson, Centurion's national vice president for behavioral services;

---

[72] As detailed at ¶ 381, Dr. Penn's consultants—even in their extremely narrow and brief reviews of the records—found problems in at least 11 of 19 suicides.

[73] As discussed in the Conclusions of Law, *infra*, "death or morbidity or mortality" is not the governing legal standard. The Eighth Amendment is violated if Defendants, acting with deliberate indifference, expose Plaintiffs to a "substantial *risk* of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (emphasis added).

[74] As noted above in ¶ 38, in October 2021, the U.S. Department of Justice opened an investigation into conditions in Texas' state-run juvenile facilities to examine whether children in the state's juvenile prison system are provided "reasonable protection from physical and sexual abuse by staff and other residents, excessive use of chemical restraints[,]excessive use of isolation[, and] whether Texas provides adequate mental health care." Ex. 2201; Penn TT at 3058:16-20, 3348:14-22. Dr. Penn testified that he is responsible for and oversees the provision of mental health care to children incarcerated in the Texas Department of Juvenile Justice. Penn TT at 3058:16-20.

Dr. Antonio Carr, Centurion of Arizona's regional psychiatry director; and Dr. Ashley Pelton, Centurion of Arizona's regional mental health director.

### C. Summary of the Findings Related to Mental Health Care

385. The evidence before the Court shows that multiple systemic deficiencies in Defendants' mental health care system result in the mental health care received by incarcerated people falling short of minimum constitutional standards.

386. The overwhelming evidence presented by Plaintiffs demonstrated:

- An inadequate staffing plan for Defendants' health care contractors, and a chronic shortage of qualified mental health staff to fill even that inadequate plan;

- Delays in the provision of mental health care and the outright failure to provide mental health care;

- Brief, non-confidential, and superficial contacts between mentally ill people and staff;

- Inadequate treatment plans;

- A failure to coordinate between medical, psychology, and psychiatric providers to treat complex patients;

- A failure to properly administer, monitor, and manage psychotropic medications and their side effects;

- A failure to mitigate and address acts of self-harm and suicide;

- A lack of access to inpatient mental health care for the most profoundly mentally ill patients;

- Inappropriate use of force on seriously mentally ill people; and

- Inappropriate and prolonged uses of isolation on people with mental illness.

387. These deficiencies, working individually and in combination, cause unnecessary suffering to incarcerated people who need mental health care, place them at a substantial risk of serious harm or death, and deny them the minimal civilized measure of life's necessities. Stewart TT *passim*; Stewart WT, Doc. 4109 ¶¶ 17, 18, 21-23, 32-33, 44-45, 57-60, 63-65, 68-78, 88-92, 96-97, 99-100, 112-113, 120-122, 127137.

388. The harm that results from these systemic deficiencies is profound. Under-identified and undertreated mental illness causes physical and psychological pain and

suffering in the form of persistent or worsening symptoms, permanent neurological damage, decompensation, self-harming behavior that can lead to permanent physical disfigurement and injuries, and deaths by suicide.

389. The evidence shows that many class members with serious mental illness remain profoundly symptomatic in floridly psychotic, depressed, manic, and self-harming or disabling conditions for long periods of time.

390. As described in Part II, mentally ill people are particularly vulnerable to psychological harm from harsh conditions in the isolation cells in maximum custody, close management, detention, and suicide watch units throughout the ADCRR system.

391. Many of the systemic problems with the delivery of mental health care identified at the 2021 trial in this case have existed for years prior to the trial, and Defendants and the Court had been notified repeatedly of these deficiencies. Defendants have long known about the substantial harms that result from these systemic deficiencies in the provision of mental health care, and have failed to correct them. Dr. Stewart has identified serious deficiencies with Defendants' mental health care over the course of many years in declarations based upon site visits, patient interviews, document review, and his review of hundreds of patients' medical charts comprising thousands of entries. In total, he has provided this Court with at least 18 declarations or expert reports that pertain to the provision of mental health care, preventable self-mutilation and suicides, staffing deficiencies, barriers to mental health care, untimely care, poor treatment planning and coordination, failure to provide language interpretation in mental health encounters, and myriad other systemic failures that harm the Plaintiff class and place them at serious risk of harm. *See* Stewart WT, Doc. 4109 ¶¶ 7, 12 (listing all submissions).

### D. Chronic Shortages of Qualified Mental Health and Custody Staff Contribute to Serious and Systemic Deficiencies in the Delivery of Mental Health Care

392. Sufficient numbers of qualified mental health staff are the foundation of any minimally adequate correctional mental health care system. Mental health and correctional staffing shortages drive inadequate mental health treatment in Arizona

-142-

prisons. Defendants' pervasive and longstanding failure to have adequate numbers of mental health care staff, or the appropriate mix of types of staff, undermines the ability of providers and clinicians to provide minimally adequate mental health care services. Stewart WT, Doc. 4109 ¶¶ 18, 20.

393.    Shortages of other health care staff, such as nurses who screen Health Needs Requests (HNRs) filed by patients seeking mental health care, nurses who distribute medications to patients, and medical records staff, can negatively affect the delivery of mental health services and treatment, even if those employees are not formally classified as mental health staff. Stewart WT, Doc. 4109 ¶ 23.

394.    The number of mental health staff required by ADCRR's contracts with their vendor, and the number of positions actually filled with full-time equivalent (FTE) permanent employees, is abysmally low. Stewart WT, Doc. 4109 ¶¶ 19-21.

395.    The evidence shows that shortages and vacancies in custody staff also adversely affect the delivery of mental health care: whether there are enough officers available to escort class members to mental health encounters (either at a clinic or an out-of-cell location in a housing unit), to work in clinics where telepsychiatry and counseling occurs, to provide security during group mental health services and programs, to properly monitor people placed on suicide or other mental health watches, and to properly supervise and monitor people incarcerated in isolation units who may be experiencing psychological decline due to the harsh conditions. Stewart WT, Doc. 4109 ¶ 23.

396.    The most recent health care staffing data in evidence (August 2021) show only 74% (153.43) of 206.0 FTE mental health positions filled. Ex. 2167 at ADCRR0137140. The previous months in 2021 show ongoing vacancies across a multitude of positions:

**ASPC-Eyman:**

| Position | | Contract FTE | May FTE | May % Filled | June FTE | June % Filled | July FTE | July % Filled | Aug FTE | Aug % Filled |
|---|---|---|---|---|---|---|---|---|---|---|
| Behavioral Health Tech | | 4.00 | 3.00 | 75% | 3.00 | 75% | 4.00 | 100% | 7.00 | 175% |

-143-

| Position | Contract FTE | May FTE | May % Filled | June FTE | June % Filled | July FTE | July % Filled | Aug FTE | Aug % Filled |
|---|---|---|---|---|---|---|---|---|---|
| MH Lead | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| MH Clerk | 1.00 | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| MH Midlevel (NP/PA) | 3.50 | 3.50 | 100% | 3.50 | 100% | 3.00 | 86% | 4.00 | 114% |
| MH RN | 2.00 | 0.90 | 45% | 0.90 | 45% | 0.90 | 45% | 0.90 | 45% |
| Psychiatrist | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| Psychologist | 3.00 | 1.00 | 33% | 1.00 | 33% | 1.00 | 33% | 2.00 | 67% |
| Psych Associate | 13.00 | 5.80 | 45% | 4.00 | 31% | 5.00 | 38% | 8.00[75] | 62% |
| TOTAL MH STAFF | 26.5 | 16.2 | 57% | 14.4 | 51% | 15.9 | 56% | 23.9 | 84% |

**ASPC-Florence:**

| Position | Contract FTE | May FTE | May % Filled | June FTE | June % Filled | July FTE | July % Filled | Aug FTE | Aug % Filled |
|---|---|---|---|---|---|---|---|---|---|
| Behavioral Health Tech | 4.00 | 4.00 | 100% | 4.00 | 100% | 4.00 | 100% | 0.00 | 0% |
| MH Lead | 1.00 | 1.00 | 100% | 1.00 | 100% | 0.00 | 0% | 0.00 | 0% |
| MH Clerk | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| MH Midlevel (NP/PA) | 3.50 | 3.50 | 100% | 3.50 | 100% | 3.00 | 86% | 3.00 | 86% |
| Mental Health RN | 1.00 | 0.80 | 80% | 1.00 | 100% | 1.00 | 100% | 0.00 | 0% |
| Psychiatrist | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| Psychologist | 3.00 | 0.90 | 30% | 0.90 | 30% | 0.90 | 30% | 0.90 | 30% |
| Psych Associate | 8.00 | 5.00 | 63% | 5.00 | 63% | 5.00 | 63% | 2.00 | 25% |
| TOTAL MH STAFF | 22.50 | 17.20 | 76% | 17.40 | 77% | 15.90 | 71% | 7.90 | 35% |

**ASPC-Lewis:**

| Position | Contract FTE | May FTE | May % Filled | June FTE | June % Filled | July FTE | July % Filled | Aug FTE | Aug % Filled |
|---|---|---|---|---|---|---|---|---|---|
| Behavioral Health Tech | 4.00 | 2.00 | 50% | 3.00 | 75% | 3.00 | 75% | 3.00 | 75% |
| MH Lead | 1.00 | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |

[75] In September 2021, the number of vacant psych associate positions at Eyman had grown to seven (in other words, only six of the 13 FTE positions were filled). Ex. 907 at ADCRR00210847 (Sept. 28, 2021 Eyman CQI minutes). At that point, there was a backlog of 132 uncompleted mental health psych encounters. *Id*. at ADCRR00210848. *See also* Ex. 847 at ADCRR00136579 (Aug. 12, 2021 Eyman CQI minutes) (mental health psych associate backlog of 366 patients past due); *id*. at ADCRR00136590 ("Eyman has reported a back log as we continue to have Psych associate vacancies.").

155617523.3

| Position | Contract FTE | May FTE | May % Filled | June FTE | June % Filled | July FTE | July % Filled | Aug FTE | Aug % Filled |
|---|---|---|---|---|---|---|---|---|---|
| MH Clerk | 1.00 | 2.00 | 200% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| MH Midlevel (NP/PA) | 3.50 | 2.00 | 57% | 3.00 | 86% | 3.00 | 86% | 3.00 | 86% |
| Mental Health RN | 2.00 | 1.00 | 50% | 0.00 | 0% | 0.00 | 0% | 1.00 | 50% |
| Psychiatrist | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| Psychologist | 3.00 | 3.00 | 100% | 3.00 | 100% | 3.00 | 100% | 2.00 | 67% |
| Psych Associate | 12.00 | 10.25 | 85% | 10.25 | 85% | 10.25 | 85% | 10.25 | 85% |
| **TOTAL MH STAFF** | **27.50** | **21.25** | **77%** | **21.25** | **77%** | **21.25** | **77%** | **21.26** | **77%** |

## ASPC-Phoenix:

| Position | Contract FTE | May FTE | May % Filled | June FTE | June % Filled | July FTE | July % Filled | Aug FTE | Aug % Filled |
|---|---|---|---|---|---|---|---|---|---|
| Behavioral Health Tech | 5.00 | 5.00 | 100% | 5.00 | 100% | 5.00 | 100% | 2.00 | 40% |
| Clinical Director | 1.00 | 1.00 | 100% | 1.00 | 100% | 0.00 | 0% | 0.00 | 0% |
| MH Midlevel (NP/PA) | 3.50 | 3.50 | 100% | 3.50 | 100% | 3.50 | 100% | 3.50 | 100% |
| Mental Health RN | 15.80 | 6.30 | 40% | 6.90 | 44% | 6.00 | 38% | 8.80 | 56% |
| MH RN Charge | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.90 | 190% | 0.90 | 90% |
| Psychiatrist | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| Psychologist | 4.00 | 3.50 | 88% | 3.50 | 88% | 2.50 | 63% | 2.50 | 63% |
| Psych Associate | 11.00 | 9.00 | 82% | 11.00 | 100% | 9.00 | 82% | 9.00 | 82% |
| **TOTAL MH STAFF** | **42.30** | **31.18** | **74%** | **33.78** | **80%** | **29.78** | **70%** | **28.58** | **68%** |

## ASPC-Tucson:

| Position | Contract FTE | May FTE | May % Filled | June FTE | June % Filled | July FTE | July % Filled | Aug FTE | Aug % Filled |
|---|---|---|---|---|---|---|---|---|---|
| Behavioral Health Tech | 6.00 | 6.00 | 100% | 6.00 | 100% | 6.00 | 100% | 4.00 | 67% |
| MH Lead | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| MH Clerk | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| MH Midlevel (NP/PA) | 3.50 | 3.50 | 100% | 3.50 | 100% | 3.50 | 100% | 4.50 | 129% |
| MH RN | 2.00 | 2.00 | 100% | 2.00 | 100% | 2.00 | 100% | 2.00 | 100% |
| Psychiatrist | 1.00 | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| Psychologist | 4.00 | 2.00 | 50% | 4.00 | 100% | 3.90 | 98% | 3.90 | 98% |
| Psych Associate | 14.00 | 12.00 | 86% | 11.00 | 79% | 11.00 | 79% | 11.00 | 79% |
| **TOTAL MH STAFF** | **32.50** | **27.50** | **85%** | **28.50** | **88%** | **28.40** | **87%** | **27.40** | **84%** |

155617523.3

*See* Ex. 1531 (May 2021); Ex. 1532 (June 2021); Ex. 1533 (July 2021); Ex. 2167 (Aug. 2021).[76]

397. According to a report provided by Defendants on August 31, 2021, listing all Centurion mental health staff and their licensure status, there are 14 psych associates who are listed as not being licensed, including four at Eyman, two at Florence, three at Lewis, one at Perryville, two at Phoenix, and two at Yuma. Ex. 1528 at ADRR00046154-57. As noted in the charts above, for August 2021, that would mean that 50% of the eight filled psych associate positions at Eyman were unlicensed, 100% of the two filled positions at Florence were unlicensed, and between a quarter and third of the psych associates at Phoenix and Lewis were unlicensed.[77]

398. Dr. Stewart also testified that based on his observations during his visit in September 2021 to the Phoenix facility, there were "numerous significantly profoundly mentally ill individuals, including people who have performed – accomplished really serious acts of self-harm, that are being housed there." Stewart TT at 466:19-467:14. Dr. Stewart opined that having a mental health facility such as the Phoenix facility with a vacant clinical director position meant that "there's no one that is overseeing the entire operation as far as the provision of mental health care." *Id.* at 467:5-13. Further, having only 8.8 of 15.8 contracted mental health RN positions filled at Phoenix "absolutely impacts quality of care" to patients, given the nurses' role in pill calls, distributing medication, responding to requests for care, and the like. *Id.* at 467:18-468:7.

399. Defendants have an inadequate number of psychiatrist positions to provide mental health care to class members with profound mental health disorders. Written

---

[76] The Court notes that Dr. Penn's declaration at page 26 includes three charts that purport to show mental health staffing numbers for 2012, July 2016, and July 2021. Penn WT, Doc. 4172 at 26:1-13. The Court finds this data unreliable, because Dr. Penn did not create these charts, and he does not know who did. He does not know whether the staffing numbers in the charts represent the number of positions called for by the contract, or the number of Centurion staff actually filling those positions. Penn TT at 3156:25-3157:21, 3161:4-5.

[77] The number of filled psych associate positions at Eyman in August 2021 "is grossly insufficient to meet the treatment needs of the population." Stewart TT at 459:21-460:9.

Testimony of Robert Joy ("Joy WT"), Doc. 4099-1 at ECF 6:26-7:1-3, 45:12-47:4; Stewart WT, Doc. 4109 ¶¶ 21, 194. There are very few psychiatrist physicians working in the system—there are only seven psychiatrist FTE positions listed in the statewide contract. However, according to Centurion's records, only two of those psychiatrist positions appear to be on-site (at Phoenix and Yuma); the others are listed as practicing remotely via telepsychiatry. *See* Ex. 1531 (May 2021 Staffing Report, Native Format) at "All Staff" tab (showing "Psychiatrist TH" [Tele-Health] at Eyman, Florence, Lewis, Perryville, Tucson, and Yuma, and two "Psychiatrists" (without the TH qualifier) at Phoenix and Yuma complexes).[78] Mr. Joy's analysis estimated that Defendants need at a minimum 38 psychiatrist FTEs to meet the patient needs, with a high-mid-point estimate of 58 psychiatrist FTEs. Joy WT, Doc. 4099-1 at 46-47.

400. Centurion's staffing model instead relies upon the vast majority of psychiatric services being provided by midlevel practitioners such as nurse practitioners and physician assistants, who are designated as "mental health midlevel" providers. Ex. 1531 (showing 24 "Mental Health Midlevel" positions in the statewide contract).[79]

401. Notably, Defendants' residential mental health programs are at Eyman (Browning BMU), Perryville, Phoenix (Aspen Unit), and Tucson (Rincon Unit), and until September 2021, there was a residential mental health program at Florence's Kasson Unit. Yet other than Phoenix, as noted above, none of these prison facilities has an on-site psychiatrist. The patients in residential mental health programs have complex clinical presentations and treatment requirements that exceed the professional training of a

---

[78] As of May 2021, Defendants had two psychiatrists working at Yuma—one remote and one in-person. This exceeds the contracted one psychiatrist assigned to the prison.

[79] In the Texas adult prison system, only one-third to 40 percent of the psychiatric providers are midlevels, while the rest are psychiatrists. Unlike Dr. Stewart and Mr. Joy, Dr. Penn did not analyze the ratio of psychiatric midlevels to psychiatric physicians in ADCRR. Penn TT at 3161:13-3162:1.

1  midlevel, and there is no on-site physician psychiatrist supervisor of the mental health

2  midlevel psychiatry staff. Stewart WT, Doc. 4109 ¶ 21.[80]

3      402.   Mr. Joy also concluded that there are inadequate numbers of mental health

4  clinician positions in ADCRR's current staffing plans. *See* Joy WT, Doc. 4099-1 at

5  ECF 47-52. "Mental Health Clinician," as that term is used by ADCRR, refers to

6  psychologists and psychology associates. Doc. 1185-1 at 4. Mr. Joy concluded that at a

7  minimum, Defendants need 358 FTE mental health clinician positions statewide, a "high

8  visit" estimate of 750 FTEs, and a "high mid-point estimate" of 554 FTE mental health

9  clinicians. Joy WT, Doc. 4099-1 at ECF 52.

10      403.   The "mix" of staff is also critically important. The majority of day-to-day

11  mental health therapeutic care in ADCRR is provided by psych associates (some of whom

12  are not licensed), behavioral health technicians, or even correctional officers. Without a

13  sufficient number and type of properly qualified mental health staff, it is not possible to

14  provide minimally adequate mental health treatment.

15      404.   Due to the widespread failures to recruit and retain mental health staff, there

16  is a constant churning and turnover of staff. Staff turnover impedes any sort of consistent

17  or adequate delivery of mental health care to the class members who need it, and makes

18  ───────────────

19      [80] Dr. Penn believes it would be acceptable to have one FTE psychiatric provider for every 500 SMI patients in a residential treatment unit. Penn TT at 3152:5-17. He

20  testified that "there's no standard or national standard" regarding mental health staffing in prisons and jails. *Id.* at 3148:3-11. This is false. On cross-examination, he admitted that

21  the American Psychiatric Association's *Psychiatric Services in Correctional Facilities* (3rd Ed. 2015), recommends one FTE psychiatrist for every 150 to 200 general population SMI prisoners receiving psychotropic medication, and one FTE psychiatrist for every 50

22  patients in residential treatment units. The evidence shows that ADCRR falls far short of these ratios.

23      Dr. Penn is a coauthor of this volume; he lists it on his CV as one of his publications, and he testified that it was "a major contribution to the literature." Penn TT

24  at 3148:12-17, 3149:21-3150:10, 3266:9-3267:23, 3269:6-9, 3272:5-3273:1.

    In *Psychiatric Services in Correctional Facilities* (3rd Ed. 2015), under the heading

25  "Disclosure of Competing Interests," lead author Dr. Jeffrey L. Metzner disclosed that he "consults to various state departments of corrections regarding their mental health

26  services, as well as plaintiffs and defendants, in litigation involving correctional mental health issues." By contrast, Dr. Penn "indicated no competing interests to disclose during

27  the year preceding manuscript submission," yet his CV and the Court's record shows that he had been retained by Defendants in this case since 2013. Penn TT at 3269:22-3270:23,

28  3273:2-17.

the creation of a therapeutic relationship extremely difficult, if not impossible. Platt TT at 1060:7-23; Stewart WT, Doc. 4109 ¶ 60; Stewart TT at 471:8-18. A psychological autopsy of a patient who died by suicide concluded that he "never had more than three contacts with the same psychiatric provider" prior to his death. Ex. 354 at ADCRR00000152; *see also supra* ¶¶ 358, 380 (discussion of patient's death).

405. Defendants and their current vendor are well aware of the inadequacy of mental health staffing. Numerous mental health staff working at the prisons have told Centurion's regional director of psychiatry Dr. Antonio Carr that they think that staffing levels must be increased. *See* 30(b)(6) Dep. of Centurion of Arizona, LLC (Antonio Carr) at 106:1-217-9 (testifying that "it's not uncommon for a mental health nurse or psychology associate to say, 'Hey, Carr, I think we need more staff'"); *see also* Ex. 2125 at ADCRR00078070 (2/12/20 email from Dr. Carr to numerous ADCRR and Centurion officials, stating "Our inpatient unit needs a larger investment from Psychiatry, Nursing, Mental Health, ADC and Medical"); Stallcup TT at 2514:22-2515:2 (ADCRR mental health program director testified she was concerned that Centurion was not fully staffed up to the contract's requirement for mental health staff). Dr. Platt testified that mental health staff at the "vast majority" of prisons, including Eyman, Phoenix, Lewis, Florence, Perryville, and Tucson, told her of their concerns about workloads being too high. Platt TT at 1053:4-9, 1053:14-20. She would report back to others at Centurion regional headquarters about this, and Dr. Carr was often with her at the prisons and heard it himself. *Id.* at 1054:7-12.

406. Unless and until these staffing shortages are addressed, people with mental illness will continue to suffer needlessly—often resulting in permanent psychological trauma and suffering, physical disfigurement due to profound acts of self-harm and self-injurious behavior, and in the most tragic of outcomes, death by suicide. *See* ¶¶ 69, 76, 80, 87, 391, 535, 568, 779. Many of the systemic deficiencies with mental health care set forth below are rooted, in whole or in part, in ADCRR's chronically inadequate health care and custody staffing.

155617523.3

407. The Court finds that Defendants' failure to provide adequate numbers of qualified mental health staff, and adequate numbers of custody staff, exposes class members to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

**E. Timely Mental Health Screening and Referrals**

408. It is important that a correctional mental health care system effectively identify and respond to persons in need of mental health services. It is self-evident and common sense that mental health staff must be aware of the people in the prison system who need treatment, and for what conditions, as a prerequisite to providing that treatment. Defendants' failure to identify the people who need mental health services denies class members access to necessary care, and creates a substantial risk of serious harm for the people who are not identified as needing psychological and psychiatric treatment.

409. Defendants fail to ensure that ADCRR's intake process results in people with high mental health needs being assessed by a provider in a timely manner to continue or initiate necessary mental health treatment. Dr. Stallcup, Defendants' mental health program director, admitted that mental health intake can be done by an unlicensed clinician, and there is no minimum duration required for the intake interview. Stallcup TT at 2594:10-2595:1. Nor did she know the average or typical length of these intake mental health interviews. *Id*.

410. Persons taking psychotropic medications in jail prior to commitment to ADCRR, or who were taking medications in the community before the revocation of their parole, often experience interruptions or delays in continuing their medications. Dr. Stewart conducted a clinical review of the medical records, psychological autopsy report, and mortality review report of a patient who died by suicide in early 2021, two weeks after the patient's intake to ADCRR custody. *See* Stewart WT, Doc. 4109-1 at 110-111. Dr. Stewart noted that,

> upon intake to ADC, an initial mental health assessment by psychology was performed that lasted only five minutes. It was determined that [the patient] had recently been on

-150-

medications for anxiety and depression while in jail, which he had discontinued two weeks previously. Evaluation at that time revealed history of methamphetamine use and history of both sexual and physical abuse in childhood. He was determined to have "no emergent MH issues" and no subsequent mental health appointments were scheduled.

*Id*.

411. Nine days after his mental health intake assessment, the patient submitted an HNR, writing, "I need to see a psych doctor about the voices I am hearing in my head. They returned since I stopped taking my medications." He was not seen by health care staff, and two days later he died by suicide. *Id*. at 110. The mortality review noted that the decedent "had a history of depression with recent discontinuation of medications, suicidal ideations, auditory hallucinations, anxiety, illicit substance use, tobacco use, accidental drug overdose…" Ex. 256 at ADCRRM0026203.

412. Dr. Stewart concluded that

The inadequate intake screening of [the patient] and significant delay in psychiatric care after his report of severe psychiatric symptoms fall below the standard of care. The severity of his psychiatric problems was not appreciated by the mental health or medical staff, perhaps due to the very brief (5-minute) intake evaluation. Given his distressing auditory hallucinations, adequate inquiry about the nature of the voices was not conducted to determine if there was a risk of imminent harm, such as voices commanding [him] to harm himself. Furthermore, given that health care staff had knowledge of [the patient] having psychiatric treatment in jail, they should have promptly requested and reviewed prior medical records before determining his Mental Health score and level of care. This suicide was preventable.

Stewart WT, Doc. 4109-1 at 111.

413. The mortality review found that there was a failure to recognize symptoms or signs of mental health distress, and that this patient's death was possibly avoidable. Dr. Stallcup testified that she agreed with these conclusions. Stallcup TT at 2540:19-2542:12.[81]

_____

[81] One of the four psychiatrists who reviewed medical records for Defendants' expert Dr. Penn concluded that this patient's care rated "No" on the metric of "Access to Care." *See* Ex. 2262 at ADCRR00232580 (Patient 6). Dr. Penn testified that this patient

414.    For those who have been incarcerated for longer periods of time, an ongoing robust screening and monitoring system is also critical. People experiencing severe mental health crises may not always seek out help, because the nature of their illness or their symptoms makes them unable to recognize their illness or ask for assistance. Therefore, it is of paramount importance that there is a system in place where both mental health and custody staff, as well as other incarcerated persons, are able to make referrals.

415.    For those suffering from severe mental health symptoms who may not ask for help, especially those incarcerated in isolation units, the monitoring they receive is limited to brief, cursory checks by behavioral health techs. These short and cursory checks are inadequate, and as detailed more above in ¶¶ 341-346, and below in ¶¶ 552-570, people who are psychotic or are repeatedly engaging in acts of self-harm while housed in isolation units suffer for days or weeks on end, without custody staff contacting mental health staff.

416.    Defendants use behavioral health technicians ("BHTs") with no formal mental health training to do health and welfare screening checks of people in isolation units—to check on people with known mental health diagnoses and to identify non-diagnosed persons who may be suffering from the adverse effects of prolonged isolation. Stewart TT at 479:16-480:9 (describing this as a "formula for disaster"); Stewart WT, Doc. 4109 ¶¶ 75, 77.

417.    Dr. Stewart explained that

> These periodic clinical rounds function as a mentally ill prisoner's lifeline when he or she is housed in isolation. These encounters are crucially important to ensure that if a prisoner is decompensating, the problems are identified and steps are taken to move him or her to a mental health crisis bed in a clinical setting, and increase monitoring to reduce the likelihood of self-harm or suicide. In order to determine if a prisoner is showing signs and symptoms of a serious mental disorder, there must be meaningful communication between

---

was the only one of the 275 patient files that he says that he reviewed where he concluded that there might have been any sort of possible deficiency in the delivery of mental health care, but he ultimately concluded that the patient's treatment met the standard of care. *See supra* ¶ 379.

the mental health staff and the patient, and the person performing the rounds must be competent to evaluate the patient for signs of decompensation.

The MHTM [Mental Health Technical Manual] sets forth no guidance on how these rounds are to be performed, and no minimum qualifications for the persons performing them, except that they must be "mental health staff or medical staff (not to include LPNs)." It appears that in practice these checks are often performed by a "Behavioral Health Technician" or a "Mental Health Clerk."

Stewart WT, Doc. 4109 ¶¶ 76-77. *See also* Ex. 1632 (MHTM) at Ch. 3, § 8.0, "Mental Health Service Delivery in Restrictive Housing" (all people in restrictive housing, regardless of mental health score, should receive a weekly health and welfare check, and persons classified as SMI should receive three health and welfare checks a week).

418.    The Eyman isolation units house many very seriously mentally ill persons who are not in any mental health program. According to policy, they are entitled to as little as 2-1/2 hours of recreation, three times a week. *See infra* ¶ 154. Moreover, that is a best-case scenario; many people describe frequent cancellations of recreation, and psychological pain due to the lack of human contact, material deprivations, and profound levels of enforced idleness and inactivity. Haney WT, Doc. 4120 ¶¶ 129-130. Defendants' "failure to regularly and meaningfully monitor the mental health status of *all* of the incarcerated persons confined in such places, all significantly contribute to the extremely high suicide rate from which the system suffers." Haney WT, Doc. 4120 ¶ 115; *see also id.* ¶¶ 129, 130, 147, 150, 153, 154, 157, 159, 160, 163; *see also infra* ¶¶ 552-583.

419.    Dr. Platt, who was Centurion's regional mental health director until late July 2021, testified that the only skills requirement for BHTs was to pass a Microsoft Excel proficiency test; and while it is preferred, it is not required that BHTs have any experience providing mental health care or have a bachelor's degree. Platt TT at 1062:4-18, 1062:23-25. BHTs are paid between $21.50 and $22.50 an hour. *Id.* at 1062:19-22. They receive "general onboarding" where they are told how to look for "warning signs" when doing rounds; if they find people who are having problems, they are told to document problems

and notify someone at a higher level. *Id*. at 1063:4-19. There is no written policy as to how soon the BHTs are supposed to report the problems that they identify during health and welfare checks in isolation units, "but the expectation is that day." *Id*. at 1063:20-23.

420.    Incarcerated people who Dr. Haney interviewed in ADCRR isolation units complained at length about the quality of mental health care, describing contacts with mental health staff as pro forma and perfunctory, and inadequate in frequency, duration, and caring. Although well over half of those interviewed had a mental health diagnosis and were on the mental health caseload, they spoke consistently about the inadequacy of care they received. Indeed, many appeared confused when Dr. Haney asked them about mental health treatment; they were unsure what he meant by "treatment," because they described receiving only "check-ins" and "drive-bys," where mental health staff go quickly by the cells, ask them "are you okay?", and then move on. These cursory checks are not mental health "treatment." Haney WT, Doc. 4120 ¶ 109; *see also id*. ¶¶ 147, 150, 153, 154, 157, 160, 162, 166, 168, 170, 172; Haney TT at 775:15-777:8, 780:9-15.

421.    ADCRR's failure to devise and implement careful mental health monitoring and screening policies for all persons held in isolation units places all such people at unreasonable risk of harm. Haney WT, Doc. 4120 ¶ 189.

422.    Additionally, while custody staff can provide useful information regarding a person's behavior, and are supposed to report abnormal behavior or acts of self-harm to mental health staff, they are not trained to identify mental illness. And the widespread shortages in custody staff, especially at isolation units, (*see* ¶¶ 392-395 below), mean that custody staff are stretched thin, often with only one or two custody officers to cover multiple units, and therefore abnormal behavior or acts of self-harm often go undetected, and unreported. *See* Stewart TT at 470:25-471:7 ("[W]hen we look at the custody staff, and especially in these high-security units or where a lot of the mentally ill are housed, it often requires … at least two or sometimes three custody staff to move an individual from their cell to a confidential area where a mental health encounter may take place. And if

1    you're short custody staff, it's very difficult … to be able to do proper mental health

2    care.").

3        423.    The Court finds that Defendants' failure to provide adequate mental health

4    screening, referrals, monitoring, and access to care exposes class members to a substantial

5    risk of serious harm and denies them the minimal civilized measure of life's necessities.

6        **F.    Inadequate Treatment Plans and Failure to Coordinate Care**

7        424.    Treatment planning is the foundation of all forms of health care, including

8    mental health care. A treatment plan must be formulated by key members of the treatment

9    team; it must be regularly updated to reflect changes in the patient's condition; and it must

10   be readily accessible when treatment is rendered. Stewart WT, Doc. 4109 ¶ 78. Through

11   the treatment planning process, providers and clinicians should identify the patient's target

12   symptoms and treatment goals and coordinate long-term care as necessary. When staff

13   from multiple disciplines such as psychiatric, psychological, nursing, and medical staff are

14   involved in a patient's treatment, treatment planning should involve key people from each

15   discipline in order to ensure consistent care. *Id.* Treatment planning is particularly

16   important in the prison context, where patients have almost no ability to ensure the

17   consistency of their own care; it is even more crucial in the context of ADCRR, where

18   many patients are often transferred across facilities and the staff turnover rate is high.

19       425.    Mental health treatment plans by psychology staff often fail to incorporate

20   the input of or involvement by prescribing psychiatrists, including in cases with patients

21   who were prescribed psychotropic medication. Stewart WT, Doc. 4109 ¶¶ 53, 78-82; *see*

22   *also* Doc. 4109-1 at 30-31, 32-33, 35, 38-39, 40-41, 53-55, 65, 67-68, 70-71.[82] In fact,

23   Defendants admitted that "treatment teams" often consist solely of the patient and an

24   unlicensed counselor. Stallcup at TT 2568:7-11.

25   _____

26       [82] Dr. Penn's consulting psychiatrists identified at least three patients whose
     medical records showed there were delayed referrals, or no referral, from nursing staff or
27   therapists to prescribing psychiatry providers for review of medication for treatment of
     problematic symptoms. Ex. 2262 at ADCRR00232587 (Patient # 32); *id.* at
28   ADCRR00232593 (Patient # 86); *id.* at ADCRR00232595 (Patient # 105).

426. ADCRR's failure to provide appropriate treatment planning can have disastrous consequences. The mortality review for a patient who died by suicide in April 2021 found that he died shortly after being removed from suicide watch without a suicide risk assessment being completed. The mortality review report stated that "[t]here was no crisis treatment plan developed within 1 business day of placement on watch (there was no plan developed for the entirety of his watch)," and "[t]here is no indication that multidisciplinary consultation was conducted prior to discontinuing watch." Ex. 403 at ADCR00000108. The psychological autopsy recommended that "[i]t would behoove the team to ensure they are collaborating with ADCRR partners and psychiatric providers prior to decisions to remove an individual off of a suicide watch." Ex. 404 at ADCRR00000192.

427. Dr. Stallcup, ADCRR's mental health program director, agrees with the mortality review's conclusion that these systemic failures contributed to the patient's death being "possibly avoidable." Stallcup TT at 2543:23-2544:15. Dr. John Wilson, Centurion's national vice president for behavioral health services, admitted that the deficiencies identified in this mortality review—no suicide risk assessment, no crisis treatment plan developed, no indication that safety was reliably reestablished prior to discontinuing watch, and no indication that a multidisciplinary consultation was held prior to discontinuing watch—could all be caused or affected by a shortage of mental health staff. Dep. of John Seddon Wilson, PhD, CCHP-MH, CPHQ ("Wilson Dep."), Doc. 4186-1 at 235-236. Dr. Stewart's clinical review of this patient's file concluded his death was avoidable because of the mental health staff's failure to confer with a prescribing provider. Stewart WT, Doc. 4109-1 at 115-16.

428. Similarly, Defendants fail to coordinate among psychiatric, psychological, and medical providers and clinicians to implement comprehensive mental health and medical care treatment plans. Stewart WT, Doc. 4109 ¶¶ 83-88. Patients with complicated physical and mental health presentations often have intertwined problems. These failures to coordinate, or staff from one discipline not consulting with their colleagues regarding

patients, resulted in serious permanent injury, and were identified as contributing factors to the deaths by suicide of at least five people. *Id.*

429.    As discussed below in ¶¶ 694-703, Dr. Wilcox described cases where pain management by medical providers was wholly inadequate. Notably, several recent suicides involved patients with serious medical conditions—such as end-stage cancer, disabilities from physical injuries, or fibromyalgia—who were told that their pain was not real, or were judged to be "drug-seeking," and whose medical providers failed to engage in a discussion about appropriate and adequate pain management, or to collaborate with psychiatric and mental health staff. *Id.* ¶¶ 86-88; Doc. 4109-1 at 87-89, 90-93, 101-102, 107-108, 117.

430.    For example, one patient died by suicide in May 2021 at ASPC-Yuma La Paz Unit. According to the psychological autopsy report, the patient had a history of chronic pain and certain psychiatric disorders. When he was first incarcerated in 2015, he submitted an HNR stating that he had serious nerve damage in his arm and hand due to a gunshot wound and was prescribed Gabapentin, "the only thing that [h]elps my problem as [f]or [p]ain [e]tc." Ex. 218 at ADCRR00000125. He also "reported chronic pain in his back, with burning sensation 'all the time' per provider note on May 26, 2021," shortly before his death. *Id.* He submitted numerous HNRs in the weeks before his death detailing severe debilitating pain, said that his physical therapist had concluded that physical therapy would not address his orthopedic concerns, and asking for reinstatement of his pain medications. *Id.* at ADCRR00000125-27. The psychological autopsy concluded that "[i]t appears he lost function due to the pain he was experiencing could have played a role in his decision to end his life." *Id.* at ADCRR00000129-30. The patient "told mental health in the past that he had contemplated suicide in the past when he was in severe pain." *Id.* The psychological autopsy report recommended:

> Increase psychoeducation, specifically understanding the cycles of depression where there may be times a patient may feel good whereas at times one can go into depressive episodes. Advising patients against going off antidepressants

when they have a history of depression may be good and providing a physical form of psychoeducation.

[…] Increase psychoeducation on the relationship between mental health and chronic pain. Increase the utilization of a holistic approach and treatment plan for chronic pain.

*Id.* at ADCRR0000131.

431. Dr. Pelton, Centurion's regional mental health director, testified she reviewed this psychological autopsy but was unaware if any of the recommendations had been implemented. Dep. of Ashley Pelton, Ph.D. (filed at Doc. 4186-1 at ECF 45) ("Pelton Dep.") at 161:21-168:6; *see also* ¶¶ 947-954 *infra*.

432. Another patient's death by suicide in 2019 at Tucson Winchester Unit also illustrates the failure of medical, psychiatric, and mental health staff to collaborate to create a comprehensive treatment plan for a complicated patient. Stewart WT, Doc. 4109-1 at 90-93. Dr. Stewart's clinical analysis and review of relevant records concluded the patient "did not have an adequate medical referral, follow up, or treatment of medical issues, including a recurrence of cancer," that "[t]he mental health team did not appropriately evaluate and treat the patient for mood disorders," and that "[t]here was a lack of multidisciplinary team discussion in treatment planning." *Id.* at 90.

433. The patient had medical and mental health diagnoses including malignant tongue, throat, and oral cancer that had disseminated, pulmonary nodules, osteoporosis, adjustment disorder, hyperthyroidism, and hepatitis C. Ex. 355 at ADCM1585582-83. He had a history of depression and "reported having trouble sleeping on multiple occasions and reported experiencing anxiety and stress." *Id.* at ADCM1585583. He had reported to a nurse that "he 'just wants to die,'" and told a psychologist twelve days before his suicide, "I will not release before the cancer gets me." *Id.* at ADCM1585588. The psychological autopsy concluded "[he] may have chosen to end his life based on the concern that his cancer had returned," *id.* at ADCM1585587, and found that:

[the patient] made concerning statements not addressed by staff. He endorsed wanting to die in an encounter with nursing staff in 2018 and it appears there was no follow up from this

-158-

statement. . . . The behavior of [the patient] that was reported by security staff was indicative of someone who was withdrawn and someone who lacked any social contact or support. . . . It may have been helpful for medical and mental health staff to consult with peers regarding this case as well as for security staff to consult with medical and mental health staff for a referral to care.

*Id.* at ADCM1585590.

434. And the mortality review committee recommended in its final report that:

1. Prior to the discontinuation of prescribed medications, patients are to be seen and counseled as appropriate.

2. Medications that can potentially cause significant side effects (Elavil - sedation in this case) should be discussed with the patient and dose at a time when possible that helps to mitigate significant side effects.

3. This patient had significant throat pain that possibly could have been better controlled with medication trial.

*Id.* at ADCM1585579.

435. The mortality review also found that "[d]espite several Health Need Requests submitted by the patient, Nursing staff [did] not appreciate the level and severity of pain symptoms and therefore no referrals made to the health care practitioner," "[t]imely follow up of pain issues appeared lacking," and "[m]edications appeared to have been discontinued due to the patient's non-compliance, without seeing and counseling the patient." *Id.* at ADCM1585578. The mortality review found that preventative measures were not taken "as it related to pain control," that "[t]reatment was inadequate for pain," and it was "undetermined" if his death could have been prevented or delayed by more timely intervention. *Id.* at ADCM1585577-78.

436. Dr. Stewart concluded that "[i]n my professional opinion, the patient had inadequate medical and psychiatric care," and:

There was a lack of coordination for a multidisciplinary team discussion, as indications for Elavil appeared to be for treatment of pain by medical providers, but in attempts to restart Elavil patient was switched to Venlafaxine for mood by the mental health team. The patient had stopped after two doses shortly before his death. It also appears that the patient

-159-

was self-medicating with non-prescribed opiates given the toxicology report. There was suspicion by the psychiatric provider for drug abuse due to vitals.

It is likely the patient may have severe distress due to ongoing chronic medical issues and comorbid severe psychological pain. The need to self-medicate indicates inadequately treated chronic pain, psychological distress or drug dependence. The patient reported having increased withdrawal from engaging in provider treatment and other social interactions. This increased withdrawal is a significant risk factor towards suicide and should have prompted close observation by the mental health team.

Both the psychological autopsy and Mortality Review Committee shared significant concerns for the medical and psychiatric care provided to the patient. There was also an acknowledgment of inadequate pain management. Had the patient had timely and appropriate medical and psychiatric follow up, better rapport could have been formed with the patient which would have allowed the treatment team to better appreciate the underlying psychological distress as a result of the recurrence of cancer and untreated pain.

Stewart WT, Doc. 4109-1 at 92-93.

437. Another patient who died by suicide, was housed at Perryville, Santa Cruz Unit in September 2020, and suffered from fibromyalgia, a serious chronic condition that results in widespread muscle pain and tenderness. Stewart WT, Doc. 4109-1 at 108; Ex. 364 at ADCRR00000160. She complained frequently to health care staff of excruciating pain in the weeks before her suicide. *Id.*

438. The patient repeatedly told health care and custody staff that she was in such unbearable physical pain that she viewed suicide as her only pathway to relief. On July 17, 2020, she was placed on suicide watch after making the statement, "the pain is so bad I feel like killing myself." *Id.* at ADCRR00000159. Her "plan at that time was to throw herself off the balcony." *Id.* On July 18, 2020, she said, "If I could I would off myself to take this pain away." *Id.* at ADCRR00000160. According to the mortality review report, on July 31, 2020, the patient reported "feeling hopeless because [of] the treatment she is receiving from medical staff[,]" which she saw as "dismissive." Ex. 363 at ADCRRM0005585. Dr. Stewart's clinical review relays three health care encounters in

her chart where she terminated them early because she was in too much physical pain to go on, (Stewart WT, Doc. 4109-1 at 107), and that inadequate care directly contributed to the patient's suicide:

> Overall, the relationship between her pain and her risk for suicide was missed in the last four visits prior to her death. This was due in part to the inexperience of the unlicensed and unsupervised clinician and the abbreviated nature of the visits, particularly her final mental health encounter, which lasted 3 minutes. These brief visits did not allow for the clinician to fully appreciate the relationship between her pain and her suicidality. The brevity of these visits and the clinician's failure to appreciate the gravity of the patient's situation directly contributed to her suicide.

Stewart WT, Doc. 4109-1 at 108.

439. The Mortality Review Committee report, written by ADCRR Medical Director Dr. Grant Phillips, recommended that "[f]or challenging cases, convening a multidisciplinary committee to address a patient's care from a medical and mental health standpoint should take place. The site medical director should help guide the patient's care until the multidisciplinary team meets." Ex. 363 at ADCRRM0005588.[83]

440. The Court finds that Defendants' failure to provide adequate mental health treatment planning and coordination of care exposes class members to a substantial risk of serious harm and denies them the minimal civilized measure of life's necessities.

**G.    Access to Ongoing and Comprehensive Mental Health and Therapeutic Care**

441. When an incarcerated person requests mental health care, either due to a previously-diagnosed condition or new symptoms or trauma, the prison must address

---

[83] Defendants' expert Dr. Penn's reviewers concluded that, while this patient's case did not present problems with access to mental health care, it showed "[p]ossible problems with medical access for care." Ex. 2262 at ADCRR00232581 (Patient 12). Dr. Penn apparently concluded that this case met the standard of care, although he failed to take any notes on his file review and did not document or explain in written or trial testimony why he disagreed with the conclusions of the ADCRR mortality review committee, ADCRR psychological autopsy, Dr. Stewart, and his own psychiatrist reviewer. Penn TT at 3117:15-18; 3120:17-3121:1; 3133:11-23. The Court therefore finds Dr. Penn's opinion on this patient's death to be unpersuasive.

these concerns in a competent and timely manner.[84] And people with mental health diagnoses who are prescribed psychotropic medications need to be seen regularly by their prescriber for medication management, and be seen by mental health staff to monitor side effects and to provide non-pharmaceutical therapeutic treatment. Stewart WT, Doc. 4109 ¶ 34.

442. The evidence shows multiple patients experiencing profound mental health symptoms who encountered delays in being seen, or a failure to be seen, by mental health staff, resulting in avoidable suffering, acts of self-harm, and in at least two cases, death by suicide. Stewart WT, Doc. 4109 ¶¶ 35-36; Doc. 4109-1 at 37-38, 60, 69-70, 110-11; Exs. 256, 293-294.[85]

443. For example, the person described above at ¶¶ 410-413, who died by suicide in 2021 two weeks after his first-time intake to prison, did not receive sufficient care for his mental health issues after he requested care. The mortality review identified "failure to recognize symptoms or signs," "delay in access to care," "diagnosis not timely" and "treatment not timely" as contributing factors to his "possibly avoidable" suicide after the patient had "submitted a HNR requesting to be seen by mental health staff" about hearing voices, but "[n]o appointment was scheduled." Ex. 256 at ADCRRM0026204-05. The mortality review recommended that "[c]linical complaints that indicate a psychiatric component (acute and/or serious), like hearing voices, danger to self, or danger to others, need to be prioritized." *Id.* at ADCRRM0026206.

444. Dr. Stewart's clinical review of the patient's medical record, the mortality review report, and the psychological autopsy report, concluded that "[t]his patient did not receive a timely mental health assessment, despite appropriately notifying health care staff

---

[84] Dr. Stallcup, ADCRR's mental health program director, admitted that she is aware of cases in which mental health HNRs were not triaged within the time frames required by policy, as recently as earlier in 2021. Stallcup TT at 2574:10-18.

[85] Dr. Penn's findings in this area lack credibility since he admitted that his written testimony regarding the frequency with which patients classified as MH-4 and MH-5 receive mental health services is based solely upon ADCRR written policies and what he was told by ADCRR and Centurion staff. Penn TT at 3167:15-3169:5; Penn WT, Doc. 4172 ¶¶ 112-113.

1   through the HNR system of severe psychiatric symptoms." Stewart WT, Doc. 4109-1 at

2   110.

3       445.    In another case, a young woman who died by suicide in 2019 at Perryville

4   had repeatedly sought mental health care prior to her taking her life. Stewart WT,

5   Doc. 4109-1 at 87-89; Ex. 294 at ADCM1588589. She had a long history of self-harm and

6   had been on suicide watch multiple times while in prison, including two months prior to

7   her death, due to multiple self-inflicted razor wounds—"deep cuts" that were "fairly lethal

8   in nature," according to the psychological autopsy—which resulted in 14 stitches. Ex. 293

9   at ADCM1588580; *see also id*. at ADCM1588583.

10      446.    According to other people on the patient's prison yard, she was often crying

11  in the days before her death and "asked an officer if she could be seen by mental health."

12  Ex. 293 at ADCM1588579. "One patient reported that there was a time that [she] was

13  asking about death and reported wanting to be with her [then-recently deceased] aunt." *Id*.

14  The psychological autopsy detailed that she repeatedly sought mental health care in the

15  days leading up to her death, but some requests were ignored. *Id.* at ADCM1588582. She

16  submitted HNRs two days apart in the days before her death, asking to "talk to a psych

17  about some issues I am having" and asking to be moved to the residential mental health

18  program, but these HNRs were not sent for review by mental health staff. *Id*.

19      447.    The psychological autopsy "recommended the HNR process at Perryville

20  Complex be reviewed to ensure they are referred correctly to mental health and review

21  any obstacles impacting the process that could be improved." Ex. 293 at ADCM1588587.

22  It further recommended that "[c]onsideration should be given to those patients with

23  significant trauma issues being referred to a residential program so that the treatment can

24  be provided in appropriate timeframes and the response to treatment be more closely

25  monitored." *Id*. This conclusion is echoed in the morality review, which while it deemed

26  "undetermined" if the death was preventable, recognized that "admission to emotional

27  trauma residential counseling could have been beneficial to the patient." Ex. 294 at

28  ADCM1588592.

155617523.3

448.   Dr. Stewart unequivocally concluded that this suicide was preventable, with myriad serious problems in her care, including "a lack of appropriate communication between staff members regarding [the] treatment plan, her need to see her prescribing provider, and staff concerns for her mental health[;]" failure to follow up on her need for residential treatment; placement of the onus on the patient to request suicide watch; and failure to modify the patient's medication following her last two counseling sessions, both of which occurred following the acute stressor of her aunt's death, at which she had complaints regarding her medication. Doc. 4911-1 at 89.[86]

### 1.   There is inadequate access to or provision of therapeutic treatment.

449.   There are deficiencies in the residential mental health programs. As detailed above, there are no on-site psychiatrists at any of the prisons with residential mental health programs, except for the Phoenix facility, and the other facilities show widespread vacancies at a multitude of mental health staff classifications. *See supra* ¶¶ 395-396, 401. There also are widespread vacancies in custody staff at some of these prisons, which puts patients at serious risk of injury when they engage in acts of self-harm without detection.

450.   For example, at Florence, the May 2021 CQI minutes detail an emergency response the previous month at the Kasson behavioral health unit, where an unidentified person was found unresponsive after being able to hang himself by his shoelaces undetected by custody staff. Ex. 818 at ADCRR00056375-76.[87] The patient was cut down and after he was revived reported that he had somehow also managed to "swallow[] 30 pieces of metal, 7-8 pencils, [and] insert[] a spork handle 'melded' to a razor in his

_____

[86] Dr. Penn's psychiatric reviewer also found that the patient's care prior to her suicide did not meet the standard of care for access to mental health care. *See* Ex. 2262 at ADCRR00232588 (Patient 38) ("Only medication: Fluoxetine 60 mg – not appropriate for Bipolar DO […] no initial psych eval or intake note on file in 2018 or 2019[.] Only 1 prescriber visit (midlevel) in 2019. Problematic note from PA dated 6/28/19.").
[87] "CQI" stands for Continuous Quality Improvement. CQI meeting minutes are internal quality control documents generated at each prison on a monthly basis after interdisciplinary meetings of custody and health care staff.

155617523.3

urethra." *Id*. at ADCRR00056376. Yet a review of the incident and the response, found custody staff's response to this patient to be "excellent." *Id.* at ADCRR00056377.

451.   There also is a failure by Defendants to ensure that the custody staff who work in these residential mental health units know how to interact with the often-challenging population of patients with serious mental illnesses. For example, Dr. Platt was questioned about a psychological autopsy of a patient who died by suicide in 2021, while a patient at the Tucson Rincon Unit's residential mental health unit. As regional mental health director, she participated in mortality review committee meetings and reviewed and signed off on all psychological autopsy reports of all people who died by suicide. Platt TT at 1035:12-1036:5; 1038:11-13. She testified that she reviewed and signed off on the psychological autopsy report for this patient (Ex. 184). *Id*. at 1037:7-8, 1038:7-10. The report noted that

> On 2/4/2021, house six therapist submitted an information report (IR) regarding a contact she had with an inmate in house six. The IR submitted conveyed another inmate alleged witnessed a female Correction Officer screaming at [patient] and calling him names. The interview with the female Correction Officer, who was initially on Charlie run, denied hearing [the patient's] suicidal ideation claims.

Ex. 184 at ADCRRM0026160. The patient "was overheard by a peer that he was going to 'kill himself' after the alleged incident that transpired between the female Correctional Officer and [the patient]," and a "motivation for [his] actions" could include "[p]ossible threat / intimidation / bully by peers and/or institutional staff." *Id.* at ADCRRM0026173. The reviewer conducting the psychological autopsy recommended "all institutional staff receive mental health training specific to the forensic population." *Id*. at ADCRRM0026176.

452.   Custody staff assigned to facilities or units designated for profoundly mentally ill people "must receive specialized training above and beyond whatever is given to all officers, about how to interact with people with mental illness or developmental disabilities." Stewart WT, Doc. 4109 ¶ 199. Dr. Platt testified that it is "very much" her opinion that custody staff assigned to units housing mentally ill or developmentally

-165-

disabled people should receive additional training specific to interacting with and understanding the behavior of these patient populations. Platt TT at 1041:3-9. She testified that to her knowledge, by the time she left her employment with Centurion in late July 2021, there had been no specialized training of the custody staff who worked in the residential mental health unit at Rincon, despite the recommendation of the psychological autopsy report. Platt TT at 1039:4-22, 1040:17-1041:2.

453.    Treatment for class members incarcerated outside the residential mental health units is also inadequate. Prison systems must provide not only medication but also psychotherapy and/or counseling to people who need it to treat their mental health needs; a mental health program limited to medication is inadequate for many people with mental health diagnoses, or for people in need of therapy for situational stressors. Stewart WT, Doc. 4109 ¶¶ 37-38; Ex. 1644 at 37-38. The vast majority of class members with mental illness or mental health diagnoses are ***not*** housed in the inpatient mental health unit at Phoenix, or the residential mental health programs at Perryville, Phoenix, or Tucson, but they still must have access to a full range of mental health services necessary to provide adequate care. This includes individual and group therapy, active treatment planning, and pharmacological treatment. Stewart WT, Doc. 4109 ¶ 37.[88]

454.    The treatment for many seriously mentally ill outpatients in ADCRR is limited to medication management and monitoring by mental health staff that is not frequent enough given the patient's acuity. With little or no access to critical psychosocial rehabilitation services and timely access to a provider, many seriously mentally ill patients decompensate. *See, e.g.*, Stewart WT, Doc. 4109 ¶¶ 47-56, 79, 107, 109-111 176, 196; Stewart TT at 486:14-488:14.

---

[88] Dr. Penn's consulting psychiatrist reviewed the medical chart of a patient who died by suspected suicide in the fall of 2020, and concluded that he did not receive adequate access to care and Defendants "[d]id not offer psychotherapy for probably adjustment disorder related to marital stressors." Ex. 2262 at ADCRR00232580 (Patient 1).

-166-

### 2. Group mental health care is frequently cancelled and inadequate.

455. Group mental health therapy is an important component of treating people with mental illness, behavior disorders, or serious mental health symptoms. Stewart WT, Doc. 4109 ¶ 38.

456. While some group mental health programming is in theory provided in ADCRR max custody units, most of it is offered only to people formally classified as SMI. Others diagnosed by ADCRR clinicians with serious mental illnesses like schizophrenia or psychotic disorders, and/or who may have multiple instances of suicidal behavior, but are not classified as SMI, are not eligible. Haney WT, Doc. 4120 ¶ 85.

457. As noted above at ¶¶ 156-163, 166-170, Defendants' records show numerous out-of-cell activities cancelled due to staffing shortages, especially in maximum custody and detention units, and pre-dating the start of the COVID pandemic. From March or April of 2020 through June 2021, *all* mental health programming was cancelled at Eyman-Browning and Florence-Kasson. Even "table time"—unstructured out-of-cell time—was eliminated for most of this period. Haney WT, Doc. 4120 ¶¶ 85-86.

458. Dr. Pelton, Centurion's regional mental health director, admitted that there have been instances recently when mental health group sessions for people in maximum custody were cancelled due to a shortage of custody staff. Pelton Dep. at 205:4-8. She testified that she did not know if BHTs are required to have any sort of license, yet she admitted that the BHTs are tasked with leading group therapy. *Id.* at 109:1-5, 109:13-20.

459. To the extent that mental health groups actually occur, many of these programs are led by BHTs for whom the only job requirement is that they pass a test of their ability to use Microsoft Excel. Platt TT at 1062:4-18, 1062:23-25; Stewart WT, Doc. 4109 ¶¶ 42-43 (patients reporting that groups are frequently canceled or consist of non-clinicians who show DVDs of TV shows and movies). Dr. Haney testified that people he spoke with

> acknowledged that they were happy to be out of their cells for programs, but had mixed reactions to the facilitators, including that they were often CO-IIIs with no mental health training.

-167-

> Even when they participated in the groups, however, many acknowledged having no idea what the group was actually about or how it addressed their mental health needs — "it's chit chat," as one said. Several at Eyman noted that they had finally been allowed out of their cells to watch the movie "The Hangover: Part Three" with others.

Haney WT, Doc. 4120 ¶ 88.

460. Named Plaintiff Jason Johnson testified that at Eyman-SMU I, he is supposed to receive weekly group therapy classes, but the classes are generally unstructured and "a lot of the time" are cancelled due to staffing shortages. Johnson TT at 1222:8-16, 1229:15-1230:4, 1231:1-18, 1231:23-1232:5. When the classes are offered, he has at times refused to attend the group classes because he does not feel like talking to a different counselor every time, and generally finds them unhelpful. *Id.* at 1230:5-19, 1231:19-20, 1232:6-12.

461. Dr. Stallcup described the psychoeducational groups led by BHTs as "providing tools to manage symptoms" of mental illness, (Stallcup TT at 2502:25-2503:23), and admitted that the ostensibly therapeutic group sessions can be led by unlicensed psych associates, and there is no requirement that there be a written lesson plan or syllabus for the sessions. *Id.* at 2575:11-22. Dr. Platt described the psychoeducational groups led by BHTs as "workbook oriented." Platt TT at 1063:24-1065:11.

462. And in detention units there are no mental health groups of any kind, even for people classified as SMI. Haney WT, Doc. 4120 ¶ 90.

463. All mental health group sessions should be led and coordinated by licensed masters' level psychology associates. Stewart WT, Doc. 4109 ¶ 42. Defendants did not refute this; indeed, Dr. John Wilson, Centurion's national vice president of behavioral health services, testified that he agrees with Dr. Stewart that all behavioral health groups should be coordinated by licensed behavioral health professionals, and that psychotherapeutic behavioral health groups need to be delivered by a licensed behavioral health professional. Wilson Dep. at 24:18-25, 105:23-106:8.

-168-

464. Given the unrebutted testimony of Dr. Stewart, and the concurrence by Centurion's national vice president of behavioral health services, the Court finds that mental health group sessions must be led and coordinated by licensed, masters' level mental health staff.

**H.  Brief, Non-Confidential, and Superficial Contacts With Mental Health Staff**

465. In his October 2019 report, Court expert Dr. Marc Stern identified the issue of "very short mental health visits (some as short as 5, 3, or 2 minutes)." Ex. 1860 at 28. He concluded that "some of the short visits are too short to be clinically effective, and in the context of the cases, place patients at significant risk of substantial harm." *Id*. at 31. He further opined that "care delivered during many of these short visits was not safe." *Id.* at 32 n.24; *see also* Doc. 3921 at 12-13 (quoting Stern report).

466. In response to Dr. Stern's conclusions, the Court established a presumptive minimum duration of ten minutes for watch-related mental health encounters, and thirty minutes for non-watch encounters. If these minimum durations were not met, the encounter was to be reviewed by a "mental health clinician" to "determine whether the length was meaningful and appropriate in the context of the patient's overall care." Doc. 3518 at 4.

467. After the Court's order,

> Defendants ignored the requirement that a mental health clinician determine whether a visit of less than ten minutes was meaningful and appropriate. Rather, Defendants left the determination to the compliance monitors (without mental health training) who had not reviewed the prisoners' medical records. The Court ordered a mental health professional to perform the necessary evaluation. (Doc. 3861 at 13). But Defendants failed to comply, forcing Plaintiffs to move for relief again.
> Defendants had failed to comply with the previous order requiring a mental health professional evaluate encounters that fall below the minimum duration threshold, so Defendants were again reporting artificially inflated compliance numbers. Sadly, this may have been confirmed by recent suicides. Three prisoners committed suicide between January 5 and February 3, 2021 after receiving only very short mental health care encounters. One of the mortality reviews said "failure to communicate effectively with patient" was a

contributing cause and that the suicide was "possibly avoidable." (Doc. 3903-3 at 44).

Defendants admitted they ignored the Court's Order regarding mental health review, stating "ADCRR determined [mental health professional review] could not be done." (Doc. 3907 at 6). Critically, Defendants never sought reconsideration or informed the Court that they could not or would not comply. Simply, they chose to violate the order and Stipulation.

Doc. 3921 at 16-17 (footnote omitted).

468.    A meaningful encounter with a patient with mental illness requires documentation of their subjective experience of their illness since the last encounter. The clinician must document the course of treatment since the last encounter, including responses to medications and/or therapy and any side effects from the medications, and perform a comprehensive mental status examination as well as a safety check about potential self-harm and harm to others. The clinician or provider must conduct a meaningful assessment of the patient's condition and prognosis, including any risk of harm to the patient. This is particularly critical when the patient has already been identified as someone at risk of self-harm or suicide. Finally, the clinician should make a diagnosis and a plan for further treatment. Stewart WT, Doc. 4109 ¶¶ 58-59.

469.    It is not possible to assess a patient and determine their risk of self-harm or suicide in an encounter lasting five, three, or two minutes. Such an assessment requires more than literally "'seeing' a patient; it first requires establishing a therapeutic relationship." Stewart WT, Doc. 4109 ¶ 60; Stewart TT at 475:10-23.

470.    Dr. Stallcup admitted that a one-minute mental health encounter with a patient on suicide watch is never sufficient to determine if the patient is not at risk of self-harm. Stallcup TT at 2547:23-2548:11.[89]

---

[89] By contrast, Centurion's current regional mental health director Dr. Pelton testified that she thinks that a one-minute cell-front encounter is "not going to be optimal" but "you could make a definitive answer" and "obtain enough information" to determine if a patient is no longer a danger to self or others, (Pelton Dep. at 139:19-140:11); that a 30-second encounter "could be" sufficient to determine a patient is no longer at risk of self-harm or suicide, (*id*. at 140:21-141:7); and that "it's possible" that a 15-second encounter would be sufficient to determine a person was no longer at risk of self-harm or suicide. *Id*. at 142:15-20. Defendants' expert Dr. Penn similarly testified that a one-minute

-170-

471.    Moreover it "is not acceptable for a mental health clinician to reflexively acquiesce in a patient's request to terminate the encounter." The mental health provider should still conduct visual observations and assessments of the patient. Stewart WT, Doc. 4109 ¶¶ 66-68; *see also* Stewart TT at 476:6-20.

472.    Yet, ADCRR records confirm that mental health staff interactions with people in isolation units are often extremely brief. Ex. 5244(a); Haney TT at 958:15-959:23 (counseling sessions lasting five, six, and two minutes).

473.    The Court finds that it is patently obvious that a cell-front encounter lasting seconds or a few minutes is inadequate to make the profoundly important decision that a person is no longer a threat of harm to self or others. For example, the policy in place for the Illinois Department of Corrections is that daily mental health watch checks are to be at least 15 to 20 minutes in length, so that the clinician has time to make their assessment and then provide meaningful treatment to the patient. Stewart TT at 475:24-476:5.

474.    Dr. Stewart previously described a number of patient encounters that occurred *after* the Court's March 11, 2020 order establishing a presumptive minimum length of ten minutes for mental health "watch-related" encounters and of thirty minutes for "non-watch-related" mental health encounters, Doc. 3518, that were so brief and superficial as to place the patient at a significant risk of serious harm. Ex. 1928 at 3, 5-8.

475.    The evidence shows that extremely brief encounters with profoundly and seriously mentally ill persons, including people engaging in repeated acts of self-harm, were still occurring in the weeks before trial. Stewart WT, Doc. 4109 ¶ 65.

476.    Based on his clinical review of the medical records, psych autopsies, and mortality reviews, Dr. Stewart found that brief and superficial mental health encounters were a factor in the suicides of at least five people in ADCRR custody since 2019. *See* Stewart WT, Doc. 4109 ¶ 64; Doc. 4109-1 at 87-89, 103-111 (Ex. 3 at pp. 10-12, 26-27, 28-29, 30-31, 33-34); *see also* Exs. 256 (mortality review) and 257 (psychological

---

encounter is sufficient to determine that a patient is not at risk of self-harm. Penn TT at 3172:6-22.

autopsy); Exs. 265 (mortality review) and 266 (psychological autopsy); Docs. 293 (psychological autopsy) and 294 (mortality review); Exs. 353 (mortality review) and 354 (psychological autopsy); Exs. 363 (mortality review) and 364 (psychological autopsy).

477. Dr. Platt testified that the Court's order on the presumptive minimum length of encounters "helped clinicians do more than box-check in other way[s], like think about different things to document in a way that has them generate better treatment plan intervention ideas." Platt TT at 1089:1-5. Similarly, Jose Bucio, the lead mental health psychology associate at Yuma, told Dr. Penn that the Court's order has contributed to the overall improvement in quality of care and attention to patients. Penn TT at 3174:1-10.

478. Centurion's current regional mental health director Dr. Pelton does not know if the Court's order on the presumptive minimum duration of mental health visits has been codified into any written policy. Pelton Dep. at 134:5-135:1.

479. Aside from the Court's order regarding the presumptive minimum length of mental health encounters, there are no corresponding ADCRR or Centurion policies setting presumptive minimum lengths; if the Court's order were to be vacated, there would be no minimum duration required for any mental health encounter in ADCRR. Stallcup TT at 2593:12-2594:9.

480. The evidence also shows that many mental health care encounters occur at cell-front, especially in isolation, detention, and mental health watch units, with the mental health staff member standing outside the cell, speaking through the locked cell door to the patient who is confined. By their very nature, such encounters are superficial and uninformative; many patients are unwilling to share relevant information as other incarcerated people and / or custody staff are within earshot. This makes it difficult or impossible for a treating clinician to accurately treat a patient whose problems or concerns have not surfaced in the encounter. Moreover, cell-front mental health encounters reduce the already meager out-of-cell time that SMI or other persons experiencing major mental health problems receive while housed in isolation units. Haney WT, Doc. 4120 ¶¶ 91, 164, 166.

155617523.3

481. Many of the short mental health encounters that Dr. Stewart found in his clinical review of medical records occurred at cell-front. "Many of these encounters involved desperately ill people—precisely those who are most in need of unimpeded, confidential communication with mental health professionals so that their illness can be diagnosed and treated." Stewart WT, Doc. 4109 ¶ 74.

482. People on suicide watch have not been offered out-of-cell confidential counseling because there are not sufficient security staff working to bring them out o. Pelton Dep. at 154:14-21. Specifically, this has happened at the Phoenix inpatient mental health facility. *Id*. at 154:23-155:2, 155:13-19.

483. The Court notes that ADCRR's Phoenix prison is where the most seriously mentally ill patients in the state prison system are found; often the people on suicide watch at Phoenix are unable to have their mental health needs met even there. For example, Dr. Stewart described his attempts to speak with a near-catatonic patient at Phoenix who was responding to internal stimuli but not to the people around him, who has been on suicide watch for most of the previous two years, including a six-month continuous period, and at the time of Dr. Stewart's file review did not appear to be taking any psychotropic medication. Stewart WT, Doc. 4109 ¶¶ 109-111; Doc. 4109-1 at 62-63 (Doc. 4109-1, Ex. 2 at 33-34).[90] Dr. Stewart also met with a profoundly mentally ill class member who was housed in suicide watch at Phoenix's Flamenco Unit (Quiet Ward) due to numerous acts of self-mutilation; Dr. Stewart described this patient as "one of the most poorly managed cases that I have seen in my 39 years as a psychiatrist," and that "I am at a loss for words to describe just how bad" were the patient's care and inaccurate diagnosis (of "adjustment disorder"). Stewart WT, Doc. 4109-1 at 59 (Doc. 4109-1, Ex. 2 at 30). He testified that:

---

[90] One of Dr. Penn's consulting psychiatrists who reviewed this patient's chart concluded that the patient received timely access to care, but that the medication "is inadequate as evidenced by symptoms. May have catatonia which would benefit from benzo or ECT [electroconvulsive therapy]." Ex. 2262 at ADCRR00232598 (Patient # 152); Penn TT 3128:11-20.

[the patient] was currently on watch status due to his untreated auditory hallucinations telling him to harm himself. He subsequently stabbed himself in the abdomen. When I asked to see his most recent self-inflicted injury, he lifted the blanket he had wrapped against him and revealed an abdomen that had been stabbed numerous times. I must point out that these self-inflicted stab wounds were not minor scratches of his abdominal area. Rather, they were a variety [of] serious wounds to his intestines that have resulted in his having an ostomy bag for a year and a half. He reported that medical staff told him that they will not authorize him for a surgery to reverse the ostomy because of his repeated acts of self-harm. The patient admitted that he has been stabbing himself since at least 2017 when he was 21 years old. He went on to report that he is being prescribed the antipsychotics Thorazine and Geodon, which only partially address his command auditory hallucinations. He had a flat affect, and when his ostomy bag started leaking while speaking with me, he appeared to not be aware of that.

*Id.*; *see also* Stewart TT at 509:16-510:18 (court testimony regarding same patient).

484. Confidentiality of the interaction between patient and clinician is essential to the provision of effective mental health treatment and assessment of the patient's risk. Even more than a clinician treating physical ailments, a mental health clinician must rely on full and frank disclosure by the patient of her symptoms, thoughts, and feelings. If a patient withholds information because of a fear that they will be overheard, the clinician may be unable to establish a therapeutic relationship, make an accurate diagnosis, or effectively plan treatment. In less serious cases this will lead to erroneous diagnosis and ineffective treatment; in more serious cases it may lead the clinician to miss critical warning signs of impending self-harm or suicide. Stewart WT, Doc. 4109 ¶ 69.

485. Dr. Stewart testified that

in speaking to them through their cell doors, [] we have to speak very loudly and we're asking them to shout loudly through the crack in the door. We can't even see the individual when they're giving us a response. How can that be considered an effective way to communicate with a patient?

How are you going to establish therapeutic relationship? How are you going to actually do an adequate assessment when you're shouting … to a person through a crack in a cell door and they're giving you their response that are in earshot of the cells adjacent to them and at the earshot of custody staff.

-174-

155617523.3

Stewart TT at 477:13-25; *see also id.* at 478:8-13 (mental health staff "need to observe them for evidence of self-harm, self-injurious behavior, but also for any number of medication-induced side effects. …[I]t's really important to be able to view the entire person").

486. The Court's expert, Dr. Marc Stern, similarly found in his 2019 report that "[c]ell-front visits during watch are, unfortunately, very common at ADC." Ex. 1860 at 29 n.20. He explained:

> [C]onducting [mental health] encounters in a confidential space is of paramount importance for patients on watch because it helps ensure that the patients share complete and accurate information with the clinician, information which is key to assessing risk. Unfortunately, a very high percentage of the watch-related encounters I reviewed were conducted at the cell-front (i.e. non-confidentially).
>
> * * *
>
> Inadequate assessments can result in one or more of the following errors: (1) inappropriate initial assignment to a particular level of watch (i.e., constant observation, 10-minute checks, 30-minute checks); (2) inappropriate promotion to a less intense level of watch; (3) failure to provide adequate treatment or resolution of factors which contributed to the need to be placed in watch.

Ex. 1860 at 121.

487. Dr. Stern, Dr. Stewart, and Dr. Haney have all opined that the onerous security practices in place in isolation units contribute to patients' unwillingness to leave their cells. Dr. Stern stated in his report to the Court that

> [T]he policy of shackling patients when taking them from their cells to private rooms to meet with the mental health clinician merits scrutiny. Currently patients on watch are housed in living units designated as high level of custody. Many, if not most, of these patients do not meet the criteria of high custody. However, they are still subjected to the requirements of high custody (notably shackling before removal from the cell). It is likely that the prospect of having to be shackled serves as a deterrent to agreeing to be taken out of their cell. It is also possible that CO and mental health clinician staffing levels would need to be adjusted because transferring a patient from his or her watch cell to a confidential setting is more time-consuming than cell-front encounters, not only because the transfer takes time, but also because the encounters are likely to last longer.

-175-

1  Ex. 1860 at 123. Dr. Stewart testified that

2    The people with mental illness who I spoke with at Eyman
3    Browning and SMU-I overwhelmingly told me that due to the
     onerous security practices that were in effect every time they
4    left their cells, including strip searches and in some cases body
     cavity inspections, and being uncomfortably chained at their
5    hands and ankles, that to the extent they were even offered a
     confidential setting for a mental health encounter, they always
6    refused and said that a cell-front was acceptable. That said,
     they also indicated that because they were speaking to mental
7    health staff cell-front, normally within earshot of other
     incarcerated people and correctional officers, they normally
8    self-censored and would not report problematic side effects or
     symptoms

9  Stewart WT, Doc. 4109 ¶ 73. Additionally,

10   these people were very psychotic and paranoid and they were
     afraid that if they were to be taken out of their cells, that they
11   would be at risk of being attacked by others. And I understand
     there's a certain amount of reality to that in prisons, but these
12   people exceeded that. It was based on their own improperly
     treated mental illness.

13

14 Stewart TT at 478:18-24.

15     488.   People in ADCRR isolation units are offered a Hobson's choice of cell-front

16 encounters with mental health staff, where communication through the cell door can be

17 difficult and they are not comfortable sharing personal information for fear of being

18 overheard by incarcerated people and custody staff; or being strip-searched, restrained,

19 and locked in a cage, still in restraints, in order to receive mental health treatment. Haney

20 TT at 877:24-879:2. While being in one of these cages would be more private than

21 speaking to mental health staff at the cell front, that setting does not allow for a positive

22 patient encounter or allow for the establishment of a therapeutic relationship. Stewart TT

23 at 479:10-15.

24     489.   People understandably sometimes decline these encounters because they

25 find the procedures dehumanizing and hardly conducive to building trust and rapport, or

26 encouraging candor. It is also the case that this physical configuration and arrangement is

27 difficult if not impossible for persons with mobility-related impairments to use. Haney

28 WT, Doc. 4120 ¶ 94; Haney TT at 784:4-786:25.

-176-

490.    Class member Mr. Muhammad testified that being in a "one-by-two cage" is not productive to establish a dialogue or therapeutic relationship with mental health staff. Muhammad TT at 912:23-913:8. He does not leave his cell to speak with mental health staff while on suicide watch, because he is uncomfortable doing so while naked and clothed only in a suicide smock. *Id.* at 927:11-22. These cages are the dimensions of a telephone booth, made of mesh. Stewart TT at 478:25-479:9, as shown below:



Haney WT, Doc. 4120 ¶ 94 (ADCRR00108104), ASPC-Eyman.

491.    The Court finds that Defendants' failure to provide class members adequate access to mental health treatment, including failure to provide the opportunity for meaningful, confidential interactions with mental health clinicians, exposes class members to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

### I.    Access to Psychiatric Medication

492.    In a prison setting, the incarcerated patient is entirely dependent on prison health care staff to prescribe medications necessary and appropriate to treat their mental illness, to monitor any side effects from medications, and to timely obtain and deliver the medications to the patients. Class members with mental illness who are not prescribed

155617523.3

appropriate medications responsive to their symptoms or their needs, or who are not given their medications as prescribed, are at substantial risk of harm from prolonged untreated worsening symptoms and possible further deterioration, often to a point of being a danger to themselves and others.

493. The evidence shows that Defendants' medication prescription, distribution, and management practices are inadequate and fall below the standard of care. Stewart TT at 490:2-493:6, 500:24-506:6; *see generally* Stewart WT, Doc. 4109 ¶¶ 128-165. One paradigmatic example of these three issues is seen in the 2019 suicide of a seriously mentally ill patient incarcerated in Eyman SMU-I's Complex Detention Unit, who prior to his death experienced numerous deficiencies in the prescribing, delivery, and monitoring of the effects of his medication. Stewart WT, Doc. 4109-1 at 82-84, Doc. 4109-1, Ex. 3 at 5-7; *see also* Exs. 375-376 (patient mortality review and psychological autopsy).

494. In the weeks leading up to this patient's suicide, there were significant issues involving his medication and clear signs of psychological decompensation that were not brought to the prescriber's attention. Just over a month before his suicide, he was switched from Haloperidol [Haldol] to Ziprasidone [Geodon],[91] although no review was conducted to "effectively evaluate whether Ziprasidone would be an appropriate antipsychotic for [the patient]." Stewart WT, Doc. 4109-1 at 82. The dosage prescribed to the patient—20 mg, once daily—was beneath the therapeutic range for schizophrenia (40 mg to 200 mg per day), and was "nowhere near [the] therapeutic equivalent" of the patient's prior Haloperidol dosage. *Id*. at 83. Despite the patient's SMI designation, the change of medications, and the determination that the patient had poor judgment and impulse control, his next psychiatric appointment was not scheduled to occur until three months later. *Id*. at 82.

---

[91] Ziprasidone is an anti-psychotic medication sometimes referred to by its brand name, Geodon. *See* National Alliance on Mental Illness, Ziprasidone (Geodon), Feb. 2020, https://www.nami.org/About-Mental-Illness/Treatments/Mental-Health-Medications/Types-of-Medication/Ziprasidone-(Geodon).

-178-

495.    Two weeks after the change in the patient's medication regime, he was seen on nurse's line after reporting worsening paranoia, during which he admitted missing his medication the previous day. *Id*.; *see also* Ex. 376 at ADCM1584787-88. Further decompensation is evident in subsequent medical encounters: the next day, he gave delayed responses to the interviewer, "mumbling at various points during the assessment" and appearing unaware that he was not communicating with his interlocutor; and two days after that, after telling his interlocutor that he "guess[ed]" he was "OK," he proceeded to "stare[] at a distant cell wall" and discontinued eye contact and conversation. Ex. 376 at ADCM1584788. The psychological autopsy noted that the patient's decompensation coincided with a pattern of failure to administer the patient's medication. *Id*. at ADCM1584789.

496.    The mortality review identified a "failure to recognize and address [his] mental health decompensation …, delay in medication administration …, and questions relating to observation issues by Security[,]" as well as confusion about the patient's whereabouts the day before his death, when he was finally scheduled for a psychiatrist appointment, but that he ultimately was not brought to because he had been moved to the SMU-I detention unit. Ex. 375 at ADCM1584254. The mortality review concludes that the patient's death was "possibly avoidable." *Id*. It recommends that "education … be provided to medication administration nurses as it pertain[s] to psychotropic medications[,]" noting the importance of nursing staff to elevate information relating to missing medications and refusal of medications by patients to prescribing providers. *Id*. at ADCM1584255.

497.    The psychological autopsy found that when "psychiatric patients are referred to mental health by custody due to exhibiting significantly maladaptive behavior, the responding clinician should conduct a thorough chart review and document that review in order to assess whether there is a pattern of deterioration and gain an overview of the patient's psychiatric history." Ex. 376 at ADCM1584792. The report further

recommended a "comprehensive review of the factors impacting the inconsistencies in medication administration and interdisciplinary communication[.]" *Id.*

498. Dr. Stewart testified that this patient's suicide "could have been avoided, had he received appropriate transition to Ziprasidone antipsychotic with timely follow up for therapeutic titration." Stewart WT, Doc. 4109-1 at 84. The clinical review found that the patient was given subtherapeutic antipsychotic dosing, which was inconsistently administered and monitored in the weeks leading up to his suicide. *Id.*[92]

499. This failure to recognize decompensation was found in one of Dr. Penn's consulting psychiatrists' review of Named Plaintiff Verduzco's medical record. While the reviewer marked "Yes" for the narrow parameter of timely access to care, they also wrote:

> Access to care adequate but some concerns about the care. HSR [HNR] 8/29/21 requesting depression medication. Seen 9/7/21 (borderline long wait), but provider had knowledge of subtherapeutic lithium level (0.5 on 9/4/21), and opted to start a very low dose of an antidepressant instead of optimizing treatment.

Ex. 2262 at ADCRR00232594 (Patient # 94).

## 1. Inadequate formulary for psychotropic medications

500. Dr. Stewart identified instances from medical charts and from patients' reports where medications were abruptly changed or patients were denied medications they had taken prior to coming to prison, on the basis that the medication was not on the formulary. Stewart WT, Doc. 4109 ¶ 129.

---

[92] Dr. Penn's psychiatrist reviewer also concluded that this patient did not receive appropriate access to care prior to his death by suicide. Ex. 2262 at ADCRR00232583 (Patient 17). Specifically, Dr. Penn's reviewer found multiple delays in referral to a psychiatrist for evaluation of tardive dyskinesia side effects, failure to be seen for follow up to HNRs requesting care, and that the patient's "treatment with 20 mg of ziprasidone (total daily dose) is very low for schizophrenia, even if absorption was not a concern. He was asking for Haldol, which he had been apparently on for many years before … his treatment regimen at the time of death required attention." *Id.*

Dr. Penn's consulting psychiatrists who reviewed medical charts identified multiple other cases where the medications prescribed were atypical or insufficient for the patients' symptoms. *See* Ex. 2262 at ADCRR00232580-611 (Patients 1 [suspected suicide], 7, 10, 55, 91, 94, 99, 102, 119, 121, 125, 129 [suicide attempt], 136, 145, 146, 152, 155, 156, 159, 160, 161, 163, 167, 168, 174, 235, 258).

501.   Dr. Stewart reviewed the most recent formulary provided by Defendants (Ex. 1271, July 2021), and found multiple "obvious omission[s]"—commonly-used medications that should be on the formulary but are not. Stewart WT, Doc. 4109 ¶¶ 130-131, 133-134; Stewart TT at 490:6-25. He offered the examples of frequently prescribed and effective psychotropic medications including Wellbutrin (antidepressant), Trileptal (mood stabilizer), and Seroquel and Clozaril (antipsychotics), that were not on Centurion's approved formulary. *Id.*

502.   Dr. Stewart testified Defendants' position that certain medications were omitted from the formulary because the medications had the potential to be abused, would not change his opinion:

> All psychotropic medications are possibly abusable medications, some more than others. But if you have an adequate medication distribution system that can ensure that the person gets the medication they're prescribed and takes it, rather than somehow, the term is cheeking it, where they pretend to swallow it and they don't actually do it, it's indicative of they're having a poor medication distribution system, and patients are left to suffer for that.
>
> In fact, that one patient I described earlier about running around his cell at the Phoenix facility naked and agitated actually passed me out some pills that he had been given that he cheeked. And I immediately turned them over to the warden of the facility. Which showed me that their medication distribution system is significantly flawed. Which is unfortunate because it then results in denying appropriate medication … for people that are seriously ill and that need that particular medication.

Stewart TT at 491:6-22.

503.   Centurion's formulary includes older first-generation medications that "are not used in modern clinical practice" due to numerous side effects, including placing the patient at a significant risk of heat-related problems. Stewart WT, Doc. 4109 ¶¶ 132, 135.

### 2.   ADCRR's medication distribution practices puts mentally ill people at risk of harm.

504.   As detailed more below in ¶¶ 767-780, the evidence shows that the medication distribution systems in Arizona's state prisons for all prescribed medications

-181-

1  are extremely dysfunctional. The failure to provide patients timely and consistent delivery

2  of psychotropic medications puts the patients at substantial risk of serious physical and

3  psychological harm. Stewart WT, Doc. 4109 ¶¶ 136-141; Stewart TT at 492:14-493:6.

4  505.    Named Plaintiff Dustin Brislan testified that when he does not get his

5  antipsychotic medications as scheduled, he becomes extremely paranoid and also

6  experiences voices commanding him to hurt himself or others. Brislan TT at 1297:8-11.

7  506.    Alarmingly, CQI meeting minutes show that Phoenix—which houses the

8  most seriously mentally ill patients—has had profound breakdowns and delays in

9  delivering medications to patients. In January 2021, Defendants documented that 16

10  patients in Phoenix's Baker Unit were erroneously given their medications at 4:00 p.m.

11  and again at 8:00 p.m. "due to several breakdowns in communications…" Ex. 905 at

12  ADCRRM0013395. Five months later, the June 2021 CQI minutes documented that the

13  problem persisted: "[m]edication errors were noted and discussed with individual staff."

14  Ex. 831 at ADCRR00061889.

15  507.    Multiple patients at Phoenix's outpatient specialized mental health program

16  reported that due to a shortage of nurses to distribute the pills, morning medications are

17  delivered as late at 10 am, and evening medications as early as 3:30 or 4:00 p.m. Stewart

18  WT, Doc. 4109 ¶ 140. The 2021 staffing variance reports (through August 2021) provided

19  by Defendants show that there is a shortage of contracted Nursing Assistant / Patient Care

20  Technicians at the Phoenix facility, as shown below.[93]

| Contract FTE (NA / PCT) | Jan | Feb | March | April | May | June | July | Aug |
|---|---|---|---|---|---|---|---|---|
| 5.75 | 3.6 | 3.0 | 3.8 | 3.1 | 1.9 | 2.9 | 2.9 | 1.9 |

[93] *See* Exs. 1539 at ADCRRM0013325 (Jan. 2021); 1540 at ADCRRM0018600 (Feb. 2021); 1541 at ADCRRM0019583 (March 2021); 1543 at ADCRRM0024281 (April 2021); 1531 (Native) (May 2021); 1532 (Native) (June 2021); 1533 (Native) (July 2021); 2167 (Native) (Aug. 2021).

-182-

### 3. Defendants fail to properly monitor patients for medication side effects or for continuing mental health symptoms.

508. Defendants lack an adequate system to ensure that people prescribed psychotropic medications are properly monitored by a prescribing psychiatrist. Stewart WT, Doc. 4109 ¶¶ 143-146, 154. This is necessary because many psychotropic medications can cause serious side effects. *Id*. ¶ 145; *see also* Penn TT at 3126:25-3127:3.

509. There are two major side effects that can occur with antipsychotics—movement disorders and metabolic disorders. Stewart TT at 500:24-502:5; Stewart WT, Doc. 4109 ¶ 145. To identify any sign of movement disorder side effects, the prescriber must use diagnostic tools such as the Abnormal Involuntary Movement Scale ("AIMS") test; and to identify metabolic side effects, baseline blood lab tests must be done prior to prescribing the medication, followed by starting medication at a low dose and increasing as tolerated, while continuing to take regular labs. Stewart TT at 502:6-21; Stewart WT, Doc. 4109 ¶ 145. Similarly, people prescribed medications such as Lithium or Haldol must be prescribed at lower doses and closely monitored to ensure that they do not build up toxicity, and when necessary, the medication levels must be adjusted. Stewart WT, Doc. 4109 ¶¶ 152, 154; Stewart TT at 503:16-505:17.

510. Dr. Stewart's review of medical charts and observations at prisons in September 2021 found multiple patients experiencing profound side effects from medications, some of which he was easily able to observe personally (i.e., uncontrolled movement disorders). Stewart TT at 502:22-505:6, Stewart WT, Doc. 4109 ¶¶ 147-153, 155-156; Doc. 4109-1 at 31-32, 32-33, 36-37, 38-39, 41-42, 45-47, 49-50, 56, 58-59, 62, 64, 65, 72-73; Ex. 412 (mortality review); *see also* Ex. 902 at ADCRRM0019495 (March 2021 CQI minutes) (describing a patient who died shortly after his psychiatric medications were increased; the increase made him drowsy and he had an "acute mental status change" prior to his death).

511. Dr. Stewart's review included a patient he interviewed at Perryville who reported experiencing auditory hallucinations and was started on Haldol injections in

-183-

February 2021, but suffered severe metabolic side effects from the Haldol that resulted in her hospitalization in August 2021. Stewart TT at 503:16-504:2. His clinical review found,

> on 2/23/2021, the provider started her on injectable long-acting Haloperidol Decanoate. The note had a box for "consent form" unchecked. It was not until 7/12/2021 after she experienced side effects from Haldol that there was written mention of actually discussing risks and side effects with this medication. It was during this encounter that the consent form box was finally checked, indicating that she consented to continue such treatment. A month later, in August 2021, she was admitted to the outside hospital after she was found suffering seizures on the ground. The documentation revealed the seizures were due to Psychogenic Polydipsia (uncontrolled drinking of water), which in turn caused hyponatremia (dangerously low serum sodium levels). Haldol can both lower seizure threshold and cause a syndrome of inappropriate secretion of antidiuretic hormone (SIADH), which can manifest as increased consumption of water with a simultaneous reduction in urine output. SIADH is a well-known side effect of the use of Haldol. Upon return from the hospital, the psychiatric team did not mention any of these recent events, nor was there any discussion about medications to maintain stabilization of mental health concerns, given her refusal of the Haldol, without any clear plans.

Stewart WT, Doc. 4109 ¶ 152, *see also* Doc. 4109-1 at 45-46.[94]

512. It is critically important to monitor the blood levels of certain psychotropic medications, such as Lithium. Stewart WT, Doc. 4109 ¶ 154. "If the level is too low, the patient will not receive the desired therapeutic effect; if it is too high, it can be toxic. Lithium levels need to be checked at least every six months. Monitoring the patient's lithium level is especially important in the heat of Arizona as lithium makes a person very susceptible to heat-related illnesses." *Id*.

513. The evidence showed that a 77-year-old class member, who died in January 2021 after displaying symptoms of acute renal failure, was found to have a Lithium level

---

[94] One of Dr. Penn's reviewers concluded this patient had adequate access to mental health care, but also noted that she was diagnosed with schizophrenia in January 2019, but was not provided any antipsychotics for more than two years until February 25, 2021, despite being on suicide watch during that interval of time. Ex. 2262 at ADCRR00232594 (Patient #91).

155617523.3

greater than 4.0 mEg/L. Stewart WT, Doc. 4109 ¶ 155; *see* Ex. 412 (mortality review). Upon starting Lithium, the patient should have seen the prescribing provider and had his levels checked within two weeks, and not a month later, as had been scheduled. Stewart TT at 504:4-505:1. A Lithium level greater than 4.0 is "tremendously high" (normal range is 0.5 to 1.0), and "as was shown in this individual, it resulted in renal failure. That high a dose of lithium shuts down your kidneys." Stewart TT at 505:5-17. The mortality review final report, written by ADCRR Medical Director Grant Phillips, M.D., recommended:

> There were significant lapses in lithium monitoring. It is unclear why a level was not performed in December 2020. May have been due to the patient being housed in isolation at that time. Appropriate observations were made about the patient's altered mental status prior to the ICS, but appropriate actions were not taken.

> Including lithium toxicity in the differential diagnosis in these situations is important in guiding decision making and treatment.

> Consider provider education for all providers regarding lithium toxicity, as well as toxicity from other psychiatric medications. [...]

> Lithium toxicity should be considered for all patients on lithium with altered mental status.

Ex. 412 at ADCRRM0026241-42. On the box asking "is it likely that the patient's death was caused by or affected in a negative manner by medical or mental health personnel?" Dr. Phillips checked "Yes." *Id.* at ADCRRM0026240. "Complications of treatment for bipolar disorder" was listed as a contributory cause of death for the patient. *Id.* at ADCRRM0026239.[95]

514. An additional common side effect of psychotropic medications is that people taking those medications are at greater risk of suffering serious heat-related

---

[95] One of the psychiatrists who analyzed medical records for Defendants' expert Dr. Penn reviewed this patient's medical chart, and also concluded that there was not adequate access to mental health care. Ex. 2262 at ADCRR00232591 (Patient 56). Dr. Penn's reviewer reported that another prisoner apparently submitted a health needs request on the patient's behalf "because he was confused in the cell," and while the patient was seen by health care staff, the patient's "[c]onfusion / disorientation / poor concentration noted but no objective information included. Was restarted on lithium 11/3/20, but no lithium levels obtained before his acute change of mental status." *Id.*

problems such as heat exhaustion and heat stroke. The death rate for heat stroke ranges from 10% to 75%, depending on several variables, including how promptly treatment is sought. Stewart WT, Doc. 4109 ¶¶ 157-165.

> Antipsychotic medications impair the body's ability to regulate its own temperature. Antipsychotic, antidepressant, and anticholinergic medications all impair the body's ability to perspire, and hence cool itself off. Lithium causes significant fluid loss that can exacerbate heat-related health problems. Finally, a common side effect of psychotropic medications is sedation. All of these factors combine to place the mentally ill, especially those treated with psychotropic medications, at significant risk of suffering from heat-related health problems, including serious injury and death. For all of these reasons, protection from heat injury is an essential element of the proper use of psychotropic medications to treat mental illness.

*Id*. ¶ 159; *see also* Penn TT at 3238:12-19 (Dr. Penn agrees that some psychotropic medications can make patients more susceptible to injury or death from high temperatures). Humidity is also an important variable, as higher humidity reduces the body's ability to cool itself through perspiration. Stewart WT, Doc. 4109 ¶ 161.

515. Additional factors making people with mental illness at higher risk include the fact that at times their cognitive functioning can be impaired, which prevents them from taking precautions to protect themselves, and that many symptoms of heat-related problems mimic mental health behaviors, and thus the actual cause of their symptoms is misunderstood. Stewart WT, Doc. 4109 ¶ 158.

516. People at risk for heat injury, including those taking psychotropic medications, should be housed in areas where the ambient temperature does not exceed 85 degrees Fahrenheit; this is the practice in the Maricopa County Jail. *Id*. ¶¶ 161-162.

517. During his September 2021 inspection tours of ADCRR facilities, Dr. Stewart spoke with numerous people who take psychotropic medications and felt the ill effects of the heat, and said they were not provided the opportunity to be in cooler locations. . Stewart WT, Doc. 4109 ¶ 163. In addition, both Dr. Stewart's interviews and his chart reviews confirmed that patients taking psychotropic medications are not

155617523.3

1    routinely counseled on the risk of heat injury or death, how to recognize its symptoms,

2    and how to protect themselves. *Id.* ¶¶ 163-165.[96]

3        518.    Defendants' temperature logs show that indoor temperatures in the housing

4    units and cells regularly are at or exceed 90 degrees Fahrenheit at multiple prison

5    complexes, including the Eyman-SMU 1 and Eyman-Browning isolation units, and the

6    Tucson Rincon Mental Health Unit.[97] These high temperatures pose a substantial risk of

7    serious harm to persons who are vulnerable to heat because of psychotropic medications

8    or for other reasons.

9        519.    During his tours of ADCRR facilities in September 2021, Dr. Penn did not

10   observe any training of staff about heat reactions or emergency response to heat reactions,

11   or any precautions or heat mitigation measures being put into place in individual cells.

12   Penn TT at 3239:12-20. Dr. Penn did not review temperature logs or any documents

13   showing humidity levels in ADCRR housing units. *Id.* at 3241:3242:1. Accordingly, he

14   does not know the levels of heat or humidity that exist in those housing units. *Id.* at

15   3238:19-3242:1.

16       520.    The Court finds that Defendants' failure to provide adequate access to

17   psychotropic medications, including their failure to monitor for therapeutic efficacy and

---

[96] Dr. Penn's psychiatric consultants identified two additional patients who were not monitored for side effects of psychotropic medication, including sensitivity to heat and Depakote levels. Ex. 2262 at ADCRR00232585 (Patient 29) and ADCRR00232595 (Patient 99).

[97] Ex. 1506, Aug. 2021– Yuma, ADCRR00111478 (Native) Cheyenne Unit (sheet 3): 8/29: 90, 91, 92, 93, and 94 degrees; 8/3 and 8/4: 92, 93 degrees. Ex. 1502, Aug. 2021– Phoenix, ADCRR00111474 (Native) Alhambra Unit (sheet 1): 8/28: 90 degrees; 7/9: 90 degrees; 7/17: 91, 92, and 93 degrees; 7/21: 91, 92, 93 degrees. Ex. 1501, Aug. 2021– Perryville, ADCRR00111473 (Native) San Pedro Unit (sheet 5): 8/2: 95 degrees in 4 locations, 94 degrees in 3 locations; 8/3: 94 degrees in 4 locations, 93 degrees in 2 locations, 92 degrees in 2 locations; 8/6: 91, 92, 93, and 94 degrees; 8/7: 90, 91, 92, 93, and 94 degrees. Ex. 1499, Aug. 2021– Florence, ADCRR00111471 (Native) South Unit (sheet 5): 7/9: 95, 92, 91 (two locations), and 90 degrees; 4/4: 99, 94, 93, and 90 degrees (three locations). Central (sheet 3): 6/20: 93 degrees (2 locations). Ex. 1494, July 2021– Tucson, ADCRR00069763 (Native) Rincon Mental Health Unit (sheet 7): 7/10: 90 degrees (2 locations). Ex. 1488, July 2021– Eyman SMU, ADCRR00069757 (Native): 6/27: 94 degrees (2 locations). Ex. 1487, July 2021– Eyman Browning, ADCRR00069756 (Native): 6/12: 91 degrees (4 locations), 90 degrees (4 locations); 6/10: 91 degrees (2 locations), 90 degrees (4 locations); 7/28: 91 and 90 degrees; 7/29: 90 degrees (numerous locations).

-187-

failure to monitor for and protect against side effects, exposes class members to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

### J. Mentally Ill People Remain Profoundly Symptomatic For Long Periods of Time

521. Because of the inadequate quantity and type of mental health staff, incomplete and uncoordinated treatment plans, and problems associated with the prescription, administration, and management of psychotropic medications, as described above, class members with serious mental health disorders often decompensate, and remain profoundly symptomatic for long periods of time without their symptoms ameliorating. Stewart WT, Doc. 4109 ¶¶ 113-119.

522. A failure to address these concerns leads to the "kindling effect," a neurobiological occurrence whereby the more the brain cells misfire, the more they affect surrounding neurons and brain cells, and if the brain circuity is permitted to misfire, the cascading cycle of depression or psychosis worsens with time. Stewart WT, Doc. 4109 ¶ 113; Stewart TT at 486:14-487:15.

523. Dr. Stewart observed "numerous patients that were severely symptomatic, either depressed, manic, or psychotic. And based on their chart reviews, they had been symptomatic for months or even years. In my opinion, those patients' prognosis was getting worse because they were not properly treated." Stewart TT at 487:21-25. He described an "acutely manic and psychotic individual" at the Phoenix inpatient mental health facility who was "[j]umping around his cell naked, agitated" as an "example of allowing someone to be so mentally ill and symptomatic that it would result in his having a worse prognosis." *Id*. at 488:1-14; *see also* Stewart WT, Doc. 4109 ¶¶ 115-117.

524. Dr. Stewart's written testimony included detailed summaries of interviews with patients and reviews of their medical charts, where he identified more than 30 other people who had remained highly symptomatic for very long periods of time, causing unnecessary suffering and exposing them to a high risk of harm. Stewart WT, Doc. 4109

¶¶ 114, 118-119; Doc. 4109-1 at 31-32, 33-34, 35, 36-37, 38-41, 42, 46-47, 49-50, 51-52, 55-56, 57-60, 61, 62-63, 64, 67, 69-72, 73-74, 75.

525. In his interviews in Lewis prison's Rast Max and Stiner Detention Units, Dr. Haney similarly found numerous people who reported serious mental health problems, including several who appeared obviously and profoundly mentally ill. These people consistently reported no more than a paltry level of clinical programming or other mental health treatment—even those whose serious mental health problems were well-documented and longstanding. Haney WT, Doc. 4120 ¶ 143.

526. One factor contributing to seriously mentally ill patients remaining profoundly symptomatic for long periods of time is related to Defendants' practice that Dr. Stewart identified of mental health staff removing and changing mental health diagnoses, including SMI classification, or "de-diagnosing" patients from psychotic disorders like schizophrenia to less serious conditions such as behavioral disorders or mood disorders, abruptly and with minimal support for the diagnostic change. Stewart WT, Doc. 4109 ¶ 120; Stewart TT at 488:15-490:1.

527. Defendants' data show that only approximately six to seven percent of the people incarcerated in ADCRR have been diagnosed with a serious mental illness (not necessarily designated as "SMI"), but the relevant literature from prison systems across the United States show that between 17 and 30 percent of incarcerated people in state prison systems are seriously mentally ill. Joy WT, Doc. 4099-1 at ECF 25-26.

528. Defendants admitted that neither ADCRR or Centurion track how often a patient's SMI designation is removed. Stallcup TT at 2570:3-6. Additionally, any staff person, including custody staff, can request that a patient's SMI designation be removed. *Id*. at 2569:12-15. Except for SMI classifications made in the community prior to incarceration, the designation can be removed by any level of mental health care staff, including unlicensed psych associates. *Id*. at 2568:1-11. There is no policy requiring that a decision to remove a patient's SMI designation be reviewed by anyone other than the staff person making the decision. *Id*. at 2568:23-2569:4.

529.  Dr. Stewart testified that psychiatric conditions such as schizophrenia or schizoaffective disorder are lifelong chronic conditions that are manageable and treatable but not curable, and that it is "highly implausible" that a person with a longstanding psychiatric disorder would suddenly no longer have the condition. Stewart WT, Doc. 4109 ¶¶ 121-122; Stewart TT at 489:17-490:1. Dr. Stewart testified that

> There are only two possibilities: either the initial diagnosis of major mental illness was incorrect—in which case the patient was not receiving appropriate treatment—or that original diagnosis was correct and is now being inappropriately changed. Even if it were plausible that all of these patients were incorrectly diagnosed with major mental illness—often over a period of many years and by a number of different clinicians—there was typically not adequate assessment and documentation in the record to justify the change of diagnosis made by Centurion mental health staff.
>
> [...]
>
> Unfortunately, such "de-diagnosing" is a recognized phenomenon in prison mental health systems, particularly those that are subject to litigation. Because the mental health services a patient receives are typically dependent upon his or her diagnosis, or classification, de-diagnosing reduces the burden on what is perhaps already an overtaxed and understaffed prison mental health system. Where the system's performance is being monitored as part of an injunction or settlement in litigation, de-diagnosing can make that performance look better than it actually is. I cannot, of course, know whether the de-diagnosing I have observed in ADC is occurring for this reason, but whatever the reason, it falls below the standard of care and puts patients at risk of harm.

Stewart WT, Doc. 4109 ¶¶ 122, 127.

530.  Dr. Stewart's written testimony included a detailed description of his clinical medical file review for numerous class members and five named plaintiffs who had their longstanding psychiatric diagnoses changed to a mood or behavioral disorder by mental health staff, oftentimes without any explanation or documentation. *Id*. ¶¶ 123-126; Doc. 4109-1 at 33, 34-35, 40-41, 43-44, 45-48, 55-56, 64, 65-67, 70-71.[98]

---

[98] Dr. Penn's consulting psychiatrists also described a patient who appeared to be an example of de-diagnosing. The patient's official diagnosis was antisocial personality disorder and mood disorder, but the patient was prescribed olanzapine for symptoms of auditory hallucinations and paranoia. Ex. 2262 at ADCRR00232595 (Patient # 98) (also

-190-

531. For example, he described his review of Named Plaintiff Christina Verduzco's chart over the past seven or eight years where he found an interplay between the failure to properly manage her symptoms and her ever-changing diagnoses:

> After I evaluated her in 2013, Ms. Verduzco was persistently misdiagnosed for seven years. She was assigned the following diagnoses: Borderline (5/14/14), Borderline (11/05/15), Unspecified mood disorder (2/9/16), Borderline (4/15/16), Borderline (7/6/16), substance-induced psychosis (7/6/16), PTSD (5/29/18), Anxiety disorder, unspecified (9/19/18), Unspecified psychotic disorder (3/19/20), Schizoaffective disorder (7/2/20), Schizoaffective disorder, bipolar (10/26/20), Schizoaffective disorder, bipolar (1/11/21), Other Schizoaffective disorder (8/10/21).

> A review of Ms. Verduzco's medical record reveals that Schizoaffective Disorder is the most accurate diagnosis. However, her treatment and case remains concerning. First, she was misdiagnosed, and therefore inappropriately treated, for seven years after I evaluated her, until the correct diagnosis was finally reached in July 2020. This kind of delay in diagnosing and treating mental illness can cause the illness to become more severe and more resistant to treatment. Second, because of the frequency with which Ms. Verduzco's diagnosis has been changed in the past, there is a risk that her diagnosis will be inappropriately changed once again.

Stewart WT, Doc. 4109-1 at 55-56.

532. The Court finds that Defendants' failure to address the ongoing symptoms of persons with serious mental illnesses exposes class members to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

### K. Access to Inpatient Mental Health Care

533. Eight of the nine prisons that house men do not offer psychiatric inpatient treatment for profoundly mentally ill people. Therefore, men who need inpatient care must be transferred to the inpatient mental health facility at ASPC-Phoenix. The people who are in inpatient treatment are "the most acutely and seriously mentally ill. They may be actively self-harming or actively psychotic. And they require the highest level of care that we can provide." Stallcup TT at 2483:3-8.

---

noting that the patient was on suicide watch for 19 days, but did not see a psychiatric provider until ten days after being removed from watch). *Id.*

534. However, the evidence shows that Defendants fail to transfer to Phoenix those people whose mental illness or psychotic behavior is so severe that they cannot be adequately treated at the other facilities.

535. Dr. Stewart observed numerous acutely mentally ill people at the Tucson and Eyman prisons, including in the residential mental health program and in the maximum custody units, who were in need of immediate, hospital-level, inpatient mental health treatment, and were engaged in repeated and serious acts of self-mutilation that necessitated hospitalization for physical injuries; but there was no indication from their medical records that Defendants envisioned transferring these patients to Phoenix, despite the obvious failure to provide them adequate care at their current facilities. Stewart WT, Doc. 4109 ¶¶ 47-55.

536. At the same time that Dr. Stewart encountered these patients who were clearly in need of a higher level of care, only one-third of the inpatient mental health beds at Phoenix were actually filled at the time of his visit on September 23, 2021:

| Unit | Capacity | 9/23/21 Pop. | % Beds Filled |
|------|----------|--------------|---------------|
| Baker Ward | 48 | 24 | 50% |
| Flamenco – Ida Ward | 25 | 14 | 56% |
| Flamenco – Ida Watch (Quiet) | 15 | 0[99] | 0% |
| Flamenco – John PS | 30 | 9 | 30% |
| Flamenco – King Ward | 35 | 9 | 26% |
| Flamenco – George Ward | 20 | 7 | 35% |
| **All MH-5 Beds** | **173** | **63** | **36%** |

Stewart WT, Doc. 4109 ¶ 46.

537. The failure to transfer people to Phoenix's inpatient mental health unit who clearly need it, despite the open beds at the Phoenix facility, may be driven in part by the vacancies in mental health staff described above at ¶¶ 395-98, 449, and the fact that the persons at the MH-5 level of care require much more frequent contact with providers and clinicians. Stewart WT, Doc. 4109 ¶ 55.

---

[99] ADCRR records showed zero people in Flamenco Ida Watch Unit on September 23, 2021; however, when Dr. Stewart visited that unit on that date, there were four people there. Stewart WT, Doc. 4109 at ¶ 46 n.20.

155617523.3

538. There is no requirement that after a patient has been on suicide watch for a certain length of time, mental health staff evaluate sending him to Phoenix for more intensive mental health treatment. Stallcup TT at 2544:24-2545:7; Pelton Dep. at 152:25-153:4; Platt TT at 1068:15-19.

539. Once ordered, transfers to the inpatient mental health facility at Phoenix can take up to two weeks. Pelton Dep. at 218:10-18. Dr. Pelton testified that it normally can take between four days to a week to effectuate a transfer. *Id*. at 217:17-218:8. Delays in transferring patients for necessary intensive inpatient mental health treatment result in people unnecessarily suffering. Stewart WT, Doc. 4109 ¶¶ 45, 47-55.

540. Dr. Pelton and Dr. Platt admitted that custody staff have the authority to override the recommendations of mental health staff that a person be transferred to Phoenix for inpatient mental health care. Platt TT at 1068:9-13; Pelton Dep. at 216:5-19. Dr. Pelton admitted that patients who are at max custody level cannot be transferred to Phoenix's residential mental health program at Aspen Unit. Pelton Dep. at 227:3-7.[100]

541. As described in greater detail above at ¶¶ 154-70, in Eyman's Browning and SMU-I max custody and detention units, people are locked down practically 24 hours a day, and very seldom leave their cells. Many of these people are acutely mentally ill and require an inpatient level of care that is not provided in these housing units. *See, e.g.*, Horn WT, Doc. 4130 ¶ 278. Many of their cells are littered with trash, used food cartons, and vermin. The conditions in which these persons are incarcerated and live, coupled with the inadequate treatment they receive, exacerbate their mental illness and undermine any treatment they do receive.

---

[100] Dr. Penn's written testimony that referrals to ADCRR's inpatient units are completed within 48 hours, and immediately if clinically indicated, was based solely upon ADCRR written policies and what he was told by ADCRR and Centurion staff. He did not review transfer logs or intake logs. He did not review a sample of medical records of people transferred to the inpatient facilities to analyze the timeliness of transfer, and did not review any data or reports calculating the average length of time for transfer to inpatient mental health beds. Penn TT at 3169:6-3170:14; Penn WT, Doc. 4172 ¶ 127.

155617523.3

542.  Dr. Platt confirmed that the mental health treatment that is provided at the other prisons is not equivalent to what is available at Phoenix. Platt TT at 1099:22-25.

543.  Dr. Wilson, Centurion's national vice president for behavioral services, admitted that "in-cell self-study programming," while a component of mental health care, "certainly does not constitute the entire spectrum of mental health treatment." Wilson Dep. at 41:2-13. He also confirmed that "written patient education handouts" are no substitute for face-to-face encounters. *Id*. at 41:14-42:1.

544.  Named Plaintiff Ronald Slavin testified regarding his experiences trying to obtain more intensive levels of mental health care since his incarceration in 2019. Mr. Slavin is classified as SMI because of his ongoing psychosis and auditory hallucinations. Slavin TT at 248:9–15, 248:21–249:21, 253:12-24; *see also id.* at 248:16–20, 249:22–252:25 (describing symptoms of schizophrenia, depression, and PTSD). He has been housed in the Eyman-Cook Unit since he was incarcerated. *Id.* at 253:1–5, 253:25–254:4. In the Cook Unit, the mental health resources available to him are quite limited—he is able to see a psychiatrist once every three months, take medications for his mental illnesses, and see a psychologist once every one month. *Id.* at 254:5–19, 255:13–17, 255:24–256:1, 260:5–8.

545.  The resources available to Mr. Slavin at the Cook Unit are inadequate to treat his mental illnesses. Although the medications that he is prescribed now have helped him to some extent, he was previously prescribed medications prior to his incarceration that were much more effective. Slavin TT at 257:5–19, 258:6–14, 258:23–259:15, 259:20–260:4. Meetings with the psychologist have been even less productive. The psychologist has merely advised Mr. Slavin—a seriously mentally ill individual who hears voices and experiences severe paranoia and depression—to listen to podcasts to improve his mental health. *Id.* at 260:15–261:14. Unsurprisingly, this "treatment" does not come close to effectively treating his mental illnesses. *Id.* at 261:15–262:1.

546.  Mr. Slavin has repeatedly requested that he be transferred to ADCRR's Men's Treatment Unit ("MTU"), so that he would have access to those mental health

resources, including more frequent interactions with mental health professionals and participation in mental health groups and other activities. Slavin TT at 260:15–25, 262:22–264:14; *see also* 11/2/21 Tr. at 264:21–268:9 (admitting Exhibits 2387, 2388, and 2389, each of which document Mr. Slavin's HNRs asking to be transferred to an SMI yard). Mr. Slavin's Centurion psychologist agreed that he should be transferred, noting in October 2020 that he "appears to need more mental health resources than are available at this location" and opining that he is "a good candidate for referral to the MTU." Ex. 2401. Despite Mr. Slavin's requests, and despite the psychologist's recommendation, he continues to be housed at the Cook Unit and is denied the mental health resources that he needs. Slavin TT at 273:7–274:12.

547. In another case, one of Dr. Penn's psychiatric consultants concluded that a patient who died by suicide "might have benefitted from a prison inpatient unit." Penn TT at 3316:19-25: Ex. 2262, ADCRR 232596 (Patient 115).

548. While the women incarcerated at Perryville do not have to leave that prison complex to receive an inpatient level of mental health care, Dr. Stewart testified that ADCRR's records showed that on September 10, 2021, the date he visited Perryville's inpatient mental health unit, only seven of 16 beds were occupied. Stewart WT, Doc. 4109 ¶ 56. He described meeting with women who had been moved to general population or mental health step-down units "who reported that while they had received adequate treatment in the inpatient facility, they did not feel stable enough to leave, and history had proven that they would decompensate in general population and cycle back to the more intensive mental health care units." *Id.*

549. Dr. Pelton testified that she could not think of any example of a patient ever being transferred to an inpatient facility as a result of advocacy by *Parsons* plaintiffs' counsel requesting evaluation and possible transfer. Pelton Dep. at 219:18-220:2.

550. Defendants similarly fail to transfer mental health patients to residential treatment facilities when the acuity of their illness so requires. For example, the psychological autopsy of a patient who died by suicide at Perryville described above at

¶¶ 445-48, detailed that in the days before her death she asked to be moved to a residential mental health program, but her HNR was not reviewed. Ex. 293 at ADCM1588582. The psychological autopsy report recommended that "[c]onsideration should be given to those patients with significant trauma issues being referred to a residential program so that the treatment can be provided in appropriate timeframes and the response to treatment be more closely monitored," *id.* at ADCM1588587, and the mortality review report concluded that "admission to emotional trauma residential counseling could have been beneficial to the patient." Ex. 294 at ADCM1588592.[101]

551.    The Court finds that Defendants' failure to provide adequate access to inpatient and residential mental health care for those patients who require it exposes class members to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

**L.    Treatment of Suicidal / Self-Harming People**

552.    Defendants fail to provide adequate care to people who are self-harming, expressing suicidality, or experiencing other mental health crises. People placed on mental health watch receive less contact with and less monitoring by providers and clinicians than the acuity of their condition demands.  Stewart WT, Doc. 4109 ¶ 168. Dr. Stewart provided the Court with a report including his analysis of the medical records, mortality reviews, and psychological autopsies of most of the incarcerated people who died by suicide since 2019. *See generally* Doc. 4109-1, Ex. 3.

553.    ADCRR's own report shows that Fiscal Year 2021 (July 1, 2020-June 30, 2021) had the highest number of suicides since FY 2011, when the prison population was higher:

---

[101] One of Dr. Penn's consulting psychiatrists reviewed the medical records of another patient who died by suicide in January 2021, and while finding "Yes" on the question of "Access to Care," concluded that the patient "might have benefitted from a prison inpatient unit." Ex. 2262 at ADCRR00232596 (Patient 115).

**INMATE DEATHS BY YEAR AND CAUSE**

| TYPE | FY 10 | FY 11 | FY 12 | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 | FY 19 | FY 20 | FY 21* | FY 22* | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Natural Causes | 67 | 64 | 71 | 66 | 91 | 82 | 102 | 107 | 105 | 93 | 128 | 134 | 28 | 1138 |
| Suicide | 10 | 13 | 6 | 7 | 8 | 6 | 6 | 8 | 7 | 7 | 6 | 10 | 2 | 96 |
| Accidental | 4 | 5 | 7 | 7 | 3 | 6 | 11 | 15 | 12 | 17 | 8 | 7 | 2 | 104 |
| Homicide | 5 | 4 | 3 | 3 | 5 | 6 | 6 | 6 | 11 | 2 | 3 | 2 | 0 | 53 |
| TOTAL | 86 | 86 | 87 | 83 | 105 | 99 | 125 | 136 | 135 | 119 | 145 | 153 | 32 | 1,391 |
| ADP | 40,458 | 40,226 | 40,011 | 40,048 | 41,084 | 42,132 | 42,902 | 42,428 | 42,113 | 42,074 | 42,105 | 36,569 | **35,410 | |

*FY 2022 as of 9/30/2021
Includes ADCRR and Contract Beds
** Actual inmate population as of 9/30/2021 ADP – Average Daily Population (for Fiscal Year)
Cause of death figures are subject to change based on official medical examiner reports, which may be issued in a subsequent month

Ex. 2148(a) at 4 (ADCRR Inmate Assault, Self-Harm, & Mortality Data, Sept. 30, 2021); Stallcup TT at 2539:4-2540:17 (confirming this data).

554. ADCRR's ten suicides in FY 2021, with a total prison population (including non-class members incarcerated at private prisons) of 36,569, yields a suicide rate of 27.3 per 100,000 incarcerated persons. This is substantially higher than the 2015-19 national average suicide rate in state prisons, of 22 per 100,000. Ex. 2148(a) at 4; Ex. 3333 at 21, Table 11 (State total, 2015-19). Centurion's national vice president for behavioral health services admitted that mental health and custody staff shortages could be contributing factors to the increased suicides in Arizona prisons. Wilson Dep. at 87:9-19, 148:20-149:1.

555. Conditions in suicide watch cells are stark and austere. People placed on watch are stripped of all belongings and clothing, denied the ability to contact or communicate with family, friends, or attorneys on the outside, and placed in cells that offer nothing but a thin plastic mattress and a rip-proof blanket; the utterly predictable result is that many people struggling with suicidal impulses or who are planning suicidal acts do not report their thoughts or plans precisely because of the unduly harsh conditions they would experience on suicide watch. Haney WT, Doc. 4120 ¶ 143; Stewart WT, Doc. 4109 ¶¶ 72-73, 200:





Haney WT, Doc. 4120 ¶ 143; ADCRR158743, ADCRR158746 (Lewis suicide watch).

556. There are three different suicide watch intervals in ADCRR: a thirty-minute watch, a ten-minute watch, and a continuous watch. Stallcup TT at 2546:13-16; Ex. 1315, DO 807 § 8.

557. Defendants' employees confirmed that people on mental health watch seldom get out of their cells and have minimal access to their belongings. Coleman TT at 2098:2-10. As noted above, these harsh conditions discourage people from revealing thoughts of self harm. Some patients are not provided any access to out-of-cell recreation

while on suicide watch. Stallcup TT at 2545:11-2546:5; Pelton Dep. at 146:21-147:1. Contrary to policy, the final decision as to which patients on mental health watch, if any, receive out-of-cell time is left to security staff and not mental health staff. Pelton Dep. at 147:17-148:1, 148:16-20. Mr. Muhammad did not have access to his property and was not given any chance to come out of the suicide watch cells at multiple prisons for recreation or programming. Muhammad TT at 926:2-23. Similarly, Named Plaintiff Brislan was placed on watch five or six times while housed at Florence-Kasson Unit (between late November 2018 and December 2020, and April-September 2021), and he was not offered any out-of-cell time or access to the phone while on watch. Brislan TT at 1304:22-1305:4, 1308:21-1309:3, 1315:24-1316:3. He was not offered out-of-cell recreation time or phone calls while on suicide watch at Lewis-Rast Unit. *Id*. at 1315:16-23.

558.    There is no time limit on how long a person can be continuously on suicide watch, nor a requirement that a patient be transferred to an inpatient setting after a certain length of time on suicide watch. Stallcup TT at 2544:25-2545:7; Pelton Dep. at 152:25-153:4; Platt TT at 1068:15-19. Dr. Stallcup was unable to state the longest a patient has continuously been on suicide watch since she became ADCRR's mental health program director. Stallcup TT at 2545:8-10. Dr. Stallcup has held this position since August 2020. *Id.* at 2435:15-25. Dr. Pelton, Centurion's regional mental health director since July 2021, is aware of people who have been on watch "for months." Pelton Dep. at 153:5-22.[102]

559.    Mr. Muhammad was on mental health watch for a total of 234 days between March 31, 2020, and late September, 2021. *See generally* Ex. 2395. His longest continuous stay on watch during that period of time was 45 days (from August 4, 2020, to September 17, 2020). *Id*. at 6-7. He usually is placed on suicide watch because of acts of self-harm, primarily banging his head on walls and cell doors. Muhammad TT at 925:12-16. He described the experience of being on suicide watch as "appalling," "demoralizing,"

---

[102] Defendants' documents confirm that patients routinely remain on watch for weeks or months at a time. *See, e.g.*, Doc. 4240-1 at 10 (89 days and 97 days); 12 (105 days); 15 (76 days); 28 (64 days); 29 (64 days); 31 (83 days); 38 (62 days); 39 (69 days).

and "inhumane." *Id*. at 925:17-23. He characterized the mental health care treatment in the watch units as "a fiasco," where "they just yell at you, or sometimes the COs curse you out." *Id*. at 913:24-914:9.

560.    Mr. Brislan was on suicide watch at Lewis-Rast for about three weeks to a month in April 2021, when he was transported back to Florence-Kasson's behavioral management unit. Brislan TT at 1312:25-1313:6.

561.    In 2020 the number of incidents of self-harm in ADCRR were higher than historic numbers, and "towards the end of 2020" when Dr. Platt was regional mental health director for Centurion, she and others at the company were tracking "[m]ostly individuals out of Florence, Tucson, and Lewis" who were the "self-harmers that were harming frequently or more frequently, would have multiple incidents" of self-harm. Platt TT at 1059:6-16. She testified that ADCRR used to track incidents of self-harm based on incident reports until about 2018 or 2019, when the department began to require health care vendors to track that information for them. *Id*. at 1058:13-23.[103]

562.    It is unclear why, if there are only a limited number of patients engaged in self-harm, an adequate treatment plan, including therapy and medication, could not have been put in place to manage these patients' behaviors. Dr. Platt testified that despite the fact that the most frequent "self-harmers" were at the Florence, Tucson, and Lewis facilities, additional mental health staff were not allocated to those prisons. Platt TT at 1059:24-1060:6.

563.    At one point in November or December 2020, Centurion regional officials considered the creation of two additional mental health positions to help mitigate self-harm across the state, and to attend to the high-need population of the people who most frequently engaged in acts of self-harm. Platt TT at 1055:12-20, 1056:18-23. These additional positions were approved by officials in Centurion's corporate headquarters. *Id*.

---

[103] The chart on page 83 of Dr. Penn's declaration referring to "suicide spectrum behavior" was created by Dr. John Wilson, a psychologist who works for Centurion; Dr. Penn had no role in making it. Dr. Penn does not know who created the chart pertaining to suicides that appears at p. 84 of his declaration. Penn TT at 3192:5-3193:3.

155617523.3

at 1055:3-1056:4. These positions were to be created because these positions could help mitigate risk of harm to mentally ill patients engaged in repeated acts of self-harm. *Id.* at 1057:11-18.

564.    While these positions were discussed with and approved by Centurion's corporate headquarters in late 2020, at some point the decision was made to "freeze" any recruitment for the positions, and they were abandoned; as a result, no additional mental health staff positions were created at those prisons, nor were any mental health staff reallocated to those prisons from other Arizona facilities. Platt TT at 1055:3-1056:4, 1056:11-1057:17, 1059:24-1060:6.

565.    ADCRR did not increase the number of custody staff at facilities with the most frequent self-harmers, or at units with the highest rates of self-harm, except that the department tried to "heavily recruit in general for more custody staff." Platt TT 1060:24-1061:5.

566.    All observation of people on mental health watch, including continuous watch, is done by custody officers, not by mental health staff. Stallcup TT at 2547:12-14; Platt TT at 1061:10-11. Custody officers assigned to conduct continuous or other suicide watches do not receive any training on interacting with the mentally ill population beyond what all custody officers receive. Platt TT at 1061:12-24.

567.    The unrebutted testimony by class members diagnosed with serious mental illness described how they were able to continue to engage in acts of self-harm while on suicide watch. Mr. Muhammad testified that he repeatedly engaged in additional acts of self-harm while on watch, with the result that he was pepper sprayed at least 48 times between August 2020 and November 2021. Muhammad TT at 928:16-25. He testified that when he is self-harming, he is hearing voices telling him to do so. *Id.* at 929:1-2, 932:8-9, 932:15-19.

568.    Dr. Stewart's clinical review of patients' medical records confirmed the testimony of incarcerated people that seriously mentally ill people—including those on mental health watch—were able to engage in serious acts of self-harm and self-mutilation

that resulted in hospitalization. Stewart WT, Doc. 4109 ¶¶ 170, 175; Doc. 4109-1 at 32, 39-41, 42, 47-48, 51-52, 53-55, 59-60, 61, 63-64, 65-67, 70-71 (Doc. 4109-1, Ex. 2 at 3, 10-12, 13, 18-19, 22-23, 24-26, 30-31, 32, 34-35, 36-38, 41-42).

569. Defendants' own reports also demonstrated that people placed on mental health watch are able to continue to engage in acts of self-harm, including while on continuous watch. For example, the CQI minutes from Phoenix, the dedicated mental health facility for men, show that month after month there were multiple self-harm incidents. *See* Ex. 771 at ADCRR00103987 (Dec. 2020 minutes) ("Self-Harm incidents in November: 10 of the 14 incidents were completed by 1 inmate"); Ex. 791 at ADCRRM0018565 (Feb. 2021 meeting minutes) ("(13) of the (23) [self-harm] incidents were completed by (2) patients"); Ex. 821 at ADCRR0056547 (May 2021 minutes) ("Self-Harm incidents in April: 10 of the 17 incidents were completed by 2 IMs"). These acts of self-harm are sometimes serious enough to warrant hospitalization. *See* Ex. 791 at ADCRRM0018566 (Feb. 2021 minutes) ("ER send out on 1/02/2020 [sic] for a hanging attempt;" "ER send out on 1/04/2021 for a hanging attempt").

570. On April 28, 2021, a patient at the Phoenix mental health facility was able to remove ten staples from his abdominal wound, and swallow the staples, *while on a continuous watch*. The nurse noted wound dehiscence (splitting open) and "risk for airway obstruction," and the patient was taken to hospital. Ex. 821 at ADCRR0056570-71 (May 2021 minutes). Dr. Pelton, Centurion's regional mental health program director, conceded that this incident caused her concern, but that she could not speak to any specific steps actually taken in response to the factors that led to this patient's actions. Pelton Dep. at 191:11-16, 192:5-193:5, 193:12-19.[104]

571. Incarcerated people also report that while they are on mental health watch, some officers engage in what is known as "kickstarting," where the custody or other staff

---

[104] By contrast, Dr. Penn testified that this incident did not cause him any concern about whether continuous suicide watches are being performed correctly. Penn TT at 3229:1-3231-23.

goad or taunt the person on watch to hurt himself. Brislan TT at 1310:5-8; Johnson TT at 1239:15-18, 1240:24-1241:9.

572. Mr. Brislan was placed on suicide watch approximately five or six times while at Florence-Kasson, and some of the officers at the unit would kickstart him and encourage him to hurt himself. Brislan TT at 1308:21-1309:3, 1310:9-13. While Mr. Brislan was on suicide watch at Lewis-Rast, the officers would kickstart him and encourage him to cut himself because "they wanted to see how bad I could get." *Id*. at 1310:15-21.

573. Named Plaintiff Jason Johnson worked as a porter at Florence-Kasson from late 2019 to October 2020 (Johnson TT at 1216:15-18, 1220:18-25, 1233:4-10), and while he was out of his cell working, he witnessed officers mistreating other incarcerated people. *Id*. at 1237:17-19. Specifically, he often heard officers taunting people with SMI, treating them "rough," and officers would get into heated arguments with and goad mentally ill patients solely to "get them to freak out," at which point the officers would use chemical spray on them. *Id*. at 1238:18-1239:14; 1241:14-1242:6.

574. The notes taken by Defendants' expert Dr. Penn during his September 24, 2021 tour of the inpatient mental health facility at Phoenix corroborate this. His notes reflect that, when meeting with Dr. Pelton, Centurion's regional mental health director, she stated that one problem she faced was "getting custody on board. We can create the most wonderful treatment plans. CO start banging on their door, set them off." Ex. 2262 at ADCRR00232509.

575. Unfortunately, it is not just custody staff who encourage psychologically fragile people to hurt themselves. In February 2020, the Phoenix inpatient facility had an acutely mentally ill patient who, according to an ADCRR monitor,

> has been self harming by banging his head for the past several days resulting in multiple ICS events and the use of OC spray. Mental health appears to be at a loss on how to deal with this inmate.
>
> In an email sent today the Regional Director of Mental Health basically said to continue using OC spray as needed while the

155617523.3

on site mental health team comes up with a treatment plan. We are told that Dr. Carr [the Regional Director of Psychiatry] has been consulted by phone but there is minimal documentation in the medical record to support any significant involvement by a psychiatrist. This inmate now has wounds on the back of his head and on his forehead from the head banging. There are staples holding the wound edges together on the back of his head but the forehead wound remains open as the two previous attempts to staple his frontal wound have failed because of the continuous head banging.

We just received a copy of an I/R [incident report] completed by security staff from last evening indicating that the mental health RN was encouraging the inmate to bang his head so that the restraint chair could be used. At the time of this nurse/patient encounter, the patient was NOT participating in head banging but began banging his head after the nurse told him to do so … which resulted in a Use of Force event. This entire event was captured on video.

[…] [T]he patient has allegedly lost 30 pounds since December[,] Mental health staff and nursing staff are verbally reporting that the condition of this patient "is deteriorating" from his normal baseline standards[,] When asked at the Tracker meeting this afternoon why this situation has not (apparently) been escalated to a psychiatric emergency with a Psychiatrist coming to Phoenix to complete a comprehensive examination and evaluation of this patient, the FHA [Facility Health Administrator] responded that Dr. Carr would be coming on **February 24** to assess the patient. Apparently Dr. Carr is out of town. When the Warden asked the FHA if there is another Psychiatrist in the system who can come to Phoenix to assess the patient, she did not know.

Ex. 2125 at ADCRR00078072-73 (emphasis in original).

576. Dr. Stewart testified that this case "is profoundly troubling for multiple reasons—particularly because the situation occurred at ASPC-Phoenix. … It is totally inappropriate under any context for a nurse to tell a patient to harm himself." Stewart WT, Doc. 4109 ¶ 193. It is highly inappropriate for mental health care staff to direct custody officers "to continue using OC spray as needed" while the mental health team develops a treatment plan, as "it's abundantly clear that the use of OC spray is not an appropriate psychiatric intervention for an acutely mentally ill individual." *Id.*; Stewart TT at 516:7-9.

577. Additionally, "it is incomprehensible that, faced with … 'a true psychiatric emergency,' Dr. Carr … was not planning to assess the patient until … **twelve days** after the date of [the] email." Stewart WT, Doc. 4109 ¶ 194. Dr. Platt testified that at the time

of this incident, there was no on-site psychiatrist working at Phoenix, that the sole psychiatric provider for the facility was via telehealth, and there was only one psychiatrist besides Dr. Carr working for Centurion who was physically present in Arizona. *Id*.

578.    Dr. Stewart testified that this case is an example of the "kindling" effect when very symptomatic people "are left to spiral out of control," and it is "the height of irresponsibility for facility psychiatric providers and mental health clinicians to throw their hands in the air and say, 'we can't do anything for this patient,' and let the patients cycle ever deeper into worsening self-injurious and decompensating behavior." Stewart WT, Doc. 4109 ¶ 196.

579.    In another example, the death by suicide in April 2021 of a patient at SMU-I's Complex Detention Unit shortly after being discharged from suicide watch, described above in ¶¶ 426-27, raised questions about the quality of the suicide watch discharge plan. Based upon his clinical review of this patient's medical record, Dr. Stewart concluded that the death was, without qualification, "avoidable." Stewart WT, Doc. 4109-1 at 116 (Doc. 4109-1, Ex. 3 at 39). The patient

> did not receive an appropriate referral to a prescribing psychiatrist to thoroughly evaluate his psychiatric deterioration. There were significant red flag symptoms that were psychotic in nature which should have prompted immediate involvement of a psychiatric prescriber. On 4/12/2021, the history shared by the patient may not be a good reflection of symptoms he was actually experiencing, and more thorough evaluation and frequent follow-up should have been conducted prior to downgrade from crisis watch. The patient's criminal history as a stressor was not appropriately addressed, given the significant paranoia he reported about this issue.
>
> Furthermore, it is well known that such incarcerated individuals are at significant risk for harm towards them, supporting his paranoia. It is suspected his paranoia was primarily from a delusional psychotic backdrop given the increasing concern for his safety while on crisis watch and endorsement of experiencing auditory hallucinations.

*Id*. at 115-16 (Doc. 4109-1, Ex. 3 at 38-39).

580.    The mortality review report detailed the following "Mental Health concerns":

1. There was no suicide risk assessment conducted upon placement or removal from watch.

2. There was no crisis treatment plan developed within 1 business day of placement on watch (there was no plan developed for the entirety of his watch).

    A. Because of this, there was no documentation showing his resolution of the issues that precipitated his placement on watch.

3. There was no indication that safety was reliably re-established prior to discontinuing watch (***in fact the patient's mental status was significantly worse at the time of discontinuing watch than when it was started***).

4. There is no indication that multidisciplinary consultation was conducted prior to discontinuing watch.

Ex. 403 at ADCR00000108 (emphasis added). Dr. Stallcup admitted that a suicide risk assessment is required prior to removing a patient from mental health watch, and confirmed that it was not done in this patient's case. Stallcup TT at 2544:9-15.

581. As with all suicides, Centurion mental health staff wrote a psychological autopsy report for this patient. *See* Ex. 404. The report determined that "[o]f note, throughout the duration of his mental health watch placement, a crisis treatment plan failed to be documented." *Id.* at ADCRR00000187. Dr. Stewart agreed "with the psychological autopsy that there was not an adequate risk assessment prior to downgrade from suicide watch." Stewart WT, Doc. 4109-1 at 113 (Doc. 4109-1, Ex. 3 at 36).

582. The psychological autopsy detailed the same encounters that Dr. Stewart described in his clinical review. *Compare* Ex. 404 at ADCRR00000187 *with* Stewart WT, Doc. 4109-1 at 113-14 (Doc. 4109-1, Ex. 3 at 36-37). The psychological autopsy noted that on April 9, 2021, two days after being placed on watch, that the patient "began to endorse experiences of hallucinations," and that on April 10, and he "state[d] that he could not come off mental health watch status because he was feeling depressed." Ex. 404 at ADCRR00000187. The next day, April 11, four days after being placed on suicide watch, the patient "endorsed experiencing auditory hallucinations, expressed fear for his safety, and detailed content appearing delusional and bizarre in nature. ***Following this encounter***

*with the mental health clinician, his case was consulted with other staff at the facility and he was discharged from suicide watch*." *Id*. (emphasis added). He was returned to SMU-I's Complex Detention Unit and four days after discharge from suicide watch, was found dead by suicide in his isolation cell. *Id*. at ADCRR00000185.[105]

583. The psychological autopsy recommendations included:

> further staff training on suicide prevention, policies, and procedures, as well as tracking completion of the appropriate documentation for all suicide watches. For instance, a suicide risk assessment was not completed upon the decision to discharge this patient from suicide watch. A review of protective and risk factors is crucial to properly assessing risk. Further, resolution of symptoms should be clearly documented in the decision to alter suicide watch levels, as well as discharge patients from a suicide watch status. It would behoove the team to ensure they are collaborating with ADCRR partners and psychiatric providers prior to decisions to remove an individual off of a suicide watch. It is recommended that staff are provided these training tools and further ensure the completion of risk assessments and crisis treatment planning.

Ex. 404 at ADCRR00000192. However, as Dr. Platt admitted, there is not a system in place for Defendants to determine if any of the mortality review's or psychological autopsy's recommendations are actually implemented or if any policies are changed. Platt TT at 1036:20-1037:5.[106]

---

[105] Dr. Stallcup testified she did not know what proportion, if any, of patients being removed from suicide watch are transferred directly to residential mental health treatment, versus being returned to their prior housing location. Stallcup TT at 2547:2-11.

Lewis-Rast Max Deputy Warden Coleman testified that people coming off suicide watch are placed directly back into their max custody location "all the time," and that they frequently go back and forth between the max custody unit and the suicide watch area, such that he refers to them as the "frequent flyers." Coleman TT at 2097:12-20. Mr. Coleman confirmed that these people receive no follow up from custody staff after they return to their max custody cell following a stay on suicide watch. *Id*. at 2097:22-2098:1.

[106] Dr. Penn testified that, despite the conclusions by ADCRR and Centurion in the mortality review and psychological autopsy report with regard to the deficiencies in this patient's care, he concluded that the care the patient received met the standard of care. Penn TT at 3222:25-3225:19. He was unable to say if he had asked anyone at ADCRR or Centurion if the improvements recommended in the psychological autopsy were ever implemented. *Id.* at 3225:20-3226:18.

1    584.   The Court finds that Defendants' failure to implement an effective program

2    to prevent self-harm and suicide exposes class members to a substantial risk of serious

3    harm, and denies them the minimal civilized measure of life's necessities.

4    **IV.   MEDICAL / PHYSICAL HEALTH CARE**

5         **A.   Background**

6    585.   Plaintiffs contend that the ADCRR has a constitutionally inadequate system

7    for delivering medical care to patients in the ten Arizona State Prison Complexes.

8    586.   At trial, the Court heard testimony and received trial declarations from two

9    expert witnesses. Dr. Todd Wilcox, M.D., M.B.A., testified for the plaintiffs.[107] He has 27

10   years of experience in correctional healthcare, as the medical director of the Salt Lake

11   County jails, former Medical Director for the Maricopa County Jail, and former President

12   of the American College of Correctional Physicians. Written Testimony of Dr. Todd

13   Wilcox ("Wilcox WT"), Doc. 4138 ¶¶ 2, 4. Dr. Wilcox has continued to provide direct

14   patient care throughout his career, and at the Salt Lake County jails, he typically spends

15   70 percent of his time providing care to patients. Wilcox TT at 1620:10-17. He also

16   teaches medical students and residents as an adjunct faculty member at the University of

17   Utah School of Medicine. *Id.* at 1628:3-7.

18   587.   Dr. Wilcox consults frequently with correctional systems nationally to

19   improve delivery of medical care, including the California Department of Corrections and

20   Rehabilitation, Mississippi Department of Corrections, Maricopa County Jail (Phoenix,

21   AZ), Santa Clara County Jail (San Jose, CA), Pima County Department of Institutional

22   Health (Tucson, AZ), the National Institute of Corrections and the American Jail

23   Association. Wilcox WT, Doc. 4138 ¶ 2.

24   588.   Dr. Wilcox based his opinion on his extensive examination of the ADCRR's

25   medical care delivery system and his experience as a medical expert in this action since

26

27   [107] Dr. Wilcox received his B.S. from Duke University, his M.D. from Vanderbilt University School of Medicine, and his M.B.A. from University of Utah David Eccles School of Business. He is board-certified in Urgent Care Medicine. Wilcox WT, Doc.4138, App. A.

28

2013. Wilcox WT, Doc. 4138 ¶¶ 6-8, 18-27. For this trial, Dr. Wilcox reviewed ADCRR's medical policies and procedures, the Court Expert's Report, monitoring data compiled by Defendants related to the parties' Stipulation, and medical charts for approximately 120 patients, comprising thousands of medical records. *Id.*; Wilcox TT at 1968:7-1969:1. He also reviewed Continuous Quality Improvement minutes and mortality reviews for patients who died after January 1, 2019, in addition to visiting the four prisons with IPCs (*i.e.*, "Inpatient Care" units, which are infirmaries) for one day each and interviewing patients, including most of the patients housed in the infirmaries. Wilcox WT, Doc. 4138 ¶¶ 7, 18-22, 398, 399, 415-423, and App. C; *see also* Wilcox TT at 1968:7-1969:1.[108]

589. Dr. Wilcox's opinion is also based upon his extensive experience in this action, including the multiple reports and declarations he has submitted addressing medical care delivery in Defendants' prisons, as well as monitoring tours and visits during the pendency of the Stipulation. Wilcox WT, Doc. 4138 ¶ 6; Wilcox TT at 1636:22-1637:7 and 1668:17-1674:23. The Court finds Dr. Wilcox's opinions credible and well-grounded in the facts and in a reasonable methodological approach.

590. Dr. Owen Murray, the defendants' expert, is the Vice President of Offender Health Services for the University of Texas Medical Branch, where he has worked for 26 years. He oversees the provision of medical, mental health and dental services for incarcerated adults in the Texas Department of Criminal Justice state jails and prisons, and

---

[108] Dr. Wilcox's methodology involved extensive review of a wide range of data and information, including scores of medical charts for sick patients. He has used this methodology to evaluate care in other cases, and other experts use this type of methodology. Wilcox TT at 1675:2-6.

Defendants' expert Dr. Murray attempted to discredit Dr. Wilcox's opinions, stating that they were not based upon "random record selection" and looked at a narrow subset of the population. Murray TT at 3491:3-3492:4. Dr. Murray himself, however, based his own opinions, for example regarding the lack of adequate preventive care, on extremely small samples. *See* Murray TT at 3506:1-14. More importantly, Dr. Wilcox addressed the concerns about his methodology, indicating that he chose to focus his chart review on patients who have higher medical utilization, including those who are in the prison infirmaries, because those charts contain multiple transactions, permitting a better system evaluation. Wilcox TT at 1676:16-1678:25. This Court credits Dr. Wilcox's testimony and finds that his methodology, including his reliance on his extensive chart reviews, is reliable.

1  to incarcerated juveniles in the Texas Juvenile Justice Department facilities. He is Board-
2  certified in family practice medicine. Murray WT, Doc. 4206 ¶¶ 3-4.

3      591.    Dr. Murray evaluated ADCRR's medical care delivery system by visiting
4  ten prisons, for about three hours each. Murray TT at 3496:1-9. He also based his opinion,
5  in part, on a study that included only people with a chronic care diagnosis. *Id.* at 3501:23-
6  3502:9. Dr. Murray did not review the files himself but delegated that task to other
7  clinicians.[109] Murray WT, Doc. 4206 ¶¶ 204-206. The study was based on 80 class
8  members' medical charts, chosen from a list of patients with multiple chronic care
9  diagnoses, with ten records chosen for each of eight ADCRR prisons. Murray WT, Doc.
10  4206 ¶ 201. As part of his study, he compared the blood pressure and A1c (blood sugar
11  readings) for these patients and concluded they were consistent with ADCRR's scores on
12  benchmarks set forth in the Healthcare Effectiveness Data and Information Set (HEDIS).
13  *Id.* ¶ 1018. Dr. Murray did not conduct an evaluation about the core deficiencies in the
14  ADCRR healthcare system identified by Dr. Wilcox, including related to medication
15  administration, specialty care, hospitalizations, discharge after hospitalizations, sick call,
16  nursing care, and access to providers, although, as discussed below, his reviewers did find
17  corroborating evidence of such problems in the course of their limited HEDIS review.
18  Murray TT at 3504:21-3505:21.

19      592.    The Court also heard testimony from Defendants Shinn and Gann; two
20  physicians, Dr. Grant Phillips, ADCRR's Medical Director, and Dr. Elijah Jordan,
21  Centurion's Site Medical Director for Yuma; and two Named Plaintiffs, Kendall Johnson
22  and Laura Redmond.

23      593.    The evidence before the Court makes clear that Defendants' medical system
24  does not meet constitutional standards. Plaintiffs presented overwhelming evidence to
25  demonstrate that there is a pattern of grossly inadequate medical care in the state prisons,

26  _____

27      [109] Dr. Murray apparently reviewed additional records after submitting his expert report regarding his opinions and after Plaintiffs took his deposition. This Court granted
28  Plaintiffs' motion to bar his testimony regarding his untimely review of these records. Murray TT at 3400:14-3401:1

that there are systemic and gross deficiencies in the system's staffing, supervision, and procedures, and that the lack of adequate medical care is harming incarcerated people and placing them at substantial risk of serious harm.

594. This evidence includes extensive, undisputed written and trial testimony from Dr. Wilcox documenting cases of shockingly poor medical care for scores of class members that subjects them to extreme pain and suffering, as well as mortality reviews and Defendants' monitoring data under the parties' Stipulation ("CGAR reports"),[110] medical records, staffing reports, and Continuous Quality Improvement (CQI) minutes.

595. It also includes Dr. Murray's testimony concurring that Defendants' electronic health record, preventive care practices, death review process, and pain medication prescribing practices are deficient. Murray TT at 3507:14-25, 3511:6-10, 3522:25-3524:13, 3512:11-23. In addition, Dr. Murray's study of chronic care patients demonstrates that a substantial proportion of the 80 patients whose medical charts were reviewed did **not** receive care that was timely or reflected good decision-making:

- Episodic care: 44%
- Chronic care: 72%
- Quality of documentation: 82%

Murray TT at 3544:12-3547:13.

596. With the exception of a portion of a single case, (*compare* Murray WT, Doc. 4206 ¶¶ 1046-1055 *to* Wilcox WT, Doc. 4138 ¶¶ 282-283 and 430-437), Defendants offered no evidence to refute any of Plaintiffs' facts regarding the shocking cases of deficient care that Dr. Wilcox presented. Completely absent from the ADCRR's defense is any explanation for how an adequately functioning healthcare system produced case after case of appalling mistreatment.

---

[110] As discussed in ¶ 3, *supra*, under the Stipulation, Defendants were required to assess and report monthly on their compliance with 104 health care performance measures at ten prisons. Defendants' monitoring reports are referred to as CGAR reports.

597.    The Court agrees with the Plaintiffs' expert, Dr. Wilcox, who concluded that Defendants' medical care system is "terrible." Wilcox TT at 1679:16-1680:1. Medical care has been and continues to be grossly inadequate to meet the basic needs of incarcerated patients who are ill or injured, resulting in unnecessary deaths, and placing patients at substantial risk of serious harm. Wilcox WT, Doc. 4138 ¶ 507.

598.    As described below, the record reveals systemic deficiencies that have spanned multiple private health care contractors and that render the system incapable of meeting patients' serious medical needs. The record also shows that defendants have, despite many years of litigation, remained deliberately indifferent to those needs.

**B.      People Incarcerated in Arizona Prisons Have Serious Medical Needs**

599.    There is no doubt that people who are incarcerated in the ADCRR have serious medical needs. Like the population at large, people entering the prisons suffer from diseases such as asthma, hypertension, diabetes, hepatitis C and substance use disorder. Indeed, the evidence shows that patients who are incarcerated tend to be less healthy, to have more chronic illnesses including substance use disorder, and to have more stressors in their lives than people who live in the general community. Wilcox WT, Doc. 4138 ¶ 252. The class of patients in this action clearly have needs that are genuine, frequent, serious, and, sadly, unmet.

**C.      People Needlessly Suffer and Die in ADCRR Custody Due to Long-Standing Systemic Deficiencies in Defendants' Medical Care System**

600.    It is well established that Defendants' health care delivery system is seriously deficient, and has been at least since this case commenced in 2012. Wilcox WT, Doc. 4138 ¶ 6.

601.    Evidence presented at trial in 2021 established that the health care in Arizona's state prisons continues to harm many patients and places all class members at substantial risk of serious harm. Wilcox WT, Doc. 4138 ¶ 28.

602.    The systemic deficiencies include a pattern of poor nursing care, deficient provider care, failure to engage in differential diagnoses, failure to follow up on abnormal

-212-

test results, failure to ensure continuity of care for the sickest patients returning from the hospital, failure to treat adequately certain conditions including hepatitis C, substance use disorder and pain, and poor access to critical specialty care. *Id.* ¶¶ 28-30, 126, 328-29, 336, 366.

603. These problems are the result of a combination of factors, including inadequate staffing, inadequate physician-level attention to problems, and a poorly designed electronic health care record that impairs the clinicians' capacity to synthesize a comprehensive picture of a patient's healthcare. *Id.* ¶ 31; Murray TT at 3508:1-5.

**1. Prison nurses fail to provide adequate care and act as a barrier for patients seeking access to treatment**

604. Incarcerated people must be provided access in a timely fashion to medical staff who are qualified to treat their conditions.

605. Class members are too often unable to access timely and adequate care because nursing care is poor, and because nurses block patients from seeing their providers.[111] Wilcox WT, Doc. 4138 ¶¶ 161, 164.

**(a) The nurse line is a barrier to timely health care as nurses exceed the scope of their license and prevent patients from seeing providers**

606. In a healthy system, nurses perform triage: they assess the patient and assign a degree of urgency to the patient's condition, and then refer the patient to a provider for care on that basis.[112] Wilcox WT, Doc. 4138 ¶ 162.

607. Defendants have instead set up a nursing sick call system in which nurses act as gatekeepers to the providers.[113] Wilcox WT, Doc. 4138 ¶¶ 163-164. Nurses prevent

---

[111] The term "provider" refers to physicians, nurse practitioners and physician assistants, *i.e.*, the clinicians who are licensed to prescribe and order care for patients. Wilcox TT at 1643:6-1644:2.

[112] The ADCRR Medical Technical Manual lacks any directives establishing that the function of the RN is to assess patients and refer them to a provider, based upon the urgency of their symptoms. The only reference to the process for referring a patient from the nurse line to the provider line states the timing if a referral is made: "Nurse line referrals to Practitioner/Provider will be evaluated on Provider Line within fourteen days of referral date." Ex. 1634 at 138.

155617523.3

patients from seeing their providers by erroneously determining that they are not sick enough, or do not meet their criteria to see a provider. Wilcox TT at 1734:2-7. With this model, "the nurses are really the frontline providers" and are "empowered to be the final decision maker." *Id.* at 1680:10:1681:17.

608. This system results in terrible care because RNs do not have the education, training or licensure to function as the final decision maker. Wilcox TT at 1681:6-12.

609. Nurses who decide whether or not a patient should see a provider are practicing outside the scope of their training. Wilcox TT at 1969:2-5; *see also* Ex. 1860 at 113 (Dr. Stern Report: "RNs are given a tremendous amount of responsibility in ADC to independently manage a broad spectrum of health conditions which are ordinarily managed by providers in the community.").

610. The ADCRR's mortality reviews repeatedly criticize the nurses' failure to refer patients to a provider for care when indicated. One 29-year-old patient, for example, submitted multiple Health Needs Requests (HNRs) for pain during a two-month period, including one in which he wrote, "My right foot, leg and thigh are swollen to the point where I cannot walk . . . , cant even put my [s]hoes on . . . I am in extreme, extreme pain." Ex. 152 at ADCM1580648. After seeing a nurse multiple times, and with only limited access to a provider, he was finally sent to the hospital, where he was diagnosed with metastatic cancer and died within a month. *Id.* at ADCM1580645-0652. The mortality review noted the nurse's failure to timely refer the patient to a provider, in addition to poor nurse charting. *Id.* at ADCM1580651.

611. Numerous mortality reviews document this problem—the patients presented with serious complaints, including, among other things, debilitating pain, a nonhealing ulcer on the foot of a diabetic patient, and chest pain, but nurses failed to refer them to a

---

[113] The ADCRR Medical Technical Manual lacks any directives establishing that the function of the RN is to assess patients and refer them to a provider, based upon the urgency of their symptoms. The only reference to the process for referring a patient from the nurse line to the provider line states the timing if a referral is made: "Nurse line referrals to Practitioner/Provider will be evaluated on Provider Line within fourteen days of referral date." Ex. 1634 at ADCRR00137518.

155617523.3

provider. *See e.g.*, Ex 155 at ADCRRM0019597-9599 (hypoglycemic patient not sent to provider); Ex. 159 at ADCM1591245-1249 (diabetic patient with nonhealing foot wound not sent to provider); Ex. 161 at ADCRRM0012707-12710 (patient with depressed blood pressure not sent to provider); Ex. 229 at ADCM1603887-03888 (significant change in physical findings not elevated to provider); Ex. 241 at ADCRRM0012727-2730 (patient with COVID symptoms not sent to provider); Ex. 327 at ADCM1603931 ("Patients['] condition should have been elevated by nursing/corrections officers/fellow inmates due to obvious symptoms (edema, odor, drainage) of something wrong"); Ex. 344 at ADCM1584248-42499 (patient returning from offsite with altered mental state should have seen provider), Ex. 346 at ADCRR00000095-96 (patient reporting 10/10 pain should have been referred to provider); Ex. 355 at ADCM1585578 (patient with poorly controlled cancer pain seen several times by nurse, without provider referral; patient found hanging in cell); Ex. 398 at ADCM1589807 (patient with blood in stool not referred to provider; ultimately diagnosed with colon cancer); Ex. 422 at ADCM1589813-9820 (patient with severe gastric symptoms sees nurse multiple times without provider referral, ultimately diagnosed with colon cancer); Ex. 442 at ADCM1578154-8158 (nurse failed to send patient with sharp chest pain to provider; patient died two weeks later of sepsis); Ex. 445 at ADCM1598093 ("HCP [provider] not called re the patient's chest pain despite CP [chest pain] symptoms of 2 mo duration and an abnormal EKG"); Ex. 2102 at ADCRR00088330-8331 ("Elevation of the EKG reading on 6/16/21 should be escalated in a timely manner to the provider level.").

612. This problem is long-standing. In a 2013 report submitted to the Court, Dr. Wilcox warned that nurses were practicing outside the scope of their licenses, and explained that "The heart of a functional healthcare delivery system is the ability of the appropriate clinicians to exercise their professional medical judgment regarding patient care. In order for that to happen, providers must first be able to see patients and second must be equipped with the appropriate information to diagnose and treat them. Nurses

155617523.3

1   cannot dictate care in the same way." Wilcox WT, Doc. 4138 ¶ 167; Ex. 1842 at PRSN-

2   TRW 00045-46.

3           **(b)    Nurses perform inadequate assessments.**

4       613.   Nurses in ADCRR also do not adequately assess their patients. Wilcox WT,

5   Doc. 4138 ¶ 172.

6       614.   Review of hundreds of individual healthcare nursing encounter records

7   shows that nurses "routinely fail to accurately identify the patient's presenting

8   complaints," fail to adequately analyze and document the patient's needs, and "often fail

9   to reach the correct disposition." Wilcox WT, Doc. 4138 ¶ 164. This places patients at an

10  obvious risk of harm. In some cases, patients deteriorated, and by the time they were

11  finally seen by a provider or sent to the hospital, it was too late, as they had suffered

12  serious and permanent harm, or died. *Id.* ¶ 165; *see e.g.*, Ex. 152 at ADCM1580646-52

13  (patient with undiagnosed metastatic cancer placed multiple HNRs for pain, but nurse

14  failed to do proper work up).

15      615.   Nurses repeatedly fail to consider patients' overall health or recent history,

16  and instead focus only on the symptoms immediately before them. Wilcox WT, Doc. 4138

17  ¶ 172. In practice, nurse line visits are perfunctory, self-contained episodic visits that do

18  not incorporate the patient's history and trending of repeat complaints. *Id.*

19      616.   Unable to see their providers, patients submit multiple HNRs and see nurses

20  multiple times, often with worsening symptoms, without receiving the care they need.

21  Wilcox WT, Doc. 4138 ¶ 165. Instead, they are told to return to their housing, hydrate,

22  and submit an HNR or declare an emergency if their symptoms worsen. *Id.* ¶ 169.

23      617.   Defendants' mortality reviews regularly criticize the quality of nursing

24  encounters and documentation, including where nurses fail to take vital signs, fail to

25  document care, and fail to follow wound care protocols. *See, e.g.*, Ex. 152 at

26  ADCM1580652 (nursing notes for transfer are deficient); Ex. 153 at ADCRR00000003

27  (nursing notes omit vital signs); Ex. 183 at ADCRRM0026153 ("nursing documentation

28  for a patient being send to the hospital must include consultation with the on call provider,

as well as a specific plan"); Ex. 189 at ADCM1578125 ("Documentation does not support appropriate and timely Foley catheter care by nursing staff"); Ex. 268 at ADCRRM0000030-0033 (patient with chest pain and shortness of breath did not have blood pressure recorded before transport to hospital); Ex. 275 at ADCM1575249 ("very poor [nurse] charting on perimortem events. Video suggests nurse saw [patient] and left him on the floor without performing evaluation"); Ex. 296 at ADCRRM0019639 (after ICS, "there was no report of clinical status, including a physical exam…. The 'who, what, why, where, when' was not addressed in the documentation"); Ex. 306 at ADCRR00000059 ("Wound care documentation lacks sufficient detail, including documentation of actual completion of wound care"); Ex. 314 at ADCRR00000063 ("ICS note on 4/21/21 lacks subjective, initial assessment, initial accu check… In addition, there were several instances of insulin not being administered in the month prior to the patient's death"); Ex. 356 at ADCM1669337 ("No vital signs nor nursing assessment were documented in a timely manner"); Ex. 386 at ADCM1603943 ("weight documentation not done properly, if done at all"); Ex. 390 at ADCM1669345 ("No oxygen was administered during transport to Manzanita, despite the patient having [ ] low oxygen saturation"); Ex. 395 at ADCRRM0019675-19676 (for infirmary patient, "Minimal documentation of wound care. There is no documentation of position changes to prevent skin breakdown"); Ex. 429 at ADCRR00000116 (incomplete nursing assessment documentation); Ex. 444 at ADCRRM0005592 ("Nursing documentation should include a treatment plan"); Ex. 445 at ADCM1598093 ("lack of proper nursing assessment; lack of recognizing and properly assess [sic] the patient abnormal physical findings"); Ex. 470 at ADCM603811 ("No intake assessment documented"); Ex. 517 at ADCRR00088423 ("Nursing documentation should include more detail about who they spoke to."); Ex. 521 at ADCRR000883223 (discussing need for "[e]ducation of nursing staff regarding assessing a patient with

complaint of chest pain and how to communicate an accurate assessment to the provider").[114]

618. These widespread nursing practices delay critical care and result in serious injury to patients, including patients who suffered disabling spine injuries, lifelong cardiac injuries, and the spread of cancer. Wilcox WT, Doc. 4138 ¶¶ 116-117, 123, 189-195, 197-207.

619. These practices also contribute to avoidable deaths, including that of a 37-year-old man who died of Valley Fever after multiple ineffective RN visits for disabling pain and severe shortness of breath, and the death of a 42-year-old man with multiple complicated conditions who repeatedly saw nurses who failed to recognize he was in acute renal failure over the course of two months. Wilcox WT, Doc. 4138 ¶¶ 174-187.

        **(c)**      **Nurses do not have adequate clinic space to treat patients.**

620. Adequate space to provide medical care is critical to a health care delivery system. The ADCRR requires that "all complexes and ADCRR facilities have designated adequate clinical space for providing health services to inmate-patients." Ex. 1305 at 79.

621. Basic equipment for medical services includes an exam table, which is essential for competently performing certain nursing assessments, including abdominal exams and orthostatic blood pressure checks. *Id.* at 79-80; *see also*, Wilcox TT at 1958:23-1959:6.

622. The clinical space allocated to the nursing staff at some prisons makes it impossible for nurses to adequately do their jobs. Wilcox WT, Doc. 4138 ¶ 210. At

---

[114] ADCRR tries to use Nursing Encounter Tools (NETs) to guide nurses in evaluating patients. Trial Testimony of Elijah Jordan ("Jordan TT") at 2639:17-2640:7. It is important for nurses to pick the correct assessment tool for patient encounters because if they do not, a patient may not get the evaluation or treatment that is appropriate for their condition or illness. *Id.* at 2640:8-12. But nurses repeatedly failed to select the correct assessment tool. Wilcox WT, Doc. 4138 ¶¶ 76, 163-64. Yuma repeatedly scored low in self-audits of whether nurses correctly selected the correct assessment tool in 2021, and did not correct the problem. *See, e.g.*, Ex. 825 at ADCRR00056755 (13%); Ex. 835 at ADCRR00062056 (14%); Ex. 855 at ADCRR00137064 (0%); Ex. 914 at ADCRR00211170-72 (43%, 58%, 20%).

ASPC-Lewis, the exam rooms allocated to RNs did not have exam tables. *Id.*; Wilcox TT at 1958:11-1959:18.

623.    Failing to adequately furnish the rooms where RNs provide health care reinforces the notion that a nurse's physical assessment (as opposed to the taking of vital signs and a brief interview) is not necessary. Wilcox WT, Doc. 4138 ¶ 210.

624.    Below are pictures of the RN exam rooms at ASPC-Lewis.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108134

ASPC-LEWIS, BUCKLEY CLINIC (EX. 1233)

155617523.3



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108135

ASPC-Lewis, Buckley Clinic (Ex. 1236)

### (d) Nursing appointments are not timely.

625.    It is important that patients are seen by an RN within 24 hours after an HNR is received or immediately if identified with an emergent need or on the same day if identified as having an urgent need. Jordan TT at 2634:19-2635:7.

626.    ADCRR fails to ensure that patients are seen by the nurses on a timely basis. Wilcox WT, Doc. 4138 ¶ 213.

627.    Under the Stipulation, Defendants monitored their compliance with a benchmark that required that patients be seen within 24 hours of submitting a sick call slip.[115] Ex. 1850 at 10; *see also* Trial Testimony of Grant Phillips ("Phillips TT") at 3625:18-21; Jordan TT at 2634:19-2635:7. ADCRR medical leadership testified at trial that this requirement is important, and its purpose is to provide patients with timely access

---

[115] Performance Measure 37 provided: "Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need)." Ex. 1850 at 10; *see also* Ex. 1323 at § 3.2.1.

155617523.3

to care. *See* Phillips TT at 3624:19-3625:1; Jordan TT at 2635:2-7. Yet six years after agreeing to this measure, Defendants consistently failed to meet this timeline requirement at some prisons. Wilcox WT, Doc. 4138 ¶¶ 212-213; Ex. 1258.[116]

628.    For example, nurses at Tucson, a prison with some of the highest acuity patients in the state, failed this basic requirement for the first seven months in 2021, and in some months scored less than 50%. Ex. 1258; Phillips TT at 3626:2-20.

629.    Defendants were well aware of the problem and have failed to fix it. Ostensibly using the Corrective Action Plan (CAP) process set forth in the Stipulation, Defendants repeatedly demonstrated their inability to address critical deficiencies. *See* Wilcox WT, Doc. 4138 ¶¶ 215-217; Ex. 1971 at 109-138.

630.    For example, at Tucson, the CAPs for PM 37 identified short-staffing as the reason for non-compliance month after month in 2019, 2020 and 2021. Wilcox WT, Doc. 4138 ¶ 216; Ex. 1971 at 126-132. Over and over, the CAPs stated the solution was to hire and train nurses and to use agency nurses to fill the gaps; over and over, this measure failed. The dismal results are demonstrated in the monthly compliance failures. *Id.* at 126-32; *see also* Phillips TT at 3627:9-23 (ADCRR medical director testifying that as of early October 2021, he did not know whether nurses had been hired at Tucson to address this problem, or whether any other steps taken by Centurion to address this issue at Tucson had been successful).

631.    Similarly, at Lewis, a shortage of staff has consistently been identified as the root of their noncompliance for this measure. Wilcox WT, Doc. 4138 ¶ 217; Ex. 1971 at 118-125. As with Tucson, year after year, Defendants' plan was to hire and train more nurses, yet Lewis achieved only 69% compliance with PM 37 in July 2021. Wilcox WT, Doc. 4138 ¶ 217. The CAP process does not work and Defendants have failed to recognize the problem or remedy it in any meaningful way.

---

[116] Defendants' mortality reviews also cite problems with timely access to nurses. Ex. 211 at ADCM1584298; Ex. 287 at ADCRRM0019635.

155617523.3

632. Defendants' failure to address, over a period of years, this fundamental access to care issue demonstrates indifference. The Court finds that Defendants' failure to provide adequate nursing care exposes class members to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

## 2. Prisons Have Too Few Physicians and Many Primary Care Providers Deliver Inadequate Care

633. Primary care providers (PCPs) in any healthcare system manage patients' day-to-day health care needs. Wilcox WT, Doc. 4138 ¶ 218.

634. In the Arizona prison system, the PCPs are supposed to treat patients for episodic care, chronic conditions, and preventive health screening, and refer them for care from specialists when necessary. *Id.* They are also supposed to coordinate care when patients return from treatment at an offsite hospital. *Id.*

635. When patients successfully break through the nurse line obstacle and are able to see their PCPs, the care they receive is often poor quality, particularly if they have complex medical conditions. Wilcox WT, Doc. 4138 ¶ 219.

636. This is due in part to Defendants' heavy reliance on non-physician mid-level practitioners—nurse practitioners and physician assistants—to provide most of the primary care in their system. *Id.* In many cases, these non-physician practitioners lack the necessary training and expertise to treat their complex patients. *Id.*

637. The problem is not limited, however, to the mid-levels. *Id.* The medical records show a broken system where providers of every level fail to do basic screening, fail to analyze and diagnose their patients, fail to manage their complex patients following specialty consults and hospitalizations, and sometimes fail to treat them with humanity. *Id.* As a result, many patients receive terrible care. *Id.*

-222-

**(a)** **Defendants rely heavily on mid-level providers who do not have the necessary skills to treat complex patients.**

638.    Medically complex patients receive deficient care from mid-level practitioners who clearly lack expertise to treat the patients and/or were poorly supervised. Wilcox WT, Doc. 4138 ¶ 225.

639.    Mid-level providers can handle routine health care duties, but they cannot take the place of a physician because they do not have the training and expertise necessary to treat more complex patients, including patients with multiple chronic conditions.[117] Wilcox WT, Doc. 4138 ¶ 221; *see also* Ex. 1860 at 116 (Stern Report: "I found many examples of poor quality clinical decisions made by medical providers …; most of these were made by mid-level providers."); Phillips TT at 3632:1-8 (ADCRR medical director testifying that mid-level providers require physician supervision, particularly when treating complex patients).

640.    According to ADCRR's June 2021 health care staffing reports, prisons were staffed with the equivalent of 58.66 mid-level providers providing medical care to patients and 8.48 staff physicians, a ratio of roughly seven to one. Wilcox WT, Doc. 4138 ¶ 220; Ex. 1606 at ADCRR00021949-21952; Ex. 1532, "Position" worksheet. Three prisons (Douglas, Safford, and Winslow) have no contracted staff physicians for the facilities. Wilcox WT, Doc. 4176 ¶ 220; Ex. 1606 at ADCRR00021953, ADCRR00021956,

---

[117] Physician assistants cannot practice independently, but can practice only as the agent of a supervising physician, under the terms of a written agreement. A.R.S. § 32-2531. "The physician assistant may provide any medical service that is delegated by the supervising physician if the service is within the physician assistant's skills, is within the physician's scope of practice, and is supervised by the physician." *Id.*

The role of a nurse practitioner, also called a registered nurse practitioner, is also more limited than that of a physician. Wilcox WT, Doc. 4138 ¶ 223. According to the Rules of the Arizona State Board of Nursing, Standards Related to Registered Nurse Practitioner Scope of Practice, "An RNP shall refer a patient to a physician or another health care provider if the referral will protect the health and welfare of the patient and consult with a physician and other health care providers if a situation or condition occurs in a patient that is beyond the RNP's knowledge and experience." Ex. 1393 (R4-19-508, Standards Related to Registered Nurse Practitioner Scope of Practice, https://www.azbn.gov/sites/default/files/2020-03/RULES.Effective.June3.2019.pdf.).

ADCRR00021965, ADCRR00021968, ADCRR00021971; Ex. 1532, "Facility" worksheet.

641. ADCRR's widespread use of mid-level providers harms patients with complex conditions. One tragic example is a 60-year-old man diagnosed with severe liver fibrosis from hepatitis C who died earlier this year. Wilcox WT, Doc. 4138 ¶ 60; Ex. 940. This patient repeatedly informed medical staff of his urgent health concerns and, with no physician-level oversight, died as a result of a severe upper gastrointestinal bleed related to liver damage and gross prescribing errors. Wilcox WT, Doc. 4138 ¶¶ 60-62, 65.

642. Patients with hepatitis C and severe fibrosis require close monitoring for disease progression and development of complications. Wilcox WT, Doc. 4138 ¶ 61. This patient's nurse practitioner should have ordered liver ultrasounds, prophylactic medication to prevent GI bleeds, and an upper endoscopy at least yearly. *Id*. None of these routine preventive interventions was apparently ever considered or ordered for him. *Id*.

643. In November 2020, his nurse practitioner prescribed indomethacin, a potent non-selective non-steroidal anti-inflammatory drug (NSAID) for pain. Wilcox WT, Doc. 4138 ¶ 62. This was dangerous—indomethacin not only causes bleeding, but it also increases blood pressure and decreases platelet counts. *Id*. ¶ 64; *see also* Murray TT at 3512:11-23. There were many safer options. Wilcox WT, Doc. 4138 ¶ 64.

644. When lab results in January 2021 clearly signaled that the patient was bleeding internally, there was no clinical response, and when he had increased pain in March, the nurse practitioner compounded her error by tripling his dose of indomethacin, without even seeing him in person. Wilcox WT, Doc. 4138 ¶¶ 62-64.

645. On April 21, 2021, an emergency was called when the patient was found in his cell, after vomiting a liter of blood. Wilcox WT, Doc. 4138 ¶ 71. He was sent to the hospital where he died, two days later. *Id*.

646. In the five weeks prior to his death, the patient had submitted at least five HNRs reporting severe pain, difficulty breathing, bleeding, an inability to eat, an inability

to use the restroom, and an inability to walk. Wilcox WT, Doc. 4138 ¶ 65, Ex. 940 at PLTFS005588-92.

647. His deteriorating condition and increasing desperation is seen in the HNRs, where he begged to be taken to the hospital. In an HNR dated March 24, 2021, he wrote

> for the past almost 3 months ago nothing has changed about the treatment you gave me. Nothing.…You need to send me to an outside hospital because I might die. Please send me to a hospital. This isn't a joke. It's my life [you're] playing with me. Hurry before I die?? Hurry please.

Wilcox WT, Doc. 4138 ¶ 65, Ex. 940 at PLTFS005590.

648. He died less than a month later. Ex. 357 at ADCRR00000098. This was an entirely avoidable death. Wilcox WT, Doc. 4138 ¶ 75. The medication that health care staff gave him is absolutely contraindicated for people with serious liver disease, and they increased his dose as he became sicker and sicker, until he died—tragically but predictably—of a massive hemorrhage. *Id*.

649. This medically fragile patient should have been managed by a physician, not a mid-level provider, with frequent visits and comprehensive surveillance. Wilcox WT, Doc. 4138 ¶ 74. Dr. Wilcox described other cases where similarly complicated patients were mishandled by mid-level providers, including a patient who was morbidly obese, suffered from hypertension, and complained repeatedly of shortness of breath in May 2021. The nurse practitioner who treated him for over the course of a month failed to adequately assess the patient or order appropriate diagnostic tests, and treated him only with an inhaler and antibiotic without written justification. In fact, the patient was acutely ill with congestive heart failure, a condition that is treatable if timely diagnosed. By the time the patient was sent to the hospital emergently in June 2021, he was very ill, and he died shortly thereafter. *Id.* ¶¶ 233-238.

**(b)  Providers do not develop and test differential diagnoses.**

650. Accurate diagnoses are essential to the provision of appropriate treatment. Wilcox WT, Doc. 4138 ¶ 227. To arrive at an accurate diagnosis, providers must often use the differential diagnosis process. *Id.* ¶ 228.

-225-

651.   ADCRR's medical care is poor because providers do not engage in the critical differential diagnosis process when treating patients. Wilcox WT, Doc. 4138 ¶ 230. Failure to engage in this analysis results in missed or inaccurate diagnoses, and patients suffer as a result. *Id.* ¶¶ 226-251.

652.   Determining the differential diagnosis is the process of distinguishing one disease from another that presents with similar symptoms. *Id.* ¶ 228. With the chief complaint established, the provider takes a patient history and performs a physical examination. *Id.* Analyzing the information gathered, the provider generates a list of possible diseases by ranking the most common diagnoses and the most serious or "not to miss" diagnoses. *Id.*[118]

653.   Developing and documenting differential diagnoses is particularly important in prison, where patients regularly see different providers, so that each person treating the patient knows the treatment history and can continue the diagnostic process. Wilcox TT at 1682:2-11. However, ADCRR providers do not document their care well, failing to show what they are attempting to rule in or out. *Id.* at 1683:12-17.

654.   Defendants are aware of the problem—they have identified it in their mortality review process, finding, for example, that, when a patient complained of hemorrhoids causing rectal bleeding, health care staff failed to evaluate the patient for possible causes, and he subsequently died of colon cancer. Ex. 398 at ADCM1589803-08. *See also* Ex. 148 at ADCM1589774 (delays in working up cancer patient); Ex. 153 at ADCR00000004 (failure to adequately work up patient with cardiovascular symptoms); Ex. 189 at ADCM1578125 (no workup for severe pain in legs); Ex. 211 at ADCM1584298 (multiple significant symptoms signaling GI malignancy ignored);

---

[118] For example, when the patient presents with a cough, the provider considers the most common diseases that present with cough, forming a working differential diagnosis list. Wilcox WT, Doc. 4138 ¶ 229. The provider analyzes the data obtained, eliminates some diseases, and narrows down the differential diagnosis. *Id.* At times, further diagnostic testing is needed to make the final diagnosis. *Id.* The construction of a differential diagnosis and the methodical working through the various possibilities to prove or disprove them is essential in making an accurate diagnosis. *Id.*

155617523.3

Ex. 422 at ADCM1589819 (alarming symptoms missed); Ex. 433 at ADCRRM0026245 (inadequate work-up for chest pain); Ex. 445 at ADCM1598093 (failure to properly assess respiratory symptoms).

655. Named Plaintiff Kendall Johnson's case vividly illustrates the systemic failure to properly apply the differential diagnosis process. Wilcox TT at 1683:25-1684:15; Ex. 931.

656. Ms. Johnson developed multiple sclerosis in prison. Over a period of years, her providers failed to do appropriate diagnostic tests or imaging, significantly delaying her multiple sclerosis diagnosis.[119] Wilcox TT at 1693:9-25.

657. Ms. Johnson enjoyed relatively good health until September 2017, when she submitted an HNR stating that her feet and legs had been numb for weeks. Wilcox WT, Doc. 4138 ¶ 100.

658. A nurse practitioner (NP) assessed her, indicating they should rule out multiple sclerosis vs. idiopathic neuropathy. Wilcox TT at 1684:18-25.[120] However, the NP failed to take a history of the problem, failed to order the relevant diagnostic tests and failed to order an MRI as would be expected with this presentation. *Id.* at 1685:13-1686:3.

659. For the next two years, Ms. Johnson regularly submitted HNRs reporting that her symptoms were worsening. Wilcox WT, Doc. 4138 ¶ 104; Ex. 931 at PLTFS005396-97. In response, she saw nurses, her NP, and starting in September 2018 a physician, all of whom failed to do proper physical exams or necessary imaging. Wilcox

---

[119] Multiple sclerosis (MS) is a chronic disease of the central nervous system (spinal cord, brain and optic nerves). Wilcox WT, Doc. 4138 ¶ 99. People with MS develop multiple areas of scar tissue in response to the nerve damage and, depending on where the damage occurs, symptoms may include problems with muscle control, vision, balance and speech. *Id.* The type of MS that Ms. Johnson has is called "primary-progressive." *Id.* There is no cure for this disease, and it is characterized by steady and constant decline in functionality. *Id.* However, if identified timely and adequately treated, the progression can be substantially delayed. *Id.*

[120] Idiopathic neuropathy is an illness where sensory and motor nerves of the peripheral nervous system are affected and no obvious underlying etiology is found. Wilcox WT, Doc. 4138 ¶ 100.

WT, Doc. 4138 ¶ 105. At one point, her providers inappropriately diagnosed her with conversion disorder. *Id.* ¶ 102.[121]

660. In September 2018, she saw a physician, who was an obstetrician providing primary care. Wilcox TT at 1688:16-18. He also failed to do an appropriate workup. *Id.* at 1688:12-18.

661. Finally, in December 2019, after more than two years of staff dismissing her concerns, Ms. Johnson's doctor ordered the critical MRI. *Id.* ¶ 109; Ex. 931 at PLTFS005403-5406. The MRI results strongly supported a diagnosis of MS. Wilcox TT at 1689:12-18.

662. In March 2020 Ms. Johnson saw a neurologist, who recommended a return visit in one month. Due to a series of delays, Ms. Johnson did not see the neurologist again until November 2020, who at that point, confirmed that she had MS, more than three years after she initially reported symptoms. Wilcox WT, Doc. 4138 ¶ 111.

663. After more delays, Ms. Johnson finally started six months later receiving Ocrevus, the appropriate medication for her condition. Wilcox WT, Doc. 4138 ¶ 112.

664. Ms. Johnson testified at trial that she came to prison a healthy teenager who played basketball. K. Johnson TT at 14:6-16. At age 37, she is now unable to walk, feed or wash herself, and her eyesight is failing. *Id.* at 11:15-12:10. She is completely dependent on others to help her with toileting, eating, washing and virtually every activity of daily living. *Id.* at 11:15-12:21. Her hands lack dexterity, and she has a significant tremor. Wilcox TT at 1692:7-12.

665. Treatment with Ocrevus will not cure Ms. Johnson, nor will it reverse her deterioration. Wilcox WT, Doc. 4138 ¶ 113. At best, it will slow the progression of her disease. *Id.* Had she been started on Ocrevus four years earlier, when she first exhibited

---

[121] Conversion disorder is a psychiatric condition that is considered a diagnosis of exclusion that is reached after all physical explanations have been ruled out. Wilcox WT, Doc. 4138 ¶ 103. Since the medical staff failed to investigate Ms. Johnson's medical condition with proper and thorough testing, "conversion disorder" should not have been considered. *Id.* Moreover, Ms. Johnson's clinicians did not refer her to mental health or neurology for this rare diagnosis, as would have been appropriate. *Id.*

symptoms, she might have staved off her more severe symptoms for months or even years. *Id.* She would likely have a higher level of functioning than she has now. Wilcox TT at 1696:12-18.

666. Assuming the Ocrevus is effective, it will allow her to continue to speak, swallow, and shift her body weight for some period in the future. Wilcox WT, Doc. 4138 ¶ 114. She is profoundly and permanently disabled. *Id.*

667. Another horrific case involves a 69-year-old man who died from metastatic lung cancer that first went undetected and then was ignored for years. Wilcox WT, Doc. 4138 ¶ 32. Multiple red flags should have alerted the prison medical staff to his possible cancer diagnosis but were overlooked. *Id.*

668. The patient complained of dramatic weight loss for four years, starting in 2015 when housed at Eyman. Wilcox WT, Doc. 4138 ¶ 33. In 2013, he was 5'10" and weighed 190 pounds. *Id.* By 2018, his weight had dropped to 122 pounds. *Id.* ¶ 34. His unexplained 68-pound weight loss over five years was documented by multiple providers, but no one ever properly investigated the cause. *Id.*

669. By February 2019, this man only weighed 110 pounds, and complained of bloody bowel movements, nausea, and vomiting. Wilcox WT, Doc. 4138 ¶ 36. He was sent to the hospital where he was diagnosed with a bleeding ulcer, and underwent surgical repair. *Id.* During his workup, the hospital identified evidence of metastatic cancer. *Id.*; Ex. 927 at PLTF005369-70.[122]

670. The medical records provide myriad other examples of providers failing to go through the critical process of identifying possible diagnoses, and then failing to take the necessary diagnostic steps to rule in or out the condition resulting in unnecessary suffering and, in some cases, death. Wilcox WT, Doc. 4138 ¶¶ 239-251.

---

[122] As explained further below at ¶¶ 688-689, this patient's care continued to be terrible even after the hospital identified his lung cancer.

155617523.3

(c)     **Providers fail to adequately manage their chronic care and complex cases.**

671.    Related to the problem of failing to develop differential diagnoses is the larger issue of patient management for patients with multiple healthcare conditions. Defendants fail to adequately manage the medical care of patients with multiple medical (and, sometimes, mental health) conditions. Wilcox WT, Doc. 4138 ¶¶ 252-254.

672.    Complex patients often suffer from a variety of difficult-to-treat conditions in combination, including, for example, hypertension, Type 2 diabetes, morbid obesity and hypothyroidism. *See*, Wilcox WT, Doc. 4138 ¶¶ 252-282. Treatment plans for patients with this level of complexity generally include complicated medication regimens, regular diagnostic tests with active review of results, and monitoring by specialists. *Id.* Care for these patients also requires coordination between nursing and provider staff; this does not happen in Arizona prisons. *Id.*

673.    Instead, ADCRR's medical records for highly complex patients are often a mess, with zero coordination, inconsistent prescriptions, and no evidence of a coherent treatment plan. Wilcox WT, Doc. 4138 ¶ 254.

674.    Complicated and fragile patients should be managed by, or at least have access to, a physician. *Id.* ¶ 253. However, Defendants do not assign patients to physician PCPs based on acuity. Dep. of Wendy Michelle Orm, M.D. ("Orm Ind. Dep.") at 27:14-20; *see also* Phillips TT at 3630:10-18.

675.    The evidence shows a pattern of avoidable or possibly avoidable deaths due to abysmal care coordination; often these patients are treated exclusively by a nurse practitioner or a physician assistant, and often, those practitioners lack the expertise to provide adequate treatment. Wilcox WT, Doc. 4138 ¶¶ 254-276. One such patient, a 26-year-old woman, died two months after her arrival at prison from an asthma exacerbation. *Id.* ¶¶ 266-268. Had the nurse practitioner treating her recognized her need for careful management, she likely would not have died. *Id.*

676.  Dr. Wilcox has, since 2013, highlighted the lack of competent chronic care management within the Arizona prison system, calling it "haphazard at best" and a serious danger to fragile patients. Wilcox WT, Doc. 4138 ¶ 253; Ex. 1842 at PRSN-TRW 00034-37; *see also* Ex. 1669 at 22-23.

677.  Dr. Murray's study of chronic care patients revealed that just 28% of the 80 patients his team reviewed received care that was timely and based on good decision-making. Murray TT at 3546:15-3547:2. For the "quality of documentation" benchmark for these chronic care patients, the score was even worse—just 18% of the patients had documentation that was rated as timely and based on good-decision making. *Id.* at 3547:6-13.

678.  Defendants' mortality reviews identify significant lapses in ADCRR's chronic care program, including failure to enroll sick people, failure to recognize diagnoses, failure to adjust treatment plans following specialty consults, and failure to adequately monitor diabetic patients. *See, e.g.,* Ex. 200 at ADCRRM0026186 (patient with history of transient ischemic attack, pulmonary coccidiomycosis, GERD not enrolled in chronic care); Ex. 228 at ADCRR00000047 ("patient had a STEMI [myocardial infarction or heart attack] in 7/2020, but was not seen for a chronic care visit until 5/2021"); Ex. 314 at ADCRR00000063-64 (failure to adequately treat/monitor uncontrolled diabetes); Ex. 407 at ADCRRM0026237 (failure to timely enroll patient with liver cirrhosis, pacemaker, diabetes and coronary artery disease in chronic care program); Ex. 436 at ADCRR00000120 (failure to diagnose latent TB infection).

(d)  **Providers fail to follow-up on significantly abnormal diagnostic test results.**

679.  Providers must timely review the results of diagnostic laboratory and imaging tests, in order to determine whether and how the results impact the patient's plan

of care. Wilcox WT, Doc. 4138 ¶ 284.[123] The failure to timely act on abnormal labs and diagnostic imaging places patients at high risk of harm. *Id.* ¶ 297.

680. Patients' health records are replete with examples of providers failing to timely review laboratory results and/or to appreciate their significance and modify the patient's treatment plan accordingly, or work through differential diagnoses. Wilcox WT, Doc. 4138 ¶ 285, *see e.g.* Ex. 189 at ADCM1578125 (failure to follow abnormal labs); Ex. 211 at ADCM1584298 (HCP failed to review ordered tests in patient with cancer) Ex. 396 at ADCRRM0026225 (failure to acknowledge positive COVID-19 result); Ex. 437 at ADCM1603954 (failure to timely follow up on abnormal findings in cancer patient).

681. These failures include, among other things, missing obvious cancer diagnoses, signs of internal bleeding, Valley Fever diagnoses, and clear indications of infection, and they place patients at risk of serious harm, including death. Wilcox WT, Doc. 4138 ¶¶ 285-296.

682. This is a problem that is long-standing and has been brought to the Defendants' attention in at least three previous reports filed in this action. Wilcox WT, Doc. 4138 ¶ 297; *see, e.g.*, Ex. 1842 at PRSN-TRW 00074-76; Ex. 1843 at PRSN-TRW 00138-139; Ex. 1852 at 53-55.

683. Defendants have also identified substandard performance on the part of its providers in this area, as seen in CGAR data for the Stipulation's performance measure regarding review of diagnostic reports.[124] Ex. 1260. Half of the prisons fell below the

---

[123] Values that are outside the normal range to a degree that may constitute an immediate health risk to the individual constitute "critical lab values" and usually require immediate action. Wilcox WT, Doc. 4138 ¶ 284. Normal values should be communicated to the patient, but may require no other action from the provider. *Id.* In between those two extremes, providers must make a choice about how the results should impact the plan of care for the patient and when the patient should be notified. *Id.*

[124] Performance Measure 46 states "A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison." Ex. 1850 at 11.

155617523.3

1  Stipulation's benchmark of 85% compliance at least once during the first seven months of

2  2021. *Id.*

3      684.  Moreover, the Stipulation's standard for substantial noncompliance of 85%

4  for this Performance Measure is not medically defensible because, as Dr. Wilcox

5  explained, "[a]nything less than 100% performance on this is inadequate and it puts

6  patients at risk." Wilcox WT, Doc. 4138 ¶ 299. If a clinician decides that a diagnostic test

7  is medically necessary for a patient, then the results of that test must be timely reviewed,

8  100% of the time. *Id.*

9

10                 **(e)**    **Providers fail to obtain hospital records and review and act on them.**

11      685.  Patients who go to the hospital—among the most vulnerable in the system—

12  must have the records of their hospitalization timely reviewed, and must be timely seen by

13  their provider upon their return, so that adequate care can be provided. Wilcox WT,

14  Doc. 4138 ¶ 300; Orm Ind. Dep. at 34:23-35:12.

15      686.  Defendants have a pattern and practice of failing to obtain and timely review

16  hospitalization records. Many charts for complex patients who have been hospitalized lack

17  the record of the course of their hospital stay, and if the hospital record is present, there is

18  often no indication that it has been reviewed by a provider. Wilcox WT, Doc. 4138 ¶ 301.

19      687.  This is dangerous. It can and does lead to serious treatment lapses and errors

20  that harm patients. In one such case, a patient underwent an unnecessary and invasive

21  procedure (lung biopsy) because his provider at the prison failed to review or document in

22  his record a diagnosis made during an earlier hospitalization; the second biopsy was

23  complicated when the patient suffered a collapsed lung. Wilcox WT, Doc. 4138 ¶¶ 301-

24  305.

25      688.  Even when the hospitalization records are present, ADCRR staff sometimes

26  fail to act on them. The tragic case of the 69-year-old man who died of lung cancer after

27  years of dramatic weight loss, mentioned above at ¶¶ 667-669, is one such example.

28

155617523.3

689.    In that case, his hospital records indicating he had lung nodules consistent with metastatic lung disease were scanned into his medical record on February 28, 2019. Wilcox WT, Doc. 4138 ¶ 37. Although a nurse practitioner signed off on the hospital records, no follow-up or specialty consults were ordered, and no treatment was provided. *Id.* His metastatic lung cancer was ignored until he was finally hospitalized nine months later in November 2019, following an episode of coughing up blood; he died a few months later. *Id.* ¶¶ 48-49; Ex. 174.

690.    Defendants are well aware of this significant documentation problem. They have repeatedly identified in their mortality reviews that a lack of hospitalization records and/or the failure to prescribe treatment based on the records is a problem. Ex. 199 at ADCRRM0019615-16 (scanned hospital records not in eOMIS); Ex. 213 at ADCRRM0019619-20 (failure to obtain records for cancer treatment); Ex. 280 at ADCM1651473 ("several gaps in the scanned documentation where hospitalizations should have been placed"); Ex. 352 at ADCRRM0019659-60 ("January-February 2021 hospital records are not in the chart"); Ex. 378 at ADCM1649376-77 ("it is not clear from the record what was done for the patient at St. Joseph's Hospital"); Ex. 387 at ADCM1618289-90 ("is unclear as to the hospital findings both clinically and diagnostically as limited hospital data is available at the time of this review"); Ex. 400 at ADCM13849-51("Lack of documentation is evidenced by lack of efficient transmission of the record from Mountain Vista to provider. The [sic] caused a delay in care."); Ex. 450 at ADCM1584305-09 ("Unable to find whether the Path[ology] report results from the liver biopsy were requested by health staff. No results were found. It is also not clear whether the patient was seen by the Oncologist as there is no documentation"); Ex. 515 at ADCMRRM0012719-21 (hospital discharge summary scanned six weeks after patient's death); Ex. 523 at ADCRR00088491 ("Hospital records from the 12/2/2020 hospitalization were not scanned into the chart"); Ex. 524 at ADCRR00088497 (ER records for patient "presumably ruled out for a myocardial infarction" were not in the record).

691.    Under the Stipulation, Defendants monitored whether staff reviewed patients' discharge recommendations when returning from the hospital.[125] The relevant CGAR measurement shows nine of the ten prisons scored abysmally low on this measure during the first seven months of 2021. Ex. 1259.

|  | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| Douglas | 100.00 | 85.71 | 100.00 | 100.00 | 75.00 | 100.00 | 100.00 |
| Eyman | 51.85 | 56.00 | 69.23 | 77.78 | 55.56 | 68.42 | 56.52 |
| Florence | 87.88 | 65.63 | 70.97 | 60.71 | 86.84 | 53.13 | 71.43 |
| Lewis | 80.77 | 88.00 | 65.52 | 72.00 | 70.97 | 75.61 | 75.76 |
| Perryville | 82.35 | 79.17 | 87.50 | 94.74 | 80.77 | 91.67 | 82.14 |
| Phoenix | 50.00 | 50.00 | 100.00 | 100.00 | 100.00 | 100.00 | 0.00 |
| Safford | 100.00 | 100.00 | N/A | 100.00 | 100.00 | 100.00 | 100.00 |
| Tucson | 74.07 | 60.47 | 58.97 | 66.67 | 65.22 | 34.15 | 65.96 |
| Winslow | 54.55 | 100.00 | 100.00 | 83.33 | 100.00 | 100.00 | 100.00 |
| Yuma | 40.00 | 80.00 | 37.50 | 80.00 | 85.00 | 65.00 | 70.37 |

692.    Defendants' data demonstrates not only the failures in this area, but the system's inability to self-correct. Wilcox WT, Doc. 4138 ¶ 307. According to Defendants, the reasons for Eyman's dismal performance on Performance Measure 44 have been consistent over nearly four years: providers fail to timely note responses to each hospital discharge order and fail to justify any changes to the orders; and nurses fail to administer the treatment that is ordered by providers. Ex. 1971 at 201-215. The Eyman CAPs set forth essentially the same actions, month after month, and year after year: for the most part, they state that a supervisor and/or other staff will review discharges for compliance and that providers and nurses will be trained and reeducated. *Id*. Yet nothing changed, month after month, year after year. *Id.*

693.    The CAPs for Florence and Lewis demonstrate the same shortcomings, repeatedly identifying the same problems and listing the same ineffective remedial plans.

---

[125] Performance Measure 44 states, "Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours." Ex. 1850 at 11.

Ex. 1971 at 216-228 and 229-240. The CAPs at Yuma for this measure were likewise ineffective. Jordan TT at 2637:3-2639:11.

**(f) Providers fail to provide adequate pain medication to those who need it.**

694. Patients who suffer from cancer, have had a traumatic injury, or are recovering from surgery require pain management. Wilcox WT, Doc. 4138 ¶ 310. The failure to provide proper pain management is an indication of callous disregard for patients. *Id.*

695. Defendants have a pattern of failing to adequately address patients' pain, including for end-stage cancer patients, resulting in severe and unnecessary suffering. Wilcox WT, Doc. 4138 ¶ 309; *see also* Ex. 450 at ADCM1584308 ("The patient was initially prescribed Tylenol #3 for metastatic cancer pain. More aggressive treatment of cancer pain should be considered").

696. The case of the 69-year-old patient with lung cancer from Eyman is illustrative. After this patient's cancer was ignored for years as discussed above, at ¶¶ 667-669 and 688-689, he was forced to suffer unnecessarily because his pain management was either non-existent or grossly inadequate in the months before his death. Wilcox WT, Doc. 4138 ¶ 309. Although his provider referred him to oncology for possible radiation and palliative (comfort) care, Centurion inexplicably canceled it. *Id.* ¶ 53.

697. While in the ADCRR prison infirmary, he was prescribed NSAIDs for pain control and Tylenol #3. Wilcox WT, Doc. 4138 ¶¶ 51-52. Dr. Wilcox explained that this was malpractice: this patient had suffered a massive GI bleed, so NSAIDs were contraindicated, and prescribing pills was inappropriate because he was being tube fed as he was unable to swallow. *Id.* It was not until the last month of his life that he finally received IV morphine, and even then, administration was sporadic. *Id.* ¶ 56. According to Dr. Wilcox, his "end of life care does not conform to any standard of care for palliative or hospice care." *Id.* ¶ 57.

698.    This patient's case is not unique. In ADCRR, pain medication prescribed at a hospital or by a specialist is often disrupted, discontinued, or ignored without explanation once the patient returns to prison. Wilcox WT, Doc. 4138 ¶ 310. Patients on certain pain medications for some time are abruptly removed from them and not provided an adequate substitute, often apparently without any notice or consultation with the patient. *Id.*

699.    Patients who require pain management who are not housed in the infirmary units are almost always prescribed Tylenol #3 (Tylenol with codeine). Wilcox WT, Doc. 4138 ¶ 312. This is an extremely poor choice—because it is short-acting, it must be taken frequently to achieve pain relief (every four to six hours), but ADCRR patients are almost invariably prescribed the medication only twice daily. *Id.* The medication thus wears off well before the next dose becomes available, forcing the patient to endure unnecessary pain. *Id.*

700.    This is a long-standing problem that Dr. Wilcox raised in a prior declaration in 2017. Wilcox WT, Doc. 4138 ¶ 313; Ex. 1858 ¶¶ 12-18, 27 (Dr. Wilcox's review of case where cancer patient suffered excruciating needless pain from cancer that was poorly managed in the months prior to his death. This patient died on September 7, 2017 from invasive squamous cell cancer that had resulted in a very large (6 by 7 cm) open lesion on his head that invaded the underlying skull bone and caused the bone to die and ultimately become infected.).

701.    The evidence shows that providers continue to prescribe pain medications inappropriately, including for terminally ill people, and for people who are recovering from major surgery and have been recommended an appropriate pain regimen. *Id.* ¶¶ 321-323; Ex. 175 at ADCM1651463 (patient with metastatic cancer received only one order of pain medication, five days before his death); Ex. 218 at ADCRR00000131 (chronic pain patient committed suicide, may have been undertreated); Ex. 364 at ADCRR00000168 (same); Ex. 355 at ADCM1585578 (timely follow up of pain issues lacking); *see also*

*supra* ¶¶ 428-439 (deaths by suicide of patients who were suffering chronic and significant pain that was not addressed).

702.    In addition, Defendants' expert Dr. Murray found ADCRR providers prescribing NSAIDs to patients with active liver disease. Murray TT at 3512:11-13. NSAIDs can cause life-threatening internal bleeding for people who have liver disease. *Id.* at 3512:11-23.

703.    Healthcare staff also prescribe pain medications that are contraindicated for use together or are contraindicated in light of the patient's medical condition. Wilcox WT, Doc. 4138 ¶ 320. Examples include prescribing prednisone, ibuprofen and Toradol—three medications which, when prescribed together, are likely to cause gastric bleeding, and prescribing ibuprofen with methotrexate, which can lead to kidney injury. *Id.*

### (g)    Providers delay treatment for patients with hepatitis C.

704.    Chronic hepatitis C is a major health concern in the ADCRR impacting approximately 8,000 people in ADCRR prisons. Phillips TT at 2893:22-25.

705.    Defendants fail to provide timely care for people with chronic hepatitis C and, as a result, some people suffer unnecessarily. Wilcox WT, Doc. 4138 ¶ 328. Defendants have for years failed to follow the community standard for treating this disease. *Id.* ¶ 329.

706.    Hepatitis C is a viral infection that causes liver inflammation, sometimes leading to serious liver damage.[126] Wilcox WT, Doc. 4138 ¶ 324. The hepatitis C virus spreads through contaminated blood. *Id.* While a *new* infection with hepatitis C does not always require treatment, as the immune response in some people will clear the infection,

---

[126] Chronic hepatitis C is a progressive disease. Phillips TT at 3637:22-23. People with chronic hepatitis C are given fibrosis scores based upon the degree of scarring to their liver. *Id.* at 3636:16-25. The scores range from F0 to F4, with the higher number signifying more advanced disease. *Id.* at 3637:1-4. The greater the level of scarring, the greater the chance the patient will develop cancer, cirrhosis or advanced liver disease. *Id.* at 3637:5-12. In general, people's scores will increase over time if untreated. *Id.* at 3638:6-8. People who are not treated can transmit the virus to others, regardless of their fibrosis score. *Id.* at 3868:16-20.

155617523.3

*chronic* hepatitis C infection must be treated. *Id.* ¶ 325. The goal of treatment is to cure the disease. *Id.*

707. Currently, treatment for hepatitis C has an initial cure rate of 95-99%, is well-tolerated by patients, is completed in less than 24 weeks, and generally does not create significant drug-interaction issues with other medications. Wilcox WT, Doc. 4138 ¶ 325. This treatment cures hepatitis C, and it is conceivable that transmission of the virus can be eliminated. *Id.* The treatment has also recently become much more affordable. Phillips TT at 3639:19-21.

708. As the result of Defendants' failure to follow the community standard for treatment, patients have been harmed, and some have died. Wilcox WT, Doc. 4138 ¶¶ 329-334. ADCRR's own mortality reviews document this problem. Ex. 226 at ADCM1584240-41 (mortality review concludes that the patient should have been worked up for hepatitis C treatment); Ex. 232 at ADCRRM0019625 (patient died of hepatitis C complications, no discussion of hepatitis C treatment or work up); Ex. 236 at ADCRRM0013723-25 (patient had hepatitis C for 20 years; not considered for treatment until months before his death from complications of hepatitis C and liver cancer); Ex. 332 at ADCRRM0004666 (patient had hepatitis C since 1981, not worked up for hepatitis C treatment); Ex. 358 at ADCM1623216 (patient had hepatitis C since 2004 and died of hepatitis C-related liver cancer; "unclear if the patient was evaluated for HCV treatment"); Ex. 437 at ADCM1603954 ("2/21/18 labs showed elevated APRI score with early liver fibrosis. Record does not document whether the inmate was referred to Hep C Committee for treatment consideration"); Ex. 460 at ADCM1598098 (patient who died of complications of hepatic cirrhosis: "No documentation found as to whether the patient was presented to the Hep C Committee for treatment consideration"); Ex. 915 at ADCRR00210795-98 (patient who died of liver cancer due to hepatitis C did not have necessary screening ultrasounds every six months).

709. Defendants released a revised protocol for treating hepatitis C in August 2021, after the Court has set this matter for trial. Ex. 1305 at Appendix C, § 2.

710. According to ADCRR's Medical Director Grant Phillips, approximately 800 patients have received hepatitis C treatment as of August 31, 2021. As of early October 2021, ADCRR had enrolled people for treatment at the rate of 50 patients per month, statewide, and ADCRR had no plans to increase the number of patients being started on treatment each month. Phillips TT at 3640:3-14, 3641:19-3642:2; Phillips WT, Doc. 4158 ¶ 51.

711. Under Defendants' current plan and schedule for hepatitis C treatment, it will take twelve more years to treat the patients who are currently identified as having chronic hepatitis C. The treatment timeline that Defendants have implemented is excessively long and is unacceptable. The evidence is clear that it will result in some people getting seriously ill or dying, and others transmitting the virus unnecessarily in the meantime. Wilcox WT, Doc. 4138 ¶ 328.

### (h) Providers fail to treat Substance Use Disorder with community-standard, evidence-based treatment.

712. Opiate Use Disorder (OUD) is a chronic disease that must be medically managed. Dep. of Johnny Wu, M.D. ("Wu Dep.") at 34:19-35:5; *see also* Jordan TT at 2628:14-17.

713. There are a significant number of people in ADCRR prisons with a history of Substance Use Disorder (SUD) and/or OUD, and many people use illicit substances, including injected opiates, while incarcerated in Defendants' prisons.[127] Wilcox WT, Doc. 4138 ¶ 335; *see also* Phillips TT at 3649:17-23; Orm Ind. Dep. at 60:13-61:7.

714. Tragically, there have been numerous ADCRR deaths in the last three years resulting from or related to substance misuse. Wilcox WT, Doc. 4138 ¶¶ 339-347; *see also,* Ex. 144 at ADCM1603877 (patient died of methamphetamine toxicity); Ex. 145 at ADCM1615615 (patient died of acute polydrug toxicity); Ex. 201 at ADCM1623201

---

[127] Dr. Orm of Centurion confirmed that people in ADCRR prisons misuse controlled substances, and she is aware of this because patients test positive in drug screens, they overdose, they are found with controlled substances in their possession, and they become reinfected with hepatitis C. Orm Ind. Dep. at 60:17-21, 61:2-7.

(patient's "history of substance abuse and being unable to maintain sobriety may have contributed to her motivation to complete suicide"); Ex. 202 at ADCM1624354-55; (patient who committed suicide had significant history of drug abuse "escalating in severity"); Ex. 223 at ADCRRM0026199-202 (review recommends "more intensive drug prevention programming" in case where patient committed suicide by hanging and tested positive for methamphetamine); Ex. 221 at ADCM1575445 (patient died of methamphetamine toxicity); Ex. 224 at ADCRR00000140 (re patient who committed suicide by hanging "it is possible that [his] motivation for his actions was reflected in his drug use, which was spiraling out of control"); Ex. 233 at ADCM1669316 (patient died of "acute intoxication of multi week supply of prescription[] medications including methamphetamines"); Ex. 260 at ADCM1603904 (patient died of "acute drug toxicity involving heroin"); Ex. 275 at ADCM1575247 (patient died of heroin toxicity); Ex. 279 at ADCRRM0004662 (patient died of heroin and fentanyl intoxication); Ex. 283 at ADCM1578139 (patient died of "toxic effects of fentanyl and heroin"); Ex. 313 at ADCM1570724 (patient died of acute polydrug toxicity); Ex. 318 at ADCM1598079 (patient died of morphine toxicity); Ex. 323 at ADCM1603925 (patient died of fetanyl intoxication); Ex. 380 at ADCM1669339 (patient committed suicide by hanging, had history of opioid misuse and tested positive for morphine and codeine); Ex. 381 at ADCRRM0000076 (patient who hanged himself had history of heroin withdrawal and opioid use); Ex. 432 at ADCM1578112 (patient with history of IV drug dies from sepsis, complications of infective endocarditis).

715.  Despite these grim facts, Defendants lack a comprehensive and effective program to treat Substance Use Disorder (SUD). *See* Wilcox WT, Doc. 4138 ¶ 336; Platt TT at 1043:8-12.

716.  SUD treatment is not part of the contract for medical services with Centurion. Platt TT at 1042:17-23.

155617523.3

717.    The community standard for treating SUD, and particularly OUD, includes the use of Medication Assisted Treatment (MAT).[128] Wilcox WT, Doc. 4138 ¶ 335. Effective treatment programs in correctional systems include medication, cognitive behavioral therapy, continuity of care on release, training for providers, and education for patients. Wu Dep. at 28:10-18, 29:5-13.

718.    MAT is considered an effective treatment for many people with SUD, because it can reduce relapses and overdose deaths. Phillips TT at 3645:9-16.

719.    It is clinically effective to alleviate symptoms of withdrawal, reduce cravings, and block the brain's ability to experience the opiate's effect. Wilcox WT, Doc. 4138 ¶ 335.

720.    Dr. Johnny Wu, Chief Clinical Officer for Centurion, acknowledged that MAT saves lives. Wu Dep. at 34:12-35:11. He further testified that, if implemented state-wide in ADCRR, a MAT program would reduce prison violence. *Id*. at 38:5-39:2.

721.    Maintaining MAT for the duration of incarceration been proven to cut overdose rates in half, and decrease rates of HIV and hepatitis C transmission. Wilcox WT, Doc. 4138 ¶ 335. Research shows that a combination of MAT and behavioral therapies is a successful method to treat SUD. MAT in correctional settings has been proven to lower mortality on release: the Rhode Island Department of Corrections reduced overdose deaths by 61% within a year of their MAT program (which offers all MAT

---

[128] MAT is approved by the FDA (*see* U.S. Food & Drug Administration, Information About Medication-Assisted Treatment (MAT) (2/14/19), https://www.fda.gov/drugs/information-drug-class/information-about-medication-assisted-treatment-mat), the Department of Health and Human Services (*see* U.S. Dep't of Health & Human Services, How to Find Opioid Treatment Programs? (4/19/18), https://www.hhs.gov/opioids/treatment/index.html.), the National Institute on Drug Abuse (*See* Nat'l Institutes of Health, Policy Brief: Effective Treatments for Opioid Addiction (Nov. 2016), https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction); the Office of National Drug Control Policy (*See* Office of Nat'l Drug Control Policy, National Treatment Plan for Substance Use Disorder 2020 (Feb. 2020), https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/02/2020-NDCS-Treatment-Plan.pdf.), and the Substance Abuse and Mental Health Services Administration (SAMHSA) (*See* U.S. Dep't of Health & Human Services, Substance Abuse and Mental Health Services Administration, Medication-Assisted Treatment (MAT) (10/7/21), https://www.samhsa.gov/medication-assisted-treatment.).

options—buprenorphine/Suboxone, methadone, and naltrexone/Vivitrol) to incarcerated people. *Id.*[129]

722. The only MAT program in ADCRR other than the taper of medication for people arriving at the prison already on MAT, and the continuation of MAT for those who are pregnant, is a small pre-release program at Lewis and Perryville. Phillips TT at 3646:20-3648:11. In that program, patients who are leaving the prison may receive two injections of naltrexone, upon request. *Id*. at 3646:20-3647:5.

723. The failure to offer on a system-wide basis the community standard of care for SUD, including MAT, harms incarcerated people and places them at unreasonable risk of harm. Wilcox WT, Doc. 4138 ¶ 337.

724. Absent a significantly expanded MAT program, ADCRR will continue to have unnecessary cases of injury and death related to substance abuse inside the prison system. Wilcox WT, Doc. 4138 ¶ 337.

### (i) Providers fail to offer or follow up on necessary health screenings based on age, medical history, and gender.

725. Providers must promote the health and well-being of their patients by educating them and offering them periodic screening tests. Wilcox WT, Doc. 4138 ¶ 349.

726. Two cancer screenings in particular are critical for adults. *Id.* All women aged 21-65 should be screened for cervical cancer every three years, and all adults aged 45-75 should be screened for colorectal cancer (until this year, the age was 50-75). *Id.* In addition, men aged 55-69 should have an opportunity to discuss the potential benefits and harms of periodic screening for prostate cancer with their clinician and be permitted to choose whether to have the prostate-specific antigen screening, which is typically done every two years. *Id.*

---

[129] *See* Traci C. Green, PhD, MSc, Jennifer Clarke, MD, and Lauren Brinkley-Rubinstein, PhD, Postincarceration Fatal Overdoses After Implementing Medications for Addiction Treatment in a Statewide Correctional System, JAMA Psychiatry 75(4):405-407 (2018), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/2671411.

727.   Defendants' expert Dr. Murray acknowledged that patients in his study did not always have the correct preventive screenings ordered, and he attributed this in part to the fact that the health record lacks prompts for providers to ensure tests are done. Murray TT at 3510:8-3511:10.

728.   Defendants' failure to ensure timely screening has resulted in harm. Wilcox WT, Doc. 4138 ¶¶ 351-354; Ex. 195 at ADCRR00000031-32 (55-year-old patient died of heart disease; failure to provide annual physical for patient over 50); Ex. 427 at ADCRR00000113 (failed to offer colon cancer screening to patient with colon cancer).

* * * * *

729.   In sum, the Court finds that ADCRR providers fail to deliver adequate care to patients. Defendants' overreliance on midlevel providers who do not have the necessary skills to treat complex patients, and the failure of providers to (1) develop and test differential diagnoses; (2) adequately manage their chronic care and complex cases; (3) follow up on significantly abnormal diagnostic test results; (4) obtain hospital records and review and act on them; (5) provide adequate pain medication to those who need it; (6) provide timely treatment for patients with hepatitis C; (7) treat Substance Use Disorder with community-standard, evidence based treatment; (8) offer or follow up on necessary health screening, separately and collectively expose class members to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

**3.    Patients Cannot See Specialists When Medically Necessary.**

730.   Specialty referrals are a critical component of safe provision of health care. Wilcox WT, Doc. 4138 ¶ 365. The exercise of professional judgment sometimes requires more in-depth knowledge than primary care providers possess. *Id.* In those cases, the provider must recognize the need and be able to refer patients for consultations with a specialist, such as a neurosurgeon, cardiologist, urologist, infectious disease specialist, pulmonologist, or ophthalmologist. *Id.*

731.   Patients in ADCRR custody are at substantial risk of serious harm because they do not timely receive specialty care. *Id.*

-244-

1

2

        **(a)     Providers fail to recognize when patients require specialty care.**

3

732.    Too often, providers, and particularly mid-level providers, fail to recognize

4

when patients need a specialist to address diseases and conditions that require additional

5

expertise. Wilcox WT, Doc. 4138 ¶ 368.[130]

6

733.    The record is replete with examples of patients requiring consultation with

7

or management by specialists because their complex conditions, including heart disease,

8

kidney failure, and liver disease, were beyond the capacity of their primary care providers,

9

yet the necessary referrals were never made or completed. Wilcox WT, Doc. 4138 ¶¶ 368-

10

373; *see also* Ex. 189 at ADCM1578125 (failure to request consult for patient with lower

11

urinary tract obstruction); Ex. 213 at ADCRRM0019619 (failure to refer patient to

12

orthopedics following hospitalization for acute fracture); Ex. 359 at ADCM1608449-56

13

(patient suffers from shortness of breath, dizziness and fatigue for 22 months, eventually

14

diagnosed with metastatic lung cancer; provider failed to seek specialty consult when

15

patient's condition failed to improve); Ex. 433 at ADCRRM0026245 (patient with

16

ultrasound showing blockage in his heart referred but never scheduled with cardiologist);

17

Ex. 460 at ADCM1598100 (failure to send patient to GI specialist following

18

hospitalization for cirrhosis).

19

        **(b)     Specialty care is not provided in a timely manner.**

20

734.    Patients suffer from unreasonable delays in being seen by specialists, and

21

the records reveal a pattern of delay that places patients at risk of serious harm.[131] Wilcox

22

WT, Doc. 4138 ¶ 374, *see also* Trial Testimony of Larry Gann ("Gann TT") at 2295:2-6.

23

735.    These delays happen because, among other things, healthcare staff do not

24

request the appropriate appointments, do not request appointments as urgent or emergent

25

---

26

[130] This problem is not new. Dr. Wilcox wrote in 2013: "I saw numerous examples of people whose cases clearly required input from specialists or a more advanced understanding of their complex needs but yet they were not referred for that care." Wilcox

27

WT, Doc. 4138 ¶ 368; *see* Ex. 1842 at PRSN-TRW 00057.

[131] Dr. Wilcox also raised this systemic issue in 2013 and in 2014. Ex. 1842 at 62

28

and Ex. 1669 at 34.

when necessary, fail to provide the specialist with necessary medical records to conduct the encounter and develop a treatment plan, fail to timely obtain and act on specialty reports, and otherwise fail to adequately manage and coordinate care. Wilcox WT, Doc. 4138 ¶ 396.

736. There is a pattern of delays in cancer diagnosis and treatment. Wilcox WT, Doc. 4138 ¶ 376. This places people at risk of harm, because time is of the essence when dealing with a new cancer diagnosis. *Id.* ¶ 382.

737. Patients in ADCRR are harmed by these delays. One particularly egregious example involved a young man who died of testicular cancer in June, 2021.[132] Ex. 154 at ADCRR00000005. He reported a "super sensitive" lump on his left testicle in August 2020. Wilcox WT, Doc. 4138 ¶ 76. The community standard of care for a young man with a testicular mass would be to do imaging and have the patient seen by a urologist rapidly, probably within five days. Wilcox TT at 1668:2-7.

738. The nurse who saw him did not understand the urgency of the situation, failed to do an adequate exam, advised him to "go easy on workouts" and did not refer him to a provider. Wilcox WT, Doc. 4138 ¶¶ 76-78.

739. The patient finally saw a prison provider two months later, who documented the mass and entered the consult order for the ultrasound. Wilcox WT, Doc. 4138 ¶ 79. The October 23, 2020 ultrasound results indicated the mass was "highly concerning for a testicular malignancy." *Id.* ¶ 80.

740. When the patient saw a urologist on November 25, 2020, the urologist recommended a radical orchiectomy STAT (*i.e.*, immediate removal of his testicle). Wilcox WT, Doc. 4138 ¶ 82. A series of delays ensued and the patient had to see a different urologist in mid-February 2021. *Id.* ¶¶ 82-83. However, Defendants failed to

---

[132] This case is particularly tragic because testicular cancer is one of the most curable cancers and accounted for only 0.1 percent of all deaths from cancer in men in the United States in 2019. Wilcox WT, Doc. 4138 ¶ 96. It has a five-year survival rate of over 95 percent. *Id.* Americans do not typically die from testicular cancer. Wilcox TT at 1642:3-5.

send any of the ultrasound results or the labs so the visit was essentially worthless. *Id.* ¶ 83. The urologist repeated studies that they had already done, and those studies took a full month to obtain. *Id.* ¶¶ 83-84.

741. The patient finally had his radical orchiectomy on April 8, 2021, five months after the urologist's recommendation for immediate surgery, and eight months after he reported the lump. Wilcox WT, Doc. 4138 ¶ 87. However, Centurion failed to send the patient back to the surgeon to develop a post-surgical treatment plan. *Id.*; Wilcox TT at 1650:8-12.

742. This patient required, but did not receive, care from an oncologist to do disease surveillance and provide chemotherapy or radiation therapy, as is usually necessary in testicular tumor cases. Wilcox WT, Doc. 4138 ¶ 88; Wilcox TT at 1650:17-1651:2.

743. Two months later, he developed gastrointestinal bleeding, for which he was inadequately evaluated. Wilcox WT, Doc. 4138 ¶ 89. When he was finally taken to the hospital after five days of reporting symptoms, the patient was found to have a widely metastatic tumor and metastasis to the stomach causing the bleeding. *Id.* ¶ 94. The bleeding could not be controlled, and he died. *Id.* He was 30 years old. Ex. 154 at ADCRR00000005.

744. This case is not unique. In fact, Dr. Wilcox had previously identified three other young men whose treatment for testicular cancer cases was likewise grossly delayed while in ADCRR custody. Wilcox WT, Doc. 4138 ¶ 95. Two of those patients had also died, while the third was discharged several months after his diagnosis, without having seen an oncologist. *Id.*

745. This pattern of delays and mismanagement implicated other serious cancer cases as well – patients with cancer of the prostate, the lungs, and the liver all suffered from similarly delayed care. Wilcox WT, Doc. 4138 ¶¶ 380, 382-383, *see also* Ex. 304 at ADCM1575463 (window for possibly curative treatment missed twice due to delays); Ex. 352 at ADCRRM0019660 (cancer referrals not made urgently).

746. Serious and damaging delays in specialty referrals harm ADCRR patients with non-cancer conditions as well, including patients who have serious conditions, including obstructive kidney stones, chronic and severe shoulder pain, lupus, diabetes and Valley fever. Wilcox WT, Doc. 4138 ¶¶ 384-395, *see also* Ex. 395 at ADCRRM0019676.

747. Arizona law requires that ADCRR pay specialty consultants treating incarcerated people at the Medicaid (Arizona Health Care Cost Containment System "AHCCCS") rate, which is typically lower than the market rate. Murray TT at 3512:24-3513:5. That law makes it difficult to find specialists willing to see ADCRR patients. *Id.* at 3513:6-8. Defendants' medical expert Dr. Murray testified that ADCRR should pay the market rate to provide access to these specialty services. *Id.* at 3513:9-13.

748. These findings are consistent with the CGAR data collected regarding Performance Measures 50 and 51 of the Stipulation, which shows that, for the first seven months of 2021, all of the prisons except ASPC-Douglas (one of the smaller prisons) failed to meet the agreed upon 85% benchmark for timely scheduling approved appointments at least once. Exs. 1263 and 1264; Jordan TT at 2631:2-2632:16.

749. Defendants' monthly CQI meeting minutes identify delays in obtaining Utilization Management approval as one source of the scheduling problems. Ex. 666 at ADCRR00099608-09, Ex. 676 at ADCRR00148477, and Ex. 686 at ADCRR00100014; [Douglas, February-April, 2020] ("It is taking us about 3 weeks to get items approved [by Utilization Management]. This is leaving us with very little time to get appointments scheduled and completed. We continue to struggle scheduling Urology and GI appointments on the outside as well as Neurology appointments"); Ex. 677 at ADCRR00148512 [Eyman, March 2020] ("There is a time delay in [Utilization Management] approvals. Routines are taking approximately one month and Urgents take approximately 1-2 weeks."); Ex. 670 at ADCRR00099784, Ex. 680 at ADCRR00148728; Ex. 690 at ADCRR00100249; Ex. 700 at ADCRR00100755; Ex. 710 at ADCRR00101086 [Perryville, February-June, 2020] ("Clinical Coordinator notates that consults are taking at least 3 weeks to review by the UM team"); Ex. 681 at

ADCRR00148734 [Phoenix, March 2020 ("Timeliness for UM to approve consults continues to be challenging"); Ex. 684 at ADCRR00148863 [Winslow, March 2020] (12 days to approve "urgent" consult).

750. Specialty care has also been unnecessarily delayed by the failure of health care staff to properly prepare patients for their procedures. *See, e.g.*, Ex. 793 at ADCRRM0018579 and Ex. 803 at ADCRR00105794 [Tucson, February-March 2021] ("continue to experience delays in consults due to improper (or lack of) procedure prep on the yards"); Ex. 813 at ADCRR00106425, Ex. 823 at ADCRR00056669; Ex. 833 at ADCRR00062006, Ex. 843 at ADCRR00000862, Ex. 853 at ADCRR00137012 [Tucson, April-August, 2021] ("We have had some issues with pre-op prep, to include COVID testing, being completed in a timely manner").

751. Patients at Eyman were denied access to a neurosurgeon because providers at the institution failed to follow the consultant's recommendations. Ex. 667 at ADCRR00099642 [Feb. 2020] ("Onsite providers are not following protocol set in place by Neuro surgeons [sic] and as a result, they are denying our patients.").

752. In addition, providers' poorly written consult requests have caused Utilization Management to issue Alternative Treatment Plans (ATPs), thereby delaying patient's specialty care. *See, e.g.*, Ex. 707 at ADCRR00101013 [Eyman, June 2020] ("Ophthalmology consult placed without Acuities causing increase of ATP"); Ex. 780 at ADCRR00104368, Ex. 790 at ADCRRM0018558, Ex. 800 at ADCRR00105681, Ex. 810 at ADCRR00106331, Ex. 820 at ADCRR00056515, Ex. 830 at ADCRR00061883, Ex. 840 at ADCRR00062547, Ex. 850 at ADCRR00136940 [Perryville, January-August, 2021] ("starting to see an increase in ATPs for specialty consults. Please be thorough in your request for a consult").

753. These delays in specialty care are entirely avoidable, and demonstrate a systemic failure that places patients at risk of harm. Wilcox WT, Doc. 4138 ¶ 401.

155617523.3

754.    The Court finds that Defendants' failure to provide patients timely access to medically necessary specialty health care exposes class members to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

### (c)    Providers fail to timely review and act on recommendations from specialists.

755.    After patients are seen by specialty consultants, their provider must review the resulting report to follow-up on recommended treatment and adjust the treatment plan as necessary. Wilcox WT, Doc. 4138 ¶ 402. ADCRR has failed for years and continues to fail to ensure that consultants' reports are reviewed and timely incorporated into the patients' treatment plan. *Id.* at ¶¶ 402-403.

756.    Records often lack sufficient (or any) documentation showing that the ADCRR provider had reviewed the specialist recommendations or discharge plans, and sometimes the provider acted only after a lengthy, dangerous delay. Wilcox WT, Doc. 4138 ¶¶ 403-404. This places patients at substantial risk of serious harm. *Id.*

757.    Defendants' CGAR data for Performance Measure 52 ("Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report") shows the untimely provider reviews of specialty consultants' reports is a widespread practice in the Arizona prison system. Ex. 1265.

758.    The CAP process has not fixed these chronic deficiencies. Eyman CAPs from 2017 to June 2021 cite a wide range of reasons for compliance failures, including new staff, delays in scanning, provider shortages, high turnover for the Clinical Coordinator and scheduler positions, and inadequately educated providers, and they propose adding trackers, staff and training, among other measures. Ex. 1971 at 427-438. Similarly, the CAPs for Florence prison identify problems with new staff, scanning delays, the lack of a clinical coordinator, staffing vacancies among providers, high turnover in the Clinical Coordinator and scheduler positions, new and poorly trained staff, and inadequately educated providers, and include plans for more staff, new equipment and additional training. *Id.* at 439-447.

-250-

759. Despite these CAPs, the poor results persist, demonstrating that these barriers to care are systemic, and ADCRR cannot or will not resolve them.

760. The Court finds that Defendants' failure to ensure that prison providers review and act upon specialists' recommendations in a timely and competent manner exposes class members to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

### 4. Defendants Fail to Provide People with Disabilities with Medically Necessary Care, Supplies, and Equipment.

761. Prisons must be equipped and staffed to ensure that people who have disabilities are provided medically necessary care, supplies, and equipment in order to protect them from physical injury and pain, and to allow them to safely perform basic life functions like using the toilet. Wilcox WT, Doc. 4138 ¶ 424.

762. Patients with disabilities receive inadequate care, supplies and equipment related to their disabilities, and are harmed or at substantial risk of serious harm as a result. Wilcox WT, Doc. 4138 ¶ 424.

763. The record shows that people with mobility impairments were unable to obtain properly-fitting and functioning prosthetics, were unable to obtain properly-fitting wheelchairs, and were denied necessary equipment, including medical shoes, sliding boards for transferring, and catheters, even after repeated requests. Wilcox WT, Doc. 4138 ¶¶ 424-437.

764. Among the people impacted is a 43-year-old man with paraplegia who has a long history of wounds and injuries on his buttocks and scrotum that necessitated amputation of his penis. He requires—but has not received—among other things, a global assessment of his physical needs, a properly fitting wheelchair, a sliding board to facilitate his transfers, special shoes to protect his swollen feet, and moistened wipes to assist with toileting to guard against further skin breakdown. Wilcox WT, Doc. 4138 ¶¶ 430-436. Another mobility-impaired patient was forced to wait for months after he reported that his prosthetic leg was broken, causing him significant pain and interfering with his mobility.

155617523.3

*Id.* ¶¶ 428-429. When he was finally seen by an orthotic specialist, almost eight months after first reporting the problem, the specialist noted that the patient's supplies (stump sleeve) and prosthetic were badly damaged, and this placed him at risk of skin breakdown and infection. *Id.* ¶ 429.

765. Defendants' practices result in patients suffering from avoidable infections, skin breakdown, and chronic ulcers that are challenging and expensive to repair. Wilcox WT, Doc. 4138 ¶¶ 438-441.

766. The Court finds that Defendants' failure to provide adequate care, supplies, and assistive devices exposes class members to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

## V.   SYSTEMIC DEFICIENCIES THAT AFFECT ALL HEALTH CARE

### A.   ADCRR Fails to Consistently Provide Patients Essential Medications.

767. Roughly two-thirds of class members are prescribed medications, and approximately one quarter of them receive medication for mental health conditions. Gann TT at 2284:12-15, 2286:2-4. Prescribed medications must be provided to patients in a timely, consistent manner. They must be renewed regularly and without interruption, and patients must be able to transfer housing locations without medication interruptions. Wilcox WT, Doc. 4138 ¶ 356; Ex. 1842 at PRSN-TRW 00071.

768. ADCRR has a long history of failing to ensure that prescription medications are timely renewed and delivered to patients. Wilcox WT, Doc. 4138 ¶ 356; Ex 1842 at PRSN-TRW 00071-74. This failure to provide patients timely and consistent delivery of prescription medications—especially for chronic medical and psychiatric conditions—puts them at serious risk of physical and psychological harm. *Id.*; Stewart WT, Doc. 4109 ¶¶ 136-141; Stewart TT at 492:14-493:6.

769. There are unacceptable disruptions in administration of medication in the prisons. Wilcox WT, Doc. 4138 ¶ 357. This problem manifests in different ways, including through failure to promptly provide medications when they are first prescribed,

to ensure medication continuity, and to administer medications on a timely basis, including after transfer, any of which can result in serious harm to patients. *Id.*

770.   First, a key component of medication administration is making sure that prescriptions are refilled and renewed without interruption. ADCRR has failed to consistently ensure timely renewal of chronic care and psychotropic medication, such that patients do not experience a lapse in receiving their medications. Performance Measure 13 of the Stipulation requires that "[c]hronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication." But the 2021 data show that many prisons still could not reach the 85% compliance threshold:

|  | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| Douglas | 97 | 100 | 100 | 100 | 93 | 96 | 96 |
| Eyman | 86 | 84 | 84 | 80 | 92 | 88 | 92 |
| Florence | 88 | 65 | 77 | 86 | 88 | 88 | 75 |
| Lewis | 69 | 95 | 93 | 99 | 85.71 | 91 | 77 |
| Perryville | 84 | 82 | 86 | 79 | 74 | 73 | 85.56 |
| Phoenix | 94 | 91 | 91 | 97 | 98 | 95 | 100 |
| Safford | 90 | 90 | 100 | 90 | 100 | 97 | 100 |
| Tucson | 90 | 94 | 94 | 82 | 67 | 70 | 79 |
| Winslow | 100 | 100 | 100 | 100 | 93 | 100 | 100 |
| Yuma | 64 | 74 | 78 | 74 | 68 | 76 | 96 |

Stewart WT, Doc. 4109 ¶ 142; Ex. 1256.

771.   Dr. Stewart and Dr. Wilcox opined that, even if ADCRR was reaching 85%, this is too low, as it still condones as acceptable that staff fail 15% of the time. *See, e.g.*, Wilcox WT, Doc. 4138 ¶ 363 ("All of these medications are presumably medically necessary for mental health and chronic health conditions. As such, continuity of care must be maintained and the medically acceptable target has to be 100 percent. Glitches do happen with mail-order medication renewals, which is why the on-site pharmacy and the backup pharmacy exist -- so those glitches can be bridged and continuity of medically necessary medication can be ensured"); Stewart WT, Doc. 4109 ¶ 142 ("I do not think it is

-253-

acceptable that 15% of all mentally ill prisoners could day after day experience interruptions in receiving their psychotropic medications, or that on any given day 15% of all patients didn't get their medications. This is such a critical part of ensuring ongoing stability for patients, that the threshold for compliance on a critical performance measure should be set much higher than the 85% threshold.").

772.   ADCRR also has failed to consistently ensure that patients receive their newly prescribed formulary medications within two business days after prescribed, or immediately if prescribed stat. This Stipulation requirement (PM 11), in place since 2015, shows ongoing failures. *See* Wilcox WT, Doc. 4138 ¶ 363 n.23; Ex. 1255 (five prisons failed to meet performance measure benchmarks in first seven months of 2021). Defendants also fail to ensure that patients who are transferred receive their medications at the receiving prison without interruption, despite the Stipulation requirement (PM 35). Ex. 1257 (four prisons failed to meet benchmarks in first seven months of 2021).

773.   Defendants do not provide patients medications such as insulin or psychotropic medications on the very strict time schedules for which they are prescribed. For example, given the time-release nature of many psychotropic medications, and their half-lives, it is essential that these medications be taken with a consistent frequency every eight or 12 hours (depending upon the medication) so that they are properly metabolized by the body. Stewart WT, Doc. 4109 ¶¶ 136, 140; Stewart TT at 492:14-493:6. The evidence described below shows that this clearly does not happen.

774.   While people in the community are able to take their medications on the schedule prescribed, in a prison system the incarcerated person is at the mercy of the prison health care and custody staff to timely hold pill calls or come to their cell to distribute their medications because these medications are not "Keep on Person" or "KOP," but rather are classified as "Direct Observed Treatment," or "DOT," also referred to as "watch swallow" medications where the staff observe the patient swallow the medication to ensure it is not diverted.

1    775.    Shortages in nursing and custody staff negatively affect the delivery of

2    medications.

> Timely delivery and administration of medication relies upon
> having enough nursing staff available to run efficient "pill
> calls" or "med pass" (at lower security yards) at a set given
> time, or to have enough nursing staff to be able to go through
> isolation and high-security units to deliver medication cell-
> front to patients. Even if the "pill calls" are occurring at
> facilities, if there is only one nurse responsible for distributing
> the medications, and there are dozens of persons (or on some
> yards, 100-200 persons) waiting in line, patients report that
> they will sometimes refuse or give up because they are unable
> to stand for long periods in extreme temperatures.

Stewart WT, Doc. 4109 ¶ 137.

776.    Defendants' own documents show that they lack a reliable system to ensure

that medications are provided to patients as prescribed. For example, the March 2021 CQI

minutes from Tucson indicate "multiple med errors for missed doses." Ex. 803 at

ADCRR00105792-93. Similar notations appear in the March 2021 CQI minutes at

Perryville ("multiple med errors were submitted") (Ex. 800 at ADCRR00105679), and

Eyman ("multiple medication errors were discovered"). Ex. 797 at ADCRR00105202.

These problems continued throughout 2021; for example, the August 31, 2021 CQI

minutes from Tucson stated that "our biggest obstacle currently is lack of RNs to run the

nurse lines and see the patients. Staffing is 51% and most of our RNs end up running pill

lines." Ex. 853 at ADCRR00137035.

777.    Insulin delivery at Tucson's Winchester Unit was delayed multiple times in

February 2021 possibly due to inadequate staffing. Gann TT at 2369:13-2370:23. Staff

reported that medication pass was delayed and insulin not given until after 11 a.m.—hours

after morning insulin should be provided to diabetic patients—on a day when only one

LPN was present. Ex. 2074 at ADCRR00075935.

778.    "Pre-pouring" is when medications are taken from blister packs and put into

envelopes labeled with the patients' names for delivery; it is typically done to save time,

or due to inadequate staffing, laziness, or poor culture. Gann TT at 2371:13-2372:1.

Defendant Gann admitted that pre-pouring medications is a problem, because it means the

-255-

LPN delivering medication is practicing beyond their scope of licensure (removal from the blister back and placing in an envelope constitutes pharmaceutical dispensing); it is also a problem because it can lead to errors and mistaken delivery. *Id.* at 2373:25-2374:8. Defendant Gann identified pre-pouring as a problem at Lewis, Eyman, and Yuma. *Id.* at 2372:2-12. It took over a year for corrective directives to go into effect because "[i]t wasn't easy to change the culture nor the logistics of the facility." *Id.* at 2372:13-16.

779. Defendants' failure to ensure timely and consistent medication places patients at substantial risk of serious harm, including needless pain and suffering from cancer and other untreated illnesses, psychological pain and mental deterioration, and self-mutilation or suicide. Wilcox WT, Doc. 4138 ¶¶ 359-362; *see generally* Stewart WT, Doc. 4109 ¶¶ 128-156; Exs. 375, 376 at ADCM1584789-92; *see also supra* ¶¶ 429-430, 432-439.

780. The Court finds that Defendants' failure to provide consistent and timely access to prescription medications exposes Plaintiffs to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

### B. Medical Records Are Incomplete, Inaccurate, and Difficult to Review

781. Accurate and complete medical records are essential to adequate medical care. Poor medical recordkeeping makes it very difficult to determine medical histories and provide adequate care. Wilcox WT, Doc. 4138 ¶ 469.

782. Defendants' medical records system is currently inadequate, and it has been so for years. Wilcox WT, Doc. 4138 ¶ 469; *see also* Ex. 1842 at PRSN-TRW 00047; Ex. 1669 at 30.

783. The Court finds that Defendants' failure to maintain a functional, accurate, and complete medical records system, as described below, exposes Plaintiffs to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

### 1. ADCRR's electronic system is a barrier to care because it makes it very difficult for health care staff to review and compare critical information.

784. The medical record system used by the ADCRR, the Electronic Offender Management Information System (eOMIS), is a barrier to providing adequate care to patients. eOMIS makes it very difficult to get a complete view of patients' medical conditions because the data in the record is poorly organized and presented. Wilcox WT, Doc. 4138 ¶ 489. *See also* Wu Dep. at 50:6-8 (eOMIS is "very difficult to navigate" for some providers).

785. Defendants' expert Dr. Murray testified that the eOMIS system prevents nurses and providers from easily accessing information about their patients. Murray TT at 3507:17-20. The record makes it difficult to determine whether a certain action has been taken or not. *Id.* at 3507:21-25. It lacks safeguards to ensure that all the necessary information is included in the chart. *Id.* at 3508:11-25. It does not permit clinicians to easily determine trends, which help to understand whether the patient's treatment is effective or needs to be changed. *Id.* at 3509:1-16; *see also* Wilcox WT, Doc. 4138 ¶¶ 490, 492.

786. Centurion's national Executive Vice President/Chief Clinical Officer, Dr. Wu, acknowledges that, because of the problems with eOMIS, providers may not be able to access patient records for treatment purposes, and providers may not be able to communicate coherently with other providers to prevent treatment errors. Wu Dep. at 50:13-24.

787. Dr. Murray agrees that ADCRR's electronic health record should be replaced because eOMIS has "lived its useful life." Murray TT at 3459:20-21. Defendant Gann admitted that eOMIS is "completely inadequate." Ex. 2067 at 112:3.

788. In short, Defendants' medical record is an impediment to the timely and efficient care of patients. Murray TT at 3508:1-5.

155617523.3

### 2. Medical records are incomplete and contain inaccurate information.

789. In addition to having a deficient electronic medical record, ADCRR has poor health care documentation practices that harm patients and place them at risk of harm.

790. The clinicians' notes are cursory, incomplete, sometimes contradictory and insufficient to facilitate adequate health care. Wilcox WT, Doc. 4138 ¶ 473. Medical staff often simply click boxes and enter 1-2 lines of text. *Id.* This practice is particularly disruptive and dangerous in ADCRR because responsibility for a single patient is episodic and dispersed among many RNs, NPs, and other medical staff, with minimal or no physician- or provider-level oversight or encounters or longitudinal planning. *Id.* Thus, health care staff are forced to rely on the little information about a patient entered across the electronic medical record, which provides an incomplete and, in some cases, inaccurate view of the patient and their needs. *Id.*

791. Dr. Stewart, for example, identified multiple patients with mental illness whose medical records did not provide sufficient documentation explaining why diagnoses or medications were changed. *See* Stewart WT, Doc. 4109-1 Ex. 2 at 11, 16-21, 23-24, 38, 42-44. He also described people at risk of harm, and also deaths by suicide that occurred after medical, mental health, and psychiatry staff did not collaborate and apparently were unable to engage in multidisciplinary treatment planning, or review what one another was doing. Stewart WT, Doc. 4109 ¶¶ 78-88.

792. Providers fail to list differential diagnoses, as described *supra* ¶¶ 650-670, which means the next staff person who sees the patient cannot continue evaluation and care in a logical and efficient manner. Wilcox WT, Doc. 4138 ¶ 474.

793. Defendants' expert Dr. Murray agrees with Dr. Wilcox that the quality of notes makes it difficult to figure out the clinician's thought processes for some clinical decisions. Murray TT at 3508:6-9.

-258-

794.    The problem is exacerbated by records that are scanned in the wrong place or not scanned at all, and chronic care encounter notes that do little more than simply list the patient's chronic conditions. Wilcox WT, Doc. 4138 ¶ 471.

795.    Defendants themselves repeatedly have identified this problem, and yet the problem persists. *See, e.g.*, Ex. 175 at ADCM1651465 ("[a]nother major concern in this [mortality review] is in documentation"); Ex. 252 at ADCM1615630 ("following the patients' course in the electronic health record is cumbersome and difficult"); Ex. 340 at ADCM1623212 ("[m]edical record documentation very confusing"); Ex. 323 at ADCM1603927 (mortality review unable "to determine if care met community standards, based upon lack of documentation in the medical record"); Ex. 515 at ADCRR0012721 (critical records not scanned timely or not legible).

796.    When Dr. Stallcup joined ADCRR in August 2020, she found that the notes written in eOMIS by mental health clinicians were "very sparse." This was a systemwide problem, not limited to particular facilities. Stallcup TT at 2551:12-2553:9.

797.    One of Dr. Penn's psychiatric reviewers noted that "documentation is poor" in the patient's record. Penn TT at 3141:20-3142:35; Ex. 2262 at ADCRR00232609 (Patient 252). In another case, Dr. Penn's reviewer noted that although the patient had been admitted in 2006, the medical record goes back only to January 2020; "limited documentation available." Penn TT at 3142:23-3143:7; Ex. 2262 at ADCRR00232613 (Patient 271).

798.    There is a substantial risk that health care staff will make poor or dangerous decisions based on inaccurate, incomplete, and confusing information in patients' medical records, including through ordering unnecessary and invasive tests. Wilcox WT, Doc. 4138 ¶ 472.

### 3.    Current health problems and conditions are not accurately documented.

799.    Health care staff fail to keep the list of "Current Health Problem/ Conditions" accurate and up-to-date. Wilcox WT, Doc. 4138 ¶ 478.

-259-

800.    Defendants are aware of this problem as they repeatedly have identified it in their mortality reviews. Ex. 143 at ADCM1608405 (Addison's Disease diagnosis not documented); Ex. 174 at ADCM1608413 (inadequately updated problem list); Ex. 175 at ADCM1651465 (problem list omits cancer); Ex. 360 at ADCRRM0019663-64 (problem list omitted cancer); Ex. 433 at ADCRRM0026245 (problem list omitted asthma and obesity).

801.    Failure to list a patient's current health problems and conditions leads to treatment errors, including in the case of a patient with a lung mass who was diagnosed at the hospital with sarcoidosis (an inflammatory lung disease). Because his health record was never updated, he was sent to the hospital six months later for another evaluation and underwent an unnecessary and invasive procedure. Wilcox WT, Doc. 4138 ¶¶ 302-304.

### 4.    Medical scores do not reflect patients' conditions.

802.    A medical classification system, if used properly, makes it easier to manage a health care system and estimate demand for care. Wilcox WT, Doc. 4138 ¶ 483. It is useful for, among other things, determining how many physician-level positions should be allocated and determining which patients must be seen regularly by a physician (as opposed to a mid-level). *Id.*

803.    ADCRR's medical score system requires that practitioners "assign accurate medical scores to all inmates," and that the score "will be updated whenever there is a change in the inmate's medical condition that warrants a change in their medical score." Ex. 1305 at Ch. 7, Sec. 9. The scores are from 1 to 5, with 1 being for people with no special physical requirements, and 5 being severely limited, requiring housing in an inpatient or assisted living setting. Wilcox WT, Doc. 4138 ¶ 484.

804.    ADCRR's medical score system is useless because the scores assigned to patients have little basis in reality. Wilcox WT, Doc. 4138 ¶¶ 485, 487. For example, Named Plaintiff Kendall Johnson, who is a full-time wheelchair user and is unable to walk, bathe, feed herself, or perform other basic activities of daily living due to her advanced Multiple Sclerosis, has a medical score of 3. *Id.* ¶ 488.

155617523.3

805.   Many of the patients who died whose records Dr. Wilcox reviewed had scores of 1 or 2 at the time of their death, which did not accurately describe their medical conditions at that time. Wilcox WT, Doc 4167 ¶ 487; Ex. 1266; *see also* Ex. 428 at ADCM1575254 (patient with colon cancer scored as 2, when he should have been 5).

806.   Patients housed in the infirmaries are also often inaccurately classified with medical scores of 1 or 2. Wilcox WT, Doc. 4138 ¶ 487; *see also* Exs. 1267-1270.

### 5.   People in ADCRR custody are wrongly barred from knowing their own health care information.

807.   Patients have a right to know about their own health care and treatment plan. Wilcox WT, Doc. 4138 ¶ 495. In the community, individuals have a legal and enforceable right to see and receive copies of the information in their medical records just by requesting it. *Id.*

808.   The Health Insurance Portability and Accountability Act of 1996 (HIPAA) provides that patients have a right of timely access to inspect and obtain a copy of certain medical information. 45 C.F.R. § 164.524.[133]

809.   Providing patients with full and complete information about their medical condition(s) and treatment plan supports quality control within the health care system. Wilcox WT, Doc. 4138 ¶ 495.[134]

---

[133] Although there is a limited exception where "an inmate's request to obtain a copy of protected health information . . . would jeopardize the health, safety, security, custody, or rehabilitation of the individual or of other inmates, or the safety of any officer, employee, or other person at the correctional institution or responsible for the transporting of the inmate" (*id.* § 164.524(a)(2)(ii)), this narrow exception cannot support an absolute bar on providing incarcerated patients with copies of their records. *See* Ex. 1325 at 3.

[134] *See* U.S. Dep't of Health & Human Services, Individuals' Right under HIPAA to Access their Health Information 45 CFR § 164.524 (Jan. 31, 2020), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/access/index.html ("Providing individuals with easy access to their health information empowers them to be more in control of decisions regarding their health and well-being. For example, individuals with access to their health information are better able to monitor chronic conditions, adhere to treatment plans, find and fix errors in their health records, track progress in wellness or disease management programs, and directly contribute their information to research.").

810. Defendants fail to ensure that patients have access to basic information about their own health care. Wilcox WT, Doc. 4138 ¶ 495. Providers refuse to tell them about their health care and do not discuss test results with them. *Id.* ¶ 496.

811. As shown below, Centurion's forms explicitly direct specialty consultants to withhold treatment information from the patient:

## centurion.

### Practitioner Consultation Report

| Auth #: | | Date of Service: | |
|---|---|---|---|
| Patient: | Inmate ID: | | DOB: |
| Facility: ASPC LEWIS | SERVICE TYPE: | | Phone: 623-386-6160 |
| Practitioner: | | | Location: |

*** See Attached Consultation Request for Health Services Authorized***

For security reasons inmates must NOT be informed of recommended treatment or possible hospitalization. Due to security considerations, all recommended tests and treatments are to be scheduled by Centurion.

THIS IS A PRISONER WITH THE ARIZONA STATE PRISON LEWIS COMPLEX.

**FOR SECURITY REASONS THIS INMATE IS NOT TO SEE, OVERHEAR,**

**OR BE TOLD OF ANY MEDICATIONS OR FOLLOW-UP APPOINTMENT DATES OR TIMES.**

PLEASE SEAL ALL INFORMATION IN THIS ENVELOPE AND GIVE TO THE TRANSPORTATION OFFICER.

THANKS-

ASPC LEWIS CLINICAL COORDINATOR

*See* Ex. 945 at ADCRR00200874, 200876.

812. Patients have a right to know and participate in their care as well as to refuse care. If specialists cannot talk to the patient about the care they need to receive, then

patients cannot reasonably or competently consent to future care. Wilcox WT, Doc. 4138 ¶ 503.

813. Defendants also impede patients from viewing and obtaining copies of their own medical record. Wilcox WT, Doc. 4138 ¶ 497. Department Order 1104, Inmate Medical Records, outlines the process by which patients can view their medical records: they must submit a written request, may only review records "once per quarter", and only for "a maximum of 45 minutes." Ex. 1325 at 3. Patients are "allowed to make handwritten notes during the review" but not to obtain copies of their medical record unless they are acting as their own attorney in a lawsuit, pursuant to a filed discovery request, where the Attorney General's office has not objected to the document production. *Id.* Even then, non-indigent patients are charged 50 cents per page. *Id.* This is a considerable sum for most incarcerated people, who if they are able to work a prison job, are guaranteed a minimum wage of only 10 to 25 cents an hour.[135]

814. This is not sufficient access. Wilcox WT, Doc. 4138 ¶ 498. It is very time-consuming and difficult to review, much less take handwritten notes of, a medical record, particularly one as poorly maintained and scattered as those in the ADCRR. *Id.*

815. Under the Stipulation, providers had a very narrow obligation to communicate the results of patients' diagnostic tests, upon the patient's request.[136] Defendants failed to consistently comply even with that quite limited provision. Ex. 1261 (summarizing PM 47 scores from January-July 2021). Seven of the ten prisons failed to

---

[135] *See* Department Order 903 (Inmate Work Activities) (Eff. Dec. 3, 2021) *available at* https://corrections.az.gov/sites/default/files/policies/900/0903_120321.pdf, at § 2.3.1 (incarcerated workers' "pay rate shall remain .10 cents per hour until functional literacy is earned or exempted…"); § 2.3.1.2 (people enrolled in correctional technical educational programs "shall earn .15 cents per hour"); § 2.5.1 (functionally illiterate prisoners "shall be paid the lowest wage (.10 cents) in a pay grade for the work performed, regardless of earned incentive phase level or performance pay enhancement criteria met, until the applicable Department literacy standards is met.") (citing A.R.S. § 31-229); *see also id.* Attachment A (Pay Scale).

[136] Performance Measure 47 required providers to "communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request." Doc. 1185-1 at 11.

155617523.3

1  meet the 85% benchmark at least once in the first seven months of 2021, and Tucson met

2  the benchmark only one of those months. *Id.*[137]

3  **C.**  **Defendants' Failure to Provide Adequate Language Interpretation in**
          **Health Care Encounters to Prisoners Not Fluent in English Puts Them**
4         **at Substantial Risk of Serious Harm**

5      816.  Effective communication between patients and health care staff is a

6  fundamental component of providing adequate medical and mental health care. *See*

7  Stewart WT, Doc. 4109 ¶ 89; Stewart TT at 481:7-16; Wilcox WT, Doc. 4138 ¶ 442;

8  Stallcup TT at 2577:1-5; Phillips TT at 3636:3-9. "Patients must be able to answer

9  questions, fully and accurately describe their symptoms and concerns, and understand

10 information about their medical conditions, treatment options, and treatment plans,

11 including those related to medication administration and dangerous side-effects." Wilcox

12 WT, Doc. 4138 ¶ 442.

13     817.  Defendants' failure to provide language interpretation during health care

14 encounters places patients not fluent in English at substantial risk of serious harm. *See*

15 Stewart WT, Doc. 4109 ¶¶ 89, 93, 96 (discussing importance of language to mental health

16 provider evaluating severity of symptoms, including for "those patients with suicidal or

17 homicidal thoughts, or people experiencing auditory or visual hallucinations"); Stewart

18 TT at 606:25-607:25; Wilcox WT, Doc. 4138 ¶ 454; *see also* Doc. 3921 at 32 (order

19 finding that failure to provide language interpretation services during health care

20 encounters "may have led to a medical condition going undiagnosed and untreated").

21     818.  This is not a new issue. As the Court has noted, under Paragraph 14 of the

22 Stipulation, "Plaintiffs were promised . . . language interpretation services at every health

23 care encounter; Defendants opted not to provide such services." Doc. 3921 at 31; *see*

24 Ex. 1849 at 6 ("For prisoners who are not fluent in English, language interpretation for

25 _____

26  [137] Defendants' failures with PM 47 are not a recent development. The Court's first
     contempt order of June 2018 found that "Defendants did not introduce any evidence to the
27  Court about specific efforts" to bring the measure into compliance. *Parsons v. Ryan*, 2018
     WL 3239691 at *10 (D. Ariz. June 22, 2018) (finding Defendants in contempt and fining
28  them for noncompliance with PM 47 at five prisons), *aff'd Parsons v. Ryan* ("*Parsons*
     *III*"), 949 F.3d 443 (9th Cir. 2020). Doc. 2898 at 19.

-264-

health care encounters shall be provided by a qualified health care practitioner who is proficient in the prisoner's language, or by a language line interpretation service."). In 2016, the Court granted Plaintiffs' motion to enforce the Stipulation in part regarding Defendants' failure to monitor and document compliance with Paragraph 14. Doc. 1673 at 1-2, 8. In 2020, Dr. Stewart described numerous problematic mental health encounters between clinicians and class members who did not speak English fluently—either monolingual Spanish speakers, or Deaf people who communicate using American Sign Language (ASL) or other systems of sign language. Stewart WT, Doc. 4109 ¶ 94 (citing Ex. 1879 (Doc. 3626) ¶¶ 14-16, 18, 24-28).

819. On February 24, 2021, the Court found that Defendants failed to provide language interpretation to patients not fluent in English as required by the Stipulation and ordered Defendants to submit a compliance plan within 30 days. Doc. 3861 at 11-12.

820. Nonetheless, Defendants did not develop or implement policies and procedures to remedy their systemic failures in the provision of language interpretation, and the risk of harm persists.

**1. Defendants do not properly identify which class members require language interpretation and do not consistently provide interpretation during health care encounters**

821. Defendants do not have a reliable system in place to identify which patients need language interpretation during health care encounters. Wilcox WT, Doc. 4138 ¶¶ 446-453; Stewart WT, Doc. 4109 ¶ 95 (Dr. Stewart testifying that "almost eight years after my report detailed why not providing interpretation for mental health services was deeply problematic, the Department continues to not have a system in place to identify and track class members who require an interpreter in health care encounters, nor does it track which staff are bilingual. That is simply unacceptable.").

822. In fact, Defendants admit that they do not have "*any* written policies or procedures for identifying incarcerated persons who are not fluent in English, their primary language, and/or their need for an interpreter." Ex. 1976, RFA Number 3

(capitalization removed, emphasis added); *see also* Stewart WT, Doc. 4109 ¶ 95; Wilcox WT, Doc. 4138 ¶ 445.

823.    This is true even though the Court previously ordered Defendants to develop a plan that, "at a minimum, explain[s] how class members who are not fluent in English will be identified[.]" Doc. 3861 at 12.

824.    In the absence of such a plan, whether or not a patient is provided an interpreter at any given health care encounter comes down to a roll of the dice, determined by individual health care staff who lack any objective criteria to guide their decision. Not surprisingly, without clear direction or guidance, different staff come to different conclusions for the same patient.

825.    Named Plaintiff Laura Redmond is a good example. Ms. Redmond became deaf when she was 15 months old and is profoundly deaf in both ears. Trial Testimony of Laura Redmond ("Redmond TT") at 317:22-23, 318:9-10. Her hearing aid allows her to hear only environmental noises, not discern speech, and her primary language is ASL. *Id.* at 318:7-24, 319:8-9. She is diagnosed with schizophrenia, bipolar disorder, and post-traumatic stress disorder, and is classified by ADCRR as SMI. *Id.* at 320:25-321:3, 321:25-322:8. She also has serious medical conditions, including a seizure disorder, asthma, hepatitis C, and swelling in her head/eye as a result of a head injury. *Id.* at 328:11-25. She requires a sign language interpreter for her medical and mental health appointments.

826.    Although she has been provided a sign language interpreter on occasion, Ms. Redmond is not provided an interpreter on a consistent basis for all of her medical and mental health encounters. Wilcox WT, Doc. 4138 ¶ 452. In fact, only three of the 20 health care entries that appear in Ms. Redmond's medical record between August 14, 2021, and October 14, 2021, recognized that she requires interpretation services.[138] The

---

[138] *See* Ex. 934 at PLTFS005551-58 (nurse sick call on 10/14/21); *id.* at PLTFS005521-27 (mental health mid-level on 9/22/21); *id.* at PLTFS005468-472 (mental health non-clinical contact note on 8/26/21).

155617523.3

remaining 17 (85%), including mental health counseling appointments, encounters with medical providers, and encounters with nurses, stated that interpretation services were *not* needed.[139]

827. On August 26, 2021, a psychologist wrote: "it appears that not all staff are aware of IM's [inmate's] level of hearing impairment and/or . . . are unaware of, Centurion staff access to ASL interpreter." Ex. 934 at PLTFS005468. Nonetheless, the very next day, Ms. Redmond was not provided with an interpreter during a health care encounter, *see id.* at PLTFS005493; nor was she provided an interpreter during a mental health counseling appointment the following month. *Id.* at PLTFS005514.[140]

828. This problem is not unique to Ms. Redmond. Another Deaf patient had four health care encounters between September and October 15, 2021. Ex. 933 at 0933-0001. During two of those encounters, health care staff documented that interpreter services were needed. *See id.* at 0933-0003-07 (9/7/21) ("Interpreter Haley from Language Line for ASL. I/M responded well and was very appreciative."); *id.* at 0933-0015 (10/10/21). During the other two encounters, however, health care staff inexplicably wrote that

---

[139] *See* Ex. 934 at PLTFS005544-550 (mental health individual counseling on 10/12/21); *id.* at PTFS005539-543 (provider follow-up care on 9/30/21); *id.* at PLTFS005534-38 (provider follow-up care on 9/30/21); PLTFS005528-533 (provider follow-up care on 9/23/21); *id.* at PLTFS005514-520 (mental health individual counseling on 9/22/21); *id.* at PLTFS005506-513 (nurse sick call on 9/12/21); *id.* at PLTFS005499-5505 (mental health individual counseling on 8/31/21); *id.* at PLTFS005493-98 (provider follow-up care on 8/21/21); *id.* at PLTFS005488-492 (nurse treatment call on 8/27/21); *id.* at PLTFS005480-87 (nurse sick call on 8/26/21); *id.* at PLTFS005473-79 (nurse return from offsite on 8/26/21); *id.* at PLTFS005461-67 (mental health mid-level on 8/26/21); *id.* at PLTFS005453-460 (nurse sick call on 8/25/21); *id.* at PLTFS005448-452 (provider follow-up care on 8/20/21); *id.* at PLTFS005440-47 (nurse sick call on 8/20/21); *id.* at PLTFS005435-39 (nurse treatment call on 8/19/21); *id.* at PLTFS005429-434 (dental encounter on 8/19/21).

[140] Defendants previously represented that they would create "a demographic banner field [in the medical record] that will display whether an inmate requires interpretation services." Ex. 1972 at 3. But there are no written policies about that field and, in practice, it has not resolved the problem and only resulted in continued inconsistency. For example, the banner for Ms. Redmond on October 14, 2021, stated that she requires an interpreter, but the banner on October 9 and 18, 2021, said that she does not. Wilcox WT, Doc. 4138 ¶¶ 450-51 & App. F. There is no explanation in her record for these changes. *Id.* ¶ 451.

interpreter services were *not* needed. *See id.* at 0933-0009 (9/12/21); *id.* at 0933-0012 (9/14/21).

829.    Medical records for other Deaf patients show similar inconsistencies, with health care staff recognizing the need for an interpreter at one encounter but not another, without explanation. *Compare* Ex. 922 at 0047-48 ("Deaf, uses interpreter") (nurse sick call), *with id.* at 0922-0016 ("THIS PT IS DEAF, SO TW GESTURED TO THE PT ASKING IF HE WAS OK, AND PT GAVE THE OK SIGN") (mental health and welfare rounds); *compare* Ex. 919 at 0919-0058, *with id.* at 0919-0081; *compare* Ex. 925 at 0925-0018, *with id.* at 0925-0024.

830.    Even when Ms. Redmond expressly requested an interpreter, she was not provided one. In July 2021, Ms. Redmond submitted an HNR explaining that she was not able to understand what her provider said during a health care encounter because there was no interpreter. Ex. 2391; Ex. 934 at PLTFS005559. Remarkably, when she was seen in response to that HNR a week later, health care staff still did not provide her with a sign language interpreter and instead wrote: "Pt was able to read my lips and hear me through my mask as well when I talked louder." Ex. 5454 at 5454-00209.

831.    In fact, Ms. Redmond's health record shows that some health care staff believe that does not require an interpreter because she can read lips. Wilcox WT, Doc. 4138 ¶¶ 455-459; *see, e.g.*, Ex. 5454 at 5454-00141. But other health care staff noted that Ms. Redmond has stated that she cannot read lips. *See, e.g.*, Ex. 5454 at 5454-00217 ("states she has difficulty reading lips").

832.    The assumption that a Deaf patient can read lips also is not unique to Ms. Redmond. Health care staff wrote in the medical record for another Deaf class member that the class member requested a language interpreter, but that one was not provided, because "he can read lips and will communicate by writing as well." Ex. 923 at 0923-0017-020.

833.    Lipreading alone is insufficient to ensure effective communication during health care encounters. Wilcox WT, Doc. 4138 ¶ 460. Lipreading is inadequate and

-268-

unreliable, particularly in a health care setting involving complex medical vocabulary. *Id.* Lipreading can lead to misunderstandings, as both the person talking and the person lipreading often think the communication is more successful than it actually is. *Id.* The patient is in the best position to determine their disability and language needs so that they can fully participate in a health care encounter; if they request a sign language interpreter, one should be provided. *Id.*

834. Similarly, written notes are not an equivalent alternative for encounters with Deaf patients, because staff often will write more limited versions of what they would normally verbalize to a hearing patient; thus less information is conveyed via notes. Stewart TT at 485:20-486:12; Stewart WT, Doc. 4109 ¶¶ 101-02; Wilcox WT, Doc. 4138 ¶ 467 n.29. Using written notes for health care encounters also assumes that the Deaf patient is fluent in written English, but ASL is a completely different language than English; Dr. Stewart testified that

> [a]sking a Deaf person experiencing mental health issues to write in a language they are not fluent in is unreliable and totally puts the burden of achieving effective communication on the patient. These people are already burdened enough by being incarcerated, and by being in a setting where they are completely isolated from meaningful human interaction due to their disability, and it is absurd to expect that they will be able to meaningfully engage with treatment staff without interpretation.

Stewart WT, Doc. 4109 ¶ 103.[141]

835. And the problem is not limited to Deaf patients. Dr. Stewart, who is fluent in Spanish, testified that he seeks out monolingual Spanish speakers with mental health diagnoses to interview when visiting ADCRR prisons because during his past visits, such patients "reported that they were unable to have meaningful mental health encounters with

---

[141] *See also* Stewart WT, Doc. 4109 ¶ 99 ("A head-shake, "thumbs up," "thumbs down," or finger-spelling simply is inadequate to assess if a person is suicidal. With regard to written notes, given that English is not the first language of most Deaf people, and many if not most have limited reading / writing skills in English, this is patently inadequate for mental health staff to determine if patients exhibit possible signs and symptoms of a serious mental or medical condition and to provide patient education to a patient.").

staff due to language barriers. . . . They often report suicidal thoughts or auditory or visual hallucinations, but when I review their medical charts, there is nothing recorded that reflects that. This is of significant concern." Stewart WT, Doc. 4109 ¶ 92.

836. Dr. Stewart reviewed the medical records of an extremely mentally ill man at Phoenix's inpatient mental health unit who was mostly catatonic but only seemed to respond to questions Dr. Stewart directed towards him in Spanish. Dr. Stewart found no indication in the patient's records that mental health staff had ever attempted to communicate with him in Spanish or use an interpreter for their encounters. Stewart WT, Doc. 4109 ¶¶ 109-111; Stewart TT at 605:11-20, 606:8-13.

837. It is extremely problematic that patients classified as SMI, like this patient at the inpatient mental health facility and Named Plaintiff Redmond, are not consistently provided interpreters for their mental health encounters with clinicians and prescribing providers. Accurate mental health diagnosis and effective mental health treatment require accurate communication between the patient and the provider. The patient must be able to describe their emotional or cognitive state, and the provider must be able to observe often subtle cues in the patient's speech. Ex. 1644 at 49. A mental health provider must make nuanced assessments, such as whether a patient is paranoid or attending to internal stimuli, and whether the patient's thoughts are tangential. *Id*. at 51. People experiencing severe depression, anxiety, and suicidal ideation have clear differences in the way that they communicate, both in terms of substance and style. Stewart WT, Doc. 4109 ¶ 93. The mental health provider needs to evaluate the severity of the symptoms and pick up on the nuances and subtleties of both the words the patient uses as well as how the statements are conveyed. *Id*.; *see also* Ex. 1879 ¶¶ 29-34 (Dr. Stewart describing Defendants' failure in 2019 and 2020 to provide any sort of group mental health programming or therapy with interpretation services, or in special groups for people who do not speak English).

838. Through this litigation, Defendants have been on notice of these specific problems for years. *See, e.g.*, Ex. 1878 at 7 ("D/deaf class members uniformly report that a sign language interpreter was not provided for health care encounters.") (citing class

member declarations); *id.* at 10 ("Defendants do not accurately document whether a class member is not fluent in English and therefore requires an interpreter for health care encounters. . . . In some cases, medical staff improperly state that a class member who is not fluent in English does *not* need an interpreter for a specific encounter. And a single class member can have inconsistent entries; some encounters state that the class member needs an interpreter, and other encounters state that the same class member does not need an interpreter.") (parenthetical omitted); *id.* at 12 ("monolingual Spanish speaking class members are incorrectly listed as not requiring interpreter services for healthcare encounters").

839. And, through this litigation, Defendants have been on notice of the inadequacies of lipreading and written notes, including through the expert testimony of a professor of ASL that:

> "Lipreading raises several concerns regarding low accuracy, and it is usually not enough on its own to effectively communicate, particularly in settings like a medical encounter."

> "[B]oth the person doing the talking and the person doing the lipreading usually think that communication is more successful than it actually is, which leads to both frustration and misunderstandings."

> "The average deaf lipreader will catch approximately 30% of what is on the mouth (and typically that speech is predictable and highly routinized, like: What's your name? What's your address?, etc.). Most speech is occluded from sight."

> "Except in highly exceptional cases, lipreading should not be relied upon for anything other than very superficial communication such as basic needs: Where is the restroom? What's your name? Anything more risks taking away the Deaf person's ability to fully and reliably communicate."

> "Even more troubling is when lipreading is required by virtue of a lack of access to any other alternative such as signing. Deaf people in this situation often feel forced to accept this as the only option. They may think they are understanding what is being said, but they have no way to know this for sure. And they have had a lifetime of experience that speaks to the unreliability of lipreading."

> "Medical professionals are no better than the members of general hearing community in assuming that lipreading is an effective form of communication when it often is not."

> "ASL has a different grammatical structure than English, so Deaf people who are trying to use English to write are usually unable to follow the same grammar as English."

> "When written communication is expected to be used as the primary form of communication, service providers tend to rush through and reduce how much they write, since the time needed for writing is much more labor intensive and time consuming than for a spoken language interchange. . . . One of the greatest obstacles is never knowing for sure if what one thinks they have understood was indeed the message; or worse, assuming one has understood something that was not the case. The simple fact that a Deaf person and a hearing person exchanged written notes does not mean that both parties necessarily fully understood each other."

Ex. 1940 at 7-9, 11-12; *see also* Ex. 1939 at 17 ("class members clearly explained in their declarations that they cannot understand a health care encounter by lipreading") (citing *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 276 (D.D.C. 2015) ("[I]t goes almost without saying that [defendant]'s argument that [plaintiff] could read lips because [defendant]'s employees believed that he could is a nonstarter; the [defendant] has not shown that its employees had any prior knowledge of, or had received any training about, communicating with deaf inmates.")); Ex. 1878 at 9 ("[M]any D/deaf people are not fluent in English—verbal or written. In fact, D/deaf class members reported that they did not understand English notes written by health care staff.") (citing class member declarations).

840. Defendants' steadfast failure to remedy this clear problem, notwithstanding the Court's previous order, is the epitome of deliberate indifference to a substantial risk of serious harm.

## 2. Defendants continue to permit unqualified staff to conduct encounters in non-English languages.

841. Since at least June 2020, Defendants have been on notice that health care staff who are not proficient in languages other than English fail to use interpretation services during encounters with patients who are not fluent in English and instead attempt

-272-

155617523.3

to conduct the encounter in the non-English language. *See, e.g.*, Ex. 1878 at 16-17 ("Spanish-speaking class members report that practitioners sometimes try to communicate with them in Spanish, but the staff member is not proficient in the language and therefore neither the patient nor health care staff is able to fully understand what is going on.") (citing class member declarations); Ex. 1939 at 25-27.

842.    Nonetheless, Defendants admitted at trial in November 2021 that, despite the Court's orders, and the Stipulation's requirements, they still do not evaluate staff proficiency in non-English languages. Jordan TT at 2651:7-12; Stallcup TT at 2577:6-9, 2585:12-22; Ex. 1976, RFA Number 10.

843.    And Defendants still allow health care staff who have not been determined to be proficient in a non-English language to conduct or serve as interpreters during health care encounters in those languages. Jordan TT at 2651:7-12; Stallcup TT at 2577:6-9, 2585:12-22; *see, e.g.*, Ex. 919 at 0919-0081 (documenting that health care staff provided interpreter services); Ex. 922 at 0047 (same); Ex. 925 at 0925-0018 (same). In fact, Dr. Jordan testified that the practice at Yuma is for nurses to conduct encounters in Spanish, even though they have not been evaluated and determined to be qualified to do so, instead of using certified interpreters through LanguageLine. Jordan TT at 2624:11-20.[142]

844.    The same problems identified in June 2020 can be seen in medical records over a year later. For example, an RN documented that "Healthcare Staff Used for Interpreter Services" for a July 2021 encounter with a patient who, the RN wrote, "speaks Spanish and minimal English." Ex. 928 at 0928-0001. It appears the RN was not in fact proficient in Spanish, however, as she wrote in that same record: "Used google translation for interpretation of questions and responses," and documented the following in the

---

[142] This contradicts Defendants' assurance to the Court that "[w]hile Paragraph 14 [of the Stipulation] permits interpretation services to be provided by a qualified health care practitioner who is proficient in the prisoner's language, training will direct that *primary emphasis shall be placed on use of LanguageLine Solutions* and AmWell platform video interpretation services." Ex. 1972 at 5 (emphasis added, internal parentheticals omitted).

155617523.3

Assessment Notes: "Alteration in communication with anxiety r/t language barrier." *Id.* at 0928-0001-02.

845.    Google Translate is not an adequate substitution for a language interpreter during a health care encounter. Wilcox WT, Doc. 4138 ¶ 463.

846.    And in June 2021, an RN documented that "Healthcare Staff Used for Interpreter Services" for a June 2021 encounter with another patient. Ex. 922 at 0922-0041. The RN later documented, however, in the same medical record entry: "Patient is deaf, but he can read lips," making it unclear whether the encounter was in fact conducted in sign language. *Id.* at 0922-0042.

847.    Allowing unqualified health care staff to conduct or provide interpreter services during health care encounters in non-English languages places patients not fluent in English at substantial risk of serious harm.

### 3.    Defendants lack an accurate way to monitor whether language interpretation was provided.

848.    Defendants do not have a reliable system in place to document whether language interpretation was provided to a patient during a health care encounter. *See* Wilcox WT, Doc. 4138 ¶¶ 464-68. This has been a problem since at least 2016. *See* Ex. 1878 at 4-7 (reciting procedural history dating to Plaintiffs' July 2016 enforcement motion (Doc. 1625) describing Defendants' refusal "to monitor and document compliance" with Paragraph 14 of the Stipulation); Doc. 1673 at 2, 8 (holding that "Plaintiffs are entitled to timely data demonstrating Defendants' compliance" with Paragraph 14 and ordering Defendants to "propose a reporting procedure to demonstrate compliance" with the language interpretation requirement).

849.    For each health care encounter, staff must answer, "Are interpreter services needed for this inmate?" Ex. 1972 at 8-9. If they answer "Yes," staff must then answer, "What type of interpreter services were used for the encounter?" *Id.* Staff have only three options they can select from a drop-down menu in the medical record:

- LanguageLine,

1              • Healthcare Staff Used for Interpreter Services, and

2              • Inmate Refused Interpreter Services.

3    *Id.* at 9; *see also* Stallcup TT at 2584:25-2585:9.

4              850.    This system is flawed.[143] First, the pre-set, drop-down selections allow staff

5    to document only compliance, and not noncompliance, because there is no option for staff

6    to record when interpretation services were not available or when they improperly used

7    custody staff or other incarcerated people to interpret. *See* Ex. 2398 (custody staff used to

8    interpret for mental health encounter); Ex. 2403, p. 3; Penn TT at 3255:12-3256:11 (Dr.

9    Penn told by officer at Tucson that custody staff can interpret for health care

10   encounters).[144]

11             851.    This problem can be seen in the medical records. For example, a Nurse

12   Practitioner ("NP") documented that "Language Line" was used during an encounter with

13   a Deaf patient in June 2021. Ex. 936 at 0936-0001. In fact, however, Language Line was

14   not used; the NP documented elsewhere on that same medical record entry: "(sign

15   language line tried no one came on line/ answered from the sign language site,)

16   communicated with IM by writing her questions and written answer." *Id.*; *see also*

17   Ex. 5454 at 5454-00111 (RN documented in record of another Deaf patient that Language

18   Line was used, but also wrote: "Language line not working Pt agrees to read lips and go

19   forward with the visit."); Ex. 933 at 0933-0021 (Nursing Director documented in record

20   of another Deaf patient that Inmate Refused Interpreter Services, but also wrote: "IM IS

21   DEAF. UNABLE TO PULL UP ASL INTERPRETER").

22

23   ───────────────

24       [143] Although this problem is self-explanatory, Defendants also have been on
     specific notice of it through prior enforcement litigation. *See, e.g.*, Ex. 1878 at 13-16;
     Ex. 1939 at 8; Ex. 1968 at 3-4.

25       [144] It is not appropriate to use custody staff as interpreters during health care
     encounters. Stewart WT, Doc. 4109 ¶ 91; Stewart TT at 482:5-25; Jordan TT at 2649:24-
26   2650:19. Such use necessarily results in inappropriate disclosure of confidential patient
     health information and may cause patients to withhold important information from health
27   care staff. *Id.* For the same reasons, it is inappropriate to use incarcerated people as
     interpreters during health care encounters. Stewart WT, Doc. 4109 ¶ 91; Stewart TT at
28   483:3-10; Wilcox WT, Doc. 4138 ¶ 449; Jordan TT at 2650:20-24.

852.   In addition, a nurse documented that "Language Line" was used during an encounter with a Spanish-speaking patient in August 2021. Ex. 930 at 0930-0001. Later in that same medical record entry, however, the nurse wrote: "During encounter pt tried to explain that he once was taking a pill for his stomach and would like to take it again, but due to the language barrier and poor reception with the language line interpreter, we could not determine what medication the patient was referring to." *Id.*

853.   Second, it is impossible to tell, when health care staff is used for interpreter services, whether that staff was qualified to do so, because, as noted above, Defendants do not evaluate staff proficiency in non-English languages.

854.   Defendants' failure to address problems with their provision of health care to patients not fluent in English, coupled with their refusal to put in place a system to accurately track the issue going forward, even after multiple Court orders, evidences their continued deliberate indifference to a substantial risk of serious harm. *See* Phillips TT at 3636:10-13 (testifying as Rule 30(b)(6) designee that he does not know if Defendants track whether patients are provided interpretation services during health care encounters).

### 4.   Defendants' proffered evidence regarding language interpretation is not credible or reliable

855.   The only contrary evidence supplied by Defendants was from Dr. Penn. Dr. Penn's opinions regarding language interpretation were deeply flawed.

856.   Dr. Penn's opinion appears to be that Defendants have met any obligation because interpretation services are available through staff or Language Line. *See, e.g.*, Penn WT, Doc. 4172 ¶ 185 ("Mental health staff have access to professional interpreter and sign-language services. There is no failure to provide language interpretation during mental health treatment encounters for non-predominant English-speaking inmates and inmates with other disabilities."); *id.* ¶ 269 ("I disagree that ACDRR [sic] and Centurion failed to provide language interpretation in mental health treatment places [sic] to Non-English Speaking Class Members. Due to the availability of onsite staff who serve as

interpreters and the availability of professional interpreters via the language line, this does not place class members with disabilities at risk of harm.").

857.    But Plaintiffs do not dispute that the "widely accepted standard is for community and correctional healthcare providers to use translation/interpretation services if the healthcare provider is not proficient," Penn WT, Doc. 4172 ¶ 180, or that some healthcare staff "are fluent in Spanish." *Id.* ¶ 178. Rather, Plaintiffs offer undisputed evidence that, in practice, patients not fluent in English do not have a provider proficient in their primary language, and are do not have an interpreter during healthcare encounters. Indeed, Dr. Penn's own consulting psychiatrist identified this problem. *See* Penn TT at 3123:5-10, 3183:9-3184:13 (reviewer noted "health care request written in Spanish, yet most mental health meetings say no interpreter was used and do not state whether interview was conducted in Spanish"); Ex. 2262 at ADCRR00232597 (Patient 131).

858.    When faced with such evidence, Dr. Penn flip-flopped. For example, in his written testimony, Dr. Penn disputed Dr. Stewart's determination that several patients that Dr. Stewart had personally interviewed were monolingual Spanish speakers, and asserted broadly that "a review of these inmates' records evidences their ability to communicate in English." Penn WT, Doc. 4172 ¶ 184. But, during his oral testimony, Dr. Penn contradicted his previous opinion, stating that he in fact could *not* form an opinion as to a patient's language needs based on the medical record alone, and instead would need to talk with the patient. Penn TT at 3184:2-3186:11, 3189:24-3191:23.

859.    In addition, Dr. Penn testified that his opinion that patients identified by Dr. Stewart did not require an interpreter was based on his determination that allegedly "many of them were able to write in English" in an HNR. Penn TT at 3185:18-3186:18.[145] But, when shown an HNR submitted by one of the patients Dr. Stewart interviewed that was written in Spanish, Dr. Penn refused to apply his own methodology and instead

---

[145] However, Dr. Penn testified repeatedly that he did not take a single written note while reviewing medical records, so he could provide no basis to support his sweeping conclusory assertion. Penn TT at 3093:9-19, 3117:17-18, 3127:25-3128:3.

insisted that he could not tell if the patient himself had written the HNR (something that would also be true of HNRs written in English), *see* Penn TT at 3187:17-19 ("Q. So he wrote this HNR in Spanish? A. Well, we believe. I mean, I don't know what the inmate's handwriting style is. I am not a handwriting expert."), and said that he could not in fact determine from the HNR what the patient's language needs were. *See id.* at 3188:7-3189:9; Ex. 2223.

860. Finally, Dr. Penn stated that whether an interpreter is necessary "is dependent upon the nature and extent of the encounter." Penn WT, Doc. 4172 ¶ 175.[146] But he was unable to say whether an interpreter would be required for individual health care counseling, mental health groups, suicide watch checks, chronic care appointments, or other appointments with health care or mental health providers. Penn TT at 3180:8-3181:3. To conclude there were no problems with individual healthcare encounters, Dr. Penn simply referred to the opinions set forth in his previous declaration filed in support of Defendants' unsuccessful opposition to Plaintiffs' Paragraph 14 enforcement motion. *See* Penn WT, Doc. 4172 ¶ 172 (citing declaration as "extensive support for my professional opinion").[147] Dr. Penn again "concluded," without any evidence other than

---

[146] Dr. Penn attempted to support his opinion with NCCHC standards. Penn WT, Doc. 4172 ¶ 172. But as noted in the Conclusions of Law, those standards do not provide the operative legal framework. In addition, as Dr. Penn acknowledges, there are no NCCHC standards about language interpretation. Penn WT, Doc. 4172 ¶ 172. Instead, the discussion section of the NCCHC measures related to information on health services (P-E-01), receiving screening (P-E-02), and care for the terminally ill (P-F-07) note the importance of effective communication in a "language fully understood by the inmate" and the need to make arrangements for an interpreter. *See* Ex. 3304 at 3304-0104, 0107, 0141. But that in no way limits the need for an interpreter to those few contexts.

And critically, Dr. Penn did not appear aware of other standards governing provision of interpretation services during healthcare encounters. For example, he testified that he was not familiar with the U.S. Department of Justice Guidelines for Services to Limited English Proficiency Persons in Health Care Settings, or the requirements of the Americans with Disabilities Act. Penn TT at 3179:15-3180:7. And he dismissed contrary policies based on superficial and incorrect legal analysis. *Compare* Penn WT, Doc. 4172 ¶ 173 (dismissing court-ordered interpretation requirements for Orleans Parish Prison because they are "due to settlement agreements, and exceed[] the standard of care"), *with Jones v. Gusman*, 296 F.R.D. 416, 454, 469 (E.D. La. 2013) (holding that specific language interpretation policies were necessary for Orleans Parish Prison to meet minimum constitutional standards).

[147] Dr. Penn's previous declaration was not admitted as evidence at trial.

his own medical record review alone, "that the healthcare staff conducting the encounter was likely proficient in Spanish (and/or the inmate patient could also speak sufficient English)." *Id.* ¶ 179. But this Court already found this argument to be "specious." Doc. 3921 at 15. As the Court previously found in granting the motion to enforce Paragraph 14: "The Court does not doubt that some medical encounters proceeded despite language barriers. But there is no way to determine whether appropriate care was provided." Doc. 3861 at 12 n.10.

861.  For these reasons, the Court finds the opinions of Dr. Penn related to language interpretation to be unreliable and unpersuasive.

862.  The Court finds that Defendants' failure to provide adequate language interpretation in health care encounters to patients not fluent in English exposes class members to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

## D. Widespread, Ongoing Deficiencies in Health Care and Custody Staffing Put Class Members at Substantial Risk of Serious Harm

### 1. Medical staff shortages adversely affect patient care.

863.  Medical staffing shortages drive inadequate health treatment. Sufficient numbers of qualified medical health staff are the foundation of any minimally adequate correctional medical health care system. Wilcox WT, Doc. 4138 ¶ 6 ("At the core of these deficiencies has been a long-standing failure to provide enough competent clinical staff with the appropriate level of expertise to care for this population").

864.  Defendants' pervasive and longstanding failure to have adequate numbers of medical health care staff undermines the ability of providers and clinicians to provide minimally adequate medical health care services. Wilcox WT, Doc. 4138 ¶¶ 6, 10, 30-31, 151. The number of medical staff required by Defendants' contracts with their vendors, and the number of actually filled positions, is abysmally low.

865.  Many health care decisions are handled—by design—by registered nurses who often are practicing outside the scope of their licenses. Wilcox WT, Doc. 4138 ¶ 28;

*see also* Ex. 1860 at 113-115. The RNs function as gate-keepers to the providers and in doing so, function as providers themselves. Wilcox WT, Doc. 4138 ¶¶ 163, 165. This does not work. *See* Part IV, ¶¶ 607-612.

866. When patients are referred to a prison provider, it is almost always to a mid-level provider. Wilcox WT, Doc. 4138 ¶ 29.

867. The ratio of staff physicians to mid-level providers (*i.e.*, nurse practitioners and physician assistants) is about 1:7, and as of June, 2021, three prisons had no assigned staff physicians. Ex. 1606 at ADCRR00021949-76; Wilcox WT, Doc. 4138 ¶ 20. This reflects the pattern that Mr. Joy identified as "[o]ne of the more notable staffing disparities when compared to external data." Joy WT, Doc. 4099-1 at 85. "ADCRR uses APPs [Advanced Practice Providers] at rate nearly 13 times greater than the national ratio of physicians to APPs, both overall and in primary care specifically. The overall ADCRR APP to physician ratio compared to community practices in Arizona data is nearly 20 times higher than expected." *Id*. at 86.[148]

868. Further exacerbating the harm from Defendants' over-reliance on midlevel providers is the level of disease in a prison population, where some patients are so complex as to require primary care from a physician rather than a mid-level provider. Ex 1860 at 99; Wilcox WT, Doc. 4138 ¶ 221.

869. Mid-level providers miss, with alarming frequency, serious and urgent medical problems. Wilcox WT, Doc. 4138 ¶ 29.

870. Many patients have suffered harm and are at serious risk of harm because they receive care from mid-level providers who lack the expertise to treat the patient and/or are poorly supervised. Wilcox WT, Doc. 4138 ¶¶ 224-225.

871. Patient care also suffers because nurses routinely function outside the scope of their licenses and act as providers. Wilcox WT, Doc. 4138 ¶ 169.

---

[148] Advanced Practice Providers is another term for mid-level providers.

155617523.3

872. Without a sufficient number and type of properly qualified medical health staff, it is impossible to provide adequate medical treatment. Wilcox WT, Doc. 4138 ¶ 10.

873. Defendant Gann does not know how much overtime Centurion nursing staff are working, even though he has requested that information. Gann TT at 2360:13-17.

874. The management teams at six out of the ten prisons that Defendants' expert Dr. Murray toured in September 2021 reported nursing shortages to him. Murray TT at 3516:3-6. Dr. Murray did nothing to determine if or how these shortages were adversely affecting patient care. *Id.* at 3516:7-10.

875. Facility health care management teams also expressed concern to Dr. Murray about nursing vacancies in September 2021. Murray TT at 3513:15-18. At Perryville, only 50% of the Assistant Director of Nursing (ADON) positions were filled, and 14 out of 30 RN positions were unfilled. *Id.* at 3513:19-23; 3514:14-17. At Lewis, five out of six of the ADON positions were vacant. *Id.* at 3514:8-13. ADONs are important because they provide supervision of the nurses. *Id.* at 3514:5-7.

876. The Staffing Variance Report of August 2021 shows Eyman with only 110.85 of the 132.5 positions filled, including only three ADONs hired out of six required by the contract, 19.7 LPNs hired out of 30 required by the contract, 9.9 FTE RNs hired out of the 20 required by the contract, and only two psychologists hired out of the three required by the contract. Ex. 2167.

877. At Tucson, Dr. Murray found that "[t]hey were using a lot of agency and overtime to be able to meet the sick call needs of the offenders." Murray TT at 3455:11-12. Use of agency clinicians is "challenging." *Id.* at 3515:1-5. Use of overtime can lead to low morale, mistakes, and resignations. *Id.* at 3515:17-3516:2; Gann TT at 2368:22-2371:6, 2374:9-2377:21; Ex. 2072; Ex. 2074.

878. Many of the deficiencies Dr. Wilcox identified in the delivery of medical care are directly tied to inadequate staffing. Wilcox TT at 1723:12-14.

879. The failure to timely review lab results is almost always a staffing issue. Wilcox TT at 1724:5-9. So is the failure of providers to take time to engage in the

-281-

differential diagnosis process, including ordering correct diagnostic tests and scheduling appropriate follow-up visits. Wilcox WT, Doc. 4138 ¶ 31. Both problems are present in Defendants' prisons. *Id.* ¶¶ 230, 285.

880. The delays in reviewing imaging reports and specialty consult reports are also likely related to an excessive workload volume. Wilcox TT at 1724:16-25.

881. Limited staffing contributes to failures to obtain and review hospital records timely, and incorporate them into the patients' care plan. Wilcox TT at 1725:1-18.

882. Defendant Gann admitted that when there is not enough health care staff, employees start to cut corners. Gann TT at 2368:4-6. Defendant Gann admitted documentation suffers with inadequate staff. *Id.* at 2368:8-10. Defendant Gann admitted that Eyman, Florence, Lewis, Tucson, and Yuma have compliance problems with the performance measures in the Stipulation and the contract. *Id.* at 2368:11-21. Tucson and Yuma have staffing problems. *Id.* at 2368:23-24.

883. Tucson canceled its nursing line more than 20 times in a one-week period in January and February 2021, and had numerous delays in the delivery of medications and insulin, due to inadequate staffing; similar cancellations were documented in reports dated near the close of discovery for this trial. Ex. 2074 at ADCRR00075935-36; Gann TT at 2368:25-2369:3; *see also* Ex. 2072 at ADCRR00070090 (June 7, 2021 Centurion Action Meeting notes stating "Nurses Lines – ***32 more cancelled***") (emphasis in original). Defendant Gann admitted that these cancellations are a problem because nursing lines need to be done daily to make sure patients have access to care. Gann TT at 2376:19-25. Tucson had a backlog of HNRs due to inadequate staffing. Ex. 2074 at ADCRR00075935-36; Gann TT at 2369:4-6. Defendant Gann admitted that "[m]ost of the issues at Tucson seem to be related to staffing." *Id.* at 2377:2-3.

884. Unless and until these staffing shortfalls are addressed, patients with medical issues will continue to suffer needlessly, with otherwise treatable health issues escalating into more serious health issues and death.

155617523.3

## 2. Mental health staffing shortages adversely affect patient care.

885. Mental health and correctional staffing shortages drive inadequate mental health treatment. Defendants' failure to have adequate numbers of mental health care staff undermines the ability to provide minimally adequate mental health care services. Stewart WT, Doc. 4109 ¶¶ 18, 20.

886. The number of mental health staff required by ADCRR's contracts with their vendors, and the number of actually filled positions, are abysmally low. Stewart WT, Doc. 4109 ¶ 20. Sufficient numbers of qualified mental health staff are the foundation of any minimally adequate correctional mental health care system. *Id.* ¶ 18. Shortages of other health care staff, such as nurses who screen HNRs filed by patients seeking mental health care, nurses who distribute medications to patients, and medical records staff, can negatively affect the delivery of mental health services and treatment, even if those employees are not formally classified as mental health staff. *Id.* ¶ 23.[149]

887. As detailed in Parts II and III, shortages and vacancies in custody staff will also adversely affect the delivery of mental health care if there are not enough officers available to escort class members to mental health encounters (either at a clinic or an out-of-cell location in a housing unit), to work in clinics, to provide security during group mental health services and programs, to properly monitor people placed on suicide or other mental health watches, and to properly supervise and monitor people incarcerated in isolation units who are experiencing psychological decline due to the harsh conditions. As a result, mental health staff often have to rely upon brief, superficial cell-front encounters, which cannot be considered comparable to confidential, out-of-cell appointments.

888. Unless and until these staffing shortfalls are addressed, incarcerated people with mental illness will continue to suffer needlessly—often resulting in permanent

---

[149] Accordingly, many of the staffing deficiencies identified in the previous section, such as inadequate numbers of nurses and delays in processing HNRs, adversely affect mental health as well as medical care. Stewart WT, Doc. 4109 ¶ 23.

1 psychological trauma and suffering, physical disfigurement due to profound acts of self-
2 harm and self-injurious behavior, and in the most tragic of outcomes, death by suicide.

3     889. Dr. Stefanie Platt, the former statewide regional mental health director for
4 Centurion of Arizona, testified that there was never a time during her tenure as regional
5 mental health director or associate regional mental health director, when all mental health
6 positions called for in the contract were 100% filled by Centurion. Platt TT at 1047:17-24.
7 Similarly, there was never a time while Dr. Platt was the associate regional mental health
8 director for Corizon when all positions called for in the contract were 100% filled by
9 Corizon. *Id.* at 1047:25-1048:1.

10     890. Dr. Platt monitored vacancies in mental health staff working at the prisons
11 when she was regional director. Platt TT at 1046:18-24. Dr. Platt is familiar with the
12 number of mental health staff that ADCRR's contract with Centurion requires at each
13 prison. *Id.* at 1046:15-17. Additional mental health staff were needed to comply with the
14 Court's order regarding the presumptive length of mental health encounters. *Id.* at
15 1044:14-25; 1045:7-9. This analysis was done by a behavioral health technician at Tucson
16 in the fall or winter of 2020. *Id.* at 1045:10-13, 1045:19-24. The analysis concluded that
17 there were not enough staff in the current contract to comply with the order. *Id.* at
18 1045:25-1046:3. But no additional staff were hired.

19     891. Dr. Platt visited prisons as regional director for a variety of reasons,
20 including to lend extra support. Platt TT at 1052:12-18. Mental health staff at the "vast
21 majority" of prisons, including Eyman, Phoenix, Lewis, Florence, Perryville, and Tucson,
22 expressed to her their concerns about their workloads being too high. *Id.* at 1053:4-9,
23 1053:14-20. Staff morale was "fairly low" at the prisons, *id.* 1053:22-24, and "people said
24 they felt overworked" and "didn't feel valued." *Id.* at 1054:5-6.

25     892. The number of mental health staff required by ADCRR's contract with
26 Centurion, as well as the number of actually filled positions, are too low to meet the needs
27 of the prisoner population. Stewart WT, Doc. 4109 ¶ 20. Even if 100% of the mental
28 health positions in the contract had been filled, there would still be more patient needs

than the staffing plan can meet. Platt TT at 1048:2-5. Dr. Platt raised her concerns about the adequacy of the contracted staffing plan with her supervisor, Regional Psychiatric Director Dr. Antonio Carr, as well as Tom Dolan, the Regional Vice President of Operations; Regional Psychology Associate Jessica Raak; Regional Release Planner Jackie Miller; and Regional Behavioral Health Technician Christian Ruiz. *Id.* at 1048:6-1049-2. Dr. Platt could not remember if Mr. Dolan expressed concern with the adequacy of the ADCRR contract, but "all of the mental health staff members did," including Dr. Carr. *Id.* at 1049:3-13. According to Dr. Platt, Mr. Dolan's response was essentially "this is what we have to work with, . . . this is what the contract says." *Id.* at 1051:24-1052:8.

893. Dr. Platt left Centurion because she didn't feel that she had the resources available to her to address the barriers to providing adequate mental health care, including financial resources to retain and recruit staff. Platt TT at 1077:10-22.

894. Dr. Stallcup is ADCRR's Mental Health Program Director and her duties include ensuring that Centurion is "meeting or exceeding the expectations laid out in their contract." Stallcup TT at 2438:10-15. In the summer of 2021, after hearing concerns from mental health staff at Eyman, she was concerned that there were not enough mental health staff at the facility to allow them to do their jobs. *Id.* at 2514:12-21.

895. Dr. Stallcup expressed her concern to Defendant Gann that Centurion was not fully staffed up to the contract's requirement for mental health staff. Stallcup TT at 2514:22-2515:2.

896. In an August 27, 2020, email to Defendant Gann, Dr. Stallcup wrote:

> In reviewing the mental health vacancies I have some concerns that I would like to address. Although the majority of the support positions for mental health are filled, there are significant vacancies in clinical mental health staff who are primarily responsible for providing the behavioral health contacts, required by the courts in the March 11, 2020 order, the Psychologists and Psychology Associates.

Ex. 2141 at ADCRR00074733.

-285-

897.  Dr. Stallcup's email went on to list mental health staff vacancies at the Eyman, Florence, Perryville, Tucson, and Yuma prisons. Ex. 2141 at ADCRR00074733-736. She could not recall if Defendant Gann ever responded to this email. Stallcup TT at 2515:17-2517:9; Ex. 2141.

898.  On November 9, 2020, Dr. Platt sent Dr. Stallcup a list of vacant mental health positions at the Eyman, Florence, Lewis, Yuma, and Tucson prisons. Dr. Stallcup responded the same day, copying Defendant Gann and Mr. Dolan, writing, "I am really concerned about the vacancies at Florence and Eyman, given the high need and high risk patient populations." Ex. 2142 at ADCRR00078986. On November 12, 2020, Dr. Stallcup emailed Dr. Platt again, copying Defendant Gann and Mr. Dolan, writing that "the quality of care being provided is not adequate, as PMs 80, 86 & 95 were failed the last two months in a row at Eyman." PMs 80, 86, and 95 are mental health performance measures set forth in the Stipulation. Stallcup TT at 2517:10-2519:24; Ex. 2142 at ADCRR00078985.

899.  On January 5, 2021, Dr. Stallcup again emailed Dr. Platt, copying Defendant Gann and Mr. Dolan, writing that "I am concerned about Eyman mental health services. The staffing has improved, yet we have 4 consecutive months, August-November [2020], of failures on PM 80. Please let me know what the plan is to bring Eyman's mental health services into compliance." Stallcup TT at 2520:1-2521:4; Ex. 2143 at ADCRR00078969.

900.  The August 2021 health care staffing variance report shows vacancies in mental health staff at the Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma prisons—in other words, at all state-run prisons with the exception of Winslow and Safford, which are "non-corridor" facilities where ADCRR tries not to place people with mental health needs. Stallcup TT at 2521:6-2523:18; Ex. 2167. The vacancies

documented in the August 2021 report concern Dr. Stallcup. Stallcup TT at 2526:5-2528:17.[150]

3    901.    Dr. Stallcup is aware that, due to a lack of mental health staff, patients did not receive individual counseling with the frequency required by policy based on their mental health score. This occurred as recently as the summer of 2021. She is similarly aware of cases in which patients were not seen by the psychiatric provider with the frequency required by policy based on their mental health score. Stallcup TT at 2573:2-2574:9.[151]

902.    Mental health treatment groups have been canceled due to a lack of mental health staff; this occurred as recently as summer 2021. Stallcup TT at 2575:23-2576:2.

903.    Dr. Stewart testified that after touring Eyman prison in September 2021, and reviewing the August 2021 staffing matrix showing only two out of three psychologist positions filled there, "I don't see how one or two psychologists could even begin to address the needs" of the patients at Eyman. Stewart TT at 453:19-454:11. The low numbers of psychologists at Eyman results in persons with mental illness "not [] receiving adequate care." *Id.* at 454:14-15.

904.    The failure to have adequate numbers of mental health care staff undermines the ability of providers and clinicians to provide minimally adequate mental health care services. Without a sufficient number of properly qualified mental health staff, it is impossible to provide adequate mental health treatment. Stewart WT, Doc. 4109 ¶¶ 18-24; Stewart TT at 471:23-472:7.

---

[150] The August 2021 health care staffing variance report (Ex. 2167) was the most recent report admitted into evidence at trial.

[151] In September 2021, there was a backlog of 132 uncompleted mental health psych encounters at Eyman due to seven out of 13 psych associate positions being vacant. Ex. 907 at ADCRR00210847-48 (Sept. 28, 2021 Eyman CQI minutes). *See also* Ex. 847 at ADCRR00136579 (Aug. 12, 2021 Eyman CQI minutes) (mental health psych associate backlog of 366 patients past due); *id*. at ADCRR00136590 ("Eyman has reported a back log as we continue to have Psych associate vacancies.").

### 3. Correctional staff shortages adversely affect patient care.

905. Sometimes the provision of health care is dictated by the number of correctional staff available; custody staff are needed to escort patients to appointments at the prison clinics or offsite. Gann TT at 2388:25-2389:14. For example, in January 2021 at Eyman-Browning, the site medical director could not physically examine patients at their cells in Maximum Custody because there was no sergeant available to open the cell door. Ex. 2076 at ADCRR00076093. One of those patients was diabetic, and did not receive his insulin until the day after the medical director attempted to examine the patients. *Id*.

906. The Florence, Eyman, and Winslow facilities have custody staff vacancy rates ranging from 20.94 percent to 37.75 percent. Shinn TT at 2189:3-2190:24; Ex. 2174 at ADCRR00111462; Ex. 2175 at ADCRR00111403; Ex. 2176 at ADCRR00111388.[152] And the daily staffing operational strength is frequently between 40 percent and 50 percent—meaning that at those prisons between 40 and 50 percent of the custody officer positions are actually filled. Shinn TT at 2190:24-2191:7; Ex. 2174 at ADCRR00111462; Ex. 2175 at ADCRR00111403; Ex. 2176 at ADCRR00111388. These prisons contain high custody level populations, and therefore shortages or high vacancy rates among custody officers can cause "operational strain, contribute to unsafe working conditions for staff and unsafe living conditions for inmates and curtail access to inmate programming." Shinn TT at 2192:9-16; Ex. 2174 at ADCRR00111462.

907. The Court finds that Defendants' failure to provide adequate numbers and types of qualified health care staff, and adequate numbers of custody staff, exposes class members to a substantial risk of serious harm, and denies them the minimal civilized measure of life's necessities.

---

[152] Staffing in isolation units is discussed in more detail in Part II.

### 4. ADCRR's health care contract and spending fail to meet patients' needs.

908. The current contract between Centurion and ADCRR mandates that Centurion provide 1,052.75 full-time equivalent ("FTE") staff for health care and mental health care in Arizona prisons. Gann TT at 2289:15-17; Trial Testimony of Thomas Dolan ("Dolan TT") at 3597:7-9.

909. The health care staffing levels in the Arizona prison system were set by ADCRR in the 2019 Request for Proposal ("RFP"). Ex. 535 at PLTFS000120; Dolan TT at 3596:20-23. The current health care staffing matrix is the same as the one in the 2019 RFP. Dolan TT at 3596:24-3597:1; Ex. 535; Ex. 2026.

910. Defendants rely on Centurion to tell them how many health care staff are needed. Gann TT at 2357:19-21. Nobody who testified from ADCRR or Centurion knows the source of the 1,052 FTE number, or how or when the number and allocation of staff was arrived at. Dolan TT at 3597:24-3598:2; Gann TT at 2360:4-10. It is believed that the 1,052 FTE number dates at least as far back as ADCRR's original RFP with their previous vendor, Corizon, in 2013. Gann TT at 2289:11-14.

911. Centurion does not have its own health care staffing model for ADCRR, separate from the matrix provided by ADCRR. Dolan TT at 3597:21-23.

912. Centurion assumed control of the delivery of health care services in July 2019, and within six months Centurion did an independent evaluation to determine whether the existing contracted health care staffing model was sufficient. Dolan TT at 3598:8-11. In conducting this evaluation, Centurion looked at a number of factors, including current staffing overages and needs. *Id.* at 3598:12-19; *see also id.* at 3603:21-3604:7 (explaining—in response to the Court's line of questioning—that Centurion's recommendations were based on an assessment of the current workload). Specifically, Centurion looked at ADCRR's monthly data for provider visits, nurse visits, health needs requests, medication passes, and man-down encounters, and built staffing recommendations based on that data. *Id.* at 3613:16-20.

-289-

913.  In January 2020, Centurion provided then-Defendant Richard Pratt and others at ADCRR a proposal regarding the increase of staffing allocation. Ex. 2166; Dolan TT at 3599:3-10. The document included staffing recommendations for each position (e.g., providers, registered nurses, psychology associates, medical records clerks), at each prison. *See generally* Ex. 2166. The proposal also included explanations for requested additions. Dolan TT at 3604:12-15. For example, at Yuma, Centurion recommended hiring 11 additional LPNs/MAs and 5.5 additional Nursing Assistants (NAs) / Patient Care Technicians (PCTs), and explained that the prison's positions were "[o]riginally staffed for 2000 inmates," but the population is "now plus 4000." Ex. 2166 at ADCRR00111129. In some instances, Centurion recommended staffing reductions. *See, e.g.*, Ex. 2166 at ADCRR00111129 (recommending one fewer dental assistant at Florence). Overall, however, Centurion found a total of 1,214.25 FTEs were needed to meet the workload at that time in ADCRR—an additional 161 FTEs above the number included in the contract. *Id.*; Dolan TT at 3602:16-24.

914.  Nothing became of Centurion's proposal, because ADCRR refused to amend the contract to add additional FTEs. Dolan TT at 3599:11-3600:20.[153]

915.  There is no evidence in the record that ADCRR has done an analysis of its health care and mental health care staffing needs, either in total or by facility. Defendant Gann admitted that he has not done a health care staffing plan or analysis for any individual prison facility or the ADCRR system as a whole since assuming his position in April 2020. Gann TT at 2392:8-15.

916.  Defendants have no policies or procedures regarding the number of health care staff needed at each prison. Gann TT at 2360:18-21. Defendants have no policies or procedures regarding the required level of skill or licensure for health care staff. *Id.* at 2360:25-2361:8.

---

[153] At one point during his testimony, Mr. Dolan referred to this staffing proposal as a "wish list." Dolan TT at 3598:20-3599:2. In response to questions from the Court, however, he explained the only portion that was a "wish list" was the staffing request for a "dedicated man-down team." *Id.* at 3614:1-17.

155617523.3

917. Centurion has returned about $4 million to the State (referred to as "staffing allocation offsets") since the beginning of its work in Arizona in July 2019. These are payments compensating ADCRR when Centurion does not meet minimum contractual staffing requirements and has to pay the state back for those staff hours. Gann TT at 2330:3-2331:2, 2393:15-25.

918. Centurion spends about $300,000 a year on recruiting for Arizona—which is about one-tenth of one percent of its $216 million contract with ADCRR. Dolan TT at 3596:14-19; Ex. 535.

919. Centurion has had difficulty recruiting for many health care positions, including Assistant Directors of Nursing ("ADONs"), Directors of Nursing ("DONs"), Registered Nurses ("RNs"), License Practical Nurses ("LPNs"), and psychologists as well as other mental health positions.[154] Gann TT at 2361:9-21, 2379:25-2380:8. Some facilities have gone without Facility Health Administrators for a year. *Id.* at 2366:12-17.[155]

920. Centurion struggles to recruit nurses to work in ADCRR. Dolan TT at 3589:18-19, 3604:16-18. Centurion relies on overtime and agency staff to reach a 90% fill rate. *Id*. at 3589:20-23.

921. Currently, the highest-paid RN in ADCRR makes $40 an hour; LPNs make around $30 an hour. Dolan TT at 3590:10-12. Defendant Gann admitted that he has "no idea" how much Centurion pays its permanent nursing employees. Gann TT at 2365:10-12.

---

[154] ADONs supervise the RNs and LPNs in a clinic. The DON is the director of nursing for the entire prison facility.

[155] The Facility Health Administrator is responsible for ensuring that the daily operations of the health care delivery system are compliant with all administrative directives charged to not only the FHA but all Vendor Supervisory personnel and the adherence by all Vendor staff to ADCRR Department Orders and Medical Services Contract Monitoring Bureau Technical Manuals. It is the responsibility of the Vendor Facility Health Administrator (FHA) or designee to ensure that adequate services are available to the inmate population in the following areas: Dental, Medical, Mental Health, Nursing, Pharmacy, Medical Records, Laboratory, and X-ray. Ex. 1305 at 41.

922. Centurion has been paying $90 an hour to staffing agencies for temporary RNs when the "going rate" being paid to staffing agencies is $125 an hour; the nurses typically only get paid half of whatever the staffing agency is paid (in other words, $45). Gann TT at 2311:14-20, 2363:23-2364:1 ("Just as a rule of law, it's usually half goes to the nurse."), 2364:11-14. Whether it is the $40 an hour to permanent RNs that Mr. Dolan testified to, or the $90 an hour to staffing agencies (and thus the $ 45 that actually filters down to an agency nurse) that Defendant Gann testified to, Centurion is not paying nurses "the going rate" or as much as they can earn in Texas or California. *Id.* at 2365:7-9. Defendant Gann has not asked Centurion to pay permanent nurse employees as much as they could earn in Texas or California. *Id.* at 2365:19-22.

923. The Court's expert Dr. Stern compared spending by ADCRR to the amounts spent in the community by the Arizona Health Care Cost Containment System ("AHCCCS") for persons who qualify for Medicaid, and reported to the Court in October 2019 that "the severe level of under-funding of health care services at ADC is the single most significant barrier to compliance with the PMs in this case. At a minimum, the gap between what it costs to take care of this population according to AHCCCS rates and what ADC spends, is at least $74 million." Ex. 1860 (Doc. 3379) at 94.

924. ADCRR and Centurion signed a June 18, 2021 contract amendment that increased the contract price by $12 million to $216,709,753. Ex. 2085.

925. Centurion did not request any additional health care staff in the 2021 contract amendment. Gann TT at 2310:3-8, 2411:4-7. Defendants Shinn and Gann admitted that ADCRR has never asked Centurion to increase the number of health care staff in the contract. Shinn TT at 2238:4-6; Gann TT at 2411:11-12.

### 5. The only staffing model presented to the Court shows increased numbers of health care staff are needed.

926. The evidence before the Court includes an analysis of the demand for health care and mental health care services in ADCRR prisons by Plaintiffs' expert witness, Robert Joy, who has worked for 12 years as an Executive Quality Management Consultant

for California Correctional Health Care Services. Notably, Defendants did not submit any explanation or justification for their current staffing model, and the Court concludes that many of the systemic problems in the delivery of medical and mental health care set forth in Parts III and IV, *supra*, are rooted in the inadequate number of health care staff, both the number required by the current contract and the number actually working in the prisons. Wilcox WT, Doc. 4138 ¶ 10; Stewart WT, Doc. 4109 ¶¶ 16-17, 32.

927.  Mr. Joy created a staffing model similar to the model he has previously created for California Correctional Health Services that focuses on the demand for medical and mental health services in ADCRR prisons. To determine the demand for medical and mental health care services, Mr. Joy considered the following information:

- The estimated number of health care services that ADCRR residents require annually across various service types;

- The estimated numbers and types of health care services that each staff full-time equivalent ("FTE") in various clinical classifications can provide annually for ADCRR residents;

- The estimated number of staff FTEs in various classifications that are required to meet ADCRR resident health care demands of various types, presented as a range due to the nature of the estimates involved in determining the potential staffing numbers;

- The estimated average daily number of ADCRR residents in the various cohorts that impact service demand;

- The estimated number of various clinical services expected for each resident annually in these cohorts;

- The estimated number of various clinical services one FTE in each classification can support each day; and

- The estimated number of days available for patient care in each classification, per year and per FTE.

Joy WT, Doc. 4099-1 at ECF 6, 13; Trial Testimony of Robert Joy ("Joy TT") at 176:23-177:9.

928.  Once he was able to estimate the demand for various medical and mental health services and the number of health care staff needed to meet that demand, Mr. Joy compared that against the number of staff currently provided for in Defendants' contract with Centurion. Mr. Joy concluded that "there is a significant gap between the

-293-

current number of contracted or hired staff providing health care services to ADCRR residents and the estimated number of staff needed in the model." Joy WT, Doc. 4099-1 at ECF 6-7. Specifically, the percentage differences between the staff needed and the staff required by the current contract are as follows:

- Primary Care Providers: -30%
- Psychiatrists: -17%
- Mental Health Clinicians: -72%[156]
- Behavioral Health Technicians: -92%
- Nursing Assistant / Patient Care Technicians: -52%[157]
- Licensed Practical Nurses and Medical Assistants: -39%
- Registered Nurses: -33%
- Lab Technicians: -97%
- Medical Radiological Technicians: -12%
- Pharmacy Technicians: -47%

Joy WT, Doc. 4099-1 at ECF 6-8, 67-68; Joy TT at 98:3-102:3.

929.   Mr. Joy found similar staffing shortages between the staff he estimated was necessary to address the demand for health care services and the staff required by the current contract at all ten ADCRR prisons, including a shortfall of 30-40% for primary care providers, and 33-46% for registered nurses. Joy WT, Doc. 4099-1 at ECF 6-7.[158]

930.   Mr. Joy also calculated, based upon his review of the relevant literature and conversations with Dr. Todd Wilcox, that between 21% and 26% of persons incarcerated in ADCRR prisons need treatment for substance use disorder that includes MAT. Joy WT,

---

[156] Mr. Joy defined "mental health clinician" to mean "psychologist, [licensed clinical social worker] or other mental health clinician with an advanced degree." Joy WT, Doc. 4099-1 at 27:11-12.
[157] Mr. Joy explained that the "primary role for NA and PCT staff is to provide support for activities of daily living among [Special Needs Unit] and [infirmary] residents." Joy WT, Doc. 4099-1 at 54:16-17.
[158] Mr. Joy's findings of a 30-40% deficit for primary providers and a 33-46% deficit for registered nurses were consistent with Dr. Wilcox's expectations based on his review of the healthcare system and the deficiencies he identified. Wilcox WT, Doc. 4138 ¶ 10 n.1.

Doc. 4099-1 at ECF 26-28 and n.38. Mr. Joy estimated that between 41% and 52% of persons in ADCRR prisons need treatment for substance use disorder that does not include MAT. *Id.* at ECF 28.

931. Mr. Joy did not consider the current patient utilization numbers of medical and mental health care in Arizona prisons, because the current supply of staff limits the amount of care that can be delivered. Due to the limited supply, the patient population's mental health and medical needs are what should be used to determine the true need for health care services. Joy TT at 119:11-24, 122:4-18, 191:3-23.

932. When calculating the number of providers necessary to provide care to patients in Arizona prisons, Mr. Joy estimated that providers would be able to see approximately 12 patients per day, based in part on information from Dr. Wilcox. Joy TT at 94:18-22.

933. Mr. Joy explained that his estimates for provider productivity for Arizona are impacted by the high percentage of people who are housed in isolation. Providing health care to people in isolation "is far more inefficient and it reduces provider productivity because of the security issues that need to be taken into consideration." Joy TT at 80:2-6. The rate of isolation in Texas prisons, where Dr. Murray practices, is about 2-3%, the average percentage as reported by 38 states was 3.8% (*see* Ex. 3530 at ADCRR00231471, 231475), whereas the rate in Arizona is about 10% or possibly higher. *See supra* n.2; Joy TT at 80:7-81:10, 172:12-20.[159] Providing health care to people in isolation "is far more inefficient and it reduces provider productivity because of the security issues that need to be taken into consideration." Joy TT at 80:2-6.

934. Dr. Wilcox explained in response to the Court's question that his productivity estimate for ADCRR providers was based upon his site visits, review of physical plant, and the poor quality of the electronic health record system. Wilcox TT at

---

[159] Although Mr. Joy estimated the rate of isolation is approximately 18-20%, other experts presented varying calculations, and in an abundance of caution, this Court relies on the most conservative estimate of 9.6%. *See supra* n.2.

1717:3-1718:6. Providers may be able to increase the number of patients they can see on a given day if Defendants make systemic changes to increase productivity, such as implementing a new and better electronic health record. *Id.* at 1720:4-15.

935. In response to the Court's questions, Dr. Wilcox testified that since he began working as an expert for Plaintiffs in this case, he has consistently recommended in Court filings and to ADCRR that they do a workload staffing study. Wilcox TT at 1729:21-1730:13; *see also* Ex. 1671 at 4-6; Ex. 1855 at 2-4. Dr. Wilcox testified that Mr. Joy's staffing model and methodology are consistent with staffing studies that he has done. Wilcox TT at 1711:25-1711:5, 1714:14-1729.

936. Dr. Wilcox has performed workload studies, including while he was medical director at Maricopa County Jail. Wilcox TT at 1705:1706:1. To do the Maricopa County study, he worked with a consulting team to study the actual work done, and created a mathematical model for assessing staffing needs. *Id.* at 1706:1707:4. His Maricopa County jail staffing study was developed to staff the entire medical department. When they applied the mathematical model, the County increased the number of full-time providers in the jail from 31 to 43. *Id.* at 1707:16-25. Maricopa County adopted the new staffing allocation based on Dr. Wilcox's staffing study. *Id.* at 1708:1-5. Dr. Wilcox has also used this mathematical staffing model to estimate the staffing levels needed for Pima County Jail, which used the data for their health care RFP. *Id.* at 1709:10-19.

937. The fact that Mr. Joy's report relied on national data rather than the actual number of patient encounters that occurred in ADCRR does not negate the value of his model and conclusions. On the contrary, ADCRR is so significantly understaffed that using their actual data would be more prone to error than using nationally accepted data for the types of health care that need to be done in large systems. Wilcox TT at 1961:17-1962:6. Prison health care staff can only operate at the level of their understaffing, so the

-296-

number of encounters and tasks that existing staff are currently able to complete undercounts the patients' true demand. *Id.* at 1961:17-1962:6.[160]

938. Plaintiffs' mental health care expert, Dr. Pablo Stewart, also conferred with Mr. Joy when Mr. Joy was creating his staffing model, and agreed that the best methodology to determine how many and what type of mental health staff are needed would not be to look at the number of patients currently being seen by the filled positions, because "there's a limit to the number of patients seen by any professional." Stewart TT at 460:10-21. Rather, the way to assess a facility's staffing needs would be to see how many mentally ill persons there are at the prison, the severity of their mental illness, and their treatment needs for group and individual counseling. *Id.* at 460:23-461:11, 462:24-463:2.

939. Dr. Wilcox opines that, based his experience managing health care, his reviews of system issues and the deficiencies in the system operations, and the fact that many relatively simple tasks are not done, the only reasonable explanation for the systemic deficiencies is that ADCRR is too understaffed to get tasks done in a reasonable amount of time. Wilcox TT at 1718:13-19.

940. Mr. Joy's declaration confirmed Dr. Wilcox's belief that ADCRR is significantly understaffed. Wilcox TT at 1719:2-6.

941. The Court finds that Mr. Joy's methodology and analysis are reliable and based on the evidence described above, agrees with his finding that there is a significant gap between the current number of contracted or hired staff providing health care services to ADCRR residents and the number of staff needed to address the demand for those health care services.

---

[160] ADCRR's data on severity of medical condition is not reliable. It is based on medical conditions scores that are "pretty inaccurate" and that don't appear to change when the patient's condition changes. Wilcox TT at 1727-1728:8.

155617523.3

# VI. DEFENDANTS LACK THE CAPACITY FOR QUALITY REVIEW AND SELF-CORRECTION

942. It is uncontested that state officials' capacity to identify and fix problems that can lead to serious harm and death to people in their custody is a critical component to any functioning prison system. *See, e.g.*, Horn WT, Doc. 4130 ¶ 323 ("As a manager of a prison system, it is critical to know what is happening in the system: if you can't measure it, you can't manage it."); Wu Dep. at 108:2-9; Wilcox WT, Doc. 4138 ¶ 127. Defendants fail to accomplish this essential function. Years into this litigation, Defendants remain on notice of longstanding, fundamental and sometimes fatal infirmities through their own mortality review and psychological autopsy process and their own monitoring of performance measures under the Stipulation. Nonetheless, they have put their efforts more in concealing and minimizing problems than in designing and implementing solutions in a good-faith effort to solve them. That is clear evidence of deliberate indifference.

## A. Defendants' Mortality Review and Psychological Autopsy Process Fails to Identify and Correct Medical and Mental Health Treatment Errors

943. When a patient dies in custody, review of that death is "a critically important element of patient safety" to ensure that errors—both those causally related to the death and those that are not—are recognized and addressed. Ex. 1860 at 132-133; *see also* Wilcox WT, Doc. 4138 ¶ 128.

944. Mortality reviews should identify errors in care as well as process; they should allow a system to learn from experience, improve quality of care, and act to avoid serious and fatal mistakes in the future. Wilcox WT, Doc. 4138 ¶ 128. S*ee also* Murray TT at 3465:8-13; Ex. 1860 at 135 (Dr. Stern recommends death review process in which significant errors are identified, root cause analysis is conducted as appropriate, and an effective and sustainable remedial plan is implemented and monitored).

945. Similarly, the mortality review and psychological autopsy process for deaths by suicide is "[t]o look at the process as well as the people involved and see if there are

-298-

opportunities to improve the process, provide education or recommend any human resources actions, if appropriate." Stallcup TT at 2441:11-18; *see also* Platt TT at 1036:12-19. Dr. Pelton, who replaced Dr. Platt as Centurion's regional mental health director in late July 2021, testified that the purpose of the psychological autopsy is to "determine if there's any corrective action that needs to take and any improvements that we can make in terms of providing care . . . to see if there's anything we can do better going forward, in terms of health care." Pelton Dep. at 156:11-157:4.

946. It is "very important" that recommendations from the mortality review process be implemented. Murray TT at 3523:11-15.

947. ADCRR's mortality review process is woefully deficient. Wilcox WT, Doc. 4138 ¶¶ 130-131. The Court's expert Dr. Stern observed that the

> structure for tracking quality improvement/remediation following death or other untoward event ("Sentinel Event Corrective Action Plan") is also devoid of any mention of measuring the effectiveness of remedial actions. During my review of deaths, I encountered problems with care related to a death, and would encounter the same problem related to another death months later.").

Ex. 1860 at 135.

948. First, the mortality reviews minimize harm caused by health care staff. Wilcox WT, Doc. 4138 ¶ 133. For example, in the death review for the 60-year-old patient with severe liver disease described at ¶¶ 641-648, who died of a massive gastrointestinal bleed after his PCP prescribed, and then increased, NSAIDs (known to cause bleeding in patients with liver disease), the reviewers simply recommended "a 30 to 45 day follow up" for patients who are newly prescribed NSAIDs. Ex. 357 at ADCRR00000098-101.

949. Second, the mortality reviews fail to identify clear errors and the parties responsible for those errors. Wilcox WT, Doc. 4138 ¶ 134. In one such case, discussed above at ¶¶ 667-669, 688-689, a patient with terminal cancer was denied adequate pain medications for months while in the infirmary, yet the review was silent regarding the lack of pain management. Ex. 174 at ADCM1608413. In another, staff clearly erred in

failing to send out a very sick patient, but the review fails to identify the staff or the clinical signs that were overlooked. Ex. 385 at ADCM1615640. In addition, mortality reviews of those who died from overdose fail to identify the need for medication-assisted treatment. *See, e.g.*, Exs. 145, 275, 279, 313, 323.

950. Third, the mortality review recommendations are usually incomplete, general, or too cursory to be effective. Wilcox WT, Doc. 4138 ¶ 136. In the case of a patient who died of pancreatic cancer, for example, the reviewers concluded that his "pain was not addressed adequately" but included no recommendations beyond "education" of medical staff to address the failure for future patients. Ex. 422 at ADCM1589819-9820.

951. In other cases, the recommendations often fail because they simply restate what should already have been the standard, without explaining what will be done in the future to ensure the standard is followed, or what how staff will be held accountable for violating standard policy and practice. Wilcox WT, Doc. 4138 ¶ 138. For example, these "recommendations" include directions such as: "[r]ecogniz[e] and recheck[] any abnormal vital signs and be alert for questionable clinical findings and escalate," Ex. 385 at 1615641; "[s]cheduled follow up visits for provider, pulmonary clinic, and chronic care visits shall be documented in electronic health record," Ex. 176 at ADCRR00000016; and "when Consultant's notes are reviewed by the HCP [health care provider], notation should be made detailing the next plan of care," Ex. 272 at ADCM1623209. All of these things should have happened according to existing policy, but did not in their respective cases. Nothing in the reviews addresses how they will happen in the future.

952. Fourth, and critically, Defendants lack a reliable system to translate findings from the mortality reports into corrective action. Wilcox WT, Doc. 4138 ¶ 141. According to Dr. Wendy Orm, Centurion's Medical Director for Arizona, corrective action plans, known as CAPs, are written when a recommendation in a mortality review is "actionable," are documented in CQI minutes, and monitored by ADCRR's monitoring bureau. Orm Ind. Dep. at 140:5-12, 140:18-23, 141:3-4. However, mortality reviews often

155617523.3

lack "actionable" items. Wilcox WT, Doc. 4138 ¶ 142; *see, e.g.*, Orm Ind. Dep. at 165:5-18, 168:12-21, 172:1-5, 172:17-20, 173:15-18, 175:20-21.

953.    Similarly, there is no system in place to determine if any recommendations made in a psychological autopsy following a death by suicide are actually implemented. Platt TT at 1036:20-1037:5. Dr. Pelton admitted that she did not know what—if anything—had ever been done to implement the recommendations that were made in a psychological autopsy report that she authored in August 2020, (Pelton Dep. at 158:6-161:17 (Ex. 381)); in a psychological autopsy report that she reviewed of a person who died by suicide on May 31, 2021, (*id.* 161:21-168:6 (Ex. 218)); or that were made in a psychological autopsy report that she reviewed of a person who died by suicide on June 9, 2021, (*id.* 168:19-176:7 (Ex. 391)). Dr. Phillips similarly admitted he did not know whether the recommendation he made in a mortality review of a patient who died in November 2020 had been implemented. Phillips TT at 3657:15-18.[161]

954.    Defendants fail to examine systemic root causes of deaths. For example, even though isolation units account for about 11% of the total ADCRR prisoner population, more than 60% (33 of 54) of all deaths by suicide since 2014 occurred in an isolation unit. Haney WT, Doc. 4120 ¶ 114; Haney TT at 793:24-795:23, 858:7-24.[162] The evidence also shows that in the past eight years, there were least six suicides that occurred while the patient was on suicide watch, or within days of his or her removal from watch. *See* Exs. 403 & 404 (April 2021 death at Eyman SMU-I CDU discussed above); Haney WT, Doc. 4120 ¶ 114 (February 2021 death at Tucson Rincon Mental Health Watch; January 2021 death of a patient recently off suicide watch at Lewis Buckley; July 2019

---

[161] Defendants were unable to provide their medical expert Dr. Murray with any data showing that mortality review recommendations have been implemented. Murray TT at 3523:5-10. Defendants' mental health expert Dr. Penn did not inquire from anyone at ADCRR or Centurion whether they actually implemented the multiple recommendations made in the psych autopsies and mortality reviews of two patients whom he contended received satisfactory mental health care prior to their deaths by suicide. Penn TT at 3209:8-3211:10 (Exs. 226, 403).

[162] Dr. Penn admitted that he has not done an analysis of the housing locations of the people who died by suicide in ADCRR custody. Penn TT at 3228:22-24.

155617523.3

death of a patient recently off suicide watch at Perryville Santa Cruz; March 2019 death of a patient recently off suicide watch at Phoenix-Flamenco-Ida; March 2018 death of a patient recently off suicide watch at Yuma La Paz; July 2016 death of a patient recently off suicide watch at Perryville Lumley Mental Health Unit). None of these patterns were identified by Defendants.

955. These failures have serious consequences for the Plaintiff class. For example, an April 2021 death by suicide in a detention unit by a person who was recently released from suicide watch included echoes of a previous suicide—a July 2016 death by suicide at Perryville's Lumley Mental Health Unit. That earlier death involved an 18-year-old woman who took her own life shortly after being removed from suicide watch, and after enduring months of being placed in solitary confinement for engaging in acts of self-harm and disruptive behavior related to her mental health conditions. When Dr. Haney toured the Perryville prison in 2016, this young woman was still 17 and housed in the Minors Unit. Several people told Dr. Haney about her and expressed concern regarding her well-being. Dr. Haney asked to see her, but prison officials and Defendants' attorneys refused to allow him to visit her. In consultation with Dr. Haney, Plaintiffs' counsel wrote a letter to Defendants, expressing concern about the prolonged isolation of this adolescent. She nevertheless remained in isolated confinement until she turned 18, and was moved to the adult women's unit where she was soon put on suicide watch. Days after her release from suicide watch, she died by suicide. Haney WT, Doc. 4120 ¶¶ 137-138 & n.110; Haney TT at 796:2-798:14.

956. Five years later, in April 2021, a class member who had spent a great deal of time enduring the harsh conditions of isolation in detention, max custody, and suicide watch units, similarly died by suicide four days after his discharge from suicide watch back to Eyman SMU-I's Complex Detention Unit, without mental health staff completing a suicide risk assessment or a discharge treatment plan. *See supra,* ¶¶ 426, 580-583; Exs. 403, 404.

## B. Defendants' Corrective Action Plan System Under the Stipulation Has Failed to Significantly Improve Care

957. Defendants' corrective action plans (CAPs) are ineffective outside of the mortality review context as well, as has been repeatedly demonstrated by the CAPs initiated under the Stipulation in this case. Defendants had failing scores on multiple performance measures month after month, and would often implement the identical CAP, without moving the needle on compliance. *See, e.g.*, Ex. 1971 (June 2021 report of CGAR scores for various performance measures and CAPs proposed to address noncompliance).

958. For example, CGAR scores have revealed medication delivery failures for years, but Defendants' CAPs month after month repeatedly fail to remedy this problem. At half of the Arizona state prison complexes—Eyman, Florence, Lewis, Perryville, and Yuma—repeated failing scores from November 2020 to June 2021 were met time and again with the essentially same CAP: the pharmacy will report expiring medications, the Site Medical Director will ensure that prescriptions are timely renewed, and providers will ensure at appointments that medications are active. *See* Ex. 1971 at 24-34, 36-39 (Defendants' report of CGAR scores and CAPs for PM 13, assessing whether "chronic care and psychotropic medications renewals [are] completed in a manner such that there is no interruption of lapse in medication"). The record in this case is replete with similar examples. *See, e.g.*, *id.* at 126-32 (CGAR scores and CAPs for PM 37 at Tucson repeatedly identifying the same cause of non-compliance, recommending essentially the same interventions, and continuing to report failing scores each month); *id.* at 118-25 (similar pattern for PM 37 at Lewis); *id.* at 201-15 (similar pattern for PM 44 at Eyman); *id.* at 216-28 (similar pattern for PM 44 at Florence); *id.* at 229-40 (similar pattern for PM 44 at Lewis); *see also* Wilcox WT, Doc. 4138 ¶¶ 215-17, 306-08, 363-64, 405-07 (documenting failures of the CAP system to address noncompliance with performance measures); Jordan TT at 2630:21-2639:14 (Yuma site medical director testifying to persistent noncompliance with certain measures at that prison, despite CAPs in place).

959. These CAPs essentially restate policy and were utterly ineffective, as demonstrated by the continued failing CGAR scores. An effective CAP imposes a change, be it a creative solution, a different methodology, an added layer of review, some degree of accountability, or a combination of those measures. Wilcox WT, Doc. 4138 ¶ 364. Through years of noncompliance with fundamental measures in the Stipulation in this case, ADCRR has continuously demonstrated a lack of capacity to use CAPs to self-correct.

## C. Defendants Have Consistently Failed to Even Recognize, Let Alone Attempt to Correct, Serious Problems with the Administration of Solitary Confinement

960. Defendants have repeatedly informed this Court that they have a "robust" system of review of the conditions in Maximum Custody and monitoring compliance with the Stipulation. *See* Docs. 3108 at 6, 3667 at 2. They do not. Instead, they created a process designed to conceal their compliance failures.

961. Warden Van Winkle testified about Defendants' system of monitoring isolation. Van Winkle TT at 2682:20-2689:10. He participated in the process many times, and as warden, was the final layer of review. *Id.* at 2685:6-24. Nonetheless, he displayed a remarkable lack of knowledge about what was actually counted in the review process. For example, he testified that visitation and work are not counted as out-of-cell time, but they in fact are counted as such. *Id.* at 2677:18-2678:14, 2807:11-2809:5, 2821:15-2822:10. Similarly, he was unfamiliar with the recreation requirements at his own facility, Florence Kasson, but has signed off on the reviews many times. *Id.* at 2685:6-24, 2828:20-2830:7.

962. In one particularly Orwellian example, Warden Van Winkle testified that cancelled out-of-cell time is counted as offered out-of-cell time, unless, for example, the information report for the cancellation indicated that the staff did not complete the out-of-cell activity because "staff just didn't want to do it." Van Winkle TT at 2685:25-2688:15. Staffing shortages that have continued for years are considered a "legitimate" reason for cancelling out-of-cell time, and therefore, out-of-cell time that was actually cancelled due to chronic staff shortages is reported as out-of-cell time that was offered. *Id.* at 2866:13-

-304-

2867:12, 2874:18-2875:1. Indeed, Defendants train their staff that "DOC still gets credit for cancellations" as long as the cancellations are documented. *Id.* at 2746:11-2748:23; Ex. 1674 at 26. Warden Van Winkle testified that he has never determined that cancelled out-of-cell time should not be counted toward the out-of-cell time offered for purposes of monitoring and reporting. Van Winkle TT at 2835:17-23. ADCRR cancelled nearly all out-of-cell programming at Eyman-Browning, Eyman-SMU I, and Florence-Kasson from approximately March 2020 through June 2021. *See supra*, ¶¶ 156-158. Yet Defendants falsely reported 100% compliance with the required programming throughout these months at those facilities. Exs. 1980, 1717-1731.

963. Further, Warden Van Winkle testified although the review process requires additional forms to be included for review when a person is in a housing location that has a monthly recreation incentive, he had never seen those additional forms included. Van Winkle TT at 2759:17-2761:4. Despite the failure to include such forms, which are necessary to determine whether people had received the exercise to which they were entitled, Defendants reported compliance, and that people received the requisite exercise. *Id.* at 2761:18-2762:5.[163]

964. Defendants have conclusively demonstrated that they cannot or will not accurately report, let alone correct, the conditions in their solitary confinement units.

---

[163] *See also, e.g.*, Ex. 2313 at ADCM1652802-1652803 (Out-of-cell time sheet for a person at Step 3 at Eyman Browning offered recreation only in the "chute", but deemed compliant, despite lack of evidence of meeting monthly incentives) and Ex. 1318, DO 812, Attachment B; Ex. 2314 at ADCM1637111-1637112, ADCM1637133-1637134, ADCM1637148-1637149 (same for individuals at Step 2 and 3 at Eyman SMU I) and Ex. 1318, DO 812, Attachment C; Ex. 2315 at ADCM1637796-1637797, ADCM1637849-1637850, ADCM1637879-1637880 (same for individuals at Step 3 at Lewis Rast) and Ex. 1318, DO 812, Attachment C.
Each of these examples comes from January 2020, prior to the impact of COVID-19 on operations at ADCRR. There are many other examples, from before, during and after the pandemic. *See* Exs. 1980, 1681-1688, 2265-2373.

-305-

**D. Defendants Have No Capacity to Improve Clearly Deficient Levels of Custody and Health Care Staffing**

965. Leaders responsible for health care operations in correctional systems must ensure there is adequate staffing. Wilcox WT, Doc. 4138 ¶ 151.

966. As detailed above, staffing deficiencies are and have long been a core cause of the deficiencies with health care in ADCRR. *Id. See also* Ex. 1860 at 95-98 (Dr. Stern finds staffing levels must be increased and recommends ADCRR perform a staffing analysis and adjust staff accordingly.)

967. The persistence of this problem is directly attributable to leadership failures. Testimony from Centurion's Regional Medical Director Dr. Wendy Orm; Centurion's Vice President of Operations Tom Dolan, testifying on behalf of Centurion; and Defendant Gann, testifying on behalf of ADCRR, demonstrates that both entities have washed their hands of any responsibility for health care staffing levels, with each claiming they have no power to affect either the type or number of health care workers hired.

968. Dr. Orm disavowed any input into or influence over the health care staffing levels. 30(b)(6) Dep. of Centurion of Arizona, LLC (Wendy Michelle Orm, M.D.) ("Orm 30(b)(6) Dep.") at 17:20-24, 19:12-20:1, 28:1-12. According to Dr. Orm, "whatever that staffing matrix was that was agreed on that the ADCRR supplies is how we assign staff," and she testified that she had no knowledge regarding how those staffing levels were determined, nor has she provided feedback to ADCRR about their staffing levels. *Id.* at 22:8-10, 28:5-8, 18:8-12. Mr. Dolan likewise testified that Centurion was not involved in determining staffing levels. Dolan TT at 3597:24-3598:2.

969. Defendant Gann, who is responsible for overseeing the health care contract with Centurion, similarly disavows responsibility for health care staffing, claiming that Centurion chose the numbers. Gann TT at 2262:15-2263:17 ("I manage the comprehensive health care plan with Centurion."), 2357:19-21, 2360:4-10, 2360:18-21.

155617523.3

970.   Mr. Gann further admits that the ADCRR monitoring bureau cannot track staff vacancies, nor can they track how many FTEs are being supplied from Centurion on a pay period or monthly basis. Gann TT at 2348:13-16, 2357:7-12.

971.   In a letter dated February 14, 2020, two weeks after the Court's issuance of an Order to Show Cause (Doc. 3490), Defendant Shinn asked that Centurion reallocate existing Arizona health care personnel to locations that face compliance challenges. Ex. 2165; *see also* Shinn TT at 2227:22-25, 2228:19-22. He did not follow up on this request: he does not know how many health care staff, if any, were ever reallocated by Centurion within Arizona, or if they were, from which facilities. Shinn TT at 2228:23-2229:1, 2230:6-9, 2230:14-17, 2230:21-23.

972.   In this letter, Defendant Shinn asked Centurion to transfer Centurion health care personnel temporarily from other states to help Arizona achieve compliance. Ex. 2165a; *see also* Shinn TT at 2227:22-25, 2230:24-2231:3. He did not follow up on this request: he does not know how many health care personnel, if any, were transferred. Shinn TT at 2231:4-11.

973.   Defendant Shinn also asked Centurion to increase their use of telemedicine. Ex. 2165a. But again, he did not follow up: he admitted that he does not know if the use of telemedicine went up in response to his request, or if it were increased, at which facilities or for which health care specialties. Shinn TT at 2227:22-25, 2231:12-21, 2232:13-16.

974.   Defendant Shinn asked in his February 2020 letter that Centurion take "all reasonable efforts" to fill current FTE vacancies to improve/achieve compliance with the contract. He did not define "all reasonable efforts" in his letter. He again admitted to the Court that he did not follow up on this request: he does not know what, if anything, Centurion did or how many vacancies they filled in response to the request. Ex. 2165; Shinn TT at 2227:22-25, 2232:17-21, 2233:4-19.

975.   Defendant Shinn testified that in his opinion, his February 2020 letter (Ex. 2165) was reasonable and necessary in order to comply with the Court's order at that time as well as the contract in place. Shinn TT at 2249:25-2250:22. As far as he knows,

1    ADCRR is still asking Centurion to comply with his February 14, 2020 letter, but he has

2    not confirmed this. *Id.* at 2252:3-7; Ex. 2165.

3    976. The Court finds that ADCRR has profound health care staffing problems

4    that adversely affect patient care and harm patients, that persist and recur because neither

5    Defendants nor their vendor adequately analyze, monitor, or take responsibility for

6    addressing them. The finger-pointing and bureaucratic intransigence demonstrated at trial

7    ensure that the staffing levels will not be scrutinized, staffing deficiencies will not be

8    addressed, and patients will continue to be denied the health care they need, with adverse

9    or fatal results.

10   **E.    Defendants' Evidence Regarding NCCHC Accreditation Does Not
             Rebut the Credible and Reliable Evidence of Serious Deficiencies in
11           ADCRR's Health Care System**

12   977. The National Commission on Correctional Health Care (NCCHC) accredits

13   correctional facilities for compliance with NCCHC's standards regarding medical and

14   mental health care. *See* Penn WT, Doc. 4172 ¶¶ 59-61; Phillips TT at 2925:11-17; Wilcox

15   TT at 1770:21-1771:3.

16   978. NCCHC accreditation is requested by the prison or jail facility, and is

17   provided on a fee-for-service basis. The institution seeking accreditation must pay an

18   initial fee, as well as an annual fee to maintain accreditation. Penn TT at 3067:2-3068:18.

19   NCCHC will accredit a facility if it finds that a facility meets all "essential" NCCHC

20   standards and 85% of all "important" NCCHC standards. Wilcox TT at 1774:6-15; Gann

21   TT at 2329:24-2300:3-11.

22   979. Centurion provides financial support to NCCHC. Penn TT at 3065:2-11,

23   3076:6-3077:18.

24   980. Plaintiffs' medical expert, Dr. Todd Wilcox, testified that NCCHC reviews

25   are "primarily done in advance with a large policy and procedure review." Wilcox TT at

26   1965:10-11. NCCHC surveyors "have a fairly limited period of time to be on site," with a

27   typical onsite review lasting two and a half days. *Id.* at 1675:12-23.

28

155617523.3

981.    Dr. Wilcox stated that surveyors conduct limited "double checking" of the facility's practices against the written policies and procedures while onsite, looking at "fairly high-end data." Wilcox TT at 1675:21, 1965:10-13. "[W]hat they're really looking at is the overall presence or absence of certain core functions." *Id.* at 1965:14-17. For example, he explained that NCCHC surveyors will check whether the facility holds quality improvement meetings and chronic care clinics, but surveyors will not evaluate the content and efficacy of those meetings or the quality of the care provided to patients in those clinics. *Id.* at 1965:15-21.

982.    Dr. Wilcox is familiar with the NCCHC accreditation process. He has been through numerous NCCHC surveys as the medical director of the Salt Lake County jail, Wilcox TT at 1676:5-10, and the jail has been continuously accredited by the NCCHC during Dr. Wilcox's tenure as medical director. *Id.* at 1628:8-18. Dr. Wilcox has also served as a surveyor for the NCCHC, (*id.* at 1675:24-1676:2), and has been certified by the NCCHC's Certified Correctional Health Care Provider Board. *Id.* at 1776:7-16.

983.    Dr. Grant Phillips, ADCRR's medical services program director, testified that, generally, the NCCHC accreditation process includes a review of the facility's policies and procedures, followed by an onsite visit, which includes "discussions with custody leadership and custody staff, and interviews with the inmate population." Phillips TT at 2924:11-15. He also testified that NCCHC surveyors conducted chart reviews to look at "how readable or accessible" the chart is and "the quality of the documentation." *Id.* at 2925:18-2926:5. However, he did not explain how compliance with each standard was assessed. Similarly, Defendant Gann testified that the NCCHC accreditation process is "more than just a policy review," but, like Dr. Phillips, provided only general information about the accreditation process. *See* Gann TT at 2298:3-2299:3. He also testified that while he has been through many NCCHC audits in his work at jails across the country, he has never actually conducted any audits for the NCCHC. *Id.* at 2297:18-20, 2299:4-9.

984.    Defendants' mental health expert Dr. Penn described the overall survey and accreditation process, but he also did not explain how NCCHC determines compliance with each standard. Penn TT at 2949:22-2951:19; Penn WT, Doc. 4172 ¶ 61. He admitted that when an NCCHC accreditation survey team visits a prison or jail, there is no minimum number or percentage of medical records that are required to be reviewed, and no requirement to interview a certain number or type of health care staff or incarcerated people. Penn TT at 3082:3-3083:13. And, he stated that he has never surveyed a state prison or prison system for NCCHC, and that the last NCCHC audit he conducted of any facility was in 2013. *See id.* at 3234:22-3235:10.

985.    Dr. Penn was Chair of the Board of NCCHC until November 1, 2021, and remains a member of the NCCHC Board. Penn TT at 3062:25-3064:2. As a member of NCCHC's Board, Dr. Penn receives free registration to its meetings, and contributions to his expenses to travel to Board meetings. *Id.* at 3078:25-3079:7.

986.    Finally, Defendants asserted that "[a]pproximately 500" facilities across the nation are accredited by NCCHC. Phillips TT at 2927:21-23. The significance of this is unclear, however, as no evidence was submitted establishing how many facilities have applied or paid for NCCHC accreditation. Defendants' mental health expert, Dr. Penn, testified that of the five jails and ICE detention facilities he has surveyed for the NCCHC, all received accreditation, except for a jail in Orleans Parish, Louisiana, immediately after Hurricane Katrina. Penn TT at 3070:7-3071:9.

987.    The Court finds there is insufficient evidence in the record from which to draw a conclusion as to the thoroughness of the NCCHC accreditation process and the reliability of their accreditation decisions, including how they relate to constitutional standard. However, the Court does not need to make a determination on this issue to reach a ruling in this case. The Court finds that the general finding of accreditation by NCCHC does not rebut the overwhelming evidence of deficient care or the numerous systemic deficiencies that currently are present in the ADCRR. Nor does accreditation establish that a correctional facility provides health care that meets constitutional standards. Rather,

-310-

accreditation by the NCCHC means that the commission has determined, through its own review process, that the correctional facility meets a sufficient number of the NCCHC's own standards. *See* Wilcox TT at 1628:19-24, 1770:21-1771:3, 1966:7-12; Penn WT, Doc. 4172 ¶ 61 (NCCHC assesses the "facility's compliance with the respective jail or prison NCCHC standard[s]"); Phillips TT at 2925:11-17 (same).

988. Evidence of accreditation by the NCCHC thus does not rebut the substantial evidence of longstanding unconstitutional deficiencies in medical and mental health care in this case, which the Court finds credible and reliable.

## VII. CONCLUSION

989. Based on the evidence presented at trial, Defendants' knowledge of the substantial risk of serious harm to class members reliant upon ADCRR to meet their health care needs and the risk to those incarcerated in isolation units cannot be questioned.

990. Despite their awareness of these dangerous conditions, Defendants have consistently failed to take sensible and reasonable steps to remedy them. Instead, they have chosen repeatedly to vigorously oppose Plaintiffs' motions to enforce the Stipulation, and then file baseless appeals in the Ninth Circuit when this Court rules against them.

991. There is only one conclusion: Defendants know that the people incarcerated in their prisons are at substantial risk of harm, and they do not care.

### A. Defendants' State of Mind

#### 1. Years of litigation establish longstanding constitutional deficiencies

992. Defendants know of the substantial risk of serious harm to the plaintiffs because the history of dysfunction and constitutional deficiencies in the health care delivery system and their use of isolation has been exhaustively documented in this litigation since it began in 2012. *See supra* ¶¶ 1-6; *see generally Jensen*, 2021 WL 3828502, at *2 [Doc. 3921 at 3-27].

155617523.3

993. After this Court's approval of the 2014 Stipulation settling the case, Defendants failed to comply with the agreed-upon performance measures required by the Stipulation, and Plaintiffs began filing a series of motions to enforce its terms. *See e.g.*, Docs. 1535, 1576, 1625, 1663, 1806, 1863, 1936, 1944, 2253, 2520, 3026.

994. In 2016 and 2017, the Court consistently found Defendants in violation of the Stipulation and ordered them to submit remedial plans. *See, e.g.*, Docs. 1583 at 2, 1673 at 8, 1709 at 1-2. When those plans failed, the Court ordered further relief, including requiring Defendants to utilize community health providers when they were not able to provide timely care to patients. Doc. 1754 at 4. The Ninth Circuit affirmed this order in 2018. *Parsons v. Ryan* ("*Parsons II*"), 912 F.3d 486, 499 (9th Cir. 2018).

995. But those further orders still did not result in compliance. Noting Defendants' "pervasive and intractable failures" to comply with the Stipulation, in October 2017, the Court ordered them to comply with select measures, report their noncompliance, and show cause why contempt sanctions should not be imposed. Doc. 2373 at 3-4. This also failed.

996. In June 2018, the Court found Defendants' "repeated failed attempts, and too-late efforts, to take their obligation seriously demonstrate a half-hearted commitment that must be braced." *Parsons v. Ryan*, No. CV-12-0601-PHX-DKD, 2018 WL 3239691 at *11 (D. Ariz. June 22, 2018) [Doc. 2898 at 20]. Based on 1,445 instances of non-performance, the Court found Defendants in contempt, and assessed $1,445,000 in contempt fines. *Id.* at 11 [Doc. 2898 at 23]. The Ninth Circuit affirmed this contempt finding in 2020. *Parsons v. Ryan* ("*Parsons III*"), 949 F.3d 443, 473 (9th Cir. 2020).

997. In the Fall of 2018, this Court appointed a Court expert to review Defendants' substantial noncompliance with critical aspects of health care delivery. Doc. 2905. The Court expert, Dr. Marc Stern, found that, with regard to numerous performance measures, Defendants' failure to comply often posed a substantial risk of serious harm to class members. *See, e.g.*, Ex. 1860 (Stern Report) (Doc. 3379) at 63, 74, 76-83, 85-87.

155617523.3

998. Based upon Dr. Stern's report, this Court concluded that Defendants' failure to comply with the performance measures had created "a significant risk of serious harm to prisoners' health and . . . that additional funding [will] be necessary to provide required health care." Doc. 3385 at 2. After seeking input from the parties on how to proceed, the Court ordered several rounds of settlement negotiations. They were not successful.

999. In May 2019, the Court issued an Order finding that Defendants were continuing to be substantially noncompliant with numerous performance measures and that "Defendants' continued excuses for noncompliance do not reflect the seriousness of their prolonged breach of the Stipulation or the ramifications of their failure to meet their obligations in the affected fundamental aspects of health care delivery." Doc. 3235 at 1. The Court issued an Order to Show Cause that Defendants bring 34 performance measures at different prisons into substantial compliance no later than July 1, 2019, or face a contempt finding and sanction of $50,000 for each finding of noncompliance. *Id*. at 6-7.[164]

1000. In January 2020, this Court identified 145 performance measures at various prisons for which Defendants continued to be substantially noncompliant, and ordered them to bring each measure into immediate compliance. Doc. 3490 at 1-4. Failure to do so would result in a contempt finding, and sanctions of $100,000 per performance measure per month per prison. *Id*. at 3. The January 2020 OSC was the third OSC that the Court had issued against Defendants in less than three years. *See* Doc. 3921 at 17 ("The first sanction was $1.445 million and the second was $1.10 million. Neither sanction coerced or even motivated complete compliance. Thus, the January 31, 2020 Order to Show Cause was the third attempt to address Defendants' failure to comply with the Stipulation in critical and significant ways.").

---

[164] In February 2021, the Court found Defendants in contempt of the May 2019 OSC (Doc. 3235), and fined Defendants $1.1 million for their failure to achieve compliance with 22 of the 34 performance measures for the month of June 2019. Doc. 3861 at 14.

155617523.3

1001. Also in 2020, Plaintiffs moved to enforce the Court's Order (Doc. 3518) that implemented Dr. Stern's recommendations about the presumptive length of mental health encounters, and required that shorter encounters be reviewed by clinicians to determine if they were meaningful and appropriate. Doc. 3694. The Court then ordered that a mental health professional perform the necessary evaluation of encounters shorter than the presumptive length. Doc. 3861 at 13, *see also id*. n.11 ("The risk associated with failure to provide meaningful mental health care cannot be overstated."). But Defendants did not comply, forcing Plaintiffs to move for relief again, and once again showing that Defendants had reported inflated compliance numbers. Doc. 3921 at 16. In July 2021, the Court held that

> Defendants admitted they ignored the Court's Order regarding mental health review, stating 'ADCRR determined [mental health professional review] could not be done.' (Doc. 3907 at 6). Critically, Defendants never sought reconsideration or informed the Court that they could not or would not comply. Simply, they chose to violate the order and the Stipulation.

*Id*. at 17.

1002. Defendants' March 26, 2021 response to the January 2020 OSC substantially undercounted the instances of noncompliance for March through December 2020, because they used data they knew to be false. Doc. 3921 at 20; *see* Doc. 3881 at 16; Doc. 3881-2 ¶ 10. Defendants knew when they filed their response with the Court that their data was false because, after Plaintiffs had separately alerted the Court in November 2020 to obvious errors in Defendants' reporting on two measures regarding access to specialty care and one involving dental care (Doc. 3805 at 4-10), Defendants had admitted to the Court—including in declarations signed under penalty of perjury—that their data was wrong because they incorrectly counted noncompliant files as compliant. Doc. 3921 at 20; *see* Doc. 3822 at 2; Ex. 2078 (Doc. 3822-1 ¶¶ 10-11).

1003. At the time of their acknowledgement in December 2020, Defendants assured the Court that they would either re-audit the performance measures on this critical aspect of health care delivery, or change the compliance scores to zero. Doc. 3921 at 20;

-314-

*see* Doc. 3822 at 3.[165] But they did neither. Doc. 3921 at 20. Defendants never updated the Court on the correct data. Instead, when Defendants submitted their March 2021 OSC response, they used the same bad data, once again misrepresenting their compliance failures to the Court, and further demonstrating their lack of commitment to address the deeply entrenched deficiencies. Doc. 3921 at 20.

1004. As this Court has previously noted, between the months of March and December 2020, Defendants were noncompliant with 231 performance measures in the January 2020 OSC, "at $100,000 per violation, for a total of $ 23.1 million." Doc. 3921 at 20. The Court also noted Defendants' noncompliance with 119 performance measures in January-April 2021, which would have been another $11.9 million in possible contempt fines. *Id*. at 25-27. In July 2021, the Court concluded that rather than issuing a contempt fine of $35.0 million, there

> is no plausible compensation that can be provided to Plaintiffs. The dead are not advantaged by Defendants' repeated promises of better behavior in the future, nor are they able to gain from monetary awards. It is impossible to quantify, monetarily, the harm suffered by prisoners because of a lack of adequate health care.

*Id*. at 32.

1005. In July 2021, this Court held that since there was "no evidence that Defendants are interested in performing their obligations under the Stipulation," further measures to elicit different behavior from Defendants would be fruitless, and set the matter for trial. Doc. 3921 at 36-37.

---

[165] Defendants also assured the Court that they had done an investigation and determined that no other performance measures were calculated incorrectly. Doc. 3822 at 3. For this investigation, Defendant Larry Gann submitted a sworn declaration stating that he "conferred with each of the monitors," "analyzed the CGAR findings from the relevant time period," and confirmed that no other performance measures were impacted by Defendants counting as compliant cases that were in fact noncompliant. Doc 3822-1 at ¶ 13.

However, Mr. Gann subsequently admitted in his deposition that contrary to his sworn statement, he had not, in fact interviewed each of the monitors as part of his investigation. Ex. 2067, Individual Deposition of Larry Gann (Oct. 13, 2021) at 111:10-13.

1006. Similarly, Defendants have for years failed to comply with the Stipulation with regard to the isolation Performance Measures. After briefing that continued over the course of two full years (Docs. 3108, 3177, 3203, 3359, 3599, 3775, 3846), in February 2021 this Court found that Defendants were out of compliance with multiple aspects of the Stipulation's isolation provisions. Doc. 3861 at 7-11. The Court found that chronic staff shortages did not justify cancellations of out-of-cell time. *Id*. at 9. The Court also found that the failure to provide recreation in the prescribed locations violated the Stipulation. *Id*. at 10-11. Further, the Court found numerous procedural problems with the way ADCRR was monitoring and documenting practices in max custody units. *Id*. at 7-9. At an even more basic level, the Court found that Defendants' statements regarding their failure to implement the Maximum Custody step program were specious, and concluded that "[i]f Defendants mean that they did not have an intent to 'implement' the [program], then they acknowledge they entered into the Stipulation in bad faith." *Id*. at 2; *see also* Doc. 3734 at 3-4; Doc. 3921 at 15-16.

### 2. Evidence at trial establishes Defendants' knowledge of the violations of constitutional rights.

1007. Evidence presented at trial further establishes that Defendants are well aware of the extensive systemic deficiencies that plague their health care system and their isolation units.

1008. Defendants' refusal to address the chronic and intractable staffing issues is illustrative.

1009. Defendant Shinn admitted that the correctional staffing shortages in ADCRR can pose safety and security risks to incarcerated people. Shinn TT at 2195:21-2196:8.

1010. Insufficient numbers of custody and health care staff have long impeded the delivery of health care. Wilcox WT, Doc. 4138 ¶¶ 10, 151-60; Ex. 1860 (Stern Report) at 95-101; Stewart WT, Doc. 4109 ¶¶ 16-32. Defendants themselves have acknowledged that staffing shortages are a barrier to delivering timely health care. *See e.g.*, Gann TT at

-316-

155617523.3

2366:18-2367:20 (Defendant Gann admitting that many staff have told him that insufficient numbers of health care staff are a barrier to compliance with the Stipulation); Ex. 1971 at 89-91 (Eyman blames nurse shortage for failure to comply with PM 35 requiring transferring medications with patients); *id* at 111-16 (Eyman blames staffing issues for failure to comply with PM 37 requiring timely nurse sick call); *id.* at 118-25 (same at Lewis); *id.* at 126-32 (same at Tucson); *id.* at 139-44 (Eyman cites shortage of CNAs for failure to comply with PM 39 requiring timely scheduling of provider appointments); *id.* at 159-60 (Yuma cites provider shortage for failure to comply with PM 39); *id.* at 259 (Tucson cites staff shortages for failure to comply with PM 45 requiring timely diagnostic tests); *id.* at 439-46 (Florence cites provider shortage for failure to comply with PM 52).

1011. Yet, despite the overwhelming evidence that deficiencies in health care staffing have harmed many class members, and place all class members at substantial risk of serious harm, Defendants have failed to come up with an adequate strategy to address the deficiencies. In fact, as detailed above at ¶¶ 965-76, Defendants cannot even identify how they determined the current number of health care staff required to deliver care under their health care contract, seemingly an essential step toward resolving the problem. Defendants testified that the number was set by Centurion, while Centurion testified that ADCRR set the number. Gann TT at 2360:4-10; Dolan TT at 3596:20-23. Neither party could explain how or when the contractual number of staff was computed.

1012. What is most telling, however, is that months after taking over the contract to provide health care in ADCRR in 2019, Centurion submitted a proposed staffing plan that would have increased health care staffing by 15%. Dolan TT at 3600:24-3601:11; Ex. 2166. Centurion's proposal was based upon an independent evaluation to determine if the number of staff was sufficient. *Id.* at 3598:8-11.

1013. In conducting their independent evaluation, Centurion looked at staffing overages and current needs, and worked with the prison sites to identify additional staff to meet the Stipulation's performance measures. Dolan TT at 3598:12-24. Specifically,

Centurion reviewed "provider visits, nurse lines, number of HNRs, med passes, number of meds that patients are on[, . . . and] man-down encounters per facility. We look at . . . the overall delivery in that facility, and then build the staffing based on the data." *Id.* at 3613:9-20. Among the staffing increases proposed was the addition of a second director of nursing, because Centurion's analysis of the current workload supported having regional nursing directors over the northern and the southern part of the state. *Id.* at 3603:13-3604:7.

1014. Defendants received this staffing proposal from Centurion on January 14, 2020. Dolan TT at 3601:2-11. Defendants effectively ignored it. *Id.* at 3600:9-20.

1015. And in fact, rather than increase the number of health care staff called for in the contract, or address the failure to fill the current positions, Defendants are finding ways to get around the shortages that are particularly problematic. To give one example, Defendant Gann admitted that to address the shortage of psychologists, rather than identify the root causes of why the psychologist positions cannot be filled or stay filled, ADCRR is working with Centurion to instead amend the contract to convert these psychologist positions into lower-level psych associate positions. Gann TT at 2361:9-2362:3. But psych associates have a narrower scope of practice than psychologists, can be unlicensed, and if unlicensed cannot do certain tasks, such as remove people from suicide watch. *Id.* at 2362:4-11.

1016. Defendants also ignore critical information gathered through their internal review processes. Although their mortality review process and psychological autopsy process is flawed (*see supra*, ¶¶ 943-56), Defendants have, in evaluating the care for those who have died, collected substantial information regarding systemic deficiencies through their mortality review and psychological autopsy processes.

1017. These alarming deficiencies include nurses impeding patients' access to their providers and providing inadequate care, providers failing to work up their patients or provide adequate chronic care, providers failing to follow up with patients when they return from the hospital, a failure to identify patterns of self-harm that can escalate to

-318-

suicide attempts, and a failure to monitor the deleterious side effects of psychotropic medications. *See supra* ¶¶ 413, 426-27, 434-35, 443, 496, 513, 610-11, 654, 678, 690, 708

1018. Defendants are aware of these mortality review and psychological autopsy findings. ADCRR's Medical Director, Dr. Grant Phillips, and Centurion's Medical Director Dr. Orm both review and participate in the mortality reviews. Phillips TT at 2895:9-2896:14; Orm Ind. Dep. at 129:3-22. Mental health staff participate in mortality reviews that involve deaths by suicide, as well as psychological autopsies.

1019. Despite the involvement of ADCRR's and Centurion's top medical and mental health officials, the mortality review and psychological autopsy process fails to generate improvement in care because ADCRR lacks a reliable system to translate findings and recommendations into corrective action. Wilcox WT, Doc. 4138 ¶ 141; *see also* Murray TT at 3523:5-10 (Defendants were unable to provide their own expert with any data showing that mortality review recommendations have been tracked or implemented). Similarly, there is no system in place to implement the findings made in a psychological autopsy, and disturbing patterns and similarities have appeared in the deaths by suicide. *See supra* ¶¶ 953-54.

1020. Further, Defendants have ample knowledge of the violations of the rights of the people in solitary confinement. As discussed above, Defendants developed a system of reviewing out-of-cell time and other conditions in Maximum Custody. *See supra* ¶¶ 960-64. According to Warden Van Winkle, the Maximum Custody Notebooks were exchanged between the supervisors at different units to "go through and critique" each book and "make sure that . . . the information in it was correct," and then any discrepancies would be addressed. Van Winkle TT at 2683:16-2684:6. The review process was then repeated by deputy wardens and associate deputy wardens. *Id.* at 2684:7-19. Finally, the review process was repeated by the wardens or deputy wardens of operations. *Id.* at 2684:20-2695:5.

1021. All of these individuals, based on the training provided by ADCRR, reported out-of-cell time that was cancelled as out-of-cell time that was offered, recreation

155617523.3

that was offered in the wrong location as recreation that was offered in the right location, and requirements that were not documented as being met as having been met. *See supra* ¶¶ 961-63. These patently false statements about compliance with the Stipulation were then entered into the CGARS, which were filed with the Court. Van Winkle TT at 2745:7-10; *see, e.g.*, Docs. 3848, 3856, 3865, 3883, 3900, 3915.

1022. Defendant Shinn admitted that the correctional staffing shortages in ADCRR can lead to cancellation of out-of-cell time for people in Maximum Custody units. Shinn TT at 2202:22-2203:9.

1023. Defendant Shinn admitted that correctional staffing shortages in ADCRR can pose safety and security risks to incarcerated people. Shinn TT at 2195:21-2196:8. Defendants create weekly reports that reflect the CO staffing levels at each facility. *See, e.g.*, Exs. 1001-1017, 2177, 2178. The reports for the week of August 23, 2021 showed that at Lewis, CO vacancy rates by housing unit ranged from 15.87% to 61.76%. Shinn TT at 2201:4-17; Ex. 2177. At Eyman, that same week, vacancy rates by housing unit ranged from 30.71% to 48.24%. Shinn TT at 2201:22-2202:5; Ex. 2178. And Defendant Shinn was aware that, as of January 28, 2021, 23% of all COs leave ADCRR within their first year of employment. Shinn TT at 2203:19-2204:4.

### 3. Defendants willfully ignore the grave risk of injury and death to class members

1024. The evidence presented at trial overwhelmingly demonstrated a system in deep crisis, and Defendant prison officials who are "unwilling or incapable of breaking out of a deeply entrenched bureaucratic mind-set, and have refused or been able to take the steps necessary to prevent further needless loss of life and suffering among" incarcerated class members. *Plata v. Schwarzenegger*, No. C01-1351-TEH, 2005 WL 2932253, at *26 (N.D. Cal. Oct. 3, 2005) As another district court found, when appointing a receiver to oversee the delivery of medical care in the California prison system due to its sustained noncompliance with a settlement agreement:

> This mind-set is a classic example of . . . "trained incapacity." State officials have become so inured to erecting barriers to problems that appear to threaten the bureaucracy (or that at least appear to require the bureaucracy to bend or flex) that the officials have trained themselves into a condition of becoming incapable of recognizing, and acting in response to, true crisis.) (citations omitted) Defendants failed to offer any insight how these disastrous conditions developed and what the Defendants are doing to remedy these interdependent and broken systems that have led to numerous disastrous outcomes.

*Id.*

1025. In fact, rather than acknowledge or meaningfully address the overwhelming evidence of problems and harm to the class, Defendants willfully embraced an alternate reality of denialism. For example, Defendant Shinn testified that he was extremely satisfied with Centurion's "extraordinary" performance, that he believes the medical and mental health care provided to incarcerated people meets and often exceeds the community standard of care, and that it has done so continuously for the two years since he became Director. Shinn TT at 2240:22-2241:20. Without a shred of evidence in support, he flippantly asserted that the care incarcerated people receive in state prisons is better than the care that he and others receive in the community, and that the timeliness and access to care that people have in the community is "not even close" to what is provided in ADCRR. *Id.* at 2241:21-2242:5. He confirmed his past statements and reiterated his opinion that ADCRR prisons have been among the safest places in Arizona to live during the COVID-19 pandemic. *Id.* at 2173:10-14, 2242:19-22.

1026. Without any evidence, Defendant Shinn defended the conditions in ADCRR's isolation units, and its policies to indefinitely incarcerate thousands of people in isolation, as not the extreme outliers that they are in the correctional world, but rather as policies that many other prison systems have. He could articulate no legitimate penological justification for the many written and ad-hoc policies that keep hundreds of people in isolation for very long periods of time, with no way to exit these conditions. *See* Shinn TT at 2207:20-2209:3 (admitting that he is unable to identify the penological justification for ADCRR's policy requiring life-sentenced persons to spend a minimum of two years in isolation). He recognized the importance of doing health and welfare checks

-321-

in solitary confinement units, but had no knowledge that industry standards require them to be conducted twice as often as they are conducted in ADCRR. *Id*. at 2218:25-2221:7; *see supra* ¶¶ 209-19. As shown above (*see* ¶¶ 19, 42-43, 45, 54, 101, 149, 289, 348), his assertions that ADCRR's isolation policies are anywhere near the norm compared to other state prison systems are patently false.

1027. Defendants' failure to track basic information about their use of isolation, despite the substantial risk of serious harm it creates, also demonstrates deliberate indifference. Defendants do not track basic data on length of stay in isolation, and thus have no idea how long people are exposed to these damaging conditions. Shinn TT at 2217:6-2218:6. ADCRR does not track the amount of pepper spray used at any facility or by any officer. *Id*. at 2224:14-2225:3, 2225:15-19. ADCRR does not in any way track the use of pepper spray on people on mental health watch. *Id*. at 2225:20-23. Defendant Shinn does not know whether ADCRR tracks information about how long people remain in Maximum Custody even after they have been approved for a lower custody placement. *Id*. at 2213:8-18.

1028. Finally, Defendant Shinn, in preparation for this trial, could not even be bothered to read a single one of the Plaintiffs' expert reports prepared in this case. Shinn TT at 2239:12-2240:8. Nor, for that matter, did Defendant Gann review Dr. Haney's or Dr. Stewart's expert reports regarding mental health care and the psychological damage caused by solitary confinement. Gann TT at 2354:22-25.

1029. In short, there is an abundance of undisputed evidence and court rulings showing that the State of Arizona through its Director of Corrections and his subordinates have at a minimum demonstrated a reckless disregard for their constitutional obligations. This has spawned tragic consequences that never should have been tolerated much less permitted to continue for almost a decade. This Court has no trouble findings Defendants deliberately indifferent to the serious needs of those in their custody.

155617523.3

### B. Defendants' Failure to Take Reasonable Steps to Address Deficiencies

1030. Given Defendants' lack of concern and denialism about ADCRR's current state of dysfunction, it is tragic but predictable that the few steps that they have taken or plan to take to improve conditions are limited and patently insufficient.

1031. Indeed, some of the steps that they have taken are affirmatively counterintuitive to addressing deficiencies. ADCRR *reduced* the penalty for its health care vendor for failing to meet performance measures from $5,000 per month per facility to $500 per month per facility. Shinn TT at 2235:4-18. And as noted above at ¶ 1015, Defendants' solution to an inability to hire psychologists is to convert those contracted positions to lower-level psych associates. Gann TT at 2361:22-2362:3.

1032. Defendants offered evidence of only four primary actions that they assert they have recently undertaken, or that they hope to undertake, to address deficiencies in their prison system:

- In an attempt to address ADCRR's and its vendors' chronic inability to fill vacant health care staff positions, the June 2021 contract amendment has provisions for a fund to provide bonuses to new Centurion staff who stay on for a certain period of time. Gann TT at 2308:2-16.

- Defendant Gann claimed at trial that the monitoring bureau had recently implemented a new process to investigate and hold meetings about possible root causes of poor performance with some Stipulation performance measures. Gann TT at 2275:10-2276:6, 2279:5-8, 2279:20-2280:4, 2282:25-2283:10.

- Dr. Phillips very recently instituted quarterly meetings to provide education to clinicians about deficiencies identified in the mortality reviews. Phillips TT at 3668:14-3669:16. Defendants offered no evidence that similar remedial measures may be planned with regard to deficiencies identified in psych autopsies and mortality reviews of class members who die by suicide.

- The outstanding Request for Proposals for the next round of the privatization of health care services asks that eOMIS, the current electronic health record, be replaced. Gann TT at 2349:19-2350:5.

1033. The Court finds that these half-hearted remedial efforts aimed at the health care system, most of which were undertaken only after the Court set the matter for trial or have not actually gone into effect, fail to approach the type of dramatic and transformative measures that will be necessary to ensure that people incarcerated in Defendants' prisons have access to medical and mental health care that is minimally adequate. Moreover, in

-323-

the case of the first three items, the initiatives are very new, and lack any type of track record to demonstrate sustainable resolution of the underlying deficiencies. *See, e.g.*, Gann TT at 2411:13-17 (Defendant Gann testifying that he does not know how many positions have been filled, if any, as a result of the sign-on bonus). The fourth measure, replacement of the inadequate electronic health record, has yet to occur.

1034. Finally, during the entirety of the trial, Defendants failed to offer *any* evidence of *any* remedial efforts to address the unconscionable conditions of confinement in their isolation units.

155617523.3

# CONCLUSIONS OF LAW

To the extent that any Findings of Fact above are deemed to be Conclusions of Law, they are incorporated into these Conclusions of Law.

## I.  THE EIGHTH AMENDMENT ANALYSIS FOR PROSPECTIVE RELIEF

1035. "Underlying the Eighth Amendment is the fundamental premise that [incarcerated people] are not to be treated as less than human beings." *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979). Thirty years later, the Supreme Court affirmed this principle:

> As a consequence of their actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.

*Brown v. Plata*, 563 U.S. 493, 510 (2011) (citations and internal quotation omitted).

1036. When challenging conditions of confinement under the Eighth Amendment, incarcerated people must satisfy a two-part test. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The first, "objective" prong requires a showing that a person "is incarcerated under conditions posing a substantial risk of serious harm." *Id*. The second, "subjective" prong requires a showing that "a prison official . . . ha[s] a sufficiently culpable state of mind" in order to be liable under the Eighth Amendment. *Id*. Such a state of mind "is one of deliberate indifference to inmate health or safety." *Id*.

1037. Under the objective prong, incarcerated people must provide evidence of harms that deprive them of the "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. These necessities include "food, clothing, shelter, medical care and reasonable safety," *Helling v. McKinney*, 509 U.S. 25, 32 (1993), along with "warmth [and] exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991), and "social contact and environmental stimulation." *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 679 (M.D. La.

2007). And "the requirements for mental health care are the same as those for physical health care needs." *Doty v. Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994).

1038. Eighth Amendment protections are not limited to health care or safety. Prison officials' treatment of incarcerated persons violates the Eighth Amendment, regardless of whether it causes physical injury, when it "offend[s] contemporary concepts of decency, human dignity, and precepts of civilization which we profess to possess." *Hope v. Pelzer*, 536 U.S. 730, 737 & n.6, 738 (2002) (holding that prison officials violated the Eighth Amendment by handcuffing a prisoner to a hitching post, thereby knowingly subjecting him to a substantial risk of physical harm, unnecessary pain, prolonged thirst, taunting, and deprivation of bathroom breaks that created a risk of discomfort and humiliation; and finding that such treatment "violated the basic concept underlying the Eighth Amendment, which is nothing less than the dignity of man.") (citations and quotation marks omitted); *see*, *e.g.*, *Benefield v. McDowall*, 241 F.3d 1267, 1272 (10th Cir. 2001) (declaring that psychological injury claims are cognizable under the Eighth Amendment); *Scher v. Engelke*, 943 F.2d 921, 924 (8th Cir. 1981) (holding that "the scope of Eighth Amendment protection is broader than the mere infliction of physical pain;" evidence of "fear, mental anguish and misery" can be sufficient to state an Eighth Amendment claim).

1039. In assessing whether a risk of harm violates "contemporary standards of decency," courts rely on federal and state practices, as well as scientific studies. *See Hall v. Florida*, 572 U.S. 701, 709-10 (2014) (holding that it was "proper to consider the psychiatric and professional studies" to resolve an Eighth Amendment claim); *Graham v. Florida*, 560 U.S. 48, 62 (2010) (looking to federal and state practices to resolve Eighth Amendment claim); *Spain*, 600 F.2d at 200 ("[W]hen confronting the question whether penal confinement in all its dimensions is consistent with the constitutional rule, the court's judgment must be informed by current and enlightened scientific opinion as to insure good physical and mental health for prisoners.").

155617523.3

1040. Conditions of confinement can violate the Eighth Amendment "alone or in combination." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). If a prisoner challenges a combination of conditions, she must demonstrate that the conditions have "a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Wilson*, 501 U.S. at 304.

1041. Based on the evidence presented at trial and as detailed exhaustively above in the Findings of Fact (FOF), *see* ¶¶ 367-976, the Court concludes that the systemic deficiencies in Defendants' provision of health care to incarcerated people in Arizona's prisons places Plaintiffs at substantial risk of serious harm, including permanent injury and death. Similarly, the Court concludes that Defendants' isolation practices and conditions in ADCRR isolation units create a substantial risk of serious harm to all persons who are exposed to them. FOF ¶¶ 14-366.[166]

1042. Under the subjective prong of the *Farmer* inquiry, deliberate indifference "l[ies] somewhere between the poles of negligence . . . and purpose or knowledge . . ." *Farmer*, 511 U.S. at 836. Put another way, deliberate indifference "is the equivalent of recklessly disregarding" a "substantial risk of serious harm." *Id*. Though the "Eighth Amendment requires consciousness of a risk," *id.* at 840, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official failed to act despite his knowledge of a substantial risk of serious harm," *id.* at 842, and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that it was obvious." *Id*. Circumstantial evidence, if strong enough, may be sufficient to establish deliberate indifference even without direct evidence of what prison officials knew or thought. *Id.* at 842-43.

1043. In an injunctive case, such as this one, prison officials' knowledge of the risk is not at issue, as the litigation itself puts them on notice. *See Hadix v. Johnson*, 367

---

[166] All citations to the Findings of Fact incorporate by reference any citations to the record contained therein.

155617523.3

F.3d 513, 526 (6th Cir. 2004) ("If [prison] conditions are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong because the same information that would lead to the court's conclusion was available to the prison officials"). Moreover, in an injunctive case, the plaintiffs do not seek to impose individual liability on the defendants, but rather sue defendants in their official capacity and seek a court order to remedy the problem. *See Hutto v. Finney*, 437 U.S. 678, 699 (1978) (holding that an injunctive suit is, for practical purposes, a suit against the state); *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985) (same). Therefore, the focus on deliberate indifference is "broader and more generalized" than in damage cases, with the emphasis on the "combined acts or omissions" of the prison officials. *See Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Courts have held that in injunctive cases, liability can be premised on "'repeated examples of negligent acts which disclose a pattern of conduct . . .' or by showing 'systemic or gross deficiencies in staffing, facilities, equipment or procedures.'" *French v. Owens*, 777 F.2d 1250, 1254 (7th Cir. 1985) (*quoting Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980), *cert denied* 450 U.S. 1041 (1981)).

1044. "That the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). In an injunctive case, plaintiffs need not show actual physical injury; rather, the Constitution is violated by an unreasonable risk of harm. *Id*. at 33, 34 (noting that it "would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them"); *see also Brown*, 563 U.S. at 531-32 ("Even prisoners with no present physical or mental illness may become afflicted, and all prisoners in California are at risk so long as the State continues to provide inadequate care. . . . Prisoners who are not sick or mentally ill . . . [are] in no sense [] remote bystanders in California's medical care system. They are that system's next potential victims."); *Parsons v. Ryan*, 754 F.3d 657, 677 (9th Cir. 2014) ("*Parsons I*") ("we have repeatedly recognized that prison officials are constitutionally prohibited from being

deliberately indifferent to policies and practices that expose inmates to a substantial risk of serious harm").

1045. Finally, a "[l]ack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations." *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc) (citations omitted); *Casey v. Lewis*, 834 F. Supp. 1477, 1548 & n.6 (D. Ariz. 1993) ("[b]udgetary constraints are not a defense to liability for deliberate indifference to inmates' serious medical care needs."); *see also Kosilek v. Maloney*, 221 F. Supp. 2d 156, 161 (D. Mass. 2002) ("It is not, however, permissible to deny an inmate adequate medical care because it is costly.").

1046. Based on the overwhelming undisputed evidence presented at trial, Defendants' own testimony, and the detailed evidence summarized above in the Findings of Fact, the Court concludes that, given the years of litigation, (a) Defendants are fully aware of the constitutional deficiencies in their isolation units and in health care; (b) Defendants have failed to take reasonable steps to address these deficiencies; and (c) Defendants willfully disregard the substantial risk of serious harm to Plaintiffs, including permanent injury or death, and thus have acted and continue to act with deliberate indifference. FOF ¶¶ 989-1034.

## II.   THE MINIMAL REQUIREMENTS OF A PRISON HEALTH CARE SYSTEM

1047. The Eighth Amendment's prohibition on "cruel and unusual punishments" extends to a State's failure to provide minimally adequate health care that "may result in pain and suffering," and accordingly the Eighth Amendment prohibits deliberate indifference to prisoners' serious health needs. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or

injury states a cause of action under § 1983." *Graves v. Arpaio*, No. CV-77-0479-PHX-NVW, 2008 WL 4699770, at *8 (D. Ariz. Oct. 22, 2008), *aff'd* 623 F.3d 1043 (9th Cir. 2010).

1048. The elements of a minimally adequate correctional health care system under the Eighth Amendment include:

> that prison officials provide a system of ready access to adequate medical care. Prison officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical problems known to the medical staff. Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems. The medical staff must be competent to examine prisoners and diagnose illnesses. It must be able to treat medical problems or to refer prisoners to others who can. Such referrals may be to other physicians within the prison, or to physicians or facilities outside the prison if there is reasonably speedy access to these other physicians or facilities. In keeping with these requirements, the prison must provide an adequate system for responding to emergencies. If outside facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then the prison must provide adequate facilities and staff to handle emergencies within the prison. These requirements apply to physical, dental and mental health.

*Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (citation omitted), *overruled in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *see also Brown*, 563 U.S. at 510-11 ("Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate care, is incompatible with the concept of human dignity and has no place in civilized society.").

1049. To provide constitutionally-adequate medical care, prisons must provide treatment that meets "[a]ccepted standards of care and practice within the medical community." *Edmo v. Corizon, Inc*., 935 F.3d 757, 767 (9th Cir. 2019); *Howell v. Evans*, 922 F.2d 712, 719 (11th Cir. 1991) ("[T]he contemporary standards and opinions of the medical profession also are highly relevant in determining what constitutes deliberate indifference to medical care."); *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (holding that the incarcerated plaintiff could "prove his case by establishing that [his] course of

-330-

1  treatment, or lack thereof, so deviated from professional standards that it amounted to

2  deliberate indifference").

3      1050. When the entire system of health care is challenged in a class action

4  injunctive suit, as it is here, deliberate indifference "may be shown by proving repeated

5  examples of negligent acts which disclose a pattern of conduct by the prison medical staff,

6  or by proving there are such systemic and gross deficiencies in staffing, facilities,

7  equipment, or procedures" that effectively deny incarcerated persons access to adequate

8  medical care. *Ramos*, 639 F.2d at 575 (citation omitted); *Gibson v. Cnty. of Washoe*, 290

9  F.3d 1175, 1196 (9th Cir. 2002) ("When policymakers know that their medical staff

10  members will encounter those with urgent mental health needs yet fail to provide for the

11  identification of those needs, it is obvious that a constitutional violation could well

12  result."); *Cabrales v. Cnty. of L.A.*, 864 F.2d 1454, 1461 (9th Cir. 1988), *vacated and*

13  *remanded*, 490 U.S. 1087 (1989), *reinstated*, 886 F.2d 235 (9th Cir. 1989) (concluding

14  that mentally ill detainees went untreated because the limited number of psychiatric staff

15  permitted only minutes per month with each patient); *Toussaint v. McCarthy*, 801 F.2d

16  1080, 1112 (9th Cir. 1986) ("If plaintiffs correctly contend that unqualified personnel

17  regularly engage in medical practice, precedent indicates that the prison health care

18  delivery system may reflect deliberate indifference to plaintiffs' medical needs."),

19  *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *Wellman*

20  *v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (citing *Ramos*, 639 F.2d at 575); *Casey v.*

21  *Lewis*, 834 F. Supp. 1477, 1543 (D. Ariz. 1993) (citing *Wellman*, 715 F.2d at 272).

22      1051. Defendants must meet constitutional requirements, regardless of which

23  private vendor they may hire to provide health care services. "Contracting out prison

24  medical care does not relieve the State of its constitutional duty to provide adequate

25  medical treatment to those in its custody." *West v. Atkins*, 487 U.S. 42, 56 (1988); *see also*

26  *Ancanta v. Prison Health Servs., Inc.*, 769 F.2d 700, 706 & n.11 (11th Cir. 1985) (holding

27  that the state is liable for the contractor's unconstitutional policies and practices if the

28  contractor is allowed to determine policy either "expressly or by default").

155617523.3

**A.    Serious Medical or Mental Health Need**

1052.  In the Ninth Circuit, an incarcerated person may show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (citation and quotation marks omitted); *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), *cert. granted, judgment vacated sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), *and opinion reinstated*, 658 F.3d 897 (9th Cir. 2011) (same); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (same); *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (same); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (same), *overruled in part on other grounds by WMX Techs., Inc.* v. *Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

1053.  Conditions that significantly affect a person's daily activities or result in chronic and substantial pain constitute serious medical needs, even if they are not life-threatening. *See*, *e.g.*, *Akhtar*, 698 F.3d at 1213 (rejecting officials' claims that prisoner had not alleged sufficiently serious medical needs when officials repeatedly ignored his disability, causing him chronic pain and humiliation); *McGuckin*, 974 F.2d at 1059-60 ("[T]he presence of a medical condition that significantly affects an individual's daily activities[,] or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment."); *Glover v. Ryan*, No. CV-21-00676-PHX-ROS (CDB), 2021 WL 2714620, at *6 (D. Ariz. July 1, 2021) (granting preliminary injunction ordering ADCRR and Centurion to send prisoner to urology specialist after he suffered groin and abdominal pain for untreated shrunken testicle); *Moreland v. Wharton*, 899 F.2d 1168, 1170 (11th Cir. 1990) (holding that the lack of medical treatment for a "significant and uncomfortable health problem" states a constitutional claim).

1054.  Mental health needs are as serious as physical health needs. *Doty*, 37 F.3d at 546 ("In accordance with the other courts of appeals that have examined this issue, we now hold that the requirements for mental health care are the same as those for physical

-332-

health care needs.") (citing *Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991); *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990); *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990)); *see also Partridge v. Two Unknown Police Officers*, 791 F.2d 1182, 1187 (5th Cir. 1986) ("A serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills."). In *Coleman v. Wilson*, the court set out "six basic, essentially common sense, components of a minimally adequate prison mental health care delivery system" to include:

> (1) a systematic program for screening and evaluating inmates to identify those in need of mental health care; (2) a treatment program that involves more than segregation and close supervision of mentally ill inmates; (3) employment of a sufficient number of trained mental health professionals; (4) maintenance of accurate, complete and confidential mental health treatment records; (5) administration of psychotropic medication only with appropriate supervision and periodic evaluation; and (6) a basic program to identify, treat, and supervise inmates at risk for suicide.

912 F. Supp. 1282, 1298 & n.10 (E.D. Cal. 1995) (citing *Balla v. Idaho State Bd. of Corrs.*, 595 F. Supp. 1558, 1577 (D. Idaho 1984).

1055. The evidence before the Court establishes that many people incarcerated in Arizona's state prisons have serious medical and mental health needs. *See generally* FOF ¶¶ 367-766. And while there may be other class members who currently do not have a "present physical or mental illness," they "may become afflicted, and … are [the] system's next potential victims." *Brown*, 563 U.S. at 531-32.

**B.    Adequate Numbers and Types of Qualified Health Care Staff**

1056. "[A] district court may infer a policy of deliberate indifference from evidence of medical understaffing." *Graves*, 2008 WL 4699770, at *9 (citing *Cabrales*, 864 F.2d at 1461). To provide constitutionally adequate health care, prisons must have "sufficient, qualified" staff who are "properly trained and supervised." *Madrid v. Gomez*, 889 F. Supp. 1146, 1201 (N.D. Cal. 1995) (medical); *see Coleman*, 912 F. Supp. at 1298 & n.10 (mental health); *see also Balla*, 595 F. Supp. at 1577 (adequate treatment of

-333-

mentally ill incarcerated people "requires the participation of trained mental health professionals, who must be employed in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders") (citation omitted); *French*, 777 F.3d at 1254.

1057. Prisons must not only have sufficient numbers of staff, *see Graves v. Arpaio*, 48 F. Supp. 3d 1318, 1335 (D. Ariz. 2014), *amended*, No. CV-77-00479-PHX-NVW, 2014 WL 6983316 (D. Ariz. Dec. 10, 2014) ("A policy of medical understaffing may show deliberate indifference."), but such staff must be "competent to examine prisoners and diagnose illnesses," *Hoptowit*, 682 F.2d at 1253. "Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems." *Id*.

1058. The failure to fill health care and / or correctional staff positions "illustrates . . . disregard of risk of harm. . . . because systemic and gross deficiencies arising from understaffing have persisted and effectively denied prisoners access" to adequate care. *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1256 & n.81 (M.D. Ala. 2017) (citing *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000)). "Furthermore, difficulties in recruiting do not negate the fact that understaffing has caused this serious systemic deficiency." *Id*.; *see also Wellman*, 715 F.2d at 273 (failure of prison to fill authorized position weighs "more heavily against the state than for it," because the authorized salary was inadequate and the prison's effort was insufficient); *Madrid*, 899 F. Supp. at 1227 (holding that "recruitment difficulties do not excuse compliance with constitutional mandates.").

1059. The evidence establishes that Defendants, acting with deliberate indifference, have failed for years to ensure that there is an adequate number or classifications of health care staff to ensure that minimally adequate mental health and medical care is provided to people in their prisons, and that the failure to ensure adequate staffing places all Plaintiffs at substantial risk of serious harm, in violation of the Eighth Amendment. FOF ¶¶ 392-407, 457-460, 507, 539, 630-631, 640, 758, 776-779, 863-941, 965-969, 976, 1008-1015, 1031-1033.

### C. Health Care Records

1060. "Inadequate medical records may create a risk of unnecessary pain and suffering in violation of the Eighth Amendment." *Graves*, 2008 WL 4699770, at *10. "Accurate and complete medical records are essential to adequate medical care." *Madrid*, 889 F. Supp. at 1203; *see also Coleman*, 912 F. Supp. at 1314 ("A necessary component of minimally adequate medical care is maintenance of complete and accurate medical records. Defendants have a constitutional obligation to take reasonable steps to obtain information necessary to the provision of adequate medical care. … The harm that flows to class members from inadequate or absent medical records is manifest."); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1055 (8th Cir. 1989) ("The keeping of medical records is . . . a necessity.").

1061. The Court concludes, based upon the evidence before it, that Defendants, acting with deliberate indifference, fail to maintain a functional, accurate, and complete health records system, and that Defendants' poor and incomplete health care records system places Plaintiffs at substantial risk of serious harm, in violation of the Eighth Amendment. FOF ¶¶ 673, 735, 781-815.

### D. Timely Access to Competent and Minimally Adequate Care

1062. Prison officials may not subject incarcerated people to unreasonable delays in providing health care, *Estelle*, 429 U.S. at 104, and prisons must "provide a system of ready access to adequate medical care." *Hoptowit*, 682 F.2d at 1253. The failure to provide a sick call system that ensures incarcerated people receive required care amounts to deliberate indifference. *Id.* at 1252-53 ("[p]rison officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical problems known to the medical staff."); *see also Bass ex rel. Lewis v. Wallenstein*, 769 F.2d 1173, 1184-86 (7th Cir. 1985) (finding that known deficiencies in the sick call system supported a finding of deliberate indifference); *Morales Feliciano v. Roselló González*, 13 F. Supp. 2d 151, 210 (D.P.R. 1998) (the failure to provide a sick call system that ensures that incarcerated people receive needed care can result in constitutional violations).

-335-

1063. Once incarcerated persons are seen by a nurse on sick call, if their health needs require the attention of a more highly-trained provider, then they must be given timely access to the higher levels of care. *Hoptowit*, 682 F.2d at 1253 ("medical staff must . . . be able to treat medical problems or to refer prisoners to others who can"); *Mata v. Saiz*, 427 F.3d 745, 756-58 (10th Cir. 2005) (reversing summary judgment in favor of a licensed practical nurse (LPN) who failed to consult with a provider about a patient suffering from severe chest pain); *Mandel v. Doe*, 888 F.2d 783, 789-90 (11th Cir. 1989) (damages awarded where physician's assistant failed to diagnose a broken hip, refused to order an x-ray, and failed to refer the patient to a physician); *Rodrigue v. Morehouse Det. Ctr.*, No. 09-985, 2012 WL 4483438, at *6 (W.D. La. Sept. 28, 2012) (entering judgment against LPN who failed to fulfill function as gatekeeper in the case of a patient with persistent severe abdominal pain); *Petricjko v. Kurtz*, 117 F. Supp. 2d 467, 473 (E.D. Pa. 2000) (denial of access to a physician for two weeks stated a deliberate indifference claim); *Langley v. Coughlin*, 715 F. Supp. 522, 540 (S.D.N.Y. 1989) (use of unqualified lower level mental health staff, with inadequate involvement and supervision by a psychiatrist, supported constitutional claims).

1064. Reliance on "physician substitutes" results in having lower-level personnel make decisions and perform services beyond what they are qualified and trained to perform. *Ramos*, 639 F.2d at 576; *Toussaint*, 801 F.2d at 1111-12 (medical technical assistants and registered nurses cannot lawfully render services beyond their qualifications); *Madrid*, 889 F. Supp. at 1258 (noting inadequate supervision of medical assistants who determined if a patient could see a physician); *Balla*, 595 F. Supp. at 1566, 1575-76 (lower level medical personnel of a "medical services manager," physician's assistant, and nurse practitioner were performing functions that should have been performed by a doctor, and for which "they are neither trained nor licensed to provide."). *See also Garner v. Winn Corr. Ctr.*, No. 1:08-CV-01977, 2011 WL 2011502, at *5 (W.D. La. May 18, 2011) ("Simply sending an LPN to look at Garner and make a 'diagnosis'

was not providing Garner with medical care."). Nor can "standing orders" substitute for adequate access to an on-site physician. *Ramos*, 639 F.2d at 576.

1065. Finally, the receipt of some minimal health care treatment is not dispositive of an Eighth Amendment claim; "a prisoner is not required to show that he was literally ignored" in order to show prison officials were deliberately indifferent to health care needs. *Greeno v. Daley*, 414 F.3d 645, 653-54 (7th Cir. 2005); *see Rodriguez v. Ryan*, No. CV-11-01373-PHX-NVW, 2013 WL 11311237, at *3 (D. Ariz. Sept. 9, 2013) (same).

1066. The evidence before the Court establishes that Plaintiffs experience unacceptable delays before receiving what is often inadequate or superficial health care, and often suffer a failure to receive any health care at all; and that Defendants, acting with deliberate indifference, over-rely upon lower-level health care personnel to provide health care to many patients with complex medical and mental health needs. FOF ¶¶ 381, 408-491, 521-550, 552-570, 575-584, 654-678, 694-729. Accordingly, the Court concludes that these systemic deficiencies in access to timely and competent health care place Plaintiffs at substantial risk of serious harm, including injury and death, in violation of the Eighth Amendment.

### E. Language Interpretation in Health Care Encounters

1067. Another essential component of a constitutionally adequate health care system is patients' ability to fully, effectively, and accurately communicate with health care staff. Prison officials must provide interpretation services during health care encounters for patients who do not speak English. *See Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1317 (9th Cir. 1995), *opinion amended on denial of reh'g*, 75 F.3d 448 (9th Cir. 1995) (affirming injunction requiring provision of non-detainee translators for medical encounters, and noting that the evidence showed that relying on other incarcerated people to serve as translators "was inappropriate and potentially inaccurate"); *Wellman*, 715 F.2d at 272 ("An impenetrable language barrier between doctor and patient can readily lead to misdiagnoses and therefore unnecessary pain and suffering"); *see also Graves*, 2008 WL 4699770, at *29 ("Some pretrial detainees do not speak or write English; some are not

-337-

1  literate at all. They have difficulty communicating about their health care needs in writing

2  on the sick call request forms.").[167]

3     1068. This includes people who are deaf and who communicate using sign

4  language. In *Pierce v. Dist. of Columbia*, the court held that

> prison officials have an affirmative duty to assess the potential
> accommodation needs of inmates with known disabilities who
> are taken into custody and to provide the accommodations that
> are necessary for those inmates to access the prison's
> programs and services, without regard to whether or not the
> disabled individual has made a specific request for
> accommodation and without relying solely on the assumptions
> of prison officials regarding that individual's needs.

10  128 F. Supp. 3d 250, 272 (D.D.C. 2015); *see also Armstrong v. Brown*, 939 F. Supp. 2d

11  1012, 1026 (N.D. Cal. 2013) (ordering California prison system to provide qualified sign

12  language interpreters during all mental health rounds of segregation units, and reiterating

13  past orders and agreements to provide them in all other health care encounters).[168]

14     1069. The Court concludes, based upon the evidence before it, that Defendants,

15  acting with deliberate indifference, fail to ensure full, accurate, and effective

16  communication between class members who are not fluent in English (either because they

17

---

18  [167] *See also* U.S. Dep't of Justice, App'x A, *Guidance to Federal Financial
   *Assistance Recipients Regarding Title VI Prohibition Against National Origin*
19  *Discrimination Affecting Limited English Proficient Persons*, 67 Fed. Reg. 41,455, 41,469
   (June 18, 2002) ("Intake/Orientation plays a critical role . . . in the system's identification
20  of LEP prisoners"); *Jones v. Gusman*, 296 F.RD. 416, 454 (E.D. La. 2013) (finding the
   defendant "does not keep a record, whether through intake classification or through some
21  other process, of inmates that do not speak English.").
   [168] Public entities such as ADCRR must provide people not fluent in English who
22  are deaf with needed auxiliary aids to ensure "effective communication" in health care
   encounters under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et
23  seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Arizonans
   with Disabilities Act, A.R.S. § 41-1492 *et seq.* "In determining what type of auxiliary aid
24  is necessary, a public entity must 'give primary consideration' to the accommodations
   requested by the disabled individual." *Updike v. Multnomah Cnty.*, 870 F.3d 939, 950 (9th
25  Cir. 2017) (quoting 28 C.F.R. § 35.160(b)(2)). "Medical evaluations often will be the type
   of complex and lengthy situation in which an [American Sign Language] interpreter
26  should be provided." *Id.* at 956.
      It is undisputed that "[s]tate prisons fall squarely within the statutory definition of
27  'public entity,' which includes 'any department, agency, special purpose district, or other
   instrumentality of a State or States or local government.'" *Penn. Dep't of Corrs. v. Yeskey*,
28  524 U.S. 206, 210 (1998) (quoting ADA, 42 U.S.C. § 12131(1)(B)).

speak another language, or because they are d/Deaf) and health care staff, and Defendants' failure to provide appropriate accommodations and interpretation in health care encounters places non-English speaking class members at substantial risk of serious harm, in violation of the Eighth Amendment. FOF ¶¶ 816-862.

### F. Access to Necessary Medications

1070. One cornerstone of an adequately functioning correctional health care system is that incarcerated people are provided necessary and appropriate medications, and the failure to provide needed medication or to properly supervise their prescription, constitutes deliberate indifference to serious health care needs. *See, e.g.*, *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (failure to provide medications ordered by doctor violates Eighth Amendment); *Sullivan v. Cnty. of Pierce*, No. 98-35399, 2000 WL 432368, at *1-2 (9th Cir. Apr. 21, 2000) (reversing and remanding for reconsideration of deliberate indifference where a jail detainee did not receive his HIV medication for at least two days); *Deng v. Ryan*, No. 19-04589-PHX-JAT (JFM), 2021 WL 3709810, at *11-12 (D. Ariz. Aug. 20, 2021) (denying summary judgment for Arizona's health care vendor Centurion when diabetic incarcerated person did not receive necessary medications due to interruptions in refilling the prescriptions: "A prison would expect to have prisoners in its custody who require continued medication for chronic conditions. It follows that policies would be implemented to address the renewals and refills of medication. . . . Centurion was obligated under the Eighth Amendment to provide adequate medical care, including medication, and a practice of failing to timely renew medications may rise to deliberate indifference. Likewise, a failure to enact a policy to guide employees and ensure that there are no lapses in medically necessary medication may also rise to deliberate indifference."). *See also Steele v. Shah*, 87 F.3d 1266, 1269-70 (11th Cir. 1996) (deliberate indifference can be found in abrupt and unsupported discontinuation of medications); *Gates v. Cook*, 376 F.3d 323, 342-43 (5th Cir. 2004) (monitoring and assessment of psychotropic medication levels required); *Thomas v. Kippermann,* 846 F.2d 1009, 1010-11 (5th Cir. 1988) (noting that the plaintiff's claim was

viable "if he told jail authorities that he needed his prescribed medication . . . and if they did not have him examined or otherwise adequately respond to his requests"); *Wellman*, 715 F.3d at 272-73 (psychiatrist must supervise psychotropic medication).

1071. A prison's failure to provide and manage current, appropriate medication (or, in other words, a prison's practice of offering older or cheaper medications that put patients at higher risk of preventable side effects), also can constitute deliberate indifference. *See Porretti v. Dzurenda*, 11 F.4th 1037, 1052 (9th Cir. 2021) (affirming preliminary injunction requiring defendants to provide incarcerated plaintiff Wellbutrin and Seroquel); *Atwood v. Days*, No. CV-20-00623-PHX-JAT (JZB), 2021 WL 5811800, at *6-7 (D. Ariz. Dec. 7, 2021) (this Court rejecting as "unpersuasive" Centurion's reliance on its "unwritten policy that opiates only be prescribed for patients with severe pain, terminal illness with pain, or other long-term disease" in abruptly discontinuing Tramadol for patient who has spinal injuries requiring full-time use of a wheelchair, and issuing preliminary injunction to restore the patient's Tramadol prescription and the specialist's recommended epidural injections); *see also Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (officials' failure to provide prisoner with already prescribed pain medication for the pain of cancer and cancer treatment "borders on the barbarous"); *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 48 (D. Mass. 2018) (finding likelihood of success on Eighth Amendment claim where officials ignored doctor's recommendation to provide Medication Assisted Therapy (MAT) for opioid use disorder);[169] *Taylor v. Barnett*, 105 F. Supp. 2d 483, 489 & n.2 (E.D. Va. 2000) (allegation that HIV medication was changed solely for reason of cost, without medical reason, stated a deliberate indifference claim). This is especially the case for medications that have the side effect of making patients more susceptible to injury or death from high temperatures. *See Gibson v. Moskowitz*, 523 F.3d 657, 662-63 (6th Cir. 2008) (affirming jury's finding of deliberate indifference by

---

[169] Opiate withdrawal is a serious medical need to which prison officials may not be deliberately indifferent. *Foelker v. Outagamie Cnty.*, 394 F.3d 510, 513 (7th Cir. 2005) (finding opiate withdrawal is a serious medical need); *Gonzalez v. Cecil Cnty.*, 221 F. Supp. 2d 611, 616 (D. Md. 2002) (heroin withdrawal is a serious medical need).

prison to the "thermoregulation" side effects of prescribed psychotropic medications); *Graves*, 623 F.3d at 1048-49 (affirming injunction requiring that incarcerated patients who are taking psychotropic medications be housed in areas where temperatures do not exceed 85 degrees Fahrenheit).

1072. A functioning prison health care system also must have a sufficiently organized and staffed system for the delivery and administration of medication. *See, e.g.*, *Williams v. Edwards*, 547 F.2d 1206, 1216-17 (5th Cir. 1977) (finding deliberate indifference where there were, among other things: a disorganized pharmacy, out-of-date supplies, no system for updating supplies, outdated drugs, inadequate records of medications dispensed, and prisoners not receiving their prescribed medications); *Newman v. State of Ala.*, 503 F.2d 1320, 1331 (5th Cir. 1974) ("Courts will not tolerate serious shortages in medication."); *Graves*, 2008 WL 4699770, at *32 (finding that defendant "does not consistently ensure that all pretrial detainees actually receive all prescribed medications as ordered").

1073. The evidence before the Court establishes that Defendants, acting with deliberate indifference, (a) fail to provide and manage current, appropriate medications; (b) fail to administer and deliver medications—especially medications for serious chronic medical and mental health conditions—as prescribed; and (c) fail to monitor patients for adverse side effects due to prescription medications. FOF ¶¶ 126-129, 381, 410-413, 432-436, 441-448, 492-520, 694-724, 767-780. These systemic failures, individually and in combination, places Plaintiffs at substantial risk of serious harm, in violation of the Eighth Amendment.

### G.    Access to Medical Supplies, Appliances, and Assistive Devices

1074. Pursuant to their obligations under the Eighth Amendment, prison officials must provide incarcerated people with serious medical needs or disabilities the medical devices, supplies, and equipment that such patients need to live a minimally decent life in prison. *See Casey*, 834. F. Supp. 1569, 1581 (D. Ariz. 1993) ("mobility impaired inmates must be provided with wheelchairs and other mobility aids."), citing *Johnson v. Hardin*

*Cnty., Ky.*, 908 F.2d 1280, 1284 (6th Cir. 1990); *see also Miller v. King*, 384 F.3d 1248, 1261-62 (11th Cir. 2004) (allegations by person with paraplegia of denial of leg braces, orthopedic shoes, and urinary catheters raised an Eighth Amendment claim), *vacated and superseded on other grounds*, 449 F.3d 1149 (11th Cir. 2006); *Bradley v. Puckett*, 157 F.3d 1022, 1025-26 (5th Cir. 1998) (denial for two months of a shower chair to a person with leg braces raised an Eighth Amendment claim); *Hennings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998) (denial of crutches to person with serious leg injury raised an Eighth Amendment claim); *Johnson*, 908 F.2d at 1284 (denial of crutches supported a finding of deliberate indifference); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1243-44 (5th Cir. 1989) (failure to provide catheter supplies, a hospital mattress, and other medical supplies to an incontinent man with paraplegia raised an Eighth Amendment claim); *Parrish v. Johnson*, 800 F.2d 600, 605 (6th Cir. 1986) (leaving a patient with paraplegia lying in his own feces violated the Eighth Amendment); *Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir. 1980) (denial of personal hygiene products to a patient confined to a hospital bed raised a constitutional claim); *Lavender v. Lampert*, 242 F. Supp.2d 821, 843, 849 (D. Or. 2002) (failure to provide orthopedic footwear to person with paralysis in one foot supported Eighth Amendment claim, and holding that "[t]o unnecessarily deny the use of a wheelchair to someone who obviously has an injury, and who lacks mobility without it, would constitute deliberate indifference to a serious medical need."); *Kaufman v. Carter*, 952 F. Supp. 520, 526 (W.D. Mich. 1996) (failure to provide bilateral amputee with rubbing alcohol to clean his prosthetic legs and Ace bandages to maintain the size of his leg stumps, resulting in an inability to use his prostheses and reliance upon a wheelchair, raised an Eighth Amendment claim).

1075. The Court concludes that Defendants, acting with deliberate indifference, fail to ensure that people with disabilities receive medically necessary supplies, assistive devices, and equipment in order to protect them from injury and pain, or to allow people with disabilities to safely and independently perform activities of daily living, and

Defendants' failure places people with disabilities at substantial risk of serious harm, in violation of the Eighth Amendment. FOF ¶¶ 761-766.

## H. Chronic Disease Management

1076. Courts require prisons to provide treatment and disease management to incarcerated patients with chronic health conditions, including but not limited to conditions such as asthma; blood diseases (*e.g.*, sickle-cell anemia); cancer; dementia; diabetes; hyperlipidemia; hypertension; or neurological diseases (*e.g.*, multiple sclerosis or epilepsy). *See, e.g.*, *Graves*, 2008 WL 469970, at *29 (finding that defendant "does not maintain a list of pretrial detainees with chronic diseases and cannot readily determine where they are housed and what medications have been prescribed for them"); *Casey*, 834 F. Supp. at 1546 (inadequate chronic care provided by Arizona prison officials).[170]

1077. The evidence before the Court establishes that Defendants, acting with deliberate indifference, fail to provide appropriate and proper treatment and disease management to people with chronic medical conditions and diagnoses, which places Plaintiffs at substantial risk of serious harm, in violation of the Eighth Amendment. FOF ¶¶ 595, 671-678.

## I. Access to Specialty Care and Diagnostic Procedures

1078. If an incarcerated person has health care needs that cannot be met within the prison's system, the failure of prison officials to obtain such care elsewhere may constitute deliberate indifference. When prison medical staff cannot treat certain medical conditions, they must "refer prisoners to others who can" and such referrals must be "reasonably speedy." *Casey*, 834 F. Supp. at 1544, 1546 (quoting *Hoptowit*, 682 F.2d at 1253); *Jett v. Penner*, 439 F.3d 1091, 1096-97 (9th Cir. 2006) (two-month delay in

---

[170] Chronic disease management also includes the provision of medically-indicated diets. *See Devine v. Ryan*, No. CV-18-04286-PHX-MTL (MTM), 2021 WL 3130334, at *12-13 (D. Ariz. July 23, 2021) (holding that prisoner with documented diagnosis of celiac disease who was denied medical diet despite losing a "significant amount of weight" and who "was repeatedly documented as having 'altered nutrition'" raised an Eighth Amendment claim that ADC and Corizon had "an unwritten policy or custom of denying or delaying medical diets.").

receiving treatment for fractured thumb and 19-month delay in being seen by hand specialist sufficient to state deliberate indifference claim); *Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (holding that the failure of prison health care staff to follow a treating specialist's recommendation raises an Eighth Amendment claim); *see also Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794-95 (9th Cir. 2017) (reversing summary judgment for Arizona's health care contractor and finding that the plaintiff "has shown at least a dozen instances of Corizon denying or delaying consultations, biopsies, and radiation treatment for his prostate cancer over the course of almost a year" and that "a reasonable jury may conclude that such delay tactics amount to a Corizon custom or practice of deliberate indifference to prisoners' serious medical needs."); *Farley v. Capot*, 384 F. App'x 685, 686-87 (9th Cir. 2010) (complaint alleging two-month delay in surgery for cancerous tumor alleged deliberate indifference to serious medical needs); *Glover*, 2021 WL 2714620, at *5-6 (this Court issuing preliminary injunction ordering ADCRR and Centurion to send patient to a urologist after Centurion's regional medical director offered a "conclusory opinion," without examining patient, to justify the company's unexplained denials of the provider's request for referral: "The Court sometimes has difficult decisions to make, particularly in prisoners' allegations of mistreatment. This is not one."); *Lindley v. Corizon Health, Inc.*, No. 18-01860-PHX-DGC (JFM), 2020 WL 1812039, *11 (D. Ariz. Apr. 9, 2020) (holding that the denial by Corizon of three different prison providers' four separate requests for a diagnostic MRI of the patient, submitted over a two-year period, "were not the exception to Corizon's policy, but the rule, and thereby constituted a custom or practice of deliberate indifference").

1079. In *Harper v. Ryan*, this Court found that: (1) multiple advocacy letters sent by *Parsons* counsel regarding the delays in specialty cancer treatment from 2018 to 2019 for a man incarcerated at ASPC-Florence were imputed to Defendant Ryan via his counsel and constituted a failure to act; (2) Defendants' contractor Corizon and its counsel falsified medical records after receiving correspondence from *Parsons* plaintiffs' counsel detailing the class member's delays in care; and, (3) this behavior by Defendant Ryan, his

-344-

successor, employees, agents, and ADCRR's various health care vendors was so egregious that:

> [t]he Court is deeply troubled by the facts of this case. The Court is equally troubled that Defendants would file a motion for summary judgment in light of such facts, fail to file a reply brief, fail to provide key medical records, and submit records that appear to have been altered, as discussed above. The Court therefore will require that this order be read personally by (a) ADC Director David Shinn, (b) the highest official of Corizon responsible for the operations to which Plaintiff has been subjected, and (c) the Arizona Attorney General. Although Director Shinn bears the responsibility of executing any injunctive relief, because Centurion of Arizona is the current contracted health care provider and thus should be aware of Harper's condition, the Court will also require that this order be read by the Centurion Statewide Medical Director. Defendants shall file a certification within 30 days that this order has been read – personally – by each of these individuals.

No. CV-18-00298-PHX-DGC (CDB), 2020 WL 836824, *21-24 (D. Ariz. Feb. 20, 2020); *see also Newman v. Ryan*, No. 18-00481-PHX-DGC (DMF), 2020 WL 554394, *8, *10 (D. Ariz. Feb. 4, 2020) (noting that ADCRR's vendor Corizon "misrepresents [the specialist's] findings" with regard to a patient after brain tumor surgery who experienced "double vision and redness of eyes, bad vision, and . . . yellowish greenish discharge from his eyes and nose for the past 2.5 to 3 years as well as chills and frequent headaches" and who needed follow-up care, with the Court concluding this raised an Eighth Amendment claim); *Greeno*, 414 F.3d at 655; *LaMarbe v. Wisneski*, 266 F.3d 429, 440 (6th Cir. 2001) ("[I]f a doctor knows of a substantial risk of serious harm to a patient and is aware that [they] must either seek immediate assistance from another doctor to prevent further serious harm or must inform the patient to seek immediate assistance elsewhere, and then fails to do in a timely manner what [their] training indicates is necessary to prevent such harm, that doctor has treated the patient with deliberate indifference").

1080. A failure to timely transfer to a hospital patients who need medical or mental health treatment when prison staff cannot adequately diagnose or treat a significant health condition amounts to deliberate indifference. *Hoptowit*, 682 F.2d at 1253 ("Such referrals may be [made] … to physicians or facilities outside the prison"); *Kamisnky v.*

*Rosenblum*, 929 F.2d 922, 927 (2d Cir. 1991) (failure to act on recommendation for immediate hospitalization); *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990) (failure to transfer to a cardiology unit); *Washington v. Dugger*, 860 F.2d 1018, 1021 (11th Cir. 1988) (failure to return patient to VA hospital for treatment of Agent Orange exposure); *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) (reversing dismissal where prison refused to transfer incarcerated person to hospital to get surgery that prison was not equipped to perform); *Inmates of Allegheny Cnty. Jail v. Pierce*, 487 F. Supp. 638, 642 (W.D. Penn. 1980) (delay in transferring incarcerated people who had been committed to mental hospitals formed part of constitutional violation; court ordered prison to establish policies for "transferring patients with delirium tremens promptly to appropriate facilities").

1081. Relatedly, prison officials can be found deliberately indifferent when an incarcerated person actually does see a specialist, who recommends a certain treatment plan, which is then disregarded or not implemented by the health care staff at the prison. *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment when prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (when treating physician and specialist recommended surgery, a reasonable jury could find it was deliberate indifference for non-treating, non-specialists to deny these recommendations for surgery), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014); *Kirby v. Ryan*, No. CV-16-01053-PHX-ROS (MHB), 2017 WL 6883772, *14 (D. Ariz. Oct. 31, 2017) (failure to provide physical therapy and assistive devices recommended by hospital specialists raises a triable issue of fact); *Benge v. Ryan*, No. CV-14-00402-PHX-DGC (BSB), 2016 WL 51237, at *25 (D. Ariz. Jan. 5, 2016) (physician assistant's decision to not prescribe medication recommended by the physician could raise an Eighth Amendment claim).

1082. Additionally, of critical relevance during a time when Defendants blame their failure to meet Constitutional requirements on the COVID-19 virus or the outside

-346-

providers, the fact that a particular off-site medical provider cannot schedule appointments for prisoners in a timely manner does not absolve prison officials of their responsibility to ensure the provision of timely off-site care. "It is no excuse for appellees to urge that the responsibility for delay in surgery rests with the [hospital]. . . . The responsibility for securing medical care for [a] prisoner's needs rests with the prison authorities, not with some outside medical facility." *Johnson v. Bowers*, 884 F.2d 1053, 1056-57 (8th Cir. 1989); *see also Parsons v. Ryan*, 912 F.3d 486, 499-501 (9th Cir. 2018) ("*Parsons II*") (affirming this Court's issuance of the "Outside Provider Order" directing Defendants to use outside providers if they could not comply with the Stipulation's performance measures, and rejecting their argument that the order was burdensome or created a security risk); *Martinez v. United States*, No. 20-CV-7525 (VEC), 2021 WL 4224955, *9 (S.D.N.Y. Sept. 16, 2021) ("that the delays in Plaintiff being taken to see a urologist may have been attributable to decisions by or the inaction of others is not fatal to Plaintiffs' claim.").

1083. Finally, prison officials may not deny prisoners access to outside specialty consultation or treatment on the grounds of cost. *See Peralta*, 744 F.3d at 1083. This Court recently held that:

> Plaintiff relevantly alleged . . . that Corizon has an administrative policy and/or custom of denying and delaying specialist recommended care to save costs and that, based on this policy, Corizon, via its [Utilization Management Team] made the decision to deny and delay Plaintiff's care, causing permanent damage . . . Defendants fail to provide medical evidence to support the UM Team's conclusions, and they fail to show that the individuals responsible for approving or denying Consultation Requests have any medical expertise from which to make these decisions, particularly when overriding the recommendations of treating providers and specialists, … Defendants fail to show that Corizon's UM Team made decisions based solely on medical necessity and not on a policy or practice of denying recommended specialty care to save costs.

*Thompson v. Corizon Health Care Inc.*, No. CV-19-02841-PHX-SRB (ESW), 2020 WL 6748736, *16-17 (D. Ariz. July 27, 2020) (finding Defendants' arguments "disingenuous and not well taken"); *Rosado v. Alameida*, 349 F. Supp. 2d 1340, 1348 (S.D. Cal. 2004)

(holding that costs alone cannot impede surgery for an incarcerated person, and that "the Ninth Circuit expects lower courts to protect [an individual from] physical harm . . . over monetary costs to government entities."); *see also Monmouth Cnty. Corr. Inst.. Inmates v. Lanzaro*, 834 F.2d 326, 336-37 (3d Cir. 1987); *Ancanta v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).

1084. The Court concludes that based upon the evidence before it, Defendants, acting with deliberate indifference, fail to provide timely access for Plaintiffs who need to receive medical treatment from consulting specialists, and fail to act upon and implement the recommendations made by these specialists. FOF ¶¶ 730-760. These systemic failures place class members at substantial risk of serious harm, in violation of the Eighth Amendment.

### J.     Responses to Emergencies

1085. It is self-evident and axiomatic that incarcerated people have a clear right to emergency medical treatment. *Casey*, 834 F. Supp. at 1544 (quoting *Hoptowit*, 682 F.2d at 1253) ("[T]he prison must provide an adequate system for responding to emergencies. If outside facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then the prison must provide adequate facilities and staff to handle emergencies within the prison."); *see also Madrid*, 889 F. Supp. at 1257 (holding that prison medical staff must be trained to cope with emergencies).

1086. The evidence establishes that Defendants, acting with deliberate indifference, fail to provide adequate and appropriate responses to and care of medical emergencies or other emergencies (*i.e.*, fights, fires, suicide attempts) that place people at substantial risk of serious harm, in violation of the Eighth Amendment. FOF ¶¶ 150, 206-219, 221, 228-229, 450, 575-578.

### K.     Mental Health Care

1087. All of the standards described above apply equally to mental health care. Incarcerated people are entitled to meaningful mental health therapeutic treatment. *See Hoptowit*, 682 F.2d at 1253 (minimal constitutional requirements for a prison health care

-348-

system "apply to physical, dental and mental health"); *Cabrales*, 864 F.2d at 1461 (affirming district court's conclusion that deliberate indifference was shown based on evidence that "understaffing at the jail" meant that "psychiatric staff could only spend minutes per month with disturbed inmates."); *see also Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995) (holding that "when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference."); *see also Steele v. Shah*, 87 F.3d 1266, 1270 (11th Cir. 1996) (denying summary judgment to prison physician who discontinued suicidal patient's psychiatric medication based on a cursory interview without reviewing medical records); *Coleman*, 912 F. Supp. at 1298 & n.10 (setting out six elements of a functional mental health system); *Casey*, 834 F. Supp. at 1548 (noting that in ADCRR prisons, "it may take several days to a week for inmates to see a psychiatrist.").

1088. "[P]rescription and administration of behavior-altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision and periodic evaluation, is an unacceptable method of treatment." *Balla*, 595 F. Supp. at 1577 ("Wholesale prescription of psychotropic drugs is an unacceptable means of dealing with psychiatric disorders . . . . [T]he prescription of these drugs cannot supplant the necessity of psychiatric counseling.").

1089. Prisons must maintain a "systematic program" to screen and evaluate incarcerated people in order to identify and treat those needing mental health treatment. *Coleman*, 912 F. Supp. at 1298 (citing *Balla*, 595 F. Supp. at 1577); *Madrid*, 889 F. Supp. at 1259 ("[s]creening and referral mechanisms are inadequate"). The need for a proactive mental health evaluation system is necessary in part because people experiencing severe mental illness may be incapable of initiating the communication and making their needs known to staff, or they may not recognize their need for treatment. *See Casey*, 834 F. Supp. at 1547 ("[S]eriously mentally ill male and female inmates do not receive treatment until they request treatment or regress to the point that security staff recognize the illness or lock them down for the behavior caused by the mental illness. Thus, mentally ill

-349-

1    inmates are unable to make their problems known to staff and their constitutional rights

2    are violated."). *See also Madrid*, 889 F. Supp. at 1257; *Coleman*, 912 F. Supp. at 1305.

3        1090. Medical and custodial staff must timely refer symptomatic mentally ill

4    prisoners to mental health staff for treatment. *Waldrop v. Evans*, 871 F.2d 1030, 1036

5    (11th Cir. 1989) (physician's failure to refer a suicidal prisoner to a psychiatrist could

6    constitute deliberate indifference); *Madrid*, 889 F. Supp. at 1259. Courts have held that

7    the failure of mental health staff to respond to such referrals rises to deliberate

8    indifference. *Arnold ex rel. H.B. v. Lewis*, 803 F. Supp. 246, 253, 257-58 (D. Ariz. 1992)

9    (finding deliberate indifference to a schizophrenic ADCRR prisoner's serious mental

10   health needs "[w]hen the incident reports were sent to psychiatric staff, DOC psychiatrists

11   did not respond at all, even when the behavior reported indicated obvious psychiatric

12   deterioration," and concluding that the prison "lacks an adequate system for behavior

13   problems to be referred to psychiatric staff").

14       1091. Prison officials must ensure that a provider actively assesses and treats

15   seriously mentally ill prisoners according to their clinical condition; monthly assessments

16   by a psychiatrist without regard to the patient's acuity and living conditions amount to

17   deliberate indifference. *See Arnold*, 803 F. Supp. at 250 (finding deliberate indifference

18   when a seriously mentally ill ADCRR prisoner on lockdown was not seen immediately by

19   a psychiatrist, and was only seen by a psychiatrist on a monthly basis, despite her acuity).

20       1092. Brief, cursory, superficial contacts with mental health staff can violate the

21   Eighth Amendment. *Disability Rights Montana v. Batista*, 930 F.3d 1090, 1094 (9th Cir.

22   2019) (complaint alleging, *inter alia*, that prisoners' "primary contact with mental health

23   staff … last no more than a few minutes" stated an Eighth Amendment claim).

24       1093. The evidence before the Court overwhelmingly supports its conclusion that

25   Defendants, acting with deliberate indifference, systematically fail to provide minimally

26   adequate mental health care and treatment to Plaintiffs, and that Defendants' failure to do

27   so places Plaintiffs at a substantial risk of serious harm, including injury and death, in

28   violation of the Eighth Amendment. FOF ¶¶ 385-391, 408-532.

## 1. Prevention of Suicide and Self-Harm

1094. "Identification, treatment, and monitoring of those who have heightened suicide risks are important because they provide the last safety net before the worst possible outcome in mental-health care: suicide." *Braggs*, 257 F. Supp. 3d at 1219. Prison systems must have "a basic program for the identification, treatment and supervision of inmates with suicidal tendencies." *Balla*, 595 F. Supp. at 1577; *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1244-45 (9th Cir. 2010) (failure to implement appropriate anti-suicide procedures), *overruled on other grounds by Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1069-70 (9th Cir. 2016); *see Arnold*, 803 F. Supp. at 257-58; *see also Woodward v. Corr. Med. Servs.*, 368 F.3d 917 (7th Cir. 2004) (failure to respond to signs that prisoner was suicidal); *De'Lonta v. Angelone*, 330 F.3d 630 (4th Cir. 2003) (failure to treat prisoner's compulsion to self-mutilate); *Olsen v. Bloomberg*, 339 F.3d 730 (8th Cir. 2003) (failure to take reasonable steps to prevent prisoner suicide); *Cavalieri v. Shepard*, 321 F.3d 616, 621-22 (7th Cir. 2003) (failure to respond to warnings that prisoner was suicidal).

1095. "The use of lockdown as an alternative to mental health care for inmates with serious mental illnesses clearly rises to the level of deliberate indifference to the serious mental health needs of the inmates and violates their constitutional rights to be free from cruel and unusual punishment." *Casey*, 834 F. Supp. at 1549; *see also Arnold*, 803 F. Supp. at 256 (finding a violation of the Eighth Amendment when Arizona prison and mental health officials repeatedly "placed plaintiff in lock down as punishment for the symptoms of her mental illness and as an alternative to providing mental health care."). In a recent case challenging the delivery of mental health care to incarcerated state prisoners, a district court held that

> Out-of-cell time is crucial for patients housed in mental-health units. Without bringing patients out of their cells for counselling sessions, treatment team meetings, group sessions, and activities, placement in a 'mental-health unit' does no good for patients who need the highest level of care; careful observation and treatment cannot happen when confined in a small cell all day. In fact, without out-of-cell time and

> effective treatment, housing severely mentally ill prisoners in a mental-health unit is tantamount to "warehousing" the mentally ill.

*Braggs*, 257 F. Supp. 3d at 1214 (quoting *Wyatt v. Aderholt*, 503 F.2d 1305, 1309 & n.4 (5th Cir. 1974).

1096. Based upon all evidence before it, the Court concludes that Defendants, acting with deliberate indifference, fail to provide adequate care to people who are self-harming, expressing suicidality, or experiencing other mental health crises; and that Defendants' failure to do so places class members at a substantial risk of serious harm, including injury or death, in violation of the Eighth Amendment. FOF ¶¶ 49, 59-61, 72, 76, 83-95, 220-244, 341-347, 351-353, 356-360, 381, 404, 410-413, 416-420, 422, 426-439, 442-448, 450-454, 467-470, 474-476, 482-490, 493-498, 552-584, 714, 954-956.

## 2. Access to Inpatient Mental Health Care

1097. One aspect of adequate mental health care is the availability of the appropriate level of care. Incarcerated people who are suffering from acute mental health symptoms or who are profoundly mentally ill must be provided with inpatient mental health care. *See Coleman*, 912 F. Supp. at 1309; *Braggs*, 257 F. Supp. 3d at 1192, 1212. Moreover, transferring seriously mentally ill prisoners to psychiatric facilities for brief hospital stays, and then providing them with inadequate care on their return, amounts to deliberate indifference. In *Arnold*, this Court held ADCRR officials liable for failing to timely transfer to the Arizona State Hospital Ms. H.B., an incarcerated person with schizophrenia, who could not be adequately treated at the Perryville prison. 803 F. Supp. at 257. Ms. H.B. had been repeatedly transferred to the state hospital for short stays, then moved back to the prison, where she often ended up in lockdown units, and clinically deteriorated. *Id.* at 249, 253. The Court concluded, "because of her mental illness, [Ms. H.B.] needs the therapeutic environment of a mental health treatment facility; however, such environment has not been provided by the DOC for nearly ten years." *Id.* at 256. *Cf. Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1121-22 (9th Cir. 2003) (finding months-long delay in transferring incompetent prisoners to mental hospital denied due process).

-352-

1098. The Court concludes based upon all evidence before it that Defendants, acting with deliberate indifference, fail to provide acutely and seriously mentally ill people with adequate access to inpatient and residential mental health care, and Defendants' failure to do so places Plaintiffs at a substantial risk of serious harm, including injury and death, in violation of the Eighth Amendment. FOF ¶¶ 533-551.

### 3.      Uses of Force on People with Severe Mental Illness

1099.  Failing to ensure the intervention of mental health staff, when possible, prior to a planned use of force on prisoners with mental illness violates the Eighth Amendment. *Coleman v. Brown*, No. CIV.S-90-520 LKK/DA (PC), 2014 WL 1400964, at *12-13 (E.D. Cal. Apr. 10, 2014) (finding that prison policy requiring a mental health consultation prior to a planned use of force nonetheless violated the Eighth Amendment because it failed "to require consideration of the inmate's ability to conform his or her conduct to the order or directive giving rise to the use of force," and did not "vest mental health clinicians with sufficient authority in decisions concerning use of force" because, "[i]n every instance, final decisionmaking responsibility and authority for all uses of force rest[ed] with custodial staff"); *see also Thomas v. Bryant*, 614 F.3d 1288, 1315 (11th Cir. 2010) (finding that the Florida DOC's failure to adopt a policy requiring consideration of an inmate's mental health history before a planned use of force, through a mental health consultation or other means, supported a finding of "more than mere or even gross negligence on the part of the DOC"); *cf. Coleman*, 912 F. Supp. at 1320 (holding that "being treated with punitive measures by the custody staff to control the inmates' behavior without regard to the cause of the behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illnesses" violated seriously mentally ill prisoners' Eighth Amendment rights).

1100.  "[I]f [an] inmate cannot understand a command or cannot comply with it, the force simply produces pain, except to the extent the inmate is (in some cases only very temporarily) incapacitated by the force used." *Thomas v. McNeill*, No. 3:04-cv-917-J-32JRK, 2009 WL 64616, at *23 (M.D. Fla., Jan. 9, 2009), *aff'd sub nom. Thomas v.*

-353-

*Bryant*, 614 F.3d 1288 (11th Cir. 2010); *see also Hope*, 536 U.S. at 737 (holding that punitive treatment levied against a restrained prisoner was unconstitutional gratuitous infliction of wanton and unnecessary pain); *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (finding that complaint alleging corrections officers failed to offer prisoners showers or medical attention after use of chemical spray stated a claim for Eighth Amendment violation).

1101. The Court concludes that Defendants, acting with deliberate indifference, improperly and unjustifiably use force on people, including seriously mentally ill people, purportedly to prevent self-harm, sometimes in violation of Defendants' own policies, and subject Plaintiffs to a substantial risk of serious harm or even death, in violation of the Eighth Amendment. FOF ¶¶ 205-244, 575-576.

### L.     Trade Group Accreditation Is Not Constitutional Compliance

1102. This Court has expressly and squarely rejected any argument that accreditation of prison or jail facilities by the National Commission on Correctional Health Care ("NCCHC") means that there is *per se* compliance with the Constitution:

> The Court decides independently whether there are current and ongoing violations of pretrial detainees' constitutional rights and does not rely on any determinations made by an accrediting organization such as the NCCHC. ... The NCCHC 'essential' standards do not specifically focus on all of [incarcerated persons'] constitutional rights... .

*Graves*, 2008 WL 4699770, at *25 (citations omitted). The Court proceeded to find that health care provided in the Maricopa County jail system was unconstitutional, despite NCCHC accreditation. *Id*. at *51. Six years later, this Court held the same, again holding conditions in the jail unconstitutional despite NCCHC accreditation: "Compliance with NCCHC standards is not equivalent to complying with constitutional standards. Nationally recognized best practices may exceed constitutional standards in some areas and fall short in others." *Graves*, 48 F. Supp. 3d at 1338.

1103. The Supreme Court has also observed that prison officials' "reliance … on correctional standards issued by various groups is misplaced." *Bell v. Wolfish*, 441 U.S.

-354-

520, 543 n.27 (1979) (noting that "while the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question."); *see also Grenning v. Miller-Stout*, 739 F.3d 1235, 1341 (9th Cir. 2014) (accreditation by American Correctional Association (ACA) does not entitle defendants to summary judgment on Eighth Amendment claim regarding conditions of confinement).

1104.  Other courts have characterized the argument that trade group accreditation immunizes a prison or jail system from constitutional challenge as "absurd," *Gates*, 376 F.3d at 337, or "simply ludicrous." *Boulies v. Ricketts*, 518 F. Supp. 687, 689 (D. Colo. 1981). *See also Ruiz v. Johnson*, 37 F. Supp. 2d 855, 902 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F. Supp. 2d 975 (S.D. Tex. 2001) (holding that NCCHC accreditation "simply cannot be dispositive" of the question whether medical care is constitutional); *Morales Feliciano*, 13 F. Supp. 2d at 158 (Puerto Rico's prison health care system found unconstitutional despite recent NCCHC accreditation); *LaMarca v. Turner*, 662 F. Supp. 647, 655 (S.D. Fla. 1987) (ACA accreditation has "virtually no significance" to lawsuit, because accredited prisons have been found unconstitutional.).

1105.  Relatedly, any contention by Defendants that ADCRR and/or their health care vendor have written policies describing how to conduct their health care system does nothing to show that they actually comply with, or enforce, the relevant policies. This Court previously told Defendants that such an argument "miss[es] the mark" because "Defendants' oft-repeated contention that Plaintiffs' allegations are inconsistent with ADC policies misunderstands the substance of Plaintiffs' claims. Plaintiffs' claim is that *despite* ADC stated policies, the actual provision of health care in its prison complexes suffers from systemic deficiencies that rise to the level of deliberate indifference." *Parsons v. Ryan*, 289 F.R.D. 513, 520-21 (D. Ariz. 2013).

1106.  The Court concludes and reiterates its previous holding that accreditation "is not equivalent to complying with constitutional standards[,]" *Graves*, 48 F. Supp. 3d at

1338, and adheres to the Supreme Court's holding that trade groups such as NCCHC "simply do not establish the constitutional minima …" *Wolfish*, 441 U.S. at 543 n.27. The Court finds that the general finding of accreditation by NCCHC does not rebut the overwhelming evidence of deficient care or the numerous systemic deficiencies that currently are present in the ADCRR. Nor does accreditation establish that a correctional facility provides health care that meets constitutional standards.

### III.  THE LEGAL STANDARD REGARDING THE USE OF ISOLATION

1107.  More than a century ago, the Supreme Court described the effects of solitary confinement as it was practiced in the early days of the United States:

> A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.

*In re Medley*, 134 U.S. 160, 168 (1890).

1108.  The label a prison applies to its solitary confinement regime is irrelevant to the Eighth Amendment analysis. In a recent findings letter, the U.S. Department of Justice concluded that prolonged "mental health watch" (that is, exceeding 14 days) under isolated conditions violates the Eighth Amendment. *Investigation of the Mass. Dep't of Corr.*, U.S. DEP'T OF JUSTICE 15, 18 (Nov. 17, 2020), *available at* https://www.justice.gov/opa/press-release/file/1338071/download.[171]

1109.  In *Davis v. Ayala*, a case concerning a capital defendant who had been isolated for decades, Justice Kennedy authored a concurrence in which he stated that "research still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price." 576 U.S. 257, 289 (2015) (Kennedy, J.,

---

[171] Defendants assert that they no longer house women in maximum custody units. That said, ASPC-Perryville still has mental health watch units, detention units, and an intake/reception unit, where women are incarcerated in conditions that meet the functional definition of solitary confinement. *See*, e.g., Ex. 1304 (showing 17 people on mental health watch, 9 people in detention, and 70 people in the reception unit at Perryville on September 30, 2021).

155617523.3

concurring). He added that "[i]n a case that presented the issue, the judiciary may be required ... to determine whether workable alternative systems for long-term confinement exist, and, if so, whether a correctional system should be required to adopt them." *Id.* at 289-90.

1110. Indeed, the harms of solitary confinement are undisputed. *See, e.g.*, *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017) (detailing the "robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement"); *Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019) (noting that "[i]n recent years, advances in our understanding of psychology and new empirical methods have allowed researchers to characterize and quantify the nature and severity of the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions"); *Troutman v. Louisville Metro Dep't of Corrs.*, 979 F.3d 472, 484 & n.9 (6th Cir. 2020) ("The Supreme Court, as far back as 1890, has expressed concern about the mental anguish caused by solitary confinement") (internal quotation marks omitted).

1111. The Third Circuit explained these harms:

> A comprehensive meta-analysis of the existing literature on solitary confinement within and beyond the criminal justice setting found that "[t]he empirical record compels an unmistakable conclusion: this experience is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term ... damage." Specifically, based on an examination of a representative sample of sensory deprivation studies, the researchers found that virtually *everyone* exposed to such conditions is affected in some way. They further explained that "[t]here is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects." And as another researcher elaborated, "all [individuals subjected to solitary confinement] will ... experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli."

> Anxiety and panic are common side effects. Depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are also frequent results. Additional studies included in the aforementioned meta-

analysis further "underscored the importance of social contact for the creation and maintenance of 'self.'" In other words, in the absence of interaction with others, an individual's very identity is at risk of disintegration.

…

As if psychological damage was not enough, the impact of the deprivation does not always stop there. Physical harm can also result. Studies have documented high rates of suicide and self-mutilation amongst inmates who have been subjected to solitary confinement. These behaviors are believed to be maladaptive mechanisms for dealing with the psychological suffering that comes from isolation. In addition, the lack of opportunity for free movement is associated with more general physical deterioration. The constellations of symptoms include dangerous weight loss, hypertension, and heart abnormalities, as well as the aggravation of pre-existing medical problems.

*Williams v. Sec'y, Penn. Dep't of Corrs.*, 848 F.3d 549, 566–68 (3d Cir. 2017), *cert. denied sub nom. Walker v. Farnan*, 138 S. Ct. 357 (2017). *See also Gillis v. Litscher*, 468 F.3d 488, 489 (7th Cir. 2006) ("Stripped naked in a small prison cell with nothing except a toilet; forced to sleep on a concrete floor or slab; denied any human contact; fed nothing but "nutri-loaf"; and given just a modicum of toilet paper—four squares—only a few times. Although this might sound like a stay at a Soviet gulag in the 1930s, it is, according to the claims in this case, Wisconsin in 2002") (vacating grant of summary judgment to prison officials); *Littlefield v. Deland*, 641 F.2d 729, 731, 732 & n.2 (10th Cir. 1981) (confining a prisoner in "a strip cell for more than 56 days," with "no windows, no interior lights, no bunk, no floor covering, and no toilet except for a hole in concrete floor which was flushed irregularly from outside cell," and mostly deprived of clothes, bedding, recreation, or reading and writing materials violated the Constitution).[172]

---

[172] The fact that Defendants often double-cell people in isolation units (or in some cases, place three people in a two-person cell) does not change the reality that isolation—regardless of whether the person is alone or with another—constitutes solitary confinement, and has the same deleterious impacts on the body and mind. The U.S. Department of Justice defines "restrictive housing" to include situations in which a person is incarcerated with a cellmate. *See U.S. Dep't of Justice Report & Recommendations Concerning the Use of Restrictive Housing*, U.S. Dep't of Just., (Jan. 2016) ("For the purposes of this report, we define "restrictive housing" as any type of detention that involves: (1) removal from the general inmate population, whether voluntary or involuntary; (2) placement in a locked room or cell, whether alone or with another inmate;

-358-

1112. The Court concludes that Defendants, acting with deliberate indifference, subject people incarcerated in ADCRR's isolation units to extreme social isolation; insufficient out-of-cell time; insufficient opportunities for personal hygiene; constant artificial illumination; insufficient nutrition; unsanitary conditions; lack of meaningful mental health care; use of chemical agents, even against those on psychotropic medication; and exposure to extreme levels of heat, regardless of the types of medications they take. FOF ¶¶ 103-244. These conditions, alone and in combination, deprive Plaintiffs of the minimal civilized measure of life's necessities and place them at substantial risk of serious harm, in violation of the Eighth Amendment. *See Ruiz*, 37 F. Supp. 2d at 914-15 (finding prison officials "deliberately indifferent to a systemic pattern of extreme social isolation and reduced environmental stimulation" in segregation units); *Wilkerson*, 639 F. Supp. 2d at 679 (reasonable trier of fact could find that solitary confinement deprived plaintiffs "of at least one basic human need, including but not limited to sleep, exercise, social contact and environmental stimulation.").

1113. As the Supreme Court has observed, "[s]ome conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Wilson*, 501 U.S. at 304 (emphasis omitted); *see also Scarver v. Litscher*, 371 F. Supp. 2d 986, 1001 (W.D. Wis. 2005) (conditions including 24-hour illumination, near-constant cell confinement, and infrequent human interaction "could have a mutually enforcing effect causing the deprivation of a prisoner's basic human need for social interaction and sensory stimulation").

1114. And the Ninth Circuit has specifically and repeatedly recognized that confinement in Arizona's isolation units can cause mental deterioration, even for those without pre-existing mental illness. *See, e.g., Miller ex rel. Jones v. Stewart*, 231 F.3d

---

and (3) inability to leave the room or cell for the vast majority of the day, typically 22 hours or more."), *see* https://www.justice.gov/archives/dag/report-and-recommendations-concerning-use-restrictive-housing.

1248, 1252 (9th Cir. 2000) ("it is well accepted that conditions such as those present in [ADCRR's Browning Unit] . . . can cause psychological decompensation to the point that individuals may become incompetent"); *Comer v. Stewart*, 215 F.3d 910, 916 (9th Cir. 2000) ("we and other courts have recognized that prison conditions remarkably similar to [Browning Unit] can adversely affect a person's mental health").[173]

### A.     Out-of-Cell Time

1115. "Exercise is 'one of the basic human necessities protected by the Eighth Amendment.'" *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (quoting *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993)). The Ninth Circuit has held that "outdoor exercise can indeed be required [by the Eighth Amendment,] when 'otherwise meaningful recreation' is not available." *Norbert v. City & Cnty. of S.F.*, 10 F.4th 918, 929 (9th Cir. 2021) (quoting *Shorter v. Baca*, 895 F.3d 1176, 1185 (9th Cir. 2018)). While the deprivation of outdoor exercise is not violative of the Eighth Amendment in all instances, "'the long-term denial of outside exercise is unconstitutional,'" *id.* (quoting *LeMaire*, 12 F.3d at 1458), and the denial of access to the outdoors and outdoor exercise may be unconstitutional based on "the cumulative effect of related prison conditions," including "degrading conditions" where prisoners are held "in continuous segregation, spending virtually 24 hours every day in their cells with only meager out-of-cell movements and corridor exercise, had minimal contacts with other persons, and were offered no affirmative programs or training of rehabilitation." *Id.* (quoting *Wright v. Rushen*, 642 F.3d 1129, 1134 (9th Cir. 1981), and *Spain*, 600 F.2d at 199-200).

---

[173] Under international human rights law, solitary confinement—defined as "the confinement of prisoners for 22 hours or more a day without meaningful human contact"—is permissible "only in exceptional cases as a last resort, for as short a time as possible and subject to independent review, and only pursuant to the authorization by a competent authority." Indefinite solitary confinement, prolonged solitary confinement (lasting longer than 15 days), and solitary confinement by virtue of an incarcerated person's sentence are categorically prohibited. United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules), Rules 43, 44, 45, *available at* https://cdn.penalreform.org/wp-content/uploads/1957/06/ENG.pdf.

1116. Based upon the evidence before it, the Court concludes that Defendants, acting with deliberate indifference, do not provide adequate out-of-cell time in ADCRR's solitary confinement units, even according to Defendants' own policies. The Court further concludes that the failure to provide adequate out-of-cell time unreasonably subjects Plaintiffs to a substantial risk of serious harm, in violation of the Eighth Amendment. FOF ¶¶ 152-199.

### B.    Interference with Sleep or Constant Illumination

1117. Courts recognize the rights of incarcerated people against prison conditions that deprive them of "identifiable human need[s]" such as sleep. *See Wilson*, 501 U.S. at 304; *accord Keenan v. Hall*, 83 F.3d 1083, 1087-88, 1090-91 (9th Cir. 1996) (holding that "the Eighth Amendment require[s] that [incarcerated people] be housed in an environment . . . reasonably free of excess noise" and denying summary judgment for prison officials on claims related to constant noise and constant illumination causing "grave sleeping problems" and "physical and psychological harm"); *Grenning*, 739 F.3d at 1239-40 (holding that 13 days of constant cell illumination in "Special Management Unit" could violate Eighth Amendment; reversing summary judgment for defendants); *see also Rico v. Ducart*, 980 F.3d 1292, 1305 (9th Cir. 2020) (Silver, J., concurring in part and dissenting in part) ("The right to adequate sleep, a well-recognized human need is also established by persuasive authority. Our sister circuits have not often decided cases involving sleep deprivation, but every circuit that has held that conditions of confinement depriving inmates of sleep violate the Eighth Amendment.") (citing *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013); *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999); *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 374 (3d Cir. 2019); *Walton v. Dawson*, 752 F.3d 1109, 1120 (8th Cir. 2014)).

1118. Based upon the evidence before it, the Court concludes that Defendants, acting with deliberate indifference, maintain 24-hour illumination in their isolation units, which as well as the lack of ventilation or adequate living space, deprives them of sleep, a

1  basic human need. Defendants' actions place subclass members at a substantial risk of

2  serious harm, in violation of the Eighth Amendment. FOF ¶¶ 107-129.

3  **C.  Adequate Nutrition**

4  1119.  "There is no question that an inmate's Eighth Amendment right to adequate

5  food is clearly established." *Foster v. Runnels*, 554 F.3d 807, 815 (9th Cir. 2009)

6  (reversing grant of summary judgment to prison officials who denied prisoner 16 meals

7  over a 23-day period); *LeMaire*, 12 F.3d at 1456 (prisoners must "receive food that is

8  adequate to maintain health."). "In the same way that an inmate relies on prison officials

9  to provide appropriate medical care, and protection from assaults by other inmates,

10  inmates rely on prison officials to provide them with adequate sustenance on a daily basis.

11  The repeated and unjustified failure to do so amounts to a serious depr[i]vation. The risk

12  that an inmate might suffer harm as a result of the repeated denial of meals is obvious."

13  *Foster*, 554 F.3d at 814 (internal citations omitted); *see Andrich v. Arpaio*, No. 16-02111-

14  PHX-DJH (JZB), 2016 WL 11631346, at *7 (D. Ariz. Dec. 13, 2016) ("[A]n inmate may

15  state a claim where he alleges that he is served meals with insufficient calories for long

16  periods of time") (citing *LaMaire*, 12 F.3d at 1456); *Graves*, 2008 WL 4699770, at *42,

17  *44 (holding that Eighth Amendment requires that incarcerated people be provided food

18  that is adequate to maintain health, and are prepared under conditions that do not threaten

19  their health and well-being, and finding that the practice of providing detainees a sack

20  meal in the morning, a warm meal in the late afternoon, and otherwise requiring detainees

21  to purchase food from the canteen did not meet constitutional requirements).

22  1120.  The Court concludes based upon all evidence before it, that Defendants,

23  acting with deliberate indifference, fail to provide adequate nutrition to Plaintiffs

24  incarcerated in ADCRR's solitary confinement units, even according to Defendants' own

25  policies, which are themselves inadequate. Defendants' failure to provide adequate

26  nutrition subjects Plaintiffs to a substantial risk of serious harm, in violation of the Eighth

27  Amendment. FOF ¶¶ 200-205.

28

155617523.3

### D.    Length of Time in Isolation

1121.    The Supreme Court has made clear that duration matters: "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards." *Hutto v. Finney*, 437 U.S. 678, 686 (1978); *see also DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (holding that "the circumstances, nature, and *duration* of the challenged conditions must be carefully considered" and that "[w]hile no single factor controls the outcome of these cases, the length of exposure to the conditions is often of prime importance.") (emphasis added). Courts have repeatedly invalidated stays of months or one to two years in solitary confinement, particularly when the duration is disproportionate to the offense for which it was ostensibly imposed. *See, e.g.*, *Adams v. Carlson*, 368 F. Supp. 1050 (E.D. Ill. 1973) (16 months for participating in a work stoppage); *Fulwood v. Clemmer*, 206 F. Supp. 370 (D.D.C. 1962) (two years for taking part in unauthorized religious ceremonies); *Chapman v. Pickett*, 586 F.2d 22 (7th Cir. 1978) (seven months for refusing to handle pork).

1122.    Additionally, the U.S. Supreme Court and other federal courts have found even relatively brief periods of solitary confinement to violate the Eighth Amendment when accompanied by aggravating conditions:

> [F]or six full days in September 2013, correctional officers confined [plaintiff] in a pair of shockingly unsanitary cells. The first cell was covered, nearly floor to ceiling, in massive amounts of feces: all over the floor, the ceiling, the window, the walls, and even packed inside the water faucet. Fearing that his food and water would be contaminated, Taylor did not eat or drink for nearly four days. Correctional officers then moved Taylor to a second, frigidly cold cell which was equipped with only a clogged drain in the floor to dispose of bodily wastes. Taylor held his bladder for over 24 hours, but he eventually (and involuntarily) relieved himself, causing the drain to overflow and raw sewage to spill across the floor. Because the cell lacked a bunk, and because Taylor was confined without clothing, he was left to sleep naked in sewage.

*Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (per curiam) (reversing grant of qualified immunity and summary judgment to Texas prison officials). *See Grenning*, 739 F.3d at 1239-40 (holding that 13 days of constant cell illumination in "Special Management Unit"

could violate Eighth Amendment; reversing summary judgment for defendants);[174] *see also Mammana*, 934 F.3d at 373–74 (denial of bedding and clothing, accompanied by low cell temperatures and 24-hour illumination, over a period of four days stated an Eighth Amendment claim).

1123. The Court concludes based upon all evidence before it, that Defendants, acting with deliberate indifference, fail to comply with their own policies, let alone constitutional norms, in their excessive and arbitrary use of solitary confinement, their failure to track peoples' lengths of stay in isolation units or the reasons for placement in isolation, and their failure to offer Plaintiffs incarcerated in solitary confinement any meaningful method by which they can exit solitary confinement. FOF ¶¶ 284-340. The Court finds that Defendants' systemic deficiencies in the use of solitary confinement place Plaintiffs at a substantial risk of serious harm, in violation of the Eighth Amendment.

### E. Arbitrary and Automatic Placement in Isolation

1124. If the conditions of isolation in ADCRR are imposed with deliberate indifference and expose Plaintiffs to a substantial risk of serious harm, and thus violate the Eighth Amendment, there is no penological justification that can save them from invalidation by this Court. *Johnson v. California*, 543 U.S. 499, 511 (2005) (holding that the *Turner v. Safley*, 482 U.S. 78 (1987), test of reasonable relationship to legitimate penological justifications does not apply to Eighth Amendment claims of cruel and unusual punishment in prisons, "because the integrity of the criminal justice system depends on full compliance with the Eighth Amendment").

1125. That said, the "[t]he existence of a legitimate penological justification has . . . been used in considering whether adverse treatment is sufficiently gratuitous to constitute punishment for Eighth Amendment purposes." *Grenning*, 739 F.3d at 1240; *see*

---

[174] The Ninth Circuit also held that state prison officials' assertions that the constant illumination in the Special Management Unit had "passed the national accreditation standards" of the American Correctional Association was of no significance in reaching its conclusion that the 13 days of constant illumination could violate the Eighth Amendment. *Grenning*, 739 F.3d at 1241.

*also Porter v. Clarke*, 923 F.3d 348, 362 (4th Cir. 2019) ("Put differently, if a prison official lacks a legitimate penological justification for subjecting an inmate to a condition of confinement that poses a substantial risk of serious harm—like prolonged solitary confinement…—then the official is presumptively acting with deliberate indifference to that risk.").

1126. In a case, like this one, involving confinement in an isolation unit, the Ninth Circuit concluded:

> Even if it were possible for a defendant to defeat an Eighth Amendment conditions of confinement claim at summary judgment by showing a legitimate penological interest, Defendants have failed to make such a showing in this case. The record shows that an individual may be placed in the SMU for a number of reasons, including reasons that do not appear to support a blanket policy of continuous lighting. There are several possible reasons for placing an inmate in segregation at Airway Heights: "Threat to Others," "Threat to Self," "Threat to Security," "Threat to Orderliness of Facility," and "Other." The paperwork in Grenning's case indicates that he was placed in the SMU, "pending investigation of an assault," under the heading of "Threat to Orderliness of Facility[.]" So far as the record shows, Grenning could have been placed in the SMU because he attacked someone, because he was a victim of an attack, or because he was an innocent bystander caught up in a melee. There is thus no indication that Defendants' proffered justifications for constant illumination were relevant to Grenning.

*Grenning*, 739 F.3d at 1240-41.

1127. The *Grenning* court's reasoning is equally applicable here. The evidence at trial showed that many persons are confined in ADCRR's isolation units absent *any* individualized determination that they require such harsh and restrictive conditions. For those persons, their continued confinement in isolation serves no legitimate penological interest, and therefore presumptively violates the Eighth Amendment.

1128. The Court concludes that the categories of policies and practices that serve no legitimate penological purpose include (a) Defendants' practice of automatically imposing solitary confinement for the first two years of a person's life sentence; (b) Defendants' policies that permit classification overrides resulting in isolation for reasons completely unrelated to the person's in-prison behavior; (c) Defendants' policy of placing

-365-

people who are in fear for their safety into isolation; and (d) Defendants' failure to move people from isolation units to lower levels of security even after the prisoner has been approved for removal from isolation. Defendants' acts and omissions place Plaintiffs incarcerated in isolation units at a substantial risk of serious harm, in violation of the Eighth Amendment. FOF ¶¶ 290-340.

## F. The Use of Isolation on People with Mental Illness

1129. Many courts—including, significantly, this Court with regard to ADCRR—have held that solitary confinement of persons with serious mental illness violates the Eighth Amendment because of the increased risk of extreme suffering and death that isolation poses to them. In *Casey*, this Court found an "appalling" Eighth Amendment violation when, "[d]espite their knowledge of the harm to seriously mentally ill inmates, [the Arizona Department of Corrections] routinely assigns or transfers seriously mentally ill inmates to [segregation units]." 834 F. Supp. at 1548, 1550. The court concluded that "ADOC punishes these inmates by locking them down in small, bare segregation cells for their actions that are the result of their mental illnesses. These inmates are left in segregation without mental health care . . . and may remain there for months without care." *Id.* at 1550. Other courts agree:

> Most inmates have a difficult time handling these conditions of extreme social isolation and sensory deprivation, but for seriously mentally ill inmates, the conditions can be devastating. Lacking physical and social points of reference to ground them in reality, seriously mentally ill inmates run a high risk of breaking down and attempting suicide.

*Jones'El v. Berge*, 164 F. Supp. 2d 1096, 1098 (W.D. Wis. 2001); *see also Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) ("It goes without saying that '[s]uicide is a serious harm.'").

1130. In *Disability Rights Mont. v. Batista*, 930 F.3d 1090 (9th Cir. 2019), the plaintiffs challenged (among others) the following prison practices:

> 1) placing prisoners with serious mental illness in various forms of solitary confinement for 22 to 24 hours per day for months and years at a time; 2) placing prisoners with serious

-366-

mental illness on behavior management plans that involve solitary confinement and extreme restrictions of privileges; [and] 3) having no standards for determining whether placing a prisoner with serious mental illness in solitary confinement or on a behavior management plan will be harmful to the prisoner's mental health[.]

930 F.3d at 1094. The Ninth Circuit reversed the district court's dismissal of the complaint:

DRM's complaint alleged that prisoners with serious mental illness are denied diagnosis and treatment of their conditions, described a distressing pattern of placing mentally ill prisoners in solitary confinement for "weeks and months at a time" without significant mental health care, alleged frequent, improper use of this punishment for behavior arising from mental illness, marshalled relevant quotations from national prison health organizations about the unacceptability of subjecting prisoners to extensive solitary confinement, and alleged that the defendants did not respond appropriately to threats of suicide by mentally ill prisoners, increasing the risk of suicide. . . . These allegations, by themselves, were enough to make it plausible that prison policies and practices pose a substantial risk of serious harm.

*Id*. at 1098.[175]

1131. In *Palakovic v. Wetzel*, the Third Circuit vacated a dismissal of a complaint alleging that prison staff were deliberately indifferent by placing a prisoner with mental illness in solitary, where he eventually took his own life. 854 F.3d 209, 215-17 (3d Cir. 2017). After detailing the "robust . . . legal and scientific authority" establishing the "devastating" consequences of solitary confinement, the court reinstated the complaint. *Id*. at 225. "[Plaintiffs'] non-conclusory allegations support an inference that, despite knowing of [the decedent's] vulnerability and the increased risk of suicide that solitary confinement brings, the defendants disregarded that risk and permitted [him] to be repeatedly isolated in solitary confinement anyway." *Id*. at 232.

---

[175] Punishment for behavior that is the product of mental illness is unconstitutional regardless of whether the practice is a result of "inadequate training of the custodial staff [such] that they are frequently unable to differentiate between inmates whose conduct is the result of mental illness and inmates whose conduct is unaffected by disease" or is the result of a "policy or custom of intentionally inflicting severe harm on mentally ill inmates." *Coleman*, 912 F. Supp. at 1320.

-367-

1132. In *Braggs v. Dunn*, the federal court held that Alabama prison officials' isolation and treatment of mentally ill prisoners violated the Eighth Amendment. 257 F.Supp.3d at 1267. Specifically, they unconstitutionally incarcerated "seriously mentally ill prisoners in segregation without extenuating circumstances and for prolonged periods of time;" placed "prisoners with serious mental-health needs in segregation without adequate consideration of the impact of segregation on mental health;" and provided "inadequate treatment and monitoring in segregation." *Id*. at 1268. Citing Justice Kennedy's *Ayala* concurrence, *id*. at 1236, the court held: "it is categorically inappropriate to place prisoners with serious mental illness in segregation absent extenuating circumstances; even in extenuating circumstances, decisions regarding the placement should be with the involvement and approval of appropriate mental-health staff." *Id*. at 1247.

1133. Similar holdings are common. *See Ind. Prot. & Advoc. Servs. Comm'n v. Comm'r*, No. 1:08–cv01317–TWP–MJD, 2012 WL 6738517 (S.D. Ind. Dec. 31, 2012) (Indiana prison officials' practice of placing people with serious mental illness in segregation violated the Eighth Amendment); *Jones'El*, 164 F. Supp. 2d at 1101–02 (ordering removal of people with serious mental illness from Wisconsin's "supermax" prison); *Ruiz*, 37 F. Supp. 2d at 915 (holding that conditions in the Texas prison's administrative segregation unit violated constitutional standards when imposed on mentally ill people); *Coleman*, 912 F. Supp. at 1321 ("[D]efendants' present policies and practices with respect to housing of [prisoners with serious mental illness] in administrative segregation and in segregated housing units violate the Eighth Amendment rights of class members."); *Madrid*, 889 F. Supp. at 1265 (concluding that placing mentally ill people "in the SHU [supermax] is the mental equivalent of putting an asthmatic in a place with little air to breathe"); *Langley v. Coughlin*, 715 F. Supp. 522, 540 (S.D.N.Y. 1989) (evidence of prison officials' failure to screen out from segregation unit "those individuals who, by virtue of their mental condition, are likely to be severely

-368-

and adversely affected by placement there" plausibly rises to the level of cruel and unusual punishment).

1134. Housing people with serious mental illness in isolation units also creates intolerable conditions for other incarcerated persons, who must endure the disruptive behavior (such as screaming, yelling, failing to maintain a modicum of basic hygiene) of their inadequately treated mentally ill neighbors and/or cellmates. These practices are violative of the rights of the non-seriously mentally ill. *See Casey*, 834 F. Supp. at 1548-49 (condemning delays that resulted in people in Arizona's prisons diagnosed with psychosis remaining in lockdown units); *Gates*, 376 F.3d at 342-43 (incarcerated people with psychosis and severe mental illness must be held separately from others); *Thaddeus X. v. Blatter*, 175 F.3d 378, 403 (6th Cir. 1999) (en banc) (non-mentally ill prisoner stated Eighth Amendment claim when he was housed with seriously mentally ill prisoners who threw human waste and urine, creating a constant foul odor, and who repeatedly banged on walls and doors creating noise); *DeMallory v. Cullen*, 855 F.2d 442, 444-45 (7th Cir. 1988) (allegation that mentally ill persons incarcerated with non-mentally ill in high security unit causing filthy and dangerous conditions stated an Eighth Amendment claim by the non-mentally ill against prison officials); *Hassine v. Jeffes*, 846 F.2d 169, 178 & n.5 (3d Cir. 1988) (plaintiffs could seek relief due to the consequences of the failure to provide other prisoners needed mental health services); *Carty v. Farrelly*, 957 F. Supp. 727, 738-39 (D.V.I. 1997) ("Failure to house mentally ill inmates apart from the general prison population also violates the constitutional rights of both groups.").

1135. The Court concludes that Defendants, acting with deliberate indifference, fail to exclude people with serious mental illness from isolation. That failure places Plaintiffs with serious mental illness at substantial risk of serious harm or injury, including death, in violation of the Eighth Amendment. FOF ¶¶ 341-347.

### G.     The Use of Isolation on Children

1136. For more than half a century, the Supreme Court has repeatedly reaffirmed that "[c]hildren have a very special place in life which law should reflect." *May v.*

*Anderson*, 345 U.S. 528, 536 (1953) (Frankfurter, J., concurring); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011) ("'[O]ur history is replete with laws and judicial recognition' that children cannot be viewed simply as miniature adults.") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115-116 (1982)); *Kent v. United States*, 383 U.S. 541, 556 (1966) ("There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children.").

1137. The basic principle that minors are different from adults, and that the "distinctive attributes of youth" have legal significance, is reflected in a myriad of constitutional contexts, including the Eighth Amendment protection against cruel and unusual punishments. *See, e.g.*, *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (Eighth Amendment bars mandatory sentence of life without parole for crimes committed before the age of 18, as "children are constitutionally different from adults for purposes of sentencing."); *J.D.B.*, 564 U.S. at 272 (explaining that youth "are more vulnerable or susceptible to . . . outside pressures than adults," and adopting a "reasonable child" standard for determining the scope of *Miranda* protections) (citation and internal quotation marks omitted); *Graham*, 560 U.S. at 82 (striking down life without parole sentences for juveniles convicted of nonhomicide offenses); *Roper v. Simmons*, 543 U.S. 551 (2005) (Eighth Amendment bars capital punishment for crimes committed before the age of 18).

1138. For the children under 18 who are in Defendants' custody, this legal principle is of paramount importance. These children—who were involuntarily removed from their families and communities, and often have complex histories of trauma, abuse, and high needs—are entirely dependent upon the state for care, safety, education, and physical and mental well-being. Federal courts increasingly recognize that solitary confinement of youth can violate the Constitution even in circumstances in which it might be permissible for adults.

155617523.3

1139. Even under the Eighth Amendment, children have greater rights and protections than adult prisoners.[176] Of particular relevance here, the Supreme Court in its Eighth Amendment analysis has emphasized that adolescents' developmental characteristics render them more vulnerable to lasting psychological harm than adults. *See Graham*, 560 U.S. at 68 ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds."); *Roper*, 543 U.S. at 569 (explaining that adolescence is a period when youth are "most susceptible . . . to psychological damage") (quoting *Eddings*, 455 U.S. at 115). Because of this developmental vulnerability, conditions that may be constitutionally acceptable for adults are often found to be unduly harsh for children. *See Montgomery*, 577 U.S. at 206 ("[C]ertain punishments [are] disproportionate when applied to juveniles.") (citing *Miller*, *Graham*, and *Roper*).

1140. Although the Supreme Court has not yet addressed the constitutionality of solitary confinement of juveniles, as noted above the Court has repeatedly emphasized that children's developmental characteristics include vulnerabilities that require unique protections and consideration, and virtually every federal court that has to date confronted

---

[176] Most federal courts, including the Ninth Circuit, use the "more protective" Fourteenth Amendment's substantive due process standard to analyze the conditions of confinement for youth in juvenile correctional and detention facilities, instead of the Eighth Amendment's deliberate indifference analysis, because juvenile adjudications are not equivalent to criminal convictions. *See Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987) (citing *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986) and *Whitley v. Albers*, 475 U.S. 312 (1986)); *see also A.M. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 579 (3rd Cir. 2004) (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982)); *Santana v. Collazo*, 714 F.2d 1172, 1180-83 (1st Cir. 1983); *Nelson v. Heyne*, 491 F.2d 352, 358, 360 (7th Cir. 1974).

The Ninth Circuit has not definitively ruled as to whether the conditions of confinement claims of children who are incarcerated in adult prison facilities due to an adult criminal court conviction are subject to the Eighth or Fourteenth Amendment standard—in part because so few states engage in the practice of incarcerating minors in adult prisons, as Arizona does—but in any event, Defendants' policies and practices with regard to the use of isolation for children violate the more exacting Eighth Amendment standard. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)("[T]he due process rights of a person . . . are at least as great as the Eighth Amendment protections . . . .").

-371-

the issue has found that even short periods of solitary confinement violate juveniles' constitutional rights under the Eighth or Fourteenth Amendments.

1141. "A growing chorus of courts have recognized the unique harms that are inflicted on juveniles when they are placed in solitary confinement." *J.H. v. Williamson Cnty., Tenn.*, 951 F.3d 709, 718-20 (6th Cir. 2020) (holding that a fourteen-year-old pretrial detainee's substantive due process rights were violated when he was held in disciplinary solitary confinement for 21 days at a county juvenile detention center). But this is not a novel concept—federal courts across the country have for at least five decades found the use of isolation against juveniles to be profoundly harmful and violative of their rights. *See, e.g.*, *H.C. ex rel. Hewett v. Jarrard*, 786 F.3d 1080, 1088 (11th Cir. 1986) (describing the emotional harm caused by isolation of a juvenile for seven days, "deprived of virtually every physical or emotional stimulus," and noting that "[j]uveniles are even more susceptible to mental anguish than adult convicts"); *Santana*, 714 F.2d 1172 (experts' testimony on lack of therapeutic and disciplinary benefits from isolation sufficient to warrant remand for further factual findings); *Milonas v. Williams*, 691 F.2d 931, 942-43 (10th Cir. 1982) (affirming injunction against placing children in isolation for any reason other than to contain violent behavior); *Nelson*, 491 F.2d at 358, 360 (affirming district court holding that extended periods of solitary confinement of juveniles at the Indiana Boys School was cruel and unusual punishment under the Eighth Amendment, and a violation of procedural due process under the Fourteenth Amendment); *see also Paykina ex rel. E.L. v. Lewin*, 387 F. Supp. 3d 225, 232-33 (N.D.N.Y. 2019) (granting a preliminary injunction ordering immediate release of a 17-year-old from solitary confinement in an adult prison); *A.T. ex rel. Tillman v. Harder*, 298 F. Supp. 3d 391, 414 (N.D.N.Y. 2018) (holding that "there is a broad and growing consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults"); *V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554, 588-89 (N.D.N.Y. 2017) ("[D]efendants' continued use of solitary confinement on juveniles puts them at serious risk of short- and long-term psychological

155617523.3

damage"); *Doe ex rel. Frazier v. Hommrich*, No. 3-16-0799, 2017 WL 1091864, at *12 (M.D. Tenn. Mar. 22, 2017) (noting that "courts around the country have found increased protections for juveniles and persons with diminished capacities" and concluding that "solitary confinement of juveniles in government custody for punitive or disciplinary reasons" likely violates the Eighth Amendment and issuing a preliminary injunction prohibiting defendants from "placing juveniles in solitary confinement or otherwise isolating them from meaningful contact with their peers as punishment or discipline"); *Turner v. Palmer*, 84 F. Supp. 3d 880, 884 (S.D. Iowa 2015) (allegation that 16-year-old plaintiff "spent numerous consecutive weeks locked in small cement isolation cells with only a thin mat to sleep on and was only allowed to leave to use the restroom" stated a constitutional claim); *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1155 (D. Haw. 2006) (finding the state juvenile facility's practice of isolating LGBT teenagers in solitary confinement ostensibly for their "protection" violated the minors' rights, and collecting cases); *D.B. v. Tewksbury*, 545 F. Supp. 896, 905 (D. Or. 1982) (holding that "[p]lacement of younger children in isolation cells as a means of protecting them from older children" violated the Fourteenth Amendment); *Feliciano v. Barcelo*, 497 F. Supp. 14, 35 (D.P.R. 1979) ("Solitary confinement of young adults is unconstitutional."); *Morgan v. Sproat*, 432 F. Supp. 1130, 1138-40 (S.D. Miss. 1977) (relying on expert testimony of harm to conclude that confining juveniles for an average of 11 days, with time out of their cells for recreation and showers, violates the Eighth Amendment); *Inmates of the Boys' Training Sch. v. Affleck,* 346 F. Supp. 1354, 1372 (D.R.I. 1972) (finding the isolation of juveniles in cold, dark isolation cells containing only a toilet and a mattress constituted cruel and unusual punishment and violated the Due Process Clause); *Lollis v. N.Y. State Dep't of Soc. Servs.*, 322 F. Supp. 473, 480 (S.D.N.Y. 1970) (concluding that juvenile plaintiff's solitary confinement was unconstitutional after considering extensive expert testimony

stating that the extended use of isolation on children is "cruel and inhuman," and "counterproductive to the development of the child").[177]

1142. Moreover, in 2016, the federal government eliminated the use of solitary confinement of juveniles in federal custody, and a number of states and municipalities have similarly eliminated or severely curtailed the use of protective or disciplinary isolation of juveniles. *See* https://obamawhitehouse.archives.gov/the-press-office/2016/01/25/fact-sheet-department-justice-review-solitary-confinement; *see also* Barack Obama, *Why We Must Rethink Solitary Confinement*, WASH. POST. (Jan. 25, 2016), *available at* https://www.washingtonpost.com/opinions/barack-obama-why-we-must-rethink-solitary-confinement/2016/01/25/29a361f2-c384-11e5-8965-0607e0e265ce_story.html; *V.W. ex rel. Williams*, 236 F. Supp. 3d at 584 ("[T]he federal government and at least 21 states have prohibited the use of disciplinary segregation for juveniles . . . .").[178]

1143. The Court concludes that Defendants, acting with deliberate indifference, fail to prohibit the use of isolation on children. This failure is shocking and outside the norms of a civilized society. Defendants' acts and omissions place children incarcerated in Defendants' prisons at a substantial risk of serious harm or injury or death, in violation of the Eighth Amendment. FOF ¶¶ 45, 51, 60, 97-102, 348-353, 365.

---

[177] The Nelson Mandela Rules prohibit the solitary confinement of persons under the age of 18. *See supra* n. 8, Rule 45 (citing United Nations Rules for the Protection of Juveniles Deprived of their Liberty, Rule 67).

[178] In 2012, the U.S. Attorney General's National Task Force on Children Exposed to Violence found that:

> Nowhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement. A 2002 investigation by the U.S. Department of Justice showed that juveniles experience symptoms of paranoia, anxiety, and depression even after very short periods of isolation. Confined youth who spend extended periods isolated are among the most likely to attempt or actually commit suicide.

Robert L. Listenbee, Jr., *Report of the Attorney General's National Task Force on Children Exposed to Violence*, 178 (Dec. 12, 2012), www.justice.gov/defendingchildhood/cev-rpt-full.pdf.

## IV. THE LEGAL STANDARD REGARDING REMEDY

1144. In 2011, the Supreme Court held that

> To incarcerate, society takes from prisoners the means to provide for their own needs. . . . If government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation. . . . Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals. . . . Courts nevertheless must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners. . . . Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.

*Brown*, 563 U.S. at 510-11 (internal citations and quotation marks omitted). The Ninth Circuit noted that in the context of prison litigation,

> [i]n many cases it would not be possible for a district court to produce a meaningful need-narrowness-intrusiveness findings concerning each isolated provision of a remedial order. Prospective relief for institutions as complex as prisons is a necessarily aggregate endeavor, composed of multiple elements that work together to redress violations of the law. This is all the more true when relief must be narrow and minimally intrusive: courts often must order defendants to make changes in several different areas of policy and procedure in order to avoid interjecting themselves too far into any one particular area of prison administration. In such circumstances, the necessity of any individual provision cannot be evaluated in isolation. What is important, and what the PLRA requires, is a finding that the set of reforms being ordered—the "relief"—corrects the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures.

*Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070-71 (9th Cir. 2010); *see also Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir. 2014) (holding that "[t]he ongoing, intractable nature of this litigation affords the district court considerable discretion in fashioning relief.").

1145. "[W]here a court seeks to correct a constitutional violation established in the course of litigation, the court's exercise of equitable discretion must heel close to the identified violation and respect the interests of state . . . authorities in managing their own affairs, consistent with the Constitution." *Gilmore v. California*, 220 F.3d 987, 1005 (9th

-375-

Cir. 2000) (citation and quotation marks omitted); *see also id.* at 998-999 (setting out the Prison Litigation Reform Act's "comprehensive set of standards to govern prospective relief in prison conditions cases"). While the PLRA imposes significant additional requirements for court-enforceable settlements in prison conditions cases, for litigated injunctions the PLRA standard for granting relief "differs little" from prior law; "[d]istrict courts were already bound to follow a nearly identical standard." *Id.* at 1006.

1146. Additionally, there is no need for separate or additional hearings on remedies. In fact, this Court ruled on both liability and remedies simultaneously in litigation regarding ongoing violations at the Maricopa County Jail, which the Ninth Circuit affirmed:

> While *Lewis* is clear that prison officials must be given an opportunity to propose remedies in the first instance, the Supreme Court did not specify whether that opportunity must come after the district court finds ongoing constitutional violations. The Court did suggest that, ideally, a district court would first determine whether there are ongoing violations, then assign the state "the task of devising a Constitutionally sound program" to correct those constitutional violations, and then finally approve the state's plan subject to any amendments necessary to address well-founded objections raised by the prisoners. *Id.* at 362, 116 S. Ct. 2174 (internal quotation marks omitted). The Court recommended this procedure but did not require it.
>
> The district court did not err by requiring Sheriff Arpaio to propose remedies at the twelve-day hearing on the Renewed Motion to Terminate. District courts have broad discretion when it comes to trial management. *See Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir.2001) ("We review such challenges to trial court management for abuse of discretion."); *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1021 (9th Cir.2004) ("A district court's refusal to bifurcate a trial is accordingly reviewed for an abuse of discretion."). Federal-state comity requires a district court to give prison officials an opportunity to propose remedies; the Constitution does not also dictate the precise timing for that proposal or how that proposal should be submitted for consideration by the court. Such logistical issues are best left to the district court's discretion. In light of the PLRA's clear instruction that a district court "promptly rule on any motion to modify or terminate prospective relief in a civil action with respect to prison conditions," 18 U.S.C. § 3626(e)(1), and the lower court's reasonable desire to act quickly to curb ongoing civil rights violations at Maricopa County jails, we cannot say

that it was an abuse of discretion for the district court to hear evidence on both rights and remedies at one hearing.

*Graves v. Arpaio*, 623 F.3d 1043, 1046-47 (9th Cir. 2010) (quoting *Lewis v. Casey*, 518 U.S. 343 (1996)).

## A.    Legal Standard to Appoint a Receiver

1147.    This Court has the power to enter an injunctive order under Rule 66 of the Federal Rules of Civil Procedure to appoint a receiver to manage ADCRR's delivery of health care services. While courts historically and most often have appointed receivers to care for property and assets, their use expanded during the civil rights era. *See, e.g.*, *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976) (affirming appointment of court receiver to implement school desegregation orders); *Turner v. Goolsby*, 255 F. Supp. 724, 730 (S.D. Ga. 1965) (appointing receiver for county school system).

1148.    Courts have appointed receivers to enforce orders related to prisons and jails, including in relation to the delivery of health care to incarcerated people. *See, e.g.*, *Brown*, 563 U.S. at 511 (holding that "[c]ourts faced with the sensitive task of remedying unconstitutional prison conditions must consider a range of options, ***including appointment of special masters or receivers*** and the possibility of consent decrees.") (emphasis added); *id*. at 507-08 (detailing the circumstances that led to the district court's appointment of a receiver for medical care services in California state prisons); *Plata v. Schwarzenegger*, 603 F.3d 1088, 1093 (9th Cir. 2010) (holding that "[c]ertainly nothing in the PLRA expressly prohibits the appointment of a receiver. Receiverships were far from unknown in prison litigation before the enactment of the PLRA . . . ."); *Plata v. Schwarzenegger*, No. C01-1351-TEH, 2005 WL 2932253, at *1 (N.D. Cal. Oct. 3, 2005) (appointing a receiver to "reverse the entrenched paralysis and dysfunction and bring the delivery of health care in California prisons up to constitutional standards."); *see also United States v. Hinds Cty.*, No. 3:16-CV-489-CWR-RHWR, 2021 WL 5501442, at *12 (S.D. Miss. Nov. 23, 2021) (issuing order to show cause why a receivership should not be created to operate county jail); *Inmates of D.C. Jail v. Jackson*, 158 F.3d 1357, 1359 (D.C.

155617523.3

Cir. 1998) (describing how the district court had ordered the jail's medical and mental health services be placed in receivership); *Shaw v. Allen*, 771 F. Supp. 760, 763 (S.D. W.Va. 1990) (appointing receiver for county jail after ongoing noncompliance with a settlement agreement regarding the conditions in the jail); *Newman v. State of Ala.*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) (appointing receiver for Alabama state prison system because "[t]he Court can no longer brook non-compliance with the clear command of the Constitution, represented by the orders of the Court in this case."). !

**B.** **The Court Has the Power to Supersede or Rescind State Laws**

1149. The Court also has the power to modify or supersede state laws that it concludes create an untenable barrier for Defendants to comply with their obligations under federal law and the Constitution. *N.C. Bd. of Educ. v. Swann*, 402 U.S. 43, 45 (1971) (holding that "state policy must give way when it operates to hinder vindications of federal constitutional guarantees"); *Hook v. Ariz. Dep't of Corrs.*, 107 F.3d 1397, 1402-03 (9th Cir. 1997) (holding that enforcement of state law prohibiting the payment of a Special Master appointed by this Court was precluded by the Supremacy Clause, when appointment of the Special Master was necessary to vindicate the constitutional rights of people incarcerated in Arizona prisons); *Stone v. City & Cnty. of S.F.*, 968 F.2d 850, 862 (9th Cir. 1993), *cert denied*, 506 U.S. 1081 (1993) (holding that "state laws . . . cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme."); *Coleman*, 952 F. Supp. at 931 (waiving sections of California Penal Code "to the extent necessary" to implement prison population reduction plan); *cf.* 18 U.S.C. § 3626(a)(1)(B) (permitting courts to order prospective relief requiring or permitting government officials to exceed authority under State or local law where federal law requires the relief, the relief is necessary to correct the violation, and no other relief will correct the violation).

. . .

. . .

. . .

Dated:  January 28, 2022

**ACLU NATIONAL PRISON PROJECT**

By: ___s/ Corene Kendrick___
     David C. Fathi (Wash. 24893)*
     Maria V. Morris (D.C. 1697904)**
     Eunice Hyunhye Cho (Wash. 53711)*
     915 15th Street N.W., 7th Floor
     Washington, D.C. 20005
     Telephone:  (202) 548-6603
     Email:     dfathi@aclu.org
                mmorris@aclu.org
                echo@aclu.org

     *Admitted *pro hac vice*; not admitted
      in DC; practice limited to federal
      courts

     **Admitted *pro hac vice*.

     Corene Kendrick (Cal. 226642)*
     **ACLU NATIONAL PRISON
     PROJECT**
     39 Drumm Street
     San Francisco, California 94111
     Telephone:  (202) 393-4930
     Email:     ckendrick@aclu.org

     *Admitted *pro hac vice*.


     Daniel C. Barr (Bar No. 010149)
     John H. Gray (Bar No. 028107)
     Austin C. Yost (Bar No. 034602)
     Karl J. Worsham (Bar No. 035713)
     Kathryn E. Boughton (Bar No. 036105)
     Kelly Soldati (Bar No. 036727)
     Alisha Tarin-Herman (Bar No. 037040)
     **PERKINS COIE LLP**
     2901 N. Central Avenue, Suite 2000
     Phoenix, Arizona 85012
     Telephone:  (602) 351-8000
     Email:     dbarr@perkinscoie.com
                jhgray@perkinscoie.com
                ayost@perkinscoie.com
                kworsham@perkinscoie.com
                kboughton@perkinscoie.com
                ksoldati@perkinscoie.com
                atarinherman@perkinscoie.com
                docketphx@perkinscoie.com

155617523.3

Victoria Lopez (Bar No. 330042)*
Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:      vlopez@acluaz.org
            jkeenan@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct.
R. 38(d)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Rita K. Lomio (Cal. 254501)*
Sophie Hart (Cal. 321663)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:      dspecter@prisonlaw.com
            ahardy@prisonlaw.com
            snorman@prisonlaw.com
            rlomio@prisonlaw.com
            sophieh@prisonlaw.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm; Desiree
Licci; Joseph Hefner; Joshua Polson; and
Charlotte Wells, on behalf of themselves and
all others similarly situated*

**ARIZONA CENTER FOR DISABILITY
LAW**


By:  s/ Maya Abela
     Asim Dietrich (Bar No. 027927)
     5025 East Washington Street, Suite 202
     Phoenix, Arizona 85034
     Telephone:  (602) 274-6287
     Email:      adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR
DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:
  rdalyrooney@azdisabilitylaw.org
    jrico@azdisabilitylaw.org
    mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

155617523.3

1                **<u>CERTIFICATE OF SERVICE</u>**

2        I hereby certify that on January 28, 2022, I electronically transmitted the above

3 document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4 Notice of Electronic Filing to the following CM/ECF registrants:

5

6                    Michael E. Gottfried
                      Lucy M. Rand

7           Assistant Arizona Attorneys General
              Michael.Gottfried@azag.gov

8               Lucy.Rand@azag.gov

9                Daniel P. Struck
                    Rachel Love

10             Timothy J. Bojanowski
                Nicholas D. Acedo

11              Ashlee B. Hesman
                  Jacob B. Lee

12              Timothy M. Ray
                 Anne M. Orcutt

13              Eden G. Cohen
     STRUCK LOVE BOJANOWSKI & ACEDO, PLC

14             dstruck@strucklove.com
               rlove@strucklove.com

15          tbojanowski@strucklove.com
             nacedo@strucklove.com

16           ahesman@strucklove.com
               jlee@strucklove.com

17              tray@strucklove.com
            aorcutt@strucklove.com

18           ecohen@struclove.com

19            *Attorneys for Defendants*

20

21                     s/ D. Freouf

22

23

24

25

26

27

28

155617523.3