Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, et al., | NO. CV-12-00601-PHX-ROS |
| Plaintiffs, | |
| v. | |
| David Shinn, et al., | **DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Defendants. | |

# TABLE OF CONTENTS

Page

I. Background ................................................................................................. 1

    A. Complaint ......................................................................................... 1

    B. Class Certification ........................................................................... 2

    C. Summary Judgment ......................................................................... 4

    D. Stipulation ....................................................................................... 4

    E. Rescission Order .............................................................................. 6

    F. Trial .................................................................................................. 7

II. Legal Standards ......................................................................................... 7

    A. Burden of Proof ............................................................................... 7

    B. Scope and Nature of Plaintiffs' Claims .......................................... 8

        1. Class Claims ........................................................................... 8

        2. Policy or Custom .................................................................... 8

        3. Systemwide Deficiencies ....................................................... 9

    C. General Eighth Amendment Principles ......................................... 11

        1. Health Care Claims .............................................................. 12

        2. Conditions of Confinement Claims ...................................... 15

            a. Recreation ................................................................. 17

            b. Social Contact ........................................................... 17

            c. Cell Illumination ...................................................... 21

            d. Property ..................................................................... 23

            e. Nutrition ................................................................... 24

        3. Excessive Force Claims ....................................................... 25

III. Findings of Fact and Conclusions of Law .............................................. 27

    A. ADCRR & Centurion ..................................................................... 27

    B. National Commission on Correctional Health Care ...................... 41

    C. Plaintiffs' Individual Claims ......................................................... 87

i

|   |   |   | Page |
|---|---|---|---|
| | 1. | Kendall Johnson | 87 |
| | 2. | Ronald Slavin | 88 |
| | 3. | Laura Redmond | 90 |
| | 4. | Abdul-Rahim Muhammad | 93 |
| | 5. | Dustin Brislan | 95 |
| | 6. | Jason Johnson | 98 |
| | 7. | Robert Gamez | 102 |
| | 8. | Jonathan Gonzalez | 103 |
| | 9. | Shawn Jensen | 104 |
| | 10. | Joshua Polson | 105 |
| | 11. | Sonja Rodriguez | 106 |
| | 12. | Jeremy Smith | 108 |
| | 13. | Christina Verduzco | 109 |
| D. | | Medical Care Class Claims | 110 |
| | 1. | Todd Wilcox | 110 |
| | 2. | Owen Murray | 117 |
| | 3. | ADCRR's Provision of Medical Care Is Constitutionally Adequate | 123 |
| E. | | Mental Health Care Class Claims | 202 |
| | 1. | Pablo Stewart | 202 |
| | 2. | Joseph Penn | 206 |
| | 3. | ADCRR's Provision of Mental Health Care Is Constitutionally Adequate | 225 |
| F. | | Dental Care Class Claims | 316 |
| G. | | Subclass Claims | 316 |
| | 1. | Craig Haney | 316 |
| | 2. | Martin Horn | 324 |

| | | | | Page |
|---|---|---|---|---|

3. The Conditions of Confinement at ADCRR Exceed Constitutional Minimums.............................335

    a. Psychiatric Monitoring of Maximum Custody Inmates...... 337

    b. Mental Health Staffing.........................................338

    c. Use Of Chemical Agents......................................338

    d. Social Isolation....................................................345

    e. Cell Illumination .................................................360

    f. Property .............................................................360

    g. Nutrition ...........................................................364

H. The Testimony and Opinions of Robert Joy Will Not Be Considered ..... 365

IV. Conclusion ........................................................................... 371

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Aguilar v. Schriro*
  2006 WL 2471830 (D. Ariz. 2006) ................................................................ 20

*Allen v. Bosley*
  253 F. App'x 658 (9th Cir. 2007) ................................................................... 26

*Anderson v. Cty. of Kern*
  45 F.3d 1310 (9th Cir. 1995) .......................................................................... 17

*Ayotte v. Barnhart*
  973 F. Supp. 2d 70 (D. Me. 2013) ................................................................. 16

*Balla v. Idaho State Bd. of Corr.*
  2020 WL 2812564 (D. Idaho May 30, 2020) ......................................... 10, 13

*Baptisto v. Ryan*
  2005 WL 2416356 (D. Ariz. Sept. 30, 2005) ......................................... 20, 24

*Baptisto v. Ryan*
  2006 WL 798879 (D. Ariz. Mar. 28, 2006) ....................................... 17, 23, 24

*Bearchild v. Cobban*
  947 F.3d 1130 (9th Cir. 2020) ........................................................................ 26

*Beaton v. Tennis*
  2010 WL 2696857 (M.D. Pa. May 10, 2010) ................................................ 16

*Bell v. Wolfish*
  441 U.S. 520 (1979) ........................................................................................ 26

*Bermudez v. Ryan*
  2006 WL 2547345 (D. Ariz. Aug. 31, 2006) ......................................... 20, 23

*Bono v. Saxbe*
  620 F.2d 609 (7th Cir. 1980) .......................................................................... 19

*Brauner v. Coody*
  793 F.3d 493 (5th Cir. 2015) .......................................................................... 13

*Brown v. Plata*
  563 U.S. 493 (2011) ........................................................................................ 11

*Cano v. Taylor*
  739 F.3d 1214 (9th Cir. 2014) ........................................................................ 13

*Chappell v. Mandeville*
  706 F.3d 1052 (9th Cir. 2013) ................................................................. 21, 22

*Chavarria v. Stacks*
  102 F. App'x 433 (5th Cir. 2004) ................................................................... 21

*Chhoun v. Woodford*
  2005 WL 1910930 (N.D. Cal. 2005) .............................................................. 23

*Clem v. Lomeli*
  566 F.3d 1177 (9th Cir. 2009) ........................................................................ 15

*Clement v. Gomez*
  298 F.3d 898 (9th Cir. 2003) ................................................ 26
*Coleman v. CDCR*
  2012 WL 6045979 (E.D. Cal. Dec. 5, 2012) ......................... 19
*Cunningham v. Cook*
  185 F.3d 866 (9th Cir. 1999) ................................................ 21
*Deorle v. Rutherford*
  272 F.3d 1272 (9th Cir. 2001) .............................................. 27
*Dickens v. Danberg*
  2012 WL 2089516 (D. Del. June 8, 2012) ............................. 19
*Dickson v. Valenzuela*
  2016 WL 7187628 (C.D. Cal. Nov. 4, 2016) ......................... 18
*Dockery v. Hall*
  443 F. Supp. 3d 726 (S.D. Miss. 2019) ........................... 10, 17
*Drummond v. City of Anaheim*
  343 F.3d 1052 (9th Cir. 2003) .............................................. 27
*Dunn v. Castro*
  621 F.3d 1196 (9th Cir. 2010) .............................................. 21
*Edmo v. Corizon, Inc.*
  935 F.3d 757 (9th Cir. 2019) ........................................... 12, 13
*Estelle v. Gamble*
  429 U.S. 97 (1976) ................................................. 12, 13, 14
*Ex parte Young*
  209 U.S. 123 (1908) ............................................................... 9
*Farmer v. Brennan*
  511 U.S. 825 (1994) ...................................................... passim
*Fraihat v. U.S. Immigration & Customs Enforcement*
  16 F.4th 613 (9th Cir. 2021) ................................................ 10
*Franklin v. Smalls*
  2013 WL 941569 (S.D. Cal. Mar. 8, 2013) ........................... 21
*Freeman v. Miller*
  615 F. App'x 72 (3d Cir. 2015) ............................................. 18
*Freemon v. Ryan*
  2011 WL 5169342 (D. Ariz. 2011) ....................................... 19
*Furnace v. Evans*
  2009 WL 2511967 (N.D. Cal. Aug. 14, 2009) ....................... 23
*Furnace v. Sullivan*
  705 F.3d 1021 (9th Cir. 2013) .............................................. 26
*Gates v. Cook*
  376 F.3d 323 (5th Cir. 2004) ................................................ 15
*Gerber v. Hickman*
  291 F.3d 617 (9th Cir. 2002) ................................................ 21

*Gibson v. Cty. of Washoe*
290 F.3d 1175 (9th Cir. 2002) ..................................................... 15

*Graham v. Connor*
490 U.S. 386 (1989) .................................................................... 25

*Graves v. Arpaio*
48 F. Supp. 3d 1318 (D. Ariz. 2014) ........................................... 13

*Graves v. Penzone*
2019 WL 4535543 (D. Ariz. Sept. 19, 2019) ............................... 10

*Green v. Coleman*
2013 WL 6185172 (W.D. Pa. Nov. 26, 2013) ............................... 19

*Green v. Ferrell*
801 F.2d 765 (5th Cir. 1986) ...................................................... 25

*Green v. Mansour*
474 U.S. 64 (1985) ........................................................................ 7

*Hamby v. Hammond*
821 F.3d 1085 (9th Cir. 2016) .................................................... 13

*Hampton v. Ryan*
2006 WL 3497780 (D. Ariz. Dec. 4, 2006) ............................. 20, 22

*Harris v. Horel*
2009 WL 2761339 (N.D. Cal. Aug. 31, 2009) ............................. 23

*Harrison v. Bledsoe*
2010 WL 186804 (M.D. Pa. 2010) .............................................. 23

*Haynes v. Sisto*
2010 WL 2076970 (E.D. Cal. May 24, 2010) ............................. 21

*Helling v. McKinney*
509 U.S. 25 (1993) ............................................................ 12, 16, 17

*Hoptowit v. Ray*
682 F.2d 1237 (9th Cir. 1982) .................................................... 16

*Howard v. Nunley*
2010 WL 3785536 (E.D. Cal. 2010) ........................................... 27

*Hudson v. McMillan*
503 U.S. 1 (1992) ............................................................. 12, 15, 25

*Ingraham v. Wright*
430 U.S. 651 (1977) .................................................................... 11

*Jackson v. Heer*
322 F. Supp. 3d 406 (S.D.N.Y. 2018) ......................................... 18

*Jackson v. McMahon*
2018 WL 6016981 (C.D. Cal. May 29, 2018) .............................. 18

*Jackson v. Meachum*
699 F.2d 578 (1st Cir. 1983) ...................................................... 19

*Jett v. Penner*
439 F.3d 1091 (9th Cir. 2006) .................................................... 12

*Johnson v. Lewis*
    217 F.3d 726 (9th Cir. 2000) .................................................................. 15, 16

*Jonas v. Schriro*
    2006 WL 2772641 (D. Ariz. Sept. 25, 2006) ................................... 20, 23, 24

*Jose v. Thomas*
    2012 WL 2091527 (D. Ariz. June 11, 2012) ........................................... 23

*Keenan v. Hall*
    83 F.3d 1083 (9th Cir. 1996) ............................................................. 21, 23

*Kentucky v. Graham*
    473 U.S. 159 (1985) ................................................................................ 9

*King v. Frank*
    371 F. Supp. 2d 977 (W.D. Wis. 2005) ..................................................... 22

*Lakin v. Barnhart*
    2013 WL 5407213 (D. Me. Sep. 25, 2013) ............................................... 16

*LeMaire v. Maass*
    12 F.3d 1444 (9th Cir. 1993) ................................................................. 17

*Lerajjareanra-O-Kel-ly v. Johnson*
    2009 WL 1513285 (D. Idaho 2009) ........................................................ 23

*Lewis v. Casey*
    518 U.S. 343 (1996) ................................................................................ 9

*Maloney v. Ryan*
    2013 WL 3945921 (D. Ariz. 2013) ......................................................... 25

*Martin v. Scott*
    156 F.3d 578 (5th Cir. 1998) ................................................................. 18

*May v. Baldwin*
    109 F.3d 557 (9th Cir. 1997) ................................................................. 17

*McBride v. Frank*
    2009 WL 2591618 (E.D. Wis. Aug. 21, 2009) ......................................... 22

*McKune v. Lile*
    536 U.S. 24 (2002) ............................................................................... 17

*Mendiola-Martinez v. Arpaio*
    836 F.3d 1239 (9th Cir. 2016) ............................................................... 24

*Monell v. New York City Department of Social Services*
    436 U.S. 658 (1978) ................................................................................ 9

*Murray v. Edwards Cty. Sheriff's Dep't*
    248 F. App'x 993 (10th Cir. 2007) ......................................................... 21

*Murray v. Keen*
    763 F. App'x 253 (3d Cir. 2019) ............................................................ 22

*Norbert v. City & Cty. of San Francisco*
    10 F.4th 918 (9th Cir. 2021) .................................................................. 17

*Onstad v. Hobbs*
    607 F. App'x 595 (8th Cir. 2015) ........................................................... 22

*Osolinski v. Kane*
  92 F.3d 934 (9th Cir. 1996) ............................................................ 11

*Overton v. Bazzetta*
  539 U.S. 126 (2003) ...................................................................... 21

*Owens v. Ayers*
  2002 WL 73226 (N.D. Cal. 2002) .................................................. 23

*Parsons v. Ryan*
  754 F.3d 657 (9th Cir. 2014) ........................................................ 8, 9

*Peralta v. Dillard*
  744 F.3d 1076 (9th Cir. 2014) .................................................. 13, 14

*Pierce v. Cty. of Orange*
  526 F.3d 1190 (9th Cir. 2008) ...................................................... 17

*Porras v. Cty. of Los Angeles*
  2006 WL 4941837 (C.D. Cal. Oct. 31, 2006) ............................... 10

*Rasho v. Jeffreys*
  __ F.4th __, 2022 WL 108568 (7th Cir. Jan. 12, 2022) ........ 12, 14, 15

*Rhodes v. Chapman*
  452 U.S. 337 (1981) ................................................................ 11, 15

*Rotondo v. Ryan*
  2012 WL 424384 (D. Ariz. Feb. 9, 2012) ..................................... 23

*Ruiz v. Johnson*
  37 F. Supp. 2d 855 (S.D. Tex. 1999) ............................................ 13

*Sanders v. Trinity Servs. Grp. Inc.*
  2021 WL 698166 (D. Ariz. Feb. 23, 2021) ................................... 24

*Sandin v. Connor*
  515 U.S. 472 (1995) ...................................................................... 16

*Shapley v. Nev. Bd. of State Prison Comm'rs*
  766 F.2d 404 (9th Cir. 1985) ........................................................ 13

*Shorter v. Baca*
  895 F.3d 1176 (9th Cir. 2018) ...................................................... 17

*Shrader v. White*
  761 F.2d 975 (4th Cir. 1985) ........................................................ 16

*Sims v. Piazza*
  462 F. App'x 228 (3d Cir. 2012) ................................................... 22

*Solis v. Cty. of Los Angeles*
  514 F.3d 946 (9th Cir. 2008) .......................................................... 7

*Soto v. Dickey*
  744 F.2d 1260 (7th Cir. 1984) ...................................................... 26

*Standley v. Ryan*
  2012 WL 3288728 (D. Ariz. 2012) ............................................... 24

*Stockton v. Tyson*
  2011 WL 5118456 (E.D. Cal. 2011) ............................................. 23

**Page**

*Tasby v. Cain*
   2017 WL 4295441 (M.D. La. Sept. 12, 2017) ............................................................ 19

*Thomas v. Ponder*
   611 F.3d 1150– (9th Cir. 2010) .............................................................................. 22

*Toguchi v. Chung*
   391 F.3d 1051 (9th Cir. 2004) .......................................................................... 12, 13

*Toussaint v. McCarthy*
   801 F.2d 1080 (9th Cir. 1986) .......................................................................... 18, 21

*Trevino v. Gates*
   99 F.3d 911 (9th Cir. 1996) ...................................................................................... 9

*Turner v. Safley*
   482 U.S. 78 (1987) .................................................................................................. 11

*Turner v. Upton*
   2013 WL 4852689 (M.D. Ga. 2013) ....................................................................... 23

*Vasquez v. Frank*
   290 F. App'x 927 (7th Cir. 2008) ........................................................................... 21

*Washington-El v. Beard*
   2011 WL 891250 (W.D. Pa. Mar. 11, 2011) .......................................................... 18

*Webb v. Goord*
   340 F.3d 105 (2d Cir. 2003) ...................................................................................... 9

*Whitley v. Albers*
   475 U.S. 312 (1986) ............................................................................. 11, 12, 25, 26

*Will v. Michigan Dep't of State Police*
   491 U.S. 58 (1989) .................................................................................................... 9

*Williams v. ICC Comm.*
   812 F. Supp. 1029 (N.D. Cal. 1992) ....................................................................... 21

*Wills v. Terhune*
   404 F. Supp. 2d 1226 (E.D. Cal. 2005) ................................................................... 22

*Wilson v. Seiter*
   501 U.S. 294 (1991) ................................................................................... 11, 14, 16

*Wood v. Housewright*
   900 F.2d 1332 (9th Cir. 1990) ................................................................................ 13

*Wright v. Rushen*
   642 F.2d 1129 (9th Cir. 1981) .......................................................................... 16, 17

**Statutes**

18 U.S.C. § 3626 ............................................................................................................ 7

42 U.S.C. § 1983 ............................................................................................................ 1

**Other Authorities**

2009 Ariz. Legis. Serv. 3rd Sp. Sess. Ch. 6 (H.B. 2010) .................................................. 2, 27
2011 Ariz. Legis. Serv. 1st Sess. Ch. 278 (H.B. 2011) .................................................. 2, 27

At the Court's request, Defendants David Shinn and Larry Gann submit this Proposed Findings of Fact and Conclusions of Law.

# I. Background.

## A. Complaint.

On March 22, 2012, Plaintiffs—thirteen inmates in the custody of the Arizona Department of Corrections ("ADC"), and the Arizona Center for Disability Law—filed this class-action lawsuit in the United States District Court for the District of Arizona.[1] (Dkt. 1.) They sued the former ADC Director, Charles Ryan, and the Interim Division Director of the Division of Health Services, Richard Pratt, in their official capacities. (*Id.*, ¶¶ 21–22.) The complaint raised five Eighth Amendment claims, pursuant to 42 U.S.C. § 1983, on behalf of themselves and all others similarly situated:

> **First Cause**: Inadequate health care (delays and denials of health care requests; untimely emergency treatment; failure to provide necessary medication and medical devices; and insufficient health care staff. (*Id.*, ¶¶ 26–57.)

> **Second Cause**: Inadequate medical care (failure to provide care for chronic diseases and protection from infectious diseases; and untimely access to medically necessary specialty care. (*Id.*, ¶¶ 58–69.)

> **Third Cause**: Inadequate dental care. (*Id.*, ¶¶ 70–73.)

> **Fourth Cause**: Inadequate mental health care (denial of mental health treatment, including proper management and administration of psychotropic medication, therapy, and inpatient treatment; and denial of mental health care to suicidal and self-harming prisoners. (*Id.*, ¶¶ 74–89.)

> **Fifth Cause**: Inadequate nutrition, mental health treatment, conditions of extreme isolation and environment deprivation for those prisoners who are confined in a cell for 22 hours or more each day or confined in one of four specific housing units. (*Id.*, ¶¶ 90–100.)

(*See also id.*, ¶¶ 140–149.)

---

[1] The original individual Plaintiffs were Victor Parsons, Shawn Jensen, Stephen Swartz, Dustin Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells. (Dkt. 1, ¶¶ 6–20.)

Plaintiffs sought class certification, declaratory and injunctive relief, and attorneys' fees. (*Id*., ¶¶ 150–151.)  For injunctive relief, Plaintiffs requested the Court "to develop and implement, as soon as practicable, a plan to eliminate the substantial risk of serious harm that prisoner Plaintiffs and members of the Plaintiff Class suffer due to Defendants' inadequate medical, mental health, and dental care, and due to Defendants' isolation policies." (*Id*., ¶ 151.)

On July 1, 2012, three months after Plaintiffs filed their Complaint, the legislative mandate requiring the privatization of the provision of healthcare to ADC inmates went into effect.  *See* 2009 Ariz. Legis. Serv. 3rd Sp. Sess. Ch. 6 (H.B. 2010); 2011 Ariz. Legis. Serv. 1st Sess. Ch. 278 (H.B. 2011).  ADC contracted with Wexford Health Services to provide inmate health care. (Dkt. 50-4.)  On March 4, 2013, Corizon took over for Wexford as ADC's health care provider. (Dkt. 344.)

## B.    Class Certification.

On March 6, 2013, the Court certified a Class and a Subclass. (Dkt. 372.)  In certifying the Class, the Court relied on a September 21, 2012 Cure Notification Letter authored by Wexford that identified and detailed 20 health care deficiencies "at all ten ADC complexes." (*Id*. at 5–7.)  That Letter "tip[ped] the balance in favor of concluding that the problems identified in the provisions of health care are not merely isolated instances but, rather, examples of systemic deficiencies that expose all inmates to a substantial risk of serious harm." (*Id*. at 14.)

The Court defined the Class as including "[a]ll prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC" and certified the following Class claims:

      i.      Failure to provide timely access to health care;

      ii.     Failure to provide timely emergency treatment;

     iii.     Failure to provide necessary medication and medical devices;

     iv.     Insufficient health care staffing;

| v. | Failure to provide care for chronic diseases and protection from infectious disease; |
|---|---|
| vi. | Failure to provide timely access to medically necessary specialty care; |
| vii. | Failure to provide timely access to basic dental treatment; |
| viii. | Practice of extracting teeth that could be saved by less intrusive means; |
| ix. | Failure to provide mentally ill prisoners medically necessary mental health treatment (i.e. psychotropic medication, therapy, and inpatient treatment); and |
| x. | Failure to provide suicidal and self-harming prisoners basic mental health care. |

(*Id*. at 22.)[2] The Court did not certify any other Class claims. (*Id*.) As Class Representatives, the Court designated Jensen, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, Gamez, Chisholm, Licci, Hefner, Polson, and Wells because they had established exposure to one or more of these alleged practices. (*Id*. at 15–16.) The Court dismissed Parsons because he had been released, which undermined his adequacy as a Class representative. (*Id*. at 19.)

The Court defined the Subclass as including "[a]ll prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units: Eyman-SMU 1; Eyman-Browning Unit; Florence-Central Unit; Florence-Kasson Unit; or Perryville-Lumley Special Management Area." (*Id*. at 22.) It certified the following Subclass claims:

| i. | Inadequate psychiatric monitoring because of chronic understaffing; |
|---|---|
| ii. | Use of chemical agents against inmates on psychotropic medications; |
| iii. | Lack of recreation; |
| iv. | Extreme social isolation; |

---

[2] Plaintiffs voluntarily dismissed class claims vii and viii involving dental care during trial. (R.T. 11/3/21 p.m. at 707.)

| | |
|---|---|
| 1 | v.      Constant cell illumination; |
| 2 | vi.     Limited property; and |
| 3 | vii.    Insufficient nutrition. |

(*Id*. at 22–23.)  The Court did not certify any other Subclass claims.  (*Id*.)  As Subclass Representatives, the Court designated Gamez, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, and Polson, each of whom alleged exposure to one or more of the certified claims.  (*Id*. at 17–18, 23.)

### C.      Summary Judgment.

On May 16, 2014, Defendants moved for summary judgment on all Class and Subclass claims.  (Dkt. 895.)  Though questioning the veracity of the individual Plaintiffs' own allegations, the Court concluded that genuine issues of material fact precluded summary judgment on their systemic allegations.  (Dkt. 1065.)  However, the Court dismissed Brislan as a Class and Subclass Representative because he had been released from ADC custody.[3]  (*Id*. at 12.)

The Court set trial for October 21, 2014.  (Dkt. 1075.)

### D.      Stipulation.

On the eve of trial, the parties entered into a settlement agreement ("Stipulation"), whereby ADC agreed to comply with 103 Health Care Performance Measures ("HCPM") and nine Maximum Custody Performance Measures ("MCPM"), which applied to all or some of the facilities.[4]  (Dkt. 1185.)  Defendants denied all allegations in the complaint, and the parties agreed that the Stipulation "d[id] not constitute and shall not be construed or interpreted as an admission of any wrongdoing or liability by any party."  (*Id*., ¶¶ 4–5.)

The stipulated compliance rate for the first 12 months of the Stipulation was 75%; after 12 months it was 80%; and after 24 months it was 85%.  (*Id*, ¶¶ 10.a, 20.a.)  To comply with a performance measure, ADC was required to meet or exceed these compliance rates.

---

[3] Up to this point, the Honorable Neil V. Wake presided. (Dkt. 4.) On August 11, 2014, the case was reassigned to the Honorable Diane J. Humetewa. (Dkt. 1074.)

[4] The MCPMs applied only to Subclass inmates. (Dkt. 1185, ¶ 3.)

(*Id.*, ¶¶ 9–10, 20.)  Defendants' duty to measure and report on a performance measure terminated once it was compliant for 18 months out of a 24-month period and had not been out of compliance for three or more consecutive months within the previous 18-month period.  (*Id.*, ¶¶ 10.b, 20.b.)  The Stipulation also included specific requirements for maximum-custody inmates.  (*Id.*, ¶¶ 22–28.)

The parties conferred authority on Magistrate Judge David K. Duncan to resolve disputes relating to the Stipulation and enforce its provisions.  (*Id.*, ¶¶ 29, 35–36.) Following a notice period and hearing pursuant to Rule 23(e), Judge Duncan approved the Stipulation on February 25, 2015.  (Dkt. 1458.)  That approval effectively started the compliance/monitoring period in March 2015.

In June 2018, Judge Duncan terminated 140 HCPMs (PMs 7, 38, 56, and 71 at all ten Arizona State Prison Complex ("ASPC"); PMs 33, 34, 62, 75, and 76 at Douglas, Florence, Lewis, Safford, Winslow, and Yuma; PMs 57, 58, 60, 61, and 74 at Douglas, Eyman, Florence, Lewis, Safford, Tucson, Winslow, and Yuma; and PMs 63, 64, 65, 68, and 70 at Douglas, Eyman, Phoenix, Safford, Winslow, and Yuma). (Dkt. 2900 at 12–13.)

In September 2019, Judge Duncan terminated MCPMs 4 and 7 (at all Units) and all MCPMs at Florence-Central Unit and Perryville.  (Dkt. 3359. At 11.)

In February 2020, the Court adopted several of Dr. Stern's recommendations relating to the termination or retirement of 60 more HCPMs (PMs 12, 16, 18, 19, 20 and 54 at all ten complexes) and directed the parties to stipulate to which measures were or should be terminated at specific locations.[5]  (Dkt. 3495 at 13–14, 23.)  Following their stipulation, the Court terminated an additional 102 HCPMs (PMs 6, 9, 10, 17, 28, 29, 79, 96, 99 and 101 at all ten complexes, and PM 61 at Perryville and Phoenix).  (Dkt. 3518 at 6; Dkt. 3575-1.)

In December 2020, the parties stipulated that 139 additional HCPMs (PMs 1, 2, 3, 5, 8, 15, 26, 30, 31, 59, 72, and 97 at all ten complexes; PMs 57, 58, and 60 at Perryville; PM 62 at Eyman, Perryville, Phoenix, and Tucson; and PMs 65, 68, and 69 at Florence, Lewis,

---

[5] The Court appointed Dr. Marc Stern to investigate, among other things, the monitoring process and compliance with the Stipulation. (Dkt. 3089.)

5

Perryville, and Tucson) should be terminated. (Dkt. 3881-2, ¶ 6.) Defendants also moved to terminate an additional 142 HCPMs for compliance. (Dkt. 3840.)

Despite being compliant with most of the performance measures for the duration of the Stipulation, Defendants were consistently noncompliant with several, resulting in contempt sanctions. On June 22, 2018, Defendants were sanctioned $1,445,000 for noncompliance with 35 HCPMs at different facilities (involving PMs 35, 39, 44, 46, 47, 50, 51, 52, 54, 66). (Dkt. 2898.) And on February 24, 2021, Defendants were sanctioned $1,100,000 for noncompliance with 22 HCPMs at different facilities (involving PMs 11, 12, 14, 15, 19, 24, 37, 39, 40, 42, 47, 49, 50, 51, 52, 66, 67). (Dkt. 3861.) All that noncompliance and resulting sanctions occurred during Corizon's tenure as ADC's health care provider—i.e., prior to July 1, 2019. (Dkt. 2124, 2373, 3235.)

Centurion took over the provision of healthcare on July 1, 2019. (Dkt. 3187-1.) Director Ryan retired on September 13, 2019, and David Shinn was appointed Director and began his tenure on October 21, 2019. (Dkt. 3412.) Richard Pratt retired on March 26, 2020, and Larry Gann was appointed to replace him on April 20, 2020. (Dkt. 3746.) In addition, in January 2020, ADC changed its name to the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR").[6] (*Id.*)

**E.     Rescission Order.**

On January 31, 2020, the Court issued an Order to Show Cause, threatening a $100,000-per performance measure sanction for any noncompliance with 127 HCPMs at certain facilities that did not meet or exceed the 85% compliance threshold in February 2020.[7] (Dkt. 3490; 3495.) On February 24, 2021, the Court clarified and modified its Order to Show Cause as applying to any noncompliance of those 127 HCPMs from March through December 2020, increasing the total sanction exposure to $127,000,000. (Dkt. 3861.)

---

[6] Judge Duncan retired in June 2018. This Court was reassigned to the case on June 26, 2018. (Dkt. 2911.)

[7] These performance measures included PMs 11, 13, 14, 15, 24, 35, 37, 39, 40, 42, 44, 45, 46, 47, 49, 50, 51, 52, 55, 66, 67, 72, 80, 85, 91, 92, 93, 94, 97, and 98. (Dkt. 3490; 3495).

1    Defendants responded to the OSC, noting the negative impact that COVID-19 had on

2    compliance with the Stipulation during those months. (Dkt. 3881.) And though technically

3    there were 229 instances of noncompliance during that 10-month span, the overall adjusted

4    compliance rate with the Stipulation was still between 88.59% and 96.17%, and the average

5    scores for the identified 127 HCPMs were between 89% and 95%. (*Id*. at 21.)

6        On July 16, 2021, the Court rescinded its prior approval of the Stipulation and set

7    the matter for trial "on Plaintiffs' claims in the original complaint." (Dkt. 3921.) The Court

8    determined that "material breaches" of the Stipulation existed, that "Plaintiffs have been

9    deprived of many of the core benefits of the Stipulation," and that the case "must move

10   beyond six years of judicial attempts to enforce the Stipulation." (*Id*.)

11       **F.    Trial.**

12       The Court set the trial to begin on November 1, 2021, with all fact discovery to

13   conclude by October 15, 2021. (Dkt. 3931.) On September 29, 2021, Plaintiffs moved to

14   add six additional Plaintiffs/Class Representatives—Kendall Johnson, Laura Redmond,

15   Ronald Slavin, Jason Johnson, Jonathan Gonzalez, and Dustin Brislan (who was re-

16   institutionalized in 2017)—because seven of the original named Plaintiffs/Class

17   Representatives (Parsons, Swartz, Thomas, Licci, Chisholm, Hefner, and Wells) were no

18   longer in custody. (Dkt. 4006.) The Court granted that Motion. (Dkt. 4061.)

19       Trial began on November 1 as scheduled and continued until December 8, 2021, for

20   a total of 15 trial days. At the conclusion of trial, the Court ordered the parties to file

21   simultaneous proposed findings of fact and conclusions of law. (Dkt. 4220.)

22   **II.    Legal Standards.**

23       **A.    Burden of Proof.**

24       Plaintiffs have the burden of proving each of their constitutional claims by a

25   preponderance of the evidence. *Solis v. Cty. of Los Angeles*, 514 F.3d 946, 957 (9th Cir.

26   2008). Because Plaintiffs seek prospective relief, to prevail on any claim they must

27   establish that there is a current constitutional violation. *Farmer v. Brennan*, 511 U.S. 825,

28   845 (1994); *Green v. Mansour*, 474 U.S. 64, 73 (1985); *see generally* 18 U.S.C. § 3626.

**B.    Scope and Nature of Plaintiffs' Claims.**

      **1.    Class Claims.**

As this is a class-action lawsuit, Plaintiffs' claims are limited to those certified by the Court. These 17 specified alleged practices were certified based on the evidence presented at the class-certification stage and satisfied Rule 23's requirements. They were the "glue" that held the classes and subclasses together and permitted class certification. *Parsons v. Ryan*, 754 F.3d 657, 678–79 (9th Cir. 2014). The purpose of the trial was to resolve whether any of these practices currently exist on a systemic level and, if so, whether they "are deliberately indifferent to inmates' health and safety in violation of the Eighth Amendment and subjection to unconstitutional conditions of confinement." *Id*. at 673 (quoting Dkt. 372 at 11).

Claims or allegations that were not raised in the Complaint or certified and subjected to Rule 23 scrutiny are therefore not before the Court. Therefore, health care allegations concerning the availability of language interpretive services, substance use treatment, and the mortality review process are not before the Court. Nor are conditions allegations that: showers are not clean in some units; inmates are not receiving programming or unstructured out-of-cell time required by the Stipulation; water fountains and toilets are inoperable; there are no mister systems; the use of double celling falls below the standard of care; padlocks on cell doors are dangerous; there is inadequate ventilation in some cells; inmates are irregularly provided cleaning supplies and toiletries; staff are not responsive to grievances; inmates in detention do not have tablet computers; staff wearing security equipment demonizes inmates; there is inadequate security staffing and inadequate supervision of inmates; there is perfunctory security checks; ADCRR improperly classifies inmates and prolongs their detention; and staff excessively use force involving non-chemical agents. Presenting this evidence for the first time at trial is procedurally improper and its consideration in conjunction with the certified claims deprives Defendants due process.

      **2.    Policy or Custom.**

"Section 1983 provides a federal forum to remedy many deprivations of civil

liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989). The Eleventh Amendment generally bars such suits. *Id*. An exception to this general rule is suits for injunctive relief against a state official in his official capacity. *Id*. at 71 n.14 (citing *Ex parte Young*, 209 U.S. 123, 159–160 (1908)). In that instance, any § 1983 claim must go through the framework set forth in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Plaintiffs must therefore establish not only an underlying constitutional violation, but that an ADCRR "policy or custom" was the "moving force" behind the deprivation. *Id*.; *see also Monell*, 436 U.S. at 694–95. Respondeat superior principles do not apply. *Monell*, 436 U.S. at 691. In other words, Defendants cannot be vicariously liable for a constitutional violation inflicted by an employee or agent. *Id*. Moreover, if the claim is grounded in a custom (as opposed to a written policy), Plaintiffs must establish that it is "so 'persistent and widespread' that it constitutes a 'permanent and well settled'" policy. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691). Liability "may not be predicated on isolated or sporadic incidents." *Id*.

### 3.     Systemwide Deficiencies.

Plaintiffs styled their Complaint as a systemic challenge to the health care and conditions at ADCRR's 10 state-operated facilities. *See Parsons*, 754 F.3d at 664 ("The 74–page complaint in this case contains detailed factual allegations concerning the existence of uniform, statewide policies and practices in *all* ADC facilities.") (emphasis added); *id*. at 676, 681 (Plaintiffs' claims are grounded in allegations "that ADC policies and practices of statewide and systemic application expose all inmates in ADC custody to a substantial risk of serious harm. … It involves uniform statewide practices.").

To prove a systemwide claim, Plaintiffs must "show widespread actual injury" suffered by the class as a whole not simply "isolated instances of actual injury." *Lewis v. Casey*, 518 U.S. 343, 347 (1996); *see also, e.g.*, *Webb v. Goord*, 340 F.3d 105, 109 (2d Cir. 2003) ("Amalgamating more than forty discrete incidents of misconduct by DOCS officials

does not make for a sustainable [class action] lawsuit.").  A systemwide claim attacking policies or customs at every facility "demands proof that would meet it."  *Fraihat v. U.S. Immigration & Customs Enforcement*, 16 F.4th 613, 646 (9th Cir. 2021).  Proof of a deficient policy or custom at less than all facilities is "insufficient to support" a systemwide claim. *Id*. at 647; *see also id*. at 645 (finding "facility-specific declarations" insufficient to show "deliberate indifference on a system-wide basis," and holding that "Plaintiffs have not demonstrated that the conditions at their individual facilities support a showing that ICE has acted with deliberate indifference or reckless disregard as to the approximately 250 immigration detention facilities nationwide."); *Balla v. Idaho State Bd. of Corr.*, 2020 WL 2812564, at *9, 22 (D. Idaho May 30, 2020) (in a 39-year old case involving alleged systemic failures, finding that "the mere existence of instances of, for example, constitutionally deficient medical treatment … would not establish a systemic Eighth Amendment violation precluding termination of prospective relief under § 3626(b)"); *Dockery v. Hall*, 443 F. Supp. 3d 726, 740 (S.D. Miss. 2019), *aff'd sub nom. Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2021) (finding no deliberate indifference due to "insufficient evidence that Plaintiffs, as a class, suffered substantial harm as a result of the missed doses or delays"); *Graves v. Penzone*, 2019 WL 4535543, at *3 (D. Ariz. Sept. 19, 2019) ("This case has always been about systemic failures amounting to constitutional violations. Proof of some individual failures does not establish systemic constitutional failures, and discovery regarding mere individual failures is not warranted."); *Porras v. Cty. of Los Angeles*, 2006 WL 4941837, at *4 (C.D. Cal. Oct. 31, 2006) ("Plaintiffs offer a mere thirteen examples, grossly insufficient to establish a pattern of conduct for purposes of demonstrating a systemic failure. According to Plaintiffs, 200,000 inmates flow through Defendants' jail system each year.  The tiny selection offered by Plaintiffs tells no particular story of a systemic failure.  Similarly, the inmate complaint forms offered by Plaintiffs are varied in their particulars. The Court cannot infer a systemic failure from such a small and varied array of data.") (internal footnote and record citation omitted).

Moreover, the Supreme Court has recognized that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. … Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have … additional reason to accord deference to the appropriate prison authorities." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). "Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

## C. General Eighth Amendment Principles.

"[T]he Constitution does not mandate comfortable prison," and the Eighth Amendment does not compel institutional changes that result in a perfect environment for long-term confinement. *Rhodes v. Chapman*, 452 U.S. 337, 348–49 (1981). The Eighth Amendment "prohibits only cruel and unusual *punishment*," *Wilson v. Seiter*, 501 U.S. 294, 300 (1991), which is the "unnecessary and wanton infliction of pain," *Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (citations omitted).

Cruel and unusual punishment "involve[s] more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id*.; *see also id*. (cruel and unusual punishment "involve[s] more than ordinary lack of due care for the prisoner's interests or safety"). Thus, "[n]ot every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny," *id*., and "[not] every injury suffered by an inmate … necessarily translate[s] into constitutional liability for prison officials," *Osolinski v. Kane*, 92 F.3d 934, 937 (9th Cir. 1996).

"What is necessary to establish an 'unnecessary and wanton infliction of pain[]' … varies according to the nature of the alleged constitutional violation." *Hudson v. McMillan*, 503 U.S. 1, 5 (1992) (citation omitted). A prisoner alleging inadequate healthcare must show "deliberate indifference" to their "serious medical needs," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); a prisoner alleging unconstitutional conditions of confinement must show "deliberate indifference" to a "substantial risk of serious harm," *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); and a prisoner alleging excessive force must show that the force was applied "maliciously and sadistically for the very purpose of causing harm," *Whitley*, 475 U.S. at 320–21. Thus, every Eighth Amendment claim has both an objective and subjective component. *Helling v. McKinney*, 509 U.S. 25, 35 (1993).

### 1. Health Care Claims.

"'Deliberate indifference to serious medical needs of prisoners' violates the Eighth Amendment." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (quoting *Estelle*, 429 U.S. at 104). "To establish a claim of inadequate medical care, a prisoner must first show a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)) (internal quotations omitted); *see also Hudson*, 503 U.S. at 9.

If "a prisoner establishes a sufficiently serious medical need, that prisoner must then 'show the official's response to the need was deliberately indifferent.'" *Id.* at 786 (quoting *Jett*, 439 F.3d at 1096). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "[I]t requires a showing of something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rasho v. Jeffreys*, __ F.4th __, 2022 WL 108568, at *4 (7th Cir. Jan. 12, 2022). "A mere difference of medical opinion is insufficient, as a matter of law, to establish deliberate indifference." *Toguchi*, 391 F.3d at 1058.

"To 'show deliberate indifference, the plaintiff must show that the course of treatment the official chose was medically unacceptable under the circumstances *and* that

the official chose this course in conscious disregard of an excessive risk to the plaintiff's health.'" *Edmo*, 935 F.3d at 786 (quoting *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016)) (emphasis added). "An inadvertent or negligent failure to provide adequate medical care is insufficient to establish a claim under the Eighth Amendment." *Id*. (citing *Estelle*, 429 U.S. at 105–06). Even "gross negligence" and "medical malpractice" are insufficient to establish a constitutional deprivation. *Toguchi*, 391 F3d at 1061 (citing *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990)). So too is a mere delay in medical care. *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).

"Deliberate indifference is not established when medical records indicate that the plaintiff was afforded extensive medical care by prison officials." *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) (citation omitted). The Ninth Circuit has emphasized the number of medical visits as evidence of the prison's attentiveness to an inmate's care. *See*, *e.g.*, *Cano v. Taylor*, 739 F.3d 1214, 1217 (9th Cir. 2014) ("The record is replete with health need request forms filed by [inmate] and the record indicates that [inmate] was seen by mental health care employees regularly for his complaints").

NCCHC accreditation is also compelling evidence of constitutionally adequate health care. *See*, *e.g.*, *Balla*, 2020 WL 2812564, at *1 ("The NCCHC accreditation and the MCP compliance, while not determinative, constitute substantial evidence of adequate medical care."); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 902 (S.D. Tex. 1999), *rev'd and remanded on other grounds by Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001) (though not dispositive, "accreditation does bolster defendants' claims that its medical care system is functioning constitutionally"). "NCCHC standards are designed to ensure that systems, policies, and procedures of correctional institutions are 'in keeping with nationally recognized best practices' in correctional medical care.'" *Balla*, 2020 WL 2812564, at *10 (quoting *Graves v. Arpaio*, 48 F. Supp. 3d 1318, 1338 (D. Ariz. 2014)).

Because "prison officials aren't deliberately indifferent to a prisoner's medical needs unless they act wantonly, … whether an official's conduct 'can be characterized as 'wanton' [also] depends upon the constraints facing him.'" *Peralta v. Dillard*, 744 F.3d 1076, 1082

13

(9th Cir. 2014) (quoting *Wilson*, 501 U.S. at 303; citing *Estelle*, 429 U.S. at 104). "What is reasonable depends on the circumstances, which normally constrain what actions a state official can take," *id.*, and "[e]vidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference," *Rasho*, 2022 WL 108568, at *5 (citing *Farmer*, 511 U.S. at 844).

In a similar class action against the Illinois Department of Corrections ("IDOC"), the Seventh Circuit recently vacated a permanent injunction enjoining IDOC to increase staffing and take other specific measures to remedy "systemically inadequate prison healthcare" in five areas that the plaintiffs' expert (Pablo Stewart) identified as noncompliant with the parties' settlement: mental-health evaluations, treatment planning, medication management, crisis treatment, and segregation. *Rasho*, 2022 WL 108568, at *5. IDOC prison officials were not deliberately indifferent because they "made reasonable efforts to cure the deficiencies," even though their "efforts fell short" of complying with the prescribed settlement agreement:

> These actions by IDOC administrators demonstrate a commitment to addressing the problem—the antithesis of the callous disregard required to make out an Eighth Amendment claim.
>
> To be sure, IDOC's efforts fell short: the prison system has not yet provided the level of care prescribed by the settlement, nor has it hit the personnel targets laid out in its 2014 Remedial Staffing Plan. But that does not equate to a constitutional violation. For one thing, there is no evidence that the terms of the settlement and IDOC's staffing plan matched the constitutional floor, an issue we address below. But even assuming IDOC's goals corresponded to the Eighth Amendment minimums, the defendants cannot have been deliberately indifferent because they undertook reasonable measures to achieve those goals, even though they were ultimately unsuccessful.
>
> [I]t is always possible to do more or move faster, but the existence of policies that may have been more effective does not mean an official recklessly disregarded the risk of harm.
>
> [P]ut simply, IDOC officials took multiple reasonable steps to fix the complex problem of understaffing in mental-health services, so they cannot have been deliberately indifferent. It was error to find otherwise.

14

1     *Id.* at *5 (internal citations omitted).

2            **2.      Conditions of Confinement Claims.**

3        Under the Eighth Amendment, "[p]rison officials have a duty to ensure that prisoners

4 are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety."

5 *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (citations omitted). But "prison

6 officials are liable under the Eighth Amendment only if they demonstrate 'deliberate

7 indifference' to 'conditions posing a substantial risk of serious harm' to an inmate." *Clem*

8 *v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (quoting *Farmer*, 511 U.S. at 834).

9        Deliberate indifference is a subjective standard akin to criminal recklessness.

10 *Farmer*, 511 U.S. at 837–40. A prison official cannot be liable "unless the official knows

11 of and disregards an excessive risk to inmate health or safety; the official must both be

12 aware of facts from which the inference could be drawn that a substantial risk of serious

13 harm exists, and he must also draw the inference." *Id*. at 837. "[A]n official's failure to

14 alleviate a significant risk that he should have perceived but did not, while no cause for

15 commendation" is not deliberate indifference. *Id*. at 838; *see also Gibson v. Cty. of Washoe*,

16 290 F.3d 1175, 1188 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of Los*

17 *Angeles*, 833 F.3d 1060 (9th Cir. 2016) ("If a [prison official] should have been aware of

18 the risk, but was not, then the [prison official] has not violated the Eighth Amendment, no

19 matter how severe the risk."). Moreover, "prison officials who actually knew of a

20 substantial risk to inmate health or safety may be found free from liability if they responded

21 reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at

22 844.

23        "Because routine discomfort is considered to be 'part of the penalty that criminal

24 offenders pay for their offenses against society,'" only "extreme deprivations" violate the

25 Eighth Amendment's objective component. *Hudson*, 503 U.S. at 9 (quoting *Rhodes*, 452

26 U.S. at 347). Anything less—even restrictive or severe conditions of confinement—are not

27 enough. *Rhodes*, 452 U.S. at 347; *see also Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004)

28 (framing the standard "as requiring extreme deprivation of any 'minimal civilized measure

of life's necessities'") (citation omitted); *Johnson*, 217 F.3d at 731 ("[T]he routine discomfort inherent in the prison setting is inadequate to satisfy the objective prong of an Eighth Amendment inquiry.").

A substantial risk of harm is sufficiently serious only if it is "sure or very likely to cause serious illness and needless suffering" or gives rise to "sufficiently imminent dangers" and "current unnecessary and wanton infliction of pain and suffering." *Helling*, 509 U.S. at 33–34. The mere "possibility of harm is not equivalent to the substantial risk of harm." *Ayotte v. Barnhart*, 973 F. Supp. 2d 70, 80 (D. Me. 2013). The risk must also be "pervasive" and one that results in a real and proximate threat, as opposed to "isolated incidents." *Lakin v. Barnhart*, 2013 WL 5407213, *7 (D. Me. Sep. 25, 2013) (citing *Shrader v. White*, 761 F.2d 975, 978 (4th Cir. 1985)); *Beaton v. Tennis*, 2010 WL 2696857, **5–6 (M.D. Pa. May 10, 2010), *aff'd*, 460 F. App'x 111, 114–15 (3d Cir. 2012).

"The circumstances, nature, and duration of a deprivation of these necessities must be considered in determining whether a constitutional violation has occurred." *Johnson*, 217 F.3d at 731. However, "[c]ourts may not find Eighth Amendment violations based on the 'totality of conditions' at a prison." *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982), *overruled on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995) (quoting *Wright v. Rushen*, 642 F.2d 1129, 1132 (9th Cir. 1981)). If none of the alleged conditions, standing alone, rises to the level of a constitutional violation, a violation cannot be found based on the overall conditions. *See Wilson*, 501 U.S. at 304–05 ("Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists.'"); *Hoptowit*, 682 F.2d at 1258 ("It was error, however, for the district judge to examine conditions in the isolation, segregation, and protective custody units under the totality of conditions standard.").

In suits seeking "injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, 'the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct,' their attitudes and conduct at the time suit is brought and persisting thereafter." *Farmer*, 511 U.S. at 845

(quoting *Helling*, 509 U.S. at 36).

### a.    Recreation.

Although "exercise is 'one of the basic human necessities protected by the Eighth Amendment,'" *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (quoting *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993)), the Eighth Amendment does not mandate *outdoor* exercise. *Norbert v. City & Cty. of San Francisco*, 10 F.4th 918, 929 (9th Cir. 2021). It requires only "outdoor recreation opportunities, *or otherwise meaningful recreation*, to prison inmates." *Id*. (quoting *Shorter v. Baca*, 895 F.3d 1176, 1185 (9th Cir. 2018)). Moreover, the Ninth Circuit has upheld as few as two hours of recreation per week. *See Pierce v. Cty. of Orange*, 526 F.3d 1190, 1213 (9th Cir. 2008); *see also Dockery*, 443 F. Supp. 3d at 743 ("Although Plaintiffs complain that they often do not get the five-hours-per-week recreation time, or the three showers-per-week as prescribed by EMCF policy, longer periods of continuous cell time have been found constitutional."); *Baptisto v. Ryan*, 2006 WL 798879, at *33 (D. Ariz. Mar. 28, 2006) ("*Baptisto I*"), *aff'd sub nom. Mullins v. Stewart*, 252 F. App'x 837 (9th Cir. 2007) ("While inmates were permitted only three hours at the time these suits were commenced, they may now spend six hours per week in the recreation area. Other courts, including the Ninth Circuit, have generally found five hours of recreation time per week to be constitutionally sufficient.").

### b.    Social Contact.

"It is well settled that the decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002). "[P]rison officials have a legitimate penological interest in administrative segregation, and they must be given 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Anderson v. Cty. of Kern*, 45 F.3d 1310, 1316 (9th Cir. 1995) (citation omitted). Although "[c]onfinement in a cell for most of the day is not pleasant, … 'courts may not institute reform programs on their own under the guise of correcting cruel and unusual punishment.'" *Id*. (quoting *Wright*, 642 F.2d at 1135).

Moreover, "absent extraordinary circumstances, administrative segregation … being an incident to the ordinary life of a prisoner, will never be a ground for a constitutional claim because it simply does not constitute a deprivation of a constitutionally cognizable liberty interest." *Martin v. Scott*, 156 F.3d 578, 580 (5th Cir. 1998); *see also Freeman v. Miller*, 615 F. App'x 72, 77 (3d Cir. 2015) ("Placing an inmate in restricted housing does not violate the Eighth Amendment as long as the conditions of confinement are not foul, inhuman or totally without penological justification."); *Jackson v. Heer*, 322 F. Supp. 3d 406, 412-13 (S.D.N.Y. 2018) (holding that conditions "normally associated with [isolated] confinement" do not give rise to a constitutional claim). Indeed, the Ninth Circuit has held that "administrative segregation, even in a single cell for twenty-three hours a day, is within the terms of confinement ordinarily contemplated by a sentence," *Id.* (citing *Toussaint v. McCarthy*, 801 F.2d 1080, 1091–92 (9th Cir. 1986).

"Although prolonged confinement under conditions of extreme social isolation and reduced environmental stimulation may cause psychological harm, it is not in and of itself an Eighth Amendment violation." *Jackson v. McMahon*, 2018 WL 6016981, at *15 (C.D. Cal. May 29, 2018). "[T]he mere placement in solitary confinement, despite its accompanying 'extreme social isolation and reduced environmental stimulation'—and the likelihood of 'some degree of psychological trauma' that it entails—is not enough to rise to the level of an Eighth Amendment violation." *Washington-El v. Beard*, 2011 WL 891250, at *3 (W.D. Pa. Mar. 11, 2011), *aff'd*, 562 F. App'x 61 (3d Cir. 2014); *accord Toussaint*, 801 F.2d at 1107 (holding it was insufficient for prisoners to "point to the violence and psychological pain that enforced idleness engenders" because they are not related conditions that combine to deny a single basic human need but rather conditions that result from another condition); *Dickson v. Valenzuela*, 2016 WL 7187628, at *8 (C.D. Cal. Nov. 4, 2016), *report and recommendation adopted*, 2016 WL 7187293 (C.D. Cal. Dec. 9, 2016) (no Eighth Amendment claim "simply by pointing to the generalized 'psychological pain,' – i.e., the loneliness, frustration, depression or extreme boredom—that inmates may experience by virtue of their confinement in the [secured housing unit]").

Similarly, "[i]nactivity, lack of companionship and a low level of intellectual stimulation do not constitute cruel and unusual punishment even if they continue for an indefinite period of time …." *Bono v. Saxbe*, 620 F.2d 609, 614 (7th Cir. 1980). The lack of social contact with other inmates in segregation does not result in a cruel and unusual punishment, even if the inmate suffers depression. *See Jackson v. Meachum*, 699 F.2d 578, 583 (1st Cir. 1983) (finding social isolation in segregation was not cruel and unusual punishment); *Green v. Coleman*, 2013 WL 6185172, at *5 (W.D. Pa. Nov. 26, 2013) ("The practice of housing certain problem prisoners in isolation from other inmates is not a condition of confinement that violates the Eighth Amendment."), *aff'd*, 575 F. App'x 44 (3d Cir. 2014) ("Green stated only that he had been in solitary confinement since October 2009, and that it was causing him psychological distress. Dismissal was therefore correct.").

Nor does it offend the Eighth Amendment to place a mentally ill prisoner in segregation. *See Tasby v. Cain*, 2017 WL 4295441, **9–10 (M.D. La. Sept. 12, 2017) (confinement of mentally ill prisoner in isolation for 15–18 years did not violate Eighth Amendment even though prisoner's mental health deteriorated in isolated housing); *Coleman v. CDCR*, 2012 WL 6045979, at *5 (E.D. Cal. Dec. 5, 2012) ("[M]ere placement in ad seg/SHU of mentally ill prisoners is not sufficient to demonstrate an objectively serious harm."); *Dickens v. Danberg*, 2012 WL 2089516, at *8 (D. Del. June 8, 2012) (dismissing as "frivolous" Eighth Amendment claim that prison officials "tortured" inmate by placing him "in a cell with reduced environmental stimulation, by covering his windows so he could not see outside of his cell" and inmate "did not know the time of day and was not in touch with his surroundings").

This Court has consistently held that inmates in ADCRR's segregation units have constitutionally adequate opportunities for social interaction. *See*, *e.g.*, *Freemon v. Ryan*, 2011 WL 5169342, at *16 (D. Ariz. 2011) ("Defendants' evidence shows that inmates can communicate with other inmates in their cell group, though not face-to-face. And, as Plaintiff acknowledges, there is visitation at the Browning Unit. Inmates are permitted a weekly two-hour block of non-contact visitation with up to four visitors at a time. STG-

validated inmates are allowed one telephone call per week. In addition, inmates housed at the Browning Unit may possess soft cover books and cassette players and head phones. The undisputed evidence shows that Plaintiff has opportunities for limited social contact and, therefore, is not isolated to a degree that would violate the Eighth Amendment.") (internal citations omitted); *Hampton v. Ryan*, 2006 WL 3497780, at *12 (D. Ariz. Dec. 4, 2006), *aff'd*, 288 F. App'x 404 (9th Cir. 2008) (finding inmate's eight-year placement in ADCRR's Eyman-Browning Unit did not violate Eighth Amendment because "[t]he evidence shows that Plaintiff is not totally isolated and his confinement is not indeterminate. Plaintiff is allowed visitors and he may use the telephone. Plaintiff's visitation is limited, however, such limitation is constitutionally permissible. Plaintiff may talk to staff and counselors, he is allowed out of his cell several hours a week, he may write and receive letters, and he has access to the library and various forms of media.") (internal citations omitted); *Jonas v. Schriro*, 2006 WL 2772641, at *4 (D. Ariz. Sept. 25, 2006) ("SMU II inmates are allowed one non-contact visit per week for a maximum of two hours, with up to four visitors at one time, and one five-minute phone call per week. Inmates also have contact with staff and are permitted to see prison and religious counselors. Plaintiff may have a radio and a television … and may pursue individual educational courses from their cells. … [P]laintiff has now shown that this social interaction is constitutionally inadequate."); *Aguilar v. Schriro*, 2006 WL 2471830, at *3 (D. Ariz. 2006) (same, plus plaintiffs had access to mental health services); *Bermudez v. Ryan*, 2006 WL 2547345, at *3 (D. Ariz. Aug. 31, 2006) (same); *Baptisto v. Ryan*, 2005 WL 2416356, at *13 (D. Ariz. Sept. 30, 2005) ("*Baptisto II*") ("Even assuming that Plaintiff is not allowed to communicate with other inmates, it can hardly be considered a 'minimal civilized measure of life's necessities' to communicate with other inmates in SMU II, especially when Plaintiff is not barred from various other avenues of communication, such as speaking with visitors in person, speaking on the cellular phone, and speaking to a counselor and other members of the staff. Plaintiff does not claim that there is no valid penological purpose for this alleged limitation.").

Finally, inmates have no constitutional right to receive visitation while incarcerated. *See Overton v. Bazzetta*, 539 U.S. 126, 131 (2003); *Dunn v. Castro*, 621 F.3d 1196, 1202 (9th Cir. 2010); *Gerber v. Hickman*, 291 F.3d 617, 621 (9th Cir. 2002). "To the extent that denial of contact visitation is restrictive and even harsh, it is part of the penalty that criminals pay for their offenses against society." *Toussaint*, 801 F.2d at 1114. Nor does the denial of telephone access violate the Eighth Amendment. *See Williams v. ICC Comm.*, 812 F. Supp. 1029, 1034 (N.D. Cal. 1992) ("This court is aware of no authority to support a claim of constitutional violation due to the deprivation of telephone access for convicted prisoners."); *Haynes v. Sisto*, 2010 WL 2076970, at *2 (E.D. Cal. May 24, 2010) ("[D]epriving a prisoner of phone calls and visits for four and a half months likely does not violate the Eighth Amendment.").

### c. Cell Illumination.

Constant cell illumination will only give rise to an Eighth Amendment violation if it exposes a prisoner to a substantial risk of harm, e.g., it causes "grave sleeping problems and other mental and psychological problems." *Keenan v. Hall*, 83 F.3d 1083, 1090–91 (9th Cir. 1996); *accord Chappell v. Mandeville*, 706 F.3d 1052, 1057–58 (9th Cir. 2013). Such claims are difficult to establish. *See*, *e.g.*, *Cunningham v. Cook*, 185 F.3d 866 (9th Cir. 1999) (affirming dismissal of cell illumination claim where allegations failed to show a substantial risk of serious harm); *see also Vasquez v. Frank*, 290 F. App'x 927, 929 (7th Cir. 2008) (holding "24–hour lighting involving a single, 9–watt fluorescent bulb does not objectively constitute an 'extreme deprivation'") (citation omitted); *Murray v. Edwards Cty. Sheriff's Dep't*, 248 F. App'x 993, 999 (10th Cir. 2007) (plaintiff "produced no evidence that the lighting, which only sometimes disturbed his sleep or gave him headaches, caused him to suffer the severe depression that he alleged"); *Chavarria v. Stacks,* 102 F. App'x 433, 436–37 (5th Cir. 2004) (holding that prison policy requiring 24-hour illumination of cells in administrative segregation, which allegedly caused an inmate to suffer sleep deprivation, did not violate the Eighth Amendment); *Franklin v. Smalls*, 2013 WL 941569, at *7–8, 18–20 (S.D. Cal. Mar. 8, 2013) (constant light from 7-watt fluorescent

bulb was not excessively bright so as to be unconstitutional); *McBride v. Frank*, 2009 WL 2591618, at *5 (E.D. Wis. Aug. 21, 2009) (9-watt fluorescent bulb does not objectively deny the "minimal civilized measure of life's necessities"); *Wills v. Terhune*, 404 F. Supp. 2d 1226, 1230 (E.D. Cal. 2005) (holding 24-hour illumination by 13-watt bulb constitutional because it was not of the type that caused "grave sleeping problems" and, there was no evidence in the medical records that he suffered symptoms from the lighting conditions); *King v. Frank*, 371 F. Supp. 2d 977, 985 (W.D. Wis. 2005) (no showing of a serious harm where "[t]he only light in his cell that plaintiff does not have the power to turn off is a 9–watt fluorescent light that remains lit at all times to allow prison officials to observe inmates at night. To block out this minimal amount of light, inmates are allowed to cover their eyes with a towel, washcloth, or t-shirt while sleeping").

Furthermore, even if constant cell-illumination inflicts pain, there is no constitutional violation if Defendants have a "reasonable justification." *Chappell*, 706 F.3d at 1057–58; *Thomas v. Ponder*, 611 F.3d 1150–51 (9th Cir. 2010); *see*, *e.g.*, *Murray v. Keen*, 763 F. App'x 253, 256 (3d Cir. 2019) (no Eighth Amendment violation from constant illumination due from 7-watt bulb kept on at night for safety and security needs); *Onstad v. Hobbs*, 607 F. App'x 595, 596 (8th Cir. 2015) ("In prior cases, we found no constitutional violation when prison officials subjected prisoners to constant lighting in circumstances where, as here, defendants proffered an explanation for why it was necessary.") (citations omitted); *Sims v. Piazza*, 462 F. App'x 228, 232 (3d Cir. 2012) ("Continuous lighting has been held to be permissible and reasonable in the face of legitimate penological justifications, like the need for security and the need to monitor prisoners.").

This Court has routinely dismissed cell-illumination claims against ADCRR, holding that its legitimate use for safety and security reasons did not violate the Eighth Amendment. *See*, *e.g.*, *Hampton*, 2006 WL 3497780, at *13 ("The prison has a legitimate penological interest in 24–hour cell lighting. The lighting allows correction officers to conduct regular security checks on the inmates while maintaining officer safety. Additionally, the lighting ensures that an inmate is never in complete darkness and thus may be observed at any time,

resulting in him being less likely to manufacture contraband materials."); *accord Rotondo v. Ryan*, 2012 WL 424384, at *13 (D. Ariz. Feb. 9, 2012); *Jose v. Thomas*, 2012 WL 2091527, at *6 (D. Ariz. June 11, 2012); *Jonas*, 2006 WL 2772641, at *3; *Bermudez*, 2006 WL 2547345, at *2; *Baptisto I*, 2006 WL 798879, at *28.

### d. Property.

Like any other Eighth Amendment conditions-of-confinement claim, an inmate must establish that "a sufficiently serious deprivation resulted from" the denial of his personal property. *Furnace v. Evans*, 2009 WL 2511967, at *12 (N.D. Cal. Aug. 14, 2009); *see Keenan*, 83 F.3d at 1092 (there is no constitutional right to canteen products).

Courts routinely reject property claims brought by high-custody inmates challenging the type or amount of property they can possess in their cells. *See, e.g.*, *Turner v. Upton*, 2013 WL 4852689, at *5, 12 (M.D. Ga. 2013) (personal property restrictions in SMU housing unit and in strip cells did not violate Eighth Amendment); *Harrison v. Bledsoe*, 2010 WL 186804, *5–6, 9 (M.D. Pa. 2010) (same); *Stockton v. Tyson*, 2011 WL 5118456, at *3 (E.D. Cal. 2011) ("Plaintiff's claims that he was deprived of personal property, including reading material, and was denied out of cell relief do not show that he was deprived of something sufficiently serious, nor does Plaintiff allege facts that he was at a 'substantial risk of serious harm.'"); *Lerajjareanra-O-Kel-ly v. Johnson*, 2009 WL 1513285, at *2 (D. Idaho 2009) (rejecting claim based on personal property restriction in administrative segregation); *Harris v. Horel*, 2009 WL 2761339, at *4 (N.D. Cal. Aug. 31, 2009) ("Plaintiff has not alleged, nor shown, that Defendants failed to provide the basic necessities of life …, or that the denial … of personal property constituted such a deprivation."); *Chhoun v. Woodford*, 2005 WL 1910930, at *10 (N.D. Cal. 2005) ("As a matter of law, living for 90 days without [2 books, 3 magazines, an address book, some letters, writing materials, 3 stamps, and a television] did not amount to cruel and unusual punishment."); *Owens v. Ayers*, 2002 WL 73226, at *3 (N.D. Cal. 2002) ("It belittles the Eighth Amendment to suggest that a three-month ban on the possession of personal property, such as tobacco and lighters (which could not be used within the housing unit in

any event), amounts to cruel and unusual punishment.").

This Court reached the same conclusion when faced with a similar Eighth Amendment claim by an ADCRR inmate at SMU-II: "It is irrelevant for Eighth Amendment purposes what criteria prison officials use to limit Plaintiff's access to music and reading materials, as the Court can find no case where depriving an inmate of such materials amounted to cruel and unusual punishment." *Baptisto II*, 2005 WL 2416356, at *14.

### e.    Nutrition.

"The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." *LeMaire*, 12 F.3d at 1456; *see also Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1260 (9th Cir. 2016) (affirming dismissal of Eighth Amendment claim where pregnant inmate failed to show that the food she received was inedible or "nutritionally inadequate under the United States Department of Agriculture's recommended caloric intake" or "left her or her baby in poor health").

Courts consistently reject Eighth Amendment nutrition claims against ADCRR, finding that its meal plan is nutritionally adequate. *See Sanders v. Trinity Servs. Grp. Inc.*, 2021 WL 698166, at *12 (D. Ariz. Feb. 23, 2021) ("Because Defendants have shown that the Standard Menu served at ASPC Lewis is adequate to maintain health by 1989 national nutrition standards and does not deprive Plaintiff of necessary calories or nutrients, and Plaintiff fails to create a genuine issue of material fact that the diet is inadequate and deprives him of the minimal civilized measure of life's necessities, Plaintiff's Eighth Amendment claims based on his prison diet fail as a matter of law."); *Standley v. Ryan*, 2012 WL 3288728, at *14 (D. Ariz. 2012) (granting summary judgment dismissing nutrition claim, where prisoner presented "no specific facts or evidence to dispute Defendants' evidence that the calories provided to him are determined by a nutritionist to meet his health needs, nor … any evidence that Defendants have withheld food to punish STG-validated inmates"); *Baptisto I*, 2006 WL 798879, at *6–8, 27–28 (no violation based on food that provided adequate amount of federally recommended nutrition levels); *Jonas*, 2006 WL 2772641, at *3 (finding no violation where "SMU II inmates [were] given a

reduced calorie diet based on a less active life-style. This diet was developed by a dietician and provides SMU II inmates with three meals per day during the week and two meals per day during the weekends") (internal record citation omitted).

Courts have also upheld ADCRR's use of a streamlined or restricted-movement meal plan against similar Eighth Amendment challenges. *See*, *e.g.*, *Maloney v. Ryan*, 2013 WL 3945921, at *6–8 (D. Ariz. 2013) (rejecting Eighth Amendment claim of ASPC Florence Muslim inmate to mega-sack meal plan during Ramadhan as two meals gave inmate recommended daily caloric intake for sedentary lifestyle); *Gamez v. Ryan*, No. CV10-2663-PHX-JWS (MEA), Doc. No. 86 at 6, (D. Ariz. Dec. 21, 2012) ("The record makes clear that Plaintiff receives three meals per day, but two meals are delivered in the morning at the same time and one meal is delivered in the evening. Plaintiff has not introduced any legal authority suggesting that the prison is prohibited from streamlining the distribution of meals to inmates in the manner currently being employed."); *see also Green v. Ferrell*, 801 F.2d 765, 770–71 (5th Cir. 1986) (finding two meals a day sufficient if nutritionally and calorically adequate and "[e]xpert recommendations do not create constitutional standards under the [E]ighth amendment.").

### 3. Excessive Force Claims.

The Eighth Amendment prohibits prison officials from using excessive force against inmates. *Hudson*, 503 U.S. at 9. "That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.*; *accord Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Not every push or shove" violates the constitution) (citation omitted). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9 (quotations omitted).

An Eighth Amendment excessive force claim "turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320. "This standard necessarily

involves a more culpable mental state than that required for excessive force claims arising under the Fourth Amendment's unreasonable seizures restriction." *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2003). A prisoner asserting an excessive force claim must show "malicious and sadistic force, not merely objectively unreasonable force." *Id*. "Under this heightened standard, the officials' liability for excessive force in this case is much more doubtful." *Id.* This heightened standard is in place because "[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley*, 475 U.S. at 321–22 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

In determining whether force was applied maliciously and sadistically for the purpose of causing harm, courts consider: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." *Bearchild v. Cobban*, 947 F.3d 1130, 1140 (9th Cir. 2020) (quoting *Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013)); *accord Whitley*, 475 U.S. at 321.

The Ninth Circuit has repeatedly held that prison officials deploy chemical agents in good faith rather than sadistically and maliciously when used against inmates for disruptive activity or non-compliance with prison rules. *See*, *e.g.*, *Clement*, 298 F.3d at 903–04 (upholding use of pepper spray to quell a fight between two inmates); *Allen v. Bosley*, 253 F. App'x 658 (9th Cir. 2007) (finding inmate "failed to raise a triable issue that the defendants possessed malicious and sadistic intent when they administered pepper spray in an effort to restore discipline after another inmate … refused to comply with orders to submit to standard handcuffing procedure and attempted to block a cell extraction team from entering his cell"); *see also Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) ("The Supreme Court has never held, nor have we or any other court of appeals, so far as we can determine, that the use of tear gas or a chemical agent is a per se violation of the Eighth

Amendment . . . ."); *Howard v. Nunley*, 2010 WL 3785536, at *3 (E.D. Cal. 2010) ("The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary to ... subdue recalcitrant prisoners does not constitute cruel and inhuman punishment.").

Moreover, the fact that an inmate has a mental illness or is taking psychotropic medications does not constitutionally exempt the use of OC spray. *See Deorle v. Rutherford,* 272 F.3d 1272, 1283 (9th Cir. 2001) ("We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals"); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) ("[S]ome force was surely justified in restraining [mentally ill arrestee] so that he could not injure either himself or the arresting officers.").

## III.    Findings of Fact and Conclusions of Law.

### A.    ADCRR & Centurion.

1.     ADCRR operates 10 prison complexes statewide:  ASPC Douglas, ASPC Eyman, ASPC Florence, ASPC Perryville, ASPC Phoenix, ASPC Lewis, ASPC Safford, ASPC Tucson, ASPC Winslow, and ASPC Yuma.  (Ex. 1304.)  ASPC Perryville incarcerates only female inmates.  Although ADCRR contracts with private companies to operate additional facilities, this lawsuit and the Class/Subclass claims involve only these 10 state-operated facilities.

2.     When Plaintiffs filed their Complaint, healthcare at ADCRR was self-operated.

### The Privatization of Healthcare

3.     The State Legislature privatized ADCRR healthcare effective July 1, 2012. *See* 2009 Ariz. Legis. Serv. 3rd Sp. Sess. Ch. 6 (H.B. 2010); 2011 Ariz. Legis. Serv. 1st Sess. Ch. 278 (H.B. 2011).  The original healthcare vendor was Wexford Health Services. (Dkt. 50-4.)  On March 4, 2013, Corizon took over for Wexford as ADC's health care provider.  (Dkt. 344.)

4.     On June 1, 2018, Request for Proposal No. ADOC18-00008264 ("RFP") for comprehensive correctional health services to inmates housing the state-operated facilities

was released. (Ex. 2068, ¶¶ 28–29.) The contract was awarded to Centurion of Arizona, and Centurion took over the provision of healthcare on July 1, 2019. (Dkt. 3187-1.)) Centurion's regional office consists of 40 employees, including a regional Medical Director, regional Psychiatry Director, regional Mental Health Director, regional Dental Director, Associate Directors, two Directors of Operations, and several Directors of Nursing. (R.T. 12/8/21 p.m. at 3582:6-15.)

5.    The original contract with Wexford in July 2012 was approximately $117,000,000. It is currently $216,000,000 with Centurion. (R.T. 11/16/21 a.m. at 2171:19-25.) In addition to that amount, the State agreed to a $2,500,000 supplement for COVID-related expenses and a $15,000,000 supplement for additional staffing (to compete with public and private health care entities), and it added a $2,000,000 liability cap for court-ordered sanctions so that Centurion could focus its resources on staffing and healthcare. (R.T. 11/16/21 a.m. at 2172:1-16, 2236:10-13; R.T. 12/8/21 p.m. at 3585:15-24.)

6.    On June 18, 2021, ADCRR extended its contract with Centurion for an additional 15 months. (R.T. 11/16/21 a.m. at 2235:19-22.)

7.    The State currently spends approximately $7,700 per inmate per year on healthcare. (*Id*. at 2172:17-23.)

**ADCRR's Contract with Centurion for the Provision of Healthcare**

8.    Under the contract, Centurion must comply with all 103 HCPMs required under the original language of the Stipulation, regardless of whether the Court has terminated or retired a Performance Measure (except for Performance Measure 54, which was collapsed into Performance Measure 55 by order of the Court). (Ex. 2068, ¶ 19.)

9.    The contract has a three-tier system of sanctions designed to promote compliance with the contract, as well as with the Stipulation, and to improve healthcare throughout the system. Those sanctions are imposed as offsets on amounts due by the State to Centurion. Each separately monitored noncompliant Performance Measures counts as a separate instance of noncompliance under this sanction scheme. (*Id*., ¶ 30; R.T. 11/17/21 a.m. at 2429:8-2429:12.)

10. The contract includes a first-tier of performance sanctions, to ensure that Centurion strives to comply with the Performance Measures. For each Performance Measure monitored by the MSCMB, even if a compliance failure does not result in the extension of the twenty-four-month rolling period of the Stipulation (and even for those measures which have been retired by the Court), Centurion's failure to meet the 85% compliance threshold at any complex during any audited month will result in a fixed-rate performance offset of $500.00 per measure, per month, per facility. In contrast, performance sanctions imposed on Corizon were limited only to instances of noncompliance that extended the twenty-four-month rolling period. (Ex. 2068, ¶ 31.)

11. In addition, the contract also includes a second-tier of performance sanctions, which is a graduated-scale performance offset which applies only to Performance Measures where noncompliance at a particular complex or month will result in the extension of the twenty-four month rolling period of the Stipulation. (*Id.*, ¶ 32.)

12. These graduated-scale offsets necessarily apply to all Performance Measures set forth in the Court's January 1, 2020 Order to Show Cause (with the exception of Health Care Performance Measures 12, 19 and 20, which were subsequently terminated on February 12, 2020), as any further instance of noncompliance would extend the time period before the measure was eligible for termination. (*Id.*, ¶ 33.)

13. Under the graduated-scale offset, the lowest amount of the sanction is $2,500.00 for each noncompliant Performance Measure where a month of noncompliance results in an extension of the Stipulation. The amount of the offset increases based upon the amount of those compliance failures which occur in a particular month. For example, there is a $2,500 offset per instance for up to nine noncompliant results, and a $20,000 offset per instance for 50 or more noncompliant results. (*Id.*, ¶ 34.)

14. By way of example, in a hypothetical month where MSCMB monitors found that Centurion did not meet the 85% compliance threshold for 40 Performance Measures, and those failures extended the term of the Stipulation, the total amount of the offset would be $262,500.00 (9 measures x $2,500.00) + (10 measures x $5,000.00) + (10 measures x

29

$7,500.00) + (10 measures x $10,000.00) + (1 measure x $15,000.00). Once this system was developed for the RFP, the graduated-scale offset system was also imposed by Amendment during the remaining term of the Corizon contract. (*Id*., ¶ 35.)

15.    Third, the contract provides for staffing offsets/paybacks for hours of service if the actual number of hours worked by personnel in contract job descriptions in a month falls below the level of hours to be worked by a full-time equivalent ("FTE") employee identified in the staffing matrix at the regional office or at a facility. Where positions are under-filled in a particular month, the contractor is subject to an offset based upon the average hourly rate for that provision for each hour that was uncovered. To avoid these offsets, Centurion may use more qualified staff to cover the hours (for example an RN may be used to complete the work of an LPN, or a physician may work to cover the hours for a mid-level provider listed in the staffing plan). (*Id*., ¶ 36.)

16.    The staffing offset is designed to eliminate any perverse financial incentive if the contractor decides that it may be economically advantageous to leave a position on the staffing plan unfilled, even where there is a sanction for noncompliance. If a position on the staffing plan is not actually worked in the month, the amount of the payment due to the contractor is offset by the wage or salary due to that particular position for each vacancy. (*Id*., ¶ 37.)

17.    The staffing sanctions are imposed based upon hours worked by hired staff up to one FTE per Centurion employee.  Hours worked by Centurion employees as overtime, as well as hours worked by locums, agency staff, or independent contractors, do not reduce the staff sanction imposed in a given month. (*Id*., ¶ 38.)

18.    In the first nine months of contract performance, total offsets of $8,362,040.14 were imposed. (*Id*., ¶ 57.)

19.    In the first 18 months of contract performance, total offsets of $12,277,066.91 were imposed. (Ex. 2079, ¶ 35.)

20.    In total, Centurion has been subject to over $17 million in sanctions since the beginning of its contract, including $4 million in staffing allocation offsets. (R.T. 11/16/21

30

p.m. at 2330:4-2330:7.)

21.     The sanctions imposed upon Centurion began to be applied in the first month of contract performance. This is a significant change from the initial Corizon contract which did not include any performance offsets for noncompliant measures in the initial contract period, and then included caps on performance sanctions.  (Ex. 2068, ¶ 58.)

22.     By imposing immediate and substantial sanctions, ADCRR clearly and unequivocally communicated the importance and necessity for Centurion to ensure compliance with the terms of the contract and the Performance Measures contained in the Stipulation.  (*Id*., ¶ 59.)

23.     While Centurion initially experienced some large sanctions under the three-part offset system, it appears that those large sanctions resulted in higher performance compliance.  (*Id*., ¶ 60.)

24.     The contract requires 1,052.75 FTEs.  (R.T. 12/8/21 p.m. at 3587:11-12.) One FTE is 40 hours.  (*Id*. at 3588:7.)

25.     In July 2019, hired FTEs were approximately 70%.  (*Id*. at 3587:23-24.) Centurion worked hard to increase that percentage.  (*Id*. at 3587:15-23.)

26.     Hired FTE does not include PRN staff (agency staff, which is locum tenens and registry nurses) or overtime; worked FTE captures these things and is a true measure of staffing.  (*Id*. at 356:2-3587:6.)

27.     Under the contract, hired FTEs has ranged from 75% to 80%, and worked FTEs has ranged from 80% to 90%.  (*Id*. at 3587:7-10.)  On October 15, 2021, worked FTEs were approximately 90%.  (*Id*. at 3587:13-19.)  In other words, 90% of the 1,052.75 FTEs were filled.  (*Id*. at 3587:17-18.)

**ADCRR Current Leadership & Organizational Structure**

28.     Director Shinn is the Director of the Arizona Department of Corrections. (R.T. 11/16/21 a.m. at 2148:1-2.)  He has been the Director since October 21, 2019.  (*Id*. at 2148:3-4.)

29.     Director Shinn previously worked with the Bureau of Prisons ("BOP"),

beginning in February 1991.  (*Id*. at 2148:11-12.)  He started as a correctional officer and worked his way up the ranks, including as Accreditation Manager and in Executive Leadership working directly with the Director of the Bureau of Prisons, the Assistant Directors, and the Regional Directors to facilitate the management of BOP.  (*Id*. at 2148:13-2150:5.)  While in Executive Leadership, Director Shinn was responsible for "doing the research, looking at trends, challenges, and opportunities that existed in the field of corrections to maintain accreditation" and industry standards.  (*Id*. at 2150:7-13.)

30.     After working in Washington D.C., Director Shinn served as Associate Warden and Warden at several BOP facilities, where he helped improve the facility's health care staffing shortages and worked very closely with the federal courts (more than 100 judges at three or four different courthouses in the Central District of California) and supported the U.S. Marshals pretrial detainee population. (*Id*. at 2151:12-2152:12, 2153:5-10, 2153"17-2154:5, 2155:5-2156:4, 2157:19-23.)  One of those facilities (Victorville) is BOP's third or fourth largest complex, and it included both high and medium security components.  (*Id*. at 2157:23-2158:5.)  When Director Shinn started at Victorville, there were security challenges at the facility, but over the course of his first six months, Director Shinn was able to reduce the violent incidences throughout the complex by approximately 80% and that reduction sustained for the three years he was the Warden.  (*Id*. at 2158:6-15.)

31.     Director Shinn's last BOP assignment was as an Assistant Director over its Program Review Division, which was responsible for conducting internal audits for 122 facilities (240,000 inmates and 39,000 employees).  (*Id*. at 2159:12-18.)  In that position, Director Shinn examined 17 different disciplines on an annual basis and conducted more than 900 in-person audits.  (*Id*. at 2159:15-18.)

32.     Director Shinn was also a member (and Chairman) of the Federal Executive Board, which worked to enhance public communication, emergency management, and training and staff development, and the High Intensity Drug Trafficking Area task force. (*Id*. at 2156:16-2157:9, 2157:10-18.)  While he was Chairman, the Federal Executive Board came up with recommendations to overcome challenges in recruiting, retention, and

development of senior executives, which were ultimately included in President Obama's SES Reform Initiative. (*Id*. at 2158:16-2159:9.)

33. When Director Shinn took over as Director, he immediately restructured and modernized its executive leadership to help overcome the challenges in this litigation. (*Id*. at 2161:6-17.) He added a second Deputy Director to scrutinize healthcare more closely. (*Id*. at 2161:18-2162:3.) That allowed the other Deputy Director to focus primarily on security, programming, and staffing. (*Id*. at 2161:23-25.) Director Shinn also reorganized Divisions within ADCRR to provide more specialized focus on subject matters. As part of that reorganization, Director Shinn replaced approximately 80% of ADCRR's executive leadership and added staff that had external experience. (*Id*. at 2162:4-12.)

34. To improve the provision of healthcare, Director Shinn hired Larry Gann to be the Assistant Director of the Medical Services Contract Monitoring Bureau ("MSCMB"). Gann had a tremendous background in health care and success at other institutions and provided an external prospective. (*Id*. at 2162:13-2163:3.)

35. Director Shinn also added a new Clinical Director, Dr. Grant Phillips, and Mental Health Director, Dr. Bobbie Stallcup, both of whom had tremendous resumes and experience in correctional health care. (*Id*. at 2163:4-6, 2164:20-2165:9.)

36. Larry Gann has been a Registered Nurse ("RN") since 2005 and is licensed or has been licensed as an RN in Alabama, Arizona, Nevada, Oregon, California, Ohio, Texas, and Florida. He is also a Certified Correctional Health Professional. (Ex. 2068, ¶ 3; R.T. 11/16/21 a.m. at 2253:21-2253:25.)

37. From July 2006 to July 2015, Gann worked for NaphCare Inc., a privately owned correctional health care company that partners with city, county, state, and federal correctional facilities nationwide to provide proactive, patient-focused healthcare. (Ex. 2068, ¶ 5.)

38. From July 2006 to March 2008, Gann was the Health Services Administrator and Director of Nursing at the Clark County Detention Center in Las Vegas, Nevada. In that role, he provided direct supervision of all healthcare delivery operations (medical,

mental health, dental) and was responsible for a multidisciplinary team of 178 healthcare professionals who cared for an average daily population of 3,800 patients.  (*Id.*, ¶ 6.)

39.    From May 2008 to January 2010, Gann was NaphCare's Chief Nursing Officer, and from January 2010 to July 2015, he was NaphCare's Vice President of Operations.  In these roles, he was directly responsible for the Standards of Nursing Practice throughout all his assigned facilities throughout the United States, and he directly managed 18 facilities and more than 800 health care professionals to ensure that nursing services were provided in compliance with all applicable standards and requirements of the National Commission on Correctional Health Care, the Joint Commission on Accreditation of Healthcare Organizations, the American Correctional Association, and the regulatory State Boards of Nursing.  (*Id.*, ¶ 7.)

40.    From October 2009 through April 2012, Gann was an RN at the Veteran's Administration / Birmingham Regional Medical Center.  (*Id.*, ¶ 8.)

41.    From August 2015 to February 2019, Gann was the Director of Nursing ("DON") for Maricopa County Correctional Health Services ("MCCHS").  When he began his tenure at MCCHS, the Maricopa County jail system had been subject to a 1977 consent decree relating to the provision of healthcare, *Graves v. Penzone*, No. 77-cv-00479-PHX-NVW. His efforts and leadership helped MCCHS finally come into compliance with that consent decree, which the Court ultimately terminated just a few months after his departure. (*Id.*, ¶ 9.)

42.    From February 2019 to April 2020, Gann was the Assistant Vice President of Operations for Corizon Health in Baltimore, Maryland.  Corizon was responsible for providing healthcare to the State of Maryland's detainee and inmate patient population. Gann was recruited to help cure noncompliance with a consent decree dating back to 1978, involving the provision of healthcare at the Baltimore City Detention Center, *Duvall v. Hogan*, No. ELH-94-2541.  (*Id.*, ¶ 11.)

43.    Gann has prepared staffing plans for over six different state systems and written staffing plans for 30 facilities throughout the United States.  He has extensive

experience in the development of staffing plans for jails and prisons both at the local and state level. (R.T. 11/16/21 a.m. at 2258:19-2258:22, 2259:4-2259:7.)

44. As the Assistant Director, Gann oversees the Medical Services Contract Monitoring Bureau ("MSCMB"), and one of his responsibilities is to ensure that ADCRR's healthcare vendor—currently Centurion of Arizona—is complying with all aspects of its Contract with ADCRR. He is also responsible for ensuring that Centurion provides ADCRR's inmate population with a quality system of healthcare and in accordance with all applicable laws, rules, and regulations; the American Correctional Association; the National Commission on Correctional Health Care; and ADCRR policies and procedures. (Ex. 2068, ¶ 14; R.T. 11/16/21 a.m. at 2262:18-2262:25.)

45. Prior to January 2020, the Assistant Director of Medical Services reported directly to the Director. In January 2020, ADCRR split the responsibilities of the Deputy Director into two separate positions. Gann, along with the Assistant Directors for Financial Services and Contract Compliance, report to one Deputy Director. The ADCRR Assistant Directors for Inmate Programs and Reentry, Arizona Correctional Industries, and Prison Operations report directly to the other Deputy Director. (Ex. 2068, ¶ 16.)

46. Director Shinn and Gann have implemented many changes to improve the quality of healthcare at ADCRR. (Ex. 2079, ¶¶ 37–54; R.T. 11/16/21 a.m. at 2263:1-2263:15, 2277:1-2277:6, 2277:6-2277:10.)

47. Gann meets with the Deputy Director for a formal meeting at least once a week and has multiple engagements with him daily. Their meetings consist of comprehensive interpretation of statistical and analytical data which assists us in focusing the MSCMB's efforts. A great deal of this data is quantitative material, but they hone in on the details to ensure that qualitative measures are being addressed by Centurion. For instance, instead of focusing solely on whether medication was passed out to the patients, they focus on whether the medications were administered correctly. (*Id*., ¶ 17.)

48. The MSCMB monitors Centurion's compliance with the Health Care Performance Measures required under the Stipulation. This monitoring serves two related

purposes: (1) monitoring compliance with the Stipulation; and (2) monitoring health care contractor performance since the Health Care Performance Measures are incorporated in the terms of the contract. Although the Stipulation has been rescinded, Centurion must still comply with the Performance Measures, and the MSCMB still monitors Centurion's compliance, because Centurion is required to comply under the terms of the contract. (*Id.*, ¶ 18.)

49. Gann created a Bureau Administrator position. The Bureau Administrator is responsible for managing 10 facility medical liaisons (Licensed Practical Nurses and Registered Nurses who serve as contact points, identify and assist with solving facility-specific issues, and, with them, identifying and resolving compliance issues, and address non-performance). The Bureau Administrator is also responsible for the creation of a real-time corrective action plan format that allow all team members the ability to see each identified barrier's cure status in an up-to-date format. This information is then shared with the Director on a monthly basis during his Business Review Meetings and his Strategic Plan Initiative. (*Id.*, ¶ 68.)

50. The Program Evaluation Administrators are responsible for the day-to-day monitoring of Performance Measure compliance. The monitors report directly to them. Program Evaluation Administrators discuss issues with the monitors and Gann on a daily basis. (*Id.*, ¶¶ 63–64, 67.)

51. Prior to Gann's appointment as Assistant Director, MSCMB monitors were assigned to audit all applicable Performance Measures for a specific facility. To comply with the February 12, 2020 order in this litigation, monitors transitioned to statewide monitoring. Monitors are now responsible for auditing a Performance Measure at all applicable facilities. (*Id.*, ¶ 63.)

52. Monthly monitoring generally involves reviewing a random sample of inmate medical records—selected upon criteria set forth in the Monitoring Guide—from each unit in each complex and determining whether those records reflect compliance with the particular Performance Measure for that month. For each measure, each complex is given

a compliance score, depending on the number of records audited and the number of compliant audited records. For example, if 50 total medical records are reviewed at ASPC Eyman and 42 of those files reflect compliance with a Performance Measure, ASPC Eyman will receive an 84% compliance score for that Performance Measure in the monitored month. These compliance scores are tabulated using the Compliance Green Amber Red ("CGAR") reporting tool and reported to Plaintiffs' counsel and the District Court each month. (*Id.*, ¶ 20.)

53.    Certain complexes will not be audited for specific Performance Measures in a particular month, and therefore will not receive a compliance score for that month. This occurs because a particular complex does not house a particular inmate population (e.g., female inmates or MH-5 inmates) or have the facilities (e.g., intake or IPC) that the Performance Measure is designed to cover. For example, Performance Measure 61—requiring all female inmates ages 21 to 65 to be offered a pap smear every 36 months after initial intake—cannot apply to any complex that does not house female inmates. Performance Measure 62—requiring all inmates to be screened for tuberculosis upon intake—cannot apply to any complexes that are not in-take facilities. Performance Measure 89—requiring all MH-5 inmates to be seen by a mental health clinician for a 1:1 session a minimum of every seven days—cannot apply to complexes that do not house MH-5 inmates. For these (and similar) Performance Measures, medical services staff cannot provide the care required, because there is (and there is not expected to be) any inmate at the complex who could receive the care. For those reasons, these measures are "deactivated" in the CGAR reporting tool, and do not come up for monitoring. The monthly CGAR reports provided to the Court do not mention these deactivated measures. If an operational change in population or facility occurs at a complex where a deactivated measure may be applicable, like the recent transfer of female inmates to ASPC Douglas, these "deactivated" Performance Measures will be activated, and Centurion must provide the care required, and the MSCMB will monitor Centurion's compliance and tabulate a compliance score. (*Id.*, ¶ 21.)

54.     In addition, there are certain Performance Measures where, although it is possible that an inmate at a complex may qualify under the Monitoring Guide for his or her record to be audited, there are no qualifying records to audit in a particular month.  In those instances, the monitor notes that there are no records, and does not enter a compliance score.  These Performance Measures are frequently considered to be the "N/A" findings because there were no applicable qualifying inmates to monitor in a particular month at a particular complex.  While there is no performance score given, these instances are reported in the CGAR reports and given a "Green" score on the audit tool, since there is no basis to conclude that the healthcare contractor failed to provide adequate care relating to that measure.  (*Id.*, ¶ 22.)

55.     When ADCRR reports the "overall" or "systemwide" compliance rate, it is reporting that percentage based upon the formula of:

$$\frac{\text{\# activated measures - \# noncompliant activated measures}}{\text{\# activated measures}} \times 100$$

The "activated measures" in this formula include the Maximum Custody Outcome Measures, the "N/A" Measures, and Measures that have been terminated or retired by the Court (with the exception of PM 54, effective March 2020). Additional rates can be calculated from the underlying data contained in the CGAR reports.  (*Id.*, ¶ 23.)

56.     In addition to monitoring compliance, monitors are tasked with identifying and solving problem-specific issues, beginning with Performance Measures that have been chronically noncompliant.  (*Id.*, ¶ 69.)  If monitors identify a barrier to compliance with a Performance Measure, they will forward the issue to the Bureau Administrator and the medical liaison team.  (*Id.*, ¶ 68.)

57.     Excluding the Maximum Custody and N/A Measures, the MSCMB audited 746 Health Care Performance Measures in June 2019; 741 in February 2020; 732 in March 2020; and 731 in April 2020. If the Maximum Custody and N/A measures are excluded from both the numerator and denominator of the equation, the adjusted compliance rate for

those time periods, respectively, are: 89.01% in June 2019; 94.74% in February 2020; 96.17% in March 2020; and 96.17% in April 2020. (*Id.*, ¶ 24.)

58. Excluding the Maximum Custody and N/A Measures, the MSCMB audited, the MSCMB audited 740 Performance Measures in May 2020; 727 in June 2020; 724 in July 2020; 732 in August 2020; 739 in September 2020; 737 in October 2020; 736 in November 2020; and 736 in December 2020. The overall adjusted compliance rate for those months were: 89.73%; 89.82%; 89.09%; 89.75%; 89.72%; 92.54%; and 92.26%, respectively. (Ex. 2079, ¶ 5.)

59. Centurion has been compliant with contract requirements at an average of 93% since they took over the contract. Currently, the overall compliance rate with performance measures in the ADCRR system is at 92%. (R.T. 11/16/21 p.m. at 2367:15-2367:20, 2343:1-2343:4; Ex. 2068, ¶ 61.)

**Overcoming Challenges**

60. State corrections systems, like ADCRR, are especially challenging, predominantly because of the lack of fiscal resources. (R.T. 11/16/21 p.m. at 2160:9-16.) It also takes a tremendous emotional and personal toll to work in corrections. (*Id.* at 2161:3-5.)

61. Despite these challenges, there is a "tremendous will to succeed" in ADCRR. ADCRR staff are committed to making the lives of the men and women in its custody better at every personal level. (*Id.* at 2160:22-2161:5.)

62. When Director Shinn arrived at ADCRR, the MSCMB had been focused on contract compliance. He and his team changed this focus to quality of care and a technical perspective to actively identify and overcome health care challenges. (*Id.* at 2163:11-2164:5, 2165:15-19.) ADCRR also strengthened its relationship with Centurion and developed a more collaborative approach to the delivery of healthcare. (*Id.* at 2164:6-19.)

63. Wardens and facility administrators have daily meetings to resolve issues and remove barriers. (*Id.* at 2186:23-24.)

64. ADCRR and Centurion coordinate transports of multiple inmates (10 to 40)

1  to outside providers and schedule a full day with the provider to avoid interaction with the
2  public. (*Id*. at 2187:4-11, 2188:13-15.)

3       65.     Regarding staffing, ADCRR and Centurion have emphasized telehealth and
4  telepsychiatry and, instead of forcing people to work at certain locations, they have focused
5  on hiring people who want to work and live in the location. (*Id*. at 2166:9-25, 2170:14-16.)

6       66.     Correctional healthcare staffing is a universal challenge, not something
7  unique to Arizona, and health care staffing in general is a national challenge. (*Id*. at 2167:4-
8  8.) Providers and nurses are in high demand. (*Id*. at 2167:9.) Were it not for privatized
9  healthcare, it would be even more difficult to hire people at state salaries. (*Id*. at 2168:5-9,
10  2169:7-8.)

11       67.     To stay competitive, ADCRR correctional officers received a 10% salary
12  increase in July 2019, and a 5% salary increase in July 2021. (*Id*. at 2169:20-2170:7.)
13  ADCRR also implemented an 8% stipend for those with direct inmate contact and a 25%
14  stipend for those who have direct contact with inmates who were COVID-19 positive. (*Id*.
15  at 2169:24-2170:5.)

16       68.     In January 2020, Director Shinn made the decision to deactivate the Florence
17  facility. (*Id*. at 2170:20-2171:3.) That decision allowed ADCRR to redeploy correctional
18  officers and medical staff to other facilities with staffing challenges, particularly ASPC
19  Eyman. (*Id*. at 2171:3-10.) One of four units have been deactivated, and ADCRR is in the
20  process of contracting for 2,700 beds with a private vendor. (*Id*. at 2171:12-18.)

21       69.     ASPC Florence-Kasson Unit has been closed, which has allowed the transfer
22  of inmates with mental health needs to be transferred to Tucson-Rincon Unit, which has
23  more space, more classrooms, and extraordinary mental health professionals. (Id. at
24  2177:19-2178:13.)

25       70.     Following the January 31, 2020 Order to Show Cause, Director Shinn
26  demanded that Centurion reallocate existing staff to locations that needed to achieve
27  compliance with the Stipulation. (*Id*. at 2228:19-22.) He also demanded that Centurion
28  increase the use of telemedicine and to take all reasonable efforts to fill the current FTE

40

vacancies. (*Id*. at 2232:8-21.) These demands remain in place today. (*Id*. at 2252:3-7, citing Exhibit 2165.)

71. Prior to COVID-19, worked FTEs were above 100% in the aggregate. (R.T. 12/8/21 p.m. at 3589:8-10.)

72. COVID-19 has affected the vacancy rate because it has forced staff to go on leave or exit the health care industry. (*Id*. at 3588:24-3589:7.)

73. Today, there is a nationwide shortage of nurses and recruiting is very difficult, but Centurion has managed to maintain a 90% aggregate worked FTE. (*Id*. at 3589:14-23.)

74. Currently, Centurion uses eight temporary agencies. (*Id*. at 3589:24-3590:4.) For recruiting, it utilizes social media, academic fairs, school associations, mailers, billboards, newspaper advertisements, and text campaigns. (*Id*. at 3591:5-14.)

75. Between July 2019 and October 2021, Centurion has spent between $120,000 and $150,000 every six months in recruiting. (*Id*. at 3591:15-24.)

76. To retain employees, Centurion utilizes retention bonuses, recognition programs, and local events. (*Id*. at 3591:25-3592:12.)

77. Retention bonuses are up to $30,000 for providers and $15,000 for mid-level providers, nurses, and mental health staff. (Id. at 3592:18-3593:9.)

78. Centurion had spent approximately $2,000,000 in bonuses since January 2021. (*Id*. at 3593:10-16.)

79. Centurion has also increased compensation, with two market adjustments since 2019. (*Id*. at 3593:17-22.)

80. In 2020, Centurion spent approximately $4,000,000 in overtime pay, and in 2021 it spent approximately $6,000,000 in overtime pay. (*Id*. at 3594:1-9.)

81. Centurion has created an exceptional telehealth program, which is URAC accredited, and allows it to supplement the provision of care through subspecialists. (*Id*. at 3594:10-3595:6.)

**B.     National Commission on Correctional Health Care.**

82. The National Commission on Correctional Health Care ("NCCHC") has

offered a voluntary health services accreditation program for correctional facilities since the 1970s, when an American Medical Association study of jails found inadequate, disorganized health services and a lack of national standards. (Dkt. 4174, ¶ 59; Ex. 3304 at ADCRR00210368.)  In collaboration with other organizations, the AMA established a program that in 1983 became NCCHC, an independent, not-for-profit 501(c)(3) organization whose early mission was to evaluate and develop policy and programs for a field clearly in need of assistance.  (Dkt. 4174, ¶ 59.)

83.　　The NCCHC is the preeminent accrediting body for correctional institutions in the United States.  (R.T. 11/18/21 p.m. at 2924:1-2924:3.)  It is the "gold standard" for health care accreditation.  (R.T. 11/16 a.m. at 2151:9-11.)

84.　　Based on its Jail, Prison, Mental Health, and Opioid Treatment Programs in Correctional Facility Standards, the process uses external peer review, specifically impartial, unbiased, neutral and qualified and trained survey teams composed of experienced and knowledgeable correctional nurses, physicians, psychiatrists and/or other qualified mental health professionals, and/or correctional health care administrators who perform surveys to determine whether correctional institutions meet the standards in provision of health services.  (Dkt. 4174, ¶ 59.)  The categories of standards include access to care, making sure care is available, off-site referrals, chronic care, and medication administration.  (R.T. 11/16/21 p.m. at 2300:12-2300:17)

85.　　Since 1970, NCCHC has issued and updated its standards, with the most recent revision occurring in 2018.  (Ex. 3304 at ADCRR00210368.)

86.　　NCCHC's mission is to improve the quality of health care in jails, prisons, and juvenile confinement facilities.  (Dkt. 4174, ¶ 60; R.T. 11/16/21 p.m. at 2298:11-2298:12); Ex. 3304 at ADCRR00210368).  NCCHC establishes standards for health services in correctional facilities, operates a voluntary accreditation program for institutions that meet those standards, produces resource publications, conducts educational conferences and offers certification for correctional health professionals.  (Dkt. 4174, ¶ 60.) NCCHC is supported by the major national organizations representing the fields of health,

mental health, law, and corrections. (Dkt. 4174, ¶ 60.) Less than 5% of jails, prisons, juvenile detention and correctional facilities, and opioid treatment programs within US correctional settings have achieved and maintain current NCCHC accreditation. (Dkt. 4174, ¶ 60.)

87. The NCCHC Standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system and are intended for prisons of any size. The NCCHC standards have helped prisons improve the health of inmates and the communities to which they return, increase the efficiency of the health services delivery, strengthen their organizational effectiveness, and reduce their risk of adverse patient outcomes. (Ex. 3304 at ADCRR00210368 and ADCRR00210376.)

88. Facilities that follow the NCCHC Standards are encouraged to become accredited by NCCHC, which provides an independent, professional assessment of compliance with the standards. (Ex. 3304 at ADCRR00210368 and ADCRR00210376.) Documented benefits of NCCHC Accreditation include promotion of an efficient and well-managed health care delivery system, enhanced facility prestige, increases in health staff morale and support of recruiting efforts, provision of pathways to continuous improvement, suggestion of new efficiencies and possible cost-savings, and provision of an expert, independent assessment of what is working well as well as opportunities for improvement. (Ex. 3304 at ADCRR00210517.)

89. The process for a jail, prison, or other correctional facility or system to apply for and receive an initial survey, begin a self-study to review their facility's compliance with the respective jail or prison NCCHC standards and be considered for initial accreditation is requires team approach and staff buy-in and is quite time consuming. (Dkt. 4174, ¶ 61.) The facility health care staff then complete a self-survey questionnaire (SSQ). (Dkt. 4174, ¶ 61.) Information provided on the SSQ is reviewed by NCCHC staff and is used to help the facility prepare for the on-site survey. (Dkt. 4174, ¶ 61.) An on-site survey is conducted by a team of experienced surveyors. (Dkt. 4174, ¶ 61; R.T. 11/16/21 p.m. at 2298:14-2298:25-2299:1-2299:3.); (R.T. 11/18/21 p.m. at 2924:4-2924:10.) The lead

43

surveyor prepares a report that undergoes a blinded review by the accreditation committee (the committee has no knowledge of the facility, health care entity or any other potentially identifying information). (Dkt. 4174, ¶ 61.)

90.     The compliance indicators listed in each NCCHC standard are the same measures used by accreditation surveyors when they come on-site. Compliance may be verified through record reviews, observation, interviews, and other information-gathering methods. (Ex. 3304 at ADCRR00210376.)

91.     Accreditation by the National Commission on Correctional Health Care is a process of external peer review in which NCCHC, an independent, not-for-profit organization dedicated to supporting and improving correctional health care, grants public recognition to detention and correctional institutions that meet its nationally recognized Standard for Health Services. Through accreditation, NCCHC renders a professional judgment on the effectiveness of a correctional facility's health services delivery system and assists in its continued improvement. (Ex. 3304 at ADCRR00210517.)

92.     Facilities are advised that the on-site accreditation survey should be viewed as a learning experience for staff and one that provides a means for improvement and attainment of professional excellence. NCCHC's survey teams are composed of highly experienced correctional health professionals, who receive the most rigorous training in the field. Surveyor's receiving initial and ongoing training from NCCHC to ensure that they possess the knowledge and preparation needed to interpret and apply the standards fairly and accurately. (Ex. 3304 at ADCRR00210518.)

93.     NCCHC surveyors are neutral and objective. (R.T. 11/19/21 a.m. at 2946:3-22.) They do not work within the correctional system that is being audited. (R.T. 11/19/21 a.m. at 2947:21-2947:25.) NCCHC vets the surveyors very carefully. (R.T. 11/19/21 a.m. at 2946:3-22.) They must have 5 or more years of correctional experience. (R.T. 11/19/21 a.m. at 2946:3-22.) Survey teams are composed mainly of three different groups: Correctional nurses, physicians, and healthcare administrators. (R.T. 11/19/21 a.m. at 2946:3-22.)

94.     In advance of a survey, postings are put up throughout the facility in the housing units so that the inmate population knows what to expect and can request a face-to-face interview with a NCCHC surveyor.  (R.T. 11/18/21 p.m. at 2924:16-2924:20.)

95.     An NCCHC on-site survey entails "an extensive review of health records and other documents, including facility policies and procedures; a tour of the facility with a focus on health services areas; entrance and exit conferences with key personnel; and structed interviews with health staff, administrators, custody staff, inmates and patients." (Ex. 3304 at ADCRR00210518.)

96.     During the survey, the surveyors meet with staff and leadership to get a better sense of the census and mission of the facility.  (R.T. 11/19/21 a.m. at 2949:22-2951:19 Then, they ask to review charts which, in Dr. Penn's opinion, is important.  (R.T. 11/19/21 a.m. at 2949:22-2951:19.)  Then, they will want to review a sampling of charts (seriously mentally ill, suicides, etc.) and review the facility's policies and procedures.  (R.T. 11/19/21 a.m. at 2949:22-2951:19.); R.T. 11/16/21 p.m. at 2299:21-2299:25-2300:1-2300:3); R.T. 11/18/21 p.m. at 2924:11-2924:15, 2925:18-2925:22.)  They will also tour the facility to look at the infrastructure and where healthcare is delivered.  (R.T. 11/19/21 a.m. at 2949:22-2951:19.)  They also interview healthcare & custody staff, and inmates.  (R.T. 11/19/21 a.m. at 2949:22-2951:19.); R.T. 11/16/21 p.m. at 2299:16-2299:20); R.T. 11/18/21 p.m. at 2927:6-2927:18.)  The survey team then meets as a group to discuss their findings, thoughts, and how the facility is meeting the standards.  (R.T. 11/19/21 a.m. at 2949:22-2951:19.)  At the conclusion of the tour, they conduct an exit interview and describe what the observations were.   (R.T. 11/19/21 a.m. at 2949:22-2951:19.)   If there are concerns or problems, they inform the facility. (R.T. 11/19/21 a.m. at 2949:22-2951:19.); R.T. 11/18/21 p.m. at 2925:2-2925:17.)

97.     NCCHC on-site reviews and accreditation are often quite collegial, and expert accreditation team survey members may offer suggestions to prisons undergoing accreditation surveys based upon their own years of experience. (Ex. 3304 at ADCRR00210376.)

98.     After the survey, the accreditation committee receives the report from the lead surveyor. (R.T. 11/19/21 a.m. at 2951:20-2953:6.) The committee then reviews it blindly— only known the general geographic location of the facility not the name or the precise location. (R.T. 11/19/21 a.m. at 2951:20-2953:6.) And then a decision is made as to whether they should be accredited. (R.T. 11/19/21 a.m. at 2951:20-2953:6.) Alternatively, the committee can condition them with verification of additional information or defer accreditation pending more documentation. (R.T. 11/19/21 a.m. at 2951:20-2953:6.)

99.     Following an on-site survey, which usually lasts 2-3 days, the lead surveyor will submit a report for review by the NCCHC Accreditation Committee. The NCCHC Accreditation Committee will review the report, gather additional information needed to evaluate compliance with the standards, and render a decision of accredited, accredited upon verification, deferred, or denied accreditation. When a facility does not achieve full compliance with all 100% of the essential standards and at least 85% of the applicable important standards, NCCHC will work with the facility to help achieve compliance. If the NCCHC awards Accreditation with Verification or Continuing Accreditation upon Verification ("CAV"), it indicates that full accreditation will be awarded when NCCHC receives satisfactory evidence of corrective action. On the other hand, when a facility has significant deficiencies in meeting the standards or needs more time to complete corrective actions, the Accreditation Committee may defer the decision to accredit or place the facility on probation. Accredited facilities on probation are at risk of losing their accreditation if they do not achieve compliance within the specified time. In cases where the NCCHC has extended time, support, and consultation, but the facility remains unable to improve its system and demonstrate consistent compliance, or when vital services are absent or severely out of compliance, the accreditation committee will deny or withdraw accreditation. (Ex. 3304 at ADCRR00210518-19.)

100.    Approximately 500 facilities are accredited across the country which represents a minority of the 4,500 facilities eligible for accreditation. (R.T. 11/18/21 p.m. at 2927:21-2927:25-2928:1-2928:6.) BOP maintains accreditation with NCCHC. (R.T.

1 11/16/21 a.m. at 2151:5-11.)

2     101.   Once accredited, each year the facility submits a written report (Annual

3 Maintenance Report) with updates on relevant information. (Dkt. 4174, ¶ 61.) Additional

4 on-site visits will occur about every three years. (Dkt. 4174, ¶ 61.) To ensure Dr. Penn's

5 objectivity and neutrality, he declined to participate in any Arizona correctional facility

6 surveys or re-surveys, and also recused himself during accreditation committee review,

7 discussion, or voting regarding any ADCRR or any other Arizona correctional facility.

8 (Dkt. 4174, ¶ 61.)

9     102.   The usual NCCHC on-site survey cycle is every 3 years. The accreditation

10 committee has discretion to schedule focused surveys or resurveys more frequently.

11 However, all facilities, including those scheduled for resurvey, must submit an Annual

12 Maintenance Report to NCCHC to confirm continuing compliance with the standards. (Ex.

13 3304 at ADCRR00210519.)

14     103.   NCCHC has essential and important standards. (R.T. 12/07/21 p.m. at

15 3365:5-19.) A facility must score 85 percent on the important standards and 100 percent

16 on the essentials. (R.T. 12/07/21 p.m. at 3365:5-19.); R.T. 11/16/21 p.m. at 2300:3-

17 2300:11.) Only 5% of facilities in the United States are accredited by NCCHC. (R.T.

18 11/19/21 a.m., 2948:2-2948:12.) It is the Rolls Royce accreditation and not easy to achieve.

19 (R.T. 11/19/21 a.m., 2948:2-12.) Typically, facilities wait until they are accreditation ready

20 before applying for NCCHC accreditation. (R.T. 11/19/21 a.m., 2948:2-25.)

21     104.   NCCHC is not a membership organization and there is no requirement to

22 becoming accredited other than meeting the standards and adhering to NCCHC

23 accreditation policies. (Ex. 3304 at ADCRR00210376.)

24     105.   As a not-for-profit organization, NCCHC assesses accreditation fees based on

25 the type of facility, the facility's average daily population, the presence of satellites and

26 their distance from the main facility, and the complexity of programs offered. There is an

27 initial accreditation fee and smaller annual fees thereafter. (Ex. 3304 at ADCRR00210519.)

28     106.   Centurion's contract with ADCRR requires that all ten facilities maintain

NCCHC accreditation. (R.T. 11/16/21 p.m. at 2303:13-2303:16.)

107.    All ten ADCRR facilities are accredited by the NCCHC.  (R.T. 11/18/21 p.m. at 2927:19-2927:20.); R.T. 11/16/21 p.m. at 2307:11-2307:20); (R.T. 11/16/21 a.m. at 2176:25-2177:4.)

108.    NCCHC conducted an on-site continuing accreditation survey at ASPC Douglas from December 10-12, 2018, using the 2018 Standards for Health Services in Prisons.  All applicable essential and important standards were found to be in full compliance and Accreditation was awarded on February 9, 2019.  (Ex. 3305 at ADCRR00138360-61; Dkt. 4174, ¶ 63.)

109.    NCCHC conducted an on-site continuing accreditation survey at ASPC Eyman from March 16-19, 2020, using the 2018 Standards for Health Services in Prisons. On May 29, 2020, the Accreditation Committee voted to award the facility Continuing Accreditation with Verification due to certain standards being found to be noncompliant or partially compliant.  (Ex. 3307 at ADCRR00138459-60.)  Following receipt and review of additional documentation, the Accreditation Committee determined that non-compliances had been resolved, but three essential standards remained partially complaint and on November 9, 2020, voted to continue Eyman's Continuing Accreditation with Verification Status, contingent on receiving additional compliance verification.  (Ex. 3307 at ADCRR00138524-25.)  That additional verification was provided, and full Accreditation was awarded to Eyman on January 15, 2021 based upon 100% compliance with all applicable essential and important standards.  (Ex. 3307 at ADCRR00138545 and ADCRR00138549; Dkt. 4174, ¶ 63.)

110.    NCCHC conducted an on-site continuing accreditation survey at ASPC Florence from March 22-24, 2021, using the 2018 Standards for Health Services in Prisons. On April 30, 2021, the Accreditation Committee voted to award the facility Continuing Accreditation with Verification, contingent upon receiving additional requested compliance documentation for four essential standards which were determined to be partially compliant. (Ex. 3309 at ADCRR00138595-96).  Following receipt of the requested additional

compliance documentation, the Accreditation Committee determined on September 9, 2021, that Florence was in 100% compliance with all applicable essential and important standards and awarded full Accreditation to Florence. (Ex. 3309 at ADCRR00210544-45; Dkt. 4174, ¶ 63.)

111. On December 1-5, 2014, NCCHC conducted its review for continuing accreditation of ASPC Lewis under the 2014 Standards for Health Services in Prisons, which resulted in the facility being placed on probation on April 12, 2015. Subsequent submissions of corrective actions resulted in the facility being found to be in compliance with 95% of applicable essential and 100% of applicable important standards. NCCHC conducted a focused survey on December 18, 2015, and on January 16, 2016, the Accreditation Committee found that ASPC Lewis was in full compliance with all applicable essential and important standards and voted to continue accreditation of ASPC Lewis. (Ex. 3310 at ADCRR00138653.)

112. NCCHC conducted an on-site continuing accreditation survey at ASPC Lewis on April 10-14, 2018, using the 2014 Standards for Health Services in Prisons. Based upon findings that only 60% of applicable essential standards and 71% of applicable important standards were in compliance, the Accreditation Committee voted on June 22, 2018, to placed Lewis on Probation. (Ex. 3311 at ADCRR00138664-65. A focused on-site survey to verify corrective action was conducted from December 17-18, 2018, which determined that 85% of applicable essential standards and 100% of the applicable important standards were in compliance. On February 8, 2019, the NCCHC Accreditation Committee voted to continue Probation for Lewis, pending additional on-site verification. (Ex. 3311 at ADCRR00138687. An additional focused survey occurred on April 24-25, 2019, where Lewis was found to be in full compliance with 100% of the applicable essential and important standards. On July 19, 2019, the NCCHC Accreditation Committee voted to award full Accreditation to Lewis. (Ex. 3311 at ADCRR00138706; Dkt. 4174, ¶ 63.)

113. NCCHC conducted an on-site continuing accreditation survey at ASPC Perryville on January 8-11, 2019, using the 2018 Standards for Health Services in Prisons.

Based upon findings that 90% of applicable essential standards and 100% of applicable important standards were in compliance, the Accreditation Committee voted on February 9, 2019, to award the facility Continuing Accreditation with Verification pending submission of additional compliance verification. (Ex. 3313 at ADCRR00138722-23.) Based upon further submissions, on December 4, 2019, the Accreditation Committee found that Perryville was in full compliance with 100% of the applicable essential and important standards and awarded full accreditation. (Ex. 3313 at ADCRR00138785; Dkt. 4174, ¶ 63.)

114. NCCHC conducted an on-site continuing accreditation survey at ASCP Phoenix on October 8-9, 2018, using the 2014 Standards for Health Services in Prisons. On November 16, 2018, the Accreditation Committee found that ASPC Phoenix was in compliance with 87% of the appliable essential standards and 100% of the applicable important standards and voted to award Continuing Accreditation with Verification contingent upon receiving additional evidence of compliance. (Ex. 3315 at ADCRR00138795.) Following receipt of additional documentation, on May 23, 2019, the Accreditation Committee found that Phoenix was in full compliance with the exception of on essential standard, and voted to continue the facility's CAV status, contingent upon receiving additional evidence of compliance. (Ex. 3315 at ADCRR00138812.) Following review of additional compliance documentation, on October 15, 2018, the Accreditation Committee found that Phoenix was in full compliance with 100% of the applicable essential and important standards and awarded full Accreditation. (Ex. 3315 at ADCRR00138817; Dkt. 4174, ¶ 63.)

115. NCCHC conducted an on-site continuing accreditation survey at APSC Safford-Fort Grant Unit, a satellite unit, on November 5-6, 2018, and at the Safford main complex from November 7-9, 2018, using the 2018 Standards for Health Services in Prisons. The Accreditation Committee found that both the Safford main complex and Fort Grant Unit complied with 100% of the applicable essential standards and 95% of the important standards, and awarded full Accreditation to both Safford and the Fort Grant Unit on February 9, 2019. (Ex. 3316 at ADCRR00138878 (ASPC Safford); Ex. 3318 at

ADCRR00138824 (Fort Grant Unit); Dkt. 4174, ¶ 63.)

116. NCCHC conducted an on-site continuing accreditation survey at ASPC Tucson during the week of April 22-26, 2019, using the 2018 Standards for Health Services in Prisons. 87% of the applicable essential standards were found to be in full compliance and 79% of the applicable important standards were found to be in full compliance. On July 19, 2019, the Accreditation Committee voted to award Continuing Accreditation with Verification to ASPC Tucson, contingent on receiving additional requested compliance verification. (Ex. 3320 at ADCRR00138952-53.) Following receipt of additional compliance documentation which established that ASPC Tucson was 100% compliant with all applicable essential and important standards, the Accreditation Committee awarded full accreditation on December 17, 2019. (Ex. 3320 at ADCRR00139012-13; Dkt. 4174, ¶ 63.)

117. NCCHC conducted an on-site continuing accreditation survey of the ASPC Winslow satellite Apache Unit on February 21-22, 2019, and at the ASPC Winslow main complex on February 25-27, 2019. At the Apache Unit, 89% of the applicable essential standards and 95% of the applicable important standards were found to be in full compliance, while at the ASPC Winslow main complex, 92% of the applicable essential standards and 95% of the applicable important standards were found to be in full compliance. On May 3, 2019, the Accreditation Committee voted to award Continued Accreditation with Verification to both ASPC Winslow and the Apache Unit, contingent upon timely submission of additional evidence of compliance. (Ex. 3322 at ADCRR00139100-01 (ASPC Winslow main complex) and Ex. 3323 at ADCRR00139051-52 (Apache Unit).) On October 24, 2019, upon review of additional documentation, the NCCHC Accreditation Committee found that both the Apache Unit and ASPC Winslow main complex were in full compliance with 95% of the applicable essential standards and 95% of the applicable important standards and voted to continue CAV status pending the submission of additional evidence of compliance for the partially compliant measures. (Ex. 3322 at ADCRR00139157-58 (ASPC Winslow) and Ex. 3323 at ADCRR00139150-51 (Apache Unit).) Full accreditation was awarded on February 20, 2020. (Ex. 3322 at

ADCRR00210551; Dkt. 4174, ¶ 63.)

118. NCCHC conducted an on-site continuing accreditation survey of ASPC Yuma from June 7-10, 2021. On August 5, 2021 the Accreditation Committee found that ASPC Yuma was fully-compliant with 97% of the applicable essential standards (and partially compliant with the one remaining applicable essential standard) and fully-compliant with 94% of the applicable important standards (and partially compliant with the one remaining applicable important standard) and voted to award Continuing Accreditation with Verification, contingent upon receiving additional compliance verification by December 6, 2021. (Ex. 3325 at ADCRR00139175; Dkt. 4174, ¶ 63.)

119. To illustrate the significance of this achievement, within the state of Arizona, the only facilities that have achieved and maintain current NCCHC accreditation are ADCRR, Maricopa County Jail, and two ICE facilities. (Dkt. 4174, ¶ 62.)

120. The 2018 NCCHC Prison Health Standards contain 60 standards grouped under seven general areas: Governance and Administration (10 standards); Health Promotion, Safety, and Disease Prevention (9 standards); Personnel and Training (9 standards); Ancillary Health Care Services (8 Standards); Patient Care and Treatment (10 standards); Special Needs and Services (7 standards); and Medical-Legal Issues (7 standards). Each standard is classified as either "essential" or "important." (Ex. 3304 at ADCRR00210370.) Generally, "essential" standards are more directly related to the health, safety, and welfare of patients and are the critical components of a health care system. (Ex. 3304 at ADCRR00210518.)

121. NCCHC Standards are different from position statements. NCCHC position statements are of interest to policy makers and the public because they often frame the social, economic, and political aspects of contemporary correctional health care issues. However, compliance with position statements is not required to achieve NCCHC accreditation. (Ex. 3304 at ADCRR0021068.)

122. Essential NCCHC Standard P-A-01 requires that inmates have access to care for their serious medical, dental, or mental health needs. Compliance indicators are that the

responsible health authority identifies and eliminates any unreasonable barriers, whether intention or unintentional, to inmates receiving health care. "Access to care" as used by NCCHC means that, in a time manner, a patient is seen by a qualified health care professional, is rendered clinical judgment, and receives care that is ordered. (Ex. 3304 at ADCRR00210379; Ex. 3303 at ADCRR00231713.)

123. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-A-01 relating to Access to Care. (Ex. 3305 at ADCRR00138363 (Douglas); Ex. 3307 at ADCRR00138462 (Eyman); Ex. 3309 at ADCRR00138598 (Florence); Ex. 3311 at ADCRR00138707-08 (Lewis); Ex. 3313 at ADCRR00138725 (Perryville); Ex. 3315 at ADCRR00138797 (Phoenix); Ex. 3316 at ADCRR00138880 (Safford); Ex. 3318 at ADCRR00138826 (Fort Grant Unit); Ex. 3320 at ADCRR00138954 (Tucson); Ex. 3322 at ADCRR00139103 (Winslow); Ex. 3323 at ADCRR00139054 (Apache Unit); and Ex. 3325 at ADCRR00139177 (Yuma).)

124. Essential NCCHC Standard P-A-02 requires that the Responsible Health Authority ensures that the facility maintains a coordinated system for health care delivery. Compliance indicators include that the Responsible Health Authority (a designated individual tasked with ensuring the organization of delivery of all health care in a facility) ensures quality, accessible, and timely health services for all inmates; has a documented written responsibilities; is on site at the facility at least once a week; ensures that final clinical judgment rests with a single, designated, licenses, responsible physician; the responsible physician is frequently available at the facility sufficient to fulfill clinical and administrative responsibilities; and that where facilities have separate organization structures for mental health and dental services, that there are designated mental health and/or dental clinicians. (Ex. 3304 at ADCRR00210380; Ex. 3303 at ADCRR00231714.)

125. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-A-02 relating to the Responsible Health Authority. (Ex. 3305 at ADCRR00138363-64 (Douglas); Ex. 3307 at ADCRR00138462-63 (Eyman); Ex. 3309 at ADCRR00138598-99 (Florence); Ex. 3311 at ADCRR00138667 (Lewis); Ex. 3313 at

ADCRR00138725-26 (Perryville); Ex. 3315 at ADCRR00138797 (Phoenix); Ex. 3316 at ADCRR00138880-81 (Safford); Ex. 3318 at ADCRR00138826-27 (Fort Grant Unit); Ex. 3320 at ADCRR00138954-55 (Tucson); Ex. 3322 at ADCRR00139103-04 (Winslow); Ex. 3323 at ADCRR00139152 (Apache Unit); Ex. 3325 at ADCRR00139177-78 (Yuma).)

126. Essential NCCHC Standard P-A-03 requires that health care decisions are made by qualified health care professionals (defined to include physicians, physician assistants, nurses, nurse practitioners, dentists, mental health professionals who are permitted by law to evaluate and care for patients) for clinical purposes. Compliance indicates include that: clinical decisions be determined by qualified health care professionals and implemented in an effective and safe manner; administrative decisions to be coordinated, if necessary, with clinical needs so that patient care is not jeopardized; custody staff support the implementation of clinical decisions; and, that health staff recognize and follow security regulations. (Ex. 3304 at ADCRR00210382; Ex. 3303 at ADCRR00231716.) As noted in the discussion of this standard, insufficient security staffing to carry out day-to-day medical support services or cancellations of outside medical appointments would impair the ability of medical staff to perform their professional responsibilities and jeopardize the medical autonomy. (Ex. 3304 at ADCRR00210382-383; Ex. 3303 at ADCRR00231716.)

127. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-A-03 relating to Medical Autonomy. (Ex. 3305 at ADCRR00138364 (Douglas); Ex. 3307 at ADCRR00138463 (Eyman); Ex. 3309 at ADCRR00138599 (Florence); Ex. 3311 at ADCRR00138667-68 (Lewis); Ex. 3313 at ADCRR00138726 (Perryville); Ex. 3315 at ADCRR00138797 (Phoenix); Ex. 3316 at ADCRR00138881 (Safford); Ex. 3318 at ADCRR00138827 (Fort Grant Unit); Ex. 3320 at ADCRR00138955 (Tucson); Ex. 3322 at ADCRR00139104 (Winslow); Ex. 3323 at ADCRR00139055 (Apache Unit); Ex. 3325 at ADCRR00139178 (Yuma).)

128. Essential 2018 NCCHC Standard P-A-04 requires that the facility health and correctional administrators coordinate the health care delivery system through joint

monitoring, planning and problem resolution.  Compliance indicators include the holding of administrative meetings, at least quarterly, between the correctional administrator and responsible health authority (or their designees), and attended by other medical, dental, mental health, and correctional staff as appropriate, with minutes being maintained and available for review by all appropriate personnel; the holding of health staff meetings, at least monthly, to address pertinent health care issues, with minutes made, retained, and made available to and reviewed by all health staff; and, preparation of monthly statistical reports to the correctional administrator and others to monitor trends in the delivery of health care.  (Ex. 3304 at ADCRR00210384; Ex. 3303 at ADCRR00231718.)

129.  The NCCHC notes that monthly statistical reports should include service volume and incidence of certain illnesses, diseases, and injuries.  Those reports may be used to plan for staffing, space, and equipment needs, as well as to compare facilities.  (Ex. 3304 at ADCRR00210385; Ex. 3303 at ADCRR00231718-19.)

130.  All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-A-04 relating to Administrative Meetings and Reports.  (Ex. 3305 at ADCRR00138364-65 (Douglas); Ex. 3307 at ADCRR00138526 (Eyman); Ex. 3309 at ADCRR00138599-600 (Florence); Ex. 3311 at ADCRR00138689-90 (Lewis); Ex. 3313 at ADCRR00138726-27 (Perryville); Ex. 3315 at ADCRR00138797 (Phoenix); Ex. 3316 at ADCRR00138881-82 (Safford); Ex. 3318 at ADCRR00138827-28 (Fort Grant Unit); Ex. 3320 at ADCRR00138955-56 (Tucson); Ex. 3322 at ADCRR00139104 (Winslow); Ex. 3323 at ADCRR00139055-56 (Apache Unit); Ex. 3325 at ADCRR00139178-79 (Yuma).)

131.  Essential NCCHC Standard P-A-05 requires that the responsible health authority ensure that health care policies and procedures are developed, documented, and readily available to the staff.  Compliance indicators include whether policies and procedures address each appliable NCCHC standard; policies and procedures are site specific; are reviewed at least annually by the responsible health authority and responsible physician, and those reviews are documented; health care staff review policies when they are revised or new policies are introduced; other policies such as those relating to custody,

kitchen, and department administration do not conflict with health care policies; and, if the compilation of policies is accessible to health staff. (Ex. 3304 at ADCRR00210386; Ex. 3303 at ADCRR00231720.)

132. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-A-05 relating to Policies and Procedures. (Ex. 3305 at ADCRR00138365 (Douglas); Ex. 3307 at ADCRR00138464-65 (Eyman); Ex. 3309 at ADCRR00138600 (Florence); Ex. 3311 at ADCRR00138690 (Lewis); Ex. 3313 at ADCRR00138727 (Perryville); Ex. 3315 at ADCRR00138797 (Phoenix); Ex. 3316 at ADCRR00138882 (Safford); Ex. 3318 at ADCRR00138828 (Fort Grant Unit); Ex. 3320 at ADCRR00139014 (Tucson); Ex. 3322 at ADCRR00139105 (Winslow); Ex. 3323 at ADCRR00139056 (Apache Unit); Ex. 3325 at ADCRR00139179 (Yuma).)

133. Essential NCCHC Standard P-A-06 requires that each prison have a CQI program that monitors and improves health care delivered in the facility. Compliance indicators include regular meetings, at least quarterly, of a quality improvement committee which identifies aspects of health care to be monitored, designs monitoring activities, analyzes the results, designs and implements improvement strategies, and monitors performance after implementation of improvement strategies; documents CQI meeting minutes and makes the available for review by all appropriate personnel; the responsible physician or designee guides health record reviews; when a site-specific health concern is identified by the quality improvement committee that a process and/or outcome quality improvement study is initiated and documented; that each facility complete at least one process and/or outcome quality improvement study each year; and, that the quality improvement committee conduct and annual review of the effectiveness of the CQI program by reviewing the studies and minutes, of the CQI and other administrative or staff meeting minutes. (Ex. 3304 at ADCRR00210388; Ex. 3303 at ADCRR00231722.)

134. NCCHC notes that the CQI program is intended to be self-critical. The benefit of a successful CQI program is that problems can be identified early, and strategies developed for their resolution before they worsen. An essential element is thus the

monitoring of high-risk, high-volume, or problem-prone aspects of health care provided to patients. Success in this area is not measured by the number of studies done, but rather by the relevance of the studies and effectiveness of corrective action. (Ex. 3304 at ADCRR00210389.)

135. NCCHC further notes under its discussion of potential CQI study types, that the gauge the effectiveness of care, facilities should monitor clinical outcome measures for certain common chronic diseases, such as hemoglobin A1c in diabetes patients housed for a designated period of time. Another common measure is the percentage of patients with a given disease in a period of time whose disease is measured as being in good control. These data can be use can be used a benchmark against other facilities or against the community. (Ex. 3304 at ADCRR00210392; Ex. 3303 at ADCRR00231726.)

136. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-A-06 relating to Continuous Quality Improvement Program. (Ex. 3305 at ADCRR00138366-67 (Douglas); Ex. 3307 at ADCRR00138465-66 (Eyman); Ex. 3309 at ADCRR00138601-602 (Florence); Ex. 3311 at ADCRR00138668-69 (Lewis); Ex. 3313 at ADCRR00138728-29 (Perryville); Ex. 3315 at ADCRR00138797-98 (Phoenix); Ex. 3316 at ADCRR00138882-83 (Safford); Ex. 3318 at ADCRR00138828-29 (Fort Grant Unit); Ex. 3320 at ADCRR00139015-16 (Tucson); Ex. 3322 at ADCRR00139105-06 (Winslow); Ex. 3323 at ADCRR00139056-57 (Apache Unit); Ex. 3325 at ADCRR00139180 (Yuma).)

137. NCCHC Essential Standard P-A-08 requires facilities to create and maintain confidential health records using a standardized format. Compliance indicators include a responsible health authority approved the methods of recording entries in the health record, the record contents and format; integration of information in electronic health records with paper records; evidence that the health record is available to staff and that encounters are documents; and that confidentiality of the record is maintained. (Ex. 3304 at ADCRR00210395; Ex. 3303 at ADCRR00231835 and ADCRR00231837-39.) In the 2014 Edition, this standard was separated into standards P-H-01 through P-H-04. (Ex. 3304 at ADCRR00210373; Ex. 3303 at ADCRR00231835 and ADCRR00231837-39.)

138.    All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-A-08 relating Health Records or the prior applicable 2014 standards.  (Ex. 3305 at ADCRR00138367-68 (Douglas); Ex. 3307 at ADCRR00138467-68 (Eyman); Ex. 3309 at ADCRR00138602-03 (Florence); Ex. 3311 at ADCRR00138684-85 (Lewis); Ex. 3313 at ADCRR00138729-30 (Perryville); Ex. 3315 at ADCRR00138809-10 (Phoenix); Ex. 3316 at ADCRR00138884-84 (Safford); Ex. 3318 at ADCRR00138830-31 (Fort Grant Unit); Ex. 3320 at ADCRR00138959-60 (Tucson); Ex. 3322 at ADCRR00139107-08 (Winslow); Ex. 3323 at ADCRR00139058-59 (Apache Unit); Ex. 3325 at ADCRR00139181-82 (Yuma).)

139.    NCCHC Important Standard P-A-09 requires the responsible health authority to conduct a thorough review of all deaths in custody to improve and prevent future deaths. Compliance indicators include: conducting a clinical mortality review within 30 days; conducting an administrative review with custody staff; performing a psychological autopsy for deaths by suicide within 30 days; informing staff of pertinent findings of all reviews. (Ex. 3304 at ADCRR00210399; Ex. 3303 at ADCRR00231732.)  NCCHC recommends that corrective actions identified through the review process following a death in custody are to be implemented and monitored through the quality improvement program for systemic issues and through the patient safety program for staff related issues.  (Ex. 3304 at ADCRR00210400; Ex. 3303 at ADCRR00231733.)  In the 2014 Edition, this standard was numbered P-A-10.  (Ex. 3304 at ADCRR00210371; Ex. 3303 at ADCRR00231732.)

140.    All ADCRR-operated facilities are in full compliance with NCCHC Important Standard P-A-09 relating to Procedure in the Event of an Inmate Death, or the prior applicable 2014 standard.  (Ex. 3305 at ADCRR00138368-69 (Douglas); Ex. 3307 at ADCRR00138527-28 (Eyman); Ex. 3309 at ADCRR00138603-04 (Florence); Ex. 3311 at ADCRR00138707-08 (Lewis); Ex. 3313 at ADCRR00138730-31 (Perryville); Ex. 3315 at ADCRR00138799 (Phoenix); Ex. 3316 at ADCRR00138885-86 (Safford); Ex. 3318 at ADCRR00138831-32 (Fort Grant Unit); Ex. 3320 at ADCRR00138960-61 (Tucson, noting that "[w]hile there were 103 deaths over the period surveyed (2017, 2018, and 2019), almost

all of these patients were seriously and/or terminally ill, and automatically transferred to this site"); Ex. 3322 at ADCRR00139108 (Winslow); Ex. 3323 at ADCRR00139059 (Apache Unit); Ex. 3325 at ADCRR00139183 (Yuma).)

141. NCCHC Important Standard P-B-01 requires that health care policies, procedures, and practices emphasize health promotion, wellness, and recovery. Compliance indicators include: health staff documentation that patients received individual health education and instruction for self-care for their health conditions; provision of a nutritionally adequate diet to the entire population; a registered dietician nutritionist or other licensed qualified nutrition professional documents annually the nutritional adequacy of the regular diet; and, that the facility notify the registered dietician nutritionist of changes to the diet. (Ex. 3304 at ADCRR00210405; Ex. 3303 at ADCRR00231801, ADCRR00231803, and ADCRR00231805.) NCCHC defines a nutritionally adequate diet to be one which incorporates current American Heart Association diet and lifestyle recommendations and U.S. Department of Agriculture dietary guidelines consistent with the current Dietary Reference intakes for age, gender, and activity levels of the population. (Ex. 3304 at ADCRR00210405.) In the 2014 Edition, this standard was separated into standards P-F-01, P-F-02, and P-F-03. (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231801, ADCRR00231803, and ADCRR00231805.)

142. All ADCRR-operated facilities standards are in full compliance with NCCHC Important Standard P-B-01 relating to Healthy Lifestyle Promotion or the previous analogous 2014 standards. (Ex. 3305 at ADCRR00138370-71 (Douglas); Ex. 3307 at ADCRR00138470-71 (Eyman); Ex. 3309 at ADCRR00138605-06 (Florence); Ex. 3311 at ADCRR001386681 and ADCRR00138701-02 (Lewis); Ex. 3313 at ADCRR00138732-33 (Perryville); Ex. 3315 at ADCRR000133806-07 (Phoenix); Ex. 3316 at ADCRR00138887 (Safford); Ex. 3318 at ADCRR00138833 (Fort Grant Unit); Ex. 3320 at ADCRR00138962 (Tucson); Ex. 3322 at ADCRR00139109-10 (Winslow); Ex. 3323 at ADCRR00139060-61 (Apache Unit); Ex. 3325 at ADCRR00139184-85 (Yuma).)

143. NCCHC Essential Standard P-B-02 requires that there be a comprehensive

institutional program that includes surveillance, prevention, and control of communicable disease. Compliance indicators include: a written exposure control plan, approved by the responsible physician, that is reviewed and updated at least annually; responsible health authority ensures that medical, dental and laboratory equipment and instructions are appropriately cleaned and sterilized, and that medical waste is disposed of properly; responsible health authority ensures that surveillance to detect inmates with infectious and contagious diseases are detected, and that when identified and clinically indicated, inmates with contagious diseases are medically isolated; effective ectoparasite control procedures to treat infected inmates and disinfect clothing and bedding; and monthly environmental inspections of the health services area to ensure adequate sanitation. (Ex. 3304 at ADCRR00210408; Ex. 3303 at ADCRR00231736.) In the 2014 Edition, this standard was numbered P-B-01. (Ex. 3304 at ADCRR00210371; Ex. 3303 at ADCRR00231736.)

144. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-B-02 relating to Infectious Diseases Prevention and Control, or the prior applicable 2014 standard. (Ex. 3305 at ADCRR00138371-72 (Douglas); Ex. 3307 at ADCRR00138528-30 (Eyman); Ex. 3309 at ADCRR00138606-07 (Florence); Ex. 3311 at ADCRR00138693 (Lewis); Ex. 3313 at ADCRR00138733-34 (Perryville); Ex. 3315 at ADCRR00138813-14 (Phoenix); Ex. 3316 at ADCRR00138888-89 (Safford); Ex. 3318 at ADCRR00138834-35 (Fort Grant Unit); Ex. 3320 at ADCRR00138963-64 (Tucson); Ex. 3322 at ADCRR00139110-11 (Winslow); Ex. 3323 at ADCRR00139061-62 (Apache Unit); Ex. 3325 at ADCRR00139185-86 (Yuma).)

145. NCCHC Essential Standard P-B-03 requires that inmates be provided with clinical preventative services as medically indicated. Compliance indicators include that the responsible physician determine: the medical necessity and timing of screening and other preventative services; the frequency and content of periodic health assessments; the medical necessity and/or timing of screening for communicable diseases; and, that immunizations be administered as clinically indicated. (Ex. 3304 at ADCRR00210411.) This standard was substantially revised such that there is no clear analog in the 2014

standards.

146. Almost all ADCRR-operated facilities accredited using the 2018 standards are in full compliance with NCCHC Essential Standard P-B-03 relating to Clinical Preventative Services. (Ex. 3305 at ADCRR00138372-73 (Douglas); Ex. 3307 at ADCRR00138546 (Eyman); Ex. 3309 at ADCRR00210546 (Florence); Ex. 3313 at ADCRR00138734-35 (Perryville); Ex. 3316 at ADCRR00138889 (Safford); Ex. 3318 at ADCRR00138835 (Fort Grant Unit); Ex. 3320 at ADCRR00138964-65 (Tucson); Ex. 3322 at ADCRR00139159 and ADCRR00210551 (Winslow).) ASPC Yuma was found to be partial compliance with the standard on August 5, 2021, with additional compliance verification requested to be submitted to NCCHC during trial. (Ex. 3325 at ADCRR00139174-75 and ADCRR00139187.)

147. NCCHC Essential Standard P-B-05 requires that suicides are prevented when possible by implementing prevention efforts and intervention. Compliance indicators include: the existence of an approved suicide prevention program that includes identification of suicidal inmates and initiation of precautions; evaluation of suicidal inmates by a designated health professional which directs the intervention and follows up; constant observation by security staff of actively suicidal inmates; monitoring of nonacutely suicidal inmates by facility staff at unpredictable intervals with no more than 15 minutes between checks; development of treatment plans for addressing suicidal ideation and its reoccurrence; and, patient follow-up as clinically indicated. (Ex. 3304 at ADCRR00210415; Ex. 3303 at ADCRR00231818.) In the 2014 Edition, this standard was numbered P-G-05. (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231818.)

148. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-B-05 relating to Suicide Prevention and Intervention, or the prior applicable 2014 standard. (Ex. 3305 at ADCRR00138374 (Douglas); Ex. 3307 at ADCRR00138474-75 (Eyman); Ex. 3309 at ADCRR00210547-48138598 (Florence); Ex. 3311 at ADCRR00138703 (Lewis); Ex. 3313 at ADCRR00138779-80 and ADCRR00138785 (Perryville); Ex. 3315 at ADCRR00138815 (Phoenix); Ex. 3316 at ADCRR00138890-91

(Safford); Ex. 3318 at ADCRR00138836-37 (Fort Grant Unit); Ex. 3320 at ADCRR00139016-17 (Tucson); Ex. 3322 at ADCRR00139112-13 (Winslow); Ex. 3323 at ADCRR00139063-64 (Apache Unit); Ex. 3325 at ADCRR00139188-89 (Yuma).)

149. NCCHC Essential Standard P-B-07 requires that treating health staff and facility administration communicate regarding inmates' significant health needs that must be considered in classification decisions to preserve the health and safety of that inmate, other inmates, or staff. Compliance indicators include documentation of communications advising correctional staff of inmate health needs that may affect housing, work assignments, program assignments, disciplinary measures, outside transports to appointments, admissions to and transfers to certain facilities, and activities of daily living. (Ex. 3304 at ADCRR00210420; Ex. 3303 at ADCRR00231729.) In the 2014 Edition, this standard was numbered P-A-08. (Ex. 3304 at ADCRR00210371; Ex. 3303 at ADCRR00231729.)

150. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-B-07 relating to Communication on Patients' Health Needs, or the prior applicable 2014 standard. (Ex. 3305 at ADCRR00138375 (Douglas); Ex. 3307 at ADCRR00138476 (Eyman); Ex. 3309 at ADCRR00138610-11 (Florence); Ex. 3311 at ADCRR00138670 (Lewis); Ex. 3313 at ADCRR00138737-38 (Perryville); Ex. 3315 at ADCRR00138799 (Phoenix); Ex. 3316 at ADCRR00138891-92 (Safford); Ex. 3318 at ADCRR00138837-38 (Fort Grant Unit); Ex. 3320 at ADCRR00138967-68 (Tucson); Ex. 3322 at ADCRR00139113-14 (Winslow); Ex. 3323 at ADCRR00139064-65 (Apache Unit); Ex. 3325 at ADCRR00139190 (Yuma).)

151. NCCHC Important Standard P-B-08 requires that facility staff implement systems to reduce risk and prevent harm to patients. Compliance indicators include: the implementation of patient safety systems to prevent adverse and near-miss clinical events; and a non-punitive system for staff to voluntarily report adverse and near-miss events that affect patient safety. (Ex. 3304 at ADCRR00210422; Ex. 3303 at ADCRR00231739.) NCCHC notes that "[t]he key to instilling a culture of patient safety is to understand that

there is no one way to reduce error and no infallible system that prevents medical errors. Therefore, the health service administrator should employ a range of activities that communicate to staff that a culture of patient safety is largely a matter of attentiveness to what is being done (or not done) and encouragement to openly address problems and offer solutions." (Ex. 3304 at ADCRR00210422; Ex. 3303 at ADCRR00231740.) In the 2014 Edition, this standard was numbered P-B-02. (Ex. 3304 at ADCRR00210371; Ex. 3303 at ADCRR00231739.)

152. All ADCRR-operated facilities are in full compliance with NCCHC Important Standard P-B-08 relating to Patient Safety, or the prior applicable 2014 standard. (Ex. 3305 at ADCRR00138376 (Douglas); Ex. 3307 at ADCRR00138476-77 (Eyman); Ex. 3309 at ADCRR00138611 (Florence); Ex. 3311 at ADCRR00138671 (Lewis); Ex. 3313 at ADCRR00138738 (Perryville); Ex. 3315 at ADCRR00138800 (Phoenix); Ex. 3316 at ADCRR00138892 (Safford); Ex. 3318 at ADCRR00138838 (Fort Grant Unit); Ex. 3320 at ADCRR00138968 (Tucson); Ex. 3322 at ADCRR00139114 (Winslow); Ex. 3323 at ADCRR00139065 (Apache Unit); Ex. 3325 at ADCRR00139190-91 (Yuma).)

153. NCCHC Essential Standard P-C-01 requires that the facility's qualified health care professionals are legally eligible to perform their clinical duties. Compliance indicators include that: all qualified health care professionals be credentialed and provide services consistent with their licensing; credentials are verified for all new hires, including inquiry of professional discipline; credentials are re-verified to ensure that they remain current; and, that qualified health care professionals do not perform tasks beyond those permitted by their credentials. (Ex. 3304 at ADCRR00210427; Ex. 3303 at ADCRR00231746.)

154. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-C-01 relating to Credentials. (Ex. 3305 at ADCRR00138377 (Douglas); Ex. 3307 at ADCRR00138478 (Eyman); Ex. 3309 at ADCRR00138612-13 (Florence); Ex. 3311 at ADCRR00138693-94 (Lewis); Ex. 3313 at ADCRR00138739 (Perryville); Ex. 3315 at ADCRR00138800 (Phoenix); Ex. 3316 at ADCRR00138893-94 (Safford); Ex.

3318 at ADCRR00138839-40 (Fort Grant Unit); Ex. 3320 at ADCRR00138969-70 (Tucson); Ex. 3322 at ADCRR00139115-16 (Winslow); Ex. 3323 at ADCRR00139066-67 (Apache Unit); Ex. 3325 at ADCRR00139192 (Yuma).)

155.    NCCHC Essential Standard P-C-03 requires the facility's qualified health care professionals to maintain current clinical knowledge and skills.  Compliance indicators include that all qualified health care professionals obtain at least 12 hours of continuing medical education per year or have proof of a valid medical license in states where continuing education is required for licensure; all qualified health professionals are current in CPR techniques; and, that the responsible health authority documents compliance with these requirements.  (Ex. 3304 at ADCRR00210431; Ex. 3303 at ADCRR00231750.)

156.    All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-C-03 relating to Professional Development.  (Ex. 3305 at ADCRR00138379 (Douglas); Ex. 3307 at ADCRR00138480 (Eyman); Ex. 3309 at ADCRR00138614 (Florence); Ex. 3311 at ADCRR00138708 (Lewis); Ex. 3313 at ADCRR00138741 (Perryville); Ex. 3315 at ADCRR00138801 (Phoenix); Ex. 3316 at ADCRR00138895 (Safford); Ex. 3318 at ADCRR00138841 (Fort Grant Unit); Ex. 3320 at ADCRR00138971 (Tucson); Ex. 3322 at ADCRR00139117 (Winslow); Ex. 3323 at ADCRR00139068 (Apache Unit); Ex. 3325 at ADCRR00139194 (Yuma).)

157.    NCCHC Essential Standard P-C-04 requires that correctional officers be trained to recognize the need to refer an inmate to a qualified correctional health care professional.  Compliance indicators include that: the responsible health authority establish, approve and maintain a training program curriculum; at least every two years, correctional officers with inmate receive training including first aid, CPR, acute manifestations of certain chronic illnesses (asthma, seizures, diabetes), intoxication and withdrawal, adverse reactions to medications, signed and symptoms of mental illness, dental emergencies, procedures or suicide prevention, procedures for referral of inmates with medical, dental or mental health needs to health staff, precautions and procedures with respect to infectious and communicable diseases, and patient confidentiality.  NCCHC compliance required that

a minimum of 75% of the staff present on each shift be current in their health-related training.  (Ex. 3304 at ADCRR00210432; Ex. 3303 at ADCRR00231751.)

158.    All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-C-04 relating to Health Training for Correctional Officers.  (Ex. 3305 at ADCRR00138379-80 (Douglas); Ex. 3307 at ADCRR00138533-34 (Eyman); Ex. 3309 at ADCRR00138614-15 (Florence); Ex. 3311 at ADCRR00138693 (Lewis); Ex. 3313 at ADCRR00138741-42 (Perryville); Ex. 3315 at ADCRR00138801 (Phoenix); Ex. 3316 at ADCRR00138895-96 (Safford); Ex. 3318 at ADCRR00138842-43 (Fort Grant Unit); Ex. 3320 at ADCRR00138971-73 (Tucson, noting that "an average of 95% of all officers across the nine [units at ASPC Tucson] were in compliance with training"); Ex. 3322 at ADCRR00139117-18 (Winslow); Ex. 3323 at ADCRR00139068-69 (Apache Unit); Ex. 3325 at ADCRR00139194-95 (Yuma).)

159.    NCCHC Essential Standard P-C-05 requires that personnel who administer or deliver prescription medication be appropriately trained.  Compliance indicators include that staff who administer or deliver prescription medication be permitted by state law to do so and receive responsible physician approved training in matters of security, accountability, common side effects, and documentation of administration.  (Ex. 3304 at ADCRR00210434; Ex. 3303 at ADCRR00231753.)

160.    All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-C-05 relating to Medication Administration Training.  (Ex. 3305 at ADCRR00138381 (Douglas); Ex. 3307 at ADCRR00138482-83 (Eyman); Ex. 3309 at ADCRR00138616 (Florence); Ex. 3311 at ADCRR00138695 (Lewis); Ex. 3313 at ADCRR00138742-43 (Perryville); Ex. 3315 at ADCRR00138801 (Phoenix); Ex. 3316 at ADCRR00138897 (Safford); Ex. 3318 at ADCRR00138843 (Fort Grant Unit); Ex. 3320 at ADCRR00138973 (Tucson); Ex. 3322 at ADCRR00139160 and ADCRR00210551 (Winslow); Ex. 3325 at ADCRR00139196 (Yuma).)

161.    NCCHC Essential Standard P-C-06 requires that health services be provided by health staff and not inmate workers.  NCCHC does permit inmates to be participate in

peer-health related programs, such as assisting patients in activities of daily living or receive experience participating in a reentry health care training program but may not substitute for regular program or health staff. (Ex. 3304 at ADCRR00210435; Ex. 3303 at ADCRR00231754.)

162. NCCHC Essential Standard P-C-06 is not applicable at all ADCRR-operated facilities. (Ex. 3305 at ADCRR00138381-82 (Douglas)). All ADCRR-operated facilities where standard P-C-06 relating to Inmate Workers is applicable, are in full compliance. (Ex. 3307 at ADCRR00138483-84 (Eyman); Ex. 3309 at ADCRR00138616-17 (Florence); Ex. 3311 at ADCRR00138695-96 (Lewis); Ex. 3313 at ADCRR00138743-44 (Perryville); Ex. 3315 at ADCRR00138801 (Phoenix); Ex. 3316 at ADCRR00138897-98 (Safford); Ex. 3318 at ADCRR00138843-44 (Fort Grant Unit); Ex. 3320 at ADCRR00138973-74 (Tucson); Ex. 3322 at ADCRR00139119 (Winslow); Ex. 3323 at ADCRR00139070 (Apache Unit); Ex. 3325 at ADCRR00139196-97 (Yuma).)

163. NCCHC Important Standard P-C-07 requires that the responsible health authority ensure that there are sufficient numbers and types of health staff to care for the inmate population. Compliance indicators including an approved staffing plan; prescriber and nursing time be sufficient to fulfill clinical responsibilities; responsible physician time be sufficient to fulfill administrative responsibilities; and assessment of the adequacy and effectiveness of the staffing plan based upon the facility's ability to meet the health needs of the inmate population. (Ex. 3304 at ADCRR00210437; Ex. 3303 at ADCRR00231756.) This standard establishes that staffing is correct to provide the quality of care throughout the rigorous standards of the NCCHC. (R.T. 11/16/21 p.m. at 2304:19-2304:25-2305:1-2305:3.) The NCCHC notes that "[w]hile it is not possible to specify exact prescriber-to-patient ratios, the amount of prescriber time must be sufficient to prevent unreasonable delay in patients receiving necessary care." (Ex. 3304 at ADCRR00210437; Ex. 3303 at ADCRR00231757.) "The sufficiency of the staffing plan can be assessed by a number of factors. These include an adequate number of prescribers and support staff to provide necessary care; timely and thorough physician encounters; and the length of the backlog."

(Ex. 3304 at ADCRR00210438; Ex. 3303 at ADCRR00231757.)

164. All ADCRR-operated facilities are in full compliance with NCCHC Important Standard P-C-07 relating to Staffing. (R.T. 11/16/21 p.m. at 2305:21-2305:23); Ex. 3305 at ADCRR00138382-83 (Douglas); Ex. 3307 at ADCRR00138484-85 (Eyman, noting that "even through the vacancy rate is high, shifts are covered and staffed adequately and care is being provided" although a 85% of nurse staffing is by contracted agency); Ex. 3309 at ADCRR00138617-18 (Florence); Ex. 3311 at ADCRR00138674-75 (Lewis); Ex. 3313 at ADCRR00138744-45 (Perryville); Ex. 3315 at ADCRR00138801-02 (Phoenix); Ex. 3316 at ADCRR00138898-99 (Safford); Ex. 3318 at ADCRR00138844-45 (Fort Grant Unit); Ex. 3320 at ADCRR00138974-76 (Tucson); Ex. 3322 at ADCRR00139120-21 (Winslow); Ex. 3323 at ADCRR00139071-72 (Apache Unit); Ex. 3325 at ADCRR00139197-98 (Yuma).)

165. NCCHC Essential Standard P-D-01 requires that pharmaceutical operations meet the needs of the facility and conform to legal requirements. Compliance indicators include that: the facility comply with all application laws and regulations relating to the prescribing, dispensing, administration, procurement, and disposing of pharmaceuticals; pharmaceuticals be timely procured, dispensed, and distributed; adequate control and accountability of all medications be maintained; and that medications be appropriately stored and maintained. (Ex. 3304 at ADCRR00210445; Ex. 3303 at ADCRR00231762.)

166. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-D-01 relating to Pharmaceutical Operations. (Ex. 3305 at ADCRR00138385-86 (Douglas); Ex. 3307 at ADCRR00138487-88 (Eyman); Ex. 3309 at ADCRR00138620-21 (Florence); Ex. 3311 at ADCRR00138708-11 (Lewis); Ex. 3313 at ADCRR00138747-48 (Perryville); Ex. 3315 at ADCRR00138802 (Phoenix); Ex. 3316 at ADCRR00138901-02 (Safford); Ex. 3318 at ADCRR00138847-48 (Fort Grant Unit); Ex. 3320 at ADCRR00138977-78 (Tucson); Ex. 3322 at ADCRR00139122-23 (Winslow); Ex. 3323 at ADCRR00139073-74 (Apache Unit); Ex. 3325 at ADCRR00139200-01 (Yuma).)

167. NCCHC Essential Standard P-D-02 requires that medications be provided to

prisoners in a timely, safe, and sufficient manner. Compliance indicators include that: prescription medications be given only by order of a legally authorized individual; the responsible physician determines facility prescribing practices; where a formulary is used that there be a process to timely obtain non-formulary medications; medications be kept under control of appropriate staff members, except for approved self-medication programs, which include prescription medications necessary to the emergency management of a condition which are carried by the inmate; and, that the ordering prescriber be notified of the impending expiration of an order so that they may determine if the prescription is to be continued or altered. (Ex. 3304 at ADCRR00210447; Ex. 3303 at ADCRR00231765.)

168. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-D-02 related to Medication Services. (Ex. 3305 at ADCRR00138386-87 (Douglas); Ex. 3307 at ADCRR00138489 (Eyman); Ex. 3309 at ADCRR00210548-49 (Florence); Ex. 3311 at ADCRR00138676 (Lewis); Ex. 3313 at ADCRR00138780-81 (Perryville); Ex. 3315 at ADCRR00138802-03 (Phoenix); Ex. 3316 at ADCRR00138902-03 (Safford); Ex. 3318 at ADCRR00138848 (Fort Grant Unit); Ex. 3320 at ADCRR00138978-79 (Tucson); Ex. 3322 at ADCRR00139123-24 (Winslow); Ex. 3323 at ADCRR00139074-75 (Apache Unit); Ex. 3325 at ADCRR00139201-02 (Yuma).)

169. NCCHC Important Standard P-D-03 requires that sufficient and suitable space, supplies, and equipment are available for the facility's medical, dental, and mental health services. Compliance indicators include that examination and treatment rooms are available and equipped for the needs of the patient population; pharmaceuticals, medical supplies, and emergency equipment is available and routinely checked; there is adequate administrative space for offices and records storage; and, that the facility have certain specified minimum equipment, supplies, and materials available for examination and treatment of patients. (Ex. 3304 at ADCRR00210450; Ex. 3303 at ADCRR00231767-68.) The NCCHC notes that "[t]he amount of space and configuration may vary within a facility depending on the services rendered at each encounter area, as long as it is appropriate for that purpose. The types of equipment, supplies, and materials for examination and

treatment depend on the level of health care provided and the capabilities and needs of specific health staff." (Ex. 3304 at ADCRR00210451; Ex. 3303 at ADCRR00231768.)

170. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-D-03 relating to Clinic Space, Equipment, and Supplies. (Ex. 3305 at ADCRR00138387-89 (Douglas); Ex. 3307 at ADCRR00138490-92 (Eyman); Ex. 3309 at ADCRR00138622-24 (Florence); Ex. 3311 at ADCRR00138676 (Lewis); Ex. 3313 at ADCRR00138749-51 (Perryville); Ex. 3315 at ADCRR00138803 (Phoenix); Ex. 3316 at ADCRR00138903-04 (Safford); Ex. 3318 at ADCRR00138849-50 (Fort Grant Unit); Ex. 3320 at ADCRR00138979-81 (Tucson); Ex. 3322 at ADCRR00139124-25 (Winslow); Ex. 3323 at ADCRR00139075-76 (Apache Unit); Ex. 3325 at ADCRR00139202-04 (Yuma).)

171. NCCHC Essential Standard P-D-05 requires that medical diets be provided that enhance patients' health. A medical diet is a modified diet ordered for temporary or permanent health conditions where the types, preparation, and/or amounts of food are altered. Compliance indicators include that medical diets be provider per prescriber order; medical diets orders be properly communicated to dietary staff and documented; a registered dietician nutritionist or other qualified nutritional professional, documents a review of all medical diets for nutritional adequacy at least annually; when medical diet menus are changed, the nutritionist is notified and reviews the changes; that workers who prepare medical diets are supervised in diet preparation; and, that follow-up nutritional counseling is provided to inmates who refuse medical diets. (Ex. 3304 at ADCRR00210453; Ex. 3303 at ADCRR00231803.) In the 2014 Edition, this standard was numbered P-F-02. (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231803.)

172. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-D-05 relating to Medical Diets, or the analogous 2014 standard. (Ex. 3305 at ADCRR00138390 (Douglas); Ex. 3307 at ADCRR00138492-93 (Eyman); Ex. 3309 at ADCRR00138625 (Florence); Ex. 3311 at ADCRR00138701-02 (Lewis); Ex. 3313 at ADCRR00138751-52 (Perryville); Ex. 3315 at ADCRR00138807 (Phoenix); Ex. 3316 at ADCRR00138905-06 (Safford); Ex. 3318 at ADCRR00138851 (Fort Grant Unit); Ex. 3320

at ADCRR00138982-83 (Tucson); Ex. 3322 at ADCRR00139126 (Winslow); Ex. 3323 at ADCRR00139077 (Apache Unit); Ex. 3325 at ADCRR00139204-05 (Yuma).)

173.    NCCHC Important Standard P-D-06 requires that facility staff ensure that patients can meet scheduled health care appointments.  Compliance indicators include that patients are transported safely and in a timely manner for medical, dental, and mental health clinic appointments both inside and outside the facility; and, that patient confidentiality be maintained during those transports.    (Ex. 3304 at ADCRR00210455; Ex. 3303 at ADCRR00231793.)  In the 2014 Edition, this standard was numbered P-E-10.  (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231793.)

174.    All ADCRR-operated facilities are in full compliance with NCCHC Important Standard P-D-06 relating to Patient Escort, or the prior applicable 2014 standard. (Ex. 3305 at ADCRR00138390-91 (Douglas); Ex. 3307 at ADCRR00138493 (Eyman); Ex. 3309 at ADCRR00138625-26 (Florence); Ex. 3311 at ADCRR00138679 (Lewis); Ex. 3313 at ADCRR00138781-83 (Perryville); Ex. 3315 at ADCRR00138805 (Phoenix); Ex. 3316 at ADCRR00138906 (Safford); Ex. 3318 at ADCRR00138852 (Fort Grant Unit); Ex. 3320 at ADCRR00138983 (Tucson); Ex. 3322 at ADCRR00139126-28 (Winslow); Ex. 3323 at ADCRR00139077-78 (Apache Unit); Ex. 3325 at ADCRR00139205 (Yuma).)

175.    NCCHC Essential Standard P-D-07 requires that facilities plan for emergency health care to ensure that all staff are prepared to effectively respond during emergencies. Compliance indicators include provision of 23-hour emergency medical, dental, and mental health services; facility staff provide emergency services until qualified health care professionals arrive; existence and approval of a documented emergency response plan, with certain required elements; critiqued and routinely conducted mass disaster drills, with participation by each shift at least once every three years; and, critiqued and routinely conducted man-down drills with participation by each shift at least annually.  (Ex. 3304 at ADCRR00210456; Ex. 3303 at ADCRR00231727 and ADCRR00231789.)  In the 2014 Edition, this standard was separated into standards P-A-07 and P-E-08.  (Ex. 3304 at ADCRR00210371-72; Ex. 3303 at ADCRR00231727 and ADCRR00231789.)

176. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-D-07 relating to Emergency Services and Response Plan or the prior applicable 2014 standards. (Ex. 3305 at ADCRR00138391-92 (Douglas); Ex. 3307 at ADCRR00138536-37 (Eyman); Ex. 3309 at ADCRR00138626-27 (Florence); Ex. 3311 at ADCRR00138679 and ADCRR00138690-91 (Lewis); Ex. 3313 at ADCRR00138752-53 (Perryville); Ex. 3315 at ADCRR00138805 and ADCRR00138818 (Phoenix); Ex. 3316 at ADCRR00138906-07 (Safford); Ex. 3318 at ADCRR00138852-53 (Fort Grant Unit); Ex. 3320 at ADCRR00138983-86 (Tucson); Ex. 3322 at ADCRR00139161-62 (Winslow); Ex. 3323 at ADCRR00139155-56 (Apache Unit); Ex. 3325 at ADCRR00139206-07 (Yuma).)

177. NCCHC Essential Standard P-D-08 requires that hospitalization and specialty care are available to patients who need these services. Compliance indicators include: evidence of appropriate and timely access to hospital and specialist care when necessary; written or verbal communication about the patient and specific problem to be addressed with the outside facility; and documented results and recommendations from off-site visits are maintained in the health record (or attempts by health staff to obtain those results). Ex. 3304 at ADCRR00210459. The NCCHC notes that "[c]linical need dictates the time required to receive the ordered service; in general, waiting times should not exceed average waiting times in community practice." (Ex. 3304 at ADCRR00210459; Ex. 3303 at ADCRR00231770.) In the 2014 Edition, this standard was numbered P-D-05. (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231770.)

178. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-D-08 relating to Hospital and Specialty Care or the prior applicable 2014 standard. (Ex. 3305 at ADCRR00138392 (Douglas); Ex. 3307 at ADCRR00138495 (Eyman); Ex. 3309 at ADCRR00138627 (Florence); Ex. 3311 at ADCRR00138677 (Lewis); Ex. 3313 at ADCRR00138754 (Perryville); Ex. 3315 at ADCRR00138803 (Phoenix); Ex. 3316 at ADCRR00138907-08 (Safford); Ex. 3318 at ADCRR00138853 (Fort Grant Unit); Ex. 3320 at ADCRR00138986 (Tucson); Ex. 3322 at ADCRR00139129 (Winslow); Ex. 3323 at ADCRR00139079 (Apache Unit); Ex. 3325 at ADCRR00139207

(Yuma).)

179. NCCHC Essential Standard P-E-01 requires that upon arrival at the facility, inmates are informed of the availability of health care services and how to access them. Compliance indicators include a sign in the intake/processing area explaining how to access health services; provision of an orientation to inmates within 24-hours of arrival regarding health services access; and procedures for inmates with difficulties communicating to understand how to access health services. (Ex. 3304 at ADCRR00210463; Ex. 3303 at ADCRR00231773.) The NCCHC notes that "[a]rrangements should be made for an interpreter or assistive device whenever effective communication is compromised due to speech, hearing, or language deficits. Selection of the interpreter or form of assistance should consider the patient's needs and abilities." (Ex. 3304 at ADCRR00210463; Ex. 3303 at ADCRR00231773-74.)

180. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-E-01 relating to Information on Health Services. (Ex. 3305 at ADCRR00138393 (Douglas); Ex. 3307 at ADCRR00138496 (Eyman); Ex. 3309 at ADCRR00138628 (Florence); Ex. 3311 at ADCRR00138677 (Lewis); Ex. 3313 at ADCRR00138754-55 (Perryville); Ex. 3315 at ADCRR00138803 (Phoenix); Ex. 3316 at ADCRR00138908 (Safford); Ex. 3318 at ADCRR00138854 (Fort Grant Unit); Ex. 3320 at ADCRR00138986-87 (Tucson); Ex. 3322 at ADCRR00139129-30 (Winslow); Ex. 3323 at ADCRR00139079-80 (Apache Unit); Ex. 3325 at ADCRR00139208 (Yuma).)

181. NCCHC Essential Standard P-E-02 requires that screening is performed on all inmates upon arrival at the intake facility to ensure that emergency and urgent health care needs are met. Compliance indicators include: immediate referrals to care and medical clearance into the facility by security staff, as necessary; a receiving screening by a qualified health care professional as soon as possible, with certain required history and observations; that the disposition of the inmate be appropriate to the findings of the receiving screening; and, certain screening tests be administered. (Ex. 3304 at ADCRR00210464-65; Ex. 3303 at ADCRR00231775-76.)

182.     NCCHC Essential Standard P-E-02 relating to Receiving Screening is not applicable at ADCRR-operated facilities which do not receive inmates from the community or from facilities outside the correctional system.  (Ex. 3309 at ADCRR00138629-31 (Florence); Ex. 3316 at ADCRR00138909-11 (Safford); Ex. 3323 at ADCRR00139080-82 (Apache Unit).)  All ADCRR-operated facilities, where NCCHC Essential Standard P-E-02 is applicable, are in full compliance.  (Ex. 3305 at ADCRR00138394-96 (Douglas); Ex. 3307 at ADCRR00138497-99 (Eyman); Ex. 3311 at ADCRR00138698 (Lewis); Ex. 3313 at ADCRR00138755-57 (Perryville); Ex. 3315 at ADCRR00138803-04 (Phoenix); Ex. 3317 at ADCRR00138854-56 (Fort Grant Unit); Ex. 3320 at ADCRR00138987-89 (Tucson); Ex. 3322 at ADCRR00139130-32 (Winslow); Ex. 3325 at ADCRR00139209-11 (Yuma).)

183.     NCCHC Essential Standard P-E-03 requires that inmates who are transferred within the same correctional system continue to receive appropriate health services. Compliance indicators include: review of each transferred inmate's health record to ensure continuity of care and medications; and, that documentation in the health record demonstrates the continuity of health care and medication administration.  (Ex. 3304 at ADCRR00210467; Ex. 3303 at ADCRR00231778.)

184.     All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-E-03 relating to Transfer Screening.  (Ex. 3305 at ADCRR00138396 (Douglas); Ex. 3307 at ADCRR00138499 (Eyman); Ex. 3309 at ADCRR00138631 (Florence); Ex. 3311 at ADCRR00138678 (Lewis); Ex. 3313 at ADCRR00138757 (Perryville); Ex. 3315 at ADCRR00138804 (Phoenix); Ex. 3316 at ADCRR00138911 (Safford); Ex. 3318 at ADCRR00138856-57 (Fort Grant Unit); Ex. 3320 at ADCRR00138989-90 (Tucson); Ex. 3322 at ADCRR00139132 (Winslow); Ex. 3323 at ADCRR00139082 (Apache Unit); Ex. 3325 at ADCRR00139211 (Yuma).)

185.     NCCHC Essential Standard P-E-04 requires that inmates receive initial health assessments.  Compliance indicators include that: all inmates received an initial health assessment no later than seven calendar days after admissions; vital signs be recorded by a

qualified health care professional; a physical examination be conducted by a licensed practitioner; provider review of all abnormal findings; and development of diagnostic and therapeutic plans for each problem, as clinically indicated. (Ex. 3304 at ADCRR00210468; Ex. 3303 at ADCRR00231779-80.)

186. NCCHC Essential Standard P-E-04 relating to Initial Health Assessment is not applicable at ADCRR-operated facilities which do not receive inmates from the community or from facilities outside the correctional system. (Ex. 3309 at ADCRR00138632 (Florence).) All ADCRR-operated facilities where NCHC Essential Standard P-E-04 is applicable are in full compliance. (Ex. 3305 at ADCRR00138396-97 (Douglas); Ex. 3307 at ADCRR00138499-500 (Eyman); Ex. 3311 at ADCRR00138678 (Lewis); Ex. 3313 at ADCRR00138757-58 (Perryville); Ex. 3315 at ADCRR00138804 (Phoenix); Ex. 3316 at ADCRR00138911-12 (Safford); Ex. 3318 at ADCRR00138857-58 (Fort Grant Unit); Ex. 3320 at ADCRR00138990-91 (Tucson); Ex. 3322 at ADCRR00139132-33 (Winslow); Ex. 3323 at ADCRR00139082-83 (Apache Unit); Ex. 3325 at ADCRR00139211-12 (Yuma).)

187. NCCHC Essential Standard P-E-05 requires that mental health screenings be performed to ensure that urgent mental health needs are met. Compliance indicators include that a mental health screening be performed within 14 calendar days of admission by a qualified mental health professional which includes structured interview inquiries into mental health history and status and screening for intellectual functioning; inmates who screening positive for mental health problems are referred to qualified mental health professionals for further evaluation within 30 days; and, that inmates who required acute mental health services beyond those available on site are transferred to an appropriate facility. (Ex. 3304 at ADCRR00210470; Ex. 3303 at ADCRR00231783.)

188. NCCHC Essential Standard P-E-05 relating to Mental Health Screening and Evaluation is not applicable at ADCRR-operated facilities which do not receive inmates from the community or from facilities outside the correctional system. (Ex. 3309 at ADCRR00138633-34 (Florence).) All ADCRR-operated facilities where NCCHC

Essential Standard P-E-05 is applicable are in full compliance. (Ex. 3305 at ADCRR00138397-99 (Douglas); Ex. 3307 at ADCRR00138500-02 (Eyman); Ex. 3311 at ADCRR00138678 (Lewis); Ex. 3313 at ADCRR00138758-60 (Perryville); Ex. 3315 at ADCRR00138804 (Phoenix); Ex. 3316 at ADCRR00138912-13 (Safford); Ex. 3318 at ADCRR00138858-59 (Fort Grant Unit); Ex. 3320 at ADCRR00138991-92 (Tucson); Ex. 3322 at ADCRR00139133-34 (Winslow); Ex. 3323 at ADCRR00139083-84 (Apache Unit); Ex. 3325 at ADCRR00139212-14 (Yuma).)

189. NCCHC Essential Standard P-E-06 requires that inmates' dental needs are addressed. (Ex. 3304 at ADCRR00210472; Ex. 3303 at ADCRR00231785.)

190. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-E-06 relating to Oral Care. (Ex. 3305 at ADCRR00138399-400 (Douglas); Ex. 3307 at ADCRR00138502-03 (Eyman); Ex. 3309 at ADCRR00138634-35 (Florence); Ex. 3311 at ADCRR00138678 (Lewis); Ex. 3313 at ADCRR00138781-83 (Perryville); Ex. 3315 at ADCRR00138804 (Phoenix); Ex. 3316 at ADCRR00138914 (Safford); Ex. 3318 at ADCRR00138859-60 (Fort Grant Unit); Ex. 3320 at ADCRR00138992-93 (Tucson); Ex. 3322 at ADCRR00139134-35 (Winslow); Ex. 3323 at ADCRR00139084-85 (Apache Unit); Ex. 3325 at ADCRR00139214-15 (Yuma).)

191. NCCHC Essential Standard P-E-07 requires that inmates' nonemergent health care needs are met. Compliance indicators include that: inmates have daily opportunities to submit oral or written health care requests; health care requests are picked up daily by health staff; health care requests are reviewed and prioritized daily by qualified health care professionals; a face-to-face encounter is conducted by a qualified health care professional, within 24-hours of receipt of the request; patients are evaluated in a clinical setting; all aspects of the health care request practice are documented; and, that the frequency and duration of the response to health services request is sufficient to meet the needs of the inmate population. (Ex. 3304 at ADCRR00210474; Ex. 3303 at ADCRR00231787.)

192. In its discussion of NCCHC Essential Standard P-E-07, the NCCHC

recognizes that many health encounters may be with nursing staff, rather than providers. "In general, when a patient presents for nonemergency health services *more than two times* with the same complaint and has not seen a provider, he or she receives an appointment to do so." (Ex. 3304 at ADCRR00210475 (emphasis added); Ex. 3303 at ADCRR00231788.)

193.    All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-E-07 relating to Nonemergency Health Care Requests and Services.  (Ex. 3305 at ADCRR00138400 (Douglas); Ex. 3307 at ADCRR00138537-38 (Eyman); Ex. 3309 at ADCRR00210549-50 (Florence); Ex. 3311 at ADCRR00138711-12 (Lewis); Ex. 3313 at ADCRR00138761 (Perryville); Ex. 3315 at ADCRR00138804-05 (Phoenix); Ex. 3316 at ADCRR00138915 (Safford); Ex. 3318 at ADCRR00138860-61 (Fort Grant Unit); Ex. 3320 at ADCRR00138994 (Tucson); Ex. 3322 at ADCRR00139135-36 (Winslow); Ex. 3323 at ADCRR00139085-86 (Apache Unit); Ex. 3325 at ADCRR00139215 (Yuma).)

194.    NCCHC Important Standard P-E-08 requires that nursing assessment protocols and procedures are appropriate to the level of competency and preparing of the nursing personnel and comply with the relevant state practice acts.  Compliance indicators include: development and annual review of the protocols by the nursing administrator and responsible physician; documentation of the nurses training in the use of the assessment protocols, including evidence of training provided to new nursing staff, annual review of competency, and retraining when protocols or procedures are introduced or revised; non-emergency health care protocols include over-the-counter medications only; assessment protocols which pertain to emergency life-threatening conditions (e.g. chest pain, shortness of breath), may contain prescription medications and must include immediate communication with a provider; and, a provider order must be obtained before or immediately after emergency administration of prescription medications.  (Ex. 3304 at ADCRR00210746; Ex. 3303 at ADCRR00231794.)  In the 2014 Edition, this standard was numbered P-E-11.  (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231794.)

195.    All ADCRR-operated facilities are in full compliance with NCCHC Important Standard P-E-08 relating to Nursing Assessment Protocols and Procedures, or

76

the prior applicable 2014 standard.  (Ex. 3305 at ADCRR00138401-02 (Douglas); Ex. 3307 at ADCRR00138504-05 (Eyman); Ex. 3309 at ADCRR00138636-37 (Florence); Ex. 3311 at ADCRR00138699-700 (Lewis); Ex. 3313 at ADCRR00138762-63 (Perryville); Ex. 3315 at ADCRR00138805 (Phoenix); Ex. 3316 at ADCRR00138915-16 (Safford); Ex. 3318 at ADCRR00138861-62 (Fort Grant Unit); Ex. 3320 at ADCRR00139019-20 (Tucson); Ex. 3322 at ADCRR00139136-37 (Winslow); Ex. 3323 at ADCRR00139086-87 (Apache Unit); Ex. 3325 at ADCRR00139216-17 (Yuma).)

196.    NCCHC Essential Standard P-E-09 requires that patient medical, dental, and mental health care is coordinated and monitored from admission to discharge.  Compliance indicates include: that: patients received medical, dental and mental health services from admission to discharge per prescribers' recommendations, orders, and evidence-based practices; prescriber orders are implemented in a timely manner; if deviations from evidence-based practices are indicated, clinical justification for the alternative treatment plan is documented; diagnostic tests are reviewed in a timely manner; treatment plans are modified as clinically indicated by diagnostic tests and treatment results; and, for hospitalizations, urgent care, emergency department and specialty visits, that patients are seen by a qualified health care professional upon return, recommendations are reviewed for appropriateness and use in the correctional environment, and a provider is timely contacts to ensure proper implementation of any orders and arrange appropriate follow-up.  (Ex. 3304 at ADCRR00210478; Ex. 3303 at ADCRR00231796.)  In the discussion of this standard, NCCHC notes that "[b]ecause of the nature of providing health care in a correctional environment, care must be taken to ensure that all patient care, especially that ordered or provided by noncorrectional prescribers, is adapted as needed to the patient and circumstances."  (Ex. 3304 at ADCRR002104788.)  In the 2014 Edition, this standard was numbered P-E-12.  (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231796.)

197.    All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-E-09 relating to Continuity, Coordination, and Quality of Care During Incarceration, or the prior analogous 2014 standard.  (Ex. 3305 at ADCRR00138402-03

(Douglas); Ex. 3307 at ADCRR00138505-06 (Eyman); Ex. 3309 at ADCRR00138637-38 (Florence); Ex. 3311 at ADCRR00138712-13 (Lewis); Ex. 3313 at ADCRR00138763 (Perryville); Ex. 3315 at ADCRR00138814-15 (Phoenix); Ex. 3316 at ADCRR00138916-17 (Safford); Ex. 3318 at ADCRR00138862-63 (Fort Grant Unit); Ex. 3320 at ADCRR00138996-97 (Tucson); Ex. 3322 at ADCRR00139137 (Winslow); Ex. 3323 at ADCRR00139087 (Apache Unit); Ex. 3325 at ADCRR00139217 (Yuma).)

198. NCCHC Essential Standard P-E-10 requires that discharge planning is provided for inmates with serious health needs whose release is imminent. Compliance indicates include: arranging for a reasonable supply of current medications for inmates with planned releases; referrals to follow-up services with community providers for patients with serious health needs; assistance with health insurance applications prior to release; and, documentation of discharge planning in the health record. (Ex. 3304 at ADCRR00210480; Ex. 3303 at ADCRR00231798.) In the 2014 Edition, this standard was numbered P-E-13. (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231798.)

199. In discussing Essential Standard P-E-10, NCCHC notes that patients with an opioid addiction history are at higher risk of overdose after discharge and recommends that "consideration should be given to beginning medication-assisted treatment *immediately prior to release*. When this is not available, facilities should establish a community partnership for enrollment in an opioid treatment program *immediately after release*." (Ex. 3303 at ADCRR00210481 (emphases added).)

200. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-E-10 relating to Discharge Planning, or the analogous 2014 standard. (Ex. 3305 at ADCRR00138403 (Douglas); Ex. 3307 at ADCRR00138506-07 (Eyman); Ex. 3309 at ADCRR00138638 (Florence); Ex. 3311 at ADCRR00138713-14 (Lewis); Ex. 3313 at ADCRR00138764 (Perryville); Ex. 3315 at ADCRR00138806 (Phoenix); Ex. 3316 at ADCRR00138917-18 (Safford); Ex. 3318 at ADCRR00138863 (Fort Grant Unit); Ex. 3320 at ADCRR00138997 (Tucson); Ex. 3322 at ADCRR00139138 (Winslow); Ex. 3323 at ADCRR00139088 (Apache Unit); Ex. 3325 at ADCRR00139218 (Yuma).)

201. NCCHC Essential Standard P-F-01 requires that patients with chronic disease, other significant health conditions, and disabilities receive ongoing multidisciplinary care aligned with evidence-based standards. Compliance indicators include that: patients with chronic diseases and other special needs are identified; the responsible physician establishes and annually reviews clinical protocols that are consistent with national clinical practice guidelines for conditions including asthma, diabetes, HIV, hyperlipidemia, hypertension, mood disorders, and psychiatric disorders; a physician or other qualified provider develops individualized treatment plans at the time the condition is identified, and update the plans when warranted; the health record documents that providers are following chronic disease protocols and special needs treatment plans as clinically indicated, including frequency of follow-up, monitoring of the patient's condition, identifying type and frequency of diagnostic testing, documenting patient education, and clinically justifying any deviation from the protocol; and, that medical prothesis and other aids to reduce effects of impairment are supplied in a timely manner when patient health would otherwise be adversely affected, as determined by the responsible physician. (Ex. 3304 at ADCRR00210485; Ex. 3303 at ADCRR002317807, ADCRR00231810 and ADCRR00231831.) In the 2014 Edition, this standard was separated into standards P-G-01, P-G-02 and P-G-10. (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231807, ADCRR00231810 and ADCRR00231831.)

202. In discussing Essential Standard P-F-01 relating to chronic diseases and special needs, NCCHC notes that "treatment plan[s] may use any format that contains all of the required elements…. SOAP (subjective, objective, assessment, plan) notation in the progress notes is another way to document a treatment plan." (Ex. 3304 at ADCRR00210487; Ex. 3303 at ADCRR00231812.)

203. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-F-01 relating to Patients with Chronic Disease and Other Special Needs, or the analogous 2014 standards. (Ex. 3305 at ADCRR00138403-05 (Douglas); Ex. 3307 at ADCRR00138546-47 (Eyman); Ex. 3309 at ADCRR00138639-40 (Florence); Ex. 3311 at

ADCRR00138682-84 and ADCRR00138702-03 (Lewis); Ex. 3313 at ADCRR00138764-66 (Perryville); Ex. 3315 at ADCRR00138807 and ADCRR00138809 (Phoenix); Ex. 3316 at ADCRR00138918-19 (Safford); Ex. 3318 at ADCRR00138864-65 (Fort Grant Unit); Ex. 3320 at ADCRR00139020-22 (Tucson); Ex. 3322 at ADCRR00139138-39 (Winslow); Ex. 3323 at ADCRR00139088-89 (Apache Unit); Ex. 3325 at ADCRR00139218-20 (Yuma).)

204. NCCHC Essential Standard P-F-02 requires that infirmary-level care, when provided, is appropriate to meet the health care needs of patients. Compliance indicators include that: applicable policies definiens the scope of care available to on-site patients who need infirmary-level care; that patients needing infirmary-level care are always within sight or hearing of a facility staff members and that a qualified health care professional and respond in a timely manner; the number of qualified health care professionals providing infirmary-level care is based on the number of patients, severity of their illness, and the level of care required for each; a supervising RN ensures, at least daily, that care is being provided as ordered; provider orders are used to initiate and discontinue infirmary-level care; the frequency of provider and nursing rounds for patients who need infirmary-level care is specified based on the clinical acuity and categories of care provided; and, that health records properly document provision of infirmary-level care. (Ex. 3304 at ADCRR00210488; Ex. 3303 at ADCRR00231813.) In the 2014 Edition, this standard was numbered P-G-03. (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231813.)

205. NCCHC Essential Standard P-F-02 relating to Infirmary-Level Care is not applicable at ASPC Eyman, ASPC Phoenix, ASPC Safford, or ASPC Yuma. (Ex. 3307 at ADCRR00138509 (Eyman); Ex. 3315 at ADCRR00138807 (Phoenix); Ex. 3316 at ADCRR00138919-20 (Safford); Ex. 3318 at ADCRR00138865-66 (Fort Grant Unit); Ex. 3325 at ADCRR00139220 (Yuma).) Where it is applicable, all ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-F-02 or the analogous 2014 standard. (Ex. 3305 at ADCRR00138405-06 (Douglas); Ex. 3309 at ADCRR00138640-41 (Florence); Ex. 3311 at ADCRR00138683 (Lewis); Ex. 3313 at ADCRR00138766-67 (Perryville); Ex. 3320 at ADCRR00138999-9000 (Tucson); Ex. 3322 at ADCRR00139140

(Winslow); Ex. 3323 at ADCRR00139090 (Apache Unit).)

206. NCCHC Essential Standard P-F-03 requires that mental health services are available to all inmates who require them. Compliance indicators include that mental health needs are addressed on-site or by referral to appropriate alternative facilities; minimum outpatient services be provided including identification and referral of patients with mental health needs, crisis intervention services, psychotropic medication management (when indicated), individual counseling, group counseling and/or psychosocial or psychoeducation programs; outpatients receiving mental health services are seen as clinically indicated and as prescribed in their individualized treatment plans; mental health, medical and substance abuse services are sufficiently coordinated to integrate appropriate patient management to meet medical and mental health needs and address the impact of these conditions on each other; and, when commit or transfer to an inpatient psychiatric setting is clinically indicated, that such transfers follow required procedures, occur in a timely manner, and that the patient is safely housed and monitored until the transfer occurs. (Ex. 3304 at ADCRR00210490; Ex. 3303 at ADCRR00231816.) In the 2014 Edition, this standard was numbered P-G-04. (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231816.)

207. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-F-03 relating to Mental Health Services, or the prior analogous 2014 standard. (Ex. 3305 at ADCRR00138406-07 (Douglas); Ex. 3307 at ADCRR00138510-11 (Eyman); Ex. 3309 at ADCRR00138641-42 (Florence); Ex. 3311 at ADCRR00138683 (Lewis); Ex. 3313 at ADCRR00138767-68 (Perryville); Ex. 3315 at ADCRR00138807-08 (Phoenix); Ex. 3316 at ADCRR00138920-21 (Safford); Ex. 3318 at ADCRR00138866-67 (Fort Grant Unit); Ex. 3320 at ADCRR00139000-01 (Tucson); Ex. 3322 at ADCRR00139140-41 (Winslow); Ex. 3323 at ADCRR00139090-91 (Apache Unit); Ex. 3325 at ADCRR00139221 (Yuma).)

208. NCCHC Essential Standard P-F-04 requires that inmates who are intoxicated or undergoing withdrawal are appropriately managed. Compliance indicators include:

protocols for managing inmates under the influence or undergoing withdrawal from alcohol, sedatives, opioids, or other substances, which are consistent with nationally acceptable treatment guidelines and approved by the responsible physician, at least annually; individuals showing signed of intoxication or withdrawal are housed in a safe location and monitored by qualified health care professionals; medically supervised withdraw be initiated when clinically warranted, and be done under provider supervision. (Ex. 3304 at ADCRR00210492; Ex. 3303 at ADCRR00231822 and ADCRR00231824.) In the 2014 Edition, this standard was separated into standards P-G-06 and P-G-07. (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231822 and ADCRR00231824.)

209. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-F-04 relating to Medically Supervised Withdrawal and Treatment, or the prior analogous 2014 standards. (Ex. 3305 at ADCRR00138407-08 (Douglas); Ex. 3307 at ADCRR00138511-12 (Eyman); Ex. 3309 at ADCRR00138642-43 (Florence); Ex. 3311 at ADCRR00138683-84 (Lewis); Ex. 3313 at ADCRR00138768 (Perryville); Ex. 3315 at ADCRR00138815-16 (Phoenix); Ex. 3316 at ADCRR00138921-22 (Safford, noting that "inmates on [Medication Assisted treatment] are screened out at sending facility and not admitted to this facility"); Ex. 3318 at ADCRR00138867-68 (Fort Grant Unit); Ex. 3320 at ADCRR00139022-23 (Tucson); Ex. 3322 at ADCRR00139141-42 (Winslow); Ex. 3323 at ADCRR00139091-92 (Apache Unit); Ex. 3325 at ADCRR00139222 (Yuma).)

210. NCCHC Essential Standard P-F-05 requires that pregnant inmates are given comprehensive counseling and care in accordance with national standards and their expressed desires regarding their pregnancy. Compliance indicators include: provision of prenatal care; limitations on use of custody restraints; availability of emergency delivery kits; and provision of postpartum care. (Ex. 3304 at ADCRR00210494; Ex. 3303 at ADCRR00231828.) In the 2014 Edition, this standard was numbered P-G-09. (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231828.)

211. NCCHC Essential Standard P-F-05 relating to Counseling and Care of the Pregnant Inmate and the prior analogous 2014 standard is not applicable at most ADCRR

Facilities. (Ex. 3305 at ADCRR00138408-09 (Douglas); Ex. 3307 at ADCRR00138512-13 (Eyman); Ex. 3309 at ADCRR00138643-44 (Florence); Ex. 3311 at ADCRR00138684 (Lewis); Ex. 3315 at ADCRR00138809 (Phoenix); Ex. 3316 at ADCRR00138922-23 (Safford); Ex. 3318 at ADCRR00138868-69 (Fort Grant Unit); Ex. 3320 at ADCRR00139002-03 (Tucson); Ex. 3322 at ADCRR00139142-43 (Winslow); Ex. 3323 at ADCRR00139092-93 (Apache Unit); Ex. 3325 at ADCRR00139223 (Yuma).) ASPC Perryville is in full compliance with NCCHC Essential Standard P-F-05. (Ex. 3313 at ADCRR00138783-85 (Perryville).)

212. NCCHC Essential Standard P-F-06 requires that facility staff ensure that victims of sexual abuse receive appropriate intervention. Compliance indicators include training in detecting, assessing and responding to signs of sexual abuse and harassment, and preservation of evidence of sexual abuse; unless recent sexual assault is referred to a community facility for treatment and evidence collection, certain guidelines are followed for procedures performed at the facility; prophylactic treatment is provided and follow-up care for sexually transmitted infections is offered to all victims; a qualified mental health professional conducts and evaluation for crisis intervention and follow-up; and that reports made to correctional authorities to effect a separation of the victim from their abuser. (Ex. 3304 at ADCRR00210497; Ex. 3303 at ADCRR00231742-43.) In the 2014 Edition, this standard was separated into two separate standards, P-B-04 and P-B-05. (Ex. 3304 at ADCRR00210371; Ex. 3303 at ADCRR00231742-43.)

213. All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-F-06 relating to Response to Sexual Abuse or the analogous 2014 standards. (Ex. 3305 at ADCRR00138409-10 (Douglas); Ex. 3307 at ADCRR00138513-14 (Eyman); Ex. 3309 at ADCRR00138644-45 (Florence); Ex. 3311 at ADCRR00138672 (Lewis); Ex. 3313 at ADCRR00138770-71 (Perryville); Ex. 3315 at ADCRR00138800 (Phoenix); Ex. 3316 at ADCRR00138923-24 (Safford); Ex. 3318 at ADCRR00138869-70 (Fort Grant Unit); Ex. 3320 at ADCRR00139003-04 (Tucson); Ex. 3322 at ADCRR00139143-44 (Winslow); Ex. 3323 at ADCRR00139093-94 (Apache Unit); Ex. 3325 at

ADCRR00139224-25 (Yuma).)

214.     NCCHC Essential Standard P-G-01 requires the responsible health authority to ensure that when restraints are used for clinical or custody reasons, the inmate is not harmed by the intervention.  Compliance indicators include specific policies and practices relating to the clinically ordered restraint or seclusion, as directed by a physician or other qualified health professional as authorized by law; health staff monitor inmates in custody-ordered restraints (emergency restraint chair or electronic control devices) and communicate with custody staff if use of restraints may be jeopardizing an inmate's health.  (Ex. 3304 at ADCRR00210503-04; Ex. 3303 at ADCRR00231841-42.)   In the 2014 Edition, this standard was numbered P-I-01.  (Ex. 3304 at ADCRR00210373; Ex. 3303 at ADCRR00231841-42.)

215.     All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-G-01 relating to Restraint and Seclusion or the prior analogous 2014 standard.  (Ex. 3305 at ADCRR00138411-12 (Douglas); Ex. 3307 at ADCRR00138515-17 (Eyman); Ex. 3309 at ADCRR00138646-47 (Florence); Ex. 3311 at ADCRR00138685 (Lewis); Ex. 3313 at ADCRR00138772-73 (Perryville); Ex. 3315 at ADCRR00138810 (Phoenix); Ex. 3316 at ADCRR00138925-27 (Safford); Ex. 3318 at ADCRR00138871-72 (Fort Grant Unit); Ex. 3320 at ADCRR00139005-06 (Tucson); Ex. 3322 at ADCRR00139145-46 (Winslow); Ex. 3323 at ADCRR00139095-96 (Apache Unit); Ex. 3325 at ADCRR00139226-27 (Yuma).)

216.     NCCHC Essential Standard P-G-02 requires that any practice of segregation should not adversely impact an inmate's health.  Compliance indicators include: documented medical review of segregation placements to identify medical, mental health, or dental needs requiring accommodation; monitoring inmates based upon the dree of isolation; documentation of segregation rounds either on individual logs, cell cards, or the inmate health record; documentation of significant health findings in the health record; and identification and notification of custody officials of inmates in segregation who are physically or psychologically deteriorating and those exhibiting other signs or symptoms of

failing health.  (Ex. 3304 at ADCRR00210505; Ex. 3303 at ADCRR00231791.) In the 2014 Edition, this standard was numbered P-E-09.  (Ex. 3304 at ADCRR00210372; Ex. 3303 at ADCRR00231791.)

217.    The NCCHC defines "segregated inmates" as "those isolated from the general population and who receive services and activities apart from other inmates."  Facilities may be in compliance with NCCHC Standard P-G-02, if inmates who are segregated and have limited contact with staff are monitored 3 days a week by medical or mental health staff.  The NCCHC distinguishes "solitary confinement (also referred to as isolation)" as "an extreme form of segregation where an inmate is isolated and encounters staff or other inmates fewer than three times a day."  To comply with NCCHC Standard P-G-02, inmates in solitary confinement are to be monitored daily by medical staff and at least once a week by mental health staff.  (Ex. 3304 at ADCRR00210505; Ex. 3303 at ADCRR00231791-92.)

218.    All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-G-02 relating to Segregated Inmates or the prior analogous 2014 standard.  (Ex. 3305 at ADCRR00138412-13 (Douglas); Ex. 3307 at ADCRR00138548 (Eyman); Ex. 3309 at ADCRR00138648-49 (Florence); Ex. 3311 at ADCRR00138679 (Lewis); Ex. 3313 at ADCRR0013873-74 (Perryville); Ex. 3315 at ADCRR00138805 (Phoenix); Ex. 3316 at ADCRR00138927-28 (Safford); Ex. 3318 at ADCRR00138872-73 (Fort Grant Unit); Ex. 3320 at ADCRR00139007-08 (Tucson); Ex. 3322 at ADCRR00139146-47 (Winslow); Ex. 3323 at ADCRR00139096-97 (Apache Unit); Ex. 3325 at ADCRR00139227-28 (Yuma).)

219.    NCCHC Essential Standard P-G-03 requires health staff to follow policies developed for the emergency forced use of medications as governed by the applicable laws where the facility is located.  Compliance indicators include that only licensed providers can authorize use of forced psychotropic medications, the provider documents the threat posed, reason for forcing the medications, and any other attempted treatment modalities in the health record; appropriate follow-up care is provided; and nursing staff monitor and document the inmate's condition within 15-minutes of the of forced medication administration, and at least every 30-minutes thereafter until the inmate is transferred to an

inpatient setting or no longer requires monitoring.  (Ex. 3304 at ADCRR00210507; Ex. 3303 at ADCRR00231843.)  In the 2014 Edition, this standard was numbered P-I-02.  (Ex. 3304 at ADCRR00210373; Ex. 3303 at ADCRR00231843.)

220.    All ADCRR-operated facilities are in full compliance with NCCHC Essential Standard P-G-03 relating to Emergency Psychotropic Medication or the prior analogous 2014 standard.  (Ex. 3305 at ADCRR00138414 (Douglas); Ex. 3307 at ADCRR00138518-19 (Eyman); Ex. 3309 at ADCRR00138649 (Florence); Ex. 3311 at ADCRR00138685 (Lewis); Ex. 3313 at ADCRR0013874-75 (Perryville); Ex. 3315 at ADCRR00138810 (Phoenix); Ex. 3316 at ADCRR00138928 (Safford); Ex. 3318 at ADCRR00138873-74 (Fort Grant Unit); Ex. 3320 at ADCRR0013908-09 (Tucson); Ex. 3322 at ADCRR00139147-48 (Winslow); Ex. 3323 at ADCRR00139097-98 (Apache Unit); Ex. 3325 at ADCRR00139228-29 (Yuma).)

221.    NCCHC Important Standard P-G-05 requires that inmates have the right to make informed decisions regarding health care, including the right to refuse care. Compliance indicators include: obtaining written documentation of informed consent for procedures and medications where informed consent would be obtained in a community setting; documentation of refusals of care, which includes a description of the service refused, evidence that the inmate has been informed of adverse health consequences that may occur as a result of the refusal, the health staff witness signature, and the inmate's signature (or signature of a second health or custody staff witness).  (Ex. 3304 at ADCRR00210511; Ex. 3303 at ADCRR00231849.)  In the 2014 Edition, this standard was numbered P-I-05.  (Ex. 3304 at ADCRR00210373; Ex. 3303 at ADCRR00231849.)

222.    All ADCRR-operated facilities are in full compliance with NCCHC Important Standard P-G-05 relating to Informed Consent and Right to Refuse, or the prior analogous 2014 standard.  (Ex. 3305 at ADCRR00138415-16 (Douglas); Ex. 3307 at ADCRR00138542-43 (Eyman); Ex. 3309 at ADCRR00138650-51 (Florence); Ex. 3311 at ADCRR00138686 (Lewis); Ex. 3313 at ADCRR00138776 (Perryville); Ex. 3315 at ADCRR00138811 (Phoenix); Ex. 3316 at ADCRR00138929-30 (Safford); Ex. 3318 at

1 ADCRR00138875 (Fort Grant Unit); Ex. 3320 at ADCRR0013909-1054 (Tucson); Ex.

2 3322 at ADCRR00139148-49 (Winslow); Ex. 3323 at ADCRR00139098-99 (Apache

3 Unit); Ex. 3325 at ADCRR00139230 (Yuma).)

4      223. ADCRR is in the process of getting accredited by the American Correctional

5 Association. (R.T. 11/16/21 a.m. at 2177:11-18.) The ACA has nearly 600 standards,

6 touching on every aspect of corrections, including health care, training, security, and

7 programming. (*Id*. at 2149:16-20.)

8      **C.    Plaintiffs' Individual Claims.**

9           **1.    Kendall Johnson.**

10      224. ADCRR inmate Kendall Johnson has been incarcerated for 17 years and is

11 currently incarcerated at ASPC Perryville. (R.T. 11/1/21 a.m. at 11:9-12.)

12      225. In March 2020, after receiving an MRI, she was diagnosed with multiple

13 sclerosis in March 2020. (*Id*. at 11:17-18, 24:6-25:17.) Unfortunately, there is not an

14 effective way to reverse that diagnosis, only treatment to slow its progress. (R.T. 11/10/21

15 a.m. at 1690:10-19.)

16      226. Because of her diagnosis, Johnson lives in the Special Needs Unit and needs

17 assistance with her daily activities. (R.T. 11/1/21 a.m. at 12:17-21, 11:22-12:4.)

18      227. In the Special Needs Unit, Johnson has a call button for staff if she needs help,

19 which she has used many times. (*Id*. at 36:22-37:6.)

20      228. She receives medication daily. (*Id*. at 37:7-8.)

21      229. She receives Gabapentin (pain medication) twice a day. (*Id*. at 37:9-11.)

22      230. She receives muscle relaxants twice a day. (*Id*. at 37:14-20.)

23      231. She is seen by a provider on a regular basis. (*Id*. at 37:24-38:1.)

24      232. In November 2020, Johnson saw a neurologist to discuss her treatment

25 options. (*Id*. at 29:12-24.)

26      233. In May 2021, Johnson was prescribed Ocrevus, which is intended to slow the

27 progression of the disease. (*Id*. at 30:2-21.)

28      234. Johnson testified that the Ocrevus has helped with her symptoms, including

1    regaining feeling and movement in her legs. (*Id*. at 30:22-23.)

2    235. Johnson's allegations were not raised in the Complaint. (Dkt. 1.) Her

3    individual claim is dismissed on that basis alone.

4    236. Moreover, ADCRR and Centurion were not, and are not, deliberately

5    indifferent to Johnson's medical needs. To the contrary, they are actively and successfully

6    treating Johnson's multiple sclerosis.

7    237. To the extent that Johnson contends that ADCRR and Centurion did not

8    diagnose her disease quickly enough, these allegations reflect, at most, negligence.

9    238. Plaintiffs have failed to establish by a preponderance of the evidence that

10    Johnson's Eighth Amendment rights were, or are being, violated.

11    239. Johnson's testimony also demonstrates that ADCRR's medical care system is

12    functioning adequately and undermines the alleged systemic Class claims pertaining to

13    access to care, medication, staffing, chronic disease care, and specialty care.

14    240. Johnson does not make any allegations nor provide any evidence supporting

15    Plaintiffs' claims relating to emergency treatment, medication, medical devices, staffing,

16    infectious disease care, mental health care, or the conditions of her confinement.

17    **2. Ronald Slavin.**

18    241. ADCRR inmate Ronald Slavin has been incarcerated since 2019 and is

19    currently incarcerated at ASPC Eyman-Cook Unit. (R.T. 11/2/21 a.m. at 253:2-8, 254:1-3,

20    255:19-21.)

21    242. He is diagnosed with psychosis, schizophrenia, post-traumatic stress disorder

22    ("PTSD"), and manic-depressive and is classified as Seriously Mentally Ill ("SMI"). (*Id*.

23    at 248:13-14, 248:20-21, 253:21-25.)

24    243. His mental illnesses date back to his youth. (*Id*. at 249:7-11, 250:4-6, 251:4-

25    5.)

26    244. Although Slavin thinks about harming himself, he has not harmed himself

27    since 2018. (*Id*. at 251:20-22, 252:5-6.)

28    245. At Cook Unit, Slavin sees a psychiatrist every three months, and he gets a 30-

minute counseling session with a psychiatrist once a month.  (*Id*. at 254:6-9, 255:19-21.)

246.    He has met with a psychologist and they "[w]ork on my mental health issues and concerns."  (*Id*. at 260:10-15.)

247.    He has developed a treatment plan with a mental health professional.  (*Id*. at 255:2-8.)

248.    Slavin goes to counseling once a month.  (*Id*. at 255:9-11.)

249.    He is not denied counseling sessions, but he has refused to meet with counselors "[n]umerous times."  (*Id*. at 262:4-6, 281:1-4.)

250.    When Slavin attends counseling, he and his counselor discuss his mental health issues.  (*Id*. at 260:16-261:6.)

251.    His counselor has suggested that he listen to a podcast, which he did and which "helped explain things that were going on with myself."  (*Id*. at 261:5-262:2.)

252.    Slavin is prescribed a total of four or five medications, two for his mental health, and a total of four or five medications, including Wellbutrin, Keppra, Abilify.  (*Id*. at 256:3-257:5.)

253.    He is not being denied prescribed medications.  (*Id*. at 280:19-21.)

254.    He has been given his medications every day.  (*Id*. at 280:22-25.)

255.    The Wellbutrin and Keppra have helped his mental health.  (*Id*. at 257:6-20, 279:25.)

256.    When asked if he is "satisfied" with these medications, Slavin testified: "I know there's better medications than what they're prescribing that I've been on out in society. The medications that I'm on now, you have to go through a formula just to reach something that somewhat alters my disabilities. But out in society I'm given a whole new regimen of medications because there's better medications out there that assist with my issues and concerns."  (*Id*. at 258:7-15.)

257.    Slavin prefers to be housed in the Men's Treatment Unit because, in his opinion, it provides more mental health resources.  (*Id*. at 262:23-263:17.)

258.    When previously housed there, he believed that his mental health improved,

and he believes that his mental health would continue to improve if he was transferred there. (*Id.* at 264:12-15, 273:16-274:8.)

259.    Slavin admitted, however, that to be transferred to the Men's Treatment Unit, he needs a psychologist to authorize his transfer, and he has refused to meet with his psychologist the past several months. (*Id.* at 277:14-19, 278:17-22.)

260.    Slavin's allegations were not raised in the Complaint. (Dkt. 1.) His individual claim is dismissed on that basis alone.

261.    Moreover, ADCRR and Centurion were not, and are not, deliberately indifferent to Slavin's mental health needs.  To the contrary, they are actively and successfully treating Slavin's mental illnesses.

262.    Slavin's preferences for a particular medication or Unit do not state an Eighth Amendment claim.

263.    Plaintiffs have failed to establish by a preponderance of the evidence that Slavin's Eighth Amendment rights were, or are being, violated.

264.    Slavin's testimony also demonstrates that ADCRR's mental health care system is functioning adequately and undermines the alleged systemic Class claims pertaining to access to care, medication, staffing, necessary mental health care, and basic mental health care for self-harming inmates.

265.    Slavin does not make any allegations nor provide any evidence supporting Plaintiffs' claims relating to emergency treatment, medical devices, staffing, infectious diseases care, chronic disease care, specialty care, or the conditions of his confinement.

### 3.    Laura Redmond.

266.    ADCRR inmate Laura Redmond is currently incarcerated at ASPC Perryville-Carlos Unit. (R.T. 11/2/21 p.m. at 317:2-14.)

267.    She has been deaf since she was 15-months old. (*Id.* at 317:20-23.)

268.    Unfortunately, medical staff has determined that she is not a good candidate for a cochlear implant because she has been deaf since childhood. (*Id.* at 370:3-371:17 (citing Exhibit 5454x).)

269. Redmond wears a hearing aid in one ear, which allows her to hear and distinguish someone's words or speech "a little bit." (*Id*. at 318:11–19:5.)

270. Redmond can understand 50% of what is being said by lip reading, although she cannot understand complex or complicated medical information. (*Id*. at 320:10-12, 320:16-24.)

271. Redmond is fluent in American Sign Language. (*Id*. at 319:6-7.)

272. Redmond is also diagnosed with PTSD, bipolar, and schizophrenia, and she is classified as SMI. (*Id*. at 320:25-321:3, 322:3-4.)

273. She takes "a lot of different medications" for these illnesses. (*Id*. at 323:17-24.)

274. Redmond has a mental health appointment with a psychologist or a psychologist associate, and sometimes a psychiatrist, once a month. (*Id*. at 324:7-14.)

275. These appointments are either in person or virtually. (*Id*. at 325:8.)

276. There are interpreters present for all her mental health appointments, and she can effectively communicate and fully understand. (*Id*. at 325:9-25, 353:18-21.)

277. Redmond also has several medical issues, including "eyes swelling," back problems, seizures, Hepatitis C, and asthma. (*Id*. at 328:9-20.)

278. She testified that she needs an interpreter during her medical appointments, but that they are never present, she has never been asked if she needs one, and her requests for an interpreter are always denied. (*Id*. at 320:1-6, 329:12-17, 329:18-22, 336:16-19.)

279. During her cross examination, however, it was revealed that an interpreter was present and used for many of her medical appointments: on April 29, 2020 (encounter for seizures); on May 2, 2020 (encounter for seizures); on May 5, 2020 (encounter for blisters); on May 7, 2020 (encounter for neck pain); on May 8, 2020 (encounter for neck and back numbness); on May 12, 2020 (encounter for medication); on May 12, 2020 (encounter for water blisters); on May 13, 2020 (telemedicine encounter); on June 4, 2020 (encounter for keep-on-medicine); on June 12, 2020 (encounter for right foot pain); on August 30, 2020 (flu shot encounter); on June 30, 2021 (cochlear implant encounter); on

July 8, 2021 (hearing aids encounter); and on July 22, 2021 (telemedicine encounter). (*Id*. at 347:1-2, 341:18-342:8 (citing Exhibit 5454a), 342:19-343:6 (citing Exhibit 5454b), 343:15-24 (citing Exhibit 5454c), 348:2-7 (citing 5454d), 350:6-13 (citing 5454e), 352:3-10 (citing Exhibit 5454f), 353:17-353:6 (citing Exhibit 5454g), 353:13-21 (citing Exhibit 5454h), 355:12-19 (citing Exhibit 5454j), 356:18-357:17 (citing Exhibit 5454l & 5454m), 368:24-369:4 (citing Exhibit 5454t), 369:4-25 (citing Exhibit 5454w), 370:3-371:17 (citing Exhibit 5454x), 372:7-11 (citing Exhibit 5454y).)

280. Ultimately, Redmond backtracked and admitted that "sometimes" interpreters are provided. (*Id*. at 393:3-5.)

281. On August 23, 2020, Redmond had a medical encounter for a swollen right hand; the interpretive services line was not working, and Redmond agreed to read lips and/or writing notes. (*Id*. at 365:14-366:8 (citing Exhibit 5454r).)

282. On October 21, 2021, Redmond had an encounter, and no interpreter was available, but she was able to communicate. (*Id*. at 382:13-384:11 (citing Exhibit 5454ff).)

283. On July 22, 2021, Redmond threatened medical staff that she was going to complain to the ACLU. (*Id*. at 384:12-385:25 (citing Exhibit 5454gg).)

284. On August 26, 2021, Redmond was given a copy of the ASL website and a log-in ID, which would have assisted her in letting providers know that she wanted an interpreter. (*Id*. at 374:22-375:6 (citing Exhibit 5454aa).)

285. Redmond never brought it to a subsequent appointment; she lost it and has never asked for another copy. (*Id*. at 375:11-376:20.)

286. Redmond's allegations challenge the adequacy of ADCRR's and Centurion's interpretive language services. Her allegations were not raised in the Complaint—either individually or on behalf of the Class—nor were these allegations certified by the Court. Her individual claim is dismissed on that basis alone and the allegations cannot be considered to support any of the Class claims.

287. Moreover, ADCRR and Centurion were not, and are not, deliberately indifferent to Redmond's medical needs. To the contrary, they are actively and successfully

1    providing her adequate medical care and accommodating her deafness.

2        288.    Redmond has not established by a preponderance of the evidence that the

3    medical care she receives has or could result in significant injury or the unnecessary and

4    wanton infliction of pain, and thus she has failed to establish an Eighth Amendment

5    violation.

6        289.    Redmond's testimony also demonstrates that ADCRR's medical care system

7    is functioning adequately and undermines the alleged systemic Class claims pertaining to

8    access to care, medication, medical devices, staffing, and necessary mental health care.

9        290.    Redmond does not make any allegations nor provide any evidence supporting

10   Plaintiffs' claims relating to emergency treatment, medication, staffing, chronic disease

11   care, infectious disease care, specialty care, mental health care, or the conditions of his

12   confinement.

13               **4.    Abdul-Rahim Muhammad**

14       291.    ADCRR inmate Abdul-Rahim Muhammad is currently incarcerated at ASPC

15   Tucson-Rincon Unit.  (R.T. 11/4/21 p.m. at 891:17-22.)

16       292.    He is not a Plaintiff, a Class Representative, or a Subclass Representative.

17   (Dkt. 1, 4061.)

18       293.    His allegations undermine the allegations of the Named Plaintiffs and the

19   Class and Subclass claims.

20       294.    According to Muhammad, he was born with schizoaffective disorder, PTSD,

21   and anxiety.  (*Id*. at 892:3-9.)

22       295.    He is prescribed Seroquel, Zoloft, and Clonidine.  (*Id*. at 892:24-893:1.)

23       296.    Muhammad is a maximum custody inmate, step level 5.  (*Id*. at 893:5-9.)

24       297.    Throughout his time while classified as maximum custody, he has had

25   cellmates.  (*Id*. at 907:11-13.)

26       298.    Muhammad was previously incarcerated at ASPC Eyman-SMU I.  (*Id*. at

27   900:6-902:25.)

28       299.    At SMU I, he received recreation once a week.  (*Id*. at 900:6-10.)

                                            93

300. At SMU I, he was offered showers twice per week. (*Id*. at 901:6-9.)

301. At SMU I, he was offered programming once a week. (*Id*. at 901:19-21.)

302. He also had a job at SMU I. (*Id*. at 902:15-18.)

303. At SMU I, the lights in his cell were on during the day, but they were off at night. (*Id*. at 902:19-25.)

304. Muhammad was also previously incarcerated at ASPC Eyman-Browning Unit. (*Id*. at 904:12-906:2.)

305. At Browning Unit, showers were offered twice a week, he was provided a table, and he could turn the lights in his cell on and off. (*Id*. at 904:24-905:3, 905:4-8, 905:18-21.)

306. Muhammad was also previously incarcerated at ASPC Florence-Kasson Unit, and he remembers that he was able to turn his cell lights on and off while there. (*Id*. at 906:3-8, 906:15-17.)

307. Muhammad was also previously incarcerated at ASPC Phoenix. (*Id*. at 908:5-908:18.)

308. At ASPC Phoenix, he had recreation once or twice a day, he got showers every day, and he received programming three or four times a week. (*Id*. at 907:24-908:4, 908:5-7, 908:8-9.)

309. About his time at ASPC Phoenix, Muhammad testified: "Any time you want to come out of the cell, if you're having a problem, they'll pull you out. You can come out for five, ten minutes and just look at the sun or watch the birds fly. They'll pull you out of the cell and then put you back in there when you calm down. They'll work with you -- you know what I mean -- in Phoenix." (*Id*. at 908:13-18.)

310. Muhammad testified that, at ASPC Tucson, he is not getting adequate mental health treatment. (*Id*. at 913:24-914:1.)

311. Because of his penchant for self-harm, Muhammad is frequently placed on mental health watch. (*Id*. at 922:7-12, 925:12-16.)

312. When in watch, staff visit him every day. (*Id*. at 927:8-10.)

313. When in watch, Muhammad refuses to eat premade food. (*Id*. at 928:1-13.)

314. Muhammad, however, has not engaged in self-harm the last two months while at Rincon Unit. (*Id*. at 933:5-11.)

315. And, in the last two months, there has been no force used against him. (*Id*. at 933:15-17.)

316. Muhammad has been going to group programming every week. (*Id*. at 933:23-934:14.)

317. He has been working out and going to recreation. (*Id*. at 934:15-19.)

318. He has had individual counseling and is eating and sleeping well. (*Id*. at 935:3-8.)

319. He is taking Seroquel and "feeling more stable." (*Id*. at 935:12-18.)

320. On the day of his testimony, Muhammad became eligible for step level 3. (*Id*. at 935:20-23.)

321. Muhammad's testimony demonstrates that ADCRR's mental health care system is functioning adequately and undermines the alleged systemic Class claims pertaining to necessary mental health care, mental health care for self-harming inmates, medication, and staffing. Muhammad's testimony regarding SMU I, Browning Unit, and Kasson Unit further undermines the alleged systemic Subclass claims concerning the conditions of confinement for maximum custody inmates.

322. Muhammad did not provide any testimony supporting Plaintiffs' claims relating to access to health care, emergency treatment, medication, medical devices, chronic disease care, infectious disease care, or specialty care.

### 5. Dustin Brislan

323. ADCRR inmate Dustin Brislan is currently incarcerated at ASPC Tucson-Rincon Unit, which is a maximum custody and mental health unit. (R.T. 11/6/21 a.m. & p.m. at 1293:14-19.)

324. He is a maximum custody inmate, step level 4, and classified as SMI. (*Id*. at 1294:15-17, 1300:2-3.)

325.    Brislan has had mental illnesses since he was 8-years old.  (*Id*. at 1294:18-21.)

326.    He has been diagnosed with schizophrenia and borderline personality disorder. (*Id*. at 1296:23-1297:2.)

327.    For medications, Brislan is taking: "Abilify, the antipsychotic, Artane is for the antipsychotic -- the symptoms for TD.  I take Wellbutrin for depression. And I took some antianxiety or blood pressure medication."  (*Id*. at 1297:16-20.)

328.    Brislan was prescribed Abilify at his request.  (*Id*. at 1325:12-1326:4.)

329.    As to those medications, Brislan testified: "I have been on Abilify before, and I really like this medication. Artane, I think, is a good for the TD. The Wellbutrin pretty much eliminates my depression. I do get depressed every now and again, but not as bad." (*Id*. at 1298:21-24.)

330.    Brislan goes to recreation on "Sunday, Monday, Thursday for three hours," and has access to showers and therapy group sessions.  (*Id*. at 1299:22-25, 1332:13-19.)

331.    Brislan is allowed to walk to the shower and to the recreation yard without restraints.  (*Id*. at 1301:3-5.)

332.    He has three hours of group therapy on Tuesdays.  (*Id*. at 1327:2-5.)

333.    Brislan testified that he has refused group therapy before.  (*Id*. at 1305:23-25.)

334.    Brislan chooses not to leave his cell for table time.  (*Id*. at 1299:18-19.)

335.    Brislan testified that the "programming is a lot better" at Rincon Unit than at other units. (*Id*. at 1300:14-18.)

336.    He further testified: "I've never seen -- there has been one time when they had a canceled program, but they do make it up. Therapy is way better. The psychologists here are a lot nicer, more respectful. They know what they're doing. … The table time, they are never short-staffed, unlike every other unit, to interfere with our -- with our therapy and whatnot, and even table time.  But if they are short-staffed, they will not let us go out to rec, but do make that up on Friday. So they are very good about making sure." (*Id*. at 1300:18-

1301:2.)

337. About Rincon Unit, Brislan testified: "I feel a lot better. I actually see hope at this unit." (*Id*. at 1301:8-9.)

338. He testified that mental health staff is "responsive" at Rincon Unit. (*Id*. at 1301:22-23.)

339. Brislan further testified that Drs. Mozolik and Shear "are amazing people." (*Id*. at 1301:24-25.)

340. He further testified that Dr. Mozolik, his current therapist, is "hands down the best therapist I've ever seen." (*Id*. at 1327:13-23, 1330:16-18.)

341. Brislan testified that "she has done an amazing job." (*Id*. at 1330:19-21.)

342. His one-on-one therapy with Dr. Mozolik is 30 minutes to an hour a week, which is in addition to the three hours of group therapy a week. (*Id*. at 1331:24-1332:12.)

343. Brislan further testified that psychology associate Mocha "is an amazing person. In fact Mozolik, Dr. Sharr, Dr. Mocha, Dr. Pelton and Dr. Stallcup, clear at the top. They have shown me support now. They show me complete support. I like them all. I really do." (*Id*. at 1328:3-6.)

344. He further testified that Mocha "gave [him] complete adequate health care. She is an amazing therapist." (*Id*. at 1329:8-11.)

345. Mocha had been Brislan's therapist at Florence-Kasson Unit as well. (*Id*. at 1329:16-19.)

346. Brislan has sent letters to Dr. Stallcup thanking her and his treatment team. (R.T. 11/17/21 a.m. at 2510:18-2511:18.)

347. In one letter, Brislan stated that he had unmeasurable respect for Dr. Stallcup and his treatment team, and that he knows they have gone out of their way to treat him and provide the services he needs. (*Id*. at 2510:18-2511:18.)

348. In another letter, Brislan stated that his treatment team is professional, courteous, and that they truly care about "all of us." (*Id*. at 2510:18-2511:18.).

349. Brislan testified that he "don't have concerns about being" at Rincon Unit.

(R.T. 11/6/21 a.m. & p.m. at 1302:1-2.)

350.    He also has a good relationship with the morning custody staff and can paint portraits of them.  (*Id*. at 1332:1333:8.)

351.    Brislan requested and received Dialectical Behavioral Treatment at Rincon Unit.  (*Id*. at 1330:24-1331:10.)

352.    He testified: "DBT is an amazing course."  (*Id*. at 1331:21.)

353.    Brislan's allegations were not raised in the Complaint.  (*See* Dkt. 1, ¶¶ 9, 48, 75, 79, 88, 99.)  His individual claim is dismissed on that basis alone.

354.    Brislan is not a Subclass Representative.  (Dkt. 4061.)

355.    Moreover, ADCRR and Centurion were not, and are not, deliberately indifferent to Brislan's mental health needs. To the contrary, they are actively and successfully treating his mental illnesses.

356.    Brislan's general allegations concerning the conditions of his confinement at Kasson Unit and Rast Unit do not evince an Eighth Amendment violation, i.e., that he was exposed to a substantial risk of harm.

357.    Plaintiffs have failed to establish by a preponderance of the evidence that Brislan's Eighth Amendment rights were, or are being, violated.

358.    Brislan's testimony also demonstrates that ADCRR's mental health care system is functioning adequately and undermines the alleged systemic Class claims pertaining to necessary mental health treatment, mental health care for self-harming inmates, access to care, medication, and staffing.

359.    Brislan does not make any allegations nor provide any evidence supporting Plaintiffs' claims relating to access to care, emergency treatment, medication, medical devices, staffing, infectious diseases care, chronic disease care, specialty care, mental health care, or the conditions of his confinement.

### 6.    Jason Johnson

360.    ADCRR inmate Jason Johnson has been incarcerated since May 2018 and is currently incarcerated at ASPC Eyman-SMU 1.  (R.T. 11/8/21 a.m. & p.m. at 1212:10-12,

1214:14-16.)

361.     He has been diagnosed with depression, which he has suffered from his whole life.  (*Id*. at 1213:10-24.)

362.     Johnson is classified as SMI.  (*Id*. at 1215:18.)

363.     Although Johnson has attempted to commit suicide and acts of self-harm, he has not done so in "over a year."  (*Id*. at 1214:3-11.)

364.     Johnson was previously housed at ASPC Tucson-Rincon Unit and ASPC Florence-Kasson Unit.  (*Id*. at 1216:1-6.)

365.     Kasson Unit provided "weekly mental health group, and then they would schedule you for monthly one-on-ones. … they had a token economy thing where you could earn points to get stuff to buy out of the store. … you would see a provider for medications, but that was – it was every 90 days as long as your medication was fine."  (*Id*. at 1216:24-1217:6.)

366.     When asked if he found "the mental health care available to you at Kasson helpful for your mental health symptoms," Johnson testified, "I did."  (*Id*. at 1217:7-9.)

367.     Kasson Unit provided one-on-one appointments in a confidential setting with a "psych associate or mental health staff. And what [Johnson] liked about it the most, it was always the same -- you would always deal with the same mental health staff."  (*Id*. at 1217:10-24.)

368.     Johnson was also able to meet with a counselor in a confidential setting outside of his scheduled monthly one-on-one meetings, which were helpful.  (*Id*. at 1217:25-1218:3, 1218:13-15, 1218:25-1219:3.)

369.     Kasson Unit would have group classes that "would go over packets with us, do movies. We'd play games, color, do arts and crafts, stuff like that."  (*Id*. at 1218:18-19.)

370.     When group classes were canceled because of understaffing, they would "do it at cell front, which was fine because you are dealing with everybody in the pod that is dealing with mental health problems."  (*Id*. at 1219:13-23.)

371.     When Johnson refused to attend group classes, staff would instead go to his

cell.  (*Id*. at 1220:4-10.)

372.   At Kasson Unit, inmates are given tokens "for doing certain things, participating, keeping clean, stuff like that," and you can use them at the commissary.  (*Id*. at 1291:15-24.)

373.   Johnson was ultimately transferred from Kasson Unit to SMU I for disciplinary reasons.  (*Id*. at 1220:15-17.)

374.   Johnson does not think that the mental health care at SMU I is as good as the mental health care at Kasson Unit.  (*Id*. at 1220:11-14.)

375.   His biggest complaint is that he cannot develop a rapport with staff at SMU I.  (*Id*. at 1226:5-12, 1226:22-25, 1227:9-25.)

376.   As a result, Johnson has refused to attend counseling sessions.  (*Id*. at 1230:5-14.)

377.   But he admitted that "some of [the counselors] … are very nice, you know, and I wish that I could see over and over and over again to, you know, be able to work on some things."  (*Id*. at 1230:22-25.)

378.   Johnson also testified that he still meets with a provider every 90 days, and he can schedule a visit if he is having a problem with his medication.  (*Id*. at 1223:10-15.)

379.   Johnson also testified that he is seen once a month for his one-on-one mental health counseling.  (*Id*. at 1265:19-21, 1267:20-23.)

380.   Johnson also testified that, if a group class is canceled because they are short staffed, staff will come by his cell and talk to him.  (*Id*. at 1231:25-1232:5.)

381.   Johnson has attended programming classes.  (*Id*. at 1263:1-4, 1280:17-19, 1282:3-1283:10.)

382.   Johnson has had a cellmate while in SMU I.  (*Id*. at 1243:8-10.)

383.   Johnson testified that he is "doing pretty good" with his medications right now, which include Zoloft, Wellbutrin, and Lisinopril.  (*Id*. at 1285:6-9.)

384.   Johnson testified that he "wish[es] [the mental health care at SMU I] was better."  (*Id*. at 1232:13-17.)

385. Sometimes, Johnson will refuse the group classes because he does not want to "sit in a classroom chained to a table." (*Id*. at 1232:6-12.)

386. Johnson has refused table time and recreation. (*Id*. at 1255:15-1258:24 (citing Exhibit 5636), 1260:4-10, 1260:21-2161:1 (citing Exhibit 5636), 1264:12-22.)

387. Johnson has refused confidential setting appointments. (*Id*. at 1270:18-1271:5 (citing Exhibit 5277a), 1272:19-1273:4, 1273:22-24 (citing 5277b), 1279:17-1280:1.)

388. Johnson has refused programming. (*Id*. at 1281:10.)

389. Johnson's allegations were not raised in the Complaint. (Dkt. 1.) His individual claim is dismissed on that basis alone.

390. Moreover, ADCRR and Centurion were not, and are not, deliberately indifferent to Johnson's mental health needs. To the contrary, they are actively and successfully treating Johnson's mental illnesses.

391. Johnson's general allegations concerning the conditions of his confinement at SMI I do not evince an Eighth Amendment violation, i.e., that he was exposed to a substantial risk of harm.

392. Johnson's preference for a particular Unit and "better" treatment do not state an Eighth Amendment claim.

393. Plaintiffs have failed to establish by a preponderance of the evidence that Johnson's Eighth Amendment rights were, or are being, violated.

394. Johnson's testimony also demonstrates that ADCRR's mental health care system is functioning adequately and undermines the alleged systemic Class claims pertaining to access to care, medication, staffing, necessary mental health care, and basic mental health care for self-harming inmates.

395. Johnson does not make any allegations nor provide any evidence supporting Plaintiffs' claims relating to emergency treatment, medication, medical devices, staffing, infectious diseases care, chronic disease care, or specialty care.

### 7. Robert Gamez[8]

396. Despite being an original named Plaintiff, a Class representative, and a Subclass Representative, Plaintiffs did not call ADCRR inmate Robert Gamez to testify at trial; Defendants designated portions of his deposition.

397. Gamez is currently incarcerated at ASPC Eyman-SMU I. (Dkt. 4226-1 at 21:11-13.)

398. Gamez is serving a 150-year sentence. (*Id.* at 64:6-10.)

399. He has been classified as maximum custody since 2003. (*Id.* at 22:7-12.)

400. Gamez has been disciplined for "stabbing incidences," manufacturing weapons, and assaulting staff. (*Id.* at 48:20-49:5.)

401. He once had a porter job, but he was removed when he assaulted staff. (*Id.* at 54:23-55:20.)

402. He is in protective custody because of "[m]ultiple hit lists." (*Id.* at 50:22-25.)

403. He is currently maximum custody, step level 1. (*Id.* at 33:17-23.)

404. Gamez believes he should have a different classification. (*Id.* at 57:1-4.)

405. Gamez is prescribed Wellbutrin and two other medications for depression and chronic pain. (*Id.* at 19:17-20:7.)

406. Mental health staff will come by his cell once a week to talk to him, but Gamez does not relate his issues. (*Id.* at 38:15-23.)

407. Gamez attends group classes. (*Id.* at 40:3-5.)

408. Gamez has a tablet, where he can watch movies, listen to music, play games, E-message, read the news, listen to podcasts, and submit inmate requests. (*Id.* at 54:1-18.)

409. He has visitation privileges and can make phone calls. (*Id.* at 52:18-53:14.)

410. Gamez testified that, when he feels depressed or suicidal, he does not tell mental health staff because he does not want to be placed on mental health watch. (*Id.* at 35:25-36:18.)

---

[8] Because multiple deposition transcripts were filed within Dkt. 4226-1, citations are to the ECF pagination.

411. Gamez testified that he does not know what kind of mental health care he would like; he just does not like the care he is receiving. (*Id*. at 62:21-63:9.)

412. Gamez testified that, at ASPC Lewis-Rast Unit, where Gamez was previously incarcerated, the lights would dimmer at night. (*Id*. at 62:1-10.)

413. ADCRR and Centurion were not, and are not, deliberately indifferent to Gamez's mental health needs. To the contrary, they are actively and successfully treating Gamez's mental illnesses.

414. Gamez's preference for different treatment does not state an Eighth Amendment claim.

415. Gamez's general allegations concerning the conditions of his confinement at SMI I do not evince an Eighth Amendment violation, i.e., that he was exposed to a substantial risk of harm.

416. Plaintiffs have failed to establish by a preponderance of the evidence that Gamez's Eighth Amendment rights were, or are being, violated.

417. Gamez's testimony also demonstrates that ADCRR's mental health care system is functioning adequately and undermines the alleged systemic Class claims pertaining to access to care, medication, staffing, necessary mental health care, and basic mental health care for self-harming inmates.

418. Gamez's testimony regarding SMU I also undermines the alleged systemic Subclass claims.

419. Gamez does not make any allegations nor provide any evidence supporting Plaintiffs' claims relating to emergency treatment, medication, medical devices, staffing, infectious diseases care, chronic disease care, or specialty care.

### 8. Jonathan Gonzalez

420. Gonzalez testified that he was incompetent, he did not trust his attorneys, and he refused to answer any questions. (Dkt. 4226-1 at 81:13-83:7.)

421. As a result, the deposition was suspended. (*Id*. at 84:3-16.)

422. Having failed to even attempt to make an allegation, Gonzalez is dismissed

from this lawsuit.

### 9. Shawn Jensen

423. Despite being an original named Plaintiff, a Class representative, and a Subclass Representative, Plaintiffs did not call ADCRR inmate Shawn Jensen to testify at trial; Defendants designated portions of his deposition.

424. Jensen is taking Lisinopril and Amiloride for his blood pressure. (Dkt. 4226-1 at 97:11-16.)

425. While incarcerated, Jensen had a prostatectomy followed by radiation and chemotherapy. (*Id*. at 99:23-100:2.)

426. He recently had his catheter removed. (*Id*. at 98:6-14.)

427. His last PSA check was "good." (*Id*. at 99:1-5.)

428. Most of Jensen's health care requests pertain to his catheter. (*Id*. at 100:7-13.)

429. Jensen testified that, in his opinion, Centurion botched his catheter, but Centurion did not become the health care vendor until after his catheter was put in. (*Id*. at 100-102.)

430. Jensen testified that he had an occlusion sometime in the last year; that he awoke at 10 pm.; and that he was taken to the hospital at midnight. (*Id*. at 105:4-108:7.)

431. His complaint is with how the hospital handled his care, not Centurion. (*Id*.)

432. When asked if he had any issues with Centurion, Jensen testified: "My wife would know, but I don't." (*Id*. at 109:1-12.)

433. Jensen did not recall any issues he has had with the care provided by Centurion. (*Id*. at 114:17-25.)

434. Plaintiffs have failed to establish by a preponderance of the evidence that Jensen's Eighth Amendment rights were, or are being, violated.

435. Jensen's complaints relate to stale allegations or allegations against third parties and, at most, allege negligence.

436. Jensen's testimony also demonstrates that ADCRR's medical care system is

functioning adequately and undermines the alleged systemic Class claims pertaining to access to care, medication, staffing, and specialty care.

437. Jensen does not make any allegations nor provide any evidence supporting Plaintiffs' claims relating to access to care, medication, staffing, infectious diseases care, chronic disease care, specialty care, mental health care, or conditions of confinement.

### 10. Joshua Polson

438. Despite being an original named Plaintiff, a Class representative, and a Subclass Representative, Plaintiffs did not call ADCRR inmate Joshua Polson to testify at trial; Defendants designated portions of his deposition.

439. Polson is currently incarcerated at ASPC Lewis-Buckley Unit. (Dkt. 4226-1 at 135:14-18.)

440. Polson is taking Bupropion for his depression, which helps him, and Keppra. (*Id*. at 128:20-25, 155:14.)

441. Polson does not disagree with the medications he is prescribed. (*Id*. at 166:7-25.)

442. Polson has an inhaler that he keeps on him. (*Id*. at 179:6-8.)

443. Polson testified that he does not have any HNRs outstanding. (*Id*. at 185:14-18.)

444. Polson sees a psychiatric provider every three months and someone who can prescribe medication every four months. (*Id*. at 138:3, 163:21-164:165:1.)

445. Despite testifying that his requests to see medical staff are not answered, Polson could not remember any dates or timeframes that this happened, nor could he remember the names of any staff that were involved. (*Id*. at 146:5-19.)

446. Polson complained that Lewis does not have "[c]oping skills classes" and that "direct therapy, like medication and stuff" is "garbage," but he further testified that, in the past month, "it's been all right." (*Id*. at 153:1-154:19.)

447. Polson thinks he should be getting medication three times a day like "[o]n the streets," not twice a day." (*Id*. at 154:23-155:22.)

105

448.    Polson complained that they do not take his blood pressure frequently enough and they prescribed him blood pressure medication, but he is not sure if he needs it.  (*Id*. at 179:9-180:23.)

449.    ADCRR and Centurion were not, and are not, deliberately indifferent to Polson's medical or mental health needs.  To the contrary, they are actively and successfully treating his health care needs.

450.    Polson's preference for different medication or treatment does not state an Eighth Amendment claim.

451.    Plaintiffs have failed to establish by a preponderance of the evidence that Polson's Eighth Amendment rights were, or are being, violated.

452.    Polson's testimony also demonstrates that ADCRR's health care system is functioning adequately and undermines the alleged systemic Class claims pertaining to access to care and medication.

453.    Polson does not make any allegations nor provide any evidence supporting Plaintiffs' claims relating to emergency treatment, medication, medical devices, staffing, infectious diseases care, chronic disease care, specialty care, mental health care for self-harming inmates, or conditions of confinement.

### 11.    Sonja Rodriguez

454.    Despite being an original named Plaintiff, a Class representative, and a Subclass Representative, Plaintiffs did not call ADCRR inmate Sonja Rodriguez to testify at trial; Defendants designated portions of her deposition.

455.    Rodriguez testified that she has no understanding what her role is in this case.  (Dkt. 4226-1 at 207:6-8.)

456.    Rodriguez is currently incarcerated at ASPC Perryville-San Pedro Unit.  (*Id.* at 208:2-3.)

457.    She is classified as minimum custody.  (*Id*. at 208:6-23.)

458.    Rodriguez is prescribed Abilify and Effexor.  (*Id*. at 201:8-12.)

459.    Rodriguez had suffered negative side effects from Haldol, but she admitted

that she is no longer prescribed that medication. (*Id*. at 234:12-235:14.)

460. On a weekly basis, Rodriguez attends her job, programming, and recreation, and she sees a psychiatrist (for medication) and a psychologist (for counseling) once a month if not more frequently. (*Id*. at 211:2-212:7.)

461. Rodriguez testified: "I've been on all the medications the whole -- going on 13 years that I've been in prison, and I've been on every medication there is for my mental health issues." (*Id*. at 223:9-12.)

462. Rodriguez testified that she would like to take a different medication, a medication that she had taken "on the streets," but she did not remember the name. (*Id*. at 226:25-227:6.)

463. When asked if there was a particular provider who failed to provide her with a medication that she wanted, she answered that she did not know. (*Id*. at 228:10-13.)

464. Rodriguez testified that she frequently refuses medication. (*Id*. at 241:9-21.)

465. Rodriguez has not filed a grievance about her mental health treatment in the last two years. (*Id*. at 245:5-7.)

466. ADCRR and Centurion were not, and are not, deliberately indifferent to Rodriguez's mental health needs. To the contrary, they are actively and successfully treating her mental health.

467. Rodriguez's preference for a different medication does not state an Eighth Amendment claim.

468. Plaintiffs have failed to establish by a preponderance of the evidence that Rodriguez's Eighth Amendment rights were, or are being, violated.

469. Rodriguez's testimony also demonstrates that ADCRR's mental health care system is functioning adequately and undermines the alleged systemic Class claims pertaining to access to care, medication, and necessary mental health care.

470. Rodriguez does not make any allegations nor provide any evidence supporting Plaintiffs' claims relating to access to care, emergency treatment, medication, medical devices, staffing, infectious diseases care, chronic disease care, specialty care,

mental health care for self-harming inmates, or conditions of confinement.

## 12. Jeremy Smith

471. Despite being an original named Plaintiff, a Class representative, and a Subclass Representative, Plaintiffs did not call ADCRR inmate Jeremy Smith to testify at trial; Defendants designated portions of his deposition.

472. Smith is currently incarcerated at ASPC Lewis-Rast Unit. (Dkt. 4226-1 at 271:5-9.)

473. Smith is a member of the Aryan Brotherhood and a maximum custody inmate. (*Id*. at 271:10-12, 299:24-300:1.)

474. Smith is prescribed Gabapentin (twice a day), Keppra (twice a day), Vistaril, and Lipitor. (*Id*. at 262:1-5, 263:17-21, 282:24-25.)

475. He takes Gabapentin for neuropathy in his elbow and wrist and back pain; Keppra is an enhancer; he takes Vistaril for his mental health (anxiety); and he takes Lipitor is for cholesterol. (*Id*. at 282:9-283:6.)

476. Smith was previously on Effexor for his mental health, but that did not work so he was prescribed Vistaril. (*Id*. at 294:25-296:6.)

477. Smith refused to see a mental health provider sometime in the last two weeks. (*Id*. at 285:17-286:2.)

478. Smith has completed mental health programming, including anger management, PTSD, and inside out. (*Id*. at 303:19-304:7.)

479. Smith can submit HNRs through a tablet. (*Id*. at 304:19-21.)

480. Smith attends the chronic care clinic. (*Id*. at 312:21-22.)

481. Smith emails his family and friends through his tablet and calls them once a week. (*Id*. at 316:25-317:14.)

482. ADCRR and Centurion were not, and are not, deliberately indifferent to Smith's mental health needs. To the contrary, they are actively and successfully treating his mental health.

483. Smith's general allegations regarding his treatment do not state an Eighth

Amendment claim.

484. Plaintiffs have failed to establish by a preponderance of the evidence that Smith's Eighth Amendment rights were, or are being, violated.

485. Smith's testimony also demonstrates that ADCRR's mental health care system is functioning adequately and undermines the alleged systemic Class claims pertaining to access to care, medication, and necessary mental health care.

486. Smith does not make any allegations nor provide any evidence supporting Plaintiffs' claims relating to emergency treatment, medication, medical devices, staffing, infectious diseases care, chronic disease care, specialty care, mental health care for self-harming inmates, or conditions of confinement.

### 13.    Christina Verduzco

487. Despite being an original named Plaintiff, a Class representative, and a Subclass Representative, Plaintiffs did not call ADCRR inmate Christina Verduzco to testify at trial; Defendants designated portions of her deposition.

488. Verduzco testified that she was unaware that she was plaintiff and class representative in this litigation.  (Dkt. 4226-1 at 340:8-18.)

489. Verduzco testified that she was unaware that she would be testifying at trial or what her testimony would be.  (*Id*. at 346:2-18.)

490. Verduzco is currently incarcerated at ASPC Perryville-Lumley Unit in a residential treatment unit.  (*Id*. at 340:19-341:9.)

491. Verduzco takes medications every day.  (*Id*. at 333:19-22.)

492. Verduzco attends educational programming Monday through Friday from 9:00 a.m. to 10:30 a.m.  (*Id*. at 342:4-343:23.)

493. About that programming, she testified: "[I]t's just a fun gathering. And all of us girls in the -- in the class get along together pretty well, and we're a good group together. There's really no problems in that group."  (*Id*. at 343:14-17.)

494. Verduzco has recreation every day for approximately two hours.  (*Id*. at 344:2-11.)

495. When asked if she had any issues with her mental health treatment, Verduzco testified: I'm actually doing pretty good right now. I'm not healed, but from -- may I just say I've been locked up 19 years, and these last -- these last six months have been an experience where I have overcome a lot. And ever since they moved me to LMHU, I – I've changed a lot. And I'm not stable but pretty much – I've gained a lot of knowledge, and I'm almost on my feet. I talk to my mom and grandfather every morning. I'm – I'm doing fine." (*Id*. at 348:16-349:4.)

496. Over the past six months, Verduzco has felt "the most stable mentally" and in "the best place mentally." (*Id*. at 349:14-17, 350:14-18.)

497. Plaintiffs have failed to establish by a preponderance of the evidence that Verduzco's Eighth Amendment rights were, or are being, violated. In fact, Verduzco does not make any allegations criticizing the health care she has received or the conditions of her confinement.

498. Verduzco's testimony also demonstrates that ADCRR's mental health care system is functioning adequately and undermines the alleged systemic Class claims pertaining to access to care, medication, and necessary mental health care.

**D.** **Medical Care Class Claims.**

    **1.** **Todd Wilcox**

**Credibility**

499. Todd Wilcox, M.D., is the CEO of a private, for-profit company called Wellcon, Inc. Wellcon does not provide medical services to any other incarcerated settings besides Salt Lake County Jail. The Salt Lake County Jail has a current inmate population of approximately 1500 inmates. During COVID that number dropped down to approximately 1250 inmates. The jail system is comprised of two facilities that are very close together. (R.T. 11/09/21 p.m. at 1619:11-1620:10.)

500. Dr. Wilcox has not worked clinically in a prison setting for at least 22 years, when he worked part-time, two days a week in a facility in the Utah Department of Corrections. (R.T. 11/10/21 a.m. at 1746:10-1746:22.)

110

501.   Dr. Wilcox's experience is stale, irrelevant, and not substantial enough to qualify him to render the opinions he provides.

502.   Dr. Wilcox is not qualified to provide opinions with respect to the provision of medical care in a prison setting.

503.   When Wilcox worked in Maricopa County for 15 months in 2004 and 2005, he was also working full time at the Salt Lake City Jail.  While he was providing clinical care in the Maricopa County Jail and in the Salt Lake City Jail, he was also participating in a study, along with three or four other doctors and Deloitte & Touche, looking at staffing in the Maricopa County Jail.  The analysis took five months to complete after a detailed workload-based staffing study was undertaken to break down at each of the different levels of licensure to determine what their duties were and how long it took to perform these tasks. The team looked at how many patients were being treated, how many chronic care patients were treated, and determined how long it took to provide individualized care.  (R.T. 11/10/21 a.m. at 1751:2-1753:9.)

504.   The average length of stay in the Salt Lake County Jail is 29 days.  There are two facilities that make up the Salt Lake County Jail: Metro Jail and Oxbow Jail.  There are distinct differences between providing care in a jail system as opposed to a prison system, including seeing far more patients who are entering the system with acute substance abuse issues.  In fact, one of the biggest challenges that the Salt Lake County Jail has is treating people who are coming in off the street on illicit drugs, leading to concerns about drug withdrawal.  This has led to the development of a screening tool for opiate withdrawal that must be utilized by health care providers, called the Wellcon Opiate Withdrawal scale, or WOWS.  Most of the individuals who provide health care at the Salt Lake County Jail are County employees.  Wellcon submits an RFP to Salt Lake County Jail to hire the providers that come in and work primarily at the Metro Jail.  Dr. Wilcox oversees Wellcon's obligation under the contract and is designated as the Medical Director under the agreement. As part of the agreement, Wellcon provides 24-hour on-call coverage with on-call providers who are accessible electronically.  There is typically no physician on-site in the Salt Lake

County Jail during the graveyard shift, between 10 p.m. and 6 a. m. If something happens at 2 in the morning at Metro jail, no doctor is there. The jail is staffed with an RN. Salt Lake County requires Wellcon to train the nurses on topics related to their clinical work, such as nursing triage, patient assessments, and certain disease processes. (R.T. 11/10/21 a.m. at 1754:10-1759:20.)

505.    One of the other things Dr. Wilcox does under the services agreement with Salt Lake County is to provide continuing education for the nurses, consistent with the Utah Division of Professional Licensing and consistent with the National Commission on Correctional Health Care (NCCHC). (R.T. 11/10/21 a.m. at 1759:22-1760:3.)

506.    As part of its agreement with the county, Wellcon is required to comply with the standards of NCCHC in the delivery of the consultant services under the agreement and to assist the Sheriff in maintaining NCCHC accreditation. This is important to Salt Lake County and Dr. Wilcox. (R.T. 11/10/21 a.m. at 1760:5-1760:17.)

507.    Dr. Wilcox resigned from Maricopa County on February 20, 2008. In a letter to the Maricopa County Board of Supervisors and Sheriff Joe Arpaio, he wrote that one of the main reasons he resigned was because Maricopa County Correctional Health Services (CHS) had decided to let its NCCHC accreditation lapse. At the time of his resignation, he served two roles, as a specialty physician for orthopedics and as an in-house expert witness defending CHS with regard to health care practices and the standard of care within the correctional setting. Dr. Wilcox believed that giving up Maricopa County's NCCHC accreditation would be devastating and would open Maricopa County and CHS to a new era of litigation assault, making it almost impossible to defend civil allegations that health care in the Maricopa County jail system fell below the applicable standard of care. Dr. Wilcox also believes that if the Salt Lake County Jail is not accredited by the NCCHC, it would open up Salt Lake County and the Sheriff to civil lawsuits that would be almost impossible to defend. (R.T. 11/10/21 a.m. at 1760:18-1772:3.)

508.    Dr. Wilcox cannot state how many examples of delays in obtaining specialty care need to be shown for anyone to determine that the issue is systemic. He also could not

state how many examples of delays in obtaining specialty care he saw, or whether these delays occurred in all ten ADCRR facilities. Any delay he saw was included in his report. (R.T. 11/10/21 p.m. at 1810:18-1811:10.)

509. When tabulating his ratio of staff physicians to midlevel providers, Dr. Wilcox reviewed a staffing report, but did not look at the FTE allotment per facility, locum tenens use, or count the medical directors, because he believed that the medical directors do not provide patient care. (R.T. 11/10/21 p.m. at 1856:13-1857:20.)

510. Dr. Wilcox agreed that delays in receiving specialty care noted in his report were possibly affected by the pandemic. (R.T. 11/10/21 p.m. at 1858:1-11.)

511. Dr. Wilcox admits that inmates are known to be crafty regarding drug-seeking behavior. Inmates will regurgitate the medicine, or cheek the medicine to be able to trade the medicine as a commodity. This is something that occurs in all jails and prisons, including Salt Lake County Jail. (R.T. 11/10/21 p.m. at 1865:23-1866:14.)

512. Providers in ADCRR can ask for meds that are not included in the formulary and obtain them through Diamond Pharmacy. This is the same process that Dr. Wilcox utilizes at Salt Lake County Jail. Dr. Wilcox also takes into account whether a patient has history of substance abuse when prescribing medication. (R.T. 11/10/21 p.m. at 1867:17-1868:9.)

513. From the third week in July 2021 to November 14, 2021, Dr. Wilcox charged $115,000 for his work on this case. (R.T. 11/15/21 a.m. at 1894:11-1894:16.)

514. Wellcon is required by Salt Lake County to undergo performance reviews. These performance reviews are based on performance standards set forth in the contract and allow Salt Lake County to review inmate medical charts to determine compliance with these standards. The minimum sampling size that Salt Lake County requires is 5 percent of the average daily population of the jails. With a current average daily population around 1500, the county would pull 75 random files to ensure contract compliance. Reviewing 5% of the medical files in ADCRR's 10 state-operated facilities would be 1,350 files. (R.T. 11/15/21 a.m. at 1901:11-1904:12.)

515. Dr. Wilcox is also supposed to provide in-person quarterly training for medical staff, and is to supervise, oversee, and audit clinical components of medical care, including utilization review and continuous quality improvement, including medical, dental, nursing, behavioral health services, pharmaceuticals, outside hospital admissions, acute mental health, acute medical diagnostic services, laboratory and medication assisted treatment. (R.T. 11/15/21 a.m. at 1901:11-1904:12.)

516. The medical care at the Salt Lake County Jail has received negative press, alleging cruelty and indifference. Salt Lake County Jail has been sued for deliberate indifference to health care and has settled several cases. The former mayor of Salt Lake City, Ross Anderson, in a letter to Salt Lake County officials, described the health care provided by Wellcon at the jail as akin to a Medieval dungeon where detainees are treated with verbal and physical abuse and are denied lifesaving medical and mental health services. The culture of disdain, cruelty, and indifference is perpetuated by people from the top of administration down to the nurses. In a case involving the death of Lisa Ostler, her failure to receive care was a result of systemic failures in a long-time culture and custom of disdain, contempt, and abuse towards inmates and indifference to their serious medical and mental health problems. Lisa Ostler died of peritonitis. According to expert H Tai Kim, MD, Lisa Ostler would have survived had she been provided the Prilosec that was ordered by the Salt Lake County Jail, but never given to her in the four days she was in the jail. On the night before she died, Lisa Ostler pressed her emergency button for help 17 times, and no one responded. Despite having vital signs indicating that she was in medical distress, which should have warranted a call to a provider, no care was provided. Dr. Wilcox, in his mortality review, did not find any mistakes in the care she received. (R.T. 11/15/21 a.m. at 1910:1-1926:4.)

**Methodology**

517. Dr. Wilcox based his opinions in this case on a records review designed to ensure the outcome that plaintiffs are advocating. Specifically, Dr. Wilcox based his opinions on hand-picked mortality reviews, medical records chosen by plaintiffs' counsel,

who have had access to eOMIS for several years, inmates who had "advocacy letters" written for them by plaintiffs' counsel, and inmates who were patients in infirmaries that Dr. Wilcox toured, as well as inmates who are named plaintiffs in this case. Dr. Wilcox did not conduct a randomized review of medical records of the plaintiff class. (R.T. 11/10/21 a.m. at 1672:17-1673:21.)

518. Dr. Wilcox went to the infirmaries to find the sickest patients but was unable to testify as to how many infirmary patients he saw that were housed there. He was also unable to state how many of these patients ended up in his report. (R.T. 11/10/21 a.m. at 1677:23-1678:22.)

519. As part of Dr. Wilcox's methodology, he asked plaintiffs' counsel to provide him with names of individuals of whose records they wanted him to review records. To assess a population of approximately 27,000 ADCRR inmates, he chose to analyze the medical records for only approximately 58 inmates, or only approximately 0.002% of the total ADCRR population. (R.T. 11/10/21 p.m. at 1800:9-1808:10.)

520. Although he could have done so, Dr. Wilcox did not review a random sample of medical records of ADCRR inmates who were more frequent patients due to chronic care issues. This contrasts with the methodology employed by Dr. Murray, who selected a stratified random sample of inmates with multiple chronic care conditions. This is also in contrast to what Dr. Wilcox himself reviews in evaluating the medical care system in Salt Lake County, where he selects a random sample of 5% of the inmate population. (R.T. 11/10/21 p.m. at 1800:9-1808:10; R.T. 11/15/21 a.m. at 1901:11-1904:12; Dkt. 4203 ¶¶ 12, 201.)

521. Dr. Wilcox is an advocate and not a neutral expert. As such, his opinions are biased and therefore unreliable.

522. Dr. Wilcox never saw the staffing model used by Robert Joy to determine its validity, and he never checked Joy's math to ensure accuracy. (R.T. 11/10/21 p.m. at 1789:12-1790:10.)

523. As a result, Dr. Wilcox's vouching for the validity of Joy's methodology and

analysis should be disregarded.

524. When Dr. Wilcox was on a team that performed a staffing analysis for Maricopa County, it took six months to complete. The team reviewed how many health care encounters were actually occurring, as well as how many provider encounters were occurring in the Maricopa County Jail system. They also looked at how many nursing encounters were occurring and how many health needs requests were sent by the inmates to help determine staffing. Mr. Joy did none of that. Joy simply took information as to what he thought Centurion had with respect to staffing and determined how many staff he thought they needed. (R.T. 11/10/21 p.m. at 1793:1-1794:23.)

525. Dr. Wilcox believes that the art form in providing health care in a prison or jail setting is to understand what the minimum standard of care is, and to deliver that care in an effective and cost-effective way, because health care administrators shouldn't squander the limited resources provided by the taxpayers, and a health care administrator should not be lavish and spend more money than is necessary. (R.T. 11/10/21 a.m. at 1780:19-1781:10.)

526. Dr. Wilcox looked at a very narrow subset of the ADCRR population, including inmates who passed away and inmates who voiced complaints about their care. As a result, he cannot generalize his findings to the broader ADCRR population. (R.T. 12/08/21 a.m. at 3491:10-3492:21, 3553:15-3554:11.)

527. Dr. Murray reviewed the expert report submitted by Dr. Wilcox on October 9, 2021, along with the supplement he issued on October 18, 2021, and found it troubling that he attempts to make sweeping conclusions about the systemic delivery of healthcare in ADCRR based on anecdotal instances of care that he finds deficient. (Dkt. 4203, ¶ 1042.)

528. Dr. Murray consulted with epidemiology expert Dr. Baillargeon about Dr. Wilcox's methodology as set forth in his October 9, 2021 report and his decision not to review a random sample of patients "because when evaluating a healthcare delivery system, it is generally not as helpful to examine care for healthy people as it is to look at the treatment of sick people, particularly those with complex or chronic conditions that require

coordination, communication, and judgment." (Dkt. 4203, ¶ 1042, Dkt. 4206-3.)

529. In Dr. Baillargeon's opinion: To conduct a rigorous and representative analysis of the ADCRR health care system, it is critically important to select a random and representative sample of all inmates who received health care over the period of interest. At a minimum, Dr. Baillargeon would recommend examining a representative sample of a subset of inmates with known health conditions, such as chronic conditions. Focusing exclusively on inmates who died or who voiced complaints about their care while in custody would likely result in a biased assessment and would substantially limit one's ability to make any generalizable inferences about the healthcare received by the entire ADCRR population. (Dkt. 4203, ¶ 1043, Dkt. 4206-3 at 4.)

530. Reviewing a randomly drawn sample of chronic care patients would have permitted Dr. Wilcox to examine the delivery of healthcare for these conditions and make inferences about the entire population, which is what Dr. Murray did in his review for his own expert report. Instead, Dr. Wilcox chose to focus on a non-randomly drawn subset of inmates who either died in custody or submitted complaints about their medical care to Plaintiffs' counsel. It is not surprising, then, that he was able to identify instances of allegedly deficient care. (Dkt. 4203, ¶ 1044.)

531. Dr. Wilcox only includes a substantive discussion of the medical care of 58 inmates in the body of his expert report. Of these inmates, they were only housed at ASPC Eyman (5), ASPC Florence (6), ASPC Tucson (15), ASPC Lewis (18), ASPC Perryville (8), and ASPC Yuma (1). Dr. Wilcox did not find fault with the medical care provided for any inmates at ASPC Douglas, Safford, Winslow, or Phoenix. (Dkt. 4140.)

532. This is not adequate to prove a systemwide claim.

533. Dr. Wilcox has only identified isolated instances of alleged harm which are not sufficient to show widespread actual injury or a systemwide claim.

### 2. Owen Murray

**Credentials:**

534. Dr. Owen J. Murray is a physician board certified in the field of Family

Practice. (Dkt. 4203, ¶ 2.)

535. Dr. Murray has considerable expertise in correctional healthcare, with more than 30 years of experience in correctional medicine. For the past 26 years, Dr. Murray has worked for the University of Texas Medical Branch (UTMB) Offender Health Services Program. (Dkt. 4203, ¶ 3.)

536. Dr. Murray currently serves as the Vice President of Offender Health Services, in which capacity he is responsible for ensuring the provision of all medical, mental health, and dental services for approximately 98,000 adult offenders in the Texas Department of Criminal Justice state jails and prisons (i.e., approximately 80% of the state's correctional facility population), as well the delivery of such services to juvenile offenders in the Texas Juvenile Justice Department facilities. (Dkt. 4203, ¶ 4.)

537. The Texas Department of Criminal Justice is the largest state correctional system in the United States. (R.T. 12/07/21 p.m. at 3424:21-3425:1.)

538. Dr. Murray oversees a staff of approximately 3,500 healthcare and clinical support employees located at more than 100 correctional facilities throughout the state of Texas, as well as the 120-bed prison hospital on the Galveston campus. (Dkt. 4203, ¶ 5; R.T. 12/07/21 p.m. at 3423:4-3423:10.)

539. Before joining UTMB in 1995, Dr. Murray served as a Divisional Medical Director of Chicago's Cook County Jail and several correctional facilities operated by the Illinois Department of Corrections. (Dkt. 4203, ¶ 6.)

540. In addition, Dr. Murray has served as a healthcare consultant for a number of correctional systems, including the Illinois, North Carolina, California, and Arizona Departments of Corrections. (Dkt. 4203, ¶ 7; R.T. 12/07/21 p.m. at 342910:17-3431:14.)

**Methodology:**

541. Dr. Murray was asked to evaluate whether the overall health care system for inmates in the custody of the Arizona Department of Corrections Rehabilitation & Reentry ("ADCRR") contains systemic deficiencies which render the delivery of health care services below the standard of care. (Dkt. 4203, ¶ 10.)

542.    To do so, Dr. Murray conducted site visits, reviewed documents, reviewed a series of objective outcome metrics, and worked with a team of correctional experts to perform chart reviews for a random sample of ADCRR inmates with two or more chronic care conditions.  (Dkt. 4203, ¶¶ 11–12, 14–15, 201, 204.)

543.    Between September 20, 2021 and October 19, 2021, Dr. Murray reviewed the medical facilities and programs at all 10 of the state-run ADCRR facilities through in-person tours and interviews with medical staff and program managers.  (Dkt. 4203, ¶ 15.)

544.    The objective of the review was to determine if these facilities are providing an acceptable level of healthcare.  (Dkt. 4203, ¶ 16.)

545.    Dr. Murray's facility review focused on evaluating six components of medical care that have been identified by correctional healthcare experts as essential for an adequate healthcare delivery system.  These components are staffing, access to care, diagnostic services, records and facilities, pharmacy services, and quality monitoring.  Dr. Murray evaluated each of these six components at each of the 10 ADCRR complexes.  (Dkt. 4203, ¶ 17; R.T. 12/08/21 a.m. at 3451:12-3452:9.)

546.    With respect to staffing, healthcare delivery is dependent upon having adequate and qualified medical professionals.  Dr. Murray's evaluation of this component included a review of the institutions' medical organizational structure, current staffing plans, healthcare staffing levels, recruitment and retention, staff development opportunities, and credentialing requirements.  Dr. Murray also spoke with available members of the facility leadership teams, typically to include the Site Medical Director (SMD), Facility Health Administrator (FHA), and the Director of Nursing (DON).  (Dkt. 4203, ¶ 19.)

547.    As to access to care, the cornerstone of any correctional medical delivery system is its ability to provide all levels of medical care in a timely manner.  To evaluate this component, Dr. Murray reviewed the sick call process, chronic disease management, dietary services, emergency care, hospital care, specialty services, and patient education being provided.  (Dkt. 4203, ¶ 20.)

548.    As to diagnostic services, the two major areas of this component are medical

imaging and laboratory services.  (Dkt. 4203, ¶ 21.)

549.    With respect to records and facilities, two specific components were evaluated.  The first was an assessment of the adequacy of the physical space for providing medical care (e.g., clinics, emergency room, special medical programs, etc.) as well as availability of medical supplies and equipment.  The second component was an assessment of the eOMIS medical record currently in use throughout the ADCRR system.  (Dkt. 4203, ¶ 22.)

550.    As to pharmacy services, Dr. Murray's inspection included an evaluation of the pharmacy program, to include prescription ordering, turnaround times, local procurement, and the medication administration process.  (Dkt. 4203, ¶ 23.)

551.    Quality assurance monitoring is an essential process in any healthcare system. Dr. Murray's assessment of quality monitoring at ADCRR facilities focused on the use of objective metrics, current performance measures, mortality review, and process improvement.  (Dkt. 4203, ¶ 24.)

552.    During his visits, Dr. Murray toured sick call areas, inpatient care areas, and observed the inner workings of the healthcare facilities.  (R.T. 12/08/21 a.m. at 3453:17-3453:19.)

553.    At each facility, Dr. Murray met privately with the provider team to get a better understanding of their issues, the strengths and weaknesses of their program, and any suggestions they might have in terms of improving the system.  Dr. Murray also met separately and privately with the administrative staff, including the facility health administrator and the director of nursing.  Staff interviews were conducted without the presence of senior Centurion leadership to promote free discussion.  (Dkt. 4203, ¶ 11; R.T. 12/08/21 a.m. at 3453:20-3454:11.)

554.    Dr. Murray also sought data from ADCRR and Centurion regarding the systemic delivery of healthcare, including certain objective outcome measures that he found useful for comparing across populations.  (Dkt. 4203, ¶ 14.)

555.    Dr. Murray assessed available Healthcare Effectiveness Data and Information

Set (HEDIS) metrics, which were developed by the National Committee for Quality Assurance (NCQA) to evaluate and report on the quality of managed care and other healthcare organizations in the United States. The HEDIS metrics are a tool used by more than 90 percent of U.S. health plans to measure performance on critical aspects of care and service delivery. Over 190 million people are enrolled in health plans that report quality results using HEDIS. Due to its broad utilization with so many health plans and because the measures are so specifically defined, HEDIS can be used to make comparisons among healthcare organizations. (Dkt. 4203, ¶¶ 1011, 1012.)

556. Dr. Murray asked Centurion to provide data from eOMIS utilizing the HEDIS parameters to enable him to objectively evaluate the quality of healthcare across the ADCRR system and make comparisons between ADCRR and other free world healthcare systems. (Dkt. 4203, ¶ 998.)

557. Specifically, Dr. Murray selected the HEDIS metrics regarding blood pressure control and diabetic care for review because they represent two of the largest and most visible patient populations in both free world and corrections settings. (R.T. 12/08/21 a.m. at 3470:7-3470:10, 3562:21-3563:4.)

558. The population total used by Centurion for the HEDIS metrics was 27,181 ADCRR inmates. The HTN sample totaled 4,806 inmates, and the diabetes sample totaled 787 inmates. (Dkt. 4203, ¶ 1026.)

559. In addition to the HEDIS metrics, Dr. Murray also reviewed other metrics, including a comparison of national mortality rates, COVID-19 vaccination rates, and Hepatitis C treatment rates. (Dkt. 4203, ¶¶ 1032, 1041.)

560. To validate the HEDIS results, Dr. Murray requested a random selection of inmates being treated for chronic medical conditions to allow for review of chronic care, episodic care, and documentation and to evaluate whether the content and care in the eOMIS medical records was consistent with the HEDIS metrics. (Dkt. 4203, ¶¶ 12, 1018; R.T. 12/08/21 a.m. at 3479:14-3479:19, 3480:1-3480:3, 3483:3-3483:5.)

561. A random review of (10) medical records of patients with at least two chronic

care diagnoses was performed at all ADCRR facilities except ASPC Phoenix and ASPC Florence.[9] To conduct the random sample, Dr. Murray and his team received a list of patients that are enrolled in Chronic Care Clinics (CCC) in ADCRR. The number of chronic care diagnoses and the patients' units of assignment was also provided on the list. The patient list was initially sorted by unit of assignment. Next, each facility list was sorted by the number of chronic care diagnoses for each patient. Patients were pooled by the number of chronic care diagnoses (8, 7, 6, etc.) and then two records were randomly selected from each pool using a random number generator until a count of 10 was reached. This methodology allowed for a patient with varying degrees of chronic issues to be reviewed, but also ensured that patients with more complex medical needs were included in the sample. (Dkt. 4203, ¶ 201; R.T. 12/08/21 a.m. at 3481:6-3481:16, 3483:8-3483:13.)

562. Dr. Murray consulted with Dr. Jacques Baillargeon, the Director of Epidemiology and Outcomes Research in the Division of Correctional Managed Care and a Senior Epidemiologist in the Office of Biostatistics at the University of Texas Medical Branch, regarding the adequacy of his sampling method. Dr. Baillargeon concluded that "[a]lthough the overall sample size was small (n=80), the sampling approach is likely to have yielded a reasonable representative sample." Consultation with an epidemiologist regarding sampling methodology is something reasonably relied upon by experts in Dr. Murray's field. (Dkt. 4203, ¶ 202; Dkt. 4206-3 at 5.)

563. Because Dr. Murray used an appropriate sampling methodology, the findings from his team's chart reviews can be generalized to the ADCRR population as a whole.

564. In reviewing the 80 randomly selected charts, Dr. Murray's team focused on the quality of chronic care provided, documentation of chronic care, and quality of episodic care provided, if any. (R.T. 12/08/21 a.m. at 3483:16-3483:21.)

565. Additionally, as Dr. Murray conducted his own review of the 80 charts, he

_____

[9] Dr. Murray did not review chronic care records at ASPC Florence in light of the closure of the facility and determined the sample size of inmates receiving chronic care treatment at ASPC Phoenix, which is almost exclusively an intake facility with only a very small permanent population, would be too small.

122

reviewed the blood pressure and A1C results for each applicable patient for consistency with the HEDIS results and found them to be consistent with the systemwide ADCRR scores. (Dkt. 4203, ¶ 1018.)

566. The review of the patient care was based on information available in eOMIS and was focused most specifically on the provider care. The medical records reviewed contained hundreds of unique healthcare transactions and demonstrated most of the essential health delivery processes. (Dkt. 4203, ¶ 203.)

567. Dr. Murray's team used a Likert scale of 1 to 5, with 1 being poor and 5 being excellent, to evaluate and score the chronic care, documentation, and episodic care found in the random chart reviews. (R.T. 12/08/21 a.m. at 3484:5-3484:9.)

568. Dr. Murray and his team were frank in their assessment of the care and documentation they found in the records, pointing out both examples of excellent care and areas for improvement.

569. Dr. Murray is an unbiased, neutral expert and his opinions are therefore more reliable than Dr. Wilcox, whose methodology suffers from significant selection bias.

### 3. ADCRR's Provision of Medical Care Is Constitutionally Adequate.

570. Applicable Department Orders 1101, 1102, and 1104 and the Medical Services Technical Manual ("MSTM") are the policies that governs the provision of medical care to ADCRR inmates. (Ex. 1324, 3039, 1325, and 1305.)

571. The MSTM, organized in nine chapters, provides technical and professional guidance for the delivery of quality health care within ADCRR facilities, including such topics as: Quality Improvement of Health Services, Peer Review of Professional Activity, Incident Command System, Urgent Notification List, Emergency Medical Supplies, Confidentiality, Medical Grievance system, Resourced Administration, Pharmacy Inventory Control, Medical Sharp and Tool Control. Budget and Inventory Control. Infection Control. COVID-19, Environmental Health, Kitchen Sanitation, Ectoparasite Control and Treatment Procedures, Responsible Authorities & Staff Administration,

Staffing Patterns, Credentialling Responsibilities, Orientation and Education for Health Services Staff, Medication Administration Training, Clinic Space Equipment & Supplies, Student and Extern Clinical Rotation Programs, Inmate Workers, Training for Correctional Officers, Pharmacy Administration, Pharmaceutical Dispensing Procedures, Pharmacy Medication Issued to Clinic Stock, After Hours Pharmacy Support and Clinic Stock Medication Storage Area, Pharmacy Security, Post-Exposure Prophylaxis for Employees, Non-Formulary Drug Requests, Compounding and Prepackaging, Drug Utilization Review/Evaluation, Drug Recalls, Special Pharmacy Issues, Psychotropic Medications, Methadone Use, Laboratory Procedures, Radiologic Imaging Procedures, Inmate Access to Health Care, Transportation of Inmate-Patients, Special Handling Intake/Medication Issues Intake/Gender Dysphoria Issues, Paper Health Records – Transfer Process of Released Offenders, Transfer Inmates to ICE, Continuous Progress Notes (SOAPE), Treatment Plans, Nursing Assessment and Protocols, Intake & Return to Custody, Intake at Non-Reception Facility, Non-Emergency Health Issues, Routing Appointments Health Needs Request (HNR), Inmate Access to Appointment Locations, Routine Appointments – Recording, Continuity of Care Upon Transfer, Chronic Condition Care (Monitored Conditions), Security of Accountability of Paper Health Records, Organization of the health Record, Medication Delivery (Keep On Person), Transfer Medications, Outside Intake and Transfer Medications Orders, Adverse Drug Reactions, Medications Administration, Narcotics Accountability, Medication Error Reporting, Clinical Follow Up Requirements, Missed Appointments, Appointment of Treatment Refusals, Health Services Fees, Oral Health Care Services, Health Education and Promotion, Tobacco Use, Exercise, Personal Hygiene, Self-Catheterization and Colostomy Care, Facility Capabilities Supporting Special Needs and Services, Alcohol & Substance Abuse, Sun Exposure Program, Therapeutic Diets, The Pregnant Inmate, Tuberculosis Screening & Management, Suicide or Mental Health Watch, Hunger Strike Clinical Support, ADA Eligible Inmate Management, Clinical Staffing of Special Problems, Special Needs Considerations and Orders (SNO), Outside (Specialty) Care and Clinics, Outside Hospitalization, Infirmary

(IPC), Emergency Medical Transportation Services, Segregation (lockdown status), Management of Terminal Illness, Inmate Mortality, Paper Health Records Transfer Process – Deceased Inmates, Hospice services Support Organization, Medical ACIS Entries, Medical Classification Scores, Sexual Assault, Orthotic and Prosthetic Aids, Establishment of Health Record, Content to Treat/Informed Consent, Release of Medical Information, HIPPA Ruling, Request for Medical Records from Outside Healthcare Practitioner/Provider, Retention of Paper Health Records, Inmate access to Health Record Information, Release of Information, Discharge Planning, Medical Research, Access to Custody Information, Restraints and Medical Seclusion, Forensic Examinations and Information, and Executions.  (Ex. 1305 at 2-301.)

572.    The MSTM also includes nine appendices which include information on Statistics and Reporting Requirements, Dental Services, Chronic Illnesses (including Hepatitis C), Communicable Diseases, Emergency Response Orders, Nursing Encounter Tool Use, Nursing Assessment Protocols, Treatment Guidelines for a plethora of medical conditions, Forms and Stamps, Mental Health Services, Authorized Abbreviations, and a Glossary.  (Ex. 1305 at 302-493.)

573.    ADCRR's medical policies, including the MSTM and DOs 1101, 1102, and 1104, were submitted to NCCHC for review during the accreditation process and found to meet applicable NCCHC standards, as evidenced by ADCRR's accreditation at all 10 state-run facilities statewide.

574.    As ADCRR Medical Director, Dr. Phillips' primary responsibility is to ensure high quality comprehensive medical care to the inmate population across the prison complexes in the State of Arizona.  (R.T. 11/18/21 p.m. at 2882:14-2882:18.)

575.    Dr. Phillips did his residency in family medicine at Phoenix Baptist Hospital and served active duty in the United States Air Force stationed at Luke Air Force Base.  (R.T. 11/18/21 p.m. at 2880:4-2880:6.)

576.    In late 2010, Dr. Phillips began working at Maricopa County Correctional Health Services and spent 10 years at that location.  He was Medical Director from February

2018 to November 2020. (R.T. 11/18/21 p.m. at 2880:12-2880:18.)

577. Dr. Phillips is board certified by the American Board of Family Medicine. (R.T. 11/18/21 p.m. at 2879:17-2879:24.)

578. Dr. Phillips has published and given presentations that concentrate on medication assisted treatment and substance abuse and use disorders. (R.T. 11/18/21 p.m. at 2880:22-2880:24.)

579. While at Maricopa County Correctional Health Services Dr. Phillips implemented an opioid treatment program at Maricopa County in 2015 which led to various presentations including one at the NCCHC conference. (R.T. 11/18/21 p.m. at 2881:2-2881:10.)

580. Dr. Phillips became ADCRR's Medical Director in November 2020. (R.T. 11/18/21 p.m. at 2915:10-2915:11.)

581. As ADCRR's Medical Director, Dr. Phillips works with Centurion's Regional Medical Director, the Regional Manager of Continuous Quality Improvement, and Site Medical Directors to accomplish his job duties. (R.T. 11/18/21 p.m. at 2882:19-2882:25.)

582. Dr. Phillips regularly tours various facilities and witnesses hands-on medical care given by the frontline staff. (R.T. 11/18/21 p.m. at 2883:1-2883:17.)

**ADCRR Medical Facilities and Medical Classification System**

583. There are ten separate facilities in the ADCRR system and each of those facilities has a medical unit staffed with medical personnel from Centurion. (R.T. 11/18/21 p.m. at 2883:18-2883:25.)

584. There are corridor facilities which are located near larger population centers where high level off-site medical care is available. (R.T. 11/18/21 p.m. at 2884:2-2884:4.)

585. The seven corridor facilities are Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma. (R.T. 11/18/21 p.m. at 2884:8-2884:14.)

586. There are both inpatient units (IPC) and special needs units (SNU) in some of the ADCRR facilities. (R.T. 11/18/21 p.m. at 2884:18-2884:25.)

587. An IPC unit provides medical care to any patient who needs a higher level of care that justifies 24/7 nursing care. Each of the IPC units in the ADCRR system is staffed 24/7 with a registered nurse. (R.T. 11/18/21 p.m. at 2885:4-2885:11.)

588. A SNU unit is for patients that do not need as high a level of care but might need assistance with activities of daily living, or for someone who cannot live in the general population for whatever reason, whether it be mobility issues or memory issues. There may be some debility, or some frailty associated with these patients. (R.T. 11/18/21 p.m. at 2885:17-2885:23.)

589. SNU units are staffed with 24/7 nursing, but it may be on an LPN level. (R.T. 11/18/21 p.m. at 2885:12-2885:16.)

590. There is no IPC or SNU at the Douglas facility. (R.T. 11/18/21 p.m. at 2884:18-2884:23.)

591. There is no IPC or SNU at the Eyman facility. (R.T. 11/18/21 p.m. at 2885:24-2885:25--2886:1-2886:4.)

592. There is both an IPC and an SNU at the Florence facility. (R.T. 11/18/21 p.m. at 2886:4-2886:8.)

593. The Lewis facility has an IPC but no SNU unit. (R.T. 11/18/21 p.m. at 2886:24-2886:25-2887:1-2887:2.)

594. ASPC Perryville has both an IPC and an SNU unit. (R.T. 11/18/21 p.m. at 2887:3-2887:6.)

595. ASPC Phoenix does not have an IPC or SNU unit. (R.T. 11/18/21 p.m. at 2887:7-2887:10.)

596. ASPC Safford does not have an IPC or SNU unit. (R.T. 11/18/21 p.m. at 2887:11-2887:14.)

597. ASPC Tucson has both an IPC and an SNU unit. (R.T. 11/18/21 p.m. at 2887:15-2887:18.)

598. ASPC Winslow does not have an IPC or an SNU unit. (R.T. 11/18/21 p.m. at 2887:19-2887:22.)

599. ASPC Yuma does not have an IPC or an SNU unit. (R.T. 11/18/21 p.m. at 2887:23-2887:25-2888:1.)

600. The IPC and SNU units house the highest acuity patients in the system. These are the patients who need the highest level of care. They need 24/7 nursing care, they may be immune compromised, they may have serious mobility issues, and they may be at risk for developing decubitus ulcers. They may need IV treatments like antibiotics, or they may be receiving cancer treatments. Many of them will need frequent transports to off-site specialty visits. (R.T. 11/18/21 p.m. at 2888:2-2888:14.)

601. Within the IPC units there is a call button on every bed, and providers are tasked with rounding on the patients face to face once every 72 hours. (R.T. 11/18/21 p.m. at 2888:15-2888:25.)

602. The total population systemwide of the IPC units is approximately 160 patients. (R.T. 11/18/21 p.m. at 2889:1-2889:3.)

603. The total population systemwide of the SNU units is approximately 60 patients. (R.T. 11/18/21 p.m. at 2889:4-2889:5.)

604. There is a medical classification system that exists within ADCRR. The system is in place to communicate the housing needs for individual patients. There are designations 1 through 5 with 1 being the lowest needs patient and 5 being the highest needs patient. (R.T. 11/18/21 p.m. at 2889:7-2889:17.)

605. The medical classification system focuses in on the patient's level of function, whether they need assistance with daily living, their mobility level, the number of chronic care conditions they may have, their medical needs, if there is an urgent or emergent situation, their likelihood of having one or more of those situations and therefore assigning them to a housing location that has a higher level of care. (R.T. 11/18/21 p.m. at 2891:12-2891:20.)

606. A level 1 individual is healthy. They may have a well-controlled chronic condition but really have no level of debility. (R.T. 11/18/21 p.m. at 2891:21-2891:23.)

607. A level 2 patient is someone with a couple of chronic care conditions that are

128

managed well. They may be on medications. They have limited needs in the way of assistance from staff members, and if they have a mobility issue, it is something they can handle on their own. (R.T. 11/18/21 p.m. at 2891:24-2891:25-2892:12892:4.)

608. A level 3 patient would be a patient with additional chronic care conditions possibly needing to go see specialists on a routine basis. There may be mobility issues, but they can still handle it on their own. (R.T. 11/18/21 p.m. at 2892:10-2892:15.)

609. A level 4 patient would be a patient with multiple chronic conditions, more serious mobility issues, someone who is insulin dependent, and who is not well controlled, a patient that needs to see staff regularly, and needs to be sent offsite. Category 4 requires the patient to be housed in a corridor facility with closer access to a higher level of care. (R.T. 11/18/21 p.m. at 2892:20-2892:25-2893:1-2893:4.)

610. A level 5 patient is one that is really debilitated, and they need to be housed in an Infirmary. They need nursing care 24/7, they may have chronic illnesses, they may have a terminal condition, or they may be receiving care for a condition like cancer. (R.T. 11/18/21 p.m. at 2893:5-2893:10.)

611. There are approximately 10,000 patients classified as M1 within the ADCRR system. (R.T. 11/18/21 p.m. at 2889:22-2889:24.)

612. There are approximately 12,000 patients classified as M2 within the ADCRR system. (R.T. 11/18/21 p.m. at 2889:25-2890:1.)

613. There are approximately 2000 patients classified as M3 within the ADCRR system. (R.T. 11/18/21 p.m. at 2890:2-2890:3.)

614. There are approximately between 400 and 500 patients classified as M4 within the ADCRR system. (R.T. 11/18/21 p.m. at 2890:4-2890:5.)

615. There are approximately 20 patients classified as M5 within the ADCRR system. (R.T. 11/18/21 p.m. at 2890:6-2890:7.)

616. The overall inmate population is approximately 26,000. (R.T. 11/18/21 p.m. at 2890:8-2890:9.)

617. Ninety percent of the inmate population is classified in the M1 through M3

1 classifications.  (R.T. 11/18/21 p.m. at 2890:10-2890:12.)

2     618.    Each of the ADCRR facilities is tied into the medical classification system.

3 (R.T. 11/18/21 p.m. at 2890:13-2890:15.)

4     619.    The maximum medical classification level for the Douglas facility is 3.  (R.T.

5 11/18/21 p.m. at 2890:16-2890:18.)

6     620.    The maximum medical classification level for the Eyman facility is 4. (R.T.

7 11/18/21 p.m. at 2890:19-2890:20.)

8     621.    The maximum medical classification level for the Florence facility is 5. (R.T.

9 11/18/21 p.m. at 2890:21-2890:22.)

10     622.    The maximum medical classification level for the Lewis facility is 5. (R.T.

11 11/18/21 p.m. at 2890:23-2890:24.)

12     623.    The maximum medical classification level for the Perryville facility is 5.

13 (R.T. 11/18/21 p.m. at 2890:25-2891:1.)

14     624.    The maximum medical classification level for the Phoenix facility is 4. (R.T.

15 11/18/21 p.m. at 2891:2-2891:3.)

16     625.    The maximum medical classification level for the Safford facility is 3. (R.T.

17 11/18/21 p.m. at 2891:4-2891:5.)

18     626.    The maximum medical classification level for the Tucson facility is 5. (R.T.

19 11/18/21 p.m. at 2891:6-2891:7.)

20     627.    The maximum medical classification level for the Winslow facility is 3. (R.T.

21 11/18/21 p.m. at 2891:8-2891:9.)

22     628.    The maximum medical classification level for the Yuma facility is 4. (R.T.

23 11/18/21 p.m. at 2891:10-2891:11.)

24     **Dr. Murray's Facility Site Visits**

25     **ASPC Tucson**

26     629.    Dr. Murray visited ASPC Tucson on September 20, 2021.  On the day of the

27 review, the inmate population was 4,423 inmates.  (Dkt. 4203, ¶ 34.)

28     630.    ASPC Tucson is divided into the following units: Catalina, Cimarron,

Complex Detention, Manzanita, Rincon Transitory, Rincon, Santa Rita, Whetstone, and Winchester. General medical and dental care can be accessed by inmates located in any of the units. (Dkt. 4203, ¶ 35.)

631. At the time of Dr. Murray's visit, on-site provider staffing was 1 Site Medical Director (SMD, who is a physician with clinical responsibility for medical care provided at a site), 1 MD (30 hours/week), and 7 full time Family Nurse Practitioners (FNPs). (Dkt. 4203, ¶ 35.)

632. Mid-level provider staffing has improved "significantly" since Centurion assumed responsibility in July 2019, and the facility recently recruited Dr. Winfred Williams. (Dkt. 4203, ¶ 38.)

633. As of the date of Dr. Murray's visit, the facility had 39 RN budgeted positions, of which 23 were filled with a full-time employee. Regarding LPNs, they had 48.75 budgeted positions with 29 filled. Agency RNs (9.9 FTEs) and LPNs (7.2 FTEs), as well as the use of overtime, cover about 30% of the vacant shifts. Additionally, there were 9 Assistant Director of Nursing (ADON) positions, with 5 vacant. (Dkt. 4203, ¶ 39.)

634. The facility has taken steps to provide additional nurse call lines by FNPs on Saturdays. Centurion has provided additional bonus pay ($250-$500 per shift) to encourage staff to pick up these extra shifts. Additionally, the facility utilizes nurse telehealth triage to assist with nurse lines. The backlog of HNRs went from 184 to 24 in a week given this additional effort. (Dkt. 4203, ¶ 40.)

635. HNRs have risen dramatically with up to 200-300 per day, and many of the requests are duplicates (e.g., if the patient had not been seen the previous day). Units that would pre-pandemic have 3-4 HNRs/day now have upwards of 25. The primary reason for the increase in HNRs is the suspension of the copay program[10] during the COVID-19 pandemic. (Dkt. 4203, ¶ 35.)

---

[10] With some exceptions, ADCRR inmates typically pay a small copay to access medical care. However, copays were suspended during the pandemic to encourage any potentially symptomatic inmate to seek care. (Dkt. 4203, n. 2.)

636.     ASPC Tucson has a 66-bed inpatient clinic (IPC) and a 48 bed special needs unit (SNU).  ASPC Tucson also provides dialysis services on-site for twenty patients and manages the only Methadone program in ADCRR.  The facility also has a 50-bed residential housing unit for patients who primarily require assistance with their activities of daily living (ADLs).  (Dkt. 4203, ¶ 42.)

637.     Banner University Medical Center-South is the closest hospital, and all 911 emergencies are referred there.  If patients require higher levels of care, they are typically transferred to University Medical Center Main.  Lifeflight is available through the hospital if a higher level of care is required.  (Dkt. 4203, ¶ 43.)

638.     Access to subspecialty care improved dramatically with the change from Corizon to Centurion.  Centurion implemented a no Utilization Review (UR) approval process for the first six months of the contract to clear the substantial backlog of requests for subspecialty care they inherited from Corizon, which provided minimal subspecialty clinic support after learning that their contract would not be renewed.  (Dkt. 4203, ¶ 44.)

639.     The COVID-19 pandemic reduced subspecialty capacities at private specialty care providers statewide, which impacted ASPC Tucson.  Scheduling of appointments has improved significantly, but neurology, orthopedics, and urology clinics are still intermittently challenged to find an available appointment.  ASPC Tucson recently added a new contract with a urology group in Phoenix that provides in-person and telehealth services.  (Dkt. 4203, ¶ 45.)

640.     Centurion has established more on-site subspecialty services, such as ultrasound, audiology, physical therapy, and optometry.  (Dkt. 4203, ¶ 46.)

641.     The Tucson Fire Department provides EMS services, and they are directly across the street from the facility.  The management team at ASPC Tucson had no issues with the timeliness or adequacy of emergency response provided to the facility for healthcare emergencies.  (Dkt. 4203, ¶ 47.)

642.     ASPC Tucson utilizes urology, infectious disease, and primary care telehealth services on an as-needed basis.  The facility is currently fully staffed for providers, so they

are not currently utilizing any primary care telehealth.  Centurion has added access to a telehealth RN, which has been used to assist with nurse line encounters.  (Dkt. 4203, ¶ 48.)

643.    On-site radiology is provided at all ASPC complexes by a state contract with Trident Care.  Trident Care reads all plain films with a normal turnaround time between 24-48 hours.  STAT readings can be requested and are returned in approximately 2 hours, depending on the facility.  (Dkt. 4203, ¶ 49.)

644.    Radiology units are located at the HUB and Manzanita.  Ultrasound is available on-site weekly.  MRI and CT studies go off-site locally.  (Dkt. 4203, ¶ 49.)

645.    Garcia Laboratory provides the lab services for all 10 ADCRR complexes. The turnaround time for routine labs is typically 48 hours from the time they are drawn. STAT labs go to Phoenix with a four-hour return on results.  Occasionally STAT lab may be taken to Banner.  (Dkt. 4203, ¶ 50.)

646.    The SMD, Director of Nursing (DON), Facility Health Administrator (FHA), Mental Health Lead (MHL), and dental director (DD) comprise the facility management team at ASPC Tucson.  The SMD, DON, and FHA meet daily, and the entire team meets weekly.  The healthcare team is part of the daily security meeting scheduled at 9 AM.  (Dkt. 4203, ¶ 51.)

647.    The members of the CQI team at ASPC Tucson are the FHA, Assistant Facility Health Administrator (AFHA), SMD, MHL, DON, Healthcare Delivery Facilitator (HDF), infection control, clinical coordinator, DD, pharmacy (inventory control), and medical records administrator. They meet monthly by policy and have a standard routine agenda from which minutes are produced.  (Dkt. 4203, ¶ 52.)

648.    Dr. Salazar believes that the healthcare provided at ASPC Tucson is better than what is found in the community.  (Dkt. 4203, ¶ 53.)

**ASPC Yuma**

649.    Dr. Murray visited ASPC Yuma on September 21, 2021. On the day of the review, the inmate population was 3,346 inmates.  (Dkt. 4203, ¶ 54.)

650.    ASPC Yuma is a correctional complex made up of five units: Cheyenne,

Cibola, Cocopah, Dakota, and La Paz. Inmates can participate in a variety of education, treatment, and work programs. One of the most coveted work programs at this facility is the wild land and fire crew, which teaches inmates to fight forest fires. Inmates can also earn their GED and learn a variety of vocational skills. (Dkt. 4203, ¶ 55.)

651. As of the date of Dr. Murray's visit, on-site provider staffing was 1 SMD, 1 MD (30 hours/week), and 4 mid-level providers. There were 2 full time telehealth FNPs and a 0.25 telehealth physician. The telehealth providers are Centurion employees and are assigned to the complex. The additional telehealth coverage is used in part to assist with CGAR compliance. (Dkt. 4203, ¶ 57.)

652. Provider staffing has improved "significantly" since Centurion assumed responsibility in July 2019. From March 2018 through October 2019, the only providers were Dr. Jordan and one physician's assistant. Salary flexibility and benefits with Centurion are much improved over that with Corizon, and Centurion pays for provider travel and housing, which has allowed for a greater recruiting radius. The complex has not had any provider vacancies since January 2020. (Dkt. 4203, ¶ 58.)

653. Nurse staffing currently is excellent. The complex has an allotted capacity for 14 RNs, with 17 filled. Allotted LPNs is 10, with 14 filled. There are 4 ADON positions and 1 DON position, all of which are filled. Ms. Most of the staff have been at ASPC Yuma for an extended period, and nursing turnover is low. The remainder of the healthcare staffing is excellent with no critical vacancies. (Dkt. 4203, ¶ 59.)

654. Yuma Regional Medical Center is approximately 20 minutes away from ASPC Yuma and provides emergency and inpatient services. Lifeflight is available if Yuma Regional is unable to provide the necessary level of care. (Dkt. 4203, ¶ 61.)

655. The availability and scheduling of outpatient subspecialty consultations prior to the pandemic was not an issue. However, during the pandemic scheduling became much more of a challenge. The primary reason was that many community subspecialists stopped seeing all patients. The Yuma GI clinic currently has a 6-month wait for new patient referrals, and the facility has had to relocate those consults to an available consultant in

Phoenix.  (Dkt. 4203, ¶ 62.)

656.    Access to subspecialty care dramatically improved with the change from Corizon to Centurion, and Centurion has established more on-site subspecialty services such as audiology, ultrasound, physical therapy, and optometry.  (Dkt. 4203, ¶ 63.)

657.    San Luis Fire Department provides EMS and typically responds to a facility emergency call within 10 minutes.  The management team at ASPC Yuma had no issues with the timeliness or adequacy of emergency response provided to the facility for healthcare emergencies.  (Dkt. 4203, ¶ 64.)

658.    ASPC Yuma utilizes two full-time telehealth FNPs, as well as an as-needed physician.  Centurion has added access to a telehealth RN, which the facility uses to assist with nurse line encounters.  Telehealth orthopedics, urology, and GI are subspecialty services available to the facility; however, the facility typically does not require their use. (Dkt. 4203, ¶ 65.)

659.    Ultrasound is available on-site eight hours per week.  MRI and CT studies go off-site locally.  (Dkt. 4203, ¶ 66.)

660.    The turnaround time for Garcia labs is typically 48 hours from the time they are drawn.  STAT lab studies go to Yuma Regional hospital.  (Dkt. 4203, ¶ 67.)

661.    The SMD, DON, FHA, MHL, and DD comprise the facility management team at ASPC Yuma.  The SMD, DON, and FHA meet daily, and the entire team meets weekly.  The health team is part of the daily security meeting scheduled at 9 AM.  (Dkt. 4203, ¶ 68.)

662.    The members of the CQI team at ASPC Yuma are the FHA, SMD, MHL, DON, HDF, infection control clinical coordinator, DD, pharmacy (inventory control), and medical records administrator.  They meet monthly by policy and have a standard routine agenda from which minutes are produced.  (Dkt. 4203, ¶ 69.)

**ASPC Douglas**

663.    Dr. Murray visited ASPC Douglas on October 18, 2021.  On the day of the review, the inmate population was approximately 1500 inmates.  ASPC Douglas contains

the Eggers, Gila, Maricopa, Mohave, and Papago Units and is a non-corridor facility.[11] (Dkt. 4203, ¶ 70.)

664.    At the time of Dr. Murray's visit, on-site provider staffing was 1 SMD and 2 mid-level providers. The facility had no vacancies.  (Dkt. 4203, ¶ 57.)

665.    Nurse staffing currently is excellent.  The complex has an allotted capacity for eight RNs, with 8.2 filled.  Allotted LPNs is four, with four filled.  There is one Assistant Director of Nursing (ADON) and one complex Director of Nursing (DON), both of which are filled.  Most of the staff have been at ASPC Douglas for an extended period, and nursing turnover is low.  The remainder of the healthcare staffing is excellent with no critical vacancies.  (Dkt. 4203, ¶ 73.)

666.    The facility has been able to transition LPNs to RNs and provide career continuity for them.  Currently, Centurion pays $6-8/hr. more than the community, making ASPC Douglas a preferred choice.  (Dkt. 4203, ¶ 73.)

667.    Douglas ER is approximately 15 minutes away from ASPC Douglas and provides emergency services.  Lifeflight is available out of Douglas ER.  (Dkt. 4203, ¶ 75.)

668.    Specialty Cardiology is provided in Douglas, but the bulk of the clinics the facility uses are located in Phoenix.  Scheduling for subspecialty care has returned to pre-pandemic levels at ASPC Douglas.  (Dkt. 4203, ¶ 76.)

669.    Access to subspecialty care at ASPC Douglas dramatically improved with the change from Corizon to Centurion, and Centurion has established more on-site subspecialty services, such as audiology, ultrasound, and optometry.  (Dkt. 4203, ¶ 77.)

670.    Douglas Fire Department provides EMS and typically responds to a facility emergency call within 20-30 minutes.  The management team at ASPC Douglas had no issues with the timeliness or adequacy of emergency response provided to the facility for healthcare emergencies.  (Dkt. 4203, ¶ 78.)

671.    ASPC Douglas utilizes two full-time telehealth FNPs, as well as an as-needed

_____

[11] Patients with higher Medical scores are not housed at non-corridor facilities.

physician.  Centurion has added access to a telehealth RN, which the facility uses to assist with nurse line encounters.  Telehealth Orthopedics, Urology, and GI are subspecialty services available to the facility, however they typically do not require their use.  (Dkt. 4203, ¶ 79.)

672.    Ultrasound is available as needed.  MRI and CT studies go off-site to Canyon Vista Hospital in Sierra Vista.  (Dkt. 4203, ¶ 80.)

673.    Turnaround time for Garcia labs at ASPC Douglas is typically 48 hours from the time they are drawn.  STAT lab studies go to Douglas ER.  (Dkt. 4203, ¶ 81.)

674.    The SMD, DON, FHA, MHL, DD, HCF, and the medical records lead comprise the facility management team at ASPC Douglas.  The entire team meets four days a week.  The FHA is part of the daily security meeting scheduled at 4 PM and a weekly Executive Staff meeting.  (Dkt. 4203, ¶ 82.)

675.    The members of the CQI team at ASPC Douglas are the FHA, SMD, MH lead, DON, Healthcare Delivery Facilitator (HDF), DD, pharmacy (inventory control), medical records administrator, and clinical coordinator.  They meet monthly by policy and have a standard routine agenda from which minutes are produced.  (Dkt. 4203, ¶ 83.)

**ASPC Lewis**

676.    Dr. Murray visited ASPC Lewis on September 22, 2021. On the day of the review the inmate population was 4,401 inmates.  (Dkt. 4203, ¶ 84.)

677.    ASPC Lewis is divided into eight units: Bachman, Barchey, Buckley, Eagle Point, Morey, Rast, Stiner, and Sunrise.  Each of these units offers a variety of programs, some of which are not offered at other units.  Lewis houses all custody levels (minimum through maximum), and now also houses Minors (both male and female) at Sunrise.  (Dkt. 4203, ¶ 85.)

678.    At the time of Dr. Murray's visit, the facility had six ADON positions, with five vacant.  Five ADONs had recently stepped down, with 4 remaining in RN positions. There were 30 RNs budgeted, with 9 unfilled.  Agency nursing was filling six FTEs, and the remainder of the coverage came from additional staff overtime.  The facility had 40

budgeted LPN positions, with 12 vacant. The facility has been able to cover half the LPN vacancies with agency staffing. However, they have been only able to fill one RN position through agency staffing. Agency nursing as a whole is incredibly limited due to the dramatic premiums being paid to nurses in the community. (Dkt. 4203, ¶ 87.)

679. Centurion has increased their sign-on bonus to $10K for RNs and LPNs and has offered RNs an additional $1200 plus overtime per shift and LPNs $900 plus overtime to improve facility staffing. This is in addition to the bonus pay ($250-$500 per shift) that Centurion is offering to all staff to encourage them to pick up extra shifts. Additionally, the facility utilizes nurse telehealth triage to assist with nurse lines. (Dkt. 4203, ¶ 88.)

680. Allotted staffing at ASPC Lewis is two MDs and six mid-level providers, of which the facility has two physician vacancies. They use primary care telehealth services as needed. (Dkt. 4203, ¶ 89.)

681. ASPC Lewis has a 13-bed IPC. (Dkt. 4203, ¶ 90.)

682. Abrazo West is the closest hospital, and all 911 emergencies are referred to that facility. It is approximately 40 miles from ASPC Lewis. LifeFlight is available out of the facility if it is required. Abrazo Central in Phoenix or University Medical Center in Phoenix are additional facilities that are utilized for emergent patient referral. (Dkt. 4203, ¶ 91.)

683. In the early part of the pandemic, finding available off-site specialty clinic appointments was challenging due to significantly reduced capacities. However, clinic capacities are returning to pre-pandemic levels, and scheduling is getting back to normal. Centurion is providing more on-site subspecialty care than Corizon had in the past. (Dkt. 4203, ¶ 92.)

684. ASPC Lewis attempts to utilize the same specialty physicians and specialty groups because they understand the nuances of correctional care and doing so improves continuity and consistency of specialty services. The facility will reach out for additional clinics if scheduling times exceed the current metrics. (Dkt. 4203, ¶ 93.)

685. EMS services are available. (Dkt. 4203, ¶ 94.)

686. ASPC Lewis utilizes telehealth for cardiology, infectious disease, urology, endocrinology, rheumatology, ENT, ortho-spine, and nephrology. The facility has access to all specialties as required. They use CareClix to access the subspecialty telehealth system. (Dkt. 4203, ¶ 95.)

687. STAT radiology readings can be requested and are returned in approximately four hours at ASPC Lewis. Ultrasound is available on-site weekly. MRI and CT studies go off-site locally. (Dkt. 4203, ¶ 96.)

688. Since Centurion's arrival, the number of radiology studies has increased by 20%. Centurion added new views for various studies, such as flexion-extension for the evaluation of back pain. Additionally, Trident offers multiple radiology specialists to evaluate films, which is a significant improvement over Corizon, which employed only a single radiologist to read all films. (Dkt. 4203, ¶ 97.)

689. The turnaround time for routine labs by Garcia labs at ASPC Lewis is typically 48 hours from the time they are drawn. STAT labs go to Tempe-St. Luke's. (Dkt. 4203, ¶ 98.)

690. The SMD, DON, FHA, MHL, and DD comprise the facility management team at ASPC Lewis. The SMD, DON, and FHA meet daily at 8:15 AM. They meet with the warden daily at 3:15 PM. (Dkt. 4203, ¶ 99.)

691. The members of the CQI team at ASPC Lewis are the FHA, SMD, MH lead, DON, HDF infection control clinical coordinator, DD, pharmacy (inventory control), and medical records administrator. They meet monthly by policy and have a standard routine agenda from which minutes are produced. (Dkt. 4203, ¶ 100.)

**ASPC Winslow**

692. Dr. Murray visited ASPC Winslow on October 19, 2021. On the day of the review, the inmate population was approximately 1400 inmates. ASPC Winslow includes the Coronado, Kaibab, and Apache units and is a non-corridor facility. (Dkt. 4203, ¶ 101.)

693. As of the date of Dr. Murray's visit, on-site provider staffing was 1 SMD, 2 mid-level providers, and 2 prn Mid-Level Providers (MLPs). (Dkt. 4203, ¶ 102.)

694. Nurse staffing is excellent. At the time of Dr. Murray's visit, the complex had an allotted capacity for 10 RNs, with 14 filled. Allotted LPNs was 5, with 2 filled and 3 prn[12] appointments. The facility can use RNs to cover LPN vacancies if necessary. There were 2 ADONs and one complex DON, all of which were filled. (Dkt. 4203, ¶ 104.)

695. Most of the staff stay for an extended period, and nursing turnover is low. Many of the nurses have been there since the prison was built. The remainder of the healthcare staffing is excellent with no critical vacancies. The facility has a small Centurion float pool to fill vacant shifts. (Dkt. 4203, ¶ 105.)

696. There is a nursing school in Winslow which assists with nurse hiring. (Dkt. 4203, ¶ 106.)

697. Little Colorado Medical Center (LCMC) is approximately 4 minutes away from ASPC Winslow and provides emergency services. Lifeflight is available out of LCMC. Patients requiring more advanced services are sent to Flagstaff Medical Center, which is 45 minutes away. (Dkt. 4203, ¶ 108.)

698. The availability and scheduling of outpatient subspecialty consultations prior to the pandemic was not a problem. However, during the pandemic, scheduling became much more of a challenge. The primary reason was that many subspecialists stopped seeing all patients. (Dkt. 4203, ¶ 109.)

699. Most of the subspecialty clinics the facility uses are in Flagstaff. Scheduling has returned to pre-pandemic levels. (Dkt. 4203, ¶ 110.)

700. Access to subspecialty care dramatically improved with the change from Corizon to Centurion. Under Corizon it was a painstaking process to get a patient off-site, even at times to the ER. (Dkt. 4203, ¶ 111.)

701. Centurion has established more on-site subspecialty services, such as audiology, ultrasound, and optometry. (Dkt. 4203, ¶ 112.)

702. Action Medical provides EMS and typically responds to a facility emergency

---

[12] PRN positions are typically on-call and utilized as needed.

call within 4-7 minutes.  The management team at ASPC Winslow had no issues with the timeliness or adequacy of emergency response provided to the facility for healthcare emergencies.  (Dkt. 4203, ¶ 113.)

703. ASPC Winslow does not utilize telehealth for specialty care at this time, however all services are available if needed.  (Dkt. 4203, ¶ 114.)

704. Trident Care reads all plain films with a normal turnaround time between 24-48 hours at ASPC Winslow. STAT readings are done at LCMC.  Ultrasound, MRI, and CT studies go off-site to Northern Arizona Radiology in Flagstaff.  (Dkt. 4203, ¶ 115.)

705. The turnaround time for Garcia labs at ASPC Winslow is typically 48 hours from the time they are drawn.  STAT lab studies go to LCMC.  (Dkt. 4203, ¶ 116.)

706. Diamond Pharmacy provides next day delivery at ASPC Winslow on routine medications provided the order is placed before 2 PM. Stat medications are obtained at the local Walmart on an as-needed basis.  (Dkt. 4203, ¶ 117.)

**ASPC Perryville**

707. Dr. Murray visited ASPC Perryville on September 22, 2021. On the day of the review the inmate population was 3,318 female inmates.  (Dkt. 4203, ¶ 118.)

708. ASPC Perryville is made up of the following units: Complex (or Central, which includes IPC, SNU, watch cells, Reception, Mental Health Unit, and MH Ward), Lumley (including MH, Medium), Piestewa, San Carlos, San Pedro, Santa Cruz, Santa Maria (including Detention), Santa Rosa (including Second Chance Center), Special Management, and Women's Treatment Units.   Like most correctional institutions, Perryville offers inmates an adult basic education (ABE) program and a GED program. Basic medical and dental care is offered to all inmates, as well as substance abuse treatments.   Inmates may also take advantage of many vocational programs, such as working in a print shop, garment factory, kitchen, warehouse, laundry, farming, auto auction, wildfire crew, and state fair crew.  Inmates can also work on road and maintenance crews that work at various cities in the area.  (Dkt. 4203, ¶ 119.)

709. At the time of Dr. Murray's tour, on-site provider staffing was 2.5 FTEs for

physicians and six FTEs for mid-level providers. The facility has not had challenges with provider staffing. Additionally, ASPC Perryville has two full time OB-Gyn physicians on-site who manage all the prenatal and gynecologic care. (Dkt. 4203, ¶ 121.)

710. Nurse staffing has been challenging during the pandemic. Prior to that time, nurse staffing was never a problem. At the time of Dr. Murray's tour, the facility had 6 ADON positions, with three vacant. There are 30 RNs budgeted, with 14 unfilled. Nursing agency has been able to fill 6 FTEs, and the remainder of the coverage comes from additional staff overtime. The facility has 24 budgeted LPN positions, with only 3 vacant. (Dkt. 4203, ¶ 122.)

711. Centurion has increased their sign-on bonus to $10K for RNs and LPNs and has offered RNs an additional $1200 plus overtime per shift and LPNs $900 plus overtime to improve facility staffing. This is in addition to the bonus pay ($250-$500 per shift) that Centurion is offering to all staff to encourage them to pick up extra shifts. Additionally, the facility utilizes nurse telehealth triage to assist with nurse lines. (Dkt. 4203, ¶ 123.)

712. ASPC Perryville has a 15-bed IPC and a 12-bed SNU. (Dkt. 4203, ¶ 124.)

713. The COVID-19 pandemic reduced subspecialty capacities statewide, which affected ASPC Perryville. State-mandated AHCCCS reimbursement rates for subspecialty care creates an additional hurdle at times for accessing subspecialty services for ASPC Perryville inmates. (Dkt. 4203, ¶ 127.)

714. Centurion has established more on-site subspecialty services, such as ultrasound, audiology, physical therapy, optometry, and OB-Gyn services. (Dkt. 4203, ¶ 128.)

715. Dr. Ibrahim believes that the healthcare provided at ASPC Perryville is comparable to what is found in the community. (Dkt. 4203, ¶ 129.)

716. EMS services are available and arrive at the facility typically within 15 minutes. The management team at ASPC Perryville had no issues with the timeliness or adequacy of emergency response provided to the facility for healthcare emergencies. (Dkt. 4203, ¶ 130.)

717. ASPC Perryville utilizes telehealth for cardiology, infectious disease, rheumatology, neurology, and nephrology. (Dkt. 4203, ¶ 131.)

718. Trident Care reads all plain films with a normal turnaround time between 24-48 hours at ASPC Perryville. STAT readings can be requested and are returned in approximately two hours. Ultrasound is available on-site weekly, and MRI and CT studies go off-site locally. (Dkt. 4203, ¶ 132.)

719. The turnaround time for routine labs by Garcia labs is typically 48 hours from the time they are drawn. STAT labs go to Tempe-St. Luke's. Dr. Ibrahim and his provider team voiced no concerns regarding lab services. (Dkt. 4203, ¶ 133.)

720. The SMD, DON, FHA, MHL, and DD comprise the facility management team at ASPC Perryville. The SMD, DON, and FHA meet daily, and the entire team meets weekly. The health team is part of the daily security meeting scheduled at 9 AM. (Dkt. 4203, ¶ 134.)

721. The members of the CQI team at ASPC Perryville are the FHA, AHFA, SMD, MH lead, DON, HDF, infection control clinical coordinator, DD, pharmacy (inventory control), and medical records administrator. They meet monthly by policy and have a standard routine agenda from which minutes are produced. (Dkt. 4203, ¶ 135.)

**ASPC Safford**

722. Dr. Murray visited ASPC Safford on October 18, 2021. On the day of the review the inmate population was approximately 1500 inmates. ASPC Safford includes the Graham, Tonto, and Fort Grant satellite units and is a non-corridor facility. (Dkt. 4203, ¶ 136.)

723. At the time of Dr. Murray's visit, ASPC Safford had one DON position and two ADON positions, with no vacancies. There were 16 RN positions, with no vacancies and 6 LPN positions, with three vacancies. LPN vacancies were easily covered with overtime. The facility can also fill LPN vacancies with RN staff. The facility has 1 SMD and two additional mid-level provider positions, with no vacancies. (Dkt. 4203, ¶ 138.)

724. Mt. Graham Regional Medical Center (MGRMC) hospital is the nearest

hospital and receives all the 911 and emergency transfers. The facility is approximately 20 minutes away. (Dkt. 4203, ¶ 140.)

725. The pandemic created challenges with subspecialty clinic scheduling; however, that has improved significantly. AHCCCS reimbursement rates do still create some challenges finding specialists willing to see ASPC Safford patients. (Dkt. 4203, ¶ 141.)

726. The facility has optometry and audiology services on-site. (Dkt. 4203, ¶ 142.)

727. Southwest EMS provides EMS services. They typically arrive at the facility within 20-30 minutes. The management team at ASPC Safford had no issues with the timeliness or adequacy of emergency response provided to the facility for healthcare emergencies. (Dkt. 4203, ¶ 143.)

728. ASPC Safford occasionally utilizes telehealth for Urology. Typically, they have no issue finding available specialty clinic appointments. Most subspecialty referrals are sent to Tucson or Phoenix. (Dkt. 4203, ¶ 144.)

729. Trident Care reads all plain films with a normal turnaround time between 24-48 hours at ASPC Safford. STAT readings can be requested and are returned in approximately two hours. Ultrasound is available on-site weekly. MRI and CT studies go off-site locally. (Dkt. 4203, ¶ 145.)

730. The turnaround time for routine labs by Garcia labs at ASPC Safford is typically 48 hours from the time they are drawn. STAT labs go to MGRMC. (Dkt. 4203, ¶ 146.)

731. The Site Medical Director (SMD), Director of Nursing (DON), ADONs, Facility Health Administrator (FHA), Mental Health (MHL) and Dental Director (DD) comprise the facility management team at ASPC Safford. The SMD, DON, FHA, AFHA, and HDF meet informally daily and a formal meeting twice a week. The health services team meets with the Warden every daily 9:30 AM. (Dkt. 4203, ¶ 147.)

732. The members of the CQI team at ASPC Safford are the FHA, SMD, MH lead, DON, ADONs, Healthcare Delivery Facilitator (HDF) infection control clinical

coordinator, DD, pharmacy (inventory control), and medical records administrator. They meet monthly by policy and have a standard routine agenda from which minutes are produced. (Dkt. 4203, ¶ 147.)

### ASPC Eyman

733. Dr. Murray visited ASPC Eyman on September 23, 2021. On the day of the review the inmate population was 5,180 inmates. (Dkt. 4203, ¶ 149.)

734. ASPC Eyman is comprised of five separate units: Browning, Cook, Meadows, Rynning, and SMU I. Custody levels include medium through maximum, and different units have slightly different programming. ASPC Eyman has a variety of programs and work that inmates can participate in, including basic adult education, GRE courses, a license plate factory, laundry, and bakery. This facility offers substance abuse treatments and mental health programs that are aimed to improve impulsiveness in inmates, as well as curbing aggression. Vocational skills that inmates can learn at this facility include culinary arts, business management, construction, plumbing, and custodial skills. (Dkt. 4203, ¶ 150.)

735. At the time of Dr. Murray's tour, ASPC Eyman had six ADON positions with two vacancies. There were 20 RN positions with nine vacancies and 30 LPN positions with seven currently vacant. The facility was able to cover both the RN and LPN vacancies using agency and overtime. (Dkt. 4203, ¶ 151.)

736. Dr. Stewart is currently the SMD, and there is one additional physician position which is vacant. There are five mid-level provider positions, all of which are filled. ASPC Eyman additionally has the service of one full-time NP through the telehealth program. Centurion has added two additional mid-level provider positions due to the increasing acuity at the facility. (Dkt. 4203, ¶ 153.)

737. Florence Anthem hospital is the nearest hospital and receives all the 911 and emergency transfers. The facility is approximately 20 minutes away. However, EMS may divert the patient's care to Mountain Vista Medical Center in Mesa if clinically indicated. (Dkt. 4203, ¶ 155.)

738. The pandemic created challenges with subspecialty clinic scheduling at ASPC

Eyman; however, that has improved significantly. AHCCCS reimbursement rates do create challenges in finding specialists willing to see Florence/Eyman patients. Additionally, free world facilities must make special accommodations to inmate patients. Audiology and physical therapy are available on-site. (Dkt. 4203, ¶ 156.)

739. EMS services are available and arrive at the facility typically within 10-15 minutes. The management team at ASPC Eyman had no issues with the timeliness or adequacy of emergency response provided to the facility for healthcare emergencies. (Dkt. 4203, ¶ 157.)

740. ASPC Eyman utilizes telehealth for pulmonology, infections disease, urology, and rheumatology. They have access to all specialties. They use CareClix and Amwell to see patients through telemedicine. The facility uses primary care telehealth typically for chronic care services. They do not use nurse telehealth services. (Dkt. 4203, ¶ 158.)

741. ASPC Eyman provides Basic Life Support services and minor emergency care at the facility. The treatment room has one bed and can provide intravenous fluids. The limit on patient time spent in the on-site ER is eight hours. (Dkt. 4203, ¶ 159.)

742. Trident Care reads all plain films with a normal turnaround time between 24-48 hours at ASPC Eyman. STAT readings can be requested and are returned in approximately two hours. Ultrasound is available on-site weekly. MRI and CT studies go off-site locally. (Dkt. 4203, ¶ 160.)

743. The turnaround time for routine labs by Garcia labs at ASPC Eyman is typically 48 hours from the time they are drawn. STAT labs go to Tempe-St. Luke's. (Dkt. 4203, ¶ 161.)

744. The SMD, DON, FHA, MHL, and DD comprise the facility management team at ASPC Eyman. The SMD, DON, FHA, AFHA, and HDF meet at 9:00 AM daily. The health services team meets with the warden every Tuesday at 10:30 AM. (Dkt. 4203, ¶ 162.)

745. The members of the CQI team at ASPC Eyman are the FHA, AHFA, SMD,

1   MH lead, DON, HDF infection control clinical coordinator, DD, pharmacy (inventory

2   control), and medical records administrator.  They meet monthly by policy and have a

3   standard routine agenda from which minutes are produced.  (Dkt. 4203, ¶ 163.)

**ASPC Florence**

4

5   746.   Dr. Murray visited ASPC Florence on September 23, 2021.  On the day of the

6   review the inmate population was 2,522 inmates.  (Dkt. 4203, ¶ 164.)

7   747.   At the time of Dr. Murray's visit, ASPC Florence included the following

8   units: Central, East, South, and Globe.  ASPC Florence was in the process of being closed,

9   with staff to be reassigned to ASPC Eyman.  All the units with the exception of East offer

10  basic adult education and have a GED program.  East unit has a focus on reducing domestic

11  violence and centers around shaping the way offenders think to try and lower aggression

12  and impulsive behavior.  East also offers a parenting class, poetry workshop, and re-entry

13  for inmates preparing for release.  Globe and South unit have the most vocational programs.

14  Globe has a forestry work program as well as wastewater, fire crew, landfill crew, barber,

15  tailor, and kitchen vocational classes.  South unit offers construction and fabrication in

16  metal and wood classes.  (Dkt. 4203, ¶ 165.)

17  748.   At the time of the visit, on-site provider staffing was one SMD, two MDs

18  (filled with part-time providers), and six mid-level providers with two vacancies.  ASPC

19  Florence was preparing for closing, and the staffing allocations were being reduced in line

20  with the facility depopulation.  Nurse staffing was one DON, which was filled, and six

21  ADONs, with two vacancies which were not going to be filled due to the facility transition.

22  There were 36 RN positions with 15 vacancies which were being filled through overtime

23  and agency coverage.  The facility had 30 LPN positions with seven vacancies, and

24  overtime and agency were used to fill shifts as necessary.  (Dkt. 4203, ¶ 167.)

25  749.   ASPC Florence has a 57-bed IPC and 5 dialysis chairs.  (Dkt. 4203, ¶ 168.)

26  750.   Florence Anthem Hospital provides emergency medical services.  Mountain

27  Vista Medical Center in Mesa is also utilized based upon the patient's condition.  (Dkt.

28  4203, ¶ 169.)

751. The availability and scheduling of outpatient subspecialty consultations prior to the pandemic was not a problem. However, during the pandemic, scheduling became more of a challenge. The primary reason was that many subspecialists stopped seeing all patients. The Florence Gastroenterology (GI) clinic currently has a six-month wait for new patient referrals. The facility has had to relocate those consults to an available consultant in Phoenix. Centurion has established on-site sub-specialty services, such as audiology, ultrasound, physical therapy, and optometry. (Dkt. 4203, ¶ 170.)

752. The Florence Fire Department provides EMS and typically responds to a facility emergency call within 10-15 minutes. There are two sub-stations close to the facility. The management team at ASPC Florence had no issues with the timeliness or adequacy of emergency response provided to the facility for healthcare emergencies. (Dkt. 4203, ¶ 171.)

753. ASPC Florence utilizes Pulmonary, ID, Urology, and Rheumatology services primarily. They have access to all specialties if needed. They occasionally have used primary care telemedicine services, typically for management of chronic care patients. (Dkt. 4203, ¶ 172.)

754. Trident Care reads all plain films with a normal turnaround time between 24-48 hours at ASPC Florence. STAT readings can be requested and are returned in approximately two hours. Ultrasound is available 8 hrs./week. MRI and CT studies go off-site locally. (Dkt. 4203, ¶ 173.)

755. The turnaround time for Garcia labs at ASPC Florence is typically 48 hours from the time they are drawn. STAT lab studies go to Florence Regional hospital. (Dkt. 4203, ¶ 174.)

756. The SMD, DON, FHA, MHL, and DD comprise the facility management team at ASPC Florence. The SMD, DON, FHA, HDF, and AFHA meet daily at 9:00 A.M. There is a weekly Warden's meeting held every Tuesday at 10:30 A.M. that health services attends. (Dkt. 4203, ¶ 175.)

757. The members of the CQI team at ASPC Florence are the FHA, SMD, MHL,

DON, HDF, infection control, clinical coordinator, DD, pharmacy (inventory control), chronic care nurse, and medical records administrator.  They meet monthly by policy and have a standard routine agenda from which minutes are produced.  (Dkt. 4203, ¶ 176.)

### ASPC Phoenix

758.  Dr. Murray visited ASPC Phoenix on September 24, 2021.  On the day of the review the inmate population was 2,522 inmates.  Phoenix has a reception unit, inmate worker unit, Aspen unit, and Alhambra unit.  (Dkt. 4203, ¶ 177.)

759.  At the time of Dr. Murray's visit, on-site provider staffing was one SMD, which was filled, and one MD, which was recently vacant and for which they were recruiting.  Additionally, the facility had four full-time mid-level provider positions, all of which were filled, and two half-time mid-levels as additional staffing.  Nurse staffing was one DON position, which was filled, and three ADON positions, which were not filled.  There were 39 RN positions, with 20 filled, and 3 LPN positions, with zero vacant. (Dkt. 4203, ¶¶ 179, 180.)

760.  Centurion has increased their sign on bonus to $10K for RNs and LPNs and offered RNs an additional $1200 plus overtime per shift and LPNs $900 plus overtime to improve facility staffing.  Centurion has provided additional bonus pay ($250-500 per shift) to encourage staff to pick up these extra shifts.  Additionally, the facility utilizes nurse telehealth triage to assist with nurse lines.  (Dkt. 4203, ¶ 181.)

761.  ASPC Phoenix is the primary Intake Facility for ADCRR and has no special medical programs.  The facility is scheduled to have IPC capabilities later this year.  (Dkt. 4203, ¶ 182.)

762.  Emergency referrals are sent to Valleywise Hospital, the hospital serving Maricopa County.  The facility is within close proximity to ASPC Phoenix.  (Dkt. 4203, ¶ 183.)

763.  Given the facility's Intake mission, off-site subspecialty services are generally required only on an emergent basis.  On those occasions when subspecialty care is emergently required, ASPC Phoenix has not had difficulty finding available capacity.

(Dkt. 4203, ¶ 185.)

764.     Optometry is available on-site.  (Dkt. 4203, ¶ 186.)

765.     EMS services are available and arrive at the facility typically within 5-10 minutes.  The management team at ASPC Phoenix had no issues with the timeliness or adequacy of emergency response provided to the facility for healthcare emergencies.  (Dkt. 4203, ¶ 187.)

766.     ASPC Phoenix has access to all specialties.  The facility uses CareClix and Amwell to see patients through telemedicine.  (Dkt. 4203, ¶ 188.)

767.     Trident Care reads all plain films with a normal turnaround time between 24-48 hours at ASPC Phoenix.  STAT readings can be requested and are returned in approximately two hours. Ultrasound is available on-site weekly.  MRI and CT studies go off-site locally.  (Dkt. 4203, ¶ 189.)

768.     The turnaround time for routine labs by Garcia labs at ASPC Phoenix is typically 48 hours from the time they are drawn.  STAT lab goes to Tempe-St. Luke's. (Dkt. 4203, ¶ 190.)

769.     The SMD, DON, FHA, AFHA, MHL, and DD comprise the facility management team at ASPC Phoenix.  The SMD, DON, and FHA meet daily, and entire team meets weekly.  The health team is part of daily security meeting scheduled at 9 AM. (Dkt. 4203, ¶ 191.)

770.     The members of the CQI team at ASPC Phoenix are the FHA, AHFA, SMD, MH lead, DON, HDF, infection control, clinical coordinator, DD, pharmacy (inventory control), and medical records administrator.  They meet monthly by policy and have a standard routine agenda from which minutes are produced.  (Dkt. 4203, ¶ 192.)

**Medical Care at ASPC Yuma**

771.     Dr. Elijah Jordan testified at trial in this matter as an exemplar medical provider and to provide context for the Court around the provision of medical care by Centurion within a specific ADCRR complex.

772.     Dr. Jordan is the Site Medical Director at ASPC Yuma.  (R.T. 11/17/21 at

2609:16-21.)  He has been the Site Medical Director at Yuma since July 2019.  (*Id*. at 2613:12-14.)

773.    As of October 15, 2021, ASPC Yuma had a full complement of medical staffing: one full-time medical doctor, one full-time physician's assistant, three full-time nurse practitioners, and telemedicine assistance.  (*Id*. at 2614:24-2615:11.)  Yuma's telemedicine providers assist with chronic care patients.  (*Id*. at 2615:12-18.)  Yuma staff also utilize RubiconMD eConsults Services, which provides certain specialty are (dermatologists, endocrinologists, cardiologists, etc.).  (*Id*. at 2616:8-21.)

774.    If a patient has an issue with their care, they can follow-up with Dr. Jordan, and he will go and evaluate the patient and see if something more can be done.  (*Id*. at 2617:6-2618:12.)

775.    Inmates use tablets to submit HNRs, which has increased the number of HNRs they submit.  (*Id*. at 2618:25-2619:13.)

776.    If a patient needs specialty care, staff will write a consultation and send the patient out.  (*Id*. at 2620:14-2621:1.)  There are no problems getting approval for specialty consultations.  (*Id*. at 26621:2-5.)  Urgent consultations are approved within 48 to 72 hours; routine consultations are approved within 30 days.  (*Id*. at 2621:6-111.)

777.    The only backlog for specialty consultations is for a GI specialist, but that is likely because of COVID precautions that are being taken with those patients.  (*Id*. at 2621:12-17.)

778.    COVID-19 has impacted the provision of care at ASPC Yuma.  It shut down the nurse lines and slowed the provider lines.  (*Id*. at 2621:22-2622:6.)  To ensure proper care, nurses would go out to the housing units to see patients and supplement care with telemedicine.  (*Id*. at 2622:7-2623:6.)

779.    ASPC Yuma does not have any problems getting nonformulary medicine. (*Id*. at 2623:7-12.)

780.    The staff at ASPC Yuma can adequately treat the patient population there. (*Id*. at 2625:1-4.)

781. If a patient needs acute medical care, they will be transferred to another facility. (*Id*. at 2628:6-13.)

782. Patients with Hepatitis C are seen regularly by a committee. (*Id*. at 2630:1-20.)

783. Yuma has monthly Continuous Quality Improvement ("CQI") meetings. (*Id*. at 2640:25-2641:4.)

**ADCRR Medical Statistics**

784. In the month of September 2021 there were approximately 8,000 inmates diagnosed with hepatitis C within the ADCRR system. (R.T. 11/18/21 p.m. at 2893:22-2893:25.)

785. In the month of September 2021 there were approximately 3,000 specialty consults completed within the ADCRR system. (R.T. 11/18/21 p.m. at 2894:15-2894:3.)

786. In the month of September 2021 there were approximately 30,000 medical health needs requests received in the ADCRR system. (R.T. 11/18/21 p.m. at 2894:4-2894:6.)

787. In the month of September 2021 there were approximately 3,000 dental health needs requests received in the ADCRR system. (R.T. 11/18/21 p.m. at 2894:7-2894:9.)

788. In the month of September 2021 there were approximately 1,400 mental health needs requests received in the ADCRR system. (R.T. 11/18/21 p.m. at 2894:10-2894:12.)

789. In the month of September 2021 there were approximately 60,000 medical related medications issued to the inmate population within the ADCRR system. (R.T. 11/18/21 p.m. at 2894:13-2894:16.)

790. In the month of September 2021 there were approximately 13,000 mental health related medications issued to the inmate population within the ADCRR system. (R.T. 11/18/21 p.m. at 2894:17-2894:19.)

791. In the month of September 2021 there were approximately 39 patients receiving dialysis within the ADCRR system. (R.T. 11/18/21 p.m. at 2894:20-2894:22.)

792.    In the month of September 2021 there were approximately 75,000 healthcare encounters that patients had with qualified healthcare professionals within the ADCRR system. (R.T. 11/18/21 p.m. at 2894:23-2894:25-2895:1.)

793.    The monthly statistics recur every month with slight variations. (R.T. 11/18/21 p.m. at 2895:25-2895:8.)

794.    There are approximately 4,000 outside consult referrals made each month. (R.T. 11/16/21 p.m. at 2283:23-2283:25-2284:1.)

795.    Each month ADCRR tracks between 3,000 and 3,500 outside consults, and each month they are reviewed at a business review meeting with Director Shinn. (R.T. 11/16/21 p.m. at 2284:3-2284:10.)

796.    Systemwide, 64% of all inmates (28,000) are on or receive pain medication. (R.T. 11/16/21 p.m. at 2284:12-2284:25.)

797.    Systemwide for fiscal year 2020, there were approximately 475,000 inmate contacts with health care professionals. (R.T. 11/16/21 p.m. at 2286:19-2286:22-2287:2-2287:6.)

798.    During the 12-month period from September 2020 through August 2021, Centurion completed 1,567,352 medical, mental health, and dental encounters at the 10 ADCRR complexes at issue.  (Ex. 3053 at -0029 to -0052.)

799.    During this 12-month period, an average of more than 130,000 encounters were completed each month, with the highest monthly total of 140,603 encounters occurring in January 2021, and the lowest monthly total of 115,364 encounters occurring in July 2021. (Ex. 3053 at -0029 to -0052.)

800.    From September 2020 through August 2021, Centurion medical practitioners (physicians and mid-level providers) completed 355,453 encounters at the 10 ADCRR complexes at issue.   (Ex. 3053 at -0029 to -0052.)

801.    During this 12-month period, an average of more than 29,000 medical provider encounters occurred each month, with the highest monthly total of 34,017 encounters occurring in December 2020, and the lowest monthly total of 27,361 encounters

occurring in May 2021.  (Ex. 3053 at -0029 to -0052.)

802.    From September 2020 through August 2021, Centurion nursing staff completed 797,586 medical health care encounters at the 10 ADCRR complexes at issue. (Ex. 3053 at -0029 to -0052.)

803.    During this 12-month period, an average of 66,464 medical nursing encounters occurred each month, with the highest monthly total of 77,949 encounters occurring in October 2020, and the lowest monthly total of 52,789 encounters occurring in July 2021.  (Ex. 3053 at -0029 to -0052.)

804.    From September 2020 through August 2021, Centurion licensed mental health providers completed 93,487 mental health encounters at the 10 ADCRR complexes at issue.  (Ex. 3053 at -0029 to -0052.)

805.    During this 12-month period, an average of more than 7,865 licensed mental health encounters were completed each month, with the highest being 9,168 encounters occurring in December 2020, and the lowest being 4,749 occurring in September 2020.  (Ex. 3053 at -0029 to -0052.)

806.    From September 2020 through August 2021, Centurion nursing staff and other unlicensed mental health professionals completed 278,233 mental health encounters at the 10 ADCRR complexes at issue.  (Ex. 3053 at -0029 to -0052.)

807.    During this 12-month period, an average of more than 23,186 mental health encounters were completed each month by nursing and other unlicensed mental health staff, with the highest being 26,909 mental health encounters in March 2021, and the lowest being 21,384 occurring in July 2021.  (Ex. 3053 at -0029 to -0052.)

808.    Systemwide for fiscal year 2020 to 2021 there were 302,000 HNRs submitted by inmates for medical care.  (R.T. 11/16/21 p.m. at 2283:16-2281:18; R.T. 11/16/21 p.m. at 2287:11-2287:14.)

809.    From 2012 until present there has been a continual decline in the overall average daily population of the Arizona Department of Corrections.  (R.T. 11/16/21 p.m. at 2287:18-2287:25-2288:1-2288:4.)

810.    In FY 2012, when the litigation was filed ADCRR had a total inmate population of 39,877 inmates housed in both state-operated and contract facilities.  (Ex. 3101 at ADCRR00138101-102.)

811.    ADCRRs total inmate population peaked in FY 2016, with 49,902 inmates housed in both state-operated and contract facilities.  (Ex. 3101 at ADCRR00138102.)

812.    On January 1, 2016, there were 35,761 inmates assigned to the state-operated complexes at issue.  (Ex. 3109 at ADCRR00220371.)  Two years later, on January 1, 2018 that number had declined to 33,669.  (Ex. 3116 at ADCRR00229225.)  By January 1, 2021, that number had further declined by approximately ten percent to 30,483 inmates.  (Ex. 3122 at ADCRR00229232.)  The decline in ADCRR population further continued, with only 27,774 inmates assigned to the ten state-operated complexes at issue on September 30, 2021.  (Ex. 3109 at ADCRR00220371.)

813.    In FY 2020, ADCRR had a net decrease in inmate population of 2,161 inmates.  (Ex. 3102 at ADCRR0061547.)

814.    As of September 30, 2021, ADCRR had a total operating capacity of 45,254 inmates, of which 8,562 minimum or medium custody male inmates could be housed in contracted beds at Central Arizona Correctional Facility, ASP-Phoenix West, ASPC Florence West, ASP-Kingman, ASP-Red Rock, and the Marana Correctional Treatment Center.  (Ex. 3109 at ADCRR00220372.)

815.    On September 30, 2021, ADCRR housed 7,616 male inmates in its 8,562 contracted beds at facilities which are not at issue.  (Ex. 3109 at ADCRR00220372.)

816.    ADCRR's male inmate population (consisting of those inmates in both state-operated and contract facilities), decreased every single month between November 30, 2019 and August 31, 2021.  (Ex. 3104.)

817.    ADCRR's female inmate population (consisting entirely of those housed in state-operated facilities), also decreased every single month between November 30, 2019 and August 31, 2021.  (Ex. 3105.)

818.    In FY 2021, ADCRR anticipated a further net decrease in inmate population

of 4,197 inmates.  (Ex. 3102 at ADCRR00061547.)

819.    ADCRR does not predict any further growth in detainee population during fiscal years 2021 to 2026.   (Ex. 3101 at ADCRR00138101-102; Ex. 3102 at ADCRR00061549-552; Ex. 3103.)

820.    During the twenty-six months from July 2019 through August 2021, in an average month, only 35 deaf inmates were in ADCRR custody.  This ranged from a high of 42 deaf inmates in November 2019, to a low of 26 deaf inmates in March and April 2021.  (Ex. 3052.)

821.    No deaf inmates have been housed at ASPC Safford or ASPC Winslow since December 2019.  (Ex. 3052 at -0012 to -00052.)

822.    ADCRR's annual budget for healthcare is approximately $225 million for approximately 27,000 inmates, or approximately $8,333.33 per inmate.  Texas UCMB has an annual budget for inmate healthcare of $660 million for approximately 97,000 inmates, or approximately $6,804.12 per inmate.  (R.T. 12/08/21 a.m. at 3460:25-3463:8.)

**Clinical Outcome Metrics/Statistics**

**Healthcare Effectiveness Data and Information Set (HEDIS) Metrics**

823.    HEDIS is the national benchmark created by the NCQA that is used in the free world medical community to evaluate quality of healthcare.  (R.T. 12/08/21 a.m. at 3468:18-3469:3.)

824.    NCQA is dedicated to improving healthcare quality by evaluating and reporting on the quality of managed care and other healthcare organizations in the United States.  NCQA has developed the HEDIS measures as a tool to measure the performance of health plans on the quality of care and services provided to their patients.  (Dkt. 4203, ¶ 1011.)

825.    The HEDIS measures are used by more than 90 percent of U.S. health plans to measure performance on critical aspects of care and service delivery.  Over 190 million people are enrolled in health plans that report quality results using HEDIS.  Due to its broad utilization with so many health plans and because the measures are so specifically defined,

HEDIS can be used to make comparisons among healthcare organizations. (Dkt. 4203, ¶ 1012.)

826. HEDIS measures have also been embraced by the Centers for Medicare and Medicaid (CMS), which can potentially alter how they reimburse healthcare programs based on their performance on the HEDIS metrics. (R.T. 12/07/21 p.m. at 3435:4-3436:9.)

827. HEDIS quality measures evaluate: Effectiveness of Care, Access/Availability of Care, Utilization, Risk Adjusted Utilization, and Measures Reported Using Electronic Clinical Data Systems. (Dkt. 4203, ¶ 1013.)

828. The use of HEDIS guidelines in the correctional setting is highly appropriate and becoming more prevalent. For example, the Texas Department of Criminal Justice correctional health care system uses HEDIS metrics to evaluate and compare clinical outcomes against free-world healthcare systems. (Dkt. 4203, ¶ 1014.)

829. While randomly selected chart reviews can be valuable in evaluating the quality of care provided within a system, there will always be some element of subjectivity in the reviews, as two different doctors may evaluate the same care differently. (Dkt. 4203, ¶ 1015.)

830. By contrast, the HEDIS metrics are an objective measure of clinical outcomes. And because the HEDIS metrics include the entire population of patients who meet a set of standardized parameters, they provide a complete assessment of the patient care being delivered across the healthcare system, eliminate any concerns around sampling bias or error, and eliminate the subjectivity that is inherent in having physicians reviewing individual medical records. (Dkt. 4203, ¶¶ 1016-1017, R.T. 12/07/21 p.m. at 3436:10-3437:8, R.T. 12/08/21 a.m. at 3469:10-3469:15, 3559:10-3559:17.)

831. Achieving or surpassing a HEDIS benchmark does not occur by chance; rather, it is reflective of a well-run, patient-centered healthcare organization. That is because it is not possible to get a good clinical outcome for an entire population on a HEDIS metric without having a system in place that will drive patients to that outcome. That does not happen by luck, and you cannot surpass the benchmark in a system that is broken. (Dkt.

4203, ¶ 1019, R.T. 12/08/21 a.m. at 3469:19-3470:5, 3472:7-3473:7.)

832.    HEDIS also allows for an indirect measure of the individual components of the healthcare delivery system, include intake processing, diagnosis of chronic and other health conditions, prescription and delivery of medications, diagnostic and specialty care, and ongoing monitoring and treatment.  (R.T. 12/08/21 a.m. at 3478:25-3479:10, 3551:1-3552:22.)

833.    Improving the quality of healthcare is important to both patients and the healthcare system.  Quality in healthcare means providing the care the patient needs when the patient needs it, in a safe, effective manner.  It also represents the degree to which these provided health services increase the likelihood of a desired health outcome.  Dkt. 4203, ¶ 997.)

834.    There are two HEDIS measures (Controlling High Blood Pressure and Comprehensive Diabetic Care) that are applicable to any correctional healthcare population and can be used to measure essential care for two of the larger chronic care populations found in the prison setting.  (Dkt. 4203, ¶ 1020.)

835.    The HEDIS metric for Controlling High Blood Pressure assesses the percentage of adults 18–85 years of age who had at least one outpatient visit with a hypertension diagnosis during the first 12 months of the measurement year whose blood pressure was adequately controlled based on blood pressure <140/90 mm Hg.  (Dkt. 4203, ¶ 1021.)

836.    The HEDIS metric for Comprehensive Diabetic Care assesses the percentage of adults 18–75 years of age with diabetes (type 1 and type 2) who had each of the following:

- Hemoglobin A1c (HbA1c) testing
- HbA1c poor control (>9.0%)
- HbA1c control (<8.0%)
- HbA1c control (<7.0%) for a selected population
- Eye exam (retinal) performed
- Medical attention for nephropathy

- BP control (<140/90 mm Hg)

(Dkt. 4203, ¶ 1022.)

837. HEDIS evaluates A1C scores for diabetic patients because it is a consistent measure of someone's blood sugar and allows for an evaluation of the stability of diabetic patients. (R.T. 12/08/21 a.m. at 3471:3-3471:8.)

838. Dr. Murray used HEDIS metrics to evaluate the quality of healthcare across the ADCRR system and make comparisons to other free world healthcare systems. (Dkt. 4203, ¶ 998.)

839. Dr. Murray asked Centurion to provide data for the HEDIS blood pressure control and diabetic control metrics for all ADCRR inmates systemwide who met the criteria for that particular measure. The data for these metrics were compiled by Chris Bourque, in consultation with Dr. Johnny Wu, using data pulled from eOMIS. (Dkt. 4203, ¶ 1023.)

840. Dr. Murray provided the parameters to Mr. Bourque using the same parameters published by HEDIS, with one exception. HEDIS only measures individuals who have been undergoing treatment for at least 12 months. Dr. Murray wanted to be more inclusive and conservative in his review of the care provided by Centurion to ADCRR inmates and accordingly included all patients who have been in treatment for at least six months.[13] This had the effect of setting the bar higher for Centurion. If Dr. Murray and Centurion had used the 12-month threshold, the ADCRR results for these measures would likely have resulted in ADCRR scoring even higher than the benchmark HEDIS populations. (Dkt. 4203, ¶ 1024.)

841. When the data sets were completed, Dr. Murray asked Dr. Wu, who is familiar with HEDIS, to review them with Mr. Bourque for accuracy. (Dkt. 4203, ¶ 1025.)

842. The population total used for the HEDIS metrics was 27,181 ADCRR

---

[13] Additionally, HEDIS allows for the optional exclusion from the sample of individuals with certain conditions, including patients with end-stage renal disease, patients on dialysis, and pregnant females, but Dr. Murray elected not to exclude anyone from the ADCRR sample based on these conditions. (Dkt. 4203, n. 6.)

inmates. The HTN sample totaled 4,806 inmates, and the diabetes sample totaled 787 inmates. (Dkt. 4203, ¶ 1026.)

843. Consistent with the HEDIS parameters, for the HTN sample, Dr. Murray and Centurion used the latest blood pressure recorded for that inmate in eOMIS. For the diabetes sample, they used the most recent A1C result for that inmate from Garcia Labs. (Dkt. 4203, ¶ 1027.)

844. The percentages for ADCRR were then compared to nationwide commercial HMO, commercial PPO, and Medicaid populations. (Dkt. 4203, ¶ 1028.)

845. As evident in the charts below, the HTN and diabetic HEDIS scores for the care provided by ADCRR are above the national average for HMO, PPO, and Medicaid populations, reflecting excellent care delivery and outcomes. Additionally, these results are indicative that ADCRR is exceeding the community standard of care. The results are consistent among the various ADCRR facilities. (Dkt. 4203, ¶ 1029.)

846. ADCRR exceeds the HEDIS national benchmark and commercial and Medicaid scores for blood pressure control at all 10 state-run facilities and performed better than the Texas system on this measure. (R.T. 12/08/21 a.m. at 3474:22-3475:3, 3475:16-3475:22.; Dkt. 4023, ¶ 1030.)



160





847. ADCRR performed higher than the national average of community commercial and medical scores average at all 10 state-run facilities on the HEDIS metric for blood pressure control in diabetic patients. (R.T. 12/08/21 a.m. at 3476:5-3476:20; Dkt. 4023, ¶ 1030.)





848. ADCRR's performance on the HEDIS metric for controlling hemoglobin A1C reflects excellent management of diabetic patients systemwide. (R.T. 12/08/21 a.m. at 3476:21-3477:14; Dkt. 4023, ¶ 1030.)





Comparison of HgbA1c <7 as an Indicator of Diabetes Control by Facility



Comparison of HgbA1c >9 as an Indicator of Diabetes Control by Facility

849. Importantly, these HEDIS measures evaluate the quality of care provided to thousands of ADCRR patients across the ADCRR system. Surpassing the HEDIS benchmark requires the critical, system-wide health delivery processes as a whole to function efficiently and effectively. These healthcare processes include intake screening, nursing evaluation, intake physical examination, chronic care clinic enrollment, laboratory ordering, laboratory results review, medication ordering, medication administration, compliance monitoring, patient education, dietary counseling and management, nursing appointments for blood pressure and blood sugar checks, insulin administration process,

chronic care clinic, clinical documentation, and data collection and management. ADCRR could not have exceeded the HEDIS benchmark on both the HTN and diabetic metrics if these critical processes were broken or otherwise not functioning effectively across the ADCRR system. (Dkt. 4203, ¶ 1030.)

850. Because the HEDIS metrics include all ADCRR inmates who have been receiving treatment for hypertension and/or diabetes, they objectively demonstrate that ADCRR and Centurion provide ADCRR inmates timely access to competent care for chronic diseases systemwide.

### Other Outcome Metrics

851. Other metrics for evaluating the systemic delivery of healthcare in a correctional setting include Hepatitis C treatment rates and COVID-19 vaccination rates. The Hepatitis C treatment outcomes and inmate COVID-19 vaccination rates shown are additional quality outcomes that demonstrate a health system that is working to deliver quality care. (Dkt. 4203, ¶ 1032.)

852. ADCRR and Centurion have prioritized the treatment of Hepatitis C. This focus is also reflected in the below chart, which shows the increase in numbers of inmates receiving treatment for Hepatitis C. (Dkt. 4203, ¶ 1033.)



853.    COVID-19 vaccination rates are a good indicator of the efficacy of a prison healthcare system's patient educational processes and coordination of efforts between medical staff, custody staff, and outside agencies.  As shown in the chart below, ADCRR's inmate vaccination rates are significantly higher than community rates for both Arizona and the U.S., reflecting a high-functioning system.  (Dkt. 4203, ¶ 1035.)



854.    These Hepatitis C and COVID-19 measures is objective evidence that Defendants do not have a policy or practice of failing to mitigate the risk of infectious and communicable diseases.

**System-Wide Encounter Statistics**

855.    Another important measure is the number of encounters for critical processes (e.g., intakes, chronic care visits, medication administration, etc.) on a monthly and/or annual basis across the system. No healthcare delivery system is perfect, and human error will occasionally occur in any system, no matter how high quality the system is or how caring the individual providers are.  For this reason, it is critical to view mistakes and poor outcomes in the context of the overall volume of care being delivered, recognizing that 50 such outcomes in a very small system could potentially be indicative of a systemic problem, whereas even ten times the number of outcomes in a much larger system would likely not

be reflective of any systemic issues with the delivery of care.  (Dkt. 4203, ¶ 1036.)

856.    The Centurion Monthly Clinical Data reports, which show that between July 2019 and August 2021, ADCRR received a total of 571,708 HNRs, or an average of 21,989 HNRs per month. These HNRs resulted in 328,509 scheduled nursing appointments (or an average of 12,635 scheduled nursing appointments per month) and 39,832 scheduled provider appointments (or an average of 1,532 provider appointments per month).[14]  (Dkt. 4203, ¶ 1037; Ex. 3054.)

857.    From July 2019 through August 2021, Centurion nurses completed more than 283,500 encounters and Centurion providers completed more than 36,000 encounters in response to inmate HNRs related to medical concerns.  (Ex. 3054.)  The highest number of completed provider appointments in a month was 2,217 in March 2020 and the highest number of nursing appointments in a month was 16,964 occurring in August 2021.  (Ex. 3054).

858.    During the twenty-six months from July 2019 through August 2021, Centurion received more than 32,000 Health Needs Requests relating to mental health services. (Ex. 3054.)  Following a nursing triage, more than 83% resulted in the scheduling of nearly 27,000 mental health appointments.  (Ex. 3054.)  Fewer than 5% of those scheduled appointments resulted in an inmate refusal or no-show, with more than 25,000 mental health encounters occurring in response to inmate health needs requests. (Ex. 3054).  The highest number of completed mental health encounters in response to HNRs was in December 2020, when 1,452 mental health appointments were completed across the ten complexes at issue.  (Ex. 3054.)

859.    During the first six months of 2021, Centurion reported that an average of 191 inmates per month in ADCRR custody were HIV+.  Of those, more than 94% on average

---

[14] Not all HNRs require appointments (e.g., requests for medication refills, medical record copies, etc.), and some inmates submit multiple HNRs that result in a single appointment. The above appointment figures are only for HNR-generated visits and do not include other types of visits, including chronic care, IPC rounding, follow-up visits, etc. (Dkt. 4203, n. 7.)

(180) were prescribed medication to assist with control of HIV.  (Ex. 3439).

860.    During the first six months of 2021, Centurion reported that an average of 284 inmates per month had Diabetes and were insulin dependent.  Of those 100% were prescribed medication to assist management of their diabetes.  (Ex. 3439.)

861.    During the first six months of 2021, Centurion reported that an average of 232 inmates per month had been diagnosed with some form of cancer.  Of those, 100% were either prescribed medication or were seen by a provider for that condition each month.  (Ex. 3439.)

862.    During the twenty-six months from July 2019 through August 2021, Centurion received more than 43,000 Outside Consults Requests relating to specialty medical services. (Ex. 3055).  More than 91% resulted in the scheduling of nearly 40,000 outside consultation appointments.  (Ex. 3054.)  The highest number of completed outside consults was in March 2021, when 2,213 outside transports for specialty appointments were completed across the ten complexes at issue.  (Ex. 3055.)

863.    During the twenty-four months from July 2019 through June 2021, there were a total of 5,486 emergency transports. (Ex. 3078). The highest number of emergency transports completed were in July 2019, when 332 inmates were transported.  (Ex. 3078).

864.    During the twenty-four months from July 2019 through June 2021, there were a total of 3,118 inmate hospital admissions.  (Ex. 3081). The average length of hospital stay for this period was 3.4 days.  (Ex. 3081).

865.    Given the sheer volume of medical care and associated diagnostic testing, specialty consults, and medications being provided to ADCRR inmates each month across the 10 state-run prisons, it is to be expected that some appointments would be untimely, some diagnoses would be delayed or not interpreted correctly, and some medication doses would be missed.  However, the isolated occurrences of these issues identified by Plaintiff's medical expert, Dr. Wilcox, across his hand-picked, non-representative samples are in no way a reflection of systemic deficiencies in the delivery of care to ADCRR inmates, particularly when compared to the totality of care provided.  (Dkt. 4203, ¶ 1038.)

**Mortality Rates**

2    866.   Preventable deaths and sub-optimal patient care are certainly not unique to

3    ADCRR and are found in the community, the rates of which are uncertain due to under

4    reporting.  In fact, the third leading cause of death in the United States is medical error.

5    (Dkt. 4203, ¶ 1039.)

6    867.   Related to mortality reviews, another important measure of the functioning of

7    a prison system's healthcare delivery system is its mortality rate, which also provides for

8    comparisons across systems.  Available 2015-2018 statistics from the U.S. Bureau of Justice

9    show that Arizona's prison mortality rate compares favorably to the other states with the

10    largest prison populations.  (Dkt. 4203, ¶ 1041.)

11    868.   From 2001-2019, the Bureau of Justice Statistics collected data under the

12    Mortality in Correctional Institutions of incident-level data on all adults who died while in

13    the physical custody of the 50 state departments of corrections and had a 100% response

14    rate from all states.  Data included the location and type of facility where the inmate died,

15    decedent characteristics (sex, race or ethnicity, and age), admissions data, conviction status,

16    admission offense and the cause of death as determined by autopsy or another official

17    medical investigation.  (Ex. 3333 at ADCRR00210611; Ex. 4453 at ADCRR00138228.)

18    The Mortality in Correctional Institutions data collection is the only national statistical

19    collection that obtains comprehensive information about death among prisoners in the

20    custody of adult correctional facilities.  (Ex. 4453 at ADCRR00138210 and

21    ADCRR0138228.)

22    869.   The Bureau of Justice Statistics ceased collection of mortality data after 2019,

23    due to additional enforcement and compliance requirements in the reauthorization of the

24    Death in Custody Reporting Act that are incompatible with BJS's authorizing statute as a

25    federal statistical agency.  The most recent available BJS data is for 2019.  (Ex. 3333 at

26    ADCRR00210612; Ex. 4453 at ADCRR00138228.)

27    870.   BJS calculates mortality rates by the number of deaths per year divided by the

28    December 31 population of prisoners in custody, with the result multiplied by 100,000.  To

improve comparability between years, updated year-end population figures have been used to update estimated mortality rates. (Ex. 3333 at ADCRR00210614; Ex. 4453 at ADCRR00138229-30.) Mortality rates per 100,000 prisoners permit a comparison of different years or systems, even where the inmate populations may differ greatly. (R.T. 11/19/21 a.m., 3051:23-3052:11)

871. The Bureau of Justice Statistics analyzes mortality in state and federal prisons. In 2018, 79.1% of all state prisoner deaths in the United States were caused by illness. Of these deaths, 25.4% were by heart disease, 27.5% by cancer, .05% AIDs-related, 5.2% liver disease, 6.9% respiratory illness, and 13.5% all other illnesses. In terms of all prisoner deaths in the United States of individuals incarcerated in the state facilities,7.5% of all deaths are by suicide. In 2018, as to all causes of death, the mortality rate throughout the United States is 344 prisoners per 100,000.

872. In 2018, the number of deaths (4,135 prisoners) and the morality rate (344 deaths per 100,000) prisoners in state prisons were the highest since the BJS began collecting mortality data from state prisons in 2001. (Ex. 4453 at ADCRR00138208.)

873. The BJS calculated that based upon a nationwide prison morality rate of 319 deaths per 100,000 prisoners in 2018, that state prisoners were less likely to die than were adult U.S. residents (those aged 18 or older), when the resident population was adjusted to the age, sex, and race or ethnicity distribution of state prisoners, resulting an adjusted average U.S. population mortality rate of 419 per 100,000 adult U.S. residents. (Ex. 4453 at ADCRR00138209.)

874. In 2018, ADCRR's mortality rate (for all causes of death), was 312 deaths per 100,000 prisoners, which was less than the average rate of 344 deaths per 100,000 prisoners across all state Corrections Departments. (Ex. 4453 at ADCRR00138222.)

875. ADCRR's morality rate (for all causes of death) has been lower than the nationwide average of state Corrections Departments every year since 2008. (Ex. 4454 at ADCRR00138222.)

876. In 2018, ADCRR's mortality rate (for all causes of death) of 312 per 100,000

prisoners, was lower than or equal to the rate for 23 other state Corrections Departments, specifically Alabama (577), Arkansas (488), California (352), Florida (460), Kansas (332), Kentucky (381), Louisiana (766), Maine (336), Massachusetts (497), Michigan (348), Mississippi (572), Missouri (349), New Hampshire (312), New Mexico (332), North Carolina (336), Oklahoma (415), Pennsylvania (358), South Carolina (539), Tennessee (619), Texas (337), Utah (327), Virginia (358), and West Virginia (583). (Ex. 4453 at ADCRR00138222-23; R.T. 11/15/21 a.m. at 1952:21-1955:24.)

877. After trial commenced, the BJS released its final prison mortality report from the Mortality in Correctional Institutions data collection, Mortality in State and Federal Prisons, 2001-2019 – Statistical Tables, in December 2021. (Available at: https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf.)

878. In 2019, for every 100,00 prisoners in the custody of state- and privately operated prison facilities, 261 died from illness and 46 died from suicide. (BJS, Mortality in State and Federal Prisons, 2001-2019 – Statistical Tables (December 2021) at 2. Available at: https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf.)

879. Adult U.S. residents in 2019 (adjusted for sex, race or ethnicity, and age) died at higher rates than state prisoners from all causes of death except suicide, homicide, and cancer. In 2019, adult U.S. residents had an overall adjusted mortality rate of 435 per 100,000, which was 1.4 times the mortality rate for state prisoners. (BJS, Mortality in State and Federal Prisons, 2001-2019 – Statistical Tables (December 2021) at 3. Available at: https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf.)

880. In 2019, the ADCRR mortality rate (for all causes of death), declined by more than 13% from 2018 to 269 per 100,000 prisoners -- approximately 20% less than the nationwide rate for all state Corrections Departments. (BJS, Mortality in State and Federal Prisons, 2001-2019 – Statistical Tables (December 2021) at 22. Available at: https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf.)

881. In 2019, ADCRR's mortality rate (for all causes of death), was less than or equal to that of 36 state Corrections Departments, specifically: Alabama (588), Arkansas

170

(483), California (330), Delaware (257), Florida (425), Georgia (316), Hawaii (292), Idaho (304), Indiana (349), Kansas (358), Kentucky (516), Louisiana (678), Maine (375), Maryland (327), Massachusetts (434), Michigan (305), Mississippi (544), Missouri (327), Nebraska (308), Nevada (272), New Hampshire (325), New Mexico (271) North Carolina (345), Ohio (270), Oklahoma (396), Oregon (271), Pennsylvania (346), South Carolina (386), South Dakota (322), Tennessee (532), Texas (307), Utah (412), Vermont (300), Virginia (308), West Virginia (474), and Wyoming (378).  (BJS, Mortality in State and Federal Prisons, 2001-2019 – Statistical Tables (December 2021) at 22-23.  Available at: https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf.)

882.    ADCRR's decline in mortality rate and favorable performance in relation to other state corrections departments is objective evidence of an effective healthcare delivery system that provides timely access to necessary routine, urgent, emergent, and specialty care to ADCRR inmates systemwide.

**Access to Care**

**JPay**

883.    The ADCRR inmate population now has access to a JPay electronic health needs request system incorporated into personal tablets.  (R.T. 11/16/21 p.m. at 2327:1-2327:4.)

884.    The JPay system provides 24/7 access to filing a health needs request ("HNR"). (R.T. 11/16/21 p.m. at 2327:9-2327:10.)

885.    Currently there is no cost associated with submitting a HNR and there are no copays. (R.T. 11/16/21 p.m. at 2327:12-2327:14.)

**Telehealth**

886.    Telemedicine is useful in the prison setting because it removes the need of moving the inmate to receive care, which improves access to care, availability of care, patient consent to treatment, and productivity.  (R.T. 12/08/21 a.m. at 3457:21-3458:8.)

887.    The cancellation of nurse lines can create a backlog of HNRs, but ADCRR works with Centurion to have providers handle the HNRs, share staff with another facility,

and use telehealth to alleviate the problems. (R.T. 11/16/21 p.m. at 2376:19-2376:25-2377:1-2377:8.)

### Patient Education

888. All ADCRR complexes have access to the patient education provider KRAMES, which provides both print and digital patient education for all levels of health literacy and is used routinely by both nursing and providers. The system includes an online tutorial and can generate patient education handouts on specific topics (e.g., diabetic education regarding diets). (R.T. 12/08/21 a.m. at 3458:9-3458:19; Dkt. 4203, ¶ 29.)

### Specialty Care

889. The MSTM has procedures for the management of outside consults. (R.T. 11/18/21 p.m. at 2907:20-2907:22.)

890. The procedure for a referral to a specialist to conduct an outside consult begins with an order by the provider which is placed into the electronic medical record. The referral then goes through the utilization management department to look at the clinical indication to make sure it is appropriate. If the referral gets approved, then it goes to the clinical coordinator at the facility who then schedules the appointment with a specialist near the facility. (R.T. 11/18/21 p.m. at 2908:1-2908:16.)

891. Dr. Phillips closely monitors the provision of specialty care within the system. (R.T. 11/18/21 p.m. at 2909:6-2909:8.)

892. In September 2021, the Medical Services Contract Monitoring Bureau met with all the clinical coordinators of every facility to review the process utilized in making specialty referrals. The purpose of the meeting was to identify obstacles and to create an action plan to improve the scheduling process. (R.T. 11/18/21 p.m. at 2911:3-2911:23.)

893. Telehealth impacts the specialty consult process because the provider can conduct a specialty visit from a remote location. The patient stays at the prison facility and has a face-to-face conversation while the specialist is in their office. An evaluation can be done including vital signs and a physical exam. Clinical decisions can be made at that time without the need to actually have a face-to-face in person visit. (R.T. 11/18/21 p.m. at

2912:2-2912:13.)

894. Outside consults impact custody staff because anytime an inmate needs to be transported off site it requires custody staff to transport that inmate. If a patient has exhibited dangerous behaviors, then it can potentially expose the transport staff, as well as members of the public, to a dangerous situation. (R.T. 11/18/21 p.m. at 2912:18-2912:23.)

895. ADCRR and Centurion are bringing specialists into the facilities as opposed to taking inmates out of the facility. Specific services such as radiology, optometry, and physical therapy can be done inside the facility without the need to transport an inmate. (R.T. 11/18/21 p.m. at 2913:1-2913:20.)

896. When Centurion took over the contract, there was a large backlog of specialty consults. Centurion removed the utilization review process to freely schedule any patient that had specialty care needs and clear the backlog. (R.T. 12/08/21 a.m. at 3454:22-3455:3.)

897. The COVID-19 pandemic resulted in unavoidable disruptions and delays in health care in prisons and jails, including making it difficult to schedule patients for outside consults. (R.T. 11/10/21 p.m., 1808:15-1808:25.)

898. Centurion brought on the Rubicon service, which is a telehealth platform for subspecialty consultations. A Centurion provider can fill out a form regarding subspecialty needs, write up a case history, attach photographs, and send the case to a Rubicon specialist to evaluate the case and present a presumptive treatment plan for the provider to use for that patient. (R.T. 12/08/21 a.m. at 3456:1-3456:9.)

899. Centurion has also implemented CareClix, which is a telehealth network that permits the facility to access various specialists to see ADCRR patients through telemedicine. (R.T. 12/08/21 a.m. at 3457:5-3457:8.)

900. Centurion has introduced additional specialty services and resources that are available across the system. (Dkt. 4203, ¶ 3.)

901. Centurion provides access to My Wound Care Doctor to facilitate better coordination and timely provision of advanced wound care management. (Dkt. 4203, ¶ 30.)

902. Centurion also provides access to RubiconMD eConsults. Rubicon is a health

1 delivery service that enables primary care clinicians to discuss their consults with over 120

2 different specialists. There is no utilization review approval process for using the service,

3 which expedites care provision. The Centurion providers, nurses, and facility

4 administrators consider it to be a great learning resource to improve the care they provide,

5 and they use it regularly. (Dkt. 4203, ¶¶ 30, 46.)

6      903. Centurion has substantially improved access to and availability of specialty

7 care both on and off-site. Specialty care through telemedicine is readily available to all

8 facilities, and Centurion has made Rubicon available to assist all providers with access to

9 specialty expertise. (Dkt. 4203, ¶ 198.)

10      904. The specialty care off-site referral process is initiated by the submission of an

11 offsite referral form. (R.T. 11/16/21 p.m. at 2281:3-2281:4.)

12      905. The form is submitted for review and if approved it is given to the clinical

13 coordinators to make an offsite appointment. The process is called utilization review. (R.T.

14 11/16/21 p.m. at 2281:4-2281:11.)

15      906. Once the offsite referral is made it must be scheduled as either routine or

16 urgent and the appointment must be made within 30 or 60 days pursuant to the Stipulation.

17 (R.T. 11/16/21 p.m. at 2281:13-2281:20.)

18      907. The clinical coordinators schedule the offsite appointments with the

19 specialist. (R.T. 11/16/21 p.m. at 2282:4-2282:7.)

20      908. To increase performance on PM 50 and PM 51 (Offsite Specialty Care), the

21 Monitoring Bureau brought all the clinical coordinators from every facility into the Bureau

22 to review the entire utilization management process. (R.T. 11/16/21 p.m. at 2279:20-

23 2279:25-2280:1-2280:4.)

24      909. The purpose of the meeting was to find out why it was so difficult to achieve

25 compliance on PM 50 and 51. (R.T. 11/16/21 p.m. at 2283:1-2283:2.)

26      910. At the meeting it was discovered that each facility had a different process in

27 place. The Monitoring Bureau utilized facilities that were succeeding in complying with

28 the performance measures to establish best practices to follow. A unified process was then

1  put into place systemwide. (R.T. 11/16/21 p.m. at 2283:2-2283:13.)

2  911.  As a result of the change, PM 50 is at 93% compliance and PM 51 is at 95%

3  compliance.  (R.T. 11/16/21 p.m. at 2283:16-2281:18.)

4  912.  There is great difficulty in obtaining individuals to provide outside specialty

5  consult services to correctional systems.  (R.T. 11/16/21 p.m. at 2290:12-2290:19.)

6  913.  ADCRR has been assisting Centurion with providing contacts to outside

7  specialty providers.  (R.T. 11/16/21 p.m. at 2291:8-2291:12.)

8  914.  ADCRR has worked with the Florence Anthem Hospital to establish

9  radiology, gastroenterology surgeries, and general surgeries to be provided at the lock-up

10  secured unit within the hospital.  (R.T. 11/16/21 p.m. at 2294:4-2294:18.)

11  915.  ADCRR is working on bringing in ophthalmology and optometrists on-site to

12  eliminate utilization of specialty offsite consultation services. (R.T. 11/16/21 p.m. at

13  2295:16-2295:18.)

14  916.  The above joint efforts between ADCRR and Centurion to improve access to

15  medically necessary specialty care is evidence that Defendants are not deliberately

16  indifferent to a substantial risk of serious harm to ADCRR inmates.

17  **Diagnostic Services**

18  917.  TridentCare is used for radiology and imaging services statewide.  There are

19  no issues with being able to access these services, and the turnaround time for STAT films

20  is excellent at two hours or less.  (R.T. 12/08/21 a.m. at 3464:8-3464:18.)

21  918.  Centurion uses Garcia Labs, a nationwide provider of lab services, at all

22  ADCRR facilities systemwide.  The facility health teams at each ADCRR complex did not

23  report any issues with access to lab services.  (R.T. 12/08/21 a.m. at 3464:3-3464:18.)

24  **Pharmacy Services**

25  919.  With respect to pharmacy services, all ADCRR complexes utilize Diamond

26  Pharmacy Services, which is the largest provider of correctional pharmacy services in the

27  world and helps manage over 700,000 correctional patients in 47 states in 1,700 correctional

28  facilities and 120 juvenile detention centers.  (Dkt. 4203, ¶ 27.)

920.   Diamond Pharmacy provides next day delivery on routine medications provided the order is placed before 2 PM.  STAT medications are obtained at the local Walgreens or CVS on an as-needed basis.  (Dkt. 4203, ¶ 27.)

921.   It is not an onerous process to get approval for non-formulary medications. (Dkt. 4203, ¶ 27.)

### Dietary Services

922.   ADCRR provides a registered dietician for the entire system, and necessary dietary counseling is done by a nurse or provider.  None of the healthcare teams Dr. Murray spoke with had any concerns regarding dietary services.  (Dkt. 4203, ¶ 28.)

923.   Plaintiffs have not offered any evidence in support of their claim that Defendants have a policy and practice of providing nutritionally inadequate diets to ADCRR inmates.

### Emergency Services

924.   The ADCRR facilities have no issue accessing emergency services, including 911 and emergent services.  (R.T. 12/08/21 a.m. at 3463:10-3463:17.)

925.   Plaintiffs have not offered any evidence in support of their claim that Defendants have a policy and practice of failing to provide timely and competent responses to healthcare emergencies as alleged in their Complaint.

### Electronic Health Records

926.   ADCRR is requiring a new EHR system in the upcoming RFP, which will likely result in overall improved care.  (Dkt. 4203, ¶ 196; R.T. 11/16/21 p.m. at 2351:11; Ex. 33031 at ADCRR00219899-95.)

927.   Section 1.23 Electronic Medical Record System seeks to effectuate a change in the electronic medical record system from eOMIS to something new. (R.T. 11/16/21 p.m. at 2351:17-2351:23.)

928.   The purpose of changing the EMR system is an attempt to find a more effective way to provide health care to the patient population that is data minable for quality assurance purposes so that reports can be produced utilizing real time data which will enable

the ADCRR to immediately address problems when found. (R.T. 11/16/21 p.m. at 2349:24-2349:25-2350:1-2350:11.)

**NETS**

929.    A NET is a nursing encounter tool that is embedded in the electronic medical record. (R.T. 11/18/21 p.m. at 2928:14-2928:22.)

930.    A NET is a standardized form that nurses use based on a patient's complaint for a face-to-face visit. It includes the complaint at the top of the form. There are a series of questions with checkboxes and there are spaces for vital signs, an evaluation, a physical evaluation by the nurse, and a plan. (R.T. 11/18/21 p.m. at 2929:2-2929:14.)

931.    The purpose of the NET is to provide a guideline and a framework to standardize the care that nurses give. (R.T. 11/18/21 p.m. at 2929:16-2929:17.)

932.    The nurse's scope of practice is part of the NET. For example, there are no prescription medications listed on a NET. Only over-the-counter medications may be given by a nurse to a patient. (R.T. 11/18/21 p.m. at 2929:20-2929:25.)

933.    The NET also lists parameters for the nurse to escalate a patient to a provider. (R.T. 11/18/21 p.m. at 2930:2-2930:6.)

934.    Based upon their education, licensure, and training, a nurse always has the option within their scope of practice to make a referral to a provider even if the NET does not have that as an option for the patient's condition. (R.T. 11/18/21 p.m. at 2930:7-2927:14.)

**Treatment of Chronic Conditions**

935.    The MSTM provides procedures for the treatment of chronic conditions which exist in the inmate population. (R.T. 11/18/21 p.m. at 2906:2-2906:4.)

936.    Chronic conditions are medical conditions that generally need to be managed long term and do not have a defined cure. They are conditions such as diabetes, hypertension, seizure disorders, and cardiac conditions. (R.T. 11/18/21 p.m. at 2906:7-2906:12.)

937.    The MSTM requires that chronic conditions need to be followed by a provider

and that there need to be regular visits with lab work, renewal of medications, and appropriate specialty referrals. (R.T. 11/18/21 p.m. at 2906:14-2906:17.)

938. Chronic care patients are tracked by the facility health administrator to ensure that these individuals are identified, their condition described, and there is follow-up medical care. (R.T. 11/18/21 p.m. at 2906:22-2906:25-2907:1.)

939. The population of chronic care patients within the system requires more attention from health care staff and a greater number of face-to-face interactions. (R.T. 11/18/21 p.m. at 2907:2-2907:6.)

940. The quality of care provided to the chronic condition inmate population is reflective of the quality of care in the system as a whole. (R.T. 11/18/21 p.m. at 2907:13-2907:16.)

**COVID-19 Protocols and Treatment**

941. There were three broad categories where COVID-19 affected the inmate population. One is in the management of the pandemic and spreading or potential spreading of the virus, especially before a vaccine was available. Second was access to care. Patients were being quarantined and staff were devoting a lot of their energy to that situation, so it was difficult to provide the normal day-to-day medical care. Third was how to handle elective procedures that had to be scheduled off-site in light of the quarantine guidelines and limitations about getting a patient to an offsite facility and knowing whether that facility was offering services. (R.T. 11/18/21 p.m. at 2914:14-2914:25-2915:1-2915:5.)

942. During the pandemic the ADCRR was still receiving inmates from county jails across the State. (R.T. 11/18/21 p.m. at 2916:4-2916:6.)

943. During the pandemic, in addition to the normal intake procedures, special procedures had to be established to test inmates, check their symptoms, temperature, and oxygen level, and review the transfer summary to identify those who had been exposed to COVID-19. (R.T. 11/18/21 p.m. at 2916:7-2916:19.)

944. A normal intake requires the preparation of a receiving screening where urgent and emergent conditions are identified. Vital signs are taken, there is a mental health

screen, a dental screen, and a health assessment performed by a medical provider. If a patient comes in with a condition requiring medications, then those items are addressed immediately to maintain a continuity of care. (R.T. 11/18/21 p.m. at 2916:20-2916:25-2917:1-2917:10.)

945. Patients on quarantine would be checked every day by nursing staff to see if the patient had an elevated temperature, check their oxygen level, and see if the person was experiencing any COVID-19 symptoms. During these contacts the patient was able to ask questions about other conditions and would receive treatment immediately. (R.T. 11/18/21 p.m. at 2917:20-2917:25-2918:1-2918:2.)

946. When Dr. Phillips started with ADCRR there was a backlog of elective procedures such as radiology, CT scans, and MRIs due to a statewide moratorium on elective procedures due to COVID-19. These were all eventually cleared. (R.T. 11/18/21 p.m. at 2918:3-2918:13.)

947. COVID-19 vaccines became available in January 2021, and ADCRR/Centurion immediately began to vaccinate employees and vendors. Inmate vaccines started in March 2021. The progression of vaccinations was done in accordance with the Department of Health Services priority list. (R.T. 11/18/21 p.m. at 2918:14-2918:24.)

948. ADCRR engaged in mass testing of the entire inmate population on two separate occasions. (R.T. 11/18/21 p.m. at 2919:2-2919:4.); (R.T. 11/16/21 a.m. at 2175:19-2176:2.)

949. ADCRR created educational information to inform the inmate population of the vaccinations. ADCRR wrote a MSTM chapter on COVID-19. (Ex. 1303 at 55-60.) ADCRR recorded a video and posted it on inmate television to talk to them about what to expect with the vaccine, potential side effects, and efficacy of the vaccine. (R.T. 11/18/21 p.m. at 2919:7-2919:18.)

950. ADCRR has fully vaccinated over 80% of the inmate population. (R.T. 11/18/21 p.m. at 2919:22-2918:24.); R.T. 11/16/21 a.m. at 2175:19-2176:2.)

951. The vaccination rate within the ADCRR system is higher than the vaccination rate in the community. (R.T. 11/18/21 p.m. at 2919:25-2920:1-2920:2.)

952. ADCRR is exceeding the community standard of care with regard to COVID-19 management. (R.T. 11/18/21 p.m. at 2920:3-2920:5.)

953. The fatality rate from COVID-19 in ADCRR is far lower than the fatality rate in the community. (R.T. 11/18/21 p.m. at 2920:6-2920:18.)

954. ADCRR had a "99-plus percent recovery rate amongst [its] inmate population for COVID." (R.T. 11/16/21 a.m. at 2173:10-14.)

955. Centurion "stepped up in a way that few could have or would have and were with us from day one in creating solutions." (*Id*. at 2173:19-21, 2174:15-2175:17.) Their efforts saved lives. (*Id*. at 2174:5-6.)

956. During COVID-19, there was an increase in callouts by custody staff. (*Id*. at 2244:4-10.)

957. ADCRR suspended healthcare copays and utility fees and provided four free 15-minute phone calls to help improve quality of life for inmates during COVID-19. (*Id*. at 2180:18-2181:9.) It also provided free video visitation for inmates, one of the first departments in the country to do so, and it provided tablets to inmates. (*Id*. at 2181:10-2182:4.)

958. Centurion has also taken a very proactive approach to influenza. They are doing the same thing this year as last year and are vaccinating large numbers of inmates. (R.T. 11/18/21 p.m. at 2920:19-2920:23.)

959. ADCRR and Centurion's response to COVID-19 shows that they are not deliberately indifferent to a substantial risk of serious harm to ADCRR inmates.

**Treatment of Hepatitis C**

960. There are approximately 8,000 inmates with hepatitis C in the ADCRR system. (R.T. 11/18/21 p.m. at 2920:24-2920:25-2921:1-2921:2.)

961. Since assuming the contract in July 2019, Centurion has prioritized treatment of chronic Hepatitis C for ADCRR inmates. (Dkt. 4158, ¶ 41.)

1    962.    The effort has largely been spearheaded by Dr. Wendy Orm, with active

2    monitoring of patients overseen by Nurse Practitioner Amy Phillips.  (Dkt. 4158, ¶ 42.)

3    963.    There are currently approximately 1,800 in-custody ADCRR inmate-patients

4    who are candidates for hepatitis C treatment.  (Dkt. 4158, ¶ 43.)

5    964.    ADCRR's policies and procedures for the evaluation and treatment of

6    hepatitis C have recently been updated to ensure consistency with evidence-based practices.

7    (Dkt. 4158, ¶ 44.)

8    965.    Patients in Priority Level 1 are in the highest priority group for evaluation and

9    treatment and include patients with Fibrosis Stage 4 (F4) disease (cirrhosis), as well as those

10    with HIV or hepatitis B virus co-infection. (Dkt. 4158, ¶ 46.)

11    966.    Priority Level 2 patients are in the intermediate priority group and include

12    patients with Fibrosis stage 3 (F3) disease (advanced fibrosis), as well as patients with

13    Fibrosis stage 2 disease, along with comorbid conditions (e.g., chronic kidney disease,

14    diabetes). (Dkt. 4158, ¶ 47.)

15    967.    Finally, Priority Level 3 patients are those with Fibrosis stages F2 through F0.

16    (Dkt. 4158, ¶ 48.)

17    968.    This priority system allows for evaluation and treatment of patients with the

18    most advanced disease, while also monitoring the progression of patients with less advanced

19    liver disease. (Dkt. 4158, ¶ 49.)

20    969.    There is a proactive approach to treating hepatitis C in the system because

21    80% of people will develop chronic hepatitis C and can develop problems like liver cirrhosis

22    and liver cancer. (R.T. 11/18/21 p.m. at 2921:3-2921:11.)

23    970.    The Hepatitis C program is described in the MSTM and is structured in such

24    a fashion that patients with the most advanced liver disease are treated first. (R.T. 11/18/21

25    p.m. at 2921:12-2921:17; Ex. 1305 at 305-313.)

26    971.    The treatment is highly effective and achieves a cure rate of approximately

27    95%.  (R.T. 11/18/21 p.m. at 2921:17-2921:19.)

28    972.    Between 20 and 25% of the inmate population within ADCRR is infected

181

with hepatitis C. (R.T. 11/18/21 p.m. at 2922:1-2922:5.)

973.    As of October 15, 2021, there were over 800 patients treated for hepatitis C. The plan is to have completed treatment for all individuals with an F3 and F4 fibrosis score by June 2022 and then to focus on the patients with lower fibrosis scores like F2. (R.T. 11/18/21 p.m. at 2922:13-2922:21.)

974.    Prior to the implementation of the Centurion program, 160 inmates had been treated.  As of August 31, 2021, 827 inmates had completed treatment, 130 inmates were undergoing treatment, and 664 were in the process of being worked up for inclusion in the program. (Dkt. 4158, ¶ 51.)

975.    The goal is to complete treatment for all F3 and F4 inmates by the end of the second year of the program.  During that timeframe, some inmates with lower Priority Levels will also be treated.  After the first milestone is reached, then the focus will shift to completing treatment for all inmates, which will continue to be based on the systemic approach outlined in the ADCRR policies and procedures. (Dkt. 4158, ¶ 52.)

976.    Compared to other states, Arizona is at the leading edge of hepatitis C treatment for inmates. (R.T. 11/18/21 p.m. at 2922:25-2923:1-2923:2.)

977.    ADCRR's hepatitis C protocols are set up to provide a treatment regimen using the Bureau of Prisons guidelines which identify the best practices that occur nationally for this type of care. (R.T. 12/8/21 p.m. at 3677:24-3677:25-3678:1-3678:13.)

978.    Dr. Wilcox identified several cases in his report of inmates whose treatment for hepatitis C he claims were delayed or who experienced poor outcomes. However, the delays in treatment he identified largely pre-date the Centurion hepatitis C program. (Dkt. 4158, ¶ 56.)

979.    Additionally, successful treatment of hepatitis C at late stages is not a guarantee of a good outcome, and it is to be expected in any system, particularly in a correctional system, that some percentage of individuals with cirrhosis and/or advanced fibrosis will experience poor outcomes despite receiving appropriate care. (Dkt. 4158, ¶ 57.)

980.    Centurion's hepatitis C program is very proactive and is at the leading edge compared to many other states.  Centurion's program represents best practices for the treatment of hepatitis C in a correctional setting. (Dkt. 4158, ¶ 59.)

981.    Centurion's program for the treatment of hepatitis C is an excellent program. It is proactive and will have tangible benefits on the current health of inmates as well as the inmates' health for the next couple of decades.  It represents the best practices of medical care in the industry.

982.    These continual improvements in ADCRR and Centurion's response to Hepatitis C show that they are not deliberately indifferent to a substantial risk of serious harm to ADCRR inmates.

**Quality Monitoring**

**Mortality Review Process**

983.    The mortality review process is set forth in the Medical Services Technical Manual.  (Ex.1305 at 257-259) which provides a step-by-step description of the timing and what is to be done. (R.T. 11/18/21 p.m. at 2895:12-2895:16.)

984.    The purpose of a mortality review is to look at the events leading up to a patient's death to identify what problems if any there were in the delivery of care to the patient. (R.T. 11/18/21 p.m. at 2895:17-2895:20.)

985.    The process involves working backwards from the event of death and examining the emergency response, the coordination of the emergency response between healthcare staff, emergency medical staff, and custody staff, and reviewing the care leading up to the patient's death in the days, weeks, and months leading up to that individual's mortality. The process continues by looking further back at the care that was given and viewing it from a preventative standpoint. (R.T. 11/18/21 p.m. at 2895:20-2895:25-2896:1-2896:5.)

986.    The goal of the analysis is to identify either individual issues regarding training, education, and supervision or possibly issues on a higher level over which we have control. (R.T. 11/18/21 p.m. at 2896:5-2895:10.)

987.    Dr. Phillips participates in every mortality review and performs a critical examination and analysis of the medical charts of the patient. He is critical and objective in his review of medical charts because he is trying to identify causative factors that led to the patient's death that were preventable so that they can avoid having it happen again. (R.T. 11/18/21 p.m. at 2896:13-2896:25.)

988.    The mortality review process is part of the quality assurance process that ADCRR engages in to improve the quality of care systemwide. (R.T. 11/18/21 p.m. at 2897:1-2897:3.)

989.    The mortality review should be done within 30 days of the date of death and needs to include people at the regional level as well as the health care staff who were present in the facility delivering care to the patient. (R.T. 11/18/21 p.m. at 2897:14-2897:19.)

990.    The joint Mortality Review Committee which includes the facility health administrator, the director of nursing, and the site medical director will meet to discuss the case and decide which actions are to be taken at the committee level. The actual staff who were involved in the hands-on care are also present at some of these meetings. (R.T. 11/18/21 p.m. at 2898:1-2898:15.)

991.    The point in having participation in the meeting by the people who provided the hands-on care to the patient is to provide a teaching moment for medical staff. (R.T. 11/18/21 p.m. at 2898:16-2898:19.)

992.    The ADCRR mortality review system is robust, and it covers all the necessary bases. (R.T. 11/18/21 p.m. at 2898:25-2899:1-2899:4.)

993.    The results of the mortality review include corrective action plans or actions involving staff. The corrective action plan can involve a facility, or it may be generalizable to other facilities from an educational standpoint. (R.T. 11/18/21 p.m. at 2899:21-2899:25-2900:1-2900:2.)

994.    When an issue is found to be generalizable to other facilities, the committee will send out information to the facility level Continuous Quality Improvement (CQI) committee meetings for distribution to all medical personnel systemwide. (R.T. 11/18/21

1  p.m. at 2900:23-2900:25.)

2      995.   The MSTM was recently revised to improve the mortality review process.

3  (R.T. 12/8/21 p.m. at 3680:2-3680:5  *See,* Ex. 1305 at 257-259.)

4      996.   The mortality review process was revised such that the review is conducted

5  within 30 days of the patient's death and the participants are to include the site medical

6  director, the facility health administrator, the director of nursing, and anyone who was

7  directly involved in patient care to review the case. (R.T. 12/8/21 p.m. at 3680:16-3680:23.)

8      997.   Regarding actions taken as part of the mortality review, the individual

9  education will take place before the committee meets.   If there is a performance

10  improvement plan, peer review, or board reporting, these items do not appear in a mortality

11  review report. Even though not in the report, these actions do take place based upon

12  discussions between Dr Phillips and Centurion leadership. (R.T. 12/8/21 p.m. at 3671:3-

13  3671:9.)

14  **Continuous Quality Improvement (CQI)**

15      998.   The MSTM has a section in it for continuous quality improvement (CQI).

16  (R.T. 11/18/21 p.m. at 2901:13-2901:21; Ex. 1305 at 21-23.)

17      999.   The CQI process focuses on quality issues. A CQI meeting is a regular

18  meeting that takes place at each of the complexes every month. Minutes are kept and then

19  those minutes are sent into the regional office. (R.T. 11/18/21 p.m. at 2902:2-2902:5.)

20      1000.  When there are items in a mortality review that require further attention, that

21  information is fed into the CQI process. (R.T. 11/18/21 p.m. at 2902:6-2902:8.)

22      1001.  There is a monthly meeting of the joint Mortality Review Committee to

23  ensure that any corrective action plan put in place is getting addressed. (R.T. 11/18/21 p.m.

24  at 2904:19-2904:25.)

25      1002.  The process also looks at adverse clinical events and near miss clinical events

26  to assure patient safety.  These are types of events which resulted in a bad outcome for the

27  patient or could have possibly resulted in a bad outcome. (R.T. 11/18/21 p.m. at 2902:17-

28  2902:24.)

1003. Dr. Phillips reviews the CQI meeting minutes to make sure the corrective action plans have been put into place and to make sure staff understand the information presented and are moving toward making a tangible change. (R.T. 11/18/21 p.m. at 2904:8-2904:14.)

1004. One of the most important parts of Dr. Phillips' job duties is affecting the system's localized behavior to make sure that things improve. (R.T. 11/18/21 p.m. at 2904:15-2904:17.)

1005. There exists a peer review process which is part of the CQI process. (R.T. 11/18/21 p.m. at 2905:1-2905:2.)

1006. The peer review process consists of chart reviews and one-on-one conversations with the supervisor and the reviewed employee. (R.T. 11/18/21 p.m. at 2905:5-2905:6.)

1007. Within the MSTM there is also a peer review and chart review done monthly by the site medical directors to assure quality. It is done on a regular basis with the intention of giving immediate feedback to people rather than waiting for an annual review. (R.T. 11/18/21 p.m. at 2905:19-2905:23; Ex. 1305 at 22.)

1008. Dr. Phillips reviews the CQI meeting minutes on a regular basis to make sure peer reviews are being conducted at the facility level. (R.T. 12/8/21 p.m. at 3677:9-3677:19.)

1009. ADCRR and Centurion have a standardized CQI process to identify concerns and address them through monthly leadership team meetings. The ADCRR process is comparable to the CQI process employed by other state correctional systems, including Texas. (R.T. 12/08/21 a.m. at 3464:19-3465:17.)

1010. Each week there is a Centurion action items meeting attended by all executive leadership from the Medical Services Contract Monitoring Bureau as well as Centurion. The meeting is held to address action items that come to the attention of the Monitoring Bureau on a weekly basis and to review vendor performance reports. (R.T. 11/17/21 a.m. at 2431:2-2431:16)

1011. The purpose of the meeting is to improve the overall health care throughout the State system. (R.T. 11/17/21 a.m. at 2432:11-2432:13)

**Staffing**

1012. To meet the NCCHC staffing standards, ADCRR must ensure that there are sufficient numbers and types of health care staff to care for the inmate population. NCCHC auditors determined that ADCRR approved the health care staffing plan and that there was sufficient medical provider and nursing time to fulfill clinical responsibilities and administrative responsibilities. NCCHC auditors also determined that ADCRR had a documented plan in place for custody staff to follow when a health care situation arises, and health staff are not present. The NCCHC auditors further determined that the ADCRR staffing plan was adequate and effective and that the staffing at each facility was able to meet the needs of the inmate population. (R.T. 11/10/21 a.m., 1772:12-1777:23.) (Wilcox); Ex. 3305 at ADCRR00138382-83 (Douglas); Ex. 3307 at ADCRR00138484-85 (Eyman, noting that "even through the vacancy rate is high, shifts are covered and staffed adequately and care is being provided" although a 85% of nurse staffing is by contracted agency); Ex. 3309 at ADCRR00138617-18 (Florence); Ex. 3311 at ADCRR00138674-75 (Lewis); Ex. 3313 at ADCRR00138744-45 (Perryville); Ex. 3315 at ADCRR00138801-02 (Phoenix); Ex. 3316 at ADCRR00138898-99 (Safford); Ex. 3318 at ADCRR00138844-45 (Fort Grant Unit); Ex. 3320 at ADCRR00138974-76 (Tucson); Ex. 3322 at ADCRR00139120-21 (Winslow); Ex. 3323 at ADCRR00139071-72 (Apache Unit); Ex. 3325 at ADCRR00139197-98 (Yuma).

1013. The availability of nursing staff is currently challenging in both corrections and free world settings. This is likely due to the pandemic pushing nursing staff out of the healthcare market, resulting in fewer nurses, LPNs, and RNs in the population available for hire. Additionally, nursing salaries have become increasingly competitive since the start of the pandemic, and nurses have the opportunity to make significantly more money than before. (R.T. 12/08/21 a.m. at 3455:8-3455:24.)

1014. Centurion and ADCRR have initiated aggressive actions regarding the use of

contemporary pay practices (sign-on bonuses, shift differentials, retention bonuses, and incentive pay) to help facilitate the filling of vacant positions and retention of current staff. The use of overtime, nursing agency staff, and telehealth has also been able to provide relief for vacancies. (Dkt. 4203, ¶ 194.)

1015. Centurion management teams at each of the ADCRR complexes agreed that if staffing vacancies were filled to contracted levels, a new EHR system was deployed, and the CGAR performance measurement process was adjusted, there would be more than enough time to provide necessary care to inmates statewide. (R.T. 12/08/21 a.m. at 3465:25-3466:15.)

1016. Facility leadership teams do not believe that additional staffing beyond the current allocated positions are necessary. If vacancies are filled, the current workload would be manageable with the current number of healthcare positions. Dr. Murray's experience working with facility leadership teams is that they are not reticent about requesting additional staff if needed. (Dkt. 4203, ¶ 197.)

1017. ADCRR's ratio of providers to patients is approximately 1 to 750, which is in line with the Texas system. (R.T. 12/08/21 a.m. at 3495:11-3495:16.)

1018. Staffing has increased since privatization in 2012 all the way through Wexford, Corizon, and Centurion. (R.T. 11/16/21 p.m. at 2289:6-2289:14.)

1019. The current allocated level of staffing that exists in the State of Arizona is 1,052 full time equivalents (FTEs). (R.T. 11/16/21 p.m. at 2289:15-2289:17.)

1020. As a result of the Florence facility shutdown, patients at Florence will be sent to a 2,706-bed private facility. (R.T. 11/16/21 p.m. at 2295:7-2295:14.)

1021. As a result of the Florence facility shutdown, ADCRR and Centurion will be reallocating 122 staff positions to different facilities throughout the State. (R.T. 11/16/21 p.m. at 2295:15-2295:22.)

1022. ADCRR negotiated a contract amendment with Centurion to provide for sign-on bonuses and to help Centurion get fully staffed. (R.T. 11/16/21 p.m. at 2308:3-2308:16.)

1023. Since Centurion was unable to compete with the salary levels in the

1    community, the contract was amended to include an extra $15 million to assist with

2    increased salary ranges. (R.T. 11/16/21 p.m. at 2308 3:9-2308:22.)

3        1024.  In addition, the amendment to the contract includes a salary bonus structure

4    to be paid if there is consistency in performance measure compliance on a quarterly basis.

5    (R.T. 11/16/21 p.m. at 2308:19-2308:25-2309:1-2309:4.)

6        1025. Payment of the $15 million contract amendment is dependent upon

7    Centurion's hiring practices.  If Centurion can hire people, the amendment allows a sign-

8    on bonus payable to new employees on a yearly basis. (R.T. 11/16/21 p.m. at 2310:10-

9    2310:17.)

10        1026.  As part of the contract amendment, a greater sign-on bonus is allocated to

11    geographic areas where it is difficult to recruit. (R.T. 11/16/21 p.m. at 2309:5-2309:7.)

12        1027.  Of the $15 Million, $8 million is tied to compliance with the performance

13    measures on a consistent basis. (R.T. 11/16/21 p.m. at 2310:14-2310:21.)

14        1028.  The contract amendment was entered into to assist Centurion with recruiting

15    because of competition with other entities in Maricopa County to hire staff. (R.T. 11/16/21

16    p.m. at 2311:125-2311:25-2312:1-2312:5.)

17        1029.  In addition to competition within Maricopa County, there is also competition

18    for out-of-state traveling assignments for nursing personnel. (R.T. 11/16/21 p.m. at 2312:6-

19    2312:15.)

20        1030.  ADCRR's current Request for Proposal for systemwide provision of medical

21    services to the inmate population has minimum staffing requirements set at 1,052 but there

22    are considerable changes in the methodologies as far as what will be considered for

23    liquidated damages or staffing allocation offsets and how those items will be tabulated

24    going forward.  (Ex. 3301; R.T. 11/16/21 p.m. at 2343:16-2343:21.)

25        1031.  Section 1.17.5.2 is a change in the methodology to track staffing within the

26    ADCRR system by utilizing position control numbers for every allocated post or position

27    in the system. (R.T. 11/16/21 p.m. at 2348:7-2348:12; Ex. 3301 at ADCRR00219864.)

28        1032.  The change in methodology will allow ADCRR to monitor the aging of the

1  vacancy of positions.  When a position is open for more than 30 days, penalties will be
2  applied to that position. (R.T. 11/16/21 p.m. at 2348:21-2348:25.)

3      1033.  The change in methodology will also lead to less reliance on registry nursing
4  and more hiring of staff into the system, resulting in more effective ownership of job duties.
5  (R.T. 11/16/21 p.m. at 2349:2-2349:10.)

6      1034. ADCRR's efforts to increase staffing for healthcare positions through
7  payment of recruitment and retention bonuses and imposition of sanctions for failure to fill
8  positions show that they are not deliberately indifferent to the serious medical needs of
9  ADCRR inmates.

10      1035.  ADCRR relies on Centurion to tell it how many health care staff are needed.
11  (R.T. 11/16/21 p.m. at 2357:19-2357:21.)

12      1036.  Centurion is not having difficulty recruiting physicians. (R.T. 11/16/21 p.m.
13  at 2361:9-2361:19.)

14      1037.  Recruiting of nurses is a nationwide problem.   (R.T. 11/16/21 p.m. at
15  2362:18-2362:20.)

16      1038.  Maxim Healthcare is a temporary agency that provides registry nurses for
17  Centurion and many other entities throughout Phoenix. (R.T. 11/16/21 p.m. at 2363:7-
18  2363:10.)

19      1039.  Registry nursing assignments last for 13 weeks. (R.T. 11/16/21 p.m. at
20  2363:17-2363:18.)

21      1040.  The billing rate to Centurion for registry nurses is $125 per hour. (R.T.
22  11/16/21 p.m. at 2363:19-2363:25.)

23      1041.  The registry nurse will receive one-half of the $125 per hour paid to the
24  temporary agency. This rate of pay is substantially more than the community standard of
25  pay. (R.T. 11/16/21 p.m. at 2364:2-2364:7.)

26      1042.  Centurion is currently paying their nurses a comparable salary to other nurses
27  within the community. (R.T. 11/16/21 p.m. at 2365:15-2365:16.)

28      1043.  Insufficient staffing has not been a barrier to being compliant with the

1   requirements in the *Parsons* contract. (R.T. 11/16/21 p.m. at 2366:18-2366:23.)

2       1044. Centurion has been compliant with contract requirements at an average of

3   93% of the total performance measures since they took over the contract. (R.T. 11/16/21

4   p.m. at 2367:15-2367:20.)

5       1045. Centurion has added another 114 FTEs to its workforce above the contracted

6   1,052 staff within the staffing matrix in its contract with ADCRR. Centurion has hired 94

7   of the 114 FTEs. (R.T. 11/16/21 p.m. at 2382:7-2382:14.)

8       1046. ADCRR has hired two staffing specialists to assist in tracking Centurion

9   staffing. (R.T. 11/16/21 p.m. at 2383:13-2383:18.)

10      1047. Within the past two months, ADCRR was able to assign position control

11  numbers per position so that tracking may begin, and they can age vacancies. (R.T. 11/16/21

12  p.m. at 2383:18-2383:20.)

13      1048. ADCRR has been granted access to Centurion's Kronos payroll system to

14  better track the hours worked by staff systemwide for contract compliance purposes. (R.T.

15  11/16/21 p.m. at 2384:15-2384:23.)

16      1049. Centurion is providing over 90% of the hours that are mandated by the

17  contract.  The overall hours are more in line with contract compliance.  (R.T. 11/16/21 p.m.

18  at 2385:6-2385:15.)

19      1050.  As part of the $15 million bonus structure, ADCRR has requested a position

20  to assist Centurion's technician to process calls from the Friends and Family line.  (R.T.

21  11/16/21 p.m. at 2404:21-2404:25-2405:1-2405:2.)

22      1051. Director Shinn created the Constituent Services Department to better field

23  ongoing calls from the public concerning medical care of inmates. (R.T. 11/16/21 p.m. at

24  2405:10-2405:19.)

25      1052. The $15 million amendment to the contract includes funds to pay for

26  understaffed areas during nights and weekends based upon shift differentials and stipends.

27  (R.T. 11/16/21 p.m. at 2409:19-2409:25.)

28      1053. The sign-on bonuses are paid to the employee each quarter for four quarters

until the final amount is paid. (R.T. 11/16/21 p.m. at 2410:18-2410:21.)

1054. Exhibit 2167 - Staffing Variances Hired FTE Versus Contract FTE Report does not identify the amount of staffing coverage available to provide health care to the inmate population. (R.T. 11/17/21 a.m. at 2433:17-2433:23-2434:1)

1055. Exhibit 2167 - Staffing Variances Hired FTE Versus Contract FTE Report does not include any overtime hours, part time hours, or registry staff who may have worked. (R.T. 11/17/21 a.m. at 2434:1-2434:6)

1056. Exhibit 2167 - Staffing Variances Hired FTE Versus Contract FTE Report is not the report that is used as a basis to calculate offset sanctions. (R.T. 11/17/21 a.m. at 2434:17-2434:19.)

1057. Recently there have been nurse line cancellations at the Tucson facility because of a statewide nursing shortage. (R.T. 11/18/21 p.m. at 2930:15-2930:17; 2932:1-2932:2.)

1058. To address the nursing shortage in Tucson, Centurion has established a same-day clinic. The plan is to staff the nurse line with providers instead of registered nurses. This will allow the patient to be seen within 24 hours of the submission of a HNR and allow a provider to treat the patient without the need to be referred from the nursing encounter. (R.T. 11/18/21 p.m. at 2933:1-2933:10.)

**Staffing Plan Preparation**

1059. Creating a staffing plan is very complicated and involves an understanding of the logistics of the facility. (R.T. 11/16/21 p.m. at 2313:21-2313:25.)

1060. Creating a staffing plan also requires you to go out and see the work areas that staff are going to be in and identify logistical barriers. The most important part of the correctional facility is the correctional clock: when people are fed, when they're moved, when they're showering. You must understand the correctional clock in order to properly staff the facility. (R.T. 11/16/21 p.m. at 2314:5-2314:16.)

1061. Mr. Gann has never in his career seen a predictable model of providing staffing for a facility. (R.T. 11/16/21 p.m. at 2314:17-2314:18.)

1062. In addition to prepare a staffing plan you need to look at the characteristics of a facility, look at the logistics of the facility, and the statistical analysis of the previous health care that was provided. (R.T. 11/16/21 p.m. at 2315:24-2313:25-2316:1-2316:2.)

1063. The characteristics of the facility would include an identification of whether the facility is linear in nature or whether there are multiple levels involving a large area. This is important because you will need to identify whether medical carts are needed, gear tractors are needed, how you will get people to ICS, how staff are going to get med carts from one end to the other and is there ample medical staffing rooms in each one of the modules. (R.T. 11/16/21 p.m. at 2316:15-2316:25-2317:1-2317:4.)

1064. A typical LPN nurse can pass meds to just over 300 people in one med pass. (R.T. 11/16/21 p.m. at 2317:13-2317:14.)

1065. To prepare a staffing plan one must also know about the characteristics of the inmate population including chronic care data and the percentage of the population diagnosed with hepatitis C. (R.T. 11/16/21 p.m. at 2317:18-2317:25-2318:1-2318:4.)

1066. The age of the population will also impact the staffing plan since healthier younger populations require less care and do not have the acuity needed to care for inmates in a geriatric unit. (R.T. 11/16/21 p.m. at 2318:15-2318:20.)

1067. To prepare a staffing plan, one must look at actual statistics from the facility. (R.T. 11/16/21 p.m. at 2319:1-2319:2.)

1068. More staff does not always guarantee better care. Appropriately staffed facilities provide better care and expectations. (R.T. 11/16/21 p.m. at 2319:11-2319:13.)

1069. The gender of a population will also affect the preparation of a staffing plan because female populations tend to have more health needs and will also need greater provider and nursing care. (R.T. 11/16/21 p.m. at 2319:14-2319:21.)

1070. The layout of the facility is also very important in preparing a staffing plan. (R.T. 11/16/21 p.m. at 2319:2-2320:1-2320:3.)

1071. The ten facilities within the ADCRR system do not physically have the same layout. (R.T. 11/16/21 p.m. at 2321:12-2321:14.)

1072. Each facility needs a specific analysis to determine staffing levels at that facility. (R.T. 11/16/21 p.m. at 2321:15-2321:17.)

1073. It would be impossible to utilize a staffing analysis done at one facility and overlay it onto another facility, such as utilizing a staffing analysis from Eyman and overlaying it on Lewis. (R.T. 11/16/21 p.m. at 2321:18-2321:21.)

1074. The reason it is impossible to overlay a staffing analysis from one facility to another is because the logistics of each facility are completely different, and the requirements of the populations are different. (R.T. 11/16/21 p.m. at 2321:22-2321:25.)

1075. The requirements of the population are the chronic care statistics that need to be included in the staffing analysis. At Eyman there are secure maximum custody units which will require nurses to take all of the care to the inmates. In a less secure area the patients can come to the medical hub and people can be seen more readily and quicker. (R.T. 11/16/21 p.m. at 2322:1-2322:9.)

1076. Additional factors that need to be considered when preparing a staffing plan is what percentage of inmates are on medications, the percentage of patients on mental health medications, the percentage of inmates that have some type of infectious disease, and every chronic care statistic broken down by infectious disease. (R.T. 11/16/21 p.m. at 2324:6-2324:25-2325:1-2325:2.)

1077. Another factor needed to prepare a staffing plan is to identify the current staffing level in the facility. (R.T. 11/16/21 p.m. at 2325:2-2325:3.)

1078. One of the most important factors is to tour the facility to understand the logistics and layout and what actual space there is to provide medical care. (R.T. 11/16/21 p.m. at 2325:13-2325:19.)

1079. To develop a staffing plan, you would need to know how many labs were drawn in the last three years and how the medication process is currently being delivered. (R.T. 11/16/21 p.m. at 2326:6-2326:13.)

**Dr. Murray's Randomly Selected Chart Reviews**

1080. Dr. Murray's team's review of the 80 randomly selected charts revealed

194

improvements in chronic care management from Corizon to Centurion, as well as substantial improvements in medical documentation over the past two years. The records reflected timely reviews for specialty care, including referrals for oncology, cardiology, GI, and retinopathy. There has also been a significant increase in treatment of patients for Hepatitis C. (R.T. 12/08/21 a.m. at 3489:10-3490:16.)

1081. Overall scores across the three areas reviewed by Dr. Murray and his team averaged from good (documentation) to very good (quality of chronic care, quality of episodic care).

**Quality of Care Review for Chronic Disease Patients**
**Average for All Complexes**

| Facility | Documentation | Chronic Care | Episodic Care |
|----------|---------------|--------------|---------------|
| Safford | 2.5 | 2.8 | 3.6 |
| Winslow | 3.3 | 3.8 | 4.4 |
| Yuma | 4.0 | 4.0 | 4.9 |
| Douglas | 3.6 | 3.8 | 4.1 |
| Eyman | 2.5 | 3.8 | 4.5 |
| Lewis | 4.6 | 4.9 | 4.7 |
| Perryville | 4.2 | 3.6 | 4.3 |
| Tucson | 2.4 | 3.3 | 4.3 |
| | | | |
| Average | 3.4 | 3.8 | 4.4 |

1- POOR
2- FAIR
3- GOOD
4- VERY GOOD
5- EXCELLENT

(Dkt. 4203, ¶ 988.)

1082. There was evidence of real motivation and effort to provide excellent care. It was also evident that the care that is being delivered over the past two years is more comprehensive than it was previously. There was more effort at good documentation, provision of preventive care by disease state, and timelier referral to specialty care than previously seen. There were obvious efforts to treat patients for Hepatitis C and to achieve goals in HTN and diabetic patients. (Dkt. 4203, ¶ 989.)

1083. Referrals for oncology, cardiology, and GI are happening expeditiously, especially over the past two years. Diabetics have been receiving timely referrals for

retinopathy evaluations reliably over the past several years as well.  (Dkt. 4203, ¶ 993.)

1084.  Overall, the quality of care being provided in ADCRR is good and meets the standard of care.  The care seems to have steadily improved over the most recent two years since Centurion assumed the contract.  The healthcare teams are working very hard to give excellent care and there is passion evident in their work.  (Dkt. 4203, ¶ 995.)

1085.  The record reviews revealed some instances where the care that was delivered was not consistent with the standard of care; however, that is found in every healthcare system and is to be expected.  Most of these were errors of omission based on the challenges created by eOMIS.  Overall, the health care being provided within the ADCRR system meets or exceeds the standard of care.  (Dkt. 4203, ¶ 996.)

1086.  The continual improvements in the quality of chronic and episodic care provided to ADCRR inmates and in the documentation of the care noted by Dr. Murray and his team show that Defendants are not deliberately indifferent to the serious medical needs of ADCRR inmates systemwide.

## Chart Review Findings for ASPC Tucson

1087.  The staff at the Tucson complex are highly motivated to provide excellent care, there is no sign of indifference in the care delivered by providers, and the Tucson providers seem extremely competent and up to date on their medical knowledge.  For example, Dr. Murray's team noted less use of NSAIDS than at other facilities.  (Dkt. 4203, ¶ 316.)

1088.  The care at ASPC Tucson is much improved and better documented over the past 2-3 years.  For example, Dr. Murray's team noted improved attention to documenting a detailed foot exam and to screening for colon cancer and HIV over the past couple of years under Centurion.  Much of that seems to be related to the providers free-typing chronic clinic notes instead of attempting to use the chronic clinic template.  (Dkt. 4203, ¶¶ 319, 321.)

1089.  Referrals also happen very readily when needed.  (Dkt. 4203, ¶ 320.)

**Chart Review Findings for ASPC Yuma**

2      1090.  The staff at the Yuma complex are highly motivated to provider excellent

3  care, there is no sign of indifference in the care delivered by providers, and the Yuma

4  providers seem extremely competent and up to date on their medical knowledge.  (Dkt.

5  4203, ¶ 442.)

6      1091.  The care at ASPC Yuma is much improved and better documented over the

7  past 2-3 years.  There is more evidence of continuity of care and much less duplication of

8  care.  The Yuma facility, especially, seems to have the same provider doing a patient's care

9  over time, and the care has been more coherent in the past couple of years.  (Dkt. 4203, ¶

10  445.)

11                        **Chart Review Findings for ASPC Douglas**

12      1092.  Patients were seen nearly equally by mid-level providers and physicians in

13  chronic care and follow-up visits.  (Dkt. 4203, ¶ 510.)

14      1093.  There was never a delay in chronic care, as ASPC Douglas methodically

15  schedules patients at regular intervals, and the providers always order labs in preparation

16  for the next chronic care visit.  (Dkt. 4203, ¶ 511.)

17      1094.  Immunizations were offered to every patient reviewed at ASPC Douglas, but

18  the EHR lacked an immunization tab/section to view these without having to click through

19  each nurse immunization note.  (Dkt. 4203, ¶ 513.)

20                        **Chart Review Findings for ASPC Lewis**

21      1095.  The staff at the Lewis complex are very detail-oriented and provide excellent

22  clinical care.  They use current chronic disease treatment recommendations from national

23  guidelines and apply standard protocols for common chronic processes. The Lewis

24  providers seem extremely competent and motivated to provide excellent care.  (Dkt. 4203,

25  ¶ 590.)

26      1096.  There were no significant errors in care found on the Lewis complex in Dr.

27  Murray's review, but there is a potential for errors in patient care as a result of the EHR

28  being fragmented, forcing providers to improvise with documentation workarounds.  (Dkt.

4203, ¶ 591.)

1097.  There is an obvious difference in the patient care documentation over the last 2-3 years at ASPC Lewis.  The content quality of the chronic care notes has improved dramatically, as the providers have abandoned the radio-button templates and have inserted a standard SOAPE note format.  The notes are very comprehensive and follow a disease management guideline for common problems.  (Dkt. 4203, ¶ 592.)

1098.  Preventive notes for infectious diseases, especially Hepatitis C, are consistent and include monitoring labs at ASPC Lewis.  (Dkt. 4203, ¶ 593.)

**Chart Review Findings for ASPC Eyman**

1099.  The staff at ASPC Eyman are highly motivated to provide excellent care.  The Eyman providers seem extremely competent and up to date on their medical knowledge.  (Dkt. 4203, ¶ 984.)

1100.  The ASPC Eyman patients are very complex, and the care these patients have received is quite remarkable despite the difficulties that are inherent in reviewing care in eOMIS.  (Dkt. 4203, ¶ 985.)

1101.  The care at ASPC Eyman is much improved and much better documented than over the past.  Much of that seems to be related to the providers free-typing chronic clinic notes instead of attempting to use the chronic clinic templates.  (Dkt. 4203, ¶ 986.)

1102.  In the random sample, there were some examples of excessive lab testing using panels that are not required per national guidelines, which should be minimized to increase efficiency.  (Dkt. 4203, ¶ 987.)

**Dr. Murray's Opinions**

1103.  HEDIS metrics are reflective of the community standard of care in terms of quality of care being provided.  (R.T. 12/08/21 a.m. at 3477:22-3478:14.)

1104.  As evidenced by the HEDIS scores, ADCRR exceeds the community standard of care with respect to the management of two critical chronic care populations:  hypertensives and diabetics.  (R.T. 12/08/21 a.m. at 3478:15-3478:24.)

1105. ADCRR has the necessary physical plant and infrastructure to deliver

appropriate care.  (Dkt. 4203, ¶ 193.)

1106.  The facility management teams Dr. Murray spoke with were entirely professional and dedicated to providing the best care possible for the patients in their charge.  (Dkt. 4203, ¶ 193.)

1107.  ADCRR has the necessary staff and facilities to deliver healthcare that meets or exceeds the community standard of care.  Currently nurse staffing is a challenge at several of the facilities; however, it is not significantly different than what exists in the healthcare community at large.  Centurion is applying appropriate recruiting measures, such as sign-on bonuses and shift differentials, to ameliorate these local staffing challenges.  (Dkt. 4203, ¶ 1074.)

1108.  Healthcare starts with the people who are responsible for providing the services.  In corrections, the best barometer for how a facility medical department operates is to observe the facility management team.  Dr. Murray's facility interviews revealed that the healthcare management teams were comprised of dedicated people who were committed to doing the best for their patients.  Each member was passionate about ensuring that every patient received quality care.  They were articulate on both the strengths and weaknesses of their programs.  They had a deep appreciation for what changes could be made in the delivery system that would allow them the opportunity to provide their best care.  (Dkt. 4203, ¶ 1075.)

1109.  Centurion is providing industry standard services in radiology, pharmacy, and laboratory to support each ADCRR facility.  (Dkt. 4203, ¶ 1076.)

1110.  Centurion has added additional value-added programs, such as KRAMES for patient education, Rubicon for specialty care, and CareClix for telemedicine access, which further enhances ADCRR's ability to provide quality care.  (Dkt. 4203, ¶ 1076.)

1111.  Community subspecialty care availability, which had been challenged during the early stages of the pandemic, has returned to more historic levels.  (Dkt. 4203, ¶ 1076.)

1112.  ADCRR, through its health provider, Centurion, is providing a level of healthcare consistent with the community standard of care.  (Dkt. 4203, ¶ 1077.)

1113. ADCRR and Centurion's current performance on the objective HEDIS measures for HTN and diabetes surpass that provided by the major U.S. health plans. This is a remarkable achievement and is reflective of a health system operating efficiently and focused on best care for the patients. Dr. Murray's random medical record review validated the HEDIS scores and the quality of chronic care that is being provided. (Dkt. 4203, ¶ 1077.)

1114. The COVID-19 vaccination rates achieved within ADRCC are admirable and reflect a health system that is working well and collaborating with security to achieve superior outcomes. (Dkt. 4203, ¶ 1077.)

1115. ADCRR's Hepatitis C treatment program has significantly increased the number of patients being treated. (Dkt. 4203, ¶ 1077.)

1116. Overall, ADCRR is delivering care that meets or exceeds the community standard. While Dr. Murray identified some areas for improvement with eOMIS, PM reporting, and the mortality review process, he did not find any systemic deficiencies with the provision of health care to ADCRR inmates. (Dkt. 4203, ¶ 1082.)

1117. Plaintiffs have not met their burden of proving systemic deficiencies in the delivery of medical care to ADCRR inmates. Plaintiff's medical expert, Dr. Wilcox, makes substantive criticisms of the medical care provided to only 58 ADCRR inmates out of a total population of 27,000 inmates. Of these 58 inmates, they were housed at only six ADCRR complexes: ASPC Eyman (5 inmates), ASPC Florence (6 inmates), ASPC Tucson (15 inmates), ASPC Lewis (18 inmates), ASPC Perryville (8 inmates), and ASPC Yuma (1 inmate). Dr. Wilcox did not find fault with the medical care of *any* ADCRR inmates housed at ASPC Douglas, ASPC Safford, ASPC Winslow, or ASPC Phoenix.

1118. Additionally, Dr. Wilcox's methodology does not allow him to generalize his findings relating to these 58 inmates to the wider ADCRR population. Dr. Wilcox chose not to review a random sample of inmate medical records and instead reviewed only a hand-picked set of records from inmates who died while in ADCRR custody, submitted complaints about their medical care to Plaintiffs' counsel, or chose to speak with him about

their medical care during his tours of ADCRR facilities. These isolated instances are not sufficient to "show widespread actual injury" as required to prove a systemwide claim regarding provision of medical care.

1119. In addition to the failure to prove a systemic violation of their Eighth Amendment rights with respect to their medical care, Plaintiffs have also failed to offer any evidence in support of specific class claims, including Defendants' alleged failure to provide timely emergency treatment and alleged failure to provide necessary medical devices. As a result, Plaintiffs have failed to meet their burden with respect to these class claims, and they should be dismissed.

1120. Based on the evidence presented at trial, the Court concludes that Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of failing to provide timely access to healthcare.

1121. Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of failing to provide emergency treatment.

1122. Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of failing to provide necessary medication and medical devices.

1123. Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of insufficient health care staffing.

1124. Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of failing to provide care for chronic diseases and protection from infectious disease.

1125. Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of failing to provide timely access to medically necessary specialty care.

1126. Plaintiffs have not established by a preponderance of the evidence that ADCRR is deliberately indifferent to the health care needs of inmates in its care.

## E. Mental Health Care Class Claims.

### 1. Pablo Stewart

**Credibility**

1127. Dr. Pablo Stewart conceded that courts have previously found him not to be credible. (R.T. 11/03/21 a.m. at 555:23-25.) In fact, Judge Mollway in Hawaii District Court previously found that honesty was unimportant to Dr. Stewart. (R.T. 11/03/21 a.m. at 557:16-558:16.). And there have been previous cases where courts have not permitted Dr. Stewart to testify at trial. (R.T. 11/03/21 a.m. at 559:20-23.) For example, one court did not permit him to testify because it found his opinion to be unreliable. (R.T. 11/03/21 a.m. at 561:8-17.)

1128. Dr. Stewart is not credible, and his opinions are therefore unreliable.

1129. While Dr. Stewart currently works one day a week at the Oahu Correctional Center, his responsibilities are limited to supervising residents and he does not have complete access to the facility. (R.T. 11/03/21 a.m. at 541:6-542:14.) He does not provide direct patient care to inmates in the jail. (R.T. 11/03/21 a.m. at 543:24-544:4.) While Dr. Stewart provided direct care to inmates in the custody of San Francisco's City Jail from 1986 to 1990, a portion of that work was overseeing inmates in a jail ward within a hospital not at the correctional facility itself. (R.T. 11/03/21 a.m. at 544:7-545:14.) The jail hospital ward consisted of only 12 beds. (R.T. 11/03/21 a.m. at 544:7-545:14.)

1130. Remarkably, Dr. Stewart's only experience providing direct patient care to inmates was limited to only four years in the late 1980s. (R.T. 11/03/21 a.m. at 545:20-546:1.) Since 1990, he has not provided direct clinical patient care to anyone in a correctional setting. (R.T. 11/03/21 a.m. at 544:7-10; 545:20-546:1.) Despite this, Dr. Stewart touts himself as having "extensive experience in management of patients in institutionalized populations." (R.T. 11/03/21 a.m. at 546:3-7.) And he considers himself a prison conditions expert. (R.T. 11/03/21 a.m. at 549:25-550:2.)

1131. Dr. Stewart has never published anything peer reviewed or in another medical journal with respect to correctional psychiatry. (R.T. 11/03/21 a.m. at 562:14-21.)

1132. Dr. Stewart has never written anything in any correctional psychiatry textbook. (R.T. 11/03/21 a.m. at 562:14-21.)

1133. Real-world correctional experience matters when rendering an opinion in a case such as this. (R.T. 11/19/21 a.m. at 2959:5-17.) To testify in a case like this, 10-20 years of correctional experience, national exposure, working in state prison systems, having familiarity with prison standards and the applicable standard of care, is necessary to be able to opine or present testimony in this format. (R.T. 11/19/21 a.m. at 2959:5-17.)

1134. Dr. Stewart does not have the requisite background, knowledge, or experience to provide opinions regarding the provision of mental health care in the correctional setting.

1135. Any experience he has is stale, irrelevant, and not substantial enough to qualify him to render the opinions he provides.

1136. Dr. Stewart is not qualified to provide opinions with respect to the provision of mental health care in the correctional setting.

1137. Dr. Stewart has a passion for social justice and has previously testified that when hired by the ACLU, he sometimes advocates for the rights of prisoners and assists them in advocating for the rights of prisoners. (R.T. 11/03/21 a.m. at 553:25-555:19.)

1138. Dr. Stewart has never been involved with a correctional mental health care system that he believed met the standard of care. (R.T. 11/03/21 a.m. at 564:24-565:4; 565:17-21.)

1139. Finally, Dr. Stewart is not fellowship trained nor board certified in forensic psychiatry and lacks the direct clinical and administrative corrections experience necessary to offer opinions regarding the systemic provision of mental health care to a state prison system. (Dkt. 4174, ¶ 46; R.T. 11/03/21 a.m. at 540:6-11.)

1140. Even if Dr. Stewart were qualified (he is not), he is an advocate and not a neutral expert. As such, his opinions are biased and therefore unreliable.

**Methodology**

1141. By Dr. Stewart's own admission, the 156 files he reviewed in preparation of his report suffer from selection bias. (Dkt. 4174, ¶ 44.) This is because he chose only to

review files of inmates that were either: (1) hand selected by Plaintiffs' counsel; (2) agreed to speak to him; or (3) died by suicide. (Dkt. 4174, ¶ 44.)

1142. Significantly, Dr. Stewart did not review or provide comment on any mental health records from inmates housed at Douglas, Safford, or Yuma. (Dkt. 4111.)

1143. This is not adequate to prove a systemwide claim.

1144. Dr. Stewart's methodology is further flawed by his decision to "focus [only] on persons with the most serious mental health concerns or diagnoses." (Dkt. 4174, ¶ 44.); (R.T. 11/03/21 a.m. at 527:23-528:3.) Such individuals represent such a small number of the inmates in ADCRR custody and on the mental health case load. (Dkt. 4174, ¶ 44.) Mental health codes are assigned based upon level and acuity of care. (R.T. 11/17/21 a.m. at 2453:19-2453:23.). The "mental health case load" is comprised of inmates who are designated MH3, MH4, and MH5. (R.T. 11/17/21 a.m. at 2459:6-9.)

1145. When conducting a random sample, it is important to obtain an adequate sample size so that it is a representative sample of the entire ADCRR system. (R.T. 11/19/21 a.m. at 2962:16-2964:4.)

1146. The non-random sample selected by Dr. Stewart is not employed utilizing a true scientific analysis or methodology. (Dkt. 4174, ¶ 44.) He did not speak to or review records of a random sample of all inmates. (R.T. 11/03/21 a.m. at 528:4-7.) Nor did he conduct a random sample of inmates on the mental health case load. (R.T. 11/03/21 a.m. at 528:16-20.) Instead, he focused on people with the most serious mental health concerns and diagnoses. (R.T. 11/03/21 a.m. at 527:23-528:3.) By doing so, Dr. Stewart's review is flawed by selection bias as he decided who was going to be studied. (R.T. 11/03/21 a.m. at 528:24-530:20.)

1147. Indeed, to conduct a rigorous and representative analysis of the ADCRR health care, it is critically important to select a random and representative sample of all inmates who received mental health care over the period of interest. (Dkt. 4174, ¶ 44.) Focusing exclusively on inmates who died while in custody would likely yield a skewed and non-representative view of health care service availability and delivery in the ADCRR

system. (Dkt. 4174, ¶ 44.) As such, Dr. Stewart's opinions are not and cannot be reflective of ADCRR's system as a whole. (Dkt. 4174, ¶ 44.) No healthcare system—correctional or otherwise—is perfect. (Dkt. 4174, ¶ 44.) Even in the highest-staffed and best-managed hospitals and other health care systems, adverse patient outcomes occur. (Dkt. 4174, ¶ 44.) Focusing only on these outlier outcomes, as Dr. Stewart does, misses the big picture. (Dkt. 4174, ¶ 44.) And does not provide a 30,000-foot view of ADCRR's system as a whole. (R.T. 11/19/21 a.m. at 2969:3-22.)

1148. Dr. Stewart has only identified isolated instances of alleged harm which are not sufficient to show widespread actual injury as required to prove a systemwide claim.

1149. As a forensic psychiatrist, one should be very skeptical when an attorney selects or only hands over materials that they think are advantageous to their case. (R.T. 11/19/21 a.m. at 2957:21-2959:4.). Forensic psychiatrists are trained to not accept things as facts based on self-report. (R.T. 11/19/21 a.m. at 2957:21-2959:4.)

1150. Rather, forensic psychiatrists need to conduct their own investigation and question competing hypotheses. (R.T. 11/19/21 a.m. at 2957:21-2959:4.) These are the most important principles of being a good forensic psychiatrist—striving for objectivity and neutrality. (R.T. 11/19/21 a.m. at 2957:21-2959:4.)

1151. Dr. Stewart's opinions are further discredited by his reliance upon a general psychiatry resident trainee, Dr. Greg Nikogosyan, to assist in his records review. (Dkt. 4174, ¶ 45.) Dr. Nikogosyan has not completed a general psychiatry residency training program and thus does not maintain an ability to independently practice. (Dkt. 4174, ¶ 45.) Nor is Dr. Nikogosyan board certified in general or forensic psychiatry. (Dkt. 4174, ¶ 45.) Given the numerous complexities of this case, Dr. Penn has numerous questions and concerns regarding Dr. Stewart's utilization of a general adult psychiatry resident to assist in reviewing the records which form the basis of his opinions. (Dkt. 4174, ¶ 45.)

1152. Even if Dr. Stewart were qualified (he is not) or unbiased (he is not), Dr. Stewart's opinions are not reliable because the methodology he employed, including the trainee he selected to assist him, suffers from significant flaws. As such, he is unreliable.

### 2. Joseph Penn

1153. Since 2013, Dr. Joseph Penn has served as Defendants' mental health expert in this matter. (Dkt. 4174, ¶ 2.)

1154. Beginning in 2013 he toured numerous Arizona state prison "corridor" facilities (facilities with inmates on psychotropic medications, on the mental health caseload, or receiving mental health services). (Dkt. 4174, ¶ 3.) He also focused several tours to examine unit watch cells (inmates placed on and undergoing suicide watch precautions), inmates housed in restrictive housing units, and various specialty programs for inmates with medical and mental health needs. (Dkt. 4174, ¶ 3.)

1155. His assessment of the mental health and psychiatric services provided within ADCRR under the current contracted health care provider, Centurion, represents a current correctional psychiatric review of the current mental health practices, intake health screening and procedures, mental health and psychiatric evaluation and treatment services, psychotropic medications, policies and procedures, staffing, suicide prevention policy and procedures, audits and compliance reports, medical records and other documents with an emphasis on state inmates' access to mental health and psychiatric care. (Dkt. 4174, ¶ 5.)

1156. Dr. Penn is a psychiatric physician based in Conroe, Texas. (Dkt. 4174, ¶ 7.) He is triple board-certified in forensic psychiatry, general psychiatry, and child and adolescent psychiatry. (Dkt. 4174, ¶ 7.) All these boards are under the American Board of Psychiatry and Neurology (ABPN); this is a member board of the American Board of Medical Specialties (ABMS) that grants board certification for psychiatrists and neurologists in the United States. (Dkt. 4174, ¶ 7.) He is fully licensed as a health care professional, specifically as a medical doctor (M.D.), to practice medicine in Texas. (Dkt. 4174, ¶ 7.) He specializes in correctional medicine, specifically, correctional psychiatry. (Dkt. 4174, ¶ 7.) He has devoted most of his professional time in the past 20-plus years in both the practice and in the teaching of general adult, child and adolescent, and forensic and correctional psychiatry. (Dkt. 4174, ¶ 7.)

1157. Forensic psychiatry is a subspecialty of general psychiatry. (R.T. 11/19/21

a.m., 2940:22-2941:2)  To be a board-certified forensic psychiatrist, one would need to complete a forensic psychiatry fellowship training program and then sit for a written board examination and then requalify every ten years, to take the exam every ten years.  (R.T. 11/19/21 a.m., 2940:22-2941:2)

1158. He has served in a variety of capacities as a forensic psychiatrist expert witness, in civil matters involving jails, prisons and other correctional and forensic psychiatry and community settings.  (Dkt. 4174, ¶ 8.)  He has been retained in civil matters as a court appointed expert, plaintiff's expert, and defense expert; and in criminal matters as a prosecution expert, defense expert, and a court appointed expert.  (Dkt. 4174, ¶ 8.)  He is committed to honesty and strives for objectivity throughout his correctional and forensic psychiatric work.  (Dkt. 4174, ¶ 8.)

1159. He attended medical school at the University of Texas Medical Branch (UTMB), Galveston, Texas, graduating in 1992.  (Dkt. 4174, ¶ 9.)  He completed three residency and fellowship training programs for a total of seven years of specialty/subspecialty residency training – four years of general psychiatry in 1996 at Brown University, Providence, Rhode Island, two years of child and adolescent psychiatry in 1998 at Brown University, Providence, Rhode Island, and one year of forensic psychiatry, at Yale University, New Haven, Connecticut, in 1999.  (Dkt. 4174, ¶ 9.)

1160. For more than two decades, he has dedicated his career to clinical and administrative work within correctional settings.  (Dkt. 4174, ¶ 1 0.)  Since 1999 he has focused his clinical, administrative, and forensic work within correctional settings including detention facilities, jails, and prisons.  (Dkt. 4174, ¶ 10.) Additionally, he has achieved and maintained specialized certification as a Certified Correctional Health Professional-Mental Health (CCHP-MH) since 2004, approximately 17 years, by the National Commission on Correctional Health Care (NCCHC).  (Dkt. 4174, ¶ 10.)  To become a CCHP-MH, you must have five years of actual experience working in corrections.  (R.T. 11/19/21 a.m., 2955:11-2956:6.) This also requires passing of a written national examination, demonstration of proficiency in national correctional health standards, annual attestation of continuing

medical education credits, full medical licensure without restrictions, and annual re-certification. (Dkt. 4174, ¶ 10.)

1161. He remains current in the evaluation, diagnosis, and treatment of individuals within both correctional, forensic, and non-correctional non-forensic settings as demonstrated by his national board re-certification and maintenance of certification within general, child and adolescent, and forensic psychiatry. (Dkt. 4174, ¶ 11.) He remains knowledgeable in clinical and administrative psychiatry and systems of care issues within non-correctional settings through his leadership work at the national and state level within the American Academy of Psychiatry and the Law (AAPL), American Psychiatric Association (APA), Texas Society of Psychiatric Physicians (TSPP) the state district branch of the APA, the American College of Psychiatrists, and through other medical and psychiatric organizations. (Dkt. 4174, ¶ 11.)

1162. Since 2008, he has served as the Director of Mental Health Services for UTMB Correctional Managed Care (CMC). (Dkt. 4174, ¶ 12.) This is the division within UTMB that provides health care across a variety of correctional settings. (Dkt. 4174, ¶ 12.) In this capacity, he oversees the provision of psychiatric, psychological, and mental health services to approximately 80% (approximately 110,000 adult offenders) of the entire Texas state jail and state adult prison population housed within the Texas Department of Criminal Justice (TDCJ) facilities statewide. (Dkt. 4174, ¶ 12.) He also oversees the delivery of psychiatric services to approximately 800 youths housed statewide within state juvenile correctional institutional facilities (referred to as state schools) and halfway houses within the Texas Juvenile Justice Department (TJJD). (Dkt. 4174, ¶ 12.) He also oversees the delivery of psychiatric services to several county jails and short-term detention facilities in Texas (this is described in more detail below). (Dkt. 4174, ¶ 12.)

1163. In his administrative role, he oversees approximately 315 mental health staff including psychiatrists, psychologists, mental health managers and clinicians, case managers, psychiatric nurse practitioners, psychiatric physician assistants, and other mental health professionals and student trainees across the state. (Dkt. 4174, ¶ 13.) He provides

both clinical and administrative support, oversight, quality assurance, supervision, and leadership.  (Dkt. 4174, ¶ 13.)  He reviews and co-signs at least 10 percent of charts of psychiatric nurse practitioners and physician assistants that he directly supervises.  (Dkt. 4174, ¶ 13.)  Also, he conducts peer reviews of psychiatrists and mid-level psychiatric providers.  (Dkt. 4174, ¶ 13.)  Frequently, he provides clinical support, prescribes, orders, reorders or adjusts psychotropic medications and provides other behavioral treatment recommendations to treatment staff.   (Dkt. 4174, ¶ 13.)

1164. Periodically, he evaluates TDCJ and TJJD patients in person or via telepsychiatry at a variety of locations.  (Dkt. 4174, ¶ 14.)  Also, he participates in systemwide on- call duties and assists with direct patient care as needed.  (Dkt. 4174, ¶ 14.)

1165. He previously served as the acting clinical director (lead psychiatrist) on different occasions, and oversaw the care of more than 500 crisis management, diagnostic and evaluation treatment track inmate patients admitted to two dedicated inpatient psychiatric prison units, further detailed in his CV.  (Dkt. 4174, ¶ 15.)  These inmates were housed at two of three TDCJ dedicated psychiatric inpatient/behavioral health units located in Texas.  (Dkt. 4174, ¶ 15.)  As opposed to inmates with serious mental illness, the crisis management inmates for whom he oversaw care had been determined by an outpatient unit based Qualified Mental Health Professional ("QMHP") to be at imminent risk of significant self-injury or suicide, or their mental health needs could not be managed at their assigned outpatient unit.  (Dkt. 4174, ¶ 15.)

1166. He is routinely involved in the referral, acceptance, and admission and transfers or discharges of inmate patients within the state's three dedicated TDCJ inpatient psychiatric prison units.  (Dkt. 4174, ¶ 16.)  When needed, he also consults and oversees the evaluation and management of particularly complicated patients across TDCJ outpatient units, TDCJ inpatient/behavioral health prison units, and medical/psychiatric inpatients housed in TDCJ medical infirmary prison units or within our specialty medical surgical hospital, a maximum security prison unit, Hospital Galveston (HG), on the grounds of the UTMB academic medical center, medical school and other UTMB complex hospitals in

Galveston, Texas. (HG is the only one of its kind in the United States.)  (Dkt. 4174, ¶ 16.)

1167.  He obtained hospital privileges at a local community hospital where he transferred nursing home level of care state prison patients.  (Dkt. 4174, ¶ 17.)  This facility lacked a consulting psychiatrist; accordingly, he stepped in and oversaw the patients' psychotropic medication treatment and provided onsite and telephonic consultation to the patients' treatment hospitalist and other medical teams when patients demonstrated agitation, confusion, or other changes in mental status.  (Dkt. 4174, ¶ 17.)

1168.  He has approximately 13 years of clinical and administrative experience in the provision of psychiatric services and psychotropic medication treatment within state jails and state prisons, county jails, short-term Substance Abuse Felony Punishment treatment programs (SAFPs) and short-term Intermediate Sanction Facilities (ISFs) across Texas.  (Dkt. 4174, ¶ 18.)  He also has expertise in the evaluation and treatment services that are provided to adult state inmates who are identified as requiring substance abuse treatment and may have comorbid mental disorders.  (Dkt. 4174, ¶ 18.)  He has additional recent experience in the provision of short-term mental health and psychiatric treatment and management for undocumented migrant detainees with pending state charges.  (Dkt. 4174, ¶ 18.)  Lastly, he had previous oversight of on-site psychiatric and mental health services that UTMB CMC previously provided at four Federal Bureau of Prison (FBOP) units in Beaumont, Texas, and two county jails, specifically the Galveston County Jail, Galveston, Texas and Brazoria County Jail in Angleton, Texas.  (Dkt. 4174, ¶ 18.)

1169.  He has extensive experience in examining access to care and continuity of care.  (Dkt. 4174, ¶ 19.)  He performs psychiatric evaluations and suggests treatment approaches to mitigate possible mental health sequelae for certain juveniles and adult inmates in restrictive housing settings.  (Dkt. 4174, ¶ 19.)  He is familiar with mental health and psychiatry best practices to include suicide prevention policies and practices within juvenile and adult correctional settings nationally.  (Dkt. 4174, ¶ 19.)  For example, he presented at an American Correctional Association meeting regarding the development and implementation of three mental health diversion treatment programs for inmates previously

in restrictive housing settings in the Texas state prison system.  (Dkt. 4174, ¶ 19.)  He also published and presented in the areas of correctional mental health care and suicide prevention at state, national, and international meetings.  (Dkt. 4174, ¶ 19.)

1170.  He has extensive experience in the evaluation and treatment of incarcerated juveniles and adults with ADHD, disruptive behavior disorders, impulse control disorders, severe self- harming and self-mutilating behaviors, intellectual developmental disorders, and neurocognitive disorders (including head injuries, dementia, and other neurocognitive disorders).  (Dkt. 4174, ¶ 20.)  He oversees two state prison developmental disabilities sheltered housing programs, the Hodge DDP program which houses approximately 600 male and the Valley Crain satellite DDP program which houses approximately 100 female state prisoners identified with possible intellectual developmental disorders and/or adaptive functioning impairments.  (Dkt. 4174, ¶ 20.)

1171.  He has served on several national task forces and committees and have published on the use of psychotropic medications within correctional settings.  (Dkt. 4174, ¶ 21.)  He is involved in the oversight of state prison, county jail, and juvenile correctional disease management guidelines (DMGs), clinical protocols, decision-making regarding psychotropic medications and treatment protocols, formulary and non-formulary approval of psychotropic medications and psychiatric evaluation and treatment of individuals with serious mental illness (such as schizophrenia and other psychotic disorders) and also depressive disorders, ADHD, disruptive behavior disorders, and PTSD and anxiety disorders.  (Dkt. 4174, ¶ 21.)  As a result, he maintains a current clinical knowledge of the unique mental health needs individuals with serious mental illness such as psychotic disorders (e.g., schizophrenia, schizoaffective disorder, and other psychotic disorders), bipolar disorders, severe depressive disorders, and personality disorders, and those with co-occurring substance disorders across a variety of correctional settings.  (Dkt. 4174, ¶ 21.)  In my clinical role, he performs both on-site and telepsychiatric evaluations and treatment management of high profile and more complicated patient offenders within juvenile and adult correctional systems statewide.  (Dkt. 4174, ¶ 21.)

1172. He currently serves on the Executive Operations Council of UTMB CMC, the Pharmacy and Therapeutics Committee (he is a past Chair), other Joint UTMB CMC and TDCJ Health Services and other Joint UTMB CMC and TJJD committees, and various other local, state, and national committees. (Dkt. 4174, ¶ 22.) He was recently re-appointed as the Chair of the Joint Mental Health Work Group, and Co-Chair of the Gender Dysphoria Work Group. (Dkt. 4174, ¶ 22.) This demonstrates his knowledge and direct interaction regarding the provision of psychiatric and mental health care to incarcerated state inmate patient and various special populations. (Dkt. 4174, ¶ 22.)

1173. He has been appointed to councils, committees, work groups, task forces, and made numerous national and international contributions for example, the American Psychiatric Association (APA), American Academy of Child and Adolescent Psychiatry (AACAP), American Academy of Psychiatry and the Law (AAPL), and even within two non-psychiatrist led organizations, for example, the International Association for Correctional and Forensic Psychology (IACFP), and the American College of Correctional Physicians (AACP) (formerly known as the Society of Correctional Physicians (SCP)). (Dkt. 4174, ¶ 23.) He served as an appointed member of the APA Council on Psychiatry and Law, which reviews law and psychiatry issues pertaining to correctional and community settings, and as past chair of the APA Council on Children, Adolescents and Their Families. (Dkt. 4174, ¶ 23.)

1174. He has published extensively in scientific journals and other peer reviewed publications in the areas of correctional patient care, correctional psychiatry and mental health, incarcerated individuals with mental health and substance abuse issues, mental health needs of geriatric inmates and other special populations, recidivism, and continuity of care of offenders, and suicide prevention. (Dkt. 4174, ¶ 24.) Some recent publications specifically in correctional psychiatry and mental health include Psychiatric Services in Correctional Facilities: A Work Group Report of the American Psychiatric Association, the chapter, "Standards and Accreditation for Jails, Prisons, and Juvenile Facilities," in the Oxford Textbook of Correctional Psychiatry, and the chapter, "Correctional Psychiatry" in

the most current edition of the Kaplan and Sadock's Comprehensive Textbook on Psychiatry (now in its 50th anniversary edition). (Dkt. 4174, ¶ 24.) He was a lead author in the American Academy of Psychiatry and the Law (AAPL) "Resource Document for Prescribing in Corrections," and also a subsequent revision (which is in press), and a separate "Resource Document for Prescribing in Juvenile Justice/Correctional Settings." (Dkt. 4174, ¶ 24.)

1175. He has presented nationally and internationally and has consulted nationally on correctional and non-correctional mental health care delivery and standards of care. (Dkt. 4174, ¶ 25.) Some recent examples: the Office of the California Attorney General regarding the California Department of Corrections and Rehabilitations (CDCR); Office of the Nevada Attorney General regarding the Nevada Department of Corrections, Sacramento County Jail, Rio Consumnes Correctional Center (RCCC) and Yolo County Jail, and other surrounding county jails; Technical Assistance Project Consultant, U.S. Department of Justice in several states regarding jails, prisons and tribal nation correctional facilities, National Institute of Corrections (NIC); Technical Assistance to New York County Jails, Valhalla, New York; Consultant to the State of Vermont Department of Corrections; and Consultant, National Institute of Mental Health (NIMH) regarding ICE detainees. (Dkt. 4174, ¶ 25.)

1176. He has undergone specialized initial and ongoing training and served as a physician surveyor for the National Commission on Correctional Health Care (NCCHC), a national organization that provides health care accreditation of jails and short-term detention facilities, prisons, juvenile facilities, and opioid treatment programs in correctional facilities. (Dkt. 4174, ¶ 26.) He has surveyed several major metropolitan county jails, short term detention facilities (e.g., US Immigration and Customs Enforcement [ICE] facilities) nationally (these are listed in his CV). (Dkt. 4174, ¶ 26.) He is the past chair of the NCCHC accreditation committee and continues to serve as a committee member. (Dkt. 4174, ¶ 26.) He has served on several NCCHC standards revision task force groups to revise the NCCHC health care standards: NCCHC Standards for Health Services

in Jails and Prisons, NCCHC Standards for Mental Health Services in Correctional Facilities, and the NCCHC Juvenile Health Standards (he serves as the current chair of the juvenile standards revision work group). (Dkt. 4174, ¶ 26.) This demonstrates his current knowledge and direct involvement in the provision of psychiatric and mental health care to detained/incarcerated juvenile and adult offender populations. (Dkt. 4174, ¶ 26.)

1177. He is actively involved at a national level in a leadership role within several psychiatric organizations. (Dkt. 4174, ¶ 27.) He is on the Council of the American Academy of Psychiatry and the Law (AAPL) and am the AAPL representative to the NCCHC Board of Directors. (Dkt. 4174, ¶ 27.) He is a past chair of the AAPL Suicidology committee, a committee focused on suicide phenomenology and suicide assessment and prevention and remain an active committee member. (Dkt. 4174, ¶ 27.) He also serves on the AAPL Government Action Committee and the AAPL Media and Public Relations, and the AAPL Rappeport Fellowship Committee. (Dkt. 4174, ¶ 27.) He also serves on the American Academy of Child and Adolescent Psychiatry (Children and the Law committee, formerly known as the Rights and Legal Matters committee). (Dkt. 4174, ¶ 27.) He was previously the AACAP's representative to the NCCHC Board of Directors and am now the AAPL representative. (Dkt. 4174, ¶ 27.) He is the immediate past chair of the NCCHC Board of Directors. (R.T. 11/19/21 a.m. at 3063:9-23.)

1178. He has guided the development of correctional psychiatry resource documents, publications, policy, best practices, and position statements within the American Psychiatric Association, the American Academy of Psychiatry and the Law, the American Academy of Child and Adolescent Psychiatry, and the Texas Society of Psychiatric Physicians. (Dkt. 4174, ¶ 28.) He is a past president of the Texas Society of Psychiatric Physicians, the Texas statewide branch of the American Psychiatric Association. (Dkt. 4174, ¶ 28.) He is also involved at a state level and has testified at the Texas State Capital on a variety of psychiatric, correctional, and forensic psychiatry and mental health issues. (Dkt. 4174, ¶ 28.)

1179. In addition to those leadership roles, he also serves on the behavioral health

committee and the health care committee of the American Correctional Association (ACA), (the ACA also provides accreditation of correctional facilities nationally). (Dkt. 4174, ¶ 29.) He is a past board member of the American College of Correctional Physicians. (Dkt. 4174, ¶ 29.) He routinely observes and inspects jails and prisons not only across the United States but has also done so in Guatemala. (Dkt. 4174, ¶ 29.)

1180. He has extensive experience in examining access to care, continuity of care, mental health and psychiatric evaluation and treatment approaches to mitigate possible mental health sequelae for certain inmates in restrictive housing settings and other mental health and psychiatry best practices to include suicide prevention policies and practices within juvenile and adult correctional settings nationally. (Dkt. 4174, ¶ 30.) He has also published and presented in the areas of correctional mental health care and suicide prevention at state, national, and international meetings. (Dkt. 4174, ¶ 30.)

1181. He maintains ongoing communication with other correctional professionals who provide direct clinical, administrative, and/or consultative work within correctional settings across the United States (and several other countries). (Dkt. 4174, ¶ 31.) He frequently attends and presents at correctional health and other correctional related conferences and serves on several committees, as described earlier, including those conferences organized by the National Commission on Correctional Health Care (NCCHC), and the American Correctional Association (ACA). (Dkt. 4174, ¶ 31.) He served on the two most recent NCCHC task forces/work groups that were responsible for revising the separate NCCHC standards for jails and prisons in 2014 and 2018. (Dkt. 4174, ¶ 31.) He has participated in various American Psychiatric Association (APA), American Academy of Psychiatry and the Law (AAPL), and American Academy of Child and Adolescent Psychiatry (AACAP) committees and task force/work groups with relevance to adult and juvenile correctional health, suicide prevention policies and best practices, and the development of correctional standards and position statements. (Dkt. 4174, ¶ 31.) He is frequently contacted/consulted regarding policies, procedures, best practices, challenging patient cases or clinical situations, regarding his professional recommendations re: how to

provide access to care, continuity of care, and implement efficient psychiatric and mental health care to jails, prisons, and other correctional settings, and have been qualified and rendered testimony at depositions and trials as an expert witness in several state and federal courts. (Dkt. 4174, ¶ 31.)

1182. Through these various experiences and his ongoing continuing medical education, he remains current in best practices for correctional mental health care services. (Dkt. 4174, ¶ 32.) Further, he continually reviews emerging correctional health research and evidence-based practices and quality improvement initiatives. (Dkt. 4174, ¶ 32.) For example, in his role as a reviewer for several scientific journals and through his work on the editorial board of the Journal of Correctional Health Care, he has knowledge and experience in reviewing the scientific merit and methodology of correctional health manuscripts/reviews. (Dkt. 4174, ¶ 32.) He is also particularly knowledgeable and maintain daily direct clinical and administrative involvement in establishing access to mental health and psychiatric care and continuity of care in the Texas state prison system regardless of the medical and/or mental health need and acuity, across a variety of custody levels. (Dkt. 4174, ¶ 32.) This includes restrictive housing settings, suicide prevention, psychiatry evaluation, and treatment practices and modalities within state prison correctional settings. (Dkt. 4174, ¶ 32.) Due to his direct work experience and career focus on correctional psychiatry, and his work within organized psychiatry, correctional and forensic psychiatry at a state and national level, he is uniquely qualified to render opinions regarding the provision of psychiatric services within correctional settings. (Dkt. 4174, ¶ 32.)

1183. In summary, Dr. Penn has dedicated his career to direct patient care, other clinical and administrative work, and consultative services within juvenile and adult correctional settings for approximately 22 years. (Dkt. 4174, ¶ 33.)

1184. With respect to his academic work and clinical teaching roles, he is a Clinical Professor, Department of Psychiatry and Behavioral Sciences, UTMB, Galveston, Texas. (Dkt. 4174, ¶ 34.) He was previously Clinical Associate Professor in the Department of

Psychiatry and Human Behavior, at Brown University and the Warren Alpert Medical School, Providence, Rhode Island. (Dkt. 4174, ¶ 34.) He provides clinical supervision to several psychiatrists, psychiatric nurse practitioners, physician assistants, and student trainees. (Dkt. 4174, ¶ 34.) He provides grand rounds, lectures, and trainings on a variety of correctional psychiatry topics at several medical schools and residency/fellowship training programs, to clinical faculty, psychiatry residents, medical students, physician assistant students and other trainees, treatment program staff, other professional organizations and is frequently invited to lecture in state, nationally, and internationally. (Dkt. 4174, ¶ 34.)

1185. He attends state and national meetings and has completed continuing medical education (CME) and maintenance of certification requirements to become and maintain his status as a triple board-certified psychiatrist – board certified in forensic psychiatry, general adult psychiatry, and child and adolescent psychiatry. (Dkt. 4174, ¶ 35.) He previously served as a board examiner for the American Board of Psychiatry and Neurology (ABPN) in the areas of general adult psychiatry and child and adolescent psychiatry, on the general psychiatry recertification committee, and on the forensic psychiatry committee (for individuals who had completed a forensic psychiatry fellowship training program and are now sitting for their initial ABPN board certification exam in forensic psychiatry, or alternatively sitting for their 10 year recertification exams. (Dkt. 4174, ¶ 35.) He currently serves on the ABPN Forensic Psychiatry Maintenance of Certification (MOC) committee. (Dkt. 4174, ¶ 35.)

1186. He has been qualified as an Expert Witness in various State and Federal Courts, in the field of Forensic, Child and Adolescent, and Correctional Psychiatry (1998-present), and has given expert opinion in the several areas, for example, standards of care in jails, prisons, juvenile correctional facilities and other settings. (Dkt. 4174, ¶ 36.) He has also provided expert opinion regarding the use of psychotropic medications, psychic harm, PTSD, suicide, suicide prevention, suicide risk assessment, seclusion and restraint and other mental health and psychiatry content areas. (Dkt. 4174, ¶ 36.)

1187.   From 2013-2014 he was a Correctional Psychiatric Consultant to the Special Master, Coleman v. Brown, Governor of California, et al., United States Court of Appeals, Ninth Circuit, Pasadena, California.  (Dkt. 4174, ¶ 37.)  From 2017–2019, he served as a consultant to the State of California's Office of the Attorney General regarding psychiatrists, psychologists, and other mental health professional staffing, use of telepsychiatry, and increasing level of efficiencies within the health care service delivery within the California Department of Corrections and Rehabilitation (CDCR) state prison units statewide.  (Dkt. 4174, ¶ 37.)  He has also toured several CDCR prison facilities, interviewed CDCR health care staff, and in particular focused site evaluations of restrictive housing units and specialty programs for inmates with medical and mental health needs with respect to access to care and continuity of care concerns.  (Dkt. 4174, ¶ 37.)

1188.   Since 1998, he has conducted numerous evaluations and site tours of various state prisons in Rhode Island, Vermont, Texas, California, and Arizona.  (Dkt. 4174, ¶ 38.)  He has toured numerous high security restrictive housing settings (formerly known as ad seg/administrative segregation) to include male and female Death Row units in Texas and Arizona.  (Dkt. 4174, ¶ 38.)  Based upon his experience, he is familiar with different custody and housing levels, inmate movement for various activities (custody escorts to medical clinics for medical, mental health or specialty clinic appointments, inmate movement for recreation, dining, work assignments, commissary, showers, visitation) and other operational issues.  (Dkt. 4174, ¶ 38.)  While he does not suggest that he is an expert with regard to general correctional custody issues, he has a fundamental appreciation of the impact and interplay between correctional custody and mental health delivery in custodial situations.  (Dkt. 4174, ¶ 38.)

1189.   His state medical and federal Drug Enforcement Agency (DEA) licenses are on file with the proper authorities.  (Dkt. 4174, ¶ 39.)  He holds a full and unrestricted medical license to practice in the State of Texas.  (Dkt. 4174, ¶ 39.)  He previously held full and unrestricted medical licenses in Rhode Island, Massachusetts, and Connecticut (they remain in lapsed and/or inactive status because he lives and practices correctional and

forensic psychiatry exclusively in Texas.)  (Dkt. 4174, ¶ 39.)

1190.  Although he has extensive state and national correctional health experience, aside from his retention in this case, he has no current or past affiliations with ADCRR, defendants, or other facility correctional custody, contracted health care, or administrative staff.  (Dkt. 4174, ¶ 40.)

1191.  Based upon his many years of study and practice and ongoing requirements in order to achieve and maintain triple board certification in the areas of general adult psychiatry, child and adolescent psychiatry, and forensic psychiatry, combined with his 20 plus years of work providing direct patient care as well as administering mental health care delivery systems in a variety of correctional settings, he is amply qualified to render opinions on the standard of care as it relates to the psychiatric and mental health treatment services provided by ADCRR and Centurion, across the various Arizona prison complexes. (Dkt. 4174, ¶ 41.)

1192.  In summary, he has "real world" experience in all aspects of mental health care within state prison and other correctional settings.  (Dkt. 4174, ¶ 42.)  He has over 15 years serving on three different pharmacy and therapeutics committees and is involved in formulary medication decisions. (Dkt. 4174, ¶ 42.)  He reviews and approves, versus defers, non-formulary psychotropic medication requests.  (Dkt. 4174, ¶ 42.)  With regard to his work as a forensic psychiatrist, he is not solely a plaintiff or defense expert.  (Dkt. 4174, ¶ 42.)  When possible, he attempts to balance as a court appointed expert, plaintiff's expert, and defense expert.  (Dkt. 4174, ¶ 42.)

1193.  Dr. Penn is a qualified, triple-board-certified psychiatrist with over 22 years of correctional mental health care experience.

1194.  Based upon his review of mortality reviews, psychological autopsies, mental health records of inmates whose in-custody deaths were determined to be suicides, correctional records, and his interviews of various Centurion and ADCRR staff, Dr. Penn formed opinions regarding the allegations in Plaintiffs' Complaint and the opinions of their experts, Dr. Pablo Stewart and Craig Haney.  (Dkt. 4174, ¶ 47.)  Each of his opinions are

detailed below and are based upon his review of the documents mentioned above and his years of training and experience. (Dkt. 4174, ¶ 47.) All his opinions are to a reasonable degree of medical and psychiatric certainty. (Dkt. 4174, ¶ 47.)

1195. To avoid the selection bias present in the files selected by Plaintiffs' counsel and Dr. Stewart, and to capture the overall quality of mental health and psychiatric services being provided to ADCRR inmates, Dr. Penn utilized a truly random and standardized process to select files for review. (Dkt. 4174, ¶ 48.) To ensure that this selection focused on ADCCRR inmates with mental health needs, he had ADCRR generate a list of all inmates housed at all six corridor facilities, with a MH-score of 3 or higher. (Dkt. 4174, ¶ 48.) The report he received contained the data aggregated and sorted by facility. (Dkt. 4174, ¶ 48.) For each row of each complex, a column was added with MS Excel's random number function (=RAND()). (Dkt. 4174, ¶ 48.) Because the value changes with every edit to an MS Excel workbook, those data columns were copied and pasted as "valued only" to preserve the number. (Dkt. 4174, ¶ 48.) Those random values were then sorted from smallest to largest, with the rows for the 15 smallest random values selected for review from ASPC Eyman, Florence, Phoenix, Lewis, Tucson and Yuma. For ASPC Perryville, the same process was used with 30 rows selected. (Dkt. 4174, ¶ 48.) Only one file identified through this random selection also appeared on the list of files reviewed by Dr. Stewart. (Dkt. 4174, ¶ 48.)

1196. Dr. Penn reviewed both the charts reviewed by Dr. Stewart and the random charts selected through his methodology described above. (R.T. 11/19/21 a.m. at 2965:9-14.)

1197. Unlike the selection-bias methodology employed by Dr. Stewart, the random sample methodology employed by Dr. Penn is a sound and reliable methodology that is representative of the ADCRR system as a whole.

1198. To assist in his review of the voluminous individual chart review, due to the accelerated time in which his report was to be completed, Dr. Penn utilized four practicing correctional psychiatrists (Donald Reeves, M.D., Anthony Tamburello, M.D., Nubia

Lluberes, M.D., and Gabrielle Hobday, M.D.), each of whom completed both a general and forensic psychiatry program and currently works within a state prison correctional system as a psychiatrist. (Dkt. 4174, ¶ 49.)

1199. With no prior knowledge of the current ADCRR litigation, Dr. Penn asked them to independently review the randomly selected medical charts or charts reviewed by Dr. Stewart. (Dkt. 4174, ¶ 50.) To ensure objectivity, these consultants were blinded. (Dkt. 4174, ¶ 50.) They did not know whether the medical record files they reviewed were part of the random selection or the hand-picked "persons with the most serious mental health concerns or diagnoses" files selected by Plaintiffs and Dr. Stewart. (Dkt. 4174, ¶ 50.) Moreover, files were assigned for review in a manner such that no one consultant would be responsible for the exclusive review of any ADCRR complex. (Dkt. 4174, ¶ 50.) Dr. Penn also reviewed each of these files—some of them several times. (R.T. 11/19/21 a.m. at 2968:4-6.)

1200. Each of the consultants were instructed to determine whether access to care was provided for each of the charts they reviewed. (R.T. 11/19/21 a.m. at 2966:19-2968:3.) Dr. Penn instructed them to look for the good, bad, and ugly and to not hold anything back. (R.T. 11/19/21 a.m. at 2966:19-2968:3.) The consultants took notes regarding their chart reviews and shared them with Dr. Penn. (R.T. 11/19/21 a.m. at 2966:19-2968:3.) After Dr. Penn provided them with the instructions, he had no further contact with them. (R.T. 11/19/21 a.m. at 2968:7-14.)

1201. Thus, the access to mental health care via medical record review at each ADCRR corridor complex was reviewed by not only Dr. Penn, but also by these multiple independent consults with correctional and forensic training and 46 years cumulative of correctional psychiatry experience. (Dkt. 4174, ¶ 51.)

1202. The consultants' notes strongly reinforced Dr. Penn's opinions in this case. (R.T. 11/19/21 a.m. at 2969:23-2970:16.) Specifically, of the 156 files that Dr. Stewart reviewed, the consultants determined that only 33 may have had access to care issues. (R.T. 11/19/21 a.m. at 2969:23-2971:5.) 79% of the files, however, demonstrated appropriate

access to care. (R.T. 11/19/21 a.m. at 2969:23-2971:5.) This is significant as these are the "worst of the worst" files selected by Dr. Stewart. (R.T. 11/19/21 a.m. at 2969:23-2971:5.) Of the 120 charts that Dr. Penn randomly selected, the consultants determined that only five may have had access to care issues. (R.T. 11/19/21 a.m. at 2969:23-2971:5.) Significantly, of the five cases, there were no adverse patient outcomes—there was no morbidity or mortality. (R.T. 11/19/21 a.m. at 2972:23-2973:12.) Put another way, 95% of the randomly selected files demonstrated appropriate access to care according to the consultant's neutral, objective review. (R.T. 11/19/21 a.m. at 2969:23-2971:5.)

1203. Because Dr. Penn used an appropriate sampling methodology, the findings from his team's chart reviews can be generalized to the ADCRR population as a whole.

1204. It is Dr. Penn's opinion that, based upon his review of the above-referenced inmate medical charts, that is there is adequate access to mental health care (whether it be suicide risk assessment, mental health evaluations, suicide precautions, psychiatric evaluations, psychotropic medication treatment, etc.). (R.T. 11/19/21 a.m. at 2971:6-24.) While Dr. Penn acknowledges that there are bad outcomes in healthcare, and that he believes a breakdown between nursing triage and mental health staff occurred in one particular file, the totality of his review led him to conclude that, overall, there is adequate access to mental health care. (R.T. 11/19/21 a.m. at 2971:6-24.)

1205. Dr. Penn's opinion with respect to access and continuity of care is further supported by his review and analysis of HNR data, to include how long it took to triage an HNR and be seen. (R.T. 11/19/21 a.m. at 2986:25-2988:3.) Based upon his review of this data, he opines that overall, inmates are timely seen within the standard of care. (R.T. 11/19/21 a.m. at 2986:25-2988:3.)

1206. Dr. Penn has previously toured all corridor ADCRR facilities. (Dkt. 4174, ¶ 52.) In preparation of this report, however, due to travel and time restrictions, Dr. Penn limited his tours to the corridor facilities that incarcerate ADCRR inmates who are on the mental health case load: Phoenix, Eyman, Lewis, Perryville, Yuma, and Tucson. (Dkt. 4174, ¶ 52.) He did not tour Florence, as inmates on the mental health case load were

transferred from the facility prior to his tour. (Dkt. 4174, ¶ 52.) During his tours, he visited the state-licensed inpatient psychiatric units at Perryville and Phoenix; specialized female treatment programs at Perryville; specialized male treatment programs at Phoenix; and high-custody housing areas. (Dkt. 4174, ¶ 52.) Before each tour, he met with the respective complex's correctional and healthcare leadership in a group setting. (Dkt. 4174, ¶ 52.) Throughout the tour and upon its conclusion, he had the opportunity to ask additional, individualized questions of corrections and healthcare staff. (Dkt. 4174, ¶ 52.)

1207. Below is a description of the methodology utilized by Dr. Penn to conduct his September 2021 (and all previous) tours:

> He conducted a physical tour of intake and reception areas, housing areas, and individual cells. Upon entering individual cells, he noted the following items: reading materials, writing materials, boxes containing legal files, personal items, food, keep on person (KOP) medications, music, walkmans, tablet computers, and televisions which were allowed and available. He also observed day areas, recreation areas (with an emphasis on higher custody recreation areas), medical, dental, and mental health clinic areas. Further, he toured educational facilities, unit medical records departments, and other administrative support office space. He focused his tours on areas of higher custody levels, where prisoners were housed in any type of additional or special observation, and where prisoners were being monitored in "watch cells" while on various suicide prevention observation levels.

> He performed additional observation of state prisoners engaging in recreational activities while in their housing area such as basketball, jogging, weightlifting, and exercising. He saw work detail assignments including sweeping, cleaning, landscaping, gardening, and painting murals. Further, he noted groups of inmate movement going to and from the chow hall (dining area) and in line for store items (commissary area). He observed inmates in waiting room and clinic areas, group education, group psychotherapy, and vocational education.

> He observed medications being administered in pill lines by nursing staff at several facilities. He also observed mental health staff assessing prisoners housed on suicide precautions or in other high security settings. Within certain units, staff were mandated to wear protective stab-proof vests and protective eye wear or, alternatively, spit shield helmets. In several watch status and high custody housing settings, he watched mental health care staff wearing protective stab-proof vests and goggles as they interacted with inmates. They spoke in a calm, professional, and therapeutic manner. Similarly, nursing staff (wearing the same protective gear) administered

223

medications, organized medications and blister packs, and documented their clinical activities.

(Dkt. 4174, ¶¶ 53, 54.)

1208. During his tours, he looked for similar things that a surveyor would look for when conducting an NCCHC audit, including employing the same principles of objectivity and neutrality. (R.T. 11/19/21 a.m. at 2961:8-2962:2.)

1209. Additionally, during his September 2021 tours, he observed correctional officers conducting mental health watches and mental health staff's interactions with ADCRR inmates. (Dkt. 4174, ¶ 54.) He did not observe them reading books or engaging in other distracting activities, as Dr. Stewart claims. (Dkt. 4174, ¶ 54.) He also reviewed various watch logs and confirmed that they were completed timely and in accordance with policy. (Dkt. 4174, ¶ 54.) Additionally, he observed the Warden, Deputy Warden, and other correctional and healthcare staff interacting with individual inmates across different settings such as: housing pods, restrictive housing units, and clinic areas. (Dkt. 4174, ¶ 54.) He also interviewed a variety of facility employees, including captains, majors, lieutenants, assistant deputy wardens, senior wardens, educational staff, unit psychiatric providers (nurse practitioners), unit mental health leads, lead psychologists, psychology associates, pharmacy staff, and mental health staff. (Dkt. 4174, ¶ 57.) Most notably, he spoke often with the following individuals:

> Bobbie Pennington Stallcup, PsyD (Doctor of Psychology), Mental Health Program Director, Health Services Contract Monitoring Bureau, Arizona Department of Corrections
>
> Mark Haldane, Program Evaluation Administrator for ADCRR Monitoring Bureau
>
> Micaela McLane, Program Evaluation Administrator for ADCRR Monitoring Bureau
>
> Antonio Carr, MD, Statewide Psychiatric Director – Centurion
>
> Dr. Ashley Pelton, Clinical Psychologist, Regional Mental Health Director – Centurion

(Dkt. 4174, ¶ 57.)

1210. He was not permitted to interview any individual inmates, including those

who are referenced in Dr. Stewart's Report.  (Dkt. 4174, ¶ 58.)  Not being permitted to speak to inmates, at Plaintiffs' counsel's instruction, was the biggest challenge during Dr. Penn's tour.  (R.T. 11/19/21 a.m. at 2961:8-2962:13.)  However, he did review their records in eOMIS.  (Dkt. 4174, ¶ 58.)

### 3. ADCRR's Provision of Mental Health Care Is Constitutionally Adequate.

1211.  Dr. Stallcup is the Mental Health Program Director for ADCRR's Medical Services Contract Monitoring Bureau.  (R.T. 11/17/21 a.m. at 2435:17-2435:23.)

1212.  As the Mental Health Program Director, Dr. Stallcup ensures that the medical vendor (Centurion) is meeting or exceeding the expectations laid out in their contract.  (R.T. 11/17/21 a.m. at 2438:10-2438:22.)  Additionally, she ensures that ADCRR's practices are in line with national standards set forth by NCCHC, ACA, and Court orders.  Finally, Dr. Stallcup reviews inmate medical charts each day to ensure these tasks are being met.  (R.T. 11/17/21 a.m. at 2438:10-2438:25.)

1213.  The purpose of reviewing inmate medical charts (approximately 4,000 documents a month) is to ensure that ADCRR is meeting the Stipulation's standards.  (R.T. 11/17/21 a.m. at 2439:8-2439:14, 2439:21-2440:5.)  If problems are identified, ADCRR develops solutions to address those problems and ensure the solutions are actually being put into place.  (R.T. 11/17/21 a.m. at 2439:8-2439:14.)

1214.  To assist her in these duties, Dr. Stallcup has two licensed mental health clinicians who serve as mental health monitors and two program evaluation specialists, who are similar to a behavior health technician.  (R.T. 11/17/21 a.m. at 2439:4-2439:7.)

1215.  Dr. Stallcup meets with her team each week, to talk about their findings and identify areas for improvement.  (R.T. 11/17/21 a.m. at 2439:15-2439:20.)

1216.  Additionally, Centurion restructured its regional mental health team to create a better on-site support staff.  (R.T. 11/5/21 p.m. at 1086:14-17.)

1217.  There are 27 mental health performance measures.  (R.T. 11/17/21 a.m. at 2440:15-17.) As of July 2021, these measures were performing above 90%.  (R.T. 11/17/21

1 | a.m. at 2443:18-2443:20.)

2 1218. Since assuming the role of Mental Health Program Director in August 2020,
3 Dr. Stallcup implemented guidelines for medical record documentation. (R.T. 11/17/21
4 a.m. at 2435:22-25; 2443:21-2444:16.) Such guidelines include what the patient told the
5 provider, what the provider observed, what the provider's assessment was, what treatment
6 was provided, and what follow-up plan was developed. (R.T. 11/17/21 a.m. at 2443:21-
7 2444:16.) These guidelines exceed the Stipulation's requirements and have improved chart
8 documentation. (R.T. 11/17/21 a.m. at 2444:22-2445:19.) While lack of documentation
9 does not necessarily indicate that care was not provided, detailed documentation allows a
10 reviewer to assess if care was provided and whether it was appropriate. (R.T. 11/17/21 a.m.
11 at 2444:17-2444:21, 2445:11-2445:19.)

12 1219. From June 2020 to July 2021, Dr. Stephanie Platt was the Regional Mental
13 Health Director at Centurion. (R.T. 11/5/21 a.m. at 1030:3-7.) She oversaw the mental
14 health programs and operations at ADCRR. (*Id*. at 1030:8-11.)

15 1220. Dr. Platt assisted Dr. Stallcup in ADCRR's endeavor to reduce self-harm
16 incidents. (R.T. 11/5/21 a.m. at 1057:11-25; R.T. 11/5/21 p.m. at 1079:21-1080:6, 1081:15-
17 21.).

18 1221. Dr. Platt and Dr. Stallcup also worked together to improve quality of patient
19 care, documentation, interventions, and treatment planning. (R.T. 11/5/21 p.m. at 1082:5-
20 16.)

21 1222. They also "implemented plans to have several stages of treatment plans,
22 several tiers of individuals that would oversee the treatment plans, review them, contribute
23 to them, and thus have something very individualized and more complex that was developed
24 to help with preventive care for individuals that were feeling suicidal or possibly self-
25 injurious, things like that." (*Id*. at 1083:8-14.)

26 1223. About Dr. Stallcup, Dr. Platt testified: "I have a very high opinion of her
27 actually. I believe that she is somebody that is passionate about what she does. I think she
28 very much cares about the patient population we work with and pours herself into working

1    to do whatever she can to benefit and improve the quality of care." (*Id*. at 1086:9-13.)

2        1224. When Dr. Platt resigned, she noted that "it was a pleasure to work in the

3    Arizona system," that she was "grateful to have the opportunity to effect the positive

4    changes," that she "worked with a phenomenal team of mental health providers and

5    administrators," that she "had the privilege to work on meaningful corporate projects with

6    outstanding leaders," and that it was her hope that "the positivity [from some of the changes

7    she put into place] can be reaped within the Department for years to come." (*Id*. at 1092:19-

8    1093:12.)

9        **Staffing**

10       1225. It is important to begin with the fact that there is no national requirement or

11   guideline for recommended staffing in jails or prisons. (Dkt. 4174, ¶ 65.) Staffing levels

12   are virtually impossible to set with any objective formula or standard that has general

13   applicability. (Dkt. 4174, ¶ 65.) In Dr. Penn's opinion, setting national staffing standards

14   would be arbitrary and would not provide correctional system with flexibility. (R.T.

15   11/19/21 a.m. at 2974:16-2975:8.) For this reason, staffing cannot be static or fixed in Dr.

16   Penn's opinion. (R.T. 11/19/21 a.m. at 2974:16-2975:8.) Rather, staffing levels should be

17   assessed for a particular system based upon a clinical determination that adequate mental

18   health services may be, or are, provided by a particular number of various types of

19   professional staff providing the required services. (Dkt. 4174, ¶ 65.) To put it another way,

20   staffing rations in correctional settings must allow for the provision of care which meets the

21   standard of care. (Dkt. 4174, ¶ 65.) In Dr. Penn's opinion, NCCHC provides a simplistic

22   standard for staffing—the healthcare system or facility must have adequate staff to provide

23   the services required or needed. (R.T. 11/19/21 a.m. at 2974:16-2975:8.) This, in Dr.

24   Penn's opinion, makes perfect sense. (R.T. 11/19/21 a.m. at 2974:16-2975:8.)

25       1226. Because there is not a one size fits all standard to mental health staffing in

26   corrections, to render an opinion as to whether the staffing is adequate, Dr. Penn relied upon

27   the following prior to rendering his opinion that mental health staffing at ADCRR is

28   adequate: staffing reports and trends, interviews of staff at both the facility and regional

level, interviews with the monitoring bureau. (R.T. 11/19/21 a.m. at 2977:8-2978:16.) Among questions he asked, included what occurs when they have a vacancy and what do they do; what the process for staffing is on weekends, holidays, and after hours. (R.T. 11/19/21 a.m. at 2974:16-2975:8.) This allowed Dr. Penn to get a sense of, aside from just papers, to answer the pivotal question—do they have enough staff to achieve the desired results? (R.T. 11/19/21 a.m. at 2974:16-2975:8.) Through these interviews, he learned that Centurion utilizes a staffing agency, that staff work overtime or cross-cover when needed, and that there is a robust on-call system. (R.T. 11/19/21 a.m. at 2974:16-2975:8.)

1227. When he conducted these staffing interviews, he informed staff that he wanted them to be straightforward with him, to tell him their dirty laundry, the real deal, and to not hold back. (R.T. 11/19/21 a.m. at 2978:17-2979:10.) Some staff shared with him what is common with anyone who works in healthcare—they always want more staff. (R.T. 11/19/21 a.m. at 2974:16-2975:8.) In healthcare, it would be rare for staff to tell you they do not need additional staff. (R.T. 11/19/21 a.m. at 2974:16-2975:8.)

1228. It was extremely important to Dr. Penn to analyze staffing trends from 2012 to the present because it demonstrated that under Centurion, staffing has increased. (R.T. 11/19/21 a.m. at 2979:14-2980:12.) Specifically, they have increased their psychiatric mid-levels and psychology associates. (R.T. 11/19/21 a.m. at 2974:16-2975:8.)

1229. It is Dr. Penn's opinion that ADCRR's contracted mental health services vendor, Centurion, has adequate numbers and types of mental health staffing. (Dkt. 4174, ¶ 66.) NCCHC defines a staffing plan as a plan that "lays out the full-time equivalent staff coverage required, lists current incumbents and vacancies, and addresses how full coverage will be accomplished if all positions are not filled (e.g., use of agency, temporary, or part-time staff)." (Dkt. 4174, ¶ 66.) ADCRR's staffing matrix accomplishes these goals, particularly where existing staff occasionally work beyond their set schedules to cross cover to fill a vacancy. (Dkt. 4174, ¶ 66.)

1230. Indeed, NCCHC found that ADCRR's staffing plans were adequate during all accreditations. (Dkt. 4174, ¶ 67; Ex. 3305 at ADCRR00138382-83 (Douglas); Ex. 3307

228

at ADCRR00138484-85 (Eyman, noting that "even through the vacancy rate is high, shifts are covered and staffed adequately and care is being provided" although a 85% of nurse staffing is by contracted agency); Ex. 3309 at ADCRR00138617-18 (Florence); Ex. 3311 at ADCRR00138674-75 (Lewis); Ex. 3313 at ADCRR00138744-45 (Perryville); Ex. 3315 at ADCRR00138801-02 (Phoenix); Ex. 3316 at ADCRR00138898-99 (Safford); Ex. 3318 at ADCRR00138844-45 (Fort Grant Unit); Ex. 3320 at ADCRR00138974-76 (Tucson); Ex. 3322 at ADCRR00139120-21 (Winslow); Ex. 3323 at ADCRR00139071-72 (Apache Unit); Ex. 3325 at ADCRR00139197-98 (Yuma)).

1231. Dr. Penn disagrees with Dr. Stewart's assertion that ADCRR healthcare staffing, specifically mental health professionals, is inadequate. (Dkt. 4174, ¶ 68.) Centurion directly employs an array of qualified mental health professionals including:

- psychiatric director
- mental health director (doctorate level psychologist)
- staff psychiatrists
- staff psychiatric mid-level practitioners
- nurse practitioners and physician assistants
- staff psychologists (both doctoral and masters level)
- masters level clinicians
- licensed clinical social workers
- case managers/case workers
- other masters and bachelors level mental health clinicians
- psychiatric nurses

(Dkt. 4174, ¶ 68.)

1232. Dr. Penn further disagrees with Mr. Joy's opinion that voluminous numbers of substance abuse counselors should be employed within ADCRR facilities. This is unnecessary and would represent a waste of resources. (Dkt. 4174, ¶ 69.)

1233. There is a national shortage of psychiatrists in the U.S. In his administrative capacity and in his consulting, national presentations, involvement in state and national

organizations, committee work, and communication with other correctional health care professionals nationally, Dr. Penn is extremely familiar with the challenges in the recruitment and retention of psychiatrists, psychologists, and other qualified mental health professionals to work within correctional settings. (Dkt. 4174, ¶ 70.) Due to a variety of factors, including geographical challenges (many prisons are in remote, rural areas), stigma and safety issues associated with working in a correctional setting, lack of awareness of unique patient population and career opportunities, and funding limitations, many psychiatrists avoid practicing in correctional settings. (Dkt. 4174, ¶ 70.) It is also important to note that health care staffing recruitment and retention challenges and shortages have been magnified—for all agencies—due to the unexpected absences resulting from the unprecedented COVID-19 pandemic. (Dkt. 4174, ¶ 70.) As a result, utilization of mid-levels has increased in the last 10-15 years. (R.T. 11/19/21 a.m. at 2980:13-2981:24.) Mid-levels are less expensive and typically have both nursing and clinical experience. (R.T. 11/19/21 a.m. at 2974:16-2975:8.) As such, correctional systems are moving toward using more mid-levels. (R.T. 11/19/21 a.m. at 2974:16-2975:8.) Utilization of mid-levels meets the standard of care. (R.T. 11/19/21 a.m. at 2981:25-2982:12.)

1234. Despite these challenges, however, mental health staffing at ADCRR has continuously increased (and nearly doubled) since health care was privatized in 2012. (Dkt. 4174, ¶ 71.) In 2012, there were only 67.5 budgeted mental health positions. As of July 2016, there were 78.9 budgeted mental health positions. By July 2021, there were a total of 131 budgeted mental health positions. (Dkt. 4174, ¶ 71.) Between 2012 and July 2021, there was a 377% growth in the number of FTE psychiatric providers (from 7.5 to 31), and 64% growth in the number of FTE psychology clinicians (from 61 to 100) in the 10 ADCRR complexes at issue. (Dkt. 4174, ¶ 71.)

1235. It is important to note that ADCRR's inmate population is also on a declining trend—and fewer inmates require fewer staff. (Dkt. 4174, ¶ 72.) To illustrate, when Centurion came on board on July 1, 2019, there were 34,015 inmates in ADCRR custody at the facilities at issue. (Dkt. 4174, ¶ 72.) On October 18, 2021, that population was down

to 27,174. (Dkt. 4174, ¶ 72.) This represents a reduction of 6,841 inmates or 20.11% of ADCRR's population over 27 months. (Dkt. 4174, ¶ 72.) Importantly, while the inmate population has declined by more than 20%, the contractual staffing levels have not. (Dkt. 4174, ¶ 72.)

1236. That the inmate population has significantly decreased, but staffing levels have not, indicates Defendants are not deliberately indifferent.

1237. Additionally, as Centurion's Vice President of Operations, Arizona, Tom Dolan, detailed, Centurion has made a concerted effort to recruit, retain, and competitively compensate mental health staff. (Dkt. 4174, ¶ 73.)

1238. ADCRR's and Centurion's efforts to increase staffing show they are not deliberately indifferent to the serious mental health needs of ADCRR inmates.

1239. Dr. Stewart asserts a need for more reliance on psychiatric physicians within this state correctional system, but this is neither clinically indicated, justifiable, or in keeping with correctional health practices nationwide. (Dkt. 4174, ¶ 74.) It is Dr. Penn's opinion that the rote expansion in numbers of psychiatric physicians (as is the case in the State of California) has not demonstrated any advantageous clinical outcomes and is instead a fiscal burden. (Dkt. 4174, ¶ 74.) Psychiatric physicians tend to be one of the smallest percentages of mental health work forces found within county, state, and federal correctional systems and public and county mental health systems nationally. (Dkt. 4174, ¶ 74.) Most correctional mental health systems nationally mirror private and public mental health systems (VAs, state hospitals, and mental health centers) and largely rely on and emphasize a behavioral team approach to patients with serious mental illness. (Dkt. 4174, ¶ 74.) In other words, case workers, case managers, social workers, bachelors and masters-level licensed professional counselors and psychologists, and doctoral level psychology staff, psychiatric physicians, psychiatric nurse practitioners, physician assistants, and other staff work in a collaborative team approach to address treatment needs. (Dkt. 4174, ¶ 74.)

1240. In Dr. Penn's opinion, the utilization and staffing of psychiatric nursing, as implemented by Centurion at ADCRR, is a best practice within a state prison correctional

setting and conforms to the standard of care. (Dkt. 4174, ¶ 75.) In many state correctional systems, psychotropic medications are routinely administered at pill windows by less qualified or experienced pharmacy techs or non-nursing staff. (Dkt. 4174, ¶ 76.) Psychiatric nursing staff have additional training regarding mental illness, psychotropic medications, and side effects. (Dkt. 4174, ¶ 76.) They provide psychotropic medication education and stress the need for medication compliance. Psychiatric nurses have a greater comfort level and experience dealing with inmates with mental disorders and serious mental illness. (Dkt. 4174, ¶ 76.) Non-psychiatric nurses, "medical" nurses, typically do not have this background. (Dkt. 4174, ¶ 76.)

1241. The unique role and skill set of psychiatric nurses are particularly valuable when administering PMRB/forced antipsychotic medications. (Dkt. 4174, ¶ 77.) They are often able to develop therapeutic working relationships with particularly distrustful inmates with serious mental illnesses, encourage them to comply with their medications, and accept medications voluntarily, which is more likely to prevent the inmate from decompensating in a manner which otherwise might result in a use of force. (Dkt. 4174, ¶ 77.)

1242. A bulk of mental healthcare delivery is provided by nonpsychiatrists in the community. (Dkt. 4174, ¶ 78.) In a similar manner nationally, due to a shortage of psychiatrists and/or other payer issues, psychiatric care is typically provided in primary care settings by nonpsychiatrists, specifically family physicians, internists, and pediatricians for adults and youths, respectively. (Dkt. 4174, ¶ 78.) These primary care professionals typically treat outpatients with non-psychotic mental illness, such as anxiety and depression, and psychiatrists are viewed as specialty referrals and are only used for a minority of complicated cases. (Dkt. 4174, ¶ 78.) Although the State of California has increased its base pay for psychiatrists and has implemented sweeping increases in the number of psychiatrists on site at various facilities, there is no published data to date that has demonstrated any improvements in the caliber and quality of mental healthcare in that system based on increased psychiatry staffing. (Dkt. 4174, ¶ 78.)

1243. Independent of the psychiatric staffing expectations that Dr. Stewart

proposes, according to Dr. Penn, there is no established or empirically validated correctional staffing plan, staffing ratios or recommendations for mental health and psychiatric staff within correctional settings. (Dkt. 4174, ¶ 78.) Instead, this should be performed based on patient clinical needs on an individual facility, county, or state basis. (Dkt. 4174, ¶ 78.) The current psychiatric and mental health staffing, available and offered mental health services of the above (availability of licensed and qualified and non-licensed mental health staff, psychologists, and psychiatrists) and availability of individual and group therapy for clinically appropriate offender patients and psychotropic medication treatment are well within the generally accepted standards for psychiatric and mental healthcare in state prison settings. (Dkt. 4174, ¶ 78.) The above staffing availability allows for services to be provided when an offender requests medical or mental health services or is identified to be in need of services. (Dkt. 4174, ¶ 78.) It also allows for the required services for state prisoners who experience suicidal behavior or ideation. (Dkt. 4174, ¶ 78.)

1244. To illustrate the inaccuracy of Dr. Stewart's opinions, according to the California Correctional Health Care Services website, recently there were over 90 vacant psychiatry positions in the state despite an average annual salary of $273,156 to $381,696. (Dkt. 4174, ¶ 79.) There is also a lack of psychiatrists nationwide. (Dkt. 4174, ¶ 79.) In Dr. Penn's opinion, this is not an Arizona-specific problem or an issue that is related to salary. (Dkt. 4174, ¶ 79.)

1245. At ADCRR, Centurion takes a multidisciplinary treatment team approach to provision of inmate mental health care. (Dkt. 4174, ¶ 80.) Encouraging and supporting a collaborative relationship and good communication between mental health and custody staff maximizes the likelihood of delivering quality clinical services. (Dkt. 4174, ¶ 80.) At ADCRR, mental health clinicians, nursing, and other health care staff, and custody personnel are partners in providing safe and effective services to inmates. (Dkt. 4174, ¶ 80.) It is essential that they align their efforts to identify inmates with mental illness and coordinate an effective response. (Dkt. 4174, ¶ 80.) Such collaborative efforts are present in the ADCRR system. (Dkt. 4174, ¶ 80.) A multidisciplinary approach is important

because doctoral level providers are not necessarily the ones that know the patient the best. (R.T. 11/19/21 a.m. at 2985:5-2986:4.) Rather, this can be a correction officer, psychology tech, nurse, or psychology lead. (R.T. 11/19/21 a.m. at 2985:5-2986:4.) In Dr. Penn's opinion, every multidisciplinary team does not need to include a psychiatrist. (R.T. 11/19/21 a.m. at 3010:13-15.)

1246. In Dr. Penn's professional opinion, Centurion maintains more than adequate mental health staffing to meet the mental health needs of ADCRR inmates with mental disorders and serious mental illnesses. (Dkt. 4174, ¶ 81.) Mental health and psychiatric provider staff are readily available during regular work hours. (Dkt. 4174, ¶ 81.) On call emergency psychiatry and psychology is available 24-hours, 7 days/week. (Dkt. 4174, ¶ 81.) All corridor facilities have, at a minimum, 24-hour nursing/medical staff on-site. (Dkt. 4174, ¶ 81.) This is important for a variety of reasons, including to address inmates with comorbid medical diseases or conditions and to readily assess inmates engaging in self-harm. (Dkt. 4174, ¶ 81.) This level of 24-hour medical staffing on-site at all facilities statewide exceeds that typically found in other states. (Dkt. 4174, ¶ 81.)

1247. Moreover, there are mental health staff on-site every weekday, and some additional staff on weekends when clinically indicated, who will cross cover or come in for special clinical needs or cases. (Dkt. 4174, ¶ 82.) Additionally, there is always an on-call psychiatrist/psychiatric provider 24-7/365 days per year. (Dkt. 4174, ¶ 82.) Notably, the staff Dr. Penn spoke to frequently mentioned that Dr. Carr and Dr. Pelton are readily available for field inquiries. (Dkt. 4174, ¶ 82.) In Dr. Penn's opinion, this multidisciplinary and layered mental health work force is clinically appropriate to meet the mental health needs of an incarcerated population. (Dkt. 4174, ¶ 82.)

1248. It is Dr. Penn's professional opinion that since Centurion assumed management, there has been a sustained improvement in mental healthcare staffing levels, to include the addition of mental health leads. (Dkt. 4174, ¶ 83.) A mental health lead must be a licensed mental health clinician, holding a master's degree or higher. (R.T. 11/5/21 p.m. at 1077:4-9.)

1249. Staffing levels at ADCRR are sufficient and comport with the correctional standard of care. (Dkt. 4174, ¶ 83.) The correctional standard of care should mirror what is available in the community, considering the unique challenges that are present in correctional systems such as utilizing telemedicine to provide access to care in geographically challenging areas. (R.T. 11/19/21 a.m. at 2973:10-2974:7.)

1250. Significantly, while Dr. Stewart criticizes staffing, he fails to tie any of the individual files highlighted in his report to understaffing or explain how staffing deficiencies caused the alleged risks of harm he cites. (Dkt. 4174, ¶ 84.)

1251. In Dr. Penn's opinion, ADCRR has sufficient mental health staff to meet the clinical needs of its inmate population and to provide timely access and continuity of care to their inmates. (R.T. 11/19/21 a.m. at 2986:9-16.)

1252. Staffing is also very important to Dr. Stallcup. (R.T. 11/17/21 a.m. at 2451:20-2452:6.). She monitors mental health staffing levels by receiving weekly reports from Centurion. (R.T. 11/17/21 a.m. at 2451:20-2452:6.). She reviews the reports and tracks the levels of care for each inmate at each facility and how many staff are at each facility to assess if there is enough staff to do the job. (R.T. 11/17/21 a.m. at 2451:20-2452:6.)

1253. The Levels of Care report, which Dr. Stallcup receives on a weekly basis, shows the number of inmates at each level of mental health care (MH1, 2, 3, 3E, 3D, 3C, 3B, 3A, 4, and 5) and the number and types of mental health staff for each facility. (R.T. 11/17/21 a.m. at 2453:4-2453:18; Ex. 3326.) This allows Dr. Stallcup to determine the caseloads per mental health staff. (R.T. 11/17/21 a.m. at 2453:4-2453:18; Ex. 3326). By comparing this document to the staffing report, Dr. Stallcup can analyze whether there are enough mental health staff to provide the care that is needed. (R.T. 11/17/21 a.m. at 2455:5-8.) Based upon her review of these numbers each week, at the time of her testimony, Dr. Stallcup did not have concerns regarding staffing levels at the facilities which incarcerate inmates on the mental health case load. (R.T. 11/17/21 a.m. at 2461:6-9; R.T. 11/17/21 p.m. at 2601:3-25, 2602:11-2603:8; Ex. 3326.) Dr. Stallcup is confident that the current

mental health staffing is adequate to meet the mental health needs of ADCRR's inmate population. (R.T. 11/17/21 a.m. at 2523:19-24; R.T. 11/17/21 p.m. at 2601:3-25, 2602:11-2603:8.)

1254.  Indeed, there is an on-site psychiatric provider at each corridor facility. (R.T. 11/17/21 a.m. at 2461:6-9; R.T. 11/17/21 p.m. at 2567:2-12.)

1255.  That NCCHC determined that ADCRR's staffing plans are adequate, coupled with the fact that ADCRR's staffing levels meet the needs of ADCRR's population, demonstrates that ADCRR's staffing levels are constitutional.

**Telepsychology & Telepsychiatry Services**

1256.  Except ASPC Yuma, each facility has more on-site than telepsych psychiatric providers.  (R.T. 11/17/21 a.m. at 2461:16-23.)  Telepsych is not utilized at the in-patient units at ASPC Phoenix and ASPC Perryville.  (R.T. 11/17/21 a.m. at 2461:24-2462:5.)

1257.  It is Dr. Penn's opinion that Centurion appropriately uses telepsychology and telepsychiatry services to provide mental health care and medication management to ADCRR inmates. (Dkt. 4174, ¶ 85.) The American Psychiatric Association ("APA") is the oldest medical organization in the United States, and the largest organization of psychiatrists. (Dkt. 4174, ¶ 86.)  It describes telepsychiatry as:

> Telepsychiatry, a subset of telemedicine, can involve providing a range of services including psychiatric evaluations, therapy (individual therapy, group therapy, family therapy), patient education and medication management.  Telepsychiatry can involve direct interaction between a psychiatrist and the patient. It also encompasses psychiatrists supporting primary care providers with mental health care consultation and expertise. Mental health care can be delivered in a live, interactive communication. It can also involve recording medical information (images, videos, etc.) and sending this to a distant site for later review.

(Dkt. 4174, ¶ 86.)

1258.  According to the APA, telepsychiatry is a clearly accepted and evidence-based technology and health care delivery medium.  (Dkt. 4174, ¶ 87.)  In February 2018, the APA updated its Policy on Telepsychiatry as follows:

236

Telemedicine in psychiatry, using video conferencing, is a validated and effective practice of medicine that increases access to care. The American Psychiatric Association supports the use of telemedicine as a legitimate component of a mental health delivery system to the extent that its use is for the benefit of the patient, protects patient autonomy, confidentiality, and privacy; and when used consistent with APA policies on medical ethics and applicable governing law.

(Dkt. 4174, ¶ 87.)

1259. Video-based telepsychiatry helps meet patients' needs for convenient, affordable and readily accessible mental health services. It can benefit patients in a number of ways, such as:

- Improve access to mental health specialty care that might not otherwise be available (e.g., in rural areas)

- Bring care to the patient's location

- Help integrate behavioral health care and primary care, leading to better outcomes

- Reduce the need for trips to the emergency room

- Reduce delays in care

- Improve continuity of care and follow-up

- Reduce the need for time off work (e.g., childcare services) to access appointments far away

- Reduce potential transportation barriers, such as lack of transportation or the need for long drives

- Reduce the barrier of stigma

(Dkt. 4174, ¶ 88.)

1260. While some people may be reluctant or feel awkward talking to a person on a screen, in Dr. Penn's experience, most people are able to get comfortable with it. (Dkt. 4174, ¶ 89.) This has also become less of an issue as people become more familiar and comfortable with video communication in everyday life. (Dkt. 4174, ¶ 89.)

1261. Telepsychiatry allows psychiatrists to treat more patients in distant locations.

(Dkt. 4174, ¶ 90.)   Psychiatrists and other clinicians need to be licensed in the state(s) where the patient they are working with is located.  (Dkt. 4174, ¶ 90.)  State licensing boards and legislatures view the location of the patient as the place where "the practice of medicine" occurs.  (Dkt. 4174, ¶ 90.)

1262.  Although telepsychiatry has the disadvantage of the patient and psychiatrist not being in the same room, it can create enhanced feelings of safety, security, and privacy for many patients.  (Dkt. 4174, ¶ 91.)

1263.  According to Dr. Penn, telepsychiatry is beneficial and an integral part of providing quality mental health care in a correctional setting.  (Dkt. 4174, ¶ 92.)  The Handbook of Correctional Mental Health, (Scott 2010) highlights the value that telepsychiatry has had in psychiatric assessment and treatment in a correctional setting:

> Over the past decade, the use of telepsychiatry has played a significant role in psychiatric assessments and treatment in correctional settings. By 2001, correctional services in 26 states used some form of telemedicine, with provision of mental health care being one of the most common applications.
>
> The results from the use of telepsychiatry in correctional settings have been encouraging. Evidence indicates that telepsychiatry can deliver treatment whose results do not differ significantly from the gold standard of in-person evaluation. Studies of incarcerated populations show no difference between telepsychiatry and face- to-face therapy in measures of perception of the therapeutic relationship, post-session mood, or general satisfaction with services. In addition, the use of telepsychiatry appears to improve the safety and security of the institution and staff due to decreased inmate movement and increase the availability of specialized providers familiar with the setting, and decrease wait times and improve follow-ups.

(Dkt. 4174, ¶ 92.)

1264.  In Dr. Penn's opinion, telepsychiatry has been of immense value to ADCRR inmates.  (Dkt. 4174, ¶ 93.)  This evaluation and treatment modality improves access to care, particularly in areas where there is a physician and health care manpower shortage.  (Dkt. 4174, ¶ 93.)   Currently, ADCRR and its contract vendor, Centurion, utilize telepsychiatry to provide consistent and quality mental health care to inmates.  (Dkt. 4174, ¶ 93.)

1265. Based on Dr. Penn's observations and his own experience with providing effective treatment through telepsychiatry, it is his opinion that ADCRR's use of telepsychiatry is within the standard of care and leads to positive mental health management among the inmate population. (Dkt. 4174, ¶ 94.) This remains true, even as ADCRR continues to utilize a multi-disciplinary treatment team approach and on-site availability. (Dkt. 4174, ¶ 94.) In fact, ADCRR employs on-site staff psychiatrists, psychiatric midlevel practitioners, psychologists, and other mental health staff at facilities that house state inmates with higher acuity mental health needs or those inmates requiring suicide observation. (Dkt. 4174, ¶ 94.)

1266. There is the presence of an on-site mental health clinician or other healthcare professionals at facilities with less state inmate mental health acuity. (Dkt. 4174, ¶ 95.) Also, Dr. Penn found that mental health and other healthcare staff are readily able to identify inmates who might refuse a psychiatric evaluation via telepsychiatry, leave, or attempt to leave the clinic area, or make threats of self-harm or harm to others. (Dkt. 4174, ¶ 95.) In any case where the clinical acuity or mental health needs of a state inmate exceed those immediately available via telepsychiatry, they ensure prompt transfer for the inmate to a facility with additional mental health services. (Dkt. 4174, ¶ 95.)

1267. Texas and ADCRR are not the only state prison systems that have implemented telepsychiatry with positive results. (Dkt. 4174, ¶ 96.) Turning to Telemedicine for Prisoners' Mental Health Treatment (Arndt, 2018), describes the growing use of telepsychiatry by the California Department of Corrections and Rehabilitation. (Dkt. 4174, ¶ 96.) Dr. Edward Kaftarian, who was the statewide chief of telepsychiatry for California Correctional Health Care Services through 2017 stated, "By providing services remotely, we've been able to alleviate the staffing shortages and deliver care to patients who would otherwise not have been seen by psychiatrists." (Dkt. 4174, ¶ 96.) Through telepsychiatry, doctors are able to see an average of 12 inmates per day. (Dkt. 4174, ¶ 96.)

1268. Dr. Penn has personally have used telepsychiatry in treating inmates and find it to be just as effective as on-site treatment. (Dkt. 4174, ¶ 97.) Based on Dr. Penn's

experience, and his interviews with Centurion staff, he highly endorses its use in ADCRR facilities. (Dkt. 4174, ¶ 97.)

1269. ADCRR's reliance upon and strategic use of telepsychology and telepsychiatry services demonstrates that inmates have access to mental health care through various avenues and a lack of deliberate indifference by Defendants.

### **Mental Health Licensure**

1270. It is Dr. Penn's professional opinion that Centurion recruits and employs qualified Mental Health Professionals who practice within the scope of their licenses. (Dkt. 4174, ¶ 98.) He was impressed that 88% of the counseling staff who provide counseling services at ADCRR are licensed. (Dkt. 4174, ¶ 98.) Dr. Penn found that they follow ADCRR and Centurion policies and procedures, are practicing within the standard of care, and do not place class members at substantial risk of serious harm. (Dkt. 4174, ¶ 99.)

1271. Importantly, all ADCRR facilities were found 100% compliant with NCCHC Standard P-C-01–Credentials, which determines whether the facilities' qualified health care professionals are legally eligible to perform their clinical duties. (Dkt. 4174, ¶ 100; Ex. 3305 at ADCRR00138377 (Douglas); Ex. 3307 at ADCRR00138478 (Eyman); Ex. 3309 at ADCRR00138612-13 (Florence); Ex. 3311 at ADCRR00138693-94 (Lewis, met 2014 Standard P-C-01); Ex. 3313 at ADCRR00138739 (Perryville); Ex. 3315 at ADCRR00138800 (Phoenix, met 2014, Standard P-C-01); Ex. 3316 at ADCRR00138893-94 (Safford); Ex. 3318 at ADCRR00138839-40 (Fort Grant Unit); Ex. 3320 at ADCRR00138969-70 (Tucson); Ex. 3322 at ADCRR00139115-16 (Winslow); Ex. 3323 at ADCRR00139066-67 (Apache Unit); Ex. 3325 at ADCRR00139192 (Yuma).)

1272. Behavior Health Technicians ("BHT") assist with scheduling and conduct "health and welfare" checks in maximum custody units. (R.T. 11/17/21 a.m. at 2462:12-22.) The purpose of a "health and welfare" check is to establish a rapport with the patients, offer them mental health services, and report any differences or concerns back to the mental health team so that action can be taken. (R.T. 11/17/21 a.m. at 2462:12-22.) BHTs serve as the eyes on the ground in maximum custody units. (R.T. 11/17/21 a.m. at 2462:23-

2463:7.)  It is beneficial to have BHTs conduct these checks so that they can establish a baseline presentation for inmates in maximum custody.  (R.T. 11/17/21 a.m. at 2462:23-2463:7.)  With respect to training, BHTs receive New Employee Orientation ("NEO") training provided by Centurion and are trained by the lead as to the purpose of the round, what to look for when conducting rounds (hygiene, cell cleanliness, changes in behavior, etc.) and on the importance of reporting any findings back to the mental health team.  (R.T. 11/17/21 a.m. at 2463:8-16.)  The licensed mental health lead at the facility supervises BHTs.  (R.T. 11/17/21 a.m. at 2463:17-18.)  When Dr. Stallcup served as a BHT in the community, she was permitted to do much more than ADCRR allows BHTs to do within its facilities.  (R.T. 11/17/21 a.m. at 2464:13-2465:4.)  For example, as a BHT in the community, she provided basic care and distributed medication.  (R.T. 11/17/21 a.m. at 2464:13-2465:4.)  ADCRR does not allow this level of practice at their facilities.  (R.T. 11/17/21 a.m. at 2464:13-2465:4.)

1273.  Psych associates hold a master's degree in professional counseling, social work, marriage & family therapy, or substance-abuse counseling.  (R.T. 11/17/21 a.m. at 2465:5-13.)  They can be licensed or unlicensed.  (R.T. 11/17/21 a.m. at 2465:5-13.)  Unlicensed clinicians receive the supervision needed to become licensed and are required to do so within 18 months of hire.  (R.T. 11/17/21 a.m. at 2465:5-13.)  Unlicensed psych associates are permitted to practice by the Arizona Board of Behavioral Health Examiners.  (R.T. 11/17/21 a.m. at 2465:14-18.)  However, 89% of ADCRR's psych associates are licensed.  (R.T. 11/17/21 a.m. at 2466:10-11.)  This is how psych associates are utilized in the community.  (R.T. 11/17/21 a.m. at 2465:19-23.)  At ADCRR, psych associates provide individual treatment (counseling, crisis treatment, group counseling, & preparation for reentry into the community), crisis intervention, and group counseling.  (R.T. 11/17/21 a.m. at 2465:25-2466:5.)

1274.  That NCCHC determined that ADCRR staff legally perform their duties, coupled with the fact that ADCRR utilizes staff as they are utilized in the community, demonstrates that the manner in which ADCRR utilizes various mental health licensures,

including the use of BHTs, is constitutional and does not subject inmates to a substantial risk of serious harm.

### **Delivery of Mental Health Care**

1275.  Based upon his review of the documents outlined above, his tours of the corridor facilities, and interviews with the individuals described above, it is Dr. Penn's professional opinion that the mental health treatment provided to inmates incarcerated within ADCRR facilities exceeds correctional and community mental health standards. (Dkt. 4174, ¶ 101.)

1276.  It is also Dr. Penn's opinion that the policies, procedures, standards, and practices utilized by ADCRR and Centurion, exceed generally accepted standards for state prisons.  (Dkt. 4174, ¶ 102.)  There are clinically appropriate referral processes and procedures in place, with an opportunity for continuous quality improvement.  (Dkt. 4174, ¶ 102.) And that there are adequate, qualified, trained mental health professionals to provide clinically appropriate access to care and to support the mental health needs of the prisoners. (Dkt. 4174, ¶ 102.)

1277.  It is Dr. Penn's opinion that the Policies, Procedures, and Standards utilized by ADCRR, to include Department Orders and the Mental Health Technical Manual, regardless of the correctional housing setting – even those alleged to constitute isolation or segregation by Plaintiffs – do not cause an undue risk of harm to state prisoners incarcerated at different facilities.  (Dkt. 4174, ¶ 103.  *See,* Ex. 3022; Ex. 3025.)   Dr. Penn considered the following areas in his assessment:

- mental healthcare
- mental healthcare staffing
- medical record organization
- medication system
- monitoring of prisoners taking psychotropic medication
- monitoring of psychotropic medication therapeutic levels and side effects
- access to medical and mental healthcare

1    •    mental health programming

2    •    inpatient care

3    •    treatment plan

4    •    heat precaution

5    •    suicide prevention

6    •    confinement of prisoners with mental illness

7    •    use of chemical agents with prisoners with mental illness

8    •    use of telepsychiatry

9    •    monitoring and oversight overall access to mental health services

10   (Dkt. 4174, ¶ 103.)

11       1278.  The Mental Health Technical Manual outlines the guidelines and expectations

12   that staff are expected to follow when providing mental health care to inmates incarcerated

13   within ADCRR.  (R.T. 11/17/21 a.m. at 2466:12-2467:5; Ex. 3025).

14       1279.  Inmates who are designated MH 1 or 2 are seen by mental health upon their

15   request or via referral from staff or a family member.  (R.T. 11/17/21 a.m. at 2474:1-20.)

16   MH 3As are seen every 30 days by a mental health clinician and every 90 days by a

17   psychiatric provider.  (R.T. 11/17/21 a.m. at 2475:18-21.)  MH 3Bs who have a major

18   depression, bipolar, or psychotic disorder are seen every 90 days by both the mental health

19   clinician and psychiatric provider.  (R.T. 11/17/21 a.m. at 2476:12-18.)  If they have another

20   disorder, they are seen by a psychiatric provider every 180 days.  (R.T. 11/17/21 a.m. at

21   2476:12-18.)  MH 3Cs are seen by a psychiatrist every 180 days and are seen for counseling

22   via submission of a health needs request or referral.  (R.T. 11/17/21 a.m. at 2477:10-20.)

23   MH 3Ds are seen by a psychiatrist within 30 days of discontinuing medication and then

24   every 90 days, for a minimum of two times in six months, for counseling.  (R.T. 11/17/21

25   a.m. at 2477:21-2478:12.)  MH 3Es are seen for counseling every 90 days or upon HNR or

26   referral.  (R.T. 11/17/21 a.m. at 2478:13-20.)  MH 4s are inmates in ADCRR's residential

27   treatment units and MH 5s reside in ADCRR's inpatient units.  (R.T. 11/17/21 a.m. at

28   2478:21-24.)  Unless an inmate is housed in a residential treatment or inpatient unit, they

1     are considered housed in outpatient. (R.T. 11/17/21 a.m. at 2476:8-11.)

2          1280. While the above describes appointments that are automatically generated for

3 inmates, all inmates (regardless of whether they are on the mental health case load) can

4 request mental health treatment at any time by submitting a Health Needs Request ("HNR").

5 (R.T. 11/17/21 a.m. at 2476:19-2477:3; 2493:12-24; 2493:25-2494:6.) HNRs are triaged

6 by nursing within 24 hours. (R.T. 11/17/21 a.m. at 2493:12-24.) If it is a clinical mental

7 health need, they are seen within 5 days. (R.T. 11/17/21 a.m. at 2493:12-24.) If it is a non-

8 urgent psychiatric concern, they are seen within 14 days. (R.T. 11/17/21 a.m. at 2493:12-

9 24.) If the concern is urgent, they are seen the same day. (R.T. 11/17/21 a.m. at 2493:12-

10 24.)

11          1281. In addition to being able to request mental health treatment through an HNR

12 and the prescriptive appointments generated based upon an inmate's mental health score,

13 inmates may also receive mental health treatment at the request of friends, family, or

14 custody staff. (R.T. 11/17/21 a.m. at 2494:7-18.)

15          1282. Inmates can be designated SMI either prior to or during incarceration. (R.T.

16 11/17/21 a.m. at 2468:21-2469:16.) The SMI designation is for individuals that have a

17 serious mental illness or personality disorder that impacts their ability to function. (R.T.

18 11/17/21 a.m. at 2468:21-2469:16.) Primarily, however, it is assigned in the community.

19 (R.T. 11/17/21 a.m. at 2468:21-2469:16.) Any inmate who received the SMI designation

20 in the community will continue to maintain that designation while in ADCRR custody.

21 (R.T. 11/17/21 a.m. at 2468:21-2469:16.) An SMI designation can be made any time during

22 an inmate's incarceration at ADCRR. (R.T. 11/17/21 a.m. at 2470:13-19.) While an inmate

23 can request to have their SMI designation removed while in custody, this occurs very

24 infrequently. (R.T. 11/17/21 a.m. at 2470:20-25.)

25          1283. An SMI designation does not equate to a need for residential or inpatient

26 treatment. (R.T. 11/17/21 a.m. at 2469:17-2470:2.) This is because an inmate may receive

27 treatment needed to function appropriately. (R.T. 11/17/21 a.m. at 2469:17-2470:2.)

28 Indeed, the goal of treatment is to stabilize the inmate so they can function appropriately in

the community. (R.T. 11/17/21 a.m. at 2469:17-2470:2.) In Dr. Stallcup's experience, inmates will be designated SMI in the community where they do not have the support and structure, but when provided with that in a prison setting (daily giving of medication, management of clothing, pre-determined time of when to eat and when to attend activities), they function quite well. (R.T. 11/17/21 a.m. at 2470:3-12.)

1284. Not all SMI patients require the same type of treatment. (R.T. 11/19/21 a.m. at 3043:5-17.)

1285. The custody staff interviewed by Dr. Penn were uniformly pleased with mental health access, availability, coverage, and services. (Dkt. 4174, ¶ 55.) Universally, custody leadership reported an ability to timely reach mental health staff—typically the mental-health lead—via phone to notify them of a concern with an inmate. (Dkt. 4174, ¶ 55.) If urgent, the mental health staff assesses the inmate that same day. (Dkt. 4174, ¶ 55.) If it is not urgent, staff sees the inmate the next day. (Dkt. 4174, ¶ 55.) Custody also described that mental health staff are available to provide timely consultation regarding the management of inmates who showed signs of clinical deterioration. (Dkt. 4174, ¶ 55.)

1286. Inmates on the mental health case load at ADCRR receive timely, appropriate, and constitutional access to mental health services which does not place them at a substantial risk of serious harm.

**Quality Assurance Monitoring**

1287. ADCRR's Monitoring Bureau, which is comprised of a team of qualified mental health professionals, serves as a quality assurance safeguard. (Dkt. 4174, ¶ 104.) Pursuant to ADCRR's contract with Centurion, the Bureau monitors a variety of indicators (which often exceed standard of care minimums) to determine compliance and assess the overall provision of mental health care within the system. (Dkt. 4174, ¶ 104.) The Bureau serves as a checks and balance, to ensure Centurion is providing access to care, continuity of care, and quality care. (Dkt. 4174, ¶ 104.)

1288. The mental health portion of the Bureau works diligently to ensure the contracted vendor provides appropriate, timely, and professional mental health care to

inmates at assigned state and contracted private prisons. (Dkt. 4174, ¶ 105.) They work to ensure that the contracted vendor's services are in line with NCCHC standards, ACA standards, and Court orders. (Dkt. 4174, ¶ 105.) The work collaboratively with the contracted vendor, on a daily basis, providing information regarding areas that need improvement as well as instruction on how to improve different processes and procedures. (Dkt. 4174, ¶ 105.) They assist with gathering data, conducting daily audits, and ensuring the appropriate forms are in the chart as required for different processes. (Dkt. 4174, ¶ 105.) Currently, they are conducting daily audits to ensure that all individuals placed on watch have a Crisis Treatment Plan completed within one day of placement on watch and a Suicide Risk Assessment completed prior to the patient discontinuing watch. (Dkt. 4174, ¶ 105.)

1289. In addition to submitting requests to health care and mental health staff through the health needs requests, should an inmate be dissatisfied with the response, they may avail themselves to the grievance process, which is set out in Departmental Order 802. (Dkt. 4174, ¶ 106.) If an inmate is unable to resolve their concern informally with the contract Assistant Director of Nursing (ADON), they may file a formal grievance to the CO IV Grievance Coordinator (and ADCRR employee). (Dkt. 4174, ¶ 106.) The CO IV Grievance Coordinator will refer the grievance to the contract Director of Nursing (DON), ensure a timely response, and ensure that all grievance records are directed to the Bureau. (Dkt. 4174, ¶ 106.) Furthermore, if the inmate remains dissatisfied with the response, they may submit an appeal to the unit CO IV Grievance Coordinator, who will refer the appeal to the contract Facility Health Administrator (FHA), ensure a timely response, and will ensure that all grievance records are ultimately directed to the Bureau for review. (Dkt. 4174, ¶ 106.) While the Bureau reviews the grievance records, the decision of the FHA is final. (Dkt. 4174, ¶ 106.)

1290. ADCRR's Monitoring Bureau and grievance system serve as quality assurance mechanisms which decrease any risk of harm to inmates and establish that Defendants are not deliberately indifferent to the mental health needs of ADCRR's inmates.

1     **Intake Screening**

2        1291.  When transferred or reincarcerated prisoners go through the intake process,

3 all prior medical and mental health requests and services are accessible during screening.

4 (Dkt. 4174, ¶ 107.)  In Dr. Penn's opinion, ADCRR provides timely and adequate mental

5 health screening of prisoners upon admission to intake facilities. (Dkt. 4174, ¶ 107.)

6 Subsequently, where necessary, there is adequate and appropriate mental health evaluation,

7 re-evaluation, and clinically indicated referrals to psychiatric professionals.  (Dkt. 4174,

8 ¶ 107.)  Further, inmates may submit health services requests pertaining to any mental

9 health concern, any psychotropic medication side effects, or perceived lack of effectiveness.

10 (Dkt. 4174, ¶ 107.)  Also, they can make requests for changes in medication type, dose, or

11 scheduling. ADCRR inmates undergo a clinically appropriate sick call triage process, and

12 when indicated by policy or by clinical necessity, are referred to qualified mental health

13 professionals in a timely manner.  (Dkt. 4174, ¶ 107.)

14        1292.  Upon an inmate's arrival to ADCRR, they are input into eOMIS (electronic

15 medical record) and ACIS (custody record) and assessed for their current medical and

16 mental health needs and history of same.  (R.T. 11/17/21 a.m. at 2466:12-2467:5.)

17        1293.  All new intakes will receive an initial mental health assessment within 48

18 hours of their arrival.  (R.T. 11/17/21 a.m. at 2468:11-13.)  Their level of care is assessed

19 both at this time and throughout their stay at each encounter they have with a psych associate

20 or psychiatric provider. (R.T. 11/17/21 a.m. at 2468:14-20; 2471:1-7.)  These intake mental

21 health assessments and detailed descriptions of the mental health scores are detailed in the

22 Mental Health Technical Manual.  (Ex. 3025.)

23        1294.  During the mental health intake assessment, the clinician verifies that records

24 of previous treatment are provided, and if not provided, requests them in accordance with

25 the Medical Services Technical Manual Chapter 8 so they are available.  (R.T. 11/17/21

26 a.m. at 2466:12-2467:5.)  The clinician also reviews their medications.  (R.T. 11/17/21 a.m.

27 at 2466:12-2467:5.)  If they're on any psychotropic medications, they contact the provider

28 and request a bridge order so that their medications can continue without interruption.  (R.T.

1 | 11/17/21 a.m. at 2466:12-2467:5.)

2     1295. Next, the clinician will assign the inmate a mental health score. (R.T.
3 11/17/21 a.m. at 2467:6-11.) If they have had no history of mental health treatment or
4 needs, then they are assigned a score of MH 1. (R.T. 11/17/21 a.m. at 2467:11-2468:10.)
5 If they have a history of mental health treatment/needs, but do not have current needs, they
6 are designated as MH 2. (R.T. 11/17/21 a.m. at 2467:11-2468:10.) The MH 3 designation
7 is broken down into subcodes, to stratify the individual needs of the patients in this
8 population. (R.T. 11/17/21 a.m. at 2475:10-17.) If they have a history of mental health
9 treatment and a current minimal need for counseling only, they would be designated as MH
10 3E. (R.T. 11/17/21 a.m. at 2467:11-2468:10.) MH 3D is not assigned at intake because it's
11 based on the discontinuation of medication while in custody. (R.T. 11/17/21 a.m. at
12 2467:11-2468:10.) The MH 3D designation serves as a safeguard for inmates who have
13 discontinued medications to ensure they remain stable. (R.T. 11/17/21 a.m. at 2477:21-
14 2478:12.) An inmate would receive a score of MH 3C if their mental health needs could
15 adequately be managed solely through psychotropic medication. (R.T. 11/17/21 a.m. at
16 2467:11-2468:10.) If, however, they have mental health needs that require psychotropic
17 medication and counseling, they would be designated as a MH 3B. (R.T. 11/17/21 a.m. at
18 2467:11-2468:10.) Inmates who are designated Seriously Mentally Ill would be designated
19 a MH 3A or higher. (R.T. 11/17/21 a.m. at 2467:11-2468:10.) If the inmate requires
20 residential treatment, they are classified as MH 4. (R.T. 11/17/21 a.m. at 2467:11-2468:10.)
21 Finally, if they require inpatient treatment they are classified as MH 5. (R.T. 11/17/21 a.m.
22 at 2467:11-2468:10.) The frequency by which an inmate is automatically seen by mental
23 health (in addition to any clinical needs they may have) is dependent on their mental health
24 score. (R.T. 11/17/21 a.m. at 2472:21-2473:1.)

25     1296. ADCRR conducts timely and comprehensive mental health intake
26 examinations which are constitutional and do not subject inmates to a substantial risk of
27 serious harm.

28

## Access to Adequate Mental Health Care & Continuity of Care

1297.  Importantly, all ADCRR facilities were found 100% compliant with NCCHC Essential Standard P-A-01–Access to Care, which requires that inmates have access to care for their serious medical, dental, and mental health needs.  (Dkt. 4174, ¶ 108; Ex. 3305 at ADCRR00138363 (Douglas); Ex. 3307 at ADCRR00138462 (Eyman); Ex. 3309 at ADCRR00138598 (Florence); Ex. 3311 at ADCRR00138707-08 (Lewis); Ex. 3313 at ADCRR00138725 (Perryville); Ex. 3315 at ADCRR00138797 (Phoenix); Ex. 3316 at ADCRR00138880 (Safford); Ex. 3318 at ADCRR00138826 (Fort Grant Unit); Ex. 3320 at ADCRR00138954 (Tucson); Ex. 3322 at ADCRR00139103 (Winslow); Ex. 3323 at ADCRR00139054 (Apache Unit); Ex. 3325 at ADCRR00139177 (Yuma).)   According to NCCHC, "access to care means that, in a timely manner, a patient is seen by a qualified health care professional, is rendered a clinical judgment and receives care that is ordered." (Dkt. 4174, ¶ 108; Ex. 3304 at ADCRR00210379.)

1298.  Additionally, all ADCRR facilities met NCCHC Important Standard P-D-06–Patient Escort, which looks to whether facility staff ensure that patients can meet scheduled health care appointments.  (Dkt. 4174, ¶ 109; Ex. 3305 at ADCRR00138390-91 (Douglas); Ex. 3307 at ADCRR00138493 (Eyman); Ex. 3309 at ADCRR00138625-26 (Florence); Ex. 3311 at ADCRR00138679 (Lewis, met analogous 2014 standard P-E-10); Ex. 3313 at ADCRR00138781-83 (Perryville); Ex. 3315 at ADCRR00138805 (Phoenix, met analogous 2014 standard P-E-10); Ex. 3316 at ADCRR00138906 (Safford); Ex. 3318 at ADCRR00138852 (Fort Grant Unit); Ex. 3320 at ADCRR00138983 (Tucson); Ex. 3322 at ADCRR00139126-28 (Winslow); Ex. 3323 at ADCRR00139077-78 (Apache Unit); Ex. 3325 at ADCRR00139205 (Yuma).)  According to NCCHC, the first compliance indicator is that "Patients are transported safely and in a timely manner for medical, dental, and mental health clinic appointments both inside and outside the facility."  (Dkt. 4174, ¶ 109.)

1299.  Further, all ADCRR facilities met NCCHC Essential Standard P-E-09– Continuity, Coordination, and Quality of Care During Incarceration, which determines whether patient, medical, dental, and mental health care is coordinated and monitored from admission to

discharge. (Dkt. 4174, ¶ 110; Ex. 3305 at ADCRR00138402-03 (Douglas); Ex. 3307 at ADCRR00138505-06 (Eyman); Ex. 3309 at ADCRR00138637-38 (Florence); Ex. 3311 at ADCRR00138712-13 (Lewis, met analogous 2014 standard P-E-12); Ex. 3313 at ADCRR00138763 (Perryville); Ex. 3315 at ADCRR00138814-15 (Phoenix, met analogous 2014 standard P-E-12); Ex. 3316 at ADCRR00138916-17 (Safford); Ex. 3318 at ADCRR00138862-63 (Fort Grant Unit); Ex. 3320 at ADCRR00138996-97 (Tucson); Ex. 3322 at ADCRR00139137 (Winslow); Ex. 3323 at ADCRR00139087 (Apache Unit); Ex. 3325 at ADCRR00139217 (Yuma).) According to NCCHC, while "[o]ther standards address elements of the patient's total care, this standard focuses directly on the health staff's ability to integrate all of these individual compliance standards while ensuring a continuum of care from admission to discharge." (Dkt. 4174, ¶ 110.)

1300. ADCRR has a variety of mental health units and programming available to its inmate population. (Dkt. 4174, ¶ 111; Ex. 3352.) It is Dr. Penn's opinion that there is adequate access to care by qualified mental health professionals. (Dkt. 4174, ¶ 111.)

1301. As detailed in the Mental Health Technical Manual, inmates who are admitted to a Residential Treatment Plan are classified as MH-4 and are provided several residential services. (Dkt. 4174, ¶ 112.) Specifically, they are seen by a mental health clinician a minimum of every thirty days. (Dkt. 4174, ¶ 112.) Inmates who receive psychotropic medications are seen by a P/PNP a minimum of every ninety (90) days. (Dkt. 4174, ¶ 112.) Further, inmates are provided structured program activities on a weekly basis by health services and operation staff assigned to the program. (Dkt. 4174, ¶ 112; Ex. 3352 at ADCRR00177017-19.) Upon discharge from the program, the inmate's mental health score is lowered to MH-3 including a clinically appropriate subcode. (Dkt. 4174, ¶ 112.) The change in score shall occur at the time that movement is required, and the inmate shall remain in a corridor facility for a minimum of six (6) months. (Dkt. 4174, ¶ 112.)

1302. Inmates who are admitted to an Inpatient Treatment Program (which are programs licensed by the Department of Health Services) are classified as MH-5 and are provided several inpatient services. (Dkt. 4174, ¶ 113.) Specifically, they are seen by a

mental health clinician a minimum of every seven (7) days, seen a minimum of every thirty (30) days by a P/PNP, they are provided structured program activities on a daily basis by health services and operation staff assigned to the program, and any patient identified as being actively psychotic or actively suicidal is placed on a Continuous Mental Health Watch and is seen daily (including weekends and holidays) by a licensed mental health clinician. (Dkt. 4174, ¶ 113; Ex. 3352at ADCRR00177018-19.)  Further, upon discharge from the program, every effort is made to transition the patient to a residential program prior to placement in an outpatient setting.  (Dkt. 4174, ¶ 113.)  The change in score occurs at the time the movement is required, and the inmate remains in a corridor facility for a minimum of six (6) months.  (Dkt. 4174, ¶ 113.)

1303.  When an inmate is transferred from one ADCRR facility to another, their medical record is reviewed by medical or mental health within 12 hours of arrival to their new facility.  (R.T. 11/17/21 a.m. at 2471:22-2472:11.)  If the review is conducted by medical, they provide their review to mental health staff within 24 hours.  (R.T. 11/17/21 a.m. at 2471:22-2472:11.)  Inmates are then added to the new facility caseload, their outstanding HNRs are addressed and scheduled, and their medications are transferred. (R.T. 11/17/21 a.m. at 2471:22-2472:11.)

1304.  Additionally, as shown by the volume of encounters, ADCRR provides appropriate continuity of care and clinically ordered and appropriate mental health and psychiatric treatment services.  (Dkt. 4174, ¶ 114.)

| Month | Practitioner - MH | Professional - MH | Total Number of MH Encounters |
|---|---|---|---|
| July 2019 | 5,369 | 31,407 | 36,776 |
| August 2019 | 6,318 | 28,356 | 34,674 |
| September 2019 | 5,295 | 27,896 | 33,191 |
| October 2019 | 6,043 | 25,444 | 31,487 |
| November 2019 | 13,376 | 17,094 | 30,470 |
| December 2019 | 5,126 | 21,050 | 26,176 |
| January 2020 | 5,076 | 21,005 | 26,081 |

| Month | Practitioner - MH | Professional - MH | Total Number of MH Encounters |
|---|---|---|---|
| February 2020 | 7,809 | 25,225 | 33,034 |
| March 2020 | 6,256 | 27,920 | 34,176 |
| April 2020 | 6,474 | 30,933 | 37,407 |
| May 2020 | 6,539 | 31,063 | 37,602 |
| June 2020 | 6,375 | 29,061 | 35,436 |
| July 2020 | 6,338 | 29,083 | 35,421 |
| August 2020 | 5,947 | 14,602 | 20,657 |
| September 2020 | 4,749 | 23,667 | 28,416 |
| October 2020 | 8,525 | 21,735 | 30,260 |
| November 2020 | 7,776 | 22,354 | 30,130 |
| December 2020 | 9,168 | 24,251 | 33,419 |
| January 2021 | 8,525 | 21,735 | 30,260 |
| February 2021 | 7,563 | 23,693 | 31,256 |
| March 2021 | 8,857 | 26,909 | 35,766 |
| April 2021 | 8,131 | 25,249 | 33,380 |
| May 2021 | 7,611 | 22,992 | 30,603 |
| June 2021 | 7,814 | 22,343 | 30,157 |
| July 2021 | 7,494 | 21,384 | 28,878 |
| August 2021 | 8,174 | 21,921 | 30,095 |
| **Total** | **186,728** | **638,372** | **825,208** |

(Dkt. 4174, ¶ 114; Ex. 3053.) This speaks volumes to the fact inmates know how to submit an HNR and the majority are seen in a timely manner. (R.T. 11/19/21 a.m. at 2988:7-24.)

1305. Dr. Penn reviewed the Mental Health Technical Manual's guidelines, timeframes, and content with respect to intake, evaluations, follow ups, and frequency of encounters for inmates on the mental health case load and those who are in restrictive housing, to include health and welfare checks. (Dkt. 4174, ¶ 115.) Such guidelines comport with the correctional standard of care. (Dkt. 4174, ¶ 115.)

1306. Additionally, ADCRR has established classification systems to help custody and mental health staff easily identify inmates with mental health needs. (Dkt. 4174, ¶ 116.) Further, they prioritize housing of inmates who are on the mental health caseload or take psychotropic medications. (Dkt. 4174, ¶ 116.) ADCRR houses these inmates in designated

"corridor" units with medical and mental health capabilities as opposed to keeping these inmates in non-mental health caseload prisons. (Dkt. 4174, ¶ 116.)

1307. ADCRR continues to put its daily count out by unit. (Dkt. 4174, ¶ 117.) Those ADCRR state prison units designated as residential or inpatient mental health units have a separate locator number. (Dkt. 4174, ¶ 117.) Inmates with current mental health needs are clustered in those units to provide mental health and psychiatric services more efficiently. (Dkt. 4174, ¶ 117.) Mentally ill offenders are housed in a manner to facilitate and improve custody supervision and clinical staff access, treatment planning, and case coordination efforts. (Dkt. 4174, ¶ 117.) When an inmate is identified to have an acute or chronic mental disorder, there is a joint custody and healthcare process. (Dkt. 4174, ¶ 117.) The decision-making protocols are based on the particular mental health signs, symptoms, functioning, and overall clinical acuity of the inmate. (Dkt. 4174, ¶ 117.) Healthcare staff's clinical assessment and treatment recommendations are reviewed, while maintaining correctional awareness of security and physical safety risks to other offenders. (Dkt. 4174, ¶ 117.) Correctional and healthcare staff are all incorporated into unit and housing placement decisions. (Dkt. 4174, ¶ 117.)

1308. Inmates who demonstrate clinical deterioration, mental health symptoms, problem behaviors, clinical impairments, decline in daily living activities, self-injurious behaviors, suicidal ideation, or suicide attempts are triaged by nursing or mental health care staff and are referred to mental health professionals as per the correctional health standard of care. (Dkt. 4174, ¶ 118.)

1309. As a result of the implementation of electronic documentation in the eOMIS system, mental health staff have immediate access to patients' most relevant data such as: mental health records, laboratory results, medication lists, and medication allergies. (Dkt. 4174, ¶ 119.) This meets the standard of care. (Dkt. 4174, ¶ 119.) The statewide implementation of an electronic medical record is a significant improvement when compared to the previous paper records format. (Dkt. 4174, ¶ 119.) For example, previously when an inmate moved from one unit to another, there was a risk of delay or

mishandling of a paper medical chart. (Dkt. 4174, ¶ 119.) Facility staff who were on the receiving end might not have had immediate access to data regarding a newly arrived inmate. (Dkt. 4174, ¶ 119.) With eOMIS, this is no longer the case. (Dkt. 4174, ¶ 119.) All health care staff with eOMIS access are now able to obtain patient health care information in real time and share this information as clinically indicated. (Dkt. 4174, ¶ 119.)

1310. Centurion health care staff utilize the eOMIS system in a consistent and clinically appropriate manner. (Dkt. 4174, ¶ 120.) They generate specific mental health documents such as the Intake Mental Health Screening, Medical Intake Screening, and progress notes. (Dkt. 4174, ¶ 120.) The use of these documents is in keeping with the correctional mental health standard of care. They provide essential clinical history such as: suicide attempts, suicide ideation, mood, other mental health symptoms, psychiatric treatment history, and psychotropic medication history. (Dkt. 4174, ¶ 120.)

1311. Importantly, all ADCRR-operated facilities where NCCHC Essential Standard P-E-05 is applicable are in full compliance. (Dkt. 4174, ¶ 121; Ex. 3305 at ADCRR00138397-99 (Douglas); Ex. 3307 at ADCRR00138500-02 (Eyman); Ex. 3311 at ADCRR00138678 (Lewis); Ex. 3313 at ADCRR00138758-60 (Perryville); Ex. 3315 at ADCRR00138804 (Phoenix); Ex. 3316 at ADCRR00138912-13 (Safford); Ex. 3318 at ADCRR00138858-59 (Fort Grant Unit); Ex. 3320 at ADCRR00138991-92 (Tucson); Ex. 3322 at ADCRR00139133-34 (Winslow); Ex. 3323 at ADCRR00139083-84 (Apache Unit); Ex. 3325 at ADCRR00139212-14 (Yuma). NCCHC Essential Standard P-E-05 relating to Mental Health Screening and Evaluation is not applicable at ADCRR-operated facilities which do not receive inmates from the community or from facilities outside the correctional system. (Dkt. 4174, ¶ 121; Ex. 3309 at ADCRR00138633-34 (Florence, where screening is conducted at intake center prior to transfer).)

1312. Additional on-site mental health care services include crisis intervention services, psychotropic medication management, and psychiatric re-evaluation by psychiatrists and psychiatric mid-level professionals. (Dkt. 4174, ¶ 122.) There was ample

evidence of teamwork, collaboration, and communication among correctional, nursing, medical, and mental healthcare staff. (Dkt. 4174, ¶ 122.) Great efforts are made to identify inmates with mental health problems and to provide timely referrals, evaluations, and follow-up evaluations as clinically indicated. (Dkt. 4174, ¶ 122.) It is Dr. Penn's opinion that there is continuity of mental healthcare during incarceration, unit transfers, and eventual release. (Dkt. 4174, ¶ 122.)

1313. That NCCHC determined that: (1) inmates have access to care for their serious mental health needs; (2) staff ensure that patients can meet scheduled health care appointments; and (3) mental health care is coordinated and monitored from admission to discharge establishes Defendants are not deliberately indifferent and do not expose inmates to a substantial risk of serious harm.

1314. The Mental Health Technical Manual ("MHTM") outlines robust policies to ensure inmates have access to and continuity of care. Further, Plaintiffs have failed to provide evidence of any widespread systemic practice of disregarding the policies in the MHTM. This establishes that Defendants are not deliberately indifferent and do not expose inmates to a substantial risk of serious harm.

1315. Inmates' access to care is further demonstrated by the percentage of submitted mental health HNRs that result in scheduled appointments. (Dkt. 4174, ¶ 123.) While there is still some variability (which appears that it would likely track community COVID-19 spikes), since December 2019, all scheduled appointments were either completed, resulted in a no show, or resulted in a refusal in the same month. (Dkt. 4174, ¶ 123.) Moreover, there are a few months where the rate to scheduled appointment is greater than 100%, which suggests that some HNRs were not scheduled to a subsequent month (due to receipt late in a reporting month) but were scheduled and completed in the next month. (January 2020, February 2020, October 2020, and November 2020). (Dkt. 4174, ¶ 123.) This suggests concerted effort to eliminate any temporary backlog. (Dkt. 4174, ¶ 123.)

1316. The volume of HNRs which result in scheduled appointments objectively demonstrates that Defendants do not have a practice of failing to provide inmates with

1 access to or continuity of care.

**Accessibility of Inpatient & Residential Mental Health Treatment**

1317. Residential treatment units are for inmates that have serious mental illness who are unable to function in outpatient. (R.T. 11/17/21 a.m. at 2479:12-22.) Inmates in residential treatment units require a setting where they are housed only with other inmates that share their unique set of mental health needs. (R.T. 11/17/21 a.m. at 2479:12-22.) With the exception of the Behavioral Management Unit ("BMU"), all residential treatment units are providing the same level of mental health care. (R.T. 11/17/21 a.m. at 2479:23-2480:6.) Treatment within the BMU focuses on individuals with primary personality disorders as opposed to primary mental illness. (R.T. 11/17/21 a.m. at 2479:23-2480:6.) Inmates in BMU have personality disorders that result in acting out behaviors, sometimes victimization or predatory behavior. (R.T. 11/17/21 a.m. at 2480:10-19.) While these inmates still need treatment and assistance to manage their unique issues, placing them in a typical mental health program is not beneficial, and could place other inmates at risk. (R.T. 11/17/21 a.m. at 2480:10-19.) Since 2013, ADCRR has increased the number of residential treatment beds by over 40%. (R.T. 11/17/21 a.m. at 2480:23-2481:4.) Residential treatment and inpatient units are available to all inmates of all custody levels. (R.T. 11/17/21 a.m. at 2501:4-11.) The purpose of a residential treatment unit is to step down or transition an inmate from a higher level of treatment like an inpatient unit. (R.T. 11/19/21 a.m. at 2998:14-2999:5.)

1318. ADCRR's inpatient wards house the most acutely and seriously mentally ill. (R.T. 11/17/21 a.m. at 2483:3-16.) Any inmate who requires this level of care is eligible for placement in an inpatient treatment unit. (R.T. 11/17/21 a.m. at 2489:15-17; 2490:4-8.) There are four male wards and one female. (R.T. 11/17/21 a.m. at 2483:3-16.) Other than differences in custody levels, the treatment provided at each of these wards is the same. (R.T. 11/17/21 a.m. at 2483:3-16.) Each of ADCRR's inpatient wards are independently licensed by the Department of Health Services ("DHS"). (R.T. 11/17/21 a.m. at 2488:21-25; 2489:12-14.) The Department of Health Services audits ADCRR's inpatient wards each

year to ensure they meet all requirements that an inpatient facility in the community needs to be licensed through DHS. (R.T. 11/17/21 a.m. at 2489:1-11.)

1319. The in-patient ward for females is located at ASPC Perryville. ASPC Perryville is unique in that it is the only ASPC complex in the State where female offenders are housed. (Previously females who required an inpatient level of care/transfer to an inpatient unit for specialized mental healthcare required a transfer off-site to ASPC Phoenix, but now there is new and dedicated inpatient psychiatric care provided onsite at the Perryville facility.) (Dkt. 4174, ¶ 130.) Dr. Penn was particularly impressed with how this unit resembled a community residential treatment facility as opposed to a correctional unit or even a psychiatric inpatient unit or ward. (Dkt. 4174, ¶ 130.) The unit is bright and clean and decorated by artwork. (Dkt. 4174, ¶ 130.) The females housed there were very proud of their unit and the work and role that they take part such as ensuring their cells or cots are neat and the beds are made and that their photos, drawings, and other personal possessions were contained and kept neat and orderly. (Dkt. 4174, ¶ 130.) There was ample therapeutic programming. (Dkt. 4174, ¶ 130.) The day room had sunlight and there were concerted efforts by custody and health care staff to provide a therapeutic and supportive milieu. (Dkt. 4174, ¶ 130.) Females were allowed to have access to day room, television and washer and dryer in the day room, areas to sit or walk or engage in the dayroom and in the nearby outdoor recreational activities, where there was particularly beautiful landscaping, and personal possessions and individual and group therapy and other treatment programming opportunities. (Dkt. 4174, ¶ 130.) Dr. Penn testified to this unit's beautiful landscaping, and to the fact it was clean and calm. (R.T. 11/19/21 a.m. at 2990:23-2991:15.)

1320. The inpatient wards for males are located at ASPC Phoenix in Phoenix, Arizona. (Dkt. 4174, ¶ 131.) ASPC Phoenix is a unique facility in the ADCRR system. (Dkt. 4174, ¶ 131.) ASPC Phoenix has a 336-bed reception unit where all new male intakes are screened, classified, evaluated, and held until transport to their assigned permanent housing location (except male inmates with a death sentence who bypass ASPC Phoenix and receive their intake at the ASPC Eyman-Browning Unit). (Dkt. 4174, ¶ 131.)

Additionally, there is a 61-bed minimum custody general population inmate worker unit, which houses minimum custody general population male inmates who work at the ASPC Phoenix Complex. (Dkt. 4174, ¶ 131.) The mental health programs conducted in the Flamenco Unit (also referred to as the Alhambra Behavioral Health Treatment Facility) are State of Arizona Department of Health Services licensed (Behavioral Health Services Agency) Level 1 Sub- Acute Agencies. (Dkt. 4174, ¶ 131.) They have also achieved NCCHC accreditation and remain accredited. (Dkt. 4174, ¶ 131.) The Flamenco Unit is a licensed 125-bed intermediate mental health unit, which is subdivided into the King Ward (capable of housing up to 35 inmates), John Ward (capable of housing up to 30 inmates), Ida Ward (capable of housing up to 40 inmates, including up to 15 on watch status), and George Ward (capable of housing up to 20 inmates). (Dkt. 4174, ¶ 131.) Finally, the Aspen Unit, also referred to as the Men's Treatment Unit, operates as a transitional care unit for mental health inmates and has capacity to house 150 medium custody male inmates. (Dkt. 4174, ¶ 131.)

1321. The purpose of an inpatient ward is to provide crisis stabilization and then to move them to a mental health treatment program. (R.T. 11/19/21 a.m. at 2997:6-2998:6.)

1322. As of November 17, 2021, none of ADCRR's residential treatment or inpatient units were at capacity. (R.T. 11/17/21 a.m. at 2485:21-2488:2.) Despite allegations to the contrary, this is not because of inadequate staffing. (R.T. 11/17/21 a.m. at 2488:3-6.) This is because there are not enough inmates within ADCRR who require these higher levels of care. (R.T. 11/17/21 p.m. at 2589:11-20.)

1323. Each week, Dr. Stallcup participates in a call with the deputy wardens and Centurion's Regional Mental Health Director to discuss referrals for inpatient and residential treatment. (R.T. 11/17/21 a.m. at 2490:9-18.) This ensures that inmates who require a higher level of care can be transferred in a timely fashion. (R.T. 11/17/21 a.m. at 2490:20-21.) In Dr. Stallcup's experience, routine referrals take approximately a week and urgent referrals within 24 hours. (R.T. 11/17/21 a.m. at 2490:22-2491:3.) Just because a referral to inpatient is made does not mean the inmate requires inpatient care. (R.T.

11/17/21 a.m. at 2491:4-13.) Inpatient care should be utilized relatively infrequently. (R.T. 11/17/21 a.m. at 2491:4-13.) This is a best practice that is analogous to what occurs in the free world and in specialty care centers. (R.T. 11/19/21 a.m. at 2993:3-2994:15.)

1324. In most cases, after being discharged from inpatient, the inmate will be stepped down to a residential treatment unit prior to being housed in an outpatient setting. (R.T. 11/17/21 a.m. at 2497:25-2498:13.)

1325. Custody can refer inmates for a provider assessment for admission to inpatient units at ASPC Phoenix (males) and ASPC Perryville (females) complexes. (Dkt. 4174, ¶ 56.) Nevertheless, mental health staff ultimately determine whether transfer is clinically indicated. (Dkt. 4174, ¶ 56.) When it is clinically indicated, *and* emergent, transfers have and can be accomplished in less than 24-hours from referral to admission. (Dkt. 4174, ¶ 56.) In summary, custody unit leadership denied any concerns regarding mental health staff's responsiveness or accessibility. (Dkt. 4174, ¶ 56.)

1326. Dr. Penn disagrees with Dr. Stewart's opinion that there is inadequate access to inpatient mental health care. (Dkt. 4174, ¶ 125.) To the contrary, Dr. Penn opined that when clinically indicated, inmates across the state are referred and transferred to the inpatient units at Phoenix and Perryville. (Dkt. 4174, ¶ 125.)

1327. At ADCRR, there is a continuum of care that includes access to intensive inpatient mental health care. (Dkt. 4174, ¶ 124.)

1328. In Dr. Penn's opinion, the inpatient intensive mental health care and treatment services available onsite at these two specially designated, state department of health independently licensed facilities, as described above, meet, or exceed the standard of care. (Dkt. 4174, ¶ 126.)

1329. The facility's mental health lead determines referrals, which is then approved by an admissions committee (including regional mental health director and mental health leads across the state) and then DWOP for security concerns. (R.T. 11/5/21 a.m. at 1066:17-1068:4.)

1330. Currently, the inpatient units at both Perryville and Phoenix have available

beds. (Dkt. 4174, ¶ 128.) (Ex. 3353.) There is no wait time. (Dkt. 4174, ¶ 128.) In Dr. Penn's chart review, he did not come across any inmates who he believed required a higher level of treatment but had not been transferred. (R.T. 11/19/21 a.m. at 2991:22-2992:20.) Similarly, with one exception, he did not encounter any patients that appeared to be disorganized or psychotic. (R.T. 11/19/21 a.m. at 2991:22-2992:20.) While he witnessed one patient who had psychotic symptoms, that individual was already in the inpatient unit at Phoenix. (R.T. 11/19/21 a.m. at 2991:22-2992:20.) In Dr. Penn's opinion, he was where he needed to be. (R.T. 11/19/21 a.m. at 2991:22-2992:20.)

1331. ADCRR's in-patient units are audited and independently licensed by the Department of Health Services and are not at capacity. As such, inmates have access to such units if clinically indicated. This establishes that Defendants are not deliberately indifferent and do not subject inmates who require in-patient treatment to a substantial risk of serious harm.

### Privacy & Confidentiality in Mental Health Encounters

1332. Importantly, all ADCRR facilities were found compliant with NCCHC Important Standard P-A-07–Privacy of Care, which requires that health care encounters and exchanges of information remain private. (Dkt. 4174, ¶ 133; Ex. 3305 at ADCRR00138367 (Douglas); Ex. 3307 at ADCRR00138466 (Eyman); Ex. 3309 at ADCRR00138602 (Florence); Ex. 3311 at ADCRR00138670 (Lewis, met analogous 2014 standard P-A-09); Ex. 3313 at ADCRR00138729 (Perryville); Ex. 3315 at ADCRR00138799 (Phoenix, met analogous 2014 standard P-A-09); Ex. 3316 at ADCRR00138884 (Safford); Ex. 3318 at ADCRR00138830 (Fort Grant Unit); Ex. 3320 at ADCRR00138958 (Tucson); Ex. 3322 at ADCRR00139106 (Winslow); Ex. 3323 at ADCRR00139057 (Apache Unit); Ex. 3325 at ADCRR00139181 (Yuma).) According to NCCHC, "Privacy is made more difficult when triaging health complaints at the inmate's cell, in segregated housing, or in supermax housing, or when conducting interviews during the intake process. (Dkt. 4174, ¶ 133.) When cell-side triage is required, or when conducting interviews during intake, health staff take extra precautions to promote private communications." (Dkt. 4174, ¶ 133.)

1333. ADCRR inmates are offered private meeting space to ensure confidentiality during mental health encounters. (Dkt. 4174, ¶ 134.) During his September 2021 tours, mental health staff at all sites confirmed this to Dr. Penn. (Dkt. 4174, ¶ 134.) If inmates refuse this setting, mental health staff attempt to clarify the etiology. (Dkt. 4174, ¶ 134.) If an inmate is exhibiting symptoms suggestive of a psychotic disorder, mental health staff increase their attempts to monitor this patient. (Dkt. 4174, ¶ 134.) They would refer the patient for a psychiatric evaluation, prescribe PMRB medication, if indicated, or transfer the patient to Phoenix or Perryville inpatient units. (Dkt. 4174, ¶ 134.) Such offerings are consistent with the correctional standard of care and with the ultimate goal—particularly with inmates on watch—of keeping the inmate safe. (Dkt. 4174, ¶ 134.)

**Cell-Front Encounters for Mental Health Assessment**

1334. Plaintiffs' expert, Dr. Stewart, asserts that the use of cell-front encounters is clinically inappropriate and that this practice places ADCRR inmates at serious risk. (Dkt. 4174, ¶ 135.) Dr. Penn disagrees, and in his view, the use of cell-front encounters to provide focused mental health assessment of inmates on suicide watch or other watch status is clinically appropriate. (Dkt. 4174, ¶ 135.) The use of cell-front encounters, in and of themselves, do not place inmates at a risk of harm. (R.T. 11/19/21 a.m. at 3000:21-3001:7.)

1335. From a mental health and psychiatric perspective, and according to Dr. Penn the practice of cell-front encounters does not cause a patient on a suicide watch or other watch status to be at increased serious risk of harm to self. (Dkt. 4174, ¶ 136.) The goal and focus of mental health treatment regarding a suicide watch or watch status is to keep the inmate safe, to safely monitor an inmate patient for possible acts or attempted acts of self-harm, self-injury, or any suicide attempts. (Dkt. 4174, ¶ 136.) The goal is not to engage the patient in extended diagnostic interviewing or individual psychotherapy or other treatment services. (Dkt. 4174, ¶ 136.) The immediate goal is to maintain the patient's safety and to re-assess the inmate's risk of harm, activities of daily living and whether they should remain on the suicide watch, the frequency of monitoring by custody staff should remain the same, be increased or be reduced. (Dkt. 4174, ¶ 136.) Moreover, cell-front

encounters have the added benefit of allowing staff to see the inmate's cell and its contents, which allows staff to get a sense of whether the person is mentally stable. (R.T. 11/19/21 a.m. at 2999:13-3000:20.)

1336. Should a patient demonstrate clinical deterioration or further self-harm or suicide attempts even while on a suicide watch or watch status, nursing and/or mental health staff re-evaluate the inmate to identify further behavioral management, treatment plans, programming, and further evaluation and treatment interventions, to include the possibility of transfer to a higher level of care, such as an inpatient psychiatric unit, the medical clinic (in the event of self-harm), or other clinical management. (Dkt. 4174, ¶ 137.) The ultimate goal is to afford an inmate patient the least restrictive environment that is clinically appropriate and thus the goal is to assess the patient frequently to better identify if the watch is clearly clinically warranted. (Dkt. 4174, ¶ 137.)

1337. Additionally, where a patient refuses a confidential encounter, cell-front encounters can be appropriate. (R.T. 11/19/21 a.m. at 2999:13-3000:20.)

1338. Dr. Stewart appears to argue that inmates on watch status should never undergo cell-front encounters and should always be seen in a private confidential setting. (Dkt. 4174, ¶ 138.) This is ultimately an individual clinical decision but must be carefully considered due to a variety of resulting custody, escort, and patient and staff safety issues and risks. (Dkt. 4174, ¶ 138.) For example, even when undergoing careful supervision and monitoring and custody escort to and from the private confidential setting, an inmate on a suicide watch who is seen out of their cell may surreptitiously gain access to miscellaneous items (e.g., pens, pencils, paper clips, various sharp items, ligature items) that could result in further serious self-harm (ingestion, insertion, cutting, other severe self-injury) or suicide attempts. (Dkt. 4174, ¶ 138.)

1339. ADCRR appropriately utilizes cell-front encounters and provides confidential settings where clinically indicated. This is supported by NCCHC's determination that health care encounters and exchanges of information remain private. The settings which ADCRR provides to its inmates for mental health encounters is constitutional and does not

create a substantial risk of serious harm.

**Minimum Duration of Encounters**

1340.  In Dr. Penn's view, setting minimum required durations for mental health care encounters can hamper the clinician's ability to provide mental health care.  (Dkt. 4174, ¶ 139.)  Treatment encounters should absolutely not have a minimum duration in which to be completed as it undermines the provider's training and expertise.  (R.T. 11/19/21 a.m. at 3001:16-3002:19.)   Providers have an ethical duty to meet the patient where the patient's at and to work with the patient there.  (R.T. 11/19/21 a.m. at 3001:16-3002:19.)

1341.  In Dr. Penn's September 11, 2020 Declaration, he noted numerous examples of situations when continuing a mental health encounter just to comply with a minimum duration requirement would have been clinically inappropriate and could have risked causing the patient to develop anger, agitation, or other manifestations of behavioral dyscontrol or dysregulation to include impulsive, agitated, threatening, assaultive, or self-injurious behaviors in a patient who wanted to be left alone.  (Dkt. 4174, ¶ 140.)

1342.  In his review of inmate charts, both in preparation of that Declaration and in preparation of his trial testimony, Dr. Penn noted that psychiatric staff and other mental health care staff appropriately terminated clinical encounters when it became apparent that the particular inmate patients were no longer interested in continuing the individual therapy, new or follow-up evaluation, or other therapeutic encounter.  (Dkt. 4174, ¶ 141.)  This decision by qualified mental health professionals is clinically appropriate.  (Dkt. 4174, ¶ 141.)   In addition, attempting to develop and further strengthen a therapeutic working relationship with an inmate patient results in trust and rapport between mental health staff and inmate patients.  (Dkt. 4174, ¶ 141.)  The availability of this shared and respectful treatment partnership will also have an added benefit in encouraging other inmates who may not be on the current mental health caseload to seek mental health treatment when needed. (Dkt. 4174, ¶ 141.)  This permits future, longer (if and when clinically necessary) and more in-depth encounters to take place where appropriate.  (Dkt. 4174, ¶ 141.) Establishing a voluntary right to treatment as opposed to an arbitrary time mandated clinical

encounter is particularly essential. (Dkt. 4174, ¶ 141.) This will reduce patient's resistance, reluctance, and frank refusal to comply with future clinical encounters or to seek future mental health treatment. (Dkt. 4174, ¶ 141.) It is important to meet the patients where they are. (Dkt. 4174, ¶ 141.) Forcing a patient to engage in conversation for the sake of meeting stop-watch timeframes jeopardizes the ability to establish and build upon this potentially fragile therapeutic treatment relationship. (Dkt. 4174, ¶ 141.) And this creates an adversarial (as opposed to therapeutic) relationship between the inmate and mental health provider. (R.T. 11/19/21 a.m. at 3001:16-3002:19.)

1343. Likewise, requiring an inmate to execute a refusal form if he does not want to be seen by the prescribed minimum, significantly jeopardizes the therapeutic relationship between the inmate and provider. (R.T. 11/19/21 a.m. at 3002:20-3003:19.) Dr. Penn was told, from pretty much every single mental health staff member he spoke with, that this puts them in an ethical quandary because they go from being a healthcare provider to filling a custodial role where inmates perceive their actions to be disciplinary in nature. (R.T. 11/19/21 a.m. at 3002:20-3003:19.)

1344. It is Dr. Penn's opinion that the interactions of mental health clinicians and inmates evidenced in his chart reviews were "meaningful" and "appropriate" and met the standard of care. (Dkt. 4174, ¶ 142.) These contacts, although sometimes brief, still provided vital information (such as mental health inquiry and assessment of the inmate patients' ability to communicate any subjective complaints such as suicidal or self-injurious impulses, thoughts of harm to self or others, or other emotional or physical distress or other health care needs or other requests), the inmate patient's activities of daily living (ADL's) and their recent adjustment and functioning as noted by their grooming, hygiene, evidence of recent acts of self-harm/injury, the status of their cell and contents, and objective measures such as the patient's ability to reality test, answers provided via mental status testing, and overall clinical stability) to the mental health clinician and were utilized in evaluating the condition of the patient and in guiding treatment decision-making for example, whether to increase or reduce the frequency of monitoring, or discontinue a watch

status.  (Dkt. 4174, ¶ 142.)  According to Dr. Penn, it is important to view these contacts as part of an overall treatment plan.  (Dkt. 4174, ¶ 142.)  Also, he noted during his facility tours that mental health staff routinely reviewed watch logs (documented by correctional staff) which provided additional data to assist the mental health professional in their clinical determinations.  (Dkt. 4174, ¶ 142.)  He also learned during additional staff interviews that custody staff and leadership are readily available to discuss complicated inmate patients and to provide additional information to mental health staff when needed.  (Dkt. 4174, ¶ 142.)

1345.  There is no national correctional health standard of care that establishes or defines an expected duration, timeframe, or range of time for a mental health professional to conduct any type of mental health or psychiatric interaction or encounter with a patient inmate.  (Dkt. 4174, ¶ 143.)

1346.  There is no national definition, standard for health services in prisons, licensing board (e.g., medical board for psychiatrists, psychology board for psychologists, and the like) requirements, established correctional clinical practices or national position statements or clinical guidelines, or any other national promulgated expectations regarding any defined time frame or expected duration for any particular type of mental health screening, evaluation, contact, or any type of treatment services within correctional settings.  (Dkt. 4174, ¶ 144.)

1347.  Regardless of the location, setting, or type of mental health encounter (e.g., a segregation visit, watch and post-watch encounters, crisis intervention treatment services, suicide risk assessment, individual counseling session), there is no defined or expected duration of time for any mental health professional within a correctional setting.   (Dkt. 4174, ¶ 145.)

1348.  The duration of each mental health encounter should be based on the professional's clinical judgment, background, training, professional experience, and individualized determination of each inmate's current clinical status and evaluation/individual treatment needs.  (Dkt. 4174, ¶ 146.)  It is critical for the clinician to

have the latitude to utilize their own professional judgment regarding the clinically indicated duration of any mental health encounters to build rapport, and to further develop and maintain a working therapeutic treatment relationship.  (Dkt. 4174, ¶ 146.)

1349.  The length of time needed to conduct a meaningful encounter will also vary depending on the type of encounter and its intended purpose.  (Dkt. 4174, ¶ 147.)

1350.  The purpose of a suicide watch follow-up by a mental health professional is to identify if the patient currently on suicide watch or recently removed from suicide watch presents with clinical impairment, poses imminent risks of harm to self or others, and to identify what level of supervision and follow-up is clinically indicated or recommended. (Dkt. 4174, ¶ 148.)

1351.  There is no nationally defined time duration requirement to conduct any type of mental health interaction or evaluation of a prisoner prior to, while on, or subsequent to removal from a suicide or mental health watch.   (Dkt. 4174, ¶ 149.)

1352.  According to the most current NCCHC Standards for Health Services in Prisons, 2018 (and the similar standards for Jails and Juvenile Health Standards), the Standard for Suicide Prevention and Intervention is defined, "Suicides are prevented when possible by implementing prevention efforts and intervention."  (Dkt. 4174, ¶ 150.)  There is no language in the NCCHC standard's compliance indicators, definitions, or discussion section that mandates or promulgates a minimum or certain amount of time or time range to be utilized during any of these encounters.  (Dkt. 4174, ¶ 150.)

1353.  Ultimately, it was and still is Dr. Penn's opinion that there should be no mandated minimum amount of time for mental health professionals to see a patient, but that any contact should be guided by the independent clinical judgment of the mental health professional.  (Dkt. 4174, ¶ 151.)  Such mandated minimums shift the focus from clinical care and can be counterintuitive where the inmate does not desire to be seen for the arbitrary amount of time.  (Dkt. 4174, ¶ 151.)

1354. Dr. Stallcup agrees that imposing minimum durations for encounters disempowers providers to use their clinical judgement in assessing the patient, treating

1  them, and determining how long is required to accomplish these tasks.  (R.T. 11/17/21 a.m.

2  at 2451:10-2451:17.)   Imposition of minimum durations put providers in the awkward

3  position of making patients stay longer than they want or need.  (R.T. 11/17/21 a.m. at

4  2451:10-2451:17.)

5       1355.  Timeframes take away providers' autonomy and ability to make their own

6  clinical decisions.  (R.T. 11/5/21 p.m. at 1089:6-10.)

7       1356.  And, as Dr. Platt testified, the Court's minimum-duration order impacted

8  staffing and was a barrier to staffing.  (R.T. 11/5/21 p.m. at 1087:8-1088:17.)

9       1357.  Imposition of minimum durations was unnecessary and hampered providers'

10  ability to make clinical decisions and subjective assessments of each individual patient.  The

11  Court will not continue to require minimum durations for any mental health encounter as it

12  finds it is unnecessary (and often creates a barrier) to the provision of constitutionally

13  adequate mental health care.

14  **Treatment Plans & Timely Communication**

15       1358.  In Dr. Penn's opinion, the standard of care does not require that a formal

16  treatment plan be created, beyond the SOAPE note charting that providers conduct.  (R.T.

17  11/19/21 a.m. at 3006:23-3008:12.)   Inmates on the mental health case load, however, do

18  receive a treatment plan.  (R.T. 11/17/21 a.m. at 2491:17-23.)  A treatment plan is not "one

19  size fits all" and is individually tailored to address each inmate's specific mental health

20  concerns.  (R.T. 11/17/21 a.m. at 2491:24-2492:5; 2492:25-2493:2.)  MH 3s have treatment

21  plans created within 30 days of their designation and MH 4s and 5s have them created upon

22  their admission to residential or inpatient treatment.  (R.T. 11/17/21 a.m. at 2491:24-

23  2492:5.)

24       1359.  Treatment plans can occur either informally, formally, or both.   (R.T.

25  11/19/21 a.m. at 3006:14-22.)   Treatment planning is really like a verb—it is a process.

26  (R.T. 11/19/21 a.m. at 3006:14-22.)

27       1360.  To develop a treatment plan, the inmate meets with a psych associate to

28  discuss their mental health symptoms and functional impairments.  (R.T. 11/17/21 a.m. at

2492:6-13.)  The psych associate then determines what treatment is needed to address the inmate's specific symptoms and impairments and what the inmate should expect during treatment.  (R.T. 11/17/21 a.m. at 2492:6-13.)  MH 3As, 4s and 5s have their treatment plans updated every 90 days.  (R.T. 11/17/21 a.m. at 2492:14-17.)  The rest of the MH 3s' treatment plans are updated annually.  (R.T. 11/17/21 a.m. at 2492:14-17.)  Sometimes, depending on the inmate's individual needs, other disciplines can be brought in to assist with development of a treatment plan.  (R.T. 11/17/21 a.m. at 2493:3-11.)

1361.    In preparation of his testimony, Dr. Penn reviewed numerous ADCRR inmate medical records.  (Dkt. 4174, ¶ 152.)  In his view, ADCRR provides comprehensive treatment plans, timely communication, and multidisciplinary coordinated care between psychiatric and mental health staff, nursing staff, medical providers, and custody staff.  (Dkt. 4174, ¶ 152.)  Such records are kept in accordance with the correctional standard of care.  (Dkt. 4174, ¶ 152.)  This significantly reduces the risk of an inmate's risk of harm to self or others.  (Dkt. 4174, ¶ 152.)

1362.  This is further supported by the fact that all ADCRR facilities were found 100% compliant with NCCHC Essential Standard P-F-01–Patients with Chronic Disease and Other Special Needs, which determines whether patients with chronic disease, other significant health conditions, and disabilities received ongoing multidisciplinary care aligned with evidence- based standards.    (Dkt. 4174,  ¶  153-154; Ex. 3305 at ADCRR00138403-05 (Douglas); Ex. 3307 at ADCRR00138546-47 (Eyman); Ex. 3309 at ADCRR00138639-40    (Florence);    Ex.    3311    at    ADCRR00138682-84    and ADCRR00138702-03 (Lewis, met analogous 2014 standard P-G-01); Ex. 3313 at ADCRR00138764-66 (Perryville); Ex. 3315 at ADCRR00138807 and ADCRR00138809 (Phoenix, met analogous 2014 standard P-G-01); Ex. 3316 at ADCRR00138918-19 (Safford);    Ex.    3318    at    ADCRR00138864-65    (Fort    Grant    Unit);    Ex.    3320    at ADCRR00139020-22 (Tucson); Ex. 3322 at ADCRR00139138-39 (Winslow); Ex. 3323 at ADCRR00139088-89 (Apache Unit); Ex. 3325 at ADCRR00139218-20 (Yuma).)    This includes individualized treatment plans for SMI inmates.  (Dkt. 4174, ¶ 153.)

1363. To determine whether this standard is met, NCCHC looks to whether "Treatment plans for patients with mental health conditions should incorporate ways to address the patients' problems and enhance patients' strengths, involve patients in their development, and include strategies to prevent relapse. (Dkt. 4174, ¶ 154.) The strategies should describe signs and symptoms associated with relapse or recurring difficulties (e.g., auditory hallucinations), how the patient thinks a relapse can be averted, and how best to help the patient manage crises. (Dkt. 4174, ¶ 154.) The treatment plan may use any format that contains all the required elements. (Dkt. 4174, ¶ 154.) Individual treatment forms are preferable since they facilitate developing a comprehensive plan that is easily identifiable. (Dkt. 4174, ¶ 154.) SOAP (subjective, objective, assessment, plan) notation in the progress notes is another way to document a treatment plan." (Dkt. 4174, ¶ 154.)

1364. Importantly, all ADCRR facilities were found 100% compliant with NCCHC Essential Standard Essential Standard P-A-08–Health Records. (Dkt. 4174, ¶ 155; Ex. 3305 at ADCRR00138367-68 (Douglas); Ex. 3307 at ADCRR00138467-68 (Eyman); Ex. 3309 at ADCRR00138602-03 (Florence); Ex. 3311 at ADCRR00138684-85 (Lewis, met analogous 2014 standards P-H-01 to P-H-04); Ex. 3313 at ADCRR00138729-30 (Perryville); Ex. 3315 at ADCRR00138809-10 (Phoenix, met analogous 2014 standards P-H-01 to P-H-04); Ex. 3316 at ADCRR00138884-84 (Safford); Ex. 3318 at ADCRR00138830-31 (Fort Grant Unit); Ex. 3320 at ADCRR00138959-60 (Tucson); Ex. 3322 at ADCRR00139107-08 (Winslow); Ex. 3323 at ADCRR00139058-59 (Apache Unit); Ex. 3325 at ADCRR00139181-82 (Yuma).) According to NCCHC, a confidential health record is created and maintained using a standardized format. (Dkt. 4174, ¶ 155.)

1365. In Dr. Penn's record review of ADCRR medical and mental health records, he found them organized by section and category and were easily accessible, even by him, as he lacks any formal eOMIS training. (Dkt. 4174, ¶ 156.) The records clearly demonstrated that when patients submitted medical health needs requests, there was timely response, evaluation, and treatment. (Dkt. 4174, ¶ 156.) Dr. Penn found a pattern of evidence of patient-centered treatment planning, including attempts at providing informed

consent, treatment plans, and documentation of all healthcare encounters. (Dkt. 4174, ¶ 156.)

1366.  While Dr. Penn is aware that many users believe the eOMIS system could be made more user-friendly, the fact that when used by a mental health practitioner it contains accessible links to vital signs, medication orders, lab results, treatment plans, and prior encounters means that there is no justifiable reason for any mental health clinician or psychiatric provider or mid-level to spend time duplicating information in their entries in the manner which may have been previously appropriate when paper charts were maintained.  (Dkt. 4174, ¶ 157.)

1367. Based on Dr. Penn's record review and interviews with Centurion and ADCRR staff, there was evidence of ongoing multidisciplinary individualized treatment planning based on the acuity and complexity of a particular patient.  (Dkt. 4174, ¶ 158.) There was also evidence of documented treatment planning and psychoeducation in eOMIS records that he reviewed.  (Dkt. 4174, ¶ 158.)

1368.  Dr. Penn opines that the current medical records documentation of treatment planning is adequate.  (Dkt. 4174, ¶ 159.)  Treatment planning is a process rather than spending an inordinate amount of time documenting treatment plans or treatment planning in the medical record. (Dkt. 4174, ¶ 159.)  There are no established correctional standards regarding duration, amount, or length of treatment planning documentation or treatment team meetings.  (Dkt. 4174, ¶ 159.)  While it is important to allow additional detail and individualization in particularly complex cases with acute mental health needs, the structure of the ADCRR mental health classification, particularly with respect to various MH-3 subgroups, as well as design of the residential programs, serves the function of ensuring that comprehensive treatment is provided, and may reduce the need to include detail, which would only be necessary in a system where such policies are not directed system-wide. (Dkt. 4174, ¶ 159.)

1369. There was evidence of treatment planning, timely communication, and multidisciplinary coordinated care between psychiatric and mental health staff, nursing

staff, and when indicated medical providers, and custody staff.  (Dkt. 4174, ¶ 160.)  This practice significantly reduces the risk of an ADCRR inmate patient's risk of harm to self or others or clinical deterioration.  (Dkt. 4174, ¶ 160.)

1370.  Inmates at ADCRR receive appropriate and robust treatment plans which exceeds what is required under the standard of care.  This is supported by NCCHC's determination that treatment plans at ADCRR incorporate ways to address the patients' problems and enhance patients' strengths, involve patients in their development, and include strategies to prevent relapse.  Defendants' development of treatment plans is constitutional and does not create a substantial risk of serious harm.

**Educational & Therapeutic Programming**

1371.  Psychoeducation programming provides tools to manage symptoms whereas psychotherapy addresses the symptoms themselves.  (R.T. 11/17/21 a.m. at 2502:25-2503:4.)

1372. Psychotherapy groups are provided by psych associates and psychoeducational groups may be provided by BHTs.  (R.T. 11/17/21 a.m. at 2503:5-9; Ex. 3052.)  In addition, security staff (CO-IIIs) may provide additional educational programming to inmates with mental health needs, which provides an additional structured environment where they may practice prosocial behaviors.  (Ex. 3052).

1373.  Any inmate can request counseling services.  (R.T. 11/17/21 a.m. at 2508:6-9.)  Counseling services are performed by psychologists or psych associates.  (R.T. 11/17/21 a.m. at 2507:22-25.)

1374.  From early October to early November 2021, ADCRR inmates attended 2,000 group programming sessions.  (R.T. 11/17/21 a.m. at 2508:17-24.)  Each month over 15,000 hours of group programming is offered to ADCRR inmates.  (R.T. 11/17/21 a.m. at 2508:17-24.)  In Dr. Penn's opinion, ADCRR provides more programming that what would be available in the community.  (R.T. 11/17/21 a.m. at 3014:8-19.)  In the community you would have to have one of three serious mental illness diagnoses.  (R.T. 11/19/21 a.m., 3014:13-3014:19.)  In Dr. Penn's opinion, one would either have to have schizophrenia or

some other psychotic disorder, severe bipolar, or severe major depression to qualify for community mental health services, and you would not probably get the same level of group psychotherapies that are available within ADCRR. (R.T. 11/19/21 a.m. at 3014:13-3014:19.)

1375. The volume of programming sessions attended by ADCRR inmates objectively demonstrates that Defendants have a practice of providing substantial group programing services to its inmate population.

1376. Group topics include a wide range of subjects, including mental health treatment, education, vocation, substance abuse, sex offender treatment, criminal thinking, and thinking of a change. (R.T. 11/17/21 a.m. at 2508:25-2509:12.) With respect to mental health focused group programming, such topics include managing depression, addressing past trauma, importance of taking medications as prescribed, and importance of hygiene. (R.T. 11/17/21 a.m. at 2509:13-22.)

1377. Inmates can also access mental health services via their tablets. (R.T. 11/17/21 a.m. at 2509:23-2510:9.) For example, there are free podcasts that have information regarding self-help materials on ways to manage different mental health illness and mindfulness training. (R.T. 11/17/21 a.m. at 2509:23-2510:9.) Additionally, there are free self-paced educational courses available to inmates on their tablet. (R.T. 11/17/21 a.m. at 2509:23-2510:17.) These educational courses also cover a wide range of topic areas such as math, science, communication, or any other subject that would be taught in school. (R.T. 11/17/21 a.m. at 2509:23-2510:17.)

1378. ADCRR has a multitude and wide variety of both educational and therapeutic group programming available to its inmate population. (Dkt. 4174, ¶ 161.) Such programming includes topics on anger management, anxiety, mindfulness, coping with incarceration, grief support, post- release, medication education, parenting, journaling, self-care, and much more. (Dkt. 4174, ¶ 161.)

1379. There is also a separate section of programming for substance abuse treatment that include Alcoholics Anonymous and Narcotics Anonymous group therapy. (R.T.

1    11/17/21 a.m. at 3012:7-3013:4.)

2        1380.  In preparation of his testimony, Dr. Penn reviewed various schedules,

3    outlines, and lists of the group activities (both therapeutic and education) offered by

4    ADCRR and find them to be appropriate and proper for the treatment of inmates on the

5    mental health caseload.  (Dkt. 4174, ¶ 162.)  Group programming is organized and offered

6    through three primary forms.  (Dkt. 4174, ¶ 162.)  Group psychotherapy is facilitated by

7    qualified mental health professionals, as is the standard of care.  (Dkt. 4174, ¶ 162.)  In the

8    residential treatment settings, those sessions are scheduled once/week.  (Dkt. 4174, ¶ 162.)

9    In addition, there are separate weekly psycho- educational groups which are facilitated by

10   Behavioral Health Technicians, as well as a third weekly educational group facilitated by

11   qualified security personnel.  (Dkt. 4174, ¶ 162.)  This is an appropriate division of labor

12   and comports with the standard of care.  (Dkt. 4174, ¶ 162.)  The groups are properly

13   facilitated by qualified mental health professionals and are offered and available to ADCRR

14   inmates.  (Dkt. 4174, ¶ 162.)  It is unnecessary for a qualified mental health provider to

15   facilitate all groups.  (Dkt. 4174, ¶ 162.)  Whether a particular program should be facilitated

16   by a mental health professional depends on the level of the group.  (R.T. 11/17/21 a.m. at

17   3013:5-3014:7.)  Depending on the group, Dr. Penn opines that it can be appropriate for

18   correctional officers to facilitate them.  (R.T. 11/17/21 a.m. at 3013:5-3014:7.)

19       1381.  The fact that one psychotherapy group may be cancelled on a day due to a

20   facilitator absence, is not indicative of falsification of medical records where it is noted that

21   the inmate participated in a psycho-educational group.  (Dkt. 4174, ¶ 162.)

22       1382.  All ADCRR facilities met NCCHC Essential Standard P-F-03–Mental Health

23   Services – which, among other things, analyzes whether "in the correctional setting, as in

24   most other environments, the immediate objective of mental health treatment is to alleviate

25   symptoms of mental disorders and prevent relapses to sustain patients' ability to function

26   safely in their environment.  (Dkt. 4174, ¶ 163; Ex. 3305 at ADCRR00138406-07

27   (Douglas); Ex. 3307 at ADCRR00138510-11 (Eyman); Ex. 3309 at ADCRR00138641-42

28   (Florence); Ex. 3311 at ADCRR00138683 (Lewis, met analogous 2014 standard P-G-04);

Ex. 3313 at ADCRR00138767-68 (Perryville); Ex. 3315 at ADCRR00138807-08 (Phoenix, met analogous 2014 standard P-G-04); Ex. 3316 at ADCRR00138920-21 (Safford); Ex. 3318 at ADCRR00138866-67 (Fort Grant Unit); Ex. 3320 at ADCRR00139000-01 (Tucson); Ex. 3322 at ADCRR00139140-41 (Winslow); Ex. 3323 at ADCRR00139090-91 (Apache Unit); Ex. 3325 at ADCRR00139221 (Yuma).)  Ideally, individual counseling, group counseling, self-help groups, residential programs, and clinical management are coordinated.  (Dkt. 4174, ¶ 163.)  In any event, policy and procedures define the roles of the treatment team and the health care team, as well as the areas of mutual Interest and collaboration.  (Dkt. 4174, ¶ 163.)  Community self-help initiatives such as Alcoholics Anonymous and Narcotics Anonymous may be an appropriate supplement or alternative to counseling provided by staff."  (Dkt. 4174, ¶ 163.)

1383.  Like other state prison systems, ADCRR implemented a reduction of group therapy and out-of-cell time for state prisoners due to the COVID-19 pandemic.  (Dkt. 4174, ¶ 164.)  This was due to a variety of public health and safety measures which have been promulgated as best practices by the Centers for Disease Control (CDC).  (Dkt. 4174, ¶ 164.)  These practices are aimed to minimize and reduce COVID-19 spread in correctional settings where many inmates have medical and mental health risk factors and comorbidities. (Dkt. 4174, ¶ 164.)

1384.  Similar to ongoing free world efforts, there has been great attention to social distancing, avoiding crowds, and airborne spread of COVID-19.  (Dkt. 4174, ¶ 165.)  During the pandemic surge, ADCRR inmates exited their cells, had shower time and phone time in groups of 4-6 to minimize the potential for COVID-19 spread.  (Dkt. 4174, ¶ 165.)  Similar to other correctional systems nationwide, inmates who tested positive for COVID-19, demonstrated symptoms, or had possible COVID-19 exposure were subjected to medical quarantining or cohorting to reduce the risk of transmission between housing areas.  (Dkt. 4174, ¶ 165.)  Similarly, new intakes to ADCRR from county jails also require further monitoring.  (Dkt. 4174, ¶ 165.)

1385.  To its credit, ADCRR has achieved 80% vaccination rates, which according

to Dr. Penn, is a remarkable accomplishment and well above the free world average. (Dkt. 4174, ¶ 166.) In his administrative capacity, Dr. Penn was directly involved in the development of a protocol aimed at reducing the number of prisoners gathering during out-of-cell time and ambulating to pill windows for medication administration. (Dkt. 4174, ¶ 168.) He was also involved in a shared strategy between nursing, pharmacy, psychiatry, and custody leadership to administer some psychotropic medications as KOP, again, to reduce inmate movement and COVID-19 infection risk. (Dkt. 4174, ¶ 168.)

1386. Significantly, however, when groups could not be held due to COVID-19 concerns, inmates were provided with in-cell workbooks and packets which were subsequently discussed with a mental health provider during their next encounter. (Dkt. 4174, ¶ 169.) Such self-guided packets ranged in topic area and instructed inmates on suggested approaches to dealing with a variety of situations. (Dkt. 4174, ¶ 169.)

1387. Moreover, Dr. Penn disagrees with Dr. Stewart's assumptions regarding use of "movies and T.V." in group programming. (Dkt. 4174, ¶ 170.) First, at ADCRR, such video programming is rarely utilized in psychotherapy. (Dkt. 4174, ¶ 170.) While it is sometimes used in educational groups—just as in educational settings on the outside—such programming is used to jumpstart group discussions where the programming's content is discussed. (Dkt. 4174, ¶ 170.) Second, video programming is often utilized as a reward for appropriate community behavior or for holiday or other celebratory events. (Dkt. 4174, ¶ 170.)

1388. ADCRR inmates have an array and variety of group and educational programming to them. Such programming furthers their mental health treatment and assists in the provision of constitutionally adequate mental health care.

### **Access to Language Interpretation Services**

1389. Pursuant to NCCHC guidelines, it is permissible to have an officer provide interpretation services in an emergency. (R.T. 11/17/21 p.m. at 2599:4-10.)

1390. If an inmate refuses interpretation services, with the inmate's permission, it is appropriate to utilize a correctional officer to interpret. (R.T. 11/17/21 p.m. at 2583:22-

1 | 2584:9.)

2 | 1391. Based on his review of individual inmate records, facts, and data, Dr. Penn

3 | developed a basis and had sufficient information to establish his professional opinion, to a

4 | reasonable degree of medical and psychiatric certainty, that the mandated use of certified

5 | translators for all healthcare interactions and/or for group psychotherapy is not the requisite

6 | standard of care within a correctional setting. (Dkt. 4174, ¶ 171.) The standard of care

7 | within a state prison healthcare setting does not require the use of translators/interpreters

8 | for all encounters, but rather it depends upon the nature and extent of the encounter. (Dkt.

9 | 4174, ¶ 171.)

10 | 1392. There is nothing in the NCCHC 2018 Prison Health Care standards that

11 | provide for an explicit standard relating to effective communication with Limited English

12 | Proficient ("LEP") inmates. (Dkt. 4174, ¶ 172.) Only the notes in NCCHC standards and

13 | select standards in the ACA Performance Based Expected Practices for Adults in

14 | Correctional Institutions identify the specific circumstances in which language

15 | interpretation services should be used. (Dkt. 4174, ¶ 172.) These circumstances are when

16 | effective communication is compromised due to speech, hearing, or language deficits;

17 | receiving screening; when identifying advanced directives; and for informed consent. (Dkt.

18 | 4174, ¶ 172.)

19 | 1393. To the extent language interpretation services are provided by corrections

20 | departments in other jurisdictions, such as by CDCR and the Orleans Parish Prison (a New

21 | Orleans Louisiana County jail, not a Louisiana state prison), such service is due to

22 | settlement agreements, and exceeds the standard of care. (Dkt. 4174, ¶ 173.)

23 | 1394. For example, the standard of care in the community and in correctional

24 | healthcare is for staff to assess their own level of comfort and proficiency before

25 | determining whether a separate translator/interpreter or translator service is required—it

26 | would be improper for a provider to order or to document that translation service would be

27 | required where staff is proficient. (Dkt. 4174, ¶ 174.)

28 | 1395. The standard of care further mandates that the use of an interpreter is

dependent upon the nature and extent of the encounter.  (Dkt. 4174, ¶ 175.)  For instance, an inmate receiving a blood pressure measurement, or a fingerstick blood sugar test most likely does not need an interpreter.  (Dkt. 4174, ¶ 175.)  An interpreter would be necessary, however, where there are discussions regarding advance directives, as discussed above. (Dkt. 4174, ¶ 175.)

1396.  In Dr. Penn's opinion, to require anything different from the standard of care would be unreasonable and at times, can lead to medical malpractice.  (Dkt. 4174, ¶ 176.) For example, in emergency situations, time is simply not available to have translators/interpreters and other services available—rather, the standard of care is to provide emergency care and any delay in care may be alleged or viewed as medical malpractice.  (Dkt. 4174, ¶ 176.)

1397.  There are also inmates who would not require language interpretation services, such as inmates with varying degrees of deafness, who may be able to utilize hearing aids or other assistive devices, including cochlear implants to communicate with medical and mental health staff.  (Dkt. 4174, ¶ 177.)  Dr. Penn's July 27, 2020 report outlined numerous examples of inmates whose eOMIS records reflect their ability to communicate with the use of such devices.  (Dkt. 4174, ¶ 177.)  Other inmates may be comfortable with lip reading, provided the speaker slows his or her rate of speech and articulates clearly. (Dkt. 4174, ¶ 177.)  Other deaf or hearing-impaired inmates may prefer written communications. Thus, there is no one-size fits all standard for interacting with deaf inmates.  (Dkt. 4174, ¶ 177.)

1398.  Additionally, it is Dr. Penn's understanding, based on his extensive review of inmate medical records and interviews with medical, mental health, administrative, and custody staff over the almost decade of his involvement in this case, that many individuals providing medical, nursing, and mental health care in the ADCRR system are fluent in Spanish.  (Dkt. 4174, ¶ 178.)

1399.  In conducting his review of inmate charts for his July 27, 2020 report, where it was noted that an inmate speaks a language other than English (for example Spanish) but

the healthcare staff did not indicate interpreter services were required, Dr. Penn concluded that the healthcare staff conducting the encounter was likely proficient in Spanish (and/or the inmate patient could also speak sufficient English). (Dkt. 4174, ¶ 179.) This conclusion is based upon the detailed nature of the SOAPE (Subjective, Objective, Assessment, Plan, Education) notes, indicating the healthcare staff could understand the nature of the complaints made by the inmate as documented in the subjective portion of the SOAPE note, and the provision of care/treatment that was consistent with and in response to the complaint made by the inmate. (Dkt. 4174, ¶ 179.) Additionally, the HSRs (Health Service Requests) and grievances Dr. Penn reviewed were detailed in nature and responded to consistent with the conclusion that the recipient understood the inmate's communications. (Dkt. 4174, ¶ 179.)

1400. Accordingly, it is Dr. Penn's opinion that the current standard of care relating to accommodations for LEP inmates, or other inmates who Plaintiffs assert require language interpretation services, should remain the status quo. (Dkt. 4174, ¶ 180.) This widely accepted standard is for community and correctional healthcare providers to use translation/interpretation services if the healthcare provider is not proficient. (Dkt. 4174, ¶ 180.) Translation and interpretation services may be sought through another proficient healthcare staff member who is proficient in the language at issue, including a nurse, medical assistant, or another healthcare administrative support staff member (all of whom receive training in health information privacy), or to use a commercially available voice language telephone line. (Dkt. 4174, ¶ 180.)

1401. With respect to American Sign Language (ASL) inmates, the current standard, if an ASL proficient health services member is not available, is to use visual interpretation through a remote videoconference service, just as ADCRR does through Language Line InSight Video Interpreting. (Dkt. 4174, ¶ 181.)

1402. Dr. Penn's most recent series of facility tours is also illustrative of his opinion. (Dkt. 4174, ¶ 182.) During his September 2021 tours, mental health care staff uniformly and consistently explained that if they had an inmate patient who had difficulty

communicating in English, that they could utilize another health care professional as an interpreter or the language line. (Dkt. 4174, ¶ 182.) They also clarified that unless this was an emergency situation, they would not rely on custody staff to serve as translators. (Dkt. 4174, ¶ 182.) In Dr. Penn's opinion, this complies with NCCHC requirements and the standard of care. (Dkt. 4174, ¶ 182.)

1403. During his most recent random eOMIS record review, Dr. Penn did not identify any non-predominant English-speaking individuals or other ADCRR individuals with other disabilities who had delays in access to mental health care, lack of continuity of care, or delays in receiving clinically indicated mental health treatment services due to a lack of professional interpreters or sign language services. (Dkt. 4174, ¶ 183.) Similarly, he did not identify any adverse patient outcomes resulting in morbidity or mortality due to a lack of professional interpreters or sign language services. (Dkt. 4174, ¶ 183.)

1404. While Dr. Stewart opines that he interviewed monolingual Spanish speakers during his September 2021 tours, a review of these inmates' records evidences their ability to communicate in English. (Dkt. 4174, ¶ 184.)

1405. In Dr. Penn's opinion, mental health staff have access to professional interpreter and sign-language services. (Dkt. 4174, ¶ 185.) There is no failure to provide language interpretation during mental health treatment encounters for non-predominant English-speaking inmates and inmates with other disabilities. (Dkt. 4174, ¶ 185.)

1406. The wide-spread availability of language-line services to inmates who require language assistance during mental health encounters is further evidence that ADCRR provides access to mental health treatment. The availability of language-line services further demonstrates that inmates have access to and continuity of mental health care, indicating Defendants are not deliberately indifferent.

**Treatment of Recurrent Behavioral Problems**

1407. Some ADCRR inmates have severe personality disorders and/or significant impulse control disorders and may engage in recurrent problem behaviors. (Dkt. 4174, ¶ 186.) In Dr. Penn's opinion, however, Centurion mental health staff properly provide

279

access to care and continuity of care for these treatment-refusing or refractory inmates in compliance with the correctional standard of care. (Dkt. 4174, ¶ 186.)

1408. Based on Dr. Penn's record review and interviews with Centurion mental health care staff, he determined that there is a concerted and genuine effort to identify a particular inmate patient's strengths and weaknesses and to gain diagnostic clarification. (Dkt. 4174, ¶ 187.) Whether an inmate has a sole or primary Axis I psychiatric disorder such as a mood or depressive disorder, anxiety disorder, or a psychotic disorder, or situation distress or stressors resulting in an adjustment disorder. (Dkt. 4174, ¶ 187.) Centurion staff attempt to identify the inmate patient's treatment needs. (Dkt. 4174, ¶ 187.) The staff universally expressed an understanding of the complex interplay with ADCRR patients presenting with a standard Axis I disorder, with the possible comorbidity of a co-occurring impulse control disorder or a mild, moderate, or severe personality disorder (antisocial, borderline, narcissistic personality disorder) or maladaptive personality traits. (Dkt. 4174, ¶ 187.) There is no fiscal or financial incentive or goal for mental health staff to place (or remove) inmate patients on/from the mental health caseload or refrain from referring to the psychiatrist or psychiatric mid-level provider for further diagnostic evaluation and psychotropic medication consideration. (Dkt. 4174, ¶ 187.)

1409. As expected within any jail or prison setting, there is an over-representation of inmates with severe personality disorders and/or significant impulse control disorders within the ADCRR. (Dkt. 4174, ¶ 188.) Similarly, many of these individuals will have difficulties following rules, requests, and getting along in a pro-social manner within a congregate care setting such as a jail or prison setting. (Dkt. 4174, ¶ 188.) Many of these inmates may engage in assaultive, self-injurious, or other problem behaviors. (Dkt. 4174, ¶ 188.) Based on his record review and interviews and facility tours and review of available treatment programming, it was very clear to Dr. Penn that mental health treatment services are available to ADCRR inmates with severe personality disorders and/or impulse control disorders. (Dkt. 4174, ¶ 188.)

1410. Moreover, whether inmates choose to partake in offered individual and group

psychotherapy treatment services targeting impulse control and better understanding their problem behaviors and the impact on others, take psychotropic medications as prescribed, refrain from illicit substance abuse, psychotropic medication diversion, trafficking and trading, and other severe problem behaviors, is not something that can be externally changed. (Dkt. 4174, ¶ 189.) Centurion mental health care staff make reasonable attempts to provide access to care and continuity of care for these treatment-refusing or refractory inmate patients. (Dkt. 4174, ¶ 189.) This is further illustrated by the outreach efforts where refusing inmates are brought to medical to speak with a nurse or clinician, are advised of the consequences of refusing treatment, and must execute a written refusal. (Dkt. 4174, ¶ 189.) To the extent that inmates are not able to be transported to the medical area, mental health or nursing staff will round and go cell-side to see the inmates, counsel them, and obtain a signed-refusal. (Dkt. 4174, ¶ 189.) In his professional opinion, this actually exceeds the community standard of care. (Dkt. 4174, ¶ 189.) In private or community mental health practices, should an individual not arrive for a scheduled appointment with a therapist or a psychiatrist, the mental health professional would not, as a common practice, travel to the patient's home and attempt to meet with them at the patient's home, or have the patient brought to their office for counselling on the refusal. (Dkt. 4174, ¶ 189.)

1411. Specialized mental health treatment services are available to ADCRR inmates with severe personality disorders and/or impulse control disorders. Availability of such services only expand upon the access to care provided to these inmates and show that Defendants are not deliberately indifferent.

**Changes to Mental Health Diagnoses**

1412. In Dr. Penn's opinion, the practice of adding, discontinuing, or modifying psychiatric mental disorders is a necessary and common component of the provision of mental health treatment. (Dkt. 4174, ¶ 190.) He opines that this practice comports with accepted correctional and community standards of care and does not put class members at risk of harm to self or others. (Dkt. 4174, ¶ 190.) Dr. Penn did not witness any of the de-diagnosing practices alleged by Dr. Stewart. (R.T. 11/19/21 a.m. at 3016:14-3017:21.) It

is well within accepted community and correctional standard of care to change diagnoses because in mental health (unlike in medical) diagnoses are not black and white. (R.T. 11/19/21 a.m. at 3016:14-3017:21.)  But the diagnosis is still in the problem list.  (R.T. 11/19/21 a.m. at 3016:14-3017:21.)  So it is still there for the reader, whoever is looking at the medical record.  (R.T. 11/19/21 a.m. at 3016:14-3017:21.)  It is still in the chart.  (R.T. 11/19/21 a.m. at 3016:14-3017:21.)

1413.  The diagnosis and treatment of mental illness is a subjective process, which sometimes involves making a preliminary diagnosis, attempting a treatment, and based upon subsequent experience and behavior, may result in changing the diagnosis.  (Dkt. 4174, ¶ 191.)  This may be further complicated as certain behaviors result from substance abuse issues.  (Dkt. 4174, ¶ 191.)  For example, a person while using methamphetamines may appear to be manic, and exhibit symptoms of depression while not using. (Dkt. 4174, ¶ 191.)  While that could be diagnosed as bi-polar disorder, being in a setting where the individual refrains from use of illicit substances may result in cessation of the symptoms and demonstrate that the initial diagnosis was incorrect.  (Dkt. 4174, ¶ 191.)

1414.  It is Dr. Penn's opinion that it is within accepted medical and psychiatric practice and the correctional and community standard of care to add, modify or remove medical International Classification of Diseases (ICD) or psychiatric (DSM) diagnoses. (Dkt. 4174, ¶ 192.)  Contrary to medical and surgical specialties, there are no diagnostic blood, urine, or other tests that would definitively rule in or rule out a psychiatric diagnosis. (Dkt. 4174, ¶ 192.)  Psychiatric diagnoses are best made longitudinally as opposed to cross sectionally.  (Dkt. 4174, ¶ 192.)

1415.  Within correctional settings, many inmates at the time of intake will self-report past, recent or current psychiatric diagnoses and/or psychotropic medication due to a variety of reasons.  (Dkt. 4174, ¶ 193.)  Many inmates may under-report or not clarify the extent of their substance abuse versus dependence which can affect their mood, behavior, and functioning.   (Dkt. 4174, ¶ 193.)

1416.  It is within accepted community and correctional practice for psychiatrists,

doctoral level psychologists, and other qualified mental health professionals to consider patient reported symptoms, diagnoses, and then based on the patient's clinical presentation, current signs and symptoms, and when indicated, additional record review of additional collateral information (past records, drug testing results, prior custody and legal information) and other historians to add, discontinue or modify provisional "working" or current psychiatric diagnoses. (Dkt. 4174, ¶ 194.) This practice is individualized to the particular patient, is a clinically reasoned and determined decision- making process and does not put class members at risk of harm to self or others. (Dkt. 4174, ¶ 194.)

1417. The fact that ADCRR contracted mental health staff are willing to change course, when clinically appropriate demonstrates that they comport with the standard of care. (Dkt. 4174, ¶ 195.) In his records review, Dr. Penn did not see the improper "de-diagnosing" practice claimed by Dr. Stewart. (Dkt. 4174, ¶ 195.) In fact, all inmates highlighted by Dr. Stewart as experiencing "de-diagnosing" still have major mental illnesses listed in their current mental health status. (Dkt. 4174, ¶ 195.)

1418. At ADCRR, diagnoses are made by qualified mental health professional that are appropriately trained and qualified. Dr. Penn found no evidence that someone who was not a qualified mental health professional was putting diagnoses in the chart or giving the patient a diagnosis. (R.T. 11/19/21 a.m. at 3019:19-3020:1.)

1419. Based upon the evidence presented, no such "de-diagnosing" practice exists at ADCRR.

**Prescription, Dispensing, Delivery & Management of Psychotropic Medications**

1420. Dr. Penn has experience sitting on both the adult and juvenile Pharmacy and Therapeutics Committees. (R.T. 11/19/21 a.m. at 3020:2-25.) As a committee member, Dr. Penn determined what the evidence is for use of medications and whether they are safe. (R.T. 11/19/21 a.m. at 3020:2-25.) For example, not only what a medication's long-term side effects are, but could this medication be used as a weapon. (R.T. 11/19/21 a.m. at 3020:2-25.) He thinks about medications from an evidence-based perspective and looks at the costs, effectiveness, and availability within a correctional setting. (R.T. 11/19/21 a.m.

at 3020:2-25.) There are unique nuances with provision of medications within corrections that someone who works in corrections would need to understand. (R.T. 11/19/21 a.m. at 3021:11-3022:1.) As a lead author in the American Academy of Psychiatry and the Law, Dr. Penn authored a document called Resource Guide for Prescribing in Correctional Settings. (R.T. 11/19/21 a.m. at 3022:3-22.) This guide was published in the peer-reviewed journal, the Journal of the American Academy of Psychiatry and the Law. (R.T. 11/19/21 a.m. at 3022:3-22.) It is now in its second version, which Dr. Penn is again involved in drafting. (R.T. 11/19/21 a.m. at 3022:3-22.) It is the only document of its type in a peer-reviewed journal that goes through every single psychotropic medication and analyzes the issues described above within correctional settings. (R.T. 11/19/21 a.m. at 3022:3-22.)

1421. Importantly, all ADCRR facilities were found 100% compliant with NCCHC Essential Standard P-D-01–Pharmaceutical Operations, which determines whether pharmaceutical operations meet the needs of the facility and conform to legal requirements. (Dkt. 4174, ¶ 196; Ex. 3305 at ADCRR00138385-86 (Douglas); Ex. 3307 at ADCRR00138487-88 (Eyman); Ex. 3309 at ADCRR00138620-21 (Florence); Ex. 3311 at ADCRR00138708-11 (Lewis); Ex. 3313 at ADCRR00138747-48 (Perryville); Ex. 3315 at ADCRR00138802 (Phoenix); Ex. 3316 at ADCRR00138901-02 (Safford); Ex. 3318 at ADCRR00138847-48 (Fort Grant Unit); Ex. 3320 at ADCRR00138977-78 (Tucson); Ex. 3322 at ADCRR00139122-23 (Winslow); Ex. 3323 at ADCRR00139073-74 (Apache Unit); Ex. 3325 at ADCRR00139200-01 (Yuma).)

1422. Additionally, all ADCRR facilities were found 100% compliant with NCCHC Essential Standard P-D-02–Medication Services, which determines whether medications are provided in a timely, safe, and sufficient manner. (Dkt. 4174, ¶ 197; Ex. 3305 at ADCRR00138386-87 (Douglas); Ex. 3307 at ADCRR00138489 (Eyman); Ex. 3309 at ADCRR00210548-49 (Florence); Ex. 3311 at ADCRR00138676 (Lewis); Ex. 3313 at ADCRR00138780-81 (Perryville); Ex. 3315 at ADCRR00138802-03 (Phoenix); Ex. 3316 at ADCRR00138902-03 (Safford); Ex. 3318 at ADCRR00138848 (Fort Grant Unit); Ex. 3320 at ADCRR00138978-79 (Tucson); Ex. 3322 at ADCRR00139123-24 (Winslow); Ex.

3323 at ADCRR00139074-75 (Apache Unit); Ex. 3325 at ADCRR00139201-02 (Yuma).)

1423.   In Dr. Penn's opinion, the following Policies, Procedures and Standards utilized by ADCRR are  within generally accepted practices:  (1) the review of recent mental health treatment and, in particular, county jail (prior to ADCRR admission) and community "free world" psychotropic and pharmacotherapy treatment; (2) past psychiatric diagnoses and treatment; (3) verification and corroboration of prior psychotropic pharmacotherapy; (4) initiation of psychotropic pharmacotherapy treatment when clinically indicated upon a state inmate's admission to a ADCRR facility, transfer to another ADCRR facility, or while housed within the ADCRR system.  (Dkt. 4174, ¶ 198.)

1424. Before switching to eOMIS, the prescribing system was based on a written/paper entry medical record that required individual physician or mid-level provider ordering of psychotropic and non-psychotropic medications, individual nursing transcription of these orders, and creation and documentation of delivery of medications in a written/paper Medication Administration Record (MAR) system. (Dkt. 4174, ¶ 199.) While such system is still within generally accepted practices, the ability to automate such a system upon entry of the medication order by a provider streamlines the process, reduces the time before medications can be provided, and reduces the risk of improper medication ordering.  (Dkt. 4174, ¶ 199.)

1425.  ADCRR's mental health ordering system is effective.  In August 2021, alone, Diamond Pharmacy filled 13,627 mental health prescription orders, among the following psychotropic medication categories: Anti-anxiety – 2,102; Anti-Cholinergic – 639; Atypical Antidepressant – 2,692; Atypical Antipsychotic – 3,065; Benadryl – 43; Benzodiazepine – 10; Central Nervous System (CNS) Stimulants – 5; Mood Stabilizer – 696; Sedative-Hypnotic – 5; Selective Serotonin Reuptake Inhibitors (SSRI) – 3,407; Tricyclic Antidepressants – 479; Typical Antipsychotics – 498; and Other – 16.  (Dkt. 4174, ¶ 200; R.T. 11/19/21 a.m. at 3023:2-3024:8.)  A psychotropic medication is any medical that has some effect on the chemical in the brain.    (R.T. 11/19/21 a.m. at 3024:16-24.)

1426. Dr. Penn was surprised to see that ADCRR uses a lot of atypical

antipsychotics (22%), which are much more expensive than the older, typical antipsychotics (3.7%). (R.T. 11/19/21 a.m. at 3027:24-3028:23) Examples of atypical antipsychotics are Seroquel, Abilify, Geodon, Risperdal Consta, Risperdal. (R.T. 11/19/21 a.m. at 3028:25-3029:3)

1427. There are no medications Dr. Penn is aware of that ADCRR does not use that might be effective. (R.T. 11/19/21 a.m. at 3026:24-3027:1.)

1428. Medication doses may, occasionally, be missed. (Dkt. 4174, ¶ 201.) A missing medication dose may occur due to the following factors: the sheer size and large volume of prescriptions; large prison facilities; physical plant issues; geographical challenges of the Arizona system; custodial movement of state prisoners within units; restrictions in offender movement in unit lockdowns; changes in unit assignments; other transportation and classification issues that are beyond the scope of healthcare staff; and especially during COVID-19, supply-chain disruptions which may render certain medications unavailable from pharmaceutical manufacturers. (Dkt. 4174, ¶ 201.) In Dr. Penn's opinion, there is no perfect correctional or free world health system. (Dkt. 4174, ¶ 201.) And COVID-19 has amplified correctional health care challenges (and made them extreme challenges) such as getting inmates brought up to medical and providing access and continuity of care. (R.T. 11/19/21 a.m. at 2971:25-2972:16.) Even with the above-mentioned factors, Dr. Penn did not find any evidence that an isolated event of a state prisoner missing his/her medications caused immediate or delayed clinical decompensation or further problems. (Dkt. 4174, ¶ 201.) Dr. Penn found no undue delay or that anyone was harmed as result of the delay. (Dkt. 4174, ¶ 201.)

1429. Centurion utilizes a mail order distributer, Diamond Pharmacy, for mail ordering, packaging, and dispensing of medications to unit staff. (Dkt. 4174, ¶ 202.) In Dr. Penn's opinion, this model is common practice, used nationally, and he has immediate familiarity with this pharmacy practice in his prior roles in the State of Rhode Island and currently in the State of Texas. (Dkt. 4174, ¶ 202.) When nonclinical urgent medications are needed, it is important to note that there is a mechanism to request and obtain any urgent

medications in a more expedited and immediate manner via designated local community pharmacies. (Dkt. 4174, ¶ 202.) Utilizing a mail-order pharmacy ensures medication are readily available and that inmates get medications in a timely manner. (R.T. 11/19/21 a.m. at 3030:2-3031:15.)

1430. In addition to the records of the named Plaintiffs, and the randomly pulled records referenced earlier, Dr. Penn also reviewed records of inmates who were diagnosed with mental illness and who were cited as examples of an alleged lack of an effective medication system in Dr. Stewart's Report. (Dkt. 4174, ¶ 203.) His review revealed there was no delay with respect to each of these patients' care in violation of generally accepted standards for a state prison facility. (Dkt. 4174, ¶ 203.) On-site outpatient and inpatient (when clinically indicated) mental health services included the identification and referral of state prisoners with mental health needs or past or current psychotropic medication treatment. (Dkt. 4174, ¶ 203.) Even inmates with no immediately identified clinical need or acuity, except for current/recent psychotropic medication treatment, were referred for follow-up mental health and psychiatric evaluation and treatment in a timely and clinically appropriate manner. (Dkt. 4174, ¶ 203.)

1431. Dr. Stewart asserts there are delays in the prescribing and delivery of psychotropic medications and delays in mental health treatment within ADCRR. (Dkt. 4174, ¶ 204.) It is Dr. Penn's opinion from record reviews, that the time frames for screening, referral, psychiatric evaluation, verbal/in-person medication orders after obtaining clarification and verification of the exact psychotropic medication, dose and schedule, informed consent from an inmate, medication ordering, filling, and dispensing, and medication administration are all within the standard of care of correctional psychiatry, are clinically justifiable practices within a state prison correctional setting, and are systemically implemented at ADCRR. (Dkt. 4174, ¶ 204.) Dr. Penn did not witness delays in the delivery of psychotropic medications. (R.T. 11/19/21 a.m. at 3031:23-3032:1.) Dr. Penn opines that ADCRR's medication dispensing, delivery, and management meets or exceeds the standard of care and is an efficient, organized, and well managed system. (R.T.

1  11/19/21 a.m. at 3032:2-14.)

2      1432.  According to NCCHC Accreditation Report of the Health Care Services at

3  ADCRR, NCCHC standard P-A-08–Health Record Format and Contents, this essential

4  standard was met at all complexes and separately accredited satellite units. (See above).

5  (Dkt. 4174, ¶ 155 and ¶ 205; Ex. 3305 at ADCRR00138367-68 (Douglas); Ex. 3307 at

6  ADCRR00138467-68 (Eyman); Ex. 3309 at ADCRR00138602-03 (Florence); Ex. 3311 at

7  ADCRR00138684-85 (Lewis, met analogous 2014 standards P-H-01 to P-H-04); Ex. 3313

8  at ADCRR00138729-30 (Perryville); Ex. 3315 at ADCRR00138809-10 (Phoenix, met

9  analogous 2014 standards P-H-01 to P-H-04); Ex. 3316 at ADCRR00138884-84 (Safford);

10  Ex. 3318 at ADCRR00138830-31 (Fort Grant Unit); Ex. 3320 at ADCRR00138959-60

11  (Tucson); Ex. 3322 at ADCRR00139107-08 (Winslow); Ex. 3323 at ADCRR00139058-59

12  (Apache Unit); Ex. 3325 at ADCRR00139181-82 (Yuma).)

13      1433.  The volume of psychotropic medications that are dispensed each month to

14  ADCRR's inmates, coupled with the testimony regarding sufficiency of these medications,

15  objectively demonstrates that Defendants prescribe, dispense, deliver, and manage

16  psychotropic medications in a constitutional manner.  This is further supported by

17  NCCHC's finding that ADCRR's pharmaceutical operations meet the needs of its facilities,

18  conform to legal requirements, and are provided in a timely, safe, and sufficient manner.

19      **Formulary & Non-Formulary Drugs**

20      1434.  A formulary is akin to a first-line agent that is approved by an insurance

21  company.  (R.T. 11/19/21 a.m. at 3032:15-3033:6.)  However, an individual provider can

22  always appeal and request a non-formulary agent.  (R.T. 11/19/21 a.m. at 3032:15-3033:6.)

23  This is similar to what occurs in ADCRR, and how all correctional systems work nationally.

24  (R.T. 11/19/21 a.m. at 3032:15-3033:6.)  Thus, just because a medication is not on the

25  formulary, does not mean ADCRR inmates are unable to receive it.  (R.T. 11/19/21 a.m. at

26  3033:20-23.)  Every decision regarding a specific inmate's medication is clinically made

27  by the practitioner.  (R.T. 11/19/21 a.m. at 3033:24-3035:1.)  If the provider believes that a

28  formulary medication is not working, they can always reach out to Dr. Carr or file a non-

1  formulary request.  (R.T. 11/19/21 a.m. at 3033:24-3035:1.)  Dr. Carr will then make the

2  decision.  (R.T. 11/19/21 a.m. at 3033:24-3035:1.)

3       1435.  Centurion's formulary and non-formulary medication lists for psychotropic

4  medications comply with generally accepted practices of a state prison facility. And that the

5  practice and policy of using formulary medications and having a nonformulary medication

6  approval process was within national correctional health standards and practices.  (Dkt.

7  4174, ¶ 206.)

8       1436.  In Dr. Penn's opinion, the Policies, Procedures and Standards utilized by

9  ADCRR and Centurion with respect to the review of recent mental health treatment and, in

10  particular, "free world" psychotropic and pharmacotherapy treatment, past psychiatric

11  diagnoses and treatment, and verification and corroboration of prior psychotropic

12  pharmacotherapy, initiation of psychotropic pharmacotherapy treatment when clinically

13  indicated upon a state prisoner's admission to a facility, transfer to another facility, or while

14  housed within the system, are within the generally accepted practices.  (Dkt. 4174, ¶ 207.)

15       1437.  Dr. Penn's review of the medication lists clearly establishes that various

16  psychotropic medication classes and agents are available.  (Dkt. 4174, ¶ 208.)  Dr. Penn

17  disagrees with Dr. Stewart's opinions regarding prescriptions that should be added to or

18  removed from Centurion's formulary.  (Dkt. 4174, ¶ 208.)  Significantly, according to Dr.

19  Penn, Dr. Stewart fails to appreciate that in any correctional environment (jail, prison,

20  juvenile correction setting, etc.), there is a need for health care and custody staff to maintain

21  a high index of suspicion for the abuse, diversion, and trafficking of prescribed psychotropic

22  and non-psychotropic medications.  (Dkt. 4174, ¶ 208.)  Psychiatrists and other health care

23  professionals providing direct and indirect (such as emergency departments, regional

24  hospitals, clinics, and consulting specialists) services to inmates may be naive to this risk,

25  especially for noncontrolled (e.g., non-narcotic and non-stimulant) medications.  (Dkt.

26  4174, ¶ 208.)

27       1438.  Dr. Penn disagrees with Dr. Stewart's assertion that Wellbutrin should be

28  included on Centurion's formulary.  (Dkt. 4174, ¶ 209.)  Wellbutrin is a particularly

problematic medication and is thus typically a non-formulary agent in correctional settings. (Dkt. 4174, ¶ 209.) Specifically, it is commonly abused in correctional settings because, when it is ground up, it has the same chemical reaction as if the user snorted cocaine. (R.T. 11/19/21 a.m. at 3035:15-3036:15.) As such, it is commonly trafficked and traded. (R.T. 11/19/21 a.m. at 3035:15-3036:15.) Additionally, it can cause seizures. (R.T. 11/19/21 a.m. at 3035:15-3036:15.) Moreover, while Wellbutrin is an approved and supported option for the treatment of depression, it is not the only option for the treatment of depression. (Dkt. 4174, ¶ 209.) There are numerous SSRIs and SNRIs which can be utilized to treat depression. (Dkt. 4174, ¶ 209.) The efficacy of SSRIs/SNRIs is equal in comparison to Wellbutrin. (Dkt. 4174, ¶ 209.) Including Wellbutrin on Centurion's formulary is not necessary, nor is it required by the standard of care. (Dkt. 4174, ¶ 209.) If Dr. Stewart had worked in corrections, he would understand that Wellbutrin is a known agent of abuse and diversion. (R.T. 11/19/21 a.m. at 3035:15-3036:15.) Despite this, Dr. Penn reviewed charts of ADCRR inmates who were prescribed Wellbutrin. (R.T. 11/19/21 a.m. at 3035:15-3036:1.)

1439. Dr. Penn also disagrees with Dr. Stewart's assertion that Trileptal is not sufficiently utilized within ADCRR's system. (Dkt. 4174, ¶ 210.) Oxcarbazepine (generic name, brand name is Trileptal) is an anticonvulsant which is only FDA-approved for the treatment of seizures. (Dkt. 4174, ¶ 210.) It does not have a current FDA-approved indication for the treatment of bipolar or any mood disorders. (Dkt. 4174, ¶ 210.) The use of this medication for the treatment of mood disorders and impulse control is considered off-label use and is supported by limited literature. (Dkt. 4174, ¶ 210.) The APA guidelines recommend lithium or valproate or an antipsychotic for the treatment of bipolar disorder. (Dkt. 4174, ¶ 210.) Oxcarbazepine is to be used as an alternative option. (Dkt. 4174, ¶ 210.) Additionally, it is abused, trafficked, and traded within correctional settings. (R.T. 11/19/21 a.m. at 3037:2-17.) Dr. Penn shares these same concerns regarding the use of Seroquel. (Dkt. 4174, ¶ 210.) Quetiapine (generic name for Seroquel) is a treatment option for the management of schizophrenia. (Dkt. 4174, ¶ 210.) The efficacy of quetiapine is similar to

other antipsychotics within the class of Second-Generation Antipsychotics. (Dkt. 4174, ¶ 210.) Quetiapine, although a good therapeutic option, is associated with frequent misuse and abuse. (Dkt. 4174, ¶ 210.) Literature indicates that Quetiapine may be the most abused and misused Second-Generation Antipsychotic. (Dkt. 4174, ¶ 210.) Due to its serious risk for abuse, misuse, diversion, trafficking and trading, Seroquel is a nonformulary medication in many jail and prison settings. (Dkt. 4174, ¶ 210.) Despite this, Dr. Penn reviewed charts of ADCRR inmates who were prescribed Seroquel. (R.T. 11/19/21 a.m. at 3037:18-3038:4.)

1440. And, for similar reasons, Dr. Penn disagrees with Dr. Stewart's opinion that Clozapine "should definitely be on Centurion's formulary." (Dkt. 4174, ¶ 211.) Clozapine (generic name for Clozaril) is an antipsychotic medication option that is typically used only for patients with treatment- refractory or resistant schizophrenia (when numerous other antipsychotic medication trials have been ineffective). (Dkt. 4174, ¶ 211.) While Clozapine may be beneficial, it is important to determine if the patient is a candidate for clozapine treatment. (Dkt. 4174, ¶ 211.) There are a myriad of risks and side effects (lowering of seizure threshold, sialorrhea (drooling), sedation, etc.) associated with this medication. (Dkt. 4174, ¶ 211.) Clozapine is also associated with neutropenia (an abnormally low concentration of neutrophils, a type of white blood cell) making one prone to infections and neutropenic sepsis, a condition which may become life-threatening. (Dkt. 4174, ¶ 211.) Thus, regular blood monitoring is required. (Dkt. 4174, ¶ 211.) Additionally, all prescribers of clozapine products must certify in the Clozapine REMS Program. (Dkt. 4174, ¶ 211.) For these and other reasons, Clozapine is not a first line antipsychotic medication treatment. (Dkt. 4174, ¶ 211.) Rather, Clozapine is typically reserved for certain patients who have severe schizophrenia and no other medications have been effective. (R.T. 11/19/21 a.m. at 3038:7-3039:8.) To ensure patient safety, the need for crucial blood monitoring, and other necessary safeguards, it is a non-formulary medication which requires special review within community and correctional settings. (Dkt. 4174, ¶ 211.)

1441. Centurion's pharmacy and therapeutic committee's decision-making and

psychiatric leadership's decision to have Wellbutrin, Trileptal, Seroquel, and Clozapine as non- formulary agents are within accepted correctional psychiatry prescribing practices and meet the correctional standard of care. (Dkt. 4174, ¶ 212.)

1442. Dr. Penn also disagrees with Dr. Stewart's opinion that Tri-cyclic anti-depressants ("TCAs") are inappropriate and place ADCRR inmates at risk. (Dkt. 4174, ¶ 213.) While TCAs may have a higher risk of causing certain anticholinergic side effects (e.g., dry mouth, blurry vision, constipation) these can be managed and monitored safely within community and correctional settings. (Dkt. 4174, ¶ 213.) Dr. Penn agrees that TCAs may be associated with increased heat-related illness risks, however, the efficacy of this class of medication is undisputed and is comparable to other antidepressant medication classes such as SSRI/SNRIs. (Dkt. 4174, ¶ 213.) TCAs may be safely utilized for patients who are not responsive to first and second-line antidepressants. (Dkt. 4174, ¶ 213.) Further, TCAs are one of the only antidepressant agents that have an established therapeutic window that can be monitoring via blood monitoring to establish treatment compliance, medication metabolism, and efficacy. (Dkt. 4174, ¶ 213.) Based upon Dr. Penn's record review, they were not often utilized by ADCRR (less than 5%). (R.T. 11/19/21 a.m. at 3039:24-3041:5.)

1443. Dr. Stewart fails to acknowledge that within a correctional setting TCAs may be used for a variety of other nonpsychiatric medical uses, medical indications such as enuresis (bedwetting), insomnia, diabetic neuropathy, low back pain, migraine headaches, and other chronic pain conditions. (Dkt. 4174, ¶ 214.) Medical staff and other correctional primary care providers often utilize TCAs as opposed to narcotic and opiate and other pain medication which are particular agents of abuse, diversion, addiction and dependence and put the patient at risk for extortion for these medications within correctional settings. (Dkt. 4174, ¶ 214.) Moreover, many county jails may have previously initiated TCAs for insomnia and sedative hypnotic agents. (Dkt. 4174, ¶ 214.) Thus, ADCRR may have inherited patients from the county jail or the community on these medications. (Dkt. 4174, ¶ 214.) Discontinuing past medications, even when the therapeutic benefit or risk to benefit ratio is problematic, is often a challenging issue for correctional psychiatric and medical

1 | providers. (Dkt. 4174, ¶ 214.)

2 | 1444. Dr. Penn opines that a "newer" medication does not always equate to better

3 | medication. (Dkt. 4174, ¶ 215.) Instead, in Dr. Penn's opinion, it is better to look at the

4 | evidence, double-blind placebo-controlled studies, not what the pharmaceutical companies

5 | are marketing or touting. (R.T. 11/19/21 a.m. at 3039:9-23.) Perphenazine,

6 | Prochlorperazine and Trifluoperazine are First Generation Antipsychotics ("FGAs"). (Dkt.

7 | 4174, ¶ 215.) Dr. Stewart opines that they are no longer used, nor should they ever be and

8 | are, generally, not utilized within the ADCRR as often due to the availability of Second

9 | Generation Antipsychotics ("SGAs"). (Dkt. 4174, ¶ 215.) Dr. Stewart fails to describe

10 | numerous common short- and long-term metabolic side effects to include significant weight

11 | gain, pre-diabetes and metabolic syndrome that place patients at risk for morbidity and

12 | mortality and are commonly associated SGAs. (Dkt. 4174, ¶ 215.) Additionally certain

13 | SGAs require baseline and serial electrocardiogram (EKG) testing/monitoring due to

14 | serious pro-arrythmia inducing risks. (Dkt. 4174, ¶ 215.)

15 | 1445. Dr. Penn's review of ADCRR pharmacy and medical records demonstrated

16 | that a majority of ADCRR inmates treated with antipsychotic medications were typically

17 | on second generation oral agents. (Dkt. 4174, ¶ 216.) Some were on long-acting injectable

18 | agents, but very few were on Perphenazine (brand name is Trilafon) or Trifluoperazine

19 | (brand name is Stelazine). (Dkt. 4174, ¶ 216.) FGAs may be associated with an increased

20 | risk of movement disorders, however, many of these agents are still utilized in community

21 | and correctional settings and have a role in the treatment of schizophrenia and other

22 | psychotic disorders. (Dkt. 4174, ¶ 216.) Indeed, APA guidelines continue to recommend

23 | utilization of both FGA and SGA based on patient specific factors. (Dkt. 4174, ¶ 216.)

24 | Further, in Dr. Penn's clinical experience, many patients with psychotic disorders who are

25 | offered "newer" SGAs verbalize a preference to remain on older agents due to their

26 | familiarity with the medication, its short- and long-term side effects, and other beneficial

27 | effects. (Dkt. 4174, ¶ 216.) In Dr. Penn's opinion, sharing a respectful, empathic, and

28 | collaborative treatment approach with these patients to develop and maintain treatment and

medication compliance, is essential and should override a move towards the "newest" medication.  (Dkt. 4174, ¶ 216.)

1446.  Finally, Dr. Penn was puzzled by Dr. Stewart's insinuation that Prochlorperazine is being utilized within ADCRR primarily as an antipsychotic medication.  (Dkt. 4174, ¶ 217.)  This medication's brand name is Compazine and is commonly used for the acute treatment of nausea and vomiting.  (Dkt. 4174, ¶ 217.)  Dr. Penn did not find/review a single chart or medical document of an ADCRR patient with a psychotic disorder that was treated with prochlorperazine as a designated, sole or primary/specific antipsychotic agent or intent.  (Dkt. 4174, ¶ 217.)  According to Dr. Penn, it is possible a patient with a psychotic disorder may have developed a gastro-intestinal issue with nausea and vomiting and medical/health care staff ordered Compazine as a time-limited agent for symptom relief.  (Dkt. 4174, ¶ 217.)  Compazine may be used similar to other gastrointestinal relief agents within community emergency and urgent care settings and correctional settings.  (Dkt. 4174, ¶ 217.)

1447.  The type and variety of medications on ADCRR's formulary and the ability for inmates to receive non-formulary medications when clinically indicated (which the evidence demonstrates occurs often) shows that ADCRR's formulary is constitutional and does not create a substantial risk of serious harm to its inmates.

### **Administration & Distribution of Psychotropic Medications**

1448.  It is Dr. Penn's professional opinion that ADCRR has an adequate psychotropic medication administration and distribution system and meets correctional health and community standards of care.  (Dkt. 4174, ¶ 218.)

1449.  He found that the Policies, Procedures and Protocols for the administration of psychotropic medication(s) are within the generally accepted practices of a state prison facility.   (Dkt. 4174, ¶ 219.)  The psychotropic medications that were administered were done so by trained medical staff qualified to dispense medications.  (Dkt. 4174, ¶ 219.)  The practice and policy of using formulary medications and having a nonformulary medication approval process is within national correctional standards.  (Dkt. 4174, ¶ 219.)

**PMRB Process**

2    1450. If an inmate is unwilling to receive medication that they require, a

3    psychotropic medication review board will review their case to determine whether

4    involuntary medication is required.  (R.T. 11/17/21 a.m. at 2504:22-25.)  The board is

5    comprised of a non-treating psychologist, non-treating psychiatrist, and a deputy warden.

6    (R.T. 11/17/21 a.m. at 2505:19-22.)  Upon referral from a staff member, the board will

7    discuss why the referring individual believes the inmate requires involuntary medication.

8    (R.T. 11/17/21 a.m. at 2505:1-25.)  If the board, as a group, determines the inmate requires

9    involuntary medication, the inmate is placed on PMRB which will allow them to receive

10    the medication involuntarily.  (R.T. 11/17/21 a.m. at 2505:1-25.)  It is important to have

11    non-treating clinicians serve on the board to eliminate clinician bias and ensure the decision

12    is based upon facts.  (R.T. 11/17/21 a.m. at 2506:1-4.)  Once an inmate is placed on PMRB

13    status, they are reviewed every 90 days.  (R.T. 11/17/21 a.m. at 2506:5-8.)  The PMRB will

14    expire after 6 months.  (R.T. 11/17/21 a.m. at 2506:5-8.)  ADCRR takes very seriously the

15    ability to involuntarily medicate an inmate and balances it with their right to refuse

16    treatment.  (R.T. 11/17/21 a.m. at 25076:24-2507:9.)

17    1451. When there is a clinical question involving the clinical necessity,

18    consideration of the clinical necessity and/or appropriateness of PMRB, or the need to begin

19    to pursue this process with due process protections for inmate patients who may be

20    subjected to involuntary administration of psychotropic mediations (when clinically

21    indicated as a means of treating psychiatric illness or urgently reducing harm,

22    dangerousness, or severe violence towards self or others), Dr. Carr (or his designee) are

23    readily available to discuss by phone, or alternatively, an on call psychiatrist is available 24

24    hours per day, 365 days per year, even afterhours and on weekends.  (Dkt. 4174, ¶ 220.)

25    This same process is in place for orders of seclusion or restraint.  (Dkt. 4174, ¶ 220.)

26    1452. Dr. Penn opined it is significant that, with respect to the emergency use of

27    psychotropic medication, all ADCRR facilities were found 100% compliant with NCCHC

28    Essential Standard P-G-03–Emergency Psychotropic Medication, which requires that

health staff follow policies developed for the emergency use of force psychotropic medication as governed by the laws applicable in the jurisdiction. (Dkt. 4174, ¶ 221; Ex. 3305 at ADCRR00138414 (Douglas); Ex. 3307 at ADCRR00138518-19 (Eyman); Ex. 3309 at ADCRR00138649 (Florence); Ex. 3311 at ADCRR00138685 (Lewis, met analogous 2014 standard P-I-02); Ex. 3313 at ADCRR0013874-75 (Perryville); Ex. 3315 at ADCRR00138810 (Phoenix, met analogous 2014 standard P-I-02); Ex. 3316 at ADCRR00138928 (Safford); Ex. 3318 at ADCRR00138873-74 (Fort Grant Unit); Ex. 3320 at ADCRR0013908-09 (Tucson); Ex. 3322 at ADCRR00139147-48 (Winslow); Ex. 3323 at ADCRR00139097-98 (Apache Unit); Ex. 3325 at ADCRR00139228-29 (Yuma).)

1453. The PMRB process in place at ADCRR includes many steps requiring input from a multitude of both treating and non-treating professionals which allows for both an objective finding that is also subjective based upon the individual's goals, history, and presentation. This process furthers inmates' access to mental health services and supports the finding that ADCR provides constitutionally adequate healthcare to its inmates. Additionally, NCCHC determined that ADCRR health staff follow policies developed for the emergency use of force psychotropic medication as governed by the laws applicable in the jurisdiction.

**Prevention of Heat-Related Illnesses**

1454. ADCRR requires temperature checks in housing units/cells and requires mitigation efforts when cell temperatures reach 95 degrees. Specifically, facility temperature checks (including housing units (twice a day), cells (one cell per tier, twice a day), and recreation facilities) are taken with a digital anemometer from April to October each year, documented, and mitigation efforts are employed when Arizona cell temperatures reach 95 degrees. These mitigation efforts include notification of facility leadership, placement of fans and opening of cell door food straps, as well as providing inmates with showers and ice. ADCRR also directs its correctional personnel to provide temporary housing of pregnant inmates when cell temperatures exceed 86 degrees as well as mitigation efforts that require rehousing inmates on psychotropic medications who have

suffered a heat intolerance reaction when cell temperatures exceed 85 degrees. ADCRR also maintains heat intolerance logs that document which inmates on psychotropic medications may have suffered a heat intolerance reaction. (Ex. 1736, 1737, 1740, 3031; 1462-1488; 1491; 1493-1496; 1499-1502; 1505-1509; 1524; R.T. 11/15/21 p.m. at 2023:6-25, 2082:25-2083:14; R.T. 11/05/21 p.m. partial at 1106:9-1107:25.)

1455. In addition, pursuant to the ADCRR Mental Health Technical Manual, certain policies and procedures must be followed to manage heat intolerance during use of psychotropic medications. (Dkt. 4174, ¶ 222.) Specifically, Chapter 4, Section 11.0 provides that the medical provider must assess heat intolerance in combination with psychotropic medications and to duly act in accordance with the protocols outlined in the section. (Dkt. 4174, ¶ 222; Ex. 3025 at ADCRR00138184.) These protocols include, but are not limited to: medical staff must verify all cases of suspected heat intolerance, medical staff must document the clinical examination in the medical record, inmates prescribed psychotropic medication must be referred for additional psychiatric management, and all reasonably available steps must be taken to prevent heat injury or illness and if symptoms continue, the inmate must be transferred to a housing area where the temperature does not exceed 85 degrees. (Dkt. 4174, ¶ 222.)

1456. Dr. Penn observed first-hand the mitigation efforts implemented by ADCRR in both past and recent tours. (Dkt. 4174, ¶ 223.) His observations follow. (Dkt. 4174, ¶ 223.) During his tours of outdoor recreational areas, enclosures, and open recreation yards, he observed several facilities have implemented outdoor heat precautions. (Dkt. 4174, ¶ 223.) Correctional staff demonstrated several preventative steps, including shaded areas, misters, misting units, opportunities for water/hydration, and the like. (Dkt. 4174, ¶ 223.) Correctional staff also shared that inmates had the opportunity to decline recreation time during temperature extremes. (Dkt. 4174, ¶ 223.)

1457. Dr. Penn also observed multiple postings that remind correctional and healthcare staff of the need to be aware of heat related issues and responses. (Dkt. 4174, ¶ 224.) In addition to postings, ADCRR has issued memorandums to its wardens

concerning Standardized Temperature Checks. (Dkt. 4174, ¶ 224.) One memorandum, dated March 23, 2021, reminds wardens to direct the taking and logging of temperatures on April 1st of every year, and to ensure that temperature taking, and logging continues through October 31st. (Dkt. 4174, ¶ 224.) It further explains that where there is a cell identified as having a temperature of above 95 degrees, the Shift Commander must notify the Deputy Warden or the On Call Duty Officer. (Dkt. 4174, ¶ 224.) Then, immediate steps shall be taken to bring the temperature down. (Dkt. 4174, ¶ 224.) As to inmates on psychotropic medications who are suffering a heat intolerance reaction, "all reasonable available steps [must] be taken to prevent heat illness or injury. (Dkt. 4174, ¶ 224.) If all other steps have failed to abate heat intolerance reaction, the prisoner will be transferred to a housing area where the cell temperature does not exceed 85 degrees Fahrenheit." (Dkt. 4174, ¶ 224.) Based upon Dr. Penn's inspection of ADCRR complexes, understanding of the temperature monitoring methods, and personal experience, he does not believe that temperature readings measured in this manner above 90 degrees pose an undue risk of harm. (Dkt. 4174, ¶ 224.)

1458. It is his professional opinion that temperatures are appropriately monitored by trained correctional staff, that staff receive training and training materials regarding heat extremes, basic first aid, and emergency response, and staff respond appropriately to higher temperatures by implementing appropriate precautions to prevent heat related injury to all inmates, including those that might be on psychotropic medications. (Dkt. 4174, ¶ 225.)

1459. Dr. Penn did not identify any medical records or reports of inmates with psychotropic medications or heat related complications or death. (Dkt. 4174, ¶ 226.) It is his professional opinion that, as a matter of practice, heat related precautions are being addressed and meet the standard of care. (Dkt. 4174, ¶ 226.)

1460. ADCRR further manages and oversees the provision of psychotropic medications by appropriately monitoring inmates for heat-related reactions. This is further evidence that the manner in which ADCRR provides psychotropic medications is constitutional and does not create a substantial risk of serious harm to its inmate population.

**Treatment for Suicidal or Self-Harming Inmates**

1461. In Dr. Stewart's opinion, if a person is determined to kill themselves, then many times they will be able to do that. (R.T. 11/03/21 p.m. at 610:21-611:10.)

1462. At ADCRR, suicide prevention begins the minute an inmate is admitted into custody. (R.T. 11/17/21 a.m. at 2499:12-2500:2.) In intake, there are posters for suicide prevention and new intakes are assessed for suicidality. (R.T. 11/17/21 a.m. at 2499:12-2500:2.) These posters are also available to inmates on their tablets, and they are required to acknowledge it before they can utilize the tablet. (R.T. 11/17/21 a.m. at 2499:12-2500:2.) During their incarceration, including during mental health encounters, inmates are regularly assessed on a continuous basis for suicidality. (R.T. 11/17/21 a.m. at 2499:12-2500:2.)

1463. During NEO, custody staff receive suicide prevention training. (R.T. 11/17/21 a.m. at 2498:18-2499:11.) Additionally, custody officers who work in maximum custody, residential, or inpatient settings, are provided with an additional three-day training that speaks to watch, mental health first aid, and communication skills. (R.T. 11/17/21 a.m. at 2498:18-2499:11.)

1464. Centurion created a suicide prevention committee and promoted a "culture whereby creating comprehensive individual treatment programs was important, particularly in a crisis or instances of multiple self-harm incidents." (R.T. 11/5/21 p.m. at 1084:10-18.)

1465. Centurion implemented additional staff training, including de-escalation skills, borderline personality disorder, suicide prevention, self-harming behaviors, behavioral treatment planning, diagnostic and assessment skills and tools, and antisocial personality disorders. (R.T. 11/5/21 p.m. at 1084:19-1085:13.)

1466. Additionally, since assuming her role, Dr. Stallcup took steps to reduce incidents of self-harm. (R.T. 11/17/21 a.m. at 2445:20-2446:2.) Specifically, she looked at the individuals who were placed on watch and reviewed each of their charts and supporting documentation to identify individuals that were on watch for a longer period of time, that had come off and on watch numerous times, or individuals who had self-harmed numerous times. (R.T. 11/17/21 a.m. at 2450:12-2451:1.) From there, she asked her team

299

to develop individualized crisis treatment plans to address the patient's concerns, ensure the plans were put into place, and to evaluate the patients for a potential higher level of care. (R.T. 11/17/21 a.m. at 2450:12-2451:1.)  And if a higher level of care was warranted, to get them moved into that higher level of care so they could receive the treatment they need. (R.T. 11/17/21 a.m. at 2450:12-2451:1.)

1467.  Centurion performed a root cause analysis to determine why the number of self-harm incidents increased.  (R.T. 11/5/21 a.m. at 1058:1-10.)  Centurion also implemented a tracking for individuals who stayed on suicide watch for more than 14 days so that they could implement a more robust treatment plan.  (R.T. 11/5/21 p.m. at 1083:15-25.)  Centurion began tracking people who were on watch for extended periods of time and devised plans to reduce their acuity and their mental health needs.  (R.T. 11/5/21 p.m. at 1085:14-19.)

1468.  ADCRR also heavily recruited more custody staff to mitigate self-harm incidents.  (R.T. 11/5/21 a.m. at 1060:24-1061:5.)

1469.  As a result of these efforts, from 2020 to 2021, ADCRR reduced self-injurious behavior by 43%.  (R.T. 11/17/21 a.m. at 2451:2-2451:4.)

1470.  From 2020 through 2021, there was a 75% reduction of self-harm emergency room send-outs.  (R.T. 11/5/21 p.m. at 1081:22-1082:4.)

1471.  Additionally, because of ADCRR's and Centurion's focus and commitment, suicide watches and length of stay on watch "drastically decreased." (R.T. 11/5/21 p.m. at 1082:23-1083:2.)

1472.  These decreases show significant improvement and reflect a lack of deliberate indifference to a substantial risk of serious harm to ADCRR inmates.

1473.  At ADCRR, mental health watch is utilized for individuals at risk of self-harm or are acutely psychotic and unstable.  (R.T. 11/17/21 a.m. at 2494:24-2495:1.)  RNs, psych associates, or providers with a higher licensure can place an inmate on watch.  (R.T. 11/17/21 a.m. at 2495:2-6.)  Only a licensed psych associate or higher licensure can remove an inmate from watch. (R.T. 11/17/21 a.m. at 2495:7-8.)  While unlicensed psych associates

1 can place an inmate on watch (this serves as a safeguard), they are not permitted to provide

2 follow-up contacts or remove an individual from watch. (R.T. 11/17/21 a.m. at 2495:9-19.)

3   1474. There are three different types of mental health watches at ADCRR:

4 continuous, ten-minute, and thirty-minute. (R.T. 11/17/21 a.m. at 2495:24-2496:10.)

5 Continuous watch is for inmates that are actively self-harming, at acute risk for self-

6 harming, or whose mental functioning places them at acute risk for self-harm. (R.T.

7 11/17/21 a.m. at 2495:24-2496:10.) The ten-minute watch is for inmates who are still at

8 high risk of self-harm but are not actively self-harming. (R.T. 11/17/21 a.m. at 2495:24-

9 2496:10.) The thirty-minute watch is for individuals that are stabilizing. (R.T. 11/17/21

10 a.m. at 2495:24-2496:10.) While they may have some risk, it is not acute, and the purpose

11 is to assess them for stability and the ability to transfer off watch. (R.T. 11/17/21 a.m. at

12 2495:24-2496:10.)

13   1475. Inmates on watch are offered the opportunity to come out of their cells for

14 confidential counseling each day. (R.T. 11/17/21 a.m. at 2496:11-15.) Additionally, they

15 are permitted to go to recreation, visitation, and make phone calls, unless such items are

16 clinically contraindicated and written on the watch order. (R.T. 11/17/21 a.m. at 2497:14-

17 19.)

18   1476. Prior to being removed from watch, a suicide risk assessment is completed.

19 (R.T. 11/17/21 a.m. at 2496:23-2497:7.) Upon completion, the inmate may be removed

20 from watch. (R.T. 11/17/21 a.m. at 2496:23-2497:7.) After removal, the inmate receives

21 follow up appointments between 1-3 days, 7-10 days, and 21-24 days to ensure they have,

22 in fact, stabilized. (R.T. 11/17/21 a.m. at 2496:23-2497:7.)

23   1477. Each day, every inmate on watch is audited to ensure they have a crisis

24 treatment plan when they are placed on watch and a suicide risk assessment before they are

25 taken off. (R.T. 11/17/21 p.m. at 2605:7-23.)

26   1478. It is Dr. Penn's professional opinion that ADCRR provides clinically

27 appropriate mental health and psychiatric evaluation, crisis stabilization, supportive

28 psychotherapy, and other treatment services to inmates who are potentially suicidal or at

high risk for imminent self- harm.  (Dkt. 4174, ¶ 227.)  And that this mental health care meets the correctional and community standard of care.  (Dkt. 4174, ¶ 227.)  When rare suicides occur, psychological autopsies and administrative suicide reviews are conducted.  (Dkt. 4174, ¶ 227.)  Morbidity and mortality reviews are completed.  (Dkt. 4174, ¶ 227.)  An assessment is made regarding the various factors that potentially culminated in a particular inmate's suicide.  (Dkt. 4174, ¶ 227.)

1479.  According to Dr. Penn, this is supported by the fact all ADCRR facilities were found 100% compliant with NCCHC Essential Standard P-B-05–Suicide Prevention and Intervention, which determines whether suicides are prevented, when possible, by implementing prevention efforts and intervention.   (Dkt. 4174, ¶ 228; Ex. 3305 at ADCRR00138374 (Douglas); Ex. 3307 at ADCRR00138474-75 (Eyman); Ex. 3309 at ADCRR00210547-48138598 (Florence); Ex. 3311 at ADCRR00138703 (Lewis, met analogous 2014 standard P-G-05); Ex. 3313 at ADCRR00138779-80 and ADCRR00138785 (Perryville); Ex. 3315 at ADCRR00138815 (Phoenix, met analogous 2014 standard P-G-05); Ex. 3316 at ADCRR00138890-91 (Safford); Ex. 3318 at ADCRR00138836-37 (Fort Grant Unit); Ex. 3320 at ADCRR00139016-17 (Tucson); Ex. 3322 at ADCRR00139112-13 (Winslow);  Ex. 3323 at ADCRR00139063-64 (Apache Unit); Ex. 3325 at ADCRR00139188-89 (Yuma).)

1480.  ADCRR strives for and implements timely suicide prevention practices and efforts.  (Dkt. 4174, ¶ 229.)

1481.  The United States Department of Justice, Bureau of Justice Statistics ("BJS"), routinely collects, compiles, and reports on in-custody deaths including those by suicide.  (Dkt. 4174, ¶ 230.)  The most recent report released in October 2021 reveals a nationwide long-term trend of increasing suicides in all custodial environments.  (Dkt. 4174, ¶ 230.)

1482.  BJS is an arm of the United States Department of Justice.  (R.T. 11/19/21 a.m. at 3050:11-3051:11.)  They mine criminal justice data and publish them.  (R.T. 11/19/21 a.m. at 3050:11-3051:11.)   BJS statistics are very matter of fact—they do not point fingers.  (R.T. 11/19/21 a.m. at 3050:11-3051:11.)  In Dr. Penn's opinion, the October 2021 report

that reports the number of deaths by suicide in jails and prisons is important and timely. (R.T. 11/19/21 a.m. at 3050:11-3051:11.)  Dr. Stewart agrees that the BJS statistics is a reliable statistical source on suicide rates and data. (R.T. 11/03/21 p.m. at 611:11-16.)

1483.  A suicide rate utilizes a benchmark of 100,000.  (R.T. 11/19/21 a.m. at 3051:15-3052:11.)

1484.  Dr. Penn reviewed Arizona's suicide rate (for 2015-2019) and how it compares nationally.  (R.T. 11/19/21 a.m. at 3052:12-17.)  Arizona's rate was 17 per 100,000.  (R.T. 11/19/21 a.m. at 3053:5-20.)  Compared to other states, it is low; for example, Alaska's suicide rate is 61 per 100,000, Idaho is 34, Colorado is 26, and California is 23.  (R.T. 11/19/21 a.m. at 3053:5-20.)  And, according to Dr. Penn, California is an example of a state that has increased their staffing and other services, yet its suicide rate is still higher than Arizona.  (R.T. 11/19/21 a.m. at 3053:5-20.)

1485.  In the last ten years, there has been an 85% increase in suicides nationally in jails and prisons.  (R.T. 11/19/21 a.m. at 3053:21-3054:9.)  In Dr. Penn's opinion, based upon this, Arizona's numbers are flatlined—it has not had an increase in any suicides, at least over the last 2-3 years.  (R.T. 11/19/21 a.m. at 3053:21-3054:9.)

1486.  Moreover, as detailed in Department Order 807, ADCRR properly trains and refreshes staff regarding suicide prevention training.  (Dkt. 4174, ¶ 231.) Additionally, ADCRR conducts three-minute man-down drills at least once a month on each shift. (Dkt. 4174, ¶ 231.)  Preventative training reduces risk of harm to the inmate population and ensures both custody and healthcare staff are prepared for emergency scenarios.   (Dkt. 4174, ¶ 231.)  Importantly, all healthcare and custody staff are required to maintain CPR certification. (Dkt. 4174, ¶ 231.)  Custody staff are also trained on how to conduct suicide watches.  (R.T. 11/5/21 a.m. at 1061:12-17.)

1487.  In Dr. Penn's opinion, the success of these efforts is reflected in the trending decline in both the actual number and rate per 100,000 of self-harm incidents in 2019, 2020, and 2021, as shown in the following graphs:





(Dkt. 4174, ¶ 232.)

1488. As the below chart indicates, from July 2019 to August 2021, there is no concentration of completed suicides at any particular ADCRR Complex (or custody level).

| Month | Douglas | Eyman | Florence | Lewis | Perryville | Phoenix | Safford | Tucson | Winslow | Yuma | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| July 2019 | - | - | - | - | 1 | - | - | 1 | - | - | 2 |
| Aug 2019 | - | - | - | - | - | - | - | - | - | - | 0 |
| Sept 2019 | - | - | - | - | - | - | - | - | - | - | 0 |
| Oct 2019 | - | - | - | - | - | - | - | - | - | - | 0 |
| Nov 2019 | - | - | - | - | - | - | - | - | - | - | 0 |
| Dec 2019 | - | - | - | - | - | - | - | - | - | - | 0 |
| Jan 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| Feb 2020 | - | 1 | - | - | - | - | - | - | - | - | 1 |
| Mar 2020 | - | 1 | - | - | 1 | - | - | - | - | - | 2 |
| Apr 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| May 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| June 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| July 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| Aug 2020 | - | 1 | - | - | - | - | - | - | 1 | - | 2 |
| Sept 2020 | - | - | - | - | 1 | - | - | 1 | - | - | 2 |
| Oct 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| Nov 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| Dec 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| Jan 2021 | - | - | - | 1 | - | - | - | 1 | - | - | 2 |
| Feb 2021 | - | - | - | - | - | - | - | 1 | - | - | 1 |
| Mar 2021 | - | - | - | - | - | - | - | - | - | - | 0 |
| Apr 2021 | - | 1 | - | - | - | - | - | - | - | - | 1 |
| May 2021 | - | - | - | - | - | - | - | - | - | 1 | 1 |
| June 2021 | - | - | - | - | - | - | - | 1 | - | - | 1 |
| July 2021 | - | - | - | - | - | - | - | - | - | - | 0 |
| Aug 2021 | - | 1 | - | - | - | - | - | - | - | - | 1 |
| Total | 0 | 5 | 0 | 1 | 3 | 0 | 0 | 5 | 1 | 1 | 16 |

(Dkt. 4174, ¶ 233.)

305

1489. When compared to national data, suicides at ADCRR are low compared to other comparable sized state prisons. (R.T. 11/19/21 a.m. at 3049:4-16.)

1490. That ADCRR reports suicides by fiscal (as opposed to calendar) year is confusing and can be misleading. (R.T. 11/19/21 a.m. at 3049:25-3050:7.) It is much easier to review trends over a calendar year. (R.T. 11/19/21 a.m. at 3049:25-3050:7.)

1491. BJS aggregates suicide statistics into 5-year period so stable suicide mortality rates can be calculated. (Ex. 3333 at ADCRR00210583.)

1492. From 2001 to 2019, the number of suicides in all state prisons increased 85% from 168 to 311, while total deaths from all causes in those facilities grew more than 34%. (Ex. 3333 at ADCRR00210585.)

1493. The average annual suicide rate for all state prison systems grew from 15 per 100,000 state prisoners to 21 per 100,000 between the 4-year period of 2001-2004 and the five-year period of 2015-2019. This is an overall 49% increase in the suicide rate during these time periods. (Ex. 3333 at ADCRR00210585.)

1494. The nationwide number of state prisoners who committed suicide increased 20% from 2017 (259) to 2018 (311), marking the highest number of suicides that BJS recorded in the first 18 years of collected morality data. (Ex. 4453 at ADCRR00138208.)

1495. ADCRR's average rate of suicides per 100,000 prisons was 20 during the five-year period from 2010—2014 and declined to 17 during the subsequent five-year period from 2015—2019. (Ex. 3333 at ADCRR00210602.)

1496. In comparison, during the five-year period from 2015—2019, ADCRR's suicide mortality rate was less than or equal to that of 40 states, specifically: Connecticut (28), Delaware (27), Massachusetts (32), New York (29), Pennsylvania (28), Rhode Island (44), Vermont (49), Illinois (17), Indiana (22), Iowa (20), Kansas (27), Nebraska (27), North Dakota (36), Ohio (18), South Dakota (21), Wisconsin (24), Alabama (23), Arkansas (39), Florida (20), Georgia (31), Louisiana (20), Maryland (18), Mississippi (41), North Carolina (17), Oklahoma (22), South Carolina (40), Tennessee (34), Texas (23), West Virginia (20), Alaska (61), California (23), Colorado (26), Hawaii (23), Idaho (34), Montana (29), Nevada

(18), New Mexico (23), Utah (41), Washington (19), and Wyoming (18). (Ex. 3333 at ADCRR00210602-03.)

1497. Only nine states (Maine, New Hampshire, New Jersey, Michigan, Minnesota, Missouri, Kentucky, Virginia, Oregon) and the BOP had a lower suicide morality rate than ADCRR during the five-year period from 2015—2019. (Ex. 3333 at ADCRR00210602-03.)

1498. While a significant majority of suicides are completed by suffocation, the Bureau of Justice Statistics recognizes that suicides may occur due to self-inflicted blunt force trauma and includes those in its mortality reports under "Other" as the method of suicide. (Ex. 3333 at ADCRR00210588, ADCRR00210606 and ADCRR00210608.)

1499. The BJS statistics, coupled with NCCHC's determination that ADCRR prevents suicides, when possible, by implementation of prevention efforts and intervention, demonstrates that ADCRR's suicide rates are low compared to other states and that ADCRR's prevention efforts are successful. Defendants do not place inmates at a substantial risk of harm to commit suicide.

**Reduction in Use of Force on SMI Inmates**

1500. Use of force on the mentally ill cannot be completely eliminated. (Dkt. 4174, ¶ 234.) When an inmate is self- harming, Dr. Penn opines that the immediate goal is to stop the harm for the safety and security of the inmate. (Dkt. 4174, ¶ 234.) Custody staff are paramount to achieving this goal as they are the first line of defense. (Dkt. 4174, ¶ 234.) Use of OC spray, after verbal attempts to stop the behavior fail, represents a minimally restrictive solution that comports with the standard of care in Dr. Penn's opinion. (Dkt. 4174, ¶ 234.) Custody staff that work in restrictive units and inpatient units, are provided with a three-day mental health training regarding various de-escalation tactics. (Dkt. 4174, ¶ 234.)

1501. It is Dr. Penn's professional opinion that from a psychiatric/mental health point of view that the various units of ADCRR have a sufficient procedure in place to protect against any alleged or claimed substantial risk of harm from the use of OC spray and

chemical agents. (Dkt. 4174, ¶ 235.) Specifically, ADCRR correctional and Centurion health care staff training and education, documentation, attempt de-escalation approaches and other alternatives to OC spray, and the additional policy, procedure, and practice, of ensuring that any inmate upon which OC spray is used is immediately taken to nursing and medical personnel for nursing assessment and medical evaluation. (Dkt. 4174, ¶ 235.) Dr. Penn opines, should there be any emotional or psychic distress, additional mental health referral and evaluation provides an added level of protection more than sufficient to address the "risk of harm." (Dkt. 4174, ¶ 235.) Further, the policy, procedure, and practice of ensuring that each inmate where chemical spray is utilized receives both the opportunity to wash and have a change of clothing, further reduces any "risk of harm" claimed by Dr. Stewart, according to Dr. Penn. (Dkt. 4174, ¶ 235.) Finally, the ready availability and access of CPR trained custody and health care staff, nearby emergency departments and other local hospitals also mitigate any additional "risk of harm." (Dkt. 4174, ¶ 235.)

1502. Dr. Penn is not aware of any literature, such as the American Medical Association, American Psychiatric Association, or American Academy of Pediatrics, or any other medical organization definitively saying, prohibiting, or discouraging the use of OC spray in correctional settings. (R.T. 11/19/21 a.m. at 3045:15-25.)

1503. During his September 2021 ADCRR tours, Dr. Penn did not witness any uses of force. (Dkt. 4174, ¶ 236.)

1504. Defendants' use of force tactics are limited to narrow situations where, significant de-escalation efforts fail. There is not a practice of overuse of force, or force that utilizes OC spray. Defendants' use of force, including with OC spray, is constitutional and does not subject inmates to a substantial risk of serious harm.

**Segregated Confinement of Inmates with Mental Illness**

1505. Within 72 hours of placement into a maximum custody setting, all inmates are assessed for their current mental health needs, and their history in maximum custody settings is reviewed. (R.T. 11/17/21 a.m. at 2450:13-2501:3.) After completion of this assessment, a determination as to whether the inmate can be housed in maximum custody

308

is made.  (R.T. 11/17/21 a.m. at 2450:13-2501:3.)  SMI inmates, however, are evaluated within 24 hours of placement in a maximum custody setting.  (R.T. 11/17/21 a.m. at 2501:12-19.)

1506.  For enhanced and restrictive housing, Dr. Stallcup and Centurion's Mental Health Director, Dr. Pelton, must approve SMI patients before they can be housed in these settings. (R.T. 11/17/21 a.m. at 2501:12-2502:2.)  However, Dr. Stallcup has never received a request to have an SMI housed in either of these housing settings. (R.T. 11/17/21 a.m. at 2502:3-5.)

1507.  While in maximum custody housing, MH 3 inmates are offered counseling sessions (group or individual) every 30 days or less.  (R.T. 11/17/21 a.m. at 2502:9-12.)  SMIs are offered individual counseling every 30 days, ten hours of out-of-cell unstructured time, one hour of psychotherapy group, one hour of psychoeducation group, and an additional group facilitated by CO-IIIs.  (R.T. 11/17/21 a.m. at 2502:18-24.)

1508.  Additionally, MH 3s receive a health and welfare check once a week, and SMIs receive these checks three times a week.  (R.T. 11/17/21 a.m. at 2503:10-23.)  The purpose of a health and welfare check is to build rapport with the inmate, provide tools (such as handouts) if needed, assess the cleanliness of their cell and themselves, and report any concerns or changes in behavior back to the mental health team.  (R.T. 11/17/21 a.m. at 2503:14-23.)  Health and welfare checks are in addition to the prescriptive encounters that inmates receive depending on their mental health designation and in addition to the security checks that are conducted by security staff.  (R.T. 11/17/21 a.m. at 2503:24-2504:5.)

1509.  If clinically indicated, mental health can recommend that an inmate be removed from the maximum custody setting.  (R.T. 11/17/21 a.m. at 2504:6-13.)  This is accomplished by raising the concern with the mental health lead at the facility and then requesting the move during a meeting with the deputy warden.  (R.T. 11/17/21 a.m. at 2504:6-13.)

1510.  Close management status inmates are afforded a mental health assessment

within three business days of placement in close management. (Ex. 1319 at 3 (Section 3.2).)

1511. Detention status inmates are provided mental health services in the normal course and are seen upon request or as needed. (Ex. 3006 at ADCRR00098850 (Section 1.2.9.)

1512. There is tremendous disagreement regarding the definition of "solitary confinement." (Dkt. 4174, ¶ 237.)

1513. Haney implies in his expert report that there is empirical research that clearly established an immediate and direct cause and effect, and he infers that all individuals with mental illness will demonstrate clinical deterioration and exacerbation of their mental illness and engage in self-injurious behaviors and suicide attempts if placed in "solitary confinement." (Dkt. 4174, ¶ 238.) Several of the articles cited by Haney are books or book chapters or other thought pieces, many are in obscure journals, and most do not appear to have undergone any type of exhaustive/rigorous peer-review. (Dkt. 4174, ¶ 238.)

1514. The articles cited by Haney are problematic due to a variety of methodological, design (lack of control group and instruments), and ethical (lack of informed consent) issues. (Dkt. 4174, ¶ 239.) Further, the articles cited are presented as evidence-based, scientific studies, which they are not. (Dkt. 4174, ¶ 240.) Dr. Penn takes issue with the fact that none of the articles refers to a single controlled adult prison, juvenile detention, or juvenile correctional facility. (Dkt. 4174, ¶ 240.) None includes risk of psychological or emotional harm using baseline and outcome criteria and assessment instruments by clinicians. (Dkt. 4174, ¶ 240.)

1515. Instead, Haney cites articles pertaining to restrictive housing settings and risk of harm that are, in reality, position papers put out by organizations who cite literature from attorneys and advocacy groups. (Dkt. 4174, ¶ 241.) It is important to note that they are neither peer-reviewed nor published in medical journals. (Dkt. 4174, ¶ 241.) In Dr. Penn's opinion, this is significant because Plaintiffs argue that ADCRR purposefully places inmates with serious mental illness into isolated confinement with a resulting effect of emotional or psychological harm. (Dkt. 4174, ¶ 241.)

1516. In Dr. Penn's opinion, scientific literature is currently lacking on this topic. (Dkt. 4174, ¶ 242.) The only statewide study on the effects of long-term segregation that was conducted by medical professionals in Colorado was from 2007-2010. (Dkt. 4174, ¶ 242.) The Colorado study is the only one that provides established scientific methodology and rigorous research. (Dkt. 4174, ¶ 242.) Significantly, and contrary to the hypothesis of its researchers, the results contradict Mr. Haney's opinions. (Dkt. 4174, ¶ 242.) The Colorado study is the only current adult correctional system study that has been published in a medical journal, as opposed to those in non-peer reviewed literature. (Dkt. 4174, ¶ 242.)

1517. The Colorado study reviewed at individuals that had a serious mental illness and had a comparison group of individuals in restrictive housing that did not have a mental illness. (R.T. 11/19/21 a.m. at 3055:11-3056:14.) They followed them over time to see whether the mental illness worsened or deteriorated while in restrictive housing or, alternatively, whether someone with no mental health history developed mental illness or deterioration de novo. (R.T. 11/19/21 a.m. at 3055:11-3056:14.) The study found three was no resulting effect, mental health morbidity or mortality related to being housed in restrictive housing. (R.T. 11/19/21 a.m. at 3055:11-3056:14.) It passed muster of an institutional review board and was conducted utilizing scientific method and a control group, and the study was statistically significant. (R.T. 11/19/21 a.m. at 3055:11-3056:14.)

1518. In Dr. Penn's opinion, the Colorado study is significant because it is the first pee-reviewed study in a major academic journal that's a longitudinal study of inmates with or without mental illness that were housed in restrictive housing settings such as administrative segregation. (R.T. 12/07/21 p.m. at 3393:12-3394:20.) And there was a comparison group, individuals that went and stayed in general population, even if they were in higher security status, and there was a baseline, there were inclusion and exclusion criteria. (R.T. 12/07/21 p.m. at 3393:12-3394:20.) And they used a validated instrument. (R.T. 12/07/21 p.m. at 3393:12-3394:20.) The Colorado study has been validated in forensic populations, which are very similar to prisons with prisoners. (R.T. 12/07/21 p.m.

at 3393:12-3394:20.) And it was given and administered in a standardized manner. (R.T. 12/07/21 p.m. at 3393:12-3394:20.) The researchers were expecting to see that inmates with previous mental illnesses would worsen. (R.T. 12/07/21 p.m. at 3393:12-3394:20.) So they postulated that as a hypothesis, and they actually were surprised to find that that wasn't the case. (R.T. 12/07/21 p.m. at 3393:12-3394:20.) None of the groups, either individual state inmates with mental illness before, no previous mental illness, no one had a worsening of their mental illness over this one-year period. (R.T. 12/07/21 p.m. at 3393:12-3394:20.)

1519. Haney asserts that "isolated confinement" is analogous to "solitary confinement" such as that allegedly found in supermax confinement special housing units (SHU) in the U.S. federal prison system or other administrative segregation settings (referred to as "restrictive housing" settings) in state and federal prisons for adult inmates. (Dkt. 4174, ¶ 243.) He opines that "isolated confinement" is akin to an SHU setting and that there is sensory deprivation, no stimulation, and other social isolation. (Dkt. 4174, ¶ 243.) Haney is curiously silent regarding the serious risks of harm that many of these individuals pose to other inmates, custody, and health care staff. (Dkt. 4174, ¶ 243.) These types of settings are used in correctional systems for adults who belong to security threat groups (STG). (Dkt. 4174, ¶ 243.) In Dr. Penn's opinion, these prisoners are extremely aggressive and assaultive, often members of prison, national, or regional gangs. (Dkt. 4174, ¶ 243.) Dr. Penn opines, in these instances, isolated confinement is used only after less restrictive housing and supervision efforts have been unsuccessful. (Dkt. 4174, ¶ 243.)

1520. In Dr. Penn's professional opinion, ADCRR custody staff and Centurion health care staff work collaboratively to identify and divert individuals at risk. (Dkt. 4174, ¶ 244.) And ADCRR inmates, with or without current mental disorders, who engage in serious disciplinary infractions and face restrictive housing have full access to medical and mental health care. (Dkt. 4174, ¶ 244.) These inmates are routinely assessed by medical and mental health staff to identify any medical or psychiatric contraindications to this type of placement. (Dkt. 4174, ¶ 244.) They are screened and monitored to assess for signs of

clinical deterioration. (Dkt. 4174, ¶ 244.) Reasonable efforts are made to identify individuals who are engaging in problem behaviors due to a mental disorder. (Dkt. 4174, ¶ 244.) In these cases, they provide additional mental health treatment and divert them from restrictive housing settings when possible. (Dkt. 4174, ¶ 244.) Should there be evidence of deterioration when the inmate is housing in these disciplinary settings, health care staff intervene. (Dkt. 4174, ¶ 244.) They evaluate the individual to determine their medical or mental health treatment needs. (Dkt. 4174, ¶ 244.) Mental health staff provide recommendations to custody staff regarding a possible move to a housing setting where their health care needs could be better addressed. (Dkt. 4174, ¶ 244.)

1521. In Dr. Penn's opinion, there is timely communication and interface between mental health and custody. (Dkt. 4174, ¶ 245.) Custody staff readily consult mental health for their clinical input regarding cases, bookings, disciplinary housing, and other treatment efforts/planning for challenging/difficult inmates. (Dkt. 4174, ¶ 245.) This demonstrates the good collegiality/partnership and collaboration and timely communication between clinical and security staff on difficult to manage inmates. (Dkt. 4174, ¶ 245.) Dr. Penn opines that these efforts, as further detailed in Department Orders 807, 812, & 813, comply with the correctional standard of care and represent the various steps taken by ADCRR to screen inmates in restrictive housing settings for mental disorders, serious mental illness, self- injurious and suicidal behaviors, and clinical deterioration in the activities of daily living. (Dkt. 4174, ¶ 245.) Dr. Penn also opines that, as further detailed in these policies, nursing and mental health care staff conduct timely and appropriate rounding within restrictive housing settings and inmates are provided with therapeutic and educational programming in classroom settings. (Dkt. 4174, ¶ 245.) Further, inmates who are prescribed psychotropic medications, who demonstrate medication non-compliance, are (in Dr. Penn's opinion) timely seen by mental health staff. (Dkt. 4174, ¶ 245.) According to Dr. Penn, these checks and balances appropriately mitigate precipitation or worsening of mental illness. (Dkt. 4174, ¶ 245.)

1522. In summary, ADCRR avoids the prolonged segregation of minor youth (youth

waived to the adult state prison system) and adult inmates with mental disorders. (Dkt. 4174, ¶ 246.) Custody and health care staff work proactively to place inmates with mental disorders in restrictive housing settings if there is potential for harm to themselves or others. (Dkt. 4174, ¶ 246.) If an inmate with serious mental illness is placed in a restrictive housing setting or higher custody settings which the Plaintiffs may argue is "segregation," ADCRR employs a variety of in-cell and out-of-cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space, adequate unstructured out-of-cell time is implemented, and other safeguards are permitted. (Dkt. 4174, ¶ 246.) Centurion mental health staff work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for these individuals. (Dkt. 4174, ¶ 246.)

1523. Haney's opinions are further discredited by the fact that all ADCRR facilities were found 100% compliant with NCCHC Essential Standard P-G-02–Segregated Inmates, which states that any practice of segregation should not adversely affect and inmate's health. (Dkt. 4174, ¶ 247; Ex. 3305 at ADCRR00138412-13 (Douglas); Ex. 3307 at ADCRR00138548 (Eyman); Ex. 3309 at ADCRR00138648-49 (Florence); Ex. 3311 at ADCRR00138679 (Lewis, met analogous 2014 standard P-E-09); Ex. 3313 at ADCRR0013873-74 (Perryville); Ex. 3315 at ADCRR00138805 (Phoenix, met analogous 2014 standard P-E-09); Ex. 3316 at ADCRR00138927-28 (Safford); Ex. 3318 at ADCRR00138872-73 (Fort Grant Unit); Ex. 3320 at ADCRR00139007-08 (Tucson); Ex. 3322 at ADCRR00139146-47 (Winslow); Ex. 3323 at ADCRR00139096-97 (Apache Unit); Ex. 3325 at ADCRR00139227-28 (Yuma).) To determine whether this standard is met, NCCHC looks to whether for solitary confinement (defined as less than three encounters with staff or other inmates per day), daily monitoring by medical staff is needed, coupled with monitoring by a mental health clinician at least once per week. (Dkt. 4174, ¶ 247.) For other segregation with more routine contact, only three medical and/or mental health contacts are required per week. (Dkt. 4174, ¶ 247.)

1524. For this standard, compliance indicators include that a qualified professional

reviews the inmate's health record, that healthcare is notified when they are placed in segregation, and how much contact they have with other individuals, the frequency by which they are seen by mental health staff. (R.T. 12/07/21 a.m. at 3366:13-3367:16.)

1525. NCCHC defines solitary confinement as an extreme form of segregation where an inmate is isolated and encounters staff and other inmates fewer than three times a day. (R.T. 12/07/21 a.m. at 3368:17-21.) There are no inmates within ADCRR who fall within this definition of solitary confinement.

1526. There is no reliable evidence that segregation of mentally ill inmates, particularly with the numerous safeguards ADCRR has in place, poses a substantial risk of serious harm to inmates.

1527. There is no policy or practice of isolating mentally ill inmates at ADCRR's facilities.

**Dr. Penn's Opinion**

1528. It is Dr. Penn's opinion that, regardless of the housing setting, whether someone's in general population or they're housed in a restrictive housing setting at ADCRR, that they have ready and available access to nursing and to mental health care and mental health -- qualified mental health professionals. (R.T. 11/19/21 a.m. at 3057:8-14. They have access and they have continuity of care to provide systemic care of their mental health needs. (R.T. 11/19/21 a.m. at 3057:8-14.)

1529. Plaintiff's mental health expert, Dr. Stewart, is not qualified to render his opinions and is neither reliable nor credible due to his inherent bias and faulty methodology which failed to review the systemic provision of mental health care at ADCRR.

1530. Based on the evidence presented at trial, the Court concludes that Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of failing to provide necessary mental health treatment.

1531. Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of failing to provide basic mental health care to suicidal or self-harming inmates.

1532. Plaintiffs have not established by a preponderance of the evidence that ADCRR is deliberately indifferent to the mental health needs of inmates in its care.

### F.     Dental Care Class Claims.

1533. At trial, Plaintiffs voluntarily dismissed their claims related to dental care.

1534. The Class claims concerning the alleged failure to provide timely access to basic dental treatment and alleged practice of extracting teeth that could be saved by less intrusive means are dismissed.

### G.     Subclass Claims.

#### 1.     Craig Haney.

**Credibility**

1535. Craig Haney has been a professor of psychology at the University of California at Santa Cruz since 1977. (R.T. 11/04/21 a.m. at 718:17-25.) He has no clinical psychology experience whatsoever and never practiced law.  Rather, Haney is a social psychologist (study of human behavior "in a whole range of different circumstances and settings), not a clinical psychologist. (R.T. 11/04/21 a.m. at 719:8-17, 811:25-812:13.)

1536. Haney is not board certified, has never been licensed as a psychologist in any state, has never worked in private practice, and has never diagnosed or treated a patient. While he has worked as a litigation consultant since the early 1980s, he has never been retained to testify for the defendant in a civil conditions of confinement lawsuit.  (R.T. 11/04/21 a.m. at 812:14-24, 813:10-814:17.)

1537. Haney does not have the requisite background, knowledge, or experience to provide opinions regarding the psychological effects of isolation.

1538. Any experience he has is stale, irrelevant, and not substantial enough to qualify him to render the opinions he provides.

1539. While in graduate school (1971), he was involved as a senior researcher in what has now become known as the Stanford Prison Experiment which was an attempt to study how prison conditions would affect an otherwise psychologically health person.  The experiment was performed in the basement of the Stanford psychology department using

volunteers and ended after only six days because of the reactions by the volunteers to the "simulated" prison conditions that gave one group of pretend prison officials complete control over a group of "derogated" pretend. (R.T. 11/04/21 a.m. at 719:18-720:21, 815:10-816:11.)

1540. Haney acknowledges that the study has been criticized as to methodology and was criticized as recently as 2019 by the American Psychological Association for unethical treatment of the experiment participants. (R.T. 11/04/21 a.m. at 719:18-720:21; 816:5-818:4.)

1541. Since the 1971 Stanford Prison Experiment, Haney has studied what he terms to be the psychological effects of "solitary confinement" or "isolated confinement" on inmates – two terms which he uses interchangeably and defines as the experience of "the deprivation of normal meaningful human social contact", limited movement, absence of programing, absence of daily activities enjoyed by general population inmates, and confined to cell 22-23 hours a day on average. (R.T. 11/04/21 a.m. at 722:9-723:14.)

1542. He acknowledges that the psychological effects of isolation that he believes to generally exist comes in a wide range of reactions that can range in severity and depend on the conditions at issue and the length of time exposed to "the conditions." (R.T. 11/04/21 a.m. at 7730:3-19.)

**Methodology**

1543. When determining his opinions in this case, Haney admits he started with the general conclusion that "isolation" carries with it adverse psychological effects. This pre-disposed general opinion is derived from research and studies sourced from journal articles including articles published in journals from other countries regarding prison systems other than the United States (i.e., articles published about Canadian, British. European, Scandinavian prison systems). (R.T. 11/04/21 a.m. at 773:3-19; 820:11-824:6.)

1544. To form his generalized opinion that prolonged segregation or isolation negatively affects the psychological well-being of inmates, Haney also relies upon *position statements* (versus studies) advanced by the American Psychiatric Association, American

Psychological Association, American Public Health Association, and National Commission on Correctional Healthcare that advocate that isolation/segregation/solitary confinement should be avoided or even eliminated entirely due to *potential* for harm. (Ex. 2214, 2215, 2216, 2217, 2218; R.T. 11/04/21 a.m. at 738:11-748:25.)

1545. In deriving his 2021 generalized opinion that ADCRR systemically subjects its maximum custody, detention status, and mental health watch status inmates to unnecessary "isolation" and thus *potential* for psychological harm, Haney acknowledges that his opinion is based touring only two of ADCRR's ten state-operated complexes over the course of three days, visiting only the following select housing locations within the two prison complexes: Eyman-SMU I Unit; Eyman-Browning Unit; Lewis-Rast Max Unit; Lewis-Barchey and Morey medium security Units; Lewis-Stiner detention Unit; and Lewis-Sunrise minors' Unit. He did not tour any maximum custody, detention, or mental health watch units at the Florence, Phoenix, Tucson, Yuma, Douglas, Safford, or Winslow prison complexes. (R.T. 11/04/21 a.m. at 753:8-25; 828:9-839:13.)

1546. While touring only select locations at just two of ADCRR's ten prison complexes, he only interviewed 75 inmates, split fairly evenly between the two prison complexes he toured – Eyman and Lewis. The split of 75 inmates interviewed as between the two prison complexes was coincidental. He had no target number of inmates he wanted to interview to derive his opinions. (R.T. 11/04/21 a.m. at 753:8-25; 772:4-14; 828:9-829:13; 830:5-831:19.)

1547. As to methodology for conducting inmate interviews, Haney admits that in selecting inmates for interviews during tours of Eyman and Lewis, he tried to locate some inmates he previously interviewed in 2013 to re-interview them and also interviewed inmates cell front as he walked around. There was no methodology as to how he selected inmates to interview at cell front, admitting "[p]eople who I picked kind of quasi random. No particular selection frame in mind, just went to, as randomly as I could, went to some cells in the unit and asked to talk to the person who was housed in the cell." Accordingly, Haney interviewed those inmates who happened to be awake and willing to talk to him.

(R.T. 11/04/21 a.m. at 769:15-770:24; 830:14-832:6.)

1548.  He did not utilize housing unit count sheets or any randomization computer program to select either a number of inmates to interview at any particular housing location or who to interview; this, despite the fact that to some extent he employed such methods when interviewing ADCRR inmates in 2013 and 2014.  (R.T. 11/04/21 a.m. at 832:7-16.)

1549.  Likewise, Haney utilized no interview methodology in interviewing the inmates other than telling them who he was, what he was doing, and asking open-ended questions about "what your life is like and how you feel you're being affected by the conditions and the procedures and your treatment."  He did not utilize any set number or types of questions, questionaries, or surveys.  He also did not obtain any formalized informed consent from the inmates.  This, despite the fact that in 2013 and 2014 when interviewing ADCRR inmates pre-settlement, he utilized a standard questionnaire comprised of 27 categories of symptoms when conducting most of his interviews.  For those inmates he previously interviewed in 2013/2014 and reinterviewed again in 2021, he did not re-review questionnaires completed in 2013/2014 on the same inmates in providing his 2021 report/declaration.  (R.T. 11/04/21 a.m. at 832:17-835:3; R.T. 11/04/21 p.m. at 843:14-848:17.)

1550.  He relied on the mental health diagnoses the inmates provided him.  Haney admitted that for the unknown number of records he did review, he cannot remember whether he reviewed hard copies of medical records or the electronic record.  He reviewed some number of 145 medical records provided to him by counsel.  He also did not review available medical records to attempt to verify what inmates told him during the interviews.  (R.T. 11/04/21 a.m. at 835:3-837:5; R.T. 11/04/21 p.m. at 849:10-851:24; R.T. 11/05/21 a.m. and p.m. at 993:5-25.)

1551.  According to Haney, touring three prison complexes (out of ten statewide) and interviewing 75 inmates (out of more than 27,000 housed in state operated prison complexes) on a "quasi random" basis (and reviewing policies and inmate records) is a reliable method of study to opine that system-wide, ADCRR's "isolation practices" create

as substantial risk of serious harm for all inmates and is the methodology commonly used by experts in his field to determine the same. (R.T. 11/04/21 a.m. at 753:8-25; 769:15-770:24; 772:4-14; 791:20-792:25.)

1552. Haney conducted no study of the type or frequency of mental health symptoms reported by Subclass members as compared to inmates housed at other housing locations or at different custody levels. (R.T. 11/04/21 p.m. at 851:25-853:11.)

1553. Haney acknowledged that the inmates he interviewed were pleased with having access to tablets. He further admitted that provision of tablets to ADCRR inmates is an important innovation which provides inmates (including maximum custody inmates) with access to books, music, electronic submission of Health Needs Requests, and video visits with family, which served the inmates well during restriction of in-person visitation during COVID. Inmates can also take their tablets with them to outdoor recreation. (R.T. 11/04/21 a.m. at 781:15-19; 826:12-828:8.)

1554. While Haney opines that ADCRR keeps inmates in "isolation" for too long, he has no idea what the average length of stay is in "isolated confinement" (which is undefined as to housing location for ADCRR inmates). He bases his "too long" opinion on what the inmates told him and did not review any inmate institutional or classification reasons to determine why ADCRR classified an inmate as it had done. Thus, Haney's "too long" in "isolation" opinion is based upon inmate complaints of "too long" in "isolation." (R.T. 11/04/21 a.m. at 764:11-14; R.T. 11/04/21 p.m. at 853:12-854:9.)

1555. While according to Haney, ADCRR's "isolated confinement" is "among the most severe" of 25 other states that he has studied, he does not give specific examples to distinguish his ranking of ADCRR as "among the most severe," only specifying that North Dakota, Oregon, and Washington are on the "good side" of the scale. These three states rank on the "good side" because the inmates are offered at least two hours of out of cell time a day including recreation and programming. (R.T. 11/04/21 a.m. at 768:1-8; 808:16-11; 811:5-24.)

1556. In response to follow up questions by the Court on this statement that ADCRR

320

"isolated confinement" conditions are "among the most severe," Haney stated that he did not study 25 different prison systems, but 25 different "isolation units" across the United States. According to Haney, prison systems have different characteristics and practices, making it difficult to rank them all. (R.T. 11/04/21 a.m. at 799:3-800:10.)

1557. Haney testified that it is "virtually impossible" to rank which prison complex or system that he is toured is "the worst." And he is unable to compare Arizona to California because California's model is different than Arizona's. (R.T. 11/04/21 a.m. at 809:12-810:3; R.T. 11/05/21 a.m. and p.m. at 965:23-967:25.)

1558. Haney admitted that these 25 prison units he has toured occurred over the span of nearly 50 years and in the *last three to five years, he has only toured one facility in the state of Florida*. (R.T. 11/04/21 a.m. at 807:5-25.)

1559. On redirect and in response to more questions posed by the Court regarding his comparison of ADCRR's "isolation" conditions of confinement to other state systems, Haney increased the number of studies he's conduced over the last 40 years to 28 or 29, and again characterizing the studies as involving prison systems compared to earlier contradictory testimony that he was referring to 25 prison facility locations, he still could not "rank" where Arizona falls in comparison to the increasing number of state systems. (R.T. 11/05/21 a.m. and p.m. at 1015:24-1017:10.)

1560. Haney has never developed any models for housing of high custody inmates or inmates with serious mental illness for any prison system. (R.T. 11/05/21 a.m. and p.m. at 967:1-8.)

1561. In Haney's opinion, there should be limits on the time an inmate can be housed in "solitary confinement" and be in-line with New Jersey, Pennsylvania, and New York – which place time limits "in the neighborhood of 15 to 30 days", and should only be used as a response to an emergency situation (where the inmate is a danger to self or others). (R.T. 11/04/21 a.m. at 801:5-802:24.)

1562. However, Haney admitted on cross examination that the Federal Bureau of Prisons ("FBOP") employs a Special Management Unit program that is twelve months in

length and affords for five hours of outdoor recreation per week (1-hour blocks five days a week) unless the Warden cancels the same for safety, security, or orderly prison operations reasons. The FBOP's operations are consistent with American Correctional Association standards that recommend that restrictive housing inmates are offered five hours of recreation per week – although Haney has not studied ACA guidelines on the issue even though he attends ACA conferences. (Ex. 5634, 3531 at 145, 153; R.T. 11/05/21 a.m. and p.m. at 969:1-977 at 24.)

1563. Haney testified that the State of New York affords its Special Housing Unit inmates with a step level program similar to ADCRR's DO 812 and for outdoor recreation offers one hour a day of recreation for level 1 inmates. (Ex. 5635 at 12; R.T. 11/05/21 a.m. and p.m. at 985:1-987:5.)

1564. Haney admitted that while inmates told him that they are to be afforded offers of certain out of cell time, he does not know if there are any ADCRR records that actually show how much out of cell time is offered to the Subclass inmates (maximum custody and detention status inmates). He was not provided any records to review so he could not check inmate reports against documents reflecting actual out of cell time offered to the inmates. (R.T. 11/04/21 a.m. at 804:5-14, 804:23-805:8.)

1565. Haney opines that while ADCRR's DO 812 provides for weekly out of cell time for maximum custody inmates based upon their Step Level, ADCRR actually does not offer the amount of out of cell time prescribed by DO 812. However, for this opinion, he relies solely on inmate self-reporting and has never examined or sought to review any maximum custody inmate out of cell tracking forms that document the same. (R.T. 11/04/21 p.m. at 868:16-871:9.)

1566. Haney admitted that the risk of harm posed by "isolation" varies by individual and does not apply in predictable ways where there is "no science" on how isolation presents an alleged risk of harm to certain categories of inmates or inmates with certain personality characteristics. (R.T. 11/04/21 p.m. at 855:24-857:3.)

1567. As to ADCRR's determination of maximum custody classification for any

individual inmate, he concedes that the assessment considers an inmate's dangerousness. He also conceded that "detention" is a housing status and not a classification – thus non-maximum custody inmates may be placed on detention status for a variety of reasons to include disciplinary violation investigation, protective custody investigation, and refusal to house status – all circumstances based upon then-occurring circumstances versus a custody classification. (R.T. 11/04/21 a.m. at 805:9-807:4.)

1568. Haney admits that he never measured the size of any cells he viewed on his inspections of certain locations at ASPC Eyman and ASPC Lewis in 2021. (R.T. 11/04/21 p.m. at 874:15-875:3.)

1569. He also admits that the outdoor recreation enclosures for maximum custody inmates at ASPC Eyman and ASPC Lewis provide for shade covering, mist systems, drinking water, and recreation facilities in the larger group recreation enclosures such as basketball hoops and exercise facilities. (R.T. 11/04/21 p.m. at 880:13-881:16.)

1570. Group programming classrooms are also provided at these locations, outfitted with desk set ups that also facilitate restraint of the inmates for safety reasons. (R.T. 11/04/21 p.m. at 881:17-22.)

1571. All maximum custody and detention cells that Haney saw in 2021 either provided windows to the outside within the cell or for those cells without windows to the outside within the cell, the cell fronts had windows and the housing pods had natural light. While some inmates complained they could not sleep because of lighting in the cells at night, he does not know how many complained of this and has no idea what the wattage of the night security lights are in any locations he toured in 2021. He also agrees that there is a legitimate penological reasons to prove some cell lighting at night so that officers can perform safety and security checks to make sure the inmates are alive and well. (R.T. 11/04/21 p.m. at 882:7-884:8.)

1572. While Haney believed the housing units to be "hot" when he toured in late summer 2021 and acknowledges that ADCRR has practices in place to measure cell temperatures and employ mitigation efforts if cell temperatures exceeded 85 degrees

Fahrenheit, he has no idea what the cell temperatures were when he toured. (R.T. 11/04/21 p.m. at 884:8-885:10; Ex. 3031.)

1573. While Haney opined that several inmates he interviewed reported they were not provided meaningful access to mental health care, he conceded on cross examination that the particular inmates received frequent mental health encounters to include private confidential setting counseling. (Ex. 5244A, 5291A; R.T. 11/05/21 a.m. and p.m. at 957:25-965:21.)

1574. Haney opines that ADCRR's use of chemical agent use of force on SMI inmates is inappropriate. However, Haney refers only to one inmate (Inmate Muhammed) and reviewed of use of force videos regarding this inmate for only the months of August 2020 and December 2020 (13 videos) to derive his systemic constitutional violation opinion. Haney has no corrections experience and does not opine that use of chemical agent use of force caused the inmate to suffer any measurable psychological harm. (Dkt. 4120 & Appendix C at 150.)

1575. Haney's review of one inmate to support his opinion regarding use of force is not adequate to prove a systemwide claim.

1576. Even if Haney had identified measurable psychological harm to Inmate Muhammed (which he did not), isolated instances of alleged harm are not sufficient to show widespread actual injury as required to prove a systemwide claim.

1577. Finally, Haney acknowledged that the U.S. Department of Justice, Office of Justice Programs for Bureau of Justice Statistics released a report in October 2021 regarding inmate suicide rates in local jails, state prisons and the FBOP. The report contains statistics for 2015-2019. Thirty-eight states' suicide rate exceeded Arizona's and one state reported the same statistic as Arizona (17 per 100,000 inmates). (Ex. 3333 at 21-22; R.T. 11/05/21 a.m. and p.m. at 987:7-992:9.)

## 2. Martin Horn.

### Credibility

1578. At trial, Martin Horn testified: "I take a back seat to no one in my opposition

324

to use – to the use of solitary confinement. I have written, spoken and worked against it. I have publicly stated that solitary confinement is never justified in a correctional setting." Horn has held this predisposed opinion since 2014. (R.T. 11/09/21 a.m. at 1464:1-1465:23.)

1579. During trial, Horn re-tweeted articles detailing witness testimony even though the parties invoked the rule of exclusion of witnesses during trial (to which he claimed ignorance. (Ex. 5637; R.T. 11/09/21 a.m. at 1466:6-1472:21.)

1580. Horn also did not disclose on his CV that from 2009 to 2020, he was a member of the board for Fortune Society. One of the missions of Fortune Society is to end solitary confinement in the United States. (R.T. 11/09/21 a.m. at 1479:2-1480:15.)

1581. Even if Horn were qualified (he is not), he is an advocate, not a neutral expert. As such his opinions are biased and therefore unreliable.

1582. Horn claimed that he has *never* been disqualified as an expert witness but later had to admit on cross examination that indeed he has been found not qualified to testify as an expert. In the case *Bornstein vs. County of Monmouth* (D.N.J) (2014), which involved a claim of deadly excessive use of force, the court found that as a non-healthcare professional in a case alleging medical malpractice, Horn was not qualified to give expert opinion testimony regarding the medical standard of care. (R.T. 11/08/21 a.m. and partial p.m. at 1347:5-13-15; Ex. 5638; R.T. 11/09/21 a.m. at 1481:6-1484:15.)

1583. Horn is a corrections litigation consultant. While he served as a Warden for one year for the New York State Department of Correctional Services from 1984 to 1985, his experience was limited to overseeing operations at a 402-bed medium custody, dormitory style male housing unit. (R.T. 11/08/21 a.m. and partial p.m. at 1334:5-1336:4; R.T. 11/09/21 a.m. at 1478:2-1479:1.)

1584. Horn never oversaw day-to-day operations at a maximum custody prison. He never served as a correctional officer, sergeant, lieutenant, or any position that actually worked a housing unit in a prison. He never participated in a use of force upon an inmate and has never deployed chemical agents to stop an inmate from engaging in self-harm. (R.T. 11/09/21 a.m. at 1473:4-15; R.T. 11/09/21 p.m. at 1568:18-20.)

1585.  As Commissioner for New York City Department of Corrections, he oversaw 10 jail facilities housing 15,000 detainees/inmates (including a jail built on barge), but these facilities housed inmates sentenced to serve a year or less (or temporarily housed inmates from the state department of corrections on a temporary basis).  (R.T. 11/09/21 a.m. at 1474:20-1478:1.)

1586.  Horn is not a psychologist, psychiatrist, or physician.  (R.T. 11/08/21 a.m. and partial p.m. at 1359:14-24; R.T. 11/09/21 a.m. at 472:22-1473:3.)

1587.  Horn learned about what he purports to be the negative effect of restrictive housing conditions on inmates with mental illness by reading about the subject; specifically relying on writings authored by Plaintiffs' other expert, Haney, as well as an article by NASA regarding the effects of reduced sensory stimulation for astronauts in space, a case from 1890, and the late Senator John McCain's experience as a prisoner of war in Vietnam. (R.T. 11/09/21 a.m. at 1484:16-1488:23.)

1588.  As to experience in inmate classification, when he was with New York City, he signed off on policies and "prided [himself] on reading every one and tinkering with it before I would ultimately sign it . . ."  (R.T. 11/08/21 a.m. and partial p.m. at 1337:9-14.)

1589.  Horn does not have the requisite background, knowledge, or experience to provide opinions regarding the effects of isolation or other conditions of confinement on ADCRR inmates.

1590.  Any experience Horn has is stale, irrelevant, and not substantial enough to qualify him to render the opinions he provides.

**Methodology**

1591.  To derive his opinions in this case, he toured only two of ADCRR's ten prison complexes – ASPC Eyman and ASPC Lewis – and within these two complexes, he did not tour every restrictive housing location.  He has never toured any of ADCRR's other eight prison complexes – including ASPC Tucson-Rincon Unit where then new maximum custody mental health program is located or detention units at ASPC Yuma, Tucson, Douglas, Winslow, and Phoenix.  (R.T. 11/08/21 a.m. and partial p.m. at 1341:22-1342:20;

R.T. 11/09/21 a.m. at 1515:22-1516:13.)

1592. He also interviewed inmates while touring only select locations at the two prison complexes. His methodology for conducting inmate interviews was to "walk slowly by and stop at the front of every cell." Some inmates were up, some were asleep, and some did not want to talk to him. For the inmates who wanted to talk to him, he would "chat with them briefly and obtain as much information form them as [he] could." (R.T. 11/08/21 a.m. and partial p.m. at 1342:5-1343:2.) Horn failed to document any information regarding the inmates who, when advised of the reason for his visit, refused to speak with him.

1593. Horn interviewed only 60 ADCRR inmates and believed what they told him during his "brief chats" because the inmates complained about similar things. He reviewed only 12 or 14 inmate institutional files – only the ones Plaintiffs' counsel requested from ADCRR and provided to him to review. (R.T. 11/08/21 a.m. and partial p.m. at 1343:17-1345:22.)

1594. As to his 60 inmate interviews, he did not parse out the interviews among maximum custody, detention status, or mental health watch status inmates. Nor did he use any interview tools or questionnaires; rather he just chatted briefly using open ended questions. (R.T. 11/09/21 a.m. at 1519:17-1520:12.)

1595. Touring only select locations (not all restrictive housing locations) at two of ten ADCRR prison complexes, having brief chats with 60 inmates, and looking at 12-14 inmate institutional files is not adequate to support a claim of systemic deficiencies.

1596. Horn spent approximately 100 hours on this case with 21.5 of those 100 hours spent traveling to the prison tours and 32.5 hours touring select locations at two prison complexes ($40,000.00 in fees). (R.T. 11/09/21 a.m. at 1520:20-1521:12.)

1597. Horn acknowledges that the American Correctional Association (ACA) (of which he is a member) is the largest national professional organization representing the corrections industry and has been in existence for 100 years. Horn relies upon ACA standards in his report/declaration regarding the use of restrictive housing but acknowledges that neither ACA standards nor ASCA standards (Association of State Correctional

Administrators) have the force of law, and thus their standards on operation of restrictive housing units are aspirational. (R.T. 11/08/21 a.m. and partial p.m. at 1338:3-1340:22; R.T. 11/09/21 a.m. at 1480:16-1481:3; 1490:25-1491:11.)

1598. Horn uses the terms "restrictive housing" and "isolation" interchangeably and defines these terms as "the confinement of an inmate in a cell for more than 22 hours a day on average." (R.T. 11/08/21 a.m. and partial p.m. at 1340:23-1341:4.)

1599. According to Horn, across the nation, only Colorado, Maine, New York, Connecticut, and Pennsylvania have restricted their use of restrictive housing. (R.T. 11/08/21 a.m. and partial p.m. at 1341:5-10.)

1600. Horn criticizes ADCRR's use of restrictive housing because he believes there's "an awful lot of people in restrictive housing and that they over use it." Yet, he had no idea how many ADCR inmates (27,794) as of September 30, 2021, were maximum custody (1,636), detention (750) or on mental health watch (81). (Ex. 1304; R.T. 11/08/21 a.m. and partial p.m. at 1341:11-21; R.T. 11/09/21 p.m. at 1596:13-25.)

1601. Horn agrees that segregation of certain inmates will always be required in prison operations for safety reasons. (R.T. 11/09/21 a.m. at 1490:3-12.)

1602. On cross examination, Horn admitted that the New York State Corrections and Community Supervision Standards (September 2021) for special housing units are offered seven hours of recreation a week. (Ex. 5635; R.T. 11/09/21 p.m. at 1585:12-1587:12.)

1603. Horn also concedes that the ACA standards that govern restricted housing and enhanced management guide that inmates should be offered five hours of recreation a week (ordinarily in one-hour blocks on different days). The ACA also recommends programming but does not prescribe the type or amount of weekly programming suggested. He denied knowledge that the Federal Bureau of Prisons (FBOB) follows ACA standards on recreation for restricted housing inmates because he focuses mostly on state agencies. (Ex. 5633, 5634, 3532 at 145, 143; R.T. 11/09/21 p.m. at 1581:20-1582:16.)

1604. Horn admits that the Pennsylvania Department of Corrections affords its

inmates in administrative custody five hours a week of recreation (one hour a day, five days a week). Pennsylvania does not limit the time an inmate can be housed in administrative segregation and thus does not limit the time inmates are assigned to restricted housing. (Ex. 5639; R.T. 11/09/21 p.m. at 1588:5-20.)

1605. Horn admits that per ADCRR's DO 812 governing maximum custody management, ADRR maximum custody inmates are offered 7.5 hours a week of outdoor recreation. (Ex. 3013; R.T. 11/09/21 p.m. at 1587:13-17.)

1606. Horn acknowledges that both "end of the run" concrete recreation enclosures that he saw at Eyman and Lewis as well as the 10x10 individual recreation enclosures allowed maximum custody inmates the opportunity to go outside for fresh air and be in a setting larger than a cell. (R.T. 11/08/21 p.m. late at 1418:22-1419:12.)

1607. Horn criticizes what he characterizes as an eighty percent refusal rate by maximum custody inmates to participate in offered outdoor recreation. He admits that he derived his opinions regarding refusal rates by looking at summary charts of maximum custody out of cell tracking forms compiled by Plaintiffs' counsel, also acknowledging that the summary chart first reported refusal rates higher than a later corrected version. (R.T. 11/08/21 p.m. late at 1417:16-1419:9.)

1608. He reviewed "several" actual maximum custody out of cell tracking forms, despite knowing that a large number had been produced – although he did not know that over 100,000 maximum custody documents had been produced in this case. And, while focusing on examining refusal rates for offered outdoor recreation, Horn admitted he did not specifically study how much time inmates actually accepted for offered recreation time. (R.T. 11/09/21 a.m. at 1517:7-1519:15.)

1609. While Horn opines that correctional personnel should not record offers of recreation as a refusal if the inmate's cell is out of compliance with rules regarding cell maintenance, he admits he never saw documentation in out of cell tracking forms that this occurs. He also believes that inmates who are not ready for recreation when officers come to escort them because they are taking a "bird bath" in the sink or have not dressed yet

should not be considered a refusal for recreation; rather, in Horn's opinion officers should wait for the inmates to finish whatever they are doing and wait until the inmates are ready before escorting them out for recreation. (R.T. 11/09/21 a.m. at 1554:20-1558:20.)

1610. Horn criticizes the completeness of ADCRR documentation regarding recreation opportunities, shower opportunities, laundry exchanges, and delivery of meals to inmates housed in detention units. Horn did not testify that any detention unit inmates ever told him that such services were actually not being provided to them. (Ex. 1697; R.T. 11/09/21 a.m. at 1458:7-1461:25.)

1611. Based on review of "some" use of force reports and "some" use of force videos, Horn opines that ADCRR is ill-prepared to deal with inmates suffering from mental illness "other than through the use of a chemical spray." (R.T. 11/08/21 p.m. late at 1421:12-24.)

1612. Indeed, to arrive at this generalized and non-specific opinion that he extrapolates to be an ADCRR systemic issue, Horn admits that despite the availability of many more, Plaintiffs' counsel provided him with use of force videos for only 14 inmates. While he was aware Defendants had produced more in discovery, he was not aware that approximately 800 use of force videos (and documentation) were produced by Defendants. (R.T. 11/09/21 a.m. at 1516:14-1517:6.)

1613. At trial he only testified about use of force videos for two inmates from discrete time periods in 2021 to illustrate his use of force opinion. (Ex. 4034, 4036, 4038, 4040-; R.T. 11/08/21 p.m. late at 1422:4-1434:5.)

1614. As to use of force by correctional personnel, he admits that if an inmate is engaging in self harm, "we want officers to intervene to stop it" and he does not dispute that use of chemical agents to stop inmate self-harm is a "less onerous or less dangerous or less risky use of force than use of actual physical body-to-body force." He also opines that it is "good practice" to have a counselor or mental health professional respond to incidents where inmates are engaging in self harm. (R.T. 11/08/21 p.m. late at 1422:21-1423:21.)

1615. Horn further admits that use of chemical agents is an important use of force

tool that is part of the use of force continuum used in corrections.  It is a lesser level of force than physically going hands on with an inmate and is effective in preventing an inmate from injuring or killing himself and to stop inmates from fighting rather than the officers going hands-on with inmates to stop their self-injurious or assaultive behavior.  (R.T. 11/08/21 p.m. late at 1426:20-1427:12.)

1616.  Horn admits that ADCRR's use of force policy (DO 804) is overall a sound policy, appropriate, and "consistent with common practice within the industry." (Ex. 3006; R.T. 11/08/21 p.m. late at 1434:25-1435:9.)

1617.  Horn acknowledges that DO 804 provides that planned uses of force involving maximum custody inmates, maximum custody inmates designated as SMI, and inmates housed in designated mental health units require the use of a cool down period to give the inmates an opportunity to comply with officer orders and for a medical/mental health clinical intervention to occur before the deployment of chemical agents.  Horn agrees that this use of a cool down period before deployment of chemical agents is good correctional practice, and he compliments it.  (Ex. 3006; R.T. 11/09/21 a.m. at 1558:22-1562:20.)

1618.  After watching five videos during direct examination of Inmate Muhammed engaging in self harm and the resulting use of chemical agents by correctional officers to stop the inmate from forcefully ramming his head into the solid metal cell door, Horn testified that he was impressed with the professionalism of officers and admitted that the use of chemical agents upon the inmate resulted in immediate cessation of the self-harm behavior and compliance by the inmate.  Horn described the inmate as "pretty docile" even though the inmate was aggressively banging his head into the cell door.  He also did not believe that an inmate walking aggressively from the back of his cell and ramming his head into the solid metal cell door constituted an imminent threat because he does the same thing day after day and "[h]e's not actually trying to hurt himself, he's trying to annoy us or get our attention or something."  (Ex. 4034, 4036, 4038, 4040; R.T. 11/08/21 p.m. late at 1422:4-1428:21.)

1619. On cross examination, Horn maintained that Inmate Muhammed, despite repeatedly ramming his head into a metal cell front day after day, was not engaging in self harm. Whether doing so could possibly result in a concussion at some point was a "medical judgment" that he would not commit to. (R.T. 11/09/21 p.m. at 1569:1-1570:3.)

1620. Horn also admitted on cross examination that indeed medical personnel responded to Inmate Muhammed's cell on one occasion before chemical agents were deployed to stop the inmate from repeatedly ramming his head into the metal cell front. The inmate continued to ram his head into the cell front 10 more times after medical arrived on scene. While refusing to consider the inmate's behavior as self-harm, he admitted that deployment of chemical agents immediately stopped the behavior and the inmate immediately submitted to restraints and exited the cell. After acknowledging that before deployment of chemical agents, the inmate climbed up on something and either dove or fell to the ground, Horn changed course and conceded that "you could make the argument" that the force used was appropriate. He also acknowledged that staff acted professionally, he was evaluated by medical personnel, and was decontaminated. Horn also admitted that, following the use of force, Inmate Muhammed reported to medical personnel that he was trying to hurt himself – trying to hurt his neck or spine. Because of this statement, Horn agreed that after this incident it would be reasonable to infer that the inmate indeed was trying to hurt himself if he started ramming his head into the cell front. (Ex. 4046; R.T. 11/09/21 p.m. at 1570:11-1574:17.)

1621. Horn did not actually read all the use of force document packets regarding Inmate Muhammed. Rather, he "read several and perused others." (R.T. 11/09/21 p.m. at 1574:23-1575:1.)

1622. Horn admitted that with reference to the use-of-force incident involving Inmate Muhammed at Exhibit 4046 (last video), medical responded and engaged with the inmate but he did not stop ramming his head against the metal cell front. Horn characterized the event as the inmate "trying to make a point." Horn refused to characterize the inmate's conduct as immediate self-harm. (R.T. 11/09/21 p.m. at 1575:14-1578:2.).

1623. In watching four videos during direct examination of a second inmate engaging in self harm and the resulting use of chemical agents by correctional officers to stop the inmate from forcefully backwards donkey kicking his cell door or cell wall, Horn opined that ongoing kicking of a cell door/wall with bare feet is not self-harm that requires officers to intervene to stop the inmate from potentially injuring himself after verbal commands to stop the self-harm prove unsuccessful.  (Ex. 4084, 4098; 4100, 4018; R.T. 11/08/21 p.m. late at 1429:8-1434:5.)

1624.  Horn maintained that the inmate was "more like a child having a tantrum." (R.T. 11/09/21 p.m. at 1578:3-1579:4.)

1625.  Horn conceded that post orders included procedures for housing unit temperature checks with a digital anemometer from April to October each year and mitigation efforts when Arizona cell temperatures reach 95 degrees to include notification of facility leadership, placement of fans and opening of cell door food traps and providing inmates with showers and ice.  Despite approximately 15,000 pages of documentation of temperature taking efforts by ADCRR being produced in this case, Horn could not remember if he ever reviewed any of the documentation.  He never reviewed ADCRR's direction to correctional personnel regarding temporary housing of pregnant inmates when cell temperatures exceed 86 degrees or mitigation efforts and rehousing for inmates on psychotropic medications who have suffered a heat intolerance reaction when cell temperatures exceed 85 degrees.  (Ex. 1736, 1737, 3031; R.T. 11/09/21 a.m. at 1521:18-1529:4.)

1626.  Regarding cell lighting at the select locations he toured, Horn admits that the Lewis-Rast Max Unit was in good condition and provided adequate light and ventilation.  While he criticized ventilation in cells at other unspecified locations, he did not do any testing of these conditions at any locations. (R.T. 11/09/21 a.m. at 1530:14-1533:13.)

1627.  As to cell size at the non-specified locations he toured, Horn had no specific criticism other than those conditions may be "harsh" if two inmates occupy a double-occupancy cell.  He never measured the size of the cells other than to "pace" them off and

estimate that they were 80 square feet in size, which is the cell size recommended by the ACA. The cells were outfitted with bunks, toilet, sink, and stool/table (in some locations), which is consistent with what he has seen in other prisons in the last forty years. While Horn was critical of seeing some toilets that were not in working order, he admitted that these cells were not occupied. (R.T. 11/09/21 a.m. at 1533:14-1537:3.)

1628. Horn criticized ADCRR's practice of serving Subclass members both their breakfast and lunch in what is called a "Mega Sack" which contains both meals. Horn opined that the service of the Mega Sack requires inmates to "ration" their food, but also admits that the Mega Sack contains two meals and thus the inmates are fed three meals a day. Horn acknowledged that the Mega Sack includes cereal, milk, boiled egg, cheese slice, turkey and ham slices, bread, salad dressing, coffee, turkey bologna, peanut butter and jelly, mustard, chips, cookie, and a drink. Horn cannot challenge the nutritional adequacy of the meals served to ADCRR inmates. (R.T. 11/09/21 a.m. at 1537:19-1541:16.)

1629. Horn criticized ADCRR's requirement that staff working maximum custody and detention units wear eye protection and protective stab vests because he believes this affects the mental health of the inmates and makes the inmates believe that the officers are afraid of them. No inmate has ever expressed such a perception. (R.T. 11/09/21 a.m. at 1544:15-1546:12.)

1630. Horn conceded that there has been one study conducted regarding the psychological effects of placement in maximum custody within the ADCRR system. The study, published by the U.S. Justice Department, Office of Justice Programs in 2020, found that while ADCRR inmates in restricted housing reported on average a higher level of psychosomatic symptoms as compared to inmates in close or medium custody, those symptoms did not worsen as more time was spent on restrictive status housing. Horn admitted that he did not analyze or cite this study in rendering his opinions in this case. (R.T. 11/09/21 p.m. at 1591:4-1594:4.)

1631. Finally, when faced with the ASCA Liman study which ranked for 2019 the percentage of inmates incarcerated in a location where inmates spent 22 hours a day in their

cells for 15 or more days, Horn conceded that 4.6% of ADCRR's population fell that category. And out of the 39 state corrections departments reporting, the following states exceeded Arizona's percentage rate: Arkansas, Montana, Missouri, Kansas, Tennessee, Maryland, Indiana, Oklahoma, Georgia, Oregon, Louisiana, North Carolina, and Nebraska. (Ex. 3530; R.T. 11/09/21 p.m. at 1597:21-1601:23.)

1632. Horn is not credible, and his opinions are therefore unreliable.

### 3. The Conditions of Confinement at ADCRR Exceed Constitutional Minimums.

1633. In August 2021, 26,596 inmates (in both state and privately operated facilities) were participating in inmate programs, including 18,403 inmates participating in work programs. Nearly 70% of ADCRR's total inmate population were violent offenders: 58.1% were current violent offenders, and 11.3% were historical violent offenders. Almost 48% of ADCRR's inmate population is between 25 and 39 years of age. (Ex. 1358 at 15-16.)

1634. As of September 30, 2021, ADCRR's total inmate population, including inmates housed in ADCRR operated prison complexes and private contract facilities, was 35,410. There were 27,794 inmates housed in ADCRR's 10 state-operated prison complexes. Within the 27,794 population, only 1,636 inmates were classified as maximum custody; only 7 inmates were on close management status; only 750 inmates were on detention status; and only 81 inmates were on mental health watch status. (Ex. 1304.)

1635. Based upon these statistics, as of September 30, 2021, ADCRR's maximum custody population constituted 4.6% of the total ADCRR prison population (no maximum custody inmates are housed in private contract facilities); 0.019% of ADCRR's inmates were assigned to close management status (no close management inmates are housed in private contract facilities); 2.7% of ADCRR's state-operated prison complex population was on detention status; and 0.029% of ADCRR's state-operated prison complex population was on mental health watch status. (Ex. 1304.)

1636. In 2012, ADCRR's maximum custody population was roughly 3,100 inmates.

By the end of September 2021, the maximum custody population had reduced to 1,636 inmates – nearly a 50% reduction. There are no female inmates classified as maximum custody; ADCRR does not classify the female population as maximum custody. (Ex. 1304; R.T. 11/17/21 p.m. at 2672:4-12.)

1637. That the maximum custody population currently makes up only 4.6% of ADCRR's total inmate population further shows that Defendants do not overuse the maximum custody classification.

1638. That the close management status population makes up less than ½ of 1 percent of ADCRR's total inmate population shows that Defendants do not overuse the maximum custody classification.

1639. That only 2.7% of ADCRR's inmate population (housed in ADCRR operated facilities) is housed on detention status shows that Defendants do not overuse detention.

1640. That less than ½ of 1 percent of ADCRR's inmate population (housed in ADCRR operated facilities) is housed on mental health watch status shows that Defendants do not overuse mental health watch.

1641. Currently (and as of September 30, 2021), maximum custody inmates are housed at:

- ASPC Eyman-Browning Unit (general population, security threat group ("STG"), restrictive housing program, enhanced management, and behavior management program also known as "BMU" populations);

- ASPC Eyman-SMU I Unit (general population, sex offender, and protective custody populations);

- ASPC Lewis-Rast Max Unit: (protective custody and refusal to house populations) and

- ASPC Tucson-Rincon Unit (residential mental health treatment program).

All locations may house maximum custody inmates designated as SMI. (Ex. 1304; R.T. 11/02/21 p.m. at 401:5-404:17; R.T. 11/05/21 a.m. and p.m. at 1192:3-12; R.T. 11/05/21 a.m. and p.m. at 1146:22-1148:15; R.T. 11/15/21 p.m. at 2094:16-2095:11, 2097:9-11; R.T.

11/17/21 p.m. at 2669:17-25.)

1642. ASPC Florence-Kasson Unit previously housed Seriously Mentally Ill ("SMI") inmates participating in either a residential mental health treatment program or a a BMU program. In September 2021, BMU inmates at Kasson Unit were moved to ASPC Eyman-Browning Unit and inmates participating in the residential mental health treatment program were moved to ASPC Tucson: Rincon Unit as part of the overall graduated deactivation plan for ASPC Florence. (Ex. 1304; R.T. 11/05/21 a.m. and p.m. at 1151:22-1152:25; R.T. 11/17/21 p.m. at 2669:17-2670:14).

1643. Only ASPC Lewis-Rast Unit houses close management status inmates.[15] (Ex. 1304; R.T. 11/15/21 p.m. at 2096:12-13.)

1644. Detention units are operated at ASPC Douglas, ASPC Eyman, ASPC Florence (Globe Unit only), ASPC Perryville, ASPC Lewis, ASPC Safford, ASPC Tucson, ASPC Winslow, and ASPC Yuma. (Ex. 1304.)

1645. Mental health watch pods are operated at ASPC Eyman, ASPC Florence, ASPC Perryville, ASPC Phoenix, ASPC Lewis, and ASPC Tucson, although inmates at any prison complex can be placed on a mental health watch. (Ex. 1304.)

### a. Psychiatric Monitoring of Maximum Custody Inmates

1646. As set forth above, ADCRR's efforts to assess the mental health needs of inmates admitted to maximum custody within 24 (SMI) to 72 (non-SMI) hours of intake, thereafter monitor the well-being of the Subclass on a frequent basis, provide clinically indicated counseling and mental health care to the Subclass no matter their housing location, and monitor living unit/cell temperatures to protect against Subclass members taking psychotropic medications from suffering a heat intolerance event shows that Defendants are not deliberately indifferent to the mental healthcare needs of the Subclass.

1647. Moreover, ADCRR's demonstrated efforts to reduce inmate self-injurious

---

[15] Close management status is designed for inmates who fall into specified behavior categories and are considered management problems, unable to live in general population but not yet requiring a maximum custody classification. (Ex. 1319 at 1 (Section 1.1).)

behavior (a 43% decrease from 2020 to 2021) and reduce self-harm emergency room send-outs (a 75% reduction from 2020 to 2021) is further evidence that Defendants are not deliberately indifferent to the healthcare needs of the Subclass.

1648. Based on the evidence presented at trial, the Court concludes that Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of failing to monitor the mental healthcare needs of the Subclass inmates.

1649. Plaintiffs have not established by a preponderance of the evidence that Defendants are deliberately indifferent to the mental healthcare needs of the Subclass inmates.

### b. Mental Health Staffing

1650. As set forth above, ADCRR's efforts to increase staffing for healthcare positions through payment of recruitment and retention bonuses and imposition of sanctions for failure to fill positions show that they are not deliberately indifferent to the serious mental health needs of the Subclass.

1651. That the NCCHC determined that ADCRR's staffing plans are adequate and that the staffing levels meet the needs of the ADCRR Subclass population further demonstrates that ADCRR staffing levels are constitutional.

1652. Based on the evidence presented at trial, the Court concludes that Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of inadequate psychiatric monitoring because of chronic understaffing.

1653. Plaintiffs have not established by a preponderance of the evidence that Defendants are deliberately indifferent to the mental healthcare needs of the Subclass inmates.

### c. Use of Chemical Agents

1654. ADCRR's DO 804 applies to all planned/controlled uses of force involving chemical agents for all inmates, including SMI maximum custody inmates and inmates housed in designated mental health units. (Ex. 3006 at ADCRR00098855-65 (Section 4.0, 5.0.)

1655. Plaintiffs agree that ADCRR's use of force policy (DO 804) is a sound policy, appropriate, and "consistent with common practice within the industry." (R.T. 11/08/21 p.m. late at 1434:25-1435:9.)

1656. Under DO 804, staff may only use force "when persuasion, counseling, warnings and direct orders are found to be insufficient to obtain cooperation from the inmate[.]" Staff may use less than lethal force to obtain inmate cooperation. This includes the use of chemical agents. (Ex. 3006 at ADCRR00098855 (Section 4.0, 4.1).)

1657. Circumstances warranting use of force include the necessity to maintain control and order, prevent commission of a crime, prevent escape, prevent suicide or serious self-injury, protect against another's use or attempted use of unlawful physical force, prevent hostage taking or infliction of serious injury upon another, or maintain/restore control and order to move an unwilling inmate. (Ex. 3006 at ADCRR00098855-98856 (Section 4.1.2).)

1658. All planned uses of force involving the use of Oleoresin Capsicum ("OC") spray or chemical agents on both SMI and non-SMI maximum custody inmates require a cool down period involving correctional staff and a mental health/health care clinician to try to establish rapport with the inmate and allow the inmate the opportunity to comply with orders without the need for force. (Ex. 3006 at ADCRR00098856-98857, 99861-99864(Section 4.1.3, 5.0, 5.1-5.3).)

1659. Staff shall use only the amount of force necessary to resolve the incident, using sufficient force to quickly regain control of the inmate with minimal risk to staff. (Ex. 3006 at ADCRR00098857 (Section 4.1.5).)

1660. Use of force is progressive (from least to maximum level permitted), and the force options should be commensurate with the circumstances presented. Where possible based upon the circumstances, the progressive use of force shall be:

- psychological (physical presence, body language, verbal and non-verbal communication);
- Hand-held and pepper ball sprays;

- Less than lethal options (stun devices, TASER, stun shields, Conducted Electrical Weapons);

- Less than lethal weapons/munitions (12 fa/37 mm bean bags, wooden batons, sting-ball grenades, diversionary devices, CS/OC grenades, 12ga/37 and 40 mm projectiles);

- Service dogs;

- Cell extraction teams; and

- Lethal force (where authorized).

(Ex. 3006 at ADCRR00098857-9889 (Section 4.2).)

1661. Staff may use chemical agents such as OC spray outside of a planned use of force. Chemical agents may be used to avoid the use of physical force to prevent injury to inmates or to stop an imminent danger to an inmate. (Ex. 3006 at ADCRR00098862 (Section 5.3).)

1662. Use of OC spray and chemical agents is restricted for SMI maximum custody inmates and inmates housed in designated mental health units. In these cases, OC/chemical agents may only be used to address imminent threats to a person's safety or immediate action to stop a threat such as on-going physical harm, active physical resistance, or escape/attempted escape. After-care and decontamination efforts must be carried out after deployment of OC/chemical agents. (Ex. 3006 at ADCRR00098862-99864 (Section 5.3.1.4, 5.3.1.5, 5.3.2).)

1663. Complex wardens review every of use of force incident that occurs at their facility as part of a committee review; that review includes the deputy warden of operations, unit deputy warden or associate deputy warden, captain, and a member of the criminal investigations unit. After review at the prison complex review, additional review is conducted by the regional operations director and assistant director of operations. (Ex. 3006 at ADCRR00098867-98869 (Section 5.6); R.T. 11/18/21 a.m. at 2732:22-2735:6.)

1664. Use of force packets containing all documentation regarding a particular use of force is also included in the Stipulation's monthly Max Custody Notebooks for chemical agent use of force incidents involving SMI maximum custody inmates. (R.T. 11/18/21 a.m.

at 2734:21-2735:17.)

**Inmate Muhammad**

1665.  In December 2020, while housed at ASPC Eyman-Browning Unit, maximum custody inmate Muhammad engaged in repeated incidents of self-harm, walking from the back of his cell, and ramming his head into the solid steel cell door.  (Ex. 1049-1065, 4030, 4032, 4034, 4036, 4038, 4040, 4044.)

1666.  After one incident in which he appears to climb up on something in his cell and dive off it onto the ground, Muhammad told medical personnel that he was trying to hurt his neck or spine.  (Ex. 4046; R.T. 11/09/21 p.m. at 1570:11-1574:17.)

1667.  Both correctional and medical personnel were calm and professional in their interactions with Muhammad before, during, and after the use of force incidents, and there can be no dispute that the use of chemical agents was successful in immediately stopping the self-injurious behavior and gaining compliance and control of the inmate.  (Ex. 4034, 4036, 4038, 4040; R.T. 11/08/21 p.m. late at 1422:4-1428:21.)

1668.  When medical personnel responded to Muhammad's cell to attempt to engage him before the deployment of chemical agents, such efforts proved unsuccessful to deescalate the situation and instead caused him to escalate and ram his head even more forcefully and rapidly into the cell front. (Ex. 4046; R.T. 11/09/21 p.m. at 1570:11-1574:17.)

1669.  The pepper ball system was used to stop Muhammad from immediate and serious self-harm on only one occasion, and only after the inmate had engaged in the same serious self-harm for nine days in a row.  (Ex. 4040, 1065, R.T. 11/09/21 p.m. at 1574:23-1575:13, 1575:14-1578:2.)

1670. Muhammad transferred from ASPC Eyman-Browning Unit to ASPC Florence-Kasson Unit (which provided a higher level of mental health care) in January 2021.  While at Kasson Unit, Muhammad was participating in the BMU program because of his behavioral challenges.  (R.T. 11/18/21 p.m. at 2861:152862:10.)

1671.  When he was first transferred from ASPC Eyman-Browning Unit to ASPC

Florence-Kasson Unit in January 2021, Muhammad was not engaging in self harm incidents. However, after a month or so, the self-harm incidents started back up. Centurion mental health staff participated in Warden VanWinkle's reviews of each use of force incident involving him. (R.T. 11/18/21 p.m. at 2856:21-2860:6; 2860:9-2861:8.)

1672. After an initial period of non-self-injurious behavior at ASPC Florence-Kasson Unit, Muhammad again started to repeatedly engage in self harm by aggressively walking from the back of his cell and ramming his forehead into the metal cell door over and over. (Ex. 1105, 4002; R.T. 11/18/21 a.m. at 2737:23-2738:23; 2741:4-8.)

1673. Because Muhammad continued to engage in frequent self-harm by continuously ramming his head into the metal cell door until staff deployed OC spray, in July 2021, Warden Van Winkle worked with mental health staff to move the inmate to ASPC Phoenix where he could receive a higher level of mental healthcare than what he could be provided as part of the BMU at Kasson. (R.T. 11/18/21 a.m. at 2743:8-17; 11/18/21 p.m. at 2856:21-2861:10.)

1674. ADCRR determined that using chemical agents on Muhammad to stop his aggressive self-harm efforts was appropriate under the circumstances and necessary to immediately stop him from engaging in self harm after verbal commands to do so proved unsuccessful. Under the circumstances presented by the inmate's aggressive conduct, use of chemical agents was the only reasonable option. (Ex. 1049-1066, 1085, 4022, 4024, 4026, 4030, 4032, 4034, 4036, 4038, 4040, 4044, 4048, 4054, 1065, 4002; R.T. 11/18/21 a.m. at 2738:20-2740:18; R.T. 11/18/21 p.m. at 2855:5-2857:18.)

1675. Muhammad's aggressive self-injurious behavior not only presented a risk of harm to himself but also a risk of harm to the officers that were required to quell the self-harming conduct, enter the cell, and restrain him (a large and strong individual). (Ex. 1049-1066, 1085, 4022, 4024, 4026, 4030, 4032, 4034, 4036, 4038, 4040, 4044, 4048, 4054, 1065, 4002; R.T. 11/18/21 p.m. at 2855:5-2856:5.)

1676. Mental health staff were not required to be called to try to gain compliance before officers deployed chemical agents to stop the self-harm because the spontaneous

nature of the incident required officers to immediately act to stop the self-harm and protect his health and safety.  (R.T. 11/18/21 p.m. at 2846:22-2847:20.)

1677.  Following the chemical agent use of force incidents, Muhammad was taken to the medical unit for evaluation and decontamination and allow mental health staff to speak with him.  (Ex. 1049-1066, 1085, 4022, 4024, 4026, 4030, 4032, 4034, 4036, 4038, 4040, 4044, 4048, 4054, 1065, 4002; R.T. 11/18/21 a.m. at 2738:20-2740:18; 2741:17-25.)

1678.  While Muhammad's conduct presented a risk that he could sustain a permanent head injury, his injuries did not require emergency care or hospitalization, as chemical agent use of force stopped the self-injurious behavior.  (R.T. 11/18/21 a.m. at 2740:25-2741:16; 2742:17-2743:7; R.T. 11/18/21 p.m. at 2848:11-17.)

**Inmate X**

1679.  Plaintiffs also presented video evidence at trial of a Kasson Unit inmate who would repeatedly and very forcefully kick his cell door with enough force as to move the lock on the cell door.  (Ex.4084, 4098; 4100, 4018, 4083, 4097, 4099, 4107; R.T. 11/18/21 a.m. at 2736:12-25.)

1680.  Warden VanWinkle testified that it was appropriate for correctional staff to use OC to stop the self-injurious behavior because the repeated kicking with bare feet on solid steel or concrete posed a substantial risk that the inmate would injure himself and break bones.  Officers have a duty to protect inmates from harming themselves and must use force to stop the threat of harm if orders to stop the conduct prove unsuccessful.  Officers cannot stand by and wait for an inmate to injure himself and break bones before taking action to stop the threat.  (R.T. 11/18/21 a.m. at 2736:12-2737:2.)

1681.  The uses of force concerning this inmate were found by ADCRR to be appropriate to stop him from continued self-harm and the risk of breaking an ankle or other bone.  Chemical agents were only deployed after he was given the opportunity to but failed to respond to officers' verbal orders to stop kicking the metal cell door.  Use of chemical agents was successful in stopping the self-harm behavior.  (Ex. 4084, 4098; 4100, 4018, 4083, 4097, 4099, 4107; R.T. 11/18/21 a.m. at 2735:18-2737:22.)

1682. Mental health staff were not required to be called to try to gain compliance from the inmate before officers deployed chemical agents to stop the self-harm because the spontaneous nature of the incident required officers to immediately act to stop the self-harm and protect his health and safety. (R.T. 11/18/21 p.m. at 2844:23-2846:19.)

1683. Because the inmate continued to engage in the self-injurious conduct, the inmate was transferred from Kasson Unit to a location that could provide him with a higher level of mental health care. (R.T. 11/18/21 p.m. at 2845:18-2846:7.)

1684. Defendants' use of force tactics are limited to narrow situations where, significant de-escalation efforts fail. There is not a practice of overuse of force or overuse of OC spray. Defendants' use of force policies and practices, including the use of OC spray, are constitutional and do not subject inmates to a substantial risk of serious harm.

1685. Plaintiffs' corrections expert, Horn, makes substantive criticisms regarding the use of chemical agents on Subclass members who take psychotropic medications but actual provision of recreation time for the Subclass but reviewed use of force videos for only 14 inmates and at trial focused on only two. Horn's methodology does not allow him to generalize his findings related study of less than 15 inmates (and focus on two) to the wider ADCRR Subclass population. Isolated instances of alleged excessive force on only two inmates for which Plaintiffs even admitted videos or use of force documents at trial are woefully insufficient to "show widespread actual injury" as required to prove a systemwide claim regarding conditions of confinement.

1686. Based on the evidence presented at trial, the Court concludes that Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of unconstitutionally utilizing chemical agents against inmates on psychotropic medications.

1687. Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of using force in bad faith, maliciously and sadistically, and without penological justification.

1688. Plaintiffs have not established that Defendants are deliberately indifferent to

the mental healthcare needs of the Subclass.

### d. Social Isolation

**Behavioral Step Program**

1689. ADCRR's DO 812 governs maximum custody management and, consistent with the prior Stipulation provisions regarding maximum custody out of cell time, provides a progressive step incentive system for maximum custody inmates that rewards pro-social behavior and offers increased privileges as maximum custody inmates work through three step levels. (Ex. 3013; R.T. 11/18/21 a.m. at 2750:6-16; R.T. 11/15/21 p.m. at 2101:1-13; R.T. 11/05/21 a.m. and p.m. at 1192:16-1193:15; R.T. 11/02/21 p.m. at 396:22-397:4.)

1690. The purpose of restrictive housing status within the maximum custody classification is to address management of inmates that commit serious assaults on staff, serious inmate on inmate assault(s) with a weapon, or multiple inmates assaulting an inmate with serious injury offenses ("Forbidden Three acts"). Enhanced management status housing is used to manage inmates who present exceptional security concerns, commit continued Forbidden Three violations, or the nature of their criminal offense committed prior to incarceration presents the highest of safety and security threats. (Ex. 3013 at ADCRR00216290-216293 (Sections 6.0, 7.0).)

1691. In early November 2021, ASPC Eyman-Browning Unit, which houses enhanced management and restrictive housing status inmates, had only 30 enhanced management inmates and 11 restrictive housing status inmates. (R.T. 11/05/21 a.m. and p.m. at 1151:1-7.)

1692. Step level progression carries with it increased privileges (property, visitation, telephone calls, etc.) and recreation, programming, and out-of-cell opportunities. (Ex. 3013 at ADCRR00216296-216307 (Attachments B-I); R.T. 11/18/21 a.m. at 2750:6-16; R.T. 11/15/21 p.m. at 2101:1-13; R.T. 11/05/21 a.m. and p.m. at 1147:9-1150:22.)

**Recreation and Programming**

**Maximum Custody Inmates**

1693. After this case settled in 2014, ADCRR made substantial physical plant

1  improvements to facilitate increased recreation opportunities for maximum custody

2  inmates. Additional outdoor recreation facilities were built at all maximum custody

3  locations. (R.T. 11/17/21 p.m. at 2667:18-24.)

4  1694. At ASPC Eyman-SMU-I, numerous outdoor 10x10 enclosures were added,

5  as well as two 20x40 outdoor recreation enclosures. Tables were added to housing pods to

6  facilitate out of cell "table time" for maximum custody SMI inmates, and classrooms were

7  added to the maximum custody units for out of cell group programming. (Ex. 4902 at

8  ADCRR00232528, ADCRR00232530, ADCRR00232532, ADCRR00232533,

9  ADCRR00232539, ADCRR00232541, ADCRR00232542 and ADCRR002325547; R.T.

10  11/17/21 p.m. at 2667:25-2668:11; R.T. 11/18/21 a.m. at 2696:18-2697:8; R.T. 11/18/21

11  p.m. at 2868:7-2869:8.)

12  1695. In addition to outdoor chute recreation enclosures, ASPC Eyman-Browning

13  provides 10x10 outdoor enclosures, 20x40 enclosures, and a 50x90 enclosure. The 20x40

14  enclosure has a basketball hoop for basketball games, and the 50x90 provides an exercise

15  par course for pull-ups, abdominal workouts, etc., a basketball hoop, and a ramada with

16  table for socializing. Step Level 3 inmates are eligible for 50x90 recreation in groups of 32

17  inmates per designated frequency set forth in DO 812. (R.T. 11/05/21 a.m. and p.m. at

18  1158:3-25.)

19  1696. The 10x10 outdoor recreation enclosures allow inmates to socialize with

20  others, as the enclosures are situated in lines next to and across from one another, allowing

21  inmates to see and talk to others. (Ex. 4902 at ADCRR002325547; Ex. 4904 at

22  ADCRR00232559, ADCRR00232569; R.T. 11/18/21 p.m. at 2868:7-2869:16.)

23  1697. The 10x10 and larger outdoor recreation enclosures provide shade coverings,

24  misting systems, and water for recreating inmates. The larger outdoor recreation enclosures

25  also provide recreation equipment, such as basketball hoops, pull up bars, sit-up equipment,

26  and tables. (Ex. 4904 at ADCRR00232558, ADCRR00232559, ADCRR00232569; R.T.

27  11/18/21 p.m. at 2869:17-23; 2871:12-23; R.T. 11/05/21 a.m. and p.m. at 1159:11-1160:8.)

28  1698. Existing "chute" recreation facilities are outdoor recreation enclosures

attached to the housing unit buildings. A door opens from the housing pod to the outdoor enclosure that has cement walls but is open to the sky. (Ex. 4901 at ADCRR00232486, ADCRR00232487, ADCRR00232488; 4902 at ADCRR00232530; 4904 at ADCRR00232564; R.T. 11/05/21 a.m. and p.m. at 1157:20-24.)

1699. Programming classrooms are outfitted with special desks providing for a classroom atmosphere while allowing restraint of the inmates to the desks for safety and security reasons. (Ex. 4902 at ADCRR00232541, ADCRR00232542; 4904 at ADCRR00232560, ADCRR00232561, ADCRR00232568; 4905 at ADCRR00232573, ADCRR00232574; R.T. 11/17/21 p.m. at 2680:15-25; R.T. 11/18/21 a.m. at 2696:1-13.)

1700. When maximum custody inmates were moved to ASPC Florence-Kasson Unit, 10x10 outdoor recreation enclosures were built, as well as two 20x40 outdoor recreation enclosures. In September 2021, the maximum custody SMI inmates at Kasson Unit that were participating in the residential mental health program were moved to ASPC Tucson-Rincon Unit. The maximum custody SMI inmates participating in Kasson's BMU program were moved to ASPC Eyman-Browning Unit. These population moves were part of the deactivation of the Florence prison complex. (Ex. 4905 at ADCRR00232575, ADCRR00232579, ADCRR00232583; R.T. 11/17/21 p.m. at 2668:20-2669:7:18-25.)

1701. Correctional and Centurion mental health staff previously assigned to the Kasson Unit deployed to the ASPC Eyman-Browning Unit. (R.T. 11/17/21 p.m. at 2670:1-14.)

1702. Two hundred maximum custody inmates previously housed at the Kasson Unit are now housed at either the ASPC Eyman-Browning Unit or ASPC Tucson-Rincon Unit. (R.T. 11/17/21 p.m. at 2671:13-2672:3.)

1703. Under DO 812, maximum custody inmates at ASPC Lewis-Rast Max and ASPC Eyman-Browning and SMU I are offered at least 7.5 hours of outdoor recreation per week (in three 2.5-hour blocks in varying enclosure size locations per Step Level/location). (Ex. 3013 at ADCRR00216295-216304 (Attachments B-F); R.T. 11/17/21 p.m. at 2674:20-2675:18; R.T. 11/02/21 p.m. at 407:24-414:14.)

1704. Maximum custody inmates at ASPC Florence-Kasson Unit (now at ASPC Tucson-Rincon Unit) are offered at least 9 hours of outdoor recreation per week (in varying enclosure size locations per Step Level). (Ex. 3013 at ADCRR00216301-216302 (Attachment E; R.T. 11/17/21 p.m. at 2674:20-2675:18.)

1705. Maximum custody inmates are provided programming commensurate with their Step Level. Step Level 1 inmates do their programming in their cells. Step Level 2 and 3 maximum custody inmates are offered one hour of out of cell group programming per week taught by a COIII. (Ex. 3604; R.T. 11/17/21 p.m. at 2676:19-2677:11; R.T. 11/05/21 a.m. and p.m. at 1193:2-15; R.T. 11/05/21 a.m. and p.m. at 1164:12-1165:21.)

1706. Programs that are conducted by COIIIs include, but are not limited to, Self-Control, Responsible Thinking, Socialization, Merging Two Worlds, Core Skills, Feelings, Changing Offender Behavior, Substance Abuse, Social Values, and Money Management. (Ex. 3013 at ADCRR216305-216306 (Attachments G, H); R.T. 11/02/21 p.m. at 414:15-19; R.T. 11/05/21 a.m. and p.m. at 1164:12-1165:21.)

1707. SMI maximum inmates are afforded the opportunity for increased programming and unstructured out of cell time (2 SMI out of cell group programs taught by Centurion mental health personnel and regular COIII programming offered per step level), as well as 10 additional hours of unstructured out of cell time. (Ex. 3604; R.T. 11/17/21 p.m. at 2674:20-2675:18, 2679:3-2680:3; R.T. 11/05/21 a.m. and p.m. at 1193:2-15; R.T. 11/05/21 a.m. and p.m. at 1164:12-1165:21.)

1708. Table time for SMI inmates (at least 10 hours a week of unstructured time offered) allows SMI inmates to leave their cells and participate in various activities at a table in the dayroom area of a housing pod or in a classroom. During table time, the inmates can visit with other inmates also out of cell for table time, watch television, do classroom work, play games, work on crafts, etc. (R.T. 11/17/21 p.m. at 2679:3-2680:3; 2679:3-23.)

1709. Restraint during table time is dependent on Step Level. Step Level 1 inmates are restrained to the dayroom table with leg restraints and one wrist restraint leaving the other hand free. Step Level 2 inmates are restrained by leg restraint only (both hands free).

Step Level 3 inmates are not restrained at all while participating in table time.  (R.T. 11/17/21 p.m. at 2680:4-14.)

1710.   Considering weekly offerings of outdoor recreation, out of cell programming, and additional programs, as well as 10 hours of table time offered to SMI inmates, maximum custody inmates are offered at a minimum between 7.5 and 22+ hours of out of cell time per week depending on Step Level and SMI status.  (R.T. 11/17/21 p.m. at 2679:3-23.)

1711.   While DO 812 prescribes a minimum recreation time offered per week of 7.5 hours (unless justified cancellations occur), maximum custody inmates are generally offered greater recreation opportunities than the prescribed minimum as reflected in the monthly Maximum Custody Notebooks at Tabs 6 and 7.  For example, at ASPC Eyman-Browning Unit and ASPC Lewis-Rast Max Unit, approximately 9 hours of recreation are offered per week; at ASPC Eyman-SMU I, approximately 10 hours are offered per week; and at ASPC Florence-Kasson, approximately 10.5 hours were offered per week.  Further, all maximum custody locations offer Step 2 and 3 inmates a minimum hour out of cell time per week for programming or education classes.  (R.T. 11/17/21 p.m. at 2679:3-23; R.T. 11/05/21 a.m. and p.m. at 1132:6-1139:21; R.T. 11/05/21 a.m. and p.m. at 1156:15-1157:19; *see also* Maximum Custody Notebooks admitted at trial at Tabs 6 and 7 for Out of Cell Tracking Forms (hereinafter referred to in bulk as "Maximum Custody Notebook Exhibits at Tabs 6 and 7") at Ex. 3602 (ADCRR00214421-ADCRR00214693), 3604 (ADCRR00214742-ADCRR00214998), 3606 (ADCRR00215056-ADCRR00215345), 3608 (ADCRR00215418-ADCRR00215687), 1681 (ADCRR00211311-ADCRR00211554), 1682 (ADCRR00211615-ADCRR00211941), 1683 (ADCRR00211984-ADCRR00212318), 1684 (ADCRR00212402-ADCRR00212707), 1685 (ADCRR00212795-ADCRR00213038), 1686 (ADCRR00213091-ADCRR00213320), 1687 (ADCRR00213379-ADCRR00213679), 1688 (ADCRR00214007-ADCRR00214320), 2265 (ADCM1568982-ADCM1569176), 2266 (ADCM1569231-ADCM1569413), 2267 (ADCM1569501-ADCM1569705), 2268

| 1 | (ADCM1569762-ADCM1570011), | 2269 | (ADCM1574037-ADCM1574234), | 2270 |
| 2 | (ADCM1574294-ADCM1574456), | 2271 | (ADCM1574530-ADCM1574722), | 2272 |
| 3 | (ADCM1574780-ADCM1575033), | 2273 | (ADCM1576024-ADCM1576221), | 2274 |
| 4 | (ADCM1576272-ADCM1576463), | 2275 | (ADCM1576511-ADCM1576768), | 2276 |
| 5 | (ADCM1576858-ADCM1577070), | 2277 | (ADCM1578454-ADCM1578644), | 2278 |
| 6 | (ADCM1578698-ADCM1578809), | 2279 | (ADCM1578842-ADCM1579097), | 2280 |
| 7 | (ADCM1579191-ADCM1579410), | 2281 | (ADCM1582381-ADCM1582562), | 2282 |
| 8 | (ADCM1582613-ADCM1582758), | 2283 | (ADCM1582793-ADCM1583054), | 2284 |
| 9 | (ADCM1583260-ADCM1583452), | 2285 | (ADCM1585951-ADCM1586138    ), | 2286 |
| 10 | (ADCM1586199-ADCM1586342), | 2287 | (ADCM1586377-ADCM1586640), | 2288 |
| 11 | (ADCM1586882-ADCM1587110), | 2289 | (ADCM1592117-ADCM1592348), | 2290 |
| 12 | (ADCM1592426-ADCM1592546), | 2291 | (ADCM1592582-ADCM1592844), | 2292 |
| 13 | (ADCM1593105-ADCM1593350), | 2293 | (ADCM1600263-ADCM1600488), | 2294 |
| 14 | (ADCM1600544-ADCM1600687), | 2295 | (ADCM1600749-ADCM1601015), | 2296 |
| 15 | (ADCM1608043-ADCM1608292), | 2297 | (ADCM1611203-ADCM1611422), | 2298 |
| 16 | (ADCM1611590-ADCM1611752), | 2299 | (ADCM1611789-ADCM1612052), | 2300 |
| 17 | (ADCM1612178-ADCM1612415), | 2301 | (ADCM1612488-ADCM1612748), | 2302 |
| 18 | (ADCM1612826-ADCM1613018), | 2303 | (ADCM1613086-ADCM1613349), | 2304 |
| 19 | (ADCM1613454-ADCM1613702), | 2305 | (ADCM1616238-ADCM1616506), | 2306 |
| 20 | (ADCM1616565-ADCM1616765), | 2307 | (ADCM1617061-ADCM1616928), | 2308 |
| 21 | (ADCM1617375-ADCM1617622), | 2309 | (ADCM1619416-ADCM1619828), | 2310 |
| 22 | (ADCM1619869-ADCM1620041), | 2311 | (ADCM1620090-ADCM1620411), | 2312 |
| 23 | (ADCM1638293-ADCM1638546), | 2313 | (ADCM1652788-ADCM1653123), | 2314 |
| 24 | (ADCM1637023-ADCM1637186), | 2315 | (ADCM1637784-ADCM1638042), | 2316 |
| 25 | (ADCM1637250-ADCM1637551), | 2317 | (ADCM1653197-ADCM1653525), | 2318 |
| 26 | (ADCM1653586-ADCM1653764), | 2319 | (ADCM1654128-ADCM1654419), | 2320 |
| 27 | (ADCM1653790-ADCM1654087), | 2321 | (ADCM1654469-ADCM1654826), | 2322 |
| 28 | (ADCM1654883-ADCM1655083), | 2323 | (ADCM1655112-ADCM1655415), | 2324 |

| | |
|---|---|
| 1 | (ADCM1655551-ADCM1655837), 2325 (ADCM1660230-ADCM1660560), 2326 |
| 2 | (ADCM1660639-ADCM1660822), 2327 (ADCM1660865-ADCM1661158), 2328 |
| 3 | (ADCM1661499-ADCM1661780), 2329 (ADCM1661886-ADCM1662275), 2330 |
| 4 | (ADCM1662351-ADCM1662564), 2331 (ADCM1662592-ADCM1662894), 2332 |
| 5 | (ADCM1663216-ADCM1663507), 2333 (ADCM1663605-ADCM1663867), 2334 |
| 6 | (ADCM1663967-ADCM1664250), 2335 (ADCM1664304-ADCM1664592), 2336 |
| 7 | (ADCM1664800-ADCM1665111), 2337 (ADCM1665175-ADCM1665435), 2338 |
| 8 | (ADCM1665497-ADCM1665772**),** 2339 (ADCM1665819-ADCM1666103), 2340 |
| 9 | (ADCM1666291-ADCM1666588), 2341 (ADCM1666763-ADCM1667000), 2342 |
| 10 | (ADCM1667060-ADCM1667344), 2343 (ADCM1667375-ADCM1667673), 2344 |
| 11 | (ADCM1667823-ADCM1668141), 2345 (ADCRRM0003428-ADCRRM0003664), 2346 |
| 12 | (ADCRRM0022152-ADCRRM0022481), 2347 (ADCRRM0003693-ADCRRM0003982), |
| 13 | 2348 (ADCRRM0004254-ADCRRM0004576), 2349 (ADCRRM0028251- |
| 14 | ADCRRM0028476), 2350 (ADCRRM0028522-ADCRRM0028843), 2351 |
| 15 | (ADCRRM0028893-ADCRRM0029200), 2352 (ADCRRM0029258-ADCRRM0029576), |
| 16 | 2353 (ADCRRM0007971-ADCRRM0008203), 2354 (ADCRRM0008247- |
| 17 | ADCRRM0008522), 2355 (ADCRRM0008556-ADCRRM0008843), 2356 |
| 18 | (ADCRRM0009000-ADCRRM0009306), 2357 (ADCRRM0029774-ADCRRM0030003), |
| 19 | 2358 (ADCRRM0030058-ADCRRM0030322), 2359 (ADCRRM0030372- |
| 20 | ADCRRM0030662), 2360 (ADCRRM0030840-ADCRRM0031162), 2361 |
| 21 | (ADCRRM0031266-ADCRRM0031496), 2362 (ADCRRM0031568-ADCRRM0031846), |
| 22 | 2363 (ADCRRM0032201-ADCRRM0032518), 2364 (ADCRRM0031890- |
| 23 | ADCRRM0032176), 2365 (ADCRRM0032632-ADCRRM0032865), 2366 |
| 24 | (ADCRRM0032931-ADCRRM0033213), 2367 (ADCRRM0033729-ADCRRM0034025), |
| 25 | 2368 (ADCRRM0033313-ADCRRM0033627), 2369 (ADCRR00066141- |
| 26 | ADCRR00066368), 2370 (ADCRR00066415-ADCRR00066696), 2371 |
| 27 | (ADCRR00066785-ADCRR00067077), 2372 (ADCRR00067145-ADCRR00067453), |
| 28 | 2373 (ADCRR00067515-ADCRR00067759), 2374 (ADCRR00067803- |

ADCRR00068082), 2375 (ADCRR00068115-ADCRR00068437), 2377 (ADCRR00068576-ADCRR00068848), 2378 (ADCRR00068946-ADCRR00069279), 2379 (ADCRR00069350-ADCRRM0069670).)

1712. As also reflected in the monthly Maximum Custody Notebooks at tab 7, while SMI inmates are offered at least 10 hours of out of cell time for unstructured ("table time"), therapy, or psycho educational activities per week (unless justified cancellations occur), the maximum custody locations generally offer greater numbers of hours for these activities. For example, at ASPC Eyman-Browning Unit, SMI inmates are offered between 12 and 16 hours for these activities; at ASPC Eyman-SMU I, between 12 and 24 hours are offered; at ASPC Lewis-Rast Max Unit, between 12 and 24 hours are offered; and at ASPC Florence-Kasson Unit, between 12 and 20 hours are offered. (See Citation at paragraph 1721 for Maximum Custody Notebook Exhibits at Tabs 6 and 7; R.T. 11/17/21 p.m. at 2679:3-23; R.T. 11/05/21 a.m. and p.m. at 1132:6-1142:8.)

1713. All offered out of cell time for maximum custody inmates is documented on weekly individual out of cell tracking forms. (Ex. 3604; R.T. 11/17/21 p.m. at 2681:1-12; R.T. 11/05/21 a.m. and p.m. at 1195:18-1196:1; R.T. 11/02/21 p.m. at 397:11-13.)

1714. Offered out of cell time is audited monthly with 10 inmates randomly selected from each maximum custody location as well as an additional 10 SMI inmates also randomly selected from each housing location (for a total of 20 monitored each month at each maximum custody location). The monthly monitoring data underwent three levels of review to determine compliance before monthly compliance data was reported to Plaintiffs and the Court during the Stipulation. Each maximum custody location's monthly Max Custody Notebooks contained several hundreds of pages of supporting documentation, and the wardens of the maximum custody units completed the final review and reported compliance scores. (Ex. 3028 at ADCM1036849-51 at Methodology (a, b); R.T. 11/17/21 p.m. at 2679:3-23; R.T. 11/17/21 p.m. at 2682:1-2686:12; R.T. 11/15/21 p.m. at 2031:7-2035:10, 2079:18-2081:15; R.T. 11/05/21 a.m. and p.m. at 1132:6-1142:8; R.T. 11/05/21 a.m. and p.m. at 1172:10-1174:7.)

1715. Three showers a week are also offered but do not count as minimally offered out of cell time. (Ex. 3604 at Tabs 6, 7; R.T. 11/05/21 a.m. and p.m. at 1195:15-1196:1.)

1716. Visitation and telephone calls are also not counted towards the audit of weekly offered out of cell time. The same goes for healthcare appointments, classification hearings, and job assignments. (Ex.3604; R.T. 11/17/21 p.m. at 2677:13-2678:14; R.T. 11/05/21 a.m. and p.m. at 1195:15-1196:1.)

1717. Cancellations of activities due to legitimate reasons, such as staffing challenges on a particular day, emergency lockdowns, or in the last two years – COVID-19 – count towards compliance where the cancellation was justified, and the cancellation was documented not only on the out of cell tracking forms but also in Information Reports contained in the monthly Max Custody Notebooks. (Ex. 3028 at 9-10; R.T. 11/17/21 p.m. at 2687:1-2689:10; R.T. 11/15/21 p.m. at 2033:1-2038:9, 2079:18-2081:15; R.T. 11/18/21 p.m. at 2873:12-2875:25.)

1718. While ample out of cell time is offered to maximum custody inmates weekly, it is not unusual for inmates to refuse offers for out of cell time based upon a myriad of personal preference reasons. Refusals of out of cell time are tracked on the inmates' individual out of cell tracking forms by noting an "R" to reflect a refusal of time. Further explanation regarding the amount of time refused is documented on the back of the out of cell tracking form. Furthermore, supervisors are tasked with reviewing weekly refusals and following up with inmates who exhibit an unusual pattern of refusals to determine the reason for the refusals. The counseling sessions regarding refusals are documented on the back of the out of cell tracking forms. Starting in mid-2021, supervisors also track counseling sessions regarding patterns of refusal on a separate tracker. This allows supervisors to track unusual rates of refusal and determine why an inmate may be refusing out of cell time so that any issues impeding the same may be addressed. (Ex. 3604 at 191-92; 3606 at 20, 30; R.T. 11/18/21 a.m. at 2697:18-2705:6.)

1719. COVID-19 affected opportunities for out of cell time, resulting in cancellations. In accordance with CDC Guidelines, activities such as group programming

classes and recreation beyond individual recreation (chute recreation or 10x10s) had to be curtailed to mitigate the spread of the disease and afford for social distancing. At times, recreation was curtailed when staffing challenges dictated the same while still attempting to make up recreation on other days. Where feasible, recreation was not necessarily cancelled in all housing locations but would proceed on a more limited availability in one location. Efforts were made to "round robin" recreation curtailment so that if recreation had to be curtailed, it was not repeatedly cancelled in the same area. Visitation was stopped but inmates were able to still make phone calls or do video visits on their tablets. When prioritizing cancellation of activities, all efforts are made to run medical lines. (R.T. 11/18/21 a.m. at 2707:22-2711:14; R.T. 11/18/21 a.m. at 2755:12-20; 2756:8-2757:11; 2800:21-2802:13; R.T. 11/18/21 p.m. at 2873:12-2876:223:12; R.T. 11/05/21 a.m. and p.m. at 1166:8-1167:19, 1169:19-1172:9.)

1720. Significantly, when mental health groups could not be held due to COVID-19 concerns, inmates were provided with in-cell workbooks and packets which subsequently discussed with a mental health provider during their next encounter. Such self-guided packets ranged in topic area and instructed inmates on suggested approaches to dealing with a variety of situations. (Dkt. 4174, ¶ 169.)

1721. Group programming for maximum custody inmates resumed in late summer 2021. Even during the challenging times of COVID-19 in which group programming classes were cancelled, recreation was still provided weekly in either chute recreation or the individual 10x10 enclosures subject to some cancellations for legitimate operational reasons. Use of large recreation enclosures was due to COVID-19 restrictions and exposure mitigation efforts. (Ex. 3602, 3604, 3606, 3608; R.T. 11/18/21 a.m. at 2787:23-2795:22; 2797:4-2800:19; 2802:15-2803:18; R.T. 11/03/21 p.m. at 686:21-687:14; R.T. 11/05/21 a.m. and p.m. at 1164:12-1165:21.)

1722. During the COVID-19 pandemic, staff call-ins created additional staffing challenges because staff call-ins encompassed not only staff who had tested positive for (and were recovering from) COVID, but also call-ins due to COVID exposures, suspected

COVID symptoms, the need to care for others who had COVID, and normal absences. These absences affected entire prison complexes, thus having a ripple effect on staffing in maximum custody housing locations. (R.T. 11/18/21 p.m. at 2871:24-2873:11.)

### Close Management Status Inmates

1723. DO 813 governs close management status placement. (Ex. 1319.)

1724. Privileges in close management are dependent on an inmate's phase within close management (there are three phases). At all phases, close management inmates are offered six hours of outdoor recreation a week. (Ex. 1319 at Attachment A.)

1725. Close management inmates are also offered both self-study and small classroom opportunities for programming, including Self-Control, Responsible Thinking, Core Skills, Money Management, Thinking for a Change, Feelings, Substance Abuse, Social Values, and Merging Two Worlds. (Ex. 1319 at Attachment B.)

### Detention Units

1726. DO 804 governs detention units which separates inmates from the general population to maintain the safe, secure, and orderly operation of a prison complex while safeguarding the safety, health, and welfare of the inmates. (Ex. 3006 at ADCRR00098848 at "Purpose"; R.T. 11/15/21 p.m. at 2038:17-2039:10.)

1727. Complex Wardens and Deputy Wardens may place inmates on detention status to ensure safety/security/orderly operations; ensure the integrity of a pending or ongoing investigation; while determining eligibility for protective custody; for observation status for inmate self-harm concerns; pending classification review and placement, such as pending transfer to a higher custody level; pending revocation of parole/work furlough/home arrest/pending release; and/or to fulfill disciplinary sanctions. (Ex. 3006 at ADCRR00098849 (Section 1.1); R.T. 11/05/21 a.m. and p.m. 1186:1-1188:4; R.T. 11/15/21 p.m. at 2038:17-2041:19.)

1728. While detention status is designed to be temporary, there may be occasions where a particular inmate remains in detention for a more extended period of time. (R.T. 11/15/21 p.m. at 2070:8-12.)

1729. Detention inmates are offered three showers per week and 6 hours a week of outdoor recreation (three 2-hour blocks). (Ex. 3006/1312 at ADCRR0009885 (Section 1.2.6).)

### Mental Health Watch

1730. ADCRR's DO 807 governs inmates placed on mental health watch status. Inmates are not placed on mental health watches for disciplinary sanction reasons or to address behavior unrelated to mental health issues. (Ex. 1315 generally; 1315 at 9 (Section 7.1.); R.T. 11/03/21 p.m. at 683:2-.)

1731. Mental health clinicians dictate the conditions of confinement for watch inmates to protect the inmate's welfare and safety and may restrict an inmate's activities to include recreation and showers. Correctional personnel must follow the mental health watch orders. (Ex. 1315 at 9-13 (Section 7.0, 8.0, 10.0); R.T. 11/03/21 p.m. at 683:2-685:24.)

1732. ADCRR's efforts to provide ample recreation and programming opportunities to maximum custody and close management inmates that exceeds the constitutional minimums of two to five hours of recreation per week shows that Defendants do not deny the Subclass basic human needs.

1733. Plaintiffs' expert, Horn makes substantive criticisms regarding the actual provision of recreation and programming time for the Subclass but interviewed only 60 non-randomly selected inmates at two prison complexes (ASPC Eyman and ASPC Lewis), reviewed only 12-14 inmate institutional files, and reviewed "a few" maximum custody out of cell tracking forms. Horn's methodology does not allow him to generalize his findings related to these 60 inmate reports to the wider ADCRR Subclass population.

1734. Plaintiffs' identification of alleged isolated instances of denial of recreation opportunities not supported by legitimate penological reasons for restrictions or cancellations are not sufficient to show widespread actual injury as required to prove a systemwide claim.

1735. Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of providing the Subclass with less than

two to five hours of recreation per week.

**Visitation, Telephone Calls, and Tablets**

1736.  Maximum custody inmates are offered the opportunity to communicate with friends and family through mail, telephone calls, and visitation.  Depending on Step Level, maximum custody inmates are offered telephone calls and visitation as follows:

| Item | Step 1 | Step 2 | Step 3 |
|------|--------|--------|--------|
| Phone | 1 per week/15 minutes | 2 per week/15 minutes | 3 per week/15 minutes |
| Visits | 1, 2-hour non-contact visit per week<br><br>(*upon approval of Program Team at Kasson) | 2, 2-hour non-contact visits per week (Browning, SMU I, Rast)<br><br>1, 3-hour contact visit per week with approval of Program Team (Kasson) | 3, 2-hour non-contact visits per week (Browning & SMU I)<br><br>1, 4-hour contact visit per week (Rast)<br><br>1, 4-hour contact visit block with approval of Program Team (Kasson) |

(Ex. 3013 at ADCRR00216295, 216297, 216301 (Attachment B, C, E).)

1737.  Maximum custody inmates assigned to the restrictive housing program are offered one phone call per week for 15 minutes at Step Level 3 only.  Step Level 2 inmates are offered one, two-hour non-contact visit per month.  Step Level 3 inmates are offered two, two-hour non-contact visits per month.  (Ex. 3013 at ADCRR00216299 (Attachment D).)

1738.  Maximum custody inmates assigned to enhanced management are offered one phone call per week for 15 minutes at all three Step Levels.  Enhanced Management inmates are also offered one, two-hour non-contact visit per week at all three Step Levels.  (Ex. 3013 at ADCRR00216303 (Attachment F).)

1739.  Maximum custody inmates are also issued tablets (except for those in

restrictive housing or enhanced security), which offer email with video/photo gram messages (there is charge for this service of approximately $0.25 by the tablet provider, not ADCRR); Ecards; secure communications with prison staff; video visitation; inmate banking; magazines, books, movies, music, and games; religious materials; educational content; legal resources; job preparation applications; and radio.  (Ex. 1308 at 1-6 (Section 1.0, 2.0-6.0); R.T. 11/15/21 p.m. at 1194:1-1195:10, 2085:8-22, 2086:21-2087:4.)

1740.  Moreover, Subclass cells provide inmates the opportunity to see and speak to other inmates, correctional personnel who regularly walk the pods/feeding/escorting/performing security checks, medical/mental health personnel making rounds and distributing medications, and programming personnel through a vision panel in the door or cell wall. (R.T. 11/18/21 a.m. at 2705:7-2707:12; R.T. 11/18/21 p.m. at 2839:17-2840:25; 2867:13-2868:11.)

1741.  Close management status inmates receive telephone calls and visitation as follows:

| Item | Phase 1 | Phase 2 | Phase 3 |
|------|---------|---------|---------|
| Phone | 1 per month/10 minutes | 3 per month/10 minutes | 1 per week/ 10 minutes |
| Visits | 1, 2-hour non-contact visit per month | 2, 2-hour non-contact visits per month | 3, 2-hour non-contact visits per month |

(Ex. 1319 at Attachment A.)

1742.  Inmates on detention status may make one telephone call per week (for 10 minutes), except when precluded by disciplinary sanctions.  (Ex. 3006/1312 at ADCRR00039951 (Section 1.2.14); DO 900, Attachment A at https://corrections.az.gov/sites/default/files/policies/900/0915_073021.pdf., last visited 1/25/2022.)

1743.  Non-contact visits are also available for detention status inmates as directed

by the Warden or Deputy Warden, except when precluded by disciplinary sanctions and/or watch orders.  (Ex. 3006/1312 at ADCRR00098851 (Section 1.2).)

1744.  Unless contraindicated as determined by licensed mental health personnel, mental health watch inmates may participate in visitation and telephone calls.  (Ex. 1315 at 10 (Section 7.6, 7.7).)

1745.  Haney criticizes the actual provision of socialization opportunities for the Subclass but interviewed only 75 non-randomly selected inmates at two prison complexes (ASPC Eyman and ASPC Lewis).  But his methodology does not allow him to generalize his findings related to these 75 inmate reports to the wider ADCRR Subclass population. These alleged isolated instances of denial of social opportunities are not sufficient to "show widespread actual injury" as required to prove a systemwide claim regarding conditions of confinement.

1746.  ADCRR's efforts to provide ample recreation, programming, visitation, telephone contact, and access to tablets that offer Ecards; secure communications with prison staff; video visitation; inmate banking inquiry; magazines, books, movies, music, and games; religious materials; educational content; legal resources; job preparation applications; and radio, shows that Defendants do not deny the Subclass the opportunity for socialization.

1747.  Based on the evidence presented at trial, the Court concludes that Defendants' segregation and recreation policies and practices do not violate the Eighth Amendment.

1748.  Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of subjecting Subclass inmates to extreme social isolation.

1749.  Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of providing unconstitutional levels of recreation.

1750.  Plaintiffs have not established by a preponderance of the evidence that Defendants' segregation and recreation policies and practices expose Subclass inmates to a

substantial risk of harm.

1751. Plaintiffs have not established by a preponderance of the evidence that Defendants are deliberately indifferent to a substantial risk of harm to Subclass inmates.

### e.    Cell Illumination

1752. Maximum custody, detention, and mental health watch cells are illuminated in some manner during sleeping hours for legitimate safety and security reasons, which is common and accepted practice in the corrections industry. Correctional personnel must be able to visually observe the welfare of inmates 24 hours a day as safety/security/welfare checks and inmate counts are performed. (R.T. 11/04/21 p.m. at 882:7-884:8.)

1753. Plaintiffs have not offered any evidence whatsoever of the wattage (or frequency) of the lighting for any cells where the Subclass is housed.

1754. Based on the evidence presented at trial, the Court concludes that Defendants' cell illumination policies and practices do not violate the Eighth Amendment.

1755. Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of subjecting Subclass inmates to unconstitutional levels of cell lighting.

1756. Plaintiffs have not established by a preponderance of the evidence that Defendants' cell illumination policies and practices expose Subclass inmates to a substantial risk of serious harm.

1757. Plaintiffs have not established by a preponderance of the evidence that Defendants are deliberately indifferent to a substantial risk of harm to Subclass inmates.

### f.    Property

1758. As a general matter, ADCRR inmates are permitted to possess religious property as approved by ADCRR and consistent with the practices of an inmate's chosen religion (except where restricted by watch status). (Ex. 3018 at ADCRR00216370 (Section 2.6); 1315 at 10-13 (Sections 7.6, 7.7, 8.0).)

1759. ADCRR inmates are issued and may possess a tablet, except for inmates under watch status, who have demonstrated destructive behavior involving a tablet/kiosk in

the last year, or detention status inmates pending transfer to close management, restrictive housing, or enhanced security. (Ex. 1308 at 1 (Section 1.1).)

1760. The tablets offer the following systems: email with video/photo messages; Ecards; communications module (secure communications with prison staff); video visitation; inmate banking inquiry; magazines, books, movies, music, and games; religious materials; educational content; legal resources; job preparation applications; and radio. (Ex. 1308 at 2-6 (Sections 2.0-6.0).)

1761. The total value of an inmate's personal property may not exceed $800.00, excluding authorized specialized personal medical property. (Ex. 3018 at ADCRR00216371 (Section 2.8).)

1762. Maximum custody inmates at the following locations are permitted store purchases per Step Level, as well as allowable personal property.

1763. Browning, SMU I, and Rast Max:

| Step Level 1 | Step Level 2 | Step Level 3 |
|---|---|---|
| $60/week - $80/Holiday | $80/week - $120/Holiday | $100/week - $160/Holiday |

Loaner televisions are issued upon availability to indigent inmates with an emphasis on delivery of programming content. (Ex. 3013 at ADCRR00216295, 00216297.)

1764. Kasson Mental Health Unit (now at Rincon Unit):

| Step Level 1 | Step Level 2 | Step Level 3 |
|---|---|---|
| $60/week – $80/Holiday Limited items specialized mental health store list with Program team authorization. | $80/week - $120/Holiday Limited items specialized mental health store list with Program team authorization. | $100/week - $160 Holiday Limited items specialized mental health store list with Program team authorization. |

Loaner televisions may be provided for inmates without one upon approval of the mental health treatment team. (Ex. 3013 at ADCRR00216301.)

1765. Browning Unit – Enhanced Management:

| Step Level 1 | Step Level 2 | Step Level 3 |
|---|---|---|
| $10/week – hygiene and stationery only | $15/week ($10/hygiene, $5/limited store menu) | $10/week ($10/hygiene, $10/limited store menu) |

(Ex. 3013 at ADCRR00216299.)

1766. Browning Unit – Restricted Status Housing Program:

| Step Level 1 | Step Level 2 | Step Level 3 |
|---|---|---|
| Allowable personal property:<br>• 1 box legal material<br>• Religious material consistent with detention placement<br>• 1 each hygiene items (shampoo, soap, etc.)<br>• 1 book<br>• 2 jumpsuits<br>• 2 t-shirts<br>• 2 pair socks<br>• Deck/shower shoes<br>• 1 towel and washcloth<br><br>*Loaner televisions as determined by the Restrictive Status Housing Committee. | Same as Step 1 | As determined by Restrictive Status Housing Program Committee.<br><br>*Loaner televisions as determined by the Committee. |

(Ex. 3013 at ADCRR00216300.)

1767. Close Management Status:

| Phase 1 | Phase 2 | Phase 3 |
|---|---|---|
| $20/week | $25/week | $30/week |

(Ex. 1319 at 9, Attachment A.)

1768. ADCR Department Order (DO 909) at Attachment A provides the lengthy 16-page store/property list, designated by classification categories, from which inmates may purchase store items (including quantity allowance). (Ex. 3018 at ADCRR00216389-216403.)

1769. Detention status inmates are permitted access to legal materials, hygiene and toiletry items, clothing, bedding and linen, and reading material, unless restricted by disciplinary sanctions. They are also permitted their regular store purchase privileges per their custody level unless precluded by disciplinary sanctions. (Ex. 3006/1312 at ADCRR00098849-98850 (Section 1.2); Ex. 3018 at ADCRR00216389-216403.)

1770. For safety and security reasons, inmates on mental health watch status are afforded property as determined by their watch status and mental health staff. (Ex. 1315 at 10-13 (Sections 7.6, 7.7, 8.0).)

1771. Defendants restrict the property that the Subclass may possess based upon legitimate penological goals of maintaining safety, security, and inmate health/welfare.

1772. Plaintiffs presented no evidence in support of this claim.

1773. Plaintiffs have failed to prove that any Subclass inmate was deprived of property afforded by ADCRR policy without a legitimate penological reason for the restriction.

1774. Based on the evidence presented at trial, the Court concludes that Defendants' property policies and practices do not violate the Eighth Amendment.

1775. Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of subjecting Subclass inmates to unconstitutional property restrictions.

1776. Plaintiffs have not established by a preponderance of the evidence that Defendants' property policies and practices expose Subclass inmates to a substantial risk of serious harm.

1777. Plaintiffs have not established by a preponderance of the evidence that Defendants are deliberately indifferent to a substantial risk of harm to Subclass inmates.

### g. Nutrition

1778. During the Stipulation, Plaintiffs monitored the nutritional value of meals provided to maximum custody inmates. Plaintiffs agreed that the attendant performance measure monitoring nutrition was retired due to demonstrated compliance by ADCRR. (Dkt. 1185 at 11; Ex. 2268 at 1569747; R.T. 11/18/21 a.m. at 2720:4-2721:22.)

1779. ADCRR contracts with Trinity Services Group, Inc. (a national corrections industry food services provider) to provide meal services for inmates in ADCRR's ten state-operated prison complexes. Maximum custody inmates (and detention inmates at some locations) are fed in their cells and are fed three meals a day. Breakfast and lunch are served at the same time in a "Mega Sack" which contains food items for both breakfast and lunch. Dinner is a hot meal. (Ex. 4414; R.T. 11/18/21 a.m. at 2719:2-2720:3; R.T. 11/15/21 p.m. at 2051:19-2052:3; https://spo.az.gov/ (Arizona Department of Administration Procurement – current Trinity Food Services contract.)

1780. The daily average calorie count for meals served to ADCRR inmates is approximately 2700 calories for male inmates and 2200 calories for female inmates. The menus meet or exceed recommended nutrient amounts as specified by Recommended Dietary Allowances from the National Academy of Sciences and the Trinity-ADCRR contract parameters. (Ex. 4402.)

1781. Prison officials monitor food services, portions are controlled and weighed, and food items are tasted by officials to monitor portions and quality. Inmates who have complaints about food may use the inmate grievance process to address the same. (R.T. 11/18/21 a.m. at 2726:10-2728:3; R.T. 11/15/21 p.m. at 2052:4-2057:15.)

1782. Complaints by inmates that they are not actually being fed are rare. (R.T. 11/18/21 a.m. at 2725:3-2726:25; R.T. 11/15/21 p.m. at 2069:23-2072:22.)

1783. The Mega Sack (regular meal) for maximum custody inmates includes for breakfast: cereal, boiled egg, cheese slice, turkey/ham, wheat bread (2 slices), salad dressing, 2% milk (1 cup), coffee, and salt/pepper. Lunch as contained in the Mega Sack includes turkey bologna or salami, peanut butter and jelly, mustard, wheat bread (4 slices),

tortilla chips, assorted cookie, and a beverage. Hot dinners rotate per the menu and include a hot entrée (i.e., chili con carne, spaghetti with meat sauce, stroganoff, baked chicken with gravy, jambalaya, stir fry with turkey, burrito mix, pizza, etc.), a vegetable side dish, a variety of bread offerings (i.e., garlic bread, cornbread, roll, bread dressing, biscuit), dessert and a beverage. (Ex. 4406.)

1784. Plaintiffs have abandoned their insufficient nutrition claim, having stipulated to retire the Stipulation Performance Measure that monitored the nutritional adequacy of the Level 5 meal plan provided to maximum custody inmates.

1785. Plaintiffs have not offered any evidence to challenge the nutritional content of the meals provided to the Subclass.

1786. Based on the evidence presented at trial, the Court concludes that Defendants' nutrition policies and practices do not violate the Eighth Amendment.

1787. Plaintiffs have not established by a preponderance of the evidence that Defendants have a systemwide policy or practice of subjecting Subclass inmates to unconstitutional nutritional levels.

1788. Plaintiffs have not established by a preponderance of the evidence that Defendants' nutrition policies and practices expose Subclass inmates to a substantial risk of serious harm.

1789. Plaintiffs have not established by a preponderance of the evidence that Defendants are deliberately indifferent to a substantial risk of harm to Subclass inmates.

**H.      The Testimony and Opinions of Robert Joy Will Not Be Considered. Credibility**

1790. Robert Joy is purportedly a remedies expert.

1791. Joy has no medical training. (R.T. 11/01/21 p.m. at 109:10-109:11.)

1792. Joy has never created a dental or mental health staffing model. (R.T. 11/01/21 p.m. at 112:12-112:19.)

1793. Joy has only employed his model in one other state and is not aware of any other states in which a similar model has been employed. (R.T. 11/01/21 p.m. at 112:12-

112:23, 193:3-193:10, 194:20-194:21.)

1794. Joy relied on a clinical team who interviewed staff and completed chart reviews to determine inmate demand for medical services in creating his staffing model in California. (R.T. 11/01/21 p.m. at 110:11-111:1.)

1795. In creating his staffing model in California, Joy relied on data from the prison system to categorize patients, determine inmate needs for care, and determine how many services a provider or clinician can provide in a day. (R.T. 11/01/21 a.m. at 62:1-64:14.)

1796. In California, Joy spoke with clinicians in creating his staffing model to make sure he was "not missing anything in the model." (R.T. 11/01/21 a.m. at 68:9-68:15.)

1797. Joy acknowledges that he does not make recommendations about staffing in California. (R.T. 11/01/21 p.m. at 112:6-112:11.)

1798. Joy is unable to confirm that California has met the demand for primary care providers calculated by his model. (R.T. 11/01/21 p.m. at 194:5-194:19.)

1799. Joy is unable to verify whether the budget proposal for implementing his staffing model was approved in California. (R.T. 11/01/21 p.m. at 194:5-194:19.)

1800. Joy acknowledges that California has staffing vacancies but has not looked at the recruitment and retention challenges California has. (R.T. 11/01/21 p.m. at 194:19, 161:13-161:16.)

1801. Joy lacks knowledge as to how Arizona currently compares to other states in per-inmate spending on prison healthcare. (R.T. 11/01/21 p.m. at 192:19-192:23.)

1802. Joy is not familiar with NCCHC standards for staffing. (R.T. 11/01/21 p.m. at 115:12-115:18.)

1803. Joy has not reviewed the NCCHC consulting proposal with respect to conducting a staffing analysis. (R.T. 11/01/21 p.m. at 115:19-115:23.)

**Methodology**

1804. Joy bases his productivity calculations for his medical staffing model solely on conversations he had with Plaintiffs' expert Dr. Wilcox regarding his opinions on how many patients a provider can see per day. (R.T. 11/01/21 p.m. at 183:3-183:15.)

1805. Joy bases his estimate as to the number of working days per medical provider on "some references" he had on correctional officer time off. (R.T. 11/01/21 p.m. at 183:15-183:23.)

1806. Joy admits that if his figures for primary care provider FTEs in ADCRR are incorrect, his figures for nursing and other staff would also be incorrect. (R.T. 11/01/21 p.m. at 167:15-168:3.)

1807. Joy determined that Eyman should have between 34.6 and 47.2 lab techs because he "heard someone say it's a larger institution, larger prison." (R.T. 11/01/21 p.m. at 185:25-186:21.)

1808. Joy disregarded actual data regarding the percentage of Arizona inmates with either no chronic conditions or only one stable chronic condition (90%) and instead created his own estimate (52%). (R.T. 11/01/21 p.m. at 129:3-129:23.)

1809. Joy's staffing analysis only considers demand for healthcare services but not whether there are available professionals to fill positions. (R.T. 11/01/21 p.m. at 161:21-162:6.)

1810. Joy claims that the number of SMI patients in Arizona could be as much as five times higher than ADCRR is reporting but could not point to any specific sources to support this claim and acknowledges that he is unaware of what percentage of California inmates are SMI. (R.T. 11/01/21 p.m. at 162:12-164:12, 164:22-164:23.)

1811. Joy admits that he does not know the percentage of SMI inmates determined by the NCCHC. (R.T. 11/01/21 p.m. at 173:3-173:8.)

1812. Joy claims that 20% of ADCRR inmates are housed in isolation and based his estimates on provider productivity and needs for welfare checks and other mental health services on that percentage. (R.T. 11/01/21 p.m. at 164:24-165:4.) However, Joy acknowledged on cross-examination that if the actual percentage of inmates in isolation was lower than 10%, productivity would increase and the demand for welfare checks and other mental health services would decrease. (R.T. 11/01/21 p.m. at 166:1-167:2.)

1813. Joy admits that his staffing analysis contains mathematical errors and

incorrect figures.  (R.T. 11/01/21 p.m. at 173:19-175:3.)

1814.  Joy does not know how the CDC creates the statistics that he relies on in his staffing analysis.  (R.T. 11/01/21 p.m. at 179:8-179:15.)

1815.  Joy did not do any independent research to validate Dr. Stern's conclusions regarding staffing levels that he relied upon in developing his staffing analysis.  (R.T. 11/01/21 p.m. at 180:11-180:24.)

1816.  Joy admits that he has no idea how many primary care providers visits actually occurred in the ADCRR system.  (R.T. 11/01/21 p.m. at 182:2-182:7.)

1817.  Joy admits that his staffing estimates are based on "inexact science."  (R.T. 11/01/21 a.m. at 97:1-97:7.)

1818.  Joy's team reviewed health records and data regarding the number of visits in conducting the staffing analysis in California, but he acknowledges that he did not review medical records or data regarding the number of visits in creating his staffing model for this case.  (R.T. 11/01/21 p.m. at 116:12-116:20.)

1819.  Joy relied on non-peer-reviewed studies in creating his estimates as to how many inmates should have mental health or medical conditions.  (R.T. 11/01/21 p.m. at 135:6-135:22.)

1820.  Joy relied heavily on a Bureau of Justice Statistics ("BJS") report in creating his estimates regarding the prevalence of mental illness which carries a disclaimer that it does not contain official government statistics and has several potential limitations due to the small sample size employed.  (R.T. 11/01/21 p.m. at 138:16-139:19, 140:3-140:17.)

1821.  Joy's team in California conducted interviews with clinicians regarding appropriate staffing levels, but he acknowledges that he did not so in creating his model for this case.  (R.T. 11/01/21 p.m. at 116:21-117:24.)

1822.  Joy did not use ADCRR health services utilization data in creating his staffing model.  (R.T. 11/01/21 p.m. at 118:9-118:14.)

1823.  Joy assumed that ADCRR staffing levels were inadequate based on Dr. Stern's report and statements in the court record from Plaintiffs.  (R.T. 11/01/21 p.m. at

121:3-121:18.)

1824.  Joy only reviewed current staffing numbers for ADCRR and did not review any changes to staffing levels or ratios from 2012 to present.  (R.T. 11/01/21 p.m. at 141:9-141:22.)  However, Joy compared Arizona's current staffing levels to national staffing data from 2011 and 2015.  (R.T. 11/01/21 p.m. at 142:6-143:11.)

1825.  Joy relied heavily on a national survey on prison healthcare from the CDC National Center for Health Statistics that contained a disclaimer that not all states provided accurate information and there was a "high level of item nonresponse for questions relating to contracting and staffing."  (R.T. 11/01/21 p.m. at 149:14-150:12, 154:2-154:15.)

1826.  Joy requested data from the CDC that was not contained in the official CDC report and used it in his analysis and report.  (R.T. 11/01/21 p.m. at 152:2-153:5.)

1827.  In California, Joy used actual encounter data in developing the staffing model but did not do so in this case.  (R.T. 11/01/21 p.m. at 124:1-124:7.)

1828.  Joy could have reviewed actual ADCRR healthcare encounter data and staffing levels to calculate the average number of patients that a provider at ADCRR can see in a day.  (R.T. 11/01/21 p.m. at 122:5-122:13.)   Instead, Joy relied on hypothetical information from conversations with Dr. Wilcox and stale data from the literature to craft his own estimates as to provider productivity.  (R.T. 11/01/21 p.m. at 122:14-122:18; R.T. 11/01/21 a.m. at 94:18-94:22.)

1829.  Joy did not visit any Arizona prisons, inquire about the physical plant, or observe the intake process, screening process, medication administration, or segregation housing units in creating his staffing models.  (R.T. 11/01/21 p.m. at 126:7-126:9, 127:13-128:4.)

1830.  Joy relied heavily on an article on Veteran's Administration primary care settings in determining provider to nursing staffing ratios, as well as on staffing ratios in nursing homes, in creating his staffing model for the Arizona state prisons.  (R.T. 11/01/21 p.m. at 167:10-169:13.)

1831.  Joy based his staffing model for behavioral health technicians (BHTs) off his

interview with Plaintiffs' expert, Dr. Stewart, and staffing ratios in nursing homes. (R.T. 11/01/21 p.m. at 169:14-170:3.)

1832. Joy based his conclusion that behavioral health technicians (BHTs) are not qualified within the scope of their practice to lead group sessions for patients with mental illness on his conversation with Dr. Stewart. (R.T. 11/01/21 p.m. at 167:10-169:13.)

1833. Joy based his assertions regarding the community standard of care for substance abuse disorder on his conversation with Plaintiffs' expert Dr. Wilcox. (R.T. 11/01/21 p.m. at 167:10-169:13.)

1834. Joy compares current ADCRR staffing levels and the outputs from his staffing model to 2011 data from the CDC's National Center for Health Statistics and the Bureau of Justice Statistics to establish what he claims is an appropriate "benchmark." Besides the problem of using "comparative" data from a decade ago, Joy also sets the "benchmark" at the 75th percentile, rather than the 50th percentile, to justify the outputs of his staffing model. Dr. Murray is unaware of any reason to set the benchmark at that level, and Joy does not offer any support for doing so. (Dkt. 4203, ¶ 1073, R.T. 12/08/21 a.m. at 3493:5-3493:6, R.T. 11/01/21 a.m. at 103:8-103:20.)

1835. Joy's assumption that a provider can only see 10-12 patients per day is not reflective of reality in a correctional setting. Based on Dr. Murray's decades of correctional experience, it is his opinion that a provider who maintained such a low output would likely experience remedial action. The expected norm is 16-20 patients per eight-hour shift, and Dr. Murray is personally capable of seeing 18-20 patients per shift. Based on that level of output, Centurion has the appropriate staffing levels to meet the needs of the ADCRR population. This was confirmed in Dr. Murray's interviews with staff, who did not feel that additional staff was needed beyond contract levels. (Dkt. 4203, ¶ 1071, R.T. 12/08/21 a.m. at 3493:7-3494:1.)

1836. Joy incorrectly claims that the ratio of mid-level providers to physicians at ADCRR is 6:1. However, the ratio as set out in the new RFP is actually 2:1, which is better than the community standard of 3:1 that Joy cites for Arizona. (Dkt. 4203, ¶ 1071.)

1837. Joy relies almost exclusively on interviews with Plaintiffs' other experts and non-corrections sources (e.g., nursing homes and the Veteran's Administration) to develop his staffing model. He also explicitly states that while he was provided data regarding the numbers of encounters performed by various disciplines within the ADCRR system, he chose to entirely disregard that information in developing his model. Instead, he claims, without any support or data to validate his claims, that there are unmet needs for healthcare of various types. Remarkably, he then proceeds to create his own estimates of the amounts and types of care needed in the system, all without conducting any tours of the facilities or any interviews with staff. (Dkt. 4203, ¶ 1070.)

1838. Joy does not rely on evidence customarily relied upon by experts in creating a staffing analysis/plan or follow the methodology that he personally used in California.

1839. Joy is not credible, his methodology is flawed, and his expert opinions should be stricken.

1840. The Court will not consider his testimony or opinions.

## IV.  Conclusion.

Defendants request this Court to adopt these findings of fact and conclusions of law and enter judgment in their favor on all individual, Class, and Subclass claims.


DATED this 28th day of January, 2022.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC


By /s/ Daniel P. Struck
Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

*Attorneys for Defendants*

| 1 | **CERTIFICATE OF SERVICE** |

2       I hereby certify that on January 28, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

3  Notice of Electronic Filing to the following CM/ECF registrants:

4  Alisha Tarin-Herman    atarinherman@perkinscoie.com

5  Alison Hardy:    ahardy@prisonlaw.com

6  Asim Dietrich:    adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org;

7        phxadmin@azdisabilitylaw.org

    Austin C. Yost:    ayost@perkinscoie.com; docketPHX@perkinscoie.com

8

9  Corene T. Kendrick:    ckendrick@aclu.org

    Daniel Clayton Barr:    DBarr@perkinscoie.com; docketphx@perkinscoie.com;

10      sneilson@perkinscoie.com

11  David Cyrus Fathi:    dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

12  Donald Specter:    dspecter@prisonlaw.com

13  Eunice Cho    ECho@aclu.org

14  Jared G. Keenan    jkeenan@acluaz.org

15  John Howard Gray:    jhgray@perkinscoie.com; slawson@perkinscoie.com

16  Karl J. Worsham:    kworsham@perkinscoie.com; docketphx@perkinscoie.com

17  Kathryn E. Boughton:    kboughton@perkinscoie.com; docketphx@perkinscoie.com

18  Kelly Soldati    ksoldati@perkinscoie.com; docketphx@perkinscoie.com

19  Maria V. Morris    mmorris@aclu.org

20  Maya Abela    mabela@azdisabilitylaw.org

21  Mikaela N. Colby:    mcolby@perkinscoie.com; docketphx@perkinscoie.com

22  Rita K. Lomio:    rlomio@prisonlaw.com

23  Rose Daly-Rooney:    rdalyrooney@azdisabilitylaw.org

24  Sara Norman:    snorman@prisonlaw.com

25  Sophie Jedeikin Hart    sophieh@prisonlaw.com

26  Victoria Lopez:    vlopez@acluaz.org

27

28

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/     Daniel P. Struck