1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Victoria Lopez (Bar No. 330042)*
Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:  vlopez@acluaz.org
          jkeenan@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(d)

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>                    Plaintiffs,<br><br>          v.<br><br>David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities,<br><br>                    Defendants. | No. CV 12-00601-PHX-ROS<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (Doc. 4309)** |

1

**TABLE OF CONTENTS**

2

Page

3  I.   INTRODUCTION ...................................................................................... 1

4  II.  THE METHODOLOGIES USED BY PLAINTIFFS' EXPERTS ARE
     SOUND, AND THEIR TESTIMONY IS CREDIBLE. .......................... 4

5
     A.   Plaintiffs' Experts' Methodologies Are Sound and Reliable. ....................... 4

6
          1.   The Plaintiffs' experts' methodologies include review of many
7              information sources, including interviews and chart reviews, for
               patients chosen on a random and non-random basis. ........................... 4

8
          2.   Defendants' criticisms of Plaintiffs' experts' methodology are
9              baseless. ........................................................................................... 7

10             (a)   The experts sampled patients who were representative and
                     appropriate for their purpose, using both random and non-
11                    random samples. ...................................................................... 8

12             (b)   The prisons the experts visited provided an appropriate
                     basis for their conclusions. ...................................................... 15

13
          3.   The methodology used by Mr. Joy in analyzing staffing
14             shortages is sound .............................................................................. 18

15     B.   Plaintiffs' Experts Are Credible. ................................................................. 19

16         1.   Dr. Todd Wilcox is qualified and credible. .......................................... 19

17         2.   Dr. Pablo Stewart is qualified and credible. ........................................ 23

18         3.   Dr. Craig Haney is qualified and credible. ........................................... 26

19         4.   Martin Horn is qualified and credible. ................................................. 32

20         5.   Robert Joy is qualified and credible. .................................................... 40

21     C.   Defendants' Experts Fail to Offer Any Credible Opinions to Counter
            Plaintiffs' Experts ...................................................................................... 42
22
          1.   Defendants' medical experts are not credible or reliable. .................... 43
23
               (a)   Dr. Murray's opinions are not credible or reliable. ................. 43
24
               (b)   Dr. Phillips' opinions are not credible or reliable. .................. 51
25
          2.   Defendants' mental health expert Dr. Penn is not credible. ................. 51
26
               (a)   Dr. Penn's opinions are not credible or reliable. ..................... 51
27
               (b)   Dr. Penn is not qualified to offer expert testimony on
28                    solitary confinement. ............................................................... 56

155931733.2

**TABLE OF CONTENTS**
(continued)

Page

III. DEFENDANTS REPEATEDLY MISSTATE THE APPROPRIATE LEGAL STANDARDS FOR THE COURT'S ANALYSIS .............................. 58

    A. Defendants Misstate the Legal Standard for Deliberate Indifference. ......... 58

    B. Defendants' Reliance Upon Pro Se Damages Cases Is Misplaced in This Class Action Seeking Injunctive Relief. ................................ 59

    C. Defendants Misstate the Legal Standard for Use of Force. ....................... 60

    D. Defendants Incorrectly Argue That Plaintiffs Must Suffer Actual Injury or Death to Establish an Eighth Amendment Violation. ................... 60

    E. Defendants' Assertion That All Named Plaintiffs Must Show Continuing and Ongoing Harm Is Incorrect. .............................. 63

    F. The Court Must Examine The Actual Practices in Defendants' Prisons Rather Than Aspirational Written Policies. ................................ 64

    G. The Purported Volume of Health Care Encounters Is Irrelevant to The Eighth Amendment Inquiry. ........................................... 65

    H. Defendants Misstate the Legal Standard for Analyzing Conditions in Isolation Units. .................................................... 66

    I. Blanket Deference to Defendants Is Not Warranted. ................................. 68

    J. The *Monell* Analysis of Municipal Liability Is Inapplicable Here. ............. 69

    K. Defendants Consistently Misstate the Law and Misrepresent the Cases Upon Which They Rely. ........................................ 70

IV. DEFENDANTS MISSTATE THE FACTS AND RELY ON INFORMATION THAT IS NOT IN EVIDENCE ............................................ 73

    A. Defendants Rely Upon Information Not Admitted into Evidence. .............. 73

    B. Defendants Broadly Cite to NCCHC Standards and Findings Were Admitted for Limited Purposes. ........................................ 75

V. ISOLATION .................................................................... 80

    A. Definition of Solitary Confinement ..................................... 80

    B. Overuse of Solitary Confinement ....................................... 81

    C. Isolation of People Who Are Mentally Ill ............................... 87

    D. Isolation of Children .................................................. 89

    E. Out-of-Cell Time ...................................................... 90

**TABLE OF CONTENTS**
(continued)

Page

      1.    Cancellations of Out-of-Cell Time.......................................92

      2.    Refusals of Out-of-Cell Time...............................................96

      3.    Auditing and Reporting of Out-of-Cell Time ....................99

F.    Mental Health Care in Solitary Confinement..............................100

G.    The Use of Force on Incarcerated People with Serious Mental Illness .....103

      1.    Rahim Muhammad........................................................104

      2.    Mr. L............................................................................110

H.    Cell Illumination...........................................................................111

I.    Property ........................................................................................113

J.    Nutrition .......................................................................................115

VI.   MENTAL HEALTH CARE...........................................................116

A.    Defendants Fail to Respond to the Substantial Evidence of Unconstitutional Mental Health Care in ADCRR Prisons..........116

B.    Intake Screening ..........................................................................118

C.    Access to Mental Health Care ......................................................120

D.    Accessibility to Inpatient and Residential Mental Health Treatment ........121

E.    Privacy and Confidentiality in Mental Health Encounters, Cell-Front Encounters, and the Minimum Duration of Encounters.............122

F.    Treatment Plans and Timely Communication..............................126

G.    Educational and Therapeutic Programming.................................128

H.    Changes to Mental Health Diagnoses .........................................130

I.    Treatment of Recurrent Behavioral Problems.............................131

J.    Treatment for Suicidal / Self-Harming Class Members.............132

VII.  MEDICAL CARE .........................................................................135

A.    Defendants Do Not Have Meaningful Quality Improvement Processes to Identify Deficiencies in Medical and Mental Health Care and Improve Delivery of Care................................................................137

      1.    Mortality Reviews .......................................................137

**TABLE OF CONTENTS**
**(continued)**

| | | | | Page |
|---|---|---|---|---|

2.   CGAR Data and Other Audits........................................................143

3.   Peer Reviews ...............................................................................146

B.   Notwithstanding Defendants' Stated Medical Policies and Procedures, the Actual Provision of Medical Care Suffers from Systemic Deficiencies That Rise to the Level of Deliberate Indifference.................146

   1.   Medical Care at Arizona State Prison Complex (ASPC)-Yuma......147

   2.   Medical Classification System........................................................154

   3.   Health Needs Requests and Volume of Health Care Encounters ....155

   4.   Specialty Care ...............................................................................156

   5.   Diagnostic Services .......................................................................161

   6.   Emergency Services .......................................................................162

   7.   Electronic Health Records..............................................................163

   8.   Nursing Encounter Tools ...............................................................164

   9.   Treatment of Chronic Conditions....................................................164

   10.   Hepatitis C.....................................................................................166

   11.   Medical Devices.............................................................................168

VIII.   SYSTEMIC DEFICIENCIES THAT AFFECT ALL HEALTH CARE .............168

   A.   The Evidence Overwhelmingly Shows That Inadequate Numbers and Types of Health Care Staff Put All Class Members at Substantial Risk of Serious Harm. ...............................................................................168

      1.   Defendants fail to rebut substantial evidence of inadequate medical care staffing. .....................................................................168

         (a)   The staffing levels set forth in Defendants' contract with Centurion are not based on a current staffing analysis. ........169

         (b)   NCCHC findings related to medical staffing were not admitted at trial and, in any event, there is no evidence that NCCHC's "simplistic" review of staffing is reliable and outweighs substantial contrary evidence.......................176

      2.   The evidence shows longstanding and chronic shortages of mental health staff. ........................................................................177

   B.   Defendants' Reliance Upon the Purported Mortality Rates in Arizona Prisons Is Misplaced..................................................................................181

**TABLE OF CONTENTS**
(continued)

Page

C.   Defendants' Failure to Provide Adequate Language Interpretation to Patients Not Fluent in English Places Them At Substantial Risk of Harm. ........................................................................................... 185

D.   Defendants' Medication Services Are Constitutionally Inadequate. ......... 196

   1.   The Evidence Overwhelmingly Shows That Defendants Fail to Provide Patients Necessary Medications in a Timely and Regular Manner. ........................................................................ 196

   2.   Defendants' Formulary is Inadequate and Patients are Prescribed Less Effective Medications as a Result. ..................... 198

   3.   Defendants Fail to Protect Patients from Medication-Induced Heat Injury and Side Effects. ............................................. 200

IX.   CONCLUSION ........................................................................................ 201

155931733.2

# I.     INTRODUCTION

Plaintiffs' proposed Findings of Facts and Conclusions of Law (Doc. 4308) sets forth overwhelming evidence that ADCRR's health care and its use of isolation in Arizona's state prisons constitute cruel and unusual punishment in violation of the Eighth Amendment. As described in detail below, Defendants' Findings of Fact and Conclusions of Law (Doc. 4309) are unsupported by the evidence, the expert opinions on which they rely are not credible, and their legal analysis misstates the case law.

The Court should find for Plaintiffs on the merits, and when fashioning relief it should consider the significance not only of the effect these unconstitutional conditions have on the incarcerated population, but also Defendants' consistent unwillingness to acknowledge, and their inability to resolve, the serious problems that have plagued ADCRR for at least the last decade. Defendant Shinn's testimony provides compelling evidence that he willfully ignores the obvious risks that have been proven again and again in this case, testifying that Centurion has done "extraordinary work" and that he is satisfied with its performance. Trial Testimony of David Shinn ("Shinn TT") at 2241:5-12; *see also id.* at 2239:16-2240:8 (claiming that he wants to know about problems in the department but failing to read any of Plaintiffs' expert reports). And Defendant Gann's testimony that insufficient staffing has not been a barrier to compliance with the Stipulation is belied by years of litigation and is based on a theory that the Court already has rejected as "a sad illusion." Trial Testimony of Larry Gann ("Gann TT") at 2366:18-2367:20; Doc. 3921 at 24.

The procedural history of this case is extraordinary in at least one material respect. The trial in this case occurred after more than six years of proceedings aimed at enforcing promises Defendants made to improve prison conditions through a settlement embodied in the Stipulation. The Court's July 2021 Order setting the case for trial (Doc. 3921), made clear that all previous judicial efforts to compel compliance with the Stipulation had one thing in common—they all failed. These efforts included orders for specific performance, orders requiring plans to remedy low performance measure scores, injunctions,

appointment of court experts, mediation, and two separate contempt orders and millions of dollars in contempt fines.

In short, this Court already has exhausted all of the usual judicial remedies normally employed in institutional litigation. Doc. 3921 at 1 ("The Court has repeatedly used the remedies authorized by the Stipulation and often exercised forbearance rather that imposing sanctions. The remedies and the tolerance by the Court have proven ineffective.").[1]

This extraordinary record demands an extraordinary remedy—a receivership for health care. *Brown v. Plata*, 563 U.S. 493, 511 (2011) ("Courts faced with the sensitive task of remedying unconstitutional prison conditions must consider a range of available options, including appointment of special masters or receivers . . . .").[2] "The harm already done in this case to [Arizona's] prison inmate population could not be more grave, and the threat of future injury and death is virtually guaranteed in the absence of drastic action. The Court has given defendants every reasonable opportunity to bring its prison medical system up to constitutional standards, and it is beyond reasonable dispute that the State has failed." *Plata v. Schwarzenegger*, No. C-01-1351 TEH, 2005 WL 2932253 at *1 (N.D. Cal. Oct. 3, 2005). Similarly, with regard to the subclass claims, the Court should appoint an independent expert pursuant to Rule 706 to advise it as to the reforms needed to ameliorate the unconstitutional conditions of confinement and practices related to isolation units.

Defendants simply lack the will, ability, or inclination to take the steps necessary to cure the health care and isolation violations on their own. Doc. 4309 ¶¶ 1024-1028. The

---

[1] Page citations to documents filed with the Court are to the page numbers assigned by the ECF system.

[2] A special master's authority is extremely limited under the Prison Litigation Reform Act ("PLRA") and would be insufficient to address the severe and longstanding issues in this case given Defendants' well-documented election to engage in baseless and scorched-earth litigation rather than "acknowledge their shortcomings and identify plausible paths to compliance." *See* Doc. 3921 at 33-34; 18 U.S.C. § 3626(f) (Special Master's compensation is capped at CJA rate and their monitoring powers are limited to holding adversarial hearings).

usual strategy employed in prison conditions cases of issuing injunctions is almost certain to be ineffective against Defendants. Requiring them again to develop plans or to comply with specific instructions will surely meet the same fate as this Court's past orders to enforce the Stipulation. Defendants' history of aggressive legal tactics, groundless appeals, and general resistance to the Court's authority would undoubtedly continue to take the place of concerted, diligent, good faith efforts to improve the deplorable conditions. *See, e.g.*, Doc. 3866 at 3 ("Despite the outlays in fines and attorneys' fees, Defendants' counsel continues to litigate each and every issue to the maximum extent possible, including frivolous ones. Counsel files repetitive motions, close-to-baseless appeals, and petitions for writs of certiorari. From the two published opinions by the Ninth Circuit addressing five appeals, Defendants have prevailed on only a few minor issues. . . . And neither petition for writ of certiorari has been granted. It is unclear whether Arizona taxpayers are directly footing the bill for this conduct but it is time for those responsible for this litigation to reexamine whether the six years of litigation represents a wise use of resources going forward."); Doc. 2900 at 11 ("Defendants and their contractor are at times more interested in obtaining compliance with the Stipulation by playing a shell game than by providing care to the Plaintiff Class.").[3]

A receiver would have those powers now vested in the Director to operate the health care system. The receiver would be able to hire staff, enter into contracts and perform all other lawful functions necessary to achieve a constitutionally adequate system.[4] When that goal is reached, the authority of the receiver would end, and the power

---

[3] And in its February 24, 2021 Order, the Court recognized that Defendants' position that subclass members need not actually have an avenue out of maximum custody indicated that they had not acted in good faith to resolve the unconstitutional conditions of confinement in isolation units. Doc. 3861 at 2.

[4] With regard to the isolation claim, the Court should appoint an expert under Fed. R. Civ. P. 706 to monitor implementation and compliance with all remedial orders. Such an expert should have the ability to inspect the facilities as they see fit, including through unannounced inspections.

During the remedial phase of this litigation, including the receivership and monitoring by a Rule 706 expert, Plaintiffs' counsel must continue to have reasonable access to documents, electronic medical records, prisons, their clients and Defendants'

-3-

1   to operate the health care system would return to the State. *See Plata v. Schwarzenegger*,

2   No. C-01-1351 TEH, (Order Appointing Receiver) (N. D. Cal. Feb. 14, 2006), attached

3   hereto as **Exhibit 1**.

4        The Constitution cannot condone another decade of willful refusal by Defendants

5   to obey its commands under the Eighth Amendment. A receivership is the only hope that

6   the people incarcerated in ADCRR's prisons will eventually be treated in a manner

7   consistent with civilized standards of decency. *Brown*, 563 U.S. at 510-11. ("A prison that

8   deprives prisoners of basic sustenance, including adequate medical care, is incompatible

9   with the concept of human dignity and has no place in civilized society."). Therefore, the

10  Court should order the parties to submit the names of potential receiver and Rule 706

11  candidates, and issue the proposed Order filed previously. Doc. 4308-1.

12
13  **II.    THE METHODOLOGIES USED BY PLAINTIFFS' EXPERTS ARE
        SOUND, AND THEIR TESTIMONY IS CREDIBLE.**

14      **A.    Plaintiffs' Experts' Methodologies Are Sound and Reliable.**

15       Plaintiffs' experts used well-grounded methodological approaches, incorporating a

16  wide array of information sources, to determine if Defendants systematically put class

17  members at a substantial risk of serious harm. Each expert used methodologies that are

18  considered reliable in their fields, and that they have used previously. Nevertheless,

19  Defendants have complained about the sample composition and size that each expert

20  considered as part of their evaluations, and the fact that they conducted site visits at many,

21  but not all, of the state prisons. Their criticisms are baseless, as set forth below.

22           **1.    The Plaintiffs' experts' methodologies include review of many
            information sources, including interviews and chart reviews, for

23           patients chosen on a random and non-random basis.**

24       The methodologies used by all of Plaintiffs' experts are reliable. For example, the

25  sources Dr. Wilcox reviewed to assess healthcare delivery in the ADCRR include the

26
27  ───────────────────────────────────────────

28  employees in order to monitor compliance and thereby fulfill their obligations to the
    plaintiff class. Doc. 4308-1 at 13.

155931733.2

charts of patients whom he interviewed in the infirmaries and other housing units, patients who had died between January 2019 and September 2021, and patients identified by counsel.[5] He reviewed the monitoring data compiled by Defendants related to the parties' Stipulation, Continuous Quality Improvement minutes, Defendants' policies and procedures, 100 mortality reviews, deposition testimony, and his own previous reports prepared for this case; he visited the four prisons with Inpatient Care units; and he interviewed patients, including most of the patients housed in the infirmaries. *See* Doc. 4308 ¶ 588; Written Testimony of Dr. Todd Wilcox ("Wilcox WT"), Doc. 4138 ¶¶ 8, 20-24, 167. He also reviewed the ADCRR's written policies and procedures for delivering healthcare, and the October 2019 Report submitted to the Court by the Court's Expert, Dr. Marc Stern. Wilcox WT, Doc. 4138 ¶¶ 8, 18. The methodology he used is typically used by experts in the field of correctional health care, and Dr. Wilcox has used it to evaluate care in other cases. Trial Testimony of Dr. Todd Wilcox ("Wilcox TT") at 1674:24-1675:4. His sampling methodology is reliable because it focuses on patients with "higher medical utilization" enabling him to evaluate "how information flows through the system and how the care is coordinated." *Id.* at 1676:16-1677:10.

Similarly, Dr. Stewart reviewed the medical records of numerous patients with serious mental health needs, interviewed numerous patients at four prisons, reviewed current ADCRR and Centurion policies, procedures, and practices, observed housing units at four prisons where people classified as seriously mentally ill are incarcerated, and reviewed close to 20 psychological autopsies and mortality reviews that Defendants had produced, accounting for most of the patients who died by suicide between January 2019 and September 2021. *See* Written Testimony of Pablo Stewart, M.D. ("Stewart WT"), Doc. 4109 ¶¶ 8-9, 13. This methodology is reliable and is customarily used by experts in

---

[5] Defendants incorrectly state that Dr. Wilcox analyzed records for only 58 patients. Doc. 4309 ¶ 519. The cited eight-page range from his trial testimony does not in any way support this false assertion. *Id.*, citing Wilcox TT at 1800:9-1808:10. Dr. Wilcox testified that he personally reviewed the charts for 120 patients. Wilcox TT at 1805:25-1806:7.

this field; Dr. Stewart uses this methodology in his other correctional psychiatry work, including his work as a court-appointed monitor in a statewide class action prison mental health care case in Illinois. Stewart TT at 451:1-9.

Dr. Haney based his opinions on on-site inspections at ASPC-Eyman and ASPC-Lewis, 75 interviews with incarcerated people, many of them selected at random, and on his review of medical records, mortality reports, psychological autopsies, and ADCRR and Centurion documents, including rules, regulations, and procedures. Doc. 4308 ¶ 32.[6] His methodology is reliable and is customarily used by experts in his field. Trial Testimony of Craig Haney ("Haney TT") at 791:20-792:5 ("It's the only methodology that I know is used in cases like this. You examine documents, you inspect facilities, you conduct interviews. Interviews of prisoners and under whatever ground rules apply, interviews with staff members or depositions and other materials that may be provided by staff members as well."). Dr. Haney testified, "I've testified in prison conditions cases since the late 1970s, early 1980s, and in every single instance this is the way that I and other experts have approached the task of trying to understand how a prison operates and what its impact is on the people who are there." Haney TT at 792:6-10.

Mr. Horn conducted over sixty interviews with class members, carried out on-site inspections of ASPC-Eyman and APSC-Lewis, and reviewed thousands of pages of policies, reports, logs, institutional files of class members provided by counsel, and numerous use of force videos. Written Testimony of Martin Horn ("Horn WT"), Doc. 4130 ¶ 2; Doc. 4130-1 at Ex. 1. He chose people to interview by visiting housing units, stopping at each cell, and talking to people who were awake and willing to talk to him. Trial Testimony of Martin Horn ("Horn TT") at 1342:14-1343:2. The methodology Mr. Horn used is reliable and customarily used by experts in his field. Horn TT at 1346:4-

---

[6] Although Dr. Haney holds a Ph.D. in psychology from Stanford University (Written Testimony of Craig Haney ("Haney WT"), Doc. 4120 ¶ 1), Defendants and their expert Dr. Penn stubbornly refuse to accord him the basic respect of the title "Dr.," referring to him on occasion as "Mr. Haney" or more often, simply "Haney." *See, e.g.*, Doc. 4309 ¶¶ 1513-1516.

8. He has used this assessment methodology for isolation units in Middlesex County (New Jersey), the District of Columbia, Pennsylvania, Connecticut, Florida and Tennessee. *Id.* at 1346:9-19. It is substantially similar to the methodology he has used in other cases in which he has given expert testimony. *Id.* at 1347:16-22. He has submitted expert reports approximately 20 or more times. *Id.* at 1346:20-1347:2. He has been offered to testify as a witness at trial about 12 times, and has each time be found qualified to testify as an expert witness using his methodology. *Id.* at 1347:3-12. No court has found that he was not qualified to testify as an expert. *Id.* at 1347:13-15.

Each of these seasoned experts based their conclusions regarding the mistreatment of individuals in ADCRR's care on a multifaceted review that included both random and nonrandom components. Across the various types of data that these experts reviewed, regardless of methodology, the experts drew a consistent conclusion: ADCRR's broken system puts class members at a substantial risk of serious harm. As Dr. Wilcox explained, "The problems I found . . . were consistent across the different categories of medical records I reviewed (those who died, those I met during site visits, and those identified by Plaintiffs' counsel)." Wilcox WT, Doc. 4138 ¶ 24; *see also* Horn TT at 1344:5-11 ("[W]hen you hear the same thing from different people expressed albeit slightly differently but essentially telling you the same -- describing the same phenomenon or the same story . . . in different places, different housing units, different buildings, different prisons, and it has the ring of truth and then it is further reinforced when you look at documents that seem to bear it out."). That is, Plaintiffs' four experts not only arrived at the same conclusion, but each of these experts based their individual conclusions on multifaceted reviews of Defendants' deficient systems.

## 2.    Defendants' criticisms of Plaintiffs' experts' methodology are baseless.

In an effort to distract from these robust, multifaceted reviews, Defendants criticize Plaintiffs' experts for not reviewing a sufficiently random sample of patient medical

1   records and for purportedly not visiting enough prisons. *See* Doc. 4309 ¶¶ 520, 530, 531,

2   1146, 1548, 1593. These criticisms are misplaced, as set forth below.

3           **(a)**    **The experts sampled patients who were representative and**

4                              **appropriate for their purpose, using both random and**
                              **non-random samples.**

5        Defendants' complaints regarding the Plaintiffs' experts' methods for choosing

6   patients for interviews and chart reviews are meritless.

7        ***First***, Defendants ignore and understate the degree of randomness that indeed

8   exists in these experts' methodologies. For example, within Dr. Wilcox's and

9   Dr. Stewart's focused studies of patients' charts with severe medical and mental health

10  needs, they did not cherry-pick or only look at entries within the charts that exhibited

11  deficiencies in Defendants' treatment of these patients and review only these entries.

12  Rather, for the 120 patients whose medical charts Dr. Wilcox reviewed, he reviewed

13  thousands of entries for encounters, laboratory orders, consult requests, and diagnostic test

14  results. Doc. 4308 ¶ 588; Wilcox TT at 1971:24-1972:3. Similarly, for Dr. Stewart, the

15  hundreds of patients whose charts he reviewed comprised thousands of separate entries.

16  Doc. 4308 ¶ 391.

17       These experts' conclusions regarding Defendants' deficient medical and mental

18  healthcare systems were based not on isolated, handpicked reviews of the most

19  concerning records in a given patient's chart, but on expansive reviews of various types of

20  encounters that individual patients had with different providers. *See, e.g.*, Wilcox WT,

21  Doc. 4138 ¶ 164 ("In reviewing hundreds of individual healthcare encounter records, I

22  have observed that nurses routinely fail to accurately identify the patient's presenting

23  complaints, choose the wrong NET for the patient's complaints, fail to complete the

24  nursing NETs that are supposed to guide their actions, and often fail to reach the correct

25  disposition."); Wilcox TT at 1971:14-1972:3. Moreover, Dr. Wilcox reviewed a

26  combination of medical charts of patients identified by counsel, of patients who had died

27  in custody, and of random patients whom he met and interviewed while touring the IPCs.

28  *See* Wilcox WT, Doc. 4138 ¶¶ 20-22.

1   Defendants write that "[b]y Dr. Stewart's own admission, the 156 files he reviewed
2   in preparation of his report suffer from selection bias." Doc. 4309 ¶ 1141, citing
3   Doc. 4174 ¶ 44. This is doubly false. First, Dr. Stewart made no such admission, as it is
4   untrue; second, the purported citation to his "own admission" actually cites to the
5   conclusory and unsupported assertions of Defendants' expert Dr. Penn. Rather, as detailed
6   in Dr. Stewart's written declaration, during his September 2021 visits, he attempted to
7   meet with (1) people who appeared often on Defendants' self-harm and mental health
8   watch logs as persons with very long stays on suicide watch or frequent acts of self-harm,
9   (2) class members whom he interviewed in the past, to determine how their mental health
10  has worsened or progressed since their last meeting, and (3) monolingual Spanish
11  speakers (based upon ADCRR's language interpretation logs, that Defendants provided
12  prior to his tours) who are on the mental health caseload. Doc. 4308 ¶ 371. The remaining
13  people whom Dr. Stewart interviewed were chosen by going to specialized mental health
14  and isolation housing units and walking from cell to cell, to observe and speak with
15  people whom Defendants had chosen to incarcerate in those units. *Id*.; Stewart WT,
16  Doc. 4109 ¶ 9. Like Dr. Wilcox, Dr. Stewart reviewed the medical records of many of the
17  people he met with while at the prisons, and of most of the class members who have died
18  by suicide since January 2019. Unlike Dr. Penn, Dr. Stewart took notes and provided the
19  Court with comprehensive write-ups and summaries with his clinical review and analysis
20  of the care provided to named plaintiffs and class members with mental illness. Stewart
21  WT, Doc. 4109 ¶¶ 11-13; Doc. 4109-1, Exs. 2 and 3.[7]

22  And while Defendants allege that Dr. Haney "did not review available medical
23  records to attempt to verify what inmates told him during the interviews," (Doc. 4309

24

25  ───────────────
    [7] Defendants claim that "[s]ignificantly, Dr. Stewart did not review or provide
26  comment on any mental health records from inmates housed at Douglas, Safford, or
    Yuma." Doc. 4309 ¶ 1142 (citing generally Doc. 4111 [no pinpoint cite provided]). This
27  is false. *See* Doc. 4109 ¶ 63 (Dr. Stewart's written testimony referencing his review of
    records of two patients at Yuma). Moreover, Defendants' expert Dr. Penn did not review
28  any records from patients at Douglas, Safford, or Winslow prisons. Doc. 4309 ¶ 1195.

¶ 1550), this is false. Dr. Haney specifically testified that he "spot checked [the medical record] in a number of cases," (Haney TT at 848:22-849:18), and that he "relied on what [interviewees] told me about their diagnosis, which oftentimes I was able to corroborate by looking at their medical records." *Id.* at 835:4-11; *see also id.* at 993:5-994:2.

In similar fashion, the experts interviewed both patients identified by counsel and patients randomly selected while the experts were on-site at the prisons. *See* Wilcox TT at 1968:7-20 (discussing "random patient encounters" conducted at the four prisons with IPCs); Stewart WT, Doc. 4109 ¶ 9 ("Holding aside seeking out [patients identified by counsel] and persons who I've previously spoken to on past visits, all other class members who I spoke to on the tours were chosen randomly by walking through the housing units and going cell-to-cell, asking people to speak to me cell-front."); Horn WT, Doc. 4130 ¶ 2; Horn TT at 1342:14-1343:2 (discussing over sixty interviews conducted with class members not preselected by counsel); Haney WT, Doc. 4120 ¶ 13 ("Many of these incarcerated persons were chosen randomly and interviewed cell-front in the course of inspecting the various housing units.").[8]

**Second**, with respect to certain non-random methods that Plaintiffs' experts used, Defendants offer no support for their insinuation that the use of human judgment in devising a sample dataset necessarily taints the results of the sampling. *See E.E.O.C. v. Sears, Roebuck & Co.*, 628 F. Supp. 1264, 1310 & n.49, 1311 (N.D. Ill. 1986) (defending expert's use of non-random, "judgment sample" survey that "requir[ed] use of human judgment in selecting stores" from which sample data would be drawn), *aff'd*, 839 F.2d 302 (7th Cir. 1988).

---

[8] With respect to Dr. Haney, Defendants acknowledge that his methodology was to pick people "as randomly as I could" for cell-side interviews. Doc. 4309 ¶ 1547. But, without a shred of support, they attempt to cast doubt on this methodology because he "did not utilize housing unit count sheets or any randomization computer program." *Id.* ¶ 1548. Nowhere do Defendants explain why Dr. Haney's efforts to randomize the population that he sampled fell below any standard or were otherwise inadequate.

Indeed, courts routinely rely on experts whose reports and testimonies are based on focused, non-random datasets, including in prison conditions litigation. For example, in *Madrid v. Gomez*, the district court found that a California prison had a constitutionally inadequate healthcare system, by relying in part on the plaintiffs' expert's non-random "focused study" of certain patients' medical records. 889 F. Supp. 1146, 1200 n.102, 1204-05, 1212 (N.D. Cal. 1995) (finding that the expert's "focused study which highlighted systemic problems at Pelican Bay" showed "a rampant pattern of improper or inadequate care that nearly defies belief.") (internal quotation marks omitted). Similarly, in *Casey v. Lewis*, this Court relied on the findings of the plaintiffs' mental health expert, which were based in part on non-random medical record reviews, in concluding that the Arizona Department of Corrections' mental health care system was constitutionally deficient. *See* 834 F. Supp. 1477, 1512, 1521, 1526, 1537, 1542-43 (D. Ariz. 1993). And in *Brown v. Plata*, the Supreme Court upheld the evidentiary foundation of the district court's findings regarding constitutional violations in California state prisons without requiring particular sampling methods from plaintiffs' experts (including Dr. Stewart and Dr. Haney). *Brown*, 563 U.S. at 517-24; *see also Ruiz v. Johnson*, 37 F. Supp. 2d 855, 891 (S.D. Tex. 1999) ("The fact that 30 records show excessive uses of force does not change because the records were selected non-randomly."), *rev'd and remanded on other grounds*, 243 F.3d 941 (5th Cir. 2001).

It bears emphasizing that courts not only admit expert testimony based on non-random sampling methodologies (over *Daubert* objections, as this Court has already done, *see* Doc. 1040), but also rely on the substance of such testimony. For example, in *Coleman v. Wilson*, the district court considered the defendants' argument that the plaintiffs' experts' declarations were "entitled to little weight" on the merits in determining whether the defendants had violated the Eighth Amendment, in part because "they [we]re based on medical files 'pre-selected' by plaintiffs' counsel." *Coleman v. Wilson*, 912 F. Supp. 1282, 1302-303 (E.D. Cal. 1995). The district court rejected the

1  defendants' attempt to cast doubt on the reliability of the experts' declarations. *Id.*

2  ("[T]heir attack upon the files selected is without merit.").

3  Even further, courts have recognized that in qualitative research, randomness in

4  data sampling may actually be undesirable. In *Braggs v. Dunn*, for example, the court

5  discussed favorably the idea—set forth by a plaintiffs' expert in another case—that a non-

6  random, "judgment sample" is the "gold standard" in qualitative research:

7  
8  Instead of using random number generators to select samples,
   a judgment sample is chosen based on the expertise and
   judgment of a subject matter expert with knowledge of the

9  system or process being assessed. The goal is to obtain a
   sample which is as broad, rich, and representative of the

10  diversity of operational conditions as possible. . . . Judgment
    samples are appropriate because ensuring that all potential
    observational units in a population and sampling time frame

11  have equal probability of selection is often not the most
    desired or beneficial strategy. Rather, we look to the subject

12  matter experts to guide which areas, times of day, or segments
    of the population are most important to study and understand.

13  

14  *Braggs v. Dunn*, 317 F.R.D. 634, 646 (M.D. Ala. 2016) (quoting *Dockery v. Fischer*, 253

15  F. Supp. 3d 832, 844 (S.D. Miss. 2015)).

16  In line with these cases, where Plaintiffs' experts departed from pure randomized

17  sampling, these departures were purposeful and well-reasoned. Plaintiffs' experts partially

18  utilized non-random methodologies where pure random selection would have yielded less

19  relevant data about Defendants' treatment of patients and system operations. For instance,

20  Dr. Wilcox deliberately focused his chart review on patients who have higher medical

21  utilization, including those who are in the prison infirmaries, because those charts contain

22  multiple encounters, permitting a better system evaluation. *See* Doc. 4308 ¶ 588 n.108.

23  Defendants cite their medical expert Dr. Murray's testimony to conclude that Dr. Wilcox

24  cannot generalize his findings about certain patients whose records he reviewed to the

25  broader ADCRR population. Doc. 4309 ¶¶ 526-527. But Defendants distorted and

26  mischaracterized Dr. Wilcox's testimony. In fact, Dr. Wilcox concluded that there are

27  systemic deficiencies in the ADCRR health care system based upon his review of many

28  sources in addition to patients' health care charts, including but not limited to ADCRR's

-12-

1   mortality reviews, CGAR data, and CQI minutes. Wilcox WT, Doc. 4138 ¶¶ 18-27. The

2   chart reviews he did for patients who had very high rates of contact with the health care

3   system confirmed that the systemic deficiencies evident from those other sources are

4   harming patients, and place all patients at risk of harm.[9]

5        Similarly, Dr. Wilcox's decision to study a significant number of charts of patients

6   who died in ADCRR custody between January 2019 and September 2021 reflected a

7   thoughtful, practical methodology, not personal bias:

8            In my experience, the examination of health care records of
             patients who have died provides tremendous insight into
9            quality of care for some of the most complex, difficult, and
             fragile patients in the system. Often, this population has
10           enhanced needs for specialty care, hospitalization, emergency
             care, and the coordination of complex conditions that can test
11           a system's capacity.

12   Wilcox WT, Doc. 4138 ¶ 21.

13        Defendants assert that Dr. Stewart "focused on people with the most serious mental

14   health concerns and diagnoses" as if this constitutes some sort of methodological flaw in

15   analyzing the delivery of mental health care. Doc. 4309 ¶ 1146. But Dr. Stewart explained

16   that he purposefully focuses on these patients, or those who died by suicide, precisely

17   because they are the ones that a functioning correctional mental health care system

18   should—at a minimum—prioritize. Stewart WT, Doc. 4109 ¶ 10.[10] Relatedly, Dr. Haney

19

20        [9] Defendants cite Dr. Baillargeon, an epidemiologist whom Dr. Murray consulted,
     who opined regarding Dr. Wilcox's methodology. Doc. 4309 ¶ 529. Dr. Baillargeon's
21   opinion is hearsay. His opinion is admissible for the limited purpose of explaining the
     basis for Dr. Murray's opinion in this case. Fed. R. Evid. 703. But Dr. Baillargeon's
22   opinions regarding the validity of Dr. Wilcox's methodology are otherwise inadmissible
     hearsay, and are not admissible for the truth of the matter asserted. Fed. R. Evid. 802.
23        [10] While Defendants tried to attack Dr. Stewart's methodology as "flawed" because
24   he focused his interviews and record reviews on people with mental illness, Doc. 4309
     ¶ 1144, their expert Dr. Penn similarly asked Defendants' counsel to select patients for his
25   consulting psychiatrists' medical record review only out of a pool of people with a mental
     health score of MH-3 or higher, because "I wanted to identify anyone that was on the
26   mental health caseload that had either an acute or chronic mental illness, or perhaps a
     serious mental illness; anyone that was on psychotropic meds; was either in a mental
27   health treatment program, or, alternatively, was in – was housed in an inpatient setting. So
     that was MH-3, MH-4, MH-5s." Penn TT at 2964:8-16. When he visited prisons, Dr. Penn
28   similarly only visited the units where MH-4 and MH-5 patients live, because, as he

explained that in addition to conducting randomized interviews, "[w]here possible . . . I also made a point of interviewing incarcerated persons housed in the units I was touring and inspecting whom I had interviewed on past visits, to assess their opinions about whether and how the ADCRR conditions, policies, and practices had changed since the entry of the Stipulation." Haney WT, Doc. 4120 ¶ 13.[11]

**_Third_**, to the extent that the Defendants complain or imply that the Plaintiffs' experts failed to include an adequate sample size from which to identify systemic deficiencies (*see, e.g.*, Doc. 4309 ¶¶ 531, 1594, 1612), their argument is undermined by their own expert's testimony. Defendants' expert Dr. Murray and the team working for him reviewed the records of 80 people, and they reviewed only the care provided by their primary care providers. He did not do a similar study for medication administration, specialty care, hospitalizations, sick call, utilization review, language interpretation, emergency care, nursing care, radiology, or preventive care. Trial Testimony of Dr. Owen Murray ("Murray TT") at 3504:21-3505:25. Despite the fact that he did not conduct a study of preventive care, Dr. Murray made recommendations for systemic improvements to that system based on problems identified in approximately ten files. Murray TT at 3506:1-20. Dr. Murray also identified a systemic problem with the prescription of NSAIDs for people with liver disease, based on ten files and some mortality reviews. *Id.*

---

testified, it is important to know how the system treats the sickest patients. *Id*. 3089:19-3090:14.

Defendants complain that Dr. Penn was "[n]ot … permitted to speak to inmates, at Plaintiffs' counsel's instruction," Doc. 4309 ¶ 1210, but this misleading statement attempts to conceal a strategic choice made by Defendants' counsel. Dr. Penn could have met with class members had Defendants allowed counsel for Plaintiffs to be present for such interviews, just as Defendants' counsel were present for all interactions that Dr. Stewart had with Centurion or ADCRR employees during his prison visits. As Defendants chose to not allow Plaintiffs' counsel to be present for Dr. Penn's visits, it was impermissible for him to speak to represented class members outside Plaintiffs' counsel's presence. *Cf. Coleman v. Brown*, 938 F. Supp. 2d. 955, 962-63, 968-69 n.20 (E.D. Cal. 2013).

[11] Defendants disparage Dr. Haney's methodology in that he "interviewed those people who happened to be awake and willing to talk to him." Doc. 4309 ¶ 1547. This is true: Plaintiffs' experts interviewed incarcerated people who were alive, alert, awake, and willing to talk to them. It's unclear what else Defendants expected Dr. Haney to do.

at 3523:25-3524:16; Written Testimony of Dr. Owen Murray ("Murray WT"), Doc. 4206 ¶¶ 509, 629, 639, 776, 824, 845, 856, 948, 956; *see also* note 83, *infra*.

In summary, Plaintiffs' experts' opinions were based on a wide array of documentary evidence and methodological approaches, of which reviews of patient records were but one component. *See Ruiz*, 37 F. Supp. 2d at 891 ("Statistical models are simply not the only method for making general inferences from specific data"); *Braggs*, 317 F.R.D. at 646 ("[T]his sort of [non-random] sampling is particularly reasonable when it is part of a multifaceted review that considers not only the records and statements of individuals but also other sources such as deposition transcripts and other documents that allows an expert to 'draw general conclusions.'" (citing *Jama v. Esmor Correctional Services., Inc.*, 2007 WL 1847385, at *26–27 (D.N.J. June 25, 2007)). In other words, it was not solely charts identified by counsel that revealed systemic deficiencies in ADCRR's healthcare and isolation systems—the numerous methods that the experts employed to gather data about these systems all yielded the same underlying conclusion.

> **(b)      The prisons the experts visited provided an appropriate basis for their conclusions.**

Defendants similarly criticize Plaintiffs' experts for inspecting what they claim are an inadequate number of sites and interviewing class members only in specialized units. *See* Doc. 4309 ¶¶ 518, 1591. This criticism is similarly meritless.

*First*, as the Ninth Circuit explained when affirming the district court's order granting class certification in this case, this is a case about statewide systems—"*all members* of the putative class and subclass are allegedly exposed to a substantial risk of serious harm by a specified set of centralized ADC policies and practices of uniform and statewide application." *Parsons v Ryan* ("*Parsons I*"), 754 F.3d 657, 688 (9th Cir. 2014) (emphasis added). Further,

> What all members of the putative class and subclass have in common is their alleged exposure, as a result of specified statewide ADC policies and practices that govern the overall conditions of health care services and confinement, to a substantial risk of serious future harm to which the defendants

-15-

> are allegedly deliberately indifferent. As the district court recognized, although a presently existing risk may ultimately result in different future harm for different inmates—ranging from no harm at all to death—*every inmate suffers exactly the same constitutional injury* when he is exposed to a single statewide ADC policy or practice that creates a substantial risk of serious harm.

*Id.* at 678 (emphasis added). Plaintiffs challenge Defendants' systems for delivering care statewide at all of their institutions, including their systems for staffing and supervising healthcare positions, providing access to primary care, mental health care, specialty care, medications, and their systems for confining class members in isolation units. Therefore, the experts' review of representative prisons and housing units is entirely reasonable.

**Second**, it is well-established that experts evaluating statewide prison systems may draw on on-site inspections of a selection of prisons, and need not conduct on-site inspections of every prison in a given system (or every housing unit or building within every prison). For instance, in *Plata*, as in this case, Dr. Haney visited a selection of prisons within the California state prison system that housed people in maximum custody conditions, and from this sample was able to extrapolate systemic conclusions, which were cited with approval. *See* 563 U.S. at 522 (discussing Dr. Haney's on-site inspection of a selection of California prisons in review of statewide prison system).

Defendants fault Dr. Haney for not visiting any maximum custody units at "Yuma, Douglas, Safford, or Winslow prison complexes" (Doc. 4309 ¶ 1545)—but these are prisons where, as Defendants are well aware, there are no maximum custody units. *See* Ex. 1304 (Sept. 30, 2021 ADC Count Sheet). Such misplaced criticism is risible at best. And as Defendants acknowledge, Dr. Haney visited Eyman-SMU 1, Eyman-Browning, and Lewis-Rast Max, which collectively hold the vast majority of ADCRR maximum custody prisoners. *See id.*[12] More fundamentally, it is undisputed that conditions in Defendants' maximum custody units are governed by uniform policies of statewide

---

[12] Dr. Haney—unlike Defendants' expert Dr. Penn—also visited Lewis Sunrise Minors Unit, where children were held in long-term isolation in detention units. Doc. 4308 ¶ 32. Dr. Haney also visited Lewis prison's Morey and Stiner Units. *Id.*

1    application. *See, e.g.*, Ex. 1318 (ADCRR Department Order 812 – Inmate Maximum

2    Custody Management and Incentive System); *see also* Doc. 4308 ¶¶ 245-283.

3        Dr. Haney testified that the opinions he expressed regarding the isolation units he

4    toured at Eyman and Lewis would also apply to other ADCRR isolation units governed by

5    the same policies. Haney TT at 1004:2-24. Dr. Haney selected Eyman and Lewis as the

6    most appropriate prisons to inspect on-site "on the basis of the concentration of people

7    who were in isolated confinement." Haney TT at 828:17-21; *id.* at 829:14-21 (explaining

8    that the detention and mental health watch units at Florence, Phoenix, Perryville, Tucson,

9    Yuma, Safford, Douglas, and Winslow contain a small number of people).[13] *See also*

10   Doc. 4308 ¶¶ 25-26 (discussing Mr. Horn's tours of Lewis and Eyman that included

11   inspections of maximum custody units, detention units, and one close management unit,

12   including interviews with class members in these various types of units).

13       ***Third***, the insinuation that Plaintiffs' experts did not see enough of the ADCRR

14   system in person is belied by the evidence presented at trial. In a one-month period

15   preceding trial alone, Plaintiffs' experts inspected six out of the ten ADCRR prisons

16   (Eyman, Lewis, Tucson, Perryville, Phoenix, and Florence). *See* Wilcox WT, Doc. 4138

17   ¶ 26 (Lewis, Perryville, Tucson, Florence); Stewart WT, Doc. 4109 ¶ 8 (Eyman, Tucson,

18   Perryville, Phoenix); Doc. 4308 ¶ 32 (Dr. Haney inspected multiple max custody,

19   detention, and mental health watch units, plus the only ADCRR unit for minors, at Eyman

20   and Lewis); Horn WT, Doc. 4130 ¶ 77 (max custody, detention, and mental health watch

21   units at Eyman and Lewis). These six prisons collectively hold more than 73% of the class

22   members in this case. Ex. 1304.

23       Like their decisions as to which categories of records to review, the experts'

24   choices on which prisons to tour were deliberate and well-reasoned. For instance,

25   Dr. Stewart inspected prisons with high concentrations of patients with serious mental

26

27   _____

     [13] Defendants fault Dr. Haney for visiting "only" seven housing units over three

28   days. Doc. 4309 ¶ 1545. This is false; in fact, his inspection tours lasted four days. Haney
     WT, Doc. 4120 ¶ 11; Haney TT at 753:8-25.

1   health needs; accordingly, touring prisons like Winslow or Safford, which are "non-

2   corridor" facilities where ADCRR does not incarcerate people with mental health needs,

3   would not have yielded relevant data for him to review. *See* Stewart WT, Doc. 4308

4   ¶ 900. And Dr. Wilcox visited every ADCRR prison with an infirmary, where those with

5   higher medical utilization are housed. Doc. 4308 ¶ 588. At those prisons, he visited not

6   only infirmaries but also special needs units and other housing units. Wilcox WT,

7   Doc. 4138 ¶ 21.

8

9   > ### 3.    The methodology used by Mr. Joy in analyzing staffing shortages is sound.

10   Mr. Joy has over 30 years of experience in healthcare, including more than two

11   decades working with executives at large state health agencies to measure and improve

12   health system performance. Written Testimony of Robert Joy ("Joy WT"), Doc. 4099-1 at

13   6-7; Trial Testimony of Robert Joy ("Joy TT") at 60:19-61:6. Since 2009, California's

14   prison medical Receiver has retained Mr. Joy as an external consultant to improve

15   healthcare in prisons, evaluate the prison system's healthcare performance, create medical

16   staffing models for each of its 34 prisons, and support efforts to raise the quality of health

17   services delivered to a level of constitutional adequacy. Joy WT, Doc. 4099-1 at 6; Joy TT

18   at 61:7-66:18. The Receiver has successfully implemented many of the reforms Mr. Joy

19   helped design. Joy TT at 64:15-66:6.

20   Mr. Joy's recent work to develop a medical staffing model for California's prisons,

21   the model on which his expert report in this case is based, required no chart reviews, site

22   visits or staff interviews. Joy TT at 67:9-68:8. Instead of relying on chart samples or staff

23   anecdotes, Mr. Joy's empirical, transparent, and evidence-based staffing model relied on

24   census, utilization, and provider capacity data to estimate how many providers in various

25   classification were required to meet residents' basic health care needs. Joy TT at 62:1-

26   64:14, 70:15-74:13; Joy WT, Doc. 4099-1, Ex. C; Doc. 4308 ¶ 927.

27   Like California's healthcare staffing model, Mr. Joy's model for Arizona's prisons

28   boils down to a set of dispassionate, simple mathematical word problems. For example, if

-18-

1    a prison has an average of 1,000 residents on any day, and each resident is expected to
2    need an average of three doctor visits per year, and each doctor can see 10 patients a day,
3    and a doctor can work 200 days in a year, how many doctors does the prison need?

4         Mr. Joy relied on ADCRR data, external U.S. prison benchmarks, healthcare
5    community standards, and the input of correctional physician experts to provide the
6    quantitative inputs to each variable in these word problems. *Id.* To arrive at the output
7    described in his expert report, Mr. Joy validated and reconciled these various inputs by
8    applying his three decades of experience with state-run healthcare systems and
9    correctional agencies. Mr. Joy also validated the staffing rates from this analysis against
10   other prison systems and the opinions of correctional physician experts to verify the
11   estimated staffing requirements were reasonable. Joy TT at 77:21-81:1; Joy WT,
12   Doc. 4099-1 at 78:12-82:11.

13                                        * * * * *

14        In sum, Plaintiffs' experts based their opinions in this action on sound
15   methodologies that overwhelmingly support the conclusion that Defendants have been and
16   continue to be deliberately indifferent to the substantial risk of serious harm to Plaintiffs.

17        **B.    Plaintiffs' Experts Are Credible.**

18        In addition to their flailing and ineffectual attacks on Plaintiffs' experts'
19   methodology, Defendants assail Plaintiffs' experts as not credible, conjuring baseless
20   accusations and irrelevant assertions about their backgrounds. Plaintiffs will not repeat
21   their experts' credentials as detailed in their Proposed Findings of Fact as well as in the
22   experts' written and trial testimony, but rather only respond to some of the more egregious
23   and groundless criticisms leveled by Defendants.

24              **1.    Dr. Todd Wilcox is qualified and credible.**

25        Plaintiffs' medical care expert, Dr. Todd Wilcox, presented extensive written and
26   trial testimony establishing that ADCRR's health care system fails to provide patients
27   with the community standard of care, based upon his recent investigation for this trial, and
28   informed by his experience in this case for the last nine years. Rather than responding to

                                        -19-

the substance of Dr. Wilcox's testimony, Defendants make a half-hearted swipe at his expert credentials, mount a baseless and irrelevant attack on medical care at the Salt Lake County Jail, and miscite and/or manipulate his testimony. *See generally*, Doc. 4309 ¶¶ 499-533. Notwithstanding Defendants' baseless attacks, Dr. Wilcox is a highly experienced and reliable expert whose testimony in this action is essentially unchallenged.

Defendants challenge Dr. Wilcox's expertise, stating that he has not worked clinically in a prison setting since working in a Utah state prison 22 years ago, and thus is "not qualified to provide opinions with respect to the provision of medical care in a prison setting." Doc. 4309 ¶¶ 500-502. Defendants' position is absurd and contrary to the evidence presented. Dr. Wilcox's expertise in correctional medicine is based on, in addition to his service at the Utah state prison, close to three decades of experience as the medical director of a large county jail, and as a correctional medicine consultant to state prison systems, county jails, the National Institute of Corrections, and the American Jail Institution. Wilcox WT, Doc. 4138 ¶ 2; Wilcox TT at 1621:18-1625:22. He has served as an expert witness evaluating cases to determine whether the care at prisons meets the standard of care, and this work has been split between work for defense and for plaintiffs. Wilcox TT at 1626:5-9. He is an adjunct faculty member at the University of Utah School of Medicine and teaches and supervises medical students and residents at the jail. Wilcox TT at 1628:2-7. For the last 26 years, a significant proportion of his work has included providing direct clinical care. *Id.* at 1620:10-20. A past President of the American College of Correctional Physicians, and former Chairman of the Physician Certification Committee for the National Commission on Correctional Health Care (NCCHC), Dr. Wilcox is a recognized expert in the field of correctional health care and is highly qualified to provide opinions with respect to the provision of health care in a prison setting. Doc. 4138-1 at 3-4.

Defendants undermine their credibility by launching an unsupported and highly unprofessional attack on Dr. Wilcox and his work as the Medical Director at the Salt Lake County Jail. Doc. 4309 ¶ 516. Without citation, Defendants attempt to smear Dr. Wilcox

-20-

with unsubstantiated criticisms regarding delivery of health care in his jail from a former mayor of Salt Lake City, and an expert who commented on an in-jail death. Neither the former mayor nor that expert presented testimony at this trial. Defendants' inflammatory hearsay allegations are not admissible under any exception to the federal rule against hearsay. Fed. R. Evid. 802. There is no admissible evidence before this Court that Salt Lake County jail received negative press alleging cruelty and indifference. Defendants' discussion of the case of a patient who died of peritonitis is also entirely unsupported by any admissible evidence, except to the extent that Dr. Wilcox testified she died of peritonitis. Wilcox TT at 1923:18-21. This entire paragraph is meritless and must be disregarded.

Without challenging any of the factual underpinnings of Dr. Wilcox's testimony, Defendants misquote and misrepresent his statements. For example, Defendants claim that Dr. Wilcox testified that "any" delay he saw with regard to specialty care was included in his report. Doc. 4309 ¶ 508. In fact, Dr. Wilcox's affirmative response to Mr. Struck's awkwardly posed question does not establish that "any" delay was included. Wilcox TT at 1811:9-11 ("Are – the delays in care that you saw with respect to this declaration are included in this report?"). Regarding his prescribing practices, according to Defendants, Dr. Wilcox "takes into account whether a patient has a history of substance abuse when prescribing medication." Doc. 4309 ¶ 512. Defendants include this cite without providing context—Dr. Wilcox responded to Defendants' questions about prescribing pain medications to incarcerated people. *See* Wilcox TT at 1866:22-1868:9. Defendants mislead the Court by citing only part of Dr. Wilcox's testimony about his approach to medicating pain. Dr. Wilcox's full testimony includes his statement that "But what's more important to me is treating their medical condition appropriately." Wilcox TT at 1868:3-9.

Defendants both misstate Dr. Wilcox's testimony regarding contract monitoring requirements for Salt Lake County Jail, and draw unsupported conclusions from their incorrect citations. First, they incorrectly state that Dr. Wilcox evaluates care at the Jail by selecting and reviewing records for a random sample of five percent of the jail population.

-21-

Doc. 4309 ¶ 520. This is false: Dr. Wilcox does not review the care of five percent of the jail population to evaluate the medical care system of Salt Lake County Jail. As Dr. Wilcox testified, his company Wellcon contracts with Salt Lake County, and under that contract, the *county* can review patient medical charts for five percent of the average daily population to determine Wellcon's compliance with specific performance standards set forth in the contract. Wilcox TT at 1901:16-25. Defendants suggest without any explanation that the contract provision allowing Salt Lake County to review a sample of charts, chosen at random, to assess Wellcon's contract compliance, undermines Dr. Wilcox's choice not to fully randomize the sample that he reviewed. As set forth above in Part A, Dr. Wilcox's conscious choice here to review charts for patients was purposeful, designed to focus on patients in the Arizona prison system with "higher medical utilization" in order to enable him to evaluate "how information flows through the system and how the care is coordinated." *Id.* at 1676:16-1677:10. The fact that Salt Lake County uses a different method to evaluate contract compliance in no way undermines the validity of Dr. Wilcox's methodology in this action.

Without citation, Defendants assert that Dr. Wilcox is an "advocate," to apparently argue that he is thus biased or unreliable. Doc. 4309 ¶ 521. It is unclear what Defendants mean by this. In his written and trial testimony, Dr. Wilcox described scores of cases involving truly horrendous care that, he explained, is the result of the systemic deficiencies that are well-documented in CGAR results, mortality review, CQI minutes and the health care records for the 120 patients that he reviewed. Remarkably, as previously noted, Defendants have not raised any defense to the quality of care that they provided in those cases, but rather attacked Dr. Wilcox's character for "advocating" for class members to receive health care that meets basic standards of care.[14] Dr. Wilcox's

---

[14] This absurd accusation is not limited to Dr. Wilcox. *See also infra* note 18 (Defendants' attack on Dr. Pablo Stewart as an "advocate" after he testified that he cares about social justice, and is concerned as a physician that incarcerated people with mental illness receive adequate psychiatric and psychological care from prison and jail systems).

1    opinions are sound and overwhelmingly support a finding that Defendants' health care

2    system places all patients at substantial risk of serious harm.

3                    **2.      Dr. Pablo Stewart is qualified and credible.**

4           Defendants misstate and miscite the testimony of Plaintiffs' psychiatric expert

5    Dr. Pablo Stewart, in a misguided and ineffectual attempt to disparage and discredit him.

6    *See* Doc. 4309 ¶¶ 1127-1152. These efforts clearly miss the mark. Plaintiffs have set forth

7    Dr. Stewart's experience working with incarcerated mental health patients, including as a

8    neutral court-appointed psychiatric expert in a statewide class action brought on behalf of

9    all people with mental illness in the Illinois Department of Corrections, and will not repeat

10   it here. *See generally* Doc. 4308 ¶¶ 369 n.64, 375, and evidence cited therein. And Dr.

11   Stewart's methodology, as described above and detailed at Doc. 4308 ¶¶ 369-374, and his

12   written and oral testimony cited therein, is sound; his conclusions have thorough bases in

13   his clinical review of medical records and his detailed write-ups, his reviews of numerous

14   other documents and Defendants' employees' testimony, and interviews with patients

15   with serious mental illnesses; and his methodology has been previously upheld by this

16   court over Defendants' *Daubert* motion. Doc. 1040.

17          Rather than give an exhaustive list of Defendants' every misrepresentation with

18   regard to Dr. Stewart (much of which was cut-and-pasted verbatim from Dr. Penn's

19   written testimony), Plaintiffs highlight only the most egregious.

20          First, Defendants attack Dr. Stewart, a board-certified psychiatrist with more than

21   four decades of clinical, research, and academic experience in the diagnosis, treatment,

22   and community care programs for persons with psychiatric disorders, and incarcerated and

23   institutionalized patients with dual diagnoses, including psychotic disorders, on the basis

24   that courts supposedly "found that honesty was unimportant to Dr. Stewart." and "have

25   not permitted [him] to testify at trial." Doc. 4309 ¶ 1127. This utterly misrepresents the

26   courts' conclusions in both cases, but in any event these cases are not relevant as they do

27   not relate to a prison mental health care system or to Dr. Stewart's methodology in

28   reaching conclusions regarding a prison system's delivery of care. Trial Testimony of

Pablo Stewart, M.D. ("Stewart TT") at 671:20-672:11. Most notably, Defendants conspicuously do not quote the actual text of the court opinions that they had offered up in cross-examination ostensibly to impeach Dr. Stewart, but rather cite to their counsel's self-serving questions mischaracterizing the contents of those exhibits.[15]

The first case Defendants reference (but again, do not actually quote), *United States v. Gowadia*, No. 05-00486 SOM, Dkt. 512 (D. Haw. Jan. 21, 2010) (Ex. 5629), involved a defendant's competency to stand trial for federal espionage charges. Dr. Stewart was hired by the defense attorney to conduct a competency assessment, using the commonly-used MacArthur Competency Assessment Tool ("MacCAT"). The district court disagreed with Dr. Stewart's interpretation of some of the defendant's answers to MacCAT questions that are designed to evaluate, among other things, a defendant's attitude toward cooperating with and rationally assisting their attorney. Ex. 5629 at 6-7. Of note, the defendant was asked about his likelihood to plead guilty while continuing to proclaim his innocence, and he said that pleading guilty would be tantamount to lying. *Id*. at 10. The MacCAT also includes a hypothetical about a person pleading guilty to receive a six-month sentence, versus pleading not guilty and going to trial and risking a 10-year sentence. *Id*. at 11-12. This defendant said that he would risk a 10-year prison sentence by going to trial because that would be the honest thing to do; Dr. Stewart concluded that pleading guilty (even if one is factually innocent) and "not exposing oneself to a potential 10-year sentence was an advantage," and that the defendant's failure to appreciate the legal dangers of going to trial was an indication of his inability to rationally work with and assist his attorney. *Id*.

The district court in *Gowadia* disagreed with Dr. Stewart's interpretation of the answer to the two questions, and that he "does not explain to this court's satisfaction why a claim of innocence and reliance on honesty is either irrational or an indication that [the

---

[15] Counsel for Defendants' inability or unwillingness to accurately quote the actual source document calls into question the credibility of this and many statements contained in both their Conclusions of Law and Findings of Fact.

-24-

defendant] is unable to assist in his defense." *Id*. at 12. This hardly supports Defendants'
hyperbolic statement that "Judge Mollway in Hawaii District Court [sic] previously found
that honesty was unimportant to Dr. Stewart." Doc. 4309 ¶ 1127 (citing Defendant's
counsel's questions). Accordingly, their false and overblown slur should be disregarded.[16]

Defendants state that "there have been previous cases where courts have not
permitted Dr. Stewart to testify at trial" and that a court "found his opinion to be
unreliable." Doc. 4309 ¶ 1127 (citing transcript at 559:20-23 and 561:8-17). Again, this
misrepresents reality, and in any event, it did not relate to prison mental health care.
Rather, the case referenced, *David et al. v. Signal Int'l, LLC, et al. / EEOC v. Signal Int'l,
LLC, et al.*, 2015 WL 151451 (E.D. La. Jan. 10, 2015) (Ex. 5630), was a civil case about
working conditions at a so-called "man camp" at an industrial employer, where workers
live on-site. Ex. 5630 at 2.[17] Counsel for plaintiffs offered Dr. Stewart as an expert on the
psychological impact of overcrowded housing, based upon his expertise in prison
overcrowding. *Id*. The court granted the corporate defendant's *Daubert* motion, noting
that while the defendant "does not deny Dr. Stewart is qualified as an expert witness to
testify about prison overcrowding," that "there are too great of analytical gaps between
Dr. Stewart's expertise in prison overcrowding and his opinions offered on overcrowding
at the man camp" by plaintiffs' counsel. *Id*.

In contrast, here, over the course of nine years Dr. Stewart has met with, and
reviewed medical records of, hundreds of persons incarcerated in ADCRR, and for
purposes of this testimony, met with dozens of class members in September 2021,

---

[16] The *Gowadia* court also noted that the psychiatrist for the government, who
administered the same MacCAT to the same defendant, similarly concluded that the
defendant "had a factual understanding of this case but that he was not rational.
. . . [B]ecause of [defendant's] Narcissistic Personality Disorder or grandiosity, [he] had
an impaired ability to reason. . . . [The government psychiatrist] reasoned that [he] was
impaired because [he] expressed a desire to testify, thinking that he could explain why he
was not guilty and he could cross-examine the Government's witnesses and 'make them
cry.'" Ex. 5629 at 13-14. Many of the MacCAT scores the government's psychiatrist
assigned to the defendant and conclusions matched those of Dr. Stewart. *See id*.

[17] Technically these are multiple "cases," as the EEOC and a group of employees
separately sued the corporation; but were consolidated into one proceeding.

1   reviewed numerous medical records, and (unlike Defendants' expert Dr. Penn, who

2   testified that he keeps everything "in [his] head" but could not testify about what was in

3   his head), provided the Court with a copious and detailed written analysis of his

4   interviews and clinical reviews of the medical records. Doc. 4308 ¶¶ 369-372, 375.

5          Defendants also falsely assert that Dr. Stewart "does not provide direct patient care

6   to inmates in the jail" at Oahu Correctional Center and that his "only experience providing

7   direct patient care to inmates was limited to only four years in the late 1980s." Doc. 4309

8   ¶¶ 1129-1130. In fact, when Defendants' counsel asked Dr. Stewart—who testified via

9   Zoom in this trial precisely because of his need to provide clinical care to and see his

10  incarcerated patients at the Oahu jail with University of Hawai'i psychiatric residents—

11  when he had last "provided clinical services in a correctional setting," he truthfully

12  answered, "Yesterday." Stewart TT at 540:23-25. Dr. Stewart testified that "I oversee the

13  psychiatric residents' work in their provision of care. So I'm right there when they

14  interview patients. I'm there when they review charts. We discuss their findings, and we

15  come up together with a treatment plan." *Id*. at 541:17-21.[18]

16          **3.     Dr. Craig Haney is qualified and credible.**

17          Defendants assert that Dr. Haney "does not have the requisite background,

18  knowledge, or experience to provide opinions regarding the psychological effects of

19  isolation." Doc. 4309 ¶ 1537. They are stupendously wrong. Dr. Haney is one of the

20  nation's leading experts on the effects of solitary confinement. As Defendants

21  acknowledge, he is a social psychologist who has been studying the psychological effects

22

23  _____

24          [18] Defendants seemingly find it shocking that Dr. Stewart describes himself as a
    person who cares about social justice or incarcerated human beings. Doc. 4309 ¶ 1137.
    Dr. Stewart explained that he considers himself "an advocate for prisoners" because "as a

25  physician, I'm an advocate for people having good health care, including psychiatric care.
    So in that sense, if we're talking about prison mental health, I guess you could call me an

26  advocate, but it has to do with my role as a physician." Stewart TT at 671:6-12.
          Absurdly, counsel for Defendants actually asked Dr. Stewart "isn't it true you took

27  that position with the Oahu Community Correctional Center due to the criticisms you've
    received from lawyers and judges in cases like this for not having correctional

28  experience?", *id*. at 547:2-5, to which he responded, "Not at all," *id*. at 547:6.

of solitary confinement for 40 years. Doc. 4309 ¶ 1541; *see also* Haney WT, Doc. 4120-1 at 3-46. Dr. Haney's qualifications and experience are set forth in detail in his testimony and Plaintiffs' Findings of Fact and will not be repeated here. Haney WT, Doc. 4120 ¶¶ 1-7; Doc. 4120-1 at 3-46; Doc. 4308 ¶¶ 27-31.

Dr. Haney has published three sole-authored books and co-authored a fourth; he has also written numerous scholarly articles and book chapters on topics including the psychological effects of incarceration and the nature and consequences of solitary confinement. Haney WT, Doc. 4120 ¶¶ 2, 4; Haney TT at 727:1-728:4. Dr. Haney has been qualified and testified as an expert on solitary confinement in numerous federal and state courts, and his research, writing, and testimony has been cited by state courts, federal district and appellate courts, and the U.S. Supreme Court. Haney WT, Doc. 4120 ¶ 7. Defendants' expert Dr. Penn simply does not have comparable credentials in this area.[19]

Defendants also repeatedly miscite and mischaracterize Dr. Haney's testimony and the basis for his opinions. Defendants assert that "[Dr.] Haney implies in his expert report that there is empirical research that clearly established an immediate and direct cause and effect, and he infers that all individuals with mental illness will demonstrate clinical deterioration and exacerbation of their mental illness and engage in self-injurious behaviors and suicide attempts if placed in 'solitary confinement.'" Doc. 4309 ¶ 1513,

---

[19] A formative experience that Dr. Haney had in 1971, while pursuing a Ph.D. in psychology, was serving as the lead graduate research assistant in what is now widely known as the "Stanford Prison Experiment." Haney WT, Doc. 4120 ¶ 5. Yet Defendants bizarrely choose to attack his credibility and testimony in November 2021 based on his role in a seminal research project from five decades ago that is universally studied in modern psychology for both its insights and its flaws that changed the entire academic field of behavioral science and human subject studies.

Defendants assert that "[Dr.] Haney acknowledges that the study has been criticized as to methodology and was criticized as recently as 2019 by the American Psychological Association for unethical treatment of the experiment participants." Doc. 4309 ¶ 1540. Besides the staggeringly obvious fact that the Stanford Prison Experiment is hardly relevant to Dr. Haney's work 50 years later in this case, this is yet another mischaracterization by Defendants of a witness's testimony. In reality, Dr. Haney testified that the APA did *not* criticize the Stanford Prison Experiment, but it published an article in its journal in 2019, by someone who is not a member of the APA, who criticized the Stanford Prison Experiment. Haney WT at 719:18-720:24, 816:5-818:4.

1    citing Doc. 4174 ¶ 238. Defendants' statement is doubly false: first, they are not citing to

2    Dr. Haney's written testimony (or anything that he could have "implied"), but rather their

3    expert Dr. Penn's written testimony. Second, it misstates his trial testimony; Dr. Haney

4    explained that some people will be harmed by solitary confinement, others will not, and

5    there is no way of determining who will be harmed by isolation, except that the science

6    clearly shows that people with grave mental health conditions and children are much more

7    likely to suffer psychological harm than others. Haney TT at 856:5-857:3.

8         Defendants also assert that the articles cited by Dr. Haney about the harmful effects

9    of solitary confinement "are neither peer-reviewed nor published in medical journals,"

10   cutting-and-pasting the written testimony of Dr. Penn. Doc. 4309 ¶ 1515. This is

11   demonstrably false. When questioned about these articles on cross-examination, Dr. Penn

12   either admitted that the journal in question was peer-reviewed, or admitted that he did not

13   know whether it was peer-reviewed. Trial Testimony of Joseph Penn ("Penn TT") at

14   3054:17-24,  3280:17-3281:11,  3286:16-3287:5,  3287:24-3288:21,  3289:7-3291:24,

15   3314:11-3315:24. Dr. Penn further admitted that Dr. Haney's report cites articles

16   published in medical, psychiatric, and scientific journals, including, but not limited to, the

17   British Journal of Psychiatry (*id.* at 3286:16-3287:5); the Canadian Psychiatric

18   Association Journal (*id.* at 3290:2-10); and the American Journal of Psychiatry (*id.* at

19   3291:7-15). Indeed, Dr. Penn testified that the American Journal of Psychiatry is

20   "probably one of the premier journals." *Id.* at 3291:21-24.

21        Defendants also criticize Dr. Haney, stating that the articles he cites are not

22   rigorous, and they falsely claim that the only study on solitary confinement that "provides

23   established scientific methodology and rigorous research" is the so-called Colorado study,

24   the results of which, they assert, "contradict [Dr.] Haney's opinions." Doc. 4309 ¶¶ 1514-

25   16 (cutting and pasting Dr. Penn's WT, Doc. 4174 ¶¶ 240-42). But the Colorado study is

26   not what Defendants and Dr. Penn have asserted or hoped it to be. While Dr. Penn

27   testified on direct examination that the Colorado study was done by academic researchers,

28   he admitted on cross-examination that the face of the study itself showed that the primary

-28-

researcher was an employee of the Colorado Department of Corrections, and that he actually knew nothing about her background, qualifications, or prior experience conducting research, despite his previous sworn direct testimony. Penn TT at 3297:1-24. Nor was he aware that the primary researcher conducted the research under pressure from the Warden of the Colorado supermax prison. *Id*. at 3298:10-13. Dr. Penn had no knowledge about the qualification or oversight of the research assistant who gathered data. *Id*. at 3297:25-3298:9. Dr. Penn acknowledged that the primary researcher had described in sworn testimony that the selection of incarcerated people for the study was "haphazard," and that her study disproportionately focused on the prison that happened to be closest to the researchers' office. *Id*. at 3300:2-6, 3303:21-25. Dr. Penn was unaware that participants in this study, which purported to compare the effects of administrative segregation and general population, moved back and forth between the two comparison groups, so people who were in general population would be moved over to administrative segregation, people on administrative segregation would be moved over to general population and back, repeatedly so they were not static in one group for the entire period of the study. *Id*. at 3303:4-12. Dr. Penn was unaware that most of the mental health scales used to assess the mental health of the study participants had not been normed or validated on a prison population. *Id*. at 3303:21-25. One of the only things that Dr. Penn did know about the Colorado study is that after the study was completed, the Colorado Department of Corrections implemented a 15-day limit on the use of isolation. *Id*. at 3304:1-5.

In a remarkable display of chutzpah, Defendants fault Dr. Haney for having "no idea what the average length of stay is in isolated confinement" in ADCRR. Doc. 4309 ¶ 1554 (internal quotation marks omitted). But Defendants fail to explain that the reason Dr. Haney does not know the average length of stay *is that Defendants do not collect or report this information*. Haney TT at 853:16-19; *see also* Shinn TT at 2218:2-6; Doc. 3755; *see also* Haney TT at 1004:25-1005:8 (Dr. Haney has requested length of stay data in this case since 2013 and has consistently been told it is not calculated).

In another example of fictitious assertions pulled from thin air, Defendants falsely claim that Dr. Haney "acknowledges that ADCRR has practices in place to measure cell temperatures and employ mitigation efforts if cell temperatures exceeded 85 degrees Fahrenheit." Doc. 4309 ¶ 1572, citing to Ex. 3031. Besides the fact that Defendants didn't actually cite to anything stated by Dr. Haney, this is false: Defendants asked Dr. Haney if he was aware of any ADCRR "reaction protocols for cells that reach temperatures of, for example, 85 degrees or higher" and he testified in response that he was *not* aware of the existence of such policies. Haney TT at 884:9-22. This is not an "acknowledgment" of anything, let alone that Defendants measure cell temperatures and take mitigation efforts when temperatures exceed 85 degrees.

Compounding Defendants' false assertion is that the exhibit cited by Defendants as their "protocol" does not require prison staff to employ mitigation efforts if cell temperatures exceed 85 degrees Fahrenheit. To the contrary, Exhibit 3031 requires mitigation efforts only if cell temperatures exceed **95 degrees**. Ex. 3031 at ADCRR00172371. And Deputy Warden Scott and Warden Van Winkle both testified that pursuant to ADCRR policies, there is no requirement to take mitigation efforts for any person vulnerable to heat unless the temperature in the cells was above 95 degrees Fahrenheit. Trial Testimony of Travis Scott ("Scott TT") at 1106:22-1107:25; Trial Testimony of Jeffrey Van Winkle ("Van Winkle TT") at 2715:9-2717:4.

Defendants attack Dr. Haney on the demonstrably false basis that "*in the last three to five years, he has only toured one facility in the state of Florida*." Doc. 4309 ¶ 1558, citing Haney TT at 807:5-25 (emphasis in original). But italicizing a falsehood doesn't make it true; the cited testimony entirely fails to support this claim.

Defendants criticize Dr. Haney for not precisely ranking the isolation conditions in ADCRR among the dozens of isolation units around the country that he has analyzed. Doc. 4309 ¶¶ 1554-59. Defendants' contention is misguided; identifying unconstitutional prison conditions is not time-keeping at Olympic speedskating races. Dr. Haney explained in great detail to the Court the numerous factors and elements of the conditions that

-30-

1    combine to make ADCRR's isolation regime "a very harsh, very severe system." Haney

2    TT at 768:1-769:14. And he explained why precise rank ordering, or giving ADCRR a

3    gold medal for the worst solitary confinement system in the United States, is not possible:

4             What I said was Arizona is not the worst. It's a hard
         designation to make. I said it was among the most severe.
5         Places are different. They have different characteristics, there
         are different practices. So it's difficult even to rank all of
6         them, but I did -- but I think I can say that **the level of**
         **deprivation, the amount of time people spend in these units,**
7         **the fact that Arizona does things that oftentimes are not done**
         **in other places such as isolating juveniles, isolating the**
8         **seriously mentally ill, it makes it among the most severe and**
         **among the [ ] worst. Or the most problematic**.
9

10   Haney TT at 799:24–800:10 (emphasis added).[20]

11           Defendants go on to assert that "[Dr] Haney admitted that the risk of harm posed

12   by 'isolation' varies by individual and does not apply in predictable ways where there is

13   'no science' on how isolation presents an alleged risk of harm to certain categories of

14   inmates or inmates with certain personality characteristics." Doc. 4309 ¶ 1566. This is yet

15   again a mischaracterization of Dr. Haney's testimony. Dr. Haney testified that there is no

16   science for determining precisely who will be gravely damaged by the experience of being

17   in isolation "except for the categories of exclusion that we've already talked about.

18   Especially vulnerable people are much more likely to be harmed by this environment than

19   others." Haney TT at 856: 19-857:3. Immediately prior to this, Dr. Haney had identified

20   the categories of especially vulnerable people as "people who have serious mental illness

21   and juveniles." *Id*. at 856:5-7.

22           Finally, Defendants claim that "[w]hile [Dr.] Haney opined that several inmates he

23   interviewed reported they were not provided meaningful access to mental health care, he

24

25           [20] Defendants claim that Dr. Haney "stated that he did not study 25 different prison
26   systems, but 25 different 'isolation units' across the United States." Doc. 4309 ¶ 1556. In
     fact, Dr. Haney's testimony was precisely the opposite: "Well, first of all, it was 25 other
27   state systems. Oftentimes multiple prisons within – within the prison system. So it's not
     just 25 prisons but many different isolation units in 25 or so different states." Haney TT at
28   799:4-16.

conceded on cross examination that the particular inmates received frequent mental health encounters to include private confidential setting counseling. (Ex. 5244A, 5291A; R.T. 11/05/21 a.m. and p.m. at 957:25-965:21.)" Doc. 4309 ¶ 1573. This is inaccurate. Dr. Haney's testimony made clear that numerous incarcerated people told him of a lack of meaningful access to mental health care in Defendants' isolation units. Doc. 4120 ¶¶ 91, 109, 147, 150, 153, 154, 157, 160, 162, 164, 166, 168, 170, 172. The testimony cited by Defendants involves only two prisoners. For the first, the mental health encounters cited by Defendants all occurred while the prisoner was in Barchey Unit, not while he was in isolated confinement, and are thus entirely irrelevant to Dr. Haney's testimony about conditions in isolation units. Haney TT at 955:13-24, 958:14-961:2; Ex. 5244A (showing that all the cited encounters occurred in Barchey Unit). This leaves Defendants with a single example of a prisoner who, they allege, received adequate mental health care while in isolation—based solely upon the fact that he received six encounters over an eight-month period. Haney TT at 965:13-18.

### 4.    Martin Horn is qualified and credible.

Defendants grossly misrepresent Plaintiffs' expert Martin Horn's qualifications and experience in corrections. *See, e.g.*, Doc. 4309 ¶¶ 1578-1590. Mr. Horn is a credible, highly-respected, and highly-qualified corrections management expert with more than four decades of leadership experience in corrections. Moreover, he was the sole corrections expert to testify at trial; Defendants offered no counter to his expert testimony.[21]

As detailed in Mr. Horn's testimony and Plaintiffs' Findings of Fact, he has worked in corrections for over forty years in a variety of frontline and management roles

---

[21] Dr. Penn purported to opine on the security issues posed by people housed in solitary confinement. Penn WT, Doc. 4174 ¶ 243. But as Defendants concede, Dr. Penn is not an expert on correctional or custody issues. Doc. 4309 ¶ 1188; *see also* Penn TT at 3283:1-2 ("So, Your Honor, I don't consider myself to be a custody expert"). He is therefore unqualified to render opinions on the alleged dangerousness of the persons in ADCRR custody, or the security measures they require. *See, e.g.*, Doc. 4309 ¶ 1519. Indeed, Defendants presented no expert testimony at all on correctional or custody issues.

in several state prisons and New York City's jails, where he was responsible for the safety and welfare of the people incarcerated and working in the facilities, and their budgets, personnel, and policies. Doc. 4308 ¶¶ 20-24; Horn WT, Doc. 4130 ¶¶ 6-8 and Ex. 6; Horn TT at 1335:12-1337:14, 1474:3-10. He also described his educational and professional background relevant to corrections administration, and that he has served as an expert in 30 different court proceedings, including more than 20 in federal courts. Horn WT, Doc. 4130 ¶¶ 5-6; Doc. 4130-1 at 1491-154; Horn TT at 1335:20-1336:4, 1346:20-1347:15.

Mr. Horn learned of, and developed his opinions about, restrictive housing and its harmful effects through his role as the Secretary of the Pennsylvania Department of Corrections, and the Commissioner of the City of New York Department of Corrections, where he was "disturbed" by the impact of isolation on people with mental illness. Horn TT at 1603:2-18. Due to the harmful effects, he worked within these two systems to attempt to limit the placement of people with mental illness into restrictive housing, and to find other ways of managing people who were threats to the safety and orderly operation of the facilities. *Id*.

Besides his real-world experience running correctional systems and his educational background, Mr. Horn also relies for his understanding of norms and standards of restrictive housing on the position statements and standards published by a variety of professional associations and agencies in correctional and health care fields, including the Association of State Correctional Administrators (later renamed Correctional Leaders Association) ("CLA"), the American Correctional Association ("ACA"), the American Psychiatric Association ("APA"), and the U.S. Department of Justice. *See* Horn WT, Doc. 4130 ¶¶ 18-33 and nn.13-28. Unlike Defendant Shinn, who either is shockingly ignorant of, or falsely testified that he is unfamiliar with, the provisions of industry standards and ADCRR policies applicable to isolated housing units (*see* Shinn TT at 2220:2-2221:7), Mr. Horn is aware of and uses these standards and ADCRR policies and practices to form his opinions. Horn WT, Doc. 4130 ¶¶ 34-35.

But similar to their practice of running roughshod over the facts or the actual testimony of other expert witnesses in this case, Defendants again misrepresent Mr. Horn's testimony and knowledge regarding the use of isolated confinement, and the impact of sustained solitary confinement upon the operations of these units and upon the human beings who are incarcerated or working in these grim conditions. Plaintiffs highlight and refute the most egregious of Defendants' misrepresentations regarding Mr. Horn below, but this is not an exhaustive recitation of all of Defendants' false assertions with regard to Mr. Horn.

As a threshold matter, similar to the objections Defendants threw up to Dr. Stewart and Dr. Wilcox, Defendants are inexplicably horrified by the idea that Mr. Horn—a former state corrections director, and the former leader of the largest jail system in the United States—acknowledges and recognizes the fundamental humanity of people incarcerated in prisons and jails. Doc. 4309 ¶¶ 1578, 1580. This is absurd, and Mr. Horn's concern for the physical and mental well-being of incarcerated persons does not render him unqualified or unsuitable as an expert.

Defendants falsely assert that Mr. Horn claimed not to have been disqualified as an expert witness but that he "had to admit on cross examination that indeed he has been found not qualified to testify as an expert." Doc. 4309 ¶ 1582. This is untrue. In a single case, Mr. Horn's testimony was limited. In *Bornstein v. Cnty. of Monmouth*, a case against a Sheriff's Department and the contractor health care provider about a death in a county jail, Mr. Horn's testimony was limited in that he was not permitted to testify against the health care provider regarding the medical care provided to the decedent, but he was permitted to testify against the county, and did in fact do so. *See Bornstein v. Cnty. of Monmouth, et al.*, Doc. 291, No. 11-cv-5336 (AET), (D. N.J. Feb. 25, 2015), Trial Testimony of Martin Horn, available at https://ecf.njd.uscourts.gov/doc1/11919636004 (Ex. 5638). The impact of this limitation on Mr. Horn's testimony was so minimal that Mr. Horn was unaware that his testimony had been limited to testimony against the Sheriff's Department. Horn TT at 1481:16-19.

-34-

1      Defendants claim that Mr. Horn testified that "across the nation, *only* Colorado,

2  Maine, New York, Connecticut, and Pennsylvania have restricted their use of restrictive

3  housing." Doc. 4309 ¶ 1599 (emphasis added). He did not. When asked if he was aware of

4  any states that had restricted their use of isolation in recent years, Mr. Horn testified: "Of

5  course most notably Colorado, Maine, New York, Connecticut, Pennsylvania, *among*

6  *others*." Horn TT at 1341:5-10 (emphasis added). *See also* Doc. 4308 ¶ 54 (listing

7  Colorado, Connecticut, Maine, New Jersey, North Dakota, Ohio, Oregon, Pennsylvania,

8  New York, and Washington, as among the states that have in recent years taken steps to

9  reduce the number of people in solitary confinement and/or to limit the amount of time

10  incarcerated people can be in solitary confinement).

11      Defendants faulted Mr. Horn because he did not know off the top of his head while

12  on the stand in mid-November precisely how many of the total ADCRR population on

13  September 30, 2021 (27,794), were on that day designated as maximum custody (1,636),

14  detention (750), or on mental health watch (81). Doc. 4309 ¶ 1600. Mr. Horn freely stated

15  that he had not memorized the numbers of people who were in isolation on September 30.

16  Horn TT at 1596: 14-25. But that doesn't negate the fact that Mr. Horn had used the daily

17  count sheet to calculate the numbers of people in isolation on that day and to formulate his

18  opinions as set out in his written testimony. Horn WT, Doc. 4130 ¶ 331 & n.245.

19  Moreover, as discussed below at Part IV, Defendants misstated at trial and in their

20  proposed Findings of Fact the number of people in maximum custody on that day.

21  Ex. 1304; Horn TT at 1596:14-17; Doc. 4309 ¶ 1600.

22      Defendants state that Mr. Horn "admits that he derived his opinions regarding

23  refusal rates by looking at summary charts of maximum custody out of cell tracking forms

24  compiled by Plaintiffs' counsel, also acknowledging that the summary chart first reported

25  refusal rates higher than a later corrected version." Doc. 4309 ¶ 1607. Mr. Horn reviewed

26  out-of-cell-time tracking sheets as well as the summary. Horn WT, Doc. 4130 ¶ 2;

27  Doc. 4130-1 at 5-6. Further, he testified that he reviewed the initial chart, and the

28  corrected version, and that the corrections did not change his opinion. Horn TT at 1418:6-

21. He specifically testified that both before and after the corrections, there were weeks when the rate of refusal of recreation was over 80%. *Id.* And the evidence of the extraordinary level of refusals is overwhelming. *See* Doc. 4308 ¶¶ 172-186. Moreover, Mr. Horn's opinion about the refusal rates was that it suggested that the refusals were not genuine, and the evidence that they are not is also overwhelming. *See id.* ¶¶ 172-199.

Defendants state that "[w]hile [Mr.] Horn opines that correctional personnel should not record offers of recreation as a refusal if the inmate's cell is out of compliance with rules regarding cell maintenance, he admits he never saw documentation in out of cell tracking forms that this occurs." Doc. 4309 ¶ 1609. The reason he would not have seen "documentation in out of cell tracking forms that this occurs" is because non-compliance that is deemed as a "refusal" is documented as a refusal, as clearly explained in one of the Information Reports submitted as evidence. At Eyman SMU I, in January 2021, an officer reports in 4 Dog cluster:

> Summary: On the above date and approximate time, I COII Garcia #5029 was posted as 4Dog Floor, myself and my partner, COII Dietrich #4584 (4Able Floor) offered all inmates on the back half cells, showers and rec. All inmates in 4Dig either refused shower and rec or were not in 704 compliance. I have attached a list of all refusals for showers and rec in 4Dog. Report written by COII Garcia #5029 on 01/20/2021 at approximately 1000 hours. Refusals also notated in service journal. End of report.

Ex. 1301 at ADCRR00055385.

The Information Report then attaches the roster of people in 4 Dog who were deemed to have refused, without differentiating between those who "refused shower and rec" and those who "were not in 704 compliance." *Id.* at ADCRR00055387-55388. For good measure, the person making the notations added: "R=refused." *Id.* An officer in 4 Baker/Charlie clusters similarly reported:

| Time | Date | Location |
|------|------|----------|
| 0615 | 01·20·21 | Wing 4 B/C Clusters |

**Summary** On the above date and approximate time, I CO II Dobbs 8364 placed the inmates whose name are highlighted on the count sheet on stand by for recreation and showers. Six inmates, with indications of "S" or "R", took their showers/rec. The other inmates without either refused or were out of compliance. End of Report.

Employee's Signature ___#1364___    Title CO II

Ex. 1301 at ADCRR00055389.

As stated in the Information Report, the count sheet highlights those who were purportedly offered showers and recreation, with an indication of S or R for the six people who had a shower or recreation, and the rest are blank without differentiation between actual refusals and people where were "out of compliance." *Id.* at ADCRR00055391-94. Notably, these Information Reports show that people who are not in compliance with D.O. 704 are deemed to refuse showers as well as recreation.

Defendants also claim that Mr. Horn "believes that inmates who are not ready for recreation when officers come to escort them because they are taking a 'bird bath' in the sink or have not dressed yet should not be considered a refusal for recreation; rather, in Horn's opinion officers should wait for the inmates to finish whatever they are doing and wait until the inmates are ready before escorting them out for recreation." Doc. 4309 ¶ 1609. What Mr. Horn actually testified was that recreation is important, staff should make efforts to accomplish it, and that staff should be reasonable—taking someone who is ready and coming back for the person who was not ready, or waiting a moment for the person to "towel off and put on [his] shirt." Horn TT at 1553:14-1554:8, 1555:6-1558:17.

Defendants claim that "[Mr.] Horn criticizes the completeness of ADCRR documentation regarding recreation opportunities, shower opportunities, laundry exchanges, and delivery of meals to inmates housed in detention units." Doc. 4309 ¶ 1610. Mr. Horn did not criticize the "completeness of ADCRR documentation;" he criticized the lack of "recreation opportunities, shower opportunities, laundry exchanges,

-37-

1   and delivery of meals to inmates housed in detention units," based upon the

2   documentation. Horn TT at 1458:7-1461:25. Indeed, he stated that people in detention in

3   ADCRR "are in some of the direst conditions I've observed and are routinely not

4   receiving the requisite amount of access to outdoor exercise, and frequently are not

5   receiving the requisite three meals a day and often are not receiving the requisite three

6   showers a week." *Id.* at 1461:20-25.

7       One of the few places where Defendants correctly cite Mr. Horn's testimony is in

8   stating his opinion that "it is 'good practice' to have a counselor or mental health

9   professional respond to incidents where inmates are engaging in self harm." Doc. 4309

10  ¶ 1614. Defendants omit, however, that when Mr. Horn said this, it was in the context of

11  criticizing ADCRR for not actually doing this good practice. Horn TT at 1423:15-21.

12      Defendants also mischaracterize Mr. Horn's testimony regarding the uses of force

13  against isolation subclass member Rahim Muhammad. Doc. 4309 ¶¶ 1618-1622.

14  Mr. Horn testified that, based on his experience and his viewing of the videos of

15  Mr. Muhammad, Mr. Horn did not see "immediate self harm," and that was the reason

16  why he did not think that the uses of force were appropriate. Horn TT at 1569:1-19.

17  Mr. Horn further stated that he was concerned that "if [Mr. Muhammed were] allowed to

18  do that over the course of weeks on a daily basis, that at some point banging your head on

19  perforated metal at the intensity he was, could result in possibly even a brain injury" and

20  that was why it is important to come up with a behavioral management plan, rather than

21  just perpetuating the repeated circumstances in which a person bangs his head and is then

22  sprayed with O.C. spray or shot with a pepperball gun, only to have the same thing

23  happen again the next day. Horn TT at 1570:5-10.

24      Defendants state that "[Mr.] Horn conceded that post orders included procedures

25  for housing unit temperature checks with a digital anemometer from April to October each

26  year and mitigation efforts when Arizona cell temperatures reach 95 degrees." Doc. 4309

27  ¶ 1625. He did confirm the substance of the orders, and they do say that. Horn WT,

28  Doc. 4130 ¶ 246; Ex. 1736 at ADCRR00220685-220686; Ex. 1737 at ADCRR00220689-

220690. But the point is that this is, in fact, what Mr. Horn criticizes. Mr. Horn opined: "By not requiring mitigation efforts at temperatures significantly lower than 95 degrees, ADCRR is putting the health and even lives of all people confined to cells in ADCRR at risk." Horn WT, Doc. 4130 ¶ 246.

Defendants also claim that Mr. Horn "never reviewed ADCRR's direction to correctional personnel regarding temporary housing of pregnant inmates when cell temperatures exceed 86 degrees or mitigation efforts and rehousing for inmates on psychotropic medications who have suffered a heat intolerance reaction when cell temperatures exceed 85 degrees." Doc. 4309 ¶ 1625, citing Exhibits 1736, 1737, 3031. But the documents referenced by Defendants do not direct the rehousing of people psychotropic medications who have suffered a heat intolerance reaction when the temperature in a housing unit exceeds 85 degrees. Exhibits 1736 and 1737 set out the provision that mitigation efforts are required only if temperatures exceed *95* degrees. They do not mention incarcerated people who are pregnant or taking psychotropic medications. Exs. 1736, 1737. Exhibit 3031 provides only that when a person who is on psychotropic medications suffers a heat intolerance reaction, Defendants will respond to this serious, potentially life-threatening medical event, including, if necessary, by placing the person somewhere that the temperature does not exceed 85 degrees. Ex. 3031 at ADCRR00172371; *see* Stewart WT, Doc. 4109 ¶¶ 157-162. Moreover, Deputy Warden Scott and Warden Van Winkle both testified that there was no requirement to take mitigation efforts unless the temperature in the cells was above 95 degrees. Scott TT at 1106:22-1107:25; Van Winkle TT at 2715:15-2717:4.

With regard to the size of two-person cells, Defendants claim Mr. Horn "estimate[d] that they were 80 square feet in size, which is the cell size recommended by the ACA." Doc. 4309 ¶ 1627. This is false. While he testified that ACA standards for Restrictive Housing should "provide a minimum of 80-square feet and shall provide 35-square feet of unencumbered space for the first occupant and 25-square feet of unencumbered space for each additional occupant," he further testified that the two-person

1   cells that he saw in Defendants' prisons did ***not*** meet that standard. Horn WT, Doc. 4130

2   ¶¶ 233-34.

3       Defendants assert that "when faced with the ASCA Liman study which ranked for

4   2019 the percentage of inmates incarcerated in a location where inmates spent 22 hours a

5   day in their cells for 15 or more days, [Mr.] Horn conceded that 4.6% of ADCRR's

6   population fell that [sic] category." Doc. 4309 ¶ 1631. This is false; Mr. Horn made no

7   such concession. He agreed that the data Arizona reported to ASCA and Yale's Liman

8   Center was that in 2019, 4.6% of its prison population was supposedly in restrictive

9   housing. Horn TT at 1599:11-1600:3. But Defendants critically omit the part of Mr.

10  Horn's testimony that Arizona used as the baseline for the entire population, contrary to

11  the terms and instruction of the ASCA study, *all* people in ADCRR's legal custody,

12  including thousands of low-security persons incarcerated in many private prisons (who

13  also are not included within the class in *Jensen v. Shinn*). *Id*.; *see also* Ex. 3530 at

14  ADCRR00231472. By falsely reporting to ASCA/Liman surveyors a larger pool than

15  what was requested, (in other words, using a bigger denominator), Defendants artificially

16  lowered the reported percent in restrictive housing. There is no evidence as to what the

17  total population in restrictive housing was at the time in 2019 when ADCRR reported its

18  data to the ASCA/Liman study, but, as discussed at pages 82-83, if calculated using the

19  ASCA/Liman study actual instructions, the percentage in restrictive housing as of

20  September 30, 2021 was 9.3%, higher than the all but one of the states in the study.

21          **5.     Robert Joy is qualified and credible.**

22      Defendants offer three criticisms of Mr. Joy's analysis and model. First, they say

23  Mr. Joy should have reviewed charts, visited prisons, and interviewed staff. As stated

24  above, Mr. Joy's model does not require chart reviews, site visits, and staff interviews.

25  However, at Mr. Joy's request, Plaintiffs' correctional physician experts, Drs. Todd

26  Wilcox and Pablo Stewart, conducted chart reviews, site visits, and interviews to validate

27  whether ADCRR data on resident medical and mental health classifications is a reliable

28  source for estimating the level of illness among ADCRR residents. Joy TT at 77:14-80:6;

1   Joy WT, Doc. 4099-1 at 27 n.43-44, 33 n.53, 37 n.57, 43 n.64, and 56 n.79. Drs. Wilcox

2   and Stewart determined based on the local prison evidence they reviewed that the

3   ADCRR data is unreliable. Joy TT at 77:20-78:22. Mr. Joy chose not to risk the accuracy

4   of his report by using inaccurate data from ADCRR sources.

5        Second, defendants assert that Mr. Joy should have used ADCRR data for his

6   staffing model. However, Mr. Joy did use ADCRR census and staffing data extensively in

7   his analysis, and he reviewed healthcare policies to understand the types of health services

8   delivered to class members. Joy WT, Doc. 4099-1, Ex. C. However, in addition to the

9   reliability issues reported to him by Drs. Wilcox and Stewart, Mr. Joy found that

10  ADCRR's reported percentage of in-state prison residents with multiple chronic medical

11  conditions (10%) or serious mental illness (6-7%) to be improbably low when compared

12  to the range of expected percentages cited in external benchmarks (25-33% and 18-30%

13  respectively). Joy TT at 76:4-81:10. This is especially notable, as pursuant to the contracts

14  with the private prisons, only healthy people are sent to the contract prisons, with more

15  seriously physically and mentally ill people staying at ADCRR prisons.

16       Mr. Joy testified that he found significant and pervasive inconsistencies in the

17  health care services utilization data Defendants provided, which rendered them unusable.

18  A key problem in relying upon this utilization data is that it shows only the total number

19  of encounters or services that the currently inadequate supply of health care personnel

20  could actually accomplish during their shifts. Due to the documented and systemic

21  staffing vacancies, ADCRR's utilization data does not reflect the true need for services

22  that patients require. Joy TT at 119:11-24, 122:4-18, 191:3-23. Mr. Joy chose to avoid the

23  risk that the utilization data underreported the true demand for health care visits, as this

24  also would have rendered his expert report knowingly inaccurate.

25       Defendants' third criticism of Mr. Joy's analysis is that they claim he relied too

26  heavily on only a few documents. However, even a quick examination of Mr. Joy's 82-

27  page expert report shows that it includes 99 footnotes, most of which included at least one

28  document reference. Joy WT, Doc. 4099-1. Exhibit C to Mr. Joy's declaration shows that

-41-

as part of his analysis Mr. Joy considered 340 documents, most of which are official state or federal government agency statistical reports. *Id.* at Ex. C. The majority of the remainder of documents and studies that Mr. Joy considered were from non-profit research institutes or from the academic literature. The only documents Mr. Joy found to be unreliable were ADCRR's own reports.[22]

### C.    Defendants' Experts Fail to Offer Any Credible Opinions to Counter Plaintiffs' Experts

Notably, Defendants provide no credible expert testimony to challenge the well-reasoned opinions of Plaintiffs' experts. Instead, Defendants' experts offer sweeping conclusions, supported only by superficial analysis and conjecture. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Indeed, for the most part, Defendants' experts simply accepted and repeated what Defendants' employees or contractors told them, without making any effort to validate the information. That is not the proper role of an expert and reveals an impermissibly ends-oriented approach. *See Allen v. Am. Capital Ltd.*, 287 F. Supp. 3d 763, 786 (D. Ariz. 2017) (finding that expert report displaying "an ends-driven approach . . . negatively affects the reliability of his opinion"); *United States v. Asiru*, 222 F. App'x 584, 587-88 (9th Cir. 2007) (affirming district court exclusion of expert testimony as based on unreliable methodology where expert did not review pertinent documents); *Abarca v. Franklin Cty. Water Dist.*, 761 F. Supp. 2d 1007, 1066 n.60 (E.D. Cal. 2011) ("[A] reliable expert would not ignore contrary

---

[22] Defendants also incorrectly imply that Dr. Wilcox was insufficiently familiar with Robert Joy's staffing model, and thus lacks a basis to vouch for its validity. Doc. 4309 ¶¶ 522-23. Dr. Wilcox did not see the model Mr. Joy used for his report; however, he reviewed the report, which used a methodology he was familiar with, considers reliable, and had used himself. Wilcox WT, Doc. 4138 ¶ 10 n 1. Dr. Wilcox's testimony regarding Mr. Joy's staffing model is both relevant and grounded in his expert experience.

1    data . . . [and] make sweeping statements without support") (citations omitted); Fed. R.

2    Evid. 702(b) ("A witness who is qualified as an expert by knowledge, skill, experience,

3    training, or education may testify in the form of an opinion or otherwise if . . . the

4    testimony is based on sufficient facts or data.").

5              **1.     Defendants' medical experts are not credible or reliable.**

6              **(a)     Dr. Murray's opinions are not credible or reliable.**

7          Dr. Murray's opinions are not reliable or credible. As explained below, Dr. Murray

8    has not practiced clinical medicine for a quarter century, his sweeping opinions are based

9    in large part on meetings with Centurion employees in preparation for trial, he never

10   validated the information he received at those meetings, his methodology is inadequate

11   and inconsistent, he did not review more than a handful of medical records himself, the

12   comparison of HEDIS to ADCRR scores for diabetes and hypertension is useless, the

13   random study he relied on has never been used before and was developed solely for this

14   litigation and, in any event, the results demonstrate that the care patients receive by his

15   own measure places a substantial number of them at serious risk of harm.[23] Dr. Murray's

16   opinions that ADCRR's health care system and all of its component parts meets the

17   community standard of care should be discarded. *See* Doc. 4309 ¶¶ 1103-1116.

18         As an initial matter, while Dr. Murray manages a large correctional healthcare

19   system in Texas, his position is mainly administrative; he does not provide direct patient

20   care. Murray TT at 3527:17-22. The last time he provided such direct patient care was

21   about 25 years ago. *Id.* at 3527:23-25. In contrast, Dr. Wilcox has provided such hands-on

22   care in both prisons and jails throughout his 27-year career, in addition to being the

23   medical director of a large county jail. Doc. 4138 ¶ 2.

24         The methodology Dr. Murray used to form his opinions is suspect for several

25   reasons. First, with one very limited exception, he did not acknowledge nor address any of

26

27         [23] HEDIS stands for Healthcare Effectiveness Data and Information Set. It is a set
     of measures developed by the National Committee for Quality Assurance Metrics. Murray
28   WT, Doc. 4206 ¶¶ 1011-1012.

                                              -43-

the failures to provide adequate care to the scores of patients discussed by Dr. Wilcox in his direct testimony. Dr. Murray's failure to respond to or explain how such malpractice and neglect could occur so frequently is inconsistent with his opinion that ADCRR's medical care system is functioning properly.[24]

Second, Dr. Murray's analysis was extremely superficial. He didn't speak to a single patient about the care they received. Murray TT at 3497:25-2498:2. He didn't investigate ADCRR's compliance (or lack thereof) with the Stipulation's performance measures. *Id.* at 3499:18-3450:2. Nor did Dr. Murray personally review more than a handful of patient medical charts to prepare his written testimony. *Id.* at 3486:4-11, 3528:10-25 (admitting he had only reviewed four or five charts). These glaring omissions seriously compromise and cloud the opinions that he expressed.

Dr. Murray reviewed the health care system at the ten facilities "through in-person tours and interviews with medical staff and program managers." Murray WT, Doc. 4206 ¶ 15. He spent only about three hours at each institution, with management staff interviews lasting on average about half of that time. Murray TT at 3496:8-14. Yet during these short visits, Defendants implausibly claim that Dr. Murray completed all of the following tasks:

- evaluated staffing, access to care, diagnostic services, records, facilities, pharmacy services and quality monitoring;
- reviewed the sick call process, chronic disease management, dietary services, emergency care, hospital care, specialty services and patient education;

---

[24] In the case of the one exception that Dr. Murray reviewed, he did not actually contest Dr. Wilcox's testimony regarding a patient with paraplegia, which was supported by Dr. Wilcox's firsthand observation and photographic evidence, that the patient scrapes his buttocks and genitals on the wheel of his broken wheelchair without being provided a sliding board to safely transfer to the toilet, that the patient has pressure ulcers on the bottom of his feet and has been denied properly fitting shoes for his swollen feet, and that this patient has been denied sanitary wipes even though he has a suprapubic catheter and cannot control his bowel movements, so cleanliness is critical. *Compare* Murray WT, Doc. 4206 ¶¶ 1045-1060, *with* Wilcox WT, Doc. 4138 ¶¶ 282, 430-36. Instead, Dr. Murray copies and pastes encounter notes from 2014-2019 to speculate or suggest that this disabled patient somehow holds his healthcare team "hostage" and then Dr. Murray goes on to discuss an unrelated catheter issue. Murray WT, Doc. 4206 ¶¶ 1050-58.

-44-

- reviewed the physical space for providing care, including clinics, emergency rooms, special medical programs and the availability of medical supplies and equipment;
- evaluated prescription ordering, turnaround times, local procurement and the medication administration process;
- assessed the quality assurance process;
- toured sick call areas, inpatient care areas and observed the "inner workings of the healthcare facilities."

Doc. 4309 ¶¶ 545, 547, 549-52.

But in fact, most, if not all, of the information Dr. Murray relied on came from statements made by Centurion management staff at each prison. Murray WT, Doc. 4206 ¶¶ 33-192, 1075, 1078, 1080; Doc. 4309 ¶¶ 629-770. These managers were notified that the information they provided would be used in a report for this litigation (Murray TT at 3497:4-9) and by virtue of their employment by Centurion, they obviously had a stake in the outcome. Although Dr. Murray believed it would be important to meet privately with health care administrative staff, a Centurion attorney often joined these meetings by phone. Murray TT at 3496:15-23.

Most importantly, Dr. Murray never took any steps to validate the information he received during these meetings. Murray TT at 3507:2-13. Nor did he consider other readily available information. For example, he relies on the bare statement from Dr. Salazar, Tucson's Site Medical Director, that health care at his facility is better than in the community, in order to opine the same. Doc. 4309 ¶ 648; Murray WT, Doc. 4206 ¶ 53. But CQI meeting minutes demonstrate that sustained staffing shortages have adversely affected patient care at Tucson for years. *See, e.g.*, Ex. 673 at ADCRR00099896 (Feb. 2020) ("Multiple inmates with medications administered out of time frame due to staffing issues."); Ex. 723 at ADCRR00101618-101619 (July 2020) ("What contributed most to [medication administration error] occurrence: . . . We were also short handed, had 0 CNAs for 3 days, had 0 porters for 3 days."); Ex. 803 at ADCRR00105862 (Mar. 2021) (reporting that nurse in the IPC during night shift had "to do both LPN and RN roles" and "accidentally pulled 2 caps of Gabapentin 300mg" and gave to the wrong patient); Ex. 853 at ADCRR00137035 (Aug. 2021) ("Our biggest obstacle currently is lack of RNs

-45-

to run the nurse lines and see the patients. Staffing is 51% and most of our RNs end up running pill lines."). Short-staffing also resulted in ASPC-Tucson's inability to comply with PM 37, which required that patients be seen within 24 hours of submitting a sick call slip. Doc. 4308 ¶ 627 (citing Ex. 1258). Nurses at Tucson, a prison with some of the highest acuity patients in the state, failed this basic requirement each of the first seven months in 2021, and in some months scored less than 50%. *Id.* ¶ 628 (citing Ex. 1258; Trial Testimony of Grant Phillips ("Phillips TT") at 3626:2-20). The CAPs for PM 37 repeatedly identified short-staffing as the reason for non-compliance month after month in 2019, 2020, and 2021. *Id.* ¶ 630 (citing Wilcox WT, Doc. 4138 ¶ 216; Ex. 1971 at 126-132).[25] Dr. Murray's reliance on the unsubstantiated statements of Centurion's own employees seriously undermines the credibility of his opinions.

Third, Dr. Murray used benchmarks from a national database on two discrete conditions, diabetes and hypertension, to support his opinions. His reliance on these benchmarks, called HEDIS (Healthcare Effectiveness Data and Information Set) scores, have limited relevance to the correctional setting. HEDIS is a set of measures developed by the National Committee for Quality Assurance Metrics. Murray WT, Doc. 4206 ¶¶ 1011-1012. The data is from government (Medicare and Medicaid) and commercial healthcare plans in the free community. *Id.*

Unlike health plans in the free community, access to care is a critical issue in prisons. Here, the Court has before it undisputed evidence of a pattern and practice of nursing staff denying patients access to the appropriate clinicians for care and treatment. *See* Doc. 4308 ¶¶ 604-619. Dr. Murray compared the HEDIS benchmarks for diabetes and hypertension with data compiled by Centurion, without engaging in the most critical threshold determination of whether Centurion is accurately identifying and treating all the people in the prison population suffering from diabetes or hypertension. Murray TT at

---

[25] Defendant Gann also admitted that Tucson's ongoing noncompliance with the Stipulation was rooted in their long-standing inadequate numbers of health care staff. Gann TT_at 2368:4-24.

3525:22-3526:3, 3527:8-13, 3534:10-14. Without data demonstrating that virtually all people in ADCRR's prisons with diabetes and hypertension are identified and treated, the comparison with HEDIS scores is of little value. Even if a comparison were to be valid, it proves only the discrete point that ADCRR can control diabetes and hypertension in patients that are identified as suffering from those two conditions and who have been in treatment for at least six months. *Id.* at 3525:8-14.

Based on Dr. Murray's testimony and mathematical calculations on hypertension and diabetes, Defendants claim that their performance on these two specific metrics "is reflective of a well-run, patient-centered healthcare organization." Doc. 4309 ¶ 831; *see also id.* ¶¶ 832, 848, 850. Defendants greatly exaggerate the significance of the two HEDIS scores. What their findings do not explain is how, for example, the routine administration of medication for diabetes and hypertension proves that there is adequate clinical space, that patients are being seen appropriately and timely by outside specialists, that patients are being seen for appropriate follow-up after being discharged from the hospital, or that patients are referred for preventative care screening, an issue that Dr. Murray identified as a problem, *see* Murray TT at 3537:24-3538:3 (mortality review documented failure to provide early screening for patient who died from colon cancer), or that the electronic medical record is adequate. *See id.* at 3459:20-21 ("eOMIS has "lived its useful life").

Fourth, implicitly recognizing the limitations of using HEDIS scores to evaluate prison healthcare systems, Dr. Murray had a sample of medical charts reviewed to determine whether the care actually provided was consistent with the HEDIS scores. Murray TT at 3479:14-19. The chart review of selected medical charts of chronic care patients revealed exactly the opposite.[26]

---

[26] Notably, while Defendants fault Plaintiffs' expert Dr. Wilcox for focusing on patients with serious medical needs, their own expert similarly reviewed records from a pool of prisoners with diagnosed serious chronic medical conditions, rather than the entire pool of all people incarcerated in the prison system.

According to Dr. Murray, his assistants reviewed a random sample of 80 charts for patients with identified chronic conditions. The assistants rated the quality of the provider care that each patient received in each of three categories—documentation, quality of chronic care and quality of episodic care. Each patient received a score from 1 to 5 for each category, with 5 being "Excellent" care and 1 being "Poor" care. Murray WT, Doc. 4206 ¶¶ 207-213.

Preliminarily, the analysis Dr. Murray relied on has several fundamental flaws. The methodology was developed solely for the purposes of this litigation and has never been used to evaluate the adequacy of health care in any other correctional system, including the department in which Dr. Murray works. Murray TT at 3531:19-3532:5. Nor has this type of analysis ever been used in the community. *Id.* at 3543:6-24.

Dr. Murray reviewed only a handful of the 80 charts himself; instead he relied on the findings of his assistants.[27] Murray TT at 3528:6-25. But those assistants were not given clear directions about how to apply the definitions for rating each encounter. *Id.* at 3532:12-22 (testifying that his assistants were not given the written definitions and he does not even know what verbal instructions they received).

The scoring labels themselves are misleading and the definitions do not always make sense. For example, "5-Excellent" care is defined as care that was "timely and reflected good decision-making." Murray WT, Doc. 4206 ¶ 209. But an encounter by a provider can be rated as Excellent even though the provider failed to order preventative care, which can and has resulted in death. *Id.*; Murray TT at 3535:7-21, 3537:24-3538:3; Ex. 427 (colon cancer was a contributing cause of death, but preventative measures such as a colonoscopy should have been ordered to detect the cancer earlier). Dr. Murray

---

[27] Defendants' proposed findings of fact state that Dr. Murray reviewed all 80 charts and reviewed the blood pressure and A1c results for each applicable patient. Doc. 4309 ¶ 565 (citing Murray WT, Doc. 4206 ¶ 1018). However, the Court excluded Dr. Murray's testimony that he personally reviewed the 80 files. Murray TT at 3407:6-10 (striking paragraph 206 and second sentence of paragraph 1018 of his written testimony); *see also* Doc. 4207 at 3-7 (underlying motion to strike those portions of Dr. Murray's written testimony).

1   agreed that it does not help the patient to provide so-called "Excellent" care for some

2   problems but not to address a problem that has a significant risk of causing an adverse

3   outcome. Murray TT at 3541:6-11. Similarly, the care could be rated as "4-Very Good"

4   even though that delay could have increased the risk of harm to the patient. *Id.* at 3539:16-

5   20; Murray WT, Doc. 4206 ¶ 210.

6        Ironically, the definition of "3-Good" care includes medical care that in fact was

7   poor. Murray WT, Doc. 4206 ¶ 211 ("A rating of **3-Good** may represent a mix of care that

8   was sometimes poor and sometimes great."). So, for example, the review described the

9   treatment for a 59-year-old woman with diabetes, hypertension, a heart murmur and

10  cirrhosis. She was prescribed prednisone even though that drug is contraindicated for

11  someone with liver damage. She was at risk for internal bleeding but never was referred to

12  a gastroenterologist. *Id.* ¶ 762; Murray TT at 3565:7-3566:8. And she was referred to a

13  cardiologist for her heart murmur, but that appointment did not occur. Murray TT at

14  3566:9-12. Yet, despite these many glaring problems, the quality of chronic care as rated

15  by Dr. Murray's assistants was "3-Good" and the quality of episodic care was rated as "4-

16  Very Good." *Id.* at 3566:13-16.[28]

17       Even if scoring labels were not inflated and misleading, and the definitions were

18  not vague and confusing, the results of Dr. Murray's own study show that the quality of

19  chronic care in ADCRR is terrible. As shown in the table, thirty-five percent of patients in

20  Dr. Murray's study who received episodic care by a provider did not receive care that was

21  timely or reflected good decision-making. Murray WT, Doc. 4206 ¶¶ 214-983.[29]

22

23

24       [28] While Dr. Murray stated his record review involved 80 patients, his testimony
25  omits one of them—Patient 9 at ASPC-Tucson. *See* Murray WT, Doc. 4206 ¶¶ 295-304.
    Because Plaintiffs cannot be certain of Patient 9's scores based on Dr. Murray's written
26  testimony alone, Patient 9 is omitted from the calculations in this section.
         [29] At trial, Plaintiffs' counsel inadvertently included the percentage of patients who
27  scored "N/A" in the percentage of patients who scored between 1 and 4. *See* Murray TT at
    3545:21-3546:6. Plaintiffs' proposed findings of fact repeated the error. Doc. 4308 ¶ 595.
28  The percentages have been corrected in the tables above.

| Quality of Episodic Care Scores | | | | | |
|---|---|---|---|---|---|
| **1** | **2** | **3** | **4** | **5** | **N/A** |
| 0 | 8 | 4 | 16 | 44 | 7 |
| (0%) | (10.1%) | (5.1%) | (20.2%) | (55.7%) | (8.9%) |
| 28 | | | | 44 | 7 |
| (35.4%) | | | | (55.7%) | (8.9%) |

The quality of chronic care for over 70% of the patients was not timely nor did it reflect good decision-making. *Id.* ¶¶ 214-983; Murray TT at 3546:24-3547:2.

| Quality of Chronic Care Scores | | | | | |
|---|---|---|---|---|---|
| **1** | **2** | **3** | **4** | **5** | **N/A** |
| 1 | 9 | 21 | 25 | 22 | 1 |
| (1.2%) | (11.4%) | (26.6%) | (31.6%) | (27.8%) | (1.2%) |
| 56 | | | | 22 | 1 |
| (70.8%) | | | | (27.8%) | (1.2%) |

In 81% of files, the quality of the documentation was not timely nor did it reflect good decision-making. Murray WT, Doc. 4206 ¶¶ 214-983; Murray TT at 3547:6-9.

| Documentation of Chronic Care Scores | | | | | |
|---|---|---|---|---|---|
| **1** | **2** | **3** | **4** | **5** | **N/A** |
| 3 | 13 | 26 | 22 | 14 | 1 |
| (3.8%) | (16.5%) | (32.9%) | (27.8%) | (17.7%) | (1.2%) |
| 64 | | | | 14 | 1 |
| (81.0%) | | | | (17.7%) | (1.2%) |

Under these circumstances it is not surprising that 53 out of the 79 patients (67%) received a score from Dr. Murray's assistants indicating a serious risk of harm in at least one of the three categories. Murray TT at 3548:18-23, 3541:12-15.[30]

For these reasons, Dr. Murray's opinions are not entitled to any weight.

---

[30] *See* Murray WT, Doc. 4206 ¶¶ 214-983 (**Tucson**: Patient 1, Patient 2, Patient 3, Patient 4, Patient 5, Patient 6, Patient 7, Patient 8, Patient 10; **Yuma**: Patient 1, Patient 2, Patient 3, Patient 4, Patient 5, Patient 6, Patient 7; **Douglas**: Patient 2, Patient 4, Patient 7, Patient 8, Patient 9, Patient 10; **Winslow**: Patient 2, Patient 3, Patient 4, Patient 5, Patient 6; **Perryville**: Patient 1, Patient 2, Patient 3, Patient 5, Patient 6, Patient 7, Patient 8, Patient 9; **Safford**: Patient 1, Patient 2, Patient 3, Patient 4, Patient 5, Patient 6, Patient 7, Patient 9, Patient 10; **Eyman**: Patient 1, Patient 2, Patient 3, Patient 4, Patient 5, Patient 7, Patient 8, Patient 9, Patient 10). The chart review in Dr. Murray's written testimony did not include any patients at Florence or Phoenix. *Id.* ¶ 201.

-50-

**(b)    Dr. Phillips' opinions are not credible or reliable.**

Dr. Grant Phillips, the ADCRR Medical Director, was designated as an expert witness and produced a short, seven-page declaration related to Medication-Assisted Treatment for Substance Use Disorder and hepatitis C treatment. Defendants' proposed Findings of Fact discuss this written testimony only as it relates to hepatitis C treatment. *See* Doc. 4309 ¶¶ 960-982. Defendants fail to offer any response to the evidence offered regarding the need for Medication-Assisted Treatment for Substance Use Disorder, including the testimony of Dr. Phillips, Dr. Wilcox, and other current and former Centurion officials. *See* Doc. 4308 ¶¶ 712-724. Dr. Phillips' designation as an "expert" in this matter is clouded by the fact that he is Defendants' employee, and his "expert" testimony largely recited (and praised) his employer's policies. *See* Written Testimony of Grant Phillips, ("Phillips WT"), Doc. 4158 ¶¶ 44-55. His opinions regarding hepatitis C treatment are discussed in more detail in Part VII (A) (10) below.

**2.    Defendants' mental health expert Dr. Penn is not credible.**

**(a)    Dr. Penn's opinions are not credible or reliable.**

Review of Dr. Penn's written and trial testimony makes abundantly clear that he simply accepted at face value Defendants' written policies and whatever he was told by ADCRR and Centurion staff, aggressively avoiding any information that might have contradicted the rosy picture painted by Defendants and their for-profit contractor. When ADCRR and/or Centurion staff did concede that there were shortcomings in care, Dr. Penn either ignored or affirmatively contradicted these admissions.

Although a completed suicide obviously represents a catastrophic outcome, Dr. Penn simply ignored the vast majority of suicides in ADCRR. His written testimony mentions only *two* of the 23 patients who died by suicide between January 1, 2019 and the time of trial. Penn TT at 3222:13-23; Haney WT, Doc. 4120 ¶ 114 (listing suicides in ADCRR). (Doc. 4308 ¶ 377 n.68). For one of the two suicides he did mention, the ADCRR mortality review included several recommendations. Ex. 256. Dr. Penn did not

1    inquire from anyone at ADCRR or Centurion whether any of these recommendations were

2    actually implemented. Penn TT at 3209:8-3211:10.

3         Dr. Penn opined that "ADCRR strives for and implements timely suicide

4    prevention practices and efforts" (Doc. 4174 ¶ 229), but there is no apparent basis for this

5    opinion. During his September 2021 tours of ADCRR facilities, he did not observe any

6    suicide prevention training, or any three-minute "man down drills." He did not review any

7    documents to verify that these drills actually take place. Penn TT at 3204:14-3206:16.

8         Similarly, while Dr. Penn testified that "ADCRR avoids the prolonged segregation

9    of minor youth" (Doc. 4174 ¶ 246), no basis for this opinion is provided, as none exists.

10   On his September 2021 visit to ASPC-Lewis, Dr. Penn did not visit the Sunrise Minors

11   unit; he did not review unit logs from that unit; and he did not review any youth's central

12   file. Penn TT at 3342:10-3343:5 (Doc. 4308 ¶ 349 n.62).

13        Dr. Penn acknowledges that use of pepper spray (also known as oleoresin capsicum

14   spray, or OC spray) can be fatal. Doc. 4308 ¶ 223 & n.44. However, his opinions on

15   ADCRR's use of OC spray, set forth at paragraph 235 of his written testimony and cut-

16   and-pasted verbatim into Defendants' proposed Findings of Fact (Doc. 4309) at

17   paragraph 1501, are based solely upon his review of written policies and discussion with

18   ADCRR and Centurion staff. Dr. Penn did not observe any training of correctional staff

19   on use of force; he did not observe any training of health care staff on use of force; he did

20   not review any training materials on use of force; he did not review any use-of-force

21   packets; and he did not review any videos depicting use of force. Penn WT, Doc. 4172

22   ¶ 235; Penn TT at 3236:20-3238:11 (Doc. 4308 ¶ 224 n.45).

23        Dr. Penn's written testimony asserting that referrals to ADCRR's inpatient units

24   are completed within 48 hours, and immediately if clinically indicated, was similarly

25   based solely upon ADCRR written policies and what he was told by ADCRR and

26   Centurion staff. He did not review transfer logs or intake logs, he did not review a sample

27   of medical records of people transferred to the inpatient facilities to analyze the timeliness

28   of transfer, and he did not review any data or reports calculating the average length of

1    time for transfer to inpatient mental health beds. Penn TT at 3169:6-3170:14; Penn WT,

2    Doc. 4172 ¶ 127 (Doc. 4308 ¶ 540 n.100).

3          In yet another example of Dr. Penn's willingness to simply believe whatever

4    Defendants told him, Dr. Penn admitted that his written testimony regarding the frequency

5    with which patients classified as MH-4 and MH-5—the most desperately ill patients in the

6    system—receive mental health services is based solely upon ADCRR written policies and

7    what he was told by ADCRR and Centurion staff. Penn TT at 3167:15-3169:5; Penn WT,

8    Doc. 4172 ¶¶ 112-113 (Doc. 4308 ¶ 442 n.85).

9          Similarly, despite Dr. Penn's acknowledgement that high temperatures and

10   humidity can be particularly dangerous for people who take psychotropic medications, he

11   did not review any temperature logs from ADCRR housing units. Penn TT at 3241:1-

12   3242:1. Nor did he observe the temperature checks, any temperature mitigation measures,

13   or any staff training about heat reactions. *Id*. at 3239:12-19. Nonetheless, he opined that

14   the temperature is adequately monitored, excessive heat is appropriately mitigated, and

15   staff receive training on reactions to heat. *Id*. at 3238:25-3239:11 (Doc. 4308 ¶ 128 n.16).

16         Defendants' Finding of Facts are largely a wholesale cut-and-paste of Dr. Penn's

17   written testimony. *See* Doc. 4309 ¶¶ 1233-1237, copying verbatim Doc. 4174 ¶¶ 70-74;

18   Doc. 4309 ¶¶ 1487-1488, copying verbatim Doc. 4174 ¶¶ 232-233. That written testimony

19   contains multiple charts and graphs, ostensibly referring to statistics on staffing and self-

20   harm and suicide, of which Dr. Penn proclaimed complete ignorance, and which were

21   obviously created by Defendants, Centurion, or their counsel. *See* Doc. 4308 ¶ 396 n.76;

22   Penn TT at 3156:25-3157:21, 3161:4-5 (Dr. Penn testifying that he did not create the

23   mental health staffing charts at p. 26 of his written testimony (Doc. 4174 ¶ 71), and does

24   not know who did; he also does not know whether the staffing numbers in those charts

25   represent the number of positions called for by the contract, or the number of Centurion

26   staff actually filling those positions); *see also* Doc. 4308 ¶ 561 n.103; Penn TT at 3192:5-

27   3193:3 (Dr. Penn admitting under oath that the charts on pages 83-84 of his written

28   testimony (Doc. 4174 ¶ 232) referring to "[s]uicide [s]pectrum [b]ehavior" were created

by Dr. John Wilson, who works for Centurion, and Dr. Penn had no role in creating them; and that Dr. Penn has no idea who created the chart pertaining to suicide that appears at p. 84 of his written testimony (Doc. 4174 ¶ 233)).

Most egregiously, when Dr. Penn's four hand-picked psychiatric reviewers found deficient care in dozens of cases, including some in which the patient died by suicide, Dr. Penn simply stated, without explanation, that he disagreed with them, and proclaimed that the care was adequate. Doc. 4308 ¶¶ 360 & n.64, 379, 381 & n.71, 382 & n.72, 413 & n.81, 425 & n.82, 439 & n.83, 448 & n.86, 453 & n.88, 483 & n.90, 498 & n.92, 499, 511 & n.94, 513 & n.95, 517 & n.96, 547, 550 & n.101, 797, 857. Similarly, in cases of suicide in which ADCRR's and/or Centurion's own reviewers found deficiencies in care, Dr. Penn disagreed, and testified—while unable to articulate any basis for his conclusion—that the care received by the patient before his or her suicide was adequate. *See, e.g.*, Doc. 4308 ¶¶ 413 & n.81, 439 & n.83.

When Dr. Penn was provided information that did not favor Defendants' litigation position, he either ignored it or actively concealed it. For example, José Bucio, the lead mental health psychology associate at Yuma, told Dr. Penn that the Court's order on the presumptive minimum durations of mental health contacts has contributed to the overall improvement in quality of care and attention to patients. Penn TT at 3174:1-10. But that statement is conspicuously absent from Dr. Penn's written testimony on this subject (Doc. 4174 ¶¶ 139-151), and did not prevent Dr. Penn from testifying under oath that "the mental health staff that I spoke with, both the master's level licensed mental health staff, the doctorate-level psychologist, *the mental health leads*, *all the staff* that do routine day-to-day contacts with patients found [the Court's order] to be extremely problematic because it changed the dynamic in their treatment relationship." Penn TT at 3172:23-3173:8 (emphasis added).

Dr. Penn produced two sets of notes from his inspection tours of ADCRR facilities. His final notes (Ex. 2262) were produced, albeit untimely, in response to Plaintiffs' subpoena *duces tecum* for his deposition. His original notes (Ex. 2403) were not produced

-54-

by Defendants until November 18, 2021, after Plaintiffs first learned of the existence of these notes during Dr. Penn's second deposition on November 17, 2021 (which was ordered by the Court due to Defendants' failure to timely produce Exhibit 2262), and filed a motion for sanctions due to Defendants' failure to produce these original tour notes in response to the subpoena and due to Dr. Penn's deposition testimony that he had deleted these notes despite the Court's order to counsel that experts preserve all notes. Penn TT at 3247:25-3248:25; Doc. 4187 (Plaintiffs' motion); Doc. 4190 (Defendants' response).

A comparison of Dr. Penn's original notes (Ex. 2403) with his final notes (Ex. 2262) reveals multiple substantive changes that render the final notes more favorable to Defendants than the original version. Defendants' representation to the Court that the two sets of notes "are identical in substance" (Doc. 4190 ¶ 4) is false. For example, Dr. Penn's original notes give this account of his interview with CO II Pierce at Tucson:

> English as second language/health care staff can be used or alternatively phone line translator/also custody who are fluent.[31]

By contrast, his final notes omit any mention of using custody staff as interpreters:

> In cases of English as a second language, fluent prison staff are brought in or a phone line translator is utilized.

Ex. 2403 at 3; Ex. 2262 at ADCRR 232513; Penn TT at 3255:12-3256:11.

Similarly, Dr. Penn's original notes from his September 2021 interview with CO II Pierce at Florence prison read "Florence was short staffed." By contrast, his final notes have been changed to: "*Inmates claim that* Florence is short-staffed" (emphasis added). Ex. 2403 at 4; Ex. 2262 at ADCRR 232514; Penn TT at 3256:13-3257:11.

Dr. Penn's original notes from his interview with Sgt. Dame at Tucson, discussing a ranking of medical services on a five-point scale, read that she told him that "[i]nmates would rank 1-2/5 complain about medical." Ex. 2403 at 9. In his final notes, the rating has

---

[31] Relying upon custody staff to provide language interpretation to incarcerated patients in health care encounters is obviously problematic and implicates incarcerated patients' privacy rights. *See infra* Part VIII (C).

inexplicably increased to 2.5 out of 5: "she added that inmates would give medical a low rating of 2.5 out of 5." Ex. 2262 at ADCRR 232519; Penn TT at 3261:2-12.

Dr. Penn's original notes from his September 2021 interview with Katie Masters at Eyman read "Staffing was really bad in July, four psychology associates." Ex. 2403 at 35. His final notes read "According to Ms. Masters staffing was very challenging in July 2021;" there is no reference to there being only four psychology associates. Ex. 2262 at ADCRR 232488; Penn TT at 3261:16-3262:15.[32]

In sum, Dr. Penn displayed a credulous willingness to accept as true whatever was written in ADCRR policies or told to him by ADCRR and Centurion; ignored or affirmatively concealed information unfavorable to Defendants' litigation position; and repeatedly disagreed, without explanation, with ADCRR and Centurion reviewers and with his own hand-picked psychiatric reviewers when they found deficiencies in care. His extraordinary statement that he found only a single case of possibly deficient care in ADCRR is, standing alone, fatal to his credibility.[33] The Court should not credit his testimony.

### (b)   Dr. Penn is not qualified to offer expert testimony on solitary confinement.

Dr. Penn is simply not qualified to testify as an expert on the effects of solitary confinement. He has never published an article on solitary or isolated confinement and has never conducted a systematic study on the use of isolation in any prison system. Doc. 4308 ¶ 36.

Moreover, Dr. Penn is an egregious outlier whose idiosyncratic views on the mental health effects of solitary confinement are far outside the mainstream of the psychiatric and correctional mental health professions. Although he was until recently

---

[32] ADCRR's health care contract with Centurion requires 13 FTE psych associates at Eyman. Ex. 2167 at ADCRR00137140.

[33] Even in this single case—involving a suicide—Dr. Penn ultimately concluded that the patient's treatment before his suicide met the standard of care. Doc. 4308 ¶¶ 379, 413 & n.81.

1    Chair of the Board of the National Commission on Correctional Health Care (NCCHC)

2    and considers NCCHC to be the "Rolls Royce" of correctional mental health care, he

3    disagrees with NCCHC's position statement that solitary confinement lasting longer than

4    15 days "is cruel, inhumane, and degrading treatment, and harmful to an individual's

5    health," and that people with mental illness should not be placed in solitary confinement

6    at all. Ex. 2216; Doc. 4308 ¶ 37. While he is listed as an author of the American

7    Psychiatric Association's position statement opposing the solitary confinement of children

8    (Ex. 2218), and credits himself as the co-author on his CV, he testified that he disagrees

9    with that position statement, too, and he does not think that placing children in isolation is

10   harmful to them. Doc. 4308 ¶ 37. He similarly disagrees with the position statement of the

11   American Psychological Association opposing the solitary confinement of children (Ex.

12   2217); the position statement of the American Psychiatric Association opposing the

13   solitary confinement of persons with serious mental illness (Ex. 2214); and the position

14   statement of the American Public Health Association opposing the solitary confinement of

15   children and people with serious mental illness (Ex. 2215). Doc. 4308 ¶ 37.

16         Given Dr. Penn's lack of concern about the harms of solitary confinement, it is

17   perhaps not surprising that mental health care and the use of isolation in the Texas

18   juvenile prison system, whose mental health care Dr. Penn oversees, is currently the

19   subject of a U.S. Department of Justice investigation of "systemic violations of the rights

20   of young people" to "examine whether Texas provides children confined in these facilities

21   reasonable protection from physical and sexual abuse by staff and other residents,

22   excessive use of chemical restraints[,] excessive use of isolation[, and] whether Texas

23   provides adequate mental health care." Doc. 4308 ¶ 38.

24         The Court should not credit Dr. Penn's opinions on solitary confinement.

25

26

27

28

1
2

### III.   DEFENDANTS REPEATEDLY MISSTATE THE APPROPRIATE LEGAL STANDARDS FOR THE COURT'S ANALYSIS

3

#### A.   Defendants Misstate the Legal Standard for Deliberate Indifference.

4

Defendants' out-of-Circuit cases cannot overcome the controlling law of this

5

Circuit. *See* Doc. 4309 at 23-24 (citing Fifth and Seventh Circuit cases). A showing that

6

"DOC defendants knew about the risks to which prisoners were exposed and that the DOC

7

defendants deliberately chose to maintain the harmful policies" suffices to establish

8

deliberate indifference. *Disability Rts. Mont., Inc. v. Batista*, 930 F.3d 1090, 1099 (9th

9

Cir. 2019); *see also Lemire v. Cal. Dep't of Corr. and Rehab.*, 726 F.3d 1062, 1078 (9th

10

Cir. 2013) (concluding that plaintiffs stated a claim for deliberate indifference where

11

"litigation specifically alerted prison officials to the acute problem of inmate suicides").

12

Of particular relevance to this case, prison officials' failure to comply with their own

13

policies is evidence of deliberate indifference. *Allen v. Sakai*, 48 F.3d 1082, 1088 (9th Cir.

14

1994) (failure to provide outdoor exercise as required by policy).

15

Moreover, "[l]ack of resources is not a defense to a claim for prospective relief

16

because prison officials may be compelled to expand the pool of existing resources in

17

order to remedy continuing Eighth Amendment violations." *Peralta v. Dillard,* 744 F.3d

18

1076, 1083 (9th Cir. 2014) (en banc); *see also Wright v. Rushen,* 642 F.2d 1129, 1134 (9th

19

Cir. 1981) ("[C]osts cannot be permitted to stand in the way of eliminating conditions

20

below Eighth Amendment standards.").

21

The fact that Defendants may have taken some remedial steps under the pressure of

22

this litigation does not foreclose a finding of deliberate indifference. *Jones v. City & Cnty.*

23

*of S.F.*, 976 F. Supp. 896, 908-09 (N.D. Cal. 1997) (correction of many fire safety

24

deficiencies was a "less than reasonable" response, and did not foreclose a finding of

25

deliberate indifference, where other serious inadequacies persisted).[34] Put another way,

26

---

27

    [34] This Court has similarly made clear in this case that "Defendants' changes at the prison since the filing of this lawsuit also do not preclude an injunction." Doc. 815 at 2-3 (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).

28

1    "[p]atently ineffective gestures purportedly directed towards remedying objectively

2    unconstitutional conditions do not prove a lack of deliberate indifference, they

3    demonstrate it." *Coleman v. Wilson*, 912 F. Supp. 1282, 1319 (E.D. Cal. 1995).[35]

4

5    **B.    Defendants' Reliance Upon Pro Se Damages Cases Is Misplaced in This Class Action Seeking Injunctive Relief.**

6            Many of the cases relied upon by Defendants were brought by pro se incarcerated

7    people. Such cases are of limited precedential value, as pro se incarcerated plaintiffs are

8    generally unable to develop the factual record and counter defendants' evidence. For

9    example, *Garner v. Kennedy*, 713 F.3d 237 (5th Cir. 2013), the Fifth Circuit held that the

10   Texas prison system's prohibition on beards violated the Religious Land Use and

11   Institutionalized Persons Act (RLUIPA). The Court distinguished two recent pro se cases

12   in which it had upheld the same Texas policy as compliant with RLUIPA:

13           *DeMoss* and *Gooden* are not controlling here. In both cases,
             the plaintiffs were pro se and there is no indication that they
14           countered TDCJ's evidence as Garner has done. In this case,
             we are presented with a substantially different record. Garner
15           disputed TDCJ's evidence: he was represented by counsel,
             thoroughly cross-examined all TDCJ witnesses, proposed
16           different alternatives to the no-beard policy than have been
             previously offered, and presented expert testimony from a
17           long-time prison administrator. Our decisions in *DeMoss* and
             *Gooden* are not controlling in light of the more-developed
18           record and the factual findings present here that were
             not present in previous cases.
19

20   *Id*. at 244-45. Similarly, this Court should accord little or no weight to the pro se cases

21   relied upon by Defendants. *See, e.g., Aguilar v. Schriro*, 2006 WL 2471830 (D. Ariz.

22

23

24           [35] Defendants' extensive reliance on the Seventh Circuit's opinion in *Rasho v.
25   Jeffreys*, 22 F.4th 703 (7th Cir. 2022), is misplaced. *Rasho* is not the law of this Circuit;
     indeed, the majority opinion is an outlier that, as the dissenting judge noted, "sets our
26   circuit on a lonely course." *Id*. at 720 (Ripple, J., dissenting). More specifically, in
     reversing the district court's finding of deliberate indifference, the Seventh Circuit
27   explicitly relied on prison officials' "limited resources." *Id*. at 711. But the law of this
     Circuit is that "lack of resources" is not a defense to liability in an injunctive action. *See
28   Peralta, supra*.

1   2006) (pro se plaintiff failed to respond to defendants' summary judgment motion);

2   *Bermudez v. Ryan*, 2006 WL 2547345 (D. Ariz. Aug. 31, 2006) (same).

3           **C.      Defendants Misstate the Legal Standard for Use of Force.**

4           Defendants assert that Plaintiffs' challenge to Defendants' use of force against

5   persons with mental illness requires Plaintiffs to show that such force was used

6   "maliciously and sadistically for the very purpose of causing harm," relying upon *Whitley*

7   *v. Albers*, 475 U.S. 312 (1986). Doc. 4309 at 23, 36-37. Defendants are wrong. The

8   *Whitley* standard applies in an action against the individual officer who actually applied

9   force. Ninth Circuit precedent is clear that where, as here, Plaintiffs seek injunctive relief

10  against high-ranking prison officials responsible for a systemwide use of force policy, the

11  deliberate indifference standard applies. *Jordan v. Gardner*, 986 F.2d 1521, 1528 (9th Cir.

12  1993) (en banc) (when "officials formulate a policy in circumstances where there are no

13  particular constraints on the officials' decisionmaking process, and the implementation of

14  the policy will inflict pain upon the inmates on a routine basis, we need not look for a

15  showing of action taken 'maliciously and sadistically' before Eighth Amendment

16  protections are implicated") (citation omitted); *Madrid v. Gomez*, 889 F. Supp. 1146, 1250

17  (N.D. Cal. 1995) ("in a case such as this, where class representatives are seeking to obtain

18  injunctive relief against high ranking prison administrators for an ongoing pattern of

19  excessive force, the subjective prong of the Eighth Amendment is satisfied by a showing

20  of deliberate indifference").

21

22          **D.      Defendants Incorrectly Argue That Plaintiffs Must Suffer Actual Injury
                    or Death to Establish an Eighth Amendment Violation.**

23          Defendants continue to approach this case as if it were an amalgamation of

24  personal injury damages cases, in which plaintiffs must show actual physical injury or

25  death in order to prevail. *See, e.g.,* Doc. 4309 ¶ 1403 (alleging that Defendants' expert

26  "did not identify any adverse patient outcomes resulting in morbidity or mortality due to a

27  lack of professional interpreters or sign language services"); ¶ 1428 (alleging that

28  Defendants' expert did not find that failure to provide prescribed medication "caused

immediate or delayed clinical decompensation or further problems"); ¶ 1574 (citing Plaintiffs' alleged failure to show that Defendants' repeated use of pepper spray and pepper-ball guns on Rahim Muhammad "caused the inmate to suffer any measurable psychological harm").[36]

As a threshold matter, Plaintiffs have identified dozens of avoidable deaths, and innumerable cases of avoidable injury and suffering, directly traceable to the dangerous deficiencies in Defendants' medical and mental health care systems and conditions in isolation. But more fundamentally, Defendants' approach misses the mark. In an injunctive class action challenging prison conditions under the Eighth Amendment, the question is whether defendants, acting with deliberate indifference, expose incarcerated people to a "substantial *risk* of serious harm." *Farmer v. Brennan*, 511 U.S. 828, 828 (1994) (emphasis added). "That the Eighth Amendment protects against future harm to inmates is not a novel proposition," *Helling v. McKinney*, 509 U.S. 25, 33 (1993), and "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Id*. at 34; *see also* Doc. 4308 ¶ 1044 (collecting cases).[37]

---

[36] *See Parsons v. Ryan* ("*Parsons I*"), 754 F.3d 657, 675 n.17 (9th Cir. 2014) ("The cases cited in the defendants' briefs, many of which involve individuals challenging particular instances of medical treatment or conditions of confinement, confirm that they (erroneously) view the plaintiffs' claims as ultimately little more than a conglomeration of many such individual claims, rather than as a claim that central policies expose all inmates to a risk of harm"). Defendants ignore the Ninth Circuit's admonition, yet again relying upon inapplicable individual damages actions, many of which were pro se, and not injunctive class actions.

[37] Defendants repeatedly assert that Plaintiffs are required to show "widespread actual injury," quoting *Lewis v. Casey*, 518 U.S. 343 (1996). Doc. 4309 at 20; *id.* ¶¶ 533, 1118, 1148, 1576, 1685, 1734, 1745. But *Lewis* was not an Eighth Amendment case; it involved prisoners' right of access to the courts which, the Supreme Court held, requires a plaintiff to show "actual injury" in the form of "a nonfrivolous legal claim [that] had been frustrated or was being impeded." *Id*. at 352-53 (footnotes omitted). As both this Court and the Ninth Circuit have held in this case, no such requirement applies to the Eighth Amendment injunctive claims at issue here. *Parsons v. Ryan*, 289 F.R.D. 513, 521 (D. Ariz. 2013) ("When seeking only injunctive relief, a plaintiff need not wait until he suffers an actual injury because the constitutional injury *is* the exposure to the risk of harm") (emphasis in original), *aff'd*, 754 F.3d 657 (9th Cir. 2014); *Parsons I*, 754 F.3d at 677 ("[W]e have repeatedly recognized that prison officials are constitutionally prohibited

-61-

Because the constitutional violation here is the substantial *risk* of harm created by systemwide policies and practices, the violation is *a fortiori* systemwide, and requires systemwide relief. Defendants cite *Fraihat v. U.S. Imm. & Customs Enforcement*, 16 F.4th 613 (9th Cir. 2021), but that case involved "a nationwide network of over 250 detention facilities," *id*. at 620, including contracted providers, all of which differed in ownership, operation, and the provision of medical care:

> These facilities differ in various ways. ICE owns some of the detention facilities; others are operated under contract with state or local agencies or government contractors. Some of the centers are "dedicated" facilities, which hold only ICE detainees, whereas others are "non-dedicated" facilities, which also hold non-ICE detainees. … Facilities also vary based on who provides medical care. Government employees, as part of the ICE Health Services Corps (IHSC), provide direct medical care at twenty facilities, which together hold about 13,500 detainees. The remaining facilities employ medical staff that the federal government does not directly employ.

*Id*. at 620; *see also id*. at 645 (citing "the material differences across ICE facilities").

*Fraihat* is thus fundamentally different from this case which, as the Ninth Circuit observed, involves "33,000 inmates in the custody of a single state agency" and "uniform statewide practices created and overseen by two individuals who are charged by law with ultimate responsibility for health care and other conditions of confinement in all ADC facilities." *Parsons v. Ryan* ("*Parsons I*"), 754 F.3d 657, 681 (9th Cir. 2014). *See also id*. at 662 ("To satisfy the duty imposed by statute on its director, ADC has promulgated extensive statewide policies governing health care and conditions of confinement that apply to all of the inmates in its custody, all of its staff, and all of its facilities") (citing A.R.S. §§ 31–201.01 and 41–1604); *id*. at 683 n.27 ("the challenged ADC policies and practices are uniform across facilities and statewide in their scope").[38]

---

from being deliberately indifferent to policies and practices that expose inmates to a substantial risk of serious harm.").

[38] That Ninth Circuit ruling—and others in this case that Defendants ignore—are the law of the case, and the Court should not accept Defendants' invitation to disregard or revisit these holdings now. *See United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000) (holding that under the "law of the case" doctrine, "a court is generally

155931733.2

Indeed, the *Fraihat* court specifically cited *Parsons I* with approval on this point, characterizing *Parsons* as involving "exposure of prisoners to substantial risk of serious harm through statewide policies and practices." 16 F.4th at 637.[39]

### E.   Defendants' Assertion That All Named Plaintiffs Must Show Continuing and Ongoing Harm Is Incorrect.

Defendants' attacks on the named plaintiffs and testifying class members (or what they erroneously characterize as "Plaintiffs' Individual Claims," Doc. 4309 at 98) miss the mark. *See* Doc. 4309 ¶¶ 224-498. Even if this issue were again up for debate, this Court noted in denying Defendants' summary judgment motion that:

> [T]his argument continues to misconstrue the foundation upon which this case was certified and the governing legal standard controlling it. This action never relied solely upon the experiences of the Named Plaintiffs. *Parsons I,* 289 F.R.D. at 524 ("The remedy in this case would not lie in providing specific care to specific inmates."). As the Court has repeated, and reinforced by the Ninth Circuit, data establishing whether the prison has sufficient resources to provide adequate care is what will underlie the conclusion in this case (Doc. 446, Transcript of April 26, 2013 Hearing at 18:4–6) ("[W]hat will really matter is the systemic data itself as to what resources are being put in[.]"); *see id.* at 19:16–19 ("The evidence that matters about the level of healthcare is going to be gross evidence about budgeting, staffing, number of people being served."). As a result, the Named Plaintiffs would no more be able to win their case by establishing that they had

---

precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case").

[39] Defendants purport to cite *Fraihat* for the proposition that "[p]roof of a deficient policy or custom at less than all facilities is 'insufficient to support' a systemwide claim." Doc. 4309 at 21. But the cited page of *Fraihat* says no such thing. And to the extent that Defendants assert that Plaintiffs must separately and independently prove their case at each of the ten prison complexes, the Court rejected that argument when it denied Defendants' motion to reconsider its class certification decision because not all deficiencies had been proven at all ten facilities. *See Parsons,* 289 F.R.D. at 526 ("The abundant evidence underlying the Cure Notification, Plaintiff's declarations, and the experts' declarations soundly support the conclusion that commonality exists among the Class and Subclass members. Further, this determination was not conditioned on an explicit finding that all twenty failures existed at all ten complexes and remains the same in view of Defendants' clarification that the failures existed at several [but not all] complexes. In short, the Court found that the evidence in its totality constituted 'significant proof' that ADC inmates face a substantial risk of serious harm stemming from inadequate health care and finds no basis to reconsider that ruling").

-63-

155931733.2

1

2

experienced deliberate indifference than Defendants can win by establishing they did not.

3

4

*Parsons v. Ryan*, No. CV-12-00601-PHX-NVW, 2014 WL 3887867, at *2 (D. Ariz. Aug. 7, 2014). The Court continued:

5

As the Supreme Court explained in *Plata*:

6

7

8

9

10

11

12

Because plaintiffs do not base their case on deficiencies in care provided on any one occasion, this Court has no occasion to consider whether these instances of delay-or any other particular deficiency in medical care complained of by the plaintiffs-would violate the Constitution under *Estelle v. Gamble,* if considered in isolation. Plaintiffs rely on systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to "substantial risk of serious harm" and cause the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of a maturing society. (citations omitted).

13

14

15

16

*Id.* at *3 (quoting *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011)). In sum, "even assuming that each Named Plaintiff received constitutionally adequate medical care, that alone does not prove the absence of systemic deficiencies in the provision of medical care." *Id.* The same principle applies regarding conditions in ADCRR's isolation units.[40]

17

18

**F.     The Court Must Examine The Actual Practices in Defendants' Prisons Rather Than Aspirational Written Policies.**

19

20

21

22

Defendants' filing consists largely of a recitation of their written policies, and their experts' opinions that those written policies are adequate. However, as this Court has repeatedly reminded Defendants, Plaintiffs' challenges focus primarily on Defendants' actual practices, not their written policies:

23

24

25

Defendants' oft-repeated contention that Plaintiffs' allegations are inconsistent with ADC policies misunderstands the substance of Plaintiffs' claims. Plaintiffs' claim is that *despite* ADC stated policies, the actual provision of health care in its

26

27

28

[40] Defendants assert that, in denying summary judgment, the Court "question[ed] the veracity of the individual Plaintiffs' own allegations." Doc. 4309 at 15. No page citation is provided for this statement, and it is false.

-64-

prison complexes suffers from systemic deficiencies that rise
to the level of deliberate indifference.

*Parsons*, 289 F.R.D. at 520–21 (emphasis in original); *see also Parsons*, 2014 WL 3887867, at *4 ("Most of [Defendants'] argument rests on ADC's written policies to demonstrate that Defendants provide sufficient access to emergency care, medication and medical devices and have sufficient procedures to mitigate the spread of infectious diseases. But Plaintiffs' claim is that despite ADC's policies, its practices are constitutionally deficient"). *See also Orantes Hernandez v. Holder*, 321 F. App'x 625, 628 (9th Cir. 2009) ("The government's insistence that the existence of its forms and policies alone obviates the need for the injunction misses the point. … [T]he injunction seeks to remedy the government's actual practices, not just its policies on paper."); *cf. Ware v. Jackson Cnty.*, 150 F.3d 873, 882 (8th Cir. 1998) (holding that "the existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced") (jail case); *Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000) ("[A] 'paper' policy cannot insulate a municipality from liability where there is evidence, as there was here, that the municipality was deliberately indifferent to the policy's violation") (jail case).

## G. The Purported Volume of Health Care Encounters Is Irrelevant to The Eighth Amendment Inquiry.

Defendants present various statistics regarding the number of health care encounters conducted in ADCRR (Doc. 4309 ¶¶ 784-808, 855-864), and assert that "as shown by the volume of encounters, ADCRR provides appropriate continuity of care and clinically ordered and appropriate mental health and psychiatric treatment services." *Id.* ¶ 1304; *see also id.* ¶ 1315 (citing "the percentage of submitted mental health HNRs that result in scheduled appointments"). However, this Court has already explained that this is a non-sequitur:

Defendants list the number of "encounters" each Named
Plaintiff had with healthcare staff, which includes all types of
providers, and draws the conclusion that ADC provides

1
2
3
4

> constitutionally adequate mental health care. There is no breakdown or analysis as to the types of encounters each inmate received or the provider level for each encounter. This argument does not exclude a genuine issue of material fact because the number of healthcare encounters alone is insufficient to establish quality care.

5   *Parsons*, 2014 WL 3887867, at *5 (citing *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir.

6   2000) ("A prisoner need not prove that he was completely denied medical care"); *Ortiz v.*

7   *City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (same)); *see also Edmo v. Corizon,*

8   *Inc.*, 935 F.3d 757, 793 (9th Cir. 2019) ("The provision of some medical treatment, even

9   extensive treatment over a period of years, does not immunize officials from the Eighth

10  Amendment's requirements"); Murray TT at 3541:6-11 (Defendants' expert Dr. Murray

11  agrees that it does not help the patient to provide excellent care for some problems, but

12  fail to address a problem that has a significant risk of causing an adverse outcome).

13
14

### H.     Defendants Misstate the Legal Standard for Analyzing Conditions in Isolation Units.

15        Defendants urge the Court to consider each of the conditions in their isolation units

16  individually, without considering the interaction or cumulative effect of those conditions.

17  They contend that "[i]f none of the alleged conditions, standing alone, rises to the level of

18  a constitutional violation, a violation cannot be found based on the overall conditions."

19  Doc. 4309 at 27, citing *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991).

20        In fact, the cited portion of *Wilson* says exactly the opposite of what Defendants

21  cite it for:

22
23
24
25
26
27

> Some conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets. Compare *Spain v. Procunier*, 600 F.2d 189, 199 ([9th Cir.] 1979) (outdoor exercise required when prisoners otherwise confined in small cells almost 24 hours per day), with *Clay v. Miller*, 626 F.2d 345, 347 ([4th Cir.] 1980) (outdoor exercise not required when prisoners otherwise had access to dayroom 18 hours per day).

28

-66-

1    *Wilson*, 501 U.S. at 304–05 (emphasis omitted). And yet again, this Court has already

2    rejected Defendants' argument:

> 3    Defendants present evidence regarding each of the conditions
> 4    in ADC's isolation units (Doc. 902 at 45–59). In the Order
>      granting class certification, the Court rejected the notion that
> 5    each condition would be evaluated in isolation and explicitly
>      considered the conditions in the aggregate. *Parsons I*, 289
> 6    F.R.D. at 523 (considering the conditions of confinement
>      claim "in the aggregate instead of [evaluating] each condition
> 7    on its own"). Proof of the sufficiency of specific services and
>      practices will lean toward the ultimate conclusion Defendants
> 8    seek. But even assuming that Defendants were entitled to
>      summary judgment on each individual condition, this does not
> 9    create the absence of a genuine issue of material fact as to
>      whether the totality of the conditions in the isolation units
> 10   exposes the inmates to a substantial risk of serious harm,
>      namely a lack of social interaction and environmental
> 11   stimulation.
>
> 12   The Court is persuaded that *Wilson v. Seiter,* 501 U.S. 294,
>      305 (1991), lays the groundwork for such a claim, particularly
> 13   in view of the experts' opinions regarding the cumulative
>      effect of these conditions on the inmates confined in the
> 14   isolation units (Doc. 967, Ex. 1, Stewart Report at 58
>      ("Isolated confinement—that is, confinement in a cell for
> 15   more than 22 or more hours each day with limited social interaction
>      and environmental stimulation—can be profoundly damages
> 16   [sic] to mental health even for prisoners with no known mental
>      illness."); Doc. 968, Ex. 1, Vail Report at 10 ("There is broad
> 17   consensus in the corrections and mental health community that
>      placement of mentally ill inmates in isolation creates a
> 18   significant risk of harm."). Their conclusions, at a minimum,
>      create an issue of fact for trial, precluding summary judgment
> 19   on the Subclass claim.

20   *Parsons*, 2014 WL 3887867, at *6.

21          Similarly, at trial, Plaintiffs' experts repeatedly explained how the cumulative

22   effect of conditions in Defendants' isolation units harms those who are exposed to them.

23   *See* Haney WT, Doc. 4120 ¶ 40 (citing the cumulative effect of "extremely high levels of

24   repressive control, enforced idleness and inactivity, reduced environmental stimulation,

25   and a number of physical restrictions and deprivations that collectively exacerbate

26   [incarcerated people's] psychological distress and can create even more lasting negative

27   consequences"); *id*. ¶ 105 ("The stark conditions in isolation are further exacerbated by

28   the lighting . . . Both the constant artificial illumination and the minimal natural light adds

1   to [the] disorienting nature of the conditions in these units"); Haney TT at 768:1-769:14

2   ("All of these things together collectively make this a very harsh, very severe system");

3   Horn WT, Doc. 4130 ¶¶ 238-39 (opining that the living conditions in isolation cells were

4   unacceptable due to the combination of long hours confined to the cells, inadequate space,

5   and the infrequency of recreation and the frequent cancellation of recreation), ¶ 261 ("The

6   problems endemic to [the isolation] units are multiple – from physical plant design to

7   routine maintenance and repair to their daily operational practices – [and] add significant

8   risk of harm to all prisoners, but especially prisoners with mental illness."); *see also*

9   Doc. 4308 ¶¶ 103-244 (describing the cumulative effect of inadequate living space, light,

10  and ventilation; excessive heat; unsanitary and unsafe environmental conditions;

11  inadequate nutrition; inadequate or nonexistent out-of-cell time; failure to supervise

12  people in isolation units; and inappropriate uses of force on people on mental health

13  watch).

14      Defendants offered no correctional expert evidence to refute Dr. Haney's or

15  Mr. Horn's expert testimony.

16  **I.      Blanket Deference to Defendants Is Not Warranted.**

17      Defendants urge the Court to grant them "deference" regarding the conditions in

18  their prisons. Doc. 4309 at 22. But as the Supreme Court has emphasized, deference is not

19  abdication:

20          Courts must be sensitive to the State's interest in punishment,
            deterrence, and rehabilitation, as well as the need for
21          deference to experienced and expert prison administrators
            faced with the difficult and dangerous task of housing large
22          numbers of convicted criminals. Courts nevertheless must not
            shrink from their obligation to enforce the constitutional rights
23          of all persons, including prisoners. Courts may not allow
            constitutional violations to continue simply because a remedy
24          would involve intrusion into the realm of prison
            administration.

25

26

27

28

1    *Brown*, 563 U.S. at 511 (citations, internal quotation marks omitted).[41]

2         The blanket deference Defendants seek would be singularly inappropriate in this

3    case for at least two reasons. First, the Supreme Court has recognized that "the State's

4    responsibility to provide inmates with medical care ordinarily does not conflict with

5    competing administrative concerns." *Hudson v. McMillian,* 503 U.S. 1, 6 (1992). Second,

6    the expertise of prison administrators is simply not at issue where, as here, Defendants

7    have admitted that they hold hundreds of people in isolation without *any* individualized

8    determination that they require such harsh conditions—and indeed, in many cases, after

9    Defendants have determined, through the exercise of their professional judgment, that

10   they do *not* require such conditions and can safely be removed from isolation. *See*

11   Doc. 4308 ¶¶ 312-318 (describing prisoners who have been approved for removal from

12   max custody but nevertheless remain in max custody); *see also id*. ¶ 301 (Defendant

13   Shinn is unable to state the penological justification for requiring all persons with a life

14   sentence to automatically spend two years in isolation). *See Coston v. Nangalama*, 13 F.

15   4th 729, 734 (9th Cir. 2021) ("We have long recognized that a jury need not defer to

16   prison officials where the plaintiff produces substantial evidence showing that the jail's

17   policy or practice is an unnecessary, unjustified, or exaggerated response to the need for

18   prison security") (quoting *Shorter v. Baca*, 895 F.3d 1176, 1183 (9th Cir. 2018)).

19        **J.    The *Monell* Analysis of Municipal Liability Is Inapplicable Here.**

20        Defendants rely upon *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658

21   (1978), which established the standard for municipal liability, and *Treviño v. Gates*, 99

22   F.3d 911 (9th Cir. 1996), another municipal liability case. Doc. 4309 at 19-20. But "cases

23   like this one [against a state prison system] for official or supervisory liability must meet a

24   different standard than cases for municipal liability. The DOC defendants' numerous

25

26

27
     ---
28        [41] Defendants quote the first sentence of this passage from *Brown v. Plata*, but
     conspicuously omit the following two sentences. Doc. 4309 at 22.

1   citations to the municipal liability standard are therefore unhelpful." *Batista*, 930 F.3d at
2   1097 n.4.

### K.   Defendants Consistently Misstate the Law and Misrepresent the Cases Upon Which They Rely.

5      In addition to Defendants' numerous misstatements of the law detailed above,
6   Defendants consistently—and egregiously—misrepresent the cases cited in their brief. A
7   few illustrative examples (but by no means a comprehensive list) follow.

8      *First*, Defendants cite *Norbert v. City & Cnty. of S.F.*, 10 F.4th 918, 929 (9th Cir.
9   2021), for the proposition that "the Eighth Amendment does not mandate *outdoor*
10  exercise." *See* Doc. 4309 at 28 (emphasis in original). In fact, the cited page of *Norbert*
11  says precisely the opposite: "We have stated that the long-term denial of *outside* exercise
12  is unconstitutional. … Thus, to vindicate a constitutional right to exercise, outdoor
13  exercise can indeed be required, when otherwise meaningful recreation is not available."
14  10 F.4th at 929 (emphasis in original; citation, internal quotation marks omitted).

15     *Second*, Defendants claim that "the Ninth Circuit has upheld as few as two hours
16  of recreation per week," citing *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1213 (9th Cir.
17  2008). *See* Doc. 4309 at 28. But the *Pierce* court did no such thing. Rather, it reversed a
18  lower court decision terminating an order requiring two hours of recreation per week. It
19  did not hold that two hours per week satisfied the Constitution; indeed, it noted that the
20  two-hours-per-week order "requires considerably *less* exercise . . . than the one hour a day
21  recognized elsewhere as a constitutional floor." 526 F.3d at 1213 (emphasis in original).

22     *Third*, Defendants claim:

> Indeed, the Ninth Circuit has held that "administrative segregation, even in a single cell for twenty-three hours a day, is within the terms of confinement ordinarily contemplated by a sentence." *Id*. (citing *Toussaint v. McCarthy,* 801 F.2d 1081, 1091-92 (9th Cir. 1986).

26  Doc. 4309 at 29. But the quoted language does not appear either in *Toussaint* or in any of
27  the three cases to which Defendants' "*id*." could possibly refer—and none of those three
28  cases cite *Toussaint*.

-70-

**Fourth**, Defendants quote *Jackson v. McMahon*, No. CV 17-7296-AG (JPR), 2018 WL 6016981, at *15 (C.D. Cal. May 29, 2018), a pro se case, for the proposition that "Although prolonged confinement under conditions of extreme social isolation and reduced environmental stimulation may cause psychological harm, it is not in and of itself an Eighth Amendment violation." Doc. 4309 at 29. However, they omit the next sentence of the opinion: "Under some circumstances, an inmate without prior history of mental illness may state an Eighth Amendment claim based on being confined to his cell for more than 22 hours a day." *Jackson*, 2018 WL 6016981, at *15.

**Fifth**, Defendants quote *Washington-El v. Beard*, No. 08-1688, 2011 WL 891250, at *3 (W.D. Pa. Mar. 11, 2011), *aff'd per curiam*, 562 F. App'x 61 (3d Cir. 2014) (unpublished), another pro se case, for the proposition that: "[T]he mere placement in solitary confinement, despite its accompanying 'extreme social isolation and reduced environmental stimulation'—and the likelihood of 'some degree of psychological trauma' that it entails—is not enough to rise to the level of an Eighth Amendment violation." Doc. 4309 at 29. But two sentences later, the opinion adds the following language, which Defendants conspicuously omit from their filing:

> Various federal courts, however, have recognized that individuals who are at a particularly high risk for suffering very serious or severe injury to their mental health may suffer a constitutional deprivation by being placed in solitary confinement—particularly in instances where there is no penological justification for doing so. Inmates who are already mentally ill at the time of their placement in segregation, or who have a history of prior psychiatric problems or chronic depression are in this group.

*Washington-El*, 2011 WL 891250 at *3 (citations and internal quotation marks omitted).

**Sixth**, Defendants declare that "inmates have no constitutional right to receive visitation while incarcerated," citing *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003); *Dunn v. Castro*, 621 F.3d 1196, 1202 (9th Cir. 2010); and *Gerber v. Hickman*, 291 F.3d 617, 621 (9th Cir. 2002). Doc. 4309 at 32. But none of the cited cases say any such thing. *See Overton*, 539 U.S. at 131 ("[w]e do not hold, and we do not imply, that any right to intimate association is altogether terminated by incarceration or is always irrelevant to

-71-

1    claims made by prisoners); *Dunn*, 621 F.3d at 1205 ("Like the Court in *Overton,* we do

2    not hold or imply that incarceration entirely extinguishes the right to receive visits from

3    family members"); *Gerber*, 291 F.3d at 621 (stating only that "it is well-settled that

4    prisoners have no constitutional right while incarcerated to contact visits or conjugal

5    visits").

6        **Seventh**, Defendants write:

7            Furthermore, even if constant cell-illumination inflicts pain,
         there is no constitutional violation if Defendants have a
8            "reasonable justification." *Chappell* [*v. Mandeville*], 706 F.3d
         [1052], 1057–58 [(9th Cir. 2013)]; *Thomas v. Ponder*, 611
9            F.3d 1150–51 (9th Cir. 2010)[.]

10   Doc. 4309 at 33. But the term "reasonable justification" appears nowhere in *Chappell*.

11   And *Thomas* has nothing to do with cell illumination.

12       **Eighth**, Defendants claim that "the fact that an inmate has a mental illness or is

13   taking psychotropic medications does not constitutionally exempt [sic] the use of OC

14   spray," citing *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001), and *Drummond

15   v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003). Doc. 4309 at 38. But neither of

16   the cited cases involved a so-called "inmate;" neither involved the Eighth Amendment;

17   and neither involved OC spray or other chemical weapons. These Fourth Amendment

18   policing cases simply do not support the proposition for which Defendants cite them.

19   Indeed, the *Deorle* court held that "[e]ven when an emotionally disturbed individual is

20   'acting out' and inviting officers to use deadly force to subdue him, *the governmental

21   interest in using such force is diminished* by the fact that the officers are confronted, not

22   with a person who has committed a serious crime against others, but with a mentally ill

23   individual." *Deorle*, 272 F.3d at 1283 (emphasis added). And, in both cases, the Ninth

24   Circuit concluded that the force used against mentally ill persons by law enforcement was

25   excessive.

26                    * * * * *

27       In sum, Defendants' recitation of the controlling legal standards to be applied in

28   this case is rife with misrepresentations and outright falsehoods. Accordingly, the Court

-72-

should approach Defendants' legal arguments and proposed Conclusions of Law with a highly skeptical eye.

## IV.    DEFENDANTS MISSTATE THE FACTS AND RELY ON INFORMATION THAT IS NOT IN EVIDENCE

As detailed throughout Plaintiffs' Response below, Defendants repeatedly misstate the factual evidence before the Court, and mischaracterize witness testimony. Plaintiffs briefly summarize two other problems that infect Defendants' proposed Findings of Fact: reliance upon information not admitted into evidence, and reliance upon information that was admitted for a limited purpose as the basis of an expert's opinion, and not for the truth of the matter asserted in the exhibit.

### A.    Defendants Rely Upon Information Not Admitted into Evidence.

Defendants repeatedly rely upon information that was not admitted into evidence.

For example, Defendants' discussion of mortality rates includes multiple citations to a report that they admit was released "[a]fter trial commenced," and that they did not offer as an exhibit at any time during trial, or during post-trial briefing on the admissibility of evidence. *See* Doc. 4309 ¶¶ 877-881 (citing E. Ann Carson, *Mortality in State and Federal Prisons, 2001-2019 – Statistical Tables*, Bureau of Justice Statistics (Dec. 2021), https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf); Doc. 4118-1, Ex. 2 (Defendants' Trial Exhibit List); Doc. 4220 at 1 (12/8/21 Minute Order) ("The parties shall advise the Court, in writing, no later than December 15, 2021 whether or not there are any other disputes regarding exhibits."); Doc. 4234 (Defendants' Statement of Disputed Admission of Exhibits and Request for Admission of Same, not offering this December 2021 report). For that reason alone, the Court should not adopt Paragraphs 877-881 of Defendants' proposed findings of fact relying on the undisclosed data not before the Court as evidence.

Another example is that Defendants' Findings of Fact regarding specialty care cite Defendant Gann's trial testimony on November 16, 2021, claiming that Centurion's compliance with Performance Measure 50 "currently this month is 93%; 51 is at 95% compliance." Doc. 4309 ¶ 911; Gann TT at 2283:16-18. But Defendants provided no

-73-

1    documentation to support this self-serving assertion, and this testimony should not be

2    considered. *See* Trial Testimony of Bobbie Pennington-Stallcup ("Stallcup TT") at

3    2441:19-2442:20 (Court stating that it will not consider testimony regarding CGAR data if

4    documentation has not been provided); Phillips TT at 3625:10-15 (Court entering into the

5    record that the last month that Defendants produced CGAR scores to Plaintiffs was July

6    2021). Accordingly, the Court should not adopt Paragraph 911 of Defendants' Findings of

7    Fact relying on Mr. Gann's testimony at 2283:16-18.

8        Defendants also claim that their pending RFP requires bidders to have a new

9    electronic health record (EHR) system, and a new EHR system "will likely result in

10   overall improved care." Doc. 4309 ¶¶ 926-927. They further state that they seek a new

11   EHR system to facilitate "data-min[ing]" for quality assurance purposes. *Id.* ¶ 928. But

12   this Court ordered that all fact discovery ended on October 15, 2021, and rank speculation

13   about the hypothetical benefits or features of a future EHR system that may be created by

14   a hypothetical future vendor is not relevant or properly before the Court. These proposed

15   findings related to a future EHR system should not be considered.

16       There are numerous other proposed Findings of Fact in Defendants' filing that

17   should be similarly disregarded due to this fatal defect of citing to Exhibits that were not

18   admitted into evidence, oftentimes due to the Court sustaining objections to their

19   admission. *See* Doc. 4309 ¶ 387 (citing counsel's representations about the contents of

20   unadmitted Exs. 5277a and 5277b), ¶ 570 (citing unadmitted Exs. 3039), ¶¶ 810-811

21   (citing unadmitted Ex. 3101), ¶ 812 (citing unadmitted Exs. 3116 & 3122), ¶ 816 (citing

22   unadmitted Ex. 3104), ¶ 817 (citing unadmitted Ex. 3105), ¶¶ 813, 818 (citing unadmitted

23   Ex. 3102), ¶ 819 (citing unadmitted Exs. 3101-3103), ¶ 1277 (citing unadmitted

24   Ex. 3022), ¶¶ 1300-1302 (citing unadmitted Ex. 3352), ¶ 1562 (citing unadmitted

25   Ex. 3531), ¶ 1603 (citing unadmitted Ex. 3532), ¶¶ 1620, 1622, 1666, 1668 (citing

26   unadmitted Ex. 4046), ¶¶ 1679, 1681 (citing unadmitted Exs. 4083, 4097, 4099, 4107,

27   4108), ¶ 1633 (citing unadmitted Ex. 1358), ¶¶ 1758, 1761, 1768, 1769 (citing unadmitted

28   Ex. 3018).

155931733.2

1

2

### B. Defendants Broadly Cite to NCCHC Standards and Findings Were Admitted for Limited Purposes.

3    Defendants cite extensively to the National Commission on Correctional Health

4    Care ("NCCHC") standards (Ex. 3304) and findings contained in various NCCHC surveys

5    of ADCRR prisons (Exs. 3305-25). *See* Doc. 4309 ¶¶ 85, 87-88, 90-92, 95, 97, 99, 102,

6    104-05, 108-18, 120-222. But these documents were admitted over Plaintiffs' hearsay

7    objections only for the limited purpose of explaining the basis of Dr. Penn's opinions

8    regarding mental health care, under Rule 703.[42] *See* Penn TT at 3364:23-3365:2, 3368:3-

9    5, 3397:13-14 (the Court ruling documents would be admitted "for [Dr. Penn's] reliance

10   on [them] under [Rule] 703 only" and "not for the truth of what is asserted"); *see also*

11   Gann TT at 2304:10-15 (hearsay objection to NCCHC report for ASPC-Douglas [Ex.

12   3305] sustained). Defendants' numerous citations to these documents for the truth of the

13   matter asserted—rather than to explain the basis of Dr. Penn's opinions—are improper.[43]

14   "Rule 703 merely permits such hearsay, . . . upon which an expert properly relies, to be

15   admitted to explain the basis of the expert's opinion." *Paddack v. Dave Christensen, Inc.*,

16   745 F.2d 1254 (9th Cir. 1984); *see also Engebretsen v. Fairchild Aircraft Corp*., 21 F.3d

17   721, 728 (6th Cir. 1994) ("Rules 702 and 703 do not, however, permit the admission of

18   materials, relied on by an expert witness, for the truth of the matters they contain if the

19   materials are otherwise inadmissible.").

20   Most troublingly, Defendants include extensive citations to NCCHC findings that

21   are not relevant to Dr. Penn's opinions. Dr. Penn opined only on the quality of ADCRR's

22

23   _____

[42] Defendants also cite Exhibit 3303 (the 2014 NCCHC Standards) extensively. *See*
24   Doc. 4309 ¶¶ 120-222. This document has not been admitted into evidence. Defendants
have requested admission of this exhibit, *see* Doc. 4234 at 3, and Plaintiffs have objected,
25   on hearsay grounds, *see* Doc. 4243 at 5-6.
[43] In some instances, Defendants' statements about NCCHC accreditation are false.
26   Defendants state "[a]ll ten ADCRR facilities are accredited by the NCCHC." Doc. 4309 ¶
107; *see also id.* ¶ 573. But as Defendants elsewhere acknowledge, ASPC-Yuma has not
27   achieved full NCCHC accreditation. *See* Doc. 4309 ¶ 118 ("On August 5, 2021 the
Accreditation Committee . . . voted to award Continuing Accreditation with Verification,
28   contingent upon receiving additional compliance verification by December 6, 2021.").

-75-

1    mental health care system. Dr. Murray, Defendants' medical expert, did not discuss the

2    NCCHC reports in his written or oral testimony. But Defendants repeatedly ask the Court

3    to rely on the NCCHC reports to enter findings related to ADCRR's medical care

4    system.[44] Any NCCHC findings regarding medical care are plainly irrelevant to

5    Dr. Penn's opinions as a mental health care expert and outside the scope of the Court's

6    limited admission of these documents. These citations should not be considered by the

7    Court.[45]

8         Defendants could have, but did not, call as a witness someone from the NCCHC

9    who conducted these audits and could testify to the contents of these reports. This would

10   have given Plaintiffs the necessary opportunity to cross-examine the auditor on the

11   accreditation process and the methodology used to assess each prison's compliance with

---

[44] *See, e.g.*, Doc. 4309 ¶¶ 122-23 (discussing standard regarding access to health care, including medical care), 124-25 (coordination of health care system, including medical), 126-27 (qualification of health care professionals, including medical), 128-30 (coordination of custody and health care systems, including medical), 131-32 (health care policies, including medical), 133-36 (quality improvement programs), 137-38 (health care records), 139-40 (reviews of deaths in custody), 141-42 (nutrition), 143-44 (communicable diseases), 145-46 (preventative medical services), 149-50 (communications between classification and health care staff, including medical), 151-52 (patient safety programs), 153-54 (credentialing and licensing of health care staff, including medical), 155-56 (continuing medical education), 157-58 (referrals to health care from custody staff), 159-60 (medication administration), 161-62 (incarcerated workers providing services related to health care), 163-64 (health care staffing, including medical), 165-66 (pharmaceutical operations), 167-68 (medication administration), 169-70 (clinic space), 171-72 (medical diets), 173-74 (transportation to health care appointments), 175-76 (health care during emergencies), 177-78 (hospital and specialty care), 179-80 (orientation to health care services, including medical), 181-82 (medical screenings during intake), 183-84 (continuity of care after transfers), 185-86 (medical screenings during intake), 191-93 (nonemergent health care needs), 194-95 (nursing assessments), 196-97 (coordination of care), 198-200 (discharge planning), 199 (treatment of opioid addiction), 201-03 (treatment of chronic diseases and other significant health conditions), 204-05 (infirmary care), 208-09 (care for patients undergoing withdrawal), 210-11 (care during pregnancy), 212-13 (treatment for victims of sexual abuse), 221-22 (right to refuse treatment/informed consent).

[45] Dr. Penn's broad statement in his written testimony that "all [NCCHC] standards and ADCRR facilities' compliance with same are indicative of the exceptional mental health care provided within its facilities," thus does not address this evidentiary problem, because, again, Dr. Penn exclusively opined on ADCRR's mental health care system, not its medical care system. *See* Penn WT, Doc. 4172 ¶ 64.

-76-

155931733.2

the relevant standards. Defendants cannot circumvent this fundamental requirement by shoehorning the entirety of these reports into evidence through Rule 703. *See Matter of James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992) ("[I]t is improper to use an expert witness as a screen against cross-examination . . . .").

Defendants failed to produce sufficient evidence that any of the NCCHC findings they cite are reliable and resulted from methodologically sound, thorough reviews. Defendants devote more than 100 paragraphs to critiquing the methodology of Plaintiffs' experts. *See* Doc. 4309 ¶¶ 517-33, 1141-52, 1543-77, 1591-1632. At the same time, Defendants ask the Court to rely unquestioningly on findings from various NCCHC audits without detailing the methodology used for each of these reviews. Defendants did not establish, for example, the number of and selection process for staff and patient interviews, the number of and selection process for patient chart reviews, how many and which meeting minutes were reviewed, whether and which other data sources/reports were considered, and how much time the auditors spent on site at each prison. Again, Defendants failed to call as a witness anyone who conducted any of these audits of ADCRR facilities.

Instead, Defendants offer only very general statements from the NCCHC regarding the accreditation process, and general testimony from Dr. Penn, Mr. Gann, and Dr. Phillips. *See* Doc. 4309 ¶ 90 (summarizing the NCCHC standards as indicating "[c]ompliance may be verified through record reviews, observation, interviews, and other information-gathering methods"), ¶ 96 (summarizing testimony of Dr. Penn, Mr. Gann, and Dr. Phillips). Mr. Gann's and Dr. Phillips' testimony is of extremely limited value, as neither testified that they served as an NCCHC surveyor for any ADCRR prison, and neither testified in an expert capacity regarding the NCCHC accreditation process.[46] Indeed, Defendants' reliance on Mr. Gann's and Dr. Phillips' testimony is at odds with the

---

[46] In fact, Mr. Gann conceded at trial that although he has had NCCHC auditor training, he has "never actually audited a facility." Gann TT at 2297:18-20; Doc. 4308 ¶ 983.

1   position they took on this issue during trial. At trial, Defendants objected to Plaintiffs'

2   request to call a rebuttal witness with decades of experience as an NCCHC auditor,

3   claiming Plaintiffs' proposed fact witness "cannot offer any testimony regarding the

4   relevance of NCCHC accreditation to this case, *given that she was not part of the NCCHC*

5   *accreditation survey team for any of the ADCRR facilities*." Doc. 4217 at 3 n.1 (emphasis

6   added); *see also* Doc. 4205 at 5. In addition to their lack of personal knowledge, neither

7   Dr. Phillips nor Mr. Gann explained the NCCHC's methodology for the ADCRR audits in

8   detail. *See, e.g.*, Gann TT at 2418:20-2419:20 (testifying that he is "not aware" of how

9   many patients are interviewed by NCCHC surveyors, or whether there is a specific

10   requirement related to such interviews); *see also* Doc. 4308 ¶ 983.

11          Dr. Penn also did not explain the NCCHC surveys of ADCRR prisons in detail, nor

12   has he participated in any NCCHC surveys of ADCRR. In fact, he testified that he has not

13   worked as an auditor for the NCCHC since 2013, and that, in general, when an NCCHC

14   accreditation survey team visits a prison or jail, there is no minimum number or

15   percentage of medical records that are required to be reviewed, and no requirement to

16   interview a certain number or type of health care staff or incarcerated people. Doc. 4308

17   ¶ 984.[47] Defendants' witnesses' general praise of the NCCHC accreditation process was

18   also firmly contradicted by the testimony of Plaintiffs' medical expert, Dr. Wilcox. *See*

19   Doc. 4308 ¶¶ 980-82.

20          Finally, many of the general NCCHC findings cited by Defendants were also

21   contradicted by other clear and detailed evidence presented at trial—including

22   Defendants' own monitoring data. For example, Defendants claim all prisons are in

23   compliance with NCCHC Standard P-D-08, which requires that prisons provide

24   "appropriate and timely" access to hospital and specialty care. *See* Doc. 4309 ¶¶ 177-78.

25   But this finding was plainly contradicted by Defendants' own monitoring data of

26

27   _____

28      [47] Dr. Penn also admitted that he had never conducted a single assessment for
     NCCHC of a state prison facility, let alone a state prison system. Doc. 4308 ¶ 984.

-78-

1   Performance Measures 50 and 51 in this case, which measured access to routine and
2   urgent specialty care. Defendants' data shows widespread noncompliance with both
3   metrics in 2021. For the first seven months of 2021, *all* of the prisons except ASPC-
4   Douglas (one of the smaller prisons) failed to meet the agreed upon 85% benchmark for
5   these metrics for at least one month. *See* Doc. 4308 ¶ 748; Exs. 1263 & 1264.

6        Similarly, Defendants claim all prisons are in compliance with NCCHC Standard
7   P-E-07, which requires that "inmates have daily opportunities to submit oral or written
8   health care requests" and that "a face-to-face encounter is conducted by a qualified health
9   care professional, within 24-hours of receipt of the request." Doc. 4309 ¶¶ 191-93. Again,
10  however, Defendants' own data plainly contradicts the NCCHC's findings. Under the
11  Stipulation, Defendants monitored their compliance with a benchmark that required that
12  patients be seen within 24 hours of submitting a sick call slip (Performance Measure 37).
13  Defendants' monitoring data for 2021 showed persistently low scores with this metric at
14  ASPC-Tucson and ASPC-Yuma. *See* Doc. 4308 ¶¶ 625-32; Ex. 1258; *see also* Phillips TT
15  at 2931:5-7 (acknowledging that at ASPC-Tucson "patients are not being seen face-to-
16  face within 24 hours of submitting a health needs request, and that's an NCCHC
17  standard").

18       Defendants assert that ADCRR's compliance with an NCCHC standard on
19  "Segregated Inmates" undermines Dr. Haney's opinions. Doc. 4309 ¶¶ 1523-24. But the
20  evidence presented at trial indicates that NCCHC surveyors conduct limited "double
21  checking" of the facility's practices against the written policies and procedures while
22  onsite, looking at "fairly high-end data." Wilcox TT at 1675:21, 1965:10-13. "[W]hat
23  they're really looking at is the overall presence or absence of certain core functions." *Id.*
24  at 1965:14-17. Dr. Phillips, Defendant Gann, and Dr. Penn asserted that the NCCHC
25  review included more than just a review of policies, but provide no detail about what is
26  reviewed and how it is assessed. Doc. 4308 ¶¶ 983-984.

27       In sum, Defendants inappropriately cite extensively to findings in NCCHC reports
28  that were not admitted into evidence. Defendants also failed to establish that these

-79-

1    NCCHC findings are reliable, or that they rebut the substantial evidence of constitutional

2    violations presented by Plaintiffs in this case.[48]

3    **V.    ISOLATION**

4        **A.    Definition of Solitary Confinement**

5        Isolation, or solitary confinement, has been defined in this case as confinement in a

6    cell for 22 or more hours per day. *Parsons*, 289 F.R.D. at 525. Defendants improperly

7    attempt to inject uncertainty into this definition where none exists. Doc. 4309 ¶ 1512.

8    They state that "NCCHC defines solitary confinement as an extreme form of segregation

9    where an inmate is isolated and encounters staff and other inmates fewer than three times

10   a day," and that "[t]here are no inmates within ADCRR who fall within this definition."

11   *Id.* ¶ 1525. This characterization of NCCHC's definition is false; NCCHC's Position

12   Statement on Solitary Confinement (Isolation) defines it as follows:

> Solitary confinement is the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals. Those in solitary confinement often experience sensory deprivation and are offered few or no educational, vocational, or rehabilitative programs. Different jurisdictions refer to solitary confinement by a variety of terms, such as isolation; administrative, protective, or disciplinary segregation; permanent lockdown; maximum security; supermax; security housing; special housing; intensive management; and restrictive housing units. *Regardless of the term used, an individual who is deprived of meaningful contact with others is considered to be in solitary confinement.*

20   Ex. 2216 at 1 (emphasis added).

---

22   [48] Plaintiffs have already explained that fee-for-service "accreditation" by a private trade group like NCCHC does not control this Court's Eighth Amendment analysis. *See* Doc. 4308 ¶¶ 977-988, 1102-1106. Defendants assert that NCCHC accreditation is "compelling evidence of constitutionally adequate health care," Doc. 4309 at 24, but cite no authority that remotely supports that outlandish claim. Indeed one of the cases cited by Defendants, *Ruiz v. Johnson*, held that NCCHC accreditation "simply cannot be dispositive" of the Eighth Amendment question, noting that "the standards by which NCCHC evaluated the medical units did not actually measure the actual standard of medical care provided by the prison system," and that "[r]ather than analyze the actual quality of the medical care received by inmates, the NCCHC's evaluation focuses on the written standards, policies, protocols, bureaucracy, and infrastructure that makes up the medical care system." 37 F. Supp. 2d 855, 902 (S.D. Tex. 1999) (citations omitted), *rev'd and remanded on other grounds*, 243 F.3d 941 (5th Cir. 2001).

-80-

1   Under this definition, thousands of ADCRR prisoners are held in solitary

2   confinement. *See* Doc. 4309 ¶ 1600; Ex. 1304. Moreover, the NCCHC Position Statement

3   provides, *inter alia*, that "[p]rolonged (greater than 15 consecutive days) solitary

4   confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's

5   health," and that "[j]uveniles, mentally ill individuals, and pregnant women should be

6   excluded from solitary confinement of any duration." Ex. 2216 at 5.

7   **B.    Overuse of Solitary Confinement**

8   Defendants make claims about the size of the Maximum Custody population in

9   2012, and the purported reduction since then. Doc. 4309 ¶ 1636. In addition to simply

10   being wrong about the current Maximum Custody population (see below), Defendants

11   appear to be claiming credit for a reduction in the size of the Maximum Custody

12   population. But they cite to no evidence about the prior size of the population, nor have

13   they submitted any such evidence.

14   Defendants assert that, as of September 30, 2021, of the 27,794 people incarcerated

15   in the ten ADCRR-run prisons, 1,636 people were classified maximum custody and seven

16   (7) had close management status. Doc. 4309 ¶ 1634, citing Ex. 1304. They understate the

17   number of people in maximum custody by more than 150 people. According to Exhibit

18   1304, which shows maximum custody units in the first column, the maximum custody

19   population on September 30, 2021 was not 1,636 as Defendants claim, but rather 1,801:

| Max Custody Housing Unit | Population |
|---|---|
| Lewis Rast | 311 |
| Tucson Rincon | 77 |
| Eyman SMU I | 350 |
| Eyman SMU I SO | 130 |
| Eyman SMU I PC | 16 |
| Eyman Browning Intake | 31 |
| Eyman Browning Unit | 435 |
| Eyman Browning STG | 144 |
| Eyman Browning Death Row (Max) | 15 |
| Eyman BMU | 11 |
| Eyman Browning Enhanced | 31 |
| Eyman Browning RSHP | 6 |

| Max Custody Housing Unit | Population |
|---|---|
| Phoenix Reception | 212 |
| Phoenix B-Ward | 32 |
| **Total** | **1,801** |

Defendants also misstate the number of people with close management status as of September 30, 2021. They say there were seven people total; but Exhibit 1304 shows seven at Lewis Rast, and another 15 people at Eyman Rynning. Ex. 1304.

Defendants assert, without support, that the percentage of people in each of the types of solitary confinement (4.6% in maximum custody, less than 0.5% in close management, and 2.7% in detention) demonstrate that they do not overuse the various solitary confinement statuses. Doc. 4309 ¶¶ 1637-1639. In addition to the number and percent of people in max custody being incorrect, this makes no sense. Defendants did not identify a number or percent at which overuse begins. The only reasonable way to think about whether a number or percent shows that there is overuse of restrictive housing is by comparison with other systems. Defendants submitted an exhibit that allows for such comparison for maximum custody, close management, and detention (Ex. 3530), but do not cite to it, presumably because it shows that they are overusing restrictive housing.

The CLA/Liman Time-In-Cell Study is a snapshot in time of the use of restrictive housing in jurisdictions across the country. Ex. 3530. The study provides information about restrictive housing in 39 states. *Id*. at ADCRR00231472. The study's authors specifically requested the following data from the states:

- "Please indicate the total population under your DIRECT CONTROL[49] . . . for which you can provide restrictive housing data"
- "How many people total are in restrictive housing, defined as in cell for an average of 22 or more hours a day for 15 or more continuous days, in the facilities under your direct control?"

*Id*. at ADCRR00231474.

_____

[49] The survey defined "direct control" as when a jurisdiction "hires and supervises staff and . . . provides the governing rules and policies" at the relevant facilities, including "facilities where certain services, such as health care or laundry, are performed by subcontractors." Ex. 3530 at ADCRR00231472. Thus, the prison population incarcerated in the private prisons should not be counted for this purpose. *Id*.

The median percentage of the population held in restrictive housing was 3.4%, the average was 3.8%. *Id.* Four states—Colorado, Delaware, North Dakota, and Vermont—reported that they had entirely stopped using solitary confinement of 22 or more hours per day for 15 or more consecutive days. *Id.* at ADCRR00231472, ADCRR00231571.[50]

Even if one counted only the max custody population in ADCRR, the evidence shows that Defendants overuse restrictive housing. The total population in ADCRR's direct control as of September 30, 2021, which is the Plaintiff class, was 27,794. Doc. 4309 ¶ 1634; Ex. 1304. As detailed above, 1,801—or 6.5%—of these people were in maximum custody. This is nearly double the median percentage found in the CLA/Liman Study, and well above the average. Only five states reported a higher percentage. Ex. 3530 at ADCRR00231475-231476.

But notably, the definition of restrictive housing includes more than just those individuals in maximum custody. It includes *anyone* kept in their cell for an average of 22 hours or more each day for 15 or more consecutive days. As Defendants admit, they do not track how long people are in solitary confinement. *See* Shinn TT at 2218:2-12; Doc. 3701 at 1; Doc. 3755 at 1-2. The evidence is clear that most people in max custody, close management, and detention are there for longer than 15 days. (And Defendants' mental health watch units also meet this definition of restrictive housing as well). In maximum custody, one cannot even get to Step 2 within 15 days, let alone progress

---

[50] Defendants cite policies from the New York state prison system in an attempt to validate their isolation practices. Doc. 4309 ¶ 1563. But those policies pre-date the effective date of New York's Humane Alternatives to Long-Term ("HALT") Solitary Confinement Act, which prohibits solitary confinement for more than 15 consecutive days, and bans solitary confinement entirely for persons under 22 or over 54 years of age, those who are pregnant, persons with disabilities, and persons with serious mental illness. Doc. 4120 ¶ 63. The Act, signed by the Governor on March 31, 2021, takes effect on March 31, 2022. S. 2836, § 14, *at* https://www.nysenate.gov/legislation/bills/2021/s2836, Haney TT at 998:21-999:13.

Pursuant to Fed. R. Evid. 201(c)(2), Plaintiffs request that the Court take judicial notice of this information from the website of the New York Senate. *See Disabled Rts. Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 n.1 (9th Cir. 2004) (courts "may take judicial notice of the records of state agencies and other undisputed matters of public record").

through the steps and be reclassified. Ex. 1318, DO 812 § 5.5 & Attachs. B-F. In close management, one must progress through three phases, only the first review occurs during the first 15 days; and subsequent reviews, at which phase levels can be changed, may be scheduled "30, 60, 90, or 180 calendar days" from the initial review. Ex. 1319, DO 813 § 3.5, Attachs. A and B.

Although there is no specific program progression or minimum time for people in detention units, it is clear that most people spend far more than 15 days in detention. For example, in Eyman SMU I, the largest detention unit in the state, 91 of the 154 people in detention during the week of September 13, 2021 had been there for at least a month.[51] *See* Ex. 1694 at ADCRR00184327-184955; *see also* Doc. 4308 ¶¶ 337-339. As to whether people in each of these classifications meet the specification of 22 hours per day in the cell, that too is clear. According to policy, in max custody, people are offered only between seven and ten hours of recreation per week, and may have a small amount of out-of-cell programming. Ex. 1318, DO 812, Attachs. B-F. In close management, policy provides that people get only six hours of recreation per week, in-cell programming in phases I and II, and a small amount of out-of-cell programming in phase III. Ex. 1319, DO 813, Attachs. A, B. In detention units, policy provides that people receive only six hours of recreation per week, and no programming. Ex. 1312, DO 804 § 1.2.6.5.

When the three categories of people who are likely to have been in restrictive housing for 15 or more days are added together, there were 2,573 such people on September 30, 2021 (1,801 in Maximum Custody, 22 in Close Management, and 750 in Detention). Ex. 1304. That is 9.3% of the ADCRR population on that day. *Id*. This is nearly three times the median percentage and more than double the average reported in the CLA/Liman Study. Ex. 3530 at ADCRR00231475-231476. Only one other state reported keeping a larger percent of its population in restrictive housing. *Id*.

---

[51] People may be transferred to the Eyman SMU I "statewide" detention unit from another detention unit. *See, e.g.*, Ex. 1697 at ADCRR00188088, ADCRR00188114.

Beyond the question of how many people are in solitary confinement, a critical question to determine if ADCRR overuses solitary is *why* people are being isolated. Defendants put people in solitary confinement without any penological justification. They automatically place all men starting a life sentence into solitary confinement for a minimum of two years, although they can articulate no penological justification for doing so. Doc. 4308 ¶¶ 296-301. They keep people in solitary confinement on an opaque status referred to as an "OSB Hold"—which does not exist in their policies. *Id.* ¶¶ 302-303. They cruelly isolate vulnerable people who have been attacked, or otherwise need protection from harm from others. *Id.* ¶¶ 305-310. They keep people in solitary confinement despite the incarcerated persons being disciplinary free, following all rules, and consistently demonstrating positive social interaction skills and a good work ethic for years at a time. *Id.* ¶¶ 331-333. And they bizarrely keep people in solitary confinement after they conclude that there is no reason to keep them in these units. *Id.* ¶¶ 312-317.

Defendants quote Dr. Penn's opinion that restrictive housing settings "are used in correctional systems for adults who belong to security threat groups (STG)," that "these prisoners are extremely aggressive and assaultive, often members of prison, national, or regional gangs," and that "in these instances, isolated confinement is used only after less restrictive housing and supervision efforts have been unsuccessful." Doc. 4309 ¶ 1519. But, as Defendants concede, Dr. Penn is not an expert on correctional or custody issues. *Id.* ¶ 1188; *see also* Penn TT at 3283:1-2 ("So, Your Honor, I don't consider myself to be a custody expert"). He is therefore utterly unqualified to render opinions on the alleged dangerousness of the persons in ADCRR custody, or the security measures they require. Indeed, Defendants presented *no* expert testimony at all on correctional or custody issues.

Defendants provide no evidence that in ADCRR "isolated confinement is used only after less restrictive housing and supervision efforts have been unsuccessful" as Dr. Penn asserted. Doc. 4309 ¶ 1519. And few of the people in restrictive housing are members of "STGs." *See* Ex. 1304 (showing 144 people in the Eyman Browning STG unit). As discussed above, Defendants place and keep people in solitary confinement for many

-85-

1   different reasons and often for no reason at all. *See, e.g.*, Doc. 4308 ¶¶ 296-301 (all

2   persons beginning a life sentence are automatically placed in solitary confinement for two

3   years, regardless of their behavior or individual risk factors).

4       Defendants also assert that the fact that less than 0.5% percent of the ADCRR

5   population was housed on mental health watch status on September 30, 2021 shows that

6   Defendants do not overuse mental health watch. Doc. 4309 ¶ 1640. Defendants cite

7   nothing whatsoever to indicate whether maintaining a prison system in which 0.5% of the

8   total population on a given day is on suicide watch is appropriate.

9       However, the overuse is apparent. The United States Department of Justice, Civil

10  Rights Division, recently issued a findings letter, concluding that holding persons in

11  mental health crisis on mental health watch for 14 consecutive days or more under

12  restrictive housing conditions subjects them to a substantial risk of serious harm, and

13  shows deliberate indifference to their health and safety in violation of the Eighth

14  Amendment. United States Department of Justice, Civil Rights Division, *Report on*

15  *Investigation of the Mass. Dep't of Corrs.*, November 17, 2020, available at

16  https://www.justice.gov/opa/press-release/file/1338071/download          (last    visited

17  February 21, 2022), at 17-18.[52] Defendants' documents show that patients routinely

18  remain on watch for weeks or months at a time. *See, e.g.*, Doc. 4240-1 at 10 (89 days and

19  97 days); 12 (105 days); 15 (76 days); 28 (64 days); 29 (64 days); 31 (83 days); 38 (62

20  days); 39 (69 days). Dr. Pelton testified that she is aware of people who have been on

21  watch "for months." Doc. 4308 ¶ 558. There is no time limit on how long a person can

22  continuously be on suicide watch, nor a requirement that a patient be transferred to an

23  inpatient setting after they spend a certain length of time on suicide watch. *Id.*

24

25

---

26      [52] Pursuant to Fed. R. Evid. 201(c)(2), Plaintiffs request that the Court take judicial
    notice of this information from the website of the United States Department of Justice,
27  Civil Rights Division. See *Disabled Rts. Action Comm. v. Las Vegas Events, Inc.,* 375
    F.3d 861, 866 n.1 (9th Cir. 2004) (courts "may take judicial notice of the records of state
28  agencies and other undisputed matters of public record").

155931733.2

1

### C.    Isolation of People Who Are Mentally Ill

2      Without citing any evidence, Defendants assert that "[t]here is no policy or practice

3 of isolating mentally ill inmates at ADCRR's facilities." Doc. 4309 ¶ 1527. But, just five

4 paragraphs earlier, they acknowledge that ***they view mental illness a reason to put people***

5 ***into solitary confinement, not a reason to keep them out of it***: "Custody and health care

6 staff work proactively to place inmates with mental disorders in restrictive housing

7 settings if there is potential for harm to themselves or others." *Id*. ¶ 1522.

8      Moreover, Defendants' claim is contradicted by the testimony of Defendants'

9 Mental Health Director Dr. Stallcup, who testified there is no policy restricting the

10 placement of persons with serious mental illness in max custody units, and confirmed that

11 persons with serious mental illness are confined in max custody units. Stallcup TT at

12 2571:6-21. She similarly testified that there is no policy restricting the placement of

13 persons with serious mental illness in detention units, and that people with serious mental

14 illness are confined in those detention units. *Id.* at 2571:22-2572:9.

15      Defendants also assert that they "avoid[] the prolonged segregation" of people with

16 mental disorders. Doc. 4309 ¶ 1522.[53] As demonstrated by the evidence, this is false.

17 Named Plaintiff Jason Johnson is classified as SMI and has spent at least the last two

18 years in solitary confinement. Trial Testimony of Jason Johnson ("Johnson TT") at

19 1213:6-1215:21, 1216:15-18, 1212:9-12, 1220:15-1221:3. Named Plaintiff Dustin Brislan

20 is classified as SMI and has been kept in solitary confinement units continuously since

21 2017. Trial Testimony of Dustin Brislan ("Brislan TT") at 1293:14-19, 1294:15-17,

22 1300:2-12. Subclass Member J.J. is recognized as having a serious mental illness and has

23 been in solitary confinement since 2012. Doc. 4308 ¶¶ 186, 303, 322. Subclass Member

24 T.A. is recognized as having a serious mental illness and was kept in solitary confinement

25

26 _____

27      [53] Although they say they avoid "prolonged segregation," Defendants do not define
what "prolonged" means. The NCCHC's Position Statement on Solitary Confinement
28 (Isolation) defines prolonged segregation as "greater than 15 consecutive days" in solitary.
Ex. 2216 at 5.

1    for at least a year after it was determined that there was no penological reason to do so.

2    Doc. 4308 ¶ 316; Horn WT, Doc 4130 ¶¶ 111-115. Subclass Member M.M. is recognized

3    as having a serious mental illness and has been kept in solitary confinement since

4    February 2019. Doc 4132 ¶ 120; Ex. 1202 (noting that M.M. is SMI). Subclass Member

5    Mr. Muhammad has a mental disorder and suffers from command hallucinations and

6    delusions, and has been kept in solitary confinement since 2014. Trial Testimony of

7    Abdul-Rahim Muhammad ("Muhammad TT") at 892:2-23, 898:6-8. Subclass Member

8    Mr. L. has an SMI and was kept in solitary confinement for at least one month, while

9    being repeatedly sprayed with O.C. spray. Horn WT, Doc. 4130 ¶ 293.

10       Although Defendants claim to "avoid" prolonged segregation of people who are

11   mentally ill, they nonetheless claim "[t]here is no reliable evidence that segregation of

12   mentally ill inmates, particularly with the numerous safeguards ADCRR has in place,

13   poses a substantial risk of serious harm to inmates." Doc. 4309 ¶ 1526.

14       This statement, for which no citation is provided, in contradicted by the testimony

15   of numerous witnesses, not least Defendants' expert Dr. Penn. Penn TT at 3282:17-

16   3283:19 ("I generally agree that restrictive housing can have a risk for certain individuals

17   if they have a mental illness or, alternatively, if they don't have a mental illness but

18   they're put in restrictive housing;" "THE COURT: . . . Restrictive housing in a prison

19   setting can be – can be adverse under some circumstances to somebody with mental health

20   issues. THE WITNESS: Yes, Your Honor. I agree with that."). It is also contradicted by

21   the numerous federal court holdings (including from this Court) that confining persons

22   with mental illness in isolation exposes them to a substantial risk of serious harm. *See*

23   Doc. 4308 ¶¶ 1129-1135; *see also Disability Rights Mont. v. Batista*, 930 F.3d 1090, 1098

24   (9th Cir. 2019) (complaint alleging, *inter alia*, solitary confinement of persons with

25   mental illness states an Eighth Amendment claim); *Miller ex rel. Jones v. Stewart*, 231

26   F.3d 1248, 1252 (9th Cir. 2000) ("both experts state that it is well accepted that conditions

27   such as those present in [ADCRR's Browning Unit] . . . can cause psychological

28   decompensation to the point that individuals may become incompetent"); *Comer v.*

-88-

1  *Stewart*, 215 F.3d 910, 916 (9th Cir. 2000) ("we and other courts have recognized that

2  prison conditions remarkably similar to [Browning Unit] can adversely affect a person's

3  mental health"); *Graves v. Arpaio*, 48 F. Supp. 3d 1318, 1335 (D. Ariz. 2014) ("Holding

4  inmates with serious mental illness in prolonged isolated confinement may cause serious

5  illness and needless suffering in violation of the Eighth Amendment.").

6      Further, the evidence shows that more than 60 percent of the deaths by suicide in

7  ADCRR custody between January 1, 2014 and September 8, 2021 occurred while the

8  person was incarcerated in some form of isolation, although people in isolation make up

9  less than one-tenth of the ADCRR population. Haney WT, Doc. 4120 ¶ 114; Horn WT,

10  Doc. 4130 ¶ 331 n.245.

11      Finally, Mr. Muhammad testified that interaction is what helps him control the

12  voices in his head, and that the voices are the reason he engages in self-harm—harm that

13  Defendants insist is sufficiently serious to warrant the repeated use of force on a person in

14  a mental health crisis. Muhammad TT at 907:3-10, 912:15-18, 928:16-929:2; Doc. 4309

15  ¶ 1674.

16      **D.    Isolation of Children**

17      Defendants state that: "ADCRR avoids the prolonged segregation of minor

18  youth. . . ." Doc. 4309 ¶ 1522. Defendants cite only Dr. Penn's written testimony, which

19  says the same thing and provides zero support for the statement. *Id.*; Doc. 4174 ¶ 246.

20  There is no other mention of minors in Dr. Penn's written testimony. *See generally*

21  Doc. 4174. The only other mention of children in Defendants' proposed Findings of Fact

22  is a confirmation that they are incarcerated in the Sunrise Unit at ASPC-Lewis. Doc. 4309

23  ¶ 677. Dr. Penn testified at trial that he did not visit the Sunrise Unit, did not review the

24  logs from that unit, and did not review any young person's central file. Penn TT at

25  3342:10-3343:5. There is accordingly no evidence to support Defendants' claim.

26      On the other hand, Plaintiffs submitted overwhelming evidence that the use of

27  isolation on children is profoundly damaging and that Arizona is an extreme outlier with

28  regard to the use of solitary confinement on children in adult prisons.  Doc. 4308 ¶¶ 348-

353. In addition, any opinions by Dr. Penn asserting that solitary confinement does not put children at risk are fatally undermined by the fact that the U.S. Department of Justice is currently investigating Texas' juvenile prisons, whose mental health care Dr. Penn supervises, regarding the excessive use of isolation and inadequate mental health care provided to incarcerated children. *See* Doc. 4308 ¶ 38.

###### E.    Out-of-Cell Time

Defendants make many assertions about the amount and quality of out-of-cell time provided for in their policies. *See* Doc. 4309 ¶¶ 1695-1712 (Maximum Custody), 1723-1725 (Close Management), 1726-1729 (Detention), and 1730-1731 (Mental Health Watch).[54] However, Defendants' records and the testimony from trial demonstrate clearly that the reality is far different from the policies.[55]

Defendants claim that people in maximum custody are offered between 7.5 and 22 hours per week of out-of-cell time, depending on Step Level and SMI status, citing "in bulk" many maximum custody notebooks. Doc. 4309 ¶¶ 1710-11. But if one looks at the actual individual tracking sheets in the notebooks, they show that Defendants' "in bulk" statement is false. For example, Defendants rely "in bulk" on Ex. 2361. But the twenty

---

[54] Defendants claim that "chute" recreation facilities—where most recreation happens at Eyman Browning, Eyman SMU I, and Lewis Rast—are outdoor recreation enclosures. Doc. 4309 ¶ 1698. They are not, and Defendants routinely recognize that they are not. In the Information Reports about cancellations, the reports distinguish between inside or "chute" recreation and outside recreation. *See, e.g.*, Ex. 1296 at ADCRR00052183 ("Outside and chute recreation … will be conducted"), ADCRR00052187 ("curtailment of outside rec"), ADCRR00052201 ("The outside I/M recreation was curtailed...chute rec / showers were completed"), ADCRR00052204 ("Outside recreation, chute recreation / showers completed"), ADCRR00052205 ("I cancelled outside recreation... conducted chute recreation"); Ex. 1297 at ADCRR00053612 ("All inside recreation … being conducted.... Level 5 inmates, 4 Baker cluster's outside recreation is cancelled, but will still be given shute [sic] rec."), ADCRR00053614 ("Outside recreation, inside shute [sic] rec... all being conducted.").

[55] Defendants do not record out-of-cell time for people in close management, making it essentially impossible to prove that people in close management receive *any* out-of-cell time, or whether out-of-cell time is offered in amounts consistent with policy. *Compare* Ex. 1319, DO 813, Forms List *with* Ex. 1318, DO 812, Forms List ("812-1, Maximum Custody Out of Cell) *and* Ex. 1312, DO 804, Forms List ("804-3, Individual Inmate Detention Record").

out-of-cell time tracking sheets in this exhibit showed that only four of the individuals whose files were reviewed that month were even within this range:

| Bates No. | Step | SMI | Total out-of-cell time offered |
|---|---|---|---|
| ADCRRM0031268 | 1 | Y | 6 hours |
| ADCRRM0031280 | 3 | N | 9 hours, 3 min |
| ADCRRM0031290 | 1 | N | 6 hours, 21 min |
| ADCRRM0031299 | 1 | N | 6 hours, 10 min |
| ADCRRM0031306 | 2 | N | 6 hours |
| ADCRRM0031316 | 1 | N | 6 hours |
| ADCRRM0031326 | 1 | N | 6 hours, 4 min |
| ADCRRM0031335 | 3 | N | 6 hours |
| ADCRRM0031348 | 1 | N | 6 hours |
| ADCRRM0031361 | 1 | N | 6 hours, 31 min |
| ADCRRM0031373 | 1 | Y | 6 hours, 10 min |
| ADCRRM0031386 | 1 | Y | 6 hours, 2 min |
| ADCRRM0031398 | 1 | Y | 6 hours, 4 min |
| ADCRRM0031412 | 1 | Y | 6 hours, 8 min |
| ADCRRM0031424 | 1 | Y | 9 hours |
| ADCRRM0031436 | 3 | Y | 9 hours, 13 min |
| ADCRRM0031450 | 1 | Y | 6 hours |
| ADCRRM0031462 | 1 | Y | 6 hours, 3 min |
| ADCRRM0031474 | 1 | Y | 6 hours, 2 min |
| ADCRRM0031486 | 1 | Y | 9 hours, 12 min |

Ex. 2361. Defendants' failure to provide the amount of out-of-cell time they claim to offer is longstanding and widespread. *See generally* Doc. 4308 ¶¶ 154-165.

Citing only to their policy, Defendants claim that people in detention units are offered three 2-hour blocks of recreation and three showers every week. Doc. 4309 ¶ 1729. They are not. According to the Individual Inmate Detention Records, where, according to the same policy, showers, recreation, and meals for people in detention must be recorded (Ex. 1312, DO 804 § 1.4.2), in some detention units, people are being offered far fewer than the six hours of recreation and three showers each week. For example, at Lewis Morey, during the week of August 16-22, 2021, of the 61 people in detention for

the entire week, 7 were not offered recreation at all, 45 were offered recreation a single time, and 7 were offered two blocks of recreation. Ex. 1697 at 188078-188206. The same week in the same unit, 10 of the 61 people were not offered three showers. *Id*. The failure to provide even the six hours of recreation and three showers occurs routinely throughout ADCRR. *See* Doc. 4308 ¶¶ 143, 166-170.

Finally, with regard to out-of-cell time for people on mental health watch, Defendants claim "[c]orrectional personnel must follow the mental health watch orders." Doc. 4309 ¶ 1731. But they do not. Deputy Warden Scott testified that, regardless of what the watch orders say, at Eyman Browning, most people on watch cannot go to recreation. Scott TT at 685:4-10. Mr. Muhammad testified that he is not allowed to go to recreation when on watch, but mental health watch orders show that mental health staff did not indicate that he should not go to recreation. Muhammad TT at 926:16-18; Ex. 4002 at ADCRR00159826, ADCRR00159915.  *See also* Part VI.J., *infra*.

### 1. Cancellations of Out-of-Cell Time

Defendants discuss the cancellation of out-of-cell time only in the context of COVID-19. Doc. 4309 ¶¶ 1719-1722. Defendants claim that "[i]n accordance with CDC Guidelines, activities such as group programming classes and recreation beyond individual recreation (chute recreation or 10x10s) had to be curtailed to mitigate the spread of the disease and afford for social distancing. At times, recreation was curtailed when staffing challenges dictated the same while still attempting to make up recreation on other days." *Id.* ¶ 1719. Although they do not mention it in their proposed Findings of Fact, Defendants also cancelled unstructured out-of-cell time for people who have a serious mental illness. Scott TT at 686:21-687:2.

As an initial matter, the cancellations started long before COVID-19. For example, in maximum custody at Eyman SMU I, in the first two months of 2020, there were 53 cancellations. Ex. 1297 at ADCRR00053602-53707. During the same pre-COVID period, there were 72 cancellations at Eyman Browning. Ex. 1296 at ADCRR00042183-52327.

Second, Defendants have not demonstrated anything about why they needed to cancel all group programming, classes, unstructured out-of-cell time, or recreation in the larger enclosures. As shown in photographs, the classrooms are large enough that social distancing would have been possible. *See* Ex. 4901 at ADCRR00232500, 232502, 232503, 232507, 232509-10; Ex. 4902 at ADCRR00232541. Nor is it clear why it would be necessary to eliminate unstructured out-of-cell time, during which an individual essentially sits alone at a table, outside of the cell but inside the pod. Defendants have also failed to explain the reason for not using the larger outdoor recreation areas from March 2020 through June 2021. Though they would have needed to limit the numbers of people in the enclosures, recreation in the larger enclosures would provide for more normal human contact. It appears that Defendants simply decided that they did not need to conduct the activities required by the Stipulation and their policies, and necessary for the mental and physical well-being of the people they keep in solitary confinement.

Also, Defendants' documents show they did not "attempt[ ] to make up recreation on other days." The Information Reports on which they documented the reasons for cancelling activities are clear on this point. For example, at Florence Kasson, starting on April 18, 2020, and continuing through June 19, 2021, every week "CO III program classes, mental health classes and SMI unstructured time were cancelled for the week." Ex. 1298 at ADCRR00054287-54254; Ex. 1302 at ADCRR0055737-55786. For all but three weeks during this period, the Information Report about the cancellations stated:



Ex. 1298 at ADCRR00054287-54254; Ex. 1302 at ADCRR0055737-55786.

155931733.2

This language, including the ungrammatical "are not be possible," appears to have been cut and pasted into the Information Reports over the course of the 14 months.[56] For the three remaining weeks, Defendants did not even make this minimal nod to the requirement to attempt to make up cancelled out-of-cell time. Ex. 1298 at ADCRR00054297, ADCRR00054307; Ex. 1302 at ADCRR00055702. Despite the clear evidence that there was no effort to make up cancellations, Warden Van Winkle, the Florence warden throughout this time, testified that Defendants do not call cancellations "cancellations", and instead "use the verbiage 'curtail' because we hope to make that activity up if we can by the end of that week." Van Winkle TT at 2709:24-2710:5.

At trial, Warden Van Winkle repeatedly testified that the cancellations from March 2020 through June 2021 were pursuant to a "COVID Protocol" and that they could therefore be counted as out-of-cell time that was offered. Van Winkle TT at 2761:21-2798:25. He described the "COVID Protocol," a written document provided by the Central office that indicated what was to be "curtailed." Van Winkle TT at 2800:21-2801:17.[57]

Moreover, Defendants previously informed the Court of the steps they were taking to prevent the spread of COVID-19. Doc. 3527 at 3-4. None of the out-of-cell activities that were required by the Stipulation and by Defendants' policies were mentioned in their

---

[56] Starting in February of 2021, some of the reports removed the extra "be," but the language otherwise remained the same. *See, e.g.*, Ex. 1302 at ADCRR00055751.

[57] This protocol should have been produced in discovery, but was not. Plaintiffs' Request for Production of Documents # 41 requested "All Centurion or ADCRR policies, procedures, and other documents pertaining to the mission, operation, and staffing of any and all specialized mental health housing units in each of the ten ASPCs." Defendants' response referenced to their Response to RFP 33, which consisted of Department Orders, the Medical Services and Mental Health Technical Manuals, NCCHC standards, ACA standards, and licensing requirement. *See* **Ex. 2** (Defendants' Twelfth Supplemental Response to Plaintiffs' First Request for Production of Documents, Oct. 22, 2021) at 14, 16. But the "COVID Protocol," which was clearly a procedure that pertained to the operation of Florence-Kasson, a specialized mental health housing unit, was not produced. While Warden Van Winkle testified that it existed in a written format, it was not offered into evidence by Defendants as a documentary exhibit, and so the only evidence regarding its existence or its contents was his testimony.

1    statement of preventive measures. *Id*. Nor did they update the Court or Plaintiffs
2    whenever they decided that they no longer were required to abide by the terms of the
3    Stipulation with regard to out-of-cell time. Instead, Defendants secretly decided that they
4    could cancel classes, programs, unstructured out-of-cell time and recreation according to a
5    protocol that they did not disclose, and pursuant to this protocol, claim 100% compliance
6    across the board, without having to actually provide the out-of-cell time.[58]

7         Finally, Defendants assert that "Group programming for maximum custody
8    inmates resumed in late summer 2021." Doc. 4309 ¶ 1721. This is directly contrary to the
9    evidence presented at trial in two ways, and appears to be a desperate attempt by
10   Defendants to fix a problem with their case. First, the COVID restrictions ended at the end
11   of June or beginning of July 2021, not late summer. Van Winkle TT at 2798:18-25,
12   2802:15-2803:18; Scott TT at 646:21-647:14. The Court specifically asked Warden Van
13   Winkle "So if we looked at the July numbers, are you saying that we wouldn't see
14   cancellations [due to the COVID Protocols]?", to which he replied: "Unless it was for
15   staffing issues, yes, ma'am, that's what I'm saying." Van Winkle TT at 2799:1-4.

16        Second, there is no evidence that group programming did resume. All SMI classes
17   at Eyman Browning were canceled for July, August, and part of September 2021 due to
18   the lack of mental health staff to lead them. Scott TT at 1167:12-19. All programs offered

19

20   ───────────────

21        [58] *See* Ex. 1717 at ADCM1621158, ADCM1621218-1621219, ADCM1621284-1621285; Ex. 1718 at ADCM1626226, ADCM1626285-1626286, ADCM1626348-1626349; Ex. 1719 at ADCM1643445, ADCM1643507-1643509, ADCM1643578; Ex. 1720 at ADCM1652317, ADCM1652374-1652375, ADCM1652438; Ex. 1721 at ADCM1656755, ADCM1656809-1656810, ADCM1656875; Ex. 1722 at ADCM1668221, ADCM1668275-1668276, ADCM1668344; Ex. 1723 at ADCM1671091-1671092, ADCM1671141-1671142, ADCM1671209; Ex. 1724 at ADCRRM00007496-5954-5955, ADCRRM0006005-6006, ADCRRM0006073; Ex. 1725 at ADCRRM0007496-7497, ADCRRM0007548-7549, ADCRRM0007618; Ex. 1726 at ADCRRM0017033-17034, ADCRRM0017083-17084, ADCRRM0017152; Ex. 1727 at ADCRRM0021240-21241, ADCRRM0021290-21291, ADCRRM0021360; Ex. 1728 at ADCRRM0034164-34165, ADCRRM0034216-34217, ADCRRM0034287; Ex. 1729 at ADCRR00123875-123876, ADCRR00123942-123944, ADCRR00124035-124036; Ex. 1730 at 124494-124495, 124565-124567, ADCRR00124658-124659; Ex. 1731 at ADCRR00125112-125113, ADCRR00125178-125180, ADCRR00125270-125271.

to SMI patients at SMU-I whose records were reviewed in August 2021 were cancelled. Trial Testimony of Lori Stickley ("Stickley TT") at 2032:14-2038:16. Programming and unstructured out-of-cell time were also cancelled at Lewis Rast Max in July 2021 due to low staffing. Trial Testimony of Anthony Coleman ("Coleman TT") at 2103:20-2105:6, 2114:18-2115:1; Ex. 1303 at ADCRR00158893-95. Much of the mental health programming in the mental health unit at Florence Kasson was cancelled in July and August 2021 due to low staffing. Van Winkle TT at 2828:7-15, 2831:21-2832:1, 2833:1-3. And while there is evidence of the cancellations continuing through August and even into September, there is no evidence that the cancellations have stopped.

### 2. Refusals of Out-of-Cell Time

People in solitary confinement in ADCRR prisons are documented as refusing out-of-cell time at extraordinarily high levels. Doc. 4308 ¶¶ 172-179. Based on his decades of experience in corrections, Mr. Horn testified that seeing rates of recreation refusals as high as 80% is striking because incarcerated people "like the opportunity to get out in the fresh air." Horn TT at 1417:16-1418:5. In some of the Detention units, upwards of 90% of the people refuse all recreation. Doc. 4308 ¶ 179. Some weeks in some units, not a single person goes to recreation. *Id.*

Defendants claim to employ a variety of steps to determine why people refuse out-of-cell time in maximum custody. Doc. 4309 ¶ 1718. There are numerous problems with the steps that they have taken. *See generally* Doc. 4308 ¶¶ 172-199. The biggest problem is that there is substantial evidence that many of the refusals are not actually refusals.

Defendants have a form, the Out-of-Cell-Time Tracking sheet, that if filled out would go a long way toward proving that refusals are actually refusals, at least in maximum custody. The Out-of-Cell-Time Tracking sheet has a column for the incarcerated person to sign if they are refusing an out-of-cell activity. Coleman TT at 2114:4-17; *see, e.g.*, Ex. 1187 at ADCRR00051043. If it is not feasible for the incarcerated person to sign, a second staff person is supposed to sign for each refusal. Coleman TT at 2114:4-17; *see, e.g.*, Ex. 1187 at ADCRR00051043. Either the

1    incarcerated person or a second staff member should sign for every refusal. Coleman TT
2    at 2114:4-17.

3        In February 2021, this Court ordered that there should be a second signature
4    "[a]bsent clear evidence of impracticality." Doc. 3861 at 8. The purpose of this protocol is
5    to ensure that refusals are genuine. But almost none of the Out-of-Cell-Time Tracking
6    sheets include any signature of any incarcerated person, and they rarely have a second
7    signature. *See, e.g.*, Ex. 1187 (year's worth of tracking sheets includes some signatures of
8    second staff person, no signatures of the incarcerated person), 1190 (year's worth of
9    tracking sheets, includes no signatures of the incarcerated person or second staff person),
10   1193 (year's worth of tracking sheets, includes second staff person signatures on just
11   under half of the forms, no signatures of the incarcerated person), 1196 (year's worth of
12   tracking sheets, includes a few signatures of second staff person, no signatures of the
13   incarcerated person), 1199 (year's worth of tracking sheets, includes three signatures of
14   the incarcerated person, no signatures of a second staff person), 1202 (almost a year's
15   worth of tracking sheets, includes a few signatures of second staff person, no signatures of
16   the incarcerated person), 1205 (almost a year's worth of tracking sheets, includes a few
17   signatures of second staff person, no signatures of the incarcerated person). Plaintiff Jason
18   Johnson testified he is not asked to sign when he refuses some activity. Johnson TT at
19   1288:6-1289:17.

20       Beyond Defendants' failure to comply with the signature requirement, there is
21   substantial evidence that the recorded refusals are not simply refusals. In Lewis Rast,
22   there was a sign that said that a person and their cell must comply with DO 704 to go to
23   recreation, and that failure to comply would be documented as a refusal. Doc. 4308 ¶ 179.
24   Similarly, the sign stated that if a person was not "ready to exit the cell when the officers
25   arrive," this too would be deemed a refusal. *Id*. There is no exception stated for using the
26   toilet, finishing getting dressed, or anything else. *Id.* The policy set out in this sign is
27   consistent with what Mr. Horn testified he heard from incarcerated people he interviewed.
28   Horn WT, Doc. 4130 ¶ 146; Horn TT at 1415:15-1416:19. Deputy Warden Coleman

-97-

confirmed that "non-compliance with 704 is considered a refusal of recreation." Coleman TT at 2127:17-19. Additionally, Information Reports corroborate that this is the policy. At Eyman SMU I, in January 2021, after months when nearly all out-of-cell time was cancelled (*see* Ex. 1297), officers reported that people "either refused showers and rec or were not in 704 compliance" and that they were designated as having refused. Ex. 1301 at ADCRR00055385; *see also id*. at ADCRR00055389.

Notably, non-compliance with DO 704, which is also purportedly considered in maximum custody step level reviews, is not documented, nor is it indicated on the Out-of-Cell Time Tracking Sheet. Coleman TT at 2128:21-2129:1; Stickley TT at 2009:23-2010:4; *see, e.g.*, Exs. 1187, 1190, 1193, 1196, 1199, 1202, 1205.

Moreover, Mr. Horn testified this is a known problem in corrections. He explained that some officers "[l]ook for ways to not have to take inmates outside to rec. They have to cuff them, they have to unlock the cell, they have to unlock the enclosure, they have to escort them, it often takes more than one officer." Horn TT at 1420:1-10. He continued, "I've had experience myself in prisons I've been responsible for where the officers come around at 5:00 in the morn and very quietly say "Rec," and if the inmates aren't up and don't respond, they record it as refusals. Officers do that. That has been my experience. … [W]hen I see levels [of refusals] like this and reports like this, it says to me that they're looking for a way to avoid having to take these inmates to outside rec." *Id*. Defendants do not acknowledge the evidence that the "refusals," are not, in fact, refusals.

Additionally, none of the measures Defendants claim to take to determine why people refuse recreation in maximum custody even apply in detention or close management.[59] *See* Doc. 4309 ¶ 1718.[60]

---

[59] As noted above, Defendants do not record out-of-cell time for people in close management. As a result, not only do they not know how much out-of-cell time is offered to these people, they do not know the refusal rate.

[60] As discussed above, people on mental health watch are not offered recreation, so the issues of refusals does not arise.

### 3.     Auditing and Reporting of Out-of-Cell Time

Defendants assert that they audit the out-of-cell time offered to people in Maximum Custody every month. Doc. 4309 ¶ 1714. However, the evidence presented at trial demonstrated clearly that this process makes a mockery of the term "audit" and conceals rather than reveals the truth about out of cell time.

Warden Van Winkle, who testified that he has participated in these audits every month for years, did not know the requirements for compliance even at his own institution. Van Winkle TT at 2828:7-2830:21. He testified that although he was aware that the Maximum Custody Monitoring Guide required the inclusion of additional out-of-cell-time tracking sheets for people whose monthly recreation incentives had not been met during the monitoring week, he had never seen any additional tracking sheets in the Maximum Custody Notebooks. *Id*. at 2759:17-2761:4. He testified incorrectly that visitation and work time are not counted as out-of-cell time, but in fact they are. *Id*. at 2677:18-2678:14, 2807:11-2809:5, 2821:15-2822:10.

Even now, Defendants assure the Court that visitation and work time are "not counted towards the audit of weekly offered out of cell time." Doc. 4309 ¶ 1716. But they are. For example, in the April 2021 maximum custody notebook for Florence Kasson, one person is reported as having had visitation. Ex. 2375 at ADCRR00068146. The amount of time for the visitation is included in the "Total # of OOC Hours" (as is a substantial amount of cancelled out-of-cell time). *Id*. The "Total # of OOC Hours", including the visitation time, is then reported in the CGAR that was submitted to the Court. Ex. 1729 at ADCRR00123492. Similarly, in the July 2020 maximum custody notebook for Florence Kasson, one person is reported as having worked for three hours as a porter. Ex. 2339 at ADCM1665936-1665937. The amount of time that the prisoner worked is included in the "Total # of OOC Hours." *Id*. The "Total # of OOC Hours," including the work time, is then reported in the CGAR that was submitted to the Court. Ex. 1720 at ADCM1652374.

More disturbingly, Defendants intentionally and systematically misrepresent the amount of out of cell time they offer. Defendants train their staff that "DOC still gets

-99-

credit for cancellations" as long as the cancellations are documented. Van Winkle TT at 2746:11-2748:23; Ex. 1674 at PLTFS003867. Warden Van Winkle testified that he has *never* determined that cancelled out-of-cell time should not be counted toward the out-of-cell time offered for purposes of monitoring and reporting. Doc. 4308 ¶ 962. ADCRR cancelled nearly all out-of-cell programming at Eyman-Browning, Eyman-SMU I, and Florence-Kasson from approximately March 2020 through June 2021. Doc. 4308 ¶¶ 156-157. Yet Defendants falsely reported to the Court 100% compliance with the required programming throughout these months at those facilities. Exs. 1980, 1717-1731.

### F.   Mental Health Care in Solitary Confinement

Defendants claim that "[i]f an inmate with serious mental illness is placed in a restrictive housing setting or higher custody settings which the Plaintiffs may argue is 'segregation,' ADCRR employs a variety of in-cell and out-of-cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space, adequate unstructured out-of-cell time is implemented, and other safeguards are permitted." Doc. 4309 ¶ 1502. But, as discussed above, out-of-cell opportunities—programming, classes, and unstructured out-of-cell time—are all frequently cancelled.

Defendants claim people classified as SMI are offered "ten hours of out-of-cell unstructured time, one hour of psychotherapy group, one hour of psychoeducation group, and an additional group facilitated by CO-IIIs." Doc. 4309 ¶ 1507. This is untrue. All programming, classes, group education, SMI classes, and education were cancelled at Eyman Browning from March 2020 through June 2021. Doc 4308 ¶ 156. Unstructured out-of-cell time for people classified SMI was cancelled at Browning from March 2020 through March 2021. *Id.* During this period, most out-of-cell time was also cancelled at Eyman SMU I. *Id.* ¶ 157. All mental health groups and classes, CO-III classes, and SMI unstructured out-of-cell time were cancelled at Florence Kasson, a mental health unit, from April 18, 2020 through June 25, 2021.

In the months after ADCRR purportedly "went back to normal operations" in early summer 2021 after COVID-19 vaccines were deployed and infection rates and risk went

1   down, cancellations continued. Doc. 4308 ¶ 160. All SMI classes at Eyman Browning

2   were canceled for July, August, and part of September 2021 due to the lack of staff. *Id.*

3   All programs offered to SMI patients at SMU-I whose records were reviewed in August

4   2021 were cancelled. *Id.* Much of the mental health programming in the mental health unit

5   at Florence Kasson was cancelled in July and August 2021 due to low staffing. *Id.* ¶ 161.

6   Additionally, regardless of whether someone is classified as SMI, according to policy, this

7   "additional group facilitated by CO-IIIs" that Defendants refer to (Doc. 4309 ¶ 1507), is

8   only for people at Step 2 and 3. *See* Ex. 1850 at 38 (Maximum Custody PM 2); Ex. 3028

9   at ADCM1036853; *see, e.g.*, Ex. 3602 at ADCRR00214547 (showing that a person at

10  Step 1 with an SMI was not offered a CO-III program).

11      Defendants assert that people in restrictive housing in ADCRR "are routinely

12  assessed by medical and mental health staff to identify any medical or psychiatric

13  contraindications to this type of placement," "are screened and monitored to assess for

14  signs of clinical deterioration." Doc. 4309 ¶ 1520. Defendants also claim that

15  "[r]easonable efforts are made to identify individuals who are engaging in problem

16  behaviors due to a mental disorder," and "in these cases, they provide additional mental

17  health treatment and divert them from restrictive housing settings when possible." *Id.*

18  Defendants claim that if there is "evidence of deterioration when the inmate is housing in

19  these disciplinary settings, health care staff intervene. They evaluate the individual to

20  determine their medical or mental health treatment needs. They provide recommendations

21  to custody staff regarding a possible move to a housing setting where their health care

22  needs could be better addressed." *Id*.

23      None of these assertions is supported by any evidence in the record. First,

24  Defendants solely cite to Dr. Penn's written testimony, which in turn cites to nothing.

25  Doc. 4309 ¶ 1520; Doc. 4174 ¶ 244. Nothing in his written or live testimony explains

26  what he based these opinions on. To the contrary, Dr. Penn testified that he did not review

27  a sample of medical records of people transferred to the inpatient facilities to analyze the

28

155931733.2

timeliness of transfer, and did not review any data or reports calculating the average length of time for transfer to inpatient mental health beds. Penn TT at 3169:6-3170:14.

Further, the evidence before the Court shows that people whose mental health is deteriorating in solitary confinement remain there for a long period. Mr. Muhammad started having mental health crises in August 2020. Muhammad TT at 928:19-25; *see generally* Ex. 2396. During these crises, it was apparent that he was experiencing psychosis. Stewart TT at 512:11-513:13; Muhammad TT at 929:1-2. It was not until July 2021—and after scores of uses of force—that he was moved to Phoenix where he was able to get out of his cell more and stopped having these crises. *See* Ex. 2396 at 6.[61]  The evidence does not show how long it took until Mr. L. was moved, but he had to endure 14 uses of force in the month of July 2021. Doc. 4308 ¶¶ 241-242.[62]

Defendants also claim that

> There is timely communication and interface between mental health and custody. Custody staff readily consult mental health for their clinical input regarding cases, bookings, disciplinary housing and other treatment efforts / planning for challenging / difficult inmates. This demonstrates the good collegiality / partnership and collaboration and timely communication between clinical and security staff on difficult to manage inmates. These efforts, as further detailed in Department Orders 807, 812, and 813, comply with the correctional standard of care and represent the various steps taken by ADCRR to screen inmates in restrictive housing settings for mental disorders, serious mental illness, self- injurious and suicidal behaviors, and clinical deterioration in the activities of daily living. As further detailed in these policies, nursing and mental health care staff conduct timely and appropriate rounding within restrictive housing settings and inmates are

---

[61] Defendants assert Mr. Muhammad was moved to a higher level of care when he moved to Florence Kasson. Doc. 4309 ¶ 1670. But during his time at Kasson, there were no mental health groups, no psychoeducational classes, no unstructured out-of-cell time, and no CO III classes. Van Winkle TT at 2802:15-2803:1; Ex. 1302. Mr. Muhammad testified he was not offered programming while at Kasson. Muhammad TT at 906:9-11.

[62] Citing the testimony of Dr. Stallcup, Defendants assert that "[i]f clinically indicated, mental health can recommend that an inmate be removed from the maximum custody setting." Doc. 4309 ¶ 1509.

This is an incomplete and misleading account of Dr. Stallcup's testimony. She testified that security staff can override mental health staff's recommendation to transfer a patient out of maximum custody for mental health reasons, and that she has seen this happen with death-sentenced prisoners. Stallcup TT at 2504:6-18.

1
2
3
4

provided with therapeutic and educational programming in classroom settings. Further, inmates who are prescribed psychotropic medications, who demonstrate medication non-compliance, are timely seen by mental health staff. These checks and balances appropriately mitigate precipitation or worsening of mental illness.

5   Doc. 4309 ¶ 1521. But, again, Defendants copy-and-paste and cite to nothing but Dr.

6   Penn's written testimony. *Id*. And, to the extent Dr. Penn cites to anything at all, it is

7   solely written policies. Doc. 4174 ¶ 245. Neither Defendants nor Dr. Penn provide any

8   evidence that these "checks and balances" actually happen. Such self-serving conclusory

9   recitations of written policies cannot overcome the ample evidence presented by Plaintiffs

10  showing the systemic inadequacy of mental health care provided to people incarcerated in

11  isolation units.

12  **G.     The Use of Force on Incarcerated People with Serious Mental Illness**

13  Defendants assert that "[a]ll planned uses of force involving the use of Oleoresin

14  Capsicum ("OC") spray or chemical agents on both SMI and non-SMI maximum custody

15  inmates require a cool down period involving correctional staff and a mental health/health

16  care clinician to try to establish rapport with the inmate and allow the inmate the

17  opportunity to comply with orders without the need for force." Doc. 4309 ¶ 1658 (citing

18  Ex. 3006 (ADCRR DO 804: Inmate Behavior Control)).

19  But Defendants' rote recitation of the written policy ignores that this case asserts,

20  and the evidence shows, that Defendants' actual practice is of widespread and

21  indiscriminate use of force on people who engage in self-harm. The evidence shows that

22  Defendants do not call mental health staff or allow for a "cool down period," even when

23  they do not consider the situation to be a "spontaneous" use of force, as illustrated by the

24  use of force packets and videos of the uses of force on Isolation Subclass Members Rahim

25  Muhammad and Mr. L., and ample other evidence presented to the Court. *See* Doc. 4308

26  ¶¶ 220-243, 552-583.

27  Defendants assert that the "[u]se of OC spray, after verbal attempts to stop [self-

28  harming] behavior fail, represents a minimally restrictive solution that comports with the

-103-

standard of care in Dr. Penn's opinion." Doc. 4309 ¶ 1500. But the use of force is a correctional decision. And Dr. Penn, as both he and Defendants admit, is not a correctional expert, so his "opinion" is irrelevant. Doc. 4309 ¶ 1188; *see also* Penn TT at 3283:1-2. Defendants did not proffer a correctional expert.

Defendants assert that "Dr. Penn is not aware of any literature, such as the American Medical Association, American Psychiatric Association, or American Academy of Pediatrics, or any other medical organization definitively saying, prohibiting, or discouraging the use of OC spray in correctional settings." Doc. 4309 ¶ 1502. This is unsurprising, as the use of force is a correctional decision and thus, medical and psychiatric bodies would be unlikely to weigh in.

Defendants argue that their "use of force tactics are limited to narrow situations where, significant de-escalation efforts fail. There is not a practice of overuse of force, or force that utilizes OC spray." Doc. 4309 ¶ 1504. Defendants cite to no evidence for this statement. And the evidence submitted shows that this is not true. Defendants routinely fail to provide a cool down period or to call for mental health staff for an intervention prior to using force, and Warden Van Winkle testified that he thinks there is nothing wrong with a situation where, day after day, a person self-harms, and the response, day after day, is the use of chemical agents. *See* Doc. 4308 ¶ 237; Van Winkle TT at 2845:21-2846:21; *see also* Exs. 1065, 4002, 4034, 4036, 4038, 4040, 4084, 4098, 4100, 4108 (use of force packets). Further, Defendants do not know how often they use force generally, nor how often they use OC spray specifically, because they do not track these important metrics. Shinn TT at 2224:14-2225:23.

### 1.    Rahim Muhammad

Defendants claim that "Centurion mental health staff participated in Warden Van Winkle's reviews of each use of force incident involving [Mr. Muhammad]." Doc. 4309 ¶ 1671. This statement is contrary to the evidence presented at trial, and to Warden Van Winkle's testimony.

First, the 256 pages of use of force packets from the seven months Mr. Muhammad was at Florence in 2021 do not show mental health staff participating in the reviews of the uses of force. *See* Ex. 4002.

Second, the list of his encounters with mental health staff belies Defendants' statement. His medical records show that the only contacts he had with mental health staff between the self-harm and use of force on April 4 and the self-harm and use of force on April 10, 2021 were cell-front watch contacts. Ex. 2396 at 11-12. Between April 10 and the next incident of self-harm and use of force on April 18, 2021, his only contacts with mental health were cell-front watch contacts, cell-front Health and Welfare Rounds, and a scheduled appointment with a Psychiatric Nurse. *Id*. at 11. The only contacts with mental health between the uses of force on June 23 and June 27, 2021 were cell-front watch contacts. *Id*. at 8.

Third, Warden Van Winkle did *not* testify that mental health staff participated in the reviews. All that Warden Van Winkle testified to was that "mental health becomes involved in every single one of those [incidents of self-harm]". Van Winkle TT at 2857:10-15. Moreover, it was clear that this was an assumption, not knowledge. As Warden Van Winkle said, "*I can only assume* what a conversation took place between him and mental health, what it was all about as far as changing the plan for him." *Id*. (emphasis added).

Defendants also assert that "[a]fter an initial period of non-self-injurious behavior at ASPC Florence-Kasson Unit," Mr. Muhammad again started banging his head into the "metal cell door", and therefore "in July 2021, Warden Van Winkle worked with mental health staff to move the inmate to ASPC Phoenix where he could receive a higher level of mental healthcare than what he could be provided as part of the BMU at Kasson." Doc. 4309 ¶¶ 1672-73.

This is highly misleading. As an initial matter, the cell doors in the Kasson Unit are not metal. Mr. Muhammad was banging his head on a plastic portion of the cell door. *See, e.g.*, Ex. 4108.[63]

Warden Van Winkle testified that Mr. Muhammad re-commenced the self-harming behavior "within the first two or three weeks he was at Kasson." Van Winkle TT at 2738:24-2739:4. Mr. Muhammad had arrived at Kasson on December 30, 2020, and his first instance of self-harm at Kasson was three weeks later on January 20, 2021. Ex. 2396 at 15-16. Warden Van Winkle also knew that Mr. Muhammad continued self-harming, and being sprayed with OC spray, until he was moved to ASPC-Phoenix in July 2021. But when asked by the Court "So it wasn't until there had been a substantial period of time where he had been engaging in this conduct that you went to mental health, or did you go to them constantly, and then finally he was moved?", Warden Van Winkle dissembled, minimizing the harm to Mr. Muhammad, saying that he had been at Kasson for only a month or a month and a half before his transfer. Doc. 4308 ¶¶ 237-238.

Moreover, the use of force packets from Browning and Kasson make it clear that everyone had decided that the way to manage Mr. Muhammad's mental illness was to spray him with OC spray on almost a daily basis:

- "This is the fourth incident with this inmate in four (4) calendar days….Inmate continues to commit self harm which staff must intervene to prevent serious injury from occurring. Amount of force used was appropriate and justified." Ex. 1065 at ADCRR00159335-37 (12/12/2020)

- "This was the 4th use of force in as many days. Inmate is continuing his self injurious behavior. Amount of force used was appropriate and justified." *Id*. at ADCRR00159362-63 (12/13/2020)

- "Inmate would not stop banging his head on the cell front. O.C. spray was used to stop the self-harm." *Id*. at ADCRR00159379-81 (12/15/2020)

---

[63] Exhibit 4108 shows the cell doors in the Kasson Unit. No videos of the use of force against Mr. Muhammad at Kasson Unit were admitted into evidence. Exhibit 4108, which shows the use of force against Mr. L, is cited here only as evidence of the type of doors at Kasson Unit.

-106-

- "Inmate Muhammad #215306 continues to create self harm by banging his head. OC utilized after verbal direction was give [sic] and refused." *Id*. at ADCRR00159409-11 (12/16/2020)

- "This notes the eighth consecutive day of Inmate Muhammad committing self harm with this exact same behavior. . . .Inmate Muhammad continued to bang his head despite de-escalation efforts and directives to stop. The use of chemical agents was appropriate and necessary to prevent serious injury." *Id*. at ADCRR00159419-21 (12/17/2020)

- "Each use of force (pepperball shots) were [sic] used to stop the self harm." *Id*. at ADCRR00159441 (12/18/2020)

- "Inmate was committing self harm and would not stop. O.C. spray was used to stop the head banging." *Id*. at ADCRR00159469-71 (12/21/2020)

- "[T]his self destructive behavior continuously displayed by this inmate is a disruption to the operations of Browning Unit. The inmate should be housed in an environment better suited for his behavioral management. . . . Inmate was banging his head and refused to stop. O.C. spray was used to stop the self harm." *Id*. at ADCRR00159477-79 (12/22/2020)

- "To stop the inmate from self harm O.C. spray was used." Id. at ADCRR00159497-99 (12/23/2020)

- "This self destructive behavior is displayed by this inmate almost daily for approximately 3 weeks between the hours of 0930-1100. Force used is justified and appropriate to stop the inmates [sic] behavior." *Id*. at ADCRR00159525-27 (12/24/2020)

- "Inmate continues to commit self harm almost daily . . . The inmate would not stop the self harm with verbal directives. O.C. spray was used to stop the self harm." *Id*. at ADCRR00159545-47 (12/25/2020)

- "O.C. spray was used to prevent further self injury because the inmate would not stop bang [sic] his head. Second incident of the day. . . ." *Id*. at ADCRR00159567-69 (12/25/2020)

- "Inmate would not comply with verbal directives to stop banging his head. O.C. spray was used to stop the self harm." *Id*. at ADCRR00159584-86 (12/29/2020)

- "IM Muhammad has been involved in multiple uses of force while housed at Kasson. This use of force was justified." Ex. 4002 at ADCRR00159759 (4/4/2021)

- "The amount of force used was the appropriate in order to gain compliance of the inmate. The inmate has a history of self-harm." *Id*. at ADCRR0000159785 (4/18/2021)

-107-

- "Inmate Muhammad has a long history at Kasson of Banging [sic] his head. Use of force was justified." *Id.* at ADCRR00159848-49 (5/22/2021)

- "Inmate Muhammad has a history of self harm and not following directives and force having to be used to stop him." *Id.* at ADCRR00159860-61 (5/23/2021)

- "Inmate Muhammad has a history of self harm and not following directives and force having to be used to stop him." *Id.* at ADCRR00159868-70 (5/23/2021, second use of force)

- Inmate Muhammad has a history of self harm and force having to be used to make him stop." *Id.* at ADCRR00159880-81 (6/23/2021)

- Inmate Muhammad has a history of force being used on him to stop his self harming behavior." *Id.* at ADCRR00159905-07 (6/28/2021)

- "Inmate Muhammad has a history of Self Harm by banging his head." *Id.* at ADCRR00159920 (7/5//2021)

- "Inmate Muhammad has a history of self harm and forcing [sic] having to be used to make him comply with directives." *Id.* at ADCRR00159938-39 (7/8/2021)

- Inmate has a long history of self harm. Use of force was justified." *Id.* at ADCRR00159948-50 (7/9/2021)

- "Inmate Muhammad has a history of self harm and force having to be used to make him stop." *Id.* at ADCRR00159959 (7/12/2021)

Defendants assert that there was no need for mental health staff to speak with Mr. Muhammad prior to the uses of force due to the "spontaneous nature" of the uses of force. Doc. 4309 ¶ 1676. But the use of force packets indicate when a use of force is spontaneous. *See* Ex. 1065 at ADCRR00159357 (memo for spontaneous use of force on December 13, 2020), ADCRR00159419 (noting the absence of a video due to the "spontaneous nature" of the use of force on December 17, 2020). Only two of the packets indicate that the use of force was spontaneous. *See generally* Exs. 1065 and 4002. And it strains credulity to claim that the use of force is spontaneous when it is in response to conduct that a person has been engaging in "almost daily for approximately 3 weeks between the hours of 0930-1100." Ex. 1065 at ADCRR00159527.

Defendants further claim that Mr. Muhammad was taken to the medical unit after the uses of force, to "allow mental health staff to speak with him." Doc. 4309 ¶ 1677.

1    Taking him to see mental health staff after the use of force obviously serves a different

2    purpose than having mental health staff intervene to attempt to avoid the perceived need

3    for force. Moreover, the records are clear that mental health staff was rarely there to talk

4    to him. The use of force packets show that in just one-third of the 22 instances that force

5    was used against Mr. Muhammad during his seven months in the mental health unit at

6    Florence-Kasson was mental health staff available to talk with Mr. Muhammad after the

7    use of force. *See, e.g.* Ex. 4002 at ADCRR00159756, ADCRR00159799-803,

8    ADCRR00159824,       ADCRR00159902,       ADCRR00159929,       ADCRR00159958,

9    ADCRR00159972.

10       Also, Defendants assert they had to keep spraying Mr. Muhammad because they

11   were concerned that he might "sustain a permanent head injury." Doc. 4309 ¶ 1678. When

12   asked by the Court if Mr. Muhammad had "injuries to his brain and to his head," Warden

13   Van Winkle testified he never saw any injuries, undermining the entire justification of the

14   use of force. Van Winkel TT at 2741:5-16. If, as seen in the videos, Mr. Muhammad hit

15   his head on the cell front six (Ex. 1049), ten (Ex. 1055) or even eleven times (Ex. 1050),

16   after they started videotaping, which itself is presumably after he started hitting his head,

17   without visible injury, it suggests that the force of the head banging was not so great as to

18   warrant the immediate use of OC spray on a person in a mental health crisis. Defendants

19   did not ever bother taking Mr. Muhammad to a neurologist to determine if he had a brain

20   injury. Van Winkle TT at 2848:12-17; Ex. 2396. This gives the lie to their post hoc

21   assertion that they were concerned about him sustaining a permanent head injury.

22       Plaintiffs are not suggesting that Defendants should not have stopped Mr.

23   Muhammad's self-harm. To the contrary, as Plaintiffs' expert explained,

24           You would expect that somebody in the administration of the
             ADCRR at that facility would say we have to come up -- we
25           have to understand why this guy is doing this and come up
             with a better way of dealing with it.
26

27   Horn TT at 1425:10-14.

28

But Defendants waited for a *year* before transferring Mr. Muhammad to a higher level of care where the self-harm and use of force abruptly stopped. Ex. 2396; Muhammad TT at 928:19-25, 933:5-17; *see also infra* Part VI (D). During that year, Defendants did not stop Mr. Muhammad from self-harming; instead of giving him the treatment (and human and humane interaction) he needed, they did nothing until he self-harmed, then reacted to his self-harm with force, spraying him with OC spray or shooting him with pepperball guns more than 40 times. Muhammad TT at 928:19-25; Ex. 2396; Horn WT, Doc. 4130 ¶¶ 311-315; Ex. 1065; Ex. 4002.

### 2.    Mr. L.

Defendants assert the uses of force on Mr. L. were appropriate because they were stopping his "self-injurious behavior" of kicking the cell-front with the bottom of his foot. Doc. 4309 ¶¶ 1679-1682.[64] Defendants assert he could have harmed himself by kicking "solid steel or concrete," and therefore their actions were justified. *Id*. ¶ 1680.

The actions of Mr. L. do not explain the rush to spray him with OC spray nor the failure to have him seen by mental health staff prior to the use of force. Contrary to Defendants' assertion, he was not kicking "solid steel or concrete." In each of the videos submitted into evidence, Mr. L. is kicking the plastic plexiglass portion of the cell front or cell door. *See* Exs. 4084, 4098, 4100, 4108. In two of the videos in which Mr. L. appears to be on Mental Health Watch, correctional staff talk with Mr. L., walk away, come back and talk some more with him—for about four minutes or more. Exs. 4084, 4108. Their actions do not suggest any urgent concern for his safety; they could have called mental health staff to intervene, but chose to use OC spray instead to address behavior that was more annoying than in any way an act of self-harm.

Also, even if Mr. L. was not choosing the most pliable part of his environment for his behavior, the worst he might theoretically do is break his ankle. Doc. 4309 ¶ 1681.

---

[64]   Defendants cite unadmitted Exhibits 4083, 4097, 4099, 4017, 4018 at paragraphs 1679 and 1681 of their Proposed Findings of Fact. *See supra* Part IV.A.

Defendants repeatedly used OC spray to stop him. Horn WT, Doc. 4130 ¶ 293; Exs. 4084, 4098, 4100, 4108. OC spray can cause death. Penn TT at 3235:11-3236:4.

Further, the cycle of Mr. L., who is SMI, kicking his cell door and getting pepper sprayed happened 14 times, just in the month of July 2021, before transfer to a higher level of care. Horn WT, Doc. 4130 ¶ 293; Doc. 4309 ¶ 1683. As with Mr. Muhammad, the response should have been "we have to understand why this guy is doing this and come up with a better way of dealing with it." Horn TT at 1425:10-14. Instead, Defendants' "way of dealing with it" was the repeated use of potentially lethal force.

**H.    Cell Illumination**

Defendants claim that "Maximum custody, detention, and mental health watch cells are illuminated in some manner during sleeping hours for legitimate safety and security reasons, which is common and accepted practice in the corrections industry. Correctional personal must be able to able visually observe the welfare of inmates 24 hours a day as safety/security/welfare checks and inmate counts are performed." Doc. 4309 ¶ 1752.

Defendants cite the trial testimony of Dr. Haney to support these statements, however this grossly misstates Dr. Haney's testimony. Notably, Dr. Haney was not asked about, and made no mention of, what he considered "common and accepted practice in the corrections industry" concerning cell illumination. *See* Haney TT at 882:7-884:8. Additionally, he did not testify concerning what correctional personnel must be able to do 24 hours a day. *Id.* He simply agreed that there "is a legitimate penological purpose to having at least some lighting of a cell during nighttime hours so that correctional officers who are doing safety and security checks can actually look in the cell and make sure that the inmate is alive and okay." Haney TT at 884:3-8.

Defendants further state: "Plaintiffs have not offered any evidence whatsoever of the wattage (or frequency) of the lighting for any cells where the Subclass is housed." Doc. 4309 ¶ 1753. This is not accurate. Plaintiffs presented evidence (including photographs) at trial concerning ADCRR's cell illumination practices, including the

155931733.2

frequency of lighting in the cells, and the impact cell illumination has on class members who are housed in isolation units. *See generally* Doc. 4308 ¶¶ 107-117; Muhammad TT at 905:18-24 (testifying that the "dim and morbid" lighting in the cells at Eyman Browning made him depressed).

Expert testimony from Dr. Haney and Mr. Horn, as well as testimony from Isolation Subclass members about lighting in ADCRR and its impact on people in solitary confinement, was presented at trial. Dr. Haney testified that many of the prisoners he spoke with recounted that it was difficult to sleep when the lights were not turned off. Doc. 4308 ¶ 110. This was supported by the testimony of Mr. Muhammad, who noted he was not able to turn the lights on and off in his cell when he's been on mental health watch, that the lights were on "24/7," and that this caused him to feel "insane." *Id.*; Muhammad TT at 926:24-927:5. He elaborated that "You want to get some sleep. The light's blaring on you. You try to put your head under the blanket, and they talk about spraying you." *Id.* at 927:5-7. Dr. Haney also observed many cells where the people living there had covered up the light, demonstrating its negative impact on them. Haney WT, Doc. 4120 ¶ 105.

Additionally, there was ample evidence presented that the majority of isolation cells do not have any access to direct natural light. Horn WT, Doc. 4130 ¶¶ 240, 242, 244, 364; Horn TT at 1350:13-16, 1352:4-7, 1353:22-1354:1; Haney WT, Doc. 4120 ¶ 105. Many isolation cell doors at Eyman are steel doors with small round holes covered in plexiglass, which further restricts the ability of natural light to enter the cell. Doc. 4308 ¶ 111. Dr. Haney also testified regarding the juvenile detention cells at Lewis-Sunrise Unit, where he spoke with three youths who had been detained in cells with no windows and no natural light for nearly 3 weeks. *Id.* ¶¶ 114, 350.

Plaintiffs therefore clearly presented evidence that the stark living conditions in the isolation units are made even more harsh by various lighting conditions, including constant artificial illumination and the lack of direct natural light in isolation cells. See

1   Haney WT, Doc. 4120 ¶ 105 ("Both the constant artificial illumination and the minimal

2   natural light adds to [the] disorienting nature of the conditions in these [isolation] units").

3       **I.**    **Property**

4         Defendants claim "Plaintiffs presented no evidence in support of [the claim relating

5   to property restrictions]." Doc. 4309 ¶ 1772. This is demonstrably false. Defendants cite

6   to policy alone to support the assertion that "[f]or safety and security reasons, inmates on

7   mental health watch status are afforded property as determined by their watch status and

8   mental health staff." Doc. 4309 at ¶ 1770, citing Ex. 1315 (DO 807, Inmate Suicide

9   Prevention, Mental Health Watches, and Progressive Mental Health Restraints). This

10  recitation of policy does not match actual practice of property restriction occurring in

11  ADCRR mental health watch units.  Plaintiffs presented evidence that directly contradicts

12  that this policy is being followed in practice, including a sign posted in mental health

13  watch units at ASPC-Lewis which stated:

14

15

16

17



18

19

20

21

22

23

24  Doc. 4308 ¶ 555 (ADCRR00158743).

25        Additionally, testimony from class members who had spent time on mental health

26  watch, including Mr. Muhammad, confirmed that they are not given access to any

27  property on mental health watch. Muhammad TT at 926:2-23. This practice of depriving

28  people of any property, including material that does not pose a safety concern, which

-113-

might alleviate idleness or help to redirect thoughts for those experiencing acute mental distress is harmful. Horn WT, Doc. 4130 ¶¶ 280-281.

With regard to detention units, Defendants again recite written policy stating that "Detention status inmates are permitted access to legal materials, hygiene and toiletry items, clothing, bedding and linen, and reading material, unless restricted by disciplinary sanctions." Doc. 4309 ¶ 1769 (citing Ex. 3006, DO 804 – Inmate Behavior Control, and Ex. 3018, DO 909 – Inmate Property). In practice, this exception appears to have swallowed the rule. Mr. Horn noted the "puzzling" practice of denying people in detention their property for thirty days, including people who are not in detention for disciplinary reasons (e.g., Refuse To House status). Horn WT, Doc. 4130 ¶¶ 71-72. Further, interviews with class members in detention units revealed examples of property deprivation in contradiction to stated policy. *Id.* ¶¶ 126 (on loss of privilege status for 2 years), 128 (not provided toilet paper or bedding), 129-130 (on Refuse to House status and deprived of property).

As Plaintiffs demonstrated, people incarcerated in isolation units experience psychological pain due to the lack of human contact, material deprivations, and profound levels of enforced idleness and inactivity. Haney WT, Doc. 4120 ¶¶ 129-130. Lack of property contributes to this problem, and while tablets can help mitigate idleness for those subclass members who have access to them, they "do not substitute for the lack of meaningful human contact and interaction." Haney WT, Doc. 4120 ¶ 106.[65] Further, as Defendants admit, there are a number of circumstances where people are denied access to tablets altogether, such as for those who demonstrated "destructive behavior" with a tablet or kiosk in the last year, and all persons in the max custody behavioral management units, detention units, on mental health watch, and in restrictive housing or enhanced security.

---

[65] Also, many of the features of the tablet are also available only to those who can afford to purchase them. Ex. 1308 at Attachment C.

1    Doc. 4309 ¶ 1759; Doc. 4308 ¶ 105 n.13; Horn WT, Doc. 4130 ¶¶ 257, 279; Haney WT,

2    Doc. 4120 ¶ 106; Coleman TT at 2098:2-4, 8-10; Brislan TT 1308:17-20.

3        **J.    Nutrition**

4        Defendants claim "[t]he existence of a contract with Trinity Services Group, Inc. to

5    supply food to ADCRR's ten state-operated prison complexes" is evidence people in

6    isolation units receive meals as required. Doc. 4309 ¶ 1780. Additionally, Defendants cite

7    solely to a three-year-old document (Statement of Nutritional Adequacy dated

8    December 3, 2018) in support of their statement that the meals served meet required

9    caloric and nutrient requirements. *Id.* ¶ 1781. But the size, weight, and/or calorie-content

10   of the food is relevant only if the food is actually served to people, as required.

11       Moreover, contrary to Defendants' assertion, Plaintiffs have not "abandoned" the

12   insufficient nutrition claim. Doc. 4309 ¶ 1784. Class members report that meals in

13   isolation units are insufficient and they go hungry. Haney WT, Doc. 4120 ¶ 104; Horn

14   WT, Doc. 4130 ¶259; Muhammad TT at 903:9-24, 927:23-928:15.[66] And, Plaintiffs

15   presented extensive evidence that ADCRR's own documents show that numerous people

16   miss many meals in ADCRR detention units with alarming regularity. *See* Doc. 4308

17   ¶¶ 203-204. In the Individual Detention Records for people housed in detention that

18   document the person had not been provided meals as required, each entry for each day

19   was signed off on by an ADCRR employee, and sometimes two. *See generally id.* The

20   Deputy Wardens are also responsible for detention in their units, and yet several did not

21   know about the documentation of missed meals. Coleman TT at 2119:4-21; Stickley TT at

22   1184:6-22, 2052:21-2057:7; Van Winkle TT at 2854:17-19.

23       Defendants attempt to run away from the story told by their own records, but they

24   conspicuously failed to introduce any contrary evidence. Warden Van Winkle testified

25   that he could look in the Kitchen Logs or the Correctional Service Journals to see if,

26

27       [66] Warden Van Winkle also admitted that the most complaints received in Kasson
     and SMU-I were "complaints about the portions. Inmates claiming they're not getting the
28   portions of food they're supposed to be getting." Van Winkle TT at 2726:7-14.

contrary to what was stated on the Individual Inmate Detention Records, people did in fact receive all their meals. Van Winkle TT at 2724:3-19. Similarly, Deputy Warden Stickley testified that the Correctional Service Logs could be reviewed to see if the Individual Inmate Detention Records were incorrect. Stickley TT at 2057:5-17, 2084:2-11. She also testified that she could have verified whether the detention records were correct, but that had not done so. Stickley TT at 2087:10-2088:10. Further, Defendants, who have possession of the Kitchen Logs and Correctional Service Journals/Logs, did not introduce any of these records to show that the people in detention were actually fed on the dates and times where it is marked on their Individual Detention Record that they did not receive a meal. Accordingly, the evidence that is before the Court on this issue consists of reams of Individual Detention Records, prepared and signed off on by ADCRR employees, that document that people in detention were repeatedly not provided their meals as required. Ex. 1697.

## VI.   MENTAL HEALTH CARE

### A.   Defendants Fail to Respond to the Substantial Evidence of Unconstitutional Mental Health Care in ADCRR Prisons.

Defendants' proposed findings of fact regarding mental health care (Doc. 4309 ¶¶ 1127-1532) are little more than cutting-and-pasting the unsupported assertions and hearsay in Dr. Penn's report, a recitation of ADCRR and Centurion written policies that are more honored in the breach than in their observance, repeatedly pointing to NCCHC standards, and false citations to the evidence and the testimony of Plaintiffs' experts and other witnesses. Defendants' flailing and gratuitous attacks on the methodology and credibility of Dr. Stewart and Dr. Haney were addressed above in Part II, and Plaintiffs respond to Defendants' proposed findings related to mental health staffing levels, and medication administration, at Part VIII below.

Defendants assert that their provision of mental health care is constitutionally adequate, Doc. 4309 ¶¶ 1211-1224, relying upon a description of the tasks that ADCRR Mental Health Program Director Dr. Stallcup testified she and others in the monitoring

1   bureau perform to evaluate Centurion's compliance with the privatization contract, and

2   Dr. Platt's testimony about limited efforts in 2020-2021 to address widespread

3   deficiencies in mental health care. The descriptions of how the monitoring bureau is

4   structured, and of Defendants' limited remedial efforts, fall far short of showing that

5   mental health care is constitutionally adequate.

6       Defendants assert that "[t]he Mental Health Technical Manual outlines the

7   guidelines and expectations that staff are expected to follow when providing mental health

8   care to inmates incarcerated within ADCRR." Doc. 4309 ¶ 1278. But the cited testimony

9   does not support this statement. And while it may be true that the MHTM sets out the

10  "guidelines and expectations" for mental health staff, the crux of Plaintiffs' case is that

11  what happens in practice, and what class members in need of mental health care

12  experience, falls far short of what is contained in any written manuals or policies.

13  Likewise, as discussed in Plaintiffs' Proposed Findings of Fact (Doc. 4308 ¶¶ 977-987,

14  accreditation by NCCHC centers on a prison system paying annual fees to NCCHC for

15  certification, and on the existence of written policies, with little or no analysis of actual

16  practice. *Id*. ¶¶ 980-981; *see also id.* ¶ 983 (ADCRR medical services director Dr. Phillips

17  testifying that accreditation primarily consists of a review of policies and procedures, and

18  an onsite visit to the prison to meet with custody leadership). Accordingly, the fact that

19  NCCHC has found that Defendants' prisons "meet" any specific standard simply means

20  that ADCRR and Centurion have written policies on the topic.

21      But Defendants cannot contort themselves into constitutional adequacy simply by

22  building a Potemkin Village of aspirational written policies—for example, as noted

23  below, providing a laundry list of psycho-educational programs that they provide no proof

24  they have ever offered—that are not even close to the actual daily reality experienced by

25  mentally ill incarcerated people and the overextended mental health staff attempting to

26  provide care. And this Court and others have repeatedly rejected the argument by jail or

27  prison officials that NCCHC accreditation means that there is compliance with the

28  Constitution. *Graves*, 2008 WL 4699770, at *25, *51; *see Graves*, 48 F. Supp. 3d at 1338

-117-

("Compliance with NCCHC standards is not equivalent to complying with constitutional standards."); *see also Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979) (noting that "while the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima . . .").

Defendants describe the frequency with which patients with various mental health scores are allegedly seen by mental health staff, relying exclusively on the trial testimony of Dr. Stallcup. Doc. 4309 ¶ 1279. But this testimony—yet again—describes what should happen pursuant to written policy, not what actually occurs in practice. On cross-examination, Dr. Stallcup admitted that she is aware of cases in which, due to a lack of mental health staff, patients did not receive individual counseling with the frequency required by policy based on their mental health score. This occurred as recently as the summer of 2021. She is similarly aware of cases in which patients were not seen by the psychiatric provider with the frequency required by policy based on their mental health score. Stallcup TT at 2573:2-2574:9.

Defendants also assure the Court that "all inmates (regardless of whether they are on the mental health case load) can request mental health treatment at any time by submitting a Health Needs Request ("HNR")" and that "HNRs are triaged by nursing within 24 hours," again relying exclusively on the testimony of Dr. Stallcup. Doc. 4309 ¶ 1280. Once again, this is a statement of aspirational policy, not actual practice. On cross-examination, Dr. Stallcup admitted that she is aware of cases in which HNRs were not triaged within the time frames required by policy; this occurred as recently as earlier in 2021. Stallcup TT at 2574:10-18.

## B.    Intake Screening

Defendants claim that "ADCRR conducts timely and comprehensive mental health intake examinations which are constitutional and do not subject inmates to a substantial risk of serious harm." Doc. 4309 ¶ 1296. They base this conclusion upon a single paragraph of Dr. Penn's written testimony, which provides no basis for his opinion, a

passage from the Mental Health Technical Manual, and Dr. Stallcup's summary of the policies. *Id.* ¶¶ 1291-1295.

This sunny account is difficult to square with the reality of the suicide of the patient described at Doc. 4308 ¶¶ 410-413. At his five-minute mental health intake examination, staff noted that he had recently been on psychotropic medications for anxiety and depression while in jail, which he had discontinued two weeks previously. The intake also detailed a history of methamphetamine use, and of both sexual and physical childhood abuse. Nevertheless, he was deemed to have "no emergent MH issues" and no subsequent mental health appointments were scheduled. *Id.* ¶ 410.

Nine days after this mental health intake exam, he submitted an HNR, writing, "I need to see a psych doctor about the voices I am hearing in my head. They returned since I stopped taking my medications." He was not seen by health care staff, and two days later he died by suicide. *Id.* ¶ 411.

Dr. Stewart concluded that this suicide was preventable.

> The inadequate intake screening of [the patient] and significant delay in psychiatric care after his report of severe psychiatric symptoms fall below the standard of care. The severity of his psychiatric problems was not appreciated by the mental health or medical staff, perhaps due to the very brief (5-minute) intake evaluation.

*Id.* ¶ 412. The ADCRR mortality review similarly concluded that there was a failure to recognize symptoms or signs of mental health distress, and that this patient's death was possibly avoidable. Dr. Stallcup testified that she agreed with these conclusions. *Id.* ¶ 413. Dr. Penn's psychiatric reviewer similarly concluded that this patient did not receive adequate access to care. *Id.* ¶ 413 n.81. But contrary to Dr. Stewart, Dr. Stallcup, the ADCRR mortality review, and his own hand-picked psychiatric reviewer, Dr. Penn concluded that the treatment received by this patient—like the mental health care of every other patient whose file he testified that he reviewed— met the standard of care. *Id.*

1

### C.   Access to Mental Health Care

2          Defendants assert that they provide access to and continuity of care to patients with

3    mental illness. Doc. 4309 ¶¶ 1297-1316. Dr. Penn specifically asked his four psychiatric

4    reviewers to assess patient records to determine whether the patient received adequate

5    "access to care." Doc. 4308 ¶ 376. His reviewers found inadequate access to care in 37

6    cases, as well as finding deficiencies in at least 36 additional cases. *Id.* ¶ 381. But

7    Defendants' section on "Access to Adequate Mental Health Care" is entirely silent on

8    these dozens of cases. Nor does it address the 2021 suicide in which ADCRR's own

9    Mortality Review identified "delay in access to care" as a contributing factor to this

10   "possibly avoidable" suicide (*id.* ¶ 443). Rather, Defendants once again simply cite their

11   written policies, as well as Dr. Penn's conclusory and evidence-free assertions that

12   everything Defendants do meets the standard of care.

13         Defendants' claims cannot withstand even minimal scrutiny. Defendants cite the

14   frequency with which mental health patients are supposed to be seen by mental health

15   staff according to policy (Doc. 4309 ¶¶ 1301, 1302)—but Dr. Stallcup testified that these

16   timeframes are sometimes not met due to a lack of mental health staff. Stallcup TT at

17   2573:2-2574:9.[67] Defendants purport to rely on the statewide "volume of encounters" and

18   "volume of HNRs which result in scheduled appointments" as somehow establishing

19   adequate access to mental health care (Doc. 4309 ¶¶ 1304, 1315, 1316), but the Court has

20   already rejected this argument, and it is meritless. *See* Part III.G., *supra.* Finally, Dr.

21   Penn's rapturous description of the eOMIS medical records system (Doc. 4309 ¶¶ 1309,

22   1310) is sharply at odds with the views of Defendant Gann, Defendants' medical expert

23   Dr. Murray, and Centurion Chief Clinical Officer Dr. Johnny Wu. *See* Ex. 2067 at 112:3

24   (Defendant Gann testifies eOMIS is "completely inadequate"); Murray TT at 3459:20-21

25   (eOMIS should be replaced because it has "lived its useful life"); Deposition of Johnny

26

27

28         [67] Defendants cite to Ex. 3352 in Paragraphs 1301 and 1302 of Docket 4309, but
     that Exhibit was not admitted into evidence.

155931733.2

1   Wu, M.D. ("Wu Depo.") at 50:13-24 (eOMIS makes access to records difficult for

2   clinicians).

3          In short, nothing Defendants say even addresses, let alone refutes, the serious and

4   sometimes lethal deficiencies in access to mental health care shown by Plaintiffs at trial.

5   *See* Doc. 4308 ¶¶ 441-491.

6          **D.    Accessibility to Inpatient and Residential Mental Health Treatment**

7          Defendants state that none of ADCRR's residential treatment or inpatient mental

8   health facilities are at capacity and, citing the testimony of Dr. Stallcup, assure the Court

9   that "[t]his is because there are not enough inmates within ADCRR who require these

10  higher levels of care." Doc. 4309 ¶ 1322.

11         Given the numerous desperately ill patients described by Dr. Haney and Dr.

12  Stewart who were *not* in residential or inpatient units, this is implausible on its face. It is

13  also contradicted by the Centurion psychological autopsy for a patient who died by

14  suicide after repeatedly requesting to be moved to a residential unit; the autopsy

15  concluded that "admission to emotional trauma residential counseling could have been

16  beneficial to the patient." Doc. 4308 ¶¶ 446-448, 550. Similarly, one of Dr. Penn's

17  psychiatric consultants concluded that another patient who died by suicide "might have

18  benefitted from a prison inpatient unit." Doc. 4308 ¶ 547.

19         Indeed, on cross-examination, Dr. Stallcup acknowledged that in an October 15,

20  2020 eOMIS entry for named plaintiff Ronald Slavin, who was housed at Eyman-Cook

21  Unit, Centurion psychologist Dr. Ruth Tenrreiro wrote, "patient appears to need more

22  mental health resources than are available at this location. He is a good candidate for

23  referral to the MTU." The MTU is a residential treatment unit. As of October 13, 2021,

24  Mr. Slavin remained at Eyman-Cook Unit. Stallcup TT at 2589:7-2592:8; Ex. 2401.

25  Mr. Slavin testified on November 2, 2021, that he remains at the Cook Unit, and that the

26  resources available to him there are inadequate to treat his mental illness, and he is no

27  longer receiving the more effective psychiatric medications he was on prior to

28  incarceration. Doc. 4308 ¶¶ 544-546. He testified that the psychologist advised him to

1   self-help and improve his mental health himself by listening to podcasts on his tablet—as

2   if these would be sufficient to treat his ongoing auditory hallucinations and psychosis

3   symptomatic of his diagnosed schizophrenia. *Id.*

4        A far more plausible explanation for the low occupancy of the residential and

5   inpatient units is the mental health staffing vacancies at the Eyman, Perryville, Phoenix,

6   and Tucson facilities, where those units are located. Doc. 4308 ¶ 396 (showing August

7   2021 mental health staffing vacancies at Eyman, Perryville, Phoenix, and Tucson, as well

8   as other complexes), ¶ 401; Stallcup TT at 2521:5-2523:18.

9        Defendants offer conflicting testimony on the timeliness of transfers of patients to

10  residential or inpatient care. Dr. Penn, relying solely upon written policies and what he

11  was told by ADCRR and Centurion, testified that referrals to inpatient facilities are

12  accomplished within 48 hours, and immediately if clinically indicated. Doc. 4308 ¶ 540 &

13  n.100. Dr. Stallcup, by contrast, testified that routine referrals take approximately a week,

14  and urgent referrals are accomplished within 24 hours. Stallcup TT at 2490:22-2491:3;

15  Doc. 4309 ¶ 1323. Finally, Dr. Pelton testified that once ordered, transfers to inpatient

16  facilities normally take between four days and a week, and can take up to two weeks. Dep.

17  of Ashley Pelton, Ph.D. (filed at Doc. 4186-1 at ECF 45) ("Pelton Dep.") at 217:17-

18  218:18. Delays in transferring patients for necessary inpatient treatment result in

19  unnecessary suffering. Stewart WT, Doc. 4109 ¶¶ 45, 47-55 (Doc. 4308 ¶ 539).

20       There are additional barriers to residential and inpatient treatment that Defendants

21  fail to acknowledge. Custody staff can override the recommendations of mental health

22  staff that a patient be transferred to Phoenix for inpatient mental health care. And patients

23  who are max custody level cannot be transferred to Phoenix's residential mental health

24  program at Aspen Unit. Doc. 4308 ¶ 540.

25

26   **E.    Privacy and Confidentiality in Mental Health Encounters, Cell-Front Encounters, and the Minimum Duration of Encounters**

27       Defendants do not dispute the widespread documentary evidence in patients'

28  medical charts, and the abundant additional documentary evidence and testimony, that

-122-

1   many mental health care encounters in ADCRR occur cell-front, especially in isolation,

2   detention, and mental health watch units. These cell-front encounters involve mental

3   health staff standing outside the cell door and speaking through it to the confined patient,

4   often within earshot of the patient's cellmate and other incarcerated persons, as well as

5   custody staff. *See generally* Doc. 4308 ¶¶ 480-490 and evidence cited therein.

6        Rather, Defendants rely upon their expert's conclusion—contrary to that of

7   Plaintiffs' experts and the Court's expert Dr. Marc Stern, as well as contrary to common

8   sense—that a meaningful therapeutic encounter can be accomplished by yelling through a

9   cell door within earshot of others. Doc. 4309 ¶¶ 1334-1336. Defendants justify cell-front

10  encounters—including with patients on mental health watch—based on speculation that

11  while out of their cell, they could surreptitiously gain access to items such as paper clips

12  or pencils, with which they could engage in acts of self-harm. Doc. 4309 ¶ 1338 (citing to

13  Penn WT, Doc. 4174 ¶ 138). As Defendants concede (Doc. 4309 ¶ 1188; *see also* Penn

14  TT at 3283:1-2), Dr. Penn is not an expert on custody or corrections issues, and thus is not

15  qualified to render an opinion on the security risks allegedly posed by out-of-cell mental

16  health encounters. Moreover, Defendants offered *no* evidence that ADCRR patients on

17  suicide watch have *ever* engaged in acts of self-harm using items they surreptitiously

18  obtained during an out-of-cell mental health encounter. Rather, Plaintiffs offered evidence

19  that people on suicide watch are affirmatively egged on or "kick-started" by health care

20  staff and custody officers to engage in self-harm. Doc. 4308 ¶¶ 571-576.[68]

21       Related to the issue of cell-front encounters is that of extremely short mental health

22  encounters in general. In his October 2019 report, Court expert Dr. Marc Stern identified

23  the issue of "very short mental health visits (some as short as 5, 3, or 2 minutes)."

24

25  _____

[68] Moreover, it is unclear how a person on suicide watch would be able to
26  surreptitiously access these items; when they are seen out-of-cell for mental health
    encounters, they are locked in cages the size of phone booths, are stripped naked save for
27  a rip-proof suicide smock, escorted in handcuffs and chains by officers between their cell
    and the mental health cage, and strip-searched after the out-of-cell mental health
28  encounter. Doc. 4308 ¶¶ 488-490.

Ex. 1860 at 28. He concluded that "some of the short visits are too short to be clinically effective, and in the context of the cases, place patients at significant risk of substantial harm." *Id*. at 31; *see also* Doc. 3921 at 12-13 (quote Stern report). He further opined that "care delivered during many of these short visits was not safe." Ex. 1860 at 32 n.24.

In response to Dr. Stern's conclusions, the Court established a presumptive minimum duration of ten minutes for watch-related mental health encounters, and thirty minutes for non-watch encounters. If these minimum durations were not met, the encounter was to be reviewed by a "mental health clinician" to "determine whether the length was meaningful and appropriate in the context of the patient's overall care." Doc. 3518 at 4 (internal quotation marks omitted). The Court later modified its order to require that the review of whether the encounter was "meaningful and appropriate" be conducted by a psychiatrist rather than a mental health clinician. Doc. 3861 at 13, 15.[69]

Defendants now attack the Court's order, but conspicuously fail to propose any alternative solution to the problem Dr. Stern identified, or even to acknowledge that the problem exists.[70] Instead, Defendants rely on their expert's facially implausible claim that a *one-minute* encounter is sufficient to determine that a patient is not at risk of self-harm. Penn TT at 3172:6-22.[71]

Moreover, Defendants do not attack the order the Court actually issued; instead, they aim their fire at a straw man of their own creation. So, for example, they characterize

---

[69]The Court subsequently described at length Defendants' protracted failure to comply with its order, and noted that "[t]hree prisoners committed suicide between January 5 and February 3, 2021 after receiving only very short mental health care encounters." Doc. 4308 ¶ 467 (quoting Doc. 3921 at 16-17). The Court had previously noted that "three class members committed suicide between August and September 2020 and for two of them, every mental health encounter since March 11 [2020] fell below the minimum durations set by the Court." Doc. 3861 at 13 n.11.

[70] Indeed, Defendants fail to acknowledge *any* of Dr. Stern's findings and recommendations regarding the provision of medical and mental health care in ADC. *See generally* Doc. 4309.

[71] Dr. Stallcup, Defendants' mental health program director, contradicted Dr. Penn's testimony and admitted that a one-minute mental health encounter with a patient on suicide watch is never sufficient to determine that the patient is not at risk of self-harm. Stallcup TT at 2547:23-2548:11.

-124-

the Court's order as setting forth "minimum required durations," "arbitrary time mandated clinical encounter[s]," and "mandated minimums." Doc. 4309 ¶¶ 1340, 1342, 1353. According to Defendants, the order requires "[f]orcing a patient to engage in conversation for the sake of meeting stop-watch timeframes" and "put[s] providers in the awkward position of making patients stay longer than they want or need." *Id*. ¶¶ 1342, 1354.

But the problem for Defendants is that the Court's order does none of these things. Indeed, the Court emphasized that "it is important to stress that the 30-minute minimum does not prohibit shorter visits. Rather, it merely requires that visits of less than 30 minutes be evaluated by a mental health clinician to determine whether the length was meaningful and appropriate in the context of the patient's overall care." Doc. 3518 at 4 (internal quotation marks omitted). Defendants' suggestion that the Court's order requires that an unwilling patient be compelled to remain in a mental health encounter is utterly false, as Dr. Stallcup conceded on cross-examination. Stallcup TT at 2593:12-22.[72]

Similarly, Defendants complain that "requiring an inmate to execute a refusal form if he does not want to be seen by [sic] the prescribed minimum, significantly jeopardizes the therapeutic relationship between the inmate and provider." Doc. 4309 ¶ 1343. This may or may not be true, but it has nothing to do with the Court's order. The requirement that the patient sign a refusal form has been unilaterally imposed by Defendants (*see* Doc. 3909 at 1-2); it is found nowhere in the Court's orders. *See* Docs. 3518, 3861.

Defendants also claim that "Dr. Platt testified [that] the Court's minimum-duration order impacted staffing and was a barrier to staffing. (R.T. 11/5/21 p.m. at 1087:8-1088:17.)" Doc. 4309 ¶ 1356. But once again, Defense counsel's question to Dr. Platt was not about the order that the Court actually issued, but rather about a different, hypothetical

---

[72] Because they did not want to comply with the Court's order that psychiatrists conduct the "meaningful and appropriate" reviews, *Defendants* ultimately decided to "eliminate the 'meaningful and appropriate' review and impose minimum durations." Doc. 3907 at 6; *see also id*. ("[i]f an encounter does not meet [the presumptive durations set forth in the Court's order], unless an inmate refuses, it is marked noncompliant"). But that is a voluntary and unilateral decision by Defendants, not a requirement of the Court's order.

155931733.2

1  order under which clinicians "had to see patients for either the 10 [minutes] or either [sic]

2  the 30 [minutes] without exception." Trial Testimony of Stephanie Platt ("Platt TT") at

3  1088:7-17. Dr. Platt also gave the following testimony about the Court's order on

4  presumptive minimum durations for mental health encounters, which Defendants omit:

5  "However, I do also believe that those court orders have helped clinicians do more than

6  box check in other ways like think about different things to document in a way that has

7  them generate better treatment plan intervention ideas, things like that." Doc. 4308 ¶ 477;

8  Platt TT at 1089:1-5. And Defendants ignore the fact that the lead mental health

9  psychology associate at Yuma told Dr. Penn that the Court's order has resulted in an

10 overall improvement in quality of care and attention to patients. *Id*.

11      Dr. Stallcup testified that there is no ADCRR policy setting forth a presumptive

12 minimum duration for mental health encounters and accordingly, were the Court's order

13 to be vacated, there would be no minimum duration required for any mental health

14 encounter. Doc. 4308 ¶ 479. Given the testimony of Centurion's current statewide mental

15 health director that "it's possible" that an encounter of *fifteen seconds* would be sufficient

16 to determine that a person was no longer at risk of self-harm or suicide, Pelton Dep. at

17 142:6-20, it is clear that the Court's order is the only thing standing in the way of a

18 wholesale return to the dangerous "drive-by" mental health encounters about which

19 Dr. Stern warned.[73]

20      **F.    Treatment Plans and Timely Communication**

21      Defendants' discussion of treatment planning and coordination is notable for what

22 it omits. Doc. 4309 ¶¶ 1358-1370. Defendants simply fail to respond, except in the most

23 superficial and conclusory manner, to the serious deficiencies Plaintiffs showed at trial.

24

25

26

27 ───────────

   [73] In this section, as they do elsewhere in their Findings, Defendants attribute to Dr.
   Stewart statements that he supposedly "asserts" or "appears to argue," but in reality, they
   cite to conclusory statements cut-and-pasted from Dr. Penn's written testimony. *See, e.g.*,
28 Doc. 4309 ¶¶ 1334, 1338 (citing to Penn WT, Doc. 4174 ¶¶ 135, 138).

For example, Dr. Stewart identified multiple cases in which mental health treatment plans by psychology staff failed to incorporate the input of or involvement by prescribing psychiatrists, including with patients who were prescribed psychotropic medication. Stewart WT, Doc. 4109 ¶¶ 53, 78-82. Similarly, Dr. Penn's consulting psychiatrists identified at least three patients whose medical records showed there were delayed referrals, or no referral, from nursing staff or therapists to prescribing psychiatry providers for review of medication for treatment of problematic symptoms. Doc. 4308 ¶ 425 & n.82.

Even more disturbing, Dr. Stewart discussed multiple suicides in which he identified failure to coordinate among psychiatric, psychological, and medical providers and clinicians to implement comprehensive mental health and medical care treatment plans as a contributing factor. Doc. 4308 ¶¶ 428, 432-439. In one of these cases, The Mortality Review Committee report, written by ADCRR Medical Director Dr. Grant Phillips, recommended that "[f]or challenging cases, convening a multidisciplinary committee to address a patient's care from a medical and mental health standpoint should take place. The site medical director should help guide the patient's care until the multidisciplinary team meets." *Id.* ¶ 439.

Defendants do not discuss any of these cases, or respond to this showing at all, except to assert *ipse dixit* that "[t]here was evidence of treatment planning, timely communication, and multidisciplinary coordinated care between psychiatric and mental health staff, nursing staff, and when indicated medical providers, and custody staff." Doc. 4309 ¶ 1369 (copying verbatim Penn WT, Doc. 4174 ¶ 160).

Defendants, Centurion, and Defendants' medical expert Dr. Murray are united in their opinion that ADCRR's electronic medical record system, eOMIS, is obsolete and a barrier to providing adequate care. *See* Part VI.C., *supra*.  But not Dr. Penn—he believes that records in eOMIS are "easily accessible." *See* Doc. 4309 ¶¶ 1365-1366; Penn WT, Doc. 4174 ¶¶ 156-157. Dr. Penn's stubborn refusal to acknowledge *any* problems in

1 ADCRR—even those conceded by Defendants and their health care contractor and

2 medical expert—further undermines his credibility.

3       **G.**    **Educational and Therapeutic Programming**

4      Defendants' findings of fact describing the educational and group programming

5 ostensibly provided to prisoners relies overwhelmingly upon the testimony of their mental

6 health expert, Dr. Penn. Doc. 4309 ¶¶ 1371-1387. However, the cited written testimony of

7 Dr. Penn that forms the basis of their entire discussion, Doc. 4174 ¶¶ 161-170, is, aside

8 from an irrelevant citation to NCCHC accreditation reports, completely unsupported. *Id*.

9 Defendants cannot convert the conclusory, utterly unsupported assertions of their expert

10 into actual facts simply by citing them.[74]

11      Defendants assert, citing Dr. Penn's unsupported written contentions, that

12 "ADCRR has a multitude and wide variety of both educational and therapeutic

13 programming," on topics including "anger management, anxiety, mindfulness, coping

14 with incarceration, grief support, post-release, medication education, parenting,

15 journaling, self-care, and much more," as well as Alcoholics Anonymous and Narcotics

16 Anonymous group therapy. Doc. 4309 ¶¶ 1378-1379, citing Doc. 4174 ¶ 161 and Penn TT

17 at 3012:7-3013:4. This list of programs is aspirational at best, as Defendants did not

18 provide any evidence that any of these group programs actually are occurring, or when

19 and where or how frequently they are occurring. None of the incarcerated people whom

20 Dr. Stewart, Dr. Haney, or Mr. Horn interviewed offered up examples of any of these

21 programs occurring—for example, "mindfulness" would be memorable—but rather said

22 that if they had group sessions, which were very rare, they were led by non-clinicians and

23 custody officers. Doc. 4308 ¶ 459 (Dr. Haney describing interviewees as "happy to be out

24

---

25     [74] Defendants cite Exhibit 3052 to support their contention that "[p]sychotherapy groups are provided by psych associates and psychoeducational groups may be provided

26 by BHTs. … In addition, security staff (CO-IIIs) may provide additional educational programming to inmates with mental health needs, which provides an additional

27 structured environment where they may practice prosocial behaviors." Doc. 4309 ¶ 1372. Exhibit 3052 is a compilation of special accommodation spreadsheets and does not

28 support this contention in any way.

of their cells," but "'it's chit chat,'" as one incarcerated person described it; and several people at Eyman separately describing getting to see the movie "The Hangover: Part Three" for their group therapeutic programming).

Plaintiffs provided ample evidence—including Defendants' own out-of-cell activity logs—to show that any access to therapeutic and group programming is fleeting and episodic at best, and Defendants' records show that there have been frequent and longstanding cancellation of such programs, that pre-dated the start of the COVID pandemic and continued at least into the fall of 2021. Doc. 4308 ¶¶ 156-164, 453-458, 460.[75] Many of these group programs, to the extent that they occur, are led by Behavioral Health Technicians, who are unlicensed, and whose only job requirement is that they pass a test on how to use Microsoft Excel. *Id.* ¶¶ 458-459. There is no requirement that there be a written lesson plan or syllabus for sessions led by BHTs or by psych associates (and many psych associates are unlicensed). *Id.* ¶ 461.

Astonishingly, Defendants point to the availability of tablets to some prisoners as a form of "mental health services." Doc. 4309 ¶ 1377. This is absurd on its face; no patient in the community would consider possession of a tablet to constitute mental health treatment. In addition, tablets are not available to all prisoners, including some of the most seriously mentally ill. Tablets are not permitted in the maximum custody Behavioral Management Unit, a decision which Dr. Haney opined was "profoundly counterintuitive," as it deprived a group with serious mental illness of the tablets.[76] Doc. 4308 ¶ 105 n.13; Brislan TT at 1308:17-20; Shinn TT at 2223:16-21. People also do not have access to

---

[75] There are no mental health groups of any kind in detention. Doc. 4308 ¶ 462.

[76] Defendants note that "[Dr.] Haney acknowledged that the inmates he interviewed were pleased with having access to tablets. He further admitted that provision of tablets to ADCRR inmates is an important innovation which provides inmates (including maximum custody inmates) with access to books, music, electronic submission of Health Needs Requests, and video visits with family, which served the inmates well during restriction of in-person visitation during COVID. Inmates can also take their tablets with them to outdoor recreation." Doc. 4309 ¶ 1553. This is true, but out of context. Dr. Haney testified that other than the introduction of the tablets, everything else had gotten worse for incarcerated people since he first analyzed the situation in Arizona prisons in 2013-14. Haney TT at 826:12–827:2.

tablets in detention, or if they are on Loss of Privileges, or on mental health watch. Doc. 4308 ¶ 105 & n.13; Horn WT, Doc. 4130 ¶ 257. And while a few programs are provided for free, most reading or educational materials available on the tablet require payment to Defendants' telecom contractor, as does using the tablet to communicate with loved ones. Doc. 4308 ¶ 105 & n.13.[77]

Defendants also point to in-cell workbooks as substituting for in-person therapy. Doc. 4309 ¶ 1386. Again, this cites to Dr. Penn's unsupported assertions, which appear to be based upon hearsay statements made by prison staff. Defendants do not provide any evidence of the actual content of the workbooks. Moreover, Dr. Platt, Centurion's statewide mental health director during much of the pandemic, testified that these self-study options are not equivalent to receiving intensive in-person mental health care. Platt TT at 1099:4-25. And Centurion's national vice president for behavioral services, Dr. John Wilson, agreed with Dr. Platt, testifying that "written patient educational handouts" are no substitute for face-to-face encounters. Doc. 4308 ¶ 543. Dr. Wilson admitted under oath that "in-cell self-study programming," while a component of mental health care, "certainly does not constitute the entire spectrum of mental health treatment." *Id.*

Defendants also do not explain how patients who are told to self-study for therapy—either via tablet or written workbooks—are supposed to do so if they are illiterate, vision-impaired or blind, or are not fluent in written English.

### H.   Changes to Mental Health Diagnoses

Plaintiffs' mental health expert Dr. Stewart described numerous cases in which patients with long-standing diagnoses of serious psychotic disorders or SMI classification suddenly had their psychotic disorder diagnosis changed to less serious conditions such as behavioral disorders or mood disorders, abruptly and with minimal or no support in the medical record for the change of diagnosis. Doc. 4308 ¶¶ 526-531. Dr. Stewart referred to

---

[77] Dr. Stallcup testified that she believes that the majority of ADCRR prisoners have tablets; asked for the basis for that belief, she stated "that's just what I believe." Stallcup TT at 2595:2-2597:9.

1    this practice as "de-diagnosing" the patient, and testified that unfortunately it is an all-too-
2    common practice in prison systems where the severity of the diagnosis dictates the
3    frequency with which the patients need to be seen by staff, because changing the
4    diagnosis to a milder condition can give a measure of relief to overworked and
5    understaffed mental health teams. *Id*. ¶¶ 526, 529.[78]

6         Defendants' response, Doc. 4309 ¶¶ 1412-1419, is to admit that diagnoses are
7    changed, but to claim that their mental health expert Dr. Penn thinks that the practice
8    meets the standard of care. This ignores Dr. Stallcup's testimony that neither ADCRR or
9    Centurion track how often a patient's SMI designation is removed, and her admissions
10   that anyone—including custody staff—can ask mental health staff to evaluate a patient to
11   remove their SMI classification, that any mental health care staff person (including
12   unlicensed psych associates) can remove the designation or change a diagnosis, and that
13   there is no requirement that changes in diagnosis or SMI classification be reviewed.
14   Doc. 4308 ¶ 528. Defendants also ignore the fact that their own data show that fewer than
15   seven percent of class members have been diagnosed with a serious mental illness (not
16   necessarily designated as "SMI" as that classification is legally defined by Arizona
17   statute), whereas relevant literature shows that between 17 and 30 percent of people
18   incarcerated in state prison systems across the country have such a diagnosis. *Id*. ¶ 527.

19        **I.   Treatment of Recurrent Behavioral Problems**

20        Plaintiffs presented overwhelming evidence of how the interplay of systemic
21   problems such as the inadequate quantity and types of mental health staff, incomplete and
22   uncoordinated treatment plans, problems with medication prescription and administration,
23   lack of therapeutic services, and the abysmal conditions of confinement and prolonged
24   isolation combine into a perfect storm that leads to mentally ill class members

25

26   _____

27        [78] Dr. Penn's consulting psychiatrist identified a case of apparent de-diagnosis: a
     patient who appeared to have an incorrect diagnosis of a mood disorder and personality
28   disorder, while experiencing symptoms of paranoia and auditory hallucinations, and
     receiving medication to address those symptoms. Doc. 4308 ¶ 530 n.98.

1    decompensating and remaining profoundly symptomatic for long periods of time without

2    their symptoms ameliorating, which results in psychological pain and acts of self-harm

3    and suicide. Doc. 4308 ¶¶ 387, 418, 420, 422, 437-439, 442, 445-448, 454, 483, 493-499,

4    510-511, 521-525, 535, 547-550, 567-570.

5        Defendants offer nothing in response except another cut-and-paste citation to Dr.

6    Penn's written testimony regarding services ostensibly provided to patients with "severe

7    personality disorders and/or significant impulse control disorders," none of which is

8    supported in his declaration. Doc. 4309 ¶¶ 1407-1410 (citing Doc. 4174 ¶¶ 186-189).

9        **J.    Treatment for Suicidal / Self-Harming Class Members**

10       Defendants fail to refute the detailed analysis and write-ups by Dr. Stewart of the

11   medical records, psychological autopsies, and mortality review reports of many persons

12   who died by suicide since January 2019; his review of CQI minutes and policies; or his

13   analysis that profound understaffing among mental health staff contributes to the high

14   number of avoidable suicides. Stewart WT, Doc. 4109 ¶¶ 168-175; Doc. 4109-1, Ex. 3.

15       Defendants' Findings of Fact, much like Dr. Penn, simply ignore the vast majority

16   of suicides in ADCRR. Doc. 4309 ¶¶ 1461-1499. Dr. Penn's written testimony mentions

17   only *two* of the 23 patients who died by suicide between January 1, 2019 and the time of

18   trial. Penn TT at 3222:13-23; Haney WT, Doc. 4120 ¶ 114 (listing suicides in ADCRR);

19   Doc. 4308 ¶ 377 n.68. For one of the two suicides he did mention, the ADCRR mortality

20   review included several recommendations. Ex. 256 at ADCRRM0026206. Dr. Penn did

21   not inquire from anyone at ADCRR or Centurion whether any of these recommendations

22   were actually implemented. Penn TT at 3209:8-3211:10.

23       Indeed, while Defendants make much of the fact that mortality reviews and

24   psychological autopsies are completed when a patient dies by suicide (Doc. 4309 ¶ 1478),

25   Dr. Platt testified that there is no system in place to ensure that recommendations made in

26   a psychological autopsy following a death by suicide are actually implemented. Platt TT

27   at 1036:12-1037:5. Dr. Pelton admitted that she did not know what—if anything—had

28   ever been done to implement the recommendations that were made in a psychological

-132-

autopsy report that she authored in August 2020, (Pelton Dep. at 156:2-161:17 (Ex. 381));
in a psychological autopsy report that she reviewed of a person who died by suicide on
May 31, 2021, (*id.* at 161:21-168:6 (Ex. 218)); or in a psychological autopsy report that
she reviewed of a person who died by suicide on June 9, 2021, (*id.* at 168:19-176:7
(Ex. 391)). Doc. 4308 ¶ 953. Defendants' Findings related to quality assurance for mental
health care simply cuts-and-pastes a few paragraphs of their mental health expert Dr.
Penn's unrelated written testimony reciting his description of the role of ADCRR's
monitoring bureau and what he believes is the grievance process, and does not include any
discussion of mortality reviews, psychological autopsies, or of the CQI process generally.
Doc. 4309 ¶¶ 1287-1289.

Although Defendants quote Dr. Penn's opinion that "ADCRR strives for and
implements timely suicide prevention practices and efforts" (Doc. 4309 ¶ 1480, quoting
Doc. 4174 ¶ 229), there is no factual basis for this opinion. During his September 2021
tours of ADCRR facilities, Dr. Penn did not observe any suicide prevention training, or
any three-minute "man down drills," nor did he review any documents to verify that these
drills are actually taking place. Penn TT at 3204:14-3206:16.[79]

It also is unclear what exactly Defendants think they gain from their assertion that
"[i]n Dr. Stewart's opinion, if a person is determined to kill themselves, then many times
they will be able to do that." Doc. 4309 ¶ 1461. The fact that some people are able to
complete a suicide in no way means that efforts should not be made to address the
underlying mental illness that is driving them to suicide. Dr. Stewart made clear that "[i]f
a person is determined to kill themselves and that determination is based on untreated

---

[79] Defendants also cut-and-paste from Dr. Penn's written testimony (Doc. 4174 ¶ 232) into their Findings of Fact (Doc. 4309 ¶ 1487), multiple charts referring to "suicide spectrum behavior," that were created by Dr. John Wilson, a psychologist who works for Centurion. Dr. Penn admitted on cross-examination that he had no role in making these charts, could not define what "suicide spectrum behavior" meant; and did not know who created the chart that was at paragraph 233 (page 84) of his written declaration, which Defendants also cut-and-pasted into their Findings of Fact. Doc. 4309 ¶ 1488. Accordingly, the Court should disregard these charts and any testimony based upon them.

1    mental illness, then the first thing we do is treat the mental illness." Stewart TT at 609:6-

2    8. Such treatment is sorely lacking in ADCRR.

3         Relying exclusively on the testimony of Dr. Stallcup, Defendants claim that

4    "Inmates on watch are offered the opportunity to come out of their cells for confidential

5    counseling each day." Doc. 4309 ¶ 1475. This is untrue. Dr. Pelton testified that people on

6    suicide watch are not being offered out-of-cell confidential counseling because there are

7    not sufficient security staff working to bring them out of their cells. Pelton Dep. at

8    154:14-21. This has happened even at the Phoenix inpatient mental health facility. *Id*. at

9    154:23-155:2, 155:13-19. (Doc. 4308 ¶ 482).

10        Defendants also claim that patients on watch "are permitted to go to recreation,

11   visitation, and make phone calls, unless such items are clinically contraindicated and

12   written on the watch order." Doc. 4309 ¶ 1475. This, too, is untrue. On cross-examination,

13   Dr. Stallcup testified that some patients do not receive any out-of-cell exercise while on

14   watch. Stallcup TT at 2545:11-2546:5. And it is security staff, not mental health staff,

15   who make the final decision whether a patient on watch receives out-of-cell time. Pelton

16   Dep. at 147:11-148:1, 148:12-20. Indeed, Deputy Warden Scott testified that at Eyman-

17   Browning, people on watch generally cannot be taken out for exercise due to the physical

18   layout of the facility. Horn WT, Doc. 4130 ¶ 154; Scott TT at 685:7-10.

19        Mr. Muhammad did not have access to his property and was not given any chance

20   to come out of the suicide watch cells at multiple prisons for recreation or programming.

21   Muhammad TT at 926:2-23. Similarly, Named Plaintiff Brislan was placed on watch five

22   or six times while housed at Florence-Kasson Unit (between late November 2018 and

23   December 2020, and April-September 2021), and he was not offered any out-of-cell time

24   or access to the phone while on watch. Brislan TT at 1304:7-1305:4, 1308:21-1309:3,

25   1315:24-1316:3. He was similarly not offered out-of-cell recreation time or phone calls

26   while on suicide watch at Lewis-Rast Unit. *Id.* at 1315:16-23 (Doc. 4308 ¶ 557).

27        Relying on the testimony of Dr. Stallcup, Defendants assert that "Prior to being

28   removed from watch, a suicide risk assessment is completed" (Doc. 4309 ¶ 1476), and

-134-

1    that "Each day, every inmate on watch is audited to ensure they have a crisis treatment
2    plan when they are placed on watch and a suicide risk assessment before they are taken
3    off." Doc. 4309 ¶ 1477. Once again, this is a statement of aspirational policy, not actual
4    practice. On cross-examination, Dr. Stallcup testified about a patient who did *not* have a
5    suicide risk assessment prior to his removal from watch, and died by suicide shortly
6    thereafter. Stallcup TT at 2542:14-2544:15; Ex. 403 at ADCRR00108. The ADCRR
7    mortality review for this patient also states that "There was no crisis treatment plan
8    developed within 1 business day of placement on watch (there was no plan developed for
9    the entirety of his watch")". Ex. 403 at ADCRR00108. The mortality review concluded that
10   adequate mental health care was not provided to this patient, and that his suicide was
11   possibly avoidable. *Id.* at ADCRR00107-108. Dr. Stallcup admitted that she participated
12   in this mortality review, Stallcup TT at 2542:14-23, and that she agreed with the mortality
13   review committee's conclusion that there was a failure to follow clinical guidelines, and
14   that the death was possibly avoidable. *Id.* at 2543:2-2544:2. She admitted that a suicide
15   risk assessment is required, and was not done in this case. *Id*. at 2544:9-15; *see also* Doc.
16   4308 ¶¶ 426-427, 579-583 (discussion of this patient's death by suicide); *see generally,*
17   Exs. 403 and 404 (mortality review and psychological autopsy of this patient). Although
18   the patient's mortality review report and psychological autopsy detailed numerous failures
19   in care that led to this preventable suicide, and Dr. Stallcup testified that she agreed this
20   death by suicide was possibly avoidable, Defendants' expert Dr. Penn testified that he
21   alone disagreed, and found that this patient's care met the standard of care. Doc. 4308 ¶
22   583 n.106.

23   **VII.   MEDICAL CARE**

24        Defendants' scattershot proposed findings of fact related to medical care
25   (Doc. 4309 ¶¶ 499-1126) amount to little more than a recounting of "facts" that were
26   relayed to their medical expert Dr. Murray by ADCRR and Centurion staff during his
27   brief site visits; Dr. Murray's sweeping conclusions about the system that, as detailed
28   above in Part II.C.1.a., are based upon a methodology that has never been used before and

-135-

1   is wholly inadequate; and a mechanical recitations of policies and procedures that often

2   are not followed and, absent meaningful oversight and quality improvement processes, are

3   inadequate to protect patients from substantial risk of serious harm.80 And, Defendants

4   ignore contrary evidence, including from their own audits, CQI meetings, and mortality

5   reviews, and even their own expert, that overwhelmingly documents continued and

6   pervasive failures at all levels.81 Finally, although Defendants quibble with Dr. Wilcox's

7   credentials, they can find no fault in his medical judgment in documenting, in painstaking

8   detail, longstanding, repeated, and unconscionable failures in medical care within the

9   Arizona prison system.

10

11

12

---

13   [80] As noted previously, Defendants also improperly focus on the medical care provided to specific Named Plaintiffs. *See* Part III.E., *supra*. That is wrong as a matter of

14   law. *Id.* In addition, Defendants offer nothing to contradict Dr. Wilcox's expert testimony regarding the "pattern of grossly deficient care" provided to Named Plaintiff Kendall

15   Johnson. *See* Wilcox WT, Doc. 4138 ¶¶ 98-114; Doc. 4309 ¶¶ 224-240. And Defendants mischaracterize the testimony of Named Plaintiff Shawn Jensen. For example, Defendants

16   state that during his deposition, Mr. Jensen "did not recall any issues he has had with the care provided by Centurion." Doc. 4309 ¶ 433. This is false. In support of this proposed

17   "fact," Defendants cite to a portion of Mr. Jensen's deposition in which he was asked whether he could recall *additional* problems with his medical care, *beyond* those he

18   described earlier in his deposition. *See id.* (citing Doc. 4226-1 (excerpts of Jensen Dep.) at 114:17-25 ("Q. Okay, *besides the infection issue and the delay with respect to the*

19   *replacement of the suprapubic catheter approximately a year ago*, can you think of any other medical issues or issues in which you believe that you didn't receive the appropriate

20   medical care?" (emphasis added)). Earlier in his deposition, Mr. Jensen described multiple recent problems with his care, including, for example, an incident in which he experienced

21   unnecessary delays in receiving appropriate care for a urinary infection, due to nursing staff's failure to order appropriate and timely testing. *See* Doc. 4226-1 at 110:2-111:7; *see*

22   *also id.* at 100:14-18 ("Q. And you believe that at least since Centurion is taking over that in terms of your catheter maintenance and exchange that they have been doing a good job

23   with that? A. No."); *id.* at 101:18-23 ("Q. Were the issues that you had with respect to staff being unfamiliar or unable to, in your view appropriately replace your prior catheter,

24   was that before, when Corizon was providing health care or was that when Centurion was providing health care? A. Both."); *id.* at 104:1-12 (describing recent delays in treatment

25   for an occlusion, or blockage, of his catheter, including a two-hour delay in being sent to the hospital).

26

27   [81] Plaintiffs' response to Defendants' proposed findings of fact related to mortality rates (Doc. 4309 ¶¶ 866-82) and health care staffing (*id.* ¶¶ 1012-1079) can be found in

28   Parts VIII.B. and VIII.A.1., below.

A.     **Defendants Do Not Have Meaningful Quality Improvement Processes to Identify Deficiencies in Medical and Mental Health Care and Improve Delivery of Care.**

The parties agree that Continuous Quality Improvement (CQI) processes, including mortality reviews, are critical ways to identify deficiencies in medical care and improve delivery of care. *See, e.g.*, Doc. 4308 ¶¶ 942-946, 959; Doc. 4309 ¶¶ 984, 1002 (stating that CQI process examines events that "resulted in a bad outcome for the patient or could have possibly resulted in a bad outcome").

Defendants, in their proposed findings of fact, provide a general overview of CQI processes and suggest that ADCRR's Medical Director, Dr. Phillips, through his review of CQI meeting minutes, "make[s] sure that things improve." Doc. 4309 ¶ 1004; *see id.* ¶¶ 983-1011. But Defendants mischaracterize the record and ignore overwhelming evidence that the CQI processes, as currently implemented in the Arizona state prison system, are not doing what they should—identifying problems, implementing solutions, and evaluating efficacy, and there is no meaningful oversight by Defendants, Dr. Phillips, institution leadership, or anyone else.

1.     **Mortality Reviews**

It is undisputed that mortality reviews are necessary to identify errors in care as well as process so that the system can learn from experience, improve quality of care, and act to avoid serious and fatal mistakes in the future. *See* Doc. 4308 ¶¶ 943-946; Doc. 4309 ¶¶ 984-88, 993-94. The parties agree that mortality reviews are an important means to identify deficiencies in health care prior to a death as well as possible preventive measures that could have been taken earlier. Doc. 4309 ¶¶ 984-88; Doc. 4308 ¶¶ 943-946. The parties also agree that, when a corrective action plan is developed as part of the mortality review process, "you would want to make sure [it] occurs, and then make sure you have the documentation to know that it did occur." Murray TT at 3524:10-13.

Defendants claim broadly that their mortality review process is "robust," "covers all the necessary bases," and results in "corrective action plans or actions involving staff." Doc. 4309 ¶¶ 992-93. In fact, the evidence shows the process is feeble and ineffective. *See*

Doc. 4308 ¶¶ 947-956. Plaintiffs already have demonstrated that mortality reviews minimize the harm caused by health care staff, fail to identify clear errors and those responsible, and are incomplete, general, and cursory. *See id*. ¶¶ 948-951. And most critically, Defendants lack a reliable system to translate findings from mortality reviews into future corrective action, or to determine if any of a mortality review's recommendations are actually implemented or if any policies are changed to comport with the recommendations. *Id*. ¶¶ 583, 952-956.

Defendants have long been aware that their mortality review process fails miserably to perform the essential function of fixing problems that lead to deaths; in 2019, for example, Dr. Stern, the Court-appointed expert, reported that he "encountered problems with care related to a death, and would encounter the same problem related to another death months later." Ex. 1860 at 135; *see also* Doc. 4308 ¶¶ 583, 743-744, 952-956, 1019. And, to the extent that the mortality reviews do identify problems, the same problems are identified over and over. *See, e.g.*, Exs. 155, 161, 229, 241, 344, 346, 355, 362, 393, 398, 442, 445, 488, 2102 (all finding that nurses failed to recognize signs and symptoms requiring provider level attention).

Defendants' claims regarding the substance and quality of their mortality review process are based primarily upon the self-serving testimony of their Medical Director, Dr. Phillips, who participates in all of the mortality reviews. *See* Doc. 4309 ¶¶ 984-996; Phillips TT at 2896:11-14. However, Dr. Phillips's testimony regarding how the mortality reviews are done destroys any confidence in the process. For example, when asked at trial for an example of a mortality review that resulted in healthcare improvement, Dr. Phillips referred to one where "we identified that someone had been receiving anti-inflammatory medication, and it was likely a contributory case to a bleeding issue" in a patient that had underlying liver disease. Phillips TT at 2900:3-15. He explained that the provider involved received education, "close supervision, peer reviews at the site level" and the case summary was "sent out for the CQI meetings that take place at individual facilities so that others can learn from this." *Id*. at 2900:13-25. He further stated that this knowledge is

"generalizable, especially since we have nurse practitioners in other facilities who may need to learn from that instance." *Id.* at 2900:16-22.

What actually happened in that particular case, however, played out very differently and demonstrates the mortality review process's failure to identify critical issues, supply actionable recommendations, and achieve meaningful results. In July 2021, Dr. Phillips signed a mortality review concerning a patient with hepatic failure due to hepatitis C infection who died one month after his provider at ASPC-Lewis tripled his dose of anti-inflammatory medication. Ex. 357. The review correctly recognized that the medication the patient was prescribed "is considered a potent NSAID that can cause GI bleeding and renal problems." *Id.* at ADCRR00000100. The reviewers, however, including Dr. Phillips, concluded it was "undetermined" as to whether the death was avoidable. *Id.* Dr. Wilcox reviewed this case and determined the reviewers' conclusion was "absurd." Wilcox WT, Doc. 4138 ¶ 75. Finding this death "entirely avoidable," he explained:

> The medication that healthcare staff gave [the patient] is absolutely contraindicated for people with serious liver disease, and they increased his dose as he became sicker and sicker, until he died – tragically but predictably-- of a massive hemorrhage.

*Id*.

Moreover, Dr. Wilcox identified additional serious deficiencies that the ADCRR mortality review simply omitted, including that the patient's liver fibrosis was not properly monitored with screening ultrasounds, that he was not provided preventive treatment to reduce chances of esophageal bleeding, that necessary bloodwork that would have identified his clotting impairment was not done, and that healthcare staff failed to respond when his physical condition deteriorated rapidly. Wilcox WT, Doc. 4138 ¶¶ 72-73. Dr. Wilcox's opinions on this case are undisputed.

The mortality review's recommendation in this case regarding the use of NSAIDs for a patient with liver disease was likewise tepid and incomplete: "Patients started on chronic NSAIDs should have a 30 to 45 day follow up after any new medication start or

1   dosing change." Ex. 357 at ADCRR00000101. Centurion's Medical Director Dr. Orm
2   participated in this mortality review. Dep. of Wendy Michelle Orm, M.D. ("Orm Ind.
3   Dep.") at 168:12-25. In deposition, Dr. Orm admitted that using any NSAID for a liver
4   patient is risky. *Id.* at 172:6-10. She also admitted she did not know if a follow-up
5   appointment 30-45 days after the medication change would have "made a difference" in
6   this case, as this patient ***had already died within 30 days of the change***. *Id.* at 172:6-
7   173:6. When asked how the recommendation that clinicians schedule a 30-45 day follow
8   up after any new medication start or dosing change was translated into a corrective action
9   plan, she responded only, "Good question." *Id.* at 173:15-18. She did not know. *Id.*

10      Defendants claim that "[w]hen there are items in a mortality review that require
11  further attention, that information is fed into the CQI process" and documented as a CAP
12  in the CQI meeting minutes. Doc. 4309 ¶¶ 1000, 1003. The CAP developed from this
13  mortality review was astonishingly weak: "SMD [Site Medical Director] to to [sic]
14  provide education on the need to follow up on newly prescribed NSAIDs within 30-45
15  days." Ex. 909 at ADCRR00211064. Moreover, it was entirely non-responsive to the
16  patient death that triggered it. Whereas the original mortality review recommended follow
17  up appointments both for patients who were newly started on NSAIDs and those who, like
18  the patient who died, *had their NSAID prescription increased*, the CAP focused only on
19  those patients with new NSAID prescriptions. The CAP was approved on September 23,
20  2021, and "completed" five days later, without development of, or revision to, policies or
21  procedures and without any ongoing monitoring or oversight. The education also was
22  limited to the prison where the patient had died—ASPC-Lewis. The September 2021 CQI
23  meeting minutes of the other prisons do not mention any training or other corrective
24  action related to NSAIDs.[82]

25

26

---

27      [82] *See* Ex. 906 (Douglas); Ex. 907 (Eyman); Ex. 908 (Florence); Ex. 910
    (Perryville); Ex. 911 (Safford); Ex. 912 (Tucson); Ex. 913 (Winslow); Ex. 914 (Yuma).
28  (Defendants did not produce the September 2021 CQI meeting minutes for Phoenix.)

Dr. Orm's cavalier attitude, the lack of meaningful follow-up on this issue at ASPC-Lewis, and the lack of any apparent follow-up on this issue statewide is particularly alarming given that the serious error identified in this mortality review exists system-wide. The Arizona prison system houses "a lot of patients with hepatitis C" and chronic liver disease, and patients with advanced liver disease "should not be receiving anti-inflammatory medication." Phillips TT at 2900:7-12. Even Defendants' own expert commented on this widespread problem, finding, among the randomly selected patients that his team reviewed medical records for, that at least **ten of the 80** patients from *across the state* "had NSAIDs ordered for them, despite a contraindication to NSAIDs," and several in fact "then experienced upper GI bleeding or worsening kidney function." Murray WT, Doc. 4206 ¶ 991; Murray TT at 3512:11-23.[83] For that reason, Defendants' expert concluded: "There appeared to be an under-recognition of active liver disease being a contraindication to NSAIDs," and potentially life-threatening.  Murray WT, Doc. 4206 ¶ 991.

Defendants assert that "Dr. Phillips reviews the CQI meeting minutes to make sure the corrective action plans have been put into place and to make sure staff understand the

---

[83] *See* Murray WT, Doc. 4206 ¶ 509 (noting patient at Douglas with liver disease and possible cirrhosis was prescribed ibuprofen, which "may be unsafe due to risk of GI bleeding"); ¶ 629 (noting that patient at Winslow "with CKD, thrombocytopenia, and cirrhosis" was prescribed NSAIDs and "then went on to a GI bleed," and stating that "NSAIDs should not be used in the presence of any of these conditions"); ¶ 639 (noting that another patient at Winslow "was placed on an NSAID in January 2020 and bled from his stomach a couple months later. NSAIDs should be avoided whenever possible, especially in the elderly and especially when Tylenol has not been tried"); ¶ 776 (noting patient at Perryville "was prescribed ibuprofen 600 mg 3 times daily as needed while on celecoxib despite her history of an acute GI bleed due to NSAIDs"); ¶ 799 (noting that cirrhotic patient at Stafford "was placed on NSAIDs for pain and should not have been"); ¶ 824 (noting that another patient at Safford "was started on NSAIDs at one point, which are contraindicated with active liver disease"); ¶ 845 (noting that yet another patient at Safford "was put on NSAIDs (2 different kinds) despite him being on ASA for his heart condition and despite having CHF and HCV. NSAIDs should be avoided in this patient."); ¶ 856 (stating, when discussing yet another patient at Safford, "I disagree with the use of NSAIDs in patients with liver disease and gastritis"); ¶ 948 (noting that patient at Eyman "has been on and off of NSAIDS for the past years despite having CKD"); ¶ 956 (noting, for another patient at Eyman, that "there is the use of NSAIDs in this very high-risk patient").

1  information presented and are moving toward making a tangible change." Doc. 4309

2  ¶ 1003 (citing Phillips TT at 2904:8-14). The record, however, makes clear that this

3  process is ineffective, and no meaningful oversight occurs.[84] For example, during trial, Dr.

4  Phillips discussed a mortality review he conducted for an elderly man who died after he

5  was sent to the hospital multiple times and medical staff repeatedly failed to carry out

6  basic diagnostic tests after each hospitalization. Phillips TT at 3654:21-3657:18; Ex. 423;

7  *see also* Wilcox WT, Doc. 4138 ¶¶ 269-76. Dr. Phillips testified that he in fact did not

8  know whether the sole recommendation in the mortality review—to implement a

9  verification process to ensure diagnostic tests are carried out—had ever been

10  implemented. *See* Phillips TT at 3657:15-18; Ex. 423 at ADCRRM0019685 (completed

11  Mar. 31, 2021). Troublingly, the prison's CQI meeting minutes following the mortality

12  review, which Dr. Phillips purportedly reviewed to ensure appropriate action was taken,

13  do not indicate that a CAP based on that recommendation ever was implemented or

14  completed. *See* Ex. 807 at ADCRR00106118 (April 2021) (asserting a plan to implement

15  and complete a CAP by May 2021); Ex. 817 (May 2021) (same); Ex. 827 (June 2021) (no

16  mention of this CAP); Ex. 837 (July 2021) (no mention of this CAP); Ex. 847 (August

17  2021) (no mention of this CAP).

18      In addition, Dr. Phillips discussed a mortality review he conducted for a young

19  woman who died of a severe anoxic brain injury after suffering an asthma attack. In the

20  two months leading up to her death, she was seen multiple times by nursing staff for

21  asthma symptoms, but was seen by a provider only twice, and was not seen by a provider

22  after being discharged from the infirmary. *See* Phillips TT at 3658:20-3661:15; Ex. 176;

23

---

24  [84] As part of his review process, Dr. Murray tried to track whether the recommendations that the mortality review committee made were implemented. However, he could not determine whether mortality review committee recommendations were actually implemented because ADCRR was not able to provide him with the data he requested. Murray TT at 3522:25-2523:10. Defendants' mental health expert Dr. Penn admitted that he did not inquire from anyone at ADCRR or Centurion whether they actually implemented the multiple recommendations made in the psych autopsies and mortality reviews of patients who he contended had received satisfactory mental health care prior to their deaths by suicide. Penn TT at 3202:8-3211:10 (Exs. 226, 403).

1   Wilcox WT, Doc. 4138 ¶¶ 266-68. The mortality review found that "follow up provider
2   visits/pulmonary clinic visits were not scheduled" and obliquely recommended that
3   "follow up visits . . . shall be documented in the electronic health record." Ex. 176 at
4   ADCRR00000015-16 (completed June 21, 2021). Contrary to Defendants' assertion that
5   Dr. Phillips ensures that staff, through the CQI process, are "moving toward making a
6   tangible change," Dr. Phillips testified that he did not know whether, after this mortality
7   review, the ADCRR began tracking whether people discharged from the infirmary were
8   being seen by their providers. Phillips TT at 3662:12-15. And, again, the CQI meeting
9   minutes that purportedly provide the basis for Dr. Phillips's monitoring and oversight of
10  successful implementation of mortality review recommendations do not document any
11  plan to determine whether these follow-up appointments are occurring. *See* Ex. 840 (July
12  2021) (stating only that nurses should schedule these follow-up appointments and
13  documenting a plan that "[t]his expectation will be shared" with staff).

14          **2.      CGAR Data and Other Audits**

15          Institutions review CGAR scores during the monthly CQI meetings and develop
16  Corrective Action Plans (CAPs) anytime a CGAR score falls below 85%. *See* Jordan TT
17  at 2630:21-2633:11. And yet, month after month, year after year, the CAPs fail to
18  adequately improve "some of the most fundamental and critical aspects of medical and
19  mental health care delivery." Doc. 3921 at 25-27 (reviewing compliance with certain
20  performance measures between January and April 2021). The CAPs usually simply restate
21  existing policy and provide no additional action, including oversight and accountability, to
22  resolve the problem. *See* Doc. 4308 ¶¶ 957-959. The Court in June 2018 described the
23  "nonchalance" with which Defendants approached the CAP process:

24              In one recent example, Defendants had no information about
                what could be done to improve compliance for PM 50 at
25              Tucson and failed to even attempt to provide a corrective
                action plan at the May 2018 Status Conference. (Doc. 2810).
26              In another example, instead of presenting a corrective action
                plan aimed at trying something new, Defendants informed the
27              Court at the June status hearing that they will continue to use
                their previous plan even though the CGARs reflect that the
28

previous plan has not obtained consistent compliance for PM 39 at Lewis. (Doc. 2874-1 at 81).

Doc. 2898 at 19-20.

But years later, Defendants still do not ensure that necessary remedies are implemented. For example, in 2021, the CGAR data showed that nurses at Tucson, which houses medically complex patients and has a large infirmary and supportive housing units, failed to see patients within 24 hours of submitting an HNR, something important to ensure timely access to care, with a score of 43.84 percent in June 2021 for Performance Measure 37. Phillips TT at 3624:19-3626:20; Ex. 1258. To address these low compliance scores, Dr. Phillips spoke with Centurion about ensuring sufficient nursing staffing. Phillips TT at 3627:9-15. But, as of October 2021, Dr. Phillips did not know whether more nurses had been hired or whether any other steps taken by Centurion to address the issue had, in fact, been successful. *Id.* at 3627:16-23; *see also id.* at 3627:24-3628:11 (stating he also did not know whether Centurion had addressed similar noncompliance at Yuma); Phillips TT at 3629:18-3631:25 (testifying that he did not know chronic care compliance and had never seen the database used by facility health administrators to track chronic care conditions).

Even when institutions develop their own audits, they are unable to fix problems. For example, between at least January 2020 and September 2021, Yuma conducted monthly audits of emergency responses at each of its five units, and set 90% as a passing score. *See, e.g.*, Ex. 665 at ADCRR00099510. Yet month after month, Yuma failed to meet this threshold complex-wide. During CQI meetings, staff acknowledged their unsatisfactory performance on numerous occasions: "As a complex, results were very low."[85] Between August 2020 and September 2021, however, the CQI minutes assert: "As

---

[85] *See* Ex. 665 at ADCRR00099510 (Jan. 2020); Ex. 675 at ADCRR00099967 (Feb. 2020); Ex. 685 at ADCRR00148872 (Mar. 2020); Ex. 695 at ADCRR00100494 (Apr. 2020); Ex. 705 at ADCRR00100965 (May 2020); Ex. 715 at ADCRR00101261 (June 2020); Ex. 725 at ADCRR00101706 (July 2020).

-144-

a complex, results are getting better."[86] That, unfortunately, was often not true. In fact, in 2021 alone, complex-wide scores dropped five out of the nine months, and never met or exceeded 90%.[87] And September 2021 represented the lowest scores over 21 months of auditing. *See* Ex. 914 at ADCRR00211163 (Sep. 2021) (67% average of unit scores of 69%, 56%, N/A, 72%, and 70%).[88] The CQI process simply failed to address this serious issue.

---

[86] *See* Ex. 735 at ADCRR00102178; Ex. 745 at ADCRR00102833 (Sep. 2020); Ex. 755 at ADCRR00103545 (Oct. 2020); Ex. 765 at ADCRR00103912 (Nov. 2020); Ex. 775 at ADCRR00104020 (Dec. 2020); Ex. 785 at ADCRR00104672 (Jan. 2021); Ex. 795 at ADCRRM0018592 (Feb. 2021); Ex. 805 at ADCRR00106020 (Mar. 2021); Ex. 815 at ADCRR00106469 (Apr. 2021); Ex. 825 at ADCRR00056733 (May 2021); Ex. 835 at ADCRR00062045 (June 2021); Ex. 845 at ADCRR00062626 (July 2021); Ex. 855 at ADCRR00137055 (Aug. 2021); Ex. 914 at ADCRR00211163 (Sep. 2021).

[87] *See* Ex. 775 at ADCRR00104020 (Dec. 2020) (80% average of unit scores of 71%, 73%, 83%, 82%, and 91%); Ex. 785 at ADCRR00104673 (Jan. 2021) (73% average of unit scores of 63%, 80%, 80%, 69%, and 74%); Ex. 795 at ADCRRM0018592 (Feb. 2021) (88% average of unit scores of 78%, 90%, 91%, 92%, and 90%); Ex. 805 at ADCRR00106020 (Mar. 2021) (69% average of unit scores of 56%, N/A, 71%, 81%, and 68%); Ex. 815 at ADCRR00106469 (Apr. 2021) (76% average of unit scores of 89%, 64%, 60%, 96%, and 71%); Ex. 825 at ADCRR00056734 (May 2021) (72% average of unit scores of 81%, 68%, 71%, 85%, and 55%); Ex. 835 at ADCRR00062046 (June 2021) (74% average of unit scores of 58%, 69%, 78%, 91%, and 72%); Ex. 845 at ADCRR00062626 (July 2021) (81% average of unit scores of 73%, 81%, 67%, 95%, and 87%); Ex. 855 at ADCRR00137055 (Aug. 2021) (72% average of unit scores of 75%, 70%, 79%, 78%, and 56%); Ex. 914 at ADCRR00211163 (Sep. 2021) (67% average of unit scores of 69%, 56%, N/A, 72%, and 70%). Individual unit scores are listed in the parentheticals above in the following order: Cheyenne, Cibola, Cocopah, Dakota, and La Paz.

[88] *See* Ex. 665 at ADCRR00099510 (Jan. 2020) (76% average of unit scores of 67%, 63%, 93%, 78%, and 78%); Ex. 675 at ADCRR00099968 (Feb. 2020) (81% average of unit scores of 67%, 79%, 100%, 90%, and 69%); Ex. 685 at ADCRR0148872-73 (Mar. 2020) (73% average of unit scores of 66%, 70%, 71%, 76%, and 80%); Ex. 695 at ADCRR0100495 (Apr. 2020) (76% average of unit scores of 70%, 78%, 75%, 77%, and 78%); Ex. 705 at ADCRR00100966 (May 2020) (85% average of unit scores of 78%, 83%, 91%, 93%, and 81%); Ex. 715 at ADCRR00101262 (June 2020) (79% average of unit scores of 85%, 76%, 78%, 79%, and 76%); Ex. 725 at ADCRR00101706 (July 2020) (73% average of unit scores of 71%, 66%, 91%, 69%, and 70%); Ex. 735 at ADCRR00102178 (Aug. 2020) (78% average of unit scores of 73%, 76%, 76%, 79%, and 85%); Ex. 745 at ADCRR00102833-34 (Sep. 2020) (79% average of unit scores of 81%, 82%, 89%, 76%, and 67%); Ex. 755 at ADCRR00103545 (Oct. 2020) (87% average of unit scores of 83%, 91%, 89%, 86%, and 87%); Ex. 765 at ADCRR00103912 (Nov. 2020) (82% average of unit scores of 74%, 84%, 86%, 87%, and 77%); note 87, *supra* (listing scores between December 2020 and September 2021).

1          **3.     Peer Reviews**

2          Finally, Defendants assert that "Dr. Phillips reviews the CQI meeting minutes on a

3    regular basis to make sure peer reviews are being conducted at the facility level."

4    Doc. 4309 ¶ 1008 (citing Phillips TT at 3677:9-19). That assertion is not supported by the

5    record. Rather, Dr. Phillips testified only that CQI meeting minutes contain some

6    discussion of the peer-review process. Phillips TT at 3677:9-19. He testified that he

7    reviews CQI meeting minutes for corrective action plans put in place through the

8    mortality review process. *Id.* at 2904:2-17. He did not testify that he in any way audited

9    the frequency or content of peer reviews through CQI meeting minutes. Indeed, he

10   expressly testified that he is "***not*** involved in the discipline or the peer reviews . . . , that's

11   Centurion's role." *Id.* at 3668:5-10 (emphasis added); *see also id.* at 3635:21-25

12   (testifying that he is unfamiliar with how many peer reviews were done in 2020 or how

13   frequently those reviews are done in practice) .

14         In sum, Defendants' failure to have reliable processes for identifying serious health

15   care deficiencies, and for developing and monitoring corrective action to address these

16   findings constitutes deliberate indifference.

17         **B.     Notwithstanding Defendants' Stated Medical Policies and Procedures,
                    the Actual Provision of Medical Care Suffers from Systemic
18                  Deficiencies That Rise to the Level of Deliberate Indifference.**

19         Apart from unwarranted reliance on Dr. Murray's cursory analysis and attempts to

20   convert the hearsay representations of prison officials into reliable "fact" simply because

21   they were presented through Dr. Murray, the remainder of Defendants' proposed findings

22   of fact primarily outline medical policies and procedures. But Defendants ignore

23   overwhelming evidence that, in practice, those policies and procedures do not work; and,

24   as noted above, "Plaintiffs' claim is that despite ADC stated policies, the actual provision

25   of health care in its prison complexes suffers from systemic deficiencies that rise to the

26   level of deliberate indifference." Parsons, 289 F.R.D. at 521, aff'd, 754 F.3d 657 (9th Cir.

27   2014). Before addressing each so-called "access to care" proposed finding in turn, we

28

show how Defendants' simplistic approach and rote recitation of policies masks considerable system failures at ASPC-Yuma.

### 1. Medical Care at Arizona State Prison Complex (ASPC)-Yuma

Defendants attempt to position ASPC-Yuma as an "exemplar" to "provide context for the Court around the provision of medical care by Centurion within a specific ADCRR complex," relying solely on the testimony of Dr. Elijah Jordan, Yuma's Site Medical Director. Doc. 4309 ¶ 771; *see id.* ¶¶ 771-783. In fact, Yuma demonstrates how selective and superficial recitation of policies and unsupported assurances from medical managers ignores pervasive failures common to the ADCRR medical care delivery system that put patients at substantial risk of serious harm.[89]

Defendants claim that "[a]s of October 15, 2021, ASPC Yuma had a full complement of medical staffing" and that its Site Medical Director believes that the staff "can adequately treat the patient population there."[90] Doc. 4309 ¶¶ 773, 780. The undisputed evidence, however, shows that Yuma repeatedly has failed to meet the most basic requirements for the delivery of adequate medical care, with no meaningful corrective action by its medical leadership.

---

[89] Yuma is an odd choice to use as an exemplar because, as Defendants recognize, it does not house patients with acute medical care needs. *See* Doc. 4309 ¶ 781; Jordan TT at 2627:21-2628:13 (noting that Yuma does not have an inpatient clinic, special needs unit, or residential housing unit for patients who require help with activities of daily living, and does not provide dialysis on site). And the only findings Defendants propose based on their own expert's testimony is that care at Yuma "is much improved," there is "more evidence of continuity of care," "much less duplication of care," and "more coherent" care. Doc. 4309 ¶ 1091 (citing Doc. 4203 ¶ 445). Even if that faint and relative praise were true and based on a reliable methodology (which it is not), Defendants nowhere suggest that these improvements have been sufficient or provide any supporting documentation.

[90] It is not clear that Yuma in fact had a "full complement" of staff as of October 15, 2021. Dr. Jordan conceded on cross examination that he served as both the Site Medical Director of Yuma and the Acting Site Medical Director of Winslow up until the week of November 8, 2021, potentially for more than a month, but he could not remember. Jordan TT at 2626:1-2627:8. According to Dr. Murray, Dr. Jordan was serving in both roles when he visited Winslow on October 19, 2021. Murray WT, Doc. 4206 ¶¶ 102-03.

For example, in 2021, patients at ASPC-Yuma repeatedly were not timely seen by a nurse after submitting an HNR (PM 37), were not timely seen by a provider after an urgent provider referral (PM 40), did not have their hospital discharge recommendations timely reviewed and acted upon by a provider (PM 44), and did not have their diagnostic reports timely reviewed and acted upon by a provider (PM 46). *See* Ex. 1258 (PM 37); Ex. 1726 at ADCRRM0017424; Ex. 1727 at ADCRRM0021632; Ex. 1728 at ADCRRM0034562; Ex. 1729 at ADCRR00124376; Ex. 1730 at ADCRR00124995; Ex. 1731 at ADCRR00125610; Ex. 1732 at ADCRR00126180 (PM 40); Ex. 1259 (PM 44); Ex. 1260 (PM 46).

Defendants, in their proposed findings of fact, state that there "are no problems getting approval for specialty consultations" at Yuma. Doc. 4309 ¶ 776; *see also* Gann TT at 2280:5-2281:25 (explaining that specialty consultation requests are reviewed and approved outside the individual ASPCs). Even if true, that ignores the fact that Yuma repeatedly failed to timely schedule and complete urgent specialty consultations (PM 50), to timely schedule and complete routine specialty consultations (PM 51), and to ensure that providers timely review and act on specialty consultation reports (PM 52). *See* Ex. 1263 (PM 50); Ex. 1264 (PM 51); Ex. 1265 (PM 52).[91]

And, although Defendants state that "ASPC Yuma does not have any problems getting nonformulary medicine" (Doc. 4309 ¶ 779), that narrow statement, based only on the testimony of the Site Medical Director and without any supporting evidence, again misses the mark; Yuma repeatedly failed in 2021 to ensure that renewals of chronic care and psychotropic medications did not result in interruptions or lapses in medication (PM 13). *See* Ex. 1256; *see also infra* Part VIII.D. for a general discussion of delays in the delivery of medication at Yuma and other prisons.

---

[91] Although Defendants, relying on Dr. Jordan, state that "routine consultations are approved within 30 days" (Doc. 4309 ¶ 776 (citing Jordan TT at 2621:6-11)), policy requires that such decisions be made within 14 calendar days. *See* Ex. 1305, Ch. 7, Sec. 2.0 § 2.2.2.3.

**TABLE: SELECT CGAR DATA FOR ASPC-YUMA (JANUARY – JULY 2021)**[92]

|       | January | February | March  | April | May    | June   | July  |
|-------|---------|----------|--------|-------|--------|--------|-------|
| PM 13 | 64.00   | 74.00    | 78.00  | 74.00 | 68.00  | 76.00  | 96.00 |
| PM 37 | 78.00   | 84.00    | 88.00  | 90.00 | 66.00  | 74.00  | 88.00 |
| PM 40 | N/A     | 60.00    | 100.00 | N/A   | 25.00  | 100.00 | 50.00 |
| PM 44 | 40.00   | 80.00    | 37.50  | 80.00 | 85.00  | 65.00  | 70.37 |
| PM 46 | 86.00   | 86.00    | 90.00  | 92.00 | 78.00  | 88.00  | 90.00 |
| PM 50 | 56.67   | 88.00    | 84.00  | 77.14 | 76.92  | 96.97  | 58.06 |
| PM 51 | 72.00   | 86.00    | 86.00  | 80.00 | 88.00  | 88.00  | 86.00 |
| PM 52 | 76.09   | 80.00    | 90.00  | 89.13 | 76.00  | 92.00  | 86.00 |

As the Court already has found, these Performance Measures represent "some of the most fundamental and critical aspects of medical . . . care delivery." Doc. 3921 at 27 (discussing, among other things, PMs 13, 27, 40, 44, 46, 50, 51, and 52).[93] The failure of medical leadership at Yuma to resolve longstanding failures to meet these requirements is emblematic of system-wide inability to self-correct. *See* Doc. 4308 ¶¶ 942, 957-59; *see also* Ex. 1971 at 36-39 (CAPs for PM 13 at Yuma between 2018 and 2021), 134-38 (CAPs for PM 37 at Yuma between 2019 and 2021), 276-78 (CAPs for PM 36 at Yuma between 2018 and 2021), 421-26 (CAPs for PM 51 at Yuma between 2018 and 2021). Put differently, it is not enough that medical leadership meet monthly for CQI meetings to "evaluat[e] our performance, the performance measures, making sure that we are giving

---

[92] *See* Ex. 1256 (PM 13); Ex. 1258 (PM 37); Ex. 1726 at ADCRRM0017424; Ex. 1727 at ADCRRM0021632; Ex. 1728 at ADCRRM0034562; Ex. 1729 at ADCRR00124376; Ex. 1730 at ADCRR00124995; Ex. 1731 at ADCRR00125610; Ex. 1732 at ADCRR00126180 (PM 40); Ex. 1259 (PM 44); Ex. 1260 (PM 46); Ex. 1263 (PM 50); Ex. 1264 (PM 51); Ex. 1265 (PM 52).

[93] Some of these Performance Measures at Yuma were subjects of the Court's last Order to Show Cause. *See* Doc. 3490 at 1-2 (PMs 13, 37, 46, and 51).

good health care to our patients."[94] Jordan TT at 2655:3-7; *see also* Doc. 4309 ¶ 783. The medical leadership must be able to in fact address chronic barriers to the delivery of adequate medical care.

The facility's failure to address nurses' repeated inability to select the correct assessment tool to guide their evaluation of patients is illustrative. As noted below in Part VII.B.8., ADCRR attempts to use Nursing Encounter Tools (NETs) to guide nurses in evaluating patients. Jordan TT at 2639:17-2640:7. According to the ADCRR Medical Services Technical Manual, "The purposes of the . . . Nursing Encounter Tools (NETS), are to provide [Centurion] nursing staff with standardized nursing practices based on nursing statutes and regulations to deliver quality nursing care to the inmate population." Ex. 1305, Ch. 5, Sec. 1.5. "The NETS and Nursing Assessment Protocols provide[] step-by-step guidelines in the management of the patient . . . ." *Id.* § 1.2. Dr. Jordan admitted that it is important for nurses to pick the correct assessment tool for patient encounters because if they do not, a patient may not get the evaluation or treatment that is appropriate for their condition or illness. Jordan TT at 2640:8-12. Dr. Wilcox found, in his review of hundreds of individual healthcare encounter records, a systemic failure by nurses to select the appropriate NET. Wilcox WT, Doc. 4138 ¶¶ 76, 163-64.

---

[94] Dr. Jordan testified that, in his role as Site Medical Director, he reviews monthly CGAR scores and, during monthly CQI meetings, develops CAPs anytime a CGAR score falls below 85%. Jordan TT at 2630:21-2633:11. He agreed that Yuma scored unacceptably low on important Performance Measures in 2021. *Id.* at 2630:25-2639:14. The only explanation he gave at trial for the poor performance was that there was a COVID-19 outbreak at the institution in January 2021, and "the latter part of March is when we were kind of coming out of – or recovering COVID patients." *Id.* at 2651:20-2652:25; *see also id.* at 2662:18-2663:8. But this Court already has explained that "Defendants should not expect invocation of COVID-19 to excuse noncompliance throughout 2020." Doc. 3866 at 3; *see also* Doc. 3921 at 21 ("Defendants were told 'COVID-19 cannot be used as a complete shield against noncompliance.'") (quoting Doc. 3866 at 3). In any event, an outbreak in January 2021 does not explain or excuse continued low CGAR scores in subsequent months, up to and including July 2021—the most recent CGAR scores available to Plaintiffs. *See* Phillips TT at 3625:10-15.

Yuma audited nurses' selection of the correct NET at each of its five complexes and, in 2021, had persistent failing scores, as shown in the table below. *See* Jordan TT at 2639:21-2649:19.

**TABLE: SELF-AUDIT OF WHETHER THE CORRECT ASSESSMENT TOOL WAS USED (MAY-SEPT. 2021)[95]**

| | ASPC-Yuma Complex | | | | |
| --- | --- | --- | --- | --- | --- |
| | Cheyenne | Cibola | Cocopah | Dakota | La Paz |
| May | 57% (4 of 7) | 20% (1 of 5) | 40% (2 of 5) | 64% (9 of 14) | 13% (1 of 8) |
| June | 0% (0 of 3) | 0% (0 of 3) | 60% (3 of 5) | 81% (13 of 16) | 14% (1 of 7) |
| July[96] | N/A | N/A | N/A | N/A | N/A |
| August | 67% (4 of 6) | 17% (1 of 6) | 33% (1 of 3) | 83% (15 of 18) | 0% (0 of 5) |
| September | 67% (2 of 3) | 43% (3 of 7) | N/A[97] | 58% (7 of 12) | 20% (1 of 5) |

Dr. Jordan, Yuma's Site Medical Director, admitted that he had seen the audits, that the audits were discussed during monthly CQI meetings, that the institution had done quite poorly on this measure, and that the scores were concerning. Jordan TT at 2640:20-2649:9. He said that each yard usually had only one nurse assigned to conduct nurse line and use the assessment tool, and that he expected the director of nursing to "[e]ducate that nurse on how to go about, you know, choosing the correct assessment." *Id.* at 2656:3-9,

---

[95] Ex. 825 at ADCRR0056751-55 (May 2021); Ex. 835 at ADCRR00062052-56 (June 2021); Ex. 855 at ADCRR00137060-64 (August 2021); Ex. 914 at ADCRR00211169-172 (September 2021).

[96] The CQI meeting minutes for July 2021 produced by Defendants did not include any attachments, including self-audit reports. *See* Ex. 845.

[97] The CQI meeting minutes for September 2021 produced by Defendants do not include scores for Cocopah. *See* Ex. 914.

2658:14-19. Nonetheless, although on notice of the problem for months, Defendants were unable to adequately educate the few nurses responsible for using the NETs.[98]

The failure of medical leadership at Yuma to address these longstanding barriers to care has resulted in serious harm. In 2019, for example, ADCRR's own mortality review concluded that a young patient's death "was caused by or affected in a negative manner by medical . . . personnel." Ex. 152 at ADCM1580650. This was not the result of a single error. Indeed, the mortality review found that the patient submitted at least five HNRs while housed at Yuma over a 45-day period reporting swelling of his legs and arms, extreme pain throughout his body, an inability to walk to the medical clinic, and delays in testing. *Id.* at ADCM1580646-48. During subsequent nurse encounters, the mortality review committee found, the patient reported swelling, hardening, and bruising of his veins; that the swelling had persisted for months; nausea and vomiting; and that it was too painful to sleep. *Id.* When he was finally sent to an off-site hospital, he was diagnosed with bilateral deep venous thrombosis ("DVT"), adenocarcinoma (a type of cancer), and a lesion on the aortic valve, and was recommended for "palliative chemo" and to be transferred to a tertiary care center for further care. *Id.* at ADCM1580648-49. His admission note to St. Joseph's Hospital stated that "Pt is critically ill and has one or more critical illness or one or more vital organ system failures such that there is a high

---

[98] Although Dr. Jordan appeared to believe that the audit examined whether the nurse selected the proper NET during nurse line (Jordan TT at 2655:21-2657:18), it appears that the audit instead was of the NETs selected during ICS responses. *See, e.g.*, Ex. 805 at ADCRR00106020. Yuma also scored quite poorly on the full ICS audit, which measured medical emergency, medications, provider referrals, and emergency department send-outs during an ICS, between January 2020 and September 2021, and almost always well below the institution's own 90% benchmark. *See* Part VII.A.2., *supra*; Ex. 665 at ADCRR00099510; Ex. 675 at ADCRR00099967-68; Ex. 685 at ADCRR0148872-74; Ex. 695 at ADCRR00100494; Ex. 705 at ADCRR00100965-66; Ex. 715 at ADCRR00101261-62; Ex. 725 at ADCRR00101706; Ex. 735 at ADCRR00102178; Ex. 745 at ADCRR00102833-34; Ex. 755 at ADCRR00103545; Ex. 765 at ADCRR00103912; Ex. 775 at ADCRR00104020; Ex. 785 at ADCRR00104672-73; Ex. 795 at ADCRRM0018592; Ex. 805 at ADCRR00106020; Ex. 815 at ADCRR00106469; Ex. 825 at ADCRR00056733-34; Ex. 835 at ADCRR00062045-46; Ex. 845 at ADCRR00062626; Ex. 855 at ADCRR00137055; Ex. 914 at ADCRR00211163.

probability of imminent life threatening deterioration in the patient's conditions." *Id.* at ADCM1580649. He died five days later at the age of 29.[99] *Id.* at ADCM1580645.

The mortality review committee identified a number of contributing factors, including no physical assessment upon transfer, untimely triaging of HNRs, inadequate nursing work-ups, failure to recognize symptoms or signs, inadequate medical record documentation, delays in access to care by a provider, failure to perform STAT labs as ordered, untimely diagnosis, and a level of care that was inappropriate for the severity of the illness. Ex. 152 at ADCM1580650-52.

Among other recommendations, the mortality review, which was completed in August 2019, stated that "[a]ny HNR with a physical complaint must be seen by nursing within 24 hours" (Ex. 152 at ADCM1580652)—restating something already required by policy. Phillips TT at 3624:19-3625:21; Jordan TT at 2634:19-2635:1; Ex. 1305, Ch. 5, Sec. 3.1 § 3.0; Ex. 1850 at 10 (PM 37). Nonetheless, over a year later, ASPC-Yuma still failed to meet this critical benchmark, scoring 78%, 84%, 88%, 90%, 66%, 74%, and 88% between January and July 2021. Ex. 1258.

In addition, in 2020, a 60-year-old patient at Yuma died of an intracranial hemorrhage. Wilcox WT, Doc. 4138 ¶ 264; Ex. 166 at ADCM1652229. Dr. Wilcox concluded that the patient's death could have been prevented "if the clinicians had controlled his blood pressure appropriately." Wilcox WT, Doc. 4138 ¶ 264. Defendants' own mortality review found "inconsistent monitoring of the patient's BP [blood pressure] and inconsistent intervention when BP was markedly elevated," and noted that "giving subq epinephrine [an injection] without appropriate monitoring was out of scope of nursing practice." Ex. 166 at ADCM1652233. Defendants, however, developed a CAP that was far "too narrow to address the endemic issue of nurses practicing outside the scope of their licenses with insufficient physician oversight." Wilcox WT, Doc. 4138

---

[99] Although the mortality review states that the patient is 30 years old, he in fact was 29 years old at the time of his death based on his date of birth. *See* Ex. 152 at ADCM1580645.

¶ 135 n.3 (citing Ex. 166 at ADCM1652234). As implemented by the institution, the CAPs amounted to little more than one-time "education emails" sent to nursing staff, with no continued oversight or monitoring. *See* Ex. 745 at ADCRR00102917-18; Ex. 755 at ADCRR00103569-571.

In sum, neither institution nor headquarters staff have addressed chronic and severe failures of the medical care delivery system at Yuma that can (and have) led to serious harm to patients. Rather than acknowledge these failures, Defendants instead hold the institution up as an "exemplar." *See* Doc. 4309 ¶ 771. That itself is clear evidence deliberate indifference.

## 2. Medical Classification System

The parties agree that Defendants' ten separate facilities each have a medical clinic unit that is staffed with medical personnel and that some of those prisons have an infirmary and/or special needs unit. Doc. 4309 ¶¶ 583-599.

As Dr. Wilcox explained, a medical classification system, if used properly, makes it easier to manage a healthcare system and estimate demand for care, and is useful for allocating staffing. Wilcox WT, Doc. 4138 ¶ 483. Defendants claim that "a medical classification system exists within ADCRR." Doc. 4309 ¶ 604. They further claim that the system exists to communicate the housing needs for individual patients, with patient ranked at "1" having the lowest needs and "5" having the highest needs. *Id.* Plaintiffs' evidence demonstrates, however, that Defendants' medical classification system is deficient and unreliable. Doc. 4308 ¶¶ 802-06.

Defendants state that the total number of people in the system is approximately 26,000 people. Doc. 4309 ¶ 616. However, when totaling the number of incarcerated people in the five medical classifications, Dr. Phillips' figures added up to only 24,520, leaving approximately 1500 people unaccounted for. *See id*. ¶¶ 611-16.

This apparent undercounting is consistent with Plaintiffs' undisputed testimony that Defendants' Medical Classification system is inherently unreliable and fails to accurately classify patients. *See* Doc. 4308 ¶ 804; Wilcox WT, Doc. 4138 ¶¶ 485-88. For

-154-

example, Named Plaintiff Kendall Johnson cannot walk or feed herself, but is classified as a level 3, *i.e.*, "a patient with additional chronic care conditions possibly needing to go see specialists on a routine basis. There may be mobility issues, but they can still handle it on their own." Doc. 4308 ¶ 804; Wilcox WT, Doc. 4138 ¶ 488; Doc. 4309 ¶ 608. Similarly, Dr. Wilcox reviewed the scores for some of the patients whom he had interviewed in the IPCs, and found that they too were often under-classified. Doc. 4308 ¶ 806. This included one patient who is in the IPC because he is on long-term antibiotics due to a damaged heart valve that impairs his physical activities, who was scored as a "1," and another who is partially paralyzed and has difficulty leaving his bed, who was scored as a "2." Wilcox WT, Doc. 4138 ¶ 487; Exs. 1267-1270.

Dr. Wilcox also found that he reviewed scores of people who had died and were discussed in his report, and found most had medical classification scores of 1 or 2, which did not appear to accurately describe their medical conditions at the time. Wilcox WT, Doc. 4138 ¶ 486; Ex. 1266.

Plaintiffs' evidence of the substantial deficiencies in Defendants' medical classification system is undisputed.

### 3.    Health Needs Requests and Volume of Health Care Encounters

Defendants claim that they use telehealth, and other strategies, to address backlogs caused by the cancellation of nurse lines. Doc. 4309 ¶ 887. The evidence, however, is clear that Defendants' efforts to mitigate delays in access to nurse appointments have not been successful. Doc. 4308 ¶¶ 604-609; Ex. 1258 (showing four of larger ADCRR prisons failed to ensure patient see nurses timely after submitting a sick call slip in first seven months of 2021); Wilcox WT Doc. 4138 ¶¶ 212-217. Defendants also present various statistics regarding the number of health care encounters conducted in ADCRR. Doc. 4309 ¶¶ 784-808, 855-864. As explained above, the volume of health care encounters is irrelevant to the Eighth Amendment inquiry.[100] *See* Part III.G., *supra*.

---

[100] Defendants also provide no additional context for these statistics. Indeed,

1          **4.      Specialty Care**

2          Defendants provide only a cursory overview of the specialty care process. *See*

3    Doc. 4309 ¶¶ 889-916. But Plaintiffs presented overwhelming evidence of longstanding

4    delays and interruptions in delivery of specialty care that harms patients and places them

5    at risk of harm, as set forth in Dr. Wilcox's testimony, in the CGAR results, in the CQI

6    meeting minutes, and in the death reviews. *See* Wilcox WT, Doc. 4138 ¶¶ 365-407;

7    Doc. 4308 ¶¶ 730-760.[101] And Plaintiffs identified a number of cases where providers

8    failed to initiate the specialty care process in the first place. *See, e.g.*, Wilcox WT,

9

10   Defendants waited until after the conclusion of trial to seek the admission of many of
     them. *See* Doc. 4234 (Defendants' post-trial motion for admission of exhibits); Doc. 4243

11   at 2-3 (Plaintiffs' response noting that Defendants "failed to lay the necessary foundation
     to establish admissibility"); Doc. 4309 ¶¶ 856-57, 862 (citing unadmitted Exhibit 3054);

12   *id.* ¶ 862 (citing unadmitted Exhibit 3055); *id.* ¶ 864 (citing unadmitted Exhibit 3081); *id.*
     ¶¶ 859, 861 (citing unadmitted Exhibit 3439). The Court has not yet ruled on Defendants'

13   motion.

     [101] *See, e.g.*, Ex. 666 at ADCRR00099608-09, Ex. 676 at ADCRR00148477, and

14   Ex. 686 at ADCRR00100014; [Douglas, February-April, 2020] ("It is taking us about 3
     weeks to get items approved [by Utilization Management]. This is leaving us with very

15   little time to get appointments scheduled and completed. We continue to struggle
     scheduling Urology and GI appointments on the outside as well as Neurology

16   appointments"); Ex. 677 at ADCRR00148512 [Eyman, March 2020] ("There is a time
     delay in [Utilization Management] approvals. Routines are taking approximately one

17   month and Urgents take approximately 1-2 weeks."); Ex. 670 at ADCRR00099784,
     Ex. 680 at ADCRR00148728; Ex. 690 at ADCRR00100249; Ex. 700 at

18   ADCRR00100755; Ex. 710 at ADCRR00101086 [Perryville, February-June, 2020]
     ("Clinical Coordinator notates that consults are taking at least 3 weeks to review by the

19   UM team"); Ex. 681 at ADCRR00148734 [Phoenix, March 2020 ("Timeliness for UM to
     approve consults continues to be challenging"); Ex. 684 at ADCRR00148863 [Winslow,

20   March 2020] (12 days to approve "urgent" consult); Ex. 793 at ADCRRM0018579 and
     Ex. 803 at ADCRR00105794 [Tucson, February-March 2021] ("continue to experience

21   delays in consults due to improper (or lack of) procedure prep on the yards"); Ex. 813 at
     ADCRR00106425, Ex. 823 at ADCRR00056669; Ex. 833 at ADCRR00062006, Ex. 843

22   at ADCRR00000862, Ex. 853 at ADCRR00137012 [Tucson, April-August, 2021] ("We
     have had some issues with pre-op prep, to include COVID testing, being completed in a

23   timely manner"); Ex. 667 at ADCRR00099642 [Feb. 2020] ("Onsite providers are not
     following protocol set in place by Neuro surgeons [sic] and as a result, they are denying

24   our patients."); Ex. 707 at ADCRR00101013 [Eyman, June 2020] ("Ophthalmology
     consult placed without Acuities causing increase of ATP"); Ex. 780 at ADCRR00104368,

25   Ex. 790 at ADCRRM0018558, Ex. 800 at ADCRR00105681, Ex. 810 at
     ADCRR00106331, Ex. 820 at ADCRR00056515, Ex. 830 at ADCRR00061883, Ex. 840

26   at ADCRR00062547, Ex. 850 at ADCRR00136940 [Perryville, January-August, 2021]
     ("starting to see an increase in ATPs for specialty consults. Please be thorough in your

27   request for a consult").

28

Doc. 4138 ¶¶ 368-373; Ex. 213 at ADCRRM0019619 (failure to refer patient to orthopedics following hospitalization for acute fracture); Ex. 359 at ADCM1608449-56 (patient suffers from shortness of breath, dizziness and fatigue for 22 months, eventually diagnosed with metastatic lung cancer; provider failed to seek specialty consult when patient's condition failed to improve); Ex. 433 at ADCRRM0026245 (patient with ultrasound showing blockage in his heart referred but never scheduled with cardiologist); Ex. 460 at ADCM1598100 (failure to send patient to GI specialist following hospitalization for cirrhosis).

Defendants failed to present admissible evidence sufficient to counter Plaintiffs' case. Instead, they assert, without support in the record and contrary to the evidence, that they have specialty referral process that they monitor and that they have improved access to specialty care. For the reasons below, this Court should reject Defendants' position.

**First**, Dr. Phillips testified he "closely" monitors the provision of specialty care within the system. Doc. 4309 ¶ 891. Dr. Phillips has been the ADCRR's Medical Director since November 2020. Ex. 2259. Assuming he has closely monitored the process, his monitoring has not improved specialty scheduling. For example, during the first seven months of 2021, nine of the ten prisons failed to meet the CGAR benchmark for at least one month for Performance Measure 50 (requiring urgent specialty consultations and urgent specialty diagnostic services to be completed within 30 calendar days of the provider's request.). Wilcox WT, Doc. 4138 ¶ 397; Ex. 1263. Indeed, Yuma scored 56.6% on this performance measure in January, and by July, their score was virtually the same, at 58%—a score the Site Medical Director agreed was "unacceptably low." *Id.*; Jordan TT at 2631:2-2632:16.[102]

---

[102] Defendants also cite Mr. Shinn's testimony that ADCRR and Centurion coordinate transportation for multiple patients in order to fill the day's schedule for offsite providers in order to minimize interaction with the public. Doc. 4309 ¶ 64; Shinn TT at 2187:4-2188:8. This testimony does not undermine Plaintiffs' overwhelming evidence of specialty care delays and lapses. *See* Doc. 4308 ¶¶ 730-760.

***Second***, Defendants assert, based on Defendant Larry Gann's testimony, that clinical coordinators met in September 2021 to address noncompliance with Performance Measures 50 and 51, and, at the meeting, "it was discovered that each facility had a different process in place," so the Monitoring Bureau reviewed best practices and developed "a unified process" that was implemented statewide. *See* Doc. 4309 ¶¶ 908-911. Defendant Gann then claimed that for Performance Measure 50 "currently this month [*i.e.,* November 2021] is 93%; 51 is at 95% compliance." Gann TT at 2283:16-18; Doc. 4309 ¶ 911. But Defendants provided no documentation to support this self-serving assertion. Therefore, this testimony should not be considered or given any weight. *See* Stallcup TT at 2441:19-2442:20 (Court stating that it will not consider testimony regarding CGAR data if documentation has not been provided); Phillips TT at 3625:10-15 (Court entering into the record that the last month that Defendants produced CGAR scores to Plaintiffs was July 2021). The purported real-time CGAR data also falls well after the fact discovery deadline of October 15, 2021. Doc. 3931 at 2. Finally, it is not credible that reliable November 2021 CGAR data in fact existed and was available on November 16, 2021, the date Defendant Gann testified. The CGAR data collection process is a time-intensive process, and final scores for a given month are not available until months later. *See* Gann TT at 2262:15-25 (testifying that performance measure monitoring is "quite rigorous" and monitors "are always monitoring two months in arrears"); Jordan TT at 2653:1-11.

Moreover, Defendants' evidence undercuts any claim that this September 2021 meeting—held after this Court set the matter for trial—fixed Defendants' specialty care scheduling problems. Defendants' own medical director, Dr. Phillips, also participated in and testified about the meeting. Phillips TT at 2910:24-2911:4. He acknowledged that the meeting participants identified some of the obstacles, and "[s]ome of those obstacles were outside of our realm and we don't have control over." *Id.* at 2911:9-13. Regarding the matters they had control over, they reportedly developed an action plan. *Id*. at 2911:12-13. When asked directly whether he had seen results from the action plan, Dr. Phillips failed

to identify any concrete improvement. Instead, he responded that people from ADCRR and Centurion intended to create an education program, and planned another meeting in December 2021. Phillips TT at 2911:3-20 ("One of the actions was to put together an educational program. And a member of my team and a member of the Centurion team is going to do that. And so we have a follow-up meeting in December. So that's more of a long-term issue.").

**Third**, Defendants claim that they are bringing specialists into the facilities to provide treatment at the prisons, and that "[s]pecific services such as radiology, optometry, and physical therapy can be done inside the facility without the need to transport an inmate." Doc. 4309 ¶ 895 (citing Dr. Phillips' testimony). But Defendants misstate the evidence and Dr. Phillips' testimony. When asked whether ADCRR and Centurion were currently bringing specialists into the prisons rather than sending the patients to outside clinics, Dr. Phillips failed to provide a substantive response. Phillips TT at 2913:1-4 ("I have had some conversations about that, yes."). When pressed by the Court to explain the time frame for these efforts, Dr. Phillips could not provide one, and merely stated that there are some services "that can be" done at the facility. *Id.* at 2913:7-11. He confirmed only that physical therapy is currently done at the prisons. *Id.* at 2913:16-21. Defendants' statements about what may be possible, rather than what is currently happening, are irrelevant.

Defendants also claim that they are "working on" bringing in ophthalmology and optometrists onsite. Doc. 4309 ¶ 915. Defendants' citation to the record (R.T. 11/16/21 at 2295:16-18) relates to the planned closure of the prison at ASPC-Florence, and does not support Defendants' vague assertion.

**Fourth**, Defendants assert that when Centurion took over the contract, there was a backlog of specialty consults, and that Centurion removed the utilization review process "to freely schedule any patient that had specialty care needs and clear the backlog." Doc. 4309 ¶ 896. This assertion, however, is based solely upon Dr. Murray's testimony about a conversation that he had *during his site visit of Tucson*. Murray TT at 3454:12-

3455:5 (Dr. Murray responds to question, "And based your tour, interviews, did you come to any conclusions with respect to Tucson?"). Nothing in Dr. Murray's testimony suggests that this information provided at Tucson was relevant to any other prison.

More importantly, however, as explained above in Part II.C.1.a., Dr. Murray never attempted to validate the information he received from prison staff during his site visits.

*Fifth*, Defendants claim to have engaged additional services to facilitate access to specialists. Doc. 4309 ¶¶ 898-899 (citing Dr. Murray's testimony). But Dr. Murray's testimony cited regarding Defendants' engagement of a service called "CareClix" was equivocal at best, and insufficient to establish that Defendants use this service or that it is effective in remedying the systemic problems identified by Dr. Wilcox. *Id.* ¶ 899; *see* Murray TT at 3457:5-8 (Dr. Murray testified "But CareClix is, I think, the program that they access to be able to tap into a telehealth network where they can get various specialists to see patients at the facility through telemedicine.").

Defendants admit, and Plaintiffs agree, that they have had difficulty finding specialists willing to provide care to ADCRR patients. Doc. 4309 ¶ 912; Gann TT at 2290:11-18. Defendants' expert Dr. Murray recognized that this is in part because Arizona law requires ADCRR to pay specialty consultants treating incarcerated people at the Medicaid rate, which is typically lower than the market rate. Murray TT at 3512:24-3513:5. In order to provide access to these specialty services, Dr. Murray recommended that ADCRR change their practice and pay the market rate to specialists treating ADCRR patients. *Id.* at 3513:9-13. Plaintiffs concur; and this was recommended by the Court's expert Dr. Marc Stern in his 2019 report to the Court. *See* Ex. 1860 at 101-102; *see id.* at 102 ("ADC should be allowed to pay community specialists at the rate necessary, based on market forces, so it can provide medically necessary care to its patients and provide that care in a timely manner. Plaintiffs concur. Defendants take no position.").

Plaintiffs provided overwhelming evidence of Defendants' widespread failure to timely review and act on recommendations from specialty providers. *See* Doc. 4308 ¶¶ 755-760; Wilcox WT, Doc. 4138 ¶¶ 402-406. This evidence is undisputed.

Defendants assert that the joint efforts of ADCRR and Centurion to improve access to specialty care is evidence that they are not deliberately indifferent to the serious risk of harm to Plaintiffs. Doc. 4309 ¶ 916. As noted above, Defendants have failed to present admissible evidence that any efforts undertaken have been successful, nor do they offer any evidence to dispute Dr. Wilcox's testimony that providers too often fail to recognize the need to refer patients to specialty care. Poor access to specialty care has been a well-established systemic deficiency since 2013. *See* Wilcox WT, Doc. 4138 ¶¶ 365-368. Defendants' inability to rectify this critical shortcoming in their healthcare delivery system demonstrates their deliberate indifferent to patients' serious medical needs.

### 5. Diagnostic Services

Defendants assert that they use outside vendors for radiology and for lab services and that they provide their services timely, including providing stat films in two hours or less. Doc. 4309 ¶¶ 917-918. Their sole support for this assertion is the testimony of their expert Dr. Murray, who again based this opinion on his conversations with prison staff during his site visits. *Id.*; *see* Murray TT at 3463:22-3464:18. Dr. Murray, however, undertook no efforts to do his own investigation to validate the information he received from Defendants and Centurion employees. Murray TT at 3506:21-3507:13. He did not look at records to determine whether x-ray films were processed in two hours, and he did not review logs to determine whether this information was true or not. *Id.* at 3507:2-8.

Moreover, Defendants offer no facts to counter Plaintiffs' extensive evidence that Defendants regularly fail to timely act on abnormal labs and diagnostic imaging. Doc. 4308 ¶¶ 679-684; *see, e.g.*, Ex. 189 at ADCM1578125 (failure to follow abnormal labs); Ex. 211 at ADCM1584298 (HCP failed to review ordered tests in patient with cancer); Ex. 396 at ADCRRM0026225 (failure to acknowledge positive COVID-19 result); Ex. 437 at ADCM1603954 (failure to timely follow up on abnormal findings in cancer patient). This is a problem that has persisted for years. Wilcox WT, Doc. 4138 ¶ 297. It is well documented in Defendants' own CGAR reports, which show that, for the first seven months of 2021, five of the ten prisons failed to meet the 85% benchmark at

1    least once in the first seven months of 2021. Ex. 1260.[103] Moreover, as Dr. Wilcox

2    explained, the 85% benchmark for this performance measure is medically indefensible

3    because "if a diagnostic test is medically necessary for a patient, then the results of that

4    test must be timely reviewed 100% of the time." Wilcox WT, Doc. 4138 ¶ 299.

5          Defendants provide no evidence to controvert Plaintiffs' evidence that, once results

6    are provided, providers fail to timely review and act on them. Defendants' practice of

7    failing to provide this critical follow-up harms patients and places them at substantial risk

8    of serious harm.

9                  **6.**    **Emergency Services**

10          Defendants assert that ADCRR facilities "have no issue accessing emergency

11    services, including 911 and emergent services." Doc. 4309 ¶ 924. Again, they cite in

12    support only Dr. Murray's trial testimony, which in turn references his written testimony.

13    *Id.* (citing Murray TT at 3463:10-17). Dr. Murray's written testimony makes clear that the

14    information that he has about how systems function at each prison is derived only from

15    interviews with staff (*see* Doc. 4206 ¶¶ 33-192); there is no indication that he relied on

16    any other sources for that information. He acknowledged that he did not validate the

17    information he received in these interviews. Murray TT at 3507:10-13.

18          Defendants claim that Plaintiffs have not offered any evidence in support of the

19    claim that Defendants have a policy and practice of failing to provide timely and

20    competent response to health care emergencies. Doc. 4309 ¶ 925. They are wrong.

21    Plaintiffs presented evidence that Defendants' emergency response system operates

22    poorly, including as documented in Defendants' mortality reviews. Wilcox WT,

23    Doc. 4138 ¶¶ 409-418. One review, for example, involved a patient with chest pain, where

24    video of the event:

25

26

27        [103] Performance Measure 46 required that "A Medical Provider will review the

28    diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison."

-162-

1
2
3

> suggests nurse saw [patient] and left him on the floor without performing evaluation. It is important to note here that policies and procedures were not followed during the time spent in the medical holding area for chest pain. There was n[] assessment or EKG done by nursing.

4   Ex. 275 at ADCM1575249. In other cases, medical and custody staff failed to timely call

5   911, and failed to timely notify providers regarding emergent situations. *See* Wilcox WT,

6   Doc. 4138 ¶¶ 410-414.

7        Plaintiffs also submitted evidence that Defendants' practice of placing people in

8   isolation units, without call buttons, with very limited visibility into cells, and with

9   insufficient staff supervision, places people at risk of serious harm in part because these

10  practices impede emergency response. *See* Doc. 4308 ¶¶ 206-219 (patients housed in

11  isolation cells, without call buttons, and with inadequate supervision are at risk of serious

12  harm because medical emergencies, suicide attempts and fights will not be detected

13  quickly enough to address them effectively). Plaintiffs also provide evidence of cases in

14  which emergency response was deficient, creating a risk of harm for the patients. *Id.* ¶ 358

15  n.63 (patient who died by suicide, Dr. Penn's reviewer wrote that "[o]f note, ambulance

16  team refused to go to [patient's] location 'due to their policy' and he was brought to

17  medical on a gurney"); ¶ 450 (failure to provide adequate emergency response for suicide

18  attempt); *id.* ¶¶ 575-578 (failure to provide adequate emergency response to psychiatric

19  emergency).

20            **7.    Electronic Health Records**

21        The parties agree that Defendants' electronic health record (EHR) system is

22  inadequate. *See* Ex. 2067 at 112:3 (Defendant Gann testifies eOMIS is "completely

23  inadequate"); Murray TT at 3459:2021 (eOMIS should be replaced because it has "lived

24  its useful life"); Wu Dep. at 50:13-24 (eOMIS makes access to records difficult for

25  clinicians).

26        Defendants claim that their pending RFP requires bidders to have a new EHR

27  system, and a new EHR system "will likely result in overall improved care." Doc. 4309

28  ¶¶ 926-927. They further state that they seek a new EMR system to facilitate "data-

-163-

mining" for quality assurance purposes. *Id.* ¶ 928. As noted above, this Court ordered that all fact discovery end on October 15, 2021, and speculation about the benefits of a future EHR that may be created by a future vendor is not relevant or properly before the Court.

### 8. Nursing Encounter Tools

Defendants next describe Nursing Encounter Tools ("NETs"), which are standardized forms for various health concerns that are intended to guide nurses in evaluating patients. *See* Doc. 4309 ¶¶ 929-934; *see* Jordan TT at 2639:17-2640:7. Defendants do not explain the relevance of the NETs, or how they relate to the adequacy of their healthcare system. Doc. 4309 ¶¶ 929-934. Nor can they.

As explained in Plaintiffs' proposed findings of fact (Doc. 4308 ¶ 617 n.114), ADCRR attempts to use Nursing Encounter Tools (NETs) to guide nurses in evaluating patients. Jordan TT at 2639:17-2640:7; Ex. 1305, Ch. 5, Sec. 1.5. It is important for nurses to pick the correct assessment tool for patient encounters because if they do not, a patient may not get the evaluation or treatment that is appropriate for their condition or illness. *Id.* at 2640:8-12. But the undisputed evidence is that nurses repeatedly failed to select the correct assessment tool. Wilcox WT, Doc. 4138 ¶¶ 76, 163-64 (basing his conclusion on review of "hundreds of individual healthcare encounter records"). For example, a 30-year-old patient reported a lump on his testicle. *Id.* ¶ 76. He was seen by an RN who improperly selected the musculoskeletal NET to guide her assessment, and as a result confined her review to the patient's "handgrips," "posture," and "gait," which had nothing to do with his testicle or genitourinary system. *Id.* The patient later died of testicular cancer. *Id.* Defendants' own audits also found that nurses failed to select the appropriate NET. *See* Part VII.B.1., *supra*.

### 9. Treatment of Chronic Conditions

The parties agree that chronic conditions are "medical conditions that generally need to be managed long term and do not have a defined cure" and that patients with these conditions may require more attention from healthcare staff and a greater number of face-to-face interactions. Doc. 4309 ¶¶ 936, 939. They also agree that the Medical Services

Technical Manual sets forth procedures for the treatment of some chronic conditions, and that they require the patient be followed by a provider, receive regular visits and lab work, renewed medications and appropriate specialty referrals. *Id.* ¶¶ 935, 937.

Defendants assert that "chronic care patients are tracked by the facility health administrator to ensure that these individuals are identified, their condition is described, and there is follow-up care. Doc. 4309 ¶ 938. However, the overwhelming evidence that Plaintiffs presented demonstrates that, to the extent chronic care patients do receive care, it is often poor quality and/or untimely. Doc. 4308 ¶¶ 671-678. Indeed, Defendants' own expert found that, in his study of patients with two or more chronic conditions, only about one in four chronic care patients received care that was timely and reflected good decision-making – over 70 percent of the patients he reviewed did ***not*** receive such care. Murray TT at 3481:8-13; 3546:15-3547:2.[104]

Dr. Murray's findings are consistent with those of Dr. Wilcox, who opined that the care provided to patients, particularly those with complex medical conditions, is often of poor quality. Wilcox WT, Doc. 4138 ¶ 219. Defendants provided no evidence to counter Dr. Wilcox's presentation of numerous cases of extremely poor care for patients with chronic conditions, some of whom suffered avoidable or possibly avoidable deaths. *Id.* ¶¶ 255-283. For example, a patient with hypertension, Type 2 diabetes, morbid obesity and hypothyroidism, whose provider failed to receive appropriate monitoring or specialty consults, died at age 42, of renal failure. *Id.* ¶¶ 255-261. His premature death might have

---

[104] This is obscured in Defendants' table entitled, Quality of Care Review for Chronic Disease Patients: Average for All Complexes. *See* Doc. 4309 ¶ 1081. The table blurs patients together and ignores the fact that Dr. Murray's team's record review revealed serious risk of harm in delivery of medical care provided to **two thirds of the randomly selected chronic care patients**. *See* Murray TT at 3548:18-23, 3541:12-15. And, as explained above (see Part II.C.1.a., *supra*), the scoring labels of "Good" (3), "Very Good" (4), and "Excellent" (5) are misleading; a score of "Good" includes poor care and indicates a serious risk of harm. *See* Murray TT at 3548:18-23, 3541:12-15. "Excellent" care—care that was "timely and reflected good decision-making" (Murray WT, Doc. 4206 ¶ 209)—should be the expectation and practice, not the aspiration. *See* Doc. 4309 ¶ 1082 (citing Dr. Murray's written testimony for the proposition that "[t]here was evidence of real motivation and effort to provide excellent care" and "more effort at good documentation).

-165-

1   been avoided had his provider not "utterly failed to manage his care in the last 18 months

2   of his life. . . ." *Id.* ¶ 261. Another patient died after just four months in prison, of an

3   intracranial hemorrhage, after his provider failed to provide him with necessary

4   medications for his uncontrolled hypertension. *Id.* ¶¶ 262-64. A 26-year-old woman died

5   two months after her arrival at prison, of an asthma exacerbation after her provider failed

6   to adequately and timely monitor her. *Id.* ¶¶ 266-68. An elderly man with coronary artery

7   disease, hypertension, kidney disease and superficial bladder cancers was poorly followed

8   and failed to receive necessary medications and diagnostic tests. When hospitalized, he

9   was diagnosed with multiple conditions including chronic kidney failure, sepsis,

10  malnutrition and multiple stomach ulcers, resulting in anemia—a competent physician

11  should have been able to avoid this health crisis. *Id.* ¶¶ 269-276. Dr. Wilcox also

12  identified cases of patients with hypertension whom Defendants have failed to adequately

13  follow. *Id.* ¶¶ 277-78. Additionally, as discussed further below, Defendants have for years

14  failed to adequately treat the thousands of people in prison who have hepatitis C, and their

15  current schedule for initiating such care results in inexcusable delays, placing thousands

16  of people at risk of serious harm. *Id.* ¶¶ 324-334.

17      Defendants assert that "[t]he quality of care provided to the chronic condition

18  inmate population is reflective of care in the system as a whole." Doc. 4309 ¶ 940.

19  Plaintiffs agree. As Dr. Wilcox has explained and the evidence demonstrates, chronic

20  patients, like all ADCRR patients, suffer harm and are at substantial risk of harm because

21  the healthcare provided is inadequate. Wilcox WT, Doc. 4138 ¶ 28.

22                      **10.    Hepatitis C**

23      The parties agree on the essential facts regarding treatment for hepatitis C in

24  ADCRR. First, hepatitis C is a viral infection that can cause serious liver damage.

25  Doc. 4308 ¶ 706; Phillips TT at 3636:16-18. It is a progressive disease: "80% of people

26  will develop chronic hepatitis C and can develop problems like liver cirrhosis and liver

27  cancer." Doc. 4309 ¶ 969; Doc. 4308 n.126. It is also transmissible: people who are not

28

1    treated can transmit the virus to others, regardless of how advanced their disease currently

2    is. Phillips TT at 3638:16-20; Doc. 4308 ¶ 706, n.126.

3        Second, there is a "highly effective" treatment available for hepatitis C. Doc. 4309

4    ¶ 971; Doc. 4308 ¶ 707. The treatment has a cure rate of at least 95%. Doc. 4308 ¶ 971;

5    Doc. 4308 ¶ 707. It has minimal, if any, side effects, can take as little as 12 weeks to

6    work, and recently became much more affordable. Phillips TT at 3639:13-21; Doc. 4309

7    ¶ 707.

8        Finally, a large number—approximately 8,000—of people incarcerated in ADCRR

9    have chronic hepatitis C infections. Doc. 4308 ¶ 704; Doc. 4309 ¶ 960. Yet fewer than

10   25% (1,800) of those with chronic hepatitis C infections are eligible for treatment under

11   ADCRR and Centurion's current policies. Doc. 4309 ¶ 963. Under Defendants' current

12   plan for hepatitis C treatment, it will take <u>twelve years</u> to treat the patients who are

13   currently identified as having chronic hepatitis C. Doc. 4308 ¶ 711.

14       Defendants provide no medical justification for this extreme delay. Instead,

15   Defendants offer the conclusory opinion of their own medical director, Dr. Phillips, who

16   opined that ADCRR's plan "represents best practices" and is "at the leading edge

17   compared to many other states." Doc. 4309 ¶¶ 976, 980. But, at trial, Dr. Phillips not only

18   failed to explain how ADCRR's program compares to other states, he testified that he

19   "do[es]n't know specific numbers about how our state compares to other states." Phillips

20   TT at 3678 at 18-19. And, critically, Dr. Phillips failed to provide a medical justification

21   for this delay in treatment—in fact he agreed that treatment for hepatitis C "reduces

22   mortality and morbidity <u>at all stages of the disease</u>." Phillips TT at 3639:22-24 (emphasis

23   added); *see also id*. at 3681:17-3682:3 (agreeing that the American College of

24   Correctional Physicians, of which Dr. Phillips is a member, found research has shown that

25   HCV treatment reduces morbidity and mortality at all stages of the disease).

26       The evidence plainly establishes that hepatitis C is a serious health condition, for

27   which there is a readily available, efficacious treatment that can reduce morbidity and

28

mortality. Defendants' plan to take twelve years to provide this treatment to those in ADCRR custody with active hepatitis C infections is unreasonable.

### 11. Medical Devices

Defendants state in their Findings of Fact that Plaintiffs presented no evidence on the failure to provide appropriate medical devices for patients. Doc. 4309 ¶ 1119. They are wrong. *See* Doc. 4308 ¶¶ 761-765; Wilcox WT, Doc. 4138 ¶¶ 424-441.

## VIII. SYSTEMIC DEFICIENCIES THAT AFFECT ALL HEALTH CARE

### A. The Evidence Overwhelmingly Shows That Inadequate Numbers and Types of Health Care Staff Put All Class Members at Substantial Risk of Serious Harm.

#### 1. Defendants fail to rebut substantial evidence of inadequate medical care staffing.

Plaintiffs' proposed findings of fact demonstrate inadequate medical staffing at all levels, including nurse supervisors and physicians, and extensive use of overtime and agency staff to fill vacancies. This results in serious deficiencies in the medical care delivery system and poorly supervised nurses and mid-level providers acting outside the scope of their licenses and expertise. *See* Doc. 4308 ¶¶ 863-84, 908-41. The consequences are seen in Defendants' own audits, which show, for example, failure to timely review lab results, review imaging reports and specialty consult reports, and incorporate hospital records into a patient's care plan. *See id.* ¶¶ 878-81; Ex. 1259; Ex. 1260; Ex. 1265. Defendant Gann also testified about unsafe corner-cutting that can and has resulted from inadequate medical staffing in the state prison system. *See* Doc. 4308 ¶¶ 882-83.

Defendants' proposed findings of fact ignore these undisputed facts. Defendants instead ask the Court to find that they have fulfilled all constitutional obligations simply because (a) they made some efforts to improve Centurion's compliance with the staffing requirements set out in their contract, and (b) NCCHC auditors reviewed Defendants' staffing plan. As explained below, neither argument has merit. The contract staffing levels are not based on a current staffing needs and instead appear to be a vestige of an old 2013 contract. And Defendants offer nothing to contradict overwhelming evidence that

-168-

insufficient staffing continues to place patients at substantial risk of serious harm. That is why the Court should order that "an independent person or entity . . . conduct a staffing analysis of both clinical and custody positions at each prison." Doc. 4308-1 ¶ 4 (Proposed Permanent Injunction).

> **(a)** **The staffing levels set forth in Defendants' contract with Centurion are not based on a current staffing analysis.**

Defendants first contend that their medical staffing is adequate because "Centurion is providing over 90% of the hours that are mandated by the contract." Doc. 4309 ¶ 1049; *see also id.* ¶ 1019 ("The current allocated level of staffing that exists in the State of Arizona is 1,052 full time equivalents (FTEs)."). But no one who testified at trial could articulate the basis of the current contract staffing levels. Doc. 4308 ¶ 910. In fact, Defendant Gann believed that the 1,052 FTE requirement under the contract dated as far back as the 2013 contract with another private healthcare corporation. *Id.*

Notably, although Defendants list the many factors that they believe should be evaluated to develop a staffing plan, they do not (because they cannot) say that their current contract staffing levels are the result of such an analysis. Doc. 4309 ¶¶ 1059-79 (stating that "[c]reating a staffing plan is very complicated" and requires consideration of "logistical barriers," "characteristics of a facility," "characteristics of the inmate population," and statistical analyses, including "how many labs were drawn in the last three years and how the medication process is currently being delivered"); *see* Doc. 4308 ¶ 915 (citing Gann TT at 2392:8-15).[105]

---

[105] Plaintiffs disagree, as explained previously, with Defendants' continued attempt to tether staffing levels to artificially low health care utilization data. *See* Doc. 4309 ¶¶ 1062, 1067; Part II.B.5., above ("A key problem in relying upon this utilization data is that it shows only the total number of encounters or services that the currently inadequate supply of health care personnel could actually accomplish during their shifts. Due to the documented and systemic staffing vacancies, ADCRR's utilization data does not reflect the true need for services that patients require."). And Defendants' sweeping assertion that "[a] typical LPN nurse can pass meds to just over 300 people in one med pass" (Doc. 4309 ¶ 1064) is exactly the kind of overbroad statement that ignores the very factors Defendants contend should be considered, including unit characteristics (such as whether a unit is maximum custody), and population needs (such as the medication needs of the

1    Defendants' failure to develop and implement a staffing plan at any time since
2    2013 is itself evidence of deliberate indifference. The Court has explained since at least
3    2017 that "hiring sufficient staff" is "a viable solution that Defendants can (and probably
4    should) implement on their own." Doc. 1917 at 3.[106] And, in 2019, the Court's expert Dr.
5    Stern recommended that Defendants "conduct a staffing analysis and then implement
6    staffing changes accordingly." Ex. 1860 at 98 (Recommendation 52); *see also* Doc. 3495
7    at 20-21 (directing Defendants to explain whether they will comply with that
8    recommendation). Indeed, "[i]n the Class Certification Order, the Court identified
9    evidence regarding longstanding staffing deficiencies," and "the Stipulation was intended
10   to address these, and other, deficiencies." Doc. 3921 at 30 (citing Doc. 372 (2013)).
11   Thereafter, the Court repeatedly identified staffing as a barrier to compliance. *See, e.g.*,
12   Doc. 3057 at 4 (2018) ("the failure to meaningfully comply with the Stipulation was
13   ultimately a matter of staffing"); Doc. 3635 at 3 (2020) ("Critical staffing shortages . . .
14   impede Defendants' ability to perform these obligations under the Stipulation."); Doc.
15   3921 at 23 (2021) ("[S]taffing shortages are nothing new; it has been the Achilles' heel of
16   the entire duration of the Stipulation."). Defendant Gann's self-serving testimony to the
17   contrary is simply not credible, and Defendants' proposed finding of fact based on it
18   should be discounted. *See* Doc. 4309 ¶ 1043 ("Insufficient staffing has not been a barrier
19   to being compliant with the requirements in the *Parsons* contract.") (citing Gann TT at
20   2366:18-23).

21   The main evidence Defendants offer now to suggest that their contract's staffing
22   levels are sufficient comes in the form of inadmissible hearsay—what "Centurion

23

24   ———————————
     patients housed in a unit). This Court need not enumerate the factors and predicate
25   workload assumptions that should be incorporated into a staffing analysis, and instead
     should appoint an independent person or entity to determine how best to conduct such an
26   analysis and develop a methodology.
27   [106] At that time, the Court incorrectly believed it could not order Defendants to do
     so under the Stipulation. The Ninth Circuit subsequently ruled that the Court did have
     authority to order Defendants to develop a general staffing plan. *Parsons v. Ryan*, 912
28   F.3d 486, 498 (9th Cir. 2018).

management teams" reportedly told Defendants' expert in interviews in preparation for trial. Doc. 4309 ¶¶ 1015-16 (citing written and oral testimony of Dr. Murray); *see also* Part II.C.1.a., *supra* (discussing inadequacy of Dr. Murray's methodology, including failure to verify what Centurion staff told him); *Matter of James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992) ("[I]t is improper to use an expert witness as a screen against cross-examination."). Even then, the declarants apparently conditioned their statement on having "vacancies filled," "a better [electronic health record]," and undefined "relief from how these performance measures are being evaluated." Murray TT at 3466:11-15; *see also* Doc. 4308 ¶¶ 874-77. Those vague, out-of-court statements certainly cannot outweigh overwhelming evidence of inadequate medical staffing, including the comprehensive reviews of Dr. Wilcox and Mr. Joy. *See* Doc. 4308 ¶¶ 863-84, 908-41.

Defendants also suggest that their contract staffing levels are sufficient because "Centurion has been compliant with contract requirements at an average of 93% of the total performance measures since they took over the contract." Doc. 4309 ¶ 1044. But this Court already rejected that argument as "a sad illusion"; in fact, it was one of the reasons the Court set the case for trial:

> Defendants' final argument is their overall theory of compliance. They view the health care performance measures in the aggregate (103 x 10 facilities) and maintain that their overall compliance during 2020 ranged between 77.78% and 94.12%. This is a sad illusion. The performance measures that have been and remain noncompliant over the past six years involve some of the most fundamental and critical aspects of health care that formed the basis of this lawsuit in 2012, of which Defendants are very aware.

Doc. 3921 at 24.

The Stipulation's performance measures also have proven to be incomplete and inadequate measures of performance of the medical care delivery system.[107] *See, e.g.,*

---

[107] This is not a new issue. Defendants have been on notice of it since Dr. Stern filed his report and recommendations in 2019. *See* Ex. 1860 at 113 (noting that "report addresses potentially problematic aspects of care delivered at ADC that are not measured by the existing 103 PMs"). Indeed, Dr. Stern specifically identified a number of core medical issues that were not captured by the Stipulation's performance measures—the

Wilcox WT, Doc. 4138 ¶¶ 11-17 (noting that most of the Stipulation's performance measures "were 'extrinsic' measures that measured whether a task was completed or timely," and not "whether a task was completed appropriately"); *id.* ¶¶ 129-31 (discussing failure of performance measures to assess adequacy of the mortality review process); *id.* ¶ 365 n.25 (noting that "[t]he Stipulation did not include qualitative review of the specialty care process and did not evaluate whether providers appropriately sought specialty consults or whether Utilization Management properly reviewed and authorized those requests").

Moreover, the Stipulation's 85% target for certain performance measures was unacceptably low from a medical standpoint, such that "compliance" could still result in

---

very issues that Dr. Wilcox testified at trial continue to place patients at unacceptable risk of harm. *See, e.g.*, *id.* at 113-14 (noting that RN responsibility to "independently manage a broad spectrum of health conditions which are ordinarily managed by providers in the community" is not covered by existing performance measures); *id.* at 115 ("[T]here is no PM that examines whether clinical notes by nurses are complete and comprehensible."); *id.* at 116 ("Some PMs measure whether, and how timely, providers conduct some of these activities, but none measure the quality of the care the provider delivers during the activity."); *id.* at 118 (discussing insufficiencies with PM 54 and PM 55 to manage chronic care conditions); *id.* at 125 ("There is no PM that assesses whether patients who require SUD treatment are offered or provided such treatment."); *id.* ("There are other components to an emergency response including the subsequent care provided by medical staff, joint care provided by medical and custody staff, coordination of the care with community resources, and, as with all other health care, documentation of the event . . . neither PM 25 nor any other PM would accurately reflect the adequacy of these other components."); *id.* at 126-27 ("No PM addresses the need for a provider's initial and immediate involvement in the admission process to instruct nurses on necessary monitoring and/or treatment."); *id.* at 127 ("Safe patient care requires not only that tasks be done on time, but also that they be done competently. No PM currently assesses the adequacy of medical decision making by providers while patients are in the IPC."); *id.* at 128 ("While the timeliness of the steps in the decision/reporting process is an important dimension of care, the appropriateness of the underlying approval/denial decision is even more critical to patient safety and is not currently measured by any of the PMs [48, 49, 50, and 51]."); *id.* at 129 ("[T]here is currently no PM that measures the appropriateness of acceptance of denials by requesting providers or their follow through with the recommendations stated in ATPs."); *id.* at 131 ("No PM addresses a major component of medication delivery: the administration of deployed medications to the patient at each prescribed dosing (unless the patient refuses or no-shows)."); *id.* at 133 ("While these PMs [30, 31, and 32] address the need for MR activities to be completed and completed within a certain timeframe, they are silent with regard to the adequacy of the MR process.").

-172-

dangerously poor care. *See, e.g.*, Wilcox WT, Doc. 4138 ¶ 299 (testifying that Stipulation's standard for substantial noncompliance of 85% for timely review of diagnostic test results is not medically defensible); *id.* ¶ 363 (testifying that 85% standard for timely renewal of chronic care and psychotropic medication is unacceptably low). Indeed, even Defendant Shinn recognized the need to reach full (100%) compliance. *See* Shinn TT at 2176:16-24 (testifying that he has "asked from the very beginning to be 100 percent in every one of [the Stipulation's performance measures] at every location" and that "it is my desire and my ask of our partner [Centurion] to be at 100 percent at every location every day").

The remainder of Defendants' proposed findings of fact related to medical staffing cannot withstand even minimal scrutiny. First, Defendants ask the Court to find that "ADCRR relies on Centurion to tell it how many health care staff are needed." Doc. 4309 ¶ 1035 (citing Gann TT at 2361:9-19). To the extent Defendants are suggesting that Centurion, and not ADCRR, is responsible for identifying the number and type of medical staff needed, they are wrong on the law and the facts. "Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody." *West v. Atkins*, 487 U.S. 42, 56 (1988). Centurion does not have its own health care staffing model for ADCRR and had to agree to ADCRR's contract staffing levels to participate in the RFP process. Dolan TT at 3596:7-23. And Defendants rejected Centurion's request to increase staffing levels following Centurion's independent evaluation of health care staffing needs shortly after assuming the contract, including a request for additional medical staff at ASPC-Yuma based on significant patient population increases. Doc. 4308 ¶¶ 912-15.

Second, Defendants discuss a $15 million contract amendment, a portion of which is meant "to help Centurion get fully staffed." *See* Doc. 4309 ¶¶ 1014, 1022-29, 1034, 1050-1053. But Defendant Gann testified that the "majority" of $8 million of those funds was designated as bonuses for Centurion's compliance with the Stipulation's performance measures. Gann TT at 2409:19-2410:2. Only $7 million was "earmarked for sign-on

-173-

1    bonuses to help ADCRR Centurion healthcare workers get fully staffed." *Id.* at 2308:12-

2    2311:7. That, in turn, goes only to meeting preexisting contract staffing levels, which, as

3    noted above, were not based on current staffing needs and do not set the constitutional

4    floor.[108] In any event, Defendant Gann testified that none of those funds in fact have been

5    distributed because Centurion had not submitted any "accurate invoice[s]" as of the date

6    of trial. *Id.* at 2308:12-2311:7; *id.* at 2410:11-17.[109]

7         Moreover, Defendants nowhere explain whether or how these modest efforts will

8    be sufficient to address recruitment and retention challenges. *See* Doc. 4309 ¶ 1013 ("The

9    availability of nursing staff is currently challenging in both corrections and free world

10   settings."); *id.* ¶ 1057 (noting recent "nurse line cancellations at the Tucson facility").

11   Defendants' proposed finding that "Centurion is currently paying their nurses a

12   comparable salary to other nurses within the community" similarly lacks necessary

13   context. *Id.* ¶ 1042. It is undisputed that "[r]ecruiting of nurses is a nationwide problem,"

14   that nurses would make more in places like Texas and California, and that Defendants

15   have not asked Centurion to ensure its salaries remain competitive on a nationwide basis.

16   *See id.* ¶ 1037; Gann TT at 2365:7-22 ("Q. My question was whether you had asked

17   Centurion to pay its permanent nurses as much as what they could make in Texas or

18   California. Yes or no? A. That's a no. That's their business.").

19        Third, Defendants list temporary, stop-gap measures, including "use of overtime,

20   nursing agency staff," and staffing "the nurse line with providers instead of registered

21   nurses." Doc. 4309 ¶¶ 1014, 1038-41, 1058. But those, of course, are not long-term

22

23        [108] Defendants' proposed findings of fact related to tracking compliance with
24   contract staffing requirements are irrelevant for the same reason. *See* Doc. 4309 ¶¶ 1030-
     33, 1046-48. So, too, is the proposed finding that "Centurion is not having difficulty
25   recruiting physicians." Doc. 4309 ¶ 1036. The concern is that there are far too few
     physicians within the prison system, which instead relies too heavily on mid-level
26   providers. *See* Doc. 4308 ¶¶ 636, 649, 802, 867-68.
          [109] In addition, Defendant Gann testified that the technician Defendants had asked
27   for to process phone calls from patients' loved ones had not yet been hired, and there was
     no deadline for Centurion to fill the position. Gann TT at 2404:21-2405:9; *see* Doc. 4309
28   ¶¶ 1050-51.

1   solutions, as Defendants elsewhere acknowledge. *Id.* ¶ 1033 (recognizing that "less

2   reliance on registry nursing" will result "in more effective ownership of job duties"); *see*

3   *also* Doc. 4308 ¶ 877 ("Use of overtime can lead to low morale, mistakes, and

4   resignations.") (citing, *inter alia*, Murray TT at 3515:17-3516:2 and Gann TT at 2368:22-

5   2371:6, 2374:9-2377:21).

6       Fourth, Defendants ask the Court to find that "patients at Florence will be sent to a

7   2,706-bed private facility" and that as a result, "ADCRR and Centurion will be

8   reallocating 122 staff positions to different facilities throughout the State." Doc. 4309

9   ¶¶ 1020-21 (citing Gann TT at 2295:7-22). But it is not at all clear how these positions

10  will be distributed, much less whether they will effectively remedy the many

11  constitutional violations that exist throughout the state. *See* Gann TT at 2295:18-22,

12  2296:6-18 (testifying only that the 122 staff members include clinical, administrative, and

13  other positions, and are needed "to shore up some problems"). In addition, the record does

14  not support Defendants' proposed findings. Defendant Gann testified only that a process

15  was in place "**to try to** house those patients privately." Gann TT at 2295:11-14 (emphasis

16  added); *see also id.* at 2295:18-22 ("a lot of those patients will go to a private prison and

17  in other modules throughout the state"). In any event, to the extent there are, in the future,

18  patient and staff movement related to the planned closure of ASPC-Florence, that

19  information can be taken into account by an independent staffing expert in developing a

20  staffing plan.

21      Fifth, Defendants ask the Court to find that "ADCRR's ratio of providers to

22  patients is approximately 1 to 750, which is in line with the Texas system." Doc. 4309

23  ¶ 1017 (citing Murray TT at 3495:11-16). It is not clear what the relevance of this

24  proposed finding is, without an understanding of, for example, the adequacy of the Texas

25  correctional health care system, the number of mid-level providers and physicians, and

26  supervision policies. *See* Joy WT, Doc. 4099-1 at 86 ("ADCRR uses APPs [Advanced

27  Practice Providers] at rate nearly 13 times greater than the national ratio of physicians to

28  APPs, both overall and in primary care specifically. The overall ADCRR APP to

-175-

1  physician ratio compared to community practices in Arizona data is nearly 20 times

2  higher than expected.").

3

4          **(b)    NCCHC findings related to medical staffing were not
              admitted at trial and, in any event, there is no evidence
5              that NCCHC's "simplistic" review of staffing is reliable
              and outweighs substantial contrary evidence.**

6          Defendants also ask the Court to find that their medical staffing is adequate

7  because the NCCHC purportedly has reviewed and approved their staffing plans. Doc.

8  4309 ¶ 1012; *see also id.* ¶¶ 163-64. But, again, the NCCHC reports relied on by

9  Defendants were not admitted for this purpose. Instead, the NCCHC reports were

10 admitted only on a limited basis, under Rule 703, to explain the basis of Dr. Penn's

11 testimony **regarding mental health care**. *See* Part IV.B., *supra*. (Defendants' medical

12 expert Dr. Murray did not discuss NCCHC reports.) Defendants also cite the testimony of

13 Plaintiffs' medical expert, Dr. Wilcox. Doc. 4309 ¶ 1012. But Dr. Wilcox did not testify

14 that the NCCHC approved ADCRR's staffing plans for medical care; indeed, he expressly

15 disclaimed any knowledge of NCCHC's findings. *See* Wilcox TT at 1774:20-23 ("Q. But

16 as you sit here today, you don't know whether or not they passed the staffing analysis

17 with respect to the particular accreditation, do you? A. I do not."). Defendants therefore

18 offered no admissible evidence to demonstrate that the NCCHC has approved ADCRR's

19 staffing plans for **medical staff**.

20         Even if the NCCHC reports had been admitted for a broader purpose (which they

21 were not), there is no evidence that any findings about staffing are reliable. Indeed,

22 Defendants' own mental health expert described the NCCHC staffing standard as

23 "simplistic." Penn TT at 2975:9-17. And Dr. Wilcox testified that the "NCCHC does not

24 even have any type of quantitative model or any metrics against which to render an

25 opinion about the adequacy of staffing." Wilcox TT at 1965:23-1966:1. Even Defendants'

26 own employees agreed that the NCCHC does "not dictate specific staffing ratios," and

27 provided little detail on what an NCCHC review entails. *See* Phillips TT at 2926:12-

28 2927:18 (testifying that NCCHC auditors "look at staffing plans" and "talk to staff and

-176-

1   ask them if staffing is adequate"); Gann TT at 2301:6-19 (testifying that the NCCHC

2   "won't particularly give . . . a staffing ratio," and stating only that "it's very important to

3   actually look at the workload"). The NCCHC reports therefore cannot outweigh ample

4   testimony of inadequate staffing levels from a variety of other reliable sources.

### 2.    The evidence shows longstanding and chronic shortages of mental health staff.

7       Plaintiffs' Proposed Findings of Fact presented the abundant evidence showing that

8   Defendants' pervasive and longstanding failure to have adequate numbers of mental

9   health care staff, or the appropriate mix of the types of staff, is a root cause of the failure

10  to provide minimally adequate health care services. Doc. 4308 ¶¶ 392-406, 410-413, 415-

11  418, 422, 425-426, 438-439, 442-449, 506-507.[110]

12      Defendants cite Dr. Penn's unsupported assertion that that "there is no national

13  requirement or guideline for recommended staffing in jails or prisons." Doc. 4309 ¶ 1225

14  (citing Doc. 4174 ¶ 65); *see also* Doc. 4309 ¶ 1243 ("[A]ccording to Dr. Penn there is no

15  established or empirically validated correctional staffing plan, staffing ratios[,] or

16  recommendations for mental health and psychiatric staff within correctional settings.")

17  (citing Doc. 4174 ¶ 78). However, this is contradicted by a publication that Dr. Penn

18  himself co-authored. *See* Doc. 4172-1 at 12 (publication #21, listing himself as co-author).

19  On cross-examination, Dr. Penn admitted that the American Psychiatric Association's

20  publication *Psychiatric Services in Correctional Facilities* (3rd Ed. 2015), recommends

21  one FTE psychiatrist for every 150 to 200 general population SMI prisoners receiving

22  psychotropic medication, and one FTE psychiatrist for every 50 patients in residential

23  treatment units. Dr. Penn admitted that he lists this volume on his CV as a publication he

24  coauthored, proudly describing it as "a major contribution to the literature." Ex. 2190;

---

[110] The evidence also shows that shortages in custody staff cause a failure to provide basic mental health services. Doc. 4308 ¶¶ 156-163, 166-170, 449-451, 457-458, 460. And in detention units there are no mental health group services offered to anyone in those units, including people classified as SMI. *Id.* ¶ 462.

Penn TT at 3148:12-17, 3149:21-3150:10, 3266:9-3267:23, 3269:6-9, 3272:5-3273:1. The evidence shows that ADCRR falls far short of these recommendations.

Defendants cite solely to Dr. Penn's written testimony for their assertion that the level of mental health staff "continuously increased (and nearly doubled) since health care was privatized in 2012." Doc. 4309 ¶ 1234 (citing Doc. 4174 ¶ 71). But this is false. On cross-examination, he was questioned about the assertions in paragraph 71 of his report and the three charts that purport to show mental health staffing numbers for 2012, July 2016, and July 2021. Penn TT at 3156:25-3157:21, 3161:4-5. He admitted that he did not create the charts, nor did he know who made them: "I don't know if it was ADCRR or Struck Love Law Firm, but one of those two probably did." *Id*. at 3157:7-8; *see also id*. at 3160:6-7. He also said that he didn't know if the numbers in the chart (which Defendants repeat verbatim in their proposed Findings of Fact) actually represent the number of positions called for by the contract, or the number of Centurion staff actually filling those positions. *Id*. at 3157:14-21, 3161:4-5. Dr. Penn also admitted that he did not analyze the amount of overtime used by Centurion, or the percentage of staff time that is being filled with agency temps or locums tenens. Penn TT at 3161:6-12.

Defendants assert that Tom Dolan of Centurion "has made a concerted effort to recruit, retain, and competitively compensate mental health staff," Doc. 4309 ¶ 1237, but inexplicably cite to Dr. Penn's written testimony. (Doc. 4174 ¶ 73). This double hearsay is impermissible, and ignores the fact that Mr. Dolan was repeatedly notified by ADCRR and Centurion mental health leadership that there were insufficient numbers of health care staff. *See* Doc. 4308 ¶¶ 892, 898-899. Mr. Dolan testified that Centurion spends about $300,000 per year recruiting all levels and types of health care staff—which is about one-tenth of one percent of its $216 million contract with ADCRR. *Id*. ¶ 918.[111]

---

[111] Centurion's national vice president for behavioral health services, Dr. John Wilson, admitted that the deficiencies in care that were documented in a mortality review and psychological autopsy of a patient who died by suicide in April 2021 (Exs. 403, 404)—no suicide risk assessment, no crisis treatment plan developed, no indication that safety was reliably reestablished prior to discontinuing suicide watch, and no indication that a

Moreover, Defendant Gann testified that ADCRR and Centurion's "solution" to the problem of chronic shortages of psychologists is to convert those psychologist positions to lower-level psych associate positions. Doc. 4308 ¶ 1015. But, as Defendant Gann admitted, psych associates have a narrower scope of practice than psychologists, and do not have to be licensed. *Id*.

Defendants did not contest the evidence before the Court showing that the most recent health care staffing data in evidence (August 2021) showed only 74 percent (153.43 of 206.0 FTE) of mental health positions were filled. Doc. 4308 ¶ 396. Defendants assert that Dr. Penn "was impressed that 88% of the counseling staff who provide counseling services at ADCRR are licensed." Doc. 4309 ¶ 1270 (citing Doc. 4174 ¶ 98). But Dr. Penn's report cites no source for this statistic. Doc. 4174 ¶ 98. Moreover, it's false: Defendants' own document dated August 31, 2021 listing all Centurion mental health staff and their licensure status (Ex. 1528) showed that as of that date, there are 14 psych associates who are listed as not being licensed, including four at Eyman, two at Florence, three at Lewis, one at Perryville, two at Phoenix, and two at Yuma. Ex. 1528 at ADRR00046154-57. When compared to Defendants' August 2021 staffing and vacancy report, (Ex. 2167) it showed that 50% of the eight filled psych associate positions at Eyman were unlicensed, 100% of the two filled positions at Florence were unlicensed, and between a quarter and third of the psych associates at Phoenix and Lewis are unlicensed. Doc. 4308 ¶¶ 396-397.[112]

---

multidisciplinary consultation was held prior to discontinuing watch—could all be caused or affected by a shortage of mental health staff. Doc. 4308 ¶ 427.

[112] Defendants assert at paragraph 1272 that "Behavior Health Technicians ("BHT") assist with scheduling and conduct "health and welfare" checks in maximum custody units. (R.T. 11/17/21 a.m. at 2462:12- 22.) The purpose of a "health and welfare" check is to establish a rapport with the patients, offer them mental health services, and report any differences or concerns back to the mental health team so that action can be taken. (R.T. 11/17/21 a.m. at 2462:12-22.)." However, the cited testimony does not support these statements. There is no mention in the cited testimony of "health and welfare" checks.

Defendants' conclusory assertion—that yet again simply copies and pastes Dr. Penn's written testimony (which lacked any underlying citations or support) rather than any other evidence—is that "while Dr. Stewart criticizes staffing, he fails to tie any of the individual files highlighted in his report to understaffing or explain how staffing deficiencies caused the alleged risks of harm he cites." Doc. 4309 ¶ 1250, citing Doc. 4174 ¶ 84. Defendants' unsupported statement is utterly false. In reality, Dr. Stewart's written testimony exhaustively details the numerous mentally ill class members who were placed at substantial risk of harm, or who suffered actual harm—including psychological anguish, self-mutilation, and death by suicide—due to inadequate mental health care that could be traced to lack of staffing. *See* Stewart WT, Doc. 4109 ¶¶ 34-77 ("ADCRR's Chronic Lack of Staffing Leads to an Inability to Provide Adequate Mental Health Care") and evidence cited therein (detailing dozens of class members, including numerous deaths by suicide and persons causing serious bodily injury to themselves (including repeated opening of abdominal cavities, cutting their own throat, serious suicide attempts); where lack of mental health staffing resulted in widespread cancellations of or delays in individual and group mental health care; delayed access to intensive mental health care; and brief and superficial contacts with mental health staff).

Defendants assert that Dr. Stallcup "did not have concerns regarding staffing levels at the facilities" that incarcerate people on the mental health caseload based on comparing a "Level of Care report" (Ex. 3326) with monthly staffing reports. Doc. 4309 ¶ 1253. This is an incomplete and misleading account of her testimony. Defendants' Exhibit 3326 purported to show the number of patients with mental health needs, the number of mental health staff, and patient-to-staff ratios ("average caseload"), for each of the ten prison facilities. But on cross-examination, Dr. Stallcup testified that the mental health staff numbers set forth in Defendants' Exhibit 3326 are those required by the Centurion contract, *and do not reflect the number of Centurion mental health staff actually providing services at the prison each month*. Stallcup TT at 2531:6-13. For example, Exhibit 3326 assumes 18 mental health staff at Eyman as of September 20, 2021, but as of August 2021

there were only 11 (Stallcup TT at 2531:15-2532:11; Ex. 2167; Ex. 3326).[113] Similarly, Exhibit 3326 assumes 15 mental health staff at Phoenix, while as of August 2021 there were 11.5 (Stallcup TT at 2532:13-22; Ex. 2167; Ex. 3326). The corresponding numbers for Tucson are 24 mental health staff set forth in Exhibit 3326, and 15.9 actually providing services as of August 2021. Stallcup TT at 2532:23-2533:9; Ex. 2167; Ex. 3326. If Exhibit 3326 used the number of Centurion staff actually providing services, rather than the number called for in the contract, the average caseloads calculated would be higher than those set forth in Ex. 3326. Stallcup TT at 2533:10-14.

During her trial testimony on November 17, 2021, Dr. Stallcup was impeached with her deposition testimony on October 15, 2021, that she *was* at that time concerned about mental health staffing vacancies. Stallcup TT at 2526:11-2528:17. Indeed, Dr. Stallcup testified at trial that, repeatedly throughout 2020 and 2021, she expressed concern about mental health staffing. *See* Doc. 4308 ¶¶ 894-900. She did not explain her sudden change of position on the eve of trial.[114]

### B.   Defendants' Reliance Upon the Purported Mortality Rates in Arizona Prisons Is Misplaced.

Defendants assert that a purported "decline in mortality rate and favorable performance in relation to other state corrections departments is objective evidence of an effective healthcare delivery system that provides timely access to necessary, routine, urgent, emergent, and specialty care to ADCRR inmates systemwide." Doc. 4309 ¶ 882.

---

[113] Dr. Stallcup testified that the "mental health staff" listed in Ex. 3326 includes psychologists and psych associates. Stallcup TT at 2530:3-7.

[114] The August 2021 staffing reports were the most recent ones provided by Defendants and those reviewed at Dr. Stallcup's deposition and testimony. And according to other evidence, in September 2021, mental health staffing levels had actually gotten worse. For example, the number of vacant psych associate positions at Eyman had grown to seven (in other words, only six of the 13 FTE positions were filled). Ex. 907 at ADCRR00210847 (Sept. 28, 2021 Eyman CQI minutes). At that point, there was a backlog of 132 uncompleted mental health psych encounters. *Id*. at ADCRR00210848. *See also* Ex. 847 at ADCRR00136579 (Aug. 12, 2021 Eyman CQI minutes) (mental health psych associate backlog of 366 patients past due); *id*. at ADCRR00136590 ("Eyman has reported a back log as we continue to have Psych associate vacancies.").

To make this argument, Defendants rely on "[m]ortality rates per 100,000 prisoners" in 2015-18 and 2019, as set forth in U.S. Bureau of Justice Statistics ("BJS") reports. *Id.* ¶¶ 866-881. Defendants also argue that Arizona's suicide rate for 2015-2019 that the State reported to BJS is low, *id.* ¶ 1484, and rely upon Dr. Penn's "opinion" that Arizona's suicide "numbers are flatlined—it has not had an increase in any suicides, at least over the last 2-3 years." *Id.* ¶ 1485; *see also id.* ¶¶ 1489-1498.[115]

Defendants' reliance on these outdated statistics is misplaced. As an initial matter, and as Defendants concede, the 2019 data appear only in a BJS report that was released "[a]fter trial commenced" and that Defendants did not offer as an exhibit at any time during trial, or during post-trial briefing on the admissibility of evidence. *See* Doc. 4309 ¶ 877; Doc. 4220 at 1. For that reason alone, Paragraphs 877-881 of Defendants' proposed findings of fact relying exclusively on the undisclosed data not before the Court as evidence should be discounted.

Moreover, the number that Defendants represent to be "ADCRR's mortality rate" is not, in fact, the mortality rate in the ten state-run prisons incarcerating class members at issue in this case, but instead is aggregated data from those prisons **and** "private state facilities." *See* Ex. 4453 at ADCRR00138222, Table 13, note b; U.S. Dep't of Justice, Mortality in State and Federal Prisons, 2001-2019 – Statistical Tables 22-23, Table 15, note b, https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf (Dec. 2021); *see also* Ex. 4453 at ADCRR00138229 ("For state prisons responding to the survey, prisoners in physical custody include those held in any private prison facility under contract to the responding states' DOCs or in any of their state-operated facilities, such as halfway houses, prison

---

[115] Dr. Penn's "opinion" about more recent years' suicide rates is not based on Defendants' own data. ADCRR's own report shows that in Fiscal Year 2021 (July 1, 2020-June 30, 2021), the department had the highest number of suicides since FY 2011, when the prison population was much higher. Doc. 4308 ¶ 553. The ten suicides in FY 2021, with a total prison population (including non-class members incarcerated at private prisons) of 36,569, yields a suicide rate of 27.3 per 100,000 incarcerated people, which is substantially higher than the 2015-19 national average suicide rate in state prisons, of 22 per 100,000. *Id.* ¶ 554.

camps or farms, training or treatment centers ,and prison hospitals.").[116] Defendants' self-reported suicide data also includes in the denominator people in the ten ADCRR prisons as well as the contracted for-profit prisons. Doc. 4308 ¶ 553; Ex. 2148 at 4 ("Includes ADCRR and Contract Beds").

In any event, the three-judge court in *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. Cal./N.D. Cal. 2009), rejected this same argument over a decade ago, noting that statistics for average mortality rates per 100,000 state prisoners "failed to control for demographics of each state's inmate population; the statistics are therefore of limited value in comparing states." *Id.* at 942. The same is true here. Beyond simply reciting select aggregated data, Defendants' experts provided no analysis of the data, no explanation for its relevance or the weight it should be given, and no evaluation of the adequacy of the medical care delivery systems of other states that the Arizona mortality rate is being compared to.

Dr. Murray devoted just two sentences of his testimony to this topic, stating only that between 2015 and 2018, the Arizona mortality rate "compares favorably to the other states with the largest prison populations." Murray WT, Doc. 4206 ¶ 1041. In fact, Arizona had a **higher** mortality rate than four of the nine states Dr. Murray compared it with (Georgia, Ohio, New York, and Illinois). *Id.* In any event, it is not clear what weight Dr. Murray believes the mortality rate should be given and what conclusions can be drawn from such superficial comparisons absent an understanding of the demographics of each state's prison population and the adequacy of their correctional healthcare system.

---

[116] As noted *supra* Part V.B., Defendants similarly provided data to researchers purporting to include the number of people incarcerated in restricted housing, but contrary to the instructions of the surveyors collecting the data, included the thousands of people incarcerated in private prisons (where there are no isolation units), thus making their rate of isolation almost half of what it would be when looking solely at the ten ADCRR prisons that are defined to be part of this class action. And Defendants here failed to acknowledge that pursuant to the contracts with the private prison companies, persons with serious medical or mental health conditions are not sent to the private prisons.

With regard to Defendants' assertions about suicide rates, they regurgitate the dubious and unsupported assertions of their expert Dr. Penn. Doc. 4309 ¶¶ 1481-1498. They repeat Dr. Penn's nonsensical position that reporting the number of suicides in a fiscal year versus a calendar year is "confusing" and "misleading," *id*. ¶ 1490, without acknowledging that these deaths still exist regardless of which twelve-month period is used. And Dr. Penn conceded in cross examination that the suicide rate was "an indicator," and emphasized that it was not "a litmus test" and that he would not make conclusions about quality of care based on it alone. *See* Penn TT at 3053:21-3054:3.

Simply put, the overbroad and opaque mortality rate is too blunt a metric for an Eighth Amendment inquiry, which examines whether "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (citation omitted); *see also Farmer*, 511 U.S. at 828, 837 (holding that Eighth Amendment analysis focuses on deliberate indifference to a "substantial *risk* of serious harm") (emphasis added); Doc. 4308 ¶¶ 1047-055 (setting forth legal standard).

As set forth in Plaintiffs' Findings of Fact, the record contains overwhelming evidence, including from Defendants' own audits, establishing core deficiencies in the delivery of medical and mental health care within the state-run prisons that already have caused, and that without judicial intervention will continue to cause, serious harm, including permanent and accelerated disability (*see, e.g.*, Wilcox WT, Doc. 4138 ¶¶ 98-114, 115-125, 321-23, 392); sepsis, heart damage, liver cancer, and loss of kidney function that could have been prevented or delayed (*see, e.g., id.* ¶¶ 189-195, 296, 330-331, 372-73); needless pain and suffering, including for terminal patients (*see, e.g., id.* ¶¶ 32, 57, 137, 309, 314, 316, 359, 385); and preventable acts of self-harm resulting in grave permanent injuries, or worse yet, death by suicide. Doc. 4308 ¶¶ 568-583; Stewart WT, Doc. 4109-1, Ex. 3.

In sum, as in *Coleman*, "serious deficiencies continue to exist in the [Arizona] prison system such that [Arizona] inmates are not receiving adequate care. This is true

-184-

1  regardless of where [Arizona] might rank in a valid comparison of inmate death rates

2  among the states." *See* 922 F. Supp. 2d at 942 (discussing California state prison system).

3  **C.    Defendants' Failure to Provide Adequate Language Interpretation to**
**Patients Not Fluent in English Places Them At Substantial Risk of**

4  **Harm.**

5  Almost all of Defendants' proposed Findings of Fact related to language

6  interpretation are based on (and lifted verbatim from) Dr. Penn's written testimony.

7  *Compare* Doc. 4309 ¶¶ 1391-1406, *with* Penn WT, Doc. 4172 ¶¶ 171-185. (The first two

8  proposed findings are taken from Dr. Stallcup's testimony at trial. Doc. 4309 ¶¶ 1389-

9  1390.) Plaintiffs' Findings of Fact explain why Dr. Penn's opinions related to language

10  interpretation are patently unreliable and should be given no weight. *See* Doc. 4308

11  ¶¶ 855-862.

12  Here, Plaintiffs respond briefly to each proposed finding. As shown in the table

13  below, the proposed findings are largely irrelevant or based on purported "expert"

14  testimony that impermissibly "is connected to existing data only by the *ipse dixit* of the

15  expert." *Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply too great an

16  analytical gap between the data and the opinion proffered."). Indeed, to arrive at his

17  sweeping conclusions regarding language interpretation, Dr. Penn "cherry-pick[s] data"

18  with little or no relevance to the matter, ignores pertinent evidence, and otherwise

19  "displays an ends-driven approach" that already has been soundly rejected by this Court.

20  *See Allen*, 287 F. Supp. 3d at 786.

| Defendants' Proposed Findings of Fact | Plaintiffs' Response |
|---|---|
| **1389**. Pursuant to NCCHC guidelines, it is permissible to have an officer provide interpretation services in an emergency. (R.T. 11/17/21 p.m. at 2599:4-10.) | This is irrelevant. Industry standards, including by the NCCHC or ACA, do not provide the operative legal framework. *See* Doc. 4308 ¶¶ 1102-06.<br><br>In any event, the general proposition is not disputed. Wilcox WT, Doc. 4138 ¶ 465 ("[E]xcept in rare cases of a true medical emergency, healthcare encounters with patients not fluent in English should only |

| Defendants' Proposed Findings of Fact | Plaintiffs' Response |
|---|---|
| | proceed with an interpreter."). |
| **1390**. If an inmate refuses interpretation services, with the inmate's permission, it is appropriate to utilize a correctional officer to interpret. (R.T. 11/17/21 p.m. at 2583:22-2584:9.) | It is not clear what this opinion by Dr. Stallcup is based on or what the relevance is. It also conflicts with paragraph 1389 of Defendants' proposed findings of fact, above, which also was based on Dr. Stallcup's testimony, as well as Dr. Penn's testimony.<br><br>In particular, Dr. Penn testified that during his prison tours, mental health staff told him "unless this was an emergency situation, they would not rely on custody staff to serve as translators." Penn WT, Doc. 4172 ¶ 182. Dr. Penn stated that "[t]his complies with NCCHC requirements and the standard of care." *Id.*; *see also* Ex. 3304 at ADCRR00210463 (discussion in NCCHC standards stating that "officer interpreters should not be used except in an emergency").[117] |
| **1391**. Based on his review of individual inmate records, facts, and data, Dr. Penn developed a basis and had sufficient information to establish his professional opinion, to a reasonable degree of medical and psychiatric certainty, that the mandated use of certified translators for all healthcare interactions and/or for group psychotherapy is not the requisite standard of care within a correctional setting. (Dkt. 4174, ¶ 171.) The standard of care within a state prison healthcare setting does not require the use of translators/interpreters for all encounters, but rather it depends upon the nature and extent of the encounter. (Dkt. 4174, ¶ 171.) | As explained in the remainder of this section, these sweeping statements are baseless.<br><br>Contrary to Dr. Penn's position, there is not in fact a different standard for language access "within a state prison healthcare setting" as opposed to outside of prison. *See* Stewart WT, Doc. 4109 ¶ 96; Stewart TT at 605:3-607:25. |
| **1392**. There is nothing in the NCCHC 2018 Prison Health Care standards that provide for an explicit standard relating to | This is irrelevant. Industry standards, including by the NCCHC or ACA, do not provide the operative legal framework. |

---

[117] *See* Part II.C.2(a), *supra*, for a discussion of how Dr. Penn's interview notes regarding language interpretation by custody staff changed without explanation.

| Defendants' Proposed Findings of Fact | Plaintiffs' Response |
|---|---|
| effective communication with Limited English Proficient ("LEP") inmates. (Dkt. 4174, ¶ 172.) Only the notes in NCCHC standards and select standards in the ACA Performance Based Expected Practices for Adults in Correctional Institutions identify the specific circumstances in which language interpretation services should be used. (Dkt. 4174, ¶ 172.) These circumstances are when effective communication is compromised due to speech, hearing, or language deficits; receiving screening; when identifying advanced directives; and for informed consent. (Dkt. 4174, ¶ 172.) | *See* Doc. 4308 ¶¶ 1102-06.<br><br>In addition, as Dr. Penn admits, there are no NCCHC standards about language interpretation. Penn WT, Doc. 4172 ¶ 172. Instead, the discussion section of the NCCHC measures related to information on health services (P-E-01), receiving screening (P-E-02), and care for the terminally ill (P-F-07) note the importance of effective communication in a "language fully understood by the inmate" and the need to make arrangements for an interpreter. *See* Ex. 3304 at ADCRR00210463, ADCRR00210466, ADCRR00210500. But that in no way limits the need for an interpreter to those few contexts.<br><br>Neither Defendants nor Dr. Penn identify the ACA standards they believe are relevant. The ACA standards were excluded at trial. *See* Haney TT at 977:4-981:15. In any event, as with the NCCHC standards, Defendants and Dr. Penn badly misconstrue the relevance of the ACA standards.[118]<br><br>In addition, Dr. Penn did not appear aware of other standards governing provision of interpretation services during healthcare encounters. For example, he testified that he was not familiar with the U.S. Department of Justice Guidelines for Services to Limited English Proficiency Persons in Health Care Settings, or the requirements of the Americans with Disabilities Act. Penn TT at 3179:15-3180:7; *see* U.S. Dep't of Justice, Guidance to Federal Financial Assistance |

---

[118] Although Defendants do not identify the specific ACA standards, they may be referencing 5-ACI-6A-01 (receiving screening) and 5-ACI-6C-04 (informed consent). *See* Ex. 3531 (*not admitted at trial*) at ADCRR00232080, ADCRR00232113. Those standards say only that information regarding access to care should be "communicated orally and in writing, and is conveyed in a language that is easily understood by each inmate," and "[i]nformed consent standards in the jurisdiction are observed and documented for offender care in a language understood by the offender." *Id*. As with the NCCHC standards, nothing in the ACA standards suggests that language interpretation should be limited to these two specific situations.

| Defendants' Proposed Findings of Fact | Plaintiffs' Response |
|---|---|
| | Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41,455 (June 18, 2002). |
| **1393**. To the extent language interpretation services are provided by corrections departments in other jurisdictions, such as by CDCR and the Orleans Parish Prison (a New Orleans Louisiana County jail, not a Louisiana state prison), such service is due to settlement agreements, and exceeds the standard of care. (Dkt. 4174, ¶ 173.) | This is false. A federal court determined that specific language interpretation policies were necessary for Orleans Parish Prison to meet minimum constitutional standards. *See Jones v. Gusman*, 296 F.R.D. 416, 454-55, 469-70 (E.D. La. 2013). |
| | Defendants have been on notice of this for almost two years. *See* Ex. 1939 at 32-33 n.24 ("Defendants contend that the Court should not consider the consent judgment related to Orleans Parish Prison because it 'exceed[s] the constitutional healthcare standard of care.' . . . The consent judgment [in that case] . . . complied with the Prison Litigation Reform Act and constitutional standards.") (citing *Jones v. Gusman*, 296 F.R.D. 416 (E.D. La. 2013)); Ex. 1878 at 19-20; Doc. 3625-1 at 50. |
| **1394**. For example, the standard of care in the community and in correctional healthcare is for staff to assess their own level of comfort and proficiency before determining whether a separate translator/interpreter or translator service is required—it would be improper for a provider to order or to document that translation service would be required where staff is proficient. (Dkt. 4174, ¶ 174.) | Dr. Penn does not explain what this sweeping conclusion is based on; as noted in response to paragraphs 1392 and 1393 of Defendants' proposed findings of fact, above, Dr. Penn badly misconstrues the NCCHC and ACA standards, is unfamiliar with federal standards governing provision of interpretation services during healthcare encounters, and misapprehends relevant case law. |
| | In fact, as Defendants are aware, the federal court in *Jones v. Gusman*, 296 F.R.D. 416, 454 (E.D. La. 2013), found that Orleans Parish Prison "does not keep a record or otherwise identify staff members who are bilingual" and approved a settlement that required assessment of bilingual staff and a list of such staff. *See* Ex. 1878 at 19-20 (including citation in the record to the settlement, which |

| Defendants' Proposed Findings of Fact | Plaintiffs' Response |
|---|---|
| | required Orleans Parish Prison to "[r]egularly assess the proficiency and qualifications of bilingual staff to become an [Orleans Parish Prison] Authorized Interpreter ('OPPAI')" and "[c]reate and maintain an OPPAI list"). |
| **1395**. The standard of care further mandates that the use of an interpreter is dependent upon the nature and extent of the encounter. (Dkt. 4174, ¶ 175.) For instance, an inmate receiving a blood pressure measurement, or a fingerstick blood sugar test most likely does not need an interpreter. (Dkt. 4174, ¶ 175.) An interpreter would be necessary, however, where there are discussions regarding advance directives, as discussed above. (Dkt. 4174, ¶ 175.) | This Court, in approving the Stipulation, already concluded that it is necessary to provide language interpretation during all healthcare encounters for patients who are not fluent in English. *See* Ex. 1849 at 6 (Paragraph 14 of the Stipulation); Doc. 1458 at 6. <br><br> It is not clear what Dr. Penn's opinion to the contrary is based on, or how it could be applied in practice. Dr. Penn claims that certain medical procedures "***most likely*** do[] not need an interpreter," but does not provide any explanation of how to determine when an interpreter would be needed for such procedures and does not explain how patients not fluent in English would be able to follow instructions, ask questions, be educated about the procedure, or be able to give their informed consent absent language interpretation. *See* Penn WT, Doc. 4174 ¶ 175 (emphasis added). <br><br> And there is a wide range of care events between the diagnostic procedures and advanced directives that Dr. Penn cites. *See* Penn TT at 3180:8-18 (conceding that "a lot of medical encounters . . . fall between that spectrum"). There, too, Dr. Penn was unable to say whether interpreter services would be needed. For example, Dr. Penn was unable to say whether an interpreter would be required for individual health care counseling, mental health groups, suicide watch checks, chronic care appointments, or other appointments with health care or mental health providers. Penn TT at 3180:8-3181:3. But effective communication is a fundamental component of therapeutic and medical care. *See, e.g.*, Stewart WT, Doc. 4109 ¶ 89; Stewart TT at 481:7-16; Wilcox WT, |

| Defendants' Proposed Findings of Fact | Plaintiffs' Response |
|---|---|
| | Doc. 4138 ¶¶ 442-443. |
| **1396**. In Dr. Penn's opinion, to require anything different from the standard of care would be unreasonable and at times, can lead to medical malpractice. (Dkt. 4174, ¶ 176.) For example, in emergency situations, time is simply not available to have translators/interpreters and other services available—rather, the standard of care is to provide emergency care and any delay in care may be alleged or viewed as medical malpractice. (Dkt. 4174, ¶ 176.) | This is irrelevant. There is no dispute that encounters may need to proceed without the assistance of a language line interpreter or healthcare staff proficient in the class member's language "in rare cases of a true medical emergency." Wilcox WT, Doc. 4138 ¶ 465. |
| **1397**. There are also inmates who would not require language interpretation services, such as inmates with varying degrees of deafness, who may be able to utilize hearing aids or other assistive devices, including cochlear implants to communicate with medical and mental health staff. (Dkt. 4174, ¶ 177.) Dr. Penn's July 27, 2020 report outlined numerous examples of inmates whose eOMIS records reflect their ability to communicate with the use of such devices. (Dkt. 4174, ¶ 177.) Other inmates may be comfortable with lip reading, provided the speaker slows his or her rate of speech and articulates clearly. (Dkt. 4174, ¶ 177.) Other deaf or hearing-impaired inmates may prefer written communications. Thus, there is no one-size fits all standard for interacting with deaf inmates. (Dkt. 4174, ¶ 177.) | This is irrelevant. It is undisputed that "many deaf or hard-of-hearing patients . . . do not know sign language." Wilcox WT, Doc. 4138 ¶ 460. They may require other auxiliary aids or other disability accommodations to be able to fully participate in a healthcare encounter.[119] *Id.* <br><br> That is why the U.S. Department of Justice has advised state governments that "the individual with a disability is most familiar with his or her disability and is in the best position to determine what type of aid or service will be effective." *See* U.S. Dep't of Justice, Title II Technical Assistance Manual § II-7.1100. For this reason, federal regulations implementing Title II require public entities to "give primary consideration to the requests of individuals with disabilities" when "determining what types of auxiliary aids and services are necessary." 28 C.F.R. § 35.160(b)(2). <br><br> The question here is whether those who require sign language interpretation to |

---

[119] Plaintiffs have explained elsewhere why lipreading and written notes are inadequate substitutes for those who communicate through sign language. *See* Doc. 4308 ¶¶ 833-34; *see also* Doc. 4309 ¶ 270 (acknowledging that deaf patient "cannot understand complex or complicated medical information" through lipreading). Hearing aids also do not always allow the wearer to distinguish spoken speech; in some cases, they can only hear environmental noises such as alarms or doors slamming. *See, e.g.*, Trial Testimony of Laura Redmond ("Redmond TT") at 318:11-319:5; Doc. 4138 ¶ 465; Doc. 4309 ¶ 269.

-190-

| Defendants' Proposed Findings of Fact | Plaintiffs' Response |
|---|---|
| | communicate effectively in healthcare encounters are properly identified as needing such interpretation and are, in fact, provided such interpretation. The evidence offered at trial shows that they regularly are not. *See* Doc. 4308 ¶¶ 825-830. Indeed, Defendants admit that Named Plaintiff Laura Redmond has been deaf since she was fifteen months old and is fluent in American Sign Language. Doc. 4309 ¶ 267, 271. Nonetheless, she is not recorded in their system as requiring a sign language interpreter and, even by Defendants' own admission, is not always provided one during healthcare encounters.[120] Doc. 4308 ¶¶ 826-827 & n.140 (citing Wilcox WT, Doc. 4138 ¶¶ 450-51 & App. F); Doc. 4309 ¶¶ 281-82. |

---

[120] Defendants' suggestion in their proposed findings of fact that Ms. Redmond, who has serious medical and mental health concerns, including PTSD, bipolar disorder, schizophrenia, seizures, hepatitis C, asthma, and back problems, somehow is to blame for health care staff's failure to provide her sign language interpretation because she was responsible for teaching staff, before each encounter, how to log onto the language interpretation website is absurd and only underscores the urgent need for judicial intervention. *See* Doc. 4309 ¶¶ 272, 277, 284-85 ("On August 26, 2021, Redmond was given a copy of the ASL website and a log-in ID, which would have assisted her in letting providers know that she wanted an interpreter. Redmond never brought it to a subsequent appointment; she lost it and has never asked for another copy." (citations omitted)).

It is Defendants' obligation to ensure that their staff know who needs an interpreter and how to access interpreter services. *See* Doc. 3861 at 12 (ordering Defendants to develop a compliance plan that, "at a minimum, explain[s] how class members who are not fluent in English will be identified" and "how such services should be requested"); Ex. 934 at PLTFS005468 (note in medical record from psychologist on August 26, 2021, stating: "it appears that not all staff are aware of IM's [inmate's] level of hearing impairment and/or . . . are unaware of, Centurion staff access to ASL interpreter."). And it is undisputed that Ms. Redmond did not receive interpretation services even after she requested them and informed healthcare staff she was unable to understand without one. *See, e.g.*, Doc. 4308 ¶ 830 (citing Ex. 2391; Ex. 934 at PLTFS005559; Ex. 5454 at 5454-00209); Redmond TT at 375:11-18 ("Q. On appointments after August 26th, 2021, did you bring along this paper when you went to have any kind of a health care encounter? A. No, I never did. Q. Why not? A. Because I forgot. I didn't remember where I put it. You know, I had packed up into boxes and my things, so I just used this card that I have on my lanyard, and I show that."); Ex. 934 at PLTFS005544 ("Pt. reported that she was told that her Neurology appointment has been cancelled. Pt. states that she does not know why her Neurology appt. was cancelled. She stated that 'the providers refuse her an interpreter.'").

| Defendants' Proposed Findings of Fact | Plaintiffs' Response |
|---|---|
| **1398**. Additionally, it is Dr. Penn's understanding, based on his extensive review of inmate medical records and interviews with medical, mental health, administrative, and custody staff over the almost decade of his involvement in this case, that many individuals providing medical, nursing, and mental health care in the ADCRR system are fluent in Spanish. (Dkt. 4174, ¶ 178.) | This is irrelevant. It is undisputed that some healthcare staff may be fluent in Spanish. The problem is that Defendants do not evaluate the proficiency of staff in non-English languages, and permit staff who have not been determined to be proficient in a non-English language to nonetheless attempt to conduct healthcare encounters in that language. Doc. 4308 ¶¶ 841-47; *see* Ex. 1976, RFA Number 10; Jordan TT at 2624:11-20, 2651:7-12; Stallcup TT at 2577:6-13, 2585:12-22; Ex. 919 at 0919-0081; Ex. 922 at 0922-0047; Ex. 925 at 0925-0018; Ex. 928 at 0928-0001-02 (nurse attempted to conduct healthcare encounter with a patient who "speaks Spanish and minimal English" using Google translate). |
| **1399**. In conducting his review of inmate charts for his July 27, 2020 report, where it was noted that an inmate speaks a language other than English (for example Spanish) but the healthcare staff did not indicate interpreter services were required, Dr. Penn concluded that the healthcare staff conducting the encounter was likely proficient in Spanish (and/or the inmate patient could also speak sufficient English). (Dkt. 4174, ¶ 179.) This conclusion is based upon the detailed nature of the SOAPE (Subjective, Objective, Assessment, Plan, Education) notes, indicating the healthcare staff could understand the nature of the complaints made by the inmate as documented in the subjective portion of the SOAPE note, and the provision of care/treatment that was consistent with and in response to the complaint made by the inmate. (Dkt. 4174, ¶ 179.) Additionally, the HSRs (Health Service Requests) and grievances Dr. Penn reviewed were detailed in nature and responded to consistent with the | This argument is blatantly ends-oriented. Dr. Penn's conclusion based on medical record review alone that it is "likely" that healthcare staff was "proficient in Spanish (and/or the inmate patient could also speak sufficient English)" (Doc. 4174 ¶ 179) is simply wishful thinking, and ignores both the possibility of noncompliance as well as the possibility that the provider and patient each mistakenly thought they were being understood by the other party.<br><br>Indeed, Dr. Penn's methodology and opinion here already have been soundly dismissed by the Court as "specious."[121] Doc. 3921 at 15. As the Court found in granting the motion to enforce Paragraph 14: "The Court does not doubt that some medical encounters proceeded despite language barriers. But there is no way to determine whether appropriate care was provided." Doc. 3861 at 12 n.10. That is why the Court ordered Defendants to develop a compliance plan that, "at a minimum, explain[s] how class members |

---

[121] Dr. Penn's July 27, 2020 report was not offered or admitted at trial, but instead was submitted in support of Defendants' unsuccessful litigation of the motion to enforce Paragraph 14 of the Stipulation. *See* Doc. 4118, Ex. 2; Doc. 3673-8.

| Defendants' Proposed Findings of Fact | Plaintiffs' Response |
|---|---|
| conclusion that the recipient understood the inmate's communications. (Dkt. 4174, ¶ 179.) | who are not fluent in English will be identified." Doc. 3861 at 12. |
| **1400**. Accordingly, it is Dr. Penn's opinion that the current standard of care relating to accommodations for LEP inmates, or other inmates who Plaintiffs assert require language interpretation services, should remain the status quo. (Dkt. 4174, ¶ 180.) This widely accepted standard is for community and correctional healthcare providers to use translation/interpretation services if the healthcare provider is not proficient. (Dkt. 4174, ¶ 180.) Translation and interpretation services may be sought through another proficient healthcare staff member who is proficient in the language at issue, including a nurse, medical assistant, or another healthcare administrative support staff member (all of whom receive training in health information privacy), or to use a commercially available voice language telephone line. (Dkt. 4174, ¶ 180.) | This is irrelevant. Plaintiffs do not dispute that the "widely accepted standard is for community and correctional healthcare providers to use translation/interpretation services if the healthcare provider is not proficient." Penn WT, Doc. 4172 ¶ 180.

Rather, Plaintiffs offer undisputed evidence that (1) in practice, patients not fluent in English do not have a provider proficient in their primary language and are not provided a language line interpreter during healthcare encounters, and (2) notwithstanding the Court's finding of noncompliance and order for corrective action, Defendants failed to put any reliable policies and oversight mechanisms in place. Doc. 4308 ¶¶ 816-854, 857. Dr. Penn simply ignores such evidence. |
| **1401**. With respect to American Sign Language (ASL) inmates, the current standard, if an ASL proficient health services member is not available, is to use visual interpretation through a remote videoconference service, just as ADCRR does through Language Line InSight Video Interpreting. (Dkt. 4174, ¶ 181.) | See response to paragraph 1400 of Defendants' proposed findings of fact, above. |
| **1402**. Dr. Penn's most recent series of facility tours is also illustrative of his opinion. (Dkt. 4174, ¶ 182.) During his September 2021 tours, mental health care staff uniformly and consistently explained that if they had an inmate patient who had difficulty communicating in English, that they could utilize another health care professional as an interpreter or the language line. (Dkt. 4174, ¶ 182.) They also clarified that unless this was an emergency situation, they would not rely | See responses to paragraphs 1389, 1392, and 1396 of Defendants' proposed findings of fact, above.

In addition, the ability of certain staff to recite what interpretation services are available during pre-trial expert tours does not establish that, in practice, those services reliably are being used in healthcare encounters statewide, particularly when the evidence presented at trial established that this is not in fact |

| Defendants' Proposed Findings of Fact | Plaintiffs' Response |
|---|---|
| on custody staff to serve as translators. (Dkt. 4174, ¶ 182.) In Dr. Penn's opinion, this complies with NCCHC requirements and the standard of care. (Dkt. 4174, ¶ 182.) | occurring consistently in practice. |
| **1403**. During his most recent random eOMIS record review, Dr. Penn did not identify any non-predominant English-speaking individuals or other ADCRR individuals with other disabilities who had delays in access to mental health care, lack of continuity of care, or delays in receiving clinically indicated mental health treatment services due to a lack of professional interpreters or sign language services. (Dkt. 4174, ¶ 183.) Similarly, he did not identify any adverse patient outcomes resulting in morbidity or mortality due to a lack of professional interpreters or sign language services. (Dkt. 4174, ¶ 183.) | It simply is not possible to determine from the medical records alone whether, in fact, harm resulted. *See* Doc. 3861 at 12 n.10 ("The Court does not doubt that some medical encounters proceeded despite language barriers. But there is no way to determine whether appropriate care was provided."). And, regardless, that is not the correct legal framework. *See Farmer*, 511 U.S. at 828, 837 (holding that Eighth Amendment inquiry focuses on whether there is a "substantial *risk* of serious harm") (emphasis added); Doc. 3921 at 32 (order finding that failure to provide language interpretation services during health care encounters "may have led to a medical condition going undiagnosed and untreated"). In addition, Dr. Penn's methodology here again is unreliable. Dr. Penn did not recall whether he reviewed any medical records of deaf patients. Penn TT at 3182:25-3183:5. Furthermore, he stated that he based this statement on the reviews his consultants did, but admitted that he did not tell them to evaluate them for language interpretation issues. *Id.* at 3183:9-3184:1. Even then, one of Dr. Penn's own consulting psychiatrists did identify this problem. *See* Penn TT at 3123:5-10, 3183:9-3184:13 (reviewer noted "health care request written in Spanish, yet most MH meetings say no interpreter was used and do not state whether interview was conducted in Spanish."); Ex. 2262 at ADCRR00232597 (Patient 131). |

155931733.2

| Defendants' Proposed Findings of Fact | Plaintiffs' Response |
|---|---|
| **1404**. While Dr. Stewart opines that he interviewed monolingual Spanish speakers during his September 2021 tours, a review of these inmates' records evidences their ability to communicate in English. (Dkt. 4174, ¶ 184.) | During his oral testimony, Dr. Penn contradicted this opinion and rejected his own methodology, stating that he in fact could ***not*** form an opinion as to a patient's language needs based on the medical record alone, and instead would need to talk with the patient. Penn TT at 3190:19-23.

In addition, Dr. Penn testified that his opinion that patients identified by Dr. Stewart did not require an interpreter was based on his determination that allegedly "many of them were able to write in English" in an HNR. Penn TT at 3186:14-15. But, when shown an HNR submitted by one of the patients Dr. Stewart interviewed that was written in Spanish, Dr. Penn refused to apply his own methodology and instead insisted that he could not tell if the patient himself had written the HNR (something that would also be true of HNRs written in English), *see* Penn TT at 3187:17-19 ("Q. So he wrote this HNR in Spanish? A. Well, we believe. I mean, I don't know what the inmate's handwriting style is. I am not a handwriting expert."), and said that he could not in fact determine from the HNR what the patient's language needs were. *See id.* at 3188:7-3189:9; Ex. 2223.

It is improper for an expert to take one approach to evidence that is favorable to his client's position and another approach to evidence that is not. |
| **1405**. In Dr. Penn's opinion, mental health staff have access to professional interpreter and sign-language services. (Dkt. 4174, ¶ 185.) There is no failure to provide language interpretation during mental health treatment encounters for non-predominant English-speaking inmates and inmates with other disabilities. (Dkt. 4174, ¶ 185.) | Defendants ignore undisputed evidence that, in practice, patients not fluent in English do not have a provider proficient in their primary language or a language line interpreter during healthcare encounters. *See* Doc. 4308 ¶¶ 824-830, 843-47, 851-52, 857.

And, despite a Court order to identify patients who are not fluent in English, Defendants have not developed or implemented policies or procedures to address their failures to provide |

155931733.2

| Defendants' Proposed Findings of Fact | Plaintiffs' Response |
|---|---|
| | interpretation services. |
| **1406**. The wide-spread availability of language-line services to inmates who require language assistance during mental health encounters is further evidence that ADCRR provides access to mental health treatment. The availability of language-line services further demonstrates that inmates have access to and continuity of mental health care, indicating Defendants are not deliberately indifferent. | See response to paragraph 1405 of Defendants' proposed findings of fact, above. |

### D.   Defendants' Medication Services Are Constitutionally Inadequate.

#### 1.   The Evidence Overwhelmingly Shows That Defendants Fail to Provide Patients Necessary Medications in a Timely and Regular Manner.

According to Defendants, approximately two-thirds of class members are prescribed medications, and approximately one quarter of them receive medication for mental health conditions. Gann TT at 2284:12-15, 2286:2-4. Prescribed medications must be provided to patients in a timely, consistent manner: they must be renewed regularly and without interruption, and patients must be able to transfer housing locations without medication interruptions. Wilcox WT, Doc. 4138 ¶ 356. Plaintiffs provided the Court with overwhelming and undisputed evidence of Defendants' failure to ensure timely prescription and distribution of medication. Doc. 4308 ¶¶ 504-507, 767-779.

Defendants ignore that their own CGAR data documenting the persistent systemic failure to ensure medication continuity, placing patients at substantial risk of serious harm. *See* Doc. 4308 ¶ 770 (CGAR data shows half the prisons failed to meet the 85% benchmark for Performance Measure 13 during the first seven months of 2021); ¶ 772 (CGAR data shows that five prisons failed to meet the 85% benchmark for Performance

Measure 11 during the first seven months of 2021).[122] Problems with these two performance measures are deep rooted, as they have been the subject of contempt orders and orders to show cause. *See* Doc. 3490 at 1-2 (ordering Defendants to immediately come into compliance with PM 11 at Eyman, Florence, Lewis, Tucson, Winslow, and Yuma; and PM 13 at Douglas, Eyman, Florence, Lewis, Perryville, Tucson, and Yuma; or "pay $ 100,000 for each instance of future noncompliance with this Order."); Doc. 3921 at 18 (showing noncompliance with Doc. 3490 for PMs 11 and 13 on 20 separate occasions in March-December 2020); *id*. at 25 (showing noncompliance with Doc. 3490 for PMs 11 and 13 on 17 separate occasions in the first four months of 2021).[123]

Defendant Gann also testified about and confirmed the accuracy of ADCRR reports showing repeated delays in the administration of insulin to people with diabetes throughout 2021 at the Tucson prison, where many of the sickest patients are housed. *Id.* ¶ 777; *see also id.* ¶ 778 (Defendant Gann admitting that the practice of "pre-pouring" medications, often done to save time, or due to inadequate staffing, laziness, or poor culture, puts patients at risk of harm and involves Licensed Practical Nurses practicing beyond the scope of their licensure).[124] Moreover, numerous CQI meeting minutes throughout 2021 repeatedly describe a failure to provide patients their medications, and medication documentation errors, at Eyman, Perryville, Phoenix, and Tucson prison complexes, oftentimes attributed to nursing staff vacancies and shortages. *Id.* ¶¶ 506, 776.

---

[122] Plaintiffs' experts Dr. Wilcox and Dr. Stewart agree that even if Defendants were to achieve 85 percent compliance on these two Performance Measures, that would still be too low because on "such a critical part of ensuring ongoing stability for patients … the threshold for compliance on a critical performance measure should be set much higher than the 85% threshold." Doc. 4308 ¶ 771.

[123] PM 11 requires that "Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT." Doc. 1185-1 at 8. PM 13 requires that "Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication." *Id.*

[124] Dr. Penn admitted that he was aware of a wide-spread practice of pre-pouring of medications at Arizona prisons in the years prior to his September 2021 visits. Penn TT at 3166:24-3167:1, 3167:9-12.

1    In addition to Defendants' own reports detailing delays in the delivery of
2    medication, Dr. Wilcox and Dr. Stewart described their reviews of patients' charts
3    showing continuing unacceptable disruptions in the prescription, delivery, and
4    administration of essential chronic care and psychotropic medications to patients, and the
5    resulting harm patients suffered. Wilcox WT, Doc. 4138 ¶¶ 356-364; Stewart WT,
6    Doc. 4109 ¶¶ 136-142; Doc. 4308 ¶¶ 767-779.

7
8    ## 2.    Defendants' Formulary is Inadequate and Patients are Prescribed Less Effective Medications as a Result.

9    Defendants breezily assert that "it is not an onerous process to get approval for
10   non-formulary medication. Doc. 4309 ¶ 921; *see also id*. ¶ 1434. The sole source for these
11   assertions is one paragraph from their expert Dr. Murray's written testimony, *see* Doc.
12   4309 ¶¶ 919-921 (citing Doc. 4203 ¶ 27), and Dr. Penn's unsupported assertion that "just
13   because a medication is not on the formulary, does not mean ADCRR inmates are unable
14   to receive it." *Id*. ¶ 1434 (citing Penn TT at 3033:20-23). To the extent Dr. Murray had a
15   basis for his conclusory statement, it appears that like many of his other conclusions, it
16   was based solely on his "interviews with the management teams" at the prisons he visited.
17   *See* Doc. 4203 ¶ 26 ("My interviews with the management teams from the complexes
18   revealed the following regarding these components:"). Dr. Penn's assertion is based upon
19   written ADCRR policies and the fact that Defendants' prisons are accredited by NCCHC.
20   Doc. 4308 ¶¶1421-1423, 1436, 1449. In fact, Dr. Penn admitted on cross examination that
21   he did not know or request data about what percentage of requests for nonformulary
22   psychiatric medications are approved by Centurion's utilization management unit (which
23   must approve all requests). Penn TT at 3162:21-3163:7.

24   Plaintiffs presented substantial evidence based upon Dr. Stewart's review of
25   mortality review reports, psychological autopsies, and medical charts, of patients who did
26   not receive the necessary and appropriate medications to address their mental health
27   symptoms. Doc. 4308 ¶¶ 492-502. This included mortality reviews and psychological
28   autopsies written by ADCRR and Centurion staff regarding process failures that

-198-

contributed to deaths by suicide, *id*. ¶¶ 493-497, Exs. 375, 376; and Dr. Penn's own psychiatric reviewers who found medication problems in multiple cases, including a suicide, a suspected suicide, an attempted suicide, and for 25 other patients. *Id*. ¶ 498, n.92.

Defendants trot out Dr. Penn's unsupported assertions, including his incredible assertion on direct testimony that the commonly-prescribed antidepressant Wellbutrin is just like cocaine, Doc. 4309 ¶ 1438, and that other psychotropic medications can be abused, to justify Centurion's refusal to include these commonly-used and widely-accepted medications on their formulary. *Id*. ¶¶ 1437-1446. But the solution is obvious and one routinely used in functional correctional health care systems: the medications that have the potential for abuse can be prescribed as watch-swallow (also known as Direct Observation Therapy), meaning that the staff person administering the medication ensures that the patient has swallowed it, and therefore cannot hoard or otherwise divert it. Dr. Stewart testified that the potential for abuse or misuse of so-called watch-swallow medication is an indicator of an ineffective medication distribution process, or of a carceral system not having enough nursing or custody staff to ensure that medication is not improperly diverted. Doc. 4308 ¶ 502. Dr. Penn also admitted on cross-examination that if psychotropic medications prescribed as watch-swallow were being diverted and abused, there should be an investigation into the medication administration system to determine why these drugs are getting diverted and abused despite their watch-swallow status. Penn TT at 3165:16-22.

A prison system cannot deny patients necessary medication based on a fear of diversion. *See Coston v. Nangalama*, 13 F.4th 729, 735 (9th Cir. 2021) (incarcerated person's allegation that his medication was discontinued based on fear that he would divert it could violate the Eighth Amendment, where prisoner "introduced substantial evidence . . . that the prison had several less drastic alternatives available, including Direct Observation Therapy"); *Porretti v. Dzurenda*, 11 F.4th 1037, 1052 (9th Cir. 2021) (affirming preliminary injunction requiring defendants to provide incarcerated plaintiff

-199-

Wellbutrin and Seroquel); *see also Atwood v. Days*, No. CV-20-00623-PHX-JAT (JZB), 2021 WL 5811800, at *6-7 (D. Ariz. Dec. 7, 2021) (rejecting as "unpersuasive" Centurion's reliance on its "unwritten policy that opiates only be prescribed for patients with severe pain, terminal illness with pain, or other long-term disease implicating severe pain symptoms" in abruptly discontinuing Tramadol for ADCRR patient who has spinal injuries requiring full-time use of a wheelchair, and issuing preliminary injunction to restore the patient's Tramadol prescription and the specialist's recommended epidural injections).

### 3. Defendants Fail to Protect Patients from Medication-Induced Heat Injury and Side Effects.

The parties agree that some psychotropic medications can make patients more susceptible to injury or death from high temperatures. Doc. 4308 ¶ 514 (citing Stewart WT, Doc. 4109 ¶ 159 and Penn TT at 3238:12-19). People at risk for heat injury, including those taking psychotropic medications, should be housed in areas where the ambient temperature does not exceed 85 degrees Fahrenheit. *Graves v. Arpaio*, 623 F.3d 1043, 1048-49 (9th Cir. 2010) (affirming this Court's injunction requiring that incarcerated patients in Maricopa County Jails who are taking psychotropic medications be housed in areas where temperatures do not exceed 85 degrees Fahrenheit).

Defendants do not meet this legal standard. They contend that they have written policies that require them to take steps to mitigate patients' reactions to temperatures over *95* degrees Fahrenheit; these mitigation efforts include: "notification of facility leadership, placement of fans and opening of cell door food straps [sic], as well as providing inmates with showers and ice." Doc. 4309 ¶ 1454.

Defendants cite Dr. Penn's written testimony about what prison staff told him are the policies regarding heat mitigation efforts, and his recitation of the written policies, as the basis for their assertion that patients' needs are met. Doc. 4309 ¶¶1456-1457. This ignores the fact that Dr. Penn admitted on cross-examination that high temperatures and humidity can be particularly dangerous for people who take psychotropic medications, but

he did not review any temperature logs. Penn TT at 3241:1-3242:1; *see also* Doc. 4308 ¶ 519. Accordingly, Dr. Penn has no knowledge of the temperatures in ADCRR housing units. Nor did he observe the temperature checks, any temperature mitigation measures, or any staff training about heat reactions. Penn TT at 3239:12-20; Doc. 4308 ¶ 519. Nonetheless, he opined (and Defendants assert) that the temperature is adequately monitored, excessive heat is appropriately mitigated, and that staff receive training on reactions to heat. *Id.* at 3238:25-3239:11; Doc. 4309 ¶ 1458.

Defendants' conclusory assertions based upon written policies and prison staff's hearsay reports are insufficient to counter the overwhelming evidence—including Defendants' own temperature logs—showing indoor temperatures at multiple housing units, including mental health units, often exceed 90 degrees Fahrenheit. Doc. 4308 ¶ 518 & n.97. This also ignores the evidence that Dr. Stewart presented based upon his patient interviews and medical record reviews showing that seriously mentally ill people on psychotropic medications experience adverse reactions to excessive heat, *id.* ¶ 517, and that Dr. Penn's psychiatric consultants identified during their chart reviews at least two additional patients who were not monitored for the side effects of psychotropic medications, including heat sensitivity. *Id.* n.96.

## IX.   CONCLUSION

The Court should find that the deficiencies in Defendants' medical and mental health care and use of isolation, as described herein and in Plaintiffs' Proposed Findings of Fact and Conclusions of Law (Doc. 4308), violate the Eighth Amendment.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

-201-

155931733.2

1

Dated:  February 25, 2022                    **ACLU NATIONAL PRISON PROJECT**

2

3
By:   s/ Corene T. Kendrick
David C. Fathi (Wash. 24893)*

4
Maria V. Morris (D.C. 1697904)**
Eunice Hyunhye Cho (Wash. 53711)*

5
915 15th Street N.W., 7th Floor
Washington, D.C. 20005

6
Telephone:  (202) 548-6603
Email:     dfathi@aclu.org

7
            mmorris@aclu.org
            echo@aclu.org

8
*Admitted *pro hac vice*; not admitted

9
 in DC; practice limited to federal
 courts

10
**Admitted *pro hac vice.*

11
Corene T. Kendrick (Cal. 226642)*
**ACLU NATIONAL PRISON**

12
**PROJECT**
39 Drumm Street

13
San Francisco, California 94111
Telephone:  (202) 393-4930

14
Email:     ckendrick@aclu.org

15
*Admitted *pro hac vice.*

16
Daniel C. Barr (Bar No. 010149)
John H. Gray (Bar No. 028107)

17
Austin C. Yost (Bar No. 034602)
Karl J. Worsham (Bar No. 035713)

18
Kathryn E. Boughton (Bar No. 036105)
Kelly Soldati (Bar No. 036727)

19
Alisha Tarin-Herman (Bar No. 037040)
**PERKINS COIE LLP**

20
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012

21
Telephone:  (602) 351-8000
Email:     dbarr@perkinscoie.com

22
            jhgray@perkinscoie.com
            ayost@perkinscoie.com

23
            kworsham@perkinscoie.com
            kboughton@perkinscoie.com

24
            ksoldati@perkinscoie.com
            atarinherman@perkinscoie.com

25
            docketphx@perkinscoie.com

26

27

28

155931733.2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Victoria Lopez (Bar No. 330042)*
Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:      vlopez@acluaz.org
                jkeenan@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct.
R. 38(d)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Rita K. Lomio (Cal. 254501)*
Sophie Hart (Cal. 321663)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:      dspecter@prisonlaw.com
                ahardy@prisonlaw.com
                snorman@prisonlaw.com
                rlomio@prisonlaw.com
                sophieh@prisonlaw.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco  on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**


By:   s/ Maya Abela
         Asim Dietrich (Bar No. 027927)
         5025 East Washington Street, Suite 202
         Phoenix, Arizona 85034
         Telephone:  (602) 274-6287
         Email:     adietrich@azdisabilitylaw.org

155931733.2

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
 rdalyrooney@azdisabilitylaw.org
   jrico@azdisabilitylaw.org
   mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

-204-

155931733.2

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on February 25, 2022, I electronically transmitted the above

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to the following CM/ECF registrants:

5

6                              Michael E. Gottfried
                               Lucy M. Rand
7                       Assistant Arizona Attorneys General
                          Michael.Gottfried@azag.gov
8                            Lucy.Rand@azag.gov

9                              Daniel P. Struck
                                Rachel Love
10                          Timothy J. Bojanowski
                              Nicholas D. Acedo
11                            Ashlee B. Hesman
                                Jacob B. Lee
12                             Timothy M. Ray
                               Anne M. Orcutt
13                             Eden G. Cohen
                    STRUCK LOVE BOJANOWSKI & ACEDO, PLC
14                          dstruck@strucklove.com
                             rlove@strucklove.com
15                        tbojanowski@strucklove.com
                            nacedo@strucklove.com
16                          ahesman@strucklove.com
                              jlee@strucklove.com
17                            tray@strucklove.com
                            aorcutt@strucklove.com
18                           ecohen@struclove.com

19                           *Attorneys for Defendants*

20

21                                              s/ D. Freouf

22

23

24

25

26

27

28

155931733.2