Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, et al., | NO. CV-12-00601-PHX-ROS |
| Plaintiffs, | |
| v. | |
| David Shinn, et al., | **DEFENDANTS' RESPONSE TO PLAINTIFFS' FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.   Medical Care. ......................................................................................................... 1

   A.   Background ..................................................................................................... 1

      1.   Medical Expert Testimony ..................................................................... 1

         a.   Dr. Wilcox ..................................................................................... 1

         b.   Dr. Murray ..................................................................................... 3

   B.   Defendants Provide Adequate Care for the Serious Medical Needs of
ADCRR Inmates ............................................................................................. 6

   C.   Plaintiffs Fail to Establish Systemic Deficiencies in ADCRR's Medical Care
System. ............................................................................................................ 6

1.   Nurses Provide Adequate Care and Appropriate Referrals to Providers. ................. 6

      2.   ADCRR and Centurion have Sufficient Providers to Deliver
Adequate Medical Care. ........................................................................ 9

         a.   Mid-Level Providers ..................................................................... 9

         b.   Differential Diagnoses ................................................................ 11

         c.   Management of Chronic Care and Complex Cases ............... 12

         d.   Diagnostic Testing ...................................................................... 13

         e.   Hospital Records ......................................................................... 14

         f.   Pain Medication .......................................................................... 15

         g.   Treatment of Hepatitis C ............................................................ 17

         h.   Treatment of Substance Use Disorder ................................... 19

         i.   Preventive Screenings .......................................................... 24

      3.   Defendants Provide Access to Medically Necessary Specialty Care.
.............................................................................................................24

      4.   Defendants Provide People with Disabilities Medically Necessary
Care, Supplies, and Equipment. ........................................................ 28

i

1    D.   Defendants have Established that ADCRR Delivers Medical Care to
2         Inmates that Meets or Exceeds the Standard of Care. ................................... 33
3         1.   Objective Measures of Quality. ........................................................... 34
4         2.   Other Objective Outcome Metrics. ...................................................... 36
5    II.   Overall Healthcare Delivery System. ......................................................... 37
6    A.   Medications. ......................................................................................... 37
7    B.   Medical Records. ................................................................................... 39
8    C.   Defendants Provide Adequate Language Interpretation in Health Care
9         Encounters to Inmates Not Fluent in English. ................................................ 41
10        1.   Plaintiffs' Evidence is Comprised of Isolated Incidents that do not
11             Establish that Interpretation Services Were Unavailable. .................. 44
12   D.   Staffing. ................................................................................................ 45
13        1.   Healthcare Staffing. ........................................................................... 45
14        2.   Healthcare Contract and Spending. ................................................... 48
15        3.   Joy's Staffing Model Should be Disregarded. .................................. 50
16   III.  Quality Review. .......................................................................................... 52
17   A.   Mortality Reviews. ................................................................................ 52
18   B.   Corrective Action Plans ("CAPs"). ...................................................... 56
19   C.   Maximum Custody Monitoring. ............................................................ 57
20   D.   Staffing. ................................................................................................ 57
21   E.   NCCHC. ................................................................................................ 58
22   IV.   The Stern Report is Immaterial. ................................................................. 59
23   V.    Mental Health Care. ................................................................................... 61
24   A.   Background ............................................................................................ 61
25   B.   Plaintiffs' Evidence Regarding Mental Health Care. ........................... 62
26        1.   Dr. Stewart ......................................................................................... 62
27        2.   Dr. Penn .............................................................................................. 63
28        3.   Other Witnesses ................................................................................. 67

| | | | |
|---|---|---|---|
| | C. | Plaintiffs' Summary of the Alleged Findings Related to Mental Health Care. | |
| | | ................................................................................................ 67 | |
| | D. | Alleged Shortages of Mental Health and Custody Staff. ............................ 68 | |
| | E. | Timely Mental Health Screening and Referrals. .......................................... 73 | |
| | F. | Treatment Plans and Coordination of Care. ................................................. 75 | |
| | G. | Access to Ongoing and Comprehensive Mental and Therapeutic Care. ....... 77 | |
| | | 1. | There is Adequate Access to & Provision of Therapeutic Treatment at ADCRR. ................................................................................... 78 |
| | | 2. | Group Mental Health Care at ADCRR Exceeds the Standard of Care. ………………………………………………………………..79 |
| | H. | Mental Health Encounters. ........................................................................... 80 | |
| | I. | Access to Psychiatric Medication .................................................................. 82 | |
| | | 1. | Adequate Formulary for Psychotropic Medications. ....................... 82 |
| | | 2. | ADCRR's Medication Distribution Practices Exceed the Standard of Care ……………………………………………………………..83 |
| | | 3. | Defendants Properly Monitor Inmates for Medication Side Effects and for Continuing Mental Health Symptoms. ................................ 84 |
| | J. | There is no Evidence that Mentally Ill Inmates Remain "Profoundly Symptomatic" For "Long" Periods of Time. ................................................ 85 | |
| | K. | Access to Inpatient Mental Health Care. ..................................................... 86 | |
| | L. | Appropriate Treatment of Suicidal & Self-Harming Inmates. ..................... 88 | |
| VI. | | SUBCLASS CLAIMS – CONDITIONS OF CONFINEMENT ........................... 90 | |
| | A. | Background ................................................................................................... 90 | |
| | B. | Methodology Flaws Eviscerate the Reliability of Plaintiffs' Experts Opinions. ..................................................................................................... 94 | |
| | C. | Plaintiffs' Experts' Reliance On "Correctional Industry Standards" Is Misplaced and Not Determinative of Constitutional Minimums. ................ 97 | |

| | | | |
|---|---|---|---|
| 1 | | D. | Plaintiffs' Reliance on Literature Criticizing "Solitary Confinement" Is |
| 2 | | | Misplaced and Not Persuasive. ....................................................... 98 |
| 3 | | E. | Cell Lighting Conditions Do Not Violate the Eighth Amendment. ........... 100 |
| 4 | | F. | Cell Ventilation Is Not A Subclass Claim and Plaintiff Have No Evidence |
| 5 | | | To Support Their Poor Cell Ventilation Claim. ......................................... 102 |
| 6 | | G. | Cell Size Is Not A Subclass Claim and Further Does Not Violate the Eighth |
| 7 | | | Amendment. ................................................................................ 103 |
| 8 | | H. | Cell "Excessive Heat" Is Not A Subclass Claim and Further, Cell Heat |
| 9 | | | Conditions Do Not Violate the Eighth Amendment. ................................. 104 |
| 10 | | I. | Alleged Unsanitary Conditions Is Not A Subclass Claim and Further, |
| 11 | | | Sanitation Does Not Violate the Eighth Amendment. .............................. 107 |
| 12 | | J. | ADCRR Inmates are Not Exposed to Extreme Isolation And Are Provided |
| 13 | | | Opportunities for Out of Cell Time That Exceeds Eight Amendment |
| 14 | | | Mandates. ................................................................................ 110 |
| 15 | | K. | ADCRR Provides Nutritional Meals to Inmates. ...................................... 119 |
| 16 | | L. | Alleged Inadequate Security Supervision Is Not a Subclass Claim and |
| 17 | | | Further Does Not Violate the Eighth Amendment. ................................... 122 |
| 18 | | M. | ADCRR Does Not Use Excessive Force (Chemical Agents) on Mentally Ill |
| 19 | | | Inmates Engaging In Self-Harm. ............................................................... 125 |
| 20 | | N. | Alleged Overuse of the Maximum Custody and Detention Is Not a Subclass |
| 21 | | | Claim and Furthermore Is Not Overused. ................................................. 130 |
| 22 | | O. | Subclass Conditions of Confinement Do Not Cause Inmates to Commit |
| 23 | | | Suicide. ................................................................................ 136 |
| 24 | VII. | | Many of Plaintiffs' Conclusions of Law Cannot Be Adopted. ............................ 138 |
| 25 | VIII. | | Plaintiffs' Proposed Remedies Are Premature. ...................................... 141 |
| 26 | IX. | | Plaintiffs' Proposed Remedies Are Too Abstract and Violate the PLRA ............. 142 |
| 27 | X. | | It Is Premature to Consider Appointing a Receiver. ............................................ 149 |
| 28 | XI. | | The Court Cannot Simply Rescind a State Law. .................................................. 151 |

1

XII.   Conclusion. .......................................................................................... 152

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Balla v. Idaho State Bd. of Corr.,*
    2020 WL 2812564 (D. Idaho May 30, 2020) ................................................. 58

*Baptisto v. Ryan,*
    2006 WL 798879 (D. Ariz. Mar. 28, 2006) ................................................. 112

*Bell v. Wolfish,*
    441 U.S. 520 (1979) ......................................................................................... 97

*Boulies v. Ricketts,*
    518 F. Supp. 687 (D. Colo. 1981) ............................................................... 141

*Bracco v. Lackner,*
    462 F. Supp. 436 (N.D. Cal. 1978) ............................................................. 149

*Brown v. Plata,*
    563 U.S. 493 (2011) ....................................................................................... 149

*Davis v. Scherer,*
    468 U.S. 183 (1984) ....................................................................................... 106

*Disability Rts. Montana, Inc. v. Batista,*
    930 F.3d 1090 (9th Cir. 2019) ..................................................................... 141

*Dixon v. Barry,*
    967 F. Supp. 535 (D.D.C. 1997) .................................................................. 149

*Dockery,*
    443 F. Supp. 3d ............................................................................................. 111

*Edmo v. Corizon, Inc.,*
    935 F.3d 757 (9th Cir. 2019) ....................................................................... 140

*Estelle v. Gamble,*
    429 U.S. 97 (1976) ......................................................................................... 140

*Florence v. Bd. of Chosen Freeholders of Cty. of Burlington,*
    566 U.S. 318 (2012) ....................................................................................... 147

*Fraihat v. U.S. Immigration & Customs Enforcement,*
    16 F.4th 613 (9th Cir. 2021) .......................................................................... 91

*Franklin v. District of Columbia,*
    163 F. 3d  (D.C. Cir. 1998) ............................................................................ 44

*Gates v. Cook,*
    376 F.3d 323 (5th Cir. 2004) ....................................................................... 141

*Graham v. Florida,*
    560 U.S. 48 (2010) ......................................................................................... 138

*Graves v. Arpaio,*
    48 F. Supp. 3d 1318 (D. Ariz. 2014) ............................................................ 59

*Graves v. Arpaio,*
    623 F.3d 1043 (9th Cir. 2010) ..................................................................... 142

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Grenning v. Miller-Stout,*
    739 F.3d 1235 (9th Cir. 2014) ........................................................................... 123, 141
*Hall v. Florida,*
    572 U.S. 701 (2014) ................................................................................................ 138
*Inmates of D.C. Jail v. Jackson,*
    158 F.3d 1357 (D.C. Cir. 1998) .............................................................................. 150
*Leer v. Murphy,*
    844 F.2d 628 (9th Cir. 1988) .................................................................................. 139
*LeMaire v. Maass,*
    12 F.3d 1444 (9th Cir. 1993) .................................................................................. 111
*Lewis v. Casey,*
    518 U.S. 343 (1996) ........................................................................................ 142, 147
*May v. Baldwin,*
    109 F.3d 557 (9th Cir. 1997) .................................................................................. 111
*Newman v. State of Ala.,*
    466 F. Supp. 628 (M.D. Ala. 1979) ........................................................................ 150
*Norbert v. City & Cty. of San Francisco,*
    10 F.4th 918 (9th Cir. 2021) ................................................................................... 111
*Ortega Melendres v. Penzone,*
    No. CV-07-2513-PHX-GMS, 2021 WL 4458241 (D. Ariz. Sept. 29, 2021) ............. 151
*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014) .......................................................................... 142, 143
*Peralta v. Dillard,*
    744 F.3d 1076 (9th Cir. 2014) ................................................................................ 140
*Pierce v. Cty. of Orange,*
    526 F.3d 1190 (9th Cir. 2008) ................................................................................ 111
*Pierce v. D.C.,*
    128 F. Supp. 3d 250 (D.D.C. 2015) ........................................................................ 138
*Pintek v. Superior Court,*
    78 Ariz. 179 (1954) .................................................................................................. 92
*Plata v. Schwarzenegger,*
    603 F.3d 1088 (9th Cir. 2010) ................................................................................ 149
*Plata v. Schwarzenegger,*
    No. C01-1351 TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ..................... 149, 150
*Porter v. Triad of Arizona (L.P.),*
    203 Ariz. 230 (Ct. App. 2002) .................................................................................. 92
*Ramos v. Lamm,*
    639 F.2d 559 (10th Cir. 1980) ................................................................................ 140
*Rasho v. Jeffreys,*
    22 F.4th 703 (7th Cir. 2022) ................................................................................... 148
*Shaw v. Allen,*
    771 F. Supp. 760 (S.D.W. Va. 1990) ...................................................................... 150
*Shook v. Bd. of Cty. Commissioners of Cty. of El Paso,*
    543 F.3d 597 (10th Cir. 2008) .......................................................................... 143, 147

*Shorter v. Baca*,
    895 F.3d 1176 (9th Cir. 2018) ..................................................... 111
*Stone v. City & Cty. of San Francisco*,
    968 F.2d 850 (9th Cir. 1992) ...................................................... 151
*Toussaint v. McCarthy*,
    801 F.2d 1080 (9th Cir. 1986) .................................................... 140
*United States v. Hinds Cty.*,
    No. 3:16-CV-489-CWR-RHWR, 2021 WL 5501442 (S.D. Miss. Nov. 23, 2021) ..... 150
*Valdivia v. Schwarzenegger*,
    599 F.3d 984 (9th Cir. 2010) ...................................................... 151
*Wilson v. Seiter*,
    501 U.S. 294 (1991) ................................................................ 139

Statutes

18 U.S.C. § 3626(a)(1)(A) ............................................................ 142, 143
A.R.S. § 31-221 ....................................................................... 40
A.R.S. §§14-5201, 14-5404, 14-5424, 14-5410 .......................................... 92

Rules

Fed.R.Civ.P. 17(c) ..................................................................... 92

Defendants submit this Response to Plaintiffs' Proposed Findings of Fact and Conclusions of Law (Dkt. 4308).

I.    **Medical Care.**

    **A.    Background**

        **1.    Medical Expert Testimony**

The parties presented the Court with two very different perspectives on the medical care provided to ADCRR inmates across the ten state-run Arizona State Prison Complexes. Indeed, the two accounts are so different that a casual observer could easily believe that they address two entirely different systems.

           **a.    Dr. Wilcox**

Plaintiffs presented live testimony and a written Declaration from Dr. Wilcox (Dkt. 4138), who runs Wellcon, a private, for-profit correctional health company that is contracted to provide medical care to approximately 1500 inmates in the two Salt Lake County jails.  (Dkt. 4309, ¶ 499.)  Dr. Wilcox has been Plaintiffs' expert since the early stages of this litigation.  (Dkt. 4138, ¶ 6.)  Throughout that time, Dr. Wilcox has utilized essentially the same methodology for his expert reports and Declarations: he reviews a set of medical records that has been hand-selected for him by Plaintiffs' counsel because the inmates have either died in custody[1] or submitted complaints to counsel regarding their medical care.  (Dkt. 4309, ¶ 517.)  He also interviews a list of inmates that has been provided to him by counsel, again because they have submitted complaints regarding their medical care.  (*Id.* at ¶ 519.)  Dr. Wilcox acknowledges that he could have conducted a random review of chronic care inmates to evaluate individuals with the highest number of encounters with the healthcare delivery system.  (*Id.* at ¶ 520.)  But he nonetheless defends his methodology, proclaiming that reviewing the "sickest" inmates in the system will yield more data.  (Dkt. 4140, ¶ 25.)  What has become clear over the last decade of this litigation, however, is that the goal is not to obtain more or better data, but to obtain anecdotes that

---

[1] While the purpose of the mortality review process is to improve care, Dr. Wilcox uses it as a sword.

confirm Plaintiffs' initial allegations as set out in their 2012 Complaint regarding deficiencies in their medical care.  Plaintiffs' counsel has had unlimited access to eOMIS for many years, allowing them ample opportunity to search for cases to present to their experts for such confirmation.  (Dkt. 1619.)  Yet despite this, Plaintiffs have been able to identify only a few examples[2] of allegedly poor care to support each of their claims with respect to medical care in the ADCRR system, which does not amount to a pattern or practice or demonstrate any systemic deficiencies in the delivery of care.

Plaintiffs also cite to select Stipulation Performance Measures ("PMs") at certain ASPCs to support Dr. Wilcox's assertions.  However, Plaintiffs fail to acknowledge the large number of PMs in which Defendants have been repeatedly compliant across all or most complexes for many years, and they also ignore Defendants' overall compliance rate with the Stipulation PMs, which exceeds 90%.  (Dkt. 4309, ¶ 59.)

Dr. Wilcox admits that he has never drawn a random sample of inmates in evaluating the ADCRR system, although he acknowledges that in Salt Lake County, his performance as the contracted healthcare vendor for the jails is evaluated through a random sample of 5% of the total inmate population.  (*Id.* at ¶ 514.)  To assess a population of approximately 27,000 ADCRR inmates, Dr. Wilcox chose to substantively discuss the medical care of only approximately 58 inmates in his written trial testimony in this case, which reflects a mere 0.002% of the ADCRR inmate population.  (*Id.* at ¶ 519.)  Of these inmates, they were only housed at ASPC Eyman (5), ASPC Florence (6), ASPC Tucson (15), ASPC Lewis (18), ASPC Perryville (8), and ASPC Yuma (1).  (*Id.* at ¶ 531.)  Dr. Wilcox did not find fault with the medical care provided for any inmates at ASPC Douglas, Safford, Winslow, or Phoenix.  (*Id.*)

Because Dr. Wilcox did not utilize a random sample, he is unable to generalize his findings to the ADCRR population as a whole.  (*Id.* at 529.)  At most, Dr. Wilcox's

---

[2] Within these examples, Wilcox ignores those portions of the records that do not support his contentions, and he repeatedly goes back to the well, citing to the same inmates multiple times for multiple issues.

1   methodology yields some isolated instances of medical negligence, or areas in which he

2   disagrees with medical decision-making,[3] which do not amount to either deliberate

3   indifference or a systemic deficiency in the delivery of medical care to the ADCRR system.

4          Most tellingly, Dr. Wilcox only has concerns with the care provided to ADCRR

5   inmates with multiple chronic conditions or severe illness and admits that less serious

6   disorders or medical problems are addressed "just fine" in the ADCRR system.  (R.T.

7   11/15/21 a.m. at 1983:22-1984:2.)   Under ADCRR's medical classification system, the

8   inmates Dr. Wilcox is concerned about are classified as M4s (patients with multiple chronic

9   conditions, more serious mobility issues, and/or insulin dependence that is not well

10  controlled and need to be housed in a corridor facility) or M5s (patients who need to be

11  housed in an infirmary because they need 24/7 nursing care, have a terminal condition, or

12  are receiving care for a condition such as cancer).  (Dkt. 4309, ¶¶ 609-10.)  There are

13  approximately 400 to 500 ADCRR inmates classified as M4s and approximately 20 inmates

14  classified as M5s.  (Dkt. 4309, ¶¶ 614-15.)  M4s and M5s cannot be housed at Douglas,

15  Safford, or Winslow.  (Dkt. 4309, ¶¶ 619, 625, 627.)  The less serious conditions that Dr.

16  Wilcox acknowledges can be handled "just fine" within ADCRR are classified as M1s,

17  M2s, or M3s.  Approximately 24,000 (or 90%) of ADCRR inmates are classified as M1s

18  through M3s. (Dkt. 4309, ¶ 617.)  Accordingly, Dr. Wilcox admits that he is not concerned

19  with the medical care provided to 90% of the ADCRR inmate population or at the Douglas,

20  Safford, or Winslow facilities.   As a result, Plaintiffs have not met their burden of

21  establishing a systemic violation with respect to the delivery of medical care.

22                              **b.    Dr. Murray**

23          By contrast, Defendants presented live testimony and a written Declaration (Dkt.

24  4203) from Dr. Murray, who oversees the University of Texas Medical Branch (UTMB)

25  Offender Health Services program, which provides healthcare to 98,000 inmates in the

26  Texas Department of Criminal Justice state prisons and jails.  (*Id.* at ¶¶ 535-36.)  Dr. Murray

27

28          [3] As will be shown below, in many of these instances, Dr. Wilcox is simply wrong.

3

was asked to evaluate whether the healthcare delivery system for inmates in ADCRR custody contains systemic deficiencies which render the delivery of medical care below the standard of care. (*Id.* at ¶ 541.) Rather than searching for examples to confirm his own pre-existing opinions and biases, as Dr. Wilcox did, Dr. Murray instead took an objective look at the ADCRR system. To do so, Dr. Murray toured and interviewed medical staff at the healthcare clinics at each of the ten ADCRR complexes, analyzed systemwide, objective outcome metrics, and employed a team of correctional health experts to review a random sample of medical records to assess chronic and episodic care and documentation. (*Id.* at ¶ 542.)

Dr. Murray's facility tours focused on evaluating six components of medical care that have been identified by correctional healthcare experts as essential for an adequate healthcare delivery system: staffing, access to care, diagnostic services, records and facilities, pharmacy services, and quality monitoring. (Dkt. 4309, ¶ 545.) To assess access to care, Dr. Murray reviewed the sick call process, chronic care management, dietary services, emergency care, specialty care, and patient education. (Dkt. 4309, ¶ 547.) To assess pharmacy services, Dr. Murray reviewed prescription ordering, turnaround times, local procurement of stat orders, and the medication administration process. (Dkt. 4309, ¶ 550.) Dr. Murray also assessed the adequacy of the physical space and equipment for providing care, including both sick call areas and inpatient care areas. (Dkt. 4309, ¶¶ 549, 552.)

Dr. Murray's random sample was drawn from inmates with two or more chronic conditions in order to assess a patient population with a high number of encounters with on-site and off-site healthcare providers. (Dkt. 4309, ¶ 561.) The medical records reviewed by Dr. Murray's team contained hundreds of unique healthcare encounters and demonstrated most of the essential health delivery processes. (Dkt. 4309, ¶ 566.) Dr. Murray's team ranked the chronic care, episodic care, and documentation for each inmate on a scale of 1 (poor) to 5 (excellent). (Dkt. 4309, ¶ 567.) Contrary to Plaintiff's mischaracterization of the scoring system and ratings (*see* Dkt. 4308, ¶ 595), Dr. Murray's

1    team concluded that documentation was good (overall average of 3.4 out of 5) and quality
2    of chronic care and quality of episodic care were very good (3.8 out of 5 and 4.4 out of 5,
3    respectively).   (Dkt. 4203, ¶ 988.)   While Plaintiffs attempted to pin Dr. Murray into
4    testifying that only care or documentation that was scored as excellent was timely and
5    reflected good decision-making, he repeatedly disagreed with this proposition.   (R.T.
6    12/08/21 a.m. at 3544:20-24, 3546:2-3546:8, 3546:24-3547:2, 3547:10-3547:13, 3548:18-
7    3548:23.)

8        Based on the truncated expert discovery period for this trial, in which Defendants'
9    expert reports were due only three weeks after Plaintiffs' expert reports were served (Dkt.
10   3931 at 2), Dr. Murray did not have sufficient time to review the medical care of the inmates
11   discussed by Dr. Wilcox in his expert report and supplemental expert report.   (Dkt. 4203, ¶
12   1045.)   However, Dr. Murray was sufficiently familiar with the medical care of ADCRR
13   Inmate Jason Y, who was referred to extensively by Dr. Wilcox in his October 9, 2021
14   expert report, to provide a detailed rebuttal of Dr. Wilcox's specific claims regarding his
15   care.   (*Id.*)   As a result, Dr. Wilcox significantly reduced his commentary on Inmate Y in
16   his written trial testimony (*see* Dkt. 4138, ¶¶ 282, 430-37), and Plaintiffs withdrew Inmate
17   Y from their trial testimony list entirely.   (Dkt. 4088.)   Dr. Murray's rebuttal of Dr. Wilcox's
18   claims regarding Inmate Y are discussed in further detail below.

19       In his expert report/Declaration and testimony, Dr. Murray candidly shared his
20   findings, identifying areas in which ADCRR exceeds national benchmarks, as well as
21   opportunities for improvements in the delivery of care.   (Dkt. 4309, ¶¶ 845-46, 847, 568.)
22   Dr. Murray is an unbiased, neutral expert whose opinions are therefore more reliable than
23   Dr. Wilcox, who is an advocate and whose methodology suffers from significant selection
24   bias.[4]

25
26
27   _____
         [4] Dr. Wilcox is also prone to exaggeration, repeatedly referring to the care provided
28   as "terrible," "shocking, " and "appalling."

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.     Defendants Provide Adequate Care for the Serious Medical Needs of ADCRR Inmates.**

Defendants do not dispute that ADCRR inmates have serious medical needs and have presented objective, system-wide evidence that the healthcare delivery system provides adequate care for these needs.

**C.     Plaintiffs Fail to Establish Systemic Deficiencies in ADCRR's Medical Care System.**

**1.     Nurses Provide Adequate Care and Appropriate Referrals to Providers.**

Dr. Wilcox finds fault with ADCRR and Centurion utilizing nurses to triage inmate health needs requests ("HNRs"). (Dkt. 4308, ¶¶ 606-07.) Yet, Dr. Wilcox himself utilizes the very same approach in the Salt Lake County Jail. (R.T. 11/10/21 p.m. at 1813:13-1814:24.) Moreover, in his written and live trial testimony, Dr. Wilcox did not cite to any other correctional systems employing a different approach.

Plaintiffs cite to Dr. Stern's report for the proposition that ADCRR nurses who decide whether a patient should see a provider are practicing outside their scope. (Dkt. 4308, ¶ 608-09.) For the reasons articulated in Defendants' Motion to Strike and Reply thereto (Dkt. 4219 at 2-3, Dkt. 4239), the Court should not consider the Stern report. However, if the Court does not grant Defendants' Motion as to the Stern report, Plaintiffs mischaracterize Dr. Stern, who stated that the actions of the two nurses referenced in his report "were within the RN's legal scope of practice." (Dkt. 3379 at n. 81.)

Plaintiffs point to a few examples across the entire ADCRR system in which nurses should have referred a patient to a provider (or more timely done so). (Dkt. 4308, ¶¶ 610-11.) However, this situation is not unique to ADCRR. Dr. Wilcox's company was sued following the tragic death of a Salt Lake County jail inmate from peritonitis, where the inmate pushed the emergency call button in her cell 17 times but was ignored by nursing staff, resulting in agonizing pain and eventually death. (Dkt. 4309, ¶ 516.) Dr. Wilcox, who completed the mortality review of the inmate concluded that there were no mistakes in the care she was provided. (*Id.*) However, expert H Tai Kim, MD opined that she would

6

1    have survived if she had been provided the Prilosec that was prescribed for her but never
2    given to her in the four days she was in the jail.  (*Id.*)

3         Additionally, in many of the examples cited by Plaintiffs in paragraph 611, the
4    mortality review concluded that delays by nursing in referring the inmate to a provider did
5    not cause or contribute to the outcome.  These include Ex. 155 (concluding that death could
6    not have been prevented or delayed by more timely intervention; death was not caused by
7    or affected in a negative manner by medical personnel; care met community standards; and
8    death was unavoidable) (*see* ADCRRM0019598-99); Ex. 161 (concluding that death could
9    not have been prevented or delayed by more timely intervention; death was not caused by
10   or affected in a negative manner by medical personnel; care met community standards; and
11   death was unavoidable) (*see* ADCRRM0012708-09); Ex. 241 (finding a delay in access to
12   access to care but concluding that death could not have been prevented or delayed by more
13   timely intervention; death was not caused by or affected in a negative manner by medical
14   personnel;  care  met  community  standards;  and  death  was  unavoidable)  (*see*
15   ADCRRM0012728-09); Ex. 2101 (finding that nurse's failure to timely elevate EKG
16   reading to the provider level was non-contributory to the patient's outcome and concluding
17   that death could not have been prevented or delayed by more timely intervention; death was
18   not caused by or affected in a negative manner by medical personnel; care met community
19   standards; and death was unavoidable) (*see* ADCRR00088330-31).   Predictably, Dr.
20   Wilcox did not include any of these mortality reviews in his expert Declaration, and the
21   reviewer's conclusions are therefore unrebutted by any competent evidence.

22        Plaintiffs also point to several examples of mortality reviews in which the reviewer
23   was critical of the quality of the nursing documentation in the records.  (Dkt. 4308, ¶ 617.)
24   However, in many of these examples, the deficiencies in documentation did not contribute
25   to the outcome.  For the inmate identified in Ex. 183, the mortality review noted that nursing
26   documentation on the date the inmate was sent out to the hospital did not outline the transfer
27   or the treatment plan; however, this issue did not affect the outcome, where the inmate died
28   at the hospital.  (Ex. 183 at ADCRRM0026150-52.)  The mortality review concluded that

death could not have been prevented or delayed by more timely intervention; death was not caused by or affected in a negative manner by medical personnel; care met community standards; and death was unavoidable. (*Id.* at ADCRRM0026151-52.) For the inmate identified in Ex. 268, the mortality review was critical of failure to document the inmate's blood pressure before a hospital transport but concluded that care met community standards and the death could not have been prevented or delayed by more timely intervention, was not caused by or affected in a negative manner by medical personnel, and was unavoidable. (Ex. 268 at ADCRRM0000031-32.) For the inmate identified in Ex. 306, the mortality review was critical of a lack of documentation of wound care, but this did not contribute to the inmate's death where he had terminal cancer with a poor prognosis and had refused treatment other than comfort care. (Ex. 306 at ADCRR00000057, ADCRR00000059.) The reviewer concluded that the inmate's care met community standards and the death could not have been prevented or delayed by more timely intervention, was not caused by or affected in a negative manner by medical personnel, and was unavoidable. (Id. at ADCRR00000058-59.) For the inmate identified in Ex. 386, the mortality review was critical that weight documentation was not done properly but concluded, "[t]his was an expected death in an elderly male with many complicating health factors. Care was appropriate and compassionate." (Ex. 386 at ADCM1603943.) For the inmate identified in Ex. 444, the mortality review found that nursing documentation regarding a hospital send-out was incomplete because no action plan was documented, but the reviewer noted that the patient was timely sent to the hospital, where he later died. (Ex. 386 at ADCRRM0005591.) The reviewer concluded that the inmate's care met community standards and the death could not have been prevented or delayed by more timely intervention, was not caused by or affected in a negative manner by medical personnel, and was unavoidable. (*Id.* at ADCRRM0005590-91.) For the inmate identified in Ex. 517, the mortality review states "[n]ursing documentation should include more detail about who they spoke to (ie. [sic] "spoke with charge nurse at the emergency department and report was given")." (Ex. 517 at ADCRR00088423.) However, this lack of detail in documentation

did not have any bearing on the outcome, and the inmate died at the hospital two days later. (*Id.* at ADCRR00088421.)  The reviewer concluded that the inmate's care met community standards and the death could not have been prevented or delayed by more timely intervention, was not caused by or affected in a negative manner by medical personnel, and was unavoidable.  (*Id.* at ADCRR00088422-23.)

Plaintiffs claim that ADCRR does not have adequate clinic space for nurses to treat patients.  (Dkt. 4308, ¶¶ 602-22.)  But in support for this they cite only to two photographs that Dr. Wilcox requested to be taken on his tour of ASPC-Lewis.  (Dkt. 4308, ¶ 624.)  Dr. Wilcox was told by facility leadership during the tour that the two rooms were not exam rooms but rather were storage rooms that were on occasion used for overflow triage of patients.  (Dkt. 4203, ¶ 1065.)  Despite being told that he was mistaken, Dr. Wilcox nonetheless included the photographs in his expert report and written trial testimony, and Plaintiffs continue to rely on them.  (*Id.*)  Dr. Murray, who toured all the medical clinics at the ten state-run ADCRR prison complexes immediately prior to the trial, opines that there is adequate clinic space at each complex to treat patients.  (Dkt. 4203, ¶¶ 17, 22, 1065, 1074.)

Plaintiffs also assert that nursing appointments are not timely.  (Dkt. 4308, ¶ 626.)  In support, Plaintiffs cite to Defendants' performance on Stipulation Performance Measure 37, which requires that inmates be seen within 24 hours of receipt of an HNR, at just two ADCRR complexes – ASPC-Tucson and ASPC-Lewis (where Plaintiffs note a single month of non-compliance in 2021).  (Dkt. 4308, ¶¶ 627-28, 631.)  What Plaintiffs fail to mention is that the other eight ASPCs consistently meet or exceed this PM, as demonstrated by Plaintiffs' summary chart admitted as Exhibit 1258.

### 2.    ADCRR and Centurion have Sufficient Providers to Deliver Adequate Medical Care.

#### a.    Mid-Level Providers

Plaintiffs claim that mid-level providers lack the expertise to treat complex patients and are poorly supervised.  (Dkt. 4308, ¶ 638.)  Plaintiffs fail to recognize that each ASPC

9

1    has a physician-level site medical director who provides direct patient care and supervises

2    the mid-level providers at that complex.  (Dkt. 4309, ¶¶ 509, 631; Dkt. 4203, ¶ 1064.)

3    Centurion's Statewide Medical Director, Dr. Orm, and Corporate Clinical Director, Dr. Wu,

4    are also available for consultations and supervision of mid-level providers.  (Dkt. 4203, ¶

5    1064.)  Additionally, Centurion provides the Rubicon MD service, which allows nurses,

6    mid-level providers, and physicians to consult with specialists on their cases without

7    needing any utilization management approval.  (Dkt. 4309, ¶¶ 898, 902-03, Dkt. 4203, ¶

8    1064.)  This is consistent with the Arizona State Board of Nursing Standards cited by

9    Plaintiffs, which provide that an RN should consult with a physician or other health care

10   providers if a situation or condition occurs in a patient that is beyond the RNP's knowledge

11   and experience.  (Dkt. 4308 at n. 117.)

12       Plaintiffs also incorrectly claim that ADCRR has a ratio of roughly seven mid-level

13   providers to one physician.  (Dkt. 4308, ¶ 640; Dkt. 4203, ¶ 1071.)  In making this

14   calculation, Plaintiffs ignore the existence of the site medical directors at each complex,

15   who are all physicians, and count only staff physicians.  (Dkt. 4309, ¶ 509.)  When

16   calculated accurately, ADCRR's ratio is actually two mid-levels to one provider, which is

17   consistent with other correctional systems and the community standard.  (Dkt. 4309, ¶¶

18   1836, 1017; Dkt. 4203, ¶ 1071.)  Plaintiffs have not cited any evidence to the contrary.

19       Plaintiffs fault ADCRR for relying on mid-level providers to provide much of the

20   primary care in the system.  (Dkt. 4308, ¶ 636.)  However, Plaintiffs have not pointed to

21   any correctional systems in which primary care is provided only by physicians.  Nor have

22   they cited to any statutes or standards that preclude ADCRR from doing so.  While Arizona

23   law requires that physician's assistants be supervised by a physician under a written

24   agreement, Centurion employs only a handful of physician's assistants statewide, and the

25   remainder of the mid-level providers employed by Centurion are able to practice

26   independently.  (Dkt. 4294 (10/13/2021 Tr. of Wendy Orm, M.D. at 31-33).)

27

28

### b. Differential Diagnoses

Plaintiffs assert that providers do not develop and test differential diagnoses. (Dkt. 4308, ¶ 650.) Plaintiffs again cite to a few isolated instances in support of this claim, primarily relying on the case of named Plaintiff Kendall Johnson. Dr. Wilcox concedes that Ms. Johnson, who has been diagnosed with multiple sclerosis ("MS"), had "an unusual disease process." (R.T. 11/10/21 p.m. at 1683:25-1684:1.) Ms. Johnson is receiving Ocrevus, which Dr. Wilcox agrees is the only appropriate medication for her condition (primary progressive MS), and Ms. Johnson testified that Ocrevus has helped to reverse her symptoms, including the numbness in her legs and inability to move them. (Dkt. 4308, ¶ 663; R.T. 11/01/21 a.m. at 30:22-31:1.) Plaintiffs allege that if she had been started on Ocrevus when she first exhibited symptoms, she might have staved off more severe symptoms for months or years. (Dkt. 4308, ¶ 665.) However, this is highly speculative, given the rapid onset and severity of Ms. Johnson's symptoms. Additionally, Ocrevus was not even approved by the FDA at the point at which Plaintiffs claim she would have benefitted from its use.[5] On cross examination, Dr. Wilcox could not recall when he first saw Ocrevus used with his patients, stating "I've just seen it come through." (R.T. 11/10/21 p.m. at 1841:12-1841:13.) Dr. Wilcox acknowledges that Ocrevus is a non-formulary medication that has to be requested through Diamond Pharmacy. (*Id.* at 1840:22-1841:4.)

Plaintiffs also criticize the delays from an outside neurologist in confirming Ms. Johnson's diagnosis, but they ignore that her first neurology visit was in March 2020, immediately prior to wide-scale COVID-19 lockdowns across the state. (R.T. 11/10/21 a.m. at 25:8-12.) The neurologist asked for additional imaging and lab tests and wanted to see Ms. Johnson for follow-up in one month, but then stopped seeing all patients due to COVID-19 prior to that follow-up. (*Id.* at 25:22-25:23, 26:2-26:5; Ex. 2385.) As a result,

---

[5] The Court can take judicial notice of the FDA's approval of Ocrevus as the only available treatment of primary progressive multiple sclerosis on March 28, 2017. *See FDA approves new drug to treat multiple sclerosis*, available at https://www.fda.gov/news-events/press-announcements/fda-approves-new-drug-treat-multiple-sclerosis.

1    a second neurologist had to be obtained who was willing to see patients despite the

2    pandemic.  (R.T. 11/10/21 a.m. at 29:10-29:15.)

3                        **c.        Management of Chronic Care and Complex Cases**

4          Plaintiffs claim that providers fail to adequately manage their chronic care and

5    complex cases. (Dkt. 4308, ¶ 671.)  In support, Plaintiffs rely on the opinions of Dr. Wilcox,

6    who asserts that inmates with multiple medical conditions should be managed by a

7    physician, rather than by a mid-level provider.  (*Id.* at ¶ 674.)  Dr. Murray disagrees, noting

8    that in his experience, mid-level providers are capable of managing patients with multiple

9    chronic conditions and that Centurion provides ample support and resources, including

10   access to site-level, regional, and corporate physicians and Rubicon MD specialists for

11   consultations when needed on complex cases.  (Dkt. 4203, ¶ 1064.)  Dr. Wilcox cites to no

12   examples of, and Plaintiffs have presented no evidence of, any other correctional health

13   systems in which inmates are treated exclusively by physicians.  Additionally, Dr. Wilcox

14   admits that there is no physician staffed at one of the two Salt Lake County jails, only an

15   RN.  (R.T. 11/10/21 p.m. at 1819:16-1820:1.)

16         Plaintiffs also incorrectly cite Dr. Murray's ratings for his chronic care sample,

17   claiming that his team found only 28% of the 80 patients received care that was timely and

18   reflected good decision-making and 18% had documentation that was timely and based on

19   good decision-making.  (Dkt. 4308, ¶ 677.)  However, Plaintiffs mischaracterize Dr.

20   Murray's scoring system, conflating his rating of excellent care or documentation with

21   timeliness and good decision-making.  In actuality, Dr. Murray's team found that chronic

22   and episodic care was good to very good (average = 3.8 and 4.4, respectively), and

23   documentation was good (average = 3.4).  (Dkt. 4203, ¶ 988.)  Plaintiffs attempted to pin

24   Dr. Murray into testifying that only care or documentation that was scored as excellent was

25   timely and reflected good decision-making, but he repeatedly disagreed with this

26   proposition. (R.T. 12/08/21 a.m. at 3544:20-24, 3546:2-3546:8, 3546:24-3547:2, 3547:10-

27   3547:13, 3548:18-3548:23.)

28

1    Plaintiffs also cite to a few mortality reviews which they claim identify "significant

2    lapses" in ADCRR's chronic care program. (Dkt. 4308, ¶ 678.) However, the mortality

3    reviews cited by Plaintiffs for this proposition are unavailing. For example, in the first

4    mortality review cited by Plaintiffs as a failure of chronic care management (Ex. 200), the

5    inmate was not enrolled in a chronic care clinic because he did not actually have a chronic

6    care diagnosis. (Ex. 200 at 1.) The mortality review documents that he received ample

7    treatment – he was sent out to the hospital for evaluation multiple times in the month leading

8    up to his death and was admitted to the infirmary following his return from the hospital,

9    where he had access to 24/7 nursing care. (*Id.*) The mortality review concluded that the

10   inmate's care was timely and met the standard of care, and his death was unavoidable. (*Id.*

11   at 2-3.)

12                      d.    **Diagnostic Testing**

13   Plaintiffs allege that providers fail to follow up on significantly abnormal diagnostic

14   tests. (Dkt. 4308, ¶ 680.) In support, Plaintiffs rely on several isolated instances from

15   mortality reviews and Dr. Wilcox's hand-selected records reviews. (*Id.* at ¶¶ 608-81.)

16   Plaintiffs also cite to Dr. Wilcox's prior expert reports, which should be excluded as

17   inadmissible hearsay as previously stated in Defendants' Motion to Strike and Reply

18   thereto.[6] (Dkt. 4219 at 6, 4239 at 4-6.) To the extent that the Court does not exclude these

19   prior reports, they do not suffice to put Defendants on notice of a long-standing, systemic

20   problem as claimed by Plaintiffs because the handful of examples highlighted in the prior

21   reports suffer from the same selection bias that has plagued Dr. Wilcox's work throughout

22   this litigation. When viewed against the backdrop of the sheer number of diagnostic tests

23   ordered throughout the ADCRR system, it is to be expected that some test results would be

24   delayed, and some diagnoses missed, particularly when Plaintiffs have had a team of

25   attorneys and staff searching medical records for years to find examples of poor outcomes

26

27          [6] Plaintiffs' argument that the challenged evidence is being offered to establish
     notice has been raised and rejected by the Court multiple times, and the Court should not
28   entertain Plaintiffs' repeated attempt to overturn the Court's ruling on this issue.

1   to feed to their medical expert.  (Dkt. 4203, ¶ 1038.)  Indeed, Plaintiffs' counsel have had
2   access to eOMIS since September 2016 after the Court granted their request for access on
3   June 24, 2016.  (Dkt. 1619.)

4         Plaintiffs also cite to ADCRR's performance on Stipulation PM 46, which provides
5   that a provider must review diagnostic reports and act upon those with abnormal values
6   within 5 days of receipt.  (Ex. 1850 at 11.)  Plaintiffs have not presented any evidence that
7   the Stipulation PMs, which were created and negotiated by attorneys, somehow set the
8   standard of care.  Additionally, Plaintiffs ignore that Douglas, Eyman, Lewis, Florence, and
9   Safford were all compliant with PM 46 every month in 2021, and Perryville and Yuma each
10  had only a single month of non-compliance.  (Ex. 1260.)  While Tucson, Phoenix, and Yuma
11  had two or three months of non-compliance with this measure (*see id.*), the performance of
12  the majority of the ASPCs proves that there is no systemic issue with follow-up on abnormal
13  diagnostic tests.  Moreover, the new EHR system that is required as part of the current RFP
14  should alleviate the challenges presented by eOMIS, which does not have an automatic
15  tickler system to notify providers when diagnostic results are available for review.  (Dkt.
16  4203, ¶ 1069.)

17            **e.**    **Hospital Records**

18        Plaintiffs also claim that providers fail to obtain hospital records and review and act
19  on them.  (Dkt. 4308, ¶ 686.)  Plaintiffs further claim that ADCRR has a "significant
20  documentation problem" and has repeatedly identified that "a lack of hospitalization records
21  and/or the failure to prescribe treatment based on the records is a problem."  (Dkt. 4308, ¶
22  690.)  None of the mortality reviews cited by Plaintiffs for this proposition suggest that a
23  delay in receiving hospital records or failure to prescribe treatment based on those records
24  contributed to poor care.  Further, except for the mortality review in Ex. 199, all other
25  mortality reviews found the care met the standard of care and that death was
26  unavoidable.[7]  The criticisms in Ex. 199 focus on a mental health clinician's failure to report

27  _____
28        [7] Notably, none of these mortality reviews were included in Dr. Wilcox's written
    trial testimony.  (Dkt. 4138.)

14

medical concerns to nursing despite observing patient illness. (Ex. 199 at ADCRRM0019615.) As to the missing records, the recommendation was, "[r]ecords from hospitalizations must be scanned into eOMIS according to established policies and procedures." (*Id.* at ADCRRM0019616.) Predictably, Plaintiffs exclude information detrimental to their argument. For example, in Ex. 400, the mortality review states that the "[l]ack of documentation is evidenced by the lack of efficient transmission of the records from Mountain Vista to provider. The [sic] caused a delay in care." (Ex. 400 at ADCM1613851.) But Plaintiffs exclude the very next sentence: "However, this would not have changed the outcome." (*Id.*) In addition, Ex. 515 does not support their claim that the lack of hospital records or the failure to prescribe treatment based on those records is a documentation problem because the records in question were from a hospitalization which resulted in the inmate dying in the hospital. (Ex. 515 at ADCRRM0012719.) As a result, timely receipt of the hospital records could not have impacted the outcome.

Plaintiffs also cite to ADCRR's performance on PM 44, which requires that providers review and act upon hospital treatment recommendations within 24 hours. (Ex. 1850 at 11.) Plaintiffs have not demonstrated that there is a system-wide issue with respect to this PM, where Safford was compliant every month in 2021, Douglas had only a single month of non-compliance, and Phoenix and Winslow were compliant the majority of the time. (Ex. 1259.) As with PM 46, performance on PM 44 is complicated by eOMIS – the records must be received from the outside hospital and scanned into the inmate's chart, and there is no automatic mechanism to notify the provider that hospital records are available for review. (Dkt. 4203, ¶ 1069.) The new EHR should greatly improve the efficiency of this process, resulting in more timely review of hospital records. (*Id.*)

### f.    Pain Medication

Plaintiffs allege that providers fail to provide adequate pain medication. (Dkt. 4308, ¶ 695.) As with their other assertions, Plaintiffs base this claim on a few anecdotal examples gleaned from Dr. Wilcox's non-random records review and a handful of mortality reviews and psychological autopsies. And as with other sections of their proposed findings,

1    Plaintiffs either mischaracterize or make entirely unfounded statements regarding the
2    records.  For example, Plaintiffs claim as to the inmate identified in Ex. 218 that he "may
3    have been undertreated." (*Id.* at ¶ 701.)  However, the psychological autopsy does not come
4    to this conclusion, nor would the psychologist who completed the review have been acting
5    within the scope of her license to come to such a conclusion.  (Ex. 218 at ADCRR00000131-
6    32.)  Additionally, Dr. Wilcox did not offer any such opinion regarding this inmate, either
7    at trial or in his written trial testimony, and the psychological autopsy reflects that the inmate
8    was receiving medications, physical therapy, treatment with a TENS unit, and ongoing
9    monitoring by medical three times per week for his chronic pain.  (*Id.* at ADCRR00000125.)
10   Plaintiffs cite to the inmate identified in Ex. 364 for the "same" issue (Dkt. 4308, ¶ 701),
11   but a review of the psychological autopsy, again completed by a psychologist not a medical
12   doctor, did not conclude that the inmate was "undertreated" for her pain.  Instead, the
13   psychological autopsy reflects that the inmate was sent for testing for vulvodynia, diagnosed
14   with fibromyalgia, and prescribed Cymbalta for her pain.  (Ex. 364 at ADCRR00000168.)
15   As with the inmate in Ex. 218, Dr. Wilcox did not offer any opinions regarding her care,
16   and there is no other competent evidence from which the Court can reach such a conclusion.
17   Plaintiffs' bald claims regarding any inadequacies in the care provided to these inmates with
18   respect to pain management are utterly unsupported and should be disregarded by the Court.

19          Plaintiffs also cite to the inmate identified in Ex. 355 as an example of "timely follow
20   up of pain issues lacking." (Dkt. 4308, ¶ 701.)  While the mortality review for this inmate
21   states that "follow up of pain issues appeared lacking," the inmate also had a significant
22   history of non-compliance with and likely diversion of his prescribed pain medications.
23   (Ex. 355 at ADCM1585578, ADCM1585583.)  The inmate requested that his morning dose
24   of pain medication (amitriptyline) be discontinued a few months before his death and was
25   later observed by corrections staff "pocketing" his evening dose of this medication.  (Ex.
26   355 at ADCM1585583.)  Additionally, the review notes that the inmate's morphine had
27   been recently discontinued due to none being detected in his system in his lab results.  (*Id.*)
28   At his last mental health visit prior to his death, the inmate refused a diagnostic lab panel

1    and drug screen, likely reflective of the illegal drugs found in his system.  (*Id.* at
2    ADCM1585576.)

3         Plaintiffs also assert that the use of Tylenol #3 is a poor choice for pain control.  (Dkt.
4    4308, ¶ 699.)  They base this assertion on Dr. Wilcox's claim that "[m]odern medicine just
5    does not use Tylenol #3."  (Dkt. 4139, ¶ 312.)  However, this claim has been debunked by
6    Dr. Murray, who opines that the Centurion formulary includes appropriate options for pain
7    medication (Tylenol #3 and morphine), and the UTMB system uses the same two options
8    available in Arizona.  (Dkt. 4203, ¶ 1067.)  Dr. Murray further opines that limiting opioid
9    prescriptions "is consistent with the nationwide effort to implement opioid stewardship
10   programs to help providers to safely initiate opioid prescribing, set patient expectations
11   around pain management, and balance the risks and harms associated with opioid use and
12   abuse."  (*Id.*)  Dr. Murray also notes that the process for obtaining approval for non-
13   formulary medications, including pain medications, is not burdensome in the ADCRR
14   system and can be used when in the provider's medical judgment, another option is
15   clinically indicated.  (*Id.*)

16              **g.    Treatment of Hepatitis C**

17        Plaintiffs additionally claim that Defendants fail to provide timely treatment for
18   Hepatitis C and are not following the community standard for treatment (Dkt. 4308, ¶¶ 705,
19   708.)  In support, they cite to a few examples of inmates whose treatment they claim was
20   delayed or who experienced poor outcomes.  (*Id.* at ¶ 708.)  However, the delays in
21   treatment identified by Dr. Wilcox largely pre-date the Centurion Hepatitis C program.
22   (Dkt. 4158, ¶ 56.)  Additionally, successful treatment of Hepatitis C at late stages is not a
23   guarantee of a good outcome, and it is to be expected in any system, but particularly in a
24   correctional system, that some percentage of individuals with cirrhosis and/or advanced
25   fibrosis will experience poor outcomes despite receiving appropriate care.  (*Id.* at ¶ 57.)
26   This is in no way an example of a systemic problem with the delivery of Hepatitis C
27   treatment.  (*Id.* at ¶ 58.)

28

1    Defendants presented evidence that since assuming the contract in July 2019,
2    Centurion has prioritized treatment of chronic Hepatitis C for ADCRR inmates. (*Id.* at ¶
3    41; Dkt. 4309, ¶ 961.) ADCRR's policies and procedures for the evaluation and treatment
4    of Hepatitis C have also recently been updated to ensure consistency with evidence-based
5    practices. (Dkt. 4309, ¶ 964.) Centurion's Hepatitis C program is designed to provide
6    treatment based on the severity of illness and risk of complication, and patients with chronic
7    Hepatitis C are classified into groups based on Priority Levels. (Dkt. 4158, ¶ 57.) Patients
8    in Priority Level 1 are in the highest priority group for evaluation and treatment and include
9    patients with Fibrosis Stage 4 (F4) disease (cirrhosis), as well as those with HIV or hepatitis
10   B virus co-infection. (Dkt. 4309, ¶ 965.) Priority Level 2 patients are in the intermediate
11   priority group and include patients with Fibrosis stage 3 (F3) disease (advanced fibrosis),
12   as well as patients with Fibrosis stage 2 disease, along with comorbid conditions (e.g.,
13   chronic kidney disease, diabetes). (Dkt. 4309, ¶ 966.) Finally, Priority Level 3 patients are
14   those with Fibrosis stages F2 through F0. (Dkt. 4309, ¶ 967.) This priority system allows
15   for evaluation and treatment of patients with the most advanced disease, while also
16   monitoring the progression of patients with less advanced liver disease. (Dkt. 4309, ¶ 968.)
17   Prior to the implementation of the Centurion program, 160 inmates had been treated.
18   (Dkt. 4309, ¶ 974.) As of August 31, 2021, 827 inmates had completed treatment, 130
19   inmates were undergoing treatment, and 664 were in the process of being worked up for
20   inclusion in the program. (*Id.*) The goal is to complete treatment for all F3 and F4 inmates
21   by the end of the second year of the program. (Dkt. 4309, ¶ 975.) During that timeframe,
22   some inmates with lower Priority Levels have also been treated, but after that first milestone
23   is reached, the focus will shift to completing treatment for all inmates, which will continue
24   to be based on the systemic approach outlined in the ADCRR policies and procedures. (*Id.*)
25   Additionally, the program is not static, and Centurion is continually looking at ways
26   of innovating and best utilizing available resources to treat as many patients in the shortest
27   possible timeframe. (Dkt. 4158, ¶ 53.) ADCRR has worked closely with Centurion
28   throughout the implementation of the program and has recently revised the Medical

18

1    Services Technical Manual ("MSTM") to remove a previous exclusion from Hepatitis C

2    treatment of inmates with an active substance abuse disorder diagnosis, as well as

3    disciplinary action for a positive urinalysis.  (Dkt. 4158, ¶ 54.)  The complete revision of

4    the Hepatitis C MSTM chapter to reflect current evidence-based practices is a reflection of

5    the high priority that ADCRR has placed on positive health outcomes for the prison

6    population.  (Dkt. 4158, ¶ 55.)

7         In Dr. Phillips' opinion, Centurion's Hepatitis C program is very proactive and

8    represents best practices for the treatment of Hepatitis C in a correctional setting.  (*Id.* at ¶

9    59.)  Dr. Murray agrees that ADCRR and Centurion's testing and treatment protocol, which

10   relies on staging, "reflects current best practices in a correctional setting and is in line with

11   what other state correctional systems are currently doing."  (Dkt. 4206, ¶ 1034.)  Because

12   Plaintiffs have not cited to any other correctional systems or presented any evidence

13   establishing the community standard of care with respect to the treatment of Hepatitis C in

14   a correctional setting, the Court should accept Dr. Phillips' and Dr. Murray's conclusions

15   as unrebutted.

16        Plaintiffs assert that Defendants fail to offer or follow-up on necessary health

17   screenings based on age, medical history, and gender (Dkt. 4308, ¶¶ 726, 728.)  Plaintiffs

18   cite to a few isolated instances of inmates who were not offered preventive screenings.  (*Id.*

19   at ¶ 728.)  Dr. Murray also found a few such examples in his random sample but was

20   informed that ADCRR and Centurion are revising guidelines for age-appropriate screenings

21   and are prioritizing provider education on the importance of preventive screenings.  (Dkt.

22   4203, ¶ 1068.)  Dr. Murray opines that "[i]mplementing a new EHR as is required in the

23   new RFP will help tremendously in this regard, as it will have appropriate safeguards to

24   alert providers when such screenings are due."  (*Id.*)

25                    **h.    Treatment of Substance Use Disorder**

26        Plaintiffs claim that Defendants fail to treat Substance Use Disorder ("SUD") with

27   community-standard, evidence-based treatment, namely Medication assisted treatment

28   ("MAT").  (Dkt. 4308, ¶¶ 717, 723.)  Because treatment of SUD is not mentioned anywhere

in Plaintiffs' Complaint and was not certified as a class claim, the Court should disregard any evidence from Plaintiffs regarding treatment of SUD.  If the Court nonetheless decides to consider the issue, the Court should find that Defendants' approach to treatment of SUD to be consistent with other prison systems and the community standard of care.

MAT is the administration of one of three types of medications – methadone, buprenorphine, and injectable naltrexone – to patients with opioid use disorder.  (R.T. 12/8/21 p.m. at 3616:12-3616:16.)  MAT is part of an overall comprehensive treatment of opioid use disorder and includes counseling, group therapy, 12-step programs, and possible treatment of concomitant mental health issues, and then medication administration is the "medication assisted treatment" portion of the treatment regimen.  (R.T. 12/8/21 p.m. at 3616:19-3616:24.)

Contrary to Dr. Wilcox's claims, MAT is available to ADCRR inmates. (Dkt. 4158 at ¶ 29.)  There are two Second Chance Centers – one located at Perryville and the other at Lewis – that provide the treatment.  (R.T. 12/8/21 p.m. at 3617:2-3617:5.)  The Second Chance Centers are residential treatment programs and are used for patients with a diagnosed opioid use disorder who have 60 days left in custody.  (R.T. 12/8/21 p.m. at 3617:6-3617:11.)  At the end of that program Vivitrol injections are offered as well as a transition into the community for patients who desire to be on other forms of MAT.  (*Id.*)

Ongoing MAT for inmates who are not about to be released poses significant security concerns because there is a strong incentive for diversion. (Dkt. 4158 at ¶ 22.)  Methadone and buprenorphine have a high value as contraband in a correctional setting.  (Dkt. 4158 at ¶ 23.)  Additionally, inmates who are known to be receiving MAT may be threatened or targeted for abuse by other inmates.  (Dkt. 4158 at ¶ 23.)  As a result, methadone and buprenorphine cannot be administered during a regular pill pass or pill call.  (Dkt. 4158 at ¶ 24.)  They must be administered in a controlled setting, where medical and corrections staff are available to supervise administration of the medication and individually verify its consumption.  (Dkt. 4158 at ¶ 24.)

20

Administration of MAT in the clinic therefore requires a significant amount of time, staffing resources, and valuable clinic space to conduct properly. (Dkt. 4158 at ¶ 27.)  There are numerous security risks associated with a MAT program.  (R.T. 12/8/21 p.m. at 3618:1-3618:20.)  First, the medications can be diverted within the system to other inmates.  (R.T. 12/8/21 p.m. at 3618:4-3618:20.)  Second, there is the possibility of overdose of the diverted medications.  (R.T. 12/8/21 p.m. at 3618:10-3618:17.)  Third, the inmates in the program could potentially be targeted by other inmates who want to get the medication.  (R.T. 12/8/21 p.m. at 3618:12-3618:20.)  Because of the length of sentences for the inmate population, the establishment of a MAT program systemwide at ADCRR would prove to be a big challenge.  (R.T. 12/8/21 p.m. at 3619:17-3620:7.)  It would drastically impact staffing and there would need to be a separate physical plant, including separate housing, in which to administer the medication. (R.T. 12/8/21 p.m. at 3620:1-3620:17.)

The current MAT program that exists in the ADCRR is not staffed with Centurion employees.  (R.T. 12/8/21 p.m. at 3620:18-3620:20.)  ADCRR has a special programming division with licensed counselors who take care of those patients, conduct the groups, and complete the discharge planning.  (R.T. 12/8/21 p.m. at 3620:18-3620:22.)  The current MAT program does not fall under the Centurion contract for the provision of health care. (R.T. 12/8/21 p.m. at 3620:23-3620:25.)

ADCRR also has a separate pilot program called the Men In Recovery Community (MIRC), which is located at the Tucson Manzanita unit.  (R.T. 12/8/21 p.m. at 3621:6-3621:9.)  It is a residential treatment program, with 80 inmates currently participating.  (R.T. 12/8/21 p.m. at 3621:8-3621:11.)  The MIRC program is six months long and is geared toward patients who have a substance use disorder with a high risk for recidivism.  (R.T. 12/8/21 p.m. at 3621:12-3621:14.)  Part of that program entails offering comprehensive MAT services. (R.T. 12/8/21 p.m. at 3621:12-3621:16.)

Dr. Phillips reviewed Dr. Wilcox's claims regarding provision of MAT for substance use disorder ("SUD"), as well as Robert Joy's resulting assumptions that he included in his staffing analysis. (Dkt. 4158 at ¶ 11.)  When Dr. Phillips was at Maricopa County, he was

21

part of the team that developed a treatment program using methadone and naltrexone, as well as supporting the initiation of buprenorphine, for individuals in the Maricopa County jails who were about to be released and were identified as being at high risk of relapse upon return to the community. (Dkt. 4158 at ¶ 18.)

For those individuals, Maricopa County offered medication induction in the 7-to-10-day period immediately before their release and coordinated with community Opioid Treatment Programs to develop treatment plans to ensure continuity of care upon release into the community. (Dkt. 4158 at ¶ 19.)  Dr. Wilcox sent a team approximately three years ago to visit Maricopa County to observe the program and potentially implement best practices for use in the Salt Lake City jail system. (Dkt. 4158 at ¶ 20.)

In designing the program at Maricopa County, Dr. Phillips focused on high-risk individuals immediately prior to their release because he concluded that this approach presented the best balance between reducing risk of relapse and limiting security risks posed by the administration of the medications. (Dkt. 4158 at ¶ 21.)  In Dr. Phillips' experience, MAT for SUD using methadone, buprenorphine, or naltrexone can be an effective component of treatment under certain circumstances, particularly immediately prior to release to the community, but its prolonged use in a correctional setting has significant risks and limitations. (Dkt. 4158 at ¶ 13.)

It is not the standard of care to provide MAT for SUD on such a large scale with a prison population, and, notably, neither Dr. Wilcox nor Joy cite to any literature or other sources that support such a claim. (Dkt. 4158 at ¶ 12.)  Enrolling large numbers of inmates in an opioid treatment program for an indefinite period of time has the strong potential of diverting resources that should be devoted to conducting daily clinical operations, like nursing sick call and provider chronic care visits. (Dkt. 4158 at ¶ 28.)

Inmates in ADCRR are also able to request naltrexone induction prior to release from custody.  (Dkt. 4158 at ¶ 30.)  ADCRR has a partnership with a pharmaceutical company that will supply the first dose of the medication to the prison, and the patient is provided with a follow-up treatment plan to allow for continued treatment in the community after

release.  (Dkt. 4158 at ¶ 30.)  There are several patients at Perryville and a patient at Lewis who have recently requested naltrexone injections.  (Dkt. 4158 at ¶ 30.)

In a jail setting, on average, individuals with SUD will be released from custody into the community much more quickly, where they are often at high risk of relapse.  (Dkt. 4158 at ¶ 15.)  By contrast, individuals in a prison setting have sentences lasting at least a year and often much longer, and the risk of relapse is more remote in time.  (Dkt. 4158 at ¶ 16.)  As a result, the need for MAT for the treatment of SUD is significantly lower in a prison setting than in a jail setting.  (Dkt. 4158 at ¶ 17.)

Within the ADCRR system, there is a large population of inmates with SUD.  Dkt. 4158 at ¶ 35.)  If MAT were to be started long-term on a large scale, the evaluation, treatment, and monitoring of this population would require not only an increase in healthcare staffing, but also additional security staff and additional facility infrastructure.  Dkt. 4158 at ¶ 35.)  It would also pull essential resources away from daily healthcare operations like sick call and medication administration.  (Dkt. 4158 at ¶ 35.)  A much more practical approach would be to include MAT as a potential component of release planning.  (Dkt. 4158 at ¶ 37.)

Plaintiffs' purported staffing expert Robert Joy claims that between 41% and 52% of ADCRR inmates need substance abuse treatment, but he admits that he is unaware of any other states that provide the same level of substance abuse programming.  (R.T. 11/01/21 p.m. at 159:10-159:15, 159:20-160:10.)  Joy is only aware of substance abuse treatment programs in California and Rhode Island and acknowledges that California's program is new.  (R.T. 11/01/21 p.m. at 161:5-161:12.)  Joy also assumes that there are unmet needs for certain services at ADCRR.  For example, he claims that 100% of the ADCRR inmate population need substance abuse disorder education, 62% of the population is in need of treatment for substance abuse disorder, and 21% of the population is specifically in need of medication-assisted treatment for substance abuse disorder.  (Dkt. 4203, ¶ 1072.)  Substance abuse disorder treatment has never been raised as an issue in this

case until now, and Dr. Murray is unaware of any other prison systems that provide medication-assisted treatment for substance abuse on nearly that scale. (Dkt. 4203, ¶ 1072.)

It is certainly not the standard of care to provide MAT for all inmates with SUD regardless of their release date, as claimed by Dr. Wilcox and Joy. (Dkt. 4158 at ¶ 38.)  In Dr. Phillips' opinion, the current approach at ADCRR to treatment of SUD is in accordance with the standard of care in a correctional setting. (Dkt. 4158 at ¶ 39.)

### i.    Preventive Screenings

Plaintiffs assert that Defendants fail to offer or follow-up on necessary health screenings based on age, medical history, and gender (Dkt. 4308, ¶¶ 726, 728.)  Plaintiffs cite to a few isolated instances of inmates who were not offered preventive screenings. (*Id.* at ¶ 728.)  Dr. Murray also found a few such examples in his random sample but was informed that ADCRR and Centurion are revising guidelines for age-appropriate screenings and are prioritizing provider education on the importance of preventive screenings. (Dkt. 4203, ¶ 1068.)  Dr. Murray opines that "[i]mplementing a new EHR as is required in the new RFP will help tremendously in this regard, as it will have appropriate safeguards to alert providers when such screenings are due." (*Id.*)

### 3.    Defendants Provide Access to Medically Necessary Specialty Care.

Plaintiffs claim that providers fail to recognize when patients require specialty care because their complex conditions are beyond the capacity of primary care providers. (Dkt. 4308, ¶¶ 732-33.)  In support, Plaintiffs cite to a handful of mortality reviews, only one of which (Ex. 189) was addressed by Dr. Wilcox. (*Id.* at 733.)  The inmate identified in Ex. 213 is cited for "failure to refer patient to orthopedics following hospitalization for acute facture" (Dkt. 4308, ¶ 733), but the mortality review does not include this statement, and the review concluded that the inmate's "[c]are met community standards and/or correctional standards without negative findings." (Ex. 213 at ADCRRM0019619.)  The mortality review for the inmate identified in Ex. 359 states that while "perhaps thought should have been given to seek additional specialty consultation," "it is doubtful that the outcome would have been any different considering the nature of the patient's disease," and the inmate's

1    death was "unavoidable." (Ex. 359 at ADCM1608455.) The mortality review for the

2    inmate identified in Ex. 460 notes "work up and further evaluation not performed in a timely

3    manner beginning in 2012" but also that "[p]rocedures are currently in place that have

4    addressed the deficiencies represented in theis [sic] case." (Ex. 460 at ADCM1598100.)

5    Because Plaintiffs have not presented any competent evidence establishing that the care

6    provided caused or contributed to the outcomes, the Court should disregard Plaintiffs'

7    citations to these cases.

8            Plaintiffs allege that specialty care is not provided in a timely manner. (Dkt. 4308,

9    ¶ 734.) In support, Plaintiffs primarily rely on the case of the inmate identified in Ex. 154.

10   Dr. Wilcox criticizes the care provided to the inmate with respect to diagnosing and treating

11   a testicular mass, alleging delays in submission/approval of an outside consult, delays in

12   receiving a stat radical orchiectomy, and failure to send the inmate back to the surgeon for

13   post-operative follow-up. (Dkt. 4308, ¶¶ 737, 740, 741.) However, Dr. Wilcox conceded

14   on cross-examination that these delays were due to factors outside ADCRR and Centurion's

15   control. Dr. Wilcox conceded that the outside lab that reported lab findings for the patient

16   made errors in reporting the inmate's beta HCG as normal. (R.T. 11/10/21 p.m. at 1833:6-

17   1834:3.) Dr. Wilcox conceded that the urologist who recommended a stat radical

18   orchiectomy on November 25, 2020 closed his practice, and as a result, another urologist

19   had to be obtained for the inmate. (*Id.* at 1829:2-1829:7.) Dr. Wilcox was not aware that

20   the inmate tested positive for COVID-19 on November 27, 2020 and had to be placed into

21   medical isolation. (*Id.* at 1839:3-1839:6.) Dr. Wilcox agreed that if the surgeon wanted to

22   see the inmate for post-operative follow-up, this should have been included in the discharge

23   instructions, but Dr. Wilcox was unable to locate any such notation in the inmate's records.

24   (*Id*. at 1836:5-186:10, 1838:3-1838:14.) Dr. Wilcox also conceded that the consult request

25   for the stat radical orchiectomy that he claimed was untimely was actually approved by

26   Centurion on an expedited basis within seven days. (*Id.* at 1826:3-1827:13, 1828:10-

27   1829:1.)

28

                                                    25

1        Another inmate cited by Plaintiffs as an example of alleged delays in management

2 of cancer is the inmate identified in Ex. 352, who was diagnosed with stage IV

3 adenocarcinoma of the lung while hospitalized for COVID-19.   (Ex. 352 at

4 ADCRRM0019657.)  While the mortality review contains the statement that "[r]eferrals for

5 cancer treatment should be submitted as 'urgent,'" submission of an urgent referral for

6 treatment of the inmate's cancer would not have changed the outcome, when due to the

7 advanced stage of his disease, the inmate elected to be DNR and to receive comfort care

8 only.   (*Id.* at ADCRRM0019660, ADCRRM0019657.)   Because this inmate was not

9 addressed by Dr. Wilcox in his Declaration, Plaintiffs have not presented any competent

10 evidence to rebut the conclusions of the mortality review that the care met the community

11 standard of care, the inmate's death could not have been prevented by more timely

12 intervention, and the death was unavoidable.   (*Id.* at ADCRRM0019658-

13 ADCRRM0019660.)

14        Plaintiffs also point to 2021 performance on Stipulation PMs 50 and 51, which relate

15 to timeliness of scheduling/completion of urgent and routine consults, in support of their

16 claim that specialty care is not timely.  However, Plaintiffs do not include charts showing

17 performance on these measures, presumably because they are not helpful to this argument.

18 For PM 50 (urgent consults), Douglas and Winslow were compliant every month, and

19 Perryville, Phoenix, Safford, and Tucson had only one month of non-compliance each. (Ex.

20 1263.)  For PM 51 (routine consults), Douglas and Safford were compliant every month,

21 Florence and Phoenix had only one month of non-compliance each, and Eyman, Tucson,

22 Winslow, and Yuma were compliant the majority of the time. (Ex. 1264.)  The fact that the

23 majority of the ASPCs were compliant with these measures the majority of the time is even

24 more remarkable against the backdrop of factors outside Defendants' control, including

25 continued spikes in community COVID-19 cases that cause disruptions in scheduling and

26 availability of outside providers and shortages of specialty providers willing to pay

27 Medicaid rates for treating inmates as mandated by Arizona law.

28

1          Plaintiffs also cite to a few scattered sets of CQI meeting minutes from early 2020

2     that identify issues with obtaining timely Utilization Management (UM) approval for

3     specialty consults as a source of scheduling problems.  (Dkt. 4308, ¶ 749.)  However,

4     Plaintiffs have not cited to any more recent CQI meeting minutes for this proposition, and

5     any such issues have clearly been fixed since that time given the high level of compliance

6     on PMs 50 and 51 throughout 2021.

7          Plaintiffs additionally point to a few examples of delays in specialty care at Tucson

8     due to issues with pre-op prep, refusal of a neurosurgeon to accept Eyman patients, and UM

9     issuance of Alternative Treatment Plans (ATPs) at Eyman and Perryville due to consult

10    requests not being sufficiently thorough.  (Dkt. 4308, ¶¶ 750-52.)  However, these isolated

11    instances fall far short of showing any systemic deficiencies in the provision of specialty

12    care to ADCRR inmates.

13         Plaintiffs also assert that providers fail to timely review and act on recommendations

14    from specialists.  (Dkt. 4308, ¶ 755.)  In support of their claim that "the untimely provider

15    reviews of specialty consultants' reports is [sic] a widespread practice in the Arizona prison

16    system," Plaintiffs cite to 2021 performance on Stipulation PM 52, which requires that

17    providers review and act upon specialty consult reports within 7 days.  (*Id.* at ¶ 757.)  But

18    as with PMs 50 and 51 above, Plaintiffs do not include a chart of these results in their

19    proposed findings, presumably because it is not favorable to their argument.  For PM 52,

20    Douglas and Safford were both compliant every month, Phoenix and Winslow had only one

21    month of non-compliance each, and Perryville, Tucson, and Yuma were all compliant the

22    majority of the time.  (Ex. 1265.)  Plaintiffs also cite to CAPs from Eyman and Florence for

23    PM 52 that they claim are evidence of systemic barriers to care.  (Dkt. 4308, ¶¶ 758-59.)

24    However, the fact that the majority of the ASPCs were compliant with PM 52 for the

25    majority of the time demonstrates that there are not any systemic deficiencies in reviewing

26    and acting upon treatment recommendations from specialists.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#### 4.      Defendants Provide People with Disabilities Medically Necessary Care, Supplies, and Equipment.

Plaintiffs assert that Defendants fail to ensure that inmates with disabilities are provided medically necessary care, supplies, and equipment.  (Dkt. 4308, ¶ 761.)  In support, Dr. Wilcox continues to claim that Inmate Y[8] had to have his penis amputated because he was denied accommodations for his disabilities.  (Dkt. 4138, ¶ 282.)  However, Inmate Y's medical records tell a very different story.  (Dkt. 4203, ¶ 1047.)

While the highly compressed timeframe of expert discovery in this case did not permit Dr. Murray to review the individual files of the inmates cited in Dr. Wilcox's expert report or trial Declaration, he was already familiar with Inmate Y's care, having previously prepared a declaration in this case dated September 25, 2020, in which he outlined his review of Inmate Y's records in response to an August 2020 letter from the Prison Law Office.  (Dkt. 4203, ¶ 1045.)

In preparation of that declaration, Dr. Murray reviewed the care of Inmate Y available in eOMIS from July 15, 2013 through September 25, 2020.  (Dkt. 4203, ¶ 1046.)  Dr. Murray also spoke with Centurion leadership and administrative staff, including Dr. John May, Dr. Johnny Wu, the Florence Facility Health Administrator, Centurion's Regional Director for CQI, and Inmate Y's treating providers, including Dr. Gilbreath and NP Stockton, regarding his care.  (Dkt. 4203, ¶ 1046.)

Over the period of Dr. Murray's review, Inmate Y was evaluated over 300 times by medical and mental health providers and had thousands of nursing encounters.  (Dkt. 4203, ¶ 1048.)  Inmate Y has intermittently refused evaluations from nursing, physician and mid-level practitioners, specialist physicians, hospital care, medications, and treatments.  (Dkt. 4203, ¶ 1049.)  The medical record is replete with numerous examples of Inmate Y's insistence that care be provided to his specifications dating back to 2014.  (Dkt. 4203, ¶ 1049.)

---

[8] This inmate is identified at paragraph 1045 of Dr. Murray's expert Declaration, filed under seal at Dkt. 4203.

1    The following excerpts taken from eOMIS accurately reflect Inmate Y's attitude and

2   behavior towards the clinical recommendations and requests from ADCRR's healthcare

3   vendor:

4   **8/26/2014**
       • Discussed with patient importance of following treatment
5         protocols outlined.

6      • Specifically:
          1) need for offloading sacrum and turning frequently.  Pt
7         indicated understanding
          2) need for antibiotics for infected wound.  Pt indicated
8         understanding
          3) pain management.  Pt notified that he would be required to
9         take his antibiotic prior to receiving any narcotics.  He was told
          that he can no longer pick and choose which medications he
10        would take.  He has the right to refuse treatment, but it would
          mean he cannot choose only to receive pain medications for a
11        wound he is refusing to take antibiotics for or leave a wound
          vac for.  Pt indicated understanding.
12
       • Discussion was observed by the on-duty nursing staff. - Dr.
13        Johnson

14  **9/16/2014**
       • follow-up note
15
       • Pt has been extremely manipulative and refuses all care.  He is
16        demanding the return of his Clinitron bed.  The
          recommendation from Dr. Lipan is for a Clinitron bed as well.  I
17        do not believe that the patient's wounds will adequately heal
          until he follows the recommendations of a wound vac and
18        antibiotic therapy along with frequent turning to off-load his
          wounds no matter what type of bed he is in.  This patient has a
19        history of refusing to be turned when in the Clinitron bed due
          to personal preference and comfort and he refuses to leave the
20        wound vac in place.  We have tried 3 different types of wound
          vacs in order to obtain Inmate Y's compliance, but he has
21        removed all of them repeatedly.

22     • Please re-order a Clinitron bed for this patient and attempt to
          initiate a 2 hour turning except at night.  - Dr. Johnson
23
    **4/10/2015**
24     • the foley catheter has come out.

25     • Time Stamp: 10 April 2015 13:16:07 --- User: Jeffrey Sharp
          (SHAJE01)
26        added hx: "this happened to me before. I don't want a
          suprapubic cath. Just give me a condom cath and it will heal by
27        itself I can pee now as it is."

28

- IM refusing to go to the hospital. Dr. Ripsin says he can't refuse - send him.

- Now the pt has a penis that is splayed open ventrally and the foley cath has come out.

- IM refuses hosp care and suprapubic cath. told pt he has to go to the hospital, listen to urologist tell him what is appropriate care (he can tell the urologist his story) and go from there.

- direct admit to MV hosp for suprapubic cath and urology management.
  IM refuses to go. discussed w Dr. Johnson and Dr. Ripsin again. IM cannot refuse to go to the hospital. sending via DOC transport for hosp admit and urology eval.  - Dr. Sharp

**4/14/2015**
- Return from hospital

- as a post script, it should be noted that this pt hid this condition from us for some weeks because he did not want to go back to IPC.  even when the penile issue was discovered by me, he wanted no tx except a condom catheter. he refused to go to the hospital, go in an ambulance, or go to IPC....until...he was told he could not refuse housing and was being sent to the hospital anyway. He was told he could refuse care there. He said he had had this condition previously and that it resolved spontaneously with a condom catheter. Doubting that was true I sent him to the hospital. - Dr. Sharp

**1/17/2017**
- Inmate presents to discuss his pain medications.  Referencing last note, because at that time he refused to have both his tramadol and gabapentin levels checked, I DC'd the medications.  I'm now offering to have him try other pain medications, yet he does not want to; he wants to go back on the tramadol and gabapentin.  I tried to convince him to at least try other pain medications, but he refused.  The meeting then ended.  - PA Denehy

**8/24/2017**
- Pt reports wound to his buttocks healed around April or May of this year and no longer needs duoderm or wound care. Pt is asking about new chair and noted he got his last wheelchair in April or May of this year. He states that he wants one that reclines more. Pt also states that he would like a rojo cushion to prevent further skin issues. States this was not a concern previously as he was changing positions frequently but now that he works, he sits more and does not want another wound. Pt also wants to talk about his medications. He states Pamelor does not help and would like T4's or baclofen started. Noted pt has not been on these medications in quite a while and reviewed purpose of TCS's, SSRI's in chronic pain management. Pt is agreeable to trying alternate pain medication. - Burns, NP

**12/22/2017**
- Pt presents to "POST D/C FROM IPC - F/U WOUND CARE ON BUTTOX" Initially, pt wanted to refuse today's PL visit. Reports he does not want to be seen by medical stating medical does not provide medication for his pain. Pt requesting T3. States his wound is healed and does not need anything from medical at this time. Pt eventually agrees to be seen and examined by provider. Pt reports R. leg spasm. - PA Igwe

**7/2/2018**
- "C/O ABDOMINAL PAIN" Pt states "you guys don't do anything for me. You took me off my gabapentin and tramadol 2 yrs ago; you are giving me psych meds but I do not want to take psych medications. I requested Xrays to see if the bullets in my body are now on the surface. My doctor told me to do Xrays to see if the bullets can be removed by surgery. I do not want any medications. You guys have other people on gabapentin, but you will not give me gabapentin. I am already in a lawsuit against Corizon and my lawyer said there is no reason why I should not be given gabapentin. You guys do not do anything for me".

- Pt reports ongoing L. sided abdominal pain radiating to his R. abdomen. Pain at 9/10 worse at night at 10/10. Constant associated with sharp back upper pain. Reports H/O gunshot wound approx. 7 yrs ago, with 5 retained bullets on back abdomen and chest areas. Pt requesting back and chest Xray - states he was told by a doctor in 2011 to find out if the bullets have surfaced to a site where they could be removed. - NP Igwe

**7/2/2019**
- PATIENT SEE TODAY 7/02/19 AT 12:10 ROUND.

- Sheltered housing visit/round. Patient was seen but not fully evaluated. Patient awake alert and to his own ability. Patient refused to be evaluated. Per nursing staff patient is refusing wound care. Patient not in any acute distress at this time. - NP Eze

(Dkt. 4203, ¶ 1050.)

These examples accurately reflect Inmate Y's consistent efforts to undermine his own healthcare outcomes by refusing to participate in his care plan.  He holds himself and the healthcare team hostage to his particular care preferences.  (Dkt. 4203, ¶ 1051.)  It is difficult to provide care when an individual repeatedly refuses the care.  (Dkt. 4203, ¶ 1052.)  Inmate Y's health care team has recruited mental health services on numerous occasions to assist with Inmate Y's participation in his care plan, to no avail.  (Dkt. 4203, ¶ 1052.)

Inmate Y has been a challenging patient for many years, and the medical record

repeatedly documents Inmate Y's refusals of evaluations, medications, wound care, and other treatments from on-site nursing staff and providers, offsite specialists, and hospital-based providers.  (Dkt. 4203, ¶ 1053.)  In fact, there are 113 refusals for wound care and nursing assessments between July 2019 and the end of December 2019 alone.  (Dkt. 4203, ¶ 1053.)

Inmate Y is an extremely challenging patient who puts his own life at risk in efforts to ensure treatment as he believes it should be administered.  (Dkt. 4203, ¶ 1054.) In Dr. Murray's view, Inmate Y experienced an unfortunate outcome, but it cannot be blamed on medical or custody staff, particularly when he himself refused care on so many occasions.  (Dkt. 4203, ¶ 1055.)  Dr. Murray did not see anything in the recent records to change his earlier opinions as to Inmate Y's treatment, and he stands by his conclusion in his declaration that the care provided to Inmate Y met the standard of care.  (Dkt. 4203, ¶ 1056.)

More recently, during an expert tour on September 8th of this year, Dr. Wilcox requested that nursing staff perform a urinalysis of Inmate Y, who has a chronic indwelling suprapubic catheter, based on the appearance of the urine in his collection bag.  (Dkt. 4203, ¶ 1057.)  In his October 9. 2021 expert report, Dr. Wilcox claims that Inmate Y's urinalysis showed infection but that he was not provided an antibiotic to treat the infection until September 21.  (Dkt. 4203, ¶ 1057.)  Beyond the troubling concern that Dr. Wilcox was attempting to direct patient care during a site visit, Dr. Murray also questions his conclusions.  (Dkt. 4203, ¶ 1057.)

Asymptomatic bacteriuria exists in all chronically catheterized patients.  (Dkt. 4203, ¶ 1058.)  A diagnosis of a UTI in a catheterized patient is made when the patient has signs and symptoms that are consistent with a UTI or a systemic infection that is otherwise unexplained.  (Dkt. 4203, ¶ 1058.)  Inmate Y had no signs or symptoms of a UTI at the time that Dr. Wilcox declared he had one based solely on the appearance of the urine in the collection bag.  (Dkt. 4203, ¶ 1058.)  The appearance or smell of the urine should not be used to diagnose a UTI when found in isolation.  (Dkt. 4203, ¶ 1058.)  Pyuria (elevated

white blood cell count, which leads to cloudy urine or pus in the urine) is frequently found in catheterized patients with bacteriuria, whether they have symptoms or not, and odorous or cloudy urine has not been demonstrated to be indicative of either bacteriuria or UTI. (Dkt. 4203, ¶ 1058.)  If Dr. Wilcox is going to direct care for a patient, he should, at the very least, brush up on the literature, as the concept of "asymptomatic bacteriuria" or "colonization" in a catheterized patient is not new.  (Dkt. 4203, ¶ 1058.)

When Inmate Y was seen on September 21, 2021 by the unit provider, it is documented that he reported chills and "kidney pain."  (Dkt. 4203, ¶ 1059.)  However, he had no fever or other objective signs of an infection and likely should not have been treated for a urinary tract infection.  (Dkt. 4203, ¶ 1059.)  Dr. Wilcox, himself, may have been the cause of the decision to treat this patient, who likely should not have had a urinalysis done in the first place, since he was not symptomatic.  (Dkt. 4203, ¶ 1059.)  When a patient with a chronic indwelling catheter actually does have a symptomatic UTI, it is important to get a urine culture to guide therapy.  (Dkt. 4203, ¶ 1060.)  In this case, the most recent culture that had been done grew a bacteria that is sensitive to ceftriaxone, which was the antibiotic given to Inmate Y.  (Dkt. 4203, ¶ 1060.)  However, it does not appear that Inmate Y should have been given antibiotics at all.  (Dkt. 4203, ¶ 1060.)

### D. Defendants have Established that ADCRR Delivers Medical Care to Inmates that Meets or Exceeds the Standard of Care.

In Dr. Wilcox's written trial testimony and in their proposed findings, Plaintiffs ignore any examples of care that was timely and/or met the standard of care.  Likewise, Plaintiffs ignore any Stipulation PMs in which Defendants have been compliant for years at all or most ASPCs.  Instead, they focus on isolated instances of delays, allegedly poor care, and unfortunate outcomes harvested from their lengthy access to eOMIS.  They gloss over or attempt to diminish the importance of objective measures of quality, including HEDIS benchmarking and NCCHC evaluation and accreditation.

1        **1.      Objective Measures of Quality.**

2        In contrast to Dr. Wilcox's trial Declaration (Dkt. 4138), in which he substantively

3    discusses the care of only 57 ADCRR inmates, Dr. Murray has presented evidence of the

4    systemic delivery of healthcare to the ADCRR population as whole.  By utilizing the HEDIS

5    benchmarks for diabetic and blood pressure control, Dr. Murray was able to compare

6    ADCRR's system-wide and per-complex performance against large, nationwide, free-world

7    healthcare systems, including HMOs, PPOs, Medicaid.  (Dkt. 4309, ¶¶ 844-45.)  Indeed,

8    more than 90% of all U.S. healthcare plans use HEDIS metrics to evaluate performance on

9    critical aspects of care and service delivery, and over 190 million people are enrolled in

10   health plans that report quality results using HEDIS.  (*Id.* at ¶ 825.)

11       Because the HEDIS metrics include the entire population of patients that meet a set

12   of standardized parameters, they provide a complete assessment of the patient care being

13   delivered across the healthcare system, thereby eliminating any concerns around sampling

14   bias and avoiding the subjectivity that is inherent in having physicians review individual

15   medical records.  (*Id.* at ¶ 830.)

16       Dr. Murray selected the HEDIS metrics for Controlling High Blood Pressure and

17   Comprehensive Diabetic Care because they can be used to measure essential care for two

18   of the largest chronic care populations found in the prison setting.  (*Id.* at ¶ 834.)  The

19   HEDIS metric for Controlling High Blood Pressure assesses the percentage of adults with

20   a hypertension ("HTN") diagnosis whose blood pressure was adequately controlled based

21   on the latest blood pressure reading.  (*Id.* at ¶ 835.)  The HEDIS Comprehensive Diabetic

22   Care measures the percentage of adults with type 1 or 2 diabetes whose HbA1c scores are

23   within a certain range and who have had a retinal exam performed, medical attention for

24   nephropathy, and adequate blood pressure control.  (*Id.* at ¶ 836.)  To create the HTN

25   sample, Dr. Murray directed Centurion to pull all ADCRR inmates within the system with

26   a HTN diagnosis who had been in treatment for at least six months.[9]  (*Id.* at ¶¶ 839-40.)  For

27   _____

28       [9] Typically, HEDIS samples are comprised of individuals who have been in treatment for at least 12 months, but Dr. Murray used six months to capture more ADCRR

1   the diabetic sample, Dr. Murray directed Centurion to pull all ADCRR inmates with a
2   diagnosis of type 1 or type 2 diabetes who had been in treatment for at least six months.
3   (*Id.* at ¶ 839.)  The HTN sample for the HEDIS metrics totaled 4,806 ADCRR inmates, and
4   the diabetes sample totaled 787 ADCRR inmates.  (*Id.* at ¶ 842.)

5           As shown in Defendants' Findings of Fact and Conclusions of Law, the HTN and
6   diabetic HEDIS scores for the care provided by ADCRR are above the national average for
7   HMO, PPO, and Medicaid populations, reflecting excellent care delivery and outcomes.
8   (*Id.* at ¶¶ 846-47.)  Additionally, these results demonstrate that ADCRR is exceeding the
9   community standard of care.  (*Id.* at ¶ 845.)  The results are consistent among the various
10  ADCRR facilities.  (*Id.*)  ADCRR exceeds the HEDIS national benchmark and commercial
11  and Medicaid scores for blood pressure control at all 10 state-run facilities.  (*Id.* at ¶ 846.)
12  ADCRR performed higher than the national average of community commercial and medical
13  scores average at all 10 state-run facilities on the HEDIS metric for blood pressure control
14  in diabetic patients.  (*Id.* at ¶ 847.)

15          Surpassing the HEDIS benchmark requires the critical, system-wide health delivery
16  processes as a whole to function efficiently and effectively.  (*Id.* at ¶ 849.)  These healthcare
17  processes include intake screening, nursing evaluation, intake physical examination,
18  chronic care clinic enrollment, laboratory ordering, laboratory results review, medication
19  ordering, medication administration, compliance monitoring, patient education, dietary
20  counseling and management, nursing appointments for blood pressure and blood sugar
21  checks, insulin administration process, chronic care clinics, clinical documentation, and
22  data collection and management.  (*Id.* at ¶ 849.)  ADCRR could not have exceeded the
23  HEDIS benchmark on both the HTN and diabetic metrics if these critical processes were
24  broken or otherwise not functioning effectively across the ADCRR system.  (*Id.*)

25          Plaintiffs make only a passing mention to HEDIS in their proposed findings (*see*

26  _____

27  inmates in his samples.  (Dkt. 4309, ¶ 840.)  As a result, ADCRR is being compared against
    commercial and Medicaid populations that have had twice as long to stabilize blood
    pressure and blood sugar readings, which makes ADCRR's above average scores even more
28  remarkable.

1    Dkt. 4308, ¶ 591) but otherwise have not attempted in any way to address or dispute Dr.
2    Murray's conclusions with respect to ADCRR's performance on these measures.  As a
3    result, the Court should conclude that ADCRR has an effective healthcare delivery system
4    and is exceeding the community standard of care for the management of chronic conditions
5    systemwide.

6              **2.      Other Objective Outcome Metrics.**

7              COVID-19 vaccination rates are a good indicator of the efficacy of a prison
8    healthcare system's patient educational processes and coordination of efforts between
9    medical staff, custody staff, and outside agencies.  (Dkt. 4309 ¶ 853.)  As shown in
10   Defendants' Findings of Fact and Conclusions of Law, ADCRR's inmate vaccination rates
11   (80%) are significantly higher than community rates for both Arizona (57.3%) and the U.S.
12   (66.9%), reflecting a high-functioning healthcare delivery system.  (*Id.*)  As a result, the
13   Court should conclude that Defendants do not have a policy or practice of failing to mitigate
14   the risk of infectious and communicable diseases.

15             Another key indicator of the quality of a prison healthcare delivery system is its
16   mortality rate.  The Bureau of Justice Statistics ("BJS") analyzes mortality rates in state and
17   federal prisons.  (*Id.* at ¶ 871.)  In 2018, 79.1% of all state prisoner deaths in the United
18   States were caused by illness.  (*Id.*)  Of these deaths, 25.4% were by heart disease, 27.5%
19   by cancer, .05% AIDs-related, 5.2% liver disease, 6.9% respiratory illness, and 13.5% all
20   other illnesses.  (*Id.*)  Another 7.5% of all state prisoner deaths in 2018 were by suicide.
21   (*Id.*)  In 2018, ADCRR's mortality rate (for all causes of death), was 312 deaths per 100,000
22   prisoners, which was less than the average rate of 344 deaths per 100,000 prisoners across
23   all state Corrections Departments and lower than or equal to the rate for 23 other state
24   Corrections Departments.  (*Id.* at ¶¶ 874, 876.)  Additionally, ADCRR's morality rate (for
25   all causes of death) has been lower than the nationwide average of state Corrections
26   Departments every year since 2008.  (*Id.* at ¶ 875.)

27             After trial commenced, BJS released its 2019 mortality report.  (*Id.* at ¶ 877.)  In
28   2019, for every 100,00 prisoners in the custody of state and privately operated prison

facilities, 261 died from illness and 46 died from suicide.  (*Id.* at ¶ 878.)  In 2019, the ADCRR mortality rate (for all causes of death), declined by more than 13% from 2018 to 269 per 100,000 prisoners – approximately 20% less than the nationwide rate (307 per 100,000 prisoners) for all state corrections departments.  (*Id.* at ¶ 880.)  Significantly, ADCRR's mortality rate (for all causes of death), was less than or equal to that of 36 state corrections departments in 2019.  (*Id.* at ¶ 881.)

ADCRR's decline in mortality rate and favorable performance compared to other states is objective evidence of an effective healthcare delivery system that provides timely access to necessary routine, urgent, emergent, and specialty care to its inmates.

## II. Overall Healthcare Delivery System.

### A. Medications.

Plaintiffs assert that Defendants fail to consistently provide patients essential medications.  (Dkt. 4308, ¶ 767.)  In support, Plaintiffs cite to Defendants' compliance with Stipulation PM 13, which provides that "[c]hronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication."  (Dkt. 4308, ¶ 770.)  However, for 2021, Defendants complied with this measure every month at Douglas, Phoenix, Safford, and Winslow and were compliant most months at Florence and Lewis.  (Ex. 1256.)

Plaintiffs now disagree with the Stipulation's 85% compliance threshold as to PM 13 (Dkt. 4308, ¶ 771), yet they negotiated the terms at great length following the parties' settlement in 2014.  Moreover, Defendants' compliance with the Stipulation is no longer relevant now that the Court has rescinded the Stipulation.  (Dkt. 3921.)

Plaintiffs additionally cite to Defendants' performance on Stipulation PM 11 ("Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT.") and PM 35 ("All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption.") (Dkt. 4308, ¶ 772; Dkt. 1185-01 at 8, 10.)  Plaintiffs do not include charts for either PM in their proposed

findings, presumably because the results are not favorable to their argument.  For PM 11 in 2021, Defendants were compliant every month at Douglas, Florence, Lewis, Winslow, and Yuma and had only one month of non-compliance each at Perryville, Phoenix, and Tucson and two months of non-compliance at Safford.  (Ex. 1255.)  For PM 35 in 2021, Defendants were compliant every month at Eyman, Florence, Perryville, Phoenix, Safford, and Yuma and had only one or two months of non-compliance at the remaining complexes (Douglas, Lewis, Tucson, and Winslow).  (Ex. 1257.)

Plaintiffs also claim that "[d]efendants' own documents show they lack a reliable system to ensure that medications are provided to patients as prescribed."  (Dkt. 4308, ¶ 776.)  In support, they cite CQI meeting minutes from March 2021 at Tucson, Perryville, and Eyman that identify missed medication doses and from February and August 2021 at Tucson that identify staffing challenges with pill passes.  However, given Defendants' strong performance on PMs 11, 13, and 35, these isolated issues did not impact compliance levels and do not show that Defendants lack a reliable system to ensure the delivery of medications.

Plaintiffs are also critical of the practice of "pre-pouring" medications (*see* Dkt. 4308, ¶ 778), which Larry Gann explained as taking medications out of blister packs and placing them in envelopes with the inmate's name and number prior to delivery.  (R.T. 11/16/21 p.m. at 2371:13-2731:19.)  Plaintiffs are correct that Mr. Gann is also critical of the practice, which he testified can be done to save time.  (*Id.* at 2371:20-2372:1.)  But they otherwise mischaracterize his testimony.  He disagreed that pre-pouring is done due to a lack of staffing and identified it as a common issue at prisons nationwide.  (*Id.*)  He testified that it took nearly a year to correct because he had to address offline functionality issues with eOMIS, which required working with the software developer.  (*Id.* at 2372:13-2372:16, 2372:23-2373:13.)  Mr. Gann also testified that he and his team continue to monitor pill passes at all facilities to ensure his directives are being followed.  (*Id.* at 2372:17-2372:21, 2373:16-2373:17.)  These efforts to correct the issue reflect a lack of deliberate indifference on the part of ADCRR.

Plaintiffs have not demonstrated any systemic deficiencies in the provision of essential medications to ADCRR inmates.  To the contrary, their evidence is limited to three Stipulation PMs in which Defendants were compliant every month at several complexes and the majority of the time at the majority of the other complexes.  They rely upon a handful of CQI meeting minutes that mention various issues with medications, none of these which caused non-compliance on the related PMs.  Plaintiffs have not met their burden in establishing systemic violations with respect to the delivery of medications or demonstrated that Defendants are deliberately indifferent to the serious medical needs of ADCRR inmates who are prescribed medications.

## B.    Medical Records.

Plaintiffs criticize eOMIS, ADCRR's electronic health records (EHR) system, as inadequate.  Indeed, Dr. Murray, Dr. Wu, and Mr. Gann have all noted challenges with the functionality of eOMIS.  (Dkt. 4308, ¶¶ 782, 785-87.)  And the issues cited in Section V.B.1-3 of Plaintiffs' proposed findings with respect to accuracy and accessibility of information are the result of an EHR that "has lived its life," as Dr. Murray stated.  ADCRR is aware of the shortcomings of eOMIS.  As such, the current Request for Proposal (RFP) requires that the vendor implement a new EHR system.  (Ex. 535 at 147-53; Dkt. 4309, ¶¶ 187-88.)  The contract is expected to be awarded in July 2022, with the vendor implementing the new EHR within 60 days of the contract award.  (*Id.*)  The new EHR should alleviate the concerns raised by Plaintiffs with eOMIS functionality and medical documentation.

Plaintiffs assert that ADCRR's medical classification system is deficient because the scores are not accurate.  (Dkt. 4308, ¶ 804.)  Plaintiffs fail to appreciate that the primary purpose of ADCRR's medical classification system is to determine an inmate's initial housing location upon intake into the ADCRR system.  (Ex. 1310 at 31.)  The medical classification score determines whether an inmate can be housed in a non-corridor facility or if the inmate requires greater access to care and closer proximity to community medical resources.  Plaintiffs cite to Kendall Johnson, who is classified as an M3 but due to her

39

1  progressive MS is now wheelchair bound and requires assistance with daily life activities.

2  (Dkt. 4308, ¶ 804.)What Plaintiffs fail to note is that Ms. Johnson is housed in a special

3  needs unit where she has access to 24/7 nursing care and receives the assistance she needs

4  for her medical condition.  (Dkt. 4309, ¶¶ 226, 588-89.)  Plaintiffs have not pointed to any

5  examples of inmates who have been denied necessary treatment based on their medical

6  classification score or otherwise shown that Defendants are deliberately indifferent to the

7  needs of ADCRR inmates.

8         Plaintiffs also claim that Defendants fail to ensure that inmates have access to

9  information regarding their own health care.  (Dkt. 4308, ¶ 810.)  In support, they cite a

10  Centurion outside consult form which directs outside providers not to provide inmates with

11  information regarding scheduling of future treatment and appointments and to schedule any

12  recommended tests or treatments with Centurion.  This is done for valid security reasons to

13  ensure that inmates do not have advance notice of outside appointments, which could aid in

14  an escape.  Plaintiffs have not cited any examples of inmates who were prevented from

15  discussing their health conditions with outside specialists or unable to make an informed

16  consent or refusal with respect to their own care.

17         Plaintiffs claim that Defendants impede inmates from viewing and obtaining copies

18  of their own medical records.  (Dkt. 4308, ¶ 813.)  Plaintiffs find fault with Department

19  Order 1104, which requires inmates to submit a written request, places limits on how often

20  and how long an inmate can have access to eOMIS, and sets copying charges for non-

21  indigent inmates unless the records are being used in a pro se inmate lawsuit.  (Ex. 1325.)

22  Plaintiffs cite to the Health Insurance Portability and Accountability Act ("HIPAA") for the

23  proposition that patients have a right of timely access to inspect and obtain a copy of medical

24  information.  (Dkt. 4308, ¶ 808.)  Plaintiffs acknowledge that there is an exception in

25  HIPAA[10] which limits an inmate's access to medical records when it "would jeopardize the

26  health, safety, security, custody, or rehabilitation of the individual or of other inmates, or

27

28         [10] Arizona state law also places some restrictions on inmate access to medical and
institutional records.  *See* A.R.S. § 31-221.

1   the safety of any officer, employee, or other person at the correctional institution or
2   responsible for transporting of the inmate," but they claim that this exception cannot support
3   an "absolute bar on providing inmates copies of their records." (Dkt. 4308, ¶ 808 & n.133.)
4   However, ADCRR policy does not place a bar on inmates from receiving copies of their
5   records, and inmates are permitted to take notes during review of eOMIS if they do not want
6   to pay copying charges.  Plaintiffs could also ask their counsel for copies, given that
7   Plaintiffs' counsel has access to eOMIS.

8       Plaintiffs also complain that under the Stipulation, providers "had a very narrow
9   obligation to communicate the results of patients' diagnostic tests, upon the patient's
10  request." (Dkt. 4308, ¶ 815.)  As with the 85% compliance threshold, this provision in PM
11  47 was negotiated and agreed upon by Plaintiffs' counsel following the parties' settlement
12  in 2014. (Dkt. 1185.)  Plaintiffs also claim that Defendants fail to consistently comply with
13  PM 47. (Dkt. 4308, ¶ 815.)  However, Plaintiffs ignore that in 2021, Douglas, Florence,
14  and Yuma were all compliant every month, and Eyman, Phoenix, Safford, and Winslow
15  each only had one month of non-compliance. (Ex. 1261.)

16      Plaintiffs have not demonstrated that they are barred from knowing their own health
17  information, and the functionality limitations of eOMIS that pose challenges with
18  navigating and updating information within inmate medical records will be alleviated with
19  the implementation of the new EHR system.  Plaintiffs have not shown that there are any
20  systemic issues that need to be addressed with respect to medical records in the ADCRR
21  system.

22      **C.   Defendants Provide Adequate Language Interpretation in Health Care Encounters to Inmates Not Fluent in English.**
23
24      Plaintiffs are not denied access to medical care and Defendants are not deliberately
25  indifferent to the provision of medical care utilizing interpretive services.  Contrary to
26  Plaintiffs' position, Defendants provide language interpretation services during healthcare
27  encounters and have various policies and practices to effectuate the provision of interpreters
28  during healthcare encounters.

41

The provision of interpreters begins at intake while the inmates are at the reception centers.  While at the reception centers, every inmate is provided a handout which outlines how they are to access health care.  This includes utilization of the LanguageLine service.  All handouts are provided to the inmates in both Spanish and English.  Exhibit 1305 at p. 122 (ADCRR Medical Services Technical Manual).

Centurion is required to ensure that each facility establishes a method for distributing information regarding the availability of, and access to, healthcare services to inmates upon arrival at the facility.  Exhibit 1305 at p. 145 (Medical Services Technical Manual).

At each facility, signage is posted on how to access healthcare in the intake processing area of the facility.  Within 12 hours of arrival inmates are given written information regarding how to access emergency and routine medical, mental health, and dental services. The information includes the use and preparation of the HNR form and that special procedures such as interpreters are available to ensure that inmates who have difficulty communicating understand how to access health services. Instructions are available in written form both in English and Spanish.  Exhibit 1305 at p. 145-146 (Medical Services Technical Manual)

Plaintiffs, who have the burden of proof, fell woefully short of satisfying that burden.  As detailed below, their evidence was sparse and heavily discredited upon cross examination.  Plaintiffs called Laura Redmond as a witness to testify regarding alleged problems she experienced with interpretive services during healthcare encounters.  (T.R. 11/2/2021p.m. at 316:19-316:25.)  Ms. Redmond is deaf. (T.R. 11/2/2021p.m. at 317:20-317:21.)

She testified inconsistently regarding the utilization of the LanguageLine at her medical appointments.  First, she testified that she is never provided an ASL interpreter for any medical appointments.  (T.R. 11/2/2021 p.m. at 329:12-329:17.) Then she testified that there has always been an ASL interpreter for her psychiatric appointments. (T.R. 11/2/2021 p.m. at 353:18-353:21.)

Ms. Redmond further admitted that on numerous occasions she did not remember utilizing the LanguageLine interpreter during a medical appointment, but the medical records indicate that one was used. (T.R. 11/2/2021 p.m. at 342:5-342:8.) She also testified she has a bad memory because of seizures which make her forget. (T.R. 11/2/2021 p.m. at 343:7-343:9.)

Numerous records were admitted into evidence showing that LanguageLine was used during medical appointments with Ms. Redmond. (Exhibits 5454a-5454jj.) When medical appointments were conducted, Ms. Redmond was not denied care but was provided treatment even when an interpreter was not utilized. (Exhibits 5454a-5454jj.) At no time did any provider or nurse refuse Ms. Redmond access to care due to a lack of availability of interpretive services.

Dr. Elijah Jordan acknowledged that many of the nurses at the Yuma facility speak Spanish so they do not use LanguageLine that often. (T.R. 11/17/2021 p.m. at 2624:13-2624:20.)

Dr. Jordan testified that LanguageLine is user friendly. (T.R. 11/17/2021 p.m. at 2624:21-2624:25.) Indeed, each inmate is assessed during the intake process to identify their primary language. At this time the electronic medical record is programmed to identify whether an inmate needs interpreter services or not. (Dkt. 4231-1 at 96: 14-25- 4231-1 at 97:1-12.) For each inmate processed through intake, a hard stop is established in the electronic medical record which means that the provider who is working in the patient's record cannot proceed further until the provider answers the question of whether the patient needs interpreter services or not. (Dkt 4231-1 at 97:8-12.)

Centurion requires interpretation services be made available during every patient encounter with the health care staff, and Plaintiffs failed to prove they are not. (Dkt. 4231-1 at 98: 24-25- 4231-1 at 99:1-3.) Interpretation services are available by telephone or any platform that has audio including a computer screen for use in sign language interpretation. There is a computer screen in every clinic exam room which allows for interpretation services visually. (Dkt 4231-1 at 100:3-17.) Centurion's preference is that the providers

use LanguageLine as opposed to speaking to the inmate in their native language. Generally, it is noted in the medical chart that the provider is speaking to the inmate in their native language. (Dkt 4231-1 at 102:4-17.) Interpretation is provided to inmates who are deaf or hard of hearing through the use of LanguageLine. In addition, Centurion will have the inmate evaluated by the audiology group and fit them with a hearing aid so they are able to hear what staff are saying. (Dkt 4231-1 at 103:8-18.)

There are a few inmates in the system who prefer to speak in Sign Language, and Centurion accommodates their needs through use of the LanguageLine system. (Dkt 4231-1 at 103:24-25.-4231-1 at 104:1-16.) Dr. Orm opines that the interpretation services provided at ADCRR are better than she had when she was practicing in the community. (Dkt 4231-1 at 105:5-19.)

Defendants object to the expert testimony cited in Plaintiffs' Findings of Fact and Conclusions of Law at Dkt. 4308 at 279:10-28-280:1-20. Plaintiffs never identified Amy June Rowley as an expert, nor was an expert report prepared or listed in Plaintiffs' disclosures to Defendants. In addition, the cited opinions are hearsay and should not be relied upon by the Court.

At best Plaintiffs' evidence indicates there is an imperfect enforcement of a policy concerning the use of LanguageLine at every medical appointment. Such evidence is not sufficient to establish deliberate indifference to access to care. *Franklin v. District of Columbia*, 163 F. 3d 626 (D.C. Cir. 1998) (holding that deliberate indifference in providing interpreters for limited English proficient inmates was not established based upon imperfect enforcement of a policy).

### 1. Plaintiffs' Evidence is Comprised of Isolated Incidents that do not Establish that Interpretation Services Were Unavailable.

Dr. Penn did not testify that he would need to interview an inmate to determine if the individual spoke Spanish, as Plaintiffs claim. (Dkt. 4308, ¶ 859.) Rather, he testified that he could not form an opinion regarding one inmate's ability to speak English based solely upon an isolated HNR that Plaintiffs' counsel had shown him. (R.T. 11/19/21 p.m.,

3189:24-3190:23.)  Ironically, the HNR example Plaintiffs showed Dr. Penn evidenced that the inmate requested treatment in Spanish and was provided a response in Spanish, which contradicts their claim that interpretation services are not available to ADCRR inmates. (R.T. 11/19/21 p.m., 3190:13-3191:15.)  Plaintiffs' allegation that Dr. Penn was unable to say whether an interpreter would be required for certain types of encounters is misleading. (Dkt. 4308, ¶ 860.)   In response to Plaintiffs' counsel's broad questions as to whether language services generally are required for health care counseling, group, watch checks, or appointments, Dr. Penn maintained his opinion that "it depends" because "some individuals are more fluent."  (R.T. 11/19/21 p.m., 3180:8-3181:3; 3181:16-3182:6.)

More importantly, even if every example Plaintiffs highlighted demonstrated that the inmate was not offered interpretative services on a particular day, this would still fall woefully short of establishing that, systemically, ADCRR inmates are not offered interpretative services.[11]

## D.   Staffing.

### 1.   Healthcare Staffing.

Plaintiffs claim that medical staff shortages adversely impact patient care and drive inadequate treatment.  (Dkt. 4308, ¶ 863.)  In support, Plaintiffs repeat their various claims, already addressed by Defendants above, that nurses are acting outside the scope of their licenses, referrals are almost always to a mid-level provider rather than a physician, and mid-level providers lack the experience to treat complex patients and/or are poorly supervised.  (Dkt. 4308, ¶¶ 865-66, 868-71.)  However, Plaintiffs have neither proven these alleged issues nor tied them to a lack of staffing.

Plaintiffs additionally assert that three ADCRR facilities have no assigned staff physicians (Dkt. 4308, ¶ 867), but they ignore that all 10 ADCRR complexes have a physician-level site medical director who provides patient care and supervises the mid-level

---

[11] The Court should disregard the citations to Dkt. 3921 and 3861 as referenced in Paragraph 860 of Plaintiffs' Proposal, as these items are not in evidence.  (Dkt. 4308, ¶ 860.)

providers.  (Dkt. 4203, ¶ 1064; R.T. 11/17/21 p.m. at 2615:19-2616:5.)  At the smaller, non-corridor facilities, there is no need for an additional staff physician.  Plaintiffs' own expert, Dr. Wilcox, acknowledges that he does not have a staff physician assigned to the smaller of the Salt Lake County jails.  (R.T. 11/10/21 p.m. at 1819:16-1820:1.)

Plaintiffs also repeat their incorrect calculation of the ratio mid-level providers to physicians (7:1) and cite to Joy's claim that ADCRR uses mid-level providers at a rate that is 13 times higher than national ratios and 20 times higher than in Arizona.  (Dkt. 4308, ¶ 867.)  The correct ratio as set out in the new RFP is 2:1, which is better than the community standard of 3:1 that Joy cites for Arizona.  (Dkt. 4309, ¶ 1836.)  Joy admitted that he did not include site medical directors in his calculation of the ratio because he did not believe they provided patient care, which has a significant impact on the calculated ratio.  (R.T. 11/01/21 p.m., 155:7-156:24.)  Joy also acknowledged during questioning from the Court that he made mathematical errors.  (R.T. 11/01/21 p.m. at 173:19-175:3.)  Joy is not credible, and the Court should disregard both his incorrect ratio of mid-level providers to physicians and his flawed staffing model.

Plaintiff claim that facility management teams expressed concern to Dr. Murray about nursing vacancies (Dkt. 4308, ¶¶ 874-75).  However, Dr. Murray reported that the facility management teams were unanimous in expressing their opinion that contracted staffing levels are sufficient and the functional challenges with eOMIS and the administrative burdens associated with compliance monitoring are the actual impediments to providing timely care to patients.  (Dkt. 4203, ¶¶ 195-97.)  The teams felt that improved functionality of the EHR and some relief from PM monitoring would allow significantly more time for patient care.  (*Id.* at 197.)

Plaintiffs also cite to a single staffing variance report for August 2021 for Eyman, which indicates that 110.85 of the 132.5 positions were filled.  (Dkt. 4308, ¶ 876.)  However, the staffing variance reports do not capture locum tenens, registry, or overtime and are not used by ADCRR to evaluate actual staffing levels.  (R.T. 11/17/21 a.m. at 2433:16-2434:19.)  Rather, ADCRR uses actual hours worked (worked FTEs) versus contractual

1    hours billed to determine compliance with staffing requirements and to assess sanctions
2    where needed.  (*Id.*)  Hired FTEs do not include PRN staff (locum tenens or registry nurses)
3    or overtime; worked FTEs capture these items and are a true measure of staffing.  (R.T.
4    12/8/21 p.m. at 356:2-3587:6.)  During Centurion's tenure, hired FTEs have ranged from
5    approximately 70 to 80%, and worked FTEs has ranged from 80% to 90%. (*Id.* at 3587:7-
6    10.) On October 15, 2021, worked FTEs were approximately 90%. (*Id.* at 3587:13-19.) In
7    other words, 90% of the 1,052.75 FTEs were filled. (*Id.* at 3587:17-18.)

8          Plaintiffs also cite to Dr. Wilcox's testimony that failure to timely review lab and
9    imaging results, specialty consult reports, and hospital records is usually due to limited
10   staffing (Dkt. 4308, ¶¶ 879-81).  However, the facility management teams and Dr. Murray
11   point instead to limitations with eOMIS, which lacks automatic notifications for receipt of
12   lab results, outside consult forms, and hospital records, as the impediment to timely review
13   of these items.  (Dkt. 4203, ¶ 1069.)  In his interviews, nurses and providers all recognized
14   the importance of timely reviewing labs, consults, and hospital records.  (*Id.*)

15         Plaintiffs also cite to cancellation of nursing lines and a backlog of HNRs at Tucson
16   in early 2021 due to staffing shortages at that complex.  (Dkt. 4308, ¶ 883.)  Mr. Gann
17   testified that ADCRR continues to work with Centurion to increase staffing levels at Tucson
18   and avoid cancellations of nursing lines but ultimately assessed $220,000 in sanctions as a
19   result of the cancellations. (R.T. 11/17/21 a.m. at 2429:14-2430:8.)  To address the nursing
20   shortage in Tucson, Centurion has established a same-day clinic staffed with providers
21   instead of registered nurses, which will allow the patient to be seen within 24 hours of the
22   submission of a HNR and allow a provider to treat the patient without the need to be referred
23   from the nursing encounter. (R.T. 11/18/21 p.m. at 2933:1-2933:10.)

24         These scattered and unconnected claims from Plaintiffs do not establish either the
25   existence of systemic staffing shortages or that any such shortages are negatively impacting
26   the delivery of patient care to ADCRR inmates.  In making these claims, Plaintiffs ignore
27   that Defendants have continually increased staffing levels since 2012.  (R.T. 11/16/21 p.m.
28   at 2289:6-2289:14.)  Additionally, Centurion has added another 114 FTEs to its workforce

47

1    above the contracted 1,052 staff within the staffing matrix in its contract with ADCRR and

2    has hired 94 of the 114 FTEs. (R.T. 11/16/21 p.m. at 2382:7-2382:14.).  With the shutdown

3    of the Florence facility and transfer of the Florence inmates to a private prison, 122

4    healthcare staff positions from Florence will be reallocated to other facilities throughout the

5    state.  (R.T. 11/16/21 p.m. at 2295:15-2295:22.)

6         As staffing levels have increased, the ADCRR inmate population has been on a

7    declining trend.  When Centurion came on board on July 1, 2019, there were 34,015 inmates

8    in ADCRR custody at the facilities at issue. (Dkt. 4174, ¶ 72.) On October 18, 2021, that

9    population was down to 27,174. (Dkt. 4174, ¶ 72.) This represents a reduction of 6,841

10   inmates or 20.11% of ADCRR's population over 27 months. (Dkt. 4174, ¶ 72.) Importantly,

11   while the inmate population has declined by more than 20%, the contractual staffing levels

12   have not. (Dkt. 4174, ¶ 72.)

13        Moreover, any alleged staffing issues have not been a barrier to Centurion complying

14   with the Stipulation PMs. (R.T. 11/16/21 p.m. at 2366:18-2366:23.)  Centurion has been

15   compliant with contract requirements at an average of 93% of the total performance

16   measures since they took over the contract. (R.T. 11/16/21 p.m. at 2367:15-2367:20.)

17                    **2.    Healthcare Contract and Spending.**

18        Plaintiffs claim that ADCRR's healthcare contract and spending fail to meet patients'

19   needs.  (Dkt. 4308 at p. 289.)  In support, Plaintiffs argue that the current healthcare staffing

20   matrix is the same as the one in the 2019 RFP, and no one who testified from Centurion or

21   ADCRR knows the source of the 1,052.75 FTEs contained in the RFP.  (Dkt. 4308, ¶¶ 909-

22   910.)

23        Plaintiffs reference a staffing evaluation that Centurion performed, which resulted in

24   a proposal to ADCRR for additional staffing that Centurion's regional leadership

25   characterized as a "wish list."  (Dkt. 4308, ¶¶ 912-13 & n. 153.)  Plaintiffs state that nothing

26   became of this proposal because ADCRR did not amend the contract to add additional

27   FTEs.  (Dkt. 4308, ¶ 914.)  However, they also note that Centurion did not ask ADCRR for

28   additional staff in the 2021 amendment (Dkt. 4308, ¶ 924) and ignore the fact that Centurion

                                        48

has added another 114 FTEs to its workforce above the FTEs in its contract with ADCRR. (R.T. 11/16/21 p.m. at 2382:7-2382:14.)

Plaintiffs are critical that ADCRR does not have any policies or procedures regarding the number of staff needed at each prison and that neither ADCRR nor Mr. Gann has done an analysis of its healthcare and mental health care staffing needs or a health care staffing plan. (Dkt. 4308, ¶¶ 915-16.)  However, Plaintiffs have not explained why any such policies or analyses are necessary when the contracted vendor is given discretion to allocate staff between the prisons to meet inmate demand for healthcare services.  Plaintiffs are also critical that ADCRR does not have any policies or procedures regarding the required level of licensure for healthcare staff.  (Dkt. 4308, ¶ 916.)  There is no need for such policies though, as Arizona state law dictates licensure for healthcare positions.

Plaintiffs also cite to staffing allocation offsets paid by Centurion as well as Centurion's spending on recruiting, difficult recruiting for certain nursing positions, and hourly rates paid for permanent nursing employees and staffing agencies for temporary nurses.  (Dkt. 4308, ¶¶ 917-22.)  Plaintiffs claim that Centurion is paying $90 per hour to staffing agencies which is below "the going rate" for nurses. (Dkt. 4308, ¶ 922.)  However, the figures they cite are not accurate, as Centurion is paying $125 per hour, which is substantially more than the community standard of pay.  (R.T. 11/16/21 p.m. at 2363:19-2363:25, 2364:2-2364:7.)

Plaintiffs also cite Dr. Stern's report, in which he compared ADCRR's spending against the amounts spent in the community by AHCCCS for people who qualify for Medicaid.  (Dkt. 4308, ¶ 923.)  The Court should not consider the Stern report for the reasons articulated in Defendants' Motion to Strike and Reply thereto (Dkt. 4219 at 2-3, Dkt. 4239).  Additionally, AHCCCS spending for non-incarcerated Medicaid patients is an apples to oranges comparison and should be disregarded.  A more appropriate comparison would be to other state correctional systems.  As Dr. Murray testified, Arizona's per-inmate spending compares favorably to that of the Texas system: ADCRR's annual budget for healthcare is approximately $225 million for approximately 27,000 inmates, or

approximately $8,333.33 per inmate, compared to Texas UCMB's annual budget for inmate healthcare of $660 million for approximately 97,000 inmates, or approximately $6,804.12 per inmate. (R.T. 12/08/21 a.m. at 3460:25-3463:8.)

Plaintiffs fail to connect the dots on any of these disparate citations or explain how they somehow add up to any failure to meet ADCRR inmates' healthcare needs. Plaintiffs also ignore that the amount of money spent on healthcare in ADCRR has increased over the course of this litigation despite the decline in the ADCRR inmate population. ADCRR has also added $15 million in recruiting and retention incentives on top of the increased contract price.

### 3.      Joy's Staffing Model Should be Disregarded.

Plaintiffs ask that the Court to adopt the staffing model prepared by Joy. (Dkt. 4308, ¶ 926, 941.) The Court should decline to do so. Joy is not credible, and his methodology is both biased and flawed.

Joy testified that he has only employed his model in one other state (California) and is not aware of any other states in which a similar model has been employed. (R.T. 11/01/21 p.m. at 112:12- 112:23, 193:3-193:10, 194:20-194:21.) However, in creating his staffing model in California, Joy and his team relied on medical records and healthcare encounter/utilization data from the prison system to categorize patients, determine inmate needs for care, and determine how many services a provider or clinician can provide in a day. (R.T. 11/01/21 a.m. at 62:1-64:14, R.T. 11/01/21 p.m. at 116:12-116:20, R.T. 11/01/21 p.m. at 124:1-124:7.) Joy also spoke with clinicians in creating his staffing model to make sure he was "not missing anything in the model." (R.T. 11/01/21 a.m. at 68:9-68:15.)

In creating his model in Arizona, by contrast, Joy did not use ADCRR health services utilization data. (R.T. 11/01/21 p.m. at 118:9-118:14.) Joy admits that he has no idea how many primary care providers visits actually occurred in the ADCRR system. (R.T. 11/01/21 p.m. at 182:2-182:7.) Joy assumed that ADCRR staffing levels were inadequate based on Dr. Stern's report and statements in the court record from Plaintiffs. (R.T. 11/01/21 p.m. at 121:3-121:18.) However, Joy did not do any independent research to validate Dr. Stern's

50

conclusions regarding staffing levels that he relied upon in developing his staffing analysis. (R.T. 11/01/21 p.m. at 180:11-180:24.)  Joy did not visit any Arizona prisons, inquire about the physical plant, or observe the intake process, screening process, medication administration, or segregation housing units in creating his staffing models. (R.T. 11/01/21 p.m. at 126:7-126:9, 127:13-128:4.)  Joy disregarded actual data regarding the percentage of Arizona inmates with either no chronic conditions or only one stable chronic condition (90%) and instead created his own estimate (52%). (R.T. 11/01/21 p.m. at 129:3-129:23.)

Joy based much of his model on conversations he had with Plaintiffs' retained experts.  He drew his productivity calculations for his medical staffing model solely on conversations he had with Plaintiffs' expert Dr. Wilcox regarding his opinion that a provider can only see 10-12 patients a day.[12] (R.T. 11/01/21 p.m. at 183:3-183:15.)  He based his estimate as to the number of working days per medical provider on "some references" he had on correctional officer time off. (R.T. 11/01/21 p.m. at 183:15-183:23.)

Joy based his staffing model for behavioral health technicians (BHTs) off his interview with Plaintiffs' expert, Dr. Stewart, and staffing ratios in nursing homes. (R.T. 11/01/21 p.m. at 169:14-170:3.)  Joy based his conclusion that behavioral health technicians (BHTs) are not qualified within the scope of their practice to lead group sessions for patients with mental illness on his conversation with Dr. Stewart. (R.T. 11/01/21 p.m. at 167:10-169:13.)  Joy based his assertions regarding the community standard of care for substance abuse disorder on his conversation with Plaintiffs' expert Dr. Wilcox. (R.T. 11/01/21 p.m. at 167:10-169:13.)

Joy claimed that the number of SMI patients in Arizona could be as much as five times higher than ADCRR is reporting but could not point to any sources to support this claim.  He acknowledged that he is unaware of what percentage of California inmates are SMI. (R.T. 11/01/21 p.m. at 162:12-164:12, 164:22-164:23.)  Joy admitted that he does not know the percentage of SMI inmates determined by the NCCHC. (R.T. 11/01/21 p.m. at

---

[12] This is not reflective of reality in a correctional setting, where the expected norm is 16-20 patients per shift.  (Dkt.4203, ¶ 1071.)

173:3-173:8.)  Joy claimed that 20% of ADCRR inmates are housed in isolation and based his estimates on provider productivity and needs for welfare checks and other mental health services on that percentage. (R.T. 11/01/21 p.m. at 164:24-165:4.)  However, Joy acknowledged on cross-examination that if the actual percentage of inmates in isolation was lower than 10% (which it is), productivity would increase and the demand for welfare checks and other mental health services would decrease. (R.T. 11/01/21 p.m. at 166:1-167:2.)

Joy compared ADCRR current staffing levels and the outputs from his staffing model to 2011 data from the CDC's National Center for Health Statistics and the Bureau of Justice Statistics to establish what he claims is an appropriate "benchmark."  Besides the problem of using "comparative" data from a decade ago, Joy inexplicably sets the "benchmark" at the 75th percentile, rather than the 50th percentile, to justify the outputs of his staffing model.  Joy admits that he used the CDC data despite a disclaimer that not all states provided accurate information and there was a "high level of item nonresponse for questions relating to contracting and staffing." (R.T. 11/01/21 p.m. at 149:14-150:12, 154:2-154:15.)

Joy does not rely on evidence customarily relied upon by experts in creating a staffing analysis/plan or follow the methodology that he personally used in California.  Joy admits that his staffing estimates are based on "inexact science" and that that his staffing analysis contains mathematical errors and incorrect figures. (R.T. 11/01/21 a.m. at 97:1-97:7, R.T. 11/01/21 p.m. at 173:19-175:3.)  Dr. Wilcox's attempt to bolster Joy's opinions should be rejected, where he admits that he did nothing to verify Joy's staffing model or calculation.  (R.T. 11/10/21 p.m., 1790:1-1790:10)  In short, Joy is not credible, his methodology is flawed, and his opinions should be stricken.

## III.   Quality Review.

### A.   Mortality Reviews.

Of the 94 mortality review and psychological autopsies cited in Plaintiffs' Findings of Fact, only 32 were addressed by Dr. Wilcox in his expert Declaration.  Not surprisingly,

the vast majority of the mortality reviews/psychological autopsies that Dr. Wilcox omitted from his report concluded that the care provided met the community standard of care, and the death was unavoidable.  (*See* Ex. 155, 161, 2102, 183, 268, 306, 314, 386, 390, 444, 517, 200, 228, 407,436, 213, 352, 378, 387, 400, 450, 523, 524, 218, 364, 226, 232, 236, 332, 358, 201, 202, 223, 224, 221, 233, 260, 283, 318, 380, 381, 432, 360, 428.)  Because the Court was not provided any contrary testimony, the findings from each of these mortality reviews/psychological autopsies must be accepted as unrebutted and therefore correct.

Plaintiffs entered into evidence 349 mortality reviews for deaths in custody occurring between April 28, 2015 and August 20, 2021.  Ten of those (Ex. 141, 150, 214, 230, 244, 246, 281, 382, 448 and 497) are duplicate or prior copies of reviews contained in other exhibits.  Additionally, one should not be considered as it occurred at ASP-Kingman, a private facility not at issue in this litigation.  (Ex. 520).

Sixteen of those were for accidental deaths.  Seventy-five percent of those involved cases where the accidental death was determined to be unavoidable, and the health care provided met community standards and/or correctional standards without negative findings.  (Ex. 173, 221, 232, 260, 279, 283, 313, 318, 371, and 372).  In three cases, it could not be determined whether or not the death was avoidable.  (Ex. 275, 323, and 429).  In only one of these accidental deaths, was it determined that the death as possibly avoidable based upon the health care provided (Ex. 393).  This single instance, an accidental mortality occurring at ASPC-Eyman in July 2019, does not reflect systemic deliberate indifference in health care.  Three were homicides.  In all cases, the mortality review determined that the death was unavoidable and the health care provided meet community standards and/or correctional standards without negative findings.  (Ex. 178, 220, and 259).  Forty-two were completed suicides.  Nearly 55% (23) of those were cases where the suicide was determined to be unavoidable and the medical and mental health care met community standards and/or correctional standards without negative findings. (Ex. 162, 201, 217, 223, 233, 238, 265, 353, 380, 392, 405, 440, 474, 482, 484, 490, 492, 496, 498, 500, 504, 508, and 510).  Two

1   more (both of which occurred in 2016), were found to be unavoidable but noted either a

2   lack of documentation of timely treatment or that there was an operations delay to access

3   for a resuscitation effort. (Ex. 468 and 476). In 13 cases, it could not be determined whether

4   or not the death was avoidable. (Ex. 185, 294, 355, 368, 464, 470, 472, 478, 486, 488, 494,

5   502, and 506). In only four cases was it determined that the death was possibly avoidable

6   (Ex. 256, 363, 375, and 403). Finally, only one case (from 2016), was determined that the

7   death was avoidable (Ex. 480). Yet, even among the 11.9% of suicides where the death

8   was determined to have been "possibly avoidable" or "avoidable," the reasons for those

9   determinations differ. For example, one in 2017 at ASPC-Tucson noted that the death was

10  "avoidable," and that treatment was inappropriate and level of care was inappropriate for

11  the severity of illness. (Ex. 480). One in 2019 at ASPC-Eyman noted the death was

12  "possibly avoidable" because preventative measures were not taken and mental health

13  watch was not instituted prior to death, treatment was not timely, and unable to care for

14  patient appropriately due to security issues, operation observation issues. (Ex. 375). One

15  occurring in 2020 at ASPC-Perryville was noted to be "possibly avoidable" because

16  physician guidance and coordinate multidisciplinary effort would have been appropriate.

17  (Ex. 363). One occurring in January 2021 at ASPC-Lewis was noted as "possibly

18  avoidable" due to untimely diagnosis and treatment. (Ex. 256). The final one occurring in

19  April 2021 at ASPC-Eyman was noted as "possibly avoidable" because the level or care

20  was inappropriate for the severity of illness. (Ex. 403). All of these relate to different

21  individual treatment decisions by different medical staff at different locations, and do not

22  reflect systemic deliberate indifference in health care.

23        The manner of death could not be determined for six inmate mortalities occurring

24  between 2016 and 2021. (Ex. 157, 361, 439, 463, 466, and 519). In only one instance, a

25  2016 mortality occurring in 2016 at ASPC-Eyman, where suicide was originally marked as

26  the manner of death but it was later corrected to undetermined, was there a general critique

27  that the level of health care provided was met, but "not optimal." (Ex. 466). In all others,

28  the health care provided was found to meet community standards and/or correctional

1  standards without negative findings.  (Ex. 157. 361, 439, 463, and 519).

2  Finally, there were 269 mortalities occurring between September 1, 2018 and August

3  20, 2021 (more than 62% of which occurred since March 1, 2019 and many during the

4  COVID-19 pandemic) due to natural causes.  223 of these were determined to have been

5  unavoidable with medical care meeting community and/or correctional standards without

6  any negative findings.  (Ex. 137-140, 142, 146-147, 149, 151, 155-156, 158, 160-161, 164-

7  172, 177, 179-183, 186-188, 191-194, 196-198, 200, 203-210, 212-213, 215, 222, 225-228,

8  231, 235-236, 242-243, 245, 247-255, 258, 261-264, 268-274, 276-278, 280, 282, 284, 286-

9  291, 295, 297-303, 305-312, 314-317, 319-322, 324-326, 328-343, 345, 347-348, 350-352,

10  358, 360, 362, 365-367, 373, 377-379, 383-384, 386, 388-390, 394, 397, 399-402, 407-411,

11  413-421, 424-426, 428, 430-432, 434-436, 438, 441, 443-444, 446-447, 449, 450, 452-453,

12  455-458, 461-462, 512-518, 521, 524-529, and 2102).  Thirteen had various critiques

13  relating to untimely diagnosis (8), untimely treatment (5), level or care inappropriate to

14  severity of illness (2), inadequate documentation (1), minimal documentation of wound care

15  and vital signs (1), diagnosis inaccurate (1), complication of therapies or procedures (1),

16  and/or preventative measures were not taken (1) – nevertheless, in all of these cases, the

17  critique notwithstanding, the ultimate fatal outcome was unavoidable.  (Ex. 148, 152, 175,

18  219, 241, 344, 349, 356, 359, 395, 422-423, and 427).  More than 87% of the inmate

19  mortalities in ADCRR facilities between September 1, 2018 and August 20, 2021 were

20  unavoidable.

21  Of the remaining, in only 11 instances did the mortality review conclude that the

22  mortality due to natural causes was "possibly avoidable."  In most of these cases the critique

23  was generally that diagnosis or treatment was untimely, but some also contain notations that

24  preventative measures were not taken (Ex. 159), diagnosis was inaccurate (Ex. 211, 327,

25  and 445), treatment was inappropriate (Ex. 327), and level of care was inappropriate for the

26  severity of illness (Ex. 327).  Further, there was only one mortality due to natural causes,

27  which occurred at ASPC-Florence in June 2019, where it was determined that the death was

28  "avoidable" with concerns about untimely and inaccurate diagnosis, and untimely treatment

55

1   (Ex. 398).  The 12 "possibly avoidable" and "avoidable" mortalities due to natural causes

2   account for less than 4.45% of the mortalities due to natural causes.  Further, these were

3   limited only to ASPC-Eyman (Ex. 143 and 412); ASPC-Florence (Ex. 211, 398, and 445);

4   ASPC-Perryville (Ex. 433); and ASPC-Tucson (Ex. 154, 159, 174, 304, 327, and 915).

5          In 22 cases occurring at ASPC-Douglas (Ex. 195); ASPC-Eyman (Ex. 199, 229, 326,

6   396); ASPC-Florence (Ex. 153, 189, 296, 370, 437 and 451); ASPC-Lewis (Ex.357, 387,

7   442, and 460); ASPC-Perryville (Ex. 176, 189, 216, 285, and 385); ASPC-Tucson (Ex.

8   459); and ASPC-Yuma (Ex. 454) between January 31, 2019 and June 4, 2021, it could not

9   be determined whether the death was unavoidable or possibly avoidable.  As with the prior

10  mortality reviews, there is no single uniform critique of the medical care provided which

11  could support an inference of systemic deliberate indifference.

12         In contrast, Plaintiffs, in their Proposed Findings of Facts and Conclusions of Law,

13  ignore the big picture.  Instead of attempting to examine all of the evidence in context, they

14  cherry-pick selected morality reviews relating to various causes of 92 deaths occurring

15  between March 9, 2016 and August 20, 2021.  Of those, only 13 were determined to have

16  been "possibly avoidable" or "avoidable" mortalities (Ex. 143, 154, 159, 174, 211, 304,

17  327, 375, 398, 403, 433, 445, and 915); with 20 being unable to determine whether or not

18  the health care provided contributed to the inmate's death (Ex. 153, 176, 189, 195, 199,

19  229, 275, 296, 323, 346, 355, 357, 385, 387, 396, 429, 437, 442, 460, and 470).  While

20  many of the final 59 mortality reports cited by Plaintiffs may contain some self-critical

21  analysis intended to promote higher quality medical care, notwithstanding those

22  observations, the ultimate result was unavoidable.  (Ex. 144-145, 148, 152, 155, 161, 175,

23  183, 200-201, 213, 221, 223, 226, 228, 232-233, 236, 241, 252, 260, 268, 272, 279-280,

24  283, 306, 313-314, 318, 332, 340, 344, 352, 356, 358-360, 378, 380, 386, 390-391, 395,

25  400, 407, 422, 427, 428, 432 436, 444, 450, 515, 517, 521, 523-524, and 2102.)

26      **B.    Corrective Action Plans ("CAPs").**

27         Plaintiffs assert that Defendants' CAP system fails to significantly improve care.

28  (Dkt. 4308 at 303.)  However, Plaintiffs fail to appreciate that the purpose of the CAPs is

56

1   to improve compliance with the Stipulation PMs, which were incorporated into the contract

2   and are used to monitor the healthcare vendor's contractual compliance.  As noted by Dr.

3   Stern, the Stipulation PMs are extrinsic measures, which do not require clinical judgment

4   and do not reflect the adequacy or quality of the care being provided.  (Ex. 1860 at 113.)

5   Additionally, Plaintiffs only point out issues with the CAPs when a compliance issue is not

6   fixed; they ignore CAPs that have resulted in increased compliance.

7           **C.    Maximum Custody Monitoring.**

8           Plaintiffs assert that Defendants have consistently failed to recognize and correct

9   serious problems with the monitoring of maximum custody operations and criticize the

10  accuracy of documentation produced to Plaintiffs in monthly maximum custody notebooks.

11  (Dkt. 4308 at 304.)   However, Plaintiffs fail to appreciate that the compilation and

12  production of the maximum custody notebooks was a product of the Stipulation and served

13  to provide source documents evidencing Defendants' compliance with the Stipulation's

14  maximum custody performance measures. Plaintiffs' criticism of the monitoring process

15  methodology for determining Stipulation compliance is no longer of consequence and does

16  not constitute trial evidence proving unconstitutional conditions of confinement.

17          **D.    Staffing.**

18          Plaintiffs claim that Defendants have no capacity to improve deficient levels of

19  custody and healthcare staffing.  (Dkt. 4308 at p. 306.)   They base this assertion on

20  conflicting testimony from Centurion's regional leadership and Mr. Gann – none of whom

21  were employed in their current roles at the time – as to whether ADCRR or Centurion

22  determined the staffing levels specified in the contract.  (Dkt. 4308, ¶¶ 968-69.)  Plaintiffs

23  also cite to a letter Director Shinn sent to Centurion in February 2020 following the Court's

24  issuance of an Order to Show Cause (Dkt. 3490) asking Centurion to reallocate staffing to

25  non-compliant facilities, fill vacancies, and increase the use of telemedicine to improve

26  Stipulation compliance levels.  (Dkt. 4308, ¶¶ 971-74.)

27          As with their other staffing-related claims addressed previously in this Response,

28  Plaintiffs ignore the fact that Centurion has greatly increased recruiting efforts, has filled

1    most vacant positions with registry nurses, locum tenens, or staff working overtime, and

2    has greatly increased the use of telemedicine.

3         The issue the Court must consider with respect to staffing is whether current staffing

4    allocations and actual FTEs worked are sufficient to meet the healthcare needs of ADCRR

5    inmates.  Dr. Murray opines that that they are based on Centurion's provider to patient ratio

6    of 750 to 1 and his interviews with Centurion facility leadership teams, who believe that

7    with the implementation of a new EHR, current staffing allocations are sufficient to meet

8    inmate needs.  (Dkt. 4309, ¶¶ 1016-17.).  While Joy disagrees, his methodology suffers

9    from fatal flaws, and his staffing analysis should be summarily rejected.  Dr. Wilcox's

10   attempts to vouch for Joy's analysis should likewise be disregarded when he admits that he

11   did not review Joy's model or take any steps to verify Joy's analysis.

12        **E.    NCCHC.**

13        Plaintiffs assert that Defendants' evidence regarding NCCHC accreditation does not

14   rebut evidence of serious deficiencies in ADCRR's healthcare system.  (Dkt. 4308 at p.

15   308.)  Plaintiffs attempt to cast the NCCHC accreditation process as a "fee-for-service"

16   endeavor.  (Dkt. 4308, ¶ 978.)  However, the application and renewal process is no different

17   from other professional licensure or certification processes in which an applicant pays an

18   initial application and an annual registration fee.  Plaintiffs also question the thoroughness

19   of the accreditation process, claiming that Defendants have not presented evidence as to

20   how the NCCHC determines compliance with each standard.  (Dkt. 4308, ¶¶ 983-84.)

21        To the contrary, Defendants have exhaustively detailed in their Findings of Fact each

22   of the NCCHC standards that are relevant to the claims in this litigation.  While Plaintiffs

23   attempt to diminish the import of NCCHC accreditation, courts have recognized NCCHC

24   accreditation as compelling evidence of constitutionally adequate healthcare.  *See*, *e.g.*,

25   *Balla v. Idaho State Bd. of Corr.*, 2020 WL 2812564 at *1 (D. Idaho May 30, 2020)

26   ("NCCHC standards are designed to ensure that systems, policies, and procedures of

27   correctional institutions are 'in keeping with nationally recognized best practices' in

28

correctional medical care.'") (quoting *Graves v. Arpaio*, 48 F. Supp. 3d 1318, 1338 (D. Ariz. 2014).

Plaintiffs' own expert, Dr. Wilcox, agreed on cross-examination that NCCHC accreditation is important.  Indeed, one of the main reasons that Dr. Wilcox resigned from his position with Maricopa County was because the jail system decided to let its NCCHC accreditation lapse.  (Dkt. 4309, ¶ 507.)

The NCCHC standards are a comprehensive and objective measure of a prison healthcare system's policies, procedures, and processes, and evidence of ADCRR's accreditation at all ten state-run complexes demonstrates that Defendants are delivering constitutionally adequate health care to ADCRR inmates.

**IV.     The Stern Report is Immaterial.**

In their Proposal, Plaintiffs repeatedly cite to the Stern report, which is the subject of Defendants' pending Motion to Strike (Dkt. 4219 at 2-3, Dkt. 4239).  In addition to the reasons articulated in Defendants' Motion, the Court should decline to consider the Stern report because it was prepared in response to concerns around the accuracy of monitoring the Stipulation PMs, which are no longer relevant to this litigation in light of the Court's Order rescinding the Stipulation (Dkt. 3921).  In addition, Plaintiffs attempt to rely on Dr. Stern as an expert, but neither party designated him as such.  To the extent that the Court nonetheless considers the Stern report in its ruling, the following points should be noted.

In describing the scope of his investigation and report Dr. Stern stated, "I did not conduct a systemic evaluation of the adequacy of all healthcare delivered at ADC."  (Ex. 1860 at p. 113.)  Dr. Stern did not view his charge from the Court to include rendering an opinion on the severity of the noncompliance or its systemic pervasiveness.  (Ex. 1860 at p. 72.)

Most of the performance measures contained in the Stipulation do not require clinical judgment. Such tools are extrinsic measures. Extrinsic measures are necessary but not sufficient by themselves to reflect the adequacy of care being provided.  (Ex. 1860 at p. 113.)

Dr. Stern did not identify any subjective intent on the part of ADCRR to deny medical care to the inmate population, stating: "It is my firm conclusion that ADC monitors conduct their work as fiduciaries for patients incarcerated at ADC. Their first and only consideration is whether patients are safe, as measured by the PMs they review. If anything, I found their audit decisions, at times, to be less forgiving of the vendor's actions than I might have been myself."  (Ex. 1860 at p. 10.)

Dr. Stern stated that compliance with and monitoring of the performance measures drives much of the workload for both ADC and the vendor. To the extent that compliance with a given performance measure does not improve patient safety, continued measurement of that performance measure diverts valuable resources away from achieving compliance with the remaining performance measures. Thus, these non-value-added performance measures contribute to noncompliance.  (Ex. 1860 at p. 53.)

Dr. Stern reviewed the following issues to determine if the performance measures accurately reflect the adequacy of care being provided: Quality of clinical decision making by RNs; Quality of clinical decision making by medical providers; Chronic disease management - medical; Mental health treatment plans; Management of suicide patients on watch; Management of mental health patients generally; Treatment of substance use disorder; Management of patients during an emergency response; Management of patients upon admission to an IPC; Management of patients in the IPC; Utilization management process denials of specialty referral requests; Utilization management process-managing patients after denials of specialty referral requests; Medication provision; and Mortality review.  Dr. Stern stated regarding all these issues that, "*my inclusion of an issue here does not necessarily mean that there is a systemic problem with care at ADC relative to that issue.*" (Emphasis in original.)  (Ex. 1860 at pp. 113-135.)

Dr. Stern's draft report recommended that 508 performance measures be terminated from the Stipulation; 19 performance measures to be retired or terminated contingent on the Court's acceptance of the recommendation cited; and 61 performance measures that Dr.

1    Stern recommended be retired or terminated contingent upon the Court's acceptance of the
2    recommendation cited and subsequent success on reaudit.  (Dkt. 3382-1 at 8-10.)

3         Dr. Stern reviewed individual cases to determine whether the failure to comply with
4    a particular performance measure posed a significant risk of serious harm to that particular
5    inmate. Dr. Stern stated, "However, the failure to comply does not necessarily mean that
6    other patients in different circumstances would have been exposed to a significant risk of
7    harm, and not all individual patient cases at facilities that fail to successfully perform on
8    PMs carry this same level of risk. Further, no harm may have actually resulted in the cases
9    I cite: my assessment was focused on whether the failure posed a *risk* of serious harm. I do
10   not opine as to whether any particular inmate's constitutional rights were violated.."  (Ex.
11   1860 at p. 72.)

12        In developing his report, Dr. Stern concluded that the deficiencies he found did not
13   exist because of a knowledge deficit on the part of the contracted vendor that requires the
14   expertise of an external expert to fix.  (Ex. 1860 at p. 89.)

15   **V.    Mental Health Care.**

16        **A.    Background**

17        The Background section of Plaintiffs' Proposed Findings of Fact & Conclusions of
18   Law is comprised of unsupported argument manufactured by Plaintiffs' counsel, which
19   does not appear in the record.[13]  While Plaintiffs purport to cite to trial evidence, the
20   citations they provide do not support the preceding assertions.  (Dkt. 4308, ¶¶ 367–368.)
21   Further, Defendants would be remiss not to highlight that Plaintiffs repeatedly rely upon
22   and cite to the same handful of inmates to support each of the different sections of their
23   Proposal.  For example, the inmates referenced in Paragraphs 510–511 are the same inmates
24   listed under Paragraph 493.  And the inmate referenced in Paragraph 513 has been cited
25   many times throughout Plaintiffs' proposal.  The inmates referenced in Paragraph 530 of

26

27        [13] This deficiency is not unique to Plaintiffs' Background section.  As detailed below,
     their entire proposal is riddled with unsupported contentions and argument from counsel
28   that are not contained in the scant citations they provide.

1   Plaintiffs' proposal largely overlap with the inmates cited in Paragraph 524.  The inmate

2   referenced in Paragraph 550 of Plaintiffs' proposal, is the same inmate referenced at

3   Paragraphs 445–448, & 476.  The inmate referenced in Paragraphs 410–413 is the same

4   inmate referenced in 443–444, & 476.  The inmate referenced in Paragraphs 438– 439 is

5   utilized again in Paragraphs 428 and 476.  The inmate referenced in Paragraphs 432–436 is

6   also cited in Paragraph 428.  Nowhere in Plaintiffs' proposal did they identify sufficient

7   evidence to establish a systemic violation, this is particularly so where they recycle

8   examples in a failed attempt to convince the Court that alleged deficiencies are more

9   prevalent than they actually are.

10          To begin, Plaintiffs take the testimony from Dr. Stewart cited in Paragraph 367 out

11   of context as support for an unrelated point regarding Defendants' staffing model.  (Dkt.

12   4308, ¶ 367.)  Significantly, Dr. Stewart was asked what his opinion was regarding a staffing

13   model (like Defendants) that has more nurse practitioners than psychiatrists.  (R.T. 11/03/21

14   a.m. at 468:23–469:13.)  He responded that "there's nothing necessarily wrong with it."

15   (*Id*.)  Similarly, the first two sentences of Paragraph 368 are unsupported.  Further,

16   Plaintiffs' attempt to rely on the Stern Report fail for several reasons.  First, the Stern report

17   has not been admitted into evidence.  (Dkt. 4228.)  Second, the portions of the report that

18   Plaintiffs cite do not discuss mental health care.  Of particular significance, in the portions

19   Plaintiffs cite, Dr. Stern does not discuss the alleged competing interest of trying to satisfy

20   shareholders rather than providing high quality care, as Plaintiffs allege.

21          **B.      Plaintiffs' Evidence Regarding Mental Health Care.**

22                 **1.      Dr. Stewart**

23          Plaintiffs' entire mental health case rests on the opinion of one person—Dr. Stewart.

24   Dr. Stewart's insufficient credentials, experience, and faulty methodology are detailed in

25   Defendants' Proposed Findings of Fact & Conclusions of Law.  (Dkt. 4309, ¶¶ 1127–1152.)

26   To summarize, Dr. Stewart's only experience providing direct patient care to inmates is

27   limited to four years in the late 1980s.  (*Id*., ¶ 1130.)   While Dr. Stewart currently works

28   one day a week at the Oahu Correctional Center, his responsibilities are limited to

supervising residents and he does not have complete access to the facility.  (*Id*., ¶ 1129.) He does not provide direct patient care to inmates in the jail.  (*Id*.)  Thus, Plaintiffs' assertion (which is not supported by the citation they reference) that Dr. Stewart provides "clinical care to jail detainees" is false.  (Dkt. 4308, n.65.)  As is their claim that Dr. Stewart has 40 years of extensive experience in management of patients in institutionalized populations. (*Id*.)  Not surprisingly, Plaintiffs made no attempt to support this assertion with a citation to the trial record.  While Plaintiffs purport to outline the type of inmates Dr. Stewart interviewed in preparation of rendering his opinion, they conveniently omit that many of these individuals were hand selected by Plaintiffs' counsel. (Dkt. 4309, ¶ 1141.)

Much of what is contained in Paragraph 374 is unsupported.  While the timing of mortality reviews is accurate, the arguments regarding their function and the entire second sentence is unsupported.  With respect to Dr. Penn's testimony regarding mortality reviews, Plaintiffs provide no citation for their assertions (Dkt. 4308, ¶ 380), and falsely claim that he testified he did not review a psychological autopsy report for a person who died by suicide in 2020.  (Dkt. 4308, ¶ 380, n.70.)  His actual testimony was, "It's possible I reviewed it.  I don't recall as we sit here today.  I reviewed thousands – or hundred, maybe thousands of pages of documents." (R.T. 12/07/21 a.m. at 3217:22-3218:12; 3220:6-16.)

## 2. Dr. Penn

Plaintiffs' attempt to argue that, like Plaintiffs' counsel, Defense counsel also selected files for Dr. Penn to review, fails and (again) is not supported by their citations. (Dkt. 4308, n.66.)  With respect to the files Dr. Penn reviewed, they were selected *at random* and *generated* by *ADCRR* utilizing Excel's random number function.   (Dkt. 4309, ¶ 1195.) Which is a significantly different (and more reliable) methodology than that employed by Dr. Stewart, who conceded that the files he selected were not at random and were *hand selected* by *Plaintiffs' counsel*.   (Dkt. 4309, ¶ 1141.)  Thus, the methodology Plaintiffs criticize was only employed by their own expert.  Remarkably, they even argue that this methodology of "focusing on one metric" (worst of the worst) "is of limited value when evaluating a nuanced and complex mental health system."  (Dkt. 4308, ¶ 376.)

1    Confusingly, Plaintiffs are critical that Dr. Penn's consultants were not provided with

2    the Mental Health Technical Manual, mortality reviews, or psychological autopsy reports.

3    (Dkt. 4308, ¶ 376.)  Indeed, that was the point—to ensure the consultants were "blinded,"

4    provided only the facts (the medical records), and not unduly influenced by others' opinions

5    or ADCRR-specific policy that may exceed constitutional minimums or the standard of

6    care.  (Dkt. 4309, ¶¶ 1195, 1199.)  For these reasons, Dr. Penn's opinion is far more reliable

7    than Dr. Stewart, who was greatly influenced by Plaintiffs' counsel and his decision to limit

8    his review to "worst of the worst" files.  (*Id*., ¶¶ 1141, 1202.)  These deficiencies, combined

9    with his significant bias (*Id*., ¶¶ 1137–1138), and threadbare credentials and experience (*Id*.,

10    ¶¶ 1127-1152), render him uncredible and unreliable.  His opinions should be rejected by

11    the Court.

12    Plaintiffs also criticize Dr. Penn for instructing his consultants to utilize what they

13    refer to as a "nebulous 'access to care' metric."  (Dkt. 4308, ¶¶ 376, 381.)  "Access to care,"

14    however, is a term of art, defined by NCCHC Standard P-A-01 as, "in a timely manner, a

15    patient is seen by a qualified health care professional, in rendered a clinical judgment, and

16    receives care that is ordered."  (Dkt. 4174, ¶ 108.)  The records review was an attempt to

17    "capture the overall quality of mental health and psychiatric services being provided to

18    ADCRR inmates."  (*Id*., ¶ 48.)  In terms of the instructions given to his consultants, Dr.

19    Penn testified:

20    I basically gave them the marching orders, I want you to review these charts and tell me the good, the bad, and the ugly.  Don't
21    hold anything back, don't hold any punches, just tell me what you find.  So I had that meeting with them in the beginning….
22    And the question poses to them was, was access to care provided, and I think it had parentheses, something like timely,
23    appropriate, met the standard of care, something like that, close parentheses.   So  that  was  a  question  posed  to  the
24    consultants.  And then they wrote their notes and their answer was yes or no.  If it was a yes, they met the standard of care or
25    – sorry, met access to care or, no, it did not meet access to care in their opinions.

26    (R.T. 11/19/21 a.m. at 2966:19-2968:1.)

27

28

64

1      Further, Dr. Penn advised his consultants that access to care meant it was timely,

2  appropriate, and met the standard of care.  (*Id*. at 2967:18–22.)  As Dr. Penn testified on

3  cross examination, he asked his consultants to "look at everything. . . [to include] look[ing]

4  at both medications, correct appropriate mediations, dosage, schedules, compliance, side

5  effects, management of side effects, all of those sort of things would have been subsumed

6  under the, was access to care provided?" (*Id*. at 3101:5–14.)  Plaintiffs' attempt to criticize

7  the term "access to care," which is defined by NCCHC and routinely utilized in the practice

8  of correctional medicine, fails.

9      Next, Plaintiffs attack Dr. Penn for not having committed the entire contents of each

10  of the 276 charts he reviewed to memory.[14]  (Dkt. 4308, ¶ 378.)   An expert's credibility

11  and reliability cannot be gauged on their ability to memorize medical charts.  What does

12  affect an expert's reliability and credibility, however, is their methodology.  As detailed

13  above and throughout Defendants' Proposal, Dr. Stewart's methodology suffers from

14  selection bias.  Moreover, he drew conclusions from discussions of inmates, but (with one

15  exception related only to language line) did not bother to review their charts.  (R.T. 11/03/21

16  p.m. at 602:14-20; 604:5-19; 651:9–652:20; 657:12-10; 669:10-18; 659:5-11; 663:18-25.)

17      With respect to Dr. Penn's opinions regarding the 276 files he reviewed in

18  preparation of rendering his opinions, Plaintiffs incorrectly state he "did not find any issues"

19  and "found no problems" with any of the 275 records other than one.  (Dkt. 4308, ¶ 379.)

20  This is false.  And, once again, Plaintiffs' citations do not support the assertion.  What Dr.

21  Penn actually testified to is that, other than one file, he "did not find any gross deviations in

22  standard of care or any access to care or continuity of care that fell below the standard of

23

24

25

26

27

28

---

[14] To support this assertion, Plaintiffs cite exchanges where Dr. Penn asked to review a record to confirm counsel's representations were accurate and counsel refused to show it to him.  (R.T. 11/19/21 p.m. at 3176:4-3178:16.)  And exchanges that were not regarding medical records or regarding files Penn reviewed, as Plaintiffs claim.  (*Id*. at 3182:7-24) (regarding deaf inmate declarations); (*Id*. at 3187:7-3189:10; Ex. 2262, Ex. 3 at 7; Ex. 2223) (regarding an HNR that was not reviewed by either Dr. Stewart or Dr. Penn in preparation of their opinions); (R.T. 12/07/21 a.m. at 3278:11-3279:265; 3280:13-16) (regarding a European Journal of Pschotraumatology article cited by Mr. Haney);  (*Id*. at 3298:19-3299:5) (regarding statements made by an author to an article which were not contained in the study reviewed by Dr. Penn).

care."  (R.T. 12/07/21 a.m. at 3381:23 –3382:2.)  He further testified that of the additional 275 files, he did not find there was a *systemic* problem with respect to care.[15]  (R.T. 12/07/21 a.m. at 3398:2–3399:19.)  Dr Penn further testified that based upon his review of the 276 files:

> Health care is not perfect.  There's always room for improvement.  We could always document better.  We could probably always provide more care and more services.  But I think in the totality, looking at everything, I really felt -- and I opined that as a system, from 30,000 feet up, they are providing reasonable access to care and continuity of care to males, females, transgender, or gender dysphoria, juveniles, other -- geriatric, folks with mobility issues and hearing and language impairments, they really are providing constitutional level of care to all of those inmates.

(*Id*., 3399:10–19.)

Remarkably, of the 156 files Dr. Stewart reviewed, Dr. Penn's consultants determined that only 33 *may have* had access to care issues.  (Dkt. 4309, ¶ 1202.) 79% of the files, however, demonstrated appropriate access to care.  (*Id*.)  This is significant as these are the "worst of the worst" files selected by Dr. Stewart.  (*Id*.)  Of the 120 charts that Dr. Penn randomly selected, the consultants determined that only five *may have* had access to care issues.  (*Id*.)  Significantly, of the five cases, there were no adverse patient outcomes—there was no morbidity or mortality.  (*Id*.)  Put another way, 95% of the randomly selected files demonstrated appropriate access to care according to the consultant's neutral, objective review.  (*Id*.)  Not surprisingly, Plaintiffs' Proposal ignores this important data and instead resorts to highlighting a small number of anecdotal cherry-picked examples in an unsuccessful attempt to prove a systemic deficiency.  While there were isolated instances of less-than-ideal outcomes or isolated examples where improvements could be made—these are reflected in the data above.  And, even considering these outliers, there is no systemic deficiency in the provision of mental healthcare to ADCRR inmates.

---

[15] Plaintiffs' statement that Dr. Penn testified that the one file still met the standard of care is not supported by their citation to the record.  (Dkt. 4308, ¶ 379.)

While Plaintiffs quibble with the timing of Dr. Penn's chart review, the fact remains that in addition to the assistance he received from his consultants, he reviewed all 276 files himself—some of them several times.  (Dkt. 4309, ¶ 1199.)  That Dr. Penn utilized the consultants' notes to guide him through his review, rather than taking duplicative notes of his own, is not persuasive.  (R.T. 11/19/21 p.m., 3147:11–18.)

Plaintiffs' remaining statements regarding Dr. Penn are largely unsupported.  For example, Plaintiffs provide no citation for their summary of what Dr. Penn did to prepare for his opinions, for the speculative attempts to justify why they precluded Dr. Penn from speaking to inmates, or for the numbers and findings by Dr. Penn's consultants.  (Dkt. 4308, ¶ 376, n.67; ¶¶ 382, n.72; ¶ 383.)  And, as detailed above, the portions they do provide citations for, are taken out of context or do not support the statements made.

Thus, the section of Plaintiffs' Proposal they claim outlines the evidence regarding mental health care that should be considered by the Court, is bare bones at best and fails to even come close to establishing their high burden of proving systemic violations.

### 3.   Other Witnesses

Paragraph 384 of Plaintiffs' Proposal outlines testimony from other witnesses, but does not provide any citation to any evidence, let alone specific testimony, from these witnesses.  Moreover, most of the witnesses referenced in this Paragraph are subject to outstanding motions regarding their testimony which has not yet been admitted into evidence.  (Dkt. 4292; Dkt. 4292-1.)  For these reasons, this Paragraph should be disregarded.

### C.   Plaintiffs' Summary of the Alleged Findings Related to Mental Health Care.

Plaintiffs begin this section of their Proposal by outlining what they believe the evidence demonstrated.  (Dkt. 4308, ¶¶ 385–386, 389.)  Despite summarizing 15 days of trial testimony, and 787 additional pages of written expert testimony, they fail to provide any citations to where these alleged findings can be found in the record.[16]  Nor do they

_____

[16] With respect to the citations in Paragraph 387 of their Proposal, the terms

provide any citation for the alleged harm they claim has resulted to class members. (*Id*., ¶¶ 388, 390.) Their inability to support their sweeping contentions is telling. And their only attempt to set forth evidence of alleged systemic "problems," is (again) not supported by the two paragraphs of Dr. Stewart's declaration they cite.[17] (Dkt. 4308, ¶ 391.) Paragraph 7 only identifies Dr. Stewart's previous reports and declarations. Significantly, while Paragraph 12 highlights 65 inmates, there were 27,794 inmates in state-owned and operated ADCRR facilities on September 30, 2021. (Ex. 3109 at 3.) Thus, strikingly, Plaintiffs' evidence of systemic deficiencies in the provision of mental health treatment is supported by examples from .002% of ADCRR's inmate population. This is a far cry from the *system-wide* evidence they needed (but could not obtain) to prevail on their claims.

### D.   Alleged Shortages of Mental Health and Custody Staff.

There is no national requirement or guideline for recommended staffing in jails or prisons. (Dkt. 4309, ¶ 1225.) While Plaintiffs attempt to discredit this testimony by Dr. Penn, they were unable to provide any citation to the record to support their arguments. (Dkt. 4308, n.80.) Thus, Dr. Penn's testimony is unrebutted.

With respect to ADCRR's mental health staffing, Plaintiffs provide no support for their attempt to connect Dr. Stewart's conclusory statements regarding staffing to the adequacy of mental health treatment at ADCRR. (Dkt. 4308, ¶¶ 392, 885–886.) And while they cite Stewart's testimony regarding "other healthcare staff" shortages, such testimony is equivocal and not definitive as he testified only that this *can* negatively affect the delivery of medical services, not that it does or that there was evidence of this in any ADCRR facility, let alone system wide. (*Id*., ¶ 393.) Likewise, Dr. Stewart's opinions regarding

---

"unnecessary suffering," "substantial risk," and "minimal civilized" do not appear in the cited testimony. In fact, in the live testimony, neither the term "unnecessary suffering" or "minimal civilized" were used by any witness. As for the phrase "substantial risk," Dr. Stewart only used it (or agreed to use it) when testifying regarding the need for a language line for monolingual Spanish-speakers (R.T. 11/03/21 p.m. at 607:22-25) and alleged "isolation" of adults and minors. (R.T. 11/04/21 a.m. at 792:11-793:23). Similarly, the phrases "unnecessary suffering" and "minimal civilized" are not used in Dr. Stewart's declaration.

alleged shortages of custody staff are unsupported by any evidence that such shortages actually impacted mental health care at ADCRR.[18]  (*Id.*, ¶ 395.)  More significantly, as detailed in Defendants' Proposal, Dr. Stewart does not opine that any staffing shortage caused harm (or a risk of harm) to the inmate class.  (Dkt. 4309, ¶ 1250.)  While Plaintiffs conclude that systemic deficiencies are rooted in inadequate staffing, they cite no evidence in support.[19]  (Dkt. 4308, ¶ 406.)  And their support for the staffing opinions in their Proposal are based upon Dr. Stewart's **one-day** tour of **one facility** two months before trial.  (Dkt. 4308, ¶ 398.)  Such a limited data set cannot be extrapolated to the ADCRR system as a whole.  Moreover, the citations to Dr. Stewart's Declaration do not support the psychiatrist staffing allegations contained in Paragraph 399 of Plaintiffs' Proposal, and FN 78 (which purports to summarize current psychiatry staffing) is unsupported by any citation to the record.[20]

Importantly, Dr. Stewart's staffing opinion is incomplete as his analysis is based exclusively on hired FTEs, which do not account for overtime or the use of locum tenens.  A *hired* FTE does not include any PRN staff (per diem), agency staff, or any staff that are salaried and working overtime.[21]  (R.T. 12/8/21 p.m. at 3586:12-3586:14.)  In contrast, *Worked* FTEs include overtime, any agency staff hours that are not represented in the hired FTE, any salaried staff that work above their 40 hours, locum tenens, and registry nurses.

---

[18] Indeed, Plaintiffs' conclusions regarding custody staff staffing in Paragraphs 887–888 of their Proposal is devoid of any citation to the record.  (Dkt. 4308, ¶ 887.)  The Court should disregard it.

[19] Indeed, none of the paragraphs cited in Paragraph 406 discuss staffing.  (Dkt. 4308, ¶ 406.)

[20] Footnote 75 of Plaintiffs' Proposal is misleading and omits important information regarding the efforts to fill vacancies (note in Ex. 907 that offers were extended to 4 candidates; note on page ADCRR00136579 of Ex. 847 that there were 8 psych associate vacancies and one MH lead vacancy, meaning the number actually decreased; citation to Ex. 847 at ADCRR00136590 is incomplete, misquoted, and out of context as Plaintiffs did not include the following sentence, "Katie Maters is the inter[i]m MH lead and has assisted with scheduling additional tele psych line to assist with the Eyman needs.").

[21] FTEs are defined as full-time equivalents not full-time employees.  (R.T. 12/8/21 p.m. at 3586:3-3586:4.)

1    (R.T. 12/8/21 p.m. at 3586:24-3586:25-3587:1-3587:6.)   On average, Centurion has 75%

2    to 80% hired FTEs and 80% to 90% worked FTEs. (R.T. 12/8/21 p.m. at 3587:7-3587:10.)

3         Further, the Staffing Variances-Hired vs. Contract FTE report (Ex. 2167), does not

4    show the amount of staffing coverage available to provide health care to the inmate

5    population at any given facility.  (R.T. 11/17/21 a.m. at 2443:16-2443:26-2434:1.)   Nor

6    does it show overtime hours, part time hours that may have been worked to 40 hours, or use

7    of registry staff. (R.T 11/17/21 a.m. at 2434:1-4.)   The report only shows what FTE

8    personnel have been hired in the particular matrix within the report.  (R.T. 11/17/21 a.m. at

9    2434:5-6.)   And the Staffing Variances-Hired vs. Contract FTE report is not used to

10   calculate the staffing offsets to sanction Centurion.  (R.T. 11/17/21 a.m. at 2434:17-19.)

11   The staffing offsets are calculated based upon contract language with Centurion and is done

12   through paid hours. (R.T. 11/17/21 a.m. at 2434:10-11.)  There are approximately 185,000

13   hours worked per month which then has an algorithm applied to it to calculate the difference

14   in hours worked and hours to be provided under the contract which forms the basis of the

15   staffing offset amount.  (R.T. 11/17/21 a.m. at 2434:11-16.)  From a contractual standpoint,

16   and what is being reported by hours, Centurion is providing over 90% of the hours that are

17   mandated by the contract.  (R.T. 11/16/21 p.m. at 2385:10-12.)  As Dr. Stallcup testified,

18   the actual staffing levels at each facility are currently sufficient.  (R.T. 11/17/21 a.m. at

19   2461:6-9; R.T. 11/17/21 p.m. at 2603:5-8.)

20        Footnote 80 of Plaintiffs' Proposal misstates Dr. Penn's testimony regarding

21   sufficiency of psychiatric staffing for SMI inmates.  (Dkt. 4308, ¶ n.80.)  With respect to

22   the adequacy of the number of psychiatric providers for SMI inmates, Dr. Penn testified

23   only that *it depends*, but that it is *possible* that one FTE psychiatric provider could be

24   adequate for every 500 SMI inmates.[22]  (R.T. 11/19/21 p.m., 3152:13-17.)  The Court

25   _____

26   [22]Nor was this testimony in relation to residential treatment units as Plaintiffs claim.
     (Dkt. 4308, ¶ n.80; R.T. 11/19/21 p.m. at 3152:13-17.)  With respect to Plaintiffs' assertions
     regarding the type of inmates in ADCRR's residential treatment programs, the citation to
27   Dr. Stewart's Declaration does not support their claims.  (Dkt. 4308, ¶ 401.)

28

should also reject Plaintiffs' arguments regarding the use of BHTs, psych associates, and correctional officers in relation to the provision of mental health care, as Plaintiffs were unable to provide any citation to the record in support.  (Dkt. 4308, ¶ 403.)

As detailed in Defendants' Proposal, the Court should reject any opinion from Mr. Joy as he is not credible, and his methodology is flawed.  (Dkt. 4309, ¶¶ 1790–1840.)  This is particularly true for his opinions referenced in Paragraph 399 of Plaintiffs' Proposal, as they suffer from the significant deficiency of overlooking the role of mid-level mental health providers.  As detailed in Defendants' Proposal, utilization of mid-levels meets the standard of care and correctional systems, just as hospitals and physicians' offices in the general public, are moving toward increasing the use of mid-levels.[23]  (Dkt. 4309, ¶ 1233.)

Additionally, Plaintiffs' attempt to link retention of staff to the inability to create therapeutic relationships also misses the mark.   (Dkt. 4208, ¶ 404.)  Neither Dr. Platt nor Dr. Stewart (the only testimony cited by Plaintiffs) testified that Centurion failed to recruit or retain mental health staff which made the ability to create therapeutic relationships "extremely difficult, if not impossible."  (*Id.*)  Plaintiffs cite one inmate example to bolster this statement, but the inmate's file does not support such a claim.  (*Id.*)  Indeed, that inmate's psychology autopsy states:

> Of note were the many times he was transferred to different complexes during his mental health treatment.  This limited how well any mental health clinician or psychiatric provider was able to know the patient."  **This suggested and individualized problem, based upon changes in housing location, rather than an issue due to "churning and turnover of staff."** (emphasis added).

Thus, even the single incident Plaintiffs cite for this proposition fails to support it.

Plaintiffs' argument that Defendants and Centurion were "well aware of the inadequacy of mental health staffing" is also unsupported.  (Dkt. 4308, ¶ 405.)  First, the citation to Dr. Carr's testimony is incorrect.  (*Id.*)  And the actual citation is missing

---

[23] Indeed, there is a national shortage of psychiatrists in the United States.  (Dkt. 4174, ¶ 70.)  To illustrate, according to the California Correctional Health Care Services website, recently there were over 90 vacant psychiatry positions in the state despite an average annual salary of $273,156 to $381,696.  (*Id.*, ¶ 79.)

important context.  Indeed, Dr. Carr explained that sometimes a request for "more staff" is just a request for assistance with time management or prioritization.  *See* 30(b)(6) Dep. Of Centurion (Antonio Carr) at 106:10–107:16.   And he could not recall whether such comments had been made at each ADCRR facility.  (*Id*.)   While Dr. Stallcup expressed concern that Centurion was not fully staffed, such concerns were limited to one facility (Eyman) in summer of 2021.  (R.T. 11/17/21 a.m., 2514:16-2515:2.)   Importantly, she testified that she no longer had these concerns.  (R.T. 11/17/21 p.m., 2603:14-2604:15.)  This is because the closure of the mental health units at Florence allowed staff to transfer from Florence to Eyman, which increased staffing there.  (*Id*.)  Staffing was also increased due to staff transferring from Phoenix to Eyman and due to implementation of telepsych.  (*Id*.)  As Dr. Stallcup testified, sometimes vacancies occur.  (*Id*.)  When that happens, Dr. Stallcup raises them with Centurion and they work together to resolve it, as they did with the temporary vacancies at Eyman.  (*Id*.)  This echoes what Dr. Platt testified to, "The response with Dr. Carr was we'd collaborate and discuss ways we could make people feel more valued and see what we can do to mitigate stressors and try to problem solve and strategize to help support staff better, the best we could, and attend, you know in-person things at the complex more frequently.  Things of that sort."  (R.T. 11/05/21 a.m. and p.m., 1054:10–18.)

Finally, Plaintiffs take issue with the charts contained on Page 26 of Dr. Penn's Declaration, because he was unsure of who specifically input the data from the source documents into the charts.  (Dkt. 4308, ¶ n.76.)  But the sources used to create the charts were cited in Dr. Penn's Declaration and he testified he reviewed the sources to check the accuracy of the information in the charts.  (R.T. 11/19/21 p.m., 3157:4-13.)  Despite having access to the source documents, Plaintiffs do not attempt to dispute that the information contained in the charts is accurate.[24]  (Dkt. 4308, n.76.)

---

[24] The Court should reject Plaintiffs' assertions in Paragraph 397 regarding licensing status, as the only evidence they cite in support is a document not in evidence.  Moreover, the conclusions Plaintiffs draw regarding licensure status from this unadmitted exhibit are speculative, as there was no testimony as to what the "N/A" designation in this report

E.    **Timely Mental Health Screening and Referrals.**

Paragraphs 408 & 414 of Plaintiffs' Proposal regarding the alleged requirements of a correctional mental health care system contain broad assertions without any citation to the evidentiary record.  (Dkt. 4308, ¶ 408.)  The Court should disregard them.

While Paragraph 409 of Plaintiffs' Proposal criticizes Defendants' intake process, the paragraph is devoid of any citation to the record in support.  (*Id.*, ¶ 409.)  Likewise, Plaintiffs note that unlicensed mental health clinicians may conduct the initial mental health intake, but they do not cite any evidence that this violates the standard of care or (in any way) creates a risk to ADCRR's inmate population.

With respect to licensure at ADCRR, psych associates can be licensed or unlicensed.  (Dkt. 4309, ¶ 1273.)  Unlicensed clinicians receive the supervision needed to become licensed and are required to do so within 18 months of hire.  (*Id.*)  Unlicensed psych associates are permitted to practice by the Arizona Board of Behavioral Health Examiners.  (*Id.*)  89% of ADCRR's psych associates are licensed.  (*Id.*)  This is how psych associates are utilized in the community.[25]  (*Id.*)  At ADCRR, psych associates provide individual treatment (counseling, crisis treatment, group counseling, & preparation for reentry into the community), crisis intervention, and group counseling.  (*Id.*)  If an inmate's intake assessment is not completed by a licensed mental health clinician, then the completed assessment is reviewed by a licensed mental health clinician within one business day.  (Ex. 3025-0022.)  Additionally, the inmate is seen by a mental health clinician within fourteen days of arrival to ADCRR.  (*Id.*)  Plaintiffs offer no evidence that the standard of care requires a licensed clinician to perform the intake assessment.

In Paragraph 410, Plaintiffs conclude that inmates "often" experience delays or interruptions in the continuation of their medications.  (Dkt. 4308, ¶ 410.)  The only evidence they cite is Dr. Stewart's testimony regarding *one* inmate.  (*Id.* at ¶¶ 410–413.)

_____

means.

        [25] Plaintiffs offered no evidence to dispute this.

Indeed, as Plaintiffs note in Footnote 81 of their Proposal, Dr. Penn's consultants agreed that this patient did not have proper access to care.  (Ex. 2262 at ADCRR00232580 (Patient 6.).)  Importantly, as detailed above, this inmate was one of the "worst of the worst" files selected by Dr. Stewart.  Even considering its outcome, 79% of Dr. Stewart's "worst of the worst" files, demonstrated appropriate access to care.[26]  (Dkt. 4309, ¶ 1202.)   There is no evidence of systemic deficiencies with the provision of mental health care at ADCRR.  Isolated examples—which is the extent of the evidence Plaintiffs have—are insufficient to meet their high burden.

Defendants use BHTs to conduct "health and welfare" checks in maximum custody units.  (Dkt. 4309, ¶ 1272.)  Such checks are not mental health "screenings" as Plaintiffs allege without support.  (Dkt. 4308, ¶ 416.)  Rather, they are checks to establish a rapport with patients, *offer* them mental health services, and *report* any differences or concerns back to the mental health team so that action can be taken.  (Dkt. 4309, ¶ 1272.)  These checks are in addition to: (1) detention's security checks; (2) the substantial (and automatically generated) mental health contacts inmates receive based upon their mental health score; (3) mental health treatment received via HNR; (4) mental health treatment received based upon a referral from custody staff; and (5) mental health treatment received based upon a referral from ADCRR's family and friends' line. (R.T. 11/17/21 a.m., 2503:24-2504:5; 2493:17-2494:18; Ex. 3026-0027–0032.)  Additionally, BHTs receive training and supervision, as detailed in Defendants' Proposal.  (Dkt. 4309, ¶ 1272.)  Plaintiffs do not dispute that BHTs are permitted to do much more in the community than ADCRR allows them to do in its facilities.  (*Id*.)  The manner in which ADCRR utilizes BHTs comports with the standard of care and does not subject inmates to a substantial risk of serious harm.  (*Id*., ¶ 1274.)

The Court should disregard Mr. Haney's opinions as to whether these checks constitute mental health care, and his opinions regarding ADCRR's mental health

---

[26] More significantly, 95% of Dr. Penn's randomly selected files demonstrated appropriate access to care according to the consultants' neutral, objective review.  (Dkt. 4309, ¶ 1202.)

monitoring and screening policies, as he is not a clinical psychologist, has never been licensed as a psychologist in any state, and has never diagnosed or treated a patient.  (Dkt. 4309, ¶ 1535–1536.)  He is not qualified to render such opinions.  Even if he were, he only provides eleven inmate examples to support it.   This is not evidence of a systemic deficiency.

With respect to Dr. Stewart's opinions regarding the effect of custody staff shortages on mental health treatment, the Court should disregard it.  (Dkt. 4308, ¶ 422.)  Dr. Stewart testified only that unspecified custody shortages *could* "impact" the delivery of mental health care and that "if you're short custody staff," it is difficult to be able to "do proper mental health care."  (R.T. 11/03/21 a.m., 470:18-471:7.)  While he testified that he saw examples, he provided no specifics, such as the facilities he saw examples at, which units, or what timeframe.  (*Id*.)  Nor did he conclude that mental health care was actually impacted (or how) in the amorphous examples he references in passing. (*Id*.)

## F.      Treatment Plans and Coordination of Care.

Treatment planning is a process that can occur informally, formally, or both.  (Dkt. 4309, ¶ 1359.)  The standard of care does not require that a formal treatment plan be created, beyond the SOAPE note charting that providers conduct. (*Id*., ¶ 1358.)   Plaintiffs' statements regarding the "particular" importance of treating planning at ADCRR are unsupported by any citation to the record and should be disregarded by the Court.[27]  (Dkt. 4308, ¶ 424.)  Other than citing to one inmate file, Plaintiffs offer no evidence that the manner in which ADCRR conducts treatment planning poses a risk to its inmates or falls below the standard of care.[28]  With respect to Dr. Stewart's criticism that psychiatrists do not participate in treatment plans for inmates prescribed psychotropic medications, several of the examples he cites have no mention of being prescribed medication or are not

---

[27] And the first, third, fourth, and fifth sentences in this Paragraph are not supported by the testimony of Dr. Stewart that Plaintiffs cite.  (Dkt. 4308, ¶ 424.)

[28] The testimony from Dr. Wilson's deposition that Plaintiffs rely upon is not in evidence.  (Dkt. 4292; Dkt. 4292-1.)

prescribed psychotropic mediations.[29] (Dkt. 4109, ¶¶ 53, 81; pg. 30–31.) Importantly, Dr. Penn testified that not every multidisciplinary or treatment team needs to include a psychiatrist. (R.T. 11/19/21 a.m. at 3009:20-3011:9)

Next, Plaintiffs allege Defendants fail to coordinate treatment plans. (Dkt. 4308, ¶ 428.) Their support is limited to eight isolated examples, which are further limited to a small subset of complaints (usually with pain management and coordination). (*Id.*) The sweeping statements in Paragraph 428 are overclaimed from the actual evidence. And, a review of the individual inmates' records they cite, paint a different story. In response to a mental health referral, the inmate referenced in Paragraphs 430 of Plaintiffs' Proposal stated he did not request nor need to be seen by mental health. (Ex. 218 at ADCRR00000128.) Additionally, he requested that his psych medications be discontinued and denied requiring mental health services in the month prior to his death. (*Id.* at ADCRR00000131.) With respect to the inmate referenced at Paragraphs 432–436 of Plaintiffs' proposal, Dr. Penn testified that he "did not find inadequate treatment plans or planning or a failure to coordinate care between psychiatric and mental health staff, or with medical providers. [He] did not identify any risk of harm or adverse outcomes." (Dkt 4174, ¶¶ 267-268.) The inmate's records confirm that sufficient care was offered/provided regarding his mental health issues and that various factors contributed to his death (patient non-adherence, use of illegal substances including pocketing of medications, and refusal of treatment). (Ex. 355 at ADCM1585576, ADCM1585577, ADCM1585589.) Finally, the inmate referenced in Paragraphs 437–439 of Plaintiffs' proposal was "on the [mental health] caseload and being seen more often than policy standards." (Ex. 364 at ADCRR00000166.) "The mental health team was referring her to medical, nursing referred her to medical provider, and the medical provider sent her to a psychiatric provider. There were multidisciplinary consultations, and teams worked together to help with her pain symptoms." (*Id.*)

---

[29] Plaintiffs reference to Dr. Stallcup's testimony in Paragraph 425 of their Proposal is inaccurate. (Dkt. 4308, ¶ 425.) She did not testify that treatment teams "often" consist solely of the patient and an unlicensed counselor. (R.T. 11/17/21 p.m. at 2568:7-2568:11)

And the examples highlighted in Paragraph 429 from Dr. Wilcox's testimony are speculative.  (Dkt. 4308, ¶ 429.)  Plaintiffs have no evidence—not even from their own mental health expert, Dr. Stewart—that a failure to provide adequate pain management was a contributing factor in the inmate's decision to attempt and complete suicide.  (*Id.*)  In fact, according to Dr. Stewart, if a person is determined to kill themselves, then many times they will be able to do that.  (Dkt. 4309, ¶ 1461.)

G.     **Access to Ongoing and Comprehensive Mental and Therapeutic Care.**

Once again, Plaintiffs' allegations regarding the manner and timing in which a prison must address HNRs, are unsupported by any citation to the record.[30]  (Dkt. 4308, ¶ 441.)  And their evidence of untimely triaging of HNRs is limited to Dr. Stallcup's testimony that she is aware of cases where HNRs were not triaged within the time frames required by policy.  (*Id.*, n.84.)  Put another way, Plaintiffs' evidence of a systemic deficiency in this regard is that Defendants are not perfect and that HNRs are not addressed pursuant to policy in every single instance.  To put this into context, for fiscal year 2020 to 2021, there were 302,000 HNRs submitted at ADCRR facilities.  (Dkt. 4309, ¶ 808.)

And while Dr. Stewart opines that patients experience "profound mental health symptoms who encountered delays in being seen, or a failure to be seen, by mental health staff, resulting in avoidable suffering, acts of self-harm, and in at least two cases, death by suicide," he could only come up with 8 examples in support.  (Dkt. 4308 at ¶ 442.)

With respect to the inmate referenced in Paragraphs 443–444, as Dr. Penn testified, even if he had been seen by psychiatry and had been put on medication, it is still possible that he could have attempted and completed suicide.  (R.T. 12/07/21 a.m. at 3214:14-25.)  And Dr. Penn conceded there was a breakdown in communication between mental health and medical in this inmate's case.  (R.T. 12/07/21 p.m. at 3380:12-3381:22.)  Importantly, however, a breakdown in one case at one facility does not equate to a systemic deficiency.

---

[30] Their assertions regarding inmates on psychotropic medications is similarly unsupported by the one paragraph of Dr. Stewart's Declaration that they rely upon.  (Dkt. 4308, ¶ 441.)

1

### 1. There is Adequate Access to & Provision of Therapeutic Treatment at ADCRR.

2

3   Again, as detailed above, Plaintiffs' assertions regarding mental health staffing are

4   misleading and inaccurate because they do not take into consideration locums, registry staff,

5   or overtime.   (Dkt. 4308, ¶ 449.)   And their assertions regarding custody staff are

6   conclusions that they make no attempt to support with evidence from the trial record.  (*Id.*)

7   It is unclear what the example referenced in Paragraph 450 of Plaintiffs' proposal is meant

8   to illustrate.[31]  Similarly, the allegations regarding custody staff's alleged lack of knowledge

9   on how to interact with mentally ill patients, based upon one incident report, is completely

speculative.  (Dkt. 4308, ¶ 451.)

10   Despite Plaintiffs' claims to the contrary, custody staff *do* receive the specialized

11   training Plaintiffs accuse Defendants of not providing.  Specifically, custody staff who work

12   in maximum custody, residential, or inpatient settings, are provided with an *additional*

13   three-day training that speaks to watch, mental health first aid, and communication skills.

14   (Dkt. 4309, ¶ 1463.)  Plaintiffs' misplaced staffing arguments, reference to two isolated

15   inmate examples, and inaccurate allegations regarding specialized training for custody staff

16   working in the settings described above is their only evidence that there are "deficiencies

17   in the residential mental health programs."  (Dkt. 4308, ¶¶ 449–452.)

18   Further, Defendants' mental health program is not limited to medication as Plaintiffs

19   conclude without citation to the record.  (*Id*., ¶¶ 453–454.)  Rather, in addition to the mental

20   health treatment programs available in ADCRR's in patient and residential treatment units,

21   robust educational & therapeutic programming (in both individual and group forms) are

22   available and provided to ADCRR inmates as discussed in detail in Defendants' Proposal.

23   (Dkt. 4309 at ¶¶ 1371–1388.)  Plaintiffs attempt to link a mere 8 individual examples of

24   alleged patient "decompensate[ion]" to an alleged lack of programming, but they provide

25   no evidence to support this claim.  (Dkt. 4308, ¶ 454.)

26

27   [31] While Plaintiffs' claim Ex. 818 "found custody staff's response to this patient to be 'excellent,'" that is not what the document says.  Rather, the document indicates that the *teamwork* between health and security staff was excellent.  (*Id*. at   ADCRR00056377.)

28

2.     **Group Mental Health Care at ADCRR Exceeds the Standard of Care.**

Plaintiffs' claim that "most of" the mental health programming in ADCRR's maximum custody units is only offered to SMI inmates is supported only by an answer given by a custody (not mental health) witness during his deposition.  (Dkt. 4308, ¶ 456; Dkt. 4120, ¶ 85, n.81.)  And Mr. Scott did not testify that mental health programming is only offered to SMI inmates.  (Dkt. 4120, n.81.)  Rather, when asked whether mental health classes were offered for people who are not SMI, he stated he did not know.  (*Id*.)  Plaintiffs also rely on improper expert testimony from Mr. Haney who, as detailed above, is not qualified to render opinions regarding the adequacy of mental health programming or treatment.

As detailed in Defendants' Proposal, Psychotherapy groups are provided by psych associates and psychoeducational groups *may be* provided by BHTs.[32] (Dkt. 4309, ¶ 1372.) The evidence Plaintiffs cite does not support their claim that *many* programs are facilitated by BHTs.  (Dkt. 4308, ¶ 459.)  Plaintiffs offer no evidence that this practice somehow falls below the standard of care.  (Dkt. 4308, ¶ 459.)  While Dr. Stewart's Declaration states that mental health groups should be led and coordinated by licensed masters' level psychology associates, he provides no support or explanation for this belief.  (Dkt. 4109, ¶ 42.)  And Plaintiffs falsely claim that Defendants did not dispute this.  (Dkt. 4308, ¶ 463.)  Indeed, Dr. Penn testified that it is appropriate for some groups to be led by non-licensed staff like a BHT or correctional officers.  (R.T. 11/19/21 a.m. at 3013:5-3014:7.)  ADCRR provides more programming than what would be available in the community.[33]  (R.T. 11/19/21 a.m. at 3014:8-19.)

Finally, while they cite to Mr. Haney's Declaration where he provides non-specific

---

[32] That *group* programming is not offered in detention does not mean that mental health programming is not offered during an inmate's temporary stay in a detention unit. Indeed, detention status inmates are provided mental health services and are seen upon request or as needed.  (Dkt. 4309, ¶ 1511.)

[33] Most of the citations to Dr. Pelton's deposition testimony that Plaintiffs cite in Paragraph 458 of their Proposal are not in evidence.  (Dkt. 4308, ¶ 458.)

1    claims that an unidentified number of inmates at unidentified facilities had "mixed-
2    reactions" to group programming, such flimsy testimony cannot be used to support
3    Plaintiffs' system-wide claims.[34]

4    **H.    Mental Health Encounters.**

5        As an initial matter, the Court should disregard Plaintiffs' reliance upon Dr. Stern's
6    report and Dr. Stewart's previous reports as they are not in evidence.  (Dkt. 4308, ¶ 465,
7    474.)   Significantly, Plaintiffs' only evidence that mental health encounters should be
8    subject to minimum durations is the opinion of Dr. Stewart.   And the only support he
9    provided for his opinion is that the parties in a similar class-action in one state (Illinois)
10   agreed to impose minimum durations.   (R.T. 11/03/21 a.m. at 475:24-476:5.)   When
11   pressed, Dr. Stewart was unable to provide any other examples of any other correctional
12   institution in the country that requires minimum durations for inmates on watch.  (R.T.
13   11/03/21 p.m. at 593:15-594:5.)   Nor was he able to provide a national standard, peer-
14   reviewed medical journal, or any other literature to support this opinion.  (*Id.*)  Thus, Dr.
15   Stewart's only support for his opinion is his own opinion from another case.  Significantly,
16   in that case, the Seventh Circuit recently vacated a permanent injunction enjoining the
17   Illinois Department of Corrections to increase staffing and take other specific measures to
18   remedy "systemically inadequate prison healthcare" in five areas that Dr. Stewart identified
19   as noncompliant with the parties' settlement: mental-health evaluations, treatment planning,
20   medication management, crisis treatment, and segregation.  (Dkt. 4309 at 25–26.)

21       As detailed in Defendants' Proposal, minimum durations disempower providers to
22   use their clinical judgment and place providers in the awkward position of making patients
23   stay longer than they want or need.   (*Id.*, ¶ 1354.)   Timeframes take away providers'
24   autonomy and ability to make their own clinical decisions.  (*Id.*, ¶ 1355.)  Additionally, as
25   Dr. Platt testified, the Court's minimum-duration order impacted staffing and was a barrier

26

27       [34] Plaintiffs' allegations regarding the rate of refusal for the inmate referenced in
     Paragraph 260 of their Proposal is exaggerated.  (Dkt. 4308, ¶ 460.)  This inmate testified
     that he refused group "[m]aybe once or twice, not normally."  (R.T. 11/08/21 a.m. and
28   partial p.m. at 1232:6-12.)

to staffing.  (*Id.*, ¶ 1356.)  Setting minimum required durations for mental health care encounters hamper a clinician's ability to provide mental health care. (*Id.*, ¶ 1340.) Providers have an ethical duty to meet the patient where the patient's at and to work with them there.  (*Id.*)  Further detail regarding Dr. Penn's opinions on this subject are contained in Defendants' Proposal and his Declaration.  (*Id.*, ¶¶ 1340–1357; Dkt. 4174 at ¶¶ 139–151.)  There was a multitude of evidence at trial from other witnesses which echo Dr. Penn's concerns with imposing minimum durations.  (R.T. 11/05/21 p.m. at 1088:18-1089:18 (leads to checking the box, and strips away autonomy from clinicians); R.T. 11/17/21 p.m. at 2594:2-5 (still have requirement to provide quality care without minimum duration requirements); 3001:8-10 (no correctional standard requires MD); 3001:19-3003:19 (impairs therapeutic relationship between QMHCP and patient); 3172:23-3173:25 (same, based upon tours); 3174:16-3176:2 (same & inmates less likely to seek care, due to longer time in medical); 600:15-601:602:4 (Stewart acknowledges that clinicians just standing there to make duration would aggravate the patient)).

Importantly, there is no language in NCCHC's standard compliance indicators, definitions, or discussion section that mandates or promulgates a minimum or certain amount of time or range to be utilized during any mental health encounter.  (Dkt. 4309, ¶ 1352.)  And there is no other nationally defined time duration requirement to conduct any type of mental health interaction or evaluation of an inmate prior to, while on, or subsequent to removal from a suicide or mental health watch.  (*Id.* ¶ 1351.)  As described in Dr. Penn's Declaration, the files he reviewed demonstrated that even when "short," encounters were meaningful, appropriate and met the standard of care.  (Dkt. 4174, ¶ 142.)  Plaintiffs' evidence of "extremely brief" encounters, is limited to four inmate examples.  (Dkt. 4308, ¶ 475.)  Likewise, Plaintiffs' evidence that short encounters lead to suicide, is limited to just five inmate examples.  (*Id.*, ¶ 476.)  And their evidence that these encounters in "isolation units" are "often" extremely brief is limited to one.  (*Id.*, ¶ 472.)

With respect to Plaintiffs' claims regarding the adequacy of cell-front encounters in Paragraph 480 of their Proposal, they are solely supported by the testimony of Mr. Haney.

81

1    (Dkt. 4308, ¶ 480.)  As mentioned above, he is not qualified to render such opinions as he

2    is not a mental health professional.  Importantly, his opinion that such encounters, "by their

3    very nature" are "superficial and uninformative," are contradicted by Plaintiffs' own mental

4    health expert, Dr. Stewart.  (*Id*.)  Indeed, Dr. Stewart utilized cell-front interviews to prepare

5    his opinions in this case.  (R.T. 11/03/21 a.m. at 536:2-10.)  Thus, according to Plaintiffs'

6    own expert, the interviews conducted by Dr. Stewart in this case were uninformative and

7    superficial.  Dr. Stewart opines that "many short" mental health encounters occurred at cell

8    front, but he fails to connect this allegation to any risk of harm.  (Dkt. 4308, ¶ 481.)  And

9    while Plaintiffs allege that inmates on suicide watch are not offered out-of-cell confidential

10   counseling, their only evidentiary support is that one witness *believed* it occurred once at

11   the Phoenix facility.[35]  (*Id*., ¶ 482.)  As detailed in Defendants' Proposal, the use of cell-

12   front encounters, in and of themselves, do not place inmates at a risk of harm.  (Dkt. 4309,

13   ¶ 1334.)  For example, using cell-front encounters to provide focused mental health

14   assessments of inmates on watch is clinically appropriate. (*Id*.)  ADCRR appropriately

15   utilizes cell-front encounters and provides confidential settings where clinically indicated.

16   (*Id*., ¶ 1339.)

17           **I.    Access to Psychiatric Medication**

18           Plaintiffs' introductory Paragraph 492 is unsupported by any citation to the record.

19   (Dkt. 4308, ¶ 491.)  The Court should disregard it.

20           **1.    Adequate Formulary for Psychotropic Medications.**

21           Dr. Stewart's personal opinions regarding Wellbutrin, Trileptal, Seroquel, and

22   Clozaril, were belied by Dr. Penn's expert testimony.  (Dkt. 4309, ¶¶ 1438–1440.)  It is

23   important to reiterate that Dr. Stewart has minimal correctional experience, which

24   undermines both his credibility and ability to opine as to appropriate formulary

25   prescriptions in the correctional setting.  (Dkt. 4309, ¶¶1127–1140, ¶¶ 1437 –1438, 1443.)

26

27           [35] While Plaintiffs criticize ADCRR's security practices for removing certain
     inmates from cells for confidential encounters, they do not opine that such practices violate
28   the standard of care or inmates' constitutional rights.  (Dkt. 4308, ¶¶ 488-489.)

In contrast, Dr. Penn was the lead author of a document titled Resource Guide for Prescribing in Correctional Settings in the American Academy of Psychiatry and the Law. (*Id*., ¶ 1420.)  This guide was published in the peer-reviewed journal, the Journal of the American Academy of Psychiatry and the Law.  (*Id*.)  It is now in its second version, which Dr. Penn again is assisting in drafting.  (*Id*.)  It is the only document of its type in a peer-reviewed journal that goes through every single psychotropic medication and analyzes the issues described above within correctional settings.  (*Id*.)  Dr. Penn's opinions regarding these (and others raised by Dr. Stewart) medications are detailed in Defendants' Proposal. (*Id*. at ¶¶ 1434–1447.)  While Plaintiffs allege that Dr. Stewart "identified instances from medical charts and from patients' reports where medications were abruptly changed or patients were denied medications," the citation they provide lists zero examples.  (Dkt. 4308, ¶ 500.)

### 2.    ADCRR's Medication Distribution Practices Exceed the Standard of Care.

Plaintiffs begin this section by concluding that ADCRR's medication distribution practices put inmates at substantial risk of serious physical and psychological harm.  (Dkt. 4308, ¶ 504.)  While they cite numerous paragraphs from Dr. Stewart's Declaration, and excerpts from his trial testimony to support this statement, none of the citations contain *any* examples regarding specific inmates.  (*Id*.)

Further, Plaintiffs' reference to Plaintiff Brislan's testimony that he becomes paranoid and hears voices when he does not receive antipsychotic medications, is unconvincing for purposes of Plaintiffs' system-wide claims. (Dkt. 4308, ¶ 505.)  Indeed, Plaintiff Brislan did not testify when this occurred, how often it occurred, at what facilities it occurred at, or what specific medications he claims he did not receive.  (R.T. 11/08/21 a.m. and partial p.m. at 1297:7-11.)  Nor is it clear from the testimony Plaintiffs rely upon, whether the medication he complains of was indeed prescribed to him.  (*Id*.)

Next, in support of their system-wide allegations, Plaintiffs rely upon two incidents at one unit at one facility where medications were given at incorrect times.  (Dkt. 4308, ¶

506.)   With respect to the first incident, it was discovered within an hour, and plans were immediately put in place to check the inmates and monitor their vital signs to ensure no adverse effects. (Ex. 905 at ADCRRM0013395-96.)  Significantly, it was the result of one nurse's (who was scheduled to be off on bereavement leave) misunderstanding regarding day shift's early administration of medications. (*Id*.)  Importantly, a plan was put into place to prevent this from re-occurring. (*Id*.)  The only support Plaintiffs provide for the second incident merely notes that "Medication errors were noted and discussed with individual staff." (Ex. 831 at ADCRR00061889.)  There is no detail provided (including where it occurred) to support Plaintiffs' assumption that it occurred because of the same issue at the same unit.  Even if Plaintiffs' speculative statements are correct, such isolated incidents at one facility cannot support Plaintiffs' claims of systemic deficiencies.

Plaintiffs claim that "multiple inmates" at ASPC-Phoenix's "specialized mental health program" reported that medications are delivered late and early "due to a shortage of nurses" is not supported by the record. (Dkt. 4308, ¶ 507.)  Plaintiffs rely exclusively on Dr. Stewart's Declaration to support this claim. (*Id*.)  The Paragraph cited, however, only refers to inmates at Phoenix-Aspen. (Dkt. 4109, ¶ 140.)  Dr. Stewart only interviewed twelve inmates at Phoenix. (*Id*., ¶¶ 28–35.)  Eleven of them have no documentation of residing at the Aspen unit, mentioning delays in receiving medications, or a shortage of nursing staff. (*Id*.)  And the inmate from Aspen did not make the specific statements contained in this Paragraph. (*Id*., Exhibit 2 at 33.)  Finally, while Plaintiffs cite to a staffing variance report to support the claim that there is a nursing shortage, the report they cite pertains to nurse assistants and patient care technicians, not nurses.[36] (Dkt. 4308, ¶ 507.)

### 3.  Defendants Properly Monitor Inmates for Medication Side Effects and for Continuing Mental Health Symptoms.

Relying on Dr. Stewart, Plaintiffs conclude that ADCRR lacks an adequate system to ensure that inmates prescribed psychotropic medications are properly monitored by a

[36] AZ Board of Nursing Rule R4-19-802 does not authorize Nursing Assistants administer medications.

84

1    prescribing psychiatrist.  (*Id.*, ¶ 508.)  But Dr. Stewart's opinion is not supported by

2    systemic evidence.  Indeed, he opines only that it "was not done in cases I reviewed." (Dkt.

3    4109, ¶ 144.)  But he does not explain how many cases he allegedly found this in, which

4    facilities the inmates were housed, or when it allegedly occurred.  (*Id.*)

5        **J.    There is no Evidence that Mentally Ill Inmates Remain "Profoundly
              Symptomatic" For "Long" Periods of Time.**

6        Importantly, Dr. Stewart bases his opinions regarding this subject on his interviews

7    of inmates at just four of ADCRR's ten facilities.  (Dkt. 4109, ¶ 113; Dkt. 4308, ¶ 521.)

8    Plaintiffs also rely upon Mr. Haney's alleged "finding" that inmates appeared "obviously

9    and profoundly mentally ill," but their citation to the record includes no specific examples

10   or references to particular inmates.  (Dkt. 4108, ¶ 525.)  Even if it did, as discussed above,

11   Mr. Haney is not qualified to render such an opinion.

12       Plaintiffs' allegations regarding the alleged practice of "de-diagnosing" are

13   misplaced as they fail to appreciate (or ignore) that the diagnoses are still located in the

14   chart.  (Dkt. 4308, ¶ 526; Dkt. 4309, ¶ 1412.)  Importantly, the practice of adding,

15   discontinuing, or modifying psychiatric mental disorders is a necessary and common

16   component of the provision of mental health treatment.  (Dkt. 4309, ¶ 1412.)  This practice

17   comports with accepted correctional and community standards of care and does not put

18   class members at risk of harm to self or others.  (*Id.*)  It is well within accepted community

19   and correctional standard of care to change diagnoses because in mental health (unlike in

20   medical) diagnoses are not black and white.  (*Id.*)  But the diagnosis is still in the problem

21   list in the chart.  (*Id.*)  Dr. Penn did not witness any of the "de-diagnosing" practices alleged

22   by Dr. Stewart.  (*Id.*)  A detailed explanation of why it is proper to add, modify, and remove

23   diagnoses is detailed in Defendants' Proposal.  (*Id.*, ¶¶ 1412–1419.)

24       Plaintiffs' claims regarding SMI inmates are incomplete.  First, Dr. Stallcup's

25   testimony was that psych associates may remove a patient's SMI designation only if they

26   were designated in the prison and *only after a treatment team meeting*.  (R.T. 11/17/21 p.m.

27   at 2568:1-6.)  Second, with respect to Plaintiffs' allegations regarding tracking of SMI data,

28

1   Dr. Stallcup testified that ADCRR "can pull that data any time it is requested." (R.T.

2   11/17/21 p.m. at 2569:20-25.) Therefore, Plaintiffs' allegation that it is not "tracked," is

3   misleading. (Dkt. 4308, ¶ 528.) Finally, for the reasons discussed above, the Court should

4   disregard Paragraph 527 of Plaintiffs' Proposal as it is only supported by testimony from

5   Mr. Joy who is not a credible and unqualified to opine on this information. (Dkt. 4308, ¶

6   527.)

7       **K.    Access to Inpatient Mental Health Care.**

8       Plaintiffs note that: (1) male inmates that require in-patient services must be

9   transferred to ASPC-Phoenix to receive services; (2) there is no requirement that a patient

10  be evaluated for transfer to an in-patient ward after a certain amount of time on suicide

11  watch; and that (3) custody staff have the authority to recommend that an inmate not be

12  transferred to in-patient care.[37] (Dkt. 4308, ¶¶ 533, 538, 540.) But they do not allege that

13  any of these items present a risk of harm to the inmate class. As such, these allegations

14  provide no support for their claims. Plaintiffs claim that Dr. Stewart "observed numerous

15  acutely mentally ill people," but their citation to the record is limited to three examples at

16  just two of ADCRR's ten facilities. (Dkt. 4308, ¶ 535.)

17      With respect to Plaintiffs' assumption that the vacancies in ADCRR's in-patient

18  facilities are due to understaffing, they provide no evidence in support. (Dkt. 4308, ¶ 537.)

19  While they cite to Dr. Stewart's opinion, his opinion is equivocal and only that availability

20  in in-patient units "may be" driven "in part" due to staffing. (*Id.*) As detailed in

21  Defendants' Proposal, this is not due to staffing, but because there are not enough inmates

22  who require such high levels of care. (Dkt. 4309, ¶ 1322.) This is because, as Plaintiffs

23  note, in-patient wards should be reserved for the most acute and seriously mentally ill. (Dkt.

24  4308, ¶ 533.) Inpatient care should be utilized relatively infrequently. (Dkt. 4309, ¶ 1323.)

25  As detailed in Defendants' Proposal, each week, Dr. Stallcup participates in a call with the

26  deputy wardens and Centurion's Regional Mental Health Director to discuss referrals for

27

28      [37] Significantly, there is no evidence that custody staff have actually made such recommendations.

1   inpatient and residential treatment. (*Id.*, ¶ 1323.) This ensures that inmates who require a

2   higher level of care can be transferred in a timely fashion. (*Id.*) In Dr. Stallcup's

3   experience, routine referrals take approximately a week and urgent referrals within 24

4   hours.[38] (*Id.*) Further, Plaintiffs correctly state that maximum custody inmates are not

5   eligible to be transferred to ASPC-Phoenix' Aspen unit. (Dkt. 4308, ¶ 541.) This is correct,

6   and because maximum custody inmates are housed at a different residential treatment

7   location (ASPC-Tucson's Rincon unit) not because they are ineligible for mental health

8   care in ADCRR's residential treatment units as Plaintiffs insinuate.[39] (Dkt. 4174 at 40.)

9         In support, Plaintiffs rely upon the testimony from Plaintiff Slavin. (Dkt. 4308, ¶¶

10   544–546.) They argue the "mental health resources available to him are quite limited" and

11   "inadequate to treat his mental illness," including his interactions with a psychiatrist. (*Id.*,

12   ¶ 544–545.) But Plaintiff Slavin testified that the reason he doesn't see a psychiatrist once

13   a month is because he refuses, not because the service is not offered to him. (R.T. 11/02/21

14   a.m. at 276:1-281:11.) He also testified that he is offered counseling sessions every month,

15   but he elects to refuse those as well. (*Id.*) And, he conceded that he receives his medications

16   every single day. (*Id.*) Specifically, he testified, "[n]o, you guys are not – you're not

17   refusing me what is needed. You're not refusing me." (*Id.*) Remarkably, with respect to

18   medications, Plaintiff Slavin testified that he has "been on everything," to include

19   Wellbutrin—a medication Dr. Stewart claims ADCRR "doesn't prescribe." (*Id.*; (R.T.

20   11/03/21 a.m. at 490:17-23.)).[40]

21

22       [38] Plaintiffs attempt to discredit Dr. Penn's opinions regarding examples of inmates
who were transferred to in-patient wards within 48 hours. (Dkt. 4308, n.100.) But Dr.

23   Stallcup corroborated this. (R.T. 11/17/21 a.m. at 2490:4-2491:13.) Moreover, Dr. Penn's
opinions were not solely based upon document review. They were also based upon

24   discussions with staff. (R.T. 11/19/21 a.m. at 2993:3-2994:15; 3169:6-21; & 3170:6-14.)
More importantly, Plaintiffs were unable to dispute that the transfers highlighted by Dr.

25   Penn and Dr. Stallcup were not completed in 48 hours.

    [39] The testimony from Dr. Wilson's deposition cited by Plaintiffs in Paragraph 543

26   of their Proposal is not in evidence. (Dkt. 4292; Dkt. 4292-1.)

27       [40] As Plaintiffs forced the Court to remind them time and time again during trial, the
fact Plaintiffs' counsel sent letters to Defense counsel requesting investigations into alleged

28   individual healthcare needs of inmates, and counsel's response to same, are irrelevant to the
issues in this case. (R.T. 11/04/21 p.m. at 938:13-941:3.) As such, the Court should

1      **L.      Appropriate Treatment of Suicidal & Self-Harming Inmates.**

2          Plaintiffs' introductory paragraph under this section is not supported by the citation

3   to Dr. Stewart's Declaration provided.  (Dkt. 4308, ¶ 552.)  The Court should disregard it.

4          Plaintiffs' attempts to mold ADCRR's suicide data to fit the manner and format

5   reported by the Bureau of Justice Statistics is an unsuccessful attempt to fit a square peg

6   into a round hole.  (Dkt. 4308, ¶ 553–554.)  Fiscal year data cannot be compared to calendar

7   year data as each measures a different time period.  Thus, the Court should reject Paragraph

8   554 of Plaintiffs' proposal as it attempts to compare apples (fiscal year data) to oranges

9   (calendar year data) to create data that supports their claims.[41]  (Dkt. 4308, ¶ 553–554.)

10  Add to this, Plaintiffs' analysis improperly compares 2021 data to aggregate data from

11  2015–2019.[42]  Plaintiffs do this because, the reliable and comparable BJS data proves,

12  without question, that ADCRR's suicide rate is drastically lower than the national average.

13  The BJS data, and how Arizona compares nationally, is explained in detail in Defendants'

14  Proposal.  (Dkt. 4309, ¶¶1481–1499.)  To illustrate, only nine of the fifty states had a lower

15  suicide mortality rate than ADCRR during the five-year period from 2015–2019.  (*Id.* at

16  1497.)  And during that period, ADCRR's suicide mortality rate was less than or equal to

17  that of 40 states.  (*Id.* at 1496.)  Moreover, while BJS noted a national upward trend in

18  suicides, Plaintiffs fail to present any evidence that the nationwide rate has leveled off or

19  decreased since 2019, which is necessary to reach their manufactured conclusion by

20  utilizing subsequent ADCRR data.[43]

21  _____

disregard Paragraph 549 of Plaintiffs' Proposal.  (Dkt. 4308, ¶ 549.)

22      [41] Even if the Court were to consider Paragraph 554, it should reject the first
sentence, as it is unsupported by the record, and the last sentence as the cited testimony is
23  not in evidence.  (Dkt. 4308, ¶ 554; Dkt. 4292; Dkt. 4292-01.)  Even if it were, it is
attenuated at best, as Dr. Wilson claimed only that nonspecific "staffing shortages" *could*
24  (not that they do) contribute to an increase in suicides.  (*Id.*)

25      [42] BJS aggregates data into five-year periods so that stable rates can be calculated.
(Dkt. 4309, ¶ 1494.)  Put another way, because numbers are so small, single year
26  comparisons are not effective.  (*Id.*)

27      [43] Even if the ADCRR rate is up to 27 (BJS rounds), that is still lower or equal to the
most recent 5-year stable rates during 2015-2019 of 19 states: Connecticut (28); Delaware
28  (27), Massachusetts (32), New York (29), Pennsylvania (28), Rhode Island (44), Vermont
(49), Kansas (27), Nebraska (27), North Dakota (36), Arkansas (39), Georgia (31),

With respect to Plaintiffs' allegations pertaining to length of time inmates remain on suicide watch, they rely on misleading data that is not in evidence. (Dkt. 4308, n.102.)  Even if these logs were in evidence, they are unreliable as they are incomplete internal reports from Centurion of individuals who were on a watch for more than 14 days.  (R.T. 11/05/21 p.m. at 1083:15-25; 1085:14-16; 1093:9-1094:15.)  And their only support for their claim that inmates stay on watch "for months," is testimony from one witness where she testified, "Again, *I don't know the specifics*, but I know there's people that have been on watch for months."  (Pelton Dep. At 153:6–22) (emphasis added).  Plaintiffs have no evidence as to specifics such as when this occurred, for how long, at what facilities, or during what time period.  This is insufficient evidence to support their systemic claims.[44]

Likewise, Plaintiffs' allegations regarding incidents of self-harm are unsupported and misleading.  For example, the statements in Paragraph 561 of their Proposal that claim incidents of self-harm were "higher than historic numbers" in 2020 is completely unsupported by their citation to Dr. Platt's testimony.[45]  (Dkt. 4308, ¶ 561.)  And Plaintiffs fail to include the portion of Dr. Platt's testimony where she explains *why* the two positions put in place to mitigate self-harm were not filled.  (*Id*., ¶¶ 563–564.)  It was "because we were doing quite well with the reduction in self-harm."  (R.T. 11/05/21 a.m. and p.m. at 1056:11-17.)  Indeed, as a result of ADCRR's efforts, from 2020 to 2021, ADCRR reduced self-injurious behavior by 43%.  (Dkt. 4309, ¶ 1469.)  And, during that same time, there was a 75% reduction of self-harm emergency room send-outs.  (*Id*., ¶ 1470.)  Additionally, due to ADCRR's and Centurion's focus and commitment, suicide watches and length of

_____

Mississippi (41), South Carolina (40), Tennessee (34), Alaska (61), Idaho (34), Montana (29), and, Utah (41).  (Dkt. 4309, ¶ 1496.)

[44] Likewise, while Plaintiffs criticize the mortality review and psychological autopsy processes, by arguing the systems do not translate findings and recommendations into corrective action, they do not provide evidence that subsequent deaths were caused or contributed by a failure to implement a recommendation; and certainly not on a systemic level. (Dkt. 4308, ¶¶ 1018–1019.)

[45] Again, Plaintiffs criticize the charts referenced in Dr. Penn's Declaration because he did not personally prepare them, but do not argue or present any evidence that the data contained in the chart is inaccurate.  (Dkt. 4308, n.103.)

89

1  stay on watch "drastically decreased." (*Id.*, ¶ 1471.)  While Plaintiffs argue inmates on

2  watch are still able to engage in self-harm, none of the CQI minutes they cite in support

3  indicate that any of the self-harm incidents occurred while an inmate was on a watch.  (Dkt.

4  4308, ¶ 569.)  And the majority of the inmate examples they provide are the same inmates

5  they repeatedly cite throughout their Proposal.  (*Id.*, ¶ 568.)

6       Plaintiffs' allegations that ADCRR did not increase custody staff is also unsupported

7  by the testimony they cite.  (Dkt. 4308, ¶ 565.)  What Dr. Platt actually testified to was, "*I*

8  *cannot speak to* what the Department was doing other than I know that they were trying to

9  heavily recruit in general for more custody staff." (R.T. 11/05/21 a.m. and p.m. at 1061:3–

10  5) (emphasis added).  And, while Plaintiffs note that inmates on watch are observed by

11  custody staff, they do not allege this practice falls below the standard of care, or that it

12  creates a risk of harm to those on watch.  (Dkt. 4308, ¶ 566.)

13       With respect to training, custody staff are trained on how to conduct suicide watches.

14  (Dkt. 4309, ¶ 1486.)  They also receive suicide prevention training.  (*Id.*, ¶ 1463.)

15  Additionally, custody officers who work in maximum custody, residential, or inpatient

16  settings, are provided with an additional three-day training that speaks to watch, mental

17  health first aid, and communication skills.  (*Id.*)

18  **VI.   SUBCLASS CLAIMS – CONDITIONS OF CONFINEMENT**

19       **A.   Background**

20       In its March 6, 2013, Class Certification Order, the Court certified eight distinct

21  Subclass claims as to the following alleged practices:

22  • Inadequate psychiatric monitoring because of chronic understaffing;

23  • Use of chemical agents against inmates on psychotropic medications;

24  • Lack of recreation;

25  • Extreme social isolation;

26  • Constant cell illumination;

27  • Limited property; and

28  • Insufficient nutrition.

(Dkt. 372 at 23.) Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Proposal") abandons claims for limited property. Accordingly, judgment in favor of Defendants should be granted on this Subclass claim.

Moreover, none of Plaintiffs' trial evidence challenged any Subclass conditions of confinement at seven of ten of ADCRR's prison complexes; specifically: ASPC Douglas, ASPC Perryville, ASPC Phoenix, ASPC Safford, ASPC Tucson, ASPC Winslow or ASPC Yuma prison complexes. Moreover, ASPC Florence no longer houses maximum custody inmates, does not house close management inmates, detention conditions at the Globe unit were not challenged at trial, and mental health watch conditions were not challenged at trial for the Florence complex. Defendants are therefore entitled to judgment as a matter of law in their favor as to the constitutionality of the certified Subclass claims at these eight prison complexes. ASPC Eyman and ASPC Lewis were the ADCRR prison complexes Plaintiffs' Subclass experts toured (and interviewed inmates at). As such, even assuming that they presented sufficient evidence of constitutionally deficient policy or practice regarding any of the certified Subclass claims (which they did not), any finding must be limited to these two prison complexes. *Fraihat v. U.S. Immigration & Customs Enforcement*, 16 F.4th 613, 646-47 (9th Cir. 2021) (finding proof of a deficient policy or custom at less than all facilities is "insufficient to support" a systemwide class claim).

In addition to the certified Subclass claims, Plaintiffs' Proposed Findings of Fact and Conclusions of Law impermissibly assert additional conditions of confinement claims absent from the Complaint and never certified by the Court. These impermissible and newly created claims are:

- Lack of cell natural lighting and ventilation;
- Lack of adequate cell space;
- Excessive cell heat;
- Unsanitary conditions (presence of pests and shower cleanliness);
- Lack of adequate security supervision (security checks and physical plant sightlines); and

91

- Inappropriate classification of maximum custody inmates and assignment of inmates to detention status.

(Dkt. 4308 at 47-140.)  This Court should not consider claims not pled in the Complaint and never certified as Subclass claims where the case was to "proceed to trial on Plaintiffs' claims in the original complaint . . ."  (Dkt. 3921 at 2; 372 at 3.)

Nor should the Court consider any claims challenging conditions of confinement for minor inmates adjudicated as adults and incarcerated in the custody of ADCRR, which as of September 30, 2021, totaled a mere four inmates.  (Ex. 1304 at 2, Sunrise Minors CDU/Watch category, "Grand Total", column on far right.)  The Court never certified a Subclass of minor inmates, the Certification Order does not refer to Subclass housing locations occupied by minors, no guardian ad litem has ever been appointed in this case to represent any minor inmates, and Plaintiff has never named a minor as a Plaintiff class representative.  Accordingly, this Court should strike any and all claims advanced by Plaintiffs on behalf of minor inmates.  (Dkt. 1 generally; 372 at 22-23; 3921 at 2.)  Plaintiffs' counsel are not permitted to represent any minor inmates incarcerated by ADCRR pursuant to the Federal Rules of Civil Procedure and Arizona law.  They have never been appointed as a conservator, fiduciary or guardian ad item for Arizona's four minor inmates. Fed.R.Civ.P. 17(c); *Porter v. Triad of Arizona (L.P.)*, 203 Ariz. 230, 233 (Ct. App. 2002); *see also Pintek v. Superior Court*, 78 Ariz. 179, 184 (1954) ("[A]n infant generally may sue or be sued, and is subject to and bound by the same rules of procedure as an adult litigant, yet an infant cannot bring or defend a legal proceeding in person, but must sue or be sued by a legally appointed guardian, or next friend or a guardian ad litem."); A.R.S. §§14-5201, 14-5404, 14-5424, 14-5410.   There are no legally viable minor inmate conditions of confinement claims in this case.

Plaintiffs' introductory premise that ADCRR leads the nation in subjecting approximately 10% of its inmate population to "extremely harsh or dangerous conditions of confinement" and further asserting that Defendants "offered no evidence of the total number of people" who comprise the Subclass, is unsupported by any citation to the trial

1   record – and is   wrong.  (Dkt. 4308, ¶¶ 14-19 & n. 2.)  Likewise, Plaintiffs' "Summary of

2   Findings" regarding Subclass claims are devoid of citation to the trial record and thus should

3   not be considered.  (Dkt. 4308, ¶¶ 41-45.)

4          As of September 30, 2021, ADCRR's total inmate population including inmates

5   housed in ADCRR operated prison complexes and private contract facilities was 35,410.

6   ADCRR housed 27,794 in its ten ADCRR operated prison complexes. Within the 27,794

7   population, only 1,636 inmates were classified as maximum custody; only 7 inmates were

8   classified as close management; only 750 inmates were on detention status; and only 81

9   inmates were on mental health watch status.  (Dkt. 4309, ¶¶ 1634, 1635, Ex. 1304 at 1-3,

10  surveying the Custody column indicating maximum custody classification locations

11  "MAX" and Unit/Use columns identifying detention ("DET") and mental health watch

12  ("M/H Watch" housing locations in the far right columns, and the Grand Total column to

13  the far right to determine population numbers.)

14         Considering a total of 2,474 inmates housed in the four Subclass locations and

15  applied only to ADCRR's 27,794 inmate population housed in ADCRR-operated prison

16  complexes (which incorrectly inflates percentages where ADCRR's contract facilities do

17  not house maximum custody or close management inmates), the Subclass represented 8.9%

18  of ADCRR's population housed in ADCRR-operated prison complexes on September 30,

19  2021.  (Dkt. 4309, ¶¶ 1634, 1635.)  When applying the maximum custody and close

20  management population numbers to the total ADCRR inmate population housed in both

21  ADCRR-operated and contract prison complexes (because private facilities do not house

22  these populations), 4.6% of the total ADCRR prison population were classified as

23  maximum custody; 0.019% of ADCRR's inmates were housed on close management status

24  (no close management inmates are housed in private contract facilities); 2.7% of ADCRR's

25  state-operated prison complex population were on detention status; and 0.029% of

26  ADCRR's state-operated prison complex population were on mental health watch status.[46]

27  _____

28         [46] While Plaintiffs argue that Defendants incorrectly reported 2019 statistics for the
    ASCA Liman study which ranked reporting states as to their percentage of inmates that

(Dkt. 4309, ¶¶ 1634, 1635, Ex. 1304 at 1-3, also noting at 3 that contract facilities "Contract Male" category houses only minimum and medium custody inmates.)

Defendants did not fail to offer evidence of how many ADCRR inmates comprise the Subclass and one-tenth of ADCRR's inmate population is not subject to isolation or solitary confinement.  "Isolation" and "solitary confinement" do not exist in the ADCRR system.  (Dkt. 430, ¶ 19 & n.2.)

**B.     Methodology Flaws Eviscerate the Reliability of Plaintiffs' Experts Opinions.**

Plaintiffs' Subclass Experts (Dr. Haney and M. Horn) toured only select locations at <u>two</u> prison complexes to opine that ADCRR conditions of confinement systemically violate the Eighth Amendment.  Haney and Horn toured and interviewed inmates at the following locations:

- ASPC Eyman SMU I Unit (maximum custody, detention, and mental health watch housing);

- ASPC Eyman Browning Unit (maximum custody and mental health watch housing); and

- ASPC Lewis Rast Unit (maximum custody, close management, detention, and mental health watch housing)

- ASPC Lewis Barchey Unit (mental health watch housing)

- ASPC Lewis Morey Unit (detention housing)

- ASPC Lewis Stiner Unit (detention housing); and

- ASPC Lewis Sunrise Unit (minors detention housing).

(Dkt. 4309, ¶¶ 1591, 1545; Dkt. 4308, ¶¶ 25, 32;  Ex. 1304 at 1-2 specifying prison complexes, units, and unit use denoted categorized by custody level, "detention", or "watch cells" designations.)

---

spent 22 hours a day in their cells for 15 or more days, they fail to support this accusation with any evidence.  Moreover, their expert, Martin Horn, conceded that out of the 39 states reporting for the study, 13 states outranked Arizona.  (Dkt. 4309, ¶ 1631.)

Plaintiffs' experts did not tour or interview Subclass members at any of the following locations that house the Subclass:

- ASPC Douglas Mohave Unit (complex detention housing);
- ASPC Eyman Rynning Unit (close management and detention housing);
- ASPC Florence Globe Unit (detention housing);
- ASPC Perryville (mental health watch housing);
- ASPC Perryville Santa Maria Unit (detention housing);
- ASPC Phoenix Ida Ward (mental health watch housing);
- ASPC Lewis Bachman Unit (mental health watch housing);
- ASPC Safford Fort Grant Unit (detention housing);
- ASPC Tucson Cimarron Unit (detention housing);
- ASPC Tucson Rincon Unit (maximum custody and mental health watch housing);
- ASPC Tucson Manzanita Unit (detention and mental health watch housing);
- ASPC Tucson Winchester Unit (detention housing);
- ASPC Winslow Kaibab Unit (detention housing);
- ASPC Winslow Apache Unit (detention housing);
- ASPC Yuma Cheyenne Unit (detention housing); and
- ASPC Yuma Dakota Unit (detention housing);

(Dkt. 4309, ¶¶ 1591, 1545; Dkt. 4308, ¶¶ 25, 32; Ex. 1304 at 1-3 noting prison complexes, units, and unit use denoted categorized by custody level, "detention", or "watch cells" designations.)  Plaintiffs have provided no evidence regarding conditions of confinement at the above listed housing locations.   As such, Plaintiffs' assertion of systemic Eighth Amendment violations across all ten ADCRR-operated prison complexes fails.

Haney interviewed only 75 inmates at select locations at two the Eyman and Lewis prison complexes.  (Dkts. 4309, ¶¶ 1591, 1546; Dkt. 4308, ¶ 32.)  Considering a 2,474 inmate Subclass, he interviewed a mere 3% of the total Subclass population.  (*Id.*) Moreover, Haney's interviewees were not randomly selected and there was no methodology

employed in interviewing inmates; rather, Haney spoke to inmates who were awake and willing to talk to him about "what your life is like and how you feel you're being affected by the conditions and procedures and your treatment." Notably, he declined to use standard questionnaires analyzing 27 categories of mental health symptoms as he did in 2013 and 2014. (Dkt. 4309, ¶¶ 1546-1549, 1551; Dkt. 4308, ¶ 32.)  And while Haney claims he reviewed some unknown number of 145 inmate medical records provided to him by Plaintiffs (5.8% of the total Subclass population's records), he had to rely on mental health diagnoses reported by the inmates because Haney admittedly has never evaluated, diagnosed, or treated a patient in his life.  (Dkt. 4309, ¶¶ 1550, 1535-1537.) Haney is not qualified to offer opinions in this case that conditions of confinement for Subclass members negatively affect the mental health of the Subclass.  As a result, Plaintiffs' Subclass claims fail at the outset.  (*Id.*; Dkt. 4309, ¶¶ 1551-1560.)

Similarly, Horn only interviewed 60 inmates at select locations at the Eyman and Lewis prison complexes which constitutes only 2.45 of the Subclass population. (Dkt. 4309, ¶¶ 1591-1593; Dkt. 4308, ¶ 26.) Horn's  interviewees were not randomly selected and there was no methodology employed in interviewing inmates; rather, Horn "chatted" briefly with inmates who were awake and willing to talk to him as he walked around, declining to use standard questionnaires or any methodology to standardize his interview "technique." (Dkt. 4309, ¶¶ 1593-1595.)   Significantly, Horn admitted he reviewed only 12-14 inmate institutional files provided to him to ultimately opine that ADCRR misclassifies inmates as maximum custody.  (Dkt. 4309, ¶ 1593.)   Considering ADCRR's maximum custody population was 1,636 inmates by the end of September 2021, Horn's record "sample" equated to at most, a review of less than one percent (0.85%) of the maximum custody institutional records available to him. (Dkt. 4309, ¶¶ 1634, 1593.) Because Horn employed no reliable methodology to opine that the conditions of confinement for ten prison complexes violate the Eighth Amendment, Plaintiffs' Subclass claims fail at the outset. Plaintiffs' Subclass experts are not credible and their opinions are unreliable.

**C.    Plaintiffs' Experts' Reliance On "Correctional Industry Standards" Is Misplaced and Not Determinative of Constitutional Minimums.**

Plaintiffs' experts' reliance on "correctional industry standards" including American Correctional Association ("ACA") standards governing restrictive housing as well as National Commission on Correctional Health Care ("NCCHC") and Association of State Correctional Administrators ("ASCA") position statements regarding the same fails to establish the constitutional minimum. (Dkt. 4308, ¶¶ 47-54.) Indeed, it is well settled that "reliance on . . . correctional standards issued by various groups is misplaced . . . And while the recommendations of these groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." *Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979). Plaintiffs' experts admit the same. (Dkt. 4309, ¶¶ 1597, 1603.)

Plaintiffs admit that the ACA standards upon which they rely constitute the "best expression" of "professional expectations" – not constitutional requirements. (Dkt. 4308, ¶ 50.) "Best expressions" of "professional expectations" exceed constitutional minimums. Moreover, the ACA restrictive housing standards upon which Plaintiffs rely provide no specificity by which to assess ADCRR operations; rather, the standards provide generalized goal posts for operations such as to house inmates in a "just, humane, and constitutional manner." (*Id.*) Generalized goal posts fail to provide this Court with distinct constitutional standards by which to determine Defendants are deliberately indifferent to the health and safety of the Subclass. The same goes for Plaintiffs' reliance on NCCHC and ASCA position statements (not standards). Neither establish either constitutional minimums or even the correctional standard of care. (Dkt. 4308, ¶¶ 51-54; R.T. 11/8/21 a.m. and partial p.m. at 1339:24-1340:22.) Even if they did, Plaintiffs' experts were unable to establish that ADCRR is an outlier in comparison to the corrections departments across the nation regarding management of inmates classified as maximum custody or housed on close management, detention, and mental health watch status. (*Id.*)

Plaintiffs' experts also argue that a "number of jurisdictions across the United States

97

are moving toward severely restricting or ending the use of long-term solitary confinement" yet point to only seven states as alleged examples of what the Constitution requires.  (Dkt. 4308, ¶ 54; Dkt. 4309, ¶¶ 1555-1559, 1563, 1599-1604.)  However, based on simple math alone, reliance on seven states' varying restrictions place upon the use of restrictive housing does not establish either the Constitutional minimum or even the correctional standard of care.  Significantly, ADCRR meets or exceeds Plaintiffs' comparison states in out of cell time by providing at least 7.5 hours of recreation a week to maximum custody inmates and at least 6 hours of recreation a week for inmates on either close management or detention status.  (Dkt. 4309, ¶¶ 1605, 1724.)  Horn and Haney admitted that the ACA recommends 5 hours of recreation a week for restrictive housing inmates; New York provides 7 hours of recreation a week; Pennsylvania provides 5 hours of recreation a week; and the Federal Bureau of Prisons provides five hours of recreation a week – all of which are recreation time periods <u>less than</u> what ADCRR offers its maximum custody inmates.   (Dkt. 4309, ¶¶ 1599-1605, 1561-1563.)

Finally, while Haney continually characterized the Subclass conditions of confinement as "among the most severe" of 25 states he has studied over the last 50 years (but having only toured <u>one facility in Florida in the last three to five years</u>), he could never rank ADCRR and could only specify that North Dakota, Oregon, and Washington were on the "good side" of his severity scale because inmates were offered two hours of combined recreation and programing a day. (Dkt. 4309, ¶¶ 1555-1558.)  Haney's ranking system and both Horn and Haney's comparisons of ADCRR to other states do not even establish the correctional industry standard of care, let alone Constitutional minimums for conditions of confinement.

### D.    Plaintiffs' Reliance on Literature Criticizing "Solitary Confinement" Is Misplaced and Not Persuasive.

Plaintiffs' reliance on literature criticizing the use of "solitary confinement" is misguided and not relevant.  ADCRR conditions of confinement do not constitute "solitary confinement" and do not expose the Subclass to "inhumane, cruel and unusual conditions."

1  ( (Dkt. 4308, ¶¶ 55-102.)  Indeed, Plaintiffs' corrections expert, M. Horn, admits he learned

2  about what he alleges is the negative effect of restrictive housing conditions on inmates

3  with mental illness by relying on writings authored by Plaintiffs' expert, Haney, as well as

4  an article by NASA regarding the effects of reduced sensory stimulation for astronauts in

5  space, a case from 1890, and the late Senator John McCain's experience as a prisoner of

6  war in Vietnam.  (Dkt. 4309, ¶¶ 1586-1587.)   These "sources" do not inform the Court

7  regarding the constitutionality of conditions of confinement at ADCRR.

8  The same is true for Plaintiffs' expert, C. Haney.  Haney has never had a patient, nor

9  has he diagnosed or treated a patient.  (Dkt. 4309, ¶ 1536.)  The sources he relies upon for

10  proof that that there is a clearly established, immediate and direct cause and effect between

11  ADCRR conditions of confinement and the mental health of the Subclass are flawed due to

12  a variety of methodological, design (lack of control group and instruments), and ethical

13  (lack of informed consent) issues within the sources.  (Dkt. 4309, ¶¶ 1513-1515.)  His

14  sources are not evidence-based, scientific studies.  (*Id.*) Moreover, the source articles do not

15  refer to a single controlled adult prison, juvenile detention, or juvenile correctional facility.

16  (*Id.*) Instead, Haney cites articles pertaining to restrictive housing settings and risk of harm

17  which are in reality position papers authored by organizations who cite literature from

18  attorneys and advocacy groups.  They are neither her peer-reviewed nor published in

19  medical journals.  (Dkt. 4309, ¶ 1515.)  Because Plaintiffs' source evidence in no way

20  addresses ADCRR conditions of confinement, the "sources" are not reliable to establish

21  that ADCRR conditions expose the Subclass to a substantial risk of serious harm and mental

22  health deterioration.

23  Plaintiffs ignore the only study regarding the psychological effects of placement in

24  maximum custody within the ADCRR system. (Dkt. 4309, ¶ 1630.) The study, published

25  by the U.S. Justice Department, Office of Justice Programs in 2020, found that while

26  ADCRR inmates in restricted housing reported on average a higher level of psychosomatic

27  symptoms as compared to inmates in close or medium custody, those symptoms did not

28  worsen as more time was spent on restrictive status housing.  (*Id.*)  Plaintiffs have no

99

1    evidence to counter this study. Haney did not study the Subclass's mental health status over

2    time nor did he compare the mental health status of the Subclass with inmates classified as

3    minimum, medium, or close custody. (Dkt. 4309, ¶ 1552.)  Plaintiffs offer no evidence that

4    the conditions of confinement for the Subclass actually poses a substantial risk of harm,

5    system wide, for maximum custody inmates or inmates on close management, detention, or

6    mental health watch status.  Therefore at the outset, Defendants are entitled to judgment in

7    their favor on all Subclass claims.

8           **E.     Cell Lighting Conditions Do Not Violate the Eighth Amendment.**

9           The Court has only certified a Subclass claim for constant cell illumination.  There

10   is no certified Subclass claim alleging that cells do not receive adequate natural light and

11   thus no such "natural light" claim should be considered by this Court.  (Dkt. 372 at 3; 3921

12   at 2.)

13          Plaintiffs' constant cell illumination claim fails. While Maximum custody, detention,

14   and mental health watch cells are illuminated in some manner during sleeping hours, this is

15   done for legitimate safety and security reasons and such practice is common and accepted

16   in the corrections industry.  (Dkt. 4309, ¶¶  1571, 1752.) Correctional personnel must be

17   able to visually observe the welfare of inmates 24 hours a day as safety/security/welfare

18   checks and inmate counts are performed.  Plaintiffs agree.  (*Id.*)  If correctional personnel

19   cannot see into cells because the cells are dark, they not only cannot verify the safety and

20   welfare maximum custody, close management, detention, or mental health watch inmates

21   (inmates that pose the greatest safety/security/welfare risk), in order to verify their safety

22   and welfare at night, they would be forced to retreat decades and either wake inmates up at

23   least every once or twice every 59 minutes or shine flashlights on them to determine that

24   they are living and breathing – certainly conditions Plaintiffs would not agree to in these

25   modern times.  (*Id.*; R.T. 11/01/21 a.m. at 1452:12-1453:1.)

26          Plaintiffs similarly did not provide evidence of a systemic issue as to cell lighting.

27   Indeed, Haney admitted that he had no idea how many out of the 75 inmates he interviewed

28   actually complained to him that they were even bothered by cell lighting.  (R.T. 11/04/21

1    p.m. at 882:7-884:8; Dkt. 4309, ¶¶ 1634, 1635; Ex. 1304 at 1-3.)   Moreover, while

2    Plaintiffs' counsel complain about cell illumination, Inmate Muhammad complained that

3    the light was too dim. (Dkt. 4308, ¶ 113.)  He also testified that he could turn the cell light

4    off at Browning.  (*Id.*)

5          It is also undisputed that Plaintiffs offered no evidence as to the wattage of the cell

6    lighting at the various units at ADCRR's ten state-operated prison complexes. (Dkt. 4809,

7    ¶¶ 1571, 1753.) Without evidence as to the wattage is or evidence as to what the wattage

8    should be, Plaintiffs cannot prove that Subclass inmates are exposed to a substantial risk of

9    suffering sleeping problems or other measurable psychological or physical harm and

10   therefore the claim fails.  Indeed, Plaintiffs offered no medical evidence that any inmates

11   have actually incurred psychological or physical harm *because of* cell lighting.  There is no

12   evidence that lighting has a "negative impact" in inmates or that lighting causes inmates to

13   be "disoriented" as Plaintiffs contend.  (Dkt. 4308, ¶¶ 107, 110, 113-114.)

14         Plaintiffs' non-certified natural lighting claim also fails.  Haney and Horn toured

15   only a few units at ASPC Eyman and ASPC Lewis; but even at these two locations, it is

16   undisputed that the housing locations either provided windows to the outside within the cell

17   or for those cells without windows to the outside, the cell fronts had windows and the

18   housing pods provided natural light.  (Dkt. 4309, ¶¶ 1571.)   Horn admitted that the ASPC

19   Lewis Rast Max unit cells provided adequate light for the inmates.  (Dkt. 4309, ¶ 1626.)

20   Moreover, the photographs of Subclass locations entered into evidence at trial show that the

21   cells are well lit during daytime hours and that cells either have windows to the outside,

22   natural light floods the common areas of the housing pod, and that visibility into the cells

23   is not obstructed. (Ex. 4901, 4902, 4904; Dkt. 4308, ¶¶ 111, 112, 114, 118.)

24         Plaintiffs admit that while the cell door/window configurations varied throughout

25   the few locations that they toured at ASPC Eyman and ASPC Lewis, all cells had windows

26   looking out into the housing unit.  (R.T. 11/04/21 p.m. at 882:16-883:16.)   Plaintiffs'

27   complaint regarding perforated cell fronts at ASPC Eyman is unpersuasive where the photos

28   of the cell fronts demonstrate both good visibility through the cell fronts, that the cells are

101

1  well lighted from within, that light from the dayroom reaches into the cells, and that inmates

2  can easily see out into the dayroom of the housing.  (Ex. 4901, 4902; Dkt. 4308, ¶¶ 111,

3  112, 114, 116.)

4          Where Plaintiffs presented no evidence that measures the amount of natural light that

5  reaches Subclass inmate cells at any location throughout the state, they cannot establish that

6  the Subclass are systemically denied exposure to adequate levels of natural light when in

7  their cells. The record is also devoid of any medical evidence to establish that natural light

8  exposure has caused any inmate any actual physical or psychological harm – or that there

9  is a substantial risk of harm.  Indeed, neither Haney nor Horn are lighting experts.  Because

10  the lighting conditions are not inhumane or devoid of penological justification, no Eighth

11  Amendment violation exists.

12  **F.      Cell Ventilation Is Not A Subclass Claim and Plaintiff Have No Evidence
            To Support Their Poor Cell Ventilation Claim.**

13

14          The Court never certified a Subclass claim regarding cell ventilation.  (Dkt. 372 at

15  3; 3921 at 2.)  Even if the Court had, Plaintiffs' cell ventilation claim  fails.  Plaintiffs'

16  Subclass experts toured a few locations at ASPC Eyman and ASPC Lewis.  Horn admitted

17  that ASPC Lewis Rast Unit provided adequate cell lighting and ventilation.  (Dkt. 4309, ¶

18  1626.)  It is undisputed that neither expert did any actual tests regarding cell ventilation at

19  the locations they toured and neither are ventilation experts.  (*Id.*)  Plaintiffs also presented

20  no evidence regarding ADCRR's air return and HVAC systems for the Subclass locations

21  across ten prison complexes.  As a result, Plaintiffs have no evidence to challenge cell

22  ventilation. Plaintiffs' argument that cells with perforated steel cell fronts somehow provide

23  less ventilation than cells with solid steel doors is unsupported and is belied by photo

24  evidence presented at trial that shows that all cells depicted allow air to pass through the

25  food slots and underneath the doors, notwithstanding air vents in the cells (to which

26  Plaintiffs never made any specific challenge to air return and HVAC capability).  (Dkt.

27  4308, ¶¶  111, 114, 121; 4309, ¶ 1626; Ex. 4901, 4902, 4904.)

28

Plaintiffs presented no evidence regarding airflow in any cells at the two prison complexes they toured and thus they cannot establish that the Subclass are systemically denied a constitutional level of cell ventilation.  Indeed, Plaintiffs cite no caselaw that determines the appropriate level of cell ventilation.  The record is devoid of any medical evidence to establish that Subclass cell ventilation has caused any Subclass inmate to suffer any actual physical or psychological harm – or that there is a substantial risk of the same occurring at any ADCRR-operated prison complexes where the Subclass is housed.  Because Plaintiffs cannot prove that cell ventilation for the Subclass is inhumane, no Eighth Amendment violation exists.

**G.    Cell Size Is Not A Subclass Claim and Further Does Not Violate the Eighth Amendment.**

The Court never certified a Subclass claim regarding cell size.  (Dkt. 372 at 3; 3921 at 2.)  Even if the Court had, Plaintiffs' cell size claim  fails.  Plaintiffs predicate their cell size claim on ACA standards, which recommends cells be 80 square feet.  (Dkt. 4308, ¶ 118.)  ACA standards, however, do not set constitutional minimums and Plaintiffs admit the same.  (*Id.* at ¶ 50.)  Even if ACA standards on cell size did establish the constitutional minimum, Plaintiffs agree that the cells their experts inspected  at ASPC Eyman and ASPC Lewis were approximately 80 square feet as paced out by Horn.[47]  (Dkt. 4309, ¶ 1627; 4308, ¶ 118; R.T 11/18/21 a.m. at 2694:25-2695:22, 2701:13-20.)   While Plaintiffs criticize Warden Van Winkle for not knowing the unencumbered floor space for the cells that by Plaintiffs' expert's own admission are about 80 square feet, Plaintiffs did nothing to measure the same even though they stood inside cells and toured ASPC Eyman and ASPC Lewis to assess Subclass conditions of confinement.   (Dkt. 4309, ¶ 1627.)    Plaintiffs' criticism that inmates are double bunked in two-man cells and have to share the same toilet and sink falls flat where Plaintiffs agree that double bunking inmates has been the

---

[47] Haney admits he did nothing to measure cell size during his pretrial tours of ASPC Eyman and ASPC Lewis. (Dkt. 4309, ¶ 1568.) Warden Van Winkle testified that maximum custody cells at ASPC Eyman SMU I are roughly 11x7 feet; cells at ASPC Florence Kasson (now closed) were 9.5x7 feet (single inmate occupancy). (R.T 11/18/21 a.m. at 2694:25-2695:22, 2701:13-20.)

1    corrections industry standard for at least the last 40 years.  (Dkt. 4308, ¶ 120-121; 4309, ¶

2    1627.)

3         Plaintiffs' reliance on Inmate Muhammad's testimony regarding small cell size is

4    also unpersuasive to establish constitutional harm.  Muhammad testified that the cells are

5    so small that he cannot even do a push up in the cell.  (Dkt. 4308, ¶ 122.)  This testimony is

6    belied by use of force videos concerning Inmate Muhammad presented at trial that showed

7    that he could walk many paces from the back of his cell to the front before engaging in self

8    harm.  (Ex. 4034, 4036, 4038, 4040.)  Photos presented by Plaintiffs likewise contradict this

9    testimony, showing adequate cell floor space to do push-ups or other exercises even if

10   occupied by two inmates.  (Dkt. 4308, ¶¶ 111, 112, 114, 118; Ex. . 4034, 4036, 4038, 4040.)

11   And, while Inmate Muhammad complained that it was hard to have a cellmate if the

12   roommate does not "work out for some reason", he went on to admit that he is usually celled

13   by himself.  (Dkt. 4308, ¶ 123.)

14        Here, Plaintiffs' case lacks evidence that cell size for the Subclass is constitutionally

15   deficient.  Rather, Plaintiffs admit that cell size meets even aspirational ACA standards.

16   Scant evidence of inmate dissatisfaction with cell size is insufficient to prove that ADCRR

17   cell size or configuration is inhumane and poses a substantial risk of harm to inmate health

18   and safety. Because Plaintiffs cannot prove that cell size at ASPC Eyman and ASPC Lewis,

19   or anywhere else in the ADCRR system  violates the Eighth Amendment, this uncertified

20   claim fails.

21        **H.    Cell "Excessive Heat" Is Not A Subclass Claim and Further, Cell Heat
            Conditions Do Not Violate the Eighth Amendment.**

22

23        The Court never certified a Subclass claim regarding excessive cell heat.  (Dkt. 372

     at 3; 3921 at 2.)  Even if the Court had, Plaintiffs' claim  fails where ADCRR measures

24
     housing unit and cell temperatures from April through October and employs mitigation
25
     efforts when cell temperatures rise.  (Dkt. 4309, ¶¶ 1625, 1454-1460; Ex. 3031, 1736, 1737.)
26
     Specifically, Horn conceded that ADCRR correctional staff post orders include procedures
27
     for housing unit temperature checks with a digital anemometer from April to October each
28

                                        104

1  year and mitigation efforts when cell temperatures reach 95 degrees to include notification

2  of facility leadership, placement of fans and opening of cell door food traps and providing

3  inmates with showers and ice. (Dkt. 4309, ¶ 1625; 4308, ¶ 126 .)  Horn also admitted that

4  he never reviewed ADCRR's direction to correctional personnel to temporarily rehouse

5  pregnant inmates when cell temperatures exceed 86 degrees and temporarily rehouse

6  inmates on psychotropic medications who have previously suffered a heat intolerance

7  reaction when cell temperatures exceed 85 degrees.  (Dkt. 4309, ¶ 1625.)  There is also no

8  dispute that Horn could not remember if he ever reviewed the voluminous of temperature

9  log data provided to Plaintiffs. (*Id.*)

10         Amidst these evidentiary failings, Plaintiffs continue to assert that the temperature

11  logs "demonstrate that temperatures in the cells  rise to dangerous levels."  (Dkt. 4308, ¶

12  127.)  Plaintiffs point to some instances where housing unit/cell temperatures rose into 90s.

13  (Dkt. 4308, ¶ 518 & n. 97.)  However, they ignore evidence that cell temperatures generally

14  range in the 70s to  mid to low 80s during the summer (and more often in the 70s).  (See,

15  e.g., Ex. 1464 at ADCM1581625-54; 1466 at ADCM1589907-09, 1590211-21; 1469 at

16  ADCM1618673-83, 1618695-709, 1618844-54; 1470 at ADCM1624458-85, 1625653-62;

17  1471 at ADCM1642343-73, 1642570-80; 1472 at ADCM1644338-70, 1644533-43; 1473

18  at  ADCM1657059-69,    1657109-118,  1657277-85;  1474  at  ADCRRM0025302-32,

19  0025366-96,  0025639-53;  1483  at  ADCRR00069752  (Browning  tab);  1487  at

20  ADCRR0069756 (Browning tab);  1488 at ADCRR00069757 (SMU I June tab); 1500 at

21  ADCRR00111472 Lewis Rast Red tab); 1501 at ADCRR00111473.  Plaintiffs likewise

22  ignore that actual mitigation and repair efforts are taken when living unit/cell temperatures

23  rise.    (See,  e.g,  Ex.  1464  at  ADCM15816555-56,  ADCM1581738-39;  1465  at

24  ADCM1587871-74;  1465  at  ADCM1587885-86,  ADCM  1587872-73;  1466  at

25  ADCM1590108-09, 1590233-34; 1471 at ADCM1642448-71; 1472 at ADCM1644438-39;

26  Dkt. 4309, ¶¶ 1625, 1454-1460; Ex. 3031, 1736, 1737.) Likewise, Horn and Haney's

27  assertions that housing unit temperatures were "high" when they toured in September 2021

28  fail where they admit they did not actually measure cell or living unit temperatures while

1    touring.  (R.T. 11/04/21 p.m. at 884:8-885:10; R.T. 11/09/21 a.m. at 1521:18-1529:4.)  This

2    is especially so where for example, September temperatures for Rast and Stiner units at

3    ASPC Lewis were in the 70s to mid-80s.  (Ex. 1500, ADCRR00111472.)

4         Plaintiffs' argument that ADCRR violates its own policies if temperature checks are

5    not recorded in Correctional Service Journals also lacks merit.  (Dkt. 4308, ¶ 127 & n. 15.)

6    It is well settled that policy violations do not automatically rise to the level of constitutional

7    violations.  *See Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984).  Moreover, Plaintiffs

8    cannot legitimately argue that "it is impossible to know when or if [temperature checks] are

9    actually done each day" if the Correctional Service Journals do not document the same

10   where Defendants have provided Plaintiffs with over 10,000 pages of temperature check

11   logs.  (Compare Ex. 1462, 1463, 1464, 1465, 1466, 1467, 1468, 1469, 1470,1471, 1472,

12   1473, 1474, 1475, 1476, 1477, 1480, 1481, 1482, 1483, 1484, 1485, 1486, 1487, 1488,

13   1491, 1493, 1494, 1495, 1496, 1499, 1500, 1501, 1502, 1505, 1506, 3512, 3513, 3518, 3519

14   with Dkt. 4308, ¶¶ 127, 518 & n. 97.)  To the contrary, the efforts ADCRR takes to assess

15   housing unit and cell temperatures is commendable.

16       Finally, Plaintiffs have no evidence that housing unit/cell temperatures caused

17   inmates on psychotropic medications to suffer heat related complications or death.  (Dkt.

18   4174, ¶ 226;  4309, ¶ 1459-1460.)  Stewart's assertion that "numerous" inmates who take

19   psychotropic medications have felt the ill effects of heat and nothing was done to cool them

20   down lacks merit where Plaintiffs could not identify who or how many inmates reported

21   this to him and he did not substantiate the inmate reports with medical records to support

22   his conclusions.  (Dkt. 4308, ¶¶ 517, 518.)  Indeed, Stewart fails to specify what "numerous"

23   means and fails to refer to any notes or anything else to buttress his statement in order to

24   allow the Court to determine how many inmates made the report, who they are, what they

25   reported, and whether medical records substantiate their reports. (Dkt. 4109, ¶ 163.)

26   Therefore, Stewart's allegation is unreliable and unverifiable.  Plaintiffs' argument that

27   ADCRR fails to train staff on heat-related illnesses also lacks merit as they have no evidence

28   to the contrary.  (Dkt. 4308, ¶ 519.)  That Plaintiffs have nothing more to support their

1 purported training is persuasive because Defendants closely monitor housing unit and cell

2 temperatures and employ mitigation efforts to cool the inmate if temperatures rise, Plaintiffs

3 cannot establish deliberate indifference to inmate health and safety.

4 **I.   Alleged Unsanitary Conditions Is Not A Subclass Claim and Further, Sanitation Does Not Violate the Eighth Amendment.**

5 The Court never certified a Subclass claim regarding sanitary living conditions.

6 (Dkt.372 at 3; 3921 at 2.)  Even if the Court had, Plaintiffs' claim  fails where ADCRR

7 regularly employs pest control services and cleaning supplies are available.  Plaintiffs' trial

8 evidence on this claim fails woefully short of establishing unconstitutional conditions of

9 confinement.  Plaintiffs' anecdotal  complaints that some inmate cells were dirty but ignore

10 that inmates are employed as porters to clean common areas and showers, cleaning supplies

11 are available to inmates to clean their own cells, and cell trash is picked up daily for

12 correctional officers.  (Dkt. 4308, ¶ 132; R.T. 11/8/21 a.m. and partial p.m. at 1306:1-23,

13 1250:5-11.)

14

15 Likewise, as addressed below regarding Plaintiffs' adequate nutrition claim, cross

16 examination of a deputy warden regarding whether individual detention records were  filled

17 out by officers to reflect whether detention inmates were offered three showers a week,

18 offered cleaning supplies, or offered linen exchanges is insufficient to prove

19 unconstitutional conditions of confinement.  (Dkt. 4308, ¶¶ 142-143.)  Not one detention

20 status inmate was called to testify that he or she is regularly denied showers, cleaning

21 supplies or laundry services and as a result, he or she is exposed to some unknown

22 substantial risk of harm to safety and welfare.  Lack of documentation on Individual

23 Detention Records certainly does not establish a constitutional violation, particularly when

24 the same exhibits offered by Plaintiffs show that detention inmates were offered these

25 services.   (See, e.g., Ex. 1694 at ADCRR00183603-608,  ADCRR00183611-618,

26 ADCRR00183631-632,        ADCRR00183637-642,        ADCRR00183659-664,

27 ADCRR00183667-668,        ADCRR00183683-684,        ADCRR00183691-696,

28 ADCRR00183715-716,        ADCRR00183725-726,        ADCRR00183729-738,

107

| | | |
|---|---|---|
| 1 | ADCRR00183741-742, | ADCRR00183759-772, | ADCRR00183783-792, |
| 2 | ADCRR00183795-810, | ADCRR00183835-839, | ADCRR00183845-846, |
| 3 | ADCRR00183859-862, | ADCRR00183867-870, | ADCRR00183891-894, |
| 4 | ADCRR00183897-902, | ADCRR00183917-930, | ADCRR00183991-996, |
| 5 | ADCRR00183999-006, | ADCRR00184023-032, | ADCRR00184071-072, |
| 6 | ADCRR00184077-088, | ADCRR00184091-094, | ADCRR00184095-096, |
| 7 | ADCRR00184099-112, | ADCRR00184117-138, | ADCRR00184141-202, |

8  ADCRR00184209-216, ADCRR00184219-270; 1697 at ADCRR00186706-708,

9  ADCRR00186712-715, ADCRR00186716-719, ADCRR00186722-725,

10  ADCRR00186728-733, ADCRR00186742-755.)   Moreover, while Horn criticizes the

11  completeness of ADCRR documentation regarding recreation opportunities, shower

12  opportunities, laundry exchanges, and delivery of meals to inmates housed in detention

13  units, Horn never testified that any detention unit inmates ever actually told him that such

14  services were actually not being provided to them.  (Dkt. 4309, ¶ 1610.)

15       Next, Plaintiffs allege that ADCRR housing units are "infested" with roach and

16  rodents.  Their Proposal highlights evidence of one photo of an inmate made bug trap and

17  one photo of a trash bag hanging from the wall of a cell at ASPC Eyman SMU I.  (Dkt.

18  4308, ¶ 132; R.T. 11/4/21 a.m. at 756:11-17.)  While Haney alleges that bugs were on the

19  floors and walls "in many of the pods that he visited" and that an inmate even showed him

20  a rodent the inmate had captured, there is no photo evidence to support these allegations

21  despite the experts taking hundreds of photos during their tours.  (Dkt. 4308, ¶¶ 132, 140-

22  141.)   Moreover, Haney's trial declaration attached three photos from ASPC Eyman

23  Browning that depicted exactly five bugs – one blurred photo that looks like a bug, another

24  photo of one bug on the ground of an <u>outdoor</u> recreation enclosures, and one photo of an

25  <u>outdoor</u> recreation enclosure that shows several bugs. (Dkt. 4120-1, Appx. G, Part 1 at

26  ADCRR00108096, ADCRR00108100, ADCRR00108106.)  Horn's trial declaration

27  produced two photos also from Eyman Browning showing exactly two crickets in one

28  shower and one cricket in another (Dkt. 4130-7, Ex. 5, Part 6 at ADCRR00158629,

1   ADCRR00158632.)  This is not evidence of a systemic pest infestation at ADCRR prisons.

2   Indeed most Arizonans can attest that whether they have pest control services or not,

3   crickets can get indoors in Arizona during warmer months and is not a reflection of

4   uncleanliness.

5       Plaintiffs also ignore 395 pages worth of pest control service evidence offered for

6   ASPC Eyman, Florence, and Lewis that establish that ADCRR contracts with pest control

7   services to perform monthly pest control services (to include servicing cells.  (R.T. 11/18/21

8   a.m. at 2718:7-16; R.T. 11/3/21 p.m. at 686:2-4 (Scott); Ex. 4416, 4417, 4418.)  Because

9   Plaintiffs cannot prove a systemic pest infestation statewide and because it is undisputed

10  that ADCRR employs regular pest control services to address any pest issues, Plaintiffs

11  cannot prove either unconstitutional living conditions or a policy, custom or practice of

12  deliberate indifference to the same.

13      For shower conditions, Plaintiffs offer photos of three showers.  (Dkt. 4308, ¶¶ 134-

14  135.)  However, these three showers are at Eyman Browning and there is no other evidence

15  provided of shower conditions everywhere else in the state.  Scant anecdotal evidence  does

16  not prove the existence of systemic conditions at all ten  ADCRR operated prison

17  complexes.

18      Next, Plaintiffs assert that Subclass cells are in poor condition and repair because

19  cells have toilets and sinks that do not work.  (Dkt. 4308, ¶¶ 136-139.)  Plaintiffs' expert

20  admitted, however, that the cell he saw where the toilet and sink did not work was not

21  occupied.  (R.T. 11/9/21 a.m. at 1546:12-21.)  Nor were the cells at ASPC Eyman Browning

22  which Plaintiffs' incorrectly tout as examples of the state of cells actually occupied by

23  inmates.  (Dkt.  4308, ¶¶ 137-139.)  The Court need only look back the photos included in

24  Plaintiffs' Proposal at Paragraphs 114, 118, and 133 as well as photos attached to Plaintiffs'

25  experts' declarations to view the state of the cells actually occupied by inmates in order to

26  easily conclude that the cells in which inmates actually live are not in a disrepair.  (Dkt.

27  4308, ¶¶ 114, 118, 133; Dkt. 4130-02-4130-09, Ex. 5; Dkt. 4120-01-4120-02, Appx. G.)

28  In short, finding two instances of a sink not working with one being in an unoccupied cell,

in no way proves that system wide, ADCRR forces inmates to live in cells without working plumbing. Haney's allegation of walls covered with mold is also an extreme exaggeration where this opinion is based upon two photos of what appears to be the same area depicting dark splatters on a wall are not inside a cell. (Dkt. 4120-1, Appx. G, Part 1 at ADCRR00108093-04.) Plaintiffs cannot prove either unconstitutional conditions of confinement or deliberate indifference to the same. Indeed, the fact that inmates were not living in cells that were in need of repair shows that Defendants are not deliberately indifferent to the living conditions of the Subclass.

Finally, Plaintiffs' reliance on photos of cell at Eyman Browning that had blood on the cell front in order to prove that Subclass cells are unsanitary is manipulation of the truth. (Dkt. 4308, ¶ 138-139.) It is undisputed that the cell was unoccupied, the blood was a result of an inmate engaging in self harm the night before, maintenance workers were required to remove the plexiglass cell fronts in order to properly clean the cells, and maintenance did so. (R.T. 11/5/21 a.m. and p.m. at 1175:14-25; Ex. 4004). This isolated occurrence is not evidence of the living conditions of occupied Subclass cells across the state. Plaintiffs purported anecdotal evidence of alleged unsanitary living conditions fails to prove Defendants are systemically deliberately indifferent to unconstitutional cell conditions at ADCRR's ten prison complexes. This uncertified claim fails.

**J.    ADCRR Inmates are Not Exposed to Extreme Isolation And Are Provided Opportunities for Out of Cell Time That Exceeds Eight Amendment Mandates.**

Plaintiffs claim that Defendants expose Subclass inmates to extreme isolation and that Subclass conditions of confinement violate the NCCHC's restriction on "solitary confinement" for more than 15 consecutive days. (Dkt. 4309, ¶ 52.) The purported restriction, however, is not even an NCCHC standard, but rather it is part of a "Position Statement" put out by the NCCHC and thus is an aspirational standard that does not establish either the corrections industry standard of care or the constitutional mandates of the Ninth Circuit. (Ex. 2216 at 1, 6.) NCCHC has defined solitary confinement as housing of an inmate with "minimal to rare meaningful contact with other individuals" and extreme

isolation as "situations in which inmates encounter staff or other inmates fewer than three times a day."  (Ex. 2216 at 1;  3303 at 93-94.)   However, ADCRR does not house any inmates under conditions that constitute either "solitary confinement" or "extreme isolation" as advanced by either the NCCHC or Haney and Horn.

All Subclass cells provide inmates the opportunity to see and speak to other inmates, correctional personnel who regularly walk the pods/feeding/escorting/performing security checks, medical/mental health personnel making rounds and distributing medications, and programming personnel through a vision panel in the door or cell wall. (Dkt. 4309, ¶¶ 1740.)  All Subclass inmates are also afforded visitation, telephone calls commiserate with their housing status designation and attendant safety and security concerns.  (Dkt. 4309, ¶¶ 1740-1744.)   That Horn saw inmates asleep in their bunks when he toured certain locations at ASPC Eyman and Lewis is unpersuasive where Horn is not a mental health provider and cannot therefore surmise that the inmates he saw sleeping "shut down" because of ADCRR conditions of confinement.  (Dkt. 4308, ¶¶ 354-355.)

As set forth below, ADCRR provides the Subclass with out of cell opportunities that exceed constitutional minimums.  Thus, Plaintiffs' "extreme isolation" and lack of access to recreation claims thus fail.  The facts related to Plaintiffs' primary Subclass claim cannot be considered without acknowledging the constitutional minimums established the Ninth Circuit and how ADCRR operations exceed the constitutional minimums.

The Eighth Amendment does not mandate either outdoor exercise or out-of-cell programming for Subclass inmates.  *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (quoting *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993)), the Eighth Amendment does not mandate outdoor exercise.  *Norbert v. City & Cty. of San Francisco*, 10 F.4th 918, 929 (9th Cir. 2021).  It requires only "outdoor recreation opportunities, or otherwise meaningful recreation, to prison inmates."  *Id.* (quoting *Shorter v. Baca*, 895 F.3d 1176, 1185 (9th Cir. 2018)).  Moreover, the Ninth Circuit has upheld as few as two hours of recreation per week.  *See Pierce v. Cty. of Orange*, 526 F.3d 1190, 1213 (9th Cir. 2008); *see also Dockery*, 443 F. Supp. 3d at 743 ("Although Plaintiffs complain that they often do

111

1    not get the five-hours-per-week recreation time, or the three showers-per-week as
2    prescribed by EMCF policy, longer periods of continuous cell time have been found
3    constitutional."); *Baptisto v. Ryan*, 2006 WL 798879, at *33 (D. Ariz. Mar. 28, 2006)
4    ("*Baptisto I*"), *aff'd sub nom. Mullins v. Stewart*, 252 F. App'x 837 (9th Cir. 2007) ("While
5    inmates were permitted only three hours at the time these suits were commenced, they may
6    now spend six hours per week in the recreation area.  Other courts, including the Ninth
7    Circuit, have generally found five hours of recreation time per week to be constitutionally
8    sufficient.").

9         ADCRR offers Subclass inmates out-of-cell recreation and programming
10   opportunities that greatly exceed Ninth Circuit mandates.  ADCRR's DO 812 governs
11   maximum custody management and, consistent with the prior Stipulation provisions
12   regarding maximum custody out of cell time, provides a progressive step incentive system
13   for maximum custody inmates that rewards pro-social behavior and offers increased
14   privileges as maximum custody inmates work through three step levels. (Dkt. 4309, ¶ 1689.)
15   Step level progression carries with it increased privileges (property, visitation, telephone
16   calls, etc.) and recreation, programming, and out-of-cell opportunities.  (Dkt. 4309, ¶ 1692.)

17        Under DO 812, maximum custody inmates at ASPC Lewis Rast Max and ASPC
18   Eyman Browning and SMU I are offered at least 7.5 hours of outdoor recreation per week
19   and 9 hours of outdoor recreation per week for inmates previously at ASPC Florence
20   Kasson and now at ASPC Tucson Rincon (in three blocks in varying enclosure size
21   locations per Step Level/location to include outdoor chute recreation enclosures, 10x10
22   individual outdoor enclosures, 20x40 group enclosures, and 50x90 group enclosures with
23   group enclosures outfitted with sport and exercise equipment and all providing shade and
24   water.  (Dkt. 4309, ¶¶ 1703, 1704, 1693-1698, 1700.)  Maximum custody inmates are also
25   offered programming commensurate with their Step Level.  Step Level 1 inmates  program
26   in their cells.  Step Level 2 and 3 maximum custody inmates are offered one hour of
27   classroom group programming per week taught by a COIII.  (Dkt. 4309, ¶¶ 1705-1706.)

28        Importantly, while DO 812 prescribes the minimum offers for recreation, the

maximum security locations offer more.  For ASPC Eyman Browning Unit and ASPC Lewis Rast Max Unit, approximately 9 hours of recreation are offered per week; at ASPC Eyman SMU I, approximately 10 hours are offered per week; and at ASPC Florence Kasson, approximately 10.5 hours were offered per week.   (Dkt. 4309, ¶¶ 1711-1714.) Three showers a week, phone calls, visitation, tablet access, job assignments, and healthcare appointments increase out of cell and socialization opportunities for maximum custody inmates.  (Dkt. 4309, ¶¶ 1716, 1736-1740.)

Considering weekly offerings of outdoor recreation, out of cell programming, and 10 hours of table time offered to SMI inmates, maximum custody inmates are offered at a minimum between 7.5 and 22+ hours of out of cell time per week depending on Step Level and SMI status.  (Dkt. 4309, ¶ 1710.)  Specifically, SMI maximum inmates are afforded the opportunity for increased programming and unstructured out of cell time (2 SMI out of cell group programs taught by Centurion mental health personnel and regular COIII programming offered per step level), as well as 10 additional hours of unstructured out of cell time.  (Dkt. 4309, ¶ 1707.)  Table time for SMI inmates (at least 10 hours a week of unstructured time offered) allows SMI inmates to leave their cells and participate in various activities at a table in the dayroom area of a housing pod or in a classroom.  During table time, the inmates can visit with other inmates also out of cell for table time, watch television, do classroom work, play games, work on crafts, etc.  (Dkt. 4309, ¶¶ 1708-1709.)

Cancellations of activities due to legitimate reasons, such as staffing challenges on a particular day, emergency lockdowns, or in the last two years – COVID-19 – do occur, but efforts are made to continue to offer recreation opportunities that exceed Ninth circuit mandates of between two and five hours of recreation per week.  (Dkt. 4309, ¶¶ 1717-1722, 1719.)  ADCRR documents cancellations and thus can demonstrate the legitimacy of the same. (Dkt. 4309, ¶¶ 1717, 1719.)

DO 813 governs close management status inmates and these inmates are offered six hours of outdoor recreation per week, three showers, and classroom group programing commiserate with phase level.  (Dkt. 4309, ¶¶ 1723-25.) Per DO 804, inmates on temporary

detention status are also offered six hours of outdoor recreation per week and three showers. (Dkt. 4309, ¶¶ 1726-1729.) Per DO 807, recreation, shower and visitation opportunities for inmates on mental health watch status are dictated by watch orders created for each individual inmate to protect inmates from suicide and self-harm.  (Dkt. 4309, ¶¶ 1730-1731.)

Plaintiffs' effort to prove that Defendants are deliberately indifferent to provision of out of cell time to Subclass inmates because ADCRR cancels activities for no legitimate reason is belied by the mountain of documentary evidence to the contrary as reflected in ADCRR's monthly maximum custody notebooks and inmate out of cell tracking forms. (*Id.*; Dkt. 4308, ¶¶ 156-164.) Plaintiffs' identification of legitimate activity cancellation is insufficient to prove longstanding and pervasive denial of out of cell time without legitimate penological justification.

Plaintiffs' assertion that Defendants do not offer recreation and programming opportunities to inmates rest on Horn's opinion.  This "opinion" is predicated on interviews of only 60 non-randomly selected inmates at two prison complexes (ASPC Eyman and ASPC Lewis), a review of only 12-14 inmate institutional files, and review of "a few" maximum custody out of cell tracking forms.  (Dkt. 4309, ¶¶ 1733.)  Horn's unreliable methodology does not allow him to generalize his findings related to these 60 inmate reports to the wider ADCRR Subclass population and his "opinion evidence" does prove that for all Subclass inmates across ten prison complexes, ADCRR staff deliberately and systematically deny inmates the opportunity for out of cell time.   Indeed, no close management, detention, or mental health watch inmates testified at trial that denials of out of cell time is pervasive and long term.  And, Horn never testified that detention unit inmates told him they were not being offered recreation time. Dkt. 4309, ¶ 1610.)  Thus, Plaintiffs' reliance on cherry picked detention records for only seven out of seventeen detention units across the state proves nothing.  (Dkt. 4308, ¶ 168;  4309, ¶¶ 1591, 1545; Dkt. 4308, ¶¶ 25, 32; Ex. 1304 at 1-3 noting prison complexes, units, and unit use denoted categorized by custody level, "detention", or "watch cells" designations).)  Plaintiffs' document summaries

are suspect and unreliable where a category for "People Offered Rec 3 Times" is obviously missing and the "# People in Unit" category total seldom adds up when comparing numbers in the other attendant columns.  (*Id.*)

Plaintiffs furthermore challenge "refusal rates" of offered out of cell time, arguing that refusals really aren't refusals, but are instead malicious denials of out of cell time. Absent from Plaintiffs' case is inmate testimony proving that ADCRR correctional staff participate in a state-wide conspiracy to deliberately not offer inmates out of cell time.

Indeed, it is not unusual for inmates to refuse offers for out of cell time based upon a myriad of personal preference reasons.  (Dkt. 4309, ¶ 1719.)  As illustration, Plaintiff S. testified that he refuses all offers of recreation because he does not want to put himself in a position where he gets himself in a fight with other inmates and compromises his release date. (Dkt. 4226-1 at 302:8-303:2.)  Refusals of out of cell time are tracked on the inmates' individual out of cell tracking forms by noting an "R" to reflect a refusal of time.  (Dkt. 4309, ¶ 1719.)  Further explanation regarding the amount of time refused is documented on the back of the out of cell tracking form.  (*Id.*)  Maximum custody unit supervisors are also tasked with reviewing weekly refusals and following up with inmates who exhibit an unusual pattern of refusals to determine the reason for the refusals in order to encourage inmates to participate.  (*Id.*)  The counseling sessions regarding refusals are documented on the back of the out of cell tracking forms. (*Id.*) Starting in mid-2021, supervisors also track counseling sessions regarding patterns of refusal on a separate tracker.  (*Id.*) This allows supervisors to track unusual rates of refusal and determine why an inmate may be refusing out of cell time so that any issues impeding the same may be addressed.  (*Id.*)

Moreover, Plaintiffs' purported refusal rates fail to prove that Defendants deprive Subclass inmates of constitutional levels of out of cell time when the out of cell time opportunities provided so greatly exceed constitutional minimums of between two and four hours of recreation a week.  Plaintiffs' maximum custody refusal rate summary deliberately fails to provide the Court with information as to how many hours of recreation, programming, and table time (for SMI inmates) the inmates actually accepted.  (Dkt. 4308,

¶ 172-173.)  Defendants' summary proves that for the twenty inmates randomly monitored for the month, there is ample out of cell time accepted by the inmates even in light of the refusals.  Even where group classroom programming was cancelled due to COVID or staffing challenges, recreation continued and SMI inmates were offered ten or more hours of unstructured out of cell table time.

| Month/Year | Housing Unit | Total Rec Hours Refused | Total Rec Hours Accepted | Total SMI Hours Refused | Total SMI Hours Accepted |
|---|---|---|---|---|---|
| January 2019 | Lewis Rast | 66 hours | 73:30 hours | 62 hours | 17:51 hours |
| January 2019 | Florence Kasson | 144 hours | 36:51 hours | 177 hours | 137:29 hours |
| January 2019 | Eyman SMU I | 116 hours | 52:18 hours | 94 hours | 11:08 hours |
| January 2019 | Eyman Browning | 102 hours | 40:08 hours | 47 hours | 49:11 hours |
| April 2019 | Lewis Rast | 69 hours | 116:49 hours | 94 hours | 24:04 hours |
| April 2019 | Florence Kasson | 101:30 hours | 42:47 hours | 217 hours | 101:18 hours |
| April 2019 | Eyman SMU I | 87:30 hours | 24:26 hours | 15 hours | 9 hours |
| April 2019 | Eyman Browning | 124 hours | 22:42 hours | 13:48 hours | 71:04 hours |
| July 2019 | Lewis Rast | 120 hours | 64:35 hours | 165 hours | 21:38 hours |
| July 2019 | Florence Kasson | 128:45 hours | 81:44 hours | 144:15 hours | 188:38 hours |
| July 2019 | Eyman SMU I | 72:30 | 19:33 hours | 17 hours | 0 hours |
| July 2019 | Eyman Browning | 135:39 | 30:17 hours | 42 hours | 53:30 hours |
| October 2019 | Lewis Rast | 141 hours | 43:21 hours | 120 hours | 36:54 hours |
| October 2019 | Florence Kasson | 133:58 hours | 77:10 hours | 159:35 hours | 116:17 hours |
| October 2019 | Eyman SMU I | 97:30 hours | 19:09 hours | 131 hours | 7 hours |
| October 2019 | Eyman Browning | 121:54 hours | 25:40 hours | 44:45 hours | 140:47 hours |
| January 2020 | Lewis Rast | 102 hours | 49:20 hours | 109 hours | 71:20 hours |
| January 2020 | Florence Kasson | 197:27 hours | 12:36 hours | 127:15 hours | 188:39 hours |
| January 2020 | Eyman SMU I | 90 hours | 22:13 hours | 59 hours | 13:56 hours |
| January 2020 | Eyman Browning | 90:27 hours | 56:47 hours | 39 hours | 124:53 hours |
| April 2020 | Lewis Rast | 141 hours | 39:15 hours | 125 hours | 15:53 hours |
| April 2020 | Florence Kasson | 182 hours | 28:25 hours | 0 hours | 0 hours |

| April 2020 | Eyman SMU I | 100 hours | 5:11 hours | 33 hours | 1 hour |
|---|---|---|---|---|---|
| April 2020 | Eyman Browning | 46:10 hours | 26:50 hours | 0 hours | 0 hours |
| July 2020 | Lewis Rast | 120 hours | 67:00 hours | 119:51 hours | 32:39 hours |
| July 2020 | Florence Kasson | 196 hours | 14:00 hours | 0 hours | 0 hours |
| July 2020 | Eyman SMU I | 100 hours | 7:45 hours | 117 hours | 12 hours |
| July 2020 | Eyman Browning | 102 hours | 63:45 hours | 0 hours | 0 hours |
| October 2020 | Lewis Rast | 126 hours | 54:52 hours | 90:30 hours | 35:39 hours |
| October 2020 | Florence Kasson | 154 hours | 56:12 hours | 0 hours | 0 hours |
| October 2020 | Eyman SMU I | 162:30 hours | 18:08 hours | 115 hours | 4:08 hours |
| October 2020 | Eyman Browning | 101:58 hours | 77:44 hours | 0 hours | 0 hours |
| January 2021 | Lewis Rast | 147 hours | 47:06 hours | 143 hours | 27:48 hours |
| January 2021 | Florence Kasson | 163 hours | 7:50 hours | 0 hours | 0 hours |
| January 2021 | Eyman SMU I | 142 hours | 7:50 hours | 135 hours | 0 hours |
| January 2021 | Eyman Browning | 66 hours | 79:09 hours | 0 hours | 0 hours |
| April 2021 | Florence Kasson | 135:45 hours | 76:13 hours | 0 hours | 0 hours |
| April 2021 | Eyman SMU I | 170 hours | 22:06 hours | 168:50 hours | 11:10 hours |
| April 2021 | Eyman Browning | 61:41 hours | 102:12 hours | 0 hours | 132 hours |

(Ex. 3602 (ADCRR00214421-ADCRR00214693), 3604 (ADCRR00214742-ADCRR00214998), 3606 (ADCRR00215056-ADCRR00215345), 3608 (ADCRR00215418-ADCRR00215687), 1681 (ADCRR00211311-ADCRR00211554), 1682 (ADCRR00211615-ADCRR00211941), 1683 (ADCRR00211984-ADCRR00212318), 1684 (ADCRR00212402-ADCRR00212707), 1685 (ADCRR00212795-ADCRR00213038), 1686 (ADCRR00213091-ADCRR00213320), 1687 (ADCRR00213379-ADCRR00213679), 1688 (ADCRR00214007-ADCRR00214320), 2265 (ADCM1568982-ADCM1569176), 2266 (ADCM1569231-ADCM1569413), 2267 (ADCM1569501-ADCM1569705), 2268 (ADCM1569762-ADCM1570011), 2269 (ADCM1574037-ADCM1574234), 2270 (ADCM1574294-ADCM1574456), 2271 (ADCM1574530-ADCM1574722), 2272 (ADCM1574780-ADCM1575033), 2273 (ADCM1576024-ADCM1576221), 2274 (ADCM1576272-ADCM1576463), 2275 (ADCM1576511-ADCM1576768), 2276 (ADCM1576858-ADCM1577070), 2277 (ADCM1578454-ADCM1578644), 2278 (ADCM1578698-ADCM1578809), 2279 (ADCM1578842-ADCM1579097), 2280 (ADCM1579191-ADCM1579410), 2281 (ADCM1582381-ADCM1582562), 2282 (ADCM1582613-ADCM1582758), 2283 (ADCM1582793-ADCM1583054), 2284 (ADCM1583260-ADCM1583452), 2285 (ADCM1585951-ADCM1586138 ), 2286 (ADCM1586199-ADCM1586342), 2287 (ADCM1586377-ADCM1586640), 2288 (ADCM1586882-ADCM1587110), 2289 (ADCM1592117-ADCM1592348), 2290 (ADCM1592426-

ADCM1592546), 2291 (ADCM1592582-ADCM1592844), 2292 (ADCM1593105-
ADCM1593350), 2293 (ADCM1600263-ADCM1600488), 2294 (ADCM1600544-
ADCM1600687), 2295 (ADCM1600749-ADCM1601015), 2296 (ADCM1608043-
ADCM1608292), 2297 (ADCM1611203-ADCM1611422), 2298 (ADCM1611590-
ADCM1611752), 2299 (ADCM1611789-ADCM1612052), 2300 (ADCM1612178-
ADCM1612415), 2301 (ADCM1612488-ADCM1612748), 2302 (ADCM1612826-
ADCM1613018), 2303 (ADCM1613086-ADCM1613349), 2304 (ADCM1613454-
ADCM1613702), 2305 (ADCM1616238-ADCM1616506), 2306 (ADCM1616565-
ADCM1616765), 2307 (ADCM1617061-ADCM1616928), 2308 (ADCM1617375-
ADCM1617622), 2309 (ADCM1619416-ADCM1619828), 2310 (ADCM1619869-
ADCM1620041), 2311 (ADCM1620090-ADCM1620411), 2312 (ADCM1638293-
ADCM1638546), 2313 (ADCM1652788-ADCM1653123), 2314 (ADCM1637023-
ADCM1637186), 2315 (ADCM1637784-ADCM1638042), 2316 (ADCM1637250-
ADCM1637551), 2317 (ADCM1653197-ADCM1653525), 2318 (ADCM1653586-
ADCM1653764), 2319 (ADCM1654128-ADCM1654419), 2320 (ADCM1653790-
ADCM1654087), 2321 (ADCM1654469-ADCM1654826), 2322 (ADCM1654883-
ADCM1655083), 2323 (ADCM1655112-ADCM1655415), 2324 (ADCM1655551-
ADCM1655837), 2325 (ADCM1660230-ADCM1660560), 2326 (ADCM1660639-
ADCM1660822), 2327 (ADCM1660865-ADCM1661158), 2328 (ADCM1661499-
ADCM1661780), 2329 (ADCM1661886-ADCM1662275), 2330 (ADCM1662351-
ADCM1662564), 2331 (ADCM1662592-ADCM1662894), 2332 (ADCM1663216-
ADCM1663507), 2333 (ADCM1663605-ADCM1663867), 2334 (ADCM1663967-
ADCM1664250), 2335 (ADCM1664304-ADCM1664592), 2336 (ADCM1664800-
ADCM1665111), 2337 (ADCM1665175-ADCM1665435), 2338 (ADCM1665497-
ADCM1665772), 2339 (ADCM1665819-ADCM1666103), 2340 (ADCM1666291-
ADCM1666588), 2341 (ADCM1666763-ADCM1667000), 2342 (ADCM1667060-
ADCM1667344), 2343 (ADCM1667375-ADCM1667673), 2344 (ADCM1667823-
ADCM1668141), 2345 (ADCRRM0003428-ADCRRM0003664), 2346
(ADCRRM0022152-ADCRRM0022481), 2347 (ADCRRM0003693-
ADCRRM0003982), 2348 (ADCRRM0004254-ADCRRM0004576), 2349
(ADCRRM0028251-ADCRRM0028476), 2350 (ADCRRM0028522-
ADCRRM0028843), 2351 (ADCRRM0028893-ADCRRM0029200), 2352
(ADCRRM0029258-ADCRRM0029576), 2353 (ADCRRM0007971-
ADCRRM0008203), 2354 (ADCRRM0008247-ADCRRM0008522), 2355
(ADCRRM0008556-ADCRRM0008843), 2356 (ADCRRM0009000-
ADCRRM0009306), 2357 (ADCRRM0029774-ADCRRM0030003), 2358
(ADCRRM0030058-ADCRRM0030322), 2359 (ADCRRM0030372-
ADCRRM0030662), 2360 (ADCRRM0030840-ADCRRM0031162), 2361
(ADCRRM0031266-ADCRRM0031496), 2362 (ADCRRM0031568-
ADCRRM0031846), 2363 (ADCRRM0032201-ADCRRM0032518), 2364
(ADCRRM0031890-ADCRRM0032176), 2365 (ADCRRM0032632-
ADCRRM0032865), 2366 (ADCRRM0032931-ADCRRM0033213), 2367
(ADCRRM0033729-ADCRRM0034025), 2368 (ADCRRM0033313-
ADCRRM0033627), 2369 (ADCRR00066141-ADCRR00066368), 2370
(ADCRR00066415-ADCRR00066696), 2371 (ADCRR00066785-ADCRR00067077),
2372 (ADCRR00067145-ADCRR00067453), 2373 (ADCRR00067515-
ADCRR00067759), 2374 (ADCRR00067803-ADCRR00068082), 2375
(ADCRR00068115-ADCRR00068437), 2377 (ADCRR00068576-ADCRR00068848),
2378 (ADCRR00068946-ADCRR00069279), 2379 (ADCRR00069350-
ADCRRM0069670).

Finally, Plaintiffs' claim that refusals "are not real" because out of cell tracking forms do not contain inmate signatures is not persuasive where efforts are made to include

118

1   a second staff signature where operationally feasible. (Dkt. 4308, ¶ 184-199.)  Moreover,

2   there is no constitutional requirement that prison officials go to great lengths that they do to

3   document the ample out of cell opportunities provided to maximum custody inmates.

4   Therefore, criticism of Defendants' efforts in this regard are misplaced.   Likewise,

5   Plaintiffs' criticism as to how long maximum custody supervisors spent talking to an inmate

6   about his refusal rates or the detail of description of the same is of no consequence.    For

7   all of these reasons, Plaintiffs have not established that Defendants have a systemwide

8   policy or practice of providing the Subclass with less than two to five hours of recreation

9   per week or ample opportunities for socialization.

10          **K.     ADCRR Provides Nutritional Meals to Inmates.**

11          Plaintiffs claim that Subclass inmates are hungry and are not regularly fed.  They

12   also complain about inmates receiving three meals a day – but that breakfast and lunch are

13   served at the same time in the "Mega Sack."  (Dkt.  4308, ¶¶ 200-205.)  Yet, Plaintiffs

14   abandoned their nutrition claim years ago, agreeing that ADCRR had demonstrated it served

15   maximum custody inmates nutritionally adequate meals.  (Dkt.  4309, ¶¶ 1778, 1784.)

16   Moreover, the certified claim challenges nutritional value – it does not alleged that detention

17   inmates are denied meals.  This uncertified tack-on claim should not be permitted but even

18   if it is, it fails.  (Dkt. 372 at 23; 3921 at 2.)

19          It is undisputed that Plaintiffs have no expert witness to challenge the nutritional

20   adequacy of the meals served to ADCRR inmates.   (R.T. 11/09/21 a.m. at 1537:19-

21   1541:16.)   ADCRR inmate meals provide an average of 2700 calories to male inmates and

22   2200 calories to female inmates, and the menus meet or exceed recommended nutrient

23   amounts as specified by Recommended Dietary Allowances from the National Academy of

24   Sciences. (Dkt. 4309, ¶¶ 1779-81.)  That the breakfast/lunch Mega Sack which includes

25   cereal, boiled egg, cheese slice, turkey/ham, wheat bread (2 slices), salad dressing, 2% milk

26   (1 cup), coffee,  salt/pepper, turkey bologna or salami, peanut butter and jelly, mustard,

27   wheat bread (4 slices), tortilla chips, assorted cookie, and a beverage are cold meals is of

28   no constitutional consequence, especially where hot dinners rotate per the menu and include

a hot entrée (i.e., chili con carne, spaghetti with meat sauce, stroganoff, baked chicken with gravy, jambalaya, stir fry with turkey, burrito mix, pizza, etc.), a vegetable side dish, a variety of bread offerings (i.e., garlic bread, cornbread, roll, bread dressing, biscuit), dessert and a beverage.  (Dkt. 4309, ¶¶ 1783.)  Where Plaintiffs have no evidence to challenge the nutritional value of meals fed to inmates, they cannot provide systemic deliberate indifference to the nutritional needs of the Subclass.

Plaintiffs' attempt to prove that ADCRR actually does not feed its detention status inmates – at times for days – by merely relying on paperwork also fails.  (Dkt. 4308, ¶ 204.)  Plaintiffs called no inmates to testify that while assigned to detention, they were not fed despite their access to the inmate population since 2012.  Also absent are evidence of any written inmate complaints or grievances regarding the same.  If inmates were indeed not being fed for days at a time, or regularly missing meals, certainly Plaintiffs would have presented inmate testimony and mountains of inmate complaints and grievances regarding the same.  They did not.

At trial, Plaintiffs challenged Deputy Warden Coleman (ASPC-Lewis Rast), Deputy Warden Stickley (ASPC-Eyman SMU I), and Warden Van Winkle (ASPC-Florence) with anecdotal examples of Individual Detention Records that did not contain entries for service of meals on certain days to individual inmates, asserting that the inmates simply were not fed. (R.T. 11/15/21 p.m. at 2120:6-2126:15, 2134:3-2135:1; R.T. 11/15/21 p.m. at 2052:4-2057:15; R.T. 11/15/21 p.m. at 2069:23-2072:22, 2083:15-2085:6; R.T. 11/18/2021 p.m. at 2850:4-2854:19, 2862:15-2865:3.)  The Wardens had never seen the documents before trial.  (*Id.*) Moreover, the inmates identified in the records did not testify at trial that they in fact were never fed meals.  The Wardens explained that while there may be a deficiency in the detail of logging of daily activities done by correctional personnel, this does not mean that the inmates indeed were not fed and if such was occurring, this is an inmate complaint that the Wardens are confident that inmates would report if they were not being fed.  (*Id.*; R.T. 11/18/21 a.m. at 2725:3-10.)   Indeed one of the quickest ways to incite an inmate disturbance is to deny them food.  If the Wardens determined that inmates actually were not

120

1    fed or that there was a pattern of deficient completion of paperwork by a particular officer,

2    corrective action would be taken. (*Id.*)

3        Lacking entries for food services on Individual Detention Records is not proof that

4    detention inmates are not fed.  Plaintiffs cherry picked examples of deficient documentation

5    from 14,270 pages of Individual Detention Records in an attempt to prove a far fetched

6    claim that ADCRR singles out only detention inmates to not feed them.  Counsel fed Horn

7    only 476 out of 14,270  pages of individual inmate detention records available for review

8    (3%).  (Dkt. 4130-1, Ex. 1.)   As explained by the Deputy Wardens that testified at trial,

9    while there may be deficiencies in the logging of daily activities performed by correctional

10    staff, this does not translate to the inmates not being fed.  Plaintiffs and their expert ignored

11    the thousands of pages of detention records in evidence that show inmates in detention were

12    indeed provided their meals.  (Ex. 1694 at ADCRR00183603-608, ADCRR00183611-618,

13    ADCRR00183631-632,          ADCRR00183637-642,          ADCRR00183659-664,

14    ADCRR00183667-668,          ADCRR00183683-684,          ADCRR00183691-696,

15    ADCRR00183715-716,          ADCRR00183725-726,          ADCRR00183729-738,

16    ADCRR00183741-742,          ADCRR00183759-772,          ADCRR00183783-792,

17    ADCRR00183795-810,          ADCRR00183835-839,          ADCRR00183845-846,

18    ADCRR00183859-862,          ADCRR00183867-870,          ADCRR00183891-894,

19    ADCRR00183897-902,          ADCRR00183917-930,          ADCRR00183991-996,

20    ADCRR00183999-006,          ADCRR00184023-032,          ADCRR00184071-072,

21    ADCRR00184077-088,          ADCRR00184091-094,          ADCRR00184095-096,

22    ADCRR00184099-112,          ADCRR00184117-138,          ADCRR00184141-202,

23    ADCRR00184209-216,    ADCRR00184219-270;    1697    at    ADCRR00186706-708,

24    ADCRR00186712-715,          ADCRR00186716-719,          ADCRR00186722-725,

25    ADCRR00186728-733, ADCRR00186742-755.)

26        In sum, Plaintiffs failed to offer any evidence that meals provided to the isolation

27    subclass inmates are inedible or nutritionally inadequate.  Plaintiffs offered no evidence of

28    subclass members actually losing weight or suffering any adverse physical effects as a result

121

of provision of nutritionally inadequate meals. Inmates are served three nutritionally adequate meals a day that meet National Academy of Sciences nutritional guidelines, prepared by a national corrections food services vendor. While Plaintiffs' corrections expert disliked service of both breakfast and lunch at the same time in the Mega Sack, he admitted that he is not qualified to opine on the nutritional adequacy of the meals. ADCRR's food services do not deny inmates of the minimal civilized measure of life's necessities. And, anecdotal evidence of incomplete paperwork is insufficient to prove that system-wide, ADCRR regularly and with either intent or deliberate indifference, fails to feed its detention inmates.

**L.     Alleged Inadequate Security Supervision Is Not a Subclass Claim and Further Does Not Violate the Eighth Amendment.**

The Court never certified a Subclass claim regarding inadequate security supervision or staffing of Subclass housing locations. (Dkt.372 at 3; 3921 at 2.) Even if the Court had, Plaintiffs' claim fails where ADCRR is not deliberately indifferent to security supervision or staffing of maximum custody, close management, detention, and mental health watch housing locations.

First, linear design of housing units, wherein control room officers cannot see directly into inmate cells is not unconstitutional and Plaintiffs do not cite to any evidence to the contrary. (Dkt. 4308, ¶¶ 206-219.) The same goes for Plaintiffs' criticism that the cells are not outfitted with electronic call buttons. Plaintiffs can cite to no caselaw that requires prisons to build modern housing units outfitted with electronic monitoring of cells. (*Id.*)

Second, Plaintiffs assert that ACA standards for conducting safety/security checks sets the constitutional bar and thus because the ADCRR does not require officer to conduct checks twice an hour, Defendants have violated the Eighth Amendment. (Dkt. 4308, ¶ 209.) ADCRR's safety/security check requirement for Subclass housing locations does automatically run afoul of the ACA standard relied upon by Plaintiffs where officers must conduct safety and security checks to verify inmate welfare "as close to 30 minutes (as

duties allow) but not to exceed one hour in the assigned area. These shall be conducted randomly without establishing a pattern.  In the event a security check cannot be completed or a discrepancy is noted within the designated time, the Shift Commander shall be immediately notified."  (Ex. 1742 at ADCRR00220841.)  A plain reading of the requirement is that officers should conduct checks twice an hour unless they are unable to do so because of intervening circumstances.  (*Id.*; R.T. 11/5/21 p.m. partial at 1102:3-15.)  The requirement cannot be misconstrued like Plaintiffs wish to conclude that officers only have to conduct checks once an hour and it is of no consequence if this occurs.[48]  Plaintiffs cannot establish that ADCRR's safety/security check requirement constitutes deliberate indifference.

Third, Plaintiffs' argument that in practice, ADCRR performs safety/security checks only once per hour fails.  (Dkt. 4308, ¶¶ 211-212, 214.)  Over 4,000 pages of correctional services logs (applicable only to ASPC Eyman Browning and SMU I, Florence Kasson and Lewis Rast Max for July 2019 through September 2021) were admitted into evidence in this case by Plaintiff.  (Ex. 1292, 1293, 1294, 1295.)  Yet, Plaintiffs cite to not one page of these logs and journals to establish that ADCRR correctional staff pervasively either do not perform safety/security checks or only perform them hourly.  (*Id.*)  Plaintiffs cannot prove that Defendants are deliberately indifferent to the need to perform timely safety/security checks.  Security checks are performed.

Fourth, Plaintiffs claim that the safety/security checks that are performed are "perfunctory" because officers complete their checks in a minute or two in one pod.  (Dkt. 4308, ¶¶ 211-213, 216.)  To be clear, Plaintiffs challenge only safety/security checks

---

[48] Plaintiffs cannot use ACA standards as it benefits them based upon the claim at hand. They tout ACA standards as the constitutional minimum for security checks and other conditions of confinement issues, but in their Conclusions of Law section of the Proposal, they spend an entire subsection arguing that "Trade Group Accreditation Is not Constitutional Compliance" going so far as to cite 9th Circuit caselaw that finds that compliance with ACA standards does not insulate defendants from Eighth Amendment liability(citing *Grenning v. Miller-Stout*, 739 F.3d 1235, 1341 (9th Cir. 2014)).  (Dkt. 4308, ¶¶ 1102-1106.)  Plaintiffs cannot rely on ACA standards to establish constitutional requirements and then turn around and argue that ADCRR compliance with ACA or NCCHC standards is not evidence of constitutional compliance.

performed at Eyman Browning and SMU I units – not at any of ADCRR's nine other prison complexes.  (*Id.*)  Moreover, even for these two units, Plaintiffs advance only <u>four</u> actual log entries (two in 2019 and two in 2020) to unsuccessfully attempt to prove that the safety/security checks are too quick. (*Id.*) So, considering just a 2 ½ year time period from 2019 to mid-2021 for only one pod at ASPC Eyman Browning, and even assuming checks were performed only hourly, 21,900 safety/security checks would have occurred in one housing pod. By citing only four log entries, even if those safety/security checks were "perfunctory", Plaintiffs have still an overall 0% perfunctory safety/security check rate for only one pod at Browning.  Plaintiffs therefore have no evidence of a systemic practice of permitting "perfunctory" security checks at all ten ADCRR prison complexes.  This is especially so where it defies common sense that correctional officers could not check the safety/welfare of eight or even sixteen cells in one to two minutes. Plaintiffs acknowledging that pods at Eyman SMU I have eight cells.  (Dkt. 4308, ¶ 212, n. 42; 4130-04, Ex. 5, Part 3 at ADCRR00158510; 4130-06, Ex. 5, Part 5 at ADCRR00158576-580, ADCRR00158583.)  Common sense dictates that correctional officers could walk by eight cells in one to two minutes and verify that the inmates are living and breathing.  (R.T. 11/15/21 p.m. at 2082:3-24.)  Plaintiffs also offer no evidence that the allegedly deficient security checks have actually exposed Subclass inmates to a substantial risk of serious harm in any form. (Dkt. 4308, ¶¶ 206-214.) Plaintiffs have no evidence of deliberate indifference to inmate safety.[49]

Fifth, Plaintiffs' claim that Defendants do not adequately staff control rooms, exposing Subclass inmates across the state to substantial risk of serious harm fails.  (Dkt. 4308, ¶¶ 215-219.)  According to Plaintiffs, control room staffing levels expose inmates to

---

[49] Plaintiff Brislan testified at trial that correctional officers encouraged him to engage in self harm. (Dkt. 4308, ¶¶ 571-573.)  However, as testified to by Warden Van Winkle, Brislan's continual allegations of staff misconduct were investigated by and found to be unsubstantiated but for a challenge Brislan made regarding receipt of commissary items.  (R.T. 11/18/21 a.m. at 2728:5-2729:12.)  Plaintiff Johnson claims he witnessed officers verbally mistreat other inmates; however, his non-specific claims that fail to identify dates, times, or staff/inmates involved cannot be investigated and thus the self-serving allegations are not admissible evidence of officer misconduct. (Dkt. 4308, ¶ 571.)

a substation risk that in case of fire or smoke, inmates cannot be released from their cells and further are at risk that medical emergencies, suicides or fights will go undetected or will be slowly responded to, and correctional officers will not recognize if inmates are exhibiting abnormal behavior or engaging in self harm. (Dkt. 4308, ¶¶ 215, 218, 422.) Fatal to Plaintiffs' claim however, is the absence of any evidence that these hypothetical risks have occurred because of staffing levels. (*Id.*) Moreover, Plaintiffs focus this claim only on ASPC Eyman and no other prison complex. (Dkt. 4308, ¶¶ 215-219.) Thus at the outset, Plaintiffs cannot show a systemic deficiency across all ten ADCRR prison complexes. Even as applied to the Eyman complex, Plaintiffs cite a mere <u>twelve shifts</u> where officers covered control rooms for more than one location or activities were cancelled due to staffing levels. (Dkt. 4308, ¶¶ 215-217.) Of these twelve shifts, Plaintiffs concede that at least three shifts were overnight shifts - shifts when the inmates were sleeping and thus less activity is occurring. (*Id.*) During at least three of the day shifts at issue, movement and activities were restricted in order to address the staffing levels thus responsibly ensuring that inmate safety is increased. (*Id.*)

Twelve shift examples cannot even prove systemic deliberate indifference to inmate safety at the Eyman complex. ADCRR has made good faith efforts to address Eyman complex correctional staffing needs by deactivating ASPC Florence and reassigning staff to Eyman, cross leveling staff from the deactivated Cocopah Unit at ASPC Yuma to Eyman, and increasing recruitment efforts and pay for correctional officers. (Dkt. 4309, ¶¶ 1468, R.T. 11/17/21 p.m. at 2670:1-2671:6; 11/16/21 a.m. at 2170:18-2171:10.) Defendants are not deliberately indifferent to the staffing needs of the Eyman complex and Plaintiffs cannot prove that security operations pose a substantial risk of harm to any Subclass inmates at any of ADCRR's ten prison complexes. This uncertified claim fails.

### M. ADCRR Does Not Use Excessive Force (Chemical Agents) on Mentally Ill Inmates Engaging In Self-Harm.

ADCRR's DO 804 applies to all planned/controlled uses of force involving chemical agents for all inmates, including maximum custody inmates, SMI maximum custody

inmates, and inmates housed in designated mental health units. (Dkt. 4309, ¶ 1654.) Under DO 804, staff may only use force "when persuasion, counseling, warnings and direct orders are found to be insufficient to obtain cooperation from the inmate[.]"  Staff may use less than lethal force to obtain inmate cooperation.  This includes the use of chemical agents. (Dkt. 4309, ¶ 1656.)

Circumstances warranting use of force include the necessity to maintain control and order, prevent commission of a crime, prevent escape, prevent suicide or serious self-injury, protect against another's use or attempted use of unlawful physical force, prevent hostage taking or infliction of serious injury upon another, or maintain/restore control and order to move an unwilling inmate.  (Dkt. 4309, ¶ 1657.)  All planned uses of force involving the use of Oleoresin Capsicum ("OC") spray or chemical agents on both SMI and non-SMI maximum custody inmates require a cool down period involving correctional staff and a mental health/health care clinician to try to establish rapport with the inmate and allow the inmate the opportunity to comply with orders without the need for force.  (Dkt. 4309, ¶ 1658.)

Use of force is progressive (from least to maximum level permitted), and the force options should be commensurate with the circumstances presented.  Where possible based upon the circumstances, the progressive use of force shall be:

- psychological (physical presence, body language, verbal and non-verbal communication);
- Hand-held and pepper ball sprays;
- Less than lethal options (stun devices, TASER, stun shields, Conducted Electrical Weapons);
- Less than lethal weapons/munitions (12 fa/37 mm bean bags, wooden batons, sting-ball grenades, diversionary devices, CS/OC grenades, 12ga/37 and 40 mm projectiles);
- Service dogs;
- Cell extraction teams; and
- Lethal force (where authorized).

1    (Dkt. 4309, ¶ 1660.)  Staff may use chemical agents such as OC spray outside of a planned

2    use of force.  Chemical agents may be used to avoid the use of physical force to prevent

3    injury to inmates or to stop an imminent danger to an inmate.  (Dkt. 4309, ¶ 1661.)   Use

4    of OC spray and chemical agents is restricted for SMI maximum custody inmates and

5    inmates housed in designated mental health units.  In these cases, OC/chemical agents may

6    only be used to address imminent threats to a person's safety or immediate action to stop a

7    threat such as on-going physical harm, active physical resistance, or escape/attempted

8    escape.  After-care and decontamination efforts must be carried out after deployment of

9    OC/chemical agents.  (Dkt. 4309, ¶ 1662.)

10           In this case, Plaintiffs criticize Defendants' use of force policy in that it permits use

11   of chemical agents and even pepper ball to stop inmates on psychotropic medications from

12   engaging in self-harm.  (Dkt. 4308, ¶ 221.)  Yet, Plaintiffs' own corrections expert  agrees

13   that ADCRR's DO 804 (which includes a cool down period for planned uses of force that

14   involve mental health or medical personnel) is a sound policy, appropriate, and "consistent

15   with common practice within the industry."  (Dkt. 4309, ¶¶ 1616-1617; Ex. 3006.)  Thus,

16   Plaintiffs cannot prove that Defendants' use of force policy allowing the use of OC is

17   unconstitutional.

18           To attempt to prove that Defendants' practice of use of OC on Subclass inmates on

19   psychotropic medications violates the Eighth Amendment, Plaintiffs primarily rest on Dr.

20   Stewart's criticism of the use of OC to stop an inmate from engaging in self harm because

21   in his opinion, "it's abundantly clear that the use of OC spray is not an appropriate

22   psychiatric intervention for an acutely mentally ill individual."  (Dkt. 4308, ¶ 224.)  Yet,

23   Plaintiffs' corrections expert (Horn) admitted at trial that use of chemical agents is an

24   important use of force tool that is part of the use of force continuum used in corrections,

25   further agreeing that the use of OC is a lesser level of force than physically going hands on

26   with an inmate and is effective in preventing an inmate from injuring or killing himself and

27   to stop inmates from fighting rather than the officers going hands-on with inmates to stop

28   their self-injurious or assaultive behavior.  (Dkt. 4309, ¶¶ 1614, 1615.)   And, while Dr.

Stewart criticized Defendants for not contacting a mental health provider before OC is deployed, Horn admitted (and the Court saw) examples of medical or mental health staff responding to the exemplar uses of force but are unable to stop the inmate intent on self-harming.[50] (Dkt. 4308, ¶ 224; 4309, ¶¶ 1620, 1622.)  Plaintiffs' primary reliance on Dr. Stewart to criticize the appropriateness of use of force fails where Dr. Stewart has no corrections background whatsoever – he's a psychiatrist who has not provided clinical care in the correctional setting since 1990 (and before that he only provided direct patient care to inmates for four years in the late 1980s).  (Dkt. 4308, ¶¶ 225-233; 4309, ¶¶ 1129-30.)  And, Plaintiffs' own experts contradict themselves.

Plaintiffs' secondary reliance on Horn to attempt to prove that Defendants' use of OC to stop inmates on psychotropic medications from engaging in self harm constitutes excessive force in violation of the Eighth Amendment also fails. Plaintiffs argue that Defendants' failure to train correctional staff was evident in the use of force videos viewed, yet at trial Plaintiffs presented use of force video evidence for only two inmates (and a total of nine incidents) and Horn admitted that he was impressed with the professionalism of officers and admitted that the use of chemical agents upon the inmate resulted in immediate cessation of the self-harm behavior and compliance by the inmate.  (Dkt. 4308, ¶ 234; 4309, ¶¶ 1618-1620, 1623.)  While Plaintiffs attempt to convince the Court that Defendants widely and inappropriately use pepper ball to stop inmates on psychotropic medications from self-harming, Plaintiffs presented only one instance of the use of a pepper ball (on Inmate Muhammad.) (Dkt. 4308, ¶¶ 221, 234-235.)  Moreover, for the one instance of use of pepper ball they could prove, the use of non-lethal pepper ball came only after use of OC had failed to dissuade Inmate Muhammad from engaging in serious attempts of self-harm for nine days in a row and constituted an appropriate use of force where lesser OC means

---

[50] Plaintiffs in part criticize Dr. Penn's opinion regarding the appropriateness of the use of OC to stop inmates from self-harming because Penn did not observe training of staff regarding use of force and did not review use of force training materials – but Plaintiffs' expert did not do this. (Dkt. 4308, ¶ 224, n. 45.)

1   were proving unsuccessful in stopping from self-harming.  (Dkt.  4309, ¶¶ 1668-1669.)

2          Plaintiffs also boldly allege that people can die from being exposed to OC spray, yet

3   they have no evidence that use of OC spray has caused the death of any Subclass inmate.

4   (Dkt. 4308, ¶ 223.)  Furthermore, while Plaintiffs assert that OC spray may be painful and

5   uncomfortable for the inmates exposed to it, Plaintiffs offer no proof that OC caused the

6   two inmates upon which they rest their claims to require outside medical care because of

7   the exposure.  Plaintiffs likewise seek to have the Court ignore that the use of OC actually

8   stopped the two exemplar inmates from self-harming and suffering further injury (and they

9   were decontaminated after the use of OC as well).  (Dkt.  4308, ¶¶ 222-224; 4309, ¶¶ 1665-

10  1683.)  Plaintiffs' accusation that Warden Van Winkle sees nothing wrong with using

11  chemical agents on mentally ill inmates who engage in frequent self-harm is inaccurate.

12  (Dkt. 4308, ¶¶ 236-242.)  Rather, the record is clear that Warden Van Winkle worked with

13  the mental health team to transfer both exemplar inmates to a higher mental health care

14  setting when the self-injurious behavior continued.  (Dkt.  4309, ¶¶ 1670-73, 1683.)  The

15  Court even commended Warden Van Winkle during his testimony for the empathy he

16  showed for these two inmates that under the circumstances, also presented a risk of harm to

17  officers  who  professionally  responded  to  the  incidents  and  saved  the  inmates  from

18  escalating self-harm.  (R.T. 11/18/21 p.m. at 2855:23-2856:5.)

19         In sum, Plaintiffs' attempt to prove systemic excessive use of chemical agent force

20  on Subclass inmates who are also on psychotropic medications fails.  Plaintiffs' entire claim

21  rests on presenting the Court with nine use of force videos for only two inmates – and

22  involving uses of force only occurring at ASPC Eyman Browning Unit and ASPC Florence

23  Kasson Unit (which is now deactivated).  (Dkt. 4309, ¶¶ 1674-1675, 1679.) However, the

24  videos and accompanying use of force packets show that the use of OC to stop aggressive

25  self-harm efforts was appropriate under the circumstances and necessary to immediately

26  stop the inmates from engaging in self harm after verbal commands to do so proved

27  unsuccessful. Under the circumstances presented by the inmate's aggressive conduct, use

28  of chemical agents was the only reasonable option.  (Dkt. 4309, ¶¶ 1665-1684.)  Plaintiffs'

reliance on use of force instances involving two inmates (or even 15 if generously counting other videos relied upon by Horn but never shown to the Court at trial) does not allow Plaintiffs to generalize a handful of challenged uses of force to the wider ADCRR Subclass population of 2,474 inmates. (Dkt. 4309, ¶ 1685.) Based on the evidence presented at trial, Plaintiffs have not established evidence that Defendants have a systemwide policy or practice of unconstitutionally utilizing chemical agents against inmates on psychotropic medications.

### N.  Alleged Overuse of the Maximum Custody and Detention Is Not a Subclass Claim and Furthermore Is Not Overused.

Plaintiffs spend over thirty pages of their Proposal arguing that Defendants overuse both maximum custody and detention. (Dkt. 4308, ¶¶ 245-353.) Plaintiffs never pled a misclassification claim and no such claim has been certified by the Court. (Dkt. 1; 3921 at 2; 372 at 3.)   Accordingly, this Court should dispose of this non-pled claim at the start. Even if the Court will not, Plaintiffs have not proven a constitutional violation.

ADCRR classification processes are guided by Department Order DO 801 and the corresponding Classification Technical Manual.  (Ex. 1309 at Sections 1.0, 3.0, 4.0, 9.0, 10.0, 11.0, 12.0.)   Changes in an inmate's custody classification over the course of incarceration is largely dependent on the inmate's individual choice to exhibit or not exhibit pro-social behavior, follow institutional rules, and participate in available programming. (Ex. 1309 at Sections 4.0 (reclassification), 5.0 & 8.0 (discretionary overrides).)

Maximum custody inmates represent the highest risk to the inmate population, staff, and the public predicated on objective factors regarding their greatest risk of violence, predatory behavior and/or escape.  (Ex. 1309 at Section 2.3.1.)   As such, and because this category of classification usually comes with the longest sentences, history of violence, history of attempted/successful escape, and/or of the highest degree of demonstrated difficulty of management, this classification requires the most secure housing locations, the most security supervision, the greatest level of controlled movement/monitoring/restraint, and the most restrictive of housing conditions.  (*Id.* )

Inmates classified at custody levels lower than maximum custody may nevertheless be reclassified if their classification score increases based upon institutional history, disciplinary history, new convictions, etc. (Ex. 1309 at Sections 9.0, 10.0.) Inmates determined to require maximum custody classification are reviewed by ADCRR's classification bureau 180 days after initial placement and then annually thereafter (unless the classification to maximum Custody was an override and in that case, they are reviewed every 180 days). (Ex. 1309 at Sections 10.6-10.9.) ADCRR employs an inmate appeal process for those inmates that wish to challenge their custody classification determinations (the exceptions being those inmates housed in maximum custody medical or mental health care units regardless of custody level such as the Behavioral Management Unit ("BMU")). (Ex. 1309 at Sections 9.1, 11.0, 12.0.)

ADCRR does not employ a classification system overly weighted by subjective determination that in turn regularly impedes inmate progression from maximum custody to lower classification levels. Rather, the maximum custody classification applies to inmates who commit or lead other inmates to committee violent, disruptive, or riotous actions; escape or attempt to escape custody; assault or attempt to assault and/or sexually assault any person; cause serious physical injury or death to any person; and/or commits a criminal offense prior to incarceration to include convictions for serious assaults against law enforcement, participation in organized criminal activity, actions indicating a serious risk of escape, or first degree murder, among other serious conduct that seriously compromises the safety and security of prison operations. (Ex. 1309 at Section 2.3.1; 9.0.) ADCRR's Central Office Classification Administrator is the final approving authority for maximum custody placements. (Ex. 1309 at Section 10.4.) Thus, complex level leadership's subjective opinions regarding custody classification decisions do not carry final authoritative weight for classification determinations.

DO 804 governs detention unit placement. Detention status separates inmates from the general population to maintain the safe, secure, and orderly operation of a prison complex while safeguarding the safety, health, and welfare of the inmates. (Dkt. 4309, ¶

1726.)  Complex Wardens and Deputy Wardens may place inmates on detention status to ensure safety/security/orderly operations; ensure the integrity of a pending or ongoing investigation; while determining eligibility for protective custody; for observation status for inmate self-harm concerns; pending classification review and placement, such as pending transfer to a higher custody level; pending revocation of parole/work furlough/home arrest/pending release; and/or to fulfill disciplinary sanctions. (Dkt. 4309, ¶ 1727.) While detention status is designed to be temporary, there may be occasions where a particular inmate remains in detention for a more extended period of time.  (Dkt. 4309, ¶¶ 1567, 1728.)  Detention status is also utilized for inmate who refuse to house in a location required by ADCRR.  (Ex. 1312.)

While Horn takes issue with ADCRR's classification provision that inmates sentenced to life should not have to be classified as maximum custody for their first two years of incarceration, Plaintiffs have no caselaw or corrections industry standard evidence to show that this provision is unconstitutional.  (Dkt. 4308, ¶¶ 256, 257, 259.)  The provision is based upon legitimate penological reasons – the inmate committed such a crime that the judicial system determined that the inmate must be separated from society for his/her lifetime, thus justifying separation from most of the inmate population upon incarceration to keep the inmates, staff, and public protected from a further risk of harm posed by the convicted.  (R.T. 11/16/21 a.m., 2208:2-2208:13; 11/15/21 p.m. at 2002:2-2003:5.).

Plaintiffs cannot dispute that ADCRR's classification system was reviewed in 2013 by the National Institute of Corrections and its processes determined to be a good predictor of inmate behavior and violence. *See* Patricia L. Hardyman, Ph.D., Validation of the Arizona Department of Corrections Objective Classification System:  Final Report, Criminal Justice Institute, 2013.)  ADCRR's classification tool has also been validated by the premier classification expert in this country, James Austin, and Horn acknowledges the same.  (R.T. 11/9/21 a.m. at 1491:19-24.)  Horn, however, has no experience in classification other than reading and signing off on classification policies.  (R.T. 11/8/21

a.m. and partial p.m. at 1337:9-14.)  Horn is therefore unqualified to render any opinions regarding classification in this case.

ADCRR population numbers also defy Plaintiffs' claim that Defendants overuse maximum custody and detention.  (Dkt. 4308, ¶¶ 285-289.)  Only 4.6% of the total ADCRR prison population was classified as maximum custody and only 2.7% of inmates housed at the ten ADCRR operated prison complexes were on detention status as of the end of September 2001. (Dkt. 4309, ¶¶ 1634, 1635, Ex. 1304 at 1-3, also noting at 3 that contract facilities "Contract Male" category houses only minimum and medium custody inmates.) Indeed, ADCRR's maximum custody population has reduced by almost half since 2012, from roughly 3,100 inmates to 1,636 inmates by the end of September 2021.  (Dkt. 4309, ¶ 1636.)

Next, even if Horn were qualified to render classification opinions (which he is not), the methodology he employed to opine that ADCRR overuses maximum custody and detention is unreliable.  (Dkt. 4308, ¶¶ 290- Considering 2,386 inmates in the maximum custody and detention pool as of September 30, 2021, Horn provides examples of only  six inmates that allegedly should not have been classified as maximum custody.  (Dkt. 4308, ¶¶ 295-304.)   And he only reviewed a total of twelve to fourteen inmate institutional files to select the six.  (Dkt. 4309, ¶ 1733.) Thus, his file review constituted at most 0.5% of the applicable population and his opinion is based upon 0.25% of the total 2,386 maximum custody/detention population. He also provides not one example of an actual inappropriate detention assignment.[51]

Plaintiffs cannot prove that there were no legitimate penological reasons for classification and housing determinations for their six examples.  (Dkt. 4308, ¶¶ 295-304.)

---

[51] While Plaintiffs criticize Defendants' placement of Refusal to House and Protective Custody inmates on detention status, Horn's opinions are generalized.  (Dkt. 4308, ¶¶ 305-311.)  Moreover, he bases his conclusions on reports from "numerous" and "several" inmates who are dissatisfied with their housing status, even going so far to say that Refusal to House inmate's requests were "apparently genuine."   (Dkt. 4308, ¶ 305.) However, Horn did not review any of these unknown and uncounted inmates' institutional records and thus his opinion is unreliable.  (Dkt. 4130 at ¶ 82.)

1   Inmates S.C. and S.M. were appropriately classified as maximum custody for the first two

2   years of their sentence in accordance with DO 801 because they were sentenced to life.

3   (Dkt. 4308, ¶¶ 297-300.)  That these two inmates successfully completed their mandatory

4   two years in maximum custody without incident and progressed to close custody is not

5   evidence that ADCRR's policy is irrational.  Plaintiffs have no evidence that these two

6   inmates are the norm. While Horn states that inmates serving life sentences are among the

7   most well behaved, he has no evidence to back this statement up.  (Dkt. 4308, ¶ 301.)

8        Plaintiffs also complain that Plaintiff Muhammad is classified as close custody but

9   remains in maximum custody on an OSB hold, but he does not know why.  (Dkt. 4308, ¶

10  303.)  Inmate Muhammad does know why he was placed on a hold – because he was

11  threatening staff and the Director. (Ex. 3627 (pending admission) at ADCRR00218704,

12  ADCRR00218601-03, 13-24, 61; 3627-0136.)  Muhammad is now at the ASPC Tucson

13  Rincon Unit in a maximum custody mental health program and he reports that he is

14  programming, recreating, participating in counseling, doing artwork, being respectful to

15  staff, eating and sleeping well, taking medications that make him feel stable, has made it to

16  DO 812 Step Level 3, is receiving good mental health care, and is no longer engaging in

17  self harm.  (Dkt. 4309, ¶¶ 314-322.)  By Muhammad's own report, his current program

18  placement is a success - providing safety, security, and benefit for Inmate Muhammad.  (*Id.*)

19       Plaintiffs further assert that Inmate V.S was placed in maximum custody merely

20  because he asked for protective custody – but at the same time acknowledge he received an

21  override to maximum custody. (Dkt. 4308, ¶ 310.)  Plaintiffs insinuate that there was no

22  reason given for the override. (*Id.*)  However, Plaintiffs fail to acknowledge that Deputy

23  Warden Stickley testified that this inmate presented a complicated housing challenge and

24  there was no other housing location available to him because he has nine or ten inmates that

25  he cannot house with at the same location and these inmates are assigned to ADCRR's

26  medium custody facilities as well as ADCRR's private contract facilities.  (R.T. 11/15/21

27  p.m. at 2068:5-2069:22.)  Finally, Inmate J.J. remains in maximum custody because

28  kidnapped and he held a contract commissary worker hostage. (Dkt. 4308, ¶ 322; Ex. 1194.)

134

While he remains disciplinary free, he still poses a substantial risk of harm to staff and thus his classification is justified.  Plaintiffs complain that Inmate Z.E. spent ten years in enhanced management, but Horn never reviewed this inmate's record and therefore has no basis for challenging his maximum custody classification or housing placement.  (Dkt. 4308, ¶ 323.)

Next, Plaintiffs allege that Defendants needlessly hold inmates whose classification has been reduced in maximum custody units after their classification has changed.  (Dkt. 4308, ¶¶ 312-318.)  Plaintiffs ignore that the Deputy Wardens testified that the inmates were not purposefully being held over in maximum custody, but instead were waiting for beds to open up in lower custody housing units so that they could be transferred.  (R.T. 11/5/21 a.m. and p.m. at 1154:13-1155:3.)

Plaintiffs also assert that ACIS reports for maximum custody inmates show that some inmates spend years or even decades in maximum custody.  (Dkt. 4308, ¶¶ 319-324.)  However, these records only show movement and classification history; they do not show why the inmates are classified as they are and thus Plaintiffs cannot establish that there are no legitimate penological reasons for the classification.  (*Id.*; Ex. 1311, 1220, 1221 1222, 1223.)  Plaintiffs' challenge to the length of detention status fails where Plaintiffs looked only at how long an inmate might have been in detention but have no record evidence as to why.  Thus, they cannot challenge the legitimacy of the detention status placements.  (Dkt. 4308, ¶¶ 337-339.)  Plaintiffs' complaint that inmates do not progress through the DO 812 Step Level program fast enough is also unpersuasive where DO 812 provides no guarantee that step level progression will result in a decrease in custody classification.  (Dkt. 4308, ¶¶ 325-334; Ex. 1318 at Section 5.5 (eligible only); R.T. 11/05/21 a.m./p.m. at 1192:18-23; 1199:19-22).)

Furthermore, Plaintiffs' assertion that inmates are not evaluated by mental health prior to a maximum custody placement or thereafter monitored is wrong.  (Dkt. 4309, ¶¶ 341-345.)  It is undisputed that within 72 hours of placement into a maximum custody setting, all inmates are assessed for their current mental health needs, and their history in

1   maximum custody settings is reviewed.  (Dkt. 4309, ¶ 1505.)  After completion of this

2   assessment, a determination as to whether the inmate can be housed in maximum custody

3   is made.  (*Id.*)  SMI inmates are evaluated within 24 hours of placement in a maximum

4   custody setting.  (*Id.*)  For enhanced and restrictive housing, Dr. Stallcup and Centurion's

5   Mental Health Director, Dr. Pelton, must approve SMI patients before they can be housed

6   in these settings.  (Dkt. 4309, ¶ 1506.)  While in maximum custody housing, MH 3 inmates

7   are offered counseling sessions (group or individual) every 30 days or less and SMIs are

8   offered individual counseling every 30 days. (Dkt. 4309, ¶¶ 1507, 1508.)

9        Finally, Plaintiffs challenge ADCRR's placement of minor inmates who are

10  adjudicated as adults on detention status. (Dkt. 4308, ¶¶ 348-352.)  This Court should not

11  legally entertain claims regarding ADCRR's four minor inmates because Plaintiffs' counsel

12  have no standing to represent the minor inmates, the Court never certified a minor inmate

13  Subclass, and there are no named Plaintiffs who are minors.  Even if the Court considers

14  the challenge, Plaintiffs cannot prove that the three minor male inmates that Haney saw

15  during his 2021 tour were housed on detention status for an extended period of time.

16  Neither expert reviewed the institutional records of the three males on detention status and

17  therefore they cannot opine that their placement on detention status was unjustified, or that

18  they thereafter remained on detention status for a prolonged period of time. This uncertified

19  claim fails.

20       For the foregoing reasons, Plaintiffs' uncertified claim alleging overuse of maximum

21  custody and detention fails.  Defendants do not overuse the same and Plaintiffs cannot prove

22  that Defendants employ policy and practice of misclassification of maximum custody

23  inmates or inappropriate detention assignment.

24       **O.    Subclass Conditions of Confinement Do Not Cause Inmates to Commit Suicide.**

25

26       As explained above regarding provision of constitutional mental health care to

27  ADCRR Subclass inmates, Plaintiffs have no medical evidence to causally correlate

28  ADCRR in-custody suicides to being caused by either alleged inadequate mental health care

or Subclass conditions of confinement.  Plaintiffs' Proposal relies on three suicides for their broad (and incorrect) supposition that more than half of ADCRR in-custody suicides happen in Subclass locations which must (incorrectly) mean that maximum custody, close management, detention, or mental health watch causes the inmate to commit suicide.  (Dkt. 4308, ¶¶ 358-359.)  Plaintiffs' three examples do not prove their purported conclusion.

By Plaintiffs' own description, the first example inmate committed suicide at ASPC Perryville's Reception and Assessment Unit – which is not a Subclass housing location.  (Dkt.  4308, ¶¶ 358.)  While Plaintiffs point to the psychological autopsy recommendation to not house newly admitted inmates in Reception and Assessment for "an extended period of time," Plaintiffs knowingly omitted the very next sentence that specifies the inmate was housed alone only "over a weekend" and the recommendation was due to "unknown adjustment to the prison setting" for  a newly admitted inmate. (Dkt.  4308, ¶ 358, Ex. 202 at ADCM1624359.)   There is no mention that the recommendation was based upon anything related to the certified subclass claims: inadequate psychiatric monitoring because of chronic understaffing; use of chemical agents against inmates on psychotropic medications; lack of recreation; extreme social isolation; constant cell illumination; limited property; and insufficient nutrition. (Dkt. 372 at 23.)  For the second example, Plaintiffs' own expert opines that the inmate was at high risk because he recently renounced his gang affiliation.  (Dkt.  4308, ¶ 358.)  The certified Subclass claim conditions did not cause the inmate to commit suicide.  (Dkt. 372 at 23.)  For the third example, Plaintiffs are critical  as to the frequency with which the detainee was seen by a psychiatric provider, Plaintiffs' expert relied on the alleged brevity of mental health encounters and alleged  medication deficiencies as the primary cause of the suicide – not the certified Subclass claims (and not chronic understaffing).  (Dkt.  4308, ¶ 358.)

Here,  Plaintiffs cannot prove a causal connection between Subclass conditions of confinement and ADCRR's overall suicide rate.  Even if the three examples relied upon by Plaintiffs could be causally correlated to specific certified Subclass conditions of confinement (Defendants deny), three examples do not establish that ADCRR systemwide

Subclass conditions of confinement pose a substantial risk of suicide for all Subclass members. This is especially so where Plaintiff cannot prove systemic deliberate indifference to the mental health needs of the Subclass. Plaintiffs cannot establish that.

Based upon the totality of the evidence presented at trial, all of Plaintiffs' certified Subclass claims fail and Defendants are entitled to judgment in their favor. ADCRR provides constitutional conditions of confinement to ADCRR Subclass inmates.

**VII.   Many of Plaintiffs' Conclusions of Law Cannot Be Adopted.**

Plaintiffs cite more non-binding and/or extra-jurisdictional authority than binding authority from the United States Supreme Court or the Ninth Circuit.  (*See*, *e.g.*, Dkt. 4308, ¶¶ 1043, 1049, 1050, 1058, 1063, 1064, 1065, 1071 & n.169, 1072, 1074, 1080, 1082, 1083, 1089, 1090, 1094, 1095, 1099, 1100, 1104, 1109, 1110, 1111, 1112, 1121, 1129, 1131, 1132, 1133, 1134, 1141.)

Plaintiffs state propositions that are not supported with legal authority.  (*See*, *e.g.*, *id.*, ¶¶ 1067 n.167, 1108, 1109, 1111 n.172, 1114 n.173, 1138, 1140, 1141 n.177, 1142.)

Plaintiffs cite cases that are inapposite.  (*See*, *e.g.*, *id.*, ¶¶ 1039 [citing *Hall v. Florida*, 572 U.S. 701, 709 (2014), which addressed the constitutionality of the death penalty on intellectually disabled individuals], and *Graham v. Florida*, 560 U.S. 48, 52–53 (2010), which addressed constitutionality of natural life sentences for juvenile offenders who commit nonhomicide crime]; *id.*, ¶ 1068 & n.168 [citing *Pierce v. D.C.*, 128 F. Supp. 3d 250, 263 (D.D.C. 2015), which addressed the Rehabilitation Act and Americans with Disabilities Act]; *id.*, ¶ 1079 [discussing orders in *Harper v. Ryan* and *Newman v. Ryan* that are not relevant to, or evidence of, the claims in this lawsuit]; *id.*, ¶¶ 1137, 1139 [citing cases involving unrelated issues and minors].)

Plaintiffs cite cases that involved rulings on motions to dismiss, summary judgment rulings, and other non-final rulings with lower burdens of proof.  (*See*, *e.g.*, *id.*, ¶¶ 1062, 1065, 1067, 1070, 1071, 1074, 1078, 1080, 1081, 1082, 1083, 1092, 1094, 1119, 1121, 1131, 1134, 1141.)  Nowhere in their Conclusions of Law do they cite their burden of proof.

Plaintiffs state broad propositions supported by case-specific outcomes. (*See*, *e.g.*, *id*., ¶¶ 1050, 1053, 1062, 1063, 1064, 1067, 1068, 1070, 1071, 1072, 1074, 1076, 1078, 1080, 1081, 1082, 1083, 1090, 1091, 1111, 1115, 1117, 1119, 1121, 1131, 1133, 1134, 1141.)

Plaintiffs blend or eliminate constitutionally required elements or suggest broad constitutional standards. (*See*, *e.g.*, *id*., ¶ 1043 [attempting to eliminate the deliberate indifference subjective standard]; *compare id*., ¶ 1043 [citing *Leer v. Murphy* for the proposition that deliberate indifference is a broad standard in injunctive cases], *with Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) [noting that "*the causal link* between the deliberate indifference and the eighth amendment deprivation is broader and more generalized than when that same prisoner seeks damages for the harmful effects of such conditions"] [emphasis added]; *id*., ¶ 1072 [broadly asserting that a health care system's failure to have an organized and staffed medication delivery system is a per se constitutional violation]; *id*., ¶ 1074 [broadly asserting it is unconstitutional unless prison officials provide medical devices to inmates with serious medical needs]; *id*., ¶ 1076 [broadly asserting it is unconstitutional unless prisons provide chronic care treatment]; *id*., ¶ 1082 [broadly asserting it is a constitutional violation to fail to timely schedule an outside specialist appointment]; *id*., ¶ 1089 [broadly asserting that the failure to maintain a systematic program to screen for mental illnesses is a constitutional violation]; *see also id*., ¶¶ 1090, 1091, 1094, 1097, 1099.)

Plaintiffs rely on outdated rulings involving ADCRR to suggest that ADCRR is currently committing constitutional violations. (*See*, *e.g.*, *id*., ¶¶ 1076, 1087, 1090, 1091, 1095, 1097, 1114, 1129, 1134.)

Plaintiffs state propositions that are incorrect, incomplete, misleading, or not supported by the cited authority (*Compare id*., ¶¶ 1040, 1113 [citing *Wilson v. Seiter* for the proposition that a combination of factors can rise to the level of a constitutional violation], *with Wilson v. Seiter*, 501 U.S. 294, 305 (1991) ["Nothing so amorphous as "overall conditions" can rise to the level of cruel and unusual punishment when no specific

139

deprivation of a single human need exists."]; *compare id.*, ¶ 1045 [citing *Peralta v. Dillard* for the proposition that lack of resources is not a defense], *with Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014) [holding that "whether an official's conduct 'can be characterized as 'wanton' [also] depends upon the constraints facing him.' … What is reasonable depends on the circumstances, which normally constrain what actions a state official can take."] [citations omitted]; *compare id.*, ¶ 1049 [citing *Edmo v. Corizon* for the proposition that the constitutional standard *is* the standard of care in the medical community], *with Edmo v. Corizon, Inc.*, 935 F.3d 757, 786 (9th Cir. 2019) ["Accepted standards of care and practice within the medical community are *highly relevant* in determining what care is medically acceptable and unacceptable."] [emphasis added]; *compare id.*, ¶ 1062 [citing *Estelle v. Gamble* for the proposition that "[p]rison officials may not subject incarcerated people to unreasonable delays in providing health care"], *with Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) ["[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain," which may include "prison guards … *intentionally* denying or delaying access to medical care"] [citation omitted, emphasis added]; *compare* assertion in *id.*, ¶ 1063, *with* supporting quoted passage in *Hoptowit v. Ray*; *compare id.*, ¶ 1064 [citing *Ramos v. Lamm* for the proposition that "[r]eliance on 'physician substitutes' results in having lower-level personnel make decisions and perform services beyond what they are qualified and trained to perform"], *with Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980) ("Experts from both sides agreed that because of the inadequacy of on-site primary physician coverage, other medical personnel are being used as 'physician substitutes' and are being forced to make decisions and perform services for which they are neither trained nor qualified."); *compare id.*, ¶ 1064 [citing *Toussaint v. McCarthy* for the proposition that "medical technical assistants and registered nurses cannot lawfully render services beyond their qualifications"], *with Toussaint v. McCarthy*, 801 F.2d 1080, 1112 (9th Cir. 1986) (remanding "for entry of explicit factual findings regarding the nature of services performed by MTAs, RNs, and inmates, their level of medical qualification, and the level of

qualification required to adequately render the services that they perform"); *compare id*., ¶ 1092 [citing *Disability Rights Montana v. Batista* for the proposition that "[b]rief, cursory, superficial contacts with mental health staff can violate the Eighth Amendment"], *with Disability Rts. Montana, Inc. v. Batista*, 930 F.3d 1090, 1095, 1098 (9th Cir. 2019) (merely noting that the complaint alleged that prisoners' "primary contact with mental health staff … last no more than a few minutes," but not addressing whether that allegation stated an Eighth Amendment claim); *compare* assertion in *id*., ¶ 1103, *with* supporting quoted passage in *Bell v. Wolfish*; *compare id*., ¶¶ 1103 [citing *Grenning v. Miller-Stout* for the proposition that "accreditation by American Correctional Association (ACA) does not entitle defendants to summary judgment on Eighth Amendment claim regarding conditions of confinement"], with *Grenning v. Miller-Stout*, 739 F.3d 1235, 1241 (9th Cir. 2014) [refusing to consider ACA accreditation only because it was "unable to determine from McCallum's statement the significance of the 'accreditation' by the ACA. We are not informed of the standards of the ACA, nor are we informed about the thoroughness of the testing performed at Airway Heights"]; *compare id*., ¶ 1104 [citing *Gates v. Cook* and *Boulies v. Ricketts* for the proposition that "[o]ther courts have characterized the argument that trade group accreditation immunizes a prison or jail system from constitutional challenge as 'absurd' or 'simply ludicrous'"], *with Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004) [stating only that it is "absurd to suggest that the federal courts should subvert their judgment as to alleged Eighth Amendment violations to the ACA whenever it has relevant standards" and adding that such standards "may be a relevant consideration"], and *Boulies v. Ricketts*, 518 F. Supp. 687, 689 (D. Colo. 1981) [ruling it "is simply ludicrous for defendants to argue that they are entitled to summary judgment" because their claims of accreditation were not validated].)

**VIII.  Plaintiffs' Proposed Remedies Are Premature.**

Plaintiffs submitted a Proposed Permanent Injunction with their Findings of Fact and Conclusions of Law. (Dkt. 4308-1.) That submission is premature. The Court only ordered the parties to submit proposed findings of fact and conclusions of law. (Dkt. 4220.) Indeed,

the trial involved only *liability* on Plaintiffs' claims, not any proposed remedies. *Cf. Graves v. Arpaio*, 623 F.3d 1043, 1046–47 (9th Cir. 2010) (district court "made clear that there would be only one hearing covering both liability and remedies" and required defendant "to propose remedies at the twelve-day hearing").

Practically speaking, proposing remedies (and objecting to them) is impossible since the parties have no indication as to what needs to be remedied, if at all. *See* 18 U.S.C. § 3626(a)(1)(A) (court may only order injunctive relief that "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right"); *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014) (acknowledging that any injunction ultimately ordered by the Court "must closely track the violations established by the evidence at trial" and "that ultimate proof of some violations but not others might easily change the structure of a remedial plan"). Moreover, as the Supreme Court has made clear, "prison officials must be given an opportunity to propose remedies in the first instance." *Graves*, 623 F.3d at 1047 (citing *Lewis v. Casey*, 518 U.S. 343, 362–63 (1996)). Thus, only *if* the Court finds liability is the consideration of remedies ripe and, even then, Defendants must be afforded the first opportunity to propose remedies. *Id.*; *see also Parsons*, 754 F.3d at 689 n.35 (acknowledging "that prison officials must play a role in shaping injunctions").

The Court should deny Plaintiffs' Proposed Permanent Injunction in whole. If there is a finding of liability, the Court should permit Defendants the first opportunity to propose remedies.[52]

## IX.  Plaintiffs' Proposed Remedies Are Too Abstract and Violate the PLRA.

The Prison Litigation Reform Act limits the scope of any injunction that can be ordered in prisoner cases:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the

---

[52] Many of Plaintiffs' proposed remedies are unnecessary, detrimental, or unduly expensive. Before the Court imposes any injunction, Defendants requests an opportunity to explain if any aspect should not be ordered.

> violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). *See Parsons*, 754 F.3d at 689 n.35 (acknowledging that "any such relief must comply with the PLRA's extensive requirements").

Plaintiffs' proposed injunction fails because it is at such a "stratospheric level of abstraction," *Shook v. Bd. of Cty. Commissioners of Cty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008), that it cannot be said to be "narrowly drawn" and far exceeds what could possibly be necessary to correct a specific constitutional violation.  Nearly every proposed remedy is qualified by an ambiguous, subjective, undefined, and/or contentless term.  For example:

- Defendants must "us[e] every <u>practical</u> means to fill the vacancies with permanent staff, including raising salaries to the level <u>necessary</u> to attract sufficient staff."

- "Defendants shall develop within 30 days a <u>robust and effective</u> process for <u>improving</u> the mortality review and psychological autopsy process that includes … a process to <u>ensure</u> that the action items/recommendations are implemented in a <u>timely</u> manner, with accountability and, when appropriate, discipline."

- "Within 30 days Defendants shall develop and then implement a plan to <u>ensure</u> that the quality of health care provided is <u>consistent with</u> professional practice standards."

- "Within 90 days, the parties shall nominate an independent person(s) or entity to conduct a facilities review to determine the amount of clinical space that is <u>necessary</u> to provide adequate health care at all Arizona state prison complexes."

- "Within twelve months, Defendants shall install and implement an electronic medical record system that permits the creation of real-time tracking of all patients, and allows for <u>improved</u> reporting and accountability. Defendants

143

shall <u>ensure</u> that medical records contain the <u>necessary</u> health information and are accurate."

- "Defendants shall <u>ensure</u> that patients receive <u>timely</u> medical appointments for provider visits, specialists, and other services such as x-rays or labs consistent with any orders by a provider or registered nurse."

- "Within 90 days, Defendants shall develop and implement a plan to identify and track on an on-going basis all patients who are not fluent in English and to <u>ensure</u> that each health care encounter for those patients is either conducted by a qualified health care practitioner who is proficient in the patient's primary language or with the assistance of a qualified interpreter (not to include custody staff or other incarcerated people)."

- "Defendants shall provide *timely* access to sick call."

- "Defendants shall <u>ensure</u> that patients receive their medications as prescribed and in a <u>timely</u> manner. Defendants shall develop and implement a plan to ensure there are <u>sufficient</u> health care and custodial staff to distribute such medications during pill lines, at the cell front and any other location where medications are normally distributed."

- "Defendants shall <u>ensure</u> that patients prescribed medication are <u>timely</u> and <u>appropriately</u> monitored for therapeutic levels and side effects."

- "Defendants shall <u>ensure</u> that all laboratory and radiology results are reviewed by a provider in a <u>timely</u> manner."

- "Defendants shall hire a physician who is board certified in internal medicine whose sole responsibility shall be to monitor and <u>improve</u> the care provided to patients with chronic diseases and to <u>ensure</u> proper pain management."

- "Defendants shall <u>ensure</u> that patients are provided access to preventative care screenings and tests as <u>appropriate</u> for the patient's age, medical history, and gender."

- "Defendants shall <u>ensure</u> that providers obtain relevant hospital records and <u>timely</u> review discharge orders from hospitals."

- "Defendants shall ensure that people with disabilities are provided with medically <u>necessary</u> care, supplies, and assistive devices or medical equipment."

- "Defendants shall <u>ensure</u> that patients have <u>reasonable</u> access to their medical information, including diagnosis and treatment options from specialists."

- "Defendants shall provide <u>confidential</u>, out-of-cell mental health therapeutic treatment, not merely monitoring, to persons on mental health watch."

- "Within 240 days all custody staff assigned to work at mental health residential treatment units or mental health inpatient treatment units must have first completed <u>specialized</u> training on interacting with people with severe mental illness and / or cognitive disabilities."

- "Within 240 days Defendants shall develop and require <u>additional</u> training for all custody staff assigned to work in mental health watch units, regarding interacting with people with severe mental illness and/or cognitive disabilities, and de-escalation techniques."

- "Prior to any use of force (including chemical agents) on an incarcerated person who is engaging in self-harm and/or is on mental health watch, custody staff will immediately contact mental health staff to come to the unit, and will use <u>de-escalation techniques</u> prior to using physical or chemical force on the incarcerated person."

- "Defendants shall develop and implement a process to track and monitor, in real time, the length of stay of all people placed on mental health watch. Defendants shall <u>ensure</u> that if a person is maintained on mental health watch for 14 days, that person shall be transferred to a higher level of mental health care, unless a psychiatrist or psychologist, exercising clinical judgment and after an in-person <u>assessment</u> in a <u>confidential</u> setting, determines that such transfer is not clinically indicated. Any person remaining on mental health watch after 14 days and not transferred to a higher level of care shall be <u>assessed</u> in person, in a <u>confidential</u> setting, by a psychiatrist or psychologist, every day until the person is either discharged from mental health watch or transferred to a higher level of care."

- "Defendants shall <u>ensure</u> that patients who are prescribed psychotropic medications are housed in areas where the temperature does not exceed 85 degrees Fahrenheit."

- "Defendants shall provide mental health <u>treatment</u> as clinically indicated to all persons <u>requiring</u> it."

- "Within 30 days, Defendants shall not house in <u>isolation</u> any person diagnosed with a serious mental illness …"

- "Within 30 days, the parties shall retain one or more experts to develop Policies and Procedures to eliminate the use of <u>isolation</u> for more than four hours for persons under the age of 18."

- "Within 30 days, the parties shall retain one or more experts to develop Policies and Procedures to eliminate the use of <u>isolation</u> for persons with <u>mental illness</u>."

- "Within 30 days, the parties shall retain one or more experts to develop Policies and Procedures to eliminate the use of <u>isolation</u> for more than 15 days."

- "Within 30 days, Defendants shall <u>ensure</u> that any person whose mental health <u>deteriorates</u> while in <u>isolation</u> is removed from <u>isolation</u> within 24 hours of the time the issue is brought to the attention of mental health staff."

- "Within 90 days, Defendants shall rescind the policy requiring persons with a life sentence to spend no less than two years in <u>isolation</u>. Defendants shall not enforce any policy requiring a person's placement or retention in <u>isolation</u> based solely upon his or her commitment offense or sentence."

- "Within 90 days, Defendants shall ensure that all persons in <u>isolation</u> are offered at least two hours of out-of-cell time every day."

- "Within 90 days, Defendants shall end the practice of <u>nocturnal illumination</u> in cells in <u>isolation</u> units."

- "Within 120 days, <u>isolation</u> shall be used only when no alternative disposition would be <u>adequate</u> to control the incarcerated person's behavior and only in

146

circumstances where no other available form of housing will <u>accomplish</u> the required levels of safety and stability."

• "Within 180 days, no person with mental illness shall be placed into <u>isolation</u>."

• "Within 180 days, no person under the age of 18 shall be kept in <u>isolation</u> for more than 4 hours."

• "Within 180 days, no person shall be kept in <u>isolation</u> for more than 15 days."

• "Within 120 days, Defendants shall have in place procedures to <u>ensure</u> that <u>effective</u> security checks are completed in every <u>isolation</u> unit twice every hour, no more than 40 minutes apart."

• Within 180 days, Defendants shall have in place <u>procedures</u> to <u>protect</u> persons who are engaging in self-harm without the use of force."

• "Within 180 days, Defendants shall <u>ensure</u> that all persons in <u>isolation</u> have <u>adequate</u> light (including natural light), ventilation, nutrition, and sanitation."

(Dkt. 4308-1, §§ I.a.1, 3. 6, 8, 11–15, 17–21, 24–25, 30–33, 35, 37–38; *id*., §§ II.a.3–7; *id*., §§ 8–17, emphasis added.)  *See Shook*, 543 F.3d at 608 (rejecting proposed injunction that "order[ed] a wide range of behavior conformed to an essentially contentless standard, bounded only by reference to ambiguous terms like "reasonable" behavior or "adequate" treatment").  The proposed injunction will undoubtedly exceed what is necessary.  Failing to precisely define terms will also lead to endless litigation and deprives Defendants of notice as to what must be done to comply.

The breadth of the proposed injunction also effectively removes the deference that the Supreme Court has afforded to ADCRR officials and employees.  *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012); *see also Lewis*, 518 U.S. at 363 ("The District Court totally failed to heed the admonition of *Preiser*. Having found a violation of the right of access to the courts, it conferred upon its special master, a law professor from Flushing, New York, rather than upon ADOC officials, the

1    responsibility for devising a remedial plan. To make matters worse, it severely limited the

2    remedies that the master could choose.").

3          The proposed orders that require a specific number of hires or conduct within a

4    certain number of days, hours, or minutes, or that hamstring ADCRR's ability to safely

5    operate its facilities should not be adopted. (*See*, *e.g.*, §§ I.a.1–2, 12, 14, 16, 29, 34–37, 39;

6    *id.*, §§ II.a.2–10, 12–14.) The court in *Rasho v. Jeffreys*, 22 F.4th 703 (7th Cir. 2022),

7    rejected a similarly crafted injunction. In *Rasho*, the district court ruled that the Illinois

8    Department of Corrections failed to provide constitutionally adequate mental health care

9    and entered a permanent injunction that required IDOC "to hire and maintain a specific

10   minimum number of staff in multiple areas of care and imposing other specific requirements

11   for the delivery of mental-health services—all on a court-imposed, mandatory timetable."

12   *Id.* at 706. The Seventh Circuit rejected it:

13                This degree of specificity contravenes the PLRA's least-
             intrusive means requirement. Could IDOC have provided
14           constitutionally adequate care with 85 Psychiatric Providers
             instead of 85.5? What about using 103 Behavioral Health
15           Technicians but only 22 Staff Assistants? Could IDOC continue
             to authorize unlimited overtime and expanded telepsychiatry—
16           practices that had a proven effect of reducing treatment
             backlogs? There is no evidence in the record establishing that
17           these specific numbers correspond to the constitutional floor,
             yet the PLRA demands that injunctive relief "extend no further"
18           than necessary to remedy the constitutional violation. By
             exceeding that limitation, the judge's order impermissibly strips
19           IDOC officials of the flexibility necessary to adopt and
             implement policies that balance prison resources, safety
20           concerns, and inmate health.

21                The judge's error goes beyond staffing too. The injunction
             requires, for example, that class members in segregation for 16
22           days or more be examined by mental-health staff at least every
             7 days. That may be a valuable way of preventing the
23           deterioration of a segregated inmate's mental health, but the
             Eighth Amendment does not require the most effective solution.
24           As in *Westefer*, the judge "mistakenly conflated what is
             constitutionally adequate with what is constitutionally
25           required" and in doing so overstepped the bounds of the
             PLRA."
26
     *Id.* at 712–13 (internal citations omitted). The court also noted that the injunction "imposed
27
     specific benchmarks lifted from the settlement and IDOC's 2014 Remedial Staffing Plan
28

1    without evidence that those plans matched the constitutional floor." *Id*. at 713.  The same
2    is true here.  Many of Plaintiffs' proposed remedies are not grounded in any evidence or
3    constitutional minimum; rather, they reflect a wish list that exceeds what the Constitution
4    requires.

5    **X.     It Is Premature to Consider Appointing a Receiver. [53]**

6            Plaintiffs request the Court to appoint a receiver "to mange the health care operations
7    of ADCRR." (Dkt. 4308-1 at 12.)  Plaintiffs further request that the Court bestow upon the
8    receiver "all the powers of the Director of ADCRR that relate to health care, including the
9    power to hire, terminate, and contract for personnel and to submit budget requests to the
10   Legislature."[54]  This request is also premature.

11           A receiver is only appropriate to remedy an established constitutional violation.  *See*
12   *Brown v. Plata*, 563 U.S. 493, 511 (2011) ("Courts faced with the sensitive task of
13   remedying unconstitutional prison conditions must consider a range of available options,
14   including appointment of special masters or receivers and the possibility of consent
15   decrees."); *Plata v. Schwarzenegger*, 603 F.3d 1088, 1093–94 (9th Cir. 2010)
16   ("[R]eceiverships are recognized equitable tools available to the courts to remedy otherwise
17   uncorrectable violations of the Constitution or laws.").  Even then, a receiver is not
18   automatic.  "Receivership is a remedy of last resort." *Bracco v. Lackner*, 462 F. Supp. 436,
19   456 (N.D. Cal. 1978); *see also Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL
20   2932253, at *1 (N.D. Cal. Oct. 3, 2005) (acknowledging that appointing a receiver is a
21   "drastic" action); *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997) (considering a
22   receiver where it was "the only remedy left").

23

24           [53] Plaintiffs do not provide any authority authorizing the appointment of a Rule 706
25   expert to develop a plan for monitoring any injunction and reporting on progress to the
     court.  A Rule 706 expert is also premature and unnecessary, particularly since Plaintiffs
26   also request regular access to facilities, documents, class members, and health records.
     Plaintiffs also do not provide any authority authorizing regular access to ADCRR and
27   Centurion employees.
            [54] Plaintiffs do not provide any authority explaining the scope of a receiver's
28   authority.

The cases cited by Plaintiffs confirm that a receiver is appointed only after years of ongoing constitutional violations after a court-ordered injunction or consent decree. *See United States v. Hinds Cty.*, No. 3:16-CV-489-CWR-RHWR, 2021 WL 5501442 (S.D. Miss. Nov. 23, 2021) (court ordered defendant to show cause why a receiver should not be appointed five years after entry of consent decree in light of ongoing constitutional violations); *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) (receiver ordered more than three years after court-ordered injunction following continuing constitutional violations); *Inmates of D.C. Jail v. Jackson*, 158 F.3d 1357, 1358–59 (D.C. Cir. 1998) (court ordered a receiver 20 years after court order finding constitutional violations because of a pattern of continuing violations); *Shaw v. Allen*, 771 F. Supp. 760, 761 (S.D.W. Va. 1990) (receiver appointed seven years after court-ordered injunction); *Newman v. State of Ala.*, 466 F. Supp. 628, 629 (M.D. Ala. 1979) (receiver appointed six years after court-ordered injunction). Here, there has been no finding of a constitutional violation and therefore Defendants have not had an opportunity to comply with any injunction intended to remedy a constitutional violation.[55]

The extraordinary nature of a receiver also demands significant procedural protections, for example, an order to show cause why a receiver should not be appointed and an evidentiary hearing. *Plata*, 2005 WL 2932253, at **1–2. And then the Court must consider a variety of factors to determine whether a receiver is necessary, including:

> (1) whether there is a grave and immediate threat or actuality of harm to Plaintiffs;
>
> (2) whether the use of less extreme measures of remediation have been exhausted or prove futile;
>
> (3) whether continued insistence that compliance with the Court's orders would lead only to confrontation and delay;

---

[55] This Court has already acknowledged that a receiver "makes no sense in this case" and would be "extraordinarily expensive." (Dkt. 3093 at 4.)

(4) whether there is a lack of leadership to turn the tide within a reasonable period of time;

(5) whether there is bad faith;

(6) whether resources are being wasted; and

(7) whether a receiver is likely to provide a relatively quick and efficient remedy.

*Id.* at *23.  Plaintiffs have not even attempted to make this showing.   The Court should not appoint a receiver simultaneous with any finding of a constitutional violation.

**XI.    The Court Cannot Simply Rescind a State Law.**

Plaintiff requests this Court to order that "ADCRR shall not be restricted to paying the Medicaid (Arizona Health Care Cost Containment System – AHCCCS) reimbursement rate for specialists."  (Dkt. 4308-1, § I.a.5.)  Again, it is not that simple.

Although "otherwise valid state laws or court orders cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme," *Stone v. City & Cty. of San* Francisco, 968 F.2d 850, 862 (9th Cir. 1992), any proposed injunction must be "*required* to remedy the violation, *Valdivia v. Schwarzenegger*, 599 F.3d 984, 995 (9th Cir. 2010) (emphasis added); *see also id.* ("[U]nless a state law is found to violate a federal law, or unless the Injunction is found *necessary* to remedy a constitutional violation, federalism principles require the reconciliation of the state law and federal injunctions.") (emphasis added).  In determining "whether an injunctive requirement [is] necessary to remedy a constitutional violation," courts consider "(1) whether there was a history of noncompliance; (2) whether a less intrusive alternative was available; (3) whether the court made specific findings of the inadequacy of alternatives; (4) whether the court made an express determination that the procedure was necessary to remedy constitutional violations; and (5) whether the state law violated constitutional rights." *Ortega Melendres v. Penzone*, No. CV-07-2513-PHX-GMS, 2021 WL 4458241, at *2 (D. Ariz. Sept. 29, 2021).  That "the injunction was 'put in place to remedy claimed constitutional violations' is not enough to establish necessity." *Id.* (quoting *Valdivia*, 599 F.3d at 995).

1    Plaintiffs do not even attempt to make a showing of necessity and indeed the
2    evidence does not support one.  The Court should not override any state law.

3    **XII.   Conclusion.**

4    For these reasons, the Court should reject Plaintiffs' Proposed Findings of Fact and
5    Conclusions of Law and Proposed Permanent Injunction, adopt Defendants' Proposed
6    Findings of Fact and Conclusions of Law (Dkt. 4309), and enter final judgment in favor of
7    Defendants.

8    DATED this 25th day of February, 2022.

9                                    STRUCK LOVE BOJANOWSKI & ACEDO, PLC

10

11                                   By /s/ Daniel P. Struck
12                                      Daniel P. Struck
                                        Rachel Love
13                                      Timothy J. Bojanowski
                                        Nicholas D. Acedo
14                                      3100 West Ray Road, Suite 300
                                        Chandler, Arizona 85226
15
                                        *Attorneys for Defendants*
16

17

18

19

20

21

22

23

24

25

26

27

28

1 | **CERTIFICATE OF SERVICE**

2 | 　　I hereby certify that on February 25, 2022, I electronically transmitted the attached
3 | document to the Clerk's Office using the CM/ECF System for filing and transmittal of a
Notice of Electronic Filing to the following CM/ECF registrants:

4 | Alisha Tarin-Herman      atarinherman@perkinscoie.com

5 | Alison Hardy            ahardy@prisonlaw.com

6 | Asim Dietrich:          adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org;
phxadmin@azdisabilitylaw.org
7 |
8 | Austin C. Yost:         ayost@perkinscoie.com; docketPHX@perkinscoie.com

9 | Corene T. Kendrick:     ckendrick@aclu.org

10 | Daniel Clayton Barr:    DBarr@perkinscoie.com; docketphx@perkinscoie.com;
sneilson@perkinscoie.com

11 | David Cyrus Fathi:      dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

12 | Donald Specter:         dspecter@prisonlaw.com

13 | Eunice Cho              ECho@aclu.org

14 | Jared G. Keenan         jkeenan@acluaz.org

15 | John Howard Gray:       jhgray@perkinscoie.com; slawson@perkinscoie.com

16 | Karl J. Worsham:        kworsham@perkinscoie.com; docketphx@perkinscoie.com

17 | Kathryn E. Boughton:    kboughton@perkinscoie.com; docketphx@perkinscoie.com

18 | Kelly Soldati          ksoldati@perkinscoie.com; docketphx@perkinscoie.com

19 | Maria V. Morris        mmorris@aclu.org

20 | Maya Abela             mabela@azdisabilitylaw.org

21 | Rita K. Lomio:         rlomio@prisonlaw.com

22 | Rose Daly-Rooney:      rdalyrooney@azdisabilitylaw.org

23 | Sara Norman:           snorman@prisonlaw.com

24 | Sophie Jedeikin Hart   sophieh@prisonlaw.com

25 | Victoria Lopez:        vlopez@acluaz.org

26 |

27 |

28 |

1          I hereby certify that on this same date, I served the attached document by U.S. Mail,
2    postage prepaid, on the following, who is not a registered participant of the CM/ECF
     System:

3          N/A

4                                                      /s/ Daniel P. Struck