UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Shawn Jensen, et al., on behalf    )
of themselves and all others       )
similarly situated; and Arizona    )
Center for Disability Law,         )
                                   )
            Plaintiffs,            )    CV-12-0601-PHX-ROS
                                   )
       vs.                         )    Phoenix, Arizona
                                   )    November 3, 2021
David Shinn, Director, Arizona     )        1:18 p.m.
Department of Corrections; and     )
Richard Pratt, Interim Division    )
Director, Division of Health       )
Services, Arizona Department of    )
Corrections, in their official     )
capacities,                        )
                                   )
            Defendants.            )
                                   )
_____  )


BEFORE:  THE HONORABLE ROSLYN O. SILVER, JUDGE


REPORTER'S REDACTED TRANSCRIPT OF PROCEEDINGS

BENCH TRIAL - DAY 3 - P.M. SESSION

(Pages 572 through 712, inclusive.)



Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                           A P P E A R A N C E S

2      For the Plaintiffs:

3
                   ACLU - Washington, DC
4                  By: DAVID CYRUS FATHI, ESQ.
                       CORENE T. KENDRICK, ESQ.
5                      MARIA V. MORRIS, ESQ.
                   915 15th Street NW, 7th Floor
6                  Washington, DC  20005

7                  Prison Law Office
                   By: DONALD SPECTER, ESQ.
8                  1917 5th Street
                   Berkeley, CA  94710
9
                   Arizona Center for Disability Law - Tucson, AZ
10                 By: MAYA STOCK ABELA, ESQ.
                   177 North Church Avenue, Suite 800
11                 Tucson, AZ  85701

12

13     For the Defendants:

14                 Struck Love Bojanowski & Acedo
                   By: DANIEL PATRICK STRUCK, ESQ.
15                     RACHEL LOVE, ESQ.
                       TIMOTHY JAMES BOJANOWSKI, ESQ.
16                     ASHLEE B. HESMAN, ESQ.
                       TIMOTHY MICHAEL RAY, ESQ.
17                 3100 West Ray Road, Suite 300
                   Chandler, AZ  85226

18

19

20

21

22

23

24

25

                        UNITED STATES DISTRICT COURT

1

### INDEX OF WITNESSES

2

| WITNESSES FOR THE PLAINTIFFS: | Direct | Cross | Redirect |
|---|---|---|---|

3

| | | | |
|---|---|---|---|
| STEWART, Pablo | | 583 | 670 |
| SCOTT, Travis | 678 | | |

4

5

### INDEX OF EXHIBITS

6

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|

7

| 1066 | Use of Force Video ADCRR00159700 | 678 |
|---|---|---|
| 1216 | ASPC-Eyman Browning, Daily Post Sheets, June 19-25, 2021, July 24-30, 2021 ADCRR00097445-97498 | 678 |
| 1217 | ASPC-Eyman SMU I, Daily Post Sheets, June 19-25, 2021, July 24-30, 2021 ADCRR00097688-97714 and ADCRR00097767-97814 | 678 |
| 1218 | ASPC-Florence Kasson, Daily Post Sheets, June 19-25, 2021, July 24-30, 2021 ADCRR00098187-98269 and ADCRR00098377-98490 | 678 |
| 1219 | ASPC-Lewis Rast Max, Daily Post Sheets, June 19-25, 2021, July 24-30, 2021 ADCRR00098767-98820 | 678 |
| 1220 | EIP and Traffic Hx Eyman-Browning ADCM1644974-1647197 (Strada Dep. Ex. 14) | 683 |
| 1221 | EIP and Traffic Hx Eyman-SMU ADCM1647198-1648812 (Strada Dep. Ex. 13) | 683 |
| 1222 | EIP and Traffic Hx Florence ADCM1648813-1649642 (Strada Dep. Ex. 16) | 683 |
| 1223 | EIP and Traffic Hx Lewis ADCM1649643-1651458 (Strada Dep. Ex. 15) | 683 |
| 1296 | ASPC-Eyman Browning, Information Reports regarding Cancellations, 2020 ADCRR00052183-53601 | 678 |
| 1297 | ASPC-Eyman SMU I, Information Reports regarding Cancellations, 2020 ADCRR00053602-54254 | 678 |
| 1298 | ASPC-Florence Kasson, Information Reports regarding Cancellations, 2020 ADCRR00054278-54354 | 678 |
| 1299 | ASPC-Lewis Rast Max, Information Reports regarding Cancellations, 2020 ADCRR00158783-158847 | 678 |
| 1300 | ASPC-Eyman Browning, Information Reports regarding Cancellations, 2021 ADCRR00054355-55350 | 678 |

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| 1301 | ASPC-Eyman SMU I, Information Reports regarding Cancellations, 2021 ADCRR00055351-55736 | 678 |
| 1302 | ASPC-Florence Kasson, Information Reports regarding Cancellations, 2021 ADCRR00055737-55816 | 678 |
| 1303 | ASPC-Lewis Rast Max, Information Reports regarding Cancellations, 2021 ADCRR00158848-158900 | 678 |
| 1305 | October 4, 2021 ADCRR, Medical Services Technical manual | 678 |
| 1306 | Department Order 105 - Information Reporting | 678 |
| 1307 | Department Order 704 - Inmate Regulations | 678 |
| 1308 | Department Order 720 - Inmate Tablet Program | 678 |
| 1309 | Department Order 801 - Inmate Classification | 678 |
| 1310 | Department Order 801-Tm-OPS Objective Classification: Custody & Internal Risk Technical Manual | 678 |
| 1311 | Department Order 803 - Inmate Disciplinary Procedure | 678 |
| 1312 | Department Order 804 - Inmate Behavior Control | 678 |
| 1313 | Department Order 805 -Protective Custody | 678 |
| 1314 | Department Order 806 - Security Threat Groups | 678 |
| 1315 | Department Order 807 - Inmate Suicide Prevention, Mental Health Watches, and Progressive Mental Health Restraints | 678 |
| 1316 | Department Order 809 - Earned Incentive Program | 678 |
| 1317 | Department Order 811 - Individual Assessments and Reviews | 678 |
| 1318 | Department Order 812 - Inmate Maximum Custody Management and incentive System | 678 |
| 1319 | Department Order 813 - Close Management | 678 |
| 1320 | Department Order 904 - Inmate Recreation and Arts and Crafts | 678 |
| 1321 | Department Order 906 - Inmate Recreation Arts and Crafts | 678 |
| 1322 | Department Order 923 - Sex Offender Education & Treatment Program October 17, 2018 (amended) | 678 |
| 1323 | Department Order 1101 - Inmate Access to Health Care | 678 |
| 1681 | Max Custody Notebook, ASPC-Eyman Browning, June 2021 ADCRR00211255-211556 | 678 |
| 1682 | Max Custody Notebook, ASPC-Eyman SMU I, June 2021 ADCRR00211557-211956 | 678 |
| 1683 | Max Custody Notebook, ASPC-Florence Kasson, June 2021 ADCRR00211957-212376 | 678 |

| | EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|---|
| 2 | 1684 | Max Custody Notebook, ASPC-Lewis Rast, June 2021 ADCRR00212377-212738 | 678 |
| 3 | 1685 | Max Custody Notebook, ASPC-Eyman Browning, July 2021 ADCRR00212739-213040 | 678 |
| 4 | 1686 | Max Custody Notebook, ASPC-Eyman SMU I, July 2021 ADCRR00213041-213340 | 678 |
| 5 | 1687 | Max Custody Notebook, ASPC-Florence Kasson, July 2021 ADCRR00213341-213973 | 678 |
| 6 | 1688 | Max Custody Notebook, ASPC-Lewis Rast, July 2021 ADCRR00213974-214371 | 678 |
| 7 | 1734 | Eyman Rynning Post Order No. 35 ADCRR00220636-220644 | 678 |
| 8 | 1735 | Eyman Browning Post Order No. 12 ADCRR00220657-220660 (Strada Dep. Ex. 36) | 678 |
| 9 | 1736 | Eyman Browning Post Order No. 35 ADCRR00220672-220686 (Strada Dep. Ex. 35) | 678 |
| 10 | 1737 | Eyman SMU I Post Order No. 6 ADCRR00220687-220690 | 678 |
| 11 | 1738 | Eyman SMU I Post Order No. 12 ADCRR00220698-220700 | 678 |
| 12 | 1739 | Eyman SMU I Post Order No. 34 ADCRR00220703-220704 | 678 |
| 13 | 1740 | Eyman SMU I Post Order No. 35 ADCRR00220705-220727 (Strada Dep. Ex. 34) | 678 |
| 14 | 1741 | General Post Order No. 34 ADCRR00220828-220840 | 678 |
| 15 | 1742 | General Post Order No. 35 ADCRR00220841-220852 | 678 |
| 16 | 1743 | General Post Order No. 36 ADCRR00220853-220871 | 678 |
| 17 | 1744 | General Post Order No. 5 ADCRR00220872-220878 | 678 |
| 18 | 2131 | 2021.07.30 Daily Post Sheet (Scott Ex. 1) (ADCRR00097496-ADCRR00097498) | 678 |
| 19 20 | 2135 | Arizona Department of Corrections Rehabilitation and Reentry Information Report (Scott Ex. 7) (ADCRR00055285-ADCRR00055292) | 693 |
| 21 | 2265 | ADCM1568916-1569178 January 2019 Max Custody Notebook - Eyman Browning | 678 |
| 22 | 2266 | ADCM1569179-1569465 January 2019 Max Custody Notebook - Eyman SMU I | 678 |
| 23 | 2267 | ADCM1569466-1569707 January 2019 Max Custody Notebook - Lewis | 678 |
| 24 | 2268 | ADCM1569730-1570069 January 2019 Max Custody Notebook - Florence | 678 |
| 25 | | | |

| | EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|---|
| 1 | | | |
| 2 | 2269 | ADCM1573974-1574236 February 2019 Max Custody Notebook - Eyman Browning | 678 |
| 3 | 2270 | ADCM1574237-1574496 February 2019 Max Custody Notebook - Eyman SMU I | 678 |
| 4 | 2271 | ADCM1574497-1574724 February 2019 Max Custody Notebook - Lewis | 678 |
| 5 | 2272 | ADCM1574740-1575228 February 2019 Max Custody Notebook - Florence | 678 |
| 6 | 2273 | ADCM1575975-1576223 March 2019 Max Custody Notebook - Eyman Browning | 678 |
| 7 | 2274 | ADCM1576224-1576478 March 2019 Max Custody Notebook - Eyman SMU | 678 |
| 8 | 2275 | ADCM1576479-1576826 March 2019 Max Custody Notebook - Florence | 678 |
| 9 | 2276 | ADCM1576827-1577072 March 2019 Max Custody Notebook - Lewis | 678 |
| 10 | 2277 | ADCM1578402-1578646 April 2019 Max Custody Notebook - Eyman-Browning | 678 |
| 11 | 2278 | ADCM1578647-1578811 April 2019 Max Custody Notebook - Eyman-SMU | 678 |
| 12 | 2279 | ADCM1578812-1579158 April 2019 Max Custody Notebook - Florence | 678 |
| 13 | 2280 | ADCM1579159-1579412 April 2019 Max Custody Notebook - Lewis | 678 |
| 14 | 2281 | ADCM1582332-1582564 May 2019 Max Custody Notebook - Eyman Browning | 678 |
| 15 | 2282 | ADCM1582565-1582760 May 2019 Max Custody Notebook - Eyman SMU | 678 |
| 16 | 2283 | ADCM1582761-1583225 May 2019 Max Custody Notebook - Florence | 678 |
| 17 | 2284 | ADCM1583226-1583454 May 2019 Max Custody Notebook - Lewis | 678 |
| 18 | 2285 | ADCM1585901-1586140 June 2019 Max Custody Notebook - Eyman Browning | 678 |
| 19 | 2286 | ADCM1586141-1586344 June 2019 Max Custody Notebook - Eyman SMU | 678 |
| 20 | 2287 | ADCM1586345-1586848 June 2019 Max Custody Notebook - Florence | 678 |
| 21 | 2288 | ADCM1586849-1587112 June 2019 Max Custody Notebook - Lewis | 678 |
| 22 | 2289 | ADCM1592061-1592364 July 2019 Max Custody Notebook - Eyman Browning | 678 |
| 23 | 2290 | ADCM1592365-1592548 July 2019 Max Custody Notebook - Eyman SMU | 678 |
| 24 | 2291 | ADCM1592549-1593074 July 2019 Max Custody Notebook - Florence | 678 |
| 25 | 2292 | ADCM1593075-1593377 July 2019 Max Custody Notebook - Lewis | 678 |

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| 2293 | ADCM1600213-1600490 August 2019 Max Custody Notebook - Eyman Browning | 678 |
| 2294 | ADCM1600491-1600721 August 2019 Max Custody Notebook - Eyman SMU | 678 |
| 2295 | ADCM1600722-1601312 August 2019 Max Custody Notebook - Florence | 678 |
| 2296 | ADCM1608012-1608292 August 2019 Max Custody Notebook - Lewis | 678 |
| 2297 | ADCM1611159-1611545 September 2019 Max Custody Notebook - Eyman Browning | 678 |
| 2298 | ADCM1611546-1611764 September 2019 Max Custody Notebook - Eyman SMU | 678 |
| 2299 | ADCM1611765-1612152 September 2019 Max Custody Notebook - Florence | 678 |
| 2300 | ADCM1612153-1612417 September 2019 Max Custody Notebook - Lewis | 678 |
| 2301 | ADCM1612443-1612772 October 2019 Max Custody Notebook - Eyman Browning | 678 |
| 2302 | ADCM1612773-1613057 October 2019 Max Custody Notebook - Eyman SMU | 678 |
| 2303 | ADCM1613058-1613432 October 2019 Max Custody Notebook - Florence | 678 |
| 2304 | ADCM1613433-1613704 October 2019 Max Custody Notebook - Lewis | 678 |
| 2305 | ADCM1616184-1616508 November 2019 Max Custody Notebook - Eyman Browning | 678 |
| 2306 | ADCM1616509-1616767 November 2019 Max Custody Notebook - Eyman SMU | 678 |
| 2307 | ADCM1616768-1617250 November 2019 Max Custody Notebook - Florence | 678 |
| 2308 | ADCM1617354-1617729 November 2019 Max Custody Notebook - Lewis | 678 |
| 2309 | ADCM1619366-1619830 December 2019 Max Custody Notebook - Eyman Browning | 678 |
| 2310 | ADCM1619831-1620058 December 2019 Max Custody Notebook - Eyman SMU | 678 |
| 2311 | ADCM1620059-1620528 December 2019 Max Custody Notebook - Florence | 678 |
| 2312 | ADCM1638271-1638624 December 2019 Max Custody Notebook - Lewis | 678 |
| 2313 | ADCM1652735-1653143 January 2020 Max Custody Notebook - Eyman Browning | 678 |
| 2314 | ADCM1636983-1637223 January 2020 Max Custody Notebook - Eyman SMU | 678 |
| 2315 | ADCM1637761-1638125 January 2020 Max Custody Notebook - Lewis | 678 |
| 2316 | ADCM1637224-1637760 January 2020 Max Custody Notebook - Florence | 678 |

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| 2317 | ADCM1653146-1653527 February 2020 Max Custody Notebook - Eyman Browning | 678 |
| 2318 | ADCM1653528-1653766 February 2020 Max Custody Notebook - Eyman SMU I | 678 |
| 2319 | ADCM1654088-1654419, ADCM1659919-1659996 February 2020 Max Custody Notebook - Lewis | 678 |
| 2320 | ADCM1653767-1654087, ADCM1659937-1659918 February 2020 Max Custody Notebook - Florence | 678 |
| 2321 | ADCM1654420-1654828 March 2020 Max Custody Notebook - Eyman Browning | 678 |
| 2322 | ADCM1654829-1655085 March 2020 Max Custody Notebook - Eyman SMU I | 678 |
| 2323 | ADCM1655086-1655528 March 2020 Max Custody Notebook - Florence | 678 |
| 2324 | ADCM1655529-1655837, ADCM1660106-1660152 March 2020 Max Custody Notebook - Lewis | 678 |
| 2325 | ADCM1660168-1660577 April 2020 Max Custody Notebook - Eyman Browning | 678 |
| 2326 | ADCM1660578-1660840 April 2020 Max Custody Notebook - Eyman SMU | 678 |
| 2327 | ADCM1660841-1661462 April 2020 Max Custody Notebook - Florence | 678 |
| 2328 | ADCM1661463-1661782 April 2020 Max Custody Notebook - Lewis | 678 |
| 2329 | ADCM1661815-1662292 May 2020 Max Custody Notebook - Eyman Browning | 678 |
| 2330 | ADCM1662293-1662566 May 2020 Max Custody Notebook - Eyman SMU | 678 |
| 2331 | ADCM1662567-1663190 May 2020 Max Custody Notebook - Florence | 678 |
| 2332 | ADCM1663191-1663509 May 2020 Max Custody Notebook - Lewis | 678 |
| 2333 | ADCM1663538-1663905 June 2020 Max Custody Notebook - Eyman Browning | 678 |
| 2334 | ADCM1663906-1664278 June 2020 Max Custody Notebook - Eyman SMU | 678 |
| 2335 | ADCM1664279-1664774 June 2020 Max Custody Notebook - Florence | 678 |
| 2336 | ADCM1664775-1665111, ADCRRM0021648-21797 June 2020 Max Custody Notebook - Lewis | 678 |
| 2337 | ADCM1665113-1665437 July 2020 Max Custody Notebook - Eyman Browning | 678 |
| 2338 | ADCM1665438-1665791 July 2020 Max Custody Notebook - Eyman SMU | 678 |
| 2339 | ADCM1665792-1666265 July 2020 Max Custody Notebook - Florence | 678 |

| | EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|---|
| 1 | | | |
| 2 | 2340 | ADCM1666266-1666682 July 2020 Max Custody Notebook - Lewis | 678 |
| 3 | 2341 | ADCM1666700-1667000, ADCRRM0021809-0021837 August 2020 Max Custody Notebook - | |
| 4 | | Eyman Browning | 678 |
| 5 | 2342 | ADCM1667001-1667346 August 2020 Max Custody Notebook - Eyman SMU | 678 |
| 6 | 2343 | ADCM1667347-1667800 August 2020 Max Custody Notebook - Florence | 678 |
| 7 | 2344 | ADCM1667801-1668141, ADCRRM0021840-0021976 August 2020 Max Custody Notebook - Lewis | 678 |
| 8 | 2345 | ADCRRM0003365-0003666 September 2020 Max Custody Notebook - Eyman Browning | 678 |
| 9 | 2346 | ADCRRM0022093-0022483 September 2020 Max Custody Notebook - Eyman SMU | 678 |
| 10 | 2347 | ADCRRM0003667-0004227 September 2020 Max Custody Notebook - Florence | 678 |
| 11 | 2348 | ADCRRM0004228-0004576, ADCRRM0021989-0022076 September 2020 Max Custody Notebook - Lewis | 678 |
| 12 | 2349 | ADCRRM0028193-0028476 October 2020 Max Custody Notebook - Eyman Browning | 678 |
| 13 | 2350 | ADCRRM0028477-0028863 October 2020 Max Custody Notebook - Eyman SMU | 678 |
| 14 | 2351 | ADCRRM0028866-0029231 October 2020 Max Custody Notebook - Florence | 678 |
| 15 | 2352 | ADCRRM0029233-0029657 October 2020 Max Custody Notebook - Lewis | 678 |
| 16 | 2353 | ADCRRM0007914-8205 November 2020 Max Custody Notebook - Eyman Browning | 678 |
| 17 | 2354 | ADCRRM0008206-8524 November 2020 Max Custody Notebook - Eyman SMU | 678 |
| 18 | 2355 | ADCRRM0008525-8974 November 2020 Max Custody Notebook - Florence | 678 |
| 19 | 2356 | ADCRRM0008975-9322 November 2020 Max Custody Notebook - Lewis | 678 |
| 20 | 2357 | ADCRRM0029712-0030005 December 2020 Max Custody Notebook - Eyman Browning | 678 |
| 21 | 2358 | ADCRRM0030006-0030341 December 2020 Max Custody Notebook - Eyman SMU | 678 |
| 22 | 2359 | ADCRRM0030343-0030811 December 2020 Max Custody Notebook - Florence | 678 |
| 23 | 2360 | ADCRRM0030814-0031164 December 2020 Max Custody Notebook - Lewis | 678 |
| 24 | 2361 | ADCRRM0031202-0031519 January 2021 Max Custody Notebook - Eyman Browning (Strada Dep. Ex. 19) | 678 |
| 25 | 2362 | ADCRRM0031523-0031861 January 2021 Max Custody Notebook - Eyman SMU I (Strada Dep. Ex. 20) | 678 |

| | EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|---|
| 2363 | | ADCRRM0032177-0032538 January 2021 Max Custody Notebook - Lewis | 678 |
| 2364 | | ADCRRM0031863-0032176 January 2021 Max Custody Notebook - Florence (Strada Dep. Ex. 21) | 678 |
| 2365 | | ADCRRM0032573-0032867 February 2021 Max Custody Notebook - Eyman Browning | 678 |
| 2366 | | ADCRRM0032868-0033278 February 2021 Max Custody Notebook - Eyman SMU I | 678 |
| 2367 | | ADCRRM0033705-0034027 February 2021 Max Custody Notebook - Lewis | 678 |
| 2368 | | ADCRRM0033286-0033700 February 2021 Max Custody Notebook - Florence | 678 |
| 2369 | | ADCRR00066087-00066368 March 2021 Max Custody Notebook - Eyman Browning | 678 |
| 2370 | | ADCRR00066369-00066747 March 2021 Max Custody Notebook - Eyman SMU I | 678 |
| 2371 | | ADCRR00066756-00067116 March 2021 Max Custody Notebook - Florence | 678 |
| 2372 | | ADCRR00067120-00067453 March 2021 Max Custody Notebook - Lewis | 678 |
| 2373 | | ADCRR00067455-00067761 April 2021 Max Custody Notebook - Eyman Browning | 678 |
| 3006 | | RESTRICTED DO 804 - Inmate Behavior Control | 678 |
| 3013 | | DO 812 - Inmate Maximum Custody Management and Incentive System | 678 |
| 3028 | | Max Custody Monitor Guide | 678 |
| 3333 | | BJS Report:  Suicide in Local Jails and State and Federal Prisons, 2000-2019 - Statistical Tables (October 2021) | 620 |
| 3602 | | Max Custody Notebook, ASPC-Eyman-Browning, August 2021 | 678 |
| 3604 | | Max Custody Notebook, ASPC-Eyman-SMU I, August 2021 | 678 |
| 3606 | | Max Custody Notebook, ASPC-Florence-Central Unit, Kasson, August 2021 | 678 |
| 3608 | | Max Custody Notebook, ASPC-Florence-Rast Max, August 2021 | 678 |
| 4002 | | Collection of Use of Force Reports written at ASPC-Florence Central Unit, CB-Kasson involving I/M Muhammad, # 215306 | 678 |
| 4022 | | Video accompanying 08/17/20 use of force 2020-12053, ASPC-Eyman-SMU I involving Inmate Muhammad, R. 215306 | 678 |
| 4024 | | Videos accompanying 08/19/20 use of force 2020-12210, ASPC-Eyman-SMU I involving Inmate Muhammad, R. 215306 | 678 |

UNITED STATES DISTRICT COURT

582

* Redacted Pursuant to Order of March 28, 2022

| | EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|---|
| 1 | | | |
| 2 | 4026 | Video accompanying 11/09/21 use of force #20-15868 and 20-15770 on Inmate Muhammad, R. 215306 | 678 |
| 3 | 4030 | Videos accompanying 12/22/20 use of force 20-17726 on Inmate Muhammad, R. 215306, ASPC-Eyman-Browning | 678 |
| 5 | 4032 | Video accompanying 12/11/20 use of force #20-17257, Muhammad, R. 215306 | 678 |
| 6 | 4048 | Video accompanying 08/19/20 use of force #2020-12210 | 678 |
| 7 | 4054 | Video accompanying use of force #2020-17211, Muhammad, R. 215306 | 678 |
| 8 | 4901 | Exemplar Photographs taken at ASPC-Eyman, Browning Unit | 678 |
| 9 | 5033(a) | M****** A****** record dated | 643 |
| | 5033(b) | M****** A****** record dated | 643 |
| 10 | 5033(c) | M****** A****** Refusal to Submit to Treatment | 643 |
| 11 | 5315(a) | Health services encounter dated 8/31/21 for M****** L**** (SEALED) | 641 |
| 12 | 5480(b) | Health services encounter dated 10/21/21 for J****** R****** (SEALED) | 669 |
| 13 | 5480(c) | Health services encounter dated 10/22/21 for J****** R****** (SEALED) | 669 |
| | 5629 | Impeachment Exhibit | 631 |
| 14 | 5630 | Impeachment Exhibit | 632 |

UNITED STATES DISTRICT COURT

1          THE COURT:  Let's proceed.

2          MS. HESMAN:  Thank you, Your Honor.

3       (Dr. Pablo Stewart appeared via video teleconference.)

