UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Shawn Jensen, et al., on behalf )
of themselves and all others )
similarly situated; and Arizona )
Center for Disability Law, )
                              )
         Plaintiffs, )     CV-12-0601-PHX-ROS
                              )
     vs. )     Phoenix, Arizona
                              )     November 19, 2021
David Shinn, Director, Arizona )         1:08 p.m.
Department of Corrections; and )
Richard Pratt, Interim Division )
Director, Division of Health )
Services, Arizona Department of )      (REDACTED)
Corrections, in their official )
capacities, )
                              )
         Defendants. )  (AMENDED AS TO PAGE NUMBERS)
                              )
_____ )

BEFORE:   THE HONORABLE ROSLYN O. SILVER, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BENCH TRIAL – DAY 13 – P.M. SESSION

(Pages 3073-3198)

Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                          A P P E A R A N C E S

2    For the Plaintiffs:

3
                 ACLU – Washington, DC
4                By: DAVID CYRUS FATHI, ESQ.
                     CORENE T. KENDRICK, ESQ.
5                    MARIA V. MORRIS, ESQ.
                 915 15th Street NW, 7th Floor
6                Washington, DC  20005

7                Prison Law Office
                 By: DONALD SPECTER, ESQ.
8                1917 5th Street
                 Berkeley, CA  94710
9
                 Arizona Center for Disability Law – Tucson, AZ
10               By: MAYA STOCK ABELA, ESQ.
                 177 North Church Avenue, Suite 800
11               Tucson, AZ  85701

12

13

14

15   For the Defendants:

16               Struck Love Bojanowski & Acedo, PLC
                 By: DANIEL PATRICK STRUCK, ESQ.
17                   RACHEL LOVE, ESQ.
                     ASHLEE B. HESMAN, ESQ.
18               3100 West Ray Road, Suite 300
                 Chandler, AZ  85226
19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1                         INDEX OF WITNESSES

2    WITNESS FOR THE        Direct    Cross    Redirect
     DEFENDANTS:
3    Dr. Joseph V. Penn               3076

4

5

6

7

8

9

10

11

12

13

14

15

16

17                        INDEX OF EXHIBITS

18   EXHIBIT NO.:        DESCRIPTION:                    ADMITTED:

19    2223      2020.11.25  XXXXXXXX HNRs (Penn Ex. 39)    3192

20    2262      Documents produced by Dr. Joseph V. Penn   3148

21              in Response to Subpoena Duces Tecum
                (All notes relating to this case)
22              ADCRR00232486–ADCRR00232614

23

24

25

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)   3076

<u>P R O C E E D I N G S</u>

12:34:24PM 1

2          (Proceedings resumed at 1:08 p.m.)

3          THE COURT:  You may proceed.

4                     CROSS-EXAMINATION

1:08:51PM 5  BY MS. KENDRICK:

6   Q.  Dr. Penn, before we broke for lunch, we were talking about

7   NCCHC and your role on the board of directors.  And I believe

8   that you previously testified that you didn't know or you

9   couldn't remember how much money Centurion sponsored for NCCHC

1:09:12PM10  conferences and trainings; is that correct?

11  A.  That's correct.

12  Q.  Okay.  Would it refresh your recollection if I showed you

13  something that lists them as a sponsor?

14  A.  Well, sure.

1:09:23PM15  Q.  Okay.

16          MS. KENDRICK:  May I approach, Your Honor?

17          THE COURT:  Yes.  Or can we use the ELMO?

18          MS. KENDRICK:  I can put it on the ELMO.

19          THE COURT:  Try Mr. ELMO.

1:09:33PM20          MS. KENDRICK:  I will try Mr. ELMO.

21          THE CLERK:  It's working.

22          MS. KENDRICK:  It's working.  Excellent.

23  BY MS. KENDRICK:

24  Q.  All right.  I am showing you something from the NCCHC

1:09:42PM25  website for the spring conference 2021 sponsors for the

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)      3077

1:09:48PM 1    conference on correctional health care, and do you see that

2    under platinum sponsors it lists Centurion and another

3    corporation?

4    A.  Yes.

1:10:00PM 5    Q.  Okay.  Does that refresh your recollection as to Centurion

6    sponsoring conferences and trainings?

7    A.  Yes, and I think that's the key is that that's to the

8    educational mission of NCCHC.  It wouldn't have anything to do

9    with accreditation or the accreditation process.

1:10:18PM10    Q.  All right.  And also showing you a page from NCCHC's 2020

11    annual report, which was published in 2021 where it is thanking

12    its many inaugural donors to the NCCHC Foundation who have

13    donated to the organization between September 1, 2019 and

14    December 31st, 2020.

1:10:52PM15              And do you see in the fourth column it says, partners

16    in correctional health, annual giving society, gold partners

17    Centurion Health, Corizon Health?

18    A.  Yes.

19    Q.  Okay.  And I believe you also testified that you could not

1:11:12PM20    remember approximately what the cost was for prison or jail

21    systems to apply to get certified and then their annual fees

22    for accreditation; is that correct?

23    A.  Yes, I have no knowledge of that.  I'm not involved in any

24    of those kind of money/finance issues.

1:11:33PM25    Q.  Okay.  Well, I am showing you some cost estimates that

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)     3078

1:11:38PM  1   NCCHC sent to the Nevada Department of Corrections in 2013

        2   regarding accreditation of their prison facilities.

        3          And you will see that it lists each facility in the

        4   first column, then the average daily population, and then

1:11:59PM  5   there's a column that says, "application fee," "initial

        6   accreditation," and then, "annual accreditation fee"; do you

        7   see that?

        8   A.  It just says, "annual."  I don't see "accreditation fee"

        9   after the "annual" part.

1:12:12PM 10   Q.  Okay.  So it says "annual," and then there's numbers

       11   underneath; do you see that?

       12   A.  Yes.

       13   Q.  Okay.  Does this refresh your recollection about

       14   approximately how much NCCHC charges prison systems to accredit

1:12:29PM 15   each facility annually?

       16   A.  So I have never seen that document before.

       17   Q.  Well, you testified, I believe, that you thought it was not

       18   in the tens of thousands of dollars, but perhaps close to

       19   $10,000, so does this comport with your belief?

1:12:48PM 20   A.  Yes, that's fair.

       21          THE COURT:  And I presume you are a member of the

       22   board but you are not compensated as a member?

       23          THE WITNESS:  Correct, it is a voluntary -- and I

       24   don't -- it's pro bono.  I don't get anything for doing it.

1:13:04PM 25          THE COURT:  So you don't receive any compensation?  Do

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)          3079

1:13:07PM 1    you receive any fees whatsoever from the board?

2              THE WITNESS:  No, Your Honor, but when I go to

3    meetings, they waive the registration fee.

4              THE COURT:  Okay.  And are you compensated for, let's

1:13:19PM 5    say, your travel expenses?

6              THE WITNESS:  They give a portion towards that, but

7    pretty much it's out-of-pocket when I go to the meetings.

8    BY MS. KENDRICK:

9    Q.  And Dr. Penn, courts have found NCCHC-accredited prisons

1:13:39PM10   and jails to have unconstitutional delivery of health care,

11   correct?

12             MS. HESMAN:  Foundation.

13             THE WITNESS:  I'm sorry?

14             THE COURT:  I will sustain it on foundation.

1:13:52PM15   BY MS. KENDRICK:

16   Q.  You testified earlier that you were familiar with the

17   Orleans Parish jail that you said you surveyed and it lost its

18   accreditation after Hurricane Katrina.

19             And based on your experience of being a board member

1:14:06PM20   and a very active member of NCCHC, are you aware of any prisons

21   or jails that were NCCHC accredited and found to have

22   unconstitutional delivery of health care?

23   A.  So NCCHC is not a member organization.  I am not a member

24   of NCCHC.  I am on the board, but it is not a member

1:14:31PM25   organization.  So I guess I don't understand your question.

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)   3080

1:14:35PM  1   Q.  My question is, are you aware of the fact that federal

        2   courts have found NCCHC-accredited prisons and jails to have

        3   unconstitutional delivery of health care?

        4   A.  I am not aware of any immediate facilities, but sure, I

1:14:52PM  5   think that's possible.

        6   Q.  Are you aware that the Maricopa County jail was found to

        7   have unconstitutional conditions of health care while being

        8   accredited by NCCHC?

        9        MS. HESMAN:  Objection, vague as to time.

1:15:06PM 10        THE COURT:  Well, just generally, have you heard that?

       11        THE WITNESS:  Yes, Your Honor, I am aware that there's

       12   been a lot of media and coverage about Maricopa County jail and

       13   that they were -- they got into some trouble with the courts,

       14   but now they are back and NCCHC accredited.

1:15:22PM 15        THE COURT:  And let's get some time as to when he knew

       16   it and whether he was a board member during that time.

       17   BY MS. KENDRICK:

       18   Q.  What role were you playing with NCCHC in 2014?

       19   A.  I would have been a representative to the board of direct

1:15:45PM 20   -- the chair -- or sorry, representative to the board, NCCHC

       21   board.  And in 2014 I would have been representing the American

       22   Academy of Child and Adolescent Psychiatry.  I was their

       23   representative to the board in 2014.

       24   Q.  So you were a board member in 2014?

1:16:05PM 25   A.  Yes.

1:16:06PM 1  Q.  And are you aware that in 2014, Judge Neil Wake of this

2  court found the Maricopa County jail to have unconstitutional

3  conditions, even though it was NCCHC accredited?

4  A.  No, I was not aware.

1:16:29PM 5  Q.  Are you aware of any other prisons or jails that have been

6  found unconstitutional in the delivery of health care despite

7  accreditation from NCCHC?

8  A.  No.

9  Q.  The Texas state prisons?

1:16:46PM10  A.  I think in the 1970s the Texas state prisons were NCCHC

11  accredited, and there was a landmark case, I believe the Ruiz

12  case, yeah, so, but again, that's from like the 1970s, as I

13  recall.

14  Q.  Okay.  Ruiz was in 1999, so that might be a little more

1:17:10PM15  recent than the '70s?

16  A.  I'm sorry, I'm thinking of Estelle v. Gamble in the '70s,

17  and you're correct, Ruiz was like in the '80s and '90s.

18  Q.  And Puerto Rico, are you aware of Puerto Rico's prison care

19  being found unconstitutional despite the fact that they had

1:17:31PM20  recently been accredited by NCCHC?

21          MS. HESMAN:  Objection, vague as to time.

22          THE COURT:  Sustained.

23  BY MS. KENDRICK:

24  Q.  Are you aware that in 1998, the Federal Court for the

1:17:38PM25  District of Puerto Rico found that the prison medical care

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)      3082

1:17:42PM 1  there was unconstitutional?

2  A.  No, I was not aware of that.

3  Q.  When you do a survey on a NCCHC tour, how many charts do

4  you normally review?

1:17:59PM 5  A.  I would say it varies.  And I am not the only one reviewing

6  the charts, so it just varies depending on the duration of the

7  survey.  If it's a two-day survey or three-day survey, the size

8  of the facility.  Say it's a state-wide system, it could be a

9  five-day survey.  So it just really varies on the size of the

1:18:19PM10  facility or the system.

11  Q.  Is there a certain percentage of files that are to be

12  reviewed?

13  A.  No, there's no established percentage.

14  Q.  So there's no established percentage and there's no

1:18:33PM15  established number?

16  A.  That's fair.

17  Q.  And you stated that when you have done these surveys, you

18  interview health care staff, custody staff, and incarcerated

19  people; is that correct?

1:18:52PM20  A.  Yes.

21  Q.  And are there guidelines for the surveyors that say what

22  type and how many health care staff they need to interview?

23  A.  There's -- the lead surveyor typically will say, please

24  talk to at least three to five staff, three to five inmates,

1:19:13PM25  and three to five custody staff, so it's just a general

1:19:17PM 1  framework.  But it's not -- I don't believe it's written

2  anywhere or in any kind of document, to the best of my

3  knowledge.

4  Q.  So it depends on the individual who is kind of the team

1:19:29PM 5  leader and how she or he wants to structure it?

6  A.  I think that's fair, yes.

7  Q.  And is there any requirement that on every single survey

8  incarcerated people must be interviewed?

9  A.  I don't know if that's a must, but it's strongly

1:19:48PM 10  recommended or encouraged, so, yes, I think we really want to

11  understand from the patient's perspective of how do they access

12  health care and what's the time frame to get health care.  So

13  we want kind of patient satisfaction if you will.

14  Q.  And --

1:20:05PM 15        THE COURT:  I take it you were unable to do that

16  because of the timing in this case?

17        THE WITNESS:  I'm sorry, Your Honor, I didn't

18  understand.

19        THE COURT:  For your report in this case, I understood

1:20:18PM 20  that you were unable to talk to the inmates.

21        THE WITNESS:  I was directed by the Struck Love Law

22  Firm, I was prohibited from speaking to inmates because they

23  said the plaintiffs didn't want me talking to inmates unless

24  they were present.

25

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)   3084

BY MS. KENDRICK:

Q.  Did you request to speak to incarcerated people knowing that that would just mean that somebody from plaintiffs' counsel would be there with you when you spoke to them?

A.  When I first started doing the case in 2013, I did ask, it sure would be –– I am kind of hampered because it's not fair that the plaintiffs' expert can talk to whoever, whenever, however, but I was not allowed to talk to anybody.

     But I was allowed to observe the milieu and observe inmates in their natural environment, but, no.  I mean, I did ask Struck Love could I speak to inmates, and they told me specifically no, you are not allowed to.

BY MS. KENDRICK:

Q.  Well, did they explain you are not allowed to without the presence of counsel from plaintiffs?  So if plaintiffs' counsel were there, you could have spoken to all of the incarcerated people you wanted to.

A.  I could have, but that would have been very –– that would have hampered the evaluation or interview process, having an attorney present.  That's kind of something that the American Academy of Psychiatry and the law, as part of doing an evaluation, a forensic evaluation, ideally, unless if it's mandated by state law, it's meant to be a clinical –– with an evaluee and evaluant without an attorney present.

Q.  And turning back to your usual practice when doing an NCCHC

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)   3085

1:21:59PM 1   survey, if you are going to speak to prisoners, how are those

2   people selected?  Did the facility choose them?

3   A.  I believe that typically it's a combination of couple of

4   different things.  So when the lead surveyor meets with the

1:22:21PM 5   custody staff at the beginning of the survey, they typically

6   give them a heads-up that we are going to want to talk to some

7   of your health care staff and custody staff and some of your

8   inmates.

9        But then also as they are doing the tour, they could

1:22:37PM10   at any -- any of the surveyors could ask to speak to any

11   inmate, and actually that does occur.  It's spontaneous

12   sometimes.  If an inmate -- say there's an inmate worker there

13   who seems engaged and is there, we could potentially go up and

14   say, hey, do you mind talking to us, we're from -- and we

1:22:58PM15   explain our role.  We explain our agency.  And -- so yes, any

16   inmate could be approached to talk to give feedback on the

17   facility and on the health care services available to them.

18        THE COURT:  Why did you say that it's strongly

19   recommended that you talk to the inmates?

1:23:13PM20        THE WITNESS:  Yes, so that's the process.  NCCHC, they

21   want you to talk to health care staff, to custody staff, and to

22   inmates.  And it kind of gets at the patient's satisfaction,

23   like are they happy.  The kind of questions we would pose would

24   be, what do you think about the health care here?  If you had

1:23:32PM25   to scale it on a zero to five, five being the best, what do you

DR. JOSEPH PENN — CROSS-EXAMINATION (Continued)       3086

1:23:37PM 1    think?  What's good about it, what's not so good.

2              We try not to get into their personal health history,

3         but just like, what do you understand of how you access health

4         care in this facility.

1:23:52PM 5    BY MS. KENDRICK:

6         Q.  And when you visit prisons to do tours either for NCCHC or

7         for this or other litigation, do you -- you normally go to

8         units like the mental health inpatient center, the specialized

9         mental health units; is that correct?

1:24:15PM10    A.  I am so sorry, when you said "this," I didn't follow what

11        you meant by "this."

12        Q.  I'm sorry, what?

13        A.  When you said "this."

14        Q.  You don't understand the word "this"?

1:24:24PM15    A.  No, but in what context were you referring to "this"?

16        Q.  When you go on a tour to do a survey for NCCHC or for a

17        case like this, do you normally go to the units where there are

18        specialized mental health patients?

19             MS. HESMAN:  Objection, compound.

1:24:52PM20         THE COURT:  Do you -- did you understand that

21        question?

22             THE WITNESS:  No, Your Honor, sorry.

23             THE COURT:  Okay.  Rephrase the question.

24        BY MS. KENDRICK:

1:24:58PM25    Q.  Okay.  When you went to the prisons in September, you went

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)     3087

1:25:01PM 1    to the mental health inpatient units, didn't you?

2    A.  I went to those, yes, and I also went to other units.

3    Q.  Yes.  I am going to go through them one at a time.  I don't

4    want to ask a compound question.

1:25:13PM 5         So you went to the mental health inpatient units,

6    correct?

7    A.  Yes.

8    Q.  You went to the step down units, correct?

9         MS. HESMAN:  Objection, vague as to the term "step

1:25:23PM10    down."

11         THE COURT:  Do you understand what step down is?

12         THE WITNESS:  No, Your Honor.

13    BY MS. KENDRICK:

14    Q.  You went to the Perryville step down unit, correct?

1:25:30PM15         MS. HESMAN:  Same objection.  That's not what it's

16    called.

17         THE COURT:  She said Perryville.

18    BY MS. KENDRICK:

19    Q.  You testified on direct about the Perryville step down unit

1:25:38PM20    that you said, looked like something out of a magazine.  So

21    when you were at Perryville, you went to a step down unit,

22    correct?

23    A.  I don't recall the name of it being referred to as a step

24    down.  I thought there was a specific name for it.  I can't

1:25:50PM25    remember if it was Lumley or something like that, but if you

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)   3088

1:25:53PM 1    could name the unit by its given name, then I'd be happy to try

2    to answer your question.

3    Q.  When you went to Perryville, you went to the CRTU, that's

4    also known as building 56, didn't you?

1:26:07PM 5    A.  Yes.

6    Q.  And you also went to Lumley Behavioral Management Unit,

7    correct?

8    A.  Yes.

9    Q.  And when you went to Eyman, you went to the Browning

1:26:14PM10    Behavioral Management Unit, didn't you?

11    A.  Yes.

12    Q.  And you went to the Mental Health Watch Unit, didn't you?

13    A.  Yes.

14    Q.  And these units contain some of the most mentally ill

1:26:29PM15    people in the custody of the Arizona Department of Corrections,

16    correct?

17    A.  When you say "most mentally ill," I am not sure I

18    understand what you mean by that.

19    Q.  The people who are incarcerated in these units tend to have

1:26:44PM20    mental health scores of MH4 or MH5, correct?

21    A.  That's fair, yes.

22    Q.  And MH4 and MH5 are the scores that are given to the people

23    with the most profound mental illness by the Arizona Department

24    of Corrections, correct?

1:27:03PM25    A.  I would say they have -- some of them have serious mental

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)      3089

1:27:06PM  1  illness and some have non-serious mental illness.  I don't know

2  if I would define "profound".  That's not a term that I am

3  familiar with with regard to mental illness or diagnostic

4  categorizations of mental illness.

1:27:22PM  5  Q.  What term do you use?

6  A.  I just used it.  I said, serious mental illness or

7  non-serious mental illness.

8  Q.  Okay.  So you testified on direct about the different

9  scores and you talked about MH4s and MH5s, so holding aside the

1:27:38PM 10  fact that the label "seriously mentally ill" or "SMI" is a term

11  of art in the Arizona Department of Corrections, people who are

12  MH4 and MH5 are some of the most seriously mentally ill people

13  in the Department of Corrections, correct?

