1                **UNITED STATES DISTRICT COURT**

2                **FOR THE DISTRICT OF ARIZONA**

3                      _____

4  **Shawn Jensen, et al., on behalf**  )
    **of themselves and all others**    )
5  **similarly situated; and Arizona**  )
    **Center for Disability Law,**      )
6                         )
            **Plaintiffs,**      )   **CV-12-0601-PHX-ROS**
7                         )
        **vs.**              )   **Phoenix, Arizona**
8                        )   **November 3, 2021**
    **David Shinn, Director, Arizona**   )   **8:45 a.m.**
9  **Department of Corrections; and**    )
    **Richard Pratt, Interim Division**  )
10  **Director, Division of Health**     )
     **Services, Arizona Department of**   )
11  **Corrections, in their official**    )
     **capacities,**                  )
12                         )
            **Defendants.**      )
13  _____)

15      **BEFORE:  THE HONORABLE ROSLYN O. SILVER, JUDGE**

16      <u>**REPORTER'S REDACTED TRANSCRIPT OF PROCEEDINGS**</u>

17          <u>**BENCH TRIAL - DAY 3 - A.M. SESSION**</u>

21  **Official Court Reporter:**
     **Patricia Lyons, RMR, CRR**
22  **Sandra Day O'Connor U.S. Courthouse, Suite 312**
     **401 West Washington Street, SPC. 41**
23  **Phoenix, Arizona  85003-2151**
     **(602) 322-7257**
24

Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared with Computer-Aided Transcription

1                      **A P P E A R A N C E S**

2      **For the Plaintiffs:**

3                   **ACLU - Washington, DC**
                    **By: DAVID CYRUS FATHI, ESQ.**
4                       **CORENE T. KENDRICK, ESQ.**
                        **MARIA V. MORRIS, ESQ.**
5                   **Washington, DC  20005**

6                   **Prison Law Office**
                    **By: DONALD SPECTER, ESQ.**
7                   **1917 5th Street**
                    **Berkeley, CA  94710**
8
                    **Arizona Center for Disability Law - Tucson, AZ**
9                   **By: MAYA STOCK ABELA, ESQ.**
                    **177 North Church Avenue, Suite 800**
10                  **Tucson, AZ  85701**

11

12     **For the Defendants:**

13                  **Struck Love Bojanowski & Acedo**
                    **By: DANIEL PATRICK STRUCK, ESQ.**
14                      **RACHEL LOVE, ESQ.**
                        **TIMOTHY JAMES BOJANOWSKI, ESQ.**
15                      **ASHLEE B. HESMAN, ESQ.**
                        **TIMOTHY MICHAEL RAY, ESQ.**
16                  **3100 West Ray Road, Suite 300**
                    **Chandler, AZ  85226**

17

18

19

20

21

22

23

24

25

1              **I N D E X**

2              **EXAMINATION**

3  **WITNESS**                                               **PAGE**

4  PABLO STEWART

5         Direct Examination By Ms. Kendrick           444

6         Cross-Examination By Ms. Hesman             525

7

8              **EXHIBITS**

9  **NUMBER**      **DESCRIPTION**                  **PAGE**

10  137-529   Exhibits                                    444

11  2074      2021.02.10 Email from L.              500
            Palmer Neefe to Centurion
12            Team regarding HNR Triage-
            Lack of Nurselines Winchester
13            Tucson (Gann Ex. 7)
            (xxxxxxxxxxxxx –
14            xxxxxxxxxxxxx)

15  821       CQI Meeting Minutes May 2021,         509
            ASPC-Phoenix
16
    2125      2020.02.13 Email from A. Carr         519
17            to Dr. Roberts regarding I/M
            #29669 (Platt Ex. 5)
18            (xxxxxxxxxxxxxxxxxxxxxxxxxx

19  5627      Impeachment Exhibit                   534

20

21

22

23

24

25

**P R O C E E D I N G S**

08:40:37   1

2

3        THE COURT:  All right.  We've got an issue?

4        MS. KENDRICK:  Good morning, Your Honor.  No, we

08:45:19   5   don't have an issue.  We have a resolution.  Counsel have

6   conferred about multiple exhibits -- Mr. Struck and I have

7   conferred about the many mortality reviews and psychological

8   autopsies that are on Plaintiffs' exhibit list and the parties

9   have agreed that any person who died since July 1st, 2019, to

08:45:54  10   the present, those documents will be entered into evidence.

11        The parties are at a dispute about the people who

12   died between January 1st and June 30th, 2019.  And rather than

13   take up court time with that, we propose just submitting

14   short, however length you want, written briefs setting out our

08:46:16  15   positions.

16        THE COURT:  Okay.  Give me a synoptic version of what

17   your positions are.  Why are you -- why don't you want that

18   evidence?

19        MR. STRUCK:  Well, Your Honor, of course the

08:46:33  20   individuals who died from January 1st to July 1st, many of

21   them had care that was by Centurion -- excuse me, by Corizon.

22   Some of them, you know, received care when it was

23   self-operated, and that's when the problems initially --

24        THE COURT:  Self-operated?

08:46:57  25        MR. STRUCK:  Yes.  Prior to 2012 the Department ran

08:47:00  1    the healthcare services.

2         THE COURT:  Okay.  Sorry, the dates I'm missing here.

3    What are the dates?

4         MS. KENDRICK:  The documents are from January 1st,

08:47:08  5    2019, to the present.  So the dispute is over a six-month

6    window from January 1st, 2019, to June 30th, 2019.

7         MR. STRUCK:  Because they received care and the care

8    that's at issue occurred long before they died, in most

9    instances, and so we're going back into a period of time

08:47:29 10    that's just simply not relevant.

11         THE COURT:  I'm really --

12         MR. STRUCK:  Centurion took over in July of 2019.

13    Prior to that it was Corizon --

14         THE COURT:  Okay.

08:47:42 15         MR. STRUCK:  -- from, I believe that was December of

16    2014 until July of 2019.  And prior to that it was Wexford

17    from July 2012 until December 2014.  And before that, the

18    Department of Corrections were self-operating in terms of

19    their healthcare services.

08:48:14 20         So all of the care that was received and is -- I

21    guess the plaintiffs' experts are saying was improper with

22    respect to these individuals who died, occurred long before

23    Centurion ever came on board and it's simply not relevant.

24         THE COURT:  But it's Department of Corrections.

08:48:34 25    Doesn't make any difference who you were relying on.  So I'm

08:48:37  1    inclined to allow it, but let me see the briefing.

2         MR. STRUCK:  Okay.

3         MS. KENDRICK:  When would Your Honor like us to

4    submit it?

08:48:48  5         THE COURT:  Well, it's up to you because as soon as

6    you want to get the evidence in.  I would say do it as

7    expeditiously as possible.  You're going to be offering it

8    very quickly; right?

9         MS. KENDRICK:  Yeah.  There's a couple that will be

08:49:01  10   offered with Dr. Stewart on an individual basis.

11        THE COURT:  So you better do it expeditiously.  But I

12   will say, based upon what Mr. Struck has told me is the reason

13   for not wanting it to be admitted, if that's the only reason,

14   then that's not legitimate.

08:49:21  15        MR. STRUCK:  There are other reasons --

16        THE COURT:  Because I have said from the beginning a

17   number of times this lawsuit was brought against the

18   Department of Corrections.  It is only the Department of

19   Corrections that has constitutional obligations.  And any

08:49:37  20   contractual responsibilities that were undertaken by Corizon,

21   I guess, if that was the period of time for that --

22        MR. STRUCK:  I don't think I made myself clear and I

23   apologize, Your Honor, but the main issue is this is a case

24   regarding injunctive relief.  And so I'm not saying that the

08:50:03  25   Department isn't responsible for the healthcare, because it's

08:50:06  1    a non-delegable duty and there's no disputing that.

2              What I'm say is issues that occurred years before

3         with respect to medical problems aren't relevant to the issue

4         here, and that is whether or not the plaintiff class as of

08:50:22  5    today are receiving constitutional level of care.  Not what

6         happened in 2014 or 2015.  That's not at issue.

7              THE COURT:  But we're not talking about '14 and '15,

8         we're talking about '19; correct?

9              MR. STRUCK:  But that's --

08:50:41  10   THE COURT:  On that basis it's admissible.  I'm going

11        to allow it.  If it was 2014 and '15, I have a problem.  We're

12        talking about a potential systemic violation of constitutional

13        rights.  So that evidence is admissible to determine whether

14        or not there was deliberate indifference, and I'm sure you'll

08:51:04  15   have a response to it, so it is admitted.

16             So can we start now with our witness or are we going

17        to wait?

18             MS. HESMAN:  One more issue.  This is Ashlee Hesman

19        speaking.  We have a new party rep here today, Dr. Bobbie

08:51:20  20   Pennington-Stallcup.  She is the mental health program

21        director for the Department of Corrections.  I just wanted to

22        advise the Court of that, that she will be sitting in this

23        morning in Warden Van Winkle's stead.

24             THE COURT:  You have no objection even though she

08:51:32  25   will be a witness?

08:51:34  1          MR. FATHI:  May I respond, Your Honor?

2          THE COURT:  Yes.

3          MR. FATHI:  We do object.  Exclusion of witnesses is

4     of course mandatory subject to very limited exceptions.

08:51:43  5          THE COURT:  So I understand.  That's what I wanted to

6     know.  But I guess yesterday when Mr. Van Winkle, who was also

7     going to be a witness, that you agreed he could sit in.

8          MR. FATHI:  Yes, Your Honor.  A party is entitled to

9     designate one representative, and the defendants have

08:51:59  10    designated on the record Warden Van Winkle.  We don't believe

11    they can change their designee from day to day depending on

12    the substance of the testimony being offered that day.  That

13    obviously defeats the purpose of the rule excluding witnesses.

14          Dr. Stallcup --

08:52:14  15          THE COURT:  No.  Is there some reason why she's here

16    as the representative as opposed to I believe it was Mr. Gann.

17          MS. HESMAN:  Yes, Your Honor.  Larry Gann is a

18    defendant in this case and he has been present throughout the

19    two days of trial.

08:52:29  20          THE COURT:  So he cannot be the representative.

21          MS. HESMAN:  With respect to Mr. Gann?

22          THE COURT:  Yes.

23          MS. HESMAN:  I agree.  The reason that Dr. Stallcup

24    can be the representative, Your Honor, is they're each

08:52:40  25    representing different components of the case.  Warden

08:52:43   1   Van Winkle is the representative with respect to the max

         2   custody piece.  Dr. Stallcup is the representative with

         3   respect to the mental health care piece, which is the evidence

         4   we're hearing this morning.  And she was a 30(b)(6) witness,

08:52:53   5   which was the reason why they were allowing Warden Van Winkle

         6   to serve as a party rep because he was also a 30(b)(6) rep.

         7         MR. FATHI:  Your Honor, a party is entitled to

         8   designate one representative --

         9         THE COURT:  That is true.  One representative.  You

08:53:07  10   cannot change it merely because somebody is going to be a

        11   witness and because she has testimony that's relevant to

        12   mental health.  So you're going to have to get another

        13   representative here.  Not Ms. Stallcup.

        14         MS. HESMAN:  So that my understanding is clear, we

08:53:24  15   are -- the only representative we will be permitted to have is

        16   Warden Van Winkle?

        17         THE COURT:  That's correct.

        18         MS. HESMAN:  Thank you, Your Honor.  If I may give

        19   her a chance to leave.

08:53:35  20         THE COURTROOM DEPUTY:  Could we have plaintiff

        21   identify all the exhibits they have stipulated to --

        22         THE COURT:  Yeah.

        23         So, Counsel, in a moment we're going to talk about

        24   exhibits through Molly.  She's going to tell you what she

08:53:47  25   needs.

08:53:48  1          THE COURTROOM DEPUTY:  I just need to know what
        2   exhibits you reference this morning that you guys have
        3   stipulated to and the ones the Judge said can come in.
        4          MS. KENDRICK:  We have some folks working on that
08:53:58  5   because some of them are listed multiple times so we just kind
        6   of wanted to kind of give you all of the numbers at once.
        7          THE COURTROOM DEPUTY:  But you're going to be
        8   referencing them with his testimony this morning?
        9          MS. KENDRICK:  Yes.
08:54:11 10          THE COURT:  Are they stipulated or not?  Can you tell
       11   her now?
       12          THE COURTROOM DEPUTY:  I need to know numbers.
       13          MS. KENDRICK:  Okay.  One second.
       14          THE COURT:  So it won't take so much time for the
08:54:22 15   witness to testify if we know that in advance.
       16          MS. KENDRICK:  So these are Plaintiffs' Exhibits 137
       17   through 529.
       18          MS. HESMAN:  Your Honor, we were just told of this,
       19   this potential stipulation this morning.  We haven't had a
08:54:56 20   chance to confirm that that range is everyone who's died
       21   July 1st, '19, to the present.  My understanding is we're
       22   going to brief the issue with respect to January to July.
       23          MS. KENDRICK:  I thought the Court just ruled.
       24          THE COURT:  I did rule.
08:55:11 25          MS. HESMAN:  My apologies.

DIRECT EXAMINATION - PABLO STEWART

08:55:18   1          THE COURT:  Okay.  Anything else?

2          Molly, does that cover it?

3          THE COURTROOM DEPUTY:  So they're in?  All of those

4     are?

08:55:24   5          THE COURT:  Uh-huh.  They're admitted.

6          (Exhibits 137 through 529 admitted.)

7          THE COURTROOM DEPUTY:  Dr. Stewart, I'm going to

8     swear you in.  Can you hear me okay?

9          THE WITNESS:  Yes.

08:55:42  10                    **PABLO STEWART,**

11    called as a witness herein, after having been first duly sworn

12    or affirmed, was examined and testified as follows:

13              D I R E C T   E X A M I N A T I O N

14    BY MS. KENDRICK:

08:55:53  15    Q    Good morning, Dr. Stewart.  Can you hear me?

16    A    Yes, I can.  Thank you.

17    Q    Could you please tell us a little bit about your

18    background, about your education and training.

19    A    Starting when?

08:56:13  20    Q    Starting with college, please.

21    A    For college I went to the United States Naval Academy at

22    Annapolis, graduated 1973 with a degree in chemistry and

23    mechanical engineering.

24              After I served my obligated service, I was in the

08:56:31  25    Marine Corps for five years, and then went to medical school

DIRECT EXAMINATION - PABLO STEWART

08:56:35  1  at University of California at San Francisco, where I

2  graduated with an M.D. degree in 1982.

3        I stayed at the University of California

4  San Francisco to complete my psychiatric residency training,

08:56:47  5  which I completed in 1986.

6  Q   And how are you currently employed?

7  A   I'm currently employed as a clinical professor of

8  psychiatry at the John A. Burns School of Medicine of the

9  University of Hawaii in the Department of Psychiatry.  And I'm

08:57:10  10  also a forensic consultant.

11  Q   And in your work at the medical school at the University

12  of Hawaii, do you provide clinical services to patients?

13  A   Yes.  My job currently is to oversee the clinical care of

14  psychiatric patients both in our big hospital called Queens

08:57:33  15  Hospital, as well as in the local jail, and I supervise

16  psychiatric residents in their care of the patients.  So I'm

17  ultimately responsible for their care.

18  Q   All right.  And you also said that you have served as an

19  expert on mental health care in correctional settings.  Could

08:57:54  20  you describe what work you're currently doing besides the

21  Parsons case?

22        MS. HESMAN:  Objection, Your Honor, leading.  That's

23  not what he testified to.  He said he was a forensic

24  consultant.

08:58:05  25        THE COURT:  Is that what he said?  I don't -- let's

DIRECT EXAMINATION - PABLO STEWART

08:58:09   1   clarify that.

2   BY MS. KENDRICK:

3   Q   Dr. Stewart, can you describe your forensic consulting

4   work, please.

08:58:15   5   A   Yes.  My forensic consulting work consists of my

6   correctional psychiatry work, such as work in this case, and

7   also I am the federally appointed monitor in the case of *Rasho*

8   *v. Jeffreys* in the Central District of Illinois.  And in that

9   role I oversee a settlement agreement between parties

08:58:40   10   regarding the Illinois Department of Corrections.  I've been

11   doing that work since 2016.

12   Q   And does that -- sorry go, ahead.  Go ahead.

13   A   And -- and in addition to other correctional work that I

14   have done, I also do criminal defense work.  I specialize in

08:59:02   15   capital defense work.

16   Q   All right.  And before you joined the faculty at the

17   University of Hawaii, did you teach elsewhere?

18   A   Yes.  I joined the faculty University of Hawaii in 2018.

19   Prior to that I was a faculty member of the University of

08:59:20   20   California San Francisco, where I held the rank of clinical

21   professor also.

22   Q   And in that position, did you work with forensic patients?

23   A   In the position at University California San Francisco, I

24   did not work with forensic patients as part of my university

08:59:41   25   work.  I did work with university -- with forensic patients,

DIRECT EXAMINATION – PABLO STEWART

08:59:45  1   but not part of my university work.

2   Q   Could you tell us about that work, please.

3   A   What work?

4   Q   The forensic work you did outside of your UCSF position.

08:59:58  5   A   I worked on this matter since 2012.  I worked on several

6   jail cases in California.  And I worked on several other state

7   prison cases, namely Nebraska and Mississippi.

8   Q   Okay.  And you stated that you've been retained since 2012

9   in this case.  Have you visited the Arizona prisons?

09:00:30 10   A   Yes, I have.

11   Q   And when was that?

12   A   I initially visited the prisons in 2013, and then I had a

13   follow-up visit in 2019.  And then finally just this last

14   month, September of 2021, I also visited.

09:00:50 15   Q   Okay.  And could you briefly describe your takeaway as to

16   what you saw in September 2021 when you visited Arizona

17   prisons?

18   A   I'll try to summarize.  There was a lot of takeaways.  But

19   the most profound takeaway is my encountering numerous

09:01:19 20   severely mentally ill individuals who were displaying signs,

21   overt signs, of mental illness who reported subjectively to be

22   experiencing the symptoms of mental illness.  And in addition

23   to that, I saw multiple patients with serious self-inflicted

24   injuries while they were under the care of -- while they were

09:01:49 25   receiving mental health care.

DIRECT EXAMINATION - PABLO STEWART

09:01:51  1    And I think the final big takeaway was couldn't help

2    but notice significant number of patients who were displaying

3    overt signs of medication-induced side effects.

4    Q    And how many prisons did you visit in September 2021?

09:02:12  5    A    I visited four.  I went to Eyman, Tucson, Perryville, and

6    the Phoenix complex.

7    Q    And when you visited those prisons, did you go to specific

8    areas or units of the prisons?

9    A    I went to watch units, I went to what I would refer to as

09:02:37 10    segregated housing units, detention units, and I asked to go

11    to those units where the mentally ill, the SMIs or other

12    people in the mental health caseload, were housed.

13    Q    Okay.

14        In preparation for your expert declaration, could you

09:03:00 15    describe the people who you interviewed to prepare your

16    report.

17    A    Are you referring to the mentally ill inmates that I

18    interviewed?

19    Q    Yes, sir, the incarcerated population.

09:03:17 20    A    Okay.  I wanted to follow up with the people that I

21    originally evaluated in 2013.  So for those individuals that

22    were still in custody, I wanted to see them, follow up on

23    their care.  I also asked to see any Spanish-speaking

24    individuals that were in -- that were designated as SMI.

09:03:49 25        I also asked counsel to review self-harm logs and

DIRECT EXAMINATION – PABLO STEWART

09:03:56  1   watch logs to identify those patients that had been on those

2   logs for several -- in the case of watch logs that had had

3   significant periods of their incarceration on watch, as well

4   as individuals who had had multiple self-injurious behavior.

09:04:19  5          I also wanted to interview the named plaintiffs in

6   this case.

7          And, finally, as I was going through the areas I had

8   mentioned, looking for the people, the named plaintiffs, or in

9   the watch areas, I went to each cell and spoke to many people

09:04:39  10   at cell front and also had a large number of them pulled out

11   for confidential interviews.  That was more of a random

12   selection.

13  Q   Could you describe the process you use to review patients'

14   medical records for your report.

09:05:04  15  A   Well, I had remote access to the eOMIS system.  For

16   example, I would see an individual in the Eyman S unit, the

17   Browning Unit, for example, and then when I would return to my

18   office I would review his medical record.

19          I also enlisted the assistance of the chief resident

09:05:27  20   in my program, the psychiatric program at University of

21   Hawaii, a Dr. Nikogosyan, to help me chart review only.  He

22   would go through the chart and list different mental health

23   contacts, medication prescriptions, medication adherence.

24   These are standard chart review items.  He would provide me

09:05:54  25   that information and I would rely on that in assessment of the

DIRECT EXAMINATION - PABLO STEWART

09:06:00  1   case.

2   Q   And did you do a random file review of every prisoner in

3   ADC custody?

4   A   I did not.

09:06:10  5   Q   And did you do a random file review of every prisoner with

6   an MH-3 or higher score?

