1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ARIZONA

3                    _____

4    Shawn Jensen, et al., on behalf   )
     of themselves and all others      )
5    similarly situated; and Arizona   )
     Center for Disability Law,        )
6                                      )
                  Plaintiffs,          )   CV-12-0601-PHX-ROS
7                                      )
          vs.                          )   Phoenix, Arizona
8                                      )   November 5, 2021
     David Shinn, Director, Arizona    )   8:38 a.m.
9    Department of Corrections; and    )   REDACTED
     Richard Pratt, Interim Division   )
10   Director, Division of Health      )
     Services, Arizona Department of   )
11   Corrections, in their official    )
     capacities,                       )
12                                      )
                  Defendants.          )
13                                      )
     _____)

14

15        BEFORE:  THE HONORABLE ROSLYN O. SILVER, JUDGE

16        REPORTER'S REDACTED TRANSCRIPT OF PROCEEDINGS

17                     BENCH TRIAL - DAY 5

18            A.M. SESSION (pages 949-1073)
      AND P.M. SESSION (2:43 p.m. - 4:23 p.m.) (pages 1132-1201)

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC. 41
23   Phoenix, Arizona  85003-2151
     (602) 322-7257

24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

1                     **A P P E A R A N C E S**

2    **For the Plaintiffs:**

3                ACLU - Washington, DC
                 By: DAVID CYRUS FATHI, ESQ.
4                    CORENE T. KENDRICK, ESQ.
                     MARIA V. MORRIS, ESQ.
5                915 15th Street NW, 7th Floor
                 Washington, DC  20005
6
                 Prison Law Office
7                By: DONALD SPECTER, ESQ.
                 1917 5th Street
8                Berkeley, CA  94710

9                Arizona Center for Disability Law - Tucson, AZ
                 By: MAYA STOCK ABELA, ESQ.
10               177 North Church Avenue, Suite 800
                 Tucson, AZ  85701

11

12   **For the Defendants:**

13               Struck Love Bojanowski & Acedo
                 By: DANIEL PATRICK STRUCK, ESQ.
14                   RACHEL LOVE, ESQ.
                     TIMOTHY JAMES BOJANOWSKI, ESQ.
15                   ASHLEE B. HESMAN, ESQ.
                     TIMOTHY MICHAEL RAY, ESQ.
16               3100 West Ray Road, Suite 300
                 Chandler, AZ  85226

17

18

19

20

21

22

23

24

25

**I N D E X**

**EXAMINATION**

| WITNESS | PAGE |
|---|---|
| CRAIG HANEY | |
| Cross-Examination (Cont'd) By Ms. Love | 954 |
| Redirect Examination By Mr. Fathi | 992 |
| Cross-Examination By The Court | 1007 |
| Further Examination By Mr. Fathi | 1018 |
| STEFANIE PLATT | |
| Direct Examination By Ms. Kendrick | 1025 |
| TRAVIS SCOTT | |
| Direct Examination (Cont'd) By Ms. Morris | 1133 |
| Cross-Examination By Ms. Love | 1145 |
| Redirect Examination By Ms. Morris | 1178 |
| LORI STICKLEY | |
| Direct Examination By Ms. Morris | 1184 |

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 5244(a) | Health services encounters dated 12/17/20, 1/25/21, 1/4/21, 3/12/21, 6/2/21, 8/24/21 for MHxxxxxxxxxxxxxx | 962 |
| 5291(a) | Excerpt of eOMIS medical records for inmate TKxxxxxxxxxx, #xxxxx | 965 |

1

**INDEX CONTINUED**

2

**EXHIBITS**

3

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 5633 | Impeachment Exhibit | 971 |
| 5634 | Impeachment Exhibit | 974 |
| 5635 | Impeachment Exhibit | 987 |
| 2126 | Stefanie B. Platt – C.V. Resume (Plat Ex. 6) | 1033 |
| 4004 | Maintenance Work Order Request, Work Order 4321, dated September 8, 2021 | 1178 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

THE COURT:  All right.  So I received this morning plaintiffs' motion in limine.

08:38:44    We need a response, and defendants are to be sure and tell me, under seal, whether or not any of the information that's there or you think is there that you wish to use relates to credibility.  Meaning it has to be bias or has to indicate that she's untruthful.  And that's the only thing I 08:39:21 would under any circumstances, no matter who the witness is, consider be used.

And whatever you provided me is to be provided under seal.

Let me ask plaintiffs' attorney, you have -- you are 08:39:40 representing the plaintiffs, the real plaintiffs, not Ms. Platt.  Does she have her own attorney?

MS. KENDRICK:  Yes, she does, Your Honor.

THE COURT:  And has that attorney or does that attorney intend to file anything?

08:39:57    MS. KENDRICK:  I have not asked him, but I can inquire.  He is aware of the motion in limine and the subpoena.

THE COURT:  And I would suggest that you tell him to think about it since he's -- or she?  Did you say it was a he?

08:40:13    MS. KENDRICK:  It's a he.

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

08:40:18 1      THE COURT:  -- is representing her personally.

2      All right.  So let's proceed.

3      I had understood Dr. Haney might be appearing by

4 video.  I guess there was no agreement?

08:40:34 5      MR. FATHI:  Your Honor, defendants did not object and

6 the courtroom deputy was very helpful in communicating with

7 the Court, but by the time we received word, Dr. Haney had

8 already checked back into his hotel and changed his flight, so

9 he is here this morning.  And we're grateful to the Court for

08:40:50 10 allowing video testimony even though that did not actually

11 happen.

12      THE COURT:  Okay.  All right.  Let's proceed.

13                    **CRAIG HANEY,**

14 recalled as a witness herein, having been previously sworn or

15 affirmed, was examined and testified further as follows:

16      C R O S S - E X A M I N A T I O N  (CONTINUED)

17 BY MS. LOVE:

18 Q   Good morning, sir.

19 A   Good morning.

08:41:03 20 Q   As to your tour at the Lewis facility in late September

21 when you toured the Sunrise Unit where the minors are housed,

22 as you toured, you were aware that the three minor males that

23 were in detention were there because they had recently been in

24 a fight where they had attacked another inmate; correct?

08:41:31 25 A   I don't -- I don't -- they had been found to have been

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

08:41:36  1    involved in some disciplinary infraction. I don't remember

2    the specifics of it.

3    Q    And you were also advised that there were issues between

4    the three that had all been in the fight such that they were

08:41:50  5    being detained and being restricted at that time from

6    recreation; correct?

7    A    Again, I don't remember the specifics of what the conflict

8    was that led to them being placed in solitary confinement.

9    Q    Okay. Now, if you can -- do you have your declaration in

08:42:08  10   front of you?

11   A    I do.

12   Q    Let's go to declaration page 83, paragraph 169.

13        I want to refer you to, and I'm not going to say the

14   inmate's name but I want to refer you to the inmate that

08:42:30  15   you're speaking about in paragraphs 169 and 170.

16   A    Okay.

17   Q    This particular inmate was somebody that you had

18   interviewed in 2013 at Eyman-Browning BMU while he was in max

19   custody and then in 2021 September, late September, when you

08:42:53  20   interviewed him he was in the Lewis Barchey Unit; correct?

21   A    That's correct.

22   Q    And Lewis Barchey Unit is not maximum custody, is it?

23   A    No, it's not.

24   Q    By your notation in your declaration at page 170 you

08:43:10  25   reported the inmate had advised you that he felt there had

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

08:43:14  1    been no improvements in mental health care and complained

2    about a lack of services; correct?

3    A    Yes.  He said -- I mean, specifically he said even in the

4    medium security unit he's in now a lot of people complain

08:43:27  5    about the lack of services.

6    Q    And when you went back to review medical records regarding

7    the people you interviewed, did you look at the medical

8    records for this particular inmate?

9    A    I don't recall.

08:43:42  10   Q    Okay.  Let's look and see if maybe you'll recall when you

11   see the medical records.

12            THE COURT:  And this is in evidence?

13            MS. LOVE:  There's a stipulation as to medical

14   records, and then I will refer to distinct excerpts.

08:43:59  15            THE COURT:  And what exhibit number is this?

16            MS. LOVE:  This is Exhibit 5291.

17            THE COURT:  And it's been admitted already; right?

18            MS. LOVE:  There is a stipulation, so we would move

19   to admit since there's stipulation and no objection from the

08:44:14  20   plaintiffs, and then will advise as to the distinct excerpts

21   that we'll make separate exhibits.

22            THE COURT:  Thank you.

23            MR. FATHI:  Your Honor, if we may, I'd like to have

24   the individual excerpts admitted separately simply because

08:44:26  25   there may be multiple hearsay or other issues.

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

08:44:30   1          THE COURT:  That's fine.  But when you say there may

2     be, you need to say there is --

3          MR. FATHI:  Your Honor --

4          THE COURT:  -- otherwise -- are you saying you want

08:44:40   5     to look through it or to see there's no other hearsay?  I'm

6     only -- I am, as the fact finder, only going to consider what

7     she refers to.

8          MS. LOVE:  Correct, and that's what we intend to

9     do --

08:44:52  10          THE COURT:  Hold on.  Hold on.

11          But in case there is something you think I shouldn't

12     look at, you can later, Mr. Fathi, tell me that and then talk

13     to counsel and say let's exclude this.  Is that clear?

14          MR. FATHI:  That's fine.  Thank you, Your Honor.

08:45:04  15          MS. LOVE:  And I did make a mistake as to the exhibit

16     number.  I have the wrong inmate.  I apologize.  We're

17     actually looking at 5442 -- 5244.

18          THE COURTROOM DEPUTY:  So is this going to be a

19     screenshot of this particular page?

08:45:27  20          MS. LOVE:  There will be multiple pages and we will

21     screenshot them.

22          THE COURTROOM DEPUTY:  Let's do this -- 5344, is that

23     what it is?

24          MS. LOVE:  5244.

08:45:38  25          THE COURTROOM DEPUTY:  Okay.  5244A.

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

08:45:42    1    BY MS. LOVE:

         2    Q   Sir, if I could direct your attention, we are going to

         3    look at an encounter dated 1/26/2021.

         4             THE COURT:  It's not on screen.  He said 1/26 --

08:46:11    5             MS. LOVE:  Yes.  He's pulling it up right now.

         6             THE COURT:  I believe this is 1/25.  Is it 1/25 or

         7    1/26?

         8             MS. LOVE:  Could you move the record up a little bit,

         9    make sure we have the right one.

08:46:47   10             I apologize, Your Honor.  We're going to first go to

        11    the encounter dated December 17th, 2020.  If you can scroll

        12    down to the Subjective notes section.

        13    BY MS. LOVE:

        14    Q   And do you see where it indicates that he was seen on that

08:48:49   15    day for one on one in a private confidential setting for

        16    routine counseling?

        17    A   Yes.  He was seen for five minutes for routine counseling

        18    session.

        19    Q   Does that refresh your recollection as to any aspect of

08:49:04   20    reviewing this particular inmate's records after you

        21    interviewed him?

        22    A   No.

        23    Q   Okay.  Next let's look at the encounter dated January 25th

        24    of 2021.

08:49:13   25             And the first line of this encounter indicates on

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

08:49:23  1  this date the inmate was seen post medication termination via

2  telemonitor, and I'm paraphrasing here, in private clinic

3  office with a mental health tech; correct?

4  A   Yes.

08:49:34  5  Q   Does that refresh your recollection as to reviewing this

6  inmate's medical records after interviewing him?

7  A   No, Counsel.  I looked at a lot of different medical

8  records.  I don't know if I looked at this particular person's

9  or not.

08:49:47  10 Q   Okay.  Next encounter date, January 4th of 2021.  This one

11  indicates that inmate was seen, versus telemonitor, with a

12  mental health tech present on that date; is that correct?

13  A   Yes, that's what it indicates.

14  Q   Next encounter dated March 12th of 2021.

08:50:17  15      On this date the inmate was again seen for one on one

16  in a confidential setting for routine counseling; correct?

17  A   Yes, for six minutes.

18  Q   Next encounter, June 2nd of 2021.

19      Inmate was again seen one on one in confidential

08:50:44  20  setting for routine counseling; correct?

21  A   For two minutes, yes.

22  Q   The question is, was he was seen.

23  A   Yes, he was seen briefly.

24  Q   Next encounter, August 24th of 2021.

08:51:07  25      Again on this date inmate was seen one on one in a

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

08:51:09   1   confidential setting and, on the second line, he reported to

2   the PA that he was doing all right; correct?

3   A   Yes.  This was a longer encounter, as it indicates.

4   Q   So does this -- now seeing that this inmate was seen

08:51:23   5   regularly during this time period, does it call into question

6   what he reported to you that he was not -- that he was not

7   receiving much mental health services?

8         MR. FATHI:  Objection, Your Honor.  That misstates

9   the language of Dr. Haney's report.  It says complained about

08:51:42  10   lack of services.

11         MS. LOVE:  Okay.

12   BY MS. LOVE:

13   Q   Does this refresh your recollection as to whether or not

14   this inmate complained he had a lack of services was correct

08:51:50  15   with respect to his care?

16   A   No, I think you misunderstood this paragraph.  All

17   these --

18   Q   I --

19   A   All these encounters are taking place in Barchey Unit.

08:52:01  20   He's talking to me about what happened to him in isolation.

21   So if you read the rest of the paragraph, that's what he's

22   making clear.  Rast Max is hardly better, it's known as SMU 3

23   because it's harsh.  He talks about the lack of regular mental

24   health care and regular contact and he's talking about what it

08:52:19  25   was like in Rast Max, not what it was like in Barchey.

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

08:52:23  1   Q   While he was in Barchey, now looking in these records, you

2   would agree with me he was being seen by mental health;

3   correct?

4   A   He was being seen --

08:52:31  5   Q   Just yes or no whether or not he was being seen --

6          MR. FATHI:  Your Honor, I ask --

7          THE COURT:  That calls for yes or no answer, but if

8   you can't answer yes or no, tell her.

9          THE WITNESS:  Yes, as we've discussed.

08:52:44  10  BY MS. LOVE:

11  Q   Next I want to direct your attention to your declaration

12  at page 77.

13          Again, we're not going to say the inmate's names, but

14  if you look at paragraph 158 that starts on page 77 and then

08:53:09  15  you'll go through page 78 at 160.

16          And while you look at that, defendants move to admit

17  the particular excerpts that we will make into a new exhibit

18  of 5244A into evidence.

19          THE COURTROOM DEPUTY:  With all those different

08:53:25  20  dates, it will be one?

21          MS. LOVE:  Yes, unless you prefer us to do it

22  different.

23          THE COURTROOM DEPUTY:  Up to you.

24          MS. LOVE:  We'll do it all as one.

08:53:38  25          THE COURT:  No objection, they're admitted.

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

09:25:03 1      (Exhibit 5244(a) admitted.)

2      BY MS. LOVE:

3      Q   And have you had a chance to review those paragraphs that

4      I indicated to you?

08:54:10 5      A   I have.

6      Q   And this, again, was an inmate that you had interviewed in

7      2013 while he was maximum custody housed in SMU 1 at that

8      time; correct?

9      A   Yes, that's right.

08:54:23 10     Q   And you saw him again in 2021 and he was still in SMU 1;

11     correct.

12     A   He was.

13     Q   And in paragraph 160 you indicate that he acknowledged his

14     past suicide attempts but said that despite that he was not

08:54:47 15     getting meaningful healthcare.  Quote, "No group stuff, they

16     just put you in a cage"; correct?

17     A   Yes.

18     Q   Do you remember whether or not after interviewing this

19     inmate at SMU 1 in mid-September 2021 if you took a look at

08:55:01 20     his records to see if what he was reporting to you was

21     consistent or inconsistent with the records?

22     A   I don't recall whether I looked at this inmate's specific

23     records.

24     Q   All right, let's take a look at, then -- this is

08:55:16 25     Exhibit 5291.  And again we'll do the same thing where I'll

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

08:55:25  1  refer you to specific excerpt.  This would eventually, in a

2  little bit, would become Exhibit 4- -- or 5245(a) for you?

3       THE COURTROOM DEPUTY:  I think it's 5291, you said?

4       MS. LOVE:  Yes.

08:55:44  5       THE COURTROOM DEPUTY:  (a).

6       MS. LOVE:  It will become 5291.

7       (Exhibit 5291(a) marked for identification.)

8  BY MS. LOVE:

9  Q   If I can direct your attention, and we'll bring it up here

08:55:56  10 on the screen, to an encounter date of January 26, 2021.

11       And on this date this patient was seen at 8:10 a.m.

12 for routine one-on-one mental health follow-up appointment.

13 He was offered to meet in a private confidential setting and

14 accepted.

08:56:18  15       Do you see that?

16 A   Yes.

17 Q   Does this refresh your recollection in whether or not you

18 reviewed this particular inmate's records after interviewing

19 him in 2021?

08:56:27  20 A   No.

21 Q   Next let's look at encounter date of April 14th, 2021.

22       Here, as we see from the first two sentences, again

23 the patient was seen for routine mental health follow-up

24 assessment.  He was offered and seen in a private confidential

08:56:53  25 setting and he accepted that offer.

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

08:56:55   1          Do you see that?

2    A    I do.

3    Q    Next let's look at encounter date June 29th, 2021.

4          And on this date the patient was seen for an RTV --

08:57:14   5    RTC visit and treatment plan and he was seen in a confidential

6    one-on-one setting and he stated that "I'm all right, I mostly

7    ignore stuff," and went on to explain he listens to podcasts,

8    he does his educational stuff, economics.

9          Do you see that?

08:57:32  10    A    I do.

11   Q    With that more detailed information regarding that

12   particular inmate, does that refresh your recollection of

13   looking at these records after interviewing him?

14   A    No, it doesn't.  Again, the records are hard to identify.

08:57:45  15   I looked at a lot of different records and none of them

16   particularly stand out.  This one doesn't.  I may have looked

17   at it; I may not have.

18   Q    All right, now let's look at an encounter date of

19   September 21st, 2021.

08:57:59  20          And on this particular date we see in the second

21   paragraph that he refused his appointment that day and signed

22   his refusal, and he reported that he wanted to be seen by a PA

23   not an NL; correct?

24   A    Yes.

08:58:27  25   Q    Next encounter date, September 22nd, 2021.

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

08:58:30  1      On this date the inmate was seen for routine mental

2  health follow-up assessment and an HNR response, and he was

3  offered to be seen in a confidential setting; correct?

4  A   Yes, that's correct.

08:58:49  5  Q   Next encounter date of September 28th, 2021.

6      And on this date he was seen for his RTC HNR

7  submitted, and again offered to be seen in a private

8  confidential setting and he accepted on that date; correct?

9  A   Yes.

08:59:15  10  Q   And so we see from the health services encounters that he

11  had during the time period we've just looked at that from

12  September 28, 2021, through -- and this is reverse

13  chronological order -- January 26th, 2021, he had six mental

14  health encounters; correct?

08:59:37  15  A   Yes.  I didn't count them, but that seems accurate.

16          MS. LOVE:  And defendants move to admit.

17          THE COURT:  No objection?  It's admitted.

18          (Exhibit 5291(a) admitted.)

19  BY MS. LOVE:

08:59:58  20  Q   Yesterday we had quite a bit of discussion about where, in

21  your opinion, Arizona ranks on that sort of sliding scale as

22  to departments that are doing well on managing their

23  restrictive housing inmates and those that were not doing as

24  well, and we talked about a couple different states.  But my

09:00:20  25  question for you is:  Do you have an opinion as to where on

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

09:00:22  1   the scale, in your opinion that we've been talking about,

2   where does California rank?

3   A   Well, there are a lot of different units in California and

4   lot of different aspects to the way in which California

09:00:37  5   manages it's restrictive housing.

6        I want to keep underscoring what I did yesterday

7   which this is not a scale I created and is not a scale I'm

8   particularly comfortable talking about.

9        I made a general characterization that Arizona is in

09:00:52  10   the harsher and more severe category or quadrant of states

11   that I'm familiar with.  I was reluctant to compare states and

12   I was reluctant to put a number or rank ordering on them.

13        So in some ways California provides a lot of

14   treatment.  They have specialized housing units where people

09:01:10  15   who have mental illness go in order to receive treatment.

16   People go there instead of going to traditional restrictive

17   housing.  They have an enhanced outpatient program and units

18   which were created for people who otherwise would be in

19   segregation and instead they're receiving mental health

09:01:29  20   treatment and are out of their cell quite a bit.

21        It's by no means perfect, but it is a different model

22   from the one that's followed in Arizona.

23   Q   And you did not create the model for the California

24   system; correct?

09:01:41  25   A   No.  I certainly didn't.

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:01:43  1   Q   And you have not created any model for housing

2   high-custody inmates or those with serious mental illness for

3   any corrections department; correct?

4   A   I had input into them.  I had input into the one in

09:01:58  5   California, but I certainly didn't create it.

6   Q   And as you have studied systems across the nation as to

7   how they manage their high-custody inmates or detention

8   inmates and how much time out of cell they have, I'm sure you

9   probably -- I shouldn't assume.  Have you looked at the

09:02:15  10   Federal Bureau of Prisons?

11   A   Some.  Federal Bureau of Prisons is a massive system.  I'm

12   certainly familiar with some aspects of the system.  I spent a

13   lot of time studying the administrative maximum facility ADX,

14   for example.

09:02:33  15   Q   Have you had occasion to review the Federal Bureau of

16   Prisons policy on operation of their special management units?

17   A   I'm sure at some time.  At some time I have.  I don't

18   recall the specifics of it offhand.

19   Q   Would it refresh your recollection if I gave you a chance

09:02:54  20   to, as I ask you questions, to have the BOP policy in front of

21   you?

22   A   Sure.

23        MS. LOVE:  If we could look at Exhibit 69, please.

24        THE COURTROOM DEPUTY:  5633.

09:03:49  25        THE COURT:  Thank you.

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:03:53  1         MS. LOVE:  We'll bring that up for you on the screen
        2    in just a moment.
        3         MR. FATHI:  Objection, Your Honor.  This is not
        4    proper impeachment.  He did not testify about anything having
09:04:02  5    to do with the Federal Bureau of Prisons.  This document was
        6    not disclosed because it was characterized as an impeachment
        7    exhibit.  But, again, since he said nothing about Bureau of
        8    Prisons, this cannot be proper impeachment.
        9         THE COURT:  Well, I'm not so sure that is correct.
09:04:19 10    He did say he was a consultant for the Department of Justice
       11    in a lawsuit, so that's not exactly correct, when the
       12    Department of Justice was being sued.
       13         I'm not sure how you're going to use this.
       14         MS. LOVE:  Well, Your Honor, also he testified that
09:04:34 15    he has done extensive studies for about the last 20 years on
       16    how different systems house their restrictive custody or what
       17    he terms isolation inmates and if --
       18         THE COURT:  Overruled.
       19         MS. LOVE:  So he can't testify to this?
09:04:53 20         THE COURT:  I said overruled.
       21         MS. LOVE:  Okay.  All right.  Sorry.
       22    BY MS. LOVE:
       23    Q   So in front of you, you have the BOP Special Management
       24    Unit policy.  And looking at the first page, does this refresh
09:05:08 25    your recollection at all as to reviewing it any time recently?

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:05:12 1  A   I don't know that I've reviewed it recently.  I'm sure I

2  reviewed it sometime in the past.

3  Q   And under Purpose and Scope we see that the Special

4  Management Unit for the BOP is used where enhanced management

09:05:29 5  is necessary to ensure safety and security and orderly

6  operations of the facilities as well as protection of the

7  public; correct?

8  A   That's what it specifies, yes.

9  Q   And do you understand that the BOP employs the Special

09:05:42 10  Management Unit as a program that lasts approximately 12

11  months for their inmates?

12      MR. FATHI:  Objection, Your Honor.  This is not

13  impeachment.  This is not impeaching any of his prior

14  testimony.

09:05:53 15      THE COURT:  Well, it doesn't have to be impeachment

16  exactly.  It can be -- it can relate to his testimony.  So

17  overruled.

18      MR. FATHI:  I would just make the point, Your Honor,

19  this was characterized as an impeachment exhibit and,

09:06:07 20  therefore, not disclosed.  We don't believe this is proper

21  impeachment.

22      THE COURT:  Well, it's a new document that relates to

23  his testimony that is information that he gave on direct

24  examination.  So overruled.

25

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

09:06:25  1    BY MS. LOVE:

2    Q   And are you aware, as to the Special Management Unit for

3    the BOP, how much time as to recreation they offer their

4    Special Management Unit inmates on a weekly or daily basis?

09:06:40  5    A   I don't know it offhand.  I'm sure it's in the document.

6    Q   If you can turn to -- if you look at the bottom, there's a

7    stamp where it says C -- I'll show you on the screen, but

8    we're going to move to CH 069-0007.

9        And about in the middle of the page at number 7, do

09:07:01 10    you see where it says "Recreation"?

11    A   Yes.

12    Q   If you could give that a read and let me know if it

13    refreshes your recollection as to how much recreation Special

14    Management Unit inmates get in the BOP system.

09:07:17 15    A   Yes.  It says at least five hours per week, ordinarily in

16    one-hour periods on different days.

17    Q   You have no reason to dispute that; correct?

18    A   No, I have no reason to dispute this.  That's what it

19    says.

09:07:30 20        MS. LOVE:  Defendants move to admit.

21        THE COURT:  It's admitted.

22        THE COURTROOM DEPUTY:  The impeachment exhibit,

23    Ms. Love?

24        MS. LOVE:  Um-hmm.

09:07:43 25        (Exhibit 5633 admitted.)

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:07:45  1   BY MS. LOVE:

2   Q   Do you also, based upon your research of systems across

3   the nation, as to BOP do you understand that they also, in

4   addition to the Special Management Unit, they also employ

09:07:55  5   Special Housing Units?

6   A   Yes.

7   Q   Do you know how much out of time for exercise the Special

8   Housing Unit inmates get under the BOP system?

9   A   Not offhand, no.

09:08:10  10   Q   If I were to show you their policy on the same, would that

11   perhaps refresh your recollection if you could look at that

12   section?

13   A   I'm sure it would.

14         MS. LOVE:  We're going to look at impeachment

09:08:24  15   Exhibit 68 next.

16         THE COURTROOM DEPUTY:  This is 5634.

17   BY MS. LOVE:

18   Q   And you see there at the first page this is the policy for

19   the BOP for their Special Housing Units?

09:09:00  20   A   Yes, that's what it -- that's what it says.

21   Q   Do you understand the Special Housing Units with the BOP

22   system are used for inmates that are in disciplinary

23   segregation or administrative detention?

24   A   Yes.

09:09:15  25         MR. FATHI:  Objection, Your Honor.  Again, this is

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

09:09:16   1   not proper impeachment.

2          THE COURT:  Well, I'm not sure what you mean by that,

3   Mr. Fathi, because --

4          MR. FATHI:  Impeachment, Your Honor, is contradicting

09:09:27   5   or casting doubt upon the witness's prior testimony.

6          THE COURT:  Well, the second part of it, impeachment

7   as I thought you were saying means that he was not telling the

8   truth.  But casting doubt is also impeachment.  And it can

9   be -- and it must be based upon his testimony.  So under that

09:09:50  10   broad view, which is, in fact, impeachment, objection is

11   overruled.

12          Present the question, then.

13   BY MS. LOVE:

14   Q   Do you understand within the BOP system their Special

09:10:09  15   Housing Units are used to house inmates in disciplinary

16   segregation and administrative detention?

17   A   Yes, that's what it specifies on the page.

18   Q   And if I can direct your attention to -- it's going to be

19   impeachment Exhibit 68 at page 11, that continues to page 12.

09:10:35  20   Do you see at page 11, the bottom, Section G, about exercise?

21   A   Yes.

22   Q   If you could take a look at that and see if that refreshes

23   your recollection as to the amount of recreation these inmates

24   are afforded a week.

09:10:51  25   A   Yes.  It says outside exercise for at least five hours per

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

09:10:55   1    week.  Ordinarily, I assume, it says in one-hour periods as it

2    continues.

3    Q   Is it your understanding as well the BOP also permits

4    exercise can be denied for periods for a week by order of the

09:11:10   5    warden if there are issues regarding safety and security or

6    orderly operation of the facility?

7    A   Yes, that's what it says.

8    Q   Are you aware that BOP, as to standards in which they

9    employ their operations, are consistent with the guidelines

09:11:29   10   for -- or promulgated by the American Correctional

11   Association?

12            MR. FATHI:  Objection, vague.

13            THE COURT:  Sustained.

14   BY MS. LOVE:

09:11:38   15   Q   Do you know what the American Correctional Association is?

