1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3                  _____

4    Shawn Jensen, et al., on behalf  )
     of themselves and all others     )
5    similarly situated; and Arizona  )
     Center for Disability Law,       )
6                                     )
                    Plaintiffs,       )    CV-12-0601-PHX-ROS
7                                     )
          vs.                         )    Phoenix, Arizona
8                                     )    November 10, 2021
     David Shinn, Director, Arizona   )    8:35 a.m.
9    Department of Corrections; and   )
     Richard Pratt, Interim Division  )
10   Director, Division of Health     )
     Services, Arizona Department of  )
11   Corrections, in their official   )
     capacities,                      )
12                                    )
                    Defendants.       )
13   _____)

14

15       BEFORE:  THE HONORABLE ROSLYN O. SILVER, JUDGE

16       REPORTER'S TRANSCRIPT OF PROCEEDINGS

17    BENCH TRIAL - DAY 8 - A.M. SESSION (pages 1661-1783)

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC. 41
23   Phoenix, Arizona  85003-2151
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

 1                    **A P P E A R A N C E S**

 2    For the Plaintiffs:

 3                   ACLU – Washington, DC
                    By: DAVID CYRUS FATHI, ESQ.
 4                      CORENE T. KENDRICK, ESQ.
                       MARIA V. MORRIS, ESQ.
 5                   915 15th Street NW, 7th Floor
                    Washington, DC  20005
 6
                    Prison Law Office
 7                   By: DONALD SPECTER, ESQ.
                    By: ALISON HARDY, ESQ.
 8                   By: RITA KATHERINE LOMIO, ESQ.
                    1917 5th Street
 9                   Berkeley, CA  94710

10                   Arizona Center for Disability Law – Tucson, AZ
                    By: MAYA STOCK ABELA, ESQ.
11                   177 North Church Avenue, Suite 800
                    Tucson, AZ  85701
12

13    For the Defendants:

14                   Struck Love Bojanowski & Acedo
                    By: DANIEL PATRICK STRUCK, ESQ.
15                      RACHEL LOVE, ESQ.
                       TIMOTHY JAMES BOJANOWSKI, ESQ.
16                      ASHLEE B. HESMAN, ESQ.
                       TIMOTHY MICHAEL RAY, ESQ.
17                   3100 West Ray Road, Suite 300
                    Chandler, AZ  85226
18

19

20

21

22

23

24

25

**I N D E X**

**EXAMINATION**

<u>WITNESS</u>                                                                                      <u>PAGE</u>

TODD R. WILCOX                          1666

        Direct Examination (Cont'd) By
        Ms. Hardy

        Cross-Examination By Mr. Struck                          1746

**EXHIBITS**

| <u>NUMBER</u> | <u>DESCRIPTION</u> | <u>PAGE</u> |
| --- | --- | --- |
| 915 | Mortality – McNutt, Jack #41301 Final Mortality Review ADCRRxxxxxxxxxxxxxx | 1666 |
| 1255 | January-July 2021 Table of Performance Measure 11 CGAR Scores WILCOX000108 | 1666 |
| 1256 | January-July 2021 Table of Performance Measure 13 CGAR Scores WILCOX000109 | 1666 |
| 1257 | January-July 2021 Table of Performance Measure 35 CGAR Scores WILCOX000110 | 1666 |
| 1258 | January-July 2021 Table of Performance Measure 37 CGAR Scores WILCOX000111 | 1666 |
| 1259 | January-July 2021 Table of Performance Measure 44 CGAR Scores WILCOX000112 | 1666 |
| 1260 | January-July 2021 Table of Performance Measure 46  CGAR Scores WILCOX000113 | 1666 |

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 1261 | January–July 2021 Table of Performance Measure 47 CGAR Scores WILCOX000114 | 1666 |
| 1262 | January–July 2021 Table of Performance Measure 48 CGAR Scores WILCOX000115 | 1666 |
| 1263 | January–July 2021 Table of Performance Measure 50 CGAR Scores WILCOX000116 | 1666 |
| 1264 | January–July 2021 Table of Performance Measure 51 CGAR Scores WILCOX000117 | 1666 |
| 1265 | January–July 2021 Table of Performance Measure 52 CGAR Scores WILCOX000118 | 1666 |
| 1266 | Table of Medical Scores of Patients Before Death WILCOX000119 | 1666 |
| 1267 | Table of medical Scores of Patients Housed in the IPC at ASPC–Florence WILCOX000120 | 1666 |
| 1268 | Table of Medical Scores of Patients Housed in the IPC at ASPC–Lewis WILCOX000121 | 1666 |
| 1269 | Table of Medical Scores of Patients Housed in the IPC at ASPC–Tucson WILCOX000122 | 1666 |
| 1270 | Table of medical Scores of Patients Hused in the SNU at ASPC–Perryville WILCOX000123 | 1666 |

1                    **(Index of Exhibits Continued)**

2                              **EXHIBITS**

3    <u>**NUMBER**</u>      <u>**DESCRIPTION**</u>                        <u>**PAGE**</u>

4    1271      July 2021 Centurion Arizona          1666
                DOC Drug Formulary
5               xxxxxxxxxxxxxxxxxx

6    1305      October 4, 2021 ADCRR,               1666
                Medical Services Technical
7               Manual

8    1634      June 3, 2021 ADCRR, Medical          1666
                Services Division, Medical
9               Services Technical Manual
                xxxxxxxxxxxxxxxxxxxx
10
      2102      2021.08.04 Mxxxxxx Mortality         1666
11              Review Committee Final Report
                (Orm Ex. 14)
12              (xxxxxxxxxxxxxxxxxxxxxxxxxx)

13   1227      September 9, 2021                    1742
                Videorecording of Axxxxxxxxx
14              130917 ASPC-Florence Site
                Visit  ADCRRxxxxxxxx
15

16

17

18

19

20

21

22

23

24

25

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

1          **P R O C E E D I N G S**

2

3          THE COURT:  Good morning.  Let's proceed.

4          MS. HARDY:  Good morning, Your Honor.

08:36:09  5          Good morning, Dr. Wilcox.

6          Your Honor, I would like to begin by admitting some

7     exhibits into evidence.

8          I would like to admit Plaintiff's 915, 1255 through

9     1271, 1305, 1634, and 2102.

08:36:36  10          THE COURT:  No objection?

11          MR. STRUCK:  No objection, Your Honor.

12          THE COURT:  They're admitted.

13          (Exhibits 915, 1255 through 1271, 1305, 1634, and

14     2102 admitted.)

15

16          **TODD R. WILCOX,**

17     recalled as a witness herein, having been previously sworn or

18     affirmed, was examined and testified further as follows:

19          D I R E C T   E X A M I N A T I O N   (CONTINUED)

08:36:43  20     BY MS. HARDY:

21     Q   Dr. Wilcox, I wanted to finish up with a couple questions

22     about the case you described yesterday the young man with

23     testicular cancer.  Could you tell us why you chose to discuss

24     that particular case and highlight it in your report.

08:36:58  25     A   Yes.  The inquiry in this trial is really about systemic

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

08:37:04  1   issues in care and this case demonstrates many of the system's

2   issues that I have been critical about in my report.

3        This case demonstrates that the nurses were acting

4   outside the scope of their practice.

08:37:21  5        The initial clinical visit, the nurse decided to use

6   a musculoskeletal assessment for a testicular problem, and

7   then not refer to the patient to a provider, which meant that

8   she basically was the final decision maker, which changed the

9   trajectory of his care.

08:37:38  10       There were delays in ordering imaging and tests.

11       There were delays in signing off results from imaging

12   and testing.

13       There were delays in scheduling consults.

14       There were delays in carrying out emergency orders

08:37:50  15   from the specialist, the urologist in this case.

16       Of course we've discussed the significant error in

17   misinterpreting the critically abnormal lab result and the

18   consequences of that.

19       So in one case you see multiple systems errors that

08:38:10  20   were additive in this case and they resulted in this

21   preventible death.

22   Q    And, Dr. Wilcox, could you tell us what the community

23   standard of care would have been if you have a young man who

24   comes into your clinic and has a testicular mass.

08:38:28  25   A    Yes.  So testicular tumors grow quickly, so it is

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

08:38:34  1   imperative to move expeditiously to get the care rendered.

2        Typically, in the community if you came into a

3   primary care office, this would be imaged almost immediately,

4   probably that day or the next day, and off to a urologist.

08:38:48  5   And from my experience, the surgery and the consult with

6   urology would be probably be all accomplished within five

7   working days.

8   Q   And in this case from the time that the mass was

9   discovered until the time he had surgery, how much time was

08:39:03  10  that?

11  A   Let's see.  The mass was discovered August 5, 2020.  He

12  had surgery April 8, 2021.

13  Q   Thank you.

14       Dr. Wilcox, when you evaluated care for this

08:39:23  15  particular declaration, could you take us through the process

16  that you used.

17  A   Yes.  For this particular declaration, clearly I had the

18  benefit of a lot of previous experience in what I knew about

19  the care and systems within the Arizona Department of

08:39:41  20  Corrections, so that was an advantage that I had, and had done

21  quite a bit of work in the earlier years reviewing charts and

22  reviewing systems.

23       Clearly, things have changed within the system since

24  I last spent a real deep dive into the care, but I have at

08:39:58  25  least stayed somewhat up-to-date on the care through the

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

08:40:02  1  ongoing CGAR monitoring process that is really sort of a

2  fairly comprehensive ongoing review of the system and its

3  performance that was set up as part of the stipulation in this

4  case.

08:40:17  5          So I've been following that.  And there have been

6  some interval times where we've done tours, either in person,

7  and then during COVID we did some iPad tours, of the prisons

8  to get some updates on how things were operating.  But --

9  Q    Dr. Wilcox, could you explain what an iPad tour is.

08:40:39  10  A    Sure.  These were new to me as well.  But they arranged

11  for a tour and one of the staff members from the Arizona

12  Department of Corrections was in charge of manning an iPad, is

13  I think what they used, or similar kind of tablet, and they

14  had a WiFi connection and everybody signed in to a Zoom call

08:41:03  15  and we walked virtually around the prison and went to various

16  places.  We would talk with various patients that we

17  encountered.  We were able to ask questions of staff and of

18  the patients.  And we did a tour with the assistance of Zoom.

19  Q    So you actually weren't physically there, but you were

08:41:27  20  able to interact with the patients that you were talking to?

21  A    That's correct.  I would say that those tours are not

22  nearly as effective as the ones that are in person, but given

23  the circumstances, that was better than nothing.

24          So as we prepared to make this declaration, it was

08:41:47  25  important to me to get some updates and to understand some of

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

08:41:51  1   the changes and to refresh some of the information with

2   respect to how the health care system was operating, so I

3   chose a variety of methods to look at information.

4          One of the methods was to review the mortality

08:42:10  5   reports of individuals who had died within the system.  That's

6   a fairly standard method within healthcare, to review care in

7   healthcare and to look for examples of how the care deviated

8   from the standard of care or if you have operational issues or

9   systems issues where that impacted the outcome of a particular

08:42:31 10   case.

11   Q   Dr. Wilcox, can you clarify, who does those mortality

12   reviews?

13   A   The mortality reviews are done -- I don't know all of the

14   committee members, but the mortality reviews are done by the

08:42:43 15   Arizona Department of Corrections and by Centurion.  And they

16   look at the facts of the case, they review the medical record,

17   they review the medical examiner's report to be informed about

18   what is the official cause of death, and then they do an

19   analysis that reviews all the care and makes some

08:43:08 20   determinations with respect to whether there were deficits in

21   care that they identified, whether the cause of death was

22   something that was preventible or not.  And that creates an

23   official document.

24   Q   And those reviews are performed by people who have medical

08:43:25 25   training, including physicians; is that right?

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

08:43:28  1  A   Yes.  And they're signed off.  We looked at one yesterday.

2  They're signed off by the -- by a physician within Centurion's

3  leadership.  The one that we viewed yesterday was signed off

4  by Dr. Orm, who is their medical director.

08:43:44  5  Q   What else did you look at for this process?

6  A   I also wanted to identify patients who are high-end

7  utilizers of the health care system.  And the reason that

8  those patients are important is because when you are doing a

9  systems evaluation, what you really want to evaluate are

08:44:06 10  patients who put a little strain on the system.  They have a

11  lot of transactions in their health care.

12      It's not particularly informative about a system if

13  you have a patient that has a one-time episodic visit for a

14  sprained ankle and then they're never seen again.  That

08:44:23 15  doesn't give you very much data.  But what does give you data

16  is patients that have frequent and ongoing interactions with

17  the healthcare system because you're able to see the cord

18  nation of care, you're able to see all the different elements

19  of the system operating to care for that patient.

08:44:40 20      So the goal was to identify individuals who were at

21  the sicker end of the spectrum because they presumably would

22  have higher medical needs and the way that we chose to do that

23  is to do the tours at the prisons.  And so one of the things

24  that was important to me was going to the high acuity units,

08:45:03 25  which would be the IPCs, or the infirmary would be the common

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

08:45:08  1   name for those, and the special needs units because those

2   patients are sicker and they have more healthcare transactions

3   in their medical records and that's what they need.

4        So those are the patients who I interviewed.  And

08:45:22  5   then went back and reviewed their medical records to verify

6   their information, see what's happening with them, and to go

7   on.

8        We also in the midst -- well, just one comment on

9   that.  So I -- we just picked a day to go on a tour.  I had no

08:45:42  10   control over who was housed in those units.  We tried to speak

11   to everybody in those units who was willing to speak to us.

12   So we got as big of a sample as we could with regards to those

13   random patients who were housed in those units and then we

14   went back and looked at their charts.

08:46:00  15        We also --

16   Q   Actually, Dr. Wilcox, I'm going to stop you for a minute.

17   I realize we didn't clarify.  When you read the mortality

18   review reports, did you also look at health records related to

19   some of those mortality reviews?

08:46:13  20   A   Oh, yes.  That was a big part of the process was going

21   back and doing my own review of the medical records in

22   relationship to what the mortality review assessment was

23   performed.

24        We also did tours of the prison and were out on the

08:46:33  25   yards and in the medical clinics, and so during that process

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

08:46:39  1   we had quite a mixture of patients who came up to us randomly

2   and just wanted to talk about their healthcare issues.  And so

3   we talked to as many of them as we could, and many of them we

4   were able to speak to just briefly because it was in a public

08:46:53  5   setting and didn't really afford appropriate privacy.  So what

6   we would do is write down their name and prison number and ask

7   the staff to pull them in the afternoon so that we could speak

8   to them privately.  So we kind of generated a list on the fly

9   as we were doing our walking tours.

08:47:14  10        We also pulled patients who were named plaintiffs in

11  this -- in this proceeding.  And if we were at a facility

12  where they were housed, we would pull them out and speak to

13  them.

14        And there were also a number of patients who had

08:47:31  15  written to different advocacy groups who were seeking advocacy

16  for healthcare concerns that they had, and if any of those

17  individuals were identified and at the prison we were at, we

18  asked that they be pulled out so we could have an opportunity

19  to speak with them.

08:47:50  20  Q    Did you review any reports for this declaration?

21  A    I did.  I reviewed expert report of a Dr. Stern, which was

22  done kind of in between my significant involvement with this

23  case.  He was, I believe, a court expert who was brought in

24  after the stipulation was already set up and kind of prior to

08:48:14  25  these proceedings here this month.  And he generated a fairly

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

08:48:21  1  lengthy report about his findings of when he was looking at

2  the system here in Arizona DOC.

3  And, of course, as I said, I reviewed the ongoing

4  fairly massive amount of data that is the CGAR -- the

08:48:38  5  evolution of the CGAR data, to get sort of what the system was

6  feeling about with respect to their compliance with the

7  performance measures.

8  Q    Did you also read policies and procedures?

9  A    Yes.  I reviewed policies and procedures.  I didn't review

08:48:58  10  every one, but there were some limited ones that I wanted to

11  review.

12  What is really most important to me, though, is sort

13  of how the system performs as opposed to, you know, what they

14  say about it.

08:49:12  15  Q    And did you review the health record of every person who

16  appears in your declarations?

17  A    I did, yes.

18  Q    And is the list of patients for whom you reviewed medical

19  records for this testimony listed in Appendix C to your

08:49:25  20  declaration?

21  A    Yes.

22  Q    Is the methodology you used to evaluate care in this case

23  typically used by experts in your field?

24  A    Yes.

08:49:45  25  Q    And have you used this methodology to evaluate care in

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

08:49:48   1    other cases?

2    A    Yes.

3    Q    And do other experts use this methodology or similar

4    methodology?

08:49:56   5    A    Yes.  This methodology's a little bit more involved than

6    what you would see on, like, an NCCHC audit, but some of the

7    elements of the data that I used are similar to what NCCHC

8    reviews when they do a site survey.

9    Q    Do you consider --

08:50:14   10             THE COURT:  Can you tell me what the differences are?

11             THE WITNESS:  Oh.  Yes.  For the National Commission

12    on Correctional Health Care, when they do a site survey, they

13    have a fairly limited period of time to be on site.  Usually

14    typical survey for a facility is usually two and a half days.

08:50:31   15    And one of the elements that they always look at are deaths,

16    and so the physician who is with the survey team would do a

17    review of the death cases.  And then they also look at some

18    fairly high-end data on some chronic care or high-end

19    utilizers of healthcare just to see that there are chronic

08:50:59   20    care clinics that are operating within the institution.

21             THE COURT:  Have you ever attended or participated in

22    one of the NCCHC evaluations?

23             THE WITNESS:  Yes, Your Honor.  Many years ago I was

24    a surveyor for NCCHC for a brief period of time.

08:51:16   25             THE COURT:  Go ahead.

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

08:51:18    1    BY MS. HARDY:

2    Q    And your facilities have been subject to these NCCHC

3    evaluations; correct?

4    A    Yes.  Over my career, the surveys are typically done every

08:51:27    5    two to three years, so we've had multiple surveys and multiple

6    survey teams that have come in.  So we know that process

7    fairly well.

8    Q    Do you consider the methodology that you used in this case

9    for evaluating medical care delivery to be sound and reliable?

08:51:45   10    A    Yes.  I think the most important thing was I wanted to

11    make sure I was comfortable with the information that I had to

12    render opinions with regarding how the system operates.

13    Q    And why do you think that this particular methodology gave

14    you reliable picture of what's happening in ADCRR?

08:52:07   15    A    Well, as I mentioned earlier, the ability to look at

16    patients that have higher medical utilization, each medical

17    record contains a subset of multiple transactions:  There's

18    lots of medications that are passed, there's lots of provider

19    visits, there's lots of nursing encounters within just one

08:52:29   20    medical record.

