**Index of Exhibits to Plaintiffs' Notice of Supplemental Authority**

| Exhibit | Description |
|---------|-------------|
| 1 | United States Department of Justice, Civil Rights Division, *Investigation of the Mississippi State Penitentiary (Parchman)*, April 20, 2022 |
| 2 | Prepared Remarks of Assistant Attorney General Kristen Clarke Regarding Parchman Investigation Findings, April 20, 2022 |

# EXHIBIT 1

# Investigation of the Mississippi State Penitentiary (Parchman)



United States Department of Justice
Civil Rights Division

APRIL 20, 2022

## TABLE OF CONTENTS

I.   SUMMARY OF THE REPORT ........................................................................... 2

II.  INVESTIGATIVE PROCESS ........................................................................... 3

III. THE PARCHMAN FACILITY ........................................................................ 4

IV.  DEFICIENT CONDITIONS IDENTIFIED ..................................................... 5

   A.  MDOC Fails to Protect Incarcerated Persons from Violence. ........................................ 6

      1.  MDOC Does Not Provide Reasonable Safety from Widespread Violence. ........... 7

      2.  MDOC Fails to Provide Adequate Supervision. ..................................................... 8

      3.  MDOC Fails to Investigate Serious Incidents of Harm. ....................................... 13

      4.  MDOC Fails to Control Dangerous Contraband. .................................................. 18

      5.  MDOC Fails to Control Gang Activity and Violence Spurred by the Black
          Market for Contraband. ......................................................................................... 22

      6.  Pervasive Extortion at Parchman Exposes Incarcerated Persons to Harm. ......... 24

   B.  MDOC's Failure to Provide Adequate Mental Health Care Results in Suicides and
      Harm to Incarcerated Individuals from Prolonged Segregation in Restrictive
      Housing. ................................................................................................................... 25

      1.  MDOC Fails to Provide Adequate Mental Health Treatment to Meet
          Incarcerated Persons' Serious Needs. .................................................................... 26

      2.  MDOC Fails to Adequately Protect Incarcerated Persons at Risk of Suicide. ..... 37

      3.  MDOC Places Incarcerated Persons in Prolonged Segregation in Restrictive
          Housing with Deliberate Indifference to their Serious Medical and Mental
          Health Needs. ......................................................................................................... 44

V.   MINIMAL REMEDIAL MEASURES ........................................................... 51

   A.  Protection from Harm ................................................................................................... 51

   B.  Mental Health Care and Suicide Prevention ............................................................... 54

   C.  Restrictive Housing ...................................................................................................... 57

   D.  Deaths and Sentinel Events ......................................................................................... 58

   E.  Policies, Procedures, Training, and Quality Assurance ............................................... 58

VI.  CONCLUSION ................................................................................................ 59

# I.   SUMMARY OF THE REPORT

The United States Department of Justice (Department) conducted an investigation of the Mississippi State Penitentiary (Parchman) under the Civil Rights of Institutionalized Persons Act (CRIPA).[1]  The investigation revealed that conditions at Parchman violate the Eighth and Fourteenth Amendments to the United States Constitution.[2]  These violations are pursuant to a pattern or practice of resistance to the full enjoyment of incarcerated persons' constitutional rights.

Specifically, the Department provides notice of the following conditions that violate the constitutional rights of individuals incarcerated at Parchman:

- **MDOC fails to protect incarcerated persons from violence at the hands of other incarcerated persons.**  MDOC subjects persons confined at Parchman to an unreasonable risk of violence due to inadequate staffing, cursory investigative practices, and deficient contraband controls.  These systemic failures result in an environment rife with weapons, drugs, gang activity, extortion, and violence, including 10 homicides since 2019.

- **MDOC fails to meet the serious mental health needs of persons incarcerated at Parchman.**  MDOC's flawed intake screening and poor mental health assessments fail to identify incarcerated persons in need of mental health care.  Parchman has too few qualified mental health staff to meet the mental health care needs of persons confined at Parchman, which results in serious harm.

- **MDOC fails to take adequate suicide prevention measures.**  MDOC fails to identify individuals at risk of suicide and houses them—often unsupervised—in dangerous areas that are not suicide resistant.  MDOC does not adequately train Parchman officers to identify the signs and symptoms of suicidal behavior.  Parchman staff do not respond to self-harm emergencies in a timely or reasonable manner.  Twelve individuals incarcerated at Parchman committed suicide in the last three years.

- **MDOC's use of prolonged restrictive housing places persons incarcerated at Parchman at risk of serious harm.**  MDOC subjects incarcerated persons—

---

[1] 42 U.S.C. § 1997.

[2] We note that this Findings Report only addresses Parchman.  Our investigation of three other Mississippi Department of Corrections (MDOC) facilities (Southern Mississippi Correctional Institute, Central Mississippi Correctional Facility, and Wilkinson County Correctional Facility) remains ongoing.

including those with serious medical and mental health needs—to segregation in restrictive housing for months and even years under egregious environmental conditions that pose a substantial risk of serious harm from psychological deterioration. Of the twelve Parchman suicides in the last three years, all of them occurred in restrictive housing.

The problems at Parchman are severe, systemic, and exacerbated by serious deficiencies in staffing and supervision. MDOC has been on notice of these deficiencies for years and failed to take reasonable measures to address the violations, due in part to non-functional accountability or quality assurance measures.

Years of MDOC's deliberate indifference has resulted in serious harm and a substantial risk of serious harm to persons confined at Parchman. For example, on December 31, 2019, just hours before midnight, a fight in Parchman's Unit 29 sparked what would become a prison riot lasting several weeks. In the months leading up to the riot, there had been widespread reports about unlivable and unsanitary conditions throughout Parchman; violent murders and suicides on the rise; staffing plummeting to dangerous levels; and mounting concerns that gangs were filling the void left by inadequate staff presence and gaining increasing control of Parchman through extortion and violence.

Despite notice of these structural and administrative crises, MDOC's records show a staff that was caught off guard, utterly overwhelmed, and ultimately unable to adequately and quickly respond to fighting and significant injuries in multiple buildings. Speaking to a reporter by phone during the riot, a person incarcerated at Parchman said, "They ran the [correctional officers] out of the building last night . . . . I don't know what they're going to do. They're short on staff." The Commander and his staff shot "impact weapons" and also threw what was described as a "hand grenade" into the fighting area, to little effect. Over 100 officers were pulled from the Mississippi Highway Patrol and several local sheriff's offices, who arrived at Parchman to assist in quelling the violence. Incarcerated persons set fires. Parchman was placed on total lockdown. When the smoke began to clear, five individuals incarcerated at Parchman had been murdered, and three others committed suicide during the month of January 2020 alone.

Consistent with CRIPA's statutory requirements, we submit this Findings Report to notify the State of Mississippi of the Department's conclusions with respect to these constitutional violations, the facts supporting those conclusions, and the minimum remedial measures necessary to address the identified deficiencies.

## II.    INVESTIGATIVE PROCESS

In February 2020, the Department opened a CRIPA investigation into the conditions at four MDOC facilities: Parchman, Southern Mississippi Correctional Institute, Central Mississippi Correctional Facility, and Wilkinson County Correctional Facility. The Special Litigation Section of the Department's Civil Rights Division and the United States Attorney's

Offices for the Northern and Southern Districts of Mississippi have been conducting the investigation.  Our investigation of Parchman focuses on whether MDOC adequately protects incarcerated persons from physical harm at the hands of other incarcerated persons, as well as whether MDOC provides adequate mental health care, including examining suicide prevention and prolonged exposure to restrictive housing.  Our investigation of the other three facilities—which remains ongoing—examines whether MDOC fails to protect incarcerated persons from harm due to violence within the prisons.

Five experienced consultants assisted with this investigation.  Two of these experts are former high-ranking corrections officials with significant experience leading state and local corrections departments; two are psychiatric doctors with expertise related to correctional mental health care; and one is a nationally recognized expert on suicide prevention in correctional settings.  All of these experts participated in a virtual tour of Parchman, conducted video interviews with MDOC staff and administrators, reviewed thousands of pages of documents, and provided their expert opinions and insight to help inform the investigation and its conclusions.

Given the serious, life-threatening conditions at Parchman, we proceeded with our investigation notwithstanding the COVID-19 pandemic and the resultant suspension of in-person activities.  We conducted limited onsite tours of specific Parchman units and virtual tours facilitated by the U.S. Attorney's Office.   We conducted virtual interviews of MDOC officials and staff by video conference and requested and reviewed hundreds of thousands of pages of documents and data.  In order to inform our understanding of MDOC's practices, we reviewed, among other things, incident reports, health records, autopsies, policies and procedures, training materials, personnel files, staffing plans, monthly reports, facility logs, and investigative files.  We also received information from the community via our phone and e-mail hotlines.  We met with community members, advocates, and attorney stakeholders.  The State and MDOC cooperated fully in our investigation, facilitated our review, and provided additional documents and information in response to our follow up questions.  Throughout our investigation of Parchman, we considered all relevant information, including efforts that the State and MDOC have taken to ensure compliance with the Constitution.

In some sections of this Findings Report, we provide examples to illustrate the variety of the nature of the violations we found or the circumstances in which the violation occurs.  The number of examples used is not indicative of the number of violations that we found.  These examples comprise a subset of the total number of incidents upon which we base our conclusions of a pattern or practice of constitutional violations.

---

### III.    THE PARCHMAN FACILITY

---

Parchman is one of five state-run prisons in the MDOC system.  Established in 1901, it is located in Sunflower County, Mississippi, within the Mississippi Delta, and is the State's oldest prison.  Parchman currently holds 2,260 beds across seven housing units.  It houses all custody

levels, including the state's death row.  Shortly before our investigation, Parchman reopened Unit 32, previously a solitary confinement "supermax" unit that had been shuttered since 2010 under a consent decree.  Parchman's largest facility is Unit 29, which can house up to 1,500 individuals.  Following the January 2020 rioting, MDOC moved 375 persons from Unit 29 to a private prison in the State.  On January 28, 2020, Mississippi Governor Tate Reeves instructed MDOC to begin working toward closing Unit 29.  Parchman's average daily population dropped from 3,255 in December 2019, to 2,929 incarcerated persons in January 2020.  Its current population is 1,989.

Parchman is the only MDOC facility to have its own onsite hospital:  Unit 42.  The second floor of Unit 42 houses the acute mental health unit, and the south ward contains six suicide watch rooms and eight psychiatric observation cells.  Medical and mental health care are provided by a contract health services provider.  Centurion Health was Parchman's health services provider until it terminated its agreement effective October 2020.  VitalCore Health Strategies (VitalCore) has served in that role since that time.  Despite the change in provider, the health services leadership has remained the same, and there has not been a demonstrable improvement in mental health services provided at Parchman.

## IV.    DEFICIENT CONDITIONS IDENTIFIED

CRIPA allows the Department to investigate violations of the constitutional rights of persons in correctional facilities when such violations are "pursuant to a pattern or practice of resistance to the full enjoyment of such rights."[3]  "The Constitution does not mandate comfortable prisons,"[4] and prison conditions may be "restrictive and even harsh" without violating the Eighth Amendment.[5]  However, the Constitution prohibits officials from being deliberately indifferent to conditions that subject incarcerated persons to a "substantial risk of serious harm," including an excessive risk of violence, illness, or injury.[6]

Two elements must be met to establish unconstitutional conditions of confinement in violation of the Eighth Amendment.  First, the incarceration must involve conditions posing a substantial risk of serious harm to incarcerated persons.[7]  In this analysis, the seriousness of the

---

[3] 42 U.S.C. § 1997a(a).

[4] *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).

[5] *Id*. at 347.

[6] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976).

[7] *Farmer*, 511 U.S. at 834.

conditions is determined objectively.[8]  The Fifth Circuit's test for objectively serious conditions posing a substantial risk of serious harm requires "extreme deprivation" of the "minimal civilized measure of life's necessities."[9]  That "extreme deprivation" is measured against "the evolving standards of decency that mark the progress of a maturing society."[10]  In the Fifth Circuit, courts are called to consider the "totality of conditions" in making this determination.[11]  Under the second element, prison officials must act with "deliberate indifference" toward those conditions.[12]  This second prong requires a showing that prison officials (1) are actually aware of "an excessive risk to inmate health or safety" or should have noticed a risk that was obvious [13] and (2) disregard that risk.[14]  Conditions may result in a constitutional violation "in combination when each would not do so alone" where they have a "mutually enforcing effect" that results in the deprivation of a basic human need.[15]

### A.   MDOC Fails to Protect Incarcerated Persons from Violence.

Our investigation found widespread, largely unchecked, violence against incarcerated persons by other incarcerated persons in Parchman.  Numerous MDOC systemic deficiencies foster this pervasive violence and create an unreasonable risk of serious harm to incarcerated persons, including:

- Gross understaffing that results in inadequate supervision,
- Investigations of incidents that are cursory or incomplete,
- Insufficient security measures that result in incarcerated persons' unfettered access to contraband, and
- Uncontrolled gang activity.

These systemic failures result in an environment rife with weapons, drugs, gang violence, and extortion.  Both individually and in their totality, these systemic conditions cause incarcerated persons serious harm and pose a substantial, unreasonable risk of continued serious harm.  MDOC officials have long known about these unsafe prison conditions, but have continually failed to correct the conditions.

---

[8] *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

[9] *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998).

[10] *Trop v. Dulles,* 356 U.S. 86, 101 (1958); *see also Wilson v. Lynaugh*, 878 F.2d 846, 848 (5th Cir. 1989).

[11] *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986) (citing *Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir. 1982)).

[12] *Farmer*, 511 U.S. at 834.

[13] *Farmer*, 511 U.S. at 842; *see also Blackmon v. Garza*, 484 F. App'x 866, 873 (5th Cir. 2012).

[14] *Farmer*, 511 U.S. at 837; *accord Williams v. Hampton*, 797 F.3d 276, 280–82 (5th Cir. 2015) (en banc).

[15] *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (quoting *Wilson,*, 501 U.S. at 304).

1.   <u>MDOC Does Not Provide Reasonable Safety from Widespread Violence.</u>

Violence against incarcerated persons runs rampant through Parchman.  Pursuant to the Eighth Amendment, "[p]rison officials 'have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates.'"[16]  The Constitution does not mandate that prison officials prevent all violence in prisons.[17]  But after "having stripped [incarcerated persons] of virtually every means of self-protection and foreclosed their access to outside aid," prison "officials are not free to let the state of nature take its course."[18]  Rather, the Eighth Amendment imposes a duty on prison officials to "'take reasonable measures to guarantee the safety of the inmates.'"[19]  Thus, the "failure to control or separate prisoners who endanger the physical safety of other prisoners can constitute cruel and unusual punishment."[20]

Despite this constitutional duty, MDOC allows widespread violence to occur at Parchman.  This includes at least four known homicides in 2019, followed by six known homicides in 2020.  Three of the 2020 homicides occurred in a single week in early January, where one incarcerated person suffered 89 stab wounds, a second incarcerated person similarly suffered 75 stab wounds, and a third incarcerated individual died from strangulation.

Beyond the number of homicides, the violence at Parchman includes a high number of assaults of incarcerated persons by other incarcerated persons.  We tallied more than 100 documented assaults at Parchman from 2018 through May 2020.  Of those non-deadly assaults, more than 25—approximately 25%—involved stabbings.  Given the lack of supervision at Parchman, it is likely there are many more undocumented assaults.

The documented homicides and overall level of widespread violence show that MDOC has been on notice that its lack of staffing, poor supervision, untimely response to serious incidents, inadequate investigations, and other failures are subjecting incarcerated persons to serious harm and a substantial, unreasonable risk of harm from violence.[21]  Although we document many examples of the violent homicides and assaults in this report, we highlight one recent homicide here as it illustrates many of the systemic problems at Parchman.

---

[16] *Williams v. Banks*, 956 F.3d 808, 811 (5th Cir. 2020) (quoting *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006)); *accord Stokes v. Delcambre*, 710 F.2d 1120, 1124 (5th Cir 1983) ("All jailers owe a constitutional rooted duty to their prisoners to provide them reasonable protection from injury at the hands of their fellow prisoners.").

[17] *Adames v. Perez,* 331 F.3d 508, 512 (5th Cir. 2003); *accord Farmer*, 511 U.S. at 834.

[18] *Farmer*, 511 U.S. at 833.

[19] *Farmer*, 511 U.S. at 832–33 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).

[20] *Stokes v. Delcambre*, 710 F.2d 1120, 1124 (5th Cir 1983) (citing *Jones v. Diamond*, 636 F.2d 1364, 1374 (5th Cir.1981), *overruled on other grounds by Int'l Woodworkers of Am., AFL-CIO & its Loc. No. 5-376 v. Champion Int'l Corp.*, 790 F.2d 1174, 1175 (5th Cir. 1986) (en banc) (regarding federal diversity jurisdiction)).

[21] *See Farmer*, 511 U.S. at 842–43 (finding that evidence that a risk of attacks by incarcerated persons was "longstanding, pervasive, [or] well-documented" supports a conclusion that prison officials had actual knowledge of the risk).

In October 2020, several incarcerated individuals stabbed another incarcerated individual to death in the shower area of Unit 30. The sole correctional officer assigned to watch the approximately 180 incarcerated persons in that area did not observe any signs of disturbance from her position in a tower removed from the floor. Approximately three hours after the stabbing, an incarcerated person alerted the officer that another incarcerated person needed help, and she called for backup. When help arrived, they found the victim unresponsive, and he was pronounced dead a few minutes later.

MDOC's investigating entity, the Correctional Investigations Division (CID), interviewed several incarcerated persons, two staff, and reviewed video surveillance. Video confirmed that three incarcerated individuals met, followed the victim into the shower, and were all involved in the stabbing. They stabbed him at least 12 times. The officer on duty admitted that she did not know about the incident until three hours after it occurred. She said she conducted only visual counts from the tower and did not physically go into the housing unit. A supervisor relayed that the last time any staff entered the housing unit was approximately 5.5 hours before staff recovered the stabbing victim, which occurred only after another incarcerated person alerted them to the problem. One incarcerated person reported to CID that the stabbing was gang related. The CID report concludes that the three aggressors stabbed the victim, and that staff failed to supervise the unit "due to being short on staff." The investigation report, however, does not investigate the alleged gang cause or take any interest in what happened to the apparently unrecovered weapon.

