Victoria Lopez (Bar No. 330042)*
Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: vlopez@acluaz.org
        jkeenan@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(d)

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriquez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-ROS<br><br>**PLAINTIFFS' SUPPLEMENTAL STATEMENT REGARDING EXPERT NOMINATIONS**<br>**[Doc. 4340]** |

157543359.1

On June 30, 2022, this Court invited the parties "to nominate proposed experts to assist the Court with crafting an injunction that complies with 18 U.S.C. § 3626(a)(1)(A)." [Doc. 4335 at 180] The parties submitted their nominations on July 14, 2022. [Doc. 4338 (Plaintiffs); Doc. 4339 (Defendants)] On July 18, 2022, the Court ordered the parties to file supplemental statements, to include information on the length of time anticipated for expert review of each subject area, whether any expert is limited in the length of time they can be appointed in this case, each expert's compensation and the expected number of hours of work, any merits-based objections to the opposing side's experts, and the parties' positions on use of contempt fines currently on deposit with the Clerk of Court to cover the costs of the experts. [Doc. 4340] On July 22, 2022, the Court explained that "[t]he process of crafting the injunction to remediate the systemic constitutional violations will be intensive," that "expert assistance likely will be necessary to ensure compliance with the injunction," and that it "is seeking to determine if the same experts can be used in both crafting and monitoring the injunction." [Doc. 4342 at 2]

## I.     Supplemental Information Regarding Plaintiffs' Expert Nominations

The experts nominated by Plaintiffs all have experience with different types of injunctions in institutional reform cases and are available to assist the Court in crafting an appropriate remedy in light of the Court's detailed findings of constitutional violations, while allowing Defendants the opportunity to make policy choices on ways to accomplish compliance. Without knowing the details of the injunction that the Court will eventually issue, it is difficult to provide a reliable estimate for the length of time required to assist the Court in crafting an injunction in each area (medical, mental health, and conditions of confinement in isolation units). For example, if the Court is considering appointment of a receiver, then much of the work in developing a plan to improve care would be the responsibility of the receiver; the Court would not need to set forth detailed clinical requirements. [*See, e.g.*, Doc. 4308-1 at 12 (Plaintiffs' Proposed Permanent Injunction); *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005); *but see Gates v. Shinn*, 98 F.3d 463, 464 (9th Cir. 1996) (holding that an injunction

157543359.1

1  "requiring 'appropriate' psychiatric care" is not "specific enough to empower a court to hold prison officials in contempt for failure to do so.")]

The Court also stated that it "is seeking to determine if the same experts can be used in both crafting and monitoring the injunction." [Doc. 4342 at 2] In light of this clarification, Plaintiffs propose two additional mental health experts who are willing both to assist the Court in crafting injunctive relief, and to consider serving as monitors:

**Pablo Stewart, M.D.** The Court is familiar with Dr. Stewart's qualifications. [*See* Doc. 4335 at 70-71] Since 2016, he has served as the court-appointed monitor in *Rasho v. Baldwin*, a statewide class action involving mental health care in the Illinois prison system, for the U.S. District Court for the Central District of Illinois. [*See* Doc. 4109 ¶ 6]

**Kahlil Johnson, M.D.** Dr. Johnson is a psychiatrist, board certified in general and forensic psychiatry. *See* Declaration of Corene Kendrick, Ex. 1. He served as staff psychiatrist and lead psychiatrist at the Washington, D.C. Jail; and currently is a Clinical Assistant Professor at the University of Maryland School of Medicine's Department of Psychiatry, and an Assistant Professor at George Washington University School of Medicine and Health Sciences' Department of Psychiatry and Behavioral Sciences. *Id*. He is a mental health monitor in U.S. Department of Justice litigation involving the Miami-Dade County Jail (S.D. Fla.), and a court-appointed mental health monitor in the Santa Barbara County Jail and Riverside County Jail (both C.D. Cal.). In 2020-21, he assisted the Special Master in *Coleman v. Newsom*, a statewide class action involving mental health services in the California prison system.

