# EXHIBIT 1

# Kahlil A. Johnson, M.D.

Phone: ▮▮▮▮▮▮▮▮

Email: ▮▮▮▮▮▮▮▮▮▮▮▮▮

## LICENSES AND CERTIFICATIONS:

Current Board Certifications in General and Forensic Psychiatry by the American Board of Psychiatry and Neurology
Current Washington, D.C. and Maryland Medical Licenses
Current Washington, D.C. and Maryland Controlled Substances License
Current DEA Licenses for D.C. and Maryland

## POST-GRADUATE TRAINING:

**Forensic Psychiatry Fellow, Saint Elizabeths Hospital, Washington, D.C., July 2016 to June 2017**
Forensic Psychiatry Fellow at Saint Elizabeths Hospital which is part of the Washington D.C. Department of Behavioral Health (DBH). Rotations include: Saint Elizabeths Hospital Forensic Consult Service, Washington D.C. Jail, Comprehensive Psychiatric Emergency Program, Washington D.C. Superior Court Mental Health Urgent Care Clinic, D.C. DBH Outpatient Competency Restoration Program, and the George Washington University Human Rights Clinic.

**Congressional Fellow, American Psychiatric Association, Washington, D.C., January 2009 to November 2009**
Jeanne Spurlock Congressional Health Policy Fellow in the Office of Congressman Edolphus Towns (New York-10[th] Congressional District).

**Psychiatry Resident, George Washington University Hospital, Washington, D.C., June 2005 to June 2009**
Administrative Chief Resident, July 2008 to December 2008; Administrator of Medication Management Clinic, July 2008 to December 2008; Resident Representative, Hospital Emergency Preparedness Committee, July 2006 to December 2009.

## EDUCATION:

**George Washington University School of Public Health, Washington, D.C., September 2006 to July 2008**
Partial coursework completed for a Master of Public Health.

**M.D., Howard University College of Medicine, Washington, D.C., May 2004**
President, Class of 2004 Student Council
Chair, Class of 2004 Scholarship Committee
Recipient, Dr. Charles A. Pinderhughes Psychiatry Scholarship
Delegate, Student National Medical Association
Group Leader, Department of Pediatrics Youth Anger Management Initiative
Student Leader Representative, Liaison Committee for Medical Education
Student Tutor, Howard University College of Medicine Psychiatry Course

**Fellow, University of Regensburg, Regensburg, Germany, September 2003**
Certificate of International Telemedicine Applications, Asklepios International Telemedicine Consortium

**B.S., Howard University, Washington, DC, May 1999**
Major: Biology; Minor: Chemistry

## ACADEMIC APPOINTMENTS:

**Clinical Assistant Professor, May 2020 to Present**
Department of Psychiatry
University of Maryland School of Medicine
Baltimore, MD

**Assistant Professor, August 2017 to Present**
Department of Psychiatry and Behavioral Sciences
George Washington University School of Medicine and Health Sciences
Washington, D.C.

**Clinical Faculty, July 2015 to 2018**
Forensic Psychiatry Fellowship Program
Saint Elizabeths Hospital
Washington, D.C.

## WORK EXPERIENCE:

**Emergency Psychiatrist, University of Maryland Medical Center, 0-8 hours/month, May 2020 to Present**
- Provide comprehensive emergency psychiatric assessment and treatment, including medication management and crisis and supportive psychotherapy, to patients who are in Psychiatric Emergency Service; and when requested to the hospital psychiatry consultation-liaison service and the emergency department.
- Conduct evaluations for presence of suicidal thoughts, plans and risk as well as evaluations for risk for violence; and, provide evaluation and stabilizing treatment of psychiatric disorders including but not limited to serious mental illnesses, substance use disorders, and underlying medical causes of symptoms presenting as a mental illness.
- Arrange admission to the appropriate level of care for continued treatment when warranted including inpatient, partial hospitalization, and outpatient psychiatric and substance use treatment services.
- Provide clinical and formal instruction to psychiatry residents.
- Supervise mid-level staff in their management of patients and case review.

**Psychiatric Hospitalist, George Washington University Hospital, 0-20 hours/week, August 2017 to Present**
- Provide comprehensive psychiatric assessment and treatment, including medication management, psychotherapy, and substance use treatment services, to inpatients who are on the psychiatry unit, consultation-liaison service, or in the emergency room.
- Conduct evaluations for the decisional capacity, presence of suicidal thoughts, plans and risk as well as evaluations for risk for violence, and underlying medical causes of symptoms presenting as a mental illness.
- Provide clinical and formal instruction on the field of psychiatry to Psychiatry and Neurology Residents, and, Medical and Physician Assistant Students.
- Responsibilities also include participating in hospital committees, quality improvement endeavors, policy development and updates, assisting with educational seminars for residents and medical students, forensic psychiatry evaluations, and participation in research.
- Supervise mid-level staff in their management of patients and case review.

**Independent Mental Health Monitor, 20-40 hours/week, May 2017 to Present**
- This role is performed through Kahlil Johnson Psychiatry, LLC.
- Provide recommendations on evidence-based correctional psychiatry in a jail setting in accordance with U.S. Department of Justice CRIPA (Civil Rights of Institutionalized Persons Act) Consent or Settlement Agreements (CA/SA) with various departments of corrections and/or jail health care provider companies.
- Collaborate with a multi-disciplinary court-appointed team that includes Independent Monitors, Attorneys, and correctional professionals with specialization in correctional standards of operation and policy for officers, evidence-based correctional medicine, and safety in a correctional setting.
- Areas of focus for clinical recommendations include, but are not limited to, psychiatric assessment and treatment, including medication management, psychotherapy, behavioral management, and crisis intervention for patients incarcerated in correctional facilities with psychiatric illness or who presented with psychiatric symptoms.
- Provide recommendations on mental health policies, grievances, quality improvement, and peer review.
- Review incidents of suicide, suicide attempt, self-harm, and violence involving mentally ill patients.
- Work with correctional and correctional health care company leadership on an as needed basis for all areas of focus above.

- Perform site visits to all correctional facilities to assess the progress of all parties towards meeting the directives in the CA/SA, prepare a report of the findings, and report the findings to the court.
- Provide regular reports to the court regarding the progress of the correctional staff and the correctional health care provider in meeting the directives in the CA/SA.
- Participate in regularly scheduled meetings with all parties.

**Owner, Kahlil Johnson Psychiatry, LLC, 20-40 hours/week, May 2017 to Present**
- Evaluate and assess human behavior and mental health within a legal context and assist the court, legal professionals, or others with cases involving parties who may have mental disabilities and disorders that interest with my areas of expertise.
- Perform psychiatric assessment and forensic evaluations of persons in correctional institutions, secure hospitals, the community, and other settings.
- Areas of focus include but are not limited to: Correctional Psychiatry, Asylum and Immigration, Competency to Stand Trial, Decisional Capacity, Criminal Responsibility, Risk Assessment, Fitness-for-Duty, and Disability Assessment.

**Psychiatrist, MedOptions, Inc., 16-24 hours/week, September 2016 to September 2017**
- Provide psychiatric assessment and treatment, including medication and behavioral management, to patients residing in assisted living and skilled nursing facilities who are in need of evaluation for psychiatric illness or who present with psychiatric symptoms due to underlying medical illness.
- Perform decisional capacity evaluations on patients with dementia or other illnesses.
- Conduct evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence.
- Work with a collaborative treatment team that includes psychiatric nurse practitioners, psychologists, and clinical social workers.
- Coordinate patient care with facility clinicians and administrators.

**Psychiatric Consultant, Bread for the City, 4-8 hours/month, May 2013 to July 2016**
- Led monthly on-site meetings to provide training that includes evidenced-based diagnosis, treatment, and best-practice chronic care management of common outpatient psychiatric and substance use conditions.
- Reviewed cases with both primary care providers and social work staff and advised on best-practice evidence-based treatment.
- Provided non-urgent Psychiatric consultation via phone, email, or text message with a 24-hour response time and served as an informational resource for psychiatric and mental health service options in the District of Columbia.

**Director of Psychiatry, Unity Health Care, Inc., 40+ hours/week, January 2012 to June 2016**
- Ensured all Psychiatry providers observed HIPAA and other local and federal compliance regulations and functioned collaboratively with the health and human services offered at Unity Healthy Care, Inc. and the Washington, D.C. Department of Corrections and that all personnel of the Department were compliant with the administrative policies and procedures of both organizations.
- Identified, implemented, and supervised the clinical delivery of best practice behavioral healthcare.
- Ensured that Psychiatry providers were fully trained in all aspects of their work; especially in crisis intervention and suicide prevention at the Washington, D.C. Department of Corrections.
- Monitored psychiatric and mental health providers to assure accuracy and quality in their work. Also, periodically monitored psychiatric and mental health records, provided appropriate feedback and took corrective action, when necessary.
- Oversaw and conducted peer review of Psychiatric Providers.
- Established collaborations and partnerships with mental health providers within the District of Columbia and with national networks of Community Health Centers and Departments of Correction.
- Participated effectively as a representative of Unity Health Care, Inc. with the Washington D.C. Departments of Mental Health and Corrections, other offices of the District of Columbia, and local and national community/advocacy groups.
- Prepared testimony on mental health policy and testified under oath on behalf of Unity Health Care, Inc.
- Assessed opportunities to increase reimbursement for mental health services.

- Collaborated with the Medical and Health Center Directors to provide leadership and ensure coverage for all Unity Health Care, Inc. sites and services.
- Provided leadership with Unity Health Care, Inc. quality improvement efforts, including outside agency evaluation and accreditation review.
- Performed the clinical duties of an adult Psychiatrist at Unity Health Care, Inc. at the Washington, D.C. Department of Corrections, and various Community Health Centers in Washington, D.C.

**Lead Psychiatrist at Washington D.C. Jail, Unity Health Care, Inc., 40+ hours/week, August 2011 to January 2012**

- Developed comprehensive and therapeutic treatment plans for assigned caseload and provided direct services based on established treatment.
- Managed on-site crisis intervention.
- Conducted evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence and underlying medical causes of symptoms presenting as a mental illness.
- Assisted with educational seminars for Unity Health Care, Inc. and the Washington, D.C. Department of Corrections staff, and interviewing potential new hires for psychiatric staff. Supervised the Psychiatrists at the D.C. Central Detention Facility and Central Treatment Facility.
- Performed duties as assigned, which included but were not limited to: psychiatry peer review and quality improvement activities, attending the Washington, D.C. Department of Corrections Quality Improvement monthly meetings, directing the Psychiatry monthly meetings, and attending other meetings as assigned.
- Worked closely with the Mental Health Coordinator, Health Services Administrator, and Medical Director on tasks involving overall mental health care management to effectively promote quality of care, operational efficiency, problem-solving, etc.
- Coordinated psychiatry schedule to include approval of scheduled absences and ensure psychiatry coverage.
- Collaborated to improve or maintain provider/staff/patient satisfaction, quality of care, and productivity, provided feedback to the Medical Director and completed annual psychiatric provider evaluations.
- Represented Unity Health Care, Inc. in city-based mental health functions as determined by the Medical Director of Correctional Medicine.
- Oriented new psychiatric providers to site and served as a psychiatric resource to all providers at site.

**Staff Psychiatrist at Washington D.C. Jail, Unity Health Care, Inc., 40 hours/week, November 2009 to August 2011**

- Provided comprehensive psychiatric assessment and treatment, including medication management, to inmates who had a previous history of mental illness or who are in need of evaluation for possible mental illness.
- Provided treatment of substance use withdrawal syndromes when appropriate with referral to appropriate follow-up care.
- Conducted evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence and underlying medical causes of symptoms presenting as a mental illness.
- Interviewed potential new hires for psychiatric staff.
- Responsibilities also included: participating in quality improvement endeavors at the facility, updating jail mental health policies and clinical procedures, assisting with educational seminars for Unity Health Care, Inc. and Washington, D.C. Department of Corrections staff.

**Congressional Fellow, American Psychiatric Association, 40 hours/week, January 2009 to November 2009**

- Jeanne Spurlock Congressional Health Policy Fellow in the Office of Congressman Edolphus Towns, Chairman of the Committee on Oversight and Government Reform (NY-10th Congressional District), acting as a liaison between the Congressman, constituents, private and public sector representatives and Congressional staff regarding health policy.
- Advised and briefed the Congressman on proposed legislation, laws and contemporary issues of debate within health policy, including providing the Congressman with talking points for speeches and language regarding health care for presentations and letters to Congressional members and constituents.
- Prepared and delivered remarks on the Congressman's behalf.
- Researched health care issues for the Health Counsel on the Committee of Oversight and Government Reform and interviewed expert and lay witnesses for pre-hearing investigation and information gathering.
- Presented on the Health Care Reform Initiative at a Health Care Town Hall meeting, held in Brooklyn, NY

and assisted with its planning.
- Facilitated negotiations to include two of the Congressman's bills in the House of Representatives Affordable Health Choices Act (H.R. 3200). Duties also included writing and altering bill language before the presentation of bills to the House of Representatives Clerk's Office for assignment of a bill number, performing district health care site visits on behalf of the Congressional office with the Deputy Chief of Staff and staffing several events for the Congressman.

**PRN Psychiatrist, Washington D.C. Jail, Unity Health Care, Inc., 12-24 hours/week, February 2008 to November 2009**
- Provided comprehensive psychiatric assessment and treatment, including medication management, to inmates who had a previous history of mental illness or who are in need of evaluation for possible mental illness.
- Provided treatment of substance use withdrawal syndromes when appropriate with referral to appropriate follow-up care.
- Conducted evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence and underlying medical causes of symptoms presenting as a mental illness.

**Core Member, Homeland Security Institute Panel on Community Perception of New Technology, two sessions that each lasted 8 hours, August 2007 to February 2008**
- Worked with a multi-specialty panel of experts drawn from a cross section of all relevant professions to provide expert opinion on the potential population impact of new technologies in consideration for use by the U.S. Department of Homeland Security.
- Provided specific expert opinion on the potential medical, psychiatric, and behavioral impacts of the new technologies under consideration for use.
- Provided written feedback upon request.

**HIV Case Manager, Andromeda Transcultural Health Center, Washington, D.C., 40 hours/week, September 2004 to March 2005**
- Assisted HIV positive patients with obtaining housing, payment for past due rent, utilities, telephone bills, and with obtaining food vouchers.
- Provided patients with moderate amounts of food from a government supplied food bank once a month and with tokens and fare cards to cover daily transportation costs.
- Visited homes of clients receiving housing supplementation to verify adequate living conditions in accordance with D.C. Government regulations.
- Participated in creation and implementation of HIV Treatment Adherence Specialist quality assurance guidelines, and establishment of treatment protocols.
- Attended monthly meetings for D.C. HIV AIDS Administration Case Management Planning Committee.

**Research Intern, American Psychiatric Association, 8 hours/week, August 2004 to February 2005**
- Assisted with the implementation and preparation of a grant proposal for a psychiatric study examining first episode of antipsychotic use.
- Conducted literature reviews for treatment patterns of Attention Deficit Hyperactivity Disorder and literature reviews to identify strategies that have been effective in bringing about quality improvement in physicians' practices and reported that information to the Director of the American Psychiatric Institute for Research and Education for presentation to the American Board of Psychiatry and Neurology for the physician practice recertification proposal.

**Standardized Patient Preceptor, Howard University College of Medicine, Washington, D.C., 2 hours/week, August to September 2004**
- Assist fourth year medical students with preparation for the United States Medical Exam Clinical Skills Examination by acting as a mock patient in two clinical scenarios, twice a week, over a 5-week period.
- Allow students to gather a history of present illness and perform a physical exam over a 15-minute period during each scenario.
- Evaluate students and give feedback on the focused appropriateness of their history and physical exam performance, communicative ability and S.O.A.P. (Subjective, Objective, Assessment, and Plan) Notes on the encounter.

- Lead a 20–30-minute discussion on possible diagnoses and diagnostic tests for further evaluation.

## PUBLICATIONS & ARTICLES:

- Johnson K.  The Road to Health Policy: One Resident's Story.  American Journal of Psychiatry Resident's Online Journal, pg. 4, May 2009.
- Maxwell C.J., Reddy R., White-Coleman D, Taylor G.L., Johnson K.A.  A Comparison of Pre/Post-Menopausal HIV Infected African American Women at a Minority Teaching Hospital. Presented at the 15th International AIDS Conference, Bangkok (Thailand), July 11- 16, 2004.  Printed in the International Proceedings by Medimond, Bologna, Italy; pg. 127-131.  Vol. ISBN 88-7587-065-9.

## MEDIA:

- Arehart-Treichel, J. Nothing Bars This Psychiatrist From Helping Inmates. Psychiatric News, March 2, 2012, Vol 47 (5), pg. 12-29.
- Hausman, K. Resident Finds Rewards Atop Capitol Hill. Psychiatric News, April 2, 2010, Vol 45 (7), pg. 11.

## PRESENTATIONS:

- **"Excellence in Mental Health Advocacy: Case Studies in the Nongovernmental, Federal, and Legislative Arena"** Session, American Psychiatric Association Annual Meeting, May 2019
- **"Depression in Primary Care"** George Washington University School of Medicine and Health Sciences, recurring 3rd year medical student primary care clerkship lecture, March 2019 to present
- **"Substance Related Disorders"** George Washington University School of Medicine and Health Sciences, part of the annual 2nd year medical student Brain and Behavior lecture series, September 2018
- **"Managing Psychiatric Emergencies: A Brief Guide for the Intern"** George Washington University Department of Psychiatry, Annual Lecture, June 2018
- **"Violence Risk: Practice Relevance"** George Washington University Department of Psychiatry, Grand Rounds, January 2018
- **"Risk Factors for Terrorism: A Literature Review"** St. Elizabeths Hospital Forensic Psychiatry Fellowship, Washington, D.C., Presentation, May 2017
- **"The Appropriateness of Psychiatric Diagnosis and Psychotropic Medication Prescribing"** St. Elizabeths Hospital Forensic Psychiatry Fellowship, at the Washington, D.C. Department of Corrections, QI Study Presentation, December 2016
- **"The Appropriateness of Psychotropic Prescribing Practices"** Unity Health Care, Inc., at the Washington, D.C. Department of Corrections, QI Study Presentation, December 2010
- **"Psychiatric Disorders and Treatment Options"** Unity Health Care, Inc. at the Washington, D.C. Department of Corrections, Quarterly Mental Health Correctional Officer's Training, November 2009 to June 2016
- **"Interactions Between ART and Psychiatric Medications"** with Andrew Catanzaro, M.D., Unity Health Care, Inc., Washington, D.C. Department of Corrections Provider Meeting, May 2010
- **"America Can't Afford to Wait for Healthcare Reform"** Health Reform Town Hall, U.S. Representative Ed Towns, May 2009 **"The Man Who Can't Stop Swallowing Sharp Objects: Medical Ethics and Management Limitations in Patients with Chronic Factitious Disorder"** Issue Workshop, American Psychiatric Association Annual Meeting, May 2008
- **"Factitious Disorder: Clinical, Ethical and Legal Management Issues"** Morbidity and Mortality Conference, November 2007
- **"Dying, Death, and Bereavement"** George Washington University Department of Psychiatry, Medical Illness Conference, August 2007
- **"Uncontrollable Swallowing: A Case Conference"** Medical Illness Conference, July 2007
- **"Near Death Experiences: A Closer Look"** George Washington University Department of Psychiatry, Grand Rounds, January 2007

## PROFESSIONAL DEVELOPMENT:

- American Academy of Psychiatry and the Law Annual Conference
- American Psychiatric Association Annual Conference
- Annual Forensic Conference at Saint Elizabeths Hospital
- American Academy of Psychiatry and the Law Board Review Course
- Harvard Medical School, Risk Management Update for Physicians and Other Healthcare Professionals,
- Harvard Medical School, Meditation for Everyday Living and Peak Performance for Mental Health, Primary Care, and Medical/Surgical Practices
- National Association of Community Health Centers, New Medical Director's Training, March 2012
- National Commission on Correctional Health Care (NCCHC) Medical Director Boot Camp, Boston, July 2010
- Participated in American Association of Medical Colleges minority recruitment campaign through www.aspiringdocs.org, 2006
- Don Quijote Spanish School, Beginners and Intermediate Spanish, including medical terminology, Tenerife, Canary Islands, Spain, March 2005 to May 2005
- American Psychiatric Association Program for Minority Research Training in Psychiatry Mini-Fellowship, May 2005

## PROFESSIONAL MEMBERSHIPS:
American Psychiatric Association
American Academy of Psychiatry and the Law
National Commission on Correctional Health Care

## LANGUAGE PROFICIENCY:
Fluent in English.
Beginners level spoken Spanish and Intermediate level written Spanish

## REFERENCES PROVIDED UPON REQUEST

# EXHIBIT 2

VOL 6

PAGES 1068 – 1309

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

TO SECTION 2284, TITLE 28 UNITED STATES CODE

```
RALPH COLEMAN, ET AL.,            )
                                  )
            PLAINTIFFS,           )
                                  )
  VS.                             ) NO. CIV S-90-0520 LKK JFM
                                  )
ARNOLD SCHWARZENEGGER, ET AL.     )
                                  ) THREE-JUDGE COURT
            DEFENDANTS.           )
                                  )
_____
                                  
MARCIANO PLATA, ET AL.,           )
                                  )
            PLAINTIFFS,           )
                                  )
VS.                               ) NO. C 01-1351 TEH
                                  )
ARNOLD SCHWARZENEGGER, ET AL.     )
                                  )
            DEFENDANTS.           )
_____)
```

**TRANSCRIPT OF PROCEEDINGS**

SAN FRANCISCO, CALIFORNIA
WEDNESDAY, DECEMBER 3, 2008

(APPEARANCES ON FOLLOWING PAGES)

***REPORTED BY:***   JOAN MARIE COLUMBINI, CSR 5435, RPR
KATHERINE WYATT, CSR 9866, RMR
OFFICIAL COURT REPORTERS, U.S. DISTRICT COURT

**APPEARANCES:**

**FOR PLAINTIFFS**          PRISON LAW OFFICE
                           1917 FIFTH STREET
                           BERKELEY, CALIFORNIA  94710
                           **SARA NORMAN, ESQUIRE**
                           **ALISON HARDY, ESQUIRE**
                           **DONALD SPECTER, ESQUIRE**


                           ROSEN, BIEN & GALVAN, LLP
                           315 MONTGOMERY STREET, TENTH FLOOR
                           SAN FRANCISCO, CALIFORNIA 94104
                     BY:   **MICHAEL W. BIEN, ESQUIRE**
                           **JANE KAHN, ESQUIRE**

                           K&L GATES
                           FOUR EMBARCADERO CENTER
                           SUITE 1200
                           SAN FRANCISCO, CALIFORNIA 94111
                     BY:   **EDWARD P. SANGSTER, ESQUIRE**


**FOR CCPOA**               CARROLL, BURDICK & MCDONOUGH
                           44 MONTGOMERY STREET, SUITE 400
                           SAN FRANCISCO, CALIFORNIA  94104
                     BY:   **NATALIE LEONARD, ESQUIRE**


**FOR DEFENDANTS**          STATE OF CALIFORNIA
                           DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
                           1300 I STREET, SUITE 125
                           P.O. BOX 944255
                           SACRAMENTO, CALIFORNIA  94244
                     BY:   **LISA A. TILLMAN, ESQUIRE**

                           STATE OF CALIFORNIA
                           DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
                           455 GOLDEN GATE AVENUE, SUITE 11000
                           SAN FRANCISCO, CALIFORNIA  94102
                     BY:   **KYLE A. LEWIS, ESQUIRE**

(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES (CONTINUED):**

**FOR DEFENDANTS**          HANSON BRIDGETT
                           425 MARKET STREET, 26TH FLOOR
                           SAN FRANCISCO, CALIFORNIA  94105
                    BY:  **PAUL MELLO, ESQUIRE**

**FOR DISTRICT ATTORNEY**   THE DISTRICT ATTORNEY'S OFFICE
**INTERVENORS**             COUNTY OF RIVERSIDE
                           82-675 HIGHWAY 111, FOURTH FLOOR
                           INDIO, CALIFORNIA  92201
                    BY:  **WILLIAM E. MITCHELL, ESQUIRE**

**FOR LEGISLATOR**          AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
**INTERVENORS**             580 CALIFORNIA STREET, 15TH FLOOR
                           SAN FRANCISCO, CALIFORNIA  94104
                    BY:  **TERESA WANG, ESQUIRE**

**FOR LAW ENFORCEMENT**     JONES & MAYER
**INTERVENORS**             3777 NORTH HARBOR BOULEVARD
                           FULLERTON, CALIFORNIA  92835
                    BY:  **KIMBERLY HALL BARLOW, ESQUIRE**

**FOR COUNTY INTERVENORS**  OFFICE OF THE COUNTY COUNSEL
                           COUNTY OF SANTA CLARA
                           70 WEST HEDDING STREET
                           NINTH FLOOR, EAST WING
                           SAN JOSE, CALIFORNIA  95110
                    BY:  **THERESA FUENTES, ESQUIRE**

**FOR SONOMA COUNTY**       COUNTY OF SONOMA
**INTERVENORS**             575 ADMINISTRATION DRIVE, ROOM 105A
                           SANTA ROSA, CALIFORNIA  95403
                    BY:  **CAROL LYNNE WOODWARD, ESQUIRE**

POWERS - RECROSS / NORMAN

```
 1  Q    IS THAT POSSIBLE?

 2  A    IT'S CERTAINLY POSSIBLE.  I BELIEVE IT WOULD BE POSSIBLE TO

 3  DO THE ASSESSMENTS ON THE INDIVIDUALS IN PRISON WHETHER -- I'M

 4  NOT SURE I WOULD BE COMFORTABLE AS A PRACTITIONER MAKING

 5  REDUCTIONS IN SENTENCES BASED ON EVEN A VALIDATED RISK

 6  ASSESSMENT TOOL.

 7  Q    BUT THINGS LIKE CREDIT EARNING POTENTIAL AND REDUCING

 8  LENGTH OF STAY BASED ON IN-PRISON BEHAVIOR, THAT HAPPENS EVERY

 9  DAY IN THE PRISON ENVIRONMENT?

10  A    YES, IT DOES.

11          MS. NORMAN:  OKAY.  NO FURTHER QUESTIONS.

12          MS. BARLOW:  I HAVE NOTHING FURTHER, YOUR HONOR.

13          JUDGE HENDERSON:  OKAY.  OKAY.  COURT IS IN RECESS.

14  WE'LL COME BACK AT 1:45 AND BEGIN WITH MR. THOMAS.

15                   (LUNCHEON RECESS.)

16          JUDGE HENDERSON:  OKAY.  YOU MAY PROCEED WHEN YOU'RE

17  READY, COUNSEL.

18          MS. JOHNSON:  GOOD AFTERNOON, YOUR HONOR.  ANNE

19  JOHNSON FOR THE DEFENDANTS.  WE ARE CALLING DR. DAVID THOMAS.

20  I HAVE BEEN ASKED TO SPEAK A LITTLE LOUDER.  SORRY ABOUT THAT.

21  THAT'S A RARE, RARE REQUEST.

22          JUDGE KARLTON:  DR. THOMAS, CAN YOU HEAR US NOW?

23          THE WITNESS:  YES, SIR, I CAN.

24          JUDGE HENDERSON:  YOU ARE GOING TO BE SWORN IN,

25  DR. THOMAS.
```

POWERS - RECROSS / NORMAN                    125

```
 1              DAVID L. THOMAS,

 2  HAVING BEEN CALLED AS A WITNESS BY THE GOVERNMENT WAS FIRST

 3  DULY SWORN AND EXAMINED AS FOLLOWS:

 4         THE CLERK:  PLEASE STATE AND SPELL YOUR FULL NAME

 5  FOR THE RECORD.

 6         THE WITNESS:  DAVID L. THOMAS, D-A-V-I-D L.

 7  T-H-O-M-A-S.

 8              (DR. THOMAS APPEARED REMOTELY THROUGH VIDEO

 9              CONFERENCING.)

10         MS. JOHNSON:  DR. THOMAS'S EXPERT REPORTS IN THIS

11  CASE ARE MARKED AS DEFENDANT'S TRIAL EXHIBITS NUMBERS 1015,

12  1016, AND 1017, AND ARE HEREBY OFFERED INTO EVIDENCE.

13         ALSO, TO THE COURT REPORTER IN FLORIDA, WE DID MAIL

14  COPIES OF DR. THOMAS'S EXPERT REPORTS TO YOU, AS WELL AS A COPY

15  OF HIS DEPOSITION TRANSCRIPT.  IF YOU COULD MAKE THOSE

16  AVAILABLE TO HIM AT THIS TIME?

17         DR. THOMAS'S QUALIFICATIONS ARE SET FORTH ON PAGES 1

18  THROUGH 3 OF HIS FIRST REPORT, DEFENDANT'S EXHIBIT 1015, AND

19  HIS CURRICULUM VITAE, WHICH IS ATTACHED AS EXHIBIT A TO THAT

20  REPORT.  WE'RE GOING TO SUMMARIZE, HIGHLIGHT SOME OF HIS

21  SALIENT QUALIFICATIONS.

22         JUDGE HENDERSON:  OKAY.

23         DIRECT EXAMINATION BY MS. JOHNSON

24  BY MS. JOHNSON

25  Q   GOOD AFTERNOON, DR. THOMAS.
```

