**EXHIBIT 1**

**EXHIBIT 1**

(NIOSH), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Department of Health and Human Services (HHS) gives notice as required by 42 CFR 83.12(e) of a decision to evaluate a petition to designate a class of employees at the Vitro Manufacturing in Canonsburg, Pennsylvania, to be included in the Special Exposure Cohort under the Energy Employees Occupational Illness Compensation Program Act of 2000. The initial proposed definition for the class being evaluated, subject to revision as warranted by the evaluation, is as follows:

*Facility:* Vitro Manufacturing.
*Location:* Canonsburg, Pennsylvania.
*Job Titles and/or Job Duties:* All Atomic Weapons Employer employees.
*Period of Employment:* August 13, 1942 through December 31, 1957.

**FOR FURTHER INFORMATION CONTACT:** Larry Elliott, Director, Office of Compensation Analysis and Support, National Institute for Occupational Safety and Health (NIOSH), 4676 Columbia Parkway, MS C–46, Cincinnati, OH 45226, Telephone 513–533–6800 (this is not a toll-free number). Information requests can also be submitted by e-mail to *OCAS@CDC.GOV.*

Dated: December 4, 2008.

**Christine M. Branche,**

*Acting Director, National Institute for Occupational Safety and Health.*

[FR Doc. E8–29244 Filed 12–9–08; 8:45 am]

**BILLING CODE 4163–19–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**National Institute for Occupational Safety and Health**

**Final Effect of Designation of a Class of Employees for Addition to the Special Exposure Cohort**

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Department of Health and Human Services (HHS) gives notice concerning the final effect of the HHS decision to designate a class of employees at Connecticut Aircraft Nuclear Engine Laboratory in Middletown, Connecticut, as an addition to the Special Exposure Cohort (SEC) under the Energy Employees Occupational Illness Compensation Program Act of 2000. On October 24,

2008, as provided for under 42 U.S.C. 7384q(b), the Secretary of HHS designated the following class of employees as an addition to the SEC:

All employees of the Department of Energy (DOE), its predecessor agencies, and DOE contractors or subcontractors who worked at the Connecticut Aircraft Nuclear Engine Laboratory in Middletown, CT, from January 1, 1958 through December 31, 1965 for a number of work days aggregating at least 250 work days occurring either solely under this employment or in combination with work days within the parameters established for one or more other classes of employees in the Special Exposure Cohort.

This designation became effective on November 23, 2008, as provided for under 42 U.S.C. 7384*l*(14)(C). Hence, beginning on November 23, 2008, members of this class of employees, defined as reported in this notice, became members of the Special Exposure Cohort.

**FOR FURTHER INFORMATION CONTACT:** Larry Elliott, Director, Office of Compensation Analysis and Support, National Institute for Occupational Safety and Health (NIOSH), 4676 Columbia Parkway, MS C–46, Cincinnati, OH 45226, Telephone 513–533–6800 (this is not a toll-free number). Information requests can also be submitted by e-mail to *OCAS@CDC.GOV.*

Dated: December 5, 2008.

**Christine M. Branche,**

*Acting Director, National Institute for Occupational Safety and Health.*

[FR Doc. E8–29246 Filed 12–9–08; 8:45 am]

**BILLING CODE 4163–19–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Office of the Secretary**

**Findings of Scientific Misconduct**

**AGENCY:** Office of the Secretary, HHS.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the Office of Research Integrity (ORI) and the Assistant Secretary for Health have taken final action in the following case:

*Homer D. Venters, Jr., M.D., University of Illinois at Urbana-Champaign:* Based on the report of an investigation conducted by the University of Illinois at Urbana-Champaign (UIUC) and extensive additional image analysis conducted by the Office of Research Integrity (ORI), the U.S. Public Health Service (PHS) found that Dr. Homer D. Venters, former graduate student, Neuroscience

Program, UIUC, engaged in scientific misconduct in research supported by National Institute of Mental Health (NIMH), National Institutes of Health (NIH), awards R01 MH051569 and F30 MH12558 and National Institute on Aging (NIA), NIH, award R01 AG06246.

Specifically, PHS found that the Respondent committed misconduct in science:

• By intentionally and knowingly preparing and including duplicate image data in Figures 5 and 10 of PHS fellowship application F31 MH12558, "Neurodegeneration via TNF-alpha inhibition of IGF–1," submitted in 1999, which was funded as F30 MH12558 from June 1, 2000, to May 31, 2003. Because the duplicate data were labeled as having been obtained from different experiments, the results for at least one of the two figures were intentionally falsified and constitute an act of scientific misconduct.

• By intentionally and knowingly preparing and including duplicate image data in Figure 3 and/or 4 of a manuscript submitted and published as: Venters, H.D., *et al.* "A New Mechanism of Neurodegeneration: A Proinflammatory Cytokine Inhibits Receptor Signaling by a Survival Peptide." *Proceedings of the National Academy of Sciences U.S.A.* 96:9879–9884, 1999.

• By preparing and providing to his dissertation committee in March 2000 a thesis proposal entitled "An Alternate Mechanism of Neurodegeneration: Silencing of Insulin-like Growth Factor-I survival signals by Tumor Necrosis Factor-a," which contained five falsified figures: Figures 1.3, 1.4a, 2.1b, 2.3e, and 2.5b. In each figure, he reused data within the same figure or in another thesis proposal figure as representing differently treated samples or as data obtained with different immunoblotting antisera.

• In March and April 2001, Respondent included several of the same falsified figures as in the thesis proposal and multiple additional falsified figures in his dissertation "Silencing of Insulin-like Growth Factor I Neuronal Survival Signals by Tumor Necrosis Factor-a." In all, Figures 3.3, 3.4a, 3.4b, 4.1b, 4.3a, 4.5b, 5.1a, 5.2, 5.4a, 5.5a, 5.6a, 5.7a, and 5.8a were falsified. In each instance, he assembled figures by reusing significant data, on some occasions after manipulating the orientation of the data, either within the same figure or in other figures related to his thesis and represented the data falsely as coming from different samples or different experiments.

Dr. Venters has entered into a Voluntary Settlement Agreement

(Agreement) in which he has voluntarily agreed, for a period of three (3) years, beginning on November 19, 2008:

(1) That any institution that submits an application for PHS support for a research project on which the Respondent's participation is proposed or that uses the Respondent in any capacity on PHS-supported research, or that submits a report of PHS-funded research in which the Respondent is involved, must concurrently submit a plan for monitoring of the Respondent's research to the funding agency and ORI for approval; the monitoring plan must be designed to ensure the scientific integrity of the Respondent's research contribution; Respondent agreed that he will not participate in any PHS-supported research until such a monitoring plan is submitted to ORI and the funding agency;

(2) That Respondent will ensure that any institution employing him will submit to ORI, in conjunction with each application for PHS funds or report, manuscript, or abstract of PHS-funded research in which the Respondent is involved, a certification that the data provided by the Respondent are based on actual experiments or are otherwise legitimately derived, and that the data analyses, procedures, and methodology are accurately reported in the application or report; Respondent must ensure that the institution sends a copy of each certification to ORI; and

(3) To exclude himself from serving in any advisory capacity to PHS, including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant or contractor to PHS.

Respondent also voluntarily agreed that within 30 days of the effective date of this Agreement:

(4) He will submit a letter to the journal editor, with copies to his coauthors, identifying his falsification of Figures 3 and/or 4 in the following article: Venters *et al.* "A New Mechanism of Neurodegeneration: A Proinflammatory Cytokine Inhibits Receptor Signaling by a Survival Peptide." *Proceedings of the National Academy of Sciences* 96:9879–9884, 1999.

**FOR FURTHER INFORMATION CONTACT:**
Director, Division of Investigative Oversight, Office of Research Integrity, 1101 Wootton Parkway, Suite 750, Rockville, MD 20852, (240) 453–8800.

**Chris B. Pascal,**
*Director, Office of Research Integrity.*
[FR Doc. E8–29203 Filed 12–9–08; 8:45 am]
**BILLING CODE 4150–31–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Health Resources And Services Administration

### Agency Information Collection Activities: Proposed Collection: Comment Request

In compliance with the requirement for opportunity for public comment on proposed data collection projects (section 3506(c)(2)(A) of Title 44, United States Code, as amended by the Paperwork Reduction Act of 1995, Pub. L. 104–13), the Health Resources and Services Administration (HRSA) publishes periodic summaries of proposed projects being developed for submission to OMB under the Paperwork Reduction Act of 1995. To request more information on the proposed project or to obtain a copy of the data collection plans and draft instruments, call the HRSA Reports Clearance Officer on (301) 443–1129.

Comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden of the proposed collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology.

## Proposed Project: Health Centers Patient Survey—(NEW)

The Health Center program supports Community Health Centers (CHCs), Migrant Health Centers (MHCs), Health Care for the Homeless (HCH) projects, and Public Housing Primary Care (PHPC) programs. Health Centers (HCs) receive grants from HRSA to provide primary and preventive health care services to medically underserved populations.

The proposed Patient Survey will collect in-depth information about HC patients, their health status, the reasons they seek care at HCs, their diagnoses, the services they utilize at HCs and elsewhere, the quality of those services, and their satisfaction with the care they receive, through personal interviews of a stratified random sample of HC patients. Interviews are planned to take approximately 1 hour and six minutes each.

The Patient Survey builds on previous periodic User-Visit Surveys which were conducted to learn about the process and outcomes of care in CHCs and HCH projects. The original questionnaires were derived from the National Health Interview Survey (NHIS) and the National Hospital Ambulatory Medical Care Survey (NHAMCS) conducted by the National Center for Health Statistics (NCHS). Conformance with the NHIS and NHAMCS allowed comparisons between these NCHS surveys and the previous CHC and HCH User-Visit Surveys. The new Patient Survey was developed using a questionnaire methodology similar to that used in the past, and will also potentially allow some longitudinal comparisons for CHCs and HCH projects with the previous User-Visit survey data, including monitoring of process outcomes over time. In addition, this survey will include interviews of patients drawn from migrant populations and from residents of public housing, populations not included in the previous surveys.

The estimated response burden for the survey is as follows:

## SURVEY

| Type of respondent; activity involved | Number of respondents | Responses per respondent | Total number of responses | Burden per response (hours) | Total hour burden |
|---|---|---|---|---|---|
| Grantee/Site Recruitment and Site Training .. | 115 | 3 | 345 | 3.75 | 1294 |
| Patient Recruitment ......................................... | 5658 | 1 | 5658 | .167 | 945 |
| Patient Survey 4526 ...................................... | 4526 | 1 | 4526 | 1.1 | 4979 |
| Total ....................................................... | 5773 | .......................... | 10529 | .............................. | 7218 |

**EXHIBIT 2**

**EXHIBIT 2**



lnkd.in/gWtSr_NY lnkd.in/gJRmAfp3



linkedin.com

Martin Horn on LinkedIn: Federal Judge Rules Gruesome Medical Negl...

