# EXHIBIT 1



No. 3:16-CV-489-CWR-RHWR

UNITED STATES OF AMERICA,

*Plaintiff,*

*v.*

HINDS COUNTY, ET AL.,

*Defendants.*

————————————

ORDER

————————————

Before CARLTON W. REEVES, *District Judge*.

After nearly a decade of investigation and litigation regarding conditions at Hinds County's Raymond Detention Center (RDC), *see* Docket No. 3-4 (2014 Grand Jury Report), the factual and procedural history of this case is well-known. For today's purposes, a brief summary of the present situation will suffice.

In 2016, the United States Department of Justice brought this action to end unconstitutional conditions of confinement at

RDC and two other facilities that comprise the Hinds County jail system. The parties entered into a Consent Decree—and later, a Stipulated Order—to correct the problems.

The County managed to turn the tide at the Work Center. Through its efforts, the County transformed the Work Center into "a functional jail for the citizens of Hinds County."[1] Docket No. 100 at 8 (citing the Fourteenth Monitoring Report at 29).

The story was not the same at RDC. Despite promises to comply with this agreement, the County continually failed to abide by the Consent Decree's provisions. Conditions there remained unchanged. As a result, in November 2021 the Court issued an Order to Show Cause directing the County to "explain why it should not be held in civil contempt and why a receivership should not be created to operate RDC." *Id.* at 28.

The County responded with more promises. It vowed to correct the deficiencies at RDC if only the Court would extend the compliance deadline to July 1, 2022. *See* Docket No. 105 at 5 ("The County thus respectfully requests this Court give them until July 1, 2022 to prove they can make even more significant, positive change at RDC before the Court decides whether to take the drastic, extraordinary steps it is considering taking."). Quoting Robert Frost, the County declared "we 'have promises to keep and miles to go before we sleep.'" *Id.* at 4. Rather than work to remedy the situation, though, the County moved to terminate or modify the Consent Decree under the Prison Litigation Reform Act (PLRA). Docket No. 111.

---

[1] The third facility, the downtown jail, closed in 2020.

On February 4, 2022, disturbed by the record number of assaults, fires, and deaths, including murders, suicides, and overdoses, this Court issued its First Order of Contempt. Docket No. 126. The Order identified "more than two dozen provisions [of the Consent Decree] where the County is simply non-compliant with a Court Order." *Id.* at 20.

On February 14, 2022, the parties commenced a two-week trial regarding the appropriate remedy for the finding of contempt against the County, and to address the County's PLRA motion. The United States urged for appointment of a receiver, arguing that "[c]ontinuing remedial efforts short of receivership will only lead to further confrontation, delay, and serious harm to the people confined to the Jail." Docket No. 138 at 89. Taking the opposite position, the County contended that the Consent Decree should be "terminated and dissolved in its entirety." Docket No. 140 at 29. The United States, the County submitted, "failed to prove either that the County failed to reasonably respond to any substantial risk of serious harm or that the prospective relief in the Consent Decree meets the PLRA's . . . requirements." *Id.* at 28-29. There was no need for further oversight or supervision, the County claimed.

After the February 2022 proceedings, the Court again found the County in contempt. Docket No. 165. The Second Order of Contempt centered on the County's decision to house detainees in A-Pod, in violation of the Stipulated Order. *See* Docket No. 165. This, despite Sheriff Tyree Jones admitting that the unit was unsafe. *See id.* at 5. The Order emphasized that "[i]mposition of 'an appropriate sanction for that contempt' is again reserved pending the PLRA termination

3

motion.'" *Id.* at 18 (citing *Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 398 (5th Cir. 1987) (collecting cases)).

The County has asked the Court to reconsider that Order.[2] Docket No. 171. The United States opposes reconsideration.

Next came this Court's Order on the PLRA motion. In April, the County's motion to modify or terminate was substantially granted. The Order revised the Consent Decree, excising those provisions that exceeded the constitutional minimum. *See* Docket No. 169 ("The New Injunction"). The New Injunction removed the Work Center from the scope of remedial relief and dramatically scaled back the provisions applicable to RDC.[3]

Having given the County until July 1, 2022 to purge itself of contempt, per the County's request, the Court held a final mitigation hearing on July 19, 2022. The undersigned invited the County to argue its motion for reconsideration and welcomed any evidence that would ameliorate its record of non-compliance. After the better half of a day, the parties rested.

After ample time and opportunity, regretfully, it is clear that the County is incapable, or unwilling, to handle its affairs. The County's motion for reconsideration is denied. Additional intervention is required. It is time to appoint a receiver.

## I. Legal Standard

"There can be no doubt that the paramount duty of the federal judiciary is to uphold the law. That is why, when a state fails

---

[2] The County has not sought reconsideration of the First Order of Contempt.

