Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
JONES, SKELTON & HOCHULI P.L.C.
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 263-4552
Fax: (602) 200-7850
jpopolizio@jshfirm.com
jackerman@jshfirm.com

Attorneys for NaphCare, Inc.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Shawn Jensen, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services, Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities,<br><br>Defendants. | No. 2:12-cv-00601-ROS<br><br>**MOTION FOR LEAVE TO FILE BRIEF OF AMICUS CURIAE NAPHCARE, INC.** |

NaphCare, Inc., d/b/a NaphCare Arizona, LLC (hereinafter collectively referred to as "NaphCare") respectfully requests leave from this Court to file an *Amicus Curiae* Brief addressing the Court's forthcoming injunctive relief. NaphCare understands that the Court has made clear that, in conjunction with its expert, it intends to issue narrowly tailored relief that is necessary to correct the constitutional violations it has found. [Doc. 4335 at 179 ("Thus, the Court will employ an expert to assist with crafting an injunction that remedies the constitutional violations—no more and no less.")]. As the Court may be aware, NaphCare only very recently became the contracted medical services provider for the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR"). In this regard, NaphCare is directly impacted by the Court's forthcoming injunctive relief and has essential

11253729.1

information and perspective that will significantly aid the Court in crafting effective injunctive relief for the violations it has found. Thus, NaphCare respectfully seeks an opportunity to provide crucial input on the recent expert report before the Court issues any final injunctive relief.

I. **IDENTITY AND INTEREST OF PROPOSED AMICUS CURIAE.**

While there is no formal rule of civil procedure regarding a non-party seeking leave to file an amicus brief, it is well recognized that federal courts have significant discretion in entertaining such briefing. *See e.g., Miller-Wohl Co. v. Comm'r of Labor & Indus. State of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982); *Miracle v. Hobbs*, 333 F.R.D. 151, 156–57 (D. Ariz. 2019); *Gila River Indian Cmty. v. United States*, Nos. CV10-2017 PHX DKD, CV10-2138 PHX MHB, 2010 WL 4269590, at *4 (D. Ariz. Oct. 28, 2010); *Dible v. City of Chandler*, No. CV-03-00249-PHX-JAT, 2004 WL 7336848, at *1 (D. Ariz. Dec. 23, 2004); *In re Roxford Foods Litig.*, 790 F. Supp. 987, 997 (E.D. Cal. 1991). In this regard, "[d]istrict courts may consider amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved or if the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Macareno v. Thomas*, 378 F. Supp. 3d 933, 940 (W.D. Wash. 2019) (internal citations omitted) (emphasis added).

Here, NaphCare submits that not only is it currently impacted by the injunctive relief already issued by the Court, but given the Court's expert's recommendations, it will be directly impacted by any further injunctive relief ordered by the Court. In this regard, NaphCare has a unique perspective that can aid the Court beyond the existing parties and lawyers in this action. While not a party to this litigation, NaphCare recently contracted to serve as the healthcare services provider for ADCRR; its contractual period began October 1, 2022. In its short tenure in this role, NaphCare and its associated clinicians and support staff have made extraordinary progress improving the healthcare delivery systems, staffing levels, and services in the Arizona prisons. As just one example, in just the first two weeks of its contract, NaphCare has hired more than 1,100 team members – a 22 percent increase from previous staffing levels. NaphCare is committed to doing everything in its power to

2

11253729.1

continually improve healthcare in the Arizona prisons to create a national model for correctional healthcare.

To best implement this vision, NaphCare seeks to provide guidance to this Court in fashioning injunctive relief to address the issues identified in this Court's prior Order and any potential future injunctive relief. [*See Amicus Brief,* attached as **Exhibit 1**]. In this regard, NaphCare has two overarching concerns it seeks to directly present to the Court in its proposed brief as amicus curiae:

1. There is a significant danger of this Court's prospective order failing to include all necessary terms to ensure success. To the extent that this Court fails to include critical needs in its order, given the enormity of the scope and costs of the other terms that are being recommended, there is a danger that this Court could order relief that will steer limited resources toward unhelpful or even harmful undertakings that will have serious opportunity costs and will prevent ADCRR and NaphCare from being able to effectively partner to address the most serious needs of the patient population in the Arizona prison systems.

