**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Shawn Jensen,

           Plaintiff,

v.

David Shinn[1],

           Defendant.

No. CV-12-00601-PHX-ROS

**ORDER**

This Order includes the requirements of the planned injunction.  The parties, and Naphcare, will be allowed thirty days to file written objections as well as time to file responses to those objections.  The terms set forth in the planned injunction are the product of extensive work by the Court and its experts.  The experts worked with all counsel and personnel at ADCRR.  Therefore, the parties should not anticipate significant changes will be made absent compelling reasons.

The parties are reminded this injunction must remedy the serious constitutional violations found at trial, as found in the June 30, 2022, Order.  Any objection based on the belief that a proposed provision goes beyond the scope of the facts proven at trial must be supported by argument establishing that provision has no relation to the claims and facts proven at trial.  That is, the Court has already attempted to ensure each provision of the proposed injunction is directly linked to a constitutional violation proven at trial.  The

---

[1] The Court understands that David Shinn is no longer the Director of ADCRR.  Pursuant to Federal Rule of Civil Procedure 25(a), his successor will automatically be substituted. In responding to this Order, Defendants shall identify the appropriate individual to be substituted for David Shinn.

Court's experts made additional recommendations which the Court did not include because they could not be specifically supported by what was proven at trial. Therefore, the Court is likely to overrule any objections asserting certain provisions cannot be linked to facts proven at trial.

For any provision where the parties have an objection, they must set forth the basis for the objection and propose an alternative solution, using the same general framework set forth in the injunction. For example, the injunction bases staffing on the number of prisoners each medical professional may carry on a caseload. If Defendants believe those numbers are inappropriate, they must propose alternative numbers. Defendants may make a general objection that staffing should not be assessed in this manner, but they must also set forth their own proposed numbers accepting the assumption that the Court will adopt a caseload-based staffing approach.

Finally, the parties shall confer prior to filing their objections to reach agreements on alternatives. If the parties can reach an agreement on an alternative for a particular provision, that agreement will have substantial weight when the injunction is finalized.

Accordingly,

**IT IS ORDERED** the parties and Naphcare shall file their objections to the attached injunction no later than **February 10, 2023**. The parties and Naphcare shall file their responses to the objections no later than **February 27, 2023**.

**IT IS FURTHER ORDERED** the Motions for Leave (Doc. 4371, 4377) are **GRANTED**.

**IT IS FURTHER ORDERED** the Motions filed by class members (Doc. 4375, 4378) are **DENIED**.

Dated this 9th day of January, 2023.

Honorable Roslyn O. Silver
Senior United States District Judge

## DRAFT INJUNCTION

On June 30, 2022, the Court issued its Findings of Fact and Conclusion of Law. (Doc. 4335).  In that Order, the Court required the parties "nominate proposed experts to assist the Court with crafting an injunction that complies" with the statutory limitations on injunctions addressing prison operations.  (Doc. 4335 at 180).  The parties subsequently nominated their preferred experts.  In their list, Defendants nominated Dr. Marc Stern. (Doc. 4339).  Defendants in writing informed the Court "Dr. Stern's dedication to the design, management, and operation of health services in corrections settings [would] provide this Court and the parties with valuable guidance in crafting an injunction regarding the provision of medical care at ADCRR."  (Doc. 4339 at 4).  After reviewing the parties' lists, the Court solicited additional briefing.  (Doc. 4340).  In that additional briefing, Plaintiffs made no objection to the appointment of Dr. Stern.

On August 4, 2022, the Court held a hearing with the parties and Dr. Stern.  (Doc. 4351).  During that hearing the Court noted Dr. Stern's past work in this case made him experienced and therefore an "attractive expert" to help with crafting an injunction.[2]  (Doc. 4358 at 8).  Dr. Stern stated he could address medical care aspects of the planned injunction, but he would need additional assistance on the topics of mental health care and conditions imposed on the subclass.  Dr. Stern stated he had individuals in mind who may be able to assist him on those topics.

After finding Dr. Stern was an appropriate expert, the Court discussed with Dr. Stern and the parties the type of communications the Court's experts could have with the Court and the parties.  Both sides agreed the experts could have ex parte communications with Defendants, defense counsel, Plaintiffs' counsel, and the Court.  (Doc. 4358 at 19-20). Accordingly, the Court held the experts could have ex parte conversations as they deemed

---

[2] That hearing included some discussion of appointing a receiver.  The Court stated it was "not prepared to consider, at [that] time, a receivership.  That doesn't mean it's off the table forever in this case, but not now."  (Doc. 4358 at 4).  The refusal to appoint a receiver was based on the Court's expectation that Defendants appeared willing "to cooperate" and "act in good faith" in monitoring their performance under an injunction.  (Doc. 4358 at 7).  Any failure to act in good faith or to meaningfully comply with this injunction will revive the possibility of appointing a receiver.

1    appropriate.  The Court stated it would keep general notes regarding the contents of its

2    communications with the experts.

3         The day after the hearing, the Court formally appointed Dr. Stern and shortly

4    thereafter the Court appointed two additional experts to assist Dr. Stern to which the parties

5    had no objection.   (Doc. 4352, 4362).   Those three experts then began crafting

6    recommendations for the final injunction.  In doing so, the experts have had extensive back

7    and forth communications with individuals who had relevant information.  Thus, Dr. Stern

8    and Dr. Bart Abplanalp spoke with Plaintiffs' trial experts, Plaintiffs' counsel, Defendants'

9    counsel, Defendants, ADCRR personnel, Centurion personnel, and NaphCare personnel.

10   John McGrath spoke with some of the same individuals but he also spoke with wardens,

11   deputy wardens, and other custody staff.  Mr. McGrath visited some of the facilities to gain

12   a better understanding of possible solutions to the flaws identified by the Court.   The

13   experts have also explained some of their recommended changes to the Court.  Altogether,

14   the Court-appointed experts have spent close to 500 hours investigating and identifying the

15   appropriate solutions to the unconstitutional findings outlined in the Court's Findings of

16   Fact.

17        The back-and-forth between the parties and the Court's experts included discussions

18   regarding specific recommendations the experts might propose.   And the experts have

19   incorporated some recommendations made by the parties or their agents that the experts

20   may not have otherwise included.   In other words, the experts have thoroughly made

21   genuine efforts to assess the possible solutions to the unconstitutional conditions and they

22   paid particular attention to the solutions proposed by Defendants and their agents.   Over

23   the approximately four-month period of the experts' work, the parties or their

24   representatives have had ample opportunity to explain to the experts why particular

25   solutions were not feasible or why the experts should recommend some solutions over

26   others.   Accordingly, this detailed injunction contains little, if any, requirements that

27   surprise Defendants.

28        The Court's Findings of Fact and Conclusions of Law establish Defendants' basic

model and staffing decisions for the provision of medical and mental healthcare create an unconstitutional substantial risk of serious harm to Plaintiffs.  Therefore, the changes necessary to alleviate that risk will be substantial.  Similarly, the insufficient staffing and a wide variety of conditions of confinement combine to create an unconstitutional substantial risk of serious harm to subclass members.  Again, the changes necessary to alleviate the risk of harm to the subclass will be substantial.  Given the extent of the existing dysfunction in Defendants' operations, the Court will provide significant detail regarding medical care, mental health care, and conditions imposed on the subclass to remedy the substantial constitutional violations.[3]

The unusual scope of this injunction is informed by Defendants' actions throughout this case.  Despite their agreement and promise to the Court to do otherwise, Defendants have fought every aspect of this case at every turn.  Defendants entered into a settlement agreement where they claimed they would improve the care provided to prisoners and improve the conditions of confinement for the subclass.  Defendants almost immediately failed to perform those obligations and continued in that failure.  Instead of acknowledging their failures, Defendants kept inaccurate records and misinterpreted the settlement's requirements to their advantage.  During trial, Defendants presented arguments and witnesses that were manifestly unpersuasive.  And on some aspects, Defendants presented no meaningful defense.  For example, Defendants did not present any expert testimony that the conditions imposed on the subclass were appropriate.  Most importantly, trial established Defendants still had not made any serious effort to remedy the flaws highlighted by this litigation.  Given this history, the Court cannot impose an injunction that is even minutely ambiguous because Defendants have proven they will exploit any ambiguity to the maximum extent possible.

Despite Defendants' unsatisfactory past behavior, the Court appreciates that the

---

[3] As expressed multiple times throughout the almost ten years this case has been pending, the Court has no interest in micromanaging Defendants' operations.  At the hearing on August 4, 2022, the Court stated: "I am not -- and I have said this a number of times, I don't know how many -- but the Court is not in a position, and never should be in a position of running the prison.  That's not my job."  (Doc. 4358 at 16).

injunction is required to be narrowly drawn, extend no further than necessary to correct Defendants' ongoing violations of Plaintiffs' constitutional rights, and be the least intrusive means necessary to correct and prevent violations.  18 U.S.C. § 3626(a)(1)(A).  In addition, the injunction must "describe in reasonable detail" what Defendants must do and must be specific and definite to allow for accurate monitoring and, if necessary, enforcement.  Fed. R. Civ. P. 65(d)(1)(C); *United States v. DAS Corp.*, 18 F.4th 1032, 1039 (9th Cir. 2021) ("Civil contempt consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply.").  In light of these requirements, the Court has reviewed the experts' recommendations and has adopted only those recommendations necessary to correct the constitutional violations at issue.  The injunction that follows is narrowly drawn, extends no further than necessary, and is the least intrusive means necessary.

## Quantitative and Qualitative

The extended history of this case mandates a need for the Court to impose both quantitative and qualitative measures.[4]  Defendants' performance under the quantitative performance measures required by the settlement established the quality of the underlying care often was abysmal, even when Defendants were reporting compliance with quantitative benchmarks.  That is, history has established the quantitative performance measures were not adequate or suitable because of the enormous problems at ADCRR that were not immediately apparent.  The only possible solution is to require a significant number of qualitative benchmarks that assess whether the underlying care is constitutional.

## Monitoring

Unlike the attempt at monitoring under the parties' settlement, the Court will appoint its own experts to serve as monitors to evaluate Defendants' performance.  The Court appoints Dr. Marc F. Stern, Dr. Bart Abplanalp, Dr. Lara Strick, and an individual

---

[4] As used here, "quantitative" refers to measuring only the quantity of certain events or actions.  "Qualitative," on the other hand, refers to measuring the appropriateness of the events or actions.  The Stipulation's performance measures were "quantitative" in that they merely reflected a tabulation of acts or events.  The performance measure scores did not require a "qualitative" inquiry and did not reflect whether any of the acts or events that occurred were medically appropriate under the circumstances.

devoted to custody issues[5] to assist the court in monitoring Defendants' compliance with this Order.  Dr. Stern may appoint additional appropriately qualified and credentialed staff as needed to assist the aforementioned monitors in their work.  Defendants shall provide these monitors and additional staff remote access to the EHR and other electronic records (*e.g.*, EOMS) that are available by remote access and necessary for monitoring.

Monitors will generally provide advance notice prior to visits of facilities, however, they may make unannounced visits as needed.  Monitors and their staff may bring into facilities cell phones, computers, tablets, and cameras necessary to conduct monitoring activities.  The monitors and staff will be responsible for securing such equipment and following rules with regard to the materials.  Monitors may record any still or video images within all facilities necessary to document conditions relevant to this Order.  Monitors will make every effort to avoid including the face of any individual (staff or prisoner) unless it is necessary for monitoring purposes and the individual agrees.  In the event an image includes a face and the image is filed with the Court, the face will either be blurred to distort the image or the document itself sealed.  The monitors will submit written reports to the Court as they deem necessary.

Despite the appointment of monitors, much of the monitoring will depend on data collected by Defendants.  Therefore, Defendants shall use reasonable judgment in selecting methodologies for monitoring compliance and shall exercise care in the underlying measurements.  As part of Arizona's decision to outsource prisoner healthcare, Defendants must monitor the performance of their healthcare vendor.  Monitoring of this injunction will use that preexisting monitoring apparatus as much as possible.  But Defendants will also be required to collect monthly data and perform analyses beyond what they are doing now.  To do so Defendants will be required to employ sufficient staff of appropriate level of professional credentials and experience to conduct the monitoring described in this Order.  For example, physicians will be required to conduct qualitative review of the work of all physicians.  Defendants may not delegate such monitoring to the vendor (*e.g.*,

---

[5] This is necessary due to Mr. McGrath's passing.

