Mr. Roberto Carrasco Gamez #134101
ASPC-Eyman-SMU I
P.O. Box 4000 S Florence, Ariz. 85132

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Jensen
Plaintiff

v.

Thornell / Shinn
Defendant

CASE NO. 12-cv-0601-PHX-ROS

Motion to Intervene / Preliminary
Injunction

Comes Now, Plaintiff Gamez, in pro per, hereby asks this court to intervene and/or issue an Injunction ordering the Arizona Dept. of Correction Director Thornell/Shinn to dismantle its unauthorized barbaric Unconstitutional Solitary Confinement housing Unit at ASPC-Eyman-SMU I Florence, Arizona, As soon as possible to:

1. Declare (Special Security Unit ("SSU") and Federal Bureau of Investigation ("FBI")) SMU I (P.C.) housing conditions, as unconstitutional.

2. Produce its handbook regarding its policies and Procedures

3. Disclose Final Court Order in Clark Jr., Pitt 19-cv-4332 ROS, to All (P.C.) prisoners regarding Staff misconduct.

4. Order An Independence Investigation of On-Going Retaliatory Misconduct, Torture and Abuse (AZDCs) SMU-II (P.C.) Maximum Custody Experimental Blacksite

page 1

5. Disclose (GAMEZ') prison file to determine the severity and permanence of the situation he is currently in; All-to-frequent Memo's regarding (ADC') officials and (FBI's), and I (P.C.') Maximum Custody, "Experimental Blacksite".

## Memorandum of Points and Authorities

An injunction may be granted when the Movant shows that he is likely to succeed on the merits; that he is likely to suffer irreparable harm; in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public's interest. [Am Trucking Ass. Nat. Inc. v. Cit. of Los Angeles 559 F.3d 1046, 1052 (9th Cir 2009)] A preliminary injunction is an extraordinary and drastic remedy and should not be granted unless the movant by a clear showing carries the burden of persuasion Lopez v. Brewer 680 F.3d 1068, 1022 (9th Cir 2012)

(GAMEZ') is asking for a MANDATORY PRELIMINARY injunction which is subject to heighten scrutiny and should not be issued unless the facts and law clearly favor the moving party, DABIL. Hemp [PHARMACEUTICALS CORP. 7 F.3d 1399, 1403 (9th Cir. 1993)]

I. (GAMEZ') is likely to succeed on the merits.

To prevail on an Eighth Amendment Medical Care claim Plaintiff must demonstrate deliberate "indifference to serious medical needs" Jeff v. Penner 439 F.3 1091, 1096 (9th Cir 2006") citing Estelle v. Gamble 429 U.S. 97, 104 (1976) There are two prongs to the "deliberate indifference analysis" An objective standard and a subjective

Page 2

Standard.

First plaintiff must show an objective Serious Medical Need. Jett 439 F.3d at 1096. A Serious Medical Need exists if the failure to treat a prisoners condition could result in further significant injury or the unnecessary wanton infliction of pain. McGuckin J., Smith 974 F.2d 1050, 1059 (9th cir. 1992) overruled on other grounds, WMX Techs, Inc. v. Miller, 104 F.3d 1133, 1136 (9th cir. 1997) (en banc).

Second plaintiff must show that defendants response to that need was deliberately indifferent. Jett 439 F.3d at 1096. The state of mind required for deliberate indifference is subjective recklessness, however the standard is less stringent in cases involving a prisoners medical needs, because the states responsibility to provide inmate (with medical/mental health care ordinary does not conflict with competing administrative concerns. Snow v. McDaniel 681 F.3d 978, 985 (9th cir 2012)

The deliberate indifference prong is met if the plaintiff demonstrates:

1. A purposeful act or failure to respond to a prisoners medical need and;

2. Harm caused by the indifference. Id. Further, prison officials are deliberately indifferent to a prisoners serious medical needs if they deny delay or intentional interfere with medical treatment. Wood v. Housewright 900 F.2d 1332, 1334 (9th cir. 1990)

("Camez") is a class action representative in Jensen v. Shinn, and is part of a subclass in the present litigation. ("Camez") is currently confined to solitary confinement housed in Arizonas debilitating Eyman-SMU-I in Florence, Ariz.

Page 3

(Gamez) alleges that the Arizona Dept. of Corrections (ADC) implements a policy and practice of time under excessively harsh conditions and must have been aware that the denial of meaningful human contact for an extended period of time will cause severe psychological and physical injury.

