1   Phillip Lee Carson #091914
2   Arizona State Prison
3   PoB 13300, A44
4   Florence, Az. 85132
5   Class Action Member
6

7              UNITED STATES DISTRICT COURT
8                 DISTRICT OF ARIZONA
9

10  Shawn Jensen, et al.            No. CV-12-00601-PHX-ROS
11        Plaintiff,
12  V.                             **NOTICE TO COURT** VIA
13  Charles L. Ryan, et al,        CLASS ACTION MEMBERS
14        Defendants.              EMERGENCY "911" AT
15                                 COURTS ORDER (doc. 4410)
16

17      Class Action Member Phillip Lee Carson #091914 a prisoner at
18  Eyman Complex, Unit A44 at the "ADCRR" does hereby give
19  NOTICE to this Honorable Court THAT:
20      1) Plaintiff is a Class member in Parson now "Jensen",
21      2) The Attorneys in this Case that is The Prison law Office has
22  refused to act on this plaintiffs serious medical and Mental Health
23  issue with ADCRR and Naphcare,
24      3) Plaintiffs Medical, security and Mental Health Grievances are
25  being Denied as Unprocessed in Violation of ADCRR policy D0802 and
26  The USCA under The 14th Amend. of Equal protection, The 8th
27  Amend. under Cruel and Unusual punishment the 5th and 14th Amend. at
28  Due Process and the USCA 1st Amend. of Denial of Class Member to
29  Redress the Government see (Attach. Grievance #23-056749) (Attch. "A")
30      4) Plaintiff ("Carson") was forced to urinate on himself in his wheelchair
31  in front of his living area Bldg. 7 (ADA) for Staffs Entertainment.

1  "Carson" filed Grievance in Completion of PLRA on "Urine" issue
2  at Grievance # 23-053990

3     Plaintiff can not utilize the Courts "ORDER AND PERMANENT
4  INJUNCTION" (Doc. 4410 filed 04/07/23) and benefits thereof
5  if he is Denied Access to ADCRR's Grievance System. The
6  Plaintiff Grieved the Fact that the staff in the Grievance
7  Department make it imposible to utilize (Redress) the states
8  Grievance System because:

9     A) The Grievance System allows state Prisoners to
10 RESPOND (Reply) to Informals and Grievances within **5 work-**
11 **ing Days** from receiving states Responses or Answers,

12    However, if the Court just simply Counts with Plaintiff
13 she can see that the state officials at Unit are making it
14 imposible to use ADCRR's Grievance system DO 802, 4.2 ("The
15 inmate has **5 workdays** from **receipt** of the responder through the
16 unit (4)", but in Case Grievance # 23-056749 the Plaintiff
17 wrote his Informal on 05.26.23

18 State received it on   05.30.23
19 State responded on   06.13.23  03:39:37 pm
20 Plaintiff received response on 06.15.23 from $CO^2$ Hotline #2578
21 Plaintiff replied with Grievance on 06.22.23 and Hand Delivered
22 it to $CO^3$ Mendoza #2133 same day,
23 On 06.23.23 staff member #10293 returned Grievance as Unprocessed
24 to plaintiff, who received it on 03.26.23 from $CO^3$ Tarango who
25 said she documented in Aims or Acis System.

26    Plaintiff responded on the Fifth workday pursuant to policy
27 above, However Staff (?) states "even with one day grace period" which
28 is not even in policy, ..."you waited one day to long"...
29 OVER 15 of Plaintiffs Grievances have been made UNPROCESSED
30 by miscalculations as such, which Deprive him of Courts Order (doc. 4410)

1. Defendants violated Courts ORDER #4410 at 1.2 because
2. they Naphcare and Security have intentionally refused to
3. "Document all aspects of care to allow for monitoring of
4. these requirements", because Plaintiff on 03.25.23 at approx.
5. 1800 hrs. did:
6.    1) fall out of his wheelchair backwards hitting his
7. R. Elbow on Cement, also injuring his neck and lower back
8.    2) $CO_2$ OSKVCEK #1959 activated an ICS at approx. 1800
9. hrs. (plaintiff mistakenly used Co 2 Cordleys name at first) and helped
10. pick Plaintiff up off of floor in Bldg-7's hallway,
11.    3) Sgt. Settello came to Bldg. 7 alone with a gurney,
12.    4) $CO_2$ OSKVCEK placed Plaintiff in a wheelchair and had
13. a prisoner push plaintiff behind Sgt Settello with Gurney.
14.    5) NURSES Boyer, Caren RN, Sayer, Finger and
15. sigddested refused to adequately or even exam in and
16. treat Plaintiff's Neck or back, They also falsified medical
17. RECORDS by misquoting issue, by Claiming Plaintiff stated:
18. "I'm reports he did not fall from wheelchair",
19. Thus Minimizing and falsifying aspects of care.
20. Also ICS Document states NO security was involved.
21. Plaintiff's Grievance in this issue was also Unprocessed for time
22. frame miscalculations by ADCRR Grievance Staff.
23. Sgt. Settellos name is NOT even on ICS Report.
24.    6) In Plaintiffs Grievance over above issue No. 23-057152
25. "falsified medical Records", the State Denied on DUPLICATE of
26. GRIEVANCE, (see Attach B) 06.09.2023, Claiming issue was a Duplicate
27. of No. 23-056819, (See Attach C)
28.    Plaintiff also attaches Grievance #23-056819 which is an issue
29. regarding Plaintiff being Denied Medications or receive DISCIPLINARY
30. forcing Plaintiff to choose between Pill CALL and EDUCATION CLASS.

1  OBVIOUSLY, Naphcare and ADCRR FALSIFYING Medical Records

2  That is an ICS Document is Not Analogous/similar to Plaintiff's

3  grevance that he has to choose between pill Call and a

4  program which is mandatory i.e. "COBB" class once enrolled

5  This also VIOLATES COURTS ORDER # 4410

6

7  To make things Worse, Naphcare and ADCRR "hid"

8  said ICS, see the Prison Law offices response to the

9  Plaintiff where the state " NO ICS WAS CALLED", see

10  pg's #39-40 (Attach "B") at PLO's letter Dated April 28, 2023.

11  Because ADCRR and Naphcare "HID" ICS documentation

12  Plaintiff put in with Naphcare Records Clerk Lisa Cinquanta

13  MRC for permission to REVIEW Plaintiffs Medical Hard

14  Record File. pgs Attach 37-38 .

15  Plaintiff found the written ICS at RECORDS REVIEW

16  on 05/24/23 with Ms. Cinquanta, Ms. Cinquanta stated she

17  would enter ICS into Computer System, and 2 days ago

18  on 06/27/23 a Nurse looked on her Naphcare Computer

19  System and advised Plaintiff that the 03/25/23 ICS was

20  Noted in Computer system. See ICS Notes pg's 32 - 38 (Attach

21  B),

22  Plaintiff gives Notice that the Prison Law office has

23  not and more than probably not help ADCRR state prisoners

24  nor will Naphcare and ADCRR,

25  Plaintiff respectfully requests MONITOR ASSISTANCE

26  and correction of false Records and ILLEGITAMATE Time

27  frames used to Unprocess Plaintiffs and other Prisoners Grievances.

28  Respectfully                                   091914

29  Phillip Lee Carson, Class Action member

ATTACK "A"                    #51

1) Grievance #23-056749    20 pgs-
Unprocessed as late when it was not.


Grievance Informal Entitled:
   "I have been and am being denied my
   Right to Reddress the Government —
   'Due Process violations"

# ARIZONA DEPARTMENT OF CORRECTIONS

**Inmate Grievance**

Carson 091914

Due 6/22/23    7C10

Redress
Gov.
Grievance
Procedure

| RECEIVED BY D. Mendoza | |
|---|---|
| TITLE CO III | |
| BADGE NUMBER 2133 | DATE (mm/dd/yyyy) 06-22-23 |

Note: You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice

| INMATE NAME (Last, First M.I.) (Please print) Carson Phillip | ADC NUMBER 091914 | DATE (mm/dd/yyyy) 0800 hrs. 06/22/23 |
|---|---|---|

| INSTITUTION/FACILITY 7C10 - A44    E | CASE NUMBER 23-056749 |
|---|---|

TO: GRIEVANCE COORDINATOR

**Description of Grievance** (To be completed by the Inmate)

The majority of my Grievances have been Determined unprocess by ADCRR staff, in violation of DO 802, 7.2 (persons with disabilities) and DO 802, 1.11.1 (to proceed to the next stage when staff fails to timely respond) and DO 802 4.2 (The Inmate has 5 workdays from receipt of the of the written response from the Informal Grievance responder) though the Unit (D14) and Grievances are not being returned to me within 15 workdays in violation of DO 802, 4.4. Staff have (in violation of policy above and PLRA) Denied me access to court and policy.

**Proposed Resolution** (What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?) Informal response 6/13/23 received 6/15/23. Ive spoken with CO4 moore, CO3 vites (?), and CO3 Bell - all of whom tell me that my 5 Days to respond starts on the Date when staff enter response into the ACIS (Beast) regardless of when I receive the response. Plus staff are not counting Days correctly because ACIS won't allow it. CO4 moore and CO3 bivens state Resolution: Reprocess all of my unprocessed timely Grievances, etc. per POLICY above.

| INMATE'S SIGNATURE | DATE (mm/dd/yyyy) 06.22.23 | GRIEVANCE COORDINATOR'S | DATE (mm/dd/yyyy) 6/23/22 |
|---|---|---|---|

Action taken by Returned unprocessed:

Informal response was made on "6/13/23" (even with the one day grace period - permitted in policy - for inmate receipt). This Formal Grievance is dated "6/22/23" - 6 work days from the response date, (with the grace period taken into account). As a You waited one (1) day too long to complete Your Formal - As a result - The case is now closed in ACIS.

| STAFF MEMBER'S SIGNATURE | BADGE NUMBER 10293 | DATE (mm/dd/yyyy) RECEIVED JUN 23 2023    6/23/23 |
|---|---|---|

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy – Inmate
FINAL: White – Inmate; Canary – Grievance File    655 hrs.    Rec. 03.26.23 for CO3 Tarango    802-1    12/12/13





*Rec. 06.15.23 @*
*Ari @ 2 Hotline*
*6/15/23*
*Hotline*
*2578*

# Inmate Grievance/Informal Response Notice
## Non-Medical

**Inmate Name:** PHILLIP CARSON

**ADC#:** 91914

**Prison/Unit:** EYMAN/EYMAN
MEADOWS

**Bldg/Bed:** A44 07CDC10L

## Case #:23-056749

## Informal Complaint

**Type:** Informal Response

**Date Received:** 05/30/2023 02:47 PM

**Response Author:** STEPHEN BELL

**Responded On:** 06/13/2023 03:39:37 PM

**Decision:**

## Case Details

**Case Number:** 23-056749

**Grievance Status:** Open

## Case Data

**Prison of Complaint:** EYMAN

**Opened Date:** 05/30/2023 02:47 PM

**Grievance Category:** Procedures/Institution Orders

**Unit of Complaint:** EYMAN MEADOWS

**Grievance Stage:** Informal Submitted

## Informal Grievance Response

**Grievance Date:** 05/26/2023 12:00:00 AM

**Response Due:** 06/20/2023 02:48 PM

**Issue:** time frames

**Responder:** STEPHEN BELL

**Response:** In response to your complaint, you have admitted to Programs staff that you have held your grievance complaints until the last day to submit. ACIS will allow for timeframes per policy in DO 802-Inmate Grievance Procedure, however, if proven for any cases to be in error, the documents will be strictly handled on case-by-case basis.

⌐Unprocessed

**Officer's Name:** BELL, STEPHEN E

**Notice:** If you are dissatisfied with the Informal Complaint Response, you may file a formal grievance (form 802-1 Inmate Grievance, and/or form 802-7 GF Supplement) within five (5) workdays from receipt of the above response to the Grievance Coordinator by:
Placing a single complaint on a single Inmate Grievance form.

**NOTE: If multiple unrelated issues are on a single form or if a duplicate complaint is filed, the grievance shall be rejected and returned unprocessed.**

## ARIZONA DEPARTMENT OF CORRECTIONS
### Inmate Informal Complaint Resolution

HAND DELIVERED TO CO2 Gidley ON
05.26.23
to PUT in Box. CO3 Torres 1242

Complaints are limited to one page and one issue.

Please print all information.

23-056749 (opened 5/30 - Due 6/6)

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Carson, Philip L | 091914 | 2610, ASU, E- | 05.26.23 |

| TO | LOCATION |
|---|---|
| CO3 Torres | ASU assigned Counselor |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

means (CO3 unavailable CO4 told me to give my complaints directly to her dept.)
I have been and am being
denied my Right to Redress
the Government "DUE PROCESS VIOLATIONS"
(pursuant to the USCA amend. i and equal protections amend 14)
"Grievances Are of Constitutional magnitude and Government Violations"
1) On 05.15.23 CO4 moore informed me that
my Grievances are being unprocessed due to not meeting
time frames.
2) the reason for this is due to the Acis system controled
at C.O. counts the weekends, holidays and CO4 moore and/or
CO3 pell report the days from when they receive my Grievances
and not from when the CO2 or other ADCRR security staff
accept and sign for receiving my Grievances
3) the Grievance staff are not following the ADCRR
policy 802 #(? - the policy app is unavailable on TABLET at this
time) due to an updated system), because ADCRR DO 802 specifically
states that I (PMS) have 5 working days to respond to an
answer by staff on my Grievance or informal responses
4) However, staff starts their 5 days for me to answer
from when they answer on Acis, the days against me start regardless
of when I receive answer in my hand or not. staff at ADCRR use
to have PMS sign for when they receive their responses, but not now.
5) [not ruling] Julie Bowers (admin Griev. coordinator) at C.O. and
see if she (CO4) could accept some of my Responses due to the fact
Acis wouldn't allow a response due to missed time frames (due to counterror's)

SIGNATURE
[signature]
Earwood #8475

DATE (mm/dd/yyyy)
RECEIVED MAY 30 2023

REC 06.04.23

| Have you discussed this with institution staff? ☒ Yes ☐ No | Note pain level's due to writing are 7/10 (still denied Keyboard) |
|---|---|
| If yes, give staff member name: CO4 Moore | |

Distribution: White and Canary or Copies – Grievance Coordinator Pink or Copy – Inmate
White – Inmate; Canary – Grievance Coordinator File

1/10.1

802-11
6/25/14

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Grievance – GF Supplement**

| INMATE'S NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/FACILITY | CASE NUMBER |
|---|---|---|---|
| Carson, Phillip L. | 091914 | ZCIO, A44, E. | |

6.) ... to the ACIS (computer's operating system) counting Calendar days for responses (in violation of ADCRR policy DO 802 [ ]) instead of workdays, and accurate accounting of ACTUAL days from when I (I/m) received responses. Most of my Grievances i.e.; #'s 23-054607; 23-053947; 23-054609; 23-054754; cont. (Grievs.) 23-054318; 23-055149; 04/27/23; 04/14/23; 23-050336; 23-054238; 23-054243; 23-053996; 23-054263; 23-052861; 23-054313; 23-050336 "this one might (?) be my fault"; 23-053996; 23-054287; 23-053075 "this I admit due to response"; and one of my most recent Grievs. originally 23-052861 but now Klang, whats(?) has changed the Griev. No. to 23-054263 (not limited to) ...

have been unprocessed due to ACIS miscalculations and ADCRR Staffs dates miscalculations.

