Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriquez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>Ryan Thornell, *et al.*,<br><br>　　　　　Defendants. | No. CV 12-00601-PHX-ROS<br><br>**PLAINTIFFS' STATUS REPORT**<br><br>**[Docs. 4445 & 4449]** |

Plaintiffs provide the following responses to the topics outlined in the Court's orders. (*See* Doc. 4445; Doc. 4449).

Responses to the Questions in the Court's July 20, 2023 Order

1. *The specific actions Defendants took after issuance of the draft Permanent Injunction and after issuance of the Permanent Injunction to obtain medical and custody staffing.*

Defendants provided Plaintiffs with preliminary information on this topic during a meeting on August 8, 2023. Plaintiffs understand that Defendants will provide more detailed and complete information in their status report.

2. *The date by which Defendants expect to have hired all the staff required by the Permanent Injunction in §§ 1.15, 1.16, 6.1, and 13.1.*

Defendants provided Plaintiffs with preliminary information on this topic during a meeting on August 8, 2023. Plaintiffs understand that Defendants will provide more detailed and complete information in their status report.

3. *The specific actions Defendants took after issuance of the draft Permanent Injunction and after issuance of the Permanent Injunction to modify the delivery of medical and mental healthcare as required by the Permanent Injunction.*

Defendants provided Plaintiffs with preliminary information on this topic during a meeting on August 8, 2023. Plaintiffs understand that Defendants will provide more detailed and complete information in their status report.

4.  *Any modifications to the Permanent Injunction the parties believe would be appropriate and the basis for those modifications.*

Plaintiffs are amenable to a temporary modification of the 15% registry/locum tenens cap contained in sections 1.16, 6.1, and 13.1 of the Permanent Injunction. Defendants are not currently staffed at the levels required by the Permanent Injunction, which puts patient health and safety at risk. Plaintiffs therefore would agree to raise the 15% cap on registry/locum tenens staff in the short-term, as long as (a) Defendants are required to fill each unfilled full-time position with a full-time registry/locum tenens position until non-registry/locum tenens staff can be hired; (b) the minimum qualifications for healthcare staff set forth in sections 6.4 and 14 shall apply to registry/locum tenens staff; and (c) there is a definite and realistic timeline for meeting the 15% cap of sections 1.16, 6.1, and 13.1. As the Court previously noted, "staffing shortages are nothing new; it has been the Achilles' heel of the entire duration of the Stipulation." (Doc. 3921 at 23).

5.  *What additional Orders from the Court would be helpful to ensure Defendants comply with the Permanent Injunction.*

To ensure clear and complete communication, transparency, and timely resolution of barriers to compliance, the Court should order Defendants to file monthly status reports on their compliance with the Permanent Injunction, with detailed information about all measures taken or planned to meet each provision, identification of any barriers to compliance, and the expected timeline for full compliance with each provision. The Court should schedule status conferences at least every 60 days to allow the parties and Court Monitors to report on the progress to date, answer any questions from the Court, and address any topics that may warrant additional judicial action.

Plaintiffs lack sufficient information at this time to determine the primary barriers to compliance by Defendants and their contractors and what additional orders from the

Court would be helpful to address them. As of the parties' meeting on August 8, 2023, Defendants were still gathering information to prepare for the upcoming court hearing and to respond to Plaintiffs' questions regarding the reasons for noncompliance. Plaintiffs anticipate that further orders may be necessary to help ensure Defendants comply with the Permanent Injunction if noncompliance persists in the near future. This includes, but is not limited to, orders to:

(a) increase compensation to reach adequate healthcare and custody staffing levels, as contemplated in sections 1.25 and 20.4 of the Permanent Injunction;

(b) ensure appropriate incentives for Defendants' healthcare vendor to comply with the requirements of the Permanent Injunction;[1] and,

(c) eliminate limits on the amount paid to outside medical specialists to the Arizona Health Care Cost Containment System ("AHCCCS") rate.[2]

