Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Shawn Jensen, et al., | NO. CV-12-00601-PHX-ROS |
| Plaintiffs, | |
| v. | **DEFENDANTS' STATUS REPORT PURSUANT TO COURT ORDER (Dkt. 4449)** |
| Ryan Thornell, et al., | |
| Defendants. | |

Pursuant to the Court's July 31, 2023, Order (Dkt. 4449), Defendants submit the following status report.  ADCRR's new leadership also reaffirms its initiative to rebuild ADCRR with a central emphasis on the health and well-being of everyone in its custody, and its specific commitment to comply with all aspects of the Permanent Injunction.

**1. Do the entities operating the private facilities, as well as those entities' employees, qualify as Defendants' "agents, servants, employees," or as "other persons who are in active concert or participation" with Defendants or Defendants' "agents, servants, [or] employees" for purposes of the Permanent Injunction? Fed. R. Civ. P. 65(d). If the private entities and their employees are not covered by the language of Rule 65(d), why not?**

Entities operating the private facilities as well as those entities' employees do not qualify as Defendants' "agents, servants, employees," or as "other persons who are in active

concert or participation" with Defendants' "agents, servants, or employees for purposes of the Permanent Injunction. Since the inception of this case, beginning with Plaintiffs' Complaint, through class certification, the Stipulation, trial, and the court's Findings of Fact and Conclusions of Law, the Class and their claims have been limited to the policies and practices at the 10 state-operated facilities.

The Complaint expressly limited the Class and Class claims to the 10 state-operated facilities. *See* Dkt. 1 at 57 n.3 ("This proposed class does not include the approximately 6,400 Arizona prisoners housed in private for-profit prisons pursuant to contracts with ADC.").

In certifying the Class, the district court certified a Class consisting only of individuals incarcerated at the 10 state-operated facilities based on evidence of alleged practices at only those facilities.[1] (*See* Dkt. 372 at 1 ["ADC currently incarcerates approximately 33,000 inmates in ten complexes statewide: Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma."]; *id.* at 7 ["All twenty deficiencies were identified at all ten ADC complexes."]; *id.* at 13 ["Plaintiffs' claim is that despite ADC stated policies, the actual provision of health care in its prison complexes suffers from systemic deficiencies that rise to the level of deliberate indifference."]; *id.* at

---

[1] The district court could only certify the Class proposed in the Complaint, not anything broader. See *Reyes v. Educ. Credit Mgmt. Corp.*, 322 F.R.D. 552, 559 (S.D. Cal. 2017), *vacated and remanded on other grounds*, 773 F. App'x 989 (9th Cir. 2019) ("The Court is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond it.") (quoting *Costelo v. Chertoff*, 258 F.R.D. 600, 604–05 (C.D. Cal. 2009)); *accord Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS (NLS), 2020 WL 1550218, at *7 (S.D. Cal. Apr. 1, 2020) ("Generally, a plaintiff may only seek to certify a class as defined in a complaint—courts will not certify classes different from, or broader than, a class alleged in the complaint without plaintiff moving to amend the complaint.") (quoting *Richie v. Blue Shield of Cal.*, No. C-13-2693 EMC, 2014 WL 6982943, at *13 (N.D. Cal. Dec. 9, 2014)).

15 ["Based on Plaintiff's showing of systemic deficiencies at all ten ADC facilities, the Court finds that commonality exists with respect to the allegations in Plaintiff's Complaint that the following practices constitute deliberate indifference to all inmates."]; Dkt. 242 at 6 n.1 [Plaintiff's motion for class certification limiting Class to state-operated facilities]; Dkt. 240-1 through Dkt. 241-4 [Plaintiff's evidence submitted in support of class certification].)  Indeed, the Class Representatives were incarcerated at only state-operated facilities.  (Dkt. 1, ¶¶ 6, 19.)  And the Ninth Circuit, in affirming class certification, recognized that healthcare at only the 10 state-operated facilities was at issue. *See Parsons v. Ryan*, 754 F.3d 657, 662 & n.2 (9th Cir. 2014) ("To satisfy the duty imposed by statute on its director, ADC has promulgated extensive statewide policies governing health care and conditions of confinement that apply to all of the inmates in its custody, all of its staff, and all of its facilities. The ten ADC facilities are Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford/Ft. Grant, Tucson, Winslow, and Yuma.").  It was the alleged conditions at *those* facilities that allegedly exposed the Class members to a substantial risk of harm, and that common contention allowed the Class to be certified. *Id*. at 678.

