Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
**STRUCK LOVE BOJANOWSKI & ACEDO, PLC.**
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

KRISTIN K. MAYES
ATTORNEY GENERAL

Gregory Honig
Lucy M. Rand
Assistant Attorneys General
2005 North Central Avenue
Phoenix, AZ 85004-1592

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, et al., <br> Plaintiffs, <br> v. <br> Ryan Thornell, et al., <br> Defendants. | NO. CV-12-00601-PHX-ROS <br><br> **JOINT RESPONSE TO THE COURT** |

Pursuant to the letter dated August 18, 2023, authored by Court-Appointed Monitor Dr. Marc F. Stern, the parties submit this joint response to the Court. In Section I, the parties address each of the ten proposed uses for the contempt monies included in the August 18, 2023 letter. In Section II, Defendants propose three alternative uses for

1

the contempt monies. Section III discusses Plaintiffs' order of priority, and Section IV discusses Defendants' order of priority.

## I. TEN (10) PROPOSED USES

1. **Purchase FibroScan® machines. These are office-based portable machines that use ultrasound technology to measure liver scarring. They would be used primarily by primary care practitioners at the corridor complexes to help determine the severity of liver damage from hepatitis C which is necessary to appropriately prioritize ADCRR patients for treatment. Each unit costs roughly $15,000, for an initial cost of around $100,000, not including possible maintenance costs.**

**Plaintiffs' Position**: Plaintiffs do not support this use.

**Defendants' Position**: ADCRR does not support this use.

2. **Equip an on-site colonoscopy suite. Currently patients are transported to on off-site clinic for these procedures. The suite would be constructed at a large corridor men's facility. The potential advantages of having a colonoscopy suite within the walls is that it could simplify scheduling patients for these procedures, could reduce wait times, and could reduce custody staffing costs. However, to determine if, and if so, how much the suite would increase efficiencies in care and reduce costs depends on information not currently available. Estimates of initial costs range between $0.6 and $1.5 million.**

**Plaintiffs' Position**: Plaintiffs are neutral on this proposal. While we appreciate that an onsite colonoscopy suite would increase ADCRR's capacity to deliver necessary cancer screening and might increase patient participation, we believe that the State has the obligation to fund this capital-intensive project.

**Defendants' Position**: ADCRR is supportive of an on-site colonoscopy suite. ADCRR recognizes a huge demand for colonoscopies in our system. The ADCRR population is aging and there is a large backlog for this routine screening test. Any individual who is age 45 or older is recommended to have a colonoscopy. Most people in the ADCRR system have not received one. Whether this service can be provided effectively continues to present problems primarily due to the fact that bowel preparation effectiveness and compliance is a pervasive and ongoing problem. Any on-site colonoscopy suite would need to include a housing unit dedicated to overnight

bowel preparation. Additionally, transporting patients one at a time to individual specialist offices for colonoscopies is very time-intensive. Having the location and option to transport groups of patients to one location for this procedure would allow for the use of the facility for bowel preparations and colonoscopies on a large scale. There are, however, reasons for not performing colonoscopies on-site. These include the risk of bleeding, perforation, and the ongoing cost of maintaining high cost equipment. The preliminary cost proposal for construction costs[1] and medical equipment[2] for two (2) medical suites to accommodate an on-site colonoscopy suite along with the housing unit dedicated to overnight bowel preparation is between $824,310 and $1,055,800.

> **3. Pay for healthcare visit copayments.** Prior to the pandemic, patients were charged $4 for eligible visits. Copayments were suspended during the pandemic, but, in compliance with state law, will resume soon. However, it is the Department's intent to markedly reduce the amount of the copayment to achieve greater parity with the ratio of copayments to hourly wages in the community. The Department has not yet determined the new copayment amount, but assuming it were $0.50 and assuming all residents had 15 copayment-eligible visits per year, if the monies were only used for this purpose, it would take over 12 years to exhaust the fund. If the copayment amount is markedly reduced from its pre-pandemic level, as the Department plans, copayments would present much less of a barrier to healthcare than the previous copayment amount.

**Plaintiffs' Position**: In light of the Defendants' commitment to substantially reduce the cost of copayments to reflect parity with hourly wages, Plaintiffs agree that using the contempt monies in other areas will provide greater benefit to the class members.

**Defendants' Position**: ADCRR supports a reduction in patient copayments. However, ADCRR is already working to determine and fulfill the intent to markedly reduce the cost of copayments in order to achieve greater parity with hourly wages. Therefore, ADCRR believes that contempt monies are best spent on those items which

---

[1] Construction costs range from $393,310-$624,800.
[2] Medical equipment costs are estimated at $431,000.

will directly impact the healthcare of the patient population.

