Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Ryan Thornell, *et al.*, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-ROS<br><br>**PLAINTIFFS' OBJECTIONS TO PROPOSED CORRECTIONAL STAFFING ANALYSIS AND PLAN (DOC. 4489)** |

On October 6, 2023, Mr. Scott Frakes, the Court's Monitor for correctional issues, submitted a report and proposed correctional staffing analysis and plan. Doc. 4489. Pursuant to the Order and Permanent Injunction ("Injunction") in this case, Doc. 4410, Plaintiffs submit their objections to the proposed staffing analysis.

Plaintiffs believe that most of the staffing analysis is appropriate and adequate for the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR") to meet its obligations under the Injunction with regard to correctional staffing. However, Plaintiffs object to two aspects of the proposed staffing analysis. First, Plaintiffs do not believe that the proposed staffing analysis and plan for Eyman and Lewis-Rast is sufficient to satisfy the requirement that people must have the ability to contact a staff member immediately. Secondly, inconsistencies between the proposed staffing analyses for Eyman facilities, wings and clusters will lead to confusion and disputes.

**1. Inadequacy of Staffing in Eyman SMU-1, Eyman Browning, and Lewis Rast**

The Injunction requires that: "Defendants shall not house any prisoner in a housing location where a prisoner lacks the ability to effectively contact a staff member *immediately*, either via in-person or via a call button/intercom system." Doc. 4410 at § 22.1 (emphasis added). Plaintiffs do not believe the proposed staffing plans for Eyman SMU-1, Eyman Browning, or Lewis Rast are sufficient to meet this requirement.[1] Under the proposed staffing plans, people housed in these plans may need to wait up to 20 minutes to contact a staff person. That is not immediate.

The staffing analysis calls for the following staffing per cluster[2] in Eyman Browning and Eyman SMU-1:[3]

---

[1] Mr. Frakes does not appear to believe that this provision is currently being satisfied through the presence of call buttons, describing that as a "long-term solution." Doc. 4489 at 6. To Plaintiffs' knowledge, there are no functioning call buttons in the cells at these three units.

[2] These facilities are organized into wings, clusters, and pods. There are three or four clusters per wing. The clusters are divided into six pods, each of which consists of 12-16 cells.

[3] For simplicity, Plaintiffs here refer only to the staffing analysis for two 12-hour shifts. The issue is the same regardless of whether there are three 8-hour shifts or two 12-hour shifts. Also, there are proposed staffing plans for Eyman at the facility, wing and

| Post Location | Duties & Responsibilities | 1st Shift | 2nd Shift |
|---|---|---|---|
| Main Control | Control Unit access | 1 | 1 |
| Housing Unit Control | Control cluster, pod and cell access | 1 | 1 |
| Housing Unit Floor | Count, escorts, feeding | 4 | 4 |
| External Escort | Movement off of the housing unit | 1 | 1 |
| Watch | Direct/indirect observation | 1 | 1 |
| Recreation | Direct observation of recreation | 1 | 1 |
| Floor Rover | Direct access to staff (#22) | 1 | 1 |

Doc. 4489 at 19. According to the staffing analysis for the entire facility for Eyman SMU-1 and Eyman Browning, there is also one supervisory Sergeant assigned per wing[4] during the first shift[5] and one Sergeant assigned to all wings collectively during the second shift. *Id*. at 17, 24.

According to Mr. Frakes, the positions that can assist with meeting the requirement of ensuring the ability to "contact a staff member immediately" are the Rover Officers, Floor Officers, Watch Officers, Recreation Officers, Unit Booth Officers, the Unit Supervisors (Sergeants), and non-custody staff. Doc. 4489 at 5-6. As explained below, this staffing model does not satisfy the plain language of § 22.1.

The Rover Officers move from one pod to the next throughout their shifts. According to Mr. Frakes, they should be able to move through an entire cluster in about 20 minutes. *Id*. at 5.

