Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: jkeenan@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Ryan Thornell, *et al.*, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO THE PROPOSED CORRECTIONAL STAFFING ANALYSIS AND PLAN (DOC. 4489)** |

Scott Frakes, the Court's Monitor for correctional matters, submitted a proposed staffing analysis and plan.  Doc. 4489.  Plaintiffs and Defendants each submitted objections to the proposed staffing analysis and plan on October 16, 2023.  Doc. 4492, 4493, 4493-1.  As stated in Plaintiffs' objections, Mr. Frakes's proposed analysis and plan is mostly sufficient, except for needing more Floor Rovers and Floor Officers to meet the terms of the Order and Permanent Injunction ("Injunction").  Indeed, given the information discussed below in Section II, which was not available at the time of Plaintiffs' objections, the need for additional Floor Officers is even more apparent.

Defendants assert in their objections that they are already "appropriately staffed."  Doc. 4493 at 3.  They are not.  Just in the first three days of the weeklong period they claim shows that they are managing the detention and maximum custody housing units appropriately, they left one person locked in the shower for 9 hours and another for 8½.

Plaintiffs submit this response to Defendants' objections to Mr. Frakes's analysis and plan.  Plaintiffs do not address Defendants' concern about communications between Defendants and Mr. Frakes, as they have no knowledge of the issue.  Plaintiffs address each of Defendants' other objections below.

I.   **To Meet the Requirements of the Permanent Injunction, Staffing Levels Must Reflect Both Population and Block Size, as the Proposed Staffing Analysis Does**

For detention units (other than Eyman SMU-I), which vary in size and layout, Mr. Frakes has set forth a proposed staffing analysis and plan for units of 1-49 people and 50-99 people.  Doc. 4489 at 3.  Defendants object to this approach, claiming that it will result in staff "idleness."  Doc. 4493 at 2-3.  They complain that they will not be able "to curtail, reduce, and/or collapse posts … regardless of the inmate population count and unit vacancy."  *Id*.  Defendants' objection should be disregarded for two reasons.

First, Defendants *can* collapse posts under Mr. Frakes's proposed analysis and plan.  When the population of detention units is low, and units are vacant, the units can be closed and do not have to be staffed, as Mr. Frakes notes in his report.  Doc. 4489 at 2, 3.  Indeed, Defendants are doing this already.  For example, Defendants stated in their daily

population report for September 8, 2023, that there were six empty detention units. *See* Declaration of Maria Morris ("Morris Decl."), filed herewith, Ex. 1.   When there are fewer people in detention, they can be consolidated into fewer housing units to avoid having a very small number of people in a unit.  By doing so, Defendants can reduce the number of staff needed to work in the detention units, while still having enough staff to maintain reasonably safe conditions in the locations where people are housed.

Second, Defendants cannot provide the necessary supervision of the detention units if they do not have adequate staff. As recognized by Mr. Frakes, the number of people housed in a unit does have an impact on the number of staff needed; that is why there are two different sets of proposed staffing plans, one for units of 1-49 people, and one for units of 50-99 people.  Doc. 4489 at 3.  But attempting to adjust the required staffing more granularly to the size of the population of a unit does not make sense because, even during the hours when there is limited movement,[1] a certain number of staff must be available to operate the unit and to keep incarcerated people safe, regardless of whether there are 1, 20 or 49 people housed in the unit.

For example, staff must be available to check on people on a regular basis to make sure they are present and safe; as recognized by this Court, ADCRR's "lack of adequate staffing resulted in Defendants performing fewer welfare checks on prisoners and the checks actually performed were perfunctory."  Doc. 4410 at 51.  As required by the Injunction, incarcerated people must be able to contact staff "immediately" in the case of a medical or mental health emergency.  *Id*. § 22.1.  If there is an emergency, staff must be available to escort the incarcerated person to a medical clinic or elsewhere.

