

☒ FILED   ☐ LODGED

**Feb 02 2024**

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

*Jensen v. Thornell*
Monitors' Interim Report to Court
February 1, 2024

## INTRODUCTION             CV-12-00601-PHX-ROS

The following is an interim report to the Court regarding the status of implementation of the Court's Injunctive Order (Doc. 4410).

Due to the time needed for ADCRR to collect the extensive monthly monitoring data ("Quality Indicators"; "QI"), analyze that data, and produce a report for the Monitors, and for the Monitors to analyze that report, draft this report to the Court, vet the report with the Parties, and address any concerns of the Parties, this report is based on the monthly monitoring report for the month of September, 2023. While there is an inherent lag time with regard to reporting QI results, we are able to provide the Court with more up-to-date information about the status of certain programs to reflect progress that ADCRR has made. For this more recent information, we used a cut-off of January 10, 2024.

After completing the first draft of this report, we shared it with both Parties and sought their comments and suggested corrections or edits. Unless otherwise noted, the final report addresses any concerns the Parties shared with us.

In each of the three domains of the Injunctive Order (Subclass, Mental Health, and Medical), one of the topics we address is the status of program implementation. The term "program" is not defined in the Injunction nor do we provide an unambiguous definition here. However, the term serves some value in describing certain requirements of the Injunction that involve more than incremental changes or improvements to the way existing services are delivered, but rather involve a quantum shift to the way a particular aspect of health care is conceptualized and delivered. Admittedly, for some requirements, equally sound arguments could be made for calling them programmatic or just simple isolated changes. Nonetheless, we believe characterizing certain requirements or groups of requirements in the Injunction as "programs" is informative for the purposes of this report. It is important to note, however, that, implementation of a program is not synonymous with compliance with all individual requirements in the Injunction conceptually related to the program. For example, we characterize the several Injunction requirements for interpretation services as a program because they are part of a quantum change in the way ADCRR approaches communication for non-English speakers. ADCRR has taken the "leap" into improving interpretation services, most notably with changes such as implementing a mechanism for identifying the language of choice of individuals upon admission, and reprogramming the EHR such that this information always appears on the screen when interacting with a patient. However, specific requirements related to interpretation services may not yet be compliant. While housing units and clinics inconsistently have written information about available interpretation services posted on their walls, ADCRR is working to remedy this.

In each of the three domains we also address ADCRR's level of compliance with a number of requirements of the Injunction for which ADCRR has begun to self-assess. Where we state that ADCRR is compliant it should be understood that while these are positive achievements, they are limited determinations based on a single month – a "snap shot." Compliance with the Injunction will be evidenced by consistent and sustained compliance.

Finally, the Court Monitors ("Monitors") have developed a Monitoring Guide ("Guide") in collaboration with custody and health care staff at ADCRR and with feedback from Plaintiffs. The Guide serves to provide a uniform structure by which ADCRR can self-assess the degree to which it is satisfying the requirements of the Injunction. The data generated under the Guide also serves as one of the key tools the Monitors will use to assess the same end product for the Court. We also developed the Guide with an eye towards the future when the Court is no longer involved. Because the Guide measures the degree to which conditions in the prison are constitutionally adequate, a status that prison authorities will want to maintain, our hope is that ADCRR can continue to use the Guide when the Court no longer requires it to do so. While the requirements of the Injunction are static, monitoring – by the Monitors for the purposes of this case, or long-term by any healthy prison system for self-assessment – is dynamic. Conditions change, needs change, and measuring challenges arise. Thus, the Guide is a living document that is expected to change to adapt to the changes in the system it measures. As recently as December 2023, Court Monitors have requested changes to the various methodologies for reporting the QI's. Accordingly, the data collected and reported by ADCRR continues to be refined.

In constructing the Guide, we translated each of the actionable requirements of the Injunction into a Quality Indicator ("QI"). A copy of the Guide is attached as Attachment 1. The QIs are subdivided into one-time and ongoing indicators. Though most one-time indicators measure one-time events (e.g., construction of a housing unit or implementation of a policy), the action or change they measure must remain in effect, and so are subject to occasional review. QIs are identified by the paragraph of the Injunction upon which they are based. To enhance the ease of measuring and interpreting the results, the QIs are organized in the Guide based on topic and content rather than numerical order. For ease of data collection and ADCRR's self-auditing, many ostensibly simple requirements of the Injunction were parsed into two or more QIs. Thus, no importance should be given to a "count" of QIs. For example, the larger count of Medical versus Mental Health ("MH") care-related QIs does not mean that Medical care is being monitored more closely than MH care. For each QI related to Medical and MH, ADCRR continues to work with its Contracted Healthcare Provider (CHP; NaphCare) in the development of TechCare reports to accurately capture the requested data. Currently, a portion of the reports have been built and of those, only some are functional. Until all reports are developed and functional, ADCRR collects and reports all data manually.

## SUBCLASS

**1. Staffing**

One of the major underlying reasons for unconstitutional conditions stems from insufficient custody staffing. That need has diminished somewhat since the issuance of the Injunction due to ADCRR's efforts to reduce the number of individuals in the Subclass. As directed by the Court, Mr. Frakes completed a staffing analysis, filed with the Court October 6, 2023 (Doc. 4489). The analysis calls for approximately 500 new positions, but that number is dependent on the number of locations housing members of the Subclass. ADCRR removed all residents from SMU-1 at the beginning of November, freeing up over 280 positions that had been allocated to operate the facility. Both Defendants and Plaintiffs expressed concerns about certain elements of Mr. Frakes' report. Mr. Frakes is meeting jointly with the parties to explore these concerns and seek solutions that are satisfactory to all. He will report the results to the Court with his recommendations for the Court's final order on custody staffing. The parties and Mr. Frakes have agreed, and requested from the Court, that the custody staffing analysis deadline be delayed until April 2024, pending some significant technological enhancements (Doc. 4530).

Until the staffing plan is finalized, ADCRR is required to submit periodic "Correctional Staffing Reports." These reports have shown progress in filling vacant positions, with hiring exceeding turnover in 2023 by nearly 400 custody staff. The agency reports 1193 custody staff vacancies as of the end of October 2023.

QI 1.15 of the Injunction requires ADCRR to ensure that there is a sufficient number of custody staff to support the functioning of the health care operation. As illustrated by the case of Patient 1[1] (see case brief below), Patient 2 for whom no officer was available for Infirmary Rounds on September 19, and Patient 3 for whom no officer was available for Infirmary Rounds on September 22, custody staffing was not yet sufficient to meet this requirement. Staffing levels have continued to improve since September, however, when these events took place; we will be analyzing the effects of those increased level as our monitoring continues.

**2. Status of Program Implementation**

ADCRR has improved living conditions in general. Specifically, ADCRR has reduced the number of people in the Subclass by significantly reducing the number of people classified as MAX custody, greatly slowed the flow of people into MAX custody, and increased data collection significantly (but not flawlessly). Recognizing the horrible conditions in the Flamenco Unit at ASPC Phoenix, ADCRR has made the environment a little more livable and has made a commitment (and taken actions) to close it by June 2024.

A.      The Injunction requires that ADCRR implement a system to facilitate the return to lower levels of custody for those residents who have been in the Subclass for longer than two months.

---

[1] The names of individual patients and residents cited in this report appear in Attachment 2 which is not for public distribution.

The Injunction requires establishing specific positions to support classification processes and the timely movement of Subclass members assigned to less restrictive housing options. The positions have been established and filled. Policy revisions have been completed that capture changes to classification processes and the management of people assigned to MAX custody. ADCRR has not yet created a clear documented system for moving people to lower custody as they exceed 60 days in the Subclass. The 30-day plans, 60-day reviews, and 180-day reviews lack detail, justifications, and descriptions of the pathway to lower custody. An assessment of 180-day classification reviews completed in September and October for people assigned to remain in MAX custody shows a consistent pattern of limited or no justification and no documented plan for getting out of MAX custody. With each passing month the plans, reviews, and supporting documents are showing improvement. ADCRR has just shared draft policy revisions that include a new Restrictive Housing Case Plan that will assist staff with producing the written justifications for retaining people for longer than 60 days, as well as meaningful plans that help subclass members qualify for promotion to less restrictive housing locations.

B.      There has been an increase in communication between classification staff and members of the Subclass. The 60- and 180-day reviews typically reflect direct interaction between the staff and the person under review. Many of the documents used to support ADCRR's policies for maximum custody classification assignment and retention are currently undergoing revisions that will improve the process and required documentation

C.      The classification of residents into MAX custody has slowed significantly, however, there continues to be too many residents remaining in MAX custody and Detention status for longer than 60 days. ADCRR reports that bed space remains an issue that contributes to people remaining in MAX custody or Detention even though they are eligible for lower custody housing.

D.      The Court identified poor record keeping as a major barrier to maintaining constitutionally adequate conditions. To address this, ADCRR retained a communications engineer to conduct an assessment of the requirements to implement a web-based electronic offender management record (EMOS) where needed, and began and evaluated a pilot program of EOMS at the Browning Unit. The results of the pilot were used to develop and issue a Request for Proposals and subsequently select a vendor. The contract was awarded January 1, 2024 (Doc. 4526).

While awaiting full deployment of EOMS, ADCRR was to implement a formal process and tracking protocol to manually accomplish the functions of the EOMS, subject to monthly review by the Warden of each facility. ADCRR implemented the "Out-Of-Cell" tracking form to manually capture all the required data. The data is not yet error-free, but overall the requirement to track and measure the many data points has contributed to better sanitation, pest control, access to recreation, and other out-of-cell activities.

E.      The Injunction requires ADCRR to make a number of functional upgrades to residents' electronic tablets. The translation services are still not functional. We understand that ADCRR is in the process of awarding a contract to correct this. We do not know the expected completion date.

F.      With regard to sanitation, ADCRR was to repair or replace showers, sinks, toilets, and cells that were in disrepair. ADCRR has addressed these issues at all locations currently housing Subclass members, and appears to be current with on-going repair and maintenance needs. SMU-1 would have been the exception, but it was vacated in November and ADCRR has informed us that it has no plans to repopulate it in the foreseeable future.

G.      Documentation, site visits, and interviews show that pest control services are being delivered, but not consistently twice a month at all locations. However, site visits in June, August, and October found no evidence of pest problems at any location. To address inconsistencies, ADCRR has assigned Correctional Officer IVs to more heavily monitor the process, including being present, if available, when the pest control service is provided.

H.      The Injunction requires ADCRR to assign full-time supervisors to each Detention Unit to assure that the requirements of the Injunction are met. All of the Detention Units now have such dedicated supervisors.

**3. Status of Self-Assessment**

ADCRR has provided the Monitors its first self-measurement of ongoing indicators, completed for the month of September. ADCRR endeavored to measure all 58 of the QIs which are subject to measurement now; an additional 5 QIs are not yet due to be measured.

Of the 58 QIs ADCRR endeavored to measure, there was sufficient data collected or provided to the Monitors to be able to determine if ADCRR was compliant or not yet compliant with 48 of the measures (Table 1). For 10 of the measures ADCRR self-assessed, the Monitors were unable to determine the level of compliance due to problems with the way the data was collected or the quality of the resident-level documentation. Mr. Frakes is working with ADCRR staff to remedy these deficiencies of the self-assessment process.

Table 1

| | |
|---|---|
| # of QIs ADCRR is not yet self-assessing | 0 |
| # of QIs ADCRR is endeavoring to self-assess | 58 |

| | |
|---|---|
| # of QIs ADCRR is currently endeavoring to self-assess | 58 |
| # of QIs compliant per Monitors | 18 |
| # of QIs not yet compliant per Monitors | 30 |
| # of QIs Monitors unable to determine compliance | 10 |

**4. Risk of Harm**

Of the 48 QIs for which there is adequate data to make a determination, we have determined that ADCRR is compliant with 18 and not yet compliant with 30 indicators. The following are some examples of on-going risk of harm for the Subclass.

The following individuals were being held in the Subclass for longer than 60 days, inconsistent with QI 19.3:

o   Resident 4 was in MAX Custody for 242 days at the time of data collection. His record lacked clear justification for continuation for this length of time and the description of a pathway to lower custody focused on the on-going recommendation to get him approved for movement to a lower custody setting. (We learned that he was recently promoted to Close Custody.)

o   Resident 5 was in Max Custody for 212 days at the time of data collection. His record lacked clear justification for continuation nor any description of a pathway to lower custody.

o   Resident 6, was in Max Custody for 226 days at the time of data collection. His record lacked any justification for continuation nor any description of a pathway to lower custody.

o   Resident 7 was in MAX Custody for 222 days at the time of data collection. His record contained comments about his case but these comments failed to provide clear justification for continuation for this length of time. (We learned that he was recently promoted to Close Custody.)

Of the 711 out-of-cell sheets of Subclass members reviewed by ADCRR for the month of September, 16 were offered less than two hours of out-of-cell time, inconsistent with QI 19.3. From the records provided, we were unable to determine who the individuals were, the length of time they had been in the Subclass, and any other ill effects this caused.

The revised meal schedule was implemented in July and received generally positive comments from the Subclass members interviewed. The September self-assessment report shows two meals at Bachman CDU exceeded the Injunction requirement for no more than 14 hours between dinner and breakfast, inconsistent with QI 16.1 (but only by 45 minutes). No instances of missed meals were discovered.

## MENTAL HEALTH (MH) CARE

**1. Staffing**

Please see Staffing Subsection within the Medical Care and Issues Jointly Affecting Medical and Mental Health Care section below.

**2. Status of Program Implementation**

A.       The Primary Therapist model is the cornerstone of the safe delivery of many MH services. It includes not only the assignment of a primary therapist to each patient on the MH caseload, but also impacts the frequency of visits and involvement of, and oversight by, supervisors (psychologists) and psychiatrists, in the patient's overall care, commensurate with the patient's severity of disease. Implementation has been on pause pending a TechCare update scheduled to roll out in February 2024.

B.       To improve patient safety, the Injunction required ADCRR to implement a process for custody staff, families, or any other concerned party to refer a patient for mental health assessment and for timely response to the concern by mental health staff. There is no formalized process described in the Mental Health Technical Manual. There are two mechanisms by which friends and family can communicate concerns about the mental health of residents. They can call the Family and Friends Liaison (602 364-3945) or the NaphCare line (800 341-7024). Unfortunately, it is difficult to find these numbers on the ADCRR website. To find the first number, one must choose the "About" tab, navigate to the "Office of the Chief of Staff," and navigate to "Constituent Services" where one finds the statement: "You may contact the Family and Friends Liaison by emailing IFFLiaison@azcorrections.gov, or calling (602) 364-3945 | In-State Toll-Free (866) 333-2039." To find the second number, one must choose the "About" tab, navigate to the "Office of the Director," and navigate to "Health Care Services" where they find the statement: "If you have questions regarding medical, mental health or dental care services concerning an incarcerated individual who is a family member or a friend in one of the facilities listed above, please call (800) 341-7024 or send an email to ADCRRClinicalLiaisons@naphcare.com." Neither navigation is intuitive. The website has a search function, but a test search using the terms "inmate mental health concern" was unhelpful. Of greater concern is that both of these phone lines are only staffed during business hours. ADCRR Health Services staff informed us that family and friends could also contact the Inmate Ombudsman, but when we contacted that office, we were informed that they do not handle such calls. With regard to staff alerting concerns about the mental health of a resident, there is a formal process described in Department Order 1103, paragraph 4.0.

**3. Status of Self-Assessment**

All MH QIs (69) are currently eligible for measurement. In July ADCRR began monitoring 11 QIs, primarily associated with the qualifications and licensing status of personnel. By September they increased to 26 QIs (Table 2), many of which involved qualitative assessment of delivered services. In its feedback on the draft of this report, ADCRR notes that it is actively working on building measurement capability to address the remaining QIs.

Table 2

| Total # of QIs currently eligible for measurement | | 69 |
|---|---|---|
| | # of QIs ADCRR is not yet self-assessing | 43 |
| | # of QIs ADCRR is endeavoring to self-assess | 26 |

| # of QIs ADCRR is currently endeavoring to self-assess | | 26 |
|---|---|---|
| | # of QIs compliant per Monitors | 5 |
| | # of QIs not yet compliant per Monitors | 16 |
| | # of QIs Monitors unable to determine compliance | 5 |

Based on the monitoring results for the month of September, of the 26 QIs, ADCRR staff is collecting the correct data, appropriately analyzing, and producing accurate results for 21 QIs. For the other six QIs (13.2, 1.11, 4.3, 16.1b, 15.4, 16.3.1.1), ADCRR is endeavoring to self-assess them, but those assessments are unreliable because: (a) ADCRR is collecting the correct data, but the analysis process is still being refined; or (b) the data collection process itself is still being refined; or (c) the reporting process is still being refined. For these reasons we could not rely upon ADCRR's self-assessment of compliance. For one of the six (QI 16.3.1.1), we were able to make our own assessment and determined that it was not yet compliant. However, for the other five, due to the shortcomings described above, we could not determine compliance ourselves.

An example of (a) is QI 16.3.1.1 that addresses whether primary therapists assigned to MH-3 patients conduct a comprehensive MH evaluation within a month of arrival in the therapist's facility. ADCRR auditors considered a visit with the therapist as compliant with this requirement even if it did not include the key element of the visit: a comprehensive evaluation. As an example of (b) is QI 15.4 that addresses whether a patient is appropriately seen or referred by their primary therapist following submission of a Health Needs Request (HNR). In auditing this measure ADCRR staff sampled some cases in which there was no underlying HNR and thus should not have been in the sample. An example of (c) is QI 13.2 that assesses the availability of a MH Duty Officer at all times when facility mental health staff are not available. Reporting should include, but has not included, the staffing schedules upon which the auditors relied for their conclusions, so Monitors could not confirm the self-assessment results.

Even among QIs where both ADCRR's self-audit and our examination agreed that, overall, care was not yet compliant, ADCRR's analytic process is still in the process of refinement. For example, for QI 1.1g that examines the clinical appropriateness of care for patients in residential settings, many of the cases reviewed by ADCRR were judged by the ADCRR auditor to be compliant despite the presence of the kinds of deficiencies described below in the cases of Patient 11, and Patient 12. One auditor judged a number of patients as having received care compliant with the requirements of the Injunction despite noting, "Compliant per [Treatment] Plan, but not within standards of [Mental Health Technical Manual]," which suggests that as long as the documentation supports that a woefully inadequate treatment plan has been followed, the care in that case should be considered compliant.

