Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin
Brislan, Robert Gamez, Jonathan Gonzalez,
Jason Johnson, Kendall Johnson, Joshua
Polson, Laura Redmond, Sonia Rodriguez,
Ronald Slavin, Jeremy Smith, and Christina
Verduzco, on behalf of themselves and all
others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY
LAW**
5025 East Washington Street, Ste. 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for
Disability Law*

**[ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Ryan Thornell, *et al.*, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-ROS<br><br>**PLAINTIFFS' RESPONSE TO COURT MONITORS' INTERIM STATUS REPORT (Doc. 4539)** |

Plaintiffs submit this statement in response to the Court's Order that they "articulate their position regarding whether the Permanent Injunction has been violated and, if so, what actions they propose to take." Doc. 4538 at 2. Plaintiffs do so below, and if the Court so orders, can present further evidence in support of their position.

## Introduction

Nearly one year after the Court's issuance of injunctive relief, and more than 18 months after it found the provision of medical and mental health care and conditions of isolation to violate the Constitution, the Court monitoring team's status report details widespread and substantial violations of the Injunction. *See generally* Doc. 4539. While Defendants have made progress in significantly reducing the number of people subject to the inhumane conditions in isolation, class members remain at serious risk of harm due to Defendants' failure to comply with many critical Injunction provisions. Given the Court's 2022 finding that Defendants' medical and mental health care and treatment of the isolation subclass violate the Constitution, *see* Doc. 4335, and the requirements of the 2023 Injunction, *see* Doc. 4410, the burden is on Defendants to demonstrate compliance.[1]

The monitors' report details how Defendants and their fourth health care vendor are failing to develop systems or processes to implement the Injunction's requirements. For example, much of the chart at Attachment 1 to the report has blanks—or a handful of "Unable to determine compliance" entries—under the header of "Compliance," because Defendants still are unable to self-monitor many Injunction requirements. *See generally*

---

[1] Plaintiffs do not question the sincerity or commitment of Defendant Thornell or his team to comply with the Injunction, but they are operating under external constraints that limit their ability to make timely progress. Chief among these is that they do not have direct control over how the health care system operates and must rely on NaphCare. In any event, "there is no good faith exception to the requirement of obedience to a court order." *In re Dual-Deck Video Cassette Recorder Antitrust Litig. v. Motion Picture Ass'n of Am.*, 10 F.3d 693, 695 (9th Cir. 1993) (internal citation omitted). Defendants are responsible for compliance with the Court's orders, even if they point to the failures of their contractors or agents. *West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights."); *see* Ariz. Rev. Stat. §§ 31-201.01(B), (D) (2021) (Director Thornell is responsible for the provision of mental health and medical care to people in the department's legal custody).

Doc. 4539 at 34-50. The failure to create a viable self-monitoring system, and inability to measure or demonstrate compliance, must be presumed to be noncompliance. This is, in and of itself, a violation of the Injunction. *See Thompson v. City of L.A.*, 885 F.2d 1439, 1449 (9th Cir. 1989) (holding that "[i]t is a bedrock common law principle that in certain situations, once a condition has been proven to exist, it is presumed in the absence of proof to the contrary that the condition has remained unchanged.") (*citing* 2 J. WIGMORE, WIGMORE ON EVIDENCE § 437 (1979)), *overruled on other grounds by Bull v. City & Cnty. of S.F.*, 595 F.3d 964 (9th Cir. 2010).[2]

Plaintiffs agree with the monitors' four recommendations. *See* Doc. 4539 at 31-32. Plaintiffs also concur in their conclusion that "the lag in time between issuance of the Injunction and this most recent amendment to the contract underscores the challenges the agency faces, and may continue to face, due to the complexity and constraints of having to effect change via a third-party vendor." *Id.* at 31. To address this perennial problem that has been one of the root causes of noncompliance in this case for over a decade, through the tenure of four different for-profit vendors, Plaintiffs ask the Court to order Defendants to show cause why it should not vacate the state law privatizing correctional health care. Plaintiffs also ask the Court to order Defendants to hire (as a consultant or employee) health care delivery systems and operations turn-around expert(s) to advise them on this

---

[2] The Injunction orders:

> Defendants shall use reasonable judgment in selecting methodologies for monitoring compliance and shall exercise care in the underlying measurements. … ***Defendants will be required to collect monthly data and perform analyses beyond what they are doing now.*** … Defendants may not delegate such monitoring to the contractor (*e.g.*, NaphCare) providing health care services to prisoners, if there is one.
>
> ***Defendants shall monitor all elements of this order on a monthly basis. Monitoring shall be completed and available for inspection by the monitors by the last day of the month following the monitored month.*** Defendants shall maintain adequate supporting evidence for their monitoring results.

