KRISTIN K. MAYES
ATTORNEY GENERAL

Gregory Honig, Bar No. 018804
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
2005 North Central Avenue
Phoenix, AZ 85004-1592
Telephone: (602) 542-1645
Fax: (602) 542-7670
Gregory.Honig@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, et al., | NO. CV-12-00601-PHX-ROS |
| Plaintiffs, | |
| v. | **DEFENDANTS' RESPONSE TO MONITORS' INTERIM REPORT (DKT. 4539)** |
| Ryan Thornell, et al., | |
| Defendants. | |

Pursuant to the Court's Order (Dkt. 4538), Defendants file the following response to the Monitors' Interim Report to Court dated February 1, 2024 ("Interim Report") (Dkt. 4539).

**I.    The Interim Report does not constitute the "comprehensive guideline" contemplated by the Court.**

At the December 1, 2023 status conference, the Court informed the parties that Dr. Stern "will be preparing what I have best termed as a comprehensive guideline with complete instructions and directions on how to comply with the injunction." (12/1/23 Tr. at 4:17-20.) At the end of the hearing, the Court reiterated that the Interim Report would be "[a] comprehensive direction plan for complying with the injunction." (Id. at 48:2-3.) In response to a question from Plaintiffs' counsel regarding the Interim Report, the Court explained, "what I would like to see as much as possible, and understanding that there's going to be variances in the future, what do we need now, looking at the situation as it is, to comply with the injunction and with directions on what to do." (Id. at 48:7-11.)

In short, it appeared that the Court envisioned a comprehensive, forward-looking guide and set of directions for Defendants on how to comply with the injunction. The Interim Report, however, does not appear to fulfill that mandate from the Court. As expressly stated in the first sentence, the Interim Report is instead "an interim report to the Court regarding the status of implementation of the Court's Injunctive Order (Doc. 4410)." (Dkt. 4539 at 1.) In other words, the Interim Report is a status report on Defendants' past performance. What is distinctly absent from the Interim Report is a "how-to guide," much less a comprehensive plan, on how to achieve compliance with the Injunction.

Accordingly, Defendants are still open to receiving a comprehensive guide, if that was indeed the Court's intent consistent with the plain language of the Court's guidance during the December 1, 2023 status conference.

**II.    The Interim Report contains outdated data and information and is not reflective of Defendants' current progress and compliance with the Injunction.**

In addition to not providing Defendants with the detailed guidance on how to achieve compliance intended by the Court (as anticipated by Defendants), the Interim Report also does not serve as an accurate measure of Defendants' current progress or compliance. As acknowledged by the Monitors in the Introduction, although it was submitted to the Court on February 2, 2024, the Interim Report is based on monthly monitoring data for September

2023. (Dkt. 4539 at 1.)  While Defendants certainly understand the need for a cut-off date, it is important to note that, in this case, that cut-off date shows an inaccurate picture of current progress and compliance with the Injunction. In the few instances in which the Monitors discuss "more up-to-date information about the status of certain programs to reflect progress that ADCRR has made," the cut-off for information provided to the Court is still January 10, 2024. As a result, what the Monitors have presented to the Court is a "snapshot" of what occurred more than five months ago, supplemented in a few areas by what happened more than a month ago. As a measure of Defendants' past performance based on lagging indicators, the Interim Report is of limited utility to either Defendants or the Court even as a status report.

This is particularly true in those areas where large-scale changes have occurred in the intervening months. For example, 226.8 new healthcare positions were added to the NaphCare contract on October 1, 2023 and December 1, 2023. As a result of these new additions to the staffing matrix, NaphCare's staffing rates appear to have dropped, when in fact, NaphCare has remained diligent in its efforts to improve hiring and retention through pay increases and bonuses. In November, for example, NaphCare received 574 new applications for ADCRR contracted positions, extended conditional offers to 81, and received 59 conditional acceptances. In December, NaphCare received 787 new applications for ADCRR contracted positions, extended conditional offers to 81, and received 44 conditional acceptances. In January, NaphCare received 784 new applications for ADCRR contracted positions, extended conditional offers to 73, and received 18 conditional acceptances. Due to the inherent time lag between hire date and start date, which includes notice periods, background checks, security clearances, and training, it takes several months for new hires to reflect in the staffing reports. As of the January 2023 staffing report, NaphCare had 69.90 pending FTEs and an additional 57 pending hires to replace agency positions that are not reflected in the total staffing numbers.

