KRISTIN K. MAYES
ATTORNEY GENERAL

Gregory Honig, Bar No. 018804
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
2005 North Central Avenue
Phoenix, AZ 85004-1592
Telephone: (602) 542-1645
Fax: (602) 542-7670
Gregory.Honig@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Shawn Jensen, et al., | NO. CV-12-00601-PHX-ROS |
| Plaintiffs, | |
| v. | **DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO COURT MONITORS' INTERIM STATUS REPORT** |
| Ryan Thornell, et al., | |
| Defendants. | |

Pursuant to the Court's Orders (Dkt. 4538, 4555), Defendants file the following reply to Plaintiffs' Response to the Monitors' Interim Report (Dkt. 4552) and response to the Court's Order (Dkt. 45555) regarding increasing healthcare salaries.

**I.      Defendants' Response to the Court's Order regarding Salary Increases**

The Court's Order (Dkt. 4555) directs the parties to address (1) "the precise terms the Court should order that will result in the healthcare contractor offering higher salaries,"

(2) whether the contract amendment allows Defendants to immediately increase salaries, and (3) "if the Court should order additional salary increases at set intervals such as monthly until full staffing is achieved." (Dkt. 4555 at 2.) The contract amendment provision cited by the Court states:

> In the event that the Court orders increases in compensation for healthcare workers or the addition of positions these costs shall be born fully by ADCRR and this Contract shall be amended accordingly to provide for compensation to Contractor to pay for these obligations.

Defendants recognize Plaintiffs', the Monitors', and the Court's concerns over the time it has taken to obtain adequate healthcare staffing. Defendants do not oppose increasing healthcare salaries, but there are significant concerns related to budget limitations that must be considered, as any change in health care salaries that impacts the contracted per inmate per day ("PIPD") rates in the current contract will be subject to the legislative budget process. Below are the steps that would be required to increase salaries above the current contract rates:

1. ADCRR identifies the cost impact of increasing contracted health care staff salaries.
2. ADCRR calculates the new contracted PIPD rate and the corresponding impact to the inmate health care special line item appropriation.
3. ADCRR submits an amended budget request to the Governor's Office of Strategic Planning and Budgeting ("OSPB").
4. The Executive and Legislative branches negotiate a budget.
5. The Legislature passes a budget and transmits it to the Governor for action.
6. Final appropriations will appear in an enacted budget bill.
7. If the final appropriation includes the requested appropriation increase for contracted staff salary increases, ADCRR will draft a NaphCare contract amendment, but it will remain unsigned.
8. Before the contract amendment can be signed, ADCRR will submit a request to appear at the next Joint Legislative Budget Committee ("JLBC") meeting requesting the required JLBC review of the inmate health care contracted rate change.
9. After JLBC review and approval, ADCRR may proceed with executing the contract amendment with the new PIPD that includes increasing contracted staff salaries.

Accordingly, Defendants stress the importance of understanding that the current contract sets limits on Defendants ability to pay higher salaries, and any changes impacting the contract rates are subject to the above legislative budget process. Additionally, the Executive Budget has been submitted for FY25, and negotiations are well underway. The FY25 budget already includes a request for more than $192 million in Injunction-related costs. The earliest that ADCRR could submit a request for a supplemental appropriation is September 1, 2024. ADCRR would then need to wait to see if the supplemental appropriation is included in the enacted budget. If approved, the earliest the funds would be distributed is July 1, 2025. After a budget has been enacted, there is no mechanism for ADCRR to receive *emergency* appropriations beyond a supplemental request without the Governor convening a special session of the legislature. Therefore, any mandated changes to healthcare salaries that will raise the PIPD rate would not take effect "immediately" as intended by the Court.

With respect to the Court's inquiry into the language that would result in the healthcare contractor offering higher salaries, ADCRR is currently paying wages over the average wages provided in the contract to get staffing levels to the appropriate level. NaphCare, however, is not paying these wages. For example, the contract provides that the five (5) MAT program mid-level providers should be paid approximately $106.33 per hour. NaphCare, however, is paying those five (5) providers between $80.00 and $95.51, including employee related expenses ("ERE"). The average hourly difference between contracted rates and what NaphCare is paying is approximately $25.

