# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, | No. CV-12-00601-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Ryan Thornell, | |
| Defendant. | |

At the status hearing on March 15, 2024, the parties should be prepared to address the current state of compliance with the Permanent Injunction with particular emphasis on the following.

The Court issued the Permanent Injunction nearly one year ago, on April 7, 2023, to which Defendants agreed. (Doc. 4410). As delineated in the Monitors' Interim Report, of the 184 provisions of the Permanent Injunction related to healthcare, Defendants have not yet developed a mechanism for assessing compliance with 130 provisions. (Doc. 4539 at 8, 20). And for those 54 provisions where assessment is possible, Defendants are compliant with a total of 5 provisions for mental health care and none related to medical care. These numbers establish, with rare exceptions, a complete failure to make, or even begin, the systemic changes required by the Permanent Injunction. The Court notes Defendants have made some improvements in particular areas, such as treatment for hepatitis C. (Doc. 4539 at 19). But overall, the healthcare system remains fundamentally lacking and the Monitors' report documents continued adverse outcomes that show

prisoners remain at risk. It bears reminding all parties that the Court on June 30, 2022, issued detailed findings of fact establishing Defendants were in clear violation of the constitutional rights of the class. (Doc. 4335). Defendants did not appeal.

Defendants' failures to comply with the Permanent Injunction regarding a few specific provisions merit highlighting.

Section 7.4.7 requires Defendants shift primary responsibility for episodic care and evaluation from nurses to physicians and physician's assistants. This was a critical failure identified by the Court in its Findings of Fact and Conclusions of Law. Defendants have partially implemented the care model only at two complexes. (Doc. 4539 at 18).

Section 8.1 requires all specialty referrals be completed within the ordered timeframe. (Doc. 4539 at 30). There were 2,455 specialty referrals scheduled to be completed in the month of September. That total included 454 referrals of an urgent nature, *i.e.* those referrals that must be completed within thirty days. Of the 454 urgent referrals, 205 were completed on time while 249 were not. (Doc. 4540 at 23). Thus, despite urgent specialty referrals indicating a significant need for attention, Defendants timely completed less than half.

Section 1.16 required Defendants "fill all positions required by the current contract with the health care vendor" no later than July 7, 2023. (Doc. 4410 at 13). The Monitors' report states "[t]he cornerstone of ADCRR's successful fulfillment of the health care-related requirements of the Injunction in this case is adequate staffing." In addition, "[a]lmost every requirement rests on staffing and until ADCRR achieves sufficient staffing it will be unable to provide constitutionally adequate care." (Doc. 4539 at 16). Despite the compelling need to increase staffing and having almost one year to do so, Defendants are still not close to hiring sufficient staff.

After issuance of the Permanent Injunction, Defendants modified their contract with their health care vendor to increase the total number of positions. As of December 1, 2023, the modified contract required 1,431 FTE staff members. (Doc. 4539 at 16). But as of December 1, 2023, only 56% of those positions were filled with permanent staff and 24%

of the positions were completely unfilled. In other words, Defendants fell 346 positions short of meeting the staffing level required by the contract. And, as the parties are aware, a forthcoming staffing analysis will recommend substantial increases in staffing beyond the current level required by the contract. Thus, the actual situation is that Defendants are understaffed even beyond the 24% missing under the current contract levels.

Recognizing the importance of increasing staffing levels, the Court issued an Order noting it was time to pursue requiring "additional salary increases to ensure adequate staffing as a foundation for providing constitutionally adequate care." (Doc. 4555 at 2). The parties were ordered to "address the mechanics of mandating increased salaries." (Doc. 4555 at 2). Defendants did so by stating they "do not oppose increasing healthcare salaries," but they argue the Court must take into account the many "steps" in the "legislative budget process" that would need to be completed to make "any changes impacting the contract rates." (Doc. 4566 at 3). Defendants also contend "ADCRR is currently paying wages over the average wages provided in the contract to get staffing levels to the appropriate level" but NaphCare "is not paying these wages." (Doc. 4566 at 3). Defendants provide an example that the current contract requires certain mid-level providers be paid approximately $106.33 per hour but NaphCare is paying these providers "between $80.00 and $95.51" per hour. (Doc. 4566 at 3).

