Marvin C. Ruth (024220)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
T: (602) 381-5462
F: (602) 224-6020
mruth@cblawyers.com

*Attorneys for Movant NaphCare, Inc.*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, et al., | No. 2:12-cv-00601-ROS |
| Plaintiffs, | |
| v. | **NAPHCARE, INC.'S MOTION TO INTERVENE** |
| Ryan Thornell, et al., | |
| Defendants. | |

NaphCare, Inc. respectfully moves to intervene as a defendant in this action pursuant to Federal Rules of Civil Procedure 24(a)(2) and (b).[1] This Motion to Intervene meets the requirements of Fed. R. Civ. P. 24, as: (i) the application to intervene has been made timely and will not cause any prejudice or delay; (ii) NaphCare has significant protectable interests relating to the subject of the action; (iii) the disposition of the action may impair or impede NaphCare's ability to protect its interests; and (iv) the existing parties may not adequately represent NaphCare's interests. *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997).

. . .

. . .

. . .

. . .

---

[1] NaphCare met and conferred with the parties. ADCRR is not opposed to NaphCare's intervention. Plaintiffs, through counsel for the ACLU, stated that they would object to the Motion.

I.   INTRODUCTION

   A.   Prior to NaphCare, a Prison Healthcare System Suffering from Decades of Neglect.

This class-action was initiated nearly twelve years ago, asserting that State prisoners' constitutional rights were being violated by the substandard level of care provided. At the time, the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR") had just started the process of transitioning from State run on-site prison health care, and this matter followed a long history of complaints and litigation regarding the State's provision of care. As the Court is aware, the same year the lawsuit was filed the ADCRR began contracting out the provision of health care to a series of private providers—Wexford Health, then Corizon, and then Centurion—none of whom came close to abiding by the terms of a 2015 settlement. In fact, some of those providers appear to have actively resisted compliance with that agreement. The result: (i) a trial, after which the Court issued Findings of Fact and Conclusions of Law on June 30, 2022, identifying various constitutional violations in the provision of health care and the housing of certain prisoners [Doc. 4335] and (ii) a subsequent permanent injunction entered on April 7, 2023 [Doc. 4410] (the "Injunction"), which included the appointment of a Monitor to oversee compliance with the Injunction.

   B.   NaphCare takes over State Prison Healthcare, Significantly Improves Quality of Care.

On October 1, 2022, a mere 16 months ago, NaphCare stepped into this long-broken system. It did so fully aware that it was inheriting serious and significant issues, but fully committed, together with then-Director Shinn, and now with Director Thornell and his team, to substantially improve the quality of care provided to the disadvantaged patient population housed in ADCRR's facilities. And in its short time at the helm, NaphCare has achieved significant success:

. . .

. . .

### 1. Fostered culture change

Prior to NaphCare, the culture and philosophy were focused on cost containment. Needed care was often denied and there was poor communication between the patient population and medical staff. NaphCare's proactive care philosophy represents a complete culture change. Retraining and reorienting – and replacing where necessary – staff who have operated in a broken healthcare culture takes time. NaphCare and current ADCRR leadership are working hard to change that culture. As an example, exemplifying a renewed focus on care over cost, both on-site and off-site patient encounters have soared, and notwithstanding disruptions in prison operations, NaphCare has consistently maintained a high volume of sick call lines during its tenure across the entire DOC. As more meaningful encounters occur, appropriate plans of care are implemented, specifically medication orders. Even with this increase in volume, NaphCare has not missed a medication line and consistently administers 94% of medications every day. The remaining 6% are largely related to patient refusals and no shows to medication lines.

This trend displays renewed confidence in NaphCare's healthcare providers, who are now enabled to provide appropriate care without barriers.

### 2. Implemented improved and efficient technology

NaphCare replaced a legacy, broken electronic health record system with its TechCare EHR system. Live on day one of its operations, NaphCare expanded adoption in the State, with the private prisons now fully transitioned to the platform. In total, 34,721 patients across 16 facilities are now on the same electronic health record. This has made NaphCare staff more efficient and provides improved continuity of care to the patient population. This modern platform has enabled impactful advancements in the delivery of care, specifically by providing a patient portal feature available via the inmate tablet system at ADCRR. The TechCare Patient Portal has facilitated over 31,000 unique patients having over 919,000 interactions with health care staff. This program also enables multiple features of NaphCare's Wellness Program as well as direct

communication with NaphCare nurses and pharmacy staff to aid in health needs requests and medication management. NaphCare is expanding this platform to support direct communication between patients and physicians. Further, the TechCare EHR Platform provides real-time, population-wide statistics for monitoring the care delivered to patients. Using this platform NaphCare continues to make notable progress on complete automation of all Court-mandated quality reporting to show a transparent view of healthcare within ADCRR. NaphCare has completed 80 quality indicator reports and expects all 132 reports to be complete and fully automated by June 2024.

