1  Steve Boggs # 195143
2  ASPC - Eyman
3  Rynning Unit - 5-D-226
4  PO Box 3100
5  Florence, Arizona 85132
6
7

☒ FILED    ☐ LODGED

**Mar 25 2024**

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

8          UNITED STATES DISTRICT COURT
9              DISTRICT OF ARIZONA
10
11
12  Shawn JENSEN
13              Plaintiffs          No. CV 12-00601-PHX-ROS
14
15  V.                              MOTION TO ENFORCE
16                                  COURT ORDER
17  Ryan THORNELL, et al.,
18              Defendants
19
20
21      Subclass Petitioner Steve Boggs, in Pro Se, provides notice to
22  this Court that Defendant has failed to comply with this Court's
23  (Order and permanent injunction) dated April 7, 2023. DOC. 4410.
24  Accordingly, Petitioner respectfully moves this Court to enforce
25  the terms of the order and permanent injunction by enjoining
26  Defendant to immediately implement and comply with the Court's
27  orders.
28

## I. Background

Petitioner has been in the custody of the Arizona Department of Corrections Rehabilitation and Reentry, (ADCRR) since May 13, 2005 where Petitioner was first housed at Browning Unit and spent eleven plus years in solitary confinement. Then in July of 2017 Petitioner was moved to Central unit and reclassed as close custody. In March of 2022 Petitioner was moved to Meadows unit until, September of 2022 where Petitioner was moved to Rynning unit where Petitioner currently resides.

On April 7, 2023 the Honorable Judge Silver, Arizona District Court Judge, issued a Court order and permanent injunction (DOC. 4410) against ADCRR. (Shawn JENSEN V. Ryan THORNELL) Per Judge Silver's order and permanent injunction, Petitioner is an established party of the subclass found on page 51 of the order and permanent injunction. (See Exhibit #1, page 51 of Jensen v. Thornell)

As a subclass, Petitioner Boggs' seeks relief from this Court. Petitioner was originally diagnosed approximately around 2014 with disc/vertebrae degenerative disease, while ADCRR facilitated inmate medical care at the time. Since that time at least three contract health care service providers (Corizion, Centurion, and now Naphcare) have reviewed and continued to provide medical care in the form of medications, (naproxen 500mg and now Celecoxib 200mg) for Petitioner's lower back pain. The issues involving Petitioner's lower back have continued to progressively get worse; Petitioner has numbness in the left upper thigh region and a sciatic nerve problem which

Causes pain in the right leg and lower right side of the lower back. Petitioner requested an (in cell chair) on September 11, 2022 by way of a health needs request form, (HNR) per a nurse line visit on December 29, 2022 Petitioner was scheduled to see a provider. Petitioner was told at the time of the nurse line visit that, chair SNO's were not given thru medical that only ADCRR gave out chairs. It became somewhat confusing so Petitioner sent an inmate letter to the assigned COIII, (See Exhibit #2 Inmate letter addressing the chair matter).

On January 13, 2023 Petitioner saw the provider (Dr. Tripp) and explained the medical problems that were being experienced. Petitioner was informed that there was no medically necessary reason for a SNO to be issued for a chair, though a medical SNO was issued for lower bunk status which has since expired. Dr. Tripp ordered X-rays, which were taken and Petitioner received the diagnosis for Osteoarthritis. (See Exhibit #3 SNO).

Petitioner began the grievance process on 1-30-2023 and fully exhausted the process on 4-4-2023, (See Exhibit #4 Grievance). There was no relief provided by Naphcare or ADCRR; Petitioner was placed in a position of filing a civil complaint which Petitioner decided not to file. Then in July of, 2023 Petitioner was advised by Ashley Bardwell, a Naphcare official that the issues involving the `chair` were being reviewed and that Petitioner should restart the process. In the mean time Petitioner avoided sitting down onto the bench inside his cell, the bench which is attached to the wall with a swing arm, and sits eleven inches off the ground and is one foot four and a half inches below

the desk top. The desk itself sits two feet four and a half
inches tall, is attached to the wall and is two feet nine inches
wide by two feet long. Petitioner measured the desk and
the bench. Sitting at this desk longer than ten minutes,
caused Petitioner to experience pain in the lower back and
without lumbar support, Petitioner was forced to sit with his
elbows up upon the desk, which caused the back to stretch in
a manner, that caused Petitioner greater pain. At the end
of July 2023 Petitioner requested through ADCRR administration,
CO IV Wilde to review for approval for a chair from the previous
filed grievance. CO IV Wilde denied the request to re-review in
August 2023 during a face to face conversation, CO IV Wilde
informed Petitioner that the process would need to be started
again.

Petitioner submitted 2 HNR's in September 2023, to be seen
and requested a medical SNO for an in cell chair. Petitioner
ended up having to begin a new grievance process, just to be
seen by medical personnel. Petitioner was finally seen by a
Naphcare provider Doreen Zokvie, on 11-22-2023 after waiting
approximately 2 months. During the medical consult with
Zokvie, Petitioner discussed treatments for Osteoarthritis
which included sharing medical research of the (Merck
Manual of Medical Information). (See Exhibit #5 Merck Manual)
Zokvie first denied Petitioner's request for the chair and then
stated that, "everyone has osteoarthritis and disc degeneration,
we can't just give everyone a chair who says that their back hurts."

- 4 -

Zokvic did however order x-rays which were taken, prescribed 500 mg Acetaminophen which was dispensed and ordered a back brace which Petitioner never received. Petitioner also sent a complaint via the injunction portal app on 11-23-2023, which is on Petitioner's tablet. Petitioner continued on with the grievance process until it exhausted on 2-14-2024, on 2-16-2024 Petitioner again submitted a complaint through the injunction portal. (See Exhibit # 6 Petitioner's grievances.)

## II. Law and Argument

A. This Court retains jurisdiction to enforce the Court's order and permanent injunction. As Petitioner is a subclass party to the structure of the injunction, enforcement of its' provisions are within this Courts jurisdiction.

B. Defendant has violated the Court's order and permanent injunction. Petitioner will include the pages from the order and permanent injunction as exhibits, listed below are the subject heading for each cited violation.

1. — 1-General Requirements
    1.1. (page 11) (Exhibit # 7)
2. — 2.3. Preventable adverse event reporting
    2.3.1.1. (page 18) (Exhibit # 8)
3. — 2.5 Overall system Improvement
    2.5.1 (page 19) - (page 20) (Exhibit # 9)

Almost a year has passed since the Court issued its' order and permanent injunction; despite being afforded ample time to comply with the Court order, Defendant is still instituting methods that this Court cited on page 4 and page 5 of the order and permanent injunction. (Doc. 4410) (See Exhibit # 10). NaphCare personnel state that Petitioner does not have a medically necessary reason, for a medical SNO for an in cell chair. Yet, NaphCare seems willing to prescribe medications for pain associated with the lower back, and other treatments i.e. physical therapy. In Lavender v. Lampert, 242 F. Supp. 2d 821, 845 (D. Or. 2002) (the court cited that "the existence of chronic and substantial pain itself demonstrates a 'serious' medical need"). Courts generally agree that the existence of a serious medical need depends on the facts surrounding each individual. In Petitioner's case, evidence of a lower back problem has been established and now Petitioner seeks proper treatment for said diagnosed medical problem. While Petitioner understands that a condition may not be a serious medical need in one situation but, could be a serious medical need in another. Respectfully this Petitioner is only interested in his current medical need, not those of others. If other inmates require an in cell chair, they may go through the process the same way Petitioner did.

Even though information has been provided to NaphCare personnel, which in fact does show a medically necessary reason for and need involving the treatment for osteoarthritis (lumbar problems), which in this matter involves a need for a chair to support

Petitioner's lumbar problems. NaphCare personnel continues to state that certain medical issues will be reviewed but, here again it is simply a delay tactic meant to otherwise discourage Petitioner's effort, to attempt to mitigate a medical problem that is causing Petitioner undue pain and suffering. While Petitioner seeks approval for an in cell chair, which would mitigate the progressive lower back pain, Petitioner's condition continues. In Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) (the court held that allegation of back condition causing pain so serious it has caused Plaintiff to fall down sufficiently pled a serious need.) Petitioner has informed NaphCare personnel of the amount of pain being experienced, on a scale from one - ten, one being no pain and ten being extreme pain. Petitioner has on any given day pain that is a six or exceeds and in some cases the pain is at a nine. The lower back pain that Petitioner experiences is partially due to having to sit without lumbar support, which causes increased inflamation to the L2 through L5 vertabrea and then causes sciatic nerve pain. In Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (prisoners showing a serious medical need if, the "failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain". Petitioner has informed NaphCare personnel of the condition and pain, and there is risk of further damage if a treatment is not provided. Petitioner has informed NaphCare personnel of treatment for Osteoarthritis, which is a chair with a back that aids in lumbar support.

