Index to Exhibits to the Declaration of Corene T. Kendrick

**Exh.**       **Description**

1       Sections 1.15 and 1.16 of the Aug. 17, 2021 Request for Proposals (RFP), Solicitation No. BPM003905, for Inmate Correctional Healthcare at all ADCRR institutions

2       RFP Solicitation Amendment No. 16, Dec. 8, 2021, Questions and Answers, Numbers 90 and 91

3       Offer and Acceptance between NaphCare and ADCRR for Solicitation No. BPM003905, proposed Feb. 11, 2022, and accepted on May 24, 2022

4       Amendment 1 to Inmate Correctional Healthcare contract, dated June 10, 2022, adding indemnification terms

5       RFP Uniform Terms and Conditions, Section 9 (Contract Termination)

6       ADCRR filings in the bankruptcy proceedings of Corizon Health Care, *In re Tehum Care Servs., Inc.*, Case No. 4:23-BK-9008 (S.D. Bkrptcy. Tex.).

    a.  Doc. 232: *Arizona Department of Corrections, Rehabilitation, and Reentry's Objection to the Debtor's Emergency DIP Motion and Joinder in the Committee's Objection to the DIP Motion*, March 22, 2023;

    b.  Doc. 350: *Arizona Department of Corrections, Rehabilitation, and Reentry's Statement of Position, Joinder and Reservation of Rights Regarding the Debtor's Emergency Motion to Extend and Enforce the Automatic Stay*, April 12, 2023;

    c.  Doc. 1161: *Arizona Department of Corrections, Rehabilitation, and Reentry's Limited Objection to Debtor's Second Amended Disclosure Statement*, Nov. 30, 2023;

    d.  Doc. 1308: *Arizona Department of Corrections, Rehabilitation, and Reentry's Statement of Position on Debtor's Third Request to Extend Exclusivity*, Jan. 29, 2024;

    e.  Doc. 1365: *Arizona Department of Corrections, Rehabilitation, and Reentry's Motion to Dismiss and Joinder in the Tort Claimant Committee's Motion to Dismiss*, Feb. 22, 2024.

# EXHIBIT 1



| | **Request for Proposal**<br><br>**Notice Page** | State of Arizona<br>**Department of Corrections,**<br>**Rehabilitation & Reentry**<br>Procurement Services<br>1645 W Jefferson Street<br>Phoenix, AZ 85007 |
|---|---|---|

Solicitation Number:        BPM003905

Description:                   Inmate Correctional Healthcare

Solicitation Due Date and Time:   November 15, 2021 at 3:00 P.M. M.S.T.

Pre-Offer Conference:          September 22, 2021 at 11 A.M. M.S.T (Arizona time)

Location:                     All ADCRR Institutions

Contract Type:                Fixed Price

Contract Term:                5 Years + Option for 5 Additional Years

In accordance with Arizona Revised Statutes § 41-2534, Competitive Sealed proposals for the materials or services specified, will be received by the Arizona Department of Corrections, Rehabilitation and Reentry (ADCRR) through the State's e-Procurement System, Arizona Procurement Portal (APP) **at https://app.az.gov until the "Bid/Offer Due Date" indicated in "The State's e-Procurement System" for the Solicitation No. shown at the top of this page**. Proposals must be in the ADCRR's possession online no later than that deadline.

LATE PROPOSALS WILL NOT BE CONSIDERED. No extension or grace period will be given for delays or incomplete proposals caused by internet connectivity problems, file uploading difficulties, or misunderstand of the requirements or procedures for online submission in "The State's e-Procurement System".

Submit technical inquiries about navigating and/or submitting proposals in the State's e-Procurement System to the State's e-Procurement System Help Desk by phone at (602) 542-7600, option 2; or by email to app@azdoa.gov

It is the responsibility of the supplier/offeror to routinely check the APP website for Solicitation Amendments. Additional instructions for preparing an Offer are included in this solicitation.

Persons with a disability may request a reasonable accommodation, such as a sign language interpreter, by contacting the Solicitation contact person. Requests shall be made as early as possible to allow time to arrange for the accommodation.

**OFFERORS ARE STRONGLY ENCOURAGED TO CAREFULLY READ THE ENTIRE SOLICITATION.**

*An Equal Employment Opportunity Agency*

_____          _____

**Rocky Advani, Procurement Manager**                         **DATE**

**(602) 542-1172**
**PHONE**

_____

**DENEL PICKERING, CHIEF PROCUREMENT OFFICER**



| **Request for Proposal**<br>**Solicitation No. BPM003905**<br>**Inmate Correctional Healthcare** | State of Arizona<br>**Department of Corrections,**<br>**Rehabilitation & Reentry**<br>Procurement Services<br>1645 W Jefferson Street<br>Phoenix, AZ 85007 |
|---|---|

## Table of Contents

Scope of Work ......................................................................................................................... 4

1.1 Introduction .................................................................................................................... 4

1.2 Definitions ...................................................................................................................... 10

1.22 Qualifications ............................................................................................................... 23

1.3 Financial Responsibility ............................................................................................... 35

1.4 General Provisions ........................................................................................................ 38

1.5 Requirements ................................................................................................................. 44

1.6 Access to Healthcare Services Delivery System ........................................................ 52

1.7 Responsibility for Coordination of Care .................................................................... 54

1.8 Health Assessments/Intake Process ............................................................................ 65

1.9 Medical Services ............................................................................................................ 68

1.10 Dental Services ............................................................................................................ 90

1.11 Pharmacy Services ...................................................................................................... 93

1.12 Mental Health Services .............................................................................................. 106

1.13 Utilization Management ............................................................................................. 112

1.14 AHCCCS Requirements and Claims Processing ..................................................... 115

1.15 Inmate Grievances/Complaints ................................................................................ 120

1.16 Staffing ......................................................................................................................... 120

1.17 Reporting Requirements ............................................................................................ 129

1.18 Contract Monitoring General Requirements .......................................................... 132

1.19 Contract Performance Offsets ................................................................................... 134

1.20 Monetary Sanctions .................................................................................................... 136

1.21 Information Technology (I.T.) ................................................................................... 138

1.22 Electronic Medical Record System (EMR) .............................................................. 147

1.24 Fee Schedule ................................................................................................................ 134



| | |
|---|---|
| **Request for Proposal**<br>**Solicitation No. BPM003905**<br>**Inmate Correctional Healthcare** | State of Arizona<br>**Department of Corrections,**<br>**Rehabilitation & Reentry**<br>Procurement Services<br>1645 W Jefferson Street<br>Phoenix, AZ 85007 |

**Special Terms and Conditions** ................................................................................................... 155

**Uniform Terms and Conditions** ................................................................................................. 1755

**Uniform Instructions To Offerors** ............................................................................................. 186

**Special Instructions To Offerors** .............................................................................................. 193



| | Request for Proposal<br>Solicitation No. BPM003905<br>Inmate Correctional Healthcare | State of Arizona<br>**Department of Corrections,**<br>**Rehabilitation & Reentry**<br>Procurement Services<br>1645 W Jefferson Street<br>Phoenix, AZ 85007 |
|---|---|---|

## Scope of Work

1.1 **INTRODUCTION**

The State of Arizona is seeking proposals for delivery of Inmate Correctional Healthcare in all State owned and operated Arizona Department of Corrections, Rehabilitation and Reentry Complexes.

1.1.1   The intent of this solicitation is to allow the Arizona Department of Corrections, Rehabilitation and Reentry (ADCRR) to enter into a contract for the procurement of services as specified within the Scope of Work at a fixed price.

1.1.2   The State of Arizona is looking to the private sector to apply sound, managed care principles to a correctional healthcare services delivery system for all inmates who are committed to the custody of the ADCRR.

1.1.3   Access to correctional health services at each Arizona State Prison complex shall be provided in the following manner:  A standardized program of routine, urgent and emergency healthcare must be available to all inmates. Emphasis shall be placed on preventative healthcare practices. Inmates experiencing healthcare emergencies may request and shall receive emergency care by an on-site medical provider or mental health provider twenty-four (24) hours per day, seven days per week.  Satellite prison units (ASPC-Safford-Fort Grant, ASPC-Florence-Globe and ASPC-Winslow-Apache) are required to staff with a registered nurse 24/7 and medical staff are to be present during regular business hours.

1.1.4   The Contractor shall provide written, oral and electronic media information to all inmates regarding the availability of correctional health services and information on how to access such services.

1.1.4.1   A qualified interpreter or a language line interpretation service shall be provided for inmates who are not fluent in English, deaf or blind or exhibit significant difficulty in verbal communication unless the qualified healthcare staff is proficient in the inmate's language.

1.1.5   The Contractor shall provide correctional healthcare treatment and services in accordance with all applicable federal and state laws, rules and regulations, DOs, DIs, procedures, and Department Technical Manuals applicable to the delivery of correctional health services. In addition, the Contractor shall meet all federal and state constitutional requirements, court orders, the Stipulation in *Parsons v. Shinn,* CV 12-00601 PHX-ROS (Exhibit), and maintain full compliance with applicable NCCHC and ACA Standards for Health Services in Prisons and NCCHC and ACA Standards for Mental Health Services in Correctional Facilities. All such laws, rules and regulations, current and/or as revised, are incorporated herein by reference. The Contractor and the Department shall work



| | |
|---|---|
| **Request for Proposal**<br>**Solicitation No. BPM003905**<br>**Inmate Correctional Healthcare** | State of Arizona<br>**Department of Corrections,**<br>**Rehabilitation & Reentry**<br>Procurement Services<br>1645 W Jefferson Street<br>Phoenix, AZ 85007 |

cooperatively to ensure service delivery is in complete compliance with all such requirements.

1.1.6   Parsons v. Shinn Special Notification: On July 16, 2021, Judge Roslyn Silver of the U.S. District Court entered an Order rescinding the Court's approval of the Stipulation and setting the case for a bench trial commencing on November 1, 2021. The nature and extent of the outcome of that trial is uncertain. At a minimum, however, the Department will continue to require any and all successful vendors to comply with the Stipulation, including any revisions thereto made by the Department, as well as with all provisions of the Contract, including, but not limited to, those provisions which govern all contractual and staffing offsets and all judicially imposed sanctions and other Court-ordered expenses, unless and until ordered otherwise by the Court. If in the Department's sole discretion the Court's rulings after the bench trial constitute a material change in the manner and/or cost of delivery of inmate health care, when considered in the context of the entire Contract, then the Department may consider exploring potential remedial measures to ensure continued constitutionally compliant delivery of inmate health care by any and all successful vendors.

1.1.7   The Offeror shall conduct at Gap Analysis identifying all areas that are not currently meeting 100 percent compliance and identify exactly what resources are necessary to achieve 100 percent compliance in all analyzed areas and timeline required to do so. The Department will provide all bidders with 30 days onsite access to the current Contractor's data at all facilities statewide, during the proposal process.

1.1.8   Should any of the above rules, regulations, and governance change during the course of this procurement or resultant contract term, the updated version shall take precedence.

1.1.9   ADCRR Policies, Manuals, ADCRR Department Orders (DOs), and Director's Instructions (DIs) are available at https://corrections.az.gov/reports-documents/adc-policies. These include, but are not limited to:

1.1.9.1   DO 711 Notice of Inmate Hospitalization or Death
1.1.9.2   DO 801 Inmate Classification (Classification Manual)
1.1.9.3   DO 802 Inmate Grievance Procedure
1.1.9.4   DO 804 Inmate Behavior Control
1.1.9.5   DO 807 Inmate Suicide Prevention, Precautionary Watches and Maximum Behavioral Control Restraints
1.1.9.6   DO 1001 Inmate Release System
1.1.9.7   DO 1101 Inmate Access to Health Care
1.1.9.8   DO 1102, Communicable Disease and Infection Control
1.1.9.9   DO 1103, Inmate Mental Health Care. Treatment and Programs

# EXHIBIT 2



| Solicitation Amendment | | State of Arizona Department of Corrections, Rehabilitation, and Reentry 1645 West Jefferson Street Phoenix, AZ 85007 |
|---|---|---|
| Solicitation No.: BPM003905 | ADCRR Tracking No.: 22-036-32 | |
| Solicitation Title: Inmate Correctional Healthcare | | |
| Solicitation Amendment  No.: 16 | Date: December 8, 2021 | Contract Officer: Kristine Yaw |

c. If the answer to the preceding question is (b), which facility(s) will receive the Florence inmates?

d. Will the inmate transfers (a) be staggered over time, thus requiring Florence to be staffed on an ongoing basis throughout the facility's closure process? Or (b) done all at once, enabling the vendor to remove all of its Florence health care staff at the same time?

e. Does the ADCRR want bidders to include a full complement of health care staff for ASPC-Florence in their price proposals?

f. Please confirm that once the closure of ASPC-Florence is completed, the ADCRR will negotiate a mutually acceptable contract amendment with the health care vendor to adjust staffing and other changes to the operating cost of the contract.

**Answer #89:**    a) To be determined.
b) Inmates will be transferred to other institutions.
c) To be determined.
d) Inmate transfers are proposed to be staggered at this time.

90. This RFP specification—2.40.2—requires the health care contractor to be financially responsible for "any and all costs and attorneys' fees associated with defending any claims of noncompliance." Please provide the following information on this topic.

a. Please confirm that this excludes costs and attorney fees resulting from:

i. non-compliance caused by actions of the ADCRR or individuals acting on the ADCRR's behalf and

ii. ii. non-compliance caused by any other events or activities outside of the health care vendor's control.

b. Please confirm that the ADCRR will not require the new health care vendor to be financially responsible in any way for fines/penalties levied against the State Agency by the court system as part of the ongoing Parsons litigation.

**Answer #90:**    This is not confirmed.

91. This RFP specification requires the health care contractor to be financially responsible for "all costs and attorneys' fees incurred by Plaintiffs' counsel as a result of court intervention." Please provide the following information on this topic.

a. Does the ADCRR expect the incoming health care vendor to be appended as a named party in the Parsons litigation?

b. The new health care vendor will be entering a situation fraught with pre-existing issues that date back many years. Please discuss the ADCRR's rationale for requiring the newly arrived health care vendor to pay for legal costs relating to litigation that (a) the new vendor is trying to remedy and (b) the new vendor had no role in creating.

