CV-12-00601-PHX-ROS

Monitors' *ad hoc* Report on Five Suicides, 2024

### Part 1: Executive Summary

At the Court's request, I am filing this analysis of five suicide deaths[1] that occurred among class members at ADCRR in early 2024. I conducted this review because a temporal clustering of deaths that was noticed mid-Summer, 2024, raised the question of whether the suicides were the result of a "contagion." A suicide contagion is one in which two or more suicides occur as a result of, or related to, earlier suicides, e.g., instructions by a cult leader or learning about a previous suicide.

Based on my review, I conclude that the five suicides were not likely part of a contagion. However, the cases shared several commonalities with regard to contributing factors. These factors all reflect deficiencies in mental health care delivery that were already recognized by this Court and which the Court's Order and Permanent Injunction ("Injunction"; Dkt. 4410) addresses and seeks to remedy. In other words, adherence to the Order would have decreased the probability of, if not prevented, these deaths. Moreover, these same deficiencies have contributed to, and continue to contribute to, risk of, and actual morbidity and mortality since monitoring began in April of 2023.

The contributing factors fell into three themes:
- Theme 1: Inadequate Comprehensive Evaluation of Mental Health Needs
- Theme 2: Inadequate Mental Health Treatment Encounters
- Theme 3: Lack of a Functional Primary Therapist Model

### Part 2: Factors Contributing to the Probability of Suicide

**Theme 1: Inadequate Comprehensive Evaluation of Mental Health Needs**
The Injunction requires that all patients on the mental health caseload receive "an initial comprehensive mental health evaluation within one month of arriving at the assigned facility if not already completed when the prisoner first entered the prison system" (Dkt. 4410 ¶ 16.3.1.1[2]). Such an evaluation documents the patient's subjective concerns, the onset of their symptoms, the evolution of symptoms over the course of the patient's life, the patient's treatment history, and impairment in functioning, taking into account contextual information such as the patient's biological, developmental, and psychosocial history, as well as their readiness/ability to engage in treatment.

---

[1] I refer in this report to the five individuals as Patients 1, 2, 3, 4, and 5. A legend containing their identifying information is contained in Appendix 1.
[2] All numbers in parenthesis are references to the Injunction unless otherwise specified.

No such evaluation was conducted in any of the cases I reviewed here that required an evaluation (nor have any of the other cases I have reviewed to date, regardless of patient acuity[3]). Instead, the only assessment conducted upon arrival at ADCRR is the Initial Mental Health Assessment, a brief screening to determine whether an individual has any mental health needs at all, and if so, whether they need immediate stabilization (e.g., Mental Health Watch/crisis stabilization) or placement in an inpatient or residential setting. These initial assessments are typically completed in 10-15 minutes, which is nowhere near enough time to gather the requisite information described above for a comprehensive mental health evaluation and are therefore woefully inadequate to inform an initial diagnosis and treatment plan.

Incarcerated individuals do not spend much time at the initial Intake facility (Phoenix or Perryville) and the role of mental health staff there is more about triage than serving as a Primary Therapist. Once the patient moves to his or her receiving facility, they are supposed to be assigned a Primary Therapist who serves as the ultimate point of accountability for the patient's care and is responsible for ensuring that the patient's mental health needs are understood and documented. If a comprehensive mental health evaluation (not a brief assessment) was not conducted at Reception, then it is the job of the Primary Therapist to complete one.

This opportunity to meaningfully assess patients is missed if their Primary Therapist at the receiving institution mistakenly believes that the initial mental health assessment from Intake constitutes a comprehensive evaluation. In the absence of such an evaluation, mental health staff do not know who their patients really are or what they need. Furthermore, the reception staff complete a treatment plan based on the initial assessment which then follows the patients, but this plan is rarely changed by the Primary Therapist to reflect an increased understanding of the patients functioning and treatment needs.

For the patients under review, three of them (Patients 3, 4, and 5) were designated as MH-3 at Intake and should have had an initial comprehensive mental health evaluation when they first arrived in prison but no more than one month after arriving at their assigned facility (16.3.1.1). None of the three eligible patients had a comprehensive evaluation at Intake or any time afterward.

Patient 1 was changed from an MH-2 to an MH-3E on 05/23/23 and should have had a comprehensive mental health evaluation completed at that time to reflect the change in level of service (16.3.1.2). No such evaluation was completed, nor was one completed when Patient 1's MH-code was changed to an MH-5, and he was admitted to the Inpatient mental health unit on 08/03/23 (16.5.1). When he was discharged from the Inpatient unit and admitted to the Residential Treatment Unit three months later, he did not have a Discharge Summary as required by the injunction (16.5.1.2), nor was a comprehensive mental health evaluation completed when his MH-code was changed from MH-5 to MH-4 on 11/01/23 (16.4.1.1).

