*Jensen v. Thornell*
Monitors' Second Interim Report to Court
December 20, 2024

## I. Introduction

On behalf of the Court's monitoring team, I submit this second Interim Injunction Compliance Report as directed by the Court in its order of November 15, 2024 (Dkt. 4699). The report reflects information that the monitors have gleaned from a number of sources over the course of time since our work began on April 7, 2023. We relied in large part on monthly self-evaluations ADCRR conducts in accordance with the Order and Permanent Injunction (Dkt. 4410 at 7; "Injunction"). We concentrated on ADCRR's October, 2024 self-evaluation production which reflects the status of compliance with the Injunction during the month of September, 2024; unless otherwise noted, where I refer to the results of self-evaluation I am referring to that production. However, when we were aware of more recent evidence of compliance, we relied on that evidence if it was different from information in the September, 2024 self-evaluation production. The monitoring team also relied upon: review of ADCRR documents (including the electronic health record maintained by ADCRR's agent NaphCare); review of complaints and concerns submitted to the web-based confidential portal created for this purpose (any person, incarcerated or not, can submit information to this portal); information provided by, and conversations with, ADCRR staff and Plaintiffs' attorneys; and site visits. ADCRR has fully cooperated with any documents we requested. In contrast to my other reports to the Court, due to the rapid turn-around required for this report, I have not shared a draft copy of this report with either party, so it does not benefit from their input.

In the parts of this report relating to the delivery of health care, I sometimes use the term ADCRR and NaphCare interchangeably. I assume that readers of this report recognize that ADCRR is the defendant in this case and NaphCare is a private company that is an agent of ADCRR and not a named party. No legal connotation should be drawn from my use of either term.

Finally, while many parts of this report are critical of the delivery of health care and some custody operations, it is important to our monitoring team to express how extremely impressed we have been with the efforts and devotion of almost every front-line and supervisory staff – ADCRR and NaphCare alike – with whom we have come in contact these past two years. Systems are broken, not the people who work in them. Despite sometimes grueling and adverse conditions, they try hard, often going above and beyond the breaking point. We sincerely hope that when they read in this report a criticism of what a staff member may have done, they know we fully recognize that, with rare exception, that happened because they have been asked to do something beyond their capabilities or outside their expertise, not because they are incompetent at what they were trained to do. Residents of ADCRR would be in even greater peril if it weren't for these dedicated and courageous professionals.

# II. Overview

Subclass

Though ADCRR is still far from the finish line and progress has been slower than the Court ordered, there have been demonstrable and meaningful improvements in the conditions of confinement under which members of the Subclass are incarcerated. While many improvements have been made in operations that are easier to fix and less critical (e.g., removing and repainting peeling walls, improving the reliability of event logging), some were hard-fought and fundamental to undo some of the most serious ails of the Subclass, such as discontinuing unnecessary shackling and strip-searching of patients on mental health (MH) watch when they are removed from their cells for mental health encounters, reducing the number of Subclass members significantly enough to be able to close whole units, and assuring that youths are no longer kept in cells for more than 22 hours a day, to name a few. There has been a very recent large increase in the number of individuals in detention. We are hopeful that this increase is transient. In contrast to the weaknesses in leadership focused on addressing the health care aspects of the Injunction, ADCRR has brought consistent, able, and dedicated leadership to address the Subclass aspects of the Injunction.

Health Care

The delivery of health care – medical and mental health (MH) – to residents of ADCRR's public prisons remains poor, has shown little improvement since the start of the Injunction, and continues to place the residents at significant risk of serious harm, including death. While there has been improvement in some aspects of care, little progress has been made in the vast majority of key operations. Advance practice practitioners (APP; nurse practitioners and physician assistants) still care for complex medical patients who should be cared for by physicians. Too many mentally ill patients are still not receiving the fundamental trio of services they need to remain safe: a comprehensive evaluation upon arrival, a current meaningful treatment plan, and meaningful documented therapy sessions conducted in a therapeutic and confidential clinical setting. More than 100 positions are still vacant. Medical and mental health patients are cared for by ever-changing medical practitioners, psychology associates, and psychiatric practitioners such that patients never get to know (and trust) their providers and the providers never get to know (and feel they have the overall responsibility for) their patients, all leading to over-, under-, and mis-providing of care. The EHR in use is cumbersome and poorly adapted to providing a clinician with the information they need when they need it. Nurses practice as physicians. Thousands of consultations with off-site specialists are delayed. The use of virtual visits when hands-on care is necessary is rampant. And patients are dying. Unnecessarily.

The analysis of five suicides from the first half of 2024 by Dr. Abplanalp (Dkt. 4691), included in this report by reference, expanded by his analysis of a more recent suicide (Attachment B), and analysis of four recent non-suicide-related deaths by Dr. Strick (Attachment A), serve as a capstone of the serious and pervasive systemic health care delivery failures described in this report.

# III. Understanding "Compliance"

In subsequent sections of this report I describe ADCRR's performance in satisfying the requirements of the Injunction. To accomplish this we parsed the Injunction into meaningful – and importantly, measurable – pieces, using the paragraphs of the Injunction as the starting point. Attachment C shows our opinion regarding ADCRR's compliance with each "piece."[1] Following the Court's lead in its Order at the conclusion of trial (Dkt. 4335), we treated compliance as a dichotomous conclusion, compliant or not compliant, where compliant means that ADCRR performed as it was ordered 100% of the time. Realistically, no non-heavenly system ever performs perfectly all the time. At some point in time, when ADCRR's systems are operating with a very high level of perfection, it will be time to grapple with the question: how good is good enough? For now, that question is premature. Nonetheless, for some of the requirements of the Injunction, we – and ADCRR in its self-evaluation process – have found it useful to examine the extent to which ADCRR complies with the requirement, i.e., percentage compliance.

ADCRR might argue that for several measures, while not yet fully compliant, they are closing in on 100%. However, this is misleading for two reasons. First, in several cases, ADCRR's method of measurement is incorrect or incomplete. Four examples follow:

- Paragraph 16.3.1.1 of the Injunction requires MH-3 patients to receive an initial mental health evaluation within a month of arrival. ADCRR believes that its performance on this metric is 99%. However, it counts an arrival mental health screening as an initial evaluation. A term of art, a mental health evaluation is a comprehensive examination of a patient's history and current mental health status, often requiring 60-90 minutes, that extends well beyond the 10-15 minute screening that occurs at intake. Whereas the screening is a triage tool to identify immediate needs and to classify the patient's MH level, the evaluation forms the framework for the patient's total mental health care going forward. ADCRR's performance level for this critically important clinical task is closer to 0%.

- Paragraph 1.11 of the Injunction prohibits LPNs from practicing outside their legal (and safe) scope of practice. When scanning the EHR for LPN patient encounters, the search parameters being used limit the scan to encounters which, by definition, typically fall within an LPN's legal scope of practice, e.g., medication administration, blood pressure checks, or dressing changes. Thus, a fortiori, the result is favorable showing compliance more than 90% of the time. Despite the fact that we have informed ADCRR of this methodological flaw, they continue to measure compliance incorrectly.

- Paragraph 5.1 of the Injunction requires ADCRR to forward the medical records of releasing patients to their soon-to-be community providers. Data collection erroneously

---

[1] In the Injunction itself, the labels of all paragraphs are solely numeric. However, many of those paragraphs are comprised of two or more elements ("pieces"). For monitoring purposes, and in conjunction with ADCRR, we subdivided some of those paragraphs. In those cases, the individual elements are labeled with the paragraph number and a letter (e.g., 1.1a, 1.1b, 1.1c).

only includes released patients who were seen by a release planner. In other words, the results understate non-compliance.

- Paragraph 7.4.6 of the Injunction states that patients with non-urgent/non-emergent medical needs shall be completed in a reasonable time frame, meaning that there is not a significant backlog of patients that are waiting to be seen. There are lots of ways to "measure" a backlog, but one way is to determine on average how many appointment slots have not been used in any given week. ADCRR reports that they are compliant with this paragraph of the Injunction because "82.57% of available slots [are] unused per week across all facilities," which if measured correctly, would imply that staff are only seeing patients ~18% of the time during their scheduled clinic hours, which is obviously absurd. It is not clear to the Court Monitors what is being measured, but it is very clear that it does not in any way reflect the presence or absence of a patient backlog (i.e., how long it takes for a provider to see a patient that asks to be seen).

Second, even a verifiable 99% performance level is generally still unacceptable and potentially dangerous for certain requirements of the Injunction due to the degree of harm or risk of harm for that 1%. Although 1% may at first glance seem like a small number, for a clause of the Injunction that would apply to all individuals incarcerated at ADCRR, 1% of the population is approximately 250 individuals that are receiving inappropriate care and in harm's way, or in the worst of circumstances, at risk of death. As an example, ADCRR's self-evaluation of paragraph 16.1 requiring a MH professional to conduct a MH assessment of all individuals within one business day of arrival in ADCRR, indicates this assessment was done 97% of the time. For the month of September, this means that ADCRR failed to conduct timely MH assessments of 37 individuals, or over 400 individuals per year. Given the very high prevalence of mental illness among carceral populations, and the higher rate of suicides shortly after arrival in an institution, even a failure rate of 3% is dangerous.

It is for the above reasons that the Court Monitors have decided to continue to report measures as a binary variable of compliant or not for the time being.

## IV. Compliance with Individual Injunction Requirements

Some requirements of the Injunction deserve further discourse to explain the impact of ADCRR's failure to comply with them on the safety of incarcerated individuals and/or to explain our conclusions, especially when they differ from the conclusions of ADCRR's self-evaluations.

### Paragraph 1.1f (Clinical Appropriateness of Off-Site Specialist Referrals)

Although ADCRR recognizes as a result of its self-evaluations that overall, the care, and documentation of that care, provided by NaphCare is often not clinically appropriate and in violation of paragraph 1.1 of the Injunction, ADCRR concluded that one aspect of care, offsite referrals to specialty services (captured in Attachment C in item 1.1f), is 100% clinically appropriate and thus compliant with the Injunction. The Court Monitors found otherwise. With rare exception, only medical clinicians (i.e., not MH clinicians) make such referrals. The failures of paragraph 1.1f the Court Monitors found manifest themselves in at least three ways: failure to make a referral when needed, failure to make a referral to the correct specialist, and failure to provide the specialist with all relevant clinical information to make an informed recommendation. Each of these errors places patients at significant direct as well as indirect risk of serious harm as illustrated by the following examples.

An APP referred Patient 6[2] to an Ear, Nose, and Throat (ENT) specialist due to the oncologist's concern that the patient's cancer (Hodgkin's lymphoma) may have recurred.

> The APP informed the ENT that the referral was for biopsy of a node under her chin pursuant to a recommendation from an oncologist. Due to the APP's failure to communicate to the ENT all the relevant information he needed, most importantly that the patient had a history of cancer and this request was to excise a node that might be a recurrence of that cancer, the ENT reasonably thought that the swelling might be the result of an infection, so ordered antibiotics and deferred the needed biopsy further and unnecessarily.

> The referral to ENT should have requested the referral be completed "Urgently" (i.e., to be completed within 30 days), especially because the APP should have known that once seeing the patient in the office for the initial visit, the ENT specialist would then have to first schedule the patient for surgery, even further delaying the procedure). This would result in a violation of the general provision of paragraph 1.1 of the Injunction. Instead, the APP ordered it as "Routine" (i.e., to be completed within 60 days) which is not a clinically appropriate time frame.

> The patient's health was further put in jeopardy by ADCRR's failing to complete even the Routine consult as ordered (in violation of paragraph 8.1 of the Injunction requiring ADCRR to complete referrals within the timeframe ordered). The Routine referral should

---

[2] The full names of all patients referred to in this report appear in Attachment D.

have been completed by July 28. Instead, it wasn't completed until September 16, 50 days late.

These three errors resulted in a direct risk to the patient.

There are also indirect risks to patients. For example, during a hospitalization for another problem, doctors taking care of Patient 7 incidentally found that he had an abnormal widening of his aorta (abdominal aortic aneurysm), which can rupture, in some cases leading to rapid death. Upon visiting with an APP three weeks after return to ADCRR, the APP referred him to a general cardiologist to address the widening. This problem is one which requires surgical repair. There is no medication or non-surgical solution. A general cardiologist does not perform surgery and would not be able to help this patient. Thus, the visit to the cardiologist would be a waste of a visit. Such specialty referrals are not themselves dangerous. However, their indirect effect is that they clog the referral pipeline, delaying other necessary care and contributing to ADCRR's failure to comply with the Injunction's requirement to complete specialty referrals within the timeframe ordered (paragraph 1.22d, also capturing paragraph 8.1).

**Paragraphs 1.22 and 8.1 (Timely Completion of Off-Site Specialty Referrals)**
Paragraphs 1.22 (in general terms) and 8.1 (in specific terms) of the Injunction require ADCRR to complete off-site specialty referral within the timeframe ordered (compliance with both is captured in item 1.22d in Attachment C). The timeframe may be based on a specific date or interval stated by the practitioner (e.g., "within 3 weeks," or "by August 15"). More typically, NaphCare practitioners use the labels "Urgent" and "Routine" which, by definition, mean within 30 and 60 days, respectively. ADCRR has continued to exhibit extremely poor performance on this requirement. The serious impact on patient safety of delayed completion of specialty referrals cannot be overstated. Indeed, generally clinicians refer patients to specialists when they are so ill or complicated that their needs exceed the knowledge and/or skills of ADCRR's generalists. Thus, arguably, these patients need timely attention more than anyone else.

The degree to which ADCRR is failing to comply with this requirement is hard to imagine. There were 7,379 Routine and Urgent off-site referrals scheduled to be completed during the month of September, 2024. Of these 239 (3%) were completed within the ordered timeframe, which means that 7,140 (97%) were not[3]. Among the 7,140 that were delayed, 1208 were Urgent referrals. Only 215 of those late consults were completed, on average about 60 days late. Even more striking, however, is that the remaining nearly 1,000 consults were already late when data collection closed at the end of September, and *are still incomplete*. Even if every one of those 1,000 referrals were completed on October 1, they would already be overdue by an average of over 100 days. Of course, when finally completed, the average delay will be much higher. To provide some sense of the specialist with whom these urgent consultations were delayed:

---

[3] These calculations are based on the raw data assembled by ADCRR. We found occasional errors in the assembled raw data, for example, referrals that ADCRR considered still pending and incomplete that had, in fact, been completed, sometimes on time. Thus ADCRR's self-evaluation results may be better than they conclude. Regardless of the exact percentages, it is still clear that delayed referrals continue to be a large problem.

| Specialty | Number of Urgent Consultations in Arrears |
|---|---|
| Cardiology or Cardiovascular Surgery | 143 |
| Neurology or Neurosurgery | 110 |
| Hematology/Oncology or Chemotherapy | 69 (most of which were for cancer or possible cancer) |

**Paragraph 2.1.1 (includes 2.1.2 and 2.1.3) (System Improvement – Mortality Reviews)**

Paragraphs 2.1.1, 2.1.2, and 2.1.3 of the Injunction are arguably among the most important elements of system improvement. They require ADCRR to learn from the errors associated with deaths. Despite repeated feedback and mentoring by the Monitors, ADCRR continues to be unable to recognize errors associated with deaths in custody – some of which are causal – and therefore fails to develop remedial plans. For example, in September, 2024 ADCRR conducted a mortality review of the June death of Patient 8. Their analysis missed critically important errors, which either contributed to his death or, if not remedied, could contribute to the death in another patient, to wit:

- Upon return from the hospital, there was no plan for follow-up for pain management.
- Nurses failed to perform a physical exam, including an abdominal exam, at multiple time points and the practitioner, when consulted, did not request the exam be done.
- An RN gave the patient an asthma medication (albuterol treatment) without an order, which is clinically inappropriate and a violation of a nurse's license.
- The patient was inappropriately assigned to an APP based on the complexity of case (obesity, surgically repaired ventral hernia, high blood pressure, high cholesterol, asthma, diabetes, obstructive sleep apnea, and major depression).
- The problem list contains 40 items, some of which are repeats and non-diagnoses that are not appropriate for a usable and useful problem list.
- Suction tubing was not available during a medical emergency when the patient was found unresponsive which is clinically not acceptable.

Although ADCRR reviewers recognized another serious error – an LPN caring for a patient independently, which is in violation of the Injunction and an LPN license and one that places patients at significant risk of serious harm – they made no plan to understand how this error occurred[4] and immediately implement remedies to prevent it from recurring. This is especially distressing because this death caught the attention of the Monitors and Court, and led to a meeting between the Monitors and ADCRR primarily to discuss this serious error. Thus even when ADCRR had the benefit of having the Monitors bring this issue to its attention, the Mortality Review Committee failed to implement any recommendations or plan to prevent its recurrence.

---

[4] ADCRR did look into this event and believed it was a "one off." While ADCRR might have believed this was true at the time, the fact that an event has been identified as a "one off" does not explain what underlying system failed, allowing it to happen, and does not address what steps need to be taken to assure that those underlying failures would not happen again. And, in fact, it was *not* a "one off." As discussed elsewhere in this report (see Patient 9), LPNs continued to independently care for patients, in violation of the Injunction and state law.

As poor as this mortality review was, almost all other mortality reviews we have reviewed were worse. The recommendations that emerge from these reviews, if there are any, lack any plan of action, no less a meaningful plan, to remedy the underlying system problem and monitor the proposed remedy to assure it leads to resolution of the identified problem.

## Paragraphs 2.4.1, 2.4.2, and 2.5.1 (System Improvement - Generally)

At its core, the health care component of the Court's Injunction is about improving the system of care provided to individuals at ADCRR. While much of the Injunction prescribes "what" ADCRR must improve, this paragraph is part of a section of the Injunction that provides guidance to ADCRR on "how" to achieve that improvement. Paragraph 2.4 instructs ADCRR to regularly examine at least 12 key medical and mental health activities. It intentionally does not set thresholds at which ADCRR must be performing those 12 activities, but instead requires ADCRR to: (a) measure its performance, (b) analyze the results, (c) determine if its performance is adequate or not, (d) to the extent it determines that its performance is inadequate, make appropriate efforts to understand the reasons, (e) take steps to remedy the underlying reasons, (f) measure the success of those steps, and finally (g) make adjustments to its efforts as necessary. ADCRR has consistently failed to go beyond step (c), often stopping at step (a) or (b)[5]. Paragraph 2.5.1 details how ADCRR should incorporate all sources of errors and systems problems in addition to the issues identified from Injunction paragraph 2.4 into a single comprehensive, prioritized list for continuous quality improvement that leads to the creation of *sustainable* remedial plans that are then monitored for effectiveness. Although ADCRR has developed what they call "CQI Studies", directed the ADCRR physician monitors to review individual charts, and list various corrective action plans (CAPs), the Court Monitors have yet to see a report showing system improvement based on the implementation of a sustainable remedial plan. Our team has repeatedly provided ADCRR feedback on why they are failing in their efforts and how to improve, to no avail. ADCRR's failure to fulfill the requirements of these particular paragraphs of the Injunction may provide a window into their inability to improve performance on the myriad other requirements of the Injunction.

## Paragraph 1.11 (LPN Nursing Practice)

Paragraph 1.11 of the injunction requires that Licensed Practical Nurses ("LPN") practice within their scope of practice, to include not independently assessing patients to determine the cause of their current complaint (diagnose) or initiating a plan of care or treatment (see also Arizona Administrative Code § 4-19-401). LPNs typically undergo about one and a half to two years of training beyond high school as compared to APPs or physicians who undergo six years and 11 years of post-high school training, respectively. Thus assessments and treatment plans conducted independently by LPNs put patients at significant risk of serious harm. Though we understand that NaphCare has modified its rules regarding LPN activities, LPNs continue to provide care beyond scope of practice. For example, an LPN independently managed Patient 9 on September 4, 2024 for a headache. While most headaches are of minor significance, headaches can be evidence of serious even life-threatening conditions such as stroke, brain aneurysm, meningitis,

---

[5] For one of the 12 minimally required activities, ADCRR has unilaterally decided to examine and report on this quarterly instead of monthly, as ordered by the Court. They continue this pattern, despite our feedback.

encephalitis, and head trauma, among others. Differentiating among these diagnoses requires knowledge and skill well beyond the abilities of an LPN, even if the limited examination by the LPN were negative. But in fact it was not. The LPN recorded three very troubling facts: the patient had a recent/past head trauma/injury; the patient reported that he was also experiencing intermittent dizziness; and on examination his neck was stiff (a hallmark finding in meningitis). Despite these findings – and because an LPN could not be expected to understand their significance – the LPN, acting independently, made a nursing diagnosis of "headache" and gave the patient a series of lifestyle recommendations. This posed a significant risk of serious harm to the patient.

**Paragraph 7.4.7 (Model of Care for Delivery of Medical Care)**
Paragraph 7.4.7 of the Injunction requires one of the most fundamental changes to ADCRR's model for delivery of medical (physical health) care. The pre-existing model dangerously placed nurses at the forefront of evaluating, diagnosing, and treating patients independently presenting non-urgently (and even more so urgently) with new complaints, justified by the use of off-the-shelf general guidance handouts for 50 to 60 symptoms and diagnoses. Not only is such a system not in general use in the community because of its dangers, but it is even more dangerous in the correctional setting because this population is much sicker, having a higher prevalence of substance use disorders, mental illness, several communicable diseases (e.g., hepatitis C, hepatitis B, HIV/AIDS, tuberculosis), and several chronic diseases (e.g., diabetes, asthma, hypertension). The evaluation of *de novo* problems requires the expertise of a practitioner – often a physician – because even seemingly minor complaints can be due to serious disease. Placing RNs in this role is dangerous. Placing LPNs – who receive from two and a half to three years less training – in this role is more dangerous. And placing EMTs – who receive only 220 hours of training – is even more dangerous. Despite clear direction from the Court, as described in examples in this report, ADCRR continues to use all three of these categories of professionals[6] in this capacity, placing patients at significant risk of serious harm.

**Paragraph 1.8 (Emergency Equipment)**
Paragraph 1.8 of the Injunction addresses a number of requirements related to the equipment used for emergency medical responses. One part of the paragraph requires all necessary equipment to be available for use (1.8a). Another part requires accurate maintenance of daily and monthly checklists assuring that the equipment is available for use (1.8b). NaphCare front-line staff members are responsible for making sure that the equipment is available and also responsible for maintaining the checklists. The checklists are the basis for the data used for self-evaluation of 1.8b; ADCRR's Health Services Division (HSD) staff members' visual inspections of the equipment are the basis for the data used for self-evaluation of 1.8a. Over a year ago we discovered in the self-evaluation reports that check lists indicated that equipment had been checked and was available, but HSD inspections revealed that the same equipment was missing.

---

[6] Based on the data we have observed, ADCRR fortunately uses the latter two professionals – LPNs and EMTs – in that role much less commonly than RNs.

Because of our concern for possible false documentation in state records by NaphCare, we brought our concerns to the attention of ADCRR. Despite this, the mismatch between reality and the corresponding check list documentation continues.

**Paragraph 10.1 (Medication Administration)**

Paragraph 10.1 of the Injunction requires nurses to reliably administer medications as intended. ADCRR fails to do so. Because medications are integral and necessary parts of many treatment plans for serious medical and MH diseases, this failure places patients at significant risk of serious harm. The following example demonstrates this failure, accompanied by other failures that violate other requirements of the Injunction.

ADCRR failed to administer HIV medications to Patient 10 for five days from November 22 to 26, 2024. Nurses documented that for the first four days the patient "refused" the medication; the nurse on the fifth day documented instead that the dose was just totally missing. In addition to submitting a complaint to the Court's on-line portal, the patient submitted a Health Needs Request form on November 23 stating, "I am, again, being deprived of my chronic health care medication due to medical staff continuously allowing my prescription to expire absent renewal prior to my prescription expiration date…I need all of my chronic health care meds timely renewed and refilled ASAP!!!." Despite the patient's apparent desire to be back on his medication, an LPN signed a refusal form for all the patient's missed HIV medications on November 24, indicating that the patient refused to sign it, giving a reason for this as "na". We were unable to ascertain the veracity of this documentation, but even if true, the LPN failed to escalate the issue to a higher authority (in violation of paragraph 10.3.1 of the Injunction). Missing HIV medication for five consecutive days placed the patient at significant risk of developing resistance to his medication and therefore treatment failure. Despite this lapse, no one performed an HIV viral load to ascertain whether the patient had developed resistance. This put the patient at risk of further harm.

**Paragraph 16.5.2 (Daily MH Care for Patients Requiring Inpatient Care [MH-5])**

Paragraph 16.5.2 of the Injunction requires primary therapists to conduct daily face-to-face clinical encounters with their patients who are in MH inpatient beds (category MH-5). Patients receiving an inpatient level of care are among the most acutely and chronically mentally ill individuals at ADCRR. These patients need to have highly structured interactions with staff, close monitoring, and a collaborative approach from treatment team members which includes having regular clinically meaningful evaluations of their mental and behavioral status. When staff fail to do so, there is a significant risk of missing signs of mental and behavioral decompensation, which can result in delay of care and exacerbation of the patient's condition. Especially with patients suffering from psychotic symptoms, the more active episodes they experience, the worse their prognosis, including the elevated risk of suicide. ADCRR fails to conduct these critically important face-to-face encounters four out of every five days, on average.

**Paragraphs 11.1.1, 11.1.4, 11.1.5, 11.1.6, 11.1.7 (Treatment for Hepatitis C)**

Treatment of patients with hepatitis C (HCV) infection is one of the domains in which ADCRR claims to have made – and our team concurs – progress towards the requirements of the Injunction. However, even here, there are still significant shortcomings compared to the Injunction requirements, as seen in Attachment C (paragraphs 11.1.4, 11.1.7, 11.1.5a, 11.1.5b).

Paragraph 11.1.4 of the Injunction requires ADCRR to maintain single list of all patients with HCV infection in order of priority for treatment based on clinical factors articulated in the Injunction (severity of liver scarring, the presence of other relevant diseases ["comorbid conditions"] that impact speed of progression of the disease, likelihood of transmitting the infection to others in the prison, and expected release date to assure there is enough time to complete treatment). The priority list ADCRR generates for this purpose is not consistent with these requirements and makes no sense. The following are defects of the list or its use that we could identify: the list does not include comorbid conditions; there are patients towards the bottom of the list who are receiving treatment before those in the middle without explanation; there are patients on the list who no longer have active HCV infection. The HCV-related paragraphs also require ADCRR to determine if any newly arrived patients who test positive for HCV already have advanced liver disease from the infection (stages "F3" or "F4"), and if they do have HCV infection, offer them treatment immediately. ADCRR fails to do this, instead waiting six months to first make this determination. As a result, by the time they do, the patient's liver may have undergone more damage increasing the risk that the liver disease cannot be sufficiently reversed. This unfortunately was more likely than not the case for Patient 4 as outlined in the non-suicide death reviews (Attachment A).

