# FINAL REPORT – ADCRR HEALTH SERVICES STAFFING PILOT

## I. Introduction

The Court's Injunction, which the parties agreed to, states at Section 1.17: *"To determine the number of staff necessary to care for patients, the Court will appoint an expert to conduct a staffing analysis and plan of health care positions at each location"* (Dkt. 4410). The Court-appointed experts conducted a staffing analysis and created and submitted a plan that addressed direct patient care positions for medical and mental health care including treatment of substance use disorder with MOUD (Dkt. 4599).

The staffing plan is built on a wholesale shift in ADCRR's model of health care as the template for health services delivery. Called the *Patient Centered Care Model* (PCCM), the model incorporates evidence-based, patient-centered care practices widely known to deliver efficient, quality primary care and mental health services to correctional populations and complex populations in the community. If properly and fully implemented, it supports most health care-related elements of the Injunction, improves and expedites patient care, and has the potential to reduce health care and custody staffing needs over time.

Implementing the PCCM requires a great deal of training and guidance in the new clinical roles, team-based processes and relationships, and outcomes measurement. At ADCRR's request, the Court experts created a Pilot Project to test the staffing plan at two locations chosen by Defendants and their health care vendor: ASPC-Perryville, San Carlos Unit, and ASPC-Yuma, Dakota Unit. The Court ordered ADCRR to implement the staffing plan, subject to any future modifications based on the results of the Pilot Project (Dkt. 4637, as amended at Dkt. 4643). The Court also ordered the Court experts to submit interim reports and a final report on the implementation of the Pilot Project at Dakota and San Carlos. (Dkt. 4679). We submitted our first interim report on September 23[1] (Dkt. 4681) and our second interim report on November 1 (Dkt. 4700). This is our final report on the implementation of the Pilot Project at Dakota and San Carlos. We incorporate, and where appropriate update, the previous two reports. The final staffing plan incorporating changes to the staffing numbers, roles, and implementation based on the Pilot experience will be submitted shortly.

We provided a draft of this report to both Parties for feedback. Where appropriate, we modified the report or note why we did not. We did not circulate the draft for a second round of feedback. In addition, we provide in Appendix 3 some of ADCRR's more global feedback with annotation.

## II. Background

### A. Pilot Objectives

The Pilot included three key objectives:

---

[1] All dates are in 2024 unless otherwise specified.

1. It would test staffing assumptions and recommended panel sizes for primary care team members and caseload sizes for mental health team members. This would inform revisions to the final staffing plan.

2. The staffing plan and model of care involve extensive changes to many processes of care, clinical roles, and workflows. The Pilot would test training materials and methods and test the type and degree of primary care and mental health team support needed to help teams launch and operate effectively and with fidelity to the model's principles. It also would build and test technical tools to: empanel patients onto care teams; optimize patient primary care visits; and modify the self-scheduling module to fit the new model. These resources are key to effectively implementing the model across ADCRR.

3. The Pilot would build essential capacity within ADCRR's Health Services Division (HSD) to introduce, manage implementation of, and ultimately sustain the staffing plan and model of care statewide, ensuring fidelity to its principles and the required positions. This requires a dedicated team of administrative and clinical staff with appropriate expertise, understanding of the PCCM model, project management capacity, and ability to support ongoing PCCM health services operations. Based on our team's experience with large-scale clinical change in corrections and with this model of care, we built a detailed plan to train, mentor, and coach a permanent HSD team to whom we could hand off the management of the statewide implementation at the end of the Pilot.

At the end of the pilot, we find that the first objective was met, and the second objective was partially met and has sufficiently equipped ADCRR to implement the model statewide. The third objective was not met, and HSD does not have the necessary capacity to support statewide implementation. Detail to support these findings is provided throughout the report.

B. <u>Expectations</u>

The staffing plan and the Pilot incorporate the following Court-ordered requirements that are fundamental to the plan's success:

1. The Pilot was not conducted to determine *whether* the staffing plan would be implemented *(*Dkt. 4681 at 1-2) (Defendants' prior characterization of the Pilot). The Injunction and subsequent order for implementation make clear that the statewide model must be implemented, using information obtained from the Pilot to fine-tune and refine the staffing levels proposed in the original plan. Additionally, the Court, in its June 20 Order, stated, "*Defendants shall file status reports on October 9, 2024, and January 13, 2025, explaining their efforts to obtain additional funding for the staffing plan that will be adopted at the conclusion of the pilot program"* (Dkt. 4643).

2. ADCRR must provide sufficient, confidential clinical space for all the health care staff required in the plan to deliver services. Given the significant increase in health care staffing, many correctional units will require additional health exam rooms and patient waiting areas. The Injunction requires that Defendants "*provide sufficient space, equipment, and supplies for health care staff to deliver the health care services described in this Order*" and that "[t]*he space provided for clinical encounters shall be sufficient to allow for auditory and visual confidentiality from other prisoners or non-clinical staff*" (Dkt. 4410 at 1.6) and (Dkt. 4410 at 1.7).

3. ADCRR must provide sufficient custody staff to support health care operations. The significant increase in health care staffing required by the plan will address the unmet need for on-site patient appointments. Additional custody escorting resources will be required as the staffing plan is implemented and more patient visits occur. The Injunction requires (under Paragraph 1.15) that "Defendants shall ensure there is a sufficient number of custody staff to support the functioning of the health care operation, including but not limited to: transporting prisoners to on-site and off-site clinical encounters and appointments; administration of medications; and providing security in the venues of health care operations."

4. The PCCM model of care will perform as designed, because it is an evidence-based model and operationalizes the requirements of the Injunction. The model itself is not experimental.

ADCRR has disagreed in writing with each of these assumptions at various times throughout the Pilot.

## III. Observations Regarding the Pilot

### A. Overview

The Pilot was originally designed to occur over 24 weeks. At the Defendant's request, the Court amended the duration to 28 weeks with a start date of July 8 and an end date of January 17, 2025. The extra four weeks were intended to give NaphCare – ADCRR's agent contracted to provide health care to ADCRR residents – more time to hire pilot staff. See Dkt. 4642-2 at 2 (Gantt Chart timeline).