4       PABLO STEWART, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

5                   CONTINUED CROSS-EXAMINATION

6    BY MS. HESMAN:

7    Q.  Doctor, on direct you were shown some charts that were

8    included in your declaration with respect to staffing.  Do you

9    recall that?

10   A.  Yes.

11   Q.  And what you were implying on direct exam is that for the

12   boxes where there were vacancies, that there were no staff to

13   fill those positions; is that correct?

14   A.  I interpret that as there were vacant positions, yes.

15   Q.  Did you take into account how much overtime was used to

16   fill those vacancies?

17   A.  I did not.

18   Q.  Did you ask?

19   A.  No.

20   Q.  Did you take into account the use of locum tenens?

21   A.  In my experience, locum tenens would be listed as a staff

22   member.

23   Q.  Not my question.  My question was whether or not you took

24   into account whether or not locum tenens are utilized.  Did

25   you?

1    A.   No.

2    Q.   Did you ask?

3    A.   No.

4    Q.   So then your testimony on direct with respect to staffing

5    vacancies wouldn't account for positions that were filled by

6    way of overtime or use of locum tenens; is that correct?

7    A.   If that were the case that they were filled by overtime and

8    locum tenens, I did not take that into consideration, correct.

9    Q.   Would that have been important to take into consideration?

10   A.   I'll answer your question this way.  It is important to

11   maybe think about how much overtime is being done, because that

12   absolutely leads to staff burnout and turnout -- and turnover,

13   which at the end of the day negatively affects the ability to

14   provide care.  And the locum tenens, if we're calling in,

15   bringing in part-time people for short periods of time, that

16   may feel like a Band-Aid on a serious wound.  It may cover it

17   for a little bit, but it doesn't really do anything in the long

18   run.

19   Q.   Okay.  But you wouldn't know whether any of that's true

20   because that's not something you took into consideration here,

21   right?

22   A.   Correct.

23   Q.   Do you still have your declaration in front of you, Doctor?

24   A.   Yes.

25   Q.   I'd like to direct your attention to Paragraph 44.  Let me

STEWART - CROSS

1    know when you're there.

2    A.  I'm there.

3    Q.  The second sentence in Paragraph 44 you state "It is

4    entirely foreseeable that the most severely mentally ill

5    prisoners will require an inpatient level of care, and such

6    care must be readily available."  Do you see that?

7    A.  Yes.

8    Q.  What's that based on?

9    A.  Based on my experience.

10   Q.  What is your opinion that it is entirely foreseeable?  What

11   is that based on?

12   A.  Based on my experience as a clinical psychiatrist and a

13   correctional psychiatrist consultant.

14   Q.  That the most severely mentally ill prisoners, it is

15   entirely foreseeable that they will require an inpatient level

16   of care?  That's your opinion?

17   A.  Yes.

18   Q.  And can you give me any other specifics other than based on

19   your experience what you base that opinion on?

20   A.  Not in addition to what I've already said, no.

21   Q.  And I'd like to direct your attention to Paragraph 55.  And

22   Paragraph 55 you are discussing an alleged disconnect.  And you

23   state "The reason for this disconnect in this practice of

24   keeping inpatient population at ASPC Phoenix so low is not

25   explicitly stated, but it is my opinion that it is rooted in

1    the limited number of mental health staff contracted to work

2    and who actually work at Phoenix."  Do you see that?

3    A.  Yes.

4    Q.  What's that based on?

5    A.  Based on my observation of the low census and the data

6    provided about the census at this hospital and the fact that in

7    my touring, I encountered numerous individuals that in my

8    opinion required inpatient level of care.  So there must be a

9    reason why these people that are requiring the care are not

10   getting the care that they need.  And based on looking at the

11   overall case, I felt that it had largely to do with staffing.

12   Q.  So you said there must be a reason.  And I believe you

13   testified on direct you were shown a chart where there was the

14   percentages of beds filled at the Phoenix inpatient unit,

15   correct?

16   A.  Yes.

17   Q.  And so you've concluded that the reason all beds aren't

18   filled is because there's not enough staff, right?

19   A.  I think that's giving the department the benefit of the

20   doubt on that, that the reason --

21   Q.  Doctor, that's not my question.  My question is whether or

22   not your opinion that all beds at the Phoenix inpatient unit

23   are not filled, if that is because there are not enough staff.

24   Is that your opinion?

25   A.  Yes, that is my opinion.

1    Q.  What's that based on?

2    A.  Based on what I just said.  There are people that need --

3    There are certainly more than one.  There were several people

4    that I encountered on my touring that absolutely required

5    inpatient care.

6    Q.  And so you --

7    A.  The fact -- Excuse me.  I'm still talking.

8    Q.  I'm sorry.

9    A.  And the fact that they were not in the inpatient hospital,

10   and then I went to the inpatient hospital, and staff were few

11   and far between there.  The psychiatrists see people every

12   month or every six weeks.  So my opinion was that it was due to

13   staff.

14   Q.  So your opinion, in your opinion, you believe that

15   additional inmates require a higher level of care.  And because

16   they are not there, that has to be because there are not enough

17   staff?  Did I hear that correctly?

18   A.  Well, yes, because the alternate opinion would be that the

19   Department doesn't care about these people that are out there

20   who need inpatient care.  So I'm giving you guys the benefit of

21   the doubt that it's just due to staff.

22   Q.  But you can't point me to, other than that being your

23   assumption, to anything else you relied on to draw that

24   conclusion?

25            MS. KENDRICK:  Asked and answered.

1              THE COURT:  Sustained.

2   Q.  (BY MS. HESMAN)  Doctor, let me direct your attention to

3   Paragraph 37 of your declaration.  And while you're getting

4   there, this paragraph talks a little bit about mental health

5   programming, right?

6   A.  Yes.  I'm there.

7   Q.  Okay.  And you have a block quote there.  Do you see that?

8   A.  Yes.

9   Q.  And in this paragraph you talk about the lack of group

10  therapy and programming.  Is that fair?

11  A.  Correct.

12  Q.  And the last sentence of your block quote says, "This is an

13  extraordinary experience that I do not recall having in any

14  other prison system."  Do you see that?

15  A.  Yes.

16  Q.  Is it your testimony that there is not -- there is not

17  group therapy and programming within the Department of

18  Corrections?

19             MS. KENDRICK:  Misstates the evidence.  This is

20  quoting from his November 2013 report.

21             THE COURT:  But she's asking the question.  Overruled.

22  He can answer the question yes or no.

23             THE WITNESS:  Can you ask the question again please.

24  Q.  (BY MS. HESMAN)  Sure.  So this is your declaration that

25  you submitted at the end of October, correct?

1    A.  Yes.

2    Q.  And in it you included a block quote from your 2013 report.

3    You chose to include that, right?

4    A.  Correct.

5    Q.  And this block quote discusses group programming, group

6    therapy and programming, correct?

7    A.  Correct.

8    Q.  And the last sentence of the block quote, when you're

9    describing the lack thereof, says, "This is an extraordinary

10   experience that I do not recall having in any other prison

11   system."  Do you see that?

12   A.  Correct.

13   Q.  So my question is whether or not it is your opinion that

14   there is not group therapy in programming within the

15   Department?

16        MS. KENDRICK:  Objection, vague.  She's not referring

17   to what period of time.  This is from November 2013, so if

18   she's referring to a different time span --

19        THE COURT:  Sustained.

20   Q.  (BY MS. HESMAN)  Dr. Stewart, why did you include that

21   block quote from your 2013 report here for this case?

22   A.  In being involved in the length of time that I have been,

23   which has been over nine years with the Arizona Department of

24   Corrections, my opinion back in 2013 was that there was little

25   to no treatment, group therapy, going on at that time.  Based

1   on my current evaluation, there's little to no group therapy

2   occurring now.

3   Q.  So your opinion hasn't changed?

4   A.  My opinion is just confirmed by my recent site tours, yes.

5   Q.  Okay.  And so that's why I'm asking whether or not do you

6   still consider it an extraordinary experience?

7   A.  That other prison systems have the same lack of programming

8   for their mentally ill prisoners that Arizona Department of

9   Corrections has?  Is that the question?

10  Q.  You use the term extraordinary experience.  So I want to

11  know whether or not you still feel it's an extraordinary

12  experience and what that means.

13  A.  Well, based on in 2013, I felt it was extraordinary

14  experience because, based on my involvement with correctional

15  mental health, that most correctional systems had some degree

16  of programming and out-of-cell group therapies, et cetera.

17          That continues to be my opinion.  In my work with the

18  Rasho lawsuit where I'm the neutral federal monitor, the

19  requirement there is that they do ten hours of out-of-cell

20  structured time a week for people in isolated conditions.

21          And I did not see anything close to that occurring in

22  the Arizona Department of Corrections in my most recent tours.

23  Q.  What did you see occurring with respect to group therapy

24  and programming?

25  A.  On the four days I was there, weekdays, I didn't see any

1     group therapy going on.

2     Q.  And -- I'm sorry.  Go ahead.

3     A.  And so it could have been just luck of the draw I was at

4     the wrong place at the wrong time.  But then in speaking with

5     the mentally ill inmates and reviewing their records, I saw

6     very little evidence of group therapy going on.

7     Q.  Okay.  And, Doctor, in your experience, have you had the

8     occasion to refer inmates to a higher level of care?  And what

9     I mean by that is have you had the occasion to refer inmates

10    to, like, a hospital setting such as the Phoenix unit, Phoenix

11    complex?

12    A.  Yes, yes.

13    Q.  And what type of factors need to be considered when you

14    decide whether to transfer an inmate to an inpatient unit?

15    A.  The basic premise is that the patient's current symptoms

16    and behaviors exceed the ability of their current setting to

17    adequately and safely treat.  Then that will require a higher

18    level of care.

19    Q.  What are the factors though?  Aren't there factors that you

20    need to consider?

21    A.  Well, that is the factors, the factor that they're not

22    safely held at a lower level of care.  And so the idea is that

23    if you go to a higher level of care, that the ability to

24    provide more intense treatment would be provide them for what

25    they need as opposed to where they are now.

1    Q.  In your experience, how many inmates have you actually

2    transferred to a higher level of care?

3    A.  When I was working in the San Francisco system, we were

4    referring at least one jail inmate a day to the hospital.

5    Q.  To an inpatient type setting like -- like the Phoenix --

6    A.  Yeah.  Well, to an inpatient setting.  As I testified

7    previously, I don't believe that the Phoenix setting is really

8    a truly inpatient setting.

9    Q.  Sure.  So since the '80s, you have not had occasion to do

10   that, correct?

11   A.  No.  And then I have that, in my current work here in

12   Hawaii, that we have patients that exceed the level of -- their

13   needs exceed the level of care that can be safely provided in

14   the jail.  Then we need to go to the hospital.

15   Q.  I want to talk a little bit about your opinion with respect

16   to the minimum duration of healthcare encounters.  Do you

17   recall that testimony on direct?

18   A.  Yeah.

19   Q.  And I believe your testimony is that at a minimum, for

20   inmates on some kind of watch status, the encounter needs to be

21   at least ten minutes; is that correct?

22   A.  Yes.

23   Q.  And that for all other type of mental health encounters,

24   the encounter needs to be at least 30 minutes; is that correct?

25   A.  Correct.

1   Q.  And I believe you detail that on -- in Paragraph 61 and 62

2   of your declaration.  Do you see that?

3   A.  Yes.

4   Q.  What's that based on?

5   A.  It's based on my reviewing encounters in the Arizona

6   Department of Corrections that lasted one minute, two minutes,

7   three minutes, five minutes, and they were completely

8   inadequate, in my opinion, interactions with patients where

9   they could be safely assessed, a plan could be prepared, and

10  their safety concerns met.

11          So my opinion is that it very likely should be longer

12  than ten minutes, but I would say ten minutes is a minimum time

13  spending with a watch patient in order to do a proper

14  assessment.

15  Q.  But my question is what is that based on?  Can you cite to

16  me some kind of national standard, literature, peer-reviewed

17  medical journal, something that helped you form that opinion?

18  A.  No.  This issue has not been looked at from a scholarly

19  standpoint, so it's based on my experience as working in

20  correctional settings.  And it has been -- sort of reconfirmed

21  my opinions in my work as a neutral federal monitor in the

22  Rasho case in Illinois where the requirement is 15 to 20

23  minutes.  And even in that one I have concerns that that may

24  not be completely adequate.  But I agree with the parties, and

25  the Court has blessed that.

1    Q.  So a couple of things.  I asked for a national standard,

2    peer-reviewed medical journal, something of that nature that

3    would support your opinion.  And I believe, based on your

4    answer, there are none.  Is that correct?

5    A.  That's correct.

6    Q.  And I believe, based on your answer, that the only support

7    for that opinion is your own opinion, right?

8            MS. KENDRICK:  You're misstating the testimony and

9    argumentative.  Objection.

10           THE COURT:  Sustained.

11   Q.  (BY MS. HESMAN)  Dr. Stewart, take a look at footnote 23 on

12   Page 28.  And this is the page where you opine that there needs

13   to be 10- and 30-minute minimum durations.  Do you see that?

14   A.  Yes.

15           THE COURT:  Let me catch up with you.  23 of --

16           MS. HESMAN:  Page 28.  It's footnote 23.

17   Q.  (BY MS. HESMAN)  And, Dr. Stewart, you cite a document at

18   the end of this footnote.  Do you see that?

19   A.  Yes.

20   Q.  And I assume, since you're citing it, that that document is

21   supposed to support the statement in footnote 23, correct?

22   A.  Yes.

23   Q.  Isn't that docket your own declaration?

24   A.  Yes.

25   Q.  So then isn't it true that you're basing your opinion on

1    yourself?

2    A.  Yes.

3    Q.  Okay.

4    A.  Exactly.

5    Q.  And you talked about -- and you reference it here in the

6    footnote -- the Illinois Department of Corrections and how they

7    require minimum durations, correct?

8    A.  Correct.

9    Q.  Can you name any other system in the country that has the

10   same requirement?

11   A.  I cannot.

12   Q.  And isn't it true that Illinois has that requirement

13   because you and the same plaintiffs' lawyers in this case came

14   up with that requirement?

15           MS. KENDRICK:  Objection.  Misstates evidence.

16   Untrue.

17           THE COURT:  You can ask -- Misstating the evidence.

18   There's no evidence.  She can ask that question, and I'm not

19   sure that it's relevant, but we'll see.  You can ask the

20   question.  And so I'm overruling the objection.  Go ahead.  Ask

21   the question.

22   Q.  (BY MS. HESMAN)  Do you need me to repeat it?

23   A.  Please.

24           THE COURT:  I do.

25   Q.  (BY MS. HESMAN)  Sure, Your Honor.

1              So my question is I first asked whether or not you

2      could point me to any other system that does this.  Your answer

3      was no.

4              I then asked whether or not the reason the Illinois

5      system does this is because it's a rule that you came up with

6      the same plaintiffs' counsel that's in this case.  Is that

7      true?

8              MS. KENDRICK:  Objection.

9              THE COURT:  She's asking if that's true.  Is that

10     true?  Overruled.

11             THE WITNESS:  It is not true.

12             THE COURT:  All right.

13             THE WITNESS:  It's not true at all.

14             THE COURT:  All right.  You've got an answer.

15     Q.  (BY MS. HESMAN)  Is plaintiffs' counsel in this case the

16     same lawyers that are in that case?

17     A.  No.

18     Q.  Is there any ACA or NCCHC standard that supports the

19     minimum durations, Doctor?

20     A.  I'm not aware of any.

21     Q.  And let's, if you would please, turn to Paragraph 66 of

22     your declaration.  And while you're getting there, I believe --

23     A.  I'm there.

24     Q.  I'm sorry.  Just let me know when you're there.

25     A.  I'm there.

1    Q.   Okay.   I believe on direct exam you testified as to a

2    variety of reasons why it is inappropriate to allow an inmate

3    to refuse an encounter when the minimum duration has not been

4    complete.   Would you agree with that?

5              MS. KENDRICK:   Objection.   Misstates his testimony.

6              THE COURT:   Well, he can say yes or no.   Is that what

7    you said?

8              THE WITNESS:   I don't believe so, Your Honor.

9              THE COURT:   All right.

10   Q.   (BY MS. HESMAN)   What is your opinion with respect to

11   inmates who want to terminate an encounter earlier than the

12   minimum durations you've outlined in your declaration?

13   A.   My opinion is if they wish to terminate, that doesn't

14   remove the responsibility for that clinician to do a proper

15   assessment, and they need to use other methods of assessing the

16   patient besides just in conversation with the patient.

17   Q.   And I believe you talk about that a little bit in Paragraph

18   66.   You say a patient may ask to --

19             THE COURT:   Which paragraph as opposed to page?

20   Paragraph 66?

21             MS. HESMAN:   Yes, Your Honor, Paragraph 66.   It's on

22   Page 31.

23             THE COURT:   Thank you.

24   Q.   (BY MS. HESMAN)   You state "A patient may ask to terminate

25   an encounter precisely because she is in distress."   Do you see

STEWART - CROSS

1   that?

2   A.  Yes.

3   Q.  What's that based on?

4   A.  Based on my observation and experience dealing with

5   patients.

6   Q.  "This does not mean that the patient does not require

7   further attention from mental health staff.  In many cases it

8   means exactly the opposite."  Do you see that?

9   A.  Yes.

10  Q.  And then referring your attention to Paragraph 67, you

11  state "It is not acceptable for a mental health clinician to

12  reflexively acquiesce in a patient's request to terminate the

13  encounter."  Do you see that?

14  A.  Yes.

15  Q.  "The clinician should make repeated efforts to engage with

16  the patient and encourage him or her to talk."  Do you see

17  that?

18  A.  Yes.

19  Q.  How many efforts, in your opinion, are they required to

20  make?

21  A.  That's going to vary on each case.  And it's up to the

22  clinician's expertise in engaging the patient.  And so maybe it

23  could be done -- Maybe you come back a second time, and that

24  would be sufficient.  Maybe you need several times.  Or maybe

25  you need to walk away for a second and then come back a few

1    minutes later.  There's any number of ways this should be done.

2    Q.  So your opinion with respect to inmates who do not want to

3    be seen or want to be refused is that it's subjective, and you

4    need to take into consideration that particular patient's

5    needs.  Is that how I understand your testimony?

6    A.  Yes.  We're always taking into consideration what the

7    patient's needs are, and they're often opposite to what the

8    patient is actually acting like.

9    Q.  How then can you have an opinion that there should be a

10   prescription that applies to all patients that they must be

11   seen for 10 minutes, and they must be seen for 30 minutes if it

12   requires a subjective assessment of the individual patient?

13   A.  Because, in my experience with Arizona Department of

14   Corrections, the mental health staff are not professional

15   enough, they're not trained enough, and they're not savvy

16   enough in the provision of mental healthcare to be left to

17   their own devices to determine how long they should see the

18   patient.  So these are requirements put on people to make sure

19   they do the minimum.