14  A.  So I would say they have the possibility to have mental

1:28:01PM 15  illness or serious mental illness, but fortunately by the fact

16  they are availed mental health treatment and services and

17  evaluation and treatment, they are able to demonstrate clinical

18  improvement.

19  Q.  I am asking you a yes-or-no question, Dr. Penn.

1:28:16PM 20         Are the people in the Arizona Department of

21  Corrections who have the MH4 or MH5 label among the most

22  seriously mentally ill people in the prison's custody?

23  A.  I would say that's fair.

24  Q.  And you went to -- you affirmatively went to where these

1:28:40PM 25  people live, correct?

1:28:43PM 1    A.  Yes.

2    Q.  And that's because it's important to know how the system

3    treats the sickest patients, isn't it?

4         MS. HESMAN:  Objection, argumentative.

1:28:53PM 5         THE COURT:  Well, I never suggest that counsel have

6    one tone or another, and it's up to counsel to ask the

7    questions the way she wants.  I didn't think that the form of

8    that question was argumentative.  So overruled.

9         THE WITNESS:  I'm so sorry, what was the question,

1:29:14PM10   please?

11   BY MS. KENDRICK:

12   Q.  The question was, it's important to know how the system

13   treats the sickest patients, isn't it?

14   A.  I think that's fair.

1:29:28PM15   Q.  All right.  So I want to talk a little bit about your

16   methodology for your report.

17        MS. KENDRICK:  Could we pull up Docket 4174,

18   Dr. Penn's report, please, Mr. Campbell, and go to Exhibit 3.

19   It may be under 4176, I think, because it was under seal.

1:30:33PM20   Actually -- there we go.  And we don't want to publish this to

21   the gallery.

22        THE CLERK:  It is not.

23        MS. KENDRICK:  Thank you.

24   BY MS. KENDRICK:

1:31:00PM25   Q.  I am showing you what was listed as Exhibit 3 to your

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)     3091

1:31:03PM 1   report that was filed with the Court on Sunday, and it lists

2   275 incarcerated persons who you say in your report their files

3   were reviewed; is that correct?

4           MS. HESMAN:  Your Honor, for clarification, we are

1:31:19PM 5   talking about the declaration, not the report?

6           THE COURT:  Are we?

7           MS. KENDRICK:  Oh, the declaration, yes, sorry.

8           THE COURT:  Okay.  Thank you.

9           THE WITNESS:  Sorry, that was going to be my question,

1:31:28PM10   too.  You are right.  So this is regarding my declaration?

11   BY MS. KENDRICK:

12   Q.  Uh-huh.  And this is a complete list of the individuals

13   whose files were reviewed for your declaration, correct?

14   A.  If you could please scroll down?  Yes, that's correct.

1:32:05PM15   Q.  You testified on direct and noted in your declaration that

16   you had four consulting physicians assisting you in that file

17   review, correct?

18   A.  Yes.

19   Q.  And you were provided lists of names of patients that

1:32:20PM20   Dr. Stewart and Dr. Haney were reviewing throughout the months

21   of August and September, before your original report in

22   October, correct?

23   A.  Yes.

24   Q.  And these 275 people -- thank you.  We can take it down --

1:32:39PM25   their medical records were reviewed by these four consultants,

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)          3092

1:32:43PM  1   correct?

2   A.  Yes.

3   Q.  And the Struck Love firm divided up the assignments and

4   tracked which reviewers were assigned to which files, correct?

1:32:53PM  5   A.  No, I don't believe so.  I think I gave specific

6   instructions to the Struck Love firm and to ADCRR of what I

7   would like pulled and how and -- so I don't know who gave the

8   directions specifically with regard to division of labor.

9   Q.  Right, so that was what my question was about, the division

1:33:15PM 10   of labor.  The division of assignments you did not handle,

11   correct?

12   A.  I specifically asked -- yes, I -- well, sorry.

13        I specifically asked that no one helper be given only

14   Pablo Stewart or only Craig Haney, and that instead it would be

1:33:36PM 15   mixed to where it would be a representative sample so --

16   Q.  Right.  So what I am asking is you were not the person with

17   a list with the names of your four reviewers and for each

18   doctor it says, doctor so-and-so is reviewing these people,

19   Dr. Y is reviewing these people.  You were not handling that

1:33:58PM 20   sort of assignment and management, correct?

21   A.  That's correct.  I wanted to ensure my neutrality and

22   objectivity and not to bias it in any way.

23   Q.  Okay.  And when you were deposed on October 26th, you

24   testified that at that time, you had gone back and looked at

1:34:15PM 25   medical records of only about 100 of those persons that the

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)       3093

1:34:19PM 1  consultants had reviewed, correct?

2  A.  Yes.

3  Q.  And on Wednesday, November 17th, you testified in the

4  second part of your deposition that subsequent to your

1:34:31PM 5  October 22nd report and your October 26th deposition, you had

6  gone in and looked at the medical charts of the other 175

7  patients; is that correct?

8  A.  Yes.

9  Q.  So as you sit here today, you have now gone through and

1:34:49PM10  checked all 275 patients' medical records?

11  A.  Yes.

12  Q.  Okay.  And you testified two days ago that you took no

13  notes while going over these 275 charts in the past month and a

14  half?

1:35:09PM15  A.  That's correct, yes.

16  Q.  And you testified that you don't keep any written notes

17  from your personal medical records review because you keep the

18  information in your head, correct?

19  A.  I think that's what I said, yes.

1:35:23PM20  Q.  And you also don't know if the physicians who were helping

21  you took handwritten notes, do you?

22  A.  So I -- I don't know as we sit here today.  I don't believe

23  they took any handwritten notes.

24  Q.  And in fact you testified that you had no idea what they

1:35:46PM25  did or how they did what they did for the review, correct?

1:35:51PM 1   A.  Well, I may have testified to that, but that's not --

       2   that's kind of vague.  But I gave them specific instructions on

       3   what to do, and then they uploaded their reviews into that

       4   electronic Google document, as I mentioned earlier.  So I am

1:36:07PM 5   aware that they completed the task that was asked of them.

       6   Q.  And I believe you have stated that the only thing that you

       7   received from these four physicians was the totality of their

       8   notes in an Excel document, correct?

       9   A.  That's correct.

1:36:26PM10   Q.  And this was an Excel document that the Struck Love Law

      11   Firm provided to you?

      12   A.  Yes.

      13   Q.  And in fact, the helpers did not send any reviews directly

      14   to you, they went through the law firm?

1:36:44PM15   A.  That's correct.

      16   Q.  And you testified on October 26th that you didn't know how

      17   these four consultants were compensated nor were you involved

      18   in their compensation; is that correct?

      19   A.  No, I don't recall.  I was pretty sure they were being

1:37:04PM20   compensated, but as far as -- I believe I was to submit -- I

      21   think, if I am not mistaken, I asked them, and I don't recall

      22   the specific date, but I asked them to send their billing to me

      23   with their billable hours and a W-9 form, and then I sent that

      24   on to the law firm, but I think one or two of them sent it

1:37:35PM25   directly to one of the law firm paralegals or legal assistants

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)      3095

1:37:40PM 1    as I recall.

2    Q.  Are they also charging $500 an hour to review medical

3    records?

4    A.  I believe so, yes.

1:37:47PM 5    Q.  And you testified on October 26th, your first deposition,

6    that you had only spoken with these four consultants about the

7    project one time, correct?

8    A.  I think I clarified that I spoke with them twice because

9    one of the consultants had some questions about the question

1:38:07PM10    that was posed.  So I did have a follow-up call, so there was a

11    total of two calls with them.

12    Q.  And do you remember when those calls occurred?

13    A.  Not as we sit here today.  If I had a calendar, I would be

14    happy to try to estimate it.

1:38:25PM15    Q.  Okay.

16            MS. KENDRICK:  Mr. Campbell, could we pull up his

17    report again?  This time Exhibit 2.

18            MS. HESMAN:  I'm sorry.  Are we at the declaration or

19    the report?

1:38:45PM20            MS. KENDRICK:  This is the declaration.

21            MS. HESMAN:  Okay.  You said "report," so --

22            MS. KENDRICK:  I'm sorry.

23    BY MS. KENDRICK:

24    Q.  So Dr. Penn, this is Exhibit 2 to the declaration that was

1:38:57PM25    filed with the court on Sunday.  And it stated that it was the

1:39:02PM 1   documents that were provided to you for review.  And is it

2   accurate to say that this list will include everything that you

3   relied upon for your opinions that was in a written format?

4   A.  If you could please scroll down?  I am not sure how many

1:39:21PM 5   pages that is.  Oh, thank you.  Yes, that's correct.

6   Q.  Okay.  Is there any information that you relied upon that's

7   not cited in your report or in Exhibit 2?

8   A.  I am not sure if it's cited in my report, but I think the

9   Bureau of Justice Statistics, that suicide document, I think

1:40:09PM 10   that was the only thing I didn't see on there.

11   Q.  Okay.  Did you review any videos in preparing either your

12   report on October 22nd or this declaration?

13   A.  No, I did not.

14   Q.  You are aware of what CGAR reports are, yes?

1:40:28PM 15   A.  Yes.

16   Q.  You did not review any 2020 CGAR reports in preparing this

17   report, did you?

18   A.  I don't recall.  I have reviewed CGAR reports before since

19   2013, but I don't recall the last set of, excuse me, CGAR

1:40:44PM 20   reports that I reviewed.

21   Q.  And if you reviewed them, they would have been listed in

22   Exhibit 2, correct?

23   A.  Yes.

24   Q.  And you did not review any 2021 CGAR reports in preparing

1:40:55PM 25   your report, did you?

1:40:58PM 1    A.  I am not sure, I don't believe so.

2    Q.  And for purposes of this declaration that was filed with

3    the court on November 13th, did you review plaintiffs' expert

4    Robert Joy's declaration?

1:41:15PM 5    A.  I recall reading his expert report, but as we sit here

6    today, I don't recall if I read his declaration.

7    Q.  Did you read Dr. Pablo Stewart's declaration?

8    A.  Same thing, I remember reading his expert report, but I

9    don't recall reading his declaration.

1:41:32PM10    Q.  Did you read Dr. Craig Haney's declaration?

11    A.  Same response, I recall reading his expert report, and I am

12    sorry, I want to clarify my response in Pablo Stewart.  I

13    remember both Craig Haney and Pablo Stewart wrote both an

14    expert report and then they -- a supplemental report or

1:41:51PM15    something to that effect.  So I recall those, and reading

16    those, but I don't recall reading their declarations.

17    Q.  Okay.  How about the declaration or expert report of

18    Mr. Martin Horn?

19    A.  I recall reading his expert report, but not -- I don't

1:42:09PM20    recall reading the declaration.

21    Q.  And what about Dr. Todd Wilcox?

22    A.  I don't think I have read anything from him because my task

23    was more mental health focus, so I don't recall reading any

24    Dr. Todd Wilcox expert report or supplemental reports to date,

1:42:30PM25    but I would be happy to take a look at it.

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)          3098

1:42:33PM 1    Q.  Okay.  And did you review or read the transcripts of the

2    testimony of any of these five plaintiffs' experts?

3    A.  I don't recall.  I don't believe so.

4         MS. HESMAN:  Your Honor, is she referring to the trial

1:42:50PM 5    testimony?  Just so it's clear.

6         THE COURT:  Trial testimony or deposition testimony?

7    What are you referring to?

8    BY MS. KENDRICK:

9    Q.  To both actually, so either deposition testimony or trial

1:43:01PM10    testimony?

11    A.  I can definitely say, without a doubt, I have not read

12    anything dealing with trial testimony on any of those

13    individuals; Horn, Joy, Stewart, Haney, or Todd Wilcox.

14         As we sit here, I don't recall if I read any of

1:43:21PM15    their -- I thought I read maybe Pablo Stewart's deposition and

16    maybe Craig Haney's, but I am not sure on that.

17    Q.  Okay.  I would like to get a little bit more into the

18    medical record review.

19         MS. KENDRICK:  Mr. Campbell, could we go to Exhibit

1:43:36PM20    2262 ADCRR00232580?

21    BY MS. KENDRICK:

22    Q.  All right.  Dr. Penn, what I am showing you here is a

23    chart that the attorneys for the defendants provided us as the

24    Excel report that you described contain the notes taken by the

1:44:03PM25    consultants who reviewed the medical records.

UNITED STATES DISTRICT COURT

1:44:07PM 1          Have you seen this before?

2     A.  If I could see the whole document, please?

3     Q.  If we can --

4          (Document being scrolled through for witness by

1:44:35PM 5     Mr. Campbell.)

6     A.  Thank you.  Yes.

7     Q.  All right.  And just to confirm that is what -- that is the

8     document that you had been referring to before, the

9     spreadsheet, the Excel spreadsheet that you got with the

1:45:09PM10     reviewers' notes all compiled together for you?

11     A.  Yes.

12     Q.  Okay.  And I would like it if you could just walk us

13     through the headers on this chart so we understand what this

14     shows.  The first column states "ID."  And is that the unique

1:45:29PM15     identifier that was assigned to each patient?

16     A.  Yes.

17     Q.  The second column is called "eOMIS record number," and it

18     appears to be the patient's ADC number, correct?

19     A.  That's correct.

1:45:45PM20     Q.  The third column states "inmate name."  The fourth column

21     states "reviewed date."  The fifth column states "access to

22     care."  And then the sixth column states, "strengths,

23     deficiencies, concerns"; did I read that correctly?

24     A.  Yes.

1:46:05PM25     Q.  And I believe on direct you testified a little bit about

UNITED STATES DISTRICT COURT

1:46:09PM 1    this and the issue of access to care, and you testified that

2    this was a yes-or-no answer for the reviewers, correct?

3    A.  That's correct.

4    Q.  And the strengths, slash, deficiencies, slash, concerns

1:46:25PM 5    column is where the consultants could write their comments,

6    correct?

7    A.  Yes, that's fair.

8    Q.  And I believe you said on direct that you told the

9    consultants to tell you the good, the bad, or the ugly.  So

1:46:41PM10    this would be the column where they would write down the good,

11    the bad, or the ugly, correct?

12    A.  Yes, that's fair.

13    Q.  And you did not provide them with a copy of the Mental

14    Health Technical Manual, right?

1:46:56PM15    A.  No.

16    Q.  And you did not ask them to compare each chart to the

17    required frequency of encounters in the Mental Health Technical

18    Manual, correct?

19    A.  That's correct.

1:47:07PM20    Q.  And you did not ask them to look at medication management

21    issues, correct?

22    A.  When you say "medication management issues," I am not sure

23    what you mean by that.

24    Q.  Any problems with people getting their medications in a

1:47:22PM25    timely manner, getting the appropriate medication for their

1:47:26PM 1  mental health needs.

2          I don't see a column that says "medication" question

3  mark, so my question to you is, did you ask them to

4  specifically look at medication-related issues?

1:47:39PM 5  A.  I asked them to look at everything.  I asked them to look

6  at both medications, correct appropriate medications, dosage,

7  schedules, compliance, side effects, management of side

8  effects, all of those sort of things would have been subsumed

9  under the, was access to care provided?

1:47:59PM 10          So you are correct in that they would not have looked

11  at the technical manuals or all those things, but they did

12  review, and if there was issues of medication delivery or

13  missed medications, that would have been identifiable in the

14  medical chart.

1:48:16PM 15  Q.  And if they found those sorts of problems, would they then

16  put "no" under access of care, or could it say "yes," access to

17  care was good but medication management was not good?

18  A.  I think they could have put either.  I do recall that there

19  was maybe one or two notes where they wrote a comment regarding

1:48:35PM 20  maybe a missed med or two days of missed medications, but

21  whether they put "yes" or "no" to the question of access to

22  care, I think that was their independent decision or judgment

23  Q.  All right.

24          THE COURT:  Did you -- I just happened to notice this

1:48:54PM 25  one pop up here, "died of suspected suicide."  Did you read the

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)      3102

1:48:59PM 1   mortality report?

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  Okay.  I don't see -- is it on here?

4          THE WITNESS:  No, Your Honor.  The consultants were

1:49:11PM 5   not provided with any mortality reports or anything else.  They

6   were just asked to look at the medical record.

7          THE COURT:  Okay.  So the mortality -- you read the

8   report but it's not contained here?

9          THE WITNESS:  Correct.

1:49:24PM10   BY MS. KENDRICK:

11   Q.  And these notes are the notes of the four consultants?

12   These are not your notes, correct?

13   A.  That's correct.

14   Q.  Okay.

1:49:33PM15          THE COURT:  But these are the notes that you relied

16   on?

17          THE WITNESS:  Yes, Your Honor.

18   BY MS. KENDRICK:

19   Q.  Well, let's go through this chart.  So this first page,

1:49:44PM20   it's Bates-numbered ADCRR00232580.  It lists six people.  I am

21   not going to use their name.  I will refer to them as patients

22   using the ID numbers.

23          So patient numbers 1 through 6.  And under the column

24   that says "access to care," there are two of them that have

1:50:07PM25   "no" written there, patient number 1 and patient number 6.  Did

1:50:13PM 1    I read that correctly?

2    A.  Yes.

3    Q.  Let's go to the next page.  The next page we list seven

4    people, patients number 7 to 13, correct?

1:50:26PM 5    A.  Yes.

6    Q.  One of the seven has "no" in the "access to care" column,

7    the fifth column, that would be patient number 11, correct?

8    A.  Yes.

9    Q.  And then patient number 12 it says, "yes" under "access to

1:50:41PM10   care."  But then under the notes it states, "death by probable

11   suicide, possible problems with medical access to care" and

12   describes putting in an HSR -- which I believe is the reviewer

13   saying Health Services Request -- for pain on 9-2, "not seen by

14   medical until second HSR 9-12, seen 9-16."  Do you see that?

1:51:14PM15   A.  Yes.

16   Q.  Let's go to the next page -- actually, let's go back to the

17   previous page.

18        Patient 13 here, the last one, he has "yes" under

19   "access to care," but then the notes state that he died by

1:51:31PM20   hanging while in segregation.  And the consultant wrote, quote,

21   many late entries but seen regularly by mental health for,

22   quote, health and welfare rounds, closed quote.

23        Then the next sentence says, "possible medical access

24   to care problem."  Did I read that correctly?

1:51:52PM25   A.  Yes.

1:51:53PM 1   Q.  All right.  Next page.  This is ADCRR00232582.  It lists

2   three patients, patients number 14 through 16, correct?

3   A.  Yes.

4   Q.  And two of the three have "no" under the "access to care"

1:52:11PM 5   column, patients 14 and patients 16; is that correct?

6   A.  Yes, that's what's listed there, that's correct.

7   Q.  Let's go to the next page.

8          This is ADCRR00232583.  This lists five patients,

9   patients number 17 to 22, correct?

1:52:35PM10   A.  Yes.

11   Q.  And patient 22 and 21 is actually the same individual,

12   correct?

13   A.  That's what it appears, that's correct.

14   Q.  So there's five unique individuals listed here, and of

1:52:50PM15   those five, two of them, patient 17 and patient 21, both have

16   "no" under the fifth "access to care" column, correct?

17   A.  Correct.

18   Q.  Let's go to the next page.

19          This is ADCRR00232584.  It lists five persons,

1:53:14PM20   patients 23 to 27, correct?

21   A.  Yes.

22   Q.  And one of the five, the patient number 27, there is "no"

23   under the fifth column; is that correct?

24   A.  Yes.

1:53:31PM25   Q.  Let's go to the next page.

1:53:33PM 1        This is ADCRR00232585.  It lists two persons, patients

2  number 28 and 29, correct?

3  A.  Yes.

4  Q.  And both of these individuals have the word "no" under the

1:53:52PM 5  fifth column for access to care; is that correct?

6  A.  That's correct.

7  Q.  Let's go to the next page.

8        This is ADCRR00232586.  It lists two persons, patients

9  number 30 and 31, yes?

1:54:11PM 10  A.  Yes.

11  Q.  And one of the two people, patient number 30, he has "no"

12  under the "access to care" column; is that correct?