7   A   I did not.

8   Q   Why not?

9   A   I wanted to focus my attention on the more seriously

09:06:28  10  mentally ill.  And I just have to say that I use the term

11  "serious mentally ill" that may be different from the

12  designation of SMI, which is serious mental illness.  I'm

13  talking about people that have significant chronic mental

14  illness when I say serious.

09:06:53  15          I wanted to see these individuals because it's clear

16  to me, based on my experience as a correctional psychiatrist

17  and as a monitor, that one of the best measures of -- of

18  evaluating a system's ability to care for mentally ill inmates

19  is to look at the more serious mentally ill cases.

09:07:16  20  Q   Is the methodology you've used in this case reliable?

21  A   I believe it is, yes.

22  Q   Is this methodology customarily used by experts in your

23  field?

24  A   Yes.  And it's methodology that I used in my other

09:07:33  25  correctional psychiatry work.

DIRECT EXAMINATION – PABLO STEWART

09:07:36  1   Q   Is it the methodology you use as the court-appointed

2   monitor in the Illinois mental health care case?

3   A   Yes.

4   Q   So, Dr. Stewart, I'd like to show you what's been filed as

09:07:56  5   Docket 4109 at paragraph 17.

6        Can you see that?  We can enlarge it.

7   A   If you wouldn't mind, please.

8   Q   Of course.

9        Can you see it now?

09:08:17 10   A   Yes.

11   Q   Okay.  You state here that:

12        "It is my opinion that the chronic shortage of

13        mental health staff, delays in providing or the

14        outright failure to provide mental health treatment,

09:08:33 15        the inadequacies in the provision of psychiatric

16        medications, and the other deficiencies identified

17        in this report are systemic problems, and

18        incarcerated people who need mental health care have

19        already experienced, and will experience, a serious

09:08:47 20        risk of injury to their health if these problems are

21        not addressed.

22        "In my experience in correctional mental health

23        care, these types of systemic problems have been

24        addressed through an injunction directed against the

09:09:01 25        directors and administrators of the prison system."

DIRECT EXAMINATION - PABLO STEWART

09:09:05  1          Is this a summary of your overall opinion?

2      A    Yes, it is.

3      Q    And there's going to be some phrases that we'll be using

4      today.  I was wondering, what does "standard of care" mean and

09:09:20  5      how is it generally defined?

6      A    The standard of care is what a patient would expect to

7      receive, regardless of the setting, as far as assessment,

8      diagnosis, treatment, follow-up care, to include a variety of

9      levels of care:  Emergency care, outpatient care, and

09:09:49 10      inpatient care.  It's an evolving standard that looks at what

11      a system should be like in the community.  So that's what I

12      referred to as standard of care.

13      Q    Is there something known as a correctional standard of

14      care?

09:10:10 15      A    Well, there's no --

16          (audio interference.)

17      BY MS. KENDRICK:

18      Q    I'm sorry.  Could you repeat that?  Did you say there is

19      not a correctional standard of care?

09:10:36 20      A    Right.  I didn't answer your question right away because I

21      was hearing this conference call going on.

22          No.  There's not a separate correctional standard of

23      care.  The standard of care for -- that exists for psychiatric

24      services in a correctional setting is the same that exists in

09:10:54 25      the community.

DIRECT EXAMINATION – PABLO STEWART

09:10:58  1   Q   Are there certain matters that would only come up in the

2   context of a correctional setting with regard to treatment of

3   mentally ill people?

4   A   I'm not sure if I understand that question.

09:11:22  5   Q   So, for example, uses of force, that would be something

6   that happens in a correctional setting and not necessarily in

7   the community.

8   A   Not necessarily in the community, yes, that's an example.

9   Q   Okay.

09:11:42  10          MS. KENDRICK:  Could we turn to page 11 of his

11   report.

12   BY MS. KENDRICK:

13   Q   So, Dr. Stewart, I'm showing you page 11 from your report

14   at paragraph 20.  And these are charts that are showing the

09:12:02  15   vacancy rates at multiple prisons for behavioral health and

16   psychiatric positions at multiple prisons.

17          And did you review this information?

18   A   Yes, I have.

19   Q   And if we look at the first one for ASPC Eyman, for

09:12:30  20   example, it shows the contract in the second column calls for

21   three psychologists.  And then for three months there was only

22   one FTE and then there was two FTEs in August.  Do you see

23   that?

24   A   Yes, I do.

09:12:46  25   Q   What are the potential risks of harm that could occur from

DIRECT EXAMINATION – PABLO STEWART

09:12:48  1   only having two psychologists at the Eyman prison?

2   A    Based on my touring of the Eyman facility and seeing the

3   extent and seriousness of the mental illnesses of the

4   incarcerated individuals there, I don't see how one or two

09:13:14  5   psychologists could even begin to address the needs at that --

6   at that --

7   Q    Okay.

8   A    So it would result, in my opinion, that the mentally ill

9   inmates would not be receiving adequate care.

09:13:32  10  Q    Okay.  And then if you go to the next chart with Florence,

11  in the last column it shows that for August of this year, the

12  total mental health staff overall, only 35 percent of the --

13  all mental health positions were filled in August of 2021.

14       Does that concern you?  And why?

09:13:58  15  A    Well, if you only have a third of the people that you're

16  supposed to have, then I don't see how you can even begin to

17  provide a standard of care as far as psychiatric care goes.

18  And I think another thing I would point out in this is I don't

19  know how these FTEs were -- were calculated.

09:14:25  20       So if they're at a third of their calculated FTE, I

21  don't know if I'm comfortable by saying that's only a third

22  down.  A third of their -- a third of the type of

23  professionals they need to provide care.  For all I know, it

24  represents a tenth because of how these numbers were

09:14:46  25  originally calculated.

DIRECT EXAMINATION - PABLO STEWART

09:14:48   1    Q    You're referring --

2               MS. HESMAN:  Objection, Your Honor, move to strike,

3    nonresponsive.  The second portion.

4               THE COURT:  I'm frankly unclear of what he was saying

09:14:57   5    anyway, so I'm going to sustain the objection because there's

6    a lot of ambiguity in his answer.

7               MS. KENDRICK:  Okay.

8    BY MS. KENDRICK:

9    Q    Dr. Stewart, in your opinion, if only 35 percent of mental

09:15:15  10    health positions are filled, is there a limit to the number of

11   patients who can be seen?

12              MS. HESMAN:  Objection, foundation.  I don't think

13   she's established foundation for him to offer any opinions

14   with respect to staffing.

09:15:26  15              THE COURT:  Well, she already got -- has his opinion

16   concerning what the standard of care is in non-prison setting

17   and prison setting.

18              But I will sustain the objection.  You can obtain

19   more foundation.  It will be helpful to me also.

09:15:44  20              MS. KENDRICK:  Okay.

21   BY MS. KENDRICK:

22   Q    Dr. Stewart, you've reviewed the contracted amount of

23   positions allocated to each prison; correct?

24   A    Correct.

09:15:53  25   Q    Okay.

DIRECT EXAMINATION – PABLO STEWART

09:15:55   1        THE COURT:  Each prison here in Arizona?

2        MS. KENDRICK:  Yes.  That's the column that says

3   Contract FTE, the second column.

4   BY MS. KENDRICK:

09:16:02   5   Q   So the question is, having reviewed what the contract

6   requires, holding aside whether the contract amount is

7   adequate, if only 35 percent of the contracted positions are

8   filled, will that address the patient need?

9        MS. HESMAN:  Objection, Your Honor.  Same objection

09:16:26  10   with respect to foundation.  This also calls for speculation.

11        THE COURT:  Well, I'm not sure it calls for

12   speculation, but I'm going to sustain it on foundation because

13   we don't know how he came to the conclusion, conclusions yet

14   that the standard of care or the amount of the FTC is lower

09:16:47  15   than it should be.  We don't know -- we don't know the basis

16   of his decision, how he came about concluding that.  And I'm

17   interested in it, too.

18        MS. KENDRICK:  Okay.

19   BY MS. KENDRICK:

09:17:04  20   Q   Dr. Stewart, you have the contracted amount and then you

21   have the reports that were provided by the Department showing

22   the actual fill, the actual hired positions; correct?

23   A   Correct.

24   Q   So did you look at the number of actual FTEs and compare

09:17:25  25   it to the contract number?

DIRECT EXAMINATION - PABLO STEWART

A    I did.

Q    And based on that comparison, did you conclude that the actual staffing is inadequate to meet the needs?

MS. HESMAN:  Objection.  Same objection, Your Honor, with respect to foundation.  She's asking whether or not it is adequate to meet the inmate needs.  It is vague, it calls for speculation, and she hasn't established that he has the foundation to offer --

THE COURT:  Well, I -- I think -- I'm going to overrule the objection.  But I'm still waiting for foundation. It seems to me that's almost a common sense answer that it's different, so it's not enough.  But maybe the contract is enough.  We don't -- I don't have that yet.

Do you understand what I'm saying?  I don't know why he considers either the contract amount or the amount that's actually filled to be inadequate.  Both of those have to be established.  And then there is the basis for it.

MS. KENDRICK:  Okay.

THE COURT:  Understand what I'm saying?  He may say the contract amount is fine, and so -- and the amount that they filled is fine, but we need to know the difference between the two and why, in his opinion, it is not enough.

BY MS. KENDRICK:

Q    Okay.  Dr. Stewart, for Florence, the contract amount for total inmate staff is 22.5 at the prison.  Do you see that?

DIRECT EXAMINATION - PABLO STEWART

09:18:59  1    A    Yes.

2    Q    Okay.  Let's assume for a minute that that number would be

3    adequate to meet the needs of the patient population at the

4    prison.

09:19:12  5         Would having only 7.9 of those 22.5 contracted

6    positions, in your opinion, provide necessary mental health

7    care to the people in that prison?

8              MS. HESMAN:  Your Honor, my objection's the same.

9              THE COURT:  No, it's overruled now.  I understand --

09:19:31 10    it's overruled.  He can answer it yes or no.  What we're

11    talking about now is math, not the basis of his opinion, I

12    presume we're going to get there at some point.  So he can

13    answer that.

14              THE WITNESS:  I lost the question in all of that,

09:19:53 15    Your Honor.  Could I have --

16              THE COURT:  Give it another try.

17              MS. KENDRICK:  Sure.

18    BY MS. KENDRICK:

19    Q    So, Dr. Stewart, assuming that the 22.50 contracted FTEs

09:20:01 20    for Florence is sufficient, is only having 7.9 of those

21    positions filled in August sufficient to meet patient need?

22    A    I don't believe so.

23    Q    What is the basis for your opinion on that?

24    A    Well, go back up to Eyman, a facility that I toured,

09:20:23 25    both --

DIRECT EXAMINATION - PABLO STEWART

09:20:27  1      MS. HESMAN:  Your Honor, I'm going to object.  She

2   asked him with respect to Florence and now he's giving an

3   answer with respect to Eyman.

4      THE COURT:  Sustained.

09:20:39  5   BY MS. KENDRICK:

6   Q   So if you can just answer it as to Florence, why 7.9 out

7   of 22.5 would not meet the needs.

8   A   See, but I cannot answer that question because I didn't

9   tour Florence, so I don't know what the mental health

09:20:57 10   situation was in Florence.  That's why I was using Eyman as an

11   example.

12   Q   Okay.  Well, let's go to -- back to Eyman.

13      So Eyman has 13.0 contracted psych associates and

14   they show -- if you look across that row, for psych associates

09:21:21 15   from month to month it ranged from 31 percent filled to

16   62 percent filled.

17      Assuming the 13 percent is what is needed to meet the

18   patient needs, do the actual fill rates, in your opinion,

19   therefore meet the needs?

09:21:39 20   A   They do not, based on my touring of Eyman, by my speaking

21   to the mentally ill inmates, by my chart reviews.  It was

22   clear to me that -- and the absence of group therapies and

23   individual therapies.  Based on that combination of my

24   investigation at Eyman, I feel that that number of psych

09:22:08 25   associates, which is eight as in August, is grossly

DIRECT EXAMINATION - PABLO STEWART

09:22:12  1    insufficient to meet the treatment needs of the population.

2    Q    Now, Dr. Stewart, sticking with Eyman for a second here,

3    they show that there's only two psychologists actually filling

4    the position on the contract.  If there are only two

09:22:33  5    psychologists at a prison, is there a limit of how many

6    patients they can see in the course of a day?

7              MS. HESMAN:  Objection, foundation.

8              THE WITNESS:  Absolutely.

9              THE COURT:  Overruled.

09:22:41  10   BY MS. KENDRICK:

11   Q    You can go ahead.

12   A    Absolutely.  There's a limit to the number of -- there's a

13   limit to the number of patients seen by any professional,

14   including psychologists.

09:22:56  15   Q    So if you looked at the number of patients seen by those

16   two psychologists, would that tell you what the actual patient

17   need is?

18   A    No.

19   Q    How do you --

09:23:06  20   A    It would not.

21   Q    How do you assess the patient need?

22   A    Well, like I said, I assess the patient need by

23   interviewing many mentally ill individuals at Eyman and by

24   reviewing their charts and seeing the absence of an adequate

09:23:25  25   amount of group therapy, individual therapy, long periods of

DIRECT EXAMINATION – PABLO STEWART

09:23:32   1    time between visits, and lack of coordination in treatment

2    planning.  Any number of those factors shows me that number is

3    grossly insufficient to meet the needs of the patients.

4    Q   Now, Dr. Stewart, did you speak with Robert Joy or review

09:23:58   5    his expert report?

6    A   I did.

7    Q   And did you review the methodology he used to calculate

8    the number of mental health staff needed?

9    A   Yes, I did.

09:24:11  10    Q   Is that methodology that he used customarily used by

11    experts in the healthcare field?

12        MS. HESMAN:  Foundation.

13        THE COURT:  Sustained.

14    BY MS. KENDRICK:

09:24:21  15    Q   Are you familiar with staffing analysis being done in

16    other correctional systems?

17    A   Yes.

18    Q   Did they use -- in those other studies, did they use a

19    methodology similar to Mr. Joy's?

09:24:37  20    A   Yes.

21        MS. HESMAN:  Objection, Your Honor, foundation and

22    calls for speculation.  And I believe he testified earlier

23    that his only involvement that he has had with respect to this

24    is his own involvement at Illinois, not any other correctional

09:24:48  25    setting.

DIRECT EXAMINATION - PABLO STEWART

09:24:49   1          THE COURT:  Well, let's get some details here, I'm

2   interested in it, too.  So sustained.

3   BY MS. KENDRICK:

4   Q   Okay.  Could you tell us a little bit more about that,

09:24:56   5   Dr. Stewart, about your knowledge or work with doing sort of

6   these staffing analyses of the need for healthcare workers.

7   A   In all of the forensic cases -- in all the correctional

8   psychiatric cases I've worked on -- long experience in

9   California, Nebraska, Mississippi, Arizona -- when it comes to

09:25:27  10   staffing analysis or staffing needs, one needs to take into

11   consideration the various cohorts of patients because some

12   patients only need to be seen, let's say, for example, every

13   30 days.  But there are other cohorts of patients that need to

14   be seen weekly or daily.  So based on -- and these cohorts are

09:25:52  15   based on the severity of the mental illness and their

16   treatment needs.

17          So it's common practice, in my experience, to take

18   into consideration the level of acuity or level of severity of

19   mental illness to help factor in staffing requirements.

09:26:16  20          MS. HESMAN:  Objection, Your Honor.  I move to

21   strike, it's nonresponsive.  And I'm also going to object to

22   this witness offering any testimony with respect to staffing.

23   He has an untimely disclosed opinion with respect to staffing.

24   It was not until we received the declaration at footnote 3

09:26:32  25   that he says that he's reviewed Robert Joy's report and in his

DIRECT EXAMINATION – PABLO STEWART

09:26:36   1   opinion the calculations and conclusions are sound.  That was

2   not disclosed in his report to us.

3        THE COURT:  I don't have -- I saw that.  I read that.

4        And I don't know, has that been just recently

09:26:48   5   disclosed?

6        MS. KENDRICK:  Yes, it was.  And, again, Dr. Stewart

7   is another expert that defendants chose to not depose and

8   could have --

9        THE COURT:  When was that first provided?

09:27:04  10        MS. HESMAN:  Your Honor, we received this opinion

11   when we received his direct examination, which was

12   October 29th, well past the deadline to take depositions.

13        MS. KENDRICK:  His previous reports also indicated he

14   had spoken with and met with Mr. Joy.  His report was produced

09:27:20  15   to defendants on the same day as Mr. Joy's, so therefore he

16   did not read Mr. Joy's report until they were --

17        THE COURT:  Was that the first time, though, that he

18   provided an opinion concerning staffing?

19        MS. KENDRICK:  No.  His October 9th report discussed

09:27:37  20   staffing at length and referred to the two meetings that he

21   had with Mr. Joy that Mr. Joy testified about, but he said, "I

22   have not yet reviewed Mr. Joy's report because it's due on the

23   same day as this report."

24        MS. HESMAN:  The problem, Your Honor, is he did not

09:27:53  25   reach the ultimate conclusion that he agrees with Mr. Joy's

DIRECT EXAMINATION - PABLO STEWART

09:27:58  1    opinion and that he thinks that opinion is sound until we

2    received the declaration.  That is a new opinion.

3                THE COURT:  Is that correct?

4                MS. KENDRICK:  Yes, because that was when he finally

09:28:08  5    got to review Mr. Joy's report, was in that interim period.

6                THE COURT:  Yeah, but that's a new -- that's a new

7    opinion.  So he's essentially saying -- he's now, for the

8    first time as I understand it, correct me if I'm wrong, he's

9    now going to testify on the -- whether or not the staffing

09:28:27  10   level was appropriate.  And if he -- if you -- if he opined

11   that previously so that counsel could have considered it, then

12   that's different.

13               MS. KENDRICK:  He did opine about the staffing levels

14   being inappropriate in his October 9th report.  The only --

09:28:47  15              THE COURT:  Can you find that now so that that's

16   clear, because it doesn't sound like counsel agrees with you.

17               MS. KENDRICK:  I mean, we can pull it up and look at

18   them side by side.

19               These charts were in his October 9th report.  The

09:28:59  20   only difference is that the footnote that previously said in

21   his October 9th report "I met with Mr. Joy" now says "I

22   reviewed Mr. Joy's report, having now been submitted and it

23   appears to be of sound methodology."

24               So if there's anything that they --

09:29:17  25              THE COURT:  But did he -- did he previously state

DIRECT EXAMINATION - PABLO STEWART

09:29:20  1    that the staffing levels were inappropriate?

2                MS. KENDRICK:  Yes, he did.

3                MS. HESMAN:  I do not dispute that, Your Honor.  The

4    problem that I have is he's being called to bolster Mr. Joy's

09:29:32  5    opinions.  It was never disclosed in his report -- it was

6    never disclosed in his report that he was going to say that

7    the methodology was sound, that he agrees with it, that --

8                THE COURT:  You mean Mr. Joy?

9                MS. HESMAN:  Correct.  Correct.

09:29:44  10               THE COURT:  Mr. Joy's report?

11               MS. HESMAN:  Correct.  That's the problem that I

12   have.

13               THE COURT:  Okay.  If that's new, then he is

14   precluded from testifying about his conclusions, positive or

09:29:54  15   negative, concerning Mr. Joy's report.  He can testify,

16   however, to whether or not he believes that the staffing is

17   adequate.

18               MS. HESMAN:  Thank you, Your Honor.

19               MS. KENDRICK:  Could we go to the next page.

09:30:15  20               The next page, Charles.

21   BY MS. KENDRICK:

22   Q   Okay.  And then we're on page 12 of your report where you

23   show the staffing levels at Phoenix and at Tucson prisons.

24   Can you see those?

09:30:32  25   A   Yes.

DIRECT EXAMINATION – PABLO STEWART

09:30:34  1   Q   And those are two of the prisons that you visited;

2   correct?

3   A   Correct.

4   Q   And, again, like with the other charts, the second column

09:30:43  5   is what the contract calls for and then the other numbers are

6   what's the actual fill rate.  Do you see that?

7   A   Correct.

8   Q   Okay.  So let's take a look at Phoenix.

9       Can you briefly describe for us what the Phoenix

09:31:04 10   prison is and what you observed when you were there.

11   A   The Phoenix prison is their purported hospital, but

12   there's nothing hospital-like at all when I toured the Phoenix

13   facility on September 23rd.  There was numerous significantly

14   profoundly mentally ill individuals, including people who have

09:31:42 15   performed -- accomplished really serious acts of self-harm,

16   that are being housed there.  And I used that particularly

17   because I didn't see the fact they were receiving any

18   treatment.  The treatment that they did receive, in my

19   opinion, was grossly inadequate.

09:32:00 20   Q   Okay.  And can you see that on the second line for

21   clinical director, there's one contract FTE and the position

22   is shown as vacant in July and August?

23   A   Yes.

24   Q   And what is your opinion about a mental health facility

09:32:21 25   with a vacant clinical director position?

DIRECT EXAMINATION - PABLO STEWART

09:32:27  1   A   Well, I interpret that as there's no one that is

2   overseeing the entire operation as far as the provision of

3   mental health care.

4          MS. HESMAN:  Move to strike, Your Honor.

09:32:40  5   Nonresponsive.