16   A   Yes.

17   Q   Are you aware that within the industry they put out --

18   this organization puts out standards by which departments may

19   voluntarily choose to adhere to?

09:11:55   20   A   Yes.

21   Q   And are you aware of whether or not the BOP's -- the BOP's

22   policies and procedures relating to Special Housing Units

23   follow the ACA guidelines for restricted housing management?

24   A   I'm not offhand.

09:12:18   25            MS. LOVE:  Your Honor, we move to admit.

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

09:12:22  1            THE COURT:  Admit --

       2            MR. FATHI:  Excuse me?

       3            THE COURT:  This exhibit?  Is that what you're

       4   asking?

09:12:29  5            MR. FATHI:  I'm sorry, which exhibit?

       6            MS. LOVE:  It is --

       7            THE COURT:  5634.

       8            MR. FATHI:  No objection.

       9            THE COURT:  It's admitted.

09:25:03 10            (Exhibit 5634 admitted.)

      11   BY MS. LOVE:

      12   Q   Are the ACA standards as to management of restricted

      13   housing units something that you have studied or analyzed in

      14   conjunction with your studies across the nation as to the

09:12:58 15   effects of restrictive housing or isolation on mental health

      16   of inmates?

      17   A   No, not specifically.  I'm aware that they exist.  I'm

      18   aware they're also evolving and changing over time on this

      19   particular issue.

09:13:11 20   Q   Have you ever been to an ACA conference?

      21   A   I have.

      22   Q   Are you a member of ACA?

      23   A   I'm not.

      24   Q   Have you ever taught at an ACA conference?

09:13:19 25   A   Never taught at an ACA conference, no.

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:13:22  1  Q   Do you consider the ACA to be an organization within

       2  corrections that -- that provide guidelines that meet with the

       3  corrections industry standard of care?

       4          MR. FATHI:  Objection, Your Honor, vague.

09:13:41  5  BY MS. LOVE:

       6  Q   As to management of restricted housing units.

       7          THE COURT:  He can answer that yes or no, that's all.

       8          THE WITNESS:  Could you ask that again?  I lost the

       9  question.

09:13:50  10  BY MS. LOVE:

       11  Q   Yes.

       12          Are you aware whether or not in the corrections

       13  industry the ACA organization puts out standards for

       14  management of restricted housing units that meet or exceed the

09:14:03  15  standard of -- standard of care in corrections as to

       16  operations for those types of units?

       17          MR. FATHI:  Objection, vague and compound; there were

       18  two questions there.

       19          THE COURT:  Sustained.

09:14:17  20  BY MS. LOVE:

       21  Q   Are you aware of whether or not the ACA puts out standards

       22  within the corrections industry as to management of restricted

       23  housing units?

       24  A   Yes, they have standards that cover a number of different

09:14:33  25  things, and a specific set of them that address issues of

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

09:14:37  1  restrictive housing.

2  Q   Are you aware of whether or not the ACA then puts out

3  standards within the category for out-of-cell recreation time

4  for restrictive housing units?

09:14:52  5  A   I don't recall that offhand.  I don't know.  It's been a

6  bit of time since I looked at those standards.  I wouldn't be

7  surprised if it did.

8  Q   Would it surprise you if the standard is similar to BOP

9  where it is a recommendation or standard where restrictive

09:15:09  10  housing unit inmates are afforded five hours a week of

11  recreation, one hour per day?

12  A   It wouldn't surprise me or not surprise me.  I don't -- I

13  don't have an opinion one way or the other.  I've opined that

14  is too short a period of time in the context that we've been

09:15:26  15  discussing it in Arizona.

16  Q   Would you like to take a look at the ACA standards?

17       THE COURT:  You can ask him to look at them.  I mean,

18  you asked him if he was surprised, which is an odd question to

19  ask him.  If you want to show him something, that's fine.

09:15:46  20       MS. LOVE:  All right.

21  BY MS. LOVE:

22  Q   I'm going to have you take a look at Defendants' Exhibit

23  3531.

24       MS. LOVE:  And if we go to page 111.  This will be

09:17:03  25  145 of the Exhibit, 3531.

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

09:17:22  1   BY MS. LOVE:

2   Q   Do you see the section -- I'm sure we're getting that for

3   you.  First page here, do you see this section is special

4   management housing and restrictive housing of the ACA

09:17:39  5   standards?

6   A   Yes.

7   Q   And then if we go forward to page 119 of the ACA

8   standards, which is 153 of the exhibit, do you see the section

9   where it says "exercise out of cell"?

09:18:16  10  A   Yes.

11  Q   Does that refresh your recollection that the ACA standard

12  is minimum of one hour exercise per day outside their cells

13  five days a week, unless security or safety considerations

14  dictate otherwise?

09:18:33  15  A   Yes, that's what it indicates.

16          MS. LOVE:  Having no objection from plaintiffs in our

17  joint pretrial order to this exhibit, defendants move to

18  admit.

19          MR. FATHI:  Your Honor, we do object.  It's hearsay.

09:18:45  20          THE COURT:  I'm sorry, I thought -- is there a

21  misunderstanding between the two of you?

22          MS. LOVE:  Yes, because in the joint pretrial order

23  they made no objections to our exhibits whatsoever.

24          THE COURT:  All right.

09:18:56  25          Is that correct, Mr. Fathi?

CROSS-EXAMINATION (CONTINUED) — CRAIG HANEY

09:19:01   1          MR. FATHI:  May we have a moment, Your Honor?

          2          THE COURT:  Yes.

          3          MR. FATHI:  Your Honor, on Document 4116-1, page 45,

          4   plaintiffs said the following:  Plaintiffs received

09:20:10   5   defendants' list of trial exhibits after business hours the

          6   evening of October 28, the night before this joint statement

          7   was due.  Because of the tight deadline and number of

          8   exhibits, plaintiffs did not have time to provide an

          9   exhibit-by-exhibit objection list.  Plaintiffs and defendants

09:20:27  10   are working together, however, to agree on a procedure for

         11   exchanging objections expeditiously.

         12          Plaintiffs reserve all objections to defendants'

         13   exhibit list.  In particular, defendants' exhibits may be

         14   objectionable depending how they're presented, especially

09:20:44  15   if -- evidence -- excuse me -- especially if evidence is

         16   irrelevant for a particular purpose or issue or if the use of

         17   evidence becomes unduly cumulative or prejudicial under

         18   FRE 403.

         19          Plaintiffs also object to at least the following

09:20:59  20   categories of exhibits.  Let me see -- so, Your Honor, we

         21   believe we've preserved our objections given that we --

         22          THE COURT:  Doesn't sound like a stipulation to

         23   admit.

         24          MR. FATHI:  I'm sorry?

09:21:29  25          THE COURT:  No, I'm asking Ms. Love.  Doesn't sound

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:21:31   1    like they stipulated to admit it.

       2           MS. LOVE:  Your Honor, the parties --

       3           THE COURT:  Let me stop you for a second.  Tell me if

       4    what has been represented is incorrect.  It sounded as if they

09:21:42   5    were saying they didn't have an opportunity to review

       6    everything, so they were not waiving their objections.  And

       7    they said that perhaps you and -- defense and plaintiffs'

       8    counsel would get together and make up their mind.

       9           If you're telling me there was a decision afterwards

09:22:01  10    that everything was admitted, then I would agree with you.

      11    Otherwise, they made it clear that they were reserving their

      12    objections.  What's wrong with that?

      13           MS. LOVE:  Well, we didn't come to an agreement

      14    after, but defendants were able to do objections to the

09:22:16  15    thousands --

      16           THE COURT:  They basically said -- they basically

      17    said that they were going to maintain their objections.  So I

      18    don't read it any other way than what he has said here in

      19    court.

09:22:28  20           MR. STRUCK:  Your Honor, if I may.  On the first day

      21    of trial, you asked plaintiffs -- you pointed out the

      22    plaintiffs didn't make any objections and you asked them "Is

      23    that true you didn't make any objections," and they responded

      24    "We didn't make any objections."  That was the first day of

09:22:42  25    trial.

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:22:45  1    THE COURT:  I don't remember that I was -- you can
        2   tell me if that's correct and we --
        3        MR. STRUCK:  We can pull up the transcript.
        4        THE COURT:  Did I say you did -- did you not have any
09:22:55  5   objections?  And counsel said "no, we don't have objections."
        6        I thought the conversation was just as has been
        7   presented here, which is that they didn't have time and that
        8   both of you said -- and I think, Mr. Struck, you said "We're
        9   still working on it."  I don't think I saw anything after
09:23:17 10   that, that we've now worked it out.
       11        MR. FATHI:  There was no such statement, Your Honor.
       12        MR. STRUCK:  On the first day of trial, the Court:
       13   "It seems to me from everything I've received that the only
       14   significant issue for today are exhibits.  As much as I can
09:23:33 15   tell, plaintiffs don't have objection to the defendants'
       16   proposed exhibits.  Defendants, however, have made a number of
       17   objections to the plaintiffs' exhibits, and I'm going to
       18   undertake to resolve all those objections.  I need to know,
       19   however, so we can proceed now today whether or not I need to
09:23:53 20   resolve any of those objections that are made to any of the
       21   evidence that is to be offered today.
       22        MR. FATHI:  Your Honor, that was just a passing
       23   statement by the Court.  There's obviously no statement by
       24   plaintiff saying we have no objection.  And the joint pretrial
09:24:09 25   order speaks for itself.  We specifically said that due to the

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:24:13  1   huge number of exhibits that we have received the night before

2   this document was due, we will reserve our objections.

3            THE COURT:  Okay.  Then my understanding then was --

4   despite what I said, was incorrect as to whether or not the

09:24:30  5   plaintiffs were stipulating.

6            So the objection is sustained.

7   BY MS. LOVE:

8   Q   Sir, when you were testifying yesterday regarding -- this

9   is on direct examination.  You mentioned several jurisdictions

09:24:57 10   that you believe, based upon your research and study, put

11   limits on the time periods that inmates can be in a restricted

12   status that you consider isolation.  Do you remember

13   testifying about that?

14   A   Yes.

09:25:12 15   Q   And my understanding is you said that New York and

16   Pennsylvania both put restrictions on time, as to how much

17   time an inmate can remain in isolation.

18   A   I said New York, I didn't say Pennsylvania.

19   Q   And, for New York, have you reviewed their policy that was

09:25:32 20   last issued September 24th of 2021 for their Special Housing

21   Units?

22   A   I have.  They passed a law, the HALT Act.  I assume that's

23   what you're referring to.

24   Q   Do you know where in the policy it says that inmates in

09:25:47 25   special housing units can only be there for a set period of

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:25:50  1   time?

2   A   I'd have to look at the HALT Act.  It was recently enacted

3   and it's in the process of being implemented.

4   Q   Was it your testimony that Pennsylvania places a

09:26:00  5   restriction of 30 days on their special housing unit stays for

6   their inmates?

7   A   I didn't say anything about Pennsylvania.

8   Q   I'm sorry.  New York?

9   A   I don't recall what I said about New York.  I know they

09:26:13  10  have time limits.  I thought the time limits were 15, 20 days.

11  I'd have to look at the act.  There are time limits.

12  Q   I'm sorry, I didn't mean to interrupt.

13          Would it surprise you their brand new -- or their

14  pretty new policy of September 24th, 2021, does not contain

09:26:30  15  time limits for which inmates can be housed in special housing

16  units?

17  A   Well, it would surprise me.  It was a provision of the

18  HALT Act, yes.

19  Q   Are you aware of whether or not -- are you aware of the

09:26:44  20  exercise out of time -- exercise out-of-cell time that the

21  New York system provides for their inmates under their special

22  housing unit directives?

23  A   I haven't looked at it recently, so the answer's no.

24  Q   Would it refresh your recollection if you were able to

09:27:03  25  look at it?

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

```
09:27:04   1   A   Sure.

           2           MS. LOVE:  Going to look at now Impeachment Exhibit

           3   90.

           4           MR. FATHI:  Excuse me, Your Honor.  Could we get a

09:27:12   5   time check.  Counsel said she had about a half hour.  We're

           6   now at about 45, and I do recognize I have taken some of that

           7   time, but can we get an estimate how much longer.

           8           THE COURT:  Well, I don't know what the two of you

           9   spoke about, but yesterday I heard she thought she had an

09:27:27  10   hour.

          11           MR. FATHI:  No, she did say 30 minutes, Your Honor.

          12           MS. LOVE:  I said about 30 minutes.  And I know we're

          13   trying to stick to a schedule here, but --

          14           THE COURT:  You may proceed.  How much more time do

09:27:39  15   you think you'll have?

          16           MS. LOVE:  Ten minutes at the most.

          17           THE COURT:  Okay.

          18           And let me -- let me also make clear on exhibits so

          19   that we can save time.

09:27:48  20           As I said, I may have misunderstood what the

          21   agreement was between counsel when I made the statement that

          22   was -- that now looks like it was ambiguous as to whether or

          23   not the defendants had any -- the plaintiffs had any objection

          24   to the defendants' exhibits.  And you have read to me what

09:28:14  25   your position was, which I was aware of.  But when I made the
```

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:28:19  1   statement that I did, that I assumed there was no objection to

2   exhibits other than what I was going to undertake concerning

3   the defendants objections to plaintiffs' exhibits, you should

4   have refreshed the Court that you still had those objections.

09:28:36  5        Now I want to make sure, since I -- it was a

6   misunderstanding that I had, that if -- we're not going to run

7   into any problems, Mr. Fathi, concerning the defendants'

8   exhibits.  If you have any objections to those exhibits, you

9   need to tell the defendants now because they're on the

09:29:00 10  precipice of presenting their own case.  Clear?

11       MR. FATHI:  Yes, Your Honor.  Would you -- would the

12  Court like to set a particular deadline for that?  We'll

13  obviously do it as expeditiously --

14       THE COURT:  It's immediate.

09:29:14 15      MR. FATHI:  Immediate.  Thank you, Your Honor.

16       THE COURTROOM DEPUTY:  5635.

17  BY MS. LOVE:

18  Q   On the first page you see here is the New York State

19  Community -- Corrections and Community Supervision Policy for

09:29:36 20  Special Housing Units.  On the right-hand side you see the

21  date last revised 9/24/21.

22  A   I see that.

23  Q   If I can direct your attention now to page 12 of the

24  directive.

09:29:50 25      At Section 304.3, exercise.  Near the bottom.

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:29:54  1   A    Yes.

2   Q    And do you see where it says that the inmates must be

3   permitted outdoor exercise daily in accordance with the PIMS,

4   and it says see Attachment A?

09:30:07  5   A    Yes.

6   Q    Now if I can direct your attention to Attachment A, which

7   is the last page of the directive.

8        Do you see here this is the SHU program privileges by

9   PIMS level?

09:30:27  10  A    That's correct.  Yes.

11  Q    And do you understand -- did you have an understanding

12  prior to just talking right now about New York that they

13  employed a step-level program for their special housing units?

14  A    Yes.

09:30:39  15  Q    And if we look at, then, down three -- three categories,

16  to categories 2 and 3, to the categories of daily recreation,

17  does it tell -- does it refresh your recollection as to hours

18  of daily recreation that the inmates in the SHU program are

19  afforded in New York?

09:30:59  20  A    Yes, it does.

21  Q    And what is that?

22  A    An hour a day.  At least in the SHU program.

23  Q    And then there's also a category for, just see below, that

24  some of them, based upon step level, also get two hours;

09:31:15  25  correct?

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

09:31:16  1   A   That's correct.

2   Q   And in this step-level program they do have three levels;

3   correct?

4   A   They do.

09:31:23  5   Q   And for all of the levels, level 1, 2, and 3, inmates are

6   in some manner of restraint; correct?

7   A   I'd have to look more carefully at that.  I don't know

8   where that's specified.

9   Q   I'm sorry.  If you look down the columns you'll see on the

09:31:41  10   left it says "Restraints."

11   A   I'm not sure whether that refers to -- I'm not sure what

12   that refers to.

13   Q   Okay.  But they do have categories here for the different

14   step levels as to increasing time across step levels for

09:32:04  15   things like visitation, commissary, telephone calls; correct?

16   A   They do.

17           MS. LOVE:  Defendants move to admit.

18           MR. FATHI:  No objection, Your Honor.

19           THE COURT:  It's admitted.

09:32:20  20       (Exhibit 5635 admitted.)

21   BY MS. LOVE:

22   Q   Sir, are you aware that the U.S. Department of Justice

23   Office of Justice Programs for Bureau of Justice Statistics

24   released a report in October of 2021 regarding suicide in

09:33:00  25   local jails and state and federal prisons?

CROSS-EXAMINATION (CONTINUED) – CRAIG HANEY

09:33:03 1    A    Yes.

2    Q    And is that something that you have reviewed in the last

3    year or two?

4    A    Yes, I'm aware of it.  I generally read the justice

09:33:14 5    department documents when they're -- when they're made

6    available.  Bureau of Justice statistics is a reliable

7    reporting organization.

8    Q    Okay.  I want to take a look --

9             MS. LOVE:  This is already admitted into evidence,

09:33:28 10   Your Honor.  Defendants' Exhibit 3333.

11   BY MS. LOVE:

12   Q    Sir, as you sit here today, are you aware which states --

13   according to this report, which states for the time period

14   2015 to 2019 reported more in-custody suicides than Arizona?

09:33:54 15   A    No.  Not offhand.  I'd have to look at it.  It's got a lot

16   of data in it.

17   Q    Let's take look at table number 11, please.  And that is

18   on page 21 of Exhibit 3333, which is already in evidence.

19             And table 3333 -- I'm sorry, Table 11.  Do you see at

09:34:20 20   the top where it reports average rate of suicides per 100,000

21   prisoners in state and federal prisons by state and region,

22   2001 to 2019?

23   A    Yes, that's correct.

24   Q    And the next-to-the-last column reports statistics for

09:34:39 25   2015 to 2019; correct?

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:34:42  1   A   Yes.

2   Q   And based upon this table do you see -- we'll give you the

3   big view, the overall view -- that it breaks it down by

4   regions of the country after reporting on federal?

09:34:54  5   A   Yes.

6   Q   Do you see down there towards the bottom in the category

7   for the West, the second one down is Arizona?

8   A   I see that, yes.

9   Q   And if we look over to the second-to-last column, which

09:35:05  10   was 2000 to 2- -- 2015 to '19 data, we see that Arizona, the

11   average rate of suicide per 100,000 prisoners was 17; is that

12   correct?

13   A   That's what it indicates, yes.

14   Q   And then for the states that exceeded that number of 17,

09:35:26  15   if we look towards the top, would you agree with me that the

16   Department of Justice is reporting that for states that

17   Connecticut exceeded 17?

18   A   Yes.

19   Q   With 28; correct?

09:35:49  20   A   Yes.

21   Q   And Delaware had 27?

22   A   Correct.

23   Q   Massachusetts had 32?

24   A   Yes.

09:35:58  25   Q   New York had 29?

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:36:00  1   A   Yes.  That's what it indicates.

          2   Q   Pennsylvania had 28, according to this table?

          3   A   Yes.

          4   Q   Rhode Island had 44?

09:36:08  5   A   Yes.

          6   Q   Vermont, 49?

          7   A   Correct.

          8   Q   Illinois had the same at 17?

          9   A   Yes, that's what it indicates.

09:36:19  10  Q   Indiana had 22?

          11  A   Yes.

          12  Q   Iowa, 20?

          13  A   Yes.

          14  Q   Kansas, 27?

09:36:29  15  A   Correct.

          16  Q   Nebraska, 27?

          17  A   Correct.

          18  Q   North Dakota, 36?

          19  A   Correct.

09:36:36  20  Q   Ohio, 18?

          21  A   Yes.

          22  Q   South Dakota, 21?

          23  A   Yes.

          24  Q   Wisconsin, 24?

09:36:45  25  A   Correct.

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

| | | |
|---|---|---|
| 09:36:45 | 1 | Q   Alabama, 23? |
| | 2 | A   Yes, that's what it says. |
| | 3 | Q   Arkansas, 39, according to the table? |
| | 4 | A   Yes, according to the table. |
| 09:36:53 | 5 | Q   Florida, 20? |
| | 6 | A   Yes. |
| | 7 | Q   Georgia, 31? |
| | 8 | A   Yes. |
| | 9 | Q   Louisiana, 20? |
| 09:37:02 | 10 | A   Yes. |
| | 11 | Q   Maryland, 18? |
| | 12 | A   Yes. |
| | 13 | Q   Mississippi, 41? |
| | 14 | A   Yes. |
| 09:37:07 | 15 | Q   Oklahoma, 22? |
| | 16 | A   Yes. |
| | 17 | Q   South Carolina, 40? |
| | 18 | A   Correct. |
| | 19 | Q   Tennessee, 34? |
| 09:37:14 | 20 | A   That's what it says. |
| | 21 | Q   Texas, 23? |
| | 22 | A   Yes. |
| | 23 | Q   West Virginia, 20? |
| | 24 | A   Yes. |
| 09:37:23 | 25 | Q   Alaska, 61? |

CROSS-EXAMINATION (CONTINUED) - CRAIG HANEY

09:37:25  1    A    Correct.

2    Q    California, 23?

3    A    Yes.

4    Q    Colorado, 26?

09:37:31  5    A    Yes.

6    Q    Hawaii, 23?

7    A    Yes.

8    Q    Idaho, 34?

9    A    Correct.

09:37:38  10   Q    Montana, 29?

11   A    Correct.

12   Q    Going to the second page of this table continued at

13        page 22 of Exhibit 3333, the U.S. Department of Justice

14        reports Nevada, 18?

09:37:58  15   A    That's correct.

16   Q    New Mexico, 23?

17   A    Yes, that's what it indicates.

18   Q    Utah, 41?

19   A    Yes.

09:38:06  20   Q    State of Washington, 19?

21   A    Correct.

22   Q    And Wyoming, 33?

23   A    Yes.

24            MS. LOVE:  No further questions.

09:38:17  25            THE COURT:  Redirect.

REDIRECT EXAMINATION – CRAIG HANEY

09:38:20   1          MR. FATHI:  Briefly, Your Honor.

       2              R E D I R E C T   E X A M I N A T I O N

       3    BY MR. FATHI:

       4    Q   Dr. Haney, both the Court and Ms. Love asked you about the

09:38:59   5    other state prison systems in which you visited isolation

       6    units and there were questions about which dates and how many.

       7    Do you recall that?

       8    A   I do.

       9    Q   Would you turn to paragraph 6 of your declaration.

09:39:23  10    A   Yes.

      11    Q   Does paragraph 6 list the states in which you have visited

      12    one or more prison isolation units?

      13    A   Yes.

      14    Q   And I count 29.  Is that about right?

09:39:36  15    A   That seems right.

      16    Q   And you've also visited some federal facilities as well,

      17    including the ADX facility in Florence, Colorado, and the

      18    federal death row in Terre Haute?

      19    A   Yes.

09:39:51  20    Q   You were asked about whether or not you had indicated in

      21    your report where you had consulted an incarcerated person's

      22    medical records after speaking with him.  Do you recall that?

      23    A   I do.

      24    Q   Would you turn to paragraph 74, please.

09:40:08  25    A   Yes.

REDIRECT EXAMINATION – CRAIG HANEY

09:40:14  1   Q   Now, in paragraph 74, do you indicate that you consulted

2   the medical records of this person?

3   A   I did, yes.

4   Q   And turning to paragraph 75 on the next page.

09:40:27  5   A   Yes.

6   Q   Do you again indicate you consulted the medical records of

7   this person?

8   A   Yes.

9   Q   And please turn to page 36, paragraph 64.  I'm sorry, page

09:40:45 10   36, footnote 64.  And you say in that footnote, "This was

11   confirmed not only by the self-reports of the incarcerated

12   persons whom I interviewed, but also by their ADCRR records."

13   A   Yes.

14   Q   So can we assume from that that you consulted the medical

09:41:02 15   records of these people as well?

16   A   Yes.  As I said, not literally every one of them, but many

17   of them.

18   Q   Speaking to that, Doctor, you did testify you didn't

19   review in eOMIS the records of all of the individuals listed

09:41:18 20   in Appendix C of your report; right?

21   A   Yes.

22   Q   Why is that?

23   A   I wasn't asked to evaluate the quality of the mental

24   health care.  It was my understanding Dr. Stewart opined about

09:41:31 25   that issue.  I was really just spot checking what people told

REDIRECT EXAMINATION – CRAIG HANEY

09:41:36   1   me, their impressions of what had happened and whether they

2   were getting adequate amount of mental health care.

3           Even as I was asked that question on

4   cross-examination, in that particular inmate's description to

09:41:54   5   me, he was quite consistent with actually what was described

6   here.  He talked to me about being placed in a cage, and

7   that's what those individual counseling sessions consist of.

8   He preferred it to a cell front, but he was complaining to me

9   about the fact this is where those mental health contacts took

09:42:10  10   place.  And that was certainly consistent with what everyone

11   told me and consistent with what I observed.

12   Q   And in addition to looking at medical in eOMIS, the

13   electronic system, did you also review mortality reports?

14   A   I did.  Those were hard copies you provided me with.

09:42:30  15   Q   Did you also review psychological autopsies of people who

16   died by suicide?

17   A   Yes, I did.

18   Q   You were also asked -- you testified about people who were

19   not officially classified as seriously mentally ill, or SMI,

09:42:45  20   but nevertheless suffered what you consider significant mental

21   illness.  Do you recall that testimony?

22   A   Yes.  I believe I testified in cross-examination yesterday

23   about someone who I recall had been diagnosed schizophrenic

24   but yet was not diagnosed -- or designated seriously mentally

09:43:06  25   ill.

REDIRECT EXAMINATION – CRAIG HANEY

09:43:09  1   Q   Are you now able to identify that person or show us in

2   your report or declaration where he is discussed?

3   A   Yes.

4   Q   Would you do that, please.

09:43:16  5   A   Yes.

6        So this is not the only such person, but this was an

7   example of it.  I was asked for an example.

8        On -- in Appendix D that describes tours and the

9   interviews, if you go down to number 19, and actually 19 and

09:44:04  10  20, these are two men who were celled together and they were

11  both people who had what are typically referred to and

12  understood as serious mental illnesses and yet they were not

13  designated as SMI in the ADOC.  And I was able to interview

14  both of them and the summary of their interview is contained

09:44:35  15  in Appendix F.

16       If you go to page 4 of Appendix F, at the very

17  bottom, this is -- and it extends a little bit onto the next

18  page, page 5.  This is a summary of the interview which I

19  conducted with them.

09:44:54  20       The first gentleman I spoke to -- and I assume it's

21  okay to use his name?

22  BY MR. FATHI:

23  Q   Let's try not to use his name.  If you can identify the

24  page number and paragraph, that should be sufficient.

09:45:06  25  A   The first gentleman I spoke to was diagnosed schizophrenic

REDIRECT EXAMINATION – CRAIG HANEY

09:45:08  1   and the second person with whom he was celled was diagnosed

2   with major depressive disorder.  And this is their description

3   of what they told me.  Both living with mental illness

4   although not designated SMI, living with what are commonly

09:45:27  5   referred to as or understood as serious mental illnesses, and

6   both double celled under the conditions that I previously

7   described.

8   Q   And, Doctor, are both of these people currently still

9   incarcerated?

09:45:41  10   A   No.  Actually, the first person was recently released from

11   prison.  The person who was diagnosed with schizophrenia.

12   Q   Doctor, Ms. Love asked you about the non-U.S. research

13   that you cite in your declaration, studies that were published

14   in non-U.S. sources, studies that involved solitary

09:46:05  15   confinement that did not occur in the United States.  Why did

16   you cite those sources?

17   A   Well, it is an example of the robustness, if you will, of

18   the literature on the harmful effects of solitary confinement.

19   These are studies that have been conducted by people with

09:46:24  20   different disciplinary specialties, some of them are

21   psychiatrists, some psychologists, some epidemiologists, some

22   architects even have done studies of solitary confinement.

23       So it's -- when people from different disciplinary

24   perspectives reach the same conclusions, that's important.  It

09:46:45  25   tells you something about the robustness of the conclusion.