21          And so what you're really looking at when you do a

22    systems evaluation is how those transactions occur, how they

23    interact with each other, how the information flows through

24    the system and how the care is coordinated, because there's

08:52:48   25    usually a lot of coordination of care between, you know,

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

08:52:53  1   referrals from nurses to providers, providers to outside

2   specialists, the prison to the hospital, the hospital back to

3   the prison.  And so those are transition points where you

4   oftentimes have issues.  Systems oftentimes have issues

08:53:15  5   navigating that.  And so it's really important to choose

6   patients where you're going to find those types of things in

7   their medical records.

8        You know, clearly within the entire prison

9   population, there are plenty of young, healthy patients who

08:53:29 10   really don't put very much demand on the healthcare system.

11   Or if they do, it is a one-time situation, they have strep

12   throat, they come in, they get treated, and then everything is

13   fine.  So those patients aren't particularly useful to

14   evaluate because you're not able to see all those

08:53:47 15   transactions, you're not able to see those transitions in

16   care.

17        THE COURT:  So how did you determine which prisoners,

18   patients, had the higher medical utilization issues?

19        THE WITNESS:  So I went into the infirmaries where

08:54:05 20   they house the patients who are sicker and, you know, kind of

21   by definition, the sicker patients are housed there because

22   they have higher medical needs.  So it was a relatively easy

23   process to identify that type of patient because they were in

24   the high utilization medical housing.

08:54:26 25        THE COURT:  And if you were able, perhaps you were --

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

08:54:30  1   first of all, how many patients were there and what was the

2   percentage of patients that were in the infirmary versus other

3   patients, or prisoners?

4           THE WITNESS:  I'd have to look at the actual numbers

08:54:43  5   of who we interviewed.  I don't have that off the top of my

6   head.

7           But some of the infirmaries are relatively small.

8   And so, like, over at Lewis, I think there probably are 12 to

9   15 patients there.  At some of the other facilities there are

08:54:57 10   multiple infirmaries where you have anywhere from 20 to 30 or

11   40 patients that are housed in those types of special needs

12   units.

13          But one of the issues for me is that I don't have the

14   ability to run reports inside of eOMIS, and so I had to figure

08:55:16 15   out a methodology for identifying the sicker patients and

16   going to the sort of hospital units within the prisons in the

17   various prisons was a pretty simple and pretty reliable way to

18   find patients who at least the system felt were sicker.

19          THE COURT:  Thank you.

08:55:35 20   BY MS. HARDY:

21   Q   And in addition, did you also consider the mortality

22   review folks to be high users?

23   A    Well, yes and no.  There are -- some of the mortality

24   reviews clearly were patients that had serious medical needs

08:55:52 25   that had been ongoing and they, when they were alive they

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

08:55:57   1   definitely were high-end utilizers of healthcare.  There are

2   others in the mortality review that had a one single episode

3   of healthcare that then they decompensated and oftentimes got

4   sent out and died, and sometimes those would be things like a

08:56:17   5   drug overdose or a sudden infection from shooting up or a

6   sudden infection from -- they developed cellulitis or

7   something like that.  So some of those patients did not have a

8   long history of high-end utilization, but they had one intense

9   medical event that ended up causing their death.

08:56:42  10   Q   Dr. Wilcox, using your methodology, did you develop an

11   opinion about the adequacy of the healthcare, medical care

12   delivery system, in ADCRR?

13   A   I did.

14   Q   And what was your opinion?

08:56:54  15   A   My opinion is that the system as it exists is terrible.

16   There are so many blocks to care, barriers to care.  There's

17   so many areas where the care can get snagged up and not flow

18   appropriately, and the end result of that is that some

19   patients within the healthcare system, in fact many patients

08:57:21  20   who have higher end needs, end up getting terrible care.

21        THE COURT:  End up being -- I'm sorry?  Terrible

22   care?

23        THE WITNESS:  They end up getting terrible care.

24   BY MS. HARDY:

08:57:32  25   Q   Does this system put people at risk of harm?

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

08:57:35   1   A   It does.  Especially if you have higher end medical need,

2   you are at serious risk for harm and in some instances, as we

3   pointed out, death.

4   Q   Are there particular areas you were concerned about in

08:57:50   5   particular?  For example, nursing?

6   A   Yes.  One of the things I've spoken about in my report,

7   and we've seen couple of examples of this already, is that the

8   way the healthcare system has been set up, they have created

9   this really interesting model where the nurses are really the

08:58:12  10   frontline providers.  They -- when a prisoner submits a health

11   needs request, the nurse goes and evaluates them.  And what is

12   happening is that nurse has been empowered within the system

13   to be the final decision maker.  And that is not the way a

14   system is supposed to be set up.

08:58:34  15             THE COURT:  When you say nurses, are you talking

16   about RNs?

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  Registered nurses?

19             THE WITNESS:  A registered nurse.  And, well, they do

08:58:44  20   have LPNs as well, which are licensed practical nurses.

21             THE COURT:  I know, but your focus is on RNs.

22             THE WITNESS:  That's right, Your Honor.

23             THE COURT:  They are the ones that are the frontline

24   providers?

08:58:55  25             THE WITNESS:  They're functioning as frontline

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

08:58:57  1  providers.  And it is my opinion that that is not appropriate.

2  RNs do not have the training to function as the final

3  decision maker, they don't have the education to function as

4  the final decision maker, and they don't have the licensure to

08:59:15  5  function as the final decision maker.

6  If an RN wants to be the final decision maker in the

7  healthcare system, they would need to go back to school for

8  another couple of years, they would need to complete hundreds

9  of hours of supervised training and pass a test and then get

08:59:31 10  licensed as advanced practice RN.

11  BY MS. HARDY:

12  Q   Dr. Wilcox, did you develop an opinion about the adequacy

13  of the care provided by the physicians and mid-level

14  providers?

08:59:47 15  A   Yes.

16  Many of the healthcare encounters that I have seen, I

17  would summarize them as being superficial.  There does not

18  seem to be much of an inquiry into the possible underlying

19  causes for the complaint that the patient presents with.

09:00:08 20  In healthcare when you're -- when you are a provider,

21  your fundamental exercise of thought is what we call a

22  differential diagnosis.  And when somebody presents to you

23  with symptoms of a problem, what you are really supposed to do

24  in your mind is to think about and generate a list of the

09:00:29 25  things that could possibly cause the problem that the patient

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:00:34  1  has.

2        In medicine, there are oftentimes many diseases that

3  can look similar with respect to the symptoms that the patient

4  is experiencing.  And so the mental exercise really is to

09:00:49  5  generate that list and then to use the tools of medicine to

6  use lab results, to use imaging like X-rays or CT scans or

7  other types of testing, to determine whether these items on

8  your list qualify and can be supported by the medical evidence

9  or whether they should be eliminated as a potential diagnosis.

09:01:11  10  And then you kind of work your way down.

11        And when you generate that list, obviously it makes

12  sense to generate things at the top that are the most likely

13  causes of the problem and then to have things at the bottom

14  that are least likely.

09:01:25  15        THE COURT:  Let me ask you -- finish.

16        THE WITNESS:  That's fine.

17        So that part is missing in the notes.  I don't -- I

18  just don't find a discussion of the differential diagnosis.

19        And the reason it's so important in a system like

09:01:42  20  this is the way the model is set up, patients will see

21  different providers.  So provider one may see someone and get

22  a workup started for the patient's issues, and then a few days

23  later or in follow up they would see different provider.  And

24  it's important to be able for provider two to be able to go

09:02:07  25  back and read the provider one's thoughts and their

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:02:12 1  differential diagnosis and how they're approaching this

2  problem so that they can pick up the ball and carry it

3  forward.

4         And that's the part for me that makes it so difficult

09:02:24 5  to track the care in this system is the providers don't really

6  leave very good notes about what it is that they are working

7  up, what it is that they're talking about, what it is that

8  they are attempting to rule in or to rule out with respect to

9  the patient's problems.

09:02:46 10  BY MS. HARDY:

11  Q   Earlier this week we heard from plaintiff Kendall Johnson.

12  Ordinarily we don't say patient's name in court, but she is a

13  named plaintiff.  You met with Kendall Johnson, didn't you?

14  A   I did.

09:02:59 15  Q   And could you tell us what you learned from reviewing her

16  care?

17  A   Yes.  Well, Ms. Johnson is an example of a patient who had

18  an unusual disease process.  It's not particularly common, but

19  it does come up, and it's one of those diseases that you

09:03:19 20  really have to apply the differential diagnosis methodology to

21  arrive at the final diagnosis because, based on her original

22  symptomatology, her final diagnosis would be further down the

23  list of a reasonable differential diagnosis.  And there are a

24  number of things you would most likely evaluate initially

09:03:42 25  before you would kind of work down to what ultimately ended up

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:03:46  1  being her final diagnosis.

2      And the dilemma in her case is that they didn't

3  really do the differential diagnosis correctly and they didn't

4  do the workup correctly, and so she -- arriving at her actual

09:04:02  5  diagnosis took quite a bit of time and it really was kind of

6  haphazard in how it came to be.  And that just resulted in a

7  delayed diagnosis for her.

8  Q   So, Doctor, could you walk us through the history of her

9  case, please.

09:04:18  10  A   Sure.  Ms. Johnson first came to the attention of the

11  medical unit with respect to her issues in September 2017.

12  Q   And what were those issues?

13  A   Right.  So she presented with a complaint of some numbness

14  in her feet and legs.  She was seen by nurse practitioner and,

09:04:39  15  interestingly enough, the nurse practitioner actually listed a

16  thought process in her notes of multiple sclerosis versus

17  idiopathic neuropathy.

18      And I'll just briefly tell you, multiple sclerosis is

19  typically an autoimmune disease where the body kind of attacks

09:05:01  20  the nerves and causes the nerves to misfire.  And it's usually

21  in the brain and in the spinal cord.

22      Idiopathic neuropathy is more of a peripheral problem

23  where the small nerves in the hands or in the feet are having

24  some dysfunction.

09:05:20  25      And they are two very different processes.

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

09:05:24  1          THE COURT:  So as I understand, this is a nurse

2      practitioner.  So it was a RN with a higher degree of

3      training?

4          THE WITNESS:  That's correct, Your Honor.

09:05:36  5          Unfortunately the nurse practitioner did not really

6      do a thorough or rigorous exam.  There was no history taken

7      with respect to the problem, there were no labs that were

8      ordered that were relevant to the complaint that the patient

9      was having, and there was no imaging in the form of, like, an

09:05:59 10     MRI or something that would have been appropriate if you were

11     considering the possibility of multiple sclerosis, as the

12     nurse practitioner's note indicated.

13          On October --

14          THE COURT:  She didn't do what you ordinarily think

09:06:18 15     is necessary for a differential diagnosis, that would be

16     testing.

17          THE WITNESS:  Yes.  You have to do testing to either

18     prove or disprove what you think the diseases might be.  And

19     sometimes a simple lab test can prove that, okay, this disease

09:06:35 20     is not valid, we're going to knock that off the list.

21          THE COURT:  Okay.

22          THE WITNESS:  In October 2017 she was seen again by a

23     nurse practitioner and, without having any laboratory or

24     imaging, the nurse practitioner changed her thought process to

09:06:56 25     idiopathic neuropathy versus conversion disorder.

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:07:03  1        And a conversion disorder is an extraordinarily rare

2    condition where -- and it's actually a mental health condition

3    where somebody believes that they have a disease and they act

4    like they have a disease, but they don't really have the

09:07:20  5    disease.  It's sort of the ultimate it's-all-in-your-head

6    diagnosis.

7        And it is completely unclear to me based on the

8    medical records how she arrived at the possibility of a

9    conversion disorder because they didn't do any testing of

09:07:38 10    other possibilities to allow you to arrive at that.

11        In medicine we would consider a conversion disorder

12    to be what I would call a diagnosis of exclusion.  And what

13    that means is that in your differential diagnosis, if you're

14    considering conversion disorder, it would be at the very

09:08:00 15    bottom of your list.  And you have to methodically rule out

16    every problem above it before you can assign that diagnosis.

17    You have to do a rigorous evaluation to say it is not -- I

18    have proven that it is not any of these other problems and the

19    only thing left is a conversion disorder.

09:08:21 20        And to make a conversion disorder diagnosis, you

21    would need to involve skilled neurologists and skilled

22    psychiatrists as part of your treatment team.  You can't just

23    assign that diagnosis on the fly with any credibility at all.

24        So it is highly unusual and it is without an

09:08:47 25    appropriate level of rigor that this diagnosis became part of

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:08:52  1  her medical record.

2      THE COURT:  Was she the only one that made this

3  diagnosis?

4      THE WITNESS:  No.  The nurse practitioner was the

09:09:01  5  first one to list it.

6      THE COURT:  Okay.  And when you read her notes, did

7  she offer her reasons for this diagnosis?

8      THE WITNESS:  It's unclear.  And without having done

9  any testing, anything that she would have had as an opinion

09:09:17 10  would not really have been valid because there's so many other

11  problems that can cause numbness in your feet and legs that

12  actually you can test for.  So none of that workup was done to

13  validate a diagnosis of conversion disorder.

14      And conversion disorder is extraordinarily rare.  I

09:09:40 15  think that over my career I have seen two legitimate cases.

16  So it is not a common diagnosis at all.

17  BY MS. HARDY:

18  Q   Dr. Wilcox, if she did indeed have conversion disorder,

19  would she have needed treatment from a mental health

09:09:52 20  professional?

21  A   Oh, absolutely.  Yeah.  Conversion disorder is a very

22  difficult and complicated condition to treat and it usually

23  involves very high-end frequent dual treatment from a

24  neurologist and a psychiatrist.

09:10:08 25  Q   And was she referred to mental health?

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

09:10:11   1   A   I did not see a referral, and there's no discussion about

2   any appointments from mental health or any sort of

3   collaborative decision-making about this possible diagnosis.

4       From a physical perspective, Ms. Johnson continued to

09:10:28   5   deteriorate, so she continued to submit health needs requests

6   that document that deterioration.

7       In September of 2018, so we're now a year into this

8   evaluation, there was a physician who saw her and, as I

9   understand it, that physician is actually an obstetrician.

09:10:50   10   And I'm not sure why he's seeing primary care patient, but he

11   participated in her care.  And in his note, he unfortunately

12   did not do any workup or any imaging either.

13       THE COURT:  Was the provider outside of the

14   Department of Corrections?

09:11:11   15       THE WITNESS:  No, this is a provider within the

16   Department of Corrections.

17       THE COURT:  Thank you.

18       THE WITNESS:  So then we -- things continue to move

19   on.  In May of 2019, she had an episode where she stumbled and

09:11:25   20   fell where she was walking and shortly thereafter there was an

21   emergency call because she wasn't able to walk and they had to

22   deal with her from like a man down emergency perspective.

23       At that point the diagnosis of conversion disorder

24   was entered into her chart and there is -- and you can track

09:11:46   25   that going forward.  Once she got labeled as having conversion

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:11:50  1  disorder, that apparently continued to stick.

2          It wasn't until she was doing poorly and in December

3  of 2019 the system finally decided to get the MRI that they

4  should have gotten a couple of years earlier, and the MRI was

09:12:08  5  done in January of 2020.

6          The results from the MRI showed that she likely had

7  multiple sclerosis, and so she was referred to a neurologist

8  based on that.  And that visit occurred in March of 2020.

9  BY MS. HARDY:

09:12:27 10  Q   Dr. Wilcox, was that finally the correct person that

11  should be seeing her?

12  A   Yes.  So getting to the neurologist was an important step

13  in her diagnosis and trying to get her cared for, and so

14  that's good.

09:12:42 15          The neurologist ordered labs and the neurologist

16  requested a follow-up in one month.  This is in March.  The

17  neurology appointment did not occur until November of 2020.

18  So quite a bit of time passed during that.

19          THE COURT:  I'm sorry, I thought it was March of

09:13:02 20  2020.  Did you say first time that she saw the neurologist

21  was --

22          THE WITNESS:  March of 2020.  And then the

23  neurologist requested a follow-up in one month, and that

24  follow-up visit occurred in November 2020.

09:13:17 25          At that visit the neurologist confirmed multiple

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

09:13:21  1    sclerosis and diagnosed her with -- there's different types of

       2    multiple sclerosis, so her diagnosis is primary progressive,

       3    which is an unfortunate diagnosis for her since there really

       4    is not an effective way of reversing that and she will

09:13:39  5    continue probably to progress.  The only thing that really is

       6    the variable in her care is the speed at which she progresses.

       7    There are -- there is a medication that is able, in many

       8    cases, to slow down that progression, but it can't really

       9    change or reverse the damage that has been done.

09:13:59 10        So the diagnosis was made in November 2020.  There

      11    were some attempts to get her out to be treated and she

      12    finally received her -- the dose of her medication that she

      13    was supposed to be receiving in March of 2021.  So several

      14    months after the diagnosis was actually rendered.

09:14:27 15    BY MS. HARDY:

      16    Q   And does that treatment, is that going to be a cure for

      17    her?

      18    A   No.  Unfortunately, it won't.  The -- hopefully, the

      19    treatment will help delay her progression.  And for her, the

09:14:40 20    thing that is critical is maintaining some function.  She has

      21    deteriorated significantly and she has very little function

      22    left and she is virtually a full-care patient.  And so it's

      23    unfortunate for her the diagnosis wasn't made earlier and the

      24    only medication that would slow down her progression wasn't

09:15:01 25    able to be started earlier.

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:15:05   1    Q   Dr. Wilcox, you described her in your declaration as

2    having a Kurtzke score of 9.  That's spelled K-U-R-T-Z-K-E.

3        Can you explain what the Kurtzke score is.

4    A   Yes.  In patients like this with multiple sclerosis, the

09:15:22   5    Kurtzke score is a level of functioning, and I guess you could

6    look at it as a level of disability kind of in the opposite.

7    And the scale goes from 1 to 10.  And so -- and higher is

8    worse.  And so she's at -- based on her level of functioning,

9    she's at a level of 9.  And then 10 is death.

09:15:48 10    Q   You spoke with Ms. Johnson, didn't you?

11    A   I did.

12    Q   And could you describe the condition that you found her in

13    when you saw her in the infirmary.

14    A   Yes.  She is housed in the infirmary and she is primarily

09:16:04 15    bedridden.  They do sometimes get her up to a wheelchair, but

16    she mostly is flat on her back, bedridden, and she really has

17    very low functioning.  Her legs are not able to even assist

18    her much in moving in the bed.  Sometimes patients can use

19    their legs to roll over a little bit and move.  She doesn't

09:16:27 20    have much function there.