This homicide demonstrates MDOC's dearth of staffing and the resulting lack of supervision that essentially leaves individuals incarcerated at Parchman on their own. It further demonstrates how MDOC's cursory investigations fail to address the underlying causes for violence, such as gang activity, or the location of the weapon after the incident to prevent future violence. Finally, the incident shows how contraband, here a shank (an object sharpened into a makeshift knife) used to inflict the fatal wounds, perpetuates serious harm.

2.   <u>MDOC Fails to Provide Adequate Supervision.</u>

MDOC subjects individuals incarcerated at Parchman to serious harm and an unreasonable risk of serious harm through grossly insufficient levels of security staff that result in lack of supervision and control. MDOC has known about this understaffing and left it unremedied for years.

a.   *MDOC's Statistics Demonstrate Deficient Staffing.*

MDOC documents show a significant staff vacancy rate that is on the rise:

### Mississippi State Penitentiary
### Staff Vacancy Rate

| All Positions | Vacancy Rate |
|---|---|
| February 2018 | 43.1% |
| February 2019 | 38.9% |
| February 2020 | 47.0% |

| Security Positions* | Vacancy Rate |
|---|---|
| February 2018 | 47.5% |
| February 2019 | 43.4% |
| February 2020 | 53.5% |

| Correctional Officers | Vacancy Rate |
|---|---|
| February 2018 | 47.6% |
| February 2019 | 43.2% |
| February 2020 | 52.9% |

*Security Positions include the following classifications:  CORR-Inmate Locator; Correctional Officer Trainee, I, II, III, & IV; CORR-Correctional Supervisor (Lieutenant); CORR-Correctional Commander (Captain); CORR-Deputy Warden; Correctional Warden; and Special Staff, Chief (Chief of Security)

A May 2021 staffing report shows 206 correctional officer positions filled out of 417 positions for a vacancy rate above 50%.  MDOC recently commissioned an outside staffing analysis that confirms the massive vacancy rates.[22]  The external study suggests a need to increase authorized correctional officers from 417 to 502, which would put Parchman at a 59% vacancy rate.  Although MDOC has made some efforts recently to recruit and hire more staff, Parchman has been operating with roughly half the needed staff since at least 2018.  This demonstrates MDOC's indifference to instituting reasonable remedies to address Parchman's supervision crisis.

---

[22] Because the staffing analysis does not provide details for its methodology, we cannot confirm its thoroughness and veracity.

*b.   MDOC's Deficient Staffing Results in Systemic Supervision Failures.*

Because of these deficient staffing levels, MDOC fails to staff critical posts and ensure performance of basic security functions resulting in inadequate supervision of incarcerated persons.  Parchman's barebones staff have little physical presence inside dormitories and other housing units.  MDOC generally does not station correctional officers on the actual floors with incarcerated persons.  Instead, officers almost exclusively supervise housing units from removed towers that overlook the units.  Staff in towers cannot fully observe the incarcerated population, and camera surveillance, if any, on the units is inadequate to allow proper supervision.  From December 2019 through April 2020, Parchman Monthly Reports list the same unaddressed problem:  "Install cameras in each unit (vendor estimate sought) are needed ASAP."  Although staff indicated that Parchman recently installed some new cameras, and MDOC produced a summary list of new cameras, MDOC has not produced sufficient evidence to confirm that those cameras provide minimally-necessary coverage or are being appropriately utilized.

Officers do not physically walk though housing units with any regular frequency and do not follow MDOC policy requiring "security patrols" of housing units.  MDOC Policy requires that correctional officers walk through housing units every 30 minutes for the "expressed purpose of enforcing security protocols, detecting aberrant offender behavior and preventing events that are a threat to the safety and security of a facility, its staff and its offender population."  Regular security patrols are also required by accepted correctional practice.  Yet, Parchman supervisory staff admitted that line officers generally do not make these required patrols.  Staff shortages—compounded by officers not showing up to work—mean that there are not enough officers to patrol all housing areas.  The few officers who do make their shifts are confined in the tower or control room of each housing area and do not conduct patrols or offender headcounts for fear of personal safety.  Thus, supervisors perform any security patrols or counts.  Supervisors admitted they cannot possibly conduct hourly security patrols of each area; sometimes they cannot conduct patrols even once per 12-hour shift.  Indeed, one supervisor calculated she would need two shifts to perform a single security patrol of each of her assigned housing unit.  Consequently, housing areas in Parchman routinely go unsupervised, resulting in a dangerous environment.

As noted above, supervising Parchman housing units solely from the towers is insufficient, yet MDOC takes it a step further and sometimes fails to staff the towers at all.  For example, in June 2019, an incarcerated person was stabbed 16 times in the back and twice in the head in Parchman's Unit 29.  At the time of the attack, there was only one officer in the entire building and the security tower was not being staffed.  The victim relayed that the "hit" was gang-related, but refused to identify his attackers because they were "his [gang] brothers."  CID closed its investigation because of lack of witnesses to the incident.

The following January 2020 homicides illustrate the risk of serious harm from the lack of supervision on the housing units:

- On January 21, 2020, the Sunflower County Sheriff's Department telephoned a Parchman security supervisor to relay that they had received reports that an incarcerated individual in Unit 30 had been stabbed.  This outside call prompted the Parchman supervisor to request "welfare checks" on the Unit, which began approximately 30 minutes later.  They

discovered that two incarcerated persons had been assaulted and required an ambulance. One of the victims relayed to staff that the fight occurred approximately 12 hours before he was discovered. He died later that morning from blunt force trauma that included multiple injuries to his torso, rib fractures, and cranial fractures. MDOC has not provided a CID investigation report of the homicide.

- Another homicide occurred *in the same unit and building just a few hours later*. A correctional officer reported "some strange activities" and staff then conducted "security welfare checks" on all incarcerated individuals. They found a man lying motionless in bed. They left to call an ambulance but the inoperable phone in the building delayed the call. Medical staff eventually arrived at the unit and pronounced him dead. The autopsy ruled the death a homicide by blunt force trauma to the victim's head, neck, and body, with multiple rib fractures. MDOC has not provided a CID investigation report of this homicide.

A trainee officer working that same unit and building offered the following statement:

> [We] was just sitting around talking and every so often we would check and see if anything going on that shouldn't and it was clear. If anything happen on while we was there on duty we didn't know because they have so many blind spots on the zone and its very dark. From the time I made it to B Building 0936 hours to the time I left like at 0812 [sic] hours that night I didn't do a certified count [another officer] did but it was only a walk through. [The other trainee] left because at 5 that evening was her regular time to leave and [another correctional officer] arrived stating once again to make sure the doors are locked and etc. Which they already was. So I asked her was she gone count she said no because I know I wasn't going out on the zone by myself to count after so much that has been going on …

These homicides confirm the lack of visibility that prevents adequate supervision from outside the units, staff's general fear and unwillingness to enter the units, delays in response to critical incidents occurring on the housing units, and—incredibly—that incarcerated persons seemingly believe it is necessary to contact people outside the facility to get help.

Staff fears are well-founded. We tallied more than 30 assaults on staff from January 2018 through May 2020, which confirms that Parchman is a dangerous facility for staff as well as incarcerated persons. A CID supervisor confirmed during our interview that staff will sometimes "turn their back" to violence between incarcerated persons. Multiple interviewed supervisory officers relayed that lack of staff coverage causes officers to feel unsafe. Moreover, MDOC does not supply officers with personal safety emergency alarms to alert for help when necessary, or provide radios to all security staff.

Even when staff do observe an assault or emergency issue, the lack of available staff often prevents MDOC from responding effectively to critical incidents of harm. For example, in November 2019, a trainee officer noticed an altercation in Unit 30 and called for assistance. Approximately 20 minutes later, backup arrived and officers entered the unit to discover a person had been stabbed. They called for emergency medical staff, who arrived approximately 35

11

minutes after staff first noticed the altercation.  Although the victim was alive when medical staff arrived, he was bleeding profusely and gasping for air in the ambulance.  By the time he arrived at Parchman's medical facility, the victim had stopped breathing and had no pulse.  He died of his stab wounds.

Supervisory staff relayed that if an incident occurs in the unit, the correctional officer in the tower can make an "all available" call for assistance.  Due to the staffing shortage, typically only supervisory staff are available to respond, and if they do respond, they must divert attention from their normal duties.  While this "all available" method is not unusual in corrections, draining coverage from already understaffed areas leaves individuals incarcerated at Parchman extremely vulnerable to harm.  Indeed, as the January 2020 rioting illustrated, Parchman's staffing is not sufficient to address one incident much less multiple, simultaneous incidents.

Individuals incarcerated at Parchman resort to drastic measures to receive help due to the lack of available staff.  For example:

- In January 2020, a person incarcerated on Unit 29 set a fire inside his cell to get staff's attention after he had been stabbed by a gang member.  Officers responded to the fire, but were unable to extinguish it immediately because the cell key hole was jammed.  When officers finally opened the cell, they found the victim had been stabbed multiple times in the upper arm.  MDOC has not provided a CID investigation report of this incident.

- In June 2019, an incarcerated person punched an officer from behind during lunch on Unit 30.  Upon interview, the individual  relayed that several other incarcerated persons had assaulted him the previous night, but that he did not fight back against his attackers because they would have "stabbed him down."  He further admitted that he attacked the officer because, in contrast to the incarcerated persons who previously assaulted him, the officer did not have a knife and the individual could get medical attention by attacking the officer.  MDOC has not provided a CID investigation report of this incident.

Officers' physical presence on the units and interaction with the incarcerated population is vital to keeping people safe.  Sufficient staff must be present to adequately supervise incarcerated persons, complete security routines, respond to emergencies, and deescalate tension and problems.  Regular interaction with the incarcerated population helps staff and those in their custody develop a rapport, which helps staff acquire intelligence about problematic individuals, gangs, contraband, and potential impending harm.  Most importantly, staff presence in the housing units serves as a visual reminder of authority and security that deters misconduct.

The lack of supervision and staff presence on Parchman housing units creates an authority vacuum—where individuals incarcerated at Parchman rather than staff control the day-to-day operations of the units.[23]  As evidence of this absence of authority, persons confined to Parchman have openly defied contraband restrictions, posting photos of themselves on social

---

[23] *Cf. Farmer*, 511 U.S. at 833 (Prison officials are "not free to let the state of nature take its course.").

media,[24] or posting photos and videos of decrepit conditions in a cry for help.[25]  Unless MDOC institutes effective, necessary remedies to alleviate Parchman's staffing and supervision crises, staff and incarcerated persons will remain at an unreasonable risk of serious harm.

### 3.   MDOC Fails to Investigate Serious Incidents of Harm.

MDOC does not effectively investigate and then remedy dangerous activity inside Parchman.  Indeed, MDOC does not even investigate many reported incidents of harm and misconduct including, but not limited to, assaults by incarcerated persons on other incarcerated persons, contraband, gang activity, and other incidents of serious harm.  When MDOC does investigate, it performs cursory reviews that at best merely document what reportedly happened without identifying underlying causes and corrective action.  Without adequate investigations, MDOC cannot determine the factors that enable these security failures to persist or take the corrective actions necessary to remedy them.  MDOC's failure to investigate harm and misconduct to identify their underlying causes or implement corrective action demonstrates MDOC's deliberate indifference to serious harm and to the unreasonable risk of serious harm to incarcerated persons.

#### a.   Serious Incidents with No Investigation

We found that MDOC fails to investigate many reported incidents of harm and misconduct.  MDOC assigns investigations to CID, which has a central office as well as investigators assigned to specific prisons.  MDOC policy states the CID's overall role is "to provide the Commissioner with information pertaining to administrative and/or criminal investigations of employees, offenders or other individuals . . . and to conduct on-site MDOC facility inspections."  The policy explains that "any MDOC employee may report an incident" to CID, but staff referrals to CID for investigations appear to be discretionary.  We found no other standard directing when and under what criteria Parchman staff should refer incidents to CID.

MDOC policy states that CID screens complaints based on criteria that includes potential criminal charges, policy/procedure violations, and the "seriousness of the allegations."  The policy regarding what CID chooses to investigate is vague, but appears to require CID to investigative serious harm and misconduct, as well as misdemeanor type assaults that do not result in serious injuries as well as staff policy/procedure violations that could lead to administrative action.

---

[24] *See* WBLT, *Inmates on Social Media: Now It's Easy to Report Them* (last updated Nov. 3, 2015), https://www.wlbt.com/story/30412932/inmates-on-social-media-now-you-can-report-the-prohibited-hook-up/.

[25] *See* WTVA *Gangs, Guards and Contraband Inside State Prisons* (last updated June 28, 2021), https://www.wtva.com/content/news/Gangs-guards-and-contraband-inside-MS-prisons-568725311.html; CNN, *Mississippi Inmates Call Infamous Prison Unit Slated for Closure 'a death trap'* (last updated Feb. 4, 2020), https://www.cnn.com/2020/02/04/us/mississippi-parchman-prison-close-death-trap/index.html; NYTimes.com, *'Please Try to Help Us': Conversing with Mississippi Inmates on a Contraband Phone* (Jan. 16, 2020), https://www.nytimes.com/2020/01/16/us/mississippi-prison-cellphones.html.

Despite this policy, we found numerous serious incidents that CID failed to investigate. Most troubling, of the 100 assaults on individuals incarcerated at Parchman noted above, MDOC produced only 24 corresponding CID investigations in response to our requests. Below are examples of assaults, gang activity, large contraband finds, and other harm with no corresponding CID investigation:

- In December 2019, a "gang riot" occurred in Unit 29. The incident report confirms that the officer in the tower, who did not intervene herself, called for "all available" staff to respond. Staff responded approximately 13 minutes later. Six incarcerated persons suffered multiple stab wounds and needed transport to Parchman's medical unit. Despite the acknowledged gang activity and multiple stabbings, MDOC has not provided a CID investigation report of this incident to date.

- In August 2019, an individual incarcerated at Parchman reported to staff that he feared for his life after at least two incarcerated individuals had attacked him multiple times over the course of a week. Staff observed bruising around his eye, as well as indications of bruising, both old and new, on his body. The victim received medical treatment and was reassigned to another housing unit. The CID did not conduct an investigation, however, to determine whether or how incarcerated individuals were able to assault the victim repeatedly over the course of a week without staff intervention.

- In August 2019, staff found an incarcerated individual trying to hide a cell phone in his pillow, and sent the phone to CID. On December 2, 2019, staff searched that same Unit and found the same individual with a cell phone concealed in his TV, two other individuals with cell phones in their TVs, and stashes of tobacco, cell phone chargers, and spice[26] in the common area. CID received the contraband, but did not investigate. CID did not conduct an investigation into how or from whom the incarcerated individuals acquired the contraband despite multiple incarcerated persons being involved with cell phones, cell phone chargers and equipment, banned tobacco, and synthetic drugs. Not to mention, the same individual was caught with a cell phone a second time only a few months later.

- In August 2019, staff searched the Unit 30 kitchen. The incident report counts finding "(55 [] lbs) tobacco, (47) cans of snuff, (26) lighters, (4) books of TOP papers,[27] (4) glass pipes, (2) toothbrushes, (1) small bottle of sanitizer, (2) locks, (1) digital scale, (1) bag of rubber bands, (9) cell phones, (39) charger (wire), (8) Bluetooth device, (12) earpieces, (11) charger heads, (1) earbud, (4) earbud cases, (47) bottles of clear alcohol, (2) bottles of MO JO shots,[28] (1) brick of marijuana, (1) large pack of marijuana, (10) large packs of spice, (4) medium packs of spice, (4) small packs marijuana, (28) white pills, [and] (4)

---

[26] Spice and K2 are street names for synthetic marijuana or synthetic cannabinoids.

[27] TOP is a brand of cigarette rolling paper often used for smoking tobacco, marijuana, or other substances.

[28] MOJO Shots are a type of ready-to-serve shooter with a high alcohol by volume (ABV) percentage.

scan disc." Staff referred the contraband to CID, but CID did not conduct an investigation into who was responsible or how these large quantities of drugs, alcohol, and other contraband entered the facility.



Contraband recovered from the Unit 30 Kitchen

- In June 2019, staff conducted a "random" search of ten incarcerated persons and the common area in Unit 29 Building A. The incident report states one individual possessed "(2) books of top paper, (4) medium packs of marijuana, (4) small packs of spice, (1) digital scale, (3) chargers, (1) cell phone and (8) pair of ear bu[d]s." Another incarcerated person possessed "(3) shanks and (1) free world knife." A third person possessed "(2) cell phones, (1) ear buds, (7) medium packs of tobacco and (2) lighters."

15

The search of the common area revealed "(9) packs of marijuana, (2) small pack of spice and (9) small packs of crystal meth." The report indicates all contraband went to CID. CID conducted no investigation, into how and from whom theses incarcerated individuals obtained the weapons—including a "free world knife," drugs, cellphones, and other contraband. Nor did MDOC conduct any investigation into the likely dealing of contraband, despite that the search uncovered a digital scale.

MDOC's failure to even investigate incidents of serious harm, contraband discoveries, and potential misconduct constitutes deliberate indifference to serious harm and exhibits an unreasonable risk of harm to individuals incarcerated at Parchman.

### b.   Cursory Investigations Fail to Identify and Investigate Underlying Causes.

To the extent CID opens an investigation, the investigation is not conducted in a meaningful and thorough manner. CID's investigations do not consider the root causes of the incidents—such as underlying gang activity, contraband sources, and potential staff failures—and interconnections between incidents. The failure to properly investigate assaults, staff delinquency, large contraband finds, gang activity, and other security related incidents enables violence and harm to persist.