Information about each of Plaintiffs' proposed experts' rates and availability appears in the table below. Again, it is impossible at this stage to estimate the length of time and expected number of hours for monitoring, before the injunction has been issued. The time expended by the Court's monitors also will depend heavily on the degree of Defendants' cooperation with compliance and monitoring efforts. [*Cf.* Doc. 4335 at 4 n.2 ("[T]he Performance Measures were not comprehensive enough and under-evaluated the alleged constitutional violations. Defendants used this to their advantage to both subvert

-2-

157543359.1

the Stipulation and continue violating prisoners' constitutional rights."); Doc. 3921 at 33 ("Defendants have always deflected their failures and employed scorched-earth tactics to oppose every attempt to resolve outstanding noncompliance.")].[1]

| | |
|---|---|
| **The Honorable Thelton E. Henderson** | Judge Henderson is available to assist the Court in determining what relief is necessary to cure the constitutional violations related to the provision of health care and the conditions of confinement in isolation units. He offers his assistance to the Court *pro bono*. |
| **Dr. Homer D. Venters** | Dr. Venters is available to assist the Court in determining what relief is necessary to cure the constitutional violations related to the provision of health care, and to discuss his role in monitoring that injunction. His hourly rate is $500. |
| **Dr. Michael Puisis** | Dr. Puisis is available to assist the Court in determining what relief is necessary to cure the constitutional violations related to the provision of health care. His hourly rate is $325. |
| **Dr. Pablo Stewart** | Dr. Stewart is available to assist the Court in determining what relief is necessary to cure the constitutional violations related to the provision of mental health care, and to discuss his role in monitoring that injunction. His hourly rate is $350. |
| **Dr. Kahlil Johnson** | Dr. Johnson is available to assist the Court in determining what relief is necessary to cure the constitutional violations related to the provision of mental health care, and to discuss his role in monitoring that injunction. His hourly rate is $400. |
| **Eldon Vail** | Mr. Vail is available to assist the Court in determining what relief is necessary to cure the constitutional violations related to the conditions of confinement in isolation. His hourly rate is $175. |
| **Dan Pacholke** | Mr. Pacholke is available to assist the Court in determining what relief is necessary to cure the constitutional violations related to the conditions of confinement in isolation. His hourly rate is $200. |

---

[1] While Mr. Vail, Mr. Pacholke, and Mr. Horn are all willing to assist the Court in crafting injunctive relief, none of them are able to commit at this time to a long-term monitoring role in this case.  Plaintiffs therefore request an opportunity to propose one or more monitors for the isolation conditions portion of the case, once injunctive relief has been entered.

-3-

157543359.1

| **Martin Horn** | Mr. Horn is available to assist the Court in determining what relief is necessary to cure the constitutional violations related to the conditions of confinement in isolation. His hourly rate is $400. |
|---|---|

## II.   Plaintiffs' Responses to Defendants' Expert Nominations

This Court also directed the parties "to set forth their merits-based objections . . . to the opposing side's experts." [Doc. 4340 at 2] Plaintiffs' objections to Defendants' expert nominations are below.

### A.   Medical Care

Defendants nominated Dr. David L. Thomas and Dr. Marc Stern to assist the Court in crafting an injunction regarding medical care within the state prison system. [Doc. 4339 at 1] Plaintiffs have no objection to Dr. Stern assisting the Court in crafting an injunction.

Plaintiffs object to Dr. Thomas, an ophthalmologist, serving in any capacity in this case. Federal courts have considered his testimony to be "unpersuasive," "internally inconsistent and patently incredible," *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 946-47 (E.D. Cal. / N.D. Cal. 2009) (observing that Dr. Thomas suggested that providing medical treatment in a bathroom or closet would be appropriate in prison); "largely unsupported assertions, mere *ipse dixit*," *Lewis v. Cain*, No. CV 15-318-SDD-RLB, 2017 WL 4782653, at *6, (M.D. La. Oct. 23, 2017) (noting "serious concerns about the reliability of the foundations for Dr. Thomas's opinions"); and "riddled with conclusory statements and conjecture." *Anderson v. Dallas County*, No. 3:05-CV-1248-G, 2007 WL 1148994, at *5 (N.D. Tex. Apr. 18, 2007), *aff'd*, 286 F. App'x 850 (5th Cir. 2008).