THOMAS - DIRECT / JOHNSON                            193

```
 1   A    GOOD AFTERNOON.

 2   Q    SINCE YOU'RE TESTIFYING REMOTELY, PLEASE LET ME KNOW IF AT

 3   ANY TIME YOU HAVE DIFFICULTY HEARING ME OR SEEING A DOCUMENT

 4   THAT'S BEING PRESENTED.  OKAY?

 5   A    OKAY.  YES.

 6   Q    DR. THOMAS ARE YOU A PRACTICING PHYSICIAN?

 7   A    YES, MA'AM, I AM.

 8   Q    FOR HOW MANY YEARS TOTAL HAVE YOU PRACTICED MEDICINE?

 9   A    JUST UNDER 40.

10   Q    ARE YOU BOARD CERTIFIED IN ANY SPECIALTY?

11   A    YES, MA'AM.  I AM BOARD CERTIFIED BY THE AMERICAN BOARD OF

12   OPHTHALMOLOGY.

13   Q    DO YOU HAVE ANY FORMAL TRAINING OR EXPERIENCE IN ANY OTHER

14   MEDICAL SPECIALTIES?

15   A    YES, MA'AM.  I WAS PARTIALLY TRAINED IN GENERAL AND CHEST

16   SURGERY AND SERVED AS A GENERAL AND CHEST SURGEON IN VIETNAM.

17   AND I ALSO AT ONE TIME WAS CERTIFIED BY THE AMERICAN BOARD OF

18   AMERICAN FORENSIC EXAMINERS AS A DIPLOMATE IN FORENSIC

19   MEDICINE.

20   Q    WHEN DID YOU RECEIVE YOUR MEDICAL DEGREE AND FROM WHERE?

21   A    FROM UNIVERSITY OF MIAMI IN 1970.

22   Q    DO YOU HAVE ANY OTHER ADVANCED DEGREES?

23   A    YES, MA'AM.  I HAVE A J.D. FROM STETSON UNIVERSITY LAW

24   SCHOOL, AND I AM CURRENTLY WORKING ON A DOCTORATE IN HEALTH

25   EDUCATION.
```

THOMAS - DIRECT / JOHNSON

1  Q    ARE YOU CURRENTLY EMPLOYED?

2  A    YES, MA'AM, I AM.

3  Q    WHAT ARE YOUR CURRENT POSITIONS?

4  A    I AM PROFESSOR AND CHAIRMAN OF THE DEPARTMENT OF SURGERY,

5  PROFESSOR AND CHAIRMAN OF THE DIVISION OF CORRECTIONAL MEDICINE

6  AND PROFESSOR OF PUBLIC HEALTH, ALL AT NOVA SOUTHEASTERN

7  UNIVERSITY.

8  Q    YOU MENTIONED YOU SERVED AS A PHYSICIAN IN THE MILITARY?

9  A    YES, MA'AM.

10 Q    AND WHAT POSITIONS DO YOU HAVE -- OR WHAT WERE YOUR

11 RESPONSIBILITIES AT THAT TIME?

12 A    I WAS DRAFTED AND WENT TO VIETNAM, AND IN VIETNAM I SERVED

13 AS COMMANDING OFFICER OF A 30-BED HOSPITAL WITH THREE OR FOUR,

14 DEPENDING ON THE TIME, OTHER PHYSICIANS WORKING FOR ME.  IT WAS

15 A GENERAL MEDICAL AND SURGICAL HOSPITAL.

16 Q    DID YOU ALSO SERVE IN THE FLORIDA HOUSE OF REPRESENTATIVES?

17 A    YES, MA'AM, FROM 1984 TO 1994.

18 Q    WHAT COMMITTEES DID YOU SERVE ON WHILE YOU WERE A

19 REPRESENTATIVE IN FLORIDA?

20 A    COULD YOU RESTATE THAT QUESTION, PLEASE?

21 Q    WHAT WERE THE COMMITTEES THAT YOU SERVED ON WHEN YOU WERE A

22 REPRESENTATIVE IN FLORIDA?

23 A    OKAY.  I SERVED ON A VARIETY OF COMMITTEES, PROBABLY TOO

24 MANY TO REMEMBER ACCURATELY AS WE SIT HERE.  BUT I SERVED ON

25 APPROPRIATION.  I ALWAYS SERVED ON HEALTHCARE.  I SERVED ON

THOMAS - DIRECT / JOHNSON

1  CORRECTIONS.  I SERVED ON REAPPORTIONMENT AND A VARIETY OF

2  OTHER COMMIT -- NATURAL RESOURCES.  THOSE WERE ONES THAT COME

3  TO -- JUDICIARY.  THOSE WERE THE ONES THAT COME TO THE TOP OF

4  MY HEAD AS WE SPEAK.

5  **Q**   AFTER SERVING IN THE FLORIDA HOUSE OF REPRESENTATIVES, DID

6  YOU WORK AS A CORRECTIONAL HEALTHCARE ADMINISTRATOR FOR THE

7  FLORIDA DEPARTMENT OF CORRECTIONS?

8  **A**   YES, MA'AM.  IN 1994 I WORKED AS THE EXECUTIVE DIRECTOR

9  OF -- THE EXECUTIVE MEDICAL DIRECTOR OF ZEPHER HILLS

10  CORRECTIONAL INSTITUTION.  IN THAT CAPACITY, I SERVED AS A

11  PHYSICIAN AND AN ADMINISTRATOR, AND I HAD ABOUT NINE DOCTORS

12  WORKING FOR ME.

13  **Q**   FOR HOW MANY YEARS TOTAL DID YOU WORK FOR THE FLORIDA

14  DEPARTMENT OF CORRECTIONS?

15  **A**   NINE YEARS TOTAL.

16  **Q**   AND YOU SAID THE FIRST POSITION WAS AS EXECUTIVE DIRECTOR

17  OF THE ZEPHER HILLS FACILITY?

18  **A**   YES, MA'AM.

19  **Q**   CAN YOU JUST SUMMARIZE BRIEFLY FROM THAT POSITION UNTIL

20  YOUR LAST POSITION WHAT POSITIONS YOU HELD IN THE FLORIDA

21  DEPARTMENT OF CORRECTIONS?

22  **A**   YES, MA'AM.  AFTER BEING AT ZEPHER HILLS FOR A LITTLE LESS

23  THAN A YEAR, I BECAME THE REGIONAL MEDICAL DIRECTOR FOR REGION

24  FIVE AND HAD ABOUT 12 OR SO INSTITUTIONS THAT I WAS RESPONSIBLE

25  FOR THE MEDICAL CARE.

THOMAS - DIRECT / JOHNSON                    1198

```
 1              AFTER DOING THAT FOR ABOUT A YEAR, I BECAME THE
 2   CHIEF OF CLINICAL SERVICES, WHICH WAS LATER RENAMED DEPUTY
 3   ASSISTANT SECRETARY FOR CLINICAL SERVICES, AND I WAS
 4   RESPONSIBLE FOR THE CLINICAL CARE TO THE ENTIRE POPULATION.
 5              AFTER THAT I BECAME ASSISTANT SECRETARY FOR HEALTH
 6   SERVICES, WHICH WAS ALSO CALLED DIRECTOR OF HEALTH SERVICES,
 7   AND AT THAT TIME I HAD THE RESPONSIBILITY FOR THE CLINICAL AND
 8   ADMINISTRATIVE CARE OF THE ENTIRE 75,000 INMATES IN THE FLORIDA
 9   DEPARTMENT OF CORRECTIONS.
10   Q   WHEN YOU WERE THE ASSISTANT SECRETARY DIRECTOR FOR HEALTH
11   SERVICES FOR THE FLORIDA DEPARTMENT OF CORRECTIONS, DID YOU
12   REORGANIZE THERE THE PRISONS WITH RESPECT TO MEDICAL CARE?
13   A   YES, MA'AM, I DID.
14   Q   COULD YOU EXPLAIN BRIEFLY WHAT YOU DID?
15   A   I'LL TRY TO BE BRIEF.  TYPICAL PRISON SYSTEM HAS A
16   PHYSICIAN AND INMATE SIDE OF THAT PRISON, AND THAT PHYSICIAN IS
17   EXPECTED TO HANDLE ANY PROBLEM THAT COMES UP, ANY MEDICAL
18   PROBLEM THAT COMES UP WITH THAT PATIENT.  I FELT THAT WAS AN
19   INEFFICIENT AND INAPPROPRIATE WAY TO USE RESOURCES, SO WE
20   CREATED A LEVEL SYSTEM, AND THAT IS RELATIVELY HEALTHY INMATES
21   WERE ASSIGNED TO SPECIAL, TO CERTAIN INSTITUTIONS.  PATIENTS
22   WHO HAD CHRONIC ILLNESSES BUT THEY WERE STABLE WERE ASSIGNED TO
23   OTHER INSTITUTIONS.  HEALTHY PATIENTS WERE ASSIGNED TO LEVEL
24   ONE.  CHRONIC ILLNESS, MANY PATIENTS THAT WERE STABLE WERE
25   ASSIGNED TO LEVEL TWO INSTITUTIONS.
```

THOMAS - DIRECT / JOHNSON                             133

```
 1              LEVEL THREE INSTITUTIONS WERE PATIENTS WITH CHRONIC
 2   ILLNESSES BUT WERE NOT STABLE, AND LEVEL FOUR INSTITUTIONS WERE
 3   CENTERS OF EXCELLENCE, WHICH INCLUDED A HOSPITAL AND A 152-BED
 4   LICENSED HOSPITAL AND AN HIV CARE FACILITY.
 5   Q    WAS THERE ANY PARTICULAR ADVANTAGE THAT YOU BELIEVE WAS
 6   GAINED BY USING THE LEVEL SYSTEM YOU JUST DESCRIBED?
 7   A    SURE.  ONE, ECONOMIES OF SCALE, ECONOMIES OF PURCHASING,
 8   BETTER USE OF EMPLOYEES, FAR LESS OUTSIDE SPECIALTY
 9   CONSULTATIONS, BECAUSE AT THE LEVEL 3 AND LEVEL 4 INSTITUTIONS
10   YOU WOULD HAVE A VARIETY OF PHYSICIANS WITH VARYING SKILLS, AND
11   THEY COULD HANDLE THE PROBLEMS OF THE PATIENTS RATHER THAN
12   SENDING THEM OUT.  FEWER HOSPITALIZATIONS, BETTER PRIMARY CARE
13   AND BETTER SECONDARY CARE.
14   Q    DID YOU HAVE SPECIFIC STAFFING RATIOS FOR THE NUMBER OF
15   PHYSICIANS AND NUMBER OF PRISONERS AT THE INSTITUTIONS IN
16   FLORIDA?
17   A    NO, MA'AM.
18   Q    WHY DID FLORIDA NOT USE STAFFING RATIOS, PHYSICIAN/INMATE
19   STAFFING RATIOS?
20   A    IT WAS MY STRONG FEELING THAT ARBITRARY STAFFING NUMBERS DO
21   NOT ACTUALLY ACCOUNT FOR THE PROBLEMS OF THE PATIENTS AND THE
22   DISTRIBUTION OF PERSONNEL.  I FELT THAT -- I FELT AND STILL
23   FEEL THERE ARE BETTER WAYS TO DO THAT.
24              FOR INSTANCE, LADIES, IT'S WELL RECORDED IN THE
25   LITERATURE THAT LADY PATIENTS REQUIRE THREE TO FOUR TIMES THE
```

THOMAS - DIRECT / JOHNSON

```
 1  AMOUNT OF TIME WITH A PHYSICIAN THAN GENTLEMEN PATIENTS DO.  SO
 2  TO USE AN ARBITRARY STAFFING IN THAT SITUATION WOULD UNDERATE
 3  THE NUMBER OF PHYSICIANS NEEDED COMPLETELY.
 4           PATIENTS REQUIRE MORE TIME GENERALLY THAN SIMPLE
 5  PATIENTS.  SO, IN MY MIND, A MUCH BETTER WAY TO DO IT WAS WITH
 6  OUTCOME MEASUREMENTS OF WORK STUDY PROGRAMS.
 7  Q   WHY DID -- WHY DID YOU LEAVE YOUR POSITION AS ASSISTANT
 8  SECRETARY DIRECTOR FOR HEALTH SERVICES FOR THE FLORIDA
 9  DEPARTMENT OF CORRECTIONS?
10  A   YOU'RE GOING TO HAVE TO REPEAT THAT QUESTION AGAIN,
11  MS. JOHNSON, INTO THE OTHER MICROPHONE.
12  Q   WHY DID YOU LEAVE YOUR POSITION AS ASSISTANT SECRETARY
13  DIRECTOR FOR HEALTH SERVICES FOR THE FLORIDA DEPARTMENT OF
14  CORRECTIONS?
15  A   I WAS CALLED TO SECRETARY CROSBY'S OFFICE, WHO WAS MY
16  IMMEDIATE SUPERIOR, AND HE WANTED ME TO PRIVATIZE THE SYSTEM
17  WITHIN A TWO-MONTH PERIOD OF TIME.  THAT WAS A DIRECT DIRECTIVE
18  FROM SECRETARY CROSBY.  THAT'S IN VIOLATION OF STATE LAW, AND
19  THE ONLY WAY YOU COULD DO THAT WOULD BE TO DECLARE AN EMERGENCY
20  SITUATION.  HE ASKED ME TO DECLARE AN EMERGENCY SITUATION.  IT
21  WAS MY STRONG FEELING THAT THERE WAS NO EMERGENCY IN THE
22  HEALTHCARE, AND SO WE HAD NO MEETING OF THE MINDS.  I OFFERED
23  TO RESIGN.  HE REFUSED TO ACCEPT MY RESIGNATION AND TERMINATED
24  ME.
25  Q   DO YOU CURRENTLY HAVE ANY ROLE IN THE PROVISION OF
```

THOMAS - DIRECT / JOHNSON                              133

1   HEALTHCARE FOR THE FLORIDA DEPARTMENT OF CORRECTIONS PRISONERS?

2   **A**    THE UNIVERSITY THAT I WORK WITH, NOVA SOUTHEASTERN

3   UNIVERSITY AND COLLEGE OF MEDICINE, HAS A VARIETY OF PROGRAMS

4   IN THE FLORIDA DEPARTMENT OF CORRECTIONS.  WE HAVE MEDICAL

5   STUDENTS THAT ROTATE THROUGH THE HOSPITAL AND OTHER SITES.  WE

6   HAVE A CORRECTIONAL FELLOWSHIP THAT IS INTIMATELY RELATED TO

7   THE FLORIDA DEPARTMENT OF CORRECTIONS, AND WE ARE DEVELOPING A

8   CORRECTIONALLY-BASED PSYCHIATRY RESIDENCY.  I AM RESPONSIBLE

9   FOR THOSE PROGRAMS, THE SUPERVISION OF BOTH OUR FACULTY AND THE

10  VOLUNTARY FACULTY FROM THE DEPARTMENT OF CORRECTIONS.

11  **Q**    HAVE YOU PARTICIPATED IN ANY CORRECTIONAL HEALTHCARE

12  ORGANIZATIONS?

13  **A**    YES, MA'AM.  I HAVE BEEN A SURVEYOR FOR THE NATIONAL

14  COMMISSION OF CORRECTIONAL HEALTHCARE, AND I HAVE, ON MULTIPLE

15  OCCASIONS, PRESENTED TO THAT ORGANIZATION.  I HAVE ALSO BEEN A

16  THE CHAIRMAN AND A MEMBER OF THE COMMISSION ON ACCREDITATION IN

17  CORRECTIONS, WHICH IS AN ACCREDITING BODY FOR PRISONS AND

18  JAILS.  I HAVE BEEN WITH THAT GROUP FOR EIGHT YEARS AND WAS

19  CHAIRMAN FOR TWO.  AND I'M CURRENTLY ON THE BOARD OF GOVERNORS

20  OF THE AMERICAN CORRECTIONAL ASSOCIATION, THE LARGEST

21  CORRECTION -- LARGEST AND OLDEST CORRECTIONAL ASSOCIATION IN

22  THE COUNTRY.

23  **Q**    DID YOU --

24  **A**    ACTUALLY, IN THE WORLD.

25  **Q**    DID YOU TOUR PRISONS UNDER THE AUSPICES THE AMERICAN

THOMAS - DIRECT / JOHNSON                           1293

```
 1   CORRECTIONAL ASSOCIATION AND THE NATIONAL COMMISSION OF

 2   CORRECTIONAL HEALTHCARE IN THE UNITED STATES?

 3   A   YES, MA'AM, I DID.

 4   Q   YOU TOURED PRISONS IN APPROXIMATELY HOW MANY STATES?

 5   A   I WOULD ESTIMATE BETWEEN 20 AND 30.  NOT AS MANY AS 30, BUT

 6   PROBABLY MORE THAN 20.

 7   Q   HAVE YOU EVER TESTIFIED AS AN EXPERT IN ANY OTHER CASES

 8   REGARDING PRISON CONDITIONS?

 9   A   YES, MA'AM.

10   Q   DID YOU ACT AS A CONSULTANT IN THE RUIZ VERSUS ESTELLE

11   CASE?

12   A   YES, MA'AM, I DID.

13   Q   WHAT WAS THE RUIZ VERSUS ESTELLE CASE ABOUT?

14   A   IT WAS SPECIFICALLY ABOUT A LACK OF CARE TO THE IN -- LACK

15   OF MEDICAL CARE TO THE INMATES IN THE TEXAS DEPARTMENT OF

16   CRIMINAL JUSTICE.

17   Q   AND YOU WERE A CONSULTANT FOR WHICH SIDE IN THAT CASE,

18   DR. THOMAS?

19   A   PLEASE REPEAT THAT AGAIN, MS. JOHNSON.

20   Q   THIS MIC IS CUTTING OUT.

21          YOU WERE A CONSULTANT FOR WHICH SIDE IN THE RUIZ

22   VERSUS ESTELLE CASE?

23   A   I WAS A PLAINTIFFS' CONSULTANT IN THAT CASE.

24   Q   HAVE YOU EVER BEEN ASKED BY THE MEDICAL DIRECTOR OF A STATE

25   DEPARTMENT OF CORRECTIONS TO EVALUATE THEIR SYSTEM OUTSIDE THE
```

THOMAS - DIRECT / JOHNSON   134

1  CONTEXT OF LITIGATION?

2  **A**   YES, MA'AM.

3  **Q**   WHO ASKED YOU TO DO THAT?

4  **A**   DR. FRED MAUE, M-A-U-E, WHO WAS MEDICAL DIRECTOR OF

5  PENNSYLVANIA AT THAT TIME.  THAT WAS ABOUT '98 OR '99, MAYBE AS

6  EARLY AS '97.

7  **Q**   WHAT DID YOU DO TO EVALUATE THE PENNSYLVANIA DEPARTMENT OF

8  CORRECTIONS HEALTHCARE SYSTEM AT DR. MAUE'S REQUEST?

9  **A**   SOMEBODY COUGHED AND TOOK AWAY TWO OF YOUR WORDS.  COULD

10  YOU PLEASE REPEAT THAT AGAIN?

11  **Q**   WHAT DID YOU DO TO EVALUATE THE PENNSYLVANIA DEPARTMENT OF

12  CORRECTION'S HEALTHCARE SYSTEM AT DR. MAUE'S REQUEST?

13  **A**   THE SAME THING YOU DO ON ANY EVALUATION.  YOU TAKE A LOOK

14  AT THE FACILITIES, THEIR FUNCTIONING.  YOU TALK TO THE STAFF.

15  YOU INSPECT MEDICAL RECORDS.  YOU INTERACT WITH PHYSICIANS AND

16  NURSING PROVIDERS, CORRECTIONAL OFFICERS.  YOU WITNESS THE

17  PHARMACEUTICAL FUNCTIONING.  YOU WATCH DIRECT CARE, INCLUDING

18  TRIAGE.  YOU LOOK AT THE CHRONIC ILLNESS CLINICS.  YOU LOOK AT

19  ACUTE CARE RESPONSES.  YOU LOOK AT INDIVIDUAL PROVIDER

20  INTERACTIONS AND SYSTEM FUNCTIONING, AND I DID ALL OF THAT.

21  **Q**   AT THE TIME THAT YOU EVALUATED THE PENNSYLVANIA DEPARTMENT

22  OF CORRECTIONS HEALTHCARE SYSTEM, DID YOU OBSERVE THAT THE

23  SYSTEM WAS SEVERELY OVERCROWDED?

24  **A**   YES, MA'AM.  IT WAS MY IMPRESSION IT WAS SIGNIFICANTLY

25  OVERCROWDED.

THOMAS - DIRECT / JOHNSON                    135

1   **Q**   WHAT DID YOU SPECIFICALLY OBSERVE THAT LED YOU TO THAT

2   CONCLUSION?

3   **A**   THAT MANY CELLS WERE DESIGNED FOR SINGLE CELL -- SINGLE

4   INMATE USE BUT HAD BUNK BEDS, AND MANY OF THEM HAD WHAT ARE

5   KNOWN AS A TERM OF ART CALLED A BOAT.  A BOAT IS A FIBERGLASS

6   BED, FOR WANT OF A BETTER TERM, THAT RESEMBLES A LARGE CANOE

7   THAT'S PLACED ON THE FLOOR, AND AN INMATE SLEEPS IN THAT BOAT.

8   **Q**   SO DID THE USE OF BOATS AND THOSE BEDS PROVIDE FOR THREE

9   INMATES IN A CELL THAT HAD BEEN DESIGNED FOR ONE?

10  **A**   THAT'S CORRECT.

11          AND THEN THERE WAS ANOTHER ISSUE IN SEVERAL OF THE

12  PRISONS, WHICH WAS HOT BUNKING.  THAT'S A SITUATION WHERE A

13  PERSON GETS TO USE A BUNK ONLY FOR A CERTAIN PERIOD OF TIME AND

14  THEN HAS TO RELINQUISH THAT TO ANOTHER PERSON.

15  **Q**   DID YOU PERSONALLY OBSERVE THE PRACTICES OF HOT BUNKING AND

16  BOATS IN THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS?

17  **A**   I DID NOT WITNESS ANY INMATE BEING RELIEVED OF THE BUNK BY

18  ANOTHER INMATE, BUT I WAS TOLD BY A CORRECTIONAL OFFICER THAT

19  WAS ACCOMPANYING ME AND -- ME AND DR. MAUE THAT ONE INMATE

20  WOULD HAVE TO LEAVE AT, LIKE, 3:00 O'CLOCK BECAUSE THAT WAS

21  THEN ASSIGNED TO ANOTHER INMATE.

22  **Q**   DID YOU PERSONALLY SEE THE BOATS?

23  **A**   DID I PERSONALLY WHAT?

24  **Q**   SEE THE BOATS?

25  **A**   YES, I PERSONALLY WITNESSED THE BOATS, YES, MA'AM.

THOMAS - DIRECT / JOHNSON                        1293

1  **Q**   BASED ON YOUR REVIEW OF PENNSYLVANIA'S HEALTHCARE SYSTEM

2  WITH DR. MAUE, DID YOU REACH ANY CONCLUSIONS REGARDING THE

3  ADEQUACY OF THAT HEALTHCARE SYSTEM?

4  **A**   YES, MA'AM.  I WAS RELATIVELY -- I WAS CONVINCED THEY WERE

5  PROVIDING ADEQUATE CARE, THAT IS THE INMATES HAD ACCESS TO CARE

6  WITHOUT REAL BARRIERS.  THEY HAD ACCESS TO A PROFESSIONAL

7  MEDICAL OPINION.  THAT OPINION SEEMED TO BE CARRIED OUT.  THERE

8  DIDN'T SEEM TO BE ANY BARRIERS TO THAT, AND THERE SEEMED TO BE

9  REASONABLE DOCUMENTATION THAT THIS OCCURRED.

10 **Q**   IN BRIEF, WHAT DOCUMENTS DID YOU REVIEW IN PREPARING FOR

11 YOUR OPINIONS IN THIS CASE REGARDING CALIFORNIA'S CORRECTIONAL

12 MEDICAL CARE SYSTEM?

13 **A**   WELL, IN BRIEF IS DIFFICULT.  I CERTAINLY HAD A COMPLETE

14 SET OF THE PLATA POLICIES AND PROCEDURES, THE REPORTS OF THE

15 RECEIVER, ALL THE REPORTS OF THE RECEIVER, THE PLAINTIFF

16 COUNSEL'S LETTERS OF SITE VISIT REPORTS, COURT ORDERS, AND A

17 VARIETY OF OTHER THINGS.

18 **Q**   DR. THOMAS, IN PREPARING YOUR OPINIONS FOR THIS CASE, DID

19 YOU TOUR ANY PRISONS IN CALIFORNIA?

20 **A**   YES, MA'AM, I DID.

21 **Q**   HOW MANY?

22 **A**   A TOTAL OF EIGHT.

23 **Q**   WHICH PRISONS DID YOU TOUR IN PREPARING YOUR OPINIONS FOR

24 THIS CASE AND WHEN?

25 **A**   IN DECEMBER OF 2007 I TOURED SAN QUENTIN, THE CALIFORNIA

1   MEDICAL FACILITY, AND THE CALIFORNIA INSTITUTE FOR MEN.  IN

2   SEPTEMBER OF '08, I TOURED NORTH KERN, THE SUBSTANCE ABUSE

3   TREATMENT FACILITY, PLEASANT VALLEY, SALINA (SIC) AND HIGH

4   DESERT.

5   **Q**   WHEN YOU "SALINA" DID YOU MEAN SOLANO?

6   **A**   YES, MA'AM.  SOLANO.  I'M SORRY.

7   **Q**   IN GENERAL WHAT DID YOU DO DURING YOUR TOURS OF THESE EIGHT

8   PRISONS IN CALIFORNIA?

9   **A**   IN GENERAL?  THAT'S ALL I GOT, IN GENERAL.

10  **Q**   WHAT DID YOU DO DURING YOUR TOURS OF THESE EIGHT PRISONS IN

11  CALIFORNIA?

12  **A**   THE SAME THINGS THAT I DID WHENEVER I WAS ASKED TO EVALUATE

13  A PRISON SYSTEM.  I TOOK A LOOK AT DAILY, AND IN SOME CASES

14  WEEKEND, FUNCTIONING OF THE PRISON, THE MEDICAL FACILITIES AND

15  THEIR FUNCTIONING.  I TALKED TO STAFF.  I INSPECTED MEDICAL

16  RECORDS.  I INTERACTED WITH PHYSICIANS, PHYSICIAN PROVIDERS,

17  NURSING STAFF, CORRECTIONAL OFFICERS, INMATES; WITNESSED

18  PHARMACEUTICAL FUNCTIONING; LOOKED AT THE CHRONIC ILLNESS

19  CLINICS; LOOKED AT ACUTE CARE RESPONSES; LOOKED AT INDIVIDUAL

20  PROVIDER INTERACTIONS AND SYSTEM FUNCTIONING.

21  **Q**   DOES PLAINTIFFS' COUNSEL ATTEND THESE TOURS WITH YOU?

22  **A**   YES, MA'AM.

23  **Q**   ARE YOU FAMILIAR WITH THE CONCEPT OF PREVENTABLE DEATH IN

24  THE CONCEPT OF MEDICAL CARE?

25  **A**   YES, MA'AM.