Federal Judge Rules Gruesome Medical Neglect in Arizona Prisons Violates Eighth Amendment...

   



lnkd.in/gHM_2YBc



azcentral.com

'Plainly grossly inadequate': Arizona prison health care system ruled un...

A U.S. district judge found that Arizona is denying people's constitutional rights in state prisons by failing to provide adequate ...

   

lnkd.in/g6mvNRHr



azcentral.com
Arizona prison health care contract awarded to company that allegedly...
The state awarded a prison health care contract to NaphCare, which last
year agreed to pay nearly $700,000 after overcharging allegations.

   

Martin Hood @ROSMDocument4

lnkd.in/du5_qkSk lnkd.in/dfPFhaxn



linkedin.com

Arizona's privatized prison health care has been failing for years - Mart...

Arizona's privatized prison health care has been failing for years. A new court case could change that...

   

⤻ martin horn Retweeted



**Jimmy Jenkins** ✓ @JimmyJenkins · Nov 5                    ···

STUNNING testimony in federal court today: A Deputy Warden admitted there are night shifts at the Eyman prison when ONE correctional officer is responsible for running SIX control rooms - this means HUNDREDS of prisoners are left completely unmonitored



azcentral.com
Arizona prison health care trial: Perryville inmate testifies about poor c...
In a class-action lawsuit, Arizona prisoners argue the medical services they receive are so poor, they constitute cruel and unusual punishment.

💬 3          ⟲ 40          ♡ 83          ⬆️

⊔↑ **martin horn Retweeted**



**Amy Fettig** @abfettig · Oct 31                                              · · ·

The Trial to Watch!! Can Rule of Law finally prevail in Arizona's prisons?



> **Jimmy Jenkins** ✔ @JimmyJenkins · Oct 31
>
> Arizona's prison health care system goes on trial in federal court tomorrow. @schwartzapfel and I report for @MarshallProj and @azcentral on how privatization was supposed to save money, but ended up costing lives themarshallproject.org/2021/10/31/ari...
>
> Show this thread

💬               1              ♡ 3              



**Jimmy Jenkins** ✓ @JimmyJenkins · Oct 29 · · ·

In a major setback for Arizona ahead of next week's landmark prison health care trial, Judge Silver has excluded expert testimony from the defendants because the state failed to disclose in advance what their experts will testify about

---

Case 2:12-cv-00601-ROS Document 4107 Filed 10/29/21 Page 2 of 3

1    $26(a)(2)(B)$ nor did they provide expert disclosures pursuant to Rule $26(a)(2)(C)$

2    regarding the medical treatment of individual class members. In addition, Wendy Orm,

3    M.D., and Dr. Mahn provided Rule $26(a)(2)(C)$ expert disclosures but they plan to testify

4    regarding individual care of class members who they did not personally treat. Plaintiffs

5    request the Court exclude any testimony from Pelton, Carr, Orm, or Mahn regarding class

6    members they have not personally treated. In other words, Plaintiffs request the Court

7    follow the controlling law regarding what types of disclosures must be provided before

8    testimony will be allowed. The Court will do so. The presumptive sanction for

9    insufficient disclosures is exclusion. Accordingly, Pelton, Carr, Orm, and Mahn will not

10    be permitted to offer non-disclosed expert testimony.

11       Plaintiffs also believe the expert report provided by Dr. Phillips "is wholly

12    inadequate." (Doc. 4100 at 8). Dr. Phillips' expert report states he had insufficient time

---

💬 6      ⟲ 23      ♡ 33      ⬆

martin horn Retweeted



**Jimmy Jenkins** ✓ @JimmyJenkins · Oct 19   •••

This story published one week ago, and we have not received a denial - or any response at all - from the Arizona Department of Corrections. The Department did not respond to multiple requests for comment in the weeks before it was published

>  **Jimmy Jenkins** ✓ @JimmyJenkins · Oct 12
>
> EXCLUSIVE: I obtained Special Operations training materials and documents from Arizona Department of Corrections servers containing images that experts liken to Nazi and gang symbolism
> azcentral.com/story/news/loc...
>
> Show this thread

 6       26      ♡ 59      ⬆



**Jimmy Jenkins** ✔ @JimmyJenkins · Oct 15   •••

"Thanks — you're going to save Centurion $100,000"

Whistleblower says Arizona's prison health care contractor directed her to file a false report so the company could evade federal court sanctions



azcentral.com
Arizona prison nurse says Centurion directed her to falsify report, evadi...
A prison nurse alleged Centurion of Arizona, purposefully evaded court-ordered sanctions by directing her to file a false report.

💬 14          ⟲ 145          ♡ 208          ⬆

Show this thread

**Jimmy Jenkins** ✔ @JimmyJenkins · Oct 2  ···

$1.3 Billion and yet the Arizona Department of Corrections consistently fails to provide:

❌ Running Water

❌ Edible Food

❌ Health Care

 **Jimmy Jenkins** ✔ @JimmyJenkins · Oct 2

The Arizona Department Of Corrections' annual budget is $1.3 Billion:

"We are in a struggle to decide whether to use the water we do get for hygiene, food, or drinking"

Show this thread

unknown in it.

We are sweating in our areas since we only have evap coolers.

We are in a struggle to decide whether to use the water we do get for hygiene, food, or drinking.

I would like to relay this information to

💬 7          🔁 61          ♡ 100          ⬆



**martin horn** @HornMhorn · Oct 5
Arizona Department of Corrections, Rehabilitation and Reentry
lnkd.in/ectvbjJV

💬          ⟲          ♡          ⬆

⟲ **martin horn Retweeted**



**Jimmy Jenkins** ✔ @JimmyJenkins · Sep 30                    ...
VINDICATION!!! @AZCorrections whistleblowers told me the Department
was holding 100s of prisoners past their release dates.

I reported it. DOC denied it.

Arizona Auditor General: DOC "Did not release 313 inmates 3 months early
as required by statute" azauditor.gov/sites/default/...

> • The Department's transition program provides eligible inmates with transition services, such as counseling and job
>   placement services, in the community. In calendar year 2020, the Department:
>    ○ Did not release 313 of the 1,200 inmates (26 percent) 3 months early as required by statute, which may have
>      resulted in longer prison stays and higher Department costs. Thirty inmates we reviewed were not timely released
>      because of Department process delays and other factors.
>    ○ Denied all 45 of the inmates we reviewed of the approximately 1,600 inmates denied for the transition program in
>      line with statutory and Department requirements, such as having convictions that made them ineligible.
> • The Department has not yet programmed its system with all eligibility requirements for the transition program and
>   drug possession release. It relies on manual processes to identify eligible inmates, which takes additional staff time
>   and increases the potential for errors. The Department is working with its vendor to automate these processes and
>   expects changes to be completed between October 2021 and November 2022.

💬 21          ⟲ 195          ♡ 547          ⬆

**Show this thread**



**Jimmy Jenkins** ✔ @JimmyJenkins · Sep 23 · · ·

Current and former DOC employees - help me hold this Billion Dollar agency accountable - become an anonymous source - send tips, documents and story ideas:

Email: jjenkins@arizonarepublic.com
Protonmail: JimmyJenkinsReports@protonmail.com
Text/Signal: 812-243-5582

♡ 1          ⟲ 16          ♡ 38          ⬆

Show this thread

**EXHIBIT 3**

**EXHIBIT 3**



*Martin F. Horn*
*Distinguished Lecturer*
*Executive Director, New York State*
*Sentencing Commission*
*Department of Law, Police Science*
*and Criminal Justice Administration*

*524 W 59 St 422T*
*New York City, NY 10019*
*T 646 557 4824*
*mhornl@jjay.cuny.edu*

December 11, 2014

Mr. Gordon Campbell

Chairman

Board of Correction

51 Chambers St Rm 923

New York, NY 10007

By email to: amasters@boc.nyc.gov

Re: Proposed Rule Change to permit Enhanced Supervision Housing


Dear Mr. Campbell:

      I write in support of the request by the Department of Correction for amendments to the rules of the Board that would permit the Department to operate Enhanced Supervision Housing.  The Boards rules were first adopted in 1978 and have been relatively unchanged since that time, but for limited changes adopted in 2007.   Since 1978 the times have changed, our understanding about what works and what doesn't and the challenges facing the Department have changed as well. The Rules of the Board should change to acknowledge new challenges and try new approaches to keeping prisoners and staff, as well as the public, safe.

      When the Board first adopted its rules, it included Sec 1-02 (e) (v) that states," Prisoners placed in the most restrictive security status shall only be denied those rights, privileges and opportunities that are directly related to their status and which cannot be provided to them at a different time or place than provided to other prisoners."  It is clear that the Board acknowledged that there might well be a classification of prisoners whose management would require limitation of the rights, privileges and opportunities afforded general population prisoners.



Through the years administrators in the Department have been left with an "all or nothing" predicament in dealing with prisoners who misbehave or who are predatory and dangerous to others.  The Department had only punitive segregation as a means of enforcing discipline and administrative segregation as a means of protecting prisoners and staff from predatory and dangerous prisoners. We all agree that approach has not served us well. This administration, under Commissioner Ponte, has acknowledged and rejected the excesses of recent years and is taking thoughtful and measured steps to improve the situation it inherited.

The Department today is faced with the need to find new ways to keep the jails safe and Enhanced Supervision Housing is a sensible approach to that challenge. It is consistent with the Board's vision in §1-02 when the Rules were first adopted, that there be a higher level of security classification for prisoners who because of their behavior deserve it, in order to protect others, and that the prisoners so classified be afforded limited opportunities for access to others.

The City has a duty to protect prisoners from others who would harm them. This is as true with respect to harm from other prisoners as harm at the hands of staff. Both are to be avoided. The unfortunate reality of jails is that they house primarily young men, for long times, and with nothing to do all day. And these young men bring with them into the jail the same gang associations and bullying behaviors they experienced and participated in on the street. Ultimately, in the world of enforced scarcity that is the jail a "pecking order" emerges, prisoners extort other prisoners for that which is not available if it be cigarettes, drugs or commissary. They fight over who decides what to watch on TV and who gets to sit in the "good seats."  They fight over gambling debts and gang identification.  Left to its own, the jail is an intimidating and dangerous place.