[3] Both parties have expressed their disagreement with aspects of the New Injunction by appealing the order.

to comply with the Constitution, the federal courts are compelled to enforce it." *Newman v. State of Ala.*, 466 F. Supp. 628, 635 (M.D. Ala. 1979).

The Fifth Circuit has recognized the availability of receiverships "in the context of ensuring a governmental entity's compliance with court orders." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 306 (5th Cir. 2012) (internal citations omitted). "There can be little question . . . that receiverships are recognized equitable tools available to the courts to remedy otherwise uncorrectable violations of the Constitution or laws." *Plata v. Schwarzenegger*, 603 F.3d 1088, 1093-94 (9th Cir. 2010).

When determining whether to appoint a federal receiver to manage a state facility, a court considers the following factors:

> (1) Whether there is a grave and immediate threat or actuality of harm . . . ;
>
> (2) Whether the use of less extreme measures of remediation have been exhausted or prove futile;
>
> (3) Whether continued insistence [upon] compliance with the Court's orders would lead only to confrontation and delay;
>
> (4) Whether there is a lack of leadership to turn the tide within a reasonable period of time;
>
> (5) Whether there is bad faith;
>
> (6) Whether resources are being wasted; and
>
> (7) Whether a receiver is likely to provide a relatively quick and efficient remedy.

5

*Plata v. Schwarzenegger* ("*Plata I*"), No. C01-1351 TEH, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005) (collecting cases), *aff'd*, *Brown v. Plata*, 563 U.S. 493 (2011).

The Fifth Circuit has identified similar factors in the context of "appoint[ing] a receiver to take possession of the judgment debtor's property for preservation." *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241 (5th Cir. 1997). Factors such as "'a valid claim by the party seeking the appointment;'" "'imminent danger'" to the property at issue; "'lack of less drastic equitable remedy;'" and "'likelihood that appointing the receiver will do more harm than good'" parallel those used in the jail receivership analysis. *Id.* at 241-42 (quoting *Aviation Supply Corp. v. R.S.V.I. Aerospace, Inc.*, 999 F.2d 314, 316-17 (8th Cir. 1993)). Jail receiverships therefore hew to the recognized statutory and equitable bounds of a district court's authority.

"The most significant factor in the propriety of appointing a receiver is whether any other remedy is likely to be successful." *Dixon v. Berry*, 967 F. Supp. 535, 550 (D.C.C. 1997) (internal citation omitted).

While a court will consider whether the defendants acted in bad faith, "the Court need not ascribe ill will to defendants as a predicate to appointing a Receiver." *Plata I*, 2005 WL 2932253 at *30.

The PLRA does not prohibit or otherwise foreclose appointment of a receiver. *Plata*, 563 U.S. at 526. Critically, "[t]he PLRA should not be interpreted to place undue restrictions on the authority of federal courts to fashion practical remedies when confronted with complex and intractable constitutional violations." *Id.*

6

## II. Discussion

Below, the Court considers the *Plata* factors for appointment of a receiver. Nearly all of the factors weigh in favor of instituting a receivership.

### A. Risk of Harm

First up is whether RDC presents "grave and immediate threat or actuality of harm" to detainees. *Plata I*, 2005 WL 2932253 at \*23. The record indicates that it does. As discussed extensively in the November 2021 Show Cause Order and April 2022 Order instituting the New Injunction, conditions at RDC subject detainees to unconstitutional risk of harm, including death, rampant physical and sexual assaults, and neglect of the seriously mentally ill. *See* Docket Nos. 100 at 10-13; 168 at 43-56. Indeed, the record overwhelmingly indicates that RDC is "an institution 'where terror reigns.'" *Alberti v. Klevenhagen*, 790 F.2d 1220, 1226 (5th Cir. 1986) (citing *Jones v. Diamond*, 636 F.2d 1364, 1373 (5th Cir. 1981)).

Persistent shortcomings in staffing and supervision embolden gangs and encourage the prevalent circulation of contraband, including narcotics and weapons, within RDC. Jail staff continue to receive inadequate training regarding use of force, such as the use of tasers.

Current staffing levels are particularly egregious. "The lack of personnel has routinely been noted as the most significant problem facing the Jail System." Docket No. 167 at 2.[4] Today,

---

[4] The periodic Monitoring Reports are replete with urgent references to the County's failure to ensure adequate staffing. *See* Docket Nos. 12-1 at 2 ("The overarching problem facing the Hinds County Jail System is the inability to hire and retain enough qualified personnel (deputies) to staff

staffing is at an all-time low. As recounted by Monitor Eliza-
beth Simpson during the July 19, 2022 mitigation hearing, the
County currently employs 175 staff for the jail system, only
108 of whom work at RDC. Citing a staffing analysis, she re-
ported the jail system requires 248 people to function. More-
over, while staffing has steadily decreased, the number of de-
tainees has increased from a low of around 500 during spring
of 2021 to current levels of around 700. The staffing situation
is, candidly, deeply alarming.