2. Some of the recommendations presented to this Court are unrealistic and untested. NaphCare seeks to identify and speak directly to these "grave errors" in its proposed Amicus Curiae brief.

Thus, NaphCare respectfully submits that permitting it to file an *Amicus* Brief will address these concerns and provide it an opportunity to have a voice in the critically important task that this Court is undertaking in fashioning effective injunctive relief.

## II.  CONCLUSION.

Based on the foregoing, NaphCare respectfully requests permission to submit its proposed *Amicus Curiae* Brief on the specific issues before the Court regarding its proposed injunctive relief and associated expert report. [*See Amicus Brief,* attached as **Exhibit 1**]. NaphCare also understands that the parties are currently proposing differing alternatives on how they should comment on the current expert report submitted for the Court's review. [*See e.g.,* Doc. 4374]. While the Court has not ruled on these requests, given NaphCare's significant

3

11253729.1

involvement and interest in the implementation of any relief that this Court orders, NaphCare requests permission to provide its input now on this narrow issue before the Court.

DATED this 19th day of December, 2022.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ Joseph J. Popolizio
Joseph J. Popolizio
Justin M. Ackerman
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Attorneys for NaphCare, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of December, 2022, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

/s/Karen Gawel

4

11253729.1

# *EXHIBIT 1*

Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
JONES, SKELTON & HOCHULI P.L.C.
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 263-4552
Fax: (602) 200-7850
jpopolizio@jshfirm.com
jackerman@jshfirm.com

Attorneys for NaphCare, Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. 2:12-cv-00601-ROS <br><br> **BRIEF OF AMICUS CURIAE NAPHCARE, INC.** |

"NaphCare, Inc., d/b/a NaphCare Arizona, LLC (hereinafter collectively referred to as "NaphCare") respectfully submits the following *Amicus Curiae* Brief regarding the Court's contemplated injunctive relief in light of its Order in this action (Doc. 4335).

I.   **RELEVANT BACKGROUND.**

In order to address the ongoing challenges with the inmate healthcare delivery system, the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR") sought a new provider to better meet the inmates' healthcare and mental health needs. ADCRR recently selected NaphCare as its contracted healthcare services provider. NaphCare

11247915.1

assumed control of healthcare operations on October 1, 2022, representing a new beginning for healthcare in Arizona's prisons.

On day one, NaphCare significantly improved the inmate healthcare delivery system by installing its proprietary electronic health record and operating system, TechCare, in all ten Arizona prison complexes. NaphCare's Information Technology team worked for many weeks to integrate disjointed information from the prior vendor's systems into one streamlined and effective electronic health record.  NaphCare's efforts, however, would be futile without a strong team of doctors, nurse practitioners, nurses, mental health professionals, and other medical staff.  For many years, due in part to national shortages of qualified health care professionals, as well as the inherent challenges in recruiting and retaining talented qualified health care professionals who desire to work in the corrections environment, the prior vendor operated short-staffed, typically with staffing levels of under 900 people.  In just the first two months on the job, NaphCare hired 30% more team members than its predecessor, and is proud to report that it currently employs more than 1,175 hard-working men and women working on the Arizona contract.

NaphCare and its associated clinicians are committed to improving the inmates' health outcomes throughout Arizona and to working closely with ADCRR to create a superior prison healthcare model that meets and exceeds industry standards in the delivery of correctional health care.  In order to achieve this objective, NaphCare respectfully directs the Court's attention to critical achievable goals which it submits will ultimately facilitate the proposed injunctive relief in the most efficient and effective manner possible.  While it is clear that the recommended injunctive relief would dramatically increase costs, NaphCare does not address cost issues or concerns as part in its role as *amicus curiae*.

## II. RECOMMENDATIONS REGARDING THE COURT'S CONTEMPLATED INJUNCTIVE RELIEF.

NaphCare understands that Dr. Stern has been appointed as an expert advisor to assist the Court with crafting injunctive relief.  NaphCare supported the nomination of Dr. Stern because it has a long history of working collaboratively with him.  NaphCare recognizes Dr. Stern's commitment and expertise.