1   Naphcare) providing health care services to prisoners, if there is one.

2        Defendants shall monitor all elements of this order on a monthly basis. Monitoring

3   shall be completed and available for inspection by the monitors by the last day of the month

4   following the monitored month. Defendants shall maintain supporting evidence for their

5   monitoring results.

6        The Court's monitors may rely on monitoring conducted by ADCRR and any

7   additional information that the monitors obtain. Such additional information may come

8   from a variety of sources including but not limited to: interviews with class members

9   Defendants' staff, or contractors; complaints from prisoners or others on their behalf;

10  Plaintiffs' counsel; random or purposive review of health care records; direct observation;

11  site visits; review of paper or electronic records; and review of video records.

12       In general, where performance can be measured by automated systems, a 100%

13  sample will be required. Unless otherwise noted, where performance must be measured

14  by review of individual cases, reports, health records, events, etc., Defendants will sample

15  at least 50 items statewide, chosen in an accurate and reasonable manner. As used here,

16  "reasonable" means that the minimal sample is drawn from a relevant population at high

17  risk if performance is poor and is drawn from venues roughly in proportion to relevant

18  items at that venue. For example, if half of all maximum custody prisoners are held at

19  Complex A and half at Complex B, minimal samples regarding maximum custody would

20  be drawn in roughly equal numbers from Complexes A and B; samples beyond the

21  minimum, however, may be drawn from anywhere.

22       As an additional way to monitor compliance with this Order, the Court-appointed

23  monitors will create a confidential mechanism for current prisoners, former prisoners,

24  friends and family of prisoners, prison staff, contract staff (included the contracted

25  healthcare vendor), and the public, to notify the Court of problems or complaints of unsafe

26  and unsound health care conditions or conditions of confinement. As the monitors deem

27  appropriate, the mechanism may receive submissions by postal mail, email, or phone.

28  Within two months of this Order, Defendants shall design and implement a mechanism for

prisoners to submit communications to the Court-appointed monitors.  Submissions are solely for the purpose of providing relevant information to the monitors.  The monitors will not necessarily investigate a submission or take action on behalf of a prisoner.  Monitors may or may not provide a direct response to a submission.  Defendants' implementation shall inform prisoners and staff that this confidential mechanism does not replace any existing system by which prisoners or others are expected to inform Defendants of problems for which they require a resolution, such as the prisoner grievance system or staff reporting mechanisms.

This injunction does not set forth the full extent of the data that must be collected, analyzed, and made available to the Court-appointed monitors.  Defendants shall cooperate with the monitors in devising all appropriate methods of data collection and data transmission.[6]  If unforeseen changes in conditions or operations render any of the requirements in this Order obsolete, unnecessary, or impractical, will be identified by the monitors and recommended to the Court for alteration.  The parties may petition the Court, to modify or annul requirements.  Defendants will be allowed a reasonable amount of time to implement any modification.[7]

### Plaintiffs' Monitoring

While the Court-appointed monitors will be a valuable source of information, Plaintiffs and their counsel will still have primary responsibility for assessing Defendants' performance and, if Defendants do not perform, Plaintiffs will be responsible for seeking additional relief.  This will require Plaintiffs' counsel to have ongoing access to class members, medical records, and the locations where class members are housed.  Plaintiffs and Defendants will be required to confer and reach an agreement regarding the extent of Plaintiffs' access to information and locations.  The parties will be file the terms of their agreement.  To inform their discussion, the Court notes Plaintiffs' counsel shall have access to the information necessary to assess Defendants' compliance with all terms of this

---

[6] Defendants and their agents shall not take any retaliatory actions against anyone who gathers or produces information relevant to Defendants' performance under this injunction.
[7] This will be implemented considering the limitations set forth in 18 U.S.C. § 3626(b)(1).

injunction.  That access, however, shall not overly hamper Defendants' operations.  At present, the Court likely will order the following:

- Plaintiffs' counsel will have read-only access to class members' electronic health records;

- Plaintiffs' counsel will receive monthly data reports already being produced by Defendants and Plaintiffs may demand the gathering of additional data and production of reports, as necessary to enforce all terms of this injunction;

- Plaintiffs' counsel will be able to conduct visits to speak to class members and staff and tour units.  Those visits likely will be no less than 20 days but no more than 40 days per calendar year;

- Defendants will provide substantive and timely responses in writing to concerns raised by Plaintiffs' counsel regarding individual treatment or systemic issues.

## Medical and Mental Health Overall Requirements

**1. General Requirements**

**1.1.** All health care (including but not limited to: emergent; urgent; non-urgent episodic; chronic; palliative; scheduled; inpatient; residential; outpatient; referrals to other on-site professionals; off-site specialty referrals; modifications of specialty referral requests; action taken on post-hospital, post-ER, or specialist recommendations), and the documentation supporting that care, delivered to Plaintiffs during a medical encounter (primarily face-to-face encounters), in response to an inquiry from a nurse, during a chart review or chart-based triage decision, or upon receipt of results from a test, a report from a consultant, or other external health record, shall be clinically appropriate, including, where relevant to the circumstance and professional's credential, but not limited to, the conducting of the history and physical examination, forming and testing a differential diagnosis, arriving at a diagnosis, and ordering treatment for that diagnosis.

**1.2.** Defendants shall document all aspects of care to allow for monitoring of these requirements.

**1.3.** All prisoners with physical or mental illness that require regular follow-up shall be designated on the medical or mental health caseload and shall be seen in clinically appropriate timeframes.

**1.4.** Telehealth medicine may be used only when clinically appropriate.

**1.5.** Emergency response and care provided by custody staff shall be appropriate given the skill level and knowledge expected of custody staff.

**1.6.** Defendants shall provide sufficient space, equipment, and supplies for health care staff to deliver the health care services described in this Order, regardless of housing assignment, including housing assignments with restricted liberty.

**1.7.** The space provided for clinical encounters shall be sufficient to allow for auditory and visual confidentiality from other prisoners or non-clinical staff.   Visual confidentiality requirements apply at those times when an examination reveals

portions of the prisoner's body or the prisoner is touched in ways that would not be visualized or touched, respectively, in the typical prison environment. Exceptions may be made for encounters where providing such confidentiality would legitimately jeopardize safety, including emergency situations. In those cases, breaches of confidentiality are limited to the measures required to ensure safety, and all staff shall maintain the confidentiality of any information they acquire as a result of the breach.

**1.8.** Emergency response equipment ("Man Down Bag," Automated External Defibrillators ("AEDs"), oxygen) shall contain all items required by policy, all equipment shall be in working order, and all medications shall be unexpired. Naloxone is required to be kept on every living unit or with every AED. Emergency Response bag checklists shall reflect the equipment was checked daily and inventoried monthly. The checklists shall also reflect medications are within their expiration date and equipment is operational. Staff shall complete and document all AED manufacturer recommended checks (*e.g.*, daily, monthly, annual).

**1.9.** Directors of Nursing may not spend more than 15% of their time providing scheduled or unscheduled prisoner care.

**1.10.** All staff hired in clinical supervising positions must have at least two years clinical experience.

**1.11.** LPNs shall practice within their scope of practice set forth in Arizona Administrative Code § 4-19-401. LPNs and Behavioral Health Technicians shall not independently assess prisoners or initiate a plan of care or treatment.

**1.12.** No one hired for whom a health professions license is required may possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility.

**1.13.** Health care staff responsible for direct prisoner care shall not be mandated to work beyond the following limits: more than 12 hours in any 24-hour period; less than 8

hours off between any two shifts; more than 60 hours in a calendar week defined as Sunday through Saturday.

**1.14.** The limits on overtime may be extended during emergency situations in which a prisoner's safety is in jeopardy and no reasonable alternative can be found or during a declared emergency (*e.g.*, prison riot, natural disaster, etc.).  Time spent on-call is not included in the time limits.  For purposes of the overtime limits, "emergency situations" are defined as unforeseen events that could not be prudently planned for and do not regularly occur.  Failure to hire or retain adequate staffing is not an emergency situation.

**1.15.** Within three months of this Order, Defendants shall ensure there is a sufficient number of custody staff to support the functioning of the health care operation, including but not limited to: transporting prisoners to on-site and off-site clinical encounters and appointments; administration of medications; and providing security in the venues of health care operations.  Exceptions may be made for emergency lockdowns, natural disasters, and other unforeseen emergency situations.  Unforeseen emergencies do not include chronic understaffing.

**1.16.** For all positions for which healthcare staffing is not based on medical or mental health caseload, no later than three months after this Order, Defendants shall fill all positions required by the current contract with the health care vendor including any modifications, addenda, or updates.  A filled position is one in which there is an incumbent receiving a salary for the full intended time commitment of the position. An individual may not fill more than 1.0 FTE.

**1.17.** Defendants shall hire additional staff, above the minima described in this section, as necessary, to provide constitutionally adequate health care.

**1.18.** A staff position may be filled by persons employed by ADCRR, its health care contractor, or under temporary contract.

**1.19. Urgent Care**

**1.19.1.** When a prisoner expresses to a correctional officer that he or she has a need for health care (medical or mental health) the officer may not inquire as to the nature of the need or symptoms.  The officer's inquiry is limited to asking whether the need is immediate or if the prisoner can wait to sign up for the next scheduled clinic, or if the prisoner is thinking of harming themselves.  If the prisoner is thinking of harming themselves, the officer shall immediately ensure the prisoner's safety and contact health care staff according to policy.  For other needs that are immediate, the officer shall contact health care staff immediately.  An RN shall triage the prisoner immediately, either by seeing the prisoner, or talking to the prisoner directly over the phone.  Based on the triage results, the RN shall discuss the prisoner with a medical or mental health practitioner in a clinically appropriately timeframe, not to exceed four hours.  Based on that interaction the practitioner shall:

**1.19.1.1.** see and treat the prisoner the same day; or

**1.19.1.2.** instruct the RN on treatment to provide, and, if necessary, schedule the prisoner for further evaluation or treatment in a clinically appropriate timeframe; or

**1.19.1.3.** determine the health care need is not urgent and that a reasonable prisoner would not have considered the health care need to be urgent, defer treatment, and instruct the prisoner to access non-urgent/non-emergent care for treatment.

**1.19.2.** Nothing in the model of urgent care is meant to limit a correctional officer from making self-initiated inquiries to a prisoner when the officer has a concern about the prisoner's condition or safety.

**1.19.3.** Defendants shall track and report the number of urgent care visits conducted by RNs which shall be accessible to the monitors.

**1.20.** A prisoner may refuse any on-site or off-site provider-initiated health visit and cancel any prisoner-initiated visit.  All cancellations of prisoner-initiated visits shall

be made directly to a health care professional by telephone, video, or face-to-face. All refusals of provider-initiated on-site health visits are made by telephone, video, or face-to-face with an RN or practitioner for medical visits or a masters level therapist, psychologist, or psychiatric practitioner (psychiatrist, psychiatric nurse practitioner, psychiatric physician assistant) for mental health visits, within three days after the appointment.  All refusals of off-site health visits are made by telephone, video, or face-to-face with an RN or higher at the time of the appointment.  If a prisoner will not voluntarily displace themself to participate in the direct communication with health care staff required here, health care staff shall displace to the prisoner's location.

**1.21.** Orders from health care (medical and mental health) staff in the outpatient and inpatient arenas shall be completed within the timeframe ordered.  This includes, but is not limited to, diagnostic tests, follow-up visits with nurses or practitioners, requests for outside records, and treatments.

**1.22.** Prisoners shall be informed in a timely manner of diagnostic test results and of any request staff make for additional consultation (*e.g.*, off-site specialists).

**1.23.** When prisoners on suicide watch are removed from a cell for a healthcare-related visit, including mental health encounters conducted in or near the living unit, they shall not be restrained or strip-searched unless they have been appropriately classified at a custody level that requires such measures based on classification tools that are independent of their mental health classification.