(Gamez) has been in Solitary Confinement since March 03, approx. twenty years with no meaningful review of his conditions of confinement. In (2020) (Gamez) was placed on a secret list to be transferred to Florence Solitary Confinement. (ADC) failed to provide meaningful procedural protections when placing prisoners in "SMU I (BC) Maximum Custody experimental Black Site". In (2017) (Gamez) was placed on a terrorist watch list based on contrived, unreliable, flawed and fabricated evidence from Confidential Informants in violation of the fourteenth Amend. due process guarantees. the investigative agencies are either employed for (ADC) or the Arizona Attorney General's office.

When (Gamez) arrived to SMU I (FBI) and (ADC) officials engaged in a pattern of retaliatory misconduct, he was placed in a pod within direct earshot and visual of the same Confidential Informants (CI) participated in the botched investigation and that had associated the (FBI) and (OCU) officials. It was later determined through covert records, that the (CIs) and the investigative agencies had developed inappropriate relationships and conspired to plant and manufacture evidence against the targeted suspects. When the (FBI) attempted to speak to (Gamez) in (2017) he invoked his Fifth Amend. right to remain silent and requested a lawyer.

(ADC) prison officials routinely lie about information from the so-called "Confidential Sources", coach, use

Page 4

intimidation and incentives to gather information and use that information [in secret] to send people to its torture chambers At "SMU I (P.C) MAXImum Custody Experimental Blacksite. The habit in which ("SSU") obtains its intelligence is Flawed And Unreliable, and creates an ongoing violation of (Gamez's) Constituent rights to a meaningful Opportunity to be heared [In the context of their Ability to Refute the Veracity of the evidence used] to Avoid Harsher Condition?

(Gamez) is subjected to Constant Retaliation, Harassment, and Round the Clock Surveillance, spied on by ("SSU") and ("FBI") Confidential Informants including using advanced technology that has the capability to eavesdrop on privilege communication ("HIPAA") violations, then conveying it back by using different forms of communication including hieroglyphs Cuneiform, music, Graphics on Inmate Tablets, Radio, and T.V.s

("ACC") SMU I (P.C) MAXImum Custody Experimental blacksite operates by No official set of policies or procedures and provides No Recourse to transition out of this Blacksite. This pod consist of Approx. Twenty prisoners including all targeted suspects in the botched Terrorism investigation (Gamez) was Advised that this program was controlled by ("SSU") officials At Central Office. (Gamez) was Not told why he was transferred from Lewis where (P.C) prisoners are housed, Nor was he told About the severity and permanency of the situation he is currently in.

(Gamez) Asserts that his Allegations can be substantiated by Surveillance Cameras, Court filings in Crane Jr. V. Ritz 19-cv-115 R09; State v. Bastian (Gamez) believes ("FBI") agents are hacking into (ACC's) Electronic devices, Inmate Tablets, Cameras, phones Page 5

And using them to track it's intended targets entire life, Social Media Contacts and Search data. Maliciously hacked Software can Also be used to Remotely Active CAMERAS and hidden Microphones offering another means of glimpsing into the personal business of a target, sharing images of prisoners while completely NAKED with other Men's.

Furthermore, (FBI) and (ADC) officials are able to track prisoners Medical history, Chronic illnesses, heart Rates, pulse including the Medications prisoners take on a daily basis. (FBI) and (ADC) have Resorted to Ozone Activity like constant fogging "Gaseous Chemical", burning plastic (Toxic), then using the Ventilation System to direct the poison directly into (Gamez") Cell or spraying it into the Rec pin. Where (Gamez") Cell is adjacent to. Since (Gamez") moved to "SMU-I (PC") Maximum Custody Experimental Blacksite" has Mental and physical health has deteriorated tremendous, Exacerbated Anxiety, Chest pains, shortness of Breathe, heart attack symptoms, Asthmatic, panic Attacks. (Gamez") has become violently Insane and undoubtly Fears he will not recover his Sanity.