Similar to attachments 1-8 (in "Procedurally Flawed Grievance Calculations" printed out in the Prison Legal News magazine, articles dated from 2017 to Present) I have been DENIED Due Process (14th amend. 14), Equal Protection (14th) and the (my) vested right to Griev. or address the government, because of said issues of counting days above.

7.) Also a IS4 named called John Brewer (on 05.15.23) who was fail to NOT process my Grievances (about not limited to), I felt discriminated against (by John Brewer) because some of my similar similar situated Grievances (i.e. pertaining to ACIS calendar vs. days) were Answered (**responded to**) by ISA named by hand to bypass the "date" procs described above for whatever reason(s). ISA named felt was deserving of denied (because of date issues). John Brewer is also abusing ISA's authority or keep me (their) violating (continues) Grievances and monitoring (ECF's) who or time frames (counting days) and calculate my (I/m) received date accurately and reprocess All of my alleged unlimited Grievances!

SIGNATURE /s/

DATE (mm/dd/yyyy) 05.26.23

INITIAL DISTRIBUTION:   GF Supplement – White and Canary or Copies - Grievance Coordinator
Pink, or Copy - Inmate

FINAL DISTRIBUTION:   White or Copy - Inmate
Canary or Copy – Grievance File

802-7
12/12/13

attach's 13



**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Grievance – GF Supplement**

| INMATE'S NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/FACILITY | CASE NUMBER |
|---|---|---|---|
| Carson, Phillip L. | 091914 | 7C10, A44, F- | |

pp. 4-18.1                                        Hand pgs. ⑧40

ATTACHMENTS
PRISON LEGAL NEWS, NOTIFICATIONS (PLRA)

1) p. 4/18 "Ninth Circuit: Grievance Policy may Excuse Oregon 5/18. Prisoner's Failure to Exhaust Administrative Remedies"

2) p. 6/18 "Fifth Circuit Finds Orange Mississippi Prison Grievance System Incapable of Us"

2) p. 7/18 "Sixth Circuit says Ohio prisoner's Lack of TABLET ACCESS May Have Prevented Grievance Exhaustion". (Impt Att)

4) p. 8/18 "Fifth Circuit Again Revives Muslim Texas Prisoner's Suit over Halal 9/18. Meals Denied During Hurricane Evacuation

5) p. 10/18 "Town Ombudsman Calls Out DOC for unfair prisoner Discipline"

6) p. 11/18 "Disconnect Between Illinois Prisoner's Grievance and Complaint 12/18 Results in Failure to Exhaust"

7) p. 13/18 "Eleventh Circuit Says Georgia prisoner Exited Exhaust Remedies by Filing 14/18. Late Grievance to Ask for Investigation that Was Already Underway"

8) p. 15/18 "Fourth Circuit Denies Qualified Immunity to Prison Official Who Gave Prisoner NO Notice Before Hearing that Resulted in Transfer to Security Detention"

9) p. 16/18 "Meerts Ruling on Procedurally Flawed Grievance Statistics PLRA"

10) p. 17/18 "Second Circuit: Continuing Violations Exhausted until Single Grievance 18/18. (See John Bowers as Defendant in my active Case# 23-15 USD of 2-2-

11) p. 18/18

SIGNATURE                                        DATE (mm/dd/yyyy)
                                                05/26/23

INITIAL DISTRIBUTION:  GF Supplement – White and Canary or Copies - Grievance Coordinator
                        Pink, or Copy - Inmate

FINAL DISTRIBUTION:    White or Copy – Inmate                3/18.1
                        Canary or Copy – Grievance File

802-7
12/12/13

head strikes could cause a fatal head injury."

The Court noted there was also sufficient evidence of a custom or practice to use the Four-Way to physically abuse detainees. Both the city and its private contractor could be held liable for such policies and customs, under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) – even if the custom violated a contractual obligation, as the Court ruled *in Arnone v. Cnty. of Dall. Cnty.*, 29 F.4th 262 (5th Cir. 2022). [See: *PLN*, Mar. 2023, p.32.]

As for damages, the Court said, corporations are not immune under common law, which is the first requirement of a damages analysis under *City. of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981). "In sum, Plaintiffs' claims for punitive damages should have survived summary judgment," the Court concluded. "[Richwood and LaSalle] are not immune, and Plaintiffs have raised fact disputes over whether the defendants – other than Mitchell – acted with reckless or callous indifference," as laid out in *Sockwell v. Phelps*, 20 F.3d 187 (5th Cir. 1994).

"The record in this case is beyond troubling," the Court allowed. But it quickly added that "Plaintiffs still have a long way to go" to succeed on their claims. Given there are "fact disputes galore, it will take a jury to decide" the appropriate outcome. Thus summary judgment was affirmed with respect to Mitchell's liability in Moore's death and reversed in all other aspects. See: *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493 (5th Cir. 2022).

White's survivors also sued over his death in the same district court. Their Bossier City attorney, Patrick R. Jackson, negotiated a settlement with LaSalle for his minor children for an undisclosed sum, which was approved in 2018. See: *White v. LaSalle Corr., Inc.*, USDC (W.D. La.), Case No. 3:16-cv-01405.

The case over Moore's death has now returned to the district court, and *PLN* will update developments as they are available. See: *Moore v. LaSalle Corr., Inc.*, USDC (W.D. La.), Case No. 3:16-cv-01007. ▇

# Ninth Circuit: Grievance Policy May Excuse Oregon Prisoner's Failure to Exhaust Administrative Remedies

### by Jacob Barrett

ON OCTOBER 12, 2022, THE U.S. COURT of Appeals for the Ninth Circuit vacated dismissal of an Oregon prisoner's civil rights claims for failure to exhaust administrative remedies available in the state Department of Corrections (DOC), as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e. Because DOC policy limited the number of grievances that could be filed, its delay in processing them created a catch-22 that excused the prisoner's failure to exhaust, the Court said.

Aaron Dale Eaton, a prisoner housed at the Two Rivers Correctional Facility (TRCF), received mail with a form to file a claim in an ongoing bankruptcy case involving sexual abuse settlements by the Boy Scouts of America (BSA). The mailing included a postage prepaid return envelope from his attorney. Eaton had a time limit to fill out the form in order to file a claim in the BSA bankruptcy proceeding.

For "safety concerns," DOC mail policy prohibited prisoners from receiving postage prepaid mail inserts, like the stamped envelope Eaton's attorney sent. The mailing was thus intercepted. TRCI administrators later gave the envelope to Eaton after determining it was authorized legal mail because it was sent by an attorney

But as a consequence of the delay, Eaton asserted, he missed his opportunity to file a claim against BSA. He then attempted to file a prison grievance. But DOC administrative rules limit prisoners to no more than four grievances pending at the same time. In addition, each grievance is restricted to a single

incident. Eaton was informed he already had four pending grievances and would have to dismiss one of them to file a new one – giving up any hope of relief on that issue, if he wanted to complain about the mail violation.

Complicating the situation was the fact that Eaton's grievances had backed up only because prison officials failed to timely respond to them, as required by their own policy. Had they followed that policy and responded to Eaton's previous grievances, he could have filed the grievance challenging the confiscation of the postage pre-paid envelope.

Eaton then filed suit in federal court for the District of Oregon against DOC and its officials at TCRI. Proceeding under 42 U.S.C. § 1983, he alleged that confiscation of the envelope from his legal mail violated his First Amendment rights. The district court found Eaton had stated a viable First Amendment claim. Nevertheless it dismissed the case because Eaton had not exhausted the available administrative remedies as required PLRA. Eaton appealed.

On review, the Ninth Circuit held that forcing Eaton to choose between pursuing his mail-related grievance or forfeiting his other equally viable claims created a "'Catch 22' dilemma from which there is no escape."

"Because prison officials created the situation," the Court said, "their otherwise reasonable regulations operated to deny him access to the grievance process."

The Court rejected the DOC's argument that Eaton was in a Catch-22 only because he refused to dismiss one of his earlier grievances. Forcing him to dismiss one grievance to pursue another, the Court said, would also force Eaton to choose between constitutional claims. Citing *Hebbe v. Pliler*, 627 F.3d 338 (9th Cir. 2010), the Court said that prisoners "cannot be forced to sacrifice one constitutionally protected right solely because another is respected."

Accordingly, the district court's order was



**Ink From The Pen**

Artist behind the walls?
Inspired by prison art?
Roll with the big dogs!
Check out *Ink from the Pen!*

760.616.0557 | www.InkFromThePen.com
*Magazines are allowed in most State and Federal Prisons*

vacated and the case remanded. Eaton was represented at the Court by attorneys from the Roderick and Solange MacArthur Justice Center in San Francisco and Washington,

DC. See: *Eaton v. Blewett*, 50 F.4th 1240 (9th Cir. 2022).

The case has now returned to the district court, where Eaton is represented by Hillsboro attorney Katharine Edwards. *PLN* will continue updating developments as they are available. See: *Eaton v. Blewett*, USDC (D. Or.), Case No. 2:20-cv-01641. ▓

# "Slap On the Wrist" for California Bail Agents Who Hired Bounty Hunter Who Killed Their Client

## *by Jayson Hawkins*

A S OF DECEMBER 1, 2022, THE CALIFORNIA Department of Insurance (DOI) had decided to let two bail agents keep their licenses, even though they hired a bounty hunter who broke into the home of one of their clients and fatally shot the man – who had no active arrest warrant at the time.

When David Spann, 35, was arrested in April 2021 on a misdemeanor charge of violating a restraining order, he hired Melissa Lippert of Justice Bail Bonds in Riverside to post bail. Later that month, she was notified that Spann's GPS monitoring device had been deactivated. Lippert then hired another bail agent, Jose Navarro, to apprehend Spann. Navarro, in turn, hired bounty hunter Fabian Hector Herrera.

Early in the morning of April 23, 2021, Herrera, 37, and his mother, Lisa Roberta Vargas, 53, broke into Spann's Palm Springs home. An alarm went off, alerting the Palm Springs Police Department (PSPD), which also got calls from both Spann and Herrera. When cops arrived at the scene, the bounty hunters had Spann at gunpoint. PSPD Officer Rhett Arden tried and failed to subdue Spann with a Taser before telling Herrera, "Shoot!"

But Herrera is a convicted felon, so he was illegally in possession of the weapon, police later determined. He was arrested and charged with Spann's murder. His mother went on the run but was also arrested and charged with the killing a month later. Both are still awaiting trial.

Meanwhile DOI went after the bail agents' licenses. But at a June 2022 hearing, Lippert successfully argued that she had no way of knowing Herrera was operating illegally because bounty hunters are not regulated in California. State Insurance Commissioner Ricardo Lara accepted the recommendation of an administrative law judge hearing the case and placed Lippert's license on restriction – which doesn't really affect her ability to stay in business.

A week before Navarro's December 2022 hearing, DOI cut a similar deal with him: A one-year suspension of his license, followed

by a four-year restriction. William Spann, the father of the man killed by the bail agents' carelessness, called their discipline "a slap on the wrist." He and Kandis Spann, the mother of the dead man's children, have sued the two bail agents, as well as the city and its police department, in state court. See: *Spann v. Bankers Ins. Co.*, Cal. Super. (Cty. of Riverside), Case No. CVRI2200196.

The case shines a light on a bigger problem. DOI investigated 196 state bail agents in relation to criminal convictions over the last ten years – 120 for misdemeanors and 76 for felonies. The crimes ranged from driving under the influence and drug offenses to domestic abuse and illegally soliciting bail business. Of the agents investigated for felony convictions, some had their licenses revoked, though some of those revoked were eventually reinstated. About 40 of those 196 who were investigated still have active licenses.

DOI's division chief for investigations commented during a recent hearing that her branch is overwhelmed. "We lack the resources to allow for a comprehensive bail enforcement program," she said. "Unlike workers compensation, health care, automobile, and life and annuity fraud, bail does not have a dedicated funding stream to cover the costs of investigations … and until we have that we aren't able to adequately police the bail industry."

Unsurprisingly, there will be no discipline for Arden, the

cop who told the bounty hunter to fire at Spann. Riverside County District Attorney Mike Hestrin notified PSPD of that on July 11, 2022. But the following month, on August 15, 2022, new PSPD Chief Andy Mills announced that his officers will no longer be deployed to help bail agents attempting to apprehend their clients. His predecessor, Brian Reyes, who was in charge when Arden intervened in Herrera's attempt to nab Spann, blamed a lack of state regulation for bounty hunters for the killing.

Meanwhile, outcry over Spann's killing sparked state lawmakers finally to enact a law regulating bounty hunters in the state. AB 2043 was then signed into law by Gov. Gavin Newsom (D) on September 29, 2022. ▓

Source: *Palm Springs Desert Sun*

---

### A Jailhouse Lawyer's Manual
#### Twelfth Edition (Fall 2020)

First published in 1978, *A Jailhouse Lawyer's Manual* (*JLM*) is a practical legal resource that provides incarcerated people with the information they need to exercise their rights across a range of issue areas. The *JLM* has over 40 chapters on topics ranging from challenging unlawful convictions to securing medical care while in prison.

To order by mail, send a letter with your shipping information, shipping restrictions, and what you are ordering with a check or money order to:
Columbia Jailhouse Lawyer's Manual
Attn: JLM Order
435 West 116th Street
New York, NY 10027

You can order the *JLM* online at: https://jlm.law.columbia.edu/order-the-jlm/

The cost for incarcerated people, and their family/friends is:
A Jailhouse Lawyer's Manual (2020): $30
Louisiana State Supplement (2020): $25
Texas State Supplement (2013): $20
Immigration & Consular Access Supplement (2018): $15

Please note we do not accept stamps as payment. Do not send us stamps in the mail requesting the *JLM*.

Resources for Indigent People: if you are indigent and cannot afford a manual, please send us a letter letting us know you are requesting a free manual. We have limited resources to send free manuals to people who cannot afford them, so cannot guarantee a copy, but please ask.

For more information on A Jailhouse Lawyer's Manual, please contact us at:

*A Jailhouse Lawyer's Manual*
435 West 116th Street
New York, NY 10027
Email: JLM.board.mail@gmail.com

5/18.1

# Fifth Circuit Finds "Opaque" Mississippi Prison Grievance System "Incapable of Use"

*by Matt Clarke*

On August 16, 2022, the U.S. Court of Appeals for the Fifth Circuit held that grievance procedure rules which the Mississippi Department of Corrections (DOC) published online – but which were not given to prisoners – cannot trigger a failure to exhaust administrative remedies that would justify dismissal of a prisoner's lawsuit under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e.