If such orders or other sanctions do not spur compliance, Plaintiffs reiterate their request that the Court consider rescinding or overriding the state statute that privatized correctional healthcare in Arizona, or appoint a Receiver under Rule 66 of the Federal Rules of Civil Procedure to manage ADCRR's delivery of health care. *See* Doc. 3430 at 13-14 (collecting caselaw); Letter from U.S. Department of Justice, *Nuñez v. City of New*

---

[1] The Court has long identified that the "carrots and sticks" of fines, sanctions, and incentives used by Defendants with their health care vendors have been inadequate in spurring compliance with the prior Stipulation. (*See, e.g.*, Doc. 2898 at ¶¶ 24-41; *id.* at ¶ 41 ("Mr. Pratt has thought that if ADC pushes Corizon too hard, Corizon will terminate its contract."); *id.* at 17 ("Defendants' 'good business decision' was to provide incentive payments to a contractor who had already committed to the State to provide that very service and had repeatedly and consistently failed to meet that obligation.")).

[2] The Court's expert Dr. Marc Stern first recommended that the Legislature's instruction to ADCRR to pay community specialists at the Medicaid (AHCCCS) rate be rescinded or overridden in October 2019, *see* Doc. 3379 at 102, a recommendation that Plaintiffs joined, *see* Doc. 3430 at 6, and reiterated after the 2021 trial. (*See* Doc. 4308 at 256 ¶ 747 (noting that Defendants' medical expert testified at trial that ADCRR should pay the market rate to provide access to these specialty services); Doc. 4308-1 at ¶ 5 (Plaintiffs' Proposed Permanent Injunction); *see also* Doc. 1 at ¶ 63 (Plaintiffs' complaint discussing the 2009 legislative change and its foreseeable impact on delivery of health care)).

The Court has the power to issue orders rescinding or overriding state statutes, upon a finding that such orders are necessary to correct a violation of federal rights. *See* 18 U.S.C. § 3626(a)(1)(B).

*York*, No. 1:11-cv-05845-LTS-JCF Doc. 444 at 5 (S.D.N.Y. April 19, 2022) (informing district court that it may seek "the appointment of a receiver with independent authority to implement sweeping reforms and to take all necessary actions to comply with the Consent Judgment and Remedial Orders" related to conditions at Rikers Island Jail), https://www.documentcloud.org/documents/21655574-2971983988078868576xx444-us-letter-in-nunez.

6. *What sanctions would spur compliance with the Permanent Injunction.*

Plaintiffs believe that Defendants currently are making sincere efforts to comply with the Permanent Injunction and that the Court does not yet need to issue an Order to Show Cause regarding monetary or other sanctions.

7. *If monetary sanctions are appropriate, the amount of such sanctions.*

N/A

8. *Whether Plaintiffs' counsel believe Defendants have taken all reasonable steps to comply with the Permanent Injunction.*

Plaintiffs believe that, although Defendants are making significant and sincere efforts to comply, they have not taken all reasonable steps to comply with the Permanent Injunction. For example, as of July 14, 2023, the last date for which Defendants have produced information, although the total size of the isolation subclass has shrunk, nearly 500 people have been in the subclass for over two months. The only justification offered for a significant number of these people remaining in isolation is misconduct that occurred several years ago. *See* Permanent Injunction, section 19.3 (establishing a presumptive limit of two months in isolation). Similarly, while Defendants have removed a large

number of people from the subclass since the beginning of June, approximately 65 have waited more than 10 days to be moved, some of these people waiting months. *See* Permanent Injunction, section 29.3 ("When a higher or lower classification level is achieved, the Classification Monitor shall within ten days re-house the prisoner into a location associated with their new classification level and step . . . .").