All the discovery in this case was focused on the 10 State-operated facilities (*see* Dkt. 902, 903, 1027, 1028), and the Court determined that an issue of fact existed as to whether ADCRR's "practices" at those facilities "are constitutionally deficient."  (Dkt. 1065 at 8.)  The Stipulation and subsequent monitoring were limited to only the 10 state-operated facilities.  (*See* Dkt. 1185, Dkt. 1185-1).

Finally, the only evidence presented at trial involved healthcare at the 10-state operated facilities.  And in its Findings of Fact and Conclusions of Law, the Court found

that: "ADC operates ten prison complexes"; the Class consists of "all prisoners at ADCRR's ten complexes"; "The current contract requires Centurion provide all health services at ADCRR's ten complexes in the state"; "The health services at the ten complexes are structured the same"; "Prisoners incarcerated in ADCRR's ten complexes are subject to the same failed practices, which expose all of them to a substantial risk of serious harm"; and the constitutional "issues are pervasive at all 10 ADCRR complexes." (Dkt. 4335 at 3, 10, 11, 121, 123.) The Court also refused to consider population numbers at privately operated facilities, finding: "Given that this lawsuit challenges conditions in ADCRR-operated facilities, the population in those facilities will be used." (*Id*. at 137; *see also id*. at 182-186 [appending staffing levels from only 10 State-operated facilities].)

Because the Court only found constitutional violations at the 10 State-operated facilities and did not find any constitutional violations at any of the privately operated facilities, its Injunction can only extend and apply to the former. *See Parsons*, 754 F.3d at 689 n.35 (any injunction ultimately ordered by the Court "must closely track the violations established by the evidence at trial"); *Jordan v. Gardner*, 986 F.2d 1521, 1531 (9th Cir. 1993) ("The district judge ha[s] the power only to correct the constitutional defects that he [or she] [finds].") (citation omitted); *see generally* 18 U.S.C. § 3626(a)(1)(A). Although Rule 65(d) applies to all third-party contractors providing healthcare to individuals residing at the 10 State-operated facilities, it does not expand the Permanent Injunction to apply beyond the claims, evidence, or findings in this case—that is, to any of the privately operated facilities.[2]

---

[2] There are now only nine State-operated facilities after ASPC-Florence closed.

4

**2. How and by whom are transfer decisions either to or from privately-run facilities currently made?**

Transfer decisions in and out of privately operated facilities are generally made by ADCRR central office classification in consultation with medical and mental health, as necessary. In some cases, transfer requests originate from medical and mental health providers. For example, ADCRR's medical and mental health monitoring bureau may request movement out of a private facility if the inmate needs a higher level of care such as an IPC or SNU bed.

Transfer decisions are also based on custody and classification. For example, inmates are moved out of a private facility if they have been classified to a higher or lower custody level and no longer meet the custody level designation for that particular private facility. Inmates are also moved out of private facilities if they request protective custody or refuse to house. Movement into private facilities is based on the contractual need to keep private facilities filled along with the overall population bed management needs of the department. As discussed in more detail below, when a transfer decision is being made to a privately operated facility, ADCRR ensures that the privately operated facility is able to provide the necessary services for the individual prior to transfer.