**4. Expanding healthcare education. As proposed, this might include a variety of interventions, including free books, self-education modules on tablets, inviting external experts to conduct specialized programs, etc.**

**Plaintiffs' Position**: Plaintiffs do not support the use of the funds to provide healthcare education because that is part of ADCRR's and its vendor's responsibility.

**Defendants' Position**: ADCRR is supportive of expanding healthcare education in general. ADCRR recommends utilizing existing health staff to provide education to patients. As a start, an extensive set of patient education handouts were developed by NaphCare this year, then reviewed and approved by an outside consultant who was hired by ADCRR. These educational handouts are utilized by NaphCare staff and provided to patients.

In addition, patient education can and should be provided by providers, nurses, and counselors at the time of healthcare delivery. This is a proven model in correctional healthcare and in community primary care. In fact, the Court Monitors are currently guiding the development of a "patient centered medical home" model, which is a team-based approach to the delivery of primary care services to patients. Weekly meetings between Dr. Strick, Donna Strugar-Fritsch, and the ADCRR team have begun in order to help develop this model, with a focus on injunction item 7.4.1 (Non-Urgent/Non-Emergent Care), also known as "self-scheduling". In this model, the provider conducts the initial triage and healthcare of the patients, leaving time and resources for the nurse to conduct other duties, including patient education.

ADCRR is open to the use of additional education modules on the tablets. However, a more comprehensive review of the existing health module availability on the tablets will need to be explored, as well as identifying potential additional options and the associated costs. These costs are currently unknown.

ADCRR does not support the recommendation to invite external experts to conduct specialized patient education programs because it is simply not scalable or sustainable. Despite the high price tag this would likely require, the experts in providing patient education are the health staff who are engaging with the patients every day.

> **5. Pay for patients' access to their health record. Non-indigent patients are currently charged $0.50 per page for printed copies of their medical record. To comply with the Injunctive Order in this case, we expect this amount will be reduced considerably to parallel the ratio of the per-page rate to hourly wages in the community. However, the Department has not yet announced the revised rate. Thus, it is difficult to determine the annual cost, though it is likely to be on the same (small) order of magnitude as covering copayments.**

**Plaintiffs' Position**: In light of the Defendants' commitment to substantially reduce the cost of obtaining copies of health records to reflect parity with hourly wages, Plaintiffs agree that using the contempt monies in other areas will provide greater benefit to the class members.

**Defendants' Position**: ADCRR agrees that a reasonable revised rate for patients' access to their health record is important. ADCRR is already working to determine and fulfill the intent to markedly reduce this cost to achieve greater parity with hourly wages. Therefore, ADCRR believes that contempt monies are best spent on those items which will directly impact the health of the patient population.

> **6. Cash payments to class members. This use of the monies is fraught with conceptual challenges. For example, should class members receive an amount proportional to the risk to which they were exposed, and if so, what is a fair way to calculate that risk? It is also fraught with practical challenges: locating class members who are no longer incarcerated and heirs of deceased class members. Further the costs of administering the distribution of funds would considerably reduce the amount of remaining funds that could actually be distributed.**

**Plaintiffs' Position**: Plaintiffs do not agree with Defendants that this use of the contempt funds is categorically impermissible; civil contempt fines may be used to compensate persons injured by a party's contempt. *See Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016). However, Plaintiffs agree that the

5

logistical barriers to figuring out how to distribute the funds in an equitable manner are unduly burdensome.

**Defendants' Position**: Cash payments to class members cannot be accomplished because this is an injunctive class action only. If money damages had been requested, this case would have been tried to a jury. Cash payments cannot now be requested and administered at this procedural posture. Moreover, cash payments do not advance the healthcare needs of the plaintiff class.

7. **Pay for commissary items. There are a number of items in commissary that relate to healthcare such as over-the-counter medications and reading glasses. The monies could be used to cover the full price of the items or could subsidize part of the price. To the extent that current visits to the clinic are for episodic care to obtain over-the-counter remedies, the use of the monies for this purpose also has the potential to reduce clinic use in a safe way.**

**Plaintiffs' Position**: Plaintiffs strongly support this use. People who are incarcerated should have ready access to over-the-counter medications and products in order to better attend to their own self-care. As noted, making these products available is likely to reduce clinic use for routine conditions that are easily addressed. Other state prison systems, including the California Department of Corrections and Rehabilitation, have similar programs, and the products provided include antacids, antihistamines, nonsteroidal anti-inflammatory medications (NSAIDS), saline spray, artificial tears, moisturizing lotion, sunblock, mosquito repellant, and denture adhesive.[3] This measure would favorably impact a very large portion of the people who are incarcerated. If this option is accepted, Plaintiffs' counsel will work with Defendants to determine priorities.