The Floor Officers work in teams of two, meaning that there are two teams of Floor Officers in each cluster on each shift. *Id*. at 6. Each team of Floor Officers can only be in one pod at a time, leaving four pods unattended by Floor Officers at all times.[6]

---

cluster level. For simplicity, Plaintiffs refer to the cluster-level staffing analysis, except where a different staffing analysis adds to the total staffing.
   [4] At Eyman Browning, there is one sergeant assigned to wing 1, one assigned to wings 2 and 3, and one assigned to wing 4. Doc. 4489 at 17.
   [5] The sergeants assigned to the wings during the day are described as essential positions, meaning that they may be unstaffed up to 25% of the time. Doc. 4489 at 17, 24.
   [6] There are even fewer Floor Officers per cluster according to the wing-level staffing analysis that would, according to Mr. Frakes, be in effect if all clusters in a wing were occupied. Doc. 4489 at 6, 20. In that case, there would be a total of 12 Floor Officers per wing during the day and 8 per wing at night. Thus, there would be only 6 two-person teams for four clusters – or 1.5 teams per cluster – during the day and 4 two-

The Watch Officers are responsible for observing people on mental health watch. If there is someone on constant watch, the Watch Officer is not supposed to leave the front of the cell where the person is on watch. If there are only 10-minute or 30-minute watches occurring, it might be possible for the Watch Officer to be tasked with being the staff contact for other people in the same pod. For the Watch Officer to go into other pods would create a dangerous circumstance. The purpose of having the ability to contact staff immediately is due to the possibility of emergencies. If a Watch Officer is tasked with going into other pods between observations of the person(s) on mental health watch, they may return in time for the next observation, but if there is an emergency in a different pod, they may well not return in time for the next observation, leaving the suicidal person(s) unattended.

The Recreation Officers are stationed in the Recreation Yards. As a result, incarcerated people can contact Recreation Officers while at recreation, but not while in their cells in the housing units.

The Unit Control Officer is in the Housing Control Booth. As shown in the picture of the view from a Housing Control Booth at Eyman-SMU-1 below, the Unit Control Officer cannot see into the cells.



person teams – 1 team per cluster – at night. *Id*. at 20. For simplicity, the analysis herein focusses on the staffing analysis for a cluster, but the inadequacy of the staffing is thus exacerbated when applying the staffing analysis for a wing.

Doc. 3140-9 at 27. Without a functioning call button, a person in a cell cannot effectively contact a Unit Control Officer.

The Unit Supervisors or Sergeants also do not provide sufficient additional presence to meet the requirements of § 22.1. During the first shift, at least 75% of the time, there must be one Sergeant in each wing at Eyman SMU-1 and either one Sergeant or half a Sergeant per wing at Eyman Browning.[7] Doc. 4489 at 17, 24. During the second shift, there must be one Sergeant assigned to cover all housing units at Eyman SMU-1 and one assigned to cover all housing units at Eyman Browning. Even if these Sergeants are spending all of their time in the housing units, they add very little to the ability of a person locked in a cell to communicate with staff. At any time during the first shift, there may be one Sergeant in one of 24 pods; at any time during the second shift, there may be one sergeant in one of 72 pods (at Eyman Browning) or one of 96 pods at (Eyman SMU-1). *Id*.

Overall, the availability of staff that people locked in their cells can contact is just:

- One Rover Officer who comes through a housing pod approximately once every 20 minutes;
- Two teams of two Floor Officers per cluster, leaving four pods per cluster unattended by Floor Officers at any given time;
- Watch Officers who cannot safely leave the pod where they are conducting watch;
- A Sergeant who is responsible for supervising between 24 and 96 pods at a time.[8]

---

[7] Pursuant to Section 20 of the Injunction, all posts are designated as mandatory, essential, or important. Mandatory posts must be staffed at all times, essential posts must be staffed at least 75% of the time, and important posts must be staffed at least 50% of the time. Doc. 4410 at §§ 20.1, 20.2.1. These Sergeant posts are designated as essential. Doc. 4489 at 17, 24.

[8] Mr. Frakes also asserts that "non-custody staff" will help meet the requirement of § 22.1. Doc. 4489 at 5. Unfortunately, he provides no information about how frequently non-custody staff enter the housing units. Particularly at night, very few are likely to be in the housing units.