Defendants' proposed changes to the number of Floor Rovers and Floor Officers[2] in the detention units will predictably leave detention units without any staff at points

---

[1] Defendants note that there is less movement from 6:00 p.m. to 6:00 a.m.  Mr. Frakes's proposed staffing analysis and plan takes that into account.   In each of the detention unit plans, there is a Recreation Officer during the nearly all of the period from 6:00 a.m. to 6:00 p.m., but no Recreation Officer during the night.  Doc. 4489-1 at 2-9.
[2] Mr. Frakes uses both "Floor Staff" and "Floor Officers".  Plaintiffs understand these to refer to the same staff.  Plaintiffs use "Floor Officers" herein.

1    during the night, and will generally lead to an inability to conduct necessary tasks.

2         Mr. Frakes proposes a single Floor Rover for every detention unit on every shift.[3]

3    Doc. 4489-1 at 2-9.   Defendants object to this post for the third shift in the larger

4    detention units (Doc. 4493-1 at 3, 7) and for all night shifts in the smaller detention units

5    (*id*. at 4-5, 8-9).   Floor Rovers fill an extremely important function and are, as indicated

6    by Mr. Frakes, necessary to meet the requirements of § 22.1 of the Injunction, which

7    prohibits Defendants from housing anyone in a unit where they cannot "effectively

8    contact a staff member immediately."   Doc. 4410 at § 22.1; Doc. 4489 at 4.[4]

9         Defendants also propose having just two Floor Officers in every detention unit on

10   every shift, regardless of the size of the detention unit.   Doc. 4493-1 at 2-9.   As explained

11   by Mr. Frakes, Floor Officers work in pairs, so Defendants are proposing a single pair of

12   Floor Officers in each detention unit on each shift.   Doc. 4489 at 6.   These officers are

13   responsible for providing meals, escorting, counting, and observation.   Under Defendants'

14   proposal, no Floor Officers would remain in the unit during the time each person is

15   escorted to the recreation area, or to any program, hearing, or medical appointment.[5] If a

16   person housed in a detention unit has a medical emergency at night and there is no Rover

17   Officer and only one pair of Floor Officers, the detention unit would be entirely

18   unattended while the person was escorted to the medical clinic.[6]   Defendants have not

19

20        [3] Defendants assert that Mr. Frakes proposed four Floor Rovers for the night shift
     in detention units of 50-100 people with no control booths.  Doc. 4493-1 at 6.  This is
21   incorrect.  *See* Doc. 4489 at 12.
          [4] As discussed in Plaintiffs' objections to Mr. Frakes's proposed staffing analysis
22   and plan, the Floor Rovers are not by themselves adequate to meet the requirement of §
     22.1.  Doc. 4492 at 2-7.  Nonetheless, they are a necessary component of meeting the
23   requirement.
          [5] According to the report from EOMS (Electronic Offender Management System),
24   it sometimes takes half an hour or more to transport a person to wherever they need to be
     taken.  Morris Decl. Ex. 2.
25        [6] The EOMS Out of Cell Log 9.2.23-9.8.23 shows that people have medical
     emergencies fairly regularly.  *See* Morris Decl. ¶ 5, Ex. 3.  During the week for which
26   reports were produced, there were 14 instances when a member of the subclass at Eyman
     Browning had to go to the emergency room.  *Id*.  On four of the seven nights reported,
27   someone at Eyman Browning had to the go to the emergency room.  *Id*.  This report
     relates to Eyman Browning, not the detention units, but there is no reason that the medical
28   needs should be significantly different.  EOMS is not yet in use in the detention units.

even attempted to explain how their proposed staffing would meet the requirements of § 22.1.

Moreover, even during the day when there is a Floor Rover present, under Defendants' proposal, if there was an emergency while the single pair of Floor Officers were escorting someone to recreation or medical or somewhere else, the Floor Rover, as the only staff person on the unit, would be unable to open the cell door or take the person to the medical clinic.

Finally, over the course of each day, the Floor Officers are responsible for taking people to recreation, programs, and other appointments, providing them three meals a day, doing security checks twice an hour to ensure that each person is alive and well, and conducting all the required formal counts.   Defendants have not explained how a single pair of Floor Officers could do all the things that they are required to do in a detention unit of 50 to 100 people.