**4. Risk of Harm**

Based on ADCRR's report submitted for the month of September, of the 26 QIs endeavored to measure and for which we could make a determination of compliance, we concluded that ADCRR is compliant with five and not yet compliant with 16 indicators.[2] (Table 2)

Some specific QIs merit discussion.

QI 1.4 requires that telehealth only be used for MH care when clinically appropriate. ADCRR is not yet compliant with this QI. When conducting its evaluation, ADCRR considers a telehealth visit as clinically appropriate if: (a) there is no indication in the EHR that via the patient's statements the patient was unable or unwilling to participate in telehealth appointments; (b) there are no noted observations, current or in the recent past, that the patient has technology-related delusions; and (c) the patient is not in an inpatient setting. If any of these three situations obtained, the visit would certainly not be clinically appropriate. However, because of the nature of mental illness and of clinical encounters for it, the use of telehealth may be clinically inappropriate for more subtle reasons that may not be directly associated with either of the first two reasons above. The inappropriateness may only manifest by patient refusals to engage in the visit without the patient specifying that the barrier was the use of telehealth. Thus, assessing the clinical appropriateness of telehealth may also require a comparison of refusal rates for in-person and telehealth visits as well as an inquiry as to why certain patients are refusing.

QI 1.21 requires all refusals of patient-initiated visits to be made directly to a health care professional by telephone, video, or face-to-face and if a patient will not voluntarily displace, health care staff will go to the patient's location. The reasons for non-compliance included: missing elements from the refusal; lack of any attempt to execute a refusal with a health care professional; and a mismatch between the date of the refused visit according to the refusal documentation and the date of any scheduled appointments.

QI 16.1a requires a psych associate or psychologist to conduct a mental health assessment of each patient within one business day of that patient first entering the ADCRR system. In addition to delays of a single day, several delays were two days or greater, with two patients getting assessed nine days late. An example is Patient 13, a 40-year-old African American male who did not have his assessment until four days after his arrival. He is coded as mental health level MH-3B with history of mood and psychotic symptoms (including active auditory hallucinations), on two medications for the auditory hallucinations and mood elevation.

QI 16.5.2 requires a patient's primary therapist to have a daily face-to-face encounter with all patients in inpatient level of care unless such an encounter would be clinically contraindicated. If the patient participates in the weekly treatment progress meeting described in Section 16.5.3, it

---

[2] There are two additional QIs (16.7 and 16.3.1.3) for which ADCRR most recent assessment was for the month of July; it was not assessed in September. Care was not compliant for those two measures at that time and there is no new information suggesting that that has changed. This information is posted in the chart in Attachment 1, but is not included in the September metrics described here and in Table 2.

may be counted as a daily face-to-face encounter. Almost none of the 50 cases reviewed were in compliance. On average, seven daily encounters were missing for each inpatient for the month. These patients are the most acutely and chronically ill mental health patients in the prison, which is the reason for the daily encounter requirement. The risk of psychiatric decompensation, harm to self and others, and grave disability is highest in this population.

The following case briefs were identified during the audits of a suite of QIs that flow from the foundational QI 1.1 that states: "All health (physical and mental health) care (including but not limited to: emergent; urgent; non-urgent episodic; chronic; palliative; scheduled; inpatient; residential; outpatient; referrals to other on-site professionals; off-site specialty referrals; modifications of specialty referral requests; action taken on post-hospital, post-emergency room, or specialist recommendations), and the documentation supporting that care, delivered to Plaintiffs during a medical encounter (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, a report from a consultant, or other external health record, shall be clinically appropriate, including, where relevant to the circumstance and professional's credential, but not limited to, the conducting of the history and physical examination, forming and testing a differential diagnosis, arriving at a diagnosis, and ordering treatment for that diagnosis." and from QI 1.3 that states "All patients with physical or mental illness that require regular follow-up shall be designated on the medical or mental health caseload and shall be seen in clinically appropriate timeframes."

They demonstrate continued pervasive dangers in the delivery of MH care that relate not only on these QIs, but to others. They show not only that clinical documentation is significantly deficient, but also that the underlying clinic care is deficient in that there is inadequate conceptualization of the patients' mental illness, functional impairment, and suicide risk. In the outpatient setting we found that encounters are often too brief to allow for any meaningful assessment or treatment. In the practice of MH, treatment plans are critically important elements of minimally adequate patient care. The treatment plan is the road map the therapist (and others involved in the patient's care) must follow until the patient's condition changes and it is revised. It must be thoughtful, all-encompassing, contain details about planned interventions, and be patient-specific. Instead, we found outpatient treatment plans that lack measurable goals or objections and contain generic boilerplate language and prescribe non-specific interventions.

Treatment plans in the residential setting (patients who have greater MH needs than those who can be managed in the outpatient setting) suffer from the same deficiencies as those for outpatients. Patients are seen by multiple therapists with resultant loss of continuity, rather than by a single primary therapist. The therapists often simply duplicate the language of previous plans or notes (sometimes word for word). Whereas patients in a residential setting should typically be seen by their therapist at least weekly (with some exceptions such as significantly paranoid or delusional individuals for whom increased contact can be countertherapeutic), patients often go for weeks without being seen with little or no explanation.

o  Patient 14 is a 40-year-old Caucasian male coded as MH3-A. The patient's health record
   contained an inappropriately vague treatment plan to address a history of suicidal ideation
   and a target behavior of "stability." The goals and objectives included "maintaining
   stability" and "develop…organic coping strategies," which are too vague to be useful.
   Absent a single primary therapist, the patient's therapist changed over time. Despite a
   known trauma history, the patient has never had it addressed through treatment, as is
   minimally required. The interventions used to address his history of suicidality were
   insufficient, reduced to asking the patient if he were experiencing suicidal ideation at that
   moment. The patient also has a history of bipolar disorder, acknowledged by the
   therapist. However, none of the interventions provided to the patient were specific to
   treatment of this illness. Given his history of suicidality there should have been, but visits
   were devoid of, a comprehensive assessment of risk, exploration of triggers, or specific
   coping plans. Instead, the interventions were limited to reminding him of how to use the
   HNR system. Overall, care for this patient with a potentially life-threatening condition is
   deficient and poses a significant risk of serious harm.

   Despite the deficiencies in care described above, ADCRR self-assessment judged care
   provided to this patient to be compliant with requirements of the Injunction.

o  Patient 15 is a 41-year-old Caucasian female who was with ADCRR for less than two
   months but has been released. She was listed as SMI (Serious Mental Illness) and carried
   the diagnoses of depression, history of self-harm/suicide, generalized anxiety disorder,
   and substance use disorder. Given her diagnoses, the patient required her current
   treatment providers to arrange for follow-up in the community. However, she was not
   provided any discharge planning services as required under QI 5.1, other than a copy of
   her appointment, instructions to keep the appointment, and an informational community
   resource packet. Care for this patient was clinically inappropriate as it left the patient at
   risk of harm due the failure to provide her community provider with her mental health
   history and care plan and the resultant lack of continuity of care. .

   Despite this deficiency, ADCRR self-assessment judged care provided to this patient to
   be compliant with requirements of the Injunction.

o  Patient 16 is a 30-year-old Caucasian male coded as MH3-D, reflecting recent
   discontinuation of psychotropic medications. He has a history of attempting to take his
   life four times, most recently in 2020. One of the suicide attempts was via an overdose of
   an antipsychotic medication, resulting in a coma. The patient also has a history of
   schizophrenia, schizoaffective disorder, and bipolar disorder for which he was initially
   prescribed antipsychotic, mood stabilizers, antidepressant, and antianxiety medications.
   The patient began refusing antipsychotic medication and presented as hostile and
   irritable. At a visit one month later, the clinician described him as improved, so
   discontinued all his psychotropic medications (which he had been refusing). However,
   the length of the visit (conducted via telehealth) was six minutes. The decision to
   discontinue a patient with such a complicated and serious MH history is a complex
   undertaking and cannot be reasonably and safely accomplished in six minutes.

One month later the patient was again described as having improved, however, the accuracy of such an assessment is doubtful given the very short duration of the encounter (six minutes). Given the complexity and changing nature of this patient's condition, his treatment plan would be expected to change over time. Instead, the treatment plan remained identical from one year to the next. Further the treatment plan should have contained, but failed to contain, specific treatment goals and interventions. It contained only a vague general goal of addressing unspecified psychotic symptoms. Subsequent MH care should have, but due to the lack of an adequate treatment plan, could not have and did not, address any concrete objectives. One treatment objective that sorely needed to be addressed was the patient's non-adherence to medication therapy, other than to acknowledge the patient was declining medications.

In a patient with schizophrenia, schizoaffective disorder, and/or bipolar disorder who has discontinued medications, continuing care by a psychiatric practitioner, or, at a minimum, close coordination of care with the patient's primary therapist who would follow the patient more intensely, is clinically necessary. Instead, care from the psychiatric practitioner was decreased a month after the medications were discontinued, and no close coordination with a therapist was arranged.

Despite the patient's very significant risk of suicidality, only a single progress note mentioned this risk, the patient's treatment plan was devoid of any plan to address it, no MH staff addressed it other than to ask the patient about current ideation, and no comprehensive suicide risk assessment was performed, all of which are significant deficiencies.

Overall, care provided to this patient was clinically inappropriate. The lack of a consistent therapist functioning as the patient's primary therapist, the decrease of contact with a psychiatric provider after discontinuation of medications (based on patient declination rather than clinical judgement), the brief and incomplete encounters, the lack of a meaningful treatment plan, and possibly the inappropriate use of telehealth, put this patient at risk for significant decomposition, placing him at risk of harm including due to suicide.
Despite the deficiencies in care described above, ADCRR self-assessment judged care provided to this patient to be compliant with requirements of the Injunction.

o   Patient 11 is a 44-year-old African American male in a residential treatment unit (MH4) with diagnoses of psychotic disorder. A progress note from the patient's psychiatric practitioner indicated, by checking off boxes on a form, the practitioner provided education regarding the following: disease process, medication compliance, signs/symptoms of worsening illness/complication, medication side effects/risks/benefits, diet/exercise/weight management, treatment goals/risk reduction, and stress/anxiety reduction strategies. This was inadequate for two reasons. First, a check box is insufficient document. For patients with mental illness, the content and delivery of the same core psychoeducational information differs from patient to patient, depending on multiple factors such as their psychiatric diagnoses, personality type, and intellectual functioning. An explanation of what in particular was discussed and why was needed so

that future providers could refer back to, and build on, that information. Second, given that the entire length of the visit was ten minutes (conducted via telehealth), it is unlikely that any of this education could have been meaningfully accomplished.

Another progress note from a psychiatric practitioner indicates that the patient refused an appointment with the practitioner, but documents that a behavioral health technician (BHT) completed a suicide risk assessment at cell-front. BHTs are entry-level unlicensed MH staff members who do not have the training or legal ability to independently assess patients. Thus, assessment of a patient for suicide risk, arguably one of the, if not *the*, most important assessments that MH professionals conduct because errors in these assessments have lethal consequences, should never be conducted by BHTs (and are prohibited by the Injunction). Further, upon learning that a BHT conducted an assessment, the CHP's psychiatric practitioner should have immediately arranged for the patient to receive appropriate assessment and follow-up. Instead, practitioner noted and accepted the assessment without further action, allowing a dangerous event to go unremedied.

Another MH visit was conducted with this patient by a therapist "on rec field outside of peer and staff earshot." The therapist noted that the patient did not engage in the meeting in part because he was "going to chow." The patient's lack of engagement, however, was predictable as the encounter was scheduled during known mealtime. It should not have been. The duration of the encounter was 10 minutes. The therapist documented having provided "psycho-education." Without further elaboration, the documentation is wholly inadequate because it fails to describe the goal, content, and result of the education. The therapist should have, but failed to, indicate when the next appointment be scheduled for. The Plan/Recommendations section of the progress note consisted of only the following: "Good progress on treatment plan goal of managing psychotic symptoms, continue with current treatment plan." This statement is unsupported by the rest of the patient's health record given the lack of documentation of how (if at all) the patient is managing his psychotic symptoms given that he continually refuses encounters, does not take his prescribed medications, and refuses to allow labs to be drawn. Finally, "on the rec field" is not a clinically appropriate venue for a MH encounter.

The care provided to this mentally ill patient (and the documentation of that care) reflects a severe paucity of any meaningful assessment, planning, or treatment. (ADCRR's self-assessment did judge this patient's care as non-compliant with QI 1.1.)

o   Patient 12 is a 37-year-old African American male in a residential treatment unit (MH4). The patient visited with a psychiatric practitioner. The visit lasted eight minutes. During that meeting, the clinician described the patient's mental status as within normal limits. Her progress note indicated that she provided psycho-education regarding the following: disease process, medication compliance, signs/symptoms of worsening illness/complication, medication side effects/risks/benefits, diet/exercise/weight management, treatment goals/risk reduction, and stress/anxiety reduction strategies. At the conclusion of the visit, the practitioner documented that the patient does not have any psychiatric diagnoses ("Primary Diagnosis: No Diagnosis; Secondary Diagnosis: No

Diagnosis; Other Diagnosis: No Diagnosis"). The visit was clinically inadequate for three reasons. First, given that the entire length of the visit was eight minutes, it is unlikely that any of this education could have been meaningfully accomplished. Second, the practitioner's documentation that the patient did not have a MH diagnosis for which she was treating him was erroneous given that practitioner prescribed the patient three psychotropic medications at the conclusion of the visit. Third, the patient had been on suicide watch only a few weeks earlier. Thus it was incumbent on the practitioner to address this, e.g., determine the degree to which the patient was improving, establish whether or not there was continued risk, provide treatment (including therapy or education focused on preventing a recurrence), and designing a plan for continued monitoring and treatment of suicidality going forward. Instead, the patient's suicidal risk was ignored, placing the patient at significant risk of harm. Not surprisingly, that risk manifest as reality four days later when the patient was placed on suicide watch again, a nurse noting that he was "paranoid with disorganized thinking."

Once on suicide watch, the patient's watch level was reduced from constant watch to 10-minute watches the following day and further reduced to a 30-minute watch the day after that with no supporting documentation. As cited earlier, assessment of a patient on suicide watch for suicide risk is arguably one of the, if not *the,* most important assessments that MH professionals conduct because the outcome of these assessments have potentially lethal consequences. The decision to relax the level of observation, as was done in this case, therefore requires a thoughtful, careful, clinically appropriate evaluation in a clinically appropriate therapeutic setting. That did not happen. The two visits that were conducted leading to those relaxations of watch lasted three and 10 minutes, respectively. The therapist who conducted the first visit noted "Writer utilized a strengths-based approach, implemented reflective listening, assessed for safety, and modeled healthy boundaries." The therapist who conducted the second visit noted "Patient educated on CBT techniques of reframing and mindfulness to assist with emotional regulation." It is highly unlikely that a visit of 10-minutes' duration, no less of three-minutes' duration, could accomplish – meaningfully, if at all – the activities the therapists documented.

Both visits were conducted at cell front without any justification documented for the therapist's failure to conduct them in a clinically appropriate therapeutic setting. Cell front is not such a setting, as explained by Dr. Stewart at trial, in large part due to the lack of confidentiality, which can inhibit communication.

The overall clinical impression of the treatment providers was that the patient was not actively suicidal but rather had made suicidal statements in order to affect a housing or room change. Arriving as such an impression requires an assessment of a patient's plan, means, intent, or other static or dynamic risk factor. Absent this database, the true risk cannot be measured. There is no evidence the therapists collected this data.

Overall, failure to conduct their visits confidentially in a clinically appropriate therapeutic setting coupled with wholly inadequate assessments resulting in relaxation of suicide

precautions fell well below the standard of care and place the patient at significant risk of serious harm.

Despite the deficiencies in care described above, ADCRR self-assessment judged care provided to this patient to be compliant with requirements of the Injunction.

o   Patient 17 was a 38 year-old male who died from suicide. The care provided to this patient while on suicide watch was wholly inadequate. Documentation was boilerplate and non-individualized. The patient was not adequately assessed for suicidal risk. He had expressed feelings about wanting to harm himself but was guarded in discussing anything with the MH staff. While on suicide watch MH staff conducted only two to three minute cell-side check-ins each day. He was observed to be in bed, under the covers most of the time and declined to meet in a confidential setting. There was no description anywhere in the notes about what was or might have been going on with the individual; this should have included – at a minimum – review of previous records and collection of collateral information from other sources since the patient was unwilling to engage verbally with the counselor. The patient remained on Watch Status for ten full days with no attempt to meaningfully engage him. On the ninth day of his placement, he was noted to be tearful and asking to be placed back on medications. He was described as being fearful and stated that he didn't know why he was feeling the way he felt and complained that he "just didn't know what to do." The patient should have been, but was not, referred at any point for a psychiatric evaluation. No treatment interventions were offered. Despite the absence of sufficient clinical information to warrant it, his suicide watch was relaxed from every-10-minute watch to every-30-minute watch, which was dangerously infrequent, given the severity of his condition. He died the two days later from suicide, while on suicide watch. The lack of care likely contributed to his death.

This patient died at the end of July. A MH professional documented in mid-September that the patient was refusing to attend group therapy that day. Two other MH staff documented similar refusals of group therapy in mid-October, and a fourth MH staff documented a similar refusal in mid-November, more than four months after the patient's death. Each staff member also documented that the classes Patient 12 was refusing had between 420 and 823 attendees. Not only would a class that large be ineffective, but it is doubtful that there is an educational venue at the prison that can accommodate audiences that large. Thus multiple documentation in the patient's record were untrue, inconsistent with QI 1.1 requiring that documentation of care be clinically appropriate and inconsistent with QI 1.21a requiring that such refusals are made face-to-face.

**MEDICAL CARE AND ISSUES JOINTLY AFFECTING MEDICAL AND MENTAL HEALTH CARE**

**1. Staffing**

The cornerstone of ADCRR's successful fulfillment of the health care-related requirements of the Injunction in this case is adequate staffing: a sufficient number of appropriately qualified and trained employed medical and mental health professionals. Almost every requirement rests on staffing and until ADCRR achieves sufficient staffing it will be unable to provide constitutionally adequate care.