Doc. 4410 at 7 (emphasis added).

transition and how to implement the Injunction. Plaintiffs propose other actions the Court can take to ensure Defendants achieve compliance without further delays. *See infra* 11-15.

### Isolation Subclass Requirements and Violations of the Injunction

Overall, Plaintiffs agree with the monitors' statements about ADCRR's compliance (or noncompliance) with Injunction provisions that relate to the isolation subclass. Doc. 4539 at 3-6, 51-54. However, the report omits some crucial information.

As noted on pages 3-4 of the report, the Injunction requires Defendants to implement a system to facilitate the return to lower levels of custody for those people who have been in the subclass for longer than two months, and to document their efforts. Doc. 4410 § 19.3. A critical component is that ADCRR must provide each subclass member an "individualized case plan … that describes the actions needed, as well as associated timeframes, to progress in their steps in maximum custody and generally to gain more privileges and lower classification levels (less restrictive housing)." *Id*. § 29.2. ADCRR then must "conduct and document a [monthly] evaluation" of each person's "progress under an individualized plan." *Id*. § 29.2.1. This evaluation should "consider the state of the prisoner's mental health; address the extent to which the prisoner's behavior, measured against the plan, reasonably justifies the need to maintain, increase, or decrease the level of controls and restrictions in place at the time of evaluation; and recommend full classification review when appropriate." *Id.* The documentation must be "sufficiently detailed to show the basis for any decisions made in the evaluation (including increasing, decreasing, or maintaining privileges)." *Id*.

The monitors' report notes that the "30-day plans," like the 60-day and 180-day reviews, "lack detail, justifications, and descriptions of the pathway to lower custody." Doc. 4539 at 4. This understates the inadequacy of the plans. The plans Plaintiffs' counsel reviewed that Defendants created through the end of 2023 were not specific to the person's stay in detention or maximum custody. They were, instead, "Corrections Plans" that applied to the entirety of the person's term of incarceration. Many people have refused to house in a particular unit because of safety concerns or are seeking protective

custody. The "individualized plans" state this fact, and perhaps where the person believes they can house, and generally nothing more. For people in the subclass for other reasons, many of their "plans" are limited to the boilerplate, "it is recommended that you continue to remain disciplinary free and continue to program." Defendants have indicated that they are in the process of changing the plans to be more detailed and individualized, but Plaintiffs have not yet seen the new plans. Additionally, the Injunction requires that

> at intervals not to exceed six months, [ADCRR must] conduct a full classification review .... At that meeting it shall be determined whether the prisoner's progress toward compliance with the individual case plan or other circumstances warrant a reduction of restrictions, increased programming, or a move to a lower level of custody. If a prisoner has met the terms of the individual case plan, there should be a presumption in favor of releasing the prisoner from maximum custody or close management.

Doc. 4410 at § 29.2.2.

As with the 30-day plans, the monitors' report finds the documentation of these reviews is inadequate. Doc. 4539 at 4. However, the inadequacy goes beyond simply "lack[ing] detail, justifications, and descriptions of the pathway to lower custody." Neither the 60-day nor 180-day reviews even reference the plans. They list the reasons the person is in isolation, any disciplinaries, the person's classification scores, and then state whether the person should be moved to a different housing situation. While many people have been removed from the subclass, for which Plaintiffs applaud Defendants' efforts, this system does not meet the requirements of § 29.2.2.

The monitors' report notes that "bed space remains an issue that contributes to people remaining in MAX custody or Detention even though they are eligible for lower custody housing." Doc. 4539 at 4. This understates the magnitude of the issue. In December 2023, 1,037 people were removed from isolation. Approximately 14% of them – 146 people – were held in isolation for more than 10 days after they were deemed eligible to be housed elsewhere, in violation of § 29.3 of the Injunction. Additionally, many people are in the subclass simply because there are no housing options for them. This includes people who have refused to house, people who are seeking protective

custody, people on death row in max custody who have a long history of being disciplinary-free but cannot be housed on the only close custody death row housing unit, and people who have had conflicts with specific persons and cannot be housed in the same unit with them, but cannot go anywhere else.

In addition to the violations identified by the monitors, Plaintiffs contend ADCRR is violating the following sections of the Injunction with regard to the isolation subclass:

**§ 19.2** requires Defendants to implement a system to facilitate the return to lower levels of custody for those prisoners who have been in the subclass for longer than two months, and **§ 29.3** requires Defendants to have enough beds available for the number of people placed at each classification level. A significant portion of the people in isolation are there because they or ADCRR do not believe they are safe in housing units where they were. Many are unable to leave isolation because there is no bed available at the appropriate custody level at which they or ADCRR believe they would be safe. And when Plaintiffs' counsel recently visited ASPC-Tucson, they spoke with people who reported that they had been housed in suicide watch cells (confined to cells for more than 22 hours a day) despite not being suicidal, because they were seeking protective custody for safety reasons and there was not enough space in detention units. Plaintiffs will negotiate with Defendants about this issue. If Defendants are unable to craft and implement a plan to resolve it, Plaintiffs will present the issue to the Court.