In addition, the Interim Report does not take into account the Court's recent agreement to amend Section 1.16 of the Injunction ("Defendants may use registry and

agency staff to fill up to 15% of these FTE in each job category") to provide that "FTE filled by registry and agency staff who have worked 20 hours or more per week for at least 24 of the previous 26 weeks will not count towards the 15% limit of Section 1.16." (Dkt. 4538 at 1.) With that in mind, current staffing numbers total 944.80 as of February 14, 2024. Exempting longer-term registry/agency staff from the 15% cap has a significant impact on staffing ratios, as NaphCare has a large pool of prn staff committed to providing continuous care at the ADCRR facilities but who do not wish to work as full-time, permanent staff.

### III. The Interim Report reflects subjectivity in the assessment and reporting of Quality Indicators ("QIs") and includes factual inaccuracies.

In multiple patient cases included in the Interim Report, there was a difference of opinion between the Monitors and ADCRR's physician monitors with respect to the quality of the care provided and whether it was clinically appropriate under the circumstances.[1]

For example, Patient 24 was seen for a chronic care appointment via telehealth, during which he reported lower extremity edema. The Interim Report states that the patient should not have had a telehealth visit because there was a need for a medical exam.[2] (Dkt. 4539 at 28.) However, the Interim Report overlooks the fact that the need for a physical exam was identified by the provider who conducted the telehealth visit, who then scheduled a follow-up in-person provider visit for the patient to evaluate the lower extremity edema.

The Interim Report is critical that ADCRR's physician monitors concluded that the care and documentation supporting the care provided during the September 20, 2023, chronic care visit with Patient 24 was compliant with QI 1.1d. The corresponding portion of Section 1.1 of the Injunction provides in pertinent part that all heath care, and the

---

[1] A full discussion of the subjectivity of assessment, differences of medical opinion between ADCRR and the Monitors, and factual inaccuracies is beyond the scope of this response, and as explained elsewhere, is not appropriate given the Court's mandate that the Interim Report serve as a "comprehensive guideline with complete instructions and directions on how to comply with the injunction." (12/1/23 Tr. at 4:17-20.)

[2] A draft of the Interim Report provided to the parties for review incorrectly asserted that using telehealth for chronic care visits is not clinically appropriate. This statement was revised after ADCRR's Medical Director Dr. Phillips clarified during a January 8, 2024 meeting with the Monitors that the Injunction does not prohibit telehealth for chronic care visits, and using telehealth for primary/chronic care visits can be clinically appropriate.

documentation supporting that care, delivered *during* a medical encounter for chronic care be clinically appropriate. (Dkt. 4410 at 11.) The Monitors' comments reflect that they considered not only the initial chronic care visit on September 20, 2023, but also the follow-up visit on September 28, 2023, to assess the lower extremity edema. Conversely, and consistent with the plain language of the Injunction, the ADCRR physician monitors focused only on the care *during* the chronic care visit. If the expectation by the Monitors is that the assessment of the chronic care visit should include not only the actual chronic care visit, but also any follow-up care for *x number* of days after the visit, the Injunction should be amended to state this. In reviewing the records for the chronic care visit that took place on September 20, 2023, ADCRR's Medical Director, Dr. Phillips, concurs with the ADCRR physician monitors' conclusion that the care provided was clinically appropriate, noting that the documentation was thorough, and the clinical decision-making was excellent.

For Patient 25, the Interim Report concludes that a chronic care visit conducted via telehealth was "dangerous" because the clinician did not perform a physical exam or document a thorough history. (Dkt. 4539 at 27.) The ADCRR physician monitors and ADCRR's Medical Director agree that the documentation in the "Subjective" section of the note, including the patient's history, should have been more thorough. However, ADCRR disagrees with the use of the word "dangerous" to describe this visit, where the term simply does not apply and is misleading to a non-medically trained audience. The patient did not have any acute symptoms, he had labs ordered, his medications were reviewed, and a follow-up visit was scheduled with neurology. This is the purpose of a chronic care visit. In fact, the Monitors have suggested during meetings with ADCRR that nurses, as opposed to providers, be utilized to conduct chronic care visits, filling the important role of ensuring that labs/imaging studies are ordered, medications renewed, preventive care provided, and specialty follow-ups scheduled. The appropriate items were addressed in Patient 25's plan, and the care of this patient was in no way "dangerous."