If the Court is inclined to enter an order intended to get the healthcare contractor to increase healthcare salaries within the bounds of the current contract, thereby avoiding the necessity of engaging in the legislative budget approval process, Defendants propose that the Court enter an order that requires the following:

- ADCRR will collect and analyze current market rates for all clinical job classifications in the NaphCare contract within two weeks of the date of the order.
- ADCRR will take an in-depth look at contracted rates for all clinical positions and compare those to what is being paid by NaphCare within two (2) weeks of the date

of the order.

- Where the market rate is in line with the contracted range, ADCRR will require NaphCare to immediately raise salaries higher than the market rate to the extent allowable under the current contract.

- ADCRR will be required to sanction NaphCare monthly for any position advertised at less than 85% of the contracted rate.

- ADCRR will be required to sanction NaphCare monthly for any position paid under 90% of the maximum contracted rate until staffing reaches a 15% or lower vacancy level (85% staffed) per facility.

- If after 6 months, vacancy levels remain higher than 15%, ADCRR will be required to sanction NaphCare monthly for any position paid under 100% of the maximum contracted rate until staffing reaches a 15% or lower vacancy level (85% staffed) per facility.

If the Court orders salary increases, it should allow sufficient time for hiring, completion of background/security checks, running of notice periods, and onboarding of new employees before assessing any impact the increases may have on staffing levels. Because these processes typically take at least three to fourth months, and staffing reports are not typically available until 30 days after the close of the month, the Court should allow a minimum of six months after mandating any salary increases to assess the impact and determine whether additional increases may be needed to boost staffing levels. Prematurely increasing salaries without permitting sufficient time for them to take effect risks unnecessary expenditure of monetary resources and diversion of scarce labor resources away from community settings, including hospitals and urgent care clinics. This is particularly true considering the current nursing shortage nationwide, which is predicted to hit Arizona particularly hard. *See, e.g.*, https://ktar.com/story/5562597/health-care-report-says-arizona-nursing-shortage-will-be-biggest-in-nation-in-2025/.

## II. Defendants' Response to Monitors' Four Recommendations

In their Response, Plaintiffs note their agreement with the Monitors' four recommendations. (Dkt. 4552 at 3.) These include recommendations that the Court require that: (1) NaphCare "state the wage range that it is offering for all categories of positions for which there is insufficient staffing . . . in all public-facing oral and written

4

communications"; (2) NaphCare "actively increase those stated wage ranges to achieve minimally necessary staffing levels"; (3) NaphCare "actively increase the wages of incumbent staff in the aforementioned staffing categories if a disparity between the wage of incumbents and newly hired staff risks the departure of incumbents"; and (4) ADCRR "report to the Court, on a monthly basis for each category of staff position described above: the publicly-facing wage range; the number of FTE hired, separated, and gap between required and filled positions for the previous month; and the modifications, if any, made to the wage range based on the staffing activity of the previous month." (Dkt. 4539 at 31-32.)

Defendants agree with the Monitors' first recommendation, and ADCRR has confirmed that NaphCare is posting salary ranges on its website and third-party sites, including Zip Recruiter. There are some known issues with how certain third-party sites, including Indeed, LinkedIn, and Monster, pull the data and scrub pay ranges, which NaphCare is working to address. Defendants' response to the Court's Order regarding increasing healthcare salaries in Section I above addresses the Monitors' second recommendation. With respect to the Monitors' third recommendation, Defendants agree that increases in incumbent salaries may be necessary where a disparity between the wages of new hires and incumbents risks their departure, and NaphCare reports that they are in the second round of incumbent raises. ADCRR suggests setting a minimum and maximum range, as allowed by contract, that would allow for review and pay parity alignment for incumbents. As to the Monitors' fourth recommendation, Defendants do not have ready access to all the requested information and would need to work with NaphCare to ensure the information can be provided and vetted for accuracy.

### III. Defendants' Response to Plaintiffs' Additional Proposed Measures

In their Response, Plaintiffs propose three additional measures they contend are needed "to address continued violations of the Injunction." (Dkt. 4552 at 11.)

#### A. Waiver of state law requiring privatization of correctional health care

Plaintiffs first request the Court to "issue an Order to Show Cause why the Court should not (1) find the state legislation privatizing correctional health care frustrates

Defendants' compliance with the Injunction and the Constitution, and (2) waive its requirements." (Dkt. 4552 at 13.)