To spur hiring, Defendants claim the Court could "enter an order intended to get [NaphCare] to increase health care salaries within the bounds of the current contract." (Doc. 4566 at 3). Such an Order would require Defendants "sanction" NaphCare for not filling all positions. The Court is baffled as to what Defendants are arguing when they propose the Court "order" them to sanction NaphCare. To the extent the Court can glean the meaning of Defendants' position, it is a position the Court has repeatedly rejected.

In vacating the Stipulation, the Court noted Defendants had tried to justify their failure to satisfy performance measures by focusing on their healthcare contractor's limitations. (Doc. 3921 at 25). The Court reminded Defendants that "[ADCRR], not the private health care contractor is legally responsible in Arizona for the provision of health

care" to prisoners. (Doc. 3921 at 25). Similarly, the Court's Permanent Injunction reminded Defendants that they

> have a constitutional responsibility to care for the prisoners in their custody. Therefore, this injunction is addressed to Defendants, not their private health care contractor (presently NaphCare). Defendants must comply with the injunction and any disputes between Defendants and their private healthcare contractor are beyond the scope of this injunction.

(Doc. 4410 at 4 n.2).

As to Defendants' suggestion that the Court "order" them to sanction NaphCare, the Court reminds Defendants of the specific provisions of the contract with NaphCare. If NaphCare is not performing its contractually required obligations, that is to be resolved between Defendants and NaphCare. Defendants should take all actions they believe are appropriate under their contract with their healthcare vendor.

The Court has reviewed the current contract and notes it allows for significant "Staffing Offsets / Paybacks for Unfilled Hours of Service."[1] (RFP § 1.17.11). The contract also allows other actions, such as "monetary sanctions" or "termination" of the contract if NaphCare is not performing. (RFP § 1.19). It is plain Defendants already have contractual remedies available to them and it is neither necessary nor appropriate for the Court to "order" Defendants to pursue those remedies. Of course, if Defendants are not pursuing their contractual remedies against NaphCare, it will be exceptionally difficult for Defendants to show they "took *all* reasonable steps to comply with the [Permanent Injunction]." *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016). But beyond the issue of supporting or potentially negating a contempt finding, the disputes between Defendants and NaphCare are outside the purview of this Court's jurisdiction.[2]

---

[1] The contract also references the current case and requires NaphCare "meet all federal and state constitutional amendments [and] court orders." (RFP § 1.1.5)

[2] Plaintiffs have renewed their request "that the Court override or rescind privatization." (Doc. 4552 at 12). Defendants do not state whether they agree the state law requiring privatization should be declared unconstitutional. Rather, Defendants agree "a state law is void if it actually conflicts with a federal statute or the U.S. Constitution." (Doc. 4566 at 6). But the "Court would need to hear from the appropriate parties," *i.e.* "the Attorney General, the Speaker of the House of Representatives, and the President of the Senate," before deciding if the state law requiring privatization is unconstitutional. (Doc. 4566 at 6). The Court would need full briefing on this issue before any determination could be

The parties must be prepared to discuss these matters at the status hearing. But based on the Monitors' report, which in turn is based on undisputed evidence produced by Defendants and NaphCare, the Court expects to issue an Order to Show Cause why Defendants should not be held in contempt of the agreed upon Permanent Injunction. Should such an Order be issued, the parties' responsive briefing will address Defendants' attempts to comply with the Permanent Injunction but also whether healthcare privatization is the root cause of Defendants' failure to continue to provide constitutionally adequate health care and, if so, what are the possible legal remedies the Court may impose including appointment of a receiver.

**IT IS SO ORDERED.**

Dated this 14th day of March, 2024.

_____
Honorable Roslyn O. Silver
Senior United States District Judge

---

made.