### 3. Significantly increased staffing

NaphCare has dramatically increased staffing in the prisons and continues to make progress. Incomplete and sometimes unintentionally misleading reporting on staffing has been a serious problem. Contrary to the Monitor's Report, NaphCare is currently approaching a 91% staffing level across the system. As of March 14, 2023, NaphCare has only 153.70 vacancies out of 1,492.90 positions. That is a vacancy rate of only 10.3%.

Of the non-vacant positions, 1,221.70 have been fully hired (i.e., employees, including agency workers, who have completed the onboarding process) and 117.50 candidates have been hired *and accepted NaphCare's pay rate offer*, but are currently proceeding through the onboarding process, including background checks.[2]

NaphCare's strong fill rate is all the more impressive considering 61 new positions were added by ADCRR to the contracted staffing matrix just 13 days ago, on March 1, 2024. In fact, over 280 positions have been added to the staffing matrix since October 1, 2023. Had these recent positions not been added, NaphCare would be fully staffed today. Nonetheless, based on its recent strong progress, NaphCare is on track to have at

---

[2] NaphCare does still have registry staff filling some positions, however, NaphCare is making strong strides toward replacing registry staff with NaphCare staff. For example, NaphCare is close to fully replacing any current RN registry staff with NaphCare core RN staff. Now that RNs have been fully hired, NaphCare is continuing to focus on replacing registry staff at other positions of need, including LPNs, CNAs and Psychologists/Psychology Associates.

4

least 95% of its positions filled within the next 60-90 days by employing current processes and pay rates. Of course, NaphCare continues to process and assess pay raises on a monthly basis.[3]

### 4. Increased access to care, including specialty care

NaphCare has significantly increased access to care for the ADCRR patient population. NaphCare's innovative QUALCare team of regional and corporate midlevel providers work around the clock supplementing on-site resources and provider level coverage. Primarily focused on management of chronic conditions, including management of the massive increase in Hepatitis C and Medication Assisted Treatment for Opioid Use Disorder ("MAT"), this group of providers completes over 1,200 encounters per week. NaphCare has consistently staffed all nurse lines since day one of transition and currently provides over 64 provider lines per week dedicated to MAT, Hepatitis C management and chronic care alone. This stands in sharp contrast to the prior providers' failures. *See e.g.*, June 20, 2022 Findings of Fact (Doc. 4275) at 29 (finding that "the nurse line was cancelled in Tucson more than twenty times in January and February of 2021 due to insufficient staffing").

NaphCare has also significantly improved communication and follow-up care for patients returning from a hospital or specialty care provider. NaphCare's fully implemented EHR, TechCare, has automated this process, allowing for all offsite visit returns to be reviewed by a QUALCare provider for immediate implementation of specialist recommendations. This strategy is working to supplement on site care to meet medical needs of the patient population without delay and enabling on site providers to focus on care activities that demand in person encounters.

---

[3] In the month of February, NaphCare provided pay raises for incumbent medical and psychiatric mid-level providers, as well as for all employees with a one-year anniversary. In the month of March, NaphCare will be providing pay raises to incumbent Certified Nursing Assistants/Patient Care Technicians and dentists.

In addition, NaphCare has two secure hospital units which are utilized to provide a level of care not possible within the prison walls. Prior to NaphCare's tenure, access to specialty care for patients was limited. NaphCare has worked to streamline the process for offsite specialty care referrals with a clear focus on appropriateness of care, not cost containment. This strategy has resulted in over 1,852 specialty encounters per month, or 90 encounters per day.