Petitioner's condition will only increase and worsen as Petitioner ages, Petitioner understands this and the progression may lead to other extreme medical problems in the future. In _Maldonado v. Terhune, 28 F. Supp. 2d 284, 290 (D.N.J. 1998)_ (the Court stated; "As a general rule, it is not required that latent health problems blossom into full fledged diseases before being considered serious".) In this case, Petitioner should not have to wait until he requires the use of a wheel chair before Petitioner receives the lumbar support that Petitioner needs.

The ADCRR's failure involving communication between department officials and NaphCare personnel, have magnified and exposed a flaw in the system. Which in turn has allowed ADCRR officials and NaphCare personnel to manipulate and play off of each other. For example, ADCRR official's state that they will provide a chair, if Petitioner presents a medical SNO. NaphCare personnel state that medical does not issue SNO's for chairs, that ADCRR is responsible for issuing chairs. NaphCare personnel have further stated that if NaphCare issues the SNO for the chair, then NaphCare has to pay to purchase a chair. This is the same type of "game play" tactics that the Court cited to in the court order and permanent injunction. (DOC. 4416) on pages 4 and 5.

III. Conclusion

Defendant is causing Petitioner undue pain and suffering, Defendant has had ample time to remedy the matter. In light of the Defendant's disregard for Petitioner's health and well being, Petitioner requests that this Court issue an order that Naphcare provide a medical SNO for an in cell chair, and provide Petitioner with that chair.

Respectfully submitted this 25 day of ▮▮▮▮ March, 2024

By: _____

Steve Boggs

Jensen v. Thornell

No. CV 12-00601-PHX-ROS

Doc. 4410 Page 51

Exhibit #1

1

### Relief for Prisoners in Isolation

2   The subclass consists of "[a]ll prisoners who are now, or will in the future be,

3   subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more

4   each day." (Doc. 4335 at 123). This definition is broader than those prisoners housed at

5   particular complexes or those prisoners with particular classifications (*e.g.*, maximum

6   custody). The evidence at trial, however, established the members of the subclass were

7   those prisoners:

8       (a) Formally classified as "maximum custody" pursuant to DO 801;

9       (b) Housed in a detention unit pursuant to DO 804;

10      (c) Placed on mental health watch pursuant to DO 807; and

11      (d) Placed in close management status pursuant to DO 813.

12  (Doc. 4335 at 136). It is possible prisoners outside of these four classifications will become

13  subclass members. For example, if Defendants restricted minimum custody prisoners to

14  their cells for more than 22 hours each day, such prisoners would become members of the

15  subclass. However, there was no evidence at trial of this actually occurring. For purposes

16  of the injunction, the subclass will be construed as encompassing the four classifications

17  outlined above as well as those possible additions referenced in Section 27.1. For purposes

18  of the following sections only, "prisoners" will refer to members of the subclass.

19      As with the medical care and mental health care, the unconstitutional conditions

20  imposed on prisoners can be attributed in large part to the lack of adequate staffing. The

21  Court found the staffing levels at two locations housing prisoners were "far below what

22  prison officials acknowledge as necessary to operate the units safely." (Doc. 4335 at 148).

23  The lack of adequate staffing resulted in Defendants performing fewer welfare checks on

24  prisoners and the checks actually performed were perfunctory. (Doc. 4335 at 147-48). The

25  lack of adequate staffing also meant offers for out-of-cell time were "not made, [were] not

26  legitimate, or [were] accompanied by unreasonable consequences." (Doc. 4335 at 156).

27      Connected to the lack of staffing, the Court found Defendants' recordkeeping

28  practices were haphazard and often unreliable. The Court found Defendants knowingly

- 51 -

Jensen v. Thornell

No. CV 12-00601-PHX-ROS

ADCRR Inmate Letter

Exhibit # 2



**Arizona Department of Corrections**
**Rehabilitation and Reentry**
**Inmate Letter**

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| INMATE NAME *(Last, First M.I.) (Please print)* | ADC NUMBER | INSTITUTION/UNIT | DATE *(mm/dd/yyyy)* |
|---|---|---|---|
| BOGGS, STEVE A. | 195143 | Eyman/Rynning 5-B-11BL | 12-29-2022 |

| TO | LOCATION |
|---|---|
| CO III Freeland | Building 5 |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

I was seen by the nurses line this morning, regarding my request to have a in house chair SNO issued.

According to the nurse, ADCRR doesn't issue in house chairs and said that they are not medically necessary.

Please confirm that this is either policy or advise if this is even ADCRR's position.

Respectfully,

AFTER MAKING INQUIRIES WITH MEDICAL STAFF I HAVE DETERMINED THIS TO BE A MEDICAL ISSUE. ADCRR DOES NOT HAVE A POLICY AGAINST IN HOUSE CHAIRS AS LONG AS A MEDICAL SNO IS ISSUED & THE UNIT CHIEF OF SECURITY AUTHORIZES THE CHAIR. IN THIS CASE, MEDICAL IS NOT ISSUING A SNO FOR YOUR CHAIR.

~ COIII L. FREELAND

| INMATE SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
| *[signature]* | 12/29/2022 |

Have you addressed this with Department staff?  ☐ Yes  ☒ No

If yes, give the staff member's name and the date you addressed with them:

_____   _____
(Staff Member's Name) (Please print)          (Date addressed)

*Note: Using profanity, insulting, obscene, or abusive language and/or addressing staff with inappropriate names or making inappropriate remarks in this written correspondence (or verbal communication to staff concerning this correspondence), will not be tolerated and may result in no response to the correspondence and/or discipline pursuant to Department Order 803, Inmate Disciplinary Procedure.*

Distribution:  Original – Master File
              Copy – Inmate

916-1
7/25/19

Jensen v. Thornell

No. CV 12-00601-PHx-ROS

(SNO) Medical - Lower bunk

Exhibit # 3

| CHSS028B | Other Action/Procedure/Referral | |
|---|---|---|
| | | Tuesday September 13, 2022 16:52:05 |

Encounter Date: 09/13/2022
Location: ASPC-E Rynning D/Row [A85]

Time: 07:43:49
Staff: Lah, Fatima

Type: Provider - Sick Call - Scheduled

Category*: Medical Supplies/Special Equipment
Type*: LOWER BUNK
Count*: 0
Approximate Begin Date: 09/13/2022
Refer to Staff: Unknown
Status: Active

Sequence Number: 01
Approximate End Date: 09/14/2023

As of Date:

**Specify Comments**

Disc degeneration of the lower region and Scoliosis
TimeStamp: 13 September 2022 16:52:00 --- User: Fatima Lah (lahfa)

Jensen v. Thornell

No. CV 12-00601-PHX-ROS

(Inmate Grievance)

Exhibit # 4



# Inmate Grievance/Appeal Response Notice
## Medical

**Inmate Name:** STEVE BOGGS

**ADC#:** 195143

**Prison/Unit:** EYMAN/EYMAN RYNNING

**Bldg/Bed:** A85 5-B-118L

## Case #:23-051227

## Appeal Grievance

**Type:** Appeal Response

**Date Received:** 02/03/2023 01:51:00 PM

**Response Author:** Ashley Bardwell

**Responded On:** 03/22/2023 10:28:54 AM

**Decision:** Resolved

## Case Details

**Case Number:** 23-051227

**Grievance Status:** Resolved

## Case Data

**Prison of Complaint:** EYMAN

**Opened Date:** 02/03/2023 01:51:00 PM

**Grievance Category:** Health Care/Medical

**Unit of Complaint:** EYMAN RYNNING

**Grievance Stage:** Appeal Answered

## Appeal Grievance Response

**Responder Name:** Ashley Bardwell

**Due Date:** 03/23/2023 04:51:11 PM

**Date/Time:** 04/04/2023 05:46:39 PM

**Result:** Uphold

**Response:** As stated in the formal response, you were seen by a medical doctor on 1/13/2023 and the doctor documents "Inform the patient that I did not know of any medical necessity for a chair with a back other than stroke or neurological disability." Medical care is dictated by licensed medical professionals, not by the patient. You request for a chair was denied based on medical necessity. Please continue to utilize the HNR process for new or worsening symptoms. This matter is resolved.

⌐Override ⌐Data Input Error ⌐Unprocessed ⌐Extension

**RestitutionRecommended:** No

**Notice :** The decision of the Director is final and constitutes exhaustion of all remedies within the Department.

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Appeal

The inmate may appeal the Warden's, Deputy Warden's or Administrator's decision to the Director by requesting the appeal on this form.