**Answer #91:**    a) No, the contracted healthcare vendors have not previously been named in the litigation.
b) The incoming health care vendor is expected to resolve any issues and provide healthcare to meet Performance Measure standards at an 85% threshold.

108

# EXHIBIT 3



| Solicitation Amendment No. 18 | State of Arizona |
|---|---|
| **Attachment 1** | **Department of Corrections,** |
| **Offer and Acceptance Form** | **Rehabilitation & Reentry** |
| **Solicitation No. BPM003905** | Procurement Services |
| **Inmate Correctional Healthcare** | 1645 W Jefferson Street |
| | Phoenix, AZ 85007 |

**SUBMISSION OF OFFER:** Undersigned hereby offers and agrees to provide Inmate Correctional Healthcare Service in compliance with the Solicitation indicated above and our Offer indicated by the latest dated version below:

| | | | | |
|---|---|---|---|---|
| **Initial Offer:** | 2/11/2022 | | | |
| | Date | Signature | | |
| **Revised Offers:** | Date | Signature | Date | Signature |
| | Date | Signature | Date | Signature |
| **Best and Final Offer:** | Date | Signature | | |

| | |
|---|---|
| NaphCare, Inc. | |
| Offeror company name | Signature of person authorized to sign Offer |
| 2090 Columbiana Road, Suite 4000 | Bradford McLane, CEO |
| Address | Printed name and title |
| Birmingham, AL 35216 | Bradford McLane, CEO |
| City \| State \| ZIP | Contact name and title |
| 58-1823464 | Bradford.mclane@naphcare.com    205-536-8532 |
| Federal tax identifier (EIN or SSN) | Contact Email Address        Contact phone number |

**CERTIFICATION:** By signature in the above, Offeror certifies that it:

1. will not discriminate against any employee or applicant for employment in violation of Federal Executive Order 11246, [Arizona] State Executive Order 2009-9 or A.R.S. § 41-1461 through 1465;
2. has not given, offered to give, nor intends to give at any time hereafter any economic opportunity, future employment, gift, loan, gratuity, special discount, trip, favor, or service to a public servant in connection with the submitted offer. Failure to provide a valid signature affirming the stipulations required by this clause will result in rejection of the Offer. Signing the Offer with a false statement will void the Offer, any resulting contract, and may be subject to legal penalties under law;
3. complies with A.R.S. § 41-3532 when offering electronics or information technology products, services, or maintenance; and
4. is not debarred from, or otherwise prohibited from participating in any contract awarded by federal, state, or local government.

**ACCEPTANCE OF OFFER:** State hereby accepts the initial Offer, Revised Offer, or Best and Final Offer identified by the latest date and number at the top of this form (the Accepted Offer). Offeror is now bound (as Contractor) to carry out the Work under the attached Contract, of which the Accepted Offer forms a part. Contractor is cautioned not to commence any billable work or to provide any material or perform any service under the Contract until Contractor receives the applicable Order or written notice to proceed from the Procurement Officer.

**ADCRR's Contract Number** CTR060508
Solicitation No. BPM003905

Chief Procurement Officer Signature        **Award Date** 5/24/22

**Contract Effective Date:** Oct 1, 2022

Denel M. Pickering, Chief Procurement Officer

Chief Procurement Officer Name        Title

# EXHIBIT 4



| **Contract Amendment** | | State of Arizona Department of Corrections, Rehabilitation, and Reentry 1645 West Jefferson Street Phoenix, AZ 85007 |
|---|---|---|
| Contract No.: CTR060508 | ADCRR Tracking No.: 22-036-32 | |
| Contract Title: Inmate Correctional Healthcare | | |
| Contract Amendment No.: 1 | Date: June 10, 2022 | Contract Officer: Kristine Yaw |

NaphCare, Inc.
2090 Columbiana Road, Suite 4000
Birmingham, AL 35216
Attention: Bradford McLane, CEO
brad.mclane@naphcare.com

This Contract is amended as follows:

1.  Special Terms and Conditions, Section 2.31 Performance / Payment Bonds, Paragraph 2.31.1.1

    **From:**
    2.31.1.1   The Offeror shall be required to provide the performance/payment bonds within five (5) days after receipt of written notice of intent to award this contract.

    **To:**
    2.31.1.1   The Offeror shall be required to provide a letter of bondability for the performance/payment bonds within five (5) days after receipt of written notice of intent to award this contract. The effective date of the performance/payment bonds will be October 1, 2022 which is the start date of the contract.

2.  Special Terms and Conditions, Section 2.40 Indemnification, Paragraph 2.40.3

    **From:**
    2.40.3   The Contractor shall pay all costs and attorneys' fees incurred by Plaintiffs' counsel as a result of court intervention. The Contractor will be responsible for paying all monitoring fees and costs incurred in the event that the fees were incurred after July 1, 2019. The Contractor shall be responsible for the costs associated as a result of a court ordered remedy caused by a breach of the healthcare portion of the Stipulation which occurred during the pendency of this contract.

    **To:**
    2.40.3   The Contractor shall pay all costs and attorneys' fees incurred by Plaintiffs' counsel as a result of court intervention. The Contractor will be responsible for paying all monitoring fees and costs incurred in the event that the fees were incurred after October 1, 2022. The Contractor shall be responsible for the costs associated as a result of a court ordered remedy caused by a breach of the healthcare portion of the Stipulation which occurred during the pendency of this contract.

---

**ALL OTHER REQUIREMENTS, SPECIFICATIONS, TERMS AND CONDITIONS REMAIN UNCHANGED**

**ACKNOWLEDGEMENT AND AUTHORIZATION**

**This Contract Amendment is not binding against the State of Arizona unless signed by an authorized representative of the Contractor and then accepted in writing by an authorized representative of the State.**

| **CONTRACTOR HEREBY ACKNOWLEDGES RECEIPT, AGREES AND UNDERSTANDS THE ABOVE AMENDMENT** | **THE ABOVE REFERENCED CONTRACT AMENDMENT IS HEREBY EXECUTED THIS DATE BY THE STATE** |
|---|---|
| Signature of Authorized Representative | Signature of Authorized Representative |
| Bradford T. McLane | Denel M. Pickering |
| Typed or Printed Name | Typed or Printed Name |
| Title:   CEO | Title: Chief Procurement Officer |
| Date:   June 9, 2022 | Date:   6/30/22 |

# EXHIBIT 5



| Request for Proposal<br>Solicitation No. BPM003905<br>Inmate Correctional Healthcare | State of Arizona<br>**Department of Corrections,**<br>**Rehabilitation & Reentry**<br>Procurement Services<br>1645 W Jefferson Street<br>Phoenix, AZ 85007 |
| --- | --- |

applicable termination clauses in the Contract, exercise any of its rights and remedies under the Uniform Commercial Code, or pursue any other right or remedy available to it.

8.4.   Right of Offset. The State shall be entitled to offset against any sums due the Contractor, any expenses or costs incurred by the State, or damages assessed by the State concerning the Contractor's non-conforming performance or failure to perform the Contract, including expenses, costs and damages described in the Uniform Terms and Conditions.

9.   Contract Termination

9.1.   Cancellation for Conflict of Interest. Pursuant to A.R.S. § 38-511, the State may cancel this Contract within three (3) years after Contract execution without penalty or further obligation if any person significantly involved in initiating, negotiating, securing, drafting or creating the Contract on behalf of the State is or becomes at any time while the Contract or an extension of the Contract is in effect an employee of or a consultant to any other party to this Contract with respect to the subject matter of the Contract. The cancellation shall be effective when the Contractor receives written notice of the cancellation unless the notice specifies a later time. If the Contractor is a political subdivision of the State, it may also cancel this Contract as provided in A.R.S. § 38- 511.

9.2.   Gratuities. The State may, by written notice, terminate this Contract, in whole or in part, if the State determines that employment or a Gratuity was offered or made by the Contractor or a representative of the Contractor to any officer or employee of the State for the purpose of influencing the outcome of the procurement or securing the Contract, an amendment to the Contract, or favorable treatment concerning the Contract, including the making of any determination or decision about contract performance. The State, in addition to any other rights or remedies, shall be entitled to recover exemplary damages in the amount of three times the value of the Gratuity offered by the Contractor.

9.3.   Suspension or Debarment. The State may, by written notice to the Contractor, immediately terminate this Contract if the State determines that the Contractor has been debarred, suspended or otherwise lawfully prohibited from participating in any public procurement activity, including but not limited to, being disapproved as a subcontractor of any public procurement unit or other governmental body. Submittal of an offer or execution of a contract shall attest that the contractor is not currently suspended or debarred. If the contractor becomes suspended or debarred, the contractor shall immediately notify the State.

9.4.   Termination for Convenience. The State reserves the right to terminate the Contract, in whole or in part at any time when in the best interest of the State, without penalty or recourse. Upon receipt of the written notice, the Contractor shall stop all work, as directed in the notice, notify all subcontractors of the effective date of the termination and minimize all further costs to the State. In the event of termination under this paragraph, all documents, data and reports prepared by the Contractor under the Contract shall become the property



| | **Request for Proposal**<br>**Solicitation No. BPM003905**<br>**Inmate Correctional Healthcare** | State of Arizona<br>**Department of Corrections,**<br>**Rehabilitation & Reentry**<br>Procurement Services<br>1645 W Jefferson Street<br>Phoenix, AZ 85007 |
|---|---|---|

of and be delivered to the State upon demand. The Contractor shall be entitled to receive just and equitable compensation for work in progress, work completed and materials accepted before the effective date of the termination. The cost principles and procedures provided in A.A.C. R2-7-701 shall apply.

9.5.    Termination for Default.

    9.5.1.    In addition to the rights reserved in the contract, the State may terminate the Contract in whole or in part due to the failure of the Contractor to comply with any term or condition of the Contract, to acquire and maintain all required insurance policies, bonds, licenses and permits, or to make satisfactory progress in performing the Contract. The Procurement Officer shall provide written notice of the termination and the reasons for it to the Contractor.

    9.5.2.    Upon termination under this paragraph, all goods, materials, documents, data and reports prepared by the Contractor under the Contract shall become the property of and be delivered to the State on demand.

    9.5.3.    The State may, upon termination of this Contract, procure, on terms and in the manner that it deems appropriate, materials or services to replace those under this Contract. The Contractor shall be liable to the State for any excess costs incurred by the State in procuring materials or services in substitution for those due from the Contractor.

9.6.    Continuation of Performance Through Termination. The Contractor shall continue to perform, in accordance with the requirements of the Contract, up to the date of termination, as directed in the termination notice.

10.  Contract Claims
All contract claims or controversies under this Contract shall be resolved according to A.R.S. Title 41, Chapter 23, Article 9, and rules adopted thereunder.

11.  Arbitration
The parties to this Contract agree to resolve all disputes arising out of or relating to this contract through arbitration, after exhausting applicable administrative review, to the extent required by A.R.S. § 12-1518, except as may be required by other applicable statutes (Title 41).

12.  Comments Welcome
The State Procurement Office periodically reviews the Uniform Terms and Conditions and welcomes any comments you may have. Please submit your comments to: State Procurement Administrator, State Procurement Office, 100 North 15th Avenue, Phoenix, Arizona, 85007.

EXHIBIT 6

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TEHUM CARE SERVICES, INC. | § | CASE NO. 4:23-BK-90086 (CML) |
| | § | |
| | § | CHAPTER 11 |
| | § | |
| Debtor. | § | |
| | § | |

**ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION, AND
REENTRY'S OBJECTION TO THE DEBTOR'S EMERGENCY DIP MOTION
AND JOINDER IN THE COMMITTEE'S OBJECTION TO THE DIP MOTION**

     The Arizona Department of Corrections, Rehabilitation, and Reentry ("ADCRR"), by and through undersigned counsel, submits this Objection to the Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing DIP Financing, Use of Cash Collateral, Granting Liens and Providing Claims with Superpriority Administrative Claims Status, Modifying the Automatic Stay, and Granting Related Relief (the "DIP Motion"). Dkt # 185. In addition, ADCRR joins in the Committee's objection, including the Committee's reservation of rights, filed at Dkt # 224. Due to the emergency nature of the Debtor's requested relief, ADCRR reserves the right to supplement this Objection prior to any final hearing on the DIP Motion.

     ADCRR is the state of Arizona's department of corrections. Pursuant to pre-petition contracts with the Debtor's predecessors, ADCRR is owed for certain indemnity obligations arising from litigation between prisoners and the Debtor (or its predecessors). ADCRR estimates that it is currently owed between $1 million and $2 million for expenses that the state incurred defending lawsuits that should have been defended by the Debtor or its predecessors.

1

### I.   Introduction.

To evaluate the Debtor's DIP Motion, the Court should bear in mind what the case is about.  The Debtor is (or perhaps was) the entity divested by the Debtor's predecessors and left to be the target for litigation claims brought by numerous individuals and entities across the United States.  At the time of division, the Debtor's assets allegedly consisted of $1 million in cash and a $15 million funding agreement (the "Funding Agreement") with M2LoanCo, LLC ("M2LoanCo").  Indeed, FTI provided its opinion that the division merger was fair based on the idea that the Funding Agreement would "earmark" $11 million for the Debtor's unsecured creditors.  *See* Dkt #7, p. 6, ¶ 16 (motion), and p. 24, ¶ 7 (Perry Declaration).[1]  It is unclear if this money was ever provided to the Debtor – and because the Debtor has not yet filed schedules or statements, neither the creditors nor the Court know the true scope of the Debtor's assets.

What is clear is that the Debtor does not have a business other than to provide a pool of assets and mechanisms for distribution to deal with the Debtor's predecessors' numerous creditors.  In other words, it does not operate in a traditional sense.  The emergency in this instance arises from: (a) the apparent pre-petition drain of $15 million from the Debtor that was supposedly designed to fund the liquidation mechanism and pay creditors; and (b) the need to pay administrative professionals to continue the liquidation scheme envisioned by the division merger.