Patient 2 was not designated as an MH-3B until 03/28/24. At that time, she should have had a comprehensive mental health evaluation completed because of the change in service delivery

---

[3] One of the cases (Patient 2) did not require a Comprehensive Initial Evaluation at that time as she was appropriately assessed as an MH-2 at Intake. She did require one when her mental health code was changed to an MH-3B on 03/28/24, but no evaluation was completed at that time.

(16.3.1.2). However, no such evaluation was completed in that timeframe or before her death by suicide two months later.

Prior to the Injunction ADCRR had neither a form for comprehensive evaluations nor established expectations for the completion of these evaluations. As of this writing, ADCRR still does not have a comprehensive mental health evaluation form and the comprehensive evaluations required by the Injunction at established intervals or due to a change in condition (see for example Injunction paragraphs 16.3.1.1, 16.3.1.2, 16.3.1.3, 16.4.1.2, and 16.5.1.1) have not yet been implemented, even on a limited basis.

Of particular concern are those requirements associated with managing suicidal risk. Three requirements in the Injunction pertain specifically to assessment of suicidal risk: In-Person Suicide Risk Assessment (16.8.1), Suicide Watch Level Change Documentation (16.9.6), and Suicide Watch Discharge Suicide Risk Assessment (16.9.7). ADCRR continues to struggle with reliably having suicide risk assessments completed in a clinically adequate manner. Recurrent issues include (a) (i.e., talking through a closed cell door) encounters in a non-confidential environment that (b) last no more than a few minutes. Such brief, impersonal, perfunctory interactions do not allow for an adequate assessment of a person's risk for placement on watch, changes in level of watch, or discharge/release from watch.

As indicated elsewhere in this document, patients with the highest level of impairment (inpatient, crisis stabilization, Mental Health Watch) require tailored, collaborative treatment interventions focused on improving mental and behavioral stability. The length of stay in such an environment is determined by an adequate clinical assessment of the patient, which determines the reason for the placement (admission criteria); the anticipated treatment interventions (other than temporarily residing in a Mental Health Watch bed); anticipated length of stay; and benchmarks for stepping the individual down to their sending unit or an alternative appropriate level of care (discharge criteria). The meetings with patients should be done in a confidential setting (not at cell-front) and treatment should be provided as much as possible by the Primary Therapist or designee. The documented encounters must contain meaningful information about the patient's response to treatment and the watches should not be used punitively.

The Health Services Division (HSD) monitors have accurately noted the recurring problem of clinicians' overreliance on checkboxes rather than documenting a meaningful narrative of interventions. In large part, this issue is likely due to the legacy of mental health staff having "always done things this way" and not having been empowered, expected, and/or directed to take more ownership of the treatment of patients in crisis stabilization or on Mental Health Watch. There seems to be a tendency to view medications and the passage of time as the primary, and possibly only, factors affecting stability of the patient, which leaves the Primary Therapist effectively watching from the sidelines and only reporting on the patient's condition with brief check-ins.

The establishment of the Primary Therapist model and the designation of a single point of contact and clinical accountability for these high-risk patients will create a greater blueprint for treatment, but the importance of clinical oversight by the supervising psychologist in monitoring the care of these patients cannot be overstated.

Much of the time, when discharges from Mental Health Watch are considered compliant with the requirements of the Injunction by ADCRR internal monitors, the level of risk is not identified on the Initial Safety Assessment used for discharge. It is critical for mental health clinicians to document their conclusion about the level of risk for a person when discharging a patient from watch.

To understand a full picture of a person's risk assessment and plan for discharge, both the Initial Safety Assessment and the Suicide Watch Discontinuation notes must be reviewed. Each document has different, critical elements necessary for a comprehensive discharge plan. Staff would likely benefit if there was a single document. Of the five patients under review, three of them were identified as having suicidal concerns that resulted in their placement on Mental Health Watch, but not one of them had an adequate evaluation of their suicidal risk and all died within 17 days of their discharge from Mental Health Watch:

- Patient 1 was placed on Mental Health Watch on 02/11/24 with a cell-front Suicide Risk Assessment. He was removed from Mental Health Watch on 02/14/24 with a 3-minute cell-front Suicide Risk Assessment that determined him to be at Low Suicide Risk. He committed suicide 17 days later, on 03/02/24.

- Patient 3 placed on Mental Health Watch on 02/06/24 with a cell-front Suicide Risk Assessment that did not determine a level of Suicide Risk. He was removed from watch on 02/12/24 with a 15-minute cell-front SRA that determined him to be at Low Suicidal Risk. He died by suicide 16 days later, on 02/28/24.

- Patient 5 was placed on Mental Health Watch on 12/16/23 with no Suicide Risk Assessment. He was removed from Mental Health Watch on 12/19/23 with no Suicide Risk Assessment and died by suicide 17 days later, on 01/04/24.

- Neither Patient 2 nor Patient 4 (the women under review who died by suicide) were placed on Mental Health Watch during their time at ADCRR, although Patient 2 had complained to her psychiatric prescriber of auditory hallucinations telling her to kill herself. Patient 2 was incarcerated for 101 days before her death by suicide. Patient 4 was incarcerated for 40 days before her death by suicide.