**Paragraph 11.2 (Treatment for Dormant Tuberculosis)**

Paragraph 11.2 requires ADCRR to offer all newly admitted patients screening for latent (dormant) tuberculosis. Patients with latent tuberculosis are not currently symptomatic nor contagious. However, over the course of their lives, in approximately 10% of these patients, the tuberculosis will "awaken" resulting in active disease. Active disease is certainly a risk to the patient themselves. However, the greater concern is that active disease poses a disaster to the prison because active disease can be present for weeks or months before it is diagnosed, during which time the patient is spreading infection to others. For this reason, the CDC advises that patients with dormant tuberculosis be offered treatment for their infection to prevent reactivation, especially in a carceral setting. ADCRR is, and has been, compliant with 11.2. However, it fails to routinely offer treatment to patients with latent disease, in violation of paragraph 1.1 of the Injunction, and placing the entire population (and staff) at risk of tuberculosis.

**Paragraph 11.3.1 (Treatment for Substance Use Disorder)**

Treatment of patients with substance use disorder (SUD) is one of the domains in which ADCRR claims to have made – and our team concurs – progress towards the requirements of the Injunction. However, even here, there are still significant shortcomings compared to the Injunction requirements, as seen in Attachment C (paragraphs 11.3.1, 11.3.2, 11.3.3, 11.3.4). Paragraph 11.3.1 requires ADCRR to screen all newly admitted patients for substance use

disorder (SUD), including a history of opioid overdose. ADCRR fails to conduct this screening consistently at intake. Further, they defer determining if the patient has a history of overdose until a month or more after arrival. This leaves the patient at risk for overdose during this high-risk period, an outcome that has happened at ADCRR in the past. Paragraph 11.3.6 requires ADCRR to provide medication for treatment of patients with opioid use disorder (MOUD). ADCRR has made MOUD much more available than it was previously. However, there are still deficiencies in its provision. One of the deficiencies is inappropriate discontinuation. We have discovered that some patients are discontinuing MOUD on their own, absent informed refusal. While patients have a right to refuse medications, paragraph 10.3.1 of the Injunction requires that that refusal be an informed one, as discussed elsewhere in this report. In the absence of an informed refusal, which includes a thoughtful conversation with the patient, a stoppage is dangerous. This is especially true for MOUD where there are other known reasons for patients stopping MOUD, such as strong-arming for diversion. The following patients are examples of cases where patients discontinued MOUD without informed refusal: Patient 11, Patient 12, Patient 13, Patient 14, Patient 15. A parallel violation of paragraphs 11.3.6 and 10.3.1 is termination of patients from the program without proper discussion with the patient or alternative plan for treatment. Examples include Patient 16 and Patient 17.

## Paragraph 16.9.7 (Release from Suicide Watch)

Paragraph 16.9.7 of the Injunction requires a MH professional to conduct a careful assessment to assure that it is safe to release the patient from watch to general population. ADCRR fails to comply with this requirement. As an example, Patient 18 was on watch four separate times during the month of September. On September 20, 2024 his level of watch *appears* to have been changed from being on watch to being released from watch to general population as evidenced only by a change in custody bed assignment. ADCRR failed to conduct any clinical evaluation to arrive at a rational reason for his release. This discharge from watch was made two days after the patient had spent 15 minutes banging his head on the wall requiring emergent administration of medications. It is very possible that his placement back on watch just eight days later, due to thoughts of wanting to self-harm, would have been preventable by compliance with the Injunction's requirement of a clinically appropriate watch-level-change evaluation on September 20.

## Paragraph 20.2.1 (Custody Staffing for the Subclass)

Paragraph 20.2.1 of the Injunction requires ADCRR to fill custody positions related to the subclass at minimal levels, based on the rating of the positions: Mandatory Posts 100%; Essential Posts 75%; Important Posts 50%. The number of staff was to be determined by a staffing analysis conducted by Mr. Frakes, due six months after issuance of the Injunction. Mr. Frakes submitted this report to the Court as directed on October 6, 2023. The report called for a significant increase in custody staff. One significant driver of the increase was the requirement (paragraph 22.1 of the Injunction) that incarcerated individuals be able to contact a staff member immediately in case of emergency. ADCRR informed the Monitors that it planned to satisfy this requirement with a technology-based (rather than personnel-based) solution: the use of wireless tablets. For this reason, the parties and Mr. Frakes mutually agreed, and the Court ordered that

ADCRR could defer implementation of Mr. Frakes' staffing plan until after the tablets were implemented and Mr. Frakes revised his staffing analysis. ADCRR implemented the tablets as promised after which Mr. Frakes submitted the revised staffing plan to the Court on September 26, 2024. It called for fewer staff than originally called for (based solely on the tablet implementation), but still called for more staff than were in place at the time of his original report in October of 2023. The Court ordered ADCRR to implement Mr. Frakes' second plan on October 28, 2024.

The Injunction (paragraph 20.2.3) requires ADCRR to file with the Court a "Deviation from Staffing Plan Report" by the tenth day of the month following any month during which it fails to comply with the staffing levels established in Mr. Frakes' (second) report. Having failed to comply in November of 2024, ADCRR filed such a report in early December (Dkt. 4724, filed under seal). The report shows that ADCRR was fully compliant with staffing levels at ASPC-Douglas and ASPC-Yuma, but fell below the required staffing level on at least one shift at one unit: on three days at ASPC-Safford; on four days at ASPC-Winslow; on six days at ASPC-Lewis; on 14 days at ASPC-Perryville; almost every day at ASPC-Eyman and ASPC-Tucson. Thus, at some locations ADCRR was recently significantly understaffed with respect to the Subclass. The lowest level for any Mandatory staffing level was 25% (required: 100%), for any Essential staffing level was 0% (required: 75%) and for any Important staffing level was 25% (required: 50%).

**Paragraph 29.1 (Custody Classification Monitor)**
Paragraph 29.1 of the Injunction requires ADCRR to assign a full-time qualified staff member ("Classification Monitor"), with no other collateral duties, to each individual unit housing members of the subclass (labeled as 29.1a in Attachment C). This helps assure compliance with other requirements of the Injunction because the Classification Monitor ensures that all classification reviews and individualized plan reviews that lead to step progression (up or down) and movements to an appropriate new housing location, are processed and completed. These reviews and plans must be completed within 10 days of the step progressions or housing movements along with documentation of the reasoning and supporting evidence (labeled as 29.1b in Attachment C) ADCRR considers itself compliant with assignment of Classification Monitors, but acknowledges the reviews and individualized plans are not being completed as required. When the Court specified the need for "a" full-time Classification Monitor in each relevant housing unit, it did so with the expectation that there would be no more than approximately 100-150 individuals in each unit. But at the Browning living unit of ASPC-Eyman, there is a single Classification Monitor for over 200 individuals. Although we found ADCRR technically compliant with part of paragraph 29.1 (29.1a) ADCRR will not be able to achieve compliance with the rest of paragraph 29.1 (29.1b) until it increases the number of Classification Monitors in living units with exceptionally high occupancy, or decreases occupancy.

**Paragraphs 19.1, 19.2, and 19.3 (Custody Decisions and Time Out of Cell)**

Paragraphs 19.1 and 19.2 require ADCRR to ensure that all custody decisions and reviews made by its staff are reasonable and consistent with legitimate penological interests, including that every person is housed in the least restrictive level that is safe for them and others. We consider them together because they are inextricably linked.

We found that ADCRR is not in compliance with these requirements for two reasons. First, in ADCRR's self-report the noted that they were unable to determine their compliance with 19.1. Second, in mid-November, ADCRR informed us that movement out of the subclass was temporarily paused.

Paragraph 19.3 requires that no one be kept in a cell for more than 22 hours a day for more than two months barring extraordinary legitimate penological reasons (19.3a) and for those latter few, that there be a system in place that facilitates their return to a lower level of custody and documents those facilitation efforts (19.3b). We found that ADCRR is not in compliance with paragraph 19.3 for three reasons. First, ADCRR reports that it is still "unable to determine" the length of time individuals remain in their cells. Second, there remain an unjustifiably large number of individuals in Subclass beds beyond two months. Third, as noted above, in mid-November, ADCRR informed us that movement out of the Subclass was temporarily paused.

We want to recognize that ADCRR has made significant progress towards creating and operating an acceptable Subclass classification system. However gaps remain.

**Paragraph 19.4 (Treatment of Youth)**

Paragraph 19.4 of the Injunction prohibits ADCRR from keeping any youth in their cell more than 22 hours per day. During a recent tour by Plaintiffs' attorneys to the unit where youth are housed (Sunrise Unit) they observed what they believed were violations of 19.4. ADCRR responded to these concerns by noting that out-of-cell time has been "dramatically adjusted" and that a different Deputy Warden had been assigned to the Sunrise Unit, and self-evaluated itself as compliant with the requirements of this paragraph. These facts indicate to us that ADCRR was not compliant, took steps to remedy the situation, and was now compliant in September. A site visit completed on December 18, 2024 found ADCRR is currently in compliance with 19.4.

**Paragraph 29.2 (Individualized Case Plan)**

For individuals in maximum custody, detention, or close management, part of paragraph 29.2 of the Injunction (labeled as 29.2a in Attachment C), requires ADCRR to create and maintain an individualized case plan that describes the actions needed, as well as associated timeframes, to progress in their steps in maximum custody and generally to gain more privileges and lower classification levels (less restrictive housing). We concluded that ADCRR is currently compliant with this requirement. We believe it was able to achieve compliance because it had been successful in greatly reducing number of individuals in the Subclass. Recently, however, that number has risen significantly (~500), creating the risk that ADCRR will not be able to maintain compliance. We will monitor this closely going forward.

**Paragraph 29.2.2 (Periodic Classification Reviews)**

This paragraph of the Injunction is complex. It requires ADCRR to conduct full classification reviews of Subclass members no less often than every six months and places further requirements on the contents of those reviews and resultant actions. Due to the complexity of the paragraph, we decomposed the paragraph into subparts, both to facilitate monitoring (and self-evaluation), as well as to make it clearer to ADCRR (now, and after this case closes) about what specific component of the requirement that is not being followed requires attention. Viewed globally, ADCRR is not currently in compliance with this paragraph. However, for the reasons noted above, we found that they are compliant with some subparts. Among them, we found them in compliance with 29.2.2a which simply states that classification reviews were conducted. It is important to note that we would ordinarily find such a requirement out of compliance if it were free-standing because the task being monitored – in this case whether a review was done and done on time – would not be sufficient. The task would also have to be done appropriately[7]. However, in this particular paragraph, because there are other subparts that measure appropriateness, we feel the fairest approach is to recognize that 29.2.2a – simply performing the task, without regard to appropriateness – has been complied with.

---

[7] This Court previously dealt with a parallel issue during the Settlement phase of this case. At that time, MH professionals were required to "see" certain patients. The Court determined that "seeing" the patient was not sufficient if that interaction were not clinically adequate.

## V. Performance on Activities that Span Multiple Requirements of the Injunction

### Over- and Mis-use of Telehealth

Despite our strong recommendations to the contrary, ADCRR continues to rely heavily on, if not increases its reliance on, remote medical and mental health practitioners providing primary care in medicine and chronic care in mental health via video (telehealth; "TH"). Although the Injunction does not prohibit ADCRR from using TH, it requires ADCRR to only use TH when clinically appropriate (paragraph 1.4). Instead, ADCRR frequently uses TH when it is clinically inappropriate, and therefore dangerous. In the case discussions included in this report, we cite several such examples. We have also noted a high rate of patients refusing visits with psychiatric practitioners when scheduled for TH visits. This is not unexpected because it is more difficult for patients with significant mental illness in a prison environment to feel comfortable and safe establishing a practitioner-patient relationship with virtual image on a screen. TH can, in certain limited circumstances, be used safely for delivering primary care in medicine. To do so, however, requires some combination of the following conditions. First, TH cannot be the *only* contact between the practitioner and patient, i.e., it works when in-person visits are interspersed with virtual ones to conduct the parts of a visit that require hands-on examination. None of the practitioners we are aware of ever visit the prisons in person. Second, the TH unit must have digital equipment that permits the practitioner to conduct certain parts of an examination remotely, e.g., electronic stethoscope (to listen to the heart, lungs, etc.,), otoscope (to look in the ears), ophthalmoscope (to look in the eyes), dermatoscope (to look at skin lesions). To our knowledge, none of ADCRR's TH units have such digital equipment or if they have it, ever use it. Third, a nurse or technician can function as the "hands" of the practitioner. For this, the individual must receive special training. To our knowledge, ADCRR has not trained, and does not use, such individuals. We have discussed these three conditions with ADCRR to no avail.

### Misuse of Medical APPs to Care for Complex Patients

ADCRR's misassignment of APPs to care for complex patients is dangerous and significantly contributes to countless errors in care that occur. To prevent this from occurring, the Court ordered that APPs should only be assigned as primary care provider (PCP) to patients who do not require physicians as their PCP, i.e., patients who are not complex (paragraph 6.2 of the Injunction). By extension, even when ADCRR has not yet assigned a PCP to a patient and the patient must be treated by whomever is available, that practitioner should not be an APP for patients with complex needs. APPs – nurse practitioners and physician assistants – receive approximately two years of training beyond a bachelor's degree. By comparison, physicians receive seven. APPs do not have the requisite training to safely manage patients with multiple diseases or with single diseases that themselves are complex to manage, e.g., decompensated cirrhosis or metastatic cancer.

Despite our repeated feedback to ADCRR regarding the dangers that are attached to allowing APPs to care for patients with complex conditions or needs, the practice continues. For example, Patient 19 has advanced cirrhosis of the liver. This is a complex disease by itself, but in this patient is further complicated by esophageal varices (enlarged veins in the esophagus at high risk

of spontaneous rupture and death). This patient was inappropriately assigned to an APP resulting in care that fell well below a minimally acceptable level and placed the patient's health at significant risk of serious harm. For example, the APP did not understand the physiology of cirrhosis and the fact that the patient's test results showing an increased risk of bleeding (high INR). This is a common result of cirrhosis, rather than the result of a Vitamin K deficiency (which can cause abnormalities of bleeding in other situations). As a result of this lack of understanding, the APP prescribed the patient Vitamin K. The APP also failed to monitor the patient's cirrhosis appropriately, e.g., failing to order timely ultrasound tests to check for cancer of the liver. In the attached mortality case discussions, we provide other examples of patients being inappropriately assigned to APPs.

**Electronic Health Record**

The electronic health record (EHR) used by NaphCare – TechCare – contributes to the dysfunctional system of care. While TechCare has some useful systems, for example, for keeping track of medication administration or for entering and scheduling practitioner orders, the major component of the EHR – the recording and communicating of clinical information such as progress notes from practitioners – can best be described as a sprawling disorganized warehouse. Like a disorganized warehouse, it is relatively easy for clinicians to deposit information in the warehouse. However, to retrieve information in an organized, useful, and efficient manner is nearly impossible. Our Monitoring Team members easily spent hours on individual patient records in order to understand the basics of a patient's conditions and treatment. Even allowing for the fact that front line clinicians may be more facile with the use of TechCare than the Monitors, they would be unable to piece together the information they needed to safely care for their patients in the time allotted to them. And, indeed, our review demonstrates how time and time again, they are unable to do this.

A number of features make the EHR unusable for clinician's purposes in all but the simplest patients or when searching for a very particular piece of information. Among those features are the following:

- Progress notes, the "work horse" of patient care and communication among providers, may be stored in one of at least three disparate sections of the EHR ("History," "Recent Progress Notes," and whole folders of progress notes embedded within "History"), dependent not on their content, but whether the note is written free-form or using a template. Due to the multiple locations to find notes, it is difficult to review a patient's chart in chronological order to recreate a clinical timeline of care and know what happened. Trying to ascertain what has happened to a patient in order to decide what to do next is highly time consuming, confusing, and frustrating in TechCare due to the need to jump from one section to another to review a patient's health care in chronological order and has led directly to clinical error. To make matters worse, within the history section, some progress note types (e.g., infirmary and wound care notes) are stored in folders under the date of last entry, meaning that all progress notes written during a stay in an infirmary – which could span from days to years – are in a single folder that appears chronologically, among all other progress notes from before, during, and after that stay,

only on the date the last note was entered during the infirmary stay which is often the day the patient was discharged from the infirmary.

- A Problem List is an indispensable component of all medical records. Its purpose is to give the user of the medical record a rapid and accurate "thumb nail" overview of the patient's health care conditions that is equally important for both emergency as well as non-urgent encounters to quickly know the patient's underlying problems. Without a clear, concise, and complete Problem List, as required by the Injunction (paragraph 4.3), it is much more difficult, if not sometimes nearly impossible, to safely care for a patient. The Problem Lists contained within patient EHR records frequently are horrible. They include useless information, outdated information, are often repetitive, and most importantly, as shown in the attached mortality case reviews, can be incomplete.

## Suicide

ADCRR's fulfillment of Injunction requirements relative to care for suicidal patients continues to be very poor and places the health and lives of mentally ill patients at significant risk of harm. This risk is shown in Dr. Abplanalp's analysis of suicides from the first half of 2024, submitted to the Court on October 17, 2024 ("Monitors' *ad hoc* Report on Five Suicides, 2024" Dkt. 4691), which I include in this report by reference. It demonstrated the substantial avoidable risk of death by suicide within ADCRR. This risk continues. To demonstrate the continuing risk, I am attaching a case review by Dr. Abplanalp of another suicide death from August, 2024 (Attachment B). The system failures underlying these deaths and the risks to other individuals incarcerated in ADCRR are multiple.

- Initial suicide risk assessments are not conducted in such a way that the MH clinician can truly understand the person's concerns and risks, in violation of paragraph 16.8.1 of the Injunction. This paragraph requires MH professionals to conduct a clinically appropriate in-person assessment of any individual identified by custody staff, medical staff, or others (e.g., self, family) as suicidal. Being incarcerated is one of the greatest risk factors for a person to die by suicide. The first and most crucial step in examining a person at risk of killing themselves is assessing that person's risk appropriately. This is a critical and fundamental step in keeping a person safe. According to ADCCR's self-evaluation for September, this failed to happen more than half (52%) of the time when someone was identified at being at risk of suicide. One common flaw leading to this low compliance rate is that many assessments are completed at cell front because the patient declined to leave their cell for a truly confidential conversation. Risk assessments completed in a non-confidential setting are of limited value in determining a person's true level of risk.

  The Monitors have recommended to ADCRR more than once that they modify their procedure for interviewing such patients. The usual way of conducting these assessments is the MH professional approaches the patient directly in their cell asking if the patient wants to accompany them to another (confidential) room for an interview. This is known in health care as the "opt-in" approach, whereby a patient is given a choice. The impression that relays is that leaving or not leaving their cell are equivalent choices and with a MH patient in crisis, staying in their cell is, at first blush, more comfortable. We

recommended an "opt-out" approach whereby a custody officer (not the MH professional) informs the patient that they have come to escort the patient to a consultation with a health care professional. The patient can voice a refusal if they want (i.e., the patient is not forced to go). However, this approach conveys the impression that there is an expectation to go to the appointment (as would happen with any other health care appointment in the prison), and that that is the clinically better choice. "Opt-out" is an evidence-based health care tool that is recommended for a variety of interventions by the Centers for Disease Control (CDC) and others. ADCRR has concurred that the opt-out approach is preferable and would improve their compliance with the Injunction. However, although it may be happening sporadically in some complexes, to our knowledge, ADCRR has yet to enact a statewide change to policy and procedure.

- In the attached case review of the death of Patient 5 Dr. Abplanalp describes the risk associated with the conditions of confinement to which some patients are subject when placed in suicide watch and how fear of those conditions contributes to the risk of suicide at ADCRR. Specifically, MH professionals fail to order conditions of confinement that are specific to the needs of the individual patient based on their current needs and risks. During their suicide watch, patients are managed in an overly punitive, degrading manner, without clinical justification. For example, patients at risk for suicide by arterial laceration (and not hanging) because this is the only method by which they have attempted suicide in the past and the method by which they inform staff that they plan to kill themselves now, have all clothing and other material that can be used to hang themselves removed and are required to wear embarrassing and cold one-piece suicide smocks. Patients fear being placed there. As a result, as illustrated by the death of Patient 5, patients hide their suicidal ideation from staff. Of course, such a tailored order requires the MH professional to have conducted a clinically appropriate initial suicide risk assessment, which, as described above, is a common way in which ADCRR fails.

- Paragraph 16.9.4 of the Injunction requires a psychiatric practitioner to examine a patient placed on suicide watch within one day. ADCRR failed to fulfill this requirement for one third of patients placed on suicide watch. Examination by a psychiatric practitioner is a critically important intervention for such patients because depression, a common reason for suicidal ideation, as well as the manic phase of bipolar disorder (where the risk of suicide is amplified by boundless energy, irritability, recklessness, and impulsivity), are often quite responsive to medications, which can only be prescribed by a psychiatric practitioner. Absent a timely and effective visit, the patient may remain at risk of suicide and death.

- Paragraph 16.9.7 of the Injunction requires mental health staff to assure that it is safe for a patient to be released from suicide watch back to general population. This assurance is attained by repeated risk assessments during the watch and then prior to contemplated release conducting a clinical risk assessment that includes: identifying the original reasons for suicidal risk; the ways in which those risks have now been abated; identified protective factors that will help mitigate suicidal risk going forward; and plans for follow-up treatment, and aftercare including a safety plan developed in collaboration

between the patient and treatment providers. ADCRR's self-evaluation of this requirement shows that almost half (48%) of all suicidal patients released from suicide watch do not undergo such an assessment. In other words, they are released without knowing if it is safe to do so.

- Paragraph 16.8.3 of the Injunction instructs ADCRR to place patients on suicide watch in the same room with other suicide watch patients when clinically appropriate. Doing so is safer for appropriately selected patients because it reduces emotional isolation which can reduce suicidal ideation and because it increases the number of people monitoring the patient. ADCRR fails to comply with this requirement.

## Lack of Continuity of Care

In both the medical and MH realms, ADCRR fails to provide adequate continuity of care for patients. In the medical realm, continuity of care means that aside from patient emergencies and staff absences (planned and unplanned leave), a patient will be cared for by the same medical practitioner at every practitioner encounter. That practitioner – their primary care practitioner or PCP – is a physician or APP. In the MH realm, again aside from patient emergencies and staff absences, continuity of care means a patient will be cared for by the same clinician associate at every counseling/therapy encounter. That clinician – their primary therapist or PT – is a psychology associate (though, in limited cases, it may be a psychologist). In addition to the primary therapist, for patients on psychotropic medications, continuity of care means that a patient will also be cared for by the same psychiatric practitioner at every encounter to address psychotropic medication management. That practitioner is a psychiatrist, psychiatric nurse practitioner, or psychiatric physician assistant.

With the exception of approximately 4% of the ADCRR population – the patients participating in the staffing pilot at the Dakota Unit of ASPC-Yuma, neither medical nor MH patients have continuity of care for any of the three domains above (medical care, primary therapy, psychiatry medication management). ADCRR has made modifications to the EHR such that the names of a practitioner and psychology associate are posted as their PCP and PT, respectively, but those designations do not yet have any operational significance.

The impact of this lack of continuity of care cannot be overstated. Its impact is greatest on the patients at greatest risk: those with complex medical or MH conditions. The impact is compounded by other failures including, but not limited to understaffing (resulting in delays in visits and shortened visits) and a very cumbersome and user-unfriendly EHR. Our team's review of patient health care records showed consistent evidence, time after time, that patients are cared for by a parade of different professionals who are not aware of previously provided care or care plans. It is impossible to provide constitutionally safe care under those conditions, and our report is replete with examples.

## Understaffing and Unmanageable Patient Panels/Caseloads

ADCRR continues to fail to fill health care staffing positions as required by paragraph 1.16 of the Injunction. As of the most recent report (November, 2024), ADCRR still had 104 FTE

vacancies. As the Court recognized in its Injunctive Order, it is simply impossible to provide safe health care with insufficient staff. Medical practitioners and psychology associates have patient panels and caseloads, respectively, that are too large. This results in both delays in visits, and visits that are too short for the clinician to provide adequate care.

## Missing Elements of Basic Mental Health Care

ADCRR fails to be compliant with key requirements of the Injunction which form the underpinnings of a minimally safe mental health system. Three components are central to MH care. The first is the initial comprehensive mental health evaluation. This evaluation is critical to ensuring that treatment is provided to each person to address their mental health needs. If an evaluation is not adequate, the person may have critical needs that go unrecognized and therefore unmet. An adequate – or any – evaluation is often not completed for MH patients upon admission to ADCRR (in violation of paragraph 16.3.1.1 of the Injunction). The second is a sound treatment plan. The treatment plan is the therapeutic road map for care until it is revised. In the absence of a thoughtful treatment plan, care is haphazard and unfocused. Too often we found charts with boiler-plate, superficial, or no treatment plans (in violation of paragraph 16.3.3 of the Injunction). Further, even when a patient has a clinically adequate treatment plan, due to the poor design of the EHR, it can be hard to find it. Third, the clinical encounters, geared to execute the treatment plan that was built from the comprehensive mental health evaluation, must be clinically effective. Two key factors that help ensure clinical effectiveness are time and place: The encounter cannot be rushed and it must be in a place (confidential, clinical venue) where the patient feels comfortable sharing. Time is especially important with a correctional population where many people may have reason to hide their symptoms. For example, when a person is experiencing symptoms of psychosis, disordered thought is one of the hallmark symptoms. Many people with psychotic symptoms (particularly delusions) can maintain organized thought for up to 20-25 minutes. When encounters in such patients do not last longer than 15 minutes (a common time frame for contact), the clinicians are likely missing important observational data about their patients. Clinical encounters in ADCRR are too often too short and/or conducted cell front (in violation of paragraphs 16.7 and 1.1 of the Injunction.

# VI. Factors Contributing to Failure to Comply with Injunction

## Barriers to Timely Completion of Off-Site Specialty Referrals

We describe elsewhere in this report ADCRR's marked failure to comply with the Court's requirement that ADCRR complete referrals to off-site specialists within the timeframe ordered by the practitioner (paragraphs 8.1 and 1.22 of the Injunction), and the resultant serious risk of significant harm. ADCRR has highlighted the importance of state law (A.R.S. §41-1608) that requires ADCRR to reimburse at a level that does not exceed the capped fee-for-service schedule set by the Arizona Health Care Cost Containment System, i.e., the "Medicaid Rate," and that this poses one of the challenges associated with finding providers willing to accept this low rate, contributing to referral delays. This information is different, however, from information I received during my monitoring work with the Court, that both the previous company that provided health care services to ADCRR, Centurion, as well as the current company, NaphCare, felt that the barrier posed by the cap was surmountable by other legal means, e.g., offering retainers not linked to individual billable visits. In a conversation with at least one specialist who provides consultation in a specialty for which referrals are currently in arrears (urology), the specialist stated that he had operated under such an arrangement with Centurion but is no longer seeing ADCRR patients because he had not yet been approached by NaphCare to discuss payment options. I do not have sufficient data to determine the extent to which the cap plays a role in ADCRR's failure to provide timely referrals but based on my knowledge of the industry and the additional information I have obtained, I believe that under the private health care model, barriers posed by the cap may be surmountable by increasing specialist compensation. Under a non-privatized model of health care, however, in which ADCRR, as the health care provider, did not have the flexibility of compensation arrangements available to a non-state actor, the cap would be a barrier.