### San Carlos Pilot

Pursuant to the Court's order, the primary care teams should have been fully operational by September 30 and remained in operation through January 17, 2025. The staffing plan for San Carlos called for three primary care teams and 13.4 primary therapists. At San Carlos, there was no physician hired to staff the physician-led primary care team at the start date. That team could not be deployed, so Defendants and NaphCare had to operate the legacy model of provider, nurse, and mental health clinics (known in ADCRR as "lines") along with the new model to serve those patients. One of the two primary care teams staffed by an Advanced Practice Practitioner ("APP") and the unit's transitional APP were deployed the first week. The 6.6 mental health primary therapists and prescribers who were assigned to this primary care team's patients also saw patients in the clinic. The team behavioral health technicians (BHTs) and psychiatric registered nurses ("RN") were not deployed due to lack of clinical space. Legacy "lines" took care of the patient needs for the rest of the unit. The second APP-staffed primary care team was deployed the second week, while the patients who would have been assigned to the physician-staffed primary care team continued to be seen through "lines."

The new teams each shared a single exam room, as did the mental health clinicians. The additional patients and new health care staff combined with the existing clinical "lines" and the very heavy medication lines at the clinic created extreme crowding, chaos, stress, and extreme frustration for clinicians and patients and compromised patient confidentiality. There was simply not enough clinical space to operate both models. San Carlos immediately began to move some scheduled

3

care to the weekend and brought in extra weekend staff. When this did not alleviate the crowding enough, they began to cancel some regularly scheduled care, like OB/GYN visits. Within a few days, appointment backlogs arose and quickly grew to nearly 300 (at both San Carlos and across the complex where weekend staff was pulled from), at which time NaphCare unilaterally determined the situation to be unsafe for patients and suspended the pilot indefinitely. The pilot operated for just eight days.

NaphCare regional leaders and the primary care team members spent about two weeks prior to the start date going through the medical records of the San Carlos patients on the teams' panels who had primary care appointments scheduled, to clean up the patients' health problem lists and optimize their appointments. This provided good experience with the optimizing process. Though, the limited experience operating a primary care team and an integrated primary therapist team gave clinicians and patients solid experience with the benefits of the PCCM over traditional line-based care. They created some innovative approaches to working with their most challenging patients, and experienced efficiencies and achieved satisfying, rapid improvement in patient's chronic care conditions.

Because of the brevity of the plot, the primary care and mental health clinicians did not experience many elements of the PCCM, though, such as evolving in their unique team roles, improving their daily huddles, or working with their patients to improve self-scheduling.

Dakota Pilot

Staffing for the Dakota pilot called for three primary care teams and 7.5 mental health primary therapists. Dakota implemented two primary care teams on October 7 and the last one on October 13 , and implemented the corresponding mental health teams over time starting later in October. The last three primary therapists began working November 18, so all the mental health teams were operational but not yet working jointly with the primary care teams. The pilot's allocation of BHTs was not fully dedicated to the PCCM as they were continuing to work with the patients seen by telehealth providers.

Dakota's Warden re-assigned seven officers to escort patients to medical and mental health appointments for the pilot. As a result, very few backlogs occurred due to lack of escort. However, these were not new positions, and other officer duties across Yuma went unstaffed as a result.

Overall Pilot Findings

According to the Court-ordered schedule, there should have been 16 weeks during which three primary care teams at each Pilot site would be fully operational, for a total of 96 "team-weeks" of experience from which to draw data for the final staffing plan. The table shows the actual weeks of primary care team operation at each site. There were 45.6 "team-weeks," or 48% of what the Court ordered.

4

| CUMULATIVE PILOT EXPERIENCE | | | | |
|---|---|---|---|---|
| **PRIMARY CARE** | | | | |
| | Required Teams | Required Team Weeks | Actual Team Weeks | |
| | | | # | % of Required |
| Perryville | 3 | 48 | 1.6 | 3% |
| Dakota | 3 | 48 | 44 | 92% |
| **Total** | **6** | **96** | **45.6** | **48%** |
| **MENTAL HEALTH/PRIMARY THERAPIST** | | | | |
| | Required Primary Therapists | Required Primary Therapist Weeks | Actual Primary Therapist Weeks | |
| | | | # | % of Required |
| Perryville | 13.4 | 214 | 11 | 5% |
| Dakota | 7.5 | 120 | 91 | 76% |
| **Total** | **20.9** | **334** | **102** | **30%** |

There should have been 20.9 primary therapists for 16 weeks, for a total of 334 "primary therapist-weeks." The table shows there were 102 "primary therapist-weeks," or 30% of what the Court ordered.

The desired effects of the PCCM were realized almost immediately, albeit in smaller doses than planned, even at San Carlos with its limited experience. For example, all the primary care teams at both pilots reported:

- Improved continuity of patient care
- More effective and robust primary care visits
- Reduced number of needed primary care visits because of visit optimizing[2]
- Efficiencies and improved diagnosis and treatment through operating as a team
- Enhanced job satisfaction

The transition from the legacy model, in which nurses triage patient requests, to the PCCM model in which providers lead daily meetings during which the team triages the requests together, went smoothly and quickly at both sites. Providers expressed a high level of satisfaction with the new approach to triaging requests for health care, and RNs reported that they found it professionally stimulating and satisfying.

The mental health teams at both pilot locations reported satisfaction with smaller caseload sizes because it gave them the ability to conduct patient visits that were more clinically productive and better met their patients' needs.

---

[2] Visit "optimizing" is a feature of the PCCM in which a patient's future scheduled tasks and visits are incorporated into the primary care visit taking place today. This reduces future visits by "collapsing" them, which is an important efficiency. However, future visits that are collapsed will not fully offset the larger number of new visits that will be occurring because of the increased amount of care being delivered.

Staff at both pilots also reported that many primary care patients noticed the change right away and viewed it very favorably.  Class members also reported satisfaction. The following post appeared in the web-based blog *Perryville Women* just days after the Pilot started at Perryville:

> *Each resident is now assigned her own "team" of Provider, RN, and CNA. She sees her team each time she goes to Medical and her HNR requests are routed to that team. Continuity of care....what a concept! (Did ACLU threaten them with a firing squad?)   It's too early to tell how it will all shake out, but we'll print this excerpt from one lady at Carlos, "I feel like I hit the lotto jackpot! I got my favorite Provider Mrs. Shields, my favorite RN Mr. Anderson, and my favorite CNA Ms. Hansen. No more going to a provider that doesn't know my history, no more seeing six different providers in two weeks, this is great![3]*

In its feedback to the draft of this report, ADCRR noted that "these anecdotes are not the same as objective data." We agree, but we find them relevant and useful.