20   Q.  Okay.  But you're saying that they are -- they can make the

21   determination as to how much they press the inmate and how many

22   attempts they need to make?  That they're qualified to do?

23   A.  Not necessarily.

24   Q.  Why?

25   A.  Well, that's what I viewed from reviewing charts.  They end

1    the engagement after one minute or three minutes.

2    Q.  So if an inmate says, "Hey, doc, I'm doing good today.  I

3    don't need to be seen," are you saying the provider then needs

4    to stand at the cell for 30 minutes?

5    A.  What I'm saying is that the provider needs to understand

6    the basis of what that -- what that really means and to further

7    question.  And they don't necessarily just take people on their

8    face value when they're mentally ill.  Many suicidal patients,

9    for example, will deny being suicidal, but that doesn't mean

10   they're not suicidal.  It's up to the clinician to delve

11   further into it.

12   Q.  Sure.  And that brings up a good point.  So in my example,

13   I'm a clinician.  I go to the cell.  "What can I do for you

14   today?"

15           The inmate says, "Doc, I'm good.  I'm really good."

16           Is it your opinion then I have to stand there for 30

17   minutes because that's what the minimum duration requires?

18   A.  If the clinician were professional and competent enough,

19   then you wouldn't need to have that 30-minute time minimum on

20   that.  That's the --

21   Q.  You said would not?  I just want to make sure.  I

22   apologize.  You said would not need to have that minimum

23   duration?

24   A.  Right, if would have enough mental health competence and

25   experience to know how long would be a viable interaction.

STEWART - CROSS

1              But since that's not my experience with the clinicians

2      in the Arizona Department of Corrections, I can see why the

3      Court would want to have these minimums.

4      Q.  So is it your opinion that in other systems, clinicians are

5      capable of making the subjective determination as to whether

6      they feel their patient at that time requires more or less

7      interaction?

8      A.  I've seen that in some systems.  Not all of them.

9      Q.  So is it your opinion that these minimum prescriptions

10     should only apply to systems where you don't trust the mental

11     health staff?  Is that your testimony?

12     A.  Yes, exactly.

13     Q.  And that's why you think it should be done here?

14     A.  Clearly.

15     Q.  So in my example that I gave, wouldn't you agree that by me

16     standing outside of the cell for an additional 30 minutes, that

17     that could cause the inmate to get agitated?

18     A.  I mean, if you're not a very good clinician, it might.

19     Q.  Well, I'm a clinician, and I'm standing outside of the

20     cell, and I'm just going to stand there because I've got to

21     wait 30 minutes.  I'm just going to stare at the patient and

22     stand for 30 minutes.  Would you agree that that could

23     aggravate the patient?

24     A.  If that's what a licensed mental health professional would

25     do, then, yes, you're right, it would aggravate the patient.

STEWART - CROSS

1    It would aggravate me seeing a client -- I mean, a provider

2    standing there with their hands behind their back not saying

3    anything.   That's not what I meant, and that's taking it to an

4    absurd example.

5    Q.   But, Doctor, that's what you're saying.   You're saying

6    there has to be minimum durations, and they have to be 30

7    minutes.

8           MS. KENDRICK:   Objection.   Argumentative.

9           THE COURT:   Sustained.

10   Q.   (BY MS. HESMAN)   Doctor, I want to talk now about the

11   LanguageLine issue.   Do you recall testifying to that on

12   direct?

13   A.   Yes.

14   Q.   And correct me if I'm wrong, but I believe you testified

15   that you did not review the records of the Spanish-speaking

16   inmates who you spoke to at the facilities; is that correct?

17   A.   When I was at Tucson-Rincon Unit and spoke with

18   Spanish-speaking patients, I did not review their records.

19   There was a Spanish-speaking patient at the Phoenix complex

20   that I did reviews their records.

21   Q.   Who is that?

22          MS. KENDRICK:   Objection.   We'd rather not say the

23   patient's name in open court.

24          THE COURT:   Sustained.

25          MS. KENDRICK:   I think he's referenced him with enough

 1    specificity.

 2             THE COURT:  Do you have something for him to look at

 3    so that we don't have to have the name in court?

 4             MS. HESMAN:  I don't, Your Honor, but I will say that

 5    I will have some very specific patient questions because he's,

 6    for other patients, because he's highlighted about 34 of them

 7    in his report.  And I don't know if there's a way that I can do

 8    that without referencing their name and publishing -- I

 9    certainly won't publish it to the gallery.

10             THE COURT:  You don't have to publish it to the

11    gallery.  But the name -- But the name should not be stated.

12             MS. HESMAN:  Understood.

13             THE COURT:  You have to find a way to identify what

14    particular person you're talking about without setting forth

15    the name.

16             MS. HESMAN:  I understand, Your Honor.

17    Q.  (BY MS. HESMAN)  So other than the one patient at Phoenix

18    whose records you did not review, isn't it true that for all of

19    the Spanish-speaking inmates referenced in your report, you

20    only interviewed them, and you did not review their records?

21             MS. KENDRICK:  Objection.  She just misstated what he

22    testified.  He testified he reviewed the record of the patient

23    at Phoenix and did not review the records of the patients at

24    Tucson.

25             MS. HESMAN:  I think that's what I just said.

1          MS. KENDRICK:  It was not.

2          THE COURT:  Well, let's -- That's what I thought.  I

3  thought that what Ms. Kendall said, it was his testimony.  If

4  you think that's what you said, then ask him.

5  Q.  (BY MS. HESMAN)  Sure.  So, Doctor, my question is -- and

6  correct me if I'm wrong -- but you said you reviewed the files,

7  the medical records of an inmate at Phoenix, correct?

8  A.  Correct.

9  Q.  But for all other Spanish-speaking inmates, you did not

10  review their files, their records, correct?

11  A.  Correct.

12  Q.  And you've reached an opinion in this case that there are

13  not sufficient translation services at the Department?  Is that

14  accurate?

15  A.  Yes.

16  Q.  And so that's based on conversations, the conversations

17  that we just talked about, and your one file review for an

18  inmate at Phoenix, correct?

19  A.  Correct.

20  Q.  And based on that, you've determined that the Department

21  does not make interpretive services available?

22  A.  My most recent touring we just described in 2021

23  reconfirmed my previous opinions about lack of adequate

24  translation services during my 2013 and my 2019 visits.

25  Q.  And that's just based on the two items we just discussed,

1    correct?

2    A.   Correct.

3    Q.   Did you ask to review policies with respect to LanguageLine

4    or other interpretive services?

5    A.   I did review policies, yes.

6    Q.   And based on your review, what is it about the Department's

7    policies that you believe are insufficient?

8    A.   I didn't say the policies were insufficient.  I was saying

9    the actual practice is insufficient.

10   Q.   And how so?

11   A.   In that in my -- Let's start off with the patient that I

12   saw at Phoenix.  He was the gentleman who was referred to us

13   actually by other mentally ill inmates saying you should really

14   talk to this guy because we see him walking around his cell

15   naked, screaming, smearing feces, staring at the wall.

16        And so when I went to engage him in conversation, he

17   was lying on his bunk mute.  The custody officers actually

18   opened the door so I could have better communication with him.

19   And then I started speaking Spanish to him when he immediately

20   perked up and looked at me and acknowledged my presence.

21        And in reviewing his record -- Well, excuse me.

22   Before I get to the record --

23   Q.   Let me just stop you, Doctor.  I'm going to move to strike.

24   It's non-responsive.

25        MS. KENDRICK:  Objection, Your Honor.  She keeps

1    interrupting him in the midst of giving answers that she

2    doesn't like.

3            THE COURT:  I'm going to sustain.  Let him answer the

4    question.  Assuming that he understands the question, give him

5    a chance to answer.

6            So, Doctor, you may proceed.

7            THE WITNESS:  Thank you, Your Honor.

8            Based on my interaction with the patient, it was clear

9    to me that he was Spanish speaking, but yet he was also

10   severely psychotic and almost catatonic.  And I saw nothing in

11   the record that showed that there was any interpretive services

12   requested, there was any Spanish-speaking mental health staff

13   that had any interactions with this patient.

14   Q.  (BY MS. HESMAN)  Okay.  And so my question is other than

15   your review of that inmate's individual records and your

16   discussions with other Spanish speakers and your review of the

17   policy, those items are what led you to believe that the

18   LanguageLine services are insufficient, correct?

19   A.  It led me to believe that the translation services are

20   insufficient.

21   Q.  Sure.  And when I say LanguageLine, we're talking about the

22   same thing, LanguageLine or translation services are

23   insufficient.  That's what led you to believe that, right?

24   A.  Yeah, yes.

25   Q.  And in Paragraph 96 of your declaration, you state that

1    "Defendants' failure to adhere to standard healthcare practice

2    to ensure effective communication in healthcare encounters does

3    not meet the community standard of care."  Do you see that?

4    A.  Yes.

5    Q.  How so?

6    A.  I think I testified on direct that, I mean, how can you

7    have any sort of mental health interaction with someone when

8    there's no actual communication between the provider and the

9    patient?  And if that's due to speaking different languages,

10   then that puts the patient at risk.

11   Q.  But my question is how does the Department not satisfy what

12   you deem to be the community standard of care?

13   A.  Well, first of all, it's not just me that deems that the

14   community standard of care.  I would challenge anybody to bring

15   in an expert to say that it's okay to have mental health

16   interactions with patients when you speak different languages.

17          Second of all, based on my overall experience starting

18   in 2013 up till 2021, it remains my opinion that there's not

19   adequate translational services available to the mentally ill

20   inmates or monolingual --

21       (Reporter interrupts for clarification.)

22   Q.  Can you just repeat the end of your question.

23   A.  That the lack of adequate translation services place

24   monolingual Spanish-speaking patients at a substantial risk for

25   harm.

1    Q.  And, Doctor, now I want to talk about medication

2    administration, if you could please turn to Paragraph 128.  And

3    just let me know when you're there.

4    A.  I'm there.

5    Q.  The second sentence states that "Patients who are not

6    prescribed appropriate medications responsive to their needs or

7    who do not receive their medications as prescribed will not

8    improve and will almost always deteriorate."  Do you see that?

9    A.  Yes.

10   Q.  What's that based on?

11   A.  That's based on my experience treating thousands of

12   patients over my career.

13   Q.  How can you say "almost always"?

14   A.  If a patient is significantly symptomatic that they require

15   the treatment with a psychotropic medication, then the

16   condition will only get worse over time.

17   Q.  And that's an opinion that you apply just generally,

18   correct?

19   A.  Well, it's my experience that I apply generally.

20   Q.  Let's talk about suicides.  Let me direct you to Paragraph

21   13 of your declaration.

22         And, Doctor, I believe you stated that you looked at

23   suicides to determine whether the suicide was preventable,

24   right?

25   A.  That was one of the things that I looked at, yes.

1    Q.  And I believe you testified on direct regarding a suicide

2    that you believed was preventable, correct?

3    A.  Yes.

4    Q.  Do you believe, Doctor, that if a person is determined to

5    kill themselves, then many times they'll be able to do that?

6    A.  If a person is determined to kill themselves and that

7    determination is based on untreated mental illness, then the

8    first thing we do is treat the mental illness.  If a person is

9    non-mentally ill and determined to kill themselves, then, yes,

10   I answer your question affirmatively that people will kill

11   themselves.

12   Q.  And that's despite efforts taken by mental health

13   clinicians.  If a person is determined to kill themselves, then

14   many times they'll be able to do that.  You agree with that

15   statement, correct?

16   A.  No.  That's why I clarified in my earlier answer that as

17   long as their mental illness, which is contributing to this

18   determination to kill themselves, is not adequately addressed,

19   then the intervention is to treat the mental illness or the

20   medical illness or the combination of both, so I could say that

21   they're in a place where they're determined to kill themselves.

22   Q.  Let's go ahead and mark impeachment 74, PS074.

23        THE CLERK:  This is 5631.

24   Q.  (BY MS. HESMAN)  Dr. Stewart, I believe on direct exam you

25   testified regarding work you've done in Nebraska, correct?

1    A.  Yes.

2    Q.  And do you recall giving a deposition in the Nebraska case

3    you're involved in?

4    A.  Yes.

5    Q.  And is that case Sabata versus Nebraska Department of

6    Correctional Services?

7    A.  Yes.

8    Q.  Do you see the transcript page on your screen there?

9    A.  I do not.

10   Q.  I'm sorry.  You said you do not?

11   A.  I do not.

12   Q.  Okay.  Let's see if we can publish it to him.  Let us know

13   if it pops up.

14   A.  There.  Something popped up, yes.  Okay.

15   Q.  Are you seeing a cover page for a deposition in the Sabata

16   versus Nebraska case?

17   A.  Yes.

18   Q.  And at the bottom it says deposition of Pablo Stewart, MD.

19   Do you see that?

20   A.  Yes, I do.

21   Q.  And let's turn to Page 2.  And, Doctor, on Page 2 in this

22   deposition you were asked:  "I just have a general question and

23   not just as it relates to what you were doing with the youth

24   but just your opinion in general.  If someone wants to kill

25   themselves, is there always going to be something that you can

1    do as a psychiatrist or someone in the behavioral health field

2    to prevent it?"

3            And you answered:  "The way you described the

4    question, I would say that if a person is determined to kill

5    themselves, then many times they'll be able to do that."

6            Do you see that?

7    A.  Yes, I do.

8    Q.  Do you still agree with that?

9    A.  Yeah.  And that's consistent with the answer I gave you

10   previously.

11   Q.  And, Doctor, you would agree that the Bureau of Justice

12   Statistics is a reliable statistical source on suicide rates,

13   correct?

14   A.  Correct.

15   Q.  And suicide data, correct?

16   A.  Yes.

17   Q.  Particularly as such data relate to inmates incarcerated in

18   state and federal jails and prisons, correct?

19   A.  I don't know if in particular, but I often rely on the

20   Bureau of Justice Statistics for information.

21   Q.  Correct.  And you've relied on the Bureau of Justice

22   Statistics with respect to suicides in the Headrick case.  Do

23   you recall that?

24   A.  I do not.

25   Q.  And in the Hernandez case?  Do you recall that?

1    A.  I believe so.

2    Q.  And in the Sabata case, the Nebraska case I just referred

3    you to, you relied on BJS suicide rates.  Do you recall that?

4    A.  Yes.

5    Q.  Why aren't those rates referenced in your report or your

6    declaration in this case?

7    A.  Because I looked at the individual cases to see if in fact

8    the lack of adequate psychiatric care and medical care

9    contributed to the person's suicide.  I wasn't looking at the

10   overall rate.  I was looking at individual cases.

11   Q.  But, Doctor, you're offering opinions that the high suicide

12   rates in the Department are -- that they're high, correct?

13   A.  Did I use the word rate?  If I did, please point that out.

14           MS. KENDRICK:  Can you point us to a page and

15   paragraph in his --

16   Q.  (BY MS. HESMAN)  Let me rephrase my question.  You have

17   criticized the number of suicides within the Department of

18   Corrections, correct?

19           MS. KENDRICK:  Objection.  Foundation.

20           THE COURT:  You can ask him yes or no did he say that.

21   Q.  (BY MS. HESMAN)  Yes, that's my question.

22   A.  That what?  Can you say it again please?

23   Q.  Sure.  In your report, you attached a chart, and you

24   criticized the number of suicides in the Department of

25   Corrections in this case.  Isn't that right?

```
 1              MS. KENDRICK:  Objection.  We need a page number where
 2     there is a chart criticizing the number.
 3              THE COURT:  It's in his report where?
 4              MS. HESMAN:  It is, Your Honor.  Let me get a page.
 5              Your Honor, I don't have it handy.  I don't want to
 6     waste time, but I will grab it on a break.
 7     Q.  (BY MS. HESMAN)  My question, though, Doctor, is why
 8     weren't those statistics cited in your report here in your
 9     analysis of the provision of mental healthcare within the
10     Arizona Department of Corrections?
11              MS. KENDRICK:  Asked and answered.
12              THE COURT:  Ms. Hesman, you're losing me.  Why weren't
13     what statistics?
14              MS. HESMAN:  The Bureau of Justice.  We just talked
15     about how he relies on them, and he has relied on them in his
16     opinions in other cases, and so I'm --
17              THE COURT:  Go ahead.  Ask the question that way.
18     Q.  (BY MS. HESMAN)  Sure.  So, Doctor, you just testified that
19     in at least three other cases, you relied on the Bureau of
20     Justice Statistics to render opinions with respect to the
21     systemic provision of care in those systems, correct?
22     A.  Yes.
23     Q.  And why didn't you rely on them here?
24              MS. KENDRICK:  Asked and answered.
25     Q.  (BY MS. HESMAN)  And here I have the chart.  It's your
```

1    declaration at Page 70.  And the chart is on Page 70.  And in

2    Paragraph 168 you state that "The understaffing that I

3    described above in Part 3A directly contributes to the high

4    number of suicides."

5    A.  Okay.

6    Q.  Okay.  So my question is if you think the number of

7    suicides are high, why didn't you rely on the Bureau of Justice

8    Statistics in this case?

9    A.  I didn't feel the need that I needed to compare it to those

10   statistics.

11   Q.  Why?

12   A.  Because I was looking at individual cases.  And in several

13   of the cases that I reviewed, the lack of proper psychiatric

14   care and medical care directly contributed to the suicide.  I

15   was actually looking at the provision of care as opposed to a

16   rate of suicide.

17   Q.  But, Doctor, you're not just looking to individual suicides

18   because you include a chart on Page 70 that talks about the

19   suicides over the course of several years, and you opine not

20   just with respect to an individual case but collectively that

21   there are a high number of suicides.  And my question is why

22   then didn't you look to the Bureau of Justice Statistics to

23   confirm that your opinion that the suicides were high, you

24   know, comported with those statistics?

25        MS. KENDRICK:  Asked and answered.

1           THE COURT:  Sustained.

2    Q.  (BY MS. HESMAN)  If we could please bring up Exhibit 3333

3    and specifically Page 4.  I'm sorry.

4           Actually, Mr. Giardina, could we have the front page.

5    Thank you.

6           Doctor, have you seen this document?

7    A.  I don't know if I've seen this one in particular.  I might

8    have.

9    Q.  Do you keep up with Bureau of Justice Statistics as they

10   update their data?

11   A.  Not necessarily.

12   Q.  I believe you testified that you're a correctional expert,

13   and you have correctional expertise.  Wouldn't you want to know

14   what the Bureau of Justice Statistics was saying with respect

15   to suicide rates across the country?

16           MS. KENDRICK:  Argumentative.

17           THE COURT:  Overruled.  You can answer that yes or no.

18           THE WITNESS:  Not necessarily, because, you know, in a

19   particular matter I might but not in general.

20   Q.  (BY MS. HESMAN)  If we could please turn to Page 4 and

21   specifically the first paragraph under suicides in state

22   prisons.

23           And, Doctor, this is a recent report from just this

24   month, the Bureau of Justice Statistics, that looked at suicide

25   rates from 2000 to 2019.  And they found from 2001 to 2019 the

1    number of suicides in state prisons increased 85 percent from

2    168 to 311 while total deaths from all causes in these

3    facilities grew more than 34 percent.  Do you see that?

4    A.  Yes.

5    Q.  Does that surprise you?

6    A.  Now that you're showing me that data, it doesn't

7    necessarily surprise me.

8    Q.  Why not?

9    A.  Because I'm aware, in the cases that I am most familiar

10   with, that the lack of proper psychiatric care results in

11   suicides.  So this does not surprise me.

12   Q.  But isn't it true that if there is an increase, the way

13   it's described here, that this appears to be a national problem

14   and not an Arizona problem?

15   A.  The last time I checked, Arizona was part of the nation.

16   Q.  Sure.  I agree with you on that.

17   A.  So you are part of the problem.

18   Q.  But this isn't just an issue specific to Arizona.

19   According to the BJS, it's a national issue.  True?

20   A.  Yeah.  And if I was called in in other cases, I would say,

21   yeah, the individual -- the individual facilities are the ones

22   that are at fault, so in this case --

23   Q.  Let's talk about -- I'm sorry.

24   A.  You asked about Arizona.  And so it's my opinion that the

25   lack of proper and timely psychiatric care, including the use

UNITED STATES DISTRICT COURT

STEWART - CROSS

1    of psychotropic medications and the lax suicide watch

2    practices, contribute to the suicides in Arizona.

3    Q.  Okay.  Let's talk about the cases that you've been involved

4    in, the states, I should say, that you've been involved in and

5    how they compare.  Let's look at Page 21.

6    A.  21 of what?

7    Q.  Of the document that's in front of you.  It will populate.

8    Just give it a second.

9    A.  Okay.

10   Q.  And this is table 11 to the BJS statistics report.  Do you

11   see this, Doctor?

12   A.  Yes.

13   Q.  Okay.  And Table 11 is the average rate of suicides per

14   1,000 prisoners in state -- in state and federal prisons by

15   state region.  Do you see that?

16   A.  Yes.

17   Q.  And you would agree that this is a reliable indicator of

18   how a system's mental healthcare is functioning, right?

19   A.  It is certainly one of the indicators.

20   Q.  Sure.  Because you've relied on these before, correct?

21   A.  I've certainly looked at these statistics.

22   Q.  Okay.  So let's go down to west since these are categorized

23   by region and if we can highlight that please.

24           So actually let's back up, Mr. Giardina.  I want to

25   explain this a little more if we can pull this back out.

1          And, Doctor, what I'm going to direct your attention

2     to, you'll see that there are various columns here, one of

3     which is 2015 to 2019, and the data that follows below is the

4     rate of suicide for that time period.  Do you see that?

5     A.  Yes.

6     Q.  Now let's go ahead and highlight west.  And, Doctor, it

7     looks like Arizona's rate is 17.  Do you see that?

8     A.  Yes.

9     Q.  Which is lower than Alaska at 61, right?

10         MS. KENDRICK:  Object.  Which column were you reading

11    the 17 from?

12         MS. HESMAN:  Sure.  The second from the right.  I'm

13    sorry.  2015 to 2019.