13  A.  That's correct.

14  Q.  Let's go to the next page.

1:54:23PM 15        This is ADCRR00232587.  It lists three patients,

16  patient number 32 to 34, correct?

17  A.  Yes.

18  Q.  And one of the three, patient number 34, he has "no"

19  written under the fifth column, correct?

1:54:46PM 20  A.  It could be he or she.  There were two males and two

21  females.

22  Q.  Okay.  Well, I apologize for actually using a pronoun.

23  This patient number 34 has "no" under the fifth column,

24  correct?

1:54:59PM 25  A.  That's correct.

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)     3106

1:55:01PM 1    Q.  Let's go to the next page.

        2            This is ADCRR00232588.  It lists seven patients,

        3    assigned patient numbers 35 to 41; is that correct?

        4    A.  Yes.

1:55:18PM 5    Q.  And one of the seven patients, the patient listed at number

        6    38 has "no" under the "access to care" fifth column, correct?

        7    A.  That's correct.

        8    Q.  Did I read that correctly?

        9    A.  Yes, you did.

1:55:35PM10    Q.  All right.  Let's go to the next page.  This is

       11    ADCRR00232589.  This lists nine patients, patient numbers 42 to

       12    50, correct?

       13    A.  Yes.

       14    Q.  And one of the nine, patient number 49, has "no" for the

1:55:57PM15    "access to care" column; is that correct?

       16    A.  That's correct.

       17    Q.  Let's go to the next page, please.

       18            This is ADCRR00232590.  It lists five persons,

       19    patients number 51 to 55, correct?

1:56:22PM20    A.  Yes.

       21    Q.  And one of the five, patient number 55, has "no" under the

       22    "access to care" column; is that correct?

       23    A.  That's correct.

       24    Q.  And then another patient, number patient 52, he's listed as

1:56:39PM25    "yes" for access to care.  But then your consultant wrote that

UNITED STATES DISTRICT COURT

1:56:44PM 1    he died by suicide by hanging and, quote, of note, ambulance

2    team refused to go to the patient's location due to their

3    policy and he was brought to medical on a gurney.  Do you see

4    that?

1:57:02PM 5    A.  That's what's written there, yes.

6            THE COURT:  Let's see, the dates here are odd because

7    he died by suicide on 3-21-20.  But then underneath it's

8    3-16-21.  What is this one?  Do you see the number on number

9    52?  See the dates?

1:57:29PM10            MS. KENDRICK:  I am assuming it's a typo, Your Honor.

11            THE COURT:  Do you know what the problem would be?

12            THE WITNESS:  Yes, Your Honor, you are spot on, I

13    believe that's a typo.  That should be 3-16-20, not 21.  But

14    that was copied verbatim from the consultants.

1:57:48PM15            THE COURT:  Okay.  From the people -- when you say

16    "consultants," they are the people that were working for you?

17            THE WITNESS:  Yes, Your Honor.

18    BY MS. KENDRICK:

19    Q.  All right.  Can we go to the next one, please?

1:58:01PM20            This is Bates number ADCRR00232591.  It lists 14

21    patients, patients number 55 to 69; is that correct?

22    A.  Yes.

23            THE COURT:  56, not 55.

24            MS. KENDRICK:  56, I apologize, Your Honor.  Thank

1:58:24PM25    you.

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)          3108

1:58:25PM 1          THE WITNESS:  Correct, 56 to 69.

2    BY MS. KENDRICK:

3    Q.  And there's three patients -- 56, 61, and 62 -- who have

4    "no" under the "access to care" fifth column, correct?

1:58:38PM 5    A.  That's correct.

6    Q.  All right.  Let's go to the next page.

7          This is ADCRR00232592.  It lists 11 persons starting

8    with patient number 70 through patient number 80, correct?

9    A.  Yes.

1:58:57PM10    Q.  And two of them, patient number 72 and patient number 80,

11    both have the word "no" under the "access to care" column,

12    correct?

13    A.  That's correct.

14    Q.  Go to the next page, please.

1:59:15PM15          THE COURT:  Can you go back to that one for a moment?

16    So as much as you can tell me, Doctor, it says Mr. Blank is a

17    high service utilizer.  Many HSRs which appear to have been

18    addressed in a reasonable time.

19          So I am wondering why it says no, that he wasn't

1:59:41PM20    receiving --

21          THE WITNESS:  I think, Your Honor, what the

22    reviewer -- I think they are acknowledging that the individual

23    patient was seen in a timely manner and in reasonable time

24    frames.

1:59:56PM25          But I think their issue, it appears, that they were

1:59:59PM 1    concerned that the patient requested a long-acting injectable

2              antipsychotic, but that the psychiatry provider that saw the

3              patient thought they were more personality disordered,

4              antisocial and narcissistic, and did not.

2:00:16PM 5         It appears -- and I would have to look at the record,

6              but maybe didn't prescribe that, and there was a bad outcome

7              and maybe they thought if the patient had been on the

8              antipsychotic, maybe they wouldn't have had -- maybe they would

9              have had a better patient outcome.

2:00:31PM10        THE COURT:  So in the broad definition for ADOC's

11             definition of seriously mentally ill, antisocial and

12             narcissistic personality disorder are included within that

13             category?

14                 THE WITNESS:  No, Your Honor, they are not.  They

2:00:50PM15    would be different.  It wouldn't be considered -- although some

16             patients that have serious personality disorders can be very

17             high utilizers and cause a lot of behavioral problems.

18                 THE COURT:  Okay.  You may continue.

19                 MS. KENDRICK:  Of course.  Thank you.  Can we go to

2:01:09PM20    the next slide, please?

21             BY MS. KENDRICK:

22             Q.  So this is ADCRR00232593, and it lists nine people,

23             patients number 81 to 89, correct?

24             A.  Yes.

2:01:22PM25    Q.  And there are three of them on this page, patients 81, 82,

UNITED STATES DISTRICT COURT

2:01:27PM 1  and 87 who have the word "no" under the "access to care"

2  column, correct?

3  A.  That's correct.

4  Q.  And patient 86 has the word "yes" under "access to care"

2:01:41PM 5  but then your consultant wrote that the patient was on watch

6  from 5-5-21 to 5-19-21, quote, two weeks on watch but didn't

7  see psychiatric clinician.  Do you see that?

8  A.  Yes.

9  Q.  Can we go to the next page, please?

2:02:03PM10       This is ADCRR00232594, and it lists eight patients,

11  patients number 90 to 97, correct?

12  A.  Yes.

13  Q.  And four of these people, patient number 90, patient number

14  92, patient number 95, and patient number 97, all have the word

2:02:27PM15  "no" under the "access to care" column.  Did I read that

16  correctly?

17  A.  Yes, you did.

18       THE COURT:  What does -- when looking at number 80 --

19  or 95, this inmate, what's HSRs for psychotic symptoms?

2:02:54PM20       THE WITNESS:  Yes, Your Honor.  That's Health Services

21  Request.  That's how it is in the eOMIS, in the medical chart.

22  I think the terms are used -- HNR, Health Needs Request or

23  Health Services Request, I think those are used

24  interchangeably.

2:03:08PM25       THE COURT:  And then there's a -- third-to-the-last

2:03:11PM 1    sentence, Mr. Blank waiting almost three weeks to have

2    psychotic CO addressed.  What does that mean?

3              THE WITNESS:  CO means complaints, psychotic

4    complaints.

2:03:25PM 5              THE COURT:  I have nothing else.  You may proceed.

6              MS. KENDRICK:  Thank you.  Next page, please.

7    BY MS. KENDRICK:

8    Q.  This is ADCRR00232595.  It lists 11 people, patients number

9    98 to 108, yes?

2:03:43PM10   A.  That's how it reads, yes.

11   Q.  And one of the -- one of them, patient 100, has the word

12   "no" under "access to care" in the fifth column, correct?

13   A.  That's correct.

14   Q.  And then if you look up to the top line, the patient at 98

2:04:00PM15   has "yes" for access to care, but then in the last sentence of

16   the notes made by your consultant, your consultant wrote, "on

17   watch 6-21-19 through 7-8-19 but saw no psychiatric provider

18   until 7-18-19."

19              Is that correct?

2:04:22PM20   A.  If I could clarify -- I know you are asking me a yes or no,

21   but it would not have been per policy and per the standard of

22   care for a psychiatric provider to see someone on a suicide

23   watch.

24              A suicide watch could be assessed by a qualified

2:04:38PM25   mental health professional.  There would be no need for a

2:04:41PM 1    psychiatrist or psych provider to see someone on a watch.

2    Q.  How about in the ten days after the person comes off watch?

3    A.  If I recall policy correctly, ADCRR and Centurion require

4    mental health staff to reassess a patient after they come off

2:04:59PM 5    of watch, but they don't mandate that a psychiatrist or psych

6    provider do that.  So I don't think the helpers would have

7    known those intricacies of policy and procedure, because they

8    were not provided with policies and procedures.

9         THE COURT:  Well, is that policy or procedure that you

2:05:13PM10    were just now telling me about, that was the Department of

11    Corrections' policy and procedure, is that appropriate?

12         THE WITNESS:  Yes, Your Honor.  If I may?  In most

13    systems, a qualified mental health professional -- and this

14    goes for in the community and also in corrections -- like if

2:05:35PM15    you or I were to become suicidal and show up to an emergency

16    room, in the free world, a psychiatrist is not going to come

17    evaluate us.  It's probably going to be a master's level social

18    worker or a licensed professional counselor master's level.

19    And same thing in corrections, we save psychiatry to do more

2:05:52PM20    diagnosing and medication.

21         THE COURT:  I understand.  But what I was asking, I

22    wasn't specific, how about the amount of time for the watch?

23         THE WITNESS:  Well, Your Honor, if I may?  In

24    corrections, we really -- if we have to keep someone on watch

2:06:05PM25    for weeks or months at a time, anything we can do to keep them

2:06:10PM 1    safe, and it is better to err on the side of caution, even if

       2    --

       3              THE COURT:  Yes, but no psychiatric provider of any

       4    sort?

2:06:20PM 5              THE WITNESS:  Correct, but it's possible --

       6              THE COURT:  Is that appropriate --

       7              THE WITNESS:  I believe so.

       8              THE COURT:  -- after that time?

       9              THE WITNESS:  Your Honor, I would have to look at the

2:06:27PM10    chart to see if there was -- if there was a medication

      11    complaint or a side effect or something, then I would say they

      12    probably should have seen the psych provider.

      13              Or if the inmate submitted a sick call request saying,

      14    I am having medication side effects, then they probably should

2:06:42PM15    have seen the psych provider.  But the psych provider doesn't

      16    need to be the one managing -- putting them on the watch or

      17    taking them off the watch.

      18              THE COURT:  Okay.  And -- I am not familiar with these

      19    drugs, so olanzapine, is that a psychiatric medication?

2:07:02PM20              THE WITNESS:  Yes, Your Honor.  I'm so sorry.  That's

      21    on where?  I don't see that.

      22              THE COURT:  It's the very top page, top line.

      23              THE WITNESS:  Oh, yes, okay.  So olanzapine is --

      24    that's the generic name.  The brand name is Zyprexa, and it is

2:07:14PM25    one of the newer atypical antipsychotics.

2:07:22PM 1   BY MS. KENDRICK:

2   Q.  So this person who was prescribed an antipsychotic and was

3   on watch for more than two weeks did not see a psychiatric

4   provider for another 10 days after getting off watch?

2:07:34PM 5   A.  That's not what the helper or -- sorry, the consultant

6   wrote.  The consultant opined or felt, based on the record

7   review, that the patient probably did not require olanzapine.

8   That's a pretty high dose of olanzapine.  So that's what -- and

9   the consultant identified that the working diagnoses were

2:07:55PM10   antisocial personality disorder -- DO is disorder -- and mood

11   disorder, including impulsive self-injury.

12          So I don't think from this document what the

13   consultant wrote, that there was any immediate concerns about

14   psych med appropriateness or side effects or risk of harm,

2:08:17PM15   based on the psychotropic medications.

16   Q.  Is olanzapine normally prescribed for people who have mood

17   disorder and antisocial personality disorder?

18   A.  It can be sure.

19          THE COURT:  He says he has -- or it says, has

2:08:33PM20   hallucination and paranoia.  Is that a mood disorder?

21          THE WITNESS:  Your Honor, sometimes mood disorders can

22   have psychotic symptoms in addition.  And I think what the

23   helpers or the consultant is saying, that the psychiatric

24   providers for this patient were erring on the side of caution

2:08:55PM25   and were prescribing an antipsychotic for the patient's

2:08:58PM  1    complaint of hearing voices, auditory hallucinations, and

2              paranoia.

3                    But the patient didn't appear to be psychotic,

4              appeared to be more antisocial personality and having impulse

2:09:10PM  5    and self-injury related to a mood disorder, like depression.

6              So they --

7                    THE COURT:  I didn't see -- on this one?  Does he say

8              anti-- oh, I see it -- okay.  Antisocial personality disorder.

9                    THE WITNESS:  Yes, Your Honor.

2:09:28PM 10    BY MS. KENDRICK:

11    Q.  But the medication of olanzapine normally is not something

12          that is used to treat antisocial personality disorder, correct?

13    A.  There's really no medication treatment for antisocial

14          personality disorder, but if someone is engaging in aggressive,

2:09:45PM 15    assaultive, or impulsive behaviors, it would be within the

16          standard of care to prescribe medications like olanzapine to

17          help relieve suffering and to help reduce impulsivity, with the

18          caveat that that medication can cause significant weight gain

19          and prediabetes and metabolic syndrome.  So one would need to

2:10:05PM 20    be very careful if they were using that medication.

21                    THE COURT:  But does -- in fairness to your

22          consultants, this particular consultant said, but that is my

23          speculation.

24                    THE WITNESS:  Yes, Your Honor.

2:10:19PM 25                    THE COURT:  So he was doing the best he or she could

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)          3116

2:10:22PM  1        from the records.

           2                    THE WITNESS:  Absolutely.

           3                    THE COURT:  But was still speculating.

           4                    THE WITNESS:  Yes.

2:10:28PM  5                    MS. KENDRICK:  All right.  Can we go to the next page,

           6        please?

           7        BY MS. KENDRICK:

           8        Q.  So this is ADCRR00232596.  And it lists 20 people, patients

           9        number 109 to 128; is that correct?

2:10:44PM 10        A.  Yes.

          11        Q.  And there's one of them, patient 118, who has the word "no"

          12        under the "access to care," fifth column; is that correct?

          13        A.  Yes.

          14        Q.  And then if you go up a few rows, there's patient 114 who

2:11:03PM 15        he -- the patient is listed as yes, access to care, but then

          16        the consultant writes, Depakote prescribed at too low a dose as

          17        revealed by disturbed behavior in lab.  Do you see that?

          18        A.  Yes.

          19        Q.  And then the next patient, patient 115 has "yes" under

2:11:24PM 20        "access to care," but then in the next column the reviewer

          21        writes that the patient committed suicide on a date early in

          22        2021.  He had been on suicide watch in days previous.  And in

          23        the last sentence the consultant wrote, quote, he might have

          24        benefited from a prison inpatient unit.  Do you see that?

2:11:51PM 25        A.  Yes.

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)      3117

2:11:51PM  1   Q.  Now, if we go down to patient number --

           2            THE COURT:  So this would be one that you -- you read

           3   the mortality report, right?

           4            THE WITNESS:  Yes, Your Honor.

2:12:00PM  5            THE COURT:  Do you recall what was said on the report?

           6            THE WITNESS:  No, Your Honor, but I would be happy to

           7   review it and --

           8            THE COURT:  No, that's okay.  I just thought since you

           9   read it, you might have heard -- you might have read the same

2:12:10PM 10   thing that we see here in the report by your consultant.

          11            THE WITNESS:  Yes, Your Honor.

          12            THE COURT:  I just didn't know.

          13            THE WITNESS:  Right.

          14   BY MS. KENDRICK:

2:12:20PM 15   Q.  Did you take notes when you reviewed the mortality reviews?

          16   A.  No, I did not.

          17   Q.  Okay.  So it's up in your head?

          18   A.  Yes.

          19   Q.  All right.  And if we look down at patient number 120, this

2:12:35PM 20   patient also has yes, access to care was appropriate, but then

          21   the reviewer wrote that the patient had died by suicide, stated

          22   that it was before the relevant time for this review, and then

          23   wrote, question 5 above was answered yes only so I could submit

          24   the review.

2:12:57PM 25            Was there not a way to submit the review if the

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)   3118

2:13:00PM 1  consultant had been no?

2  A.  I -- honestly, I don't know what that response -- I don't

3  understand the context of the response.

4  Q.  Okay.

2:13:11PM 5       THE COURT:  So in your -- I don't have your report,

6  but in your declaration, is there somewhere in the declaration

7  where you set forth the mortality reviews that you made?

8       THE WITNESS:  Yes, Your Honor.

9       THE COURT:  Okay.  Can you tell me where that would

2:13:29PM10  be?

11       THE WITNESS:  Certainly.  I believe what I did was, I

12  responded -- the files that were highlighted by Dr. Stewart on

13  page 90 of my report.

14       THE COURT:  On page 90 is the mortality review?  Page

2:13:50PM15  90?  Did I miss here -- Dr. Stewart --

16       THE WITNESS:  And I thought I had a separate section

17  on suicide.

18       THE COURT:  That's okay.  We are taking a lot of time

19  with my questions, so I will let you review later before

2:14:07PM20  redirect examination so you could tell me where in your report

21  you reviewed the mortality, you know, that may refresh your

22  recollection as to what you saw in those reports.

23       THE WITNESS:  Yes, Your Honor.  Thank you.

24       THE COURT:  Yes, go ahead.

25

2:14:25PM 1   BY MS. KENDRICK:

2   Q.   So Dr. Stewart's report, he had Exhibit B, which was his

3   summary of the review of all of the mortality reviews.  Did you

4   do a similar appendix writing up your analysis of all of the

2:14:41PM 5   mortality reviews?

6   A.   So I, on page 79 of my declaration, the number 227, it says

7   "treatment for suicidal or self-harming inmates."  On line 12 I

8   noted, when rare suicides occur, psychological autopsies and

9   administrative suicide reviews are conducted, morbidity and

2:15:10PM10   mortality reviews are completed.

11            THE COURT:  I'm sorry, I am on page 79, and where is

12   it that you are reading?

13            THE WITNESS:  I'm sorry, Your Honor.  I am on number

14   12, on line 12.

2:15:20PM15            THE COURT:  Line 12 of 79?

16            THE WITNESS:  Yes, Your Honor.

17            THE COURT:  Okay.

18            THE WITNESS:  So I did review the psychological

19   autopsies and the administrative suicide reviews, and I think

2:15:33PM20   that's the important take home point, is that all of the ADCRR

21   facilities were found to be 100 percent compliant with the

22   essential standard of NCCHC suicide prevention and

23   intervention.

24   BY MS. KENDRICK:

2:15:48PM25   Q.   Okay, but I'm sorry Dr. Penn, I think maybe I was unclear.

2:15:50PM 1   My question was where did you put your write-up of all of the

2   mortality reviews and psychological autopsies that Dr. Stewart

3   had in Exhibit 2 to his declaration where he did his summary

4   write-up of all mortality reviews and suicides since January

2:16:14PM 5   2019?

6   A.  I don't think I did a separate breakout, but I did respond

7   in the files highlighted by Dr. Stewart on pages 90 through 97.

8           THE COURT:  And you have been asked a lot of

9   questions, and both of us are asking you questions.  I am the

2:16:43PM10   trier of fact, so that's why I am jumping in here as I have

11   with many witnesses.  I thought you said you personally

12   reviewed the mortality --

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  -- for every one of these?

2:16:55PM15           THE WITNESS:  For the suicides or where there was a

16   questionable death.