6          THE COURT:  Overruled.

7   BY MS. KENDRICK:

8   Q   Okay.  Then can you see that on the fourth line, mental

9   health RN, 15.8 positions in the contract and 8.8 filled?

09:32:57  10  A   Yes.

11  Q   Does that vacancy rate impact the delivery of care to

12  patients at the Phoenix facility, in your opinion?

13  A   In my opinion, it does.

14  Q   How so?

09:33:11  15  A   The nurses, although -- don't have direct mental health

16  engagement with the patients as far as providing therapy,

17  et cetera, they are involved in pill calls and handing out

18  medications, they're involved in responding to the health

19  needs request forms, and they're involved in providing medical

09:33:41  20  care to these individuals, many of whom have serious

21  self-induced injuries.  So the lack of a sufficient number of

22  nurses absolutely impacts quality of care.

23  Q   All right.  And if we go to the bottom line for Phoenix,

24  it shows there were 42.3 positions called for in the contract

09:34:07  25  and only 28.58, or 68 percent, filled in August.  Do you see

DIRECT EXAMINATION - PABLO STEWART

09:34:12  1   that?

2   A   Yes.

3   Q   In your opinion, does that impact the number of patients

4   that can be treated?

09:34:20  5   A   Yes.  There's only -- there's an absolute number of

6   patients that an individual can see per day.  And so the fact

7   they're so low here impacts their ability to see everybody on

8   a reasonable basis.

9   Q   And, Dr. Stewart, if we move on to paragraph 21 of your

09:34:44  10  report, you discuss the low level of psychiatrist staffing in

11  the system and the reliance upon nurse practitioners.

12  A   Yes.

13  Q   What is your opinion about the staffing model that has

14  more nurse practitioners than psychiatrists?

09:35:10  15  A   On face value there's nothing necessarily wrong with it,

16  but when you look at the way that it's applied in the Arizona

17  Department of Corrections is that -- it's hard for me to

18  adequately express how significantly ill the individuals that

19  I encountered are.  They were among the most mentally ill

09:35:36  20  individuals that I have seen throughout my 40 years of being a

21  psychiatrist.

22          And what I found through chart reviews and

23  interviewing of the mentally ill inmates was that the

24  mid-level practitioners, including nurse practitioners, didn't

09:36:00  25  have the proper training and experience to deal with these

DIRECT EXAMINATION - PABLO STEWART

09:36:04  1   most complex seriously mentally ill individuals.  And so I

2   found their treatment was lacking in the proper use of

3   psychotropic medications, for example.

4           MS. HESMAN:  Your Honor, I'm going to move to strike

09:36:20  5   again.  She asked him a very specific question and he's giving

6   the answer that he wants to give.  So if she could proceed --

7   or if he could proceed with actually answering the question

8   that she's asking.

9           MS. KENDRICK:  I asked him for his opinion about the

09:36:37 10   nurse practitioners and --

11           THE COURT:  I'm going to overrule.  There is no

12   objection as that -- nonresponsive objection that can be made

13   by opposing counsel.  That objection is made by the person who

14   is asking the question.  Now, that may be that there's some

09:36:54 15   other deficiency in the answer, and you can raise that, but

16   I'm not -- I'm going to overrule the objection based upon what

17   you said.

18   BY MS. KENDRICK:

19   Q   And, Dr. Stewart, does the fact that nurse practitioners

09:37:12 20   are independent practitioners under Arizona law change your

21   opinion about this?

22   A   No, it doesn't change my opinion because -- it doesn't

23   change my opinion, yes.

24   Q   Why not?

09:37:32 25   A   Because, again, we need to look at the setting.  And as

DIRECT EXAMINATION - PABLO STEWART

09:37:37 1   I'm trying to very probably inarticulately express to the

2   Court how ill these prisoners are and that the nurse

3   practitioners, in my opinion, in the charts I reviewed and the

4   cases I reviewed, don't have the proper training and

09:37:55 5   experience to deal with these people. And I believe there

6   needs to be more psychiatrists or at least an active program

7   of supervision for these nurse practitioners.

8   Q    And, Dr. Stewart, can shortages of non-mental healthcare

9   staff or custody staff impact the delivery of mental health

09:38:17 10   care in Arizona's prisons?

11   A    Yes, I believe it can and I saw examples of that. For

12   example, with psych associates, there was long frequencies

13   between visits, for example. I didn't see any evidence of

14   group therapies or individual therapies taking place.

09:38:41 15       And when we look at the custody staff, and especially

16   in these high-security units or where a lot of the mentally

17   ill are housed, it often requires, you know, two, at least two

18   or sometimes three custody staff to move an individual from

19   their cell to a confidential area where a mental health

09:39:09 20   encounter may take place. And if you're short custody staff,

21   it's very difficult in order to be able to do proper mental

22   health care.

23   Q    Does a high turnover among mental health staff impact the

24   delivery of mental health care to incarcerated people?

09:39:35 25   A    Absolutely. You know, in reviewing records, I've seen

DIRECT EXAMINATION – PABLO STEWART

09:39:40   1   that maybe over a year period there might have been two or

2   three different mental health staff interacting with a

3   patient.  And you can imagine how difficult it is to establish

4   a therapeutic relationship in the setting that we're trying to

09:40:00   5   provide psychiatric care in.  But then if the individual is

6   changing rapidly, it's even more difficult, which negatively

7   impacts the ability to provide adequate psychiatric care.

8   Q   What is your opinion about how chronically inadequate

9   mental health care staff impacts the overall delivery of

09:40:30   10   mental health care?

11   A   Can you say that again, please.

12   Q   Sure.  So if there's chronic vacancies in the mental

13   health staff as seen in the tables in your report, does that

14   impact or create other systemic deficiencies?

09:40:52   15   A   Well, if you don't have enough staff, that means you're

16   not able to see the patients at the required frequency based

17   on their clinical needs.  And if you don't have enough staff,

18   it leads to staff burnout and increased staff turnover, which

19   then leads to more problems in trying to establish a

09:41:13   20   therapeutic relationship with patients.  So it all -- it --

21   it's an additive situation.

22   Q   I would like to speak with you more about an issue that

23   you discuss in your report and you just referenced it with

24   Phoenix.

09:41:39   25           What were your observations about patients' access to

DIRECT EXAMINATION - PABLO STEWART

09:41:43  1  inpatient mental health care or residential mental health care

2  programs?

3  A    What -- what I -- what I took away from my tours this time

4  was that I didn't understand the method of getting people to

09:42:09  5  the hospital.  Because I saw many individuals at the various

6  prisons outside of Phoenix that, in my opinion, required

7  inpatient level of care.  And then going to Phoenix, noting

8  that they had a very large vacancy rate, I didn't understand

9  how those two things could exist simultaneously.  My

09:42:37  10  assessment was that it was based on inadequate number of staff

11  at Phoenix.

12  Q    Okay.

13        MS. KENDRICK:  Charles, can we pull up page 22 of

14  Dr. Stewart's report.

09:42:49  15  BY MS. KENDRICK:

16  Q    You referenced the vacancy rate among the patients,

17  Dr. Stewart.  I'm going to show you the chart from your

18  report.

19        So at the top of the page there's a list of some of

09:43:14  20  the units at Florence and the vacancy rate.  And it's listed

21  as from the Corrections Department website daily count and

22  then it says 9/23/2021 count sheet.

23        And I believe you said earlier you went to Phoenix on

24  September 23rd?

09:43:34  25  A    Correct.

DIRECT EXAMINATION - PABLO STEWART

09:43:35  1    Q    Okay.  Do these numbers appear to comport with what your

2    observations were?

3    A    Yes, very much so.

4    Q    Okay.

09:43:48  5         The population report shows that there were zero

6    people at the Flamenco suicide watch.  Did you observe

7    patients there?

8    A    You know, I observed people on suicide watch at Phoenix.

9    I can't recall right now whether I saw any on the Phoenix

09:44:14  10   suicide watch ward.

11   Q    Okay.  I believe it's blacked out, but footnote 20 in the

12   unredacted report, you list individuals you saw.

13   A    Oh.  Excuse me.  Yes.

14   Q    Okay.  And what did you observe with those people at the

09:44:42  15   suicide watch at Phoenix's inpatient hospital?

16   A    Oh boy.  It was like a parade of severe psychopathology

17   and people that had performed real serious acts of self-harm

18   and that were at risk for suicide.

19   Q    And I believe you stated that you interviewed and

09:45:13  20   encountered patients not at Phoenix who were, in your

21   professional opinion, in need of in patient care.

22   A    Yes.  Yes, definitely.

23   Q    Okay.  Can you tell us about any of those patients.

24   Without saying their names, sir.

09:45:35  25   A    There were two that stick out in my mind because of how I

DIRECT EXAMINATION – PABLO STEWART

09:45:41  1  felt they were at such risk of killing themselves.  One

2  individual had been on the Kasson watch unit, and while there

3  he had opened up his left arm with a sharp object.  They

4  described it as a several-inch, one-inch deep laceration.  He

09:46:09  5  swallowed, the report said, three razor blades.  He had gotten

6  these forks that they use to feed the patients and inserted

7  them in previously self-inflicted injuries, abdomen, which

8  resulted in his needing to go to an outside hospital.

9         And when I saw him at Eyman, his clinical situation

09:46:36  10  wasn't a lot better than it was described before he had the

11  self-injurious behaviors, and I felt that he was a significant

12  risk for self-harm.  In fact, so that I had asked the cells to

13  contact the administration there at ADC to see if we can get

14  this guy moved to the hospital.

09:47:04  15  Q   Okay.  So another area you discuss in your report has to

16  do with the length of encounters between mental health staff

17  and patients.

18         Are you familiar with the Court's order regarding a

19  minimum of ten minutes for an encounter with persons on

09:47:24  20  suicide watch and a minimum of 30 minutes for other mental

21  health encounters?

22  A   Yes, I'm familiar with the Court's order regarding those

23  time frames.

24  Q   Okay.  And why does there need to be a minimum time frame

09:47:40  25  for these sorts of encounters?

DIRECT EXAMINATION – PABLO STEWART

09:47:44  1   A   Well, in one sense it's unfortunate the Court had to

2   impose these time limits because a reasonable clinician would

3   not need limits, they would spend the appropriate amount of

4   time, which would certainly, in my opinion, exceed ten minutes

09:48:03  5   and possibly exceed 30 minutes, especially on someone who is

6   on a suicide watch cell.  They need to establish some sort of

7   therapeutic bonding with this person for them to actually tell

8   you what's going on with them, and I can't see how that's able

9   to be done in periods of time less than ten minutes.  So,

09:48:32 10   again, I think the ten minutes is a bare bones minimum, in my

11   opinion, when you're evaluating people on watch.

12   Q   What is the policy for the Illinois Department of

13   Corrections for people on watch?

14   A   Well, it was a negotiated agreement between parties that

09:48:56 15   said the watch, the daily watch checks, were to be 15 to 20

16   minutes in length.  That would give a time for the clinician

17   to make their assessment and then provide some type of

18   treatment to the individual in this one session.

19   Q   And, Dr. Stewart, what should a clinician or a provider do

09:49:26 20   if the patient is asking to terminate the encounter after 30

21   seconds or 45 seconds?

22   A   Oh, in my opinion, if the patient requests to terminate

23   the visit, that doesn't alleviate the responsibility from the

24   clinician to do an assessment.  There are a variety of ways

09:49:48 25   that a clinician can assess the mental health status of an

DIRECT EXAMINATION – PABLO STEWART

09:49:54   1   individual even without their cooperation.

2          You can look at their personal hygiene.  You would

3   observe the cell.  You would look for any signs of

4   self-injurious behavior, any scratchings or cuttings,

09:50:09   5   et cetera.  You would ask custody staff who had been observing

6   these individuals if they noted any untoward behavior.  That

7   would be able to at least get you a certain degree of

8   understanding what's happening with an individual.

9   Q    And, Dr. Stewart, in your review of patients who died by

09:50:30  10   suicide, did you find patients where they experienced very

11   short mental health encounters prior to their death?

12   A    Yes.

13   Q    I believe you referenced earlier about max custody units

14   and taking people out for confidential mental health

09:50:50  15   encounters and I'd like to ask you a little bit more about

16   that.

17          Why is it important to have a confidential mental

18   health encounter between a patient and therapeutic clinician

19   or a psychiatric provider?

09:51:08  20   A    You know, I appreciate the question, but let's just think

21   about the standard of care that any of us who receive care in

22   the community would expect.  It to be confidential between

23   yourself and the provider that you're meeting with.  There's

24   no difference in a correctional setting when it comes to

09:51:29  25   confidentiality.

DIRECT EXAMINATION – PABLO STEWART

09:51:32  1          How can we really expect mentally ill individuals to

2   be able to express to us what's actually going on with them

3   when, in our speaking to them through their cell doors, that

4   we have to speak very loudly and we're asking them to shout

09:51:52  5   loudly through the crack in the door.  We can't even see the

6   individual when they're giving us a response.  How can that be

7   considered an effective way to communicate with a patient?

8          How are you going to establish therapeutic

9   relationship?  How are you going to actually do an adequate

09:52:11 10  assessment when you're shouting through a person –– to a

11  person through a crack in a cell door and they're giving you

12  their response that are in earshot of the cells adjacent to

13  them and at the earshot of custody staff.

14          So it is so important to be able to pull these

09:52:34 15  individuals out of their cells and have confidential

16  interviews with them.

17  Q   Is part of a mental health encounter also doing the visual

18  observations of a patient?

19  A   Well, yes.  That's what I was saying earlier.  You can't

09:52:47 20  even see people at the cell front because you're trying to

21  talk to them through a crack in a cell door.  So, yes, we need

22  to observe them for evidence of self-harm, self-injurious

23  behavior, but also for any number of medication-induced side

24  effects.

09:53:05 25          So it's –– it's really important to be able to view

DIRECT EXAMINATION – PABLO STEWART

09:53:10  1   the entire person.

2   Q    Okay.  And did you speak to people who told you that they

3   refused offers of out-of-cell confidential encounters?

4   A    Yes.

09:53:25  5   Q    What reasons did they tell you as to why they refused?

6   A    I think the most consistent answer was these people were

7   very psychotic and paranoid and they were afraid that if they

8   were to be taken out of their cells, that they would be at

9   risk of being attacked by others.  And I understand there's a

09:53:58 10   certain amount of reality to that in prisons, but these people

11   exceeded that.  It was based on their own improperly treated

12   mental illness.

13   Q    And did you see in the max custody units the cages that

14   were used for confidential encounters?

09:54:20 15   A    Oh, yes.

16   Q    And could you describe it briefly, describe what they look

17   like briefly.

18   A    Well, those of us who remember telephone booths, they were

19   about telephone booth size enclosures that would have that

09:54:38 20   heavy mesh with like a chuck hole on the side.  And so, you

21   know, it was pretty extreme.  Pretty extreme setting in order

22   to have some sort of visit.

23   Q    How would being in one of those cages the size of a phone

24   booth impact an encounter with a mental health staff even if

09:55:08 25   it is confidential?

DIRECT EXAMINATION - PABLO STEWART

09:55:15  1   A   That type of setting really doesn't allow for really great

2   patient relationships or establishing a therapeutic

3   relationship.

4   Q   All right.  If we can go to paragraph 76 and 77 of your

09:55:33  5   report.

6           And this is your discussion of the health and welfare

7   checks that are conducted on all people housed in isolation.

8   And you discussed it at length.  And your opinion is that

9   these are inadequate visits.  Why is that?

09:56:11  10  A   Well, again, they're done at cell front.  And based on

11  some of the charting that I reviewed, you know, the person

12  would chart "patient gave me a thumbs-up," or "just waved me

13  away."  That's not -- the patient giving you a thumbs-up is

14  not an adequate evaluation for how they're doing in these

09:56:37  15  isolated housing units.

16          Also, they're performed by -- I believe they're

17  called behavioral health technicians, which my understanding

18  is that they have no formal mental health training.  And so

19  we're asking untrained individuals to go by a cell and to do a

09:57:10  20  brief evaluation of someone for their -- to check on their

21  well-being within an isolated housing unit.  And I think it's

22  a formula for disaster.

23  Q   In your experience with multiple prison systems, are

24  people who are housed in isolation at higher risks of suicide

09:57:35  25  and self-harm regardless of any mental health diagnosis?

DIRECT EXAMINATION – PABLO STEWART

09:57:41  1    A    Yes.   A significant proportion of suicides occur in

2    isolated housing units or segregated housing units, yes.

3    Q    So your opinion appears to be that this is the only -- I

4    believe you say, this is in paragraph 76, that this is the

09:57:59  5    only way to determine if they're showing those signs and

6    symptoms?

7    A    Yeah, because these are the rounds, so-called rounds that

8    are happening to do welfare checks for people in isolated

9    housing units, and they're done by unqualified individuals

09:58:17  10   through a cell door.

11   Q    Okay.

12        You made a reference to thumbs-up and thumbs-down.

13   And I'd like to shift gears and talk about the section of your

14   report where you discuss language interpretation.

09:58:41  15   A    Yes.

16   Q    And you also reference, I believe, that your concern that

17   communicating with deaf persons with a thumbs-up and

18   thumbs-down is inadequate.   Is that for the same reason?

19   A    Well, if a person -- yes, it is for the same reason.

09:59:10  20   Q    So taking a step back, why is it important to communicate

21   with a patient in the language in which they are most

22   comfortable?

23   A    Well, it's not just that the language they're most

24   comfortable, it may be their only language.   Really, think

09:59:30  25   about it.   How can we expect to have any type of reasonable

DIRECT EXAMINATION – PABLO STEWART

09:59:34  1   interaction with a patient if they don't understand what we're

2   saying and we don't understand what they're saying.  I mean,

3   it's -- I mean, it's beyond commonsensical that we need to

4   speak the same language.

09:59:49  5   Q   Okay.  And in your experience as a clinical psychiatrist,

6   who determines whether an interpreter is needed, the patient

7   or the provider?

8   A   That's a good question.  It's a combination.  Because in

9   my clinical work here in Hawaii, we have a lot of Pacific

10:00:16  10  Islanders and a lot of people whose primary language are Asian

11  languages.  And we have a patient interaction in a

12  confidential setting and we would try to work with the patient

13  to see if, in fact, the patient understood us and we felt

14  comfortable in understanding the patient.

10:00:36  15        So it's the interaction between the patient and the

16  clinician that would determine the need for an interpreter

17  service.

18  Q   All right.  And you also discuss the use of custody staff

19  for other incarcerated people as interpreters in mental health

10:00:54  20  encounters and you -- your opinion is that that is not

21  appropriate.  Why is it not appropriate?

22  A   This is an issue that's been going on throughout my entire

23  career where they pull a janitor off the floor to interpret a

24  woman who's getting a pap smear or something.  So it goes way

10:01:16  25  back, in my experience.

DIRECT EXAMINATION – PABLO STEWART

10:01:18  1      And so one is just because you're in a prison setting

2  doesn't mean that you give up your right to confidential

3  interaction with your health professional, be it mental health

4  professional or medical health professional.  So to bring in a

10:01:37  5  custody officer to interpret is absolutely wrong because it

6  violates any sort of assurances of confidentiality.  And then

7  it also inhibits the ability of the person to really speak

8  openly and honestly, which is the basis of a good mental

9  health evaluation.

10:01:59  10      You know, if you're there and a custody officer that

11  is the one interpreting your thoughts about whether you want

12  to harm yourself or you're hearing voices or all this, it

13  absolutely is an impediment to free and open communication.

14      Those are just two things I can think of off the top

10:02:22  15  of my head.

16  Q   And what about with using the other prisoners as

17  interpreters?

18  A   Well, the same for other prisoners.  You don't give up

19  your right to confidentiality because you're monolingual

10:02:41  20  Spanish speaking.  You expect to have a professional

21  interpreter service to help the clinician understand what's

22  going on.  And you don't want your information being shared to

23  other prisoners.

24  Q   You stated earlier that one of the groups that you

10:02:59  25  affirmatively sought out on the tour in September were

DIRECT EXAMINATION - PABLO STEWART

10:03:03  1    monolingual Spanish speakers.  Is that something you normally

2    do on prison tours?

3    A    Based on my previous experience in Arizona Department of

4    Corrections, it is a standard of my monitoring here -- not

10:03:20  5    monitoring, my visiting the prisoners in Arizona given the

6    large number of Spanish-speaking -- of monolingual

7    Spanish-speaking patients.

8    Q    And you're fluent in Spanish, Dr. Stewart?

9    A    Yes.

10:03:37  10   Q    And you interviewed monolingual Spanish speakers on your

11   last tours in September?

12   A    I did.

13   Q    Generally speaking, what did they report to you about

14   their experiences with having interpretation or not with

10:03:55  15   mental health staff?

16   A    In speaking with several monolingual Spanish patients,

17   they said that there wasn't availability of interpretive

18   services.  So it was this sort of going back and forth with

19   almost pidgin English and pidgin Spanish to try to communicate

10:04:25  20   with a patient.  And the patients themselves told me they

21   never felt the clinician absolutely understood what was going

22   on with them.