REDIRECT EXAMINATION – CRAIG HANEY

09:46:48  1       But also when people from different areas, different

2   parts of the world and different time periods have studied

3   something and reached the same conclusion, my testimony

4   yesterday I talked about the fact there was research dating

09:46:59  5   back all the way to the 19th century on the harmful effects of

6   solitary confinement.

7       That research has continued to be done in the present

8   times, but not just by people in the United States, by people

9   studying conditions very similar, if not identical, to the

09:47:15  10  ones in the United States, but reaching different conclusions

11  about their own penal systems.

12  Q   I'm sorry, Doctor, did you say reaching different --

13  A   Reaching the same conclusions about different penal

14  systems.

09:47:32  15  Q   Ms. Love asked you about an article that was published in

16  a journal of the American Psychological Association.  Do you

17  recall that?

18  A   I do, yes.

19  Q   Is it true that the American Psychological Association has

09:47:43  20  criticized you or your work?

21  A   No.  I have a very good relationship with the American

22  Psychological Association.  They actually have published two

23  of my books.  A book I published in 2006 on prisons was a book

24  that they not only published but nominated for a National Book

09:48:01  25  Award.  Just last year they published another one of my books,

REDIRECT EXAMINATION – CRAIG HANEY

09:48:04  1    Criminality in Context, which they also nominated for an

2    award.  So I've not been criticized by the American

3    Psychological Association.

4         This article was published in a journal that the

09:48:17  5    American Psychological Association publishes, but they publish

6    many, many dozens of journals and this is one journal that

7    they published, but it wasn't an official position in any way

8    or official criticism from the American Psychological

9    Association.

09:48:34  10   Q   Just a few minutes ago Ms. Love asked you about the HALT

11   Act that was recently passed in New York.  Do you recall that?

12   A   I do.

13   Q   When was the HALT Act passed?

14   A   Not long ago --

09:48:45  15        MS. LOVE:  Objection, Your Honor.  This exceeds the

16   scope.  I didn't ask him anything about an act.

17        MR. FATHI:  No, Your Honor, she asked him about his

18   testimony on direct that New York has recently restricted --

19        THE COURT:  Overruled.

09:48:58  20        THE WITNESS:  Yeah, very recently.  I'm -- I

21   apologize for not knowing the exact date.  It was not very

22   long ago and it is in the process of being implemented.

23   BY MR. FATHI:

24   Q   And do you know, Doctor, did the HALT Act take effect

09:49:10  25   immediately or was it one of those laws that takes effect at

REDIRECT EXAMINATION – CRAIG HANEY

09:49:13   1   some point in the future?

2   A   No, it certainly didn't take effect immediately.

3   Q   Yesterday, you testified on direct and then I believe

4   Ms. Love asked you on cross about the tablets that some people

09:49:28   5   in isolated confinement have.  Do you recall that?

6   A   Yes.

7   Q   Does everyone in isolation in Arizona get a tablet?

8   A   No.

9   Q   Does every seriously mentally ill person in isolation in

09:49:43   10   Arizona get a tablet?

11           MS. LOVE:  Foundation.

12           THE COURT:  Overruled.

13           THE WITNESS:  No.

14   BY MR. FATHI:

09:49:48   15   Q   Is use of the tablets free of charge?

16   A   No, no.  It's fee for service.  You have to pay for using

17   the services that the tablet provides.

18   Q   If -- so if an incarcerated person wants to use his tablet

19   for the video visits that Ms. Love asked about, is that free

09:50:06   20   of charge?

21   A   No.

22   Q   Prisoner has to pay?

23   A   Yes.

24   Q   Doctor, you were asked about accreditation by the National

09:50:14   25   Commission on Correctional Health Care, also known as NCCHC.

REDIRECT EXAMINATION – CRAIG HANEY

09:50:19   1   What do you know about the NCCHC accreditation process?

2   A   I don't know the specifics of how they go about doing that

3   accreditation.

4   Q   Does the NCC accreditation process take into account the

09:50:36   5   NCC's position statement on solitary confinement which we

6   reviewed yesterday?

7           MS. LOVE:  Foundation.

8           THE COURT:  Sustained.

9           MR. FATHI:  It's just a yes or no question,

09:50:46  10   Your Honor.

11          THE COURT:  But he has to have a foundation for a yes

12   or no answer.  So sustained.

13          MR. FATHI:  Thank you.

14          Could we bring up Defendants' Exhibit 3333, please.

09:51:15  15          THE COURTROOM DEPUTY:  Mr. Giardina?

16          MR. FATHI:  I believe Mr. Campbell --

17          THE COURTROOM DEPUTY:  Oh, you have it?  Okay.

18   BY MR. FATHI:

19   Q   Doctor, this is the BJS report on suicide in local jails

09:51:26  20   and state and federal prisons, 2000 to 2019, that we just

21   discussed.

22          Could we go to Table 11 -- or Exhibit 11, please.  Or

23   perhaps it is Table 11.

24          I believe it's on the next page.  What I'm looking

09:52:04  25   for --

REDIRECT EXAMINATION - CRAIG HANEY

09:52:07  1        THE COURT:  Says page 2 and page 11 is on page 21.

2        MR. FATHI:  Thank you.

3        What I'm looking at -- what was the page we were

4  looking at a moment ago?

09:52:19  5        MS. LOVE:  Table 11.

6        MR. FATHI:  Table 11.  Thank you.

7        MS. LOVE:  Page 21 and 22.

8        MR. FATHI:  Thank you.

9        All right.  There we go.

09:52:31 10  BY MR. FATHI:

11  Q    Doctor, do you see that Table 11, which is titled Average

12  Rate of Suicides per 100,000 Prisoners in State and Federal

13  Prisons by State and Region, 2001 to 2019?

14  A    I do.

09:52:44 15  Q    And Ms. Love asked you about or went through with you some

16  of the figures from the column labeled 2015 to '19.  Do you

17  recall that?

18  A    Yes.

19  Q    Does this report contain any information about suicides in

09:52:57 20  2020?

21  A    No, it does not.  No, it stops in 2019.

22  Q    Did it contain any information about suicides in 2021?

23  A    No, it does not.

24  Q    Doctor, Ms. Love asked you whether your opinions, of the

09:53:20 25  opinions you've expressed about isolated confinement in

REDIRECT EXAMINATION – CRAIG HANEY

09:53:22  1   Arizona, are confined to the two prisons you visited, the

2   Eyman Complex and the Lewis Complex.  Do you remember that

3   question?

4   A   I do.

09:53:31  5   Q   And you were also asked about the policies that govern

6   isolated confinement in Arizona, including DO 812, which you

7   examined.  Do you recall that?

8   A   Yes.

9   Q   If the other isolation units in Arizona that you did not

09:53:45  10   visit are operating under the same policies, would the

11   opinions you've offered be applicable to those units as well?

12       MS. LOVE:  Foundation and beyond the scope.

13       THE COURT:  Not beyond the scope.  Foundation.

14   BY MR. FATHI:

09:54:01  15   Q   Well, Your Honor -- excuse me.  Dr. Haney, one of the

16   opinions you offered or one of the observations you made is

17   that prison officials have a great deal of discretion in

18   placing and maintaining people in solitary confinement in

19   Arizona.  Do you recall that?

09:54:17  20   A   Yes, I do.

21   Q   Now, if that policy also applies to the other Arizona

22   isolation units that you did not visit, would your opinions,

23   the opinions you've offered, be applicable to those as well?

24       MS. LOVE:  Foundation and leading.

09:54:32  25       THE COURT:  Both.

REDIRECT EXAMINATION - CRAIG HANEY

09:54:33  1          MR. FATHI:  I'm sorry, Your Honor?

         2          THE COURT:  There has to be foundation.  You're

         3    asking him a hypothetical with respect to the others.  You

         4    have to provide foundation.  He's given testimony concerning

09:54:44  5    the isolation units and you're asking, as I understand, the

         6    other units.  So foundation concerning that.  If you can do

         7    it, good.  If you can't, then it's not admitted.

         8          MR. FATHI:  Just to be clear, Your Honor, I'm asking

         9    him --

09:54:58 10          THE COURT:  Well, ask him and then maybe it will be

        11    clear.

        12          MR. FATHI:  Thank you, Your Honor.

        13    BY MR. FATHI:

        14    Q    All right, Dr. Haney, let me try this again.

09:55:06 15          You visited isolation units at the Eyman Complex and

        16    Lewis Complex; correct?

        17    A    Yes.

        18    Q    Is it your understanding that there are also isolation

        19    units at some other Arizona prisons that you did not visit?

09:55:18 20    A    Yes.

        21    Q    So my question is:  If the policies that govern isolation

        22    units in Arizona also apply to those other isolation units you

        23    did not visit, would the opinions you've expressed also be

        24    applicable to those units?

09:55:37 25          MS. LOVE:  Foundation and beyond the scope of the

REDIRECT EXAMINATION - CRAIG HANEY

09:55:38   1   declaration.  And leading.

2           THE COURT:  It is leading, but there's enough

3   foundation there.

4           So you're leading him.

09:55:50   5           MR. FATHI:  I'm sorry, Your Honor, I didn't think it

6   was a leading question, but I apologize.  It was "Would your

7   opinions apply."

8           THE COURT:  Yes or no or maybe.

9   BY MR. FATHI:

09:55:59  10   Q    Yes or no, Doctor?

11   A    Yes.

12   Q    Doctor, you testified that you don't know the average

13   length, the average duration, of confinement in isolated

14   confinement in Arizona.  Do you remember that testimony?

09:56:15  15   A    I do.

16   Q    And why is that?

17   A    Because the data doesn't exist or haven't been provided.

18   I requested it and I think I testified I had requested them

19   all the way back in 2013 and since then, and including to the

09:56:31  20   present, and have been told that the data are not calculated.

21   Q    Now, Ms. Love asked you about the outdoor exercise cages

22   in the max custody units.  Do you recall that testimony?

23   A    I do.

24   Q    Doctor, during the four days that you were visiting max

09:56:53  25   custody units at Eyman and at Lewis, did you have occasion to

REDIRECT EXAMINATION - CRAIG HANEY

09:56:58  1    observe those outdoor exercise cages?

       2    A    Yes.  We made a point of going to -- I can't say literally

       3    all of them, but many of them.  As many of them as possible,

       4    particularly as we were passing through the units.

09:57:13  5    Q    And during the four days you were at those units, did you

       6    ever see any incarcerated people actually using those outdoor

       7    exercise cages?

       8    A    No, not one.

       9    Q    Now, Doctor, you've expressed --

09:57:27 10    A    Let me be clear.  The outdoor exercise cages.  The

      11    concrete enclosed cages -- or not cages, but concrete

      12    enclosures at the end of the some of the housing units, I did

      13    see people in those units.  But not in the outdoor exercise

      14    areas.

09:57:43 15    Q    Thank you.

      16           Doctor, you've expressed a number of opinions about

      17    isolated confinement as it exists in Arizona.  Is it relevant

      18    to your opinions why the person is in isolation?  For example,

      19    whether he's there as a classification matter or a

09:57:58 20    disciplinary matter?

      21    A    No.  I think I testified yesterday the psychological

      22    impact is something that derives from the nature and amount of

      23    deprivation, and the justification for the deprivation doesn't

      24    matter.  The impact on the person would be expected to be the

09:58:17 25    same.

EXAMINATION – CRAIG HANEY

09:58:20  1   Q   And, Doctor, is a written policy relevant to your opinions

2   if that policy is not actually followed in practice?

3   A   No.  And that was one of the problems that I talked about

4   both in my declaration and in my testimony yesterday.

09:58:34  5       MR. FATHI:  One moment, please, Your Honor.

6       Nothing further.  Thank you, Dr. Haney.

7       THE COURT:  Doctor, I have a couple of questions.

8       Counsel, what is -- so everybody's clear, what is the

9   exhibit number for the Department of Justice Bureau of Justice

09:58:58  10  Statistics document about suicide?

11      MS. LOVE:  3333.

12      E X A M I N A T I O N

13  BY THE COURT:

14  Q   Okay.  Let's see -- let's get that in front of you and see

09:59:11  15  if you can help me out in understanding it.

16      First of all, did you find this report valuable in

17  any way?

18  A   In --

19  Q   In this case.

09:59:29  20  A   Not in this case.  It's valuable as somebody who studies

21  prisons and studies what happens in prisons.  It doesn't drill

22  down very much on the data so it gives you a very general

23  data.

24  Q   Okay.  That's what I'm trying to figure out.  Since you

09:59:42  25  have reviewed it, maybe you can help me here.

EXAMINATION - CRAIG HANEY

09:59:44   1          Let's take look at Table 10 first.

2                And take look at Table 10 first and then -- that's on

3     page 19.  And then Table 11, which is on 21.

4                And as you look at them you will see at the top on

10:00:13   5     page 10, Aggregated Number of Suicides in State and Federal

6     Prisons by State and Region.  And Table 11 is Average Rate of

7     Suicides per 100,000 Prisoners in State and Federal.

8     A    Yes.

9     Q    Is Table 11 a percentage based upon 100,000 prisoners even

10:00:39  10     if there are no -- there aren't 100,000 prisoners in the

11    state?

12    A    Yes.  It would be the number of suicides calculated to

13    take into account the number of prisoners actually in that

14    state.  So --

10:00:58  15    Q    It's not prisons, but prisoners?

16    A    Prisoners, yes.

17    Q    So if we go down -- and, also, this exclamation point has

18    me confused.  So if you see Alaska, 33, exclamation point,

19    versus on page 10, Alaska, 6, why is there a difference?  It's

10:01:23  20    a pretty substantial difference.

21                Does that mean the percentage is 33 percent in

22    Table 1 versus the number of suicides in Table 10, which is 6?

23    A    Well, I think Alaska has a very small prison population --

24    Q    I know, but what I'm saying is I'm trying to figure out,

10:01:54  25    first of all, in Table 10 is that per capita?  Does that mean

EXAMINATION - CRAIG HANEY

10:01:58   1    for that period of time there was a total of 6 in Alaska?

2    A    Yes.

3    Q    On page 10.  And then --

4    A    Six suicides.

10:02:07   5    Q    And then on page 11 you look at Alaska and it's 33,

6    exclamation point.  Does that mean when it says, average rate

7    of suicides per 100,000 prisoners, is that a percentage?

8    A    It takes into account the number of prisoners.  So -- and

9    then it converts it to a rate per 100,000.  So in Alaska

10:02:31  10    there's nowhere near 100,000 prisoners, so --

11    Q    So what does the 33, exclamation point, mean?  Is that a

12    percentage?

13    A    Not technically a percentage.  I have to look at --

14    Q    I don't think you're going to be able to help me either.

10:02:46  15    Maybe counsel can help me, but you're not the person to ask.

16              MR. FATHI:  Your Honor, may I try --

17              THE COURT:  Later.

18              MR. FATHI:  Yes, Your Honor.

19              THE COURT:  So counsel both know, I'm having some --

10:02:59  20    I'm confused about this document and you can help me out.

21    You're the ones to help me out.

22    BY THE COURT:

23    Q    All right.  Let me ask you, on the seriously mentally ill

24    category or status, is -- in your opinion, where you have

10:03:23  25    found an individual to be seriously mentally ill in Arizona

EXAMINATION - CRAIG HANEY

10:03:25    1    but was not designated as seriously mentally ill by the

            2    Department of Corrections, is that because they violated their

            3    own policy or is that because, for an example, you said that

            4    you saw someone who was -- who was diagnosed as schizophrenic

10:03:50    5    but was not determined to be seriously mentally ill.

            6            So what I'm asking is:  Does the Department of

            7    Corrections have a list of who was seriously mentally ill?

            8    A   They have a definition that they work with but there's a

            9    certain amount of discretion to them.

10:04:09   10    Q   Okay.  Does the definition include schizophrenia?

           11    A   It is my understanding it does.

           12    Q   So you don't know if it does or not --

           13    A   I don't recall --

           14    Q   -- in answering a question by counsel that you were

10:04:25   15    concerned that there was one prisoner who was schizophrenic

           16    who had not been designated as seriously mentally ill or

           17    seriously -- fall into the category of SMI?

           18    A   Well, I think, Your Honor, what I intended to say was

           19    there were many prisoners, not just this particular prisoner,

10:04:44   20    who were diagnosed with very serious mental health conditions

           21    that in some states would be considered seriously mentally ill

           22    but --

           23    Q   We're talking about Arizona, though.  That's the issue

           24    here.

10:04:59   25            In Arizona, is it your understanding there is a

EXAMINATION – CRAIG HANEY

10:05:04  1    definition of seriously mentally ill?

2    A    Yes.

3    Q    Okay.  And is it your understanding that it doesn't have

4    categories like schizophrenia and depression, serious

10:05:24  5    depression?  It doesn't have categories or it does?

6    A    My understanding it does, but then it has an additional

7    provision that addressing the issue of impairment or level of

8    impairment --

9    Q    Okay.

10:05:35  10    A    -- so that's the typical --

11    Q    So someone could be determined to be schizophrenic but not

12    seriously mentally ill?

13    A    Under that rubric, yes.  And it's not the only state where

14    that's the case, yes.

10:05:49  15    Q    Okay, I'm talking about Arizona again.

16        So but it's your view -- or, tell me, is it your

17    view, your opinion, that if somebody has been diagnosed as

18    schizophrenic, then they must fall into the category always as

19    being seriously mentally ill no matter what their status is or

10:06:11  20    their behavior at the time?

21    A    No.  My opinion was that they were at heightened risk of

22    harm because of their mental condition.

23    Q    And it depended on the circumstances?

24    A    Yes.

10:06:23  25    Q    In other words, their behavior or the circumstances that

EXAMINATION - CRAIG HANEY

10:06:28  1  resulted in certain behavior while they're in prison?

2  A   Which -- which I would assume is part of what is taken

3  into account in decisions about whether or not to declare them

4  seriously mentally ill.

10:06:39  5        So my point was simply there's a category of

6  seriously mentally ill people, they're in solitary

7  confinement, but there's a much larger category of people not

8  designated seriously mentally ill, nonetheless suffering from

9  conditions that, in my opinion, render them vulnerable to

10:06:57  10  serious risk of harm.

11  Q   Okay.  So that's what you found.  You found that, number

12  one, there were people who were seriously mentally ill who

13  were placed in solitary confinement, but there were also

14  prisoners who, in fact, were not designated seriously mentally

10:07:13  15  ill and were placed in solitary confinement; correct?

16  A   In many of them, yes.

17  Q   Okay.  Let me -- you just made reference to your being a

18  consultant for the Department of Justice and I presume -- and

19  you said it was where the Department of Justice had been sued.

10:07:36  20  And I presume that's the Bureau of Prisons; correct?

21  A   Yes.

22  Q   That was -- okay.  And you were -- you were then a

23  consultant for them when they were a defendant; correct?

24  A   No.  I've consulted for the Department of Justice in other

10:07:57  25  contexts, not in the context when they were a defendant.

EXAMINATION – CRAIG HANEY

10:08:01  1   Q   Okay.  I misunderstood.  I thought you said they had been

2   sued.

3   A   Well, there were times they have been sued.  For example,

4   they were sued over --

10:08:09  5   Q   Were you a consultant when they were sued?

6   A   But not for them.

7   Q   Not for them.  You were for the plaintiff?

8   A   Yes.

9   Q   Okay.  All right.  Now, the final question that I have

10:08:24  10  relates to something we've talked about consistently

11  throughout your testimony, or you talked about, and that is

12  your determination after reviewing, analyzing, considering, I

13  believe, 25 state prisons -- not federal prisons, state

14  prisons -- that the Department of Corrections in Arizona was

10:08:49  15  one of the -- had one of the most severe solitary confinement

16  conditions; correct?

17  A   Yes.

18  Q   Okay.  Tell me how you came to that conclusion.

19  A   Yes.  So I took into account multiple --

10:09:06  20  Q   First of all, I'm sorry to interrupt, but was it 25

21  prisons?  State prisons?

22  A   I think -- I was comparing them to all of the different

23  state systems that I looked at.  It is probably closer to

24  about 29.

10:09:20  25  Q   29, okay.  So now tell me how you came about that

EXAMINATION - CRAIG HANEY

10:09:22   1   conclusion.

2   A   I took into account a number of things.  The physical

3   conditions themselves, which I described as severe, and some

4   photographs of which I presented in my declaration and also in

10:09:35   5   my appendix to the declaration.

6          I took into account procedures and practices like the

7   one we were just talking about, the placement of seriously

8   mentally ill in solitary confinement and a much larger

9   category of people who are suffering from mental health --

10:09:55  10   mental illnesses although not designated seriously mentally

11   ill.

12          I took into account the fact that there are

13   discretionary procedures that allow for people to be placed

14   and kept in solitary confinement even though they haven't

10:10:08  15   committed serious disciplinary infractions.

16          I took into account the fact that Arizona allows for

17   the solitary confinement of juveniles.

18          I took into account the fact that, although I don't

19   have data on exactly how much time people spend in solitary

10:10:23  20   confinement on average, that I encountered many people in the

21   course of the interviews that I did, including the random

22   interviews I did, of people who were in solitary confinement

23   for very long periods of time.  Not a year or two years but

24   some of them ten or more years.

10:10:40  25          So I took all of those things into account.

EXAMINATION – CRAIG HANEY

10:10:44   1        I also took into account what was described to me

2   repeatedly and consistently in the last set of interviews that

3   I did that many of the things that are provided for in some of

4   the rules and regulations we've been talking about are not

10:10:57   5   actually being delivered.

6        For example, we spent some time on cross-examination

7   talking about out-of-cell time.  And out-of-cell time is --

8   recreation time.  Recreation time is just one component of

9   out-of-cell time.  So although it is the case that even the

10:11:15   10   American Correctional Association provides for at least five

11   hours of rec time a week, they also provide that no prisoner

12   should be housed in solitary confinement for more than 22

13   hours a day.  And that's the ACA guidelines.

14        Ms. Love showed me the document.  She didn't talk

10:11:37   15   about the basic provision, which is no fewer than two hours a

16   day.  Nobody should be in their cell longer than 22 hours a

17   day.

18        So obviously they envision doing something else other

19   than just recreation.  If you're only getting five hours of

10:11:51   20   recreation, then there should be some other kind of activity

21   that you're engaged in.

22        That's typically not provided for in Arizona.  So

23   you're either getting your rec time or you're getting pretty

24   much nothing at all unless you're in a very special category

10:12:04   25   of solitary confinement.

EXAMINATION - CRAIG HANEY

10:12:06 1      And then I learned that people aren't even getting

2      their rec time.

3          So they're not getting educational programming.

4      They're not getting classes.  They're not getting, for those

10:12:18 5      people eligible for it, the requisite amount of group therapy.

6      But they're also not even getting their rec time, even as it's

7      specified in the regulations, which is, in my opinion, the

8      bare minimum for some of them.

9   Q   Okay.

10:12:36 10      So with respect to the other 28 prisons that you've

11      analyzed, did you do the same in-depth analysis that you did

12      for Arizona?

13  A    In most instances, yes, because that's my purpose for

14      being there, would be to look at the isolation units and

10:12:53 15      evaluate them.

16  Q   All right.  And I think you don't want to, as much as I

17      have been able to glean, that you don't want to give a -- an

18      analysis on a prison-by-prison basis in terms of who's the

19      worst, who's the best.

10:13:11 20      But at least tell me, those prisons, of the 29, where

21      you, in your view, believe you've done the same in-depth

22      analysis that did you for Arizona, which ones?

23  A   Well, Your Honor, that's impossible.  I mean, we're

24      talking about a 40-year period of time studying prisons.

10:13:33 25  Q   Well, four years -- I can remember something four years

EXAMINATION – CRAIG HANEY

10:13:37  1   ago and I would think you can.  So give me an idea.  What

2   other prisons?

3   A   I probably -- specific prisons or specific prison systems,

4   it's probably more than 29 given the fact that they're

10:13:55  5   individual prisons.

6        Ms. Love asked me about California.  I've evaluated

7   several different prisons in California.  So it would

8   probably, I would think -- I've done this kind of evaluation

9   somewhere between 25 and 35 times.

10:14:15  10  Q   Give me some states.

11  A   So the state of Massachusetts.  Individual prisons in the

12  state of Pennsylvania.  In the state of Louisiana.  In the

13  state of Georgia.  In Texas, several different prisons in

14  Texas.  Some years ago, several different prisons in Florida.

10:14:38  15  A number of prisons, I mentioned, in California.  Several

16  prisons in New Mexico.  I've evaluated conditions in Utah.

17  Illinois.

18       I'm running out of memory here.  But that's the

19  range.

10:15:07  20  Q   Okay.  Thank you.  That's all the questions I have.

21       THE COURT:  Any questions, Mr. Fathi?  Do you want to

22  follow-up with anything?

23       MR. FATHI:  Your Honor, would it be helpful to bring

24  up the Department's definition of serious mental illness?

10:15:23  25       THE COURT:  It's up to you.  If you think it's

FURTHER EXAMINATION - CRAIG HANEY

10:15:25  1    helpful to you.  Because I'm the fact finder --

        2            MR. FATHI:  All right.  Then I would like to.

        3            THE COURT:  Then you may do so.

        4            MR. FATHI:  Could we have Exhibit 1632, please,

10:15:40  5    Plaintiffs' Exhibit.

        6            And there's a table of contents.

        7            Next page please.  Okay.  Page 35, please.

        8            All right.

        9                F U R T H E R   E X A M I N A T I O N

11:19:09 10    BY MR. FATHI:

       11    Q    Doctor, showing you Plaintiffs' Exhibit 1632, which is the

       12    Department's mental health technical manual, have you seen

       13    this document before?

       14    A    It's not on my screen.

10:16:28 15    Q    Oh.  I'm sorry.

       16            THE COURTROOM DEPUTY:  I'm sorry.

       17    BY MR. FATHI:

       18    Q    Do you have it now, Doctor?

       19    A    I do.

10:16:39 20    Q    Have you seen -- I'm not asking for the moment about this

       21    particular page.  Have you seen this document before?

       22    A    Yes, I have.

       23    Q    All right.  So looking at chapter 3, Section 6.0 titled

       24    Determination and Management of Seriously Mentally Ill, paren,

10:16:54 25    SMI, close paren, Patients, and on about halfway down the

FURTHER EXAMINATION — CRAIG HANEY

10:17:01  1    first page is the definition.

2                Does that fresh your recollection as to the

3    definition of serious mental illness in the Department?

4    A    Yes.  That's what I was clumsily trying to summarize.

10:17:19  5    There's a diagnosis and an impairment requirement.

6                MR. FATHI:  Can we go to the next page, please.

7                Well, it appears we don't have the list of qualifying

8    diagnoses here which I was hoping to provide to the Court.

9                THE COURT:  But is it in a document somewhere?

10:17:56  10               MR. FATHI:  It is, Your Honor.  I don't want to take

11   the Court's time, but it certainly --

12               THE COURT:  All right.

13               You agree, Ms. Love, that somewhere I'm going to find

14   it in a document that's been admitted?

10:18:08  15               MS. LOVE:  I'm not sure if it's been admitted, but --

16               THE COURT:  Well, you can do it or you can admit it

17   or not.

18               Okay.  Is that -- are you finished?

19               MR. FATHI:  I am, Your Honor.

10:18:18  20               THE COURT:  All right.

21               Ms. Love, any questions following my questions?

22               MS. LOVE:  No, Your Honor.  Thank you.

23               THE COURT:  All right.

24               Thank you, you may step down.

10:18:25  25               Okay.  Let's take a break.

FURTHER EXAMINATION – CRAIG HANEY

10:18:26   1                And are you prepared for your next witness?

           2                MS. KENDRICK:  Yes, she is here.

           3                THE COURT:  Okay.  We're in recess for 20 minutes.

           4                (Recess taken from 10:18 a.m. to 10:43 a.m.)

10:42:57   5                THE COURT:  All right.  A motion was filed regarding

           6    this witness.  What's your position?

           7                MS. HESMAN:  Our position, Your Honor, is that you've

           8    stated that the constraints of impeachment evidence and if

           9    we're going to use it for credibility, which to the extent we

10:43:18  10    are, I really don't think we are, as I said yesterday, it will

          11    be used solely for the purpose that you outlined this morning.