21        Her hands lack dexterity and so doing any sort of

22    fine motor functions, like feeding herself and all of that, is

23    a real challenge for her.  She has a pretty significant tremor

24    and so -- and feeding is particularly difficult when you have

09:16:43 25    a tremor because you've got to get the food to your mouth and

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

09:16:47  1   it's a targeting issue.

2          And she is able to speak.  Her eyesight is failing.

3   And so she's really a pretty much full-care patient for the

4   system, which is going to be a significant burden on getting

09:17:04  5   her cared for.

6   Q   How old is Ms. Johnson?

7   A   She is 37 years old now.

8   Q   And why did you choose to highlight her case in your

9   report?

09:17:18  10  A   Again, the reason for choosing a case like this to discuss

11  when you are looking at systems issues is that her case

12  contains many of the issues that I have been critical about in

13  the Arizona Department of Corrections healthcare delivery

14  system.

09:17:38  15         The --

16         THE COURT:  Many of them that you have been critical

17  of.  Is that since you began analyzing or considering the

18  Department of Corrections healthcare or just recently?

19         THE WITNESS:  Well, I would answer that that there

09:17:54  20  are some issues that date back to my original engagement and

21  there are some that are newer.

22         THE COURT:  Okay.  Let's stop there.  Thank you.

23         THE WITNESS:  So the issues that came up in this case

24  that kind of get highlighted are that her workup -- she was

09:18:13  25  able to get to a provider, but the provider did not do an

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

09:18:17  1   adequate workup by a long shot.  There was really no

2   differential diagnosis that was worked through, they didn't do

3   appropriate labs, they didn't do appropriate imaging, and they

4   settled on this diagnosis of conversion disorder, which is

09:18:31  5   just -- it's just medically irresponsible.

6       And so the workup because it was not done with

7   appropriate rigor and appropriate attention to detail,

8   resulted in a significantly delayed diagnosis for her.

9       The thing that's really sad is the very first note

09:18:51  10  that was listed by the nurse practitioner listed multiple

11  sclerosis as a possibility and they likely could have had this

12  diagnosis, you know, way earlier if they had just done the

13  testing that her thought process should have led to.  So was

14  that's an unfortunate thing.

09:19:11  15      There were obvious physical exam findings.  I mean,

16  she had significant neurological decline that was evident on

17  her -- in her presentation, but they kind of ignored those in

18  favor of this concept that, you know, it's in your head, which

19  they've never really proved the issues.

09:19:33  20      There were delays in ordering the medical imaging.

21  There were delays in getting her out to specialty care.  Even

22  once she got to the specialist, they didn't honor the

23  specialist's request for a repeat visit on the timeline that

24  the specialist requested.  So there was another delay there.

09:19:49  25      And it is just unfortunate that kind of all these

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:19:53  1    delays were additive and she lost a substantial amount of

2    function before she was finally started on the one medication

3    that might benefit her.

4    BY MS. HARDY:

09:20:04  5    Q    So you're saying if she had gotten the medication in 2017,

6    the outcome would have been different?

7            MR. STRUCK:  Objection, calls for speculation,

8    foundation.

9            THE COURT:  I'm going to sustain it only on

09:20:14  10   foundation.

11   BY MS. HARDY:

12   Q    Doctor, are you familiar with the course of treatment for

13   multiple sclerosis?

14   A    Yes.

09:20:21  15   Q    And are you familiar with the drug Ocrevus that

16   Ms. Johnson received?

17   A    Yes.

18   Q    Are you familiar with what happens with the –– are you

19   familiar with medical literature that describes or shows what

09:20:39  20   the course of disease progression is when Ocrevus is provided?

21   A    Yes.

22   Q    And can you opine on whether there would have been a

23   different outcome had Ms. Johnson received Ocrevus in 2017?

24   A    Yes.  She likely ––

09:20:57  25           MR. STRUCK:  Your Honor, objection, foundation.

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:20:59  1   This –- he is not an expert in MS.  MS is a very difficult and

2   complicated disease process, and this witness can't come in

3   and testify like he's an expert on every possible disease.

4   Certainly not MS.

09:21:14  5          THE COURT:  Well, I'm is going to sustain it on

6   foundation only with respect to this particular disease.  I

7   don't know what else you can tell me about his experience with

8   the disease.

9   BY MS. HARDY:

09:21:27 10   Q   Dr. Wilcox, have you encountered multiple sclerosis in

11   your personal practice?

12   A   Yes.

13   Q   And have you treated people with multiple sclerosis?

14   A   Yes.

09:21:37 15   Q   And in treating with people with multiple sclerosis, have

16   you read the literature, scientific literature on how to treat

17   multiple sclerosis?

18   A   Yes.

19   Q   And are you familiar with the up-to-date literature on

09:21:50 20   treatment for multiple sclerosis?

21   A   Yes.

22          MS. HARDY:  May I proceed, Your Honor?

23          MR. STRUCK:  Object to the foundation.

24          THE COURT:  Overruled.

25

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

09:22:02  1   BY MS. HARDY:

2   Q   Dr. Wilcox, do you have an opinion on whether

3   Ms. Johnson's course of progression would have been different

4   had she received treatment in 2017?

09:22:13  5   A   Yes.  Had she received treatment in 2017, it is likely

6   that she would have progressed slower with her disease entity

7   and she likely at this time would still have -- that she would

8   have a higher level of functioning than she does now.

9   Q   Thank you.  I'm going to shift gears a little bit.

09:22:37  10        Dr. Wilcox, have you evaluated staffing adequacy in a

11   correctional setting in a formal way?

12   A   Yes.

13   Q   And what method have you used?

14   A   The typical method in healthcare is to do what is called a

09:22:54  15   workload staffing study.

16   Q   Could you explain what that is.

17   A   Yes.  So when you're looking at staffing, the important

18   thing to understand is really how much work needs to get done

19   and how long it takes to do that work.

09:23:14  20        In healthcare, there are many repetitive tasks.  For

21   example, in an intake area, there are intake screening exams

22   that have to be done --

23        MR. STRUCK:  Excuse me, Your Honor, I have an

24   objection to the line of questioning.

09:23:27  25        This opinion was added after his initial report,

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

09:23:31  1   after he'd reviewed Dr. Joy's report.  It is inappropriate for

      2   him to be testifying even though it's in his latest

      3   declaration.  This declaration was signed on November 3rd,

      4   which was after the trial even started.

09:23:45  5       They already had testimony from Mr. Joy that he was

      6   their staffing expert, now they're trying to triple down,

      7   because they have tried to do the same thing with Dr. Stewart,

      8   with Dr. Wilcox.

      9       The information in his declaration was not in his

09:24:02 10   initial declaration that was submitted on the date that the

     11   Court ordered the parties to submit declarations.

     12       MS. HARDY:  May I respond?

     13       MR. STRUCK:  This is a new opinion.

     14       THE COURT:  Yes, you may respond.

09:24:14 15       MS. HARDY:  This is not a new opinion.  The experts

     16   were permitted to file and submit separate supplemental

     17   reports on October the 18th, and that was -- he filed his

     18   first report on October 9th.  On October 18th, he was able to

     19   review whatever additional information had come in through

09:24:33 20   October 15th and submit a report on the 18th.

     21       He reviewed Robert Joy's report during that period

     22   and his supplemental report, which was served on the

     23   defendants on October the 18th, and there is a docket notice

     24   of service, and so they have had this opinion for -- since

09:24:55 25   that date.

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

09:24:57  1          THE COURT:  I'm confused.  Mr. Struck has said he

2      hasn't had it since the trial began.  So this is totally

3      inconsistent.  Is it within the written report, adequate

4      staffing or inadequate staffing?  In his supplemental report?

09:25:12  5          MS. HARDY:  It is in his supplemental report that he

6      reviewed, the Robert Joy report, and that he found it to be

7      consistent with the types of workload studies that he

8      personally has performed in correctional settings.  And that

9      was in the supplemental report.

09:25:29 10          THE COURT:  All right.  All right.  It is in the

11     supplemental report.  But what's this about the November

12     addition to the report?  Is there anything?

13          MS. HARDY:  No, the declaration --

14          THE COURT:  Hold on.

09:25:40 15          Mr. Struck.

16          MR. STRUCK:  Your Honor, perhaps I can clarify.

17          What counsel's saying with respect to October 18th is

18     accurate; however, not all the way accurate.

19          The supplementation was because there were witnesses,

09:25:52 20     ADCRR witnesses and Centurion witnesses, who were not deposed

21     until he after he submitted his initial report.  So he

22     submitted a supplemental report that included information with

23     respect to those witnesses that couldn't have been deposed

24     before he submitted his first report.

09:26:09 25          The supplemental report that I -- the issue that I'm

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

09:26:14  1   addressing here, though, is he actually took not information

2   that was new information with respect to ADCRR or Centurion

3   witnesses who were deposed, he took a look at their other

4   expert reports and said, yeah, I agree with him and let me add

09:26:30  5   a new opinion.  So --

6            THE COURT:  Well, did that -- but that came to you

7   before the trial?

8            MR. STRUCK:  Yes, it did.  But --

9            THE COURT:  So what is this that you're talking

09:26:37 10   about, which is new information after trial?

11            MR. STRUCK:  When I said -- because this declaration

12   is dated November 3rd, and that's what I said.

13            THE COURT:  Is it?  November 3rd?

14            MS. HARDY:  That's the date his trial declaration was

09:26:53 15   due for his testimony today.

16            THE COURT:  Okay.  Okay.

17            MR. STRUCK:  So I wasn't -- I didn't mean to mislead

18   the Court that that was the first time we ever saw it.  My

19   point is --

09:27:04 20            THE COURT:  Okay.  And so in other words, what was in

21   his report on November 3rd, what is in his report, was also

22   contained in the October 18th report; is that correct?

23            MR. STRUCK:  That is correct.

24            THE COURT:  Okay.  So then what's the problem?

09:27:20 25            MR. STRUCK:  The defendant's problem with that is the

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:27:21  1   only reason why they were able to supplement that report was

2   because there were some depositions that couldn't be

3   scheduled.  That -- this re- -- this opinion has to do with

4   Mr. Joy's expert report.  It has nothing to do with any

09:27:36  5   depositions.

6           THE COURT:  Well, did you ask for depositions to be

7   taken after the supplementation?

8           MR. STRUCK:  Between the parties because there were

9   issues relating to --

09:27:47  10          THE COURT:  Did you ask -- I hate to -- I'm not -- I

11  don't mean to cross-examine you, but that's a yes or no

12  answer, if you can give me that.

13          MR. STRUCK:  Did I ask?

14          THE COURT:  Yes.

09:27:55  15          MR. STRUCK:  Did we ask --

16          THE COURT:  Did the defense ask in order to get

17  prepared for trial for -- to take the depositions because you

18  saw something new in the October 18th report that you needed

19  to inquire of this witness?

09:28:12  20          MR. STRUCK:  No.  No.  The position that the

21  defendants took was because the parties agreed -- because of

22  the scheduling of some of the witness, fact witness

23  depositions, including Director Shinn, the plaintiffs said,

24  well, we want to be able to supplement our expert reports

09:28:28  25  based upon having to schedule the fact witness depositions

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

09:28:33 1   after —

2         THE COURT:  Okay —

3         MR. STRUCK:  — and then so —

4         THE COURT:  But — but this is the first time that

09:28:37 5   I've heard or counsel has heard that you're not able to

6   prepare for trial and for the cross-examination or the direct

7   examination of this witness.  In other words, you didn't ask

8   to take his deposition last week or you didn't ask to take his

9   deposition at any time because in the October 18th report, you

09:29:01 10  saw something new which apparently included something

11  concerning Mr. Joy's testimony.

12        MR. STRUCK:  Your Honor, when we said we wouldn't

13  oppose a supplemental declaration based on those, we

14  specifically said only related to the information that came

09:29:18 15  out in those depositions.  We did not agree that they could

16  supplement their report —

17        THE COURT:  Did you put that in writing or —

18        MR. STRUCK:  Yes, it's in writing.

19        THE COURT:  After you received the supplemental

09:29:29 20  report, did you complain about it?  Or am I hearing about this

21  and counsel hearing about it for the first time today?

22        MR. STRUCK:  I believe it's in the joint pretrial.

23        THE COURT:  Okay.  We're going to take a break.

24        MR. STRUCK:  Okay.

09:29:41 25        THE COURT:  But the important thing is, is if you

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:29:43  1   didn't complain about it until court here today so that it

2   could be cured for you, or you could have brought it to the

3   Court's attention, then I'm going to overrule the objection.

4         Let's take a ten-minute break.

09:30:00  5         MS. HARDY:  Your Honor, may --

6         THE COURT:  Yes.

7         MS. HARDY:  May I suggest that the Order 4019, your

8   Order 4019 is critical here and it states, "Plaintiff's

9   experts may supplement their reports through midnight on

09:30:12  10  October 18th, 2021."

11        THE COURT:  Yes.  I remember that I had to -- I was

12  wringing my hands as to what to do.  What else do I say?

13        MS. HARDY:  You said, "With information obtained

14  between October 9th, 2021, through October 15th, 2021."

09:30:27  15        THE COURT:  And this was -- this information he's

16  about to provide me was information up to October 15th?

17        MS. HARDY:  Correct, Your Honor.

18        THE COURT:  Okay.  So the information that he's about

19  to provide me, if I allow it, relates to Mr. Joy.

09:30:45  20        MS. HARDY:  Correct.

21        MR. STRUCK:  And, Your Honor, that order related to

22  the fact witness depositions, not information that was

23  included in their other experts' reports.

24        THE COURT:  Overruled.

09:30:58  25        MR. STRUCK:  And just want to note --

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

09:31:00  1        THE COURT:  You can make a record, but as far as I

       2   understand it, it's overruled.  I did not -- I did not, and I

       3   will look at the order myself, but my big concern was that

       4   both counsel have all the information they needed for expert

09:31:18  5   reports.  That was the primary reason.  Fact experts in this

       6   case are not as important as the expert witnesses.  It sounds

       7   to me from what Ms. Hardy has told me that they provided you

       8   that information.  If you had come to me and said, I need to

       9   take his deposition, I likely would have allowed it.

09:31:40  10        MR. STRUCK:  Well, your Honor, this was -- they did

       11   the same thing with Dr. Stewart and you sustained our

       12   objection when they tried to do it.

       13        THE COURT:  I'm sorry, what --

       14        MR. STRUCK:  Dr. Stewart.  They tried to do the same

09:31:52  15   thing that they are trying to do with Dr. Wilcox and talk

       16   about Dr. Joy --

       17        THE COURT:  Dr. Stewart.  Was it contained in his

       18   report?  Or was it the first time -- it sounded to me like

       19   they were raising it for the first time and it was not in his

09:32:06  20   report.

       21        Now, you can hold them, assuming you can, to what's

       22   in that supplemental report.  But I'm going to allow it

       23   because it was in the supplemental report.

       24        Correct, Ms. Hardy?

09:32:22  25        MS. HARDY:  Yes, it was, Your Honor.

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

09:32:23  1    THE COURT:  And this is different than when I ruled

2    in the defense's favor concerning Dr. Stewart.

3    MS. HARDY:  That's correct, Your Honor.

4    THE COURT:  Because Dr. Stewart, you raised that for

09:32:35  5    the first time and, as I'm now being refreshed, that's why I

6    sustained the objection.

7    Correct?

8    MS. HARDY:  That's correct, Your Honor.

9    THE COURT:  Okay.  So objection overruled.  We don't

09:32:45 10    need a break.

11    MS. HARDY:  Thank you.

12    I will point out Dr. Wilcox's deposition was noticed

13    in this case and I flew to Salt Lake City to prepare him for

14    this deposition, and it was canceled the night before the

09:32:57 15    deposition.

16    THE COURT:  And why was it canceled?

17    MS. HARDY:  Why was it canceled?  I don't know.  The

18    defendants canceled it while I was in Salt Lake City.

19    THE COURT:  Correct?

09:33:07 20    MR. STRUCK:  Yes.  We canceled the deposition.

21    That's right.

22    THE COURT:  All right.  Proceed.

23    MR. STRUCK:  And, Your Honor, for -- the information

24    is in footnote 1 on page 4 of his declaration.  I just wanted

09:33:17 25    the Court to see that just in case he starts to go beyond

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:33:20  1    that.

2         THE COURT:  No, I don't need to see it.  Let's hear

3    the testimony.

4    BY MS. HARDY:

09:33:27  5    Q   Dr. Wilcox, you said you have performed workload studies

6    yourself; is that correct?

7    A   That's correct.

8    Q   And could you describe the workload studies that you have

9    done.

09:33:35  10   A   Yes.  We've done several workload studies over my career.

11   The first one was a comprehensive study that was requested

12   when I was serving as the medical director for Maricopa County

13   and --

14        THE COURT:  So that was in -- what year is it, more

09:33:53  15   recently, I understand, but wait, when did you do that

16   comprehensive study for Maricopa County?

17        THE WITNESS:  That project would have been done, I

18   would say, 2006, 2007.

19        THE COURT:  Go ahead.

09:34:09  20        THE WITNESS:  So the Office of Management and Budget

21   for Maricopa County -- one of the reasons that I was serving

22   as the medical director there was the County was in the

23   process of building new jails out on the west side, and one of

24   those jails was a jail that was specifically designed to

09:34:28  25   manage medical and mental health patients.  It was kind of a

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

09:34:33  1    purpose-driven jail, as opposed to the others.

2         And so they were trying very hard to figure out what

3    the correct staffing would be for that new facility and how

4    the staffing should shift within the other facilities for the

09:34:46  5    medical component.

6         So they asked our consulting team, who we were

7    working with, and I was part of that consulting team, to

8    design a workload staffing study that was based on the actual

9    work that needed to be done, as opposed to other types of

09:35:06 10    staffing where you do, like, ratios or estimates or that sort

11    of thing.  This is much more mathematical.

12         And so we set about to do the mathematical model for

13    Maricopa County and put that together, and that process took

14    about six months to build that model.  And it was presented to

09:35:29 15    the Office of Management and Budget and they adopted that

16    methodology for the staffing for the Correctional Health

17    Services, which was the department that I was working with,

18    and then they also adopted it for other departments within

19    Maricopa County.

09:35:47 20    BY MS. HARDY:

21    Q    Is a workload study model, is that applicable to all

22    different kinds of work settings?