MDOC's policy requires that CID investigation reports summarize not only the "[w]ho, what, when, [and] where" but also the "how and why" for incidents, and give potential "[r]esolutions for corrective measures." Yet CID reports and memoranda generally document little investigating, but rather compile various statements into simple incident reports. Supervisory staff confirmed CID is tasked with investigating the underlying causes behind incidents, looking at patterns, or making recommendations for corrective action. A CID supervisor relayed that Parchman CID's caseload was too heavy and staff too overworked to conduct comprehensive interviews and look at underlying causes. Examples of substandard CID investigations include the three homicides and other incidents summarized below:

- On November 19, 2019, a person incarcerated at Parchman stabbed another incarcerated individual to death. An officer observed the stabbing victim bleeding profusely, and the victim requested help. Rather than immediately intervene, the officer called for help. When help arrived, they transferred the victim by ambulance to Parchman's medical unit. The CID investigation report confirms the victim's death, but does not relay when or where he died. CID interviewed no staff, but rather relied on two officer incident reports and a single interview of the incarcerated individual alleged to have committed the attack. The CID report of that one recorded interview relays that the suspect denied knowing anything about the assault—but contains a bizarre side "note" stating that the suspect admitted to the stabbing in some other unrecorded verbal statement, and that the suspect possessed a shank. Based on this, the report concludes he stabbed the victim. The staff incident reports do not name an attacker. The CID report never investigates why the stabbing occurred, how the alleged attacker acquired the shank, or if staff handled the incident appropriately. Additionally, CID took seven months to complete the investigation.

16

- On November 12, 2019—just a week before the above stabbing incident—another person incarcerated at Parchman was stabbed to death. A trainee officer noticed an altercation and called for help, which arrived approximately 20 minutes later. The victim died before reaching the Parchman medical facility. The CID investigation determined that a single incarcerated individual perpetrated the stabbing and flushed the weapon down the toilet. But the CID report also acknowledges that several others took part in the fight, that multiple persons involved were drunk or high on drugs, and that the incident seemingly involved the victim owing $40 to an involved individual who was not the person who stabbed him. The CID report does not investigate how the incarcerated individuals acquired the contraband, or if the multi-person altercation involving a debt related to gang activity. Even more problematic, the CID report indicates no staff interviews for this homicide, but rather relies on a single written incident report by the trainee officer. The report also fails to make an inquiry into whether officers were appropriately monitoring the unit or whether they should have intervened earlier.

- In August 2019, one person incarcerated at Parchman strangled his cellmate to death using a bed sheet. The CID report compiles witness statements, and relays that an officer heard a disturbance, radioed for another officer, and the two then investigated the disturbance. They found the alleged aggressor standing in the cell with the victim, who lay face down, not moving, with his arm in the toilet and cloth around his neck. The alleged aggressor told the responding officers that the two had been fighting and that he "killed him." During a CID interview, he stated that the two had always had problems, they got into an argument, that the victim tried to choke him first, and he responded to protect himself. CID concluded that the suspect killed his cellmate and referred the case to the district attorney. CID, however, made no inquiry into whether staff were on notice of the "problems" between the cellmates, whether either ever requested a cell change, or whether staff appropriately assigned them to the same cell. Nor did CID investigate whether the first officer should have intervened sooner or if officer delay potentially contributed to the death.

- In March 2020, several staff carpooling to their posts noticed three bags next to the stop sign near the Parchman Archive Building. A CID memorandum notes that the bags contained contraband and staff sent them to the crime lab for testing. The one-page memorandum closes the investigation because the crime lab results yielded "nothing that could identify a suspect" and there were no witnesses. The CID report does not identify what the contraband was, or note any effort to identify or interview potential witnesses— such as the staff posted at the Archive Building.

- In June 2019, an individual incarcerated at Parchman suffered 15 stab wounds. The observing officer who first reported the incident named three particular individuals as the attackers. CID interviewed the victim, who indicated he was he was a gang member and the attack was possibly gang related. He further stated that he was attacked from behind, and did not see anyone because "he was covering up while he was getting kick[ed] and stabbed." After the victim stated that the three persons whom the officer identified were not his attackers, CID closed the investigation. Despite potential gang activity and

17

multiple stab wounds, the two short interviews of the officer and victim appear to comprise the entire investigation.

- In May 2019, staff conducted a cell inspection of an individual who had been housed in restrictive housing in a single-person cell since March 5, 2019. The CID investigation notes that the incarcerated individual had 41 packets of marijuana, 8 packets of suspected spice, 2 cell phones, and other contraband, and that the individual had a history of contraband possession. Yet, the CID report contains no inquiry into how or from whom this individual obtained drugs and a cell phone while in restrictive housing.

MDOC fails to perform meaningful and thorough investigations of serious incidents that include homicides, large contraband discoveries, assaults and multi-inmate fights, gang activity, and potential staff failures. The cursory actions by CID also fail to investigate the underlying causes and interconnections among incidents. This deliberate indifference enables serious harm and risk of serious harm to persist.

4. MDOC Fails to Control Dangerous Contraband.

MDOC subjects persons incarcerated at Parchman to serious harm and unreasonable risk of serious harm by failing to prevent massive amounts of dangerous contraband from entering and moving throughout the facility. The Constitution requires that MDOC officials adequately monitor incarcerated individuals and confiscate weapons and other dangerous contraband to ensure incarcerated individuals' health and safety.[29] Yet in Parchman, dangerous contraband is ubiquitous, and includes weapons, drugs, and cell phones. The sheer volume of evidence summarized below show a vibrant underground contraband market. This market fosters violence used to control the contraband market, with gangs and extortion.

MDOC's knowledge of the contraband problem is well-documented:

---

[29] *Hudson v. Palmer*, 468 U.S. 517, 527 (1984) (Prison officials "must prevent, so far as possible, the flow of illicit weapons into the prison.").

## MSP

## MONTHLY CONTRABAND REPORT

### December 2019 thru May 12, 2020

| CONTRABAND | DEC 2019 | JAN 2020 | FEB 2020 | MAR 2020 | APR 2020 | MAY 2020 |
|---|---|---|---|---|---|---|
| CELLPHONES | 13 | 143 | 144 | 188 | 85 | 57 |
| SHANKS | 25 | 232 | 31 | 207 | 37 | 23 |
| ALCOHOL | (46) ½ PINTS | (8) ½ PINTS 2 GAL BUCK | (18) ½ PINTS | (25) ½ PINTS | (8) ½ PINTS 2 LITERS BUCK | (13) ½ PINTS (1) FIFTH (2) LIT VODKA |
| TOBACCO | 8 lbs. | 17 lbs. | 2 lbs. | 120 lbs. | 192.2 lbs. | 9.48 lbs. |
| MARIJUANA | .5 oz. | 2.6 oz. | 4.1 oz. | 6 lbs. | 16.5 oz. | 2.1 oz. |
| SPICE | 1.5 oz. | 3.5 oz. | 2.3 oz. | 17 oz. | 10 oz. | 1.3 oz. |
| ICE | 0 | 2.3 oz. | 0 | 0 | 0 | 0 |
| METH | .3 oz. | 2.5 oz. | .4 oz. | 0 | .6 oz. | .5 oz. |
| PILLS | 15 | 53 | 50 | 100 | 104 | 2 |
| OTHER: | | | | | | |
| OTHER: | | | | | | |
| OTHER: | | | | | | |

The 555 "shanks" recovered in fewer than six months include commercially manufactured "free-world" weapons that Parchman staff and others smuggle into the facility. Access to weapons facilitates homicides and assaults, and increases the severity of the resulting harm. Half of the 10 confirmed homicides at Parchman between July 2019 and October 2020, involved stabbings.

In addition to homicides, we identified at least 25 other non-deadly assault incidents where MDOC reported incarcerated individuals used contraband weapons to stab other incarcerated individuals. The following examples highlight how weapons inside Parchman exacerbate an already violent environment:

- In January 2020, an incarcerated person was stabbed multiple times throughout his body while showering. The severity of his injuries required Parchman to airlift him to a hospital in Jackson, Mississippi. Although staff conducted a shakedown following the incident, they were unable to recover the weapon used. The officer who was monitoring the showers at the time of the attack received a disciplinary action "for conducting showers after being told not [to] do so."

- In August 2019, two incarcerated individuals got into a physical altercation involving a homemade shank following a disagreement in the dayroom of their unit. One person suffered multiple stab wounds to his chest, wrist, and back. According to the CID

investigation report, the individuals were housed on opposite tiers and staff should never have let them out of their cells in the dayroom at the same time.

Incarcerated individuals' access to other types of contraband also poses a risk of serious harm.  For example:

- In March 2020, an incarcerated individual broke out of his cell and attacked another incarcerated individual with a broom stick.  Both men were seen by medical staff.  MDOC conducted no investigation to determine how the attacker was able to break out of his cell.

- In October 2019, several incarcerated persons beat an incarcerated person with brooms and locks inside socks.  Staff found the victim with blood covering his clothing, and the victim suffered injuries to his head and body.

- In May 2018, incarcerated persons alerted a correctional officer trainee that another incarcerated person appeared to be deceased in his cell.  Emergency medical staff arrived and transported him to the medical unit, where he was later pronounced dead.  The final pathology report concluded that the cause of death was accidental by overdose on methamphetamines.

Shakedowns routinely recover large quantities of contraband.  Just a few examples include:

- In April 2020, staff randomly searched one building of Unit 29.  According to the report, they found "One (1) Black ZTE cell phone," "One (1) Alcatel Cell Phone," " "One (1) phone battery," "One (1) Nokia cell phone," "One (1) Samsung cell phone," "Two (2) Surge Protectors," "One (1) Phone Cover Back," "Two (2) Black Doo-Rags," "Four (4) pieces of Cable Wire," "Five (5) Altered Phone Chargers," "One (1) Ear Bud," "Three (3) Altered Charger Outlets," "Three (3) Pieces Of Metal," " Eleven (11) Homemade Shanks," and "One (1) Free World Knife."

- In November 2019, staff conducted a random search of one building of Unit 30.  According to the report, they found [for 107 incarcerated persons] "(25) Cellular Phones, (1) Digital Scale, (7) Pair of Earbuds, (3) Bluetooth Devices, (23) Chargers, (11) Can of Kayak (Snuff), (4) Small Bottles of Gin, (14) Small Bottle of Vodka, (1) Large Pack of Tobacco, (1) Bottle of green Alcohol, (14) Du-rags, (32) Black & Mild Cigars, (2) Books of Top Papers, (8) Lighters, (1) Medium Pack of Spice, (1) Box Cutter, (2) Packs of Pills, (8) Shanks, (2) Pair of Clippers, (1) Vapor, (29) Medium Packs of Tobacco and (1) George Forman Grill."

- In July 2019, just a few months earlier than the preceding incident, staff conducted a shake down of four buildings of Unit 30.  According to the report, they found in the common areas " (2) scales, (26) cellphones, (1) Wi-Fi device, (9) cellphone batteries, (2) tablets, (1) free-world knife, (2) Scan Disc, (1) lighter, (30) medium packs of tobacco,

(22) Black & Mild Cigars, (1) free-world water bottle, (18) Large bags of tobacco 18 lbs., (4) medium pack of crystal methamphetamine, (3) medium pack of pills, (5) Quarts of alcohol substance, (24) Pints Ever clear alcohol, (1) Quart of clear alcohol, (31) medium packs of marijuana, (29) swisher sweet cigars, (22) mini cigars, (16) Boxes Black & Mild cigars, (20) Boxes Black Stone cigars, (52) books TOP papers, (41) pair ear buds, (27) chargers w/cards, (2) shanks, (13) medium pack of spice."  Separately, on a single incarcerated individual they found "(5) cell phones, (1) digital scale, (1) hand scale, (4) ear pieces, [and] (4) chargers."

Despite referrals to CID and the amount of contraband involved, we found no CID investigations for these contraband incidents, or any other document indicating any investigation or inquiry into how or from whom the incarcerated individuals acquired these huge amounts of contraband.  The current shakedowns are haphazard and ineffective at thwarting incarcerated persons from continuing to secure huge amounts of weapons, drugs, phones and other dangerous contraband.  The strategy is akin to scooping out water from a sinking boat full of holes, rather than plugging the leaks.

Parchman's Superintendent identified drugs and cell phones as the two biggest contraband problems at Parchman.  A K-9 supervisor estimated that 50% of searches uncovered drugs and cell phones.  Staff found 630 contraband cell phones in under six months in in early 2020.  The market trade for drugs is so pervasive that staff found at least 15 scales that incarcerated persons use to weigh drugs in 2019.  This included seven digital scales, which are rarely heard of in prisons.

The sheer magnitude of contraband  points to staff involvement.  And MDOC is aware that some staff facilitate contraband within Parchman.  Out of the 26 total Parchman staff disciplinary actions from January 2019 through March 2021, 19 staff were disciplined for contraband and another for gang activity.  Many were terminated, but five were only suspended and one was only reprimanded.  The following examples signal the extent of staff involvement:

- In November 2019, an officer who had worked at Parchman for ten years was spotted in a car with the lights off at one of the Parchman trash dumpsters.  The officer attempted to hide $1600 cash in his pocket.  According to the report, two large duffle bags behind the dumpster contained "(49) Large Bag of Tobacco, (25) Bottles of clear Alcohol, (1) pair of Clippers, [and] (1) Tube Clipper oil."

- In March 2019, a lieutenant was found to have brought in over 100 cellphones along with tobacco, Spice, pills, MDMA, marijuana, and methamphetamine.  Another officer, who was a cousin of an incarcerated person, recruited the lieutenant to move contraband.

During our interviews, multiple supervisory staff acknowledged the extensive contraband problem, and even confirmed that corrupt staff accounted for some of the contraband entry.  A CID supervisor characterized "compromised staff" as a "consistent problem" leading to contraband in Parchman.

Despite knowingly operating a porous facility, MDOC actions exhibit deliberate indifference to alleviating the problem by failing to institute effective, comprehensive remedies to stem the contraband flow through Parchman.  For example, the consistent high levels of

21

contraband should cause MDOC to increase the required searches of incarcerated persons when they move about the facility.  Yet supervisor staff interviews revealed that staff shortages prevented some already purportedly "required" pat frisks of incarcerated persons, even though they believe that "trustee" individuals allowed to circulate among cell units are likely the primary transmission conduits for contraband.  Supervisors also acknowledged that some staff assigned to conduct pat searches are "compromised" and more searches on staff should occur.

The amount of shanks, cell phones, and other metallic contraband should cause MDOC to increase the use of metal detectors throughout the prison.  Former MDOC Commissioner Pelicia Hall publicly acknowledged in early 2020 that cell phone contraband was "instrumental in escalating the violence" at Parchman.  Yet we found no discernable systematic use of metal detectors or wands inside the various housing units and staff areas of Parchman.

Indeed, from December 2019 through April 2020, Parchman's Monthly Reports list the same problem—that the Body Scanner, Bag Scanner, & Body Orifice Security Scanner Chair were "inoperable-to be repaired by maintenance."  Those same reports also consistently acknowledged the unaddressed "Cellphone epidemic.  Suggested solution:  Expedite the plan to implement cellphone interception devices to nullify the possibility of offenders utilizing cellphones."

Finally, as detailed above, MDOC's failure to investigate contraband discoveries represents a continuous missed opportunity to understand how contraband is introduced into the facility, and deliberate indifference to instituting corrective action to curb future occurrences.  Overall, MDOC appears to tolerate large amounts of dangerous contraband as part of prison life.  Until MDOC institutes a comprehensive plan and sustained practices to reduce the introduction of contraband, MDOC will continue to subject persons incarcerated at Parchman to serious harm and an unreasonable risk of harm.

5. <u>MDOC Fails to Control Gang Activity and Violence Spurred by the Black Market for Contraband.</u>

Parchman's underground economy for contraband results in dangerous competition for control of the black market.  Indeed, gangs derive their power and influence through their ability to obtain and distribute contraband.  Gangs use violence and extortion to collect debts and to intimidate and control the life of the prison.  MDOC's deliberate indifference to gang activity and extortion at Parchman causes serious harm and an unreasonable risk of harm to incarcerated persons.

MDOC knows that gangs and gang activity pervade Parchman and its thriving contraband market.  During our interviews, a CID supervisor confirmed gang involvement in the "underground economy."  A CID investigator described gangs as "widespread" and "everywhere" in both Parchman and the MDOC prison system.  An area warden similarly characterized gangs as a "big problem," and relayed that gangs assert their power and control the units through illegal substances and "marketplace control."  That warden also stated that increased staff would help control gangs, and that some staff collaborate with gangs.  A CID supervisor stated gangs derive their power from money and the underground market, gangs control drug introduction, and staff get compromised by gangs offering money.  Supervisory

staff also acknowledged that staff likely feel intimidated by the gangs.  Even worse, some staff are affiliated with gangs.  For example, Parchman terminated a correctional officer for gang activity as recently as March 2021.

Gang members routinely attack other incarcerated persons.  Indeed, the deadly riots in early 2020 were widely acknowledged to be gang-related.  The following homicide and other incidents represent some examples of the harm gangs cause:

- In July 2019, gang members beat a person incarcerated at Parchman to death.  The victim violated a "gang rule" by telling his mother about another incarcerated person's assault; his mother subsequently posted about that assault on social media.  Prior to the beating, a gang leader spoke with the victim's mother on the phone to confirm the social media post and told her he was worried the post could cause a contraband shakedown on the Unit.  Following the phone conversation, officers found the victim beaten to death in the shower, after another incarcerated person alerted them to the victim's body.  The CID investigation confirms the homicide and gang involvement but does not further investigate any potential staff transgressions, the previous assault the Facebook post referenced, or the gang's involvement in the homicide.

- In April 2020, a person incarcerated at Parchman approached the tower in his housing unit and asked for medical attention.  Tower staff called for backup in order to enter the unit.  They found that the victim had been stabbed six times in the back.  He relayed that he was not a gang member but had been attacked while trying to stop two gang members from fighting.  MDOC has not produced a CID investigation report of this incident or any other documented investigation into the potential gang activity or staff failure to observe the stabbing.

- In October 2019, an incarcerated individual was assaulted by his cellmate and several members of a gang.  According to the victim, a hit was placed on him because he had stolen $2300 from another gang member, and he subsequently stayed in his cell for six months for his safety prior to the attack.  He stated that his cellmate scalded him with hot water and beat him with a food tray in their cell, while gang members were "pulling security at the door."  The victim relayed that the gang members gave his cellmate a knife to stab him, but the cellmate refused.  The cellmate confirmed that the victim owed the gang money, and that during shower call, security staff forgot to lock the shared cell, so he jammed the door with a towel, which allowed three other incarcerated persons to enter and assault his cellmate.  The extent of the burns caused staff to take the victim to a burn center in Jackson, Mississippi.  Ultimately, CID closed the investigation because the injuries were non-life-threatening and no staff witnessed the attack.  CID did not investigate the gang activity or potential security failures.