Dr. Thomas does not have experience overseeing reforms to address systemic constitutional violations within a large correctional healthcare system. And he has asserted compliance without employing a rigorous (or any ascertainable) methodology. The Three-Judge Court in *Coleman*, for example, questioned how he could conclude that prisons were "richly staffed" when "he had not conducted or seen any . . . studies of the California prison system." 922 F. Supp. 2d at 947; *see also* Kendrick Decl. Ex. 2 at RT 1240:15-

-4-

157543359.1

1241:16, 1251:2-17 (Dr. Thomas testifying that the prisons he visited were adequately staffed for the workload, but admitting that he recorded no data during his tours, and did not review any work study or outcome data at the California prisons he visited).

And this is a critical issue: "failure to maintain adequate staff has been the fundamental cause of Defendants' unconstitutional actions." [Doc. 4335 at 5 n.3; *see also id.* at 21 ("The core issue is that staffing levels are so inadequate that the provision of constitutionally mandated care is impossible.")] In particular, this Court found that, "as Dr. Wilcox stated '[t]hese staffing problems persist and recur because neither the ADCRR nor Centurion adequately analyze, monitor, or take responsibility for addressing them.'" [Doc. 4138 at ¶ 160; *see also* Doc. 4335 at 74 ("ADCRR failed to present evidence demonstrating that its contract staffing allocation was based on an actual reliable assessment of the need for services."); *id.* at 114 ("Despite knowing a valid staffing analysis is critical for the delivery of health care, Defendant Gann has not prepared any staffing analysis for the Arizona system as a whole or for any individual complex.")] Dr. Thomas would simply be an extension of ADCRR and Centurion's approach to date.

Similarly, Dr. Thomas's views regarding the importance of medical records also represent a serious departure from the Court's findings. In particular, the Court found here that "it is undisputed the very foundation of the health care delivery system—the medical records—does not allow for comprehensive care. In terms of the relevant issue for this case, eOMIS substantially contributes to a substantial risk of serious harm." [Doc. 4335 at 97] Dr. Thomas, by contrast, has opined that constitutionally adequate care can be provided in systems where medical records are not timely maintained, are incomplete, and are unavailable to the provider at the time of service. *See* Kendrick Decl. Ex. 2 at RT 1227:12-24.

### B. Mental Health

Defendants nominated Joel A. Dvoskin, Ph.D., to assist the Court with crafting an injunction regarding mental health care within the state prison system. [Doc. 4339 at 4]

-5-

157543359.1

1  Plaintiffs object to Dr. Dvoskin serving in any capacity in this case.[2]

2  As a threshold matter, Dr. Dvoskin is not a psychiatrist, and does not have medical training, nor a medical license that allows him to prescribe or manage psychotropic medications. [Doc. 4439-1 at 28] He is thus not in any way qualified to assist the Court in crafting a remedy to address the widespread problems with psychotropic medications, an area in which this Court found significant deficiencies, and a basis for its finding of constitutional violations. [*See* Doc. 4335 at 78, 81-84, 87, 91-92, 95-96, 179-80][3]