THOMAS - DIRECT / JOHNSON                    1293

1  **Q**    WHAT IS YOUR UNDERSTANDING OF THE MEANING OF PREVENTABLE

2  DEATH IN THE CONTEXT OF MEDICAL CARE?

3  **A**    THAT'S ANY DEATH THAT OCCURRED -- THAT OCCURRED BECAUSE OF

4  A FAILURE OF THE MEDICAL SYSTEM OR AN INDIVIDUAL PROVIDER.

5  IT'S A DEATH THAT SHOULD NOT HAVE HAPPENED.

6  **Q**    DR. THOMAS, BASED ON YOUR EXPERIENCE AS A PRACTITIONER IN

7  THE COMMUNITY AND CHAIR OF THE DEPARTMENT OF SURGERY FOR SCHOOL

8  OF MEDICAL AND A PROFESSOR OF PUBLIC HEALTH, IS IT YOUR

9  UNDERSTANDING THAT PREVENTIBLE DEATHS HAPPEN IN THE COMMUNITY

10 AT LARGE?

11 **A**    YES, MA'AM.

12 **Q**    ARE YOU FAMILIAR WITH ANY STUDIES ESTIMATING THE NUMBER OF

13 PREVENTIBLE DEATHS THAT OCCUR ANNUALLY IN U.S. HOSPITALS DUE TO

14 MEDICAL ERROR?

15 **A**    YES, MA'AM.  THERE ARE A WHOLE VARIETY OF STUDIES.  THE ONE

16 THAT'S QUOTED MOST WAS -- THE DATA WAS GATHERED 1999, IT WAS

17 RELEASED IN 2000, BY THE INSTITUTE OF MEDICINE.  IT'S CALLED,

18 "TO ERR IS HUMAN," BUT THERE HAVE BEEN A VARIETY OF OTHER

19 STUDIES INDICATING THAT PEOPLE DIE UNNECESSARILY IN THE

20 AMERICAN HEALTHCARE SYSTEM.

21 **Q**    CAN YOU TELL ME WHAT RATE -- OR INCIDENCE, ACTUALLY, IS THE

22 PROPER TERM -- INCIDENCE OF PREVENTIBLE DEATH IN U.S. HOSPITALS

23 THAT "TO ERR IS HUMAN" REFERRED TO?

24 **A**    YES, MA'AM.  IT WAS SOMETHING BETWEEN 44,000 AND 98,000

25 DEATHS ANNUALLY THAT THE INSTITUTE OF MEDICINE FELT WERE

THOMAS - DIRECT / JOHNSON                                        1208

1  PREVENTIBLE.

2  **Q**   IS IT ACCURATE TO SAY "TO ERR IS HUMAN" EXPRESSED THAT

3  PREVENTIBLE DEATHS IN U.S. HOSPITALS WERE A SIGNIFICANT PROBLEM

4  THAT NEEDED TO BE ADDRESSED BY THE MEDICAL COMMUNITY?

5  **A**   YES, MA'AM.

6  **Q**   BASED ON YOUR EXPERIENCE, ARE INFECTIOUS DISEASES A PROBLEM

7  AT U.S. HOSPITALS?

8  **A**   BASED ON MY EXPERIENCE -- AND THEN YOU DROPPED YOUR VOICE.

9  BASED ON MY EXPERIENCE?

10 **Q**   ARE INFECTIOUS DISEASES A PROBLEM AT U.S. HOSPITALS?

11 **A**   YES, MA'AM, THEY CERTAINLY ARE.

12 **Q**   SPECIFICALLY, DO YOU KNOW WHETHER U.S. HOSPITALS HAVE BEEN

13 EXPERIENCING OUTBREAKS OF METHICILLIN-RESISTANT STAPHYLOCOCCUS

14 AUERUS?

15 **A**   YES, MA'AM.  THAT'S CALLED MRSA, AND THAT'S A SIGNIFICANT

16 PROBLEM.

17 **Q**   ARE THERE ANY PARTICULAR CONCERNS REGARDING THE MRSA

18 OUTBREAKS AT U.S. HOSPITALS AT THIS TIME?

19 **A**   YES, MA'AM.  OUR ONE DRUG AVAILABLE FOR THE TREATMENT OF

20 MRSA IS CALLED VANCOMYCIN, AND VANCOMYCIN IS -- MRSA IS SHOWING

21 SOME RESISTANCE TO VANCOMYCIN, AND THAT'S A MAJOR CONCERN OF

22 THE MEDICAL COMMUNITY.

23 **Q**   DR. THOMAS, BASED ON YOUR EXPERIENCE, IS THE TRANSPORT OF

24 INMATES BETWEEN FACILITIES A REALITY OF PRISONS THAT IMPACTS

25 CORRECTIONAL HEALTHCARE?

THOMAS - DIRECT / JOHNSON                    1243

1    **A**   YES, MA'AM.

2    **Q**   IN YOUR EXPERIENCE, WHAT ARE SOME OF THE REASONS THAT

3    INMATES ARE MOVED BETWEEN FACILITIES?

4    **A**   THERE ARE A WHOLE VARIETY OF REASONS.  MOST COMMONLY CITED

5    ONE IS FOR AN OUTSIDE COURT APPOINTMENT, THAT IS, THE COURT

6    DEMANDS AN INMATE BE TRANSPORTED TO A LOCAL JAIL FOR AN

7    APPEARANCE, BUT THERE ARE HUNDREDS OF OTHERS.

8            ONES THAT COME TO THE TOP OF MY MIND ARE TO PROTECT

9    THE INMATE BECAUSE THE INMATE'S CUSTODY HAS CHANGED, BECAUSE

10   THE MISSION OF THE INSTITUTION HAS CHANGED, BECAUSE THERE WAS A

11   FIGHT AND THEY HAVE TO GET SOME OF THE INMATES OUT OF THE AREA,

12   BECAUSE OF A SECURED THREAT GROUP OR A GANG, FOR PROTECTIVE

13   CUSTODY.  THERE ARE A WHOLE VARIETY OF REASONS THAT INMATES ARE

14   MOVED AND MOVED CONSTANTLY.

15   **Q**   IN YOUR EXPERIENCE, DOES THE DAILY NEED TO TRANSFER INMATES

16   IN A CORRECTIONAL SETTING IMPACT CONTINUITY OF CARE WITH THE

17   SAME MEDICAL CARE PROVIDER OR TEAM OF PROVIDERS EVEN IN PRISONS

18   OR SYSTEMS THAT ARE NOT OVERCROWDED?

19   **A**   OH, YES, MA'AM.

20   **Q**   IN YOUR EXPERIENCE, HOW DO CORRECTIONAL SYSTEMS ADDRESS THE

21   STRAIN OF ONGOING INMATE MOVEMENT BETWEEN FACILITIES?

22   **A**   WELL, THE RECEIVER HAS ALREADY ADDRESSED SOME OF THE

23   ISSUES.  IT IS UNREALISTIC IN A CORRECTIONAL SYSTEM TO EXPECT

24   TREMENDOUS CONTINUITY OF CARE WITH AN INDIVIDUAL PROVIDER, SO

25   YOU ESTABLISH CHRONIC ILLNESS CLINICS WITH DEFINED INTERVALS

THOMAS - DIRECT / JOHNSON                       1293

1    AND TIMES FOR REGULAR APPOINTMENTS.  YOU ASSIGN APPROPRIATE

2    INMATES TO APPROPRIATE CHRONIC ILLNESS CLINICS.

3           YOU ASSURE THAT HEALTHCARE IS A HIGH PRIORITY ISSUE

4    AND CONSCIOUSNESS OF ALL SECURITY PERSONNEL.  YOU HAVE AN

5    INTEGRATED PHARMACY SYSTEM.  YOU CREATE A SYSTEM OF LOGS TO

6    ENSURE FOLLOW UP.  YOU HAVE A VARIETY OF OTHER PRACTICES TO

7    ENSURE THE DELIVERY OF CONSTITUTIONAL HEALTHCARE IN THE

8    REALITIES OF PRISON LIFE.

9    **Q**   IN YOUR EXPERIENCE, ARE THERE FACTORS OTHER THAN

10   OVERCROWDING THAT IMPACT WHETHER HEALTHCARE IS BEING ADEQUATELY

11   DELIVERED IN A CORRECTIONAL SETTING?

12   **A**   COULD YOU REPEAT THAT, MS. JOHNSON?

13   **Q**   IN YOUR EXPERIENCE, ARE THERE OTHER FACTORS BESIDES

14   OVERCROWDING THAT IMPACT WHETHER HEALTHCARE IS BEING ADEQUATELY

15   DELIVERED IN CORRECTION SETTINGS?

16   **A**   OH, SURE.  THERE'S A TREMENDOUS NUMBER OF OTHER ISSUES.

17   WHILE OVERCROWDING MAY MAKE AN IMPACT, LACK OF RESOURCES, LACK

18   OF QUALITY STAFF, DISORGANIZED PHARMACEUTICAL DISTRIBUTION

19   SYSTEM, A NONFUNCTIONING SUPPLY SYSTEM, A LABORATORY REPORT

20   SYSTEM THAT'S FRAUGHT WITH DELAY, A WHOLE HOST OF OTHER THINGS.

21   **Q**   BASED ON YOUR REVIEW OF DOCUMENTS AND TOURS OF PRISONS IN

22   CALIFORNIA, HAVE THESE FACTORS BEEN PRESENT IN THE MEDICAL

23   DELIVERY SYSTEM IN CALIFORNIA'S PRISONS?

24   **A**   ALL OF THEM HAVE BEEN PRESENT, AND THE RECEIVER IS

25   ADDRESSING ALL OF THEM.

THOMAS - DIRECT / JOHNSON                     1203

1   **Q**   ARE THESE FACTORS UNIQUE TO CALIFORNIA?

2   **A**   ARE THESE FACTORS WHAT?

3   **Q**   UNIQUE TO CALIFORNIA.

4            **JUDGE HENDERSON:**  UNIQUE TO CALIFORNIA.

5            **THE WITNESS:**  I'M SORRY.  THANK YOU, YOUR HONOR.

6            NO, THEY'RE CERTAINLY NOT UNIQUE TO CALIFORNIA.

7   **BY MS. JOHNSON**

8   **Q**   BASED ON YOUR REVIEW OF DOCUMENTS AND TOURS OF PRISONS IN

9   CALIFORNIA, ARE THERE FACTORS IMPACTING THE DELIVERY OF

10  HEALTHCARE THAT ARE UNRELATED TO THE SIZE OF THE PATIENT

11  POPULATION?

12  **A**   YES, MA'AM.

13  **Q**   WHAT ARE THOSE FACTORS?

14  **A**   WELL, WE JUST ENUMERATED MANY OF THEM.  I CAN DO IT AGAIN

15  IF YOU'D LIKE, IF I CAN RECALL.

16           **JUDGE KARLTON:**  PLEASE DON'T.

17           **JUDGE HENDERSON:**  THAT'S OKAY.

18           **THE WITNESS:**  THANK YOU, YOUR HONOR.

19  **BY MS. JOHNSON**

20  **Q**   TO YOUR KNOWLEDGE -- AND I THINK YOU PERHAPS ALREADY

21  ANSWERED THIS -- IS THE RECEIVER BEGINNING TO ADDRESS THOSE

22  FACTORS?

23  **A**   YES, MA'AM.

24  **Q**   BASED ON YOUR REVIEW OF DOCUMENTS AND TOURS OF PRISONS,

25  HAVE THOSE FACTORS IMPROVED EVEN IN LIGHT OF THE SIZE OF

THOMAS - DIRECT / JOHNSON                    143

1  CALIFORNIA'S PRISON POPULATION?

2  **A**   YES, MA'AM.  IN FACT, THE COUNSEL SITE VISIT REPORTS

3  INDICATE THEY ARE IMPROVING.

4  **Q**   IN YOUR OPINION, IS THERE A SINGLE MOST IMPORTANT FACTOR IN

5  THE DELIVERY OF ADEQUATE HEALTHCARE IN A CORRECTIONAL

6  ENVIRONMENT?

7  **A**   YES, MA'AM.

8  **Q**   AND WHAT IS THAT FACTOR?

9  **A**   THE CULTURE OF THE SYSTEM.  THE CULTURE MUST FOSTER

10  PROVIDING CARE AT A CONSTITUTIONAL LEVEL.  IN THIS CASE THE

11  COURT RECOGNIZED OVER AND OVER AGAIN THAT THE MEDICAL CARE

12  STAFF HAD LEARNED A -- WHAT THE COURT CALLED A TRAINED

13  INCAPACITATION.  THE RECEIVER HAS ALSO RECOGNIZED THIS.

14  **Q**   DID YOU REVIEW --

15       **JUDGE REINHARDT:**  CAN YOU TELL ME WHAT TRAINED

16  INCAPACITATION IS?

17       **JUDGE KARLTON:**  YOU MIGHT ASK JUDGE HENDERSON.  IT'S

18  HIS PHRASE.

19       **JUDGE REINHARDT:**  I HAVEN'T HAD THE OPPORTUNITY TO

20  READ ALL HIS DECISIONS.

21       **JUDGE HENDERSON:**  I CAN TELL YOU.  I WAS HAVING

22  DINNER WITH TWO FRIENDS WHO ARE DISTINGUISHED SOCIOLOGISTS, AND

23  I WAS DESCRIBING THE CASE.  AND THEY SAID, OH, THAT'S TRAINED

24  INCAPACITY, WHICH IS CAPACITY OF AN INSTITUTION TO TRAIN ITSELF

25  OVER A PERIOD OF TIME TO SAY, OH, WE CAN'T DO THAT, EVEN THOUGH

THOMAS - DIRECT / JOHNSON                    144

1   IT IS DOABLE.

2           THAT'S THE WAY I HAVE BEEN USING THE TERM, AND THAT

3   CAME AS A RESULT OF MEETINGS BEFORE I APPOINTED A RECEIVER,

4   SAYING, WELL, WHY DON'T WE DO THIS AS A SOLUTION, AND WE'D GO

5   AWAY FOR 45 DAYS, AND THEY'D COME BACK AND SAY, WE COULDN'T DO

6   IT.  IT WAS CLEARLY, IN MY VIEW, DOABLE.

7           **JUDGE REINHARDT:**  IS THAT LIKE POLY -- WHAT WAS IT?

8           **JUDGE HENDERSON:**  POLYCENTRIC.  I'LL NEVER WRITE

9   ANYTHING AGAIN.  NO, THOSE ARE DIFFERENT.

10  **BY MS. JOHNSON**

11  **Q**  DR. THOMAS, DID YOU REVIEW PLAINTIFFS' COUNSEL'S POST-TOUR

12  LETTER REGARDING A SITE VISIT ON JULY 17TH -- REGARDING A SITE

13  VISIT ON JULY 17 AND 18, 2007, TO KERN VALLEY STATE PRISON,

14  WHICH IS MARKED AS DEFENDANT'S TRIAL EXHIBIT 1081?

15  **A**  YES, I DID.

16  **Q**  THAT'S SUPPOSED TO APPEAR ON THE SCREEN IN A MOMENT.

17          **JUDGE HENDERSON:**  WHILE WE ARE DOING THAT, I SHOULD

18  MENTION, JUDGE REINHARDT, THAT TERM WAS COINED BY THORSTEIN

19  VEBLEN, NOT MY FRIENDS, A WELL-KNOWN TERM IN SOCIOLOGY.

20  **BY MS. JOHNSON**

21  **Q**  I'M GOING TO START READING.  WE'LL TRY TO FIGURE OUT WHERE

22  IT IS IN THE LETTER HERE.  THE LETTER NOTES -- AND I'M TRYING

23  TO SEE WHERE IT IS.  "I WAS IMPRESSED -- " HERE WE GO.  IN THE

24  FIRST PARAGRAPH:

25          "I WAS IMPRESSED BY MANAGEMENT STAFF'S KNOWLEDGE

THOMAS - DIRECT / JOHNSON                              1242

```
 1          OF AND COMPETENCE IN THE PLATA POLICIES AND

 2          PROCEDURES.  THIS LETTER ..." ET CETERA.

 3               IF YOU GO TO THE NEXT PARAGRAPH?

 4          "WHILE THERE WERE -- " OKAY.

 5          "WHILE THERE WERE A NUMBER OF REQUIREMENTS OF THE

 6          POLICIES AND PROCEDURES THAT HAD NOT YET BEEN PUT

 7          INTO PLACE ON THIS TOUR, I AM OPTIMISTIC THAT KVSP

 8          WILL CONTINUE TO SPEEDILY IMPROVE ITS PLATA

 9          COMPLIANCE."

10               JUDGE KARLTON:  MS. JOHNSON, I'M SORRY.  WHO WROTE

11     THIS LETTER?

12               MS. JOHNSON:  PLAINTIFFS' COUNSEL.  I'M NOT SURE

13     WHICH ONE, YOUR HONOR.

14               JUDGE KARLTON:  OKAY.  ALL RIGHT.

15               MS. JOHNSON:  OKAY.  THE NEXT -- OKAY.

16               JUDGE REINHARDT:  HE DIDN'T FIND TRAINED

17     INCAPACITATION?

18               MS. JOHNSON:  NO.

19               JUDGE REINHARDT:  HE FOUND THEY WERE QUITE WILLING

20     TO IMPROVE.

21               MS. JOHNSON:  WE'RE GOING TO GET THERE.

22          "WHILE THERE WERE A NUMBER OF REQUIREMENTS OF THE

23          POLICIES AND PROCEDURES THAT HAD NOT YET BEEN PUT

24          INTO PLACE ON THIS TOUR, I AM OPTIMISTIC THAT KVSP

25          WILL CONTINUE TO SPEEDILY IMPROVE ITS PLATA
```

THOMAS - DIRECT / JOHNSON                    146

```
 1        COMPLIANCE.  THE DEDICATION AND COMPETENCE OF STAFF
 2        AT KVSP WAS VISIBLE IN THE FOLLOWING AREAS:
 3            "UTILIZATION MANAGEMENT, WHERE THERE WAS NO
 4        BACKLOG, AND A NURSE WHO WAS VERY KNOWLEDGEABLE ABOUT
 5        THE INDIVIDUAL PATIENTS WHOSE MEDICAL ISSUES I
 6        RAISED.  PHARMACY, WHICH WAS CLEARLY RUNNING VERY
 7        SMOOTHLY UNDER THE SUPERVISION OF TWO SKILLED PHARMS
 8        ONES.  APPEALS, WHICH HAVE MADE SIGNIFICANT
 9        IMPROVEMENTS AND HAD BEEN MUCH HELPED BY FREQUENT
10        VISITS BY HCSD.  MEDICAL RECORDS, WHERE THE LOOSE
11        FILINGS AND OLSEN REQUESTS WERE CAREFULLY MONITORED
12        AND CONTROLLED.  AND SPECIALTY, WHICH IS TRACKING THE
13        RELATIVELY SMALL NUMBER OF PENDING APPOINTMENTS
14        PROPERLY DESPITE LACKING THE SPECIALTY ACKNOWLEDGING
15        REPORT SYSTEM USED IN OTHER INSTITUTIONS."
16   BY MS. JOHNSON
17   Q    ARE THE COMMENTS IN THIS POST-TOUR LETTER BY PLAINTIFFS'
18   COUNSEL THE TYPE OF COMMENTS YOU RELIED ON TO DRAW YOUR
19   CONCLUSION THAT THE CULTURE OF THE CALIFORNIA DEPARTMENT OF
20   CORRECTIONS AND REHABILITATION WITH RESPECT TO HEALTHCARE IS
21   CHANGING?
22   A    YES, MA'AM.
23   Q    IN YOUR OPINION, IS A SEPARATION BETWEEN THE SECURITY AND
24   HEALTHCARE MISSIONS IMPORTANT IN A CORRECTIONAL MEDICAL CARE
25   SYSTEM?
```

THOMAS - DIRECT / JOHNSON                              147

1   **A**   YES, MA'AM.

2   **Q**   LOOKING AGAIN AT DEFENDANT'S EXHIBIT 1081, IF YOU GO TO THE

3   NEXT PAGE, AT THE SECOND -- THE SECOND FULL PARAGRAPH, THE

4   SECOND FULL PARAGRAPH?   THE SECOND FULL PARAGRAPH.

5           **JUDGE KARLTON:**   THAT IS THE SECOND FULL PARAGRAPH.

6           **MS. JOHNSON:**   THAT'S NOT A FULL PARAGRAPH.   THE

7   THIRD PARAGRAPH DOWN.   OKAY.

8   **BY MS. JOHNSON**

9   **Q**   CONTINUING, PLAINTIFFS' COUNSEL ALSO NOTED:

10          "ALSO, IN THE ASU2 CLINIC, WE NOTED A SIGNIFICANT

11      PROBLEM WITH CUSTODY MAKING DECISIONS AFFECTING

12      ACCESS TO MEDICAL CARE.   IN THIS ASU, PATIENTS WERE

13      NOT BEING SEEN IN FTF TRIAGE WITHIN THE TIMEFRAMES

14      REQUIRED BY THE POLICIES AND PROCEDURES BECAUSE

15      CUSTODY WAS DICTATING WHAT DAYS PATIENTS CAN COME TO

16      THE CLINIC.   CUSTODY WAS ALSO INAPPROPRIATELY MAKING

17      DETERMINATIONS ABOUT WHEN PATIENTS CAN BE SEEN IN A

18      AND B CLINICS.   THERE PRISONERS WITH EITHER LOWER

19      CUSTODY DESIGNATIONS OR GANG AFFILIATIONS ARE

20      ASSIGNED LIMITED CLINIC DAYS BY CUSTODY.   AS A

21      RESULT, MANY PATIENTS WERE NOT BEING SEEN FOR FTF

22      NURSING TRIAGE WITHIN THE TIMEFRAMES REQUIRED BY

23      PLATA AND WERE BEING DENIED TIMELY ACCESS TO NEEDED

24      MEDICAL CARE.   THIS ISSUE WAS RAISED DURING THE TOUR

25      AND WAS ACKNOWLEDGED AS PROBLEMATIC BY THE AW OF

THOMAS - DIRECT / JOHNSON                    148

```
 1        HEALTHCARE AND BY THE SERGEANT WHO ACCOMPANIED US."

 2             IS THAT THE TYPE OF ISSUE YOU ARE REFERRING TO WHEN

 3   YOU STATE THAT A SEPARATION BETWEEN THE CUSTODY AND HEALTHCARE

 4   MISSION IS IMPORTANT?

 5   A   YES, MA'AM.

 6          JUDGE KARLTON:  SIR, WHAT IS THE AW?

 7          THE WITNESS:  ASSOCIATE WARDEN OR ASSISTANT WARDEN.

 8          JUDGE KARLTON:  THANK YOU, SIR.

 9          THE WITNESS:  YES, SIR.

10   BY MS. JOHNSON

11   Q   IN YOUR OPINION, HAS THE CALIFORNIA PRISON SYSTEM OVERALL

12   SHOWN A SHIFT IN THE RELATIONSHIP BETWEEN THE SECURITY AND THE

13   HEALTHCARE FUNCTIONS?

14   A   AGAIN, IN MY OPINION, HAS THE CALIFORNIA DEPARTMENT OF

15   CORRECTIONS?

16   Q   OVERALL SHOWN A SHIFT IN THE RELATIONSHIP BETWEEN THE

17   SECURITY AND THE HEALTHCARE FUNCTIONS?

18   A   YES, MA'AM, SINCE THE RECEIVER WAS APPOINTED, THERE

19   CERTAINLY HAS BEEN.

20   Q   CAN YOU DESCRIBE THAT SHIFT AS YOU UNDERSTAND IT?

21   A   YES, MA'AM.  THE CULTURE WAS SUCH PRIOR TO APPOINTING OF

22   THE RECEIVER THAT THIS WAS A SECURITY-DRIVEN SYSTEM WITHOUT

23   REGARD FOR ANY OTHER PROGRAMS OR ANY OTHER CONSTITUTIONAL

24   REQUIREMENTS.  SINCE THE RECEIVER HAS BEEN APPOINTED, POSSIBLY

25   BECAUSE OF THE MANAGEMENT STYLE OF THE FIRST RECEIVER, BUT
```

1  THERE IS CLEAR INDICATION THAT THE CULTURE IS SHIFTING IN THE

2  DEPARTMENT TO UNDERSTAND THE NEED FOR A CORRECTIONAL HEALTHCARE

3  SYSTEM THAT WORKS ON A CONSTITUTIONAL LEVEL OF HEALTHCARE.

4  **Q**   IN YOUR OPINION, HAS THE ATTITUDE OF THE ACTUAL MEDICAL

5  STAFF -- MEDICAL CARE STAFF IN CALIFORNIA'S PRISONS CHANGED

6  SINCE THE RECEIVER WAS APPOINTED?

7  **A**   ABSOLUTELY.  FROM MY COMMUNICATION WITH OTHER CORRECTIONAL

8  SYSTEMS, PEOPLE ARE VERY ENVIOUS OF THE STAFF PATTERN AND THE

9  SALARY STRUCTURE AND THINGS LIKE THAT IN THE CALIFORNIA SYSTEM.

10  **Q**   BUT WITH RESPECT TO ATTITUDE OF MEDICAL CARE STAFF, DID YOU

11  HAVE AN OPINION REGARDING WHETHER THE ATTITUDE OF THE MEDICAL

12  CARE STAFF IN CALIFORNIA'S PRISONS HAS CHANGED SINCE THE

13  RECEIVER WAS APPOINTED?

14  **A**   YES, MA'AM.  I'M SORRY.  I INTERPRETED YOUR WORD "ATTITUDE"

15  TO BE "ADEQUATE."  I'M SORRY.

16         IN TERMS OF ATTITUDE, THERE CLEARLY HAS BEEN A

17  SHIFT.  AT ALMOST EVERY INSTITUTION I VISITED, PEOPLE IN THE

18  MEDICAL CARE SERVICE AREA FELT EMPOWERED TO DO THEIR JOB FOR

19  THE FIRST TIME, AND SOME OF THESE WERE LONG-TERM EMPLOYEES WHO

20  HAD NEVER FELT EMPOWERED.

21  **Q**   BASED ON YOUR EXPERIENCE, DO YOU HAVE AN OPINION REGARDING

22  WHETHER A CONSTITUTIONAL LEVEL OF HEALTHCARE CAN BE ACHIEVED IN

23  SEVERELY OVERCROWDED CONDITIONS?

24  **A**   SURE.  I'VE SEEN -- PERSONALLY WITNESSED HEALTHCARE

25  SERVICES DELIVERED IN EXTREMELY OVERCROWDED CONDITIONS AND THE

THOMAS - DIRECT / JOHNSON                              1243

```
 1   HEALTHCARE COMPORTS TO ALL STANDARD CONSTITUTIONAL CARE IN
 2   SPITE OF OVERCROWDING.  TIMELY QUALITY APPROPRIATE SERVICES
 3   WERE PROVIDED.
 4   Q    BASED ON YOUR EXPERIENCE, YOUR REVIEW OF DOCUMENTS AND YOUR
 5   TOURS OF PRISONS IN CALIFORNIA, DO YOU HAVE AN OPINION
 6   REGARDING WHETHER OVERCROWDING IS THE PRIMARY CAUSE OF THE
 7   ALLEGED DEFICIENCIES IN THE DELIVERY OF MEDICAL CARE IN
 8   CALIFORNIA'S PRISONS?
 9   A    YES, MA'AM.
10   Q    WHAT IS YOUR OPINION?
11   A    OVERCROWDING -- IN MY OPINION, OVERCROWDING IS NOT THE
12   PRIMARY CAUSE OF THE ALLEGED PROBLEMS IN THE DEPARTMENT OF
13   CORRECTIONS.
14   Q    BASED ON YOUR EXPERIENCE, YOUR REVIEW OF DOCUMENTS, AND
15   YOUR TOURS OF PRISONS IN CALIFORNIA, DO YOU HAVE AN OPINION
16   REGARDING WHETHER REMOVING OVERCROWDING WILL EFFECTUATE A
17   CONSTITUTIONAL LEVEL OF MEDICAL CARE DELIVERY IN CALIFORNIA'S
18   PRISONS?
19   A    YES, MA'AM, I DO.
20   Q    WHAT IS THAT -- WHAT IS THAT OPINION?
21   A    THAT THERE'S NO REAL NEXUS BETWEEN OVERCROWDING AND A
22   CONSTITUTIONAL DELIVERY OF HEALTHCARE.  IF YOU OBLIGED PEOPLE
23   TO LEAVE, THERE MAY NOT BE A NEXUS IN THEIR MEDICAL CARE NEEDS
24   TO RELIEVING THE ISSUES OF OVERCROWDING, PLUS YOU HAVE ALL OF
25   THE OTHER ISSUES THAT WE'VE TALKED ABOUT THAT THE RECEIVER IS
```

THOMAS - DIRECT / JOHNSON                    143

1   ADDRESSING.

2              **JUDGE KARLTON:**  MS. JOHNSON, CAN YOU --

3              I'M SORRY, DR. THOMAS.  I DON'T UNDERSTAND YOUR

4   ANSWER.  WOULD YOU ELABORATE AS TO WHAT IT IS YOU'RE SAYING?

5              **THE WITNESS:**  YES, YOUR HONOR.  IT IS MY STRONG

6   FEELING THAT OVERCROWDING IS NOT THE PRIMARY CAUSE OF THE

7   ALLEGED PROBLEMS OF THE DEPARTMENT OF CORRECTIONS.  THIS IS A

8   MULTIFACETED PROBLEM, AND SIMPLY REMOVING ONE ISSUE, WHILE IT

9   MAY OR MAY NOT MAKE THE RECEIVER'S JOB EASIER, WON'T GET RID OF

10  THE PROBLEM.  THE RECEIVER HAS DONE A WONDERFUL JOB IN MANY,

11  MANY AREAS.  IT IS MY STRONG FEELING, AND I'VE OPINED, THAT IF

12  THE CULTURE HAD NOT CHANGED, YOU CAN HAVE A SITUATION OF ONE

13  INMATE IN A PRISON AND THAT INMATE MAY NOT GET A CONSTITUTIONAL

14  LEVEL OF CARE BECAUSE OF A SECURITY-DRIVEN SYSTEM.  THAT IS

15  CLEARLY CHANGING, AND THAT CHANGE IN CULTURE IS THE FUNDAMENTAL

16  REASON THAT THE RECEIVERSHIP IS GOING TO SUCCEED.

17             **MS. JOHNSON:**  NO FURTHER QUESTIONS.