Staff in New York City jails is spread thin. In many housing units there is only a single officer and the prisoners are out of their cells all day. The officer has to respond to the demands of prisoners, keep an eye on the day room, shower and toilet areas, the front gate and keep records. It only works if the prisoners are cooperative and not taking the opportunity to beat up another prisoner or worse.

A single predatory bully can upset an entire housing unit. He can make it so dangerous, especially if he has confederates, that all the other prisoners must be on guard and be ready to defend himself. That is why prisoners often arm themselves with whatever they can get their hands on. It is why prisoners feel compelled to join gangs, to protect themselves from stronger more predatory prisoners.

I take a back seat to no one in my opposition to the use of solitary confinement. I have written, spoken and worked against it. I have publicly stated that solitary confinement is never justified in a correctional setting. Solitary confinement consists of sensory deprivation and extreme social isolation. That will not be the case in ESH. The Department has hired one legal coordinator, three chaplains, one social service counselor and one grievance coordinator specifically for the ESH units to ensure services are provided. They will be provided in the housing area where possible to avoid mingling ESH inmates with GP inmates but no service will

be denied or reduced. Half the prisoners will be out of their cells at one time. There will be opportunities for interaction.

In many jails throughout the U.S. and even within New York State, prisoners are not routinely out and about for more than an hour a day. New York City is an anomaly by providing that prisoners are allowed to "lock out" of their cell for up to 16 hours a day. The Minimum Standards of the State Commission on Corrections that govern the operation of the City's jails and those of all other jails in the State nowhere require that length of "lock out" time. Only New York City affords that "privilege" to its prisoners. In many jails in New York State and elsewhere, a prisoner in general population is allowed out of cell for only an hour a day. We agree that is not a good policy but nevertheless, in most of the country a 7-hour lockout period as envisioned for Enhanced Supervision housing would be judged a substantial improvement.

The proposal for ESH is most definitely not solitary confinement and should not be seen as such. Those, like the Jail Action Coalition who conflate what the Department is proposing for ESH with solitary confinement do a disservice to the campaign against solitary confinement. They diminish the importance of our national conversation about solitary confinement by alleging that ESH is, and they misguidedly imperil the very prisoners they purport to care about by trying to deprive the Department of this sensible tool.

Nobody knows for sure the answer that is guaranteed to make the City's jails safer. There is no silver bullet. It will take time and effort, and experimentation. Enhanced Supervision Housing is a sensible, experimental effort and the Department should be allowed to try it. Only time will tell if it works. The Board has the capacity and the authority to closely monitor it and you should.

I take pride in the fact that during my tenure as Commissioner from 2003-August 2009 the safety of prisoners in New York City custody improved. During that time we established a close custody housing unit at the Manhattan Detention Center based on my interpretation of §1-02.  Although a State Court later judged that unit to be in violation of the Board's rules, the fact remains, and the data demonstrates that separating out the prisoners who threatened and endangered other prisoners and staff make the jails safer. During my tenure we reduced stabbings and slashing's to their lowest levels ever and substantially reduced serious injuries to inmates to levels not seen since.

Close custody was more severe than what Commissioner Ponte proposes with Enhanced Supervision Housing. To his credit he is clearly trying to find a better solution for separating the few prisoners who endanger others with the least possible impact on their welfare.  A small number of prisoners account for a disproportionate share of the violence in the jails and by allowing the Commissioner to restrict their activities, in a measured way, and deal with them without resort to punitive or administrative segregation you will be helping to make the jails more safe.

Your Board has an obligation that goes beyond concern for the prisoners. Your obligation to the citizens of our City is to insure a jail system that is safe both for the prisoners and for the staff who work there and that insures the safety of the public. A singular concern

for the prisoners fails to meet that obligation and I urge you to take a broad view of your mandate and your responsibilities. Please don't, in a misplaced concern for the few who are predatory and dangerous, endanger the prisoners who just want to do their time and be left alone, and the staff who wish to do their job properly and return home each day to their family by rejecting this well thought out request for amendment to your rules.

You can adopt this rule, monitor its implementation, adopt rules to insure the prisoners in Enhanced Supervision Housing receive the services and programs they truly need and if, perhaps two years from now, you decide it isn't working you can change the rule back to what it is today. But give the Commissioner the tools he needs to do the job you want him to do.

Very truly yours,

Martin F. Horn

Cc:      Joseph Ponte

Martin Horn | Here's the Thing | WNYC Studios

NYPR Network

# Martin Horn

 LISTEN

 Download  </> Embed

April 28, 2013

  

MH023 - 0001

OUR PODCASTS     SUPPORT US

Here's the Thing

🔊 LISTEN FOR FREE     SUPPORT US

About



MH023 - 0002



Martin Horn

SUMMARY    **TRANSCRIPT**

Alec Baldwin: This is Alex Baldwin and you're listening to *Here's The Thing* from WNYC Radio.

Alec Baldwin: In 1988 I went to Rahway Prison in New Jersey, now called East Jersey State Prison, to do research for a film. Over the course of two weeks I interviewed several inmates who were incarcerated there. I met armed robbers, rapists, drug dealers, and murderers. And I'll never forget one minute of it.

For over 40 years, Martin Horn's career has focused on men like the ones I met, and the prisons they live in. He's held every imaginable job in corrections, from debating the fairness of states' sentencing guidelines to fixing leaky water pipes in aging facilities.

In 2002, Mayor Bloomberg appointed Horn Commissioner of the New York City Department of Probation. A year later, in an unprecedented move, Bloomberg gave Horn an additional job, Commissioner of Corrections. Horn held both positions until he left in 2009.

Leaving public office has allowed Martin Horn to be more vocal about his opinions on prisons, sentencing, and how to deal with our nation's drug problem.

Martin Horn: I would legalize drugs across the board.

Alec Baldwin: You would legalize which drugs?

Martin Horn: All of them.

Alec Baldwin: You would legalize all drugs?

Martin Horn: Yes. Yes.

Alec Baldwin: That's a pretty – I'm stunned.

Martin Horn: Yeah, well I wouldn't say that – I wouldn't say that while I worked for a governor or a mayor who was an elected official.

Alec Baldwin: Now why wouldn't you say that then as opposed to now?

Martin Horn: Because I had a mortgage to pay.

Alec Baldwin: Martin Horn's career in corrections started right out of college. Martin Horn: My first job was as a New York State Parole Officer.

Alec Baldwin: And how did you – what was it that led you down that path?

MH023 - 0003

Alec Baldwin: And how did you – what was it that led you down that path?

Martin Horn: I graduated college, I was 21 years old, I needed a job, and I took a civil service test. New York State at that time had a test called The Professional Careers Test and it was sort of a generalist examination. If you passed it, it qualified you for a variety of positions.

Alec Baldwin: Where did you grow up?

Martin Horn: I grew up in Brooklyn.

Alec Baldwin: What part?

Martin Horn: In Flatbush.

Alec Baldwin: My father's from Fort Greene.

Martin Horn: Oh, all right, well.

Alec Baldwin: So you took this test. Did you want to be a police officer? Was that the first-

Martin Horn: No. I wanted a job.

Alec Baldwin: Were your family in civil service, in police and law enforcement?

Martin Horn: No, not at all. When I took the job, I didn't know there was such a thing as a parole officer. I had never thought of it.

Alec Baldwin: And then what – so you took this test and what happened?

Martin Horn: I took this test and I got a fairly good grade and so I started getting job offers from the State of New York. I got an offer to become a purchasing agent for what was then called the East Hudson Highway Authority. I got an offer to be a business office person at Downstate Medical Center in Brooklyn.

But then I – actually I took the job to become a parole officer. I had – I knew a guy who was doing it. He said it was a good job. They trained you, the pay was nice. Alec Baldwin: How long was the training?

Martin Horn: Well actually I was in a two-year traineeship. It was two years. And they – it was on-the-job training. They started you with about six weeks of classroom training. The first thing they did was they assigned me to a unit they had then, which they no longer have, called the Employment Unit.

In our job, we would get paperwork on individuals who were coming home from New York State prisons who needed jobs and we literally pounded the pavement in New York City, walked all over, we each sort of had a neighborhood; I had Long Island City. And each day I got five or 10 guys' names and their backgrounds on little five-by-eight cards and I'd have to go out and find them jobs.

Alec Baldwin: What was people's attitudes toward employing those people back then?

Martin Horn: Well they actually – we had a very sophisticated system. We knew employers who

MH023 - 0004

had previously hired employees –

Alec Baldwin: So they were disposed.

Martin Horn: And they were disposed. And many of them said, 'Look, I hired a guy from Clinton and he was the best guy I had. Send me another one.'

Alec Baldwin: So they trusted you and they relied on you to set them up with these guys, right?

Martin Horn: Right. That was our – that was our job. So we did that for about six weeks. Then they actually sent me to Sing Sing for, I think, two months where I had to meet with inmates who were becoming eligible for release on parole and help them to prepare for their appearance before the Board of Parole and write a report about them to the Board of Parole.

Then they sent me to a unit – back then before a man or a woman could be released from prison, they had to have an acceptable residence and a job; a real job. And so –

Alec Baldwin: So you were interacting during this time with paroled inmates.

Martin Horn: Yes, but I wasn't responsible for the supervising. I was interacting with families. I was learning how to do investigations.

Alec Baldwin: So for the guy who took this test in 1969, who didn't have an eye toward this kind of work, when you were interacting with these people, what did you take from it?

Martin Horn: It was fascinating. Where else do you see the varieties of human behavior?

Alec Baldwin: The drama.

Martin Horn: I was a kid – the drama. I had grown up in a middle-class home in Brooklyn on the edge of Brownsville. I was familiar with Brownsville and East New York. They were adjacent neighborhoods.

Alec Baldwin: A tough area then.

Martin Horn: Yes. Not as tough as now. Not as desperate as now.

Alec Baldwin: But Ocean Hill-Brownsville was known as a tough area.

Martin Horn: Ocean Hill – I was working Ocean Hill – yeah, yeah, yeah. And the desperation of families and more importantly to me, the dignity of the families that were making it. I used to come home and say, 'What's remarkable is not how much crime there is, but how little crime there is when you see how people are living.'

Alec Baldwin: Right.

Martin Horn: Right?

Alec Baldwin: How much people do try to hang on.

Martin Horn: And so to this day when people talk about the relationship between poverty and crime I say, 'Listen, there are more people who grow up and live in poverty who don't commit

crime I say, 'Listen, there are more people who grow up and live in poverty who don't commit crime -

Alec Baldwin: And live with it.