---

required positions."); 16 at 2 ("Lack of staff continues to be the most criti-
cal issue facing the Hinds County Jail System."); 22 at 2 ("[T]he lack of staff
continues to be the most significant problem facing the Detention Services
Division."); 23 at 14 ("The current staffing is inadequate to safely operate
the jail."); 24 at 17 ("At the RDC lack of staff is still a critical issue."); 27 at
2 ("[T]he Detention Services Division (DSD) has made no appreciable pro-
gress in three critical areas: staffing, . . . ."); 33 at 2 ("Because of the staff
shortage, . . . the inmates, rather than the officers, are in charge of the fa-
cility."); 46 at 2 ("The lack of staff is still the most critical problem facing
the DSD."); 67 at 3 ("When one considers the fact that the staffing study
that was conducted in 2017[] called for over 400 personnel, these figures
are particularly disturbing."); 75 at 30 ("The lack of staff has consistently
been the greatest problem facing the Hinds County Jail System."); 77 at 29
("Little has changed since the last Monitoring Report."); 83 at 30 ("The lack
of staff to fill required posts has consistently been the single greatest short-
fall of the HCSO and County since the beginning of the monitoring pro-
cess in 2016."); 94 at 3 ("A review of previous Monitoring Reports points
to one commonality: an ongoing shortage of staff"); 101 at 2 ("As always,
the lack of personnel is the single greatest problem facing the Jail Sys-
tem.").

The below chart highlights the gap between the staff needed and the staff in place over the course of the monitoring reports.



Two takeaways are particularly salient. First, the County has never achieved adequate staffing. It came closest in spring of 2021. Even at that time, though, "RDC still experience[d] . . . a 40%" rate of unfilled positions. Docket No. 83 at 30.

Second, since the release of the Thirteenth Monitoring Report, the number of staff members has steadily decreased. In fact, the current staffing levels are the lowest they have ever been.

At the recent mitigation hearing, David Parrish of the Monitor's team and Sheriff Jones testified that the County had implemented some changes to increase staffing numbers. For example, the County testified that it moved to direct deposit and bi-weekly pay. Sheriff Jones has also proposed a retention rewards program. The issue is that it has taken well over six years to implement these changes, and so far, none of them have borne fruit. And as Hinds County Administrator Kenny Wayne Jones testified during the mitigation hearing, the

projected opening of a new Misdemeanor Jail next month will likely exacerbate low staffing numbers at RDC.

The staffing crisis affects nearly every facet of operations at RDC. One of those is the treatment of detainees with serious mental illness. As recounted by Ms. Simpson at the July 19 hearing, at present approximately 250 detainees require mental health services, and over 200 suffer from serious mental illness.

The Monitoring Team has long worked with the County to establish a dedicated mental health unit to ensure the constitutional treatment of detainees with mental illness. The County has abandoned those plans. Sometimes the County even abandons detainees. Indeed, in reviewing records from surveillance of suicide-watch areas, Mr. Parrish testified that several had hours-long gaps. RDC staff, Mr. Parrish testified, are supposed to place detainees in suicide-watch areas under constant watch. These gaps in logged surveillance are therefore unacceptable.

Low staffing also heightens the rate and severity of physical violence at RDC. Deficiencies in supervision and staffing lead to a stunning array of assaults, as well as deaths. Seven individuals died last year while detained at RDC. Low staffing compounds these issues by forcing workers to hold multiple posts and skip scheduled surveillance rounds. It also leads to perilous situations, such as one guard manning the control center for an entire housing pod on his own,[5] and guards

---

[5] RDC has three housing areas, A-Pod, B-Pod, and C-Pod. Each Pod has four units, and each unit holds about 64 detainees, for a total of up to 256 detainees on each Pod. *See* Tr. vol. 5 at 83; *see also* Tr. vol. 2 at 410. Each Pod also has one control room for computer surveillance.

stating that they are afraid to work and will not report to RDC if assigned to certain units or pods.

Inmates control A-Pod. Docket No. 168 at 79 (quoting Tr. vol. 1 at 96)). Failure to maintain this part of the facility enables detainees to "access the roof," such that "detainees routinely escape . . . only to return with contraband." Docket No. 165 at 17.[6] Gang committees, not guards, run A-Pod. Lack of a sprinkler system means that A-Pod is at an increased risk of burning down. The continued prevalence of trash dumpster cells, a term of art that refers to cells used as "trash receptacles," serve "as a breeding ground for vermin." *Id.* at 14 (internal quotation marks and citation omitted). These inadequacies raise serious health and safety concerns.