2

11247915.1

NaphCare also agrees with many of Dr. Stern's recommendations and stands ready to implement these recommendations. As Dr. Stern noted in his recommendations, NaphCare's TechCare electronic health record and operating system will be a valuable tool for tracking and compliance purposes, and NaphCare is committed to customizing its software systems to facilitate many of the recommendations.  For example, TechCare reports can be enhanced to highlight the continuous quality improvement program that Dr. Stern outlines in his recommendations including blood pressure goals, A1c diabetic goals, breast and cervical cancer screenings, and other quality measures noted in the report.  TechCare can also be modified to link mid-level practitioners and supervisory physicians to allow for supervisory ratios as recommended by Dr. Stern.

However, NaphCare has serious concerns with some recommendations to the Court, which Naphcare sets forth below.

**A.      Recommendations That Constitute "Grave Errors."**

<u>Model of care for medical</u>. The expert report, in part, proposes a new model of care and operations: it suggests all patients be assigned to a medical primary care practitioner; be given a daily opportunity to indicate their need to be seen for a medical appointment; does not require an inmate to indicate the reason for being seen; sets certain parameters on what "reasonable time" means for patient care; and provides certain parameters for how care is to be conducted and by what type of physician.  (Stern Report, Pages 13 – 14).

This proposed model is untested and unproven.  It creates the unnecessary risk that, by allowing inmates to self-select appointments without any triage, the sickest and highest risk inmates may not be seen in a timely manner.  If the Court is not inclined to disregard this recommendation in its entirety, then NaphCare respectfully proposes a limited pilot at one site to test-run Dr. Stern's proposal without jeopardizing the integrity of the entire inmate healthcare delivery system.

<u>Limiting clinical time for supervisors</u>.  The proposed model recommends that "Health care professionals in supervisory positions, other than Facility Medical Directors, may

3

11247915.1

1   not spend more than 15% of their time providing scheduled or unscheduled direct patient
2   care." (Stern Report, Page 3).

3   This recommendation would materially impede NaphCare's ability to deliver
4   healthcare in an efficient and effective manner.  If the Court is inclined to consider this
5   recommendation, then NaphCare respectfully proposes that such injunctive relief be limited
6   to only Facility Health Administrators (FHAs) and Assistant Facility Health Administrators
7   (AFHAs) because it is critical that positions such as Charge Nurses and Directors of Nursing
8   have the flexibility to perform necessary clinical tasks.  The micro-managing of how NaphCare
9   may exercise its discretion, if at all, with regard to the deployment of its clinical staff is
10  imprudent and harmful given the constant fluidity of personnel demands within the prison
11  system.

12  <u>Staffing mandates</u>. The proposed model recommends that certain categories of
13  staff positions are to be filled within 90 days of the Court's order, and that if vacancies exist,
14  that minimum salaries are to be set with 5% raises continuing every 30 days so long as
15  vacancies exist. (Stern Report, Pages 3-4).

16  This recommendation is dangerous and counter-productive to the collective
17  goal of improving the inmate healthcare delivery system.  Micro-managing staffing with
18  draconian mandates creates disincentives for continuous improvement.  If the Court is not
19  inclined to disregard this mandate in its entirety, then NaphCare respectfully proposes that *pro*
20  *re nata*, overtime, agency, and all possible means of filling contract hours be counted toward
21  "full staffing."  Also, the recommended never-ending 5% raises each month so long as staffing
22  levels are not met state-wide at all ten prison complexes will create significant HR/payroll
23  challenges and lead to a compounding escalation of costs over time.  In addition to these
24  ballooning payroll expenses, since staffing deficiencies will trigger staff raises of 5% every
25  month, this mandate could actually incentivize staff to not fill vacant positions in order to
26  continue to receive a 5% raise per month.  This model will also result in disparate
27  wages/salaries for positions that are less easily filled as compared to positions more easily
28  filled.

4

11247915.1

<u>Caseload-based staffing</u>. The proposed model also recommends that ADCRR will maintain staffing based on caseloads for medical and mental health services and providing certain maximum case load sizes. It also requires that all medical physicians be board certified in either Internal Medicine or Family Practice. (Stern Report, Pages 13 and 20).