**1.24.** Defendants shall take all reasonable steps to fill all staffing vacancies.  Presently, the Court will not mandate an increase in compensation to fill vacancies.  However, the Court will do so in the future should chronic understaffing continue.

## 2.  Improvement Programs

### 2.1. Mortality review

**2.1.1.** Following a prisoner death, Defendants shall identify all significant health care and custody errors (*i.e.*, near misses as well as preventable adverse events).

- 15 -

Based on prioritization of all errors identified, a root cause analysis shall be conducted if clinically appropriate, from which an effective and sustainable remedial plan shall be crafted.  A sustainable plan is one which outlives staff memory from a single training after the review or staff turnover.  Defendants shall monitor the remedial plan for effectiveness and make appropriate and timely modifications to the plan based on the monitoring.

**2.1.2.** The sustainable plan shall be implemented within one month of the death.

**2.1.3.** The plan in this section shall be crafted and implemented whether or not the medical examiner's report is available.  If the medical examiner's report was unavailable, the plan shall be revisited and modified, if necessary, within one month of receipt of the report.

## 2.2. Near-miss reporting

**2.2.1.** Defendants shall implement an appropriate near-miss error reporting policy. Defendants are encouraged, but not required, to incorporate the following elements in this policy:

- Only errors which caused no (or minimal) harm to a prisoner may be reported through this system.
- Reporting is voluntary.
- Anyone can report (including prisoners).
- The reporter is immune from discipline, punishment, or retaliation related to the error unless the following are all true: the reporter is a staff member, the error is one they made themselves, and the error is one for which they have a current disciplinary or other performance improvement plan that addresses such errors.
- Reporting is easy and fast for staff with a minimal amount of information required of the reporter initially, so that the reporting process itself is not a barrier to reporting.

- Because minimal information is required initially, reports are confidential but not anonymous, so that the reporter can be contacted to obtain more and complete detail later if needed.
- Reporters receive feedback about reports and their impact. While individual feedback might be optimal, even feedback to the whole workforce about specific prisoner safety changes that resulted from reporting can be valuable.

**2.3. Preventable adverse event reporting**

**2.3.1.** Defendants shall implement a preventable adverse event reporting policy that includes the following elements:

**2.3.1.1.** The policy requires reporting of errors which cause more than minimal harm to a prisoner.

**2.3.1.2.** All such errors shall be reported, not just medication-related errors.

**2.3.1.3.** Reporting is mandatory for all staff.

**2.4. Continuous Quality Improvement program**

**2.4.1.** Defendants shall implement a robust continuous quality improvement program to monitor the quality of clinical care.  As part of this program, Defendants shall monitor the absolute number and trend of various parameters on a monthly basis.  Where metrics or trends in metrics show room for improvement, Defendants shall make appropriate efforts to understand the underlying reason for deviation, take reasonable steps to effectuate improvement, evaluate the effectiveness of these steps in a reasonable time, and make adjustments to its improvement efforts as needed. At a minimum, Defendants shall monitor:

- percentage of individuals (regardless of whether diagnosed with hypertension) whose systolic blood pressure exceeds 140 mmHg or diastolic blood pressure exceeds 90 mmHg;

- average hemoglobin A1C (regardless of whether diagnosed with diabetes);
- percentage of individuals taking ten or more prescribed medications;
- percentage of women receiving timely breast screening;
- percentage of women receiving timely cervical cancer screening;
- percentage of pregnant women who have the results of routine prenatal laboratory tests results as recommended in current national guidelines (*e.g.*, Guidelines for Prenatal Care, 8th Edition, American Academy of Pediatrics and American College of Obstetricians and Gynecologist, Table 6-2) documented within one month of diagnosis of pregnancy;
- percentage of health care grievances which are appealed;
- percentage of health care grievance appeal replies that are appropriate;
- percentage of prisoners on antipsychotic medications receiving timely AIMS assessments;
- percentage of prisoners on antipsychotic medications receiving appropriate and timely metabolic assessments;
- percentage of prisoners receiving punishment for a rule violation, for whom a mental health intervention would have been more clinically appropriate than punishment; and
- percentage of prisoners arriving at ADCRR for whom intake screening by an RN (or higher credentialed professional) is completed more than four hours after arrival.

**2.4.2.** ADCRR shall monitor other parameters as reasonably dictated by the other Self Improvement activities described in this Order.

**2.5. Overall System Improvement**

**2.5.1.** Defendants shall evaluate errors, system problems, and possible system problems that come to their attention through sources, including but not limited to the near-miss and preventable adverse event reporting systems, mortality reviews, litigation filed by prisoners, grievances, the Court-appointed monitors, staff reports, continuous quality improvement, etc. Defendants shall address these errors and problems at a complex or statewide level, as appropriate. To prioritize analysis and remediation of errors and other system problems, Defendants shall maintain an active log of all such errors and problems to assist in deciding which issues to address and when, and to monitor progress in resolution. Based on this prioritization, either at the complex or state level, root cause analysis shall be conducted as appropriate, from which an effective and sustainable remedial plan is implemented in a timely manner. Such plan is one which outlives staff memory from a single training after the review or staff turnover. The remedial plan shall be monitored for effectiveness. Appropriate and timely modifications shall be made to the plan based on the monitoring.

## 3. Language Interpretation Services

Within three months of issuance of this Order Defendants shall implement the following to ensure adequate interpretation services are available for every material encounter where needed.

**3.1.** Defendants shall develop and implement policies to assess the English fluency of prisoners and, if not English-fluent, determine a language in which the prisoner is fluent at the following times:

**3.1.1.** during intake;

**3.1.2.** upon request by a prisoner at any time;

**3.1.3.** whenever staff have reason to believe a prisoner is not fluent in English;

**3.1.4.** whenever a prisoner's primary language of communication is not documented in the medical record.

**3.2.** A prisoner's language of choice shall be visible on all relevant screens of the prisoner's EHR.

**3.3.** For all individual and group health care encounters in all settings involving prisoners who are not fluent in English, interpretation shall be provided via:

> **3.3.1.** health care staff whose name appears on a list maintained by Defendants of people who, pursuant to written policies Defendants develop, is proficient in the language understood by the prisoner; or
>
> **3.3.2.** in-person or via video interpretation service (for sign language) or audio language interpretation service that is compliant with federal law and uses licensed interpreters, where required by state law; or
>
> **3.3.3.** in an emergency and if the above is not feasible, by other available means, *e.g.*, health care staff whose name is not on the above-cited list, non-health care staff, or other prisoners.

**3.4.** The method of interpretation for all encounters (or, in the event interpretation consistent with this Order could not be provided) shall be documented in the EHR.

**3.5.** The equipment used for interpretation shall allow for confidential communication in all circumstances (*e.g.*, dual hand- or head-set device in locations where a speaker phone or computer can be seen or overheard by other prisoners or custody staff).

**3.6.** Written available notification (such as a poster) shall be hung in all housing units and medical clinics in all prisons advising prisoners, in the ten most common languages in Arizona, of the availability of interpretation services and that they may inform healthcare staff orally in any language, in sign language, or in writing in any language that they are not fluent in English, if that is not already documented in their EHR.

**4. Electronic Health Records ("EHR")**

**4.1.** An EHR shall be used for prisoner medical and mental health care. Defendants' chosen healthcare vendor, Naphcare, currently uses TechCare. If Defendants

discontinue use of TechCare, Defendants shall transition, without gap, to another EHR.

**4.2.** In selecting an EHR, Defendants shall conduct a comprehensive needs assessment by seeking sufficient input from leaders, managers, and front-line users regarding essential functionality, and select an EHR that maximizes fulfillment of essential functions. The EHR shall include a computerized prescription order entry, electronic medication administration record, and electronic prisoner identification system (*e.g.*, ID card bar scan, biometric scan). The EHR shall include, at a minimum, all functionality of TechCare unless Defendants can justify why any non-included functionality is non-essential. Upon transition to another EHR, all existing data shall be transferred from the existing EHR to the next EHR retaining the same titles, metadata, and usability in the next EHR as it had in the existing EHR.

**4.3.** The problem list in a prisoner's health record shall be accurate, complete, and easily usable. "Easily usable" includes, but is not limited to the following qualities:

**4.3.1.** Resolved or historical conditions or diagnoses are separated from current conditions.

**4.3.2.** The date of onset or resolution of resolved or historical conditions or diagnoses is indicated, if known.

**4.3.3.** Similar or identical diagnoses of current conditions are listed only once. For example, a problem list would not simultaneously list "heart disease," "heart failure," and "congestive heart failure, not otherwise specified."

**4.4.** Imported or scanned documents (including but not limited to diagnostic test results, consultation reports, hospital discharge summaries) in the EHR shall be filed in a clear and usable manner, including, but not limited to:

**4.4.1.** Paper documents are scanned within two business days of receipt.

**4.4.2.** Documents are reviewed by a practitioner within four business days of receipt.

**4.4.3.** Documents are scanned right-side up.

**4.4.4.** Documents are accurately labeled with meaningful titles/file names.  Fewer than 1% of files are labeled/titled with names beginning with "Miscellaneous" or "Other."

**4.4.5.** Scanned documents are dated (and appear in any programmed or ad hoc list according to this date) based on the clinically relevant date of the document, not the date scanned.  For example, the clinically relevant date of a: lab test is the date the test was reported by the lab; discharge summary is the date of discharge; a prior health record is the date it was received at ADCRR; an imaging study is the date of study.

**4.5.** Defendants shall provide prisoners access to their own medical records as follows:

**4.5.1.** Access to prisoners wishing to read a copy of their health record;

**4.5.2.** Orally share with a prisoner information regarding their diagnosis or any other information about their health care unless a practitioner documents in the prisoner's EHR how disclosure of such information would jeopardize the health, safety, security, custody or rehabilitation of the prisoner or others or the safety of any officer, employee or other person at the correctional institution or of a person who is responsible for transporting the prisoner.

**4.5.3.** Defendants may charge a reasonable per-page fee to non-indigent prisoners for paper copies, but no fee may be charged to indigent prisoners.  A reasonable fee is one that has the same or lower ratio to the prevailing prisoner wage as the ratio of the prevailing fee in the Arizona medical community to the prevailing Arizona community wage.  Alternatively, if the prisoner agrees, Defendants may provide the requested records, free of charge, in an electronic medium that the prisoner is able to access.

**5.  Release Planning**

**5.1.** For prisoners with identified treatment providers in the community, if the prisoner consents, Defendants shall send each provider relevant health care information

prior to the prisoner's release. This includes, at a minimum, a problem list, list of active medications, current symptoms, functional impairments, a summary of relevant care provided during incarceration, any necessary care or follow-up care, one or more points of contact if a community provider requires further information, and, in addition, for mentally ill prisoners, name and contact information of the primary therapist, an aftercare plan that reflects progress in treatment, and a current treatment plan. The prisoner's health record shall contain documentation of the above information that was provided, when, and to whom.

**Medical**

**6. Staffing**

**6.1.** Within three months of this Order, Defendants shall maintain staffing of practitioners in medical health according to the following minimums. These are based on the number of prisoners for whom the practitioner is listed in the health record as the prisoner's primary care provider. "Physician" refers either to an M.D. or D.O. "ML" refers to mid-level practitioners with titles of nurse practitioner or physician assistant.

| Setting | 1.0 FTE Practitioner | Max. Case Load Size | Reduction of Case Load for Each ML Supervised | Max. Number of MLs Under Supervision per MD/DO |
|---|---|---|---|---|
| Outpatient, high intensity complex | Physician | 600 | 150 | 3 |
| Outpatient, high intensity complex | ML | 400 | n/a | n/a |
| Outpatient, low intensity complex | Physician | 800 | 100 | 4 |
| Outpatient, low intensity complex | ML | 600 | n/a | n/a |
| Outpatient, high intensity complex | Facility Med. Dir. | 150 | 150 | 1 |
| Outpatient, low intensity complex | Facility Med. Dir. | 200 | 100 | 1 |
| Inpatient | Physician | 50 | n/a | 0 |
| Inpatient | Facility Med. Dir. | 10 | n/a | 0 |
| Special Needs Unit | Physician | 200 | n/a | 0 |
| Special Needs Unit | Facility Med. Dir. | 40 | n/a | 0 |

**6.2.** For purposes of this staffing formula, a "low intensity" complex is one where the average number of prescription medications, measured by the same method used by Defendants and shared with the Court-appointed monitors in November 2022,

is no more than 1.75 active prescribed medications on average per complex prisoner.[8]  All other complexes are "high intensity."  At present, the low intensity complexes are Douglas, Winslow, and Safford.  That may change, however, based on population and prescription changes at each complex.