(Gamez") Alleges (SSU") and (FBI") Staff use telepathic communication to Brain Wash, desensitize, dehumanize, use as a Mind Control device in hopes (Gamez") would Commit Suicide or physically Assault another prisoner so that (ADC") or (FBI") officials have justification to shoot him (Gamez") has Visually Witnessed DRONES Fly over him on Multiple Occasions at Rec. (Gamez") feels like he is in a Constant Warzone or that the pressure continuously increases similar to an Animal in a boiler "SEE: Graphic"

Since (2017") (SSU) and (FBI") officials use (CI's") to disseminate personal information, misinformation and          Page 6

misleading information to humiliate, alienate and cause distrust amongst the prison population to divide and conquer. This staff misconduct was raised and litigated in this court in (Cruz Jr. V. Pitz 19-cv-4532 PGS) but probably not, this interval. (Gamez) is currently confined to solitary confinement, he spends 23 1/2 hours a day inside his cell.

Since the Parsons Class Action started in (2011) (Gamez) has been placed in housing assignments as a form of punishment either because of his litigious activity or being a Class Action Representative. (Gamez) has deliberately been placed in cells smeared with feces "Constant foul odor" and/or next to delusional prisoners who scream, cry, flood, bang, throw feces and commit suicide. Most recently (Gamez) was forced to live in a cell for three months where the plumbing was broke. His entire floor would flood but despite of multitude of request to move or fix it ("SOU") refuse to move him or fix the problem. (Gamez) sat in a large puddle of musty-smelly and moldy water that came from broken or backed up pipes.

II. (Gamez) will suffer irreparable harm in the absence of preliminary relief.

Not only will (Gamez) suffer irreparable harm to his health, he already is suffering irreparable harm with each day that passes. (Gamez) urgently requests that the injunction ordering this court. Order an independent investigation into the egregious misconduct described herein, dismantle (ADC's) SMU I (P.C.") Maximum          Page 7

Custody Experimental Blacksite; with the least possible delay. Each day that proper treatment is denied is an irreparable harm that will continue until this court grants Injunctive Relief to (Gamez")

III. The balance of equities tips sharply in (Gamez's) favor.

The balancing of equities involves weighing the Relative hardships on the parties if an injunction is granted. Here, the balance tips sharply in favor of (Gamez") because his serious and painful health conditions are recognized hardships whereas, the only hardship on (ADC") director is that of complying with their own stated policies, and forms of decency.

(ADC") officials should not be allowed to claim any hardship caused by following the U.S. Constitution.

IV. An Injunction is in the public interest.

It is always in the public interest to prevent the violation of a party's Constitutional rights. Melendres v. Arpaio, 695 F.3d 990, 1002 (9th cir. 2012)

V. Defendant Thornell/Shinn have Actual Notice of (Gamez's) serious mental health needs and the violation of his federal Constitutional Rights Under the Eighth and fourteenth Amend.

Fed. R. Civ. P 65 (A)(1) Requires Notice be given to        Page 8

the Adverse party. Defendants have had Notice since the start of the Parsons/Shinn CLASS Action. No further Notice should be Necessary for those defendants to present their Arguments as to why "GAMEZ" should continue to suffer without proper Mental health and Conditions of Confinement.

"GAMEZ" seeks injunctive Relief because he does not have an equally, plain, speedy, and Adequate legal Remedy. This motion is Authorized by and filed pursu Ant to Rule 65

Respectfully Submitted this 28th day of Feb. 23
Under penalty of Perjury

Mr. Roberto CARRASCO GAMEZ #131401
ASPC Eyman ~SMU I
PO Box 4000 ~ Florence

Exhibit A

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Informal Complaint Resolution

Complaints are limited to one page and one issue.
Please print all information.

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Gamez Robert C | 131401 | ASP-Eyman. EMU | 14 Feb 23 |

| TO | LOCATION |
|---|---|
| COIII Fernandas | B7 |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