Matthew Huskey was held by DOC at Wilkinson County Correctional Facility (WCCF) on September 8, 2016, when he "went to the clinic for sick call," as the federal court for the Northern District of Mississippi put it. There he encountered guard Lt. Griffin, who allegedly pulled in Lt. Scott to assault the compliant prisoner, leaving Huskey handcuffed and with a broken arm. Cpt. Derrick Munford and guard Donovan Clark then arrived, patted Huskey down and accused him of having a knife. That triggered another assault, Huskey alleged, during which "Munford said that he would teach Huskey's 'white ass' about hitting … one of his officers and having a knife," the district court continued.

Though Huskey's complaint recalled the allegation he had a knife, it neither confirmed nor denied it. But the complaint alleged he was denied medical care. When Dr. Juan Santos finally arrived many hours later, he told Cpt. Mary Jones "that [DOC] policy required that inmates visit the hospital after an altercation with staff," but Jones refused and allegedly told Santos,



"If you don't see him, he won't be seen." Allegedly, due to the interference of Dr. Henry Kuiper, it wasn't until eight months later, in April of 2017, that Huskey finally had surgery to repair his arm.

Huskey filed three grievances about the incident, requesting the guards be punished. All were rejected by the director of the Administrative Remedies Program (ARP). Huskey then filed three step-two grievances to reinstate each of his original complaints, but they were denied as well.

On September 1, 2017, Huskey filed his *pro se* federal civil rights action in the district court, pursuant to 42 U.S.C. § 1983, accusing prison guards of excessive force and prison officials and medical personnel of denying him medical treatment. A magistrate judge recommended dismissal of all claims except those against Cpt. Jones and Dr. Kuiper on February 12, 2018, adding that "claims regarding monitoring his actions with cameras should be dismissed as delusional"; the district court adopted those recommendations on February 27, 2018. See: *Huskey v. Fisher*, 2018 U.S. Dist. LEXIS 31655 (N.D. Miss.); and 2018 U.S. Dist. LEXIS 31048 (N.D. Miss.).

Defendants then moved for summary judgment, arguing that Huskey had failed to exhaust his administrative remedies as required by PLRA. The district court agreed and granted the motion on April 4, 2019, saying Huskey should have resubmitted corrected step one grievances within five days instead of proceeding to step two. Huskey appealed. But Defendants said the appeal wasn't timely filed. The Fifth Circuit said it wasn't sure, and it remanded the case on June 15, 2021, for the district court to make a determination. See: *Huskey v. Jones*, 860 F. App'x 322 (5th Cir. 2021).

At that point, the district court appointed Huskey counsel from attorney Cliff Johnson of the MacArthur Justice Center. On April 29, 2022, the district court determined that "Huskey complied with [DOC] and WCCF legal mail procedures."

"The issue in this case arose solely from an unusual and extenuating circumstance: No one was present at the Inmate Legal Assistance Program (ILAP) office during the days leading up to [the filing] deadline, and no one processed his request on the deadline … As such, the ILAP procedure was simply unavailable to him during that time." See: *Huskey v. Fisher*, 601 F. Supp. 3d 66 (N.D. Miss. 2022).

At last, the Fifth Circuit was able to hear Huskey's appeal. It began with the fact that the 2016 Inmate Handbook posted on DOC's website explained how grievances could be rejected for requesting relief beyond the power of the ARP to grant. As Huskey argued, he had no internet access to find this – he didn't even know it existed. All he had was a copy of the 2015 Inmate Handbook he was given, which listed neither the five days he had to correct technical errors in grievances nor notice that requesting relief beyond the power of the ARP to grant was a valid technical reason to reject a grievance.

But a prisoner is required to exhaust only administrative remedies that are actually available, the Court said. Quoting *Ross v. Blake*, 578 U.S. 632 (2016), it recalled that unavailability may be demonstrated when "the administrative scheme is 'so opaque that it becomes, practically speaking, incapable of use' by an ordinary prisoner."

Here the record contained no evidence that Huskey knew about the 2016 Inmate Handbook and its changes in grievance procedure. Moreover, in *Brantner v. Freestone Cnty. Sheriff's Off.*, 776 F.App'x 829 (5th Cir. 2019), the Court reversed summary judgment when "there was a genuine dispute of material fact as to whether a remedy was available to an inmate where he was given 'documents that only partially explained the prison [grievance] process.'" Since that was the case here, summary judgment was reversed and the case remanded. See: *Huskey v. Jones*, 45 F.4th 827 (5th Cir. 2022).

The case has now returned to the district court, where jury trial is set for June 2024. *PLN* will update developments as they are available. See: *Huskey v. Fisher*, USDC (N.D. Miss.), Case No. 1:17-cv-00140.

# Sixth Circuit Says Ohio Prisoner's Lack of Tablet Access May Have Prevented Grievance Exhaustion

### by David M. Reutter

TECHNOLOGY GIVETH AND TECHNOLOGY taketh away – even in prison. That was the conclusion of the U.S. Court of Appeals for the Sixth Circuit on October 26, 2022, when it reversed dismissal of an Ohio prisoner's civil rights action, finding a viable dispute regarding exhaustion of administrative remedies. The case was remanded to the U.S. District Court for the Southern District of Ohio "because there remain material disputes of fact about whether prison officials rendered administrative remedies unavailable," the Court said.

Prisoner Toby Lamb was involved in a physical altercation with a guard at Warren Correctional Institution (WCI) on April 6, 2018. He alleged in his civil rights complaint that guards Justin Reece, Justin Crowder, Shane Carey, Britney Maxwell and Sydney Hensley, along with Lt. Brent Kendrick, retaliated against him later that day by beating and pepper-spraying him while he was handcuffed and outside the view of surveillance cameras.

The beating caused Lamb's eyes to swell shut, he said, leaving serious temporary and permanent injuries. Later that evening, he was transferred to Lebanon Correctional Institution (LeCI) and placed in solitary confinement conditions.

Lamb filed an informal complaint on April 9, 2018, saying Kendrick lied when he filed a report accusing Lamb of refusing to cooperate in the guard's "use of force" statement. WCI Inspector Casey Barr responded to the complaint via JPay Securus messaging on April 17, 2018, stating he would assure Lamb was able to give a statement during the investigation. But Lamb did not receive that response until March 2020 because he did not have access to the LeCi JPay kiosk while confined in isolation.

Lamb filed a second informal complaint alleging improper use of force and retaliation against him, but Defendants contended there was no record of that complaint. After "some time" passed without a response, Lamb began asking for the requisite forms to escalate his grievance. He was allegedly told no forms were available. Inspector Lora Austin also allegedly told Lamb that a grievance would be a waste

of time because his appeal deadline had passed.

In November 2018, Lamb was transferred to Southern Ohio Correctional Facility. Once there, he sent a letter to the Chief Inspector describing the incident on April 6, 2018, as well as his grievance. Lamb alleges he never received a response to that letter, nor to a third grievance he sent on November 29, 2018.

With the aid of attorneys from Friedman, Gilbert & Gerhardstein, LLC, in Cincinnati, Lamb filed his civil rights complaint in 2020. Defendants moved for summary judgment, which the district court granted, agreeing that Lamb had failed to exhaust administrative remedies. Lamb appealed.

The Sixth Circuit began by finding that Lamb indeed failed to exhaust Ohio's three-step grievance process. However, its analysis did not end there. First, the Court noted, Lamb's failure to identify any guards in his grievance – as required by prison procedure – was reasonable because he was

pepper-sprayed and couldn't see. Thus the guards' action made the grievance procedure unavailable. The Court then found a genuine issue of fact as to whether Lamb corrected that deficiency in his second grievance.

Defendants argued that Lamb's statement alone could not prove that he filed that grievance. But the Court rejected that argument, saying "there is no rule of procedure that allows federal courts to disregard the plaintiff's testimony simply because it is self-serving."

Lamb also plausibly alleged that officials thwarted the grievance process by placing him in isolated confinement at a new prison, where he couldn't access the electronic messaging system used to process grievances, as well as refusing to provide grievance forms and misleading him that his claim was futile. Thus the district court's decision was vacated and the case remanded to resolve these factual disputes. See: *Lamb v. Kendrick*, 52 F.4th 286 (6th Cir. 2022).

# Texas Prison Warden and Brother Charged with Shooting Two Migrants, Killing One

### by Ashleigh N. Dye

A WARDEN AT A TEXAS DETENTION CENTER and his twin brother have been charged with shooting two migrants, one fatally, in the town of Sierra Blanca along the Mexican border on September 27, 2022. Michael Sheppard had been helming the West Texas Detention Facility (WTDF), which is privately operated by Louisiana-based LaSalle Corrections for federal Immigration and Customs Enforcement (ICE). His twin, Mark Sheppard, accompanied his brother during the alleged homicide. Afterward, the pair attended a meeting of the local water board. Both of the 60-year-olds were arrested on September 29, 2022.

The brothers were jailed on manslaughter charges, and each bonded out for $250,000. But they were taken into custody again when additional charges were filed for assault with a deadly weapon. They were able to bond out on the second charge only after District

Judge Roy Ferguson agreed to significantly lower their cash bond amounts – to $75,000 for the alleged shooter, Mike Shephard, and $50,000 for his brother, Mark. The remaining bond amounts were rendered as personal recognizance, meaning no cash upfront but a promise to appear in court.

According to a surviving witness, a group of migrants was at a reservoir trying to get a drink when a pickup truck approached and stopped. They claim that the occupants yelled profanities at them in Spanish. Then shots rang out, one of which hit one of the men in the head and killed him. The other hit a migrant woman in the stomach, but she survived. The truck then drove off, allegedly taking the Shepard brothers to the local water board meeting.

Using a description given by the migrants and surveillance footage from a nearby camera, authorities were able to locate the truck

# Fifth Circuit Again Revives Muslim Texas Prisoner's Suit Over Halal Meals Denied During Hurricane Evacuation

*by Matt Clarke*

On July 22, 2022, the U.S. Court of Appeals for the Fifth Circuit held that a district court erred when it tossed a Muslim prisoner's lawsuit over denial of Kosher meals during a hurricane evacuation from his Texas prison. It was the Court's second review in the case, having previously reversed an earlier dismissal because the prisoner was not given adequate opportunity to amend his complaint. Here the court chided the district court for failing to adhere to that mandate and adequately allow amendment on remand.

The prisoner, Eric Demond Lozano, was incarcerated at the Stringfellow Unit when it was evacuated for Hurricane Harvey, a Category 4 storm that struck in August 2017. Lozano was taken to the Pack Unit for temporary evacuation housing.

Stringfellow Unit is enhanced with a Kosher kitchen and designated for Jewish prisoners. But meals from the kitchen also conformed to the requirements of Lozano's Muslim faith. The Pack Unit had no Kosher kitchen, so an organization called Chabad Harvey Relief donated Kosher meals for evacuated Jewish prisoners. Chief Rabbi Goldstein of the Texas Department of Criminal Justice (TDCJ) was "running the distribution of donations for Chabad Harvey Relief in the Houston area," the Court recalled. He "received donated pre-packaged Kosher meals...to be donated only to Jewish inmates affected by Hurricane Harvey." He delivered to the Pack Unit some of the meals that a list of evacuated Jewish prisoners were authorized to receive.

At the Pack Unit, Lozano repeatedly requested but was denied Kosher meals,

despite appealing to the chaplain, kitchen captain, assistant warden and head warden. After evacuation, he was sent to LeBlanc Unit, where he started receiving donated pre-packaged Kosher meals.

In a *pro se* federal civil rights suit alleging violations of the Fourteenth Amendment's Equal Protection Clause and other claims, Lozano said he lost 14 pounds, suffered from mental and physical distress, depression and suicidal ideation from being denied Kosher meals. The federal court for the Southern District of Texas dismissed the complaint with prejudice. On appeal, the Court vacated dismissal of the Equal Protection claims, noting that "the district court improperly denied Lozano an 'adequate opportunity to cure the inadequacies in his pleading.'"

On remand, Lozano filed a motion to amend his complaint. But the district court denied it, saying the prisoner filed "[n]o proposed amended complaint for the Court to review." Defendants filed an answer and Lozano filed a reply, including several new allegations. The district court then granted defendants summary judgment and dismissed the complaint.

Once more Lozano appealed. Taking up the case again, the Fifth Circuit noted that its prior opinion stated Lozano had a plausible claim and had not been given an adequate opportunity to amend his complaint. But on remand, the district court denied his motion to amend without giving instructions on how to amend the complaint. It also did not hold an evidentiary hearing nor give Lozano a chance to clarify the facts. Therefore, the district court

did not adhere to the original mandate, the Fifth Circuit concluded.

Granting Defendants summary judgment was also an error, the Court said, since Lozano's pleadings – supported by two Jewish prisoners' affidavits – created a material fact dispute for a jury to determine whether prison officials had Kosher food available.



**There is Always Hope for Freedom from Prison**

**IBZ** BLIZZARD & ZIMMERMAN
ATTORNEYS AND COUNSELORS AT LAW

**Jacob Blizzard, Attorney**
Texas Board of Legal Specialization Certified
Criminal Law | Criminal Appeals

**Texas and Federal**

*Trial - Post-Conviction Appeals - Texas 11.07 Habeas Corpus*
*Sentence Reduction - Sentence Modification*
*2254-2255 Federal Habeas Corpus*

BlizzardLawFirm.com    Phone: 325-326-5962    freedom@blizzardlawfirm.com
Private Law Firm - Not a Pro Bono firm - Collect calls not accepted
441 Butternut St, Abilene TX 79602

for non-Jewish prisoners. Therefore, judgment was reversed and the case remanded. See: *Lozano v. Schubert*, 41 F.4th 485 (5th Cir. 2022).

The case has now returned to the district court, and PLN will update developments as they are available. See: *Lozano v. Schubert*, USDC (S.D. Tex.), Case No. 4:18-cv-01183.

Meanwhile, Lozano has at least three other claims pending at the district court. In one, arising from the same inability to get halal meals during evacuation for Hurricane Harvey, the Court affirmed dismissal of claims under the Free Exercise of Religion clause of the First Amendment on August 9, 2019. Pointing to *Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007), the Court said "we have 'already ruled that prisons need not respond to particularized religious dietary requests to comply with the First Amendment.'" But a companion claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, et seq., was remanded to the district court, where Plaintiff has made little progress; his most recent request for appointed counsel was denied on April 12, 2023. See: *Lozano v. Davis*, 774 Fed. Appx. 263 (5th Cir. 2019); and USDC (S.D. Tex.), Case No. 4:16-cv-02507 (2023).