In addition, the Permanent Injunction required Defendants, "[w]ithin three months of issuance of this Order," to implement a number of measures "to ensure adequate interpretation services are available," including the development of "policies to assess the English fluency of prisoners" and the language proficiency of healthcare staff. *See* Permanent Injunction, sections 3.1 & 3.3.1. Over four months later, no draft policies have been provided for Plaintiffs' counsel's review. (*See* Doc. 4410 at 9-10).

9.   *Any other matters the parties believe should be brought to the Court's attention.*

In section 1.17 of the Permanent Injunction, the Court determined that there was a need for "an expert to conduct a staffing analysis and plan of health care positions at each location." (Doc. 4410 at 14). Subsequently, the Court appointed the Monitor, Dr. Marc Stern, to conduct the analysis, with assistance from Donna Strugar-Fritsch and any other individuals that Dr. Stern deemed appropriate. (Doc. 4425).

The Court has recognized the necessity of a timely staffing analysis: Because "[t]he number of immediate hires may ultimately be insufficient to remedy the unconstitutional substantial risk of serious harm identified in the Court's decision . . . [,] the Court will require a further staffing analysis be completed within six months of this Order." (Doc. 4410 at 3-4).

It appears from discussions with Dr. Stern that the staffing analysis has barely begun and it is very unlikely to be completed within the six months ordered by the Court. Plaintiffs agree with the Court that a staffing analysis is critical to preventing future harm and thus are concerned with the delay in conducting this analysis. Plaintiffs therefore

request that the Court direct Dr. Stern to use all available means to complete the staffing analysis as soon as practical.

Responses to the Questions in the Court's July 31, 2023 Order

1.  *Do the entities operating the private facilities, as well as those entities' employees, qualify as Defendants' "agents, servants, employees," or as "other persons who are in active concert or participation" with Defendants or Defendants' "agents, servants, [or] employees" for purposes of the Permanent Injunction? Fed. R. Civ. P. 65(d). If the private entities and their employees are not covered by the language of Rule 65(d), why not?*

The entities operating the private facilities, as well as those entities' employees, are Defendants' "agents, servants, employees," or "other persons who are in active concert or participation" with Defendants or Defendants' "agents, servants, [or] employees." Defendants retain a significant amount of control over the entities that operate private prison facilities. As this Court observed in the July 31, 2023 Order, ADCRR has conceded that every "contractor must comply with all ADCRR orders, written instructions, and manuals, and with all court orders and state and federal laws." (*See* Doc. 4449 at 3-4 n.2 (quoting Doc. 7 at 5:11-13, *Nielsen v. Shinn*, 2:2020-CV-01182-PHX-DLR-JZB)). Defendants confirmed this during the meeting with Plaintiffs on August 8, 2023. ADCRR's control over the operations of private prisons establishes that the entities operating the privately-run facilities, and their employees, are agents of ADCRR. *See J.K. By & Through R.K. v. Dillenberg*, 836 F. Supp. 694, 699 (D. Ariz. 1993). However, as discussed below at Question 4, under circumstances as they currently exist, Plaintiffs do not believe that the persons housed in the privately-run facilities are class members.

. . . .

. . . .

. . . .

2.   *How and by whom are transfer decisions either to or from privately-run facilities currently made?*

Defendants provided Plaintiffs with preliminary information on this topic during a meeting on August 8, 2023. Plaintiffs understand that Defendants will provide more detailed and complete information in their status report.

3.   *In the parties' views, do the conditions in the privately-run facilities meet the health care and subclass requirements outlined in the Permanent Injunction?*

Plaintiffs do not have sufficient information to answer this question.

4.   *When Defendants transfer prisoners from ADCRR-run facilities to privately-run facilities, should the transferred prisoners be viewed as class members while in the private facilities? That is, should the health care requirements set out in the Permanent Injunction apply to the health care provided to ADCRR prisoners housed at private facilities?*

Under the circumstances that Plaintiffs understand exist today, transferred incarcerated people should not be viewed as class members while in the private facilities. There may be some situations in which the Court has authority to act in relation to the transfer of incarcerated people to the private facilities, such as if there is evidence that transfers are being used to retaliate against people for reporting noncompliance with the Permanent Injunction or for other protected activity, or to avoid enrolling people in healthcare programs required by the Permanent Injunction, including treatment for Hepatitis C or Substance Use Disorder. Currently there is no evidence in the record of such occurrences, and any further discussion would be speculative.