A full-time Physician Assistant serves as ADCRR's Medical Services Coordinator. One of the roles of the Medical Services Coordinator is to ensure that NaphCare is placing appropriate medical holds in patients' health records to prevent a patient in need of a higher acuity of care from being moved to a private facility. ADCRR's Medical Services Coordinator works closely to ensure that NaphCare is placing medical holds in patients' health records appropriately to prevent the movement of patients to private facilities when

they shouldn't be moved. If movement occurs incorrectly, the Medical Services Coordinator works directly with NaphCare to promptly remedy the issue and prevent a future occurrence. The Medical Services Coordinator is supervised by ADCRR's Medical Director, Dr. Grant Phillips.

There are many safeguards in place to prevent movement from happening when it shouldn't. Prior to a patient being moved from one complex to another, a nurse reviews the patient's chart, and completes a Release Summary and Facility Transfer form. The chart review includes checking for any pending offsite specialty referrals or certain medication treatments (e.g., a course of Hepatitis C treatment), which would disqualify a patient from moving. In addition, if a patient had any conditions or limitations with their activities of daily living that should prevent the move, then these are identified, and the transfer does not occur. Further, the receiving facility has healthcare staff who review the transfer list in advance of the move to determine if the patient has any condition or referrals which warrant cancellation of the movement. When the patient arrives at the new facility, verification of the patients' health conditions, medication, and special needs takes place. If the receiving facility has concerns about the transfer, the Medical Services Coordinator is contacted. If the Medical Services Coordinator concurs that there are issues accommodating the patient at the new facility, a transfer back to the sending facility occurs. Any questions that ADCRR Classification may have about whether a patient should be moved to a new facility are addressed with the Medical Services Coordinator. The Medical Services Coordinator may conduct a chart review, consult NaphCare clinical leadership, or discuss further with ADCRR's Medical Director.

On July 27, 2023, ADCRR pulled a list of individuals moved to the Kingman-Huachuca Unit after receiving the letter written by Mr. Graybill. (Dkt. 4448). In a sincere and concerted effort to increase transparency and as a demonstration of ADCRR's commitment to compliance, ADCRR provides the following information regarding the transfers to Kingman-Huachuca Unit. Between May 10, 2023, and July 26, 2023, 152 individuals moved into this unit. Two (2) individuals had a medical hold at the time of movement, four (4) were SMI, and six (6) had special needs. Of the two (2) individuals with a medical hold at the time of movement, one (1) of the individuals had been moved by mistake and was moved back to a state-run facility on August 2, 2023 (one week later) once the mistake was realized. The other individual was cleared for transfer after his medical hold expired. Of the four (4) SMI patients, ADCRR completed a chart review and confirmed that ASP Kingman has the appropriate facilities and mental health services to meet these individuals' needs based upon their documented level of functioning prior to transfer. Of the six (6) patients with special needs, all six (6) patients are still housed at Kingman and ADCRR's Medical Director has confirmed that ASP Kingman has the appropriate facilities and medical services to meet the needs of these patients.

ADCRR is in the process of re-reviewing all transfers from state complexes to private facilities since the start of the Permanent Injunction. ADCRR is committed to maintaining sound processes internally, and with its partners, to ensure that all are performing and providing the highest level and quality of care.

**3. In the parties' views, do the conditions in the privately-run facilities meet the health care and subclass requirements outlined in the Permanent Injunction?**

ADCRR requires the same level of care in the private facilities as it does in the State-

operated facilities in accordance with individual private contracts.[3] ADCRR does not have a two-tiered health system. Private facilities are required to abide by ADCRR's technical manuals, including those for medical services, mental health services, and dental services. By the end of 2023, all private facilities are anticipated to have TechCare and 340B Medications to assist with continuity of care. The private facilities have the ability to treat patients designated MH-1 to MH-3. There are, however, certain levels of care that are not available in the private facilities (e.g., inpatient mental health services, IPC, and SNU care).