**Defendants' Position**: ADCRR agrees that payment for commissary items that relate to healthcare would be useful. If adopted, ADCRR would recommend a

---

[3] *See* Plaintiffs' Position re: Proposal 8 regarding widespread provision of sunblock to class members.

prioritization of spending as follows (costs based on current commissary list and would likely decrease with bulk orders): *Reading Glasses* – currently $1.20/pair; *Over the Counter Medication* – ranging from $0.05 for Acetaminophen tablets (2) to $10.00 for Vitamins: Multi (senior) (100 ct.); and *Indigent Items*[4] – ranging from $0.02 for a comb to $2.50/each for denture care items. Because these would be on an as-needed basis it is difficult to determine the scope of cost and what these costs might look like if provided on an ongoing basis.

   8. **Install suntan lotion dispensers in recreational areas. There is an obvious value to reducing exposure to harmful UV radiation. At approximately $75 - $120 per gallon, annual costs would amount to a small fraction of the available funds.**

**Plaintiffs' Position**: Plaintiffs strongly support this use.  The history of this case shows multiple people who have developed skin cancer due to unprotected exposure to the sun while outdoors. This measure would have a direct and immediate impact upon a very large portion of the people who are incarcerated, especially in light of the prices currently charged by the ADCRR commissary (See also # 7 above).  Minimum wage for incarcerated workers is 15-25 cents per hour, and therefore a 4 ounce bottle of sunblock selling for $2.00 is equivalent to 8 to 13 hours of labor.

**Defendants' Position**: ADCRR believes that installing suntan lotion dispensers in recreational areas would have a direct, immediate benefit for the population. Currently, ISP funding can and is used to provide sunscreen to inmates on work crews. Additionally, inmates can purchase 4oz. bottles of sunscreen for $2.00/bottle. Inmates

---

[4] Costs based on current ADCRR Commissary List: Comb - $0.02; Toothpaste - $1.00; Toothbrush - $0.06; Razor, disposable - $0.10; Shave Lotion, Shampoo, Body Wash - $0.90; Deodorant - $0.40; Shave Cream - $0.43; Denture Cleaner Tablets - $1.04; Denture Adhesive Uppers - $2.50; Denture Adhesive Lowers - $2.50; Denture Adhesive - $1.50; Denture Toothbrush - $0.15; Denture Bath - $0.25; Laundry Soap - $0.39; Bar Soap - $0.32.

working on outside work crews, with medical needs, or orders due to sun exposure are provided sunscreen at no cost. However, installing suntan lotion dispensers would allow sunscreen to be readily available for use by the population.

Dispensers can be purchased for $167 each. Anchoring costs to retrofit these dispensers are minimal. ADCRR estimates needing 225 dispensers across 44 units at the state facilities, for an initial cost of dispensers totaling $37,575. Using an average estimated cost of $100/gallon, ADCRR estimates needing four (4) gallons of sunscreen per unit each month. Total annual costs for sunscreen are estimated to be $211,200/year (calculated by: 44 units x $100/gallon x (4 x 12 months = 48).

It is important to note that these costs will be ongoing and will eventually exceed the contempt monies if continued indefinitely. ADCRR also recognizes as stated in Dr. Stern's August 18, 2023 letter that, "[I]t is unlikely the Court would want to administer these funds over several years. More importantly, because of the time value of money, the sooner the money is spent, the better it will do for the class members. Thus, a time horizon that exhausts the funds over no more than the next two to three years is likely to be desirable."

**9. Provide long sleeve shirts and hats. These currently must be purchased by residents, but, like suntan lotion, play a valuable role in reducing exposure to harmful UV radiation. Provision of these items could potentially be a venture for correctional industries.**

**Plaintiffs' Position**: Plaintiffs support this use. However, this is not our first choice because we agree with Defendants that people who are incarcerated are entitled to appropriate clothing, which must be provided without financial charge. In Arizona, appropriate clothing includes long sleeved shirts and hats that offer protection from the sun, and these items should be provided free of charge as a matter of course rather than forcing incarcerated people to purchase them from the commissary. Plaintiffs interpret Defendants' statement below as a commitment to provide these clothing items after the

contempt monies are depleted.

**Defendants' Position**: Whether facilitated by contempt monies or not, ADCRR believes long sleeve shirts and hats should be provided to our population. Currently, inmates working on outside work crews may be provided long sleeve shirts and large brim hats. If an inmate is issued a special needs order from Medical they too are issued a long sleeve and/or large brimmed hat as ordered.