At Lewis Rast, the issue is similar. There is again one Rover Officer per cluster. Doc. 4489 at 22. During the first shift, there are a total of nine teams of two Floor Officers for the four clusters, during the second shift there are a total of seven teams of two Floor Officers. *Id*. There are two Watch Officers who must be at Lewis Rast 75% of the time, and one Sergeant who supervises the wing of 24 pods during the first shift (and must be assigned 75% of the time), but no Sergeants at night. *Id*.

Because there are no call buttons at these three facilities, people locked in their cells can communicate with staff only if the staff are in the pod. The only staff that is certain to regularly be in any given pod is the Rover Officer, once approximately every 20 minutes. The Floor Officers presumably move through the pods, but there is no indication of how frequently they are in each pod, and there will certainly be times at which pods have no Floor Officers in them. For example, during recreation, as the Floor Officers escort people from one pod to recreation, they will be only in that pod. The ability to contact a staff member is limited to once every 20 minutes or whenever a team of Floor Officers happens to be in the pod. This does not satisfy the requirement of people being housed only where they have the "ability to effectively contact a staff member immediately." Doc. 4410 at § 22.1. In the 20 minutes between Rover Officer rounds to each pod, a person could have a heart attack, a stroke, a seizure, or any number of medical emergencies. A person could also attempt suicide and be dead before the Rover Officer returned.

Plaintiffs have raised these concerns with Mr. Frakes, but the staffing analysis he submitted does not satisfy Section 22.1's requirements. The proposed staffing plan does not adequately account for the risk of harm to people housed in cells who are unable to contact a staff member immediately – the very risk that Section 22.1 is intended to address. In response to Plaintiffs' concerns, Mr. Frakes asserts that he "can't make a good argument for having one person posted full time in every pod housing members of the subclass (Detention or MAX) – just waiting for someone to request contact with the staff." *Id*. at 6. But the parties reached agreement on this section of the proposed

injunction and the Court ordered it. Accordingly, the staffing analysis and plan must ensure that every person locked in a cell has the ability to contact a staff member immediately.

**2. Inconsistencies between the Facility Staffing Analysis, the Wing Staffing Analysis, and the Cluster Staffing Analysis for Eyman Browning and Eyman SMU-1.**

Mr. Frakes has submitted a staffing analysis for the whole facility at Eyman Browning and at Eyman SMU-1, a staffing analysis for a single wing at Eyman, and a staffing analysis for a single cluster at Eyman. Doc. 4489 at 16-20, 23-24. In his report, he notes in his response to Plaintiffs' concerns that the staffing analysis for a wing will be used when there are people housed in every cluster in a wing, and the staffing analysis for a cluster will be used when there are people in only some of the clusters in a wing. *Id*. at 6.

As an initial matter, if there are different staffing analyses for facilities, wings and clusters, it must be specifically set out in the staffing analysis how to determine when a particular staffing analysis applies. Otherwise, there will inevitably be disagreements as to which staffing analysis applies, and thus whether the staffing requirements are met. For example, if there are four clusters in a wing occupied, and there are 12 Floor Officers on a shift, the staffing requirements of the wing staffing analysis would be met but those of the cluster staffing analysis would not. *Compare* Doc. 4489 at 19 *with id*. at 20.

More importantly, there are substantive differences between the various staffing analyses. For example, on the wing staffing analysis, there is one mandatory Sergeant for supervision of the four clusters on the wing during the first shift and one during the second shift. Doc. 4489 at 20. On the facility staffing analysis, there is one essential Sergeant per wing[9] during the first shift, and one mandatory Sergeant for all wings during the second shift. *Id*. at 17, 24. Thus, on the facility staffing analysis, the daytime

---

[9] There is one for wings 2 and 3 together at Eyman Browning. Doc. 4489 at 17.

Sergeant positions must be staffed 75% of the time, whereas on the wing staffing analysis, they must always be staffed. Also, on the facility staffing analysis, there is essentially 0.25 Sergeants per wing during the second shift, whereas on the wing staffing analysis, there is one Sergeant per wing during the second shift.