## II.   Defendants Have Not Demonstrated an Ability to Meet Their Obligations Under the Injunction with Their Current Custody Staff Levels

Defendants assert that they have shown that they are meeting the requirements for out-of-cell time in the detention units and that, therefore, they are adequately staffed already and Mr. Frakes's analysis should be rejected.  Doc. 4493 at 3-4. There are several problems with this assertion.

As a preliminary matter, the sample upon which Defendants rely is too small to show that they are in fact adequately staffed.  In theory, their sample shows the activities of 50 subclass members for one week in early September.  For several housing units, they have provided information about the out-of-cell time for just one person.  Morris Decl. ¶ 6.  For the detention unit at Douglas, which housed 18 subclass members as of the last day of their sampling week, Defendants did not produce any information.  Morris Decl. ¶ 6, Ex. 1.  Moreover, a significant number of the files that Defendants reviewed and are relying on to show the weekly out-of-cell time for subclass members show less than a week, sometimes as little as one or two days.  Morris Decl. ¶ 6.

Also, Defendants must do more than simply meet the out-of-cell time requirements.   As discussed above, they must ensure that no one is housed in a location where they cannot contact staff "immediately."  Doc. 4410 at § 22.1.  Defendants have not made any effort to show that they are currently in compliance with this provision.

Defendants must also offer and provide recreation and showers, separately serve three meals a day (two per day on weekends and holidays), escort people to hearings, medical and mental health appointments, and conduct checks to ensure that people housed in the units are present and alive.  They have produced documentation that they are doing some of these things, but, as discussed below, the evidence they provide has significant deficiencies.  Both the hand-filled Out-of-Cell-Time Tracking Forms and the Electronic Offender Management System ("EOMS") in use at Eyman Browning indicate serious problems in reporting.  Even worse, the records strongly suggest that Defendants are failing to comply with the Injunction and are not sufficiently staffed to professionally and safely manage the detention and maximum custody units.

Several of the Out-of-Cell-Time tracking forms suggest that, as was seen during trial, the entries do not accurately reflect what is happening on the housing unit.  For example, the tracking forms from Lewis Bachman reflect lunch being offered separately from breakfast on Saturday, September 2, Sunday, September 3, and Labor Day Monday, September 4. Morris Decl. Ex. 4 at 3-5, 7.[7]  Lunch was purportedly served on these days during the 10:00 a.m. hour, similar to the other days of the week.  *Id*.   Lunch was then crossed out for Saturday and Sunday, though not for Labor Day Monday.  *Id*.  None of the forms for any other unit, including the other units at Lewis, indicate that three separate meals were served on any of these three days.  *See* Morris Decl. ¶ 7; *see also* Morris Decl. Exs. 5-8.  It is nearly impossible to conceive of how these mistakes could have been made if the forms were filled out contemporaneously.  If they were not, that calls into question the accuracy of the forms in their entirety.

---

[7] Pin cites to exhibits herein refer to the ECF page number.

An Out-of-Cell-Time Tracking form from Tucson reflects that a person departed from the Eyman SMU-I detention unit at 14:40 on September 8 and did not return that day, but also reflects that the person refused recreation at 15:15 the same day. Morris Decl. Ex. 9 at 1-2. The offer of recreation and refusal are crossed out. *Id*. Similarly, another form from Tucson shows a person being offered lunch at 12:50 on September 8, but the person had been removed from the unit at 8:30, "before lunch". *Id*. at 3-4. The serving of lunch was crossed out. *Id*. It is difficult to understand how such errors were made if the tracking forms are being filled out as events occur.

Also, the forms reflect that a particular event happens at exactly the same time for each of the sample files – such as meals being served by the same officer to multiple people at the same time. For example, in Lewis Bachman, on September 6, people were served lunch and dinner as follows:

| Cell | Lunch Time | Officer | Dinner Time | Officer |
|------|-----------|---------|------------|---------|
| A12  | 1005      | Berg    | 1710       | Alfaro  |
| B8   | 1005      | Berg    | 1710       | Alfaro  |
| A17  | 1005      | Berg    | 1710       | Alfaro  |
| A02  | 1005      | Berg    | 1710       | Alfaro  |
| A08  | 1005      | Berg    | 1710       | Alfaro  |
| B07  | 1005      | Berg    | 1710       | Alfaro  |

Morris Decl. Ex. 4.[8] The same pattern holds for September 5 (lunch served to everyone at 1055 and dinner served to everyone at 1700), September 7 (lunch served to everyone at 1105 and dinner served to everyone at 1725), September 8 (lunch served to everyone at 1015 and dinner served to everyone at 1715). The same pattern occurs at Lewis Morey. *Id*., Ex. 5. As this is simply not physically possible, these patterns suggest that, at best,

---

[8] The breakfast times are not all legible.

the times shown reflect when serving meals in the unit started or ended, making it impossible to make any determination about whether any individual actually received a meal.