Unfortunately, to date, ADCRR's CHP has been consistently unable to achieve adequate staffing. The global metrics are dismal. On the day the Injunction went into effect, April 7, 2023, NaphCare's staffing level was well below the minimal level required by the Court, i.e., dangerously low, and now, some eight months later, it remains so. In response to the Court's Order of August 31, 2023 (Doc. 4472), ADCRR (and the CHP) provided four monthly reports (September 11, October 1, November 1, December 1) of the status of, and progress towards, bringing staffing to the minimal levels described. Key data from those reports appear in Table 3.

Table 3

| Report Date (2023) | Sept. 11 | Oct. 1 | Nov. 1 | Dec. 1 |
|---|---|---|---|---|
| Minimal staffing required (FTE) | 1205 | 1358 | 1358 | 1431 |
| FTE filled with permanent staff | 744 | 751 | 763 | 805 |
| FTE filled with transient staff | 239 | 261 | 271 | 280 |
| Unfilled FTE | 221 | 346 | 325 | 346 |
| | | | | |
| % of FTE filled with permanent staff (Minimum required = 85%) | 62% | 55% | 56% | 56% |
| % of FTE with no person staffing the shift | 18% | 25% | 24% | 24% |
| | | | | |
| Number of FT/PT FTE hired past month | 99 | 94 | 17 | 61 |
| Number of FT/PT FTE seperated past month | 85 | 98 | 87 | 99 |

The data show that for each of the four past months, the CHP has been unable to provide sufficient permanent staff (set at a minimum of 85%), hovering slightly above half-filled for the past three months. Further, between 217 (18%) and 343 (24%) of front line positions have simply been empty, i.e., no one, permanent or transient, showing up to perform the work.

Despite the large number of positions not filled, or filled with transient workers, the information provided by the CHP in their reports shows insufficient evidence of the CHP taking necessary steps to fill these positions.

There are two key elements of recruiting staff to fill these positions. The first is reaching the target audience. Despite the evidence presented by the CHP indicating that they maximized their efforts to broaden their reach early on, they have still fallen short in their ability to recruit. The

second element thus gains even more importance: salary. For this reason, the Court's August 31st Order attempted to also gain information about the CHP's efforts with regard to salary. Unfortunately, the CHP has not provided evidence of a sufficient effort in this regard. NaphCare explained to the Court that the major difficulty in filling the required positions is the low number of candidates and the competitiveness of the marketplace. For this reason, it is imperative for the CHP to have competitive salaries and to make potential employees aware of those salaries through its advertising. The CHP has been doing so poorly, if at all. First, when the Court asked what salaries the CHP had been posting in its advertising, in the September report, the CHP reported that it had only "recently" begun even posting its salaries, months after the Injunction went into effect. Second, the CHP posted salaries for only four categories of positions (see Table 2), despite the fact that many other categories of positions remain underfilled, including medical and psychiatric physicians and advanced practice providers (nurse practitioners and physician assistants), psych associates, and behavior health technicians, among others. Third, since the September report, the CHP has not posted the salary of any of other underfilled positions. Fourth, despite its failure to fill the required positions in these four categories, four months after posting maximum salaries, it has not increased the salary of three of them, and for the fourth – EMTs – increased the salary by only two dollars and only once. Fifth, not all the maximum advertised salaries reported to the Court are in fact the salaries that the CHP is advertising. For example, the CHP's maximum advertised salary for Registered Nurses is $44 (www.naphcare.com/careers, accessed December 25, 2023), not $50 as reported to the Court, and for Psych Associates is $44, not $50, as reported to the Court.

Table 2

| Report date (2023) | Sept. 11 | Oct. 1 | Nov. 1 | Dec. 1 |
|---|---|---|---|---|
| Maximum hourly salaried offered | | | | |
| RN | $50 | no increase | no increase | no increase |
| LPN | $36 | no increase | no increase | no increase |
| EMT | $25 | $27 | no increase | no increase |
| Psych Associate | $50 | no increase | no increase | no increase |

Recognizing that even the staffing requirements set forth in its Injunction may not be sufficient to meet the needs of patients to ensure constitutionally adequate health care, the Court directed an expert, Ms. Donna Strugar-Fritsch, to complete a staffing analysis and plan for medical and MH positions by October 6, 2023. The validity and usefulness of any such plan is heavily dependent on drawing data from observations of current operations to the extent that the current model of operations is similar to model for which the plan is designed. For this reason, the staffing analysis and plan was delayed in anticipation of ADCRR piloting the primary care model of care ordered by the Court. Even though the primary care model has not yet been fully implemented, Ms. Strugar-Fritsch did not think further delay was justified and is moving forward developing a staff plan as best she can. The report is expected to be completed in early January 2024. However, that plan will likely need to be modified as the new model of care is implemented.

**2. Status of Program Implementation**

A.      Through a number of provisions, the Injunction lays out a primary care model in which patients are assigned to a physician or nurse practitioner based on the complexity and severity of their health problems. The clinician serves as the patient's primary care provider (PCP), providing, or occasionally directing other staff in the provision of, non-urgent episodic care and chronic care. Among other changes, this model shifts primary responsibility for treating non-urgent episodic problems from nurses to practitioners. ADCRR has partially implemented the care model at two locations (Lewis Rast Max Custody and Phoenix Aspen). A pilot project was initiated at Perryville, but cut back and a pilot is planned to begin soon at the entire ASPC Douglas complex. Otherwise, nurses are still the main providers of non-urgent episodic care, some complex patients are still cared for by nurse practitioners, and much care of patients by practitioners is fragmented and uncoordinated among multiple practitioners.

B.      ADCRR has made significant progress implementing a treatment program for opioid use disorder (OUD), highlighted by the hiring of a program coordinator and centrally (virtual) located prescribers.

ADCRR was required to offer treatment (counseling and medications for OUD [MOUD]) to all patients with OUD, phasing in three complexes every six months, with the first three on line by October 7, 2023 and the final three on line by October 7, 2024. ADCRR discovered that this method of implementation was not practical (or safe) for patient care because when patients are moved from a complex with the program to a complex without the program, treatment could not easily be continued. They appropriately shifted their plan such that the program has already been implemented at all nine facilities, but with partial implementation at each. As of January 10, 2024, staff have initiated treatment on 3,419 patients. In our opinion, this pace of initiation is consistent with the pace intended by the Injunction. Some aspects of the initiation program are started but not yet fully developed, such as establishing relationships with community providers to ensure that care that is started in the prison is able to be continued upon release without interruption, establishing relationships with community housing facilities that allow individuals to be taking MOUD, and hiring nurses to accommodate the longer time required for medication administration lines. To this end, ADCRR is developing a dashboard to help manage these patients as well to monitor the degree to which they are successful at arranging community follow-up care.

As of April 7, 2023, ADCRR was required to implement a process whereby all newly admitted patients are screened for OUD. This part of the program has been implemented. If an arriving patient is discovered to currently be taking MOUD, they are supposed to have their treatment continued without interruption. This part of the program has also been largely established. Another element that is not fully established relates to the provision of methadone, one of the three MOUD medications. Federal law places restrictions on prisons' staff's ability to prescribe it. ADCRR is navigating those restrictions by trying to establish federally licensed Opioid Treatment Programs (OTP), which is a complex but laudable undertaking. License applications for OTPs at ASPCs Perryville and Tucson have been approved, and the application process is

underway for ASPC Phoenix. Pending approval of these licenses, if a patient arrives who is currently on methadone, staff are discontinuing (by tapering) their medication, with the exception of pregnant women.

As of June 7, 2023, ADCRR was required to implement a program whereby any patient with an imminent risk of opioid overdose would be offered MOUD. This program has been largely implemented. It is fully implemented for individuals who are newly arriving and for those who experience an overdose from now on. The element that is not yet established relates to individuals who experienced an overdose prior to one or two months ago.

C.      ADCRR has made significant progress implementing a treatment program for hepatitis C. The CHP is in the process of hiring additional practitioners to facilitate that care. As of October, 2023, ADCRR was required to begin treatment each month for a number of patients equal to 110 plus 70% of the number of newly admitted patients the previous month. This program is underway with 1,078 patients having begun treatment between October 1, 2023 and January 10, 2024. ADCRR's status on additional specific one-time and ongoing aspects of the hepatitis C program are captured in Attachment 1 (One-time QIs 11.1.3 and 11.1.5; Ongoing QIs 11.1.5a, 11.1.5b, and 11.1.6).

D.      As of April 7, 2023, ADCRR was required to modify the way it handles patient refusals of provider-initiated visits and medications. No changes to ADCRR or CHP policy have yet been made but policy revisions are underway.

E.      As of April 7, 2023, ADCRR was required to implement specified programs that detect and/or prevent patient care errors such as implementing changes to current policy and practice regarding near-miss reporting, preventable adverse event reporting, and a Continuous Quality Improvement program. No changes to ADCRR or CHP policy have yet been made but policy revisions are underway.

F.      As of April 7, 2023, ADCRR was required to implement improvements to interpretation services for non-English speakers, including assessing English fluency upon arrival, making the patient's language of choice visible on all screens of the electronic health record, and establishing a system for verifying the non-English fluency of CHP staff who wish to interpret without the use of a language translation service. The systems underlying these improvements have been implemented, with the exception of the latter change. However, the need for that change is moot because the CHP elected to require all staff to use a language translation service, regardless of their level of knowledge of a non-English language. ADCRR's status on specific one-time and ongoing aspects of the interpretation C program are captured in Attachment 1 (One-time QIs 3.1, 3.2; Ongoing QIs 3.1a, 3.1b, 3.3, 3.6, and 3.5).

G.      As of February 2024, ADCRR was required to markedly increase the bed space available for individuals with special needs (individuals requiring assistance with activities of daily living, or who have mobility or memory issues that preclude their placement in the general population)

along with appropriate staffing and equipment. ADCRR is ahead of schedule, already having created space for 100 patients, and transferring 68 patients to those beds.

### 3. Status of Self-Assessment

115 Medical QIs are currently eligible for measurement. In July ADCRR began monitoring 11 QIs. By September they increased to 28 QIs (Table 4), many of which involved qualitative assessment of delivered services.

Table 4

| Total # of QIs currently eligible for measurement | | 115 |
|---|---|---|
| | # of QIs ADCRR is not yet self-assessing | 87 |
| | # of QIs ADCRR is endeavoring to self-assess | 28 |

| # of QIs ADCRR is currently endeavoring to self-assess | | 28 |
|---|---|---|
| | # of QIs compliant per Monitors | 0 |
| | # of QIs not yet compliant per Monitors | 28 |
| | # of QIs Monitors unable to determine compliance | 0 |

Describing the quality of ADCRR's self-assessment of the Medical and joint Medical and MH QIs is more difficult than the corresponding description for MH QIs due to the differences in the nature of the two disciplines and therefore their QIs. Similar to MH, there are some QIs for which (a) ADCRR is collecting the correct data, but the analysis process is still being refined; or (b) the data collection process itself is still being refined. Unlike MH, for most of the QIs for which there were problems with data collection and/or analysis, the Monitors were still able to make an assessment regarding compliance. In most of these QIs we were able to do so for one of two reasons. One reason is that the error in data collection was not that ADCRR collected the wrong sample cases, but collected an incomplete sample. However, even the incomplete sample demonstrated that ADCRR was not yet compliant with the requirement. QIs 1.6, 1.7, 1.8a-d, 3.5, 3.6, 8.1, and 9.2 are examples of this. These QIs call for assessing all clinical areas, emergency bags, and/or housing units; however, only one unit/clinical area per complex was assessed. The other reason is that the policy or procedure underlying the QI had not yet been implemented, not only making measurement impossible, but also meaning that ADCRR could not possibly yet be in compliance with the QI. QI 10.3 is an example that fell into this category. This QI measures compliance with a policy that sets limits on the number of times a patient can refuse a medication over a period of time, tailored to specific medications or medication categories, and incorporating those limits into the medication administration software such that nurses receive automated alerts when those limits are reached.

We found numerous examples where the analysis process still needs to be refined. These examples were all found within the suite of QIs that flow from the foundational QI 1.1 that states: "All health (physical and mental health) care (including but not limited to: emergent; urgent; non-urgent episodic; chronic; palliative; scheduled; inpatient; residential; outpatient; referrals to other on-site professionals; off-site specialty referrals; modifications of specialty

referral requests; action taken on post-hospital, post-emergency room, or specialist recommendations), and the documentation supporting that care, delivered to Plaintiffs during a medical encounter (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, a report from a consultant, or other external health record, shall be clinically appropriate, including, where relevant to the circumstance and professional's credential, but not limited to, the conducting of the history and physical examination, forming and testing a differential diagnosis, arriving at a diagnosis, and ordering treatment for that diagnosis."

The following case brief is one such example. This case was examined as part of QI 1.1e that focuses on care provided in the infirmary setting to determine whether it was clinically appropriate. Despite the fact that the care provided to this patient in the infirmary was dangerous, ADCRR's self-assessment judged the care as clinically appropriate. In addition, as with many similar cases we reviewed, the self-assessment failed to identify that the care delivered also demonstrated serious errors in care that related to other QIs beyond the one that for which the case was sampled. Other examples of dangerous care being judged as adequate as part of self-assessment appear in some of the case briefs in the next section.

- o Patient 1 is a 42 year-old male with a history of a previous heart attack, congestive heart failure, cardiomyopathy, a cardiac dysrhythmia requiring an implanted pacemaker, cirrhosis of the liver due to hepatitis C, high cholesterol, OUD, and enlarged prostate, who was admitted to ADCRR in August 2023. About three weeks later he was placed in protective custody. The following day a nurse practitioner conducted a chronic care visit at cell front due to lack of an available custody officer to transport him to the clinic, inconsistent with QI 1.15 requiring a sufficient number of custody staff to support the functioning of the health care operation, including transporting patients to on-site encounters and appointments, and QI 1.7 requiring clinical encounters to take place in a confidential setting. Given the complexity of this patient's chronic conditions, he should have been receiving his chronic care from a physician. Instead, care was provided by a nurse practitioner. The nurse practitioner failed to conduct an adequate examination. For example, this was the patient's first visit for care of his congestive heart failure, a serious medical condition with a high risk of death, especially if mismanaged. It was thus imperative for the practitioner to obtain a thorough history of the current status of symptoms related to his heart and conduct a thorough examination of his heart, lungs, legs, and abdomen. The practitioner did none of this. Admittedly it would have been difficult, if not improper to attempt to do some of these things at cell front. However, the practitioner should have scheduled a repeat visit in the following days. Instead, she scheduled him for a routine repeat visit in a quarter of a year. Thus the care was dangerous and inconsistent with QI 6.2 requiring that the patient be cared for by a physician, and QI 1.1d requiring care delivered for chronic medical conditions to be clinically appropriate.

  The next day the patient developed acute chest pain. He received appropriate initial care at the prison and was sent to the hospital. In the hospital he was found to have a large accumulation of blood around his brain (subdural hematoma) which was removed. Due to

pain, they recommended the patient be administered oxycodone, a strong narcotic, for 10 days for pain. Upon return to ADCRR and admission to the infirmary, however, the recommendations from the hospital physicians were ignored, instead Tylenol #3 with codeine, a much weaker analgesic, was prescribed. This is inconsistent with QI 1.1g requiring CHP practitioners to follow the hospital recommendations absent a clinical justification, which, in this case, there was not.

Finally, because the patient had bleeding in his brain followed by surgery on his brain, it was imperative that the infirmary conduct a careful detailed neurologic examination to establish the patient's baseline brain functioning and order nurses to assess the patient's neurologic status on a regular basis in the infirmary to detect any changes to that baseline. Instead, neither were done.

Despite the deficiencies in care described above, ADCRR self-assessment judged care provided to this patient to be compliant with requirements of the Injunction.

## 4. Risk of Harm

Based on ADCRR's report submitted for the month of September, of the 28 QIs ADCRR endeavored to measure, we concluded that it is not yet compliant with 28.

Some specific QIs merit discussion.

QI 1.6 requires that there be sufficient space, equipment, and supplies to deliver medical care services appropriate to the location. Closely related, QI 1.7 requires in part that there be auditory and visual confidentiality during medical encounters. There were deficiencies found in several of the nine complexes facilities related to both QIs. At Phoenix, if the practitioner is using the exam room, nurses sometimes see patients at the computer workstations in a public traffic area. QI 3.5 requires that equipment used for interpretation allows for confidentiality. At one unit of ASPC Phoenix such equipment is not available and therefore when the nurse uses the speaker phone they can be heard by multiple people, breaching patient confidentiality.

QI 1.8a requires that emergency response equipment contain all items required by policy, that all equipment be in working order, and that all medications be unexpired. At ASPC Lewis the emergency response bag was missing medications and equipment. At ASPCs Safford and Winslow amount of oxygen remaining in the oxygen tanks carried to emergencies was below the acceptable level (below the "green" zone). QI 1.8d requires that naloxone (Narcan®), the medication used to treat an opioid overdose, is kept on every living unit or with every AED. Naloxone was missing in one housing unit at ASPCs Douglas and Phoenix. In an emergency, running out of oxygen or not having medications when they are critically needed could result in death.

QI 8.1 requires that all specialty referrals shall be completed within the ordered timeframe, notwithstanding any time required for processing, reviewing, or consideration of alternative treatment plans. Specialty referrals are made when the complexity of a patient's case exceeds the capabilities of the staff or equipment at ADCRR, thus are of key importance for patient safety. Though non-compliance with the requirements of the Injunction is not based on the number or percentage of patient cases that do not meet the requirement, at times metrics can be informative. There were 2,455 referrals scheduled to be completed in the month of September. 454 of these referrals were of an urgent nature (to be completed within 30 days of the request). Of these 454, 205 were completed on time and 249 were not, i.e., more referrals were delayed than were completed on time. Of the 249 urgent referrals that had not been completed on time, 179 had not been completed at the end of the data collection period, so the length of the delay is unknown.

The metrics for QI 10.1 ("Prescribed medications intended for [administration by a nurse]shall be administered as ordered or there shall be documentation of a valid reason for non-administration.") are equally informative. Of the 50 random cases sampled, in almost half (23), staff failed to administer a medication on time, or at all. While failure to provide a few of the medications (e.g., Tylenol®) was not life-threatening, that is not always the case:

o   Patient 18 is a 75 year-old male with a history of heart disease who, at the time of hospitalization for chest pain, had already had nine blockages of arteries in his heart repaired (insertion of stent). During the hospitalization he was diagnosed with a heart attack and had three additional blockages repaired (insertion of stent). Upon discharge, hospital physicians recommended that he continue to receive a blood thinner (clopidogrel) to keep the repaired arteries open to prevent a heart attack. Although ordered upon his return, NaphCare staff failed to provide it to him for two days. On the third day he had chest pain and was sent back to the hospital where he was diagnosed with a heart attack and had to have two newly blocked arteries repaired. It is critically important to continue blood thinners, like clopidogrel, without interruption. After a stent is placed, thinning of the blood is essential to prevent the blood from clotting in the newly placed stent and causing a massive heart attack and potentially death. It is likely that the medication gap of two days played a role in the new heart attack.