**§ 19.5** requires that no person designated as SMI be housed in maximum custody, detention, or otherwise kept in a cell for more than 22 hours per day. It appears that most, but not all, people with SMI are housed where they get out of their cells more than two hours a day. There are, however, people with SMI who remain in the subclass:

- In the housing units at ASPC-Eyman Browning that are nominally mental health units, it appears that most people, many of whom are designated as SMI, are not receiving more than two hours out of cell per day;

- At ASPC-Tucson Rincon's infirmary (IPC), there is a section that houses people with dementia and serious mental illness. According to nursing staff and other incarcerated people housed nearby in the IPC, these patients are

> kept in their cells nearly all the time, getting out only for occasional showers, once a week at most. Some of them are designated as SMI, or Plaintiffs' counsel observed them as presenting with active psychosis.

Plaintiffs will negotiate with Defendants about this issue. If Defendants are unable to craft and implement a plan to resolve it, Plaintiffs will present the issue to the Court.

**§ 27.3.1** requires that all people in the subclass, other than people in Maximum Custody Step 1, have some ability to socialize with others during recreation. People in the detention units at ASPC-Lewis and the Dakota detention unit at ASPC-Yuma do not have any ability to socialize with others during recreation. Plaintiffs will negotiate with Defendants about this issue. If Defendants are unable to craft and implement a plan to resolve it, Plaintiffs will present the issue to the Court.

**§ 29.2** requires an "individualized case plan … that describes the actions needed, as well as associated timeframes, to progress in their steps in maximum custody and generally to gain more privileges and lower classification levels (less restrictive housing)" for each subclass member. As discussed above, the documents used for this purpose are not individualized and do not contain the required information. Defendants stated that they are changing the plans to include the required information. Once the changes are made, Plaintiffs will review them to determine if they satisfy the Injunction.

**§ 29.2.1** requires monthly evaluations of progress under individualized plans. Due to the lack of the required information in the individualized plans, the monthly evaluations have not included consideration of whether the individuals are progressing according to the plans. As noted with § 29.2, Defendants are changing the individualized plan's format. This may resolve the violation of § 29.2.1. Plaintiffs will review the new plans and documentation to determine if they satisfy the Injunction.

**§ 29.2.2** requires a full classification review every six months, at which it shall be determined whether the person's progress toward compliance with the individual case plan warrants a reduction of restrictions, increased programming, or a move to a lower level of custody, with a presumption in favor of lowering the person's custody level, if

they have met the terms of the case plan. Again, due to the case plans' lack of detail, the plans are not considered in the process. Once the changes to the case plans are implemented, Plaintiffs will review.

**§ 29.3** requires Defendants to re-house and afford the appropriate privileges to all persons within ten days of a change to their classification or step level. As discussed above, many people are not re-housed within ten days. During the final four months of 2023, more than 10% of the people who were eligible to be removed from the subclass waited more than ten days to be re-housed:

|  | Total Removed | Total >10 day delays | % >10 day delays |
|---|---|---|---|
| September 2023 | 905 | 100 | 11% |
| October 2023 | 942 | 212 | 22.5% |
| November 2023 | 891 | 109 | 12.2% |
| December 2023 | 1037 | 146 | 14.1% |

Plaintiffs will negotiate with Defendants about this issue. If Defendants are unable to craft and implement a plan to resolve it, Plaintiffs will present the issue to the Court.

**Health Care Requirements and Violations of the Injunction**

Plaintiffs agree generally with the monitors' conclusions about Defendants' violations of the health care requirements of the Injunction. *See, e.g.*, Doc. 4539 at 34-50. Plaintiffs also agree with the monitors that the cornerstone of compliance with the Injunction is "a sufficient number of appropriately qualified and trained employed medical and mental health professionals. Almost every requirement rests on staffing and until ADCRR achieves sufficient staffing it will be unable to provide constitutionally adequate care." *Id.* at 16. The data provided by Defendants and NaphCare, summarized at Table 3 of the monitors' report, illustrates the dismal inability to fill positions, and the significant failure to retain employees. *Id.*

However, Plaintiffs disagree with the monitors about the following Injunction provisions where the monitors assert Defendants are compliant or a requirement has been

completed (either on a one-time basis, or based on data for one month, September 2023):