With respect to Patient 27, the Interim Report overstates the risk involved in the treatment. In this patient's case, his potassium level on a lab test was 5.2; the upper limit of

normal is 5.1. For the Interim Report to state that this can lead to sudden death is not appropriate or accurate. The clinically appropriate response when counseling an inmate in this situation would be to inquire about any symptoms and order a repeat lab test, not to advise that the inmate could experience sudden death because of this elevation.

Going forward, Dr. Stern has agreed to include ADCRR's physician monitors and General Counsel in monthly QI meetings, and Defendants are hopeful that doing so will help to ameliorate the concerns with the subjectivity of the Monitors' findings, but it remains to be seen whether this will remedy the issue.

## IV. The Interim Report glosses over Defendants' ongoing efforts to implement new monitoring systems for QIs consistent with the Injunction.

The Interim Report faults Defendants for being "behind schedule" on implementation of self-assessment systems for the mental health, medical, and Subclass components of the Injunction. (Dkt. 4539 at 30.) This characterization fails to appreciate the monumental undertaking required to create new monitoring frameworks and protocols to track and assess all aspects of health care delivery across a system of nearly 25,000 state inmates, as well as conditions of confinement for all inmates meeting the Subclass definition.

The Interim Report does appropriately acknowledge that ADCRR is largely reliant on third parties for the development of electronic reports to facilitate monitoring of the QIs. (Dkt. 4539 at 4, 31.) For the mental health and medical QIs, the necessary reports must be created by NaphCare. Of the 186 medical and mental health QIs, 145 of them require a report to come from the electronic health record, TechCare. While 57 reports are currently listed in TechCare, only 19 are operational and being used for monitoring. For the remaining QIs, other methods are being utilized, including "work-arounds" using advanced searches in TechCare, manual chart reviews, and modifications of existing TechCare reports not pertaining to QIs. Additional report requests have been submitted by the ADCRR Healthcare Services Division and are currently awaiting development by NaphCare.

As to the Subclass component of the Injunction, ADCRR retained a third-party consultant to conduct an assessment of the requirements to implement a web-based electronic offender management record ("EOMS") to allow for electronic tracking of the Subclass QIs. This resulted in a pilot program of EOMS at Eyman-Browning and development of a Request for Proposal to implement EOMS system wide. The contract was awarded January 1, 2024. In the interim, however, ADCRR revamped its monitoring of the Subclass through implementation of a new "Out-of-Cell" tracking form that manually captures the necessary data that will ultimately be contained in EOMS. As Subclass Monitor Scott Frakes notes, the new manual monitoring protocol has contributed to better sanitation, pest control, and access to recreation and other out-of-cell activities.

The Interim Report also acknowledges that ADCRR has hired additional staff to conduct self-assessments; the number of QIs being self-assessed doubled between the September and December monthly reporting and continues to increase; and ADCRR has moved as quickly as it could given the challenges associated with having to effect changes through third-party vendors. (Dkt. 4539 at 30-31.) In short, the Interim Report has not identified any shortcomings on the part of Defendants in implementing the new monitoring regimes required under the Injunction, but instead reflects the commitment and hard work of all involved.

**V.    The Interim Report's conclusion is not reflective of the extensive improvements Defendants have made with respect to management of the Subclass and relies on outdated data.**

While the Summary section of the Interim Report asserts that "ADCRR has not yet made sufficient improvements to conditions of confinement for the Subclass," (Dkt. 4539 at 30), the substantive commentary by Subclass Monitor Scott Frakes reflects considerable changes to operations and policies, recognizes that ADCRR is in the process of implementing technological changes through third-party vendors to address past issues with the quality and efficiency of documentation, and identifies only a few anecdotes from September 2023 in which Defendants did not achieve perfect compliance with the Injunction. (Id. at 3-4.) Additionally, Mr. Frakes' commentary regarding insufficient

custody staffing for the Subclass is both outdated, as it relies on staffing numbers from September and October 2023, and premature, given that an updated custody staffing analysis has been postponed to April 2024 to both address concerns from both Plaintiffs and Defendants with the staffing analysis, and allow time for technological advances to be properly implemented.