Defendants do not dispute the existence of the Supremacy Clause—a state law is void if it actually conflicts with a federal statue or the U.S. Constitution. *See, e.g.*, U.S. CONST. art. VI, § 2 (Supremacy Clause); *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824); *Clark v. Coye*, 60 F.3d 600, 603 (9th Cir. 1995); *Hook v. Ariz. Dep't of Corrs.*, 107 F.3d 1397, 1402-03 (9th Cir. 1997). However, as discussed in *Clark*, before ordering a State not to follow a state law, there needs to be a judicial determination that the state law at issue is unconstitutional. *See Clark*, 60 F.3d 600 at 603. Furthermore, when state laws are claimed to be unconstitutional, the Attorney General, the Speaker of the House of Representatives, and the President of the Senate should be notified and given the opportunity to intervene. *See* A.R.S. § 12-1841. The Defendants in this case do not make law; that power belongs to the Legislature. "Our system of government prohibits one branch of the government from exercising the powers granted to another branch of the government." *Yes on Prop 200 v. Napolitano*, 215 Ariz. 458, 465, 160 P.3d 1216, 1223 (App. 2007). Thus, before this Court issues any Order waiving requirements of a state law, this Court would need to hear from the appropriate parties and determine whether the law at issue violates the Constitution.

**B.     Hiring health care delivery and operations turn-around expert(s)**

Plaintiffs next request that the Court "order Defendants to hire (as a consultant or employee) health care delivery systems and operations turn-around expert(s) to advise them on this transition and how to implement the Injunction" and "to reform the current system" (Dkt. 4552 at 3-4, 15.)

ADCRR has already engaged a core team of subject matter experts with a nationwide correctional consulting and management firm ("Firm"). ADCRR's engagement with Firm is two-fold. First, ADCRR has engaged Firm for the last six months to conduct a system-wide assessment aimed at providing technical assistance and recommendations for system-wide improvement, including the implementation of the Injunction. Second, ADCRR has engaged Firm to provide an assessment of the current healthcare model with the goal of

receiving external, objective recommendations related to correctional health care delivery systems. ADCRR anticipates the recommendations will be made final by mid-2024. Ultimately, the aim is to improve the quality of care delivered; improve the experience of receiving care; reduce the costs of care; and improve the work-life balance of those who provide care. Thus, any order to hire (as a consultant or employee) a health care delivery and operations turn-around expert would be duplicative and unnecessary at this time.

**C. Provision of information pertaining to inmates (1) 65 and older; (2) permanently housed in the IPCs and SNUs; and (3) with a medical classification score of M-5**

Plaintiffs further request that the Court "order Defendants to provide detailed information related to the annual cost incurred in incarcerating and providing on-site and specialty health care to (1) all class members age 65 and older, (2) any class members housed permanently or indefinitely in the IPCs and SNUs, and (3) all persons (regardless of age or housing location) with medical classification scores of M-5 due to serious or terminal medical conditions" as well as "the number of class members that meet these criteria, and the prison complexes at which they are incarcerated." (Dkt. 4552 at 15.)

Defendants are willing to work with Plaintiffs regarding providing additional information, but much of what Plaintiffs are requesting is not available or practicable to extract from existing data sources. ADCRR can run separate or combined reports of inmates (a) age 65 and above, (b) currently housed in the IPC or SNU, and (c) with a current medical classification score of M-5. However, determining whether an inmate is housed permanently or indefinitely in the IPC or SNU would require an individualized, case-by-case review of medical records for all inmates housed in those locations and would be subject to ongoing change. Further, ADCRR does not currently track or report on the annual cost of incarceration, nor is this information readily extractable from ADCRR's enterprise financial and human resource applications, particularly at the level of detail requested by Plaintiffs as to the above specified categories of inmates. ADCRR can also run a report on specialty care, but it does not separate between on-site care and off-site consults, and some specialties (e.g., physical therapy, radiology) may be provided both on-site and off-site.

Moreover, the specialty care report does not distinguish the categories of inmates requested by Plaintiffs. Defendants believe that NaphCare maintains data on site-level health care expenditures and off-site specialty care expenditures, but it is likewise not able to segregate spending for the requested categories (age, housing location, medical score) of inmates.

**IV.     Defendants' Response to Additional Items Raised in Plaintiffs' Response**

Defendants respond as follows to various other items raised by Plaintiffs' Response.[1] Defendants note Plaintiffs' willingness to negotiate and discuss other items with Defendants and want to highlight that the relationship between the two parties has been extremely collaborative over the past eight (8) months.