NaphCare, however, harbors no illusions that its work is close to done. It recognizes the complex challenges ahead. It also understands the Court's and the litigants' frustration with the prior lack of progress and hostility to change. Fixing a healthcare system, however, takes time, particularly in a state that continues to face a significant healthcare worker shortage--a shortage that is most acute in the areas where many of ADCRR's facilities are located.[4] NaphCare is nevertheless confident that given additional time, Arizona's prison health care system, in NaphCare's hands, and with ADCRR's work and cooperation, will serve as a model for prison health care systems nationwide.

### C. NaphCare Must be Allowed to Intervene at this Juncture.

This matter has now moved past the initial litigation phase, with current proceedings focused on the Court's assessment of ADCRR's compliance with the Injunction. NaphCare, of course, is the entity on the ground, tasked with finding and implementing solutions. NaphCare's ability to provide the Court with critical, relevant information regarding *its* work, *its* proactive processes, and *its* challenges, has been limited to feeding information to intermediaries in the hopes that data will be presented fully and accurately. Often, it is not.

Further, in response to the Court's request for suggestions on increasing staffing levels, the litigants exchanged proposals that do not comply with NaphCare's contract. That oversight is not surprising, as these proposals do not include any input from the

---

[4] *See e.g.*, https://crh.arizona.edu/news/addressing-arizonas-rural-physician-shortage (noting Arizona had a shortage of 600 physicians even before the COVID-19 pandemic).

entity busily advertising for, recruiting, and hiring healthcare personnel for ADCRR's facilities—NaphCare—an entity with expertise in staffing healthcare personnel in correctional facilities all over the country. Meanwhile, less than a year and a half into NaphCare's work, Plaintiffs are already seeking severe additional restrictions that could necessarily impact NaphCare rights, including requests to appoint a receiver and to strike Arizona's statute privatizing correctional healthcare.

Giving NaphCare a seat at the table, *as a party* (not merely as a witness or an agent of ADCRR) to protect NaphCare's legal interests that are wholly tied-up in the success of Arizona's prison healthcare system, will not only serve NaphCare, but the other parties and the Court as well. Because the Motion is timely and because NaphCare has significant protectable interests that may not be adequately represented by existing litigants, NaphCare respectfully requests intervention as of right.

## II. ARGUMENT

### A. Standard for Intervention as of Right.

Rule 24(a)(2) permits an applicant to intervene as a matter of right in pending litigation if the applicant demonstrates that: (i) the application to intervene was made timely; (ii) the applicant has a significantly protectable interest relating to the transaction that is the subject of the litigation; (iii) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interests; and (iv) the existing parties do not adequately represent the applicant's interests. *Wilson*, 131 F.3d at 1302 (citing *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996)).

Rule 24(a)(2) is to be construed liberally in favor of intervenors. *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011). "[A]llowing parties with a practical interest in the outcome of [the case] to intervene" prevents "future litigation involving related issues," and allows "an additional interested party to express its views before the court." *United States v. City of L.A., Cal.*, 288 F.3d 391, 398 (9th Cir. 2002) (emphasis added). Consequently, intervention should be granted so long as the moving papers state the legal and factual grounds for intervention. *Beckman Indus., Inc. v. Int'l*

7

*Ins. Co.*, 966 F.2d 470, 474 (9th Cir. 1992). What is more, the analysis under Rule 24(a)(2) is "guided primarily by practical considerations, not technical distinctions." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001) (internal citation & quotation marks omitted).

NaphCare's Motion satisfies each requirement of Rule 24.

**B.     NaphCare's Motion is Timely.**

Whether a motion to intervene is timely is evaluated based on: (i) the stage of the proceeding; (ii) potential prejudice to other parties; and (iii) the reason for any delay in moving to intervene. *Wilson*, 131 F.3d at 1302 (citing *Orange Cty. v. Air Cal.*, 799 F.2d 535, 537 (9th Cir. 1986)).