Received By: _____
Title: _____
Badge #: _____
Date: (mm/dd/yyyy) _____

**Please Print**

| INMATE'S NAME (Last, First M.I.) (please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| BOGGS, STEVE A. | 195143 | 03-26-2023 |

| INSTITUTION | CASE NUMBER |
|---|---|
| Eyman/Rynning Unit | 23-051227 |

TO: **FHA**

I am appealing the decision of **Taylor Humphries (DON)** for the following reasons:

Humphries response is a "joke"! It is well documented that I have spinal/vertebra degeneration of the lower back. For which I take 375 mg of Naproxen, twice daily for and currently keeps the pain tolerable. The in house chair being requested, is medically necessary. It will assist in alleviating further pain and assist in lower lumbar support, for which there is none with the current swing bench. Additionally, due to a mastoid procedure on my left ear, my equilibrium is poor and that swing bench causes me to become very disoriented. This was explained already, thus making the in house chair, a medically necessary "medical instrument". If not resolved "PLO" will be contacted.

| INMATE'S SIGNATURE | DATE (mm/dd/yyyy) | GRIEVANCE COORDINATOR'S SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|---|
| | 03-26-2023 | | |

| RESPONSE TO INMATE BY | LOCATION |
|---|---|
| | |

| STAFF SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | |

DISTRIBUTION: INITIAL: White & Canary – Grievance Coordinator
Pink – Inmate
FINAL: White – Inmate
Canary – Grievance File

802-3
12/12/13



# Inmate Grievance/Formal Response Notice
## Medical

**Inmate Name:** STEVE BOGGS

**ADC#:** 195143

**Prison/Unit:** EYMAN/EYMAN RYNNING

**Bldg/Bed:** A85 5-B-118L

## Case #:23-051227

## Formal Grievance

**Type:** Formal Response

**Date Received:** 02/03/2023 01:51:00 PM

**Response Author:** TAYLOR HUMPHRIES

**Responded On:** 03/22/2023 10:28:54 AM

**Decision:** Resolved

## Case Details

**Case Number:** 23-051227

**Grievance Status:** Resolved

## Case Data

**Prison of Complaint:** EYMAN

**Opened Date:** 02/03/2023 01:51:00 PM

**Grievance Category:** Health Care/Medical

**Unit of Complaint:** EYMAN RYNNING

**Grievance Stage:** Formal Answered

## Formal Grievance Response

**Responder Name:** TAYLOR HUMPHRIES

**Due Date:** 03/23/2023 04:51:11 PM

**Date/Time:** 03/22/2023 10:28:54 AM

**Result:** Resolved

**Response:** It is documented that you seen the nurse line nurse on December 29, 2022, and were referred to the medical provider for evaluation. You seen the medical provider on January 13, 2023, and the provider stated, "he did not know of a medical necessity for a chair with a back". The medical provider did not feel this was medically necessary. At this time, you have no further assessments documented and no further HNRs regarding this concern. This grievance is resolved. Please submit an HNR for future health needs.

⌐Override          ⌐Data Input Error          ⌐Unprocessed          ⌐Extension

**RestitutionRecommended:** No

**Notice:** You may elect to appeal the decision of the Deputy Warden to the Director (Grievance Appeal form 802-3 Inmate Grievance, and/or form 802-7 GF Supplement) within five (5) workdays from receipt of the above response to the Grievance Coordinator by
•Ensuring the grievance procedure within their assigned unit and institution has been exhausted.



# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance

| RECEIVED BY | |
|---|---|
| TITLE | |
| BADGE NUMBER | DATE (mm/dd/yyyy) |

Note: You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| BOGGS, STEVE A. | 195143 | 02-28-2023 |

| INSTITUTION/FACILITY | CASE NUMBER |
|---|---|
| Eyman / Rynning | 23-051227 |

TO: GRIEVANCE COORDINATOR

**Description of Grievance** (To be completed by the Inmate)

I received a response to my medical informal, (4) days out of time frame. Due to the failure to follow the informal process, outlined in D.O. 802, Naphcare has conceded the issue. Naphcare's response is late and should be considered non-responsive. Naphcare failed to answer and prove that I do not require an (inhouse chair) one. "I" have submitted evidence to support my claim for a medically necessary chair, aside my house. Per Judge Silver's order (please see Sham No. CV-12-00601 PHX-ROS). Naphcare is to provide health care, that includes medical equipment which provides medical comfort. Which is meant to assist in alleviating and remedying pain or discomfort. Naphcare is failing to provide proper healthcare to me, which violates Judge Silver's decision, and my constitutional rights.

**Proposed Resolution** (What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)

Provide to me, an in house chair to alleviate my pain and discomfort.

| Inmate's Signature | Date 02-28-2023 | Grievance Coordinator's Signature | Date |
|---|---|---|---|

**Action taken by Documentation of Resolution or Attempts at Resolution.**

| Staff Member's Signature | Badge Number | Date |
|---|---|---|

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
FINAL: White – Inmate; Canary – Grievance File

802-1
12/12/13



# Inmate Grievance/Informal Response Notice
## Medical

**Inmate Name:** STEVE BOGGS

**ADC#:** 195143

**Prison/Unit:** EYMAN/EYMAN RYNNING

**Bldg/Bed:** A85 5-B-118L

## Case #:23-051227

## Informal Complaint

**Type:** Informal Response

**Date Received:** 02/03/2023 01:51 PM

**Response Author:** THOMAS, DAPHNE NMI

**Responded On:** 02/24/2023 05:25:48 PM

**Decision:**

## Case Details

**Case Number:** 23-051227

**Grievance Status:** Open

## Case Data

**Prison of Complaint:** EYMAN

**Opened Date:** 02/03/2023 01:51 PM

**Grievance Category:** Health Care/Medical

**Unit of Complaint:** EYMAN RYNNING

**Grievance Stage:** Informal Answered

## Informal Grievance Response

**Grievance Date:** 01/30/2023 12:00:00 AM

**Response Due:** 02/27/2023 01:51 PM

**Issue:** equipment/supplies

**Responder:** THOMAS, DAPHNE NMI

**Response:** This is in response to your Informal Complaint dated 1/28/23 and received at Health Services via ACIS on 2/3/2023 in which you are requesting a medical chair. Investigation into your issue included a review of your medical record. You have no active SNO for a "medical chair". "medical chair" is not standard SNO and is only ordered in extreme cases for very specific reasons. You were seen by the provider on 1/13/23 and he stated "he did not know of a medical necessity for a chair." Please submit an HNR for any symptoms to be evaluated by medical" Please submit an HNR for future health needs.

⌐Unprocessed

**Responder's Name:** DAPHNE THOMAS

**Notice:** If you are dissatisfied with the Informal Complaint Response, you may file a formal grievance (form 802-1 Inmate Grievance, and/or form 802-7 GF Supplement) within five (5) workdays from receipt of the above response to the Grievance Coordinator by:
• Placing a single complaint on a single inmate Grievance form.

**NOTE: If multiple unrelated issues are on a single form or if a duplicate complaint is filed, the grievance shall be rejected and returned unprocessed.**



**Arizona Department of Corrections**
**Rehabilitation and Reentry**

**Inmate Informal Complaint Resolution**

*Complaints are limited to one page and one issue.*

*Please print all information.*

| INMATE NAME *(Last, First M.I.) (Please print)* | ADCRR NUMBER | INSTITUTION/UNIT | DATE *(mm/dd/yyyy)* |
|---|---|---|---|
| BOGGS, STEVE A. | 195143 | Eyman/Rynning S-B-110 | 01-30-2023 |

| TO | LOCATION |
|---|---|
| ADON | Rynning Unit |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

### * MEDICAL INFORMAL *

On 12-28-2022 I submitted a medically necessary request for a ___ ADA Chair, for reasons involving equilibrium problems. I also brought up my lower back problems. I have a degeneration of the lower vertebrae. I explained that the current sitting bench causes me pain and alters my equilibrium the throw me off.