Problems arise when the owners' desire for control of the distribution process runs afoul of the bankruptcy process.  Here, the Court is being asked to approve a post-petition DIP loan made by M2LoanCo, an entity owned or controlled by the Debtor's owners and predecessors-in-interest, that contains the following terms in tension (or outright conflict) with the Bankruptcy Code:

---

[1]  Unless otherwise specified, all page references are to the court-stamped electronic page number.

1. The DIP Motion provides releases for the Lender and its officers, shareholders, directors, etc., from all claims including those involving the divisional merger and the pre-petition Funding Agreement.  Dkt #185, pp. 15-16.  These third-party releases provide a result that the Lender(s) (who share common ownership with the Debtor and the Debtor's predecessors) likely could not obtain through the plan process.[2]  At a minimum, the estate's claims should not be released until the Court and the creditors have had an opportunity to investigate the worth of these claims.[3]

2. The DIP Motion authorizes a lien on the Debtor's avoidance actions.  Dkt #185, p. 14.  Given the apparent "disappearance" of the money from the Funding Agreement and the controversies surrounding the divisional merger, this appears to be inappropriate prior to an opportunity to investigate those claims.

3. The DIP Motion authorizes a superpriority administrative expense claim.  Dkt #185, p. 5, ¶ 13 and Dkt #185-1, p. 19, ¶ 6.  This all-too-common provision virtually guarantees that the Debtor and its creditors will be at the mercy of M2LoanCo until the Debtor has funding in excess of the amount needed to repay the lender.  And, since the Debtor does not operate and has provided no additional evidence to support payment of the loan, it is unclear when that would occur (if ever).

4. The DIP Motion requires the waiver of the right to surcharge under Section 506(c) or obtain equitable remedies under Section 552(b).  It is unclear why

---

[2]  The practical effect of the release provisions is that the debtor-in-possession has released the lender (a non-debtor) from claims that the DIP holds on behalf of all creditors.  This likely could not be achieved in a Chapter 11 plan.  *See, e.g., In re Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009); *In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995).

[3]  The proposed order does provide a challenge period and below ADCRR addresses why that challenge period is not enough protection for the creditors.

such relief is necessary and it only deepens the problems related to giving the Debtor's owners a clean exit if they choose to default the Debtor under the loan.

5. The DIP Motion requires that parties give up their ability to challenge the or recharacterize the financing proceeds. Dkt #185, pp. 9-10. This term ordinarily would be (relatively) noncontroversial but raises problems when the Lender is in the Debtor's ownership structure and the case is largely being run to benefit those individuals.

6. That the Debtor must file a plan acceptable to M2LoanCo and obtain a confirmation order acceptable to the lender by September 1, 2023. In other words, any plan must be acceptable to the DIP lender or the Debtor will be in default.

Taken together the above-referenced provisions provide the lenders, i.e., the owners of the Debtor, with releases and the ability to default the Debtor in such a way that the creditors would be worse off than if the case were immediately converted to a Chapter 7. It would be folly to permit the Debtor's owners and predecessors-in-interest to obtain releases that they could not obtain in a Chapter 11 through the mechanism of a DIP loan. Further it is wrong to put those same owners and predecessors-in-interest in position to "tank" the bankruptcy case and put the creditors in a position worse than they would be if the case were converted to a Chapter 7.

## II.    Relevant Factual and Procedural Background.

1. The Debtor filed for bankruptcy on February 13, 2023. Dkt #1.

2. The Debtor has not yet filed its schedules and statements. They are due on March 30, 2023. Dkt # 113.

3. The actions against many non-debtors, likely including the potential lenders, were temporarily stayed by this Court through May 18, 2023. *See* Dkt #7 and Dkt # 118.

4.      The Debtor filed the emergency DIP Motion on March 15, 2023.  *See* Dkt #185 (DIP Motion) and 185-1 (proposed order and loan agreement).

5.      The Debtor has represented to the Court that its pre-petition assets consisted mainly of $1 million in cash and a $15 million Funding Agreement from M2LoanCo.  *See* Dkt #7, p. 25, ¶ 10.

6.      FTI Consulting purportedly "confirmed" the fairness of the divisional merger to Corizon's unsecured creditors in part because of the "availability of $15,000,000 from M2LoanCo, pursuant to a funding agreement (the "Funding Agreement")."  Dkt #186, p. 4, ¶ 8.

7.      "[A]s part of the Divisional Merger, the Debtor was allocated $1 million in cash, as well as the right to draw on the $15 million Funding Agreement, $11 million of which was earmarked for the Debtor's creditors."  Dkt #186, p. 5, ¶ 11.

8.      The declaration in support of the Debtor's DIP Motion states: "As of the Petition Date, the Debtor had no cash on hand to fund its ongoing efforts to wind down its assets and liabilities or pay professionals to negotiate and propose a plan of liquidation. The Debtor was not allocated any tangible real property under the Divisional Merger, and, as of the Petition Date, though the Debtor was the beneficiary under the Funding Agreement, it does not appear that any additional amounts were available thereunder as of the Petition Date. . . ."  Dkt #186, p. 6, ¶ 14.  This statement is obliquely contradicted by a footnote which provides: "Along with counsel, Aukara is investigating and analyzing the Funding Agreement transactions to determine how much, if any, funding remains available thereunder."  *Id.* at n. 2.

9.      "The Debtor is actively winding down its business as it is no longer an operating entity with any active contracts or medical service providers."  Dkt #186, p. 6, ¶ 13.

10.     The budget attached to the DIP Motion (a) does not have a beginning
balance (although it appears to be zero); and (b) does not show the Debtor receiving any
revenue over the next thirteen weeks.  Dkt #185-1, p. 98.

11.     M2LoanCo is an affiliate of the Debtor by common ownership.  *See* Dkt
#186, p. 8, ¶ 18.  M2LoanCo, however, is only the administrative agent for the proposed
DIP financing.  The actual lender (or lenders) are not identified (even in the proposed
order).  The credit agreement provides, "each of the lenders from time to time a party
hereto (each a "Lender")."  Dkt #185-1, p. 46.  In other words, an affiliate of the Debtor,
or predecessor-in-interest to the Debtor, can buy a release by becoming a "lender" under
the credit agreement.

## III.   Objection.

The Debtor's DIP Motion should be denied, even on interim basis, for two
reasons.  First, without schedules or the identity of the lenders, the Court and the creditors
cannot meaningfully evaluate the terms of the proposed DIP financing.  For example, the
Court does not know what, if anything, is available to repay the loan.  The Debtor has
indicated that it no longer operates.  Further the Debtor is releasing its avoidance claims
and potential causes of action against its owners (and likely its predecessors-in-interest).
Without bankruptcy schedules it is unclear what assets remain.  The Debtor's CRO has
suggested that there may be tax refunds "and similar receivables," but there is currently
no way to gauge whether these assets constitute enough value to pay a $10 million loan at
12% interest.

Similarly, without schedules and statements, the creditors have no idea what the
universe of potential liabilities might be.  Nor do they have any idea of the value of
potentially avoidable transfers.  Without such information the creditors do not have
sufficient information to meaningfully evaluate the proposed DIP lending transaction.

Finally, the credit agreement does not identify the lenders.  M2LoanCo appears to
be a lender (in addition to being the administrative agent), but it is not clear.  The credit

agreement, however, makes clear that M2LoanCo controls the authority exercised by the lenders under the credit agreement.  In other words, insiders of the Debtor appear to have the authority to declare a default or demand compliance with the terms of the credit agreement.  As a practical matter – and given the aforementioned problematic terms of the DIP Financing facility – it appears that the Debtor's "independent" CRO will be significantly constrained by the terms of the DIP Motion.

The second problem with the DIP Motion is that the "proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest."  *In re Mid-State Raceway*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005).  To begin, the DIP Motion tips the balance of plan negotiations in favor of the lender, i.e., the Debtor's insiders.  This includes the economic pressure of a large, secured claim; but also incorporates "collars" such as limiting the scope of the Committee's investigation by prohibiting the use of DIP financing money to investigate any claims and causes of action related to the lender, its affiliates, and YesCare, Inc. (the entity that bought the NewCo (CHS) that received the assets of Corizon in the Divisional Merger).  *See* Dkt #185, pp. 9-10.  Thus, while there is a challenge period to investigate such claims, any such investigation cannot be funded by DIP financing proceeds.[4]

Further, M2LoanCo has the sole and absolute discretion to determine what constitutes an "acceptable" plan of reorganization and an acceptable confirmation order. *See* Dkt #185, pp. 14-15.  This provides M2LoanCo with the ability to block any plan of reorganization and, through its ability to declare a default, the ability to force the case to convert to a Chapter 7 for lack of funding.  Taken together with the releases of claims

---

[4]  The DIP Motion does allow the Committee to utilize $500,000 to investigate the Divisional Merger, but there appear to be many other potential avoidance actions – including what happened to the $15 million Funding Agreement.

against lenders, releases of avoidance actions, a lien on all the Debtor's assets, a superpriority administrative expense claim, and no ability to surcharge the lender's collateral or seek equitable relief under Section 552, the DIP Motion surrenders all of the debtor-in-possession's Bankruptcy Code-based weaponry to the lender.  The approval of such terms will improperly leverage the bankruptcy process in favor of the lender and against the creditors.  As one court put it:

> Under the guise of financing a reorganization, the Bank would disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit, place the Debtor in bondage working for the Bank, seize control of the reins of reorganization, and steal a march on other creditors in numerous ways. The Financing Agreement would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the Debtor's principals who guaranteed its debt. It runs roughshod over numerous sections of the Bankruptcy Code. Under its rights of approval and supervision, the Bank would in effect operate the Debtor's business . . . . And the Bank would have the ultimate say over the very goal of this Chapter 11 case.

*In re Tenney Village Company, Inc.*, 104 B.R. 562, 568 (Bankr. D. N.H. 1989).  Here the situation is even slightly more pernicious because the lender is an insider – and one potentially subject to claims for pre-petition misconduct.[5]  In *Tenney Village Co.*, the Court concluded that the debtor-in-possession's giveaway of so many of the fiduciary responsibilities (such as pursuing avoidance actions and proposing an independent plan) violated the debtor's fiduciary obligations to the estate.  *Id.* at 569.  The Debtor's similar failures here warrant a denial of the DIP Motion.

### IV.    Notice of Reservation of Rights.

Please take further notice that neither this Notice, any subsequent appearance (by pleading or otherwise), nor any participation in or in connection with this case is intended

---

[5] The same court observed:  "It is said that a Chapter 11 lender should not be required to finance the prosecution of claims and defenses against it.  That is true.  If the lender believes that this will occur, it can elect not to make the loan.  It cannot expect, however, to change the rules of a Chapter 11 case."  *Tenney Village Co.*, 104 B.R. at 569.

to waive (i) the right to have final orders in non-core matters entered only after de novo review by a District Court Judge, (ii) the right to trial by jury in any case, controversy, or proceeding, (iii) the right to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, and (iv) any other rights, claims, actions, defenses, setoffs or recoupments to which the ADCRR is, or may be entitled, under agreements, in law or in equity, are expressly reserved.

**V.     Conclusion.**

For the reasons set forth above, and those set forth in the Committee's Objection to the DIP Motion, Dkt #224, the Court should deny the Debtor's emergency DIP Motion.  ADCRR requests any further relief that the Court deems appropriate.

DATED this 22nd day of March, 2023.


**OSBORN MALEDON, PA**

By:     /s/ Christopher C. Simpson
        Warren J. Stapleton (pro hac vice pending)
        Christopher C. Simpson (pro hac vice pending)
        2929 North Central Avenue
        Suite 2100
        Phoenix, Arizona 85012
        Telephone: 602.640.9000
        Facsimile: 602.640.9050
        Email: wstapleton@omlaw.com
        Email: csimpson@omlaw.com

        *Counsel to the Arizona Department of Corrections, Rehabilitation, and Reentry*


**Certificate of Service**

I hereby certify that on March 22, 2023 I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

        /s/ Peggy Nieto

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TEHUM CARE SERVICES, INC. | § | CASE NO. 4:23-BK-90086 (CML) |
| | § | |
| | § | CHAPTER 11 |
| | § | |
| Debtor. | § | |
| | § | |

**ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION, AND
REENTRY'S STATEMENT OF POSITION, JOINDER AND RESERVATION OF
RIGHTS REGARDING THE DEBTOR'S EMERGENCY MOTION TO EXTEND
AND ENFORCE THE AUTOMATIC STAY**

The Arizona Department of Corrections, Rehabilitation, and Reentry ("**ADCRR**"),
by and through undersigned counsel, submits this Statement of Position and Reservation
of Rights (this "**Statement of Position**") Regarding the *Debtor's Emergency Motion to
Extend and Enforce the Automatic Stay* (the "**Motion to Extend Stay**") [Docket No. 7].
ADCRR reserves the right to supplement this Statement of Position prior to any hearing
on the Motion to Extend Stay.

ADCRR is the state of Arizona's department of corrections.  Pursuant to pre-
petition contracts with the Debtor's predecessors, ADCRR is owed for certain indemnity
obligations arising from litigation between prisoners and the Debtor (or its predecessors).
Not less than four such active litigation matters are listed on Exhibit 1 to this Court's
*Order Regarding Debtor's Emergency Motion to Extend and Enforce the Automatic Stay*
(the "**Extension Order**") [Docket No. 118].  The Extension Order extended the stay
regarding specific actions through May 18, 2023.  The Motion to Extend Stay requests
extraordinary relief beyond the cases listed on Exhibit 1 to the Extension Order.

## I.     Introduction.

The Debtor seeks an extraordinary remedy to protect nondebtor affiliates and insiders without providing basic disclosures.  The Debtor requests a stay to protect third-party nondebtors, but the Debtor has not disclosed claims the estate has against these nondebtors or circumstances which may support direct claims of creditors against such nondebtors.  Further disclosure is required before the Court can consider the Debtor's request to extend the stay to third-party nondebtors.  While ADCRR believes a further temporary extension of the stay is appropriate during these early days of this case, it would be prejudicial to the litigants for the Court to issue an extended stay or channeling injunction without further disclosure.