The deficiencies I describe above are not unique to the cases under review. I have noted the same deficiencies in many cases I have reviewed since I began monitoring in April 2023, with little improvement.

**Theme 2: Inadequate Mental Health Treatment Encounters**
The Injunction requires that all mental health care be provided in a clinically appropriate manner (1.1) and that there is sufficient physical space for patients to receive mental health care in a confidential environment commensurate with that unit/facility's designated level of care (15.9).

In the overwhelming number of encounters with four of the five patients under review (Patient #4 from Perryville and all the male patients), encounters with mental health professionals

4

consisted of non-confidential cell-front interactions and/or very brief meetings. Staff are reliably documenting in the health record that they *offer* patients the opportunity to meet in a confidential environment, but in almost every encounter – including those conducted while patients were on Mental Health Watch – it is documented that the *patients opted not to meet* in a confidential setting and/or chose not to meet for anywhere near the full time that was available to them.

- **Patient 1** was seen by Mental Health staff 11 times between 11/01/23 (when he arrived at Tucson – Rincon) and 03/05/24 (the time of his death). Only eight of those meetings were completed in a confidential environment, and three of them were done at cell-front (including a cell-front Suicide Risk Assessment). Further, only six of the mental health encounters were with his Primary Therapist while the other five were with one of four different Psychology Associates. Only two of the encounters were for more than 15 minutes.

- **Patient 2** was seen twice by Mental Health clinicians between the date she was changed from an MH-2 to an MH-3B (03/28/24) and her death (05/24/24). Both of those times (04/18/24 and 05/16/24) she was seen in a confidential environment and both meetings were for 30 minutes or more. However, she should have been seen immediately on 03/28/24 when she reported auditory command hallucinations to the psychiatric prescriber but that did not occur.

- **Patient 3** was seen by Mental Health nine times by six different Psychology Associates (none of whom were identified as his Primary Therapist) between his arrival at Eyman-Browning on 02/04/24 and the date of his death just under four weeks later, on 02/28/24. Only two of those meetings took place in a confidential setting: one for 20 minutes and the other for 65 minutes. The remaining seven encounters all occurred while the patient was on Mental Health Watch. All of them were conducted at cell-front including the Suicide Risk Assessment. In all the Mental Health Watch encounters for Patient 3, the various different Psychology Associates documented that he was offered a confidential setting but declined, and the majority of those encounters were for only five minutes.

- **Patient 4** was seen by a Psychology Associate only once between the time she was admitted into ADCRR on 11/30/23 and the date of her death on 01/08/24. This encounter was conducted in a confidential environment by her assigned Primary Therapist but was only five minutes in length.

- **Patient 5** was seen by Mental Health 12 times between the date of his arrival at Eyman – Browning (12/07/23) and the date of his death (01/04/24). No Primary Therapist was ever assigned, and he was seen by seven different Psychology Associates over that period of time. Only two of those encounters took place in a confidential environment and only one of them was for more than 10 minutes.

The review of these suicides highlighted ADCRR's overreliance on an "opt-in" approach to confidential mental health encounters rather than an "opt-out" one. In an opt-in approach, patients are asked *if* they want to meet and *if* they would like to exit their cell to have the visit in a confidential setting, which fails to convey a therapeutic need for both the visit and the venue.

5

In an opt-out approach, a patient is informed by a custody officer that they have come to accompany the patient to a visit with their mental health counselor, as they would for any other (therapeutically necessary) medical or mental health visit. It sets as the "default" expectation that the patient will be attending the visit resulting in a lower likelihood of the patient declining the visit. Further, by conducting the visit in a clinically appropriate venue, the patient is less likely to abort the visit prematurely.

The deficiencies I describe above are not unique to the cases under review. I have noted the same deficiencies in many cases I have reviewed since I began monitoring in April, 2023, with little improvement.

**Theme 3: Lack of a Functional Primary Therapist Model**
The Injunction requires that patients on the mental health caseload be cared for within a model of care that assigns each patient a Primary Therapist (15.1). In such a model, the patient's Primary Therapist, typically a master's-level licensed counselor, does not change, unless the patient is moved to a different living unit. The Primary Therapist develops a therapeutic relationship with the patient, which is essential for the patient to trust and openly share their thoughts. As the ultimate point of accountability for the patient's mental health needs, the Primary Therapist also serves the role of "orchestra leader" for the patient's treatment plan, coordinating information and care. As part of the model, the Primary Therapist also assures continuity of care between the various members of the patient's mental health care team, as well as between two Primary Therapists when the patient's care must be transferred due to a housing or status change. A Primary Therapist model of care is not merely a good idea or sound mental health practice but is codified in the Injunction as a critical requirement of constitutionally mandated care.