Although specialist compensation is an important factor in ADCRR's failure to provide timely access to specialists, there are multiple other factors that contribute, all of which are interconnected and related to failures described elsewhere in this report. They include:

- Complex patients are cared for by APPs rather than physicians in violation of paragraph 6.3 of the Injunction. Having less training than physicians, APPs have a lower threshold for consulting an off-site specialist in situations where the physician would be able to handle the clinical need on-site. These referrals, in turn, clog up the system and delay appointments for other patients who critically need an offsite specialist or procedure.

- Some physicians caring for patients are not Board Certified in Family Medicine or Internal Medicine, in violation of paragraph 6.4 of the Injunction, some not having completed any residency or completed a residency in a non-relevant specialty. This impacts, at a minimum, the quality of the consultation they can provide to APPs during the latter's decision-making prior to making a specialty referral.

- The EHR in use by NaphCare is not user-friendly, as discussed elsewhere, making it difficult for any practitioner to find relevant information, especially information that would obviate the need for a referral. TechCare is also programmed to only allow

scheduling at 30 and 60 day timeframes which is an inappropriately long time interval for many urgent consultations.

- Understaffing of practitioners reduces the amount of time a practitioner has during an encounter to find the information in the EHR and provide the care that might obviate the need for a referral. It is faster to just defer the needed care to an offsite specialist.

- The over- and misuse of telemedicine, in violation of paragraph 1.4 of the Injunction, often makes it impossible to properly evaluate patients onsite, and an offsite referral is the work around.

- The lack of continuity of care, discussed elsewhere, also exacerbates these deficiencies because it is challenging for a practitioner who is seeing a patient for the first and only time to have a full understanding of the patient's needs; an off-site referral becomes a simple remedy.

- Understaffing of nurses and practitioners contributes to patients being inadequately informed about planned offsite referrals and procedures (i.e., the patient doesn't understand the nature and importance of the consultation) ahead of time or incorrectly informed at the time of transport by custody staff (i.e., inadvertently misinformed of the reason for the trip, or not knowing the reason for the trip) resulting patients refusing needed care. Once staff take the time to properly inform patients, appointments then need to be rescheduled both delaying care for the individual, and creating further backlog of the referral process.

- Such patient refusals and resulting cancellations also have a ripple effect on the specialist who now has an unused (and uncompensated) time slot, decreasing the willingness of specialists to contract with ADCRR.

- Finally, and quite importantly, there are insufficient custody resources to carry out the trips that *are* scheduled, in violation of paragraph 1.15 of the Injunction.

**Custody Understaffing**

Paragraphs 20.2.1 and 1.15 of the Injunction requires ADCRR to ensure there is a sufficient number of custody staff to execute the requirements of the Injunction with regard to individuals in the Subclass and with regard to individuals in the Class with regard to health care, respectively. ADCRR recently submitted its Deviation from Custody Staffing Plan Report (Dkt. 4724). That report shows, as does failure to comply with paragraph 1.15, that ADCRR is unable to provide a constitutionally sufficient number of custody staff. In the report, ADCRR points to the burden of MH watches as the principal cause of this failure at ASPC-Eyman ("Browning Unit needed 208 officers for the month of November to provide the required monitoring of mental health watches, which equates to 3.5 security post curtailments per shift.").

In the Injunction (paragraph 16.8.2), at our team's suggestion, the Court offered ADCRR one solution to alleviate this burden: use Behavioral Health Technicians (BHT) instead of custody

officers for MH watches. The Monitors have also suggested this option or a similar one using any vetted individuals to conduct MH watches following a short training/orientation. To our knowledge ADCRR has not implemented this approach.

Also, paragraph 16.8.3 of the Injunction instructs ADCRR to place patients on suicide watch in the same room with other suicide watch patients when clinically appropriate. Doing so is not only safer for appropriately selected patients[8], but can reduce the need for custody officers by several fold. The Monitors have found numerous cases in which the MH professional recommended such placement but it cannot be carried out. Not only is this in violation of 16.8.3, but also compounds ADCRR's inability to comply with the staffing requirements provided in paragraph 20.2.1.

**Health Care Understaffing**
As noted above, ADCRR continues to fail to fill health care staffing positions as required by paragraph 1.16 of the Injunction. ADCRR is reliant on NaphCare to recruit and retain health care staff. This staffing vacuum has existed since the inception of the Injunction. While it must be recognized that many additional staff have been hired, due to the grave degree of understaffing from which ADCRR began in April, 2023, it has been necessary to increase the goal, and thus a gap remains. NaphCare took many necessary steps early on to increase recruitment, e.g., increasing their human resources staff, acquiring new software for personnel management, contracting with staffing firms, broadening their advertising reach. Arguably these are steps that should have been in place and maximized at the outset of its contract in October, 2022, but it is still notable that they were implemented. However, as the gap between the Court-ordered goal lingered, there is insufficient evidence to show that NaphCare became significantly more aggressive in its recruitment efforts. In reports and filings of NaphCare's efforts after April, 2023, most of the steps that were being presented to the Monitors and Court as increased recruitment efforts were steps that NaphCare had already taken or should have already taken much earlier.

The *most* important step that needed to be taken to increase staff recruitment was increasing salaries. I made this observation/suggestion to ADCRR several times since the Injunction's inception in April, 2023, including suggestions to aggressively escalate salaries (e.g., five to 10%) as often as monthly based on constant and careful monitoring of responses to advertising and hiring. Despite this, NaphCare's efforts to increase salaries have been anemic, at best. I addressed this in my previous report to the Court. To update those data, I provide the following examples.

---

[8] The increased safety happens for at least two reasons. Because suicidal patients are typically depressed and immerse themselves in their own dark thoughts when alone, placing them in a room with others can reduce the intrusion of dark thoughts and solitude, decreasing the risk of suicide. Second, all the additional roommates provide additional monitoring; when placed in such settings, patients may be thinking of harming themselves, but tend to alert the monitor when they see someone else trying to harm themself.

|  | NaphCare's Advertised Hourly Salary Range in: | | |
|---|---|---|---|
| Position | Dec. 23 | July 24 | Nov. 24 |
| Dir. of Nursing | $48-58 | $50-58 | $51-58 |
| EMT | $20-25 | $20-27.50 | $20-28 |
| **Nursing Assistant** | **$17-21.50** | **$17-25** | **$17.50-25** |
| **Physician (Medical)** | **$120-134** | **$120-136** | **$120-136** |
| **Medical APP** | **$67-77** | **$65-77** | **$65-77** |
| Psychiatric APP | $80-90 | $82-90 | $75-90 |
| **Psychologist** | **$51-64** | **$60-95** | **$60-98** |
| Psychology Associate | $32-44 | $36-54 | $36-58 |
| RN | $36-48 | $38-56 | $39-56 |

The positions in bold are among those most needed. For example, there is a severe dearth of physicians at ADCRR, yet NaphCare offered a paltry $2 (1.5%) per hour increase to physician salaries between December, 2023 and July, 2024 and has made none since. In the sole case of psychologists, NaphCare aggressively increased the salary it offers. In my expert opinion, NaphCare will not be able to recruit qualified professionals to fill the positions ordered by the Court until it adequately addresses salaries in a much more aggressive manner than it has so far.

### ADCRR's Inability to Monitor Compliance

Within the medical and MH portion of this case, now, more than one and a half years after issuance of the Injunction, the Monitors and ADCRR are still unable to assess ADCRR's compliance with a number of the requirements of the Injunction because ADCRR or NaphCare is simply still unable to capture the relevant data. These are indicated as red boxes with black "X"s in Attachment C. ADCRR is aware of these data gaps; it is my understanding that for those that are dependent on NaphCare, ADCRR has been trying, but remains unsuccessful in getting their vendor to provide the required data. There are other Injunction requirements for which ADCRR's data gathering methodology remains flawed, but for which there is sufficient data for our team to determine they are not in compliance because of the marked degree of non-compliance[9]. For requirements where we are aware of the flaws, we have shared – sometimes repeatedly – feedback with ADCRR. Few have improved. Once again, we understand that ADCRR is dependent on their vendor to make needed changes.

Finally, the most prevalent data monitoring problem is ADCRR's failure to be able to correctly analyze Injunction-related data that it *is* able to collect. Our team, especially Drs. Abplanalp and Strick, has spent hundreds of hours over months providing written and oral feedback and mentoring to ADCRR on errors in its analysis and interpretation of Injunction compliance data.

---

[9] For example, ADCRR might base compliance on a sample drawn from a set of events that includes events that could not possibly be out of compliance. As such, if the health care system were "healthier" and therefore there were fewer errors, such a sample might overstate compliance. However, currently, with the abundance of errors, non-compliance is still obvious.

Since September, 2023, Dr. Strick has been providing monthly written feedback, and since January, 2024 augmented that written feedback through monthly meetings with ADCRR's medical team, to provide this feedback and mentoring on ADCRR's self-evaluation of medical-related requirements of the Injunction. These meetings were limited to discussing Injunction-related performance based on data that ADCRR was analyzing using medical practitioners. ADCRR uses other professionals, primarily nurses, to analyze many other parameters of the Injunction that don't require the expertise of practitioners, but are nonetheless very important. A number of times Dr. Strick offered to provide the same oral feedback and mentoring to the nurses and others performing these reviews, to no avail. ADCRR discontinued the meetings with the practitioners when a member of ADCRR's medical team, the medical director, left the agency in August, 2024. Dr. Strick offered to continue the meetings after his departure, to no avail. As there has been some change in personnel at ADCRR in the past few months, in November, Dr. Strick twice renewed her offer to provide feedback and mentoring. In the past few days, staff at ADCRR has expressed interest in accepting her offer, so potentially, this may occur, however, to date ADCRR has not planned anything definitive.

There has been even less receptivity for feedback and mentorship in the MH realm. Dr. Abplanalp was also having weekly meetings with ADCRR's MH team in 2023. Beginning in October, 2023, however, ADCRR began repeatedly cancelling scheduled meetings. Dr. Abplanalp typically attempted to reschedule the meetings to find those meetings cancelled as well. Between May 15 and June 26, 2024, ADCRR cancelled meetings six times. Cancellations continued into October.

Due to the minimum impact of Drs. Strick's and Abplanalp's feedback efforts, and the cost to the state[10], I had both monitors discontinue their written feedback efforts in July of this year. As noted above, both monitors have made themselves available for meetings, with variable to little uptake. In summary, ADCRR has demonstrated very limited capacity to self-evaluate its compliance with the Injunction and has failed to make use of resources the health care monitors have offered to remediate this deficit.

### Deleterious Impact of Privatization of Health Care

In 2019 this Court asked me, as its Federal Rule of Evidence 706 expert, to ascertain why ADCRR had failed, after several years, to satisfy the health care-related terms of a settlement agreement with the Plaintiffs. In my report to the Court (Dkt. 3379), I opined that the second most important reason for ADCRR's failure to provide constitutionally adequate health care was that ADCRR's health care was outsourced to for-profit vendors.

Five years and three vendors later, based on the current evidence before me, the opinions I expressed then – save one – and the underlying reasoning that led me to those opinions, have not changed. In my expert opinion, it will be difficult, but more likely impossible, for ADCRR to

---

[10] I estimated these costs to be in excess of $600,000 annually.

emerge on the other side of this Court's Injunction if it continues to outsource the provision of health care.

The use of a vendor to provide health care continues to add complexity, glacial movement, and cost to health care operation improvements needed to comply with the Injunction at a time when ADCRR desperately needs to simplify operations, be nimble, and save money. Every significant change ADCRR has needed and wanted to make to health care operations since the issuance of the order has taken valuable ADCRR management resources as well as valuable time as the change grinds its way through the layers of private company operation and legal bureaucracy.

## Limited Leadership/Management

In the section above I stated that the fact set I examined in 2019 has not changed, with one exception. That exception is that, based on the evidence our team has collected over the past two years, it is my opinion that ADCRR has insufficient leadership to promote the type of major change that has to be forthcoming in order to be compliant with the health care-related requirements of the Injunction. The following are some examples that inform my opinion.

- ADCRR continues to support the existence of three separate sets of policies and procedures governing health care operations: 1) Department Orders are ADCRR-wide policies and procedures, some of which pertain to health care operations, 2) two Technical Manuals (Medical and Dental Services Technical Manual; Mental Health Technical Manual) contain policies and procedures produced by ADCRR's Health Services Division (HSD) and are specific to the delivery of medical and mental health care, and 3) the Health Care Policy and Procedure Manual produced by the vendor, NaphCare, to whom health care is outsourced. ADCRR's expectation is that NaphCare staff will follow ADCRR policies (Department Orders and Technical Manuals). However, based on my experience, and supported by patient safety science, it is hard enough to get employees to follow a single set of policies and procedures, no less three. If the three sets were identical, this would not be an issue, but they are not. Many of the policies overlap, but a given Department Order policy may have guidance that is missing from the most closely related Technical Manual policy, and *vice versa,* requiring staff to look at multiple documents to piece together what to do. Even more concerning, however, is the existence of contradictory guidance between documents. For example, the Medical Services Technical Manual (at P-E-08.01 (2.0)) severely limits the role that nurses can play in addressing new non-urgent episodic patient complaints, consistent with the requirements of the Injunction. NaphCare's policy (at E-08), on the other hand, continues to embrace a system of care in which nurses can function as primary care practitioners, independently managing the full spectrum of complaints/symptoms, the very system of care the Injunction prohibited. NaphCare staff continue to follow their own policy, notwithstanding ADCRR's expectation to follow ADCRR policy, and in violation of the Injunction. I have shared my concern with ADCRR leaders about the multiplicity of and discordance among the extant policy manuals. The three sets of policies remain.

- To our knowledge, ADCRR has not planned for the additional space that will be required to accommodate the increase in health care staff that it inevitably will require to safely care for patients. This need is one that ADCRR leaders recognized at least as early as December, 2023. Yet, despite this recognition, and the certainty that staffing must increase to meet the requirements of the Injunction, to our knowledge, ADCRR does not yet have a plan to accommodate this increase.

- ADCRR is currently conducting a pilot of the statewide health care staffing plan developed by Ms. Strugar-Fritsch. The pilot is being conducted at two living units, one each at ASPC-Perryville and ASPC-Yuma. In order to assess the projected staffing plan, it was first necessary to pilot a model of care that is new to ADCRR and that is in-line with the Injunction, since ADCRR had not yet implemented these changes. This type of system change is operationally highly complex. Before and, when it had not materialized, during the pilot, Mr. Strugar-Fritsch, who ADCRR chose to provide consultation on the pilot, strongly recommended to ADCRR leaders that they assign an appropriately experienced individual to serve as project manager. Despite these recommendations, no one has been assigned as a dedicated project manager. To date, the pilot project – whose success has critical implications for achieving constitutional level care going forward – has suffered as a result of the lack of project management.

- Prior to issuance of the Injunction, when a patient submitted a request to be seen for a new complaint, nurses received the transmittals (HNRs), triaged them, and then typically conducted an encounter to further triage, and in many cases, treated and released the patient without provider involvement. In the interest of patient safety, the Injunction required this role to be transferred to the patient's primary care practitioner. Though amenable to follow the Court's instruction, ADCRR leaders instructed nurses to continue to receive, triage, and see patients for non-urgent complaints even when the patient would subsequently be seen directly by their primary care practitioner. We strongly advised ADCRR against this, not because it was directly dangerous, but because it was an unnecessary step, drawing nurses (who are understaffed) away from value-added functions. ADCRR leaders repeatedly declined the recommendation because they feared it would impair their ability to achieve accreditation from the National Commission on Correctional Health Care (NCCHC), despite the fact that NCCHC accreditation is not mandatory. Further, because the total system of care called for in the Injunction is safer than the system of care envisioned by NCCHC, and NCCHC entertains waivers from aspects of its standards when they are in the best interest of patient care, we recommended that if accreditation was important to them, that leaders seek such a waiver. To our knowledge they did not.

- In another NCCHC-related situation, in the middle of implementation of the staffing pilots, one of the two pilot sites was scheduled for an NCCHC accreditation site visit. Such visits, and the preparation for them, is extremely time consuming, especially for the site health care leaders. Based on the high intensity of work required to implement the pilot, the challenges already being faced due to lack or project management, the important statewide implications of lessons learned from the pilot, the fact that NCCHC accreditation is wholly voluntary, and the fact that there is no reason a facility cannot

operate in compliance with the standards without actually undergoing accreditation, I strongly recommended to ADCRR leaders that they postpone or defer the accreditation site-visit in deference to fulfilling the requirements of the Injunction. They did not.

- ADCRR currently requires medical practitioners to schedule patients with certain common chronic disease to return to clinic at a minimum of set intervals (e.g., 30 or 60 days), regardless of whether their condition warrants that frequency. Such a model of care is wasteful of scarce practitioner resources, thereby worsening access to care – a problem contributing to the unconstitutional state of care. When first starting to work with ADCRR we strongly recommended to ADCRR leaders that they remove these requirements, instructing practitioners instead to schedule patients to return to clinic at an interval clinically appropriate to their condition. Just recently, some two years later, after recommending this again, ADCRR leaders will begin implementation of this change at the two pilot sites with a plan to expand it to the entire population thereafter.

- Finally, ADCRR's leaders' ability to promote the operational changes needed to comply with the Injunction would be reflected in the way in which they manage their contract with the vendor, NaphCare. Indeed, most operational changes that ADCCR needs to make must be made via their vendor. While extant documents ADCRR normally provides to us provide a small glimpse into ADCRR's contract management history, it is impossible to have a full and fair understanding of that history without further review. ADCRR has been fully willing to share additional documents and explanation that we may need (as they have always been). However, given that all this would not be able to happen prior to issuing this report, we are unable to provide the Court with an informed opinion on this issue at this time.


Respectfully submitted,

Marc F. Stern, MD, MPH
Lead Monitor,
On behalf of the Court Monitors
Dr. Bart Abplanalp, Ph.D.
Mr. Scott Frakes
Dr. Lara Strick, MD, MS

# Attachment A
## Non-Suicide Death Reviews

# Patient 1[1]

Patient 1 was a 61 year old male who died in the hospital on 11/3/24 due to complications from poorly managed valvular heart disease and pneumonia. He was a complex patient with multiple medical problems including high blood pressure, high cholesterol, coronary artery disease, gastroesophageal reflux disease, autoimmune disease, chronic kidney disease (on dialysis until December, 2023), and severe valvular heart disease requiring surgical replacement of the tricuspid and mitral valves.

In 2023, his heart failure symptoms progressively worsened due to recurrent severe stenosis of his mitral valve requiring admission to the hospital at which time a new heart valve was surgically implanted on 8/23/2023.

On 8/28/23 the patient was discharged from the hospital. Upon discharge, the cardiologist advised that the patient should have the following follow-up care:

- Cardiology appointment in 1 week (~9/4/23).
- An echocardiogram (ultrasound) of the heart in 4 weeks (~9/25/23)
- Follow-up cardiology appointment in 4 weeks (~9/25/23)
- An echocardiogram of the heart 1 year (~8/2024)
- Follow-up cardiology appointment in 1 year (~8/2024)

> *ADCRR failed to schedule the 1-week appointment in the time frame ordered by the cardiologist. Instead it was scheduled to take place 2 weeks later (9/12/23). (in violation Injunction paragraphs 1.1; 1.22; 9.1)*

> *ADCRR failed to take the patient for the already delayed appointment on 9/12/23. There is documentation of a "refusal" of this appointment. The "refusal" was executed by an LPN (licensed practical nurse). For a refusal of such an important intervention to be clinically appropriate and valid, it requires the health care professional to: 1) understand the intervention which the patient is refusing; 2) understand the reason for the patient's refusal; 3) through that understanding, attempt to reduce or eliminate the barriers that underlie the patient's refusal; 4) explain the risks of refusal; and 5) offer alternative interventions or approaches if any exist. An LPN does not ordinarily have the knowledge or skill to conduct an informed refusal unless the LPN has had specialized training specific to the patient's underlying condition. We have no evidence that this LPN had such training, nor, to our knowledge, does NaphCare provide such training. Thus, ADCRR failed to execute the care that was ordered (in violation Injunction paragraph 1.22) and failed to obtain an informed consent (in violation Injunction paragraph 1.21).*

> *ADCRR failed to obtain the 4-week post-discharge echocardiogram (in violation Injunction paragraphs 1.1; 9.1)*

---

[1] The full names of all patients referred to in this report appear in Attachment D.

*ADCRR failed to schedule the 4-week post-discharge follow-up appointment with the cardiologist. Instead they scheduled the follow-up for 2/27/24 (a delay of 5 months). (in violation Injunction paragraphs 1.1; 9.1). Further, they did not execute even that delayed appointment. As had happened for the 1-week cardiologist appointment, a "refusal" was executed by an LPN. As described above, this was clinically inappropriate and resulted in the patient not having an informed refusal. (in violation Injunction paragraph 1.21)*

*ADCRR failed to obtain the 1-year post-discharge echocardiogram. (in violation Injunction paragraphs 1.1; 9.1)*

*ADCRR failed to schedule the 1-year post-discharge follow-up appointment with the cardiologist. (in violation Injunction paragraphs 1.1; 9.1).*

*In summary, in 14 months (from the time of discharge after a complicated cardiac surgery until re-admission to the hospital and death – see below), the patient never had a single one of the five follow-up interventions recommended by the cardiologist. At no point during this time-period did a practitioner discuss with the patient the need for follow-up after heart valve surgery, let alone the critical importance of that follow-up. Each intervention was critically important to assure his safety. Performance of any one of the five recommended follow-up activities, especially the latter ones, may have detected – and allowed for remediation of – worsening health that eventually led to his death.*

On 11/22/23 the patient was seen for a chronic care visit with an APP (Advanced Practice Practitioner, in this case, a nurse practitioner). The nurse practitioner assessment was focused on the patient's hypertension.

*Based on the high complexity of this patient, he should have been assigned to a physician, not an APP. (in violation Injunction paragraph 6.2).*

*The APP focused the visit on a single chronic disease – hypertension – ignoring his other equally, if not more acutely important, chronic medical conditions, including his valvular heart disease and recent surgery, coronary artery disease, autoimmune disease for which the patient was currently on powerful immunosuppression therapy, chronic renal disease, hyperlipidemia, and anticoagulation (i.e., need for blood thinners). Failure to appropriately monitor and address these other diagnoses was very clinically dangerous. (in violation Injunction paragraph 1.1).*

On 12/12/23 the patient was seen by the kidney specialist. The specialist confirmed that the patient no longer required dialysis and ordered the dialysis catheter to be removed. He said the patient must stop his blood thinners (i.e., warfarin and aspirin) prior to catheter removal. The tunneled hemodialysis catheter was removed on 12/29/23 while he was still receiving the blood thinners.

*ADCRR failed to hold the blood thinning medications prior to conducting the procedure. This puts the patient at significant risk of uncontrollable bleeding and serious morbidity. (in violation Injunction paragraph 1.22).*

On 4/1/24 the patient was scheduled for a chronic care visit. He did not show up for the appointment.

*Staff appear to have assumed that he refused because there was a refusal form filed in his medical record. However, the signature does not match any of his signatures that appear on other refusal forms. Further, the name and professional credential of the person executing the refusal are absent. At best, the person was an RN (registered nurse) or medical practitioner who made every effort to convince the patient of the importance of the visit, but failed to document such efforts as well as failing to adequately document their refusal. (in violation Injunction paragraphs 1.1; 1.2) At worst, the person was not an RN or practitioner (e.g., LPN, custody officer) and therefore could not have adequately executed an informed refusal of the visit. (in violation Injunction paragraph 1.21) Given the patient's very complex medical history, missing the visit put him at significant risk of serious harm.*

The patient did not show for chronic care visits scheduled for 5/11/24 and 6/10/24. Following the 6/10/24 refusal a physician ordered for him to be rescheduled 3 months hence.

*There are refusal forms in the chart for both dates. While the form for 5/11/24 was signed by an APP, the name and professional credential of the person executing the 6/10/24 form are missing. For both refusals, the patient's medical record lacks documentation of clinically adequate counseling to discuss the importance of chronic care given his severe valvular disease, chronic kidney disease and other conditions, understand the patient's reasons for refusal, and efforts to convince the patient to receive care, i.e., an informed refusal. (in violation Injunction paragraphs 1.1, 1.21). If the patient was told and understood the importance of follow-up, he may have gotten the needed care to re-evaluate his heart after his procedure in time to intervene prior to his death.*

At 12:23 AM on 9/7/24 the patient informed a NaphCare employee identified in the medical record as a "health care technician"[2] that he ran out of Tums and was experiencing worsening of his chronic heartburn. The technician elected to administer the patient one dose of Tums for the night and advised him to talk to nursing staff to reorder his medication.

*While at first blush the action of providing someone a Tums appears to be an innocent courtesy, it is, in this context, the practice of nursing, if not medicine, by an unlicensed individual. When health care is provided by someone identified to a patient as a health care provider, in response to a medical complaint, patients make the reasonable assumption that the care is qualified and based on a scientific understanding of the*

---

[2] Arizona Department of Health Services does not have any license, certification, or registration for "health care technician."

*patient's condition and needs. This patient presented to the employee at midnight with a medical complaint. This required the employee to immediately summon the assistance of an RN or practitioner. The sensation the patient was experiencing could certainly be due to simple heart burn. However, it is not unusual for cardiac chest pain to be confused with gastrointestinal symptoms by a patient and thus in this particular patient with serious heart disease, the sensation could also have been due to other serious conditions, such as an evolving heart attack or severe valvular heart disease. What the employee did was highly dangerous, placing this patient at a significant risk. (in violation Injunction paragraph 1.1 and possibly state law)*

On 9/12/24 the patient had a chronic care visit with a physician. The visit was conducted via telemedicine. The physician noted that the patient had not taken any medications for months because of "long waiting lines in the heat which he is "too tired" to tolerate," and documented that the patient had chronic shortness of breath, "no energy to do anything," and "severe fatigue." The physician also documented that his examination of the patient was limited to visual assessment because the visit was by telemedicine. The physician concluded that the "Level of Disease Control" of his cardiac disease was "Good" and "Unchanged." Among other orders, the physician ordered a complete blood count (CBC).