B. <u>Compliance with Specific Pilot Requirements</u>

The Pilot called for a carefully crafted and robust set of sequential steps and activities to be completed by various parties to ensure that the Pilot's three objectives would be met (Dkt. 4642-2 at 2).  A total of 63 explicit activities/steps were enumerated.  At the closure of the Pilot, 14 (22%) were completed, 9 (14%)  were partially completed, and 40 (63%) were not completed.  The details supporting these findings are contained in Appendices 1 and 2.

Appendix 1 contains a list of high-level steps and activities ordered by the Court to be completed across the six-month pilot period (Dkt. 4642-2 at 2). For each task we have provided an annotation describing what was and was not accomplished.

Appendix 2 contains a list of additional activities that needed to occur September through December.  They would build on the initial August training session to accomplish the tasks listed in Appendix 1. This list was shared and discussed with all parties at the initial August training. The Appendix indicates the completion status of each step.

Detail on certain key steps and activities follows.

<u>Hiring Pilot Clinical Staff</u> -- ADCRR and NaphCare had two major deviations from the Court's order to implement the Pilot that negatively impacted the Pilot. In all three cases, these unilateral deviations were made without notice to the Court experts, or without providing requested information to the Court experts.

First, hiring of Pilot staff was extremely slow as detailed in our prior Pilot status reports. As of the training in late August, none of the teams were complete. The training session was designed to help the new teams learn to function together under the parameters of the PCCM, and to give them experience through guided exercises and discussion.  Since no full teams were hired or present at the training, the impact of the session was greatly reduced.

---

[3] https://www.perryvillewomen.com/2024/10/13/did-naphcare-do-something-right/ . To be clear, patients do not choose their primary care team or primary therapist; these are assigned based on the patient's conditions.

New staff continued to be added to the teams at both pilot sites throughout September, October, and early November, when the teams were finally complete. This significantly hampered the ability of the teams to learn to function as teams, slowed their progress, and prevented them from receiving much of the intended technical assistance on topics and skills that needed to be presented in sequence.  Mental health teams were the last to be staffed, had less time to operate under the Pilot, and only received about one third of the intended training and technical support, as a result of this hiring delay.

Second, the Court gave specific instructions requiring that Pilot health care staff be permanent NaphCare employees unless the monitors granted waivers on a case-by-case basis.  NaphCare did not follow this order, and instead hired staff for the Pilot on temporary contract bases, in violation of the Court's requirement.  On November 15, the Court ordered "Defendants must provide to the Monitoring Team a full Pilot staffing list that includes staff names, the positions they fill, and an indication of whether they satisfy Court requirements to serve in the position" (Dkt. 4699).  ADCRR provided this information to our team on  January 11, 2025, after receiving a draft of this report.  The report indicates that NaphCare engaged 10 pilot staff who are temporary or PRN personnel and have not worked at ADCRR at least half-time for at least six months.  These positions were required to be individually reviewed and approved by the  monitoring team, however none were ever submitted to them for review.  There are three additional positions for which the report notes the positions are "n/a" but no definition or rational is given for this status.

In its feedback to a draft of this report, with regard to requirements about the use of registry staff for the pilot, ADCRR noted, "These were impractical requirements from the beginning." Further, citing Dkt. 4599, they noted that "the registry parameters in the Order do not apply to the pilot." The "registry parameters" that do not apply was the limitation to the use of no more than 15% registry. Dkt. 4599 is not the most recent Order. Dkt. 4642 at 3.3 states "The Monitors can make exceptions for registry staff to participate in the Pilot on a case-by-case basis." As a whole, these modified requirements by the Court were intended to *increase* NaphCare's flexibility to hire staff for the Pilots.

Developing a High-Functioning ADCRR Health Services Division (HSD) PCCM Team -- The Pilot Plan ordered HSD to create permanent PCCM team. The HSD PCCM Team would represent all clinical personnel who would, with administrative support, become the visionary, technical, and administrative face of the PCCM staffing plan and model of care, as well as its "hands."  The team was to assume responsibility for implementing the staffing plan after the Pilot concluded and assure that health care was delivered with fidelity to the staffing plan and model of care.  Also, while the actual rollout and implementation is performed by NaphCare, HSD's PCCM team was designed to ensure that the Department was involved in the oversight of, and to set expectations for, the Department's vendor.

At a minimum, the HSD PCCM Team was to include a physician, an Advanced Practice Practitioner ("APP"), an RN, and a psychology associate, and it was to have assigned administrative support. ADCRR failed to hire the full HSD PCCM Team, despite the Court's order (Dkt. 4681 at 4; Dkt. 4700 at 4). As of the date of this report, ADCRR has hired only an RN and an APP to oversee the Pilot; ADCRR failed to hire a mental health clinician or physician for this team.  Also, HSD lost its overall medical and mental health directors during the Pilot. ADCRR recently has hired a mental health director, but the medical director position remains vacant.

7

To the extent that the HSD PCCM Team existed, neither the team nor anyone else from HSD served as a project manager of the Pilot, despite our repeated requests that HSD designate someone to serve as a project manager and point of contact.

The schedule required the HSD PCCM Team to meet weekly "one-on-one" with the Court expert team specifically to develop sufficient tools and expertise to coach new teams, develop workflows, support change management, refine clinical scheduling, build and manage patient registries, among many other essential skills. These meetings were to be distinct from the many other Pilot-related meetings which the HSD PCCM team attended. They would be a confidential place to help the PCCM team grow as a team, in their skills, and in their confidence to manage the many ways clinical teams grow and change. In this setting, the PCCM team would, with our help, hone its skills as the visionary, technical, and administrative face of the PCCM staffing plan and model of care, as well as its "hands."

We made numerous efforts to impart to the HSD PCCM Team the complex skills and tools necessary to lead the implementation of the staffing model and to assure fidelity to its principles. We provided a document detailing the elements (e.g., people, skills, training, support structures, planning tools) that would need to be in place. We strongly encouraged the team to consider the document, bring us their comments, and meet weekly with us throughout the rest of the Pilot (as required) to work on developing the skills and tools they would need. Despite these encouragements and explanation of the importance of this coaching, the HSD PCCM Team members only met with us for weekly meetings three times - on September 19 October 1 and 17 - instead of the 16 weekly meetings that should have occurred September through December.

In its feedback to a draft of this report, ADCRR provided documentation of five meetings in which HSD PCCM team members participated as evidence of team members' engagement in the above coaching. However, only one those documents related to a coaching meeting.