14         MS. KENDRICK:  That's not the correct column.

15         MS. HESMAN:  It is.

16         THE COURT:  Which column?  Why don't you point to it.

17         MS. HESMAN:  Sure.  It's 2015 to 2019.

18         THE COURT:  Okay.  It's the second-to-the-last column.

19         MS. HESMAN:  Yes, from the right.  2015 to 2019,

20    second column from the right.

21         And if we can just perhaps scroll down, Mr. Giardina,

22    that might be easier for people to see.

23    Q.  (BY MS. HESMAN)  Okay.  So, Doctor, you would agree that

24    Arizona's rate is 17, right?

25    A.  Based on that column, yes.

1   Q.  And that that's significantly lower than Alaska at 61?

2   A.  Yes.

3   Q.  It's lower than California at 23?

4   A.  Yeah.

5   Q.  And you've been involved in the prison system in

6   California, correct?

7   A.  I have.

8   Q.  And it's lower than Colorado?

9   A.  Yeah.

10  Q.  Lower than Hawaii?

11  A.  Lower than Hawaii too, yeah.

12  Q.  And that's the system you're working in right now, right?

13  A.  Correct.

14  Q.  Higher suicide rate than Arizona, right?

15  A.  Yes.

16  Q.  And Idaho is higher, significantly, at 34, right?

17  A.  Yes.

18  Q.  Montana at 29?

19  A.  Uh-hmm.

20  Q.  And if we turn to the next page --

21          THE COURT:  Let me ask a question.  I couldn't read

22  everything as to how the table was created.  Is this a per

23  capita or a percentage?

24          MS. HESMAN:  It's a rate, Your Honor.  So it's based

25  on -- If you turn -- It's the average rate.  So they take it

1    per 1,000 inmates in the system -- 100,000.  I'm sorry.  I

2    misspoke.  So it's the rate of suicide per 100,000.

3              THE COURT:  Thank you.

4    Q.  (BY MS. HESMAN)  And turning back to -- Oh, thank you.

5              And Nevada's higher, right, Doctor, at 18?

6    A.  Yes.

7    Q.  And New Mexico at 23?

8    A.  Yes.

9    Q.  Oregon's lower?

10   A.  Uh-hmm.

11   Q.  But Utah, Washington, and Wyoming, all higher than Arizona,

12   right?

13   A.  Correct.

14   Q.  But you didn't -- you didn't take this into consideration

15   when you were rendering your opinions for the Arizona

16   Department of Corrections, correct?

17   A.  Correct.

18             MS. HESMAN:  Your Honor, defendants move to admit

19   Exhibit 3333.

20             MS. KENDRICK:  No objection.

21             THE COURT:  Admitted.

22   Q.  (BY MS. HESMAN)  Doctor, with respect to your opinions on

23   the use of force on inmates who are mentally ill, is it your

24   opinion that force should never be used?

25   A.  No, that was not my testimony.

1    Q.   I'm sorry.  I just couldn't hear you.

2    A.   I said no, that was not my testimony.

3    Q.   And you were shown photographs of a use of force incident

4    with respect to an inmate.  Do you recall those photographs on

5    direct?

6    A.   Yes.

7    Q.   And that inmate was banging his head repeatedly.  Do you

8    recall that?

9    A.   Yes.

10   Q.   What in your opinion was required to be done in that

11   situation?

12   A.   First of all -- First of all, you would have the person's

13   mental health clinician come up there and talk to the person.

14   Because they were able to organize the custody staff into what

15   looked like some sort of tactical squad.  They had the video up

16   and everything else.  So if they're able to do that, then

17   they're able to get a mental health person there, if they had

18   sufficient staff.  And then that person would try to intervene

19   short of use of force.

20          If that were not possible, possible, then if the

21   patient continued to harm themselves, then a use of force may

22   be indicated.

23   Q.   How long in your opinion are mental health required to

24   stand there and talk the individual down while they're

25   self-harming until force can be used?

1   A.  Well, there's no set time.  I mean, if the person has a

2   sharp object who's going to cut themselves, then that's a lot

3   different than a person maybe banging their head.  But it's an

4   individual decision, given the circumstances.

5   Q.  So given the circumstances here of repeated head banging,

6   your testimony is that what should have been done is mental

7   health should have come down and tried to engage with the

8   inmate, correct?

9   A.  Yes.

10  Q.  Because head banging's not as serious as some kind of

11  self -- I believe you said cutting or other kind of self-harm?

12  A.  I didn't say that head banging was not serious.  You asked

13  me about if there is a standard length of time that a mental

14  health professional would use to try to talk the person down

15  from harming themselves, and I said no.  And I gave you two

16  examples of someone cutting themselves and someone head

17  banging.

18  Q.  And you testified on direct that you were unaware of any

19  specialized training to officers in these mental health type

20  units with respect to dealing with inmates who are mentally

21  ill.  Do you recall that?

22  A.  Yes.

23  Q.  Did you ask for it?

24  A.  A training?

25  Q.  Yes.

1   A.   No.

2   Q.   Would it surprise you to learn that there is training?

3   A.   It wouldn't surprise me that there is training, but I just

4   saw practical application of what their training was.   I saw

5   them interacting with patients.   And based on that, I don't

6   feel they were properly trained to do this.

7   Q.   And, Doctor, you also have some opinions with respect to

8   restrictive housing of mentally ill inmates, right?

9   A.   Correct.

10  Q.   And your opinion is -- Well, what is your opinion with

11  respect to that?

12  A.   That a placement of a mentally ill individual in

13  restrictive housing will both exacerbate their preexisting

14  mental illness and will cause the presentation of a new mental

15  illness.   Restrictive --

16  Q.   What's -- Sorry.

17  A.   Restrictive housing only makes mentally ill patients worse.

18  Q.   What's that based on?

19  A.   It's based on the scientific literature and study over many

20  years.

21  Q.   What scientific literature or studies?

22  A.   Well, I couldn't quote you a particular article, but

23  authors like Dr. Haney, Dr. Grassian have written articles

24  about the significant impact that solitary confinement has on

25  the mental health of individuals.   There's also articles

1   written on the significant impact of segregated housing on the

2   medical condition of individuals.  So I base it on the

3   scientific literature as well as my own personal experience.

4   Q.  So other than Mr. Haney, who's also an expert in this case,

5   can you give me any specific name of a peer-reviewed medical

6   journal or other scientifically backed study that supports

7   that?

8   A.  Not off the top of my head.

9   Q.  Let's go ahead and show Exhibit 3527 please.

10          Dr. Stewart, are you familiar with Colorado's

11  Administrative Segregation Study?

12  A.  I know there have been several looking at Colorado.  I

13  don't know if I'm familiar with this particular article.

14  Q.  Okay.  Let's go ahead and turn to Page 2 please.

15          Dr. Stewart, this is the study that a research

16  assistant administered a battery of paper and pencil tests over

17  an approximate three-month period.  Those tests measured

18  depression, hopelessness, anxiety, psychosis, withdrawal,

19  alienation, hostility, anger control, somatization,

20  hypersensitivity, and cognitive impairment, and they compared

21  that over the course of time.  Does that, given that

22  information, are you familiar with this study?

23  A.  Can you tell me who the author of this study was?

24  Q.  Sure.  So this one is Maureen O'Keefe, and she was one of

25  the researchers who conducted the study.  But my question is

 1          just generally if you've heard of it or you're familiar with

 2          it.

 3                  THE COURT:  And what year is this?  Give him all the

 4          information needed.

 5                  MS. HESMAN:  Sure.  So the study occurred between 2007

 6          and 2010.

 7                  THE WITNESS:  Is this the study --

 8                  THE COURT:  When was the publication?  Let's get all

 9          of this on the record here.

10                  MS. HESMAN:  Sure.  The publication, Your Honor --

11                  THE COURT:  Is this an exhibit already?

12                  MS. HESMAN:  It is.  It is.  It's Exhibit 35 --

13                  THE COURT:  Has it been admitted?

14                  MS. HESMAN:  It has not been admitted yet.

15                  THE COURT:  So then you can try to get it admitted if

16          you can, but you need to provide him enough information so that

17          he can opine about whether or not it should be.

18          Q.  (BY MS. HESMAN)  So this is from May of 2017.

19                  Are you familiar with it, Doctor?

20                  THE COURT:  We don't have it on the screen yet.

21                  MS. HESMAN:  Oh, I'm sorry.

22                  THE COURT:  Pull it up there now.  Okay.  2017.

23                  THE WITNESS:  Okay.  Let me ask a question, if I

24          might, to clarify what exactly this study is.  Is this the

25          study conducted by Ms. O'Keefe looking at the original data

1    that was taken many years earlier?

2    Q.  (BY MS. HESMAN)  This is a summary of -- Ms. O'Keefe was

3    one of the original researchers, and this is a summary of her

4    findings based on that study.  And my question is just whether

5    you're generally familiar with the Colorado study.

6    A.  Now that we're talking about it, yes, I am familiar with

7    the original study, not this, you know, re -- more recent

8    review.

9    Q.  Okay.  And if we could turn to Page 2 and above the word

10   "and the unanticipated controversy," next paragraph up.  I'm

11   sorry.  Yes.

12           And, Dr. Stewart, were you aware that they found,

13   contrary to another one of their hypotheses, they found that

14   inmates in administrative segregation with mental illness did

15   not deteriorate more rapidly and extremely than those without?

16   A.  Yes.  No.  I remember this study now.  It was roundly

17   criticized for not being a valid study.

18   Q.  Why wasn't it valid?

19   A.  I couldn't tell you offhand.  It had to do with selection.

20   It had to do with administration of these measures.  And I

21   would add, to continue to answer your question about this

22   study, is that the Colorado Department of Corrections has since

23   eliminated the use of segregated housing because of a very

24   famous case of someone from segregated housing was released

25   from prison and murdered the executive director of the Colorado

1   Department of Corrections.  So whatever this study said was not

2   borne out in real life and at the time it came out was roundly

3   criticized.

4   Q.  Okay.  So let me direct your attention to Page 3, and it's

5   the second paragraph, the bottom of the second paragraph that

6   starts with "So why do people react to this study in such

7   extreme ways?"

8           Other column.  Yes, bottom of that.  Thank you.

9           And, Dr. Stewart -- Right there.  Thank you.

10          Are you familiar that this researcher, Ms. O'Keefe,

11  noted that people feel very strongly about this issue, and it

12  appears as though some researchers are so entrenched in their

13  beliefs that when presented with evidence that counters their

14  point of view, they resort to making every attempt at

15  belittling its worth.

16          Do you see that?

17  A.  Yes.

18  Q.  Is that what you're doing?

19  A.  Not at all.

20          MS. KENDRICK:  Argumentative.

21          THE COURT:  Whoa, whoa.  Sustained.  What is he doing?

22  What do you mean what is he doing?

23          MS. HESMAN:  Your Honor, I asked him about the study,

24  and then he went on to offer all the criticisms, although he

25  couldn't really tell me what exactly his criticism was.

```
 1              THE COURT:  He did tell you.  He told you what his
 2    criticism was.  So this is argumentative.
 3              First of all, you're taking it from a document that
 4    has not been admitted in evidence.  If you want to ask him the
 5    question, I still would sustain it as argumentative.
 6              MS. HESMAN:  Understood, Your Honor.  And we will go
 7    ahead and move to admit.
 8              MS. KENDRICK:  Objection.
 9              THE COURT:  On what basis?  He hasn't even identified
10    it.  You have to call the witnesses to identify it.  It's
11    hearsay, doesn't come in.
12              MS. HESMAN:  Well, he has identified it and said that
13    he's familiar with it.
14              THE COURT:  No, he hasn't.
15              MS. KENDRICK:  That misstates his testimony.
16              THE COURT:  We're not even close to his identifying
17    it.  You basically asked him questions from the document.  It's
18    not admitted.
19              MS. HESMAN:  Understood, Your Honor.
20    Q.  (BY MS. HESMAN)  And, Dr. Stewart, let's talk about some of
21    the specific files that you reviewed.
22    A.  Yes.
23    Q.  Before we go there, can I just for the record formally move
24    to admit 5628.
25              THE COURT:  5628 is what?  Is that one of the
```

1      impeachment documents?

2             MS. HESMAN:  Correct, Your Honor.  That was the

3      transcript.

4             THE COURT:  28 -- Okay.  Counsel, do you have that in

5      front of you.  That's a long document.  Do you want the whole

6      thing in or just portions of it?

7             MS. HESMAN:  Your Honor, I want the whole thing in.  I

8      will also note that it was listed as an exhibit by plaintiffs.

9             THE COURT:  Okay.  But that doesn't mean just because

10     you've listed -- it's been listed that it comes in.  Do you now

11     wish to have no objection to its admission?

12            MS. KENDRICK:  Well, the problem is that the

13     transcript that we've been given starts on Page 102.  So we're

14     missing at least 100 pages.  So it's unclear if this is a

15     complete --

16            THE COURT:  But she says -- She has told me,

17     Ms. Hesman -- Is that pronounced correctly?

18            MS. HESMAN:  It is, Your Honor.  Thank you.

19            THE COURT:  Ms. Hesman has said that this is your

20     document.  It isn't your document?

21            MS. KENDRICK:  No.

22            THE COURT:  Okay.  Then what are you talking about

23     this is --

24            MS. HESMAN:  Well, Your Honor, they have also listed

25     this transcript as one of their exhibits.

1          THE COURT:  Right.  But was it the whole transcript or

2    just a portion of it?  I think they're complaining on the issue

3    of 106, that is, the rule of completion.

4          MS. HESMAN:  I'm happy to admit the whole transcript.

5    I did not think it would be happy to -- or helpful to the Court

6    because it contains a lot of --

7          THE COURT:  Let's ask.  Do you want the whole

8    transcript in or just --

9          MS. KENDRICK:  We believe it's hearsay, but if the --

10   if it's going come in, we'd want the whole thing to come in.

11         THE COURT:  Well, it's up to you.  Are you objecting?

12         MS. KENDRICK:  Yes.

13         THE COURT:  You're objecting on the grounds that it's

14   hearsay?

15         MS. KENDRICK:  And it's incomplete.

16         THE COURT:  Then, in other words, even though you

17   marked this as your own exhibit, you're withdrawing it?

18         MS. KENDRICK:  I -- We're confirming that this is --

19   that her representation that this is listed as one of our

20   exhibits is correct.

21         THE COURT:  You're confirming that it is, but you're

22   withdrawing it because you do not want it admitted, whether as

23   a whole --

24         MS. KENDRICK:  Yes, ma'am.  If it is listed, it's

25   withdrawn.

STEWART - CROSS

```
 1              THE COURT:  Assuming that it is listed as one of your
 2    exhibits, you are objecting on the grounds of hearsay and Rule
 3    106, right?
 4              MS. KENDRICK:  I mean, we're searching the PDF of
 5    our -- we're searching our list of exhibits for anything that
 6    has the word Penzone in it, and it's not coming up.
 7              THE COURT:  So are you sure this is their --
 8              MS. HESMAN:  I am, Your Honor.  I can get the exhibit
 9    number, and we can perhaps --
10              THE COURT:  The real question is even if it was marked
11    as one of your exhibits, you can withdraw it.  I want to know
12    whether or not you're going to object to the admission of this
13    portion of the exhibit or all of it.  What do you wish to do?
14              MS. KENDRICK:  We're determining whether it was indeed
15    listed.  We can't find it listed on our side.  If it is listed,
16    we withdraw it, and we object to it as hearsay.
17              THE COURT:  Sustained.
18              MS. HESMAN:  And we'd also move to admit 5629, which
19    is another court decision.  Plaintiffs did not object to the
20    previous court order that was admitted.
21              THE COURT:  Okay.  And that's 59 you said?
22              MS. HESMAN:  Yes.
23              THE COURT:  Any objection?
24              MS. KENDRICK:  No objection.
25              THE COURT:  It's admitted.
```

1          MS. HESMAN:  Same with 5630.

2          MS. KENDRICK:  No objection.

3          THE COURT:  No objection.  It's admitted.

4          MS. HESMAN:  Same with 5631.

5          THE COURT:  Any objection?

6          MS. KENDRICK:  I'm trying to find that one.

7          THE COURT:  That's a transcript from Nebraska, a

8     conversation or a --

9          MS. KENDRICK:  Again, we object on the same ground of

10    hearsay.  And, again, this begins on Page 89 of the transcript,

11    and so it is not a complete -- It appears to jump -- It appears

12    to jump around from pages to pages, from 96 to 99 to 110, and

13    then it jumps to Page 204.

14         THE COURT:  Remind me, Ms. Hesman, which portion of

15    this did you ask Dr. Stewart about for impeachment purposes?

16    Where are we?

17         MS. HESMAN:  Page 2 was the only portion that I asked

18    him about.  It's not being offered for the truth, but it's

19    being offered to show an inconsistent statement that he's made.

20    And if they have issues with the remaining pages, I only need

21    Page 2.

22         THE COURT:  And that would be the only portion of this

23    that would be relevant.

24         MS. HESMAN:  I agree, yes.

25         THE COURT:  Do you see Page 2, and do you recall that

1      questioning?

2             MS. KENDRICK:  Well, the problem is this is a similar

3      question to what Ms. Hesman asked Dr. Stewart, and he gave a

4      qualified answer.  And given this question appears randomly

5      beginning at the top of Page 89, we cannot stipulate to

6      anything without knowing what the rest of this said.  And,

7      again, it's not complete.

8             THE COURT:  Well, it's not complete only if you can

9      establish that it's incomplete.

10            MS. KENDRICK:  Well, we can establish it's

11     incomplete --

12            THE COURT:  What I'm saying now is based upon what we

13     have here, it is maybe -- and I'm not making a finding -- it

14     may be inconsistent with what he originally testified to.  It

15     was being offered for impeachment.

16            So I'm not going to offer -- I'm not going to admit it

17     at this point.  You're going to have an opportunity for

18     redirect.  And after your redirect, you can do what you want to

19     with it.  I may reconsider whether or not it should be admitted

20     after I hear what you have to say in your questioning of the

21     doctor.  You may -- Anything else?

22            MS. HESMAN:  Thank you, Your Honor.

23     Q.  (BY MS. HESMAN)  Dr. Stewart, you highlighted several

24     inmates in your declaration, correct?  You bolded them?

25     A.  Yes.

1    Q.  And I want to first talk to you about an inmate -- the

2    inmate you reference in Paragraph 35.  Do you see that?

3    A.  Okay.

4    Q.  And in Paragraph 35, your criticism of his treatment is

5    that he submitted an HNR on August 28 but was not seen until

6    September 8th.  Do you see that?

7    A.  Yes.

8    Q.  Did you review his -- the entirety of his medical records?

9            MS. KENDRICK:  Objection.  Actually she did not read

10   the complete sentence from his declaration.  He wrote that he

11   finally saw a mental health mid-level staff person on September

12   8th.

13           THE COURT:  And I see that.  You may ask -- Go ahead.

14   Q.  (BY MS. HESMAN)  My question is the same.  Is that your --

15   That was your criticism of this particular inmate's care, that

16   he submitted an HNR on 8-28 and was not seen by a mental health

17   mid-level until September 8th, right?

18   A.  This case is demonstrative of delays in dealing with the

19   mentally ill.  There are also other criticisms I have of the

20   care this patient received.  But this was just referring to the

21   delays in treatment.

22   Q.  Sure.  And I understand that.  But you would agree that

23   that was one of the criticisms, was the delay between the

24   submission of HNR and the time he was actually seen, right?

25   A.  Correct.

1    Q.  Okay.  And if we could pull up Exhibit 5315, and these are

2    the place holder exhibits for the electronic medical records.

3    And I'll just go ahead and proceed in a similar fashion as

4    yesterday and mark them A, B, C, if --

5              THE COURT:  You may.

6              MS. HESMAN:  Thank you.

7    Q.  (BY MS. HESMAN)  Can you see what's on your screen,

8    Dr. Stewart?

9    A.  Yes.

10   Q.  Okay.  And this is an August 31st encounter.  Do you see

11   that?

12   A.  No.  Oh, yes, I see it.  Okay.

13   Q.  And if we could just scroll up just a tad.  Sorry.  All the

14   way up.

15              Okay.  And this was entered -- I'm sorry.  Scroll

16   down.  There we go.

17              And this was a late entry, but according to this

18   record, this inmate was seen on August 30th.  Do you see that?

19   A.  Yes.

20   Q.  And he asked if he could get a pencil and paper but didn't

21   report any mental health concerns.  Do you see that?

22   A.  Yes.

23   Q.  And that would have been two days after he submitted his

24   HNR?

25   A.  Correct.

1    Q.  Did you review any additional records for this particular

2    inmate?

3              MS. KENDRICK:  Objection.  Vague.

4              THE WITNESS:  For what time frame?

5              THE COURT:  Any other medical records?

6              MS. HESMAN:  Medical records, correct.

7              THE COURT:  Overruled.

8              THE WITNESS:  I reviewed the encounters that occurred

9    around this period of time.

10   Q.  (BY MS. HESMAN)  Did you review the records that indicated

11   he participated in a psychoeducation group on August 31st and a

12   psychoeducation group on September 7th?  Did you read those?

13   A.  I don't remember --

14             MS. KENDRICK:  Objection.  She's asking him about

15   things that she's not showing him.

16             MS. HESMAN:  I'm just asking if he reviewed them.

17             THE COURT:  I'm unclear what your question is and

18   whether or not it was something he could answer by what was on

19   the screen.  What were you asking?

20   Q.  (BY MS. HESMAN)  Sure.  I can show him the screen.  I'm

21   asking whether he reviewed the fact that this particular inmate

22   had an educational group on August 31st and on September 7th.

23   A.  Okay.  Yes.  I reviewed that.

24   Q.  Do you see that here?

25   A.  Yes.

1    Q.  And you did review that?

2    A.  Yes.

3    Q.  And you reviewed that prior to making your opinion that

4    group programming was not available?