17           THE COURT:  I am just wondering where that is listed

18   or where you discussed them in your -- maybe you have it in

19   your report.  Is it in your report maybe and not in your

2:17:09PM20   statement?

21           THE WITNESS:  Your Honor, I apologize.  As we sit here

22   today, I am having trouble remembering where.  I definitely

23   remember reviewing all of the morbidity and mortality reviews,

24   but as far as writing a specific analysis of each and every

2:17:25PM25   single adverse patient outcome, I don't recall writing

2:17:29PM 1    something separate.

2    THE COURT: And that's understandable. But we have

3    seen a few here where -- we've seen a couple of the reports

4    where it said -- maybe they are not the files that you had --

2:17:42PM 5    that the outcome could have been avoided.

6    THE WITNESS: Yes.

7    THE COURT: And did you see any of those?

8    THE WITNESS: I did, Your Honor.

9    THE COURT: Okay. But it wasn't important enough for

2:17:55PM 10    you to put it in your report?

11    THE WITNESS: Well, I think I acknowledged that, like

12    for example, one of the suicides, there was a breakdown

13    between -- the inmate had written a sick call -- HNR to see the

14    psych provider, and for whatever reason it didn't occur. And

2:18:11PM 15    then I believe the inmate completed suicide or had a completed

16    suicide either the next day or the day after. So, yes, that

17    was definitely a breakdown.

18    THE COURT: I think you mentioned at least on direct

19    examination there was one that you thought was a problem, but

2:18:27PM 20    that was the only one. So the rest of these that we see here

21    where you have read the mortality reports, they were not as

22    significant enough for you to be concerned?

23    THE WITNESS: Correct, Your Honor. I mean, I think,

24    to be frank, any patient death or adverse outcome is not

2:18:42PM 25    optimal. We want to minimize morbidity and mortality and

2:18:46PM 1    suffering, but it's hard.

2              I mean, I guess my task was to look at the system in

3    totality and look for systemic problems or issues.  I think any

4    one particular case, that's a question like you could have a

2:19:03PM 5    separate suit about, was the standard met in that case, and

6    that could be very voluminous.

7              THE COURT:  You found basically one where you were

8    most concerned about it?

9              THE WITNESS:  Yes, Your Honor.

2:19:14PM10              THE COURT:  And the rest of them you basically

11    reported that systemically there wasn't a problem?

12              THE WITNESS:  Correct.  Yes, Your Honor.

13              THE COURT:  Okay.  You may continue.

14              MS. KENDRICK:  Thank you, Your Honor.

2:19:28PM15              All right.  Let's go to the next page, please.

16    BY MS. KENDRICK:

17    Q.  This is ADCRR00232597.  It lists 21 people.  They are

18    patients number 129 to 149; is that correct?

19    A.  Yes.

2:19:44PM20    Q.  And it appears that three of them, patients 140, 147, and

21    148, all have "no" listed under the "access to care" column; is

22    that correct?

23    A.  That's correct.

24    Q.  And then if we go to the top row, patient number 129, he

2:20:09PM25    has "yes" under the "access to care" column, but then the

2:20:13PM 1   consultant wrote, quote, lithium continued at low 600 milligram

2   daily dose despite low level of 0.3 and a suicide attempt on

3   this dose.  Did I read that correctly?

4   A.  Yes, you did.

2:20:27PM 5   Q.  And then two down, patient 131, it states "yes" for access

6   to care, but then the reviewer noted, quote, health care

7   request written in Spanish, yet most mental health meetings say

8   no interpreter was used and do not state whether interview was

9   conducted in Spanish, closed quote.  Did I read that correctly?

2:20:49PM10   A.  Yes, you did.

11   Q.  We go down to patient number 136, this individual also has

12   the word "yes" for access to care.  But the consultant has

13   written, quote, has inexplicably been prescribed clonidine for

14   depression, slash, anxiety, correct?

2:21:11PM15   A.  So that's what it says here, but if I could clarify my

16   response, sometimes we inherit bad prescribing practices from

17   county jails or from other systems, so I don't know with that

18   particular patient if the clonidine had been prescribed by the

19   ADCRR's vendor, the Centurion, or if they inherited that

2:21:31PM20   patient either from the community or county jail on that

21   medication.

22          THE COURT:  But would that have made a difference

23   though for you to make your assessment to know the facts

24   underlying this particular statement and this inmate?

2:21:49PM25          THE WITNESS:  Your Honor, I would be happy to look at

2:21:50PM 1    the medical record again.

2        THE COURT:  But at the time you didn't think it was

3    necessary for you to look closer?

4        THE WITNESS:  Correct.  Because clonidine is really a

2:21:57PM 5    very safe medicine.  It's used -- it's used pretty much -- it's

6    FDA approved, indications for hypertension, high blood

7    pressure.

8        THE COURT:  So that's what it is, is for high blood

9    pressure?

2:22:06PM10        THE WITNESS:  Yes.  But it's used off label in mental

11    health for impulsivity, for ADHD, and for people to help them

12    sleep at night.  So you can kind of see that there's a lot of

13    reasons why this medicine may have been prescribed.

14        And I think the reviewer is saying, if the diagnosis

2:22:22PM15    is depression or anxiety, why is this patient on clonidine,

16    that's not an antidepressant or medicine for anxiety.  I think

17    that's their criticism.

18    BY MS. KENDRICK:

19    Q.  Okay.  But you are speculating that this patient somehow

2:22:37PM20    maybe could have been prescribed clonidine in the county jail,

21    correct?

22    A.  I am not speculating.  I am basically saying that that's my

23    experience in 20 years.  We inherit a lot of different

24    prescribing practices from the community, from the county jail.

2:22:52PM25    A lot of our patients demand, I want to stay on this

2:22:57PM 1    medication.  If you try to change my medication, I will report

2    you to the medical board.

3         So that's reality of working in corrections is that

4    there's occupational hazards.  Some patients are -- want to

2:23:05PM 5    stay on their medication, no ifs, ands, or buts, and you want

6    to educate them or change it, and they're like, that's the

7    medicine I want.  And so sometimes we have to kind of

8    acquiesce, and again, in medicine, it's do no harm.  So that's

9    the principle we try to follow.

2:23:20PM10    Q.  But as you sit here today, you have no evidence that this

11    patient was prescribed the clonidine in the county jail, and

12    since you took no notes when you reviewed these 275 files, you

13    have nothing to reference for your assertion that the patient

14    was prescribed clonidine in the county, do you?

2:23:39PM15    A.  If I had the opportunity to review the chart, I would be

16    happy to answer your question.  So I don't recall here as we

17    sit here today who prescribed the clonidine.

18    Q.  So you don't know who prescribed the clonidine?

19    A.  That's fair.

2:24:01PM20         THE COURT:  Okay.  Let's take a break for 20 minutes.

21    We'll see you at quarter of 3:00.

22         (Recess taken at 2:24 p.m.; resume at 2:40 p.m.)

23         THE COURT:  Go ahead.

24         MS. KENDRICK:  Okay.  Thank you.  Mr. Campbell, can we

2:40:58PM25    put back on ADCRR0032597, please?

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)      3126

2:41:05PM 1   BY MS. KENDRICK:

2   Q.   And I believe we got most of the way through this one and

3   just wanted to finish up on this page.  Patient number 145 has

4   "yes" for access to care being adequate, but then the

2:41:38PM 5   consulting physician typed, low dose of Risperdal consta 12.5

6   mg Q2 weeks despite chronic auditory hallucinations.  Do you

7   see that?

8   A.   That's what it says there, but if I may --

9   Q.   Sorry, I had a question.

2:41:56PM10          THE COURT:  You got a yes, and so go ahead, ask your

11   question.

12   BY MS. KENDRICK:

13   Q.   Q2 weeks is medical shorthand for every two weeks, correct?

14   A.   That's correct.

2:42:07PM15   Q.   And on number 146, this patient also has "yes" for access

16   to care, but then the consultant wrote that the patient was

17   taken off of Risperdal but had to be returned due to resurgent

18   psychosis and that in the physician's opinion the decision to

19   stop Risperdal was probably a mistake, but the reasoning was

2:42:29PM20   documented.  Do you see that?

21   A.   That's what it says, yes.

22          THE COURT:  You don't disagree with that, right,

23   because that was your consultant?

24          THE WITNESS:  That was my consultant, yes.  But Your

2:42:41PM25   Honor, there's a lot of reasons why somebody might discontinue

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)     3127

2:42:45PM 1    an antipsychotic medication.  All antipsychotic medications

2              have long-term risks of permanent irreversible muscle movements

3              to the face and tongue.

4                        THE COURT:  Right, with the Risperdal?

2:42:56PM 5              THE WITNESS:  Yes, that can cause that too, so --

6                        THE COURT:  But he said probably -- or she -- probably

7              a mistake.  So that's something you took into account?

8                        THE WITNESS:  Yes, Your Honor.

9    BY MS. KENDRICK:

2:43:07PM10    Q.  And you looked at this patient's medical record?

11             A.  Yes.

12             Q.  And did you conclude that this was a mistake?

13             A.  Well, to me mistake is kind of a harsh term.  In a perfect

14             world, you would be able to talk directly to the staff member

2:43:25PM15    and ask them, what was your clinical decision-making?  What did

16             you weigh?  What were the risks, benefits, alternatives?  And

17             that's typically how you look at the appropriateness of a

18             medication decision.

19                       They might have said the patient was adamant they

2:43:39PM20    didn't want this medicine, they wanted the medicine stopped.

21             We have to listen to what our patients want and respect their

22             wishes.

23             Q.  And was that in that patient's medical record?

24             A.  I don't recall.

2:43:52PM25    Q.  And you didn't take notes, correct?

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)          3128

2:43:54PM 1    A.  I think you have asked me that before, and I answered

2              that's correct, yes.

3              Q.  Okay.  That's just in your head.  All right.

4                   Can we go to the next one please, ADCRR00232598?

2:44:10PM 5          And this chart page lists five patients, patients 150

6              to 154; is that correct?

7              A.  Yes.

8              Q.  And two of them, patient number 151 and 153, both have "no"

9              under the "access to care" column; is that correct?

2:44:30PM10    A.  That's correct.

11             Q.  And on patient 152, they have put "yes" under "access to

12             care," but then in the notes they write, "low dose haloperidol,

13             1 milligram BID by psych APN is inadequate as evidenced by

14             symptoms.  May have catatonia, which would benefit from benzo

2:44:55PM15    or ECT."

16                  BID is a medical abbreviation for twice daily,

17             correct?

18             A.  That's correct.

19             Q.  And ECT is electroconvulsive therapy?

2:45:08PM20    A.  That's correct.

21             Q.  Okay.  Let's go to the next page, please.

22                  So this is ADCRR00232599.  It lists three patients,

23             155 to 158, correct?

24             A.  I think it says 157.

2:45:28PM25    Q.  Oh, 157.  Apologies, thank you.  But three people, and none

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)       3129

2:45:34PM 1   of these three have "no" written under the fifth column,

        2   correct?

        3   A.   That's correct.

        4   Q.   Okay.  But patient 155 who had "yes" under "access to care"

2:45:47PM 5   in the last column, the reviewer noted in the third sentence

        6   that lithium was increased prescribed once daily at night,

        7   which is not optimal.

        8           And then also in the last sentence noted that based on

        9   the evaluation from 2014 that gave a diagnosis of bipolar I,

2:46:12PM10   this diagnosis was not well substantiated.  Do you see that?

       11   A.   That's what it says there, but at the beginning of the

       12   paragraph it says, wants off all meds.  So the patient is

       13   conveying as of April 18th that they don't want to be on

       14   medication, so it's kind of a delicate dance where the

2:46:31PM15   psychiatry provider is trying to engage the patient in taking

       16   medications, and the patient is basically saying, I don't want

       17   these meds.  So again, that's a challenge in a correctional or

       18   a free-world setting.

       19   Q.   Okay.  And then the next person, patient number 156 listed

2:46:52PM20   as "yes" under "access to care," but the first sentence, the

       21   consulting physician wrote, "marginally adequate care"; is that

       22   correct?

       23   A.   That's what it lists there, yes.

       24   Q.   Okay.  Let's go to the next page.

2:47:05PM25           This is 232600.  It lists five patients, number 158 to

2:47:14PM 1    162, correct?

2    A.  Yes.

3    Q.  And the patient at 158 has the word "no" in response to

4    access to care, correct?

2:47:25PM 5    A.  That's correct.

6    Q.  And then patient 159 underneath has "yes" for access to

7    care, but then the reviewer writes in the first sentence,

8    "marginal adequate access to care."  Do you see that?

9    A.  Yes.

2:47:41PM10    Q.  And then the next patient 160 has "yes" as in adequate

11    access to care, but the consultant wrote that there were

12    concerns about polypharmacy and combining Cogentin with

13    Zyprexa.  Do you see that?

14    A.  Yes.

2:48:00PM15         THE COURT:  And polypharmacy means too many

16    medications, right?

17         THE WITNESS:  Yes, Your Honor.  Basically, more than

18    two or three psychotropic meds at the same time.

19         THE COURT:  And when it raises concerns, that means

2:48:14PM20    essentially that there could be a negative outcome of some

21    sort?

22         THE WITNESS:  Not necessarily, Your Honor.  Some

23    patients, for example I used the analogy earlier, they are on

24    an antipsychotic medication like, say, Haldol or Zyprexa or

2:48:29PM25    pick your medicine, and they develop muscle stiffness, or to

2:48:34PM 1   prevent muscle stiffness, you might give Benadryl or Cogentin.

2            So you can say that's polypharmacy because it's two meds.  And

3            then maybe they have sleep problems, so they're on a medicine

4            that's sedating at bed time.  They're on three meds.  Someone

2:48:45PM 5   can say that's polypharmacy, but that can be clinically

6            appropriate and they might not have any adverse or bad

7            outcomes.

8                    THE COURT:  Right.  But it says raises concerns --

9                    THE WITNESS:  Yes.

2:48:55PM10                   THE COURT:  -- about polypharmacy?

11                   THE WITNESS:  Yes.

12                   THE COURT:  So they didn't give -- your consultant did

13           not give you any reason to believe that there was an

14           explanation like you said?  So in other words, it wasn't as if

2:49:08PM15   this is 50/50, this is an issue that could have caused

16           problems; am I reading that right?

17                   THE WITNESS:  You're right, Your Honor.  And I think

18           they identify it's a 66-year-old man, and so patients that are

19           older -- and I'm sorry, I think we are all getting older --

2:49:26PM20                   THE COURT:  I'm not.  I just want something to be

21           clear on the record.

22                   THE WITNESS:  Yes, Your Honor.  But I think in prison

23           settings and in jail settings, it's almost like you add 10

24           years.  So if someone is 66, they have the body of a

2:49:44PM25   76-year-old.  They might have co-morbid medical issues, so I

2:49:48PM 1    think the consultant is concerned of -- did they take that into

2        consideration, and maybe they had some other medical

3        co-morbidities.

4              THE COURT:  Okay.  Go ahead.

2:50:02PM 5              MS. KENDRICK:  So can we go to the next page, please?

6    BY MS. KENDRICK:

7    Q.  So this is ADCRR00232601.  And it lists six individuals,

8    patient number 163 to 168, correct?

9    A.  Yes.

2:50:19PM 10   Q.  And none of the six people have the word "no" under "access

11   to care," correct?

12   A.  That's correct.

13   Q.  And then if we look at patient 167, he's the second from

14   the bottom, it says "yes" for access to care, but then the

2:50:37PM 15   first sentence written by the consultant is, "access to care

16   adequate but concerns about medication decisions."  Do you see

17   that?

18   A.  Yes.

19   Q.  And then one down, patient 168, it reads, yes, access to

2:50:53PM 20   care adequate, but then the first sentence it says, "access to

21   care adequate but concerns about decision-making."  Do you see

22   that?

23   A.  Yes.

24              THE COURT:  Does all of this kind of -- these

2:51:08PM 25   comments, which could be read as a concern about the care that

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)        3133

2:51:16PM 1    each of these patients were getting, these inmates were

       2    getting, does this -- could this have been resolved by

       3    interviewing these individuals, you think, than interviewing,

       4    let's say, the medical staff?

2:51:33PM 5           THE WITNESS:  Your Honor, if I may?  So the easiest

       6    way -- it's almost like an armchair quarterback, like the

       7    psychiatry consultant has never seen the patient, they are just

       8    looking at the medical chart, and then they are judging how --

       9    so they are kind of saying, well, I probably wouldn't have done

2:51:51PM10    it this way, I would have done it that way.

      11           But I reviewed all of these charts, I didn't find any

      12    of these patients to be -- to have death or morbidity or

      13    mortality resulting, so there wasn't a bad outcome with these

      14    patients.

2:52:05PM15           THE COURT:  Yeah, but these consultants that you

      16    relied on, and it sounds to me like you thought that they were

      17    very capable --

      18           THE WITNESS:  Yes.

      19           THE COURT:  -- of doing this work, they raised but

2:52:16PM20    concerns, but concerns about decision-making.  Did that

      21    indicate to you that you needed to do further investigation?

      22           THE WITNESS:  Yes, Your Honor, and I looked at those

      23    charts.

      24           THE COURT:  In one kind or another?

2:52:34PM25           THE WITNESS:  Correct.

2:52:35PM 1          THE COURT:  So in your best judgment as a very

2          qualified doctor, you would have done something else to

3          determine whether or not this analysis was correct?

4          THE WITNESS:  Yes.

2:52:47PM 5          THE COURT:  Okay.

6          THE WITNESS:  Yes, Your Honor.

7     BY MS. KENDRICK:

8     Q.  And what was that analysis?

9     A.  So I reviewed all of these charts.  And again, I think

2:52:57PM 10   everyone has reasonable -- I mean, everyone can disagree.  I

11   can say like, for example, in patient number 167, Paxil is

12   probably the most anticholinergic of all the SSRIs.  So there

13   may have been a reason why the patient -- sorry, why the

14   provider didn't want to prescribe Paxil.  Anticholinergic side

2:53:20PM 15   effects can be problematic.

16          So again, I think reasonable people can disagree or

17   prescribe different medicines, and it's not a hard and fast.

18   Like there's a lot -- there's like 10 or 15 different

19   antidepression medications.  There's like 10 or 15

2:53:34PM 20   antipsychotic medications.

21          So people tend to have their personal preference for

22   what medicines they feel most comfortable with at what dose.

23   And so I think that's what you are seeing with these

24   consultants.  They are basically saying, in my experience, this

2:53:46PM 25   is how I prescribe for this kind of a patient.

2:53:50PM 1    Q.  Let's go to the next page, please.

2          This is ADCRR00232602.  This lists six people,

3    patients assigned numbers 169 to 174, correct?

4    A.  Yes.

2:54:07PM 5    Q.  And one of the six of them, the patient at number 169, has

6    "no" for access to care in the fifth column; is that correct?

7    A.  Yes.

8    Q.  Okay.  Let's go to the next page.

9          This is ADCRR00232603 listing 10 patients, number 175

2:54:31PM10   to 184.  And none of them have the word "no" under the fifth

11   column; is that correct?

12   A.  That's correct.

13   Q.  And on patient 179, there's "yes" under "access to care,"

14   but the last sentence by the physician who reviewed the record

2:54:59PM15   is quote, AIMS is performed only once a year, closed quote.  Do

16   you see that?

17   A.  Yes.

18   Q.  And AIMS is an exam, physical exam that's done on people

19   who are taking certain types of psychotropic medication to

2:55:14PM20   evaluate them for possible neurological side effects, correct?

21   A.  That's fair, yes.

22   Q.  Okay.  Go to the next page, please.

23   A.  If I may, I don't know if there's an affirmative, you must

24   or you shall do an AIMS twice a year in Arizona.  I think I saw

2:55:39PM25   in some situations where they were twice a year.

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)          3136

2:55:42PM 1              In Texas, I believe we only expect it done once a

2              year.  So there's not a mandatory standard of care of how

3              often.  I think the American Psychiatric Practice Guidelines

4              say you should just do it periodically.