23   Q    But they -- did they tell you that sometimes they did have

24   an interpreter and at other times they didn't?

10:04:42  25   A    My memory is that they didn't have interpreters.  Or if

DIRECT EXAMINATION - PABLO STEWART

10:04:46 1   they did, it was going to be, like we said earlier, a custody

2   officer or a fellow patient.

3   Q   And this is just what they reported to you; correct?

4   A   Correct.

10:04:55 5   Q   Okay.  You did not review their medical records, did you?

6   A   Not in the monolingual Spanish-speaking patient.

7   Q   Okay.  And I also want to talk a little bit more about the

8   deaf population.

9        And I believe at paragraph 100 of your report you

10:05:30 10  describe why deaf people are particularly vulnerable in -- a

11  population in prisons.

12        Would you explain your context for that, for knowing

13  that in your work.

14  A   Well, the deaf individual that's housed in prison is

10:05:56 15  basically in solitary confinement because they don't have the

16  ability to have regular interactions with other individuals,

17  even in non-isolation units.  And it's very clear that this

18  sort of level of confinement negatively affects their -- both

19  their preexisting mental illness and also contributes to

10:06:19 20  development of new mental illnesses.  So it really is a bad

21  situation for these deaf individuals.

22  Q   Okay.  And in your experience either observing or

23  personally providing mental health treatment to deaf people,

24  are written notes sufficient to communicate --

10:06:42 25  A   No.  In my experience, written notes are not sufficient.

DIRECT EXAMINATION - PABLO STEWART

10:06:47   1   What -- what we utilize in my clinical work here is we have a

2   service that comes in and we have like a computer mounted on a

3   tripod and we bring to the patient.  The patient then does

4   sign language with a sign language interpreter that they can

10:07:08   5   see, and then the sign language interpreter tells us what the

6   patient is saying in real time.  That's not the standard of

7   practice for dealing with a deaf patient.

8   Q    Okay.  Up on the screen in paragraph 101 is a written note

9   that you featured that was the exchange between a psych

10:07:30  10   associate and a deaf patient when he was put on suicide watch

11   after he learned that his brother had died.

12          And, in your opinion, is this an adequate mental

13   health encounter?

14   A    It is not.

10:07:49  15   Q    Is it an adequate mental health encounter for taking

16   somebody off of suicide watch?

17   A    It's not an adequate anything.  It's certainly not an

18   adequate mental health interaction.

19   Q    Why not?

10:08:00  20   A    Well, I mean, grief is like a fart, if you force it, it

21   would just -- it just might be shit.  What kind of -- what

22   kind of mental health communication is that?  You know.  And

23   the person even misspelled "grief."  So if this is being

24   presented as an adequate mental health interaction, I have

10:08:30  25   nothing else to say about it because it certainly is not.

DIRECT EXAMINATION - PABLO STEWART

Q   Thank you.

Dr. Stewart, you've already referenced in your testimony and you describe in your report observing numerous patients that appeared to be profoundly symptomatic for a long period of time, and in your report you referred to a kindling effect.  Could you explain the kindling effect to the Court.

A   The kindling effect is a well established neurobiological occurrence that basically says the more a patient is mentally ill, the more time a person is acutely psychotic or very depressed or manic, that their prognosis becomes worse over time.

And the neurobiological explanation is that imagine there's a foci of cells that are functioning and are misfiring and that's leading to symptomatic behavior, like mania, depression, or psychosis.  And the more this goes untreated, it starts influencing the cells around it to where your foci is going to grow and grow and grow over time.

So an example of this is if you have one bout of major depressive disorder, you have over a 50 percent chance of having a second.  And if you have two bouts of major depressive disorder, you have a 70 percent chance of having a third.  That's an example in mental health.

And, also, it's the same thing as seizure disorders; you don't just let people seize because then it makes their seizure disorder worse.  So you just don't leave people

DIRECT EXAMINATION - PABLO STEWART

10:10:25  1  psychotic and lock them in a cell and let them be psychotic,

2  because it's making their underlying condition worse.

3  Q    And did you observe patients that met that description

4  that you describe of the kindling effect?

10:10:43  5  A    Well, you know, I certainly didn't see the kindling effect

6  per se because that's a neurobiological that's occurring on a

7  cellular level.  But what I did observe is numerous patients

8  that were severely symptomatic, either depressed, manic, or

9  psychotic.  And based on their chart reviews, they had been

10:11:11  10  symptomatic for months or even years.  In my opinion, those

11  patients' prognosis was getting worse because they were not

12  properly treated.

13  Q    And your report references numerous patients you observed

14  or whose records you reviewed that showed this pattern.  Could

10:11:34  15  you describe one for the Court.

16  A    Boy.  Well, one in particular that sticks out because

17  it -- the interaction occurred at the Phoenix complex in this

18  place that's referred to as a hospital.

19       An acutely manic and psychotic individual was in his

10:12:05  20  cell and even the custody guards made -- rolled over this big

21  spit screen because the person had been spitting and

22  assaulting and throwing things at officers.  And he was

23  significantly ill.  Jumping around his cell naked, agitated.

24  That's an example of allowing someone to be so mentally ill

10:12:32  25  and symptomatic that it would result in his having a worse

DIRECT EXAMINATION – PABLO STEWART

10:12:37  1   prognosis.

2   Q    And another component of clinical care that you discussed

3   in your report has to do with what you describe as

4   de-diagnosing.

10:12:53  5        Could you explain what is de-diagnosing and why is it

6   concerning.

7   A    Well, this is a situation that I encounter in pretty much

8   all of my correctional work.  De-diagnosing means that a

9   person who had previously been diagnosed, let's say with a

10:13:15  10  serious psychotic disorder like schizoaffective disorder

11  bipolar type, a very serious condition, who had previously

12  been treated with multiple psychotropic medications for this

13  diagnosis.  Over the course of months or years, the diagnosis

14  becomes a personality disorder.  It becomes borderline

10:13:39  15  personality.  So that's what I mean by de-diagnosis.

16       And there's so many things wrong with it because

17  treatment is based on a diagnosis.  So if this person had

18  previously been a schizoaffective disorder patient and now is

19  called bipolar -- not bipolar, excuse me, borderline, but yet

10:14:04  20  they're still receiving medications for the schizoaffective

21  disorder, then that means the treatment was incorrect based on

22  borderline personality diagnosis.  The diagnosis was frankly

23  wrong.

24       And so I encountered this a lot because if you can

10:14:24  25  sort of get people off, let's call it, from a serious

DIRECT EXAMINATION – PABLO STEWART

10:14:29  1   psychiatric diagnosis to a personality disorder, then that

2   somehow can justify their moving to a lower level of care.

3   Which is absolutely incorrect.

4   Q    And is a serious psychiatric disorder such as

10:14:43  5   schizoaffective disorder with bipolar tendencies curable?

6   A    It's treatable.  It's a chronic condition that is

7   treatable by the proper use of psychotropic medications.

8   Q    So it's not that you can be cured and it can be taken off

9   of your problem list?

10:15:05  10  A    No.  Chronic psychotic conditions like schizophrenia or

11  schizoaffective disorder are chronic conditions that,

12  unfortunately, if you develop them, then you have it with you

13  your entire life.  You're never cured of this condition.

14  Q    And, Dr. Stewart, you also discuss the formulary that

10:15:34  15  Centurion is using and some common well-used drugs that are

16  not on the formulary.  And could you just speak a little bit

17  about why those drugs may or may not be on the formulary.

18  A    Well, there's several things wrong with the formulary.

19  First, like your question, were there medications that should

10:16:01  20  be on the formulary that aren't?  And, yes, I encountered

21  several of those.

22       And, you know, I could only speculate why they're not

23  on the formulary.  But they're commonly used medications that

24  are very effective in certain clinical situations.

10:16:17  25       And the example that I would give is the

DIRECT EXAMINATION - PABLO STEWART

10:16:21   1   antipsychotic Clozaril.  Clozaril is a very effective

2   antipsychotic that's used when patients have failed other

3   trials of antipsychotic.  And that's not in the formulary.

4            Other problems I encountered with formulary were that

10:16:39   5   certain medications, like a very well proven effective

6   antidepressant medication called Wellbutrin or a mood

7   stabilizer like Trileptal were on the formulary, but yet in

8   interviewing patients and reviewing charts, they were refused

9   this medication because they said that they don't -- that the

10:17:04  10   Department doesn't prescribe Wellbutrin or doesn't give

11   Trileptal.  Where in other patients I saw they were getting

12   this medication.  So there's no rhyme or reason to that.

13   Q   And one reason that the Department gives and Centurion

14   gives for not including certain medications on the formulary

10:17:26  15   is that they could be potentially abused.

16            Is that a concern that changes your opinion?

17   A   It doesn't change my opinion.  And let's be real frank.

18   All psychotropic medications are possibly abusable

19   medications, some more than others.  But if you have an

10:17:49  20   adequate medication distribution system that can ensure that

21   the person gets the medication they're prescribed and takes

22   it, rather than somehow, the term is cheeking it, where they

23   pretend to swallow it and they don't actually do it, it's

24   indicative of they're having a poor medication distribution

10:18:13  25   system, and patients are left to suffer for that.

DIRECT EXAMINATION - PABLO STEWART

10:18:16  1        In fact, that one patient I described earlier about

2    running around his cell at the Phoenix facility naked and

3    agitated actually passed me out some pills that he had been

4    given that he cheeked.  And I immediately turned them over to

10:18:33  5    the warden of the facility.  Which showed me that their

6    medication distribution system is significantly flawed.  Which

7    is unfortunate because it then results in denying appropriate

8    medication to clinically -- for people that are seriously ill

9    and that need that particular medication.

10:18:58  10   Q   All right.  Thank you.

11        MS. KENDRICK:  Charles, could we pull up Exhibit

12   2074.

13   BY MS. KENDRICK:

14   Q   So this is -- this is a document that was discussed in

10:19:19  15   your declaration.  And in the bottom it's an e-mail, internal

16   e-mail to ADC and Centurion.

17        And in the bottom half, if we could zoom in where --

18   yeah -- It describes multiple canceled nurses lines at Tucson

19   but then it says repeatedly, "Med pass didn't begin until

10:19:49  20   10:30.

21        "Med pass did not begin until 10:30.

22        "Med pass delayed.  Insulin not given until after

23   11."

24        And you reference this in your report as part of your

10:20:04  25   concern about delayed delivery of medication.

DIRECT EXAMINATION - PABLO STEWART

10:20:05  1       And why do psychotropic meds need to be delivered at

2   particular times of the day?

3   A   There's a lot of reasons for that.  I think the most

4   important one is that medications are prescribed by

10:20:28  5   half-lives.  So if you take a medication twice a day, that

6   means that its half-life is 12 hours.  If you can take a

7   medication just once a day, that means it's half-life is 24

8   hours.

9       So it's important to properly spread out a medication

10:20:45  10   that needs to be given two times a day to give you about 12

11   hours between it.  Otherwise the person can be subjected to

12   worse side effects.  Or, in fact, if it's only, say, the time

13   difference between the first and second dose is only six

14   hours, then that means it's going to be 18 hours before they

10:21:06  15   get the next dose, and then the level would drop significantly

16   low and not be effective for them.

17       So that's basically the reason you spread out a

18   twice-a-day medication over a 12-hour period.

19   Q   Okay.

10:21:23  20       MS. KENDRICK:  We'd like to move to admit

21   Exhibit 2074.

22       MS. HESMAN:  Objection.  Foundation, hearsay.  This

23   isn't an e-mail to Dr. Stewart and he hasn't laid the

24   foundation that it was sent to him, it was sent by him.

10:21:41  25       THE COURT:  Is that the only -- just the foundation.

DIRECT EXAMINATION - PABLO STEWART

10:21:44  1          MS. HESMAN:  And hearsay.

2          THE COURT:  What is this being offered for?

3          MS. KENDRICK:  It's being offered to show him that

4    the med pass was happening at 10:30 and to get his opinion

10:21:55  5    about it.  And the e-mail is written by defendants' agent.  As

6    you can see at the top, it was written by somebody named

7    Marlena Bedoya, who has an azadc.gov.

8          THE COURT:  At the very top it looks like Palmer on

9    behalf of -- what do I see here.

10:22:29 10          Who is it from?  Do we know who that is?

11          MS. KENDRICK:  Based on testimony of somebody who

12    reviewed this, that was somebody who worked for Centurion at

13    the Tucson facility.

14          THE COURT:  Is that clear?  Is that correct?

10:22:44 15          MS. HESMAN:  I don't know if that's correct,

16    Your Honor, and I don't know who this individual is and I

17    don't think that --

18          THE COURT:  Let's make sure -- I can understand your

19    position that this would be -- this would constitute an

10:22:57 20    admission, which you've often said, but let's get the

21    foundation, then, before it's admitted.  You already had the

22    witness talk about it, so.

23          MS. KENDRICK:  Okay.  If we can close that part.

24          So what I was asking about was the original e-mail

10:23:14 25    that started from an Arizona Department of Corrections

DIRECT EXAMINATION – PABLO STEWART

10:23:19    1    employee.  That was the part we were focusing on.

2         THE COURT:  From Marlena Bedoya, and that is an

3    Arizona Department of Corrections employee?

4         MS. KENDRICK:  It appears to be an e-mail address,

10:23:35    5    and I think on the second page of the document we may have her

6    signature line.

7         THE COURT:  Is that correct?

8         MS. HESMAN:  Your Honor, the name sounds familiar.  I

9    don't know who she is.  I don't think that every single

10:23:46   10    employee of the Department binds the department under party

11    admission.  And I also --

12         THE COURT:  Okay.  All of that is really important.

13    Every document has to be admissible.  You have raised a number

14    of questions about hearsay.

10:24:03   15         And it is your obligation to establish it.

16         MS. KENDRICK:  Yes, ma'am.  Well, first of all, this

17    was produced by defendants.  Marlena Bedoya is listed on her

18    signature line as the medical compliance monitor at ADCRR at

19    Arizona State Prison --

10:24:20   20         THE COURT:  That should be enough.  Do you still have

21    a problem with it?

22         MS. HESMAN:  I do, Your Honor.  Most importantly, I

23    don't think that the proper foundation has been laid with this

24    particular witness.  This witness didn't send the e-mail, this

10:24:32   25    witness did not receive the e-mail.

DIRECT EXAMINATION - PABLO STEWART

10:24:33  1          THE COURT:  Well, the witness doesn't have to send it

2     or receive it if the document itself is admissible.  That's

3     the question we're dealing with.  Is it hearsay?  Is it not?

4     We already know who this individual is now.

10:24:46  5          Now, if you're going to tell me that she does not

6     have the right under any circumstances to speak or make

7     statements on behalf of DOC, then there is a problem.

8          MS. HESMAN:  That's my second objection, Your Honor.

9          THE COURT:  Are you sure of that?

10:25:01  10         MS. HESMAN:  I don't think they can any time an

11    e-mail is --

12         THE COURT:  Think.  Do you know?  If you're making

13    that objection, and it could well be a good objection, but

14    don't just speculate.

10:25:13  15         MS. HESMAN:  Understood, Your Honor.  I'm not

16    speculating.  But it shows here that she's a compliance

17    monitor.  I assume that that is accurate.  It is my position

18    that not every single compliance monitor --

19         THE COURT:  Do you know she's not?

10:25:26  20         MS. HESMAN:  Do I know that she's not?

21         THE COURT:  Yes, that she --

22         MS. HESMAN:  No.

23         THE COURT:  -- cannot speak on behalf of -- do you

24    have somebody from DOC that can say under no circumstances --

10:25:36  25         MS. HESMAN:  No, I do not have that here today.

DIRECT EXAMINATION – PABLO STEWART

10:25:40   1          MS. KENDRICK:  This is paradigmatic example of an

2     exhibit that is not hearsay under Rule 801(d)(2)(D), which

3     clearly says it's a statement offered against an opposing

4     party, it was produced by the opposing party, and it's a

10:25:51   5     statement made by a party or an agent of the defendant on a

6     matter within the scope before the Court.

7          THE COURT:  And this is an agent who can speak –– my

8     only question, and it has to be –– there has to be a

9     legitimate basis to say that she cannot speak on behalf of

10:26:12  10     DOC.  And why did you turn over the records if, in fact, she

11     cannot speak on behalf of DOC, she's not an agent?

12          MS. HESMAN:  Your Honor, we were ––

13          THE COURT:  We're going to take a break, okay, and if

14     there are any other records like this, the two of you need to

10:26:26  15     work it out.

16          We're in recess for 20 minutes.

17          MS. KENDRICK:  20-minute recess, Dr. Stewart.

18          THE WITNESS:  Thank you.

19          (Recess taken from 10:27 to 10:43.)

10:45:08  20          THE COURT:  All right.  Let's proceed.

21          MS. KENDRICK:  Your Honor, on the issue of the

22     admissibility of Exhibit 2074, it falls squarely into

23     Rule 801(2)(D) –– (d)(2)(D), which states it is not hearsay if

24     "the statement is offered against an opposing party and was

10:45:40  25     made by the party's agent or employee on a matter within the

DIRECT EXAMINATION – PABLO STEWART

10:45:45  1    scope of that relationship and while it existed."

2         THE COURT:  Okay.

3         MS. KENDRICK:  I believe Ms. Hesman's references to

4    authorization is 801(2)(d)(C) but we are offering it under

10:45:58  5    801(2) –– 801 –– 801(d)(2)(D).

6         THE COURT:  Okay.

7         Response.

8         MS. HESMAN:  Your Honor, the document's no longer on

9    the screen, but it has two layers of hearsay in it.  While

10:46:10  10   that may correct the first layer, she's reporting what she

11   heard from someone else, so it still suffers from the second

12   layer of hearsay.

13        THE COURT:  Which portion are you offering?

14        MS. KENDRICK:  The bottom of page 1 and the top of

10:46:23  15   page 2 where there is references to delayed medication passes.

16        THE COURT:  Okay.  Let's highlight that portion.

17        Is your position the same –– are there different

18   people that we're talking about here that work there?

19        MS. KENDRICK:  You're asking me ––

10:46:46  20   THE COURT:  You're looking at the document.

21        MS. KENDRICK:  Yes.

22        THE COURT:  So is it the same person from DOC?

23        MS. KENDRICK:  I believe ––

24        THE COURT:  For both of the statements.

10:46:55  25   MS. KENDRICK:  Yes, these are all in the same e-mail

DIRECT EXAMINATION – PABLO STEWART

10:46:57   1   sent by Ms. Bedoya.  And I think in the paragraph above the

           2   enlarged line that says 2/8/2021, she says something like,

           3   today –– today at the meeting ––

           4       If we could zoom out so I can read the entire

10:47:18   5   document.

           6       THE COURT:  So it's from ––

           7       MS. KENDRICK:  She states –– she opens her e-mail,

           8   "Today the following information was passed during our weekly

           9   meeting regarding canceled nurses line and other delays."

10:47:34  10       THE COURT:  That comes from Ms. Bedoya?

          11       MS. KENDRICK:  Right.

          12       THE COURT:  So everything beyond that is what you're

          13   offering?

          14       MS. KENDRICK:  Well, yes.

10:47:46  15       THE COURT:  So what's the problem?

          16       MS. HESMAN:  The problem, Your Honor, is that it

          17   says, "Today the following information was passed," so she's

          18   learned it from someone else.  And the second page says that

          19   "it was reported," so that's the second layer of hearsay.

10:47:58  20       THE COURT:  I'm not following that.  I don't see the

          21   language that you're talking about.

          22       MS. HESMAN:  The first language I'm referring to is

          23   in the middle of the page.  It says, "Today the following

          24   information was passed."  And then the second language I'm

10:48:11  25   referring to is on the second page that says, "it was

DIRECT EXAMINATION - PABLO STEWART

10:48:14   1    reported."  So those are other people that are reporting it to

2    her, and that level of hearsay has not been addressed.

3              THE COURT:  Response.

4              MS. KENDRICK:  Well, if this is a meeting being held

10:48:26   5    internally at a prison between Centurion and ADC employees,

6    again, 801(d)(2)(D) would apply because these are agents and

7    employees of the Department of Corrections speaking to one

8    another.

9              THE COURT:  Does it say -- in other words, it was

10:48:46  10    reported at that meeting, meaning it was reported by those who

11    were there at the meeting?  Is that what it means?

12              MS. HESMAN:  I do not think it's clear from the

13    document.

14              THE COURT:  Well, let me ask, is that what you

10:48:59  15    understand it to mean --

16              MS. KENDRICK:  Yes, ma'am.

17              THE COURT:  -- Ms. Kendrick?

18              MS. KENDRICK:  Yes.

19              THE COURT:  So let's see here.  "Today the following

10:49:07  20    information was passed during our weekly meeting."

21              Overruled.  It's admitted.

22              (Exhibit 2074 admitted.)

23              (The Court and the courtroom deputy confer.)

24              MS. KENDRICK:  Thank you, Charles.

25

DIRECT EXAMINATION – PABLO STEWART

10:49:34   1   BY MS. KENDRICK:

2   Q   Welcome back, Dr. Stewart.

3           I have some more questions for you about psychotropic

4   medications.  And to begin with could you describe some of the

10:49:51   5   most common side effects of psychotropic medications.