          12    So I don't think there's an issue.  They think --

          13                THE COURT:  But I haven't gotten a response.  When

          14    you said, "I don't think there's an issue" --

10:43:30  15                MS. HESMAN:  My response --

          16                THE COURT:  Let me talk to you at sidebar.

          17                (Bench conference as follows:)

          18                xxxxxxxxxx  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

          19                xxxxxxxxxx  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10:43:50  20    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

          21    xxxxxxxxxxxxxxxxxxxxxxxxx

          22                xxxxxxxxxx  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

          23    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

          24    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10:44:05  25                xxxxxxxxxxx  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

FURTHER EXAMINATION - CRAIG HANEY

10:44:07   1   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10:44:21   5         xxxxxxxxxx   xxxxxxxxxxxxxxxxxx

6         xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8   xxxxxxxxxxx

9         xxxxxxxxxxx   xxx

10:44:34  10         xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11   xxxxxx

12         xxxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10:44:44  15         xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16   xxxxxx

17         xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18   xxxxxxxx

19         xxxxxxxxxxx   xxxx

10:44:55  20         xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21   xxxxxxxxxxx

22         xxxxxxxxxxx   xxxx

23         xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24         xxxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10:45:07  25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

FURTHER EXAMINATION - CRAIG HANEY

10:45:10 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10:45:25 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxx
10:45:36 xxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxx xxxxxxxxxxxxx
xxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10:45:48 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10:45:59 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10:46:16 xxxxxxxxxxxxxxxxxxxxxxxxxxxx