23    A    Yes.  Workload staffing studies are pretty common in

24    business.  Obviously we do them in healthcare, but they're

09:36:06 25    applicable to all different types of businesses if you're

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:36:09  1    trying to figure out exactly, mathematically, what type of

2    staffing you need.

3    Q    And so when you develop this workload study and you crunch

4    the numbers, you can tell us what the results were from

09:36:21  5    Maricopa County?

6    A    Yes.  Well, there's lots of results because we staffed the

7    entire medical department.  The area I was primarily over were

8    the providers.  And so our original staffing model, the County

9    had come up with -- indicated that we needed about 31

09:36:43  10   full-time equivalent providers.  So 31 providers working

11   essentially 40 hours a week is what that means.

12         And when we applied the math to the actual numbers

13   that we were expected to take care of, the staffing shifted

14   and I believe the new number came out to about 43 full-time

09:37:09  15   equivalents.

16   Q    And did the County adopt that new staffing ratio or

17   staffing allocation that you recommended?

18   A    They did.  They weren't happy with the results, but when

19   we walked them through the math, it made sense to them and

09:37:28  20   they actually did adopt that.

21   Q    You also did a similar study for Pima County; is that

22   right?

23   A    Yes.  That came after the Maricopa County study.

24   Pima County was aware we were doing this model up in

09:37:44  25   Maricopa County.

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

09:37:46  1          MR. STRUCK:  Your Honor, this is outside of the scope

2      of his declaration.  There is nothing in here about

3      Pima County.  Or, for that matter, the Maricopa County study.

4              THE COURT:  Too late for Maricopa County.  What are

09:37:56  5      we looking at here?

6              MR. STRUCK:  I'm looking page 4, footnote 1, which is

7      where this opinion occurs in his declaration.

8              MS. HARDY:  May I read, Your Honor?

9              THE COURT:  Let me just -- let me just see here.

09:38:12 10          Is that correct -- is that the correct citation here?

11          MS. HARDY:  It is footnote 1, the second sentence.

12          THE WITNESS:  Okay.  Let me catch up with you.

13          MS. HARDY:  It's on page 4.  Sorry.

14          THE COURT:  Second sentence; correct?

09:38:48 15          MS. HARDY:  "Over my career I have been closely

16      involved with using this type of staffing model in large

17      correctional facilities."

18              And I'm asking about him about that.

19              THE COURT:  Overruled.

09:39:03 20  BY MS. HARDY:

21  Q    Dr. Wilcox, you also used this model in Pima County; is

22      that right?

23  A    That's correct.

24  Q    Can you tell us what the results of that exercise were?

09:39:12 25  A    Yes.  As I said, Pima County was aware that we were

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:39:14  1   building this model for Maricopa County and at that -- after

2   the model was built, they had looked at it and were -- they

3   liked the methodology, I guess, so they asked us to apply a

4   similar methodology to their healthcare enterprise because

09:39:30  5   they were getting ready to release an RFP and they wanted to

6   make sure that they requested minimum levels of staffing based

7   on a workload staffing style of a study in their RFP, and they

8   ultimately incorporated that and released the RFP.

9   Q    Thank you.

09:39:53  10        You said in your declaration that you reviewed

11   Robert Joy's report; correct?

12   A    I did, yes.

13   Q    Was his methodology familiar to you?

14   A    It is.

09:40:01  15   Q    And what did Robert Joy's model tell you about staffing?

16   A    Well, as a global statement, his report confirms what I

17   have believed since I began working on this project, that the

18   ADCRR --

19        THE COURT:  Since you've been working on this

09:40:23  20   project.  What project and what period of time?

21        THE WITNESS:  Since I began working on the Parsons

22   case in 2013.

23        THE COURT:  So 2013, meaning then.  And when you say

24   the project, what does that mean?

09:40:39  25        THE WITNESS:  Well, I guess I look at this as a

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:40:41  1    project.  It's a case or it's a --

2              THE COURT:  Okay.

3              THE WITNESS:  It's a lawsuit.  I'm sorry.  I just, in

4    my mind, I think of it as a project.

09:40:47  5              THE COURT:  Go ahead.  And I interrupted you.

6              So why don't you ask him the question again.

7              MS. HARDY:  Okay.

8    BY MS. HARDY:

9    Q    What does Robert Joy's model tell you about ADCRR and

09:41:02  10   their staffing?

11   A    As a simple statement it confirms what I have believed

12   since I began working on this case, that the healthcare

13   enterprise within ADCRR is understaffed across the board.

14   Q    And looking at his model, does it -- is it consistent with

09:41:22  15   the models that you have used?

16   A    Yes.  We haven't done a model that uses projections from

17   nationally published data, but the methodology for doing the

18   study is the same.  It's a mathematical model based on

19   workload.

09:41:44  20             THE COURT:  So his is a mathematical model, too, in

21   your view, after what you've reviewed?

22             THE WITNESS:  Yes, Your Honor.

23             THE COURT:  Thank you.

24   BY MS. HARDY:

09:41:53  25   Q    On page 4, footnote 1, you wrote that, "Mr. Joy's analysis

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:41:57  1    capitalizes on the most accurate data available."

2            What data are you talking about?

3    A    Well, Mr. Joy used a number of data sources to put

4    together his information.  There are -- when you're dealing

09:42:12  5    with large populations, there are some pretty good studies out

6    there that give you guidance with respect to what percentage

7    of the total population has certain levels of medical need.

8    And that's really what he utilized.

9            In his mathematical model, what he did was he said

09:42:36  10   that we have this population that we have to care for and we

11   know that there are subgroups within that population, some are

12   healthier than others, and healthy subgroups don't require

13   very much healthcare.

14           And so he identified that certain percentage of the

09:42:55  15   patients would fall into the healthy category and they would

16   require, as an estimate, I think, one healthcare visit per

17   year.  There are other individuals who have slightly higher

18   levels of healthcare needs and they would require slightly

19   higher numbers of encounters, and he kind of took that all the

09:43:15  20   way through to the high-end utilizers of healthcare who

21   require a lot of healthcare encounters.

22           MR. STRUCK:  I'm sorry, Your Honor, I'm going to ask

23   to move to strike.  This is -- goes well beyond footnote 1.

24   He's regurgitating Mr. Joy's report.

09:43:32  25           THE COURT:  Counsel?

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

09:43:36  1      MS. HARDY:  Your Honor, he is elaborating on his

2   report, which says Mr. Joy's analysis is thorough and

3   capitalizes on the most accurate data available.  I'm asking

4   him to explain that statement.

09:43:49  5      THE COURT:  I'm going to overrule it because I don't

6   see it's inconsistent.  It certainly is consistent with what

7   he has said as a general matter.

8          I'm sure on cross-examination you'll be able to point

9   out where it is inconsistent.  But this is the type of

09:44:09 10   information I'm sure could have been gleaned through a

11   deposition, which was not taken, and this is the type of

12   testimony which is allowed from an expert to support his

13   opinion, his general opinion.

14      MR. STRUCK:  Your Honor, if I may, there was a reason

09:44:23 15   why we didn't take his deposition, and that is so he would not

16   go beyond the four corners of his declaration.

17      THE COURT:  I'm sorry.  If you had come to me and

18   said, we're not taking his deposition because we don't want

19   him to exceed the four corners of his report, then I would

09:44:44 20   have considered that at the time.

21          But an expert does not need to set forth in hyper

22   detail precisely what the method -- not only that, he has to

23   set forth what his opinion is.  He has to set forth how he got

24   there.  But he can then explain, either in a deposition or at

09:45:04 25   trial, how he came to that conclusion, and that's what this

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

09:45:10  1  witness is doing.  He's elaborating.  It's fine.

2  Overruled.

3  BY MS. HARDY:

4  Q  So I believe I asked you that -- about your statement that

09:45:26  5  Mr. Joy's analysis capitalizes on the most accurate data

6  available, and you were talking about the data sources that

7  are available.

8  Could you continue with that, please.

9  A  Yes.  So he utilized data sources that allowed him to

09:45:40  10  estimate the size of the different levels of health care needs

11  that are available and those data sources are out there.  The

12  health and human services data that he utilized is very

13  popular for this type of information.  He referred to the

14  National Commission on Correctional Health Care study

09:46:00  15  regarding the health of incarcerated individuals.  And that

16  all contains information that helps you figure out how big

17  each one of those subgroups is of the total.

18  And then what he did is applied that percentage to

19  the total population of the ADCRR to figure out how many

09:46:28  20  patients there would be in each group and what their level of

21  healthcare need would be and how frequently they would need to

22  have an encounter with the healthcare system.  And then he

23  just multiplied to figure out what the demand was from a

24  projected standpoint for the ADCRR healthcare enterprise.

09:46:51  25  Q  Do you know whether he could have used ADCRR data to

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

09:46:56  1    generate that information?

2    A    There is -- within their system there is a way you could

3    do that.  The problem with that, however, is, at least in my

4    experience in reviewing the medical records, that data is not

09:47:10  5    accurate.  So I think it's -- it would be difficult to use the

6    data as it currently exists.  Perhaps if the data were more

7    accurate moving forward.  In fact that would probably be a

8    very good project for them to work on moving forward.

9             THE COURT:  When you say "them," what do you mean?

09:47:32  10             THE WITNESS:  Well, ADCRR and their vendor.

11             THE COURT:  Thank you.

12             THE WITNESS:  Whichever vendor is completing the

13    medical records.

14             That would be an important data source and, to be

09:47:42  15    honest, my recommendation would be to begin with this data

16    that Mr. Joy used as more accurate than the on-site data, but

17    to bring the on-site data up to being accurate and then go

18    with that.  I mean, the beauty of a mathematical model is if

19    your data source changes with respect to the demand for a

09:48:05  20    particular service, you can just change the number in the

21    model and it will recalculate the demand need and the

22    staffing.

23             So that's really the benefit of doing this type of

24    study, is that if your data gets better or if your situation

09:48:21  25    changes you can update the numbers in the grids and it will

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:48:25  1    recalculate your staffing.

2    Q    Dr. Wilcox, did you talk to Mr. Joy while he was writing

3    his report?

4    A    I talked to Mr. Joy in the process of doing the work.  I

09:48:41  5    don't know if he was writing at the time.  But we did have, I

6    believe, three discussions.

7    Q    And so you talked about staffing and staffing numbers.

8         Did you tell Dr. Joy that you believed that in the

9    system a provider would be able to see 10 to 12 patients a day

09:49:05  10   on average?

11   A    Yes, that was my estimate given what I had seen with

12   regard to the difficulty of using the electronic health

13   record.  One of the challenges in seeing patients is coming up

14   to speed on their healthcare.  And we've talked somewhat about

09:49:23  15   this already, that the eOMIS system is difficult to navigate

16   and it takes quite a bit of time to review their past medical

17   history and to get up to speed.  So that element slows the

18   providers down a little bit with respect to their ability to

19   do a thorough job seeing the patient.

09:49:47  20        THE COURT:  If I understand what you're saying here,

21   you told Mr. Joy that the provider would have to see 10 to 12

22   patients a day.  And when you say that, are you speaking of --

23   what's the source of that?  Is that your own -- is that from

24   the information you've derived since 2013 or -- I'm looking

09:50:14  25   for the source of this opinion.

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:50:16  1         THE WITNESS:  Well, the source of this opinion is a

         2   little bit of experience with staffing and --

         3         THE COURT:  Staffing generally?

         4         THE WITNESS:  Staffing in general.  And a lot of the

09:50:26  5   experience is just on my experience as being an administrator

         6   in a similar system.

         7         We had to navigate these issues in my own system and

         8   we --

         9         THE COURT:  And that would be your own system being

09:50:40 10   what?

        11         THE WITNESS:  The Salt Lake County jail system.  And

        12   we know a lot about how many providers or how many patients

        13   our providers can see per day based on the efficiency of the

        14   records system.  We've had three conversions of record systems

09:51:01 15   in my career in Salt Lake County and each conversion has had

        16   an impact on provider productivity.

        17         THE COURT:  So am I to understand, because you said

        18   you told Mr. Joy that 10 to 12 patients a day on average need

        19   to be seen, was that the information you provided him?  Or

09:51:23 20   were you confirming something he said?

        21         THE WITNESS:  So the way that came to be, Your Honor,

        22   is he asked me based on my experience of having taken tours

        23   within the facility and having worked extensively with eOMIS

        24   what I thought the range was for how many patients a provider

09:51:44 25   could see in an eight-hour day.  And so I was informed by my

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:51:52  1    experience on tours as far as what the physical plant is like

2    at the facility and how big the facilities are, because the

3    availability of patients to be seen is one of the impacts on

4    provider productivity.  You can have a provider in an office,

09:52:07  5    but if all of the patients are in their housing unit for count

6    or for food, lunch, they're not able to see patients even

7    though there's a provider there.  There's downtime within the

8    day.

9          And also my experience with eOMIS for how long it

09:52:24  10   takes for a provider to come up to a functional level of

11   knowledge about the patient, there's a little bit of prep time

12   within eOMIS for you to see your next patient.  And so he was

13   asking me how long that would take within the system based on

14   my experience.

09:52:41  15         So my estimate for him was that in an eight-hour day,

16   given the limitations of eOMIS and given the limitations of

17   when the institutions typically shut down for institutional

18   affairs like mealtime and head counts and things like that,

19   that a reasonable estimate would be 10 to 12 patients per day

09:53:07  20   for a provider.

21         THE COURT:  Thank you.

22   BY MS. HARDY:

23   Q   Dr. Wilcox, do you have an opinion about the healthcare

24   staffing in the ADCRR?

09:53:21  25   A   I do.

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

09:53:22  1    Q   And what have you based that opinion on?

2    A   I base that opinion upon my experience in managing

3    healthcare, as well as my reviews of the system issues in the

4    case and the deficiencies in the system operations, and the

09:53:44  5    fact that there are many relatively simple tasks that are not

6    getting done that the only reasonable explanation for that is

7    they just are understaffed to get the tasks done in a

8    reasonable amount of time.

9    Q   And did your opinion also depend somewhat on Mr. Joy's

09:54:06 10    report?

11    A   Well, no, not really.  I had that opinion well before he

12    wrote his report.

13    Q   Okay.

14    A   I think --

09:54:14 15    Q   I'm sorry, go ahead.

16    A   I think his report confirms what I have believed.  I

17    never -- I never did the mathematical study to confirm what I

18    believed.  But his study and the projections that he has done

19    certainly confirm that ADCRR is significantly understaffed and

09:54:35 20    there's certainly room to discuss the magnitude of that gap.

21    And if they're able to see more than 10 to 12 patients a day,

22    fantastic.  They should be able to see more than 10 to 12 in a

23    reasonable fashion.  That's great.  Just change the number.

24    If that's really their performance data, change the number and

09:54:57 25    you get -- it will recalculate your staffing for you.

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

09:55:00  1       THE COURT:  I'm not sure I understand what you mean

2   this is mathematical, so when you said you change the number,

3   what do you mean by that?

4       THE WITNESS:  Well, Mr. Joy has, based on some input

09:55:09  5   from me and kind of some input from other sources for how many

6   patients a doctor generally sees in a day in sort of all sorts

7   of settings, he came up with an estimate of 10 to 12.  And, of

8   course, that's a really important number because when you

9   divide into your total demand for care, it tells you how many

09:55:28  10  providers you need in total.

11       So if your providers can see more patients per day,

12  that's fantastic because you need less providers.

13       So what I would say is that I think there's an

14  opportunity, now that the model is built, there's a good

09:55:45  15  opportunity for validating the actual productivity data within

16  ADCRR, and it may well be that they're able to see more than

17  10 to 12 patients.

18       THE COURT:  So what you're saying is, the more

19  productive the providers are, the less you -- you're going to

09:56:01  20  sort of an economies of scale.  If they're better at what

21  they're supposed to do, you don't need as many providers;

22  correct?

23       THE WITNESS:  That's correct.  Or if you change the

24  system such that you make it easier for them.  Like, let's say

09:56:17  25  you implement a new electronic health record that is actually

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

09:56:20   1   reasonably easy and transparent, then you would expect that

2   productivity would go up and you could have fewer providers

3   because you've made it much easier for them to do their job.

4       THE COURT:  We'll take a break now.  We're almost at

09:56:38   5   10 o'clock.  I'll see you back here at 20 minutes after ten.

6   We're in recess.

7       (Recess taken from 9:57 to 10:21.)

8       THE COURT:  Let me ask plaintiffs counsel.  In

9   addition to the statements --

10:21:43  10       You may be seated, everybody.

11       In addition to the statements of the experts, you

12   have offered all their reports; correct?

13       MS. HARDY:  Yes, Your Honor.

14       THE COURT:  Okay.  So Dr. Wilson's report is in

10:21:59  15   evidence?  Is that one of the ones you listed at the

16   beginning?

17       MS. HARDY:  Dr. Wilcox's testimony --

18       THE COURT:  Wilcox.

19       MS. HARDY:  Dr. Wilcox's testimony for this was

10:22:08  20   submitted by declaration and that's Docket Number 4140.

21       THE COURT:  Yes, but his report.

22       MS. HARDY:  His prior reports defendants are

23   objecting to admission of.

24       MR. STRUCK:  Your Honor, you ruled yesterday that

10:22:20  25   they would not be admitted.

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

10:22:23  1        THE COURT:  Every expert?

2        MR. STRUCK:  Yes.  Expert report.  That's hearsay.

3        MS. HARDY:  That was with regard to the prior reports

4   not the declarations that they're submitting in lieu of

10:22:36  5   testimony.

6        THE COURT:  Okay.  Counsel, refresh me —

7        MS. HARDY:  You said yesterday —

8        THE COURT:  — we were talking about Dr. Horn.  Dr.

9   Horn, right — or Mr. Horn.

10:22:52 10        MS. HARDY:  I believe yesterday we were talking about

11   Dr. Wilcox's —

12        THE COURT:  Okay.  Dr. Wilcox's report and whether or

13   not it was admissible.  Yes or no?

14        MS. HARDY:  Your Honor, what defendants objected to

10:23:08 15   was his prior declarations, not his current declarations which

16   we all agree are his —

17        THE COURT:  His current declarations are different

18   than his report; am I correct?

19        MR. STRUCK:  Correct.

10:23:22 20        THE COURT:  Wasn't there for each the experts a

21   report that was prepared and then in conjunction with the

22   testimony a declaration?  Correct?

23        MS. HARDY:  Your Honor, there were one expert report

24   that everyone submitted for each of their experts and then

10:23:37 25   there was the opportunity to submit a supplemental report.  So

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

10:23:41  1   those two reports, those two reports are not in evidence.  We

2   have not offered them.  Those two reports were the basis for

3   his trial testimony that he submitted.