- In June 2019, two persons incarcerated at Parchman were assaulted by a large group of unknown incarcerated individuals.  The group stabbed one victim approximately 16 times and badly beat the other with an unknown weapon.  The stabbing victim told the investigator that he had gotten "into it" with gang members, who owed him $300.  The beaten victim told the investigator that he was a member of a different gang, and did not

know why he was assaulted.  The stabbing victim told the investigator that the group beat the other victim because he owed a third gang $1300.  At the conclusion of the cursory, half-page memorandum, the CID Director recommended closing the investigation given the absence of the initiating investigator and because of lack of information, as the assaulted individuals failed to identify their attackers, "nor [were] there any eye witnesses who are willing to provide information."

MDOC does not have an effective, comprehensive strategy to deal with its overwhelming gang problem.  MDOC purportedly tasks CID with tracking and analyzing gang activity, but CID investigations fail to analyze gang activity involved in individual incidents, and the Parchman gang coordinator position charged with analyzing overall gang activity is vacant.  Commissioner Burl Cain relayed his plan to send some gang members to out-of-state correctional facilities.  While this tactic may have some limited effect, it falls far short of a comprehensive strategy.  For example, when a gang leader is moved to an out-of-state correctional facility, a new gang leader will quickly emerge to replace the transferred one.  Without an enforced comprehensive strategy, MDOC's deliberate indifference to gang activity and related violence will continue to cause serious harm and a substantial risk of serious harm to persons incarcerated at Parchman.

6.   Pervasive Extortion at Parchman Exposes Incarcerated Persons to Harm.

In addition to other violence noted above, persons incarcerated at Parchman commonly extort other incarcerated persons and their family members.  MDOC's inability to alleviate this extortion leads to a substantial risk of serious harm and risk of harm.  The large contraband economy and significant gang activity at Parchman naturally drive extortion and violence in debt collection.

Supervisory staff confirmed that extortion occurs at Parchman, and that they receive many reports of extortion from incarcerated individuals and family members.  One supervisor relayed that almost every other day an incarcerated person requests protective custody primarily to escape extortion.

Despite this admitted extortion problem, MDOC does not devote any serious attention to investigating or alleviating extortion.  For example:

- In April 2019, an incarcerated individual told an officer he needed medical attention, and staff escorted him to the clinic.  The individual stated that gang members jumped him because he previously stabbed a gang member in another correctional facility.  He also stated that the gang had been taking his canteen and had extorted his family out of $1500.  The incident report states the individual was placed in the Unit 30 administrative Holding Tank, purportedly "for further investigation."  We found no documented further investigation of the alleged assault, gang activity, or extortion.

- In July 2019, an incarcerated individual reported to staff that he was forced to perform oral sex on another person in his unit.  The victim also reported that he and his wife were being extorted.  The incident report documents the victim's statements without any indication of investigation.  We found no other documented investigation of the alleged sexual assault and extortion.

24

- In July 2019, the mother of an incarcerated individual called Parchman to report that four incarcerated persons had assaulted her son.  When staff interviewed the victim, they noted abrasions to his face and body.  He stated that several gang members jumped him over a disagreement with an unnamed person about a canteen issue.  The victim also stated that gang members had been calling his family and trying to extort them for money.  Staff drug tested the victim, who tested positive for methamphetamine and benzodiazepines, and subsequently re-assigned his housing.  Yet we found no CID investigation into the alleged extortion or gang activity.

- In August 2019, staff performed a welfare check on an incarcerated individual after his parents called to report that their son was being extorted, incarcerated persons were taking his food, and he feared for his life.  During the welfare check, the victim confirmed the extortion and that he feared for his life, but he refused to provide names.  Although staff re-assigned the victim to a new cell, beyond the incident report we found no further investigation into the potential extortion.

MDOC does not appear to have any systematic or coordinated strategy to discover, investigate, or proactively prevent extortion.  This deliberate indifference leads to harm and an unreasonable risk of harm.

**B.    MDOC's Failure to Provide Adequate Mental Health Care Results in Suicides and Harm to Incarcerated Individuals from Prolonged Segregation in Restrictive Housing. [30]**

MDOC has a constitutional obligation to meet the serious mental health care needs of persons incarcerated at Parchman.[31]  Our investigation found that MDOC fails to fulfill this responsibility due to:

- Inadequate mental health screening, assessments, and treatment,

- Deficient suicide prevention practices, and

- Prolonged exposure to segregation in restrictive housing under grossly inadequate conditions.

---

[30] For the purposes of this report, "restrictive housing" refers to any housing condition that involves removal from the general incarcerated population and placement in a locked room or cell, whether alone or with another incarcerated person, for the vast majority of the day, typically 22 hours or more.  *See* U.S. Dep't of Justice Report and Recommendations Concerning the Use of Restrictive Housing Final Report 3 (2016), https://www.justice.gov/archives/dag/file/815551/download.

[31] *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976).

1. <u>MDOC Fails to Provide Adequate Mental Health Treatment to Meet Incarcerated Persons' Serious Needs.</u>

MDOC fails to identify and provide adequate treatment for persons with mental illness incarcerated at Parchman.  MDOC does not provide appropriate screening, assessments, or services to meet incarcerated persons' serious mental health needs.  Parchman has too few mental health staff, and the current staff are under-qualified and lack sufficient supervision.  Because of the combination of deficient practices and staffing, appropriate care is delayed, denied, and discontinued.  As a result of MDOC's failure to provide adequate treatment to meet incarcerated persons' serious mental health needs, persons incarcerated at Parchman suffer actual harm from further deterioration of their mental health status, self-injurious behavior, and increased vulnerability to harm from other incarcerated individuals.

      a.   *MDOC Fails to Adequately Screen and Identify Incarcerated Persons with SMI.*

MDOC's mental health intake screening does not identify incarcerated persons with mental illness accurately, which results in Parchman's failure to provide adequate mental health treatment.  The obligation to provide constitutionally adequate mental health care includes intake and mental health screening.[32]  Proper intake screening allows prison officials to identify individuals with serious mental health needs requiring treatment.  When an incarcerated person is identified as at risk for mental illness, referrals must also be made to staff with adequate training in mental health care.[33]   The Fifth Circuit has held that prisons must provide screening that can detect "obvious medical needs of detainees with known, demonstrable, and serious mental disorders."[34]

Most people enter MDOC's system at the Central Mississippi Correctional Facility (CMCF), which serves as the reception center for sentenced individuals arriving from county jails.  They receive an initial mental health intake screening to determine whether a newly admitted person will be referred to a provider for a mental health assessment.  However, the mental health intake screening form is more accurately described as a suicide screening form, in that the overwhelming majority of questions are focused on a new admission's risk of committing suicide.  Although the importance of adequate suicide screening cannot be overstated, the dearth of mental health screening results in a failure to identify individuals short of crisis yet in need of mental health services.  The few questions about other mental health

---

[32] *See Thompson v. Ackal*, 15-cv-02288, 2016 WL 1394352, at *8 (W.D. La. Mar. 9, 2016) (holding that inaccuracies in intake and mental health screening forms contributed to a constitutional violation); *Coleman*, 912 F. Supp. at 1305 (holding that the Eighth Amendment requires "a systematic program for screening and evaluating inmates to identify those in need of mental health care").

[33] *Thompson*, 2016 WL 1394352 at *2 (W.D. La. Mar. 9, 2016), *report and recommendation adopted*, No. CV 15-02288, 2016 WL 1391047 (W.D. La. Apr. 6, 2016) (finding that plaintiff survived motion to dismiss on deliberate indifference claim when plaintiff told nurse on two occasions he wanted to kill himself, and both times the nurse referred him "only to untrained Jail personnel," and did not report to medical staff).

[34] *Evans v. City of Marlin*, 986 F.2d 104, 107 (5th Cir. 1993) (internal quotations omitted).

issues are focused on prior psychiatric treatment, including the use of psychoactive medication, but they are not designed to identify individuals with mental health difficulties who have not received formal mental health treatment, which is a significant percentage of incarcerated individuals with mental illness.

In addition, screening staff make no attempt to confirm any of the information an incarcerated person reports on intake.  Staff fail to obtain any additional information on the person's reported treatment, symptoms, or mental health history from prior health records, community providers, family members, or former institutions.  This is true even when an incarcerated person reports a significant history of mental health treatment.

As a result of this inadequate screening process, MDOC fails to identify many persons with mental illness who should be added to Parchman's mental health caseload.  Indeed, only 10% of Parchman's incarcerated population is on the mental health caseload.  This is in stark contrast to findings that 25-30% of people in most correctional facilities are in need of mental health care.  The Chief Psychiatrist and Mental Health Director overseeing mental health care at Parchman posited that the percentage of incarcerated individuals on the mental health caseload at Parchman is low because when people are identified as having a serious mental illness, they are transferred to Eastern Mississippi Correctional Facility.  However, our records review found no support for this assertion.  A significant percentage of the individuals on the Parchman mental health caseload were not identified at intake, but then later referred to mental health by medical staff or security staff, or self-referred.  Both security staff and medical staff at Parchman stated that they believe that the percentage of incarcerated persons with mental illness is much higher than 10%.

Even if a newly admitted incarcerated individual reports a significant psychiatric history or urgent concern, the referral to mental health is usually noted as "routine."  This is problematic because it means that a person with serious mental illness may be in the facility for several weeks by the time he receives a mental health assessment, is seen by a provider who can prescribe medication, and finally begins a medication regimen.  Although existing policies and procedures allow for an emergency or urgent referral to mental health, such referrals appear to be extremely rare.

When MDOC fails to properly identify and refer incarcerated persons in need of mental health services for care, those persons go untreated and suffer actual harm in the form of further deterioration of their mental health status, which often leads to behaviors that result in the persons facing disciplinary action and restrictive housing, heightened risk of harm from other incarcerated individuals, and self-injurious behavior.

### b.   MDOC Fails to Provide Appropriate Mental Health Assessments.

The mental health assessments at Parchman do not remedy the faults of MDOC's mental health intake screening practice.  At Parchman, the mental health professionals, all of whom are Master's level social work clinicians and are not required to be licensed in their clinical field, conduct the mental health assessments.  If the mental health professional decides that mental health services are indicated, the incarcerated individual gets referred to a prescriber (a psychiatrist or nurse practitioner).

The assessments do not reflect the nature of the signs or symptoms of mental illness that the individual might be experiencing, the course of symptoms, or how symptoms interact with and/or are related to each other. Nor do the assessments explore intellectual or other cognitive difficulties, trauma, or a family history of mental illness. The assessments also fail to assess the impact of any symptoms identified on the incarcerated person's ability to function. As with intake, mental health clinicians make no attempt to obtain and consider information from collateral sources about an incarcerated person's history or family history with mental illness, response to prior medications or other therapeutic interventions, any difficulties with compliance, and any signs, symptoms or other mental health difficulties that the incarcerated individual is unwilling or unable to report. As a result, mental health providers decide whether to maintain or restart a person's prior medication regimen without a clear sense of the clinical indications for that regimen or its efficacy.

Because MDOC frequently transfers people between prisons, the assessment process is further hampered by a failure to provide sufficient information with transfers. An incarcerated person is transferred only with a list of diagnoses and medications, which can be incomplete or inaccurate, and contains no information about the incarcerated person's capacity to engage in treatment or function within a prison. It is unrealistic and overburdensome to expect each new provider to review the entire chart for each transferred individual. Thus, the insufficient information provided upon transfer interrupts continuity of care and increases the likelihood that an incarcerated individual will be misdiagnosed or receive inadequate treatment. For example, one incarcerated person experienced more than ten years of transfers between five different MDOC prisons, including three separate periods at Parchman. As he bounced around the system, he received numerous varying diagnoses, an array of different medications and medication discontinuances, a drug overdose, suffered physical and sexual assaults, was subjected to periods of extended isolation in restrictive housing units, and ultimately refused any further treatment.

Our record review revealed cases where the mental health assessments are internally inconsistent and others where the prescriber's findings from the mental status examination contradict the assessments previously conducted by the mental health professionals. This appears to be in part because an individual's reported history of mental health difficulties are usually not taken seriously until some later point in time when the person's mental health deteriorates. When the incarcerated person does experience a deterioration, the absence of a full mental health history often results in delayed treatment. Or worse, providers view the person's current symptoms as some type of manipulation instead of symptomatic of the illness he reported upon admission. In some cases where the mental health professional determined that mental health services were not indicated, a person with serious mental illness has had to repeatedly request or get referred to mental health before he was finally added to the mental health case load.

The mental health assessments performed by the prescribers are more comprehensive. However, it is striking to note that treatment can differ quite significantly based on which Parchman provider performs the assessment. Medical records demonstrate that it is common for an incarcerated person to be viewed differently as he moves from one clinician to another, and as a result, medication and other therapeutic interventions may be discontinued or changed incorrectly. This is the case even when different providers have evaluated the same incarcerated

person in close proximity to each other.  A lack of complete information in incarcerated persons' medical record may contribute to this problem and result in misdiagnoses, repetition of prior failed regimens, and discontinuation of diagnoses and medications that may be effective.

In addition to discrepancies between the different Parchman providers, the prescribers' mental health assessments are inadequate because they fail to consider issues key to an incarcerated person's mental health, such as the cyclic nature of many serious mental illnesses, the various ways that certain disorders can present, and the role of intellectual disabilities or other cognitive difficulties on a person's ability to function, including his ability to communicate with the provider in a clear and meaningful way.

Although Parchman clinical staff acknowledge that a large number of persons incarcerated at Parchman have endured early trauma and have Post-Traumatic Stress Disorder (PTSD), the mental health providers do not consider clinically significant trauma-related difficulties that could be impacting these individuals' behavior and ability to function.  Parchman does not provide trauma-informed care, even for incarcerated persons with a PTSD diagnosis prior to admission.  For example, an incarcerated person who is a war veteran and was reportedly diagnosed with PTSD prior to his admission to Parchman's death row repeatedly asked for therapy for his PTSD, but never received it over a long history at Parchman.  In July 2020, he submitted a mental health sick call to report that he was having enormous difficulty.  He described a range of severe symptoms of PTSD, and noted that some of his symptoms were triggered by events that were occurring on death row.  The nurse practitioner said that there was nothing she could do to help him with problems on the unit, but she did change his diagnosis to PTSD and restarted his medication regimen.  She also recommended that he receive therapy for PTSD, which he has never received.

Parchman mental health records also reflect an overreliance on the diagnoses of Antisocial Personality Disorder (ASPD) and Malingering.  Fifty percent of the medical records reviewed by our expert included at least one of those two diagnoses.  In the non-prison context, these diagnoses affect approximately 3% of the population.  In a correctional setting, some studies have shown these diagnoses can affect up to one-third of the population.  The high percentage of these diagnoses at Parchman is concerning because once these diagnoses are used, future providers are apt to be dismissive of legitimate mental health concerns.  For example:

- One incarcerated individual's chart shows only a diagnosis of ASPD.  He put in numerous sick calls in 2019, noting that he was hearing voices and feeling suicidal.  All of the sick calls were triaged by a mental health professional without a referral to a provider.  In October 2019, he submitted a sick call complaining of side effects from his medication.  He was not seen by a provider until February 16, 2020.  Due to the use of the ASPD diagnosis, it appears his complaints were minimized and not adequately addressed.

- Another incarcerated individual was treated by multiple providers at different MDOC prisons and received diagnoses that varied from major depressive disorder to bipolar disorder to anxiety disorder to ASPD.  He was transferred to Parchman in March 2019 with an ASPD diagnosis.  Despite experiencing the death of his father, disclosing a past sexual assault to Parchman mental health staff, reporting that he was experiencing

29

psychotic symptoms, and one nurse practitioner finding anxiety, restlessness, irritability, racing thoughts, distractibility and insomnia, he received very little treatment and only a brief prescription for an antidepressant.  In September 2020, he reported being raped at Parchman.  When the medical provider examined him, the individual reported a range of symptoms similar to those he had expressed in the past, and the medical provider prescribed an antidepressant, then referred him to mental health.  The nurse practitioner met with him, but they did not discuss the alleged rape, and the nurse practitioner determined that there was no reason to continue his medication and removed him from the mental health caseload.

- In April 2019, MDOC transferred a 19-year-old incarcerated individual to Parchman.  During a mental health sick call, he reported that he could not sleep because he was having flashbacks about his brother's death and hearing his brother's voice; that he felt his brother's spirit was haunting him, which made him paranoid; and that he was very startled by loud noises that sounded like guns.  He explained that in 2014, he saw his younger brother get shot and killed, and die in his arms.  He also reported a prior diagnosis of PTSD and treatment with antipsychotic and antidepressant medications.  The mental health professional did not further explore or assess these reports, and made no effort to get his prior medical records or any other information.  Instead, the mental health professional questioned why he had not reported any of this at intake six days earlier, and merely gave him a pamphlet on PTSD.

  Over the next few months, the individual repeatedly sought care and reported the same concerns and history.  One Parchman nurse practitioner opined that he appeared to have PTSD and major depression, and given his age, that it could be the onset of a psychotic disorder.  The very next day, a different nurse practitioner found that his symptoms were not clear and opined that he was exaggerating to move housing units.  Once she learned that he had been involved in a gang, she decided that the most appropriate diagnosis for him was ASPD and discharged him from mental health observation.  Parchman did not provide any trauma-informed care to this young man.  The diagnosis of ASPD, based on his desire to move to another unit and the fact that he had been in a gang, is not clinically sound.  In addition, even if the diagnosis of ASPD were accurate, he could still suffer from and need treatment for PTSD, as the two diagnoses are not mutually exclusive.

The excessive and presupposed use of ASPD and malingering diagnoses at Parchman results in the clinicians treating reports of mental health crisis symptoms as a behavioral concern to be addressed by security, rather than a medical concern to be addressed by a clinician.  Repetitive, "bothersome" behaviors, including suicidal gestures, are relegated to security to address.  Parchman's mental health professionals have not created or implemented any behavior modification plans to help address behavioral challenges, which may be due to their lack of therapeutic expertise.  Incarcerated persons who are suffering from a range of mental health difficulties can evidence behaviors seen in individuals who are suffering from ASPD.  If those behaviors are actually the result of a psychotic disorder, trauma-related difficulties, alcohol or substance abuse, or some other personality disorder such as borderline personality disorder, then ASPD is not an accurate diagnosis.  Furthermore, a person who is diagnosed as having ASPD might also have a coexisting mental illness that must be identified and addressed.