Dr. Dvoskin's past actions as an expert call into question his methodology. In *Coleman v. Brown*, 938 F. Supp. 2d 955 (E.D. Cal. 2013), Judge Lawrence K. Karlton struck in its entirety Dr. Dvoskin's report filed in support of the State of California's motion to terminate the consent decree in a case regarding mental health care in the state's prisons. This came after Dr. Dvoskin and other defense experts systematically conducted *ex parte* interviews with seriously mentally ill class members at 13 different prison facilities, for purposes of the State "us[ing] the information they gleaned from the inmates against the inmates, in support of their motion to terminate and vacate the injunction." 938 F. Supp. 2d at 963-64. Judge Karlton concluded that the "tainted interviews" made it "entirely proper to strike these expert reports." *Id*. at 968.[4]

In another case, *McClary v. Kelly*, Dr. Dvoskin was retained by New York state prison officials to assert that the conditions in isolation units (called "Special Housing

---

[2] Defendants assert that "[c]urrently, Dr. Dvoskin is engaged as an independent monitor in the matter *Disability Rights Montana, Inc. v. Gotkin, et al*. and is responsible for assessing and reporting findings regarding the Montana State Prison and Montana State Department of Corrections' compliance with the terms of a settlement agreement." [Doc. 4339 at 4] However, he has not started any monitoring role in that case, nor has he assessed or reported any findings in that case. [*See* Doc. 4339-1 at 30 (Dr. Dvoskin's CV showing that it is "planned" that he will serve as a monitor beginning September 2022)]

[3] It would be inadequate to rely on Defendants' proffered expert Dr. Thomas' input to craft or monitor a remedial order related to psychotropic medications, as his training and board certification are in ophthalmology, not psychiatry. [Doc. 4339-1 at 3]

[4] The court's opinion also noted that Dr. Dvoskin's "impression" of the court-appointed Special Master's Report to the Court "is of no utility to the matters at bar[,]" and – relevant to Plaintiffs' point regarding Dr. Dvoskin's lack of qualifications to assess psychiatric medications -- that "[i]ndeed, [Dr. Dvoskin's] only relevant comment is that he was leaving the assessment of the quality of psychiatric services being provided to another defense expert . . . ." *Coleman*, 938 F. Supp. 2d at 986 n.50.

-6-

157543359.1

Units" or "SHU") did not cause psychological harm to a plaintiff who had spent more than four years on continuous "administrative segregation" at Attica due to a classification decision, and not due to any misbehavior. *McClary v. Kelly*, 4 F. Supp. 2d 195, 196-97, 207 (W.D.N.Y. 1998). The court observed that while "Dr. Dvoskin eschewed any discrete theory that prolonged confinement in SHU causes a cluster of predictable psychiatric difficulties," the court found that "[a] conclusion . . . that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science." *Id.* at 207-08. The court held that the plaintiff had stated a claim that his constitutional rights were violated by his prolonged isolation in these severe conditions, without any due process.

### C. Conditions of Confinement

Defendants nominated D. Scott Dodrill to assist the Court with crafting an injunction "to address recreation and socialization opportunities for subclass members as well as delivery of food services." [Doc. 4339 at 4][5] Plaintiffs object to Mr. Dodrill serving in any capacity in this case. Defendants have provided no information about his work as a consultant, expert or monitor. [*See* Doc. 4339 at 6-7; Doc. 4339-1 at 55-57] However, in one recent case, Mr. Dodrill asserted that conditions of isolation found unconstitutional by the court were, in his opinion, constitutional.

In *Porter v. Clarke*, a case challenging the conditions of isolation for people on death row in Virginia, Mr. Dodrill opined that the conditions were constitutional. Kendrick Decl. Ex. 3. The district court found that these conditions violated the Eighth Amendment, and the Fourth Circuit agreed. *Porter v. Clarke*, 290 F. Supp. 3d 518, 533 (E.D. Va. 2018), *aff'd*, 923 F.3d 348 (4th Cir. 2019), *as amended* (May 6, 2019).