18             **JUDGE HENDERSON:**  DO INTERVENORS HAVE ANY QUESTIONS

19  OF THIS WITNESS?

20             **MR. MITCHELL:**  I HAVE NO QUESTIONS, YOUR HONOR.

21             **JUDGE HENDERSON:**  CROSS-EXAMINATION.

22                  **<u>CROSS-EXAMINATION BY MS. HARDY</u>**

23  **BY MS. HARDY**

24  **Q**   GOOD AFTERNOON, DR. THOMAS.  THIS IS ALISON HARDY FOR THE

25  PLAINTIFFS.

THOMAS - CROSS / HARDY                    1245

1   **A**   HI, MS. HARDY.

2   **Q**   HELLO.

3            YOU TESTIFIED THAT YOU HAD REVIEWED THIS REPORT FROM

4   KVSP, AND THIS REPORT FROM KVSP DRAFTED BY PLAINTIFFS' COUNSEL

5   REFLECTED THERE WAS A CHANGE IN THE CUSTODY VERSE CULTURE,

6   CORRECT?

7   **A**   YES, MA'AM.

8   **Q**   EXCUSE ME.  I'M SORRY.  I MISSPOKE.  WHAT IT SAID WAS THAT

9   THE -- THERE WERE CUSTODY-MAKING DECISIONS THAT THEY SHOULD NOT

10  BE MAKING, CORRECT?

11  **A**   THAT'S CORRECT.

12  **Q**   YOU'VE ALSO TESTIFIED THAT THE RECEIVER HAS -- HAD CHANGED

13  THAT, THAT PROBLEM, HAD ADDRESSED THAT PROBLEM SO THAT THAT IS

14  NO LONGER THE CASE THAT CUSTODY IS MAKING MEDICAL DECISIONS; IS

15  THAT RIGHT?

16            **JUDGE KARLTON:**  AT THAT PRISON.

17            **THE WITNESS:**  NO, MA'AM.  THAT -- EXCUSE ME.  NO

18  MA'AM.  THAT MISCHARACTERIZES WHAT I SAID.  THE RECEIVER IS

19  ADDRESSING THE CULTURE.  THAT'S GOING TO BE AN ONGOING ISSUE.

20  I WAS SHOCKED AT THE SHORT LENGTH OF TIME THE RECEIVER HAS BEEN

21  IN PLACE COMPARED TO THE AMOUNT OF CHANGE THAT I HAVE SEEN

22  BETWEEN '07 AND '08.

23  **BY MS. HARDY**

24  **Q**   WHEN WAS THE RECEIVER APPOINTED?

25  **A**   I DON'T REMEMBER OFF THE TOP OF MY HEAD, BUT I'M CERTAIN

THOMAS - CROSS / HARDY                                1226

```
 1   THAT DATA IS READILY AVAILABLE.

 2   Q   THANK YOU.

 3           DOCTOR, YOU DRAFTED THREE REPORTS IN THIS CASE,

 4   CORRECT?

 5   A   YES, MA'AM.

 6   Q   FOR CONVENIENCE I'M GOING TO REFER TO THOSE AS YOUR FIRST,

 7   SECOND, AND THIRD REPORTS, OKAY?

 8   A   YES, MA'AM.

 9   Q   YOUR FIRST REPORT IS DATED NOVEMBER 2007, CORRECT?

10   A   I BELIEVE I HAVE IT IN FRONT OF ME, AND I'M NOT ENTIRELY

11   CERTAIN I SEE THE DATE.  LET ME JUST LOOK.  YES.  THE NINTH DAY

12   OF NOVEMBER 2007.

13   Q   YOU DON'T RECALL WHETHER YOU VISITED ANY CALIFORNIA PRISONS

14   BEFORE DRAFTING THAT FIRST REPORT, DO YOU?

15   A   I DO NOT.  I MAY HAVE VISITED CALIFORNIA PRISONS PREVIOUSLY

16   WHEN THE ACA, THE CORRECTIONAL ASSOCIATION, HAD MEETINGS OUT

17   THERE, AND ALWAYS THERE ARE TOURS OF PRISONS, BUT I DON'T

18   RECALL WHETHER I VISITED ANY PRISONS DURING ANY OF THOSE

19   MEETINGS.

20   Q   SO FOR THE PURPOSES OF DRAFTING YOUR FIRST REPORT, YOU DID

21   NOT TOUR ANY CALIFORNIA PRISONS, CORRECT?

22   A   THAT'S ESSENTIALLY CORRECT, YES.

23   Q   AND FOR THE SECOND REPORT YOU VISITED THREE PRISONS,

24   CORRECT?

25   A   THAT'S CORRECT.
```

THOMAS - CROSS / HARDY                    154

```
1   Q    AND THE THIRD YOU VISITED FIVE PRISONS, CORRECT?

2   A    THAT'S CORRECT.

3   Q    AND THE OPINIONS THAT YOU DEVELOPED IN THIS CASE ARE

4   RELATED SOLELY TO THE IMPACT OF OVERCROWDING ON MEDICAL CARE,

5   NOT ON MENTAL HEALTHCARE; IS THAT CORRECT?

6   A    I WAS NOT ASKED TO LOOK AT MENTAL HEALTHCARE.

7   Q    AND DO YOU CONSIDER YOURSELF AN EXPERT IN MENTAL

8   HEALTHCARE?

9   A    NO, MA'AM, I DO NOT.

10  Q    YOU TESTIFIED THAT WHEN YOU VISITED THE PRISONS IN

11  PENNSYLVANIA, THAT A CUSTODY OFFICER TOLD YOU THAT THEY HOT

12  BUNK BEDS IN THE PENNSYLVANIA PRISON SYSTEM; IS THAT CORRECT?

13  A    YES, MA'AM.

14  Q    DID YOU ASK ANYONE BESIDES THAT CUSTODY OFFICER WHETHER

15  THAT WAS, IN FACT, TRUE?

16  A    NO, MA'AM, I DIDN'T THINK TO.  HE TOLD ME THAT THAT INMATE

17  HAD TO GET OUT OF THE BUNK WITHIN SEVERAL HOURS SO ANOTHER

18  INMATE COULD GET IN, AND THAT WAS MY CONCEPT AND HIS CONCEPT OF

19  HOT BUNKING.  I DID NOT ASK HIS SUPERVISOR OR ANYBODY ELSE.  HE

20  WAS THE PERSON RESPONSIBLE FOR THE INMATES.

21  Q    ARE YOU AWARE THAT THE FORMER AND THE CURRENT DIRECTORS OF

22  THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS HAVE BOTH TESTIFIED

23  IN THIS PROCEEDING ALREADY?

24  A    I HAVE NO KNOWLEDGE OF THAT.

25  Q    WOULD IT CHANGE YOUR TESTIMONY ABOUT WHETHER YOU SHOULD
```

THOMAS - CROSS / HARDY                    1222

```
 1   HAVE VERIFIED THAT INFORMATION IF YOU KNEW THAT BOTH OF THE

 2   FORMER AND THE CURRENT DIRECTORS OF THE PENNSYLVANIA DEPARTMENT

 3   OF CORRECTIONS HAVE BOTH TESTIFIED THAT PENNSYLVANIA DOES NOT

 4   NOW AND NEVER HAS HOT BUNKED?

 5           MS. JOHNSON:   YOUR HONORS, I WANT TO POINT OUT THAT

 6   PLAINTIFFS' COUNSEL HAS NOT ESTABLISHED THAT EITHER OF THOSE

 7   WITNESSES WAS THE DIRECTOR IN CHARGE AT THE TIME THAT

 8   DR. THOMAS REVIEWED THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS

 9   HEALTHCARE SYSTEM.

10           JUDGE KARLTON:   YOU CAN MAKE THAT ARGUMENT WHEN WE

11   GET TO THE APPROPRIATE PLACE.  I'M SORRY.

12           JUDGE HENDERSON:   GO ON.  YOU CAN EXPLORE THAT ON

13   REDIRECT.

14           GO ON, MS. HARDY.

15           THE WITNESS:   TO ANSWER YOUR QUESTION THEN, IT WOULD

16   NOT ALTER WHAT I WITNESSED, IT WOULD NOT ALTER WHAT I HEARD,

17   AND IT WOULD NOT ALTER WHAT I BELIEVE.

18   BY MS. HARDY

19   Q   DOCTOR, YOU BELIEVE THAT SOME PATIENT ENCOUNTERS WITH A

20   PHYSICIAN SHOULD TAKE PLACE IN A CONFIDENTIAL SETTING, CORRECT?

21   A   YES, I BELIEVE THERE ARE SOME PATIENT CARE INTERACTIONS

22   THAT SHOULD BE CONFIDENTIAL.

23   Q   AND IF A SETTING IS NOT CONFIDENTIAL, SOME PATIENTS MAY BE

24   UNWILLING TO DIVULGE INTIMATE PERSONAL INFORMATION TO THEIR

25   PROVIDER, CORRECT?
```

THOMAS - CROSS / HARDY        1223

```
 1   A    YES, THAT VARIES, BUT THERE ARE MANY PATIENTS WHO HAVE

 2   LITTLE CONCERN ABOUT CONFIDENTIALITY, BUT SOME WHO DO, MAY HAVE

 3   CONCERNS, AND I HAVE TAKEN IN -- WHEN I WAS AT JACKSON MEMORIAL

 4   HOSPITAL BOTH AS A RESIDENT AND AS FACULTY MEMBER TAKEN

 5   PATIENTS THAT WERE UNFORTUNATELY HOUSED IN THE HALL INTO THE

 6   BATHROOMS TO ACHIEVE CONFIDENTIAL LEVEL, YES.

 7   Q    AND SO IT'S YOUR TESTIMONY THAT IT'S AN APPROPRIATE

 8   ACCOMMODATION TO SPACE SHORTAGES TO PROVIDE TREATMENT TO

 9   PATIENTS IN THE MEN'S ROOM?

10   A    IT'S -- IT'S NOT NECESSARILY THE BEST WAY TO DO THINGS, BUT

11   CERTAINLY ONE HAS TO BE CREATIVE IN ACADEMIC MEDICAL CENTERS

12   AND IN TRAINING PROGRAMS AND IN CORRECTIONS.

13   Q    DOCTOR, DURING YOUR CALIFORNIA PRISON TOURS, YOU OBSERVED

14   HEALTHCARE BEING DELIVERED IN AN ENVIRONMENT THAT WAS NOT

15   CONDUCIVE TO CONFIDENTIALITY AT SOME PRISONS, CORRECT?

16   A    YES.

17   Q    AND YOU AGREE THAT EVEN THE NEWEST OF CALIFORNIA'S PRISONS

18   HAVE INADEQUATE SPACE FOR PATIENT CARE, CORRECT?

19   A    I'M NOT ENTIRELY CERTAIN I HAVE SEEN OR WITNESSED THE

20   NEWEST.  YOU WOULD HAVE TO GIVE ME THE DATES OF THE NEWEST

21   ONES.  I DID SEE FACILITIES THAT WERE NOT PURPOSE FILLED FOR

22   MEDICAL CARE BEING USED.

23   Q    DOCTOR, I WOULD DIRECT YOU TO PAGE 17 OF YOUR THIRD REPORT

24   AT PARAGRAPH 33.

25   A    YES.
```

THOMAS - CROSS / HARDY                                157

```
 1  Q    THE SECOND SENTENCE -- ACTUALLY, STARTING AT THE BEGINNING:
 2            "NOTE MUST BE MADE OF THE SPACE FOR MEDICAL
 3        FACILITIES IN THE CALIFORNIA DEPARTMENT OF
 4        CORRECTIONS AND REHABILITATION.  BECAUSE OF THE
 5        AFOREMENTIONED CULTURE OF CUSTODY DOMINANCE, EVEN THE
 6        NEWEST OF CALIFORNIA PRISONS HAVE INADEQUATE SPACE
 7        FOR CARE."
 8  A    YES, MA'AM.
 9  Q    THAT WAS YOUR TESTIMONY?
10  A    YES, MA'AM.  THAT'S NOT A TERM OF ART.  THAT'S A TERM OF
11  COMMON LANGUAGE.  THAT IMPLIES THAT THE NEWEST ONES I HAVE
12  SEEN.  I AM NOT CERTAIN IF THERE ARE OTHER FACILITIES THAT I
13  HAVE NOT SEEN THAT ARE NEWER.  BUT, CLEARLY, YOU KNOW, FROM
14  YEARS OF HAVING CUSTODY DOMINANCE, THE FACILITIES THAT I HAVE
15  SEEN DID NOT HAVE ADEQUATE SPACE FOR PATIENT CARE.
16  Q    YOU AGREE THE LACK OF ADEQUATE SPACE REFLECTS A MINDSET
17  WHERE THERE'S SIMPLY NOT MUCH THOUGHT GIVEN THE NEEDS OF
18  MEDICAL CARE FOR INMATES WHEN THESE SPACES WERE CONSTRUCTED,
19  CORRECT?
20  A    THAT'S CORRECT.
21  Q    YOU ARE AWARE THAT THE RECEIVER HAS WRITTEN THAT THE
22  FACILITIES AVAILABLE FOR PROVIDING HEALTHCARE WITHIN THE CDCR
23  ARE WOEFULLY INADEQUATE, CORRECT?
24  A    YES, MA'AM.
25  Q    AND YOU ARE AWARE THAT THE RECEIVER'S TURNAROUND PLAN OF
```

THOMAS - CROSS / HARDY                                        1229

 1  ACTION INCLUDES A BUILDING PLAN TO ADD MEDICAL BEDS TO THE

 2  SYSTEM, CORRECT?

 3  **A**   YES, MA'AM.

 4  **Q**   AND THAT BUILDING PLAN ALSO INCLUDES UPGRADES TO EXISTING

 5  MEDICAL CLINICS, CORRECT?

 6  **A**   YES, MA'AM.

 7  **Q**   AND YOU BELIEVE THE RECEIVER'S BUILDING PLAN IS NOT

 8  NECESSARY TO ACHIEVE CONSTITUTIONAL LEVEL OF HEALTHCARE IN

 9  CALIFORNIA, CORRECT?

10  **A**   THAT'S CORRECT.

11  **Q**   AND YOU DISAGREE WITH THE RECEIVER'S POSITIONS THAT

12  HEALTHCARE WILL DETERIORATE UNLESS MONEY IS ALLOCATED TO FUND A

13  BUILDING PROJECT, CORRECT?

14  **A**   THAT'S CORRECT.

15  **Q**   AND, IN FACT, YOU'VE DESCRIBED THE RECEIVER'S POSITION THAT

16  HEALTHCARE WILL DETERIORATE UNLESS MONEY IS ALLOCATED TO THE

17  BUILDING PROJECT AS LUDICROUS, CORRECT?

18  **A**   THE EIGHT BILLION DOLLARS, MA'AM.

19  **Q**   AND YOU BELIEVE THAT THE SHORTAGE OF CLINICAL SPACE IN

20  CALIFORNIA PRISONS DOES NOT CREATE A BARRIER TO THE DELIVERY OF

21  UNCONSTITUTIONAL MEDICAL CARE, CORRECT?

22          **JUDGE KARLTON:**  NO.  THE DELIVERY OF CONSTITUTIONAL.

23          **MS. HARDY:**  I'M SORRY.  THANK YOU.  I'LL SAY IT FOR

24  A CLEAR RECORD.

25

THOMAS - CROSS / HARDY                    1258

1  BY MS. HARDY

2  Q   YOU BELIEVE THE SHORTAGE OF CLINICAL SPACE IN CALIFORNIA

3  PRISONS DOES NOT NECESSARILY CREATE A BARRIER TO THE DELIVERY

4  OF CONSTITUTIONAL MEDICAL CARE, CORRECT?

5  A   THAT'S CORRECT, NOT NECESSARILY.  THERE ARE A VARIETY OF

6  THINGS THAT COULD BE DONE TO USE THE EXISTING SPACE MUCH

7  BETTER.

8  Q   AND THAT WOULD INCLUDE PROVIDING TREATMENT IN CLOSETS,

9  CORRECT?

10 A   NO, YOU WOULDN'T NECESSARILY PROVIDE IT IN A CLOSET,

11 ALTHOUGH YOU COULD DO THAT, BUT YOU COULD USE IT DURING -- MORE

12 FREQUENTLY THAN THE AVERAGE SHIFTS THAT ARE BEING USED.  YOU

13 COULD USE IT ON THE WEEKENDS WHEN IT'S NOT AS DEMANDED.  THERE

14 ARE A VARIETY OF ALTERNATIVES THAT COULD BE DONE, INCLUDING

15 MODULAR BUILDINGS AND THINGS LIKE THAT.

16 Q   THIS WOULD ALSO INCLUDE TREATING PEOPLE IN THE MEN'S ROOM

17 AS YOU ALREADY TESTIFIED?

18 A   THAT WOULD NOT NECESSARILY DO THAT, BUT I USE THAT AS AN

19 EXAMPLE FOR THE COURT, BECAUSE IN MY RESIDENCY AT JACKSON

20 MEMORIAL HOSPITAL, THE UNIVERSITY OF MIAMI, I HAVE HAD TO DO

21 THAT, AND, UNFORTUNATELY, EVEN IN THIS MODERN DAY WE HAVE

22 PATIENTS IN HALLS AND THINGS LIKE THAT THAT YOU HAVE TO ACHIEVE

23 CONFIDENTIALITY BY REMOVING THEM FROM THEIR LOCATION.

24 Q   DOCTOR, MEDICAL RECORDS PLAY AN IMPORTANT PART IN THE

25 PROVISION OF HEALTHCARE, CORRECT?

THOMAS - CROSS / HARDY                                    1223

```
 1   A    YES, MA'AM.

 2   Q    AND ONE REASON THEY ARE IMPORTANT IS THEY MAY CONTAIN

 3   INFORMATION THAT IMPACTS THE CLINICIAN'S TREATMENT DECISIONS,

 4   CORRECT?

 5   A    YES, MA'AM.

 6   Q    AND THAT INFORMATION MIGHT INCLUDE DRUG ALLERGIES, CORRECT?

 7   A    YES, MA'AM.

 8   Q    CURRENT MEDICATION REGIMES?

 9   A    YES, MA'AM.

10   Q    AND REPORTS FROM SPECIALTY PROVIDERS?

11   A    YES, MA'AM.

12   Q    YOU HAVE SEEN PRISON MEDICAL SYSTEMS THAT YOU BELIEVE

13   PRACTICE CONSTITUTIONAL LEVELS OF CARE WHERE MEDICAL RECORDS

14   ARE NOT TIMELY MAINTAINED, CORRECT?

15   A    THAT'S CORRECT.

16   Q    AND YOU HAVE SEEN PRISON MEDICAL SYSTEMS THAT YOU BELIEVE

17   PRACTICE CONSTITUTIONAL LEVELS OF CARE WHERE MEDICAL RECORDS

18   ARE NOT COMPLETE, CORRECT?

19   A    THAT'S CORRECT.

20   Q    AND YOU HAVE SEEN MEDICAL -- PRISON MEDICAL SYSTEMS THAT

21   YOU BELIEVE PRACTICE CONSTITUTIONAL LEVELS OF CARE WHERE

22   MEDICAL RECORDS ARE NOT AVAILABLE TO THE CLINICIAN AT THE TIME

23   OF SERVICE TO THE PATIENT, CORRECT?

24   A    CORRECT.

25   Q    SO, IN YOUR OPINION, MEDICAL RECORDS ARE NOT AN ESSENTIAL
```

THOMAS - CROSS / HARDY                1223

```
 1  ELEMENT OF A CONSTITUTIONAL PRISON MEDICAL CARE SYSTEM,

 2  CORRECT?

 3  A    THAT DOES NOT FOLLOW, MS. HARDY.  THAT OVERSTATES WHAT I'M

 4  SAYING.  ALL PROVIDERS, WHETHER THEY'RE IN A CORRECTIONAL

 5  SYSTEM OR A FREE SYSTEM, OCCASIONALLY SOMETIMES, UNFORTUNATELY,

 6  REGULARLY HAVE TO SEE PATIENTS WITHOUT A MEDICAL RECORD, OR THE

 7  MEDICAL RECORD IS INCOMPLETE BECAUSE OF LAB RESULTS OR OTHER

 8  THINGS.  THAT DOESN'T MEAN THE CARE PROVIDED IS POOR.  IT DOES

 9  MEAN THAT THERE ARE SOME DIFFICULTIES IN EVALUATING THE

10  PATIENT.  THE PATIENT HAS TO BE MORE COGNIZANT OF THEIR

11  HISTORY.  IT TAKES LONGER FOR THE DOCTOR TO ANALYZE THE PATIENT

12  AND MAKE A DIFFERENTIAL DIAGNOSIS.

13  Q    YOUR SECOND AND THIRD REPORTS ARE BASED IN PART OF YOUR

14  TOURS OF CALIFORNIA STATE PRISON IN DECEMBER 2007 AND

15  SEPTEMBER 2008, CORRECT?

16  A    YES, MA'AM.

17  Q    YOU TOOK NO NOTES AT ANY OF THE EIGHT PRISONS YOU TOURED,

18  CORRECT?

19  A    PLEASE SAY THAT AGAIN.

20  Q    YOU TOOK NO NOTES AT ANY OF 28 PRISONS YOU TOURED, CORRECT?

21  A    THAT'S CORRECT.  I MADE ONE PIECE OF NOTE AT ONE OF THE

22  PRISONS AND THEN THREW IT AWAY.

23  Q    AND YOU PREPARED NO NOTES FOR YOUR OWN USE AFTER DOING ANY

24  OF THE TOURS, CORRECT?

25  A    THAT'S CORRECT.
```

THOMAS - CROSS / HARDY                    1223

```
 1   Q    AND YOU DID NOT MAKE ANY AUDIO OR VIDEO RECORDINGS DURING
 2   THE TOURS, CORRECT?
 3   A    THAT'S CORRECT.
 4   Q    THE THREE PRISONS THAT YOU VISITED IN DECEMBER 2007, YOU'VE
 5   ALREADY TESTIFIED WERE SAN QUENTIN, CALIFORNIA MEDICAL
 6   FACILITY, AND CALIFORNIA INSTITUTION FOR MEN, RIGHT?
 7   A    YES, MA'AM.
 8   Q    HOW SOON AFTER THE TOURS DID YOU DRAFT YOUR REPORT?
 9   A    AS WE SIT HERE, I DON'T REMEMBER.  I MEAN, I HAD MY
10   COMPUTER WITH ME AND PROBABLY STARTED THAT NIGHT, BUT I
11   HONESTLY DON'T RECALL.
12   Q    REGARDING YOUR FIRST ROUND OF TOURS, YOU SPENT ABOUT FOUR
13   HOURS AT SAN QUENTIN, CORRECT?
14   A    HAVE NO RECOLLECTION OR KNOWLEDGE, BUT THAT SOUNDS ABOUT
15   RIGHT.
16   Q    AND ABOUT THREE HOURS AT CMF?
17   A    I WOULD -- YOUR RECORDS ARE -- I'M CERTAIN THERE ARE LOGS
18   THAT CAN DOCUMENT THAT.  THAT SOUNDS ROUGHLY CORRECT.
19   Q    AND YOU VISITED CIM ON A SATURDAY FOR A FEW HOURS, CORRECT?
20   A    THAT'S CORRECT.
21   Q    FOR EACH PRISON YOU DON'T RECALL WHO YOU SPOKE TO, CORRECT?
22   A    FOR EACH PRISON I DON'T RECALL WHAT?
23   Q    WHO YOU SPOKE TO.
24   A    THAT'S CORRECT.
25   Q    AND YOU REVIEWED UNIT HEALTH RECORDS FOR PRISONERS AT EACH
```

THOMAS - CROSS / HARDY                1290

```
 1   OF THE PRISONS, CORRECT?

 2   A   THAT'S CORRECT.

 3   Q   AND YOU DON'T RECALL HOW MANY YOU REVIEWED, CORRECT?

 4   A   THAT'S CORRECT.

 5   Q   BUT IT WAS FEWER THAN TEN AT EACH OF THE PRISONS, CORRECT?

 6   A   THAT'S ABOUT RIGHT.

 7   Q   AND YOU DON'T RECALL HOW LONG YOU SPENT WITH EACH OF THE

 8   RECORDS, CORRECT?

 9   A   THAT'S CORRECT.

10   Q   BASED ON YOUR FIRST THREE TOURS, YOU WROTE THAT ONE HUNDRED

11   PERCENT OF THE PEOPLE YOU ELICITED COMMENTS FROM FELT POSITIVE

12   AND EMPOWERED TO DO THEIR JOBS, CORRECT?

13   A   THAT'S CORRECT.

14   Q   YOU DON'T KNOW WHAT PROPORTION OF THE PEOPLE YOU SPOKE TO

15   WERE MEDICAL STAFF, CORRECT?

16   A   THAT'S NOT CORRECT.  WHEN I SAID THAT, YOU'D HAVE TO POINT

17   TO MY REPORT EXACTLY, BUT FOR THE FIRST TOUR, I AM COMMENTING

18   BASICALLY ON THE MEDICAL STAFF.

19   Q   FOR EACH OF THE THREE PRISONS YOU VISITED, YOU DON'T RECALL

20   HOW MANY PHYSICIANS, NURSES OR CUSTODY OFFICERS YOU SPOKE TO,

21   CORRECT?

22   A   YOU WOULD HAVE TO REPEAT THAT, MS. HARDY.  YOUR VOICE

23   DROPPED.  FOR EACH OF THE THREE PRISONS?

24   Q   YOU DO NOT RECALL HOW MANY PHYSICIANS, NURSES OR CUSTODY

25   OFFICERS YOU SPOKE TO, CORRECT?
```

THOMAS - CROSS / HARDY                    1233

1  **A**    THAT'S CORRECT.

2  **Q**    OTHER THAN ONE PSYCHIATRIST AT THE CALIFORNIA INSTITUTION

3  FOR MEN, YOU SPOKE TO NO PHYSICIANS AT THAT PRISON, CORRECT?

4  **A**    THAT'S CORRECT.  THAT WAS A SATURDAY.  THE PSYCHIATRIST WAS

5  THE ONLY PHYSICIAN THERE.

6  **Q**    YOU DO NOT RECALL WHAT QUESTIONS YOU ASKED THE STAFF AT

7  THESE PRISONS, CORRECT?

8  **A**    I DON'T RECALL A SPECIFIC INDIVIDUAL QUESTION; THAT'S

9  CORRECT.

10 **Q**    YOU DO RECALL SPEAKING, HOWEVER, TO A YOUNG FEMALE

11 DOCTOR IN THE SAN QUENTIN GYMNASIUM CLINIC, CORRECT?

12 **A**    THAT IS CORRECT.

13 **Q**    AND SHE TOLD YOU SHE WAS OFTEN UNABLE TO SEE ALL THE

14 PATIENTS THAT HAD APPOINTMENTS WITH HER ON A GIVEN DAY,

15 CORRECT?

16 **A**    I DON'T REMEMBER SPECIFICALLY HER WORDS.  SHE WAS CONCERNED

17 ABOUT VOLUME OF PATIENTS, YES.

18 **Q**    DOCTOR, I'LL DIRECT YOU TO YOUR DEPOSITION TESTIMONY,

19 PAGE 84, STARTING ON LINE 6.

20 **A**    WHAT PAGE ARE YOU ON, MS. HARDY?