Martin Horn: - than do. Yeah, yeah. And so it was fascinating and before I turned around it just turned into a career. I enjoyed it and I did well at it.

Alec Baldwin: When did you become an actual parole officer? When you were – after how long in the system?

Martin Horn: Well after – after the first year, you went from being a parole officer Trainee I to being a parole officer Trainee II, classic civil service. And then at the end of the second year you became a full parole officer and you got more cases assigned to you and you worked fairly independently.

Alec Baldwin: Did your attitude – and this is a very broad question – but did your overall attitude toward paroled inmates evolve over the years where you were more at eye level with them and hands-on with them, and did it change as you became more of an administrator and then became head of the department?

Martin Horn: I really think that my attitude towards imprisoned and formerly-imprisoned people was formed during those early years as a parole officer.

Alec Baldwin: How would you describe that?

Martin Horn: It was recognizing that every one of them was just a normal, ordinary guy – they were all guys back then – who had made bad judgments. I met very few – really very few – who were downright evil and mean. They were poor schlubs – I said to one guy at one time, this was a guy, this was when you could smoke on the subway.

He had a cigarette lighter that was in the shape of a Derringer. He took it out, and a cop was looking at him, and he held his arm out and aimed it at the cop and he got arrested.

I said to him, 'If stupidity was a crime, you would get the death penalty.' A lot of them were addicted to drugs. And I met their families and they were just folk, and, you know, there but for the grace of God could go anyone else.

Alec Baldwin: I agree with you. I often think to myself, 'My God, how many moments in my life could something have gone wrong, or I could be in a docket, and I could be in a courtroom, and I could be facing prison time.'

Martin Horn: And probably had the benefit of far better circumstances than most of these guys did.

Alec Baldwin: Sure.

Martin Horn: They had difficulty finding jobs.

Alec Baldwin: When you see people who do have the benefit of those circumstances and still commit crimes, the Madoffs.

Martin Horn: Right. I judge them more harshly.

MH023 - 0006

Martin Horn: Right. I judge them more harshly.

Alec Baldwin: I always think to myself, 'We've got it wrong. We need to have longer sentences for white-collar crime than we do for drug crime.'

Martin Horn: Yeah, but I've always felt – and I said this even in my last years as the head of a large corrections agency. This is what I said to my staff. I said, 'This is our standard of care. It is that every person in our custody is to be treated as we would want our own child treated if they were in that circumstance.'

Alec Baldwin: You felt that way.

Martin Horn: I absolutely felt that way.

Alec Baldwin: It could be – because for most people, you think about prison and imprisonment in our society. You know, prison is divided into a dual function. There's to protect the public and to take away these predatory people and put them away, and then the rehabilitative aspect of it. And most people -

Martin Horn: I don't accept that dichotomy.

Alec Baldwin: Tell me.

Martin Horn: Well I don't buy rehabilitation.

Alec Baldwin: By that what you mean?

Martin Horn: I don't think that prisons do a very good job of it. I think it is a valid social purpose to punish people, to reinforce our social norms. That's why we punish people. It is a valid social purpose to punish people, to extract vengeance in the name of society on behalf of aggrieved victims. It's a valid social purpose to incapacitate people who endanger us.

Alec Baldwin: See, that's the more important to me.

Martin Horn: And the prison system does those three things pretty well. There was a sociologist by the name of Hans Mattick who once said, 'You can't train an aviator in a submarine.' You can't train a man to live in the community in prison, and if a person needs rehabilitation and they're not dangerous, the best place to rehabilitate them – whatever the hell that means – is in the community where they're gonna have to live.

Alec Baldwin: Let me ask you that. Do you think – someone said something to me on this visit to Rahway, and this is probably the most significant thing someone said to me. They said, 'The problem with this system is the sentencing relative to the classification of the crime relative to the record of the individual inmate.'

Because, they said, 'Some guys come in here and the following thing takes place. They come in here and they're sorry. And then three months go by and they're really, really sorry. And six months go by and they're really, really, really sorry and they're ready to get out and they're sorry. And then you keep them in there another couple of months and they're not sorry any more.'

Martin Horn: Now they're angry.

MH023 - 0007

Alec Baldwin: They flip. And now they're angry, and now they've switched sides. And I'm wondering what your opinion is about that.

Martin Horn: My opinion is New York – well, the United States generally – incarcerates people longer than any other country. It's just our culture and it's our system and it's –

Alec Baldwin: Do you think we have overly lengthy prison sentences?

Martin Horn: Absolutely. Absolutely.

Alec Baldwin: For victimless crimes.

Martin Horn: For victimless crimes and even for crimes with victims. Ever since Richard Nixon and the war on crime, which was really just, I think, a way to capture the Southern vote because he really meant a war on black people; ever since Willie Horton, which was just an extension of that same thing, no politician has been willing to reduce criminal sentences.

You know during his tenure, Mario Cuomo, who was governor of New York, steadfastly opposed the death penalty as did Hugh Carey before him. Principled and to be honored for that, but he also, during his tenure, built more prison beds in New York State than all the former governors of New York before him.

Alec Baldwin: Mario Cuomo did.

Martin Horn: Combined. Yeah.

Alec Baldwin: Why do you think that was?

Martin Horn: Because he could not oppose efforts to make sentences and penalties longer. Because of his death penalty stance, he had to protect himself by showing he was tough on everything else.

Alec Baldwin: The one begat the other, right.

Martin Horn: I think this has been the politics and the media have driven it in this country to a terrible extent.

Alec Baldwin: So you were a parole officer for how many years?

Martin Horn: I was a parole officer for about seven years or so.

Alec Baldwin: And then what happened?

Martin Horn: Then, actually, I got a graduate degree and I moved to upstate New York to teach in the State University of New York. I got a teaching appointment as an assistant professor. I was bored out of my mind.

Alec Baldwin: You went from one prison system to another.

Martin Horn: Yes, so to speak. Although an interesting story –

Alec Baldwin: My father was a teacher so I can say that.

MH023 - 0008

Martin Horn: At the time I was a parole officer I had arrested people. I had sent people back to prison for very lengthy periods of time – guys who had committed murder, guys who had committed rape – and nobody had ever laid a glove on me. It was never a problem. I'd walk up to a guy and say, 'Look, I've got to take you back.'

I'd put the handcuffs on him, I'd put him in the car, we'd take him to jail. But while I was teaching, I got embroiled in a tenure battle with a colleague who one day walked into my office and cold-cocked me. So I always felt that teaching was somewhat more dangerous. Alec Baldwin: Yeah, teaching is really – untenured teachers are more violent than inmates.

Martin Horn: Precisely. And what they fight about in academia is so strange because what they – the issues are so petty.

Alec Baldwin: How soon after you got cold-cocked by the untenured guy did you leave?

Martin Horn: Oh, I left – six months. I went to Albany to work for the newly-appointed commissioner of corrections. This was 1977. I went there to work as the director of work release programs. New York, at that time, was really building up its investment in halfway houses - work release, as a way of reducing the time that people spent inside upstate maximum security prisons.

Alec Baldwin: What was work release then and what is it now? Is it basically the same?

Martin Horn: It's been decimated. It's been decimated.

Alec Baldwin: Why, did it cost a lot of money?

Martin Horn: I think the reaction – no, actually it saves money. It's less expensive.

Alec Baldwin: And the reaction from who, from the press?

Martin Horn: I – I think – tough on crime, tough on crime – absolutely. During the last years of the Cuomo administration, I think there may have been as many as 6,000 inmates in New York participating in work release programs in New York City.

Alec Baldwin: And they would do things, for example, like what?

Martin Horn: Well, they would – literally they would leave the upstate prisons. They'd come down to a minimum security facility located in New York. There's still one on 110th Street just off Central Park.

Alec Baldwin: That houses how many people?

Martin Horn: That one houses about probably 150, 200 people.

Alec Baldwin: Yeah?

Martin Horn: Yeah. And they get assistance finding a job, and once they find a job they're allowed to leave the premises. They leave, they go to work, they can do some personal chores and then they have to be back by a certain time.

And then if they're doing well after a period of time, on weekends they're allowed to go home for the weekend and come back. Under Governor Pataki they dramatically reduced the program. I

MH023 - 0009

the weekend and come back. Under Governor Pataki they dramatically reduced the program. I would say I'd be surprised if today there are even 600 people in work release in New York.

Alec Baldwin: What do you attribute it to?

Martin Horn: Look, this business of corrections and releasing people from prison is essentially nothing more than a risk management exercise, right? We can never eliminate risk. The only way to have no risk is to never let anybody out of their cell.

The minute you let one guy out of the cell you're incurring some risk, so how do you manage that risk? Well, if you have 6,000 guys in halfway houses, some of them are gonna screw up.

Alec Baldwin: How many New York State facilities are there today, roughly?

Martin Horn: Gee, I don't know off hand. There are probably 40 – between 40 and 50.

Alec Baldwin: Closed prisons.

Martin Horn: Several state prisons of varying sizes, right?

Alec Baldwin: So 40.

Martin Horn: Yes, but I think the story about New York that we should feel good about is that where in 1995-96, New York State had 70,000 people in prison – and mind you, when I started in 1969 there were 10,000 people in prison – so in 1995 there were 70,000. Today it's down to 50,000 as a result.

Alec Baldwin: What do you attribute that to?

Martin Horn: The reform of the Rockefeller drug laws.

Alec Baldwin: Mm-hmm.

Martin Horn: So there's no question in my mind the number of people that are in prison is a function of policy decisions made by elected officials.

Alec Baldwin: Who do you think was ultimately responsible for bringing down those laws? 'Cause a lot of people thought that was just insanity.

Martin Horn: Well, look. I think that there was an advocacy organization, Drop the Rock, in New York. I think that then-Governor Patterson deserves credit. I'm not sure any other governor would have accepted that. And then also I think you cannot ignore the cost issue.

The cost of imprisonment in New York State today even is still $2 billion a year. Just about every state in the country, over the last 20 years, the cost of imprisonment has been the fastest-growing item in state budgets.

In California, which for years was so proud of its public university system, reached the point where it was spending more on its state prisons, which now hold 160,000 people, than it was on its state universities. So I think that it was a perfect storm. All the factors came together. The fiscal conservatives were driven by the price issues, and they came together at the right

MH023 - 0010

moment.

Alec Baldwin: Interesting how that collision in conservative values has resulted in cost versus crime.

Martin Horn: Yeah, and that's happening all over the country. And my concern is that it's driven by cost and that it does not reflect a genuine rethinking of our approach to crime and imprisonment.