Many of the assaults at RDC occur in A-Pod. As recounted in the Second Contempt Order, staff's failure to address the deleterious conditions in A-Pod contributed to a detainee getting assaulted three times—twice, stabbed—within the housing unit. *See id.* at 9-10. Each of the stabbings required medical transport. Yet, staff continued to house him in A-Pod. It is challenging to conceive of a practice more deliberately indifferent to the needs of a detainee than this. Unfortunately, the record indicates that violence is the norm, not the exception, at RDC.[7]

"Detainees 'depend on the jail systems for their very lives.'" Docket No. 168 at 54 (citing PX-20 at 8). For too many years,

---

[6] As noted in the Second Order of Contempt, "not all escapees return," and of those who escape, not all are recaptured. Docket No. 165 at 17.

[7] The already cash-strapped County has had to pay millions of dollars in settling lawsuits arising from these conditions. *See* Docket No. 168 at 6 n.2 (listing the lawsuits against the County arising out of RDC's conditions).

and for too many detainees, this dependency on RDC has proved deadly.

Evidence presented during the February 2022 proceedings demonstrated that the risk of harm to detainees—and staff—at RDC remains high. *See* Docket No. 168 at 40-75, 146. Recent incident reports confirm the danger. Amongst other alarming events, these reports specifically indicate:

- Detainees summoning guards to remove other detainees from A-Pod, stating "'if you don[']t get them out of here it would be blood shed;'"
- Three detainees in A-Pod surrounding another detainee with knives to demand his food and belongings;
- Excessive contraband, including: cellphones, pills, tobacco, knives, screw drivers, lighters, 67 shanks, and other items;[8]
- Numerous assaults requiring medical treatment of the victims, both on-site and at an outside hospital;
- A March 2022 incident during which officers from Rankin County fired a beanbag shotgun at seven detainees, including one who was lying down;[9] and
- Detainees refusing placement in A-Pod due to threats of violence by other detainees.

---

[8] For a photograph of the contraband retrieved during the March 18, 2022 shakedown, *see* PX-167. During the July 19 hearing, Mr. Parrish testified that based on the documents he reviewed, prior to the March 2022 shakedown, C-Pod had not undergone a shakedown in three to five months.

[9] For contemporaneous accounts of this ill-fated use-of-force incident, *see* PX-163 through PX-166. When asked about the officers' conduct during the hearing, Mr. Parrish responded: "I've never seen anything like this."

Testimony and evidence offered during the July 19, 2022 mitigation hearing did not ameliorate these concerns. When asked about staffing levels in A-Pod, Mr. Parrish testified that it is getting worse. During an on-site visit in April 2022, for example, Mr. Parrish observed an officer leave the master control room of RDC unattended. Located in the booking area, the master control room contains video monitors that surveil the entire facility. Thus, when the sole officer on duty left that control room, he jeopardized the whole jail. When asked why he left his post, the officer said that he was tired of having to worry about opening and closing doors.

To borrow from the Supreme Court of Appeals of West Virginia, "the conditions have not improved, nor has the situation become any less unconstitutional" since the County was last directed "to remedy the problems." *Crain v. Bordenkircher*, 376 S.E.2d 140, 142 (W.Va. 1988). Such a situation, the *Crain* Court found, warranted appointment of a receiver.[10] So too here. Detainees are at documented risk of "grave and immediate threat or actuality of harm." *Plata I*, 2005 WL 2932253 at *23. Thus, the first factor counsels in favor of a receivership.

---

[10] That receiver oversaw "the construction of a new penitentiary" and the closure of the facility giving rise to the lawsuit. *See Crain*, 420 S.E. 2d at 733. Here, the undersigned will not distract from the County's plans to construct a new facility. Appointment of a receiver in the present case is instead focused on ensuring constitutional conditions at RDC. *Crain*'s analysis proves useful, however, in demonstrating the propriety of a receiver in circumstances such as these, where a facility continually displays its aversion to managing its own affairs.

## B. Failure of Less Intrusive Means

Less intrusive means remedied conditions at the Work Center. Not so at RDC. There, lesser measures have failed to ensure constitutional conditions of confinement.

The Consent Decree and the Stipulated Order both contained mechanisms intended to aid the County in reaching a minimal level of constitutional compliance. Under the Consent Decree, for example, the County has received extensive technical assistance from the Monitor and her team. The 2020 Stipulated Order, meanwhile, represented "the most comprehensive remedial plan for Hinds County to become compliant that the Court ha[d] seen from the parties. *Id.* at 11. It was necessary because "the County ha[d] reached sustained compliance . . . in only one of the 92 requirements of the Consent Decree." Docket No. 60 at 7. The Stipulated Order was thought to bolster compliance with the Constitution.[11] In retrospect, it did not.