This recommended mandate will require NaphCare to hire far more staff than it could ever reasonably recruit. It is neither reasonable, nor practically possible, to recruit and retain all of the additional staff needed to meet these requirements, especially in the more rural areas of Arizona. At the very least, NaphCare should have the flexibility to allow physician supervisors to work remotely. Micro-managing NaphCare's staffing discretion away is harmful to the goal of attracting and retaining critical healthcare personnel. In addition, the recommendation to require all medical doctors to be Board Certified in internal medicine or family practice is simply unworkable and should not be included in any injunctive relief. If the Court is not inclined to disregard this recommendation in its entirety, then NaphCare respectfully proposes that any such mandate be extended to include physicians who are certified in a broader range of practice areas, as well as physicians who are Board eligible with experience in long term care, and that NaphCare retain the discretion and flexibility to allow for remote doctor supervision of mid-level providers, which will enable NaphCare to operate consistent with the physician/mid-level provider ratios. In this context, it is important to note that Dr. Stern's recommended mandates far exceed the nationally recognized standards of care established by the National Commission on Correctional Health Care Standards for Health Services in Prisons.

<u>Supervisor Experience Requirements</u>. The proposed model recommends that "all staff hired in clinical supervising positions must have at least 5 years clinical experience." (Stern Report, Page 4). While supervisory experience should be preferred it should not be required, as this will make staffing even harder. NaphCare has capable people in leadership positions who do not meet these experience requirements. A mandate that included experience requirements would require termination and replacement of some employees who are capable and performing well in their leadership roles. This recommendation also

5

imprudently requires certain supervisory experience, which, while it is preferred, should not be required, because it will hobble NaphCare's ongoing efforts to recruit and retain clinical staff. Micro-managing the supervisory staff in this manner is likely to harm, instead of help, the inmate population.

<u>Isolation Welfare Checks</u>. The proposed model indicates that only nurses conduct welfare checks on patients in isolation. (Stern Report, Page 5). This recommendation needs to be revised to define disciplines in addition to "nurses" to handle isolation welfare checks, to include nursing assistants, psychiatric associates, behavioral health technicians, certified nursing assistants and medical assistants.

<u>Suicide Watch "Sitter" Recommendations</u>. The proposed model "encourages" ADCRR to engage trained and supervised Behavioral Health Technicians to substitute for correctional health officers, as the individuals responsible for providing safety observation for an individual or cohort of individuals on suicide watch. (Stern Report, Page 24).

NaphCare believes that suicide or safety watches are or should be primarily a custody function and that such core safety watch responsibilities should not be assigned to NaphCare Behavioral Health Technicians. If NaphCare Behavioral Heath Technicians (BHTs) are required to provide this service, then their duties must be clearly defined and the core safety watch functions must remain with ADCRR security staff. In this event, NaphCare would have to hire significantly more BHTs and increase their compensation according. This would result in an increased cost for delivery of healthcare services that cannot reasonably be calculated at this time where the number of inmates on suicide or safety watches varies daily - not only within the ADCRR system as a whole, but also internally within prison complexes and units. Additionally, those inmates on watch must be monitored around the clock and thus additional shifts of BHTs would be required to perform this function. Because of this, if ordered that BHTs must take primary responsibility for "sitter" duties, allowance should still be made for custody staff to partner with BHTs to perform this function to cover round-the-clock monitoring duties in order to protect the health and safety of inmates on watch. If a

6

11247915.1

BHT is not available to perform "sitter" duties for inmates on watch, custody staff must be permitted to perform the watch duties in accordance with existing practice.

<u>Quarterly Site Visits for Tele-psychiatry Providers</u>. This recommendation would require Tele-psychiatry providers to conduct quarterly site visits. (Stern Report, Page 24). This would hinder NaphCare's recruitment efforts and would defeat the very purpose of having Tele-psychiatry. Operationally, it will result in limiting use of Tele-psychiatry. These providers offer tele-psychiatry services for a reason, and requiring them to physically conduct site visits throughout the prison system could cause many of them to quit or simply not respond to NaphCare's recruitment efforts.

<u>Hepatitis C</u>. The proposed model includes recommendations that would dramatically expedite and increase treatment of patients with Hepatitis C. (Stern Report, Page 16). Dr. Stern's recommendation to offer testing to all patients within 60 days who have not been tested is a very aggressive timeframe for which success is not reasonably attainable. There are tens of thousands of individuals in the system that will have to be reviewed for previous test results, evaluated for current risk factors for in custody re-exposure (self-tattooing, shared needle use, etc.), offered testing, and then have blood collected. Dr. Stern also recommends a large increase in the number of new patients started on treatment every month. These Hepatitis C mandates threaten to pull resources away from addressing acute care needs of the population. Additionally, NaphCare would need to higher significant numbers of additional staff to manage the large increase in treatment numbers.