**6.3.** The ratio for "Inpatient" is based on the assumption that no more than 5 of the 50 prisoners are high acuity ("Level 1") prisoners.  When the number of Level 1 prisoners exceeds 5, the maximum caseload is 25 Level 1 prisoners per 1.0 FTE physician.

**6.4.** These assignments are mutually exclusive such that a facility medical director at a high intensity complex may directly care for 150 prisoners **or** supervise a single ML caring for 150 prisoners **or** directly care for 10 inpatient component ("IPC") prisoners.

**6.5.** Prisoners are assigned to the ML caseload in a clinically appropriate manner, *i.e.*, prisoners with multiple or complex medical conditions are only assigned to physician caseloads.

**6.6.** All medical physicians–at hiring and during employment–shall be board certified in Internal Medicine or Family Practice, or board eligible if within 7 years of their completion of an ACGME approved residency in one of these 2 specialties, with the following exceptions:

    **6.6.1.** medical directors, shall be board certified at hiring and during employment;

---

[8] Eyman is a useful example to illustrate the impact of this staffing formula.  At trial, Eyman had a prisoner population of 5,219 and had one staff physician, one medical director, and five MLs.  (Doc. 4335 at 10, 182).  Eyman qualifies as a "high intensity" facility, meaning this new staffing formula dictates a physician at Eyman will be allowed to carry a caseload of no more than 600 prisoners and a ML at Eyman will be allowed to carry a caseload of no more than 400.  A physician's maximum caseload must be decreased when supervising MLs.  Moreover, this injunction dictates what types of prisoners may be on physician or ML caseloads.  Therefore, the exact number of physicians and MLs that will be required will vary depending on the prisoner population and how Defendants choose to staff Eyman.  But if permitted by the medical needs of Eyman's population, Defendants might be able to use the maximum number of MLs and the minimum number of physicians.  In that scenario, Eyman would be required to have approximately four physicians carrying caseloads totaling 600 prisoners and twelve MLs carrying caseloads totaling 4,800.  (This example does not account for a medical director.)

- 25 -

**6.6.2.** physicians providing obstetric and gynecologic services shall be board certified or board eligible if within seven years of their completion of an ACGME approved residency in obstetrics and gynecology; and

**6.6.3.** physicians who are currently employed and are not board eligible may remain employed for no longer than one year after issuance of this Order.

## 7. Model of Care

**7.1.** A registered nurse ("RN") or higher credentialed professional shall conduct an intake screening within four hours of a prisoner's arrival or, alternatively, a rapid screening shall be conducted immediately upon arrival, but the intake screening by an RN shall be conducted as soon as possible and before the prisoner proceeds to housing. If the rapid screening is conducted by a professional of lesser credential than an RN (*e.g.*, LPN, certified medical or nursing assistant), then the screening shall not include a clinical assessment, and any abnormal response found by the LPN or similar staff shall result in immediate consultation with an RN (or higher credentialed professional).

**7.2.** A medical practitioner shall complete a history and physical examination of each prisoner by the end of the second full day after a new prisoner arrives in Defendants' custody.

**7.3.** All prisoners shall be assigned a medical primary care practitioner. Assignment to physician or mid-level practitioner shall be based on the complexity of the prisoner's health conditions.

**7.4. Non-Urgent/Non-Emergent Care**

**7.4.1.** Prisoners shall be given on a daily basis an opportunity to indicate their need to be seen for a medical clinic appointment at the next available clinic by one of the following mechanisms, depending on their living situation, freedom of movement, and access to electronics:

- affixing their name to a time slot on a paper list maintained on the living unit or in the medical unit;

- affixing their name to a time slot on an electronic list via tablet or kiosk;
- informing the nurse who conducts daily (or more frequent) welfare checks on that unit;
- an effective paper-based system developed by Defendants in the event of temporary non-functioning of the electronic system.

**7.4.2.** Prisoners should only use this system if they have a non-urgent need. Prisoners with urgent or emergent needs should notify a staff member. A reminder of these rules shall be communicated via the medium the prisoners use to make requests (*e.g.*, a statement placed on the paper or electronic sign-up list).

**7.4.3.** Prisoners shall not be required to indicate the reason for the request to be seen.

**7.4.4.** Defendants shall retain for the monitors to access all lists, paper or electronic, for their review.

**7.4.5.** To allow for effective monitoring of healthcare staffing levels, any appointment made that does not occur shall not be erased but shall be notated as not completed.

**7.4.6.** Defendants may continue to allow prisoners to submit HNRs for administrative requests that do not require a clinical encounter or clinical judgment, such as, but not limited to: a medication refill request; inquiring about the date of an appointment; a request for health records, etc.

**7.4.7.** All non-urgent/non-emergent care at the request of a prisoner shall be completed in a reasonable time. In addition to other qualitative indicators, "reasonable time" means that on average, there shall be at least three unused appointment slots per week on each medical practitioner's schedule who is expected to carry a full prisoner caseload for their job category; one unused appointment slot if the practitioner is scheduled for one day or less of prisoner

visits; and two unused appointment slots if the practitioner is scheduled for more than one day but less than a full prisoner caseload.

**7.4.8.** Except as noted in this paragraph, initial care shall be provided by a medical practitioner, or another health professional as directed by a physician or ML, as clinically appropriate. The initial care provider shall be the prisoner's primary care medical provider unless that provider is not on the premises nor conducting telehealth visits at the time. Pursuant to prisoner-specific direction provided by the medical practitioner, RN may provide initial care for a limited number of conditions that are simple, rarely serious, rarely confused with serious conditions, and appropriately treatable with self-care and/or over-the-counter medications provided that the RN operates under clinically appropriate protocols approved by the monitors. This paragraph does not have any impact on the protocols LPNs or RNs use in the first few minutes of an emergency while waiting for contact with a practitioner or arrival of emergency services. Defendants shall track and report the number of initial care visits completed by RNs.

**7.5. Special Needs Unit ("SNU")**

Within one year of this Order, Defendants shall:

**7.5.1.** Determine the number of disabled, elderly, or developmentally disabled prisoners who require SNU housing ("SNU prisoners"), exclusive of those who have acute health care needs requiring placement in an IPC and exclusive of those whose assisted living needs are minimal enough to be met by the support normally provided to prisoners in general population, such as assistance with self-administration of medicines. To determine the number of SNU prisoners, Defendants shall be guided by the health/functional/physical needs criteria established by the Arizona Health Care Cost Containment System ("AHCCCS") for individuals to receive Elderly and Physically Disabled

services as defined in Arizona Administrative Code R9-28-304, including the Pre-Admission Screening Tool;

**7.5.2.** Build (or modify existing) living units with at least the number of beds for the number of SNU prisoners at the appropriate custody levels.  The per-prisoner floor space should be consistent with AHCCCS requirements for similar populations.

**7.5.3.** Equip and staff the units to meet the assisted living needs of the SNU prisoners; and

**7.5.4.** Transfer all SNU prisoners to those beds.

**7.6. IPC Care**

**7.6.1.** A medical practitioner shall be contacted and collaborate on the creation of an immediate care plan immediately upon a prisoner being admitted to the IPC.

**7.6.2.** An RN shall complete an admission nursing assessment immediately upon a prisoner being admitted to an IPC.

**7.6.3.** A medical practitioner shall complete an admission history and physical within one calendar day of admission to the IPC for prisoners who are going to remain beyond 24 hours.

**7.6.4.** An RN shall complete an assessment in the IPC at the frequency ordered.  The spacing of the assessments are clinically appropriate.

**7.6.5.** The call buttons of all prisoners admitted to an IPC level bed are determined to be working on the day of admission and once per month.  If a call button is not working health care staff shall perform a welfare check at least once per 30 minutes.

**7.7. Observation Beds**

Defendants shall discontinue the use of Observation Beds.  Prisoners requiring monitoring or medical care beyond that normally available and safely used in non-medical living units shall be admitted to an IPC.

**8.  Referrals**

As used in this section, "specialty referral" or "referral" includes any request for a consultation, intervention, test, provision of materials, or other service, that is performed or fulfilled by someone other than employees of ADCRR or than persons filling FTE positions described in the contract and amendments with Defendants' health care contractor. Defendants shall comply with the following regarding specialty referrals:

**8.1.** All specialty referrals shall be completed within the ordered timeframe, notwithstanding any time required for processing, reviewing, or consideration of alternative treatment plans.

**8.2.** Unavailability of referral services shall not be a certain, acceptable defense for non-performance, however it may be considered when evaluating Defendants' performance. In other words, unavailability of referral services, such as not being able to find a specialist willing to see the prisoner, the specialist not having an open slot, or the specialist canceling the appointment, are situations over which Defendants might have had some control. Therefore, the onus remains on Defendants to complete the referral in the time period contemplated by the practitioner. In situations where Defendants prove they exhausted all reasonable measures, non-performance will be excused.

**8.3.** The referral order shall be completed when the referral or modified plan is completed or the referral is canceled. The referral shall be completed in the timeframe established in the practitioner's order. If the timeframe is extended by the practitioner, the referral completion is timely as long as it is completed within the extended timeframe and the extension was ordered before the original timeframe expired.

**8.4.** If Defendants or their medical care contractor utilize categorical referral timeframes, *e.g.*, "emergency," "urgent," "routine," for which it applies default timeframes for completion of the referral, Defendants shall notify the Court of those categories and timeframes and shall notify the Court within fourteen days if any of those categories or default timeframes change.

- 30 -

**8.5.** If a practitioner orders a referral to be completed in a specific timeframe (including any free text notation), that order supersedes any categorical classification of the referral. For example, if a practitioner orders a referral to be completed in ten days, and the referral request is classified as "routine" which normally indicates a longer period, the referral still shall be completed in ten days.

**8.6.** The ordering practitioner's order is the controlling order and is not merely a request for authorization. While suggestions or recommendations may be made by others, *e.g.*, utilization management personnel, to modify the order, the order is only modifiable by the ordering practitioner, their direct clinical supervisor, or, in the ordering practitioner's absence, another practitioner covering for them. The practitioner writing, modifying, or cancelling the order has a patient-practitioner relationship with the prisoner and assumes clinical responsibility for the decision.

**8.7.** If a practitioner orders, or informs a prisoner there will be an order, for an off-site test or referral, but circumstances change and the order is modified or rescinded, the prisoner shall be informed within one month of the change.

**9. Post-Referral Appointment, Post-Hospital Stay, Post-ER Management**

**9.1.** Defendants shall adopt and perform off-site orders from outside providers as soon as the records are available, unless a clinically appropriate basis exists to alter or forgo the off-site orders.

**9.2.** Prisoners returning from a hospital stay or emergency room visit shall be evaluated by an RN or higher prior to returning to their living unit. A discharge summary, physician report, or documentation of this information received via phone shall be available for this evaluation.

**10. Medications**

**10.1.** Prescribed medications intended for directly observed therapy ("DOT") administration shall be administered as ordered or there shall be documentation of a valid reason for non-administration. Documentation shall include the identity of the administrator.

**10.2.** For purposes of the preceding requirement, "as ordered" means:

**10.2.1.** For medications ordered as weekly, every other day or certain days of the week, daily ("q.d."), twice daily ("b.i.d."), thrice daily ("t.i.d."), four times daily ("q.i.d."), or every 12 hours (q. 12 hrs"), within two hours of a specific time, set in policy, procedure, or orders, for administration.  These set times shall be at reasonable times of the day.