In 2017 I was placed on Max SMU which is based on fabricated evidence by
confidential informants working for the FBI. Immediately hereafter FBI and ADC
officials have engaged in a pattern of retaliation by misconduct when Gamez was
allowed to phone. He was placed in a pod with exposed FBI contacts/informants
who had provided the FBI/ADC incriminating statements against me (Gamez) who
objected to constant retaliation, harassment and round the clock surveillance
operation of FBI and ADC intelligent bodies in advanced technology that has the
capabilities to eavesdrop on privileged communications. Telecommunication methods are
also utilized as a brainwashing mechanism used to root out movements, wants and
dictate ones behavior. Gamez is a class action representative in sensory. He
has filed multiple lawsuits against ADC and was accused of association with a
great deal of alleged terrorist suspects. I currently have pending litigation against
the FBI/CIA who have conspired to harass, retaliate and defame me. Gamez as
his best documents in 2021 Gamez was placed on a secret list to be (permanently)
(or blacklisted) that is operated by no oral set of policies or procedures and
provides no recourse to transition out of this blacklist. Gamez was not to be
about the severity and permanency of the situation he is currently in. Gamez asserts
that his allegations can be substantiated by surveillance cameras, documents and
monitors. FBI agents are hacking into ADC's electronic devices, tablets, phones and
using them to track its intended targets social media contacts and seized data.
Maliciously hacking software can also be used to remotely activate cameras and
microphones affording another means of a glimpse into the personal business of a
target snatching images of people while completely naked with other viewers.
Furthermore, FBI and ADC officials are able to track anyones medical history, medical
chronic illness, heart rate and pulse, including the Marathon prisoners take on a
daily basis and is evident by the change in his body, inability to breathe, clots in

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | 14 Feb 23 |

Have you discussed this with institution staff? ☐ Yes ☐ No

If yes, give the staff member name:

Distribution: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy – Inmate
FINAL: White – Inmate; Canary – Grievance Coordinator File

802-11
6/25/14

| INMATE'S NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/FACILITY | CASE NUMBER |
|---|---|---|---|
| Gamez Robert | 13101 | ASPC Eyman | |

his cell, watery eyes and heart attack like symptoms. For instance, a few months ago Gamez was face down inside his cell with severe chest pains and numbness to his hands and feet. A Medical ICS was initiated.

(Fox) and (ADC) have resorted to Ozone Activity like constant Fogging, burning plastic (toxic) things, thru the ventilation system to direct the poison directly into (Gamez's) cell or nearby rec run, where (Gamez's) cell is adjacent to. Since (Gamez) moved into this cell his asthmatic condition has exacerbated ten times worse. The constant fogging has debilitating effects on Gamez' physical and Mental state of Mind.

(ADC) officials have completely ignored and acquiesced these horrendous tortures and abuse, despite knowledge / threats (ADC) records witnesses and confidential informants.

(Fox) and (ADC) have used confidential informant(s) to disseminate personal information, Misinformation and Misleading information to humiliate, alienate and cause distrust amongst the prison population, And turn all against one. Furthermore despite knowledge of horrendous tortuous abusive, high pressure, tactics and psychological coercive techniques to elicit information to stop the torture. Government officials pretend not to connect the dots.

(Gamez) alleges (ADC) (SSU) staff use telecommunication tablet, radio, T.V., techniques to communicate – Telepathy as a Mind control substance to drive a person insane and control behavior. (Gamez) is currently confined to Solitary confinement he spends 22½ hours a day in his cell and has spent the previous twenty (20) years in solitary confinement.

| SIGNATURE | DATE (mm/dd/yyyy) Feb 23 |
|---|---|

INITIAL DISTRIBUTION: GF Supplement – White and Canary or Copies - Grievance Coordinator
Pink, or Copy - Inmate

FINAL DISTRIBUTION: White or Copy – Inmate
Canary or Copy – Grievance File

802-7
12/12/13

![Phoenix New Times]



Samuel Mattia                                                                 Facebook

# A Skinhead Informant, Revenge Porn, and the Extortion of a Phoenix FBI Agent

RAY STERN | APRIL 30, 2020 | 4:17PM

An explosive new federal complaint accuses an informant of extorting an FBI agent with revenge porn photos and expands on the made-for-Hollywood scenarios that led to the firing in December of the Goodyear police chief.

Use of this website constitutes acceptance of our terms of use, our cookies policy, and our privacy policy

The Phoenix New Times may earn a portion of sales from products & services purchased through links on our site from our affiliate partners.

©2020 Phoenix New Times, LLC. All rights reserved.

CALIFORNIA RESIDENTS: California Privacy Policy I California Collection Notice I Do Not Sell My Info

came out during an independent investigation into Geier, which was sparked by an ethics complaint filed by the Goodyear police union. While most of the union's complaints were tossed out, Geier's repeated untruthfulness regarding the NET team's excursion to Phoenix on April 3 was one of the main reasons for his firing.

Neither Justin nor Mikaila responded to phone calls and emails seeking comment. An email to Mikaila's FBI email address bounced back. Her FBI phone number now goes to the voicemail of another agent.