In another complaint, Lozano alleged constitutional and RLUIPA violations because TDCJ officials "denied him a designated unit or dormitory for Muslim inmates," hindering "his devotional obligations for Jum'ah, Taleem, and Quranic studies," as well as denying him "a private space for prayer" and "showers that are separate from the general population." On March 29, 2021, the district court dismissed all claims and granted Defendants summary judgment; an appeal to that ruling is pending before the Fifth Circuit, where Lozano will be represented by appointed pro bono counsel, attorney J. Robert Sheppard III of King & Spalding in Houston. See: *Lozano v. Collier*, USDC (S.D. Tex.), Case No. 3:18-cv-00237 (2019); and USCA (5th Cir.), Case No. 22-40116.

The other complaint arose from an incident most prisoners will understand: While at Stringfellow Unit, the fan stopped working in Lozano's cell during a muggy August 2019, and while waiting more than a month for a replacement, Lozano suffered medication-induced heat sensitivity. But it didn't end there, he claims;

after he filed grievances, guards allegedly retaliated against him with shakedowns, confiscating his legal materials and religious gear, some of which was destroyed. The district court refused his request for

money damages but otherwise denied Defendants' request for summary judgment on February 23, 2023. See: *Lozano v. Collier*, USDC (S.D. Tex.), Case No. 3:20-cv-00116 (2023). ▓

# Nevada Pays Over $568,000 for Denying Prisoner Cataract Surgery, Ends "One Good Eye" Policy

*by Jacob Barrett*

ON JULY 15, 2022, THE FEDERAL COURT for the District of Nevada awarded $560,587.50 in fees to attorneys representing a state prisoner who earlier settled his medical neglect claim against the state Department of Corrections (DOC) for $7,500. In addition, DOC agreed to amend its policy effectively denying surgery to any future prisoner left with "one good eye."

Clifford Miller shot himself in the head in 1999, losing sight in both eyes. One eye recovered before he was incarcerated by DOC in 2001. But repeated requests to see an eye surgeon for the other went ignored for nearly two decades before DOC finally relented, and Miller had the surgery in June 2020. Sadly, it was not successful.

By that time he also had a three-year-old suit in the Court filed in the court pursuant to 42 U.S.C. § 1983, accusing DOC Dr. Romeo Aranas of deliberate indifference to Miller's serious medical need, in violation of his Eighth Amendment guarantee of freedom from cruel and unusual punishment.

After Miller filed his suit *pro se* in 2017, he picked up counsel from Reno attorney Terri Keyser-Cooper. With her help, he amended his complaint to include a claim under the Americans with Disabilities Act, 42 U.S.C. ch. 126, § 12101, et seq.

Miller's original prison complaint mentioned only the Eighth Amendment claim that he later made in his suit, after DOC denied his grievances. To comply with the requirement that prisoners exhaust administrative remedies laid out in the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e, he was thus obliged to file a separate grievance mentioning the ADA claim.

But DOC had a policy preventing prisoners from filing two grievances over the same complaint – a policy backed up with a disciplinary sanction. Miller filed his second grievance anyway, as required by PLRA. In return, DOC sanctioned him. So his amended

complaint included not only his ADA claim but also a claim that prison officials retaliated against him for making it. As his attorney argued, "Miller was in an impossible Catch-22 position, damned if he filed an ADA grievance and damned if he didn't." On December 7, 2021, just before trial was set to begin, Miller's request for injunctive relief was amended to include a provision forcing DOC to align its grievance and disciplinary policies with PLRA. See: *Miller v. Aranas*, 2021 U.S. Dist. LEXIS 235842 (D. Nev.).

On March 4, 2022, the parties notified the Court that they had reached a settlement. Under its terms, DOC agreed to pay Miller $7,500 and strike the disciplinary action from his prison record. DOC also agreed to bring its policies in conformance with an earlier Ninth Circuit ruling in *Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014), when the appellate court determined that deliberate indifference could be demonstrated by the "one good eye" policy. Having sight reduced to one eye only "is not a trifling matter," the Ninth Circuit said then. [See: *PLN*, June 2015, p.40.]

So DOC vowed not to exclude prisoners from consideration for eye surgery because they have one good eye left. Following the Ninth Circuit's reasoning in *Colwell*, though, DOC carved out exceptions: if the surgery "is not medically indicated"; if the "condition is misdiagnosed"; if "surgery would not help"; or in the case of a "genuine difference of opinion" between prisoner and doctor or between doctors.

When the Court later considered attorney's fees and costs, the PLRA once again became an issue. DOC argued that the law limited Miller to $11,250. Miller argued that *Armstrong v. Davis*, 318 F.3d 965 (9th Cir 2003), held the PLRA did not apply to prisoners with ADA claims, since that case relied on a section of the ADA providing a court in its discretion may order reasonable

# Massachusetts Supreme Judicial Court: Jail Detainee's Urine Not a 'Noxious or Filthy Substance'

### by David M. Reutter

IN AN OPINION ISSUED ON NOVEMBER 22, 2022, the Supreme Judicial Court of Massachusetts held that urine is not a "noxious or filthy substance." Therefore, the Court affirmed dismissal of vandalism charges against a detainee for urinating on a jail's floor.

Angel O. Perez Narvaez was stopped by law enforcement and arrested on suspicion of drunk driving in the early morning hours of February 10, 2020. He was uncooperative during arrest and booking, refusing to take a breathalyzer or be fingerprinted. He was taken to Hampshire House of Correction, placed in a cell and told he had to cooperate with the booking process before he could be released on bail.

At around 7 a.m. that morning, a guard performed a cell check and noticed Perez Narvaez had "made a complete mess of (his) cell," the Court later recalled. He had urinated on the floor both inside and outside his cell; based on the location of the toilet "it (was) apparent (Perez Narvaez) purposely urinated through the cell bars on to the floor outside the cell." The urine had "seeped into the cracks between the floor tiles, potentially causing permanent damage to the subfloor beneath." The jail hired a company specializing in cleaning hazardous fluids and spills to scour Perez Narvaez's cell.

He was charged under Mass. G.L.C. 266, § 103, with vandalizing the jail with a "noxious or filthy substance." He moved to dismiss the complaint for lack of probable cause. The trial court granted the motion, and the Commonwealth appealed. The Appeals Court reversed in an unpublished opinion. The Supreme Judicial Court then granted Perez Narvaez's application for further appellate review.

The Commonwealth argued that urine is so "disgustingly dirty" that it is a "noxious or filthy substance" and said the argument should end there. But the Court disagreed, stating the terms "noxious or filthy substance" may have "different meanings dependent upon contemporary conditions, the connection in which it is used, and the result intended to be accomplished."

The law in question was enacted in 1851, in response to the "anti-temperance" movement, which fought back against those who "sought and eventually obtained a prohibition on the sale of alcohol," the Court noted. In two 1847 incidents, it detailed, coal tar was thrown into the homes of Temperance Movement supporters by anti-temperance protestors. Similar incidents involved not tar but "oil of vitriol" – concentrated sulfuric acid.

Lawmakers passed G.L.C. 266, § 103 after this. But that historical background alone was not enough to define what those lawmakers intended the phrase "noxious or filthy substance" to encompass. For that, the Court looked to provisions following § 103, which specifically list coal tar and oil of vitriol. Under the statutory canon of interpretation of *ejusdem generis*, those "necessarily were intended to limit the more general term 'other noxious or filthy substance.'"

Therefore, the Court said urine is not a "noxious or filthy substance" within the meaning of the law. The appellate court's opinion was vacated, and the trial court's judgment was affirmed. Perez Narvaez was represented by Brookline attorney Rachel T. Rose. See: *Commonwealth v. Perez Narvaez*, 490 Mass. 807 (2022).

# Iowa Ombudsman Calls Out DOC For Unfair Prisoner Discipline

### by Kevin W. Bliss

THE IOWA OMBUDSMAN OFFICE (IOO) released its Annual Report on December 15, 2022, calling out the state Department of Corrections (DOC) for unfairly addressing several difficulties it faces, including the abuse of K2 by prisoners.

Like many states, Iowa has struggled with the synthetic drug, which is easily smuggled into lockups. There it is cut into hundreds of doses and resold at a massive profit, making it extremely appealing to traffickers.

But field testing for K2 is not conclusive. Guards use field-test kits whose manufacturers state that results need to be confirmed in a certified laboratory. Since certain component chemical compounds of the drug are commonly found elsewhere, as well, false positives occur in about 38% of field tests.

Nevertheless, IOO found that many state prisoners lost privileges for alleged rule violations based solely on these undependable drug tests – without any confirmation by a lab. It recommended a change in DOC policy to verify field tests and reinstate lost privileges to prisoners when those laboratory results come back negative.

IOO also found inadequate policies to prevent interaction between protective custody (PC) prisoners and those housed in general population (GP). Institutional policy failed to protect at least one PC prisoner during transport for a routine medical call-out at a high-security state lockup; he was assaulted by a fellow prisoner, despite orders to keep them separate. To protect those in PC, the report stated that prison policies need to be revised so that transport to medical or other appointments avoids all contact with prisoners in GP.

Lastly, IOO found at least one prisoner was inappropriately denied a grievance appeal, after it was erroneously determined to be untimely filed. IOO said the appeal was timely filed – on July 8, 2022 – but the reviewing department did not stamp it received until July 16. The earlier date resulted in rejection, and it was unfair to the prisoner to deny relief when proper procedure was followed, IOO said. The report recommended that DOC change mailbox rules governing grievances or appeals to make sure timeliness determinations are based on the date the form is received and not the date it was submitted.

Source: *Iowa Office Ombudsman Annual Report FY22*

# 'Disconnect' Between Illinois Prisoner's Grievance and Complaint Results In Failure to Exhaust

### Seventh Circuit Also Rules Internal Investigation Does Not Toll Exhaustion

#### by Jacob Barrett

A JUNE 16, 2021, RULING BY THE U.S. Court of Appeals for the Seventh Circuit highlights the importance for prisoners who file grievances to make sure they are not so narrowly drawn as to preclude filing a court suit under 42 U.S.C. § 1983 if relief is not provided.

The facts of the case are troubling. While Marque Bowers was being held in the Cook County Jail in Chicago, where he was brutally attacked by fellow prisoners on December 31, 2012. As the Court noted, the assault "left Bowers in the jail infirmary with serious injuries, and the record shows that he uses a jail-provided wheelchair to this day."

To make matters worse, the jail had more disabled prisoners than it had cells compliant with the Americans with Disabilities Act (ADA), so Bowers lived almost entirely in "cells without accessible showers or toilets," the Court acknowledged.

A few days after the attack, on January 3, 2013, Bowers submitted a grievance, alleging that a guard on duty failed to respond to his "repeated cries for help" and asking for charges to be filed against the attackers he identified. The jail responded that it would contact Bowers to press charges against the prisoners he identified.

Bowers was not satisfied with that response, so he filed another appeal, which was denied on February 26, 2013. That same day, he filed a second grievance. The jail, however, required that prisoners file grievances within 15 days of the event, so it processed Bowers' second appeal as a "non-grievance," assuring him that the Office of Professional Review (OPR) was investigating his allegations against the guard.

OPR eventually cleared the guard of misconduct. After that, Bowers filed suit under § 1983 in U.S. District Court for the Northern District of Illinois on February 22, 2016, alleging that defendants failed to protect him, instituted a policy that caused the attack, and also discriminated against him because of his resulting disability.

The district court dismissed Bowers' failure-to-protect claim, saying he had not exhausted his administrative remedies as required by the Prison Litigation Reform

Act of 1995, 42 U.S.C. § 1997e(a) (PLRA) because his prison grievances did not assert the same claims as his complaint.

The court also looked at his *Monell* claim, based on *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), which permits §1983 actions against bodies of local government if a constitutional injury is caused by an official policy, a widespread and well settled practice or custom, or an official with final policy-making authority. Here the ruling also went against the prisoner, with the court finding he filed his claim after the two-year statute of limitations had expired.

Having dismissed most of Bowers' claims, the court allowed the remaining claims under ADA and the Rehabilitation Act to proceed to trial, where Bowers lost when a jury returned a verdict in favor of the defendants in September 2017.

Bowers then appealed to the Seventh Circuit. In a ruling issued on June 16, 2021, the Court affirmed the district court's dismissal of his failure-to-protect claims for failure to exhaust his administrative remedies as required by PLRA.

Specifically, while Bowers alleged in his complaint that he "made repeated complaints to defendants he had received threats of physical violence from other detainees and requested to be moved to a different housing unit," and that they "had the power to transfer, or to request a transfer, or move [him] to a more secure environment and thereby protect [him] from an unnecessary risk of physical harm," he failed to make those allegations through the grievance process.

Thus, the Court said that the lower court had correctly observed a "disconnect" between his grievance—that a guard ignored him during the assault—and his federal claim that numerous prison employees knew of the risk and did nothing to protect him.

"Contending [the guard] failed to come to his aid during the attack is not the same as alleging that the [the defendants] predicted but ignored the risk," the Court concluded.

The Court also affirmed the lower court's finding that Bowers' *Monell* claim was filed after the two-year deadline passed. He had 15 days to file any grievance related to the attack, and 14 days after he received a response to file an administrative appeal. He proceeded through that process and learned that the jail denied his appeal in February 2013. So the two-year clock began ticking, giving Bowers until February 2015 to file his federal complaint, which he didn't file until February 2016.

Bowers argued the statute of limitations should have been tolled from the later conclusion of the OPR investigation. But the Court held that "[t]he presence of an internal-affairs investigation does not lead to any remedies for the prisoner." The Court explained that "[a]n internal-affairs investigation may lead to disciplinary proceedings targeting the wayward employee but ordinarily does not offer a remedy" to the prisoner on the receiving end of the employee's misconduct. "Where a process does not lead to a remedy for the prisoner under the PLRA, there is nothing for the prisoner to exhaust and the statute of limitations does not toll," the Court concluded.

At trial, Bowers had maintained that defendants intentionally discriminated against him because of his disability when they failed to house him in an ADA-compliant cell following the attack. But the jury returned a verdict in favor of the Sheriff on this claim, and the Court noted that "Bowers had to prove that he is a qualified individual with a disability and that he was denied access to a service, program or activity because of his disability." He contended that because he was wheelchair-bound, he was impaired, or that, "at the very least, the jail regarded him as being impaired by providing him a wheelchair."

While the Court did not "doubt that a physical condition resulting in wheelchair use [would] generally be one that reflects a substantial limitation," it said that the jury was presented sufficient evidence to find that Bowers lied about needing a wheelchair. In fact, Bowers had admitted to moving his leg in a video taken immediately

after the attack, and he refused to submit to MRI and EMG testing.

"His refusal to undergo the tests may have raised suspicion with at least some members of the jury," the district court concluded, so the Seventh Circuit agreed that a reasonable jury could find that Bowers was not a qualified individual with a disability.