5. *Is Defendants' discretion in classification and housing prisoners impacted by the Permanent Injunction? Are Defendants permitted to transfer high acuity prisoners to privately-run facilities?*

Defendants' discretion in classification and housing of incarcerated people may be impacted by the Permanent Injunction as a practical matter, including the need to ensure continuity of care, but the Permanent Injunction does not on its own prevent Defendants from transferring high acuity incarcerated people to privately-run facilities or limit Defendants' discretion in classification and housing incarcerated people in privately-run facilities, except potentially for the retaliatory or other impermissible reasons set forth in response to Question 4, *supra*. Defendants may transfer high acuity prisoners to privately-run facilities if there are adequate services at those private facilities to meet the patients' needs.

6. *Are there subclass members currently housed at privately-run facilities?*

Plaintiffs do not have sufficient information to answer this question.

7. *If there are subclass members at privately-run facilities, how did the parties believe the footnote extending the Permanent Injunction to those subclass members would be monitored and enforced? Did the parties anticipate the Court and its monitors would assess the conditions at those facilities and, if necessary, order improvements?*

Plaintiffs' understanding, based upon Defendants' statements at the August 8, 2023 meeting, is that ADCRR requires the privately-run facilities to comply with all ADCRR policies, including those created or modified in response to the Permanent Injunction. Plaintiffs do not anticipate the Court or its Monitors proactively assessing conditions at

those facilities. However, should the parties or the Monitors learn that the conditions for people in detention or mental health watch at the private facilities are inconsistent with ADCRR policies or the Permanent Injunction's requirements, Plaintiffs may investigate. If appropriate, Plaintiffs would bring the issue to the Court to determine (a) whether the issue is part of the case, and (b) if so, whether the conditions in question violated the Permanent Injunction.

Dated: August 14, 2023               **PRISON LAW OFFICE**

By:  s/ Rita K. Lomio
Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Rita K. Lomio (Cal. 254501)*
Sophie Hart (Cal. 321663)*
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:   dspecter@prisonlaw.com
         ahardy@prisonlaw.com
         snorman@prisonlaw.com
         rlomio@prisonlaw.com
         sophieh@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Maria V. Morris (D.C. 1697904)**
Eunice Hyunhye Cho (Wash. 53711)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:   dfathi@aclu.org
         mmorris@aclu.org
         echo@aclu.org

*Admitted *pro hac vice*; not admitted in DC; practice limited to federal courts
**Admitted *pro hac vice*

       Corene Kendrick (Cal. 226642)*
**ACLU NATIONAL PRISON PROJECT**
39 Drumm Street
San Francisco, California 94111
Telephone: (202) 393-4930
Email:   ckendrick@aclu.org

*Admitted *pro hac vice*

Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:   jkeenan@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By:   s/ Maya Abela
    Asim Dietrich (Bar No. 027927)
    5025 East Washington Street, Suite 202
    Phoenix, Arizona 85034
    Telephone: (602) 274-6287
    Email:
       adietrich@azdisabilitylaw.org

    Rose A. Daly-Rooney (Bar No. 015690)
    Maya Abela (Bar No. 027232)
    177 North Church Avenue, Suite 800
    Tucson, Arizona 85701
    Telephone: (520) 327-9547
    Email:
       rdalyrooney@azdisabilitylaw.org
       mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2023, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Lucy M. Rand
Assistant Arizona Attorney General
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Anne M. Orcutt
Eden G. Cohen
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
aorcutt@strucklove.com
ecohen@struclove.com

*Attorneys for Defendants*

s/ Rita K. Lomio