**4. When Defendants transfer prisoners from ADCRR-run facilities to privately-run facilities, should the transferred prisoners be viewed as class members while in the private facilities? That is, should the health care requirements set out in the Permanent Injunction apply to the health care provided to ADCRR prisoners housed at private facilities?**

For the reasons discussed in response to question number one, a Class member is no longer a Class member once he is transferred out of a State-operated facility. The Permanent Injunction is a remedy to the constitutional violations found at the 10 State-operated facilities and it does not follow Class members outside of those facilities. To find otherwise would go beyond the power of the Injunction and the Court's authority and violate 18 U.S.C. § 3626. That being said, when prisoners are transferred to a privately operated facility, ADCRR requires the same level of care as it does in the State-operated facilities in accordance with individual private prison contracts. Being transferred to a private facility does not subject prisoners to a lesser standard of care. Many aspects of the Permanent Injunction are not applicable to the private facilities due to their lower acuity

---

[3] The GEO Group operates Central Arizona Correctional Facility, Florence West, Kingman, Marana, and Phoenix West. CoreCivic operates La Palma and Red Rock Correctional Center.

and classification levels; for example, maximum custody prisoners are not housed in privately operated facilities. Additionally, inmates in private facilities have administrative and legal remedies to address their grievances outside of *Jensen v. Thornell*.

**5. Is Defendants' discretion in classification and housing prisoners impacted by the Permanent Injunction? Are Defendants permitted to transfer high acuity prisoners to privately-run facilities?**

Because maximum custody inmates are not housed in private operated facilities, the Permanent Injunction has not impacted classification and housing. Because of the Permanent Injunction, ADCRR may transfer fewer patients that require Hepatitis C (HCV) treatment or medications for opioid use disorder (MOUD). Patients requiring specialty provider follow up or are otherwise high acuity are placed on a medical hold at the State-operated facilities which will prevent transfer until consultations have been completed. ADCRR does not transfer prisoners to "circumvent" compliance with the Permanent Injunction.

**6. Are there subclass members currently housed at privately-run facilities?**

No subclass members are transferred to privately operated facilities. ADCRR does not house maximum custody inmates at any of the private facilities. However, it is possible that a prisoner housed at a private facility may end up in Restrictive Housing due to a disciplinary issue, administrative issue, or suicide watch. For those prisoners whose circumstances require placement in Restrictive Housing after arrival at a private facility, ADCRR expects that no prisoner will remain in a cell for more than 21.5 hours per day. This applies equally to both private and State-operate prisons. Private facilities sometimes house prisoners designated as SMI, but they are not in maximum custody, and consistent

with the amendments to Department Order 804, *Inmate Behavior Control*, they are not placed into detention. If an SMI inmate needs to be removed from the unit due to a request for protection, a refusal to house, or for violent behavior, there is a procedure in place to do so pursuant to DO 804.

**7. If there are subclass members at privately-run facilities, how did the parties believe the footnote extending the Permanent Injunction to those subclass members would be monitored and enforced? Did the parties anticipate the Court and its monitors would assess the conditions at those facilities and, if necessary, order improvements?**

ADCRR does not transfer any member of the Subclass to privately operated facilities. As for prisoners housed at privately-operated facilities who may need to be placed into Restrictive housing for disciplinary or safety reasons, the Wardens for each of the private facilities are expected to comply with DO 804. Additionally, ADCRR has staff embedded at each private facility to monitor and ensure compliance.

DATED this 14th day of August, 2023.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/ Daniel P. Struck
Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

    I hereby certify that on August 14, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Asim Dietrich: | adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| Corene T. Kendrick: | ckendrick@aclu.org |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org; hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| Eunice Cho | ECho@aclu.org |
| Jared G. Keenan | jkeenan@acluaz.org |
| Maria V. Morris | mmorris@aclu.org |
| Maya Abela | mabela@azdisabilitylaw.org |
| Rita K. Lomio: | rlomio@prisonlaw.com |
| Rose Daly-Rooney: | rdalyrooney@azdisabilitylaw.org |
| Sara Norman: | snorman@prisonlaw.com |
| Sophie Jedeikin Hart | sophieh@prisonlaw.com |

    I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

    N/A

                                                    /s/Daniel P. Struck