Based on ADCRR's current commissary list, long sleeve shirts cost $7.50 each for sizes S-5XL, $10.95 each for sizes 6XL-8XL. Baseball caps can be purchased for $2.52 each and orange knit stocking caps can be purchased for $2.11 each. Wide brimmed hats which provide neck and ear protection are preferable. Hats with cloth that covers the back of the neck can be purchased for $3.25 each. Straw 'garden hats' can be purchased for $4.25 each.

The above-mentioned prices are fixed and there is no price break for bulk or large quantity orders. The cost to provide one (1) baseball cap for the over 24,000 inmates currently housed at state facilities at $2.52 each is approximately $61,000. The cost to provide one (1) long sleeve shirt for the over 24,000 inmates currently housed at state facilities at an average of $9.25 each is approximately $225,000. The cost to provide one (1) straw hat for the over 24,000 inmates currently housed at state facilities at $4.25 each is approximately $103,000. Due to wear and tear and to account for population growth, these figures should be considered as recurring for at least the next two (2) years.

It is important to note that these costs will be ongoing and far exceed the contempt monies if continued indefinitely. ADCRR also recognizes as stated in Dr. Stern's August 18, 2023, letter that, "[I]t is unlikely the Court would want to administer these funds over several years. More importantly, because of the time value of money, the

sooner the money is spent, the better it will do for the class members. Thus, a time horizon that exhausts the funds over no more than the next two to three years is likely to be desirable."

10. **Purchase and equip an ambulance for the Yuma complex. Due to its rural location, having an ambulance on-site at Yuma will significantly reduce hospital transport time in emergencies. An equipped ambulance would cost between $100,000 - $350,000 plus maintenance.**

**Plaintiffs' Position**: Plaintiffs do not support this use. If the Yuma complex (or, for that matter, any other prison) needs an ambulance to respond to emergencies, then this expense is appropriately allocated to the State and the State should purchase an ambulance. In addition, it would only benefit a small subset of the class.

**Defendants' Position**: ADCRR does not recommend an ambulance for Yuma. Reasons for this include the ongoing upkeep of the ambulance and the staffing required to ensure that the ambulance is operational 24 hours per day. If this option is seriously considered, then the utilization of EMS calls at Yuma should be evaluated. The following questions would need to be answered: (1) how many send-outs per month, (2) the appropriateness of the send-outs, and (3) for true emergencies, the nature of the send-outs. If there are a large number of EMS calls for overdoses, for example, then the implementation of the MAT program will likely serve to mitigate many of these calls. If there are many EMS calls for elderly or debilitated patients needing emergency care, then the opening of more IPC/SNU beds at Tucson Catalina will allow for the movement of these individuals out of Yuma prison and to a higher level of care. These measures can hopefully serve to mitigate the need for a large number of EMS calls at Yuma.

II.   **ADDITIONAL IDEAS BY DEFENDANTS**

These uses are specifically intended for use by the population at ASPC-Perryville.

1. **Adjustable Gynecological Exam Table:** An adjustable gynecological exam

table allows the physician to conduct examinations on female patients for a variety of medical indications. These include routine examinations, gynecological procedures, and urgent/emergent conditions. Patients with varying levels of physical mobility may also be accommodated by this exam table, including those who may not be able to receive a gynecological exam on traditional tables. Approximate cost for Bicakcilar Examline 740 Gynecological examination table is between $5,000 and $10,000.

**2. Mammography Services:** Mobile mammography is currently occurring once per month at Perryville. However, the current demand would be met, or at least dramatically addressed by increasing these services to weekly. Current guidelines recommend annual screening for all women age 50 and older. There is a backlog and a weekly on-site mammography clinic will help to bring down the backlog and provide timely services into the future.

There are two different options suitable for exploration. First, is to contract with mobile mammography to come on-site once or twice per week. As an example, mobile mammography through the vendor SimonMed costs $276 per patient. Currently, there is a 24-patient minimum and the total cost per day is $6,624. If this service were offered weekly for one (1) year the cost would be $344,448 ($6,624 x 52 weeks). Second, is to buy equipment and staff a mammogram tech onsite once or twice per week (and find space onsite to conduct these services). A radiology service would need to be established to read the mammograms, as well. The price range for the machine alone is between $100,000 and $250,000. ADCRR prefers the first option, mobile mammography through a qualified vendor.