Moreover, according to the cluster staffing analysis for 12-hour shifts at Eyman Browning and Eyman SMU-1, there are four Housing Unit Floor Officers assigned to each cluster on the first and second shifts. *Id*. at 19. According to the facility and wing staffing analyses for 12-hour shifts at Eyman Browning and Eyman SMU-1, there are three Housing Unit Floor Officers per cluster on the first shift and two per cluster on the second shift. *Id*. at 17, 20.

There are also some positions that are clearly not cluster-specific positions that appear on the cluster staffing analysis as a single full position, but also appear on the facility and wing staffing analyses as a single full position. For example, according to the proposed cluster staffing analysis, there should be one mandatory Assistant Shift Supervisor on every shift and one Main Control Officer on every shift. *Id*. at 19. That would mean that if, as Mr. Frakes indicates in his responses to Plaintiffs' concerns about the differing levels of staffing analyses, there were three clusters occupied in a wing, the cluster level staffing analysis would apply to each of the three clusters, thereby requiring three Assistant Shift Supervisors and three Main Control Officers on the wing to satisfy the requirements of the cluster staffing analysis. The wing staffing analysis requires one mandatory Assistant Shift Supervisor on every shift and one Main Control Officer on every shift. *Id*. at 20. Thus, for the facility, there would need to be four of each at Eyman Browing and at Eyman SMU-1, as each facility has four wings. But on the facility staffing analysis, there is just one Assistant Shift Supervisor on every shift and one Main Control Officer on every shift. *Id*. at 17, 24. Similarly, the staffing analyses have a requirement for one SSU officer on the day shift in each cluster, but two on the wing and two for the facility as a whole. *Id*. at 19, 20, 17, 24.

The existence of differing and inconsistent staffing analyses for the same facilities

will lead to confusion in implementation and disagreements about what the staffing analysis actually requires.  These ambiguities should be resolved now to avoid future disputes that will ultimately require the Court's intervention.

## CONCLUSION

As stated at the outset, Plaintiffs believe that the proposed staffing analysis and plan submitted by Mr. Frakes is, for the most part, adequate.  However, these two issues – the lack of adequate staff to meet the requirement that all subclass members be able to contact a staff member immediately as required by the Injunction, and the inconsistencies between the cluster, wing and facility staffing analyses at Eyman – should be resolved prior to the finalizing of the correctional staffing analysis and plan.

Dated:  October 16, 2023          **ACLU NATIONAL PRISON PROJECT**

By:  s/ Maria V. Morris

David C. Fathi (Wash. 24893)**
Maria V. Morris (D.C. 1697904)*
Eunice Hyunhye Cho (D.C. 1708073)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@aclu.org
          mmorris@aclu.org
          echo@aclu.org

Corene T. Kendrick (Cal. 226642)*
39 Drumm Street
San Francisco, California 94111
Tel: (202) 393-4930
Email:    ckendrick@aclu.org

*Admitted *pro hac vice*
**Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Rita K. Lomio (Cal. 254501)*
Sophie Hart (Cal. 321663)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
           ahardy@prisonlaw.com
           snorman@prisonlaw.com
           rlomio@prisonlaw.com
           sophieh@prisonlaw.com

*Admitted *pro hac vice*

Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:     jkeenan@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By: s/ Maya Abela
   Asim Dietrich (Bar No. 027927)
   5025 East Washington Street, Suite 202
   Phoenix, Arizona 85034
   Telephone: (602) 274-6287
   Email: adietrich@azdisabilitylaw.org

   Rose A. Daly-Rooney (Bar No. 015690)
   Maya Abela (Bar No. 027232)
   **ARIZONA CENTER FOR DISABILITY LAW**
   177 North Church Avenue, Suite 800
   Tucson, Arizona 85701
   Telephone: (520) 327-9547
   Email:
      rdalyrooney@azdisabilitylaw.org
      mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2023, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Lucy M. Rand
Assistant Arizona Attorneys General
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Anne M. Orcutt
Eden G. Cohen
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
aorcutt@strucklove.com
ecohen@strucklove.com

*Attorneys for Defendants*

　　　　　　　　　　　　　　　　　　*s/ Maria V. Morris*