Finally, many of the detention units appear to be offering recreation in a manner intended to discourage people from going to recreation. At Lewis Bachman, Lewis Morey, Lewis Stiner and Winslow, officers make most of the offers of recreation at around 5:00 or 5:30 a.m., and nearly all of these result in refusals.[9] Morris Decl. Ex. 4 at 1, 4-7, Ex. 5 at 1, 3, Exs. 6, 7. Also, at Lewis Bachman, Lewis Morey, Lewis Stiner, and Yuma Dakota, many people in detention are being offered recreation only in a setting where they cannot socialize, in direct violation of § 27.3.1 of the Injunction, which requires that all people in the subclass, other than people in Step 1 in Maximum Custody, have "some ability to socialize with others" during recreation. *Id*. Exs. 4-6, 8 at 1-5.[10]

The EOMS report for Eyman Browning also reveals significant issues. Following the liability trial, the Court found that Defendants were not meeting the industry standard for conducting checks to ensure the safety of people in the isolation subclass twice every hour. Doc. 4335 at 147-48. During these checks, the officer is supposed to look inside each cell and "determine if the prisoner is 'alive' and 'breathing.'" *Id*. at 147. The Court also found that doing checks of a whole pod "to determine the status of each prisoner", including "climb[ing] the stairs to the upper tier", in a minute "would be exceptionally cursory." *Id*. at 148. Plaintiffs' expert Martin Horn testified that it would be impossible to do an adequate check of a pod in one minute and he doubted that it could be done in two minutes. Trial Transcript, Nov. 8, 2021 at 1454:10-16. As explained by the Court in the Injunction, "The lack of adequate staffing resulted in Defendants performing fewer welfare checks on prisoners and the checks actually performed were perfunctory." Doc.

___

[9] Plaintiffs have repeatedly raised the issue of Defendants offering recreation so early in the morning that incarcerated people are likely to be asleep. *See, e.g*., Doc. 3177 at 20 n.16; Doc. 3599 at 9-11. In February 2021, this Court ordered Defendants not to make offers of recreation before 6:00 a.m. Doc. 3861 at 9.

[10] Although Defendants listed numerous requirements of the Injunction with which they claim to be in compliance, they do not address this requirement.

1  4410 at 51.

2       The EOMS report shows that while Defendants often conduct checks every half

3  hour or less, there are many times they do not.  For example:

4       On September 2, 2023, the late afternoon checks for one subclass member were as

5  follows:



10 Morris Decl. Ex. 10 at 2.  Thus, on this day, this person was not checked on for an hour,

11

12 and then subsequently for not checked on for 55 minutes.  The following day, custody

13 officers did not conduct a welfare/security check on this person for over ***2½ hours***:



16 *Id*. at 3.    On September 2, another individual in a different cluster at Eyman Browning

17 went for over an hour, from 12:10 to 13:14, without a check, and then, over the course of

18 the afternoon, had five periods of about 45 or 50 minutes without a check:

1    *Id*. at 4-5.[11]

2         Further, it appears that there is no one checking on people most of the time when

3    they are at recreation.  For most of the entries when a person is at recreation, the Offender

4    Log Report reflects that there was a check made of the empty cell, but that the person was

5    not present, as shown below from entries for September 5 in D (or "Dog") Cluster:

6

| | | | |
|---|---|---|---|
| 07:11:14 | *** To DOG 1 in POD REC | D-03 | 59312 |
| 07:37:29 | * Security Check/Welfare Check-Observed living breathing flesh (D-03) - Not Present - DOG 1 in POD REC | D-03 | 59312 |
| 08:01:15 | * Security Check/Welfare Check-Observed living breathing flesh (D-03) - Not Present - DOG 1 in POD REC | D-03 | 211187 |
| 08:30:06 | * Security Check/Welfare Check-Observed living breathing flesh (D-03) - Not Present - DOG 1 in POD REC | D-03 | 59312 |
| 08:57:06 | * Security Check/Welfare Check-Observed living breathing flesh (D-03) - Not Present - DOG 1 in POD REC | D-03 | 59312 |
| 09:23:53 | * Security Check/Welfare Check-Observed living breathing flesh (D-03) - Not Present - DOG 1 in POD REC | D-03 | 59312 |
| 09:32:21 | * Cleaning Chemicals/Cleaning Supplies accepted | | 177553 |
| 09:52:25 | * Security Check/Welfare Check-Observed living breathing flesh (D-03) - Not Present - DOG 1 in POD REC | D-03 | 59312 |
| 10:21:33 | * Security Check/Welfare Check-Observed living breathing flesh (D-03) - Not Present - DOG 1 in POD REC | D-03 | 59312 |
| 10:50:53 | * Security Check/Welfare Check-Observed living breathing flesh (D-03) - Not Present - DOG 1 in POD REC | D-03 | 59312 |
| 10:52:33 | NS# From DOG 1 in POD REC | D-03 | 59312 |

12   Morris Decl. Ex. 11.[12]  Although there are logs that purport to show early returns from

13   recreation, refusals of recreation and the times people are in transit to and from recreation,

14   there are no logs reflecting that anyone is conducting checks on the people – rather than

15   on the empty cells – during the hours that people are at recreation.  *Id*. ¶ 14.

16         Also, the EOMS reports show that correctional officers continue to conduct

17   "exceptionally cursory" security checks.  For example, early in the morning of September

18   5, each time officers conducted security checks – during which they claim to have

19   "[o]bserved living breathing flesh" of 28 or 29 sleeping people – in three pods in Cluster

20   D, they completed the checks in about 3.5 to 4 minutes.  Morris Decl. ¶ 15, Ex. 12. It

21   appears that the majority of that time was spent going up and down stairs and from pod to

22   pod, with just a couple seconds between the check on people in different cells in on the

23   same tier in the same pod.  *Id*.

24         Another aspect of the EOMS report suggesting Eyman Browning does not have

25

26   _____

27         [11] These are examples only.  The EOMS "Offender Log Report" runs to over 5,000
     pages.  Plaintiffs have only just begun analyzing it.

28         [12] This excerpt of the report also begs the question of how the person "accepted"
     cleaning supplies while they were at recreation.

adequate staff is that people are sometimes spending inordinate amounts of time locked in the shower.[13] One man was left in the shower for *9 hours*, from 18:56:16 on September 3 until 3:59:33 on September 4.  Morris Decl. Ex. 13.  Another person was left in the shower for 8½ hours – from 10:52:51 to 19:24:28 on September 3.  *Id*. Ex. 14. One man was left in the shower for 5 hours on September 2 and 3 hours on September 4.  *Id*. Ex. 15.

     As with recreation, it appears that often no one is checking on the people left in the shower for hours at a time, as many of the entries for the security checks say something along the lines of "* Security Check/Welfare Check-Observed living breathing flesh (C-60) - Not Present - CHARLIE 6 UPPER SHOWER".  *See, e.g., id*. Ex. 13.  There are few entries during most showers indicating that the people were actually checked in the location where they were present, the shower.  *Id*.  For example, the person mentioned above who was locked in the shower for hours at a time twice during the reporting week was not checked on at all for about two hours during each of the multi-hour showers.  *Id*. Ex. 15. And the person who was left in the shower overnight from September 3 to 4 was checked on *just one time*.  *Id*. Ex. 13.