The following case briefs document deficiencies in care resulting in significant risk of harm, related to one or multiple QIs.

o   Patient 19 was a 44-year old male at ASCP Tucson with a history of end stage liver disease (ESLD). He was sent to the hospital to remove fluid from his abdomen (ascites), a procedure done periodically on patients with ESLD if the fluid cannot be controlled with medications. Three days later, at four o'clock in the morning, he began exhibiting a change in mental status (bizarre behavior). A nurse reported that "the patient appears to be intoxicated" but the patient "denies having taken any substance." The nurse conducted no other evaluation such as confirming the presence of alcohol using a breathalyzer. Patients with ESLD are at high risk of changes in mental status due to worsening of the

liver's inability to eliminate natural toxins (hepatic encephalopathy) or due to infection. Both complications are serious and sometimes life-threatening. Therefore changes in mental status in a patient with ESLD require immediate evaluation for these complications. However, instead of ordering such an evaluation, a nurse practitioner assumed the patient was intoxicated based on the cursory observation by the nurse, and ordered the patient to be returned to his housing unit to "sober up." Custody staff placed him in a dry cell. In the morning the patient was noted on camera to fall off the toilet and hit his face. While preparations were being made to send him to the hospital for suturing, he lost consciousness. Upon arrival at the hospital he was found to have evidence of serious infection, severe anemia, severe inability for the blood to clot, and multi-organ system failure. Due to the severity of his condition, after consultation with his family, the decision was made to provide comfort care only. The patient died. The care the patient received at ADCRR was dangerous and not consistent with QI 1.1b requiring urgent care to be clinically appropriate. Though ESLD ultimately leads to death in the absence of a liver transplant, appropriate care may have prevented the patient's death at this point in his disease.

o   Patient 20 is a 72 year-old male at ASPC Pheonix who was seen in clinic by a physician for a scheduled visit to manage his chronic conditions, which include hypertension (high blood pressure), diabetes, dementia due to damage to the blood vessels of the brain, and stroke. At the time of his visit his blood pressure was elevated (137/91 normal less than 140/80). During the visit the physician needed to evaluate the status of the patient's chronic conditions and describe a plan of care, including addressing the patient's elevated blood pressure. The physician failed to do any of these tasks, including failing to note and remedy that no laboratory results had been obtained for almost one and a half years, inconsistent with QI 1.1d requiring that patients receive clinically appropriate chronic care.

Also, the patient's language for communication is Spanish, however, there is no evidence that any interactions with the patient were conducted in Spanish with the use of an interpreter, inconsistent with QI 3.1a requiring care to be delivered in the language in which the patient is fluent.

o   Patient 21 is a 69 year-old male seen for acute chest pain. CHP staff attempted to obtain an electrocardiogram (EKG) but found that the machine was broken and not working, inconsistent with QI 1.6 that requires that there be sufficient equipment on hand to deliver medical care. A NaphCare nurse contacted the practitioner on call (StatCare) who appropriately ordered the patient be sent to the emergency room by ambulance. While awaiting the arrival of the ambulance, the clinical presumption for such a patient should be that the patient is having a heart attack. Therefore NaphCare staff should have provided emergency care in the interim, e.g., chewing of a baby aspirin, administration of nitroglycerin, placement of an intravenous catheter. However, there was no on-site care ordered by the StatCare provider, by an on-site provider, or provided by nurses under

emergency nursing protocols. This lack of care increased the chances of a heart attack progressing or becoming fatal. The care was inconsistent with QI 1.1b requiring timely care for urgent medical needs.

Despite the deficiencies in care described above, ADCRR self-assessment judged care provided to this patient to be compliant with requirements of the Injunction.

o   Patient 22 is a 62 year-old male with a history of diabetes, heart attack, advanced hepatitis C (cirrhosis), *internal bleeding (from rectal and esophageal varices, complications of cirrhosis)*, *peptic ulcer disease*, and *colon cancer treated with chemotherapy and radiation*. The italicized diagnoses should have appeared on the patient's Problem List in his medical record, but they did not; they only appear within the hospital record from a previous hospitalization, inconsistent with QI 4.3 requiring the patient's Problem List to be complete. The patient was seen by on-site practitioner for a complaint of vomiting blood. The practitioner, was not aware of the patient's established diagnosis of internal bleeding from esophageal varices (a potentially life-threatening condition typically manifested by vomiting of blood) because it was missing from the patient's Problem List. As result, the practitioner informed the patient that he did not have any medical problems and certainly did not aggressively address the vomiting of blood, placing the patient at significant risk of harm, and inconsistent with QI 1.1 requiring urgent care to be clinically appropriate. Further, the patient refused a referral to a gastroenterology specialist, a physician who could further investigate the esophageal varices. The practitioner could not have counseled the patient to obtain the patient's informed refusal, which was required in such a situation, because the practitioner did not have the requisite knowledge – the history of esophageal varices – to accurately inform the patient of the risks of refusing to visit with the specialist. Thus, in summary, due to missing diagnoses in the patient's Problem List, most notably a history of varices of the esophagus that put the patient at high risk of a spontaneous, often fatal, bleeding internally, a practitioner could not possibly counsel the patient on the risks of refusing to see a specialist to address treatment for this condition when the patient reported vomiting blood which is a symptom of this condition. As a result, the patient did not make an informed refusal, and may have put his health in jeopardy due to the actions of the uniformed practitioner.
Despite the deficiencies in care described above, ADCRR self-assessment judged care provided to this patient to be compliant with requirements of the Injunction.

Unrelated to the previous condition, during a visit with a psychiatric practitioner, the practitioner doubled the dose of one of the patient's medications, prazosin, from two to four milligrams due to ongoing nightmares. Instead of administering the patient the prescribed dose, they administered prazosin at a higher dose: five milligrams. Prazosin is not only a psychotropic medication, but is also used to control high blood pressure. Thus, administration of a higher dose than ordered (which was already twice the previous dose),

placed the patient at risk of dangerously low blood pressure, inconsistent with QI 10.1 requiring that all prescribed medications are administered as ordered.

o   Patient 23 is a 34 year-old male with diabetes who injured his left ankle playing basketball. He sent an HNR about this issue. He was seen by a nurse six days later. However, this visit was due to a housing unit transfer and it does not appear the nurse was aware of the injury, so did not address it (other than documenting, as part of the routine transfer screening, that the patient ambulates with erect posture, steady gait unassisted). A nurse finally saw him for the injury 15 days later. Acting beyond his legal scope of practice, the nurse ordered an x-ray. Further, despite the patient informing the nurse that he had injured his left ankle, the nurse ordered an x-ray of the wrong body part (right foot and toes). During the x-ray encounter, the patient informed the technician that they were taking an x-ray of the wrong body part, but was ignored. The following day he was seen again for the third time by an RN, informing the RN that his ankle hurt "super bad" and that it was hard to walk. The nurse noted that the patient had a slight limp and that his left ankle was swollen with limited range of motion, but failed to conduct a full examination of the ankle. The nurse also noted that the patient's x-ray was normal, but failed to note that it was, in fact, an x-ray of the wrong body part. Other than noting that the patient was already taking anti-inflammatory medications for the swelling, the nurse took no other action. Six days later, now more than three weeks after the injury, a fourth nurse saw the patient, ordered an x-ray of the correct body part which revealed a displaced fracture of the ankle (distal tibia) resulting in what is called  an "unstable ankle joint". He was immediately taken to the hospital where he subsequently underwent two surgeries and insertion of metal hardware. At the time of review, well after his return from the hospital, the patient's Problem List in his health record carried the erroneous diagnosis of "Unspecified fracture of right toe(s)." This patient's case shows several errors in care. The patient should have been seen by a practitioner for his injury, but instead was seen for it three times by a nurse, inconsistent with QI 7.4.7 requiring the involvement of the patient's primary care provider. The patient should have had his ankle fracture properly addressed immediately. The delay of more than three weeks, during which time the patient was forced to ambulate on a fractured ankle, not only would have caused pain for an unnecessary length of time and caused additional trauma to the ankle structure, but delays make it more difficult to perform the surgery and increase the chances of residual long-term dysfunction, all inconsistent with QI 1.1b requiring timely care for urgent medical needs. The failure of the nurse to order an x-ray of the correct body part and the failure of the x-ray technician to listen to the patient when so informed added to the time delay.

o   Patient 24 is a 61-year old male with a history of asthma, seizure disorder, heart disease, high cholesterol, hypertension and congestive heart failure. He had a chronic care visit via telehealth during which the patient reported occasional shortness of breath, nausea, and bilateral lower extremity swelling (edema) for five weeks. All of these symptoms are consistent with worsening of the patient's congestive heart failure and required direct

examination of the patient's heart, lungs, liver, neck veins, and legs to confirm this diagnosis, or, find an alternative explanation for the symptoms. However, due to the fact that the visit was conducted via telehealth, the required examinations could not be done, inconsistent with QI 1.4 requiring that telehealth only be used when clinically appropriate. The patient was seen by a different physician, on-site, eight days later. The physician noted that the patient had swelling of both legs (mild pitting edema). For the reasons explained above, the physician should have examined more than the patient's legs. The physician did not. The physician simply ordered new shoes and an increase in pain medication. Thus, the physician failed to investigate the patient's significant symptoms, all suggestive of worsening of congestive heart failure. If the patient had worsening of congestive heart failure, failure to treat it increases the risk of sudden death. The chronic care this patient received was dangerous and inconsistent with QI 1.1d requiring that patients receive clinically appropriate chronic care.

Despite the deficiencies in care described above, ADCRR self-assessment judged care provided to this patient to be compliant with requirements of the Injunction.

o   Patient 25, a 52 year-old male with a history of seizure disorder, hypothyroidism, heart failure, and hypertension, had a chronic care visit via telehealth. Despite the need to obtain a thorough history and examination to assess the status of the patient's chronic conditions including review of laboratory results, any significant events since the last visit, and any new complaints, the clinician obtained no history at all and conducted no physical exam (as this was a telehealth visit), other than obtaining vital signs, and assessing "normal general appearance" and "normal mental status." This visit was dangerous, inconsistent with QI 1.1d requiring clinically adequate chronic care, and QI 1.4 requiring that telehealth only be used when clinically appropriate. Primary care, including chronic care visits, for most patients with chronic diseases cannot be accomplished by a primary care provider via telehealth due to the need for physical examination.

o   Patient 26 is a 35 year-old female with a history of several medical problems including high blood pressure, coronary artery disease, high cholesterol, and diabetes. She was seen for a chronic care visit for these conditions. The purpose of a chronic care visit is to assess the status of the patient's chronic conditions including review of laboratory results, any significant events since the last visit, and any new complaints. For this patient, assessing the chronic conditions required, among other tasks, asking the patient about symptoms that could indicate worsening of her heart disease or diabetes, such as chest pain, shortness of breath, vision changes, and headache, and assessing the status of the patient's diabetes control, blood pressure trends, and any needs for medication adjustment in light of the patient's above normal blood pressure. The clinician did none of this. Instead, the history taken during the chronic care visit solely addressed the patient's complaint of foot pain. The clinician did perform a test of the condition of the patient's nerve sensitivity (monofilament test), important to conduct in patients with diabetes as an indicator of nerve damage and as tool used to help prevent amputations. However, despite the fact that the test result was abnormal, the clinician failed to

document the nature of the abnormality (which must be done so the results can be compared to past and future tests to assess trends).

Review of previous laboratory results and significant events since the last visit was required because there were several that required attention. The patient's last blood test for diabetes was above normal; the patient had experienced a diabetes-related event manifest by symptoms of shakiness, recently requiring a nurse to deploy a hypoglycemia protocol, and during which the patient's blood sugar was dangerously elevated; and a recent blood test showed the patient was newly anemic. Each of these findings required analysis and attention. Instead the clinician merely ordered repeat blood tests five months in the future and a routine return visit in three months.

In summary, despite evidence of poor control of at least two of the patient's chronic conditions (diabetes and high blood pressure) and a new condition (anemia), little care was provided during this chronic care visit, putting the patient at risk for the long-term irreversible morbidity and death associated with these conditions and inconsistent with QI 1.1d requiring clinically adequate chronic care.

In addition to these problems, the patient's Problem List was in disarray. QI 4.3 requires a patient's Problem List to be accurate, complete, and easily usable, with resolved or historical conditions or diagnoses separated from current conditions and the date of onset or resolution of resolved or historical conditions or diagnoses recorded, if known. This patient's problem list has 32 entries in no particular order. Of these, 11 are not diagnoses at all, but rather instructions to custody staff about permissions (e.g., extra pillow, extra blanket, meals in living unit). Of the actual diagnoses listed, some are missing essential specificity (e.g., "Unspecified Injury Of Right Wrist, Hand And Finger(S), Initial Encounter," "Heart Disease, Unspecified"). One is incorrect, stating the patient is anticoagulated (receiving medications to thin the blood). Finally, the Problem List indicates the patient suffers from both Type I and Type II diabetes. Not only is this scientifically impossible, but it is critically important for users of the patient's medical record to know if the patient has Type I or Type II.

Despite the deficiencies in care described above, ADCRR self-assessment judged care provided to this patient to be compliant with requirements of the Injunction.

o  Patient 27 is a 46 year-old male with a history of high blood pressure and high cholesterol seen for a chronic care visit. The patient had a high blood potassium level obtained two weeks prior to the visit. This is one of the most worrisome short-term complications of blood pressure management and is due to a known side effect of one of the medications used to treat his high blood pressure. It can lead to sudden death. The practitioner did not address it, inconsistent with QI 1.1d requiring clinically adequate chronic care.

Despite the deficiencies in care described above, ADCRR self-assessment judged care provided to this patient to be compliant with requirements of the Injunction.

o   Patient 28 is a 27 year-old female who had right knee replacement surgery. She was admitted to the infirmary the day after surgery with surgical orders to start physical therapy within two to three days post-surgery at a cadence of twice a week for four to six weeks. NaphCare did not start physical therapy until 24 days post-surgery and it was only approved for two weeks, inconsistent with QI 1.1f requiring appropriate specialty referrals. Lack of proper physical therapy after knee replacement can lead to long-term poor mobility and lifetime restricted movement and contractures of the affected limb.

## SUMMARY

Eight months after issuance of the Court's Injunctive Order, ADCRR has not yet made sufficient improvements to conditions of confinement for the Subclass and the adequacy and safety of health care for the Class. It has not been sitting idly, however. Under the leadership of the new Director, many improvements have been made for the Subclass. ADCRR has markedly reduced the size of the Subclass which, coupled with increased hiring, has improved the staff-to-resident ratio. Contracts to improve the physical plant, security monitoring system, and record keeping system are underway. ADCRR's system for self-assessment of the Subclass component of the Injunction is behind schedule. The Court Monitors are providing feedback and guidance. One noteworthy development is that ADCRR arranged for ADCRR Monitors to meet with Court Monitors so that our team could have direct conversations about ways to improve self-assessment efforts. Initial meetings were very productive. The meetings will continue and we expect marked improvements with the January 2024 monthly report covering December.

With regard to the health care component of the Injunction, ADCRR has made many improvements, including making sea-change improvements in the treatment of substance use disorder and hepatitis C, and creating new Special Needs Units (SNUs) for residents with special physical and care needs. ADCRR staff have been highly cooperative with the Monitors and they, and every front line NaphCare care provider we have met, exudes commitment to providing safe patient care.

It is also important to note that the QI results that are the focus of this report – those for the month of September, reported in the month of October – are, by the very nature of the reporting and review process, unavoidably outdated. As noted earlier, the number of QIs ADCRR is self-reporting continues to increase and we hope to discover as we review the more current reports, that compliance has increased as well.

Despite these improvements, staffing levels are well below the minimal level set by the Court, have been so constantly since the Injunction was issued, and NaphCare's recruitment efforts are insufficient. In large part due to understaffing, the quality of care provided by NaphCare remains woefully inadequate. Patients are in daily danger. ADCRR's system for self-assessment is behind schedule and still requires refinement of data collection, analysis, and reporting. One barrier has been the slow speed with which NaphCare (which owns and operates the EHR), has programmed the necessary database reports upon which monitoring of most of the QIs depends.

Notably, the agency signed a sweeping contract amendment with NaphCare that took effect in November that should help implement many of the Injunctive requirements. The ADCRR health care team has hired additional staff to conduct self-assessments and the Monitors are providing feedback and guidance. The number of QIs being assessed is increasing. For the most recent monthly self-monitoring report completed, ADCRR approximately doubled the number of QIs it was measuring compared to the month of September. The Monitors had requested, and ADCRR had agreed to be at full speed (i.e., measuring and reporting on all Medical and Mental Health

QIs) with the January 2024 monthly report covering December, 2023, and made this goal a priority. However, ADCRR is dependent on NaphCare to code computer programs to generate the data required for monitoring and as NaphCare has failed to meet the timeline set out by ADCRR, the goal of full monitoring with the December report will not be met. Until NaphCare's computer programming work is completed, ADCRR is endeavoring to use manual work-arounds for many QIs for which work-arounds are possible.

While we believe ADCRR moved as quickly as it could, given circumstances, the lag in time between issuance of the Injunction and this most recent amendment to the contract underscores the challenges the agency faces, and may continue to face, due to the complexity and constraints of having to effect changes via a third-party vendor.

Given the commitment and hard work of the Director and his staff, and the Custody, Mental Health, and Medical teams with whom we have the pleasure of working, we are hopeful that ADCRR will be able to overcome the challenges it faces and provide constitutionally safe conditions of confinement for the Subclass and constitutionally safe health care for the entire population.

With regard to the Medical and Mental Health components of this case, however, that hope is predicated in large part on the filling of the large number of vacant staff positions. As discussed above in Part 1 of the section entitled "Medical Care and Issues Jointly Affecting Medical and Mental Health Care," to date, NaphCare has been unsuccessful in providing minimally required staffing levels. We recommend the following:

1. The Court require NaphCare to state the wage range that it is offering employees for all categories of positions for which there is insufficient staffing (i.e., every shift is filled and no more than 15% of shifts with registry or agency staff who have not worked 20 hours or more per week for at least 24 of the previous 26 weeks) in all publicly-facing oral and written communications.