**§ 2.1** requires Defendants to conduct root cause analyses following any death, suicide attempt, or other adverse event, to identify all significant health care and custody errors, and to implement sustainable remedial plans within one month of the death. The monitors noted that Defendants did not provide any documentation on this requirement for September 2023, but that "ADCRR states that this QI is currently being monitored and in compliance." Doc. 4539 at 38. Plaintiffs' counsel's review of recent mortality reviews from ASPC-Tucson and subsequent discussion with the Site Medical Director there suggests this is not true, at least at that prison. It appears that the current death review process is extremely weak and, to the extent that it does identify deficiencies in care, it fails to devise or implement any remedial plans to address those deficiencies. In fact, in one recent ASPC-Tucson death review, the exact same deadly medication error occurred that was identified before trial and criticized by experts for both sides. *See* Doc. 4335 at 52 (patient prescribed NSAIDS despite history of life-threatening GI bleed); 63 (one patient prescribed NSAIDS despite low platelet count; another prescribed NSAIDS despite liver disease). The Site Medical Director failed to identify any measures undertaken after the most recent patient death to ensure that providers in the future avoid this deadly medication error. Plaintiffs are concerned about whether ***meaningful*** post-mortem root cause analyses or remedial plans are occurring, or if there is any accountability to ensure that remedial plans are implemented to avoid preventable deaths, suicides, and other adverse events.

**§ 3.1** requires Defendants to develop and implement policies to assess the English fluency of patients during intake, and at other key points. The monitors state that the "systems underlying these improvements have been implemented." Doc 4539 at 19. In fact, Defendants have yet to produce any policies regarding the assessment of English fluency of patients. Additionally, the monitors state that NaphCare "elected to require all staff to use a language translation service" when treating non-English-speaking patients. *Id*. Plaintiffs' counsel's recent interviews with staff and non-English speaking patients at

multiple prisons reveal that NaphCare does not always use the language line, and at times continues to impermissibly use custody staff to interpret health care encounters.[3]

**§ 8.4** requires Defendants or their vendors to notify the Court of any default categorical timeframes used for completing providers' requests for specialty care, and the monitors indicate that this has been done. The monitors characterize this as a "one-time indicator" that is now complete. Doc. 4539 at 35.[4] The monitors separately explained to Plaintiffs' counsel on February 14, 2024 that this finding of compliance was made because ADCRR notified them that they and NaphCare would be using timeframes of 30 days to complete "urgent" requests and 60 days to complete "routine" specialty requests. Plaintiffs believe that the reliance on the same pre-set timeframes set by the vendor's corporate headquarters, that evidence at trial showed often did not reflect the patient's needs, is not compliant with Sections 1.1, 8.1, and 8.5 of the Injunction, which require that all care be completed in a "clinically appropriate" manner, that all "specialty referrals be completed within the ordered timeframe," and that orders for specialty referral that have specific timeframes supersede the categories set by the vendor.

**§ 11.1** requires treatment of patients with Hepatitis C. The monitors noted that for several of the components of this requirement, "ADCRR reports that it believes it is currently in compliance with this QI [al]though a report has not yet been created[,]" "ADCRR reports that it believes it is currently in compliance with this QI[,]" or "ADCRR reports that it plans to be in compliance with this QI by April 7, 2024." Doc. 4539 at 43. Such aspirational assertions, without further proof, do not establish compliance.

**§ 11.3** requires treatment of patients with substance use disorders. Again, the monitors noted in their summary chart that "ADCRR reports that it believes it is currently

---

[3] Plaintiffs agree with the monitors' other findings of noncompliance with § 3.6, and the failure to provide any proof of compliance with other provisions related to language interpretation in health care encounters. Doc. 4539 at 39.
[4] Plaintiffs agree with the monitors' other findings of noncompliance with Section 8 of the Injunction. Doc. 4539 at 42. *See also infra* page 13 for more discussion of the broken specialty care system.

in compliance with this QI." Doc. 4539 at 44. Such aspirational assertions, without further proof, do not indicate compliance.

**§ 14.1**, **§ 14.2**, **§ 1.10**, and **§ 1.12** govern qualifications for psychiatrists and mental health supervisors. The monitors found Defendants compliant with these requirements in September 2023. Doc. 4539 at 45. Plaintiffs have not independently verified these claims, but currently have no reason to question the monitors' conclusion for that month.