**VI.    Defendants have made substantial improvements to health care services and delivery.**

The Interim Report glosses over and in many cases is entirely silent as to areas in which ADCRR and NaphCare have made substantial improvements in the scope, timeliness, and quality of health care services provided to ADCRR inmates. Ignoring these improvements fails to acknowledge the extraordinary efforts of Defendants to improve the health care system across the board, in several areas reflecting a sea change in the delivery of health care to inmates.

**A.    Hepatitis C Treatment**

Defendants are meeting or exceeding the requirements of the Injunction with respect to screening and treatment of Hepatitis C. As of February 9, 2024, there are currently 953 inmates receiving treatment for Hepatitis C, and 111 inmates with future orders. The number of inmates treated per month is targeted to, at a minimum, meet the Injunction mandate of 110 inmates plus 70% of newly diagnosed inmates from the prior month. Recent monthly treatment totals are as follows:

| Month | Number of Inmates Starting Hepatitis C Treatment |
|---|---|
| October 2023 | 273 |
| November 2023 | 400 |
| December 2023 | 319 |
| January 2024 | 303 |
| Total October 1, 2023 – January 31, 2024 | 1299 |

Beginning in early January 2024, inmates with a release date in early April 2024 were prioritized to start treatment for Hepatitis C. ADCRR is on track to ensure that no consenting inmate with Hepatitis C is released without having been treated for Hepatitis C no later than one year after issuance of the Injunction.

Since inmates with Hepatitis C enter the system in high numbers (up to 250 newly diagnosed patients per month), tracking of individuals with F3/F4 fibrosis scores will continue to take place, and these individuals will continue to be prioritized for treatment without regard to their release date. To this end, a larger number of inmates were treated in November 2023, with a specific focus on inmates with F3/F4 fibrosis scores. Since October 1, 2022, ADCRR has treated 628 patients with F3/F4 fibrosis scores, which reflects 96% of the F3/F4 inmate population. The remaining 4% have either refused treatment, are in a situation in which the treatment is not clinically indicated due to advanced illness, or are awaiting additional specialty evaluations before beginning treatment.

As to screening, ADCRR has been offering opt-out screening to all individuals entering the system since 2019. In addition, Hepatitis C screening was offered to the entire ADCRR population on May 30, 2023, consistent with the Injunction requirement that screening be offered within two months of its issuance.

**B.    Medication Assisted Treatment ("MAT") Program**

Defendants are ahead of the required schedule in implementing Section 11.3.6[3] of the Injunction with respect to implementation of the Medication for Opioid Use Disorder ("MOUD") program, which is now available at all Arizona State Prison Complexes. The number of inmates receiving MAT for substance use disorders continues to grow each month. As of the end of December 2023, 3,345 ADCRR inmates were receiving treatment. That number had increased to 3,737 by the end of January 2024 and 4,096 by February 13, 2024. The breakdown by medication and complex as of February 13, 2024, is as follows:

| Drug | Douglas | Eyman | Lewis | PV | Phoenix | Safford | Tucson | Winslow | Yuma |
|------|---------|-------|-------|-----|---------|---------|--------|---------|------|
| Naltrexone HCl Oral | 1 | 4 | 5 | 28 | 4 | 1 | 12 | 0 | 6 |
| Buprenorphine HCl-Naloxone HCl Sublingual | 378 | 228 | 973 | 398 | 69 | 363 | 847 | 149 | 599 |
| Methadone HCl Oral | 0 | 0 | 0 | 13 | 3 | 0 | 13 | 0 | 0 |

---

[3] Section 11.3.6 requires Defendants to offer MOUD in three new facilities within six months of the issuance of the Injunction and every six months thereafter.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Naltrexone Intramuscular | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **378** | **232** | **978** | **440** | **76** | **364** | **873** | **149** | **605** |

As of the week of February 6, 2024, 500 ADCRR and NaphCare staff have attended training on the MAT dashboard, the platform that is utilized to coordinate reentry-planning services between multiple stakeholders, including community agencies, for individuals who are leaving prison.