**A.     Corrections Plans**

Plaintiffs contend that the Corrections Plans they have reviewed through the end of 2023 were not compliant with Section 29.2, which requires that ADCRR provide each Subclass member an "individualized case plan . . . that describes the actions needed, as well as associated time frames, to progress in their steps in maximum custody and generally to gain more privileges and lower classification levels (less restrictive housing)" (Dkt. 4552 at 4.) However, Plaintiffs acknowledge that "Defendants have indicated that they are in the process of changing the plans to be more detailed and individualized." (Id.) Indeed, Defendants provided a draft of the new Corrections Plan, which includes the items requested by Plaintiffs and is attached hereto as **Exhibit 1**, to Plaintiffs and the Monitors on February 24, 2024 for review. Once approved, ADCRR's Restrictive Housing Administrator will provide training on the new plan to all case managers.

**B.     Removal from Subclass after change in classification**

Plaintiffs assert that in December 2023, 1,037 inmates were removed from "isolation," and 14% of them were held in "isolation" more than 10 days after they were deemed eligible to house elsewhere. (Dkt. 4552 at 5.) ADCRR has reviewed the January over 10-day movement list and determined that it contains 25 clerical errors, reducing the

---

[1] Given the page limit for Defendants' Reply (see Dkt. 4538), discussion of the remainder of the items raised by Plaintiffs is impracticable.

number of movements over 10 days from 235 to 210. ADCRR takes responsibility for these errors; additional training has been implemented, and a more thorough review will be conducted to ensure accuracy of the data presented. During the time in which these inmates are waiting to be moved to close custody, they receive out of cell privileges in compliance with the Injunction.

### C. SMI individuals housed in units meeting Subclass definition

Plaintiffs contend that inmates in the mental health units at ASPC-Eyman Browning and inmates with dementia housed in the ASPC-Tucson Rincon IPC are not receiving sufficient out of cell time. (Dkt. 4552 at 6-7.) Plaintiffs concede that they have not raised this issue with Defendants, stating, "Plaintiffs will negotiate with Defendants about this issue. If Defendants are unable to craft and implement a plan to resolve it, Plaintiffs will present the issue to the Court." (Id. at 7.)

Defendants have reviewed these concerns and believe them to be unfounded. Browning Unit A86, BMU A79, and Browning Residential A81 all incorporate mental health programming due to identified need. Some, but not all, of the inmates housed in these programs are SMI. These are close custody units, and all inmates are able to receive a minimum of 2.5 hours of out of cell time every day through recreation, mental health interaction time, mental health classes, and/or pod time. While housed in these areas, inmates are permitted daily showers on their own and do not have to be escorted by staff.

The Tucson IPC houses three patients that have been recognized as having dementia, only one of which is designated as SMI. They are housed next to each other to facilitate services, as they require significant additional care. There is no designated section of the IPC for SMI inmates. The IPC has a unit clock and offers recreation every day of the week and additional out of cell time on weekends for visitation. ADCRR's Operations Compliance Monitor toured the IPC on February 22, 2024 and reviewed Information Reports, count sheets, and video in response to Plaintiffs' allegations and confirmed that all three (3) were in fact offered recreation the prior day but did not respond. Defendants believe that this addresses Plaintiffs' concerns but are willing to meet and confer with

1 Plaintiffs regarding any remaining issues.

### D. Ability to socialize in detention units at ASPC-Lewis and ASPC-Yuma

Plaintiffs contend that Defendants are not compliant with Section 27.3.1 because inmates in the detention units at ASPC-Lewis and ASPC-Yuma Dakota "do not have any ability to socialize with others during recreation." (Dkt. 4552 at 7.) As with the prior issue regarding SMI inmates, Plaintiffs concede that they have not raised this issue with Defendants, stating, "Plaintiffs will negotiate with Defendants about this issue. If Defendants are unable to craft and implement a plan to resolve it, Plaintiffs will present the issue to the Court." (Id.) As of mid-January 2024, the three (3) detention areas at Lewis (Bachman, Stiner, and Morey) and one (1) at Yuma (Dakota) have had tables installed in the day rooms and have scheduled table time, which allows for inmate socialization. Additionally, the three Lewis detention units are all in the process of building outside recreation enclosures, and Yuma Dakota has submitted a project proposal to do the same. Defendants believe that this addresses Plaintiffs' concerns but are willing to meet and confer regarding any remaining issues.