As to the first and third factors, this matter is in the post-trial stage of ensuring compliance with the Injunction.[5] NaphCare, of course, as the contracted party to provide the healthcare in question, is at the crux of the Monitor's and Court's evaluation of ADCRR's compliance. The Monitor has just issued his first interim report, and the parties are in the process of responding to that report. But the report and the responses thereto include various demands and assessments that directly implicate NaphCare's interests, including requests to appoint a receiver, invalidate Arizona's statute privatizing prison healthcare,[6] impose monetary penalties on NaphCare, and otherwise impose various

---

[5] To be clear, NaphCare is not requesting intervention for the purpose of relitigating the Injunction or seeking reconsideration of its terms. NaphCare notes, however, that working with the parties to address areas where the Monitor has identified issues, such as staffing levels, could entail tinkering with certain provisions of the Injunction. For example, the Injunction currently requires that NaphCare only hire medical doctors that are board certified (or board eligible, under certain conditions) in one of two specialties: family medicine or internal care. Expanding that provision to allow NaphCare to (i) retain certain doctors who are not board eligible and (ii) hire doctors who are certified, or eligible to be certified, by one of the other approximately 22 member boards, would increase the pool of potential candidates and help facilitate compliance with the core, quality-related healthcare mandates of the Court's Order.

[6] NaphCare does not take any position on whether state law in Arizona should *require* privatization of healthcare in the prison setting. That is a policy matter for state elected officials. NaphCare does note that, even in the event that this Court were to invalidate

8

timelines and requirements (including salary increases) that implicate NaphCare's rights under its contract (even when NaphCare agrees with the suggested course of action). NaphCare's request to intervene at this juncture to protect those rights, facilitate the Court's understanding of NaphCare's efforts and existing roadblocks, and aid in finding solutions to those roadblocks, is appropriate.

Second, allowing NaphCare to intervene will not prejudice the other parties or delay the proceedings. To the contrary, allowing NaphCare to participate *as a party* will make these proceedings more efficient and avoid potential litigation down the road. *See U.S. v. City of L.A., Cal.*, 288 at 398 ("[A]llowing parties with a practical interest in the outcome of [the case] to intervene" prevents "future litigation involving related issues," and allows "an additional interested party to express its views before the court"). NaphCare's successes, alleged failures, and ongoing efforts to improve the delivery of care are at the heart of the post-Injunction proceedings. Yet NaphCare's documents, information, thoughts, and concerns are all first filtered through various intermediaries, including ADCRR and the Monitor, before reaching the Court. To the extent additional information or further context could be helpful in assessing compliance with the Injunction and the best path forward, NaphCare currently has no direct ability to provide the Court with that information.[7] As a party to the litigation, NaphCare will be in a better position to communicate with the Court, the Court Monitors, and the Plaintiffs in seeking solutions to the challenges NaphCare and the prison healthcare system face, instead of only working with ADCRR and its counsel.

---

the state law that requires privatization, ADCRR would continue to have discretion to decide whether or not to continue to contract with NaphCare or to take services in house. NaphCare does believe that it is able to provide better healthcare in the Arizona prisons than any other provider – public or private. NaphCare's interest in being a party to this litigation is to directly defend its reputation and provide more fulsome information to the Court respecting the quality and effectiveness of its healthcare and software services.

[7] NaphCare has a long history of working effectively with the Monitor, Dr. Marc Sturn, where he has served as a contracted monitor and advisor to many of NaphCare's current clients in Washington State. In fact, NaphCare recommended Dr. Sturn as a court monitor to the prior ADCRR Director.

9

For example, Plaintiffs assert (at 7) that ADCRR has failed to "generate reliable data" regarding access to offsite specialty care, which Plaintiffs blame, in part, on "a byzantine Utilization Management approval process". NaphCare respectfully disagrees with that characterization. ADCRR has generated weekly reports that establish the dramatic increase in offsite and specialty care since NaphCare has been in charge, as set forth above. That information, unfortunately, was not conveyed to the Court. Similarly, the discrepancies in reporting staffing levels (also described above) are another significant concern. As a party, NaphCare would provide such information directly to all constituents, including the Court.

Similarly, allowing Intervention could aid in finding solutions and avoid subsequent litigation. For example, and as set forth in greater detail below (at 12), some of the proposed solutions to alleviating the staffing shortages are premised on a misreading of NaphCare's contract with ADCRR. That not only implicates NaphCare's legal interests, it risks delaying a solution, or causing additional litigation down the road. Further, NaphCare's perspective as a company that is in the business of providing health care in correctional environments nationwide (including staffing healthcare professionals in jails and prisons across the country) would allow it to offer suggestions that no other current party can provide. As a party, NaphCare could present additional context and offer solutions through the same process the current litigants are using to weigh in on the Monitor's Reports. NaphCare is not requesting any special procedures – merely the right to be heard on issues that directly impact NaphCare, and consequently, compliance with the Injunction.