The provider said that he would look into the matter and that some thing that would have to be provided for me. The provider told me he would get back to me, for which I have given ample time. (1 month)

It is imperative to notify. I've been advised to begin the grievance process by my attorney. We plan to keep a record of all of this if not abused. I was advised by attorney that Rynning administration I hope are working with me for medical treatment.

| INMATE SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
| Steve | 01-30-2023 |

Have you discussed this with institution staff?  ☐ Yes  ☒ No

If yes, give the staff member name:

Distribution:  INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy – Inmate
FINAL: White – Inmate; Canary – Grievance Coordinator File

802-11
11/17/20

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Health Needs Request (HNR)**

## SECTION/SECCIÓN I

| INMATE NAME/NOMBRE (Last, First M.I.) (Apellido, Nombre, Inicial) | ADC NUMBER/NÚMERO DE ADC | DATE/FECHA (mm/dd/yyyy) |
|---|---|---|
| BOGGS, STEVE A. | 195143 | 09-11-2022 |

| CELL/BED NUMBER/CELDA/ NÚMERO DE CAMA | UNIT/UNIDAD | P.O. BOX/APARTADO POSTAL | INSTITUTION/INSTALACIÓN: ADC |
|---|---|---|---|
| 5-B-118L | Rynning | 3100 | Eyman |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action. [Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria.]

## SECTION/SECCIÓN II

| AREA OF INTEREST (Check only one block below)/AREA DE INTERES (Marque Un Espacio Solamente) | ☒ Medical/Médico | ☐ Dental | ☐ FHA |
|---|---|---|---|

☐ Pharmacy/Farmacia ☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other (specify)/Otros (especifique) _____

PLEASE PRINT! Describe your medical/dental treatment issue need in the space below. Be clear and specific. NO ADDED PAGES. [POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramene y sea específico. ¡NO USE MAS HOJAS!]

I need to speak to the provider about being issued a SNO for a chair inside my cell. I have spinal degeneration of the lower back, the swing bench in the cell has no back support and it causes me discomfort and pain when I sit on it.

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Services fee (excluding exemptions granted by statute) for the visit that I am herein requesting. I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. [Entiendo que de acuerdo con ARS 31-201.01 se me cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo (excluyendo las exenciones otorgadas por la ley). Además entiendo que al pagar esta cuota no tengo el derecho a imponer el tratamiento o quien lo proporcione.]

INMATE SIGNATURE/FIRMA DEL PRISIONERO    St B

**REMOVE THE GOLDENROD COPY AND PLACE THE REMAINDER IN THE HEALTH NEEDS REQUEST DROP BOX [SEPARE LA COPIA DE COLOR AMARILLO OBSCURO Y DEJE LAS DEMAS EN EL BUZON PETICIÓN DE NECESIDADES MÉDICAS.]**

## SECTION III/SECCION III

| REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA | ☒ Medical/Médico | ☐ Dental | ☐ Pharmacy/Farmacia | ☐ FHA |
|---|---|---|---|---|

☐ Pharmacy/Farmacia ☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other (specify)/Otros (especifique) _____

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA (mm/dd/yyyy) | TIME/HORA |
|---|---|---|
| K/os/rc | | |

## SECTION/SECCIÓN IV

| PLAN OF ACTION/PLAN DE ACCION |
|---|
| NC |

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA (mm/dd/yyyy) | TIME/HORA |
|---|---|---|

*This document is a translation from original text written in English. This translation is unofficial and is not binding on this state or a political subdivision of this state. [Este documento es una traducción de texto original escrito en inglés. Esta traducción no es oficial y no compromete a este estado ni una subdivisión política de este estado.]*

Distribution/Distribución:   White/Blanca – Health Unit/Unidad de Salud
Canary, Pink & Goldenrod – Inmate/Amarillo Canario, Rosa y Amarillo Obscur - Prisonero

1101-10ES
12/13/16

**SECTION 4, HNR**

Jensen v. Thornell

No. CV 12 - 00601 - PHX - ROS

(Merck Manual)

Exhibit # 5



**MERCK MANUAL**
**Professional Version**

# Osteoarthritis (OA)

(Degenerative Joint Disease; Osteoarthrosis; Hypertrophic Osteoarthritis)

By **_Kinanah Yaseen_** , MD, Cleveland Clinic

_Reviewed/Revised Nov 2022_

**Osteoarthritis is a chronic arthropathy characterized by disruption and potential loss of joint cartilage along with other joint changes, including bone hypertrophy (osteophyte formation). Symptoms include gradually developing pain aggravated or triggered by activity, stiffness lasting < 30 minutes on awakening and after inactivity, and occasional joint swelling. Diagnosis is confirmed by x-rays. Treatment includes physical measures, rehabilitation, patient education, and medications to reduce pain.**

Osteoarthritis, the most common joint disorder, often becomes symptomatic in the 40s and 50s and is nearly universal (although not always symptomatic) by age 80. Only half of patients with pathologic changes of osteoarthritis have symptoms. Below age 40, most large-joint osteoarthritis occurs in men and often results from trauma or anatomic variation (eg, hip dysplasias). Women predominate from age 40 to 70, after which men and women are equally affected.

# Classification of Osteoarthritis



**Overview of Osteoarthritis**

Osteoarthritis is classified as primary (idiopathic) or secondary to some known cause.

**Primary osteoarthritis** may be localized to certain joints (eg, <u>chondromalacia patellae</u> is a mild osteoarthritis that occurs in young people). Primary osteoarthritis is usually subdivided by the site of involvement (eg, hands and feet, knee, hip). If primary osteoarthritis involves multiple joints, it is classified as primary generalized osteoarthritis.

**Secondary osteoarthritis** results from conditions that change the microenvironment of the cartilage or joint structure. These conditions include significant trauma, congenital joint abnormalities, metabolic defects (eg, <u>hemochromatosis</u>, <u>Wilson disease</u>), infections (causing postinfectious arthritis), endocrine and neuropathic diseases, and disorders that alter the normal structure and function of hyaline cartilage (eg, <u>rheumatoid arthritis</u>, <u>gout</u>, <u>calcium crystal deposition disease</u>).

# Pathophysiology of Osteoarthritis

Normal joints have little friction with movement and do not wear out with typical

use, overuse, or most trauma. Hyaline cartilage is avascular, aneural, and alymphatic. It is 95% water and extracellular cartilage matrix and only 5% chondrocytes. Chondrocytes have the longest cell cycle in the body (similar to central nervous system and muscle cells). Cartilage health and function depend on compression and release of weight bearing and use (ie, compression pumps fluid from the cartilage into the joint space and into capillaries and venules, whereas release allows the cartilage to reexpand, hyperhydrate, and absorb necessary electrolytes and nutrients).

The trigger of osteoarthritis is most often unknown, but osteoarthritis sometimes begins with tissue damage from mechanical injury (eg, torn meniscus), transmission of inflammatory mediators from the synovium into cartilage, or defects in cartilage metabolism. Obesity triggers some of these defects in cartilage metabolism, leading to cartilage matrix damage and subchondral bone remodeling mediated by adipokines, such as leptin and adipsin, and compounded by mechanical factors due to excess weight. The tissue damage stimulates chondrocytes to attempt repair, which increases production of proteoglycans and collagen. However, efforts at repair also stimulate the enzymes that degrade cartilage, as well as inflammatory cytokines, which are normally present in small amounts. Inflammatory mediators trigger an inflammatory cycle that further stimulates the chondrocytes and synovial lining cells, eventually breaking down the cartilage. Chondrocytes undergo programmed cell death (apoptosis). Once cartilage is destroyed, exposed bone becomes eburnated and sclerotic.

All articular and some periarticular tissues can become involved in osteoarthritis. Subchondral bone stiffens, then undergoes infarction, and develops subchondral cysts. Attempts at bony repair cause subchondral sclerosis and osteophytes at the joint margins. The osteophytes seem to develop in an attempt to stabilize the joint. The synovium becomes mildly inflamed and thickened and produces synovial fluid with less viscosity and greater volume. Periarticular tendons and ligaments become stressed, resulting in tendinitis and contractures. As the joint becomes less mobile, surrounding muscles weaken and become less supportive. Knee menisci, which are partially innervated, fissure and may fragment and contribute to the pain.

Osteoarthritis of the spine can, at the disk level, cause marked thickening and proliferation of the posterior longitudinal ligaments, which are posterior to the vertebral body but anterior to the spinal cord. The result can be transverse bars that encroach on the anterior spinal cord. Hypertrophy and hyperplasia of the ligamenta flava, which are posterior to the spinal cord, often compress the posterior canal, causing lumbar spinal stenosis. In contrast, the anterior and posterior nerve roots,

ganglia, and common spinal nerve are relatively well protected in the intervertebral foramina, where they occupy only 25% of the available and well-cushioned space.

# Symptoms and Signs of Osteoarthritis

Onset of osteoarthritis is most often gradual, usually beginning with one or a few joints.

Pain is the earliest symptom of osteoarthritis, sometimes described as a deep ache. Pain is usually worsened by weight bearing and relieved by rest but can eventually become constant.

Stiffness follows awakening or inactivity but lasts < 30 minutes and lessens with movement. As osteoarthritis progresses, joint motion becomes restricted, and tenderness and crepitus or grating sensations develop.