The concerns around disclosure of potential claims against nondebtor affiliates and insiders is heightened given Debtor's bold attempts to shield such parties prior to filing its schedules and statements.  *See Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**DIP Motion**") [Docket No. 185]. The DIP Motion seeks releases for the proposed lender, which is an affiliate of the Debtor, along with such affiliate's officers, shareholders, directors. [1]  Further, the DIP Motion seeks a lien on the Debtor's avoidance actions, which is a common mechanism to gain control over claims against nondebtor affiliates and insiders.  At a minimum, any deadlines for objections to the Motion to Extend Stay should be extended until sixty days after the schedules and statements are filed in this case.

---

[1] The practical effect of the release provisions is that the debtor-in-possession has released the lender (a non-debtor) from claims that the DIP holds on behalf of all creditors.  This likely could not be achieved in a Chapter 11 plan.  *See, e.g.*, *In re Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009); *In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995).

**II.    Relevant Factual and Procedural Background.**

1.     The Debtor filed for bankruptcy on February 13, 2023.  *See Voluntary Petition for Tehum Care Services, Inc.* [Docket No. 1].

2.     Fifty-nine days into the case the Debtor still has not filed its schedules and statements.  A second emergency motion to extend the time for the Debtor to file schedules and statements is pending.  *See Debtor's Second Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief* [Docket No. 264].

3.     The actions against many non-debtor affiliates and insiders, likely including the potential DIP lender, were temporarily stayed by this Court through May 18, 2023.  *See* Extension Order, Docket No. 118; *see also* Mot. to Extend Stay, Docket No. 7.

4.     An evidentiary hearing to consider the relief requested in the Debtor's Motion to Extend Stay is scheduled for May 17, 2023 at 1:00 p.m. (Central Time).

5.     The Debtor filed the emergency DIP Motion on March 15, 2023.  *See* DIP Motion, Docket No. 185; *see also* Interim DIP Order, Docket No. 185-1.

6.     "[A]s part of the Divisional Merger, the Debtor was allocated $1 million in cash, as well as the right to draw on the $15 million Funding Agreement, $11 million of which was earmarked for the Debtor's creditors."  Decl. of Russell A. Perry at 5, ¶ 11, Docket No. 186.

7.     "Also as part of the Divisional Merger, CHS was created and allocated certain of the Debtor's former assets.  CHS was subsequently acquired by YesCare Corp." Mot. to Extend Stay, ¶ 17, Docket No. 7.

8.     The declaration in support of the Debtor's DIP Motion states: "As of the Petition Date, the Debtor had no cash on hand to fund its ongoing efforts to wind down its assets and liabilities or pay professionals to negotiate and propose a plan of liquidation.  The Debtor was not allocated any tangible real property under the Divisional

3

Merger, and, as of the Petition Date, though the Debtor was the beneficiary under the Funding Agreement, it does not appear that any additional amounts were available thereunder as of the Petition Date…"  Decl. of Russell A. Perry at 6, ¶ 14, Docket No. 186.  This statement is obliquely contradicted by a footnote which provides: "Along with counsel, Aukara is investigating and analyzing the Funding Agreement transactions to determine how much, if any, funding remains available thereunder."  *Id.* at n. 2.

9.      "The Debtor is actively winding down its business as it is no longer an operating entity with any active contracts or medical service providers."  *Id.* at 6, ¶ 13.

10.     The proposed lender under the DIP Motion, M2LoanCo, is an affiliate of the Debtor by common ownership.  *See id.* at 8, ¶ 18.

### III.    Statement of Position and Joinder.

The Capital Region Medical Center, The Curators of the University of Missouri ("**CRMC**"), suggests that YesCare Corp. and Corizon, LLC's directors executed a series of fraudulent transactions intended to thwart creditors and funnel assets to YesCare through an abuse of the Texas Business Organizations Code's Divisional Merger Statute.  *See Objection to Tehum Care Services, Inc.'s Emergency Motion to Extend and Enforce the Automatic Stay (Filed by Capital Region Medical Center, The Curators of the University of Missouri)* (the "**Missouri Objection**") [Docket No. 88, p. 3].  The Debtor acknowledges that certain of its assets were transferred to CHS and YesCare and that an obligation for the Debtor to indemnify nondebtor affiliates and insiders was newly created.  *See* Mot. to Extend Stay, ¶¶ 17-19, Docket No. 7.

The ADCRR shares the concerns stated by the CRMC that the Debtor's requested stay to protect third-party nondebtors may be an attempted misuse of the Chapter 11 process.  *See* Missouri Objection, Docket No. 88.  The ADCRR hereby joins in, incorporates by reference, and adopts as its own, the arguments and assertions made by the CRMC in their Objection.

Given CRMC's assertions against affiliates and insiders, the Court needs further disclosure before making a final determination to extend the stay. One would expect that further information regarding the extent of the indemnity claims, potential avoidable transfers against affiliates and claims against insiders would be provided in the statements and schedules. To the extent the Debtor refuses to recognize a viable cause of action against an affiliate or insider, an extended stay or channeling injunction protecting such nondebtor affiliates and insiders from direct suits by creditors may not be appropriate.

This case was filed fifty-nine days ago and still no schedules or statement of financial affairs has been filed. Debtor now requests until April 28, 2023 to complete these basic documents. *See Debtor's Second Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief Filed by Debtor Tehum Care Services, Inc*. [Docket No. 264]. We cannot be certain that this will be the Debtor's last request for an extension or that tardy amendments will not materially alter the disclosure. Any extension of the stay should be temporary.

## IV.    Notice of Reservation of Rights.

Please take further notice that neither this Statement of Position, any subsequent appearance (by pleading or otherwise), nor any participation in or in connection with this case is intended to waive (i) the right to have final orders in non-core matters entered only after de novo review by a District Court Judge, (ii) the right to trial by jury in any case, controversy, or proceeding, (iii) the right to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, and (iv) any other rights, claims, actions, defenses, setoffs or recoupments to which the ADCRR is, or may be entitled, under agreements, in law or in equity, are expressly reserved. ADCRR reserves the right to supplement its pleadings prior to any hearing on the Motion to Extend Stay.

**V.      Conclusion.**

For the reasons set forth above, the Court should extend the objection deadline to the Motion to Extend Stay until sixty days after the statements and schedules are filed in this case.  Further, the Court should provide only a temporary extension of the stay until a subsequent hearing is held on the Motion to Extend Stay, following expiration of the extended objection period.  ADCRR requests any further relief that the Court deems appropriate.

DATED this 12th day of April, 2023.

**OSBORN MALEDON, PA**

By:    /s/ Christopher C. Simpson
Warren J. Stapleton
Christopher C. Simpson
2929 North Central Avenue
Suite 2100
Phoenix, Arizona 85012
Telephone: 602.640.9000
Facsimile: 602.640.9050
Email: wstapleton@omlaw.com
Email: csimpson@omlaw.com

*Counsel to the Arizona Department of Corrections, Rehabilitation, and Reentry*

**Certificate of Service**

I hereby certify that on April 12th, 2023 I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Peggy Nieto

6

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TEHUM CARE SERVICES, INC. | § | CASE NO. 4:23-BK-90086 (CML) |
| | § | |
| | § | CHAPTER 11 |
| | § | |
| Debtor. | § | |
| | § | |

**ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION, AND
REENTRY'S LIMITED OBJECTION TO DEBTOR'S SECOND AMENDED
DISCLOSURE STATEMENT**

The Arizona Department of Corrections, Rehabilitation, and Reentry ("**ADCRR**"), by and through undersigned counsel, submits this Limited Objection (this "**Objection**") to the *Second Amended Disclosure Statement Regarding Debtor and Official Committee of Unsecured Creditors' Joint Chapter 11 Plan* (the "**Disclosure Statement**") [Docket No. 1071]. ADCRR believes that the Court should condition the approval of the Disclosure Statement upon the inclusion of certain information identified below.

**I.      Limited Objection.**

The most recent version of the Disclosure Statement resolves almost all of ADCRR's objections to the previous versions of the Disclosure Statement. The Debtor and the Committee have done a commendable job of responding to requests for additional information. They also have provided – for the first time – a complete description of the transactions that preceded the Debtor's bankruptcy filing. ADCRR's only remaining Disclosure Statement objection concerns the identity of the party (or parties) providing the money for the releases to be obtained under the Second Amended Plan. The Disclosure Statement indicates that the "Settlement Parties" will make the

payments.  Docket No. 1071, pp. 33 and 94 of 177. [1]  The Disclosure Statement, however, also makes clear that the estate has strong claims against certain Released Parties[2] – and it is unclear if these individuals and entities are Settlement Parties contributing money to the settlement payment.  *Compare* definitions for Settlement Parties (definition 105) with definition of Released Parties (definition 100) in the Second Amended Plan. *Id.* at p. 94.  Indeed, none of the Settlement Parties is an individual – although there are many individuals, such as Mr. Lefkowitz, listed as Released Parties.

ADCRR believes that the Court should not approve the Second Amended Disclosure Statement until the Debtor lists, by individual and entity, the contribution each Releasing Party is making to the estate.  *See, e.g., In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401–02 (Bankr. S.D. Tex. 2016) (citing *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)) (adequate information includes "financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan"). The provision of such information will assist the creditors and the

---

[1]  Unless otherwise noted all page references are to the electronically stamped page-number placed by the Court.

[2]  Releasing Parties are defined as: "(a) the Debtor; (b) Russell Perry, the Debtor's Chief Restructuring Officer; (c) the Committee and its members; (d) the Liquidation Trustee; (e) the Personal Injury Trustee; (f) the Settlement Parties; (g) M2 EquityCo LLC; (h) Valitás Intermediate Holdings Inc.; (i) Valitás Health Services, Inc.; (j) M2 PharmaCorr Equity Holdings LLC; (k) PharmaCorr/M2 LLC; (l) PharmaCorr Holdings LLC; (m) Endeavor Distribution LLC; (n) YesCare Holdings LLC; (o) Sigma RM, LLC; (p) DG Realty Management LLC; (q) Scaracor LLC; (r) Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; (s) Sara Ann Tirschwell; (t) Ayodeji Olawale Ladele; (u) Beverly Michelle Rice; (v) Jeffrey Scott King; (w) Jennifer Lynee Finger; (x) Frank Jeffrey Sholey; (y) for each Entity listed in (a) through (x), each of their respective current and former officers, directors, and managers; (z) for each Entity listed in (b) through (x), each of their respective current and former employees and agents; and (aa) for each Entity listed in (d) through (x), each of their respective attorneys and other professional advisors; provided, however, that James Gassenheimer, Charles Gassenheimer, James Hyman, and Michael Flacks shall not be a "Released Party." Docket No. 1071, p. 33.

2

Court in evaluating the propriety of the terms of the Plan – specifically, the propriety of the releases.

ADCRR also wants to draw to the Court's attention certain revelations contained in the Second Amended Disclosure Statement.  In substance, the Disclosure Statement describes a set of transactions that were engineered by the Debtor's owners with the goal of separating the assets of the core business – the prison healthcare assets – from hundreds of millions of dollars of tort claims held by prisoners.  *See* Docket No. 1071, pp. 22-24 of 186.  Incredibly, the Disclosure Statement reveals that the fairness opinion allegedly supporting the divisional merger (the "Two Step") was false.  *See id.* at p. 23.  The Disclosure Statement indicates, "the Committee believes the Estate could bring a claim that the Divisional Merger was an avoidable fraudulent transfer because it lacked an equivalent exchange of value."  *Id.* at p. 30.

It also indicates that M2 Loan Co., the Debtor's post-petition lender, received substantial money from the Debtor pre-petition – making it subject to avoidable transfers.  *Id.* at p. 29 (describing $24,538,155.19 of transfers by the Debtor to M2 Loan Co.).[3]  Very little of this information was disclosed to the Court or the creditors in the Debtor's schedules, its statement of financial affairs, or in connection with months of hearings on the approval of the DIP financing – which sought releases for many of the same parties that are now purporting to "settle" for $37 million. *See* Docket No. 185-1, pp. 32-33.  The fact that the Debtor had substantial avoidance claims against the post-petition lender should have been fairly disclosed in connection with the DIP motion practice – but it was not.[4]

---

[3]  There are additional transfers of $5.5 million to Geneva Consulting, LLC (another entity the Committee believes is owned by Perigrove 1018 (which owned the Debtor and M2 Loan Co.).  *See* Docket No. 1071, p. 20 (description of Geneva's ownership), p. 30 (description of transfers).

[4]  ADCRR does not believe that the Debtor's professionals were knowing accomplices to the Debtor's principals' misconduct.  But, as has already been revealed by other parties in

The Debtor's belated and begrudging confessions in the Second Amended Disclosure Statement certainly call into question the good faith of the Debtor's bankruptcy filing.  Indeed, it is apparent that Debtor's principals had no trouble misrepresenting (or failing to disclose) vital information to Debtor's counsel both before and after the bankruptcy filing.  This deceptive conduct, combined with the relatively modest settlement compared to the assets transferred in the Divisional Merger (especially given the very real and substantial injuries, including wrongful deaths, inflicted by the Debtor's predecessors), amount to an abuse of the bankruptcy process.

ADCRR has approached the bankruptcy with cautious optimism.  Ultimately, however, ADCRR is charged with protecting the welfare of its prison population.  In the wake of the revelations contained in the Second Amended Disclosure Statement, ADCRR doubts the sincerity of Debtor's (and the Settling Parties') motives for the bankruptcy filing.  The amounts being offered injured claimants is simply too small in relation to the substantial claims held by the estate against the Released Parties.  Thus, notwithstanding its "limited" objection to the Disclosure Statement, ADCRR anticipates that it will oppose the Second Amended Plan.[5]

## II.    Reservation of Rights.

Please take further notice that neither this Objection, any subsequent appearance (by pleading or otherwise), nor any participation in or in connection with this case is intended to waive (i) the right to have final orders in non-core matters entered only after de novo review by a District Court Judge, (ii) the right to trial by jury in any case, controversy, or proceeding, (iii) the right to have the reference withdrawn by the District

---

this case, the Debtor's principals have substantial bankruptcy experience and are very sophisticated parties.  *See, e.g.,* Docket No. 732 pp. 9-13.