In practical terms, when a patient meets with a mental health clinician *other* than their assigned Primary Therapist (which has been the norm at ADCRR rather than the exception), that clinician may know little to nothing about the patient besides how they are presenting *at that moment*. This issue is highlighted by the Problem List in the Electronic Health Record, which frequently consists of every diagnosis a patient has ever received within ADCRR. These diagnoses are often duplicative or mutually exclusive, which clouds a clear understanding of the patient. And because ADCRR does not conduct comprehensive mental health evaluations with patients (see Theme 1 above), the mental health clinician is at a marked disadvantage in being able to effectively intervene in any way more than managing a crisis, because they do not even have a source document to refer to that would inform them about the patient's history, illness, and challenges (i.e., what has been tried, what has worked, what has not).

Four of the five patients under review were not cared for by a Primary Therapist as required (Patients 1, 3, 4, and 5). These patients received care that was largely perfunctory, loosely organized, and reactive rather than planned and thoughtful. In none of the cases were the patients provided a *course of planned treatment*. Instead, care was mostly provided in response to emergency and crisis situations, some – if not many – of which would have been preventable had the patient been receiving a proactive planned course of treatment. The care that was provided was delivered by ever-changing Primary Therapist and psychiatric prescribers in brief encounters that consisted mostly of cursory check-ins, often in the non-therapeutic cell-front setting. The

impact of these deficiencies was amplified by the high-risk nature of the patients who were expressing suicidality.

An additional layer of care that was not reliably integrated was communication between the prescribing nurse practitioners (many of whom were remote and seeing patients via telehealth) and the Primary Therapist. In several of the cases reviewed, the psychiatric prescriber noted issues with the patient that had not been previously identified by other members of the care team, but that information was not passed on to other members of the team. The information may be in the record, but without a Primary Therapist to serve as the primary point of accountability to consolidate that information and without a reliable means for communicating that information, it remained effectively siloed in the progress notes.

The deficiencies I describe above are not unique to the cases under review. I have noted the same deficiencies in many cases I have reviewed since I began monitoring in April, 2023, with little improvement.

## Case Summaries

**Patient 1**
Patient 1 was classified as an MH-4 patient who was admitted to the Tucson Rincon Mental Health Residential Treatment Unit (RTU) on 11/01/23 after recently coming off suicide watch. He died by hanging on 03/02/24.

It is not clear what Patient 1's actual mental health symptoms were because none of the progress notes written by Psychology Associates or psychiatric prescribers, nor treatment plans in the months leading up to his death identified active symptoms or impairment other than mild self-described anxiety and sleep disturbance. The Problem List included duplicative diagnoses (in violation of 4.3), he did not receive appropriate evaluations at critical times (in violation of 16.3.1.2, 16.5.1, 16.5.1.2, 16.4.1.1), and he was not appropriately evaluated for suicidal risk (in violation of 16.8.1, 16.9.7).

His most recent psychiatric prescriber progress note included the following diagnoses (some of which are duplicative): schizoaffective disorder, bipolar type; unspecified psychosis; unspecified anxiety disorder; and panic disorder. The most recent entry from the psychiatric provider documented Patient 1's request for "something more for anxiety and sleep," for which the provider increased his Vistaril.

Patient 1's medical record shows the following notable events in the week and a half prior to his death by suicide:

- **10 days prior to his death**, he had a five-minute encounter with a clinician for follow up to being on suicide watch.

- **5 days prior to his death**, he had attempted to see a psychiatric prescriber via telehealth about his medications, but the psychiatric prescriber's laptop had no internet connectivity, so the visit was cancelled and was not rescheduled.

- **1 day prior to his death**, Patient 1's father contacted NaphCare stating that his son was not receiving adequate medication and was in distress. No action was taken in response to the alert.

Patient 1's assigned Primary Therapist did not ever meet with him other than to have him sign refusals for taking part in mental health groups (he had refused to attend six mental health group sessions between January and February 2024). The patient's treatment plans were boilerplate and generic, consisting of nearly identical unexplored issues with occasional contradictory documentation (e.g., including statements by the patient that he is taking part in groups when in fact he had been refusing nearly half the time).

It was clear from the information in the record that Patient 1 had a pattern of significant decompensation when not on medications (and/or when actively using substances) to include paranoia and violence. At his request, he was switched from a long-acting injectable antipsychotic medication to an oral form of the medication, though the reason for his request for

the switch was not apparent in the record. Regardless, when the psychiatric provider changed the medication administration, this information should have been communicated to the treatment team, especially the Primary Therapist but was not. More problematic, though, is the fact that Patient 1 complained of suicidal auditory hallucinations that were not followed up on with a suicide risk assessment by his Primary Therapist.

**Patient 2**
Patient 2 entered ADCRR on February 14, 2024. She died by suicide (hanging) on May 24, 2024. Patient 2 was designated as an MH-2 at intake because she was not taking any psychotropic medications when she arrived to ADCRR, she did not request mental health treatment or medications at the time of her intake, and no major red flags stood out initially to indicate a high suicide risk for the patient.