*The saddest and most strikingly deficient aspect of this visit was the lack of a physical examination. It had now been more than 8 months since any practitioner had placed a stethoscope on Patient 1's chest to listen to either his heart or lungs. The seriousness of this deficit cannot be overstated. It would be clinically necessary to have conducted such an examination at least once or twice during this long period given his complex cardiac history, even if the patient were feeling fine. But on 9/12/24 Patient 1 was most certainly not feeling fine. Given that his death resulted in large part, if not totally, from marked deterioration (obstruction; stenosis) of his artificial heart valve, it is almost certain that by this date Patient 1's heart was generating markedly abnormal sounds that would have been recognizable even by a medical student. It was a likely contributor to, if not the cause of his shortness of breath and weakness. Identification of the abnormality at this stage would more likely than not have allowed enough time for the valve to be fixed and death avoided. Thus examination of Patient 1's heart and lung was a critical element of this visit. Instead, the physician considered the virtual visit to be sufficient and made no effort to ensure proper care for the patient, not only violating the Injunction's requirement that telemedicine only be used when clinically appropriate (in violation Injunction paragraph 1.4), but moreover, providing markedly substandard care (in violation Injunction paragraph 1.1). His documentation that the patient's cardiac condition was "Good" and "Unchanged" could not have been further from the truth; it was poor, worsening, and a harbinger to his demise.*

*The physician also failed to meaningfully and appropriately address the patient's non-adherence to medications. While ADCRR cannot force patients to take medications, it was their obligation to understand the reasons for medication refusal and, armed with that understanding, attempt to reduce or eliminate the barriers that underlain it. In this particular instance the reasons were not only clear, but rational (it was too difficult to stand in long lines in the heat, especially given his generalized weakness almost certainly*

*caused by his heart disease, low blood count, and the side effects of his medications themselves), and most importantly, within the power of ADCRR to remediate easily. Instead, the physician merely repeated warnings about the risks of non-adherence. (in violation Injunction paragraph 1.1)*

The next day, on 9/13/24, the CBC results were reported back to an APP. The number of platelets in his blood were low and dropping (from 109,000 on 3/25/24, to 98,000 on 5/17/24, to 85,000 now; normal 140,000 – 400,000). The amount of hemoglobin in his blood remained dangerously low and only slightly higher than it had been (from 7.5 on 5/17/24 to 8.8 now; normal 13.5 to 17.5).

*Both of these blood results were markedly abnormal. Platelets are responsible for helping to stop bleeding. By itself, the low level would put a patient at risk of bleeding. The fact that the patient was on blood thinners increased that risk.*

*Hemoglobin is responsible for transporting oxygen to the body. The level was now approximately half of what it should be. It was likely a major contributor to the patient's fatigue and unwillingness to stand in line to receive medications, a contributor to his shortness of breath, and posed a major risk to his heart. Instead of galvanizing a swift response from the medical team, the APP did nothing. (in violation Injunction paragraph 1.1)*

At 2:10 AM on 9/25/24 the patient presented to the clinic complaining again of heartburn and requesting Tums. He was evaluated by an RN. The nurse documented the absence of heart, lung, or neurologic symptoms, examined the patient's abdomen (but not heart or lungs), diagnosed the patient with gastroesophageal reflux (as evidenced by her selection of the treatment protocol for Gastroesophageal Reflux as her guide), told the patient to continue the pantoprazole (a medication to treat heartburn) he was already on, and issued the patient a seven-day supply of Tums. An APP cosigned the RN's report at 7:12 AM.

*As explained above, this patient's presenting complaint in the middle of the night – heartburn – could also be a symptom of a serious medical problem. It required, at a minimum, an examination of the patient's heart if not further testing, such as a heart tracing (EKG). Moreover, it required the nurse to consult with a practitioner as soon as possible, but no later than 4 hours later. Instead, the nurse conducted no such consultation. (in violation Injunction paragraphs 1.1; 1.20.1) The signature of a completed care note by a practitioner almost 5 hours later does not nearly fulfill this requirement.*

*Further, the nurse's use of a nursing protocol is a flagrant violation of paragraph 7.4.7 of the Injunction. That paragraph allows a very narrowly defined role for nursing protocols – which this protocol did not fit – for non-urgent/non-emergent care. The reason for the Injunction's restriction on the use of nursing protocols is that care of a symptom such as heartburn in a patient like Patient 1 is complicated and requires the skills of a physician to make an appropriate diagnosis and treatment plan. In contrast to a physician's 11 years of graduate education, nurses have at most, four years of graduate*

*education and therefore cannot safely diagnose and treat patients, even with the aid of a one or two page handout. If use of nursing protocols is not permitted for non-urgent/non-emergent care where the stakes are generally lower, the use of nursing protocols is certainly unreasonable in the higher stakes urgent setting. (in violation Injunction paragraph 7.4.7).*

On 9/28/24 the patient had an acute deterioration of his mental status (was found eating dirt) and was sent to the hospital. He returned from the hospital on 9/30/24. The nurse who encountered the patient upon return noted that ADCRR had received no information from the hospital about the patient. The only information she recorded was that the patient reported that he left the hospital against medical advice. His heart rate was 103 (abnormally high). The nurse's work was reviewed remotely by an APP who ordered for the patient to have nurses conduct checks of the patient's neurologic status twice daily for three days.

*Both the nurse and the APP who reviewed her work 14 minutes later failed to make any attempt to obtain clinical information about Patient 1's evaluation from the hospital (in violation Injunction paragraph 9.2). Given that medical staff sent Patient 1 to the hospital because they feared he was suffering from a serious acute ailment based on an acute change in behavior/mental status., it was critically important that they find out what the hospital discovered.*

*Despite the fact that they were operating in an information vacuum, neither the nurse nor the APP conducted any examination of the patient other than checking his vital signs (which were abnormal) and noting that he was "alert." (in violation Injunction paragraph 9.2)*

*In any patient, but especially one such as this, who has no history of mental illness and who has myriad significant medical conditions, a change in mental status is most likely due to a serious, often life-threatening physiologic, not emotional, problem. Thus the failure of staff to further evaluate him – either themselves or by seeking the result of hospital evaluations – place him at significant risk of serious harm.*

*Medical staff failed to perform five of the six neurologic status checks ordered by the APP to be done over the following 72 hours. (in violation Injunction paragraph 1.22)*

On 10/10/24 the patient was sent to the hospital for the final time for shortness of breath and coughing up blood. Upon arrival at the hospital, he already had almost every symptom of severe narrowing of his artificial heart valve (mitral stenosis): shortness of breath, fatigue, swelling of the ankles, irregular heart rhythm, coughing up blood, fluid in the lungs, and chest pain. After three and a half weeks of intensive care and surgery, he died on 11/3/24 due to his valvular disease and pneumonia.

*In summary, this patient died of the complications of severe mitral stenosis, a condition that had signs and symptoms that were present and evolving for months prior to his demise. Some of the signs and symptoms were already known to staff and others were not but would have been had he been cared for by competent staff abiding by the*

*requirements of the Injunction and practicing within a coordinated effective system of management. Instead, his deterioration was not recognized by the on-site providers even though based on his cardiac history, it is something they should have been actively monitoring for. The patient never came under the care of a primary care provider[3] (in violation Injunction paragraph 7.3) nor did any provider ever develop a plan to monitor and address his valvular disease after his cardiac procedure, which was even more critical since staff failed to fulfill the follow-up care (cardiology visits, echocardiograms) that ADCRR's specialists had recommended. But for the failures described here, more likely than not, Patient 1's death was preventable.*

*Finally, it should be noted that this is not an exhaustive description of Patient 1's care at ADCRR; it highlights a fraction of the failures in care and deviations from the Injunction that were present in his record.*

---

[3] The patient's medical record shows that ADCRR assigned him a primary care practitioner. However, this designation was a meaningless administrative action. The listed physician did not function as the patient's primary care practitioner and the patient was seen by a number of other practitioners.

# Patient 2

Patient 2 was a 61 year old male who died in ASPC Lewis on 11/6/24 due to bladder cancer that spread to his brain. He was a complex patient with a history of cardiomyopathy (i.e., a large weak heart), high blood pressure, advanced liver disease, and emphysema (chronic obstructive pulmonary disease; COPD).

In early 2024, while still at a private ADCRR prison, he was diagnosed with bladder cancer which was obstructing his ureters (the tubes bringing urine from the kidneys to the bladder). This required the surgical placement of bilateral tubes (nephrostomy tubes) to drain his urine to an external bag. He was started on chemotherapy after a PET scan showed no metastases. When he saw a surgeon in July 2024 the plan was to remove his bladder and prostate once he was cleared for surgery by a cardiologist. Thus the goal was the eradication of bladder cancer with the expectation of a cure.

On 7/30/24 he was hospitalized for heart failure and acute kidney failure. During hospitalization, he was also treated for worsening of his emphysema and/or pneumonia.

On 8/7/24 he was discharged from the hospital to the infirmary at ASPC Lewis. He was discharged with supplemental oxygen, a LifeVest® defibrillator (a wearable vest containing an external heart defibrillator that can administer an electric shock if it detects a life-threatening abnormal heart rhythm) due the risk of sudden death from his enlarged heart that now was not functioning well, and bilateral nephrostomy tubes draining urine. He was advised to have follow-up appointments with the cardiologist, oncologist, and kidney specialist. Upon admission to the Lewis infirmary, a remote APP practitioner ordered medications.

> *The APP failed to enter any other orders or instructions to infirmary nurses. Such orders are necessary for the nurses to adequately care for the patient. For example, nurses needed to know: exactly what level to set the oxygen and how to adjust that level based on the patient's condition; instructions on how to operate the LifeVest, e.g., whether it could be removed during bathing; how to care for the patient's nephrostomy tubes, e.g., how to clean the area, the frequency of nephrostomy tube dressing changes, timing of the dressing changes in relation to bathing, how often to empty the urine collection bag; what activity the patient was allowed to, and supposed to, engage in and how to facilitate that movement, e.g., whether the patient was allowed out of bed, allowed to walk. These orders were necessary for safe care of the patient. For example, lack of a proper nephrostomy tube exit site dressing or delayed emptying of the urinary collection bag increase the risk of a severe urinary infection. Thus the absence of nursing orders reflected extremely poor and dangerous care on the part of the APP for not providing them (in violation Injunction paragraph 1.1) and on the part of the nurses for failing to ask for them when they were not forthcoming (in violation Injunction paragraph 1.1).*

> *Nurses failed to conduct an admission nursing assessment immediately upon the patient's admission to the infirmary (in violation Injunction paragraph 7.6.2). Such assessments are very important because nursing care is a critically important component of care for*

*patients in an infirmary. The admission nursing assessment forms the foundation of that care, identifying the potential clinical risks the patient faces and the steps nurses should take during their subsequent assessments (and the frequency of those assessments) to prevent or detect these risks. Therefore, failure to conduct an initial nursing assessment prevented nurses from conducting appropriate subsequent evaluations of the patient during his infirmary stay (in violation Injunction paragraph 7.6.4) and posed a significant risk of serious harm.*

*In combination, the lack of adequate orders from a practitioner and the lack of an assessment by nursing at the time of admission of Patient 2 to the infirmary, led to an infirmary stay without any clinical direction or plan of care which put the patient in an extremely dangerous situation (in violation Injunction paragraph 1.1).*

On 8/8/24 a nurse wrote infirmary admission orders. These orders were limited to listing the reason for admission as "oxygen" and "LifeVest" and mentioning the need for a wheelchair.

*It was inappropriate for a nurse to write admission orders. This is beyond a nurse's legal scope of practice (in violation Injunction paragraph 1.1).*

During the patient's infirmary stay, nurses saw Patient 2 every two to three days.

*Patient 2 was a very ill patient who required daily – if not more frequent – nursing assessments. Failure to see him more often than every two to three days placed him at significant risk of developing preventable complications of his various clinical conditions (in violation Injunction paragraph 1.1).*

When documenting their encounters, nurses identified between zero and three nursing diagnoses that were addressed (i.e., impaired gas exchange, impaired urinary elimination, acute/chronic pain, decreased cardiac output, impaired physical mobility, and risk of fall).  Every nursing note documented the "Plan of Care" as either "Continue current plan of care" or just "POC" [Plan of Care].

*In the absence of an overarching plan to guide the care provided to the patient by nurses – a plan that should have been, but was not articulated upon admission – a consistent and specific focus was impossible. What resulted was a series of nursing encounters that were disconnected from each other and containing care that was so nonspecific as to render them meaningless. While the nursing diagnoses nurses documented for each encounter should have been almost identical from encounter to encounter (barring the rare resolution of an existing problem or development of a new problem) because the patient suffered from the same set of chronic and ongoing problems, they were not. Instead the nursing diagnosis nurses documented for the patient at each encounter were what can best be described as random diagnoses picked from among his five to six diagnoses, as would result from throwing darts at a dart board. The nursing care itself was correspondingly inconsistent, incomplete, and inadequate, and thus very dangerous (in violation Injunction paragraphs 1.1 and 7.6.4) placing Patient 2 at significant risk of serious harm.*

*With regard to what the nurses documented for the plan of care at each encounter ("plan of care" or "POC"), given the absence of adequate admission orders and a detailed plan of care from the outset, there was, in fact, no plan of care (in violation Injunction paragraphs 1.1, 7.6.1, and 7.6.2). Nurses documenting "plan of care" time after time was vacuous. A minimally acceptable plan of nursing care needs to be specific as to: who is responsible for each task of the plan; when and how each task is to be done; and the parameters for escalation, e.g., "notify physician if bed sores become larger than 2 cm." This particular patient required a number of very specific plans of care related to his multiple conditions and risks, for example, plans regarding management of the surgical incisions through which his nephrostomy tubes exited his skin, monitoring of the quantity and color of his urine, and monitoring of the quality of his breathing (subjective) and quality of his breathing sounds through a stethoscope (objective). Instead, and as noted earlier, no comprehensive care plan had ever been created by nurses at the time of admission. Thus, not only was subsequent repeated documentation by nurses that they were following the "plan of care" false documentation (in violation Injunction paragraph 1.1), moreover, it meant that the patient was not receiving the care that he needed, exposing him to significant risk of serious harm (in violation Injunction paragraph 1.1).*

On 8/8/24 Patient 2 was seen by his on-site primary care provider, an APP. The plan for the patient was limited to the offsite referrals recommended at hospital discharge.

*Based on the level of complexity of this patient's medical condition, he should have been assigned to a physician, not an APP (in violation Injunction paragraph 6.2). The APP failed to attempt to review Patient 2's history and pro-actively create a comprehensive care plan. As a result, she was ignorant of the plan of care developed earlier (see above) whereby once cleared by a cardiologist, he was supposed to be scheduled for curative surgery to remove the cancer. Instead, on-site care was mainly conducted in response to the patient's request or inquiry (in violation Injunction paragraph 1.1). It was not until 8/29/24, when the patient asked about the timing of his surgery that the APP reviewed the patient's chart, discovered the need for surgical clearance from a cardiologist, and requested the cardiology pre-surgical evaluation in addition to the hospital follow-up with cardiology already ordered for his enlarged heart.*

On 8/9/24 the patient began asking staff when his urine collection bag and tubes would be changed. He asked again on 8/13/24 and again on 8/15/24. Following this third request, the APP documented that she reviewed the patient's medical record and discovered that the urologist had ordered for the bag to be changed every two weeks, which was already past due at this point.

*The APP's failure to review Patient 2's medical record up to this point resulted in his care team being ignorant of his overall plan of care for his cancer, including being unaware of the plan of care for the patient's nephrostomy tubes and urine collection bag (in violation Injunction paragraphs 7.6.1, 7.6.3, 1.1). This lapse was not subtle; it should have been obvious upon arrival in the infirmary on 8/7/24 that he had objects sticking out of his body that required on-going attention. Not having any of the proper supplies on-*

*site, the provider first had to put in a request to order the supplies. The patient was also overdue to have his nephrostomy tubes surgically changed. A delay in changing the nephrostomy tubes and urine collection bag put the patient at increased risk of serious complications, including infection. The supplies to change the bag had still not arrived when the patient was urgently sent to the hospital on 9/4/24 (1.6). The APP never submitted a referral to interventional radiology to change the nephrostomy tubes (1.1).*

On 8/15/24, the patient told the APP that custody never came to take him to his regularly scheduled oncology appointment for chemotherapy that he used to get every Wednesday.

*We were unable to discern from the patient's medical record whether or not the APP knew that Patient 2 was overdue for chemotherapy, but it was only at that point that the APP noted the need to restart chemotherapy and reached out to the scheduler. A referral to oncology had already been submitted, but urgently restarting chemotherapy apparently required a separate authorization by the on-site provider. Thus the patient never restarted chemotherapy prior to seeing the oncologist on 9/4/24 (i.e., he missed chemotherapy for 6 weeks between 7/24/24 and 9/4/24[4]), which increased his risk for recurrence of his cancer (in violation Injunction paragraph 1.1).*

On 8/19/24, the patient complained of abdominal pain (nine out of a possible 10) and bloody urine. He was seen by a nurse. He did not have a fever and his blood pressure was normal, but his heart rate was 107 (abnormally fast and markedly faster than 78 which it had been three hours earlier). There was blood in his urine. A remote APP prescribed tramadol (an opioid narcotic) for pain, an antibiotic for seven days (treatment for a urinary tract infection), and measuring of vital signs twice daily for seven days.

*The nurse failed to assess the patient's abdomen for tenderness and failed to conduct a key assessment of the patient's torso for kidney infection (rapping on the patient's back near the kidneys). The remote APP, who was basing her evaluation and treatment on the patient entirely on the nurse's documentation, did not ask the nurse to perform these key assessments (in violation Injunction paragraph 1.1).*

*The APP also failed to order any laboratory tests. Although blood in the urine of a person with normal urinary anatomy can be a symptom of an uncomplicated urinary tract infection, this patient had nephrostomy tubes and was at risk for a much more severe infection. The blood was also potentially a sign of spread of his bladder cancer or internal trauma from movement of the nephrostomy tubes. For these reasons, it was not appropriate to empirically treat with antibiotics without the results of laboratory tests, especially a urine culture, placing the patient at significant risk of serious harm (in violation Injunction paragraph 1.1).*

---

[4] Lack of chemotherapy from 7/24/24 until 8/7/24 was not the responsibility of ADCRR because the patient was hospitalized during this period.

On 8/20/24, Patient 2 was seen in follow-up of the events of the previous night by a physician. The physician examined the head and determined that his skull was appropriately shaped and had not suffered any trauma, and examined the patient's heart.

> *The physician failed to examine the patient's abdomen or his urinary (kidney) system, documenting that neither was clinically indicated. This exam was not clinically appropriate and was clinically dangerous (in violation Injunction paragraph 1.1). At that moment there was no reason to suspect the patient had experienced a change in the shape of his head, head trauma, or a problem with his heart. Conversely, the patient <u>had</u> experienced a problem with his abdomen and urinary system. Further, the physician failed to correct the lapse in care of the APP the previous night by failing to consider reasons (other than a urinary tract infection) for the bleeding (in violation Injunction paragraph 1.1).*

On 8/30/24, the patient continued to complain of abdominal pain. The APP increased the dose of tramadol.

> *The APP failed to address the cause of the pain. In light of the fact that the pain was recurrent despite being treated with a narcotic analgesic and receiving an antibiotic, it was incumbent on the practitioner to consider that the original diagnosis of a urinary infection was incorrect and that the patient was suffering from a more serious diagnosis, e.g., recurrence of his bladder cancer. The APP did not, placing the patient at significant risk for unrecognized and untreated spread of his bladder cancer (in violation Injunction paragraph 1.1).*

On 8/16/24, the patient reported that his right leg had been weak for the previous five days to the point of having to manually assist his right leg into bed from the sitting position. He was seen by an APP who confirmed that his right leg was weaker than the left. She concluded that the new onset right leg weakness was most likely due to deconditioning or less likely a blood clot in the leg. In collaboration with the Medical Director of the facility, she started the patient on aspirin, planned to await the results of previously-ordered blood tests that would not be drawn until 9/3/24 (more than two weeks in the future), and encouraged the patient to get out of bed more.

> *Both the APP and the physician failed to appreciate the dire significance of the patient's condition at that moment. Not only was an alternative explanation much more obvious (i.e. bladder cancer spread), neither of the proposed diagnoses made clinical sense nor did the treatment plan[5]. In fact, the finding of sudden one-sided weakness is potentially a very serious finding, especially in someone with known cancer who has missed doses of chemotherapy, because it could mean the patient's cancer has spread to his spine or*

---

[5] It would be nearly impossible for a patient to develop weakness due to lack of conditioning in a single leg. It is also impossible to develop that level of weakness over just five days. Blood clots in a vein of the leg (deep vein thrombosis) typically cause no symptoms at all (hence their danger), or cause pain and swelling, but not weakness by itself. Blood clots in an artery of the leg could cause weakness, but would be accompanied by other catastrophic signs and symptoms including marked swelling, changes in color, and pain. Finally, both venous and arterial clots are clinical emergencies, especially in a patient with Patient 2's history, so if they were suspected, the patient should have been evacuated to a hospital.

*brain. Thus the practitioners' diagnosis and plan made had no reasonable clinical basis and was very dangerous. Not only was there no clinical indication for aspirin, it increased the patient's risk for bleeding, especially in areas of cancer invasion (in violation Injunction paragraph 1.1). The practitioners, instead, should have ordered an emergency MRI to look for spread of his cancer to the spine or brain; metastasis of cancer to the brain or spinal cord is a medical emergency that can require treatment within hours to prevent permanent paralysis, stroke, or death. Not only was an MRI not ordered, but when the patient was subsequently seen by practitioners on 8/20/24, 8/22/24, 8/23/24, and 8/26/24, he was not asked about his right leg nor was the strength in his right leg re-evaluated. Even the patient's wife, who is a nurse, recognized in a letter she sent to the facility on 8/26/24 that "it is highly likely that the leg issues ... are a direct result of the tumor progressing."*

On 8/28/24 a nurse documented that the patient's right foot was paler than the left and he had decreased feeling in his right foot.

*The nurse failed to notify a practitioner. In other words, the nurse managed this acute change in the patient's condition without escalating it to a higher trained professional. In a patient such as Patient 2, this set of symptoms could signify a serious condition requiring immediate attention such as a vascular obstruction or neurological impairment. The nurse's actions exceeded the nurse's safe practice limits and placed the patient at significant risk of serious harm (1.1).*

It was not until 8/29/24, when the patient informed staff that he was now having tremors in his right leg and right arm with progressive weakness in his right leg to the point that he had to manually help his right leg when using the walker, that the issue was brought back to an APP's attention. On exam, the APP found his right leg to be weak again. She considered cancer spread as a possible cause, but noting a PET scan done 2.5 months prior (6/12/24) that did not show any metastases, took no further action to evaluate this possibility. Instead, she considered amyotrophic lateral sclerosis (ALS; Lou Gehrig's disease) or stroke as diagnoses and ordered an "urgent" (i.e., within 30 days) MRI.

*The APP failed to correctly appreciate the uselessness of PET scan results from 2.5 months earlier. She erroneously concluded that it meant the current symptoms could not be the result of metastases to the patient's spine or brain. In fact, a patient can easily develop metastases from bladder cancer within that period of time. As noted earlier, sudden onset of weakness in the context of cancer is a clinical emergency. The inappropriate handling of this potential emergency placed the patient at significant risk of serious harm (in violation Injunction paragraph 1.1). It further demonstrates the dangers of a patient with this level of complexity being cared for by an APP rather than a physician (in violation Injunction paragraph 7.3).*

Over the next several days, the nurses notes describe the patients increasing difficulty ambulating resulting in multiple near falls. On 9/4/24 the patient had his first post-hospital-discharge visit with the oncologist. Upon learning of the patient's symptoms (as described above) he immediately instructed ADCRR to send Patient 2 emergently to the hospital ER to obtain the

needed imaging and care. The patient was admitted to the hospital where he was found to have metastases of the cancer to his brain. As a result, hospital staff concluded that he was no longer a candidate for curative surgery. ADCRR began the process of requesting a clemency release.

On 10/29/24 Patient 2 returned to ADCRR from the hospital. At this point he was dying and care was appropriately focused on making him comfortable. On 11/1/24 nurses noted that the patient had a small pressure ulcer on his left buttock. We were unable to determine whether the patient arrived from the hospital with this ulcer or if it developed in the days after he returned from the hospital. Three days later, on 11/4/24, a practitioner ordered nurses to turn the patient every two hours (he was, at this point, on "total care" status because he was unable to move himself), and the practitioner noted "current nurse ratio is 11/1 and no CNA/EMT for assistance." We were unable to determine whether this notation was an explanation for why the patient developed the pressure ulcer in the first place, or was a preemptive explanation of why his order to turn the patient frequently might not be followed. Patient 2 died on 11/6/24.

> *We were unable to determine whether the patient arrived from the hospital with the pressure ulcer because nurses failed to conduct an adequate* nursing exam inclusive of an assessment of skin integrity upon his return from the hospital (in violation Injunction paragraph 9.2).