HSD PCCM team members continue to demonstrate a lack of understanding of the fundamental principles of the Injunction: that patient care must be based on clinical needs. For example:

- During a Pilot Leadership Team Meeting on December 3, they attempted to modify the Pilot at San Carlos such that instead of three primary care teams with patient panel sizes that reflected the clinical needs of the patients (139, 590, and 590, patients respectively), there would be two teams of 600 patients each "which is what the space can hold," according to ADCRR officials.
- During a meeting on December 19, to discuss application of the staffing model to other units and complexes, they proposed staffing those clinics based on available space, not on patient need, as required in the Injunction and specified in the staffing plan.

<u>Developing and Collecting Pilot Evaluation Metrics</u> -- Evaluation metrics serve many important roles in a staffing plan and model of care. For example, they are used to:

- Determine variations in patient and staff satisfaction that may signal underlying problems

- Assess changes in patient behavior and staff practices that identify areas for improvement in units and complexes

8

- Identify clinical variation and need for education

- Identify the need for adjustment in staffing levels

Evaluation metrics were to be created by August 30 as a collaborative process among the Court experts, HSD PCCM Team, and NaphCare (Dkt. 4642-2 at 2).  Some of the necessary metrics were created.  In particular, on August 13, HSD created metrics regarding the performance and outcomes of the primary care and mental health teams.  These data should be collected for the period of time 60-90 days before the PCCM begins and tracked regularly thereafter.  These data serve to inform us about the impact of the pilot and as a template from statewide implementation.

On December 3 we asked HSD to retrospectively collect several pre-Pilot metrics for both Pilot sites.  To date, HSD has provided some, but not all, the data.  Of the data that they did provide, much of it was inaccurate. As an example, one data element to be collected was the number of patient Health Needs Requests ("HNR") submitted monthly. In their report of this data sent to our team on December 19, the number of HNRs for eight of the 10 months reported was below 400 for each unit for the entire month. However, we know that Dakota and San Carlos each receive in excess of 100 HNRs *each day*.  Another data element to be collected was to show resident movement into and out of the Pilot units. The data provided to us was not accurate. For example, it shows that during the months of August, September, October and November, one person transferred into San Carlos while 485 persons transferred out. This does not comport with the fact that San Carlos has consistently been at capacity, not drastically reducing capacity.  Data showing the number of daily emergency responses (known as "ICSs") and the number of patients admitted to the hospital was not provided.

The HSD PCCM Team was responsible for creating a survey instrument regarding the experience of the pilot staff with the August training.  The assignment was made at the end of the training, and we made several subsequent requests/reminders.  The HSD never created this instrument and we therefore have no data on this important topic.  The HSD PCCM Team was also asked to develop pre- and post-Pilot surveys of staff and patient satisfaction with primary care and medical services.  The HSD never created this instrument and we therefore have no data on these important metrics.

The Dakota teams have completed and are submitting team surveys on the Pilot experience and data on primary care visit optimization, which will inform the final staffing plan.

Other metrics regarding the success of integrating primary care, mental health, and substance use treatment were not developed as the teams were not able to experience integration.  These metrics will involve surveys and will need to be developed during statewide implementation.

<u>Weekly Meetings of HSD PCCM Team, Pilot Front-Line Staff Teams, and Court Experts</u> -- These crucial meetings were designed to provide coaching to the front-line Pilot clinical teams, identify emerging issues and needs, and to build the HSD PCCM Team's experience with coaching, distilling team experience and applying it to other teams.

These meetings should have begun when the Pilot started on October 8 but did not occur as required.  ADCRR instructed us not to have any independent contact with Pilot team staff outside of the presence of HSD staff to ensure that ADCRR had information that NaphCare received, and we were instructed to go through the HSD PCCM Team to schedule such meetings with the front-line staff who were actually implementing the Pilot and the model.  We repeatedly attempted to

9

schedule meetings through the HSD PCCM Team and impressed upon the HSD PCCM Team the importance of these meetings, but with one exception, they ignored our repeated requests: none were scheduled in October, and just one meeting occurred with the Dakota teams in November.

We were not surprised, when interviewing the front-line teams from both sites at the end of the Pilot, that they reported needing far more hands-on support, especially during their early weeks of the Pilot. It had been our intent to provide that support, but we were precluded from doing so because we had to use the HSD PCCM Team as the intermediary and they did not act on this element of the Court ordered work plan.  This substantially slowed team progress.

Because the meetings did not occur, the teams also did not receive support in using process improvement cycles, developing open scheduling, developing RN roles, strengthening daily huddles, and more.  The HSD PCCM Team did not experience coaching and their skill set did not grow as intended.  Also, the Pilot team members did not gain experience with many of the components of the PCCM and are therefore not able at this time to serve as "ambassadors" to other units and complexes on these components during the statewide implementation of the PCCM.

These meetings were also to provide information our team needed to evaluate the Pilot, modify the staffing plan, and make modifications to the plan for statewide implementation.  Because the meetings did not occur, as the Pilot drew to a close, we needed to gather the information in another way.  The Facility Healthcare Administrators ("FHA") at Perryville and Yuma helped us schedule interviews with all the primary care and mental health teams from both Pilot sites and collect this feedback retrospectively.  This provided good information but it was not as rich as it would have been collected in "real time."

<u>PCCM Team Trainings</u> -- The PCCM implementation plan called for conducting several trainings of front-line staff from September through December to provide the primary care and mental health teams with "just in time" training and coaching so that they could fully implement all the elements of the PCCM.

- Eleven trainings, meetings, and activities were scheduled in September for the Pilot primary care teams.  Of them, only four were completed.  Most were not completed because not enough of the staff had been hired by NaphCare, as described above and in our previous two reports.  Patient education and patient surveys were assigned to the HSD PCCM Team to create, which they never did.
- Seven trainings, meetings, and activities were scheduled in September for the Pilot mental health teams.  None were completed, mostly because NaphCare had failed to hire or designate mental health clinicians at either Dakota or San Carlos, as described above and in our two previous reports.  Patient education and patient surveys were assigned to the HSD PCCM Team to create, which they never did.  Three additional trainings for Pilot mental health staff were scheduled October – December to equip the teams with higher-level skills in integrated care, motivational interviewing, and managing patient panels.  Virtual "office hours" were also scheduled to allow the teams to reach out individually for specific clinical or operational support.  None of these occurred because the teams, having started a month late, were not ready for them.