5              MS. KENDRICK:  Objection.  Misstates his testimony.

6              THE COURT:  I'm going to sustain the objection because

7    I'm not sure how this relates to the answer he gave.

8              MS. HESMAN:  Sure, Your Honor.  He says that he did

9    review these records, but in his --

10             THE COURT:  Which records though?

11             MS. HESMAN:  The two records that --

12             THE COURT:  In this particular, as you call it, A or

13   B, he reviewed these records?

14             MS. HESMAN:  Correct.  That's what he just testified

15   to.

16             THE COURT:  Okay.  And now what?

17             MS. HESMAN:  And in these records it indicates that

18   this particular inmate received two therapy classes in the

19   month that he was critical of the care.

20             So my question is whether or not he reviewed those

21   before he rendered his opinion that there was no group

22   programming available.

23             THE COURT:  I see.

24             MS. KENDRICK:  Objection.  This patient's finding here

25   is not about group therapy.  It's about how quickly he got his

1    medications changed.  And he says he put in an HNR asking about

2    his medication.

3            THE COURT:  So with respect to this, this is where I'm

4    not following it, and I'm the one that needs to follow this

5    more than anything.  And if this is -- this particular patient

6    A is what was reviewed by Dr. Stewart before he made -- with

7    respect to his finding that there was not a response soon

8    enough, it has to relate to this particular issue.  So you're

9    not really impeaching him on this issue.

10           MS. HESMAN:  Well, my intent, Your Honor, is that he

11   reviewed -- he selected inmate charts, the 34 that are

12   referenced in his report, to render his opinion, one of which

13   is that there is a lack of group programming.  And so what I'm

14   trying to establish is that he only looked at certain pieces

15   and snippets.

16           THE COURT:  Well, okay.  But the point is well taken

17   that the statement here in Paragraph 35 was only for one

18   reason.  Now, if you're asking him generally about this

19   particular individual, it has nothing to do with 35.

20           MS. HESMAN:  Your Honor, I think it does, because he

21   reviewed all of the -- each of these inmate records to support

22   his opinions.  That's what he testified to.  His opinions are

23   based on his review of the records.  And what I'm trying to

24   establish is that he didn't look at certain records in these

25   files.  And had he done so, maybe his opinions with respect to

1   group programming and other things would have been different,

2   not just with respect to the narrow issue he criticizes in the

3   declaration.  I'm trying to paint the whole picture of this

4   inmate's care.

5                THE COURT:  Well, you can ask him questions about

6   various files that he reviewed, and you can bring out something

7   that you think is helpful to him.  But it does not impeach what

8   his finding is here and whether it's true or not.  His finding

9   is that the care wasn't swift enough for this particular issue,

10  that is, the meds.

11               Ask him whatever else you want to about this

12  particular inmate.

13  Q.  (BY MS. HESMAN)  Okay, Your Honor.  Understood.

14               And if, just to make the record clear, the August 31st

15  encounter that we marked, let's go ahead and mark that as (a),

16  5315(a), and we would move to admit.

17               MS. KENDRICK:  Objection.  Relevance.

18               THE COURT:  What are you moving to admit now?

19               MS. HESMAN:  I'm moving to admit the August 31st

20  encounter to show that this inmate was seen --

21               THE COURT:  Is this the document that's in front of me

22  here?

23               MS. HESMAN:  It is not.  I'm looking for the August

24  31st encounter that we were just speaking of where he conceded

25  that this inmate --

1          THE COURT:  Let's see what you're talking about here.

2          MS. HESMAN:  Sure.

3          THE COURT:  Okay.

4          MS. HESMAN:  I'm talking about the encounter where he

5    asked for the pencil and paper, Mr. Ray, and noted that he

6    didn't have any mental health concerns.  It was the late entry.

7          THE COURT:  Where does he say he doesn't have any

8    mental health concerns?

9          MS. HESMAN:  Right here, Your Honor.  It says,

10   "Patient stated if he can get a pencil and paper.  Patient did

11   not -- didn't report any mental health concerns."

12         And so I'm moving to admit this record to show that he

13   was seen, and his mental health concerns were assessed prior to

14   September 8th, as Dr. Stewart states in Paragraph 35.

15         MS. KENDRICK:  Objection.

16         THE COURT:  And the objection?

17         MS. KENDRICK:  The objection is relevance, because

18   this is one of the health and welfare checks being done by a

19   behavioral health technician who has no training and no

20   requirements.  And this Paragraph 35 regarding this patient has

21   to do with the fact that he put in an HNR saying that he needed

22   to get his med -- his psychotropic medications changed.

23         And so the discussion is about the length of time it

24   took him to see a prescribing provider.

25         There is absolutely no reason why a patient would tell

1   a behavioral health tech, who has no training and no ability to

2   help him, that he had put in an HNR the day earlier asking to

3   see a psychiatrist about his medications.

4         THE COURT:  I understand your point.  I'm going to

5   admit it.  And I understand that it has really limited

6   relevance based upon what you've said, unless you're going to

7   tell me that the individual who has interviewed him on this

8   date, which was 8-30, was someone different than you

9   understood.  Is it?

10        MS. HESMAN:  No, Your Honor.  I agree with that.  The

11  point is that he was seen by someone in the interim, and he had

12  an opportunity --

13        THE COURT:  That's fine.  It's admitted for whatever

14  limited value it has.  So it's admitted.

15        MS. HESMAN:  Okay.  Thank you.

16  Q.  (BY MS. HESMAN)  Dr. Stewart, let's turn to Paragraph 40.

17  Just let me know when you're there.

18  A.  I'm there.

19  Q.  Okay.  And in Paragraph 40 you reference an inmate, and you

20  state "He complained that there was no group mental health

21  programming.  Of note, his medical record has a discrepancy.

22  One entry from 8-24-21 says he attended group therapy while

23  another that same date says that group therapy was cancelled

24  due to staffing shortages."  Do you see that?

25  A.  Yes.

STEWART - CROSS

1    Q.  And if we could pull up Exhibit 5033, which we already

2    have, and the record from 8-24.

3           And, Dr. Stewart, do you understand the difference

4    between a psych educational group and a psych therapy group?

5    A.  Yes.

6    Q.  What's the difference?

7    A.  Well, if it's done correctly, a psych education group has a

8    topic of patients relating to a person's mental illness, and

9    the person leading the group would teach the patients about a

10   particular issue.

11   Q.  Okay.  So this record that's in front of us says that on

12   8-24 the patient attended a psych ed group and participated

13   with good behavior.  Do you see that?

14   A.  Yes.

15   Q.  And if we could pull up the other record from 8-24.

16           MS. KENDRICK:  Look at the one above.

17   Q.  (BY MS. HESMAN)  Here, Doctor, if you can see this, it

18   says, "SMI psych therapy group was cancelled."  Do you see

19   that?

20   A.  Yes.

21   Q.  So upon rereviewing these two records, wouldn't you agree

22   that that's not a discrepancy that they're talking about two

23   different groups?

24   A.  Yes.

25           MS. HESMAN:  Your Honor, I would move to admit the

1    first screen as 5033(a) and the second as 5033(b).

2              THE COURT:  It's admitted.

3    Q.  (BY MS. HESMAN)  Dr. Stewart, before you reached the

4    conclusion that there was no mental health group programming

5    for this particular inmate, did you review his refusals?

6    A.  Yes.

7    Q.  You can pull up the August 31st refusal.  Dr. Stewart, is

8    this one of the records that you reviewed prior to rendering

9    your opinion with respect to this inmate?

10   A.  Yes.

11   Q.  And this shows that he refused his psych ed group on August

12   31st, 2021?

13   A.  Yes.

14             MS. HESMAN:  Your Honor, defendants move to admit

15   Exhibit 5033(c).

16             MS. KENDRICK:  Who is this patient?  Where is the name

17   of the patient?  There's no inmate signature.

18             THE COURT:  I presume it's the same patient for --

19             MS. HESMAN:  It is, Your Honor.  His name is at the

20   bottom.

21             MS. KENDRICK:  I didn't see it.  I'm sorry.  No

22   objection.

23             THE COURT:  It's admitted.

24   Q.  (BY MS. HESMAN)  And let's move on to Paragraph 52.  Let me

25   know when you're there, Doctor.

1    A.   I'm there.

2    Q.   Okay.  I'm not.  Give me a second.  And, Doctor, in this

3    paragraph, you state "At the time of my interview, he informed

4    me that he was previously treated with a mood stabilizer

5    Trileptal."  Do you see that?

6    A.   Yes.

7    Q.   "Which significantly reduced his incidence of cutting.  He

8    stated that he was told by ADC staff he couldn't be on

9    Trileptal because, quote, inmates abuse it."  Do you see that?

10   A.   Yes.

11   Q.   And if we can pull up Exhibit 5568, the Trileptal refusals

12   please.

13            Did you review this document, Doctor, before reaching

14   that opinion?

15            MS. KENDRICK:  There's no document on the screen.

16            MS. HESMAN:  Oh, I'm sorry.

17            THE COURT:  There is a document on the screen.  Is it

18   the one?

19            MS. KENDRICK:  Not on ours.  It's a list of

20   medications on our screen.

21            MS. HESMAN:  Yes, that's what I'm referring to.  I'm

22   asking if he reviewed this list, which is a list of referrals,

23   before reaching this opinion.

24            THE COURT:  And that's what I have also.

25            MS. KENDRICK:  Ours is a list of medication.

1            MS. HESMAN:  Yes, that's what the document is.  It's a

2      list.  And I'm asking if he reviewed it.

3            THE WITNESS:  Yes.

4      Q.  (BY MS. HESMAN)  And if we could possibly go to the list

5      specific to Trileptal.

6            And, Dr. Stewart, do you see that this is the

7      medication order for the medication you were referencing,

8      Trileptal?

9      A.  Yes.

10     Q.  Can you tell me the date of that document?

11     A.  So this is a -- I'm going to show you the date at the

12     bottom.  It's a list of refusals.  I'm just showing you that

13     it's refusals for the medication we were just talking about.

14     Do you see that?

15           MS. KENDRICK:  We're going to object on relevance.

16     This was prescribed on June 20th, 2019.

17           THE COURT:  I see the effective date.  Is that

18     somehow -- That's earlier.

19           MS. HESMAN:  It is, Your Honor.  He said that the

20     inmate informed him that the inmate was not allowed to have it

21     because inmates abuse it.  I am trying to show that he was

22     prescribed it but was just refusing it.

23           THE COURT:  Are you going to show later than 2019?

24           MS. HESMAN:  No, Your Honor.

25           THE COURT:  Because this date is 2019.  What are you

1    going to show?  Because he's talking about 2021.

2              MS. HESMAN:  Correct.  He, according to the inmate

3    statement that he relies on, the inmate told him that he

4    couldn't be on Trileptal.  I'm trying to show that he at one

5    point was but was refusing it.  It's not that we wouldn't give

6    it to him.

7              THE COURT:  Oh, well, then show that.

8    Q.  (BY MS. HESMAN)  Okay.  So if we can scroll down please,

9    Doctor, do you see this medication administration record list

10   for the Trileptal medication?

11             THE COURT:  It's clear it's 2019.

12             MS. HESMAN:  I understand.

13             THE COURT:  So you understand it has limited value.

14             MS. HESMAN:  I understand.

15             THE COURT:  Go ahead.

16   Q.  (BY MS. HESMAN)  Did you review this, Doctor?

17   A.  Yeah, and it shows that he took it intermittently.

18   Q.  And that he was refusing the medication at times in 2019?

19   A.  At times he was refusing a dose of the medication, yes.

20   Q.  So at one point he was prescribed this medication, you

21   would agree, correct?

22   A.  Yes.

23             MS. HESMAN:  And defendants move to admit 5568A.

24             MS. KENDRICK:  Objection.  Relevance.  This has to do

25   with over two years ago, and the discussion in the report has

1    to do with 2021.

2              THE COURT:  And why don't you scroll all the way down,

3    because I want to see how far into 2019 it goes.  Does it go

4    into 2020 or '21, or is it just 2019?

5              MS. KENDRICK:  It cuts off there.

6              THE COURT:  So I'm going to sustain the objection.

7              MS. HESMAN:  Your Honor, just so I'm clear, is the --

8    to the extent there are records that predate his tour, is it

9    the Court's position that those are not relevant to the

10   opinions formed during his tour and records review?

11             My position is that they are relevant for the same

12   reasons that the mortality reviews we discussed this morning

13   from January 1st, 2019, to July are relevant.  This was still

14   care that's being provided, you know, within the same time

15   period, so I don't want to waste --

16             THE COURT:  I understand what you're saying, but you

17   are pointing or you have provided this document to the witness

18   and to me for the purpose of, I believe, challenging his

19   statement that he doesn't receive it because the inmates -- the

20   DOC has determined that the inmates abuse it.  So this doesn't

21   refute that.  That's why it's not admissible.

22             MS. HESMAN:  I understand, Your Honor.  The statement

23   says that ADC told him he couldn't be on it, and I'm just

24   trying to show he was on it at one point.

25             THE COURT:  Well, he couldn't be on it as of September

1    8th, 2021.  It's not -- He didn't say I could never be on it.

2    If he said I could never be on it, I was never offered it, that

3    would be different.

4             So the objection is sustained.

5    Q.  (BY MS. HESMAN)  Okay.  And let's turn to Paragraph 54.

6    A.  Yes.

7    Q.  And on Page 26 you state that there was no indication he

8    has been evaluated for transfer to inpatient mental healthcare

9    at Phoenix.  Do you see that, Doctor?

10   A.  Yes.

11   Q.  If we could pull up Exhibit 5509, the September 6, '21,

12   mental health constant watch contact.  Did you review this

13   document, Dr. Stewart?

14   A.  I don't remember offhand.

15   Q.  Okay.  Let's scroll down to the sentence where the inmate

16   states "You know, I'm just behavioral.  It isn't my mental

17   health that gets me to do these things."  Do you see that?

18   A.  Yes.

19   Q.  Does that refresh your recollection as to whether or not

20   you reviewed this before rendering your opinion with respect to

21   this inmate's care?

22   A.  Not really.

23             MS. HESMAN:  Your Honor, defendants move to admit

24   Exhibit 5509A.

25             MS. KENDRICK:  Objection.  Relevance.  It's unclear

1    what this is being introduced to show related to Paragraph 54.

2            THE COURT:  I'm trying to follow what you're doing

3    here line by line.  You're looking at -- is it Paragraph 54?

4            MS. HESMAN:  54, correct.

5            THE COURT:  And what's the sentence there in Paragraph

6    54?

7            MS. HESMAN:  It starts at the bottom of Page 26 or --

8    excuse me -- 25 and goes on to 26 and talks about there is no

9    indication that he's been evaluated for transfer to inpatient

10   care.

11           And what I'm trying to show, Your Honor, is that the

12   inmate is saying he doesn't have mental health issues; he has

13   behavioral issues.

14           That's what he says here in this record from September

15   6th, 2021.

16           THE COURT:  I don't see how that in any way is

17   inconsistent with what's in the report.

18           MS. HESMAN:  I'm not saying that it's inconsistent,

19   Your Honor.  I'm just saying that it doesn't paint the whole

20   picture.  That's the purpose of this exercise, is that he's

21   pulled pieces of records, but he has not talked about other

22   records.  And I'm trying to show that there's more to the

23   picture than what's been highlighted in this declaration.

24           THE COURT:  Overruled.

25           MS. KENDRICK:  We again object on relevance.  This has

```
 1    nothing to do with consideration for transfer to Phoenix.

 2              THE COURT:  Well, assuming that this is true -- Now,

 3    if you're making an objection on other grounds --

 4              MS. KENDRICK:  Well, it's also hearsay.

 5              THE COURT:  Okay.  Then I'll sustain it on hearsay.

 6              MS. HESMAN:  Your Honor, it's his own state --

 7              THE COURT:  Whose own statement?

 8              MS. HESMAN:  A plaintiff class member.

 9              THE COURT:  Did he fill this out?  Did he fill this

10    out?

11              MS. HESMAN:  No.

12              THE COURT:  Okay.  Sustained.

13    Q.  (BY MS. HESMAN)  Dr. Stewart, let's turn to Paragraph 80.

14    Let me know when you're there.

15    A.  Okay.

16    Q.  The second sentence states that you attempted to interview

17    Mr. Barnes cell front.  Do you see that?

18    A.  Yes.

19    Q.  And two sentences down you state "After many attempts, I

20    was unable to engage him."  Do you see that?

21    A.  Yes.

22    Q.  Did you then stand outside of his cell for a certain amount

23    of time based on your earlier testimony about the minimum

24    encounters, or how did you handle that refusal to speak to you?

25    A.  During the whole time I report what I noted, that upon
```

```
 1    approaching his cell, I noted he was pacing while shouting at
 2    non-existing individuals, just plain rambling and incoherent
 3    speech.  And after many attempts to engage him, I wasn't able
 4    to have a proper interview with him.
 5    Q.  Okay.  How many times did you try to engage him?
 6    A.  I couldn't tell you.  I know it was more than two.
 7    Q.  I'm sorry.  I just didn't hear you.
 8    A.  It was more than two.  It was several attempts.
 9    Q.  And if we can move to Paragraph 81, which continues on to
10    Page 37.  And, Doctor, I'm going to refer you to your statement
11    midway through that paragraph that says --
12                THE COURT:  It's on the next page?
13                MS. HESMAN:  Correct, Your Honor.  It's on Page 37,
14    but it's still --
15                THE COURT:  So let's read it out loud so we know.
16    Q.  (BY MS. HESMAN)  Sure.  "There appears to be no
17    multi-disciplinary team discussion or collaborative treatment
18    of her care."  Do you see that?
19    A.  Yes.
20    Q.  And if we can go to Exhibit 5211, the October 25th
21    non-clinical contact.
22                MS. KENDRICK:  We're going to object to this because
23    October 25th is after the date of his --
24                THE COURT:  Well, she hasn't asked a question yet.  Go
25    ahead.
```

1          MS. HESMAN:  Just let me know when we have that up.

2          THE COURT:  So now you're referring -- Where are you?

3          MS. HESMAN:  I think he's pulling it up.  Here we go.

4  So it's an October 25th contact.  And, Your Honor, with respect

5  to the objection, he dated this declaration after October 25th.

6  So this information was available to him before he signed his

7  declaration, and plaintiffs' counsel has access to eOMIS.

8          THE COURT:  Well, you need to lay some foundation in

9  making clear he says in -- There's some dates here in September

10 and October with nothing -- or excuse me.  August.  It looks

11 like September, September both times.  But you need to ask him.

12 Ask the witness.

13 Q.  (BY MS. HESMAN)  I am, Your Honor.

14         So your statement in the paragraph was that there

15 appears to be no disciplinary team discussion or collaborative

16 treatment of her care.  Do you see that?

17 A.  Yes.

18 Q.  And have you seen this record before?  It's a non-clinical

19 contact from October 25th.

20 A.  I have not.

21 Q.  Okay.  And if we could scroll down, this talks about --

22 that's good -- Doctor, this talks about a watch meeting that

23 was conducted with the complex ward therapist, the staff

24 psychologist, the mental health lead, and other mental health

25 staff.  Do you see that?

1    A.   Correct.

2    Q.   Would you agree that that's evidence of multi-disciplinary

3    team -- a multi-disciplinary team meeting?

4    A.   I don't see evidence that any psychiatric provider

5    participated in this meeting.

6    Q.   But would you agree that this is evidence of a

7    multi-disciplinary team meeting?

8    A.   No.

9    Q.   Why?

10   A.   Because it doesn't include the psychiatrist.  How can it be

11   multi-disciplinary when you have no therapist there?  It's

12   still one side.  It's not including the entire mental health

13   team.  So this confirms my earlier opinion.  Thank you.

14   Q.   So your testimony is that every multi-disciplinary team

15   meeting or approach has to include a psychiatrist?

16   A.   Yeah, or psychiatric provider, absolutely.

17   Q.   And let's pull up the record, the October 13th forced

18   medication hearing.

19            THE COURT:  Let's take a break before we do that,

20   20-minute break.  How much more time do you have?

21            MS. HESMAN:  Not much longer, Your Honor.  I would

22   estimate 25 minutes.

23            THE COURT:  How much time?

24            MS. HESMAN:  25 minutes.

25            THE COURT:  And there's going to be redirect, I

1    presume?

2              MS. KENDRICK:  Yes, probably about 15 to 20 minutes.

3              THE COURT:  All right.  We're in recess.  We'll see

4    you back here at 20 minutes after.

5         (Proceedings recessed from 3:04 p.m. until 3:27 p.m.)

6              THE COURT:  Let's go ahead, although I have some

7    issues to raise, but let's finish this.

8              MS. HESMAN:  Sure.  I don't have much longer, Your

9    Honor.

10   Q.  (BY MS. HESMAN)  Doctor, can you please turn to Paragraph

11   83 of your declaration.

12   A.  Okay.  I've got it.  My screen had something else on it.

13   What paragraph please?

14   Q.  Paragraph 83.

15             THE COURT:  Paragraph -- His 83?

16             MS. HESMAN:  His 83, yes, Your Honor, and it's Page

17   38.

18             THE COURT:  And read what you want him to refer to.

19   Q.  (BY MS. HESMAN)  Sure.  I was just waiting for him to get

20   there.  Are you there, Doctor?

21   A.  Yes.

22   Q.  Okay.  The last couple sentences of that paragraph you

23   state -- and you're referring to a patient -- you state "This

24   is really -- this really is not a complicated case.  It does

25   require more aggressive treatment for his diabetes and the

1    judicious use of antipsychotic medication," but then you say

2    "Also a 30-day follow-up is very inappropriate for such a

3    clinically complicated patient."  So which is it?  Is it a

4    complicated -- not a complicated case or a clinically

5    complicated case?

6    A.   It's not a complicated case, but it's certainly a

7    complicated case for the Arizona Department of Corrections.

8    Q.   So my question, though, Doctor, is you say this really is

9    not a complicated case, but then below you say it's

10   inappropriate for such a clinically complicated patient.  So is

11   the patient clinically complicated or not?