2:55:53PM 5              THE COURT:  And the person who -- the people who you

6              hired were not necessarily from Texas?

7              THE WITNESS:  Correct, Your Honor.  Two were from New

8              Jersey, and two were from Texas.

9    BY MS. KENDRICK:

2:56:17PM 10   Q.  We are taking a quick step back.  We went one page too far.

11   We are looking at page 602 -- 232602 that lists six patients,

12   patients 169 to 174.  And the person who is listed at 169 has

13   "no" for access to care.  Did I read that correctly?

14   A.  That's correct.

2:56:45PM 15   Q.  Okay.  And then we'll go to 232604.  And this list has 24

16   people on it.  If you take my word for it I counted it several

17   times, but it is patient 185 to 209, and all of them got "yes"

18   for access to care.  Is that -- am I reading that correctly?

19   A.  That's correct.

2:57:12PM 20   Q.  Okay.  And the next page, 232605, lists 18 people who are

21   assigned patient numbers 210 to 227.  All of them are listed as

22   "yes" under "access to care"; is that correct?

23   A.  Yes.

24   Q.  Okay.  Next page is 232606.  And it lists seven patients

2:57:45PM 25   assigned patient numbers 228 to 234.  Do you see that?

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)    3137

2:57:52PM 1    A.  Yes.

2          Q.  And the first patient, number 228, has "no" under the fifth

3          column.  Do you see that?

4          A.  Yes.

2:58:04PM 5    Q.  And this was a patient who died by suicide, wasn't it?

6          A.  I don't recall as we sit here today.

7          Q.  That's fine if you don't recall.

8                  Let's go to the next page, please.

9                  So this is 232607, it lists eight people.  They are

2:58:40PM 10   assigned patient number 235 to 242; is that correct?

11         A.  Yes.

12         Q.  And they all have the word "yes" for the access to care?

13         A.  Yes.

14         Q.  And the first person, who's patient number 235, the

2:58:59PM 15   reviewer wrote in the second paragraph, "It is concerning that

16         patient is not on meds and carries a diagnosis of schizophrenia

17         or bipolar DO."  Do you see that?

18         A.  Yes.

19         Q.  And it notes that this patient has been on involuntary

2:59:17PM 20   medication in the past and writes that unmedicated, he is

21         likely going to have difficulties functioning.  Do you see

22         that?

23         A.  Yes.

24         Q.  Okay.  Did this concern you?

2:59:31PM 25   A.  Well, I don't know if I would use the word "concern."  I

2:59:34PM 1    would say it's very common in correctional settings, either

2    jails or prisons, to have patients that refuse medications, and

3    they have a right to treatment.  They also have a right to

4    refuse treatment, and so there are safeguards in place.

2:59:49PM 5         And unfortunately, some patients, even though we see

6    them, we try to provide them medication and treatment, we

7    counsel them or educate them on how the medicines might help

8    them, they adamantly refuse.

9         And if they are not gravely disabled or not imminent

3:00:04PM10   risk of harm to self or others, and they are not psychotic,

11   it's very hard to compel or force them to take medications

12   against their will.

13        THE COURT:  So I can see that here, and I certainly

14   accept what you are saying, but your own reviewer had concerns?

3:00:21PM15        THE WITNESS:  Yes.

16        THE COURT:  Okay.

17   BY MS. KENDRICK:

18   Q.  But you did not share your reviewer's concerns?

19   A.  I did not share?

3:00:29PM20   Q.  Your reviewer's concerns.

21   A.  I am not sure I understand when you say, I did not share.

22   Q.  The reviewer's concerns.

23        Judge Silver said, your reviewer was concerned, and

24   you said yes.  And I said, but you did not share this

3:00:43PM25   reviewer's concerns?

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)       3139

3:00:47PM 1    A.  Well, I think I would need to look at the chart to see how

2    the staff educated the patient, what efforts they've tried to

3    do.  There's probably additional back story to this.

4         Some patients are well known to systems, and so

3:01:02PM 5    perhaps there's other -- perhaps Dr. Carr, Dr. Stallcup, or

6    Dr. Pelton know more about this patient, and all the efforts

7    that the staff had exhausted trying to work with this patient.

8         So again, this is just based on a record review, but

9    it doesn't contain what staff have done at the unit level or at

3:01:20PM10    the leadership regional level or senior level to try to address

11    this patient.

12         THE COURT:  But is there anything in your report that

13    indicates that there has been a follow-up by you, or anyone

14    else, to determine whether or not this concern was adequate?

3:01:36PM15         THE WITNESS:  Your Honor, I reviewed all of these

16    charts, and I don't recall this patient having an adverse

17    patient outcome like a death or a suicide.

18         THE COURT:  Obviously, this patient didn't have an

19    adverse -- would that be the determination by you then, whether

3:01:54PM20    or not the patient committed suicide?

21         THE WITNESS:  That would be one variable, but if, say,

22    the patient was decompensating and --

23         THE COURT:  So you didn't find anything in this report

24    that supported this concern?

3:02:11PM25         THE WITNESS:  Your Honor, I agree that there's

3:02:13PM 1  concerns with this patient, but it seems like staff, again, is

2  trying to meet the patient halfway.  And then there's --

3          THE COURT:  In the report you found something that

4  your reviewer didn't find?  In other words, you are satisfied

3:02:27PM 5  that there was something in addition to what your reviewer

6  found that would indicate that this patient was adequately

7  served.

8          THE WITNESS:  Yes, Your Honor.  Yes, Your Honor.  I

9  would say -- and I apologize, the -- I think the challenge with

3:02:43PM10  this patient is, there's multiple diagnoses like questions of

11  mood disorder versus a personality disorder versus

12  schizophrenia versus bipolar.  So there's a lot of diagnostic

13  uncertainty with this patient.

14          THE COURT:  Yeah, that's clear.  But I am wondering in

3:02:57PM15  your report is there anything to indicate how you came about

16  deciding that despite what the concerns were from your

17  reviewer, the treatment that this patient had received was

18  appropriate?

19          THE WITNESS:  Yes, Your Honor.  I would say based on

3:03:11PM20  my review of this and review of the chart, the patient has been

21  seen by mental health staff consistently.  It's not like they

22  just closed the patient out, like they said, we're tired of

23  you, go away, we are not going to keep following you.

24          Like they're continuing to outreach to this patient

3:03:27PM25  and continuing to follow and monitor the patient.

3:03:31PM  1          THE COURT:  And that's the standard of care --

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  -- that you think is appropriate?

4          THE WITNESS:  Yes, Your Honor.

3:03:38PM  5          THE COURT:  Just that they need to continue seeing the

6  patient?

7          THE WITNESS:  Yes.  If they closed him out, if they

8  said, we don't want to see him anymore, he's not mentally ill,

9  he has a personality disorder, we are going to close him out

3:03:47PM 10  and medical can see him, he can submit a sick call in the

11  future, I think that would be problematic.

12          But in this case, mental health is continuing to try

13  to see this patient, engage and work with the patient.

14          MS. KENDRICK:  Can we go to the next page, please?

3:04:03PM 15  BY MS. KENDRICK:

16  Q.  So this one is 232608.  It lists nine people, patients

17  number 243 to 251, and they all have "yes" under the fifth

18  column.  Did I read that correctly?

19  A.  Yes.

3:04:19PM 20  Q.  All right.  Let's go to the next page.

21          232609, lists three patients, numbers 252 to 254.

22  They all have "yes" for access to care.  Did I read that

23  correctly?

24  A.  Yes.

3:04:36PM 25  Q.  Patient number 252 has "yes," but then can you see the

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)          3142

3:04:41PM 1    third paragraph?  The consulting physician wrote,

2    "documentation is poor."  Do you see that?

3    A.  Yes.

4    Q.  See that?

3:04:51PM 5    A.  Yes.

6    Q.  Let's go to the next page.

7         This is ADCRR00232610.  It lists three patients,

8    numbers 255 to 257.  They all have "yes" under "access to

9    care."  Is that correct?

3:05:10PM10    A.  Yes.

11    Q.  Let's go to the next one.

12         ADCRR232611.  Two patients, number 258 and 259.  And

13    258, their entry has "no" for access to care.  Did I read that

14    correctly?

3:05:29PM15    A.  Yes, you did.

16    Q.  Okay.  And let's go to the next page.

17         This has nine people on it, patients number 260 to

18    268.  None of them have "no" under "access to care."  Did I

19    read that correctly?

3:05:47PM20    A.  Did you want to say the page number?

21    Q.  Sure, it's 232612.

22    A.  Right.  Yes, that's correct.

23    Q.  Okay.  The next page will be 232613.  Listing seven

24    patients assigned ID numbers 269 to 275.  None of them have

3:06:09PM25    "no" on the "access to care" column; is that correct?

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)        3143

3:06:14PM 1    A.   That's correct.

2    Q.   And under patient 271, it states, yes, that the patient

3    does have access to care, but then in the next column it

4    states, "admission in 2006 but encounters only go back to

3:06:32PM 5    January 2020, limited documentation available."  Do you see

6    that?

7    A.   Yes.

8    Q.   And then two down, on patient 272, says, access to care is

9    yes.  But also indicates that the -- been no scheduled visit

3:06:49PM10    with the psychiatric midlevel since August 2020.  Do you see

11    that?

12    A.   Right.  And I would need to look at the chart because it's

13    possible that the patient is not on medication so there

14    wouldn't be a need for follow-up with a midlevel.

3:07:07PM15    Q.   That's right, because you testified that your grouping of

16    patients included people who had the mental health score of 3

17    and higher, correct?

18    A.   Yes.

19    Q.   And the mental health 3 has five sublevels, right, A, B, C,

3:07:26PM20    D, and E?

21    A.   Yes.

22    Q.   And MH3D and MH3E are patients who are not on any

23    medication, correct?

24    A.   That sounds correct, yes.

3:07:35PM25    Q.   Okay.  Let's go to the next page, please.

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)          3144

3:07:39PM 1          This is ADCRR00232614.  Two patients, numbers 276 and

2      277, and neither of them has "no" under access to care,

3      correct?

4      A.  That's correct.

3:07:57PM 5      Q.  And I believe you testified on direct that about 20 percent

6      of these 276 or 75 files that were reviewed, there was an

7      answer of no on access to care; did I get that down correctly?

8      A.  I don't think it was 20 percent -- sorry, which files are

9      you referring to, please?

3:08:26PM10      Q.  The files we just walked through.

11      A.  What I recall testifying to was the files that Pablo

12      Stewart reviewed, the 155, 33 of those, my consultants opined

13      or believed that access to care was not provided, but 79

14      percent they believed demonstrated appropriate care.

3:08:49PM15          And then of the random file, I think I testified that

16      five out of the either 119 or five out of the 120 demonstrated

17      appropriate care, so 95 percent did demonstrate appropriate

18      care.  So I apologize.  I am not sure what you mean by the 20

19      percent.

3:09:31PM20      Q.  All right.  I counted up 38 entries that said no in this

21      chart here of 275.  And you read these, all of the notes in

22      this spreadsheet before you submitted your October 22nd report,

23      correct?

24      A.  That's correct.

3:09:54PM25      Q.  And did you renview them before you submitted your

3:10:00PM 1   declaration that was filed on Sunday?

2   A.  I have actually even reviewed some as recently as last

3   night, so I don't -- I can't break it up into which I did

4   before the declaration Sunday night and this morning, but I

3:10:13PM 5   reviewed a bunch of the charts -- I have rereviewed a bunch of

6   the charts also.

7   Q.  Okay.  But you do agree that of these reviews that were

8   done by the four consulting psychiatrists, that it appears that

9   in at least 38 cases they had found access to care was not

3:10:38PM10   adequate?

11   A.  I think the question was, was access to care provided, and

12   they opined no based on the document review.  And you are

13   right, it was 38 out of the 275 charts.

14        MS. KENDRICK:  Your Honor, we would like to move

3:11:04PM15   Exhibit 2262 into evidence.

16        THE COURT:  No objection, it's admitted.

17        MS. HESMAN:  She is saying 2262?  Is that what we are

18   looking at?

19        THE COURT:  Yeah.

3:11:17PM20        MS. HESMAN:  Okay.  Objection, Your Honor, it's

21   hearsay.

22        THE COURT:  It is.  Is this what we have been looking

23   at?

24        MS. KENDRICK:  Yes, it's what we've been looking at.

3:11:32PM25   But the objection that was offered previously by defendants was

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)          3146

3:11:37PM 1      402 and 403.

2              THE COURT:  So if I am understanding what the

3      testimony is, they can certainly make any objection they want

4      to in trial, so as I have heard Dr. Penn speaking, he relied on

3:11:56PM 5      these reports.  Are you saying that these reports are

6      unreliable for him to give opinions under 703?

7              MS. HESMAN:  No, Your Honor.  I understand that 703

8      allows for an expert to rely on hearsay evidence, but that does

9      not necessarily mean that it's coming into evidence, and now

3:12:13PM10      they are moving for its admission and that's the issue.

11              THE COURT:  That is correct.  But it comes in as 703

12      in evidence as the evidence that's relied on by the expert.

13              Now, I don't know, you know, maybe you are going to

14      establish that some of the evidence isn't reliable.

3:12:39PM15              MS. HESMAN:  No, Your Honor, I'm not saying that this

16      isn't reliable.  I am just trying to understand if plaintiffs'

17      counsel is trying to admit this for the truth of the matter,

18      and if so, it's still hearsay under the rule.

19              THE COURT:  Well, it's not hearsay under 703.  It will

3:12:54PM20      be taken though as documentation that he has relied on, and he

21      certainly established himself as a qualified expert and -- did

22      you rely on this for your final opinion?

23              THE WITNESS:  Yes, Your Honor.

24              THE COURT:  Okay.  Because you hired these

3:13:17PM25      individuals, correct?

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)     3147

3:13:19PM 1          THE WITNESS:  Well, Your Honor, I didn't hire them.

2     The -- I asked them to be involved with -- ADCRR is going to --

3          THE COURT:  Did you choose them, or did the lawyers

4     choose them?

3:13:32PM 5          THE WITNESS:  I chose them.

6          THE COURT:  So then you didn't hire them, they were

7     paid by somebody else, but they were your choice?

8          THE WITNESS:  Yes, ma'am.

9          THE COURT:  Is that a better way of saying it?

3:13:41PM10          THE WITNESS:  Yes.

11          THE COURT:  And then you relied on these opinions --

12     on their comments, whether or not they are opinions or not,

13     their findings --

14          THE WITNESS:  Yes.

3:13:47PM15          THE COURT:  -- correct?

16          THE WITNESS:  That's correct.

17          THE COURT:  -- in coming to your final opinion?

18          THE WITNESS:  Yes.

19          THE COURT:  Then they are admitted under 703.  And

3:13:54PM20     they are only admitted for the purpose of this Court

21     determining whether or not the witness's opinion that they are

22     reliable is in fact reliable.  So that would be the instruction

23     I give to myself, which I am giving, and I will do as I said.

24          MS. HESMAN:  Understood.

3:14:18PM25          MS. KENDRICK:  All right.

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)   3148

3:14:19PM  1          (Exhibit Number 2262 is admitted.)

2    BY MS. KENDRICK:

3    Q.  I would like to ask you some questions about staffing.  You

4    testified on direct and pointed to your declaration where you

3:14:29PM  5    said that there's no national requirement or guideline for

6    recommended staffing in jails or prisons, and that staffing

7    levels are virtually impossible to set with any objective

8    formula or standard that has general applicability.

9          That's your opinion, yes?

3:14:46PM 10   A.  I would add in standard.  There's no national standards

11   also, but, yes, that's my opinion.

12   Q.  Okay.  And you are familiar with the American Psychiatric

13   Association's publication, Psychiatric Services in Correctional

14   Facilities, Third Edition?

3:15:03PM 15   A.  Yes.

16   Q.  In fact, you're listed as a contributor and coauthor of it?

17   A.  That's correct.

18   Q.  And you are aware that the American Psychiatric Association

19   has listed the following guidelines for staffing, that in

3:15:16PM 20   general population there should be one Full Time Equivalent

21   psychiatrist for every 150 to 200 SMI prisoners who receive

22   psychotropic medication?

23          MS. HESMAN:  Your Honor, to the extent we can show the

24   witness the document that she's referring to, I think that

3:15:32PM 25   would be helpful.

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)     3149

3:15:35PM 1        THE COURT:  I am not sure he -- he looks like -- he

2      has a quizzical look on his face, so maybe he needs to see the

3      document.

4            MS. KENDRICK:  Well, let's put it up.  It's Exhibit

3:15:42PM 5    2190 --

6            THE WITNESS:  Thank you, Your Honor.

7      BY MS. KENDRICK:

8      Q.  -- which you coauthored.  And it's page 7, staffing.  And

9      towards the bottom --

3:15:54PM10        THE COURT:  What's the document number?

11           MS. KENDRICK:  It's Exhibit 2190, Your Honor.

12           THE COURT:  Okay.  Does counsel have this?

13           MS. KENDRICK:  Yeah.

14           THE COURT:  Or is this impeachment?

3:16:06PM15        MS. KENDRICK:  No, no, no.  This is predisclosed.  So

16     this is Exhibit 2190.  Would Your Honor like the cover of it?

17           THE COURT:  No, maybe the witness would, to remind

18     him -- didn't you say this was his document?

19           MS. KENDRICK:  He said he was a coauthor.

3:16:23PM20    BY MS. KENDRICK:

21     Q.  There we go.  Third Edition, Psychiatric Services in

22     Correctional Facilities, and then Dr. Penn is listed as one of

23     the contributors.

24           So on page 7 is a section called, staffing, and at the

3:16:37PM25    bottom for prisons, there's two bullet points.  And that's what

3:16:42PM 1    I was asking about is -- and if we can enlarge it so it's more

2    readable?

3              For general population needs, one Full Time Equivalent

4    psychiatrist for every 150 to 200 SMI inmates receiving

3:17:00PM 5    psychotropic medication.

6              And for residential treatment units or the equivalent

7    where a mental health diagnosis is a requirement for admission,

8    one FTE psychiatrist for every 50 patients.  Do you see that

9    language?

3:17:17PM10   A.  Yes.

11             MS. HESMAN:  Your Honor, I apologize, but Ms. Kendrick

12   sent me a list of exhibits that were going to be used with this

13   witness.  This was not on the list from this morning.

14             MS. KENDRICK:  Well, I sent the list of the medical

3:17:31PM15   records because I was told that yesterday in court we were

16   supposed to notify you of medical records.

17             MS. HESMAN:  My understanding is the Court's rules,

18   any the exhibits that are going to be used with the witness.

19   This was not one of them.

3:17:40PM20            THE COURT:  Well, you know, I have broadly -- I have

21   broadly for defense counsel interpreted the impeachment.

22             MS. KENDRICK:  Well, this is not impeachment.

23             MR. FATHI:  Yes, it is.

24             MS. KENDRICK:  I guess it is.

3:17:59PM25            MS. HESMAN:  She said twice now it wasn't impeachment

3:18:00PM 1    and that we had it.  It was just not something that was on her

2    list and --

3              THE COURT:  All right.  Do you need some time to

4    review it?  And I will certainly give you the time.

3:18:11PM 5              MS. HESMAN:  No, Your Honor, I would just ask if there

6    are any additional exhibits that she's going to use that

7    weren't on the list, that I be provided with them.

8              MS. KENDRICK:  I apologize.  I was told --

9              THE COURT:  Any additional exhibits, other than

3:18:19PM10    impeachment -- this you say is not impeachment, that's fine,

11    then provide her the full list so we -- so -- both of you want

12    to have this trial completed by another two days, let's keep up

13    with the time schedule here and the requirements.

14              MS. KENDRICK:  All right.  There was a

3:18:42PM15    misunderstanding.  I apologize.  I thought it was only medical

16    records I needed to tell her about.