6           Wait, you're muted.

7   A   Okay.  Can you hear me now?

8   Q   Yes.

9   A   Okay.  Sorry about that.

10:50:11   10          There's many side effects to psychotropic

11   medications.  So if we're just talking about the

12   antipsychotics, there are two major categories which are

13   not -- I'll call them movement disorders and metabolic

14   disorders.

10:50:36   15   Q   And could you describe the movement disorders?

16   A   Movement disorders are such that the antipsychotic work on

17   the dopamine pathway, which is also involved in muscle

18   movement, so sometimes a patient can develop a tremor,

19   stiffness, it's called Drug-Induced Parkinsonism.  So you get

10:51:01   20   the same type of symptoms that you get with a person who has

21   Parkinsons disease.  Their gait would be affected.  Their arm

22   swing would be affected.  They would have what we call a pill

23   rolling tremor.  They would drool.  Falls generally into those

24   categories.

10:51:17   25          There's another type of symptom calls akathisia.

DIRECT EXAMINATION – PABLO STEWART

10:51:21  1    Akathisia is a subjective sense of needing to be in motion.

2    It's very difficult for patients to sit still while taking the

3    medication and also sleep.

4          And, finally, these involuntary movements, if left

10:51:39  5    untreated, can develop into a potentially chronic permanent

6    situation called tardive dyskinesia, which results in

7    movements of the mouth, tongue, neck, and extremities, where

8    they can't be controlled by the patient.

9          The metabolic side effects are such that -- the major

10:52:01  10   one is called metabolic syndrome, and that means patients on

11   psychotropic medications can develop high blood sugar; high

12   lipids, which are cholesterol; and results in severe weight

13   gain.  Also, it can -- the medications can affect one's

14   electrolyte balance, so you can lose sodium.  All of these are

10:52:27  15   very important for normal -- normal functioning.

16   Q   And what does a prescribing provider need to do to ensure

17   patients don't experience these side effects?

18   A   Well, first of all, they need to do premedication lab work

19   to establish a baseline to see what the person's cholesterol

10:52:52  20   is; what their blood lipids are; triglycerides, which is a

21   measure of fat in the system.  And then follow that patient.

22         You begin medications at a low dose and then advance

23   them as tolerated, while you are checking the metabolic

24   parameters.  And you are also doing checks on these

10:53:19  25   involuntary movement disorders that can happen.  We also -- we

DIRECT EXAMINATION - PABLO STEWART

10:53:23  1  often use test called AIMS, A-I-M-S, which is abnormal

2  involuntary movement scale.  It's an objective measure of a

3  person's involuntary movements while they're taking

4  psychotropic medication.  That needs to be administered

10:53:41  5  regularly.

6  Q   Can you describe some of the patients you observed on your

7  visits who were clearly manifesting these movement side

8  effects of psychotropic medications.

9  A   I remember seeing a female patient at Perryville who had

10:54:03  10  severe hand and arm tremors.

11          THE COURT:  Let me -- Doctor, I'm sorry, this is

12  Judge Silver.  Would you please, as best as you can, tell us

13  when you observed this.  Because you have been an expert for

14  some time.  Do you recall?

10:54:25  15          THE WITNESS:  Yes, I do, Your Honor.

16  BY MS. KENDRICK:

17  Q   Was this in September 2020, Dr. Stewart?

18  A   Yes.  At Perryville it was September 2020, and I believe

19  it was September 10th, a Friday, where, in interviewing the

10:54:50  20  patient, she told me that she had had a history of auditory

21  hallucinations for which they began long-acting injectable

22  antipsychotic medication.  And she stated that these hand

23  tremors had begun after the administration of the long-acting

24  injectable medication.

10:55:16  25  Q   And do you describe somebody with a -- who had to be

DIRECT EXAMINATION - PABLO STEWART

10:55:22  1    hospitalized with low sodium levels because of a side effect

2    of Haldol.  Could you explain how Haldol could cause low side

3    effects -- low sodium.

4    A    I'll try to keep it as simple as I can.

10:55:38  5         These medications can affect your body's hormone

6    release.  And in the case of this one patient with low sodium,

7    this side effect that she experienced resulted in increasing

8    her urine output, which then, by increasing the volume,

9    lowered her sodium.  And low sodium can result in seizures and

10:56:15  10   irreversible brain damage.  And that was felt to be secondary

11   to the antipsychotic she was treated with.

12   Q    Okay.

13        MS. KENDRICK:  Can we pull up Exhibit 412, please,

14   Charles.

10:56:34  15        Could we go to the first page, if possible.

16   BY MS. KENDRICK:

17   Q    So, Dr. Stewart, this is a mortality review.  I don't want

18   to say the name of the patient, who died in 2021, not by

19   suicide, whose records you reviewed.

10:56:58  20        MS. KENDRICK:  And if we can kind of zoom in at the

21   bottom.  Yeah.

22   BY MS. KENDRICK:

23   Q    The second -- I guess the third full paragraph, it

24   describes how the gentleman had been on lithium and lithium

10:57:20  25   levels had been reviewed.

DIRECT EXAMINATION – PABLO STEWART

10:57:21  1        Do you remember reviewing this mortality review?

2    A   Yes, I do.

3    Q   Okay.  And it says that he was seen by psychiatry,

4    restarted on lithium 600 mg but then ordered for follow-up

10:57:38  5    next month.

6        Should he have had his lithium levels checked more

7    sooner?

8    A   The lithium level should be -- upon initiation of lithium

9    treatment, the lithium level should be obtained at week two of

10:57:53  10   treatment.

11   Q   Okay.  And then if you go to the second-from-the-bottom

12   paragraph, it says that he was assessed at MVMC, Mountain View

13   Medical Center, and it says that labs showed acute renal

14   failure and a lithium level greater than 4.

10:58:18  15       What is a normal lithium level?

16   A   A normal lithium level is anywhere from 0.5 to 1.0.

17   Q   And what are the possible side effects of having a lithium

18   level that is between four to eight times higher than normal

19   range?

10:58:39  20   A   Yeah.  I really need to emphasize a lithium level greater

21   than 4 is a tremendously high lithium level.  It results in --

22   you feel like you have the flu, like a stomach flu,

23   gastrointestinal problems.  You get tremors.  And, most

24   importantly, as was shown in this individual, it resulted in

10:59:04  25   renal failure.  That high a dose of lithium shuts down your

DIRECT EXAMINATION – PABLO STEWART

10:59:09  1    kidneys.

2    Q    Okay.

3              MS. KENDRICK:  Can we go to page 3.

4              In the Discussion section.

10:59:22  5              The third paragraph says, "There were significant

6    lapses in lithium monitoring.  It is unclear why a level was

7    not performed in December 2020.  May have been due to the

8    patient being housed in isolation at that time."

9              And then I think if we go down to another section.

10:59:48 10              Under General Critique.  It notes that, "The

11   diagnosis was not timely, treatment was not timely, and the

12   reviewer concluded that this death was possibly avoidable."

13             And do you agree with the conclusion by the ADCRR

14   reviewer that this death was possibly avoidable?

11:00:13 15   A    Yes.

16   Q    All right.  Thank you.

17             I'd like to move to the portion of your report where

18   you're discussing acts of self-harm and suicide.

19             And I believe when we were speaking before the break

11:00:36 20   about the Phoenix facility, you made reference to the fact

21   that you were concerned about the people who had engaged in

22   acts of self-harm while in the Phoenix Inpatient Center; is

23   that correct?

24   A    That's correct.

11:00:54 25   Q    Okay.

DIRECT EXAMINATION - PABLO STEWART

11:01:01  1           And have you analyzed and looked at some of the CQI

2      minutes from the Phoenix facility?

3      A   I have.

4      Q   Okay.

11:01:11  5           MS. KENDRICK:  Could we put up Exhibit 821, please.

6           And if we could go to page 30 of the .pdf.  It's

7      Bates stamped 56571 on the corner.

8           THE COURT:  I'm sorry, this is Exhibit -- which one

9      is this --

11:01:41 10           MS. KENDRICK:  821.

11           THE COURT:  -- Ms. Kendrick?

12           821?

13           MS. KENDRICK:  Yes.  So the next page after this.

14           If we could scroll into the top box there.

11:02:00 15   BY MS. KENDRICK:

16      Q   And, Dr. Stewart, are you familiar with reviewing this ICS

17      response, which is an emergency response for a person who

18      engaged in self-harm while on continuous suicide watch?

19      A   Yes.

11:02:22 20      Q   Okay.

21           THE COURT:  I'm sorry, but what is the date of this?

22      What was the date?

23           MS. KENDRICK:  Let's -- on the first page --

24           THE COURT:  5/14/2020.

11:02:40 25           MS. KENDRICK:  2021.  Yes.

DIRECT EXAMINATION - PABLO STEWART

11:02:42   1          THE COURT:  Thank you.

2          MS. KENDRICK:  Phoenix CQI meeting minutes.

3          THE COURT:  Yes.  Okay.  Go ahead.  I'm sorry.

4          MS. KENDRICK:  Next page.

11:02:52   5   BY MS. KENDRICK:

6   Q   So this incident that is being described here in the

7   monthly meeting at the Phoenix prison was an emergency

8   response for a patient who was on continuous suicide watch.

9   He removed ten staples from his abdominal wound and then

11:03:18  10   swallowed the staples.  The nurse determined he needed

11   additional assessment.  He was transported for treatment.  The

12   RN notated wound dehiscence and risk for airway obstruction.

13   Doctor notified, and sent the person out to the hospital for

14   wound care.

11:03:42  15          What does wound dehiscence mean, Dr. Stewart?

16   A   That means a partially healed wound opens up again.

17   Q   Are you concerned a patient who is on continuous suicide

18   watch at an inpatient mental health facility was able to

19   remove and swallow ten staples from an injury that had been

11:04:09  20   repaired?

21   A   Very much so.  I mean, it's important to remember that

22   this guy was on constant suicide watch for self-injurious

23   behavior because he had opened -- he had done this wound.  He

24   had stabbed himself in the abdomen and then had it medically

11:04:32  25   treated, and then he was able to remove staples, swallow them,

DIRECT EXAMINATION - PABLO STEWART

11:04:35  1   and then have the wound open back up.

2   Q    And did you observe -- let me take that back.

3        Who actually does the watching when people are on

4   continuous watch?  Is it custody officers or mental health

11:04:52  5   staff?

6   A    I understand it's custody officers.

7   Q    And during your visits to various mental health watch

8   units in September 2021, did you see custody staff conducting

9   suicide observation on continuous watch?

11:05:15  10   A    I observed custody staff sitting at sort of makeshift work

11   stations in front of a particular cell, and they were doing

12   this continuous watch, yes.

13   Q    And, to your knowledge, are custody officers assigned to

14   work in mental health watch in the Arizona prison system given

11:05:42  15   additional training about how to deal with mentally ill

16   people?

17   A    I'm not aware if they are or not.

18   Q    All right.

19        MS. KENDRICK:  We'd like to move Exhibit 821 into

11:05:55  20   evidence.

21        MS. HESMAN:  No objection.

22        THE COURT:  It's admitted.

23        (Exhibit 821 admitted.)

24   BY MS. KENDRICK:

11:06:06  25   Q    Were there any other cases from when you visited the

DIRECT EXAMINATION – PABLO STEWART

11:06:09  1    Phoenix prison of people who had engaged in profound self-harm

2    despite being under pretty close observation?

3    A    Well, I believe it was the same individual that we're

4    talking about who took off his ten stitches -- ten staples and

11:06:26  5    swallowed them.  I was able to interview him in a confidential

6    setting and he had injured his abdomen to the extent he needed

7    an ostomy bag.  And he still felt the need, the urge, to harm

8    himself.  And he was looking to stick things into this

9    partially healed wound.

11:06:54 10         And during the course of my interview, due to the

11    severity of his injuries that he did while in Arizona

12    Department of Corrections, his ostomy bag came apart and it

13    was just a mess.

14    Q    While he was speaking with you?

11:07:12 15    A    While he was speaking with me.

16         THE COURT:  What is this bag, ostomy bag?

17    BY MS. KENDRICK:

18    Q    Can you explain that.

19    A    When a person has a really severe abdominal injury, which

11:07:28 20    in this case was self-inflicted, the surgeons will basically

21    seal off a part of the colon to allow for the part that's

22    injured to heal.  And so in order to allow feces and waste

23    materials to exit the body, they make up what is called an

24    ostomy, which is a hole in the skin with direct communication

11:07:51 25    with the large intestine, and attach literally a plastic bag

DIRECT EXAMINATION - PABLO STEWART

11:07:56  1    to it that collects feces.  And then that needs to be changed

2    and managed.  That's what an ostomy bag is.

3              THE COURT:  Thank you.

4    BY MS. KENDRICK:

11:08:17  5    Q    Dr. Stewart, I'd like to speak with you a little bit about

6    your discussion on the uses of force against the mentally ill.

7    And you discuss this at length in your report.

8              But as a threshold question, could you explain why

9    the use of chemical agents on prisoners with severe mental

11:08:37 10    illness is harmful or contraindicated.

11   A    It's hard to express exactly how -- how wrong that is.  I

12   can think of certain cases, however, where a person is in an

13   acute situation, say making a noose or something in their cell

14   and hanging, and the officer would have to spray them briefly

11:09:07 15   to prevent them from self-harm.

16             But in the videos that I reviewed and in the cases

17   that I looked at in the record, there was mentally ill inmates

18   not responding to commands by the officers, and rather than

19   being able to contact a mental health provider to come talk to

11:09:32 20   the individual before the chemical spray was used, the

21   chemical spray was used first.

22             And that -- so you have a psychotic person who is

23   experiencing any number of psychotic symptoms that's now being

24   sprayed with this very caustic irritant that will only go to

11:09:55 25   exacerbate their underlying mental illness.

DIRECT EXAMINATION - PABLO STEWART

11:09:58   1    Q   And are there policies or protocols that can be put in

2    place to avoid or limit the use of chemical agents on people

3    with mental illness?

4    A   Yes.  Like I said, it is standard practice in correctional

11:10:21   5    settings that I'm familiar with that prior to the use of a

6    chemical agent, only in the exception of extreme circumstances

7    if the person is actually in the act of self-harm.  But if a

8    patient is not complying to custody staff's orders, first

9    thing you do is call in a mental health person to try to

11:10:46   10   address the needs of the person because it's often due to

11   unproperly treated mental illness.  And I find if that is

12   done, then it can significantly decrease the use of chemical

13   agents.

14   Q   Okay.  And you referenced two videos of uses of force that

11:11:07   15   you discussed in your report of a gentleman from last

16   December.  Can you describe --

17   A   Yes.

18   Q   -- generally what you saw when you observed these videos.

19   A   Well, the patient was -- is extremely mentally ill.  He

11:11:26   20   was psychotic.  Meaning that he was -- his thoughts and

21   actions were not based in reality.  He had a delusion that he

22   needed to kill himself in order to save his daughter from

23   being raped by this unknown outside individual.  Surely a

24   psychotic delusion.

11:11:48   25            In the video, he's walking in his cell and smashing

DIRECT EXAMINATION - PABLO STEWART

11:11:52   1   his head into the plexiglass because he was responding to the

2   psychotic delusions.

3          The custody staff there gave him orders to stop

4   hitting his head, which he obviously didn't because he was

11:12:07   5   operating under the psychotic delusion.  And he was sprayed

6   with a chemical agent.  He was taken out of his cell, and

7   taken to medical to have his head wound addressed.

8          What I noticed there was he was not decontaminated

9   from the chemical spray.  His eyes weren't washed out.  He

11:12:29  10   wasn't showered down.  Rather, his head wound was addressed

11   and he was taken right back to his cell.

12   Q   And how about the second video that you observed?

13   A   The second video was -- it started off the same.  He's

14   responding to his psychotic delusions, banging his head

11:12:52  15   against the cell wall.  The chemical spray was used.  He's

16   escorted to medicine.  Once again he was not decontaminated.

17   And then he gets into a conversation with the custody officer

18   who escorted him out of the cell, and the custody officer was

19   telling him that, look, this is your choice to do this.  This

11:13:10  20   is your behavior.  He kept using the word "behavior" and

21   "choice."  And he said, "Next time you do this, I'm going to

22   tase you."  Which is totally inappropriate.

23          One, the custody officer had no business having a

24   psychiatric intervention on this individual.  He needed to be

11:13:33  25   seen by psychiatric provider, acutely administered

DIRECT EXAMINATION – PABLO STEWART

11:13:37   1   antipsychotic medications and have his whole medication

2   regimen reevaluated for the persistent auditory hallucinations

3   he was experiencing.

4            Instead, the custody officer threatened him to be

11:13:50   5   tased the next time he did this because he thought this

6   gentleman was choosing to do this and he could stop this

7   behavior if he wanted to.

8   Q   Okay.

9            MS. KENDRICK:  Charles, could you bring up page 76 of

11:14:01   10   Dr. Stewart's report.

11   BY MS. KENDRICK:

12   Q   Dr. Stewart, you referenced in the second video that he

13   was pepper sprayed again, but was it with a pepper ball.  Is

14   this an image of what you saw on the second video?

11:14:25   15   A   Oh, yes.  I'm sorry.  Yeah.  He was -- he had that weapon

16   used against him.

17   Q   Okay.  But on this one you also said that it took a long

18   time for them to decontaminate him?

19   A   Yes.

11:14:43   20   Q   So you see that the still from the video is at 59 seconds

21   in, underneath?

22   A   Yes.

23   Q   Okay.

24            MS. KENDRICK:  So if we can go to the next page.

25

DIRECT EXAMINATION – PABLO STEWART

11:14:59  1   BY MS. KENDRICK:

2   Q    So these are stills from the same video of when he got

3   decontaminated and a shower, and those were included because

4   the time markers were around 11:39 on the video.

11:15:17  5         So does that comport with your memory of the video?

6   A    Yes.  I'm sorry, I misspoke earlier about his being

7   sprayed.  It was a pepper ball gun used against him.  Yes.

8   Q    All right.  Thank you.

9         MS. KENDRICK:  Could we bring up Exhibit 2125,

11:15:41  10  please.

11   BY MS. KENDRICK:

12   Q    So, Dr. Stewart, this is an exhibit that you discuss in

13   your report.  It's an e-mail chain between Centurion and ADC

14   people from February of 2020 involving a patient at Phoenix

11:16:11  15  who was self-harming and banging his head.

16         Do you remember this document?

17   A    Yes.

18   Q    Okay.

19         MS. KENDRICK:  Can we go to the end, please, Charles.

11:16:22  20         Go up a little, sorry.  Just one more.

21   BY MS. KENDRICK:

22   Q    So the section that you discuss and that's in here is from

23   a person named Richard Watts, again with an AZADC e-mail

24   address, and on the next page it says that he works for the

11:16:51  25  Department at the Phoenix facility.

DIRECT EXAMINATION – PABLO STEWART

11:16:54  1    And he's writing to people about a mental health

2    patient who has been self-harming by banging his head for the

3    past several days resulting in ICS events and the use of OC

4    spray.

11:17:10  5    And the next paragraph says, "The regional director

6    of mental health basically said to continue using OC spray as

7    needed while the on-site mental health team comes up with a

8    treatment plan.

9    "We are told that Dr. Carr has been consulted by

11:17:25 10    phone but there is minimal documentation in the medical record

11    to support any significant involvement by a psychiatrist."

12    When you see these statements, what are your

13    responses and thoughts as to the adequacy of the response to

14    the self-harm, treatment team management with this patient?

11:17:56 15  A    Well, it's abundantly clear that the use of OC spray is

16    not an appropriate psychiatric intervention for an acutely

17    mentally ill individual.

18    This is a fairly common situation that I run into

19    clinically.  If a person is banging their head, it's usually

11:18:19 20    because of an underlying untreated or undertreated psychiatric

21    condition.

22    Well, first what we do in someone who's chronically

23    banging their head, we move them into a restraint bed in a

24    medical setting where they can be observed.  We'd have

11:18:42 25    medications acutely administered to address his underlying

DIRECT EXAMINATION – PABLO STEWART

11:18:46  1   psychotic condition, and then have his entire medication

2   regimen reevaluated.  And in addition to work with him with

3   psychology staff to come up with a better way for dealing with

4   his issues.  And none of that happened here.

11:19:04  5   Q   Okay.

6           MS. KENDRICK:  And I'd like to go to the last

7   paragraph on this page if we can enlarge it a little.

8   BY MS. KENDRICK:

9   Q   It states:

11:19:12  10          "We received a copy of an incident report

11              completed by security staff from last evening

12              indicating that the mental health RN was encouraging

13              the inmate to bang his head so that the restraint

14              chair could be used.  At the time of this

11:19:28  15              nurse/patient encounter the patient was not

16              participating in head banging, but began banging his

17              head after the nurse told him to do so, which

18              resulted in a use of force event.  This entire event

19              was captured on video."

11:19:45  20          I have a lot of questions for you about this,

21   Dr. Stewart.

22          As a threshold matter, could you explain what a

23   restraint chair is.