FURTHER EXAMINATION – CRAIG HANEY

```
10:46:18   1         xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
           2         xxxxxxxxxxxxx   xxxxxxxxxxxxxxxxxx
           3         xxxxxxxxxx   xxxxx
           4         xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10:46:28   5   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
           6   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
           7         xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
           8   xxxxxxxxxxxxxxxxxxxxxxxxxxx
           9         xxxxxxxxxxx   xxxxxxxx
10:46:38  10         xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
          11   xxx
          12         xxxxxxxxxxx   xxxxxxxx
          13         xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
          14   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10:46:47  15         xxxxxxxxxxx   xxxxxxxxxxxxxxxxxxxx
          16         xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
          17   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
          18   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
          19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10:47:05  20         xxxxxxxxxxx   xxxx
          21         xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
          22   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
          23         xxxxxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
          24   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10:47:20  25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

FURTHER EXAMINATION – CRAIG HANEY

10:47:21  1   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2            xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3            xxxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4            xxxxxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10:47:32  5   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6            xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10:47:49 10   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

12   xxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13            xxxxxxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxx

14            xxxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10:48:03 15   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17   xxxxxxxxxxxxxxxxxx

18            xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10:48:13 20   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21            xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22            xxxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23   xxxxxxx

24            xxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxx

10:48:21 25            xxxxxxxxxxx   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

DIRECT EXAMINATION – STEFANIE PLATT

10:48:24  1       xxxxxxxxxx  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4    xxxxxxxxxxxxxx

10:48:38  5       xxxxxxxxxx  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6       xxxxxxxxxx  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7    xxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8       xxxxxxxxxx  xxxxxxxxxxxxxxxx

9       (Bench conference concludes.)

10:48:56  10      THE COURT:  All right.

11      THE COURTROOM DEPUTY:  You can come up to the lectern

12   and I'll swear you in.

13      Can you say and spell your name.

14      THE WITNESS:  Stefanie, S-T-E-F-A-N-I-E, Platt,

10:49:19  15   P-L-A-T-T.

16      THE COURTROOM DEPUTY:  Thank you.  You can come

17   around and have a seat on the witness stand.

18                    **STEFANIE PLATT,**

19   called as a witness herein, after having been first duly sworn

20   or affirmed, was examined and testified as follows:

21             D I R E C T   E X A M I N A T I O N

22   BY MS. KENDRICK:

23   Q   Good morning, Dr. Platt.

24   A   Good morning.  Can you hear me okay?

10:49:44  25   Q   Pull the microphone a little closer.

DIRECT EXAMINATION – STEFANIE PLATT

10:49:47   1   A   This better?

2   Q   Yes.

3           Have you testified in court before?

4   A   I have not.

10:49:51   5   Q   So just to let you know, again we have a court reporter

6   like we did in the deposition.  She's going to be taking down

7   everything we say, so please try not to talk over each other.

8   Okay?

9   A   Okay.  I'll try.

10:50:06  10   Q   Did you review any documents prepare to testify today?

11   A   I read my transcript from the deposition.

12   Q   Did you review anything else?

13   A   No.

14   Q   Did you review any transcripts of other persons' testimony

10:50:24  15   in this case?

16   A   No.

17   Q   And at the deposition, you testified that you had spoken

18   to nobody about your testimony that day other than your

19   attorney, Mr. Shoaf; correct?

10:50:36  20   A   I spoke to people about being anxious and things like

21   that, and that I was testifying, but not about content and

22   things.

23   Q   Okay.  Since the deposition, have you spoken with anybody

24   besides Mr. Shoaf about the content of your testimony in the

10:50:51  25   deposition?

DIRECT EXAMINATION – STEFANIE PLATT

10:50:52   1    A    About the content of my deposition?  No.  I spoke about

2    being anxious and the process, but not the specific content.

3    Q    Okay.

4         And you were subpoenaed to testify here by

10:51:10   5    plaintiffs; correct?

6    A    Is that -- yes.  Thank you.

7    Q    And have you communicated with anybody besides Mr. Shoaf

8    about the content of your testimony today?

9    A    Other than the anxiety and the press, no.

10:51:29  10    Q    Have you been contacted by anybody about testifying in

11    court today?

12    A    Friends and things like that, but not beyond that, no.

13    Q    Anybody who currently works for Centurion?

14    A    I have reached out to people that work for Centurion, just

10:51:49  15    indicating I am testifying and the date and that I was

16    anxious, but nothing further than that kind of thing.

17    Q    And did anybody else from Centurion contact you about your

18    testimony today?

19    A    Not that I can recall.  No.

10:52:05  20    Q    Has any person or any entity said or done anything that

21    could affect your ability to testify fully and truthfully

22    today?

23    A    No.

24    Q    And you testified at the deposition under questioning from

10:52:17  25    defendants' attorneys that you, quote, had concerns about

DIRECT EXAMINATION – STEFANIE PLATT

10:52:20   1    having a target on my back.  Do you remember saying that?

2    A    Yes.

3    Q    Do you still have concerns that you have a target on your

4    back?

10:52:29   5    A    Presently, as I no longer work there, no.

6    Q    Are you concerned that you may face any professional

7    repercussions in any way due to testifying today in court?

8    A    Yes.

9    Q    And will that potential professional repercussion affect

10:52:53   10   your ability to testify fully and truthfully today?

11   A    No.

12   Q    Is there any other reason why you feel you would not be

13   able to testify fully and truthfully today?

14   A    No.

10:53:04   15   Q    Dr. Platt, what is your occupation?

16   A    I'm a psychologist.

17         MS. KENDRICK:  Could we put up Exhibit 2126, please.

18   BY MS. KENDRICK:

19   Q    Can you see the screen?

10:53:15   20   A    Yes.

21   Q    Dr. Platt, what is this?

22   A    This is my CV, my resume.

23   Q    Did you create it?

24   A    I did.

10:53:27   25   Q    It's dated October 14th, 2021?

DIRECT EXAMINATION - STEFANIE PLATT

10:53:30  1    A    That's correct.

         2    Q    Is it accurate and up to date as of today?

         3    A    Yes.

         4    Q    And it states that you're a licensed -- active licensed

10:53:43  5    psychologist in Arizona?

         6    A    Correct.

         7    Q    And you're in good standing?

         8    A    Correct.

         9    Q    And under Education, it states that you have a Psy.D. in

10:53:58 10    clinical psychology from Alliant International University.

        11    A    Yes, that is correct.

        12    Q    You have an LLM in international human rights from

        13    Oxford Brookes University in England?

        14    A    Correct.

10:54:12 15    Q    You have a master's degree in psychology from Pepperdine?

        16    A    Yes.  Correct.

        17    Q    And a bachelor's in psychology from ASU?

        18    A    Correct.

        19    Q    Have you ever been licensed to practice as a psychologist

10:54:27 20    anywhere else in the United States?

        21    A    Yes.

        22    Q    What states?

        23    A    In California.

        24    Q    Have you -- any other states?

10:54:35 25    A    No, not beyond that.

DIRECT EXAMINATION – STEFANIE PLATT

10:54:36   1   Q   Have you ever had your license in California or Arizona

2   suspended or terminated?

3   A   No.

4   Q   Any disciplinaries?

10:54:45   5   A   No.

6   Q   So I just want to talk a little bit going through your

7   work experience.  At the bottom of your resume it states that

8   from June 2020 to July 2021 you were the regional mental

9   health director at Centurion; is that correct?

10:55:02  10   A   That is correct.

11   Q   And you write that you were, quote, overseeing the mental

12   health programs and operations across ten state prisons, close

13   quote.

14   A   Yes.

10:55:13  15   Q   So you had no involvement with the healthcare at the

16   private prisons; correct?

17   A   Correct.

18   Q   And approximately when in July 2021 did you leave?

19   A   Somewhere at the end of July.  I don't recall the exact

10:55:28  20   date.

21   Q   Okay.  So that was just a little over three months ago?

22   A   Yes.

23        MS. KENDRICK:  If we could go to page 2, please.

24   BY MS. KENDRICK:

10:55:39  25   Q   And at the top of your resume it shows that from

DIRECT EXAMINATION – STEFANIE PLATT

10:55:43  1    January 2020 to June 2020, you were the associate regional

2    mental health director; is that correct?

3    A    Yes.

4    Q    And if we could go down a little bit, it shows that you

10:55:58  5    were a clinical director at the Phoenix facility from August

6    2018 to January 2020?

7    A    Yes.

8    Q    And you state there that you were, quote, managing mental

9    health care for inmates across a reception unit, a residential

10:56:15  10   program, and a licensed inpatient hospital comprised of five

11   inpatient programs, as well as supervising 15 mental health

12   case workers and clinicians.

13         Is that an accurate description of your work at the

14   Phoenix facility?

10:56:28  15   A    I believe so.

16   Q    And you note that your title is the same but your employer

17   changed in 2019 from Corizon to Centurion; correct?

18   A    Yes.

19   Q    And Phoenix is the inpatient mental health facility for

10:56:44  20   male prisoners?

21   A    Yes.

22   Q    And then, finally, relevant to why we're here today, your

23   resume shows that from August 2018 to January -- I'm sorry.

24   From April 2017 to April -- strike that again.

10:57:02  25         September 2016 to July 2018 you were a psychologist

DIRECT EXAMINATION - STEFANIE PLATT

10:57:07  1   at three different facilities; is that correct?

2   A   Yes.

3   Q   Okay.  And did you ever work as a psychologist to fill in

4   at other prisons when you were working at these three?

10:57:23  5   A   Beyond -- during this period of time beyond these three

6   prisons, did I work elsewhere?  Is that the question?

7   Q   Yes.

8   A   I consulted at Lewis prison as well during that period of

9   time once, maybe twice.  Not frequently.

10:57:37  10  Q   Okay.  And when you were the associate regional mental

11  health director, did you ever provide direct patient care?

12  A   Yes.

13  Q   And could you describe that, please.

14  A   Not frequently, again, but assisting as needed in the

10:57:58  15  start of COVID with intakes.

16  Q   That would be mental health intakes?

17  A   Mental health intakes, yes.

18  Q   And at what facility or facilities did you do that?

19  A   During my time under the associate regional mental health

10:58:12  20  director position it was at Phoenix prison complex.

21  Q   And when you were the regional mental health director for

22  Centurion from June of 2020 to July of this year, did you ever

23  provide direct clinical treatment or services to patients?

24  A   Yes.

10:58:31  25  Q   How often?

DIRECT EXAMINATION – STEFANIE PLATT

10:58:32  1    A    Infrequently.

2    Q    At what facility?

3    A    I assisted with the intake process at Phoenix again, and

4    also at Tucson when the intake process started over there at

10:58:46  5    the impetus of that process in Tucson.

6    Q    When did Tucson start processing intakes?

7    A    I'm -- sometime in 2020 after I took the regional mental

8    health director role.  Shortly thereafter.  I don't know the

9    exact date offhand.

10:59:02  10   Q    Okay.

11        Would you say it was still the summertime or maybe

12   the fall?

13   A    Likely.  I don't know definitively.

14   Q    Okay.  And it lists under the regional mental health

10:59:16  15   director listing that your supervisor was Dr. Antonio Carr?

16   A    Yes; correct.

17   Q    What is Dr. Carr's title?

18   A    Statewide psychiatric director.

19   Q    And was he your supervisor the entire time that you were

10:59:32  20   the regional director?

21   A    Yes.

22        MS. KENDRICK:  Plaintiffs would move to admit Exhibit

23   2126.

24        MS. HESMAN:  No objection.

10:59:46  25        THE COURT:  Admitted.

DIRECT EXAMINATION – STEFANIE PLATT

10:59:47  1          (Exhibit 2126 admitted.)

2    BY MS. KENDRICK:

3    Q   We saw what you had listed on your resume but I was hoping

4    you could explain a little more about your job duties as

10:59:55  5    regional director of psychiatry.

6    A   Regional mental health director.

7    Q   I'm sorry.

8    A   That's okay.

9          My duties essentially were overseeing the programming

11:00:06 10    for mental health.  And by that, I mean looking into what

11    programming needs we had, what training needs we had.  You

12    know, assisting with program development, things of that

13    nature.  Making sure things were running as effectively as we

14    could have them running.

11:00:28 15    Q   Were you involved in recruiting or hiring mental health

16    staff?

17    A   A little bit, yes.

18    Q   Could you describe that.

19    A   While in the regional mental health director role?

11:00:43 20    Q   Yes.

21    A   In the regional mental health director role I at times

22    provided training for recruitees, people that were being

23    recruited in.  In addition to that, the onboarding process, I

24    would interview psychologists and do phone screens on the

11:01:00 25    front end, any psychologist candidate we had come through, and

DIRECT EXAMINATION - STEFANIE PLATT

11:01:03  1  collaborate with our recruiters.  At the regional level we had

2  weekly meetings, twice weekly, regarding recruitment.

3  Q   And when you were associate regional mental health

4  director, what was your role in recruitment and hiring of

11:01:21  5  mental health staff?

6  A   Sure.  In the associate role I also was screening

7  psychologists on the phone pertaining to psychology

8  associates, which are master's level clinicians, mental health

9  clerks, and behavioral health technicians.  I was able to

11:01:39  10  extend offers and then would submit and fill out paperwork for

11  everything to be processed for them in their onboarding.

12  Q   And the psychology associates, do they have to be

13  licensed?

14  A   They do not.

11:01:54  15  Q   Did you -- as regional mental health director, did you

16  have any role in mortality reviews or deaths by suicide?

17  A   I did.

18  Q   What was your role in that?

19  A   I would participate in mortality review committees and, in

11:02:13  20  addition to that, I would read and review psychological

21  autopsies.

22  Q   Could you describe for the Court what a mortality review

23  meeting is.

24  A   It's comprised of individuals in our system from the

11:02:28  25  Department of Corrections and regional leadership.  It is a

DIRECT EXAMINATION – STEFANIE PLATT

11:02:33   1   process whereby we discuss the case reviewing the

2   psychological autopsy results, a lot of postmortem

3   information, going through the results, looking at if --

4   looking to see if there are any pitfalls or anything that can

11:02:48   5   be improved upon.

6            That process is intended to look to see if anything

7   can be done differently to prevent such an event from

8   happening in the future.

9   Q    And are similar meetings held for serious acts of

11:03:05  10   self-injurious behavior?

11   A    Sometimes yes, but not as formal as a lined-up process

12   within policy.

13   Q    So the policy doesn't call for --

14   A    Policy does not call for that, no.

11:03:23  15   Q    And just to be clear, I think you said this but I want to

16   make sure.  The purpose of a psychological autopsy is to do

17   what?

18   A    To look at prevent -- to look at the case, each case, and

19   see if there's anything we can do differently to prevent

11:03:44  20   unfavorable outcomes of that nature in the future.

21   Q    Do those normally include recommendations?

22   A    Yes.

23   Q    And is there a system in place to ensure that those

24   recommendations are implemented?

11:04:01  25   A    There is not a specific meeting or something of that

DIRECT EXAMINATION – STEFANIE PLATT

11:04:04  1   nature that happens to check back in on that.  If that's what

2   you're inquiring about.

3   Q   Right.  So there's not a process where, say, two months

4   later we say let's look at the recommendations of what we

11:04:20  5   reviewed two months ago and see if it's actually been

6   implemented?

7   A   Right.  There's nothing etched in policy to my knowledge

8   whereby that is checked upon.

9   Q   Okay.

11:04:30  10       MS. KENDRICK:  I'd like to bring up Exhibit 184,

11   which has already been admitted.

12   BY MS. KENDRICK:

13   Q   And, Dr. Platt, I just ask -- we're trying not to say

14   patients' names.

11:04:41  15   A   Of course.

16   Q   So I'm showing you a psychological autopsy for a patient

17   who died in 2021.

18       MS. KENDRICK:  Oh.  Please don't publish to the

19   gallery.

11:04:58  20       THE COURTROOM DEPUTY:  Yeah.

21   BY MS. KENDRICK:

22   Q   Is this generally what the psychological autopsy forms

23   look like?

24   A   They're full reports.  They can vary in length.  Anything

11:05:10  25   between -- you know, generally they're a little under ten

DIRECT EXAMINATION - STEFANIE PLATT

11:05:13  1    pages up to into the twenties pages.  It depends how much

2    history is reviewed and how long someone has been in the

3    system.

4              THE COURT:  Let me just make sure I understand.

11:05:24  5              Is this a report you prepared?

6              THE WITNESS:  I did not prepare this.

7              THE COURT:  Okay.  Thank you.

8              MS. KENDRICK:  Can we go to page 23, please.

9    BY MS. KENDRICK:

11:05:35  10   Q    So at the bottom it says that it was prepared by

11   Dr. Ramirez, but then your name is written and your signature

12   for reviewing the report.

13   A    Yes.  I reviewed it.

14   Q    And as regional mental health director, did you have to

11:05:55  15   sign off on all of these autopsy reports that came through?

16   A    I had to review all of them, yes.

17   Q    Are you -- do you remember this psychological autopsy

18   report?

19   A    I remember it.  Not every single detail, but I do recall

11:06:14  20   the report, yes.

21             MS. KENDRICK:  Can we go to page 22, please.

22   BY MS. KENDRICK:

23   Q    On Section 5 at the first paragraph in the second sentence

24   it states that this gentleman was housed at Tucson - Rincon's

11:06:33  25   mental health unit yard; is that correct?

DIRECT EXAMINATION – STEFANIE PLATT

11:06:38   1   A    That's correct.

2        MS. KENDRICK:  Can we go to page 7, please.

3   BY MS. KENDRICK:

4   Q    And then the last paragraph above Section 4, it states

11:07:05   5   that:

6        "The therapist submitted an information report

7        regarding a contact she had had with an inmate in

8        house six.  The IR submitted conveyed another inmate

9        allegedly witnessed a female correctional officer

11:07:21  10        screaming at the patient and calling him names.  The

11        interview with the female correctional officer who

12        was initially on Charley run denied hearing the

13        patient's suicidal ideation claims."

14        Do you see that?

11:07:34  15   A    I do.

16   Q    Do you remember reviewing that in this report?

17   A    I do.

18        MS. KENDRICK:  Can we go back to page 23.

19   BY MS. KENDRICK:

11:07:45  20   Q    On page 23, under Recommendations, it states, quote, it is

21   recommended that all institutional staff receive mental health

22   training specific to the forensic population, close quote.

23        Do you see that?

24   A    Yes.

11:08:04  25        THE COURT:  What's a forensic population?

DIRECT EXAMINATION – STEFANIE PLATT

11:08:07 1        THE WITNESS:  Forensic population would be a

2    population that has a legal background intertwined.  So

3    inmates would constitute a part of a forensic population.  So

4    I think the implication is mental health for individuals with

11:08:21 5    incarceration.

6           THE COURT:  Forensic mental health, then.

7           THE WITNESS:  Yes.

8           THE COURT:  Thank you.

9           THE WITNESS:  Yeah.

11:08:29 10          MS. KENDRICK:  Thank you, Charles.

11   BY MS. KENDRICK:

12   Q   Had this additional training of staff at Rincon mental

13   health unit occurred by the time you left in July of 2021?

14   A   There were several trainings that had occurred with that

11:08:43 15   incorporated.  Specifically a global forensic training by

16   itself, no.  However, there were trainings about varied mental

17   health conditions within the forensic setting that had

18   happened.

19   Q   And were those mandatory for custody staff before they

11:09:00 20   could work in the Rincon mental health unit?

21   A   Oh.  I apologize.  The trainings I'm speaking of were for

22   the mental health staff rather than custody staff.

23          Do you want me to answer separately for custody?

24   Q   Please.  Yes.

11:09:15 25   A   Sure.  Thank you.

DIRECT EXAMINATION – STEFANIE PLATT

11:09:16   1        As far as custody staff is concerned, there is a

2   mental health training in general that goes on.  There is not,

3   to my knowledge, a specific separate training regarding that

4   unit.

11:09:29   5   Q   And, in fact, you testified in your deposition that you,

6   quote, absolutely thought that custody staff that worked with

7   mentally ill or developmentally disabled prisoners should

8   receive training relative to those populations?

9   A   Yes.

11:09:47  10   Q   Do you -- is that still your belief?

11   A   Very much so.

12        MS. KENDRICK:  Let's bring up Exhibit 224.

13        Your Honor, this is another psychological autopsy

14   that's already been admitted into evidence.

11:10:02  15        If we could go to page 8, please.

16   BY MS. KENDRICK:

17   Q   And, again, there's your signature for having reviewed

18   this autopsy.  Do you see that?

19   A   I do.

11:10:17  20   Q   Do you remember this patient's case?

21   A   I actually didn't see it, it went by so fast.  Apologize.

22   Q   Can we go back to page 1.

23   A   It doesn't say specifically what happened.  I recall the

24   name and I recall the date.

11:10:42  25        MS. KENDRICK:  Can we go to the next page, please.

DIRECT EXAMINATION - STEFANIE PLATT

11:10:56  1          THE WITNESS:  Yeah.

2     BY MS. KENDRICK:

3     Q    Does this refresh your memory?

4     A    Yes.  Thank you.

11:11:00  5     Q    Okay.

6          MS. KENDRICK:  Could we go back to page 8, please.

7     BY MS. KENDRICK:

8     Q    And, again, under Recommendations, there's two paragraphs

9     but I'd like to talk about the first one.

11:11:20 10          It states, quote, it is suggested that inmates with

11    noteworthy substance use issues receive more intensive drug

12    prevention programming while incarcerated, especially after

13    demonstrating an ongoing pattern of chemical dependency.

14          Do you see that?

11:11:38 15    A    I do.

16    Q    Do you agree with that recommendation?

17    A    Yes.

18    Q    Did Centurion start providing more drug prevention

19    programming in 2021 as a result of this patient's death by

11:11:48 20    suicide?

21    A    No.  However, my understanding is the way the contract

22    reads is the Department of Corrections provides substance

23    abuse treatment and they had individuals that were providing

24    those services.

11:12:06 25    Q    Did DOC start providing additional drug prevention

DIRECT EXAMINATION – STEFANIE PLATT

11:12:10  1  programming as a result of this patient's death?

2  A   I do not recall additional -- additional treatment being

3  provided.  However, treatment was being provided to -- at the

4  various facilities from the Department of Corrections.

11:12:27  5  Q   Do they provide substance abuse treatment at all ten

6  facilities?

7  A   I do not believe it's at all 10.  At the vast majority of

8  them, yes.

9  Q   Which ones do not offer it?

11:12:44  10  A   I'm not sure regarding Winslow, Safford, and Douglas.  And

11  I know Phoenix has had it and they've had moments where they

12  also have not had somebody that has been there to provide

13  those services.

14  Q   And you said DOC handles it.  So it's a Department of

11:13:07  15  Corrections employee or employees who provide these programs?

16  A   Correct.

17  Q   And do the DOC employees have mental health training or

18  background?

19  A   I don't know the exact backgrounds to the individuals

11:13:23  20  doing it.  I believe so.

21  Q   Did you ever sit in in one of these substance abuse

22  programs in your time either working in the prisons or as a

23  mental health director?

24  A   I have not.

11:13:38  25  Q   Does Centurion provide medication-assisted therapy to

DIRECT EXAMINATION - STEFANIE PLATT

11:13:42   1   persons with substance abuse disorder?

2   A   I do not know if it is presently in practice at Tucson,

3   but there was a program being put together for that in Tucson.

4   Q   Was it implemented by the time you left in July?

11:14:02   5   A   There were referrals that were going into the program

6   right around that time.

7   Q   How many patients could it serve?

8   A   I do not recall.

9   Q   Are you aware of any other medication-assisted therapy, or

11:14:17   10   MAT programs, at any of the other prisons?

11   A   I'm not.

12   Q   Are pregnant women who have opioid use disorder provided

13   methadone?

14   A   I don't know the answer to that.

11:14:33   15   Q   All right.  You're familiar with the Court's order about

16   the length of mental health encounters?

17   A   Fairly, yes.

18   Q   And this is the one about 10-minute and 30-minute

19   encounters?

11:14:49   20   A   Um-hmm.  Yes.

21   Q   And additional staff were needed to provide the care in

22   order to comply with this order.  Is that --

23        MS. HESMAN:  Objection.  Leading.

24        THE COURT:  Sustained.

25

DIRECT EXAMINATION - STEFANIE PLATT

11:15:00  1   BY MS. KENDRICK:

2   Q   Were additional staff needed to comply with this order?

3           MS. HESMAN:  Same objection, Your Honor.

4           THE COURT:  Well, she's asking were there, so it's

11:15:14  5   not leading.

6           THE WITNESS:  I can answer?

7   BY MS. KENDRICK:

8   Q   Yes.

9   A   Okay.  From information and analyses that people had done,

11:15:25 10   the analyses had implied that additional staff would be needed

11   to comply with the orders.

12   Q   And who conducted this analysis?

13   A   A behavioral technician at Tucson.

14   Q   And what is his name?

11:15:43 15   A   Ian Plamondon.

16   Q   Okay.

17           THE COURT REPORTER:  Can you spell that, please.

18           THE WITNESS:  I was worried about that.  I'll try my

19   best.  P-L-A-M-O-N-D-O-N, possibly.

11:16:02 20   BY MS. KENDRICK:

21   Q   When did Mr. Plamondon do this analysis?

22   A   I do not recall the exact time.

23   Q   Can you give us an estimate?

24   A   My guess is fall or winter of 2020.

11:16:28 25   Q   Is that your best estimate?

DIRECT EXAMINATION - STEFANIE PLATT

11:16:30   1   A   That's my best estimate, yes.

2   Q   Is it correct that Mr. Plamondon concluded that there was

3   not enough staff in the current contract to comply with the

4   order?

11:16:44   5   A   That was his conclusion.

6   Q   And just to be clear, when I talk about staffing plan or

7   contracted plan, that's the number of employees who are

8   required by the contract.  I want to make sure we're talking

9   about the same thing.

11:17:05  10   A   I think we are.  Versus what?

11   Q   Versus actual Centurion employees working.

12   A   So the matrix, the number allocated to the matrix, not the

13   number that are currently presently in practice.

14   Q   Right.  If I talk about that I'll say "actual employees."

11:17:27  15   A   Okay.  Thank you.  That's helpful.

16   Q   Okay.

17        And you were familiar with the number of staff that

18   the contract called on to have working at each prison?

19   A   Fairly.

11:17:43  20   Q   When you were regional director, did you monitor vacancies

21   at the prison?

22   A   I did.

23   Q   How did you do that?

24   A   I would track -- whenever we had a resignation or new

11:17:57  25   hire, I would track the amount of vacancies that were left and

DIRECT EXAMINATION – STEFANIE PLATT

11:18:01   1   report them every week.

2   Q    And did you or somebody who reports to you conduct exit

3   interviews with people who were leaving?

4   A    Sometimes, yes.

11:18:17   5   Q    But it was not required by policy to do that?

6   A    My understanding is that HR handles those matters.

7   However, at times we would -- I would instruct individuals to,

8   you know, check out -- check into the situation of

9   supervisees, see if we can do anything different to retain

11:18:37  10   them or just even better practice moving forward, things like

11   that.

12   Q    Did you ask HR to provide you with summaries of all of the

13   exit interviews they did?

14   A    I never requested that, no.

11:18:51  15   Q    Do you know if they prepared any sort of summary?

16   A    My understanding is that information was available.  I did

17   not know it was available until basically about the time I

18   left.

19   Q    Was there ever a time when you were regional mental health

11:19:07  20   director when all positions in the contracts were 100 percent

21   filled?

22   A    There was not.

23   Q    Was there ever a time when you were the associate regional

24   mental health director when all positions called for in the

11:19:20  25   contract were 100 percent filled by Centurion?

DIRECT EXAMINATION – STEFANIE PLATT

11:19:23  1   A   There was not.

2   Q   How about when Corizon was in charge of care?

3   A   There was not.

4   Q   And if even 100 percent of the contracted positions were

11:19:38  5   filled, was there still more patient need than the staffing

6   plan could meet?

7   A   In my opinion, yes.

8   Q   Did you raise your concerns about this, about the adequacy

9   of the contract, with anybody?

11:19:51  10   A   Yes.

11   Q   With whom?

12   A   Dr. Carr, Mr. Dolan.

13   Q   Who is Mr. Dolan?

14   A   VPO, I think is his title.  He oversees the Centurion

11:20:02  15   contract.

16   Q   VPO is vice president of operations?

17   A   Operations, yeah.

18   Q   Did you raise your concerns about the adequacy of the

19   contract with anybody else at Centurion?

11:20:17  20   A   With how many staff are allocated total to mental health?

21   Q   Correct.

22   A   I've had conversations, yes, with other regional mental

23   health staff members.  Yes.

24   Q   And who are those persons, if you remember?

11:20:36  25   A   I know the regional psychology associate, Jessica Raak.  I

DIRECT EXAMINATION - STEFANIE PLATT

11:20:41  1  know I've had the conversations with the regional release

2  planner Jackie Miller.  And I know I've had conversations with

3  Christian Ruiz, who is the regional behavioral health

4  technician.

11:20:55  5  Q   And I believe -- so you've listed five people:  Dr. Carr,

6  Mr. Dolan, Dr. Raak, Ms. Miller, and Mr. Ruiz.  Did any of the

7  five of them share your concern about the adequacy of the

8  contract?

9  A   Yes.

11:21:15  10  Q   Did all of them share your concerns?

11  A   I can't recall Mr. Dolan's opinion on the matter

12  specifically, but the rest of them, yes.  All of the mental

13  health staff members did.

14  Q   Including Dr. Carr?

11:21:27  15  A   Including Dr. Carr.

16  Q   You testified at your deposition that Mr. Dolan's response

17  to your concerns about the contract was, quote --

18          MS. HESMAN:  Objection, Your Honor, hearsay.

19          THE COURT:  Sustained.

11:21:46  20          MS. KENDRICK:  Under Rule 611(c)(2), leading

21  questions can be asked.  And it's also being made by the

22  agent --

23          THE COURT:  They can be asked under what

24  circumstances?  What are you relying on?

11:22:00  25          MS. KENDRICK:  Under 801(2)(d) -- 801(d)(2) --

DIRECT EXAMINATION - STEFANIE PLATT

11:22:05  1          THE COURT:  801 talking about hearsay?

        2          MS. KENDRICK:  Yeah, 801 --

        3          THE COURT:  You're offering -- I'm not sure where

        4     you're going with this.

11:22:12  5          MS. KENDRICK:  It's a statement of the party's agent

        6     or employee on a matter within the scope of the relationship

        7     under 801(d)(2)(D).

        8          THE COURT:  What's the question?

        9          MS. KENDRICK:  The question was what she testified to

11:22:26 10     in her deposition as to Mr. Dolan's response.

       11          THE COURT:  What are you doing here with her?  Are

       12     you refreshing her recollection?

       13          MS. KENDRICK:  Yes.

       14          THE COURT:  Then you need -- the appropriate way

11:22:42 15     to --

       16          MS. HESMAN:  The problem I have, Your Honor --

       17          THE COURT:  Hold on.

       18          The appropriate way to --

       19          MS. KENDRICK:  Can you pull up --

11:22:47 20          THE COURT:  -- refresh her recollection is to ask her

       21     if there is anything that would refresh her recollection --

       22     BY MS. KENDRICK:

       23     Q   Would it refresh --

       24          THE COURT:  -- without stating what it is.

       25

DIRECT EXAMINATION – STEFANIE PLATT

11:22:55  1  BY MS. KENDRICK:

2  Q   Would it refresh your recollection to see the transcript

3  of the deposition?

4  A   Yes.

11:23:00  5          MS. KENDRICK:  Could we have that, please.

6          This has been marked as Exhibit 21.

7          THE COURT:  And it's shown only to the witness.

8          MS. KENDRICK:  Yes.  To refresh her recollection.

9          And at page 34.

11:23:21  10          THE COURTROOM DEPUTY:  Do you need to me to get it?

11  Is it in one of these boxes?

12          I can get it, I just don't know --

13          THE COURT:  It's up on the screen.

14          THE WITNESS:  I have access to it.  Thank you,

11:23:31  15  though.

16          THE COURTROOM DEPUTY:  Oh.  Okay.  I'm sorry.

17  BY MS. KENDRICK:

18  Q   And if we could just look at lines 10 through 15.

19          THE COURT:  You can look at lines 10 through 15.

11:23:44  20          THE WITNESS:  Okay.  Thank you.

21          THE COURT:  And see if that refreshes your

22  recollection.  And if not, tell us.

23          THE WITNESS:  Correct.  Yes.

24  BY MS. KENDRICK:

11:23:58  25  Q   That refreshes your recollection to Mr. Dolan's response?

DIRECT EXAMINATION - STEFANIE PLATT

11:24:02  1   A   I recalled that statement.  His opinion on the matter I

2   don't believe is part of that statement.  I don't know what

3   his actual opinion on the matter was beyond what his response

4   was, if that makes sense.  I do recall that.

11:24:19  5   Q   Okay.  Okay.  And what was his response?

6   A   That that's essentially what the contract allows us to

7   have.  When I voiced that I thought we needed more positions

8   to do things, his response was that this is we have to work

9   with, essentially.  You know, this is what the contract says

11:24:42  10   we're allocated.

11   Q   And as part of your role --

12        MS. KENDRICK:  Thank you, Charles.

13   BY MS. KENDRICK:

14   Q   As part your role as regional mental health director, did

11:24:51  15   you visit the prisons?

16   A   Yes.

17   Q   And what was the purpose of visiting the prisons?

18   A   It varied.  Sometimes we had complex cases and would go

19   down in person and try to assist with higher level treatment

11:25:08  20   planning with staff, lend extra support, debrief after a

21   self-harm event, go after a completed suicide check in on

22   staff, show staff appreciation by bringing food and having

23   conversations about all of the great work they're doing.

24   Things of that nature.

11:25:30  25   Q   And would you attend CQI or continuous quality improvement

DIRECT EXAMINATION — STEFANIE PLATT

11:25:38   1   meetings at prisons?

2   A   Generally, no.

3   Q   Did you sometimes?

4   A   I have, but rarely, as the mental health lead is the one

11:25:48   5   who attends those meetings.

6   Q   And when you visited prisons, did mental health staff ever

7   express their concern about their workload being too much?

8   A   Yes.

9   Q   At which prison?

11:26:07   10   A   The vast majority of them.  Eyman, Phoenix, Lewis,

11   Florence, Tucson.

12   Q   Did you ever go to Yuma?

13   A   I did go to Yuma.

14   Q   Was that expressed to you at Yuma?

11:26:28   15   A   Not that I can recall.

16   Q   How about Perryville?

17   A   I have been to Perryville.  I don't recall a specific

18   conversation -- actually, I take that back.  I can recall one

19   conversation of that nature.  At Perryville.

11:26:47   20   Q   Do you remember when that was?

21   A   It was in 2021 and in spring.  I'm not sure quite

22   specifically when.  April, May is my best guestimate.

23   Q   Okay.  Thank you.

24       And how would you characterize the morale of mental

11:27:06   25   health staff at the prisons you visited?

DIRECT EXAMINATION – STEFANIE PLATT

11:27:12  1    A    Generally the morale was fairly low with staff.

2    Q    Why was morale low?

3    A    It varied.  People expressed concerns about their