4           THE COURT:  Are you not offering those reports?

10:23:56  5           MS. HARDY:  I'm not offering those reports.  They're

6   reflected in his declaration that he has provided.

7           THE COURT:  So in other words, there's nothing in

8   those reports that elucidate any of his opinions in his

9   declaration.

10:24:15  10          MS. HARDY:  No, Your Honor.  We distilled the

11  information from those two reports into this declaration for

12  trial.

13          THE COURT:  Okay.  All right.

14          THE COURTROOM DEPUTY:  Ms. Hardy, do you have your

10:24:27  15  mask.

16          MS. HARDY:  Oh.  Shoot.  I'm sorry.

17          THE COURT:  So just to be sure, the --

18          MS. HARDY:  Sorry.

19          THE COURT:  -- the declaration is his report?

10:24:48  20          MS. HARDY:  Correct, Your Honor.

21  BY MS. HARDY:

22  Q   Dr. Wilcox, are the types of problems that you've

23  identified in the ADCRR related to staffing deficiencies, in

24  your opinion?

10:24:59  25  A   Yes.  In my opinion, many of the deficiencies that I've

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

10:25:05   1   identified with the system are directly tied to inadequate

2   staffing.

3   Q   And can you talk about, for example, the lack of

4   sufficient provider staffing, which would be physicians, nurse

10:25:18   5   practitioners, and physician assistants.

6   A   Yes.

7         One of my criticisms is that their evaluations of

8   patients are very superficial and they lack rigor.  That

9   typically occurs with providers when they're just under a lot

10:25:38  10   of stress to see lot of patients and they're not able to take

11   their time to create a thoughtful note and to document fully.

12         There's a number of subactions that are required of

13   providers as they do their healthcare.  For example, when you

14   send off labs for a patient, one of the really important

10:26:01  15   functions is to evaluate those results as soon as they come

16   back because sometimes there are critical lab values that you

17   have to jump on right away.

18         What I find in my review of the medical records is

19   that there frequently is a significant delay, well beyond what

10:26:19  20   I think is safe, for lab review and that almost always is a

21   staffing issue, because reviewing the labs is a very simple

22   process.  It's not -- it's not hard.  You just have to have

23   time to do it.

24         And there's quite a number of labs that come back for

10:26:38  25   a system like this so the providers need to be able to do

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

10:26:43  1    that.  And the consistent delay in getting labs reviewed is a

        2    real problem medically because it puts patients at risk to

        3    have that delay in place.

        4          Similar thing for, like, X-rays and MRIs and imaging

10:26:59  5    reports or outside specialty consults.  There's frequently a

        6    delay in reviewing those.  And this is not a hard process.

        7    It's not anything that -- I mean, all of the providers know

        8    how to do this; it's part of your normal daily job.  But if

        9    the volume of the workload is too much, you just don't have

10:27:18 10    time to get to it.  And so improving the staffing, I think

       11    would improve many of the problems within the system, kind of

       12    as a really quick fix for a lot of the things that I have

       13    seen.

       14          Another really, really important one is there are

10:27:34 15    patients who are sent out either to specialists or they're

       16    admitted to the hospital, and when a patient goes out,

       17    particularly for a hospital admission, they get, you know,

       18    pretty sophisticated care and the hospitals send back their

       19    records that have sometimes new diagnoses or new treatment

10:27:55 20    plans that are critical for the patient, and I've found quite

       21    a number of instances where the hospital records are not

       22    reviewed in a timely fashion once the prisoner gets back to

       23    the facility, so the recommendations from the hospital are not

       24    incorporated into the care plan that is moving forward for

10:28:14 25    that patient within the prison.

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

10:28:16  1        And there have been instances where the failure to

2      read those and to incorporate those as part of the care plan

3      have hurt individuals, and there have been instances where

4      that has caused a death.

10:28:31  5        So those tasks, I think all of those would improve

6      dramatically if you just had enough staff to do the work.

7  Q   Dr. Wilcox, are you familiar with other correctional

8      systems that were understaffed that were then improved by

9      increased staffing?

10:28:46 10  A   Yes.

11  Q   Can you explain that for us.

12  A   The one I'm very familiar with Salt Lake county.  When I

13     began at Salt Lake County we were substantially understaffed.

14     That really was the majority of my work for the first year and

10:29:03 15     a half, was getting appropriate levels of staffing and getting

16     the right kind of staffing, the right kinds of medical

17     professionals, so that we could do the work that was necessary

18     within the jail system.

19        We also -- I also encountered that at Maricopa County

10:29:24 20     when the consulting group I was working with was hired to come

21     in and attempt to improve the healthcare dynamics and

22     healthcare system within Maricopa County.  They were

23     substantially understaffed in many of the specialty areas like

24     nurses and counselors and psychiatrists, and so we did some

10:29:49 25     initial staffing recommendations and analysis to get the staff

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

10:29:53  1   up to speed.

2           We hired a number of temporary staff in order to

3   relieve that staffing crisis and the throughput of data, the

4   care that was rendered, all of the dynamics that were so

10:30:09  5   bogged down by not having adequate staff just disappeared.

6   The issues just disappeared because we had people who were

7   completely qualified to do the job now and they were able to

8   do the job that needed to be done and the backlogs went away,

9   the care was much more expeditious, and the quality of the

10:30:29  10   care improved significantly.

11   Q   Thank you.

12           Shifting gears a little bit, can you tell us what

13   your opinion is of the sick call nurse provider?

14           THE COURT:  Before we go to that, I'm looking at your

10:30:49  15   statement and you have, I think to some extent, answered what

16   my question is about to be, but I want to make sure.

17           You, in your report, said Mr. Joy's analysis is

18   thorough and, the second part, capitalizes on the most

19   accurate data available.  How do you know that?

10:31:13  20           THE WITNESS:  Well, my statement really is a

21   comparison between -- really, there's sort of two general

22   sources of data available to do the mathematical model that he

23   put together.  One source would be nationally published data

24   for what the population of individuals who are justice

10:31:36  25   involved, or incarcerated, look like from healthcare

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

10:31:39   1   perspective.  What percentage are really sick, what percentage

        2   are medium sick, what percentage are not very sick.  There's

        3   data about that.

        4        The other source of information would be ADCRR's own

10:31:54   5   data.

        6        And those were really the two choices that you would

        7   typically look at for creating a mathematical model like this.

        8   And that was one of the discussions that he and I had was,

        9   based on my review of the chart, what was my estimate of the

10:32:11  10   voracity of the data within eOMIS.  And what I find in my

       11   evaluation of eOMIS is there is a severity of medical

       12   condition grade that is assigned within eOMIS.  There's a

       13   numerical score that each patient gets that describes their

       14   level of medical intensity, I guess would you say, or how sick

10:32:40  15   they are.

       16        What I find in my review of the records is that those

       17   scores are pretty inaccurate.  They don't appear that they are

       18   updated on a regular basis.  Once a score is entered and the

       19   patient's medical condition changes significantly, the score

10:32:59  20   doesn't seem to change with a change in the medical acuity.

       21        So what I told him is that based on what I have seen,

       22   using the scores that are available within ADCRR is not as

       23   reliable as what the national data would be.

       24        THE COURT:  Where's the national data?  What national

10:33:20  25   data are you speaking of?

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

10:33:23  1          THE WITNESS:  There's a number of sources that he

       2     cited.  I can list off a couple of them.  There was a

       3     comprehensive study done by the National Commission on

       4     Correctional Health Care that looked at the population of

10:33:35  5     individuals who are incarcerated and gave some guidance on

       6     what percent fall into the different severity levels of being

       7     medically ill.  Those are guidelines.  Those are published

       8     data.

       9          There's also a number of other sources that are

10:33:56 10     available.  The Department of Justice has done some studies on

      11     what the healthcare picture looks like for patients who are

      12     incarcerated.  There's data from the CDC about -- or the

      13     Centers for Disease Control, regarding healthcare of

      14     incarcerated individuals.

10:34:15 15          And so, you know, he had a difficult task because he

      16     had to choose a data source to use for his model.  And while I

      17     would generally, and in an ideal world, the local data would

      18     be preferred because it's customized to that environment and

      19     it is as accurate as you could be, that would absolutely be

10:34:36 20     the preferred data, but, unfortunately, within the eOMIS

      21     system, that data is not accurate.

      22          THE COURT:  So when you say capitalize on the most

      23     accurate data, that most accurate data was the national

      24     reports, not ADCRR data?

10:34:54 25          THE WITNESS:  Yes, Your Honor.

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

10:34:54  1        THE COURT:  Okay.  Then the second thing you say is

       2   in your report, or your statement, "I have been calling for

       3   such a study in Arizona prisons for years because I believe

       4   there was a significant gap, based on my observations, of

10:35:12  5   barriers of delivery to adequate medical care, particularly

       6   with respect to deficient practice and inadequate oversight of

       7   nurses and mid-level providers."

       8        Now, you have said that; the last portion of that you

       9   testified to.  But did you not say anything about you have

10:35:34 10   been calling for a study.  When have you called for such a

      11   study?

      12        THE WITNESS:  Your Honor, in my previous reports, the

      13   ones you guys were talking about a little bit ago, one of my

      14   recommendations in those reports was to perform a staffing

10:35:50 15   study and to create a mathematical model similar to what has

      16   been created by Mr. Joy.

      17        THE COURT:  Okay.  So when you have say you have been

      18   calling for, who have been calling to?

      19        THE WITNESS:  Well, I put it in my reports and the

10:36:05 20   reports were dispositioned and I guess --

      21        THE COURT:  Reports for this case?  Or did you have

      22   conversations with anyone from DOC?

      23        THE WITNESS:  No, these were reports for this case,

      24   and so I guess the answer would be --

10:36:20 25        THE COURT:  All right.  That's all I wanted to know.

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

10:36:22  1        MS. HARDY:  Your Honor, may I clarify?

        2        He's not talking about the two reports that are the

        3   basis for this declaration.  He's referring to declarations he

        4   has filed in this case since 2013.

10:36:35  5        THE COURT:  That are not part of this record?

        6        MS. HARDY:  Which we are --

        7        THE COURT:  They're not --

        8        MS. HARDY:  Currently they're not admitted --

        9        THE COURT:  They're not exhibits in this case.

10:36:45 10        MS. HARDY:  Correct.

       11        THE COURT:  Have you -- well, have you designated

       12   them as exhibits and do you intend to offer them?

       13        MS. HARDY:  We have designated them as exhibits and

       14   defendants have objected and --

10:36:56 15        THE COURT:  Those are -- let me just make sure I

       16   understand, Ms. Hardy.  Those are not the reports we were

       17   talking about, they are reports -- they are his statements

       18   that he would give in court?  Because that's what we're

       19   talking about before.

10:37:12 20        It seems to me that you and defense counsel agreed

       21   that the reports, original reports, that were required timely

       22   to be filed for the purpose of trial were not to be offered,

       23   just the statement.  Is this a different report?

       24        MS. HARDY:  Yes, Your Honor.  These are declarations

10:37:29 25   that have been filed in this case over time.  He filed his

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

10:37:34  1   first one in 2013 when we were supposed to go to trial in

2   early 2014.  We did not go to trial and we delayed the trial.

3       In 2014 he submitted another declaration that was to

4   be used at trial, and that declaration was filed but it was

10:37:56  5   not used at trial because we settled the case.

6       And he has submitted other declarations in support of

7   motions --

8       THE COURT:  Have they been marked as exhibits?

9       MS. HARDY:  Yes, Your Honor.

10:38:06  10      THE COURT:  Okay.

11      And Mr. Struck, you object to the admissibility of

12   those exhibits?

13      MR. STRUCK:  Yes, Your Honor.  We had a discussion

14   about this with you yesterday and you over -- you said they

10:38:18  15   were hear- -- you agreed with defendants they were hearsay and

16   were not to be admitted.

17      THE COURT:  Well, obviously I didn't understand as

18   clearly as to what we're talking about now.

19      Did you intend to offer -- is that what we discussed

10:38:33  20   yesterday?

21      MS. HARDY:  Yes, Your Honor.

22      THE COURT:  These particular exhibits?

23      MS. HARDY:  These particular exhibits.  Plaintiffs

24   would like -- the defendants objected and we had Dr. Wilcox

10:38:43  25   testify about his prior reports and you allowed him to testify

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

10:38:46  1  about the reports because they are a basis for an expert's

2  opinion, but --

3  THE COURT:  Okay.  So -- so the reports can come

4  through the testimony but not the reports themselves.

10:39:02  5  MS. HARDY:  That's what I believe you ruled

6  yesterday.

7  THE COURT:  Okay.  All right.  So I want to make sure

8  that -- that that is -- that it's clear to both counsel.  For

9  your experts, if any of them have provided reports throughout

10:39:24 10  this litigation since 2013, that -- those reports are

11  admissible through their testimony.

12  So if you wish to ask them questions, anybody, any

13  expert, about those reports and they're relevant to his

14  testimony, I will allow them.

10:39:52 15  MS. HARDY:  Thank you, Your Honor.

16  BY MS. HARDY:

17  Q  Dr. Wilcox, have you developed an opinion about the access

18  to care that people have in the prisons when they want to see

19  a provider, meaning a physician, mid-level nurse practitioner,

10:40:12 20  or physician assistant?

21  A  Yes, I have.

22  Q  And what's your opinion?

23  A  My opinion is that access to care for many of the patients

24  within ADCRR is limited by the way that they have structured

10:40:29 25  their healthcare delivery model.

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

10:40:32   1   Q   Can you explain that further?

2   A   Yes.

3         The process for someone to request to see a provider

4   in general is to submit a health needs request.  That is

10:40:45   5   something that is filled out by the patient.  It is submitted

6   to the healthcare team and then the healthcare team

7   dispositions that request from there.

8         My issue with the methodology and structure of the

9   model is that what they do is those healthcare requests are

10:41:06  10   picked up by the healthcare team and then the registered nurse

11   will go visit with the patient and do a simple assessment and

12   determine what happens with that health needs request.

13         Many times the nurse determines that the patient is

14   not sick enough or does not meet her criteria to see provider

10:41:33  15   and so the nurse ends up being the final decision maker in the

16   process for requesting a provider visit, and that is

17   inappropriate.  It creates barriers for the patients to be

18   able to see a provider.

19         It -- that -- the act of her being the final decision

10:41:56  20   maker and acting and making that decision is outside the

21   scope, the legal scope, of a nurse's practice and she does not

22   have the education, the training, or the licensure to function

23   as the final decider.

24   Q   Dr. Wilcox, are you aware of any other health care

10:42:19  25   settings where the nurse serves as final decider when someone

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

10:42:23  1   seeks to access their doctor?

2   A   No.  Considering that it's not really legal, you wouldn't

3   expect to find any others.  But, you know, can you imagine in

4   the community if you schedule an appointment with your doctor

10:42:36  5   and you're met in the lobby by the nurse who does a little

6   assessment on you and then turns you around and sends you home

7   and you're not allowed to see your doctor?  That Just doesn't

8   exist in the scope of healthcare anywhere.

9   Q   Have you observed what happens with patients who get

10:42:54 10   frustrated with this system at the ADCRR?

11   A   Yes.  There is an alternate pathway for seeing health care

12   within the system and that is the emergency pathway.  And I

13   have, in my tours and in my interviews with patients, they

14   have indicated to me that it is a well-known strategy from the

10:43:20 15   patients within ADCRR that if they really want to see a

16   provider they call an emergency versus submitting a health

17   needs request.

18   Q   Dr. Wilcox, could you turn to page 44 of your report and

19   look at the patient who appears there.

10:43:46 20          Did you see this patient when you went on one of your

21   site visits?

22   A   Yes, I did.

23   Q   And did you review his medical record?

24   A   I did.

10:43:56 25   Q   Could you describe what happens to this patient when he

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

10:43:59  1   reported pain in his neck in February 2021.

2   A   Yes.  This patient who is 44 years old had the sudden

3   onset of severe neck pain with radiation into his back, and

4   that occurred on February 23rd, 2021.

10:44:21  5       He -- over the next day he requested healthcare and

6   he was seen by three different registered nurses.  The first

7   nurse obtained orders from one of the providers to get an EKG,

8   an X-ray, and there were medications prescribed to him.  Those

9   medications were Toradol; Prednisone; Diazepam, which is

10:44:51  10  Valium; and Ibuprofen.

11      The problem with that is that those medications

12  are -- do not interact well with each other and medically they

13  are what we would call contraindicated for use together.  And

14  so it's actually really dangerous to use those medications

10:45:13  15  together.  But that was the disposition that the nurse came up

16  with by telephoning a provider instead of having the patient

17  see the provider.

18  Q   So to be clear, the nurse is not able to prescribe those

19  medications, the nurse sought out a provider by telephone and

10:45:34  20  that provider did not see the patient; is that correct?

21  A   That's correct.

22      That's a pretty common pattern that I encounter in

23  reviewing charts is that the nurse evaluates the patient and

24  then they develop a treatment plan, telephonically or

10:45:50  25  verbally, to figure out what to do for the patient but the

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

10:45:55  1   provider does not actually see the patient.

2   Q    Does the provider follow up with the patient?

3   A    That does happen occasionally, and that's really up to the

4   nurse to determine whether the patient should follow up with

10:46:07  5   provider.  And I'm sure there are discussions with provider

6   about that.  But I also run into many instances where

7   prescription medications are ordered by the provider via the

8   nurse and there's never any follow up, which is not

9   appropriate.

10:46:23  10   Q    What happened nexts for this patient?

11   A    Well, then he was seen again by another nurse who saw him

12   later that day and the patient was in so much pain that he

13   requested additional medication and that medication was denied

14   and the recommendation was to give him ice.

10:46:42  15         The following day on February 25, the patient

16   complained again and was seen yet again by a registered nurse

17   who evaluated him and her determination from that evaluation

18   and I'm quoting, "No referral to a provider was necessary.  No

19   follow up."

10:47:05  20   Q    Dr. Wilcox, what should have happened at that point?

21   A    Well, I mean, this is a patient who has had a sudden onset

22   of severe pain in his neck.  He's complained multiple times.

23   They have given him prescription medication that has not been

24   effective at alleviating the pain.  He continues to complain,

10:47:23  25   and he absolutely should have been seen by a provider

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

10:47:28  1    forthwith.