Parchman mental health records also reveal an overreliance on diagnosing incarcerated individuals with substance-induced disorders. While persons with a history of alcoholism or other substance abuse problems make up a sizeable percentage of Parchman's population, current or former substance abuse is not enough to justify a diagnosis of substance-induced disorder. A substance-induced disorder is a condition or illness in which the mental health impairment is directly caused by the substance use itself. When making such a diagnosis, one must consider whether the drug can cause the symptoms at issue, whether the usage is sufficient to cause the symptoms, and whether symptoms remit when the person stops taking the drug. We found no evidence that Parchman mental health staff considered these issues when diagnosing an incarcerated individual with a substance-induced disorder. When making a diagnosis, mental health clinicians do not even direct drug testing to determine if a person is under the influence.

Drugs are readily available to incarcerated persons at Parchman. This includes drugs known to cause or exacerbate existing mental health difficulties. Indeed, four persons who committed suicide at Parchman in the past three years had methamphetamine in their systems when they died. Mental health staff note observing patients who appear to be high on drugs. However, staff do not take the requisite steps to test if a person is using drugs, determine what drugs they might be using, address the drug use, or design treatment goals to mitigate this.

For example, in September 2019, MDOC transferred an Iraq war veteran to Parchman from CMFC. At CMFC in August 2019, he was diagnosed as having PTSD and major depressive disorder and prescribed antidepressant medication despite acknowledging a history of methamphetamine abuse. At Parchman, in January 2020, his prescription was discontinued because he had been non-compliant and a provider opined that he seemed to be okay without medication. In March 2020, the individual admitted to a nurse practitioner that he had been using methamphetamine. The nurse practitioner changed his diagnosis to methamphetamine abuse and removed him from the mental health caseload. She opined that methamphetamine could be the cause of his anxiety, without exploring how much of the drug he was using, its potential impact on him, his war experiences, or his symptoms of PTSD. There is no documented exploration of which came first, the PTSD (and associated symptoms) or his methamphetamine use. Since then, the individual has sought mental health care through sick call several times. Though he has denied continued drug use, mental health staff dismiss him as malingering and seeking unnecessary medication. He has never been offered any services and remains off the mental caseload. Mental health staff base this denial of treatment on the concern that he is using methamphetamine, but they have not confirmed that concern or allowed him to refute it by offering a drug test.

Substance-induced disorders are relatively rare. But not at Parchman, apparently. In our review of 50 Parchman medical charts, 23 had a substance-related diagnosis. Given the larger than expected number of incarcerated persons diagnosed as having substance-induced disorders at Parchman, we believe that if Parchman personnel adequately considered the issues identified above, the number of incarcerated persons carrying the diagnosis would drop, thereby eliminating a manifest barrier to more accurate diagnoses and appropriate treatment.

c.   *MDOC Fails to Provide Adequate Mental Health Treatment.*

Overall, the treatment planning process and mental health treatment services at Parchman are flawed because they do not provide for or address the mental health needs of the population. The mental health staff at Parchman do not have formal or regular treatment planning meetings. There is minimal involvement by nurse practitioners, nurses, medical staff, security staff or incarcerated persons in the treatment planning and implementation process.  Although Parchman's mental health professionals write treatment plans for persons on the mental health caseload in timely manner, the treatment plans are not developed by an interdisciplinary treatment team, and are not individualized.

The goals, objectives and interventions outlined in the treatment plans often do not relate to the individual's diagnosis.  Indeed, treatment goals appear to be cut and pasted to the next treatment plan without any documentation detailing the incarcerated person's or clinician's adjustments for progress.  Although Parchman treatment plans are reviewed every six months, which is a lengthy period between reassessments, individuals' plans often remain identical without any documentation of progress, regression, or interventions taken to support the patients' goals.  Treatment plans consistently focus on helping the incarcerated person accept the fact that he is incarcerated and adjust to incarceration, which are important issues but may not address his mental health needs.  And in situations where adjustment and coping should be a major focus, it is unclear that the mental health staff has the capacity to provide such assistance.

The individual treatment sessions provided by the mental health professionals are more accurately described as monitoring visits.  The treatment services appear to consist of medication prescriptions, and cell front clinical contacts with mental health professionals on a monthly basis. There is no individual therapy provided anywhere within the facility due to insufficient mental health staff, insufficient security staff to facilitate mental health interactions, and the limited clinical abilities of the mental health staff.  There is little-to-no evidence of actual treatment. Instead, the focus of the sessions appears to be on gathering and documenting the incarcerated person's view of how he is doing; giving the incarcerated person a puzzle or some type of pamphlet; and then, if it appears to be indicated, passing on any complaints that the incarcerated person might have in a referral to the prescriber.  Based on our review of charts, Parchman's mental health professionals are not providing the level of clinical therapeutic interventions required of Parchman's population.

Very few incarcerated persons on the Parchman mental health caseload receive group therapy.  Despite an evident need, there are no psychoeducational groups focused on helping people gain insight into their own mental illness and need for treatment, or medication groups focused on helping people learn how to better participate in the management of their medication. Parchman clinical staff consistently reported to us the unfulfilled need for group therapy throughout the facility.  Staff also indicated that increased security staffing would be necessary to facilitate group therapy.

Parchman mental health staff do not provide trauma-informed mental health services, even for incarcerated persons diagnosed with PTSD.  We found no evidence of appropriate treatment and management of the specialized needs of persons with intellectual or cognitive difficulties.  Although a large number of persons on the mental health caseload have a history of

substance abuse and a diagnosis of substance-induced disorder (which may not be accurate), there is no evidence of coordinated treatment for substance abuse and other mental health difficulties or mental health interventions focused on the treatment of substance abuse. There is a court-referred substance abuse program administered by correctional staff at Parchman, but it is not widely available to incarcerated persons on the mental health caseload, and there are no therapeutic activities offered in the substance abuse program for someone who could also suffer from a mental illness.

This failed treatment planning and treatment results in a failure to meet the mental health needs of persons incarcerated at Parchman. For example, in March 2020, an incarcerated person complained to mental health about hearing voices, seeing blood and knives, and feeling that others were out to get him. He reported that he had been having these experiences for about a year, noted that he had become increasingly frightened, and was requesting help. For almost a year after his initial request, mental health staff opined that his problems were drug-related (he was, at least at times, using drugs), that he was over-reacting to talk on his unit, and/or that he was malingering or at least exaggerating his difficulties. During this period, he was lectured about using drugs and/or offered information on coping and anger management, while his symptoms became more severe and he had physical altercations with other incarcerated persons. He was periodically suicidal, and in June 2020 he cut his wrist. Finally, in April 2021, the nurse practitioner opined that he was "obviously psychotic," admitted him to the infirmary on mental health observation, and began treatment with an antipsychotic medication. This year-long delay of treatment is unconscionable.

Parchman's mental health staff consistently reported, and the medical records confirm, that incarcerated persons with mental illness often report various fears for their safety during their mental health encounters. Individuals with serious mental illness often submit mental health sick call requests because they want to be moved to another unit, usually because they are afraid of being harmed. Mental health staff consistently tell people that there is nothing they can do about their safety concerns or housing placement, and recommend that the incarcerated individuals raise these issues with correctional staff instead.

While mental health staff may be limited in their ability to directly remedy safety concerns, they do not make any effort to at least advocate for security measures that will not exacerbate a person's mental health status. Parchman mental health staff do not assess to what extent incarcerated persons on the mental health caseload who make safety complaints are particularly vulnerable as a result of mental illness; nor assess to what extent their mental illness might be distorting their perception of danger; nor assess to what extent the dangerous environment might be exacerbating their mental illness. A meaningful exploration and assessment of these issues could result in a decision to alter a person's treatment or cause mental health staff to advocate for a change in the individual's housing placement based on his clinical needs, instead of simply referring the incarcerated person to security staff. The safety issues at Parchman, like gang activity, availability of illicit substances, and lack of sufficient supervision throughout the facility, directly impact the incarcerated population and increase the vulnerability of incarcerated persons with mental health concerns. Given that Parchman can be and often is a very dangerous place, it is imperative that mental health staff provide a clinically appropriate response to incarcerated persons with mental illness who report being fearful.

### d.   Incarcerated Persons Do Not Receive Adequate Mental Health Care through Sick Call.

The quality of the therapeutic interventions employed in response to a mental health sick call request is no better than that seen in the performance of scheduled "therapeutic" sessions. The sick call process requires that the incarcerated individual be seen by a Mental Health Professional.  Based on our record review, Parchman's mental health professionals are making clinical decisions about whether an incarcerated person  will get access to a provider that are beyond their level of training.

Moreover, there does not appear to be a manner to distinguish the urgency of the sick calls received.  Indeed, most referrals are treated as routine, regardless of the content of the referral, which results in treatment delays.  For example, an incarcerated individual put in a sick call to restart psychotropic medication on April 11, 2019.  He was not seen by a provider until April 27, 2019.  A sixteen-day delay in receiving necessary mental health treatment for a serious mental illness can result in harm to the patient.  Another incarcerated individual submitted a sick call referral for hearing voices on March 22, 2020, which can indicate a serious mental illness and should result in an emergent referral for evaluation by mental health within hours of the report.  He was not seen by a mental health professional until three days later, at which time the mental health provider directed that he be placed on safety precautions.  Another incarcerated person placed a sick call on February 28, 2019, with complaints of auditory hallucinations and was not seen by the provider until March 27, 2019.  There is no sense of urgency to address the sick calls, which leaves the incarcerated person without needed help and at risk of serious harm.

### e.   Inadequate Medication Practices Contribute to the Failure to Provide Adequate Treatment.

Incarcerated persons at Parchman with serious mental illness do not receive timely, consistent, or appropriate medication.  Continuity of medication is vitally important for mental health stability and interruption in taking prescribed psychotropic medication can result in serious side effects.  Delays occur in providing previously prescribed medications upon transfer to Parchman and also in starting a medication prescribed by Parchman providers.  For example, an incarcerated person was transferred from another MDOC facility to Parchman on December 14, 2020.  Although he had a current prescription prior to the transfer, there was no bridge order or mechanism in place to ensure he got his medication at Parchman.  On March 20, 2021, he still had not received his medication.  At that time, the Parchman provider prescribed a new medication, but six days later, the individual still had not received either medication.

Parchman mental health providers also prescribe medications that are not indicated for the conditions diagnosed.  For example:

- In March 2019, a nurse practitioner prescribed Haldol to an incarcerated individual after reviewing his extensive mental health history and changing his diagnosis from ASPD and bipolar disorder to ASPD, substance abuse, and substance-induced mood disorder. Unfortunately, Haldol is not indicated for any of the three diagnoses.

- In October 2019, a nurse practitioner improperly prescribed an antidepressant for another incarcerated individual with a long mental health history. The nurse practitioner found the individual was experiencing anxiety, restlessness, irritability, racing thoughts, distractibility and insomnia, but the antidepressant prescribed is not an indicated treatment for these symptoms. In early December 2019, when a different nurse practitioner saw the same patient for a follow-up, she opined that any anxiety he suffered was only situational and she discontinued the medication because she did not think it was doing anything for him.

> f.   *Failure to Provide Adequate Counseling Leads to Inappropriate Self-Directed Discontinuation of Mental Health Treatment.*

Incarcerated persons with mental illness are discontinuing their mental health treatment without adequate counseling, education, or consideration by mental health staff. For a host of reasons, including proximity to family, availability of work or programming options, and safety, incarcerated persons with serious mental illness at Parchman consistently request to be transferred to a regional facility or other alternate facility. However, because of the lack of mental health services at MDOC's regional facilities, people cannot be transferred to those facilities if they are on psychoactive medication. Therefore, it is common for an incarcerated person to request that his medication be discontinued, or to simply stop taking his medication, so that he can qualify for a transfer.

Parchman mental health staff reported, and medical records confirmed, that when such a request is made, or when the patient stops taking his medication, the prescriber discontinues the medication, monitors the patient for 90 days, and then drops the person from the mental health caseload. Indeed, our review of medical records did not uncover any situation where it was documented that a mental health provider told an incarcerated person that discontinuation of medication was ill advised; made a reasonable effort to educate the person about his mental illness and need for treatment; or refused to stop prescribing the medication because the clinician believed it was necessary or beneficial to the incarcerated person. Persons with mental illness must have input into and appropriate autonomy regarding their treatment, but they should not self-direct treatment decisions without first receiving adequate clinical counseling.

This practice of discontinuing medication for relatively stable persons with mental illness without adequate consideration of the person's mental health needs can result in harm. For example, in July 2018, an incarcerated person asked to be taken off the medication prescribed for treatment of major depressive disorder, which was diagnosed after his complaints of auditory hallucinations and trauma-related symptoms, so that he could be transferred to a regional facility near his family. Mental health staff discontinued his medication and removed him from the mental health caseload. During the following nine months, he remained off medication but submitted multiple mental health sick calls where he repeatedly asked if mental health could help him obtain a transfer to the regional facility but also reported experiencing more mental health symptoms, including recurrent nightmares about past trauma from which he would wake up screaming. Nothing was done in response to these reports until April 2019, when the individual finally requested to be put back on medication.

In some cases, the harm from discontinuation of treatment can be severe.  In 2020, an incarcerated person committed suicide by hanging himself.  The person had a history of serious mental illness, including diagnoses of major depressive disorder, polysubstance abuse, psychotic disorder, and bipolar disorder.  He also had a history of psychotropic medications, but his last prescription was discontinued in October 2018 "due to noncompliance."  Despite his extensive mental health history, prior suicidal ideation, and behavioral indications of mental illness immediately prior to his suicide (throwing feces), the individual was last seen by mental health staff nine months before his death.

The absence of mental health services in regional facilities puts incarcerated persons in a terrible position of choosing access to their families, opportunities for self-improvement, and safety over access to appropriate mental health care.  It is therefore essential that mental health staff provide appropriate counseling and recommendations when an incarcerated person asks to discontinue medication.

### g.   Mental Health Staffing at Parchman is Inadequate.

Parchman does not have sufficient mental health staff to meet the needs of incarcerated persons with mental illness.  The mental health staff currently employed are under-qualified and lack sufficient supervision and training.

Parchman has not had an on-site psychiatrist since 2018.  Instead, there are three part-time nurse practitioners at Parchman, who provide medication coverage for Parchman and other MDOC facilities.  The nurse practitioners are available at Parchman for a total of approximately 24 hours each week to manage a mental health caseload of about 200 incarcerated persons, with over 80% of them in need of psychotropic medication.  Parchman's prescriber hour-to-patient ratio falls below the American Psychiatric Association's recommendation that the caseload of each full-time (40 hours per week) psychiatrist or equivalent should be no more than 150 patients on psychotropic medication in the prison setting.

Within a month of our interview of him, the regional psychiatrist began working with one of the nurse practitioners to ensure the nurse practitioner's availability to work at least one day each week at Parchman.  This change is intended to allow the nurse practitioner to meet with team members and help with the treatment planning process.  Despite this recent change, Parchman's clinical staff expressed an overwhelming consensus for the need for a full-time psychiatrist at Parchman to provide leadership on the treatment team and expertise in psychotropic medication prescribing.  The absence of psychiatric leadership in the treatment planning process is striking and unacceptable.

Parchman is budgeted for three mental health professionals.  The mental health professionals are not required to hold a license; at the time of our February 2021 interviews, Parchman's mental health professionals were all Master's Level social work clinicians.  As of April 2021, two of the mental health professional positions at Parchman were vacant.   Parchman therefore was operating with one unlicensed mental health professional and the Mental Health Director, who is also unlicensed, for a census of around 200 incarcerated persons on the mental health caseload.  The three Parchman mental health professionals interviewed in February 2021 agreed that the facility needed at least two more mental health professionals, for a total of at least

five, in order to provide the level of mental health service expected for this population at Parchman.  The services they would provide would include therapeutic group sessions, individual sessions, and completion of various rounds within the facility.  As noted in Section IV.B.1.a above, the number of incarcerated persons on the Parchman mental health caseload is likely artificially low, due to inadequate screening, assessments, and discontinuances.  Especially if changes to these practices result in a higher caseload, Parchman will require adequate staffing to meet the actual need.

Parchman's current mental health professionals do not have the training or skills to provide appropriate services.  They are supervised by Parchman's mental health director, who has a PhD in Educational Psychology, which calls into question her clinical abilities to provide therapeutic mental health services and supervision in a clinical, psychiatric setting.

For example, the initial mental health assessments provided by the Mental Health Director reflect similar shortcomings to those of the mental health professionals, indicating that the clinical supervision and the support available are not enough to further develop mental health professionals' skills.  The Mental Health Director does not hold formal weekly or biweekly supervision sessions with the mental health professionals.  Many of Parchman's mental health professionals reported a need for more psychiatric training for staff.

2. <u>MDOC Fails to Adequately Protect Incarcerated Persons at Risk of Suicide.</u>

MDOC's failure to provide adequate suicide precautions subjects persons incarcerated at Parchman to serious harm, including preventable deaths.[35]  "Suicide is an objectively serious harm implicating the state's duty to provide adequate medical care."[36]  Thus, it is "clear that a failure to provide adequate protection against a prisoner's known suicidal impulses is actionable" under the Eighth Amendment.[37]  In order to demonstrate a need for supervision, one must show that a prison official (1) "had subjective knowledge of a substantial risk of serious harm" and (2) that the failure to provide supervision demonstrated "deliberate indifference to that risk."[38]

---

[35] *See Arenas v. Calhoun*, 922 F.3d 616, 621 (5th Cir. 2019) (stating that "[s]uicide is an objectively serious harm implicating the state's duty to provide adequate medical care"); *Estate of Pollard v. Hood County*, 579 F. App'x 260, 265 (5th Cir. 2014) (per curiam); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (officials violate the Constitution when they are deliberately indifferent to "an unreasonable risk of serious damage to . . . [a prisoner's] future health."); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) (noting that incarcerated individual had Eighth Amendment right to be free from deliberate indifference to serious psychiatric needs).

[36] *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996).