---

[5] Plaintiffs do not agree that this is an accurate or complete characterization of the constitutional violations found by the Court in Defendants' isolation units, or of the remedies that will be necessary to cure those violations. [*See* Doc. 4335 at 143 ("Defendants keep hundreds of prisoners in maximum custody housing despite all prison officials admitting there is no penological justification for doing so"); *id*. at 150 ("The staffing levels at SMU and Browning are far below what prison officials acknowledge as necessary to operate the units safely"); *id*. at 159 ("Based on the evidence presented at trial, the treatment of prisoners in detention units is shocking")]

157543359.1

1    Notably, the district court in *Porter* entirely disregarded Mr. Dodrill's opinion. His
2    opinion, which was relied on by the defendants, is not mentioned a single time in the
3    district court's opinion. *See generally*, 290 F. Supp. 3d 518 (E.D. Va. 2018).

4    In fact, Mr. Dodrill's views are grossly out of step with the Court's findings in this
5    case. Much of what he discussed and found unobjectionable in *Porter* was similar to
6    conditions that this Court found either contributed to, or were in and of themselves,
7    violations of the Constitution. For example:

8    1. There was a history of security lapses in the prisons at issue in *Porter*.
9       Mr. Dodrill explained that "a problem that all correctional administrators face is
10      assuring that staff follow the policies and procedures." Ex. 3 at 11. This was
11      also acknowledged by Plaintiffs' expert in this case, Martin Horn. [Doc. 4335 at
12      161-62] But rather than opining on the need to ensure that staff follow
13      procedures, Mr. Dodrill opined that staff's failure to follow procedures led to
14      security lapses that, according to him, justified keeping people locked in their
15      cells. Ex. 3 at 11. This Court, on the other hand, found that the failures to
16      comply with policies contributed to the constitutional violations it found.
17      [Doc. 4335 at 159, 161-62, 166]

18   2. This Court found that the extreme social isolation for people in isolation units
19      in Arizona violated the Constitution. [Doc. 4335 at 180] In *Porter*, Mr. Dodrill
20      opined that people with "one or more vacant cells" between them "were readily
21      able to communicate with each other" and that such isolation did not "hinder
22      interaction in any significant way." Ex. 3 at 13-14. Similarly, he opined that the
23      practice of keeping "one or two vacant [exercise] pens between each occupied
24      pen" did not impact communication. *Id*. He also stated that he supported "in-
25      cell and/or cell front programming" for the plaintiff class, noting specifically
26      that "in-cell television programming is optimal." Ex. 3 at 14. All in all, Mr.
27      Dodrill's opinions make clear that he believes the kind of social isolation this
28      Court found unconstitutional is not just permissible, but that it is "optimal."

-8-

157543359.1

3. Finally, Mr. Dodrill opined that trade association accreditation "supports the conclusion that the prison is not operating outside correctional industry standards." Ex. 3 at 18-19. This Court correctly held that accreditation does no such thing. [Doc. 4335 at 73-74]

Having so recently defended and minimized the damaging effects of unconstitutional conditions of isolated confinement, Mr. Dodrill is not an appropriate person to assist the Court in crafting a remedy for such unconstitutional conditions here.

Defendants also refer to Mr. Dodrill's experience at the Federal Bureau of Prisons ("BOP") as being of "particular importance here." [Doc. 4339 at 6] Defendants explain that Mr. Dodrill "provided leadership and policy direction to all BOP field operatives, to include 116 correctional institutions" and "provided direct supervision" of people in Administrative Maximum units in the BOP. [*Id.* at 6-7] But the year after Mr. Dodrill left the BOP, it was sued over long-standing conditions in the Administrative Maximum facility, a lawsuit that ended in a settlement requiring significant changes to its conditions. *See generally Cunningham v. Fed. Bureau of Prisons*, No. 12-CV-01570-RPM-MEH, 2016 WL 8786871, at *1 (D. Colo. Dec. 29, 2016), *aff'd*, 709 F. App'x 886 (10th Cir. 2017). His leadership, policy direction and supervision of this facility demonstrate that he is not the appropriate person to oversee compliance in this matter.