21 **Q**    PAGE 84.

22 **A**    PAGE 84.  GIVE ME JUST A SECOND, PLEASE.  PAGE 84, LINE 6.

23 **Q**    PAGE 84, LINE 6.

24        "QUESTION:  AND SHE SAID SHE WAS OFTEN UNABLE TO

25     SEE ALL OF THE PATIENTS THAT HAD APPOINTMENTS WITH

THOMAS - CROSS / HARDY                    1293

```
 1        HER ON A GIVEN DAY AT THE SAME TIME, CORRECT?
 2             "ANSWER: SHE DID SAY THAT."
 3   A   THANK YOU FOR REFRESHING MY MEMORY ON THAT.
 4   Q   YOU RECALL MEETING THE CHIEF MEDICAL DOCTOR AT SAN QUENTIN,
 5   CORRECT?
 6   A   YES.
 7   Q   YOU DON'T RECALL HOW LONG THAT MEETING LASTED, CORRECT?
 8   A   THAT'S CORRECT.
 9   Q   AND YOU DO NOT RECALL ASKING HER ANY QUESTIONS, CORRECT?
10   A   I DON'T RECALL A SPECIFIC QUESTION.  I DO RECALL THAT SHE
11   HAD SOME FUNCTION THAT SHE HAD TO BE TO.
12   Q   DOCTOR, YOUR THIRD REPORT IS BASED ON TOURS OF NORTH KERN
13   STATE PRISON, SUBSTANCE ABUSE TREATMENT FACILITY, PLEASANT
14   VALLEY STATE PRISON, SOLANO, AND HIGH DESERT, CORRECT?
15   A   THAT'S CORRECT.
16   Q   AND EACH OF THOSE TOURS TOOK LESS THAN FIVE HOURS, CORRECT?
17   A   THAT'S PROBABLY CORRECT.
18   Q   AND ON THIS ROUND OF TOURS, ALMOST ALL PERSONNEL UNIFORMLY
19   CITED THE NEED FOR MORE SPACE AND MORE STAFF, CORRECT?
20   A   THAT'S CORRECT.
21   Q   AND THE PLEASANT VALLEY STATE PRISON HEALTHCARE MANAGER
22   TOLD YOU THE PRISON WAS VERY HARD TO STAFF, CORRECT?
23   A   THE PLEASANT VALLEY HEALTHCARE ADMINISTRATOR SAID WHAT,
24   PLEASE?
25   Q   THAT THE PRISON WAS VERY HARD TO STAFF.
```

THOMAS - CROSS / HARDY                1233

1   **A**   YES, IT WAS VERY HARD TO STAFF, YES.

2   **Q**   AND THE PLEASANT VALLEY WARDEN TOLD YOU THAT POPULATION

3   REDUCTION WOULD ENHANCE THEIR ABILITY TO DELIVER HEALTHCARE,

4   CORRECT?

5   **A**   CERTAINLY MANY OF THE EMPLOYEES FELT THAT REDUCING THEIR

6   WORKLOAD WOULD MAKE IT EASIER, YES.

7   **Q**   AND AT HIGH DESERT, THE CHIEF MEDICAL OFFICER TOLD YOU SHE

8   HAD NO DOUBT THAT OVERCROWDING AFFECTED HER ABILITY TO PROVIDE

9   SERVICES IN A TIMELY FASHION, CORRECT?

10  **A**   NOT ENTIRELY.  SHE INITIALLY SAID THAT.  THEN WE DISCUSSED

11  THAT A LITTLE FURTHER, WHEN I ASKED HER ROUGHLY HOW MANY

12  PATIENTS DID SHE SAY WHEN SHE WAS PRACTICING IN -- HOW MANY

13  PATIENTS DID SHE SEE WHEN SHE WAS PRACTICING IN THE ADJACENT

14  COMMUNITY, SHE DID INDICATE THAT PRODUCTIVITY NEEDED TO BE

15  IMPROVED AT HER INSTITUTION.

16  **Q**   SHE TOLD YOU THAT THE RESOURCES SHE HAD WERE SUFFICIENT FOR

17  A POPULATION OF ABOUT HALF THE NUMBER THEY WERE TREATING,

18  CORRECT?

19  **A**   THAT WAS HER FEELING INITIALLY AT THE TIME.  THEN WE HAD

20  SEVERAL DISCUSSIONS.

21  **Q**   SHE TOLD YOU THAT THE PRESCRIPTIONS WERE OFTEN DELIVERED

22  LATE TO PRISONERS, CORRECT?

23  **A**   YES.  THERE WAS MEDICATION DELIVERY ISSUES, YES.

24  **Q**   AND SHE TOLD YOU --

25  **A**   I DON'T REMEMBER ANY MENTION OF PRESCRIPTIONS, PER SE, BUT,

```
 1   CLEARLY, THERE WERE MEDICATION DELIVERY ISSUES.

 2   Q    SHE TOLD YOU THAT SEVERAL OF THE PHYSICIANS ON STAFF AT

 3   HIGH DESERT STATE PRISON WERE NOT PROVIDING MEDICAL CARE,

 4   CORRECT?

 5   A    NO, SHE TOLD ME THAT ONE WAS FORBIDDEN TO SEE PATIENTS

 6   BECAUSE OF HER FEARS AND SOME ADMINISTRATION, ADMINISTRATIVE

 7   ISSUES.  THAT'S NOT TERRIBLY UNCOMMON IN A CORRECTIONAL SYSTEM.

 8   Q    DOCTOR, I'LL REMIND YOU, PAGE 182 OF YOUR DEPOSITION,

 9   PLEASE.

10   A    OKAY.  GIVE ME A SECOND, PLEASE.  WHAT LINE ARE WE AT,

11   MS. HARDY?

12   Q    LINE 9.

13   A    LINE 9.

14   Q               "QUESTION:  DO YOU RECALL BEING TOLD THAT

15                 THREE OF THE PHYSICIANS WHO WERE ON STAFF AT

16                 THE PRISON EITHER WERE ON LEAVE OR HAD THEIR

17                 CLINICAL PRIVILEGES TAKEN AWAY?

18            "ANSWER:  AS I MENTIONED, SHE SAID THAT ONE HAD

19          HIS CLINICAL PRIVILEGES TAKEN AWAY, AND THAT WAS

20          UNDER REVIEW.  ONE OR TWO OTHERS WERE AWAY FOR ONE

21          REASON OR ANOTHER, AND I DON'T REMEMBER."

22   A    YES, MA'AM, AND THAT'S CONSISTENT WITH WHAT I JUST SAID.

23   Q    YOU SAID THAT ONE PERSON WAS NOT PROVIDING CLINICAL CARE.

24   IT WAS MORE THAN ONE PERSON, CORRECT?

25              JUDGE KARLTON:  NEITHER YOU NOR THE WITNESS OUGHT TO
```

THOMAS - CROSS / HARDY                    1299

```
 1   BE ARGUING.

 2             THE WITNESS:  I'M SORRY.  YOUR HONOR.

 3   BY MS. HARDY

 4   Q   AT EACH OF THE FIVE PRISONS YOU REVIEWED MEDICAL FILES,

 5   CORRECT?

 6   A   YES, MA'AM.

 7   Q   AND AT SATF, DURING THE FILE REVIEWS YOU DON'T RECALL HOW

 8   MANY OF THE FILES REFLECTED THAT PRISONERS HAD REQUESTED A

 9   MEDICAL CARE APPOINTMENT, CORRECT?

10   A   AT SATF?  AND THEN YOU HAVE TO REPEAT THAT, PLEASE.

11   Q   I'LL GO FOR ALL OF THEM.

12             AT ANY OF THE PRISONS DO YOU RECALL WHETHER THE

13   PRISONER'S FILES REFLECTED THAT THE PRISONERS HAD REQUESTED A

14   MEDICAL APPOINTMENT IN THE LAST TWO MONTHS?

15   A   AT ANY OF THE PRISONS DID I NOTE WHETHER PATIENTS HAD

16   REQUESTED MEDICAL APPOINTMENTS IN THE LAST FEW MONTHS; IS THAT

17   WHAT YOU'RE ASKING?

18   Q   YES.

19   A   YES.

20   Q   AND DO YOU RECALL WHAT THEY ASKED FOR -- ASKED FOR CARE

21   FOR?

22   A   I REMEMBER TALKING TO ONE INMATE WHO WAS BITTERLY

23   COMPLAINING ABOUT THE WAIT AND HAD WAITED FOR TWO HOURS.

24   Q   DOCTOR, I'M ASKING ABOUT YOUR REVIEW.

25   A   THAT'S THE ONLY THING THAT JUMPS INTO MY MIND RIGHT NOW.
```

THOMAS - CROSS / HARDY                                    1238

```
 1  Q   IN YOUR REVIEW OF MEDICAL FILES, DOCTOR, DO YOU RECALL ANY

 2  SPECIFIC DETAILS ABOUT ANY OF THE MEDICAL FILES YOU REVIEWED ON

 3  THE FIVE PRISON TOURS YOU DID?

 4  A   NOT AS WE SIT HERE RIGHT NOW, NO.

 5  Q   YOU DO NOT RECALL HOW LONG IT TOOK FOR PATIENTS TO SEE A

 6  PRIMARY CARE PROVIDER FOR ROUTINE CARE AT ANY OF THE PRISONS

 7  YOU VISITED, DO YOU?

 8  A   AS WE SIT HERE RIGHT NOW, IT VARIES.  IT VARIED BETWEEN

 9  FOUR WEEKS AT ONE INSTITUTION AND ABOUT EIGHT AT THE OTHERS,

10  AND THE ONES THAT WERE OUTSIDE OF GENERAL PARAMETERS, I WAS

11  IMPRESSED THAT EACH OF THOSE INSTITUTIONS HAD SOME KIND OF A

12  MECHANISM TO BRING IT UP TO DATE.

13          ONE OF THE DOCTORS WAS GOING TO HAVE HIS PEOPLE WORK

14  WEEKENDS.  ANOTHER WAS GOING TO HAVE THEM DO STAGGERED SHIFTS

15  AND THINGS LIKE THAT.  BUT EACH OF THEM HAD ADDRESSED A

16  MECHANISM TO BRING THE REQUESTS INTO A TIMELY FASHION.

17          JUDGE KARLTON:  MOVE TO STRIKE AS NON-RESPONSIVE.

18          MS. HARDY:  MOVE TO STRIKE AS NON-RESPONSIVE.

19          JUDGE KARLTON:  WHAT'S YOUR QUESTION AGAIN, MA'AM?

20  DOCTOR, LISTEN TO THE QUESTION AND ANSWER THE QUESTION, IF YOU

21  WILL.

22          MS. HARDY:  I'M SORRY, COULD YOU READ BACK THE

23  QUESTION?

24          JUDGE KARLTON:  I'M SORRY.

25          MS. HARDY:  I'M ASKING THE REPORTER TO READ BACK THE
```

THOMAS - CROSS / HARDY                    1233

```
 1   QUESTION.

 2            JUDGE KARLTON:  THE QUESTION IS, ON YOUR REVIEW OF

 3   MEDICAL FILES, DOCTOR, DO YOU RECALL ANY SPECIFIC DETAILS ABOUT

 4   ANY OF THE MEDICAL FILES YOU REVIEWED OF THE FIVE PRISON TOURS

 5   YOU DID.

 6            THE WITNESS:  AS WE SIT HERE RIGHT NOW, I DON'T

 7   RECALL SPECIFIC DETAILS, THAT'S CORRECT, YOUR HONOR.

 8            JUDGE KARLTON:  AND THE NEXT QUESTION WAS, DO YOU

 9   RECALL HOW LONG IT TOOK FOR PATIENTS TO SEE A PRIMARY CARE

10   PROVIDER FOR ROUTINE CARE AT ANY OF THE PRISONS YOU VISITED?

11            THE WITNESS:  YES, SIR.

12            MS. HARDY:  HE DID ANSWER THAT QUESTION, ACTUALLY.

13            JUDGE KARLTON:  I'M SORRY?

14            MS. HARDY:  I BELIEVE HE DID ANSWER THAT QUESTION.

15            JUDGE KARLTON:  I'M SORRY.

16            MS. HARDY:  I THINK THERE'S ANOTHER QUESTION THAT

17   MIGHT HAVE HAPPENED AFTER THAT.  PERHAPS NOT.  OKAY.

18   BY MS. HARDY

19   Q   YOU DO NOT RECALL WHETHER YOU ASKED SCHEDULERS AT THE FIVE

20   PRISONS HOW LONG IT TOOK FOR THEM TO SCHEDULE A ROUTINE PRIMARY

21   CARE APPOINTMENT, DO YOU?

22   A   I SPOKE TO SOME SCHEDULERS.  MOST OF THEM WERE CONCERNED

23   WITH OUTSIDE APPOINTMENTS RATHER THAN INTERNAL PRIMARY CARE

24   PROVIDERS.  BUT AS WE SIT HERE NOW, I DON'T RECALL WHICH WAS

25   WHICH.
```

THOMAS - CROSS / HARDY                    1293

```
 1   Q    YOU TESTIFIED THAT YOU WERE IMPRESSED THAT AT EACH OF THE

 2   PRISONS THAT YOU VISITED THE STAFF HAD PLANS FOR ADDRESSING

 3   BACKLOGS OF APPOINTMENTS, CORRECT?

 4   A    THAT'S CORRECT, YES, MA'AM.

 5   Q    WHICH PRISONS -- AT WHICH PRISONS WERE YOU TOLD THAT THEY

 6   HAD A PLAN TO ADDRESS THE BACKLOG FOR OLD APPOINTMENTS?

 7   A    AS WE SIT HERE RIGHT NOW, I DON'T RECALL.  BUT, AS I

 8   MENTIONED TO YOU, IN SPEAKING TO THE CHIEF HEALTH OFFICERS AND

 9   OTHER PEOPLE, EACH OF THEM SEEMED TO HAVE CONCERNS AND PLANS TO

10   ADDRESS BACKLOGS IF THEY HAD BACKLOGS.

11   Q    AND DID YOU ASK THEM HOW LONG THEIR BACKLOGS HAD EXISTED?

12   A    SOME IN SOME PLACES I DID, YES.

13   Q    AND WHAT DID THEY TELL YOU?

14   A    THE LONGEST ONE -- WELL, ONE OF THE SHORTEST ONES WAS FOUR

15   WEEKS.  THE LONGEST ONE WAS 16 WEEKS.

16   Q    DOCTOR, I DON'T THINK YOU UNDERSTOOD MY QUESTION.  THEY HAD

17   HAD A BACKLOG FOR ONLY FOUR WEEKS, BEFORE THAT THEY HAD BEEN

18   CAUGHT UP; IS THAT YOUR TESTIMONY?

19   A    NO.  THE BACKLOG WAS FOUR WEEKS.

20   Q    SO THE BACKLOGS EXTENDED FROM FOUR WEEKS TO SIXTEEN WEEKS,

21   BUT YOU DON'T KNOW HOW LONG THEY HAD BEEN IN THAT SITUATION,

22   CORRECT?

23   A    AS WE SIT HERE NOW, I DON'T RECALL.

24   Q    AND DO YOU RECALL WHAT THE DETAILS WERE OF THEIR PLANS TO

25   ADDRESS THE BACKLOG?
```

THOMAS - CROSS / HARDY                                      1233

```
 1  A    AS I MENTIONED PREVIOUSLY, SEVERAL OF THE INSTITUTIONS WERE

 2  GOING TO DO NON-TRADITIONAL HOURS.  ONE OF THEM WAS GOING TO DO

 3  WEEKENDS.  THERE WERE OTHER MECHANISMS, BUT I DON'T RECALL WHAT

 4  THEY ARE NOW, BUT YES, EACH OF THE PEOPLE THAT I SPOKE TO FELT

 5  EMPOWERED TO BRING ABOUT CORRECTION IN THE BACKLOG.

 6  Q    AND DID YOU ASK THEM WHETHER THEY HAD THE CUSTODY COVERAGE

 7  TO PERMIT THEM TO RUN THE NON-TRADITIONAL LINES?

 8  A    I DID NOT.

 9  Q    FOLLOWING YOUR TOUR OF THE FIVE PRISONS, YOU WROTE:

10          "ONE HUNDRED PERCENT OF ALL PERSONNEL FELT THERE

11       WAS ADEQUATE COMMITMENT, ADEQUATE RESOURCES, AND

12       ADEQUATE ABILITY TO PROVIDE A CONSTITUTIONAL LEVEL OF

13       CARE," CORRECT?

14  A    COULD YOU INDICATE WHERE THAT IS?

15  Q    THAT'S IN YOUR THIRD REPORT, PAGE 3, PARAGRAPH 5, JUST

16  BELOW HALFWAY DOWN.  THAT IS:

17          "ONE HUNDRED PERCENT OF ALL PERSONNEL FELT THERE

18       WAS ADEQUATE COMMITMENT, ADEQUATE RESOURCES, AND

19       ADEQUATE ABILITY TO PROVIDE A CONSTITUTIONAL LEVEL OF

20       HEALTHCARE."

21  A    YES, MA'AM.  THAT'S EXACTLY WHAT IT SAYS.

22  Q    YOU DID NOT SPEAK TO A HUNDRED PERCENT OF THE STAFF AT EACH

23  OF THE PRISONS YOU VISITED, DID YOU?

24  A    NO, MA'AM.  THAT STATEMENT IS NOT A TERM OF ART; IT'S A

25  TERM OF COMMON USE.  A HUNDRED PERCENT OF THE PEOPLE I TALKED
```

THOMAS - CROSS / HARDY                    1248

```
 1  TO INDICATED THAT.
 2  Q    AND YOU DON'T RECALL HOW MANY PEOPLE YOU SPOKE TO AT EACH
 3  OF THE FIVE PRISONS, CORRECT?
 4  A    AS WE SIT HERE NOW, I HAVE NO RECOLLECTION HOW MANY.
 5  Q    AND YOU DO NOT RECALL WHAT SPECIFIC QUESTIONS YOU ASKED
 6  THEM, CORRECT?
 7  A    PLEASE, CAN I HAVE THAT QUESTION AGAIN, MS. HARDY?
 8  Q    YOU DON'T RECALL WHAT SPECIFIC QUESTIONS YOU ASKED THEM,
 9  CORRECT?
10  A    THAT'S CORRECT.  THAT WAS -- THAT WOULD BE PART OF A
11  DIALOGUE, YES, MA'AM.
12  Q    YOU DON'T RECALL WHETHER YOU ASKED THE SAME QUESTION OF
13  EACH PERSON, CORRECT?
14  A    THAT'S CORRECT.
15  Q    YOU WROTE THAT:
16          "WHEN PHYSICIAN'S POSITIONS WERE FILLED WITH
17           REGISTRY PROVIDERS, THOSE PROVIDERS GENERALLY HAD A
18           LONG-TERM COMMITMENT TO THE INSTITUTION."
19              THAT'S ON PAGE 2 OF YOUR THIRD REPORT, CORRECT?
20  A    YES, MA'AM.
21  Q    AND YOU TESTIFIED THAT AT EACH OF THE FIVE PRISONS VISITED,
22  YOU THOUGHT MOST OF THE PHYSICIANS WERE CONTRACT PROVIDERS
23  RATHER THAN STATE EMPLOYEES, CORRECT?
24  A    YES, MA'AM.
25  Q    AND YOU BELIEVE THAT THIS IS BECAUSE OF THE RICHNESS OF THE
```

THOMAS - CROSS / HARDY                    1243

 1  REGISTRY CONTRACT COMPARED TO THE STATE CONTRACT?

 2  **A**   SEVERAL PHYSICIANS EXPLAINED THAT TO ME, YES, MA'AM.

 3  **Q**   BUT YOU DID NOT REVIEW THE REGISTRY CONTRACTS, CORRECT?

 4  **A**   YES, MA'AM, THAT'S CORRECT.

 5  **Q**   AND YOU DO NOT KNOW HOW MANY OF THE REGISTRY PHYSICIANS AT

 6  EACH OF THE PRISONS YOU WENT TO HAD BEEN THERE FOR MORE THAN 12

 7  MONTHS, CORRECT?

 8  **A**   AS WE SIT HERE NOW, I DON'T KNOW THAT, BUT CLEARLY AT EACH

 9  OF THE INSTITUTIONS WE WENT TO, THAT WAS SOMETHING THAT WAS

10  GENERALLY DELVED INTO, AND I REMEMBER MANY OF THEM HAD BEEN

11  THERE FOR A YEAR OR MORE.

12  **Q**   YOU WROTE ON PAGE --

13  **A**   IN FACT -- EXCUSE ME.  IN FACT, THE CHIEF HEALTH OFFICER AT

14  ONE HAD BEEN A REGISTRY PHYSICIAN FOR MANY YEARS AND WAS

15  UNCOMFORTABLE GIVING IT UP TO BECOME A STATE PHYSICIAN BECAUSE

16  HIS EXPENSES WOULDN'T BE REIMBURSED, BUT HE DID IT.

17  **Q**   ON PAGE 4 OF YOUR THIRD REPORT YOU WROTE:

18       "EACH AND EVERY OFFICER IN ALL HOUSING UNITS OF

19        EVERY INSTITUTION VISITED KNEW IMMEDIATELY WHERE THE

20        REQUESTS WERE, HOW INMATES ACCESSED THEM, AND WHERE

21        THEY WERE DISTRIBUTED," CORRECT?

22  **A**   I DON'T SEE THAT, BUT THAT CHARACTERIZES CORRECTLY WHAT I

23  SAID, YES.

24  **Q**   AND YOU DID NOT SPEAK TO EVERY CUSTODY OFFICER AT ALL FIVE

25  PRISONS YOU VISITED, DID YOU?

THOMAS - CROSS / HARDY                    1243

```
 1   A   NO, MA'AM.  ONCE AGAIN, THIS IS A TERM OF COMMON USAGE.

 2   EVERY OFFICER I TALKED TO.  IT WOULD BE IMPOSSIBLE TO TALK TO

 3   EVERY OFFICER.

 4   Q   BUT YOU DID NOT ASK EVERY CUSTODY OFFICER YOU ENCOUNTERED

 5   IN THE PRISONS ABOUT THEIR KNOWLEDGE OF HEALTHCARE REQUESTS,

 6   DID YOU?

 7   A   NO, MA'AM, JUST THE ONES THAT WERE INSIDE OF FACILITIES.

 8   Q   AND YOU DON'T KNOW HOW MANY CO'S, CUSTODY OFFICERS, YOU

 9   SPOKE TO AT EACH PRISON ABOUT HEALTHCARE REQUESTS, CORRECT?

10   A   I DON'T KNOW WHAT, MS. HARDY?

11   Q   YOU DO NOT KNOW HOW MANY CUSTODY OFFICERS YOU SPOKE TO AT

12   EACH PRISON ABOUT HEALTHCARE REQUESTS, CORRECT?

13   A   THAT'S CORRECT.

14   Q   AND YOU DO NOT RECALL WHETHER YOU ASKED EACH OF THEM THE

15   SAME QUESTION ABOUT HEALTHCARE REQUESTS, CORRECT?

16   A   THAT'S CORRECT.  CORRECT.

17   Q   AGAIN, YOU WROTE ON PAGE 20 OF YOUR THIRD REPORT:

18          "ALL PROVIDERS FELT THEIR INTERACTIONS WITH

19          INMATES WERE AS GOOD OR BETTER THAN IN THE

20          COMMUNITY."

21             THAT'S ON PAGE 20 OF YOUR THIRD REPORT, AND, AGAIN,

22   YOU WERE USING THAT AS A TERM OF ART; YOU DID NOT TALK TO EVERY

23   PROVIDER AT ANY OF THE PRISONS YOU VISITED, CORRECT?

24   A   THAT'S CORRECT.

25   Q   ON PAGE 6 OF YOUR REPORT YOU WROTE:
```

THOMAS - CROSS / HARDY                     1243

```
 1            "ON THIS VISIT MOST ALL PHYSICIANS I SPOKE TO

 2         INDICATED THEY WOULD LIKE TO SPEND ABOUT AN HOUR WITH

 3         EACH INMATE AT EACH VISIT BECAUSE OF THE COMPLEXITY

 4         OF MEDICAL CONDITIONS."

 5    A    THAT'S CORRECT.

 6    Q    AND YOU DO NOT REMEMBER WHICH PHYSICIANS TOLD YOU, AT ANY

 7    OF THE PRISONS THAT YOU WENT TO TOLD YOU THIS, CORRECT?

 8    A    AS WE SIT HERE NOW, I DON'T RECALL ANY SPECIFIC INDIVIDUAL

 9    SAYING THAT.

10    Q    OKAY.

11    A    BUT MOST INDICATED THAT, YES.

12    Q    YOU WROTE IN YOUR REPORT THAT A STAFFING RATIO FOR PRIMARY

13    CARE PROVIDER TO PRISONER OF ONE TO 500 EXCEEDS TYPICAL

14    STAFFING PATTERNS THROUGHOUT THE COUNTRY, CORRECT?

15    A    THAT'S CORRECT.

16    Q    AND YOU COMPARED CALIFORNIA TO FLORIDA PRISONS WHERE YOU

17    SAID, QUOTE:

18            "ONE PHYSICIAN LEVEL PROVIDER WAS GENERALLY

19         AVAILABLE FOR EVERY 12 TO 1500 PRISONERS, EXCEPT IN

20         SPECIALIZED FACILITIES," CORRECT?

21    A    YES, MA'AM.

22    Q    AND YOU BELIEVE THAT THAT LEVEL OF STAFFING IS SUFFICIENT

23    TO PROVIDE AN ADEQUATE LEVEL OF MEDICAL CARE IN FLORIDA,

24    CORRECT?

25    A    I THINK THAT MISCHARACTERIZES WHAT I SAID.  AS I MENTIONED
```

THOMAS - CROSS / HARDY                    1243

```
 1   EARLIER, A STAFFING PATTERN IS BEST WORKED OUT WITH WORK STUDY

 2   AND OUTCOMES RATHER THAN ARBITRARY NUMBERS.

 3           IF YOU TAKE THE TOTAL NUMBER OF INMATES AND DIVIDE

 4   IT BY THE TOTAL NUMBER OF PROVIDERS, THAT MAY WORK OUT TO THAT

 5   NUMBER.  HOWEVER, THERE ARE CERTAINLY INMATES AT INSTITUTIONS

 6   THAT REQUIRE FAR MORE THAN ONE PROVIDER FOR 1,250, AND THERE

 7   ARE OTHER INSTITUTIONS THAT REQUIRE LESS THAN THAT.

 8   Q   AND, DOCTOR, HOW WOULD YOU DO ONE OF THOSE WORK STUDY AND

 9   OUTCOME TESTS THAT YOU JUST DESCRIBED?

10   A   IN THE FLORIDA DEPARTMENT OF CORRECTIONS EVERY TIME YOU SEE

11   AN INMATE, A PROVIDER SEES AN INMATE, YOU NOTE THE TIME THAT

12   YOU STARTED SEEING THEM AND THE TIME YOU STOPPED SEEING THEM.

13   THAT GIVES YOU SOME INDICATION OF THE DURATION OF EACH

14   ENCOUNTER.  THEN YOU CAN ADD TO THAT THE OUTCOME.  FOR

15   INSTANCE, IF YOU HAVE A HYPERTENSIVE PATIENT, YOU KNOW WHAT

16   PERCENTAGE HAVE CONTROLLED HYPERTENSION, AND SO YOU KNOW HOW

17   EFFECTIVE OR INEFFECTIVE YOUR STAFF RESOURCES ARE, AND YOU CAN

18   MODULATE THE STAFF RESOURCES PREDICATED ON THAT.

19   Q   DOCTOR, YOU ARE FAMILIAR WITH THE CORRECTIONAL MEDICAL

20   AUTHORITY IN FLORIDA, CORRECT?

21   A   YES, MA'AM.

22   Q   AND THE CORRECTIONAL MEDICAL AUTHORITY WAS CREATED IN THE

23   MID 1980'S TO GIVE INDEPENDENT ADVICE TO THE GOVERNOR, THE

24   LEGISLATURE, AND THE DEPARTMENT OF CORRECTIONS ON THE CONDUCT

25   OF HEALTHCARE AND MANAGEMENT OF COSTS CONSISTENT WITH QUALITY
```