Alec Baldwin: So when you leave the education job and you go work as – for the Department of Corrections in work release, when is the first time as an official of the state you walked into a prison in New York State?

Martin Horn: Oh, I had walked into prisons as a parole officer, and then –

Alec Baldwin: What's the first prison you ever walked into?

Martin Horn: The first prison I ever walked into was Sing Sing.

Alec Baldwin: Describe that, the first time you walked into Sing Sing.

Martin Horn: Well, it's Dickensian, right? I mean it's – it was built in 1819 or there abouts. The prisoners' hewed the stone off the Palisades. The walls of the original cellblocks still stand. When I was there, New York still had a death penalty, and the guy who took me around had been there since before the war.

Two things I remember about him, one was he said to me, 'Kid,' he said, 'There's nothing new under the sun in corrections.' He says, 'Everything we're doing today was done years ago, we just call it something different.'

And he's right. Our approach to imprisonment hadn't changed much. It's very much a 19th Century invention. And the other thing he did was he took me to the Death House where Ethel and Julius Rosenberg had been executed.

Alec Baldwin: Horn was only five years old when the Rosenbergs were killed, but growing up in a Jewish household in the 1950s their death had a powerful impact. Sixteen years after first seeing the Death House at Sing Sing, Horn was executive director of the New York State, division of parole, and his opinions had evolved.

Martin Horn: When I was a parole officer, we had an expression, 'Trail 'em, nail 'em and jail 'em.' And the idea was that it was up to the parolee to do all the work and if he screwed up we would catch him and lock him up.

We had this belief that if we locked him up before he committed a more serious crime we were performing a public service. I had come to the conclusion that parole, and the prison system generally, wasn't doing enough to ease the transition for people leaving prison.

When an individual comes out of prison, everybody who gets out of prison, they have some statistical probability of succeeding or failing. And we can improve those odds a little bit if we attend to three things. One was sobriety. And I'm not a teetotaler. I don't make a moral

MH023 - 0011

judgment, but sobriety is a primary condition.

If you don't stay sober – and I mean alcoholism and drugs – you will fail. You have to have a place to live. If you're living on the street, if you're living in the shelter, you're gonna fail. Today guys coming out of prison, in New York City's housing market, they can't afford a place to live.

Alec Baldwin: Of course.

Martin Horn: I mean you say, 'Oh, you can get a job.'

Alec Baldwin: People coming out of Yale Law School can't afford a place. Martin Horn: That's right. Exactly. And the prison system also has all sorts of rules that you can't have roommates that are ex-offenders. The Yale guy and the prisoner maybe should room together. So I felt that we ought to – we needed to help men leaving prison stay sober. We needed to help them find a place to live, and we needed to help them find a job. It's a three-legged stool.

If you – you know, if you can't stay sober you won't hold a job; if you don't have a job you can't pay the rent. If you lose your apartment and you're living on the street, you're hanging out with guys, you're gonna get stoned. So it's a vicious cycle.

Alec Baldwin: And one that Horn strived to change. Coming up in a minute, Martin Horn talks about serving under Pennsylvania governor Tom Ridge his return to New York, and his ultimate decision to leave public service.

Martin Horn: Because I felt that I could not trust my workforce any longer.

Alec Baldwin: This is Alec Baldwin and you're listening to *Here's The Thing* from WNYC Radio.

This is Alec Baldwin. In 1995 there were 19 newly-elected governors across the country. A new administration often means new staff, including new corrections directors. Martin Horn took advantage of the moment.

Martin Horn: And so I started making cold calls, sending letters to every newly-elected governor; 'Dear Governor-Elect, here's my resume. Wouldn't you like me to be your corrections director?' I called a friend in Pennsylvania, actually I called the president of the college I had graduated from in Pennsylvania, and he said, 'Gee I don't know, but I'll check.'

And he called me back the next day. He said, 'I spoke to the guy that lobbies for our college in Harrisburg.' And he says, 'Here's what they said. The newly-elected governor did not expect to get elected. Send him your resume. Here's the address of the transition office. And put a Post-It note on top that says, 'Put this on the pile of corrections,' because they're so disorganized, they've got resumes coming in through the transoms.' So I did exactly that. 'Dear Governor-elect' –

Alec Baldwin: Tom Ridge.

Martin Horn: Tom Ridge. 'Let me introduce myself. I'd like to be your corrections director. Here's what I've done. Here's what I' – and I put a Post-It note on it that says, 'Put it on the pile for corrections.' And two weeks later his Deputy Chief of Staff called me.

Alec Baldwin: You owe a lot to the Post-It company.

MH023 - 0012

Martin Horn: I sure do.

Alec Baldwin: How long were you in Pennsylvania with Ridge.

Martin Horn: Well I was in Pennsylvania with Ridge for seven years. I was Commissioner of Corrections for six, and then at the end of the sixth year, he appointed me to be Secretary of Administration, which took me out of the correction department and put me in charge of labor relations and IT, retirement-

Alec Baldwin: So you liked hat job if you stayed there for seven years.

Martin Horn: Oh, yeah.

Alec Baldwin: Did you develop a good relationship with Ridge?

Martin Horn: I think the world of Tom Ridge. I really think the world of Tom Ridge.

Alec Baldwin: How would you, to the extent you can, characterize the six years you ran the system in Pennsylvania.

Martin Horn: They were – but for the fact that I was in Harrisburg, Pennsylvania, they were the greatest six years of my professional career.

Alec Baldwin: Truly?

Martin Horn: Oh, yeah. I had the best boss you could have. He knew how to be a leader and he knew how to back up his people and he knew how to hold people accountable, and he was the world's best listener – better than any politician I've ever met. I think partly because he has a hearing impairment, but he listened intently and he briefed well. He had good values and good instincts.

I didn't agree with him on many issues politically, but on the core issues, I think he was – and he was just a good person. He was an approachable guy, and many of the elected officials that I've worked for aren't that way.

Alec Baldwin: In whatever way you can characterize this, how would you describe the system you inherited when you went in and what did you leave behind six years later?

Martin Horn: Well I think – you know, Pennsylvania's interesting. Pennsylvania is sort of the birthplace of American corrections. Where the first prison – the Eastern State Penitentiary, which exists to this day, is still open as a museum – was created in the early 1800's.

The Pennsylvania Society for the Alleviation of the Misery of Prisoners counted among its members Benjamin Franklin. And there was a very strong Quaker influence and a very different feel.

When I got to Pennsylvania, the prisons, overwhelmingly, were very different than in New York. There was a level of civility in those prisons that I had not experienced. In New York State and the prisons in the 70's and 80's, you could walk through the prisons and you could feel the antagonism and the tension. You could cut it with a knife. I used to say –

MH023 - 0013

Alec Baldwin: What do you attribute that to?

Martin Horn: Oh, I don't know. I think part of it –

Alec Baldwin: The training of the guards themselves?

Martin Horn: The training, the tradition, yeah, yeah.

Alec Baldwin: That brings us obviously to something that we did want to bring up, which is about this story that broke about The Program at Rikers. What happened there?

Martin Horn: Well, I don't – to this day I'm not entirely sure what happened. I will tell you this -

Alec Baldwin: Is it something you think can happen anywhere?

Martin Horn: Absolutely.

Alec Baldwin: True.

Martin Horn: And it is, I will say, what caused me to decide to retire because I felt that I could not trust my workforce any longer.

Alec Baldwin: In October 2008, an 18-year-old boy was killed at Rikers Island by fellow inmates. The Village Voice had been reporting for the past year about violence among prisoners at Rikers. Guards were said to be looking the other way. In 2012, The Voice obtained and published graphic pictures of knife wounds and other injuries from inside the jail walls.

The largest jail system in the country had a fight club that was condoned and even promoted by jail officials. "The Program," as it was called, delivered the most challenging moments of Horn's career.

Martin Horn: The story is that a young man by the name of Christopher Robinson was put into a particular housing unit in the adolescent housing unit. He had been transferred there because in the unit that he had been in previously, he had actually been extorting from a weaker inmate and he was caught. So his classification was increased and he was put into this higher classification unit – so you know, there's sort of a pecking order.

So now he gets there and these guys who had been there for a while, who were this clique, they step up to him and they said, 'We're gonna extort from you.' He says to them, 'I'm the extorter here. You don't extort from me.' So they tuned him up. They beat him up. Come to find out that they had been extorting from other inmates and that this had been going on for some time with the prior knowledge, and arguably the connivance, of the officers.

Basically the officers had made a Devil's Bargain with the inmates. 'Look, you don't beat us up. You don't attack us and we'll let you run your own show.'

Alec Baldwin: Run your own ship.

Martin Horn: Exactly. Which, by the way, you know the job that we ask corrections officers to do are terrifying. Most officers, perhaps all officers, are scared out of their minds. We ask them to supervise 50 often angry, sometimes mentally ill young men.

Alec Baldwin: During the worst period of their lives.

MH023 - 0014

Alec Baldwin: During the worst period of their lives.

Martin Horn: During the worst period of their lives, who are craving some addictive substance in an open dormitory, and they're in that dormitory by themselves. So how does this one individual assert himself? He does not carry a weapon.

He does not carry a baton. There may be another officer in a controlled room some 10-20 feet away who can sound the alarm and ask for help, but by the time help arrives he can be beaten to a bloody pulp.

So it's two in the morning. You're making your rounds, walking around this dormitory of fifty 21, 22 year old guys. In the back corner, you stumble across two of them smoking weed. You have a decision to make. You could turn your back and walk the other way. You can try and bust them and run the risk that their friends will pounce on you and pummel you.

Alec Baldwin: Which happens.

Martin Horn: Which certainly happens.

Alec Baldwin: How frequently?

Martin Horn: More frequently than we'd like it to, and that's another reasons that I left, because I feel the prisons are understaffed. I think it's wrong to ask one man – and by the way, today more than 50 percent of the correction officers in the City of New York are women.

Alec Baldwin: So when you say that two guys smoke weed, the corrections officer comes, he sees, he's got a decision to make and someone's gonna pummel you, do you have a system in place where you know who's more disposed toward violent behavior inside the facility when they come in and why can't you separate them before in an anticipatory way?

Martin Horn: Well, we have what a system we refer to as classification. You basically separate the most serious inmates and put them in maximum security. But at the end of the day somebody has to supervise those maximum security inmates.

Alec Baldwin: What reforms do you think could be made in supervising maximum security inmates so they'd be less -?