Instead, then as now, conditions at RDC are severely deficient. Cell doors still do not lock. Docket No. 168 at 6 n.2, 7, and 84. There is no lighting in many cells in A-Pod, which makes life miserable for the detainees who live there and

---

[11] Indeed, during the February 2022 evidentiary hearing, Ms. Simpson testified to providing the County with a "road map . . . to try to give step by step how to move towards compliance, and then the stipulated order itself, of course, was intended to provide—to break the steps up into more manageable steps to achieve compliance." Tr. vol. 10 at 1179. Unfortunately, when asked how the County fared following this road map, Ms. Simpson replied "not well." *Id.* She emphasized that the County's motivation to implement changes "always seemed to sort of dissipate." *Id.* Absent a receiver, Ms. Simpson testified, "I think we will not see the kind of improvements that we need to see." *Id.*

14

prevents guards from adequately surveilling detainees. *Id.* at 84. Many cameras do not function. *Id.* at 92 ("At last count, 56 cameras were not working, 14 were missing and 10 needed adjusting.'") (citing Fifteenth Monitoring Report at 72). Even when the cameras work, guards tasked with monitoring them sometimes turn to "sleeping instead of manning the cameras in the control room." *Id.* at 80 (citing Tr. vol. 11 at 1977). Staff fail to conduct mandatory welfare checks. *Id.* Such issues continue despite the original Consent Decree, Stipulated Order, and New Injunction, and we are past the July 1 deadline the County itself asked for to reach compliance.

The Court has considered other sanctions, which are both less and more intrusive than imposing a receivership.

Consider, for instance, financial sanctions that have been imposed in other jail conditions cases. *See Crain*, 376 S.E.2d at 142 (ordering the State to pay for construction of a new jail if it failed to purge itself of contempt, and recognizing this remedy as "clearly a lesser evil" than the "release [of prisoners] from the penitentiary because of the unconstitutional conditions of confinement"); *see also Morales Feliciano v. Hernandez Colon*, CIV. No. 79-4 (PG), 1990 WL 83321 at *10 (D.Puerto Rico 1990) (putting the defendants on notice of the possibility of imposing "compensatory fines for the benefit of members of the plaintiff class" or "coercive fines at a level calculated to bring about speedy compliance" with the constitutional standards of confinement). Courts also regularly require named defendants to pay a monetary fine upon finding that they failed to comply with judicial orders. *See Campbell v. McGruder*, No. 1462-71, 1987 WL 8724 at *1, 3 (D.D.C. Mar. 11, 1987).

Despite the prominence of monetary sanctions in the case law, the record suggests that financial penalties are inappropriate in this case. The County has reportedly spent millions of dollars trying to fix RDC, but to no avail. *See* Docket No. 168 at 6, n.2; 16. The purpose of sanctions in this case is to ameliorate the unconstitutional conditions at RDC. Given the ineffectiveness of the County's earlier expenditures to remedy the deficiencies at RDC, financial penalties are insufficient to cure the unlawful conditions at RDC. This type of lesser sanction is therefore inadequate.

Another option is to order the release of detainees into the public or close RDC outright. For instance, confronted with sweeping unconstitutional conditions in Alabama's prison system, Judges Frank M. Johnson, Jr. and W. Brevard Hand "enjoin[ed] state officials from accepting new prisoners into the system." Jack Bass, *Taming the Storm* 337 (1993). The run of cases indicates that these are more extreme remedies than a receivership. *See Plata I*, 2005 WL 2932253 at *28; *see also Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 951 (N.D. Ca. 2009) (ordering the release of prisoners upon finding "that the constitutional deficiencies in the California prison system's medical and mental health system cannot be resolved in the absence of a prisoner release order"); *Wayne Cnty Jail Inmates v. Wayne Cnty Chief Exec. Off.*, 444 N.W.2d 634, 645 (Mich. Ct. App. 1989) (referring to "the closing of the jail" as "an even more drastic remedy" than instituting a receivership). By extension, ordering the County to close A-Pod is also a more radical remedy than a receivership.

A third option is to require members of the Board and the Sheriff to spend a week or more[12] detained in RDC. Experiencing life at the jail firsthand would surely motivate the County's leaders to correct unconstitutional conditions therein. But this also seems an extreme remedy—at least, at present.

The troubling record in this case, then, demonstrates that a receivership is a remedy proportionate to the constitutional violations and gravity of harm faced by detainees at RDC.[13]

### C. Risk of Confrontation and Delay

Onto the third set of factors, the risk of confrontation and delay.