<u>Restraints Used Due to Mental Health Crisis</u>. The recommendations provide in part that "Restraints are only ordered and/reviewed by a psychiatrist or psychologist." (Stern Report, Page 25). These recommendations mandate that "Restraints are only ordered and/reviewed by a psychiatrist or psychologist." NaphCare is concerned that this language could be construed to require that in all circumstances, only a psychiatrist or psychologist may order restraints to prevent an inmate from engaging in self-harm when the decision whether to use restraints may initially need to be made by ADCRR custody staff. Per ADCRR's existing protocols for use of Progressive Mental Health Restrains (DO 807, Section 9.2), it provides

7

11247915.1

that the psychologist or psychiatrist (or responding health care professional during non-business hours) shall perform a face-to-face assessment of the inmate to determine if PMHRs are required and authorize the same (on-call authorization may be made during non-business hours). A Warden, DW or Duty Officer, however, may issue a temporary order to restrain an inmate engaged in serous self-harm, but must obtain verbal authorization from a psychologist or psychiatrist within one hour after restraint application. Accordingly, custody staff should be permitted to make initial orders for restraints to protect the safety of the inmate who may be suffering from a mental health event, with continued authorization ordered by the appropriate mental health provider. Moreover, after initial application, hourly checks should be permitted by either health care staff or custody staff in accordance with existing protocols. The existing protocols afford for monitoring of the health and safety of the inmates while restrains are in us. Existing protocol further provides for restraint review within five workdays of the initiation of Progressive Mental Health Restraint by both custody, health care, and mental health professionals to evaluate policy compliance

  **B.**  **Omissions and Additional Considerations That Constitute Grave Errors.**

  NaphCare also has serious concerns that many of these recommendations contain significant gaps by failing to identify systemic needs to improve healthcare, mental health, and conditions of confinement. A multitude of mandates that micro-manage the inmate healthcare delivery system without consideration of the resulting operational and financial implications could create a host of unintended consequences, some of which are harmful, and some of which are even dangerous, to the very inmates who are the intended beneficiaries of NaphCare's services. Requiring ADCRR and NaphCare to implement each of these mandates could effectively require or result in NaphCare and/or ADCRR sacrificing services in other equally or more critical areas.

  Another significant gap regards the value of adding additional Emergency Medical Technicians to the staffing matrix to improve capacity to better respond to emergencies. NaphCare and ADCRR are in discussions regarding addition of EMTs to the

8

11247915.1

staffing matrix in the contract. It is NaphCare's hope that other mandates would not intervene to prevent the addition of EMTs to the staffing model in the Arizona prisons.

Yet another significant gap is the operational reality that the mandate to add needed, additional Inpatient Component (IPC) beds needs to consider the substantial difference in the level of staffing shortages by region. While NaphCare agrees with the need to add IPC beds, NaphCare is concerned that adding this capacity in the Tucson Prison will exacerbate staffing challenges. The Tucson area remains one of the most difficult labor markets to hire healthcare professionals in the United States. If the Court is inclined to adopt some version of this recommendation, then NaphCare respectfully proposes the best solution is to pursue an avenue of adding both IPC beds as well as Special Needs Unit (SNU) beds in the appropriate regions to include the Phoenix area, where there is even a more critical need for SNU beds as compared to IPC beds.

In closing, NaphCare is concerned about possible unintended consequences of imposing multiple sweeping mandates that would micro-manage the inmate healthcare delivery system and deprive Naphcare and ADCRR of their respective clinical discretion and operational flexibility to implement changes and make improvements in a myriad of needed areas, some of which may not be covered by these new mandates.

### III.   CONCLUSION.

NaphCare respectfully requests the Court to consider its serious concerns with the aforementioned grave errors when contemplating the appropriate injunctive relief here. NaphCare welcomes any invitation by the Court, Dr. Stern, and ADCRR to participate in the ongoing efforts to address and resolve the remaining challenges.

9

11247915.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DATED this 19th day of December, 2022.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ Joseph J. Popolizio
   Joseph J. Popolizio
   Justin M. Ackerman
   40 N. Central Avenue, Suite 2700
   Phoenix, Arizona 85004
   Attorneys for NaphCare, Inc.

11247915.1

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of December, 2022, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.


/s/Karen Gawel

11

11247915.1