**10.2.2.** For medications ordered at an hourly frequency of every eight hours ("q. 8 hrs.") or more frequently, or intermediate acting insulin, within one hour of a specific time, set in policy, procedure, or orders, for administration.

**10.2.3.** For regular insulin, within thirty minutes of serving a meal, and for fast-acting insulin within fifteen minutes of the serving of a meal.

**10.2.4.** For all other medications, at the times of the day ordered.

**10.2.5.** For a prisoner newly admitted to a facility (*e.g.*, transfer from another facility, return from a hospital stay, admission from a jail) and already on a medication in their previous venue, the first dose of a medication shall be delivered keep-on-person ("KOP") or administered ("DOT") in time for their next regularly scheduled dose.

**10.2.6.** For all other prisoners, the first dose of a newly ordered medication shall be delivered ("KOP") or administered ("DOT") within the timeframe ordered, or if no timeframe is specified, within twelve hours for antibiotics and pain medications, and within three days for all other medications.

**10.3.** Unavailability of the prisoner (*e.g.*, "no-show") or unavailability of the medication (*e.g.*, gap due to delayed refill or renewal) are not valid reasons for non-administration.  Refusal is a valid reason, but only if the refusal is expressed, face-to-face between the prisoner and the health care staff, and if the medication refusal policy is followed.  Defendants shall have a medication refusal policy containing the following elements:

**10.3.1.** When a prisoner refuses a medication (or classes of medication), based on the specific medication or class and the number and pattern of refusals, the medication administrator shall be triggered to escalate the case to a higher authority and within a specified amount of time (which may differ by medication or class). Defendants should use clinical judgment in setting the refusal pattern for each medication or class and timeframe for escalation. The decision rules described above should be incorporated into the medication administration software of the EHR such that the EHR automatically alerts the medication administrator when action is needed and what action is needed, rather than relying on administrators' memory.

**10.3.2.** The higher authority referenced in the preceding paragraph shall be an RN or appropriately licensed practitioner who is then responsible for: determining the reason for the refusal and securing the prisoner's adherence with the medication, or finding a clinically appropriate alternative treatment, or assuring that the prisoner is making an informed refusal, or assuring the execution of whatever clinically appropriate action is ordered by a prescriber.

**10.3.3.** Signed refusals by the prisoner are not required.

**10.4. KOP Medication**

**10.4.1.** When prisoners request approved refills or renewals of a KOP medication, the medication shall be delivered to the prisoner before the medication runs out (based on the date of the previous fill) provided the prisoner attempted to submit the request within the required timeframe. A KOP medication shall be delivered either by providing the prisoner with the KOP supply or by staff administering the medication from stock, dose by dose, to bridge the gap until the KOP supply is delivered. Additional medication need not be delivered before the previous fill runs out if a clinically appropriate and documented determination was made by a prescriber that the medication should not be continued and the prisoner is so informed.

**10.5. Other Medication Provisions**

**10.5.1.** To decrease staff time spent on medication delivery, Defendants are encouraged, but not required, to modify their medication management practice by establishing a list of medications which are, by default, provided to prisoners as KOP. The list would be developed by health care staff in collaboration with custody staff to account for both medical and penological needs. Policy exceptions could be made for certain classifications or housing of prisoners, for example, prisoners in an inpatient medical or mental health unit, prisoners at high mental health level, etc. For all other prisoners, prescribers would be required to write a specific order and justification if they wanted a prisoner to receive a medication by DOT. Such orders would require renewal periodically. The policy could address the need for certain prisoners on DOT medications to learn how to manage and self-administer medications as they prepare for re-entry.

**10.5.2.** To decrease staff time spent on medication delivery, Defendants are encouraged, but not required, to make some of the over-the-counter medications its practitioners prescribe available, free-of-charge and upon request, from living unit officers or health care staff in FDA-approved unit dose packaging.

**10.5.3.** Prisoners released to the community shall receive a supply of medication sufficient to ensure either (a) the prisoner has medication available for a sufficient length of time to allow the prisoner to obtain and attend an appointment with a community practitioner qualified to order a new supply, or (b) to complete the course of therapy, whichever is shorter.

**10.5.4.** Prisoners with asthma who are at significant risk of serious respiratory impairment if they do not use their rescue inhaler immediately, shall be provided a rescue inhaler KOP. Exceptions may be made for prisoners living in a unit with 24-hour nursing and access to an emergency call button.

Exceptions may also be made for prisoners where Defendants can document a significant and serious penological need to prohibit a particular prisoner from having such an inhaler. This exception must be prisoner-specific and Defendants cannot apply a policy prohibiting KOP inhalers for all prisoners. Exceptions may be made for prisoners living in a unit with 24-hour nursing and access to an emergency call button.

**10.5.5.** Prisoners with diabetes who are at significant risk of hypoglycemia shall be provided a source of glucose KOP. Exceptions may be made for prisoners living in a unit with 24-hour nursing and access to an emergency call button.

**10.5.6.** Prisoners prescribed rapid-delivery nitroglycerin for cardiac disease shall be provided the medication KOP. Exceptions may be made for prisoners living in a unit with 24-hour nursing and access to an emergency call button.

**11. Disease Specific Requirements**

**11.1. Hepatitis C**

**11.1.1.** Prisoners shall receive treatment for hepatitis C infection ("HCV") according to the following requirements:

**11.1.1.1.** All prisoners are screened (by blood test) for HCV within a month of arrival, and periodically, based on risk, in accordance with CDC recommendations.

**11.1.1.2.** Defendants may wait up to six months after the date of first confirmation of the current infection (or a month after learning such date if infection was established prior to admission to prison) to begin treatment to those with sustained infection who agree to treatment, regardless of degree of fibrosis.

**11.1.2.** Exceptions to treatment may be made for those prisoners:

**11.1.2.1.** with markedly reduced life expectancy who would not be expected to benefit from treatment, or

**11.1.2.2.** prisoners who cannot complete treatment within the timeframe of their incarceration and linkage to care in the community for continuation of treatment cannot be established despite a good faith effort.

**11.1.3.** Within two months of issuance of this Order, all current prisoners who have not been screened for HCV shall be offered screening, and all who screen positive and indicate willingness to be treated shall receive treatment within the time parameters set out within this Order.

**11.1.4.** All prisoners with HCV infection shall be placed on a single list prioritized according to a scheme that considers degree of fibrosis, relevant comorbidities, likelihood of transmitting infection to others in the prison, and release date.

**11.1.5.** Using the prioritized list, Defendants shall begin treatment each month of the following number of prisoners: 100 prisoners plus 90% of the number of newly admitted prisoners who tested positive for HCV during the previous month.  For example, if 100 prisoners admitted during the month of January tested positive for HCV, Defendants shall begin HCV treatment of the next 190 prisoners on the prioritized list, during the month of February. Defendants may calculate the number of newly admitted prisoners testing positive during January based on the date of admission or the date of the test results (because prisoners may not be tested during the month of arrival and test results may not be completed during the month of arrival).  Once Defendants have chosen a method of calculation, they shall continue to use the same method.

**11.1.6.** No later than one year after issuance of this Order, no prisoner who is released on their planned release date shall release without having been screened for HCV and if positive and they accept treatment, without having completed treatment.

**11.1.7.** All prisoners with HCV shall be offered education about HCV, whether they receive treatment or not.

**11.1.8.** All HCV screening is offered under opt-out conditions.

**11.1.9.** All HCV treatment shall use the current standard of care medications.

**11.2. Tuberculosis**

Unless ADCRR, as a system, is determined by the monitors to be at minimal risk with regard to tuberculosis according to CDC guidelines, all newly admitted prisoners shall have a completed test for tuberculosis (skin test, blood test, or chest x-ray) by the end of the third full day after admission into the ADCRR system, unless the prisoner refuses. The men's and women's facilities may be considered separately in determining the CDC-based system risk level.

**11.3. Substance Abuse Disorder**

**11.3.1.** Prisoners shall be screened for, and if indicated then evaluated for, substance use disorder.

**11.3.2.** Prisoners diagnosed with substance use disorder shall be offered and provided treatment, consistent with national standards of care. Prisoners with alcohol or opioid use disorder shall be offered and provided medication assisted treatment. For prisoners with opioid use disorder, they shall be offered, as clinically appropriate, buprenorphine, naltrexone, or methadone. Prisoners admitted on treatment shall have the treatment continued without interruption.

**11.4. Immunization**

Prisoners shall be offered all immunizations recommended by a mainstream evidence-based national guideline.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Mental Health

Based on the credible trial testimony, the mental health treatment regime Defendants employ is profoundly lacking and results in grossly insufficient care, creating an unconstitutional substantial risk of serious harm.   Similar to the medical care requirements, the central aspect of relief regarding mental health care will be a mandate that Defendants increase staffing.  To ensure adequate staffing, and to allow for monitoring, Defendants shall adopt a caseload-based staffing formula.  The staffing formula and other requirements are based on Defendants' mental health scoring system already in place. (Doc. 4335 at 15 n.1).  Any changes to that scoring system will necessitate changes to the staffing formula.  Defendants shall inform the monitors immediately upon any changes to the scoring system.

**12. Mental Health Staffing**

**12.1.** Within three months of this Order, Defendants shall maintain staffing of mental health professionals according to the following limits.  These are based on the number of prisoners for whom the mental health professional is listed in the EHR as the prisoner's primary care provider.  "PP" refers to psychiatric practitioner while "PT" refers to primary therapist (*i.e.*, psych associate or psychologist):

| Setting | 1.0 FTE Professional | Max. Caseload Size |
|---|---|---|
| Outpatient (MH-3) | PT | 100 |
| Residential (MH-4) | PT | 30 |
| Inpatient (MH-5) | PT | 10 |
| Crisis Stabilization/Suicide Watch | PT | 10 (Unless PTs follow their prisoners when admitted to a crisis stabilization bed, in which case there is no change to caseloads) |
| Outpatient, prisoners on psychotropic medications | PP | 200 |
| Residential, prisoners on psychotropic medications | PP | 50 |
| Inpatient, prisoners on psychotropic medications | PP | 25 |

**12.1.1.** Outpatient psychologist shall supervise no more than five psych associates.

**12.1.2.** Inpatient psychologist shall supervise no more than four psych associates.

**12.2.** A MH Duty Officer shall be available at all times when facility mental health staff are not available.  The MH Duty Officer shall be a licensed psych associate, psychologist, or psychiatric practitioner.

**13. Staffing Qualifications**

**13.1.** All psychiatrists–at hiring and during employment–shall be board certified in psychiatry, or board eligible if within 7 years of their completion of an ACGME approved residency in psychiatry, with the following exceptions: 1) supervising psychiatrists shall be board certified at hiring and during employment; 2) psychiatrists who are currently employed and are not board eligible may remain employed for no longer than one year of issuance of this Order.

**13.2.** All psychologists and psychiatric practitioners shall have the appropriate state licenses.  All psych associates shall be licensed or become licensed within one year of hiring or within one year of this Order, whichever is later.

## 14. Model of Care

**14.1.** Each prisoner on the mental health caseload, *i.e.*, all prisoners in MH Levels 3, 4, and 5, shall be assigned a PT who serves as the single point of contact and coordination for providing care for that prisoner. PTs shall be psych associates or psychologists. When a prisoner's assigned PT is unavailable, another psych associate or psychologist acts on their behalf. Except as noted elsewhere, generally a new PT shall be assigned when a prisoner's living unit changes and the current PT does not cover that unit, *e.g.*, when the prisoner's yard or MH Level of Care changes.

**14.2.** A psychologist shall review the records of each prisoner who is added to, or discharged from, the mental health caseload. The psychologist shall provide appropriate documentation of this review in the prisoner's health record.

**14.3.** Prisoners on the mental health caseload who believe they need mental health care shall submit HNRs. The primary therapist or, if necessary, another psych associate shall triage HNRs within 24 hours of receipt. "Triage" means determining whether the request requires immediate attention and resolution or whether the request can safely be deferred until the primary therapist can address it. Documenting the word "Triaged" is adequate evidence of triage. Primary therapists shall address the HNR within three business days of its submission. "Address" means evaluating the request, determining the clinical need, and if an action is required (*e.g.*, face-to-face visit), planning that action to occur in a clinically appropriate timeframe. When the primary therapist is absent, another psych associate or a psychologist completes these tasks in their stead within the same time.