*New Times* asked the FBI about the allegations involving Mikaila and the confidential informant, whether she was still under criminal and internal investigation, and whether she still worked for the FBI. Jill McCabe, a spokesperson for the FBI's Phoenix field office, would only say in reply that "The Privacy Act prohibits us from commenting on personnel matters."

Justin Hughes, subpoenaed initially by Geier's attorney, was supposed to testify at Geier's hearing. But at the last minute, the lawyer changed his mind and Justin's testimony was canceled.

The details of the city's investigation into Justin Hughes, who has been on leave since October, have yet to be revealed, as Justin remains on extended medical leave and cannot be fired until he has finished. That means the full records about his involvement cannot yet be released, either.

*(Update: County records show Mikaila and Justin Hughes were divorced in February 2020.)*

RELATED TOPICS: **NEWS** **POLICE** **NEWS**

While there, Mattie asked for the gun he believed she had on her. Though the FBI had already taken her gun and badge away, she had acquired another gun from a Goodyear officer, according to the testimony of Mattie and Rodriguez.

Pacello, their lieutenant, had "asked for it back so he could give it back to the rightful owner," Mattie testified.

Rodriguez said the gun belonged to Lieutenant Mercy. Officers also retrieved a phone from a trash bin in a nearby park, but further details about it were not provided by hearing testimony or documents obtained by *New Times*.

"I just remember that she was distraught, possibly even suicidal, she had a mental health issue, and she had a weapon that belonged to one of our other officers," Rodriguez said at the hearing.

Her deputy chief husband wasn't doing too well, either. According to Mattie, his fellow officers were so concerned about Justin that they considered having NET team members work in shifts to monitor him "so he didn't harm himself."

## Fallout

The following day, Justin, who was on family and medical leave at the time, returned to Goodyear police headquarters because he had received an email from someone he didn't recognize, Conrad's report on Geier states. The next three lines of the report are redacted. Then, Conrad wrote that "[Justin] Hughes wanted GYPD to undertake an investigation of the CI for extortion or harassment related to [REDACTED]."

Rodriguez, Mattie, and Geier all opposed further involvement, and it seems GPD's meddling in their deputy chief's marital affairs ended there.

While Mattie searched the gutter, Mikaila's phone began pinging in a neighborhood to the west. So they drove to the house where her phone appeared to be. That's when another detective spotted Mikaila's truck pulling into a Shell gas station.

## Caught in a Lie

Mattie drove toward Mikaila and pulled up next to her so she could see it was him. She pulled over. Mattie asked her what had happened.

"She immediately started lying to me," Mattie said. "I could tell — the story just sounded so bogus. I said, 'Hey, I know what's going on,' and she eventually divulged that she was meeting a confidential informant and she had hid her phone in the women's bathroom stall."

As it turns out, Mikaila had not been meeting with a retired FBI agent, but rather, had met with a confidential informant with whom she had had an affair, Mattie and others said at the hearing.

Rodriguez's testimony indicates that he and Geier already knew that Mikaila was under investigation by the FBI, and that she had been placed on administrative leave for having an inappropriate relationship with the confidential informant prior to the incident involving her husband. Geier testified that he also believed Mikaila was being criminally investigated.

"Geier thought it was a conflict of interest and put our two departments in a bad spot," Rodriguez said at the hearing. It's unclear from hearing testimony and records obtained by *New Times* when Mikaila's husband or Mattie became aware of the internal investigation involving Mikaila.

Regardless, knowing that Mikaila was safe, the Goodyear police officers halted their operation and returned to Goodyear. But Goodyear's involvement with the FBI agent didn't end there. Several Goodyear officers, including Mattie, met with Mikaila at a Wildflower Bread Company on Litchfield and McDowell roads that night.

Eventually, at 4:21 p.m., Geier and Mattie spoke on the phone for six minutes. What Geier said is the subject of dispute: Geier claims he told Mattie he didn't want the NET team driving into Phoenix, and said he thought that either Phoenix Police or the FBI should be involved, not Goodyear PD. Mattie, however, claims he only went to Phoenix because he had Geier's approval. Whatever the case, when Geier later heard what the NET team had been up to, he did not discipline or investigate anyone for allegedly going against his orders.

After the meeting, at 4:57 p.m., Rodriguez called FBI agent Mike Caputo, assistant special agent in charge at Phoenix's FBI field office, and put him on the phone with Justin. The two sat in the same room while the deputy chief talked to Caputo for 40 minutes.