Thus, the district court's affirmation of the jury verdict in favor of defendants was also affirmed. See: *Bowers v. Dart*, 1 F. 4th 513 (7th Cir. 2021). 

# Fifth Circuit Reinstates Federal Prisoner's Tort Claim Against BOP Officials

## *by Keith Sanders*

THE U.S. COURT OF APPEALS FOR THE Fifth Circuit held on August 23, 2021, that a district court erred in dismissing a former federal prisoner's intentional tort claims.

The former prisoner, Bryan Kerr Dickson, was incarcerated by the Bureau of Prisons (BOP) at the Federal Correctional Complex in Beaumont, Texas, where he claimed that he repeatedly expressed concerns that he would be targeted by other prisoners because he had been convicted for possession and production of child pornography. Nonetheless the BOP housed him with the prison's general population, where Dickson was subsequently assaulted by another prisoner.

He was then placed in a Special Housing Unit (SHU), where he attempted suicide. His complaint alleged that prior to the attempt his requests for mental health treatment were denied and that BOP staff had even encouraged him to take his own life. After the suicide attempt, Dickson claimed that BOP officials stood by while he was again assaulted by another prisoner.

Dickson then filed suit *pro se* under the Federal Tort Claims Act (FTCA) in U.S. District Court for the Eastern District of Texas, seeking damages for negligence and an intentional tort claim. The United States, as defendant, moved to dismiss the suit, arguing that under Federal Rules of Civil Procedure 12(b)91) and (b)(6), the "district court lacked subject matter jurisdiction and that Dickson's complaint failed to state a claim." The district court agreed and granted the government's motion to dismiss for lack of subject-matter jurisdiction, on the grounds that the United States enjoyed sovereign immunity as prescribed by FTCA's "law enforcement proviso."

The district court acknowledged that FTCA permits, with certain exceptions, waivers of sovereign immunity for suits brought against the United States for monetary damages valid in state tort law for negligent or wrongful acts committed by government employees. See: *Spotts v. United States*, 613 F.3d 559, 565 (5th Cir. 2010).

However, citing the same case and its reference to federal tort liability under 28 U.S.C. § 2674, the district court ruled that one of FTCA's exceptions to such waivers blocked Dickson's negligence claims, specifically the "discretionary function exception," which eliminates an immunity waiver in situations where "although a government employee's actions may have been actionable under state tort law, those actions were required by, or were within the discretion committed to, that employee under federal statute, regulation, or policy."

The district court also held that, with respect to Dickson's intentional tort claims, the "law enforcement proviso" to FTCA's intentional tort exception did not apply. Dickson appealed the district court's ruling.

The Fifth Circuit affirmed the lower court's determination that it lacked subject-matter jurisdiction regarding the negligence claims. In its decision, the appellate court noted that "Dickson has not identified any such policy or otherwise alleged that the BOP violated a non-discretionary duty when it placed him within the general population," thus not demonstrating the FTCA's discretionary-function exception applies.

However, the Fifth Circuit reversed the district court's dismissal of the plaintiff's intentional tort claims. The lower court relied on a previous ruling by the Fifth Circuit which, under FTCA's law enforcement proviso, held that while the "defendant BOP officers had the status of law enforcement officers … they were not engaged in law enforcement activities." See: *Cross v. United States*, 159 F. App'x 572 (5th Cir. 2005).

Citing the fact that the U.S. Supreme Court had since "explicitly rejected this 'status' versus 'activities' distinction" in a later case, *Millbrook v. United States*, 569 U.S. 50, 133 S. Ct. 1441 (2013), citing 28 U.S.C. § 2680 (h), the Fifth Circuit reversed the district court's dismissal of Dickson's intentional tort claims for lack of jurisdiction.

Remanding the suit, the Fifth Circuit also instructed the district court to consider only whether BOP officials had acted within the "scope of their employment when committing the alleged torts" in order to determine if the FTCA law-enforcement proviso applies. See: *Dickson v. United States*, 11 F.4th 308 (5th Cir. 2021).

As of mid-January 2022, the case was still on remand. See: *Dickson v. United States*, USDC (E.D.Tex.), Case No. 1:14-cv-00250-MAC-CLS. 

### *From Inmate to Entrepreneur*

**Research Solutions Network** is the next level of marketing for the incarcerated individual who dares to dream. We are a network built in empowering the entrepreneurial spirit inside of those who wish to become leaders in today's society.

This brochure and guide will begin your relationship with us and we will always pride ourselves in giving you the resources and information you need. Whatever vision you have for your success beyond incarceration, Research Solutions Network is the pathway to your greatness!

*"The mind is a terrible thing to waste!"*

Send $2.00 for our business brochure

We accept institutional checks & money orders

**Research Solutions Network, LLC.** P.O. Box 2623, Virginia Beach, VA 23450

Email: info@researchsolutionsnetwork.com

# $2.2 Million Settlement Over Transgender Georgia Prisoner's Suicide Is Largest in State DOC History

*by Matt Clarke*

ON DECEMBER 7, 2021, THE PARENTS of a 25-year-old transwoman who committed suicide while imprisoned in the Georgia Department of Corrections (DOC) dismissed their federal civil rights lawsuit against DOC officials after accepting a $2.2 million settlement the preceding October 27. See: *Maree v. Igou,* 2021 U.S. Dist. LEXIS 234131 (M.D. Ga.).

The deceased prisoner, Caleb "Jenna" Mitchell, suffered from schizophrenia, bipolar disorder and gender dysphoria. Mitchell had been medically approved for sex reassignment surgery, but she was incarcerated in a men's prison while serving up to 10 years for a 2015 robbery conviction. Mitchell also had a history of self-harm and suicide attempts.

Around November 19, 2017, Mitchell was told she was being transferred to the compound for transgender prisoners. But instead, she was placed in solitary confinement. On December 4, 2017, she told guard James Lee Roy Igou she was about to hang herself and, according to a prisoner who was working in the area as an orderly, Igou taunted her, saying, "OK, what are you waiting for, go for it." A few minutes later, he walked away, and she yelled, "Don't leave me!"

Video surveillance recorded Igou walking off and, soon thereafter, the orderly checking Mitchell's cell, finding her hanging by a bedsheet tied to a ventilation grill with her feet dangling above the ground. According to a declaration by the orderly, he immediately ran to find guard Sgt. Wallace L. Richardson and informed him that Mitchell had hanged herself. The orderly said the guard smirked and laughed at the news.

The video recording shows Richardson and Igou arriving at the cell, and then they walked away, not returning for more than ten minutes. Mitchell was eventually cut down and taken to a hospital, where she remained in a coma until she died two days later.

Her parents, Sheba Maree and Jeff Spiva, filed a federal lawsuit pursuant to 42 U.S.C. § 1983 in federal district court for the Middle District of Georgia, accusing Richardson, Igou and Valdosta State

Prison warden Don Blakley of deliberate indifference to Mitchell's serious medical needs, as well as a denial of Plaintiff's access to courts with an allegedly false incident report prepared by Richardson and approved by Blakely to cover up Igou's misconduct.

Maree and Spiva were initially represented by attorney Craig T. Jones of Washington, Georgia, before the case was taken over by attorneys David B. Shanies and Deborah Ingrid Francois of New York City, as well as Andres M. Lopez Delgado, Rahul Garabadu and Sean Jengwei Young of Atlanta. After a great deal of extended discovery, the action was nearly three years old on September 21, 2021, when the Court granted Plaintiffs one last February 7, 2022. See: *Maree v. Igou,* 2021 U.S. Dist. LEXIS 179366 (M.D. Ga.). After that, the parties proceeded to reach their settlement agreement.

According to Shanies, DOC conducted a "superficial" investigation that resulted in a recommendation that DOC staff be retrained on prisoner suicide.

"The lack of any meaningful investigation was shocking and inexcusable," said Shanies. "Prison guards stood by and let a

person die in front of their eyes."

Added the attorney: "It is deeply unsettling."

There have long been allegations of prisoner abuse in the Georgia DOC, especially abuse of transgender prisoners. In September 2021, the U.S. Department of Justice (DOJ) launched a statewide investigation into violence, homicides, and sexual abuse of gay and transgender prisoners by staff and prisoners in the state. Kristen Clarke, who heads DOJ's Civil Rights Division, said the investigation would also address abusive conditions caused by "prison staff shortages, inadequate policies and training, and the lack of accountability."

The $2.2 million settlement in this case was even larger than the last seven-figure wrongful death payout by DOC. In 2016 the agency paid $1.2 million to settle a suit over the December 1999 death of Thomas M. Fitzgerald, who was strapped to a bed in an isolation cell. As part of this agreement, the parties will cover their own attorney's fees and costs. See: *Maree v. Richardson,* USDC (M.D. Ga.), Case No. 7:19-cv-00046.

Additional source: *CNN*

# Eleventh Circuit Says Georgia Prisoner Failed to Exhaust Remedies by Filing Late Grievance to Ask for Investigation that Was Already Underway

*by David M. Reutter*

HERE'S A SIMPLE MESSAGE TO PRISONers from the U.S. Court of Appeals for the Eleventh Circuit: Exhaust your remedies, no matter how redundant they may seem.

That was the key takeaway from the Court's ruling on August 31, 2021, in which it held that the grievance process in the Georgia Department of Corrections (DOC) is not an unconstitutional "dead-end" simply because it automatically refers prisoner's complaints of excessive use of force to an Internal Investigation

Unit (IIU). That process itself, the Court said, offers "the possibility of some relief," satisfying the requirement laid out by the Supreme Court in *Booth v. Churner,* 532 U.S. 731, 121 S. Ct. 1819 (2001).

The Court's opinion was issued in an appeal by DOC prisoner Christopher Varner, who was at Augusta State Medical Prison (ASMP) on February 13, 2014, when several guards entered a hallway and shouted epithets at prisoners standing there in a medication line. Varner responded to them.

Sgt. John Williams grabbed Varner, who suffers from schizophrenia, organic brain damage and bipolar disorder, and tried to handcuff him. Varner struck Williams in the head. The guards responded by taking him into a small vestibule and placing him in a chokehold until he lost consciousness.

Varner was handcuffed when he regained consciousness, and the guards "punched, kicked, and stomped on [him]" as he lay on the floor. They then took him to the medical unit, tarrying to ride up and down the elevator four times as they continued using excessive force on Varner, "including the use of pepper spray and a metal baton, despite Varner's being handcuffed and compliant." He was transferred to a hospital for treatment of a broken eye socket, jaw, and nose, and extensive bruising on his face and torso.

The day of the incident, the warden referred the matter to IIU. Varner's father and mother also lodged a complaint with ASMP. After reviewing video evidence and interviewing the three guards, IIU determined they had used excessive force. Williams and guards Antonio Binns and Justin Washington resigned in lieu of termination. They subsequently pleaded guilty to federal criminal charges related to the assault and were given five years probation, a $2,000 fine, and a special $100 assessment. See: *U.S. v. Williams*, USDC. (S.D. Ga.), Case No. 1:16-CR-00024.

Varner filed three grievances related to the excessive use of force in July 2015, June 2016 and June 2017. But under DOC policy, he was required to file a grievance within 10 days of the incident. So when he then filed suit in U.S. District Court for the Southern District of Georgia, it was dismissed for failure to exhaust his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e (PLRA). Varner appealed.

Citing *Ross v. Blake*, 136 S.Ct. 1850, 1859-60 (2016), the Court noted that relief is considered not obtainable from administrative remedies only "(1) when the procedure 'operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates'; (2) when the administrative scheme is 'so opaque that it becomes, practically speaking, incapable of use'; and (3) 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'"

But that's what Varner argued—that the grievance process was a dead end because DOC policy requires that any allegation of excessive use of force is "automatically forwarded" to IIU and "such actions automatically end the grievance process."

Not so, the Eleventh Circuit replied. The focus is on the relief available, and under DOC's policy the relief is a referral to IIU. Once that is done, administrative remedies are exhausted and the prisoner is free to file a federal civil rights action. That an IIU investigation ensued before Varner filed his grievances was of no consequence to the exhaustion issue, for PLRA simply requires a prisoner to exhaust administrative remedies, and Varner failed to do so with his untimely grievances.

Simply put: Even if the grievance will result in an investigation that is already underway, it must be filed to satisfy the PLRA's exhaustion requirement.

Finally, the Court found Varner's other argument—that his mental illness rendered the administrative remedies unavailable to him—unpersuasive. It noted that Varner used the process to file two medical grievances on March 12, 2014, which was "close enough in proximity" to the incident on February 13, 2014, to prove his knowledge of the process. Thus the district court's dismissal was affirmed.

In partial dissent, Judge Jill Pryor took exception with the majority's acceptance of the automatic referral to IIU as "relief," saying that a referral alone "does not substantively address the underlying allegations" as the Supreme Court's *Booth* decision requires. See: *Varner v. Shepard*, 11 F.4th 1252 (11th Cir. 2021).

Varner filed for writ of certiorari from the U.S. Supreme Court, but that petition was denied on February 22, 2022. See: *Varner v. Shepard*, 2022 U.S. LEXIS 841.

Varner was represented in his suit by attorneys Ryan Primerano and Sarah Elisabeth Geraghty of the Southern Center for Human Rights in Atlanta. Geraghty has since been appointed to the federal bench in the Northern District of Georgia.

## Kravis, Graham, & Zucker LLP
### A California Post Conviction Law Firm



Randy Kravis, Esq. Bruce Zucker, Esq. Ian Graham, Esq.

## Criminal Appeals * Habeas Corpus Writs
## Parole Hearings * Resentencing
## Prisoners' Rights

401 Wilshire Blvd. 12th Floor Penthouse * Santa Monica, CA 90401
Telephone (310) 975-7040   www.kgzlaw.net
This is Advertisement for Legal Services

The *Columbia Human Rights Law Review* Presents

## *A Jailhouse Lawyer's Manual*
### Twelfth Edition (Fall 2020)

The JLM is a self-help litigation book with over 40 chapters on topics ranging from challenging unlawful convictions to securing medical care while in prison. The new edition has been revised and updated by members of the *Columbia Human Rights Law Review* to thoroughly address topics of importance to incarcerated people and practitioners.

Along with the Twelfth Edition, *A Jailhouse Lawyer's Manual* also publishes the following specialty editions:

- Louisiana State Supplement (2018)
- Immigration & Consular Access Supplement (2018)
- Texas State Supplement (2013)

For more information regarding *A Jailhouse Lawyer's Manual*, please visit our website (jlm.law.columbia.edu) or contact us at:

A Jailhouse Lawyer's Manual
435 West 116th Street, New York, NY 10027
Email: JLM.board.mail@gmail.com



# Fourth Circuit Grants Qualified Immunity to Prison Official Who Gave Prisoner No Notice Before Hearing That Resulted in Transfer to Security Detention

### by David M. Reutter

IN A RULING ON MARCH 30, 2021, THE Fourth Circuit Court of Appeals held that prison officials were entitled to qualified immunity because it was not clearly established that a prisoner had a right to fair notice of a security detention hearing.