3. **Outpatient Specialty Services**

As an alternative to a full on-site colonoscopy suite build-out, ADCRR proposes a site build-out for delivery of outpatient specialty services. With this proposed use, the

site would be used for overnight bowel preparation, however the colonoscopies would be performed offsite at a local endoscopy center, drastically reducing cost (discussed below) and risk (previously addressed). The unit could also be used for outpatient specialty procedures such as echocardiograms, treadmill stress tests, cardiologist visits, and visits with other highly utilized specialists. The approximate cost of an echocardiogram machine is $25,000. The approximate cost of a treadmill for stress tests is $25,000. Subtracting out the colonoscopy suite build-out and equipment specific to providing colonoscopies (approximately $605,000), adding in the cardiology equipment and testing costs, the cost for outpatient specialty services is $500,800 (calculated by: $1,055,800 - $605,000 + $25,000 + 25,000).

**Plaintiffs' Position on # 1 and # 2:** Plaintiffs do not dispute that these measures would benefit some members of the Plaintiff class. However, they would only benefit a subset of the Plaintiff class. More importantly, these are the type of physical plant and specialty services expenditures that ADCRR (and/or its contracted vendor) is obligated to make, and should have already made, in order to provide minimally adequate healthcare – including gynecological and mammogram care — to the Plaintiff class.

**Plaintiffs' Position on # 3:** It is unclear at which prison complex this outpatient staging unit would be built, but it would again only benefit a subset of the Plaintiff class. Similar to our neutral position on the expert's proposal for an on-site colonoscopy facility, we believe that the State has the obligation to fund this capital-intensive project.

### III.  PLAINTIFFS' ORDER OF PRORITY

#8. Install suntan lotion dispensers in recreational areas.

#7. Pay for commissary items.

#9. Provide long sleeve shirts and hats.

#3. Pay for health care copayments (to the extent the rate is not reduced).

#5. Pay for patients' access to health care records (to the extent the rate is not reduced).

#2. Equip an onsite colonoscopy suite, or Defendants' Proposal #3 re: on-site staging area. (Neutral).

Plaintiffs oppose the remaining proposals.

## IV.   DEFENDANTS' ORDER OF PRIORITY

ADCRR's order of priority is as follows: (1) Outpatient specialty services, (2) Adjustable gynecological table, (3) Mobile mammography services, (4) Onsite colonoscopy suite, (5) Bulk sunscreen dispensers, (6) Including long-sleeve shirts and wide-brim hats as standard issued clothing, (7) Covering the cost of select commissary items (OTC meds, hygiene items, and reading glasses), and (8) Patient education modules on the tablets.

RESPECTFULLY SUBMITTED this 8th day of September, 2023.

**ACLU NATIONAL PRISON PROJECT**

By: s/ David C. Fathi
David C. Fathi (Wash. 24893)**
Maria V. Morris (D.C. 1697904)*
Eunice Hyunhye Cho (D.C. 1708073)*
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:    dfathi@aclu.org
          mmorris@aclu.org
          echo@aclu.org

Corene T. Kendrick (Cal. 226642)*
**ACLU NATIONAL PRISON PROJECT**
39 Drumm Street
San Francisco, California 94111
Tel: (202) 393-4930
Email:    ckendrick@aclu.org

*Admitted *pro hac vice*
**Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Rita K. Lomio (Cal. 254501)*
Sophie Hart (Cal. 321663)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          rlomio@prisonlaw.com
          sophieh@prisonlaw.com

*Admitted *pro hac vice*

Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:    jkeenan@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By: s/ Maya Abela
    Asim Dietrich (Bar No. 027927)
    5025 East Washington Street, Suite 202
    Phoenix, Arizona 85034
    Telephone: (602) 274-6287
    Email: adietrich@azdisabilitylaw.org

    Rose A. Daly-Rooney (Bar No. 015690)
    Maya Abela (Bar No. 027232)
    **ARIZONA CENTER FOR DISABILITY LAW**
    177 North Church Avenue, Suite 800
    Tucson, Arizona 85701
    Telephone: (520) 327-9547
    Email: rdalyrooney@azdisabilitylaw.org
    mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**STRUCK LOVE BOJANOWSKI & ACEDO, PLC**

By s/ Daniel P. Struck
    Daniel P. Struck
    Rachel Love
    Timothy J. Bojanowski
    Nicholas D. Acedo
    3100 West Ray Road, Suite 300
    Chandler, Arizona 85226

|   |   |
|---|---|
| 1 | KRISTIN K. MAYES<br>ATTORNEY GENERAL |
| 2 | |
| 3 | Gregory Honig<br>Lucy M. Rand<br>Assistant Attorneys General |
| 4 | 2005 North Central Avenue<br>Phoenix, AZ  85004-1592 |
| 5 | *Attorneys for Defendants* |
| 6 | |