     Defendants' assertion that their purported compliance with the Injunction demonstrates that they have enough staff already is plainly wrong.  Their documentation remains highly suspect, showing clear signs of falsification or non-contemporaneous entries.  Defendants do not even attempt to show that they are complying with all requirements of the Injunction that implicate correctional staffing.  Moreover, the documents suggest that they continue to discourage people from leaving their cells by asking people if they want to go to recreation at 5:00 or 5:30 a.m. and by leaving people locked in the shower for hours at a time, calling into question whether they could get people out to recreation and showers if they were offered and provided in a reasonable

---

[13] Plaintiffs have raised this issue many times over the years.  *See, e.g.*, Docs. 3177 at 21 n.18; 3599 at 11-12.  With the implementation of EOMS, for the first time it is possible to verify this complaint.  Sadly, EOMS shows that people are indeed left locked in the shower for hours at a time.

manner.   And the documentation strongly suggests that the security checks remain "exceptionally cursory," putting people's lives at risk.    Defendants' documents show neither compliance nor adequate staffing.

### III.    The Shift Relief Factor Should Be Further Explained

Defendants ask for clarification on how Mr. Frakes calculated the Shift Relief Factor.  Plaintiffs support this request.

A shift relief factor is "the number of full-time-equivalent (FTE) staff needed to fill a relieved post (one that is covered on a continuous basis) for a single shift." Morris Decl. Ex. 16 at 2.  To calculate the shift relief factor, one must consider the times and days a post must be staffed, whether a post must be staffed at all times, and the "[l]eave and absence patterns of the workforce."  *Id*.  In their objections to Mr. Frakes's proposed staffing analysis, Defendants submit a chart of the number of days off per year of people working at ADCRR.  Doc. 4493 at 5.  Mr. Frakes also submits such a chart, and the numbers are different.  Doc. 4489 at 29.  The differences between the two charts appear to drive the difference in the shift relief factor: Mr. Frakes calculates it as 2.7 and Defendants calculate it as 2.52.  Neither Defendants nor Mr. Frakes indicate how they arrived at the number of absences they provided.   Requiring an explanation from Defendants and Mr. Frakes of their process for determining the number of absences would clarify what the shift relief factor should be.

### IV.    Defendants' Proposed Changes to Mr. Frakes's Proposed Staffing Analysis Are Incomprehensible and Should Be Disregarded.

Defendants have submitted specific concerns about the various posts in Mr. Frakes's proposed staffing analysis.   Doc. 4493-1. Unfortunately, they are largely incomprehensible. Defendants have used an unnecessarily complicated formula, they fail to define a term they use repeatedly, and they include comments that do not correspond to their proposed changes to Mr. Frakes's staffing analysis.  The changes in Doc. 4493-1 should be disregarded.

First, the purpose of a staffing analysis is to determine how many people are

needed on ***each shift***, and then, using the shift relief factor and determinations about when each post must be staffed, extrapolate how many people are needed over the course of a week.   But, for each of the proposed staffing analyses that consider 12-hour shifts, instead of simply considering what is needed for a shift, and then extrapolating out, Defendants have asked the court to consider what is needed for two shifts, divided into four "quadrants", then dividing that by two and extrapolating it out for the week.  Doc. 4493-1 at 2, 4, 6, 8, 10-16, 19.  By doubling and then halving the staff for each shift, the total staff needed on each shift appears larger in Defendants' analysis than it is and obfuscates the differences between their analysis and Mr. Frakes' proposed staffing analysis.

Throughout their comments, Defendants make assertions about staffing "on GY". *See, e.g*., Doc. 4493-1 at 3.  Defendants nowhere define what this means, although they appear to be relying on it for their assessment.

The biggest problem with the proposed changes is that many of the comments do not correspond with the changes they are purporting to explain – or with the lack of changes that they are proposing.

For example, on the proposed staffing analysis for a 1-49 bed detention unit with a functioning control booth, working on 8-hour shifts, Defendants propose precisely the same number of Floor Officers as Mr. Frakes proposes. Doc. 4493-1 at 5.  Yet Defendants make the following comment about this position:

> The amount of floor staff being recommended is excessive based on physical plant/proximity location of detention cell housing unit. The workload or inmate movement that occurrs [sic] in these detention units do not warrant staffing being proposed by Court Monitor.