2. The Court require NaphCare to actively increase those stated wage ranges to achieve minimally necessary staffing levels. Paragraph 1.25 of the Court's Injunction presaged that such a step might be necessary. The Court might either set specific timed-based increases, e.g., five percent per month, or requires increases, as necessary.

3. The Court require NaphCare to actively increase the wages of incumbent staff in the aforementioned staffing categories if a disparity between the wage of incumbents and newly hired staff risks the departure of incumbents.

4. Until further notice, the Court require ADCRR to report to the Court, on a monthly basis for each category of staff position described above: the publicly-facing wage range; the number of FTE hired, separated, and gap between required and filled positions for the

previous month; the modifications, if any, made to the wage range based on the staffing activity of the previous month.

Marc F. Stern, MD, MPH

Lead Monitor, on behalf of the Monitoring team:

    Scott Frakes

    Bart Abplanalp, PhD.

    Lara Strick, MD, MS

Attachment 1

## One-time Indicators

| Color code: white=Med+MH; Green=Med; Red=MH; Yellow=Subclass | Order reference | Indicator | Due Date | Days till due | Additional Comments Regarding the QIs |
|---|---|---|---|---|---|
| | - | Although these are all listed as one-time measures, most are subject to review periodically. For example, | | | |
| | **Medical and MH** | | | | |
| | Page 8 | Design and implement a mechanism for patients to submit communications to the Court-appointed monitors. Inform patients and staff that this confidential mechanism does not replace any existing system. | Jun 7, 23 | Done | |
| | 1.16 | Fill all positions required by the current contract with the health care vendor including any modifications, addenda, or updates [A filled position is one in which there is an incumbent receiving a salary for the full intended time commitment of the position and is not on long term leave, e.g., Family Medical Leave Act. An individual may not fill more than 1.0 FTE. Defendants may use registry staff to fill up to 15% of these FTE in each job category.] | Jul 7, 23 | -208 | In feedback to a draft of this report, ADCRR correctly noted that it continues to report these staffing numbers monthly and quarterly and that a pending unopposed motion has been filed with the court re: 15% for registry over 6 months. |
| | 2.2.1 | Implement an appropriate near-miss error reporting policy. (See order for suggested elements.) | Apr 7, 23 | -299 | This is currently in development. |
| | 2.3.1 | Implement a preventable adverse event reporting policy that includes the following elements: requires reporting of errors which cause more than minimal harm to a patient; All such errors shall be reported, not just medication-related errors; Reporting is mandatory for all staff. | Apr 7, 23 | -299 | This is currently in development. |
| | 3.1 | Develop and implement policies to assess the English fluency of patients and, if not English-fluent, determine a language in which the patient is fluent at the following times: during intake; upon request by a patient at any time; whenever staff have reason to believe a patient is not fluent in English; whenever a patient's primary language of communication is not documented in the medical record. | Jul 7, 23 | -208 | This is currently in development and as discussed in the text of report, some elements of this have already been implemented. |
| | 3.2 | A patient's language of choice shall be visible on all relevant screens of the patient's electronic health record. | Jul 7, 23 | Done | |
| | 4.5 | Medical record policy shall indicate that: 1. Patients are charged a reasonable fee for paper copies of their medical record. A reasonable fee is one that has the same or lower ratio to the prevailing patient wage as the ratio of the prevailing fee in the Arizona medical community to the prevailing Arizona community wage; 2. As an alternative to providing paper copies, if the patient agrees, staff may provide the requested records, free of charge, in an electronic medium that the patient is able to access. | Jul 7, 23 | -208 | These policies and procedures are currently under review. |
| | **Medical** | | | | |
| | 6.1 | Hire an additional seven physicians to be allocated at the six corridor facilities based on patient need. Defendants may utilize locum tenens to hire these positions, but will be required to have no more than 15% locum tenens for this job category after six months of the signing of the order. | Jul 7, 23 | -208 | As of January 9, 2024, 5.1 FTE physicians have been hired. |
| | 7.5.1 | Build (or modify existing) living units to accommodate no less than 200 patients needing SNU housing, | Feb 1, 24 | 1 | |
| | 7.5.2 | Build (or modify existing) living units to accommodate all remaining patients requiring SNU housing, build the units with per-patient floor space consistent with AHCCCS requirements for similar | Aug 1, 24 | 183 | |
| | 7.6.5 | All IPC rooms should have a call button | Jul 7, 23 | Done | |

| | | | | | |
|---|---|---|---|---|---|
| | 7.4.1 | Patients shall be given on a daily basis an opportunity to indicate their need to be seen for a medical clinic appointment at the next available clinic by one of the following mechanisms, depending on their living situation, freedom of movement, or access to electronics: affixing their name to a time slot on a paper list maintained on the living unit or in the medical unit; affixing their name to a time slot on an electronic list via tablet or kiosk; informing the nurse who conducts daily (or more frequent) welfare checks on that unit; an effective paper-based system developed by Defendants in the event of temporary non-functioning of the electronic system.  (Defendants shall retain for the monitors to access all lists, paper or electronic, for their review. To allow for effective monitoring of healthcare staffing levels, any appointment made that does not occur shall not be erased but shall be notated as not completed.) | Jul 7, 23 | -208 | This process is being implemented. |
| | 7.4.2 | A reminder of the following rule shall be communicated via the medium the patients use to make requests (e.g., a statement placed on the paper or electronic sign-up list): Patients should only use the non-urgent system if they have a non-urgent need.  Patients with urgent or emergent needs should notify a staff member. | Jul 7, 23 | -208 | Health Needs Request notifications, this is compliant 100%. For Self-Scheduling (as part of the Patient Centered Care Model) this is in process. |
| | 7.7 | Patients requiring monitoring or medical care beyond that normally available and safely used in non-medical living units shall be admitted to an IPC; no one is placed in "observation" status. | Jul 7, 23 | Done | The completion of this one-time indicator reflects a change in policy; adherence to the policy is subject to on-going |
| | 8.4 | If ADCRR or its healthcare vendor utilize categorical referral timeframes, e.g., "emergency," "urgent," "routine," for which it applies default timeframes for completion of the referral, Defendants shall notify the Court of those categories and timeframes and shall notify the Court within fourteen days if any of those categories or default timeframes change | Jul 7, 23 | Done | |
| | 10.1 | Implement a refusal policy containing the following elements: (a) When a patient refuses a medication (or classes of medication), based on the specific medication or class and the number and pattern of refusals, the medication administrator shall be triggered to escalate the case to a higher authority and within a specified amount of time (which may differ by medication or class).  The decision rules described above should be incorporated into the medication administration software of the EHR such that the EHR automatically alerts the medication administrator when action is needed and what action is needed. (b) The higher authority referenced in the preceding paragraph shall be an RN or appropriately licensed practitioner who is then responsible for: determining the reason for the refusal and securing the patient's adherence with the medication, or finding a clinically appropriate alternative treatment, or assuring that the patient is making an informed refusal, or assuring the execution of whatever clinically appropriate action is ordered by a prescriber. | Apr 7, 23 | -299 | This is currently in development. |
| | 10.1 | Whenever a DOT medication is administered or refused, the EHR automatically records the name and title of the administrator | Apr 7, 23 | -299 | Currently, the name of the administrator is recorded but not the title, This is in progress. |
| | 10.5.2 | (ADCRR is encouraged, but not ordered, to: make KOPs the default for those meds on KOP list; make some of the over-the-counter medications available from living unit officers or health care staff in FDA-approved unit dose packaging.) | voluntary | | |
| | 11.1.3 | All current patients who have not been screened for HCV shall be offered screening ((11.1.) by blood test; (11.1.8) under opt-out conditions), and all who screen positive, have viremia based on an RNA test, and indicate willingness to be treated shall receive treatment within the time parameters set out within this Order. | Jun 7, 23 | Done | |
| | 11.1.5 | Until they begin treating patients on the Hepatitis C prioritized list, Defendants shall continue their current practice of initiating treatment of all patients identified as having more advanced hepatitis C, i.e., scores of F3 and F4. | Apr 7, 23 | Done | |
| | 11.3.6 | The Department will offer MOUD in three new facilities, including counseling, if appropriate, and | Oct 7, 23 | Done | |
| | 11.3.6 | The Department will offer MOUD in three new facilities, including counseling, if appropriate, and | Apr 7, 24 | 67 | |
| | 11.3.6 | The Department will offer MOUD in the three remaining facilities, including counseling, if appropriate, and including medication treatment for alcohol.  The Department will take the necessary steps to ensure | Oct 7, 24 | 250 | |

| | | | | | |
|---|---|---|---|---|---|
| | **Mental Health** | | | | |
| | 13.1 | Within three months of this Order, Defendants shall hire an additional two psychiatric prescribers, ten psych associates and three psychologists to be allocated at the six corridor facilities based on patient need.  Defendants may use registry and locum tenens to hire these positions, but will be required to have no more than 15% locum tenens and registry in each of these job categories within six months of the signing of the order. | Jul 7, 23 | -208 | Of these 15 positions, 1 psychologist position remains to be hired. |
| | 13.1 | Pending the outcome of a staffing analysis and plan, outpatient psychologists shall supervise no more than eight psych associates, and inpatient psychologists shall supervise no more than six psych associates. | Apr 7, 23 | -299 | |
| | 15.6 | Defendants shall modify their policies to create a formal process for custody staff, families, or any other concerned party to refer a patient for mental health assessment and for timely response to the concern by mental health staff. | Apr 7, 23 | Done | In feedback to this report ADCRR notes that although the process is in place, it is looking into ways to make it more user-friendly. |
| | 15.7 | (Defendants are encouraged, but not required, to allow MH-3C and MH-3E patients who would otherwise meet the custody classification requirements, to be housed at the Douglas, Winslow, and Safford Complexes.  Telehealth may be used.) | voluntary | | |
| | 15.8 | Defendants shall ensure the formulary for psychotropic medications is no broader than the formulary used by AHCCCS. | Apr 7, 23 | Done | |
| | 19.1 | (Defendants are encouraged, but not required, to modify their policy to include grave disability as an indication for involuntary antipsychotic medications.) | voluntary | | |
| | **Subclass** | | | | |
| | 1.15 | Within three months of this Order, Defendants shall ensure there is a sufficient number of custody staff to support the functioning of the health care operation, including but not limited to: transporting patients to on-site and off-site clinical encounters and appointments; administration of medications; and providing security in the venues of health care operations.  Exceptions may be made for a declared emergency (e.g., prison riot, natural disaster).  Chronic understaffing does not qualify as a declared emergency. | Jul 7, 23 | -208 | |
| | 19.3 | Defendants shall implement a system to facilitate the return to lower levels of custody for those residents who have been in the subclass for longer than two months | Jul 7, 23 | -208 | ADCRR is working on outlining a formal process. |
| | 21.2 | Within one month of the issuance of this Order, Defendants shall retain a communications engineer to conduct an assessment of the technical requirements to install the EOMS at the designated sites. | May 7, 23 | Done | |
| | 21.3 | By July 1, 2023, Defendants shall activate the current EOMS pilot program at the Browning Unit and shall evaluate its functionality over the ensuing two months. | Jul 1, 23 | Done | |
| | 21.4 | By September 1, 2023, Defendants shall issue a Request for Proposals to install the EOMS at the designated sites. | Sep 1, 23 | Done | |
| | 21.5 | By December 31, 2023, Defendants shall award a contract for the installation of EOMS at the designated sites. | Dec 31, 23 | Done | |
| | 21.1/21.6/21.8/ 21.9 | By December 31, 2024, Defendants shall have installed and fully implemented the EOMS at all designated sites. [The system will be Web-based and accessible via standard Web browsers and have all the capabilities described in 21.8 and 21.9 of the Order.] | Dec 31, 24 | 335 | |
| | 21.7 | In the interim before full installation of the EOMS at the designated sites, Defendants shall implement a formal process and tracking protocol to manually accomplish the functions of the EOMS, subject to monthly review by the Warden of each facility. | Apr 7, 23 | Done | |
| | 23.1 | Within three months of this Order, all showers used by patients found in disrepair (e.g., rusted, leaking, broken pipes) shall be repaired and, if needed, resurfaced, professionally painted after appropriate preparation, and/or new shower pans installed. | Jul 7, 23 | Done | |

| | | | | | |
|---|---|---|---|---|---|
| | 23.4 | Defendants shall, within three months of this Order, take the following actions regarding cells and areas used by patients: (a) repair or replace essential equipment or structures in cells found in disrepair (e.g., rusted, leaking or broken pipes, sinks and toilets); (b) cells found in need of painting shall, after appropriate preparation, be professionally painted.  New paint shall be mixed with a mildewcide additive to reduce the presence and growth of mold and mildew. | Jul 7, 23 | -208 | In feedback to a draft of this report, ADCRR indicates that all paint is mixed with mildewcide and cells are professionally painted. |
| | 24.1 | Within six months of this Order, patients' tablets shall allow them, in a language they understand, to make direct requests for services including medical/mental health services, file a letter or other request required before filing a grievance, file a grievance, file an appeal, access and send electronic mail (both personal and professional), check their commissary account balance, obtain current program schedules and curriculum, purchase commissary items, access case notices regarding letters and grievances, access the patient handbook, access disciplinary documents, access hearing documents, access appeal decisions and access current classification level and progress towards the next step down.  The tablet should also allow access to entertainment such as books, educational materials, music and movies, consistent with a patient's classification and step levels. | Oct 7, 23 | -116 | |
| | 24.1 | Until tablets are issued with the above functionality, residents will be provided with other means to access documents and make requests consistent with the patient's custody level. | Apr 7, 23 | -299 | |
| | 20.3.1 | While awaiting the expert's staffing analysis and plan, Defendants shall file with the Court a "Correctional Staffing Report"  beginning on May 1, 2023, and every quarter thereafter (i.e., March 31, June 30, September 30, December 31) a report that includes: • the number of correctional staff assigned to each facility; • the number of correctional staff still employed by each facility at the end of the quarter; • the turnover rate, that is, the number of voluntary and involuntary terminations during the quarter divided by the total number of correctional staff assigned at the end of the quarter, including each figure in the calculation in addition to the ultimate result; • the retention rate, that is, the total number of correctional staff at a facility who have worked for that facility for twelve months or longer divided by the total number of correctional staff assigned at the end of the quarter, including each figure in the calculation in addition to the ultimate result; • the total number of overtime hours for correctional staff at each facility for the quarter; and the vacancy rate (number of vacant positions at the end of the quarter divided by the total number of correctional staff and vacant positions at the end of the quarter). | May 1, 23 | Done | |
| | | | Jun 30, 23 | Done | |
| | | | Sep 20, 23 | Done | |
| | | | Dec 31, 23 | Done | |
| | | | Mar 30, 24 | 59 | |
| | 22.2 | (The installation of call buttons or an intercom system in every cell housing a patient: The Court strongly recommends but will not require, installation of such a system.) | Voluntary | | |

## Ongoing Indicators

| Color code:<br>white=Med+MH;<br>Green=Med;<br>Red=MH;<br>Yellow=Subclass | Order reference | Measure | Compliance, Report to Court, Jan. 2024 | Additional Comments Regarding the QIs |
|---|---|---|---|---|
| | Medical and MH | | | |
| | Medications | | | |
| | 10.3 | When a medication refusal policy requires escalation of the case to a higher authority, within the policy-prescribed time frame, an RN or appropriately licensed practitioner is responsible for: determining the reason for the refusal and securing the patient's adherence with the medication, or finding a clinically appropriate alternative treatment, or assuring that the patient is making an informed refusal, or assuring the execution of whatever clinically appropriate action is ordered by a prescriber. | Not yet compliant | Data collection needs refinement |
| | Urgent/Emergent Care | | | |
| | 1.2, 1.2a, b | When a patient notifies a correctional officer that he/she has a need for health care (medical or mental health), the officer may not inquire as to the nature of the need or symptoms.  The officer's inquiry is limited to asking whether the need is immediate, if the patient can wait to sign up for the next scheduled clinic, or if the patient is thinking of harming him/herself.  (If the patient is thinking of harming him/herself, the officer shall immediately ensure the patient's safety and contact health care staff in accordance with Section 16.8.1.)  For other needs that are immediate, the officer shall contact health care staff immediately.  An RN shall triage the patient immediately, either by seeing the patient, or talking to the patient directly over the phone.  Based on triage results, the RN shall discuss the patient with a medical practitioner (i.e., physician or APP) or, if the patient is already on the mental health caseload (i.e., MH-3, 4, or 5) mental health professional in a clinically appropriate timeframe, not to exceed four hours.  In this context, the mental health professional shall be a psych associate, psychologist, or psychiatric prescriber. Based on that interaction the professional who was contacted shall: see and treat the patient the same day; or instruct the RN on treatment to provide, and, if necessary, schedule the patient for further evaluation or treatment in a clinically appropriate timeframe; or determine the health care need is not urgent and that a reasonable patient would not have considered the health care need to be urgent, defer treatment, and instruct the patient to access non-urgent/non-emergent care for treatment. | | |
| | Improvement programs | | | |
| | 2.1.1 | Following any death or suicide attempt, identify all significant health care and custody errors (i.e., near misses as well as preventable adverse events).  Based on prioritization of all errors identified, a root cause analysis shall be conducted if clinically appropriate, from which an effective and sustainable remedial plan shall be crafted and implemented within one month of the death.  A sustainable plan is one which outlives staff memory from a single training after the review or staff turnover.  Monitor the remedial plan for effectiveness and make appropriate and timely modifications to the plan based on the monitoring. [2.1.3.] For each death, the plan in this section shall be crafted and implemented within one month whether or not the medical examiner's report is available. | | ADCRR did not report on this QI for the month of September, which is the subject of this report. In its feedback to this report, ADCRR states that this QI is currently being monitored and is in compliance. |
| | 2.5.1a | Staff capture errors, system problems, and possible system problems that come to their attention through sources, including but not limited to the near-miss and preventable adverse event reporting systems, mortality reviews, litigation filed by patients, grievances, the Court-appointed monitors, staff reports, continuous quality improvement, etc. | | |