**§ 16.10** has detailed requirements related to the use of restraints by mental health clinicians for clinical purposes. The court monitors found Defendants compliant with this requirement. Doc. 4539 at 50. The monitors explained to Plaintiffs' counsel on February 15, 2024, that this finding of compliance was based upon representations by ADCRR officials that the Department was compliant because no patients were placed in restraints by mental health staff in September 2023. Plaintiffs find it difficult to believe that not a single person with mental illness or experiencing a mental health crisis in the entire prison system was placed in restraints at the direction of mental health staff for the entire month of September 2023. Defendants offered no documentary support for this assertion (for example, suicide watch log sheets, reports from medical records indicating that people in crisis were **not** placed in restraints, etc.). In any event, a lack of restraint incidents in a given month does not establish compliance with the Injunction requirements. Accordingly, until Defendants offer detailed evidentiary proof showing sustained compliance, Plaintiffs take the position that Defendants are not compliant with § 16.10. Plaintiffs will confer separately with Defendants and the mental health monitor about what sort of documentary evidence will be necessary to show compliance.

**Additional Necessary Orders to Address Defendants' Violations of the Injunction**

The monitors conclude that "[p]atients are in daily danger" and "the quality of care provided by NaphCare remains woefully inadequate" due to severe and chronic understaffing. Doc. 4539 at 30. Plaintiffs wholeheartedly agree with this finding and endorse the monitors' four recommendations to the Court. *Id.* at 30-31. There are three additional measures Plaintiffs propose to address continued violations of the Injunction.

*First*, in 2009, the Arizona Legislature passed legislation to privatize prison health care. *See* 2009 Ariz. Legis. Serv. 3rd Sp. Sess. Ch. 6, § 26(C) (H.B. 2010) (WEST). Since then, the people incarcerated in the state's prisons have been subjected to a merry-go-round of four different private, for-profit vendors, with insufficient improvement in the quality of health care. In October 2019, when Defendants were still on their second vendor, Corizon, Dr. Stern described for the Court that "privatization has been, and will continue to be, a barrier to compliance" due to, among other things, (1) the increased cost to ensure a profit margin, (2) duplication of work and monitoring burdens, (3) no marginal benefit, (4) health care staff recruitment challenges, (5) poor track records, and (6) patient financial burden. *See* Doc. 3379 at 104-08. Plaintiffs joined Dr. Stern's recommendation that the Court override or rescind the privatization law "so that ADC can return to self-operating health care services." *Id*. at 108. Defendants took no position. *Id*.[5]

After the Fall 2021 trial, Plaintiffs reiterated their recommendation that the Court override or rescind privatization, *see* Doc. 4308 at ¶ 1149, and now again renew their request that the Court do so. The Court may modify or supersede state laws that it concludes create a significant barrier for Defendants to comply with their constitutional obligations or this Court's orders. Defendants cannot rely on state laws to excuse their failure to comply with the U.S. Constitution, or to oppose remedies premised on violations of federal law. *See* U.S. CONST. art. VI, § 2 (Supremacy Clause); *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824) (holding that if there is a conflict between state law and federal law or the U.S. Constitution, federal law controls); *N.C. St. Bd. of Educ. v. Swann*, 402 U.S. 43, 45 (1971) (holding that "state policy must give way when it operates to hinder vindication of federal constitutional guarantees"); *Hook v. Ariz. Dep't of Corrs*., 107 F.3d 1397, 1402-03 (9th Cir. 1997) (holding that an Arizona state law prohibiting the payment of a Special

---

[5] The privatization legislation was passed not as a stand-alone bill, but by including it as one of many amendments substituted into a final budget reconciliation bill ("BRB") without any debate at the end of the legislative special session. The Arizona Supreme Court subsequently has ruled this practice of adding substantive legislation to a last-minute BRB violates the state constitution's "title requirement" and "single subject rule." *Ariz. Sch. Boards Assoc., Inc. v. State of Ariz*., 252 Ariz. 219, 226-28 (Ariz. 2022).

Master appointed by this Court was preempted by the Supremacy Clause, when the Special Master's appointment was necessary to vindicate prisoners' constitutional rights); *Stone v. City & Cnty. of S.F.*, 968 F.2d 850, 862 (9th Cir. 1993) (holding that "state laws . . . cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme."), *cert denied*, 506 U.S. 1081 (1993); *Coleman v. Brown*, 952 F. Supp. 2d 901, 931 (E.D. Cal./N.D. Cal. 2013) (waiving "to the extent necessary" the state Administrative Procedures Act and "any and all local and state laws and regulations" in order to implement prison population reduction plan); *cf.* 18 U.S.C. § 3626(a)(1)(B) (permitting courts to order prospective relief requiring or permitting government officials to exceed authority under State or local law where federal law requires the relief, the relief is necessary to correct the violation, and no other relief will correct the violation); Doc. 4410 at 10 n.6 ("To avoid any ambiguity, the Court expressly retains jurisdiction to monitor and enforce the terms of the Permanent Injunction.").