Going forward, ADCRR is planning to initiate a pilot study for Suboxone sublingual strips, instead of tablets, which will eliminate the need to crush the tablets, and is therefore expected to expedite medication passes for inmates on MAT. ADCRR is considering Lewis Bachman as the pilot unit for this study.

### C.     Tucson Catalina Special Needs Unit ("SNU")

The addition of the Tucson Catalina SNU has provided higher-level housing accommodations to the aging population and others with functional limitations who need assistance with activities of daily living. Through daily bed management meetings that are conducted by ADCRR, with the involvement of NaphCare's Regional and complex-level health leadership on a daily basis, the health care needs of patients are coordinated comprehensively. This includes the identification of patients who need placement in the Infirmary (IPC) or SNU following a hospitalization. It also includes patients who, based on their functional status, need placement at a higher level of care in the IPC or SNU. ADCRR is approaching the needs of the patient population for placement in a higher level of care proactively to meet the needs of the population.

### D.     Off-site Specialty Care

NaphCare continues to prioritize maintaining a robust network of off-site specialty providers to ensure ADCRR inmates receive clinically necessary specialty care. In the past 12 months, there have been 222,228 off-site specialty care visits completed. The following chart shows the breakdown by specialty.

| Specialty | Number of Encounters |
|---|---|
| AristaMD | 5 |
| Audiology | 7 |
| Cardiology | 2611 |
| Cardiovascular Surgery | 38 |
| Chemotherapy | 242 |
| Infectious Disease Consultant | 1 |
| Nephrology Consultant | 2 |
| Dental | 2 |
| Dermatology | 643 |
| Dialysis | 127 |
| DME | 137 |
| Endocrinology/Immunology | 71 |
| ENT/Otolaryngology | 407 |
| Gastroenterology | 1738 |
| General Surgery | 1077 |
| Genetics | 1 |
| Hem/Oncology | 1009 |
| Infectious Disease | 110 |
| Laboratory | 5 |
| Mammogram | 90 |
| Nephrology | 383 |
| Neurology | 582 |
| Neurosurgery | 275 |
| OB/GYN | 288 |
| Occupational Therapy | 211 |
| Ophthalmology | 1377 |
| Optometry | 3 |
| Oral Surgery | 328 |
| Orthopedic Surgery | 1625 |
| Orthotics/Prosthetics | 707 |
| Outpatient Surgery | 2 |
| Pain Management | 190 |
| Physical Therapy | 1175 |
| Plastic Surgery | 143 |
| Podiatry | 295 |
| Proctology | 3 |
| Pulmonology | 180 |
| Radiation Therapy | 462 |
| Radiology | 4209 |
| Rheumatology | 55 |
| Ultrasound | 66 |
| Urology | 1021 |
| Vascular Surgery | 181 |
| Wound Care Center | 108 |

Of the completed specialty care encounters, the majority (80%) of the specialty disciplines reflect that inmates were seen within an average of 60 days or less.

### E. Bolstered Mental Health Services

Defendants have added 148 beds to ADCRR's Residential Treatment Units and continue to increase programming in residential and impatient units. This includes education, religious services, and substance use disorder treatment tailored to meet the needs of the mental health population.

### F. Language Interpretation Services

NaphCare uses Language Line Solutions, which offers on-demand translators and interpreters in more than 290 languages, during medical encounters at the ADCRR facilities. The most recent data available from NaphCare reflects that Language Line Solutions was used for 232 medical encounters in January 2024. Of these, the primary language was Spanish (93%). Other languages provided included American Sign Language ("ASL"), Somali, Romanian, Serbian, Punjabi, and Arabic. ASL is provided via video, while other languages may be provided via either video or audio. NaphCare has reconfirmed its commitment to ensure that all staff are trained on and directed to use the language line.

### VII. NaphCare has made significant strides in hiring through enhanced recruiting efforts, pay increases, and bonuses.