### E. Meaningful mortality reviews

Plaintiffs disagree that Defendants are compliant with Section 2.1 based on their review of recent mortality reviews from ASPC-Tucson and discussion with the Site Medical Director there during a recent tour. (Dkt. 4552 at 9.) ADCRR's Medical Director, Dr. Phillips, is currently in the process of revamping the entire mortality review process to provide greater transparency and ownership regarding the care provided. ADCRR will work with NaphCare to ensure that the improved process is robust and thoughtful.

### F. Assessment of English fluency of patients and provision of interpretation

Plaintiffs are critical of the Monitors' conclusion with respect to Section 3.1 that the "systems underlying these improvements have been implemented" (Dkt 4539 at 19), asserting that "Defendants have yet to produce any policies regarding the assessment of English fluency of patients." (Dkt. 4552 at 9.) Plaintiffs also assert that they have been told during recent tour interviews that NaphCare does not always use the LanguageLine for

interpretation. (Id. at 8-9.)

ADCRR is currently working with Plaintiffs' counsel and the Monitors to revise and finalize the Medical Services Technical Manual, which includes assessment of English fluency in both P-A-01.01 Access to Health Care and P-E-02.01 Receiving Screening. English fluency testing is also addressed in ADCRR Department Order 910. ADCRR is currently evaluating implementation of English fluency testing during the intake process and will update its policies where applicable. Information regarding use of LanguageLine has been posted in the medical clinics, distributed to NaphCare staff, and posted on a SharePoint accessible to NaphCare staff. NaphCare plans to create a laminated card with LanguageLine access information for employees, as well as a NaphCare University training module on LanguageLine services. NaphCare reports that from April 2023 through January 2024, LanguageLine was used for 2,315 encounters, totaling 26,825 minutes of use.

### G. Hepatitis C

Plaintiffs are critical with respect to the Monitors' commentary on Defendants' compliance with Section 11.1 regarding treatment for Hepatitis C (Dkt. 4539 at 43), stating that "[s]uch aspirational assertions, without further proof, do not establish compliance." (Dkt. 4552 at 10.) As outlined in Defendants' Response, however, Defendants have met or exceeded the Injunction mandate of treating 110 inmates plus 70% of newly diagnosed inmates from the prior month for the past four months and are on track by early April 2024 to ensure that no consenting inmate with Hepatitis C is released without having been treated. (Dkt. 4553 at 8.) For example, the total number of patients diagnosed with Hepatitis C in November 2023 was 246. Based on the calculation ($110 + 0.7(246) = 282$ patients), the mandated number of patients to be started on treatment in December 2023 was 282 patients. The actual number of patients started on treatment in December 2023 was 319. The total number of patients diagnosed with Hepatitis C in December 2023 was 218. Based on the calculation ($110 + 0.7(218) = 263$ patients), the mandated number of patients to be started on treatment in January 2024 was 263 patients. The actual number of patients started on treatment in January 2024 was 327 patients. There are currently 884 patients receiving

treatment for Hepatitis C, and another 60 with future orders to begin treatment.

### H. MAT

Plaintiffs are similarly critical with respect to the Monitors' summary chart (Dkt. 4539 at 44) regarding Defendants' compliance with Section 11.3 (treatment of patients with substance use disorders), which states "ADCRR reports that it believes it is currently in compliance with this QI." (Dkt. 4552 at 10-11.) As outlined in Defendants' Response (Dkt. 4553 at 9), Defendants have implemented the MAT program at all nine State operated complexes and are thus ahead of the schedule required by Section 11.3 of the Injunction. As of February 22, 2024, 4,364 ADCRR inmates have been treated in the MAT program.

### I. Restraints by mental health clinicians for clinical purposes

Plaintiffs take issue with the Monitors' conclusion that Defendants were compliant with the requirements in Section 16.10 pertaining to use of restraints by mental health clinicians for clinical purposes because no patients were placed in restraints by mental health staff in 2023 and demand that Defendants "offer detailed evidentiary proof showing sustained compliance." (Dkt. 4552 at 11.) Defendants have reviewed TechCare and confirmed through using the advanced search function to search for all restraint check forms and restraint flow forms, which are required to be completed any time a patient is placed in restraints by a mental health clinician for clinical purposes, that restraints were not used from September 1, 2023, through December 31, 2023. There was one test form completed to check the functionality of the search function during that time frame. Plaintiffs and the Monitors can confirm this themselves through reviewing TechCare.