Because the litigants will not suffer any prejudice, and the post-Injunction process will not suffer any delays because of NaphCare's intervention, NaphCare's Motion is timely.

**C.    NaphCare has a Protectable Interest in the Subject of the Litigation.**

An intervenor has a "significant protectable interest" that justifies intervention as a matter of right if (i) the interest is "protectable under some law" and (ii) there is a

10

"relationship between the legally protected interest and the claims at issue." *Nw. Forest Res. Council*, 82 F.3d at 837. While a mere economic stake in the interest of the litigation is insufficient to demonstrate a significantly protectable interest, the "interest" test is a "practical, threshold inquiry." *Greene v. United States*, 996 F.2d 973, 976 (9th Cir. 1993). The inquiry is "primarily a practical guide to disposing of lawsuits by involving *as many apparently concerned persons as is compatible with efficiency and due process*." *Cty. of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980) (internal quotation marks and citation omitted) (emphasis added). "[I]f the resolution of the plaintiff's claims actually will affect the applicant," the relationship requirement is met. *United States v. City of L.A.*, 288 F.3d at 398 (citation omitted). Further, in considering whether an applicant's interests may be impaired by an action, the Ninth Circuit follows the guidance of the Rule 24 Advisory Committee notes, which states: "[i]f an absentee would be substantially affected in a *practical* sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir. 2001) (quoting Fed. R. Civ. P. 24 advisory committee's notes) (emphasis added).

In short, the focus is on the *practical* impact on an intervenor's rights and whether resolution of matters before the Court could "affect" them. Here, there can be no question that (i) the ongoing evaluation of ADCRR's ability to comply with the Injunction by providing quality medical care, (ii) Plaintiff's requests for additional actions by NaphCare (several of which NaphCare agrees with)[8] or the imposition of further legal restrictions on NaphCare (such as a receivership or the proposed invalidation of the Arizona state law requiring privatization), and (iii) ADCRR's suggestions for ways to speed up compliance with the Injunction, will all necessarily have a significant, practical effect on NaphCare.

---

[8] For example, NaphCare largely concurs with Plaintiffs' suggestions to revise the compassionate release policies. NaphCare can assist by providing data and information that could support those changes.

To provide one example. The Court's Order (Doc. 4555) requires the current parties to address, among other things, "the precise terms the Court should order that will result in [NaphCare] offering higher salaries." (at 2). On its face, such an order would have a "practical" effect on NaphCare. Moreover, ADCRR's Response to that directive misconstrues its contract with NaphCare, unfairly asserts that NaphCare has failed to pay salaries at the rate paid to NaphCare under the contract, and argues that salary increases could be implemented if NaphCare simply paid staff at the levels already funded by the State Legislature. Specifically, ADCRR asserts that:

> ADCRR is currently paying wages over the average wages provided in the contract to get staffing levels to the appropriate level. NaphCare, however, is not paying these wages. For example, the contract provides that the five (5) MAT program mid-level providers should be paid approximately $106.33 per hour. NaphCare, however, is paying those five (5) providers between $80.00 and $95.51, including employee related expenses ("ERE"). The average hourly difference between contracted rates and what NaphCare is paying is approximately $25.

(Doc. 4566 at 3).

The statement that NaphCare is not using its financial resources appropriately to pay its employees is simply not accurate. The $106.33 contract rate used as an example by ADCRR does not reflect the *wage* NaphCare could pay a person for that position. Rather, that figure represents the *price* for the position, which includes not only wages, but benefits, employment taxes, overtime, and other costs borne by NaphCare, including the possibility that some positions may need to temporarily be filled through an agency at greater cost. In addition, the singular focus on wages fails to acknowledge that NaphCare is also spending more money on advertising, marketing, recruitment and retention efforts.[9]

NaphCare respectfully submits that the Court and litigants would benefit from NaphCare's ability to weigh in on these issues directly, not only to correct such

---

[9] NaphCare does note that the current contract includes a 4.76% cost of living adjustment (COLA) effective July 1, 2024. This COLA will provide NaphCare with additional funds that it can use to invest more in the effort to recruit and retain staff, which includes the ongoing effort to review and increase wages.