Early hypertrophy of cartilage is followed by notable bone, ligament, tendon, capsules, and synovial reaction, along with varying amounts of noninflammatory joint effusion, ultimately resulting in the joint enlargement characteristic of osteoarthritis.

Flexion contractures may develop. Acute or severe synovitis is rare.

Tenderness on palpation and pain on passive motion are relatively late signs. Muscle spasm and contracture add to the pain. Mechanical block by intra-articular loose bodies or abnormally placed menisci can occur and cause locking or catching. Deformity and subluxations can also develop.

Osteoarthritis is usually sporadically progressive but occasionally, with no predictability, stops.

The joints most often affected in **generalized osteoarthritis** include the following:

- Distal interphalangeal (DIP) and proximal interphalangeal (PIP) joints (causing Heberden and Bouchard nodes)

- Thumb carpometacarpal joint (the most commonly painful hand joint)

## Heberden Nodes



BY PERMISSION OF THE PUBLISHER. FROM MYERS S: ATLAS OF RHEUMATOLOGY. EDITED BY G HUNDER. PHILADELPHIA, CURRENT MEDICINE, 2005.

- Intervertebral disks and zygapophyseal joints in the cervical and lumbar vertebrae

- First metatarsophalangeal joint

- Hip

- Knee

**Cervical and lumbar spinal osteoarthritis** may lead to myelopathy or radiculopathy. However, the clinical signs of myelopathy are usually mild. Lumbar spinal stenosis may cause lower back or leg pain that is worsened by walking (neurogenic claudication, sometimes called pseudoclaudication) or back extension. Radiculopathy can be prominent but is less common because the nerve roots and ganglia are well protected. Insufficiency of the vertebral arteries, infarction of the spinal cord, and dysphagia due to esophageal impingement by cervical osteophytes occasionally occur. Symptoms and signs caused by osteoarthritis in general may also derive from subchondral bone, ligamentous structures, synovium, periarticular bursae, capsules, muscles, tendons, disks, and periosteum, all of which are pain sensitive. Venous pressure may increase within the subchondral bone marrow and cause pain (sometimes called bone angina).

**Bouchard Nodes**



© SPRINGER SCIENCE+BUSINESS MEDIA

**Hip osteoarthritis** causes gradual loss of range of motion and is most often symptomatic during weight-bearing activities. Pain may be felt in the inguinal area or greater trochanter or referred to the thigh and knee.

**Knee osteoarthritis** causes cartilage to be lost (medial loss occurs in 70% of cases). The ligaments become lax and the joint becomes less stable, with local pain arising from the ligaments and tendons.

**Erosive osteoarthritis** causes synovitis and cysts in the hand. It primarily affects the DIP or PIP

**Cervical Osteoarthritis**



joints. The thumb carpometacarpal joints are involved in 20% of hand osteoarthritis, but the metacarpophalangeal joints and wrists are usually spared. At this time, it is uncertain whether erosive interphalangeal osteoarthritis is a variant of hand osteoarthritis or whether it represents a separate entity, such as microcrystalline disease (eg, calcium pyrophosphate arthritis).



DR P. MARAZZI/SCIENCE PHOTO LIBRARY

# Diagnosis of Osteoarthritis

- X-rays

Osteoarthritis should be suspected in patients with gradual onset of symptoms and signs, particularly in older adults. If osteoarthritis is suspected, plain x-rays should be taken of the most symptomatic joints. X-rays generally reveal marginal osteophytes, narrowing of the joint space, increased density of the subchondral bone, subchondral cyst formation, bony remodeling, and joint effusions. Standing weight-bearing Merchant view (tangential view with knee flexed 30°) x-rays of the knees are more sensitive in detecting joint space narrowing. Discrepancy between severity of symptoms and severity of changes in imaging is common.

**X-Ray of the Knee in Osteoarthritis**



BY PERMISSION OF THE PUBLISHER. FROM MYERS S: ATLAS OF RHEUMATOLOGY. EDITED BY G HUNDER. PHILADELPHIA, CURRENT MEDICINE, 2005.

Laboratory studies are normal in osteoarthritis but occasionally may be required to rule out other disorders or to diagnose an underlying disorder causing secondary osteoarthritis. If osteoarthritis causes joint effusions, synovial fluid analysis can help differentiate it from inflammatory arthritides; in osteoarthritis, synovial fluid is usually clear, viscous, and has ≤ 2000 WBC/mcL.

Osteoarthritis involvement outside the usual joints suggests secondary osteoarthritis; further evaluation may be required to determine the

**Osteoarthritis of the Hip**



underlying primary disorder (eg, endocrine, metabolic, neoplastic, or biomechanical disorders).



IMAGE PROVIDED BY ROY ALTMAN, MD.

# Treatment of Osteoarthritis

- Nondrug therapy (eg, education, appropriate weight loss, rehabilitative and supportive measures)

- Drug therapy

Osteoarthritis treatment goals are relieving pain, maintaining joint flexibility, and optimizing joint and overall function. Primary treatments include physical measures that involve rehabilitation; support devices; exercise for strength, flexibility, and endurance; patient education; and modifications in activities of daily living. Adjunctive therapies include drug treatment and surgery. (See also the 2019 American College of Rheumatology/Arthritis Foundation Guideline for the Management of Osteoarthritis of the Hand, Hip, and Knee for nondrug management of hip and knee osteoarthritis.)

## Physical measures

Moderate weight loss in patients with overweight often reduces pain and may even reduce progression of knee osteoarthritis. Rehabilitation techniques are best begun before disability develops.

Exercises (range of motion, isometric, isotonic, isokinetic, postural, strengthening—see Physical Therapy) maintain range of motion and increase the capacity for tendons and muscles to absorb stress during joint motion. Exercise can sometimes arrest or even reverse hip and knee osteoarthritis. Aquatic exercises are recommended because they spare the joints from stress. Stretching exercises should be done daily.

Immobilization for any prolonged period of time can promote contractures and worsen the clinical course. However, a few minutes of rest (every 4 to 6 hours in the daytime) can help if balanced with exercise and use.

Modifying activities of daily living can help. For example, a patient with lumbar spine, hip, or knee osteoarthritis should avoid soft deep chairs and recliners in which posture is poor and from which rising is difficult. The regular use of pillows under the knees while reclining encourages contractures and should also be avoided. However, pillows placed between the knees can often help relieve radicular back

However, pillows placed between the knees can often help relieve radicular back pain. Patients should sit in straight-back chairs without slumping, sleep on a firm bed (perhaps with a bed board), use a car seat shifted forward and designed for comfort, do postural exercises, wear well-supported shoes or athletic shoes, and continue employment and physical activity.

In osteoarthritis of the spine, knee, or thumb carpometacarpal joint, various supports can relieve pain and increase function, but to preserve flexibility, they should be accompanied by specific exercise programs. For medial knee osteoarthritis, orthoses designed to reduce knee load are preferred to lateral wedge insoles, which have yielded equivocal outcomes (1).

In erosive osteoarthritis, range-of-motion exercises done in warm water can help prevent contractures.

## Drug therapy

Drug therapy is an adjunct to the physical program. Acetaminophen in dosages of up to 1 g orally 4 times a day may relieve pain and is generally safe in the absence of hepatic disease or considerable alcohol intake. More potent analgesics, such as tramadol or rarely opioids, may be required; however, these medications can cause confusion in older patients and are generally avoided. Duloxetine, a serotonin norepinephrine reuptake inhibitor, may modestly reduce pain caused by osteoarthritis. Topical capsaicin has been helpful in relieving pain in superficial joints by disrupting pain transmission.

**Nonsteroidal anti-inflammatory drugs (NSAIDs),** including selective cyclooxygenase-2 (COX-2) inhibitors or coxibs, may be considered if patients have refractory pain or signs of inflammation (eg, redness, warmth). NSAIDs may be used simultaneously with other analgesics (eg, tramadol, rarely opioids) to provide better relief of symptoms. Topical NSAIDs may be of value for superficial joints, such as the hands and knees. Topical NSAIDs may be of particular value in older patients, because systemic NSAID exposure is reduced, minimizing risk of drug adverse effects. Gastric protection should be considered when using NSAIDs on a regular basis in older patients.

**Muscle relaxants** such as cyclobenzaprine, metaxalone, and methocarbamol (usually in low doses) occasionally relieve pain that arises from muscles strained by attempting to support osteoarthritis joints, yet strong evidence is lacking unless there is coexistent central sensitization. In older patients, however, they may cause more adverse effects than relief.