[5]  ADCRR believes that the United States Trustee's Objection to the initial Disclosure Statement, Docket No. 1022, raises significant confirmation issues that have not been cured by the Second Amended Plan.  ADCRR joins in the UST's reservation of rights with regard to any Third Amended Disclosure Statement/Plan that may be filed after the Second Mediation.  *See* Docket No. 1154.

Court in any matter subject to mandatory or discretionary withdrawal, and (iv) any other rights, claims, actions, defenses, setoffs or recoupments to which the ADCRR is, or may be entitled, under agreements, in law or in equity, are expressly reserved.

**III.     Conclusion.**

For the foregoing reasons, ADCRR respectfully requests that the Court condition the approval of the Disclosure Statement upon the inclusion of the information sought above.  ADCRR requests any other relief that the Court deems appropriate.

DATED this 30th day of November 2023.

**OSBORN MALEDON, PA**

By:     /s/ Warren J. Stapleton
        Warren J. Stapleton
        Christopher C. Simpson
        2929 North Central Avenue
        Suite 2100
        Phoenix, Arizona 85012
        Telephone: 602.640.9000
        Facsimile: 602.640.9050
        Email: wstapleton@omlaw.com
        Email: csimpson@omlaw.com

        *Counsel for the Arizona Department of Corrections,*
        *Rehabilitation, and Reentry*

**Certificate of Service**

I hereby certify that on November 30, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

        /s/ Peggy Nieto

5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TEHUM CARE SERVICES, INC. | § | CASE NO. 4:23-BK-90086 (CML) |
| | § | |
| | § | CHAPTER 11 |
| | § | |
| Debtor. | § | |
| | § | |

**ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION, AND REENTRY'S STATEMENT OF POSITION ON DEBTOR'S THIRD REQUEST TO EXTEND EXCLUSIVITY**

The Arizona Department of Corrections, Rehabilitation, and Reentry ("**ADCRR**"), by and through undersigned counsel, files this Statement of Position on the Debtor's Third Request to Extend Exclusivity (the "Third Request"). *See* Docket No. 1244.

**I.     Statement of Position.**

ADCRR remains deeply concerned about the Debtor's motives for filing this bankruptcy case and the manner in which the Debtor's principals have approached their obligations under the Bankruptcy Code.  (It is important to note that this is targeted upon the Debtor, not Debtor's counsel.)  Further, ADCRR believes that the Debtor has had substantial time to formulate a plan.  That said, this case presents a host of complex challenges that provide the type of situation where exclusivity is routinely extended.  As explained in more detail below, ADCRR believes that the Court should grant the Debtor's Third Request – but that it should be the last such extension granted by the Court and the Court should track approval of the Global Settlement in conjunction with approval of the future plan.

The primary driver of ADCRR's position in the unique procedural posture of this matter.  At this juncture, the Court has before it a motion to approve a 'Global Settlement,' the "Settlement Motion" [Docket No. 1259] that has terms that contemplate

1

payments and releases of the settling parties only upon confirmation of a "to be filed" plan.  *See* Docket No. 1259, p. 3, ¶ 6 and pp. 20-21, ¶¶ 53(a) through (e).  Indeed, the lion's share of the $45 million of actual cash being paid into the estate is the $40 million be paid "upon the Plan Effective Date."  *See* Docket No. 1259, (Settlement) p. 39, ¶ 4(e). Thus, the Settlement Motion states, "If this Motion is granted, the Movants will file an amended joint plan incorporating the terms outlined herein and providing a structure for creditors to access the funds the Global Settlement provides for the Estate."  *Id.* at p. 3, ¶ 6.

This unique structure is caused, in part, by the fact that some of the releases to be granted under the settlement can only be approved in the context of the plan (and possibly not even then).  Specifically, those releases are those claims held by creditors of the estate (as opposed to those claims, such as avoidance actions, that clearly belong to the estate).  *See id.*, pp. 20-21, ¶¶ 53(a) through (e).  In other words, Court-approval of the settlement does not mandate payments or releases – which will only come upon the confirmation of the Debtor's yet to be filed, Third Amended Plan.

The timing of this process is likely not beneficial to the parties in this Chapter 11. As the Court is well aware, the hallmark of successful Chapter 11 is a consensual – or at least consensus based – plan of reorganization.  Here, the timing of the approval of the settlement, with a subsequent to-be-filed plan, creates a problem.  If the Court approves the Settlement, the Debtors and Committee will have tied their own hands with respect to pursuing avoidance actions (and other claims that could be brought against the settling parties) before the conclusion of negotiations for their final plan.  This disincentivizes and the Debtor and the Committee (and perhaps the Settling Parties) from further negotiations with other creditors.  Extending exclusivity without an opportunity for additional bargaining between the parties makes little sense.  And ADCRR would not support the extension of exclusivity if it did not believe that Debtor's counsel was willing to continue to negotiate in good faith.

2

The timing problem set forth above is easily solved by hearing the Debtor's to-be-filed plan and the Settlement Motion together.  This way, everything remains on the table for bargaining purposes, and the parties have one last opportunity to reach a true consensus.  Originally, the Debtors and the Committee approached this problem in this format – they sought approval of the settlement in connection with the Second Amended Plan.  They should follow this approach again.

Finally, the Court is likely also aware of the Tort Claimants' Committee's Motion to Dismiss.  To the extent that the Court grants the third motion to extend exclusivity, ADCRR also believes that it is appropriate to run the plan, the Settlement Motion, and the Motion to Dismiss together.  Such a procedure provides the Court and the parties with the best view of possible outcomes while simultaneously providing the best forum for negotiations.

DATED this 29th day of January 2024.

**OSBORN MALEDON, PA**

By:     /s/ Warren J. Stapleton
        Warren J. Stapleton
        Christopher C. Simpson
        2929 North Central Avenue
        Suite 2100
        Phoenix, Arizona 85012
        Telephone: 602.640.9000
        Facsimile: 602.640.9050
        Email: wstapleton@omlaw.com
        Email: csimpson@omlaw.com

        *Counsel for the Arizona Department of Corrections, Rehabilitation, and Reentry*

### Certificate of Service

I hereby certify that on January 29, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Peggy Nieto

3

Docket #1365  Date Filed: 02/22/2024

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TEHUM CARE SERVICES, INC. | § | CASE NO. 4:23-BK-90086 (CML) |
| | § | |
| | § | CHAPTER 11 |
| | § | |
| Debtor. | § | |
| _____ | § | |

**ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION, AND REENTRY'S MOTION TO DISMISS AND JOINDER IN THE TORT CLAIMANT COMMITTEE'S MOTION TO DISMISS**

The Arizona Department of Corrections, Rehabilitation, and Reentry ("**ADCRR**"), by and through undersigned counsel, files its Motion to Dismiss and Joinder in the Tort Claimants Creditors Committee (the "TCC") Motion to Dismiss.  Dkt # 1260.  ADCRR writes separately to focus on the Debtor's motives in this Chapter 11 liquidation case.[1]

**I.      Introduction.**

Safeguarding the public interest in the bankruptcy process is at the root of the Court's ability to dismiss bankruptcies filed in bad faith.  *See In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986).  Bankruptcy courts dismiss bankruptcies filed in bad faith to protect "the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons . . . available only to those debtors and creditors with 'clean hands.'"  *Id.*   In this case, there are powerful public interests at stake – personal injury tort claimants from multiple states' prison systems have filed approximately $775

---

[1]   ADCRR's motion is somewhat substantively different than the TCC's Motion to Dismiss but does not raise any "new" material.  ADCRR does not intend to prosecute it separately from the Court's resolution of the TCC's Motion to Dismiss.  In other words, it can proceed on the same discovery and trial schedule already set forth by the Court – as would be the case with any joinder.

million in claims, *see* Dkt # 1071, p. 35 of 177[2]; and the public is interested – this case has drawn substantial media attention as well as the attention of the United States Senate. *See* Exhibit A, October 27, 2023, letter from United States Senators to the Debtors seeking information attached hereto.

The extraordinary public scrutiny is warranted in this instance because it is plain from the Debtor's own filings that the Debtor filed bankruptcy to obtain an inequitable tactical advantage over its creditors and to achieve purposes improper under the Bankruptcy Code. Those improper purposes included: (A) Preserving the future value of Corizon's[3] prisoner health care business for old equity (who appear to control YesCare and the "asset side" ongoing business) – without providing amounts required by Section 1129(a)(7) and 1129(b)(2); (B) protecting the individuals who plundered the Debtor from accountability through the obtaining of releases for non-debtor third parties; and (C) avoiding financial responsibility arising from Corizon's tortious misconduct. These objectives were evident in the Debtor's initial DIP Motion, the Debtor's immediate request for a broad stay of litigation against the Debtor and non-debtors affiliated with the Debtor, and the Debtor's original, first, and second amended plans. Indeed, what these filings have in common is each is designed to achieve one of the Debtor's illegitimate goals.

Allowing this Debtor – who has so transparently signaled its odious objectives – to continue in bankruptcy would sacrifice financial and moral accountability for hundreds of tort claims (including mutilation and wrongful deaths) to the profit motives of a small

---

[2]  Unless otherwise noted, all page references are to the electronically file-stamped page number (as opposed to the document's internal pagination).

[3]  Corizon Health Care and its affiliates were the Debtor's predecessors in interest. All of the Corizon entities were merged into two Texas entities, Tehum – the Debtor, and CHS-TX – the asset side entity acquired by YesCare, Inc. ADCRR uses Corizon when referring to the Debtor's pre-petition business.

group of individuals.[4]  The Court should not permit such an abuse of the bankruptcy process.

## II.    Legal Standard.

"Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071 (5th Cir. 1986).  Judge Edith Jones, writing for the Fifth Circuit in the *Little Creek* decision, explained that the "bankruptcy court's responsibility to enforce a standard of good faith" had been "aptly summarized" by earlier Supreme Court decisions, which stated:

> "A court of equity may in its discretion in the exercise of the jurisdiction committed to it grant or deny relief upon performance of a condition which will safeguard the public interest." . . . These principles are a part of the control which the court has over the whole process of formulation and approval of plans of composition or reorganization. . . .

*Id.* at 1072 (quoting *American United Mut. Life Ins. Co. v. City of Avon Park,* 311 U.S. 138, 145, 61 S.Ct. 157, 161-62, 85 L.Ed. 91 (1940) (quoting *SEC v. United States Realty Improvement Co.,* 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1239 (1940))).  The requirement of good faith, "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes." *Little Creek*, 779 F.2d at 1072.  Further, the good faith standard is necessary to protect "the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons . . . available only to those debtors and creditors with 'clean hands.'" *Id.*

---

[4]   At the outset, and as set forth in more detail below, ADCRR wants to make clear that nothing in this joinder suggests that counsel for the Debtor, or counsel for the Committee, or the Debtor's CRO are in any way complicit in the Debtor's misconduct.  In these instances, they are essentially "trapped" by the Debtor's actions and the information it has supplied.

"Determining whether a filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and local financial realities." *In re Nat. Rifle Ass'n of America*, 628 B.R. 262, 280 (Bankr. N. D. Tex. 2021) (quoting Little Creek, 779 F.2d at 1072).  Other circuits have described this test as a "totality of the circumstances" test.  *See, e.g., In re 15375 Mem'l Corp.*, 589 F.3d 605, 618 n.7 (3d Cir. 2009); *In re Trident Assocs. Ltd. P'ship*, 52 F.3d 127, 130-31 (6th Cir. 1995).  The focus is on the debtor's motive and whether that motive is consonant with the objectives of the Bankruptcy Code.  *See Nat. Rifle Ass'n*, 628 B.R. at 280 ("two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose and (2) whether the petition is filed merely to obtain a tactical litigation advantage.")

## II.    The Debtor sought bankruptcy protection to obtain an unfair tactical litigation advantage.

There can be little doubt that the Debtor utilized the bankruptcy case to obtain a tactical litigation advantage.  In early February 2023, a Missouri state court signaled to the CHS TX-Inc. ("CHS TX"), and YesCare Corp. ("YesCare") (the "asset-side" of the divisional merger that created the Debtor) that the court was likely to grant a preliminary injunction freezing the assets of the CHS-TX and YesCare.  *See* Dkt #88, pp. 4-6.  It is important to note that the Plaintiffs in that case did ***not*** seek an injunction against the Debtor.  *See id.* at p. 4.  Nevertheless, to prevent the freezing of YesCare/CHS-TX's assets, the Debtor (only) filed a bankruptcy petition and immediately sought to enforce the stay – for itself and non-debtors CHS-TX and YesCare.  This Court granted that motion on March 3, 2023.[5]  *See* Dkt #118.

---

[5]    Subsequently, the Debtor filed an adversary proceeding to provide a more appropriate procedural posture for the application of the stay to non-debtors.  The Court granted the Section 105 litigation stay sought in that adversary on May 18, 2023.  *See* Adversary Case No. 23-3049, Dkt # 43.

As the Court and the parties would subsequently learn, Debtor's owners are likely coextensive with the owners of CHS-TX/YesCare.  *See infra* below at p. 13.  Those owners chose not to file bankruptcy for YesCare – likely due to the fact that such a filing would have reduced or eliminated the benefit of the divisional merger.  In any case, the Debtor utilized the automatic stay to stop the Missouri litigation as well as numerous tort claimant creditor lawsuits across the country.

### III.    The Debtor filed a liquidating Chapter 11 to retain control over the claims of creditors.

As the Court is aware, this case is not a reorganization – it is a liquidation.  Given the May 5, 2022 divisional merger (the "Divisional Merger"), which left Tehum[6] with $1 million and the right to borrow up to $15 million (and virtually nothing else except hundreds of millions of dollars of liabilities), one might reasonably ask why file a Chapter 11?  The answer is control.