**57 days before her death**, Patient 2 reported to her psychiatric prescriber an acute episode of panic with command auditory hallucinations to kill herself. The provider diagnosed her with Adjustment Disorder, prescribed medication for anxiety, and revised her mental health code from MH-2 to MH-3B, but she did not notify the other mental health clinicians involved in her care about these concerns. At that time, four actions were required: (1) a Primary Therapist should have been assigned because Patient 2 was now on the mental health caseload with her revised MH-code (16.6.1); (2) the Primary Therapist should have been notified about the suicidal statements (15.6); (3) an In-Person Suicide Risk Assessment should have been completed by the Primary Therapist (16.8.1); and (4) a comprehensive mental health evaluation should have been completed to document the change in the level of care as well as the diagnostic rationale and treatment plan (16.3.1.2). None of these actions occurred.

The failure to conduct a comprehensive evaluation was presumably because ADCRR believes the brief Initial Mental Health Assessment conducted at Intake serves that purpose. However, as mentioned in the previous sections, this initial assessment is a screening tool and although there is the opportunity in the free-text fields of the form to provide more comprehensive information about symptom onset, duration, severity, and functional impairment, it was not used for that purpose with this patient. As a result, there is not an established baseline of mental health issues other than the symptoms mentioned in the initial screening assessment and whatever is noted in the progress notes. Because of the lack of any formal case conceptualization, the treatment plan could not take into consideration the drivers underlying her presentation.

**31 days before her death**, Patient 2's psychotropic medication was discontinued after having refused it 14 times over a two-week period (beginning on 04/02/24) due to her complaints that it either did not work or caused headaches. These refusals were documented in the record, but the psychiatric prescriber did not meet with the about the medication efficacy or side-effects before she discontinued the medication nearly three weeks later, on 04/23/24.

---

**Patient 3**
Patient 3 entered ADCRR on May 15, 2020. He died by suicide (hanging) on February 28, 2024.

Patient 3 had diagnoses of PTSD, psychosis, mood, and anxiety disorder noted in some progress notes, but I could not find any mental health evaluation that provided any explanation of the type, severity, number, onset, or impairment of his symptoms. His problem list, however, indicates his diagnoses were schizophrenia and antisocial personality disorder. His medications were frequently started and stopped by the patient without adequate documentation of the reason for the non-adherence.

**24 days prior to his death**, Patient 3 was transferred to Eyman.

**23 days prior to his death**, Patient 3 had a Mental Health Assessment completed with Psychology Associate #1 (not the patient's Primary Therapist) who did not consider him to be an acute suicidal risk. However, Patient 3 was placed on Mental Health Watch later that same day due to statements of suicidality made in a Health Needs Request (HNR). The HNR was not available in the record, but the Psychiatric Nurse Practitioner who documented the initial Mental Health Watch placement detailed the following in the Mental Health Watch Order: "I need to see the [Opioid Use Disorder Treatment] nurse so i can continue my suboxone or enroll back into the [Opioid Use Disorder Treatment] program. I am coming down off of fentanyl heroin and my with draws are unbearable to the point i would do anything to stop them such as suicide thoughts, a lot is going on right now mentally i am having SEVERE PTSD FROM THE GUN SHOTS DURING THE RIOT I WAS IN, I AM HEARING VOICES AGAIN AND THIS SHIT IS BECOMING TO STRESSFUL."

**22 days prior to his death**, the initial Suicide Risk Assessment was conducted by Psychology Associate #2. It was entirely inadequate both in content and in process (he was seen for five minutes at cell-front for the evaluation).

**21 days prior to his death**, Psychology Associate #3 had a 5-minute cell-front encounter with Patient 3 at the conclusion of which she changed him from a continuous watch to a 10-minute watch (these encounters are supposed to be done in a confidential environment, not at cell-front).

**20 days prior to his death,** Patient 3 was seen by his assigned Primary Therapist – who met with him at <u>cell-front for 45 minutes</u>. At the end of that encounter, she noted that "Due to the Pt's stability, denial of [suicidal ideation, homicidal ideation, and auditory/visual hallucinations] Pt will be moved to [30-minute Mental Health Watch]." Again, this encounter should not have been done at cell-front and at any rate thirty-minute intervals are not appropriate when someone is on Mental Health Watch for suicidal concerns.[4]

**19 days prior to his death**, Psychology Associate #3 had a 5-minute cell-front encounter with Patient 3 in which she noted that he was doing well with no complaints. Despite this, she maintained suicide precautions and restrictions as well as a 30-minute watch.

**18 days prior to his death**, Patient 3 was seen by Psychology Associate #4, who conducted a 5-minute cell-front check-in. Once again, the patient was noted to be stable, calm, and

---

[4] Since the start of the injunction, ADCRR has been advised not to use 30-minute watches for suicide watch placement, though this interval is potentially acceptable for watches initiated for observation and evaluation of patients experiencing psychiatric decompensation without suicidal ideation.

asymptomatic. The Psychology Associate "educated the patient on new/additional coping skills that can be utilized while in the watch pod, patient appeared to be receptive. This writer staffed with the security team who denied concerns regarding the patient's behavior." He was maintained on suicide watch.