During our review of Patient 2's medical record we noted the patient's Problem List as it appeared at the time of his death:

- Cancer
- Wheelchair
- Med-hold
- Lower bunk
- Restricted movement - contagious illness
- Hypertension
- COPD/emphysema
- CAD/dyslipidemia
- Special notice
- Unspecified essential hypertension
- Acute upper respiratory infections of unspecified site
- Unspecified cataract
- Vaccination not carried out because of patient refusal
- Osteoarthrosis involving or with multiple sites but not specified as generalized
- Nocturia
- Personal history of urinary calculi
- Other and unspecified mycoses
- Hypertrophy (benign) of prostate without urinary obstruction and other lower urinary tract symptoms (luts)
- Other and unspecified hyperlipidemia
- Unspecified disorder of the teeth and supporting structures
- Unspecified otitis media
- Partial edentulism unspecified

- Chronic airway obstruction not elsewhere classified
- Unspecified dental caries
- Routine general medical examination at a health care facility
- Screening examination for pulmonary tuberculosis
- Other and unspecified alcohol dependence unspecified drinking behavior
- Hematuria unspecified
- Cirrhosis of liver without alcohol
- Urinary tract infection site not specified
- Other primary cardiomyopathies
- Osteoarthrosis unspecified whether generalized or localized involving lower leg
- Need for prophylactic vaccination and inoculation against other specified single bacterial disease
- MH-1
- Unilateral primary osteoarthritis, right knee
- Ace wrap
- Chronic kidney disease, stage 3 (moderate)
- Unspecified cirrhosis of liver
- Chronic obstructive pulmonary disease, unspecified
- Subclinical iodine-deficiency hypothyroidism
- Heart failure, unspecified
- Essential (primary) hypertension

*A Problem List is a necessary component of all medical records. Its purpose is to give the user of the medical record a rapid and accurate "thumb nail" overview of the patient's health care conditions. A typical Problem List for a complicated patient might contain five to 15 problems. Not only does Patient 2's Problem List contain an excessive number of problems (42), the list suffers from numerous other deficiencies: entries which are not diagnoses at all, e.g., "Lower Bunk"; nonsense entries, e.g., "Special Notice"; entries which are obsolete, e.g., "Ace Wrap"; redundant entries, e.g., "Hypertension," "Unspecified Essential Hypertension," and "Essential (primary) hypertension"; and entries which require additional detail to be useful, e.g., "Other primary cardiomyopathies" (in violation Injunction paragraphs 4.3.1, 4.3.2, 4.3.3). The patient's diagnosis of cancer was not even added to this laundry list of problems until 10/4/24, three weeks before his death when he was already dying. Further, even then, rather than an accurate and useful diagnosis, e.g., "spindle cell carcinoma of the bladder with metastases," it was generically and unhelpfully listed as just "cancer". As such, this patient's Problem List was very difficult for a care provider to use effectively. Coupled with the lack of a primary care provider and a very cumbersome and difficult to use electronic medical record, this contributed to the difficulty of managing this patient safely.*

*In summary, Patient 2 died from metastatic bladder cancer. Based on the timeline, it is likely that he already had silent metastases to his brain by the time he returned from the hospital to ADCRR on 8/7/24, and as such his death from cancer likely could not have been prevented. However, care providers did not know this at the time. The clinically inappropriate acts and omissions described, which ranged from serious to egregious,*

*placed this patient at significant risk for serious harm, unnecessary suffering, and early demise. For any other patient at ADCRR at an earlier stage of cancer, these clinically inappropriate acts and omissions would have placed them at the same risk, plus the risk of death.*

*Finally, it should be noted that this is not an exhaustive description of Patient 2's care at ADCRR; it highlights a fraction of the failures in care and deviations from the Injunction that were present in his record.*

# Patient 3

Patient 3 was a 64 year-old female who died in the hospital on 10/28/24 from complications of insufficient blood flow to her bowel (i.e., ischemic bowel). She had a history of high blood pressure, hyperlipidemia, smoking, osteoporosis with compression fractures of the spine, asthma, gastroesophageal reflux disease, and peptic ulcer disease.

Prior to arriving at ADCRR, while in jail, Patient 3 was sent to the hospital on 9/5/24 for trouble keeping food and water down, right flank and back pain, pain on urination, nausea, vomiting, and feeling feverish. She was transferred to intensive care due to an overwhelming life-threatening infection (sepsis) resulting in falling blood pressure and marked laboratory abnormalities due to inadequate circulation. She was found to have a serious infection of the colon (shigellosis), a severe urinary tract infection causing acute kidney injury, an abnormal heart rhythm, air in her urinary bladder likely the result of a pathological connection between her bowel and bladder, significant anemia, and severe drop in the amount of an essential electrolyte (magnesium) in her blood.

On 9/9/24 the patient was discharged back to jail with orders to: complete a 10-day course of antibiotics; continue magnesium supplementation; not to restart the high blood pressure medications until and unless her high blood pressure recurred; obtain follow-up labs in one week (~9/16/24) to reassess how she was doing.

On 9/12/24 Patient 3 was transferred from the jail to ADCRR. Upon arrival at ADCRR, an APP conducted an initial history and physical. The practitioner wrote that the patient had a "hard time remembering things", so obtained much of the past medical history from the jail transfer summary. She concluded that the patient had the following medical conditions: asthma; high blood pressure; hyperlipidemia; gastroesophageal reflux disease; and a history of urinary tract infection. The exam noted that the patient had to be washed of feces. On examination, the APP found that the patient had trace swelling of both ankles. Ordered the standard Intake blood tests and a complete blood count (CBC). She prescribed the continuation of antibiotics and magnesium supplements.

> *The APP failed to do an adequate review of her previous history that was part of the jail transfer summary sent with the patient to ADCRR, missing the fact that the patient had, within the previous week, suffered from life-threatening conditions including sepsis from serious infections of the colon and urinary tract, acute kidney injury, an abnormal heart rhythm, air in her urinary bladder, and significant anemia. While the APP did note that the patient had a history of high blood pressure, she failed to realize that her usual blood pressure medications were on hold due to the recent life-threatening drop in her blood pressure in the hospital and also failed to continue the plan ordered upon discharge from the hospital for monitoring and managing her high blood pressure going forward (which was to restart her blood pressure medications if and when her high blood pressure returned to a level requiring their resumption). This information was critically important to be able to take care of the patient appropriately moving forward. The APP also failed to order blood tests to assess the current level of magnesium, her kidney function, and other vital functions, which, just a week earlier, had been dangerously awry, to determine*

*if she needed to go back to the hospital. Other than recommending a Pap smear in 36 months, she failed to schedule for any short-term follow-up in light of her recent severe illness requiring intensive care just the week before. Each of these failures placed the patient at significant risk of harm (in violation Injunction paragraphs 7.2, 1.1).*

On the same day, after her visit with the APP, the patient had a visit with the laboratory technician for her blood tests. She refused all ordered blood tests stating to the technician "I know I don't have it." She refused again on 9/16/24 and 9/18/24.

*While patient's have the right to refuse medical care, including blood tests, such refusal is only safe and valid if it is done after having fully explained to the patient the reason for the proposed care, informing the patient of the risks of refusal, and presenting any reasonable alternatives, all known as an informed refusal. Notwithstanding the existence of three signed refusal forms in Patient 3's chart corresponding to the refusals on 9/12/24, 9/16/24, and 9/18/24, the patient did not provide informed refusal. The reason is that all three refusals were executed by the laboratory technician. A technician does not have the necessary education and knowledge to conduct the interaction described above, especially given the complexity of the patient's case. In light of the patient's life-threatening condition just a few days earlier requiring intensive care, these tests were meant to assess whether the patient was still in danger. Although not all the needed laboratory follow-up was ordered, the results of tests that were ordered may have still been sufficient to reveal if the patient was getting better or getting worse. Prompt recognition of this would allow providers to address the results in a timely manner, possibly avoiding morbidity or death. An effective and competent informed refusal must have been conducted by a practitioner, if not specifically a physician. It was not. The patient's reason for refusing the blood tests on one of the occasions ("I know I don't have it") demonstrates that neither the patient nor the technician understood why some of the most critical tests were being ordered. Indeed, that statement was only relevant if the patient thought she was only being asked to consent to the standard intake screening tests for infectious diseases like HIV, hepatitis C, syphilis, gonorrhea and chlamydia. ADCRR's failure to conduct the ordered blood tests, and by extension, the failure to conduct an effective and competent informed consent, placed the patient at significant risk of serious harm (in violation Injunction paragraph 1.21).*

*Finally, there is no indication that the technician notified the APP of any of the patient's three refusals which would have afforded the practitioner the opportunity to obtain the patient's consent, in turn protecting her health (in violation Injunction paragraph 1.21).*

*If labs were sent at some point in September, the patient likely would have been sent to the hospital sooner and may have survived.*

On 9/15/24 the patient was seen for an HNR (Health Needs Request) she submitted complaining of increasing leg pain and swelling and back pain. She was evaluated for this by a nurse. The nurse found that the patient had marked fluid swelling in her legs (which was a significant increase from what it had been three days earlier during her intake examination). The nurse

concluded that the only problem the patient had was "an alteration in comfort." She instructed the patient to have "adequate hydration."

> *The nurse's independent evaluation of a new clinical symptom, especially in a patient this complex and ill, was dangerous and in flagrant violation of the Injunction (7.4.7). Nurses do not have the clinical training or knowledge to evaluate the sudden development of edema (swelling) in a patient who was in an intensive care unit just six days earlier. Indeed, the development of edema in this patient was an ominous development that required immediate evaluation for possible worsening of kidney failure, development of heart failure, or some other serious process, all potentially life-threatening. Additionally, the nurse's recommendation to hydrate adequately risked making her condition worse.*

On 9/20/24 Patient 3 submitted another HNR complaining of leg pain and back pain. Once again, she was evaluated for this by a (different) nurse. The nurse did not examine her legs or back. The nurse concluded that the only problem the patient had, again, was "alteration in comfort," dispensed a tube of muscle rub, and informed the patient that she was already scheduled to see a practitioner (on 9/30/24).

> *This encounter suffered from all the serious failures described for the previous encounter on 9/15/24 and for the same reasons placed the patient's health at significant risk of serious harm (in violation Injunction paragraph 7.4.7)*

On 9/21/24 an officer transmitted an emergency call due to the patient having stabbing pain in her back (severity of 10 on a scale from one to 10). She stated this is a chronic issue for which she usually receives an injection of a pain medication (ketorolac; Toradol®). The EMT measured the patient's blood pressure at 140/95 (mildly elevated). She conducted no other examination, made no determination as to what was causing the problem, informed the patient that she would not receive an injection of ketorolac because it "is no longer available," and informed the patient that she would schedule her to see a nurse in clinic.

> *This was egregious misconduct on the part of the responding EMT. After conducting no physical examination (other than measuring vital signs), the EMT made a de facto diagnosis that whatever was ailing Patient 3 was not a serious or time-sensitive problem. Further, she abandoned the patient, having provided no access to treatment for the severe pain the patient was experiencing. EMTs in Arizona only receive up to 220 hours of clinical training beyond a high school diploma. Their role is to respond to emergencies and provide <u>basic first aid</u> until the patient can be transported to a higher level of care. Not even a registered nurse, with years more training than an EMT, is capable of making (nor is permitted to make, under paragraph 1.20.1 of the Injunction) a determination that the patient with such symptoms does not have a serious medical problem nor would have the authority to leave the patient's pain untreated. Further, to leave the patient in pain without treatment was cruel and inhumane (in violation Injunction paragraph 1.1).*

On 9/22/24 Patient 3 was seen by a (third) nurse for "stabbing pain" in her back. The patient reported pain at a level of seven out of 10. The nurse conducted the evaluation utilizing a

protocol she selected for the encounter entitled "Back Pain." The nurse conducted no examination other than observing that the patient had difficulty walking. The nurse , determined that the patient had chronic back pain, advised the patient to lose weight, buy over-the-counter analgesics from the commissary, and deferred any further care to an upcoming practitioner visit on 9/30/24.

> *This encounter suffered from all the serious failures described for the two previous nurse encounters on 9/15/24 and 9/20/24, as well as the failure of staff to provide treatment for pain following the EMT encounter on 9/21/24, and for the same reasons placed the patient's health at significant risk of serious harm (in violation Injunction paragraphs 7.4.7; 1.1). While chronic back pain is a common problem and could very well have been a non-urgent (aside from the pain itself) need, in the context of her recently having both a severe urinary tract and colon infection, recurrence of these two conditions – both of which can cause stabbing back pain – was a distinct possibility.*

> *Further, the nurse's use of a nursing protocol was a flagrant violation of paragraph 7.4.7 of the Injunction created to protect patients against such unqualified care. As noted earlier, a nursing protocol cannot substitute for training and experience of a practitioner and, by its design, has a high risk of leading the user down a narrow diagnostic pathway that can lead to erroneous conclusions as it did in this case. Although the patient may have had chronic back pain, her current complaints were indicative of a very serious acute problem for which an off-the-shelf protocol in the hands of a care provider unqualified to diagnose the cause of back pain was highly dangerous.*

On 9/25/24 Patient 3 was seen by a (fourth) nurse in response to another HNR asking for a wheelchair and permission to remain in her room because her symptoms had still not improved, adding "[I] need to see provider ASAP". The patient stated her back pain was now 10 out of 10 and the acetaminophen, muscle rub, and hot packs were not helping.  Her blood pressure was quite high (148/110). Her weight had dropped 16 pounds in 13 days. This nurse chose a different off-the-rack nursing protocol to guide her care, one entitled "Musculoskeletal Pain/Strain."

> *This encounter suffered from all the serious failures described for the three previous nurse encounters on 9/15/24, 9/20/24, and 9/22/24, and for the same reasons placed the patient's health at significant risk of serious harm (in violation Injunction paragraphs 7.4.7; 1.1). In addition, the nurse made other very serious errors. She failed to address the patient's newly and markedly elevated blood pressure. She failed to address the patient's sudden loss of weight. She failed to determine if the patient had chest pain, headache, or shortness of breath, any of which, in conjunction with the elevated blood pressure, would have required evacuation to the hospital.*

On 9/30/24 Patient 3 was finally seen by her assigned primary care provider, an APP, now 17 days after first developing leg pain and swelling and back pain. The APP focused the visit on addressing the patient's leg pain and swelling and constipation. The APP examined the patient's skin, vital signs, breathing pattern, gait, and general appearance. Her blood pressure was again quite elevated (129/102) and her heart rate was fast (118). The diagnoses she concluded the patient had were "constipation," "chronic pain," and "[hypertension]." She restarted medications

for high blood pressure (lisinopril and hydrochlorothiazide) and back pain (cyclobenzaprine, and naproxen).

> *There was a clinically unacceptable delay to see a practitioner for a significant acute problem (in violation Injunction paragraph 1.1). However, even when finally seen, the APP failed to provide safe care for Patient 3 during this visit (in violation Injunction paragraph 1.1). The APP wholly ignored the patient's recent history of life-threatening medical problems (serious infection of the colon (shigellosis) causing sepsis, a severe urinary tract infection causing acute kidney injury, an abnormal heart rhythm, air in her urinary bladder likely the result of a pathological connection between her bowel and bladder, significant anemia, and severe drop in the amount of an essential electrolyte (magnesium) in her blood) for which she had required care in an intensive care unit and for which the patient required close follow-up to ensure that these problems were not continuing or getting worse. The APP failed to listen to the patient's heart or lungs or to look at her legs to assess the status of the edema, missing possible evolving kidney or heart failure. The APP failed to check blood test results before restarting her medications, two of which (lisinopril and naproxen) could cause serious harm if the patient's blood results showed that her kidneys were not yet working well enough after her hospitalization. In sum, the APP treated her patient in a vacuum of information and, as a result, failed to realize how sick Patient 3 was at this point and likely caused serious harm by restarting her medications without laboratory testing, potentially hastening her death. More likely than not, proper intervention at this point could have avoided the patient's death (in violation Injunction paragraph 1.1)[6].*

> *These acts and omissions on the part of the APP are not surprising. Patients such as Patient 3 are much too complex to be managed by an APP. ADCRR's assignment of an APP as the primary care provider was dangerous, as well as the APP's care of the patient without asking for him to be reassigned to a physician, or, at a minimum, seeking consultation with a physician for this visit (in violation Injunction paragraph 7.3).*

On 10/4/24 Patient 3 was seen by a (fifth) nurse for difficulty swallowing, ongoing constipation, and a wheelchair (which she never needed in the past). The nurse noted the patient's history of urinary infection and septic shock. The patient's blood pressure was now 94/60, markedly low for a patient requiring two medications to treat high blood pressure. The nurse's examination was limited to vital signs and examining the patient's skin. Her nursing diagnosis was "alteration in comfort due to diffi[culty] swallowing, constipation." She provided the patient with stool softener and an appointment to see a practitioner in four days.

> *This encounter suffered from all the serious failures described for the three previous nurse encounters on 9/15/24, 9/20/24, 9/22/24, 9/25/24 and for the same reasons placed the patient's health at significant risk of serious harm (in violation Injunction paragraphs 7.4.7; 1.1).* The nurse failed to ask the patient any exploratory questions about her

---

[6] The medical examiner's report was not yet available at the time of this writing. This opinion is therefore based on the clinical information available in the patient's medical record. Nonetheless, our opinion regarding the inadequacy of the care stands, as it is based on the information that was available to care providers at the time, and not on a retrospective review with knowledge of the official cause of death.

difficulty swallowing, a very concerning symptom in any patient (e.g., How long had it been a problem? Did it happen with both liquids and solid food? Had she been able to eat or hydrate?). The nurse also failed to conduct a meaningful examination; examination of the patient's abdomen, heart, and lungs, at a minimum, were essential. If a clinically appropriate history and physical exam were done, it would have been clear that the patient needed urgent hospitalization for serious illness. Notwithstanding, the patient's abnormally low blood pressure was an obvious signal of illness that required immediate attention.

On 10/7/24 Patient 3 was found lying on the ground after a fall in her cubicle. Her blood pressure was again low (98/74) and the nurse noted a weak radial pulse and pale skin. The patient was transported to medical and during the assessment, the patient's blood pressure continued to drop. The patient reported that she had not been able to tolerate food or fluid for the past three weeks, that it was hard to swallow, and that she was throwing everything up. Looking at the patient's medical record, the nurse discovers that the patient lost 16 pounds over the previous three weeks since intake (178 pounds on 10/12/24, 162 pounds on 10/4/24). The nurse sent the patient to the hospital ER for "altered perfusion." At the hospital the patient was found to again have sepsis (the life-threatening body-wide effect of an infection) and acute kidney failure, likely due to insufficient blood circulation to her bowel. She eventually died of complications of these problems on 10/28/24.

During our review of Patient 4's medical record we noted the patient's Problem List as it appeared at the time of her death:
- Meals in Living Quarters
- Walker
- Medicare
- Medicaid
- Hyperlipidemia, unspecified
- Tobacco use
- Urinary tract infection following incomplete spontaneous abortion
- Encounter for gynecological examination
- Lower Bunk
- MED-2
- MH-1

> *Similar to Patient 2, the Problem List for Patient 3 was essentially useless and contributed to the horrible care received by this patient (in violation Injunction paragraphs 4.3.1, 4.3.2, 4.3.3). Numerous critically important diagnoses that the patient had and needed to appear in full view at a glance whenever any care provider opened her chart were missing. Their presence would have markedly increased the chance that a practitioner or nurse would have noticed this, "connected the dots" with her current signs and symptoms, and obtained the care for her that she needed. Instead her Problem List was carelessly cluttered with trivia.*

*In summary, Patient 3 was a patient with complex serious health problems of which ADCRR was aware, or should have been aware, upon her arrival on 9/12/24. That her health problems were at risk of worsening in the days after her arrival (which was shortly after release from the hospital's intensive care unit) was patently obvious, yet repeatedly missed by myriad health care staff.*

*Finally, it should be noted that this is not an exhaustive description of Patient 3's care at ADCRR; it highlights a fraction of the failures in care and deviations from the Injunction that were present in her record.*

# Patient 4

Patient 4 was a 62 year old male who died in the hospital on 11/5/24 of complications of liver cancer. His only medical problem was hepatitis C (HCV) infection and resulting cirrhosis (severe scarring of the liver).

On 10/3/23 Patient 4 was admitted to ADCRR. On 10/4/23 he was seen by an APP for his intake examination. The patient's intake laboratory test revealed that he had current HCV infection with evidence that the disease was already very advanced and damaging his liver (liver inflammation and cirrhosis; low albumin of 3.3, high bilirubin of 3.3, low platelets of 104, and AST>ALT).

> *Based on these laboratory results alone showing evidence of very advanced liver disease, ADCRR should have urgently assessed this patient for HCV treatment. They failed to do so (in violation Injunction paragraph 11.1.1.2).*

On 10/18/23 the patient was seen by an APP to follow-up on the intake lab results. The APP was concerned the patient could possibly have some variant of viral hepatitis, biliary disease, or cancer, and requested an abdominal CT scan to be done "urgently" (i.e., within 30 days).

> *The APP failed to recognize that the patient had HCV infection and therefore failed to notify the patient in a timely manner of this diagnosis (1.23). The diagnosis was not recognized until sometime in May of 2024 and the patient was finally informed of his HCV disease on 6/19/24, a delay of some eight months. It would not be until 6/25/24, that he was told how serious it was: that he had advanced scarring of his liver.*

> *The APP failed to conduct an appropriate physical exam for a patient suspected of viral hepatitis, omitting a search for the stigmata of chronic liver disease (e.g., jaundiced color of eyes and skin, red coloration of palms) (in violation Injunction paragraph 1.1).*

The CT scan, completed on 11/17/23, was abnormal. It revealed an indeterminate 2.7 cm lesion and a vague 7 mm lesion in the right lobe of the liver. The radiologist recommended the patient undergo an MRI. On 11/20/23 a "Routine" (i.e., within 60 days) MRI was ordered.

> *Given this finding, suggestive of cancer, especially in the context of HCV infection, the MRI should have been obtained within the next few weeks. Instead it was ordered as "Routine" (in violation Injunction paragraph 1.1).*

> *Further compounding this error, the order for a routine MRI should have been completed by 1/18/24, but was not completed until 1/31/24 (in violation Injunction paragraph 8.3).*

On 1/31/24 the MRI revealed a 2.3 cm indeterminate lesion which in the setting of cirrhosis, the radiologist wrote on his report, "…would be highly suspicious for malignancy…" Due to the significance of this finding, according to the report, the radiologist communicated the results to the "ordering physician or their representative", in addition to the normal notification process. The ordering APP reviewed the result on 2/7/24 and indicated the intent to order a repeat MRI in three months.

*Given the fact that the patient did, in fact, have cirrhosis, based on the MRI it was very likely the patient had cancer of the liver and further evaluation should not have been delayed. <u>At this point, the cancer was still treatable and potentially curable. Thus clinically appropriate action at this point could have avoided the patient's death from cancer of the liver.</u> Instead, failing to appreciate this, further action was inappropriately deferred for three months and subsequently got lost to follow-up (in violation Injunction paragraph 1.1).*

*The APP's plan to repeat the MRI, though the wrong plan for this patient, inexplicably evaporated; the order was never entered (in violation Injunction paragraph 1.1).*

Sometime in May, 2023 ADCRR confirmed the patient had HCV infection and proceeded with a treatment evaluation. An APP assigned to address HCV treatment documented that the chart was reviewed on 5/31/24.

*There is no evidence that the provider actually reviewed the chart, including the prior labs and imaging of the liver that already indicated that Patient 4 had cirrhosis and probable liver cancer. Instead, the APP just ordered new blood tests (in violation Injunction paragraph 1.1).*

On 6/5/24 the patient refused the blood tests, as documented by the laboratory technician.

*While patient's have the right to refuse medical care, including blood tests, refusals must be informed as noted above for patient's 1 and 3. Notwithstanding the existence of a signed refusal form, this patient did not provide informed refusal. The reason is that the refusal was executed by the laboratory technician. A technician does not have the necessary education and knowledge to conduct the interaction described above. That this refusal was completely uninformed is demonstrated by the fact that the patient later said the reason that he refused the lab draw was because he had not yet been told at this point that he even had hepatitis C (in violation Injunction paragraph 1.23). ADCRR's failure to conduct the ordered blood tests, and by extension, the failure to conduct an effective and competent informed consent, placed the patient at significant risk of serious harm by further delaying initiation of treatment for HCV infection (in violation Injunction paragraph 1.21).*

*Finally, there is no indication that the technician notified the APP of the patient's refusal which would have afforded the practitioner the opportunity to obtain the patient's consent prior to their appointment on 6/19/24, avoiding further treatment delay and in turn protecting his health (in violation Injunction paragraph 1.21).*

On 6/19/24 Patient 4 had his first appointment with the HCV APP. The appointment was conducted via telemedicine. It was at this appointment, that the patient was told for the first time that he had HCV infection. Learning this and now having been given the reason for the blood tests he refused on 6/5/24, he agreed to the blood tests. Because the provider had failed to review any of the patient's earlier blood test and imaging (CT, MRI) results prior to the visit, the APP –

and therefore the patient – was still unaware that he had cirrhosis, let alone cancer and as a result, initially stated that he was not interested in treatment for his HCV infection. The patient had the labs drawn the next day (6/20/24) and not surprisingly, they confirm that he has chronic hepatitis C and cirrhosis.

> *Patient 4 was now finally informed that he had HCV infection, some eight months after arrival in ADCRR and eight months after ADCRR had all the information it needed to make this diagnosis. As already noted, such delay was clinically inappropriate (in violation Injunction paragraph 1.23).*

> *The APP failed to conduct an adequate examination of the patient. Because the visit was conducted via telemedicine, the APP was not able to perform the parts of an examination that were necessary for any patient with liver disease, which not only include examination of the abdomen but also evaluation of the rest of the body (e.g., eyes, skin, hands, ankles, chest) for stigmata of advanced liver disease. In other words, this was a clinically inappropriate use of telemedicine (in violation Injunction paragraph 1.4).*

On 6/25/24 the patient was seen by an APP (not his primary care practitioner) for a chronic care visit for hepatitis C and cirrhosis. The APP deferred to the dedicated HCV practitioner to review and initiate treatment for HCV infection. He ordered an abdominal ultrasound for liver cancer screening.

> *The APP failed to order the blood test recommended to screen for liver cancer (alpha fetoprotein). Additionally, given that the patient already had an abnormal CT and MRI, an ultrasound was not the clinically appropriate test to order because it is much less sensitive than the other imaging studies already done. Indeed, when completed on 7/3/24, the ultrasound did not show the known liver mass already seen on the CT and MRI. Both errors further delayed recognition of, and possible cure of, the patient's growing liver cancer, causing him serious harm (in violation Injunction paragraph 1.1).*

> *ADCRR failed to arrange for Patient 4 to be seen by his primary care practitioner (in violation Injunction paragraph 7.3). This likely contributed to the APP's failure to know that there was already convincing evidence in the patient's record that he likely had liver cancer, knowledge of which would have avoided further delays in treatment.*

On 7/15/24 the patient was seen by the HCV practitioner via telemedicine. During the visit the patient agreed to begin treatment on 7/25/24.

> *This encounter was wholly inadequate (in violation Injunction paragraph 1.1). The practitioner either failed to review the patient's medical record or failed to understand its content, therefore failing to identify that fact that the patient likely had liver cancer, a known complication of HCV infection. The practitioner failed to ask for and review the patient's vital signs, writing in the patient's chart, "Vitals may not be obtained due to the educational rather than assessment focused nature of the visit." This boilerplate notation, which we discovered in all of this particular practitioners notes we read, is inaccurate and clinically inappropriate. This visit was most certainly "assessment*

*focused" and not just for "educational" purposes. Assessment of vital signs is simple and easy to do and an important piece of information that should be obtained for most clinical visits, especially during a visit to begin treatment for a chronic disease.*

*The practitioner failed to conduct a minimally acceptable examination for a patient with "newly" diagnosed advanced HCV infection, to include an abdominal examination to feel the patient's liver and spleen and to evaluate for the presence of ascites (free fluid in the abdomen), a mental status exam, connect-the-numbers test, and/or assessment for hand flapping to evaluate for the presence of hepatic encephalopathy (slowed thinking or confusion), among other elements (in violation Injunction paragraph 1.1). It is critically important to do this when treating a patient for HCV infection complicated by cirrhosis to ensure that the patient does not have decompensated disease (i.e., evidence that the liver is no longer functioning well because of the scarring) because it impacts the treatment selected for HCV and the ongoing clinical care. Instead, it was impossible to conduct the physical examination because the visit was conducted via telemedicine (in violation Injunction paragraph 1.4.).*

On 10/9/24, during his 3rd month of treatment for HCV infection, the practitioner wrote a note that appears to be based on a verbal report from the nurse (although it is difficult to tell the source of the information based on what the practitioner wrote). The documentation says the patient complained of "headache, myalgias, nausea and/or diarrhea" which the patient reported as side effects of his HCV treatment. The practitioner concluded that the patient's self-diagnosis was correct and prescribed medications for pain, nausea, and diarrhea, and requested for the HCV practitioner to reassess the patient in the future.