10

<u>Complex-Wide and Statewide Communication About the Pilot</u> -- In a large-scale organizational change operation such as this, these communications are essential to build anticipation about the PCCM and staffing plan, quell rumors, and give staff a venue for asking questions.

The Court required complex-wide communications across all of the Yuma and Perryville health care and custody staff beginning in late July and continuing through December.  The Facility Health Administrators ("FHAs")  were eager for this to occur as they were barraged with questions and rumors.   Our team described a number of venues through which this could occur including newsletters, reports at staff meetings, email blasts, FAQs, discussion groups, staff and patient testimonials, and more.

The Court also required communication across the rest of the ADCRR complexes beginning in late September and continuing throughout December to prepare the other seven complexes for the statewide rollout of the PCCM and staffing plan.

Neither of these steps occurred.  We reminded HSD and NaphCare of these gaps on several occasions.  NaphCare stated they did not know enough about the Pilot to communicate it to their staff.  Dr. Stern offered several times to conduct town hall meetings regarding the Pilot at the prisons with patients and staff.  No one from HSD – leadership or PCCM team – took any initiative on his offer or on any other forms of communication to the Pilot complexes or the rest of ADCRR.

ADCRR maintains that they built a communication venue, but it is just an email address to which people can submit questions.  There is no interactive quality to it, ADCRR never used it to disseminate information, and it has not been used by line staff.

Health care and custody staff at Yuma and Perryville in other units besides Dakota and San Carlos and in all of the other seven ADCRR complexes are not prepared for or anticipating the PCCM or staffing plan.  This is a significant lost opportunity.

<u>Weekly Meeting of Pilot Leadership Team</u> -- This meeting was not a specifically enumerated Court-ordered requirement but it naturally grew from the three weeks of training provided at the start of the Pilot, and became a highly effective venue for tracking Pilot developments and keeping all parties on the same page.  The meetings were attended by NaphCare leaders and regional clinicians, FHAs and their assistants, Directors of Nursing, HSD leaders, Court experts, HSD PCCM Team, and others upon invitation.  They operated weekly from July 8 through mid-December except during our site visits.

<u>Develop a Plan to Implement the PCCM and Staffing Plan Statewide at the Pilot's End</u> -- This essential, Court-required activity was scheduled to begin mid-December.  In our mid-November status report to the Court, we indicated that it must start immediately, because the scale of the resource requirements and the complexity were going to be so demanding that a planning period of a few weeks would be insufficient (Dkt. 4700 at 9-10). The Pilot was conducted at two units, one each at two complexes.  There are about 45 other units across 9 complexes in ADCRR.  The scale of statewide implementation is massive.  It is difficult to overstate the complexity of this roll-out and the resources that will be required to plan and execute it.  HSD has not responded to our numerous attempts to remind them that they must begin this work in order to comply with the Injunction and the Court's orders.

<u>Technical Capacity Necessary to Implement the PCCM Statewide</u> -- To implement the PCCM and staffing plan statewide, HSD must have internal expertise to assign patients to primary care and mental health teams.  The first two steps in any unit are empaneling all patients in that unit to the appropriate primary care team (e.g., identifying complex medical patients who need to be assigned to the physician's team), and then assigning patients on the primary care team who use outpatient mental health services to a Primary Therapist team, based on their mental health scores.

In August and September, Qian Tang, HSD's Program Evaluation Specialist, developed an excellent program for quickly turning a patient population into patient panels.  However, HSD indicated that empanelment "should be NaphCare's responsibility."  We do not believe that any steps have been taken by ADCRR to discuss the need to empanel and assign patients with NaphCare, to teach NaphCare how to run the empanelment program, or to otherwise plan to execute this first step in implementing the staffing model statewide.

In mid-December, we met with the HSD PCCM Team and an HSD analyst to teach them the separate step of converting a patient panel into primary care and mental health staffing using the staffing model tools.  At the end of the session, the HSD PCCM Team indicated that "this should be NaphCare's responsibility."  We do not believe that any steps have been taken by ADCRR to discuss this with NaphCare, engage us to teach them how, or otherwise plan to execute this first step in implementing the staffing model statewide.

<u>HSD Clinical Leaders' Expertise to Lead the Mental Health Component of the PCCM Statewide Implementation</u> -- As noted, the HSD PCCM Team did not hire the required psychology associate. The HSD mental health director left during the Pilot and her replacement joined HSD only recently. During three Pilot Leadership team weekly meetings (December 3, 10, and 17), we communicated to ADCRR the urgent need for us to teach HSD's newly hired mental health director about the Primary Therapist model, new clinical expectations for mental health care, and the staffing model for the mental health care Pilot.  To date, we have received no response, and in our opinion there is no one in HSD with a working knowledge of these matters or the ability to assure fidelity of the Primary Therapist model of care for the statewide implementation.

C. <u>Other Pilot Observations</u>

<u>Engagement of Key Operational Staff</u> – Contributions of key operational staff to those aspects of the Pilot that were successful cannot be overstated. In addition to the line staff implementing the Pilot on the ground, the most critical operational persons are the FHAs. Brin Sidi and Adalia Cerrillo, the FHAs at Yuma and Perryville, respectively, were completely invested in the Pilot and committed to its success.  Both spent many hours working with their staff, participating with the Court experts' team, and providing deep insight and imagination into the PCCM's implementation.  This experience underscores how important it will be for ADCRR and NaphCare to assure that the FHAs at the other complexes are fully supported during the statewide implementation.  Amy Reyes, NaphCare's Regional Director of Nursing, also contributed significant time and information to the implementation.  Their contributions were vital, and they were always cooperative, optimistic, and available.

<u>Adequacy of Physical Clinical and Office Space</u> -- Space was the primary barrier to implementing the Pilot at both units. It was identified by Pilot site staff as the primary barrier at the first Pilot meeting, but had been identified as a problem long before the Pilot. The lack of adequate clinical and office space was identified as a problem during the 2021 trial, and therefore the Injunction

includes requirements related to clinical space. Inadequacy of space has been a topic of discussion central to nearly all Pilot Leadership Team meetings. At San Carlos, numerous options to increase clinical space were identified and considered by ADCRR, San Carlos custody and health care people staff, NaphCare leaders, and HSD.  ADCRR did not find any of them acceptable based on cost, other ADCRR priorities, or both.  HSD leaders represented to us several times that construction to increase clinical space at San Carlos had been approved and budgeted, but this was later found to be incorrect.  Lack of sufficient clinical space is the main reason that the Court-ordered Pilot could not be conducted at San Carlos.