12              MS. KENDRICK:  Asked and answered.  Argumentative.

13              THE COURT:  Overruled.  She's asking --

14              THE WITNESS:  The --

15              THE COURT:  Just listen.  There's two last sentences.

16   And you say it's not a complicated case, and you say that it is

17   a clinically complicated patient.  Can you reconcile that or

18   not?

19              THE WITNESS:  Yes, Your Honor.  I believe I can.  And

20   if there was confusion there, it's just based on my lack of

21   writing skills.  The treatment of a patient who has diabetes

22   and psychosis is not a complicated case.  It requires

23   consultation between medical and psychiatric staff.

24              However, I commented on the 30-day follow-up.  Now,

25   that's inappropriate on this case that for the Arizona

1    Department of Corrections it is a complicated matter.  This

2    would not be a complicated matter in my clinic or my hospital,

3    but in Arizona Department of Corrections, this become a very

4    complicated case because they're not treating the guy's

5    diabetes or they're not treating his psychosis.  So obviously

6    they don't know what the heck they're doing.

7    Q.   (BY MS. HESMAN)  So you're saying it's not complicated, but

8    in this system it is because your opinion is that we don't know

9    what we're doing?  Is that -- that's my understanding of your

10   testimony?

11           MS. KENDRICK:  Argumentative.

12           MS. HESMAN:  I'm just trying to understand it.

13           THE COURT:  I'm having a little trouble understanding

14   his answer either, because it says complicated case, and it

15   says complicated patient.  So you say it's not a complicated

16   case, but you say it's a complicated patient.

17           THE WITNESS:  Yes, Your Honor.  And I'm sorry again.

18   I take responsibility for not making it clear.  I should have

19   said for a clinically complicated patient who's receiving

20   treatment in the Arizona Department of Corrections.  And I'm

21   basing the fact that people don't know what they're doing by

22   the data of this case.

23           The person has elevated blood sugar levels, and he

24   remains psychotic and not being treated with an antipsychotic

25   medication.  That is not how you deal with this case in any

1    other setting.  But that's what the Arizona Department of

2    Corrections has decided to do with this particular case.

3    Q.  (BY MS. HESMAN)  Okay.  So the statement was that it's a

4    clinically -- not a clinically complicated case but that the

5    patient is complicated.  That's what the paragraph in the

6    declaration says, right?

7    A.  That's right.

8    Q.  It doesn't say anything about the Department's ability to

9    manage the patient, does it?

10   A.  No.  And again I will own that as my error in not

11   clarifying that in my report.

12   Q.  And let's go to Paragraph 114.

13         And I'm going to refer you to a sentence that is on

14   Page 53.

15   A.  Okay.

16   Q.  Just let me know when -- You're there?

17   A.  Yeah.

18         THE COURT:  Why don't you read it.

19         MS. HESMAN:  I am going to.

20         THE COURT:  Thank you.

21   Q.  (BY MS. HESMAN)  It says, in the middle of that paragraph,

22   it says, "This case is the ultimate example of deliberate

23   indifference."  Do you see that?

24   A.  Yes.

25   Q.  And I believe based on the statement on Page 52 where you

1    say, "A review of his records reveals that in fact he is not

2    prescribed any psychotropic medications," that you believe this

3    is the ultimate case of deliberate indifference because he's

4    not receiving these medications; is that correct?

5    A.   That's the real shorthand version of what I said, but

6    generally, yes.

7    Q.   Okay.  And let's pull up an October 22nd encounter.  And

8    before I -- Well, let me go ahead and ask you about this,

9    Doctor.  Have you seen this encounter?

10   A.   I have not.

11   Q.   Okay.  Let's scroll down to the text and where he discusses

12   that he used to be on medication before coming to prison, right

13   in the middle.  "Patient reports he used to be on medication

14   before coming to prison but did not want to start medication

15   after incarceration because, quote, I figured I'd be out in a

16   year and what's the point."  Do you see that?

17   A.   Yes.

18   Q.   Is it your opinion, Doctor, that we should -- that we

19   should force medicate someone who does not want to be on

20   medication?

21   A.   That was nothing that I said in that paragraph.

22   Q.   I'm just asking if that's an opinion.

23   A.   There are times when patients should be force medicated,

24   yes.

25   Q.   Are you saying this is one of them?

1    A.  No.  What I'm saying is that he was designated SMI and

2    diagnosed with schizophrenia on May 20th, and he wasn't seen,

3    as you pointed out, until October 22nd.  That was five months

4    before this happened.  That was my basis of my opinion.

5    Q.  Well, I just asked you if the basis had to do with whether

6    or not he was on psychotropic medications, and you said yes.

7    But let's back up then.  Let's go ahead and pull the record

8    from November 23rd, 2020.  Actually I'm sorry.  Excuse me.

9    Let's start with September 21st, 2020.

10        And, Doctor, did you review this record?

11   A.  I don't remember.

12   Q.  Okay.  Let's scroll down to the section where it states

13   he's not on psych meds and stated that he doesn't want to go on

14   psych meds.  Do you see that?

15   A.  Okay.  Who saw him there?  What person?

16   Q.  Sure.  This is a psych -- a licensed psych associate, and

17   he is telling her -- if you can scroll back down -- this is in

18   September of 2020 -- that client is not on psych meds and

19   stated that he doesn't want to go on psych meds.  Do you see

20   that?

21   A.  Yes.

22   Q.  Now let's go to a November 23rd, 2020, encounter.

23        And, Your Honor, that September 21st encounter we'd

24   move to admit Exhibit 5480(a).

25        MS. KENDRICK:  We object on hearsay.

1          THE COURT:  Sustained.

2          MS. HESMAN:  Your Honor, it's a statement that he's

3     making for purposes of medical treatment.

4          THE COURT:  How do I know that?  There's no

5     foundation.

6          MS. HESMAN:  It's a record that's in his chart where

7     his provider is relaying information that was --

8          THE COURT:  So are you saying -- Does everybody agree

9     the chart is admissible without any foundation?

10          MS. HESMAN:  Yes, Your Honor.

11          THE COURT:  Well, you are, but is the plaintiff?

12     Does the document come in without foundation?

13          MS. KENDRICK:  Wait.  I'm sorry.  I didn't understand

14     your question, Your Honor.

15          MR. STRUCK:  Your Honor, there was a stipulation in

16     the joint pretrial with respect to the eOMIS records.

17          THE COURT:  So they're admitted; is that correct?

18          MS. HESMAN:  Yes, Your Honor.

19          THE COURT:  You stipulated to admit these documents?

20          MS. KENDRICK:  We stipulated to admit the documents

21     underneath the -- I think that there's an --

22          THE COURT:  I can't hear you.

23          MR. SPECTER:  One second please.

24          MS. KENDRICK:  So our understanding about the

25     stipulation was that we would not object on hearsay grounds to

1    the documents relied upon by the experts in their reports.

2           Dr. Stewart testified that he did not remember looking

3    at this document, and it did not form the basis of any

4    conclusions in his report.

5           And so we're objecting on the basis of hearsay of what

6    the patient allegedly said to the person who was doing the

7    check.

8           MR. STRUCK:  The stipulation went well beyond that,

9    Your Honor.  There was an agreement between the parties because

10   of the difficulties with respect to the electronic health

11   record that when we were cross-examining their experts or they

12   were cross-examining our experts, we would be able to utilize

13   all the records.  We had many conversations about it.  It's in

14   the joint pretrial.  Specifically --

15          THE COURT:  So tell me what it says, because obviously

16   there are a number of objections that can be made to documents.

17   First, are they authentic?  And I presume no one is contesting

18   that these are not authentic, correct?  Let me hear from

19   plaintiffs' counsel.

20          MR. FATHI:  Just one moment.

21          THE COURT:  You're not objecting that they aren't

22   authentic?

23          MS. KENDRICK:  Correct.

24          THE COURT:  So then the question is can you object to

25   the content of the documents?  What's the stipulation?

1           MR. FATHI:  I'm pulling it up now, Your Honor.

2           MR. STRUCK:  And, Your Honor, I would like to refer

3      the Court to Page 9 of the joint pretrial under stipulations

4      and undisputed facts with respect to stipulation number one.

5      "Neither party will make a hearsay objection when an expert

6      witness testifies about the content of the medical records of

7      any patient.  The opposing party retains the right to object to

8      specific medical records based on double or triple hearsay.

9      The opposing party also retains the right to argue about the

10     inferences to be drawn from the evidence.  And either party may

11     offer particular excerpts of physical medical records to

12     support or oppose that testimony."

13          THE COURT:  And that's relatively clear to me.  But as

14     I understand it -- and you may correct me if I'm wrong,

15     Ms. Hesman -- that as I heard the first part, there can be no

16     objection if the witness relies on it.  I don't think he's

17     relied on this.  Have you laid the foundation?

18          MR. FATHI:  Your Honor, I beg your pardon.  The actual

19     language is "Neither party will make a hearsay objection when

20     an expert witness testifies about the content of the medical

21     records of any patient."

22          THE COURT:  Okay.  And he didn't testify about this

23     particular record, so that's the problem.  It's an authentic

24     document.  So if you want to offer it independently, then you

25     may do so in your case in chief, if you can overcome, but not

 1    through this particular witness.

 2              MS. HESMAN:  Understood, Your Honor.  I believe their

 3    objection is to hearsay based on statements of the inmate that

 4    were made for purposes of medical treatment, and I don't think

 5    there's a double --

 6              THE COURT:  What I'm saying, though, is that the

 7    document -- the document doesn't just come in until you have

 8    somebody who is going to offer it for it.  So, in other words,

 9    if you've got an expert that's going to rely on this, that's

10    different.

11              MS. HESMAN:  Understood, Your Honor.  We'll get it in

12    in our case in chief.

13              THE COURT:  And the very point you're making, you're

14    going to have to lay the foundation, however, for the exception

15    that you're relying on.

16              MS. HESMAN:  Understood, Your Honor.

17              THE COURT:  Okay.

18    Q.  (BY MS. HESMAN)  So let's go to the November 23rd, 2020,

19    encounter.

20              Doctor, did you review this record in forming your

21    opinion?

22    A.  I did not.

23    Q.  Why didn't you?

24    A.  Because it wasn't pertinent to what I was writing in that

25    particular section in my report.

1    Q.  What you were writing is that this is the ultimate case of

2    deliberate indifference because the inmate is not receiving

3    psychotropic medications.  So wouldn't it have been important

4    to know why he's not?

5    A.  The record from '21 stated he was designated an SMI on May

6    20th, and he did not receive psychotropic medications or even

7    an evaluation by a psychiatric provider until over five months

8    later.  That was what I was looking at.

9    Q.  But you're critical of the fact that he's not on

10   medication, and my question is whether or not it would have

11   been important to know why he's not on medication, for example,

12   whether he doesn't want medication.  Would that have been

13   important to know prior to rendering your opinion?

14   A.  Not for the particular opinion that I rendered.

15   Q.  Okay.  So looking at this document Oct -- or excuse me --

16   November 23rd, 2020, and zooming in on "Patient asked if he

17   felt he needed medication," if you can locate that section.

18   There we go.  "Patient asked if he felt he needed medication

19   while in max security to help him deal with being locked down

20   in which he reports that he does not."  Do you see that?

21   A.  Yes.

22   Q.  Does that change your opinion with respect to whether or

23   not this is the ultimate example of deliberate indifference?

24   A.  It doesn't change my opinion that he wasn't seen by a

25   psychiatric provider for five months after he was designated an

1    SMI.

2    Q.  And I'm asking about your opinion with respect to whether

3    or not he's on medication, why he's not on medication.  Does

4    this change your opinion with respect to that opinion?

5    A.  No.

6    Q.  And let's pull up the October 21st, 2021, encounter.

7           Did you rely on this record, Doctor?

8    A.  No.

9    Q.  And let's scroll down please.  Do you see there where it

10   says the writer asked patient if he had any mental health

11   concerns that he would like addressed?

12   A.  No.

13   Q.  In the first -- first -- end of the first sentence?

14   A.  Okay.  I see that.

15   Q.  Okay.  And then at the bottom it states the writer asked

16   patient if he would like medication?  Do you see that?

17   A.  Yeah.

18   Q.  "Patient did not show any signs of responding to internal

19   stimuli."  Do you see that?

20   A.  Yes.

21   Q.  So if this individual doesn't want medication, is it still

22   your opinion that the Department has somehow been deliberately

23   indifferent by not prescribing him medication?

24   A.  Not after the date of this particular evaluation.  My

25   criticism was that he was designated SMI in May and wasn't seen

1    until October.

2    Q.  But, Doctor, in the declaration you state "A review of his

3    records reveals that in fact he is not prescribed any

4    psychotropic medications."  Are you no longer taking issue with

5    that?

6    A.  No.  I am taking issue with that.  And if this evaluation

7    that you just pointed out to me here had been done the day or

8    the week after he was designated SMI, then I would have no

9    criticism about this case.

10   Q.  Okay.  So is it your opinion that if an inmate does not

11   want to take medications, that we should always force medicate

12   them?

13            MS. KENDRICK:  Asked --

14            THE WITNESS:  That is not my --

15            MS. KENDRICK:  -- and answered.

16            THE COURT:  That is a different question.  But I'm

17   going to allow him to answer that.  But I think he said

18   sometimes yes, sometimes no, but go ahead.  Answer that

19   question.

20            THE WITNESS:  There are times, Your Honor, when a

21   person needs to be involuntarily medicated.

22            THE COURT:  So I'm just going to point out -- And I

23   don't care because I haven't received any objection here.

24   Maybe I'm going to see it more now that we've established that

25   these are not admitted.  They are authenticated, but they

1    haven't been admitted yet, correct?  If they're not admitted,

2    then you cannot use them to show the witness to ask them

3    questions.

4           Now, it makes it a lot easier if in fact you're asking

5    him a hypothetical.  You can look at it and ask him if you

6    later on are going to offer these as impeachment.  But I want

7    to make that absolutely clear they are not admitted, correct,

8    counsel?

9           MS. HESMAN:  That's correct, Your Honor.

10          THE COURT:  You're reading from a document then that

11   has not been admitted.

12          MS. HESMAN:  Sure, Your Honor.  I'm just asking if

13   he's familiar with it so I can attempt to admit --

14          THE COURT:  And no one has any objection to that?

15          MS. KENDRICK:  No.  We object because he said he did

16   not review this record.

17          THE COURT:  That's the point, counsel, Ms. Kendrick,

18   is you need to make your own objections, and sometimes I'm not

19   clear as to what they are.  That's why I wanted to clarify

20   this, to make sure, since I'm the fact finder.

21          These have not been admitted.  You're objecting to

22   them.  The questions are, in my view, are relevant for

23   cross-examination purposes.  But she's asking them about

24   something that's on the screen that has not been admitted.

25          Now, if you have an objection to that, then you need

1    to make it.

2              MS. KENDRICK:  All right.  Well, the other objection

3    is that fact discovery closed in this case on October 15th,

4    2021, and this is an entry from after that date.

5              THE COURT:  Well, as I said, this is an injunction

6    case, and I'm going to allow it unless somehow you've been

7    prejudiced by it.  You've had these documents before.  You may

8    have a response to it.  They're not in evidence yet.

9              MR. STRUCK:  Your Honor, may I -- I just want to get

10   some clarification, because this is not -- your ruling is not

11   my understanding of what the parties agreed to.

12             THE COURT:  Okay.

13             MR. STRUCK:  First of all, I believe that it should be

14   admitted under 803(4), but the parties in the stipulation

15   said --

16             THE COURT:  So you're saying it as a business record

17   or either that or as a public record?

18             MR. STRUCK:  And a record made for the purpose of

19   medical diagnosis under 803(4).

20             THE COURT:  Let me hear your response to that.  Is

21   there -- Have they established the basis for an exception to

22   the hearsay -- hearsay rule on medical diagnosis?

23             MS. KENDRICK:  Yes.

24             THE COURT:  They have?

25             MS. KENDRICK:  Yes.

1           THE COURT:  So it's admitted then.

2           MS. KENDRICK:  Okay.

3           MS. HESMAN:  Thank you, Your Honor.  Just for

4  clarification, 5480(a); is that correct?

5           THE CLERK:  That's -- Yes.  We marked that already.

6  But that's the one you just moved to admit.

7           MS. HESMAN:  Okay.  So then this would be 5480(b).

8           THE CLERK:  The one you just moved to admit?

9           MS. HESMAN:  Yes.

10  Q.  (BY MS. HESMAN)  And then finally, Dr. Stewart, looking at

11  the October 22nd, 2021, I believe I showed you this at the

12  beginning.  This is the statement where the inmate stated that

13  he did not want to start medication after incarceration because

14  he figured he'd be out in a year.  Do you recall that?

15  A.  Yes.

16  Q.  And did you -- I believe you testified you didn't review

17  this record before rendering your opinion?

18  A.  I did not.

19           MS. HESMAN:  Your Honor, defendants move to admit

20  5480(c).

21           MS. KENDRICK:  No objection.

22           THE COURT:  It's admitted.

23           MS. HESMAN:  Can I have just one moment, Your Honor?

24  I have nothing further, Your Honor.

25           THE COURT:  Okay.  Redirect.

REDIRECT EXAMINATION

BY MS. KENDRICK:

Q.   Thank you, Dr. Stewart, for your patience.  I just wanted to quickly recap a few things that Ms. Hesman asked you about.

        Starting with your work at the university and with the residents, and I think it may not have been very clear, but could you explain when you were working at the jail with the residents, where are you?

A.   I am in the room with the resident while we're evaluating the patient together.

Q.   So you were there also providing clinical care in tandem with the resident?

A.   I believe I am, yes.

Q.   Okay.  And you said you do this on Tuesdays at the jails, correct?

A.   Correct.

Q.   What do you normally do the other four days of the week?

A.   The other four days I work in the emergency room, again supervising residents all day Monday.  I'm supposed to be in the emergency room right now on Wednesday afternoon.  And I work in the emergency room Friday morning.  All of that has to do with direct supervision of the clinical care provided by the residents.

Q.   And do you teach any courses at the university?

A.   Yes.  I teach a course about forensic psychiatry.

1    Q.  Okay.  And you're also the court-appointed monitor in

2    Rasho?

3    A.  Yes, which is a full-time job in and of itself.  So I

4    schedule my trips around my clinical responsibilities, and I

5    work the other days here from my home office.

6    Q.  Okay.  What did you mean when you said that you were an

7    advocate for prisoners?

8    A.  Well, you know, as a physician, I'm an advocate for people

9    having good healthcare, including psychiatric care.  So in that

10   sense, if we're talking about prison mental health, I guess you

11   could call me an advocate, but it has to do with my role as a

12   physician.

13   Q.  And there's also a discussion about Dr. Stern's report.

14   And when you reviewed that report, was it your understanding

15   that a mental health specialist assisted Dr. Stern on it?

16   A.  That was my understanding, yes.

17   Q.  Did you look at any eOMIS records before going on the tours

18   in September?

19   A.  I believe I did.

20   Q.  Okay.  And I just want to clarify a couple things about

21   those cases that Ms. Hesman brought up.  The Jones case, that

22   was the death penalty case from the Georgia state court,

23   correct?

24   A.  Correct.

25   Q.  That didn't have anything to do with sampling methodology

1   or an entire mental healthcare system, correct?

2   A.  That's correct.

3   Q.  And the Gowadia case, that was also an individual case?

4   A.  Yes, it was.

5   Q.  Okay.  And that was about psychological testing?

6   A.  That had to do with what I relied upon to arrive at my

7   opinion that he was not competent to proceed in his criminal

8   case.

9   Q.  And Parsons, have you performed any psychological testing

10  on the patients you've met with?

11  A.  I have not.

12  Q.  What's a forensic psychiatrist?

13  A.  It's a -- It's, first and foremost, it's a psychiatrist

14  that works in the interface between the legal system and the

15  mental health system.  And there are many issues that come up

16  with that interface such as criminal work, correctional work, a

17  lot of civil cases, competency.  A lot of different aspects

18  fall into that category.

19  Q.  And do you have to have a special certificate or

20  certification to practice as a forensic psychiatrist?

21  A.  No, you don't.

22  Q.  Ms. Hesman asked you about some suicides that you discussed

23  in your report where you concluded that those suicides were

24  preventable.  Who else said those suicides were possibly

25  preventable?

STEWART - REDIRECT

1   A.   In reviewing the suicides, it was in either the

2   psychological autopsy and/or the administrative review,

3   mortality review, found that in some cases they found that

4   suicides were possibly preventable.

5   Q.   And another thing about the writing of your declaration

6   that was submitted last week.  You were asked a couple times

7   about why you would cite a previous declaration in there.

8   A.   Yes.

9   Q.   As if you were somehow relying on your previous opinion.

10  Why did you do that when you were doing your report here?

11  A.   Well, I cited to that as a -- I don't know what you want to

12  call it -- a shorthand because I didn't want to have to burden

13  the Court and anybody reading my report with all of the

14  factual bases upon which I arrived at my opinion that was

15  contained in my original reports.  So I just cited to the

16  section where I expressed my opinion.

17  Q.   And could you turn to Page 82 of your report.

18  A.   Yes.

19  Q.   And Paragraph 199, it's where you state that "The patients'

20  experiences illustrate your belief that custody staff that work

21  in units designed for profoundly mentally ill persons must

22  receive specialized training."  And Ms. Hesman asked you about

23  the basis for it and for your opinion.  And at footnote 34

24  you're also citing the testimony of the recent Centurion

25  behavioral health director, correct?

STEWART - REDIRECT

1    A.   Yes.

2    Q.   And she testified that custody staff do not receive

3    additional training and that the training had not occurred?

4         MS. HESMAN:   Objection, Your Honor.   Counsel is

5    testifying and reading from the document.

6         THE COURT:   Sustained.

7    Q.   (BY MS. KENDRICK)   Did you rely on Dr. Platt's testimony as

8    part of the basis for your statement that the training did not

9    appear to be occurring?

10   A.   Yes.

11   Q.   Finally, Ms. Hesman asked you a couple times about whether

12   you had determined if an outcome would have been different in

13   any given case if there had been more staff or something else.