17              MS. HESMAN:  Your Honor, I don't want to waste time.

18    She can certainly continue.  But if they can just give me the

19    list, so I can start pulling --

3:19:25PM20              THE COURT:  Sure.  If you need any time --

21              MS. HESMAN:  I am fine right now.

22              THE COURT:  You seem fine.  Let's go.

23              MS. KENDRICK:  All right.

24    BY MS. KENDRICK:

3:19:31PM25    Q.  You are familiar with these recommendations, correct?

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)     3152

3:19:34PM 1    A.  Yes.

2    Q.  Okay.  And you disagree with these recommendations,

3    correct?

4    A.  Yes, I do, and I did.

3:19:41PM 5    Q.  Okay.  And in fact you testified that you think it would be

6    acceptable to have one FTE psychiatric provider including a

7    psychiatric nurse practitioner or a physician assistant for

8    every 500 SMI patients, correct?

9    A.  I don't think there's any national standard or guideline

3:20:03PM10    for staffing ratios.  And if I may, I can answer the context of

11    this formula that was inserted in this document.  It was kind

12    of --

13    Q.  I move to strike.  That was not my question.  My question

14    was just, you've testified that it would be acceptable to have

3:20:22PM15    one FTE psychiatric provider for every 500 SMI patients?

16    A.  I would say it would depend, but, it's possible that, yes,

17    that would be an adequate number of staff.

18    Q.  Okay.  So we can take that down.

19         Actually, we would like to move this into evidence as

3:20:44PM20    a treatise under 803(18)?

21         MS. HESMAN:  It's hearsay, Your Honor.

22         THE COURT:  803.

23         MS. KENDRICK:  18.

24         THE COURT:  The foundation for it?  He disapproves of

3:21:03PM25    it.

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)   3153

3:21:03PM 1          MS. KENDRICK:  He disapproves of it, but he identifies

2      it and he was on the group that wrote the guidelines.

3          MS. HESMAN:  Your Honor, I think if he would have been

4      able to give the explanation as to what the group was --

3:21:12PM 5      consisted of and contained of, that would explain why he

6      disagrees.

7          THE COURT:  It would also be very important to find

8      out whether or not he prepared it, he drafted it.

9      BY MS. KENDRICK:

3:21:22PM10      Q.  You were part of the team that drafted this recommendation,

11      correct?

12      A.  And I strongly disagreed with this, but I was overruled.

13      It was a group project, and one of the particular senior

14      members, Jeff Metzner, who serves -- it lists there in the

3:21:37PM15      disclaimer, that he often serves as a monitor and as a

16      plaintiffs' expert.

17          I have respect for Jeff Metzner, but I think when we

18      asked him specifically, what is this formula based on?  What

19      data?  What study?  He was not able.  He just said, "In my

3:21:52PM20      experience."

21          And so we really wanted to make sure, to advance the

22      field, there needs to be evidence and data, not just putting

23      together formulas.  So I strongly disagree with this staffing

24      ratio number.

3:22:04PM25          THE COURT:  And did you include that in this report?

3:22:07PM 1          THE WITNESS:  No, Your Honor, because it was a --

2     well, actually I did I think.  I apologize.

3          THE COURT:  Okay.  The truth of what is asserted would

4     be the report itself.  And if he has -- so it doesn't come in

3:22:25PM 5     because he is disputing it -- well, even though he participated

6     in it, he disputed it, so it can't be brought in for the truth

7     of what is asserted, unless it also contains his statement that

8     he disagrees with it, then I might let it in.

9     BY MS. KENDRICK:

3:22:43PM10     Q.  Is your statement in this report, Dr. Penn?

11     A.  I'm having trouble locating it.

12     Q.  I don't think it's in front of you.  We can pull it up for

13     you or get you a hard copy.

14     A.  I'm having trouble recalling if I put it in my report or in

3:23:02PM15     the declaration.

16          THE COURT:  Okay.  Well, let's just -- I am not going

17     to include it.  I will sustain the objection unless you can

18     establish that his specific disapproval of it was contained in

19     the report.

3:23:15PM20          MS. KENDRICK:  Right.  We are introducing it for the

21     fact of the matter that it was the position of the American

22     Psychiatric Association, that was their position.

23          MS. HESMAN:  Your Honor, that is the truth of the

24     matter asserted.

3:23:28PM25          MS. KENDRICK:  That it's the official position of this

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)     3155

3:23:30PM 1   organization.

2              THE COURT:  I have to say at some point, and we are

3   not going -- I am not going to do this for you.  It has to say

4   somewhere in the report just exactly what you said, that it is

3:23:41PM 5   the report of the American Psychiatric Association.  And then

6   it might be admissible.  But let's move on, because I don't

7   have that in front of me.  So the objection is sustained.

8              MS. KENDRICK:  Okay.

9   BY MS. KENDRICK:

3:24:04PM10   Q.  So you stated in your direct testimony and in your

11   declaration at paragraph 72, that because ADCRR's population is

12   on a declining trend, fewer incarcerated people require fewer

13   staff.  Do you see that at paragraph 72, first sentence?

14             THE COURT:  Line 17.

3:24:34PM15             THE WITNESS:  Yes, Your Honor.  So my answer would be

16   that's in theory, yes, that's true.

17   BY MS. KENDRICK:

18   Q.  Okay.  But you did not request or review information to see

19   if the number of patients on the mental health caseload has

3:24:50PM20   declined in the same direction, correct?

21   A.  I believe I was provided with mental health caseload

22   numbers.  Again, I have looked at records since going back to

23   2013, and I am having trouble remembering what I reviewed most

24   recently on the mental health caseload.

3:25:09PM25   Q.  In preparing -- in your visit in September and in preparing

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)       3156

3:25:14PM 1    your expert report in October 22nd and your declaration that

2    was filed on Sunday, you did not request or review information

3    regarding changes in the mental health caseload, right?

4    A.  I don't believe so, no, that's fair.

3:25:31PM 5    Q.  And for this report and for this declaration during your

6    September 2021 visits, you did not request or review

7    information about whether the number of people on psychotropic

8    medications has declined, correct?

9    A.  I don't recall, so that's fair.

3:25:56PM10    Q.  And in your work preparing for your October expert report

11    and your November 13th declaration, you did not request or

12    review information about whether the number of SMI patients had

13    declined, right?

14    A.  I -- as we sit here today, I recall that I requested a lot

3:26:15PM15    of information.  We had several phone calls with the --

16    Dr. Stallcup from the monitoring bureau.  And I do recall

17    asking for some data, but I can't recall as we sit here today

18    what data I was provided with and what I wasn't.

19    Q.  Do you know what percentage of the SMI population has gone

3:26:43PM20    down?  Is it tracking the overall population decline?

21    A.  I would need to know what time frame you are referencing.

22    Q.  The same time frame you are referencing in your broad

23    statement that the population is on a declining trend.

24    A.  I don't know that number as we sit here today.

3:27:05PM25    Q.  And you have three charts at the top of page 26 that

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)        3157

3:27:18PM 1    purport to show staffing numbers for 2012, July 2016, and July

       2    2021, correct?

       3    A.  Yes.

       4    Q.  Did you make this chart?

3:27:35PM 5    A.  No, I am not very good with Excel spreadsheets.

       6    Q.  Who made the chart?

       7    A.  I don't know.  I don't know if it was ADCRR or Struck Love

       8    Law Firm, but one of those two probably did.

       9    Q.  And it lists some source documents there; do you see that?

3:27:51PM10    A.  Yes.

      11    Q.  And did you review the source documents to check the

      12    accuracy of the information in the charts?

      13    A.  Yes, I did.

      14    Q.  And do these charts show the number of contracted positions

3:28:06PM15    or the actual filled Centurion employee positions?

      16    A.  I believe these are just full-time FTEs, Full Time

      17    Equivalents.  I don't believe these include contract positions.

      18    Q.  So is this the number of positions called for by the

      19    contract or the number of Centurion FTE human bodies physically

3:28:33PM20    filling those positions?

      21    A.  I don't know.

      22    Q.  But you don't know which numbers are there?

      23    A.  Well, the numbers are there, but I don't know -- I don't

      24    know enough of the nuances.  I think that would be a good

3:28:47PM25    question to pose to Centurion.  They would be much more

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)      3158

3:28:50PM 1   knowledgeable about what positions are budgeted, what positions

2   are filled, and under the contract and that sort of thing.

3   Because I may have looked at the master contract, but it has

4   been probably several years since I did that.

3:29:02PM 5   Q.  Okay.  So as you sit here, you don't know if this is the

6   contracted amount or the actual amount of staff?

7   A.  I believe this is the number of actual staff.  I don't

8   believe -- I think they would have had the variants, if there

9   was an unfilled position, I think that would have been

3:29:22PM10   included.

11   Q.  Okay.  Well, let's look at the source document.

12        Mr. Campbell, can we pull up Exhibit 2195 and put

13   that -- this is the staffing contract variance report for July

14   2021.  It's Exhibit 2195.  And we will just --

3:29:45PM15        THE COURT:  Let's make sure, when you say "source

16   document," it is the source document that is listed in

17   Dr. Penn's report at line 15, correct?  Is that the source

18   document?

19        MS. KENDRICK:  It's a different Bates number, but it's

3:30:06PM20   for the same month.  This is what -- this is what had been

21   produced to us as a Bates number by defendants.

22        MS. HESMAN:  Your Honor, that's not the same source

23   document.  It has a different Bates number, and the Bates

24   numbers are indicated at line 15 --

3:30:21PM25        THE COURT:  So do you know for sure, Ms. Hesman, that

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)      3159

3:30:24PM 1    what she has placed up here in front of us is not the source

2    document, even though the number is different?

3              MS. HESMAN:  I do not know if the data is the same.  I

4    know it's not the same document, because the Bates number is

3:30:35PM 5    different, so -- the Bates number document he relied on.

6              THE COURT:  Let's make sure, since you are submitting

7    this to him for the purpose of showing the source that is

8    listed in his report, make sure it's correct.

9              MS. KENDRICK:  Okay.  This was what we were provided

3:30:54PM10    by the defendants as the July 2021 staffing report.

11             THE COURT:  Well, is that the same source number that

12    he's relying on?

13             MS. KENDRICK:  It's a different Bates number than what

14    he has listed.

3:31:06PM15             THE COURT:  What I am saying -- counsel is saying it

16    may be different, so before you show it to him, make sure that

17    it is exactly the same that he relied on and that was provided

18    to you by defense counsel.

19    BY MS. KENDRICK:

3:31:20PM20    Q.  Well, you testified you did not make this chart, correct?

21    A.  Sorry, which chart are you referring to?  There's two up on

22    the screen.

23    Q.  The ones on your report.

24    A.  There's now a bunch of charts on the screen.  I am not sure

3:31:37PM25    which one you are referring to.

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)   3160

3:31:38PM 1  Q.  On the right-hand side, that is your report, and I was -- I

2  just asked you a little while ago, did you make this chart, and

3  you said no?

4  A.  That's correct.

3:31:51PM 5  Q.  You said you didn't know who did?

6  A.  Well, I think I said it was either ADCRR or someone from

7  Struck Love Law Firm.

8  Q.  Yes, but you didn't give a name, so you don't know who

9  specifically made it?

3:32:06PM10          MS. HESMAN:  Your Honor, asked and answered.

11          THE COURT:  Yes.  Sustained.

12  BY MS. KENDRICK:

13  Q.  Did you give instruction to somebody at Struck Love or

14  ADCRR about what type of data you wanted them to include in

3:32:30PM15  this chart?

16  A.  No, I did not.

17  Q.  So this was offered to you?

18  A.  Well, I asked for staffing numbers of all of the mental

19  health positions by position -- by position name and type and

3:32:47PM20  designation.

21  Q.  And did you ask for the actual fill rate or the contracted

22  positions, including fill and vacant positions?

23  A.  So "fill rate" is not a term that I use in my work.  I

24  think basically what I asked was, how many positions are there

3:33:05PM25  and how many are vacant and how many are filled?  How many FTEs

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)    3161

3:33:12PM 1  are budgeted and how many are filled?  That's kind of how I

2  believe I asked the ADCRR, Dr. Stallcup and Dr. Carr from

3  Centurion.

4  Q.  So is this the FTE budgeted or FTE filled?

3:33:28PM 5  A.  I have no idea.

6  Q.  Okay.  And when you were writing your report about

7  staffing, did you -- you did not analyze the amount of overtime

8  used by Centurion, correct?

9  A.  That's fair.

3:33:46PM10  Q.  And you did not analyze the percentage of staff time that

11  was being filled with agency temps or locum tenens, correct?

12  A.  That's fair.

13  Q.  And I believe you testified on direct that between

14  one-third to one-half of TDCJ's psychiatric providers are

3:34:06PM15  midlevels; is that correct?  Did I hear you correctly?

16  A.  I don't know the exact numbers.  I would have to go through

17  my roster of my staff.  I oversee both the adult and juvenile,

18  so I would have to have a roster.  But I would say, I think

19  fairly, at least a third to 40 percent of our staff are

3:34:26PM20  psychiatric NPs or PAs.  That's fair.

21  Q.  Okay.  And then the balance are psychiatrists?

22  A.  Yes.

23  Q.  And did you do a similar analysis and breakdown of the

24  ratio of psychiatric midlevels to psychiatric MDs looking at

3:34:44PM25  Arizona?

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)     3162

3:34:46PM 1    A.  I don't recall doing that, no.

2    Q.  Okay.  Would it concern you that there's -- that it's

3    flipped in Arizona, that's three and a half psychiatric

4    midlevels for every one psychiatrist in the budget?

3:35:14PM 5    A.  No.

6    Q.  Okay.  So you were talking with Ms. Hesman about

7    medications and the formulary, and you stated that you found

8    that based on your conversations with staff and that patients

9    can ask for and receive nonformulary medications if the

3:35:48PM10    psychiatrist requests that; is that correct?

11    A.  I don't think that was my testimony.  I think what I said,

12    if the psych provider opines that they are clinically indicated

13    and the psychiatrist feels that the benefit-to-risk ratio

14    outweighs the risk-to-benefit ratio, it would be an

3:36:07PM15    individualized decision.

16        But it's ultimately the psych provider's decision of,

17    does this patient really warrant a nonformulary medication?  So

18    it's not that the patient calls the shots, it's the psych

19    provider decides clinically, is this indicated for this

3:36:25PM20    patient.

21    Q.  But don't all nonformulary requests have to go through

22    utilization management for approval?

23    A.  I believe so, that's fair.

24    Q.  And what percentage of nonformulary requests made by the

3:36:42PM25    prescribers are approved by utilization management in Arizona

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)          3163

3:36:48PM 1   in 2021?

2   A.  Are you asking about psychiatric providers or --

3   Q.  Psychiatric, psych meds?

4   A.  I don't know the exact number.  I don't recall getting that

3:36:58PM 5   data.

6   Q.  Did you request that data?

7   A.  I don't recall.

8   Q.  And you also talked about part of the reason that some

9   medications are not on the formulary is because some patients

3:37:15PM10   may try to hide the medication, secrete it somewhere or cheek

11   it.  And when that happens in a prison, shouldn't there be a

12   focus on where the breakdown is in medication administration?

13   A.  I'm sorry?

14   Q.  Because aren't people who are given these meds, they are

3:37:40PM15   called watch swallow, right?

16        MS. HESMAN:  Objection, Your Honor, compound.  I am

17   not sure what question --

18        THE COURT:  Did you understand the question?

19        THE WITNESS:  No, Your Honor.  When she said "secrete"

3:37:50PM20   I didn't understand what she meant by that.

21        MS. KENDRICK:  Secret, like hide.

22        THE COURT:  Sustained.

23   BY MS. KENDRICK:

24   Q.  So these type of medications are normally prescribed watch

3:38:00PM25   swallow, right?

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)      3164

3:38:00PM 1    A.  And I'm sorry, what kind of medication?

2    Q.  The medications that you said are very dangerous because --

3    and shouldn't be on the formulary because people hide them,

4    they cheek them, they do things, they try to resell them, they

3:38:12PM 5    try to abuse them.

6    A.  Are you referring to psychotropic medications?

7    Q.  Yes.

8    A.  Okay.  Because there are other medications that have street

9    value and can be --

3:38:22PM10    Q.  Yes.

11    A.  -- abused and diverted and trafficked and traded.

12    Q.  We are talking about psychiatric medication because we are

13    talking about psychiatric care.

14    A.  Okay.

3:38:32PM15    Q.  So my question is, first, those types of meds, when they

16    are prescribed, they are prescribed by something called watch

17    swallow, for the most part, yes?

18    A.  I would say it would depend.  Not all medications that are

19    abused are necessarily prescribed watch swallow.  I think when

3:38:49PM20    there's a history of an inmate abusing or trafficking or

21    trading, I believe that the provider has to write that as an

22    order for certain medication classes.

23    Q.  Do you know what watch swallow means?

24    A.  Yes.

3:39:07PM25    Q.  Watch swallow means that when you are handed a pill --

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)     3165

3:39:13PM 1              MS. HESMAN:  Objection, Your Honor, counsel is

        2    testifying.

        3              THE COURT:  No, she's -- it's cross-examination.  I

        4    haven't heard her question yet, and she knows better than to

3:39:22PM 5    testify.  So let's hear the question.

        6    BY MS. KENDRICK:

        7    Q.  So Dr. Penn, is watch swallow where the patient takes the

        8    medication, he is watched by staff to make sure he swallows it,

        9    thus it is called watch swallow.  And the usual good practice

3:39:43PM10    is that after the patient swallows the medication, he opens his

       11    mouth, lifts his tongue, shows the inside of his mouth so the

       12    nurse and security staff know he actually swallowed the

       13    medication?

       14    A.  I think that's fair, yes.  And he or she can do it, it is

3:40:03PM15    not always males.

       16    Q.  Right.  So my question is this, if these medications that

       17    are supposed to be administered as watch swallow are somehow

       18    getting diverted and abused, as a medical administrator, would

       19    you want to investigate into the root cause of why they were

3:40:29PM20    still being diverted and abused, despite being administered in

       21    this very detailed method?

       22    A.  Sure.  I would say it is not really the duty of the medical

       23    administrator.  I would say all of the health care staff have

       24    and custody staff, all have a responsibility in the issue of

3:40:50PM25    safe medication administration, but I will just share --

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)    3166

3:40:54PM 1    Q.  I think you have answered.

2    A.  Your Honor, I haven't answered --

3    Q.  No, you've answered the question.

4         THE COURT:  Your counsel can stand up and ask you to

3:41:04PM 5    finish the question.

6         THE WITNESS:  Yes, Your Honor.  Thank you.

7         THE COURT:  Or finish the answer to the question.

8    BY MS. KENDRICK:

9    Q.  And Dr. Penn, are you aware that ADCRR has had significant

3:41:16PM10    problems with the prepouring of medication at multiple prisons

11    across the system in recent years?

12    A.  When you say prepouring, I'm not sure I know what you mean

13    I think I recall prepouring, but it would be helpful for me, to

14    answer your question, to know how you are referring to

3:41:34PM15    prepouring.

16    Q.  Prepouring as it has been explained by other witnesses who

17    testified to it, is when nursing staff, rather than keeping

18    medication in the blister packs in which they are delivered to

19    them, separate them out, put them in little envelopes, labeled

3:41:52PM20    them with patients' names, and in effect they have prepoured

21    all of the medication for distribution?

22         Are you at all familiar with this concept?

23    A.  Yes.

24    Q.  And were you aware that there was prepouring occurring at

3:42:14PM25    numerous ADCRR prisons across the state for the past year or

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)      3167

3:42:19PM 1   more?

2   A.   I recall that during COVID many systems, and we in Texas

3   have gone to changes in how we administer medications.  We try

4   to minimize patients standing in line waiting at pill windows

3:42:34PM 5   or having to be escorted to minimize COVID spread.  So it

6   wouldn't surprise me that ADCRR may have changed some things to

7   try to reduce spread and infection with this deadly disease.