24   A   It's exactly that.  It's a chair type furniture thing that

11:20:01  25   has arm and leg restraints.

DIRECT EXAMINATION – PABLO STEWART

11:20:06  1    Q    And why is it used?

2    A    Well, it can be used to prevent someone from self-harming.

3    That's the usual way.  The usual indication why a restraint

4    chair or restraint bed is used.

11:20:21  5    Q    But is a restraint chair used when someone is not

6    self-harming?

7    A    No.  I mean, there's no reason to use it.

8    Q    And is it appropriate for a nurse to tell a patient to

9    start harming himself so that the restraint chair could be

11:20:41  10   used?

11   A    That is not a typical intervention for a person who is

12   acutely mentally ill.  You're not going to tell somebody in a

13   provocative fashion to start harming themselves so then we can

14   do something.  If the nurse was so concerned about this guy

11:21:04  15   banging his head, they could have put him in the restraint

16   chair without his actually banging his head and administered

17   medications.  So I don't -- this is -- this is really bad and

18   I don't understand what the thinking was behind this.

19   Q    And are nurses, registered nurses, normally, in your

11:21:26  20   experience, authorized to make the decision to put mentally

21   ill and potentially self-harming patients into restraints or

22   does it need to come from a higher level staff?

23   A    The nurse is authorized to put someone in restraints

24   emergently.  Self-harm is acting.  Then he or she needs to get

11:21:51  25   a medical order from a licensed psychiatrist and/or

DIRECT EXAMINATION – PABLO STEWART

11:21:55  1  psychologist to put someone in restraints.

2  Q   Okay.  Thank you.

3       MS. KENDRICK:  I'd like to move Exhibit 2125 into

4  evidence.

11:22:06  5       MS. HESMAN:  No objection.

6       THE COURT:  It's admitted.

7       (Exhibit 2125 admitted.)

8  BY MS. KENDRICK:

9  Q   And, Dr. Stewart, you spoke earlier about the higher rates

11:22:15 10  of suicide and self-harm among people who are in isolation.  I

11  believe -- what term do you use for it?

12  A   Well, segregated housing, restricted housing, isolated

13  housing.

14  Q   But what you're describing is people being locked up for

11:22:34 15  very long periods of time, whatever the label is?

16  A   Yes.

17  Q   Okay.  All right.

18       MS. KENDRICK:  Can we see Exhibit 354.

19       I think if we go to the end, please.

11:23:03 20  BY MS. KENDRICK:

21  Q   So this is a psych autopsy for a person who died in 2020.

22  He died by hanging.  And you reviewed this gentleman's psych

23  autopsy and discuss it in your report; correct?

24  A   I'm not sure.  I can't read the name off this.

11:23:40 25  Q   Okay.  We'll zoom in.  I don't want to say it out loud.

DIRECT EXAMINATION – PABLO STEWART

11:23:44  1   A   Okay.

2   Q   Can you see his name now?

3   A   Yes.

4   Q   And he was discussed in your Exhibit 3, I believe?

11:23:53  5   A   Yes, he was.

6   Q   So in this report:

7           "The psych autopsy which was done by Department

8        and Centurion staff, the recommendation is that

9        inmates who are placed in a detention or maximum

11:24:16 10        custody unit should be seen by the psychiatric

11        provider every three months at a minimum if they are

12        prescribed psychotropic medication to monitor their

13        adjustment to a higher level of confinement and to

14        adjust their medication accordingly."

11:24:29 15           Do you see that?

16   A   Yes.

17   Q   Okay.

18           And do you agree with the conclusion -- was your

19   conclusion in your review that this was a potentially

11:24:43 20   preventible death by suicide?

21   A   Yes.

22   Q   Okay.

23           MS. KENDRICK:  I believe this has already been moved

24   into evidence.

11:24:54 25           THE COURT:  Has it, Molly?

DIRECT EXAMINATION – PABLO STEWART

11:24:55  1      THE COURTROOM DEPUTY:  I'm sorry, what number is it?

2      MS. KENDRICK:  412.

3      THE COURTROOM DEPUTY:  Let me see.

4      MS. KENDRICK:  Oh, no, 354.  I'm sorry.  354.

11:25:13  5      THE COURTROOM DEPUTY:  This is 354?

6      MS. KENDRICK:  Yes.  Sorry.

7      THE COURTROOM DEPUTY:  Yes, it is.

8      MS. KENDRICK:  Okay.

9      I'd like to show you Exhibit 403.

11:25:26 10  BY MS. KENDRICK:

11  Q   And, Dr. Stewart, this is another mortality review of

12  somebody who died in 2021.  I don't know if you can see the

13  name.  We can scroll, but this was cited in your report.

14  A   Yes.

11:25:49 15  Q   You reviewed it?

16  A   Yes.

17  Q   Okay.

18      MS. KENDRICK:  So if we go to the third page.

19  BY MS. KENDRICK:

11:25:58 20  Q   And there's a discussion.  And these were the four

21  findings that were described as mental health concerns.

22      And in your opinion, did you agree with these four

23  concerns that are identified here?

24      "There was no suicide risk assessment conducted upon

11:26:34 25  placement or removal from watch.

DIRECT EXAMINATION - PABLO STEWART

11:26:36   1          "There was no crisis treatment plan developed within

        2     one business day of placement on watch.

        3          "There was no plan developed for the entirety of his

        4     watch.

11:26:45   5          "Because of this there was no documentation showing

        6     his resolution of the issues that precipitated his placement

        7     on watch.

        8          "There was no indication that safety was reliably

        9     reestablished prior to discontinuing watch.  In fact, the

11:27:01  10     patient's mental status was significantly worse at the time of

       11     discontinuing watch than when it was started.

       12          "There is no indication that multidisciplinary

       13     consultation was conducted prior to discontinuing watch."

       14     A    Yes.

11:27:19  15     Q    And these -- these four concerns that they raised, are

       16     these the types of concerns that you have raised in your

       17     report related to other cases as well?

       18     A    Yes.

       19              THE COURT:  Other cases --

11:27:39  20     BY MS. KENDRICK:

       21     Q    Other cases --

       22              THE COURT:  In Arizona?

       23     BY MS. KENDRICK:

       24     Q    -- in Arizona that you reviewed for your report.

11:27:43  25     A    Yes.

DIRECT EXAMINATION - PABLO STEWART

11:27:45   1   Q   Such as --

2   A   Other suicide, you know, psychological autopsies, and

3   administrative reviews, mortality reviews.  Similar issues

4   found in many of those.

11:27:58   5            THE COURT:  In Arizona?

6            MS. KENDRICK:  In Arizona.

7            THE WITNESS:  In Arizona, yes.  I'm sorry.

8   BY MS. KENDRICK:

9   Q   And some of these problems that you identified -- that the

11:28:07  10   Department identified here about risk assessment or no

11   treatment plan, did you observe these sorts of things in the

12   medical records of other patients who are mentally ill but

13   have not died by suicide yet?

14   A   Yes.  Yes.

11:28:25  15   Q   All right.  Thank you.

16            All right.

17            MS. KENDRICK:  Could we go to page 85 of his report.

18   BY MS. KENDRICK:

19   Q   Dr. Stewart, there are some pictures that you had taken at

11:28:50  20   Browning when you were there that are on pages 85, 86, and 87.

21   Could you describe what these were.

22   A   These were taken in an empty cell that had blood

23   splattered on the inside of it.  As you can see, those streaks

24   coming down the mesh, you could see where the blood is pooled

11:29:14  25   at the bottom and had gone over to the floor.

DIRECT EXAMINATION - PABLO STEWART

11:29:17  1    And the other pictures show just different aspects of
       2  how blood had been -- I don't know if it was sprayed or
       3  applied to the inside of the cell.
       4        THE COURT:  Let me interrupt for a second.  Maybe
11:29:36  5  it's undisputed, but how do you know that it was blood?
       6        THE WITNESS:  I didn't perform a chemical analysis,
       7  Your Honor, but based on my familiarity with blood splatters
       8  and situations like this, I looked at it very closely and, in
       9  my opinion, it was blood.
11:29:58 10  BY MS. KENDRICK:
      11  Q    And what did you learn about what happened there from
      12  other people in that unit?
      13  A    That an individual the day before had self-harmed
      14  themselves and the blood was inside and that person had been
11:30:18 15  taken out to outside hospital because of the severity of the
      16  injuries.
      17  Q    And the blood had not been cleaned up a day later?
      18  A    Correct.  It was striking to me that the blood was still
      19  left there for me to see.
11:30:40 20  Q    And what did that tell you about the mental health care
      21  that you were seeing at the prison?
      22  A    In my work as a plaintiff expert and in my work as a
      23  monitor, and the staff, knowing that I'm coming to do a visit,
      24  will routinely clean things up, try to make things look as
11:31:13 25  good as they can for me.  But the fact that they left this

CROSS-EXAMINATION – PABLO STEWART

11:31:17  1    there, I'm left to believe that, you know, it's no concern to

2    them that a plaintiff expert, psychiatric expert, was going to

3    come in and view the fact that there was blood in a cell, I

4    mean.

11:31:37  5    Q   All right.  Thank you, Dr. Stewart, I have nothing

6    further.

7              THE COURT:  All right.

8              Counsel, I have a few questions for him, but I can do

9    it afterwards.

11:31:48  10             Ms. Hesman, would you prefer me to ask the questions

11   or wait until later?

12             MS. HESMAN:  It's up to you.

13             THE COURT:  No, it's really up to you.  You'll get a

14   chance --

11:31:59  15             MS. HESMAN:  I would prefer to ask my questions if

16   that's okay with the Court.

17             THE COURT:  You want to go forward?

18             MS. HESMAN:  Yes.

19             THE COURT:  Go ahead.

11:32:06  20             MS. HESMAN:  Thank you.

21                 C R O S S - E X A M I N A T I O N

22   BY MS. HESMAN:

23   Q   Good morning, Dr. Stewart.  Can you hear me okay?

24   A   Yes, I can.  Thank you.  Good morning.

11:32:19  25   Q   Good morning.

CROSS-EXAMINATION – PABLO STEWART

11:32:22  1    Now, you testified on direct that the methodology you

2    employed to reach your conclusions was looking at individual

3    records for inmates at the Department; is that correct?

4    A    That was part of it, yes.

11:32:38  5    Q    And isn't it true that you selected who was going to be

6    studied for that review?

7    A    Yes.  I -- I was the one who determined which charts I was

8    going to review, yes.

9    Q    Well, that's not entirely true because in your declaration

11:32:58  10   you say that plaintiffs' counsel selected some of those files

11   for you; is that correct?

12   A    Well, plaintiff counsel, based on my instructions.  I said

13   I wanted to see people that I had seen before during my 2013

14   evaluation, I wanted to see the named plaintiffs, and I wanted

11:33:15  15   them to review the self-harm and the watch logs to see if

16   people had multiple self-harm incidents and been on watch for

17   extended periods of time.

18   Q    And, Doctor, do you have your declaration in front of you?

19   A    Yes, I do.

11:33:32  20   Q    If you could turn to paragraph 9, that's on page 6.  And

21   just let me know when you're there.

22   A    Yes.

23   Q    In that paragraph you say, "I asked plaintiffs' counsel to

24   review the most recent month's self-harm logs and --

11:33:48  25        I'll slow down.

CROSS-EXAMINATION – PABLO STEWART

11:33:50  1          "I asked plaintiffs' counsel to review the most

2     recent month's self-harm logs, mental health watch logs,

3     maintained by the Department and Centurion to identify persons

4     at the four prisons who appeared frequently on the logs."

11:34:13  5          How did you define "frequently"?

6     A    I did not.

7     Q    You left that up to plaintiffs' counsel to decide?

8     A    Yes.

9     Q    You go on to say, "... frequently on the logs for repeated

11:34:23 10   acts of self-harm."

11          How did you define "repeated"?

12    A    More than one.

13    Q    And you instructed plaintiffs' counsel about of that

14    definition?

11:34:34 15   A    Yes.

16    Q    You go on to say, "or persons with very long lengths of

17    stay on mental watch."

18          What does "very long" mean?

19    A    I can't recall exactly the definition I used.

11:34:52 20   Q    Did you give plaintiffs' counsel a definition?

21    A    Generally I said extended periods of time.

22    Q    What does "extended periods of time" mean?

23    A    I didn't give them a day length or a week length.

24    Q    So you left that up to them to decide?

11:35:10 25   A    Yes.

CROSS-EXAMINATION – PABLO STEWART

11:35:11  1  Q   Directing your attention to paragraph 10, which I believe

2  you conceded on direct, you said that your focus "was on

3  persons with the most serious mental health concerns and

4  diagnoses."

11:35:24  5          Do you see that?

6  A   Yes.

7  Q   I believe you also conceded on direct that you do not

8  speak to or review records of a random sample of all people;

9  correct?

11:35:37 10  A   That's correct.

11  Q   And you didn't even review a random sample of inmates who

12  are designated as MH-3 or higher; is that correct?

13  A   That's not 100 percent correct.  I felt my methodology was

14  that I did pick people at random.  So I had the people that I

11:35:58 15  told you that I had asked counsel to locate for me:  People

16  that I have seen before, named plaintiffs, and people who had

17  both self-harm and watch log issues.  And then while --

18  Q   My question is a little different.  My question is whether

19  or not you conducted a random sample of inmates -- excuse me.

11:36:20 20  Reviewed a random sample of records of inmates who are MH-3 or

21  higher.  Did you do that?

22  A   I did not.

23  Q   Instead you focused on people with most serious mental

24  health concerns and diagnoses; correct?

11:36:36 25  A   Correct.

CROSS-EXAMINATION – PABLO STEWART

11:36:37  1   Q    Have you heard of the term "selection bias"?

       2   A    Yes.

       3   Q    What is that?

       4   A    Well, it's if you're doing a study, that you only pick

11:36:46  5   those individuals or whatever you're studying, that you sort

       6   of -- you would pick those that would result in your achieving

       7   the opinion that you started off with.

       8   Q    Would you agree with me that the definition is a kind of

       9   error that occurs when the researcher decides who is going to

11:37:07 10   be studied?

      11        MS. KENDRICK:  Objection.  She does not state what

      12   she is quoting here.

      13        THE COURT:  She said, "would you agree with me."  She

      14   doesn't have to say what she's quoting from.

11:37:19 15   BY MS. HESMAN:

      16   Q    Would you agree with me?

      17   A    Do I answer -- ask that again, please.

      18   Q    Sure.  Would you agree with me the term "selection bias"

      19   means a kind of error that occurs when the researcher decides

11:37:29 20   who is going to be studied?

      21   A    Yeah, I agree with that definition.

      22   Q    And so it's your testimony that the files you reviewed in

      23   this case were files selected by plaintiffs' counsel, files of

      24   the named plaintiffs, and files of inmates who wanted to speak

11:37:47 25   to you; is that correct?

CROSS-EXAMINATION - PABLO STEWART

11:37:51  1  A   Well, the files that were selected by plaintiff counsel

2  were done at my direction and the individuals that I saw on

3  the different housing units were randomly selected.  I did not

4  speak to every mentally ill person on, say, SMU 1 at Eyman.

11:38:16  5  Q   Again, my question's a little bit different.

6        Isn't it true that the only files that you reviewed

7  are files that plaintiffs' counsel selected, files of inmates

8  who wanted to speak to you, or files of the named plaintiffs?

9  True?

11:38:33 10        MS. KENDRICK:  Objection.  Misstates evidence.

11        THE COURT:  Overruled.

12        THE WITNESS:  That is not true.  It wasn't just

13  people that wanted to speak with me.  I went through the

14  housing units and there were -- there were mentally ill

11:38:49 15  individuals who were too mentally ill to speak with me or flat

16  out refused to speak with me, and I then reviewed their

17  records.

18  BY MS. HESMAN:

19  Q   But you would agree with me that you couldn't speak to

11:39:06 20  someone who didn't want to speak with you; right?

21  A   Correct.

22        MS. HESMAN:  If we could please mark Impeachment 11,

23  PS 011.

24  BY MS. HESMAN:

11:39:21 25  Q   Dr. Stewart, has a court ever found that your methodology

CROSS-EXAMINATION – PABLO STEWART

11:39:32  1    was fraught with the kind of error we just described as

2    selection bias?

3    A    I can't recall right now.

4    Q    Do you recall a court finding that your opinions are

11:39:54  5    fraught with speculation, error, and clear bias?

6              THE COURT:  This is marked -- before he answers, to

7    make sure we've got a record.  And this is Impeachment Exhibit

8    Number 5627.

9              (Exhibit 5627 marked for identification.)

10             THE COURT:  Go ahead.  Ask the question.

11             MS. HESMAN:  Thank you, Your Honor.

12   BY MS. HESMAN:

13   Q    My question is whether or not you recall a court finding

14   that your opinions were fraught with speculation, error, and

11:40:28 15   clear bias.

16   A    I imagine throughout my work that that has come up at

17   least once.

18   Q    Okay.  Did that --

19   A    Some -- I was going say if you can tell me the case, I

11:40:44 20   could answer more particular.

21   Q    Are you familiar with the case *Jones v. GDCP Warden* out of

22   the Eleventh Circuit?

23             MS. KENDRICK:  Has the exhibit been shown to the

24   witness?

11:40:59 25             MS. HESMAN:  It will be.  I'm just asking if he's

CROSS-EXAMINATION – PABLO STEWART

11:41:01  1   familiar with it.

2        THE WITNESS:  Not offhand.

3   BY MS. HESMAN:

4   Q   Sure.  Let me show it to you.

11:41:06  5        MS. HESMAN:  Mr. Giardina, if we could have that

6   pulled up, please.

7        THE COURT:  Is there a particular portion you want

8   him to see?

9        MS. HESMAN:  Yes.

11:41:15  10        THE COURT:  Are you asking questions for foundation

11   purposes or do you want it admitted?

12        MS. HESMAN:  I'm just asking for questions for

13   foundation purposes at this point.

14   BY MS. HESMAN:

11:41:24  15   Q   Dr. Stewart, let me know when that comes up for you.

16   A   It's on the screen.

17   Q   Okay.  And seeing this case named *Jones v. GDCP Warden*,

18   does that refresh your recollection as to whether or not you

19   are familiar with it?

11:41:44  20   A   Oh, yes.  I remember this case.

21   Q   Was that a capital case involving a murder in Georgia

22   where you were providing an opinion as to whether the capital

23   defendant -- with respect to the capital defendant?

24   A   Yes.

11:41:59  25        MS. HESMAN:  Mr. Giardina, if we could please move to

CROSS-EXAMINATION - PABLO STEWART

11:42:04  1    page 7.

2              And right above D, if you could highlight that

3    paragraph that starts with "Dr. Elaine Walker."

4              Oh.  It's a little big; maybe zoom out a little bit.

11:42:20  5              I can just read from it.

6    BY MS. HESMAN:

7    Q    Can you see that, Dr. Stewart?

8    A    Yes.

9    Q    It says, "Dr. Pablo Stewart, a psychiatrist, conducted a

11:42:29 10    clinical review with Jones."

11             Was that the capital defendant?

12   A    Yes.

13   Q    "Dr. Stewart too diagnosed Jones with PTSD, bipolar 1

14   disorder, and relative cognitive impairments."

11:42:44 15             Do you see that?

16   A    Yes.

17   Q    "Stewart concluded that Jones' mental impairments

18   significantly contributed to the offense for which he was

19   convicted."

11:42:52 20             Do you see that?

21   A    Yes.

22             MS. HESMAN:  If we can turn to the next page, please,

23   page 8.

24   BY MS. HESMAN:

11:42:59 25   Q    In the first full paragraph, Doctor, I'd like to direct

CROSS-EXAMINATION - PABLO STEWART

11:43:09  1    your attention.

2              "The state court found that the mental health

3          expert's diagnosis of Jones were the product of

4          unsupported evidence and errant analysis.  The state

11:43:20  5          court noted that Dr. Stewart completely disregarded

6          the diagnoses of the psychiatrists who had evaluated

7          Jones in the prison and that the facts upon which

8          Dr. Stewart relied were fraught with speculation,

9          error, clear bias, and do not present an accurate

11:43:35 10          report of petitioner's life."

11              Do you see that?

12    A    I do.

13    Q    Are you the Dr. Stewart referenced in this case?

14    A    I am.

11:43:44 15    Q    Does this refresh your recollection with respect to

16    whether any court has found that your opinions were fraught

17    with speculation, error, and clear bias?

18    A    They certainly did in this case, didn't they.

19    Q    Is that a yes?

11:44:00 20    A    Yes.

21              MS. HESMAN:  Your Honor, defendants move to admit

22    Exhibit 5627.

23              THE COURT:  No objection?

24              MS. KENDRICK:  No objection.

11:44:14 25              THE COURT:  It's admitted.

CROSS-EXAMINATION – PABLO STEWART

11:44:14   1          (Exhibit 5627 admitted.)

2    BY MS. HESMAN:

3    Q   Dr. Stewart, when you were conducting your inmate

4    interviews, what did you tell the inmates that you attempted

11:44:20   5    to interview?