4    caseloads, as stated.  Some people expressed concerns about

11:27:30  5    the work environment, supervisors, the court orders and having

6    to, you know, do various things.

7           Generally, people said they felt overworked and

8    generally gave the implication they didn't feel valued.

9    Q    And when you heard this from the line staff, did you take

11:28:00  10   it back to the regional headquarters to share with others?

11   A    Yes.

12   Q    And what was the response?

13   A    Oftentimes Dr. Carr would go with me when we would have

14   these meetings, so he heard it as well.  The response with

11:28:14  15   Dr. Carr was we'd collaborate and discuss ways that we could

16   make people feel more valued and see what we can do to

17   mitigate stressors and try to problem solve and strategize to

18   help support staff better, the best we could, and attend, you

19   know, in-person things at the complex more frequently.  Things

11:28:35  20   of that sort.

21   Q    Did people express concern that they were having to work

22   overtime due to vacancies?

23           MS. HESMAN:  Objection, leading.

24           THE COURT:  Sustained.

25

DIRECT EXAMINATION – STEFANIE PLATT

11:28:49  1   BY MS. KENDRICK:

2   Q   Was overtime a concern raised?

3           MS. HESMAN:  Same objection.

4           THE COURT:  Sustained.

11:29:05  5   BY MS. KENDRICK:

6   Q   Did you ever ask if the number of contracted mental health

7   staff could be increased?

8   A   At one point there was a discussion about getting

9   specialized positions for our self-harm population and that

11:29:25 10  was taken off the table.  And so I raised some concerns around

11  that time and I also raised concerns when the court orders had

12  changed again regarding our ability to internally audit the

13  work being done and ensure everything was being done in

14  compliance.

11:29:49 15  Q   So you mentioned specialized positions for the self-harm

16  population.  Could you explain what those positions were.

17  A   There were two positions that were outside of matrix that

18  were being discussed and were approved at a corporate level to

19  help mitigate self-harm across the state.  Individuals would

11:30:14 20  be people that would specialize in behavioral management

21  treatment planning, tracking, and really honing in and

22  attending to specialized high-need populations that have a

23  propensity of self-harming.

24  Q   And did these positions envision a certain qualification

11:30:33 25  or degree for them?

DIRECT EXAMINATION – STEFANIE PLATT

11:30:36  1   A   The preference was for a psychologist in the position but

2   it was open for a master's level -- licensed master's level

3   clinician.

4   Q   And you said this was approved by corporate?

11:30:50  5   A   Um-hmm.

6   Q   Meaning corporate headquarters of Centurion?

7   A   Yes.

8   Q   And you described this as going, quote, off the matrix.

9   That's anything that was not on the contract?

11:31:02  10   A   My understanding it was outside of the matrix, it was not

11   a contracted position initially.  I don't know how they worked

12   out the logistics of that, very candidly.  That's just the

13   language that was parroted to me.

14   Q   Okay.  And you stated these two positions were, quote,

11:31:23  15   taken off the table.  What happened?

16   A   I'm not entirely sure as to the full reason why.  It was

17   presented by senior management that we would freeze the

18   recruiting process for these positions on an e-mail I was cc'd

19   on because we were doing quite well with the reduction in

11:31:45  20   self-harm and thus we would freeze this at that juncture.

21   Q   In approximately when was this discussion of creating

22   these conditions occurring?

23   A   That was -- my best guestimate, winter of 2020.

24   Q   Before the pandemic or just last winter?

11:32:10  25   A   Just last winter.  So roughly November/December, possibly,

DIRECT EXAMINATION – STEFANIE PLATT

11:32:13  1   of 2020.

2   Q    And do you remember approximately when that e-mail was

3   stating that the positions would be frozen?

4   A    I do not recall.  After that.  Sometime in 2021.

11:32:31  5   Q    Who made the decision to freeze the positions?

6              MS. HESMAN:  Objection, foundation.

7              THE COURT:  Do you know?

8   BY MS. KENDRICK:

9   Q    Do you know?

11:32:39  10  A    I can tell you who sent the e-mail.  I don't know if that

11  is where the decision was effectively made.

12  Q    Who sent the e-mail?

13  A    Mr. Dolan sent the e-mail.

14  Q    And you said these positions were being created.  Was

11:32:58  15  there an increase in incidents of self-harm that prompted the

16  decision to try to create these positions?

17  A    There -- the self-harm numbers were in general higher than

18  any of us were happy with and we wanted to do whatever we

19  could to mitigate.  Conversations circulated about what we

11:33:21  20  could do in effort to mitigate risk and be preventative in

21  this process.

22  Q    And you said there were conversations.  Was that internal

23  to Centurion or were they also with ADC officials?

24  A    The conversations I was referencing were internal to

11:33:39  25  Centurion, however the -- my mental health counterpart at the

DIRECT EXAMINATION – STEFANIE PLATT

11:33:47  1   monitoring bureau, Dr. Stallcup, was a huge advocate for

2   reducing self-harm as well, so she and I had separate

3   conversations about generating ideas.

4   Q    And did you or anybody at Centurion or DOC do a root cause

11:34:05  5   analysis of why the number of self-harm incidents were higher

6   than, like you said, seemed acceptable?

7   A    We -- we started -- we looked at the numbers, who they

8   were -- so, yes and no.  We essentially started -- we were

9   tracking the individuals, how often they were harming,

11:34:28 10   severity of the harm, things of that nature, and then we're

11   looking at who comprised most of that self-harming population

12   and honing in on very specific root analysis of what was going

13   on for these individuals.

14   Q    And when approximately did you start tracking the

11:34:49 15   self-harm like this?

16   A    Self-harm tracking evolved.  To my understanding,

17   Department of Corrections had tracked it from incident reports

18   and things of that nature initially and switched it over to

19   the contractors -- I don't want to do a bad guesstimate

11:35:11 20   here -- somewhere between 2018 and 2019.

21   Q    Did it occur when you were the associate regional health

22   director?

23   A    It was prior to that.

24   Q    Did it occur when Centurion took over the contract?

11:35:25 25   A    I believe it was prior to that, but not by much.  So

DIRECT EXAMINATION – STEFANIE PLATT

11:35:27  1    probably around 2018.  Somewhere around there.  I would have

2    to look at my e-mails to know.

3    Q    Okay.  And you said the analysis focused on who comprised

4    the population that engaged in self-harm the most.  What

11:35:42  5    was -- what was the findings?  Who were these patients?

6    A    So --

7    Q    Not names, but --

8    A    Yes.  Of course.  No.

9         When I say tracking self-harm in general, when it was

11:35:55  10   prior to me, to my role in regional, that is general tracking.

11   I just want to clarify.

12        The top 20 -- the self-harmers that were harming

13   frequently or more frequently, would have multiple incidents,

14   those individuals, those started being tracked somewhere

11:36:16  15   towards the end of 2020.  Just to clarify that distinction.

16        As far as who comprised that top portion, generally

17   most individuals at the behavioral management unit were

18   individuals that were often found on that.  Mostly individuals

19   out of Florence, Tucson, and Lewis.  But mostly it would be --

11:36:43  20   Florence was the most, mostly had that population due to

21   housing the behavioral management unit, which was a unit

22   developed for a self-harming population.

23   Q    And that was the unit at Florence Kasson?

24   A    Correct.

11:37:00  25   Q    And it's since been closed?

DIRECT EXAMINATION - STEFANIE PLATT

11:37:04  1   A   To my understanding, that's correct.

2   Q   Were additional staff allocated or hired to -- mental

3   health staff allocated or hired to work at those units that

4   you specifically identified as having the top or most frequent

11:37:23  5   self-harmers?

6   A   That is where we had thought to place those positions that

7   were outside or above matrix, those specialized self-harming

8   positions.  That never came to fruition.  So outside of that,

9   there were no additional staff added into our matrix.

11:37:53  10  Q   Is it important for clinicians to build a therapeutic

11  relationship with their patients?

12  A   Yes.

13  Q   Did you have concerns about mental health staff's ability

14  to do that?

11:38:08  15  A   Sometimes.

16  Q   How often?

17  A   That's difficult.  It's contingent upon the complex, the

18  number of vacancies, if there's a program, where the program's

19  located, if there were changes.  So sometimes it was more

11:38:34  20  frequent than others.  If a new change had occurred, then I

21  had more concerns, if that makes sense.

22  Q   It does.  You said vacancies.  Do you mean vacancies in

23  mental health staff?

24  A   Yes.

11:38:47  25  Q   Would turnover contribute to this, too?

DIRECT EXAMINATION – STEFANIE PLATT

11:38:50  1  A    Yes.

2  Q    And was there any discussion -- going back to the analysis

3  of the top and most frequent self-harmers and the units you

4  identified, to your knowledge were any efforts made to

11:39:07  5  increase the number of custody staff working at those units?

6  A    I cannot speak to what the Department was doing other than

7  I know that they were trying to heavily recruit in general for

8  more custody staff.

9  Q    Did you ever discuss with Dr. Stallcup the need to have

11:39:28  10  more custody staff in those units?

11  A    Not that I recall.

12  Q    Do the custody officers -- let me step back.

13       Who observes patients who are on suicide watch?

14  A    Correctional officers.

11:39:45  15  Q    And do the correctional officers who are assigned to

16  suicide watches receive any additional training specific to

17  that role?

18  A    I believe they're trained on how to conduct suicide

19  watches.  I don't know what that training specifically is

11:40:01  20  comprised of.

21  Q    Is that the same training that every officer receives

22  about how to do suicide watches?

23  A    I believe so.

24  Q    So no additional training beyond what every single officer

11:40:14  25  gets as part of his or her training?

DIRECT EXAMINATION – STEFANIE PLATT

11:40:16   1   A   To my knowledge I do not believe there is specialized

2   additional training provided.

3   Q   And I stated earlier that in your roles you were involved

4   at one point in recruiting and hiring behavioral health techs?

11:40:33   5   A   Yes.

6   Q   What do they do?

7   A   Behavioral health technicians can do a number of things.

8   They do database tracking to ensure that we maintain

9   compliance with CGAR standards; we have routine care

11:40:50  10   follow-ups in an appropriate and timely fashion; they can do

11   welfare checks, you know, walking units for segregation rounds

12   to ensure patients are well; they can do psychoeducational

13   therapy groups; they can sit on a telehealth line to

14   facilitate it.

11:41:20  15   Q   What is the skills requirement to be a behavioral health

16   tech?

17   A   The requirement.  Individuals take an Excel test.  It is

18   not required but it is preferable for bachelor's level

19   education and mental health experience.

11:41:39  20   Q   And you said Excel as in Microsoft Excel?

21   A   Yes.  Sorry.

22   Q   Do you know approximately what the salary is for

23   behavioral tech?

24   A   Yes, either 21.50 or 22.50 per hour as far as the budgeted

11:41:59  25   rate.

DIRECT EXAMINATION – STEFANIE PLATT

11:42:01  1    Q    And you said that behavioral health techs do health and

        2    welfare checks in segregation units?

        3    A    Yes.

        4    Q    How frequently are they supposed to do those?

11:42:15  5    A    It depends on the unit, but generally at least, I believe,

        6    three times a week.

        7    Q    And what training do they receive in order to do those

        8    health and safety welfare checks?

        9    A    It's part of the general onboarding and talking about

11:42:37 10    assessing with mental health.  There are varied discussions

       11    about things like they may not be somebody who is actively

       12    seeking help.  If you walk by and you see someone might be

       13    malodorous, you can smell or you can see someone looks

       14    withdrawn and just things like that, warning signs that we

11:42:58 15    want to make sure that we're looking at to ensure the

       16    well-being of the patient population.

       17    Q    Now, are they trained if they see anything concerning to

       18    document the concerns?

       19    A    Yes.

11:43:14 20    Q    Are they supposed to notify a psychology associate or

       21    psychologist?

       22    A    Yes.  It should be reported and elevated.

       23    Q    How soon after their observation are they supposed to

       24    report it?

11:43:27 25    A    There's nothing written in policy, but the expectation is

DIRECT EXAMINATION – STEFANIE PLATT

11:43:30  1    that day.

2    Q    And you also said that these behavioral health techs lead

3    psychoeducational therapy groups?

4    A    Yes.

11:43:42  5    Q    Could you explain for the Court what psychoeducational

6    means.

7    A    Sure.  Essentially more textbook kind of groups.  So

8    something that could be more workbook oriented.  There's mood

9    management workbooks like anger management, things of that

11:43:59  10   sort.  Things that might be -- worksheets that might help you

11   learn to stop and do deep breathing.  Things that are more

12   textbook and not process therapy whereby a group is a therapy

13   process back and forth between people, which would require a

14   higher level of degree.

11:44:19  15   Q    Do the behavioral health techs make presentations or talk

16   about what's in the workbook or do they just kind of hand out

17   the workbooks and have them handed back?

18   A    I can't speak to every tech and what they've done, but the

19   expectation is to present the material, to have a discussion

11:44:37  20   about it, rather than just, you know, here, fill something out

21   and come back.

22   Q    Is there a curriculum or syllabus that the behavioral

23   health techs are supposed to use with each learning module?

24   A    There are various.  The Centurion -- Centurion in

11:44:56  25   particular has a portal that has a plethora of group therapy

DIRECT EXAMINATION – STEFANIE PLATT

11:45:01  1   curriculum to pull from.  It's really advantageous to be able

2   to use those kinds of materials that they have been able to

3   provide.  There are resources that people are encouraged to

4   use.  Everything should be run through the mental health lead

11:45:14  5   to ensure that it is appropriate, things of that sort.

6   Q    And who supervises behavioral health techs normally at a

7   prison?

8   A    Mental health leads.

9   Q    And what exactly is a mental health lead?

11:45:29  10  A    It is an administrative leader who essentially is

11  responsible for overseeing the operational components of

12  mental health for that prison facility.  So scheduling

13  assignments to ensure things are getting done correctly, being

14  a resource for clinical consultation as needed.  So if there

11:45:50  15  was something found in a segregation walk, what do we do, how

16  do we proceed.  Making sure things are running smoothly,

17  overseeing staff.

18  Q    And does the behavioral health tech have the discretion to

19  decide each week what class or what topic she's going to

11:46:12  20  teach, or does that come from somebody higher up?

21  A    Generally it depends on the mental health lead.  Generally

22  they can make a decision and then just ensure that it's

23  appropriate with the mental health lead.

24        So I can speak -- previously people would say this

11:46:33  25  is -- I've noticed that showering has become an issue on this

DIRECT EXAMINATION — STEFANIE PLATT

11:46:41  1   unit a little bit, basic hygiene has become problematic, so

2   doing basic hygiene psychoeducational course regarding that

3   would be appropriate to the patient population needs.  So they

4   would inquire to ensure that that was appropriate and

11:46:56  5   approved, and then go forth and do that.  But make suggestions

6   and have their own autonomy to observe their surroundings and

7   notate what would be helpful.

8   Q   And, to your knowledge, does the mental health lead ever,

9   like, sit in in the classes just to observe how the behavioral

11:47:16  10  health techs are teaching or to assess them?

11  A   From time to time, yes.  Not every single class, no.

12  Q   Is that a requirement, though, that it needs to be done

13  with some frequency?

14  A   That -- a requirement that the mental health lead must

11:47:29  15  observe frequently or within certain timeframes?  No, there's

16  not a requirement.

17  Q   Okay.  And we've previously discussed you were the

18  clinical director at Phoenix from August 2018 to January 2020.

19  A   Correct.

11:47:55  20  Q   And could you describe the process by which mental health

21  staff at other prisons can get people transferred to the

22  inpatient facility at Phoenix.

23  A   Yes.  So the expectation is that staff, any staff, even a

24  correctional officer, a behavioral health technician, a

11:48:20  25  psychology associate, can say, "I've observed this individual

DIRECT EXAMINATION – STEFANIE PLATT

11:48:22  1   and I believe they have a higher level of care that's needed."

2   Subsequently they propose that to someone higher up,

3   effectively.  Their mental health lead at the site would be

4   the appropriate party.

11:48:34  5   They would then have a treatment team meeting to

6   collaborate on the clinical appropriateness of a referral,

7   keeping a multitude of things in mind:  History patterns, you

8   know, what would be advantageous for the patient.

9   Then, should the referral be decided upon as an

11:48:57 10   appropriate referral by the team, it would be referred to the

11   admissions committee.

12   The admissions committee is comprised of the regional

13   mental health director, regional mental health team members,

14   and the mental health leads across the state.

11:49:13 15   That team meets, discusses the referrals, if -- they

16   discuss the appropriateness clinically of the referral and any

17   concerns clinically for really -- regarding the referral for

18   the patient, things of that sort.

19   If it then gets passed through that portion, it would

11:49:33 20   go to the DWOPs, deputy wardens of operation.  They would then

21   be able to say specifically the proposed receiving site, if

22   there are any security concerns regarding the proposed

23   referral.  That could include a do-not-house-with, a security

24   threat, protective custody, outstanding disciplinary.  Things

11:49:55 25   of that nature.

DIRECT EXAMINATION – STEFANIE PLATT

11:49:57  1        Should there not be any concerns, it would move

2     forward.  We would look at ensuring there's no medical needs

3     that are superseding mental health needs at the time.  During

4     COVID, looking to ensure they're COVID negative prior to

11:50:12  5     transfer.  And then it would go to Central Office.  They would

6     work in concert with everyone else to ensure movement happens.

7     Q    And you stated that when it went to the deputy warden of

8     operation, or DWOP stage, that they would review it.  And then

9     you said should there be no concerns, then it would move

11:50:33 10     forward.

11        So custody staff would have the ability to override

12     the decision of the mental health team that somebody needed

13     inpatient mental health care?

14     A    They would with regard to security concerns that would

11:50:46 15     supersede the clinical recommendation.

16     Q    Okay.

17        And was there any written policy from Centurion or

18     ADC that said after a patient has been continuously on watch

19     for a certain period of time, the treatment team meets and

11:51:08 20     discusses sending the person to Phoenix?

21     A    There is no policy regarding that.

22     Q    And when you were a clinical director at Phoenix, did the

23     functions of the various units stay static or did they change?

24     A    They changed.

11:51:37 25     Q    Did they change frequently?

DIRECT EXAMINATION – STEFANIE PLATT

A    A few times.

Q    Did you make the decision to change the functions of these units?

A    My opinion was sought in some of the processes; however, the decision was not mine.

Q    Who made the decision?

A    The regional mental health staff at the time in concert with the Department of Corrections Monitoring Bureau.

Q    And what sort of changes occurred in that time to the wards within Phoenix?

A    Phoenix, while I was there, initially held the female population.  So the females were in George Unit.  They had moved to Perryville.

      Following that, Baker Unit initially was the most acute unit for male inmates across the state.  Baker Unit then changed to be more of a step-down higher functioning unit for individuals stepping down from inpatient but still needing a little bit more support that were higher cognitively functioning inmates prior to them being stepped down to a residential treatment unit to help with the transition.

      John Unit was previously a protective custody unit for inpatient.  It ended up being -- having various custodies, not just protective custody, and changed more to a mood unit function.  So individuals that had mood regulation concerns.  Perhaps somebody that was feeling suicidal, things of that

DIRECT EXAMINATION – STEFANIE PLATT

11:53:23  1   sort.

2        And King Unit was shifting into being an assessment

3   unit.  So for individuals coming into the prison system who

4   perhaps are were off of medication and needed a little bit

11:53:40  5   more time prior to going into general population, getting

6   medication back, things of that sort, or we're not sure

7   exactly what's going on with somebody, if they're self-harming

8   because they're suicidal or because they're actively

9   psychotic, because there is more of a behavioral management

11:53:59  10  component to it.  So trying to have more of an assessment of

11  the person at a higher level is what that unit turned into.

12  Q   And you testified that Baker Unit previously housed the

13  most acutely mentally ill men.

14  A   Yes.

11:54:15  15  Q   When its function changed, where did those people go?

16  A   Initially the unit had 40-something beds.  I don't

17  remember the exact number.  They were not filled when the unit

18  had the most acute individuals.  The individuals, due to the

19  smaller population size, moved over to George Unit, which is

11:54:42  20  where the females previously were.  Or potentially to one of

21  the other units.  If it was an individual that was very much a

22  mood concern, they might have gone to John Unit instead.  But

23  generally speaking, most went to George Unit.

24  Q   And when you were a clinical director, at any point was

11:55:03  25  there a special unit or ward for patients who may have had

DIRECT EXAMINATION – STEFANIE PLATT

11:55:09   1   developmental or cognitive disabilities or some sort of other

2   organic brain issue?

3   A   Sure.   Yes.   Ida Ward at Phoenix and Flamenco functioned

4   for lower cognitively functioning patient base.

11:55:25   5   Q   And when did that unit function change, if you remember?

6   A   That unit's function remained the same through the initial

7   transition; however, it changed when COVID hit.   So sometime

8   in spring of 2020, when I was in the associate role.

9   Q   And where did those lower-functioning men go?

11:55:49  10   A   Individuals that were ready to graduate from an inpatient

11   level of care were transitioned to Rincon in Tucson on a unit

12   that was optimal for ensuring that they wouldn't be preyed

13   upon.   And individuals that still required a higher level of

14   care went to other units within Phoenix inpatient facility.

11:56:16  15   Q   Did these changes and functions or movements of profoundly

16   mentally ill people become disruptive or present an obstacle

17   to providing mental health treatment?

18   A   Sometimes, yes.

19   Q   Can you tell me more about that.

11:56:33  20   A   Sure.   Sometimes changes to mental health programming were

21   made with not -- not ample notice, not ample enough notice,

22   whereby warm handoffs weren't -- were completed between staff

23   but not with an adequate amount of transition, in my opinion.

24   So an individual going from one unit to the other may not have

11:57:01  25   had proper -- again, in my opinion -- preparation from

DIRECT EXAMINATION - STEFANIE PLATT

11:57:06  1    therapeutically working through with their therapist knowing

      2    there is going to be a change.

      3         As we all know, change is hard oftentimes, even if it

      4    is positive.  So that could be difficult and would need to be

11:57:19  5    processed in therapy to prepare somebody for that movement,

      6    and then have the collaboration between the sending and

      7    receiving clinicians to ensure they're on the same page

      8    regarding collaborative continuity of care.

      9    Q    And what you just described, is that what you mean by the

11:57:34 10    phrase "warm handoff"?

      11   A    Yeah.  Sorry.  Don't mean to be jargoning.

      12        Yes, warm handoff.  Move from one clinician to

      13   another ensuring the care is transitioned in a collaborative

      14   fashion for continuity.

11:57:48 15    Q    And you said sometimes it did become an obstacle.  Were

      16   there, to your knowledge, any patients who engaged in

      17   self-harm or self-injurious behavior because they were

      18   disrupted by the transfer?

      19   A    Yes.

11:58:07 20    Q    Without giving any names, could you describe that for us.

      21   A    Some patients would -- had self-harmed out of the anxiety

      22   of the change and that's what they would indicate was the

      23   reason.  We had other patients that indicated they were angry

      24   and didn't like the change and thus self-harmed to retaliate

11:58:29 25    against staff, to make things, quote, unquote, difficult.

DIRECT EXAMINATION - STEFANIE PLATT

11:58:34   1   That could happen.  Some individuals were in their cell

2   environment for a longer standing period of time and the

3   change was quite disruptive.

4          And I can think of one individual who initially --

11:58:45   5   the change ended up being good for him, but initially flooded

6   his cell and was, you know, screaming and banging on the door

7   because it was a big change in his environment.

8   Q   And these acts of self-harm, to your knowledge did any of

9   the patients need to go outside to a hospital or receive

11:59:05  10   medical care for their injuries?

11   A   The only one I can think of was the individual who said he

12   would make it difficult and that he was self-harming to go the

13   hospital to stick the company with the bill.

14          THE COURT:  Let's stop here.  It's now noon.  See you

11:59:24  15   back at 1 o'clock.

16          (Recess taken at 11:59 a.m.)

17                            * * *

18          (Proceedings after lunch break, from 1:06 p.m. till

19   afternoon break at 2:22 p.m., pages 1074-1131, were reported

11:59:42  20   by Linda Schroeder and can be found under separate cover.)

21                            * * *

22

23

24

25

DIRECT EXAMINATION (CONTINUED) – TRAVIS SCOTT

11:59:42  1          (Proceedings resumed in open court at 2:43 p.m.)

        2          THE COURT:  All right, let's proceed.

        3                    **TRAVIS SCOTT,**

        4   recalled as a witness herein, having been previously sworn or

        5   affirmed, was examined and testified further as follows:

        6          D I R E C T   E X A M I N A T I O N   (CONTINUED)

        7   BY MS. MORRIS:

        8   Q   Deputy Warden Scott, do you know what a maximum custody

        9   notebook is?

14:44:10  10  A   Notebook?

        11  Q   Books that are created that document the information about

        12  what's going on in maximum custody every month and produced to

        13  plaintiffs for each facility that has a max custody unit.

        14  A   Yes, I know what you're talking about now.

14:44:33  15  Q   Okay.  So you are familiar with those documents even if

        16  you didn't recognize the name?

        17  A   Correct.

        18  Q   All right.  And those notebooks contain the out-of-cell

        19  time sheets for 20 people altogether each month?

14:44:44  20  A   Yes.

        21  Q   And of those 20 people, at least ten are chosen because

        22  they're people with a serious mental illness; correct?

        23  A   Yes.

        24          MS. MORRIS:  Could we please bring up Plaintiffs'

14:45:02  25  Exhibit 1681, which has been previously admitted.

DIRECT EXAMINATION (CONTINUED) – TRAVIS SCOTT

14:45:05  1          And this is something that should not be published to

2    the gallery.

3          THE COURT:  Okay.

4    BY MS. MORRIS:

14:45:10  5    Q    Is this, what we're looking at, the front of a maximum

6    custody notebook?

7    A    Yes.

8    Q    Let's move to -- sorry -- the second page, which is ADCRR

9    00211256.

14:45:30  10         And this is the table of contents for the maximum

11   custody notebook; correct?

12   A    Yes.

13   Q    It sort of lays out what's in the notebook and where we

14   can find it.

14:45:40  15   A    Yes.

16   Q    Let's go the fourth page, which is ADCRR 00211258.

17         This identifies the people whose files were reviewed

18   for this particular notebook; correct?

19   A    Yes.

14:45:56  20   Q    And it sets out their ADC number, their last name, and

21   where they're housed.

22   A    Yes.

23   Q    And there's a box at the top that are people who are not

24   chosen with any consideration of their mental health status?

14:46:14  25   A    Yes.

DIRECT EXAMINATION (CONTINUED) - TRAVIS SCOTT

14:46:15  1        THE COURT:  I'm sorry, say that again.

2        MS. MORRIS:  The box at the top includes people who

3  were chosen for review without consideration of their mental

4  health status.

14:46:27  5        THE COURT:  Thank you.

6        THE WITNESS:  Yes.

7  BY MS. MORRIS:

8  Q   And the people in the box on the bottom are people who

9  were chosen specifically because they have a serious mental

14:46:38  10  illness?

11  A   Yes.

12  Q   And we can tell they have a serious mental illness,

13  according to ADCRR, because there's an M at the end of their

14  ADC number; correct?

14:46:52  15  A   Yes.

16  Q   Let's go to page 13 which is ADCRR 00211267.

17        And this is the cover for tab 2; yes?

18  A   Yes.

19  Q   Which includes count sheets; correct?

14:47:09  20  A   Yes.

21  Q   Let's go to the next page.

22        So this is a count sheet; correct?

23  A   Yes.

24  Q   It shows who was in each housing unit and some basic

14:47:21  25  information about them; correct?

DIRECT EXAMINATION (CONTINUED) – TRAVIS SCOTT

14:47:23  1    A    Yes.

2    Q    Where they're housed?

3    A    Yes.

4    Q    And what their phase and step is.

14:47:34  5    A    Yes.

6    Q    Let's go to page 57, which is ADCRR 00211311.

7              And this is the cover for tab 6; correct?

8    A    Yes.

9    Q    This tab 6 provides out-of-cell time -- out-of-cell time

14:47:53 10   tracking forms and certain supporting documents for the people

11   whose files were reviewed for this particular month; correct?

12   A    Yes.

13   Q    Okay.

14             Let's go to page 158, which is ADCRR 00211412.

14:48:12 15             So this is an out-of-cell tracking form, out-of-cell

16   time tracking form, for the week of June 19th through

17   June 25th, 2021, for a person incarcerated in max custody at

18   Eyman-Browning; correct?

19   A    Yes.

14:48:30 20   Q    It indicates the step.  Near the top, sort of a third of

21   the way to the right, it indicates the person's step level?

22   A    Yes.

23   Q    And it indicates a little farther over to the right

24   whether or not the person has an SMI?

14:48:48 25   A    Yes.

DIRECT EXAMINATION (CONTINUED) – TRAVIS SCOTT

14:48:48   1   Q   And when I say SMI, you understand that to mean serious

2   mental illness?

3   A   Yes, ma'am.

4   Q   In the column titled Recreation the form reflects the

14:49:00   5   times -- the times this person was offered to go to

6   recreation; correct?

7   A   Yes.

8   Q   And this person was offered recreation three times this

9   week, correct?

14:49:16   10   A   Yes.

11   Q   And right next to where -- right to the left of where it

12   says that the person was offered recreation, there's an A on

13   each of those entries.  Do you see that?

14   A   Yes.

14:49:29   15   Q   And what does that mean?

16   A   By looking at the chart up above, A represents chute rec.

17   Q   So the fact there's an A there means, for each of those

18   entries, the recreation that was offered was chute recreation?

19   A   Yes.

14:49:47   20   Q   Okay.  And next to each of those entries there's an R.  Do

21   you see that?

22   A   Yes.

23   Q   And that indicates that the person refused recreation on

24   that occasion; correct?

14:49:57   25   A   Yes.

DIRECT EXAMINATION (CONTINUED) - TRAVIS SCOTT

14:50:02  1    Q   The form also indicates the programming that was offered;

2    correct?

3    A   Yes.

4    Q   And we see that in the column -- two large columns over

14:50:20  5    from Recreation there's a column entitled Program Classes,

6    slash, Groups.  Do you see that?

7    A   Yes.

8    Q   And we see there's one scheduled, one scheduled program on

9    the Thursday; correct?

14:50:33  10   A   Yes.

11   Q   And it was a class scheduled for 6 a.m.?

12   A   That's what it says.

13   Q   And that class was canceled; correct?

14   A   Yes.

14:50:49  15   Q   And we know that because there's a C next to it.

16   A   Yes.

17   Q   And if the person had had other out-of-cell time offered

18   to them during the course of the week, that would be reflected

19   on this form; correct?

14:51:04  20   A   Yes.

21   Q   At the very bottom of this form, bottom line, there are

22   some numbers handwritten in red.  Do you see that?

23   A   Yes.

24   Q   So we see under the Recreation column it says 9.  Is that

14:51:26  25   9 o'clock or nine hours?

DIRECT EXAMINATION (CONTINUED) – TRAVIS SCOTT

14:51:27  1   A    Nine hours, yes.

2   Q    Okay.  And that indicates that this person was offered

3   nine hours of recreation during the week?

4   A    Yes.

14:51:36  5   Q    That's because each block of recreation is three hours and

6   there were three blocks of recreation?

7   A    Yes.

8   Q    Under the Programming column, it indicates one hour.  Do

9   you see that?

14:51:50  10   A    Yes.

11   Q    And that's for that hour of programming that was canceled

12   on Thursday; correct?

13   A    Yes.

14   Q    But it nonetheless reflects an hour of programming was

14:52:02  15   offered.

16   A    Yes.

17   Q    And then at the far left at the bottom there is a total

18   number of out-of-cell time hours; correct?

19   A    Yes.

14:52:17  20   Q    And that's just adding together the numbers on the bottom

21   row that were written in red?

22   A    Yes.

23   Q    So for this one it is ten hours?

24   A    Yes.

14:52:27  25   Q    At the top right corner there is a box about the review of

DIRECT EXAMINATION (CONTINUED) - TRAVIS SCOTT

14:52:30    1    the document; correct?  The internal ADCRR review.

            2    A    Yes.

            3    Q    There's a line that says "weekly expectations."  Do you

            4    see that?

14:52:40    5    A    Yes.

            6    Q    And they -- and there's two options, a box that says "Met

            7    for Inmate" and "Not Met for Inmate;" correct?

            8    A    Yes.

            9    Q    In this one, "Met for Inmate" is checked.

14:52:54   10    A    Correct.

           11    Q    What is the weekly expectation box referring to?  What

           12    expectations are those?

           13    A    That they receive the appropriate amount of time out of

           14    cell as required by their step.

14:53:12   15    Q    Okay.  The maximum custody notebooks from one facility are

           16    reviewed by staff from a different facility in ADCRR each

           17    month; correct?

           18    A    Yes.

           19    Q    That's to ensure accuracy?

14:53:38   20    A    Yes.

           21    Q    Okay.

           22         MS. MORRIS:  Could we please bring up defendants'

           23    Exhibit 3602.

           24    BY MS. MORRIS:

14:53:43   25    Q    This is the maximum custody notebook for Eyman-Browning

DIRECT EXAMINATION (CONTINUED) - TRAVIS SCOTT

14:54:13  1  for August 2021; correct?

2  A    Yes.

3  Q    So about two months ago.

4  A    Yes.

14:54:27  5        MS. MORRIS:  Could we go to page 175 of the .pdf,

6  which is ADCRR 00214456.  One page earlier than on my notes.

7        Thank you.

8  BY MS. MORRIS:

9  Q    This is tab 7 cover sheet; correct?

14:54:52  10  A    Yes.

11  Q    And this is the beginning of the section in the notebook

12  where the out-of-cell time for people who were selected in

13  part -- they were randomly selected but out of the group of

14  people who are in max custody and have an SMI; correct?

14:55:13  15  A    Yes.

16        MS. MORRIS:  Let's go to the next page, please.  And

17  this is -- one more page.  Thank you.

18  BY MS. MORRIS:

19  Q    This is the out-of-cell time tracking form for a person

14:55:29  20  with an SMI; correct?

21  A    Yes.

22  Q    You see the column, second large column from the right

23  there's a column entitled SMI --

24  A    Yes, I see it.

14:55:48  25  Q    SMI additional one hour mental health programming,

DIRECT EXAMINATION (CONTINUED) – TRAVIS SCOTT

14:55:52  1  parenthesis, therapy, close parenthesis, and additional one

2  hour psychoeducational programming.  Do you see that?

3  A    Yes.

4  Q    And on this particular out-of-cell time tracking form

14:56:07  5  there are two scheduled hours of SMI programming; correct?