2         And this is a really good example of where these

3    nurses are acting as the final decision makers and they're

4    blocking the patient's access to a provider, or they're

10:47:41  5    providing access just, you know, through the telephone but the

6    provider does not have the opportunity to actually see the

7    patient and examine them.

8    Q    What happened next?

9    A    On March 3rd the patient called an emergency and the

10:48:03  10   provider actually did see him.  The visit occurred on March 4

11   and he was seen by a nurse practitioner who admonished him for

12   calling an emergency and provided some counseling and

13   suggested that he had called the emergency inappropriately.

14        On that visit, unfortunately, there was no

10:48:28  15   neurological exam, as you would expect for a neck issue.

16   There was no testing of any reflexes, there was no testing of

17   any clonus.

18        Clonus is a form of a reflex testing that you do by

19   pulling somebody's ankle upward and if there is damage to

10:48:50  20   anywhere along the central nervous system, the spinal cord up

21   into the brain, you will get an abnormal reflex when you do

22   that and it's a very common, very simple, but very important

23   physical exam procedure.

24        There is no assessment of neurological issue despite

10:49:07  25   the fact the patient was having neurological symptoms.

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

10:49:11  1     The plan from the nurse practitioner was to obtain an

2    x-ray and her follow-up plan for the patient was just as

3    needed.  There was no scheduled follow up for him despite his

4    complaints.

10:49:26  5     The lab that was ordered on March 4 and done was not

6    reviewed until March 13th.  And on that lab there was an

7    important abnormal result.  The patient had an elevated C

8    reactive protein test which came back substantially high.  And

9    C reactive protein is a lab that is run to look for acute

10:49:57  10   inflammation and it is typically indicative of an infection.

11    So he had an elevated C reactive protein at 20.3,

12   which is substantially elevated.  And, unfortunately, they

13   didn't really interpret the significance of that lab

14   appropriately.  So the follow-up appointment that was

10:50:19  15  generated from that abnormal lab was to follow up in one to

16   two weeks.  That -- based on that lab result they should have

17   assessed the patient right away to figure out what the source

18   of the infection was.

19    The patient ultimately got transferred from one

10:50:37  20  prison to another and he got transferred to Eyman on

21   March 16th or thereabouts.  I don't know if that's the exact

22   date.  But when he got to Eyman he was in so much pain that he

23   called three emergencies successively.  He had severe pain

24   down his neck and back on emergency number one, he had second

10:50:59  25  emergency where his back gave out when he was trying to get up

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

10:51:02  1  out of his bed to get his meal, and then on the third

2  emergency they transported him down to the clinic and

3  evaluated him.

4      He ultimately was seen again by nurse practitioner

10:51:14  5  three days later on March 19.  And at that point in time the

6  patient reported that he had severe back pain, he had lost the

7  sensation to the right side of his body, he had lost the

8  ability to control his bladder and so he was incontinent, and

9  he was unable to ambulate.

10:51:33  10      At that point in time the nurse practitioner felt

11  that he needed a higher level of care and transferred him out

12  to the hospital.

13      And he arrived at the hospital and they diagnosed him

14  with an epidural abscess, which is an abscess that is adjacent

10:51:51  15  to the spinal cord and oftentimes involves the vertebra, the

16  bone that supports the spinal cord.  And that was at the level

17  of C6-C7, which would be the lower part of your neck.

18      He was taken to emergency surgery where they were

19  able to decompress the abscess and stabilize that.  And he had

10:52:17  20  significant neurological injury and prolonged recovery due to

21  the severity of the neurological injury, and he was in a

22  step-down unit for approximately two months before he was able

23  to return to the prison.

24  Q   Dr. Wilcox, you met this particular patient, didn't you?

10:52:38  25  A   I did.  I spoke at length with this patient as he told me

DIRECT EXAMINATION (CONT'D) – TODD R. WILCOX

10:52:41  1    his story.

2              THE COURT:  Step-down unit was that in the prison?

3              THE WITNESS:  Yes, Your Honor.  One of the infirmary

4    units in the prison.

10:52:52  5              When we were doing our tours he indicate we had would

6    like to speak with us, so we stopped and spoke with him.

7    BY MS. HARDY:

8    Q    Could you describe the condition he was in when you talked

9    to him?

10:53:04  10   A    Yes.  When I spoke with him he was in his bed laying on

11   his back and he was able to communicate with me just fine.  He

12   has pretty good use of his hands.  He was able to do things

13   that require dexterity and function and he was able to tell

14   his story with clarity.

10:53:26  15             And then I inquired a little bit about his level of

16   functioning and he showed me the degree of atrophy that had

17   occurred in his legs, and we talked a little bit about his

18   ability to function.  And he actually was willing to show us

19   his level of functioning, so while we were on our tour I

10:53:48  20   requested that a video be taken of him doing -- moving around,

21   doing his activities, showing how his mobility has been

22   impacted by the epidural abscess and the neurological damage.

23             MS. HARDY:  Mr. Campbell, could you please bring up

24   Plaintiffs' Exhibit 1227.

25

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

10:54:10  1   BY MS. HARDY:

2   Q   Dr. Wilcox, do you recognize this video?

3   A   Yes.  That's my arm you see coming into the picture

4   occasionally.

10:54:33  5          (Video played.)

6          MS. HARDY:  Thank you.

7   BY MS. HARDY:

8   Q   Dr. Wilcox, is that the video that you requested to be

9   taken?

10:55:24  10  A   Yes.

11          MS. HARDY:  Plaintiffs move Plaintiffs' Exhibit 1227

12  into evidence.

13          MR. STRUCK:  No objection.

14          THE COURT:  It's admitted.

09:25:03  15          (Exhibit 1227 admitted.)

16  BY MS. HARDY:

17  Q   Dr. Wilcox, how old is the patient?

18  A   I believe the patient is 44 years old.

19  Q   Having reviewed his health records, do you believe he will

10:55:45  20  recover from this spinal abscess?

21          MR. STRUCK:  Foundation.

22          THE COURT:  I'm going to sustain on foundation,

23  although I believe I have read something in the record about

24  his orthopedic training, but please lay the foundation.

25

DIRECT EXAMINATION (CONT'D) - TODD R. WILCOX

10:56:00  1   BY MS. HARDY:

2   Q   Dr. Wilcox, have you trained in orthopedics?

3   A   Yes.

4   Q   And did you attend an orthopedic surgery residency?

10:56:09  5   A   Yes.

6   Q   And did you -- have you treated patients with spinal

7   abscesses?

8   A   Yes.

9   Q   And have you treated them through their recovery?

10:56:20  10  A   Yes.

11  Q   And in your opinion, do you believe that this particular

12  patient, having reviewed his records, will make a full

13  recovery from this abscess?

14  A   No.

10:56:30  15  Q   And why is that?

16  A   Well, spinal abscesses are particularly difficult.

17  Epidural abscesses are particularly difficult because the

18  nerves of the spinal cord, they don't like pressure.  So any

19  time there's pressure on those nerves and those nerve

10:56:50  20  pathways, the nerves die.  Pressure is really bad for nerves.

21          And so what is imperative in dealing with an epidural

22  abscess is getting it decompressed as quickly as possible

23  because that really is correlated with the preservation of

24  neurological function.  And in his particular case, it took a

10:57:13  25  while for him to get to the hospital, to get the right

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

10:57:17  1    diagnosis, and to get the decompression done, and so there was

2    damage to those nerves.  And those nerves have a limited

3    ability to recover.

4         And he does have some function, but it is likely that

10:57:31  5    his level of function, it may improve a little bit from where

6    we see him on the video over time, but it probably will not

7    make any significant improvement.

8         And typically for a patient like this in the real

9    world, the recovery would be tied very closely to the -- how

10:57:55  10   rigorous the physical therapy regimen is for his recovery, and

11   that's -- that type of physical therapy recovery is not really

12   available inside the prison.

13   Q    Dr. Wilcox, in your opinion was this avoidable.

14   A    Well, yes.  The abscess was not avoidable; that is

10:58:16  15   something that just developed.  The issue is the delay in

16   getting him to definitive management, and the magnitude of his

17   neurological injury was likely avoidable.

18        MR. STRUCK:  Your Honor, move to strike.  Not

19   qualified to be testifying with respect to neurological

10:58:32  20   issues.  He hasn't done any kind of an evaluation.  He's not a

21   neurologist.  He hasn't testified he's seen any films.

22        THE COURT:  I'm going to sustain on foundation with

23   respect to neurological opinions unless they relate to his

24   background, training, experience.

25

DIRECT EXAMINATION (CONT'D) — TODD R. WILCOX

10:58:53  1   BY MS. HARDY:

2   Q   Dr. Wilcox, do you have training in spinal injuries?

3   A   Yes.  Surgery on the spine is an integral part of

4   orthopedic surgery.  It's one of the subsets of orthopedic

10:59:09  5   surgery.  And in my training I have operated on the cervical

6   spine many, many times and treated patients like this, both in

7   the acute setting where the emergency surgery is being done,

8   as well as in the recovery phase after the surgery has been

9   done and we're seeing the patient in follow-up.

10:59:28  10          MS. HARDY:  May I ask the question again, Your Honor?

11          THE COURT:  Yes.  So the objection is overruled.

12   Foundation has been laid.

13   BY MS. HARDY:

14   Q   In your opinion, Dr. Wilcox, was this avoidable?

10:59:39  15   A   Yes.  As I said, the development of the epidural abscess

16   was not avoidable.  That is something that does happen and

17   patients can develop those just out of the blue.

18          However, the issue really is the delay in getting him

19   to definitive management and the delay in getting the abscess

11:00:00  20   identified and dealt with surgically, because that really is

21   the only way to deal with that problem.

22          And the goal, of course, is expeditious care because

23   time is of the essence and you have to decompress the abscess

24   and treat the infection to try to minimize damage to the

11:00:19  25   central nervous system and the spinal cord.

CROSS-EXAMINATION - TODD R. WILCOX

11:00:23  1  Q   Dr. Wilcox, why did you choose this case to highlight in

       2  your testimony?

       3  A   Well, similar to the other ones that I have discussed,

       4  this case demonstrates some of the systemic issues that I have

11:00:36  5  called out in my declaration.  In particular, this one is

       6  pretty definitive demonstration of how the nurses are acting

       7  outside of the scope of their practice and serving as the

       8  final decision maker.

       9        You know, when a nurse evaluates this individual who

11:00:55 10  clearly has a major medical problem and the nurse of her own

      11  volition makes the determination that no further follow up is

      12  necessary, that is completely outside of the scope of her

      13  practice to make that determination, and in this particular

      14  case that caused injury to this patient.

11:01:16 15        MS. HARDY:  Thank you, Dr. Wilcox.

      16        I have nothing more, Your Honor.

      17        THE COURT:  Cross.

      18        MR. STRUCK:  Thank you, Your Honor.

      19             C R O S S - E X A M I N A T I O N

11:01:22 20  BY MR. STRUCK:

      21  Q   Now, Dr. Wilcox, you testified, I believe, yesterday that

      22  you actually have worked clinically in a prison setting; is

      23  that right?

      24  A   Yes.

11:02:32 25  Q   And that was two years, part-time, in a facility in Utah

CROSS-EXAMINATION - TODD R. WILCOX

11:02:39  1    Department of Corrections?

2    A    Correct.

3    Q    And that was -- I think you said it was three days a week,

4    but that was 1997 to 1999; is that right?

11:02:52  5    A    The dates are right but the frequency is incorrect.

6    Q    I thought I wrote down yesterday you said you worked part

7    time three days a week.

8    A    No.  I worked part time two days a week.

9    Q    Two days a week.  Okay.

11:03:05 10         And then, let's see.  You also said that you did some

11    evaluation of -- is it a prison facility in Mississippi with

12    respect to staffing issues?  Is that right?

13    A    No.  I --

14    Q    I apologize.  Let me reask the question.

11:03:26 15         You actually assisted them in preparing an RFP.  You

16    and a few other members of a team assisted in preparing an RFP

17    for Mississippi with respect to staffing and getting a

18    third-party medical provider in; correct?

19    A    Well, I would say that's partly correct.  That was one of

11:03:51 20    the tasks that we did for the Mississippi Department of

21    Corrections.

22    Q    Okay.  And which facility that was for?

23    A    It was for their entire system.

24    Q    And how often -- was that through Welcon?

11:04:04 25    A    No.  That was through Phase 2 Consulting.

CROSS-EXAMINATION - TODD R. WILCOX

11:04:08  1   Q    Okay.  So you are currently the sole shareholder of

2   Wellcon; is that correct?

3   A    That's correct.

4   Q    And Wellcon is a for-profit company; correct?

11:04:20  5   A    Correct.

6   Q    And one of Wellcon's main missions is to provide a certain

7   amount of healthcare with respect to the Salt Lake County

8   jail; is that right?

9   A    Correct.

11:04:36  10   Q    And prior to that you worked with a company called

11   Phase 2; is that right?

12   A    Incorrect.

13   Q    Tell me about Phase 2.

14   A    Could you ask the question again.

11:04:56  15   Q    You're not still working with Phase 2, are you?

16   A    No.

17   Q    What is Phase 2?

18   A    Phase 2 was a healthcare consulting firm that was based

19   out of Salt Lake City, and I did some consulting work with

11:05:07  20   them along the time when I was working in the Salt Lake County

21   jail.

22   Q    It was with Phase 2 that you contracted with Correctional

23   Health Services here in Maricopa County; is that right?

24   A    Partly.  Phase 2 was the company that contracted with

11:05:28  25   Maricopa County.

CROSS-EXAMINATION – TODD R. WILCOX

11:05:28    1    Q    Okay.  And you were -- were you an employee of Phase 2?

2    A    I was an independent contractor with Phase 2.

3    Q    And were there other folks besides you who came down with

4    Phase 2 to assist Maricopa County with respect to Correctional

11:05:48    5    Health Services healthcare delivery system?

6    A    Yes.

7    Q    And how many people?

8    A    There were different levels of staffing over the span of

9    the project.  Initially there were -- have to count.

11:06:07   10         Initially there were three of us, and then there were

11    additional consultants that were brought in on a

12    project-by-project basis.

13    Q    And that -- that project began in November of 2004;

14    correct?

11:06:24   15    A    Yes, I believe that's correct.

16    Q    And for about 14 or 15 months you served as the medical

17    director for Correctional Health Services of Maricopa County

18    jail?

19    A    Yes.  I think it may have been slightly longer than that,

11:06:43   20    but that's about the time range.

21    Q    And at the same time you were still working at the Salt

22    Lake County jail; correct?

23    A    Correct.

24    Q    So you were going back and forth between --

11:06:56   25    A    That's correct.  I was airline commuting.

CROSS-EXAMINATION – TODD R. WILCOX

11:06:59   1   Q   All right.  And it's your testimony that there was some

       2   sort of a staffing analysis that was done in the Maricopa

       3   County jail by Phase 2, of which you were a member of the

       4   team?

11:07:13   5   A   Yes.  It was a staffing study that was completed and

       6   Phase 2 was one of the groups that participated in that, and

       7   there was a consultant from Deloitte Touche, who the county

       8   had hired, who also participated in the development of that.

       9   Q   As part of that study, Phase 2 came down and did a

11:07:34  10   several-month analysis of the correctional health services in

      11   the Maricopa County jail system; is that right?

      12   A   Correct.

      13   Q   And part of that analysis was to go in and -- in to each

      14   of the various facilities and observe how healthcare is being

11:07:52  15   delivered at the time?

      16   A   Yes.  We didn't specifically do, like, a time study like

      17   sometimes you do with staffing studies, but we were working in

      18   the facility at the time, so we had intimate knowledge of what

      19   the different functions were.

11:08:11  20   Q   So when you say you were working in the facility, were you

      21   actually providing clinical care at the same time?

      22   A   Yes.  I was the medical director and then at a certain

      23   point after we started they had a need for some additional

      24   clinical care and so I became licensed in the State of Arizona

11:08:29  25   and I did perform clinical care for the prisoners in the

CROSS-EXAMINATION - TODD R. WILCOX

11:08:33  1    Maricopa County jail.

2    Q   All right.  Was that after you ended your position as

3    medical director for Correctional Health Services?

4    A   No.

11:08:44  5    Q   At what point in time did you become licensed in Arizona?

6    A   It was shortly after we began the engagement.

7            THE COURT:  That would be when?

8            THE WITNESS:  Engagement began in November of 2004.

9    BY MR. STRUCK:

11:09:01 10    Q   Right.  So shortly after.  Maybe sometime in 2005, you

11    became licensed in Arizona?

12    A   Yes, I think that's correct.

13    Q   So while you were providing clinical care, you were also

14    working with Phase 2 on some sort of analysis with respect to

11:09:15 15    various staffing issues in Maricopa County jail?

16    A   Yes.

17    Q   All right.  And describe for me what that analysis was.

18    How did you perform that analysis with respect to the staffing

19    issues in Maricopa County jail?

11:09:30 20    A   Well, it was a workload-based staffing study that looked

21    at each of the different levels of licensure and broke down

22    what their duties were underneath their job and their

23    licensure and we figured out how many of those different

24    duties were necessary based on Maricopa County's own data and

11:09:56 25    then how long it took to do each one of those duties and then

CROSS-EXAMINATION – TODD R. WILCOX

11:09:59  1   you multiplied that out to figure out how many minutes of

2   labor you need to perform that task, and then you divide by

3   the number of hours that a staff member is available to work

4   to figure out how many staff members you need to complete that

11:10:18  5   task.

6           THE COURT:  What's the level of licensure?

7           THE WITNESS:  Yes.  Per level of licensure.

8           THE COURT:  What's a licensure?

9           THE WITNESS:  So, for example, Your Honor, we would

11:10:28 10   look at what were the duties for the physicians, what were the

11   duties for the nurses, the RNs.

12           THE COURT:  Thank you.

13   BY MR. STRUCK:

14   Q   And with respect to the data you were looking at, were you

11:10:38 15   looking at actual how many patients were being treated, how

16   many chronic care patients there were, all those kind of

17   statistics that Maricopa County was keeping track of?

18   A   Yes.

19   Q   All right.  And how long did this analysis take?

11:10:56 20   A   Well, the sum total of the analysis from the time that it

21   was requested and from the time that we were able to present

22   the data, I would say it was probably five months.

23   Q   And at the time you were doing this analysis, one of the

24   issues that you had, as well as other people in CHS had, was

11:11:24 25   the fact there was no electronic medical record in the

CROSS-EXAMINATION - TODD R. WILCOX

11:11:27   1   Maricopa County jail; correct?

2   A    Correct.

3   Q    So this analysis you did was done during a time in which

4   they were using paper records?