[37] *Anderson v. Dall. Cty. Tex.*, 286 F. App'x 850, 857 (5th Cir. 2008) (citing *Evans v. Marlin*, 986 F.2d 104, 107 (5th Cir. 1993)); *see also Rhyne v. Henderson County*, 973 F.2d 386, 391 (5th Cir. 1992).

[38] *Hare*, 74 F.3d at 644.

Notably, as in the corrections context, severe understaffing that makes supervision impracticable can support a finding of deliberate indifference in the healthcare context as well.[39]

        *a.    MDOC's Deficient Suicide Screening Fails to Identify Persons at Risk.*

Most incarcerated persons are sent to Parchman after undergoing initial screening and classification at CMCF. In addition to this general screening, another screening is completed upon an incarcerated person's transfer to Parchman from another MDOC facility. The intake suicide screenings completed at CMCF and the intrasystem transfer screenings at Parchman are woefully inadequate with devastating consequences.

Our review of medical charts for incarcerated individuals placed on suicide watch between December 2020 and April 2021 found that the intrasystem transfer screening forms were completed correctly in only 2 out of 15 charts. Parchman nursing staff often skip the specific questions on vital information such as prior history of psychiatric observation or suicide watch, current thoughts/plans of suicide or self-harm, history of suicide attempts, psychiatric hospitalizations, or alcohol or substance abuse. Instead, many forms simply note the following conflated question and answer: "Current Medical, Mental Health, or Dental Complaint (including suicidal ideation): No." Examination of the charts for the 20 incarcerated persons who committed suicide since 2015 revealed the same patterns, with only 7 out of 17 forms completed correctly.

Even when complete, the transfer screening forms are inadequate to identify individuals at risk of suicide due to significant design flaws. The form does not include inquiry into the following subjects critical to informing a meaningful suicide intake screen: recent significant loss (job, relationship, death of family member/close friend, etc.); expressions of helplessness and/or hopelessness regarding the future; history of suicidal behavior by family member or close friend; and observations by the transporting officer(s) believing the individual to be currently at risk. Moreover, the form unreasonably limits inquiry into prior suicide watch to 30 days prior to the date of the screen. This 30-day cut off is an arbitrary timeframe with no meaningful, clinical implication. Many incarcerated persons who committed suicide had prior histories of placement on suicide precautions that occurred outside this 30-day window, and therefore this important information was not captured in their intrasystem suicide screens.

The suicide screening process is further compromised by lack of reasonable privacy and confidentiality that also undermines clinical autonomy. The room in which the intrasystem suicide screenings occur has the doors left open with a correctional officer standing in close proximity to the incarcerated individual, instead of standing outside a closed door, while the nurse completes the screening form. Given the ability for the correctional officer and other staff or incarcerated persons passing by to hear responses to the screening form's questions, respondents may not offer truthful and complete information, especially information about past sexual abuse, trauma, or suicidal behavior.

---

[39] *See Shepard v. Hansford County*, 110 F. Supp. 3d 696, 718 (N.D. Tex. 2015); *Brown v. Plata*, 563 U.S. 493, 521 (2011) (holding that mental health treatment can be impeded by lack of adequate correctional staff, who are required to "escort prisoners to medical facilities or bring medical staff to the prisoners").

       b.   *Inadequate Suicide Prevention Training Leaves Staff Without the Skills to Identify Incarcerated Persons at Risk of Suicide.*

Parchman staff lack the skills necessary to identify incarcerated persons at risk of suicide and respond to suicide or self-harm emergencies. Suicide prevention training at Parchman is uneven, disjointed, and grossly inadequate at best, and non-existent at worst.

Parchman's health services provider's policy requires that all health care staff receive four hours of basic training in suicide prevention, followed by two hours of bi-annual suicide prevention training. We were not provided any documentation of a lesson plan for this policy requirement, nor any evidence that health care staff at Parchman were actually trained. According to Parchman's Director of Nursing, health care staff took a self-guided e-learning suicide prevention training. Although the training is intended to be 6.75 hours in length, nursing staff confirmed it was completed in 10 to 25 minutes. Not only has this training been significantly abridged, in its original format it fails to cover several critical topics, such as the components of the suicide prevention program, avoiding obstacles to suicide prevention, and identifying suicide risk despite the denial of risk.

The suicide prevention training for correctional officers was similarly abbreviated, with no evidence of drills on emergency response to suicide attempts. According to the lesson plan provided, the training is designed for 90 minutes, but MDOC's training director stated that this training was only one hour, with an annual in-service training that also is one hour. Our review of the training schedules produced showed that suicide prevention training was designated one 50-minute time slot. The training director did not describe, nor did the lesson plan show, any drills on emergency response as part of correctional officer's suicide prevention training, despite the curriculum listing the subject "Responses for Correctional Officers to Suicide Attempts or Self-Injury" and indicating instruction on cutting down incarcerated individuals who attempt suicide by hanging and initiating CPR. Parchman's Mental Health Director asserted that all correctional officers at Parchman are required to complete a separate, nationally-recognized suicide prevention training program, taught by mental health staff. Yet, upon further inquiry, the Mental Health Director described this training as being completed in 1.5 hours, even though the referenced suicide curriculum is designed to be 10 to 12 hours in length. Notably, MDOC's training director made no mention of this other training requirement for correctional staff. Despite our requests, MDOC has failed to produce any documentation to verify how many, if any, correctional officers had been actually trained in this curriculum.

       c.   *The Physical Space Designated to House Incarcerated Persons on Suicide Watch Is Dangerous and Increases the Risk of Suicide.*

Incarcerated persons placed on suicide precautions at Parchman are housed within the 14-bed mental health unit located on the second of the medical unit. Of these 14 cells, six are designated for suicide watch, and eight are designated for psychiatric observation. Psychiatric observation at Parchman includes situations where an incarcerated person is downgraded from suicide watch status, is assessed as seriously mentally ill, or is adjusting to psychotropic medication. The six cells used for suicide watch are nearly identical and were described by our suicide prevention expert as "very dangerous." Multiple ventilation grates, torn chicken wire screening that exposed a bar within the wall, mesh-covered windows, and protruding square

bolts present suicide hazards.  Although the suicide watch cells contain a CCTV monitor, there is a blind spot due to a gap between the CCTV monitor and the walls of the cells.

The eight cells used for psychiatric observation are also not suicide resistant, and similarly contain various protrusions that could be used in a suicide attempt by hanging.  While MDOC officials stated that suicidal persons are not housed in the psychiatric observation cells, records indicate otherwise.  These cells contain a metal framed bed with large holes, ceiling ventilation grates with large chicken-wire screening, wall ventilation grates and CCTV monitors that are not flush with the wall, and square screws protruding under the windows.  Incarcerated persons identified as suicidal, but who have not yet been technically admitted to Parchman's mental health unit, are held temporarily in one of three holding tanks on the first floor of the medical unit.  These holding cells are also not suicide resistant because they are encased in metal bars.

MDOC officials are aware that Parchman's suicide watch and psychiatric observation cells are dangerous and not suicide resistant because at least one person committed suicide within these cells.

- A 20-year-old incarcerated individual with a history of prior suicide attempts was admitted to Parchman's medical unit on April 6, 2017 and housed in a psychiatric observation cell, after being observed spreading feces all over the holding tank in Unit 29.  Mental health staff met with the individual on April 11, 2017, and discharged him from suicide watch but kept him housed in the medical unit.  The next morning, at approximately 8:25 am, the individual was observed over the CCTV tying a homemade rope made out of a bedsheet to the ventilation grate in his cell.  Officers were sent to retrieve the rope and bed frame, which the incarcerated individual had propped against the door.  Although the officers sent to retrieve the items from the cell claimed to have taken these items, one officer later admitted that he had forgotten to remove a second bedsheet sheet from the cell.  Staff did not place the person back on suicide watch.  About an hour later, at 9:33 am, officers noticed the person hanging from the ventilation grate by the bedsheet.  He died.

The conditions on suicide watch are also unnecessarily harsh for incarcerated persons at risk of suicide.

The cells designated to house suicidal individuals are not equipped with beds, forcing incarcerated persons to sleep on the cold cement floor with nothing other than a safety smock and blanket.  In addition, persons on suicide watch are locked down in their cells virtually 24 hours a day, with the exception of an occasional and brief opportunity to shower.  There is no opportunity for a visit, telephone call, or recreation while on suicide watch.  These conditions make it difficult, if not impossible, to accurately gauge the source of an incarcerated person's suicidal ideation, as clinicians are limited to cell-front interviews of individuals on suicide watch.

During our interviews, clinicians and nursing staff stated that persons in need of suicide watch or psychiatric observation were housed exclusively on Parchman's mental health unit for those purposes.  However, records show that at least five individuals—including four who committed suicide at Parchman from 2014 through 2021—were actually placed in Unit 29's

40

holding cells for suicide watch or psychiatric observation.  Some of these cells are made of metal grating, including on the ceiling of the cells, and have ceiling ventilation grates above the metal grating.  Others have ceiling and wall ventilation grates and fixtures that protrude from the ceiling.  Like the suicide watch and psychiatric observation cells in the medical unit, these cells pose a risk when used to house suicidal individuals.

### d.  Suicidal Persons are Left Untreated and Unsupervised.

As a result of MDOC's deficient suicide screening and training, incarcerated persons at risk of suicide do not receive necessary treatment and are often left unsupervised on suicide watch, with severely delayed and grossly inadequate response to suicide and self-harm emergencies.

Our review of suicides at Parchman since January 2015 found that the vast majority of these incarcerated persons (14 of 20 or 70%) had histories of suicidal behavior (prior suicide attempt, suicidal ideation, or self-injurious behavior) in the community or in MDOC facilities prior to their transfer to Parchman.  This same proportion of incarcerated persons also had histories of mental illness.  Yet, only few of these 14 individuals were receiving mental health services at the time of their deaths.  In 9 of 14 cases, (64%), those exhibiting suicidal ideation or self-injurious behavior were not placed on suicide precautions.

Although "Crisis Treatment Plans" were completed for the few incarcerated persons placed on suicide precautions, all were inadequate.  The plan narratives were generic, boilerplate, and not individualized to the needs of the patients.  In addition, despite the plans' suggestion that "staff intervention" would be offered to assist in reducing the patient's risk for suicide, clinician progress notes while the patient was on suicide precautions, follow-up notes when the patient was discharged from suicide precautions (albeit often untimely or not done), and weekly round notes in restrictive housing failed to document any assistance by the clinician to the patient in developing coping skills and strategies to reduce risk of self-harm.

The following cases exemplify these deficiencies:

- One incarcerated person was readmitted to MDOC after a previous incarceration.  During his initial screening at CMCF, the incarcerated person denied any current or prior history of suicidal behavior, but reported a prior history of mental illness, psychotropic medication, and two prior hospitalizations.  He was not placed on the mental health caseload.  Upon his transfer to Parchman, his intrasystem transfer screening form was missing all mental health and suicide risk inquiries except for the notation: "Current Medical, Mental Health or Dental Complaint (including suicidal ideations): No."  There was an unexplained gap in the medical chart for approximately one year, during which time the incarcerated individual apparently had been transferred to two other MDOC facilities.  A second Parchman intrasystem transfer screening form a year later indicated that he answered "Yes" to "mental health complaints" and "Yes" to "thoughts/plans of suicide or self-harm."  Despite these affirmative responses, he was not placed on suicide watch or referred to mental health.

41

- In another case, an incarcerated person began banging on his cell door and threatening suicide. Two correctional officers observed him cutting his arms with a razor blade. One officer instructed the incarcerated person not to cut himself, while the other officer allegedly said, "He is not ready to die." The officers then departed the area and did not contact medical or mental health staff about the incident. Approximately 5-20 minutes later, the person was found hanging from the light fixture by a sheet.

- In yet a third example, when an incarcerated person was transferred to Parchman, the intrasystem transfer screening once again conflated and consolidated the mental health and suicide risk inquiry into: "Current Medical, Mental Health or Dental Complaint (including suicidal ideations): No." As a result, no mental health referral was initiated, and the individual was not indicated for mental health treatment. Approximately three months later, the individual's cellmate began to bang on their cell door and yell that his cellmate was cutting himself. The officer who arrived at the cell observed the individual cutting his left wrist, and called the lieutenant (the zone commander). The lieutenant instructed the officer to call the medical unit to check on the individual's mental status. When the officer called medical, the nurse advised that the individual was not on the mental health caseload and had no history of mental illness. The officer then called the lieutenant, relayed the information, and was instructed to "keep a close watch" on the individual. The person was not referred to mental health or placed on suicide precautions. Officers did not remove the instrument that he had been using to cut his arm. A few hours later, his cellmate again began beating on their cell door, this time screaming "Man Down." When officers arrived, they observed the person hanging from the top of the cell door by a sheet. He appeared to be breathing when officers entered the cell and they removed the ligature from around his neck. Yet, correctional staff did not initiate CPR. It was not until a lieutenant arrived 12 minutes later, instructed an officer to call the medical unit, and medical staff arrived another 18 minutes later that CPR or any emergency assistance was rendered. By the time a nurse initiated CPR, the person had become unresponsive. He died.

As these examples show, MDOC fails to refer incarcerated persons at risk of suicide to mental health for treatment or place them on suicide precautions—even when MDOC staff are told of current suicidal ideation or witness active suicidal behavior.

Deficiencies in MDOC's crisis treatment plans further contribute to failed suicide prevention practices. For example, in April 2021, an incarcerated person reported to a medical provider that he swallowed pills and a razor. He also reported that gang members in his unit were "calling my family and threatening them." Consequently, the incarcerated person threatened self-harm by stating, "I'm going to be cutting myself next. These are gang members." Parchman's "Crisis Treatment Plan" contained boilerplate language that did not address the person's particular fears and reasons for self-harm.

Staff response to suicidal emergencies is grossly delayed and inadequate, evidencing a lack of urgency, inexperience borne of deficient training, and a reluctance to provide life-saving first aid. Indeed, all 20 of the Parchman suicides since January 2015 had at least one significant problem with the emergency medical response as follows:

42

- Correctional officers improperly using the cut down tool to allow suicide victims to fall unsupported to the floor in two cases.
- Correctional and nursing personnel checking pulse with ligature still tied around neck in six cases.
- CPR was not initiated in 13 of 20 (65%) cases.
- Correctional officers initiated CPR with ligature still tied around neck in one case.
- Vital signs were taken while victim was still hanging in six cases.
- Individuals were left hanging until the arrival of medical staff in two cases.
- Individuals were left hanging until the arrival of the coroner, an hour or more later, in five cases.
- CPR was initiated on a bunk or mattress and not hard surface (e.g., floor) in three cases.
- Delayed cell entry caused by jammed door locking mechanism in four cases.
- In 11 cases, medical personnel arrived from 13 to 54 minutes after incident initially discovered.

The delays in MDOC's response to suicidal emergencies are also a function of poor—and often non-existent—supervision.  If incarcerated individuals exhibiting suicidal behavior are not placed on suicide watch, or if staff simply fail to conduct required security rounds, people are given the time and space to self-harm and not be discovered until it is too late.  Our investigation found that in 9 of 20 (45%) cases, incarcerated individuals who had committed suicide were discovered hours after their deaths, their bodies in rigor mortis.  The recurring pattern, together with MDOC's failure to address the systemic training and staffing deficiencies that underlie it, further demonstrates MDOC's deliberate indifference to the risk of suicide.  The following cases exemplify these deficiencies:

- On May 5, 2019, an incarcerated person was found by another incarcerated person in Unit 29's holding tank area hanging from a ventilation grate by a sheet.  A correctional officer was notified and, approximately seven minutes later, the shift supervisor and other correctional personnel entered the holding tank area and saw his hanging body, with a deep laceration on his left wrist.  The cell door initially could not be opened because it was jammed.  The supervisor instructed an officer to call the emergency number to the medical unit.  Approximately 20 minutes later, medical staff responded to the scene, and when the cell door was finally opened two minutes later, medical staff observed that the victim's skin was cool to the touch and that his teeth were clenched down on his tongue—indicating rigor mortis.  Review of available incident reports noted that the last security round of Unit 29's holding tank area was about two hours earlier.  The person's body was left hanging until the coroner arrived—nearly two hours after he was initially discovered.

- On April 2, 2018, an incarcerated person used a cell phone to call the Sunflower County Sheriff's Department to ask for help, stating that "he fears for his life."  The incident report also noted that the person would receive a Rules Violation Report for having the cell phone.  The zone lieutenant did not find it necessary to move the person out of his housing unit because he was already in a single cell.  A few hours later, a correctional officer found the person hanging from the upper bunk by a sheet.  Video surveillance confirmed that none of the correctional staff conducted rounds of that area for more than

43

three hours leading up to the time the victim's body was found. The nursing staff responded to and found "his skin cold to touch, rigor mortis with noticeable pulling of the blood noted."

- Two weeks before his death in 2017, an incarcerated person at Parchman began displaying self-injurious behavior and expressing suicidal ideation. He first engaged in self-injurious behavior by cutting himself on his arm. When seen by a clinician, he initially denied suicidal ideation, but later stated that he had recently received bad news and overdosed on blood pressure pills hoping to kill himself. He further expressed ideation and plan by stating that he would cut his throat if he had a razor blade. The clinician noted that the individual appeared to be 'smirking' throughout the entire interview and did not place him on suicide watch. The incarcerated person was placed in restrictive housing. Two days later, he was observed to be agitated and flooded his restrictive housing cell. He again threatened suicide. The person told the clinician that he had been high for a week and tried to kill himself by shooting up with "ice" (crystal meth). He expressed despair about losing his family, stated that he had no reason to live, and noted that he had cut himself on both arms to get relief. He indicated further suicidal ideation and plans. This time, medical staff placed the person on suicide watch. Three days later, the clinician discharged him from suicide watch, noting that he had denied suicidal ideation and stated that he was ready to go to back to his housing unit. He was returned to restrictive housing. The incarcerated person did not receive any of the follow-ups required by policy after his discharge from suicide watch. Indeed, he was not seen again by mental health. One week after his discharge from suicide watch, a correctional officer found the person hanging from the top bunk in his cell by a sheet. Correctional officers arriving at the scene found the cell door jammed. By the time medical staff responded to the cell, his body was in rigor mortis.