**III.   Use of Contempt Fines**

The Court asked the parties' "positions on the Court using the contempt fines currently on deposit with the Clerk of Court to cover the costs of the experts." [Doc. 4340 at 2] Plaintiffs do not object to using contempt fines currently on deposit with the Clerk of Court to cover those costs initially. But to the extent expenditures are needed beyond those funds, Defendants should be responsible for compensating experts needed to finally remedy unconstitutional conditions. *See* Fed. R. Evid. 706 (compensation of Rule 706 experts in a civil case is payable "by the parties in the proportion and at the time that the court directs"); *McKinney v. Anderson*, 924 F.2d 1500, 1511 (9th Cir. 1991), *vacated on other grounds sub nom. Helling v. McKinney*, 502 U.S. 903 (1991), *judgment reinstated*,

-9-

157543359.1

959 F.2d 853 (9th Cir. 1992), *aff'd*, 509 U.S. 25 (1993) (holding in prison conditions case that Rule 706 "permits the district court to apportion all the cost to one side"). This Court previously ordered Defendants to pay all of fees for the Rule 706 neutral experts it appointed, and should the need arise again, do the same. [*See* Doc. 2483 at 2 (B.J. Millar); Doc. 3089 at 2 (Dr. Marc Stern)]

Respectfully submitted,

Dated: July 27, 2022

**ACLU NATIONAL PRISON PROJECT**

By: s/ Corene T. Kendrick
David C. Fathi (Wash. 24893)\*\*
Maria V. Morris (D.C. 1697904)\*
Eunice Hyunhye Cho (Wash. 53711)\*\*
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@aclu.org
mmorris@aclu.org
echo@aclu.org

Corene T. Kendrick (Cal. 226642)\*
39 Drumm Street
San Francisco, California 94111
Telephone: (202) 393-4930
Email: ckendrick@aclu.org

\*Admitted *pro hac vice*
\*\*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.

Donald Specter (Cal. 83925)\*
Alison Hardy (Cal. 135966)\*
Sara Norman (Cal. 189536)\*
Rita K. Lomio (Cal. 254501)\*
Sophie Hart (Cal. 321663)\*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email: dspecter@prisonlaw.com
ahardy@prisonlaw.com
snorman@prisonlaw.com
rlomio@prisonlaw.com
sophieh@prisonlaw.com

\*Admitted *pro hac vice*

-10-

157543359.1

Victoria López (Bar No. 330042)*
Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:  vlopez@acluaz.org
         jkeenan@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(d)

Daniel C. Barr (Bar No. 010149)
John H. Gray (Bar No. 028107)
Austin C. Yost (Bar No. 034602)
Karl J. Worsham (Bar No. 035713)
Kathryn E. Boughton (Bar No. 036105)
Kelly Soldati (Bar No. 036727)
Alisha Tarin-Herman (Bar No. 037040)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:  dbarr@perkinscoie.com
         jhgray@perkinscoie.com
         ayost@perkinscoie.com
         kworsham@perkinscoie.com
         kboughton@perkinscoie.com
         ksoldati@perkinscoie.com
         atarinherman@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen; Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

-11-

157543359.1

**ARIZONA CENTER FOR DISABILITY LAW**

By: s/ Maya Abela
    Asim Dietrich (Bar No. 027927)
    5025 East Washington Street, Suite 202
    Phoenix, Arizona 85034
    Telephone: (602) 274-6287
    Email: adietrich@azdisabilitylaw.org

    Rose A. Daly-Rooney (Bar No. 015690)
    Maya Abela (Bar No. 027232)
    177 North Church Avenue, Suite 800
    Tucson, Arizona 85701
    Telephone: (520) 327-9547
    Email: mabela@azdisabilitylaw.org
          rdalyrooney@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

157543359.1

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2022, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Lucy M. Rand
Assistant Arizona Attorney General
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Anne M. Orcutt
Eden G. Cohen
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
aorcutt@strucklove.com
ecohen@struclove.com

*Attorneys for Defendants*

            s/ C. Kendrick

157543359.1