THOMAS - CROSS / HARDY                1245

```
 1  CARE, CORRECT?

 2  A    THAT'S CORRECT.

 3  Q    AND BY STATUTE THE CORRECTIONAL MEDICAL AUTHORITY IS

 4  REQUIRED TO REPORT AT LEAST ANNUALLY TO THE GOVERNOR AND THE

 5  LEGISLATURE ON THE STATUS OF THE FLORIDA DEPARTMENT OF

 6  CORRECTIONS HEALTHCARE DELIVERY SYSTEM, CORRECT?

 7  A    THAT'S CORRECT.

 8  Q    AND THOSE REPORTS WERE REQUIRED TO INCLUDE RECOMMENDATIONS

 9  REGARDING PERFORMANCE AND FINANCIAL AUDITS OF THE DEPARTMENT OF

10  CORRECTIONS OFFICE OF HEALTHCARE SERVICES, RIGHT?

11  A    YES.

12  Q    AND YOU WERE THE ASSISTANT SECRETARY FOR HEALTH SERVICES

13  AND DIRECTOR OF HEALTH SERVICES FOR THE DEPARTMENT OF

14  CORRECTIONS FROM 1998 TO 2003, CORRECT?

15  A    THAT'S CORRECT.

16  Q    AND DID YOU REVIEW THE CORRECTIONAL MEDICAL AUTHORITY

17  ANNUAL REPORTS WHEN YOU WERE THE DIRECTOR OF HEALTH SERVICES?

18  A    SAY THAT AGAIN, MS. HARDY.

19  Q    DID YOU REVIEW THE CORRECTIONAL MEDICAL AUTHORITY ANNUAL

20  REPORTS WHEN YOU WERE THE DIRECTOR OF HEALTH SERVICES?

21  A    FREQUENTLY I DID.

22  Q    WERE YOU AWARE THAT THE CORRECTIONAL MEDICAL AUTHORITY'S

23  REPORT ON HEALTHCARE DELIVERY OF THE FLORIDA DEPARTMENT OF

24  CORRECTIONS FOR FISCAL YEAR 2002/2003 FOUND THAT THE OFFICE OF

25  HEALTH SERVICES HAD NOT PUBLISHED STAFFING STANDARDS SINCE
```

THOMAS - CROSS / HARDY                1246

```
 1  1992?

 2           MS. JOHNSON:  THAT ASSUMES FACTS THAT AREN'T IN

 3  EVIDENCE, YOUR HONOR.

 4           MS. HARDY:  IF I COULD ASK THE COURT REPORTER TO

 5  HAND DR. THOMAS A COPY OF "INSIDE COVER," WHICH WILL BE THE

 6  REPORT, THE NEXT IN ORDER EXHIBIT.

 7           JUDGE KARLTON:  DO YOU WANT THEM MARKED?  ARE THEY

 8  PRESENTLY MARKED AS EXHIBITS?

 9           MS. HARDY:  THEY ARE NOT, YOUR HONOR.

10           JUDGE KARLTON:  DO YOU INTEND TO --

11           MS. HARDY:  I WOULD LIKE TO MAKE THEM PLAINTIFFS'

12  NEXT IN ORDER, AND I HAVE A COPY FOR THE BENCH.

13           JUDGE HENDERSON:  WHAT WOULD THAT NUMBER BE?

14           JUDGE KARLTON:  DO WE KNOW WHAT NUMBER THAT WILL BE?

15           JUDGE HENDERSON:  ROWENA, ARE YOU KEEP THE NUMBERS?

16         THE CLERK:  WE DON'T HAVE THE LIST, NO.

17         MS. HARDY:  THIS IS PLAINTIFFS' 825.

18           JUDGE HENDERSON:  EIGHT TWENTY-FIVE.  OKAY.  THIS

19  WILL BE MARKED AS PLAINTIFFS' NUMBER 825 FOR IDENTIFICATION.

20               (PLAINTIFFS' EXHIBIT 825 MARKED FOR

21                IDENTIFICATION.)

22  BY MS. HARDY

23  Q  DR. THOMAS, DO YOU RECOGNIZE THIS AS A CORRECTIONAL MEDICAL

24  AUTHORITY REPORT?

25  A  I DON'T RECALL AS WE SIT HERE, NO, MA'AM.
```

THOMAS - CROSS / HARDY                              1243

```
 1  Q    IS IT A CORRECTIONAL MEDICAL AUTHORITY REPORT, DR. THOMAS?

 2  A    I DON'T REMEMBER SEEING ONE THAT SAID "INSIDE COVER" ON THE

 3  NEXT PAGE.  IT DOES TALK ABOUT THE CORRECTIONAL MEDICAL

 4  AUTHORITY, BUT I JUST DON'T RECALL THIS ONE AT ALL, AND IT

 5  COULD BE BECAUSE IT TALKS ABOUT 2002, 2003.  SO IT PROBABLY

 6  WOULDN'T BE PREPARED UNTIL AFTER I LEFT THE DEPARTMENT.

 7  Q    BUT IT WOULD HAVE COVERED THE TIME DURING WHICH YOU WERE AT

 8  THE DEPARTMENT, CORRECT, BECAUSE YOU WERE THERE IN 2003,

 9  CORRECT?

10  A    POSSIBLY, YES.

11  Q    OKAY.  AND I DIRECT YOUR ATTENTION TO PAGE 5.

12           MIDWAY DOWN THE PAGE IT SAYS:

13         "AUTHORITY SURVEYORS OVER THE PAST TWO FISCAL

14          YEARS MORE FREQUENTLY IDENTIFIED AREAS WHERE

15          INSUFFICIENT STAFFING APPEARED TO AFFECT THE

16          PROVISION OF ADEQUATE CARE AND/OR THE DOCUMENTATION

17          OF THAT CARE IN SUFFICIENT DETAIL."

18           DOCTOR, IS THIS -- DO YOU RECALL RECEIVING SURVEYS

19  THAT TOLD YOU THAT THERE WERE FREQUENTLY IDENTIFIED AREAS WHERE

20  INSUFFICIENT STAFFING APPEARED TO AFFECT THE PROVISION OF

21  ADEQUATE CARE?

22  A    I DON'T SEE WHERE YOU'RE READING, BUT I DO RECALL RECEIVING

23  COMMENTS, DOCUMENTS FROM THE CORRECTIONAL MEDICAL AUTHORITY

24  SAYING WE WERE UNDERSTAFFED.

25  Q    OKAY.  DOCTOR, YOU ARE AWARE THAT THE FLORIDA'S DEPARTMENT
```

THOMAS - CROSS / HARDY                                    1243

1   OF CORRECTIONS PRISON POPULATION IS STATUTORILY CAPPED,

2   CORRECT?

3   **A**   THAT'S CORRECT.

4   **Q**   AND THAT POPULATION CAP WAS THE PRODUCT OF A NEGOTIATED

5   SETTLEMENT IN THE SUIT *COSTELLO VERSUS WAINWRIGHT*, CORRECT?

6   **A**   THAT'S CORRECT.

7   **Q**   AND BECAUSE OF *COSTELLO*, THE FLORIDA STATE PRISON

8   POPULATION WAS REDUCED IN ORDER TO RECEIVE A CONSTITUTIONAL

9   LEVEL OF MEDICAL CARE, CORRECT?

10   **A**   THAT'S CORRECT.

11   **Q**   AND PURSUANT TO STATUTE, FLORIDA HAS A CONTROL RELEASE

12   AUTHORITY, CORRECT?

13   **A**   THAT'S CORRECT.

14   **Q**   AND THE AUTHORITY IS CHARGED WITH IMPLEMENTING A SYSTEM FOR

15   DETERMINING THE NUMBER AND TYPE OF INMATES WHO MUST BE RELEASED

16   INTO THE COMMUNITY UNDER CONTROL RELEASE TO MAINTAIN THE PRISON

17   SYSTEM BETWEEN 99 PERCENT AND A HUNDRED PERCENT OF TOTAL

18   CAPACITY, CORRECT?

19   **A**   MY RECOLLECTION IS DIFFERENT THAN THAT, MS. HARDY.  THAT

20   SUIT WAS THREE SEPARATE SUITS, AND ONE WAS MEDICAL CARE.  THE

21   OTHER WAS OVERCROWDING IN GENERAL.  I FORGET THE THIRD.  I

22   THINK IT WAS FOOD.

23          MY RECOLLECTION IS THAT IT'S 150 PERCENT OF DESIGN

24   CAPACITY.  IF YOU HAVE INFORMATION DIFFERENT THAN THAT, THAT'S

25   MORE CURRENT, I MIGHT CERTAINLY BE WILLING TO YIELD TO THAT.

THOMAS - CROSS / HARDY                                      1243

```
 1  BUT MY RECOLLECTION IS IT'S 150 PERCENT OF DESIGN CAPACITY.

 2  Q   I BELIEVE THAT TOTAL CAPACITY IS DEFINED AT 150 PERCENT OF

 3  DESIGN CAPACITY, EXCEPT THAT CERTAIN BEDS, INCLUDING MEDICAL

 4  AND MENTAL HEALTH BEDS, MUST REMAIN AT DESIGN CAPACITY.  IS

 5  THAT YOUR UNDERSTANDING?

 6  A   I DON'T RECALL NOW AS WE SIT HERE.

 7  Q   OKAY.  I'D ASK THAT THE COURT REPORTER HAND TO YOU FLORIDA

 8  STATUTE 944.023.

 9  A   WE'RE HAVING A LITTLE DIFFICULTY.  IF IT'S ACCEPTABLE TO

10  YOUR HONOR, IF YOU COULD READ THAT TO ME, IT MAY REFRESH MY

11  RECOLLECTION.

12  Q   I'M SORRY.  I WOULD LIKE TO MAKE THAT EXHIBIT NO. 826,

13  PLAINTIFFS' 826.

14          JUDGE HENDERSON:  HE ASKED IF YOU COULD READ THAT TO

15  HIM.

16          THE WITNESS:  WE DON'T SEEM TO HAVE THAT, MS. HARDY.

17  BY MS. HARDY

18  Q   YOU DO NOT HAVE 944.023?

19  A   NO, MA'AM.  THAT'S CORRECT.   MICHELLE IS INDICATING WE

20  ONLY HAVE 945 STATUTES AND 1947.

21  Q   I APOLOGIZE.

22          YOU ARE AN ATTORNEY, CORRECT, DOCTOR?

23  A   YES, MA'AM.

24  Q   AND YOU ARE FAMILIAR WITH THE FLORIDA STATUTES, CORRECT?

25  A   SAY AGAIN, PLEASE.
```

THOMAS - CROSS / HARDY                    1293

```
 1  Q    SO YOU DO HAVE SOME FAMILIARITY WITH FLORIDA STATUTES,

 2  CORRECT?

 3  A    YES, MA'AM.  I HELPED CREATE MANY OF THEM.

 4  Q    THE STATUTE NUMBER 944.023, COMPREHENSIVE CORRECTIONAL

 5  MASTER PLAN, SUB-ONE:

 6            "AS USED IN THIS SECTION, THE TERM,"

 7              AND THEN JUMPING DOWN TO SUB-B.

 8            "TOTAL CAPACITY OF THE STATE CORRECTIONAL SYSTEM

 9        MEANS THE TOTAL DESIGN CAPACITY OF ALL INSTITUTIONS

10        AND FACILITIES IN THE STATE CORRECTIONAL SYSTEM,

11        WHICH MAY INCLUDE THOSE FACILITIES AUTHORIZED AND

12        FUNDED UNDER CHAPTER 957, INCREASED BY ONE-HALF WITH

13        THE FOLLOWING EXCEPTIONS,"

14              AND INCLUDED AMONG THOSE EXCEPTIONS ARE MEDICAL AND

15  MENTAL HEALTH BEDS WHICH MUST REMAIN AT DESIGN CAPACITY.

16            SO THAT'S WHAT THE STATUTE SAYS.  THAT IS THE

17  STATUTE UNDER WHICH YOU OPERATED.

18  A    THANK YOU FOR REFRESHING MY MEMORY.  AND THE WAY THAT WAS

19  INTERPRETED, OF COURSE, WAS THE HOSPITAL AND THE INFIRMARIES

20  CAN'T EXCEED DESIGN CAPACITY, BUT THE FACILITIES THAT THEY'RE

21  ASSOCIATED WITH CAN EXCEED DESIGN CAPACITIES BY 50 PERCENT.

22  Q    CORRECT.  SO DURING YOUR TENURE AS A PHYSICIAN WITH THE

23  FLORIDA DEPARTMENT OF CORRECTIONS, THE SYSTEMS POPULATION WAS

24  NOT PERMITTED TO EXCEED 150 PERCENT OF DESIGN CAPACITY,

25  CORRECT?
```

THOMAS - CROSS / HARDY                    1293

1   **A**   THAT'S CORRECT.

2   **Q**   YOU TESTIFIED THAT A WORK STUDY AND OUTCOMES STUDY WOULD

3   NOTE THE TIME AT EACH ENCOUNTER, THE TIME OF EACH ENCOUNTER

4   WITH A PHYSICIAN, AND ANALYZE THE OUTCOME.  DID YOU DO SUCH A

5   STUDY WHEN YOU TOURED THE CALIFORNIA STATE PRISON SYSTEM?

6   **A**   NO, MA'AM.  I SAW NO SUCH DOCUMENTATION.  WERE I TO BE

7   CONSULTED BY THE SYSTEM, I FEEL THERE COULD BE SEVERAL

8   IMPROVEMENTS ADMINISTRATIVELY, YES, MA'AM.

9   **Q**   YOU TESTIFIED THAT YOU EVALUATED THE ADEQUACY OF THE

10  WORKLOADS OF THE HEALTHCARE STAFF, INCLUDING THE PHYSICIANS AND

11  NURSES AT ALL EIGHT OF THE PRISONS YOU VISITED, CORRECT?

12  **A**   THAT'S -- YES, MA'AM.

13  **Q**   AND YOU DETERMINED THAT AT EACH PRISON, AND PARTICULARLY

14  THE LAST FIVE YOU TOURED, SEEMED TO HAVE AN ADEQUATE NUMBER OF

15  STAFF TO PERFORM THE FUNCTIONS REQUIRED OF THEM, CORRECT?

16  **A**   YES, MA'AM, COMPARED TO OTHER CORRECTIONAL INSTITUTIONS, MY

17  FEELING WAS THEY WERE RICHLY STAFFED, YES.

18  **Q**   BUT YOU HAVE NO WRITTEN DATA FROM THESE TOURS, CORRECT?

19  **A**   BUT I HAVE NO WHAT DATA?

20  **Q**   WRITTEN DATA THAT YOU PERSONALLY COMPILED FROM THESE TOURS,

21  CORRECT?

22  **A**   NO WRITTEN DATA, THAT IS CORRECT.

23  **Q**   AND YOU HAVE NO STATISTICS FROM ANY OF THE PRISONS THAT YOU

24  VISITED SHOWING HOW MUCH TIME EACH OF THE REQUIRED MEDICAL

25  FUNCTIONS TAKE, CORRECT?

THOMAS - CROSS / HARDY                    1233

```
 1  A    THAT'S CORRECT.

 2  Q    AND YOU HAVE NO STATISTICS FROM ANY OF THE PRISONS SHOWING

 3  HOW MANY STAFF ARE ALLOCATED TO EACH OF THESE FUNCTIONS,

 4  CORRECT?

 5  A    THAT'S NOT NECESSARILY CORRECT.  AT EACH INSTITUTION WE HAD

 6  SOME INDICATION OF THE NUMBER OF INMATES AND THE NUMBER OF

 7  PROVIDERS AND THE NUMBER OF HEALTHCARE STAFF.

 8  Q    DO YOU RECALL HOW MANY PROVIDERS THERE WERE FOR THE NUMBER

 9  OF PRISONS AT PLEASANT VALLEY STATE PRISON?

10  A    NOT OFF THE TOP OF MY HEAD, I DON'T.

11  Q    DO YOU RECALL THE RATIO FOR ANY OF THE PRISONS YOU VISITED?

12  A    I DO RECALL AT ONE I WAS VERY IMPRESSED WITH THE FACT THAT

13  THERE WERE NO NURSING VACANCIES, AND THE NURSE -- THE CHIEF

14  NURSE HAD BEEN CREATIVE ENOUGH TO NOT ONLY HAVE 40 OF HER

15  ALLOCATED NURSES, BUT TO HAVE 41 NURSES BECAUSE SHE SWUNG, WITH

16  THE WARDEN'S PERMISSION, ANOTHER POSITION.

17  Q    WHAT PRISON WAS THAT?

18  A    I DON'T RECALL.

19            MS. HARDY:  I HAVE NOTHING FURTHER.

20            JUDGE HENDERSON:  OKAY.  DOES CCPOA HAVE ANY

21  QUESTIONS FOR THIS WITNESS?

22            MR. HENDERSON:  NOT AT THIS TIME, YOUR HONOR.

23            JUDGE HENDERSON:  OKAY, COUNSEL.

24            MS. JOHNSON:  WE HAVE NO FURTHER QUESTIONS, YOUR

25  HONOR.
```

THOMAS - CROSS / HARDY                    1253

1          **JUDGE HENDERSON:**  OKAY.  THANK YOU VERY MUCH FOR

2   TESTIFYING, DOCTOR.  YOU'RE EXCUSED AT THIS TIME.

3          **THE WITNESS:**  THANK YOU, YOUR HONOR.  I WANT TO

4   INDICATE THAT I APPRECIATE THE COURT PERMITTING ME TO DO THIS

5   BECAUSE OF PERSONAL REASONS.

6          **JUDGE HENDERSON:**  ALWAYS WILLING TO ACCOMMODATE.  I

7   HOPE IT WORKED OUT FOR YOU.  THANK YOU, SIR.  I DON'T KNOW HOW

8   TO TURN YOU OFF.  THERE WE GO.

9          **THE WITNESS:**  MY WIFE DOES THAT ALL THE TIME, YOUR

10  HONOR.

11         **JUDGE HENDERSON:**  OKAY.  YOU MAY CALL YOUR NEXT

12  WITNESS, COUNSEL.  OKAY.  WE ARE GOING TO TAKE A BREAK, A COURT

13  REPORTER BREAK.  FIFTEEN MINUTES.

14         LET'S TALK BEFORE WE DO.  WHAT'S THE REST OF THE

15  DAY?  WHAT DO WE HAVE AT THIS POINT?

16         **MS. JOHNSON:**  THE DEPOSITIONS WE WERE GOING TO READ

17  INTO THE --

18         **JUDGE HENDERSON:**  OKAY.

19         **MS. JOHNSON:**  WE HAVE THE DEPOSITIONS WE ARE GOING

20  TO READ INTO THE TRANSCRIPT.

21         **JUDGE KARLTON:**  ASSUMING THAT HAPPENS, WHAT HAPPENS

22  AFTER THAT?  THAT'S IT FOR THE DAY?

23         **MS. JOHNSON:**  THAT'S IT FOR THE DAY.

24         **JUDGE HENDERSON:**  TO GIVE YOU A LITTLE WARNING, WE

25  ARE GOING TO ASK YOU TO MAKE AN OFFER OF PROOF.  IT'S NOT CLEAR

## CERTIFICATE OF REPORTER


WE, JOAN MARIE COLUMBINI AND KATHERINE WYATT, OFFICIAL REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN CIV S-90-0520 LKK JPM, RALPH COLEMAN, ET AL V. ARNOLD SCHWARZENEGGER AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD SCHWARZENEGGER, WERE REPORTED BY US, CERTIFIED SHORTHAND REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.


/S/ JOAN MARIE COLUMBINI

JOAN MARIE COLUMBINI, CSR 5435, RPR


S/ KATHERINE WYATT

KATHERINE WYATT, CSR 9866, RMR

WEDNESDAY, DECEMBER 2, 2008

# EXHIBIT 3



*D. Scott Dodrill Consulting, Inc.*

Expert Report of D. Scott Dodrill

August 2015

In the Matter of

Porter v. Clarke
United States District Court, Eastern District of Virginia
C.A. #1:14-cv-1588

This report presents my views and opinions regarding the appropriateness of Virginia Department of Corrections (VDOC) at the Sussex I State Prison (SISP), Waverly, Virginia, utilizing single-cell segregated housing for convicted individuals sentenced to death.  In particular, I offer opinions on whether it is reasonable for a corrections administrator to confine all individuals sentenced to death to their own housing unit and to implement operating procedures and protocols that are more stringent than those used for open-population housing.  I reviewed among other things, protocols and procedures for lighting, showers, recreation, meals, programming and visitation.

My opinions in this matter are based on my more than thirty-five years of correctional experience working within the Federal Bureau of Prisons (BOP); my membership with the American Correctional Association (ACA), the Association of State Correctional Administrators (ASCA), and the North American Association of Wardens and Superintendents (NAAWS); my training with the National Institute of Corrections (NIC); my working with different state agencies while operating my own correctional consulting business; and my interaction with the members of each of these organizations.  During my employment by BOP I worked in nine separate correctional institutions, ranging in security level from "minimum" to "high."  I also worked in two regional offices and the BOP Central Office twice.  During my career, I was a member of the committee that designed the Special Confinement Unit (SCU).  I ultimately coordinated the activation of the unit, at the United States Penitentiary (USP) in Terre Haute, Indiana.  Up until that time there were 20 federal inmates sentenced to death and they were being housed in state-operated death-row units around the country.

The last eight years of my career I was a member of the BOP Executive Staff.  This group served as the decision-making body for the entire agency.  The Executive Staff made all policy, procedural and operational decisions, approved all personnel actions and conducted training on an executive level.  This body met in person four times a year and toured different correctional institutions two to three times a year.

If called upon to testify as a witness in this matter, I would offer the following opinions:

**OPINION #1:**  VDOC SISP houses death-row inmates in a reasonable manner with appropriate procedures and protocols.  None of the procedures utilized by the VDOC is new or unusual.  VDOC's death-row procedures are well within acceptable parameters in comparison with the death-row operations of other states and the federal system.

**OPINION #2:**  Inmates sentenced to death would pose a more serious safety and security threat if housed in the general prison population.

**OPINION #3:**  SISP meets all mandatory accreditation requirements as set forth by the ACA, based on a review by national correctional peers.

## QUALIFICATIONS:

I am qualified and competent to render my opinion in the case before this Court, due to my experience, training, education and professional activities in criminal justice and corrections.

I am currently self-employed as a correctional consultant.  As a consultant I enter into private agreements with criminal justice agencies to perform a wide range of services including: review of policies and procedures, performance audits and inspections, administrative investigations, development and delivery of training courses, draft policies and procedures, meeting and conference facilitation, and expert testimony in court.  I have maintained this position since February 2011.

I served as the Assistant Director of the BOP Correctional Programs Division from August 2009 until my retirement at the end of December 2010.  In this position, I provided direct supervision to over 500 employees including remote offices in Texas, Pennsylvania, California, Colorado and West Virginia.  I provided leadership and policy direction to all field operatives of the BOP, including 116 correctional institutions, six regional offices and approximately 300 residential re-entry centers.  I developed and wrote policies and directed training efforts in all departments covered by the Division.  I also directed all critical BOP inmate management and programming functions.  These areas included: intelligence gathering and sharing; counter-terrorism initiatives to include hands-on oversight of Administrative Maximum, Special Management and Communications Monitoring Unit inmates; religious activities; Re-entry affairs and inmate skills development; sex-offender certification reviews; Psychology Services, including Drug Abuse Programs and the development and delivery of all mental health programming; Correctional Services and all institution security aspects including crisis planning and gang management/monitoring; witness security and victim witness operations; designations and sentence computations of all inmates; and unit and case management, including for female offender programs.

I served as Regional Director of the northeast office for the BOP, located in Philadelphia, Pennsylvania, from January 2004 until August 2009.  This position maintained oversight for the ten states constituting the northeast section of the country (Ohio, Pennsylvania, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire and Maine).  Managing this office constituted oversight of 19 federal institutions, 35,000 inmates and over 6200 staff, with an annual budget of $850 million.  I supervised the wardens at the 19 institutions and approximately 100 regional office staff, including a legal office of eight attorneys.  On a daily basis I interacted closely with other law enforcement agencies and court officials.  I regularly responded to inquiries from the press, congressmen, senators, judges and congressional staff members.  As Regional Director I toured each of the institutions under my charge, at least once a year.  I also conducted Institution Character Profile reviews of each of these institutions once every three years, at a minimum.  This process involved a review of the entire facility, including staff and inmate interviews.

I served as Warden at the maximum-security, adult-male federal prison in Lewisburg, Pennsylvania from December 2001 until January 2004. My duties included managing the budget of approximately $40 million, supervising over 500 staff, and overseeing an inmate population of more than 2000. I provided executive direction and leadership to four associate wardens, a camp administrator, an intensive confinement center administrator, an executive assistant and an attorney. I provided indirect leadership to 22 department heads and additional professional, technical, trade and craft workers. I oversaw the operations of the Federal Prison Industries employing approximately 350 inmates in a metal factory. I regularly responded to inquiries from the press, congressmen, senators and congressional staff members. Due to the nature of the institution, I routinely worked in cooperation with the Federal Bureau of Investigation (FBI), the United States Marshals Service, the Drug Enforcement Agency, as well as local and state law enforcement agencies.

From June 1999 until December 2001, I served as warden at the Low Security Correctional Institution in Butner, North Carolina. I maintained similar duties at this facility as those listed above. That institution was a low-security, adult-male facility that was part of a three-institution correctional complex, which included a mental health facility and prison hospital facility. I was responsible for 230 staff, 1000 inmates and a budget of $23 million. I oversaw the operations of the Federal Prison Industries which employed 210 inmates in a textile factory. I also provided leadership to two associate wardens, an executive assistant and an attorney.

Before holding those positions I had over 21 years of additional experience with the BOP in various federal facilities around the country, including:

- Central Office in Washington, D.C., (BOP Correctional Services Administrator)
- Beckley, WV, (Associate Warden)
- Ashland, KY, (Associate Warden)
- Atlanta, GA, (Regional Asst. Correctional Services Administrator, Regional Correctional Services Administrator)
- Marianna, FL, (Captain)
- Tallahassee, FL, (Discipline Hearing Officer)
- Butner, NC, (Lieutenant)
- Eglin AFB, FL, (Lieutenant)
- Memphis, TN, (correctional officer, Senior Officer Specialist, case manager)

My professional training includes, but is not limited to:

- Introduction to Correctional Techniques, BOP
- National Institute of Corrections (NIC) – Jail Operations
- NIC - Jail Administration
- NIC - Contemporary Issues in Prison Management
- ASCA – New Wardens Training
- Inmate Monitoring, BOP
- Advanced Lieutenants Training, BOP
- Special Investigative Supervisor Training, BOP

- Advanced Correctional Techniques, BOP
- BOP National Leadership Forum
- New Captains Training, BOP
- IDC Certification, BOP
- Department of Justice (DOJ) Ethics Training
- NIC - Management Strategies in Prison Disturbances
- NIC - Correctional Leadership Development Program
- Associate Wardens Training, BOP
- Strategic Planning, BOP/FBI
- New Associate Wardens Training, BOP
- Basic Prisoner Transportation, BOP
- ACA Conference training
- Crisis Management, DOJ
- New Wardens Training, BOP
- Wardens Conference, BOP
- NIC Leadership Issues in Prison Management
- Command and Control Training, FBI
- Dispute resolution, DOJ
- Aspen Institute Executive Seminar
- DOJ Critical Incident Response
- BOP Executive Staff Training
- Office of Personnel Management (OPM) Senior Executive Staff Training
- Correctional Supervision, BOP
- Executive Training with BOP Executive Staff, four times a year

Over my years with the BOP I received numerous awards, including:

- 1999 Attorney General's Award for Excellence in Management, from Attorney General Janet Reno

- 2002 Designation to the Senior Executive Staff by Attorney General John Ashcroft

- 2008 Presidential Meritorious Rank Award, from President George W. Bush

- 2010 The Distinguished Service Medal from the Director of the Bureau of Prisons, Harley G. Lappin

I have qualified as an expert in corrections on several occasions in various federal courts, testified as an expert witness in various federal courts and consulted, testified and provided depositions in several cases in federal court.  I have been engaged both by government and by criminal-defense counsel.

I am a current member of ACA and NAAWS, and a former member of ASCA.

I also read professional journals to remain current in my profession.  These include, but are not limited to, *Corrections Today, The FBI Law Enforcement Bulletin,* and *The Sheriff's Star*, as well as other local sheriff department publications.