Martin Horn: Well, generally I don't like open dormitories. I think every inmate should have his own cell. Cells do not have to be oppressive. They do not have to be depressing. They can be bright and airy. They don't have to be oppressive.

Alec Baldwin: And they have cellmates or everybody has their own room?

Martin Horn: Everybody should have their own room. I don't like double-celling.

Alec Baldwin: You don't? Why?

Martin Horn: Well, I think that –

Alec Baldwin: You don't think that's cruel and unusual people have no human contact?

Martin Horn: Well, I don't like to use those terms, cruel and unusual. And in fact the Supreme

MH023 - 0015

Court has said that there is no one man/one cell rule living in the Constitution. But I think that we all have privacy needs.

Alec Baldwin: To your knowledge, and I would trust your opinion, do the inmates, do they want their own cell? Do they prefer it?

Martin Horn: Some like company. Some like company for the wrong reasons. But most people, I think, want their privacy. This is your safety zone. Nobody can get to you. If you want to come out – you know different people go to prisons and they're terrified to be out in the prison yard with all these other inmates.
Alec Baldwin: Is there a constant pulsing sense of fear for people who are in the prison yard?

Martin Horn: Not in a well-run prison. Look, it's the job of the officers to keep the inmates safe, and if we don't keep the inmates safe they'll find ways to keep themselves safe. How will they do that? They'll do that by joining gangs and they'll do that by creating and arming themselves.

Alec Baldwin: How prevalent is that in New York State now? A lot of gangs?

Martin Horn: I can't comment on New York State prisons. I know that it's –

Alec Baldwin: New York City?

Martin Horn: It's certainly a problem in New York City.

Alec Baldwin: And in the city – and they do these gangs. I guess like if I got into prison tomorrow, is it just expected I'm going to join a gang for my own protection?

Martin Horn: Well see, this gets to The Program. You're the new guy. You come into this open dormitory of 50 inmates, and there's a group of maybe 10 or 15 of them, perhaps they know themselves from the street, perhaps they self identify as Bloods or Crips or Latin Kings or –

Alec Baldwin: Aryan Nation.

Martin Horn: Whatever. Not too many of those in New York, but if you're in California sure. And they step to you and they say, 'Here's the deal. Are you with us?' And if you're stupid enough to walk into a dormitory where there are 20 inmates who call themselves Bloods and you say, 'Hell, I'm a Crip,' well they're gonna do to you the same thing they'd do to you on the street.

Get off of our turf. Prison and jail is this artificial scarcity that we've created. So there's by and large little food, there's no drugs, there's no girls, there's no sex, you know, there's no money. And phones.

Alec Baldwin: And there's a black market for all that.

Martin Horn: There's a black market. And so as with any place else, a group of inmates emerges and they say, 'We control it.' The simplest thing – and this is what was happening, certainly, in the adolescent jail where that Program occurred, there were never enough chairs for all the inmates.

And a group of inmates would say, 'On Saturday mornings when this program is on or when this sporting event is on, there's one TV set. It's for the black guys. And you Spanish guys, you stay in your cells because that's our time.' Now an officer has a choice to make. First of all he should see

MH023 - 0016

it going on, and if he sees it going on he should –

Alec Baldwin: Then he should take away that –

Martin Horn: He should take that away.

Alec Baldwin: Were there any prosecutions of any of the officers involved?

Martin Horn: Oh yeah. The officers – two officers, actually, were convicted of gang assault.

Alec Baldwin: Right.

Martin Horn: Five or seven of the inmates ultimately were convicted. I don't know what the charge was, but it might have been manslaughter. I mean I don't think they intended to kill Christopher Robinson. The troubling thing was that there had been stories for some time – and this is what The Voice documented – that this had been going on. There were breadcrumbs and if we had done a better job of following those breadcrumbs, we perhaps would have seen it earlier and prevented it.

Alec Baldwin: Do people –

Martin Horn: But you know, I'd like to get back to another point you make – you know you make the point about how we deal with white collar criminals or with – everybody uses the Madoff example. You know Martha Stewart?

Alec Baldwin: Mm-hmm.

Martin Horn: You've met her?

Alec Baldwin: Many times, yeah.

Martin Horn: I'm sure she's a lovely person. So we know that some years ago she lied to a federal officer investigating supposed insider stock manipulation. She was not convicted of the stock manipulation, she was convicted of lying to a federal officer and she got what – four months in a federal prison in Alderson. So today, but for her current troubles with Macy's and Penny's, she's better off than she was when she went to prison. What did society gain by that?

Let me suggest to you what if, instead, we had erected a 10-foot-high platform in Times Square and we had climate controlled it. We enclosed it in Plexiglas, we heated it, we air conditioned it and we put a stool – like a bar stool – in it. And we -

Alec Baldwin: Like a stocks.

Martin Horn: Well, I wouldn't put her in stocks but I –

Alec Baldwin: But similar.

Martin Horn: Every day you are to be here at 9:00 in the morning and you are to remain here until 5:00 in the afternoon. We'll protect you from the elements and you'll sit here with a sign around your neck that says, 'I'm a liar.' You can bathe, but you can't get all dressed up. You can't wear jewelry, you can't wear makeup. You can attend to all your personal needs and that sort of thing. We're not looking to harm you, but you can't do all that stuff.

thing. We're not looking to harm you , but you can't do all that stuff.

And after you've sat in Times Square for some period of time where the world can see that you are a liar, you are to perform community service for a year where you're to go out to East New York and teach young women about nutrition, about dressing for success, about all of the things that you do so well.

And in addition, you have to pay back treble or quadruple what you made on this financial fraud. And that's it, but we're not going to imprison you.

Would we have had as great a deterrent effect? Would we have punished her? Would we have convinced her not to try to do it again? Would we have deterred others? I would argue yes, and yet we don't do those things. We don't use shame in our society.

Alec Baldwin: But I agree with you in terms of what you're suggesting, however we do have that now. We have the internet. As my friend once said, the internet represents the death of forgetting. Martha Stewart is forever going to be referred to as, 'formerly incarcerated' bah, bah, bah. That's going to stay with her for the rest of her life.

Martin Horn: That's okay, but was she punished? My point is simply this. As a society, our primary response to crime is prison.

Alec Baldwin: Right.

Martin Horn: It's the only tool in our toolbox.

Alec Baldwin: It's the only thing people understand.

Martin Horn: You know the aphorism that if the only tool on your belt is a hammer, everything looks like a nail?

Alec Baldwin: Yeah, of course.

Martin Horn: That's true with respect to our approach to imprisonment.

Alec Baldwin: What do you think of the whole Prison, Inc. notion and the privatization of prisons; the myriad of things that arise from that?

Martin Horn: It's a very complicated issue and it's very easy to be opposed to private prisons. It's very easy to demonize private prisons. Private prisons arose because governments needed them.

Governments needed them because in the 80's and 90's the American prison population was growing faster than government could create capacity for prisoners. I have visited private prisons. I have visited many public prisons, and I have colleagues who work in the private prison industry.

Running a prison isn't rocket science. What they do is they hire guys like me to run their prisons. And a private prison will run as well or as poorly as the government who contracts with it wants it to. So if private prisons don't do what government asks them to do it's the fault of government for allowing them to.

MH023 - 0018

Alec Baldwin: Right, but is it understood in the current culture that private prisons – it's kind of a wink and a nod and we're not going to enforce these contracts.

Martin Horn: I am sure that it true in some places and not in others.

Alec Baldwin: Right. A little over five years ago the board of corrections in the city allowed officials to listen to inmate telephone conversations. What did you think of that?

Martin Horn: Yes. I asked for it.

Alec Baldwin: Why?

Martin Horn: Why?

Alec Baldwin: What was going on that you thought you needed to have that advantage?

Martin Horn: Well, you get to the question of The Program. Inmates are running their scams over the phones. Inmates are arranging for drugs to be brought into the prison over the phones.

Alec Baldwin: They're operating.

Martin Horn: They're operating over the phones. There's no constitutional right to even have phones in prisons. We could rip all the phones out and we'd be well within our constitutional authority. The federal law is clear that with proper notice and the consent of at least one party, a conversation can be listened to and recorded.

I felt that by giving the inmates ample opportunity – basically we said to them, 'Look, by choosing to use our phones that we're making available to you, you are waiving your right to privacy. And if you want to retain your right to privacy, write a letter.'

Alec Baldwin: If you had three things that you were gonna change about the federal, state, city – what would you change about the way we deal with convicted felons?

Martin Horn: Well, so that excludes the city. Let's talk about federal and state.

Alec Baldwin: Federal and state.

Martin Horn: The first thing I'd do is I'd legalize drugs.

Alec Baldwin: Yeah, when you say that, though, obviously there are people who inside that argument talk about cocaine and heroin. You don't care, you'd legalize everything.

Martin Horn: I would legalize drugs. We couldn't possibly do worse than we're doing now.

Alec Baldwin: Right. What would you do, to take it even further, I mean you've been involved with this system a long, long time. You'd have the government dispensing cocaine and heroin?

Martin Horn: I would sell it in the liquor stores.

Alec Baldwin: Right.

Martin Horn: And I would tax the hell out of it.

MH023 - 0019

Alec Baldwin: Right. You'd just license it and sell it. I mean I agree with you as far as marijuana is concerned.

Martin Horn: Then I would take all the money that we're spending and all the money we're gonna make and I would reinvest it in prevention. You know, I grew up never using a seatbelt and to this day I'll drive around without a seatbelt. My kids, who are now thirty-

Alec Baldwin: You can end up in prison for that, you know.

Martin Horn: I suppose. My son, when he was two years old, if I started to back the car out before he was buckled in, would have a tantrum, right?

Alec Baldwin: Right. This generation.

Martin Horn: Fewer kids are smoking today. We can prevent. We can provide treatment and there will be money –

Alec Baldwin: People can change. People can change.

Martin Horn: And there will be money to spare.

Alec Baldwin: Bobby Kennedy had the funniest line of all. Bobby Kennedy said, 'If you ever thought the day would come when you were gonna bend down with a plastic bag and pick up your dog's poop on the street and throw it in the gar-' – who ever thought that was going to happen, you know, 50 years ago.

Martin Horn: Right. There you go. And we recycle our tin cans. So I would legalize drugs. I would reduce the length of time that people who do commit crimes –

Alec Baldwin: For non-violent crimes.

Martin Horn: Well, for all crimes but for those people who scare us the most. John Muhammad, remember the Washington Sniper?

Alec Baldwin: Yes.

Martin Horn: Right? That guy scares me, right? He was just shooting people at random. You have to incapacitate him forever, right? Jeffrey Dahmer, right? You had to incapa –

Alec Baldwin: The mentally ill; the homicidal mentally ill.