The story of RDC is a tale of perennial personnel power-struggles and institutional lag. From jail administrators to the Monitor and her team, the record reveals that the County continually obstructs and frustrates the initiative of would-be contributors. *See* Tr. vol. 5 at 794-95. For example, inactivity on the part of the County led the Monitor to "fund a policy development consultant under her budget to do work that

---

[12] A week may not be an adequate dose since "[t]he length of stay at Hinds County Jail continues to be approximately double the national average," *see* Sixteenth Monitoring Report at 6, which the Bureau of Justice Statisticians most recently calculated as approximately 28 days in custody, *see* Todd D. Minton & Zhen Zeng, U.S. Dep't of Just., Bureau of Just. Stat., *Jail Inmates in 2020—Statistical Tables* 4 (2021).

[13] While the Court has considered other sanctions, it must be noted that the County has never suggested any other alternative. It has simply argued against a receivership. It continues to plead for more time, but we have been there and done that. There is no sense in granting the County more time to do nothing.

Defendants should have paid for directly and completed on their own." Docket No. 138 at 90. Ms. Simpson also "fund[ed] a human resources consultant under her budget to do work that Defendants should have paid for directly and completed on their own." *Id.* Forcing the Monitor to shoulder the burden of financing and spearheading essential initiatives contributes to further delays in work and staffing shortages.

The County's culture of inertia means that even seemingly simple tasks, such as the procurement of tables and chairs for detainees to use for meals, remain unaccomplished. *See* Tr. vol. 2 at 307.[14] More egregiously, A-Pod remains incredibly dangerous. Docket No. 165. Similarly, the placement of detainees in reconstructed units of B-Pod not yet certified for occupancy, coupled with lack of direct supervision, has caused conditions there to deteriorate. *See* Docket No. 167 at 3, 51, 73. Three witnesses at the mitigation hearing testified that conditions in B-Pod are now almost as dire as in A-Pod.

The County's brazenness extends to fulfillment of its obligations to the Monitor. Ms. Simpson testified at the July 19 mitigation hearing that, in contravention of earlier practices, the County had yet to turn over documents that were necessary to provide effective monitoring required for the most recent

---

[14] At the July 19, 2022 hearing, the Sheriff testified that tables have been purchased, installed, and in use. This is not the first time someone from the County has made such a representation. As recounted in an earlier Order, "[w]hen the Court addressed this issue in 2019, the County assured the Court that it had indeed provided detainees with tables and chairs." Docket No. 165 at 16. That was false. As of the February 2022 Evidentiary Hearing, there were still no tables or chairs. *Id.* at 17. This means that "detainees must eat on the floor or in their dark cells—the same cells with leaky or clogged toilets." *Id.*

site visit. RDC's unwillingness to provide these documents, Ms. Simpson stated, prohibited the Monitor and her team from conducting productive interviews and evaluating jail conditions.

The County's pattern of obstinance indicates that lesser measures will not bring RDC into compliance with the Constitution. Absent a receivership, the risk of confrontation and delay remains high. As was true for the *Plata* Court, here, "[i]t is resoundingly clear to the Court that continued insistence on defendants' compliance with Court orders would lead to nothing but further delay, as well as further needless death and morbidity." *Plata I*, 2005 WL 2932253 at *29. This factor therefore also weighs in favor of appointment of a receiver.

### D. Wasted Resources

The record in this case indicates "that defendants have engaged in a huge waste of taxpayer's resources." *Id.* at *31.

At the February 2022 hearing, Ms. Simpson testified that the County wastes time and resources, as "there seems to be a lot of stopping and starting and going in one direction and then . . . going in a different direction." *See* Tr. vol. 7 at 1189-90. Mr. Parrish likewise testified that failure to implement direct-supervision results in detainees "break[ing] locks, doors, and caus[ing] things to malfunction" even after the County repairs portions of the physical plant. Tr. vol. 2 at 213. When asked whether elements of the physical plant that he repairs "get broken at a pretty high rate or pretty frequently," Gary Chamblee said that they did. Tr. vol. 8 at 1506. Mr. Parrish described the cycle as "a never-ending process" where "things get repaired, and then there's more damage and they have to be repaired again." Tr. vol. 11 at 2081. Even Sheriff

19

Jones admitted that the County "waste[s] resources training people who don't stay on." Tr. vol. 10 at 1888.

This includes retaining the acting jail administrator, Frank Shaw. RDC hired Mr. Shaw for a six-month term beginning on February 7, 2022. In exchange for his part-time services, Mr. Shaw receives $12,000 a month, his expenses, a housing allowance, and a $60.00 per diem for each day he spends on-site at RDC or otherwise working for the County. It is unclear how many days, if any, Mr. Shaw has spent at RDC. No matter. By the close of his contract, Mr. Shaw will have collected at least $72,000 from Hinds County's taxpayers.