**14.4.** If a prisoner's PT determines a visit is clinically appropriate, the prisoner shall be seen by the PT or referred to another professional as directed by the PT.

**14.5.** Prisoners who are not yet on the mental health caseload but request mental health treatment shall submit requests to be seen through the procedures for seeking medical care.

**14.6.** Defendants shall modify their policies to create a formal process for custody staff, families, or any other concerned party to refer a prisoner for mental health assessment and for timely response to the concern by mental health staff.

**14.7.** Defendants are encouraged, but not required, to allow MH-3C and MH-3E prisoners who would otherwise meet the custody classification requirements, to be housed at the Douglas, Winslow, and Safford Complexes. Telehealth may be used.

**14.8.** Defendants shall ensure the formulary for psychotropic medications is no broader than the formulary used by AHCCCS. For prisoners admitted to ADCRR on a psychotropic which is not on ADCRR's formulary:

**14.8.1.** The medication shall be continued if, based on the prisoner's history, there is significant risk of worsening of the condition if a different medication is prescribed.

**14.8.2.** If no such risk exists, the medication shall be continued long enough to allow a safe transition to a different medication or medications.

**14.9.** Defendants shall ensure there is sufficient physical space to meet the treatment requirements of the mental health care system. This includes, but is not limited to, areas for mentally ill prisoners to be housed, engage in programming, and receive treatment (both individual and group) in a confidential environment commensurate with that unit/facility's designated level of care.

**15. Content of Care**

**15.1.** Defendants shall ensure a psych associate or psychologist conducts a mental health assessment of each prisoner within one business day of that prisoner first entering the ADCRR system. This assessment shall occur in a confidential therapeutically appropriate setting unless there is a clinical or legitimate and substantial safety and security concern that is documented.

**15.2.** The assessment shall identify and document sufficient relevant information regarding the presence and severity of mental health symptoms; current impact on functioning; past hospitalization/treatment including response to treatment;

medications; suicide risk; behavioral observations of staff; and a preliminary designation of level of care.

### 15.3. Outpatient

**15.3.1.** Prisoners at an outpatient level of care (*i.e.*, MH-3) shall have the following evaluations by their assigned PT:

**15.3.1.1.** an initial comprehensive mental health evaluation within one month of arriving at the assigned facility if not already completed when the prisoner first entered the prison system;

**15.3.1.2.** whenever clinically indicated to reflect a change in service delivery;

**15.3.1.3.** at least once per year.

**15.3.2.** A psychiatric practitioner shall conduct an appropriate clinical encounter with all prisoners in an outpatient level of care (*i.e.*, MH-3) on psychotropic medications as often as clinically required, but no less often than every three months.

**15.3.3.** A treatment plan meeting shall be conducted with the prisoner and their PT. A psychologist or psychiatric practitioner shall also be present for complex cases. At that meeting, the prisoner's treatment plan shall be reviewed and updated to determine adherence to treatment, efficacy of interventions, evaluation of the level of care needs, diagnostic impressions, progress to date in treatment, and steps taken toward moving to a less restrictive environment, if applicable. The timing of the treatment plan meetings should be based on the needs identified in the treatment plan, but no less often than once a year. The treatment plan shall include a date for next review based on the content of the plan. If no timeline is identified, a treatment plan meeting shall occur at least once per year.

### 15.4. Residential

**15.4.1.** All prisoners in residential level of care (*i.e.*, MH-4) shall have the following evaluations by their primary therapist:

**15.4.1.1.** whenever there is a significant change in the course of treatment, *e.g.*, new type of treatment including medication, significant decompensation;

**15.4.1.2.** at least annually, documenting the prisoner's need for residential level of care.

**15.4.2.** Prisoners in residential level of care shall have face-to-face encounters with their assigned PTs as determined by the treatment plan.

**15.4.3.** Prisoners in residential level of care shall have their treatment plans reviewed and updated as clinically indicated but no less often than every three months when the full team meeting described in the next section is conducted

**15.4.4.** A full team meeting shall be conducted at least every three months to include: primary therapist, psychologist, psychiatric practitioner, and any other staff as necessary.  Prisoners shall be included in the meeting unless there is a clinical or legitimate and substantial safety and security concern documented in the custody record.  That meeting shall include: determination of adherence to treatment, efficacy of interventions, evaluation of their level of care needs, rationale for the need for residential care, diagnostic impressions, progress to date in treatment, and steps taken toward moving to a less restrictive environment.

**15.4.5.** Prisoners in residential level of care shall have an appropriate clinical encounter with a psychiatric practitioner as often as indicated, but no less than every fourteen days.

**15.5. Inpatient**

**15.5.1.** All prisoners in inpatient level of care (*i.e.*, MH-5) shall have the following evaluations conducted by their PT if already on the mental health caseload (otherwise by the mental health provider assigned to the inpatient unit):

**15.5.1.1.** at least annually a comprehensive mental health evaluation reflecting rationale for inpatient placement including but not limited to current symptoms and functional impairment, timing and pattern of

decompensation, interventions attempted, diagnostic impressions (including potential substance-related impacts), progress in treatment to date, goals for treatment in the inpatient setting, anticipated length of stay, and criteria for discharge;

**15.5.1.2.** upon discharge from inpatient care, a discharge summary.

**15.5.2.** Prisoners in inpatient level of care shall have a daily face-to-face encounter with their PT unless such an encounter would be clinically contraindicated.

**15.5.3.** Prisoners in inpatient level of care shall have their treatment progress reviewed daily, and teams shall meet at least weekly with all providers (*e.g.*, nursing, psychiatry, mental health, social work, custody/unit staff, behavioral health technicians) and providers from the prisoner's previously assigned unit whenever possible.  Prisoners shall be included in the meeting unless there is a clinical or legitimate and substantial safety and security concern documented.  At a minimum, the focus of treatment teams shall be to provide updates on prisoner progress, the type and efficacy of interventions used, treatment adherence, potential obstacles to recovery, and rationale for continued placement in the inpatient unit.

**15.5.4.** A psychiatric practitioner shall conduct a clinical encounter with all prisoners in an inpatient level of care (*i.e.*, MH5) as often as indicated, but no less often than once per week.

**15.6.** Mental health care shall continue without interruption despite non-clinical events or conditions.   If a prisoner's treatment team changes due to a change in the prisoner's mental health level of care:

**15.6.1.** The "original" PT shall provide the "new" mental health team with the rationale for the change in mental health level and the anticipated treatment needs;

**15.6.2.** If the transition is to anything other than to residential or inpatient, the "new" PT meets with the prisoner within seven calendar days;

**15.6.3.** If the transition is to residential or inpatient level of care:

    **15.6.3.1.** the PT meets with the prisoner as soon as possible, but no more than one business day after arrival;

    **15.6.3.2.** the psychiatric practitioner is contacted and collaborates on the immediate care plan as soon as a prisoner is admitted.

**15.6.4.** If a prisoner's PT changes without a change in mental health level of care:

    **15.6.4.1.** If the transition is to anything other than to residential or inpatient, the "new" PT meets with the prisoner within seven calendar days;

    **15.6.4.2.** If the transition is to residential or inpatient level of care, the "new" PT meets with the prisoner within one business day.

**15.7.** All mental health encounters with all prisoners shall occur in a confidential, therapeutically appropriate setting unless there is a clinical or legitimate and substantial safety and security concern that is documented.

**15.8. Suicide Prevention**

**15.8.1.** During normal business hours a prisoner who presents as a suicide risk shall have a formal in-person suicide risk assessment completed by a licensed psych associate, psychologist, or psychiatric practitioner to determine the acute suicidal risk and the level of protection that is needed (*e.g.*, return to current housing, placement in one-on-one observation, etc.).  If an in-person assessment is not feasible or if the concerns are raised after normal business hours or on holidays, the on-duty mental health officer shall be consulted regarding the disposition of the prisoner (which may or may not include constant observation).  If the prisoner is placed on suicide watch as a result of the concerns raised, they should be placed under constant observation until they are able to have an in-person assessment of suicide risk by a mental health professional.

**15.8.2.** Defendants are encouraged, but not required, to engage appropriately trained and supervised Behavioral Health Technicians to substitute for correctional

officers as the individuals responsible for providing safety observation of, and engagement with, an individual (or cohort of individuals) on suicide watch depending on staffing needs of a particular location.

**15.8.3.** Upon recommendation from a psychologist or psychiatric practitioner that housing a prisoner on suicide watch in the same room with other suicide watch prisoners ("cohorting") would be clinically safer than housing each prisoner in isolation, Defendants shall cohort such prisoners, provided that based on the prisoners' custody classification (determined based on factors other than the fact that the individual is on suicide watch) such cohorting would not be contraindicated.

**15.9. Crisis Stabilization**

**15.9.1.** Crisis stabilization beds shall be used for short term (typically only a few days) management of prisoners who require acute care, *e.g.*, suicide watch.

**15.9.2.** Continued treatment in a crisis stabilization bed requires review and approval by a psychologist initially at seven days and every three days thereafter.

**15.9.3.** Prisoners in a crisis stabilization bed shall be evaluated at least daily by their PT (or another psych associate if they have not yet been assigned a PT or have transferred from another yard). Treatment providers shall document their intervention efforts, including but not limited to: assessing mental status; behavioral observations; documenting prisoner ability to independently care for activities of daily living; type(s) of treatment provided; response to interventions (including medication efficacy and compliance); anticipated length of stay; and criteria for discharge.

**15.9.4.** For prisoners placed in a crisis stabilization bed for suicidal concerns:

**15.9.4.1.** A suicide risk assessment shall be completed upon admission that identifies risk and protective factors and items/privileges they are allowed (based on treatment needs) while in crisis care.

**15.9.4.2.** The prisoner shall be assessed by a psychiatric practitioner as soon after admission as possible but no longer than one business day, in order to ensure there is not a medication issue or a question of medication appropriateness that contributed to suicidal ideation.

**15.9.5.** A clinical note shall be entered whenever the level of suicide watch is changed.

**15.9.6.** Prior to being released from a crisis stabilization bed if placed there due to suicidal concerns, a discharge suicide risk assessment shall be completed which documents: the change/reduction in suicidal risk; the prisoner's identified protective factors; and plans for follow-up treatment, and aftercare including a safety plan developed in collaboration between the prisoner and treatment providers.

**15.9.7.** "Safety contracts" (forms signed by prisoners, agreeing not to hurt themselves) shall not be used.

**15.9.8.** Transferring a prisoner in crisis to a different yard or complex can be clinically disruptive.  When possible and safe, Defendants shall attempt to provide stabilization at the complex at which the prisoner has been housed unless there is documented clinical justification for transfer based on the low likelihood of stabilization and/or clinical danger if the prisoner is maintained at the complex.

**15.10.** Restraints used by mental health clinicians for clinical purposes shall comply with the following:

**15.10.1.** Restraints shall be used only to prevent harm to oneself or to others and to ensure the safety and security of the staff and other prisoners.  They shall not be used for punishment.

**15.10.2.** Restraints shall be ordered and reviewed only by a psychiatric practitioner or psychologist.

**15.10.3.** Restraints shall only be applied for the minimum amount of time necessary to accomplish the stated need (*e.g.*, prisoner and staff safety, requisite transports, etc.).

**15.10.4.** Soft restraints shall be used whenever possible.

**15.10.5.** Subject to the following section, restraints shall not be used for more than four hours at a time. Every effort shall be made to minimize the length of time in restraints.

**15.10.6.** Renewal of restraints beyond four hours shall be approved by the Facility Medical Director/designee. If the Medical Director/designee are not available, a licensed mental health provider may approve continued use. The justification for continued use shall be documented in the prisoner's medical records. Renewals occurring after hours shall be done in collaboration with the Facility Medical Director/designee, a psychiatric practitioner, or a psychologist.

**15.10.7.** Prisoners shall be restrained only in settings that allow nurses sufficient access to perform wellness checks and provide necessary medical care. Nurses shall ensure that the restraints do not impair any essential health needs, such as breathing or circulation to the extremities. These checks shall be documented in the prisoner's medical records.