It's unclear what Justin talked to Caputo about. It wasn't explained during Geier's appeal hearing, nor was it mentioned in the records on Geier's firing obtained by *New Times*.

At about 5 p.m., Geier left work to attend a dinner honoring city employees, leaving Rodriguez in charge. Meanwhile, Mattie and a handful of NET members were en route to Phoenix to search for Mikaila.

Once in Phoenix, Goodyear detectives searched local establishments near where Mikaila's phone was pinging on a phone tracking app, but didn't find her.

That's when Bayer "dispatched an actual ping," Mattie said, and they believed her phone was pinging in a gutter.

"At that point, I believed we had a valid kidnapping," Mattie said. "I called Phoenix Fire and had them pull the manhole up so we could try to find her phone, cause in my head I was picturing she got kidnapped or killed and they tossed her phone."

So Mattie went to his house. There, Justin told him, "We gotta go, we gotta go," Mattie recalled. "And I was like, whoa, slow down, what's going on?"

Justin told Mattie he believed that his wife possibly had been kidnapped or killed. According to independent investigator Don Conrad's report on Geier, Justin believed Mikaila had been harmed by gang members who had issued death threats against her and placed a $350,000 bounty on her.

That morning, when Mikaila told Justin about her meeting with "The Godfather" to get information on the threat, Justin was immediately concerned for her safety and asked her to keep in touch while she was at the meeting. When a phone tracking app showed Mikaila's phone had been stationary for some time and she hadn't responded to his phone calls, Justin called Mattie in a panic.

"He sounded not himself," Mattie recalled. "He sounded like he was in crisis."

Mattie said they needed to tell someone above them, so they drove to the Goodyear Police Department and met with Sergeant Jason Bayer, who runs the Professional Standards Unit. Mattie says he may have involved Lieutenant Jeff Mercy as well, a member of the Special Assignments Unit.

Mattie tried to get a hold of Geier — he called him six times and sent him a text asking Geier to "call him ASAP," but the chief did not immediately respond. Santiago Rodriguez, who is currently Goodyear's acting police chief, was also nearby. He testified that he saw Justin heading into the conference room outside Geier's office looking "distraught."

Inside the room, Justin told Mattie he wanted him to take a team out to Phoenix and try to locate his wife. They involved Lieutenant Joe Pacello, head of the Criminal Investigations Division, whom Mattie testified told them to go "because her phone was pinging at 32nd and Cactus."

# PHOENIX
# New Times®



Left to right: Jason Bayer, Justin Hughes, Jerry Geier, Santiago Rodriguez, Jeff Mercy / **Goodyear Police Department annual report**

# How an FBI Agent's Bogus Disappearance Led to Goodyear Police Chief's Firing

**MEG O'CONNOR | APRIL 16, 2020 | 1:02PM**

On the morning of April 3, 2019, FBI agent Mikaila Hughes set out to meet "The Godfather," a retired FBI agent with information on the $350,000 bounty gang members had put on her head.

Or at least that's what she told her husband, Justin Hughes, deputy chief of the Goodyear Police Department.

The meeting would end with a frantic kidnapping investigation, revelations of infidelity and corruption, and the firing of Goodyear's police chief, Jerry Geier.

The dramatic string of events that unfolded that day came to light last month during Geier's appeal of his termination. He was fired in December for repeatedly lying to investigators and covering up misconduct from his officers. The city manager upheld Geier's termination on April 10.

As Harold Merkow, the hearing officer for Geier's appeal put it, Geier's "dishonesty during the investigation are unfathomable actions and are a corruption of what police work is all about."

## Stunning Disclosures at Geier's Appeal

Prior to Geier's hearing, the city had been tight-lipped about why it fired its police chief. Records on the investigation that led to Geier's firing — and the frenzied series of events that took place last April — all had been kept under wraps until last week.

The records and testimony from three high-ranking Goodyear police officers at the March 3 and 4 hearing bring to light a series of highly questionable decisions from Goodyear's top cops, as well as Geier's deceitful attempts to minimize the situation later in conversations with City Manager Dan Cotterman.

Of particular concern to investigators was how several officers with Goodyear's Neighborhood Enforcement Team drove out of jurisdiction into Phoenix on April 3, 2019, to search for Mikaila after her husband, the deputy chief, told his fellow employees in a panic that he thought she was in serious trouble. Goodyear police spent time and resources, even pinging Mikaila's phone and calling in the Phoenix Fire Department to open up a sewer grate where they believed the phone was located, all in a mad hunt for Mikaila. (Phoenix New Times *is referring to Mikaila and Justin Hughes by their first names to avoid confusion.*)

But Mikaila wasn't missing. She was meeting with a confidential informant she had cheated on her husband with, and who allegedly was blackmailing her with revenge porn photos.