The Court's opinion was issued in an appeal filed by Tamara Ravenell, the Chairperson of the Institutional Classification Committee (ICC) at South Carolina's Lieber Correctional Institution. A federal district court had denied her motion for summary judgment based upon qualified immunity in a civil rights action seeking damages asserted by prisoner Fred R. Halcomb, Jr.

Halcomb was serving a life sentence when a search of his cell on March 23, 2016, revealed contraband, including drugs, weapons, and escape tools. He received a two-week notice of a disciplinary hearing at which he was then found guilty, resulting in his transfer from short-term detention status to disciplinary detention status.

Four days after the hearing, on April 18, 2016, the ICC conducted a detention hearing to determine whether Halcomb should be transferred to security detention. Halcomb did not receive notice of the hearing or its purpose until he arrived at the hearing. He was recommended for placement on security detention, and that recommendation was adopted by a senior classification official.

In the federal civil rights complaint he then filed, Halcomb "alleged that his right to due process was violated because he did not receive notice of the security detention hearing prior to arriving at the hearing," the Court recalled.

In her answer to the complaint, Ravenell asserted a qualified immunity defense and moved for summary judgment. The district court denied the motion, and Ravenell timely appealed. On appeal, the Fourth Circuit agreed with the district court "that the right is appropriately framed as the right to 'fair' notice of a security detention hearing, rather than a specific right to 48 hours' notice."

But the Court noted that Halcomb's complaint framed the right as one to 48 hours' notice "because the South Carolina Department of Corrections policies describe an entitlement to 48 hours' notice in certain circumstances."

More importantly, it found the crux of Halcomb's argument was "that the lack of prior notice deprived him of an opportunity to prepare for the hearing." Thus, construing the complaint liberally, Halcomb had in fact complained "that he did not receive 'fair' notice of the hearing," the Court determined.

The Court then considered whether that right was clearly established. It noted that in *Wilkinson v. Austin*, 545 U.S. 209 (2005), the U.S. Supreme Court held "a policy that provided inmates with notice at least 48 hours before an administrative segregation hearing passed constitutional muster."

"Importantly, however," the Court added, the ruling in that case "did not hold that 48 hours' notice prior to the hearing was constitutionally required."

The Court allowed that in *Williamson v. Stirling*, 912 F.3d 154 (4th Cir. 2018),

it said it had given "clear notice to jail officials in 2015 that a long-term detention in solitary confinement—even when imposed for security reasons—justifies some level of procedural protection," pointing to an earlier ruling in *Incumaa v. Stirling*, 791 F.3d 517 (4th Cir. 2015).

However, the clarification and emphasis in the *Williamson* decision—upon which the district court had relied—had not come out until two years after the incident at issue in Halcomb's case. And, as the Court further noted, the *Incumaa* decision upon which the reasoning rested provided only that prisoners are entitled to 'some' level of protection.

"Thus," the Court determined, "we cannot conclude that the case law is so clearly established that a reasonable official would know whether prior notice of an administrative segregation hearing is required."

Accordingly, the district court's order was reversed and the case remanded with instructions to grant Ravenell's motion. See: *Halcomb v. Ravenell*, 992 F.3d 316 (4th Cir. 2021).

# California Appeals Court Reverses Dismissal of Charges Against Prisoners Charged in Pelican Bay Riot

### by David M. Reutter

ON JUNE 9, 2021, THE CALIFORNIA Supreme Court declined to hear an appeal to a decision handed down by the state's First District Court of Appeal on March 29, 2021, reinstating most charges that a trial court had dismissed against four prisoners involved in a riot at Pelican Bay State Prison nearly four years earlier. See: *People v. Abelino*, 2021 Cal. LEXIS 4063.

The May 24, 2017, incident started after two prisoners got into a fight in a prison yard. Guards broke up the fight with batons and O.C. (Oleoresin Capsicum) grenades, as well as with a 40-millimeter shot to the leg of one of the combatants. At that point, video records showed that other prisoners

got up from the prone position in which they had been ordered to lie and rushed the responding guards.

During the ensuing melee, guards in observation posts fired 20 rounds. Of those, five were for effect, meaning they were meant to hit a prisoner, while the others were warning shots fired into the ground. Five prisoners suffered gunshot wounds, among seven injured during the incident. Eight of the guards who were attacked were injured severely enough to require hospital treatment, two of them so significantly injured that they may never be able to return to work in law enforcement. [See: *PLN*, Feb. 2018, p.63.]

# Child Support Relief Coming for Incarcerated Parents

### In the last days of the Obama administration, regulators quietly ease the child support burden on parents in prison.

#### by Eli Hager

SQUEEZING IN AN EXECUTIVE ACTION JUST a month before president-elect Donald Trump's inauguration, on December 20, 2016 the Obama administration quietly unveiled a new federal regulation that will allow incarcerated parents to lower their child support payments while they are in prison.

The new rule, published by the U.S. Department of Health and Human Services, requires states to notify all parents incarcerated for more than six months of their right to ask the child support agency for a temporary reduction in payments.

As The Marshall Project reported in October 2015, many states have long considered incarceration a form of "voluntary" impoverishment, and therefore not a valid excuse for missing child support payments. [See: *PLN*, Sept. 2016, p.1]. But jobs in state prisons pay a median wage of about 20 cents an hour, meaning that most incarcerated parents cannot feasibly pay the full amount of their child support obligation – and end up tens of thousands of dollars in debt by the time they get out. (The best estimates indicate that one in five prisoners in the U.S. has a child support order.)

The new rule, said Vicki Turetsky, commissioner of the Office of Child Support Enforcement, is intended to keep these mostly-poor fathers out of severe debt so they are less tempted back into crime after they are released.

Republicans in Congress, including House Speaker Paul Ryan (R-Wis.) and Senator Orrin Hatch (R-Utah), introduced legislation in June 2015 to block Obama's new regulation, arguing that it would lead to more single mothers on welfare, which would be a greater burden on taxpayers. But the bill has stalled.

The incoming Trump administration could now resume efforts to undo the regulation, which also includes measures to calculate what poor parents owe based on their actual income and to reduce the uncollectible accumulated debt that forces many fathers to go underground.

But to do so, the new Health and Human Services Department under nominee Tom Price would have to go through the same extensive rulemaking process the Obama administration did – which took more than two years.

*Ed. Note*: The federal child support rule change, which amends 45 C.F.R. 303, becomes effective January 19, 2017.

*This article was originally published by The Marshall Project (www.themarshallproject.org) on December 20, 2016; it is reprinted with permission from the author, with minor edits.*



Non Nude Photo Book

FULL COLOR GLOSS PHOTOS
A Different Photo On Every Page

PUBLISHED BY GOLIATH

OVER $100 WORTH
OF SEXY PHOTOS IN ONE BOOK...
Only $24.99 plus s/h

NON NUDE PRISON FRIENDLY
Soft Cover, 8.3" x 6", 124 Gloss Color Pgs.

Freebird Publishers
$24.99 plus $7 s/h with tracking
Send $31.99 TO:
Box 541, North Dighton, MA 02764
WWW.FREEBIRDPUBLISHERS.COM

# Merits Ruling on Procedurally Flawed Grievance Satisfies PLRA

THE ELEVENTH CIRCUIT COURT OF Appeals has held that district courts may not enforce a prison's procedural rule to find a failure to exhaust administrative remedies after prison officials declined to enforce the rule themselves. The Court also found the district court failed to undertake the proper two-step process to resolve motions to dismiss for failure to exhaust.

Georgia prisoner Shawn W. Whatley alleged that he was beaten on January 12, 2011 by guards at the Telfair State Prison and transferred within hours to Ware State Prison. He also claimed he was denied medical treatment. In response to his civil rights lawsuit, prison officials filed a 300-page motion to dismiss arguing that Whatley had failed to exhaust administrative remedies as required by the Prison Litigation Reform Act (PLRA).

The district court granted the motion. At issue on appeal were two grievances Whatley had filed. The first was a January 18, 2011 informal grievance in which Whatley addressed the beating and lack of medical care. He received a receipt for the grievance, but never received a response. About three months later he filed an appeal.

There was no indication on the receipt as to what issues were raised in the informal grievance, which Whatley had appealed without filing a formal grievance as required by prison policy; the district court found that constituted failure to exhaust available remedies.

In *Turner v. Burnside*, 541 F.3d 1077 (11th Cir. 2008), the appellate court set forth a two-prong test for failure to exhaust. First, district courts must look to factual allegations in the motion to dismiss and those in the prisoner's response, and accept the prisoner's version of the facts as true. The court should dismiss if the facts as stated by the prisoner indicate failure to exhaust. Second, if dismissal is not warranted on the prisoner's version of the facts, the court must make specific findings to resolve factual disputes and should dismiss if, based on those findings, the defendants have shown failure to exhaust.

The district court did not accept Whatley's version of the facts as true when he described what he had written in his January 18 informal grievance and the efforts he made to exhaust available remedies. The court also failed to resolve factual disputes

# Second Circuit: Continuing Violations Exhausted with Single Grievance

THE SECOND CIRCUIT COURT OF Appeals held on May 16, 2012 that a New York district court had incorrectly concluded that a prisoner failed to exhaust his administrative remedies before bringing a religious freedom suit.

Muslim prisoner Neil Johnson was confined at the Federal Correctional Institution in Otisville, New York (FCI Otisville). In 2005, an FCI Otisville policy limited congregational prayers to once a day. However, Johnson's Islamic religious beliefs required group prayer five times daily.

In February 2005, Johnson exhausted an administrative grievance concerning the limitation on congregational prayer. Although prison officials denied the grievance, they coincidentally stopped enforcing the policy.

After a new warden took over at FCI Otisville in April 2007, the congregational prayer policy was reimplemented and consistently enforced, limiting Muslim prisoners to group prayer once a day, five days a week, in the facility's chapel.

On April 12, 2007, Johnson and several other Muslim prisoners were performing congregational prayer in their housing unit when a guard stopped them. Johnson was threatened with disciplinary action if he continued to engage in group prayer in violation of institutional policy.

Johnson filed suit in federal court on July 24, 2007, alleging that the limitation on congregational prayer violated his rights under the First Amendment and Religious Freedom Restoration Act (RFRA). He also raised a retaliation claim. He had not, however, filed a new grievance challenging the renewed 2007 enforcement of the policy related to group prayer.

On April 21, 2009, the district court granted partial summary judgment for the defendants, finding that Johnson had failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act (PLRA).

The Second Circuit reversed, holding "that Johnson's 2005 grievance was sufficient to exhaust his administrative remedies with respect to the continuing limitations on congregational prayer at FCI Otisville."

"Although the District Court and the defendants framed the action as concerning 'a wholly different set of circumstances' than those raised in the 2005 grievances," the appellate court found "the issue that Johnson would have raised in 2007 – the inadequacy of the spaces and times allotted for congregational prayer – was *identical* to the issue he exhausted in 2005" (emphasis in original). Three other circuits had previously held that no further grievances were necessary under such circumstances. See, e.g., *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1219 (11th Cir. 2010); *Howard v. Waide*, 534 F.3d 1227, 1244 (10th Cir. 2008) [*PLN*, March 2010, p.47]; and *Johnson v. Johnson*, 385 F.3d 503, 521 (5th Cir. 2004) [*PLN*, April 2005, p.37].

The Court of Appeals made clear, however, that its "holding is necessarily limited to cases in which a prior grievance identifies a specific and continuing complaint that ultimately becomes the basis for a lawsuit."

See: *Johnson v. Killian*, 680 F.3d 234 (2d Cir. 2012). In general, prisoners should fully exhaust their administrative remedies with respect to all issues they plan to litigate.

Following remand, the district court granted the defendants' motion to dismiss Johnson's congregational prayer claims on January 9, 2013. The court held that his claims for declaratory and injunctive relief were moot because he had since been transferred to another facility, and as a pro se plaintiff he could not represent other prisoners as a class.

With respect to Johnson's damages claims, the district court granted qualified immunity to the defendants "because it was not 'clearly established' in 2007 that Muslim inmates were entitled to participate in group prayer anywhere in the correctional facility, including in their housing units." See: *Johnson v. Killian*, U.S.D.C. (S.D.N.Y.), Case No. 1:07-cv-06641-NRB; 2013 WL 103166.

# Federal Court Enters Interim Fee Award Against BOP in FOIA Suit

THE FEDERAL BUREAU OF PRISONS (BOP) began 2013 with an adverse ruling from the U.S. District Court for the District of Oregon, after the BOP had spent several years refusing to disclose allegedly confidential information that was, in fact, already public.

In May 2009, Stephen Raher, then a law student and former co-coordinator of the Colorado Criminal Justice Reform Coalition, filed a lawsuit against the BOP that alleged the agency had improperly withheld documents requested under the Freedom of Information Act (FOIA). Raher had requested various records concerning the BOP's contracts with private prison companies, including the contracts themselves, contractor proposals and internal BOP emails.

Under the BOP contracts, private prison companies are paid a designated amount per day for each prisoner they house ("per diem" pricing). The BOP initially argued that it could not release the contractors' proposals because they contained confidential commercial information and

security details. BOP officials also claimed they could not release the number of beds they had contracted for, or the per diem prices.

The BOP argued that a wide variety of information concerning private prison operations was confidential commercial information, protected by FOIA's Exemption 4 (5 U.S.C. § 552(b)(4)), because it revealed proprietary details about how companies like Corrections Corporation of America (CCA) and GEO Group operate their facilities. The BOP supported its argument with testimony from Matthew Nace, chief of the BOP's acquisition office, who stated that per diem prices were confidential and could not be released under FOIA.

In response, Raher presented expert testimony from a professional economist. The economist described the business model of the private prison industry and explained why release of the contractor proposals and pricing information would not cause a substantial competitive disadvantage to private prison firms.

In 2011, U.S. Magistrate Judge Janice

# Pennsylvania Prison Guard Convicted in Drug Probe, Testifies Against Coworkers

Former Luzerne County Correctional Facility guard John Gonda, known as "G-Unit," was the subject of an investigation called Operation Avalanche after authorities received tips he was selling "large quantities [of drugs] in the Wilkes-Barre area." The probe targeted the Outlaws Motorcycle Club, and Gonda was among 22 people charged in connection with a $3.6 million cocaine distribution ring.

When investigators raided Gonda's home they found six bags of cocaine, a marijuana pipe, a digital scale and seven firearms. The charging affidavit said he was an "associate" of the Outlaws. He was convicted on charges of participating in a corrupt organization, conspiracy to deliver cocaine and delivery of cocaine.

Sentenced in November 2010 to one-to-two years in prison, Gonda was made immediately eligible for work release by Luzerne County Senior Judge Chester B. Muroski. Gonda obtained a job as a property manager, which permitted him to leave prison during the work week from 8:00 a.m. to 7:00 p.m.