*Id*.; *see also id*. at 9 (same).   On the following page, on the proposed staffing analysis for a 50-100 bed detention unit with a functioning control booth, working on 12-hour shifts, the only change that Defendants propose to Floor Rover post is a difference in the Shift Relief Factor.[14]   Doc. 4493-1 at 6.  As discussed above in §III, this is a difference

---

[14] They also double the number and then halve it, as discussed above. *See* Doc. 4493-1 at 6.  This does not result in any change to the proposed staffing.

attributable to the difference in the numbers of absences in the workforce between Defendants' calculation and Mr. Frakes's calculation. Thus, the only change Defendants are proposing to Mr. Frakes's proposed staffing of the Floor Rover position has nothing to do with the Floor Rover position. But again, Defendants include a comment that bears no relation to their proposed change:

> [The Floor Rover] position is currently utilized by ADCRR but does not have allocated staffing; the amount of rover coverage varies based on detention size. Typically rovers are in place during the busiest operational periods of detention to ensure that security checks remain uninterrupted even if the detention floor officer are engaged conducting other security functions. The FTE is calculated by total posts (4) x 2.52/2 (to address 4 quadrents [sic])).

*Id.*; *see also id.* at 8 (same).

Whether intentionally or not, Defendants have rendered their post-specific proposed changes unnecessarily abstruse. Neither the Court, nor Plaintiffs, nor Mr. Frakes should be required to wade through them, eliminating gratuitous calculations, guessing at the meaning of terms, and trying to decipher what Defendants' comments actually mean.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court:

1. Accept Mr. Frakes's approach of having staffing levels that are standardized by the size of the housing unit, rather than the specific population on any given day;

2. Reject Defendants' assertion that a month of what they consider to be compliance, but which is actually a demonstration of the many ways in which they are not complying with the Injunction, is sufficient to show that they have adequate staff;

3. Require Mr. Frakes and Defendants to explain how they reached the shift relief factor; and

4. Reject Defendants' confusing and internally inconsistent proposals for changes to Mr. Frakes's proposed staffing analysis and plan.

The purpose of the staffing analysis and plan is to ensure that there are enough staff to manage the subclass safely, professionally and in compliance with the Injunction.  Mr. Frakes's proposed staffing analysis and plan, with the changes proposed by Plaintiffs in their objections, would do just that.

Dated:  October 26, 2023

**ACLU NATIONAL PRISON PROJECT**

By:   s/ Maria V. Morris

David C. Fathi (Wash. 24893)**
Maria V. Morris (D.C. 1697904)*
Eunice Hyunhye Cho (D.C. 1708073)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:     dfathi@aclu.org
               mmorris@aclu.org
               echo@aclu.org

Corene T. Kendrick (Cal. 226642)*
39 Drumm Street
San Francisco, California 94111
Tel: (202) 393-4930
Email:     ckendrick@aclu.org

*Admitted *pro hac vice*
**Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Rita K. Lomio (Cal. 254501)*
Sophie Hart (Cal. 321663)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
               ahardy@prisonlaw.com
               snorman@prisonlaw.com
               rlomio@prisonlaw.com
               sophieh@prisonlaw.com

*Admitted *pro hac vice*

Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:   jkeenan@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By:  s/ Maya Abela
        Asim Dietrich (Bar No. 027927)
        5025 East Washington Street, Suite 202
        Phoenix, Arizona 85034
        Telephone: (602) 274-6287
        Email:   adietrich@azdisabilitylaw.org

        Rose A. Daly-Rooney (Bar No. 015690)
        Maya Abela (Bar No. 027232)
        **ARIZONA CENTER FOR DISABILITY LAW**
        177 North Church Avenue, Suite 800
        Tucson, Arizona 85701
        Telephone: (520) 327-9547
        Email:
          rdalyrooney@azdisabilitylaw.org
          mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on October 26, 2023, I electronically transmitted the above

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to the following CM/ECF registrants:

5

6

Lucy M. Rand
Assistant Arizona Attorneys General
Lucy.Rand@azag.gov

7

8

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Anne M. Orcutt
Eden G. Cohen
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
aorcutt@strucklove.com
ecohen@strucklove.com

9

10

11

12

13

14

15

16

17

*Attorneys for Defendants*

18

*s/ Maria V. Morris*

19

20

21

22

23

24

25

26

27

28