| | | | | |
|---|---|---|---|---|
| | 2.5.1b | Staff maintain an active log of all such errors and problems to assist in deciding which issues to address, when, and at what level (complex and/or statewide), and to monitor progress in resolution. Based on this prioritization, either at the complex or state level, root cause analysis shall be conducted as appropriate, from which an effective and sustainable remedial plan is implemented in a timely manner.  Such plan is one which outlives staff memory from a single training after the review or staff turnover.  The remedial plan shall be monitored for effectiveness.  Appropriate and timely modifications shall be made to the plan based on the monitoring. | | |
| | **Medical Records** | | | |
| | 4.4a | Imported or scanned documents (including but not limited to diagnostic test results, consultation | | |
| | 4.4b | reports, and hospital discharge summaries) in the EHR: shall be filed in a clear and usable | | |
| | 4.4c | Fewer than 1% of files are labeled/titled with names beginning with "Miscellaneous" or "Other." | | |
| | 4.4d | Documents (including but not limited to diagnostic tests, consultation reports, and hospital discharge summaries) which are manually scanned into, or electronically attached to (after receipt via email) the EHR have this completed within 2 business days of receipt and are reviewed by the medical provider  (for medical documents), or primary therapist or psychiatric prescriber (for MH documents) within 4 business days of receipt. | | |
| | 4.4e | Documents which are imported to the EHR directly via an interface are reviewed by the medical provider  (for medical documents), or primary therapist or psychiatric prescriber (for MH documents) within 4 business days of receipt | | |
| | 4.5 | Staff provide patients access to their own medical records as follows, unless a practitioner documents in the patient's EHR how disclosure of such information would jeopardize the health, safety, security, custody or rehabilitation of the patient or others or the safety of any officer, employee or other person at the correctional institution or of a person who is responsible for transporting the patient: (a) read-only access to patients wishing to read a copy of their health record; (b) orally sharing with a patient information regarding their diagnosis or any other information about their health care; (c) providing paper copies at a fee consistant with the updated policy; or (d) as an alternative to a paper copy, if the patient agrees, staff may provide the requested records, free of charge, in an electronic medium that the patient is able to access. | | |
| | **Language Interpretation** | | | |
| | 3.1a & 3.1b | The patient's preferred language is known and care is delivered in the language in which the patient is fluent at all times. | | |
| | 3.3 | For all individual and group health care encounters in all settings involving patients who are not fluent in English, interpretation shall be provided via: health care staff whose name appears on a list maintained by Defendants of people who, pursuant to written policies Defendants develop, is proficient in the language understood by the patient or in-person or via video interpretation service (for sign language) or audio language interpretation service that is compliant with federal law and uses licensed interpreters, where required by state law, unless these are not feasible due to emergency circumstances. | | |
| | 3.6 | Written available notification (such as a poster) shall be hung in all housing units and health care clinics in all prisons advising patients, in the ten most common languages in Arizona, of the availability of interpretation services and that they may inform healthcare staff orally in any language, in sign language, or in writing in any language that they are not fluent in English, if that is not already documented in their electronic health record. | Not yet compliant | Data collection needs refinement |
| | **Medical** | | | |
| | Staffing and bldg. | | | |
| | 6.2a | FMDs in low intensity facilities shall be assigned as the primary care provider for patients who need physician level care. | | |

| | | | | |
|---|---|---|---|---|
| | 6.2b | APPs will only be assigned patients who do not require a physician as their primary care provider. | | |
| | 6.2c | FMDs in high intensity facilities shall be assigned up to 100 patients as the primary care provider and shall have no other scheduled patient care assignments including supervision of APPs or as the scheduled provider for specialized units such as Inpatient Component ("IPC") or Special Needs Unit ("SNU"). This does not limit FMDs from occasional unscheduled clinical supervision and care activities. | | |
| | 7.3 | All patients shall be assigned a medical primary care practitioner. | | |
| | 6.4 | All medical physicians–at hiring and during employment–shall be board certified in Internal Medicine or Family Practice, or board eligible if within 7 years of their completion of an ACGME approved residency in one of these 2 specialties, with the following exceptions: medical directors, shall be board certified at hiring and during employment; physicians providing obstetric and gynecologic services shall be board certified or board eligible if within seven years of their completion of an ACGME approved residency in obstetrics and gynecology; and physicians who are currently employed and are not board eligible may remain employed for no longer than one year after issuance of this Order. They may also not possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. (Notify Court Monitors if there is a request for an exception) | | |
| | 1.11 | Licensed Practical Nurse ("LPNs") shall practice within their scope of practice set forth in Arizona Administrative Code § 4-19-401 (not independently assess patients or initiate a plan of care or treatment). | | |
| | 1.12 | No one for whom a health professions license is required may possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. | | |
| | 1.9 | Directors of Nursing may not spend more than 15% of their time providing scheduled or unscheduled patient care. | | |
| | 1.4 | Telehealth for medical care may be used only when clinically appropriate. | | |
| | 1.6 | There is sufficient space, equipment (e.g., otoscopes, ophthalmoscopes), and supplies (e.g., dressings)  to deliver medical care services appropriate to the location. | Not yet compliant | Data collection needs refinement |
| | 1.7 | There is auditory and visual confidentiality during medical encounters. Breaches of confidentiality are limited to the measures required to ensure safety, and all staff shall maintain the confidentiality of any information they acquire as a result of the breach. | Not yet compliant | Data collection needs refinement |
| | 3.5 | The equipment used for interpretation shall allow for confidential communication in all medical health care circumstances (e.g., dual hand- or head-set device in locations where a speaker phone or computer can be seen or overheard by other patients or custody staff). | Not yet compliant | Data collection needs refinement |
| | 1.10. | All staff hired in clinical medical supervising positions must have at least two years clinical experience. | | |
| | 1.13a, b, and c | Health care staff (Medical and Mental Health) responsible for direct patient care shall not be mandated to work beyond the following limits: more than 12 hours in any 24-hour period; less than 8 hours off between any two shifts; more than 60 hours in a calendar week defined as Sunday through Saturday. (1.14. The limits on overtime may be extended during emergency situations. Time spent on-call is not included in the time limits.) | Not yet compliant | |
| Operations | | | | |
| | 1.1, 1.3 | All  care and the documentation supporting that care, delivered during: a medical encounter (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, report from a consultant, other external health record, shall be clinically appropriate including scheduled follow-up in an appropriate timeframe when applicable . Settings include, but are not limited to: | | |
| | 1.1a | emergent; | Not yet compliant | Data collection and analysis need refinement |
| | 1.1b | urgent; | Not yet compliant | Data analysis needs refinement |
| | 1.1c | non-urgent episodic; | Not yet compliant | Data analysis needs refinement |
| | 1.1d | chronic; | Not yet compliant | Data analysis needs refinement |

| | | | | |
|---|---|---|---|---|
| | 1.1e | inpatient; | Not yet compliant | Data analysis needs refinement |
| | 1.1f | off-site specialty referrals; | Not yet compliant | Data analysis needs refinement |
| | 1.1g | action taken on post-hospital, post-emergency room, or specialist recommendations | Not yet compliant | Data analysis needs refinement |
| | 1.22 | Orders from health care staff in the outpatient and inpatient arenas shall be completed within the timeframe ordered.  This includes, but is not limited to: | | |
| | 1.22a | on-site diagnostic tests | Unable to determine compliance | Pending policy and/or procedure revision; Data collection needs refinement |
| | 1.22b | off-site diagnostic tests | Unable to determine compliance | Data collection needs refinement |
| | 1.22c | follow-up visits with nurses or practitioners | Unable to determine compliance | Pending policy and/or procedure revision; Data collection needs refinement |
| | 1.22d | Off-site referrals | Not yet compliant | Data collection needs refinement |
| | 1.21 | All refusals of patient-initiated visits shall be made directly to a health care professional by telephone, tablet, video, face-to-face, or in writing by the patient.  If a patient will not voluntarily displace, health care staff will go to the patient's location. | Not yet compliant | Pending policy and/or produre revision; Data collection needs refinement |
| | 1.1,1.21a | All refusals of provider-initiated on-site medical visits are made by telephone, video, or face-to-face with an RN or practitioner, within three days after the appointment.  If a patient will not voluntarily displace, health care staff will go to the patient's location. | Not yet compliant | Pending policy and/or procedure revision |
| | 1.1, 1.21b | All refusals of off-site health visits are made by telephone, video, or face-to-face with an RN or higher at the time of the appointment.  If a patient will not voluntarily displace, health care staff will go to the patient's location. | | |
| | 1.23 | Patients shall be informed in a timely manner of diagnostic test results | | |
| | 4.5 | Patients shall be informed in a timely manner of consultation results | | |
| | 5.1 | For patients with any medical conditions and identified treatment providers in the community, if the patient consents, health care staff shall send each provider relevant health care information prior to the patient's release.  This includes, at a minimum, a problem list, list of active medications, current symptoms, functional impairments, a summary of relevant care provided during incarceration, any necessary care or follow-up care, one or more points of contact if a community provider requires further information. The patient's health record shall contain documentation of the above information that was provided, when, and to whom. | | |
| Medical Records | | The problem list in a patient's health record: shall be accurate, complete, and easily usable; | | |
| | 4.3 | resolved or historical conditions or diagnoses are separated from current conditions; the date of onset or resolution of resolved or historical conditions or diagnoses is indicated, if known; similar or identical diagnoses of current conditions are listed only once.  For example, a problem list would not simultaneously list "heart disease," "heart failure," and "congestive heart failure, not otherwise specified." | | |
| Intake | | | | |
| | 7.1 | An RN or higher credentialed professional shall conduct an intake screening within four hours | | |
| | 7.2 | A medical practitioner shall complete a history and physical examination of each patient by the | | |
| Non-Urgent Care | | | | |
| | 7.4.6 | All non-urgent/non-emergent care at the request of a patient shall be completed in a reasonable time. | | |
| | 7.4.7a & b | The initial care for non-urgent/non-emergent care and chronic care shall be provided by the patient's primary care provider (PCP) with the exceptions noted below. (1) The care may be provided by another medical practitioner or health care practitioner as directed by the PCP as clinically appropriate. (2) If the PCP is not on the premises or conducting telehealth visits at the time, the care may provided by another medical practitioner of the same or higher credential. (3) Pursuant to patient-specific direction provided by the medical practitioner, RN may provide initial care for a limited number of conditions that are simple, rarely serious, rarely confused with serious conditions, and appropriately treatable with self-care and/or over-the-counter medications provided that the RN operates under clinically appropriate protocols approved by the monitors. | | |
| Urgent/Emergent Care | | | | |
| | 1.5 | Emergency response and care provided by custody staff shall be appropriate given the skill level and knowledge expected of custody staff. | | |

| | | | | |
|---|---|---|---|---|
| | 1.8a | Emergency response equipment ("Man Down Bag," Automated External Defibrillators ("AEDs"), oxygen) shall contain all items required by policy, all equipment shall be in working order, and all medications shall be unexpired. | Not yet compliant | Data collection needs refinement |
| | 1.8b | Emergency Response bag checklists shall reflect the equipment was checked daily and inventoried monthly.  The checklists shall also reflect medications are within their expiration date and equipment is operational. | Not yet compliant | Data collection needs refinement |
| | 1.8c | Staff shall complete and document all AED manufacturer recommended checks (e.g., daily, monthly, annual). | Not yet compliant | Data collection needs refinement |
| | 1.8d | Naloxone is required to be kept on every living unit or with every AED. | Not yet compliant | Data collection needs refinement |
| IPC | | | | |
| | 7.6.1 | A medical practitioner shall be contacted and collaborate on the creation of an immediate care plan immediately upon a patient being admitted to the IPC. | | |
| | 7.6.2 | An RN shall complete an admission nursing assessment immediately upon a patient arriving in the IPC. | | |
| | 7.6.3 | A medical practitioner shall complete an admission history and physical within one calendar day of admission to the IPC for patients who are going to remain beyond 24 hours. | | |
| | 7.6.4 | An RN shall complete an assessment in the IPC at the frequency ordered.  The spacing of the assessments shall be clinically appropriate. | | |
| | 7.6.5 | The call buttons of all patients admitted to an IPC level bed are determined to be working on the day of admission and once per month.  If a call button is not working health care staff shall perform a welfare check at least once per 30 minutes. | | |
| Specialty Care | | | | |
| | 8.1 | All specialty referrals shall be completed within the ordered timeframe, notwithstanding any time required for processing, reviewing, or consideration of alternative treatment plans. | Not yet compliant | Data collection needs refinement |
| | 8.7 | If a practitioner orders, or informs a patient there will be an order, for an off-site test or referral, but circumstances change and the order is modified or rescinded, the patient shall be informed within one month of the change. | | |
| | 9.2 | Patients returning from a hospital stay or emergency room visit shall be evaluated by an RN or higher prior to returning to their living unit.  A discharge summary, physician report, or documentation of this information received via phone shall be available for this evaluation. | Not yet compliant | Data collection needs refinement |
| | 9.1 | A practitioner shall adopt and perform off-site recommendations from outside providers, unless a clinically appropriate basis exists to alter or forgo the off-site recommendations. | | |
| Medications | | | | |
| | 10.1 | Prescribed medications intended for directly observed therapy ("DOT") administration shall be administered as ordered or there shall be documentation of a valid reason for non-administration. | Not yet compliant | Data collection needs refinement |
| | 10.2a | For a patient newly admitted to a facility (e.g., transfer from another facility, return from a hospital stay, admission from a jail) and already on a medication in their previous venue, the first dose of a medication shall be delivered keep-on-person ("KOP") or administered ("DOT") in time for their next regularly scheduled dose. | | |
| | 10.2b | The first dose of a newly ordered medication shall be delivered ("KOP") or administered ("DOT") within the timeframe ordered, or if no timeframe is specified, within twelve hours for antibiotics and pain medications, and within three days for all other medications. | | |
| | 10.4.1 | KOP medications shall be delivered to the patient before the medication runs out (based on the date of the previous fill).  A KOP medication shall be delivered either by providing the patient with the KOP supply or by staff administering the medication from stock, dose by dose, to bridge the gap until the KOP supply is delivered.  Additional medication need not be delivered before the previous fill runs out if a clinically appropriate and documented determination was made by a prescriber that the medication should not be continued and the patient is so informed. | | |

| | | | |
|---|---|---|---|
| | 10.5.4 | Patients with asthma who are at significant risk of serious respiratory impairment if they do not use their rescue inhaler immediately, shall be provided a rescue inhaler KOP.  Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button.  Exceptions may also be made for patients where the practitioner can document a significant and serious penological need to prohibit a particular patient from having such an inhaler.  This exception must be patient-specific. | |
| | 10.5.5 | Patients with diabetes who are at significant risk of hypoglycemia shall be provided a source of glucose KOP.  Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button. | |
| | 10.5.6 | Patients prescribed rapid-delivery nitroglycerin for cardiac disease shall be provided the medication KOP.  Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button. | |
| Hep C | | | |
| | 11.1.1a & b | All patients are offered a screening blood test for HCV under opt-out conditions within a month of arrival | In feedback to a draft of this report, ADCRR reports that it believes it is currently in compliance with this QI though a report has not yet been created. |
| | 11.1.4 | All patients with HCV infection shall be placed on a single list prioritized according to a scheme that considers degree of fibrosis, relevant comorbidities, likelihood of transmitting infection to others in the prison, and release date. | |
| | 11.1.7 | All patients with HCV shall be offered education about HCV, whether they receive treatment or not. | |
| | 11.1.5 | All patients with newly diagnosed HCV are tested to determine if they have more advanced hepatic disease | |
| | 11.1.5a | All patients with fibrosis scores of F3 or F4 will be offered treatment for HCV | In feedback to a draft of this report, ADCRR reports that currently approximately 32 patients with HCV and F3 or F4 HCV patients with F3/F4 scores are awaiting treatment. |
| | 11.1.5b | At least the following number of patients will begin treatment for HCV monthly using the current standard of care medications: 110 patients plus 70% of the number of newly admitted patients who tested positive for HCV during the previous month. | In feedback to a draft of this report, ADCRR reports that it believes it is currently in compliance with this QI. |
| | 11.1.6 | No patient who is released on their planned release date shall release without having been screened for HCV and if positive and they accept treatment, without having completed treatment except for those patients with markedly reduced life expectancy who would not be expected to benefit from treatment, or patients who cannot complete treatment within the timeframe of their incarceration and linkage to care in the community for continuation of treatment cannot be established despite a good faith effort or there is a documented informed refusal. | In feedback to a draft of this report, ADCRR reports that it plans to be in compliance with this QI by April 7, 2024. |
| TB | | | |
| | 11.2 | All newly admitted patients shall have a completed test for tuberculosis (skin test, blood test, or chest x-ray) by the end of the seventh full day after admission into the ADCRR system, unless the patient refuses. | |
| SUD | | | |
| | 11.3.1 | All newly admitted patients shall be screened for, and if indicated then evaluated for, substance use disorder. Screening shall include assessment as to a history of opioid overdose. | |
| | 11.3.2 | All newly admitted patients shall be offered to have current Medication for Opioid Use Disorder ("MOUD") (buprenorphine, naltrexone) continued. | |
| | 11.3.3 | All pregnant or post-partum patients with diagnosed Opioid Use Disorder ("OUD") shall be offered to have current MOUD (buprenorphine, naltrexone, methadone) continued, or if not currently on MOUD, shall be offered to initiate treatment with buprenorphine or naltrexone. | In feedback to a draft of this report, ADCRR reports that it believes it is currently in compliance with this QI. |
| | 11.3.4 | No later than two months after issuance of this order, all patients who have a documented history of opioid overdose or who upon assessment are determined to be at imminent risk of an opioid overdose, shall be offered MOUD with buprenorphine or naltrexone. | In feedback to a draft of this report, ADCRR reports that it believes it is currently in compliance with this QI. |
| | 11.3.5 | All patients offered treatment for HCV shall be evaluated for OUD and if found to have OUD, shall be offered MOUD with buprenorphine or naltrexone. | |