Accordingly, Plaintiffs request that the Court issue an Order to Show Cause why the Court should not (1) find the state legislation privatizing correctional health care frustrates Defendants' compliance with the Injunction and the Constitution, and (2) waive its requirements.

**Second**, the Court should ensure that Defendants have sufficient health care management capability to turn around this broken system. The monitors' report shows the present health care system is not functioning at a constitutional level, and there is no reason to believe it will do so in the foreseeable future. Recent events after the monitors' report make this concern even more clear. For example, Section 7.5 of the Injunction requires Defendants to create and staff a new Special Needs Unit (SNU) for patients with special physical and care needs. To date, Defendants transferred 98 patients who are elderly, have complex medical problems, or need specialized medical care to a new SNU at ASPC-Tucson's Catalina Unit. However, during the Tucson site visit in early February 2024, Plaintiffs' counsel found that only one medical doctor (who also is simultaneously working as the Site Medical Director) was working at the entire Tucson prison complex,

which incarcerates more than 4,700 people, including at a 66-bed medical infirmary and multiple other units specially designated as Medical or Mental Health housing, including a pre-existing SNU at another unit.[6] There was no dispute that this one physician could not properly address the tremendous demand for medical services required by the entire prison complex's high-needs population (and serve as the Site Medical Director, a full-time position in and of itself). To date, there has been no explanation why these patients with known serious medical conditions were transferred to a prison where NaphCare clearly was not prepared or staffed to properly care for them.

Recent visits by Plaintiffs' counsel to ASPC-Lewis and ASPC-Tucson also revealed that the system for hiring and retaining essential health care staff is still broken. The Facility Health Administrators (FHAs) and other health care staff at the prisons explained that they are in dire need of more health care staff—providers, nurses, nursing assistants, mental health clinicians, and administrative staff—and that they report this to their superiors at NaphCare regularly, but without result.

Similarly, the system for providing specialty services is broken, because NaphCare has not contracted with sufficient specialists, reportedly has not paid subcontractors in a timely manner (and specialists and hospitals are thus refusing to accept incarcerated patients), there are numerous administrative roadblocks to obtaining a specialist appointment due to NaphCare's convoluted Utilization Management approval process, and there are insufficient numbers of administrative staff assigned to positions responsible for scheduling appointments.[7]

---

[6] *See ADC Institutional Capacity Committed Population*, Feb. 15, 2024, at 2, https://corrections.az.gov/sites/default/files/documents/reports/Daily%20Count/2024/0215 2024%20daily%20count.pdf (showing ASPC-Tucson with Medical ("Med") housing units with total population of 283 people, and mental health ("MH") housing with 527 people).

[7] Health care staff at ASPC-Tucson reported a shortage of functioning wheelchair-accessible vehicles — which is directly under the control of ADCRR — led to cancelling or postponing specialty appointments for class members with mobility impairments who use wheelchairs. Custody staff said there should be three vehicles that could accommodate people using wheelchairs; but it was unclear if there were one or two of the vehicles out of order. Given the number of patients with serious medical needs using wheelchairs at the prison, a shortage and/or failure to timely repair vehicles is a contributing factor.

-13-

As the Court knows from past proceedings and briefing, Plaintiffs repeatedly have suggested it appoint a receiver under Rule 66 of the Federal Rules of Civil Procedure to manage ADCRR's health care system. *See, e.g*., Doc. 4308 ¶¶ 1147-48. Given the Court's hesitancy to do so, and Defendants' strenuous objection to this remedy, Plaintiffs are not at this time asking the Court to appoint a receiver. However, Plaintiffs recommend the Court order Defendants to hire an individual or individuals with significant health care management experience to help Defendants reform the current system. The Court, its monitors, and Plaintiffs' counsel should have an opportunity to provide feedback on potential candidates for this position.

***Third***, the Court should order Defendants to provide detailed information related to the annual cost incurred in incarcerating and providing on-site and specialty health care to (1) all class members age 65 and older, (2) any class members housed permanently or indefinitely in the IPCs and SNUs, and (3) all persons (regardless of age or housing location) with medical classification scores of M-5 due to serious or terminal medical conditions. In addition to the costs of health care and incarceration, such a report should include the number of class members that meet these criteria, and the prison complexes at which they are incarcerated.

There are many high-needs patients—many of whom are older, have multiple complex chronic medical conditions or disabilities—who account for a disproportionate amount of time and money to provide them care. It is notable that when the number of people in the isolation subclass dropped in response to the Injunction's requirements, Defendants were able to close a large supermax prison (ASPC-Eyman SMU-I), and the number of custody staff that ADCRR needed to hire accordingly dropped, because the staff that had been working at SMU-I could be redeployed. Doc. 4539 at 3.