NaphCare's staffing continues to improve through implementation of pay raises, bonuses, and significant investments in marketing and corporate resources to support recruitment and retention of staff.

Each month, NaphCare rolls out pay raises for a separate discipline. The most recent was a second round of raises for RNs in January 2024, in which incumbent RNs received raises ranging from 3-13%. Most full-time RNs are now making between $40-45 per hour. PRNs and temporary contract RNs make significantly more than full-time staff. This poses challenges, as nurses are often far more interested in prn and temporary placements for the significantly higher hourly rates, as well as flexibility in those positions, and those who do not need benefits will nearly always opt for the higher pay of temporary contract work over

full-time work. This phenomenon is typical in the community in 24/7 and/or hospital-based systems, not just in corrections.

NaphCare has been utilizing bonuses to incentivize new hires and improve retention. From December 22, 2023 to January 19, 2024 alone, NaphCare paid $1.1M in bonuses. In February 2024, NaphCare is instituting a new bonus program that will pay a $10,000 sign-on bonus to any current prn RN, LPN, or psych associate who chooses to convert from prn status to full-time status.

From August 18, 2023 to date, NaphCare has averaged a total monthly spend of over $20,000 per month in marketing, which equated to ads served to more than 1,000,000 individuals. NaphCare has seen steadily increasing numbers of applicants as a result of these efforts. For example, the following chart summarizes the number of applicants, interviews, conditional offers, and conditional acceptances for RNs.

| Month | Applicants | Interviews | Conditional Offers | Conditional Accepts |
|-------|-----------|-----------|--------------------|--------------------|
| Oct. 2023 | 40 | 20 | 20 | 2 |
| Nov. 2023 | 59 | 10 | 6 | 5 |
| Dec. 2023 | 91 | 18 | 13 | 8 |
| Jan. 2024 | 117 | 105 | 26 | 4 |

NaphCare has also recently engaged in blast text message campaigns to RNs, CNAs, and PCTs. Following the most recent campaign on February 12, 2024, NaphCare received responses from over 75 RNs and 120 CNAs. The response was so positive that NaphCare brought on an additional employee to help the recruiting team and sites, and as of February 15, 2024, the additional employee has sent out 25 conditional offer letters, 16 of which have already been accepted.

**VIII. The focus going forward should be on identifying specific, actionable steps for Defendants to take to achieve full compliance with the Injunction.**

Defendants have demonstrated an exceptional and ongoing commitment to making improvements in the conditions of confinement for the Subclass and the delivery of health care to all ADCRR inmates. Rather than dwell on those isolated past instances from September 2023 in which Subclass inmates did not receive full out-of-cell time, or in which the medical or mental health records reviewed did not reflect flawless documentation and

delivery of care, the focus for the parties, the Monitors, and the Court going forward should be on those areas where systemic changes are still being implemented or further systemic changes may be needed to achieve full compliance.

DATED this 16th day of February, 2024.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC


By /s/ Daniel P. Struck
    Daniel P. Struck
    Rachel Love
    Timothy J. Bojanowski
    Nicholas D. Acedo
    3100 West Ray Road, Suite 300
    Chandler, Arizona 85226

    KRISTIN K. MAYES
    ATTORNEY GENERAL

    Gregory Honig
    Lucy M. Rand
    Assistant Attorneys General
    2005 North Central Avenue
    Phoenix, AZ 85004-1592

    *Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy          ahardy@prisonlaw.com

Asim Dietrich         adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

Corene T. Kendrick    ckendrick@aclu.org

David Cyrus Fathi     dfathi@aclu.org

Donald Specter        dspecter@prisonlaw.com

Eunice Cho            ECho@aclu.org

Jared G. Keenan       jkeenan@acluaz.org

Maria V. Morris       mmorris@aclu.org

Maya Abela           mabela@azdisabilitylaw.org

Rita K. Lomio         rlomio@prisonlaw.com

Rose Daly-Rooney      rdalyrooney@azdisabilitylaw.org

Sara Norman          snorman@prisonlaw.com

Sophie Jedeikin Hart  sophieh@prisonlaw.com

Gregory Honig        Gregory.Honig@azag.gov

Lucy Rand            Lucy.Rand@azag.gov

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/ Daniel P. Struck

15