### J. Deaf class members with cancer not provided ASL interpretation

Plaintiffs note that a deaf inmate with cancer at ASPC-Tucson who transferred to ADCRR in June 2023 has not yet seen an oncologist and it does not appear that he has been provided an ASL interpreter for his medical encounters. (Dkt. 4552 at 17.) Defendants have confirmed that this inmate has a CT scan scheduled in February 2024 and an oncology appointment scheduled for March 2024. In addition, his most recent medical encounter on March 2, 2024 reflects that LanguageLine was used to provide ASL interpretation services.

### K. Suicides in units meeting Subclass definition

Plaintiffs assert that of seven suicides occurring between July 2023 and January 2024, it appears four were housed in units meeting the Subclass definition at the time of their deaths, including three who were on suicide watch. (Dkt. 4552 at 17.) This is not accurate. Three of the inmates were housed in Detention at the time of their death, and one was on watch. With respect to the inmate for whom Plaintiffs state, "it is unclear if he had a full mental health assessment prior to his fatal act of self-harm," Defendants have confirmed that he received an Initial Mental Health Assessment by an independently licensed clinician on the day of his arrival.

### L. ADA vans at ASPC-Tucson

Plaintiffs note in a footnote that health care staff at ASPC-Tucson reported that a shortage of functioning wheelchair accessible vehicles led to cancellation or postponement of specialty care appointments for inmates who use wheelchairs. (Dkt. 4552 at 14 n.7.) ADCRR is in the process of purchasing five additional ADA vans for use at ASPC-Tucson. In the interim, increased communication between security and NaphCare is occurring to ensure those who need ADA transportation are provided appropriate transportation means without affecting off-site care.

### M. Changes to classification of imminent danger of death

Plaintiffs assert that "the only way out of prison for the very sick, dying, or elderly is through commutation through executive clemency, which can only occur after recommendation by the Board of Executive Clemency (BOEC)" based on a finding that the individual is "imminent danger of death." (Dkt. 4552 at 16 n.8.) Plaintiffs contend that ADCRR policy, BOEC policy, and a BOEC form contain contradictory definitions of "imminent danger of death." (Id.) As Plaintiffs note, ADCRR does not have the authority to change the BOEC's rules. As it relates to release types and BOEC releases, ADCRR complies with current law and follows the rules set by the BOEC, which govern the imminent danger of death process. Accordingly, ADCRR has been following the timeline set forth in BOEC policy and is updating the definition in their Glossary of Terms.

DATED this 5th day of _March, 2024.

                              STRUCK LOVE BOJANOWSKI & ACEDO, PLC

                              By /s/ Daniel P. Struck
                                  Daniel P. Struck
                                  Rachel Love
                                  Timothy J. Bojanowski
                                  Nicholas D. Acedo
                                  3100 West Ray Road, Suite 300
                                  Chandler, Arizona 85226

                                  KRISTIN K. MAYES
                                  ATTORNEY GENERAL

                                  Gregory Honig
                                  Lucy M. Rand
                                  Assistant Attorneys General
                                  2005 North Central Avenue
                                  Phoenix, AZ  85004-1592

                                  *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy | ahardy@prisonlaw.com |
| Asim Dietrich | adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| Corene T. Kendrick | ckendrick@aclu.org |
| David Cyrus Fathi | dfathi@aclu.org |
| Donald Specter | dspecter@prisonlaw.com |
| Eunice Cho | ECho@aclu.org |
| Jared G. Keenan | jkeenan@acluaz.org |
| Maria V. Morris | mmorris@aclu.org |
| Maya Abela | mabela@azdisabilitylaw.org |
| Rita K. Lomio | rlomio@prisonlaw.com |
| Rose Daly-Rooney | rdalyrooney@azdisabilitylaw.org |
| Sara Norman | snorman@prisonlaw.com |
| Sophie Jedeikin Hart | sophieh@prisonlaw.com |
| Gregory Honig | Gregory.Honig@azag.gov |
| Lucy Rand | Lucy.Rand@azag.gov |

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/ Daniel P. Struck