12

inaccuracies, but to offer ideas and solutions.[10] As it stands, the parties are offering potential fixes to the Court that are not only unworkable but would breach the contractual obligations owed to NaphCare. NaphCare's need to protect those contractual interests in service of providing the quality healthcare required by the Injunction, mandates intervention.

### D. Existing Parties *May* Not Adequately Protect NaphCare's Interest.

Only a "minimal" showing is required to establish this final element for intervention by right under Rule 24(a)(2). *Tribovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1992). NaphCare need only demonstrate "that representation *may* be inadequate," not that *it is* inadequate. *Id.* (emphasis added); *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003). In determining whether representation may be inadequate, courts consider three factors: (1) whether the existing parties will "undoubtedly" make all the intervenor's proposed arguments; (2) whether the parties are capable and willing to make such arguments; and (3) whether the intervenor would offer any necessary elements to the proceeding that other parties would neglect. *Arakaki*, 324 F.3d at 1086. Representation *may* be inadequate where the interest of the party seeking intervention and an existing party are "different," even if they are not "wholly 'adverse,'" or where they are "similar but not identical." *Nuesse v. Camp*, 385 F.2d 694, 703 (D.C. Cir. 1967).

To be sure, both NaphCare and Director Thornell are fully committed to operating a prison healthcare system that meets and well exceeds the constitutionally required minimum. Indeed, NaphCare and ADCRR aim to create the best prison healthcare system in the nation. At the same time, however, NaphCare and ADCRR are parties on opposite sides of a contract with differing legal responsibilities, not the least of which is ADCRR's obligation to adhere to the United States Constitution and comply with the Injunction (to which NaphCare is not a party). Yet while constitutional obligations may be at the root

---

[10] One possibility would involve shifting funds currently earmarked for bonuses to base rate salaries.

of the Injunction, NaphCare still has separate protectable legal interests that are not subsumed within ADCRR's legal interests. Thus, while their interests are similar in many respects, they are not identical in all respects, and NaphCare cannot count on ADCRR to "undoubtedly" make all NaphCare's proposed arguments, either with respect to compliance with the Injunction, or Plaintiff's requests for further legal restrictions. For evidence thereof, the Court need look no further than ADCRR's proposed solution "that will result in [NaphCare] offering higher salaries," which, as set forth above, would allow ADCRR to avoid having to request further funding from the State Legislature, but would force NaphCare to come out of pocket for expenses that are ADCRR's responsibility under the contract. Those differing motivations underscore that ADCRR *may* not adequately represent NaphCare's interests.

### E. In the Alternative, NaphCare Seeks Permissive Intervention

Should the Court have concerns with NaphCare intervening as of right, NaphCare requests that the Court exercise its discretion to allow permissive intervention under Rule 24(b). Rule 24(b)(1)(B) provides that "the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." The burden is significantly less exacting than that imposed by Rule 24(a)(2), and "requires only that (1) an independent ground for jurisdiction exist, (2) that the motion to intervene be timely, and (3) that there exist a claim or defense shared between the main and the intervenor's suit." *Nikon Corp. v. ASM Lithography B.V.*, 222 F.R.D. 647, 651 (N.D. Cal. 2004) (citations omitted).

NaphCare easily satisfies these criteria for the reasons set forth above. Again, they have significant interests at stake in this litigation. By timely seeking to intervene, NaphCare will not prejudice any of the parties' rights or delay the Court's and the Monitor's oversight of the Injunction. Nor does any other factor mitigate against NaphCare from defending its interests and engaging directly with the Court, Plaintiffs, ADCRR, and the Monitor as a *party* to these proceedings. NaphCare is not simply an interested bystander, but in several respects, the ultimate *target* of Plaintiffs' actions.

## III. CONCLUSION

Ultimately, Rule 24, including the provisions related to permissive intervention, should be construed liberally to assist parties seeking to protect their rights. *Sw. Ctr. for Biological Diversity*, 268 F.3d at 818. For the reasons set forth above, permitting the intervention of NaphCare is consistent with Rule 24 and will permit NaphCare to protect its rights, while meaningfully engaging directly in the process to ensure an appropriate and functional healthcare system.

DATED this 14th day of March, 2024.

**COPPERSMITH BROCKELMAN PLC**

By */s/ Marvin C. Ruth*
    Marvin C. Ruth
*Attorneys for Defendant NaphCare, Inc.*