**Oral corticosteroids** should not be given chronically. Intra-articular depot corticosteroids can help relieve pain short-term and increase joint flexibility in some patients; however, a strong placebo effect has been shown in clinical trials. Frequently administered intra-articular injections of corticosteroids increase the risk of cartilage loss (2).

**Hyaluronic acid formulations** can be injected into the knee and provide some pain relief in some patients for prolonged periods of time. They should not be used more often than every 6 months. The treatment is a series of 1 to 5 weekly injections. However, efficacy of these formulations in patients with x-ray evidence of severe knee osteoarthritis is limited, and they are therefore not recommended unless all other options have failed to provide benefit. Hyaluronic acid formulations are not recommended in hip or shoulder osteoarthritis (3). In some patients, local injection can cause an acute severe inflammatory synovitis. Clinical studies of these drugs have shown a strong placebo effect of intra-articular injection. These injections have no demonstrated disease-modifying effect.

Glucosamine sulfate 1500 mg orally once/day has been suggested to relieve pain and slow joint deterioration; chondroitin sulfate 1200 mg once/day has also been suggested for pain relief. Studies to date have shown mixed efficacy in terms of pain relief, with onset of pain relief often delayed, and no strong effect on preservation of cartilage.

## Other adjunctive and experimental therapies

Other adjunctive measures may reduce pain, including massage, heating pads, weight loss, acupuncture, and transcutaneous electrical nerve stimulation (TENS). Laminectomy, osteotomy, and total joint replacement should be considered if nonsurgical approaches fail.

Experimental therapies that may preserve cartilage or allow chondrocyte grafting are being studied. It is not clear whether using a topical lidocaine 5% patch relieves pain. Flavocoxid, a plant-derived compound, can be tried. Injections of platelet-rich plasma have been shown to be superior to hyaluronic acid for relief of pain in 12-month studies but do not modify disease progression (4). Mesenchymal stem cell therapy for cartilage repair is claimed to yield positive outcomes, especially in knee osteoarthritis (5), but this approach is still considered experimental, with scant evidence supporting its clinical use presently (6). Monoclonal antibodies against nerve growth factor are being tested for chronic pain due to osteoarthritis. However, pilot studies resulted in accelerated osteoarthritis and osteonecrosis, necessitating

larger studies with stringent patient inclusion and exclusion criteria.

## Treatment references

1. Parkes MJ, Maricar N, Lunt M, et al: Lateral wedge insoles as a conservative treatment for pain in patients with medial knee osteoarthritis: a meta-analysis. *JAMA* 310(7):722–730, 2013. doi:10.1001/jama.2013.243229

2. McAlindon TE, LaValley MP, Harvey WF, et al: Effect of intra-articular triamcinolone vs saline on knee cartilage volume and pain in patients with knee osteoarthritis: randomized clinical trial. *JAMA* 317(19):1967–1975, 2017. doi:10.1001/jama.2017.5283

3. Kolasinski SL, Neogi T, Hochberg MC, et al: 2019 American College of Rheumatology/Arthritis Foundation Guideline for the Management of Osteoarthritis of the Hand, Hip, and Knee. *Arthritis Care Res (Hoboken)* 72(2):149–162, 2020. doi:10.1002/acr.24131

4. Hohmann E, Tetsworth K, Glatt V: Is platelet-rich plasma effective for the treatment of knee osteoarthritis? A systematic review and meta-analysis of level 1 and 2 randomized controlled trials. *Eur J Orthop Surg Traumatol*, 2020. doi 10.1007/s00590-020-02623-4. doi:10.1007/s00590-020-02623-4

5. Yubo M, Yanyan L, Li L, et al: Clinical efficacy and safety of mesenchymal stem cell transplantation for osteoarthritis treatment: A meta-analysis. *PLoS ONE* 12(4):e0175449, 2017. doi: 10.1371/journal.pone.0175449. eCollection 2017

6. Pas HI, Winters M, Haisma HJ, et al: Stem cell injections in knee osteoarthritis: a systematic review of the literature. *Br J Sports Med* 51(15):1125–1133, 2017. doi:10.1136/bjsports-2016-096793

# Key Points

- Osteoarthritis, the most common joint disorder, becomes particularly common with age.

- Key pathophysiologic features include disruption and loss of joint cartilage and bony hypertrophy.

- Osteoarthritis can affect particular joints (sometimes secondary to injury or another joint problem) or be generalized (often as a primary disorder).

- Symptoms include gradual onset of joint pain that is worsened by weight-bearing or stress and relieved by rest, and stiffness that lessens with activity.

- Confirm the diagnosis with x-ray findings such as marginal osteophytes, narrowing of the joint space, increased density of the subchondral bone, bony remodeling, and sometimes subchondral cyst formation and joint effusion.

- Discrepancy between severity of symptoms and severity of changes on imaging is common.

- Treat primarily with physical measures that involve rehabilitation; support devices; exercise for strength, flexibility, and endurance; patient education; and modifications in activities of daily living.

- Treat adjunctively with drugs (eg, analgesics, nonsteroidal anti-inflammatory drugs, muscle relaxants) and surgery.

# More Information

The following English-language resources may be useful. Please note that THE MANUAL is not responsible for the content of these resources.

2019 American College of Rheumatology/Arthritis Foundation Guideline for the Management of Osteoarthritis of the Hand, Hip, and Knee

European League Against Rheumatism: EULAR Recommendations for the Management of Rheumatoid Arthritis with Synthetic and Biological Disease-Modifying Antirheumatic Drugs: 2019 Update

# Drugs Mentioned In This Article

 **MERCK**          Copyright © 2024 Merck & Co., Inc., Rahway, NJ, USA and its affiliates. All rights reserved.

Jensen v. Thornell

No. CV 12-00601-PHX-ROS

(Inmate Grievance)

Exhibit # 6



**Arizona Department of Corrections Rehabilitation and Reentry**

**Inmate Grievance Response**

*For distribution: Copy of Corresponding Informal complaint resolution must be attached to this response.*

| INMATE PRINTED NAME *(Last, First M.I.)* | ADCRR NUMBER |
|---|---|
| BOGGS, STEVE ALAN | 195143 |
| INSTITUTION/UNIT | CASE NUMBER |
| A85-5~D~-226LEYMAN - RYNNING (BUILDING 5) | 23-063718 |

**SUMMARY OF COMPLAINT**

Patient complains that Naphcare will not issue a SNO for a plastic chair with a back to assist with is back pain.

**INMATE PROPOSED RESOLUTION**

Patient proposes Naphcare provide a SNO for a plastic chair.

**INVESTIGATIVE ACTION**

Reviewed patients medical records as well as previous grievances.

**FINDINGS & DECISION**

This is a written response to the medical grievance appeal you submitted on 12/06/2023, received by medical on 12/12/2023. This issue has been elevated to the Central Office of ADCRR as well as the corporate office of Naphcare. When a medical SNO is issued, the item must be provided by Naphcare. The plastic chairs with backs on the units are an ADCRR item. They are not provided by Naphcare. Conversations are occurring. When a resolution is determined, communication will be provided. Please continue to utilize the HNR process for medical concerns.

In accordance with Department Order 802, Inmate Grievance Procedure the decision of the Contract Facility Health Administrator is final and constitutes exhaustion of all remedies within the Department.

| STAFF PRINTED NAME *(Last, First M.I.)* | SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|---|
| Bardwell, Ashley B | | 2/14/2023 |

802-2
3/2/22

*Received on 02-16-2024*

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Appeal

The inmate may appeal the Warden's, Deputy Warden's or Administrator's decision to the Director by requesting the appeal on this form.

Please type or print in black or blue ink.
(To be completed by staff member initially receiving appeal)

Received By: FREELND
Title: COIII
Badge #: 6920
Date: (mm/dd/yyyy) 12/6/2023

**Please Print**

| INMATE'S NAME (Last, First M.I.) (please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| BOGGS, STEVE A. | 195143 | 12-06-2023 |

| INSTITUTION | CASE NUMBER |
|---|---|
| Eyman / Rynning | 23-063718 |

TO: Grievance Coordinator

I am appealing the decision of ___Helen Kline, Naphcare___ for the following reasons:

Research into Osteoarthritis, with information reviewed from (the Merck Manual of medical information) To include treatment using (chairs with relatively high seats, ie chairs with back, aid in Lumbar support.) None of the Sofar prescribed methods by Naphcare personnel have resulted in positive treatments. I continue to have Sciatic nerve pain, numbness in the upper left thigh and continued pain involving my lower back, between the L2-L5 to include the S1. This entire medical issue is over Naphcare's refusal to

PAGE 1 of 2

| INMATE'S SIGNATURE | DATE (mm/dd/yyyy) | GRIEVANCE COORDINATOR'S SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|---|
| St B | 12/06/2023 | | |

| RESPONSE TO INMATE BY | LOCATION |
|---|---|
| | |

| STAFF SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | |

DISTRIBUTION: INITIAL: White & Canary – Grievance Coordinator
Pink – Inmate
FINAL: White – Inmate
Canary – Grievance File

802-3
12/12/13

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance – GF Supplement

| INMATE'S NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/FACILITY | CASE NUMBER |
|---|---|---|---|
| BOGGS, STEVE A. | 195143 | Eyman / Rynning | 23-063710 |

issue a SND for an in cell chair. Claiming that it is not medically necessary for me to use.