If Tehum had simply filed Chapter 7 to escape the Missouri state court proceeding, a Chapter 7 Trustee (and his or her counsel) would have independently investigated the preferences, avoidable transfers, and potential causes of action available to the Debtor.  As explained in the Debtor's own Second Amended Disclosure Statement, those actions included at least $30 million of exposure for the Debtor's insiders.  *See* Dkt #1073-1, pp. 32-34.  Further, a Chapter 7 Trustee would likely not have assiduously sought to stay litigation against non-debtors.  Control of the bankruptcy process provided the ability to obtain the benefits of a stay and retained the negotiation of causes of action to parties that the Debtor's ownership could fire (such as Debtor's counsel or Ankura (the CRO)).[7]

---

[6]   As the Court knows, the asset side of the divisional merger – CHS-TX/YesCare received virtually all of the assets of the Corizon entities and its ongoing contracts, personnel, equipment, etc.  *See* Dkt # 63-1, p. 3, ¶ 3, and pp. 13-22 (Schedule 3.01(a)).

[7]   It is unclear whether the Debtor retains the ability to fire Ankura.  Although the Employment Agreement was supposed to be attached to the proposed order on Ankura's employment application – it was not.  See Dkt # 188.  Nor was it attached to the final

Thus, this "liquidating" Chapter 11 not only frees Debtor's owners and YesCare from the cost and expense of litigating hundreds of tort claims brought by prisoners who have been injured by Corizon's substandard medical care; they also escape bargaining with a truly independent party (like a Chapter 7 Trustee) over their substantial fraudulent transfer and successor liability exposure.

Additionally, by combining a divisional merger with a liquidating Chapter 11 for the "liability-side" entity, the Debtor and YesCare could try and have their cake and eat it too.  If Corizon had sought Chapter 11 protection without the Divisional Merger, the asset-side (CHS-TX/YesCare) and the liability-side (Tehum) would have remained one entity that continued operation as a going concern.  In the current scenario, "old" equity will retain the going concern value of YesCare free of the claims of Corizon's (Tehum's) creditors, that is, free of the requirement to either (a) satisfy the absolute priority rule under 11 U.S.C. § 1129(b)(2)(B), or (b) contribute the "new value's" worth of the reorganized entity that would have exited bankruptcy under a consolidated approach.  *See Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) (new value corollary could not be satisfied when old equity retains exclusive right to contribute new value without market test of that value); *In re Greystone III Joint Venture*, 995 F.2d 1274, 1281-84 (5th Cir. 1992) (*en banc*) (panel decision called into question new value corollary but *en banc* rehearing decision withdrew that portion of the opinion).

The Divisional Merger allows the Debtor's owners to avoid paying the absolute priority/new value cost of a traditional Chapter 11 for the consolidated entity.  The liquidating Chapter 11 of the liability-side entity allows Debtor's owners to retain control and settle with *themselves*, while simultaneously obtaining (or attempting to obtain) third-

---

order.  Dkt #340.  Nor, to undersigned counsel's knowledge, did it appear as an exhibit when Mr. Perry filed his first day and employment application declarations.

party releases only available in a Chapter 11.[8]  Viewed in isolation, each link in this chain might appear to be aimed at a lawful objective, but taken together this structural combination evinces an effort to enrich Corizon's/Tehum's old equity at the expense of the creditors.  Further proof of that effort can be found in the Debtor's post-petition concealment of financial information and the relationships between the Debtor, the DIP lender, and the released parties.

### IV.   The Debtor seeks impermissible non-debtor releases in connection with the DIP Motion and conceals fraudulent transfers.

Through its DIP Motion, the Debtor sought to borrow approximately $10,000,000 from M2 Loan Co and certain unidentified "DIP Lenders,"[9] lenders at 12% interest (maturing in September 2023).  *See* Dkt #185, pp. 7-9.  In exchange, the DIP Lenders sought certain extraordinary protections.  These included: (1) a senior super-priority lien position on all of the Debtor's assets – including its Chapter 5 avoidance actions, *see* Dkt #185-1, pp. 16-17 of 98; (2) no surcharge or equities of the case challenges to the DIP Lenders liens under Sections 506 or 552(b), *id.* at p. 24; (3) the requirement that the Debtor meet certain case milestones that effectively gave the DIP Lenders the right to control the shape and timing of the Debtor's plan, *id.* at pp. 29-31; (4) the ability to pay all DIP Lender expenses without Court or UST approval, *id.* at pp. 31-32; and (5) releases of all DIP Lenders for "(A) any and all claims and causes of action arising under the Bankruptcy Code, (B) the divisional merger between the Debtor and CHS TX, Inc. dated

---

[8]  It is not clear that such releases are available under applicable Fifth Circuit law.  *See, e.g., In re Pacific Lumber Co.,* 584 F.3d 229, 252 (5th Cir. 2009); *In re Zale Corp.,* 62 F.3d 746, 760 (5th Cir. 1995).  Moreover, even if the Supreme Court affirms the Second Circuit in *Purdue Pharma*, it is highly likely that this Debtor could not muster the "overwhelming acceptance" of the creditors affected by the releases that the Second Circuit required to support its decision.  *See in re Purdue Pharma,* 69 F.4th 45, 78-79 (2d Cir. 2023).

[9]  The DIP Motion identified the DIP Lenders as "M2 LoanCo, LLC, as Administrative Agent, *and any additional lenders from time to time that become party to the Loan Documents*."  Dkt #185, p. 7 (emphasis added); *see also* the definition of "Majority Lenders" in the Credit Agreement, Dkt # 185-1, p. 51 of 98.

effective as of May 5, 2022 and/or the transactions contemplated thereunder (the "Divisional Merger"), and (C) that certain Funding Agreement dated May 5, 2022 by and between the Debtor as payee and M2 LoanCo, LLC as payor." *Id.* at pp. 32-33.

The releases to be granted purported to bind the Debtor, all other parties-in-interest, the Committee "and any other statutory or non-statutory committees appointed or formed in the Chapter 11 Case and any other person or entity acting or seeking to act on behalf of the Debtor's estate, including any chapter 7 or Chapter 11 trustee or examiner appointed or elected for the Debtor, in all circumstances and for all purposes . . . ." *Id.* at pp. 33-34. The only exception to these extraordinary releases was a very short window for either the Debtor or the Committee to file a challenge to the granting of such a release. *See id.* at p. 34 of 98.

Consistent with their fiduciary obligations, the Debtor's CRO and Debtor's counsel disclosed that M2 Loan Co was an insider "by common ownership" with the Debtor. *See* Dkt #185, p. 18-19 of 30. What was not disclosed, almost certainly because Debtor's professionals did not know about it, was the following information: M2 Loan Co. had taken $24,538,155.19 from the Debtor between 12/29/2021 and 11/14/2022. Dkt #1073-1, pp. 32-33 of 186. Other entities with ownership common to M2 Loan Co and the Debtor had taken an additional $5.5 million (Geneva Consulting, LLC), *id.* at p. 33 of 186; and $956,707.08 (Amerisource Bergen), *id.* at p. 34 of 186. This information comes from the Debtor's own Second Amended Disclosure Statement.

Without disclosing these obviously material facts, M2 Loan Co (and the Debtor's owners) sought to exchange $10 million for liens over the Debtor's avoidance actions and releases for any pre-petition claims including those related to the Divisional Merger. This would have bought the DIP Lenders/insiders protection from at least $30 million in potential fraudulent transfer actions. In addition, it would have ended their exposure for any liability resulting from the Divisional Merger. At the time of the DIP Motion, the Committee stated that "YesCare is estimated to have over $173 million in assets that are

8

encumbered by less than $98 million in long-term secured debt." Dkt # 224, p. 5 of 16; *see also* Dkt #75, Exh. 3, p. 604 of 627 ("Based on recently produced financials, YesCare and CHS TX have over $173 million in assets.")  In the Second Amended Disclosure Statement, the Committee indicated that the $98 million lien position was acquired for "pennies on the dollar using, in part, Corizon's existing funds"[10] and that the M2 Loan Co $98 million prepetition loan should be "canceled and/or converted to equity by the actions, transactions, course of dealing, tax filings, and statements of the Debtor."  Dkt #1073-1, p. 21 of 186.

The Debtor's (and M2 Loan Co's) failure to disclose these transactions is breathtaking given the releases being sought.  This single act of malfeasance would have eliminated virtually all of the liability now being settled for approximately $50 million (and without requiring repayment of the original $10 million DIP loan).  If the Debtor and M2 Loan Co had obtained the relief they sought in the original DIP Motion, the bargaining power of the parties in the case would have been irretrievably altered in favor of the Debtor's owners.  By itself, this one nondisclosure – which could have cost the estate $50 million – warrants dismissal of the case.

Fortunately, a combination of vocal creditor opposition and the Court's own instincts avoided the granting of the releases and liens over the avoidance actions.  But the fact is that the Debtor sought these releases and the other overreaching relief, on an emergency basis, without disclosing that the proposed DIP Lender(s) had potential fraudulent transfer/avoidance liability of $30 million.  Certainly, the Debtor cannot take refuge in a lack of sophistication.  Other parties have documented the Debtor's principal's (Mr. Lefkowitz) substantial familiarity with the bankruptcy process.  *See, e.g.,*

---

[10]   The party that originally acquired these lien positions was the Flacks Group, Perigrove 1018, LLC's predecessor-in-interest.  Perigrove paid only a "nominal" amount for these lien positions and the purchase of the entire family of companies under the M2 Hold Co umbrella, which included M2 Equity, M2 Loan Co, Valitas Intermediate Holdings, Inc., and the Corizon entities.  *See* Dkt # 1073-1, pp. 21-22 of 186.

Dkt # 332, pp. 9-13, ¶¶ 9-20, pp. 19-21, ¶¶ 33-37.  Moreover, and notwithstanding the Debtor's disclosures in the Second Amended Disclosure Statement, the pre-petition insider transactions with M2 Loan Co, Geneva Consulting, and Amerisource Bergen, have never appeared on the Debtor's schedules or amended schedules.  This is not an accident.[11]

The relief sought in the DIP Motion confirms that Debtor's owners were focused on retaining effective control over the causes of action that could be brought against themselves or their affiliated entities.  The DIP Motion also shows that the Debtor's owners are unwilling to provide the information necessary for a fair dialogue between themselves and the creditors.  The Chapter 11 process relies upon accurate, timely, and truthful disclosures in exchange for the extraordinary relief that it provides.  That process cannot work when a Debtor is willing to lie to the Court, the creditors, and its own counsel.

**V.     The Debtor's Second Amended Disclosure Statement and Plan demonstrate that the Debtor has actively misled the Court and the creditors, and has no intention of fulfilling its obligations under Section 1129(a)(7) or 1129(b)(2).**

In August 2023, the Debtor – along with the Committee – reached an agreement with M2 Loan Co, Mr. Lefkowitz, YesCare, Inc. ("YesCare"), CHS TX, Inc. ("CHS-TX"), Perigrove 1018, LLC ("Perigrove"), Sarah Tirschwell ("Tirschwell") and a small host of related individuals and entities involved in the Divisional Merger.  It is unclear from the records available to ADCRR whether the Committee had completed its full investigation of the Debtor's transactions with these parties prior to the settlement mediation.  What is certain is that the Debtor had not disclosed the insider payments outlined above on any of its filed schedules and statements.  Nor had the Debtor fully

---

[11]   ADCRR is not accusing Debtor's counsel, the CRO, or the Committee of any participation in the Debtor's failures to disclose.  As noted above, Mr. Lefkowtiz, the Debtor's principal, is sophisticated and well aware of his fiduciary responsibilities in Chapter 11.

disclosed the various connections between the Debtor's ownership and the parties
seeking releases under the settlement.  Finally, the Debtor has never indicated what it
believes was the value of the asset-side of the Divisional Merger (i.e., the value of CHS-
TX/YesCare).  This omission persisted despite having provided the YesCare financials to
the Plaintiffs in the Missouri case that spawned this bankruptcy – which revealed assets
of $173 million.  *See* Dkt #75, Exh. 3, p. 604 of 627 and n.59.

Up until that point, all that the Debtor had provided to its creditors (other than the
Committee which was doing discovery) was inaccurate schedules and statements, and a
declaration from Mr. Perry (the CRO) which described the Divisional Merger as follows:

> To ensure that a divisional merger was a viable and fair path forward, on
> February 8, 2022, the Debtor engaged independent financial firm, FTI
> Capital Advisors, LLC ("FTI"), to render a fairness opinion on the
> proposed divisional merger. FTI conducted widescale due diligence,
> including a review and analysis of the Debtor's financial history and
> contingent liabilities. Ultimately, the conclusion was reached that the
> proposed divisional merger provided the Debtor's unsecured creditors with
> access to equal or greater value than not completing the merger, supported
> by, among other things, the availability of $15,000,000 from M2 LoanCo,
> LLC ("LoanCo") pursuant to a funding agreement (the "Funding
> Agreement"). FTI confirmed the fairness of the divisional merger in a May
> 1, 2022, fairness opinion sent to the Debtor's board of directors.

Dkt # 186, p. 4 of 12.  This statement was false.  Indeed, the Second Amended Disclosure
Statement repudiates this statement:

> The global financial advisory firm engaged to provide a fairness opinion as
> to the transaction determined, based on the information provided to it, that
> the division of assets and liabilities was fair and equitable to the Debtor's
> creditors. This fairness opinion appears to have been based largely on two
> components of the company's financials: (1) the existence of $22.3 million
> of cash in the Debtor's operating accounts, to which it was assumed the
> Debtor would have access; and (2) a purported debt obligation owed to M2
> LoanCo by all the Corizon entities of almost $100 million, which liability
> was presumed to be transferred to, and assumed by, YesCare.
>
> The Debtor and the Committee believe that neither of the assumptions
> made by the financial advisory firm in the opinion were accurate. The
> Committee also believes there are many other issues with the fairness

11

> opinion that render it fatally defective, such as the treatment of the
> purported debt obligation to M2 LoanCo discussed in detail above.

*See* Dkt # 1073-1, p. 27 of 186.  The Court should be repulsed by the Debtor's attempt to utilize a false fairness opinion to bolster its argument that the Divisional Merger was "by the book" operation under Texas statutory law.  Or any argument that a divisional merger obtained from the Debtor's board which was based on false information could not amount to a fraudulent transfer.