**17 days prior to his death**, Psychology Associate #5 met with Patient 3 for a 10-minute cell-front encounter. Once again nothing was noted that would warrant being on watch any longer, but the Psychology Associate made the following entry in her note: "Patient was staffed with mental health, medical, and security team with no further issues indicated. Patient *may benefit from continued MH monitoring* and will remain on watch status." [Emphasis added.] If the suicide risk had been assessed and determined to be low, keeping the patient in the more restrictive environment of Mental Health Watch has the appearance of being punitive.

**16 days prior to his death** – Psychology Associate #6 completed a suicide risk assessment in which she identified his suicide risk as low. He was discontinued from Mental Health Watch at this time and cleared for placement back in general population. However, the encounter was a 15-minute cell-front interaction, which brings into question the utility/validity of the information, particularly because the patient died by suicide just over two weeks later.

**15 days prior to his death**, Patient 3 was seen in person in the clinic by the psychiatric nurse practitioner who increased his medications due to agitation, psychosis and mood disturbance. It appears that none of the other staff who had seen him in previous days had documented agitation, psychosis, or mood disturbances. It is possible that this was because they only saw him cell-front for a brief time and none of them were familiar with his case.

**13 days prior to his death**, Patient 3 had a 20-minute interview-room encounter with Psychology Associate #3. He was noted to be upbeat and cooperative, future-oriented, and generally asymptomatic. He was scheduled for a return assessment in 30 days.

**9 days prior to his death**, Patient 3 met with a different mental health clinician for Return to Clinic/Watch follow-up. It was not clear from the progress note what this staff member's position is, but assuming they were a Psychology Associate, that would make them the seventh different Psychology Associate who was not Patient 3's Primary Therapist to see him in just two weeks (and the 8th Psychology Associate to see him overall).

Psychology Associate #7 made the curious entry that she offered Patient 3 to conduct the encounter in a private environment and he declined, so she saw him via telehealth. It is not clear from the progress note if this means that a computer was placed at his cell-front for the telehealth encounter. Psychology Associate #7 noted that Patient 3 was doing well, taking his medication and functioning without difficulty. Records showed that he was prescribed Zyprexa, an antipsychotic, but there was no mention of psychotic symptoms, though neither the Psychology Associate nor anyone else had asked him what he takes the medications for or explored what his mental health was like when not taking medication.

Patient 3's case is telling in the sense that – in less than one month – he was seen by at least <u>15 different mental health staff</u> including 8 Psychology Associates, 4 Behavioral Health

11

Technicians, 1 Psychiatric Nurse, 1 Mental Health Nurse, and a Psychiatric Nurse Practitioner and yet almost none of them noted anything out of the ordinary with him in the weeks prior to his death. This is a tragic example of having too many cooks in the kitchen with no head chef. The interactions with each of the staff over this time were brief, mostly at cell-front, and most of the staff did not have any real familiarity with the patient or his case. Nor did the patient have any familiarity with them. A person is more likely to share their vulnerabilities, like suicidal ideation, with someone with whom they have a relationship.

Although there were several suicidal risk factors present in Patient 3's case, it is not all clear why Patient 3 took his own life. The psychologist who completed the Psychological Autopsy indicated that although Patient 3 did not leave a suicide note, he had several recent stressors including "recent involvement in a riot at ASPC-Lewis, moving facilities, being in detention, believing his medication was ineffective, experiencing increased auditory and visual hallucinations, breaking up with his long-time girlfriend and suspecting her of cheating, and experiencing an increase in auditory hallucinations telling him to kill himself." Unfortunately, this information was only incorporated into the overall conceptualization of Patient 3's acute suicidal risk <u>after his death</u>. The lack of coordination of care, the absence of a case conceptualization of the patient, and the staggering diffusion of responsibility that resulted from having more than a dozen staff engaging in strictly perfunctory check-ins with no one person taking the lead in the case likely contributed to the outcome.

---

**Patient 4**
Patient 4 was booked into ADCRR on 11/30/23 and she died by suicide (hanging) on January 8, 2024. She had an assigned cellmate, but that individual was not in the cell at the time of Patient 4's death.

Patient 4 was only in ADCRR for just over a month before she died, and she had very limited contact with Mental Health staff during that time. At Intake on 11/30/23, she had a 10-minute encounter with a Psychology Associate. The record has her Primary Therapist listed as a Psych Intern.[5] The psych intern noted, "Client appears to have control of her mental health symptoms and reports that she does not want to re-engage in mental health services at this time. Client reported two past psychiatric hospitalizations and a suicide attempt. Client denied current SI/DTS [Suicidal Ideation/Danger To Self] and she is a moderate suicide risk at this time. Based on Client reports of past mental health treatment, mental health score will be MH2. Client was educated about HNR process."