*It would be very unusual for a patient to develop these myriad side effects from the medications this late in the course of HCV infection treatment. The APP's failure to look for an alternative and more likely cause of these potentially serious symptoms, delayed care and more than likely resulted in the emergency a few hours later described below (in violation Injunction paragraph 1.1).*

In the early hours of the next day, 10/10/24, custody staff called for an emergency medical response. A nurse evaluated Patient 4 emergently due to abdominal pain, constipation, and generalized weakness. The nurse noted that the patient's abdomen was distended and rigid in the left lower quadrant, he had poor skin turgor (a sign of dehydration), and was unable to stand long enough to measure his blood pressure and pulse in the standing position (for comparison to the sitting position, a maneuver performed to help determine if a patient is dehydrated). A remote practitioner now prescribed a liter of intravenous fluids and medication (lactulose) for constipation (this same APP had a few hours earlier given the patient medication for diarrhea). The patient felt a little better after fluids and his pulse went from 106 to 84 (improved). He was assisted back to his cell and told to return to the clinic as needed.

*The act of administering a liter of fluid rapidly intravenously is reserved for patients whose dehydration is moderate to severe and for whom a safer and more conservative approach, i.e., having the patient drink fluids slowly over a few hours, would be dangerously slow. Thus we infer from the APP's order that the APP felt the patient was*

*at least moderately unstable and/or could not be expected to maintain adequate hydration by drinking. Further, the APP also prescribed a medication for constipation, which might increase the patient's fluid losses. Therefore, at a minimum, the APP should have admitted Patient 4 to the infirmary to be monitored closely.  Letting him go back to his cell with no scheduled follow-up was dangerous (in violation Injunction paragraph 1.1).*

On 10/11/24, custody staff again called for an emergency medical response because Patient 4 lost consciousness. The patient was seen by a nurse and, for the first time, his assigned primary care practitioner. The patient was seated on his bunk, responsive but aphasic (unable to speak) and hoarse. He appeared weak and frail and was unsteady standing or walking. He was taken to the medical unit in a wheelchair for further evaluation. On examination his abdomen was slightly distended and tender, his liver was enlarged, he had tenting of his skin (a sign of dehydration), and he continued to be unable to speak.  His blood pressure was 175/87 (abnormally elevated). The patient was sent to the ER in a squad car at least an hour after the initial emergency call.

*ADCRR failed to recognize the urgency of Patient 4's condition and act accordingly. Given his sudden change in mental status (loss of the ability to speak), medical staff should have considered the reasonable possibility that he was suffering from a stroke, hepatitis encephalopathy, or pressure on his brain from metastases of his liver cancer. All of these possibilities constituted medical emergencies, for which minutes can make the difference between life and death or serious brain injury. Thus the patient should have been evacuated directly and immediately from his living unit to the hospital. Instead, he did not leave for the hospital until at least an hour later (in violation Injunction paragraph 1.1). ADCRR also failed to recognize the seriousness of Patient 4's condition. Given the diagnoses that staff should have considered as the cause of his current status, transportation by squad car instead of ambulance was dangerous (in violation Injunction paragraph 1.1). It was dangerous because the patient's condition had a significant chance of deteriorating enroute to the ER, e.g., vomiting, pulmonary or cardiac arrest, which cannot be managed in the back seat of a squad car and in the absence of medical personnel.*

The patient was in the hospital from 10/11/24 until 10/16/24 where he was found to have severe hepatic encephalopathy (decreased level of consciousness due to the failure of the liver to clear toxins from the blood) and advanced liver cancer. On 11/5/24 he was transferred to Florence Hospital Anthem to receive comfort care until he died on 11/5/24. He was scheduled to be released from prison on 11/7/24.

*In summary, Patient 4 had no significant medical problems other than HCV infection when he entered ADCRR on 10/4/23. At that point his disease had already severely damaged his liver and required urgent treatment. However, treatment was not provided until 7/25/24 allowing ongoing damage to his liver to occur. Delays in treatment were caused by myriad errors by myriad NaphCare staff, contributed to by a dysfunctional EHR. Simultaneously, the patient had growing cancer of the liver, a common and known complication of HCV infection. If the initial evidence of this cancer were recognized, the patient had a reasonable chance of cure. However, treatment was never provided,*

*resulting in the patient's death. Failure to treat his cancer, like failure to treat his HCV infection, was caused by myriad errors by myriad personnel, contributed to by a dysfunctional EHR. More likely than not, Patient 4's death was avoidable,*

*Finally, it should be noted that this is not an exhaustive description of Patient 4's care at ADCRR; it highlights a fraction of the failures in care and deviations from the Injunction that were present in his record.*

# Attachment B

Suicide Review

# Suicide Review – Patient 5[1]

Patient 5 has been in custody in ADCRR since 03/29/07 and was housed at Eyman – Rynning (Building 5) for at least the last two years of his life. Patient 5 was diagnosed with major recurrent depressive disorder, antisocial personality disorder, and adverse effect of multiple unspecified drugs. In January 2024, he was designated as an MH-3B. That code was changed to an MH-3D on 05/30/24 after having discontinued medications and was changed back to an MH-3B on 08/15/24 following his request to restart psychotropic medication.

At the time of his death, Patient 5 was coded as an MH-3B and prescribed venlafaxine (antidepressant), hydroxyzine pamoate (anti-anxiety), and clonidine (anti-anxiety). He was also participating in Opioid Use Disorder Treatment (MOUD) and was prescribed buprenorphine. Patient 5 had been struggling with what he believed to be medication side effects for at least four months before his death and this continued to be a focal point of his distress throughout the final months of his life. However, despite numerous known risk factors (both static and dynamic), a Suicide Risk Assessment was not ever completed. The documentation in the chart provides evidence that treatment providers – both mental health and psychiatry – considered the patient's statement that he was not suicidal to be the most important (if not only) factor in determining that he was not at risk for suicide. However, a patient's verbalized statements are only one aspect of a suicide risk assessment.

One of the most disturbing elements of this case was a glimpse "behind the curtains" into Patient 5's thoughts about discussing his suicidal thoughts. In July and August 2024, Patient 5 had several communications with family members through phone and messages that spoke directly of suicidal ideation. In a phone communication with his father on 07/15/24, Patient 5 acknowledged having made suicidal statements to his attorneys but he "didn't want them to call the prison and be like oh he is suicidal and then they try to lock me down, you know what I mean?" Statements like this reflect Patient 5's fears about the punitive response he expected for expressing suicidal ideation and reflects the chilling effect of using placement in a suicide watch cell (where patients are kept in a highly restrictive, austere environment with little to no active treatment other than medication administration) as the primary – if not exclusive means – of addressing suicidality in ADCRR.

Patient 5's record of mental health care illustrates the ongoing problems with ADCRR and NaphCare failing to provide clinically appropriate care, particularly with high-risk patients. In the weeks and months before his death, there were numerous violations of the Injunction and missed opportunities for assessing suicidal risk and providing clinical care that likely contributed to his death. The following provides several highlights of Patient 5's mental health issues in the month and a half leading up to his death by suicide on 08/31/24.

## 07/17/24
**45 days before his death**, Patient 5 had an encounter with his assigned Primary Therapist (Psychology Associate #1) during which he reported that he "doesn't want to 'mask' mood with medications."

---

[1] The full names of all patients referred to in this report appear in Attachment D.

*This statement was merely noted, it was not explored at all. The Objective section of the progress note consists of the same verbatim 150 words of many of this clinician's other notes. Psychology Associate #1 scheduled the patient to be seen in 60 days, which was clinically inappropriately as it should have been scheduled much sooner (in violation of Injunction paragraph 1.1d).*

**08/07/24**
**24 days prior to his death,** Patient 5 submitted a Health Needs Request (HNR) to mental health: "I am suffering from anxiety and depression." The HNR was marked as received on 08/09/24 with the notation "Added to Nurse Line." A nursing appointment for the following day (08/10/24) documented that Patient 5 "refused to come to medical and refusal to submit to treatment completed."

*ADCRR failed to alert the Primary Therapist of the HNR that clearly indicated an increase in mental distress (in violation of Injunction paragraph 15.3). This HNR should have been triaged by mental health so it would have been routed to the Primary Therapist and a Suicide Risk Assessment could have been completed at this time, but without being alerted to the patient's worsening symptoms, there is no way the Primary Therapist would have known to intervene.*

**08/14/24**
**17 days before his death**, Patient 5 was seen twice.
- **11:25am:** Patient 5 submitted an HNR stating, "I am suffering with severe depression and anxiety. This is an emergency please call me on as soon as Possible. Thank You." The HNR was responded to by Psychologist #1 because his Primary Therapist (Psychology Associate #1) was reportedly unavailable at the time. Psychologist #1 scheduled the patient for an appointment with a medical nurse ("to assess for present risk") and scheduled an appointment with mental health within five business days.

   *ADCRR failed to alert the Primary Therapist in a timely fashion when Patient 5 declared a mental health emergency. Although having a nurse assess for any contributory medical issues is a reasonable step in the overall response to a complaint like this, it is not the appropriate avenue to "assess for present risk" of self-harm or potential suicide. If the Psychologist responding to the HNR believed that the patient's statements constituted a potential "present risk" of self-harm or suicide with the patient, he should have been scheduled to see his Primary Therapist (or backup Primary Therapist) as an urgent referral rather than five days later based on the nature of the HNR (in violation of Injunction paragraphs 1.1,15.3).*

- **4:25pm**: Patient 5 was seen in the clinic by his Psychology Associate #1, who had been unavailable earlier that day. Patient 5 reported "withdrawal symptoms" from his abrupt self-discontinuation of his antidepressant. He stated that he had been reflecting on "feeling nothing" since being "sentenced to death" and complained that since he stopped taking the medication, he was "feeling everything intensely." He added that he had a visit scheduled with his legal team the following day to "discuss the option of having his case reviewed with the hopes of being given a 'life' sentence" (his current sentence was death).

*ADCRR failed to conduct an in-person Suicide Risk Assessment despite his increasing psychological distress (anxiety, depression, "feeling everything intensely"), physiological complaints ("withdrawal symptoms"), and non-adherence to his medication regimen (in violation of Injunction paragraph 16.8.1).*

Psychology Associate #1 subsequently scheduled Patient 5 for a follow-up appointment with her in seven days (08/21/24).

*A follow-up appointment with a mental health professional should have been scheduled for as soon as possible after the patient's meeting with his legal team since the potential for not having his death sentence reduced to a life sentence was such a core issue for him at this time. Although ADCRR is not in violation of paragraph 1.22 of the Injunction because the patient met with Psychology Associate #1 in five days (on 08/19/24), the timeframe established by Psychology Associate #1 for that appointment was not clinically appropriate and further delayed the opportunity for mental health to conduct a Suicide Risk Assessment (in violation of Injunction paragraph 16.8.1).*

## 08/15/24

**16 days before his death**, Patient 5 had an encounter with Psychiatric Practitioner #2 in response to an HNR to restart his antidepressant. The patient complained of "severe depression and anxiety" and stated that he was "sad, feeling horrible, restless, can't stop moving, appetite and sleep is not good due to the depression and anxiety." Psychiatric Practitioner #2 restarted the patient's antidepressant, changed the patient's MH code to MH-3B, and scheduled him for a return appointment in 60 days.

*ADCRR failed to adequately assess for suicidal risk in this instance (in violation of Injunction paragraph 16.8.1). Although the provider included the statement "Denies [Suicidal Ideation]/[Homicidal Ideation]/[Auditory/Visual Hallucinations]" this does not constitute a suicide risk assessment. This type of notation referring to an individual "denying suicidal ideation" is nearly ubiquitous throughout the mental health and psychiatric notes for this patient (as well as many others) and provides no meaningful information about suicidal ideation other than – at best –the provider asked the patient if they were suicidal and was given a negative response. However, in the context of the review of hundreds of patient cases over the course of monitoring the Injunction, the monitors consider this notation to be a perfunctory statement that is used by clinicians as the single most important (if not only) source of evidence for the absence of suicidal risk. But merely asking a person about suicidal ideation does not constitute a risk assessment. In the case of Patient 5, even a brief review of the records revealed numerous risk factors that are cause for concern including but not limited to:*

- *Caucasian male*
- *over 35 years of age*
- *previous suicide attempts*
- *history of neglect and abuse (physical and verbal)*
- *history of substance abuse (starting with IV heroin at age 14)*

- *history of juvenile criminal behavior and detention*
- *history of impulsivity and risk-taking behavior*
- *convictions for violent crime(s)*
- *sentenced to death*
- *diagnosed with recurrent depression*
- *significant anxiety symptoms (potentially an undiagnosed anxiety disorder)*
- *sleep disturbance, restlessness, irritability, impulsivity*
- *active substance use in prison (methamphetamine and opioids within the past 4 months)*
- *active withdrawal symptoms*
- *significant medication side effects and drug interactions*
- *medication non-adherence, and*
- *an upcoming meeting with legal team regarding potential for avoiding death sentence.*

## 08/17/24
**14 days before his death**, Patient 5 refused his MOUD treatment.

## 08/19/24
**12 days before his death**, Patient 5 was seen for an appointment with Psychology Associate #1 at which time he reported having attempted to discontinue buprenorphine on his own and experienced withdrawal symptoms. He reiterated his concerns about the interaction of his antidepressant and the buprenorphine and expressed his desire to switch to a different antidepressant. In the progress note, Psychology Associate #1 documented the incongruous statement, "Chart reflects medication compliance."

> *ADCRR failed to adequately assess for suicide risk (in violation of Injunction paragraph 16.8.1). Psychology Associate #1 documented that she reviewed the patient's health record, but that review did not result in a Suicide Risk Assessment despite the ongoing issues with inconsistent medication adherence, continuing emotional distress, and the myriad risk factors present in Patient 5's case.*

## 08/21/24
**10 days before his death**, Patient 5 was seen once by a psychiatric practitioner and once by his Primary Therapist.

- **12:08pm**: Patient 5 was seen by Psychiatric Practitioner #2 for a brief clinic encounter at which time Psychiatric Practitioner #2 continued his antidepressant medication and scheduled him for a return to clinic in 90 days.

- **4:29pm**: Patient 5 was seen by Psychology Associate #1 at the request of custody staff, who had noted the patient's increased anxiety symptoms. The progress note includes some contradicting information in which Psychology Associate #1 documented that the patient denied any mental health symptoms while in the very next sentence noting that he endorsed symptoms of both anxiety and depression. The Objective section of the note is nearly

identical to the clinician's note from 08/19/24. The supervising psychologist (Psychologist #2) did not cosign the note until 08/27/24, four days before the patient's death.

*ADCRR failed to adequately assess for suicide risk. There are several disturbing elements to this encounter. Although unit staff should be commended for alerting mental health to their concerns about Patient 5's presentation, the response by mental health was not clinically appropriate. The patient was seen because of increased distress that was obvious to non-mental health staff and he should have been seen in a private, confidential environment, not on the housing unit (in violation of Injunction paragraph 14.9a).*

*The clinical oversight of the Psychology Associate by the Psychologist was rendered effectively moot due to the delay in the supervising psychologist's review of the encounter.*

*The Psychology Associate considered the patient to not be at risk of suicide based on the statement that he "Denies active/passive DTS/DTO/SI/HI/SIB ideations" without a formal evaluation (in violation of Injunction paragraph 16.8.1).*

### 08/22/24
**9 days before his death**, Patient 5 experienced an episode of acute anxiety and was seen by a nurse who scheduled him for a follow-up with the MOUD provider. She also offered to schedule him for a follow-up appointment with a mental health professional, which he refused.

*ADCRR failed to provide clinically appropriate care as the mental health concerns should have been communicated to the Primary Therapist (in violation of Injunction paragraph 1.1).*

### 08/24/24
**7 days before his death**, Patient 5 was seen by Psychiatric Practitioner #1 at sick call due to Patient 5's complaint of anxiety, which he believed was caused by an interaction of his antidepressant with his buprenorphine. Psychiatric Practitioner #1 noted that the patient had actually not taken his antidepressant for two days. They noted that the patient's non-adherence to his medication regimen and included a rule-out of discontinuation syndrome in their note.

### 08/26/24
**5 days before his death**, Patient 5 was seen at several times by multiple providers.

- **6:21am**:    Psychiatric Practitioner **#4** noted that "Pt seen for this the day prior and reduced dose at that time."

- **9:43am:**   LPN **#1** met with him for Abnormal Vitals/Weight change.

- **3:37pm:**   Psychiatric Practitioner **#5** documented that the patient "has chronic anxiety and well controlled on [venlafaxine]."

    *The patient's anxiety was clearly not under control as even a casual review of the documentation showed.*

- **3:41pm:** RN **#2** saw the patient in response to an emergency response that was activated due to his complaints of difficulty breathing and acute anxiety. RN #2 documented that he had not been taking his venlafaxine and had missed three days of buprenorphine.

- **9:52pm:** Psychiatric Practitioner **#6** conducted a COWS (Clinical Opiate Withdrawal Scale) assessment and continued his current medications.

- **10:07pm:** Fifteen minutes after his visit with Psychiatric Practitioner #6, Psychiatric Practitioner **#7** documented that she received a call from RN #3 that the patient was anxious and irritable. Psychiatric Practitioner #7 ordered clonidine 0.1mg.

    *ADCRR failed to provide clinically adequate care (in violation of Injunction paragraph 1.1). The times are listed according to the timestamp in TechCare and QuickNotes, so they may not reflect the exact time of the interaction, but the number of disconnected visits with numerous different providers underscores the lack of meaningfully coordinated care with this high-risk patient. This diffusion of responsibility is highlighted by the fact that even after all these interactions, the patient was not referred to his Primary Therapist.*

**08/27/24**
**4 days before his death,** Patient 5 had several encounters with mental health and medical:

- **7:12am:** Patient 5 met on his housing unit with Psychology Associate #3 at the request of security staff due to the patient's report of increased anxiety, panic, and difficulty calming down. Patient 5 reported that he was experiencing "uncontrollable anxiety," that his "body was locked and rigid," that he "was curled up in (his) house and couldn't move," and feared that he was "going to die." The patient attributed his symptoms to his buprenorphine (which he acknowledged he was not taking reliably). Psychology Associate #3 "discussed multiple coping skills that included breathing exercises, getting out of cell and talking trying to go to recreation. From the documentation, it appeared that Patient 5's concerns were not assuaged by these suggestions as indicated by his response that his symptoms "continue to increase and 'I just sit there balled up and can't move.'"

Based on these interactions, Psychology Associate #3 concluded that Patient 5 was not a risk for self-harm or suicide and scheduled him for follow-up in 14 days.

    *ADCRR failed to provide adequate care. This patient's acute mental health symptoms were responded to by someone who was neither his Primary Therapist (Psychology Associate #1) NOR his backup Primary Therapist[2] (in violation of Injunction paragraph 1.1).*

    *He was seen in on his housing unit rather than a confidential environment (in violation of Injunction paragraph 14.9a).*

---

[2] Psychology Associate #2, who had seen the patient earlier in the day.

6

*He still did not have a Suicide Risk Assessment completed (in violation of Injunction paragraph 16.8.1).*

*Finally, he should have had an urgent referral to see his Primary Therapist as soon as possible but preferably no more than one business day later in spite of the clear increase in symptom severity and provider contacts (in violation of Injunction paragraph 1.1).*

- **10:10am:** An emergency response was activated due to Patient 5's complaints of difficulty breathing. He was seen by the psychologist and psychiatrist and complained of having "the worst anxiety, it's just getting worse." He attributed the increase in his symptoms to the buprenorphine. He had been on a buprenorphine taper but had refused the previous three doses and requested to bypass the taper and be taken off the drug altogether. Psychiatric Practitioner #3 ordered clonidine 0.1 mg tab and cleared patient to return to his housing unit.

  *Once again, the MH professional should have, but failed to, conduct a Suicide Risk Assessment (in violation of Injunction paragraph 16.8.1).*

- **10:35am**: Patient 5 was seen with a Psychiatric Practitioner (not identified in the body of the progress note) in the health unit from 10:35-10:45. The patient continued reporting increased symptoms and again coping skills were discussed. The patient reported that "I tried" but continued to have increased panic. He was prescribed medication to help with anxiety and was cleared to return to housing.

- **2:31pm**: An emergency response was activated for "altered mental status." Patient 5 was taken to the clinic via wheelchair with intermittent responsiveness. The note indicates that the Complex Medical Director had seen Patient 5 in his housing unit for complaints of severe headache and had subsequently directed medical staff to contact EMS to transport the patient to the hospital via ambulance.

  *ADCRR failed to provide adequate care. Given the ongoing issues with depression, panic, anxiety, and medication non-adherence that led to his being taken off-site to a hospital, the patient should have been receiving more intensive services by his Primary Therapist and Treatment Team long before he reached the point of needing to be sent out.*

## 08/29/24
**2 days before his death**, Patient 5 was seen by Psychiatric Practitioner #3 at 12:49pm for a 15-minute confidential interview. The patient was noted to be restless and jittery, stated that he was "going through withdrawal," and reported that he had been taken offsite to a hospital for a higher level of care and was informed upon discharge that the symptoms "will continue for some days."

The patient was noted to be non-compliant with venlafaxine: "I stopped taking [venlafaxine] because I want to get off [MOUD] before restarting medication as I have bad drug interaction when I take [venlafaxine] and [buprenorphine]." Patient 5 reported that he wanted to stop MOUD treatment due to what he believed was drug-to-drug interactions of his antidepressant (venlafaxine) and buprenorphine. He expressly stated that he did not want the venlafaxine

discontinued: "I have been taking this medication for many years, don't [discontinue] the medication, I will start taking it as soon as I stopped withdrawing."

Patient 5 was experiencing negative physical and emotional reactions to either his psychotropic medications, the MOUD medication, or a combination of the two that resulted in unreliable adherence to either. He reported sleep disturbance and complained that he could not take advantage of recreation because of his withdrawal symptoms. The Psychiatric Practitioner did not change medications at that time, and he scheduled Patient 5 for a return appointment in 90 days.

**08/31/24**
The patient was found on the floor unresponsive the result of an apparent suicide by hanging.

*In summary, ADCRR failed to provide adequate care. This tail-wagging-the-dog phenomenon of allowing the patient to loosely adhere to a treatment regimen by starting and stopping medications at any time despite experiencing ongoing and increasing negative effects from doing so is irresponsible on the part of the treatment providers. He was clearly not a good faith candidate to take medications as prescribed and the challenges he had in maintaining even a modicum of stability should have prompted a coordinated effort by his treatment team (to include the Primary Therapist, psychiatric provider, and the MAT treatment provider at a bare minimum) to more closely monitor his mental, emotional, and behavioral status. One obvious option that was not considered could have been placement in a watch area for a period of observation and evaluation, which would have allowed for more focused efforts to improve the patient's reliability in following his prescribed treatment and foster an improved treatment alliance between the patient and his treatment providers. However, the "treatment" the patient received was little more than documenting his complaints and scheduling a return appointment in 90 days that he would not be able to make because he would be dead by suicide in two days.*

*The diffusion of responsibility in this patient's care more likely than not contributed to his death. A disturbing multitude of health services staff (from LPNs and RNs to Psychology Associates, Psychiatric Nurse Practitioners, Psychiatrists, and even a Complex Medical Director) over the course of the months and weeks preceding his death by suicide – up to and particularly including the days just prior to his death – missed or outright ignored a clear opportunity (if not professional obligation) to refer the patient for more intensive care and a suicide risk assessment (in violation of Injunction paragraph 1.1a, 1.1b, and 16.8.1). Despite the severity of his symptoms and functional impairment and his increasing utilization/consumption of mental health, medical, and psychiatric resources, Patient 5 was not ever provided with an actual course of treatment for his anxiety and depression that consisted of more than simply checking in with the patient and encouraging him to use coping skills, which had clearly not been sufficient to stabilize his mental and behavioral state.*