Discussions about additional clinical space at Dakota began during our August site visit. Some space became available to the Pilot clinicians late during the Pilot. We were advised on January 12, 2025, that construction at Dakota is now complete.

Integration of Custody Personnel in Pilot -- Because successful implementation of the Pilot (and future implementation of the PCCM) requires robust integration of custody operations with health care operations, the Pilot was designed with specific steps to ensure that integration.  Among other things, the Pilot required participation of key facility custody staff in training and weekly meetings. As early as the first two trainings in August, custody staff involvement was spotty. Upper and middle-level custody managers at Dakota attended and fully participated in the August training. Perryville custody leaders did not participate but a few line staff did.  Neither Pilot site custody leaders nor ADCRR custody leaders were involved in the Pilots after the August training. Both Pilot units reported this as a significant impediment to implementing the Pilot in their units. It will also be an impediment to statewide implementation.

At Yuma, the Warden designated seven officers to the Dakota Pilot to address the need for increased patient movement.  During the Pilot, only occasional patient visits were incomplete because of a lack of custody staff.  However, those officers were not new hires – they were pulled from other duties within Yuma where their posts were not backfilled.  This is not a sustainable solution, and ADCRR will need to address the need for more officers when designing the implementation of the staffing model.  No custody staff were similarly assigned at San Carlos during the pilot.

Coordination between ADCRR and NaphCare -- In matters involving both ADCRR and NaphCare, there is marked lack of clarity about which party is responsible and accountable for what. Such matters that we raised with ADCRR and NaphCare that were critical to the success of the Pilot went unresolved with no clear recourse.  ADCRR leaders would imply that certain tasks were NaphCare's responsibility, but did not require that NaphCare act on them.  As a result of these vagaries, multiple steps in implementation were skipped or dropped, contributing to the failure to fully implement the Pilot. Examples include developing communications about the PCCM for staff and patients, initial assignment of patients to teams (patient empanelment), and learning how to assign PCCM staff.

In its feedback to a draft of this report, ADCRR noted that "ADCRR and NaphCare meet regularly and work together to coordinate roles." We acknowledge that ADCRR meets regularly with its vendor; our observation is about the lack of adequate coordination and accountability.

PCCM Project Management -- Implementation of the Pilot and the subsequent rollout of the model across the state is a complex project. The science of organizational management informs us that projects, especially complex ones, require dedicated project managers.  ADCRR did not provide

13

sufficient project management to the Pilot. It is clear that ADCRR does not have the project management capacity to roll the PCCM out statewide and implement the statewide staffing plan.

Immediately following the August training, we strongly recommended to HSD that it designate a Project Manager; they ignored our recommendation. We noted the lack of effective project management capacity as a pilot project deficit in both of our interim reports. Still ADCRR did not provide it. The Pilot has lacked a dedicated Project Manager and the organizational project management capacity to manage the schedule, marshal all assignments and deliverables, assign resources, track progress, effectively engage other ADCRR resources, effectively interface with NaphCare, and more. Many of the incomplete tasks and components we describe above are the direct result of lack of that essential capacity.

## IV. Were Pilot Objectives Met?

### Objective 1: Test Pilot Staffing

This objective was met and we have enough experience to inform the final staffing plan. The scale of the Pilot was smaller than planned, to be sure. But thanks to the extensive and continuous participation of the two FHAs and the NaphCare regional clinicians, who could and did draw conclusions which can be extrapolated to the rest of their own complexes and the seven other complexes, respectively, we obtained sufficient information to be able to confidently make modifications to the staffing plan.

In its feedback to the draft of this report, ADCRR disagreed with our conclusion that we have gained sufficient information from the Pilot so far to proceed with revision of the statewide staffing plan (see Conclusions 2 and 4) and believe therefore that the Pilot should be extended. For the reasons delineated in this report, we believe the Pilot has provided sufficient information to competently revise the statewide staffing plan.

### Objective 2A: Test Training Materials and Methods, and Staff Support

This objective was met. The Pilot provided exactly the type of useful information we sought. We were able to evaluate the training materials and methods that were used. Regarding the training content that was not delivered, the content is fairly standard and does not need to be heavily customized to ADCRR. Also we were able to infer, from considerable discussion with staff, FHAs, and NaphCare regional clinicians, that the intended materials and supports would have been extremely useful and should be developed and used in rolling the PCCM and staffing plan out across ADCRR.

In its feedback to the draft of this report, ADCRR noted that there is no data supporting this conclusion. We did, in fact, gather data regarding this conclusion. The data was qualitative, not quantitative, which is appropriate.

### Objective 2B: Build and Test Technical Tools

This objective was partially met.

- Tools for empanelment were tested and refined with support from a capable HSD analyst. Based on our review of the outcome of test empanelments, HSD's methodology is sound. However, in its feedback to the draft of this report, ADCRR informed us it was "decided that

> NaphCare would use its own version to take over empaneling." As this methodology has not been tested, we do not know if it is accurate. In the days to come, it is imperative that validity of the NaphCare methodology be tested because it is fundamental to the building of the final staffing plan.

- Through a series of meetings, NaphCare's Implementation Manager Rebecca Quince and the FHAs developed and tested several iterations of medical record modifications to empanel patients onto care teams:

    o identify each patient's primary team by the provider

    o identify each patient's primary therapist, where applicable

    o assign each patient who moved onto the unit into a temporary team primary care and mental health (if applicable) which could be tracked

    o remove patients from care teams when moving off the unit.

    These are all fully operational and ready to incorporate into the statewide rollout.

- The two Pilot sites developed slightly different tools for optimizing primary care visits. We have enough experience to guide future teams in this new work process, but we have not seen evidence that the HSD PCCM Team has documented any of the experience or options or created teaching tools.

- Tools for self-scheduling under the PCCM were not completed but this will not prevent the statewide rollout.

- Tools for modifying empanelment at the unit level were not tested but the final staffing plan will provide guidance sufficient to enable the model to move forward.

We have sufficient information to inform the statewide implementation.

Objective 3:  Build Capacity in HSD to Rollout and Manage Statewide Implementation of the PCCM and Staffing Plan

ADCRR did not meet this objective. HSD did not fully staff the required PCCM implementation team, and the team members who participated did not gain sufficient experience to fully understand the model and its premises or to serve as the visionary, technical, or administrative face of the staffing plan.