14        Were you looking specifically at outcomes in your

15   report, or were you looking for something else?

16   A.   No.   I wasn't asked to look at outcomes, I mean, future

17   outcomes.   Certainly I was able to review longitudinally cases

18   that I'm familiar with so I could just see what happened in the

19   case.   But I was never asked to speculate or render an opinion

20   about a particular outcome in a case that I saw now.

21   Q.   And again I think you testified earlier that part of the

22   reason you were doing self-run interviews was you were not

23   there to provide therapeutic services to people or medication

24   administration.   So with that one patient that Ms. Hesman asked

25   you about when she asked you how many times you tried to engage

STEWART - REDIRECT

1   with him, how many times did you say you engaged with --

2   attempted to engage with him?

3   A.  I think my answer was more than two times.

4   Q.  Okay.  But you were not there to provide clinical

5   treatment?

6   A.  I was not a psychiatric provider for that particular

7   patient, correct.

8   Q.  Then if I can find the last chart, I think we discussed the

9   suicides and the defendants' exhibit of the BJS studies?

10  A.  Correct.

11  Q.  Suicide rate.  And she asked you why you hadn't included

12  it?

13  A.  Yes.

14  Q.  And I believe -- I'm trying to find the paragraph that has

15  your table or the chart.  I'm sorry.

16          The table that you included on Page 70 of your report

17  at Paragraph 167, that data ran through what year, if you get

18  to it?

19  A.  Yes.  Yes.  I'm here.  I'm sorry.

20  Q.  Do you have it?  What year --

21  A.  Yes.

22  Q.  -- does it run through?

23  A.  It runs through fiscal year '22.

24  Q.  Okay.  And I don't have it up, but Exhibit -- Defendants'

25  Exhibit 3333, do you remember how far that data went?

UNITED STATES DISTRICT COURT

1    A.   That data went through 2019, I believe.

2             THE COURT:   Is this the document Suicide in Local and

3    State and Federal Prisons?  Is that the one you're talking

4    about?

5             MS. KENDRICK:   It was Defendants' Exhibit 3333, yes,

6    Bureau of Justice.  I don't know if you could put it up, but

7    that's what we're referring to.

8             THE COURT:   Thank you.

9             MS. KENDRICK:   All right.  Thank you very much,

10   Dr. Stewart.  I have nothing further.

11            THE WITNESS:   Thank you.

12            THE COURT:   Okay.  Well, do you intend to call anyone

13   else now?  Do you have someone to put back on the stand?

14            MS. MORRIS:   We have Deputy Warden Travis Scott here.

15   I don't believe we'd be able to finish.

16            THE COURT:   He's not here?

17            MS. MORRIS:   He is here, I believe.

18            THE COURT:   Oh, all right.  So you want to proceed?

19            MS. MORRIS:   We won't be able to finish his testimony

20   today if we start up again.

21            THE COURT:   So I take it you'd rather start tomorrow,

22   right?

23            MS. MORRIS:   I mean, I'm happy to start now.

24            THE COURT:   Well, it's your time.  It's your time.

25   It's 4:00.  We still technically have a half an hour.

1          MS. MORRIS:  I definitely will not finish within the

2    half hour.

3          THE COURT:  Well, as I said, you know the timing here.

4          MS. MORRIS:  Okay.  I'll start.

5          MR. FATHI:  Your Honor, is Dr. Stewart excused?

6          THE COURT:  Yes.  Any question about his being

7    excused, counsel?

8          MS. HESMAN:  No, Your Honor.

9          THE COURT:  He is.

10          THE WITNESS:  Thank you, Your Honor.

11          MS. KENDRICK:  Thank you, Dr. Stewart.

12          MS. MORRIS:  Your Honor, before I start, we've reached

13    several agreements about stipulations for admitting evidence.

14          THE COURT:  Sure.

15          MS. MORRIS:  We have stipulated that -- to move to

16    admit Defendants' Exhibit 3006, 3013, 3028, 3602, 4901, 4022,

17    4024, 4026, 4030, 4032, 4048, 4054, 3006 -- I'm sorry -- 3604,

18    3606, and 3608.  Those are all defendants' exhibits.  And also

19    4002.

20          And then as far as plaintiffs' exhibits, we have

21    agreed to stipulate to the admission of Plaintiffs' Exhibits

22    1305 through 1323, 2131, 1216 through 1219, 1296 through 1303,

23    1734 through 1744, 1681 through 1688, 2265 through 2373, and

24    1066.

25          MS. LOVE:  We agree to the stipulation, Your Honor.

1            THE COURT:  All right.  You may proceed.  They're

2      admitted.

3            MS. MORRIS:  Thank you.

4         TRAVIS SCOTT, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

5                 CONTINUED DIRECT EXAMINATION

6      BY MS. MORRIS:

7      Q.  Good afternoon, Deputy Warden Scott.

8      A.  Good afternoon, ma'am.

9      Q.  You've worked for ADCRR for about 25 years, correct?

10     A.  Yes, ma'am.

11     Q.  And you reached the rank of Associate Deputy Warden in

12     April, 2012?

13     A.  Yes, ma'am.

14     Q.  Since that time, you've worked at ASPC Phoenix, three

15     housing units at ASPC Lewis, and two housing units at ASPC

16     Eyman, correct?

17     A.  Yes, ma'am.

18     Q.  And at Eyman-Browning there is no close management,

19     correct?

20     A.  That is correct.

21     Q.  Yesterday at the end of the day you testified that if you

22     wanted to see a person's step progression, you would look at

23     ACIS.  Do you recall that?

24     A.  Yes.

25     Q.  ACIS is what's used for recording step progressions of

1    people in maximum custody throughout the ADCRR, correct?

2    A.  Yes, ma'am.

3    Q.  Mr. Campbell is showing you Plaintiffs' -- what's been

4    marked as Plaintiffs' Exhibit 1220.  And could we go -- please

5    go to ADCRM1645002.

6         So we're looking now at Page ADCR -- ADCM1644 -- I'm

7    sorry -- 1645002.  This is a screenshot of the ACIS system

8    showing step progression, correct?

9    A.  Yes.

10   Q.  And so, for example, with this person, we can see when the

11   person entered max custody with the initial intake down at the

12   bottom?

13   A.  Yes.

14   Q.  And we can see when the person had disciplinaries, correct?

15   A.  Yes.

16   Q.  They had two in 2016 in this case?

17   A.  Correct.

18   Q.  And we can see when this person had step reviews?

19   A.  Yes.

20   Q.  And we can see what step the person was at on any given

21   date?

22   A.  Correct.

23   Q.  We can see that this person became a step three in November

24   of 2018, correct?  So it's sort of in the middle of the bigger

25   green block.

1    A.  Yes, I see it now.

2    Q.  Is that accurate?

3    A.  Yes.

4    Q.  And this person was still in max custody and still at step

5    three as of the most recent date of this screen -- on this

6    screenshot, which was August 25th, 2020, correct?

7    A.  Yes.

8    Q.  The electronic records of which this is a screenshot are

9    created by employees of ADCRR working within the scope of their

10   employment, aren't they?

11   A.  Yes.

12   Q.  And this is the electron -- this is the system of

13   electronic records of which this is a screen -- I'm sorry.

14          This system of electronic records, ACIS, of which this

15   is a screenshot, is where the step progression of people

16   incarcerated in max custody in ADCRR are recorded, correct?

17   A.  Yes.

18   Q.  At this time I'd move to admit Plaintiffs' Exhibits 1220

19   through 1223 into evidence.  These are documents produced by

20   defendants.  They're compilations of the screenshots for all

21   people in maximum custody as of September, 2020, at -- for

22   Exhibit 1220 at Eyman-Browning, for Exhibit 1221 at Eyman-SMU,

23   for Exhibit 1222 at Florence-Kasson, and for Exhibit 1223 at

24   Lewis-Rast.

25          THE COURT:  Any objection?

1          MS. LOVE:  Yes, Your Honor.  We object to foundation,

2     especially trying to submit through this witness where that

3     range of exhibits is thousands and thousands of pages of

4     individual printouts as to inmate step level progression or

5     housing across complexes across Lewis, Florence, and Eyman both

6     Browning and SMU I, and to offer them piecemeal or offer them

7     in a bulk of thousands and thousands of pages without asking

8     what the relevance is to any particular individual and their

9     history in the Department we believe is -- I mean, it's

10    prejudicial.  There's no relevance or there's no questioning of

11    a witness as to why we're admitting this versus, just like with

12    medical records, you know, we're not going to admit thousands

13    of pages.  Somebody has to ask somebody about an individual

14    situation.

15          MS. MORRIS:  Defendants have represented to this Court

16    that they do not track step progression.  The only way they

17    track step progression is through ACIS, the screenshots that

18    we're currently looking at.  The reason there are thousands and

19    thousands of pages is because there are thousands and thousands

20    of people in maximum custody as of this date.

21          THE COURT:  So they say they don't -- they don't keep

22    a record of it, but they do, is what you're saying?

23          MS. MORRIS:  And this is the record of it.

24          THE COURT:  And this is the record.

25          MS. MORRIS:  And as far as the foundation and it being

1      a cause --

2              THE COURT:  Let me stop you for a second.  Do you

3      agree?

4              MS. LOVE:  That what?

5              THE COURT:  That the records are kept through ACIS.

6              MS. LOVE:  I agree that records like this are kept for

7      each individual inmate, which is not thousands and thousands in

8      max custody.  It's exactly, as of September 30th, 1,634.  So

9      that's an overstatement.  So, yes, the records are kept.

10     However, if they're being offered here for the purpose of

11     arguing that individual inmates are kept in either max custody,

12     detention, or on mental health watch for inappropriate reasons,

13     which plaintiffs explained to you the other day when we went

14     through what their claims were as to the isolation subclass,

15     it's over -- they're basically now making an overdetention

16     argument.  But just merely putting these records in that will

17     just say what step level is an inmate at or a custody level

18     does not -- they're offering it to try to show that there's

19     overdetention, but there's no context, and there's no

20     foundation as to why any particular inmate has stayed in max

21     custody or at a particular step progression.  So there's --

22             THE COURT:  She's just merely offering the records for

23     what I understand DOC keeps them.  You're not saying these

24     records are inaccurate, are you?

25             MS. LOVE:  No, I'm not saying that they're inaccurate.

1              THE COURT:  Okay.  Then they're admitted.

2    Q.  (BY MS. MORRIS)  Mr. Campbell, can you please bring up

3    Plaintiffs' Exhibit 1315.

4              And just for the record, 1315 is one of the documents

5    that we stipulated to the admission of.

6              Are you familiar with Plaintiffs' Exhibit 1315?

7    A.  Yes.

8    Q.  What is 1315?

9    A.  Department Order 807, Inmate Suicide Prevention, Mental

10   Health Watches, and Progressive Mental Health Restraints.

11   Q.  This is the ADCRR policy that sets out the policies

12   regarding suicide watch and suicide prevention, correct?

13   A.  Yes.

14   Q.  Could we go to what is marked on the page as Page 9, which

15   is Page 11 of the PDF.  And here we see Section 7, which is

16   Guidelines for All Mental Health Watches.  Do you see that?

17   A.  Yes, ma'am.

18   Q.  Okay.  We're actually going to go down to the next page to

19   Section 7.6.  And 7.6 provides that unless it's determined to

20   be contraindicated by a licensed mental health professional,

21   showers, telephone privileges, recreation, and visits --

22   visitation shall be made available to the inmate who's on

23   mental health watch.  Correct?

24   A.  Correct.

25   Q.  To determine whether a person is on mental health watch --

1   whether a person on mental health watch can go to recreation,

2   correctional staff look at the watch orders?

3   A.   That is correct.

4   Q.   Staff follows what the watch order says as far as letting

5   people go to recreation?

6   A.   Correct.

7   Q.   Mr. Campbell, can you please bring up Plaintiffs' Exhibit

8   2134.   And Plaintiffs' 2134 was also one of the documents

9   subject to the stipulation for admission.

10          Can you tell me what this document is.

11  A.   It is a mental health watch order.

12  Q.   So this is the kind of document that we were just talking

13  about where correctional staff would look to see whether or not

14  a person who is on mental health watch could go to recreation,

15  correct?

16  A.   Correct.

17  Q.   Deputy Warden Scott, in the middle of the page there's a

18  preprinted section that says conditions for all mental health

19  watches.  Do you see that?

20  A.   Yes, ma'am.

21  Q.   Okay.  Could we blow that up.  Thank you.

22          And it sets out the conditions for all mental health

23  watches unless they're changed, correct?

24  A.   Correct.

25  Q.   And this particular form -- I'm sorry.  The last condition

1   listed is provide telephone, recreation, and visitation

2   privileges, correct?

3   A.  Correct.

4   Q.  This particular form that we're looking at indicates that

5   the person on watch could have recreation, correct?

6   A.  Correct.

7   Q.  But at Browning you do not have the physical plant to allow

8   most people on mental health watch to go to recreation,

9   correct?

10  A.  Correct.

11  Q.  You do not know how long people spend on mental health

12  watch at Browning?

13  A.  No.  I don't -- I don't have anything to do with the

14  inmates being placed on mental health watch or how long they're

15  on mental health watch for.

16  Q.  And you don't know how long they're on watch for?

17  A.  Correct.

18  Q.  There are people at Browning who have repeatedly gone from

19  their housing unit in Browning into mental health watch back to

20  their housing unit, back to mental health watch, cycling in

21  that way, correct?

22  A.  Yes.

23  Q.  You don't know exactly how many?

24  A.  No, not exactly how many.

25  Q.  You think it's more than five people though?

1    A.   I believe it was between five and ten.

2    Q.   At least until recently, when the exterminator came to

3    Browning, they were not actually servicing the cells, correct?

4    A.   That is correct.

5    Q.   An exterminator came to Browning around September 20th of

6    this year?

7    A.   Yes.

8    Q.   And you do not know whether the exterminate -- whether the

9    exterminator serviced the cells on that visit, correct?

10   A.   No, I do not know.

11   Q.   I'm going to shift gears a little bit.  Eyman-Browning has

12   about 60 percent of the staff you need, correct?

13   A.   Correct.

14   Q.   Browning has been staffed at about that level since you've

15   been at Browning?

16   A.   Yes, ma'am.

17   Q.   Which is since March of 2020?

18   A.   Yes, ma'am.

19   Q.   Vacancies have increased at Browning in that time?

20   A.   Yes.

21   Q.   All programming, all programming, class group education,

22   outside recreation, SMI classes, and education were cancelled

23   at Browning from March, 2020, through June, 2021, correct?

24   A.   That is correct.

25   Q.   SMI table time was cancelled at Browning from March, 2020,

UNITED STATES DISTRICT COURT

687

1    through March, 2021, correct?

2    A.  Correct.

3    Q.  People only had chute recreation at Browning from March,

4    2020, through June, 2021, correct?

5    A.  Yes.

6    Q.  And chute recreation was also sometimes cancelled, correct?

7    A.  On occasions, depending on what the staffing level was that

8    day.

9    Q.  And you don't know how frequently it was cancelled,

10   correct?

11   A.  Not off the top of my head, no.

12   Q.  Usually when rec is cancelled, it's at least a cluster that

13   has rec cancelled, correct?

14   A.  Correct.

15   Q.  Could we bring up Plaintiffs' Exhibit 2031, which was

16   admitted pursuant to the stipulation.

17            THE CLERK:  I have 2131.

18            MS. MORRIS:  That is what I meant to say, Plaintiffs'

19   Exhibit 2131.

20   Q.  (BY MS. MORRIS)  What is this document 2131?

21   A.  The daily post sheet for the Browning Unit.

22   Q.  And it's for July 30th, 2021, correct?

23   A.  That is correct.

24   Q.  The AM shift?

25   A.  That is correct.

1    Q.  And the AM shift is the shift that starts at 6:00 a.m.?

2    A.  Yes.

3    Q.  And it's a 12-hour shift at Browning, correct?

4    A.  Correct.

5    Q.  And generally recreation happens during the AM shift?

6    A.  All recreation happens during the AM shift.

7    Q.  The posts listed in the left-hand column on Plaintiffs'

8    Exhibit 2131, those are the posts that are supposed to be

9    staffed, correct?

10   A.  Correct.

11   Q.  And all of the posts listed on the daily post sheet are

12   critical, correct?

13   A.  Yes.

14   Q.  The second column shows the posts that were staffed during

15   the day shift on Friday, July 30th, 2021, at some point during

16   the day, correct?

17   A.  Correct.

18   Q.  The empty boxes in the second column reflect posts that

19   were not staffed that day?

20   A.  Correct.  Well, at that time when this roster was printed,

21   it would show that that post wasn't staffed, but an earlier

22   roster, as the day progresses, there would have been changes to

23   the rosters.  So earlier in the day, depending on what time

24   this roster was printed, there might have been somebody in

25   those positions.

1    Q.  Does the roster get finalized at the end of a shift?

2    A.  It's not accurate as to what has transpired during the day.

3    Our roster system doesn't work that way.

4    Q.  Okay.  But if you were to look at the roster at

5    6:00 p.m. --

6    A.  Okay.

7    Q.  -- for the day shift.

8    A.  Okay.

9    Q.  Would that reflect what the staffing was at the end of the

10   day shift?

11   A.  Yes.

12   Q.  And would that change -- would there be any reason for that

13   to change after that point?

14   A.  There are -- There are issues with the roster.  So, like,

15   at the end of this roster here, if somebody was on overtime

16   that day or if they got moved to a different shift, then it

17   would have removed them off of the roster that's in the

18   computer system.  However, the printed out roster wouldn't

19   change.  If it was printed out, then that would be the final

20   showing what the total amount of staff was that was there at

21   the end of the shift.

22           THE COURT:  Is this the printed out -- I think what

23   we're trying to get at is is this the accurate one for that

24   day, or are you saying it could change?

25           THE WITNESS:  I'm saying that at the end of the day,

1    that was the final roster that they printed out.

2              THE COURT:  This one?

3              THE WITNESS:  This.

4              THE COURT:  Okay.  Thank you.

5              THE WITNESS:  Well, I can't say that.  I can't say

6    that that's absolutely the last one.  I don't know.  Because

7    there was probably multiple rosters printed out that day.  So

8    to absolutely say that that's the very last one, I don't know.

9    Q.  (BY MS. MORRIS)  How would -- How would it happen that

10   after the end of a shift, a person who had been on the roster

11   at the end of the shift disappeared off the roster?

12   A.  An example that I could give is when somebody's moved even

13   after in our system, not after what's been printed but in our

14   system, if somebody is moved from one shift to another, it goes

15   back, and it messes up the roster.  So it could show that the

16   person was no longer there when in actual the printed roster

17   would show that they were there.

18   Q.  Do you have no way of knowing, looking back at the rosters,

19   what posts were staffed?

20   A.  No.  I have a way of knowing.  I can go and pull the

21   journals for the shifts for the posts, and I can see who was

22   there.

23   Q.  When you say the journals, that's the correctional service

24   journals?

25   A.  Absolutely.

1   Q.  And correctional service journals are also called

2   correctional service logs?

3   A.  Correct.

4   Q.  Okay.  Do you expect that the roster at the end of the day

5   is roughly accurate?

6   A.  I expect that all of the rosters printed during that day

7   have an accurate reflection of what was going on at the time

8   that that roster was printed.

9   Q.  Do you know -- Withdrawn.  Do --

10          Does Eyman-Browning maintain a printed set of rosters?

11  A.  Yes.  The rosters are printed out at the end of every

12  shift, and they're printed out throughout the day.  And they're

13  turned in with the shift paperwork at the end of the day.

14  Q.  Can you tell me what is a floor officer as it's listed on

15  Plaintiffs' Exhibit 2131?  There is, for example, Baker floor,

16  King floor, Abel floor.  What are those officers?

17  A.  Those officers are responsible for all of the duties that

18  the floor officers have, conducting recs and showers, passing

19  out paperwork, passing out meals, facilitating movement in and

20  out of the cluster, doing counts, security checks, health and

21  welfare checks, fire safety checks throughout their day.

22  Q.  And what is a control officer?  We see several that say Dog

23  control, Lincoln control.

24  A.  The control room officers are the ones that open the doors,

25  and they write in the journal.

SCOTT - DIRECT

1    Q.  According to this daily post sheet, there was no one

2    assigned to the posts for Able control, Dog control, Lincoln

3    control, Lincoln floor, Fox control, George control, Charlie

4    control, Fox floor, John floor, Charlie floor.  Correct?

5    A.  That's what the journals -- or that's what the roster shows

6    right now.

7    Q.  And Abel, Charlie, Dog, Fox, John, and Lincoln, those are

8    all names of clusters, correct?

9    A.  Correct.

10   Q.  According to this daily post sheet -- Withdrawn.

11            Is it possible to pull it down so we can see the

12   bottom half of this page and the top half of the next page?

13            Perfect.  Thank you.

14            According to this daily post sheet, there was no one

15   assigned to three of the four recreation -- to the posts for

16   three of the four recreation officers, six of the seven mental

17   health medical program posts, either of the two DI326

18   recreation escort SMI posts, one of the two yard officers, and

19   five of the six rovers.  Correct?

20   A.  Correct.

21   Q.  Could we please bring up Plaintiffs' Exhibit 2135.

22            Are you familiar with this document?

23   A.  Yes.  It's an information report dated July 30th, 2021.

24   Q.  And are you -- do you use documents like this in the

25   ordinary course of your work?

UNITED STATES DISTRICT COURT

693

1    A.   Every day.

2    Q.   They're created by employees of ADCRR working within the

3    scope of their employment, correct?

4    A.   Correct.

5    Q.   And they're created contemporaneously with the events that

6    they report.

7    A.   Say that again please.

8    Q.   They're created at the same time, generally the same time

9    as the events that they're reporting; is that correct?

10   A.   Correct.

11   Q.   When they relate to incidents or situations at

12   Eyman-Browning like this one does, you review them, correct?

13   A.   Yes.

14   Q.   And could we go to the next page please.  And you actually

15   signed off on this particular one, correct?