8   Q.   Okay.  I would like to move to strike.

9        My question was whether you were aware that ADCRR had

3:42:55PM10   been engaged in this practice for the past couple of years, yes

11   or no?

12   A.   Yes.

13        MS. KENDRICK:  If we can bring up his report please,

14   Mr. Campbell?  At paragraph 112, which I believe is page 39.

3:43:27PM15   BY MS. KENDRICK:

16   Q.   So beginning on paragraph 112 of your report and then going

17   on to the next page 40 into paragraph 113, you are discussing

18   the services that are offered to patients who are classified as

19   MH4 or MH5; is that correct?

3:43:56PM20        Let me put both pages up so you can see.

21        Do you recognize that?

22   A.   Yes.

23   Q.   Paragraphs 112 and 113?

24   A.   Thank you.

3:44:23PM25   Q.   And you are describing what's required as policy under the

3:44:27PM 1    mental health technical manual in those paragraphs, correct?

2    A.   That's fair, yes.

3    Q.   And you testified earlier that you did not review CGARs,

4    correct?

3:44:41PM 5    A.   I think what I testified earlier was I reviewed CGARs

6    previously, but I don't recall reviewing recent CGARs in the

7    last two to three years.

8    Q.   And before we went through the chart of the consultants'

9    written reviews, you testified that you had not told them

3:45:01PM10    specifically to look at the frequency of encounters as

11    required, correct?

12    A.   Right.  They would not have known because they weren't

13    provided with the Mental Health Technical Manual or any

14    policies or procedures.

3:45:16PM15    Q.   Right.  So your statements here that this is the treatment

16    and the frequency that patients are receiving care is based

17    solely upon the written policies and what staff told you when

18    you were at the prison in September, correct?

19    A.   No, that's not correct.  I would say generally, yes, but

3:45:33PM20    also I reviewed that with Dr. Stallcup and the monitoring

21    bureau.

22          I spoke to Mark Haldane and Mikala McClane (phonetic)

23    I think was her name.  Basically the monitoring bureau, as I

24    understand it, they also audit or monitor to see if the health

3:45:50PM25    care provider, Centurion, if their mental health staff are

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)     3169

3:45:55PM 1   compliant with these metrics also.

2   Q.   So, again, the statement was based upon talking to staff,

3   including those individuals, and the written policy in the

4   manual, correct?

3:46:08PM 5   A.   That's fair.

6   Q.   All right.   If we could move to page 47, please of his

7   report.   At paragraph 127, you state that referrals to ADCRR's

8   inpatient units are completed within 48 hours and are immediate

9   if clinically indicated.

3:46:38PM 10        You see that?

11   A.   Yes.

12   Q.   And you base that statement on reviewing policy and talking

13   to Centurion and ADCRR staff, correct?

14   A.   Yes.   But I actually spoke directly to wardens because I

3:46:52PM 15   thought wardens and lieutenants and rank, in particular,

16   because they are the ones that are dealing with patients who

17   are acutely agitated or disturbed or causing problems at the

18   unit.

19   Q.   And those are staff?   So I said, reviewing policy and

3:47:08PM 20   talking to staff, so, yes.

21   A.   That's fair.

22   Q.   But you didn't review transfer logs, did you?

23   A.   I don't recall as we sit here, no.

24   Q.   And when you were there in September and working on the

3:47:19PM 25   report and the declaration, you did not review intake logs.

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)      3170

3:47:25PM 1    A.  I don't recall, no.

2    Q.  And you did not review a sample of medical records of

3    people transferred to the inpatient facility to analyze the

4    timeliness of transfer, did you?

3:47:36PM 5    A.  That's fair.

6    Q.  And you did not review any data or reports calculating the

7    average length of time for transfer to inpatient mental health

8    beds, correct?

9    A.  That's correct, but according to my discussions with

3:47:49PM10   multiple mental health staff and custody staff, everyone was

11   consistent in telling me that when they have a patient who

12   really needs to be admitted, it involves a phone call to

13   Dr. Carr and/or Dr. Stallcup or Dr. Pelton, and they were able

14   to facilitate an admission in a timely manner.

3:48:06PM15   Q.  Thank you.  So you are familiar with the Court's expert

16   Dr. Mark Stern?

17   A.  Yes.

18   Q.  And you are aware that Dr. Stern did a very detailed report

19   for this Court in 2019?

3:48:27PM20   A.  Yes.

21   Q.  Did you read Dr. Stern's report?

22   A.  Yes, I did.

23   Q.  And are you aware that Dr. Stern found that cell front

24   mental health encounters are extremely problematic and happened

3:48:41PM25   way too frequently?

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)        3171

3:48:42PM 1    A.  Yes, I did.

       2    Q.  And you disagree with Dr. Stern about this, don't you?

       3    A.  I do.

       4    Q.  And Dr. Stern has decades of experience from working with

3:48:52PM 5    the Washington Department of Corrections, doesn't he?

       6    A.  No, that's not accurate.  I don't know the duration that

       7    Dr. Stern worked for the Washington DOC, but he's not a mental

       8    health professional.  He's a -- I don't know if he's an

       9    internal medicine or family doctor, but he is not a mental

3:49:07PM10    health professional.

      11    Q.  And are you aware that he worked with a mental health

      12    professional on his report to the Court?

      13    A.  Yes.

      14    Q.  And you disagree with his assistant who is a correctional

3:49:23PM15    mental health -- correctional mental health professional?

      16    A.  I don't recall I ever was provided with that individual's

      17    qualifications or his resumé.  I think it was a Dr. Abplanalp,

      18    or something like that, from Washington state.

      19         But I don't agree with the cell front -- in my

3:49:41PM20    opinion, my professional opinion based on my 20 years of

      21    working corrections, I believe a cell front encounter can be

      22    therapeutically beneficial, and it can help you answer a

      23    clinical question regarding imminent safety and determining if

      24    an individual needs to remain on a suicide watch or not.

3:50:00PM25    Q.  And your opinion is that cell front mental health

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)     3172

3:50:08PM 1  encounters are clinically appropriate?

2  A.   That they may be clinically appropriate, yes.

3  Q.   And are they clinically appropriate for determining if

4  somebody is no longer a harm to themselves?

3:50:19PM 5  A.   Yes, they may be.

6  Q.   And how often do you need to speak with somebody who is on

7  mental health watch to determine whether or not they are no

8  longer a risk to themselves or others?

9  A.   So I would say there's no established, set time period.  It

3:50:38PM10  could be as short as five minutes.  It could be half an hour.

11  It can be an hour.  There's not a set time period.

12  Q.   Could it be one minute?

13  A.   Yes, possibly.

14  Q.   To determine that the person was no longer a risk of harm

3:50:51PM15  to themselves or others?

16  A.   Yes, certainly, if the mental health staff member knows the

17  inmate, has reviewed the chart, has spoken to staff, and is a

18  qualified mental health professional, yes, I think in one

19  minute they could do a reasonable suicide risk assessment and

3:51:10PM20  make a determination to advance the inmate, either from a

21  ten-minute to a 30-minute, or off a 30-minute check and then

22  follow them up as per policy.

23  Q.   And you talked a lot about the 10, 30 rule, as you refer to

24  it on direct, and you assert that you spoke to staff who told

3:51:43PM25  you, I think you said repeatedly, that they don't like the

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)     3173

3:51:50PM 1   rule; is that fair?

2   A.  No, that's not -- what I said was that the staff, the

3   mental health staff that I spoke with, both the master's level

4   licensed mental health staff, the doctorate-level psychologist,

3:52:04PM 5   the mental health leads, all the staff that do routine

6   day-to-day contacts with patients found it to be extremely

7   problematic because it changed the dynamic in their treatment

8   relationship.

9       And now instead of it being a therapeutic encounter,

3:52:22PM 10  when the patient wants to discontinue or stop the -- it becomes

11  adversarial, and then the patient is worried or concerned that

12  they are going to get written up or some disciplinary and it's

13  going to affect their time.

14      Number two --

3:52:38PM 15  Q.  Well, actually, I have a question for you.

16      You reference this in direct.  Is there a policy that

17  now says that patients will be given a disciplinary ticket if

18  they sign a refusal or end a mental health encounter before the

19  10 or 30-minute period is up?

3:52:57PM 20  A.  So that's not what I'm saying.  What I'm saying is that's

21  what staff reported to me with regard to it affects the

22  therapeutic alliance with the patient.  There's also numerous

23  other consequences that the 10, 30 that have impacted patient

24  movement, refusals, and patient's access to care from a mental

3:53:19PM 25  health perspective.

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)          3174

3:53:21PM 1   Q.   Okay.  Can we pull up Exhibit 2262, please.  And when you

        2   went to Yuma, you talked to Jose Bucio, correct?

        3   A.   Yes.

        4   Q.   And he's the mental health lead psychology associate at

3:53:41PM 5   Yuma, correct?

        6   A.   That's correct.

        7   Q.   And Mr. Bucio told you that he believes the 10, 30 rule has

        8   contributed to the overall improvement in quality of care and

        9   attention to patients, correct?

3:53:53PM10   A.   That's what Mr. Bucio reported, yes.

       11   Q.   Okay.  And does the 10, 30 order require mental health

       12   staff to continue a session over the objections of a patient?

       13   A.   No, as I understand it.

       14   Q.   And you testified that you didn't think that it requires a

3:54:12PM15   disciplinary ticket either, correct?

       16   A.   Again, that's not what I said.  What I said was, it creates

       17   the perception the mental health staff are becoming adversarial

       18   with the patient, and they have to have them sign refusal and

       19   that creates --

3:54:27PM20   Q.   Okay.  Let's move on to language interpretation.

       21          THE COURT:  Let's let him finish his answer.

       22          THE WITNESS:  Thank you, Your Honor.

       23          So no, what I am trying to make the point is, as a

       24   mental health professional, you are advocating for your

3:54:41PM25   patient's best interest and you're trying to be therapeutic.

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)

3:54:43PM 1          The 10, 30 rule has several unintended results or

2      consequences, which I've listed in my report and in my

3      declaration.  One, mental health staff now have an inmate sign

4      a form, a refusal form, and that creates an adversarial

3:54:59PM 5    relationship; that's not therapeutic.

6          Number two, because of the 10, 30 rule, what I have

7      learned, both from custody and from health care staff, is that

8      many patients don't want to come up to the clinic because then

9      they have to sit in the waiting room for pre-scripted 30

3:55:14PM10    minutes to an hour to an hour and a half to two hours, they

11      would rather move on with their life and go do recreation or

12      chow or do something else.

13  Q.  But if they had more mental health staff, wouldn't they be

14      able to handle more patients?

3:55:28PM15          THE COURT:  Let him finish.

16          THE WITNESS:  Thank you, Your Honor.

17          So it creates problem where, as a result of that --

18      and again, it is totally unintended.  I think it was well

19      meaning when designed.  But the problem is the reality is the

3:55:41PM20    inmate says, I don't want to go see the mental health staff

21      because then I have to sit in the clinic for an hour or two or

22      longer because of the 10, 30 rules, because it kind of binds

23      them or ties them into those time frames or constraints.

24          And so as a result, it creates risk to the system,

3:55:57PM25    because now inmates might refuse to come out to see the mental

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)     3176

3:56:00PM 1   health staff for their treatment.  So it's creating a barrier

2   that was unnecessary, in my professional opinion.

3   BY MS. KENDRICK:

4   Q.  Okay.  Can we turn back to his report, please, page 61.

3:56:24PM 5        This is your discussion about access to language

6   interpretation services.

7   A.  Yes.

8   Q.  And in your first paragraph, you make a reference to

9   certified translators, that there's a mandated use of certified

3:56:53PM10   translators.  But that's not what is required in this case,

11   correct?

12   A.  I'm sorry, I'm not sure I understand when you say "case."

13   Q.  This case, the case that we're sitting here about.

14   A.  Well --

3:57:11PM15   Q.  You filed a declaration in 2020 about an enforcement motion

16   related to paragraph 14 of the stipulation that had to do with

17   language interpretation.  And my question is, you right here

18   and throughout this section, you refer to a mandated use of

19   certified translators.

3:57:34PM20   A.  Yes, that's correct.

21   Q.  Right.  But paragraph 14 of the stipulation does not

22   require certified translators, correct?

23   A.  And I'm so sorry, I don't know when you say "stipulation,"

24   what -- I don't know what you're referring to.

3:57:51PM25   Q.  The stipulation is the document that settled the case

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)          3177

3:57:53PM  1   between the parties that you've written multiple declarations

        2   about over the years regarding enforcement related to the

        3   stipulation.

        4   A.  I'm so sorry, I'm not an attorney, so if you want to show

3:58:05PM  5   me the document, I would be happy to try to answer your

        6   question.

        7   Q.  It's not necessary to show you the document.

        8        The stipulation is the settlement agreement between

        9   the parties, and there is one paragraph about language

3:58:17PM 10   interpretation, and you have provided multiple declarations

       11   about it.  And basically what it says is that for prisoners who

       12   are not fluent in English, language interpretation for health

       13   care encounters shall be provided by a qualified health care

       14   practitioner who is proficient in the prisoner's language or by

3:58:41PM 15   a language line interpretation service.

       16        I will represent to you that's what it says in

       17   paragraph 14 of the parties' settlement agreement.  There's no

       18   reference to certified translators in that paragraph, is there?

       19   A.  Without the document in front of me, it's hard for me to

3:59:01PM 20   answer your question.

       21   Q.  Did you hear the words "certified translator" come out of

       22   my mouth when I read that sentence from the paragraph?

       23        MS. HESMAN:  Your Honor, it's argumentative.  If she

       24   could just show --

3:59:14PM 25        THE COURT:  I'm going to sustain the objection.

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)      3178

3:59:18PM 1    BY MS. KENDRICK:

2    Q.  All right.  In paragraph 174 at the bottom of page 61

3    continuing on to the next page, you assert that the standard of

4    care in the community and correctional health care is for staff

3:59:40PM 5    to assess their own level of comfort and proficiency before

6    determining whether a separate translator, slash, interpreter

7    or translator service is required.

8         It would be improper for a provider to order or to

9    document that translation service would be required where staff

4:00:01PM10   is proficient.  What is the source of this statement?

11   A.  So I'm basing that on my 20 years of working corrections

12   both -- and also in the community and in private or public

13   hospitals, in different clinical settings where different

14   languages have been spoken.  And two, I also relied upon the

4:00:23PM15   NCCHC standards, and they have found that the ADCRR prisons

16   were all in compliance.

17        When a patient needs sign language interpretation or

18   English as a second language interpretation or other assisted

19   services, they found that all of the ADCRR facilities are

4:00:42PM20   compliant with that standard.

21   Q.  And it's your testimony that in the community it is the

22   provider who decides whether interpretation services is needed

23   and not the patient?

24   A.  Yes, I think that's fair, and I can speak from personal

4:00:57PM25   experience seeing patients in the emergency room who come in,

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)        3179

4:01:00PM 1    and I try to speak to them, and I find out they speak Mong or

2    Vietnamese, and I don't speak those.  And so I quickly realize,

3    hey, I need to call the ATT language line.  And I am able to,

4    within a few minutes, get an interpreter on the line.  I have

4:01:17PM 5    had that experience happen, and then it was a different

6    dialect, and then they, within five to ten seconds, they found

7    another interpreter who spoke that additional dialect.

8         So I can speak from personal experience of having done

9    psychiatric evaluations of people in emergency room settings,

4:01:34PM10    utilizing professional language lines.

11         MS. KENDRICK:  Move to strike, Your Honor.  That was a

12    yes-or-no question, and the question --

13         THE COURT:  I will sustain the objection.

14    BY MS. KENDRICK:

4:01:46PM15    Q.  And are you aware that under the Americans with

16    Disabilities Act, the standard for accommodating people with

17    communication disabilities is that it is the patient who

18    determines what their need is and their request for translation

19    and it's not up to the provider?

4:02:07PM20         MS. HESMAN:  Objection, foundation.

21         THE COURT:  Overruled.

22         THE WITNESS:  I'm not an attorney.  I'm not versed

23    well enough in the Americans with Disabilities Act.  I know

24    some of it, and I have done evaluations as a forensic

4:02:19PM25    psychiatrist.

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)        3180

4:02:21PM 1          MS. KENDRICK:  I move to strike.  The answer is no.

2          THE COURT:  The answer is no.

3   BY MS. KENDRICK:

4   Q.  Are you familiar with the U.S. Department of Justice

4:02:28PM 5   Guidelines for Services to Limited English Proficiency Persons

6   in Health Care Settings, yes or no?

7   A.  No, I am not.

8   Q.  You also wrote at paragraph 175 that the standard of care

9   mandates that whether an interpreter is needed is dependent

4:03:15PM10   upon the nature and the event of the encounter.

11          You give the example of a finger stick blood sugar

12   test probably doesn't need an interpreter, but an interpreter

13   would be necessary when there is a discussion regarding

14   advanced directives.  Did you write that?

4:03:36PM15   A.  Yes.

16   Q.  But there's a lot of medical encounters that fall between

17   that spectrum, correct?

18   A.  I think that's fair, yes.

19   Q.  And so what about individual health care counseling?

4:03:48PM20   A.  I would say it would depend.

21   Q.  Mental health groups?

22   A.  Again, it would depend.

23   Q.  Suicide watch checks?

24   A.  Again, it would depend.

4:03:57PM25   Q.  Chronic care encounters?

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)        3181

4:03:59PM 1    A.  Same answer, it would depend.

2    Q.  Appointments with health care or mental health providers?

3    A.  It would depend.

4    Q.  So is it your position that the only time ADCRR and

4:04:16PM 5    Centurion should provide interpreters is when there's

6    discussions of advanced directives and informed consent?

7    A.  No, that's not my opinion.

8    Q.  Well, for all the other ones you said it depends, but you

9    wrote that it would be necessary for advanced directives?

4:04:34PM10    A.  So if I can answer and clarify my response?

11             THE COURT:  No, she's asking for a yes or no.

12             THE WITNESS:  Okay.  So I am not sure if I can answer

13    a yes or no to your question.

14             THE COURT:  Okay.

4:04:46PM15    BY MS. KENDRICK:

16    Q.  So my question is this:  You stated that you think that

17    there would be a need for interpreter services for something

18    like a discussion of an advanced directive, and then I listed

19    other types of encounters, and for every single one you said it

4:05:03PM20    depends.  So my question was, yes or no, advanced directive and

21    informed consent encounters are the only ones where you think

22    there definitely should be an interpreter?

23    A.  So --

24             THE COURT:  She has something marked on the screen.

4:05:21PM25             THE WITNESS:  Thank you, Your Honor.

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)      3182

4:05:22PM 1           So I stick with what I wrote in my report, but what I

2      would say is there's a lot of --

3      BY MS. KENDRICK:

4      Q.  Okay.

4:05:34PM 5      A.  -- variations on a theme.  Some individuals are more

6      fluent.

7      Q.  There's no question pending.  It was just whether that was

8      that one area where you felt that it was necessary.

9           And again, I think we referenced it, but last year you

4:05:52PM10      submitted a declaration to this Court when the plaintiffs were

11      filing an enforcement motion about paragraph 14.  And you filed

12      a declaration in response.  Were you aware that at that time a

13      deaf class member submitted a declaration attesting that he was

14      made to sign a living will and health care power of attorney

4:06:16PM15      without having an American Sign Language interpreter with him?

16      A.  I was not aware of that, and I didn't file a declaration.

17      I am not an attorney.  I would have written something that

18      would have been sent to the Struck Love Law Firm, but, no, I am

19      not aware of that case.  But I am happy to review it if I can

4:06:35PM20      try to help answer your question.

21      Q.  So you did not review this patient's declaration before

22      writing your declaration and giving it to Struck Love to file

23      on the docket for you?