6    A   Words to the effect that I introduced myself as a

7    psychiatrist working with the ACLU and I was here wanting to

8    speak with people who were on the mental health caseload.

9    Q   Did you provide a non-confidentiality warning?

11:44:42   10    A   Well, I asked them that -- I would be speaking with them

11    and some of them asked me how this information was going to be

12    used and I said it would collectively be in a report.

13    Q   My question's a little different.  Did you provide them

14    with a non-confidentiality warning when you approached their

11:45:02   15    cell before you started to speak with them?

16    A   Not in the way you're describing it.  During the course of

17    my speaking with them I let them know this information would

18    possibly be included in a report.

19    Q   And you did that with every inmate that you interviewed?

11:45:25   20    A   I attempted to do that every inmate, yes.

21    Q   Because that's required; correct?

22    A   Yes.

23    Q   How long did you spend on average with each inmate that

24    you interviewed?

11:45:44   25    A   It really depended on their -- depended on their ability

CROSS-EXAMINATION - PABLO STEWART

11:45:48  1   to be engaged in a conversation.  Some were very short, say,

2   five, ten minutes; others were much longer.

3   Q    And you conducted these interviews cell front; correct?

4   A    I conducted the initial interview cell front, but then I

11:46:09  5   also had had people pulled out of their cells for confidential

6   interviews.

7   Q    Did you have every inmate pulled out of their cell?

8   A    No.

9   Q    Those that were not pulled out of their cell, the

11:46:20 10   interview was done cell front; correct?

11   A    Correct.

12   Q    Isn't that the practice you were critical of on direct

13   exam?

14   A    Well, no, it's different.  It's a different practice.

11:46:33 15   Q    Why?

16   A    Because I wasn't there as a treating clinician.  I wasn't

17   there to assess their degree of suicidality or self-harm.  I

18   wasn't there to necessarily manage and alter and modify their

19   medications.  I wasn't there to provide any psychotherapeutic

11:46:53 20   treatment.  From that sense, it is a very different type of

21   interview that I criticized, yes.

22   Q    Sure.  But on direct exam, your issue with it was that

23   it's not confidential.  And wouldn't your interviews just the

24   same not be confidential if they're being conducted cell

11:47:10 25   front?

CROSS-EXAMINATION - PABLO STEWART

11:47:11  1   A    Yes.  You're absolutely right.  They were not

2   confidential.

3   Q    And I believe in your declaration you referenced a

4   psychiatrist that assisted you with your inmate file review;

11:47:22  5   correct?

6   A    Correct.

7   Q    And his name -- I don't want to butcher his last name, but

8   I believe it is Nikogosyan.  Is that how you pronounce it?

9   A    Nikogosyan.

11:47:35  10  Q    And Dr. Nikagosyan is a medical resident; correct?

11  A    Psychiatric resident.

12  Q    Psychiatric resident; correct?

13  A    Yes.

14  Q    He's still in training?

11:47:48  15  A    He's in his last year of training, yes.

16  Q    He cannot practice independently, can he?

17  A    He can practice independently, but that's not how I used

18  him in this case.

19  Q    And I believe you testified on direct that he assisted you

11:48:03  20  in your records review; correct?

21  A    Correct.

22  Q    And I'm not sure if you testified to this, but I believe

23  you used records -- you accessed records via the eOMIS

24  software in this case; correct?

11:48:17  25  A    That's correct.

CROSS-EXAMINATION - PABLO STEWART

11:48:17  1   Q   And a login to eOMIS was provided to you so you could

2   review those records; correct?

3   A   Correct.

4   Q   Was a login provided to the resident that was assisting

11:48:31  5   you?

6   A   No.  He used my login information.

7   Q   So you allowed a psychiatric resident to use your login to

8   confidential medical records; is that your testimony?

9   A   Yes.  Absolutely.

11:48:44  10  Q   Did you request that he have permission to review

11  confidential medical records in this case?

12  A   What do you mean if I requested did he have permission?

13  Q   I'm asking you if you asked counsel for the defendants

14  whether or not he could have a login of his own to access

11:49:02  15  these medical records.  Did you do that?

16  A   I did not.

17  Q   Are you aware that other plaintiffs' experts in this case

18  separately requested logins for individuals who were assisting

19  them with their records review?

11:49:15  20  A   I'm not aware of that.

21  Q   Are you aware that eOMIS tracks how long a user spends in

22  each medical record?

23  A   Yes, I do.

24  Q   So we wouldn't be able to tell how long you were in a

11:49:34  25  record or how long your resident assisting you was in a record

CROSS-EXAMINATION - PABLO STEWART

11:49:37   1   because you were both using the same login; correct?

2   A    That's correct.

3   Q    And I believe you testified on direct after you conducted

4   these interviews at the facilities, you then went back and

11:49:51   5   reviewed their medical records; is that correct?

6   A    Correct.

7   Q    And you conducted the tours of the facilities in

8   September?

9   A    Yes.

11:50:02   10   Q    What dates in September?

11   A    I went -- I did two different site visits.  September 8th,

12   I was at Eyman.  September 9th, I was in Tucson.

13   September 10th, I was in Perryville.  And December -- and

14   September 23rd, I was at the Phoenix Complex.

11:50:32   15   Q    Did you review any medical records during the month of

16   September?

17   A    I believe I did, yes.

18   Q    Is there a reason why on your time sheets to plaintiffs'

19   counsel you didn't note a review of any medical records in the

11:50:49   20   month of September?

21   A    If that's the case, then that was an oversight on my part.

22   Q    So your testimony is that you did review records, medical

23   records, in the month of September?

24   A    I believe I did.  I don't remember offhand.

11:51:08   25   Q    And, Dr. Stewart, you're not a forensic psychiatrist, are

CROSS-EXAMINATION – PABLO STEWART

11:51:11  1  you?

2  A    Yes, I am.

3  Q    You are a forensic psychiatrist.  That's your testimony?

4  A    Yes.

11:51:22  5  Q    And did you do a forensic psychiatry fellowship?

6  A    I did not.

7  Q    You did not?

8  A    I did not.

9  Q    Are you board certified in forensic psychiatry?

11:51:34  10  A    I'm not.

11  Q    And if you still have your declaration in front of you,

12  Doctor, if could you please turn to paragraph 3.  That's on

13  page 2.

14          And I want to direct your attention to the middle of

11:51:56  15  the paragraph where you discuss your "extensive clinical

16  research and academic experience in the diagnosis, treatment,

17  and community care programs for persons with psychiatric

18  disorders and the management of patients in institutionalized

19  populations."

11:52:12  20          Do you see that?

21  A    Yes.

22  Q    When was the last time you provided clinical services in a

23  correctional setting?

24  A    Yesterday.

11:52:20  25  Q    And where was that?

CROSS-EXAMINATION – PABLO STEWART

11:52:23  1   A    In the Oahu Community Correctional Center here in
      2   Honolulu.
      3   Q    And did you provide those services physically on-site?
      4   A    Yes.
11:52:36  5   Q    How often are you physically on-site at the Oahu
      6   Correctional Center?
      7   A    At least weekly.  One day a week.
      8   Q    One day a week.  And isn't it true that your
      9   responsibilities at Oahu Correctional Center are limited to
11:52:51 10   supervising residents; right?
     11   A    Yes.  In their provision of direct psychiatric care.  And
     12   I have to sign off on their charts so the care is actually
     13   under my signature.
     14   Q    So are you actually providing clinical care to patients or
11:53:09 15   are you overseeing their work?
     16   A    Well, I oversee the psychiatric residents' work in their
     17   provision of care.  So I'm right there when they interview
     18   patients.  I'm there when they review charts.  We discuss
     19   their findings, and we come up together with a treatment plan.
11:53:31 20   So in that sense I do provide direct care.
     21   Q    But that -- you yourself are not providing the direct
     22   care, you are there shadowing a resident and overseeing the
     23   resident's provision of care; right?
     24   A    I don't see the difference, but you're right.
11:53:51 25   Q    And isn't it true that your access to Oahu Correctional

CROSS-EXAMINATION - PABLO STEWART

11:53:54  1   Center is limited, it's limited in where you can go in that

2   facility; right?

3   A   Well, it's limited to housing areas where the mentally ill

4   are housed.

11:54:08  5   Q   Isn't your access restricted to two mental health modules

6   at the facility in a trailer, where you can go --

7   A   No.

8   Q   That's not true?

9   A   It's not.  There are several modules that house mentally

11:54:24  10  ill individuals, and we have complete access to all of them.

11  Q   But you don't have complete access to the facility, do

12  you?

13  A   No.

14  Q   And that's because you're not an employee of the facility;

11:54:37  15  right?

16  A   Well, the situation -- to answer your question, the

17  situation is that the Department of Psychiatry at the

18  University of Hawaii is the contractor for provision of

19  psychiatric services within the jail.  So in that sense I am a

11:54:59  20  contract employee for the State Department of Public Safety.

21  Q   But you're not an employee for the state of Hawaii, you're

22  an employee of the hospital; correct?

23  A   I'm an employee of -- yes.  Yes.

24  Q   And you said that you're on site weekly.  Is that your

11:55:20  25  testimony?

CROSS-EXAMINATION - PABLO STEWART

11:55:20  1   A   Currently I'm on site weekly.  Other times I'm there more

        2   frequently.

        3   Q   And currently you're there, I believe you said, one day a

        4   week?

11:55:28  5   A   Yes.

        6   Q   Other than -- well, let me back up.

        7        And you only started working at Oahu Community

        8   Correctional Center in 2018; right?

        9   A   I became a faculty member in 2018, yes.

11:55:57 10   Q   When did you actually start overseeing residents at the

       11   facility?

       12   A   July of 2019.

       13   Q   And I think you've already admitted that is your only

       14   role, is overseeing residents.  You yourself are not providing

11:56:16 15   clinical patient care; correct?

       16        MS. KENDRICK:  Asked and answered.

       17        THE COURT:  Overruled.  I wasn't quite sure what his

       18   answer was.  So he can answer that.

       19        THE WITNESS:  In my opinion, I'm providing direct

11:56:28 20   care through my supervision of the psychiatric residents.

       21   BY MS. HESMAN:

       22   Q   And that's not my question.  My question is whether you

       23   personally are going into the jail and providing direct

       24   patient care to inmates at the jail.  And I believe your

11:56:43 25   testimony earlier was that you are not, you are overseeing

CROSS-EXAMINATION – PABLO STEWART

11:56:47   1   residents' provision of treatment; right?

2   A   Correct.

3   Q   And that began in July of 2019; correct?

4   A   Correct.

11:56:58   5   Q   Prior to that, when was the last time you provided

6   clinical care in a correctional setting?

7   A   Direct clinical care, as you describe it, the last time I

8   did that in a correctional setting was in 1990.

9   Q   Well, that's not true, is it, because in 1990, you were

11:57:27   10   working at a hospital that had -- that had inmates inside the

11   hospital.  It wasn't within a correctional facility, was it?

12   A   At that time it was both.

13   Q   So your testimony is that in 1990 you were also providing

14   clinical care at a jail?  Is that your testimony?

11:57:52   15   A   It's City County Jail in San Francisco, yes.

16   Q   But the majority of your work was at the hospital that

17   happened to see inmates; correct?

18   A   I oversaw the provision of care at the hospital, which was

19   a jail psychiatric ward.  We had guards.  We had seclusion

11:58:17   20   rooms.  We had isolation rooms.  So that's direct care of

21   inmates.  And then also during that time I was responsible for

22   the care provided in the jail.

23   Q   But the inmates who were in the hospital, they were in a

24   hospital setting, they weren't in the jail.  You would agree

11:58:34   25   with me on that, wouldn't you?

CROSS-EXAMINATION – PABLO STEWART

11:58:36  1    A    No.  They were in the jail.  There was a jail ward.

2    Q    And that jail ward that you referred to only had 12 beds;

3    right?

4    A    Yes.

11:58:47  5    Q    So other than -- let me back up.

6         How long did you provide those clinical services for

7    San Francisco Jail at the 12-bed hospital unit, 1990 until

8    when?

9    A    1986 to 1990.

11:59:03 10    Q    So for four years in the late '80s, you provided clinical

11    services at -- in a hospital setting?

12    A    Yes.

13    Q    So far that's the only testimony I've heard of you

14    providing clinical care to individuals in a correctional

11:59:20 15    setting; right?

16    A    I thought I also said that I provided care in the jail

17    during that same period.

18    Q    Sure.  So the late '80s.  Other than the four years in the

19    late '80s, since that time you have not provided direct

11:59:37 20    clinical patient care to anyone in any correctional setting;

21    true?

22              MS. KENDRICK:  Misstates his testimony.

23              THE COURT:  Overruled.

24              THE WITNESS:  Until -- yes.  You're correct.

25

CROSS-EXAMINATION - PABLO STEWART

11:59:52   1   BY MS. HESMAN:

2   Q   But you're here today as a correctional expert; right?  I

3   mean, your declaration says "extensive experience in

4   management of patients in institutionalized populations."

12:00:05   5        Is that what your declaration says?

6   A   Yes.

7   Q   And your extensive experience is for four years in the

8   late '80s; right?

9   A   Where I was actually providing direct services in a jail.

12:00:17  10   Q   Correct.

11   A   But it says "institutional populations."  There's a lot

12   more involved in institutions than just correctional settings.

13   Q   Correct.  But my question is whether, since the last '80s,

14   you have not provided direct clinical psychiatric care to

12:00:37  15   people actually in correctional settings.  And I believe you

16   said that is true.

17   A   Until July of 2019.

18   Q   Well, no, because you've said that, we've already agreed

19   on that, that you're not providing direct clinical care,

12:00:51  20   you're overseeing residents; right?

21        MS. KENDRICK:  Objection.  Argumentative.

22        THE COURT:  Sustained.

23   BY MS. HESMAN:

24   Q   Dr. Stewart, isn't it true you took that position with the

12:01:03  25   Oahu Community Correctional Center due to the criticisms

CROSS-EXAMINATION - PABLO STEWART

12:01:07  1   you've received from lawyers and judges in cases like this for

2   not having correctional experience?

3   A    Not at all.

4   Q    I believe you referenced this several times on direct, but

12:01:26  5   you're a plaintiffs' expert, aren't you?

6   A    I have acted as a plaintiff expert, I've acted as a

7   defense expert, and I've acted as a federally appointed

8   monitor.

9   Q    When have you acted as a defense expert in a case like

12:01:41 10   this?

11   A    It was in New Mexico Department of Corrections.  It was

12   called the *Ayers*, A-Y-E-R-S, case.  And right now I couldn't

13   tell you when it was.

14   Q    And your testimony is the *Ayers* case is similar to this

12:01:58 15   kind of case, where you are coming in and offering an opinion

16   with respect to systemic provision of mental health services?

17   A    Especially in isolated conditions, yes.

18   Q    Other than that case, when have you served as a defense

19   expert?

12:02:21 20   A    That was my one experience as a defense expert.

21   Q    And, in fact, I believe you also conceded this on direct,

22   that the overwhelming majority of your work is actually in

23   criminal cases; right?

24   A    I never conceded the overwhelming majority of my work is

12:02:36 25   in criminal cases.  I stated that my forensic practice

CROSS-EXAMINATION – PABLO STEWART

12:02:41  1  includes correctional psychiatric work and criminal work.

2  Q  Have you ever testified in any case that the overwhelming

3  majority of your work is in criminal cases?

4  A  Well, I may have because at different times it was.

12:02:59  5  Q  When did it stop becoming, if that's your testimony, the

6  overwhelming majority of your work?

7  A  Well, it really depends on what the situation was.  I

8  don't control the cases that I'm asked to work on.  And so at

9  times I do exclusively correctional work.  At times I do

12:03:19  10  overwhelmingly criminal work.  And like right now I do

11  overwhelmingly correctional work and I have a few capital

12  cases that I consult on.

13  Q  And you refer to yourself in your CV as a plaintiff's

14  expert; right?

12:03:37  15  A  I listed I have worked as a plaintiff expert, certainly.

16  Q  But you highlight that in your CV, don't you?

17       MS. KENDRICK:  Could you put that up for the witness.

18       MS. HESMAN:  Sure.  I'm just asking if that's true.

19  I think he can answer it.  It's his CV.

12:03:54  20       MS. KENDRICK:  You're asking him what's written on a

21  document that is not in front of him.

22       THE COURT:  Sustained.

23       Do you have the document?

24       MS. HESMAN:  I do.

25

CROSS-EXAMINATION - PABLO STEWART

12:04:02  1   BY MS. HESMAN:

        2   Q   My understanding, Dr. Stewart, is that you have the

        3   supporting documents for your declaration in front of you,

        4   right?  That includes your CV?

12:04:09  5   A   I don't have my CV in front of me.

        6   Q   Okay.

        7         MS. HESMAN:  If I could get the Elmo, please.

        8         THE COURTROOM DEPUTY:  Sure.

        9   BY MS. HESMAN:

12:04:29 10   Q   Can you see this, Dr. Stewart?

       11   A   Yes.

       12   Q   So this is page 10 from your CV, do you recognize this

       13   document?

       14   A   Yes.

12:04:39 15   Q   You prepared this document?

       16   A   Yes.

       17   Q   And the title I've highlighted here for you is "Community

       18   Service and Prison Conditions Expert Work"; right?

       19   A   Yes.

12:04:49 20   Q   You consider yourself an expert in prison conditions?

       21   A   That's what the Court has designated me as.

       22   Q   That's not what I'm asking.  I'm asking whether you

       23   consider yourself a prison conditions expert.

       24   A   I do.

12:05:02 25   Q   And here you'll see that I've highlighted you note every

CROSS-EXAMINATION - PABLO STEWART

12:05:06  1   time, for every case, actually, that you list, you note that

2   you're a plaintiff's expert or a plaintiff's psychiatric

3   expert.  Do you see that?

4   A   Yes.

12:05:19  5   Q   Where on here is the New Mexico case where you told me you

6   were a defense expert?

7   A   Is there more?  Can you go to page 11.

8   Q   This is page 11, but you no longer have -- the expert work

9   is not on this page.

12:05:45  10  A   It's still there.  It's still there.  There it is, right

11  there.

12  Q   This one right here?

13  A   No, the one above it.  *Ayers* -- *Ayers* agreement.

14  Q   You say that's a settlement between the plaintiff and

12:06:03  15  NMCD?

16  A   Correct.

17  Q   And have you ever described your work with the ACLU as "we

18  like to advocate for the rights of prisoners"?

19  A   I'm not sure.  I don't believe so.

12:06:48  20  Q   Do you advocate for the rights of prisoners when you work

21  with the ACLU?

22  A   When I work with the ACLU I'm asked to do a particular

23  task.  As in this case, I was asked to update my findings from

24  2013.  I was not asked to act as a prisoner advocate.

12:07:17  25          MS. HESMAN:  If we can mark -- or let's show

CROSS-EXAMINATION - PABLO STEWART

12:07:18  1   Impeachment PS 084.

2              THE COURT:  Do you have that?  Someone have that?

3              MS. HESMAN:  We do, Your Honor.

4              THE COURT:  It will be marked.

12:08:05  5              And, Molly, what number is this?

6              THE COURTROOM DEPUTY:  This will be 5628.

7              THE COURT:  It's being marked and not admitted.

8        You're not moving to admit yet; right?

9              MS. HESMAN:  Not at this point, Your Honor, no.

12:08:19 10              (Exhibit 5628 marked for identification.)

11       BY MS. HESMAN:

12       Q   Dr. Stewart, can you see that document on your screen?

13       A   Yes.

14       Q   And this is a transcript from the *Ferreira versus Penzone*

12:08:34 15       proceeding.  Do you recall that case?

16       A   I do not.

17       Q   You were a plaintiff's expert in that case.  Actually,

18       Mr. Struck and I were defense counsel.  Do you recall that?

19       A   I do not.

12:08:49 20       Q   Well, I'd like to direct your attention to --

21              MS. HESMAN:  Do we have an exhibit number for this

22       now?

23              I'm sorry, what is that?

24              THE COURTROOM DEPUTY:  5628.

25

CROSS-EXAMINATION – PABLO STEWART

12:09:02  1          MS. HESMAN:  So 5628 at page 3.

2     BY MS. HESMAN:

3     Q   Do you see your name listed here, Dr. Pablo Stewart, under

4     "Witness"?

12:09:20  5     A   Yes.

6          MS. HESMAN:  If we can go to page 2.

7     BY MS. HESMAN:

8     Q   You were retained by Joel Robbins and Jesse Showalter.

9     Does that refresh your recollection?

12:09:35 10    A   It does not.

11    Q   It does not?

12    A   It does not.

13    Q   You have no memory of this case?

14    A   I have a vague memory of a case in Arizona during this

12:09:46 15    time frame.  I don't remember the details at all.

16    Q   It involved somebody named Daughtry and Ryan Bates.  Does

17    that refresh your recollection?

18    A   It does not.

19    Q   Do you recall testifying in the trial of this case?

12:10:04 20    A   I remember testifying around this time but, I don't

21    remember the details at all.