6  A    Yes.

7  Q    And they were both canceled?

8  A    Yes.

9  Q    Let's go to page 195, which is ADCRR 00214566.

14:56:26  10         And this is another out-of-cell time tracking form

11  for another person with SMI; correct?

12  A    Yes.

13  Q    And the column for mental health programming and

14  psychotherapy has two items in it?

14:56:46  15  A    Yes.

16  Q    Again, they were both canceled?

17  A    Yes.

18  Q    Let's go to page 210, which is ADCRR 00214581.

19         This is another out-of-cell time tracking form for a

14:57:00  20  person with SMI?

21  A    Yes.

22  Q    And again there are two scheduled times of mental health

23  programming and psychotherapy?

24  A    Yes.

14:57:09  25  Q    And they were both canceled?

DIRECT EXAMINATION (CONTINUED) – TRAVIS SCOTT

14:57:10  1   A    Yes.

2   Q    Going to page 224, which is ADCRR 00214595.

3        This is another out-of-cell time tracking form for a

4   person with SMI?

14:57:25  5   A    Yes.

6   Q    And, again, both sessions of mental health programming and

7   psychotherapy were canceled.

8   A    Yes.

9   Q    Going to page 239, which is ADCRR 00214610.

14:57:41  10       This is the time tracking sheet for another person

11  with SMI?

12  A    Yes.

13  Q    And, again, the two hours of mental health programming and

14  psychotherapy that were scheduled are both canceled?

14:57:53  15  A    Yes.

16  Q    Going to page 256, which is ADCRR 00214627.

17       This is another out-of-cell time tracking form for a

18  person with SMI?

19  A    Yes.

14:58:15  20  Q    And, again, the mental health programming and

21  psychotherapy sessions were both canceled?

22  A    Yes.

23  Q    Going to page 268, which is ADCRR 00214639.

24       This is another out-of-cell time tracking form for a

14:58:31  25  person with SMI?

DIRECT EXAMINATION (CONTINUED) – TRAVIS SCOTT

14:58:32   1   A    Yes.

2   Q    And the entries for mental health programming and

3   psychotherapy were both canceled?

4   A    Yes.

14:58:40   5   Q    Going to page 283, which is ADCRR 00214654.

6        This is the out-of-cell time tracking form for

7   another person with SMI?

8   A    Yes.

9   Q    And again, mental health programming and psychotherapy

14:58:56   10   were both canceled?

11   A    Yes.

12   Q    Going to page 295, which is ADCRR 214666.

13        And this is another out-of-cell time tracking form

14   for another person with SMI?

14:59:13   15   A    Yes.

16   Q    And both of the sessions for mental health programming and

17   psychotherapy were canceled.

18   A    Yes.

19   Q    And, finally, page 310, which is ADCRR 00214681.

14:59:28   20        This is the last of the out-of-cell time tracking

21   forms for a person with SMI?

22   A    Yes.

23   Q    And, again, the mental health programming and

24   psychotherapy sessions were both canceled?

14:59:39   25   A    Yes.

CROSS-EXAMINATION – TRAVIS SCOTT

14:59:43  1        MS. MORRIS:  Those are all my questions.

2        THE COURT:  Ms. Love.

3             C R O S S - E X A M I N A T I O N

4   BY MS. LOVE:

15:00:18  5   Q   Good afternoon, Deputy Warden Scott.

6   A   Good afternoon, ma'am.

7   Q   I know you've testified a couple times in this case in

8   smaller chunks, so I want to go back and talk to you about

9   some of the subject matter that was originally raised by

15:00:31 10   questions from counsel.

11        And going back and just looking at your unit as a

12   whole, your unit houses what custody level of inmates?

13   A   Max custody.

14   Q   You -- does your unit have any close custody inmates?

15:00:50 15   A   Yes.

16   Q   Do you know how many?

17   A   Currently I have 26 close custody condemned row inmates.

18   Q   And the intake -- the intake unit for maximum custody for

19   the entire state is at your unit; correct?

15:01:13 20   A   Only for general population max custody is at my unit.

21   Q   And you were asked questions on direct examination a few

22   days ago about whether or not maximum custody inmates in

23   intake at your unit have property when they arrive.  Do you

24   remember being asked about that?

15:01:32 25   A   Yes.

CROSS-EXAMINATION – TRAVIS SCOTT

15:01:32   1   Q    I believe you said initially they did not have property

2   when they first arrived; is that correct?

3   A    Correct.

4   Q    And when -- at what point in the intake process, if any,

15:01:42   5   do the inmates receive their property?

6   A    Try to get it to them in the first week that they're

7   there.

8   Q    And when we just use the broad term "property" for the

9   Court, can you explain what that means.

15:01:55  10   A    Property would be their clothing, hygiene items, personal

11   property like a TV, their radios.  Things like that.  Their

12   legal materials.

13   Q    The intake inmates at your unit, are they coming to your

14   unit as intake max custody because they're coming from another

15:02:19  15   custody level within the system or are they coming from just

16   being newly admitted to the system or both?

17   A    Both.

18   Q    Do you have any general sense of how long maximum custody

19   intake inmates remain in the intake area?

15:02:42  20   A    No.

21   Q    What -- is there anything particular that happens during

22   the intake process as far as is there a -- are they awaiting a

23   determination of where ultimately they're going to be housed

24   at a particular location?  Or what is happening during the

15:02:58  25   process?

CROSS-EXAMINATION - TRAVIS SCOTT

15:02:58  1   A   So we are waiting for Central Office to put travel orders

2   to move them to a certain unit where there's an opening and

3   they can best meet their needs.

4   Q   And are you aware of currently what other complexes within

15:03:15  5   the ADCRR system house maximum custody units besides your

6   Browning Unit?

7   A   Rast Max and I believe now Rincon has some maximum custody

8   inmates.

9   Q   And does SMU 1 there --

15:03:31  10  A   And SMU, I'm sorry.

11  Q   Is there any sort of -- is there any sort of

12  stratification or categorization of maximum custody inmates

13  who would remain at Browning versus ultimately go to SMU 1

14  versus going to Lewis Rast or Rincon?

15:03:52  15  A   The only ones -- max custody PC inmates wouldn't come to

16  me, they would go directly to Rast Max.  And Rincon inmates

17  would -- I believe those guys are coming from mental health --

18  or going down for mental health program at Rincon.

19  Q   Can you -- and I know we talk in a lot of code language in

15:04:16  20  corrections.  Can you explain for the Court what does PC mean?

21  A   I'm sorry.  It's protective custody.

22  Q   And so now focusing on your population there at Browning,

23  you have maximum custody intake and I understand from your

24  prior testimony you have maximum custody general population?

15:04:34  25  A   Yes.

CROSS-EXAMINATION – TRAVIS SCOTT

15:04:36  1    Q    Maximum custody STG?

       2    A    Yes.

       3    Q    Now, what is maximum custody STG?

       4    A    Max custody STG.  STG stands for security threat group.

15:04:46  5    They're validated members of a prison gang.

       6    Q    And so are they then not intermixed with, for example,

       7    general population maximum custody?

       8    A    Correct.  They're separated.

       9    Q    You also have maximum custody enhanced inmates?

15:05:10 10    A    Yes.

      11    Q    What is -- let me start here.  We heard about enhanced at

      12    your unit couple days ago.  We also heard about restrictive

      13    housing program.  Are those still maximum custody inmates in

      14    different programs or are they different custody levels?  How

15:05:27 15    does that work?

      16    A    They're max custody inmates in max custody programs.

      17    Q    So then how would -- how is the restrictive housing

      18    program maximum custody inmate different than the general

      19    population maximum custody inmates?

15:05:46 20    A    Their programming is different and their restrictions,

      21    their steps, their allowable property.  How they're escorted,

      22    how they're restrained is different than the regular max

      23    custody.

      24    Q    Are the -- are the restrictive housing inmates subjected

15:06:04 25    to a higher level of security supervision and restriction?

CROSS-EXAMINATION - TRAVIS SCOTT

15:06:08  1   A    Yes.   They have -- any time they're being escorted there's

2   two officers present.  And based off of their steps, they're

3   restricted on the amount of commissary they can purchase.

4   They only go to chute rec.  They must participate in certain

15:06:34  5   programming that is different than the max custody inmates.

6   Q    Do they still have three step levels?

7   A    Yes.

8   Q    And what would place an inmate in the restrictive housing

9   program versus the general population maximum custody, if you

15:06:50  10   know?

11   A    Restricted housing are inmates that have committed severe

12   offenses, such as severe assaults on staff, severe assaults on

13   other inmates, multiple inmates assaulting one inmate.  Those

14   are the type of incidents where an inmate would be recommended

15:07:12  15   and placed into restricted housing.

16   Q    Now, you as the deputy warden, do you have authority to

17   make the decision that a maximum custody inmate would then

18   have to go to this higher level and be part of the restrictive

19   housing program?

15:07:26  20   A    No, I do not have that authority.

21   Q    Who has that authority?

22   A    That is the sending warden and the regional operations

23   director in consultation with the receiving warden.

24   Q    And now what about enhanced security?  How is enhanced

15:07:40  25   security different, if any, and if in any way, than

CROSS-EXAMINATION – TRAVIS SCOTT

15:07:44   1   restrictive housing program?

        2   A    The programming is different.  It's more in-the-cell

        3   programming.  The restrictions on movement is two officers and

        4   a supervisor with a camera, full restraints -- to include leg

15:08:04   5   restraints, behind-the-back handcuffs, with a lead device for

        6   all movement.  And once they go outside of the pod, then there

        7   has to be a camera with them as they're walking.

        8   Q    Why is there this heightened level of security for an

        9   enhanced management inmate?

15:08:22  10   A    Because these inmates have displayed very violent behavior

       11   that is a detriment to staff safety and also to inmate safety.

       12   Q    Is there a certain level of type of conduct that would

       13   subject a person to being a person who would have to be placed

       14   in the enhanced management program?

15:08:44  15   A    Yes.  The death of any other person, to include an inmate

       16   or staff member, or a serious physical assault on a staff

       17   member resulting in serious injury, or escapes.

       18   Q    And is that conduct that is -- conduct that happens once

       19   the person is in prison or is that conduct that happens before

15:09:07  20   being incarcerated?

       21   A    It is conduct that happens after being incarcerated.

       22   Q    You as deputy warden, can you make a determination or

       23   authorize that an inmate be placed in the enhanced management

       24   program?

15:09:21  25   A    No, I cannot.

CROSS-EXAMINATION - TRAVIS SCOTT

15:09:22   1   Q    Who has authority to make that decision?

2   A    The regional operations director and the warden from the

3   sending unit in consultation with the warden of -- the

4   receiving warden.

15:09:36   5   Q    Why is it that inmates who leave their housing location in

6   the enhanced management program are videotaped if they leave?

7   A    Because they have a higher propensity for violence and we

8   want to be able to make sure -- and also so that the inmates

9   know that their movement is going to be videotaped should

15:10:00  10   something occur.

11   Q    What is a lead chain?

12   A    It is a device that connects to the restraints that are

13   behind the back, and what it allows is for the staff to keep

14   distance from the inmate.  And then when they're placed inside

15:10:19  15   of the cell, they're able to prevent the inmate from pulling

16   staff into the cell while they're holding on to the cuffs.

17   And it keeps the cuffs there at the door so staff can safely

18   remove them.

19   Q    Are the inmates in the enhanced management program

15:10:38  20   considered to be the highest level of security risk for the

21   Department?

22   A    Yes.

23   Q    Do they the also have a step level program that they go

24   through?

15:10:51  25   A    Yes.

CROSS-EXAMINATION – TRAVIS SCOTT

15:10:56  1   Q   You also have -- let me back up here and ask this

2   question.  Do you know currently how many inmates that you

3   have assigned to the enhanced management program?

4   A   Yes.  I have 30.

15:11:09  5   Q   And do you know how many inmates you have assigned to the

6   restrictive housing program?

7   A   Yes.  I have 11.

8   Q   You also, out of Browning, operate what we heard termed as

9   a BMU; correct?

15:11:24  10  A   Yes.

11  Q   What does BMU stand for?

12  A   The Behavioral Management Unit.

13  Q   And how is the Behavioral Management Unit different as to

14  how it is operated, if any, versus the maximum custody GP, or

15:11:40  15  general population, locations?

16  A   The inmate's placed into the Behavioral Management Unit,

17  they still fall underneath the same criteria as regular max

18  custody inmate; however, their programming and their

19  participation in a mental health program is what determines

15:12:00  20  their steps and their privileges and their access to have more

21  out-of-cell time.

22  Q   And is the BMU new to your unit?

23  A   It is.

24  Q   And when did the BMU start at your unit?

15:12:16  25  A   September 7, 2021.

CROSS-EXAMINATION - TRAVIS SCOTT

15:12:18  1   Q   In response to questions by counsel, I believe you

2   acknowledged during your deposition you had testified that you

3   were unaware of policies and procedures that pertain to the

4   BMU?

15:12:31  5   A   At that time, yes.

6   Q   Why is that?

7   A   Because it was new to my unit and I had been on vacation.

8   Q   Do you know, was the BMU just created at your unit or were

9   inmates in a BMU program from another location moved to your

15:12:47  10  unit?

11  A   Yes, the inmates were moved to my unit from the Kasson

12  Unit.

13  Q   When the inmates were moved from the Kasson Unit, did any

14  either ADCRR security staff or Centurion staff that provided

15:13:05  15  services for Kasson move over to Browning to assist over

16  there?

17  A   Yes.  I had one sergeant that came with the program and

18  then Centurion's mental health staff came with the program.

19  Q   And I know you're the operations side of this, but do you

15:13:23  20  have any knowledge as to what type of mental health

21  programming is provided to inmates in the BMU?

22  A   I don't know the exact types.  I just know that they do

23  programming with them, the mental health staff do, and they

24  set up programs with them to help them cope and hopefully be

15:13:46  25  able to return back to general population.

CROSS-EXAMINATION - TRAVIS SCOTT

15:13:50  1   Q   Do you know if programming afforded to the BMU inmates is

2   different in quantity as compared to programming provided to

3   the maximum custody inmates per the step program?

4   A   Yes.

15:14:06  5   Q   What is that?

6   A   They hold more meetings and more -- they're more

7   interactive with the inmates in the Behavioral Management

8   Unit.

9   Q   Do the inmates in the Behavioral Management Unit receive

15:14:21  10   more opportunities for out-of-cell time than the inmates in

11   the DO 812 step program?

12   A   Yes, they do.

13   Q   In what way?

14   A   Their steps are more subjective based off of the mental

15:14:34  15   health assessment, and so they can increase in steps quicker,

16   and then they're afforded more opportunities to be outside of

17   their cell.  When they reach Step 3 they can come out of their

18   cell and be completely unrestrained and inside of the pod.

19   Q   Are the inmates, to your knowledge, in BMU, are they all

15:14:58  20   classified as maximum custody?

21   A   Yes.

22   Q   The cells at the Browning Unit, are they all single cells

23   or do you have any double bunk cells?

24   A   I have both single and double bunk cells.

15:15:29  25   Q   Do you know how many double bunk cells you have?

CROSS-EXAMINATION – TRAVIS SCOTT

15:15:32  1   A   240 cells that can be double bunked.

       2   Q   Do you utilize the double bunk cells in that way to house

       3   two inmates together?

       4   A   Yes.

15:15:40  5   Q   Are they all filled or --

       6   A   No.  Only 128 double bunked cells are currently filled.

       7   Q   Is there a reason why not all of the double bunk cells are

       8   utilized as cells for two inmates?

       9   A   So we don't have that many inmates in maximum custody to

15:15:59 10   fill up all of them, and therefore -- and there are some

      11   inmates that we're not able to double bunk because they don't

      12   match per the 704 criteria of inmates living together.

      13   Q   Are you aware of whether or not there at the Browning Unit

      14   you have maximum -- you have inmates who at one point were

15:16:20 15   classified as maximum custody but have been reclassified down

      16   to a lower level and are awaiting transfer to another unit out

      17   of maximum custody?

      18   A   Yes.  Currently, as of last Friday, I had 44 that were

      19   currently waiting to go to a close custody unit.

15:16:42 20   Q   And are you involved in any determination as to when and

      21   where those inmates will ultimately be housed?

      22   A   No.

      23   Q   Who does that?

      24   A   It is done by Central Office classification.

15:16:53 25   Q   And do you have any personal knowledge as to why those --

CROSS-EXAMINATION - TRAVIS SCOTT

15:16:59  1  that set of inmates remains at Browning awaiting beds in

2  another area?

3  A    Just for bed space to open up.

4  Q    We talked -- and I'm going to be jumping around here

15:17:14  5  because I'm following up on different things, but you were

6  asked questions and we talked about the step program and you

7  took us through the matrix for DO 812 for your unit; correct?

8  A    Yes.

9  Q    And there have been some questions that have been asked of

15:17:29 10  you regarding step level progression for inmates through the

11  program.  Do you remember being asked generally about that

12  process?

13  A    Yes.

14  Q    And I believe you did testify that there are weekly

15:17:40 15  meetings in which step level status is discussed for your

16  maximum custody inmates.

17  A    Yes.

18  Q    Is there -- is there a team or is there a certain

19  committee or anything that is made up to look at step level

15:17:56 20  status for all of your maximum custody inmates?

21  A    Yes.

22           MS. MORRIS:  Your Honor, I'm going to object.  She's

23  leading.

24           THE COURT:  I'm sorry?

15:18:04 25           MS. MORRIS:  Leading.

CROSS-EXAMINATION - TRAVIS SCOTT

15:18:05  1        THE COURT:  Sustained.

2   BY MS. LOVE:

3   Q   Is there -- are there inmates -- I'm sorry.

4        Is there a -- is step level progression determined by

15:18:18  5   one person or is it determined by others?

6   A   It's determined by a committee.

7   Q   Who is on the committee?

8   A   Myself or my associate deputy warden, the CO-IV,

9   correctional officer IV, the assigned correctional officer

15:18:33  10   III.

11   Q   What is considered when you all meet to determine whether

12   or not an inmate is going to progress through their steps?

13   A   Their behavior, their participation in programming, their

14   disciplinary and their overall interactions with staff.

15:19:00  15   Q   Now let's switch now and talk a bit about recreation

16   offered to your maximum custody inmates.  And I believe that

17   when we looked at your matrix there for Browning Unit, it

18   provided that inmates were afforded opportunities for rec in

19   two-and-a-half-hour blocks.

15:19:16  20   A   Yes.

21   Q   Then looking at out-of-cell tracking forms, it appears

22   recreation is offered in three-hour blocks.  Did I get that

23   right?

24   A   Yes.

15:19:28  25   Q   And is there a particular reason why, if you have personal

CROSS-EXAMINATION – TRAVIS SCOTT

15:19:33   1   knowledge of it, that the recreation blocks of time afforded

2   for your inmates is actually above what the matrix says?

3   A    To make sure that they get more out-of-cell time.

4   Q    In your view as deputy warden, and you've been doing this

15:19:52   5   for about 20 years or more, is it important for inmates to be

6   afforded out-of-cell recreation time?

7   A    Yes.  Very important.

8   Q    Is it important for them to be afforded opportunities for

9   programming?

15:20:05  10   A    Yes.

11   Q    And why, in your opinion, based upon your experience, is

12   that so?

13   A    When inmates are occupied or have out-of-cell time or

14   classroom, it helps decrease tension amongst the inmates.  It

15:20:20  15   makes the unit a safer place to work.  The inmates are less

16   agitated.  It makes it safer for the staff for when they're

17   interacting with those inmates.  We want them to be able to

18   get out to do their exercises or to go to the class.  Keeps

19   them occupied.

15:20:41  20   Q    As to the recreation opportunities for your maximum

21   custody inmates at Browning, we've talked about chute rec,

22   which is the one that is the door that opens straight to the

23   outside off of the housing location; correct?

24   A    Yes.

15:20:55  25   Q    And we had some discussions about the individual

CROSS-EXAMINATION – TRAVIS SCOTT

15:20:57  1   enclosures that are outside.

2   A   Yes.

3   Q   And is there -- are there additional areas where your

4   maximum custody inmates can recreate outside?

15:21:07  5   A   Besides the 10 by 10s we also have some 20 by 40

6   enclosures and a 50 by 90 enclosure.

7   Q   For the 20 by 40 enclosure, is there any equipment that

8   provides for opportunity to do activities besides just being

9   in an open space?

15:21:28  10   A   Yes, there's a basketball hoop and a basketball.

11   Q   What about the larger, 50 by 90?

12   A   There is what we call a par course where they can do

13   certain types of exercises -- pull-ups, abdominal workouts,

14   push-ups -- and also basketball court, and a table with a

15:21:50  15   ramada over it.

16   Q   Are there certain step levels with the DO 812 step level

17   program that are afforded the opportunity to go to those two

18   larger rec areas, the one that has a basketball court and the

19   other that has the par course?

15:22:07  20   A   The step level 3s can go to the 50 by 90, and I believe --

21   yeah.  It's the step 3s that can go out to the 20 by 40s and

22   50 by 90.

23   Q   Is there a certain number or any limitation on the number

24   of inmates that could go at once out to the 50 by 90?

15:22:29  25   A   Yes.  It's set at 32.

CROSS-EXAMINATION - TRAVIS SCOTT

15:22:33  1   Q   And from an operational security standpoint, what kind of

       2   staffing does it require to turn out a group of inmates at

       3   that level to the 50 by 90?

       4   A   At least four staff on turning -- well, five staff and a

15:22:57  5   supervisor to turn out, and then once they're out, two staff

       6   to observe while they're out at recreation.

       7   Q   Does that change for providing supervision for the 20 by

       8   40?

       9   A   No, because we're turning out multiple inmates into

15:23:16 10   multiple 20 by 40s.

      11   Q   Now, the individual rec enclosures, the 10 by 10s, when

      12   inmates are out there, and we do live in Arizona here, is

      13   there any shaded portion of those 10 by 10 rec enclosures?

      14   A   Yes.

15:23:35 15   Q   How is shade provided?

      16   A   With a tarp and also the -- there's a structure over them.

      17   Q   And is there -- is there any mechanism to cool those rec

      18   areas in the summer months?

      19   A   There's a misting system.

15:23:55 20   Q   When inmates are out on rec, whether the individual

      21   enclosures, the chute, the 50 by 90, the 20 by 40, is there

      22   opportunities for the inmates to have water?

      23   A   Yes, there are water jugs present.

      24   Q   Do they have to ask the officers for water?  How does that

15:24:12 25   work?

CROSS-EXAMINATION - TRAVIS SCOTT

15:24:13    1    A    No, they have access to the water coolers and they're
            2    allowed to bring out a water bottle with them.
            3    Q    Are inmates allowed to bring anything else out to rec with
            4    them besides their water bottle?
15:24:23    5    A    They're allowed to bring their tablets out with them to
            6    recreation.
            7    Q    Can you explain to the Court how recreation is offered to
            8    inmates.
            9         Let's say it's Tuesday and a particular location is
15:24:52   10    scheduled for outdoor recreation that day, whether it's the 10
           11    by 10 or the larger.  How do the inmates know it is their
           12    opportunity for recreation that day?
           13    A    There's a schedule that's put out letting them know what
           14    day is the recreation days, and we follow that schedule as
15:25:09   15    best we can.
           16    Q    Are there certain times of the day or certain rotations in
           17    which rec is provided on a daily basis?
           18    A    It's provided every day, usually starting early in the
           19    morning up until 1500.  3 o'clock in the afternoon.
15:25:29   20    Q    If I'm an inmate there at Browning and I live in a certain
           21    location, is it the situation where my recreation period would
           22    be the afternoon rec all of the time?
           23    A    No.  It alternates.  Sometimes it's in the morning,
           24    sometimes it's in the afternoon.
15:25:44   25    Q    Is there any particular reason for that?

CROSS-EXAMINATION – TRAVIS SCOTT

15:25:47  1   A   So some inmates like to rec in the morning and there's

2   many different factors that go into play.  Sometimes inmates

3   are planning to have a phone call in the morning so they'll

4   wait to go to the afternoon rec, and vice versa.  Also, some

15:26:03  5   want to go out when it's cooler.

6       In the wintertime it will change.  Inmates won't want

7   to go out in the morning because it's cool and they'll wait

8   until the afternoon when it warms up.  And in the summertime

9   they go in the morning when it's cooler instead of the

15:26:18  10   afternoon when it's hot.

11   Q   You said some recreation periods are early in the morning.

12   Do you know what time they start?

13   A   6 a.m. -- about 6:30 in the morning they start getting

14   organized to pull the inmates out for recreation.

15:26:33  15   Q   And explain to us what you mean by getting organized.  Are

16   you talking about your staff members, your officers?

17   A   I'm talking about my staff members and going to make

18   notification to the inmates, giving them a standby, advising

19   them that they're going to be going out to rec and give them

15:26:49  20   an opportunity to prepare themselves as well to be able to go

21   outside.

22   Q   How are the inmates advised by the officers to start

23   getting ready to go to recreation?

24   A   Verbally.  They go and announce 15-minute standby.

15:27:08  25   They'll also -- on their first walk, they'll go through when

CROSS-EXAMINATION – TRAVIS SCOTT

15:27:11   1   doing their first security check and advise those inmates that

2   they have recreation scheduled.

3   Q   When you say first walk, what do you mean?

4   A   The very first security check that occurs after the

15:27:25   5   officer assumes the post.  Say, for instance, day shift, they

6   assume the post 0600, so their very first security check when

7   they start walking the pods in the cluster, they'll allow the

8   inmate -- or tell the inmates at that time that they're going

9   to be attending whatever type of recreation it is for that

15:27:45  10   day.

11   Q   Is it one announcement, like walk in and yell out for

12   everybody, "Time for recreation today"?  Or are they advised

13   cell to cell?  How does that work?

14   A   Both.  They're advised cell to cell and there's also an

15:27:56  15   announcement made.  The officer will say "15 minutes to rec

16   time."

17   Q   When is it -- there at Browning, are the meals served to

18   inmates in their cells?

19   A   Yes.

15:28:10  20   Q   What time is breakfast there, do you know?

21   A   Between 4:30 and 5:00, I believe.

22   Q   So between 4:30 and 5:00 when breakfast is offered, is

23   recreation the next activity, inmate activity, that would

24   happen in the morning?

15:28:26  25   A   Yes.

CROSS-EXAMINATION - TRAVIS SCOTT

15:28:32  1   Q   Please explain to the Court, then, how the recreation turn

2   is done by correctional officers.  And I can be more specific

3   and ask, are the doors opened and the inmates are told, okay,

4   get in line, we're going out --

15:28:48  5             MS. MORRIS:  Objection, leading.

6             THE COURT:  She's giving an example.

7             You may finish your example and then ask the question

8   in a non-leading way.  So an example and then go on.

9   BY MS. LOVE:

15:29:01  10  Q   I don't want to give an example.  Just explain to us how

11  it happens when an officer enters a housing location to start

12  to get inmates out to go to rec, how does that occur?

13  A   So the officer will approach the cell after they've

14  advised the inmate they're going to recreation.  They will

15:29:18  15  then perform a strip search on the inmate to make sure they

16  don't have any contraband.  Once completed, they will place

17  the restraints on the inmate and then ask for the cell door to

18  be opened so the inmate can come out, stand in the pod, and

19  wait while other staff go and do the same thing at multiple

15:29:40  20  cells at the same time, possibly in that pod, to get the

21  inmates all together to then escort them outside into the

22  recreation enclosure.

23  Q   How many officers does it take to take one inmate out of

24  his cell and have him restrained to go to rec?

15:29:59  25  A   In single-bunk areas, one officer.

CROSS-EXAMINATION – TRAVIS SCOTT

15:30:02  1    Q    And double-bunk areas, is it different?

2    A    Yes, it's two officers because there's two occupants

3    inside of the cell.

4    Q    Can you explain to us from a security standpoint what the

15:30:12  5    reasoning is to have two officers there if there's two inmates

6    in the cell?

7    A    So that way the single officer is not outnumbered, and

8    it's for safety reasons that we have two staff present.

9    Q    And then when the inmates are out on rec are they

15:30:33  10   unrestrained?

11   A    Yes.

12   Q    To your knowledge, what kinds of programs are afforded to

13   maximum custody inmates at Browning in the step program?

14   A    Socialization, thinking for a change.  I can't remember

15:31:01  15   them all.  I apologize, I can't remember them all.

16   Q    Who -- and the names of the kinds of programs you were

17   just saying, who are those programs administered by?

18   A    The correctional officer IIIs.

19   Q    What a correctional officer III?

15:31:19  20   A    They're staff that help the inmates with anywhere from

21   answering questions to helping them with their releases,

22   getting them the proper paperwork.  If an inmate files an

23   informal resolution, like they have an issue, it goes to the

24   correctional officer III.  They teach classes.

15:31:47  25             They're an officer that has promoted to that rank and

CROSS-EXAMINATION - TRAVIS SCOTT

15:31:55  1    they're basically there to assist the inmates.

2    Q    And in discussing operations or looking at documents, do

3    you commonly refer to that position as a CO-III?

4    A    Yes.

15:32:05  5    Q    And officers who are performing security and doing things

6    like security watches, are those officers referred to

7    differently?

8    A    They're referred to CO-IIs.

9    Q    And we also hear testimony regarding a CO-IV.  What is a

15:32:20 10    CO-IV?

11    A    That is a correctional officer IV.  They supervise

12    correctional officer IIIs.

13    Q    So there's programs, then, that are led by the CO-IIIs.

14    Are there additional programs led by mental health staff for

15:32:37 15    the maximum custody inmates?

16    A    Yes, for SMIs they have SMI classes.

17    Q    And do you have -- realizing you're not a Centurion

18    employee, do you have any knowledge as to what kind of

19    programs are offered by mental health to SMI inmates?

15:32:58 20    A    No.  I -- I don't know what the classes are that they

21    offer.

22    Q    You saw some -- counsel showed you some out-of-cell

23    tracking forms just a little while ago in which there were

24    cancellations of programming for the SMI inmates.  Do you

15:33:18 25    remember seeing that?

CROSS-EXAMINATION - TRAVIS SCOTT

15:33:21  1    A    Yes.

2    Q    And during the last two years have there been periods of

3    time where the programming, whether it be CO-III programming

4    or mental health programming, has had to be canceled for the

15:33:33  5    inmates at your unit?

6    A    Yes.

7    Q    Why?

8    A    Due to COVID.  In the beginning, March of 2020, through

9    June 2021 all classes were canceled due to COVID to ensure

15:33:49  10   social distancing and to combat the pandemic.

11   Q    Do you know whether or not, during that time period where

12   group classes were canceled, was there any form of programming

13   provided by your CO-III officers to inmates in cell?

14   A    The programming that was offered, they have the -- they

15:34:08  15   can still do the self-study and the self-help packets that are

16   available to do them inside of their cell.  Those are still

17   available to them.

18   Q    Did staffing also affect your ability to provide

19   programming during, let's say, the last six months?

15:34:30  20   A    Yes.

21   Q    Or the last year?

22   A    Yes.

23   Q    Are your programs running right now for your maximum

24   custody inmates?

15:34:44  25   A    Yes.

CROSS-EXAMINATION - TRAVIS SCOTT

15:34:45  1    Q    And there was a certain point in time where the

2    programming started again?

3    A    Yes.

4    Q    When was that?

15:34:51  5    A    June of 2021.  June 19, 2021, I believe.

6    Q    Is there any particular reason it was June?

7    A    That's when we started our phase reopening of the

8    Department.

9    Q    And are both your CO-III-led programming and mental health

15:35:07 10    programming back up and running?

11    A    Yes.

12    Q    Are there -- while we say up and running, have there been

13    any occasions where you still have to cancel, to your

14    knowledge, in the last couple months?

15:35:28 15    A    The SMI program.  The SMI classes were canceled for July,

16    August, and I believe part of September due to Centurion staff

17    not having available techs to teach the SMI class.  I'm not

18    100 percent sure on the CO-III-led programs.  Pretty sure most

19    of those have occurred.

15:35:55 20    Q    Switch gears a little on you now again.  And it wasn't

21    today but the other day you were shown some daily post sheets

22    and you were talking to counsel about staffing on particular

23    dates and what those daily post sheets look like.  Do you

24    remember that?

15:36:11 25    A    Yes.

CROSS-EXAMINATION - TRAVIS SCOTT

15:36:11    1    Q    You were asked questions as to whether or not on a

            2    particular day in question certain control rooms were -- had a

            3    person assigned to them.

            4    A    Yes.

15:36:22    5    Q    Do you remember that?

            6    A    Yes.

            7    Q    Are there times due to staffing challenges where you're

            8    unable to have all control rooms for all locations in your

            9    unit posted?

15:36:35   10    A    Every day.

           11    Q    And what do you -- what happens in that situation?

           12    A    So one officer will be assigned to two control rooms.

           13    Q    And how does that work?  Can you give us all a sense of

           14    how that works since we can't visualize what the operations

15:36:54   15    are.

           16    A    So during the day it depends on what activities are

           17    scheduled throughout the day.  Most likely in certain areas we

           18    try keep two control rooms that would be in the One Able and

           19    One Dog Cluster, we try to keep both of those filled just to

15:37:15   20    do the daily operations that happen there.

           21         The other ones we've only got the staffing to provide

           22    for one side to control both control rooms, so the officer

           23    then would go back and forth.  So there would be officers on

           24    the floor and the control room officer would follow the

15:37:37   25    officers down on the floor to open up the doors, conduct the

CROSS-EXAMINATION – TRAVIS SCOTT

15:37:41   1   activities in that one cluster.  And then when they're

2   completed then they'll go over to the cluster directly across

3   from that and that control room officer will then operate the

4   doors for that particular cluster to allow the staff to

15:37:59   5   perform their duties.

6   Q   When you say operate the doors, do you mean the doors

7   going in and out of housing locations?

8   A   Yes.

9   Q   Do you mean -- does that include cell doors for the cells

15:38:09   10   inside the housing locations?

11   A   It includes cell doors, the pod doors, and the cluster

12   doors.  You cannot get inside of them without the control room

13   officer being present.

14   Q   When there is a case where you have staffing challenges of

15:38:29   15   which you speak as to staffing your control rooms, does that

16   result in curtailment of activities such as recreation and

17   programs at times?

18   A   It can.

19   Q   And is there a method as to how you, as deputy warden, or

15:38:50   20   those who report to you would decide what activities would be

21   canceled on any particular date if there are staffing

22   challenges?

23   A   Yes.  In the mornings, the shift commander calls me every