11:11:35   5   A    That's correct.

6   Q    And I think you testified earlier that one of the

7   advantages of electronical -- electronic medical record system

8   is it allows the providers, for one, but all of the healthcare

9   providers, whether it be an RN or mid-level provider or a

11:11:57  10   doctor, to be more efficient with respect to delivery of

11   healthcare; correct?

12   A    No, I don't believe I testified to that.  I do agree that

13   that is a possible outcome if the system is well designed.

14   Q    Okay.  And so you're saying that paper -- having a system

11:12:17  15   with a paper record is just as good as an electronic medical

16   record that isn't designed as well you as you think it should

17   be?  Is that your testimony?

18   A    Yes, and that's my experience.

19   Q    Okay.  So other than here in Arizona, have you had any

11:12:33  20   experience with eOMIS, the eOMIS software?

21   A    No.

22   Q    And what other software have you experienced you felt were

23   was not efficient or just as efficient as, say, paper records?

24   A    I'm not sure if I remember the name of it.  It was one of

11:12:59  25   the early systems that was designed and deployed in the Utah

CROSS-EXAMINATION – TODD R. WILCOX

11:13:02  1    Department of Corrections, and I'm completely blanking on the

2    name of what it was.  That was a long time ago.

3    Q   Is it your testimony that in terms of the eOMIS software

4    that's utilized within the Arizona Department of Corrections

11:13:18  5    Rehabilitation Reentry, that that is equally as efficient as

6    paper records or it is it more efficient or less efficient?

7    A   Well, based on my opportunity to review medical records

8    within the system when they had paper records and my

9    opportunity to review records on eOMIS, I would say that in

11:13:45 10    certain ways the paper records are easier to read and faster

11    to read than eOMIS is to utilize.

12    Q   Okay.  So but you -- as you sit here today, you can't tell

13    me whether a provider would be able to see more patients with

14    paper records as opposed to eOMIS; is that right?

11:14:07 15    A   No, I have not studied that.

16    Q   Okay.

17        Let me go back to Salt Lake County jail, which that's

18    where you have your primary experience with respect to

19    correctional health care; is that right?

11:14:23 20    A   Correct.

21    Q   And I think you testified that your current population is

22    about 1500, is that what you said?

23    A   Currently, yes.

24    Q   And there's two different facilities, am I right, the

11:14:33 25    Metro jail and the Oxbow jail; correct?

CROSS-EXAMINATION - TODD R. WILCOX

11:14:36    1    A    That's correct.

2    Q    You -- the average length of stay according to the Salt

3    Lake City website, sheriff's website, is 29 days; is that

4    right?

11:14:50    5    A    Yes, I believe that's the mathematical average.

6    Q    So you would agree, wouldn't you, that in terms of

7    providing medical care within a jail system and medical care

8    within a prison system, there are distinct differences you

9    have to take into account; right?

11:15:06   10    A    Yes, there are differences.

11    Q    And one of those differences would be when you're working

12    in a jail system you are probably seeing a lot more people

13    coming in with acute substance abuse issues; right?

14    A    That's correct.

11:15:22   15    Q    And that's one of -- in fact, one of the biggest

16    challenges that you have at Salt Lake County jail is dealing

17    with people that are coming in that are maybe high on heroin

18    or some other illicit drug and your concern with drug

19    withdrawal; right?

11:15:41   20    A    Correct.

21    Q    In fact, I think you have developed, in conjunction with

22    some other people, a checklist that's supposed to be utilized

23    by your healthcare providers in order to determine the

24    severity of the withdrawal of -- that your patients are going

11:16:02   25    through; is that right?

CROSS-EXAMINATION - TODD R. WILCOX

11:16:04  1    A    Yes.  I would call that a screening tool for opiate

2    withdrawal.

3    Q    What do you call that?  Is that -- you have two of them.

4    The WOWS and CIWA.  Which one is the opiate withdrawal?

11:16:18  5    A    WOWS is for opiate withdrawal.

6    Q    Okay.  And what does that stand for?

7    A    Well, it stands for Wellcon Opiate Withdrawal Scale.

8    Q    Okay.  And that's something that the nurses utilize when

9    people come in to your system in order to determine the extent

11:16:37  10   of their withdrawal symptoms; correct?

11   A    Yes.

12   Q    Now, you have been providing at least a certain level of

13   medical services at Salt Lake County jail for quite some time.

14   You said 26 years; is that right?

11:16:57  15   A    That's correct.

16   Q    You don't employ all of the healthcare providers at

17   that -- and I'm using an incorrect term.  All of the

18   individuals who are providing healthcare at the jail; is that

19   right?

11:17:14  20   A    Well, I guess you'd have to define that a little bit

21   better.

22   Q    Sure.  There are -- there are many nurses.  You have

23   nurses that work at both the Metro jail and at least one nurse

24   at Oxbow; is that right?

11:17:29  25   A    Yes.

CROSS-EXAMINATION – TODD R. WILCOX

11:17:29  1   Q   And those individuals are county employees; is that

2   correct?

3   A   That's correct.

4   Q   And there are medical technicians.  Those are not your

11:17:39  5   employees either, those are county employees?

6   A   That's correct.

7   Q   Your, I guess, contract with Salt Lake County is that you

8   hire the providers to come in and work in primarily Metro

9   jail; correct?

11:18:00 10   A   Correct.

11   Q   And as part of getting that contract, you submit a --

12   there's an RFP and you submit a proposal; right?

13   A   That's correct.

14   Q   And you've done that several times over the years as you

11:18:19 15   were trying to get the contract for Salt Lake County; right?

16   A   Correct.

17   Q   All right.

18        What year is your -- you've had consulting services

19   agreements with Salt Lake County over the years; is that

11:18:59 20   right?

21   A   Correct.

22   Q   I have one that's dated June 2008.  Is that your current

23   agreement with the county?

24   A   No.

11:19:10 25   Q   All right.  What's your current agreement?  When was that

CROSS-EXAMINATION - TODD R. WILCOX

11:19:13  1  signed?

2  A   I don't remember the exact date.  It was earlier this

3  year.

4  Q   Is part of your agreement, consulting services agreement

11:19:29  5  with Salt Lake County, you are to designate one of its

6  physicians with experience in correctional healthcare or other

7  relevant medical administration who holds a Utah license to

8  oversee the consultant's obligation of the agreement; is that

9  right?

11:19:52  10  A   Correct.

11  Q   And who is that individual?

12  A   I am.

13  Q   So would you -- is your position the medical director?

14  A   Yes.

11:20:02  15  Q   And is there also an individual in a position as the

16  healthcare authority?

17  A   Yes.  It's not -- that's not the title of that job, but

18  that's the spirit of that job.

19  Q   All right.  What's the title of that job?

11:20:18  20  A   I believe it is Health Services Administrator.

21  Q   And who is that individual?

22  A   Rob Ballard.

23  Q   And how long has Mr. Ballard been in that position?

24  A   I would estimate two years.

11:20:36  25         THE COURT:  Can you spell his last name.

CROSS-EXAMINATION - TODD R. WILCOX

11:20:38  1      THE WITNESS:  Yes.  B-A-L-L-A-R-D.

2    BY MR. STRUCK:

3    Q    And as a part of your agreement with Salt Lake County, you

4    provide 24-hour on-call coverage with on-call physicians who

11:20:55  5    are accessible electronically and/or in person; is that right?

6    A    Correct.

7    Q    All right.  So is there a physician that is generally

8    there, say, at graveyards?  Say 10 a.m. to -- 10 p.m. to 6

9    a.m. do you have a physician on site at the Metro jail?

11:21:14  10   A    It really depends on what the schedule is for that day and

11   what time they're starting clinics.

12   Q    Say if something happens at 2 in the morning at Metro

13   jail, is there a doctor there?

14   A    No.

11:21:26  15   Q    And so I'm assuming there would be an RN there at least?

16   A    Correct.

17   Q    All right.  And that RN would be able to contact the

18   physician in order to let them know what's going on?

19   A    Correct.

11:21:41  20   Q    And you -- I think we talked about this.  You don't employ

21   the nurses?

22   A    That's correct.

23   Q    But as part of your agreement with Salt Lake County, you

24   are required to train the nurses; is that right?

11:21:58  25   A    Well, you'd have to clarify that.  We train on certain

CROSS-EXAMINATION - TODD R. WILCOX

11:22:01   1   topics.  We don't do all of their training.

2   Q    All right.  What topics do you train on?

3   A    Well, we train on topics that are related to their

4   clinical work.  For example, how to do nursing triage, how to

11:22:16   5   do different patient assessments.  We oftentimes will train on

6   certain disease processes.  For example, we'll provide

7   training on how to assess patients for opiate withdrawal.

8   Q    One of the other things you do under the services

9   agreement is you provide for the continuing education for the

11:22:38   10   nurses, consistent with the Utah Division of Professional

11   Licensing; is that right?

12   A    Correct.

13   Q    And also consistent with the National Commission on

14   Correctional Health Care; right?

11:22:49   15   A    Correct.

16   Q    And as part of your agreement with the county, Wellcon,

17   your company, is required to comply with the standards of

18   NCCHC in the delivery of the consultant services under the

19   agreement; is that right?

11:23:06   20   A    Correct.

21   Q    And you are also to proactively assist the sheriff in

22   maintaining NCCHC accreditation; right?

23   A    Correct.

24   Q    Salt Lake County feels NCCHC accreditation is very

11:23:18   25   important, don't they?

CROSS-EXAMINATION - TODD R. WILCOX

11:23:20  1   A   They do.

2   Q   You believe that's important, don't you?

3   A   I do.

4   Q   In fact, one of the reasons why you left Maricopa County

11:23:33  5   was your concern that Maricopa County was going to let their

6   NCCH -- NCCHC accreditation lapse; is that right?

7         MS. HARDY:  Objection, Your Honor, there's no

8   foundation for that.

9         THE COURT:  Sounds like he left, so I'm not so sure.

11:23:50  10   I'm going to let him answer that, if he can.

11         THE WITNESS:  I'm sorry, could you ask the question

12   again.

13   BY MR. STRUCK:

14   Q   Sure.

11:23:57  15         THE COURT:  Can you answer that yes or no?

16         And present the question if you want him to answer it

17   yes or no or, if you want to lay some foundation for him,

18   that's up to you.

19         MR. STRUCK:  Your Honor, I'll lay foundation.

11:24:10  20   BY MR. STRUCK:

21   Q   Now, it's my understanding that after about a year and a

22   half you ended your position with Maricopa County in terms of

23   being the medical director for Correctional Health Services,

24   but continued to provide them with some help clinically in

11:24:30  25   treating patients and you also assisted them as being an

CROSS-EXAMINATION - TODD R. WILCOX

11:24:36   1   expert witness in some of their litigation; isn't that right?

2   A   Yes.

3   Q   And on February 20th, 2008, you submitted a letter of

4   resignation to Maricopa County, did you not?

11:24:54   5   A   I would have to review the letter to confirm the date.

6   Q   Sure.

7         MR. STRUCK:   Your Honor, I'd like to show the witness

8   Exhibit 81.   Impeachment exhibit, Your Honor.

9         THE COURT:   Impeachment.   We have to number it, then.

11:25:16   10   It's not already in evidence.

11         MR. STRUCK:   Correct.

12         THE COURTROOM DEPUTY:   5640.

13         THE COURT:   5640.

14         (Exhibit 5640 marked for identification.)

11:25:52   15   BY MR. STRUCK:

16   Q   Dr. Wilcox, do you recognize this letter?

17   A   Yes.   This is the first page of the letter.

18   Q   Okay.   Well, let's show you -- I'll show -- let's show the

19   last page of the letter please.

11:26:07   20         Is that your signature, Dr. Wilcox?

21   A   It is.

22   Q   And this is a letter that you wrote to the Maricopa County

23   Board of Supervisors; is that right?

24   A   Correct.

11:26:21   25   Q   And it looks like you also copied Peter Crowley, Maricopa

CROSS-EXAMINATION - TODD R. WILCOX

11:26:26  1    County risk manager; correct?

2    A    Correct.

3    Q    And Sheriff Arpaio.

4    A    Correct.

11:26:33  5    Q    And then chief -- his chief deputy, Jerry Sheridan.

6    A    Correct.

7    Q    And many individuals from CHS as well; is that right?

8    A    Correct.

9    Q    Can we go back to the first page, please.

11:26:50 10        MR. STRUCK:  Your Honor, I move to admit

11    Exhibit 524 -- excuse me.  I think I wrote down the wrong

12    number.

13        MS. HARDY:  Objection, Your Honor.  Hearsay.

14        THE COURT:  5640.

11:27:03 15        MR. STRUCK:  5640.  Thank you, Your Honor.

16        MS. HARDY:  Objection, Your Honor.  Hearsay.

17        THE COURT:  Sustained on hearsay unless there's an

18    exception.

19    BY MR. STRUCK:

11:27:14 20    Q    Okay.  Let's take a look at the first page, and isn't it

21    true that you were writing this letter to terminate your

22    contractual relationship with Maricopa County's Correctional

23    Health Services; is that right?

24    A    Correct.

11:27:33 25    Q    Isn't it true that at the time, February 20th, 2008, you

CROSS-EXAMINATION - TODD R. WILCOX

11:27:37  1    served two roles, specialty physician for orthopedics and

2    expert witness defending CHS with regard to healthcare

3    practices and to the standard of care within correctional

4    settings; is that right?

11:27:51  5    A    Correct.

6    Q    And the next paragraph you -- isn't it true you were hired

7    by Maricopa County as part of a team from Phase 2 consulting

8    November 2004?

9    A    Correct.

11:28:11  10   Q    And that you state in this letter that you were to serve

11   as the medical --

12        THE COURT:  Don't refer to the letter, it's not in

13   evidence.

14        MR. STRUCK:  I'm sorry, Your Honor.

11:28:21  15        THE COURT:  You can ask him questions that are

16   factual.

17   BY MR. STRUCK:

18   Q    And is it true that you were hired to serve as a medical

19   director for CHS and help lead a total change process?

11:28:37  20   A    Correct.

21   Q    And isn't it true you told Maricopa County, or David Smith

22   for Maricopa County at the time, that such a goal was

23   attainable but it would take five years of active change

24   management and complete cooperation from the county; is that

11:28:57  25   right?

CROSS-EXAMINATION - TODD R. WILCOX

11:28:59  1   A   Hold on.  You're skipping around.

2   Q   Oh.  Sorry.

3   A   Can you highlight that section again, please.

4   Q   Sure.

11:29:21  5           Isn't it true that in your opinion you didn't get

6   either one of those?  You did not get active change management

7   or complete cooperation from the county; is that right?

8   A   Correct.

9   Q   And isn't it true that you believe that you made

11:29:36 10  tremendous preliminary process during the year and a half,

11  years that we were managing CHS, but the county chose to

12  disengage from the change process; is that right?

13  A   Incorrect.

14  Q   Pardon?

11:29:51 15  A   Incorrect.

16  Q   Okay.  So what was incorrect about that?

17  A   You did not read it correctly.

18  Q   All right.  Well, I'm trying to speed things up.  I was

19  paraphrasing.

11:30:07 20          THE COURT:  So he said he would like to read it, but,

21  in fact, Dr. Wilcox, what happened with respect to that issue?

22          THE WITNESS:  Your Honor, what happened is we were

23  asked to assist with making change within Maricopa County and

24  things went along pretty well for the beginning part of that

11:30:29 25  process, and then many of the recommendations we made for the

CROSS-EXAMINATION - TODD R. WILCOX

11:30:34  1   change process were denied, and so things really kind of

2   slowed down and we weren't able to continue to make the

3   changes that were necessary.

4   BY MR. STRUCK:

11:30:46  5   Q   And does that include staffing changes?

6   A   No.  The staffing piece was actually an element that the

7   Office of Management and Budget was very interested in and so

8   that project was something that we actually did and completed,

9   presented, and they incorporated into their budgeting.

11:31:07  10   Q   Did the county hire the staffing that they -- did they

11   accept your recommendation and hire the staffing that the

12   county --

13   A   I don't know because many of the staffing recommendations

14   were future oriented with the full build-out of the facility,

11:31:21  15   and at the point I left those positions were not necessary.

16   Q   Okay.  Because those positions related to the facility

17   that had not yet completed; right?

18   A   That's not correct.

19   Q   Okay.  How is that not correct?

11:31:37  20   A   Well, for the facility that primarily was of concern was

21   the Lower Buckeye jail, which was opened and was partially

22   operational, but it had additional capacity that was not fully

23   opened at the time and so they were going to grow into it.

24   Q   So at the time you left in February of 2008, those

11:32:03  25   positions that you and your team had recommended were not

CROSS-EXAMINATION – TODD R. WILCOX

11:32:06   1   filled?  Not all of them were filled?

2   A   I don't think fully, no.

3   Q   Okay.

4        Go to page 2.

11:32:26   5        And isn't it true that that the primary reason for

6   your resignation, and by far the most ominous, is the

7   significant degradation of systems and processes within CHS

8   that has occurred under the current management team.  Is that

9   right?

11:32:43  10   A   Correct.

11   Q   At the time in 2008 you were touting yourself as one of

12   most respected expert witnesses in the country in correctional

13   healthcare; is that right?

14   A   Yes.

11:33:00  15   Q   And at that time you had worked in correctional healthcare

16   for, what, 11 years you had been in correctional healthcare at

17   the time?

18   A   Yes.

19   Q   And you state that you have come to the difficult real --

11:33:21  20   sorry.

21        Is it true that you stated, "I have come to the

22   difficult realization that CHS is failing to deliver

23   healthcare that meets constitutional minimums and that the

24   current administration is unqualified and has insufficient

11:33:34  25   resources to rectify the situation moving into the future."

CROSS-EXAMINATION - TODD R. WILCOX

11:33:37  1          Is that right?

       2   A    Correct.

       3   Q    And you state below this, you talk about the three

       4   fundamental tenets of constitutionally sufficient correctional

11:33:54  5   healthcare.  And you stated the right to access to care, the

       6   right to care that is ordered, and the right to a professional

       7   medical judgment.

       8          Are those -- do you still believe those are the three

       9   fundamental tenets of a constitutionally sufficient --

11:34:15 10          MS. HARDY:  Objection, Your Honor, he's not

      11   testifying as a lawyer.

      12          THE COURT:  He can ask him that.  Apparently he may

      13   have said that before.

      14   BY MR. STRUCK:

11:34:24 15   Q    Do you understand the question?  Do you still believe

      16   those are the three fundamental tenets of a constitutionally

      17   sufficient correctional healthcare system?