   3.   <u>MDOC Places Incarcerated Persons in Prolonged Segregation in Restrictive Housing with Deliberate Indifference to their Serious Medical and Mental Health Needs.</u>

MDOC has demonstrated a pattern or practice of prolonged restrictive housing which violates the constitutional rights of persons at risk of serious harm. The frequency and duration of segregation in restrictive housing, without access to showers or outside recreation, combined with egregious environmental conditions, lack of human interaction, and denial of access to adequate medical or mental health care, compound the substantial risk of serious harm. This harm has been evidenced by signs of psychological deterioration experienced by incarcerated persons at Parchman in solitary confinement, including numerous, repeated incidents of self-harm and suicide. Despite the stark, persistent evidence of life-threating harm to incarcerated persons in restrictive housing, MDOC has failed to reform its housing practices, underscoring its deliberate indifference.

MDOC's use of prolonged restrictive housing, which has particularly dire consequences for people with mental health disabilities, implicates the Eighth Amendment requirement that

prison officials cannot be deliberately indifferent to serious medical and mental health needs.[40] In addition to MDOC's pattern or practice of placing certain persons incarcerated at Parchman in restrictive housing or "Close Custody Confinement" for years on end, MDOC also has implemented several facility-wide lockdowns of all persons, regardless of classification status or disciplinary history, for months at a time.  These extended lockdowns at Parchman have created conditions amounting to restrictive housing throughout the entire facility.

Although restrictive housing "is not *per se* cruel and unusual, there are constitutional boundaries to its use."[41]  The Fifth Circuit has recognized that "[t]here is a line where solitary confinement conditions become so severe that its use is converted from a viable prisoner disciplinary tool to cruel and unusual punishment."[42]  Factors relevant in determining whether restrictive housing has crossed that line include unsanitary living conditions "without opportunity for cleaning the cell" and deprivation of food, bedding, clothing, hygienic materials, and showers.[43]  They also include extreme temperatures.[44]  "[C]onstitutional rights don't come and go with the weather.  The right of prisoners to adequate heat and shelter was known in 1982 and that right is constant."[45]

Length of time is another factor that courts have considered when analyzing claims that placement in restrictive housing or solitary confinement violate the Eighth Amendment.

---

[40] *See Estelle*, 429 U.S. at 103, 105 (explaining that "elementary principles" of the Eighth Amendment "establish the government's obligation to provide medical care for those whom it is punishing by incarceration" and that "[r]egardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury" constitutes an Eighth Amendment violation).  *See also Partridge v. Two Unknown Police Officers of City of Houston, Texas*, 791 F.2d 1182, 1187 (5th Cir. 1986) ("A psychological or psychiatric condition can be as serious as any physical pathology or injury, especially when it results in suicidal tendencies."); *Davenport v. DeRobertis*, 844 F.2d 1310, 1313 (7th Cir. 1988) ("[T]he record shows, what anyway seems pretty obvious, that isolating a human being from other human beings year after year or even month after month can cause substantial psychological damage, even if the isolation is not total.").

[41] *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974); *see also Hutto v. Finney*, 437 U.S. 678, 686 (1978) (noting that the "length of confinement cannot be ignored" in assessing prison conditions).  Some uses of segregation may also constitute the deprivation of protected liberty interests in violation of the Due Process Clause of the Constitution.  *See Sandin v. Conner*, 515 U.S. 472, 484 (1995) (liberty interest may exist where regulations provide for "freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"); *Wilkerson v. Goodwin*, 774 F.3d 845, 855 (5th Cir. 2014) (liberty interest implicated by extended placement in solitary confinement for 23 hours per day without full exercise privileges or human contact).

[42] *Id.*

[43] *Id.* at 1305; *see also Hope v. Harris*, 861 F. App'x. 571, 583 (5th Cir. 2021) (concluding that plaintiff, by alleging prolonged placement in solitary confinement "in sometimes unsanitary conditions, including urine, feces, and mold on the walls, floor, and showers, insufficient cleaning supplies" sufficiently pled Eighth Amendment claim).

[44] *Id.* (finding that incarcerated persons' placement in solitary confinement without adequate heat factors in finding Eighth Amendment violation and affirming injunction that "all cells be adequately heated, ventilated and maintained in a sanitary condition").

[45] *Henderson v. DeRobertis*, 940 F.2d 1055, 1059 (7th Cir. 1991).

Although length of isolation cannot be considered in a vacuum, the "length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards."[46]  No court has demarked a timeframe whereby solitary confinement becomes per se unconstitutional, but courts have indicated that impermissible length of time may be a function of the seriousness of the alleged conditions in solitary and its asserted purpose.[47]  Other factors considered along with length of time include overcrowding, violence, diet, cell conditions, and staff professionalism and judgment.[48]

Most incarcerated persons in restrictive housing at Parchman are housed in Units 29 and 30, in buildings comprised of double and single-cells.  Incarcerated persons may be placed in restrictive housing for a number of reasons and under various statuses, including administrative segregation pending investigation, disciplinary action, or protective custody; classification as a member or leader of a gang, collectively called security threat groups (STGs); commitment to a sentence of death; or detention in "close custody confinement" due to a determination that the individual poses a threat to staff or other incarcerated persons, is an escape risk, or has a recent or serious disciplinary record.  With the exception of those identified as an STG member or leader or on death row, the vast majority of incarcerated persons placed in prolonged restrictive housing were those held in "close custody confinement." People in close custody confinement are locked down alone in single cells, for 23 hours per day, with one hour out of cell for recreation and showers three times per week.  We found that incarcerated persons often remain in close custody confinement for months or even years on end.

    a.    *Incarcerated Persons in Prolonged Restrictive Housing at Parchman Experience Significant Harm.*

Parchman holds hundreds of incarcerated persons in restrictive housing on a daily basis. People in close custody confinement at Parchman are held in restrictive housing for an average of 515 days, and many are held there for several years.[49]  According to the latest data provided, about a quarter of the incarcerated persons in close confinement have been held in restrictive housing for over two years straight and counting.  Over half have been in restrictive housing for more than a year.  Our investigation found that not only were these persons held in restrictive

---

[46] *Hutto v. Finney*, 437 U.S. 678, 686 (1978).

[47] *See id.* at 685–86 ("[P]unitive isolation is not necessarily unconstitutional, but it may be, depending on the duration of the confinement and the conditions thereof."); *see also Gates v. Cook*, 376 F.3d at 333, 338–42 (considering, along with length of confinement, filthy cell conditions, inadequate lighting, and risk of harm from excessive heat in affirming finding that death row conditions were unconstitutional).  *Cf. Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (finding no Eighth Amendment violation when plaintiff alleged to be in crisis management cell for three days and where "cleaning supplies were made available to [him], mitigating any intolerable conditions").

[48] *See Hutto*, 437 U.S. at 687 ("[A] filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months.").

[49] These statistics do not include analysis of those on death row, many of whom have been in segregation for decades.

housing for prolonged long periods of time, they were held in egregious environmental conditions, resulting in mental and physical harm.

People in restrictive housing are held in dilapidated, crumbling structures with collapsing ceilings, leaking water, holes in the walls and floors, and showers that either are not working or do not have any hot water. Mold is pervasive, and inoperable exhaust fans contribute to poor ventilation and extreme heat. In addition to facing these decrepit conditions, incarcerated persons are locked down in dark cells often without lighting, operable toilets and sinks with clean water, or mattresses or pillows.

Incarcerated persons languishing under these conditions have experienced significant harm as evidenced by psychological deterioration and self-harm. The following examples show the harm that prolonged restrictive housing under such harsh conditions may cause, even among those with no prior history of mental illness:

- One incarcerated individual had been in restrictive housing since his arrival at Parchman in September 2001. During his approximately 20-year confinement on Parchman's death row, there was no indication that he sought or was treated for any mental health issues. Yet, in February 2021, he began expressing suicidal ideation during the weekly restrictive housing rounds, which was captured in the clinician's note as "Suicidal Ideation." There was no narrative to explain this notation nor any suicide risk assessment completed. Approximately two weeks later, he hung himself with a bedsheet. According to one of the unit officers, this individual, along with several others, had been seeking relief from the excessive heat on the unit, which was hot the entire week leading up to his death. When this officer asked if they could turn down the heat, unit supervisors advised not to do so. This evidence not only indicates prison officials' deliberate indifference, but also demonstrates the "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment.[50] The CID investigation report found unit temperatures that week as high as 121.2 degrees Fahrenheit on the top tier and 124.5 degrees Fahrenheit on the bottom tier. MDOC's temperature logs produced for that same timeframe recorded even higher temperatures in that unit, ranging from 95 to 145.1 degrees, with an average temperature of 128.4 degrees Fahrenheit.

- In November 2018, an incarcerated person was placed in restrictive housing, under close custody confinement, in Parchman's Unit 29. During the more than 540 days he spent in restrictive housing, he began experiencing mental decompensation, or episodes of severe mental deterioration. On May 1, 2020, he was found in his cell cutting himself with a razor. Staff called for emergency assistance, describing the incident as a "psychotic episode." A nurse and officers arrived at the scene by ambulance about twenty minutes later, but left the person there. There is no evidence that the person was referred to medical or mental health after this incident.

---

[50] *Estelle v. Gamble*, 429 U.S. at 103.

- Another incarcerated individual has been in restrictive housing since November 2017. Over 600 days into his close custody confinement in Unit 29, the individual set a fire while in his cell. Officers responding to the scene discovered that the locks to his cell were jammed. After extinguishing the fire, officers called for maintenance to unjam the lock. There is no evidence that the individual was referred to medical or mental health after this incident.

As these cases exemplify, incarcerated persons in prolonged restrictive housing in egregious conditions at Parchman can and do suffer mental harm, and this harm is evidenced by self-injurious behavior.

Incarcerated persons with serious medical needs or on certain medications are at particular risk of physical harm from their placement in prolonged restrictive housing under extreme temperatures. The Centers for Disease Control and Prevention (CDC) advise that individuals with chronic medical conditions are especially vulnerable to extreme heat.[51] It is well-established that those with chronic diseases such as diabetes, hypertension, and cardiovascular disease may experience life-threatening emergencies from extreme heat.[52] These risks include hypoglycemia (low blood sugar), low blood flow, and cerebral and coronary thrombosis (blood clots in the brain or heart) leading to stroke.[53] Extreme heat poses similar risks for mental health. The American Psychiatric Association has warned that "[e]xtreme heat has been associated with a range of mental health impacts in research over many years, including increases in irritability and symptoms of depression and with an increase in suicide."[54] In addition to impacting symptoms of mood disorders, extreme heat can present dangerous physical symptoms for those with mental illness or taking psychiatric medications. For example, individuals with schizophrenia, especially those taking antipsychotic medication, may experience difficulty regulating body temperature, leading to increased risk of heat stroke.[55]

---

[51] CDC, *Heat and People with Chronic Medical Conditions*, https://www.cdc.gov/disasters/extremeheat/medical.html.

[52] Glen P. Kenny, et al., *Heat Stress in Older Individuals and Patients with Common Chronic Diseases*, 182 Can. Med. Assoc. J. 1053–60 (Jul. 13, 2010), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2900329/.

[53] *Id.*

[54] Am. Psychiatric Assoc., *Extreme Heat Contributes to Worsening Mental Health, Especially Among Vulnerable Populations* (June 30, 2021), https://www.psychiatry.org/newsroom/news-releases/extreme-heat-contributes-to-worsening-mental-health-especially-among-vulnerable-populations.

[55] *See id.* ("People with schizophrenia can experience difficulties with body temperature regulation and changes in temperature can change symptoms of mood disorders. Some psychiatric medications, including some antidepressants and antipsychotics, can affect the way the body regulates temperature."); *see also* Haggai Hermesh, M.D., et al., *Heat Intolerance in Patients with Chronic Schizophrenia Maintained with Antipsychotic Drugs*, 157 Am. J. Psychiatry 1327 (Aug. 2000), *available at* https://ajp.psychiatryonline.org/doi/pdf/10.1176/appi.ajp.157.8.1327 ("Schizophrenic patients maintained on antipsychotic drugs exhibit impaired heat tolerance. . . . Schizophrenia may be associated with hyperthermic

Documentation produced by MDOC confirms numerous reports from incarcerated individuals of extreme heat in Parchman's restrictive housing units.  Indeed, temperatures logs provided for Unit 29 show unit temperatures over 100 degrees every day during the timeframe of reported complaints, and during two-thirds of all the dates logged.  The highest temperature in that unit was recorded at the dangerously hot 145.1 degrees.

Even though MDOC is aware of the conditions and the harms taking place in restrictive housing, it has failed to remedy those conditions and failed to refer incarcerated persons demonstrating self-harm to mental health for evaluation or treatment.

> b.  *MDOC's Practice of Placing Incarcerated Persons with Serious Mental Illness in Prolonged Restrictive housing Further Exhibits its Deliberate Indifference.*

Incarcerated persons with serious mental disorders, such as major depressive disorder, schizophrenia, and bipolar disorder, are particularly vulnerable to the psychological deterioration that prolonged segregation in restrictive housing may cause.  This is why the standards of national correctional organizations call for a special mental health screening prior to placement in restrictive housing to identify vulnerable individuals and determine whether restrictive housing should be avoided in light of the risks of mental harm.[56]

Notwithstanding generally accepted professional standards, MDOC does not conduct a prior mental health review to avoid placing incarcerated persons with serious mental illness in restrictive housing.  Although nursing staff perform a "pre-segregation placement assessment" as a person is being placed in restrictive housing, this assessment is focused on physical health and does not incorporate a mental health assessment.  Indeed, when asked, Parchman's Clinical Director could not recall a single instance where a person with serious mental illness was recommended to be kept from restrictive housing after this "pre-segregation assessment."  In other words, there is no effort to protect individuals with serious mental illness from being placed in restrictive housing.

Consequently, MDOC places incarcerated persons with serious mental illness in restrictive housing under the same type of egregious environmental conditions described above. Many of these individuals remain in restrictive housing for long periods of time and end up

---

syndromes such as febrile catatonia, neuroleptic malignant syndrome, and heatstroke; therefore, schizophrenic patients might exhibit abnormal heat tolerance.").

[56] For example, both American Corrections Association (ACA) and National Commission of Correctional Health Care (NCCHC) standards require an assessment before assigning an inmate to segregation.  According to ACA Standard 4-4399: "When an inmate is transferred to segregation, health care personnel will be informed immediately and will provide assessment and review as indicated by the protocol as established by the health authority." NCCHC Standard P-G-02 states that "Upon notification that an inmate has been placed in segregation . . . a qualified health care professional reviews the inmate's health record. . . . If existing medical, dental, or mental health needs require accommodation, custody staff are notified. . . . The review and notification, if applicable, are documented in the health record."

experiencing severe mental decompensation and self-harm.  The following cases exemplify these harms:

- An incarcerated individual who has been in restrictive housing at Parchman since May 2015 has a diagnosis of major depressive disorder and was designated by MDOC as a LOC C, which means he requires ongoing mental health treatment with the regular availability of psychiatric services.[57]  During the six years he has spent in restrictive housing, the individual decompensated, attempted suicide twice, and engaged in numerous self-harming behaviors.  In May 2019, officers used OC spray on him after he yelled, kicked, and beat on his cell door.  Later that month, the individual cut himself on the neck.  About a month later, he refused to allow officers to remove handcuffs after a shower, resulting in another use of OC spray.  One week later, the individual attempted suicide by hanging in his cell.  Officers responded to the suicide attempt by using OC spray in an attempt to gain control.  The following month, the individual again beat his cell door, this time until it came off of its hinges.  Officers responded by extracting him from his cell and keeping him in restraints until maintenance fixed the door, at which time he was returned to the restrictive housing cell.  Several months later, the individual again attempted suicide, this time by cutting himself on his neck and arm.  Two months later, he cut himself again.  There is no indication that the individual was referred to mental health after any of these incidents.

- MDOC had classified another incarcerated person as a LOC C on the mental health roster with a diagnosis of bipolar I disorder (most recent episode manic) when they placed him in restrictive housing under close custody confinement in January 2018.  In March 2020, the person swallowed razor blades while in restrictive housing in Unit 29.  At the time of this incident, he had spent over 750 consecutive days in restrictive housing.  The incarcerated person was taken to the medical unit for treatment and returned to restrictive housing in Unit 29 later that same day.  There is no indication that the person was referred for mental health treatment after this incident.

- On January 31, 2020, a person incarcerated at Parchman who had been diagnosed with adjustment disorder and classified as a LOC C was discovered in his restrictive housing cell cutting his wrist with a razor blade after taking an unknown number of blood pressure pills.  Emergency assistance was called, and the person was transported for medical treatment.  The person was issued a disciplinary write-up for the incident and returned to restrictive housing in Unit 29.  There is no evidence that he was referred to mental health for treatment.  At the time of this incident, he had been in restrictive housing for nearly two and half years.

---

[57] MDOC gives each incarcerated individual a mental health classification, called "Mental Health Level of Care (LOC) Designation," to indicate the type and frequency of mental health treatment that individual requires and the type of MDOC facility where a person with that classification may be housed.  A designation of "LOC C" represents the highest level of care needed.

In addition to these examples of self-harm by persons with serious mental illness in restrictive housing, between April 2016 and August 2021, 14 people committed suicide while in restrictive housing in Parchman's Unit 29. We found that, contrary to statements made by several MDOC officials and staff during our interviews, incarcerated individuals are often placed in restrictive housing cells in Unit 29—not in Parchman's mental health wing—when expressing suicidal behavior and in need of suicide watch.

> c.   *Incarcerated Persons with Serious Mental Illness are Denied Adequate Mental Health Care in Restrictive Housing.*

After placing incarcerated persons with serious mental illness in restrictive housing, MDOC fails to adequately assess them to determine whether they are experiencing mental deterioration or harm. Although there are weekly mental health rounds in Parchman's restrictive housing units, these are brief, cell-side encounters during which mental health staff simply ask incarcerated individuals if they are 'OK.' We found no evidence that staff perform any actual assessment of individuals' mental status, let alone any assessment of whether an incarcerated person is deteriorating as a result of placement in restrictive housing or is in need of mental health services.[58] In addition, there appears to be no interdisciplinary review process of those in restrictive housing (or alternative mechanism) for mental health staff to communicate with security about the impact of disciplinary or restrictive housing decisions on persons with serious mental illness. MDOC's failure to assess individuals with serious mental illness who are languishing in restrictive housing—even after significant incidents of self-harm or attempted suicide—amounts to deliberate indifference to the serious mental health needs of those in their custody.