### DATA AND INFORMATION RELIED UPON:

1.  Complaint *Porter vs. Clarke*

2.  Virginia DOC Local Operating Procedure 460.A, Security of Offenders Under the Penalty of Death

3.  Virginia DOC Local Operating Procedure 720.1, Access to Health Services

4.  Virginia DOC Local Operating Procedure 730.4, Mental Health Services: Offenders 'at risk' in Special Housing

5.  Virginia DOC Local Operating Procedure 861.3, Special Housing

6.  Virginia DOC Local Operating Procedure 730.2, Mental Health Services: Screening, Assessment, and Classification

7.  Virginia DOC Local Operating Procedure 802.1, Offender Property

8.  Virginia DOC Local Operating Procedure 841.3, Offender Religious Programs

9.  Virginia DOC Local Operating Procedure 866.1, Grievance Procedure

10. Virginia DOC Central Classification Services document dated March 2015

11. Opening Brief of Defendants – Appellants, dated 3-24-14, in *Prieto vs. Harold W. Clarke, et al.*

12. Brief of Amici Curiae Correctional Experts in Support of Appellee, dated 6-4-14, in *Prieto vs. Harold W. Clarke, et al.*

13. Amici Supporting Appellee, dated 3-10-15, in *Prieto vs. Harold W. Clarke, et al.*

14. Defendant Harold Clarke's Response to Plaintiff's First Set of Request for Interrogatories, dated 5-22-15

15. Defendant Keith W. Davis's Response to Plaintiff's First Set of Request for Interrogatories, dated 5-22-15

16. Deposition of Harold W. Clarke in *Prieto vs. Harold W. Clarke, et al.*, Civil Action No.:  1:12-CV-01199, dated 6-27-13

17. Reply Brief of Defendants – Appellants in *Prieto* case, dated 9-2-14

18. Pod Log Books, 2010-2015

19. Visitor Registration Logs, 2010-2015

20. Virginia DOC Institutional Rules and Regulations for Offenders on Death Row, dated February 3, 2010

21. Plaintiff Anthony Juniper's Response to Defendant's First Set of Interrogatories, dated 6-24-15

22. Plaintiff Mark Lawlor's Response to Defendant's First Set of Interrogatories, dated 6-24-15

23. Plaintiff Ricky Gray's Response to Defendant's First Set of Interrogatories dated 6-24-15

24. Plaintiff Thomas Porter's Response to Defendant's First Set of Interrogatories, dated 6-24-15

25. Report of the Mecklenburg Correctional Center Study Committee, Executive Summary, dated November 7, 1984

26. Declaration of Mark Cunningham in this case, dated 7-15-15

27. Expert Report of James E. Aiken in this case, dated 7-14-15

28. Report of Michael L. Hendricks in this case, dated 7-13-15

29. Report of Toni V. Bair in this case, dated 7-15-15

30. ASCA Survey: Inmates Sentenced to Death Housing Policy,  dated 2-22-13

31. Tour of SISP in Waverly, Virginia on 7-29-15

32. Tour of the Special Confinement Unit (SCU), the federal death row, at the United States Penitentiary, Terre Haute, IN on 7-30-15

33. Texas Department of Criminal Justice Post Order, PO-07.120 (rev.4), Death Row Cellblock Picket Officer, dated 3-29-13

34. Texas Department of Criminal Justice Post Order, PO-07.121 (rev.6), Death Row Cellblock Officer (Male Unit), dated 3-29-13

35. South Dakota Department of Corrections Policy, 1.3.D.2, Capital Punishment Housing, dated 8-14-14

36. Kansas Department of Corrections General Orders, Section Number 10-102, Management of Inmates Housed on Segregation Status, dated 12-7-09

37. South Carolina Department of Corrections Procedure, OP-22.16, Death Row, dated 6-26-14

38. New Mexico Department of Corrections Policy, 050300, Inmates Under Sentence of Death, dated 3-9-15

39. Louisiana State Prison Offender Posted Policy #030, Visitation, dated 8-25-11

40. Louisiana Department of Corrections Regulation No. C-03-001, Field Operations, Death Penalty, dated 3-12-14

41. Connecticut Department of Corrections Directive 9.4.1, Restrictive Status, dated 1-2-14

42. Connecticut Department of Corrections Northern Correctional Institution Handbook, rev. 4-1-15

43. Affidavit of Harold W. Clarke with accompanying attachment of the updated Death Row Specific Rules, dated 8-5-15

44. Lem Tuggle's death-row audio-tape recording, sides A & B (available on YouTube)

45. Defendants First Set of Discovery Documents, VDOC Offender Disciplinary Actions Report of Thomas A. Porter, #1072240, pages 334-336, dated 5-18-15

46. BOP, Program Statement 5270.09, Inmate Discipline Program, dated 8-1-11

47. BOP Office of Research and Evaluation, Life Without Parole (LWOP) Discipline Data, 2008-2013

48. American Correctional Association Accreditation Report, SISP, dated 2-9-09

49. Commission on Accreditation for Corrections Standards Compliance Reaccreditation Audit, VDOC, SISP, dated 6-11

50. Commission on Accreditation for Corrections Standards Compliance Reaccreditation Audit, VDOC, SISP, dated 6-14

## BASES FOR OPINIONS:

**OPINION #1:**  VDOC SISP houses death-row inmates in a reasonable manner with appropriate procedures and protocols.  None of the procedures utilized by the VDOC is new or unusual.  VDOC's death-row procedures are well within acceptable parameters in comparison with the death-row operations of other states and the federal system.

There is a large continuum of factors to consider when establishing procedures and protocols for the operation of a death row.  Each state, and the BOP, has had to design and operate their units based on the inmates they are housing and the needs of their agencies.  The vast majority of these agencies have chosen a type of segregated housing design, with variations of the unit's operational procedures.

Once an individual is given a death sentence by the courts in the state of Virginia, they are automatically housed on death row.  Virginia is in the large majority of correctional agencies that have adopted a segregated style of housing for inmates sentenced to death.

In February 2013, ASCA conducted a survey[1] that requested information from each state correctional administrator throughout the country pertaining to their Inmates Sentenced to Death Housing Policy.  Thirty-nine states responded, with ten declaring that their state did not have the death penalty.  Of the remaining 29 respondents, an overwhelming 27 indicated that they maintained their inmates sentenced to death in some form of segregated housing.

The federal version of death row was not activated until 1999.  During my career with the BOP, I was a member of the committee that designed the unit.  I ultimately coordinated the activation of the Special Confinement Unit, (SCU), at the United States Penitentiary (USP) in Terre Haute, Indiana.  Up until that time there were 20 federal inmates sentenced to death and they were being housed in state operated death-row units around the country.  The SCU was, and still is, a segregated housing facility for maintaining federal inmates sentenced to death.

The segregation of death-row inmates is not new in Virginia.  Even in the 1980s Virginia had operated a segregated housing unit where all inmates sentenced to death were exclusively housed.  In the early 1980s the unit was operated as a stand-alone, open-housing unit.  In this type of setting death-row inmates were allowed to congregate, eat, recreate and work together within the confines of only this unit.  In this type of operation inmates were out of their cells for extended periods of time.

After a mass escape from death row at Mecklenburg Correctional Center in 1984, and the relocation of the death row to SISP, the operating procedures of the unit changed to primarily what they are now.  Before that time, however, a state study group

---

[1] Defendant's First Set of Discovery Documents, dated 5-26-15; page 236-267: ASCA Survey:  Inmates Sentenced to Death Housing Policy, dated  2-22-13

recommended in 1984 that the unit return to its open type of segregated housing. That recommendation was not followed by the Department of Corrections after it relocated death row to SISP. Despite the fact that the operating procedures of this unit are reviewed on a regular basis, sitting administrators have decided time and time again to continue using single-cell segregated-housing procedures. In my judgement, that decision is reasonable from the standpoint of a professional corrections administrator.

Gene Johnson, the former Director of the VDOC (2002-2010), advised me that he believes that death-row inmates should be separated and placed under "high security" procedures. He further related that correctional administrators should be cautious about allowing death-row inmates to congregate due to possible escape plots, and the fact that the inmates "have nothing to lose." He believes that the protocols in place at the time this lawsuit was filed were best suited to meet the needs of the agency. In my opinion, his professional judgement was reasonable.

Specifically, in my opinion, the decision to operate Virginia's death row in a more restrictive manner was justified – and continues to be justified – by a variety of factors. Virginia's death-row inmates had, when allowed to congregate, engaged in conduct that demonstrated their propensity to harm one another. Similarly, death-row inmates in a congregate setting had demonstrated their ability to obtain contraband that could be used to harm one another, themselves or staff.

For example, Dave Robinson, VDOC Chief of Correctional Operations, related an incident from September 1988 when two death-row inmates at Mecklenburg Correctional Center got into a fight. During the fight, one inmate picked the other inmate up and threw him off the tier, causing his head and back to hit the concrete floor. The resulting spinal injury left the inmate partially paralyzed with limited use of his arms and legs.

Mr. Robinson further related that in June 1993, the inmate who had thrown the other inmate off the tier, while still on death row, was able to commit suicide after smuggling contraband into the unit. The inmate was able to strangle himself after consuming cocaine and alcohol. Another inmate at Mecklenburg died from an overdose of heroin in March 1992.[2] These instances indicate that even with high-security protocols in place, inmates are still a danger to themselves, staff and the community.

In some cases, isolating inmates is for their own safety. Many times notorious inmates are in danger from other inmates because of who they are, who they represent, or what they have done. Child molesters are an easy example. Another one was just in the news, from California. One of the San Quentin Six inmates was murdered shortly after his release from over forty years of solitary confinement. The state had placed him in solitary confinement for his own protection.

The potential danger of allowing death-row inmates to congregate is underscored by an incident described by David Zook, the current warden of SISP, from his

---

[2] From an Associated Press article, published in the Lance-Star, dated 9-9-93

experiences in the Florida Department of Corrections.  In April 1995 at the Starke facility, two death-row inmates killed two other death-row inmates.  During congregate recreation, two inmates were able to convey two steel shanks onto the recreation yard and stab the other two inmates to death.

The 1984 Mecklenburg escape is another example of a security breach that justified restricting the ability of death-row inmates to congregate with one another.  Lem Tuggle, one of the 1984 escapees from Mecklenburg, made an audio tape discussing the escape.[3]  He stated that the eight inmates involved in the escape plot were able to make plans, discuss the plans among themselves, observe staff, get together and make changes to the plan, and so on, until they had a plan in which they could find no shortcomings.  He stated that they even had committees to take care of different aspects of the plan.  Tuggle's statements confirm my opinion that open segregated housing allows inmates the opportunity to hatch dangerous plans. [4]

Mr. Toni Bair[5] mentioned in his report for the plaintiffs in this case that the 1984 escape was caused by staff not following procedures, not the procedures themselves. Staff members' failure to follow the policies and procedures of the unit did make it easier for the inmates to accomplish their escape plans.  I agree that a problem that all correctional administrators face is assuring that staff follow the policies and procedures.  Operating procedures for running prisons have been in the process of revision for over a hundred years.  Administrators review procedures constantly, maintaining those that are effective, and changing or adapting those that are not.  Staff complacency and staff taking short cuts are a constant concern.

However, access to the staff, and to each other, allowed the 1984 death-row inmates the ability to observe, plan, re-observe, and re-plan, until they were ready to implement their final plan.  As a result of the open segregated operating procedures in place at the time (i.e., allowing inmates to spend hours every day for months on end observing staff) the inmates were able to determine who, when and/or under what circumstances staff would take policy shortcuts.  My experience has taught me that limiting inmates' movements and their access to other inmates and staff hinders their ability to circumvent the security of an institution.

If inmates want to escape, they will spend the entire day thinking about how to escape wherever they are housed.  Inmates will spend days on end observing staff and the procedures that are in place, looking for weaknesses.  The more time they are allowed to watch and get up close to the staff, the more intelligence they accumulate.  At the time of the Mecklenburg escape, the inmates were housed in open segregated housing.  This allowed inmates to better watch every move of the staff over the course of months in order to identify the staff that would take short cuts in performing their duties, and which short cuts would benefit the inmates in their attempt to escape.  With open segregated housing, not only do the inmates have the time to think about escape

---

[3] Lem Tuggle's Death Row audio-tape recording, sides A & B, available on YouTube, posted by mortfeuer on 11-7-09

[4] By "open segregated housing" I mean a housing unit where inmates have unrestrained congregate unit activities

[5] Report of Toni V. Bair in this case, dated 7-15-15

plans, they are also provided the opportunity to conspire.  They can use each other's strengths and rely on one another for assistance and intelligence.

For these reasons, restricting the ability of death-row inmates to congregate with one another also restricts their ability to plan an escape.  And limiting inmates' ability to plan escapes is plainly a legitimate concern for corrections officials.  Escapes are not only a public safety issue but an institutional safety issue as well.  Invariably, escape attempts involve life threatening scenarios for staff.

For example, Keith Davis, former warden at SISP, related an incident involving the escape attempt at the Nottoway Correctional Center in 1996 that turned into a hostage situation.  Four inmates jumped a correctional officer and took his uniform in an attempt to escape the facility.  Institution staff became aware of the attempt and apprehended one of the inmates.  The other three inmates retreated back into the institution taking three hostages and holding them seven hours before staff assaulted the building, freeing the hostages.  Eight staff suffered minor gun-shot wounds as a result of the assault.

Dave Robinson added that during an uprising in a high security unit at Mecklenburg Correctional Center in August 1984, nine hostages were taken and held by thirty-two disruptive inmates.  During the incident three correctional officers were stabbed.

For these reasons, it is my opinion that Virginia's decision to limit the activities of death-row inmates was predicated on reasonable safety and security concerns.  Maintaining death-row inmates in a more restrictive environment limits their ability to harm each other and staff, obtain potentially dangerous contraband, and attempt escapes – all issues that historically occurred when Virginia's death-row inmates were permitted to congregate.

The reasonableness of Virginia's policies for death-row offenders is underscored by the fact that at the time that this lawsuit[6] was filed, VDOC's procedures were not unlike those of the majority of the other states that house capital offenders on death row.  VDOC did not allow death-row inmates to move freely outside of their cells without restraints, inmates were not allowed to participate in congregate activities, they could not recreate with any other inmates, they did not have access to programs, and they had very limited contact visitation privileges.  Other states have followed similar procedures.  According to the ASCA survey:[7]

- 11 states allow freedom of movement without restraints, while 12 states and the BOP does not;
- 12 states allow inmates to participate in congregate activities, while 12 do not;
- 13 states allow death row inmates to recreate with other death-row inmates, while 13 and the BOP do not;
- 25 states and the BOP allow access to programs, while 4 do not; and
- 13 states allow contact visitation, while 16 and the BOP do not.

---

[6] Complaint *Porter vs. Clarke*, C.A. #1:14 cv 1588, dated 11-20-14
[7] Defendant's First Set of Discovery Documents, dated 5-26-15; page 236-267: ASCA Survey:  Inmates Sentenced to Death Housing Policy, dated  2-22-13

The corrections community is split in implementation of procedures in all of these areas, as evidenced in the above data.

During my visit to the death-row unit at SISP, I observed that the inmates' cells are located on the unit's upper two ranges. Therefore, seven inmates were housed throughout the 22 upper tier cells in single-cell housing. In my experience, inmates prefer single-cell housing. I have never encountered inmates in my thirty-eight years of working in prisons that wanted to be celled with other inmates. Single-cell housing is frequently used as an incentive for positive behavior. Indeed, the luxury of single-cell housing is the gold standard in corrections. Staff and inmates alike prefer a single cell over multi-bunked cells. Other units at SISP house two general population inmates in cells of the same size as those on death row.

As is common practice in most death-row units, VDOC serves meals to inmates in their cells. For example, Texas, Alabama, South Dakota, Kansas, South Carolina, Connecticut and the BOP provide meals to death-row inmates in their cells.

The showers are located on the tiers and only accessible to the inmates when they are released from their cells. While reviewing the showers, I observed that the institution had provided privacy screens in this area that not only allowed for institution security needs to be met, but also permitted the inmate a reasonable amount of privacy.

I observed that any time inmates wanted to talk to the unit staff, they would get a staff member's attention, and that staff member would approach the inmate's cell and have a conversation. There was no hesitation by staff to attend to the inmate's needs. Inmates could communicate with each other, though they would need to talk loudly to do so; but with very few inmates in the unit, sound traveled well. Staff explained that if they determined that a couple of inmates got along well and conversed regularly, the staff would move their cells closer to each other to permit them to converse and reduce the noise level. Staff stated that they placed one or more vacant cells between inmate-occupied cells to hinder the inmates conversing secretly. Since the inmates were readily able to communicate with each other and staff, I do not believe that the spaces between the cells hinder interaction in any significant way.

I witnessed rounds by the correctional officers, unit manager and medical staff and observed maintenance performing different projects within the unit. I found the unit to be surprisingly active considering the size of its inmate population.

I entered several cells to review the lighting. Currently the inmate has control of the light in his cell with the exception of a built-in night light, which never goes out. The night light is too bright. In my experience at other institutions, lighting in the cells is often wired so that the inmate can control the lights inside his cell, but there is an over-ride switch outside of the cell which the staff can turn on when they need better visibility. I recommend that the institution review this area and make adjustments to reduce the output of the night lights.

While in the cells I also looked out of the windows. The views varied, with different aspects of the institutional grounds visible from one window or another. None were

extensive, but the windows all allowed natural light into the cells.  In my experience, visibility of other parts of the institution and of other inmates is always best kept to a minimum for security purposes.  During my career, I am aware of signals or messages being relayed from inmates in segregated housing to inmates in general population, and vice versa.  Security requirements dictate that these communications be reduced as much as possible.  For example, I know that all windows in federal institutions in segregated housing are frosted for this reason.  I agree with this concept and don't believe that a better view overrides the security needs of the institution.

As indicated earlier, the majority of correctional agencies do not allow contact visitation.  At the time this lawsuit[8] was filed, VDOC also did not allow regular contact visitation.

For security reasons, I fully support a policy limiting visitation to non-contact visits.  However, visitation can be an excellent management tool, and if properly managed can greatly ease inmate tensions.  Therefore, I also support VDOC's effort to explore increasing the use of contact visitation.

At the time that this lawsuit was filed, VDOC policy allowed 60 minutes of outside recreation, five times a week.  Actual recreation time could be greater.  The baseline number is in line with several other correctional systems including Texas, Connecticut, South Carolina, and the BOP.  Kansas only allows inside recreation.  The industry standard regarding outside recreation is one inmate per recreation pen.  With the new VDOC interim policy of allowing 90 minutes of outside recreation, five times a week, plus 60 minutes of indoor, congregate recreation, five times a week, VDOC has moved well past a majority of the other correctional agencies in the amount of out-of-cell time allowed for each inmate.  In VDOC's new policy, outdoor recreation will also become congregate after construction of a new recreation area.  At that time, both the indoor and outdoor recreation will accommodate three to four unrestrained inmates congregating in the recreation areas.  In my experience, the smaller the number that recreate together the better, and the numbers preferably should be even (e.g., 2, 4, 6).  I prefer two inmates at a time because any conflict is one-on-one.  With greater numbers, especially odd numbers, the chance goes up that inmates fight and take sides, increasing the risk of serious injury or death.

Until the new outdoor recreation area is constructed, death-row inmates will continue to receive outdoor recreation in individualized pens.  Each inmate is placed in an individual pen with one or two vacant pens between each occupied pen.  Staff utilize this method to give a physical barrier between each inmate.  This type of separation does not affect communication between the inmates, but does prevent physical contact between inmates.  In my discussions with former SISP Warden Keith Davis, and with former VDOC Director Gene Johnson, both supported this practice based on their knowledge of a case in Virginia where an inmate was strangled by another inmate while in an adjoining recreation pen.

---

[8] Complaint *Porter vs. Clarke*, C.A. #1:14 cv 1588, dated 11-20-14

Regarding educational programming, there is a wide degree of difference in how these areas are addressed by other correctional agencies. For instance, Alabama does not allow any educational programming, while the BOP disseminates educational courses on in-cell televisions. Of the correctional agencies that allow educational programing, most allow in-cell education courses including cell front instruction provided by a licensed instructor. If VDOC resources allow, I support in-cell and/or cell front programming; in-cell television programming is optimal. Utilizing this method of programming allows for only the inmates who are genuinely interested in participating, thereby preventing the waste of resources. Programming is a valuable management tool. It provides inmates with the opportunity to fill their day with meaningful pursuits, while keeping them constructively occupied.

Similar to educational programming, cell-front religious services are practiced by South Carolina, Texas, Alabama and the BOP. Correctional officials need to keep security in mind when considering whether to allow congregate religious gatherings, as they have been used in the past to cover illicit activities. In January 2000, two inmates at the VDOC Augusta Correctional Center facility were able to assault a third inmate while an officer stood outside of the religious services room. The inmate died after being stabbed sixty-eight times.

Recently, VDOC has decided to permit death-row inmates to have additional privileges. In my opinion, this decision does not mean that the prior policies were unreasonable. Corrections administrators regularly change their procedures due to several factors, including the type of offender incarcerated, government policies, economics, and institutional experiences. Over the years, they have had the opportunity to re-design or change the manner in which death-row inmates are housed. Director Clarke stated in his deposition in the *Prieto* case[9] that any staff member can suggest changes to a policy at any time. He further stated that VDOC regularly reviews its policies. In fact, VDOC has an office specifically designed to review each and every policy on an annual basis.

In preparation for this case, I had the opportunity to discuss Virginia's procedures with Director Clarke, and to tour the unit at SISP. Director Clarke informed me that his office started looking at possible changes to death row procedures in 2011. Prior to the *Prieto*[10] lawsuit, he was preparing to begin implementing possible changes to the operations of death row. He further stated that once the lawsuit was filed, he did not believe the timing was right for changes. He is now proceeding with implementation of changes in an experiment to see if these new protocols will be effective for VDOC.[11]

---

[9] Deposition of  Harold W. Clarke, in *Alfredo Prieto vs. Harold W. Clarke, et al*, dated 6-27-13

[10] *Alfredo Prieto vs. Harold W. Clarke, et al*, nos. 13-8021, 14-6226, dated 9-2-14

[11] Attachments C & D; Affidavit of Harold W. Clarke with accompanying attachment of the updated Death Row Specific Rules, dated 8-5-15

**OPINION #2:** Inmates sentenced to death would pose a more serious safety and security threat if housed in the general prison population.

Director Clarke stated in his deposition in the *Prieto* case[12] that he considered the inmates on death row to be at high risk for misconduct because they have "nothing to lose." Former SISP Warden Keith Davis agreed with that assessment. He further indicated that death-row inmates pose a "future dangerousness" because they were constantly "plotting, scheming, and planning." Dave Robinson, VDOC Chief of Corrections Operations, maintained that death-row inmates were the "worst of the worst." He wants to do everything possible to ensure staff's safety when enforcing procedures regarding death-row inmates. In my conversation with SISP Warden Zook, he stated that death-row inmates were the most dangerous of all inmates. Warden Zook believes that they have a different mindset. He also believes death-row inmates can kill without remorse because they have a different thinking process and have nothing to lose. In my professional judgement, these beliefs are reasonable. Even 1984 Mecklenburg escapee Lem Tuggle supported this belief. When talking about making the escape attempt, Tuggle stated, "I'm on death row……what does it matter if I get shot?"

In his report in this case Mark D. Cunningham[13] discussed the "Texas Experience" and Missouri's "mainstreaming" of their death-row inmates. He concluded from his analysis of those two agencies that death-sentenced inmates do not have disproportionate rates of serious violence when confined under general population security conditions. I disagree.

In the Texas Experience, the Texas Department of Criminal Justice (TDCJ) moved from a segregated housing operation with stringent security procedures to an open population operation method. This plan was in place from 1985 to 1998. After serious misconduct by various inmates, and a major escape attempt,[14] the TDCJ reviewed its options. They decided to change back to the more secure procedures believing that it was necessary to properly ensure the safety of the inmates, staff and the community. In preparing for this case, I talked to former TDCJ Commissioner Wayne Scott who described the Texas operation of today. It is almost identical to the VDOC's operating plan at the time this lawsuit was filed.

I continuously reviewed data in this area while working for the BOP. Special Confinement Unit (SCU) misconduct was very low because "high security" conditions work. A good illustration of this fact can be shown with the misconduct record of Plaintiff Thomas Porter.[15] While inmate Porter was incarcerated at various facilities from February 1998 until June 2003, he was sanctioned for 51 institutional offenses.

---

[12] Deposition of Harold W. Clarke in *Prieto vs. Harold W. Clarke, et al.*, Civil Action No.: 1:12-CV-01199
[13] Declaration of Mark Cunningham in this case, dated 7-15-15
[14] The Texas escape attempt involved seven inmates who cut through an outdoor recreation fence and climbed onto the roof of the institution. Once observed by staff, shots were fired resulting in the surrender of six of the inmates. The seventh was able to successfully avoid being shot, climb two fences with razor wire and run into the surrounding woods. New York Times article dated 11-27-98
[15] Defendants First Set of Discovery Documents, VDOC Offender Disciplinary Actions Report of Thomas A. Porter, #1072240, page 334-336, dated 5-18-15

After his release and upon his return to incarceration, and placement at SISP death row with its high security protocols, he has only committed five offenses from June 2008 until present.

In relation to this case, I reviewed data for Life Without Parole inmates (LWOP) in the federal system that was collected by the BOP, Office of Research and Evaluation, in 2014. Inmate disciplinary data indicated that the amount of LWOP inmate misconduct was consistently similar to that of the rest of the inmate population year after year. The difference between the two groups was that LWOP inmates were committing offenses involving higher severity of misconduct (incidents at the 100 and 200 level) compared to the rest of the inmate population.[16]  In BOP policy: 100 level offenses are the "Greatest Severity" category; 200 level are the "High Severity" category; 300 level are the "Moderate Severity" category; and 400 level are the "Low Severity" category.[17] This data indicates that if death row inmates were housed in a general population facility, while they would probably commit offenses at a rate equal to the rest of the population, the severity of the offenses would be higher.

Currently, the high security procedures in place at SISP are working and inmate misconduct is minimal.  It is reasonable, therefore, for Virginia correctional officials to conclude that their policies are working, and that capital offenders should continue to be housed separately from the general inmate population.

Furthermore, I do not believe it is reasonable to extrapolate the data from Missouri and apply it to the rest of the country.  The Missouri statistics are based on Missouri inmates in the Missouri system only.  The race, ethnic breakdown, economics, gang affiliations, etc., of these inmates will be different than from any other system in the country.  And in my experience the breakdown of each of these characteristics can affect the behavior and chemistry of both staff and inmates.  So what works in one location may not work in other locations.  Correctional administrators must make decisions for their agencies based on the needs of their agencies.

Corrections officials are also properly less tolerant of serious misconduct by death row inmates than by other inmates.  Juries give the death penalty to a select few individuals whom they deem to be the most dangerous of the dangerous: only 8 of 4132 convicted murderers being held in the VDOC have been sentenced to death. Juries and courts imposed the death penalty with the understanding that these individuals should never be able to murder again.  There is a reasonable expectation that an inmate under a death sentence will be subject to much more security than all other inmates.  Corrections officials have an obligation to ensure that these expectations are met.

In my opinion, even if an inmate appears to be well adjusted, it doesn't necessarily mean that he's given up his desire to be free or to avoid imposition of a death sentence.  A recent example of this occurred in the New York state system, when two inmates escaped from a maximum-security prison.  Both inmates had gone years without significant disciplinary issues and were therefore placed in the "honor dorm."

---

[16] Attachment B; BOP, Office of Research and Evaluation , Life Without Parole Discipline Data,  2008-2013
[17] BOP Program Statement 5270.09, Inmate Discipline Program, dated 8-1-11

In this type of housing the inmates were placed in cells beside each other and were never rotated.  The inmates were able, based on good behavior, to get jobs in the Tailor Shop where they had access to tools.[18]  As a result of being able to spend hours and hours together each day, they were able to plan their escape and exercise influence over other staff.  The escape and its aftermath cost the state of New York over $22 million in overtime.[19]

Back in the early 2000s, recreation at the Administrative Maximum (ADX) federal institution in Florence, Colorado consisted of two to four inmates at a time in fenced recreation yards.  As a result of that practice, two separate homicides occurred.  Lawsuits were filed leading to changes in policy so that only one inmate recreated in a recreation yard at a time.  Jumping ahead to today, lawsuits are now being threatened because inmates are forced to recreate by themselves.  Yet prison administrators must be cautious not to revert to procedures that didn't work.