Martin Horn: No, no, no. The mentally ill, that's a whole different story. That's item four, because they don't belong in prison, right? The great shame of our society today is that 20 percent of the people in prison have a mental illness. More people receive acute mental health care in the jails in this country than they do in the mental hospitals.

Rikers Island provides more acute medical – psychiatric care than Bellevue. The largest provider of acute psychiatric care in the United States is the Los Angeles County Jail. Mentally ill people don't belong in jail and it is a scandal in our society.

Alec Baldwin: And you're not allowed to give violent –

MH023 - 0020

Martin Horn: Mental illness is not a crime.

Alec Baldwin: And you're not allowed to give violent inmates, in any kind of a system, drugs. You're not allowed to drug them or are you?

Martin Horn: Well, if they're being treated for mental illness –

Alec Baldwin: Not mental, just for being violent. You're not saying they're mental. You're not even saying –

Martin Horn: You can't drug them to quiet them down.

Alec Baldwin: You can't –

Martin Horn: No, not without a court order. I mean you can if there's a court order.

Alec Baldwin: Do they get court orders?

Martin Horn: Very rarely.

Alec Baldwin: Very rarely.

Martin Horn: Don't equate violence with mental illness.

Alec Baldwin: What do they do about those guys who are violent?

Martin Horn: There are some people who need to be incapacitated and I would incapacitate them. That doesn't bother me. A guy who was a serial rapist, a serial child molester, it doesn't bother me in the least to lock 'em up –

Alec Baldwin: So other than them, shorter sentences for everybody.

Martin Horn: But everybody else. The guy who commits a robbery, the guy who commits a burglary, the guy who steals your car, the – you know, they don't need to go to prison for as long as they do.

Alec Baldwin: Exactly. What is number three?

Martin Horn: Number three is I would change the way we release people from prison. I would actually do away with parole boards and discretionary parole. I would make every sentence a determinate sentence. I would say, 'You're gonna be under the control of the state for a period of time.' Let's just say for argument's sake, five years. For the first three of those years you're gonna go to prison and we'll leave it up to the corrections people to decide maximum, medium, minimum.

But at the end of three years, you're coming back to the community and when you come back to the community you're gonna live in a halfway house, and while you're in the halfway house we are going to help you connect with a relapse prevention program to prevent your relapse to drug abuse, and we're gonna help you get involved in an AA program, and we're gonna help you find a job.

And you're not gonna have to pay us any money. You're gonna save the money you earn on your

MH023 - 0021

job and we're gonna help you find a place to live.

And when you've saved enough money to pay a month's rent and a month's deposit and maybe another month, you can go home and live on your own and we're done with you.

Alec Baldwin: What's wrong with the state, for example, building a facility that is an after-care facility for prisoners to come and to live where they go to work and they continue to produce things that the state needs? Is that a possibility?

Martin Horn: It's a possibility. I mean I – I'm a believer that these communities basically have to be small.

Alec Baldwin: Right, and not resemble prisons.

Martin Horn: They should be normalized. And the point is people need to be normalized as they return to the community. So I would have fixed sentences, and that way what happens now is Johnny Jones goes to prison for five to 15 years. Well is it five or is it 15? And if the parole board paroles him at five, the victim says, 'My God. I thought he was going away for 15 years.'

Or he goes in front of the parole board and they say, 'Johnny, we're going to hold you for five more years.' He says, 'I pleaded guilty and my lawyer told me that if I did everything right and kept my nose clean I'd be out in five.' And the parole board says, 'We weren't in the room when that deal got made. We're not bound by that.'

So the whole system currently is deceptive. It causes people to distrust the system, it undermines respect for the rule of law, and it doesn't allow us to release individuals from prison in a planned way. So I would – those are the three things I would change.

Alec Baldwin: Are you glad you're done? Are you glad you're walking away from that?

Martin Horn: It was a fascinating career. I am absolutely glad I'm done.

Alec Baldwin: You are? Was it spiritually deadening in other ways as well, I mean because I can't think of anything more horrific than when I was in prison.

Martin Horn: On some level there is no place else a grown man can have as much fun. When I was the warden of Hudson Prison I used to say to people that it was a cross between being the headmaster of a somewhat down-on-its-heels boys' school and the King of England because you were in charge and you had to deal with everything from the pipes in this 100-year-old facility breaking, to making sure that there was adequate food and that the food was well prepared, to making sure that there were no contagious diseases; that tuberculosis didn't spread, that measles didn't spread – that people got psychiatric care. You had to deal with labor relations, you had to deal with ethical issues, you had to deal with legal issues.

Alec Baldwin: You were the Lord High Governor.

Martin Horn: And it was fascinating and in that respect I couldn't have had a better career.

Alec Baldwin: Today, Martin Horn is a distinguished lecturer in corrections at John Jay College and serves as the executive director of the Permanent Sentencing Commission which works to

MH023 - 0022

clarify, simplify and create New York State's sentencing guidelines. This is Alec Baldwin. *Here's The Thing* comes from WNYC Radio.

---

Produced by Emily Botein and Kathie Russo

Hosted by Alec Baldwin



Produced by WNYC Studios

## SHOWS YOU MIGHT LIKE                                                    ALL ⟩









MH023 - 0023

ABOUT WNYC STUDIOS        CONTACT US        SUPPORT US        FAQS        SPONSORSHIP
DIVERSITY (DEI)        LISTENER PANEL        TERMS OF USE        PRIVACY POLICY        ACCESSIBILITY

Follow the show          

Produced by WNYC Studios

© 2021 WNYC Studios

MH023 - 0024

**About *Correctional Law Reporter***

© 2014 Civic Research Institute

## CORRECTIONAL LAW *Reporter*

VOLUME XXVI No 1

*In This Issue:*

**Long-Term Penal Isolation: A Problem Solving Symposium**
*Fred Cohen*

**The Use of Long-Term Isolation: A Policy of Despair**
*Andrew Coyle*

**Isolation Vignettes: Practical Applications of Strict Scrutiny**
*David Lovell, Ph.D.*

**Separation Not Isolation**
*David C. Fathi*

**Safety, Yes; Near Total Isolation and Idleness, No**
*Terry Kupers, M.D., M.S.P.*

**A Former Prison Administrator Reacts**
*Martin F. Horn*

**A Close Look at the Options**
*James Austin, Ph.D.*

**Testing the Rationales for Long-Term Isolation: Three Scenarios**
*Laura L. Rovner*

## A Former Prison Administrator Reacts

### by Martin F. Horn

The foremost obligation of a prison and jail administrator is to keep the persons in their custody, the staff, and the public safe. Other responsibilities attach to the corrections administrator's role as well, but none are as important. Indeed, I would argue that absent safety all other activities within a corrections setting are undermined and the likelihood of a successful return to the community by the prisoner is diminished, the ability of staff to perform their duties effectively is undermined, and public confidence in the integrity of the corrections enterprise is damaged. Safety within a prison or jail operates on several levels. Not only does it mean keeping prisoners and staff safe from assault and the prisoners from escaping, but it also means keeping them safe from fire, disease, and from mental deterioration.

Best practice in corrections today calls for the thoughtful, objective classification of prisoners. One purpose of classification is to identify the prisoner who is predatory and to keep that person away from the prisoner who is weak or vulnerable. Over the last 40 years, as prison and jail populations grew exponentially, reliance on open dormitories and multiple occupancy cells, rather than the traditional single cell grew apace. The open dorm and multi-occupancy cell or room present difficult safety challenges that make the proper security classification of prisoners critical and make the separation of prisoners who prey on each other harder.

> Prisons—and especially jails—are today marked most significantly by boredom and ennui.

At the same time, the number of persons with mental illness in prison and jail populations has grown as well. As Bernard Harcourt observed in The New York Times, "Over the past 40 years, the United States dismantled a colossal mental health complex and rebuilt—bed by bed—an enormous prison..."[1] By contrast, prisoners cannot be so easily released to the community without setting off the "public safety alarm." Keeping prisoners safe, keeping the mentally ill safe and healthy, and keeping prisoners from harming each other and staff and doing all this with limited resources, in physical plants that are inadequate to the task has gotten immeasurably harder.

Moreover, during the last 20 years the cost of operating prisons and jails has ballooned and state and local jurisdictions throughout the country have elected to cut funding, leaving prisons and jails to operate with insufficient numbers of personnel, inadequate programs, and nonexistent or limited services to provide treatment of the mentally ill and programming for prisoners. As a consequence prisons—and especially jails—are today marked most significantly by boredom and ennui.

The three vignettes offered for comment must be read in light of these realities. The use of social isolation is of concern and very complicated; it is difficult to address all the issues implicated in the format allowed here.

As I read each of these case studies I asked myself, as a prison administrator how do I keep people safe and how do I mitigate the harm inherent in imprisonment?

**Vignette I: Tom Silver**

Reading the case of Tom Silver, the three time killer (one victim an officer) reminded me of a situation I encountered when I served as Secretary of Corrections in Pennsylvania. A 25-year-old prisoner serving five to ten years for a first degree robbery was brutally raped by another prisoner on a maximum security cell block during the time prisoners were allowed out of their cells for indoor recreation on the block. As if that were not horrific enough, I came to find out the perpetrator, who was himself serving a life term, had perpetrated a similar rape 15 years earlier. At the time, the local prosecutor declined to take the case to trial citing limited resources and on the grounds the perpetrator was already serving life, and so what more could be done to him? After serving some substantial time in punitive segregation the perpetrator was returned to general population where, some years later, he perpetrated the second rape (that we know of). All I could think to myself at the time was, "what will I say to the mother of the

**Correctional Law Reporter**
*Founded 1987*

**Fred Cohen, LL.B., LL.M.**
Executive Editor

**William C. Collins, Esq.**
Editor Emeritus

**Editorial Board**

**Michelle Deitch**
Senior Lecturer, LBJ School of Law, University of Texas

**Jamie Fellner**
Human Rights Watch

**Craig Haney**
Department of Psychology, UC Santa Cruz

**Martin F. Horn**
Distinguished Lecturer, John Jay College of Criminal Justice, CUNY

**Steven Martin**
Attorney at Law, Austin, Texas

**Michael B. Mushlin**
Professor of Law, Pace University

**James E. Robertson**
Professor, Department of Sociology and Corrections, Minnesota State University

**Donald Specter**
Executive Director, Prison Law Office

MH025 - 0001

third fellow he rapes?" What was my duty of care to the other inmates who were his future potential victims?