The County continues to allude to construction of the new jail as an opportunity for a fresh start. But, as Mr. Parrish testified during the July 19 proceeding, if the County continues to provide inadequate supervision and staffing, detainees will just dismantle that facility, too.[15] And the opening of a new jail several years in the future does not establish constitutional conditions for those detained at RDC now. Moreover, the County's responsibility to provide constitutional detention facilities for its detainees is not dissipated, suspended, or placed in abeyance while the new facility is being constructed.

Despite the expenditure of millions of dollars by the County, the evidence distinguishes RDC as an institution "that far too often neglects, mistreats, and at times literally kills those it is intended to serve." *Plata I*, 2005 WL 2932253 at *31. Accordingly, absent appointment of a receiver, RDC will continue to leech from the County's limited resources, resulting in "a massive waste of money and, more importantly, life." *Id.* A

---

[15] In fact, Mr. Parrish testified that the most recent fixes at RDC have already been damaged—the result of inadequate staffing.

receiver can prevent further misuse of financial resources and protect human lives.

### E. Leadership

Who is responsible for remedying the constitutional violations at RDC?

The parties have advanced different theories of responsibility. When pressed, Sheriff Jones admitted that the buck stops with him. But he went on to blame the facility's shortfalls on COVID, the Monitor, and previous administrator Kathryn Bryan, who was hired with much fanfare. Supervisor Calhoun blamed his predecessors on the Board of Supervisors, even his wife. The County also pointed its finger at its prior attorney for recommending the Consent Decree. [16]

Despite naming different individuals and entities, the defendants' assessments had one thing in common. When asked who was responsible, each person deflected, saying essentially, "not me." *See* Tr. vols. 9 at 1604; 10 at 1963; *see also* Docket No. 168 at 17.

The Hinds County Board of Supervisors is dysfunctional. The Board is presently distracted by a struggle regarding who is entitled to be Board President. During the Board's meetings, the would-be President, angry at being passed over, speaks over all others in the Boardroom and prevents the Board from conducting business. *See, e.g.*, Anthony Warren, *'Clown show':
Archie disrupts vote on his removal as vice president, president-*

---

[16] In the face of DOJ's voluminous and damning findings, counseling the County not to enter into the Consent Decree would have been ill-advised. *See* Docket No. 3-3 at 2 (finding by DOJ dated May 21, 2015 that "Constitutional deficiencies at the Jail violate prisoners' Eighth and Fourteenth Amendment rights," and detailing those violations).

21

*elect*, WLBT (July 28, 2021); WJTV, *Hinds County Supervisor David Archie arrested during Thursday's meeting*, YouTube (Sept. 30, 2021).

On January 12, 2022, the situation became so hostile that Sheriff Jones issued a public letter advising the Board of Supervisors that "[a]ny member or citizen interfering with the ability of the President of the Board to run the meeting in an appropriate manner will be removed, detained, and possible [sic] arrested." *See* Anthony Warren and C.J. LeMaster, *Hinds Co. Sheriff to Supervisors: Disrupt a meeting, face arrest*, WLBT (Jan. 13, 2022). A local journalists observed that "little progress has been made by the supervisors over the past five years," and therefore, "with the terrible conditions and mismanagement at the Raymond Detention, this could be that one situation where federal oversight is warranted and extremely necessary." Ted Fortenberry, *Consider This: Hinds County Jail*, WLBT (Dec. 2, 2021).

This Court agrees. The County and Sheriff cannot continue this exercise in accountability hot-potato, one which has proved deadly to detainees. *See* Tr. vol. 1 at 167; Docket No. 168 at 48-51. As with the State officials in *Plata*, the County officials here:

> have the ultimate responsibility to hire, train, supervise, and audit their own staff, and to provide sufficient resources, technology, and support for those staff members to ensure that instances of negligent care and malpractice are kept to a minimum and that the system operates at least at the level of constitutionally adequate care.

*Plata I*, 2005 WL 2932253 at *29.

Unfortunately, the record demonstrates that the County is either unable or unwilling to exhibit the leadership "necessary to protect the lives of [detainees]." *Id.* Put another way, the County is unwilling to manage its own affairs. This factor thus weighs in favor of a receivership.

### F. Bad Faith

Again, a finding of bad faith is not required to institute a receivership. *Id.* at *30. And, as observed by the *Plata* Court, "[t]he question of motive is complicated." *Id.*

Guided by the *Plata* Court's approach, this Court also declines to make a finding of bad faith. Whatever the County's motives, despite years of supervision and support by the Monitor and her team, various jail administrators, and other personnel, conditions at RDC fall below the constitutional minimum. This is the key factor.