**15.10.8.** Prisoners in restraints shall be under direct observation at all times. If an observer notes any ill effects of the restraints, every effort shall be made to remedy the ill effects and a psychiatric or medical practitioner shall be notified immediately.

**16. Training**

**16.1.** The Court recommends, but does not require, Defendants provide additional training for all custody staff regarding mental illness and suicide prevention and response.

**16.2.** Additional training would be conducted in-person at orientation/CORE training, annual in-service, and whenever clinically indicated at any given facility.

    **16.2.1.** Topics would include, but not limited to: signs and symptoms of mental illness and decompensation patterns; working with mentally ill prisoners; suicide risk detection, prevention, and response; individualized Behavior Management Plans; de-escalation techniques; additional training for staff assigned to living units that house sub-class members, those in isolation, and those in Crisis Stabilization/Suicide Watch regarding therapeutic intervention strategies specifically suited to this population.

## 17. Release to Community

**17.1.** Defendants shall comply with the following regarding any prisoner designated serious mental illness ("SMI"), MH-4, or MH-5 who shall be released and who is presumptively eligible for federal or state assistance by virtue of their mental illness:

    **17.1.1.** Defendants shall develop and document an aftercare plan that reflects the prisoner's current symptoms and functional impairments, progress in treatment, and treatment plan;

    **17.1.2.** Defendants shall facilitate evaluation for SMI designation and placement in the community, as clinically indicated; and

    **17.1.3.** Defendants shall arrange follow-up care with an appropriate community provider where possible.

## 18. Involuntary Medication

**18.1.** Defendants are encouraged, but not required, to modify their policy to include grave disability as an indication for involuntary antipsychotic medications.

**Relief for Subclass**

The subclass consists of "[a]ll prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day." (Doc. 4335 at 123). This definition is broader than those prisoners housed at particular complexes or those prisoners with particular classifications (*e.g.*, maximum custody). The evidence at trial, however, established the members of the subclass were those prisoners:

(a) Formally classified as "maximum custody" pursuant to DO 801;

(b) Housed in a detention unit pursuant to DO 804;

(c) Placed on mental health watch pursuant to DO 807; and

(d) Placed in close management status pursuant to DO 813.

(Doc. 4335 at 136). It is possible prisoners outside of these four classifications will become subclass members. For example, if Defendants restricted minimum custody prisoners to their cells for more than 22 hours each day, such prisoners would then become members of the subclass. However, there was no evidence at trial of this actually occurring. For purposes of the injunction, the subclass will be construed as encompassing the four classifications outlined above as well as those possible additions referenced in Section 27.1.

As with the medical care and mental health care, the unconstitutional conditions imposed on the subclass can be attributed in large part to the lack of adequate staffing. The Court found the staffing levels at two locations housing subclass members were "far below what prison officials acknowledge as necessary to operate the units safely." (Doc. 4335 at 148). The lack of adequate staffing resulted in Defendants performing fewer welfare checks on subclass members and the checks actually performed were perfunctory. (Doc. 4335 at 147-48). The lack of adequate staffing also meant offers for out-of-cell time were "not made, [were] not legitimate, or [were] accompanied by unreasonable consequences." (Doc. 4335 at 156).

Connected to the lack of staffing, the Court found Defendants' recordkeeping

practices were haphazard and often unreliable.  The Court found Defendants knowingly created documents in a false or misleading manner.  (Doc. 4335 at 152).  The Court also found Defendants "pre-filled" forms for entire weeks, meaning there was no evidence of "what truly happened."  (Doc. 4335 at 157).  Even when documentation was generated indicating unconstitutional treatment, there was no evidence Defendants took corrective action.

Finally, the Court found Defendants' initial classification decisions are not supported by legitimate penological interests.  In addition, Defendants place or keep prisoners in conditions rendering them subclass members even when Defendants agree those prisoners should be housed elsewhere.  For example, two Deputy Wardens admitted there were prisoners being held in maximum custody who should have been housed in less-restrictive environments.  (Doc. 4335 at 142-43).  While Defendants have a policy allowing prisoners to "earn their way" into placement in less-restrictive environments, that policy is administered "in a random and chaotic way."  (Doc. 4335 at 162).  Thus, Defendants' administration of their policies for placing, keeping, and removing prisoners from the most restrictive environments were not supported by legitimate penological purposes.

The unconstitutional treatment of the subclass can be directly attributed to inadequate staffing, unreliable or nonexistent records, Defendants' failure to review their records indicating there were problems, Defendants' classification policies, and Defendants' failure to implement their own policies.  These basic findings support the expert's recommendations for the following requirements.

**19. Basic Requirement**

Defendants shall ensure all custody decisions and reviews made by custody officers, supervisors, and committees are reasonable and consistent with legitimate penological interests.  Defendants shall implement a system to facilitate the return to lower levels of custody for those prisoners who have been housed in maximum custody or close management for longer than two months.[9]

---

[9] The expert recommended the Court prohibit Defendants from transferring subclass members to private prisons.  This prohibition would prevent Defendants from avoiding the

## 20. Staffing

**20.1.** To determine the minimum number of staff to safely operate the locations where subclass members are held, including sufficient staff to allow for out-of-cell time, the Court will appoint an expert to be named to conduct a staffing plan of custody positions at each location.  That expert's services shall be paid by Defendants.  The staffing plan shall be filed with the Court within three months from the date of this Order.  The plan shall designate each post as Mandatory, Essential, or Important. The plan shall contain recommendations that shall be reviewed and, if approved, ordered by the Court.  Any objections to the staffing plan and recommendations shall be filed within ten days and a response to the objections shall be filed within ten days thereafter.

**20.2.** Upon receiving the staffing plan from the expert, the Court anticipates ordering Defendants to comply with the following.  Defendants shall take all necessary steps to ensure performance of the following once the staffing analysis has been completed.

**20.2.1.** Defendants shall staff all Mandatory Posts at all times; Essential Posts shall always be staffed at least 75%; Important Posts shall always be staffed at least 50%.  If ADCRR falls below these levels, it shall immediately inform the Court. The failure to maintain the required staffing levels will not be an acceptable excuse for any other failure to meet requirements in this Order.

**20.2.2.** Defendants shall document on an annual basis an assessment of the operative staffing plan and document any requests for necessary adjustments to the plan.  The assessment shall be provided to the Court on the last business day of January each year.

---

requirements of this Order by transferring subclass members to locations where they might still be subject to unconstitutional conditions of confinement.  At present, the Court does not have the authority to prohibit such prison transfers.  However, at some point, the private prisons may be considered under the control of Defendants such that Defendants could be required to ensure prisoners who are transferred are held in conditions that do not violate this Order.

**20.2.3.** Whenever Defendants fail to comply with the staffing levels, Defendants shall file with the Court a "Deviation from Staffing Plan Report" by the tenth day of the following month. That report shall specifically identify the deviation(s) that occurred and provide acceptable justifications for the deviation(s).

**20.3.** While awaiting the expert's staffing plan, Defendants shall begin compiling data such that they can submit the following information:

**20.3.1.** Beginning on March 31, 2023, and continuing every quarter thereafter (*i.e.*, June 30, September 30, and December 31), Defendants shall file with the Court a "Correctional Staffing Report." Each quarterly report shall include:

- the number of correctional staff assigned to each facility;
- the number of correctional staff still employed by each facility at the end of the quarter;
- the turnover rate, that is, the number of voluntary and involuntary terminations during the quarter divided by the total number of correctional staff assigned at the end of the quarter, including each figure in the calculation in addition to the ultimate result;
- the retention rate, that is, the total number of correctional staff at a facility who have worked for that facility for twelve months or longer divided by the total number of correctional staff assigned at the end of the quarter, including each figure in the calculation in addition to the ultimate result;
- the total number of overtime hours for correctional staff at each facility for the quarter; and the vacancy rate (number of vacant positions at the end of the quarter divided by the total number of correctional staff and vacant positions at the end of the quarter).

**20.4.** Increased salaries may be necessary for Defendants to reach adequate staffing levels.  The Court will not order increased salaries at this time.  Defendants are warned that if they remain unable to recruit and retain sufficient staff, the Court may later mandate salary increases.

**20.5.** In the future, the Court may require custody staff be afforded at least 8 hours of rest between shifts and that staff who are required to commute more than 130 miles shall not be subjected to additional work assignments that occur before or after their normal working hours.  These limits may be imposed if Defendants are deemed overly reliant on overtime to perform critical duties.  Reliance on overtime can be a temporary solution but ultimately it creates a significant risk of staffing shortages should individuals discontinue volunteering for overtime.

**21. Recordkeeping**[10]

**21.1.** Defendants shall install and fully implement an electronic offender management record keeping Web-based software application ("EOMS") that is accessible via standard Web browsers.  Within six months of this Order, this system shall be installed at all areas housing subclass members.

**21.2.** The EOMS chosen by Defendants shall have the following capabilities.

**21.2.1.** Ability to automate key operational workflows, tasks, and reporting requirements such as: tracking prisoner movement out of cell, via passive, high-frequency RFID Cards, and mobile devices and/or fixed RFID readers; logging cell checks and security checks via fixed RFID Tags; store photographs and video with audio, automating prisoner activity logging, and automating whether prisoner services such as meal delivery, recreation, medications, supplies, laundry and bedding, have been completed or refused, as well as functionality Defendants believe will help validate their actions;

---

[10] Normally, requiring data collection in whatever form Defendants deemed appropriate would be the less intrusive way of tracking compliance.  However, Defendants' documented inability to generate reliable and accurate paper records requires the Court mandate installation of an electronic recordkeeping system that ensures against falsification of records.

**21.2.2.** Ensure that all electronic log entries as well as other electronically captured data cannot be edited, deleted, or altered in any way;

**21.2.3.** Support a real-time or near real-time interface with ADCRR's electronic prisoner management system to share prisoner demographics information and housing assignments;

**21.2.4.** Use portable devices that support Wi-Fi and an embedded high-resolution camera capable of taking photographs and recording videos;

**21.2.5.** Use RFID tags that are high-frequency and capable of near-field communication. RFID tags shall contain a unique identification number that cannot be duplicated or altered, support secure mounting, be enclosed in a tamper-proof, shatter-proof unit, and have the ability to identify prisoners by name when scanned;

**21.2.6.** Support digital incident codes that can be customized by system administrators and used by end users to collect observations of prisoners and other activities;

**21.2.7.** Enable users to create a unique PIN to authenticate login privileges or login via RFID fob or ID card;

**21.2.8.** Support Web browsers, such as Chrome, Firefox, or I.E. that is password protected;

**21.2.9.** Support prisoner level documentation where log entries positively identify prisoners by name and housing assignment;

**21.2.10.** Generate prisoner level reports that identify prisoners by name and identification number;

**21.2.11.** Support the ability to log meals, movements, recreation, refusals, headcounts, medications, supply passes, security checks, etc. by prisoner name, officer ID, and time/date;

**21.2.12.** Automatically distinguish (visually) between log entries created by RFID scan versus those manually recorded without an RFID scan or "read";

**21.2.13.** Include a real-time module that tracks system usage to display the date, time, and location of completed activities; and

**21.2.14.** Support electronic signature captures.

**21.3.** To ensure accurate monitoring, the EOMS chosen by Defendants shall support the following reporting capabilities:

**21.3.1.** Export data into multiple file formats, such as PDF, Excel, HTML, and XML to be printed and/or saved to a local area network;

**21.3.2.** Retain data in accordance with required state record-retention laws and rules;

**21.3.3.** Automatically generate and send reports via email to select recipients; and

**21.3.4.** Filter reports by date, time, housing unit, prisoner name, booking number, and officer ID.

**21.3.5.** Produce the following:

- Prisoner Activity Report
- Housing Activity Report
- Round Compliance Report
- Meals Report
- Recreation Report
- Movement Report
- Population Report
- Use of Confinement Report
- Maintenance and Equipment Report

**22. Access to Staff**

**22.1.** Defendants shall not house any subclass member in a housing location where a subclass member lacks the ability to effectively contact a staff member immediately, either via in-person or via a call button/intercom system.