"The deputy chief of a police department, whose wife is an FBI agent who everyone thinks may have been kidnapped or killed, turns out is just meeting up with a confidential informant she'd been having an affair with to discuss potential revenge porn pictures? Yeah. That's an embarrassing look," said Justin Pierce, the attorney fighting Geier's appeal. "No wonder that later in the day, as it became clear what was going on, Chief Geier wanted to walk back from that."

## Mikaila's Disappearance

The involvement of Goodyear police in the marital and workplace problems of Mikaila Hughes began with a frantic phone call on the afternoon of April 3 from her husband, Justin, to Sergeant Jason Mattie, the supervisor of the city's Neighborhood Enforcement Team. The deputy chief told Mattie he was just heading back to Goodyear after leaving a church in Surprise, and asked if they could meet.

"He asked if I could meet him at Litchfield and Glendale at a Circle K," Mattie recalled during the hearing on March 4. "I said okay, asked him what was going on, and he said, 'I'll tell you when you get here.' Then he said, 'No, just meet me at my house, I'll tell you everything.'"

So Mattie went to his house. There, Justin told him, "We gotta go, we gotta go," Mattie recalled. "And I was like, whoa, slow down, what's going on?"

Justin told Mattie he believed that his wife possibly had been kidnapped or killed. According to independent investigator Don Conrad's report on Geier, Justin believed Mikaila had been harmed by gang members who had issued death threats against her and placed a $350,000 bounty on her.

That morning, when Mikaila told Justin about her meeting with "The Godfather" to get information on the threat, Justin was immediately concerned for her safety and asked her to keep in touch while she was at the meeting. When a phone tracking app showed Mikaila's phone had been stationary for some time and she hadn't responded to his phone calls, Justin called Mattie in a panic.

"He sounded not himself," Mattie recalled. "He sounded like he was in crisis."

Mattie said they needed to tell someone above them, so they drove to the Goodyear Police Department and met with Sergeant Jason Bayer, who runs the Professional Standards Unit. Mattie says he may have involved Lieutenant Jeff Mercy as well, a member of the Special Assignments Unit.

Mattie tried to get a hold of Geier – he called him six times and sent him a text asking Geier to "call him ASAP," but the chief did not immediately respond. Santiago Rodriguez, who is currently Goodyear's acting police chief, was also nearby. He testified that he saw Justin heading into the conference room outside Geier's office looking "distraught."

Inside the room, Justin told Mattie he wanted him to take a team out to Phoenix and try to locate his wife. They involved Lieutenant Joe Pacello, head of the Criminal Investigations Division, whom Mattie testified told them to go "because her phone was pinging at 32nd and Cactus."

Eventually, at 4:21 p.m., Geier and Mattie spoke on the phone for six minutes. What Geier said is the subject of dispute: Geier claims he told Mattie he didn't want the NET team driving into Phoenix, and said he thought that either Phoenix Police or the FBI should be involved, not Goodyear PD. Mattie, however, claims he only went to Phoenix because he had Geier's approval. Whatever the case, when Geier later heard what the NET team had been up to, he did not discipline or investigate anyone for allegedly going against his orders.

After the meeting, at 4:57 p.m., Rodriguez called FBI agent Mike Caputo, assistant special agent in charge at Phoenix's FBI field office, and put him on the phone with Justin. The two sat in the same room while the deputy chief talked to Caputo for 40 minutes.

It's unclear what Justin talked to Caputo about. It wasn't explained during Geier's appeal hearing, nor was it mentioned in the records on Geier's firing obtained by *New Times*.

At about 5 p.m., Geier left work to attend a dinner honoring city employees, leaving Rodriguez in charge. Meanwhile, Mattie and a handful of NET members were en route to Phoenix to search for Mikaila.

Once in Phoenix, Goodyear detectives searched local establishments near where Mikaila's phone was pinging on a phone tracking app, but didn't find her.

That's when Bayer "dispatched an actual ping," Mattie said, and they believed her phone was pinging in a gutter.