Shortly after Gonda was sentenced, Judge Muroski also granted his request for weekend furloughs, which allowed him to be released from 8:00 a.m. to 4:00 p.m. on weekends for "family care hours." His furlough request noted that before being jailed he cared for his totally disabled father.

Of course, Gonda's willingness to testify against other Luzerne County prison employees may have helped him receive a lenient sentence, work release and weekend furloughs. Gonda, described as a key witness, testified in March 2011 that he had purchased cocaine from former Luzerne County prison guard Christopher J. Walsh, 29. Another guard, Joseph Ciampi, 43, who was named in grand jury records as buying cocaine but not charged, also testified against Walsh.

In addition to Walsh, prison guard Jason D. Fierman, former prison nurse Kevin D. Warman and former prison Capt. John M. Carey were charged on March 10, 2011 with drug-related offenses as part of Operation Broken Trust. Carey was accused of receiving cocaine from other prison employees, including Gonda, and from former prisoners. Fierman allegedly sold cocaine and prescription drugs

inside the prison, while Warman was accused of using fake names or the names of prisoners to obtain prescription drugs from pharmacies. Warman and Carey had previously been fired; Walsh and Fierman were suspended following their arrests.

"Any allegations that individuals in positions of authority are using their powers to commit crimes or compromise law enforcement activities are an extremely serious matter," said Acting Attorney General Bill Ryan. "These crimes are not only a violation of the public trust but also a clear threat to public safety."

Although not criminally charged, Ciampi was suspended without pay for 18 days and later demoted in April 2011. "He was not arrested, but we believe some of his actions were of poor judgment. He accepted the demotion," said Assistant County Solicitor Stephen Menn. Ciampi resigned the following month.

Despite the damning testimony from Gonda and Ciampi, Walsh was acquitted at trial on March 7, 2012, with the jury

deliberating for just over an hour. According to Walsh's attorney, Walsh will seek to regain his job as a prison guard.

Carey pleaded guilty to a misdemeanor charge of possession of a controlled substance and was sentenced in January 2012 to 18 months' probation. Warman pleaded guilty to fraudulently obtaining prescription drugs; he was sentenced on May 11, 2012 to 18 months in an intermediate punishment program that includes house arrest with electronic monitoring. Warman had implicated former Luzerne County deputy warden Sam Hyder, saying the deputy warden had received prescription drugs, but Hyder denied the accusations and was not charged.

Fierman, the last Luzerne County prison employee charged with drug offenses, is scheduled to go to trial in June 2012.

Sources: *www.standardspeaker.com, www. citizensvoice.com, www.timesleader.com, www.attorneygeneral.gov*

# Judge, Not Jury, Must Resolve Questions about Administrative Exhaustion

Factual disputes surrounding whether a prisoner properly exhausted administrative remedies under the Prison Litigation Reform Act (PLRA) prior to filing suit must be resolved by the court, not a jury, the U.S. Court of Appeals for the Second Circuit decided on July 26, 2011. In so ruling, the Second Circuit aligned itself with similar decisions from the Third, Fifth, Seventh, Ninth and Eleventh Circuits.

Rafael Messa sued numerous New York Department of Correctional Services (NYDOCS) employees after he was injured during an altercation with guards. Messa did not file any grievances about the incident before filing his lawsuit. Instead, he argued that he was not required to exhaust because he had been threatened with further violence by guards if he complained about the incident. Additionally, he alleged that NYDOCS staff refused to assist him in preparing his grievances. Messa contended that he needed help because he spoke only Spanish and was illiterate.

Messa's case was set for trial after the district court denied summary judgment

to the defendants. However, several days prior to trial, the court decided *sua sponte* to conduct a hearing on the exhaustion issue. After considering testimony from Messa and NYDOCS officials, the district court found that Messa's excuses for failing to exhaust were contrary to the evidence. Accordingly, the court dismissed Messa's suit due to non-exhaustion.

On appeal, Messa argued that the district court violated his Seventh Amendment right to a jury trial by refusing to submit the exhaustion issue to a jury. The Second Circuit disagreed.

While the Seventh Amendment guarantees the right to a jury trial "[i]n suits at common law, where the value in controversy shall exceed twenty dollars," this right does not apply to all factual disputes that may arise in a case, the appellate court held.

Instead, the Seventh Amendment's guarantee of a jury trial applies only to "the ultimate determination of issues of fact by the jury." Exhaustion of administrative remedies, according to the Court of Appeals, does not go to the ultimate issue

26

ATTACH "B"

1) Case Grievance # 23-057152   12 pgs

Falsified Medical Records



**Arizona Department of Corrections**
**Rehabilitation and Reentry**

**Inmate Grievance Response**

For distribution: Copy of Corresponding
Informal complaint resolution must be
attached to this response.

27

| INMATE PRINTED NAME *(Last, First M.I.)* | ADCRR NUMBER |
|---|---|
| CARSON, PHIILP | 091914 |
| INSTITUTION/UNIT | CASE NUMBER |
| ASPCE/MEADOWS [7C10L] | 23-057152 |

**SUMMARY OF COMPLAINT**

This is in response to your Inmate Informal Complaint, case #23-057152, regarding your concerns of falsified medical records. This submission is an exact duplicate of grievance case #23-056819, that was responded to on 6/5/2023. Therefore it is being returned to you unprocessed.

**INMATE PROPOSED RESOLUTION**

**INVESTIGATIVE ACTION**

**FINDINGS & DECISION**

Duplicate of a previos case: Returned Un-processed.

| STAFF PRINTED NAME *(Last, First M.I.)* | SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|---|
| Wanders, J | *J. Wanders* | 06/09/2023 |

802-2
3/2/22

Rec
0612-23 R
Pr' [O' Hotline

**Arizona Department of Corrections**
**Rehabilitation and Reentry**

**Inmate Informal Complaint Resolution**

*Dw 06.06.23 (NAPHCARE-MEDICAL RECORDS)*
*NAPHCARE - ADCRR STAFF*
*TH*

Hand Delivered to CO3 Hotline on 06.06.23 12:00 hrs

Complaints are limited to one page and one issue.

Please print all information.

23-057152

| INMATE NAME (Last, First M.I.) (Please print) | ADCRR NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Carson, Phillip C. | 091414 | 7C10, A44, E- | 06.05.23 |

| TO | LOCATION |
|---|---|
| CO3 Tarango | 7C10 Assigned Counselor A44 |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

**Main** (See Attachments *NOTES* with DECLARATIONS and verify issues w/ CO2 Gidley )

**(Prob)**   My Medical Records are being Falsified
by NAPHCARE NURSES and Security Staff
NAPHCARE RECORDS REGARDING MY FALL ON 03.25.23 :

**(Details)** On 05/24/23 I was called to H/u by Records Clerk Lisa Cinquanta MRC
(see attch p.___) For my Records Review. Upon reading my Records (med) I discovered that :
1) An ICS was completed w/out Security's Name (Sgt. Sottello) or signature on it, on
03.25.23 at 1808 - 1811 hrs.
2) Nurse Boyer, Caren RN filled out and signed (_) ICS form #1101-11 (2/13/23) and
or Nurse Tabitha Blick RN did NOT ADCRR security
3) Nurses Falsely Record that I said "I'm reports he did not fall from wheelchair but
caught self". CO2 Gidley ACTIVATED ICS at 1801 on 03.25.23, and because only Sgt. Sottello
showed up w/ gurney (w/out any Nurses - to 7C) CO2 Gidley had to help pick me up off of the
floor after I fell out of wheelchair.
4) ICS Form states Security Staff involved (Blank), but Sgt. Sottello came w/ gurney
5) ICS Form states Health Care Staff involved : Boyer, ringer, and sig dested, these
Naphcare Staff may have forged the ADCRR ICS FORM - illegally in Violation of Adcrr policy also.
6) NapWare Staff states on ICS Form "Area cleansed with ws/ cleanser, bacitracin and
bandage, however on 03/30/23 Dr leeds states "No ICS was Called, NO ABRASIN or BREAK in
SKIN is NOTED - The prison LAW OFFICE CONFIRMS THIS on April 28, 2023 (See Attch letters at
p.___)   Dr leeds stated there was no Break in my skin on Elbow. However on 03/26/23
at 7:44:53 am the Nurse (Tabith) recorded the small closed laceration as being 0.5 cm in size,
but said I claimed pain level as "0", BUT I claimed 7/10 , I've NEVER claimed 0 (zero) pain
or any injury ; and yet Nurse claimed increase of pain w/ movement on 3/26/23.
6) Dr leeds Recorded that "after falling out of chair rolling down hill backwards
was tipped backwards out of chair and reports landing on his Elbow (L)" (03/30/23) However

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| [signature] | 06.05.23 |

| Have you discussed this with institution staff? | ☒ Yes   ☐ No | Lisa Cinquanta MRC   05/24/23 |
|---|---|---|
| If yes, give the staff member name: | | CO3 Moore 5/31/23 |

Distribution:   INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy – Inmate
FINAL: White – Inmate; Canary – Grievance Coordinator File

RECEIVED JUN 07 2023

802-11
11/16/21



**ARIZONA DEPARTMENT OF CORRECTIONS**

Inmate Grievance – GF Supplement

2a

| INMATE'S NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/FACILITY | CASE NUMBER |
|---|---|---|---|
| Carson, Phillip L | 091914 | ZC10, AYY, E | Etm Informal #14 Corr v. 01-0606-5 |

#6 cont... I did not fall out of my Chair by rolling down a hill on 03.25.23, I fell out of my wheelchair by rolling backwards through center hallway of 7C/A and 7 A/B, my wheel hit door jam, stopped wheelchair dead in tracks and I flipped over upsidedown, smashed R Elbow on cement, then hit neck and lower back on concrete. I was never examined (to date) of my Neck or lowerback EVEN though I've complained of pain in all areas, at every Consult / Exam.

7) The Prison LAW OFFICE refused to help me or Investigate issue (as I have found out all of this at one 45 minute Records Review (on 5/24/23 w/ L.C. mac), yet they acknowledge that my Back and Neck are "sore". (April 28, 2023, Atten. p.____)

8) Dr. Gatlin on 03.25.23 had Itm Sapp (a personal Aide for 7CD) clean my blood that had squirted out, off of the hallway wall and floor in ZC/D on 3/25/23 at 1807 hrs. after my fall out of my wheelchair. See his 3/26/23 Declaration at p.____) see my Declaration of 3/25/23 as well at Atten.____)

9) On the ICS form of 3/25/23 Nurses admit that my pain levels were 8/10 yet they refused to treat back pain. Even though exam on 03/26/23 revealed injury area R Elbow was swelling w/ obvious deformity and limited ROM of afflicted area.

10) On 3/26/23 NP Rebekah mattson got Dr.'s permission to give me Ibuprofen oral 600 mg (Bid) from 3/26/23 - 4/1/23 However, I was NEVER offered said Medication at anytime then or Thereafter to date.

11) Dr. Leeds admits I saw the Chip of bone (from 3/25/23 fall) In x-ray (as [First one?]) at 3/30/23 Consult and on 4/31/23 I requested different interpretation of one markable x-ray result. Even though on 04/06/23 at 12:33 he Stated "Right Elbow/forearm x-ray reviewed by (me) provider-suspected hairline non-displaced fracture of the right ulna near the elbow articulation that was not seen by radiologist. x-ray was resubmitted for re-read by radiology extras + 2 putting edema Left." (Ogf) But Then on 05/03/23 Dr. Leeds states Notice? on x-ray (as no me-his same degraded system) by myself or radiology.

12) I wrote a detailed letter to the PLO on 03/31/23 explaining known issues. See Atten. p.

(Red) Investigate ICS w/ protocol, dx ADCRR security fill out form and sign or Do NADOR ACE Nurses, Investigate factual Disputes above Fix my med Records above and Sanction lying Staff/Nurse care

SIGNATURE

DATE (mm/dd/yyyy)
06.06.23

pain level in hand 7/10

INITIAL DISTRIBUTION: GF Supplement – White and Canary or Copies – Grievance Coordinator
Pink, or Copy – Inmate

FINAL DISTRIBUTION: White or Copy – Inmate
Canary or Copy – Grievance File

802-7
12/12/13

Name: Philip Lee Carson #091914
A.S.P.C. Eyman ~~Meadows, Cook~~ Meadows
P.O. Box ~~3300 3300~~ 3300, A44
Florence, AZ 85132

DECLARATION OF: _Affiant of Fall on 03.25.23_

I: _Phillip Lee Carson_ Declare I am over 18 years of age and am competent to testify to the matters contained herein. The following is known to me based on my own personal knowledge and observations:

1) On 03.25.23 I rolled myself backwards in my wheelchair from Bldg 7CD to 7AB in order to put on fan letter in my 203 box at apprx 1300 hrs.

2) I roll backwards because it's easier to push with my legs than to pull on my wheelchair

3) My wheels caught the inner beam of the door jam and I flipped over backwards, twisting in mid air balance to prevent my head from hitting the ground first

4) My right elbow came crashing down on cement floor, cushioning elbow and then my back of neck to lower back hit the cement and I rolled out of chair which had tipped over on floor.

5) All the stuff on my wheelchair fell into the 7AB side of DD (unit A44). Staff came out of cage in 7CD (C02 Service #1352?) and asked if I needed help. Said yes, he activated an ICS.

6) Sgt Sotelio showed up at 7CD with a gurney by himself (no nurses with him)

7) C02 Osk helped me up off of ground put me in my wheel chair, and fam Sgt got a bottle of cleaner and sprayed my blood (from small elbow cut) off of wall and floor, another fam pushed me to H/U behind the Sgt with his gurney.

8) I explained event in detail to nurse. She cleaned my cut and did no exam of my neck or back. ICS stood down and staff sent me back to my living area. Pain level 7/10

I Declare under penalty of perjury the above facts and information are true and correct. To the best of my personal knowledge and experience.

By: _Phillip Lee Carson_   Date: _03.25.2023_

Signed: _Shelly L Ca_

31

Name: Anthony Lee Sapp #284169
A.S.P.C. Eyman - Meadows
P.O. Box 3300
Florence, AZ 85132

DECLARATION OF: 3-25-23 Event

I: Anthony Lee Sapp _____ Declare I am over 18 years of age and am competent to testify to the matters contained herein. The following is known to me based on my own personal knowledge and observations:

1) I Am An Inmate At AdCCR Unit A-44 7-AB

2) On 3-25-23 I Witnessed inmate Philiph Carson On the floor between 7 A/B And 7 C/d. It Appeared As though he had fAllen Out Of his Wheel Chair.

3) COa OSkvcek WAS helping Inmate carson UP OFF OF the floor And into his Wheel chair, Which had fallen over.