| | | | | |
|---|---|---|---|---|
| | 11.3.6a & b | Patients with OUD will be offered MOUD, including counseling, if appropriate. The Department will take the necessary steps to ensure that any patient transferring to another facility will not experience an interruption in MOUD, counseling, or alcohol treatment. | | |
| | 11.3.6c & b | Patients with Alcohol Use Disorder will be offered medication treatment and counseling if appropriate. The Department will take the necessary steps to ensure that any patient transferring to another facility will not experience an interruption in medication or counseling. | | |
| | Immunization | | | |
| | 11.4a - f | Patients shall be offered all immunizations recommended by ACIP. | | |
| | Improvement | | | |
| | 2.1.3 | Following a medical-related death, if the medical examiner's report was unavailable, the plan shall be revisited and modified, if necessary, within one month of receipt of the report. | | In feedback to a draft of this report, ADCRR reports that it believes it is currently in compliance with this QI. |
| | 2.4.1 | There is a robust continuous quality improvement program to monitor the quality of clinical care. As part of this program, staff monitor the absolute number and trend of various parameters on a monthly basis. Where metrics or trends in metrics show room for improvement, staff make appropriate efforts to understand the underlying reason for deviation, take reasonable steps to effectuate improvement, evaluate the effectiveness of these steps in a reasonable time, and make adjustments to its improvement efforts as needed. At a minimum, ADCRR will monitor the following parameters and (2.4.2.) other parameters as reasonably dictated by the other self-improvement activities described in this Monitoring Guide | | |
| | 2.4.1a | percentage of individuals (regardless of whether diagnosed with hypertension) whose systolic blood pressure exceeds 140 mmHg or diastolic blood pressure exceeds 90 mmHg; | Not yet compliant | Pending policy and/or procedure revision |
| | 2.4.1b | average hemoglobin A1C (regardless of whether diagnosed with diabetes); | Not yet compliant | Pending policy and/or procedure revision |
| | 2.4.1c | percentage of individuals taking ten or more prescribed medications; | Not yet compliant | Pending policy and/or procedure revision |
| | 2.4.1d | percentage of women receiving timely breast screening; | | |
| | 2.4.1e | percentage of women receiving timely cervical cancer screening; | | |
| | 2.4.1f | percentage of pregnant women who have the results of routine prenatal laboratory tests results as recommended in current national guidelines (e.g., Guidelines for Prenatal Care, 8th Edition, American Academy of Pediatrics and American College of Obstetricians and Gynecologist, Table 6-2) documented within one month of diagnosis of pregnancy; | | |
| | 2.4.1g | percentage of health care grievances which are appealed; | | |
| | 2.4.1h | percentage of health care grievance appeal replies that are appropriate; | | |
| | 2.4.1i | percentage of prisoners on antipsychotic medications receiving timely AIMS (abnormal involuntary movement scale) assessments; | | |
| | 2.4.1j | percentage of prisoners on antipsychotic medications receiving appropriate and timely metabolic assessments; | | |
| | 2.4.1k | percentage of prisoners receiving punishment for a rule violation, for whom a mental health intervention would have been more clinically appropriate than punishment; and | | |
| | 2.4.1l | percentage of prisoners arriving at ADCRR for whom intake screening by an RN (or higher credentialed professional) is completed more than four hours after arrival. | | |
| | MH | | | |
| | Staffing and Bldg. | | | |
| | 13.2 | A MH Duty Officer shall be available at all times when facility mental health staff are not available. The MH Duty Officer shall be a licensed psych associate, psychologist, or psychiatric practitioner. | Unable to determine compliance | Data collection needs refinement |

| | | | | |
|---|---|---|---|---|
| | 14.1 | All psychiatrists–at hiring and during employment–shall be board certified in psychiatry, or board eligible if within 7 years of their completion of an ACGME approved residency in psychiatry, with the following exceptions: 1) supervising psychiatrists shall be board certified at hiring and during employment; 2) psychiatrists who are currently employed and are not board eligible may remain employed for no longer than one year of issuance of this Order; they may also not possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. (Notify Court Monitors if there is a request for an exception.) | Compliant | |
| | 14.2 | All psychologists and psychiatric practitioners shall have the appropriate state licenses.  All psych associates shall be licensed or become licensed within one year of hiring or within one year of this Order, whichever is later, and may not possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. | Compliant | |
| | 1.10. | All staff hired in clinical MH supervising positions must have at least two years clinical experience. | Compliant | |
| | 1.11 | Behavioral Health Technicians shall not independently assess patients or initiate a plan of care or treatment. | Unable to determine compliance | Data collection needs refinement |
| | 1.12 | No one for whom a health professions license is required may possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. | Compliant | |
| | 15.1a | Each patient on the mental health caseload, i.e., all patients in MH Levels 3, 4, and 5, be assigned a primary therapist (PT; psych associate or psychologist) | | |
| | 15.1b | A PT serves as the single point of contact and coordination for providing care to all patients designated MH-3 and above. When a patient's assigned PT is unavailable, another psych associate or psychologist acts on their behalf. | | |
| | 15.2 | A psychologist shall review the records of each patient who is added to, or discharged from, the mental health caseload after intake.  The psychologist shall approve or deny the level of care assignment and take appropriate action. | Not yet compliant | |
| | 1.4 | Telehealth for mental health care may be used only when clinically appropriate. | Not yet compliant | |
| | 14.9a | There is sufficient space, equipment (e.g., computer, furniture), and supplies (e.g., assessment and treatment materials) to deliver mental health care services. This includes, but is not limited to, areas for mentally ill patients to be housed, engage in programming, and receive treatment (both individual and group) in an environment commensurate with that unit/facility's designated level of care. | | |
| | 14.9b | There is auditory and visual confidentiality during MH encounters. Breaches of confidentiality are limited to the measures required to ensure safety, and all staff shall maintain the confidentiality of any information they acquire as a result of the breach. | | |
| | 16.7 | All mental health encounters with all patients shall occur in a confidential, therapeutically appropriate setting unless there is a clinical or legitimate and substantial safety and security concern that is documented. | Not yet compliant (based on most recent report submitted  in July) | |
| | 3.5 | The equipment used for interpretation shall allow for confidential communication in all medical health care circumstances (e.g., dual hand- or head-set device in locations where a speaker phone or computer can be seen or overheard by other patients or custody staff). | | |
| | Operations | | | |
| | 1.1 | All  care and the documentation supporting that care, delivered to patients during: a mental health MH (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, other external health record, shall be clinically appropriate. Settings include, but are not limited to: | | |
| | 1.1a | emergent; | | |
| | 1.1b | urgent; | | |
| | 1.1c | non-urgent episodic; | | |
| | 1.1d | outpatient counseling or psychological care | Not yet compliant | |
| | 1.1e | outpatient psychiatric care | Not yet compliant | |

| | | | | |
|---|---|---|---|---|
| | 1.1g | residential counseling or psychological care | Not yet compliant | |
| | 1.1h | residential psychiatric care | | |
| | 1.1i | inpatient counseling or psychological care | Not yet compliant | |
| | 1.1j | inpatient psychiatric care | | |
| | 1.3 | All patients with mental illness who require regular follow-up shall be designated on the mental health caseload | | |
| | 1.22a | Orders from MH staff in any setting for metabolic, drug levels, and hematologic blood tests shall be completed in the timeframe ordered. | Not yet compliant | |
| | 1.22b | Follow-up visits with MH professionals are completed within the timeframe ordered. | Not yet compliant | |
| | 1.21a | All refusals of patient-initiated visits shall be made directly to a health care professional by telephone, video, or face-to-face.  If a patient will not voluntarily displace health care staff go to the patient's location. | Not yet compliant | |
| | 1.21b | All refusals of a MH professional-initiated health visits are made by telephone, video, or face-to-face with an RN or practitioner for medical visits or a masters level therapist, psychologist, or psychiatric practitioner (psychiatrist, psychiatric nurse practitioner, psychiatric physician assistant) for mental health visits, within three days after the appointment.  If a patient will not voluntarily displace health care staff go to the patient's location. | | |
| | 5.1 | For patients on the MH caseload with identified treatment providers in the community, if the patient consents, health care staff shall send each provider relevant health care information prior to the patient's release.  This includes, at a minimum, a problem list, list of active medications, current symptoms, functional impairments, a summary of relevant care provided during incarceration, any necessary care or follow-up care, one or more points of contact if a community provider requires further information, name and contact information of the primary therapist, an aftercare plan that reflects progress in treatment, and a current treatment plan.  The patient's health record shall contain documentation of the above information that was provided, when, and to whom. | Not yet compliant | |
| | Medical Records | | | |
| | 4.3 | The problem list in a patient's health record: shall be accurate, complete, and easily usable; resolved or historical conditions or diagnoses are separated from current conditions; the date of onset or resolution of resolved or historical conditions or diagnoses is indicated, if known; similar or identical diagnoses of current conditions are listed only once.  For example, a problem list would not simultaneously list "heart disease," "heart failure," and "congestive heart failure, not otherwise specified." | Not yet compliant | Data analysis needs refinement |
| | Intake | | | |
| | 16.1a | A psych associate or psychologist conducts a mental health assessment of each patient within one business day of that patient first entering the ADCRR system. | Not yet compliant | |
| | 16.1b | The intake mental health assessment shall identify and document sufficient relevant information regarding the presence and severity of mental health symptoms; current impact on functioning; past hospitalization/treatment including response to treatment; medications; suicide risk; behavioral observations of staff; and a preliminary designation of level of care. | Unable to determine compliance | Data analysis needs refinement |

| | | | | |
|---|---|---|---|---|
| | 15.8 | For patients admitted to ADCRR on a psychotropic which is not on ADCRR's formulary, the medication shall be continued if, based on the patient's history, there is significant risk of worsening of the condition if a different medication is prescribed. If no such risk exists, the medication shall be continued long enough to allow a safe transition to a different medication or medications. | | |
| | **Non-urgent Care** | | | |
| | 15.3 | Patients on the mental health caseload who believe they need mental health care shall submit HNRs. The primary therapist or, if necessary, another psych associate shall triage HNRs within 24 hours of receipt. "Triage" in this context means determining whether the request requires immediate attention and resolution or whether the request can safely be deferred until the primary therapist can address it. Documenting the word "Triaged" is adequate evidence of triage. Primary therapists shall address the HNR within three business days of its submission. "Address" means evaluating the request, determining the clinical need, and if an action is required (e.g., face-to-face visit), planning that action to occur in a clinically appropriate timeframe. When the primary therapist is absent, another psych associate or a psychologist completes these tasks in their stead within the same time. | | |
| | 15.4 | If a patient's PT determines a visit is clinically appropriate following submission of an HNR, the patient shall be seen by the PT or referred to another professional as directed by the PT. | Unable to determine compliance | Data collection needs refinement |
| | 15.5 | Patients who are not yet on the mental health caseload but request mental health treatment shall submit requests to be seen through the procedures for seeking medical care. | | |
| | 15.6 | When custody staff, families, or any other concerned party refers a patient for mental health assessment, there is a timely response to the concern by mental health staff. | | |
| | **Chronic Outpatient Care** | | | |
| | 16.3.1.1 | MH-3 patients' assigned PT shall conduct an initial comprehensive mental health evaluation within one month of arriving at the assigned facility if not already completed when the patient first entered the prison system; | Not yet compliant | Data analysis needs refinement |
| | 16.3.1.2 | MH-3 patients' assigned PT shall conduct an evaluation whenever there is a change in MH level of care designation | | |
| | 16.3.1.3 | MH-3 patients' assigned PT shall conduct an evaluation at least once per year. | Not yet compliant (based on most recent report submitted in July) | |
| | 16.3.3a | A treatment plan meeting shall be conducted with MH-3 patients and their assigned PT. The treatment plan meeting shall occur at least once per year. | | |
| | 16.3.3b | A treatment plan meeting shall include: The Primary Therapist, The patient, A psychologist or psychiatric practitioner shall also be present for complex cases and in all other cases shall provide input to the PT prior to the treatment plan meeting. At that meeting, the patient's treatment plan shall be reviewed and updated to determine adherence to treatment, efficacy of interventions, evaluation of the level of care needs, diagnostic impressions, progress to date in treatment, and steps taken toward moving to a less restrictive environment, if applicable. The timing of the treatment plan meetings should be based on the needs identified in the treatment plan, but no less often than once a year. The treatment plan shall include a date for next review based on the content of the plan. If no timeline is identified, a treatment plan meeting shall occur at least once per year. | | |

| | | | | |
|---|---|---|---|---|
| | 16.3.2 | A psychiatric practitioner shall conduct an appropriate clinical encounter with all patients in an outpatient level of care (i.e., MH-3) on psychotropic medications as often as clinically required, no less often than every three months. | | |
| | **Residential Care** | | | |
| | 16.4.1.1 | MH-4 patients' assigned PT shall conduct an evaluation whenever there is a significant change in the course of treatment, e.g., new type of treatment including medication, significant decompensation. | Not yet compliant | |
| | 16.4.1.2 | MH-4 patients' assigned PT shall conduct an evaluation at least annually, documenting the patient's need for residential level of care. | | |
| | 16.4.2 | Patients in residential level of care shall have face-to-face encounters with their assigned PTs as determined by the treatment plan. | Not yet compliant | |
| | 16.4.3 | Patients in residential level of care shall have their treatment plans reviewed and updated as clinically indicated but no less often than every three months when the full team meeting described in the next section is conducted | | |
| | 16.4.4 | A full treatment team meeting shall be conducted at least every 3 months by the  primary therapist, psychologist, psychiatric practitioner, and any other staff as necessary. Patients shall be included in the meeting unless there is a clinical or legitimate and substantial safety and security concern documented in the custody record.  The meeting discussion shall include determination of adherence to treatment, efficacy of interventions, evaluation of their level of care needs, rationale for the need for residential care, diagnostic impressions, progress to date in treatment, and steps taken toward moving to a less restrictive environment. | | |
| | 16.4.5a | Patients in residential level of care shall have an appropriate psychiatric clinical encounter no less than every fourteen days. | | |
| | 16.4.5b | Patients in residential level of care shall have an appropriate clinical encounter with a psychiatric practitioner as often as indicated. | | |
| | **Inpatient Care** | | | |
| | 16.5.1.1 | MH-5 patients' assigned PT (or, if not already on the mental health caseload, by the mental health provider assigned to the inpatient unit) shall conduct at least annually a comprehensive mental health evaluation reflecting the rationale for inpatient placement including but not limited to current symptoms and functional impairment, timing and pattern of decompensation, interventions attempted, diagnostic impressions (including potential substance-related impacts), progress in treatment to date, goals for treatment in the inpatient setting, anticipated length of stay, and criteria for discharge. | Not yet compliant | |
| | 16.5.1.2 | MH-5 patients' assigned PT (or, if not already on the mental health caseload, by the mental health provider assigned to the inpatient unit) shall upon discharge from inpatient care, prepare a discharge summary. | | |
| | 16.5.2 | Patients in inpatient level of care shall have a daily face-to-face encounter with their PT unless such an encounter would be clinically contraindicated. If the patient participates in the weekly treatment progress meeting (described in Section 16.5.3, it may be counted as a daily face-to-face encounter. | Not yet compliant | |
| | 16.5.3 | Prisoners in inpatient level of care shall have their treatment progress reviewed daily, and teams shall meet at least weekly with all providers (e.g., nursing, psychiatry, mental health, social work, custody/unit staff, behavioral health technicians) and providers from the prisoner's previously assigned unit whenever possible.  Prisoners shall be included in the meeting unless there is a clinical or legitimate and substantial safety and security concern documented.  At a minimum, the focus of treatment teams shall be to provide updates on prisoner progress, the type and efficacy of interventions used, treatment adherence, potential obstacles to recovery, and rationale for continued placement in the inpatient unit. | | |
| | 16.5.4 | A psychiatric practitioner shall conduct a clinical encounter with all patients in an inpatient level of care (i.e., MH5) as often as indicated, but no less than once per week. | | |

| | | Continuity of MH Care | | |
|---|---|---|---|---|
| | 16.6.1 | If a patient's treatment team changes due to a change in the patient's mental health level of care the "original" PT shall provide the "new" mental health team with the rationale for the change in mental health level and the anticipated treatment needs; | | |
| | 16.6.2 | If a patient's treatment team changes due to a change in the patient's mental health level of care, if the transition is to anything other than to residential or inpatient, the "new" PT meets with the patient within seven calendar days; | | |
| | 16.6.3 | If a patient's treatment team changes due to a change in the patient's mental health level of care, if the transition is to residential or inpatient level of care, the PT meets with the patient as soon as possible, but no more than one business day after arrival, and the psychiatric practitioner is contacted and collaborates on the immediate care plan as soon as a patient is admitted. | | |
| | 16.6.4.1 | If a patient's PT changes without a change in mental health level of care, if the transition is to anything other than to residential or inpatient, the "new" PT meets with the patient within seven calendar days; | | |
| | 16.6.4.2 | If a patient's PT changes without a change in mental health level of care, if the transition is to residential or inpatient level of care, the "new" PT meets with the patient within one business day. | | |
| | 16.6.4.3 | If a patient's PT changes without a change in mental health level of care, if the change is due to a change in assignment of personnel, not a transition of the patient, the newly assigned PT shall meet with the patient in accordance with the scheduled follow-up established in the patient's treatment plan by the previous PT, but no later than the following interval after the assignment of the new PT: one business day for patients in inpatient level care, 14 calendar days for patients in residential care, and three months for patients in all other levels of care. | | |
| | 18.1 | Prior to release of any patient designated as Seriously Mental Ill ("SMI"), MH-4, or MH-5 who shall be released and who is presumptively eligible for federal or state assistance by virtue of their mental illness, ADCRR: (a) develops and documents an aftercare plan that reflects the patient's current symptoms and functional impairments, progress in treatment, and treatment plan; (b) facilitates evaluation for SMI designation and placement in the community, as clinically indicated; and (c) arranges follow-up care with an appropriate community provider where possible. | | |
| | | Suicide Prevention and Crisis Stabilization | | |
| | 16.8.1 | During normal business hours a patient who presents as a suicide risk shall have a formal in-person suicide risk assessment completed by a licensed psych associate, psychologist, or psychiatric practitioner to determine the acute suicidal risk and the level of protection that is needed (e.g., return to current housing, placement in one-on-one observation, etc.). If the concerns are raised after normal business hours or on holidays, the on-duty mental health officer shall be consulted regarding the disposition of the patient (which may or may not include constant observation). If the patient is placed on suicide watch as a result of the concerns raised, they should be placed under constant observation until they are able to have an in-person assessment of suicide risk by a mental health professional. | | |
| | 16.8.3 | Upon recommendation from a psychologist or psychiatric practitioner that housing a patient on suicide watch in the same room with other suicide watch patients ("cohorting") would be clinically safer than housing each patient in isolation, Defendants shall cohort such patients, provided that based on the patients' custody classification (determined based on factors other than the fact that the individual is on suicide watch) such cohorting would not be contraindicated. | | |
| | 16.9.2 | (Additional reference 16.9.1) Continued treatment in a crisis stabilization bed requires review and approval by a psychologist initially at seven days and every three days thereafter. Starting at ten days following placement in a Crisis Stabilization bed, the psychologist and or psychiatric prescriber shall document the justification for their continued assignment to the Crisis Stabilization bed rather than a Residential or Inpatient bed. | | |