If ADCRR or its vendors cannot hire or retain adequate numbers of qualified health care staff to care for the current population of high-needs patients, especially those with serious or terminal conditions, then Defendants and state officials must consider and

implement ways to safely decrease the number of very sick and older people incarcerated who require such care.[8]

### Conclusion

The Court held that "the extended history of this case mandates a need to impose both quantitative and qualitative measures" in the Injunction. Doc. 4410 at 5-6. This is because regardless of the presence (or current absence) of quantitative data, there must be recognition of the human toll that ongoing violations of the Injunction take on the people fully dependent upon Defendants for their medical and mental health care. The monitors' report highlighted several examples of inadequate medical and mental health care, including cases that caused great risks of harm, or in worst situations, resulted in grave and sometimes fatal outcomes. Plaintiffs are prepared to bring more examples to the Court's attention and offer some now.

---

[8] Arizona has no comprehensive medical or geriatric release system—the only way out of prison for the very sick, dying, or elderly is through commutation through executive clemency, which can only occur after recommendation by the Board of Executive Clemency (BOEC). ARIZ. CONST., art. V, § 5; Ariz. Rev. Stat. §§ 31-402(A), 31-443.

The current medical release system, such as it is, is set forth in BOEC policies that permit release of people in "***imminent danger of death***." Ariz. Bd. of Exec. Clemency Policy 114, § 1.4.4, at https://boec.az.gov/sites/default/files/documents/files/114-Commutation%20of%20Sentence%20Rev%2005-2018.pdf (emphasis added).

"Imminent danger of death" is defined in contradictory manners:
- It is defined by ADCRR as meaning a person "will, in a physician's professional opinion and with a reasonable medical certainty," result in death within ***three*** months, ADC Dep't Order 1002 § 1.12.2, at 56, at https://corrections.az.gov/sites/default/files/documents/policies/GLOSSARY%20OF%20TERMS.pdf;
- The BOEC's policy defines it as death within ***four*** months, *see* Board Policy 114, § 3.2, at https://boec.az.gov/sites/default/files/documents/files/114-Commutation%20of%20Sentence%20Rev%2005-2018.pdf; and,
- The BOEC's instructions on the form for incarcerated people seeking pardons defines it as death within ***six*** months, *see* https://boec.az.gov/sites/default/files/2023-08/Pardon%20Application_Rev%2009.01.2023.pdf.

Defendant Thornell has the power to modify DO 1002 to mirror the BOEC's definitions of "imminent risk of death" to six or four months, and he also has power to implement more robust compassionate leave policies to authorize furloughs or removal from custody for medical treatment not available at the prison or institution, Ariz. Stat. § 31-233(B). State executive officials and the BOEC have the power to change the definition of "imminent danger of death" to be more robust, without legislative action. Ariz. Rev. Stat. § 31-401(G), § 31-403(D)(1).

One example of inadequate care implicates two sections of the Injunction. Section 3 requires language interpretation of all health care encounters and Section 8 governs the process for specialty referrals. At ASPC-Tucson, Plaintiffs' counsel notified Defendants of a Deaf class member who uses American Sign Language (ASL) to communicate and has a history of a serious form of cancer. While in county jail in May 2023, an oncologist noted he required follow up and CT scans every three months to monitor for recurrence. While his transfer summary from the jail, provided to NaphCare when he transferred to prison in June 2023, indicated that he was a "Cancer Case Management" patient, health care staff did not obtain his Jail oncology reports needed to start the process to request specialty care until January 2024. This patient has yet to see an oncologist, and there is no indication he has had an ASL interpreter for his medical encounters.

On the mental health front, the monitors' report describes a failure in the provision of mental health care, including one case that resulted in a class member's death by suicide in late July 2023. Doc. 4359 at 15. Tragically, he was one of two suicides in two days at ASPC-Tucson that month, and an additional five people in Defendants' custody have died by suicide since then, including in a six-week period at the end of the year.[9]

Based on Plaintiffs' counsel's initial review of these seven patients' medical records, it appears that at least four were housed in isolation units at the time of their suicides, including three who appear to have killed themselves while on suicide watch.