During the discussion with Ms. Zokvic, a Naphcare representative, Ms. Zokvic stated that everyone has Osteoarthritis and disc degeneration. Am I to believe that I am being denied proper medical treatment because, everyone has Osteoarthritis and disc degenerative disease?

The chair is necessary to improve lumbar support, which may help in slowing the progression of the disc degenerative disease, which is exacerbated by the Osteoarthritis, that continues to worsen with time.

Naphcare's reluctancy to provide proper care, through proper medically recognized treatments. Is causing further damage to my lower back, demonstrating Naphcare's extreme indifference to my medically necessary needs.

All because Naphcare and their agents, don't want to issue a SND for a plastic chair. Which cost around 30 dollars, Naphcare would rather spend hundreds if not thousands of dollars to avoid issuing a SND for the chair.

| SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| St B | 12-06-2023 |

INITIAL DISTRIBUTION:     GF Supplement – White and Canary or Copies - Grievance Coordinator
                          Pink, or Copy - Inmate

FINAL DISTRIBUTION:       White or Copy – Inmate
                          Canary or Copy – Grievance File

802-7
12/12/13



# Inmate Grievance/Formal Response Notice
# Medical

**Inmate Name:** STEVE BOGGS

**ADC#:** 195143

**Prison/Unit:** EYMAN/EYMAN RYNNING

**Bldg/Bed:** A85 5-D-226L

## Case #:23-063718

## Formal Grievance

**Type:** Formal Response

**Date Received:** 10/19/2023 12:53:00 PM

**Response Author:** HELEN KLINE

**Responded On:** 12/05/2023 01:09:50 PM

**Decision:** Resolved

## Case Details

**Case Number:** 23-063718

**Grievance Status:** Resolved

## Case Data

**Prison of Complaint:** EYMAN

**Opened Date:** 10/19/2023 12:53:00 PM

**Grievance Category:** Health Care/Medical

**Unit of Complaint:** EYMAN RYNNING

**Grievance Stage:** Formal Answered

## Formal Grievance Response

**Responder Name:** HELEN KLINE

**Due Date:** 12/06/2023 06:03:42 PM

**Date/Time:** 12/05/2023 01:09:50 PM

**Result:** Resolved

**Response:** This is in response to your grievance dated 11/13/23 received in medical on 11/14/23. The informal response was completed on 11/8/23. You were seen by the provider on 11/22/23 in regards for your request for a chair. The provider stated you were informed you do not meet the criteria for a chair. The provider documented the following treatment plan was established during this visit: obtain a lumbar spine x-ray, request a back brace, add Meclizine and add Tylenol. Please continue to submit HNRs for any medical, mental health or dental needs.

⌐Override      ⌐Data Input Error      ⌐Unprocessed      ⌐Extension

**RestitutionRecommended:** No

**Notice:** You may elect to appeal the decision of the Deputy Warden to the Director (Grievance Appeal form 802-3 Inmate Grievance, and/or form 802-7 GF Supplement) within five (5) workdays from receipt of the above response to the Grievance Coordinator by
•Ensuring the grievance procedure within their assigned unit and institution has been exhausted.



# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance

Note: You may appeal the Grievance Coordinator's decision by filing form 802-3, within 10 calendar days of receipt of this notice.

RECEIVED BY

TITLE

BADGE NUMBER
6080

DATE (mm/dd/yyyy)
1/12/2023

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| BOGGS, STEVE A. | 195143 | 11-13-2023 |

| INSTITUTION/UNIT | CASE NUMBER |
|---|---|
| Eyman / Rynning | 23-063718 |

TO: GRIEVANCE COORDINATOR

**Description of Grievance** *(To be completed by the Inmate)*

Please note, I did not receive any paperwork back with the response to my Informal Complaint.

As of filing this grievance, I have not been seen by any health care provider. This whole issue is over my request for a In house chair SNO, due to 2 issues Osteoarthritis in the lower lumbar which is causing Sciatic nerve pain. And extreme vertigo due to possible Meniere's disease, which cause very poor balance. I have elevated pain in my lower back and continued numbness in my left thigh. I believe this pattern of abuse by (Adams) is retaliation over my previous complaints filed, and that is the reason my issues are being ignored.

**Proposed Resolution** *(What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)*

To assist in treatment of Osteoarthritis, a SNO for an In house chair which will aid in lumbar support in conjunction with my vertigo issue. Is the resolution that I am seeking and will assist in pain management.

| INMATE'S SIGNATURE | DATE (mm/dd/yyyy) | GRIEVANCE COORDINATOR'S | DATE (mm/dd/yyyy) |
|---|---|---|---|
| SB | 11-13-2023 | | 11.14.2023 |

Action taken by _____    Documentation of Resolution or Attempts at Resolution.

| STAFF MEMBER'S SIGNATURE | BADGE NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
FINAL: White – Inmate; Canary – Grievance File

802-1
10/16/16



**Arizona Department of Corrections**
**Rehabilitation and Reentry**

**Inmate Informal Complaint Resolution**

*Complaints are limited to one page and one issue.*

*Please print all information.*

| INMATE PRINTED NAME *(Last, First M.I.)* | ADCRR NUMBER | INSTITUTION/UNIT | DATE *(mm/dd/yyyy)* |
|---|---|---|---|
| BOGGS, Steve A. | 195143 | Eyman/Rynning 5-D-224 | 10-19-2023 |

| TO | LOCATION |
|---|---|
| CO IV Wilde | Building 5 Grievance Coordinator |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

Medical Grievance

A request to be seen, regarding obtaining a medical SNO for an in cell house chair. Had been made more than a month ago. Nurse line did Dr. Screen me and stated that I was scheduled to see the provider. That was 3 weeks ago after being told that I was scheduled for the provider that week. I believe that I'm being ignored deliberately by provider (Islam), who I have filed a complaint against previously. #23-eu,0893 I believe that Nighcare is instructing their personnel to mislead and bury medical needs. I further believe that (Dr. Stewart) in conjunction with the provider, are purposely ignoring my medical needs and are going to cause me further injury.

I need a SNO for an in cell house chair, medical provider and doctor are being extremely indifferent to my medical needs.

| INMATE SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
| St—B | 10-19-2-23 |

Have you discussed this with institution staff?  ☒ Yes  ☐ No

If yes, give the staff member name: Tahira 9-9-2023

Distribution: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy – Inmate
FINAL: White – Inmate; Canary – Grievance Coordinator File

802-11
11/16/21

Jensen v. Thornell

No. CV 12-00601 - PHX - ROS

DOC. 4410 Page 11

Exhibit # 7

## Permanent Injunction
## Medical and Mental Health Overall Requirements

**1. General Requirements**

  **1.1.** All health (physical and mental health) care (including but not limited to: emergent; urgent; non-urgent episodic; chronic; palliative; scheduled; inpatient; residential; outpatient; referrals to other on-site professionals; off-site specialty referrals; modifications of specialty referral requests; action taken on post-hospital, post-emergency room, or specialist recommendations), and the documentation supporting that care, delivered to Plaintiffs during a medical encounter (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, a report from a consultant, or other external health record, shall be clinically appropriate, including, where relevant to the circumstance and professional's credential, but not limited to, the conducting of the history and physical examination, forming and testing a differential diagnosis, arriving at a diagnosis, and ordering treatment for that diagnosis.

  **1.2.** Defendants shall document all aspects of care to allow for monitoring of these requirements.

  **1.3.** All prisoners with physical or mental illness that require regular follow-up shall be designated on the medical or mental health caseload and shall be seen in clinically appropriate timeframes.

  **1.4.** Telehealth medicine may be used only when clinically appropriate.

  **1.5.** Emergency response and care provided by custody staff shall be appropriate given the skill level and knowledge expected of custody staff.

  **1.6.** Defendants shall provide sufficient space, equipment, and supplies for health care staff to deliver the health care services described in this Order, regardless of housing assignment, including housing assignments with restricted liberty.