More troubling is why this information was not disclosed until the ***second*** amended disclosure statement.  It was not shared with the original plan and disclosure statement filed on September 29, 2023 (Dkt #984 and 985), nor with the First Amended Plan and Disclosure Statement filed on October 16-17, 2023.  Recall that the Debtor had received a chorus of complaints about the initial disclosures – including a very muscular objection from the United States Trustee's office – prior to filing the First Amended Disclosure Statement.  *See* Dkt #s 1022 (UST Objection), 1042 (First Amended Disclosure Statement), 1043 (First Amended Plan).  Yet Debtor only disclosed the false fairness opinion in the Second Amended Plan on October 27, 2023.  The same is true of the transactions outlined above regarding M2 Loan Co and Geneva Consulting – which also do not receive a full accounting until the Second Amended Disclosure Statement. *See* Dkt #1073-1 (redline of the Second Amended Disclosure statement which reveals the differences between the First and Second Amended Disclosure Statements).

What had happened between October 17, 2023 and October 27, 2023?  On October 24, 2023, the Debtor's principal received a letter from members of the United States Senate asking for numerous documents related to this bankruptcy case.  *See* letter attached hereto as Exhibit A.  In that letter the Senators indicated:

> Reporting suggests that the largely unknown investors and associates that
> spearheaded the Texas Two-Step have engaged in questionable and unjust
> tactics, such as: (1) stonewalling during meetings with creditors; (2)
> diverting millions of Corizon dollars to other companies that the investors
> personally owned or were associated with, likely limiting funds available

for victims; and (3) failing to substantively notify incarcerated individuals,
along with agencies that contracted with Corizon, of the divisional merger
or the bankruptcy filing.

Exhibit A, p. 4.  In connection with their letter, the Senators sought nine categories of

additional information about the Debtor's bankruptcy.  *See id.* at pp. 5-6.  Congressional

attention apparently motivated Mr. Lefkowitz to revisit his previous reticence to share the

details of his entities' transactions with the Debtor in the Second Amended Disclosure

Statement.  Indeed, ADCRR invites the Court to review the Second Amended Disclosure

Statement redline to see the substantial correlation between the Senate's information

requests (Exh. A, pp. 5-6) and the Debtor's sudden interest in disclosure.  Dkt #1073-1.

Both examples, the hiding of fraudulent transfer liability and the attempt to prove

that the Divisional Merger was fair by producing a false fairness opinion, go to the

essence of the Debtor's fiduciary duties.  And, they have cost the estates hundreds of

thousands of dollars in professional fees including, at minimum, the costs for the

investigation and discovery squabbles engaged in by the Committee (documented at

Schedule Five of the Second Amended Disclosure Statement).  *See* Dkt #1073-1, pp. 31-

32 and 86-87 of 186.  This needless effort and expense is precisely why the rules require

truthful and accurate disclosures up front.

Incredibly, despite the Committee's investigation, the UST's interest in the case,

and Congressional attention, there remain substantial questions about who owns entities

that are getting released under the proposed settlement (and eventually the Third

Amended Plan).  For example,

- YesCare Corp. -- "On information and belief, YesCare Holdings LLC holds equity
  in CHS TX Inc., d/b/a YeaCare Corp." Dkt #1073-1, p. 84 of 186.  There is no
  description of who owns YesCare Holdings – although the suggestion is that it is
  owned by Perigrove.  *See* Dkt 1073-1, p. 31 of 186 (describing Perigrove 1018,
  Geneva Consulting, M2 Loan Co. and YesCare as "Perigrove-related companies
  parties.")

- Perigrove 1018, LLC -- "Perigrove 1018 is a private equity fund owned by several individuals none of whom own more than 10% of the company." *Id.* These individuals are not identified.

According to the Second Amended Disclosure Statement, Perigrove 1018 owns M2 Hold Co which in turn owned all of the Corizon entities prior to the Divisional Merger. *See* Dkt #1073-1 p. 23 of 186. Nevertheless, neither the creditors nor the Court know who, i.e., the names of the individuals, that they are releasing when it comes to Perigrove or YesCare.[12]

Nor has the Debtor disclosed the value of the assets transferred to CHS TX/YesCare or the current value of YesCare. This was information also sought by the Senators because it is critical to understanding the value of fraudulent transfer actions related to the Divisional Merger or any successor liability action that might be brought against YesCare. *See* Exh. A, pp. 5-6. Undoubtedly, the Debtor's transfer of the assets to CHS TX within the year prior to the bankruptcy filing should have been disclosed on the Debtor's Statement of Financial Affairs ("SOFA") in answer to question 4. A year after the petition, this question remains unanswered. *See* Dkt # 482, pp. 16, 37-38 of 53; Dkt #811, pp. 6-7, 208 of 225. Without some quantification of this figure how could the creditors or the Court understand if the Debtor's plan provided creditors with the liquidation value of the Debtor's assets?

The omission of this information is all the more mysterious given the pre-petition public disclosure that YesCare's financial statements showed $173 million in assets. *See* Dkt #75, Exh. 3, p. 604 of 627 and n.59. Debtor could have easily answered the SOFA and responded to questions about the value it gave for the answer. Instead, no answer has been provided, a false fairness opinion has been used to support the Divisional Merger, and no disclosure of $30 million in fraudulent transfers was made until the United States Senate intervened. ADCRR can only conclude that the Debtor has no interest in

---

[12] At this stage of the case, it is startling that the ultimate owners of YesCare and the parties seeking to be released under the Plan have not been disclosed.

satisfying its obligations under the Bankruptcy Code, i.e., to provide at least what unsecured creditors would receive in a liquidation of the Debtor's assets (which include the Debtor's causes of action related to the Divisional Merger and the fraudulent transfers).  *See* 11 U.S.C. §§ 1129(a)(7) and (b)(2).

Doubtless Debtor's counsel and Committee counsel will take issue with many of the points raised by ADCRR.  To be clear, ADCRR does not suggest that counsel for the Debtor or the Committee are in any way complicit with the Debtor's misconduct.  Indeed, in many ways, they are additional victims in this Machiavellian tragedy.  Throughout the process the Debtor and the Committee have had to rely upon the statements (and misstatements) of the Debtor.  They will assure the Court that ***now*** the Debtor should be trusted.  But the Court should not do so for at least four reasons.  First, the Court cannot sensibly trust the statement of a party that has already concealed material facts and actively misled the parties.  Second, the Committee's own investigation revealed these misdeeds – providing the proof that the Debtor intended to use the bankruptcy for an improper purpose.  The Court cannot unsee what has already happened.  Third, a year into this case it is simply too late to rehabilitate this Debtor.  The Debtor's concealment and falsehoods will follow it into confirmation and the appellate process.  The Court cannot be certain that even a "good deal" would hold up in these circumstances.  To be sure that is not the fault of the Court, or counsel for the Debtor, or counsel for the Committee – who have worked assiduously in a difficult environment.  But Mr. Lefkowitz has been down this road before and he knew the rules of the road.  *See, e.g.,* Dkt # 332, pp. 9-13, ¶¶ 9-20, pp. 19-21, ¶¶ 33-37 (Mr. Lefkowitz had been involved in a bankruptcy case dismissed for bad faith filing before).  Finally, the Court should not attempt to balance the scales of justice to help this Debtor where on the other side of the scales are hundreds of prisoners seriously injured or even dead as a result of the Debtor's negligence.  Justice may be blind, but Equity needs to peek to do her job correctly.

In short, the Court should dismiss the Debtor's bankruptcy because the Debtor is not proceeding in good faith.  Taken together, the Debtor's pre-petition Divisional Merger, the attempt to retain control over the liquidation process, the attempt to obtain releases for non-parties that have ownership co-extensive with the ownership of the Debtor, and the Debtor's unwillingness to provide basic information required by every other debtor that appears before this Court can only be understood as a desire to evade the fiduciary responsibilities imposed by the Bankruptcy Code.  Debtor's shocking violations of candor, and its failure to correct the record with regard to previous misstatements, provide further evidence of bad faith.  This Debtor only complies with the law when it suits the Debtor, or when an investigation establishes that the Debtor has provided incomplete or untruthful information.  Such a Debtor should not be permitted the extraordinary relief reserved for the honest and unfortunate.

As noted at the outset, the Court polices bad faith filings because it is not in the public's interest to see the powerful equitable tools of bankruptcy utilized for an improper purpose.  The Court has abundant evidence – in the form of admissions contained in the Second Amended Disclosure Statement – that establish Debtor's improper objectives and methods.  The Court should dismiss this case.

DATED this 22nd day of February 2024.

**OSBORN MALEDON, PA**

By:   /s/ Warren J. Stapleton
        Warren J. Stapleton
        Christopher C. Simpson
        2929 North Central Avenue
        Suite 2100
        Phoenix, Arizona 85012
        Telephone: 602.640.9000
        Facsimile: 602.640.9050
        Email: wstapleton@omlaw.com
        Email: csimpson@omlaw.com

        *Counsel for the Arizona Department of Corrections, Rehabilitation, and Reentry*

16

**<u>Certificate of Service</u>**

I hereby certify that on February 22, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas to all parties authorized to receive electronic notice in this case.

/s/ Peggy Nieto

# EXHIBIT A

# United States Senate

WASHINGTON, DC 20510

October 24, 2023

Jeffrey Sholey                          Yitzchok Lefkowitz, a/k/a Isaac Lefkowitz
Chief Executive Officer                 Sole Director
YesCare Corporation                     Tehum Care Services, Inc.
205 Powell Place, Suite 104             205 Powell Place, Suite 104
Brentwood, TN 37027                     Brentwood, TN 37027

Dear Mr. Sholey and Mr. Lefkowitz:

We are writing to strongly object to the attempt by Corizon Health, Inc. — and related companies, Tehum Care Services, Inc. and YesCare Corporation (together, "Corizon") — to manipulate bankruptcy law with the aim of skirting accountability for the harms that incarcerated individuals have endured under Corizon's care. We urge you to use the full financial capabilities of YesCare, Tehum, and any other entities as appropriate, to provide full relief for meritorious claims against Corizon by all incarcerated people, their families, former employees, and third-party medical providers — notwithstanding your attempts to circumvent these claims through the bankruptcy process. Moreover, we urge you to ensure that the numerous creditors with unfulfilled claims against Corizon (whether they have or have not filed a current lawsuit) are properly notified of the upcoming vote on the bankruptcy plan, and of any other upcoming proceedings, and granted all requisite due process regarding the Tehum bankruptcy filing.

Corizon has been recognized for many years as one of the largest providers of prison health care services in the country.[1] In that time, it has also been the repeat target of serious claims of malpractice and patient neglect.[2] In 2013, the American Civil Liberties Union reported that, in just the five preceding years, Corizon had been named as a defendant in 660 malpractice lawsuits brought by incarcerated people in their care or their families.[3] That number has only grown since then.[4] Incarcerated people and their families have brought claims regarding:

---

[1] Prison Legal News, "Neither Fines Nor Lawsuits Deter Corizon From Delivering Substandard Health Care," Matt Clarke, Mar. 30, 2020, https://www.prisonlegalnews.org/news/2020/mar/3/neither-fines-nor-lawsuits-deter-corizon-delivering-substandard-health-care/.
[2] *Id.*; Reuters, "Special Report: U.S. jails are outsourcing medical care – and the death toll is rising," Jason Szep, Oct. 26, 2020, https://www.reuters.com/article/us-usa-jails-privatization-special-repor/special-report-u-s-jails-are-outsourcing-medical-care-and-the-death-toll-is-rising-idUSKBN27B1DH.
[3] American Civil Liberties Union, "Meet the Company Making $1.4 Billion a Year off Sick Prisoners," Sarah Solon and Jesse Lava, Oct. 8. 2013, https://www.aclu.org/news/smart-justice/meet-company-making-14-billion-year-sick-prisoners.
[4] Prison Legal News, "Neither Fines Nor Lawsuits Deter Corizon From Delivering Substandard Health Care," Matt Clarke, Mar. 30, 2020, https://www.prisonlegalnews.org/news/2020/mar/3/neither-fines-nor-lawsuits-deter-corizon-delivering-substandard-health-care/.

- Undertreatment of acute and chronic illness (such as the case of a father of four who died three days into a six-day sentence after Corizon providers ignored complaints of intense pain caused by an entirely treatable existing condition providers should have been aware of);[5]
- Lack of psychological care (such as a detention center housing 400 mentally ill patients which Corizon chose to staff with just a single psychiatrist);[6]
- Failure to adequately staff facilities (including at a facility in Oregon which Corizon left without a registered nurse for almost 20% of the time, though one was supposed to be on call at all times);[7]
- Refusal to prescribe appropriate medications (with one nurse alleging that she was explicitly asked "not to prescribe medications that [she] felt . . . were necessary");[8]
- Failure to rectify a culture of sexual abuse and misconduct (such as in the Rikers Island facility in New York, where two Corizon staffers were indicted on multiple charges of rape, sexual abuse, and related crimes);[9] and
- Other glaring instances of neglect of patients under your care.[10]

As a result of Corizon's failures, many local agencies that hold contracts with Corizon have chosen not to renew those agreements.[11] New York's State Commission of Correction described Corizon's level of care as "so incompetent and inadequate as to shock the conscience."[12] Corizon lost so many contracts between 2015 and 2021 that the company's annual revenue declined by approximately $900 million, or 60%.[13]

---

[5] Business Insider, "Hidden investors took over Corizon Health, a leading prison healthcare company. Then they deployed the Texas Two-Step," Nicole Einbinder and Dakin Campbell, Aug. 21, 2023, https://www.businessinsider.com/corizon-health-bankruptcy-yescare-texas-two-step-law-2023-8.

[6] Reuters, "Special Report: U.S. jails are outsourcing medical care – and the death toll is rising," Jason Szep, Oct. 26, 2020, https://www.reuters.com/article/us-usa-jails-privatization-special-repor/special-report-u-s-jails-are-outsourcing-medical-care-and-the-death-toll-is-rising-idUSKBN27B1DH.

[7] The Oregonian, "Dying alone: A jail inmate's health spiraled for 7 days and no one stopped it," Rebecca Woolington, Apr. 10, 2016, https://www.oregonlive.com/washingtoncounty/2016/04/dying_alone_a_jail_inmates_hea.html#incart_big-photo.