The MH-2 was a questionable designation. Regardless of Patient 4's desire not to re-engage in mental health services, she should have been referred for a more comprehensive Mental Health Evaluation to explore her past psychiatric hospitalizations and suicide attempt. Even a cursory review of the records revealed that Patient 4 was previously designated SMI-C [Serious Mental

---

[5] An intern is an individual who is a student in a training program and not yet licensed. While psychiatric and mental health interns can see patients under supervision of a licensed psychologist as part of an official internship program or practicum, the intern's caseload should be developed with careful consideration for the intern's level of knowledge, skills, and abilities within the specific framework of the work to be done at any given location. This psych intern's caseload was over 500 patients at the time, which is dangerously high.

Illness; a designation assigned by a mental health clinician in the community…], had a history of treatment in the community for PTSD, claimed to have a diagnosis of "multiple personality disorder," and had past prescriptions for Clozapine [antipsychotic], Abilify [antipsychotic], and Paxil [antidepressant]. No diagnosis was offered, even provisionally, at Intake.

Patient 4 had numerous complicating physical health issues at the same time. In addition to chronic obstructive pulmonary disease and asthma, she also had severe dental pain requiring the extraction of two teeth, which resulted in dry socket, a condition that can be quite painful. More importantly, at the time of her suicide, Patient 4 was tapering off methadone and scheduled to start suboxone more than a week later, nine days after her death. She reported having methadone withdrawal symptoms that were not responding to the typical palliative care medications like acetaminophen and Pepto Bismol.

Mental Health clinicians had only two interactions with Patient 4's case during her brief time at ADCRR prior to her death. The first was a record review and the second was in-person. However, in both cases the opportunity was missed to learn more about Patient 4's mental health history and current needs.

**18 days prior to her death**, the lead Psychology Associate changed Patient 4's Mental Health code from MH-2 to MH-3A. Because of this change a comprehensive mental health evaluation was required. None was conducted.

**13 days prior to her death,** a Psychology Associate completed a treatment plan with Patient 4. In her notes, she identified herself as the Primary Therapist (this is not who is listed as the Primary Therapist in the record). The meeting was conducted in a confidential environment, but only lasted only three minutes, so it was not surprising that the plan was boilerplate and minimalistic. At the meeting, Patient 4 reported a history of "bipolar, anxiety, PTSD, and multiple personality disorder" with active symptoms of night terrors and night sweats. At the conclusion of the three-minute meeting, the psych associate determined that Patient 4's mental health symptoms did not interfere with her functioning and encouraged her to submit an HNR if she had problems. No mental health evaluation was completed, so it is not possible to conclude that Patient 4's symptoms did not interfere with her functioning since there is no record of what those symptoms even are.

Patient 4 did not receive an appropriate evaluation of her mental health needs. This should have occurred following her intake that noted her history of treatment in the community, past psychiatric hospitalizations, past suicide attempts, and history of antipsychotic and mood stabilizing medications. Absent that, an evaluation should have been completed when she was designated as an MH-3A[6].

---

[6] An argument could be made that this does not violate the Injunction since Patient 4's death occurred less than a month later and therefore did not violate 16.3.1.1 (MH3 Evaluation within 1 Month); however, it does violate 16.3.1.2 (MH3 Evaluation for Change in Service Delivery), which requires that one should have been done at the time the MH score was upgraded to an MH-3A. More globally, Patient 4's case highlights ADCRR's failure to adhere to paragraph 1.1 of the Injunction, which states, in brief: "All mental health care (including but not limited to: emergent; urgent; non-urgent episodic care), and the documentation supporting that care shall be clinically appropriate, including, where relevant to the circumstance and professional's credential, but not limited to, the

**Patient 5**
Patient 5 had been housed in a close custody unit at ASPC-Eyman Browning Unit since 12/07/23 and was on Mental Health Watch from 12/27/23 to 01/02/24, two days before his suicide by hanging. He was housed alone at the time of his death.

At the time of his death, Patient 5 was coded as an MH-3B and prescribed a low dose of an antipsychotic (Abilify 2mg). He was also participating in Opioid Use Disorder Treatment (MOUD) and was prescribed sulfamethoxazole and buprenorphine. He had numerous active mental health disorders diagnosed nearly a decade ago (2015) that were carried over as part of the data migration to a new electronic record system; however, it was not clear what exactly was the focus of his treatment other than emergency-driven responses to behaviors that got Patient 5 placed on watch over concerns about his impulsivity and potential harm to himself. Among the historical diagnoses that had not been removed from his active problem list were bipolar disorder, unspecified (May 2015/August 2017); unspecified episodic mood disorder (August 2015/December 2017); intermittent explosive disorder (August 2015); conduct disorder (November 2015); and major depressive disorder, single episode (September 2016).