# Attachment C

Table of Injunction Compliance

| Order Reference | Injunction Requirement | Compliance<br>Color code:<br>Green=Compliant;<br>Red=Not Compliant<br>"X"=Not Compliant because no data producable |
|---|---|---|
| **Medical + Mental Health** | | |
| Staffing | | |
| 1.15 | There is a sufficient number of custody staff to support the functioning of the health care operation, including but not limited to: transporting prisoners to on-site and off-site clinical encounters and appointments; administration of medications; and providing security in the venues of health care operations. Exceptions may be made for a declared emergency (e.g., prison riot, natural disaster). | <span style="color:red">[Red]</span> |
| 1.16a | All positions required by the current contract with the health care vendor including any modifications, addenda, or updates are filled. A filled position is one in which there is an incumbent receiving a salary for the full intended time commitment of the position and is not on long term leave, e.g., Family Medical Leave Act. An individual may not fill more than 1.0 FTE. | <span style="color:red">[Red]</span> |
| 1.16b | Up to 15% of staff described in 1.16a may be filled with registry staff. | <span style="color:green">[Green]</span> |
| Medications | | |
| 10.3.1 | When a patient refuses a medication (or classes of medication), based on the specific medication or class and the number and pattern of refusals, the medication administrator shall be triggered to escalate the case to a higher authority and within a specified amount of time (which may differ by medication or class). The decision rules described above should be incorporated into the medication administration software of the EHR such that the EHR automatically alerts the medication administrator when action is needed and what action is needed. | <span style="color:red">[Red]</span> |
| 10.3.2 | When a medication refusal policy requires escalation of the case to a higher authority, within the policy-prescribed time frame, an RN or appropriately licensed practitioner is responsible for: determining the reason for the refusal and securing the patient's adherence with the medication, or finding a clinically appropriate alternative treatment, or assuring that the patient is making an informed refusal, or assuring the execution of whatever clinically appropriate action is ordered by a prescriber. | <span style="color:red">[Red]</span> |
| Urgent/Emergent Care | | |
| 1.20 | When a patient notifies a correctional officer that he/she has a need for health care (medical or mental health), the officer may not inquire as to the nature of the need or symptoms. The officer's inquiry is limited to asking whether the need is immediate, if the patient can wait to sign up for the next scheduled clinic, or if the patient is thinking of harming him/herself. (If the patient is thinking of harming him/herself, the officer shall immediately ensure the patient's safety and contact health care staff in accordance with Section 16.8.1.) For other needs that are immediate, the officer shall contact health care staff immediately. An RN shall triage the patient immediately, either by seeing the patient, or talking to the patient directly over the phone. Based on triage results, the RN shall discuss the patient with a medical practitioner (i.e., physician or APP) or, if the patient is already on the mental health caseload (i.e., MH-3, 4, or 5) mental health professional in a clinically appropriate timeframe, not to exceed four hours. In this context, the mental health professional shall be a psych associate, psychologist, or psychiatric prescriber. Based on that interaction the professional who was contacted shall: see and treat the patient the same day; or instruct the RN on treatment to provide, and, if necessary, schedule the patient for further evaluation or treatment in a clinically appropriate timeframe; or determine the health care need is not urgent and that a reasonable patient would not have considered the health care need to be urgent, defer treatment, and instruct the patient to access non-urgent/non-emergent care for treatment. | <span style="color:red">[Red]</span> |
| Improvement Programs | | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 2.1.1 | Following any death or suicide attempt, identify all significant health care and custody errors (i.e., near misses as well as preventable adverse events). Based on prioritization of all errors identified, a root cause analysis shall be conducted if clinically appropriate, from which an effective and sustainable remedial plan shall be crafted and implemented within one month of the death. A sustainable plan is one which outlives staff memory from a single training after the review or staff turnover. Monitor the remedial plan for effectiveness and make appropriate and timely modifications to the plan based on the monitoring. [2.1.3.] For each death, the plan in this section shall be crafted and implemented within one month whether or not the medical examiner's report is available. [2.1.2] | |
| 2.5.1a | Staff capture errors, system problems, and possible system problems that come to their attention through sources, including but not limited to the near-miss and preventable adverse event reporting systems, mortality reviews, litigation filed by patients, grievances, the Court-appointed monitors, staff reports, continuous quality improvement, etc. | |
| 2.5.1b | Staff maintain an active log of all such errors and problems to assist in deciding which issues to address, when, and at what level (complex and/or statewide), and to monitor progress in resolution. Based on this prioritization, either at the complex or state level, root cause analysis shall be conducted as appropriate, from which an effective and sustainable remedial plan is implemented in a timely manner. Such plan is one which outlives staff memory from a single training after the review or staff turnover. The remedial plan shall be monitored for effectiveness. Appropriate and timely modifications shall be made to the plan based on the monitoring. | |
| Medical Records | | |
| 4.4a & b | Imported or scanned documents (including but not limited to diagnostic test results, consultation reports, and hospital discharge summaries) in the EHR: shall be filed in a clear and usable manner, are accurately labeled with meaningful titles/file names, are scanned right-side up, and are filed with an appropriate document date according to the following rules: Scanned documents are dated (and appear in any programmed or ad hoc list according to this date) based on the clinically relevant date of the document, not the date scanned. For example, the clinically relevant date of a lab test is the date the test was reported by the lab; discharge summary is the date of discharge; a prior health record is the date it was received at ADCRR; an imaging study is the date of study. | |
| 4.4c | Fewer than 1% of files are labeled/titled with names beginning with "Miscellaneous" or "Other." | |
| 4.4d | Documents (including but not limited to diagnostic tests, consultation reports, and hospital discharge summaries) which are manually scanned into, or electronically attached to (after receipt via email) the EHR have this completed within 2 business days of receipt and are reviewed by the medical provider (for medical documents), or primary therapist or psychiatric prescriber (for MH documents) within 4 business days of receipt. | |
| 4.4e | Documents which are imported to the EHR directly via an interface are reviewed by the medical provider (for medical documents), or primary therapist or psychiatric prescriber (for MH documents) within 4 business days of receipt | |
| 4.5 | Staff provide patients access to their own medical records as follows, unless a practitioner documents in the patient's EHR how disclosure of such information would jeopardize the health, safety, security, custody or rehabilitation of the patient or others or the safety of any officer, employee or other person at the correctional institution or of a person who is responsible for transporting the patient: (a) read-only access to patients wishing to read a copy of their health record; (b) orally sharing with a patient information regarding their diagnosis or any other information about their health care; (c) providing paper copies at a fee consistent with the updated policy; or (d) as an alternative to a paper copy, if the patient agrees, staff may provide the requested records, free of charge, in an electronic medium that the patient is able to access. | |
| Language Interpretation | | |
| 3.1a & b | The patient's preferred language is known and care is delivered in the language in which the patient is fluent at all times. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 3.3 | For all individual and group health care encounters in all settings involving patients who are not fluent in English, interpretation shall be provided via: health care staff whose name appears on a list maintained by Defendants of people who, pursuant to written policies Defendants develop, is proficient in the language understood by the patient or in-person or via video interpretation service (for sign language) or audio language interpretation service that is compliant with federal law and uses licensed interpreters, where required by state law, unless these are not feasible due to emergency circumstances. | |
| 3.6 | Written available notification (such as a poster) shall be hung in all housing units and health care clinics in all prisons advising patients, in the ten most common languages in Arizona, of the availability of interpretation services and that they may inform healthcare staff orally in any language, in sign language, or in writing in any language that they are not fluent in English, if that is not already documented in their electronic health record. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| **Medical** | | |
| Staffing and Bldg. | | |
| 6.2a | FMDs in low intensity facilities shall be assigned as the primary care provider for patients who need physician level care. | |
| 6.2b | APPs will only be assigned patients who do not require a physician as their primary care provider. | |
| 6.2c | FMDs in high intensity facilities shall be assigned up to 100 patients as the primary care provider and shall have no other scheduled patient care assignments including supervision of APPs or as the scheduled provider for specialized units such as Inpatient Component ("IPC") or Special Needs Unit ("SNU"). This does not limit FMDs from occasional unscheduled clinical supervision and care activities. | |
| 7.3 | All patients shall be assigned a medical primary care practitioner. | |
| 6.4 | All medical physicians–at hiring and during employment–shall be board certified in Internal Medicine or Family Practice, or board eligible if within 7 years of their completion of an ACGME approved residency in one of these 2 specialties, with the following exceptions: medical directors, shall be board certified at hiring and during employment; physicians providing obstetric and gynecologic services shall be board certified or board eligible if within seven years of their completion of an ACGME approved residency in obstetrics and gynecology; and physicians who are currently employed and are not board eligible may remain employed for no longer than one year after issuance of this Order. They may also not possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. (Notify Court Monitors if there is a request for an exception) | |
| 1.11 | Licensed Practical Nurse ("LPNs") shall practice within their scope of practice set forth in Arizona Administrative Code § 4-19-401 (not independently assess patients or initiate a plan of care or treatment). | |
| 1.12 | No one for whom a health professions license is required may possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. | |
| 1.9 | Directors of Nursing may not spend more than 15% of their time providing scheduled or unscheduled patient care. | |
| 1.4 | Telehealth for medical care may be used only when clinically appropriate. | |
| 1.6 | There is sufficient space, equipment (e.g., otoscopes, ophthalmoscopes), and supplies (e.g., dressings) to deliver medical care services appropriate to the location. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 1.7 | There is auditory and visual confidentiality during medical encounters. Breaches of confidentiality are limited to the measures required to ensure safety, and all staff shall maintain the confidentiality of any information they acquire as a result of the breach. | |
| 3.5 | The equipment used for interpretation shall allow for confidential communication in all medical health care circumstances (e.g., dual hand- or head-set device in locations where a speaker phone or computer can be seen or overheard by other patients or custody staff). | |
| 1.10. | All staff hired in clinical medical supervising positions must have at least two years clinical experience. | |
| 1.13 | Health care staff (Medical and Mental Health) responsible for direct patient care shall not be mandated to work beyond the following limits: more than 12 hours in any 24-hour period; less than 8 hours off between any two shifts; more than 60 hours in a calendar week defined as Sunday through Saturday. (1.14. The limits on overtime may be extended during emergency situations. Time spent on-call is not included in the time limits.) | |
| Operations | | |
| 1.1, 1.3 | All care and the documentation supporting that care, delivered during: a medical encounter (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, report from a consultant, other external health record, shall be clinically appropriate including scheduled follow-up in an appropriate timeframe when applicable . Settings include, but are not limited to: | |
| 1.1a | emergent; | |
| 1.1b | urgent; | |
| 1.1c | non-urgent episodic; | |
| 1.1d | chronic; | |
| 1.1e | inpatient; | |
| 1.1f | off-site specialty referrals; | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 1.1g | (Additional reference 9.1) action taken on post-hospital, post-emergency room, or specialist recommendations. This includes that the practitioner shall adopt and perform recommendations from outside providers unless a clinically appropriate basis exists to alter or forgo the off-site recommendations. | |
| 1.22 | Orders from health care staff in the outpatient and inpatient arenas shall be completed within the timeframe ordered.  This includes, but is not limited to: | |
| 1.22a | on-site diagnostic tests | |
| 1.22b | off-site diagnostic tests | |
| 1.22c | follow-up visits with nurses or practitioners | |
| 1.22d | Off-site referrals | |
| 1.21 | All refusals of patient-initiated visits shall be made directly to a health care professional by telephone, tablet, video, face-to-face, or in writing by the patient.  If a patient will not voluntarily displace, health care staff will go to the patient's location. | |
| 1.1,1.21a | All refusals of provider-initiated on-site medical visits are made by telephone, video, or face-to-face with an RN or practitioner, within three days after the appointment.  If a patient will not voluntarily displace, health care staff will go to the patient's location. | |
| 1.1, 1.21b | All refusals of off-site health visits are made by telephone, video, or face-to-face with an RN or higher at the time of the appointment.  If a patient will not voluntarily displace, health care staff will go to the patient's location. | |
| 1.23 | Patients shall be informed in a timely manner of diagnostic test results | |
| 5.1 | For patients with any medical conditions and identified treatment providers in the community, if the patient consents, health care staff shall send each provider relevant health care information prior to the patient's release.  This includes, at a minimum, a problem list, list of active medications, current symptoms, functional impairments, a summary of relevant care provided during incarceration, any necessary care or follow-up care, one or more points of contact if a community provider requires further information. The patient's health record shall contain documentation of the above information that was provided, when, and to whom. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 7.4.1 | Patients shall be given on a daily basis an opportunity to indicate their need to be seen for a medical clinic appointment at the next available clinic by one of the following mechanisms, depending on their living situation, freedom of movement, and access to electronics: affixing their name to a time slot on a paper list maintained on the living unit or in the medical unit; affixing their name to a time slot on an electronic list via tablet or kiosk; informing the nurse who conducts daily (or more frequent) welfare checks on that unit; an effective paper-based system developed by ADCRR in the event of temporary non-functioning of the electronic system. | |
| Medical Records | | |
| 4.3 | The problem list in a patient's health record: shall be accurate, complete, and easily usable; resolved or historical conditions or diagnoses are separated from current conditions; the date of onset or resolution of resolved or historical conditions or diagnoses is indicated, if known; similar or identical diagnoses of current conditions are listed only once. For example, a problem list would not simultaneously list "heart disease," "heart failure," and "congestive heart failure, not otherwise specified." | |
| Intake | | |
| 7.1 | An RN or higher credentialed professional shall conduct an intake screening within four hours of a patient's arrival or, alternatively, a rapid screening shall be conducted immediately upon arrival, but the intake screening by an RN shall be conducted as soon as possible and before the patient proceeds to housing. If the rapid screening is conducted by a professional of lesser credential than an RN (e.g., LPN, certified medical or nursing assistant), then the screening shall not include a clinical assessment, and any abnormal response found by the LPN or similar staff shall result in immediate consultation with an RN (or higher credentialed professional). | |
| 7.2 | A medical practitioner shall complete a history and physical examination of each patient by the end of the second full day after a new patient arrives in ADCRR. | |
| Non-Urgent Care | | |
| 7.4.6 | All non-urgent/non-emergent care at the request of a patient shall be completed in a reasonable time. | |
| 7.4.7a & b | The initial care for non-urgent/non-emergent care and chronic care shall be provided by the patient's primary care provider (PCP) with the exceptions noted below. (1) The care may be provided by another medical practitioner or health care practitioner as directed by the PCP as clinically appropriate. (2) If the PCP is not on the premises or conducting telehealth visits at the time, the care may provided by another medical practitioner of the same or higher credential. (3) Pursuant to patient-specific direction provided by the medical practitioner, RN may provide initial care for a limited number of conditions that are simple, rarely serious, rarely confused with serious conditions, and appropriately treatable with self-care and/or over-the-counter medications provided that the RN operates under clinically appropriate protocols approved by the monitors. | |
| Urgent/Emergent Care | | |
| 1.5 | Emergency response and care provided by custody staff shall be appropriate given the skill level and knowledge expected of custody staff. | |
| 1.8a | Emergency response equipment ("Man Down Bag," Automated External Defibrillators ("AEDs"), oxygen) shall contain all items required by policy, all equipment shall be in working order, and all medications shall be unexpired. | |
| 1.8b | Emergency Response bag checklists shall reflect the equipment was checked daily and inventoried monthly. The checklists shall also reflect medications are within their expiration date and equipment is operational. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 1.8c | Staff shall complete and document all AED manufacturer recommended checks (e.g., daily, monthly, annual). | |
| 1.8d | Naloxone is required to be kept on every living unit or with every AED. | |
| **IPC** | | |
| 7.6.1 | A medical practitioner shall be contacted and collaborate on the creation of an immediate care plan immediately upon a patient being admitted to the IPC. | |
| 7.6.2 | An RN shall complete an admission nursing assessment immediately upon a patient arriving in the IPC. | |
| 7.6.3 | A medical practitioner shall complete an admission history and physical within one calendar day of admission to the IPC for patients who are going to remain beyond 24 hours. | |
| 7.6.4 | An RN shall complete an assessment in the IPC at the frequency ordered. The spacing of the assessments shall be clinically appropriate. | |
| 7.6.5 | The call buttons of all patients admitted to an IPC level bed are determined to be working on the day of admission and once per month. If a call button is not working health care staff shall perform a welfare check at least once per 30 minutes. | |
| **Specialty Care** | | |
| 8.7 | If a practitioner orders, or informs a patient there will be an order, for an off-site test or referral, but circumstances change and the order is modified or rescinded, the patient shall be informed within one month of the change. | |
| 9.2 | Patients returning from a hospital stay or emergency room visit shall be evaluated by an RN or higher prior to returning to their living unit. A discharge summary, physician report, or documentation of this information received via phone shall be available for this evaluation. | |
| **Medications** | | |
| 10.1 | Prescribed medications intended for directly observed therapy ("DOT") administration shall be administered as ordered or there shall be documentation of a valid reason for non-administration. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 10.2a | For a patient newly admitted to a facility (e.g., transfer from another facility, return from a hospital stay, admission from a jail) and already on a medication in their previous venue, the first dose of a medication shall be delivered keep-on-person ("KOP") or administered ("DOT") in time for their next regularly scheduled dose. | |
| 10.2b | The first dose of a newly ordered medication shall be delivered ("KOP") or administered ("DOT") within the timeframe ordered, or if no timeframe is specified, within twelve hours for antibiotics and pain medications, and within three days for all other medications. | |
| 10.4.1 | KOP medications shall be delivered to the patient before the medication runs out (based on the date of the previous fill). A KOP medication shall be delivered either by providing the patient with the KOP supply or by staff administering the medication from stock, dose by dose, to bridge the gap until the KOP supply is delivered. Additional medication need not be delivered before the previous fill runs out if a clinically appropriate and documented determination was made by a prescriber that the medication should not be continued and the patient is so informed. | |
| 10.5.4 | Patients with asthma who are at significant risk of serious respiratory impairment if they do not use their rescue inhaler immediately, shall be provided a rescue inhaler KOP. Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button. Exceptions may also be made for patients where the practitioner can document a significant and serious penological need to prohibit a particular patient from having such an inhaler. This exception must be patient-specific. | |
| 10.5.5 | Patients with diabetes who are at significant risk of hypoglycemia shall be provided a source of glucose KOP. Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button. | |
| 10.5.6 | Patients prescribed rapid-delivery nitroglycerin for cardiac disease shall be provided the medication KOP. Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button. | |
| Hep C | | |
| 11.1.1 | All patients are offered a screening blood test for HCV under opt-out conditions within a month of arrival | |
| 11.1.4 | All patients with HCV infection shall be placed on a single list prioritized according to a scheme that considers degree of fibrosis, relevant comorbidities, likelihood of transmitting infection to others in the prison, and release date. | |
| 11.1.7 | All patients with HCV shall be offered education about HCV, whether they receive treatment or not. | |
| 11.1.5a | All patients with newly diagnosed HCV are tested to determine if they have more advanced hepatic disease | |
| 11.1.5b | All patients with fibrosis scores of F3 or F4 will be offered treatment for HCV | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 11.1.5c | At least the following number of patients will begin treatment for HCV monthly using the current standard of care medications: 110 patients plus 70% of the number of newly admitted patients who tested positive for HCV during the previous month. | |
| 11.1.6 | No patient who is released on their planned release date shall release without having been screened for HCV and if positive and they accept treatment, without having completed treatment except for those patients with markedly reduced life expectancy who would not be expected to benefit from treatment, or patients who cannot complete treatment within the timeframe of their incarceration and linkage to care in the community for continuation of treatment cannot be established despite a good faith effort or there is a documented informed refusal. | |
| **TB** | | |
| 11.2 | All newly admitted patients shall have a completed test for tuberculosis (skin test, blood test, or chest x-ray) by the end of the seventh full day after admission into the ADCRR system, unless the patient refuses. | |
| **SUD** | | |
| 11.3.1 | All newly admitted patients shall be screened for, and if indicated then evaluated for, substance use disorder. Screening shall include assessment as to a history of opioid overdose. | |
| 11.3.2 | All newly admitted patients shall be offered to have current Medication for Opioid Use Disorder ("MOUD") (buprenorphine, naltrexone) continued. | |
| 11.3.3 | All pregnant or post-partum patients with diagnosed Opioid Use Disorder ("OUD") shall be offered to have current MOUD (buprenorphine, naltrexone, methadone) continued, or if not currently on MOUD, shall be offered to initiate treatment with buprenorphine or naltrexone. | |
| 11.3.4 | No later than two months after issuance of this order, all patients who have a documented history of opioid overdose or who upon assessment are determined to be at imminent risk of an opioid overdose, shall be offered MOUD with buprenorphine or naltrexone. | |
| 11.3.5 | All patients offered treatment for HCV shall be evaluated for OUD and if found to have OUD, shall be offered MOUD with buprenorphine or naltrexone. | |
| 11.3.6a & b | Patients with OUD will be offered MOUD, including counseling, if appropriate. The Department will take the necessary steps to ensure that any patient transferring to another facility will not experience an interruption in MOUD, counseling, or alcohol treatment. | |
| 11.3.6c & d | Patients with Alcohol Use Disorder will be offered medication treatment and counseling if appropriate. The Department will take the necessary steps to ensure that any patient transferring to another facility will not experience an interruption in medication or counseling. | |
| **Immunization** | | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 11.4a - f | Patients shall be offered all immunizations recommended by ACIP. | |
| Improvement | | |
| 2.1.3 | Following a medical-related death, if the medical examiner's report was unavailable, the plan shall be revisited and modified, if necessary, within one month of receipt of the report. | |
| 2.4.1 | There is a robust continuous quality improvement program to monitor the quality of clinical care. As part of this program, staff monitor the absolute number and trend of various parameters on a monthly basis. Where metrics or trends in metrics show room for improvement, staff make appropriate efforts to understand the underlying reason for deviation, take reasonable steps to effectuate improvement, evaluate the effectiveness of these steps in a reasonable time, and make adjustments to its improvement efforts as needed. At a minimum, ADCRR will monitor the following parameters: | |
| 2.4.1a | percentage of individuals (regardless of whether diagnosed with hypertension) whose systolic blood pressure exceeds 140 mmHg or diastolic blood pressure exceeds 90 mmHg; | |
| 2.4.1b | average hemoglobin A1C (regardless of whether diagnosed with diabetes); | |
| 2.4.1c | percentage of individuals taking ten or more prescribed medications; | |
| 2.4.1d | percentage of women receiving timely breast screening; | |
| 2.4.1e | percentage of women receiving timely cervical cancer screening; | |
| 2.4.1f | percentage of pregnant women who have the results of routine prenatal laboratory tests results as recommended in current national guidelines (e.g., Guidelines for Prenatal Care, 8th Edition, American Academy of Pediatrics and American College of Obstetricians and Gynecologist, Table 6-2) documented within one month of diagnosis of pregnancy; | |
| 2.4.1g | percentage of health care grievances which are appealed; | |
| 2.4.1h | percentage of health care grievance appeal replies that are appropriate; | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 2.4.1i | percentage of prisoners arriving at ADCRR for whom intake screening by an RN (or higher credentialed professional) is completed more than four hours after arrival. | |
| 2.4.2 | There is a robust continuous quality improvement program to monitor the quality of clinical care. As part of this program, staff monitor the absolute number and trend of various parameters on a monthly basis. Where metrics or trends in metrics show room for improvement, staff make appropriate efforts to understand the underlying reason for deviation, take reasonable steps to effectuate improvement, evaluate the effectiveness of these steps in a reasonable time, and make adjustments to its improvement efforts as needed. ADCRR will monitor parameters as reasonably dictated by the other self-improvement activities described in this Monitoring Guide | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| **Mental Health** | | |
| Staffing and Bldg. | | |
| 13.2 | A MH Duty Officer shall be available at all times when facility mental health staff are not available. The MH Duty Officer shall be a licensed psych associate, psychologist, or psychiatric practitioner. | |
| 14.1 | All psychiatrists–at hiring and during employment–shall be board certified in psychiatry, or board eligible if within 7 years of their completion of an ACGME approved residency in psychiatry, with the following exceptions: 1) supervising psychiatrists shall be board certified at hiring and during employment; 2) psychiatrists who are currently employed and are not board eligible may remain employed for no longer than one year of issuance of this Order; they may also not possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. (Notify Court Monitors if there is a request for an exception.) | |
| 14.2 | All psychologists and psychiatric practitioners shall have the appropriate state licenses. All psych associates shall be licensed or become licensed within one year of hiring or within one year of this Order, whichever is later, and may not possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. | |
| 1.10. | All staff hired in clinical MH supervising positions must have at least two years clinical experience. | |
| 1.11 | Behavioral Health Technicians shall not independently assess patients or initiate a plan of care or treatment. | |
| 1.12 | No one for whom a health professions license is required may possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. | |
| 15.1a | Each patient on the mental health caseload, i.e., all patients in MH Levels 3, 4, and 5, shall be assigned a primary therapist (PT; psych associate or psychologist) | |
| 15.1b | A PT serves as the single point of contact and coordination for providing care to all patients designated MH-3 and above. When a patient's assigned PT is unavailable, another psych associate or psychologist acts on their behalf. | |
| 15.2 | A psychologist shall review the records of each patient who is added to, or discharged from, the mental health caseload after intake. The psychologist shall approve or deny the level of care assignment and take appropriate action. | |
| 1.4 | Telehealth for mental health care may be used only when clinically appropriate. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 15.9a | There is sufficient space, equipment (e.g., computer, furniture), and supplies (e.g., assessment and treatment materials) to deliver mental health care services. This includes, but is not limited to, areas for mentally ill patients to be housed, engage in programming, and receive treatment (both individual and group) in an environment commensurate with that unit/facility's designated level of care. | **X** |
| 15.9b | There is auditory and visual confidentiality during MH encounters. Breaches of confidentiality are limited to the measures required to ensure safety, and all staff shall maintain the confidentiality of any information they acquire as a result of the breach. | |
| 16.7 | All mental health encounters with all patients shall occur in a confidential, therapeutically appropriate setting unless there is a clinical or legitimate and substantial safety and security concern that is documented. | |
| 3.5 | The equipment used for interpretation shall allow for confidential communication in all medical health care circumstances (e.g., dual hand- or head-set device in locations where a speaker phone or computer can be seen or overheard by other patients or custody staff). | |
| Operations | | |
| 1.1 | All care and the documentation supporting that care, delivered to patients during: a mental health MH (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, other external health record, shall be clinically appropriate. Settings include, but are not limited to: | |
| 1.1a | emergent; | |
| 1.1b | urgent; | **X** |
| 1.1c | non-urgent episodic; | |
| 1.1d | outpatient counseling or psychological care | |
| 1.1e | outpatient psychiatric care | |
| 1.1g | residential counseling or psychological care | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 1.1h | residential psychiatric care | |
| 1.1i | inpatient counseling or psychological care | |
| 1.1j | inpatient psychiatric care | |
| 1.3 | All patients with mental illness who require regular follow-up shall be designated on the mental health caseload | |
| 1.22a | Orders from MH staff in any setting for metabolic, drug levels, and hematologic blood tests shall be completed in the timeframe ordered. | |
| 1.22b | Follow-up visits with MH professionals are completed within the timeframe ordered. | |
| 1.21a | All refusals of patient-initiated visits shall be made directly to a health care professional by telephone, video, or face-to-face. If a patient will not voluntarily displace health care staff go to the patient's location. | |
| 1.21b | All refusals of a MH professional-initiated health visits are made by telephone, video, or face-to-face with an RN or practitioner for medical visits or a masters level therapist, psychologist, or psychiatric practitioner (psychiatrist, psychiatric nurse practitioner, psychiatric physician assistant) for mental health visits, within three days after the appointment. If a patient will not voluntarily displace health care staff go to the patient's location. | |
| 5.1 | For patients on the MH caseload with identified treatment providers in the community, if the patient consents, health care staff shall send each provider relevant health care information prior to the patient's release. This includes, at a minimum, a problem list, list of active medications, current symptoms, functional impairments, a summary of relevant care provided during incarceration, any necessary care or follow-up care, one or more points of contact if a community provider requires further information, name and contact information of the primary therapist, an aftercare plan that reflects progress in treatment, and a current treatment plan. The patient's health record shall contain documentation of the above information that was provided, when, and to whom. | |
| Medical Records | | |
| 4.3 | The problem list in a patient's health record: shall be accurate, complete, and easily usable; resolved or historical conditions or diagnoses are separated from current conditions; the date of onset or resolution of resolved or historical conditions or diagnoses is indicated, if known; similar or identical diagnoses of current conditions are listed only once. For example, a problem list would not simultaneously list "heart disease," "heart failure," and "congestive heart failure, not otherwise specified." | |
| Intake | | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 16.1a | A psych associate or psychologist conducts a mental health assessment of each patient within one business day of that patient first entering the ADCRR system. | |
| 16.1b | The intake mental health assessment shall identify and document sufficient relevant information regarding the presence and severity of mental health symptoms; current impact on functioning; past hospitalization/treatment including response to treatment; medications; suicide risk; behavioral observations of staff; and a preliminary designation of level of care. | |
| 15.8 | For patients admitted to ADCRR on a psychotropic which is not on ADCRR's formulary, the medication shall be continued if, based on the patient's history, there is significant risk of worsening of the condition if a different medication is prescribed. If no such risk exists, the medication shall be continued long enough to allow a safe transition to a different medication or medications. | |
| Non-urgent Care | | |
| 15.3 | Patients on the mental health caseload who believe they need mental health care shall submit HNRs.  The primary therapist or, if necessary, another psych associate shall triage HNRs within 24 hours of receipt.  "Triage" in this context means determining whether the request requires immediate attention and resolution or whether the request can safely be deferred until the primary therapist can address it.  Documenting the word "Triaged" is adequate evidence of triage.  Primary therapists shall address the HNR within three business days of its submission.  "Address" means evaluating the request, determining the clinical need, and if an action is required (e.g., face-to-face visit), planning that action to occur in a clinically appropriate timeframe.  When the primary therapist is absent, another psych associate or a psychologist completes these tasks in their stead within the same time. | |
| 15.4 | If a patient's PT determines a visit is clinically appropriate following submission of an HNR, the patient shall be seen by the PT or referred to another professional as directed by the PT. | |
| 15.5 | Patients who are not yet on the mental health caseload but request mental health treatment shall submit requests to be seen through the procedures for seeking medical care. | |
| 15.6 | When custody staff, families, or any other concerned party refers a patient for mental health assessment, there is a timely response to the concern by mental health staff. | |
| Chronic Outpatient Care | | |
| 16.3.1.1 | MH-3 patients' assigned PT shall conduct an initial comprehensive mental health evaluation within one month of arriving at the assigned facility if not already completed when the patient first entered the prison system; | |
| 16.3.1.2 | MH-3 patients' assigned PT shall conduct an evaluation whenever there is a change in MH level of care designation | |
| 16.3.1.3 | MH-3 patients' assigned PT shall conduct an evaluation at least once per year. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 16.3.3a | A treatment plan meeting shall be conducted with MH-3 patients and their assigned PT. The treatment plan meeting shall occur at least once per year. | |
| 16.3.3b | A treatment plan meeting shall include: The Primary Therapist, The patient, A psychologist or psychiatric practitioner shall also be present for complex cases and in all other cases shall provide input to the PT prior to the treatment plan meeting. At that meeting, the patient's treatment plan shall be reviewed and updated to determine adherence to treatment, efficacy of interventions, evaluation of the level of care needs, diagnostic impressions, progress to date in treatment, and steps taken toward moving to a less restrictive environment, if applicable. The timing of the treatment plan meetings should be based on the needs identified in the treatment plan, but no less often than once a year. The treatment plan shall include a date for next review based on the content of the plan. If no timeline is identified, a treatment plan meeting shall occur at least once per year. | |
| 16.3.2 | A psychiatric practitioner shall conduct an appropriate clinical encounter with all patients in an outpatient level of care (i.e., MH-3) on psychotropic medications as often as clinically required, no less often than every three months. | |
| Residential Care | | |
| 16.4.1.1 | MH-4 patients' assigned PT shall conduct an evaluation whenever there is a significant change in the course of treatment, e.g., new type of treatment including medication, significant decompensation. | |
| 16.4.1.2 | MH-4 patients' assigned PT shall conduct an evaluation at least annually, documenting the patient's need for residential level of care. | |
| 16.4.2 | Patients in residential level of care shall have face-to-face encounters with their assigned PTs as determined by the treatment plan. | |
| 16.4.3 | Patients in residential level of care shall have their treatment plans reviewed and updated as clinically indicated but no less often than every three months when the full team meeting described in the next section is conducted | |
| 16.4.4 | A full treatment team meeting shall be conducted at least every 3 months by the primary therapist, psychologist, psychiatric practitioner, and any other staff as necessary. Patients shall be included in the meeting unless there is a clinical or legitimate and substantial safety and security concern documented in the custody record. The meeting discussion shall include determination of adherence to treatment, efficacy of interventions, evaluation of their level of care needs, rationale for the need for residential care, diagnostic impressions, progress to date in treatment, and steps taken toward moving to a less restrictive environment. | |
| 16.4.5a | Patients in residential level of care shall have an appropriate psychiatric clinical encounter no less than every fourteen days. | |
| 16.4.5b | Patients in residential level of care shall have an appropriate clinical encounter with a psychiatric practitioner as often as indicated. | |
| Inpatient Care | | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 16.5.1.1 | MH-5 patients' assigned PT (or, if not already on the mental health caseload, by the mental health provider assigned to the inpatient unit) shall conduct at least annually a comprehensive mental health evaluation reflecting the rationale for inpatient placement including but not limited to current symptoms and functional impairment, timing and pattern of decompensation, interventions attempted, diagnostic impressions (including potential substance-related impacts), progress in treatment to date, goals for treatment in the inpatient setting, anticipated length of stay, and criteria for discharge. | |
| 16.5.1.2 | MH-5 patients' assigned PT (or, if not already on the mental health caseload, by the mental health provider assigned to the inpatient unit) shall upon discharge from inpatient care, prepare a discharge summary. | |
| 16.5.2 | Patients in inpatient level of care shall have a daily face-to-face encounter with their PT unless such an encounter would be clinically contraindicated. If the patient participates in the weekly treatment progress meeting (described in Section 16.5.3, it may be counted as a daily face-to-face encounter. | |
| 16.5.3 | Prisoners in inpatient level of care shall have their treatment progress reviewed daily, and teams shall meet at least weekly with all providers (e.g., nursing, psychiatry, mental health, social work, custody/unit staff, behavioral health technicians) and providers from the prisoner's previously assigned unit whenever possible. Prisoners shall be included in the meeting unless there is a clinical or legitimate and substantial safety and security concern documented. At a minimum, the focus of treatment teams shall be to provide updates on prisoner progress, the type and efficacy of interventions used, treatment adherence, potential obstacles to recovery, and rationale for continued placement in the inpatient unit. | |
| 16.5.4 | A psychiatric practitioner shall conduct a clinical encounter with all patients in an inpatient level of care (i.e., MH5) as often as indicated, but no less than once per week. | |
| Continuity of MH Care | | |
| 16.6.1 | If a patient's treatment team changes due to a change in the patient's mental health level of care the "original" PT shall provide the "new" mental health team with the rationale for the change in mental health level and the anticipated treatment needs; | |
| 16.6.2 | If a patient's treatment team changes due to a change in the patient's mental health level of care, if the transition is to anything other than to residential or inpatient, the "new" PT meets with the patient within seven calendar days; | |
| 16.6.3 | If a patient's treatment team changes due to a change in the patient's mental health level of care, if the transition is to residential or inpatient level of care, the PT meets with the patient as soon as possible, but no more than one business day after arrival, and the psychiatric practitioner is contacted and collaborates on the immediate care plan as soon as a patient is admitted. | |
| 16.6.4.1 | If a patient's PT changes without a change in mental health level of care, if the transition is to anything other than to residential or inpatient, the "new" PT meets with the patient within seven calendar days; | |
| 16.6.4.2 | If a patient's PT changes without a change in mental health level of care, if the transition is to residential or inpatient level of care, the "new" PT meets with the patient within one business day. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 16.6.4.3 | If a patient's PT changes without a change in mental health level of care, if the change is due to a change in assignment of personnel, not a transition of the patient, the newly assigned PT shall meet with the patient in accordance with the scheduled follow-up established in the patient's treatment plan by the previous PT, but no later than the following interval after the assignment of the new PT: one business day for patients in inpatient level care, 14 calendar days for patients in residential care, and three months for patients in all other levels of care. | |
| 18.1 | Prior to release of any patient designated as Seriously Mental Ill ("SMI"), MH-4, or MH-5 who shall be released and who is presumptively eligible for federal or state assistance by virtue of their mental illness, ADCRR: (a) develops and documents an aftercare plan that reflects the patient's current symptoms and functional impairments, progress in treatment, and treatment plan; (b) facilitates evaluation for SMI designation and placement in the community, as clinically indicated; and (c) arranges follow-up care with an appropriate community provider where possible. | |
| Suicide Prevention and Crisis Stabilization | | |
| 16.8.1 | During normal business hours a patient who presents as a suicide risk shall have a formal in-person suicide risk assessment completed by a licensed psych associate, psychologist, or psychiatric practitioner to determine the acute suicidal risk and the level of protection that is needed (e.g., return to current housing, placement in one-on-one observation, etc.). If the concerns are raised after normal business hours or on holidays, the on-duty mental health officer shall be consulted regarding the disposition of the patient (which may or may not include constant observation). If the patient is placed on suicide watch as a result of the concerns raised, they should be placed under constant observation until they are able to have an in-person assessment of suicide risk by a mental health professional. | |
| 16.8.3 | Upon recommendation from a psychologist or psychiatric practitioner that housing a patient on suicide watch in the same room with other suicide watch patients ("cohorting") would be clinically safer than housing each patient in isolation, Defendants shall cohort such patients, provided that based on the patients' custody classification (determined based on factors other than the fact that the individual is on suicide watch) such cohorting would not be contraindicated. | |
| 16.9.2 | (Additional reference 16.9.1) Continued treatment in a crisis stabilization bed requires review and approval by a psychologist initially at seven days and every three days thereafter. Starting at ten days following placement in a Crisis Stabilization bed, the psychologist and or psychiatric prescriber shall document the justification for their continued assignment to the Crisis Stabilization bed rather than a Residential or Inpatient bed. | |
| 16.9.3 | Patients in a crisis stabilization bed shall be evaluated at least daily in person by their PT (or another psych associate if they have not yet been assigned a PT or have transferred from another yard). Treatment providers shall document their intervention efforts, including but not limited to: assessing mental status; behavioral observations; documenting patient ability to independently care for activities of daily living; type(s) of treatment provided; response to interventions (including medication efficacy and compliance); anticipated length of stay; and criteria for discharge. | |
| 16.9.4 | The patient shall be assessed by a psychiatric practitioner as soon after admission to a crisis stabilization bed as possible but no longer than one business day, in order to ensure there is not a medication issue or a question of medication appropriateness that contributed to suicidal ideation. | |
| 16.9.5 | For patients placed in a crisis stabilization bed for suicidal concerns, a suicide risk assessment shall be completed upon admission that identifies risk and protective factors and items/privileges they are allowed (based on treatment needs) while in crisis care. | |
| 16.9.6 | A clinical note shall be entered whenever the level of suicide watch is changed. | |
| 16.9.7 | Prior to being released from a crisis stabilization bed if placed there due to suicidal concerns, a discharge suicide risk assessment shall be completed which documents: the change/reduction in suicidal risk; the patient's identified protective factors; and plans for follow-up treatment, and aftercare including a safety plan developed in collaboration between the patient and treatment providers. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 16.9.8 | "Safety contracts" (forms signed by patients, agreeing not to hurt themselves) shall not be used. | |
| 16.9.9 | When possible and safe, attempt to provide stabilization at the complex at which the patient has been housed unless there is documented clinical justification for transfer based on the low likelihood of stabilization and/or clinical danger if the patient is maintained at the complex. | |
| 16.10. | Restraints used by mental health clinicians for clinical purposes shall comply with the following 8 requirements: 1) Restraints shall be used only to prevent harm to oneself or to others and to ensure the safety and security of the staff and other patients.  They shall not be used for punishment.   2) Restraints shall be ordered and reviewed only by a psychiatric practitioner or psychologist. 3)  Restraints shall only be applied for the minimum amount of time necessary to accomplish the stated need (e.g., patient and staff safety, requisite transports, etc.). 4)  Soft restraints shall be used whenever possible.  5) Restraints shall not be used for more than four hours at a time.  Every effort shall be made to minimize the length of time in restraints.   6) Renewal of restraints beyond four hours shall be approved by the Facility Medical Director/designee and must be renewed at intervals no longer than four hours. If the Medical Director/designee are not available, a licensed mental health provider may approve continued use.  The justification for continued use shall be documented in the patient's medical records. Renewals occurring after hours shall be done in collaboration with the Facility Medical Director/designee, a psychiatric practitioner, or a psychologist. 7) Patients shall be restrained only in settings that allow nurses sufficient access to perform wellness checks and provide necessary medical care. Nurses shall ensure that the restraints do not impair any essential health needs, such as breathing or circulation to the extremities. These checks shall be documented in the patient's medical records.  8) Patients in restraints shall be under direct observation at all times.  If an observer notes any ill effects of the restraints, every effort shall be made to remedy the ill effects and a psychiatric or medical practitioner shall be notified immediately. | |
| Improvement Programs | | |
| 2.1.2 | Following a suicide, other MH-related death, or suicide attempt, the sustainable plan shall be implemented within one month of the death or suicide attempt. | X |
| 2.4.1 | (Additional reference 2.4.2) There is a robust continuous quality improvement program to monitor the quality of clinical care.  As part of this program, staff monitor the absolute number and trend of various parameters on a monthly basis.  Where metrics or trends in metrics show room for improvement, staff makes appropriate efforts to understand the underlying reason for deviation, take reasonable steps to effectuate improvement, evaluate the effectiveness of these steps in a reasonable time, and make adjustments to its improvement efforts as needed. At a minimum, the following are monitored:  1) percentage of patients on antipsychotic medications receiving timely AIMS (abnormal involuntary movement scale) assessments; 2) percentage of patients on antipsychotic medications receiving appropriate and timely metabolic assessments; 3) percentage of patients receiving punishment for a rule violation, for whom a mental health intervention would have been more clinically appropriate than punishment. | |
| 2.4.1j | percentage of prisoners on antipsychotic medications receiving timely AIMS (abnormal involuntary movement scale) assessments; | |
| 2.4.1k | percentage of prisoners on antipsychotic medications receiving appropriate and timely metabolic assessments; | |
| 2.4.1l | percentage of prisoners receiving punishment for a rule violation, for whom a mental health intervention would have been more clinically appropriate than punishment; and | X |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 2.4.2 | There is a robust continuous quality improvement program to monitor the quality of clinical care. As part of this program, staff monitor the absolute number and trend of various parameters on a monthly basis. Where metrics or trends in metrics show room for improvement, staff make appropriate efforts to understand the underlying reason for deviation, take reasonable steps to effectuate improvement, evaluate the effectiveness of these steps in a reasonable time, and make adjustments to its improvement efforts as needed. ADCRR will monitor other parameters as reasonably dictated by the other self-improvement activities described in this Monitoring Guide. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| **Subclass** | | |
| Staffing and Bldg. | | |
| 20.2.1a | ADCRR shall staff all Mandatory Posts at all times; Essential Posts shall be staffed at least 75%; Important Posts shall be staffed at least 50%. | |
| 20.2.1b | If ADCRR falls below these levels, it shall inform the Court within seven days. | |
| 20.2.2 | ADCRR shall document on an annual basis an assessment of the operative staffing plan and document any requests for necessary adjustments to the plan. The assessment shall be filed with the Court on the last business day of January each year. | Not yet due |
| 20.2.3a | Whenever ADCRR fails to comply with the staffing levels, the report shall specifically identify the deviation(s) that occurred and provide reasonable and adequate justifications for the deviation(s). | |
| 20.2.3b | Whenever ADCRR fails to comply with the staffing levels, Defendants shall file with the Court a "Deviation from Staffing Plan Report" by the tenth day of the following month. | |
| 23.2a | Maintain all showers in good operational state. Showers shall be sanitized daily or more often if necessary. | |
| 23.2b | Showers shall be free of filth and mold/mildew. Showers shall be resurfaced and/or painted on an as-needed basis. | |
| 23.2c | All new paint shall be mixed with a mildewcide additive to reduce the presence and growth of mold and mildew. | |
| 23.3a | Recreation areas used by individuals shall be cleaned at least daily and kept free of dirt, filth, rubbish, garbage, rodents, vermin, insects, or other matter detrimental to health (e.g., mold/mildew). | |
| 23.3b | A log entry shall be made in the EOMS application for each housing unit at the time a recreation area is cleaned. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 23.5.1 | Maintain all cells in a serviceable, good operational state, ensuring the cells are kept free of filth, mold, mildew, rust, vermin, and insects. | <span style="color:green">GREEN</span> |
| 23.5.2a | Professionally re-paint cells after appropriate preparation as needed. | <span style="color:green">GREEN</span> |
| 23.5.2b | New paint shall be mixed with a mildewcide additive to reduce the presence and growth of mold and mildew. | <span style="color:green">GREEN</span> |
| 23.5.3 | All areas used in conjunction with incarcerated individuals to include, but not limited to, dayrooms, classrooms, etc., shall be kept in a clean and sanitary condition, free from any accumulation of dirt, filth, rubbish, garbage, rodents, vermin or other matter detrimental to health (e.g., mold/mildew). | <span style="color:green">GREEN</span> |
| 23.5.4 | Each housing unit's housekeeping program shall include a daily general sanitation inspection by a supervisor.  The inspector shall make a log entry in the EOMS application for each housing location inspected. | <span style="color:red">RED</span> |
| 23.6a | Individuals shall have access to effective cleaning and sanitizing supplies necessary to properly clean and sanitize their own living area.  Supplies shall include, as consistent with operational safety, access to tools and cleaning agents, e.g., cleaning detergents, rags, sponges, scrub brushes, mops, mop bucket, broom, dustpan. | <span style="color:green">GREEN</span> |
| 23.6b | A log entry shall be made in the EOMS application for each housing location that includes the date and time the supplies were provided and the date and time the supplies were collected. | <span style="color:green">GREEN</span> |
| 23.7a | Engage a pest control contractor on a semi-monthly basis to eliminate vermin, insects, and rodents by safe and effective means in all common areas used by members of the subclass. | <span style="color:red">RED</span> |
| 23.7b | The pest control service shall be completed in all cells where the person occupying the cell agrees to the service. | <span style="color:green">GREEN</span> |
| 23.7c | A log entry shall be made in the EOMS application indicating the location, date, time, name of the company representative performing the pest control service, and the service performed. | <span style="color:red">RED</span> |
| 29.1a | Defendants shall assign a full-time qualified staff member ("Classification Monitor"), with no other collateral duties, to each individual unit housing members of the subclass. | <span style="color:red">RED</span> |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 29.1b | The Classification Monitor will ensure all classification reviews and individualized plan reviews, that lead to step progression (up or down) and movements to an appropriate new housing location, are processed and completed within ten days. The reasons and evidence considered shall be documented in the resident's classification record. | <span style="color:red">■</span> |
| Crisis Stabilization | | |
| 1.24 | When patients on suicide watch, or in a crisis stabilization bed for suicidal concerns, are removed from a cell for a healthcare-related visit, including mental health encounters conducted in or near the housing unit, they shall not be restrained or strip-searched unless the Warden or designee has determined and documented the temporary need for such measures due to exigent circumstances. | <span style="color:green">■</span> |
| Access to Services | | |
| 22.1 | ADCRR shall not house any person in a housing location where they lack the ability to effectively contact a staff member immediately, either via in-person or via a call button/intercom system. | <span style="color:green">■</span> |
| 24.1 | Via tablet or, for people who are not permitted to have electronic tablets or who do not have access to an electronic tablet due to tablet malfunction, via other means, all subclass members are able to make direct requests, in a language they understand, for services consistent with their custody level including: file a letter or other request required before filing a grievance, file a grievance; file an appeal; access and send electronic mail (both personal and professional); check their commissary account balance; obtain current program schedules and curriculum; purchase commissary items; access case notices regarding letters and grievances; access the patient handbook; access disciplinary documents; access hearing documents; access appeal decisions; medical/mental services; and access current classification level and progress towards the next step down. | <span style="color:green">■</span> |
| Operations | | |
| 19.1 | (Additional reference 19.2) ADCRR shall ensure all custody decisions and reviews made by correctional officers, supervisors, and committees are reasonable and consistent with legitimate penological interests. Every person is housed in the least restrictive level that is safe for them and others. | <span style="color:red">■</span> |
| 19.3a | No person shall be confined in a cell for 22 hours or more each day for more than two months unless there are extraordinary documented legitimate penological interests. | <span style="color:red">■</span> |
| 19.3b | ADCRR shall implement a system to facilitate the return to lower levels of custody for those people who have been in the subclass for longer than two months, and document their efforts. | <span style="color:red">■</span> |
| 19.4 | No person under the age of 18 shall be placed into maximum custody, detention, or close management, or otherwise kept in a cell for more than 22 hours each day. | <span style="color:green">■</span> |
| 19.5 | Within sixty days of this Order, no patient designated as Seriously Mentally Ill ("SMI") shall be housed in maximum custody or detention, or otherwise kept in a cell for more than 22 hours each day. | <span style="color:green">■</span> |
| 29.2a | For every residents in maximum custody or detention there must be an individualized case plan that describes the actions needed, as well as associated timeframes, to progress in their steps in maximum custody and generally to gain more privileges and lower classification levels (less restrictive housing). | <span style="color:green">■</span> |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 29.2b | ADCRR is required to provide residents in maximum custody or detention a written or electronic copy of their individualized case plan, in a language the person understands. | |
| 29.2.1 | ADCRR is required, at intervals not to exceed one month, to conduct and document an evaluation of each of the person's progress under an individualized plan.  The evaluation should also consider the state of the person's mental health; address the extent to which the person's behavior, measured against the plan, reasonably justifies the need to maintain, increase, or decrease the level of controls and restrictions in place at the time of evaluation; and recommend full classification review when appropriate.  The documentation shall be sufficiently detailed to show the basis for any decisions made in the evaluation (including increasing, decreasing, or maintaining privileges). | |
| 29.2.2a | ADCRR is required, at intervals, not to exceed six months, to conduct a full classification review. | |
| 29.2.2b | The full classification review includes a meeting with the subclass member and the classification committee.  At that meeting it shall be determined whether the person's progress toward compliance with the individual case plan or other circumstances warrant a reduction of restrictions, increased programming, or a move to a lower level of custody. | |
| 29.2.2c | The subclass member has the option to attend the classification review meeting, except for circumstances justified by legitimate safety concerns. | |
| 29.2.2d | The documentation shall be sufficiently detailed to show the basis for any decisions made in the classification review (including increasing, decreasing, or maintaining privileges or classification).  If a person has met the terms of the individual case plan, there should be a presumption in favor of releasing the resident from maximum custody. | |
| 29.2.2e | A decision to retain a person in maximum custody following consideration by the classification review committee should be reviewed by the facility warden or deputy warden, and approved, rejected, or modified as appropriate. | |
| 29.2.2f | If the facility warden or deputy warden rejects or modifies the decision of the classification committee, the documented basis for the rejection or modification of the decision is reasonable and consistent with legitimate penological interests. | |
| 29.2.2g | When the warden or deputy warden disagrees with the classification committee's recommendation, the Regional Operations Director shall review the matter and make a final determination. The documented basis for the Regional Operations Director's decision is reasonable and consistent with legitimate penological interests. | |
| 29.3a | ADCRR is required to ensure enough beds are available for the number of subclass members placed in lower classification levels. | |
| 29.3b | When a higher or lower classification level is achieved, the Classification Monitor shall within ten days re-house the person into a location associated with their new classification level. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 29.3c | When the Maximum custody step is changed, the Classification Monitor shall within ten days re-house the person, as necessary, into a location associated with their new step and afford the appropriate privileges associated with the new step. | |
| 30a | ADCRR shall assign a full-time qualified staff member, with overall unit authority and no other duties, to each detention unit to ensure all services, assessments, programs and activities in the detention unit are completed as required | |
| 30b | Subclass members who are eligible to leave the detention unit are re-housed within ten days of assessment. | |
| Meals | | |
| 26.1a | All persons shall be provided a minimum of three separately provided meals a day (breakfast, lunch, dinner) consisting of two hot meals and one cold meal with no more than 14 hours between dinner and breakfast.  Breakfast and lunch may be served together on weekends and holidays, provided one is a hot meal. | |
| 26.1b | The meals for the subclass shall be of the same quality and have the same nutritional and caloric content that meets nutritional needs and is comparable to the meals served in general population. | |
| 26.3.1 | A log entry is made when a meal is provided or refused, that includes the type of meal (regular diet, therapeutic, religious) and, if the meal was refused, a video recording of the refusal is made. | |
| 26.2 | When a person refuses three meals of any kind in a seven-day period or displays a significant change in eating habits (e.g., accepts meals but does not consume them; does not consume significant portions of a meal; refuses meals intermittently, etc.,) corrections officers shall immediately notify medical staff. | |
| 26.3.2 | A log entry is made when a therapeutic or religious diet begins and/or ends and includes the type of diet and the reason for the beginning or ending of the diet | |
| Out of cell activities | | |
| 27.1 | Subclass members, including any people who are not in maximum custody, detention, or watch, shall be offered 14 hours or more per week of out-of-cell time to include opportunities for recreation, showers, individual/group therapy where eligible for such services, visitation, phone calls, or other offered activities.  If a person is offered out-of-cell time, but the individual voluntarily refuses, the time the person would have been out-of-cell counts towards out-of-cell time.  If out-of-cell time is scheduled but not available, not offered, or offered at unreasonable times (e.g., 4:00 A.M.), that time shall not count towards out-of-cell time. | |
| 27.1.3 | When out-of-cell time must be canceled, reasonable efforts shall be made to re-offer it. | |