Throughout the Pilot, there was little evidence of ADCRR commitment to meeting the Court-ordered requirements beyond hiring staff. HSD leaders' participation in Pilot activities waned throughout the pilot and we did not see any evidence of HSD leaders' attempting to invigorate the HSD PCCM Team to meet the work plan objectives or hold them to any expectations or accountability for doing so.

The current (incomplete) HSD PCCM Team leans heavily toward monitoring and enforcing standards that are not applicable to the staffing plan and are inappropriate when introducing large-

15

scale clinical change.  Due to the lack of a project manager or person holding them to account, they did not gain sufficient experience in the art of coaching newly-formed clinical teams.

ADCRR also lacks experience with the components of the plan that involve physicians/medical judgment, or those components related to mental health care.

In our opinion, ADCRR, HSD, and the HSD PCCM Team do not have the capacity to implement the PCCM and staffing plan across ADCRR.

## CONCLUSIONS

From all of the experience related in the above, we submit the following conclusions about the staffing plan Pilot.

1. The staffing plan and the PCCM perform as intended and can be implemented across ADCRR.

2. The staffing plan will be finalized shortly with relatively minor revisions.

3. ADCRR does not have a plan to implement the staffing plan beyond the end of the Pilot, though the Court required it to be implemented immediately upon completion of the Pilot.

4. To provide the level of care required by the Injunction, ADCRR will need a much larger health care workforce in all its facilities than it currently operates.

5. To provide the level of care required in the Injunction, ADCRR will need significantly more clinical space in most of its buildings.

6. ADCRR does not have a plan for, nor the leadership expertise to, implement patient empanelment beyond the Pilot sites.

7. ADCRR does not have the technical expertise or tools to calculate the staffing of patient primary care or mental health teams based on panels and caseloads, or to modify staffing at some point in the future when patient complexity changes.

8. ADCRR has no mental health or medical leaders who have been trained in the PCCM model nor have seen it in action.  Therefore, ADCRR cannot provide clinical oversight or ensure fidelity to the primary care and mental health care components of PCCM.

9. ADCRR lacks the human resources, the space and the administrative and professional project management capacity to successfully implement the PCCM statewide or at any individual prison.

Respectfully Submitted,

Donna Strugar Fritsch BSN, MPA
Marc F. Stern, MD, MPH
January 13, 2025

##############

| | |
|---|---|
| **Appendix 1 Status of Tasks Ordered by Court** | |
| Present Administrative CHP team with staffing report and pilot | Carried out on schedule and as intended over several weeks. Weekly meetings, which included NaphCare leaders, FHAs, and HSD were continued through December as "Pilot Leadership Team" and were very productive in working through some of the pilot issues. |
| Meet with Administrative CHP team to introduce pilot concepts and expectations | |
| Train Administrative CHP team | |
| Hire HSD team (Physician, APP, RN, PA) | HSD was to engage a team of permanent PCCM leaders representing all clinical personnel who would, with administrative support, become the visionary, technical, and administrative, face of the PCCM staffing plan and model of care, as well as its hands.

ADCRR failed to hire the full HSD PCCM Team. Only an RN and APP were engaged throughout the pilot. No mental health clinician or physician participated.

Court experts tried to impart to the HSD PCCM Team the complexity of the skills and tools necessary to be able to lead the statewide implementation of the staffing model and to assure fidelity to its principles. The HSD PCCM Team did not engage with the Court experts or the pilot clinical teams as required and therefore failed to develop sufficient tools or expertise to coach new teams, develop workflows, support change management, refine clinical scheduling, build and manage patient registries, and many other essential skills.

The HSD PCCM Team continues to demonstrate a lack of understanding of the basic components of the PCCM and staffing plan. |
| Train HSD team (Physician, APP, RN, PA) as they are hired on a rolling basis | |
| Present HSD team with staffing report and pilot as they are hired on a rolling basis | |
| Meet with HSD team to introduce pilot concepts and expectations as they are hired on a rolling basis | |
| Weekly meeting with HSD (*PCCM team*) and Court experts | |
| Weekly meeting with HSD (*PCCM team*), pilot sites, and Court experts | These meetings did not occur as required. They should have begun when the pilot started October 8. The HSD PCCM Team did not experience sufficient coaching and their skill set did not grow as intended. |
| Identification of current CHP FTEs to move (subject to backfill) | Pilot staff hiring was to occur July-September. It did not begin until mid-August and at the training in late August, none of the teams were complete. Teams were finally complete at the end of October but not all had been fully oriented and ready to work on a team until early November. Mental health teams were staffed last and had less time to operate under the pilot.

The staffing plan was built on 8-hour shifts, but only the day shift positions were filled. As a result, there were fewer nursing hours (NR and LPN) hours provided for the pilot than were required.

The Court gave specific instructions requiring that staff be permanent NaphCare employees unless the Court experts granted waivers on a case-by-case basis. No waivers were sought, yet team members at both sites reported being agency employees contracted by NaphCare. |
| Hire all new CHP positions | |

| | |
|---|---|
| Proposed In-Person Expert Site Visits (TBD) | These occurred as scheduled and HSD significantly supported the execution of the first site visit/training session in August. |
| Develop evaluation metrics | This was started but not completed. We created a framework for six categories of evaluation metrics to be collected, and HSD provided input into metrics for what reports two of the categories. |
| | The HSD PCCM Team was tasked to develop evaluation instruments for the staff training and for pre- and post-pilot evaluation of staff and patient satisfaction with the pilot. They did not. |
| | We tried repeatedly to engage the HSD PCCM Team in implementing data collection at the pilot sites, but they did not respond. No data was collected by ADCRR. |
| Design and implement complex-wide communication | Neither of these occurred. No one from HSD – leadership or PCCM team – took any initiative on any other communication to the pilot complexes or the rest of ADCRR. . |
| Develop and implement system-wide communication | |
| Develop empanelment methodology | Completed. |
| Assign staff to teams and empanel patients to teams | |
| Assign patients to Primary Therapists | |
| Implement visit optimizing. | Successfully completed at both sites |
| Design roles and processes and train all CHP and HSD staff | This did not occur as planned due to short duration of pilot especially for mental health, and HSD PCCM Team did not schedule weekly meetings with teams as required. |
| Implement daily huddles | Huddles and nursing roles were implemented but are underdeveloped due to lack of coaching in weekly meetings. |
| Implement role of nurse risk managers | |
| Implement Primary Therapist Model | Incomplete. Mental health teams started too late to receive all the planned clinical training, and teams were not fully staffed with BHTs or psychiatric RNs. |
| Implement self-scheduling | This did not occur. |
| Review, modify, problem solve | This occurred to a small degree with FHAs and NaphCare throughout the pilot |
| Modify empanelment as needed | This did not occur as neither complex had a Facility Medical Director. Also, teams did not have enough time in operation to reveal patients who needed to be moved. |
| Design roll-out to other units and complexes | This did not occur. |
| Identify other needs, unsolved problem, and opportunities | This did not occur because weekly pilot team meetings, during which this would have taken place, did not occur. |
| Refine staffing plan | This has begun. |