16   A.   I did.

17        MS. MORRIS:  Going back to the first page -- Actually

18   withdrawn.

19        I move to admit this document, Plaintiffs' Exhibit

20   2135.

21        MS. LOVE:  No objection.

22        THE COURT:  It's admitted.

23   Q.   (BY MS. MORRIS)  So this is for July 30th, 2021, right?

24   A.   Yes, ma'am.

25   Q.   And that's the same day as the daily post sheet that we

694

1    were just looking at, correct?

2    A.  Correct.

3    Q.  And it's the same shift?

4    A.  Yes.

5    Q.  And this indicates in the middle section of the information

6    report that at the beginning of the day Browning had 33 posts

7    collapsed.  Could you blow that part up.

8    A.  I see it.

9    Q.  At the beginning of the a.m. shift, Browning Unit had 33

10   posts collapsed, correct?

11   A.  Yes.

12   Q.  Collapsed means that the post wasn't staffed by a single

13   person, correct, or there wasn't one person assigned to that

14   post?

15   A.  Correct.

16   Q.  And the information report goes on to say that due to low

17   staffing numbers, Dog chute rec, Henry rec 1 to 6, and John 5

18   to 6 class were curtailed.  Correct?

19   A.  Correct.

20   Q.  Henry rec 1 to 6 means in all of the pods in Henry?

21   A.  Yes.

22   Q.  And in when it says Dog chute rec, it doesn't indicate

23   which pods.  Would that mean it was all pods?

24   A.  It would mean that it was all pods.

25   Q.  And then for John, it's only pods five and six where

1    classes were curtailed?

2    A.   Correct.

3    Q.   And curtailed means that those activities were not

4    conducted, correct?

5    A.   Correct.

6    Q.   They were cancelled?

7    A.   Yes.

8    Q.   Could we go to the next page please.

9             So we're looking at ADCRR00055286 -- I'm sorry -- 287.

10            I'm sorry.  One more page.

11            This -- What is this page?

12   A.   So that's outlining what the shift commander was able to

13   post that morning and what he had to -- actually what was not

14   posted that morning.

15   Q.   So the page that we're currently looking at lists out all

16   the posts that were not staffed at the beginning of that shift?

17   A.   Correct.

18   Q.   Okay.  What is a health and welfare check?

19            THE COURT:  Why don't we stop here.  It's after 4:30.

20            Warden, we'll see you tomorrow.

21            THE WITNESS:  Yes, ma'am.  Yes, Your Honor.

22            THE COURT:  All right.  You may be excused.

23            THE WITNESS:  Thank you, Your Honor.

24            THE COURT:  Okay.  Counsel, first of all, I'm sure

25   defense counsel received the memo that I did concerning

1    Exhibit No. 635 where plaintiffs' counsel is offering this

2    exhibit to establish notice, essentially imputing the notice

3    to -- the notice to DOC, meaning because this note which is

4    attached, letter, was sent to defense counsel, that is imputed,

5    the content of it, I believe, is imputed.  They hope to impute

6    it to DOC, that is, because it was received by the Struck Love

7    firm.

8              And plaintiffs' counsel tried to answer the issues

9    that I raised, which is I don't see that it's relevant unless

10   the content is admissible.

11             So if you take -- First of all, let me give a little

12   background here.  I agree that information that's sent to a

13   lawyer can be imputed to the client.  And I have done so too.

14   But that's a very factually dense determination to be made.  It

15   has to be clear.  So, in other words, the facts have to be

16   undisputed.

17             And it's a legal issue.  And I don't see anywhere in

18   the final pretrial order that you have raised this legal issue,

19   because oftentimes when there is an argument of imputing

20   knowledge or information that's provided to a lawyer to the

21   client, there are issues that the lawyers raise about your

22   suggesting issues concerning professional responsibility and

23   are we in trouble because we didn't provide it to them.  So I'm

24   very concerned about that unless counsel has been told that

25   this is what you intended to do as a legal matter and not raise

1    it for the first time in court.

2              Now, in addition to that, though, you did try to

3    address my question about whether or not it's really hearsay

4    anyway.  And on Page 1 at the bottom of the page, Lines --

5    starting with Line 24, you say, "Plaintiffs do not offer the

6    letter to establish the truth of the assertions."  Okay.

7              Does everybody know what the letter is?

8              And that's that Mr. Slavin or Slavin -- I'm not sure

9    who it is -- routinely reports benefit of certain psychiatric

10   medications or he actually -- let's see what it is.  He needs

11   more treatment is basically what he's saying for his ongoing

12   mental health problems.

13             And that this was sent to the firm by ACLU lawyers.

14   And there was a response from the Struck Love law firm and that

15   somehow this is imputed to DOC.

16             The problem that I see is, on the issue of hearsay, is

17   you say you're not offering for the truth of what is asserted,

18   but you say, rather, seek to introduce the letter to

19   demonstrate defendants -- that would be DOC -- were put on

20   notice of perceived deficiencies in the healthcare.

21             If you want -- You can stop there that they were put

22   on notice, but it's not relevant unless they were put on notice

23   concerning perceived deficiencies.

24             So the notice has to be relevant for it to somehow --

25   for you to somehow be able to argue that DOC was deliberately

1    indifferent.

2            Got it?  So that's my problem with it.

3            MR. FATHI:  May I respond, Your Honor?

4            THE COURT:  You may.

5            MR. FATHI:  Well, first, on the question of whether

6    notice to counsel is imputed to the client, that is,

7    respectfully, Your Honor, not a matter of fact.  That is a

8    matter of agency law.  And the Supreme Court held in Link

9    versus Wabash Railroad that each party is considered to have

10   notice of all facts, notice of which can be charged upon the

11   attorney.

12           So there's no requirement to demonstrate in an

13   individual case that the attorneys didn't --

14           THE COURT:  But you didn't raise the issue that you

15   intended to do this, because you're basically saying to counsel

16   that we sent this to you, and your clients are liable because

17   we sent it to you.  So what do they do?  Do they have to call

18   and get attorneys to represent them?  It's a professional

19   responsibility issue.

20           Now, in all the cases that I've had where there's been

21   a potential imputing of notice that was received by the lawyers

22   to the client, the lawyers might be concerned about it.

23           So you never raised that, did you, or is it in the

24   pretrial order that you intended to do this?

25           MR. FATHI:  Your Honor, we weren't obligated to tell

1    them that we intended to do this.  We've been doing this as

2    a -- over a period of years to advocate for our clients who we

3    believed, after careful review of their medical records, were

4    at serious risk of imminent harm either from mental health or

5    medical reasons.  And we have sent hundreds of such letters, as

6    defendants admitted.

7              THE COURT:  Well, I'm going to ask counsel, because if

8    you are saying this, does -- I would think counsel has got to

9    be concerned that they've got a problem with their client if

10   they didn't provide this information to them.  And that's a

11   legal issue.

12             MR. FATHI:  Yes, Your Honor.

13             THE COURT:  It was cited to me the Supreme Court case

14   about agency.  Agency is not a factual issue.  It's a legal

15   issue.

16             MR. FATHI:  Precisely, Your Honor.

17             THE COURT:  Okay.  Did you raise it?  Did you tell

18   them that?

19             MR. FATHI:  Your Honor, raise what?  I'm not sure I

20   understand the question.

21             THE COURT:  Did you raise the argument that -- Did you

22   tell them that we intend to argue to the Court that every time

23   we sent a notice to you about a problem that a particular

24   prisoner was having, some issue of failure to provide mental

25   health treatment, that that's going to be imputed to your

```
 1     client --

 2              MR. FATHI:  No, Your Honor.

 3              THE COURT:  -- so you'd better be careful, because

 4     we're going to argue that that's imputed to your client, and

 5     your client is the one that has the -- is the defendant in this

 6     case.

 7              MR. FATHI:  Your Honor, we don't believe we were

 8     required to specifically give notice of that.  The knowledge --

 9     Counsel's knowledge is imputed to their client as a matter --

10              THE COURT:  Not under all circumstances.  I'll stop

11     you right there.  I've had this issue, in the 27 years I've

12     been here, a number of times.  And it is sometimes hotly

13     contested as to whether or not it can be imputed.  And you put

14     the lawyer in the middle of all of this.

15              So let me hear from defense counsel.

16              MR. FATHI:  May I say one more thing, Your Honor?

17              THE COURT:  Yes.

18              MR. FATHI:  Lawyers are presumed to know the law.  And

19     so given the fact that we have been sending, as I said,

20     hundreds of these letters over a period of years, and they

21     always send us some form of acknowledgment, even if it's just a

22     short e-mail, they are presumed to know the law and to know

23     that this is potentially --

24              THE COURT:  Maybe this isn't an issue.  Is this an

25     issue for you?
```

UNITED STATES DISTRICT COURT

1      MR. STRUCK:  The admission of these documents,

2   absolutely, is an issue, Your Honor, and for a variety of

3   reasons.

4      THE COURT:  The question is the imputing knowledge of

5   your client because you received these records.

6      MR. STRUCK:  It's an issue with respect to what they

7   were planning to do with it, absolutely.  They never said they

8   were using these as a got-you and that we're going to use it to

9   try and establish deliberate indifference on behalf of your

10   clients.

11      The first time that we knew that was when we saw all

12   these documents on the exhibit list, which we objected to.

13   There's nothing in the joint pretrial that they were going to

14   use these to establish some sort of notice.  There's additional

15   problems with the letters themselves.  As the Court pointed

16   out, that's hearsay.  It's hotly disputed, the information

17   that's in the documents that they prepared based on their

18   review of eOMIS and their view of what's appropriate care and

19   what's not appropriate care.  It makes all the lawyers in this

20   case witnesses.

21      They have over a hundred of these letters that they

22   have listed as exhibits.  We'll have to have 100 mini trials to

23   establish that it's not deliberate indifference.

24      In fact, the one that they sent with Mr. Slavin, we

25   looked at it.  It's not deliberate indifference.  It's not

1    accurate.  And --

2            THE COURT:  I'm going to let you brief it.  But it may

3    well -- I told you that I am persuaded that you should have

4    provided notice to them that every letter that we are

5    offering -- and we have one for Mr. Slavin -- if that's the

6    only one, then there's not much to worry about.  But if there's

7    many other ones which are imputing the knowledge of DOC because

8    it was received by the lawyers, as I said, a number of times,

9    the lawyers have contested that.  It's factually dense.

10           And in the final pretrial order, first of all, you

11   should have talked to counsel about it.  And, secondly, you

12   should have raised it in the final pretrial order.  And you

13   could have brought it to my attention, and I could have

14   resolved it.  We could have had a hearing for the Court to

15   determine, for every one of these letters that you received,

16   whether or not it was fair to impute knowledge to DOC.

17           Now, that's the problem.  It doesn't come in

18   automatically because you think everything is imputed.  It

19   doesn't.  Not in this case.

20           Secondly is the hearsay.  Now, it may well be that we

21   don't have to even deal with the more complicated professional

22   responsibility issue because of the hearsay.  As I said, it's

23   irrelevant unless notice is the only issue.

24           So if in fact he sent a letter to the lawyers

25   complimenting them on DOC, then -- or just sent hello, how are

1    you doing, that's not relevant to this case.  That's not

2    relevant to whether or not you can establish deliberate

3    indifference.  It's the content of it.

4          And the content here is that he's complaining about

5    not getting services, right?

6          MR. FATHI:  Yes, Your Honor.

7          THE COURT:  So it's only -- And then from that, then

8    DOC did not give them that.  So that would establish deliberate

9    indifference at least on that one instance.

10          MR. FATHI:  Your Honor, I think there's an important

11    distinction here.  The content is important.  The words that

12    are written in the letter are important.

13          The truth of the factual truth or non-truth of those

14    words is not.

15          THE COURT:  Let me tell you that can't be true,

16    because you cannot draw deliberate indifference to DOC unless

17    it is true, unless in fact he complained about not getting

18    services.  If it was just a notice, if the issue in this case

19    was just notice, in other words, that the question was was DOC

20    notified, that's when you don't have a hearsay issue.  But

21    there can't be deliberate indifference unless they were

22    deliberately indifferent to something.  And they're only

23    deliberately indifferent to something that is a constitutional

24    violation.  That is, they failed to do anything about his

25    request.

1          MR. FATHI:  Your Honor, let me give an example.  Let's

2    say DOC got a thousand of these letters saying, you know, you

3    don't have enough medical staff; I didn't get to see the doctor

4    today because you don't have enough medical staff.

5          Let's say DOC got a thousand of those letters, and

6    they took absolutely no action to investigate.  That would be

7    deliberate indifference, regardless of whether any one of those

8    letters was factually true.

9          THE COURT:  If in fact it was false, they didn't

10   have --

11         MR. FATHI:  But that's a separate --

12         THE COURT:  No, no, no.  It has to not be true.  If

13   they -- If he says -- If they say that you do not or have not

14   provided healthcare for every day in the month of October, you

15   have not provided healthcare, and they did provide it, it has

16   to be that they didn't -- if they provided it, I mean, then

17   it's irrelevant.  It has to be that they didn't provide it.

18   So, Mr. Specter's nodding his head.

19         MR. SPECTER:  Could I nod my head and add some words

20   to that?

21         THE COURT:  Yes.

22         MR. SPECTER:  Thanks.  So the idea I think that we're

23   trying to get across is that we write these letters to tell

24   them that we think in our opinion a person's not getting

25   adequate care.  That's the notice.

1            And also I believe -- and we've been told this in

2    response -- that these letters are -- our letters are forwarded

3    to Centurion, which is the agent of the ADC.  And so that, to

4    me, seems like we don't have a notice -- an agency issue so

5    much because the letters are forwarded to the parties' agent.

6            Secondly, if you have -- if we've said that, that our

7    clients are not getting care to the defendants, then the second

8    part of the proof, which we do at the trial, is whether or not

9    they actually got the care, which is your point.  Your point is

10   that we need to know whether or not they got the care that we

11   alleged that they didn't get.

12           So what -- So the factual disputes about whether they

13   got the care or not are supposed to be settled here after they

14   get the letter.

15           All we're saying is that when we establish that they

16   haven't gotten -- I'm having trouble breathing -- when they --

17   when we -- When we sent them the notice, then we establish here

18   that they didn't get the care, that's deliberate indifference.

19           THE COURT:  That's true.  But what I'm saying is this.

20   Let's do -- Because I don't think I'm able to persuade well

21   enough.

22           If the issue was notice only and they ignored it, if

23   there was a regulation that required, whether true or not, you

24   have to respond, then that's relevant to deliberate

25   indifference.

1          But it's not relevant unless in this case there was a

2     problem and they didn't respond to it.  So that's my point.

3          And, frankly, your own verbiage says that.

4          So it would -- I would agree with you if you stopped,

5     say, you know, we're on the same page, Page 1, Line 25 through

6     28, rather defendants seek to introduce the letter to

7     demonstrate the defendants were put on notice.  Stop.  If that

8     was it.

9          But it's notice of the perceived deficiencies.  Okay.

10    It's the per -- And -- Because that's all that's relevant here,

11    is the perceived deficiencies they had notice, and then they

12    didn't do anything.

13         Now, my point is if it was only notice -- And I'm not

14    going to say it anymore, because I can't seem to get through.

15    And, I mean, you can't get through to me, but it just seems

16    very obvious to me.

17         So let's get a response.  And my biggest concern,

18    though, is that you didn't raise this -- You say it's a legal

19    issue; it's so obvious that you could always impute it.  No,

20    you can't.  I've had cases where I have, and I have cases where

21    I haven't, because it's factually dense, and there are

22    professional responsibility issues on top of that.

23         MR. STRUCK:  Your Honor, when would you like that

24    response?

25         THE COURT:  I don't want to hear from the Struck Love

1   firm that they're going to have to hire lawyers to represent

2   them because you're basically saying that they have engaged in

3   professional re -- Well, their client may say it.  Why wouldn't

4   their client say it if it's going to be imputed to them that

5   they didn't do something and let them know?  That's another

6   trial.

7           MR. FATHI:  Your Honor, I want to be very clear that

8   we're not making any allegations of any improper conduct on

9   behalf of defense counsel.

10          THE COURT:  I know you aren't, because I know counsel,

11  and I know how professional you are.  But you don't see the

12  picture over here on this side of the room.

13          If it's being imputed, if they didn't send something

14  to them, and it's being imputed to their client, they're in

15  trouble.  All right.  We'll see you at 8:30 tomorrow.

16          MR. STRUCK:  Your Honor, just very quickly, with

17  respect to two things, with respect to scheduling, and also I

18  did want the Court to know that the parties or the plaintiffs

19  have agreed to dismiss the dental claims.  So there won't --

20  Dental will not be a part of the case.

21          It's also -- I know that the Court has requested that

22  we file by the end of the day a schedule.

23          THE COURT:  There is this issue about the 12th, right?

24  Is that what you're raising?

25          MR. STRUCK:  Yes.

1          THE COURT:  I don't -- Frankly, certainly if the

2    Court's going to go, I would go, but this trial's more

3    important to me.

4          But if people don't want to come in on Monday, then

5    I'll forget it.  If you don't mind coming in on Monday, then

6    we'll have to juggle things around.

7          MR. STRUCK:  We certainly don't mind coming in on

8    Monday.  We don't want to make you miss the memorial service

9    either.  So I just needed to know because we're trying to line

10   people up, so --

11         THE COURT:  Is there any objection from plaintiffs'

12   counsel carrying it over to Monday?

13         MR. FATHI:  I'm sorry, Your Honor.  You're talking

14   about Monday, the 22nd?

15         THE COURT:  Yes.  That would be the Monday after the

16   Friday, which is --

17         THE CLERK:  22nd.

18         THE COURT:  Yeah, yeah.  I'm sorry.  Yes.

19         MR. FATHI:  And that would happen if there was no

20   court on Friday, the 12th?

21         THE COURT:  Yes, exactly.  Thank you.

22         MR. FATHI:  That's fine with us, Your Honor.

23         THE COURT:  Okay.  So that means you're going to have

24   to work the schedule.  I can't do that.  You're going to push

25   things off a little bit.  All right.

```
1            MR. STRUCK:  Is it --

2            THE COURT:  And, frankly, I said I thought it was

3    approximately about three hours.  I think -- is it at 10:00?

4            THE CLERK:  It starts at 11:00.

5            THE COURT:  It starts at 11:00.  I think we leave

6    here -- So we probably won't have a morning.  So it's probably

7    going to be more than just three hours.  So we'd have to -- And

8    I'll find out.  I'll find out in the morning on that.

9            MR. FATHI:  I'm sorry, Your Honor.  I'm sure I'm just

10   missing it.  So there is no court on Friday, the 12th?  Is that

11   what we're deciding?

12           THE COURT:  We will.  But the ceremony is in the

13   morning, and then marshals have to take us over, so it takes

14   more time.  It's actually close by.  But, you know, we have to

15   go over in a bus and all that.  So I would expect I won't be

16   back here until the afternoon.  So it would be half a day.

17           I'm going to find out the details on that.  But it

18   sounds as if nobody has an objection to holding the remainder

19   of the trial, because of this interruption, on the Monday after

20   the trial was supposed to be finished, correct?

21           MR. STRUCK:  That's correct.  I just wanted to make

22   sure, because since you have ordered us to file the schedule

23   today, could we wait until we know what's going on?

24           THE COURT:  Oh, absolutely.

25           MR. STRUCK:  Okay.
```

```
 1                 THE COURT:  Thanks for asking.

 2                 MR. STRUCK:  Okay.

 3                 MR. SPECTER:  Your Honor, this is more of a

 4     convenience issue, but many of us are from out of town.

 5                 THE COURT:  Yes.

 6                 MR. SPECTER:  And so -- especially my colleagues here

 7     are from Washington, DC.

 8                 THE COURT:  Yes.

 9                 MR. SPECTER:  So I think we would prefer it, if it's

10     okay with the Court, to just not have the Court for those three

11     hours on Friday.  That way we could -- Because the 11th is a

12     holiday, and we're not going to be here for that day either.

13                 THE COURT:  So you're talking you'd like to have the

14     entire day then on Monday as opposed to breaking it up?

15                 MR. SPECTER:  Yes.

16                 THE COURT:  I see a lot of nods there.

17                 MR. STRUCK:  We don't object to that.

18                 THE COURT:  So that's what we'll do.  That makes it

19     easier for me then too because I won't then have to figure out

20     exactly when I would be back.

21                 MR. SPECTER:  That would be perfect.  Thank you.

22                 THE COURT:  So then we end up with, on the 11th we

23     don't have trial.  And Friday, the 12th, we won't have trial.

24     But we will have trial on the following -- week following

25     Monday, and that's the 22nd?
```

1        THE CLERK:  Yes.

2        THE COURT:  22nd.

3        MR. STRUCK:  And was it, I believe, the 10th that you

4    had -- were also -- was -- There was another day I thought

5    that --

6        THE CLERK:  9th we have Veterans Court, so we're

7    ending at 3:00.

8        THE COURT:  I'm going to work that.

9        THE CLERK:  We're not going to have vet court?

10       THE COURT:  It starts at 4:00, doesn't it?

11       THE CLERK:  You have staffing at 3:00.

12       THE COURT:  But I'm going to have that at noon.  Thank

13   you for that.  I have a Veterans Court here.  But we'll start

14   that court at 4:00, so we'll -- we will adjourn at 4:00.

15       MR. STRUCK:  On the 9th.  Okay.  And if there's any

16   way we could get a tabulation as far as time, that would be

17   fantastic.

18       THE COURT:  Great.  Thank you.

19       MR. SPECTER:  Thank you, Your Honor.

20       THE COURT:  Have a good evening.

21   (Proceedings recessed at 4:58 p.m.)

22

23

24

25

1                    **C E R T I F I C A T E**

2

3            I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6            I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11           DATED at Phoenix, Arizona, this 24th day of November,

12   2021.

13

14

15                              s/Linda Schroeder
                           Linda Schroeder, RDR, CRR
16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**