24      A.  I don't recall.

4:06:52PM25      Q.  And in preparation for your October 2021 report and the

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)       3183

4:06:58PM 1    declaration that you filed on Sunday, the 14th, did you review

2    the medical records of any deaf patients?

3    A.  I don't recall if any of the individuals were identified as

4    being hearing impaired or deaf so, no, I don't -- I don't

4:07:19PM 5    recall.

6    Q.  And are you aware that ADCRR has admitted that they have no

7    way to track which persons in their custody are deaf?

8    A.  No, I'm not aware.

9    Q.  We can go to the next paragraph and the next page.  And on

4:08:07PM10    paragraph 183, which is at the top of page 64, you wrote, "I

11    did not identify any non-predominant English-speaking

12    individuals or other ADCRR individuals with disabilities who

13    had delays in access to mental health care, lack of continuity

14    in care, or delays in receiving clinically-indicated mental

4:08:34PM15    health treatment services due to a lack of professional

16    interpreters or sign language services."

17             "Similarly, I did not identify any adverse patient

18    outcomes resulting in morbidity or mortality due to a lack of

19    professional interpreters or sign language services."

4:08:55PM20             That's based on the reviews that your consultants did

21    of the 275 files?

22    A.  I would answer yes, but also my review of the charts also.

23    Q.  Okay.  But you didn't tell your consultants to look out for

24    language interpretation issues when you gave them the

4:09:16PM25    assignment, right, it was about access to care?

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)      3184

4:09:19PM 1    A.  That's fair.

       2    Q.  And, in fact, when we went through the file, there was at

       3    least one individual where your consultant had noted that the

       4    patient had submitted all of his Health Needs Request in

4:09:33PM 5    Spanish, and it was unclear if he was receiving interpretation

       6    services in his encounters.  Do you remember seeing that?

       7    A.  Yes.

       8    Q.  And did you look at that patient's medical records?

       9    A.  Yes.

4:09:45PM10    Q.  And what was the conclusion that you reached?

      11    A.  Well, I am not able to form an opinion today to a

      12    reasonable degree of medical or psychiatric certainty if that

      13    patient is truly only -- Spanish-speaking only.

      14    Q.  Is that because you took no notes or?

4:09:59PM15    A.  No, it's because there's a wide range of individuals and

      16    ability to either write or read in Spanish or English, and

      17    whether someone is fluent or is either second, third, or fourth

      18    generation, there's a huge variability.

      19         And so some individuals may initially present as

4:10:26PM20    saying, I can't speak English, and then become more comfortable

      21    speaking in English, so it really varies and I'm speaking --

      22    Q.  And I --

      23    A.  I'm sorry, I hadn't finished, Your Honor.

      24         And I'm speaking as someone who was raised -- my mom

4:10:37PM25    was from Mexico.  I am bilingual.  I speak fluent Spanish.

4:10:41PM 1    And so I appreciate -- and I'm bicultural, so I'm speaking from

2    personal experience.

3    Q.  And I believe you just testified, when I asked you a few

4    minutes ago, that you are not familiar with the U.S. DOJ

4:10:54PM 5    Guidelines for Services to Limited English Proficiency Persons

6    including in Health Care Settings.

7         If we could go to paragraph 184, please.  And you're

8    referencing the section of Dr. Stewart's expert report where he

9    details the interviews he held in Spanish with monolingual

4:11:26PM 10   Spanish-speaking patients during his tours.

11        And you write that while Dr. Stewart opines that he

12   interviewed monolingual Spanish speakers during his September

13   2021 tour, a review of these inmates' records evidences their

14   ability to communicate in English.

4:11:48PM 15        And again, any review of these records were done by

16   your consulting physicians?

17   A.  And myself, yes, that's correct.

18   Q.  And so your testimony is that Dr. Stewart, whose first

19   language is Spanish, who also has a Mexican mother, reported

4:12:09PM 20   the fact, not the opinion, the fact that he interviewed these

21   people in Spanish who told him they could not communicate in

22   English, but you reviewed their medical records and concluded

23   that they actually can speak English?

24        MS. HESMAN:  Your Honor, objection.  Counsel is

4:12:26PM 25   testifying and it's argumentative.

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)          3186

4:12:28PM 1          THE COURT:  No, I am going to overrule that objection.

         2          Did you understand what she is saying?

         3          THE WITNESS:  Yes, Your Honor.  So I reviewed -- one

         4   of the disadvantages was that typically as a forensic

4:12:40PM 5   psychiatrist, when somebody evaluates someone, I would be able

         6   to look at their notes or a videotape.  As a forensic

         7   psychiatrist, when I do an evaluation, typically I videotape my

         8   evaluations; that way it's very clear what I did, how I did it.

         9          I was not able to ever review what Dr. Stewart did,

4:13:00PM10   his notes or video of his interviews with any of these

        11   individuals.

        12          I base this -- and I am not questioning Dr. Stewart or

        13   his Spanish proficiency.  My first language was Spanish also.

        14   But I reviewed the Health Needs Request from inmates, and many

4:13:16PM15   of them were able to write in English.  So -- and then by

        16   reviewing just basic medical sick call requests for tooth pain

        17   or for, I need new glasses, that's how I came to that opinion

        18   and that's why I wrote that in my report.

        19   Q.  All right.  Well -- so let's take a look at some HNRs.

4:13:36PM20          HNR forms require a simple description of the issue

        21   for which the patient is seeking care, correct?  The forms are

        22   very short, only a few lines?

        23   A.  I wouldn't agree with that.  The HNR can be lengthy in some

        24   situations if the inmate wants to write a lengthy complaint or

4:13:59PM25   write several complaints, it might be longer.

4:14:01PM 1    Q.  Okay.  I'm going to show you Exhibit 2223.  This is a

2    patient who Dr. Stewart interviewed at the Tucson facility.  We

3    are not going to use the patient's name.  But in Dr. -- he's

4    discussed at length in Dr. Stewart's report.

4:14:32PM 5            And you can see that there's only four lines for him

6    to write his request to describe his problem.  What is

7    XXXXXXXXXXXX requesting?

8    A.  Actually, there's five lines.

9    Q.  What is XXXXXXXXXXXX requesting?

4:14:49PM10   A.  So he says, "Necessito mirar al sicolico porque me siento

11   muy deprimido."

12           So he is saying, I need to see the psychologist

13   because I feel very sad -- or I feel depressed.

14   Q.  Depressed?

4:15:02PM15   A.  Depressed would be the literal translation.  I feel very

16   sad or -- "deprimido" would be depressed, right.

17   Q.  Right.  So he wrote this HNR in Spanish?

18   A.  Well, we believe.  I mean, I don't know what the inmate's

19   handwriting style is.  I am not a handwriting expert.

4:15:19PM20   Q.  The HNR is written in Spanish?

21   A.  That's fair, yes.

22   Q.  And this HNR was in the file of this patient who is

23   mentioned in Dr. Stewart's report who you concluded actually

24   could speak English?

4:15:36PM25           MS. HESMAN:  Objection, foundation.

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)          3188

4:15:37PM 1          THE COURT:  Overruled.

2      BY MS. KENDRICK:

3        Q.  And can we go to the next page?

4              THE COURT:  Did you answer?

4:15:46PM 5              THE WITNESS:  I didn't hear the question, sorry.

6      BY MS. KENDRICK:

7        Q.  I am just saying, you said that part of how you did this

8      was you looked at the HNRs in the files of the people that were

9      mentioned by Dr. Stewart?

4:15:58PM10      A.  Yes.

11        Q.  And this is one of the people mentioned by Dr. Stewart who

12      testified that he needs to communicate in Spanish, and you just

13      observed an HNR written in Spanish.  And so my question is, did

14      you review this HNR and still conclude that this patient is

4:16:18PM15      able to communicate in English?

16        A.  My opinion or my response to your question is the end

17      result is the patient was referred to mental health, so patient

18      is asking to see mental health.  Patient is referred to mental

19      health.  That's the end result, so that's -- whatever

4:16:34PM20      transpired in this encounter --

21        Q.  Move to strike as nonresponsive.

22              The question was whether this affected your opinion

23      when you concluded that this patient could communicate in

24      English.

4:16:50PM25      A.  I think the document speaks for itself.  The patient is

UNITED STATES DISTRICT COURT

4:16:53PM 1    preferring to write in Spanish, but it's possible that the

2    patient communicated in English or alternatively --

3    Q.  You have no basis for saying it's possible --

4          THE WITNESS:  Your Honor --

4:17:07PM 5          THE COURT:  Is there any way you can determine that

6    this individual can communicate in English?

7          THE WITNESS:  Not without reviewing the chart,

8    Your Honor, or speaking to the patient, which I would be happy

9    to do.

4:17:19PM 10          THE COURT:  Thank you.

11    BY MS. KENDRICK:

12    Q.  Okay.  Let's go to the next one, please.

13          So the next one is one of the -- this is what the HNRs

14    look like now with the -- on the tablets, so at the top is an

4:17:32PM 15    HNR.  If you would like, I can translate it for you, or if you

16    want to read it to yourself silently and let us know what this

17    patient is requesting.

18          MS. HESMAN:  Counsel, do we know what patient this is

19    for?

4:17:47PM 20          MS. KENDRICK:  It's the same patient.

21          MS. HESMAN:  Okay.

22          THE WITNESS:  Sorry, what's the question, please?

23    BY MS. KENDRICK:

24    Q.  So -- well, so in this HNR, I will tell you how -- I

4:18:37PM 25    translated it to say, this is the fifth HNR I have written

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)      3190

4:18:42PM 1    asking for the same medical attention.  If you do not

2    understand Spanish, please tell me and I will find a way to

3    send this in English.  I need you to send me to the urologist

4    at Banner Hospital because he is the only person who can remove

4:18:55PM 5    the probe that I have in order to urinate.  I no longer need it

6    because it is no longer helping me.  I am writing this HNR

7    because this morning someone came to change it, and I do not

8    need it or want it changed.

9          Does that change your opinion on whether this patient

4:19:13PM10    requires health care encounters to be conducted in Spanish?

11    A.  So this encounter is more medical.  It doesn't appear to

12    have any kind of mental health request.

13    Q.  My question was about the patient's ability to communicate

14    in English -- or Spanish and not necessarily the substance as

4:19:32PM15    to whether it was about mental health care or dental care

16    or medical care.

17    A.  Well, it looks likes the patient describes that I will look

18    -- "busco la manera de scribirlo en ingles."

19          So the patient is saying, I can find a way to get it

4:19:49PM20    translated to English.  So as we sit here today, without

21    reviewing the chart and without talking to the patient, I

22    wouldn't be able to answer if the patient is fluent in English

23    or not.

24          MS. HESMAN:  And, Your Honor, if we could have the

4:20:03PM25    response to this that's on the same document shown?

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)     3191

4:20:08PM 1    MS. KENDRICK:  The response is in English below.

2    THE WITNESS:  Yes, Your Honor.  So the information

3 that was contained in the sick call request, the content in

4 what the patient is complaining of was correctly reviewed by

4:20:40PM 5 the health care staff, the nurse, Jennifer Meyer, and then

6 responded about the suprapubic catheter to be removed, putting

7 another consult in with urology to get that done.  And then the

8 nurse acknowledges it's going to take time to get it approved

9 and scheduled, and then puts it back in Spanish.

4:20:59PM10 BY MS. KENDRICK:

11 Q.  Yes, it's put back in Spanish to go back to the patient.

12 A.  Yes, so it basically shows that the loop is completed.  The

13 patient had an issue, staff addressed it and responded in a

14 timely manner, within one business day it appears.  It was put

4:21:18PM15 in at 2:59 in the morning.

16 Q.  Right.  So my question isn't about the response by the

17 medical care.  My question is the fact that you assert that you

18 reviewed this patient's medical record and concluded that he

19 can communicate in English.

4:21:36PM20 A.  So again, I would need to review the patient's record in

21 its entirety and perhaps interview the patient to be able to

22 determine that.

23    MS. KENDRICK:  Okay.  We'd like to move Exhibit 2223

24 into evidence, please.

4:21:51PM25    MS. HESMAN:  No objection.

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)    3192

4:21:52PM  1            THE COURT:  It is admitted.

        2            (Exhibit Number 2223 is admitted.)

        3            MS. KENDRICK:  All right.

        4  BY MS. KENDRICK:

4:21:59PM  5  Q.  I would like to talk with you a little bit about self-harm

        6  and suicide.  There's a discussion about the Bureau of Justice

        7  Statistics suicide rates.  And if we could go to your

        8  declaration at page 84 -- actually, could we go back to 83 as

        9  well, if we can have 83 and 84 together?

4:22:36PM 10            So the chart on page 83 refers to suicide spectrum

       11  behaviors.  What is a suicide spectrum behavior?

       12  A.  So that's a term that I believe Dr. John Wilson, who is a

       13  forensic psychologist who works for Centurion, I think he is in

       14  a leadership role.  He used to work in the Bureau of Prisons,

4:23:11PM 15  and he's published and presented in correctional psychology.  I

       16  believe that's a concept or term that he has written about or

       17  he utilized this in this term.

       18  Q.  And he made these charts?

       19  A.  I believe so, yes.

4:23:26PM 20  Q.  You had no involvement in making them?

       21  A.  That's fair.

       22  Q.  And you did not look at the underlying document he cites in

       23  there?

       24  A.  Actually I did.  I reviewed the source documents.

4:23:38PM 25  Q.  All right.  And on page 84 there's another chart that is

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)   3193

4:23:46PM  1   suicides -- who made this chart?

2   A.  I am not sure if it was ADCRR or the Struck Love Law Firm,

3   or someone else perhaps.

4   Q.  Did you check the accuracy of the data?

4:24:04PM  5   A.  Yes, I did.

6   Q.  All right.  And can we bring up Exhibit 1834?  And I

7   apologize, this is actually identical to another exhibit, 2148,

8   but -- got the wrong number, but it has been admitted.

9        If we could go to page 4 of the report, please.  And

4:24:51PM 10   the chart at the bottom that says, "Inmate deaths by year and

11   cause."  And are you familiar with this report and with this

12   data, Dr. Penn?

13   A.  Yes.

14   Q.  And this was actually listed as some of the source data for

4:25:06PM 15   Dr. Wilson's charts that were in your report?

16   A.  Yes.

17   Q.  And you notice that the fiscal year 2021, it lists 10

18   suicides?

19   A.  That's what's listed here, yes, and there's an asterisk,

4:25:31PM 20   right, by both of those.

21   Q.  Yeah.  And did -- do you have any reason to doubt the

22   accuracy of ADCRR's data?

23   A.  No, I don't.

24   Q.  Okay.  And the previous year with as many suicides you have

4:25:51PM 25   to go back to fiscal year 2011, do you see that on the far

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)       3194

4:25:55PM 1    left, the 13 suicides?

2              A.   Yes.

3              Q.   But the average daily population in the prison was much

4              higher in fiscal year 2011 than it was in fiscal year 2021,

4:26:12PM 5    correct?

6              A.   I'm sorry, did you say much higher?

7              Q.   Yes, it's about 4500 more people?

8              A.   So I don't know.  I mean, in Texas we have 150,000.  Like I

9              said, I am not trying to be picky, but I would say it's

4:26:27PM10    slightly higher, yes, that's fair.

11             Q.   Okay.  And the Bureau of Justice Statistics report that you

12             were looking at and showing earlier, that shows the data from

13             2015 to 2018, correct?

14             A.   I think it was 2011 to 2019.

4:26:49PM15    Q.   Okay.  But it doesn't show the data for 2020 or 2021,

16             correct?

17             A.   That's fair.

18             Q.   And that report showed that for a four-year period, the

19             last four-year period, Arizona had a suicide rate of 17 per

4:27:06PM20    100,000; is that correct?

21             A.   That's my recollection for the report, which I don't have

22             in front of me.  But, yes, that's fair.

23             Q.   But if we look at this report here for fiscal year '21,

24             again, with the ten suicides and the population of 36,569, that

4:27:31PM25    works out to a much higher rate per 100,000, doesn't it?

DR. JOSEPH PENN - CROSS-EXAMINATION (Continued)          3195

4:27:37PM  1    A.  That's true, but as I stated or testified earlier, I rely

           2    on a calendar year and not a fiscal year.  I'm not -- I think

           3    it's misleading because we -- when I say "we," people that look

           4    at suicide rates, whether we are psychologists or

4:27:52PM  5    psychiatrists, or other mental health professionals, typically

           6    we rely on calendar years as opposed to fiscal years.

           7    Q.  But don't the other statisticians also use fiscal years?

           8    A.  What -- sorry, what statisticians are you referring to?

           9    Q.  Like the BJS and others.

4:28:11PM 10    A.  I understood it that they are relying on calendar years.  I

          11    don't recall seeing fiscal years.

          12    Q.  Why would there be any difference, because at the end of

          13    the period, you are going to have the same number of suicides?

          14    A.  Well, it's a significant difference.  A fiscal year is for

4:28:26PM 15    budget people.  It's to budget contracts.  It's to budget

          16    staffing, and it's a fiscal accounting administrative task.

          17    Q.  So --

          18    A.  From a suicide prevention perspective, we really want to

          19    look at, are there seasonal variations?  Like in the summer

4:28:44PM 20    months you would expect there to be a peak of suicides because

          21    it's hot and people are upset and their tempers.  So looking at

          22    it from a seasonal perspective is the way that I was trained

          23    and the way that I typically look at suicide patterns.

          24    Q.  So wouldn't it still be a very high rate, whether you slice

4:29:05PM 25    it and dice it as a fiscal year or a calendar year?

UNITED STATES DISTRICT COURT

DR. JOSEPH PENN – CROSS-EXAMINATION (Continued)          3196

4:29:09PM 1    A.  Not comparing --

2               MS. HESMAN:  Objection, vague as "to very high."

3               THE COURT:  Sustained.

4    BY MS. KENDRICK:

4:29:14PM 5    Q.  So you are saying that the rate would vary greatly whether

6    you are looking at a one-year period from July 1st to June 30th

7    versus January 1st to December 31st?

8               MS. HESMAN:  Same objection.

9               THE COURT:  Overruled.  He can answer that.

4:29:30PM10             THE WITNESS:  It would depend.  I mean, there could be

11   a significant difference, but then there might not be a

12   difference.  But I am just saying that looking from a fiscal

13   year doesn't make a lot of sense to me.  It's more of a

14   calendar year is the way that I would look at it.

4:29:44PM15  BY MS. KENDRICK:

16   Q.  Okay.

17             THE COURT:  All right.  We are ending it.  I will miss

18   you.  I will see you all on the 7th and 8th.

19             MR. FATHI:  Your Honor, I'm sorry, one more thing.

4:29:58PM20  When we were speaking about the schedule earlier, I said that

21   we would have possibly one rebuttal witness.  I just want to

22   say that it's highly unlikely but conceivable we could have

23   more than one, and obviously we will let the Court know as soon

24   as we have more information.

4:30:14PM25            THE COURT:  All right.  So you expect -- do you know

4:30:18PM 1   now by a preponderance of the evidence that you will have one

2   at least?

3           MR. FATHI:  I would say -- I honestly can't say, Your

4   Honor, until we complete --

4:30:30PM 5           THE COURT:  I will not press you on that.  We have two

6   days scheduled and one potential third day.

7           We are adjourned.

8           (Proceedings conclude at 4:30 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I, ELVA CRUZ-LAUER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 5th day of December, 2021.

s/Elva Cruz-Lauer
Elva Cruz-Lauer, RMR, CRR

**R E D A C T I O N    C E R T I F I C A T E**

I, ELVA CRUZ-LAUER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing is a true and correct copy of the transcript originally filed with the clerk of court but incorporating redactions of personal identifiers requested by the following attorneys of record in accordance with Judicial Conference policy:  See Court's Order Docket Number 4317.

Redacted characters appear as an "x" in the transcript.

DATED at Phoenix, Arizona, this 11th day of April. 2022.

s/ Elva Cruz-Lauer, RMR, CRR
Official Court Reporter