22    Q   Okay.

23          MS. HESMAN:  If we could pull up page 50.

24          I'm sorry, 51.

25

CROSS-EXAMINATION - PABLO STEWART

12:10:21  1  BY MS. HESMAN:

2  Q   At the bottom of page 51, Doctor, the question is asked,

3  "Do you consider yourself a prisoners' rights advocate" --

4        MS. HESMAN:  If we can get to page 52.

12:10:36  5  BY MS. HESMAN:

6  Q   -- "advocating the rights of prisoner inmates and

7  prisoners in prisons and jails?"

8        Do you see that?

9  A   Yes.

12:10:44  10  Q   And you responded, "It depends on what context you're

11  working, but in certain cases you're absolutely advocating for

12  the rights of prisoners."

13        Do you see that?  Line 10.

14  A   No.

12:10:58  15        THE COURT:  Where --

16        MS. HESMAN:  Page 52 of Exhibit 5628.

17        THE COURT:  You went from one question on 51 and then

18  you went down to a different line.

19        MS. HESMAN:  I'm sorry.

12:11:11  20        THE COURT:  Let's try that again.

21        MS. HESMAN:  Sure.

22        So page 51.

23  BY MS. HESMAN:

24  Q   The last line says, "Do you consider yourself a prisoners'

12:11:17  25  rights advocate," and the question continues, "advocating the

CROSS-EXAMINATION - PABLO STEWART

12:11:21  1   rights of prisoner inmates and prisoners in prisons and

2   jails?"

3           Do you see that?

4   A   Yes.

12:11:27  5   Q   And then your response is it says, "It depends on what

6   context that you're working and sometimes you certainly are."

7   The last sentence says I'm -- "in some cases you're absolutely

8   advocating for the rights of prisoners."

9           Do you see that?

12:11:40 10   A   Yes.

11   Q   And the next question is, "And that would be where, like,

12   for example, if the ACLU hires you, you're advocating for the

13   rights of prisoners, you're assisting them in the advocating

14   for the rights of prisoners?"

12:11:56 15           Your response, "Right, the constitutional rights of

16   prisoners.  That's what we advocate for."

17           Do you see that?

18   A   Yes.

19   Q   Was that your testimony in this case, in the *Ferreira*

12:12:05 20   case?

21   A   It obviously was.

22   Q   And isn't it true that on your CV you state you have a

23   passion for social justice; right?

24   A   I do.

12:12:27 25           THE COURT:  Ms. Hesman, I think we missed -- I think

CROSS-EXAMINATION – PABLO STEWART

12:12:33  1  the record should be clear as to what the full answer was.  I

2  think you gave his answer partially on page 52.  Can you read

3  that full answer.

4       MS. HESMAN:  Sure.

12:12:45  5       THE COURT:  It starts on line 3 and then through 6.

6  This is on page 52.  Let's make sure that's in the record.

7       MS. HESMAN:  Sure.  You're referring to his answer at

8  line 3?

9       THE COURT:  3 through 6.  I think you --

12:13:09 10       MS. HESMAN:  Sure.

11       "It depends on what context that I'm working.

12       Sometimes I certainly am.  Other times, like in this

13       case, the *Ferreira* case, I don't believe I'm a

14       prisoner rights advocate.  But in certain other

12:13:20 15       cases, yes, I'm absolutely advocating for the rights

16       of prisoners."

17       THE COURT:  Okay.  I just wanted to make sure that

18  the entire statement was in the record.

19       MS. HESMAN:  Thank you, Your Honor.

12:13:31 20       THE COURT:  You may proceed.

21  BY MS. HESMAN:

22  Q   Doctor, have any courts ever found you not to be credible?

23  A   Yes.

24  Q   How many?

12:13:45 25  A   At least one that I'm aware of.

CROSS-EXAMINATION - PABLO STEWART

12:13:48  1    Q    What case was that?

        2    A    The *Gowadia* case.

        3    Q    Can you spell that.

        4    A    I couldn't spell it now.

12:13:57  5    Q    I just want to make sure I'm understanding.  Can you say

        6    it again.

        7    A    It's begins with a G.  I believe it is pronounced Gowadia,

        8    or something like that.

        9    Q    And that was a case in Hawaii District Court in front of

12:14:14 10    Judge Mollway; right?

       11    A    It was actually, I believe, in front of the magistrate

       12    judge, if I remember the case correctly.

       13    Q    But Judge Mollway issued an order with respect to your

       14    opinions in that case; right?

12:14:32 15    A    I believe she did.

       16    Q    And it was your opinion -- let me back up.

       17         The case was with respect to a capital defendant;

       18    right?

       19    A    It wasn't -- I don't believe it was a capital case.  It

12:14:47 20    was an espionage case.

       21    Q    But it was a case in which you were brought in to

       22    determine whether the criminal defendant was competent to

       23    stand trial?

       24    A    Correct.

12:15:01 25    Q    You thought the criminal defendant lacked rational

CROSS-EXAMINATION - PABLO STEWART

12:15:04  1   reasoning because the criminal defendant thought honesty was

2   important.  Do you recall that?

3   A   I don't remember if I recall that particular statement,

4   but I was called in on that case to do a competency

12:15:16  5   assessment, yes.

6          MS. HESMAN:  Let's mark Impeachment 9, PS 009.

7          THE COURTROOM DEPUTY:  This will be 5629.

8          THE COURT:  5629.

9          (Exhibit 5629 marked for identification.)

12:16:05  10  BY MS. HESMAN:

11  Q   And, Doctor, let me know when that's up for you on the

12  screen.

13  A   I can see it.

14  Q   If we can please turn to page 10.

12:16:28  15         And the second full paragraph begins, "The

16  unimportance of honesty to Stewart is demonstrated by

17  Stewart's analysis concerning item 15 which appeared to be

18  designed to address Gowadia's ability to reason."

19         Do you see that?

12:16:46  20  A   Yes.

21         MS. HESMAN:  And continuing on to the second page,

22  page 11.

23  BY MS. HESMAN:

24  Q   The second paragraph that begins, "Stewart gave Gowadia a

12:17:06  25  score of 1 on item 15, explaining that honesty is not an

CROSS-EXAMINATION - PABLO STEWART

12:17:10  1   advantage to a defendant for purposes of pleading guilty."

2          Do you see that?

3   A   Yes.

4   Q   Then one sentence down it says -- this is an order from

12:17:18  5   Judge Mollway, "In other words, Stewart thought that Gowadia

6   lacked rational reasoning merely because Gowadia thought

7   honesty was important."

8          Do you see that?

9   A   Yes.

12:17:32 10   Q   Do you recall the court reaching that determination with

11   respect to your opinions in that case?

12   A   Yes, because every time I testify, this case is brought

13   back up.

14          MS. KENDRICK:  Counsel, what page and line are you on

12:17:44 15   here?

16          MS. HESMAN:  I was on --

17          THE COURT:  She's on page 11.

18          MS. HESMAN:  11.  But I've moved on from that.

19          MS. KENDRICK:  Where did you move to?

12:17:54 20          MS. HESMAN:  I haven't said it yet, but I'm about to.

21          MS. KENDRICK:  Oh.  Okay.

22          MS. HESMAN:  Let's go to page 7.

23   BY MS. HESMAN:

24   Q   The first line of the first paragraph says, "Stewart's

12:18:09 25   reliance on the MacCAT as his only test calls into question

CROSS-EXAMINATION - PABLO STEWART

12:18:14   1   his conclusions."

2          Do you see that?

3   A   Yes.

4   Q   And the last sentence of that paragraph says, "An

12:18:21   5   examination of Stewart's subjective scoring of Gowadia on

6   these questions raises serious questions about Stewart's heavy

7   reliance on the MacCAT."

8          Do you see that?

9   A   Yes.

12:18:35  10   Q   Did the court say these -- say these items about your

11   opinions because you only used one type of test to assess this

12   criminal defendant?

13   A   I believe so.

14   Q   Are there any other cases, Doctor, where the court has --

12:18:58  15   I guess I didn't ask this question.

16          Has a court ever struck your testimony and not

17   allowed you to testify at trial?

18   A   There have been cases in federal court where I have not

19   been allowed to testify in trial.

12:19:14  20   Q   Was one of those cases *David versus Signal?*

21   A   Yes.

22   Q   And do you recall why you weren't allowed to testify in

23   that case?

24   A   It was a civil matter and I believe the court felt that my

12:19:38  25   analysis wasn't appropriate to the issues involved in the case

CROSS-EXAMINATION - PABLO STEWART

12:19:43  1   that I was asked to consult.  That's my memory.

2              MS. HESMAN:  Let's go ahead and mark Impeachment 10,

3   PS 010.

4              THE COURTROOM DEPUTY:  5630.

12:20:17  5              THE COURT:  5630.

6              MS. HESMAN:  I'm sorry, the Exhibit Number 5630;

7   correct?

8              THE COURTROOM DEPUTY:  Um-hmm.

9              MS. HESMAN:  Thank you.

12:20:28  10             (Exhibit 5630 marked for identification.)

11  BY MS. HESMAN:

12  Q   Doctor, let me know when that's on your screen.

13  A   It's there.

14  Q   This is a January 10th, 2015 order.

12:20:42  15             Do you see that?

16  A   Yes.

17             MS. HESMAN:  If we can turn to page 2.  The last

18  paragraph is all I need.

19             Starting with the word "importantly."

12:21:07  20             There we go.

21  BY MS. HESMAN:

22  Q   Doctor, it says here, "Importantly, Dr. Stewart admits in

23  his deposition that he neither made a formal medical diagnosis

24  as to any of the plaintiffs nor spoke with any of the

12:21:19  25  plaintiffs, let alone examined them."

CROSS-EXAMINATION – PABLO STEWART

12:21:22  1        Do you see that?

2   A   Yes.

3   Q   "His opinion as to the cause of their emotional and mental

4   distress lacks a foundation of sufficient facts or data.

12:21:32  5   Dr. Stewart's third opinion, the overcrowding at the man camp

6   had a psychologically coercive effect on plaintiffs, lacks

7   reliability."

8        Do you see that?

9   A   Yes.

12:21:45 10   Q   And you weren't permitted to testify in that trial, right,

11   as a result?

12   A   Yes.

13   Q   Have you ever been certified as a correctional health

14   professional?

12:22:04 15   A   I've been qualified by federal courts as correctional

16   health facility professional.

17   Q   That's not my question.  My question is whether you've

18   actually been certified as a correctional health professional.

19   Are you aware of that designation?

12:22:20 20   A   I'm not aware that's a designation that holds any weight

21   anywhere.

22   Q   Are you aware that that's a designation through NCCHC?

23   A   I believe they're one of the organizations that gives out

24   these certificates.

12:22:37 25   Q   And, in fact, you believe NCCHC accreditation is important

CROSS-EXAMINATION - PABLO STEWART

12:22:42  1   with respect to cases where you're looking at systemic

2   provision of healthcare, wouldn't you agree?

3   A   No, I wouldn't necessarily agree with that.  I think it's

4   something to look at but I don't know if it's necessarily

12:22:55  5   important.

6   Q   Have you ever in other cases discredited a system for not

7   having NCCHC accreditation?

8   A   I don't recall offhand.

9   Q   And, Doctor, have you ever published anything, any peer

12:23:22  10  review or other medical journal, with respect to correctional

11  psychiatry?

12  A   I have a paper that's currently in review process, but I

13  don't believe I have prior to this time.

14  Q   Have you ever written anything in any psychiatric

12:23:43  15  correctional psychiatry textbook?

16  A   No.

17  Q   Have you ever been a part of the development for national

18  correctional standards as they relate to the provision of

19  mental health care?

12:24:01  20  A   Yes.

21  Q   When?

22  A   When I worked for the Judiciary Committee of -- the Senate

23  Judiciary Committee in their evaluation of the use of

24  segregated housing in the Bureau of Prisons in 2014.

12:24:18  25  Q   Have you ever performed any committee work with forensic

CROSS-EXAMINATION - PABLO STEWART

12:24:21   1   or correctional psychiatrists?

2               MS. KENDRICK:  Objection.  Vague.

3               THE COURT:  Overruled.

4               THE WITNESS:  I've certainly participated in meetings

12:24:39   5   and consultations with other correctional psychiatrists, yes.

6   BY MS. HESMAN:

7   Q   But have you ever performed any committee work with

8   forensic or correctional psychiatrists?

9   A   Well, yes.

12:24:55  10   Q   When?

11   A   In 2014, I was part of a federal inspection group that was

12   authorized by the Senate Judiciary Committee to look at the

13   use of isolated confinement in the Federal Bureau of Prisons.

14   It was a year-long commitment where we met regularly to come

12:25:17  15   up with our findings and recommendations to the Senate

16   Judiciary Committee.

17   Q   And I want to direct you to paragraph 10 of your

18   declaration, if you still have that in front of you.

19   A   Yes.

12:25:32  20   Q   I believe testified on direct, and we talked about it a

21   little this morning, as to how your methodology is to focus on

22   persons with the most serious mental health concerns or

23   diagnoses; right?

24   A   Yes.

12:25:45  25   Q   And then you underline here in this paragraph, "These are

CROSS-EXAMINATION - PABLO STEWART

12:25:48  1    the patients that a functioning correctional mental health

2    care system."

3              You see that?

4    A    Where am I looking at this?

12:25:59  5    Q    I'm sorry, you underlined a sentence in paragraph 10 of

6    your declaration.

7              Do you see that?

8    A    Paragraph 10.  I thought you said page 10.  Excuse me.

9              Okay.

12:26:10  10   Q    And I'm just referring you to the underlined portion where

11   you say -- where you refer to "a functioning correctional

12   mental health care system."

13   A    Yes.

14   Q    What is a functioning correctional mental health care

12:26:24  15   system?

16   A    A functioning mental health correctional system is one

17   that provides standard of care.

18   Q    What correctional system in the United States do you think

19   meets your definition of a functioning correctional mental

12:26:39  20   health care system?

21   A    I've never seen a -- I've never been involved with a

22   correctional mental health system that meets all the

23   requirements for standard of care.

24   Q    I want to direct your attention to paragraph 20 of your

12:27:21  25   declaration.

CROSS-EXAMINATION – PABLO STEWART

12:27:21  1   A    Yes.

2   Q    Before we get there, is your opinion that California is a

3   functioning mental health correctional -- let me use your

4   language -- is a functioning mental health care system?  Does

12:27:40  5   California have that?

6   A    I haven't been involved with the California system for

7   years, so I can't speak to how they are now.

8   Q    And you've talked about how you are a monitor in Illinois.

9   Does Illinois have -- meet that definition?

12:27:56  10  A    It does not.

11  Q    And, in fact, you've never found that any system meets

12  that definition, your definition; right?

13  A    What I testified to was that I found that certain aspects

14  of correctional systems may meet constitutional standards, but

12:28:15  15  not the entire system.

16  Q    I want to talk a little bit about staffing, and I'd like

17  to direct your attention to paragraph 20.  Just let me know

18  when you're there.

19  A    I'm there.

12:28:30  20  Q    In paragraph 20, you state that, "The number of mental

21  health staff required by ADCRR's contracts with their vendors

22  and the number of actually filled positions is abysmally low."

23        Do you see that?

24  A    Yes.

12:28:45  25  Q    Then you cite a docket number, 1538.

CROSS-EXAMINATION - PABLO STEWART

12:28:47 1        Do you see that?

2    A    Yes.

3    Q    Isn't that your own report that you're citing to?

4    A    I believe it is, yes.

12:29:06 5    Q    So your opinion that the staffing levels are abysmally low

6    is based on your opinion that the staffing levels are

7    abysmally low; is that right?

8    A    Well, yes.  I've had previous experience with the Arizona

9    Department of Corrections prior to 2021 and just confirmed my

12:29:26 10   previous opinion, yes.

11   Q    Turning now to paragraph 19.  Let me know when you're

12   there.

13        I'm sorry, Doctor, are you there?

14   A    I've been there.  Yes.

12:30:03 15   Q    Okay.  My apologies.

16        And in paragraph 19, you state that you've "been

17   struck by the chronic and extreme shortage of mental health

18   staff in ADCRR."

19        Do you see that?

12:30:15 20   A    Yes.

21   Q    What's that based on?

22   A    Based on my touring in 2013, further confirmed by my

23   touring in 2019, and finally confirmed by my touring in 2021.

24   Q    So that's based on your tours; right?

12:30:37 25   A    My tours, which include interviews of mentally ill

CROSS-EXAMINATION - PABLO STEWART

12:30:48   1   patients and chart reviews also.

2   Q    And turning your attention to paragraph 24 of your

3   declaration.

4   A    Yes.

12:30:55   5   Q    You state that you reviewed Dr. Mark Stern's expert report

6   to the court.

7         Do you see that?

8   A    Yes.

9   Q    Is Dr. Stern a psychiatrist?

12:31:10  10   A    I don't believe so.

11   Q    What mental health training does Dr. Stern have?

12   A    I couldn't tell you right now.

13   Q    And on direct you testified to a few individual files that

14   were highlighted by plaintiffs' counsel, including those, and

12:31:35  15   including those referenced in your report.

16         Is it your opinion that there would have been a

17   different outcome if there were more staff?

18   A    That's a pretty vague question.  Can you be more specific?

19   Q    You gave a pretty vague answer on direct.  You said that

12:31:52  20   "with respect to staffing levels, of course it's inadequate,"

21   and that "it can't meet the needs of the population."

22         So my question is, if there were what you term

23   adequate staff, would the outcomes have been different?

24   A    The outcomes of what?

12:32:08  25   Q    You highlight about 34 different inmates in your

CROSS-EXAMINATION - PABLO STEWART

12:32:11  1   declaration.  Do you recall that?

2   A    Yes.

3   Q    You take issue with various portions of the care provided

4   to those inmates; right?

12:32:18  5   A    Yes.

6   Q    My question is if the Department had what you call

7   adequate staffing, would those -- those outcomes have been

8   different, in your opinion?

9   A    It could have been significantly different, yes.

12:32:34  10  Q    Based on what?

11  A    Based on the fact that, for example -- let me give you, I

12  think, a very important example.  The standard of care in a

13  hospital is for psychiatry, or psychiatrist or psychiatric

14  provider, to see the patient daily.  My reviewing of the Baker

12:32:56  15  Unit and the Phoenix Facility at this purported hospital, I

16  saw that psychiatric providers were seeing people every 30

17  days, six weeks.  And so if there were sufficient number of

18  psychiatrists and the patients were seen daily, I suspect the

19  outcomes would be different, yes.

12:33:17  20  Q    And I'm not asking whether you suspect.  I'm asking

21  whether it is your opinion that -- let's take your example.

22  If psychiatric providers were seeing the inmates highlighted

23  in your report every single day, is it your opinion that the

24  outcomes would be different?

12:33:34  25  A    Yes.

CROSS-EXAMINATION - PABLO STEWART

12:33:35  1    Q   Based on what?

       2    A   Based on my experience and expertise of being a

       3    psychiatrist and working in inpatient units.

       4    Q   So your opinion is simply because mental health staff are

12:33:47  5    seeing patients, that in and of itself means there will be no

       6    bad outcomes?

       7    A   I didn't say that.  I said that the outcomes would be

       8    better.

       9           THE COURT:  Let me stop you for a moment here.  I

12:34:03 10    don't know -- I don't want to break up and that's why I let

      11    you go and I don't know how much more time you have,

      12    Ms. Hesman, but Trish needs a break.  Maybe we all do.

      13           How much more time do you think you'll have?

      14           MS. HESMAN:  Your Honor, I probably have a couple

12:34:20 15    more hours.  Plaintiffs' counsel said they were going to take

      16    one hour with him and they took significantly longer, so

      17    that's going to increase my cross.

      18           THE COURT:  Okay.  Well, that's fine, but everybody

      19    understands we're keeping score here.

12:34:35 20           MS. HESMAN:  Yes, Your Honor.

      21           THE COURT:  For both sides.

      22           Okay.  All right.

      23           MS. KENDRICK:  Could we take a 30-minute lunch break?

      24           THE COURT:  Is that enough time for everybody, 30

12:34:48 25    minutes?

12:34:48  1            Let me ask Trish.

          2            THE COURT REPORTER:  It will be a different reporter

          3    this afternoon.

          4            THE COURT:  All right.  Let's see you back here at 10

12:34:59  5    minutes after 1.

          6            (Recess taken at 12:35 p.m.)

          7            (End of transcript.)

          8                          *  *  *  *  *

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1                     **C E R T I F I C A T E**

2

3            I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7            I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14           DATED at Phoenix, Arizona, this 2nd day of December,

15   2021.

16

17

18

19

20                         s/ Patricia Lyons, RMR, CRR
                           Official Court Reporter
21

22

23

24

25

1              **R E D A C T I O N     C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing is a true and

8    correct copy of the transcript originally filed with the clerk

9    of court but incorporating redactions of personal identifiers

10   requested by the following attorneys of record in accordance

11   with Judicial Conference policy:  Joint Motion at Dkt. 4305,

12   Order at Dkt. 4317.

13         Redacted characters appear as an "x" in the

14   transcript.

15

16         DATED at Phoenix, Arizona, this 11th day of April.

17   2022.

18

19

20

21                         s/ Patricia Lyons, RMR, CRR
                           Official Court Reporter
22

23

24

25