24   day around 6:30 in the morning, advises me of how many staff

15:39:06   25   they have on site and what activities they're going to be able

CROSS-EXAMINATION – TRAVIS SCOTT

15:39:10  1   to accomplish, and then I advise them what areas to operate

       2   and go ahead and do the classes or do the recreation, and

       3   based off of information what cluster before might have been

       4   skipped to make sure we're not skipping the same cluster twice

15:39:34  5   in a week.  There's many variables that come into play when

       6   you're trying to figure out which best to operate for that

       7   particular day.

       8   Q   So I understand your testimony correctly, then, if you

       9   have a situation where you have to curtail some activities,

15:39:51 10   you may look to see can we curtail them in a certain area

      11   versus across the unit entirely?

      12   A   Correct.  So we look at what area was last curtailed.  And

      13   if it's their day again, then we're obviously not going to

      14   curtail them; we'll curtail another area instead of them.  So

15:40:13 15   then the staff will be shifted to be able to meet the

      16   obligations for that area and then curtail the operations in a

      17   different area.

      18   Q   Is -- when you have staffing challenges, is there a

      19   priority hierarchy in what you would look to see what do we

15:40:33 20   have to have happen today, what can we cancel?  Do you do an

      21   analysis such as that?

      22   A   So there are posts that have to be filled no matter what.

      23   Those posts would be the main control, the wing controls.  So

      24   south wing control, north wing control, the kitchen control

15:40:53 25   room officer, the Tower 60 officer.  Those positions have to

CROSS-EXAMINATION – TRAVIS SCOTT

15:41:00  1    be filled first.

2          Then we start looking at being able to have at least

3    one officer for every two control rooms.  So -- because

4    without that we can't do anything often the floor.

15:41:14  5          Then we look at the areas.  Double-bunked areas

6    require two staff; single-bunk areas require one staff.  Based

7    off of the last curtailment, if, say, a single-bunk area was

8    next and there was two staff down there but yet they hadn't

9    been curtailed in a while and another single-bunked area had

15:41:44 10    been curtailed, then the shift commander -- I would direct the

11    shift commander to take that one officer and move over to the

12    other area so that way they could do recreation, showers, and

13    programming in that area since they were skipped previously.

14    To help try to catch up.

15:42:07 15    Q    Do you have a medical unit on site there at Browning?

16    A    I do.

17    Q    And how does it work as to movement of inmates to or from

18    medical, if necessary, in a case of a staffing challenge day?

19    A    So we always run our medical.  Medical takes priority over

15:42:29 20    everything inside of the unit to make sure inmates are

21    receiving medical care.  So based off of how many lines or

22    appointments that medical has scheduled for that day, it will

23    determine how many staff we have to provide to medical to

24    ensure that those lines are completed.

15:42:50 25    Q    Does it take a certain number of correctional staff to

CROSS-EXAMINATION - TRAVIS SCOTT

15:42:53  1  provide security for one medical line?

2  A    Usually it's one officer for each medical line while it's

3  actively going.  We could have six lines scheduled throughout

4  the day, but while that line is going there's one officer

15:43:10  5  assigned to that line to go retrieve the inmate and bring them

6  back to the health unit, stay there with the inmate outside

7  the room while the inmate's in the appointment, and then take

8  the inmate back out and go get the next inmate for the

9  appointment.

15:43:26  10  Q    Switching gears on you again, let's talk a little bit

11  about the max custody book reviews you were asked questions

12  about.  And you were asked questions by counsel as to whether

13  or not staff from other maximum custody locations review your

14  monthly max custody book.  Do you remember being asked about

15:43:45  15  that?

16  A    Yes.

17  Q    Do you -- is -- do staff members from your unit also look

18  at your own book?

19  A    Yes.

15:43:56  20  Q    How many levels of review do those maximum custody monthly

21  books go through?

22  A    Three.

23  Q    Can you explain for us what that process is, what the

24  three process looks like.

15:44:08  25  A    So the first process is the lieutenants and sergeants in

CROSS-EXAMINATION - TRAVIS SCOTT

15:44:16 1  charge of the A12 program, we call it, will go and meet and

2  review with the other sergeants and lieutenants from the

3  different units.  They will trade books to check them for

4  accuracy, to make sure that they've followed the processes,

15:44:33 5  that they have all of the correct information.  That's the

6  first review.

7           Second review is the deputy wardens along with the

8  complex warden will get together and we will trade books and

9  do it at our level.

15:44:48 10          And then the third review is we come up to Central

11  Office with all of the wardens and the deputy wardens from

12  those units, trade books again, go through them checking for

13  accuracy and content and then they're turned in after that.

14  Q    What exactly are you checking for accuracy?

15:45:10 15  A    The first thing I check for when I'm personally doing it,

16  the first thing I do is, number one, I make sure that the

17  right inmates were selected on the book.  And then I am

18  looking at making sure that the right inmate's name, number,

19  and housing location, that the step is correct if the inmate

15:45:33 20  is at SMI.  So I make sure we have it ten regular inmates,

21  regular GP inmates, and ten inmates that are SMI listed.

22          I then look at the recreation, make sure all of those

23  totals add up, all of the different categories as we saw

24  earlier, making sure that they all add up.  If there's

15:45:56 25  refusals that -- or if there's cancellations, that it's

CROSS-EXAMINATION - TRAVIS SCOTT

15:46:00  1   documented properly.  If there's inmates that were excluded,

2   making sure there's exclusion memos and why they weren't

3   selected.

4           I look at property inventories.  Are their -- their

15:46:16  5   phone record is there, their amount of money they have on

6   their books is there.  If they've had any visitation.  Those

7   things.

8   Q   I'd like to show you Exhibit 2373 at 269 which I believe

9   is already in evidence.

15:47:01 10          MS. LOVE:  May we have permission to publish to the

11   witness?

12           THE COURTROOM DEPUTY:  Are we publishing from you?

13           MS. LOVE:  But not to the gallery.

14           THE COURTROOM DEPUTY:  Okay.

15:47:19 15          THE WITNESS:  May I have another water.

16           THE COURTROOM DEPUTY:  Oh, sure.

17           MS. LOVE:  I just confirmed with counsel that that

18   one we had stipulated to 2373, it's in.

19           THE COURT:  All right.

15:47:36 20   BY MS. LOVE:

21   Q   We've already looked at another one.  We're having a

22   little technical issue so we're going to move it along here.

23   We're just going to move on.

24           Deputy Warden Scott, were you on duty, I believe it

15:48:56 25   was in approximately September, when some of the plaintiffs'

CROSS-EXAMINATION - TRAVIS SCOTT

15:49:00  1   experts came through and toured in advance of trial?

2   A   Yes.

3   Q   And on that day do you know whether or not there was a

4   situation where there was an empty cell where there had been

15:49:13  5   an incident in the cell the night before and it needed to be

6   cleaned?

7   A   Yes.

8   Q   What do you recall that about situation?

9   A   Inmates had arrived from Kasson Unit.  It was their first

15:49:24  10  night at BMU, so it was September 7, 2021.  When the inmates

11  arrived, five of them later in the afternoon at about 3:30, 4

12  o'clock had cut themselves and injured themselves severely.

13  Q   And was there inability to be able to fully clean the cell

14  the night before the tour the next morning?

15:49:52  15  A   No.  We were able to clean up the inside of the cell but

16  we were not able to remove the Lexan off of the front of the

17  cell.

18  Q   And when you say off the front of the cell, what do you

19  mean?

15:50:02  20  A   The Lexan -- the expanded metal is inside of the Lexan.

21  So the Lexan is on the outside of the cell.

22  Q   So did you have to -- what did you have to do?  Did you

23  have to have maintenance come in or anything?

24  A   Yes.  Maintenance was advised that we needed the Lexan

15:50:27  25  removed off of the cell so we could complete the cleanup.

CROSS-EXAMINATION - TRAVIS SCOTT

15:50:31  1    Q    And that was not something that correctional personnel

2    were able to do?

3    A    No.

4    Q    Why is that?

15:50:37  5    A    Because it's maintenance and the tools are secured.  They

6    know how to remove them.  They know the proper materials.  And

7    also the staffing at night, I don't have a staff to perform

8    maintenance in the middle of the night.

9            MS. LOVE:  Could we take a look at Exhibit 4004,

15:50:54 10    please.

11            This is to be published to the witness.

12            THE COURTROOM DEPUTY:  Okay.

13    BY MS. LOVE:

14    Q    For identification purposes, Deputy Warden Scott, do you

15:51:06 15    recognize the document that is before you?

16    A    Yes, I do.

17    Q    What is that?

18    A    That is maintenance work order request.

19    Q    For what?

15:51:16 20    A    That is for the Browning Unit in Dog Cluster cell 35.

21    It's a work order asking for the Lexan to be removed from the

22    cell.

23    Q    Is this the work order that was submitted to be able to

24    take the Plexiglas off the cell to further clean the cell?

15:51:38 25    A    Yes.

REDIRECT EXAMINATION – TRAVIS SCOTT

15:51:39  1          MS. LOVE:  Move to admit.

2          THE COURT:  It's admitted.

3          (Exhibit 4004 admitted.)

4          MS. LOVE:  Deputy Warden, those are all of the

15:52:09  5    questions I have for you.  Thank you.

6          THE WITNESS:  Thank you.

7          THE COURT:  Redirect.

8              R E D I R E C T   E X A M I N A T I O N

9    BY MS. MORRIS:

15:52:29 10   Q    Deputy Warden, how many people are in the BMU?

11   A    You mean now?

12   Q    Yes.  Or on average.

13   A    I believe it's 11.  I'm sorry.

14   Q    And there are people -- withdrawn.

15:52:56 15        Not everyone who has an SMI in maximum custody at

16   Browning is in the BMU; correct?

17   A    That is correct.

18   Q    There are people with SMIs throughout max custody at

19   Browning?

15:53:11 20   A    There are inmates with SMIs that are located in One Able

21   Cluster.

22   Q    That's the only place they are?

23   A    Yes.

24   Q    And that's a general population unit?

15:53:25 25   A    Yes.

REDIRECT EXAMINATION – TRAVIS SCOTT

15:53:26  1   Q    General population maximum custody?

2   A    Yes.

3   Q    Okay.  You mentioned 44 people are waiting to go to close

4   custody.  They're waiting for beds?

15:53:36  5   A    Yes.

6   Q    How long have they been waiting?

7   A    That I don't know.

8   Q    You talked about people who are at Step 3 can go to the 50

9   by 90 recreation area.

15:53:53  10   A    Yes.

11   Q    That's only people who are Step 3 in general population

12   max custody; correct?

13   A    Yes.

14   Q    And they can go one time per month; correct?

15:54:03  15   A    Yes.

16   Q    All the other times during the month they either go to the

17   chute rec or once a week to the 10 by 10 outside recreation?

18   A    Yes.

19   Q    You have no idea how many people at Browning are there on

15:54:19  20   an override; correct?

21   A    No, I don't know how many.

22         THE COURT:  What's an override?

23         THE WITNESS:  Would you like me to explain?

24         THE COURT:  Yes, please.

15:54:28  25         MS. MORRIS:  The judge would like you to explain.

REDIRECT EXAMINATION - TRAVIS SCOTT

15:54:30  1          THE WITNESS:  Yes, Your Honor.

2          The override is an individual based off they may not

3     have max custody scores but based on certain circumstances

4     they're given an override in classification so they can be

15:54:43  5     housed at a max custody unit.

6          An example of that would be an inmate that has no

7     other housing options because of they have too many

8     do-not-house-withs and we have no other place to put them.  We

9     would then recommend an override in classification for them to

15:55:03  10    be in max custody to keep them safe or to keep them away from

11    other individuals.

12         THE COURT:  And that's usually the situation, keep

13    them safe or have some restrictions --

14         THE WITNESS:  Yes, ma'am.

15:55:16  15         THE COURT:  Thank you.

16    BY MS. MORRIS:

17    Q    There are also overrides for people serving the first two

18    years of a life sentence; correct?

19    A    That's a nondiscretionary override.

15:55:27  20    Q    But that's an override?

21    A    No.  When an inmate comes in and they're given a life

22    sentence, based off -- that's a first degree murder most

23    likely.  So when they're coming in, they are usually coming in

24    with max custody points.  So a nondiscretionary override would

15:55:47  25    be an individual that has been in max custody that is now

REDIRECT EXAMINATION - TRAVIS SCOTT

15:55:52  1   scoring close, but due to the fact they're serving a life

2   sentence, their first two years of that life sentence must be

3   served at a max custody unit.

4   Q    Are you aware that people who are serving a life sentence

15:56:07  5   could be scoring medium --

6   A    Yes.

7   Q    -- during their first two years of life sentence and

8   therefore have to go to max custody?

9   A    From my experience being the associate deputy warden at

15:56:19 10   Alhambra Unit and signing off on numerous max custody packets

11   for inmates arriving on first degree murder, most of them came

12   in with max custody points.  Very rarely did I see one that

13   did not have max custody points.

14   Q    You're aware, are you not, that people can be placed in

15:56:37 15   maximum custody on an override because they're serving the

16   first two years of a life sentence when their scores from

17   classification place them at a medium or even a minimum level

18   of custody?

19        MS. LOVE:  Your Honor, exceeding the scope of my

15:56:59 20   examination.

21        THE COURT:  Because of the question I asked, so

22   overruled.

23        THE WITNESS:  Yes.

24   BY MS. MORRIS:

15:57:06 25   Q    And just as you don't know how many people are at Browning

REDIRECT EXAMINATION - TRAVIS SCOTT

15:57:10  1    in max custody on override, you also don't know how many

2    people at Browning are, as you phrased it during your

3    deposition, truly a max custody; correct?

4    A    As far as the classification scores go, yes.

15:57:32  5    Q    Do you recall that when I was examining you before we

6    looked at some maximum custody notebooks, or a maximum custody

7    notebook?

8    A    Yes.

9    Q    And you saw that there were group therapy and

15:57:43  10   psychoeducational classes in August that were canceled?

11   A    Yes.

12   Q    That wasn't due to COVID; correct?

13   A    No, it was not.

14   Q    And that was after June 2021; correct?

15:57:52  15   A    Yes.

16   Q    Doing packets or worksheets in a cell is not out-of-cell

17   time, is it?

18   A    No, it's not.

19   Q    And it's not an opportunity to have human interaction, is

15:58:05  20   it?

21   A    Your definition of human interaction is -- I mean, they're

22   interacting with each other every day in their cell.  They

23   interact with staff all day.

24   Q    I'm sorry, that's not my question.

15:58:20  25          Doing a worksheet or a packet of worksheets is not an

REDIRECT EXAMINATION - TRAVIS SCOTT

15:58:26   1   opportunity for human interaction, is it?

2   A    No.

3   Q    Have you ever had officers assigned to three control rooms

4   at a time?

15:58:37   5   A    Not during day shift, no.

6   Q    But you might during night shift?

7   A    Yes.

8   Q    Have you ever had an officer assigned to four control

9   rooms at a time?

15:58:48  10   A    Yes.

11   Q    Have you ever had an officer assigned to five control

12   rooms at a time?

13   A    I've had an officer assigned to six control rooms at one

14   time.

15:58:58  15   Q    And that means if an officer is assigned to six control

16   rooms, that means no one can see into five control rooms --

17   into five pods -- five clusters.  I'm sorry.

18          No one can see into five clusters from the control

19   room at the time that the six control rooms are staffed by one

15:59:31  20   person?

21   A    Correct.

22          MS. MORRIS:  Nothing further.

23          THE COURT:  All right.

24          It's 4 o'clock, it's Friday.  And unless you,

15:59:39  25   plaintiffs' counsel, find it necessary to meet your schedule

DIRECT EXAMINATION – LORI STICKLEY

15:59:43    1    or you want to be very ambitious, I suggest we adjourn for the

           2    week.  What would you like to do?  Do you have a witness

           3    ready?

           4            MS. MORRIS:  I believe we do, but she certainly won't

15:59:58    5    be finished today.

           6            THE COURT:  It's up to you.  I'm here to stay.  I'm

           7    here to serve.

           8            MS. MORRIS:  We can get started.  She's here.  Yes.

           9            THE COURT:  Okay.

16:00:08   10            MS. MORRIS:  So we call Deputy Warden Lori Stickley.

          11            THE WITNESS:  Am I excused, Your Honor?

          12            THE COURT:  Yes, you may.  You've been in max custody

          13    for a while.  But we gave you water.

          14            THE WITNESS:  And I appreciate that, ma'am.

16:00:25   15            THE COURT:  You're welcome.  Have a nice weekend.

          16            THE WITNESS:  You too.

          17                         **LORI STICKLEY,**

          18    called as a witness herein, after having been first duly sworn

          19    or affirmed, was examined and testified as follows:

          20                 D I R E C T   E X A M I N A T I O N

          21    BY MS. MORRIS:

          22    Q    Good afternoon, Deputy Warden Stickley.

          23    A    Hi.

          24    Q    Hi.  You're the deputy warden for ASPC Eyman SMU; correct?

16:02:11   25    A    Yes.

DIRECT EXAMINATION – LORI STICKLEY

16:02:12  1    Q    For the purposes of your testimony, can we just refer to

2    that as SMU?

3    A    Yes.

4    Q    You've been the deputy warden at SMU since July 2020?

16:02:23  5    A    Yes.

6    Q    As the deputy warden of SMU, you oversee everything?

7    A    Correct.

8    Q    You ensure people are doing their jobs?

9    A    Yes.

16:02:33  10    Q    You ensure everything is getting done on a daily basis?

11    A    Yes.

12    Q    You do that by walking through the units?

13    A    Yes.

14    Q    By talking to staff?

16:02:42  15    A    Yes.

16    Q    By reviewing paperwork and logs?

17    A    Yes.

18    Q    Some of the logs you review are correctional service

19    journals?

16:02:49  20    A    Correct.

21    Q    You make sure daily activities are being written down?

22    A    Yes.

23    Q    You make sure staff are getting incarcerated people to

24    classes?

16:03:00  25    A    Yes, when they're scheduled.

DIRECT EXAMINATION – LORI STICKLEY

16:03:03   1   Q   You make sure staff are getting incarcerated people to

2   recreation?

3   A   Yes, when staffing allows.

4   Q   When staffing allows?

16:03:12   5   A   Correct.

6   Q   Correctional service journals are reviewed everyday?

7   A   Yes.

8   Q   You've worked for ADCRR since April 2000; correct?

9   A   Yes.

16:03:22   10   Q   And besides ASPC Eyman, you've worked at ASPC Douglas?

11   A   Yes.

12   Q   And ASPC Lewis?

13   A   Yes.

14   Q   And ASPC Perryville?

16:03:33   15   A   Yes.

16   Q   And ASPC Phoenix?

17   A   Yes.

18   Q   And ASPC Florence?

19   A   Yes.

16:03:40   20   Q   There are a little over 500 people housed in maximum

21   custody at SMU; correct?

22   A   Yes.

23   Q   And as of October 12th, 2021, the date of your deposition,

24   there were 174 people in detention at SMU?

16:04:00   25   A   Probably, yes.

DIRECT EXAMINATION – LORI STICKLEY

16:04:01   1   Q   Okay.  Do you know what they are right now, how many

2   people there are right now in detention at SMU?

3   A   I have yesterday's count.  If I can open it, I can tell

4   you.

16:04:10   5   Q   Yes, that's fine.

6   A   You said for detention?

7   Q   Yes.

8   A   152.

9   Q   People can be sent to SMU for detention from any male

16:04:25  10   facility in the state; correct?

11   A   Correct.  Statewide detention unit.

12   Q   Is SMU the largest detention unit?

13   A   I believe so.

14   Q   People can go into detention in SMU if they ask for

16:04:47  15   protective custody?

16   A   Correct.

17   Q   And you do not put people into protective custody against

18   their will?

19   A   No.

16:04:58  20   Q   People can go into detention in SMU if they refuse to

21   house?

22   A   Correct.

23   Q   If one incarcerated person gets beaten up by another

24   incarcerated person and the person beaten up does not request

16:05:15  25   protective custody but does say they will not go back to the

DIRECT EXAMINATION - LORI STICKLEY

16:05:20  1    housing unit where they were beaten up, that can be considered

2    refusal to house; correct?

3    A    It could be.

4    Q    Sometimes is?

16:05:30  5    A    Depends on the situation.

6    Q    Okay.  In the situation I just described.

7    A    It could be, yes.

8    Q    And sometimes is?

9    A    Yes, I guess.

16:05:46  10   Q    People can go into detention at SMU if they're under

11   investigation for something that happened at their unit?

12   A    Yes, at the sending unit.

13   Q    That can be either an internal investigation or external

14   investigation?

16:06:01  15   A    Correct.

16   Q    External investigation means investigation of criminal

17   charges?

18   A    No.  That would be like CIU, a criminal -- I mean if they

19   were looking at something -- I mean still within the prison.

16:06:16  20   Q    Okay.

21   A    It wouldn't be outside charges or anything like that, it

22   would still be internal.

23   Q    Okay.  Would people who had pending criminal charges be

24   placed in detention?

16:06:26  25   A    No.

DIRECT EXAMINATION - LORI STICKLEY

16:06:29   1   Q   So what's -- I'm sorry, what's an external investigation

2   that would result in people being placed in detention?

3   A   If information came from, like, CIU, internally inside the

4   prison but from another unit and they needed to look at it.

16:06:47   5   Q   Okay.  At SMU there are four wings numbered 1 through 4;

6   correct?

7   A   Correct.

8   Q   And each wing has four clusters?

9   A   Yes.

16:06:58   10   Q   And those clusters are named Able, Baker, Charley, and

11   Dog?

12   A   Correct.

13   Q   And Able and Baker are across the hall from each other;

14   correct?

16:07:08   15   A   No.  Able --

16   Q   I'm sorry.  Able and Dog.

17   A   Able and Dog.

18   Q   Charley and Baker are across the hall from each other.

19   A   Correct.

16:07:17   20   Q   And that means that one person might staff the control

21   room for Baker and Charley at the same time; correct?

22   A   If staffing numbers -- yes.

23   Q   And one person might staff the control room for Able and

24   Dog at the same time?

16:07:34   25   A   If staffing numbers are low enough, yes.

DIRECT EXAMINATION - LORI STICKLEY

16:07:37  1    Q   Okay.  Each cluster has six pods numbered 1 to 6; correct?

2    A   Correct.

3    Q   Maximum custody is in all four clusters on Wing 4?

4    A   Yes.

16:07:52  5    Q   Wing 4 is all two-person cells?

6    A   Yes.

7    Q   Though not every cell -- but that doesn't mean every cell

8    in Wing 4 actually has two people in it; correct?

9    A   Correct.

16:08:08 10    Q   There are also -- people are also in maximum custody in

11   Wing 3, Able and Dog?

12   A   Yes.

13   Q   Maximum custody protective -- maximum custody protective

14   custody is in Wing 1, Able Cluster, Pod 6, and Wing 1, Baker

16:08:27 15   Cluster, Pod 1; correct?

16   A   Can you repeat the two locations.

17   Q   Yes.  Wing 1, Able Cluster, Pod 6, and Wing 1, Baker

18   Cluster, Pod 1.

19   A   Yes.

16:08:47 20   Q   Housing of people in maximum custody is not determined by

21   step.

22        Where people are housed in maximum custody is not

23   determined by step?

24   A   Correct.

16:09:02 25   Q   Besides individual conflicts, whether two people can be

DIRECT EXAMINATION – LORI STICKLEY

16:09:07  1   housed together is determined by classification, crime, age,

2   and sentence length?

3   A    Yes.

4   Q    But someone who is step 3 could be housed in a cell with

16:09:17  5   someone who is step 1?

6   A    If their classification matches, yes.

7   Q    Okay.  It's your understanding that, because maximum

8   custody is based off scores determined in classification,

9   people's scores might not ever go down low enough for the

16:09:35  10  person to get out of max custody regardless of their behavior

11  in max custody; correct?

12  A    Just by the numbers; correct.

13  Q    Detention is in Wing 3, clusters Baker and Charley, and

14  Wing 1 Able Cluster; correct?

16:09:57  15  A    Correct.

16  Q    In detention people can be housed together if they match

17  in terms of classification and the reason they're in

18  detention?

19  A    Correct.

16:10:09  20  Q    Mental health watch is in Wing 1, Dog Cluster, Pods 4, 5,

21  and 6?

22  A    Correct.

23  Q    People who are in detention are treated like they're in

24  max custody?

16:10:23  25       MS. LOVE:  Foundation.

DIRECT EXAMINATION – LORI STICKLEY

16:10:24  1        THE WITNESS:  Correct.

2        THE COURT:  I was going to overrule it anyway.  Go

3    ahead.  Answer will remain.

4    BY MS. MORRIS:

16:10:31  5    Q    They're treated as though they were 5/5, correct, when

6    they're in detention?

7    A    Yes.

8    Q    5/5 refers to the custody level -- the first 5 in 5/5

9    refers to the custody level; correct?

16:10:43 10    A    Yes.

11    Q    And the second five in 5/5 refers to the institutional

12    risk score?

13    A    Correct.

14    Q    And the custody level and the institutional risk scores

16:10:56 15    are determined by classification?

16    A    Correct.

17    Q    5 is the highest custody level?

18    A    Yes.

19    Q    And 5 is also the highest institutional risk level?

16:11:08 20    A    Yes.

21    Q    Someone who is 4/4 is close custody?

22    A    Correct.

23    Q    And someone who is 3/3 is medium custody?

24    A    Correct.

16:11:22 25    Q    But regardless of their scores, while they're in detention

DIRECT EXAMINATION - LORI STICKLEY

16:11:24  1  they're treated like a 5/5?

2  A    Yes.

3  Q    SMU -- SMU has general population maximum custody?

4  A    Yes.

16:11:36  5  Q    And it has sex offender maximum custody?

6  A    Yes.

7  Q    There's no difference in incentives or requirements for

8  people in general population max custody and sex offender max

9  custody; correct?

16:11:47 10  A    Correct.

11  Q    SMU 1 also has max custody protective custody?

12  A    Yes.

13  Q    Throughout Eyman SMU 1, people are strip searched before

14  they leave their cells; correct?

16:12:04 15  A    In maximum custody, correct.

16  Q    There's a step matrix for people in max custody; correct?

17  A    Yes.

18  Q    Your understanding of the purpose of the step matrix

19  program is to give inmates in max custody privileges that they

16:12:19 20  might not be able to have otherwise because they will never --

21  because they will not ever get to a lower custody level;

22  correct?

23  A    Yes.

24  Q    It's your understanding that the purpose of the matrix is

16:12:30 25  also to give people in max custody something to do?

DIRECT EXAMINATION - LORI STICKLEY

16:12:39  1    A    I don't understand your question.

2    Q    Is it your understanding that one of the reasons, one of

3    the purposes, of step matrix is to give people in maximum

4    custody something to do?

16:12:57  5    A    Within reason, yes.

6    Q    I'm sorry, what do you mean by "within reason"?

7    A    Well, the step doesn't determine what they can do or not.

8    It's still -- it doesn't change their decision to do

9    something.  I mean, it's stepped out to give X amount of hours

16:13:20 10    for recreation or classes.  So it's not -- I mean, it's

11    established for steps.

12    Q    Okay.  But as people, for example, move to step 2, they

13    are able to go to the CO-III class if that's being offered;

14    correct?

16:13:42 15    A    Correct.

16    Q    So that's something to do?

17    A    Well, that's why I wasn't sure what you meant by for them

18    to do.  So, yes.

19    Q    It's good to have something to do, isn't it?

16:13:57 20    A    Yes.

21    Q    Because if you have nothing to do, your mind can wander

22    and that can result in people doing destructive things, can't

23    it?

24    A    Possibly, yes.

16:14:10 25    Q    And that's something that you think, isn't it?

DIRECT EXAMINATION - LORI STICKLEY

16:14:16  1   A   I don't -- not necessarily, I mean, no.

2   Q   Do you recall that you were deposed in this case?

3   A   Yes.

4   Q   That was on October 12th?

16:14:26  5   A   Yes.

6   Q   And you swore to tell the truth?

7   A   I did.

8   Q   And you told the truth?

9   A   Yes.  But you asked my opinion.  And I don't necessarily

16:14:36  10  think one way or other on that.

11  Q   Okay.

12       MS. MORRIS:  Could we please -- withdrawn.

13  BY MS. MORRIS:

14  Q   You swore to tell the truth under penalty of perjury.

16:14:48  15  A   Okay.  Yes.

16       MS. MORRIS:  Could we please bring up Deputy Warden

17  Stickley's transcript on page 89, line 7.

18       "Question:  Okay.  What is the purpose, as you

19       understand it, of the step matrix program?

16:15:22  20       "Answer:  So my understanding of the step matrix is

21       inmates that are in max custody that have a significant

22       sentence structure or time, is the ability to give them

23       incentives and privileges that they might not be able

24       to achieve because they will not lower in custody ever

16:15:41  25       to get down.  So they introduced this step to give

DIRECT EXAMINATION – LORI STICKLEY

16:15:46  1    incentives or, you know, to help maintain a productive

2    area within maximum custody so they have something to

3    do."

4         Could we see just a little bit farther down.

16:15:55  5      "Question:  Why would it -- why is it -- why give

6    them something to do?

7      "Answer:  Because if you have nothing to do, I mean

8    just like anybody, I mean if you're sitting around

9    bored all day with nothing to do, your mind can wander

16:16:15  10    and either do destructive things or can be mentally,

11    you know, discouraging or, you know -- I guess to be

12    productive is helpful."

13         It's good to be productive, isn't it?

14  A    Yes.

16:16:32  15  Q    For people in max custody, their out-of-cell time is

16    documented on the out-of-cell time tracking forms?

17  A    Correct.

18  Q    All of the out-of-cell time for people in maximum custody

19    is supposed to be recorded on that form?

16:16:46  20  A    Yes.  For structured activities.

21  Q    I'm sorry, what do you mean by structured activities?

22  A    Well, if they go to the shower, it's not documented on the

23    out-of-cell sheet, but if they go to a structured activity,

24    that is documented.

16:17:02  25  Q    Okay.  If they go to visitation, that would be documented?

DIRECT EXAMINATION – LORI STICKLEY

16:17:06   1   A    On the back of it, on the out-of-cell tracking sheet?  No.

2   Q    You review the out-of-cell tracking forms each day?

3   A    Yes.  Well, no.

4   Q    You or your associate warden review the out of cell --

16:17:24   5   withdrawn.

6          Department Order 812 sets out the behavior

7   expectation -- behavior expectations, requirements for step

8   advancement, bases for step reduction, recreation, and other

9   incentives for people in max custody; correct?

16:17:44  10   A    Correct.

11          MS. MORRIS:  Could we please bring up Plaintiffs'

12   Exhibit 1318.

13          And this has already been admitted.

14   BY MS. MORRIS:

16:17:56  15   Q    Can you tell us what 1318 is?

16   A    It's Department 812, inmate maximum custody management and

17   incentive systems.

18   Q    And this is the policy that sets out the amounts of

19   recreation and other privileges by step for maximum custody

16:18:14  20   units; correct?

21   A    Yes.

22          MS. MORRIS:  Could we please go to page 13 of the

23   .pdf, attachment C.

24   BY MS. MORRIS:

16:18:22  25   Q    Attachment C is the matrix that applies to all the max

DIRECT EXAMINATION – LORI STICKLEY

16:18:35  1   custody populations Eyman SMU; correct?

2   A   Yes.

3   Q   Could we go to page 5 of the .pdf please.  Which is

4   identified on the page numbers as page 3.

16:18:50  5        We see there's a Section 5.0 that is about the step

6   program, max custody population except restricted/enhanced

7   status housing program.  Do you see that?

8   A   Yes.

9   Q   Okay.  Going to the next page, we're going to look at

16:19:10  10  Section 5.5.  This provision states that inmates who have

11  maintained step 3 for a minimum of 30 consecutive days without

12  incident are eligible for consideration placement in a close

13  custody housing location; is that correct?

14  A   Correct.

16:19:37  15  Q   And it's your understanding that when the step matrix

16  program was initially implemented, it was a step-down program

17  where people start at Browning and then step down to SMU 1 and

18  then to Central Unit at Florence Kasson -- I'm sorry -- at

19  Florence; correct?

16:19:55  20  A   Yes, that was my understanding.

21  Q   And the Central Unit was a close custody unit?

22  A   Correct.

23  Q   Which meant that leaving the SMU, leaving SMU to the

24  Central Unit at Florence was leaving maximum custody.

16:20:10  25  A   Yes.

DIRECT EXAMINATION – LORI STICKLEY

16:20:11  1    Q   It's your understanding that they stopped doing that

2    step-down process before you got to Eyman SMU?

3    A   Yes.  They were not moving inmates to Central at the time

4    when I arrived at SMU.

16:20:26  5    Q   Okay.  The fact that Florence is closing makes it harder

6    to move people out of SMU to close custody?

7    A   Yes.

8    Q   And that means the movements from max custody to close

9    custody are less frequent and less quick than they used to be?

16:20:47 10    A   Yes.

11   Q   And Section 5.5 isn't really emphasized a lot now?

12   A   We still do the process, but there are travel orders

13   pending for the inmates to move once beds become available in

14   close custody.

16:21:09 15   Q   But you don't really emphasize Section 5.5?

16   A   I mean, we do it as much as we can but it's not -- I mean,

17   it moves the inmates.  It's considered and it can be

18   recommended, and we have to wait for beds available in close

19   custody.

16:21:32 20   Q   There are currently people in SMU max custody units who

21   have been reclassified as close custody; correct?

22   A   Yes.

23   Q   They're just waiting to move?

24   A   Correct.

16:21:47 25   Q   A couple months ago you looked into how many there were in

DIRECT EXAMINATION - LORI STICKLEY

16:21:49  1  that situation?

2  A    Correct.

3  Q    At that time there were 33?

4  A    Okay.

16:21:56  5  Q    Is that correct?

6  A    Probably.  I mean, it was a couple months ago.  I have

7  updated numbers that I can give, if you want.

8  Q    How many are there now?

9  A    So for max custody for AO8, which is the general

16:22:11 10  population, is 72, and for A34, which is detention, is 78.

11  Q    So there are about 150 people in max custody right now at

12  SMU who are not classified as max custody?

13  A    That have pending travel orders to a lower custody, yes.

14  Q    That means they're not classified as max custody?

16:22:36 15  A    Yes.

16  Q    Do you know how long those 150 people have been waiting

17  for transfer?

18  A    I do not.

19  Q    Steps do not affect classification; correct?

16:22:57 20  A    No.

21  Q    Steps are based on behavior in maximum custody?

22  A    Yes.

23  Q    And to your understanding, classification is based on the

24  sentence and the classification scores?

16:23:11 25  A    Yes.

DIRECT EXAMINATION – LORI STICKLEY

16:23:18  1          MS. MORRIS:  Your Honor, I'm about to switch gears

2      and I think it would make more sense to stop now.

3          THE COURT:  That's fine.

4          All right.  We are adjourned for the day.  We'll see

16:23:26  5      you on Monday.  Have a nice weekend.

6              (End of transcript.)

7                      *  *  *  *  *

1                        **C E R T I F I C A T E**

2

3              I, PATRICIA LYONS, do hereby certify that I am duly

4      appointed and qualified to act as Official Court Reporter for

5      the United States District Court for the District of Arizona.

6

7              I FURTHER CERTIFY that the foregoing pages constitute

8      a full, true, and accurate transcript of all of that portion

9      of the proceedings contained herein, had in the above-entitled

10     cause on the date specified therein, and that said transcript

11     was prepared under my direction and control, and to the best

12     of my ability.

13

14             DATED at Phoenix, Arizona, this 3rd day of December,

15     2021.

16

17

18

19

20                             s/ Patricia Lyons, RMR, CRR
                               Official Court Reporter
21

22

23

24

25

**R E D A C T I O N   C E R T I F I C A T E**

I, PATRICIA LYONS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing is a true and correct copy of the transcript originally filed with the clerk of court but incorporating redactions pursuant to Dockets 4300 and 4304, as requested by:  Corene T. Kendrick at Dkt. 4300, joinder at Dkt. 4303, Order at Dkt. 4304, plus Joint Motion at Dkt. 4305, Order at Dkt. 4317.

Redacted characters appear as an "x" in the transcript.

DATED at Phoenix, Arizona, this 13th day of January, 2022.

s/ Patricia Lyons, RMR, CRR
Official Court Reporter