      18   A    Yes.

      19   Q    And when you prepared this letter of resignation, you made

11:35:00 20   some parting recommendations.

      21          If we can go to page 3, the first paragraph.

      22          Do you see that?

      23   A    Yes, I see partial bullet point there.

      24   Q    And you have made several recommendations, or at least you

11:35:30 25   did in the February 2008.  Let's go to the last one on the

CROSS-EXAMINATION - TODD R. WILCOX

11:35:34   1   last page, please.

2            The last bullet point.  Maintain your NCCHC.

3            See it?  Okay.

4            And your last recommendation to the Maricopa County

11:35:56   5   Board of Supervisors was to maintain your NCCHC accreditation;

6   is that right?

7   A   Correct.

8   Q   And you state that the current CHS administration has

9   discussed giving this up --

11:36:13  10            THE COURT:  You're reading from the document.  Ask a

11   question.

12            MR. STRUCK:  I'm sorry.

13   BY MR. STRUCK:

14   Q   And isn't it true you believe the current CHS

11:36:18  15   administration had discussed giving up the NCCHC accreditation

16   to take the pressure off the current model of care?

17   A   Correct.

18   Q   And isn't it true you believed in February of 2008 that

19   the only thing that would occur should NCCHC accreditation go

11:36:37  20   away would be to take the pressure off the current CHS

21   administration to prove they were meeting basic healthcare

22   benchmarks of performance; correct?

23   A   Correct.

24   Q   Is it true when you left Maricopa County you believed that

11:36:54  25   if Maricopa County gave up their NCC accreditation, it would

CROSS-EXAMINATION - TODD R. WILCOX

11:37:00 1    be devastating for CHS and for the county on many levels?

2    A    Yes.  It would be the NCCHC accreditation, but yes.

3    Q    And you believed -- isn't it true you believed that it

4    would open up Maricopa County and CHS to a new era of

11:37:20 5    litigation assault that would be almost impossible to defend;

6    is that right?

7    A    Correct.

8    Q    Now, NCCHC accreditation, they come in and do audits, I

9    think you testified a little bit about that yesterday --

11:38:00 10    A    That's correct.

11    Q    -- right?

12         And one of the things they do is they look at

13    different areas that they think are important, and on the

14    important ones the facility has to score 100 percent.  Is that

11:38:17 15    right?

16    A    Incorrect.

17    Q    Okay.  So on the important ones -- on the essential ones,

18    excuse me, they have to score 100 percent.

19    A    Correct.

11:38:29 20    Q    And on the important ones they have to schedule -- they

21    have to score 85 percent; correct?

22    A    Correct.

23    Q    And so when NCCHC come in and do an audit at Salt Lake

24    County jail, they spend several days at the jail, don't they,

11:38:46 25    to do their evaluation?

CROSS-EXAMINATION - TODD R. WILCOX

11:38:49   1    A    No, I wouldn't call it several.

2    Q    They have a team come in and do an evaluation, don't they?

3    A    Sometimes.  The last one we had was virtual.

4    Q    Okay.  And that was because it was during the COVID?

11:39:02   5    A    That's correct.

6    Q    All right.  But they've been -- prior accreditation

7    periods had actually gone to Salt Lake County jail, the Metro,

8    and actually gone through and evaluated your healthcare

9    delivery system; correct?

11:39:18   10   A    Incorrect.

11   Q    They have not gone in to the Metro jail to evaluate that?

12   A    They have gone in to both metro and Oxbow to evaluate our

13   compliance with the NCCHC standards.

14   Q    All right.  And so are you saying that -- strike that.

11:39:36   15        Now, according to Salt Lake County and Salt Lake

16   County Sheriff's Office, it is very important for them to be

17   accredited by the NCCHC; correct?

18   A    Yes.

19   Q    You would agree, based on what we've heard today, that

11:39:49   20   NCCHC accreditation is important; right?

21   A    I agree with that.

22   Q    In fact, if you're not accredited by NCCHC you might

23   experience a new era of litigation assault that would be

24   impossible to defend; right?

11:40:04   25   A    Correct.

CROSS-EXAMINATION - TODD R. WILCOX

11:40:04  1  Q   Now, I think yesterday I heard you say that NCC -- I might

2   be wrong, this might be in your declaration.  But the NCCHC

3   staffing component of accreditation is not that rigorous?

4   That is that what you said?

11:40:37  5          MS. HARDY:  Objection.  I think that misstates his

6   testimony.

7          MR. STRUCK:  I'm asking.

8          THE COURT:  He can answer that yes or no, but that

9   isn't what I recall either.

11:40:44 10          Can you answer that yes or no?

11          THE WITNESS:  Well, he would have to rephrase it

12   because I'm not sure that I said that.

13   BY MR. STRUCK:

14   Q   One of the things NCCHC does under -- when they're

11:40:57 15  evaluating, say, your jail, is they look at your staffing

16   pattern; correct?

17   A   Yes, that is one of the standards.

18   Q   Okay.  And in order to evaluate those standards, they

19   actually do more than just seeing how many people you have on

11:41:14 20  the staff; correct?

21   A   Incorrect.

22   Q   I'd like to show you what plaintiffs -- Defendant's

23   Exhibit 3304.  Turning to page 78.  And this is -- this is the

24   section in NCCHC with respect to staffing standards; correct?

11:42:03 25  A   Yes.  For prisons, yes.

CROSS-EXAMINATION - TODD R. WILCOX

11:42:10  1    Q    Right.   In order to meet this important standard, the

2    responsible healthcare authority has to ensure that there are

3    sufficient numbers and types of health staff to care for the

4    inmate population; right?

11:42:23  5    A    Correct.

6    Q    And the compliance indicators that NCCHC auditors look for

7    is to determine whether or not the responsible healthcare

8    authority, in this case Arizona Department of Corrections, has

9    approved the staffing plan; right?

11:42:41  10   A    Correct.

11   Q    And that they also look at -- the auditors look at whether

12   prescriber and nursing time is sufficient to fulfill clinical

13   responsibilities; is that correct?

14   A    Correct.

11:42:52  15   Q    And then NCCHC auditors also look to make sure the

16   responsible physician time is sufficient to fulfill

17   administrative responsibilities; correct?

18   A    Correct.

19   Q    And they also look to ensure that there's a documented

11:43:07  20   plan in place for custody staff to follow when a health

21   situation arises and health staff are not present, such as an

22   emergency; correct?

23   A    Correct.

24   Q    And the NCCHC auditors also look at the adequacy and

11:43:23  25   effectiveness of the staffing plan and they assess the

CROSS-EXAMINATION - TODD R. WILCOX

11:43:27  1   facility's ability to meet the health needs of the inmate

2   population; correct?

3   A   Correct.

4   Q   And they also, to make sure -- look to make sure that all

11:43:37  5   aspects of the standard are addressed in a written policy and

6   defined procedures; correct?

7   A   Correct.

8   Q   And in order to become NCCHC accredited, a prison facility

9   would have to meet, I guess, at least 85 percent of those

11:43:57 10   particular standards; is that right?  Well, I take that back.

11   That's a bad question.

12        In order to -- in order to obtain the NCCHC

13   accreditation, they have to meet the staffing pattern;

14   correct?

11:44:13 15   A   Incorrect.

16   Q   Okay.  Why is that incorrect?

17   A   Well, you'll notice up in the upper left-hand corner it

18   indicates PC07.  That is the number of this particular

19   standard.  And underneath that you'll indicate it is an

11:44:30 20   important standard.  Important standard.

21        As we discussed earlier, in order to obtain

22   accreditation you have to meet 85 percent of the important

23   standards.  So it would be possible to not be in compliance

24   with this particular standard, since it's an important one,

11:44:49 25   and still attain accreditation.

CROSS-EXAMINATION - TODD R. WILCOX

11:44:52  1   Q   And you understand that all the prison facilities in

2   Arizona Department of Corrections Reentry Rehabilitation are

3   NCCHC accredited; correct?

4   A   Yes, that's my understanding.

11:45:07  5   Q   But as you sit here today, you don't know whether or not

6   they passed the staffing analysis with respect to the

7   particular accreditation, do you?

8   A   I do not.

9   Q   And that's not something you looked at for this case

11:45:19  10  either, is it?

11  A   I'm sorry --

12  Q   That's not something you asked to see in coming up with

13  your opinions in this case, is it?

14  A   No, I did not ask to see the breakdown of the

11:45:31  15  accreditation service.

16  Q   All right.  Thank you.

17       Now, you actually -- when you started your career,

18  isn't it true that you actually looked to NCCHC to become

19  trained with respect to providing healthcare in a

11:45:58  20  incarceration setting?

21  A   Yes.

22  Q   And because there were no other -- other than on-the-job

23  training, there really wasn't anywhere you could go other than

24  NCCHC to get that training; right?

11:46:12  25  A   Correct.

CROSS-EXAMINATION – TODD R. WILCOX

11:46:13  1   Q   And you became relatively involved with NCCHC, including

2   becoming accredited yourself; correct?

3         Certified.  Excuse me.

4   A   I'm sorry --

11:46:26  5         MS. HARDY:  Objection, Your Honor.  Dr. Wilcox is not

6   accredited by NC --

7         MR. STRUCK:  I --

8         THE COURT:  Restate the question.

9         MR. STRUCK:  I did, Your Honor.  I said, Dr. Wilcox,

11:46:36 10  you have actually become certified --

11         THE COURT:  And don't interrupt.  I wasn't finished.

12         MR. STRUCK:  I'm sorry.

13         THE COURT:  All right.  State the question so we all

14  understand it.

11:46:44 15         MR. STRUCK:  Yes.

16  BY MR. STRUCK:

17  Q   You are actually certified by the National Commission on

18  Correctional Health Care, are you not?

19  A   Well, it's a bit more nuanced than that.

11:46:55 20  Q   How so?

21  A   Well, NCCHC does offer some certifications, but it is

22  offered by the CCHP board, not offered by NCCHC itself.

23  Q   Okay.  Could you explain that further, please.

24  A   Yes.  NCCHC as the parent organization has a subgroup

11:47:20 25  called the Certified Correctional Health Care Provider Board,

CROSS-EXAMINATION - TODD R. WILCOX

11:47:26  1   and they are the ones that oversee the certification process.

2   Q   And you were certified by exam in 2007 and recertified in

3   2015; correct?

4   A   Yes, is I believe that's correct.

11:48:02  5   Q   One of the things you testified about yesterday was the

6   standard of care.  Do you remember that?

7   A   Yes.

8   Q   And you testified that the standard of care within a

9   correctional setting is generally the same as it is on the

11:48:15  10   outside, but there's going to be some differences depending

11   on -- for example, I think you gave us the TB.  Remember that?

12   A   Yes.

13   Q   And, in fact, I think your testimony was with respect to

14   at least identifying TB that the standard in a prisoner jail

11:48:33  15   setting is actually higher than it would be in the outside; is

16   that right?

17   A   Correct.

18   Q   Isn't it true that in your opinion, with respect to the

19   standard of care in a correctional setting, the art form is to

11:48:52  20   understand what the minimum standard of care is, to deliver

21   that, and to do so in an effective and cost effective way

22   because you don't want to squander the limited resources that

23   you're given by the taxpayers.

24   Would you agree with that statement?

11:49:09  25   A   In general, yes.

CROSS-EXAMINATION - TODD R. WILCOX

11:49:11  1   Q   Okay.  Specifically you don't agree with it?

        2   A   No, I was just -- I was trying to remember where that came

        3   from, but I believe I have said that in the past, yes.

        4   Q   You testified to that, actually.

11:49:32  5          THE COURT:  Is that a question?

        6          MR. STRUCK:  Not yet, Your Honor.  I'm getting there.

        7   BY MR. STRUCK:

        8   Q   Do you recall testifying in a trial in Braillard versus

        9   Maricopa County, September 13, 2012?

11:49:46 10   A   Yes.

       11   Q   And in that case you testified as a witness; is that

       12   right?

       13   A   Yes.

       14   Q   And you weren't providing expert testimony in that case,

11:49:59 15   but you were testifying with respect to your experience

       16   working in the Maricopa County jail for Correctional Health

       17   Services; right?

       18   A   Correct.

       19          MR. STRUCK:  Your Honor, I'd like to show the witness

11:50:36 20   impeachment 54, which is a transcript of the proceedings,

       21   pages 24 and 25.

       22          THE COURT:  You can, but I'm not sure, are you

       23   refreshing his recollection --

       24          MR. STRUCK:  Yes, Your Honor.

11:50:50 25          THE COURT:  -- or are you impeaching him?

CROSS-EXAMINATION – TODD R. WILCOX

11:50:52  1    MR. STRUCK:  I'm refreshing his recollection.

2    THE COURT:  Okay, then you need to ask him if there's

3    anything that will refresh his recollection.

4    MR. STRUCK:  Okay.

11:50:59  5  BY MR. STRUCK:

6  Q    Would it refresh your recollection, Doctor, to review the

7    transcript from your trial testimony in Braillard versus

8    Maricopa County?

9  A    Yes.

11:51:10  10    THE COURT:  Okay.  Now we can mark it.  Do you have

11    it?

12    MR. STRUCK:  Yes.

13    MS. HARDY:  Objection, Your Honor.  For the rule of

14    completeness we would need the whole transcript.

11:51:24  15    THE COURT:  Well, do you have -- let's see what you

16    have.  It may be the whole transcript, it may not.  And the

17    rule of completion depends upon, usually, on the question

18    asked, and maybe that you need to see --

19    MR. STRUCK:  Your Honor, we can provide them with the

11:51:40  20    whole transcript.

21    THE COURT:  Okay.

22    So in order to save some time, since you know and the

23    rest of us don't, what pages are you going to be referring to?

24    MR. STRUCK:  24 and 25, Your Honor.

11:52:51  25    THE COURT:  Only?

CROSS-EXAMINATION - TODD R. WILCOX

11:52:52   1          MR. STRUCK:  Right now yes.

           2          THE COURT:  This is Exhibit --

           3          THE COURTROOM DEPUTY:  5641.

           4          THE COURT:  5641.

11:52:59   5          (Exhibit 5641 marked for identification.)

           6   BY MR. STRUCK:

           7   Q   Doctor, if you would take a look at the question

           8   Mr. Manning asked you on starting line 22.  And when you're

           9   done reading that, we'll take you over to page 25.

11:53:19  10          THE COURT:  You want him to start at what line on

          11   page --

          12          MR. STRUCK:  I'm asking him to review line 22 through

          13   25 on page 24, Your Honor, and then, since it's on the screen,

          14   we'll have to switch over to the next page when he's done.

11:53:35  15          THE WITNESS:  Okay.

          16          MR. STRUCK:  If you could, Mr. Giardina, if you could

          17   highlight all the way down to line 21, please.

          18          MR. GIARDINA:  I'm not sure if --

          19          MR. STRUCK:  Okay.

11:54:11  20   BY MR. STRUCK:

          21   Q   Dr. Wilcox, just let me know when you're done reading.

          22   A   Okay.

          23   Q   All right.  Does that refresh your recollection as to your

          24   testimony?

11:55:03  25   A   It does.

CROSS-EXAMINATION - TODD R. WILCOX

11:55:04  1    Q   And isn't it true, sir, that you believe that the art form

2    is to understand what the minimum is, to deliver that but to

3    do so in an effective and cost effective way, because you

4    don't want to squander the limited resources that you're given

11:55:24  5    from the taxpayers and you certainly don't want to be lavish

6    and spend more money than you have to?

7    A   Correct.

8    Q   All right.  And you have -- you testified about that

9    opinion because you have to be sensitive to the fact that this

11:55:44  10   is a publicly funded healthcare and you're spending taxpayer

11   dollars; is that right?

12   A   Correct.

13   Q   And that there's a standard of care that you're obligated

14   to provide, and so the art form of practicing healthcare in

11:56:09  15   this setting is knowing what those levels are to make sure

16   that you're above them.  Right?

17   A   Correct.

18            MR. STRUCK:  Your Honor, this might be a good time to

19   break.

11:56:40  20            THE COURT:  All right.  It's very close to noon.  And

21   so I'll see you back here at 1 o'clock.

22            MS. HARDY:  Your Honor, if I may.

23            Dr. Wilcox was set to start testifying yesterday, so

24   he's been here for two full days.  He would really like to be

11:56:56  25   able to finish his cross today.  Could we hear from defendants

11:56:59  1    as to what their plan is.  And if it's possible, we could have

2    short lunch if that would help.

3            MR. STRUCK:  Your Honor, originally the plaintiffs

4    said they were going to spend one hour with Dr. Wilcox on

11:57:10  5    direct.

6            THE COURT:  Okay.  So she just wanted to know what

7    your plan is.  What is your plan?

8            MR. STRUCK:  I originally thought I was going to take

9    four and a half hours with Dr. Wilcox, but now I'm going to

11:57:19  10   have to ask him about Mr. Joy's opinion, so it may be longer

11   than that.

12           THE COURT:  More than four and a half hours?

13           MR. STRUCK:  It's going to be in that range.

14           THE COURT:  So we're already -- let's see.  You spent

11:57:33  15   about an hour, so another three and a half hours?

16           MR. STRUCK:  That sounds about right, yeah.

17           THE COURT:  All right.  Sounds like we'll be able to

18   finish with him today, then, Ms. Hardy.

19           MS. HARDY:  Thank you, Your Honor.

11:57:45  20           THE COURT:  We'll do our best.

21           All right, we're in recess.

22           (Recess taken at 11:58.)

23           (End of transcript.)

24                          * * * * *

25

1                      **C E R T I F I C A T E**

2

3            I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7            I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14           DATED at Phoenix, Arizona, this 6th day of December,

15   2021.

16

17

18

19

20                            s/ Patricia Lyons, RMR, CRR
                              Official Court Reporter
21

22

23

24

25

1      **R E D A C T I O N    C E R T I F I C A T E**

2

3              I, PATRICIA LYONS, do hereby certify that I am duly

4      appointed and qualified to act as Official Court Reporter for

5      the United States District Court for the District of Arizona.

6

7              I FURTHER CERTIFY that the foregoing is a true and

8      correct copy of the transcript originally filed with the clerk

9      of court but incorporating redactions of personal identifiers

10     requested by the following attorneys of record in accordance

11     with Judicial Conference policy:  Joint Motion at Dkt. 4305,

12     Order at Dkt. 4317.

13             Redacted characters appear as an "x" in the

14     transcript.

15

16             DATED at Phoenix, Arizona, this 11th day of April.

17     2022.

18

19

20

21                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter

22

23

24

25