## V.   MINIMAL REMEDIAL MEASURES

To remedy the constitutional violations identified in this Findings Report, we recommend that the Mississippi Department of Corrections implement, at minimum, the remedial measures listed below at Parchman, and any facility used or built to replace Parchman.

### A.  Protection from Harm

1.  Correctional Officer Staffing

---

[58] *See Braggs v. Dunn*, 257 F. Supp 3d 1171, 1210, 1245 (M.D. Ala. 2017) (finding "cell-front check-ins are insufficient as counseling and do not constitute actual mental-health treatment" and concluding that "[t]he dearth of individual encounters outside the cell, haphazard cell-front encounters, and inadequate monitoring in ADOC all show that ADOC fails to provide adequate treatment and monitoring").

a) Conduct a staffing study and ensure that correctional officer staffing and supervision levels are appropriate to adequately supervise incarcerated persons.

b) Contact the National Institute of Corrections ("NIC") to arrange a meeting between MDOC, NIC, and the Department to discuss a strategy and timeframes for increasing the number of correctional officers, including both line and supervisory positions.

c) Based on the results of the staffing study, properly screen, hire, and fully train sufficient numbers of corrections officers to ensure reasonable safety at Parchman. Determine how many new officers will be assigned to each area of Parchman, based on current vacancy rates. Within twelve months, staff Parchman with sufficient additional correctional officers to provide security.

d) Establish competitive base starting salaries and benefits packages for correctional officers.

e) Ensure that applicants for correctional officer positions can apply and interview in their local area, and provide frequent testing for applicants.

f) Ensure that applicants for correctional officer positions are adequately screened during a background investigation process to identify and, where necessary, eliminate any candidates who may pose a threat to facility security.

g) Continuously track correctional officer turnover by year, breaking out exits by years of service, age, gender, ethnicity, and facility, and use information learned through this tracking to remedy reasons for attrition.

h) Employ systematic exit interviews of correctional officers and report annually on reasons for departures, cross-tabulated by age, gender, ethnicity, and facility.

i) Assess the need for and feasibility of providing staff working in units with a location enabled emergency notification device.

j) Improve opportunities for incarcerated persons to participate in a variety of prison programming to reduce the risk of violence and abuse from idle time.

k) Implement anti-retaliatory measures to protect incarcerated persons who report misconduct and who renounce gang membership.

2. Safety and Supervision

a) Implement an appropriate, objective classification system that separates incarcerated persons in housing units by classification levels, corresponding to level of risk, to protect incarcerated persons from unreasonable risk of harm.

a) Ensure that housing and common areas are adequately supervised through direct supervision whenever incarcerated persons are present.

b) Ensure frequent, irregularly timed, and documented security rounds by correctional officers inside each housing unit.

c) Conduct regular, documented inspections of cells and common areas of the housing units to identify and prevent rule violations by incarcerated persons.

d) Implement a plan to prevent incarcerated persons from entering housing units other than the ones to which they are assigned.

e) Deploy resources to staff and electronically monitor the facility perimeter and entry/exit points, as well as screen all individuals entering the facility.

f) Identify areas in the facility where incarcerated persons are housed or work where cameras should be installed to support supervision and surveillance, and implement a documented plan for camera installation, repair/replacement, and video review and preservation, especially during CID investigation.

g) Identify all broken or jammed locks and document a plan with timeframes for their repair or replacement. Ensure that all lock repairs or replacements are conducted timely.

h) Identify all malfunctioning security equipment, including but not limited to, perimeter fencing, cameras, BOSS Chairs or Rapid Scan machines and document a plan with timeframes for their repair or replacement. Ensure that all malfunctioning security equipment repairs or replacements are performed timely.

3. Contraband

a) Develop and implement a policy and plan for detecting and reducing the amount of contraband, including the appointment of a Chief Interdiction Officer for contraband interdiction.

b) Conduct regular, documented inspections of cells and common areas to prevent, identify, and remove contraband.

c) Implement unannounced shakedowns or total searches such that at least 15% of all housing units are searched every day, with congregate areas searched weekly; maintain written documentation showing the results of those shakedowns.

d) Ensure that the facility has working metal detectors at every entry/exit point and implement a procedure to use metal detectors to screen all persons entering the facility.

e) Implement reasonable screening procedures for illegal drugs, weapons, or other contraband, especially those that cannot be detected by a metal detector.

f)   Ensure that all incarcerated persons detoxifying from illegal substances receive adequate medical treatment as contraband is reduced and eventually eliminated from the facility.

g)   Ensure that all confiscated contraband is documented/logged and preserved in evidence pending investigation and analysis by the Correctional Investigations Division.

4.   Reporting and Investigations

a)   Ensure that staff promptly and adequately report and investigate incidents of contraband, violence, gang activity, extortion, deaths, suicide attempts, and other incidents of serious harm.

b)   Ensure that incarcerated persons are able to report incidents of harm and other misconduct and that such reports are promptly reviewed and investigated.

c)   Ensure that all allegations of staff misconduct are timely and adequately investigated.

d)   Ensure that all reports by incarcerated persons, incident reports, and investigations are complete and thoroughly documented.

e)   Develop and implement a centralized system that compiles incidents of harm, examines them for patterns and trends, and identifies remedial measures to correct any identified issues.

5.   Gang Influence & Extortion

a)   Develop and implement a comprehensive, effective strategy to prevent, detect, report, and investigate  extortion of incarcerated persons and their families by other incarcerated persons and staff.

b)   Ensure that incarcerated persons or staff found to have engaged in extortion or illegal gang activity are disciplined and referred for prosecution.

**B.   Mental Health Care and Suicide Prevention**

1.   Screening and Identification

a)   Revise the mental health intake screening form and revamp the intake and intrasystem screening processes to ensure that incarcerated persons with mental health difficulties and those at risk of suicide are identified, including individuals with mental health difficulties who have never received formal mental health treatment.

b)  Ensure that information that an incarcerated person reports during intake is verified and implement measures to obtain and review documentation of prior mental health treatment.

c)  Develop and implement a plan to screen current incarcerated persons to identify individuals with mental health difficulties who have never received formal mental health treatment or are not on the mental health caseload.

d)  Ensure that all screenings are performed by staff who are trained to identify mental health needs and that appropriate care is taken to accurately record a person's current medications, any history of treatment or hospitalization, and any previous or current substance use.

e)  Ensure that comprehensive mental health assessments of all incarcerated persons are conducted within 14 days after their arrival at Parchman (or sooner if clinically indicated), with a psychiatrist conducting the assessment or overseeing registered psychiatric nurses who conduct the assessment.

2.  Access to Care

a)  Ensure that adequate treatment is immediately provided to incarcerated persons who are suicidal or psychotic, as soon as those conditions are known.

b)  Ensure that adequate treatment is timely provided to incarcerated persons presenting symptoms requiring mental health care.

c)  Ensure that adequate treatment is immediately provided to incarcerated persons who have been identified as having or potentially having abused substances and are at risk of harm from withdrawal.

d)  Ensure timely access to medical and mental health professionals when the incarcerated person exhibits symptoms of withdrawal.

e)  Develop an effective substance abuse disorder program.

f)  Ensure that appropriate, detailed treatment plans are developed for incarcerated persons with serious mental health needs, and implement procedures whereby treatment plans are regularly reviewed and revised as necessary to ensure they are being followed and are effective.

g)  Ensure that all incarcerated persons with serious mental health needs receive clinically appropriate therapy and counseling.

h)  Ensure a mental health inpatient level of care is available to all incarcerated persons who need it, including regular, consistent therapy and counseling, as clinically appropriate.

i)  Ensure that discussions about treatment between mental health professionals and incarcerated persons can be conducted in a confidential, clinically appropriate setting to allow for effective information sharing and treatment.

j)  Ensure that adequate psychiatry coverage and mental health staff is provided to timely address incarcerated persons' serious mental health needs.

k)  Ensure clinically appropriate medication administration practices, including psychiatric follow-up assessments with incarcerated persons on any new psychotropic medications or dosage changes; timely and correct administration of medications, including to incarcerated persons on lockdown status; and regular auditing of medication administration records for completeness and accuracy.

l)  Ensure that the facility's quality assurance program is adequately maintained and able to identify and correct deficiencies with the mental health care system.

3.  Suicide Prevention

a)  Ensure that suicidal individuals receive the level of care and housing classification appropriate to their acuity, as determined by a mental health professional.

b)  Ensure that incarcerated persons at risk of suicide are housed in suicide-resistant areas, free from protrusions that could be used in a suicide attempt by hanging.

c)  Reduce the unnecessarily harsh nature of suicide watch by ensuring, among other things, access to clothing, bedding, and privileges unless clinically indicated otherwise.

d)  Ensure that suicidal individuals receive adequate mental health treatment and follow-up care, including adequate out-of-cell counseling with a mental health professional.

e)  Ensure that suicidal individuals are adequately supervised according to their level of acuity.

f)  Ensure that an order of constant watch or constant observation results in staff having an unobstructed view of the incarcerated person at all times.  Also, ensure that any staff member conducting constant watch or observation has no other duties to complete during the time they are conducting the watch/observation.

g)  Ensure that suicidal individuals are provided quality, private suicide risk assessments on a daily basis.

### C.  Restrictive Housing

1. Ensure that policies, procedures, and practices regarding the use of restrictive housing, including the use of restrictive housing for incarcerated persons with serious mental illness, comport with the Constitution.

2. Ensure that incarcerated persons are housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff, other incarcerated persons, and the public.

3. Ensure incarcerated persons in restrictive housing have access to adequate medical and mental health care.

4. Ensure that if an incarcerated person shows credible signs of decompensation in restrictive housing, the individual's mental health needs are assessed by a qualified mental health professional and promptly addressed.

5. Ensure that incarcerated persons expressing suicidality or self-harming behavior are not placed, by reason of their suicidal ideation or self-harming behavior, in restrictive housing and instead are provided clinically appropriate mental health care except as provided by remedial measure C.6.

6. Ensure that custody staff consult with mental health staff before placing an incarcerated person in restrictive housing or discipline, to determine whether it is appropriate in light of the individual's mental health.  If it is impracticable to consult with mental health staff before the placement, then mental health staff should evaluate the person as soon as possible after placement to determine the appropriateness of the placement.

7. Conduct periodic review, including mental health monitoring, of all persons in restrictive housing to determine whether their housing is appropriate.

8. Report and review data regarding lengths of stay in restrictive housing, particularly with respect to persons with serious mental illness, and take appropriate corrective action to avoid prolonged restrictive housing.

9.  Ensure sanitary and safe environmental conditions in restrictive housing, including proper temperature regulation.

10. Ensure appropriate opportunities for daily recreation and sufficient time out of cell.

### D.   Deiths and Sentinel Events [59]

1.   Ensure staff conduct appropriate and timely emergency procedures and life-saving measures to incarcerated persons experiencing life-threatening emergencies.

2.   Ensure staff use approved cut-down tools to immediately cut down incarcerated persons who are discovered hanging.

3.   Develop a centralized system to timely obtain and review autopsies for all deaths.

4.   Implement a quality assurance program that includes complete, interdisciplinary morbidity/mortality reviews of all deaths, attempted suicides, or other sentinel events; is adequately maintained; examines for patterns and trends; and identifies and corrects systemic deficiencies.

5.   Ensure that all deaths of incarcerated persons are completely and adequately investigated.

### E.   Policies, Procedures, Training, and Quality Assurance

1.   Develop, revise, and implement adequate policies, procedures, and training to ensure the implementation of the minimum remedial measures identified above.

2.   Ensure that policies, procedures, and training are reviewed and updated on at least an annual basis.

3.   Ensure that all staff training is documented to demonstrate compliance with training requirements and that corrective action is taken for staff who fail to complete required training.

4.   Develop and implement a quality assurance program that identifies and corrects deficiencies with facility security, classification, supervision of incarcerated persons, incident reporting, investigations, mental health care, suicide prevention, and restrictive housing.

5.   Ensure that all corrective action is documented, adequate, and timely implemented.

---

[59]   The Joint Commission defines "sentinel event" as a "patient safety event that results in death, permanent harm, or severe temporary harm."  The Joint Commission, "Sentinel Event," https://www.jointcommission.org/resources/patient-safety-topics/sentinel-event/.

# VI.   CONCLUSION

In summary, our investigation found reasonable cause to believe that MDOC violates the constitutional rights of persons confined at Parchman by failing to:  protect incarcerated persons from violence; provide adequate mental health care; implement adequate suicide prevention measures; and avoid prolonged use of restrictive housing under harsh environmental conditions and with deliberate indifference to incarcerated individuals' serious medical and mental health needs.

We are obligated to advise you that 49 days after issuance of this letter, the Attorney General may initiate a lawsuit pursuant to CRIPA to correct deficiencies identified in this Findings Report if State officials have not satisfactorily addressed our concerns.  42 U.S.C. § 1997b(a)(1).  The Attorney General may also move to intervene in related private suits 15 days after issuance of this Report.  42 U.S.C. § 1997c(b)(1)(A).  Please also note that this Findings Report is a public document.  It will be posted on the Civil Rights Division's website.  We look forward to working cooperatively with you and MDOC administrators and staff to ensure that these violations are remedied.

# EXHIBIT 2



An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT *of* JUSTICE
STICE NEWS

### Assistant Attorney General Kristen Clarke Delivers Remarks on Findings that Conditions at Mississippi State Penitentiary Violate the Constitution

Washington, DC ~ Wednesday, April 20, 2022

---

*Remarks as Prepared*

Good afternoon. I am joined by Clay Joyner, U.S. Attorney for the Northern District of Mississippi, and Darren LaMarca, U.S. Attorney for the Southern District of Mississippi.

We are here today to announce that the Department of Justice has completed a thorough investigation of conditions at the Mississippi State Penitentiary (also known as Parchman). We conducted the investigation under the Civil Rights of Institutionalized Persons Act. Based upon our investigation, we conclude that there is reasonable cause to believe that conditions at Parchman constitute a pattern or practice of violations of the Eighth and Fourteenth Amendments to the U.S. Constitution. The constitutional violations include uncontrolled violence between incarcerated persons, inadequate mental health treatment and suicide prevention measures, and over-reliance on restrictive housing, also known as "solitary confinement", in a manner that endangers physical and mental health. These conditions have resulted in 10 homicides and 12 suicides at Parchman since 2019.

The department has issued a written report explaining its conclusions and identifying the minimum remedial measures necessary to correct the constitutional violations. We have shared our 59-page report with Mississippi officials, and we will make it available to the public.

Established in 1901, Parchman is located in Sunflower County, Mississippi, within the Mississippi Delta, and is the State's oldest prison. Parchman's incarcerated population is nearly 2,000. "Black Mississippians account for 70% of Parchman's incarcerated population, while making up 37% of the state's population."

The Supreme Court has said: "There is no iron curtain drawn between the Constitution and the prisons of this country." Under the Eighth Amendment, prison officials have a constitutional obligation to ensure reasonable care and safety for individuals under their supervision. No one's sentence should include deliberate indifference by prison officials that leads to death or serious harm. The Constitution safeguards the inherent dignity of every human being, including those serving time in our prisons and jails.

The foundation of the Justice Department's work to improve public safety is, and always has been, community trust. Unconstitutional conditions of confinement in our country's state and local prisons and jails breach that trust, which is why the department is committed to investigating conditions and practices within these institutions when and where warranted. Currently, the department is enforcing 13 settlements concerning conditions in adult jails and prisons, including 10 consent decrees. We are engaged in litigation against Alabama over the constitutionality of conditions in its prisons for men, and just last year, we opened new investigations into state prisons in Georgia and five juvenile facilities in Texas.

The importance of the department's work in remedying unconstitutional conditions of confinement is significant and far-reaching. Over two million people currently reside in our nation's prisons and jails. People of color and those with mental illness are disproportionately represented among them. Indeed, one study observed that mental illness and substance use disorders "represents a substantial component of the public health burden of mass incarceration," which is driven by "structural inequalities in race, class, law enforcement, health care and social services.

My colleagues will discuss the specific findings about Parchman in greater detail, but as a result of our team's investigation, we have concluded that the conditions at Parchman are severe, systemic, and exacerbated by serious deficiencies in staffing and supervision, which has resulted in serious harm and a substantial risk of serious harm to persons confined at the prison. For example, our report details that on Dec. 31, 2019, just hours before midnight, a fight in Parchman's Unit 29 sparked what would become a prison riot lasting several weeks. In the months leading up to the riot, there had been widespread reports about unlivable and unsanitary conditions throughout Parchman; violent murders and suicides on the rise; staffing plummeting to dangerous levels; and mounting concerns that gangs were filling the void left by inadequate staff presence and gaining increasing control of Parchman through extortion and violence. Despite notice of these issues, records show the Parchman staff that was caught off guard by the riot and ultimately was unable to adequately and quickly respond. The aftermath revealed that five individuals incarcerated at Parchman had been murdered, and three others committed suicide during the month of January 2020 alone.

As another example, many persons incarcerated at Parchman spend months and even years in restrictive housing under egregious environmental conditions. We found the conditions in restrictive housing pose a substantial risk of serious harm from psychological deterioration for all persons confined in restrictive housing for prolonged periods of time. This is the first time the department has concluded that a prison's use of restricted housing violated the constitutional rights of persons without serious mental illness. My colleagues will share more information about this and related findings, in their remarks.

We want to acknowledge and thank Mississippi officials for cooperating with our investigation. Our goal is to try to reach a consensual resolution with Mississippi on the actions necessary to address the constitutional violations we have identified.

Our investigation of three other Mississippi Department of Corrections (MDOC) facilities, (Southern Mississippi Correctional Institute, Central Mississippi Correctional Facility, and Wilkinson County Correctional Facility), remains ongoing.

I will now turn it over to Clay Joyner, U.S. Attorney for the Northern District of Mississippi, and Darren LaMarca, U.S. Attorney for the Southern District of Mississippi, for their remarks.

---

**Speaker:**
Assistant Attorney General Kristen Clarke

**Topic(s):**
Civil Rights

**Component(s):**
Civil Rights Division
Civil Rights - Special Litigation Section

*Updated April 20, 2022*