In my opinion, when administrators find procedures that effectively protect staff and inmates, those practices should be retained.  In my experience, I have found that everyone cannot be pleased but correctional professionals need to make sound correctional decisions based on their knowledge and experiences.  I believe the most conservative procedures are the most effective, resulting in less severe misconduct and protecting public safety.

**OPINION #3:**  SISP meets all mandatory accreditation requirements as set forth by the ACA, based on a review by national correctional peers.[20]

As Mr. Bair discussed in his report,[21] the American Correctional Association is recognized internationally as the standard bearer for good correctional management.

ACA grants its accreditations based on the recommendation of the Commission on Accreditation for Corrections (CAC).  This is a professional peer review process based on national standards developed by national leaders in the field of corrections, law, and other groups that are interested in strengthening correctional institutions based on sound correctional management.

The Commission approved Sussex I State Prison for accreditation at the winter meeting of the American Correctional Association in January 2009.  This was the result of SISP's satisfactory completion of a rigorous self-evaluation, followed by a thorough outside review by a team of independent auditors.  SISP scored 100% on the mandatory standards, and 98.5% on the non-mandatory standards.

---

[18] Various Associated Press news reports and CNN Special Report: The Great Prison Escape, which aired on July 28, 2015
[19] Orilliapacket.com, posted on 8-18-15
[20] American Correctional Association Accreditation Report, SISP, dated 2-9-09
[21] Report of Toni V. Bair in this case dated 7-15-15

Since the accreditation, SISP has undergone the three-year re-accreditation process twice, in July 2011 and again in July 2014, and it passed each time.[22]

None of those reviews suggested that conditions of confinement on death row at SISP violated any accrediting standard. ACA classification Standards 4-4296 and 4-4300, which Mr. Bair claims that SISP is violating, have never been raised as an issue in the accreditation process.[23] These standards indicate that all inmates should be assigned to the least restrictive custody level necessary to house their level of offender, and that each inmate's classification should be reviewed and updated every 12 months, respectively.

In sum, SISP's operating procedures have been reviewed by national correctional leaders on several occasions, and they have passed. SISP's accreditation supports the conclusion that the prison is not operating outside correctional industry standards.

## PREVIOUS CASES:

I have testified in the following cases the last four years:

*United States vs. Larry Lujan*, Federal District of New Mexico, Albuquerque, NM, 2011
    Testified at trial for the government in a capital crimes case

*United States vs. Alexis Candelario-Santana*, Federal District of Puerto Rico, San Juan, PR, 2013
    Testified at trial for the government in a capital crimes case

*United States vs. Kaboni Savage*, Federal District of Eastern Pennsylvania, Philadelphia, PA, 2013
    Testified at trial for the government in a capital crimes case

*United States vs. Wesley Paul Coonce, et al.*, Federal District of Western Missouri, Springfield, MO, 2014
    Testified at trial for the government in a capital crimes case

*United States vs. Juan Briseno*, Federal District of Northern Indiana, Hammond, IN, 2015
    Testified at trial for the government in a capital crimes case

---

[22] Commission on Accreditation for Corrections Standards Compliance Reaccreditation Audit, VDOC, SISP, dated 6-11 and 6-14

[23] American Correctional Association, Standards for Adult Correctional Institutions xvii (4th edition 2003)

**FEES:**

Hourly Rate:                           $250.00

Mileage                                .56 per mile
Plus direct expenses

I hold the opinions expressed in this report to a reasonable degree of professional
certainty.  I reserve the right to modify the opinions expressed in this report if I learn of
facts that alter my opinion and analysis.

I declare under penalty of perjury that the foregoing is true and correct to the best of
my knowledge, information, and belief.

Dated: August 23, 2015

Respectfully submitted,

D. Scott Dodrill

Attachment A


D. Scott Dodrill

Telephone: (3 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

## Profile

I have 33 years of prison management experience with the Federal Bureau of Prisons (BOP). I recently retired as the Assistant Director, Correctional Programs Division, a Senior Executive Service Staff member. I served at nine federal correctional institutions, two Regional Offices, and the Central Office on two separate occasions. I am well versed in federal prison policy and procedures and have developed many skills and abilities that are beneficial within the private and government sectors.

## Education

- West Virginia College of Graduate Studies
  M. A., Correctional Counseling and Guidance with an emphasis on Corrections, Dec. 1980

- West Virginia University
  B.A., Psychology, May 1977 (Cum Laude)

## Professional Experience

### D. SCOTT DODRILL CONSULTING, INC.

**President** – Homosassa, FL                                        02/2010-present

CEO of private consulting business serving as a correctional consultant and enter private engagements with correctional or criminal justice agencies to perform a wide range of services, including audits and inspections, review of policy and procedures, administrative investigations, audits of practices and processes, development and delivery of training courses, staff development and expert testimony in court.

## UNITED STATES FEDERAL BUREAU OF PRISONS

**Assistant Director, Correctional Programs Division (CPD)** – Central Office
Washington, DC                08/2009-01/2011

- Provided direct supervision to over 500 employees including remote offices in Texas, West Virginia, California, and Pennsylvania
- Provided leadership and policy direction to all field operatives of the BOP, to include 116 correctional institutions, six regional offices and approximately 300 residential re-entry centers
- Developed and wrote policies and directed training efforts in all departments covered by the CPD
- Directed all critical BOP inmate management and program functions
- Provided direct supervision to critical areas to include: intelligence gathering and sharing, counter-terrorism initiatives to include hands-on oversight of Administrative Maximum, Special Management and Communication Monitoring Unit inmates; Religious Services; National Re-entry Affairs and inmate skills development; sex offender certification reviews; Psychology Services to include Drug Abuse Programs and the delivery and development of mental health programming; Correctional Services and all institution security aspects including crisis planning and gang management/monitoring; witness security and victim witness operations; designations and sentence computations; unit and case management including female offender programs

**Regional Director –**                Northeast Regional Office (NERO),
                Philadelphia, PA                12/2003-08/2009

- Chief Executive Officer (CEO) of the Northeast Region consisting of 10 states
- Managed the NERO, 18 correctional institutions and five community corrections offices which provided oversight to 42 residential re-entry centers
- Provided direct supervision of 18 wardens and 13 regional administrators and responsible for 6,200 staff, 36,000 inmates and a $850 million budget
- Developed and established the national Special Management Unit at USP Lewisburg, PA
- Interacted closely on a daily basis with other law enforcement agencies and court officials
- Regularly responded to inquiries from the press, congressmen, senators, judges, and congressional staff members

**Warden / Correctional Institution Administrator –** United States Penitentiary,
                Lewisburg, PA                12/2001-12/2003

- CEO of a high-security, adult, male federal prison
- Managed a budget of approximately $40 million, over 500 staff, and an inmate population of 2,000
- Oversaw the operations of the Federal Prison Industries employing approximately 350 inmates in a metal factory
- Provided executive direction and leadership to three associate wardens, a camp administrator, an intensive confinement center administrator, an executive assistant and an attorney
- Provided indirect leadership to twenty-two department heads and additional professional, technical, trade and craft workers
- Provided oversight to the "bootcamp" and drug program operations
- Regularly responded to inquiries from the press, congressmen, senators, and congressional staff members
- Routinely worked in cooperation with the Federal Bureau of Investigation, the United States Marshals Service, the Drug Enforcement Agency, as well as local and state law enforcement authorities

- Managed the living quarters for vocational, industrial, administrative, religious and food service programs

*Warden / Correctional Institution Administrator* – Federal Correctional Complex (FCC)
Butner, NC                    06/1999-12/2001

- Maintained similar duties to those listed above
- CEO of a low-security, adult, male institution that was part of a three institution correctional complex, which included a mental health facility and prison hospital
- Responsible for 230 staff, 1000 inmates and $23 million budget
- Oversaw the operations of the Federal Prison Industries employing 210 inmates in a textile factory
- Provided oversight to two associate wardens, an executive assistant and an attorney

**Foundational Positions of Increasing Responsibility**                    1978-1999

- Correctional Officer
- Senior Officer Specialist
- Case Manager
- Lieutenant, GS-9 and Lieutenant, GS-11
- Discipline Hearing Officer
- Captain
- Regional Assistant Correctional Services Administrator
- Regional Correctional Services Administrator
- Associate Warden
- Correctional Services Administrator



- 1999 - U.S. Attorney General's Award for Excellence in Prison Management
- 2002 - Received Senior Executive Service designation from the U.S. Attorney General
- 2008 - Awarded the Meritorious Rank Award by the office of the President
- 2010 - Received the Bureau of Prisons' Distinguished Service Medal from the BOP Director



- Professional and personal references available upon request

Attachment B

## Data for 2008

Discipline Information for Inmates with Life Sentences Without Parole
Used data from July 2008 – Total sentenced inmates 185,784.

### Life Sentences

- There were 3,514 inmates with Life Sentences (no parole)
- The remainder is 182,270
- Of these inmates, 142,517 had no guilty findings for discipline during the previous 12 months
  (August 2007 through July 2008*) – 78 percent of inmates with life sentences (2,752) and 77
  percent of all other inmates (139,765).

For inmates that did have guilty findings during the previous 12 months, this table shows the percent of
inmates by severity level of most serious prohibited act for Life Sentence vs. All Others.

| Severity Level | August 2007 – July 2008 | |
|---|---|---|
| | All Else (%) | Life (%) |
| 100 | 11.63 | 22.14 |
| 200 | 29.14 | 32.69 |
| 300 | 5712 | 43.37 |
| 400 | 2.11 | 1.80 |

\* Caution: Because the time period between the occurrence of an incident and the outcome of the
hearing can take some time, and is typically longer for more serious prohibited acts, this data will not
be complete when looking at the most recent past, and can change for the same time period when
viewed from a different date, as incidents are adjudicated or expunged.   Data are shown for the date
that the incident occurred.

## Data for 2009

Discipline Information for Inmates with Life Sentences Without Parole
Used data from July 2009 – Total sentenced inmates 192,292.

### Life Sentences

- There were 3,676 inmates with Life Sentences (no parole)
- The remainder is 188,616
- Of these inmates, 146,441 had no guilty findings for discipline during the previous 12 months (August 2008 through July 2009*) – 76 percent of inmates with life sentences (2,786) and 76 percent of all other inmates (143,655).

For inmates that did have guilty findings during the previous 12 months, this table shows the percent of inmates by severity level of most serious prohibited act for Life Sentence vs. All Others.

| Severity Level | August 2008 – July 2009 | |
|---|---|---|
| | All Else (%) | Life (%) |
| 100 | 12.56 | 20.81 |
| 200 | 29.15 | 34.11 |
| 300 | 56.05 | 43.89 |
| 400 | 2.24 | 1.19 |

* Caution: Because the time period between the occurrence of an incident and the outcome of the hearing can take some time, and is typically longer for more serious prohibited acts, this data will not be complete when looking at the most recent past, and can change for the same time period when viewed from a different date, as incidents are adjudicated or expunged. Data are shown for the date that the incident occurred.

## Data for 2010

Discipline Information for Inmates with Life Sentences Without Parole
Used data from July 2010 – Total sentenced inmates 196,092.

### Life Sentences

- There were 3,839 inmates with Life Sentences (no parole)
- The remainder is 192,253
- Of these inmates, 147,159 had no guilty findings for discipline during the previous 12 months (August 2009 through July 2010*) – 75 percent of inmates with life sentences (2,886) and 75 percent of all other inmates (144,273).

For inmates that did have guilty findings during the previous 12 months, this table shows the percent of inmates by severity level of most serious prohibited act for Life Sentence vs. All Others.

| Severity Level | August 2009 – July 2010 | |
|---|---|---|
| | All Else (%) | Life (%) |
| 100 | 11.37 | 20.37 |
| 200 | 29.11 | 30.35 |
| 300 | 57.60 | 48.24 |
| 400 | 1.92 | 1.04 |

* Caution: Because the time period between the occurrence of an incident and the outcome of the hearing can take some time, and is typically longer for more serious prohibited acts, this data will not be complete when looking at the most recent past, and can change for the same time period when viewed from a different date, as incidents are adjudicated or expunged. Data are shown for the date that the incident occurred.

## Data for 2011

Discipline Information for Inmates with Life Sentences Without Parole
Used data from July 2011 – Total sentenced inmates 203,058.

### Life Sentences

- There were 3,977 inmates with Life Sentences (no parole)
- The remainder is 199,081
- Of these inmates, 154,697 had no guilty findings for discipline during the previous 12 months (August 2010 through July 2011*) – 75 percent of inmates with life sentences (3,000) and 76 percent of all other inmates (151,697).

For inmates that did have guilty findings during the previous 12 months, this table shows the percent of inmates by severity level of most serious prohibited act for Life Sentence vs. All Others.

| Severity Level | August 2010 – July 2011 | |
|---|---|---|
| | All Else (%) | Life (%) |
| 100 | 10.17 | 19.26 |
| 200 | 28.11 | 29.16 |
| 300 | 59.82 | 50.83 |
| 400 | 1.9 | 0.75 |

* Caution: Because the time period between the occurrence of an incident and the outcome of the hearing can take some time, and is typically longer for more serious prohibited acts, this data will not be complete when looking at the most recent past, and can change for the same time period when viewed from a different date, as incidents are adjudicated or expunged. Data are shown for the date that the incident occurred.

## Data for 2012

Discipline Information for Inmates with Life Sentences Without Parole
Used data from July 2012 – Total sentenced inmates 203,834.

### Life Sentences

- There were 4,031 inmates with Life Sentences (no parole)
- The remainder is 199,803
- Of these inmates, 156,258 had no guilty findings for  discipline during the previous 12 months (August 2011 through July 2012*) – 78 percent of inmates with life sentences (3,137) and 77 percent of all other inmates  (153,121).

For inmates that did have guilty findings during the previous 12 months, this table shows the percent of inmates by severity level of most serious prohibited act for Life Sentence vs. All Others.

| Severity Level | August 2011 – July 2012 | |
|---|---|---|
| | All Else (%) | Life (%) |
| 100 | 15.95 | 26.16 |
| 200 | 27.27 | 28.24 |
| 300 | 56.27 | 45.48 |
| 400 | 0.52 | 0.12 |

\* Caution: Because the time period between the occurrence of an incident and the outcome of the hearing can take some time, and is typically longer for more serious prohibited acts, this data will not be complete when looking at the most recent past, and can change for the same time period when viewed from a different date, as incidents are adjudicated or expunged.  Data are shown for the date that the incident occurred.

### Data for 2013

Discipline Information for Inmates with Life Sentences Without Parole
Used data from July 2013 – Total sentenced inmates 205,100.

### Life Sentences

- There were 4,096 inmates with Life Sentences (no parole)
- The remainder is 201,004
- Of these inmates, 157,734 had no guilty findings for discipline during the previous 12 months (August 2012 through July 2013*) – 77 percent of inmates with life sentences (3,138) and 77 percent of all other inmates (154,596).

For inmates that did have guilty findings during the previous 12 months, this table shows the percent of inmates by severity level of most serious prohibited act for Life Sentence vs. All Others.

| Severity Level | August 2012 – July 2013 | |
|---|---|---|
| | All Else (%) | Life (%) |
| 100 | 15.5 | 23.22 |
| 200 | 27.25 | 29.73 |
| 300 | 56.79 | 46.94 |
| 400 | 0.46 | 0.11 |

* Caution: Because the time period between the occurrence of an incident and the outcome of the hearing can take some time, and is typically longer for more serious prohibited acts, this data will not be complete when looking at the most recent past, and can change for the same time period when viewed from a different date, as incidents are adjudicated or expunged. Data are shown for the date that the incident occurred.

Attachment C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

THOMAS PORTER *et al.*,

　　　Plaintiff,

v.                                                  Civil Action No: 1:14-cv-1588 (LMB/IDD)

HAROLD W. CLARKE, *et al.*,

　　　Defendants.

## AFFIDAVIT

Commonwealth of Virginia, City of Richmond, to-wit:

HAROLD CLARKE, first being duly sworn, states as follows:

1.　　I am the Director of the Virginia Department of Corrections (VDOC).

2.　　I base the information contained in this affidavit on my personal knowledge and records maintained in the regular and ordinary course of business.

3.　　VDOC has actively been reviewing its policies and procedures concerning Death Row offenders housed within the Department. As a result, VDOC has made several changes to the policies and procedures governing the operation of Virginia's Death Row to provide more privileges to Death Row offenders who are in compliance with the Rules and Regulations for Death Row offenders.

1

4.     A copy of the "Interim Offender Rules and Regulations – Death Row" is attached to this affidavit as Exhibit A. These rules and regulations reflect the current policies and procedures governing Death Row and the current privileges afforded to Death Row offenders.

5.     Effective July 18, 2015, Death Row offenders' outdoor recreation hours have been extended, allowing Death Row offenders to recreate outdoors for a minimum of one hour and thirty (30) minutes per day, five (5) days per week.

6.     Effective July 30, 2015, Death Row offenders have the opportunity to participate in in-pod recreation, unrestrained, with up to three (3) other Death Row offenders at a time for a minimum of one hour per day, seven (7) days per week.

7.     Effective July 30, 2015, Death Row offenders have the opportunity to shower for up to fifteen (15) minutes per day, seven (7) days per week. Offenders may walk from their cell to the shower unrestrained and remain unrestrained while showering.

8.     Effective July 31, 2015, Death Row offenders have the opportunity to participate in contact visits with immediate family members every Friday for one hour and thirty (30) minutes.

9.     More specific details regarding the new privileges described in paragraphs 5-8 that Death Row offenders currently receive can be found in the attached Interim Rules and Regulations for Death Row. The rules and regulations also describe privileges—such as non-contact visits and personal property—that Death Row offenders received prior to the changes made between July 18-31, 2015, and will continue to receive.

10.    In addition to the changes that have already been implemented, VDOC is currently constructing a new, covered outdoor recreation yard specifically for Death Row

2

offenders. The yard will be separated into two sections, each of which will include a basketball court and an area for stationary exercise equipment. Once the yard is complete, up to four (4) Death Row offenders will be allowed to recreate together, unrestrained, in that space for a minimum of one hour and thirty (30) minutes per day, five (5) days per week. The anticipated completion date of this construction is October 1, 2015.

11.     VDOC is also constructing a multi-purpose day room inside of the Death Row housing unit. The day room will provide Death Row offenders with a designated in-pod recreation space. The day room will include a J-PAY kiosk, which was ordered on August 3, 2015. This kiosk is identical to the one currently available to general-population offenders. The kiosk will enable Death Row offenders to purchase books, purchase movies, and send e-mails. The day room will also have several telephones that inmates can use to place outside phone calls, tables for inmates to play cards and other games, and a mounted television. We also anticipate using the day room for congregate religious services, behavioral programming, and additional employment opportunities for Death Row Offenders. The expected completion date for the day room is October 1, 2015.

12.     Since the implementation of in-pod recreation, an additional job was created to clean the pod and showers. As a result, four (4) of the seven (7) Death Row offenders are currently employed. Following completion of the day room, VDOC anticipates creating an employment opportunity, for Death Row offenders who are not currently employed, assisting food services in wrapping sporks for offender meals.

13.     I have authorized these changes in an effort to explore improvements to the overall environment on Virginia's Death Row. It is my hope that the new privileges being

3

extended will inure to the benefit of staff and inmates alike.  Once construction is complete, the

"Interim Offender Rules and Regulations – Death Row" will be updated to reflect the new

privileges described in paragraphs 10-13.

HAROLD CLARKE

Affiant

Sworn and subscribed to before me, a Notary Public, in and for the Commonwealth of Virginia, City of Richmond, this __5th__ day of August, 2015.

Notary Public

My commission expires:          04.30.2019

WENDY BECKSTOFFER
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7081216
My Commission Expires 4.30.19

4

Attachment D

**COMMONWEALTH OF VIRGINIA**
**Department of Corrections**
**SUSSEX I STATE PRISON**

**Interim Offender Rules and Regulations - Death Row**

**General Rules:**

1. During the orientation period described in Operating Procedures 810.1 and 810.2, the Unit Management Team will visit with new offenders and discuss the building rules and regulations. An orientation packet will be provided for each new offender.

2. Periodic and random shakedowns of persons and property will be conducted. Daily window and cell door inspections will be conducted.

3. During times of movement (e.g. before and after recreation, visitation, and hearings), offenders will be handcuffed, with their hands behind their back. Leg irons will also be applied and removed while offenders are in the kneeling position, with their ankles behind the yellow line. Failure to comply with this procedure will be considered a refusal to comply.

4. Each offender is expected to conduct himself in an orderly manner and to dress appropriately when in the pod area and upon leaving the building.

5. Offenders are not permitted to open their tray slots or alter/damage the tray slot in any way. Offenders found to have opened, altered, or damaged a tray slot will be charged in accordance with Operating Procedure 861.1.

6. There are four (4) formal standing counts held daily, 5:45 am, 11:30 am, 5:45 pm, and 9:30 pm. All offenders are required to stand during formal standing counts.

7. Cell cleaning will be conducted each Wednesday.

8. Commissary orders will be delivered each Wednesday. Commissary orders must be placed with staff by Friday for orders to be delivered Wednesday of the following week.

9. Mail will be picked up by the Officer on the night shift between 6:00 p.m. and 9:00 p.m. and delivered to the mailbox on a daily basis.

10. Violation of these rules and regulations, failure to comply with any Virginia Department of Corrections or facility-specific Operating Procedures, and/or violation of the Code of Offenses designated in Operating Procedure 861.1 may result in loss of the privileges outlined below.

### Specific Rules

- **ATTIRE**
  - Visitation: Offenders must wear state-issued scrubs and shoes ONLY. Shower shoes, personal shoes, coats, and head gear, including doo rags, are prohibited.
  - In-Pod Recreation: Offenders may wear gym shorts, t-shirts, or other state-issued clothing. Offenders may wear personal tennis shoes or state-issued shoes. Shower shoes, coats, and head gear, including doo rags, are prohibited.
  - Outdoor Recreation: Offenders may wear gym shorts, t-shirts, or other state-issued clothing. Offenders may wear personal tennis shoes or state-issued shoes. Shower shoes are prohibited.
  - Showers: Offenders must wear a minimum of gym shorts, T-Shirt, and shower shoes, when going to and from the showers.
  - Outside of the Building: Offenders must wear state-issued scrubs and shoes ONLY. Shower shoes and personal shoes are prohibited.
  - Outside of the Prison: Offenders must wear state-issued scrubs and shoes ONLY. Shower shoes and personal shoes are prohibited.

- **MEALS**
  - Meals will be served to offenders in their cells at the approximate times: Breakfast 6:15 am, Lunch 12:00 pm, and Dinner 4:00 pm.
  - Food tray(s) and food must not be placed or thrown on the floor.
  - Offenders whose religious beliefs require them to adhere to special diets will be reasonably accommodated in accordance with Operating Procedure 500.1.

- **PERSONAL PROPERTY**
  - Offenders are permitted to have personal property items as designated in Operating Procedure 802.1.

- **LAW LIBRARY**
  - Offenders may access materials in the Law Library by submitting a request to the Law Library Supervisor stating what materials are needed. The request should be made at least forty-eight (48) hours prior to the need.
  - The Law Library Supervisor will ensure the items are retrieved from the library and are given to the offender who made the request.
  - Offenders have seven day to return all items to the Law Library Supervisor who will ensure that the items are filed for later use.
  - Offenders may review any non-security policy concerning death row or the other sections of the institution by request to their counselor or the Law Library.

- **VISITATION**
  - Legal Visitation: Offenders may have contact visits with legal counsel between 9:00 a.m. and 3:00 p.m. in the attorney-visitation area in the offenders' housing unit.
    - Legal visits will be scheduled by legal counsel who is required to call the prison to set up an appointment time in advance.

- Upon written waiver by legal counsel, offenders will have their hands unrestrained, but will remain in leg irons during the visit.
- o Institutional Chaplain or Clergy: Offenders may have contact visits with the Institutional Chaplain or Clergy between 9:00 a.m. and 3:00 p.m. in the offenders' attorney-visitation area in the housing unit.
  - Chaplain and Clergy visits shall be scheduled by the Chaplain or Clergy who are required to call the prison to set up an appointment time in advance.
  - Upon written waiver by the Chaplain or Clergy, offenders will have their hands unrestrained, but will remain in leg irons during the visit.
- o Contact Visitation: Offenders may have contact visits with immediate family members every Friday for 1 hour and 30 minutes.
  - Immediate family members are defined as the offenders' grandparents, parents, step-parents, lawful spouse, biological, step or legally adopted children, and biological, step, or legally adopted siblings.
  - Offenders will be limited to a total of four (4) adult or child visitors during each visit. If a child visitor can fit in the lap of an adult visitor, that child may visit in addition to the four (4) visitors.
  - Physical contact during contact visits is prohibited except for one brief kiss, a hand shake, and/or an embrace between an offender and each of his or her visitors at the beginning and end of each visit.
  - Offenders will have their hands unrestrained, but remain in leg irons during the visit.
  - Prior to entering the facility for contact visits, all visitors must be pre-approved to enter the facility pursuant to Operating Procedure 851.1.
  - Visitor applications should be completed on-line through the DOC Public Web site (http://www.vadoc.virginia.gov/). Visitors who are unable to apply on-line or print the forms from the DOC's website should ask the offender to mail forms to be completed and mailed back to Visitor Registration.
  - Once a visitor is approved, that visitor must call the prison in advance to set up an appointment time.
- o Non-Contact Visitation: Offenders may have non-contact visits with any approved visitor on Saturday, Sundays, and holidays for 1 hour and 30 minutes.
  - Offenders will be limited to a total of four (4) adult or child visitors during each visit. If a child visitor can fit in the lap of an adult visitor, that child may visit in addition to the four (4) visitors.
  - Offenders will have their hands unrestrained, but remain in leg irons during the visit.
  - Prior to entering the facility for non-contact visits, all visitors must be pre-approved to enter the facility pursuant to Operating Procedure 851.1.
  - Visitor applications should be completed on-line through the DOC Public Web site (http://www.vadoc.virginia.gov/). Visitors who are unable to apply on-line or print the forms from DOC's website should ask the offender to mail forms to be completed and mailed back to Visitor Registration.

- Once a visitor is approved, that visitor must call the prison in advance to set up an appointment time.
  o All visitors/offenders are expected to follow all rules outlined in Offender Rules and Regulations – Death Row, the visitation brochure, and 851.1 Offender Visitation Policy. If a visitor and/or offender violates any rules, the facility may immediately end the visit and, for good cause, suspend that visitor indefinitely from having future visits with an offender.

- **RECREATION**
  o In-Pod Recreation: Offenders will have the opportunity to participate in in-pod recreation with a maximum of three other offenders seven days per week for a minimum of one hour per day.
    - In order to participate in in-pod recreation, offenders must be in compliance with grooming standards, as defined by Operating Procedure 864.1.
    - In order to participate in in-pod recreation, offenders must be in compliance with cell rules, including not placing items over windows, doors, or light fixtures in the cell.
    - Offenders who are in their cells during a time when other offenders are participating in in-pod recreation shall comply with all orders from staff, including coming to the door of their cell for a requested visual security check.
    - Offenders will have their hands and feet unrestrained during in-pod recreation.
    - During in-pod recreation, offenders will be permitted to watch television, which will be mounted on the pod wall; play cards, chess, checkers, dominos, and any other games provided; converse with other offenders recreating at the same time; and walk around the bottom-tier of the pod. Offenders are prohibited from accessing the top tier of the pod while participating in in-pod recreation.
    - Offenders may make routine phone calls during in-pod recreation. Each call has a twenty (20) minute time limit.
  o Outdoor Recreation: In addition to the in-pod recreation, offenders will have the opportunity to participate in outdoor recreation five days per week for a minimum of 1 hour and 30 minutes per day.
    - Offenders will recreate in the building's outdoor recreation pens.
    - Offenders will have their hands and feet unrestrained during in-pod recreation
    - Offenders are permitted to exercise in their designated space and converse with other offenders recreating at the same time.

- **SHOWERS**
  o Offenders will have the opportunity to shower seven days per week.
  o Each shower will be allowed up to fifteen minutes.
  o Offenders will walk from their cell to the showers with their hands and feet unrestrained and remain unrestrained while taking showers.

- **MEDICAL/MENTAL HEALTH**
  - o Offenders will have access to medical and mental health services in accordance with Operating Procedure 720.1.

**DISCLAIMERS:**

Violation of any building rules and/or regulation may result in disciplinary actions under Operating Procedure 861.1, Offender Discipline.

These policies and procedures are not intended to establish a State-created liberty interest for employees or offenders or to create an independent duty owed by the Department of Corrections to any employees, offenders or third parties. This document is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

Warden's Signature

Date    8/6/15

Revised August 5, 2015