Tom Silver presents the same conundrum. The fact that he is 68 does not impress me. I am 66 and quite vital, and I believe that if I had to I am capable of slipping a "shiv" between the ribs of another man; without knowing more about the deterioration in his physical and mental health, I don't doubt Tom could too. How much risk with the lives and well-being of the other prisoners do we want the Warden of Tom's prison to take? I come down on the side of the other prisoners and have little reluctance to keep Tom locked up, based on what I know now. Moreover, behavior has consequences, in prison as well as in society at large. Tom's three murders cannot go unpunished.

I understand that, having said that confining Tom so that he can do no harm to other prisoners obliges me to take greater responsibility for Tom's mental well-being. Keeping him physically separated from other prisoners need not, and should not, mean depriving him of social contact, and it should not require compromising his physical and mental health. (Indeed, the jury is still out on whether isolation causes mental deterioration in all cases. Most studies that contend that it does look at a prisoner at a point in time and attribute any pathology to the segregation and fail to account for the possibility it may have been a preexisting condition.) The prison needs to find alternative means to keep Tom engaged, be it through increased staff or family contact or through other means of social stimulation. Perhaps ways could be devised for him to interact with other prisoners safely and with no opportunity to harm them himself. His long-term separation from other prisoners should not be imposed as punishment and there is no reason to deprive him of outside contact through phone calls, supervised or non-contact visits, access to television and radio, books and newspapers.

But, to do this right requires resources. And this is the challenge prison and jail administrators face. They are asked to do the impossible with little resources. If we as citizens wish our prisons and jails to be places where the prisoners and staff are kept safe, and where those who can do harm are prevented from doing so without being further harmed themselves, the corrections facility must be properly staffed-not only with correction officers but with mental health staff, recreation staff and medical staff as well. The physical plant must support the operation and not work against it as so many early generation prisons and jails do. This takes money; to manage prisons and jails right, the public and elected officials have to be willing to pay the price.

**Vignette II: Tony Menace**

Tony Menace is not very different in terms of the challenge he poses. Let's be clear, while in prison he is engaging in conspiracy to murder and deal drugs. These are serious crimes and they cannot go unremarked. My first response is to insist the local prosecutor charge him based on the evidence mentioned in the vignette. His prison term of 20 years can be extended. There must be consequences for bad behaviors, including in prison.

However, Tony Menace begs what for me is the biggest question facing American corrections today. If he is significantly mentally ill, why is he in prison? The Bureau of Justice Statistics reported, "At midyear 2005 more than half of all prison and jail inmates had a mental health problem, including 705,600 inmates in State prisons, 78,800 in Federal prisons, and 479,900 in local jails. These estimates represented 56% of State prisoners, 45% of Federal prisoners, and 64% of jail inmates."[2] In 2014 we must be challenging that reality. The problem has only gotten worse and a predatory mentally ill person like Tony Menace poses real danger to other prisoners. We have a duty to them to protect them from him, and a duty to him to treat his mental illness. Perhaps a well-run secure psychiatric hospital is a better place for Tony and for the prisoners he threatens.

Long-term social isolation of Tony is complicated by the fact of his mental illness; it can't be ignored. But prisons and jails today—jails especially—are ill-equipped to cope with the level of challenge a person like Tony can present. The problem does not belong to the prison or jail. It belongs to the community that bears the obligation to ensure Tony receives the proper level of treatment and the care appropriate to his condition, and that can't be done in a prison. Prisons were designed specifically with the idea that the mentally ill would be housed elsewhere. Again, it's a social and political question of will, and money.

**Vignette III: Sunny Bayou**

Sunny Bayou presents a very different challenge. Young persons have even greater needs for social contact than adults. The potentially debilitating effects of isolation affect the adolescent even more severely. Wherever possible the isolation of adolescent prisoners

MH025 - 0002

should be avoided. The number of adolescents in custody is too high as it is and can be reduced, as we showed in New York.[3] Confinement should be reserved for the irreducible minimum number so damaged that they are truly dangerous. That is a far smaller number than we confine today. Among that group the number requiring isolation is smaller still. When an adolescent is confined, the state's obligations to his or her education (including special education) travel with him or her and must be fulfilled. I agree with Sunny's lawyer that isolation can be particularly harmful to a 15 year old and, further, that his legally required educational needs and rights don't end at the training school door. If he is so dangerous that his behaviors can't be corrected through therapeutic interventions, then we have to bring the teachers, the resources, the physical exercise, the art and the music that he would experience in school to him.

It has been my sad experience that the young people we see in jails and prisons are very often learning disabled. Where evaluations have been done, and Individual Education Plans (IEPs) created, they don't follow the youngster into the jail, prison or youth facility. Often the fragmentation of our educational system, with local districts seeking to avoid the cost and responsibility for youngsters taken out of their jurisdictions, works to prevent the proper and appropriate response to the needs of these children. Perhaps if his educational and developmental needs were better attended to, the rage that causes him to get into fights would abate.

### General Considerations

Reading and responding to these three vignettes brings several general considerations to mind:

First, prisons and jails are not designed or equipped to cope with the mentally ill. As a society we need to rethink our approach to dealing with the mentally ill, we must ask why they are in jail and how we can better respond to the challenges they present. When I ran the jails in New York City I was served by Bellevue Hospital and had call upon the finest acute mental health care in the country. Many jails, especially in rural areas, don't have that resource and are left dangerously to their own devices when a mentally ill person is committed to their custody. This must change.

Second, juveniles and adolescents don't belong in jails and prisons and their social isolation should be avoided to the extent possible. If we were more thoughtful about juvenile detention and incarceration the problem would not loom as large. Much of the problem arises when jurisdictions that don't have appropriate places to detain youngsters who are criminally involved are, of necessity, required to house them in adult facilities. Then, concern for their safety and federal separation requirements often leave the adult jail with no recourse but to isolate them. This often leads to mental deterioration and sadly, sometimes, suicide.

Third, prisoners with time on their hands will get into trouble. The cuts to prison programming, education, and other "rehabilitative" programs during the last 20 years have had consequences. Idleness, boredom, and angry young men make for a dangerous mixture and lead to behaviors that sometimes cannot be responded to except by separation. If the level of activity inside our prisons were greater, if prisoners believed there was some opportunity for self-improvement and that society felt invested in their welfare and success, the fights and gang behaviors that lead to the use of physical segregation would be diminished.

Fourth, prisons must be places where dangerous contraband, drugs, weapons, and yes, cellphones are not allowed to enter. The artificial scarcity that marks prison life creates a black market and where there is such a market, fights for control become dangerous, feed the power of gangs, and necessitate measures such as isolation to control them. This
requires a culture of integrity, sufficient training, appropriate supervision, and the will to control the introduction of contraband.

Finally, prisons and jails must be appropriately staffed, equipped, and designed to perform the tasks we are asking of them in the 21st century. We can no longer pretend that prisoners can be confined in open dormitories and double celled without proper staffing, that the presence of the mentally ill in prison
and jail is not destabilizing, and that
false economies don't have dire consequences.

The cost of incarceration is high; the best solution is that there be less of it. n

*End Notes*

1. Bernard Harcourt, "The Mentally Ill Behind Bars," The New York Times, January 15, 2007. Available at http://www.nytimes.com/2007/01/15/opinion/15 harcourt.html

**MH025 - 0003**

2. Doris James & Lauren Glaze (Sept. 2006). Mental Health Problems of Prison and Jail Inmates, Washington, D.C.: Bureau of Justice Statistics, U.S. Department of Justice.

3. "Alternative to Jail Programs for Juveniles Reduce City Costs," New York: New York City Independent Budget Office, July 11, 2006.

*Martin F. Horn is Distinguished Lecturer, John Jay College of Criminal Justice, former Secretary of Correction, State of Pennsylvania and former Commissioner, New York City Department of Correction.

---

**To order, use the orderform or contact:**
Civic Research Institute • P.O. Box 585, Kingston, NJ 08528
Tel: 609-683-4450 • Fax: 609-683-7291
Email: order@civicresearchinstitute.com

---

©Civic Research Institute
Privacy Statement

UNIVERSITY of NOTRE DAME                    OFFICE of PUBLIC AFFAIRS and COMMUNICATIONS

## Notre Dame News

Search

FOR THE MEDIA     CONTACT

Home     Latest News     Our Experts     ND in the News     Subscribe     About Us

Home › News › Martin Horn, director of New York State Sentencing Commission, to lecture on prison reform and human dignity

# Martin Horn, director of New York State Sentencing Commission, to lecture on prison reform and human dignity

by Michael O. Garvey

September 29, 2014

Martin F. Horn, executive director of the New York State Sentencing Commission and Distinguished Lecturer in Corrections at the John Jay College of City University of New York, will give a lecture titled "Prison Reform: Problematic Necessity" at 7:30 p.m. Oct. 8 (Wednesday) in the University of Notre Dame's McKenna Hall Auditorium.



*Martin F. Horn*

Horn's lecture, sponsored by Notre Dame's Institute for Church Life (ICL) as the 2014 Human Dignity Lecture, will survey the history of prison reform efforts and argue that because imprisonment runs counter to human nature, prisons always have been and always will be flawed institutions. While acknowledging the impossibility of perfection, Horn also will suggest a reasonable path for prison reform.

From 2002 to 2009, Horn served as commissioner both of the New York City Department of Probation and the New York City Department of Correction, appointed to both positions by then New York Mayor Michael Bloomberg. During his tenure, jail violence, suicides and recidivism rates for adults on probation were all greatly reduced.

An initiative of the ICL's Human Dignity Project, the annual Human Dignity lectures are intended to make the idea of human dignity accessible to people of all faiths or no faith, and to exhort students, faculty and all others in the Notre Dame community and beyond to recognize their own human dignity and respect that of others.

***Contact:*** *Jessica Keating, 574-631-9781, Jessica.F.Keating.34@nd.edu*

POSTED IN

FAITH

### RELATED

Holocaust historian speaks on the value of mutual assistance and maintaining human dignity in 13th annual Rev. Bernie Clark, C.S.C., Lecture

Ukrainian human rights activist, Gulag survivor to lecture at 2021 Nanovic Forum

Notre Dame Stories: Remembering 9/11

Notre Dame to commemorate 20th anniversary of Sept. 11 terrorist attacks

Catholic Diocese of Cleveland and Notre Dame ACE Academies to partner in two schools

Copyright © 2021 University of Notre Dame
Notre Dame News   Notre Dame, IN 46556 USA
Accessibility Information

UNIVERSITY OF NOTRE DAME

MH030 - 0001