### G. Likelihood of a Quick and Efficient Remedy

When assessing the speed and efficiency of a remedy, "the speed of reform must be judged relative to the scale of the project." *Id.* at *31. The *Plata* court underscored the "enormous" scope of overhauling California's state prison system. *Id.* Ensuring constitutional compliance at RDC constitutes a comparatively modest project.[17]

---

[17] The opening of the new jail, projected for completion in June 2025, *see* Docket No. 168 at 21, represents a natural projected end-date to the receivership. This constrains the potential scope of the receivership, thereby enabling the Receiver to focus his or her efforts on achieving constitutional compliance for the remaining life of RDC. In due time, the Receiver may convince the Court that her oversight is no longer needed.

Nevertheless, it is challenging to gauge the speed at which a receiver can reform RDC. Some of the candidates for the role of receiver supplied by the DOJ provide reason for cautious optimism, but none are on the ground yet.[18] Under the guidance of an experienced and well-qualified receiver, this Court "believes that steady progress . . . is possible." *Id.* at *31. Hence, this factor weighs in favor of a receivership.

### H. The Role of the Court's Monitor

Since 2016, Ms. Simpson and her team have monitored the County's compliance with the Consent Decree, and later, the Stipulated Order. During this time, Ms. Simpson and her colleagues have ably served as the eyes and ears of the Court. The question is whether their services are still necessary.

---

[18] At the Court's invitation, the parties presented four candidates for the role of receiver. DOJ named three qualified potential receivers. The County chose to submit the name of one person, Frank Shaw. It appears that Mr. Shaw has no interest in being the Receiver, as his existing six-month contract with the County terminates on August 1, 2022. More importantly, as expressed in an earlier Order, Mr. Shaw's history indicates that he is wholly unqualified for the role. *See* Docket No. 168 at 20 n.8 (observing that during his tenure at Management & Training Corporation (MTC), a private prison company, "Shaw presided over a series of riots at the Kingsman Complex in Arizona," during which "[s]everal prison units were rendered uninhabitable and required tactical intervention," resulting in the transfer of over 1,200 prisoners to other facilities, the Governor of Arizona's termination of the state's contract with MTC, and the "ratings downgrade" of the local government). An assessment by the Arizona Department of Corrections (ADC) concluded that MTC's mismanagement sparked and inflamed the riots. *Id.* Based on the patterns of destruction, ADC concluded that "the riots were more likely precipitated by inmate dissatisfaction with MTC's operation of the prison than by anger among the inmates themselves." The Court will select one of the three remaining candidates to serve as receiver.

On the one hand, appointment of a receiver may negate the need for a separate monitoring team, conserving resources. On the other hand, the Monitor and her team's intimate familiarity with RDC and expertise in jail administration may aid the Receiver toward a more efficient turnaround. The Receiver can, in his or her discretion, determine whether the Monitor and her team members remain necessary in some capacity to ensure that RDC abides by the Constitution.

After the Court appoints the Receiver, the Monitor and her team should cease their operations as set forth in this Court's prior orders. Specifically, within 30 days of appointment of the Receiver, the Monitor and her team shall submit a final report and accounting. Upon receipt of the final report and accounting, the Court will be prepared to discharge Ms. Simpson as Monitor unless the Receiver determines her services remain necessary. Moving forward, the Receiver may communicate with the Monitor and her team as needed to effectuate a smooth transition.

### III. Conclusion

Nearly six years ago, the County entered into a Consent Decree, and later, a Stipulated Order, with the United States to ameliorate the unconstitutional conditions of confinement in its jail system. Its efforts succeeded at the Work Center. That facility is no longer under federal supervision. At RDC, however, the dire circumstances that drove this settlement persist.

The County refuses to take responsibility. Instead, it offers a litany of excuses. But each of these excuses ultimately boils down to the same argument: conditions at RDC are out of the defendants' hands. The County wishes to abdicate responsibility for ensuring the health and safety of detainees in its

25

custody. The Court is compelled to grant that wish. We can't wait for continued destruction of the facilities. We can't wait for the proliferation of more contraband. We can't wait for more assaults. We can't wait for another death. The time to act is now. There is no other choice, unfortunately.

Upon appointment of a receiver, RDC shall no longer languish in the County's inadequate grip. The Court will appoint a federal receiver to oversee operations at RDC, who shall begin work as soon as possible, but no later than November 1, 2022. The Second Order of Contempt shall remain undisturbed; the County's motion for reconsideration [Docket No. 171] is denied. Today's Order is intended to serve as the final sanction for the Court's two Orders of Contempt.

Within 14 days of this Order, the parties shall submit to the Court proposed orders that outline the proposed powers and duties of the Receiver. In the absence of consensus, the Court will consider the submissions of each party and devise its own list of the Receiver's duties.

**SO ORDERED**, this the 29th day of July, 2022.

s/ CARLTON W. REEVES
*United States District Judge*

26