**22.2.** The installation of call buttons or an intercom system in every cell housing a subclass member is ideal but would require significant expenditures that, at present,

does not appear merited.  The Court recommends but will not require, installation of such a system.

**23. Building Conditions**

**23.1.** Within three months of this Order, all showers used by subclass members found in disrepair (rusted, leaking, broken pipes, etc.) shall be repaired and, if needed, resurfaced, professionally painted after appropriate preparation, and/or new shower pans installed.[11]

**23.2.** Defendants shall maintain all showers used by subclass members in good operational state.  Showers shall be sanitized daily or more often if needed and shall be free of filth and mold/mildew.  Showers shall be resurfaced and/or painted on an as-needed basis and all new paint should be mixed with a mildewcide additive to reduce the presence and growth of mold and mildew.

**23.3.** Recreation areas used by subclass members shall be cleaned at least daily and kept free of filth, rodents, and insects.  A log entry shall be made in the EOMS application for each housing unit at the time a recreation area is cleaned.

**23.4.** Defendants shall, within three months of this Order, take the following actions regarding cells or areas used by subclass members:

**23.4.1.** repair or replace essential equipment or structures in cells found in disrepair (rusted, leaking or broken pipes, sinks and toilets, etc.);

**23.4.2.** cells found in need of painting shall, after appropriate preparation, be professionally painted.  New paint should be mixed with a mildewcide additive to reduce the presence and growth of mold and mildew.

**23.5.** Defendants shall, at all times after three months of this Order, ensure the following regarding cells or other areas used by subclass members:

**23.5.1.** maintain all cells in a serviceable, good operational state, ensuring the cells are kept free of filth, mold, mildew, rust, vermin, and insects.

---

[11] Obviously, as a matter of common decency, it should not require a formal injunction to prompt Defendants to repair leaking pipes, repair inoperative toilets, or collect trash. However, Defendants' behavior throughout this litigation showed they cannot be relied upon to perform such basic tasks.

**23.5.2.** professionally re-paint cells after appropriate preparation as needed.  New paint should be mixed with a mildewcide additive to reduce the presence and growth of mold and mildew.

**23.5.3.** All areas used in conjunction with subclass members to include, but not limited to dayrooms, showers, recreation areas, classrooms, etc., shall be kept in a clean and sanitary condition, free from any accumulation of dirt, filth, rubbish, garbage, rodents, vermin or other matter detrimental to health (mold/mildew).

**23.5.4.** Housing unit staff shall daily ensure the removal of trash and garbage from all areas.  Each unit's housekeeping program shall include a daily general sanitation inspection by a supervisor.  The inspector shall make a log entry in the EOMS application for each housing location inspected.

**23.6. Access to Cleaning/Sanitation Supplies**

**23.6.1.** Subclass members shall have access to effective cleaning and sanitizing supplies necessary to properly clean their own living area.  Supplies shall include, as consistent with operational safety, access to cleaning detergents, rags, sponges, scrub brushes, mops, mop bucket, broom, dustpan, etc.  A log entry shall be made in the EOMS application for each housing location that includes the date and time the supplies were provided and the date and time the supplies were collected.

**23.7. Pest Control**

**23.7.1.** Defendants shall utilize a pest control contractor on a semi-monthly basis to eliminate vermin, insects, and rodents by safe and effective means in all common areas used by subclass members.  This pest control service shall include all cells where the subclass member occupying the cell agrees to the service.  A log entry shall be made in the EOMS application indicating the location, date, time, name of the company representative performing the pest control service, and the service performed.

## 24. Subclass' Members Access to Services

This Order contemplates almost all prisoners will be able to submit requests for medical services and other matters via electronic tablets. Therefore, Defendants shall ensure the following:

**24.1.** Within six months of this Order, the tablets provided to subclass members shall allow them, in a language they understand, to make direct requests for services including medical/mental health services, file a letter or other request that is required before filing a grievance, file a grievance, file an appeal, access and send electronic mail (both personal and professional), check their commissary account balance, obtain current program schedules and curriculum, purchase commissary items, access case notices regarding letters and grievances, access to the prisoner handbook, access their disciplinary documents, access their hearing documents, access their appeal decisions and access to their current classification level and progress towards the next step down. The tablet should also allow access to entertainment such as books, educational materials, music and movies, consistent with a subclass member's classification and step levels. Until tablets are issued and have this functionality, and thereafter for prisoners who are not permitted to have electronic tablets or who do not have access to an electronic tablet due to tablet malfunction, Defendants shall provide paper or other means to access documents and make requests consistent with the subclass member's custody level.

## 25. Body Scanners

There was evidence at trial that subclass members undergo routine strip searches. The expert recommended Defendants use full-body scanners to reduce the use of and reliance on strip searches. Full-body scanners are preferable but, at this time, the Court will not mandate the installation of full-body scanners at all locations housing subclass members.

## 26. Food Service and Meals

**26.1.** All subclass members shall be provided a minimum of three separately provided meals a day (breakfast, lunch, dinner) consisting of two hot meals and one cold meal with no more than 14 hours between dinner and breakfast.  Breakfast and lunch may be served together on weekends and holidays, provided one is a hot meal and nutritional needs are met.  These meals shall be of the same quality and have the same nutritional and caloric content as meals served in general population.[12]

**26.2.** When a subclass member refuses three meals of any kind in a seven-day period or displays a significant change in eating habits (*e.g.*, accepts meals but does not consume them; does not consume significant portions of a meal; refuses meals intermittently, etc.,) corrections officers shall immediately notify medical staff.

**26.3.** The following log entries shall be made for subclass members:

**26.3.1.** when a meal is provided or refused, an entry that includes the type of meal (regular diet, therapeutic, religious) and, if the meal was refused, a video recording of the refusal;

**26.3.2.** when a therapeutic or religious diet begins and/or ends, an entry that includes the type of diet and the reason for the beginning or ending of the diet (which, for medical diets may be that the order from a medical provider began or ended).

**27. Out-of-Cell Activities**

**27.1.** Subclass members, including any prisoners in the Restrictive Status Housing Program and the Enhanced Management Housing Status who do not qualify under one of the four categories outlined previously, shall be offered 14 hours or more per week of out-of-cell time to include opportunities for recreation, showers, individual/group therapy where eligible for such services, visitation, phone calls, or other offered activities.

---

[12] The expert recommended Defendants have food service areas inspected by a health department official and that Defendants ensure they have an emergency meal plan to cover situations where food or water is temporarily unavailable.  Oddly, Defendants have contested these requirements.  The Court will not order them at this time.

**27.1.1.** If the subclass member is offered out-of-cell time, but the subclass member voluntarily does not accept, the time they would have been out-of-cell counts towards out-of-cell time.

**27.1.2.** If out-of-cell time is scheduled but not available, not offered, or offered at unreasonable times (*e.g.*, 4:00 A.M.), that time shall not count towards out-of-cell time.  When out-of-cell time must be canceled due to an unforeseen situation, reasonable efforts shall be made to re-offer the out-of-cell time.  Chronic insufficient staffing is not an unforeseen situation.

**27.1.3.** A log entry shall be made in the EOMS application that includes the type of activity, the time the activity began and ended, or, if the prisoner refuses, a video recording of the refusal.

**27.1.4.** Defendants must continue to perform and monitor their obligations under this Order even after subclass members are offered more than fourteen hours of out-of-cell time in one week.  Defendants shall continue to document activities of those locations housing subclass members as the date of this Order until such time as this Order is terminated.

**27.2.** All subclass members shall be provided regular access to showers, at a minimum of three times per week with no more than three days between showers.

**27.2.1.** For each subclass member who takes a shower or refuses to take a shower, a log entry shall be made in the EOMS application that includes a video recording of the refusal if the prisoner refused.

**27.2.2.** When a subclass member refuses to shower on a continual basis or displays a significant change in hygiene habits, medical staff shall be immediately notified.

**27.3.** Within one month after issuance of this Order, all subclass members shall be provided the following:

**27.3.1.** Regular access to outdoor recreation areas at least consistent with the subclass member's classification and, for those in Maximum Custody, their

step level as described in Department Order 812 as of November 21, 2022; at a minimum each subclass member shall have three separate 2.5-hour blocks per week in enclosures of at least 100 square feet and, for all those not in Max Custody Step 1, some ability to socialize with others.

**27.3.2.** Recreation areas shall have constant supervision, in-person, by qualified staff members and have available shade and clean drinking water.

**27.3.3.** A log entry shall be made in the EOMS application for each housing unit when a portable beverage cooler for a recreation area is provided clean drinking water.

**27.3.4.** For each subclass member who refuses to recreate, a log entry shall be made in the EOMS application that includes a video recording of the refusal.

**28. Personal Property**

The expert recommended Defendants take steps to ensure the proper distribution and laundering of clothing, the proper distribution of bedding supplies, and the proper distribution of personal care items such as soap and toilet paper.  Defendants object to this recommendation and at this time the Court will not order Defendants to distribute and track these items.

**29. Classification**

**29.1.** Defendants shall assign a corrections officer ("Classification Monitor"), with no other collateral duties, to each individual unit housing subclass members to ensure all classification reviews, step progression (up or down) and movements to an appropriate new housing location are processed and completed within ten days. The reasons and evidence considered shall be documented in the subclass member's classification record.

**29.2.** Defendants are required to provide subclass members in maximum custody or close management a written or electronic copy of their individualized case plan, in a language the subclass member understands that describes the actions needed, as well as associated timeframes, to progress in their steps in maximum custody and

generally to gain more privileges and to lower their classification level (less restrictive housing).

**29.2.1.** Defendants are required, at intervals not to exceed one month, to conduct and document an evaluation of each of the subclass member's progress under the individualized plan.  The evaluation should also consider the state of the subclass member's mental health; address the extent to which the subclass member's behavior, measured against the plan, reasonably justifies the need to maintain, increase, or decrease the level of controls and restrictions in place at the time of evaluation; and recommend full classification review when appropriate.  The documentation shall be sufficiently detailed to show the basis for any decisions made in the evaluation (including increasing, decreasing, or maintaining privileges).

**29.2.2.** Defendants are required, at intervals not to exceed six months, to conduct a full classification review involving a meeting of the subclass member and the classification committee, except in exceptional circumstances justified by legitimate safety concerns the subclass member need not attend.  At that meeting it shall be determined whether the subclass member's progress toward compliance with the individual case plan or other circumstances warrant a reduction of restrictions, increased programming, or moved to a lower level of custody.  If a subclass member has met the terms of the individual case plan, there should be a presumption in favor of releasing the subclass member from maximum custody or close management.  The documentation shall be sufficiently detailed to show the basis for any decisions made in the classification review (including increasing, decreasing, or maintaining privileges or classification).  A decision to retain a subclass member in maximum custody or close management following consideration by the classification review committee should be reviewed by the facility warden or deputy warden, and approved, rejected, or modified as appropriate.  When the

warden or deputy warden disagrees with the classification committee's recommendation, the Regional Operations Director shall review the matter and make a determination.  The Regional Operations Director's decision is final.

**29.3.** Defendants are required to ensure enough beds are available for the number of subclass members placed in each classification level.  When a higher or lower classification level is achieved, the Classification Monitor shall within ten days re-house the subclass member into a location associated with their new classification level and step as well as afford them the appropriate privileges associated with the new classification level and step.

## 30. Detention Unit Supervision

Defendants shall assign a full-time qualified staff member, with overall unit authority and no other duties, to each detention unit to ensure all services, assessments, programs and activities in the detention unit are completed as required and shall ensure those prisoners who are eligible to leave the unit are re-housed within ten days.

## 31. Disciplinary Process

The evidence established at trial that prisoners are placed in detention units, often remain there indefinitely, and that the disciplinary system was "irrational[] and unfair[]." (Doc. 4335 at 142).  The Court's expert made many reasonable recommendations for how Defendants should restructure their disciplinary processes.  The Court will not require Defendants implement them at this time.  The other limitations Defendants are ordered to comply with will ameliorate the harm caused by Defendants' irrational disciplinary policies and procedures.