"At that point, I believed we had a valid kidnapping," Mattie said. "I called Phoenix Fire and had them pull the manhole up so we could try to find her phone, cause in my head I was picturing she got kidnapped or killed and they tossed her phone."

While Mattie searched the gutter, Mikaila's phone began pinging in a neighborhood to the west. So they drove to the house where her phone appeared to be. That's when another detective spotted Mikaila's truck pulling into a Shell gas station.

## Caught in a Lie

Mattie drove toward Mikaila and pulled up next to her so she could see it was him. She pulled over. Mattie asked her what had happened.

"She immediately started lying to me," Mattie said. "I could tell — the story just sounded so bogus. I said, 'Hey, I know what's going on,' and she eventually divulged that she was meeting a confidential informant and she had hid her phone in the women's bathroom stall."

As it turns out, Mikaila had not been meeting with a retired FBI agent, but rather, had met with a confidential informant with whom she had had an affair, Mattie and others said at the hearing.

Rodriguez's testimony indicates that he and Geier already knew that Mikaila was under investigation by the FBI, and that she had been placed on administrative leave for having an inappropriate relationship with the confidential informant prior to the incident involving her husband. Geier testified that he also believed Mikaila was being criminally investigated.

"Geier thought it was a conflict of interest and put our two departments in a bad spot," Rodriguez said at the hearing. It's unclear from hearing testimony and records obtained by *New Times* when Mikaila's husband or Mattie became aware of the internal investigation involving Mikaila.

Regardless, knowing that Mikaila was safe, the Goodyear police officers halted their operation and returned to Goodyear. But Goodyear's involvement with the FBI agent didn't end there. Several Goodyear officers, including Mattie, met with Mikaila at a Wildflower Bread Company on Litchfield and McDowell roads that night.

While there, Mattie asked for the gun he believed she had on her. Though the FBI had already taken her gun and badge away, she had acquired another gun from a Goodyear officer, according to the testimony of Mattie and Rodriguez.

Pacello, their lieutenant, had "asked for it back so he could give it back to the rightful owner," Mattie testified.

Rodriguez said the gun belonged to Lieutenant Mercy. Officers also retrieved a phone from a trash bin in a nearby park, but further details about it were not provided by hearing testimony or documents obtained by *New Times*.

"I just remember that she was distraught, possibly even suicidal, she had a mental health issue, and she had a weapon that belonged to one of our other officers," Rodriguez said at the hearing.

Her deputy chief husband wasn't doing too well, either. According to Mattie, his fellow officers were so concerned about Justin that they considered having NET team members work in shifts to monitor him "so he didn't harm himself."

## Fallout

The following day, Justin, who was on family and medical leave at the time, returned to Goodyear police headquarters because he had received an email from someone he didn't recognize, Conrad's report on Geier states. The next three lines of the report are redacted. Then, Conrad wrote that "[Justin] Hughes wanted GYPD to undertake an investigation of the CI for extortion or harassment related to [REDACTED]."

Rodriguez, Mattie, and Geier all opposed further involvement, and it seems GPD's meddling in their deputy chief's marital affairs ended there.

The repercussions of that day didn't end there, though: The events of April 3 all came out during an independent investigation into Geier, which was sparked by an ethics complaint filed by the Goodyear police union. While most of the union's complaints were tossed out, Geier's repeated untruthfulness regarding the NET team's excursion to Phoenix on April 3 was one of the main reasons for his firing.

Neither Justin nor Mikaila responded to phone calls and emails seeking comment. An email to Mikaila's FBI email address bounced back. Her FBI phone number now goes to the voicemail of another agent.

*New Times* asked the FBI about the allegations involving Mikaila and the confidential informant, whether she was still under criminal and internal investigation, and whether she still worked for the FBI. Jill McCabe, a spokesperson for the FBI's Phoenix field office, would only say in reply that "The Privacy Act prohibits us from commenting on personnel matters."

Justin Hughes, subpoenaed initially by Geier's attorney, was supposed to testify at Geier's hearing. But at the last minute, the lawyer changed his mind and Justin's testimony was canceled.

The details of the city's investigation into Justin Hughes, who has been on leave since October, have yet to be revealed, as Justin remains on extended medical leave and cannot be fired until he has finished. That means the full records about his involvement cannot yet be released, either.

*(Update: County records show Mikaila and Justin Hughes were divorced in February 2020.)*

RELATED TOPICS:  **NEWS**    **POLICE**    **NEWS**