4) COa OSkvcek initiAted An I.C.S. At APPx 1800 hrs. Then Sargent Sotello Showed up Alone, from medical With A gurney, Another inmate Pushed Inmate carson to medical In his Wheel chair, Following the empty gurney.

5. The COa let me cleAn mr cArsons blood off Of the WAll & floor With A RAg And SprAy bottle. mr. cArson Returned to building 7 APPx 30 minutes lAter.

I Declare under penalty of perjury the above facts and information are true and correct, to the best of my knowledge and personal experience.

By: Anthony Lee Sapp _____ Date: 3-26-23

Signed: Anthony L. Sapp

5, 3/1, 23   records review
2t of 7.        Lisa C.

Start 3/26/23 — 4/1/23
1X Ibuprofen oral 600 mG (BID)
Doctor Mattson, Rebekah NP

Time Called   Arrival   Locate—
3/25/23   1808   1811   E

ICS: ② Elbow abrasion

patient Dm come to medical in wheelchair
with very small abrasion on ② elbow. Im
reports he did not fall from wheelchair but caught
self. Im pain 8/10

position of patient upon arrival  sitting in w/c

Vitals   HR   Temp   Resp   °Stats
B/p   115/78   82   98²   16   97   BS  NA

Morphes Evail Tramadol Verlafoxine
security Staff involved  ⊘ None
Healthcare staff involved  Soyer, mifeo, sigdestad

respiratory            Cardiovascular
WNL                    WNL

Next pg   ⟹

Nurse by Tabitha Blixt RN

33

Form 1101-11
2/13/23

☑ return to housing Unit

Progress Notes

area cleaned with wd cleanser, bacitracin
+ bandage,

pat Name cred "

Boyer, Caren RN          3.25.23

Security involved : NONE

Carsw Phillp  04/9/14
3.29.62

3/26/2023  2:44:53 Am

History - Fallen elbow  3/25/2023
locating right elbow

pain  6  w/ straightening

Treatment
small closed laceration 0.5 cm no active bleeding
unwitdt as  flooring right elbow - increase pain w/ movement

3

34

3/26/23  148/88  98  T  90.11  94/16 6⁻10/230

O2/95  pain O    mess 31.2  mean Aoteral 108
                                    pressure
              last update
                    tabitha

Areas / swelling ✓
    ✓ obvious ot deformity

Limited ROM ot affected area:

☒ consult provider immediately for gross
deformity, any possible fracture, or disproptimal
amount of pain to type of injury.

Body mechanics, lifting, stretching exercises
important prior to and after physical exertion

P 3/30/23

"after fall off oct of chair rollup down hill backwards
was flipped backwards oct of chair any reports
landing on his ® Elbow.

4   States he called #cs after his fall with blood
on wall due to a cut in skull. No #cs was
called, no abrasion or break in the skin
is noted. Patient also reports that he saw
the images on the radiology sottte and saw
a chip in his bone

States he has sore lower back and neck
but has good ROM as he is speaking
of these areas


Amanda Stone — 3/28/23 8:05:12 am
Shabbat 3/28/23
seder (meals)
forcing me to change my


4/3/23 8:36:31
Right elbow
5/10   test #m, tramadol

5

4/31/23

reporting different interpretation of xray

5/3/23

Not seen on X ray by myself
or radiology

4/6/23  12:23:46

Right elbow/forearm xray reviewed
by (me) provider suspected hairline non-displaced
fracture at the right ulna near the elbow
articulation that was not seen by radiologist.

x ray was resubmitted for re-read by radiology.

Extrems +2 pitting edema left,

Arizona Department of Corrections
Rehabilitation and Reentry
I/m letter (substitute) 916   05/12/23
Continuation Sheet – Form Number _____

Please PRINT all information

37

| INMATE NAME (Last, First M.I.) (Please print.) | ADCRR NUMBER | INSTITUTION/UNIT |
|---|---|---|
| Carson, Phillip L. | 091914 | 7010, ALN E |

Comments

H/U, ALN

TO: RECORDS MS. L. Cinquanta MRC

maam
pursuant to our short convo this am,

please just provide me all of my medical
encounters
~~Encounts~~ from Jan 1, 2023 to present review

(Excluding-Dental                    )
~~Medical~~

only
@ - I need Medication
Renewal dates only,
not daily dosage takes.

Thank you

I have a 9th cir. case due next month (June 2023)
No 23-15410 · (sorta time sensitive)
So it's getting close,

Phillip L. Carson _____ 091914 05/12/23

Spoke w/ Staff Cor Gidley about I/m letter Forms 916
unavailability and this substitute.

803-10
12/10/20



**Arizona Department of Corrections**
**Rehabilitation and Reentry**
**Inmate Letter**

*TC10L*

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

'23 APR 26 7:55

38

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Cabon, Phillip L. | 091914 | TCID, ARY, E- | 04.25.23 |

| TO | LOCATION |
|---|---|
| Medical Records MS L | ARY Medical H/U |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

Maam

please schedule me for Review
of my records from Jan 1, 2023
Just the medical Encounters i.e.
CNA
Nurses
NP
Drs etc. and dental

(No Meds)

4-27-23 Added to Medical Records review list.
L Cinquanta, MRC
L. Cinquanta, MRC

Thank you

'23 APR 26 7:55

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | 04.25.23 |

Have you addressed this with Department staff?  ☐ Yes  ☑ No

If yes, give the staff member's name and the date you addressed with them:

_____ (Staff Member's Name) (Please print)  _____ (Date addressed)

Note: Using profanity, insulting, obscene, or abusive language and/or addressing staff with inappropriate names or making inappropriate remarks in this written correspondence (or verbal communication to staff concerning this correspondence), will not be tolerated and may result in no response to the correspondence and/or discipline pursuant to Department Order 803, Inmate Disciplinary Procedure.

Distribution:  Original – Master File
Copy - Inmate

916-1
7/25/19



## PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Deputy Director:*
Sara Norman

*Legal Director:*
Margot Mendelson

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Claudia Ceseña
Steven Fama
Alison Hardy
Sophie Hart
Jacob Hutt
A.D. Lewis
Rita Lomio

# LEGAL MAIL - CONFIDENTIAL

April 28, 2023

Phillip Carson, ADC 091914
Eyman - Meadows
P.O. Box 3300
Florence, AZ 85132

Dear Mr. Carson:

    We write in response to the March 31 and April 4 letters, in which you report concerns related to your recent x-ray. We are sorry to hear you are experiencing these problems.

    In response to your letters we reviewed your recent medical records, which we can do as class counsel in the Jensen case. We do not have access to the x-rays themselves, just the notes from the x-ray tech. Your medical record states:

    "ELBOW COMPLETE MIN 3V, RIGHT
    Results: Right elbow
    There is no evidence of a positive posterior fat pad sign. There are no significant degenerative changes. There is no bone abnormality to suggest a displaced fracture or dislocation.
    Conclusion: Unremarkable elbow.
    Electronically signed by CONSTANTINA LAMPROPOULOS, M.D. 3/29/2023 11:42:41 AM PDT."

    It appears that you were given a copy of the x-ray results on March 31. It also appears that you saw your provider on March 30. The provider entered the following plan notes:

    "Patient is a 61 yo white male with PMH of HTN, HLD, migraines, GERD that presents to the clinic for follow up after falling out of his wheelchair after rolling down a hill backwards. Was flipped backwards out of the chair and reports landing on his right elbow. States he called an ICS after his fall with blood on the wall due to a cut in the skin. No ICS was called, no abrasion or break in the skin is noted. Patient also reports that he saw the images in the radiology suite and saw a chip in his bone, knew the names of the anatomic sites of the bone. Xray done shows no

**Board of Directors**
Harlan Grossman, President and Treasurer • Christiane Hipps, Vice President
Vanita Gaonkar • Nick Gregoratos • Michael Marcum • Jean Lu
Claire McDonnel • Ruth Morgan • Seth Morris • Vishal Shah • Adrienne Yandell

fracture or dislocation, bony structures are normal. Patient denies fevers chills nausea or vomiting. Staes is sore lower back and neck but has good ROM as he is speaking of these areas.

Plan:
Encounter for follow up after fall out of his wheelchair
Ibuprofen provided for his pain in right elbow- no fracture is noted
RTC PRN"

Given the above information, we recommend that you file an HNR reporting any current symptoms and the treatment you feel you need. If you are dissatisfied with the response, we advise that you file a grievance until you have exhausted the process. We will review any grievance response that you receive and will consider at that time whether we can help. We enclose a postage-prepaid envelope for your convenience in responding.

Sincerely,

Dewi Zarni
Litigation Assistant under Tania Amarillas

Enclosures:    Copy of Letter; AZ Case Update

Philip Lee Cartwright
Arizona State Prison
PMB 5300, A44
Florence, AZ 85132

**CONFIDENTIAL**
**LEGAL MAIL**

PRISON LAW OFFICE
Director: Donald Specter, Attorney at Law
General Delivery
San Quentin, California 94964-0001

**LEGAL MAIL**

94964-955555

03.31.23

Phillip Lee Carson #091944

Arizona State prison

POB 3300, A44

Florence, AZ. 85132

(Class Action)

*Please send file Stamped copy of this letter. Thank you*

Prison Law office

Director: Donald Specter, Attorney at law

General Delivery

San Quentin, Calif. 94964-0001

Re: Jensen V. Shinn, 2012

Dear Sir,

I hope all are well. Please be advised that at my R.
Elbow x-ray a few days ago I could see the x-ray tech
reviewing my x-rays on his laptop. He was at desk and
I was a couple feet behind him while he was enlarging
x-rays for clarity checks.

When he zoomed on tip of my elbow at the Ulna
head area I could see a small piece of my arm broke off
at a slicing angle, thickest break-separation was nearest to my
wrist direction and a sliver held it to my end of Ulna (nearest elbow).
I said whats that! The Tech guy said I don't do diagnostics, you'll
have to ask the provider.   03.30.23

At my NP line yesterday, x-ray results were listed as Normal.

over →

The New NP is an MD Leeds (sp?), I told her what I saw and the pain I feel 7/10 and she looked at my swollen (still) elbow. She had me move arms around then said your fine, your movements prove you have no breaks.

I told her I have a slice of my lower Ulna chipped off at an angle. She said "I know how badly you want to have a broken arm but you don't!"

I said please look at xray on your computer, she said "I can't on this one", I said you have internet access and one of the newest computer systems on the yard. She said I don't have access to xray, I said, No away.

I asked her to email xray tech and have him send you enlargeable (in real time) xray or to just ask him what I asked when I saw xray from near behind him whilst in my wheelchair. She said NO.

Funny thing is I asked Tech to preserve xray cause its going to be dumbed down or minimized by Naphcare staff, he said no it won't be.

Well it was, MD Leeds said she would enlarge it later. She aint she then denied me my copy of xray report and told me to leave (in short). Please help me.

Respectfully, Philip L.

Philip Lee Cassar, Client  03.31.23

44

ATTACH " C "

1) Grievance No.

"Pill Call / Class Issues    2pg.

Arizona Department of Corrections, Rehabilitation & Reentry

Grievance Details



45

# Inmate Grievance/Informal Response Notice
## Medical

**Inmate Name:** PHILLIP CARSON

**ADC#:** 91914

**Prison/Unit:** EYMAN/EYMAN MEADOWS

**Bldg/Bed:** A44 07CDC10L

## Case #:23-056819

## Informal Complaint

**Type:** Informal Response

**Date Received:** 05/31/2023 03:46 PM

**Response Author:** WILLIAMS, NANCY NMI

**Responded On:** 06/05/2023 12:19:52 PM

**Decision:**

## Case Details

**Case Number:** 23-056819

**Grievance Status:** Open

## Case Data

**Prison of Complaint:** EYMAN

**Opened Date:** 05/31/2023 03:46 PM

**Grievance Category:** Health Care/Medical

**Unit of Complaint:** EYMAN MEADOWS

**Grievance Stage:** Informal Answered

## Informal Grievance Response

**Grievance Date:** 05/31/2023 12:00:00 AM

**Response Due:** 06/21/2023 03:51 PM

**Issue:** Pill call/ class issues

**Responder:** WILLIAMS, NANCY NMI

**Response:** This is in response to your Informal Complaint dated 5/31/2023 and received at Health Services via ACIS on 5/31/2023 in which you are requesting early pill call. Investigation into your issue included a review of your medical record. I spoke with COII Will she states she said that to you before you told her you were in class. I reviewed your ASCIS schedule and have informed her that you will be coming to pill call immediately after class. Please submit an HNR for future health needs.

☐ Unprocessed

**Responder's Name:** NANCY WILLIAMS

Rec 06/12/23 P
At: 07 Hoffine

**Notice:** If you are dissatisfied with the Informal Complaint Response, you may file a formal grievance (form 802-1 Inmate Grievance, and/or form 802-7 GF Supplement) within five (5) workdays from receipt of the above response to the Grievance Coordinator by:
Placing a single complaint on a single inmate Grievance form.

**NOTE: If multiple unrelated issues are on a single form or if a duplicate complaint is filed, the grievance shall be rejected and returned unprocessed.**

RECEIVED JUN 12 2023

MM



**Arizona Department of Corrections**
**Rehabilitation and Reentry**
Due 06,26,23 +5=06,23,23 (workdays)
**Inmate Informal Complaint Resolution**

*med call catch 22*

Complaints are limited to one page and one issue.

Please print all information.

46

| INMATE NAME (Last, First M.I.) (Please print) | ADCRR NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Carson, Phillip L | 091914 | Jc10, ASU, E | 05/31/23 |

| TO | LOCATION |
|---|---|
| Co3 Tarango | ASU Bldg 7    assigned completors |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

maam

On 05.31.23 I was told by B³ will that if I come to meds after ✓ 0730 hrs again I will receive disciplinary

on todays for the time our building was allowed to go for am meds the (1st yard) back into tod All by the officer table bench

I am not allowed to go to any early med call meds (Ive asked for Simas and Gutierr), and Ive asked B³ Montoya to go to call I can go to meds early on for (HBP) dose days (made at 0730 hrs) +

B³ Gutierr or B³ Simas advise me to go at other times which gets at 0530 his not even than CO³ Montoya called B³ Will to where am met for Meds. Medical has not care and staff not help so I am suppose to work a miracle in a catch 22 scenario. Don't don't give to call I am going I'll be get an Report next week for being late to Med call on meds (unless Bldg 7 goes first or second) and the med line is short enough - yes Ive told me Nurse in person (No - A.E side meds) So I get reprimand for discriminag or Now ?huh (Law) - It says however I am in need of my meds are tied with time constraint

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| [signature] | 05/31/23 |

Have you discussed this with institution staff?   ☒ Yes   ☐ No   B³ Montoya, B³ Gutierr, B³

If yes, give the staff member name: Will, B³ Simas   and others

Distribution:   INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy – Inmate
FINAL: White – Inmate; Canary – Grievance Coordinator File

802-11
11/16/21