| | | | | |
|---|---|---|---|---|
| | 16.9.3 | Patients in a crisis stabilization bed shall be evaluated at least daily in person by their PT (or another psych associate if they have not yet been assigned a PT or have transferred from another yard). Treatment providers shall document their intervention efforts, including but not limited to: assessing mental status; behavioral observations; documenting patient ability to independently care for activities of daily living; type(s) of treatment provided; response to interventions (including medication efficacy and compliance); anticipated length of stay; and criteria for discharge. | | |
| | 16.9.4 | The patient shall be assessed by a psychiatric practitioner as soon after admission to a crisis stabilization bed as possible but no longer than one business day, in order to ensure there is not a medication issue or a question of medication appropriateness that contributed to suicidal ideation. | | |
| | 16.9.5 | For patients placed in a crisis stabilization bed for suicidal concerns, a suicide risk assessment shall be completed upon admission that identifies risk and protective factors and items/privileges they are allowed (based on treatment needs) while in crisis care. | | |
| | 16.9.6 | A clinical note shall be entered whenever the level of suicide watch is changed. | | |
| | 16.9.7 | Prior to being released from a crisis stabilization bed if placed there due to suicidal concerns, a discharge suicide risk assessment shall be completed which documents: the change/reduction in suicidal risk; the patient's identified protective factors; and plans for follow-up treatment, and aftercare including a safety plan developed in collaboration between the patient and treatment providers. | | |
| | 16.9.8 | "Safety contracts" (forms signed by patients, agreeing not to hurt themselves) shall not be used. | | |
| | 16.9.9 | When possible and safe, attempt to provide stabilization at the complex at which the patient has been housed unless there is documented clinical justification for transfer based on the low likelihood of stabilization and/or clinical danger if the patient is maintained at the complex. | | |
| | 16.10. | Restraints used by mental health clinicians for clinical purposes shall comply with the following 8 requirements: 1) Restraints shall be used only to prevent harm to oneself or to others and to ensure the safety and security of the staff and other patients.  They shall not be used for punishment.   2) Restraints shall be ordered and reviewed only by a psychiatric practitioner or psychologist.  3)  Restraints shall only be applied for the minimum amount of time necessary to accomplish the stated need (e.g., patient and staff safety, requisite transports, etc.). 4)  Soft restraints shall be used whenever possible.   5) Restraints shall not be used for more than four hours at a time.  Every effort shall be made to minimize the length of time in restraints.  6) Renewal of restraints beyond four hours shall be approved by the Facility Medical Director/designee and must be renewed at intervals no longer than four hours. If the Medical Director/designee are not available, a licensed mental health provider may approve continued use.  The justification for continued use shall be documented in the patient's medical records. Renewals occurring after hours shall be done in collaboration with the Facility Medical Director/designee, a psychiatric practitioner, or a psychologist.  7) Patients shall be restrained only in settings that allow nurses sufficient access to perform wellness checks and provide necessary medical care.  Nurses shall ensure that the restraints do not impair any essential health needs, such as breathing or circulation to the extremities. These checks shall be documented in the patient's medical records.   8) Patients in restraints shall be under direct observation at all times.  If an observer notes any ill effects of the restraints, every effort shall be made to remedy the ill effects and a psychiatric or medical practitioner shall be notified immediately. | Compliant | |
| | Improvement programs | | | |
| | 2.1.2 | Following a suicide, other MH-related death, or suicide attempt, the sustainable plan shall be implemented within one month of the death or suicide attempt. | | |

| | | | | |
|---|---|---|---|---|
| | 2.4.1 | (Additional reference 2.4.2) There is a robust continuous quality improvement program to monitor the quality of clinical care.  As part of this program, staff monitor the absolute number and trend of various parameters on a monthly basis.  Where metrics or trends in metrics show room for improvement, staff makes appropriate efforts to understand the underlying reason for deviation, take reasonable steps to effectuate improvement, evaluate the effectiveness of these steps in a reasonable time, and make adjustments to its improvement efforts as needed. At a minimum, the following are monitored:  1) percentage of patients on antipsychotic medications receiving timely AIMS (abnormal involuntary movement scale) assessments; 2) percentage of patients on antipsychotic medications receiving appropriate and timely metabolic assessments; 3) percentage of patients receiving punishment for a rule violation, for whom a mental health intervention would have been more clinically appropriate than punishment. | | |
| **Subclass** | | | | |
| Staffing and Bldg. | | | | |
| All | | | | |
| | 20.2.1a | ADCRR shall staff all Mandatory Posts at all times; Essential Posts shall be staffed at least 75%; Important Posts shall be staffed at least 50%. | Not yet due | |
| | 20.2.1b | If ADCRR falls below these levels, it shall inform the Court within seven days. | Not yet due | |
| | 20.2.2 | ADCRR shall document on an annual basis an assessment of the operative staffing plan and document any requests for necessary adjustments to the plan.  The assessment shall be filed with the Court on the last business day of January each year. | Not yet due | |
| | 20.2.3a | Whenever ADCRR fails to comply with the staffing levels, the report shall specifically identify the deviation(s) that occurred and provide reasonable and adequate justifications for the deviation(s). | Not yet due | |
| | 20.2.3b | Whenever ADCRR fails to comply with the staffing levels, Defendants shall file with the Court a "Deviation from Staffing Plan Report" by the tenth day of the following month. | Not yet due | |
| | 23.2a | Maintain all showers in good operational state.  Showers shall be sanitized daily or more often if necessary. | Not yet compliant | |
| | 23.2b | Showers shall be free of filth and mold/mildew.  Showers shall be resurfaced and/or painted on an as-needed basis. | Not yet compliant | |
| | 23.2c | All new paint shall be mixed with a mildewcide additive to reduce the presence and growth of mold and mildew. | Not yet compliant | |
| | 23.3a | Recreation areas used by individuals shall be cleaned at least daily and kept free of dirt, filth, rubbish, garbage, rodents, vermin, insects, or other matter detrimental to health (e.g., mold/mildew). | Not yet compliant | |
| | 23.3b | A log entry shall be made in the EOMS application for each housing unit at the time a recreation area is cleaned. | Not yet compliant | |
| | 23.5.1 | Maintain all cells in a serviceable, good operational state, ensuring the cells are kept free of filth, mold, mildew, rust, vermin, and insects. | Not yet compliant | |
| | 23.5.2a | Professionally re-paint cells after appropriate preparation as needed. | Compliant | |
| | 23.5.2b | New paint shall be mixed with a mildewcide additive to reduce the presence and growth of mold and mildew. | Not yet compliant | |
| | 23.5.3 | All areas used in conjunction with incarcerated individuals to include, but not limited to, dayrooms, classrooms, etc., shall be kept in a clean and sanitary condition, free from any accumulation of dirt, filth, rubbish, garbage, rodents, vermin or other matter detrimental to health (e.g., mold/mildew). | Not yet compliant | |
| | 23.5.4 | Each housing unit's housekeeping program shall include a daily general sanitation inspection by a supervisor.  The inspector shall make a log entry in the EOMS application for each housing | Unable to determine compliance | Data collection needs refinement and/or incomplete resident-level data |
| | 23.6a | Individuals shall have access to effective cleaning and sanitizing supplies necessary to properly clean and sanitize their own living area.  Supplies shall include, as consistent with operational safety, access to tools and cleaning agents, e.g., cleaning detergents, rags, sponges, scrub brushes, mops, mop bucket, broom, dustpan. | Not yet compliant | |

| | | | | |
|---|---|---|---|---|
| | 23.6b | A log entry shall be made in the EOMS application for each housing location that includes the date and time the supplies were provided and the date and time the supplies were collected. | Unable to determine compliance | Data collection needs refinement and/or incomplete resident-level data |
| | 23.7a | Engage a pest control contractor on a semi-monthly basis to eliminate vermin, insects, and rodents by safe and effective means in all common areas used by members of the subclass. | Unable to determine compliance | Data collection needs refinement and/or incomplete resident-level data |
| | 23.7b | The pest control service shall be completed in all cells where the person occupying the cell agrees to the service. | Unable to determine compliance | Data collection needs refinement and/or incomplete resident-level data |
| | 23.7c | A log entry shall be made in the EOMS application indicating the location, date, time, name of the company representative performing the pest control service, and the service performed. | Unable to determine compliance | Data collection needs refinement and/or incomplete resident-level data |
| | 29.1a | Defendants shall assign a full-time qualified staff member ("Classification Monitor"), with no other collateral duties, to each individual unit housing members of the subclass. | Unable to determine compliance | Data collection needs refinement and/or incomplete resident-level data |
| | 29.1b | The Classification Monitor will ensure all classification reviews and individualized plan reviews, that lead to step progression (up or down) and movements to an appropriate new housing location, are processed and completed within ten days.  The reasons and evidence considered shall be documented in the resident's classification record. | Not yet compliant | |
| Crisis Stabilization | | | | |
| | 1.24 | When patients on suicide watch, or in a crisis stabilization bed for suicidal concerns, are removed from a cell for a healthcare-related visit, including mental health encounters conducted in or near the housing unit, they shall not be restrained or strip-searched unless the Warden or designee has determined and documented the temporary need for such measures due to exigent circumstances. | Not yet compliant | |
| Access to Services | | | | |
| | 22.1 | ADCRR shall not house any person in a housing location where they lack the ability to effectively contact a staff member immediately, either via in-person or via a call button/intercom system. | Unable to determine compliance | Data collection needs refinement and/or incomplete resident-level data |
| | 24.1 | Via tablet or, for people who are not permitted to have electronic tablets or who do not have access to an electronic tablet due to tablet malfunction, via other means, all subclass members are able to make direct requests, in a language they understand, for services consistent with their custody level including: file a letter or other request required before filing a grievance, file a grievance; file an appeal; access and send electronic mail (both personal and professional); check their commissary account balance; obtain current program schedules and curriculum; purchase commissary items; access case notices regarding letters and grievances; access the patient handbook; access disciplinary documents; access hearing documents; access appeal decisions; medical/mental services; and access current classification level and progress towards the next step down. | Not yet compliant | |
| Operations | | | | |
| | 19.1 | (Additional reference 19.2) ADCRR shall ensure all custody decisions and reviews made by correctional officers, supervisors, and committees are reasonable and consistent with legitimate penological interests.  Every person is housed in the least restrictive level that is safe for them and others. | Not yet compliant | |
| | 19.3a | No person shall be confined in a cell for 22 hours or more each day for more than two months unless there are extraordinary documented legitimate penological interests. | Not yet compliant | |
| | 19.3b | ADCRR shall implement a system to facilitate the return to lower levels of custody for those people who have been in the subclass for longer than two months, and document their efforts. | Not yet compliant | |
| | 19.4 | No person under the age of 18 shall be placed into maximum custody, detention, or close management, or otherwise kept in a cell for more than 22 hours each day. | Not yet compliant | |
| | 19.5 | Within sixty days of this Order, no patient designated as Seriously Mentally Ill ("SMI") shall be housed in maximum custody or detention, or otherwise kept in a cell for more than 22 hours each day. | Not yet compliant | |

| | | | | |
|---|---|---|---|---|
| | 29.2a | ADCRR is required to provide residents in maximum custody or detention a written or electronic copy of their individualized case plan, in a language the person understands that describes the actions needed, as well as associated timeframes, to progress in their steps in maximum custody and generally to gain more privileges and lower classification levels (less restrictive housing). | Unable to determine compliance | Data collection needs refinement and/or incomplete resident-level data |
| | 29.2b | ADCRR is required to provide residents in maximum custody or detention a written or electronic copy of their individualized case plan, in a language the person understands. | Not yet compliant | |
| | 29.2.1 | ADCRR is required, at intervals not to exceed one month, to conduct and document an evaluation of each of the person's progress under an individualized plan.  The evaluation should also consider the state of the person's mental health; address the extent to which the person's behavior, measured against the plan, reasonably justifies the need to maintain, increase, or decrease the level of controls and restrictions in place at the time of evaluation; and recommend full classification review when appropriate.  The documentation shall be sufficiently detailed to show the basis for any decisions made in the evaluation (including increasing, decreasing, or maintaining privileges). | Not yet compliant | |
| | 29.2.2a | ADCRR is required, at intervals, not to exceed six months, to conduct a full classification review | Compliant | |
| | 29.2.2b | The full classification review includes a meeting with the subclass member and the classification committee.  At that meeting it shall be determined whether the person's progress toward compliance with the individual case plan or other circumstances warrant a reduction of restrictions, increased programming, or a move to a lower level of custody. | Compliant | |
| | 29.2.2c | The subclass member has the option to attend the classification review meeting, except for circumstances justified by legitimate safety concerns. | Compliant | |
| | 29.2.2d | The documentation shall be sufficiently detailed to show the basis for any decisions made in the classification review (including increasing, decreasing, or maintaining privileges or classification).  If a person has met the terms of the individual case plan, there should be a presumption in favor of releasing the resident from maximum custody. | Compliant | |
| | 29.2.2e | A decision to retain a person in maximum custody following consideration by the classification review committee should be reviewed by the facility warden or deputy warden, and approved, rejected, or modified as appropriate. | Compliant | |
| | 29.2.2f | If the facility warden or deputy warden rejects or modifies the decision of the classification committee, the documented basis for the rejection or modification of the decision is reasonable and consistent with legitimate penological interests. | Compliant | |
| | 29.2.2g | When the warden or deputy warden disagrees with the classification committee's recommendation, the Regional Operations Director shall review the matter and make a final determination. The documented basis for the Regional Operations Director's decision is reasonable and consistent with legitimate penological interests. | Compliant | |
| | 29.3a | ADCRR is required to ensure enough beds are available for the number of subclass members placed in lower classification levels. | Not yet compliant | |
| | 29.3b | When a higher or lower classification level is achieved, the Classification Monitor shall within ten days re-house the person into a location associated with their new classification level. | Not yet compliant | |
| | 29.3c | When the Maximum custody step is changed, the Classification Monitor shall within ten days re-house the person, as necessary, into a location associated with their new step and afford the appropriate privileges associated with the new step. | Unable to determine compliance | Data collection needs refinement and/or incomplete resident-level data |
| | 30a | ADCRR shall assign a full-time qualified staff member, with overall unit authority and no other duties, to each detention unit to ensure all services, assessments, programs and activities in the detention unit are completed as required | Compliant | |
| | 30b | Subclass members who are eligible to leave the detention unit are re-housed within ten days of assessment. | Not yet compliant | |

| | Meals | | | |
|---|---|---|---|---|
| | 26.1a | All persons shall be provided a minimum of three separately provided meals a day (breakfast, lunch, dinner) consisting of two hot meals and one cold meal with no more than 14 hours between dinner and breakfast.  Breakfast and lunch may be served together on weekends and holidays, provided one is a hot meal. | Not yet compliant | |
| | 26.1b | The meals for the subclass shall be of the same quality and have the same nutritional and caloric content that meets nutritional needs and is comparable to the meals served in general population. | Compliant | |
| | 26.3.1 | A log entry is made when a meal is provided or refused, that includes the type of meal (regular diet, therapeutic, religious) and, if the meal was refused, a video recording of the refusal is made. | Compliant | |
| | 26.2 | When a person refuses three meals of any kind in a seven-day period or displays a significant change in eating habits (e.g., accepts meals but does not consume them; does not consume significant portions of a meal; refuses meals intermittently, etc.,) corrections officers shall immediately notify medical staff. | Compliant | |
| | 26.3.2 | A log entry is made when a therapeutic or religious diet begins and/or ends and includes the type of diet and the reason for the beginning or ending of the diet | Compliant | |
| | Out of cell activities | | | |
| | 27.1 | Subclass members, including any people who are not in maximum custody, detention, or watch, shall be offered 14 hours or more per week of out-of-cell time to include opportunities for recreation, showers, individual/group therapy where eligible for such services, visitation, phone calls, or other offered activities.  If a person is offered out-of-cell time, but the individual voluntarily refuses, the time the person would have been out-of-cell counts towards out-of-cell time.  If out-of-cell time is scheduled but not available, not offered, or offered at unreasonable times (e.g., 4:00 A.M.), that time shall not count towards out-of-cell time. | Not yet compliant | |
| | 27.1.3 | When out-of-cell time must be canceled, reasonable efforts shall be made to re-offer it. | Compliant | |
| | 27.1.4 | A log entry shall be made in the EOMS application that includes the type of activity, the time the activity began and ended, or, if the person refuses, a video recording of the refusal. | Not yet compliant | |
| | 27.2 | All members of the subclass shall be provided regular access to showers, at a minimum of three times per week with no more than three days between showers. | Compliant | |
| | 27.2.2 | When a person refuses to shower on a continual basis or displays a significant change in hygiene habits, medical staff shall be immediately notified. | Unable to determine compliance | Data collection needs refinement and/or incomplete resident-level data |
| | 27.3.1a | At a minimum each resident shall have no less than 10 hours per week in a recreation area in blocks of no longer than 3.5 hours in enclosures of at least 100 square feet. | Not yet compliant | |
| | 27.3.1b | All those in the subclass not in Maximum Custody Step 1 have some ability to socialize with others. | Not yet compliant | |
| | 27.3.2 | Subclass members will be allowed to use the restroom during recreation periods as needed, without forfeiting the remainder of the recreation period. | Not yet compliant | |
| | 27.3.3a | Recreation areas shall have constant supervision, in-person, by qualified staff members | Not yet compliant | |
| | 27.3.3a | During recreation, individuals have available shade and clean drinking water. | Compliant | |
| | 27.3.4 | A log entry shall be made in the EOMS application for each housing unit when a portable beverage cooler of clean drinking water for a recreation area is provided. | Compliant | |
| | 27.3.5 | For each person who refuses to go to recreation, a log entry shall be made in the EOMS application that includes a video recording of the refusal. | Not yet compliant | |
| | 27.3.6 | Subclass members may voluntarily request to end their recreation period at any time, and will be returned to their cell within 15 minutes of making the request.  Any remaining time for that recreation period is forfeited. | Compliant | |