_____

[9] *See*:
1. https://corrections.az.gov/news/press-release-death-notification-gabriel-vavages (34-year-old man at ASPC-Tucson, died July 30, 2023);
2. https://corrections.az.gov/news/press-release-death-notification-adam-kallini (38-year-old at ASPC-Tucson, died July 31, 2023);
3. https://corrections.az.gov/news/inmate-death-notification-rene-valenzuela (54-year-old man at ASPC-Eyman, died Dec. 16, 2023);
4. https://corrections.az.gov/news/inmate-death-notification-sean-gorham (51-year-old man at Florence West, died Dec. 23, 2023, not a class member);
5. https://corrections.az.gov/news/inmate-death-notification-joshua-fox (23-year-old man at ASPC-Phoenix, died Dec. 26, 2023);
6. https://corrections.az.gov/news/inmate-death-notification-sean-king (41-year-old man at ASPC-Eyman, died Jan. 4, 2024);
7. https://corrections.az.gov/news/inmate-death-notification-teresa-hennessy (44-year-old woman at ASPC-Perryville, died Jan. 8, 2024).

Another class member hanged himself one day after intake to ADCRR custody, it is unclear if he had a full mental health assessment prior to his fatal act of self-harm. Another class member died by suicide almost two weeks after submitting a Health Needs Request reporting psychological distress, a SMI designation in the community, and requesting mental health medication. At the time of death, the patient had not seen a prescriber nor was prescribed any psychotropic medications.

Plaintiffs are awaiting full production of all of these patients' psychological autopsy reports and mortality reviews. In the meantime, Plaintiffs asked the Court's mental health expert Dr. Bart Abplanalp to independently review these patients' records to identify inadequate mental health care and violations of the Injunction that may have contributed to their deaths. Plaintiffs have asked Dr. Abplanalp to share his final review, conclusions, and any recommendations, with the Court and all parties, when completed. Plaintiffs ask the Court that Dr. Abplanalp's report be filed publicly on the docket when it is provided, in the interests of transparency and public accountability.[10]

Plaintiffs' counsel is prepared to discuss the above with the Court at the status hearing currently scheduled for March 15, 2024.

Respectfully submitted,

Dated: February 16, 2024

**ACLU NATIONAL PRISON PROJECT**

By: s/ Corene T. Kendrick
Corene T. Kendrick (Cal. 226642)*
425 California St., Ste. 700
San Francisco, California 94104
Tel: (202) 393-4930
Email:   ckendrick@aclu.org

---

[10] The full names of people who die in custody are reported publicly and may be used on the docket. Doc. 4335 at 30 n.17. To the extent that Dr. Abplanalp cites to mortality reviews or psychological autopsies, that portion of his report should not be redacted. *See* Doc. 4337 at 2 (Joint Statement of the Parties) (*citing Agster v. Maricopa County*, 422 F.3d 836, 839 (9th Cir. 2005); *Parsons v. Ryan*, 2018 WL 3239691, *4 (D. Ariz. June 22, 2018)).

David C. Fathi (Wash. 24893)**
Maria V. Morris (D.C. 1697904)*
Eunice Hyunhye Cho (D.C. 1708073)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:    dfathi@aclu.org
              mmorris@aclu.org
              echo@aclu.org

*Admitted *pro hac vice*
**Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.

Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:    jkeenan@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Rita K. Lomio (Cal. 254501)*
Sophie Hart (Cal. 321663)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:    dspecter@prisonlaw.com
              ahardy@prisonlaw.com
              snorman@prisonlaw.com
              rlomio@prisonlaw.com
              sophieh@prisonlaw.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

1

2

**ARIZONA CENTER FOR DISABILITY LAW**

By: _s/ Maya Abela_

3

Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Ste. 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email:    adietrich@azdisabilitylaw.org

4

5

6

Rose A. Daly-Rooney (Bar No. 015690)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
4539 E. Fort Lowell Rd.
Tucson, Arizona 85712
Telephone: (520) 327-9547
Email:
  rdalyrooney@azdisabilitylaw.org
    mabela@azdisabilitylaw.org

7

8

9

10

11

*Attorneys for Arizona Center for Disability Law*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**<u>CERTIFICATE OF SERVICE</u>**

2       I hereby certify that on February 16, 2024, I electronically transmitted the above

3   document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4   Notice of Electronic Filing to the following CM/ECF registrants:

5
6                               Gregory Honig
                                Lucy M. Rand
7                       Assistant Arizona Attorneys General
                           Gregory.Honig@azag.gov
8                            Lucy.Rand@azag.gov

9                              Daniel P. Struck
                                Rachel Love
10                          Timothy J. Bojanowski
                             Nicholas D. Acedo
11                           Ashlee B. Hesman
                               Jacob B. Lee
12              STRUCK LOVE BOJANOWSKI & ACEDO, PLC
                           dstruck@strucklove.com
13                          rlove@strucklove.com
                         tbojanowski@strucklove.com
14                          nacedo@strucklove.com
                           ahesman@strucklove.com
15                           jlee@strucklove.com

16                         *Attorneys for Defendants*

17                                                    s/ C. Kendrick

18

19

20

21

22

23

24

25

26

27

28