Jensen v. Thornell

No. CV 12-00601-PHX-ROS

DOC. 4410  Page 18

Exhibit # 8

workforce about specific prisoner safety changes that resulted from reporting can be valuable.

### 2.3. Preventable adverse event reporting

**2.3.1.** Defendants shall implement a preventable adverse event reporting policy that includes the following elements:

**2.3.1.1.** The policy requires reporting of errors which cause more than minimal harm to a prisoner.

**2.3.1.2.** All such errors shall be reported, not just medication-related errors.

**2.3.1.3.** Reporting is mandatory for all staff.

### 2.4. Continuous Quality Improvement program

**2.4.1.** Defendants shall implement a robust continuous quality improvement program to monitor the quality of clinical care. As part of this program, Defendants shall monitor the absolute number and trend of various parameters on a monthly basis. Where metrics or trends in metrics show room for improvement, Defendants shall make appropriate efforts to understand the underlying reason for deviation, take reasonable steps to effectuate improvement, evaluate the effectiveness of these steps in a reasonable time, and make adjustments to its improvement efforts as needed. At a minimum, Defendants shall monitor:

- percentage of individuals (regardless of whether diagnosed with hypertension) whose systolic blood pressure exceeds 140 mmHg or diastolic blood pressure exceeds 90 mmHg;
- average hemoglobin A1C (regardless of whether diagnosed with diabetes);
- percentage of individuals taking ten or more prescribed medications;
- percentage of women receiving timely breast screening;
- percentage of women receiving timely cervical cancer screening;

Jensen v. Thornell

No. CV 12-00601-PHX-ROS

Doc. 4410 Page(s) 19-20

Exhibit # 9

- percentage of pregnant women who have the results of routine prenatal laboratory tests results as recommended in current national guidelines (*e.g.*, Guidelines for Prenatal Care, 8th Edition, American Academy of Pediatrics and American College of Obstetricians and Gynecologist, Table 6-2) documented within one month of diagnosis of pregnancy;

- percentage of health care grievances which are appealed;

- percentage of health care grievance appeal replies that are appropriate;

- percentage of prisoners on antipsychotic medications receiving timely AIMS (abnormal involuntary movement scale) assessments;

- percentage of prisoners on antipsychotic medications receiving appropriate and timely metabolic assessments;

- percentage of prisoners receiving punishment for a rule violation, for whom a mental health intervention would have been more clinically appropriate than punishment; and

- percentage of prisoners arriving at ADCRR for whom intake screening by an RN (or higher credentialed professional) is completed more than four hours after arrival.

**2.4.2.** ADCRR shall monitor other parameters as reasonably dictated by the other self-improvement activities described in this Order.

## 2.5. Overall System Improvement

**2.5.1.** Defendants shall evaluate errors, system problems, and possible system problems that come to their attention through sources, including but not limited to the near-miss and preventable adverse event reporting systems, mortality reviews, litigation filed by prisoners, grievances, the Court-appointed monitors, staff reports, continuous quality improvement, etc. Defendants shall address these errors and problems at a complex or statewide level, as

appropriate.  To prioritize analysis and remediation of errors and other system problems, Defendants shall maintain an active log of all such errors and problems to assist in deciding which issues to address and when, and to monitor progress in resolution.  Based on this prioritization, either at the complex or state level, root cause analysis shall be conducted as appropriate, from which an effective and sustainable remedial plan is implemented in a timely manner. Such plan is one which outlives staff memory from a single training after the review or staff turnover.   The remedial plan shall be monitored for effectiveness.  Appropriate and timely modifications shall be made to the plan based on the monitoring.

## 3.  Language Interpretation Services

Within three months of issuance of this Order Defendants shall implement the following to ensure adequate interpretation services are available for every material encounter where needed.

3.1. Defendants shall develop and implement policies to assess the English fluency of prisoners and, if not English-fluent, determine a language in which the prisoner is fluent at the following times:

3.1.1. during intake;

3.1.2. upon request by a prisoner at any time;

3.1.3. whenever staff have reason to believe a prisoner is not fluent in English;

3.1.4. whenever a prisoner's primary language of communication is not documented in the medical record.

3.2. A prisoner's language of choice shall be visible on all relevant screens of the prisoner's electronic health record.

3.3. For all individual and group health care encounters in all settings involving prisoners who are not fluent in English, interpretation shall be provided via:

Jensen v. Thornell

No. CV 12-00601-PHx-RoS

Doc. 4410 Page 4-5

Exhibit # 10

1   unconstitutional substantial risk of serious harm identified in the Court's decision.

2   Therefore, the Court will require a further staffing analysis be completed within six months

3   of this Order. The results of that analysis may require that the Court order Defendants hire

4   additional staff or staff with different qualifications.

5       The parties also proposed other smaller modifications to the Draft Injunction. The

6   experts agreed adoption of those changes would continue to alleviate the unconstitutional

7   conditions set forth in the Court's findings.  Based on the experts' opinions, and

8   recognizing the Court should attempt to defer to Defendants' expertise when possible, the

9   Court will require the parties comply with the additional modifications proposed by the

10  parties.

11                          **Need for Specifics**

12      The Court's Findings of Fact and Conclusions of Law established Defendants' basic

13  model for medical and mental healthcare and staffing decisions that flow from that model

14  create an unconstitutional substantial risk of serious harm to Plaintiffs. Therefore, the

15  changes necessary to redress the failings will be substantial. As significant, the insufficient

16  staffing and a wide variety of conditions of confinement combine to create an

17  unconstitutional substantial risk of serious harm to subclass members. Again, the changes

18  necessary to alleviate the risk of harm to the subclass will be substantial. Given the

19  substantial dysfunction in Defendants' operations, the Court will provide significant detail

20  regarding medical care, mental health care, and conditions imposed on the subclass to

21  remedy the egregious constitutional violations.[2]

22      Moreover, the unusual scope of this injunction is informed by Defendants' actions

23  throughout this case. Despite their agreement and promise to the Court to do otherwise,

24

25  [2] As expressed multiple times throughout the almost ten years this case has been pending,
    the Court has no interest in micromanaging Defendants' operations. At the hearing on
26  August 4, 2022, the Court stated: "I am not -- and I have said this a number of times, I
    don't know how many -- but the Court is not in a position, and never should be in a position
27  of running the prison. That's not my job." (Doc. 4358 at 16). In addition, Defendants
    have a constitutional responsibility to care for the prisoners in their custody. Therefore,
28  this injunction is addressed to Defendants, not their private healthcare contractor (presently
    NaphCare). Defendants must comply with the injunction and any disputes between
    Defendants and their private healthcare contractor are beyond the scope of this injunction.

1   Defendants have fought every aspect of this case at every turn. Defendants entered into a

2   settlement agreement where they claimed they would improve the care provided to

3   prisoners and improve the conditions of confinement for the subclass. Yet almost

4   immediately Defendants failed to perform those obligations and continued in that failure.

5   Instead of acknowledging their failures, Defendants kept inaccurate records and

6   unreasonably misread the settlement's requirements to their advantage. During trial,

7   Defendants presented arguments and witnesses that were manifestly unreliable and

8   unpersuasive. And on some aspects, Defendants presented no meaningful defense at all.

9   For example, Defendants did not present any expert testimony that the conditions imposed

10  on the subclass were appropriate. Most importantly, trial established Defendants blatantly

11  had not made any serious effort to remedy the flaws highlighted by this litigation. Given

12  this history, the Court cannot impose an injunction that is even minutely ambiguous

13  because Defendants have proven they will exploit any ambiguity to the maximum extent

14  possible.

15      Despite Defendants' unsatisfactory past behavior, the Court embraces the rule that

16  the injunction is required to be narrowly drawn, extend no further than necessary to correct

17  Defendants' ongoing violations of Plaintiffs' constitutional rights, and be the least intrusive

18  means necessary to correct and prevent violations. 18 U.S.C. § 3626(a)(1)(A). In addition,

19  the injunction must "describe in reasonable detail" what Defendants must do and must be

20  specific and definite to allow for accurate monitoring and, if necessary, enforcement. Fed.

21  R. Civ. P. 65(d)(1)(C); *United States v. DAS Corp.*, 18 F.4th 1032, 1039 (9th Cir. 2021)

22  ("Civil contempt consists of a party's disobedience to a specific and definite court order by

23  failure to take all reasonable steps within the party's power to comply."). In light of these

24  requirements, the Court reviewed the experts' recommendations created in close contact

25  with the parties and the original proposed injunction sought to impose only those

26  requirements necessary to correct the constitutional violations at issue.

27                          **Quantitative and Qualitative**

28      The extended history of this case mandates a need for the Court to impose both