[8] Reuters, "Special Report: U.S. jails are outsourcing medical care – and the death toll is rising," Jason Szep, Oct. 26, 2020, https://www.reuters.com/article/us-usa-jails-privatization-special-repor/special-report-u-s-jails-are-outsourcing-medical-care-and-the-death-toll-is-rising-idUSKBN27B1DH.

[9] The Intercept, "In Harm's Way: Seeking Medical Care, Female Rikers Inmates Say They Faced Sexual Abuse," Erika Eichelberger, September 10, 2015, https://theintercept.com/2015/09/10/female-rikers-inmates-medical-care-sexual-abuse-allegations/.

[10] Id.; Business Insider, "Hidden investors took over Corizon Health, a leading prison healthcare company. Then they deployed the Texas Two-Step," Nicole Einbinder and Dakin Campbell, Aug. 21, 2023, https://www.businessinsider.com/corizon-health-bankruptcy-yescare-texas-two-step-law-2023-8.

[11] Business Insider, "Hidden investors took over Corizon Health, a leading prison healthcare company. Then they deployed the Texas Two-Step," Nicole Einbinder and Dakin Campbell, Aug. 21, 2023, https://www.businessinsider.com/corizon-health-bankruptcy-yescare-texas-two-step-law-2023-8; Southern Poverty Law Center, "Profits vs. Prisoners: How the largest U.S. Prison Health Care Provider Puts Lives In Danger," Will Tucker, Oct. 27, 2016, https://www.splcenter.org/20161027/profits-vs-prisoners-how-largest-us-prison-health-care-provider-puts-lives-danger.

[12] The New York Times, "City to Pay $5.75 Million Over Death of Mentally Ill Inmate at Riker's Island," Benjamin Weiser, September 27, 2016, https://www.nytimes.com/2016/09/28/nyregion/rikers-island-lawsuit-bradley-ballard.html.

[13] Business Insider, "Hidden investors took over Corizon Health, a leading prison healthcare company. Then they deployed the Texas Two-Step," Nicole Einbinder and Dakin Campbell, Aug. 21, 2023,

As Corizon's debts and liabilities increased, the company was acquired by largely anonymous investors.[14] Rather than facing victims and their families in court, Corizon attempted to shield itself by employing the so-called "Texas Two-Step,"[15] a maneuver through which companies leverage bankruptcy proceedings to attempt to evade liability and, as characterized by Tehum Director Isaac Lefkowitz, "force plaintiffs into accepting lower settlements."[16] Using a provision of Texas state law,[17] companies have employed this infamous tactic to split into two or more entities (a process known as a "divisional merger"), allocating most or all of their healthy assets to one entity and moving all of their liabilities and debts into another.[18] The liability-laden entity then files for bankruptcy, triggering an automatic stay of all proceedings against the debtor, a standard element of bankruptcy procedure. In this maneuver, however, the bankruptcy shell company then asks the court to extend the protection of the automatic stay to the non-bankrupt entity, sheltering that company's assets and freezing litigation.[19] The Texas Two-Step is a distorted use of the U.S. bankruptcy system by corporations to evade mass tort liability.[20] Your company has taken this abusive strategy a step farther — using it not only to escape tort lawsuits, but also to avoid paying your bills for tens of millions of dollars' worth of goods and services provided to Corizon by hospitals, small businesses, and your own former employees.[21]

Corizon carried out this maneuver beginning in the spring of 2022, when it changed the incorporation of the company from Delaware to Texas on April 28 and executed a divisional merger just five days later.[22] Corizon split its assets and liabilities among two new companies: (1) CHX TX, with the assets and revenue of Corizon, existing today under the name "YesCare"; and (2) Corizon, a shell company holding most of the original company's liabilities, which later changed its name to "Tehum Care Services" (Tehum).[23] On February 13, 2023, Tehum filed for Chapter 11 bankruptcy protection, attempting to dispose of claims by victims and families as

---

https://www.businessinsider.com/corizon-health-bankruptcy-yescare-texas-two-step-law-2023-8.

[14] *Id.*

[15] *Id.*

[16] *Id.*; <u>Wall Street Journal,</u> "Prison Health Contractor Expands Texas Two-Step Bankruptcy Tactic," Andrew Scurria and Akiko Matsuda, Sept. 19, 2023, https://www.wsj.com/articles/prison-health-contractor-expands-texas-two-step-bankruptcy-tactic-acac4928.

[17] Tex. Bus. Orgs. Code § 1.002 (55) (A) (2015).

[18] Business Insider, "Hidden investors took over Corizon Health, a leading prison healthcare company. Then they deployed the Texas Two-Step," Nicole Einbinder and Dakin Campbell, Aug. 21, 2023, https://www.businessinsider.com/corizon-health-bankruptcy-yescare-texas-two-step-law-2023-8.

[19] *Id.*; Law360, "Tide May Be Turning on Texas Two-Step Bankruptcy Strategy," Matthew Spero and Alexandria Tomanelli, July 19, 2023, https://www.law360.com/articles/1701203/tide-may-be-turning-on-texas-two-step-bankruptcy-strategy.

[20] *See* U.S. Senate Committee on the Judiciary, "Durbin, Senate and House Dems Object to Johnson & Johnson Bankruptcy Maneuver, Demand Answers," press release, Nov. 11, 2021, https://www.judiciary.senate.gov/press/dem/releases/durbin-senate-and-house-dems-object-to-johnson-and-johnson-bankruptcy-maneuver-demand-answers.

[21] Wall Street Journal, "Prison Health Contractor Expands Texas Two-Step Bankruptcy Tactic," Andrew Scurria and Akiko Matsuda, September 19, 2023, https://www.wsj.com/articles/prison-health-contractor-expands-texas-two-step-bankruptcy-tactic-acac4928.

[22] Business Insider, "Hidden investors took over Corizon Health, a leading prison healthcare company. Then they deployed the Texas Two-Step," Nicole Einbinder and Dakin Campbell, Aug. 21, 2023, https://www.businessinsider.com/corizon-health-bankruptcy-yescare-texas-two-step-law-2023-8.

[23] *Id.*

well as contractual claims by former employees and contractors alleging failure by Corizon to satisfy their agreements.[24] The company's assurances of "corporate separateness" between YesCare and Tehum[25] are a transparent and unconvincing attempt to avoid adequately compensating victims. Indeed, this claim of separateness contradicts the company's own assertions in business proposals, as when it leverages Corizon's operating history to assert that YesCare, a one-year old company, has "40 years of experience as the leading provider of correctional healthcare."[26]

Serious questions remain regarding YesCare and Tehum's current ownership. For example, YesCare says that it is managed by an entity called Geneva Consulting LLC.[27] But the terms of the management agreement between the two suggests that YesCare may in fact be owned by Geneva Consulting or its parent, the nursing home giant Genesis HealthCare Inc., which itself has faced scrutiny for its substandard operation of nursing homes.[28] Corizon's obfuscation of its ownership structure heightens our concern that the company is attempting to evade liability.

Reporting suggests that the largely unknown investors and associates that spearheaded the Texas Two-Step have engaged in questionable and unjust tactics, such as: (1) stonewalling during meetings with creditors; (2) diverting millions of Corizon dollars to other companies that the investors personally owned or were associated with, likely limiting funds available for victims; and (3) failing to substantively notify incarcerated individuals, along with agencies that contracted with Corizon, of the divisional merger or the bankruptcy filing.[29] This misuse of the bankruptcy system is unacceptable, and we are concerned that it may result in the denial of hundreds of claims stemming from the substandard care incarcerated people have received under Corizon's watch. These concerns have been exacerbated by the proposed global bankruptcy plan filed on September 29, 2023[30] and amended on October 17, 2023,[31] which is, in the words of the U.S. Trustee, "patently unconfirmable" due to unexplained giveaways to Corizon affiliates and

---

[24] *Id.*; Notice of Designation as Complex Chapter 11 Bankruptcy Case, p. 1, In re Tehum Care Services, Inc, No. 23-90086 (CML) (Bankr. S.D. Tex.), Feb. 15, 2023, https://www.kccllc.net/tehum/document/2390086230227000000000004.

[25] *See, e.g.*, Response in Opposition to Plaintiff's Motion, p. 24, William Kelly v. Corizon Health, Inc., No. 2:22-cv-10589-MAG-DRG (E.D. Mich.), Aug. 17, 2022, https://s3.documentcloud.org/documents/23919673/yescare-corp-and-chs-tx-incs-response.pdf.

[26] Business Insider, "Hidden investors took over Corizon Health, a leading prison healthcare company. Then they deployed the Texas Two-Step," Nicole Einbinder and Dakin Campbell, Aug. 21, 2023, https://www.businessinsider.com/corizon-health-bankruptcy-yescare-texas-two-step-law-2023-8; YesCare Corp., "About YesCare," https://www.yescarecorp.com/about.

[27] Business Insider, "Hidden investors took over Corizon Health, a leading prison healthcare company. Then they deployed the Texas Two-Step," Nicole Einbinder and Dakin Campbell, Aug. 21, 2023, https://www.businessinsider.com/corizon-health-bankruptcy-yescare-texas-two-step-law-2023-8.

[28] *Id.*

[29] *Id.*; Brief for Public Justice as Amicus Curae, p. 19, In re Tehum Care Services, Inc., No. 23-90086 (CML) (Bankr. S.D. Tex.), Mar. 3, 2023, https://www.publicjustice.net/wp-content/uploads/2023/05/0576-001.-05-17-2023-BRIEF-OF-AMICUS-CURIAE-IN-SUPPORT-OF-PRO-SE-LITIGANTS-REQUESTS-FOR-NOTICE-AND-O.pdf.

[30] Joint Chapter 11 Plan, In re Tehum Care Services, Inc., No. 23-90086 (CML) (Bankr. S.D. Tex.), Sept. 29, 2023, https://www.kccllc.net/tehum/document/2390086230929000000000004.

[31] First Amended Joint Chapter 11 Plan, In re Tehum Care Services, Inc., No. 23-90086 (CML) (Bankr. S.D. Tex.), Oct. 17, 2023, https://www.kccllc.net/tehum/document/2390086231016000000000018.

insufficient relief for victims.[32] The plan and Corizon's tactics are further called into question given the secret romantic relationship between the judge mediating the plan negotiations and the attorney representing YesCare in the negotiations.[33]

The bankruptcy system has many aims, but it was not designed to provide an avenue for companies to evade accountability for wrongdoing. Your company, however, is attempting to do just that, utilizing the "Texas Two-Step" to position yourselves to pay pennies on the dollar to claimants that deserve recompense for poor health outcomes and unpaid debts accrued under your watch.

In order to better inform our legislative efforts, and to protect and inform victims about Corizon's bankruptcy maneuver, we request that you provide answers to the following questions by November 8, 2023:

1. Please provide a full description of YesCare and Tehum's leadership and stakeholder structure, as well as the leadership and ownership of all of the entities' parent companies, and YesCare's latest corporate governance plan. In your response, please include the identities of each natural person that directly or indirectly holds an equity interest in Perigrove 1018 LLC and/or YesCare Holdings LLC, and the size of the membership interest(s) held by that natural person.

2. In a 2023 deposition, Tehum director Isaac Lefkowitz admitted to owning a stake in Perigrove, the private equity firm that took over Tehum. What role does Mr. Lefkowitz currently play within YesCare, Tehum, or any entities related to YesCare or Tehum?

3. How many claims against Corizon, Tehum, YesCare, or any affiliated entities were enjoined following Tehum's motion to extend and enforce the automatic stay? Please also provide:
   a. The estimated number of claims that will be affected by Tehum's bankruptcy filing.
   b. The number of claims related to each of the following categories and the aggregate settlement amount for each: medical malpractice, employment, and contract breach.
   c. A list of all claims by creditors and the status of those claims.

4. Please provide a list of the entities and individuals that were involved in negotiating the global settlement filed September 29, 2023. In addition, please describe the role of Elizabeth Freeman in the negotiations, and list the individuals at YesCare and Tehum that were aware of Ms. Freeman's romantic relationship with Judge David Jones, who mediated the negotiations.

5. With regard to Corizon's use of the divisional merger process to separate its assets from its liabilities:
   a. What was the rationale for determining which assets it would transfer or assign to Tehum and which it would shield from the reach of creditors through YesCare?

---

[32] Objection of the United States Trustee to Joint Emergency Motion, p. 3, In re Tehum Care Services, Inc., No. 23-90086 (CML) (Bankr. S.D. Tex.), Oct. 13, 2023, https://www.kccllc.net/tehum/document/2390086231013000000000001.

[33] Business Insider, "Lawsuit alleges undisclosed relationship involving federal judge that could cloud Corizon bankruptcy deal," Nicole Einbinder and Dakin Campbell, Oct. 15, 2023, https://www.businessinsider.com/bankruptcy-judge-david-jones-resigns-texas-corizon-2023-10.

     b.   What was the total value of Corizon's assets at the time of the divisional merger?

     c.   Please list all of the assets that were transferred to YesCare/CHS TX, Inc. and their cumulative value (excluding any liens on the assets).

     d.   Please list all of the liabilities that were transferred to Corizon, later Tehum, and their cumulative value.

6. Please list all of the assets that were transferred to affiliated entities other than YesCare/CHS TX, Inc. between December 1, 2021 and the date of Tehum's bankruptcy filing.

7. What is the total value of YesCare's current assets?

8. What is the total value of Tehum's current assets? Please include a full accounting of any funding agreement, lump sum payment, or other revenue stream provided to Tehum following the divisional merger process.

9. Please describe in detail all actions taken to provide notice of Tehum's bankruptcy filing to known and potential creditors.

We look forward to your prompt response.

                                           Sincerely,

Elizabeth Warren
United States Senator

Richard J. Durbin
United States Senator

Mazie K. Hirono
United States Senator

Jeffrey A. Merkley
United States Senator

Richard Blumenthal
United States Senator

Ron Wyden
United States Senator

Bernard Sanders
United States Senator

Peter Welch
United States Senator

Cory A. Booker
United States Senator