**19 days prior to his death,** Patient 5 was placed on Mental Health Watch by Psychology Associate #1 (not his Primary Therapist) on 10-minute watch intervals due to "auditory hallucinations calling (him) a rat…I'm gonna hurt them before they hurt me." At this time, a Suicide Risk Assessment should have been completed by his Primary Therapist, but no such evaluation was done (in violation of 16.8.1).

**18 days prior to his death**, Patient 5 was seen in a confidential setting by Psychology Associate #2 while on 10-minute watch. No Suicide Risk Assessment was completed (in violation of 16.8.1), and he remained on 10-minute watch.

**17 days prior to his death**, Patient 5 was seen by Psychology Associate #3 for a 7-minute cell-front encounter at which time he changed the watch interval from 10-minutes to 30-minutes without a clinically appropriate note (in violation of 16.9.6).

**16 days prior to his death**, Patient 5 was seen by Psychology Associate #4 for a 10-minute encounter in a confidential environment. The Psychology Associate documented Patient 5's request to be housed in a single cell. No Suicide Risk Assessment was completed, and he was discontinued from Mental Health Watch altogether (in violation of 16.8.1, 16.9.6, and 16.9.7).

**15 days prior to his death**, Patient 5 had a 10-minute cell-front encounter with Psychology Associate #5. He should have met with his Primary Therapist for follow-up, but this did not occur.

---

conducting of the history and physical examination, forming and testing a differential diagnosis, arriving at a diagnosis, and ordering treatment for that diagnosis."

**14 days prior to his death**, Patient 5 had a 6-minute cell-front encounter with Psychology Associate #3.

**13 days prior to his death**, Patient 5 had a 5-minute cell-front encounter with Psychology Associate #4. The documentation included a boilerplate treatment plan that did not mention paranoia or auditory hallucinations and noted only that the patient had only "mood disturbances and anxiety."

**8 days prior to his death**, Patient 5 was placed on Continuous Mental Health Watch due to an after-hours call from a nurse who reported "patient states others in the housing unit told him his kids have been killed. He has rubbed an area to his right wrist on the desk and has scratches. He states he does not want to harm himself."

**7 days prior to his death**, Patient 5 had a 5-mintue cell-front encounter with Psychology Associate #5. No Suicide Risk Assessment was completed even though he was endorsing suicidal ideation at that time (in violation of 16.8.1).

**6 days prior to his death**, an ICS was generated for Patient 5's complaint of chest pain.

**5 days prior to his death**, a second ICS was generated, again for chest pains. Patient 5 was seen by Psychology Associate #6 for a 5-minute cell-front encounter. He was noted to have continued (potentially delusional) concerns about his family's safety. The Psychology Associate did not complete a Suicide Risk Assessment and she changed his Watch status to 10-minute intervals at that brief cell-front encounter (in violation of 16.8.1, 16.9.6).

**4 days prior to his death**, Patient 5 was seen for a 10-minute cell-front encounter with Psychology Associate #7. He reported that he was "Good, but not good. I don't know how to answer that." No Suicide Risk Assessment was completed (in violation of 16.8.1) and despite his vague responses, he was changed to a 30-minute watch.

**3 days prior to his death**, Patient 5 was seen for a 5-minute cell-front encounter with Psychology Associate #1. He presented with blunted affect, poverty of speech, lack of emotional expression; and reports of depression and anxiety, but a Suicide Risk Assessment was still not completed with him, and he was maintained on 30-minute watch (in violation of 16.8.1). Additionally, Patient 5 was seen by medical staff on this date and the following day and treated for "wound care" for cuts to his wrist, which was listed as an "allergic reaction" in a note, rather than self-harm.

**2 days prior to his death**, Patient 5 was seen by Psychology Associate #4 for a 5-minute cell-front encounter who documented that they "attempted to inquire but patient was brief with his response." Psychology Associate #4 noted that Patient 5 had depressed affect but did not pursue this with any further probing.

Clearly, Patient 5's suicidal risk was not appropriately assessed. He did not have a suicide risk assessment completed when he reported suicidal ideation and engaged in self-injurious behaviors. He was not seen once in a confidential environment while on Mental Health Watch

15

for an entire week. He was seen by five different Psychology Associates while on Watch. He was reduced from a Continuous Watch to a 10-minute watch without a face-to-face interview and subsequently changed from a 10-minute watch to a 30-minute watch, again without a face-to-face encounter.

Patient 5 was discontinued from Mental Health Watch without an in-person Suicide Risk Assessment or Safety Plan. At no time did his assigned Primary Therapist ever meet with him. In addition, his most recent treatment plan from 12/22/23 was a 5-minute cell-front encounter that was boilerplate with no mention of his having been placed on Suicide Watch just two months earlier on 10/05/23. The only mental health score for him in his record was from 10/26/23, at which time the Psychiatric Nurse Practitioner listed him as an MH-3B; he was moved from Yuma to Eyman – Browning on 12/07/23 due to protection concerns. There was not a mental health evaluation completed at either of those times.

---

Respectfully submitted,


Dr. Bart Abplanalp, Ph.D.
Mental Health Monitor