| Order Reference | Injunction Requirement | Compliance |
|---|---|---|
| 27.1.4 | A log entry shall be made in the EOMS application that includes the type of activity, the time the activity began and ended, or, if the person refuses, a video recording of the refusal. | |
| 27.2 | All members of the subclass shall be provided regular access to showers, at a minimum of three times per week with no more than three days between showers. | |
| 27.2.2 | When a person refuses to shower on a continual basis or displays a significant change in hygiene habits, medical staff shall be immediately notified. | |
| 27.3.1a | At a minimum each resident shall have no less than 10 hours per week in a recreation area in blocks of no longer than 3.5 hours in enclosures of at least 100 square feet. | |
| 27.3.1b | All those in the subclass not in Maximum Custody Step 1 have some ability to socialize with others. | |
| 27.3.2 | Subclass members will be allowed to use the restroom during recreation periods as needed, without forfeiting the remainder of the recreation period. | |
| 27.3.3a | Recreation areas shall have constant supervision, in-person, by qualified staff members. | |
| 27.3.3b | During recreation, individuals have available shade and clean drinking water. | |
| 27.3.4 | A log entry shall be made in the EOMS application for each housing unit when a portable beverage cooler of clean drinking water for a recreation area is provided. | |
| 27.3.5 | For each person who refuses to go to recreation, a log entry shall be made in the EOMS application that includes a video recording of the refusal. | |
| 27.3.6 | Subclass members may voluntarily request to end their recreation period at any time, and will be returned to their cell within 15 minutes of making the request. Any remaining time for that recreation period is forfeited. | |