## Appendix 2 Pilot Interim Steps

| | PRIMARY CARE PCCM IMPLEMENTATION | | | | | |
|---|---|---|---|---|---|---|
| | TASK | Sep 3-6 | Sep 9-13 | Sep16-20 | Sep 23-27 | STATUS |
| Webinars are for teams from both pilot units together | Webinar: Open Scheduling | X | | | | **Did not occur** |
| | Webinar: Visit Optimization AND Using Transitional APPs | | X | | | **Complete** |
| | Webinar: Huddles, SBAR, and Documentation | | | X | | **Complete** |
| | Develop Patient Ed and Survey | X | X | X | | **Did not occur** |
| | Launch Pt ed and survey (HSD?) | | | | X | **Did not occur** |
| Team members will need approx. 5 hours a week, minimum, to conduct September work. Duties must be covered | Weekly Zoom calls with all teams (each unit separately) | | XX | XX | XX | **Did not occur** |
| | Teams work on registries | X | X | X | X | **Did not occur** |
| | Teams work on open scheduling plans/PDSAs | X | X | | | **Did not occur** |
| | Teams work on visit optimization | X | X | | | **Complete** |
| | Start visit optimization | | | X | | **Complete** |
| | Start Transitional APP brainstorming/prep | | | X | X | **Did not occur** |
| | Design visit optimization change cycles | | X | X | | **Did not occur** |
| | Work on huddles change cycles | | | X | X | **Did not occur** |

| | MENTAL HEALTH PRIMARY THERAPIST IMPLEMENATION | | | | | |
|---|---|---|---|---|---|---|
| | TASK | Sep 3-6 | Sep 9-13 | Sep16-20 | Sep 23-27 | STATUS |
| Training is for teams from both pilot units together | Training: New Outpatient Treatment Paradigm/Practice | X | | | | **Complete** |
| | Training: New Outpatient MH Team Roles | | X | | | **Did not occur** |
| | Training: Now OP MH Care Processes | | | X | | **Did not occur** |
| Team members will need approx. 5 hours a week, minimum, to conduct September work. Duties must | Develop Patient Ed and Survey | X | X | X | | **Did not occur** |
| | Launch Pt ed and survey | | | | X | **Did not occur** |
| | Weekly Zoom calls with all teams (each unit separately) | | XX | XX | XX | **Did not occur** |
| | Team designs new roles: PDSAs, etc. | | X | X | X | **Did not occur** |
| | Team designs practice implementation: PDSAs, forms, etc. | | | X | X | **Did not occur** |
| | Team designs new care processes: PDSAs, etc. | | | X | X | **Did not occur** |

| | | October | November | December | January | STATUS |
|---|---|---|---|---|---|---|
| | "Office Hours:" Lynn/DSF, Bart, Marc/Lara, Scott | Every Week, by "appointment" and topic | | | | **Did not occur** |
| | Webinar: Integrated Care | X | | | | **Did not occur** |
| | Webinar: Motivational Interviewing | | X | | | **Did not occur** |
| | Webinar: managing Patient Panels and Caseloads | | | X | | **Did not occur** |
| | Bi-monthly calls w FHAs/designees | X | X | X | X | **Did not occur** |
| | Site Visits | Oct 21-24 | | | | **Complete** |
| Teams will need scheduled weekly time for implementation support and PDSA work. Minimum 4 hours per week per person. | Team PCCM Evaluation | X | | | X | **Completed by Dakota teams in Dec.** |
| | Collect custody data | X | X | X | X | **Did not occur** |
| | Collect visit collapsing data | X | X | X | X | **Complete Dakota for 3 wks** |
| | Collect Appt rollover data | X | X | X | X | **Complete Dakota for 3 wks** |
| | HSD Training every week | X | X | X | X | **Did not occur** |

19

**Appendix 3 Additional Annotated Feedback from Parties**

The following are comments of a more global nature we received in feedback from the Parties, along with annotations.

ADCRR noted that "the fundamentals of this model are community based and do not take into account all aspects of establishing this model in a correctional setting. These critical components were not factored into the overall model at the outset but should be considered for any planned pilot rollout. For example, the recruiting, hiring, and onboarding processes take longer in a correctional setting. Background clearances must include a criminal history check, and the hiring pool of potential candidates interested in working in a correctional setting is smaller than in the community setting." We agree with ADCRR that a correctional population differs from a community population and for this reason definitely factored these differences into the staffing analysis and plan. We are also aware of the need for background checks on prospective employees, though also recognize that there are accommodations that can be made in certain circumstances pending full background check, e.g., provisional clearance, working side-by-side with a cleared employee. Finally, we also recognize that working in a correctional institution is not always the first choice for some professionals. However, while worker compensation is not the sole factor influencing prospective workers, it is an important – if not most important – factor for many. We have not witnessed evidence of aggressive increase of compensation offered by NaphCare to conclude that staffing challenges are insurmountable.

ADCRR noted that it "has yet to see a final staffing plan, which underscores the fact that it would be irresponsible and ill advised to roll PCCM out statewide at this point." We agree that it would be impossible to fully implement the PCCM statewide in the absence of the final staffing plan. However, absence of a final plan does not preclude designing a plan for statewide implementation. The complexity of such a huge rollout in terms of logistics and coordination alone, warrants careful and detailed planning, and a part of which is connected to final staffing levels. Further, in anticipation of this concern and the understandable need for ADCRR to be armed with an approximation of the staffing resources that would be needed for statewide implementation, we informed ADCRR early on that in all likelihood, they should expect the final recommendation for staffing level to fall within 10-15% of the levels described in the original staffing plan.