Jared G. Keenan (Bar No. 027068)
Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th St.
Phoenix, AZ 85006
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
         lbeall@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**DISABILITY RIGHTS ARIZONA**
5025 East Washington St., Ste. 202
Phoenix, AZ 85034
Telephone: (602) 274-6287
Email: adietrich@disabilityrightsaz.org

*Attorneys for Plaintiff Disability Rights Arizona*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Disability Rights Arizona, <br><br> Plaintiffs, <br><br> v. <br><br> Ryan Thornell, *et al.*, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br><br> **PLAINTIFFS' MOTION FOR A RECEIVER** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 2

    I.      TRIAL AND PERMANENT INJUNCTION ............................................ 3

    II.     CONTINUED AVOIDABLE SUFFERING AND DEATH ........................ 4

         A.    First Interim Report .................................................... 5

         B.    Special Report on Five Suicides ......................................... 5

         C.    Second Interim Report .................................................. 6

    III.    STAFFING PILOT PROJECT ................................................................ 7

         A.    First Staffing Pilot Report ............................................... 8

         B.    Second Staffing Pilot Report............................................ 9

         C.    Final Staffing Pilot Report .............................................. 10

ARGUMENT ............................................................................................................ 12

    I.      THE COURT SHOULD APPOINT A RECEIVER. ................................. 12

         A.    The Receivership Factors Weigh Strongly in Favor of a Receiver.......................................................................... 12

               1.    There is a grave and immediate threat of continuing harm to plaintiffs .............................................. 13

               2.    The use of less extreme measures of remediation have been exhausted or would be futile ................................. 15

               3.    Continued insistence on compliance with the Court's orders would lead only to confrontation and delay............... 19

               4.    There is a lack of leadership to turn the tide within a reasonable period of time ....................................... 20

               5.    The Court need not find bad faith; regardless of Defendants' motivations, conditions remain unconstitutional ................................................. 23

               6.    Resources are being wasted ................................... 24

               7.    A receiver is likely to provide a relatively quick and efficient remedy ........................................... 24

         B.    The Relief of Receivership Meets the Requirements of the PLRA. . 25

    II.     THIS COURT SHOULD SET FORTH CLEAR POWERS, DUTIES, AND RESPONSIBILITIES OF THE RECEIVER..................................... 26

CONCLUSION ......................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Brown v. Plata*,
  563 U.S. 493 (2011) ................................................. 1, 12

*Coleman v. Wilson*,
  933 F. Supp. 954 (E.D. Cal. 1996) ................................ 25

*Gordon v. Washington*,
  295 U.S. 30 (1935) ................................................ 24

*Hook v. Ariz. Dep't of Corrs.*,
  107 F.3d 1397 (9th Cir. 1997) .................................... 26

*Morgan v. McDonough*,
  540 F.2d 527 (1st Cir. 1976) ..................................... 12

*Newman v. State of Ala.*,
  466 F. Supp. 628 (M.D. Ala. 1979) ............................... 12

*Nuñez v. New York City Dep't of Correction*,
  No. 11-CV-5845-LTS, 2024 WL 4896317 (S.D.N.Y. Nov. 27, 2024) ............. 13, 16, 19

*Parsons v. Ryan*,
  949 F.3d 443 (9th Cir. 2020) ................................. 16, 19

*Plata v. Schwarzenegger*,
  603 F.3d 1088 (9th Cir. 2010) ........................... 12, 18, 25

*Plata v. Schwarzenegger*,
  No. C01-1351 TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ....................... *passim*

*Plata v. Schwarzenegger*,
  No. C01-1351 TEH, 2006 WL 8563430 (N.D. Cal. Feb. 14, 2006) ............................. 26

*Stone v. City & Cnty. of S.F.*,
  968 F.2d 850 (9th Cir. 1992) ................................. 26, 27

*United States v. Hinds Cnty. Bd. of Supervisors*,
  120 F.4th 1246 (5th Cir. 2024) ............................. 12, 13, 16

*United States v. Hinds County*,
  No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925
  (S.D. Miss. Jan. 30, 2023) ................................. 15, 23, 24

**Federal Statutes**

18 U.S.C. § 3626(a)(1)(A) ........................................ 25

18 U.S.C. § 3626(a)(1)(B) ........................................ 26

1

**TABLE OF AUTHORITIES**
**(continued)**

2

3    **State Statutes**

4    Ariz. Rev. Stat. § 41-1608 ............................................................................................... 27

5    H.B. 2010, 49th Leg., 3d Spec. Sess. (Az. 2009) ............................................................. 27

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2  People in Arizona state prisons "are dying. Unnecessarily." Doc. 4755 at 2. That was

3 true in 2012, it was true in 2021, and it is true today. This despite a consent decree in 2015,

4 countless remediation plans, numerous enforcement orders, millions of dollars in contempt

5 fines, the appointment of Rule 706 experts, rescission of the consent decree, a 15-day bench

6 trial in 2021, 181 pages of findings of fact and conclusions of law in 2022, and an agreed-

7 upon Injunction in 2023. The enormous expenditure of time and resources by the parties

8 and the Court has landed us in the same place: "horrible care," nurses acting outside their

9 legal scope of practice, and needless suffering and death. *Id.* at 2, 39, 52.

10  Last year, the Court ordered Defendants to implement the Patient-Centered Care

11 Model (PCCM), the foundation of the Injunction's healthcare requirements, in two prison

12 units housing only 8% of the total patient population. Doc. 4637 at 5, 7. Even with extensive

13 guidance and step-by-step instructions from the Court and its experts, Defendants failed

14 miserably. The experts' final report documents a lack of leadership, "lack of understanding

15 of the fundamental principles of the Injunction," and unapologetic disregard for this Court's

16 orders. Doc. 4761 at 2-3, 6-8, 11. The experts concluded that "ADCRR lacks the human

17 resources, the space and the administrative and professional project management capacity

18 to successfully implement the PCCM statewide or at any individual prison"—that is,

19 Defendants have proven incapable of complying with the Injunction. *Id.* at 16.

20  "In essence, the time has now come when the number of options with any realistic

21 chance of success has dwindled down to a single one—Receivership." *See Plata v.

22 Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *28 (N.D. Cal. Oct. 3, 2005).

23 Receiverships can and do work to fix prison healthcare systems that are "broken beyond

24 repair, resulting in an unconscionable degree of suffering and death." *See Brown v. Plata*,

25 563 U.S. 493, 507 (2011) (internal quotation marks and citation omitted). The district court

26 in *Plata*, for example, ordered a receivership to oversee medical care in California prisons

27 three years after the State "stipulated to a remedial injunction" but "failed to comply with

28 that injunction." *Id.*; *see Plata v. Schwarzenegger*, 2005 WL 2932253, at *1, 19. Last year,

the parties in *Plata* jointly reported that the receivership "has successfully transformed medical care" in the prison system, developed "a well-functioning healthcare system," and set "a path towards a durable remedy that will end the case." Declaration of Donald Specter, Ex. 1 at 2 (noting that the receiver has delegated authority over almost all prisons back to the State). The parties reported that the receiver "has improved record-keeping and quality management systems in [the] healthcare system, has responded promptly to crises and has successfully adapted to changes in the healthcare industry and the economy"—and that all this was accomplished "without the need for regular court intervention." *Id.* at 3.

That remedy is urgently needed in this case. The Court first found constitutional violations and ordered relief in 2015. Doc. 1458 at 6. A decade later, Defendants still have not demonstrated the will, knowledge, or capacity to reform their prison healthcare system. As a result, Plaintiffs respectfully request that the Court appoint a receiver to oversee healthcare in the Arizona state prisons.[1]

## BACKGROUND

The Court has extensively documented the history of this case elsewhere, so we do not give a full account here. In July 2021, the Court issued "findings of fact regarding Defendants' failure to perform their obligations and numerous efforts to enforce compliance" in an order rescinding the Stipulation and setting the case for trial. Doc. 3921 at 2-27. The Court found that continued efforts to enforce the Stipulation would be fruitless, finding that "Defendants have always deflected their failures and employed scorched-earth tactics to oppose every attempt to resolve outstanding noncompliance" and that "[t]here does not appear to be a contempt sanction robust enough to coerce compliance." *Id.* at 33.

---

[1] Plaintiffs do not ask that the receiver oversee the correctional conditions in the housing units encompassed by the Isolation Subclass. Plaintiffs agree with the Court experts that, "[t]hough ADCRR is still far from the finish line and progress has been slower than the Court ordered, there have been demonstrable and meaningful improvements in the conditions of confinement under which members of the Subclass are incarcerated." Doc. 4755 at 2. That said, Plaintiffs have a pending motion before the Court seeking further enforcement orders to spur compliance with Injunction requirements related to the Subclass. Doc. 4764.

1  **I.    TRIAL AND PERMANENT INJUNCTION**

2       After a 15-day bench trial in November and December 2021, the Court issued a 181-

3  page order in June 2022. Doc. 4335. The Court found that "Defendants have failed to

4  provide, and continue to refuse to provide, a constitutionally adequate medical care and

5  mental health care system for all prisoners." *Id.* at 2. The Court found that "Defendants'

6  years of inaction, despite Court intervention and imposition of monetary sanctions, establish

7  Defendants are acting with deliberate indifference to the substantial risk of serious harm

8  posed by the lack of adequate medical and mental health care affecting all prisoners." *Id.*

9  The Court stated that it would "employ an expert to assist with crafting an injunction that

10  remedies the constitutional violations—no more and no less." *Id.* at 179.

11       Defendants nominated Dr. Marc Stern to serve as the Court's expert, highlighting

12  Dr. Stern's previous work in the case to "analyze ADCRR's delivery of certain components

13  of health care" and monitoring methodology.[2] Doc. 4339 at 3. Defendants emphasized that

14  "Dr. Stern's dedication to the design, management, and operation of health services in

15  corrections settings will provide this Court and the parties with valuable guidance in crafting

16  an injunction regarding the provision of medical care at ADCRR." *Id.* at 4. The Court

17  appointed Dr. Stern, as well as additional experts to assist him, including a mental health

18  expert, Dr. Bart Abplanalp, and a corrections expert to advise on Subclass matters. Doc.

19  4352; Doc. 4362.

20       The Court shared a draft injunction with the parties in January 2023. Doc. 4380. The

21  Court noted that "[t]he unusual scope of this injunction is informed by Defendants' actions

22  throughout this case": "Given this history, the Court cannot impose an injunction that is

23  even minutely ambiguous because Defendants have proven they will exploit any ambiguity

24  to the maximum extent possible." *Id.* at 5.

25       The parties engaged in extensive discussions about the draft injunction and potential

26  modifications needed to remedy the constitutional violations found at trial. Doc. 4402 at 2;

27

28       [2] We refer to the Rule 706 experts as the "Court's experts" and "Court Monitors."

Doc. 4410 at 3-4. Neither party filed objections to the draft injunction, and instead the parties jointly filed a stipulation to the injunction with a few modifications that had been agreed upon by the parties and the experts. Doc. 4402; *see also* Doc. 4405; Doc. 4408. In April 2023, the Court issued the Permanent Injunction requested by the parties. Doc. 4410. Neither party appealed.

The Court appointed "its own experts to serve as neutral monitors to evaluate Defendants' performance," including Drs. Stern and Abplanalp. Doc. 4410 at 5-9. The Court required Defendants "to monitor all elements of this order on a monthly basis." *Id.* at 7. Finally, the Court noted that "Plaintiffs and their counsel will still have primary responsibility for assessing Defendants' performance and, if Defendants do not perform, it will be Plaintiffs' duty to seek additional appropriate relief." *Id.* at 9.

## II.    CONTINUED AVOIDABLE SUFFERING AND DEATH

In November 2023, the parties jointly asked the Court to direct its experts to provide written reports, explaining that "reports from the experts will help speed the remedial process by acknowledging areas of compliance with the Injunction and by bringing attention to areas in need of improvement." Doc. 4507 at 5. The parties agreed that "[t]he experts' opinions are critical because they are independent, neutral, and are based on expertise that the parties themselves lack." *Id.* at 5-6. The Court ordered its experts to submit written reports. Doc. 4410 at 7; Doc. 4510; Doc. 4690; Doc. 4699.

In February 2024, October 2024, and January 2025, Dr. Stern and his team filed comprehensive reports documenting Defendants' noncompliance with the Injunction. Doc. 4539; Doc. 4691; Doc. 4755.[3]

---

[3] The experts also filed two reports of Defendants' performance with quality indicators in June and July 2024. Doc. 4648 (listing Defendants noncompliant with 141 of 162 ongoing healthcare-related indicators and finding that Defendants had not completed 11 of 26 additional, one-time healthcare-related indicators); Doc. 4668 (listing Defendants noncompliant with 142 of 162 ongoing healthcare-related indicators and finding that Defendants had not completed 11 of 26 additional, one-time healthcare-related indicators). The experts cautioned that these were "not equivalent to a full Court Monitors' compliance report," that they relied "heavily on ADCRR's self-monitoring results," and that "in a full Court Monitors' compliance report, it is possible that determinations of Compliant (or, potentially, Not Yet Compliant) . . . would be reversed." Doc. 4667 at 2.

### A.    First Interim Report

In a report filed on February 2, 2024, Dr. Stern and his team found that "the quality of care provided by NaphCare remains woefully inadequate." Doc. 4539 at 30. The experts warned: "Patients are in daily danger." *Id.* They found "pervasive dangers in the delivery of [mental health] care," "significantly deficient" clinical documentation, and "inadequate conceptualization of the patients' mental illness, functional impairment, and suicide risk." *Id.* at 10. They found that Defendants were unable to identify problems with healthcare accurately and reported repeated examples of "dangerous care being judged as adequate as part of self-assessments." *Id.* at 21; *see, e.g.*, *id.* at 11-15. The experts found that "lack of care likely contributed to" the death by suicide of a young man. *Id.* at 15.

The experts also concluded that Defendants had not taken sufficient measures to achieve adequate staffing, a prerequisite for "successful fulfillment of the health care-related requirements of the Injunction": "On the day the Injunction went into effect, April 7, 2023, NaphCare's staffing level was well below the minimal level required by the Court, i.e., dangerously low, and now, some eight months later, it remains so." Doc. 4539 at 16.

Following the report, Plaintiffs asked the Court to "order Defendants to hire an individual or individuals with significant health care management experience to help Defendants reform the current system." Doc. 4552 at 15. In March 2024, Defendants claimed that such action would be "duplicative and unnecessary" because they had "already engaged . . . a nationwide correctional consulting and management firm" and anticipated that the firm's recommendations "for system-wide improvement," including related to the Injunction, "will be made final by mid-2024." Doc. 4566 at 6-7. To date, Defendants have not shared any recommendations from the firm. Specter Decl. ¶ 19.

### B.    Special Report on Five Suicides

On October 17, 2024, Dr. Abplanalp filed a report on five suicides that occurred in the state prisons over the first three months of 2024. Doc. 4691. He found that "adherence to the [Injunction] would have decreased the probability of, if not prevented, these deaths." *Id.* at 1. He highlighted three main areas of deficiencies: inadequate comprehensive

evaluation of mental health needs, inadequate mental health treatment encounters, and lack of a functional primary therapist model. *Id.* He observed that none of these areas "are unique to the cases under review" and that "these same deficiencies have contributed to, and continue to contribute to, risk of, and actual morbidity and mortality since monitoring began in April of 2023." *Id.* at 1, 4, 6, 7.

## C.    Second Interim Report

In a report filed on January 7, 2025, Dr. Stern and his team found that the delivery of healthcare in the state prisons "remains poor, has shown little improvement since the start of the Injunction, and continues to place the residents at significant risk of serious harm, including death." Doc. 4755 at 2. The experts found that "little progress has been made in the vast majority of key operations":

- "Advance practice practitioners (APP; nurse practitioners and physician assistants) still care for complex medical patients who should be cared for by physicians."

- "Too many mentally ill patients are still not receiving the fundamental trio of services they need to remain safe: a comprehensive evaluation upon arrival, a current meaningful treatment plan, and meaningful documented therapy sessions conducted in a therapeutic and confidential clinical setting."

- "More than 100 positions are still vacant."

- "Medical and mental health patients are cared for by ever-changing medical practitioners, psychology associates, and psychiatric practitioners such that patients never get to know (and trust) their providers and the providers never get to know (and feel they have the overall responsibility for) their patients, all leading to over-, under-, and mis-providing of care."

- "The EHR [electronic health record] in use is cumbersome and poorly adapted to providing a clinician with the information they need when they need it."

- "Nurses practice as physicians."

- "Thousands of consultations with off-site specialists are delayed."

- "The use of virtual visits when hands-on care is necessary is rampant."

*Id.* The experts ended their summary of findings with a grim and unflinching conclusion: "And patients are dying. Unnecessarily." *Id.*

The experts again found that Defendants were unable or unwilling to monitor their

compliance accurately. The experts found that Defendants applied inaccurate methodology that resulted in inflated results, even when the experts "informed [them] of this methodological flaw" and when the results were "obviously absurd." Doc. 4755 at 3-4. For example, the experts found that Defendants insisted their compliance with a measure related to initial mental health evaluations was 99%, when in fact the "performance level for this critically important clinical task is closer to 0%." *Id.* at 3.

The experts reported that "[d]espite repeated feedback and mentoring by the Monitors, ADCRR continues to be unable to recognize errors associated with deaths in custody – some of which are causal – and therefore fails to develop remedial plans." Doc. 4755 at 7. In other words, Defendants miss "critically important errors, which . . . if not remedied, could contribute to the death in another patient." *Id.* The experts found that even when they and the Court brought a serious error to Defendants' attention, Defendants "made no plan to understand how this error occurred" and "failed to implement any recommendations or plan to prevent its recurrence." *Id.*

Dr. Stern informed the Court that he had been first appointed over five years ago "to ascertain why ADCRR had failed, after several years, to satisfy the health care-related terms of" the Stipulation. Doc. 4755 at 26. He reported that his views had not changed, save one: he now believed "ADCRR has insufficient leadership to promote the type of major change that has to be forthcoming in order to be compliant with the health care-related requirements of the Injunction." Doc. 4755 at 27; *see also* Doc. 3379.

## III.    STAFFING PILOT PROJECT

In the Injunction, the Court found that "[t]he core issue is that staffing levels are so inadequate that the provision of constitutionally mandated care is impossible." Doc. 4335 at 21; *see also id.* at 5 n.3 (finding that "failure to maintain adequate staff has been the fundamental cause of Defendants' unconstitutional actions"). Under the Injunction, "[t]o determine the number of staff necessary to care for patients, the Court will appoint an expert to conduct a staffing analysis and plan of health care positions at each location." Doc. 4410 at 14 § 1.17. The parties agreed that Dr. Stern and Donna Strugar-Fritsch would conduct

the staffing analysis. Doc. 4425 at 1. On April 16, 2024, Dr. Stern and Ms. Strugar-Fritsch filed their staffing analysis and plan. Doc. 4599. The experts noted that the parties "would be best served by a pilot that tests the proposed staffing and allows an opportunity to revise the final staffing based on experience with it." *Id.* at 3. The pilot "would be robust and time-limited, would create direct experience with staffing of all services that can be applied as modifications to the plan herein, and would become the final staffing plan." *Id.* Defendants and their vendor recommended two units for the pilot sites. *Id.* at 3, 37. Combined, the two units housed only 8% of the total prison population. Doc. 4637 at 7. The Court ordered the pilot project to commence. *Id.* at 5-7. The Court ordered Defendants to comply with the detailed schedule developed by its experts, Doc. 4642-2 at 2, with specific modifications agreed to by the parties. Doc. 4642; Doc. 4643.

The pilot ran for 28 weeks between July 2024 and January 2025. Doc. 4761 at 3. The experts filed three reports about the pilot program in September 2024, November 2024, and January 2025. Doc. 4643 at 1-2; Doc. 4681; Doc. 4700; Doc. 4761.

### A.    First Staffing Pilot Report

The first report was filed on September 25, 2024. Doc. 4681. The experts found that Defendants had failed to meet core Court-ordered requirements, including (a) to hire the Health Services Division (HSD) team to oversee implementation, (b) to identify current staff who would be moved to the pilot units, (c) to design and implement complex-wide communication to staff, (d) to hire all new correctional health positions, and (e) to design and implement roles and processes and train all staff. *Id.* at 4-11. They noted that "many of the tasks cannot occur in accordance with the schedule because staffing is incomplete" and that other "vital elements of the program's success" "could have occurred and have not." *Id.* at 11. The experts reported that "[t]he issue of space to accommodate new clinical staff and their patients was raised at the very first pilot meeting on July 8," and that in September, "HSD reported that space modifications had been approved, budgeted, and would be complete within 90 days." *Id.* at 15. Defendants, in their response to a draft of the report, disavowed knowledge of those comments and asserted that "[t]he pilot never contemplated

building additional space and should not be contingent on building additional space." *Id.*[4]

The Court asked the parties "whether the Pilot should continue or terminate." Doc. 4683. Both parties agreed the pilot should continue, and Defendants informed the Court on October 7, 2024, that "the pilot is necessary to provide important refining information for the staffing model and new model of care being developed." Doc. 4686 at 2.

**B.    Second Staffing Pilot Report**

The experts filed a second report on November 15, 2024. Doc. 4700. They noted that Defendants had unilaterally and indefinitely suspended the pilot at one of the two sites on October 17, and that "[e]ven before the suspension, the level of implementation was markedly behind schedule." *Id.* at 1. They found implementation at the remaining unit "also markedly behind schedule." *Id.* They identified three issues that needed to be urgently addressed: project management, space for delivery of healthcare services, and staffing.

The experts reported a lack of "confidence that HSD's informal approach to project management would be sufficient," particularly in light of "tasks that should have occurred but did not" and "the emerging need for formal management and codification of the workflows and processes that are emerging from the pilots." Doc. 4700 at 9. The experts noted that "the effort to design and implement spread of the model across ADCRR . . . will be massive and calls for far more project management across the entire state." *Id.* The experts further explained that "[t]he need for adequately skilled project management cannot be overstated. This includes clinical and operational leadership and extensive administrative support." *Id.* The experts warned that "HSD should immediately begin planning the statewide spread of the PCCM" and that "*waiting until mid-December, or after the completion of the pilot, would be far too late*." *Id.* (emphasis added).

Next, the experts found that "a major increase in clinical space is needed to accommodate the volume of additional health care staff called for to meet the requirements of the injunction. . . . Adding clinical space must be the highest priority." Doc. 4700 at 10.

---

[4] The Injunction requires that Defendants "provide sufficient space" for healthcare delivery. Doc. 4410 at 11-12 §§ 1.6-1.7.

Finally, the experts reported that pilot staffing still is "not complete" and that some pilot staff do not meet the Court-ordered requirements. Doc. 4700 at 3. The experts found that "hiring staff for statewide implementation ***must begin now***," warning that "it is unlikely that staffing numbers [in the final staffing plan] will deviate by more than 15% in either direction [from the original statewide staffing plan]." *Id.* at 9 (emphasis added); *see also id.* at 8 (noting that Defendants had not yet determined the number of custody staff needed "to support patient movement for the new care model").

On November 22, 2024, Plaintiffs' counsel notified Defendants that, based on the report, "it is clear that Defendants will not be able to comply with the requirements of the pilot or the Permanent Injunction in the near future" and requested that "Defendants produce a comprehensive plan regarding how and by when they will address" the experts' urgent recommendations related to project management, space, and staffing. Specter Decl., Ex. 4 at 1, 5. A month later, on December 20, 2024, Defendants responded by saying they would not produce a plan because doing so would be "premature." *Id.*, Ex. 5 at 1. They said that Plaintiffs' letter was "inaccurate" and "disregards" Defendants' "significant effort," and did not explain how, when, or if they would address the experts' concerns. *Id.*, Ex. 5 at 3.

### C.    Final Staffing Pilot Report

The experts filed their final report on January 23, 2025. Doc. 4761. They concluded that "ADCRR lacks the human resources, the space and the administrative and professional project management capacity to successfully implement the PCCM statewide or at any individual prison" and reported that their "repeated requests" that a project manager be designated were "ignored." *Id.* at 8, 14, 16. They reported that "[l]ack of clinical space" is the "main reason" why the pilot at one site "operated for just eight days." *Id.* at 4, 13.

The experts documented Defendants' repeated violations of Court orders throughout the pilot. Among other things, Defendants made "major deviations from the Court's order" related to hiring clinical staff. Doc. 4761 at 6-7. In response to a draft of the report, Defendants responded: "These were impractical requirements from the beginning." *Id.* at 7. In addition, the experts reported that Defendants had disagreed in writing with other "Court-

ordered requirements that are fundamental to the [staffing] plan's success," including whether the staffing plan would be implemented at all, whether Defendants needed to provide sufficient clinical space to deliver healthcare services, and whether Defendants must provide sufficient custody staff to support healthcare operations. *Id.* at 2-3. Of the "carefully crafted and robust set of sequential steps and activities" ordered by the Court, the experts found only 22% were fully completed; 63% were not completed, and 14% were partially completed. *Id.* at 6. The experts calculated that Defendants achieved less than half of the pilot experience that had been ordered. *Id.* at 4-5.

The experts found that "HSD PCCM team members continue to demonstrate a lack of understanding of the fundamental principles of the Injunction: that patient care must be based on clinical needs." Doc. 4761 at 8. The experts noted that "numerous efforts to impart to the HSD PCCM Team the complex skills and tools necessary to lead the implementation of the staffing model and to assure fidelity to its principles" were largely rebuffed. *Id.*

The experts noted that the pilot was to be conducted only "at two units, one each at two complexes." Doc. 4761 at 11. "There are about 45 other units across 9 complexes in ADCRR. The scale of statewide implementation is massive. It is difficult to overstate the complexity of this roll-out and the resources that will be required to plan and execute it." *Id.* The experts noted that they had cautioned in mid-November that the work must "start immediately," but as of mid-January, "HSD has not responded to our numerous attempts to remind them that they must begin this work in order to comply with the Injunction and the Court's orders." *Id.* The experts "did not see any evidence of HSD leaders' attempting to" ensure accountability, and observed that the HSD PCCM Team "leans heavily toward monitoring and enforcing standards that are not applicable to the staffing plan and are inappropriate when introducing large-scale clinical change." *Id.* at 15-16.

The experts concluded with what had become all too clear: "ADCRR does not have a plan to implement the staffing plan beyond the end of the Pilot, though the Court required it to be implemented immediately upon completion of the Pilot," nor did it have the capacity to do so. Doc. 4761 at 16.

**ARGUMENT**

**I.    THE COURT SHOULD APPOINT A RECEIVER.**

In order "to remedy otherwise uncorrectable violations of the Constitution," "federal courts have inherent power under their equity jurisdiction to appoint receivers." *Plata v. Schwarzenegger*, 603 F.3d 1088, 1093-94, 1095 n.3 (9th Cir. 2010); *see also Brown v. Plata*, 563 U.S. at 511 ("Courts faced with the sensitive task of remedying unconstitutional prison conditions must consider . . . appointment of . . . receivers"). A receiver is "appointed by the court to take over the day-to-day management of a prison system or a segment of it." *Plata v. Schwarzenegger*, 603 F.3d at 1094. "Courts have appointed receivers to administer prisons where," as here, "unconstitutional conditions persist despite repeated orders to remediate." *United States v. Hinds Cnty. Bd. of Supervisors*, 120 F.4th 1246, 1267 (5th Cir. 2024) (affirming appointment of receiver) (collecting cases); *see Plata v. Schwarzenegger*, 603 F.3d at 1093 (affirming appointment of receiver to manage delivery of medical care); *Newman v. State of Ala.*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) (appointing receiver for Alabama state prison system because "[t]he Court can no longer brook non-compliance with the clear command of the Constitution, represented by the orders of the Court in this case").

**A.    The Receivership Factors Weigh Strongly in Favor of a Receiver.**

"The decision whether to appoint a receiver is a function of the court's discretion in evaluating what is reasonable under the particular circumstances of the case." *Plata v. Schwarzenegger*, 2005 WL 2932253, at *23; *see also Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976) ("The test is one of reasonableness under the circumstances.").

As the case law concerning the receivership remedy for the reform of public institutions has developed over the past few decades, a multi-pronged test has developed to guide the trial courts in making this often difficult determination. The test includes the following elements, the first two of which are given predominant weight:

(1)    Whether there is a grave and immediate threat or actuality of harm to plaintiffs;

(2)    Whether the use of less extreme measures of remediation have been exhausted or prove futile;

(3)    Whether continued insistence [on] compliance with the Court's orders

-12-

1    would lead only to confrontation and delay;

2    (4)    Whether there is a lack of leadership to turn the tide within a
         reasonable period of time;

3

4    (5)    Whether there is bad faith;

5    (6)    Whether resources are being wasted; and

6    (7)    Whether a receiver is likely to provide a relatively quick and efficient
         remedy.

7    *Plata v. Schwarzenegger*, 2005 WL 2932253, at *23; *see Hinds County*, 120 F.4th at 1267-

8    68 (affirming district court determination that these factors weighed in favor of appointing

9    a receiver); *Nuñez v. New York City Dep't of Correction*, No. 11-CV-5845-LTS, 2024 WL

10   4896317, at *23 (S.D.N.Y. Nov. 27, 2024) (Rikers Island jail conditions litigation)

11   (outlining factors).

12        These factors all weigh strongly in favor of a receivership here.

13
                    1.    There is a grave and immediate threat of continuing harm to
14                       plaintiffs.

15        The harm to the Plaintiff class is extreme and undisputed. The experts, in a report

16   filed last month, found that delivery of healthcare "continues to place the residents at

17   significant risk of serious harm, including death." Doc. 4755 at 2; *see also id.* at 5 ("ADCRR

18   recognizes . . . that overall, the care . . . provided by NaphCare is often not clinically

19   appropriate"). The experts included an appendix of death reviews that documented "horrible

20   care" and "myriad errors" that led to unnecessary suffering and lost opportunities for

21   treatment and cure in the months leading up to patient deaths. *Id.* at 52, 58; *see id.* at 30-68.

22   And even then, for each example, the reviews highlighted only "a fraction of the failures in

23   care and deviations from the Injunction that were present in [the patients'] record." *Id.* at

24   37 (Patient 1); *id.* at 46 (Patient 2); *id.* at 53 (Patient 3); *id.* at 59 (Patient 4).

25        The experts' report comprehensively demonstrated how these devastating failures in

26   care were not the result of individual failures by healthcare staff, but instead the natural

27   consequence of Defendants' failure to build a healthcare system as required by the

28   Injunction—or, in the experts' words: "Systems are broken, not the people who work in

-13-

them." Doc. 4755 at 1. These were not new findings. The types of systemic failures were the same as those found by the Court in 2022. *Compare, e.g.*, Doc. 4755 at 2 ("Nurses practice as physicians."), *with* Doc. 4335 at 44 ("Using nurses as the first line, and often last line, for providing care is medically unacceptable."), *and* Doc. 4637 at 5 ("Let the Court emphasize what is obvious, nurse-driven care is over.").

To provide a few examples from the report:

- "ADCRR's misassignment of APPs to care for complex patients is dangerous and significantly contributes to countless errors in care that occur."

- Defendants' failure to reliably administer medications "places patients at significant risk of serious harm."

- Defendants' failure to require primary therapists to conduct daily face-to-face clinical encounters with patients in mental health inpatient beds leads to a "significant risk of missing signs of mental and behavioral decompensation, which can result in delay of care and exacerbation of the patient's condition," including "the elevated risk of suicide."

- Defendants' failure to offer treatment to patients with latent tuberculosis in violation of the Permanent Injunction "plac[es] the entire population (and staff) at risk of tuberculosis."

- Defendants' failure to screen for substance use disorder upon intake "leaves the patient at risk for overdose during this high-risk period, an outcome that has happened at ADCRR in the past."

- "ADCRR frequently uses [telehealth] when it is clinically inappropriate, and therefore dangerous."

- "ADCRR's fulfillment of Injunction requirements relative to care for suicidal patients continues to be very poor and places the health and lives of mentally ill patients at significant risk of harm."

- "The impact of this lack of continuity of care cannot be overstated. . . . Our team's review of patient health care records showed consistent evidence, time after time, that patients are cared for by a parade of different professionals who are not aware of previously provided care or care plans. It is impossible to provide constitutionally safe care under those conditions, and our report is replete with examples."

- "ADCRR continues to fail to fill health care staffing positions as required by paragraph 1.16 of the Injunction. . . . [I]t is simply impossible to provide safe health care with insufficient staff."

Doc. 4755 at 10-12, 16, 18, 20-21.

The dangerous failures to comply with the Injunction were apparent from Defendants' own data. For example, the experts found that only ***three percent*** (3%) of off-

-14-

site specialty care referrals were completed within the ordered timeframe—the "serious impact on patient safety" of which "cannot be overstated." Doc. 4755 at 6. In addition, Defendants' data showed only 48% compliance with the requirement that mental health professionals conduct a clinically appropriate in-person assessment of any individual identified as suicidal—"[t]he first and most crucial step in examining a person at risk of killing themselves" and "keeping a person safe." *Id.* at 18. In fact, of the 178 quality indicators related to healthcare that Defendants measure, Defendants self-reported noncompliance with 153 of them. Doc. 4755 at 69-90.[5]

> 2.    The use of less extreme measures of remediation have been exhausted or would be futile.

This Court has "exhausted all reasonable coercive measures at its disposal." *See Plata v. Schwarzenegger*, 2005 WL 2932253, at *28; *see also United States v. Hinds County*, No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925, at *10 (S.D. Miss. Jan. 30, 2023) ("The County's pattern of obstinance indicates that lesser measures will not bring [the jail] into compliance with the Constitution."). Between 2016 and July 2021, "the Court issued dozens of Orders with specific directions mandating Defendants comply with the Stipulation, the Court issued three Orders to Show Cause why Defendants should not be held in contempt, the Court appointed two experts, and the Court held Defendants in contempt twice, resulting in millions of dollars in fines, which were upheld on appeal." Doc. 4335 at 4.

After those efforts failed, the Court took what it described as a "time consuming, highly expensive, and potentially harsh course" of rescinding the Stipulation, setting the case for trial, and issuing the Permanent Injunction. Doc. 3385 at 5; Doc. 3921. That, too, has proven insufficient. Twenty months after the Injunction, the experts found that there has been "little improvement," and preventable deaths continue. Doc. 4755 at 2.

---

[5] As the experts noted, Defendants' "data gathering methodology remains flawed," and four quality indicators cannot be measured at all "because ADCRR or NaphCare is simply still unable to capture the relevant data." Doc. 4755 at 25; *see id.* at 70, 83, 89.

No remedies other than receivership have a realistic hope of righting this foundering ship. First, this Court already has attempted to use "the paradigmatic coercive contempt sanction of prospective, conditional fines." *Parsons v. Ryan*, 949 F.3d 443, 455 (9th Cir. 2020) (affirming contempt order for 1,445 violations). "The first sanction was $1.445 million and the second was $1.10 million. Neither sanction coerced or even motivated complete compliance." Doc. 3921 at 17. As a result, this Court correctly has concluded that further contempt sanctions would be ineffective. *See, e.g.*, Doc. 4335 at 4 ("Imposition of substantial fines, and threats of even more, did not prompt Defendants to make required efforts to perform as they agreed under the Stipulation."); Doc. 3921 at 33 ("There does not appear to be a contempt sanction robust enough to coerce compliance."); *id.* at 35 (finding "the inability for monetary sanctions to have effect"); *id.* at 36 (finding that "[t]here is no indication a contempt fine of $1.4 million would change things" and that "it would be absurd to continue down a path of trying to elicit Defendants to act differently").

"Pursuing a contempt remedy would greatly extend the future life-span of the current dysfunctional system, thereby placing innumerable lives in grave danger, with no hope that the sanctions would produce a positive result . . . ." *Plata v. Schwarzenegger*, 2005 WL 2932253, at *27 (appointing receiver where court had exhausted "all reasonable means of compulsion"); *see also Hinds County*, 120 F.4th at 1268 (affirming receivership where court "concluded that financial penalties would be ineffective"); *Nuñez*, 2024 WL 4896317, at *22 ("[T]here is nothing in the record to suggest that increasing the financial burden on Defendants, which would in effect be a burden on taxpayers, would secure change. It does not appear that financial costs effectively motivate Defendants to improve conditions").

The utility of financial sanctions is further weakened here, as Defendants largely are indemnified by their vendor NaphCare, and where the CEO of NaphCare told this Court under oath that sanctions issued by Defendants "have not in any way incentivized or influenced NaphCare's performance or compliance." Doc. 4616-1 at 25 ¶ 10; *see also* Doc. 3921 at 33 n.14 (noting that "Defendants are indemnified from having to pay any fines themselves"); Doc. 4507-1 at 46 (amendment to indemnification agreement).

1      Even if the fines were sufficient to *motivate* Defendants, they would not be effective

2   because the record demonstrates that Defendants and their healthcare leaders lack the

3   competence to improve the prison healthcare system in a manner consistent with the

4   Injunction. The staffing pilot project is the latest example of that incompetence. The experts

5   found that the ADCRR HSD leadership who participated in the pilot do not have "sufficient

6   experience to fully understand the model and its premises or to serve as the visionary,

7   technical or administrative face of the staffing plan." Doc. 4761 at 15.[6]

8      Another example is Defendants' inability to implement credible mortality reviews.

9   In June 2022, the Court found that "despite ten years of litigation, ADCRR has never created

10  and then implemented a policy to identify systemic issues identified in mortality reviews

11  and has not taken steps to remedy them." Doc. 4335 at 43. In March 2024, Defendants

12  assured the Court that their Medical Director "is currently in the process of revamping the

13  entire mortality review process." Doc. 4566 at 10. Over ten months later, the Medical

14  Director position has been vacant since August 2024, Doc. 4755 at 26, and the experts

15  concluded in their January 2025 report that "[t]he recommendations that emerge from

16  [mortality] reviews, if there are any, lack any plan of action, no less a meaningful plan, to

17  remedy the underlying system problem and monitor the proposed remedy to assure it leads

18  to resolution of the identified problem." *Id.* at 8; *see also id.* at 7-8 (discussing "distressing"

19  September 2024 mortality review and noting that "[a]s poor as this mortality review was,

20  almost all other mortality reviews we have reviewed were worse").

21     Second, the Court since 2017 has appointed a number of Rule 706 experts who have

22  provided detailed analysis and recommendations and offered coaching and mentorship to

23  Defendants and their private healthcare vendors.[7] In the January 2025 report, for example,

---

24

25     [6] The experts also noted that ADCRR healthcare leadership suffered from many
    vacancies during much or all of the staffing pilot project, including the loss of the Medical
    Director and the Mental Health Director. *See* Doc. 4761 at 7 (noting that only two of the
26  four PCCM project leaders were hired, that the ADCRR Mental Health Director position
    had been vacant, and that the ADCRR Medical Director position was still vacant).

27     [7] *See* Doc. 2483 at 3 (appointing BJ Millar as Rule 706 expert to address "provider
    staffing and retention"); Doc. 2940-1 (report of BJ Millar); Doc. 3089 at 1 (appointing
28  Dr. Stern to evaluate "errors in the monitoring process" and reasons for "substantial

Dr. Stern detailed many examples where his "team has repeatedly provided ADCRR feedback on why they are failing in their efforts and how to improve, to no avail." Doc. 4755 at 8.[8] In addition, Dr. Stern noted that his team "has spent hundreds of hours over months providing written and oral feedback and mentoring to ADCRR on errors in its analysis and interpretation of Injunction compliance data" but, "[d]ue to the minimum impact of [those] feedback efforts, and the cost to the state, I had both monitors discontinue their written feedback efforts." *Id.* at 25-26; *see id.* at 25 n.10 (estimating "costs to be in excess of $600,000 annually"). The final report on the staffing pilot documented similar failures by Defendants to take advantage of the experts' many attempts to "impart . . . the complex skills and tools necessary to lead the implementation of the staffing model and to assure fidelity to its principles." Doc. 4761 at 8; *see id.* at 8-11.

Third, although the Court has not yet appointed a special master, "[a] special master is primarily useful for conducting hearings and making recommended findings of fact." *Plata v. Schwarzenegger*, 603 F.3d at 1098 (declining to terminate receivership and appoint a special master where it was not clear "how a special master, with the limited functions set by the PLRA [Prison Litigation Reform Act], could remedy the violations"); *see also* Doc. 2043 at 3 (explaining the limitations of special masters in cases governed by the PLRA).

_____

noncompliance with critical aspects of health care delivery"); Doc. 3379 (report of Dr. Stern); pages 3-4, above (discussing appointments of Dr. Stern and his team after trial).

[8] *See, e.g.*, Doc. 4755 at 10 ("Because of our concern for possible false documentation in state records by NaphCare, we brought our concerns to the attention of ADCRR. Despite this, the mismatch between reality and the corresponding check list documentation continues.") (emergency equipment); *id.* at 16 ("We have discussed these three conditions with ADCRR to no avail") (use of telehealth); *id.* at 16 ("Despite our repeated feedback to ADCRR regarding the dangers that are attached to allowing APPs to care for patients with complex conditions or needs, the practice continues") (misassignment of APPs); *id.* at 18-19 ("The Monitors have recommended to ADCRR more than once that they modify their procedure for interviewing such patients. . . . ADCRR has concurred that [the Monitors' proposed] approach is preferable and would improve their compliance with the Injunction. However, . . . ADCRR has yet to enact a statewide change to policy and procedure.") (assessment of suicide risk); *id.* at 25 ("For requirements where we are aware of the flaws, we have shared – sometimes repeatedly – feedback with ADCRR. Few have improved.") (monitoring methodology); *id.* at 27 ("I have shared my concern with ADCRR leaders about the multiplicity of and discordance among the extant policy manuals. The three sets of policies remain.").

Finally, there are, of course, more extreme remedies than a receivership that other courts have considered in such situations: imposing a term of incarceration on prison officials until compliance is achieved, closing prisons, and releasing people from prison. The first "would do little to advance reform or ameliorate the patterns of dysfunction," *Nuñez*, 2024 WL 4896317, at *22, and the others "would be more onerous to defendants than the establishment of a Receivership, [so] the Court need not entertain them at this time." *Plata v. Schwarzenegger*, 2005 WL 2932253, at *28; *see also Nuñez*, 2024 WL 4896317, at *22 (same).

### 3. Continued insistence on compliance with the Court's orders would lead only to confrontation and delay.

"It is resoundingly clear . . . that continued insistence on defendants' compliance with the Court orders would lead to nothing but further delay, as well as further needless death and morbidity." *Plata v. Schwarzenegger*, 2005 WL 2932253, at *29. This Court has documented Defendants' long history of evading Court orders through "scorched-earth tactics," Doc. 3921 at 33, "repetitive motions, close-to-baseless appeals, and petitions for writs of certiorari." Doc. 3866 at 3; *see also Parsons*, 949 F.3d at 462 (rejecting Defendants' invitation of "appellate micromanagement").

That practice has continued since the issuance of the Permanent Injunction. Instead of focusing on complying with the Injunction, Defendants have attempted to undermine it, resulting in needless litigation and further delays. Last year, for example, the Court overruled Defendants' "preposterous" objections to the PCCM, which the Court noted "is required in the Permanent Injunction":

> Not only does it defy common sense for Defendants to dispute the particular requirements of the Permanent Injunction particularly when Defendants agreed to its terms. It is also an attack on the substance of the Court's Findings of Fact and Conclusions of Law.

Doc. 4637 at 5. The Court noted that Defendants' position "suggests Defendants do not intend to comply with the Court's Orders." *Id.*

1    In addition, the experts documented in their final report on the staffing pilot "major"

2    and "unilateral" violations by Defendants of Court orders, including hiring staff on

3    temporary contract bases, failing to submit temporary or PRN positions to the experts for

4    review and approval, failing to hire the full HSD PCCM Team, and failing to issue complex-

5    wide and state-wide communications. Doc. 4761 at 6, 7, 11. Upon reviewing a draft of the

6    experts' report, Defendants told the experts, "[t]hese were impractical requirements from

7    the beginning." *Id.* at 7. This flippant approach to Court orders wastes time and delays the

8    substantial reform to the healthcare system required by the Injunction.

9

10             4.      There is a lack of leadership to turn the tide within a reasonable
                       period of time.

11    Dr. Stern, whom this Court first appointed as a Rule 706 expert in 2018, *see* Doc.

12    3089, recently concluded "that ADCRR has insufficient leadership to promote the type of

13    major change that has to be forthcoming in order to be compliant with the health care-related

14    requirements of the Injunction." Doc. 4755 at 27. Indeed, one need only read the experts'

15    recent reports to recognize that "[t]he past and current leaders of the prison system have

16    failed to take the bold measures necessary to protect the lives of prisoners, to find solutions

17    to the impediments posed by the State bureaucracy, and to make systemic improvements."

18    *See Plata v. Schwarzenegger*, 2005 WL 2932253, at *29.

19             In their final report on the staffing pilot, the experts found that Defendants "continue

20    to demonstrate a lack of understanding of the fundamental principles of the Injunction,"

21    "little evidence of ADCRR commitment to meeting the Court-ordered requirements," and

22    no "evidence of HSD leaders' attempting to invigorate [their] Team to meet the work plan

23    objectives or hold them to any expectations or accountability for doing so." Doc. 4761 at 8,

24    15. Instead of developing and implementing bold solutions, Defendants have demonstrated

25    a "can't do" attitude, blaming the experts for not providing them with "a 'how-to guide,'"

26    *see* Doc. 4553 at 2, blaming the Court for issuing "impractical" orders, *see* Doc. 4761 at 7,

27    and objecting to any departure from the status quo. *See, e.g.*, Doc. 4637 at 5; Doc. 4606-2

28    at 5-6 ¶ 26.

"This mind-set is a classic example of what the sociologist Thorstein Veblen terms 'trained incapacity.'" *Plata v. Schwarzenegger*, 2005 WL 2932253, at *26 (internal citation omitted). "State officials have become so inured to erecting barriers to problems that appear to threaten the bureaucracy (or that at least appear to require the bureaucracy to bend or flex) that the officials have trained themselves into a condition of becoming incapable of recognizing, and acting in response to, true crisis." *Id.*

Trained incapacity can be seen in Defendants' adopting a wait-and-see approach when the need for urgent action is obvious. For example, Defendants repeatedly have refused to create essential project management capacity, even when the experts explained the urgent need to do so to comply with the Injunction. Doc. 4700 at 9; Doc. 4761 at 14, 16; Specter Decl., Exs. 4-5. Defendants' inability to recognize a true crisis also can be seen in Defendants' glaring imbalance of priorities. *See Plata v. Schwarzenegger*, 2005 WL 2932253, at *29. Dr. Stern found that despite severe staffing shortages, Defendants insist on having nurses "see patients for non-urgent complaints even when the patient would subsequently be seen directly by their primary care practitioner"—an "unnecessary step, drawing nurses (who are understaffed) away from value-added functions"—because of a desire to comply with  National Commission on Correctional Health Care (NCCHC) requirements, even though "NCCHC accreditation is not mandatory."[9] Doc. 4755 at 28; *see also* Doc. 4761 at 15-16 (finding that HSD leadership focused on "monitoring and enforcing standards that are not applicable to the staffing plan and are inappropriate when introducing large-scale clinical change").

Trained incapacity also is apparent in Defendants' failure to address what Dr. Stern in 2019 identified as one of the "most important reason[s] for ADCRR's failure to provide constitutionally adequate health care"—namely, that "ADCRR's health care was

---

[9] The Court in June 2022 found that accreditation by NCCHC "is of very little value when determining actual performance of the ADCRR system." Doc. 4335 at 26; *see id.* (finding that NCCHC sets "standards to ensure some policies and procedures are in place to create a health care delivery system," and does not "incorporate a substantive review of the health care administered by ADCRR").

outsourced to for-profit vendors." Doc. 4755 at 26. At the time, Defendants took no position on Dr. Stern's recommendation that the state privatization law be rescinded or overridden, Doc. 3379 at 108, and since then have taken no meaningful measures to mitigate the longstanding barriers posed by privatization.

NaphCare policies flout the requirements of the Injunction. *Compare* Doc. 4755 at 27 ("NaphCare staff continue to follow their own policy, notwithstanding ADCRR's expectation to follow ADCRR policy, and in violation of the Injunction."), *with* Attorney General's Brief, Doc. 4625 at 7 ("NaphCare's contract requires it to comply with court orders"). Although the experts repeatedly have explained that "[t]he *most* important step that needed to be taken to increase staff recruitment was increasing salaries," "NaphCare's efforts to increase salaries have been anemic, at best." Doc. 4755 at 24. "For example, there is a severe dearth of physicians at ADCRR, yet NaphCare offered a paltry $2 (1.5%) per hour increase to physician salaries between December, 2023 and July, 2024 and has made none since." *Id.* at 25. The Injunction's mandate that Defendants "'fill all positions required by the current contract' within three months" remains unmet, and there is no indication that Defendants will be able to meet the "substantial increases in staffing beyond the current level required by the contract" that the Court has noted are forthcoming. Doc. 4637 at 2 (citing Doc. 4410 at 13); Doc. 4570 at 3; Doc. 4472 at 2 ("The deadlines and other requirements of the Permanent Injunction are not aspirational."); Doc. 4599 at 43 (listing increase in physicians required by experts' staffing plan).

The Court in June 2022 found that the ADCRR Director "is legally responsible for providing a constitutionally adequate health care system," and that when the Director "believes his chosen vendor must provide health care in a different manner, he must enforce his rights under the vendor contract." Doc. 4335 at 108-09 n.36 (citations omitted). But Defendants failed to hold their vendor accountable. At times, they even asked the Court to do it for them, leaving the Court "baffled as to what Defendants are arguing when they

1  propose the Court 'order' them to sanction NaphCare." *See* Doc. 4570 at 3.[10]

2      There is ample evidence in the record that ADCRR officials deflect responsibility to

3  its vendor in other areas, "saying essentially, 'not me,'" in an "exercise of accountability

4  hotpotato." *Hinds County*, 2023 WL 1186925, at *11-*12 (finding lack of leadership in

5  those circumstances). That happened throughout the pilot program, when "ADCRR leaders

6  would imply that certain tasks were NaphCare's responsibility, but did not require that

7  NaphCare act on them," which the experts found "contribut[ed] to the failure to fully

8  implement the Pilot." Doc. 4761 at 13. Even when an ADCRR staff person "developed an

9  excellent program" for empanelment (assigning patients to providers), it was not

10  implemented because ADCRR leadership "indicated that empanelment 'should be

11  NaphCare's responsibility,'" but took no steps "to discuss the need to empanel and assign

12  patients with NaphCare, to teach NaphCare how to run the empanelment program, or to

13  otherwise plan to execute this first step in implementing the staffing model statewide." *Id.*

14  at 12. All the while, Defendants continue to use NaphCare as an excuse for delay. *See, e.g.*,

15  Defendants' Response to Monitors' Interim Report, Doc. 4553 at 7 ("ADCRR has moved

16  as quickly as it could given the challenges associated with having to effect changes through

17  third-party vendors."). Such finger-pointing and blame-shifting are not new; Defendants

18  similarly blamed past failures on their for-profit vendors Wexford, Corizon, and Centurion.

19

20              5.    The Court need not find bad faith; regardless of Defendants'
                      motivations, conditions remain unconstitutional.

21      "The question of motive is complicated," and "the Court need not ascribe ill will to

22  defendants as a predicate to appointing a Receiver." *Plata v. Schwarzenegger*, 2005 WL

23  2932253, at *30. Here, "[w]hatever [Defendants'] motives, despite years of supervision and

24  support by the Monitor and [his] team, . . . conditions . . . fall below the constitutional

25

26      [10] What few sanctions Defendants have imposed have had no effect. In 2017,
    "Defendant Richard Pratt testified [the healthcare vendor] may well have decided to pay the
27  fine rather than fill staffing positions." Doc. 3921 at 6 (citing Doc. 2071 at 85); *see also*
    Doc. 2898 at 20. Seven years later, in May 2024, the new vendor testified that financial
28  sanctions issued against it "have not in any way incentivized or influenced NaphCare's
    performance or compliance." Doc. 4616-1 at 25 ¶ 10.

-23-

1    minimum. This is the key factor." *See Hinds County*, 2023 WL 1186925, at *12.

2          We note, however, that the Court already has found that "the history of Defendants'

3    conduct establishes a lack of good faith and fair dealing." Doc. 3921 at 34; *see also id.* at

4    33. Even after the Court issued the Injunction, Defendants have taken a "preposterous"

5    position that this Court found "strongly suggests Defendants' agreement to the terms of the

6    Permanent Injunction were in bad faith." Doc. 4637 at 5, 6; *see also id.* at 8 ("At this point,

7    . . . it is difficult to view [Defendants'] behavior as anything other than attempts to delay

8    issuance of a statewide staffing plan.").

9                    6.     Resources are being wasted.

10         Defendants "have engaged in a huge waste of the taxpayer's resources." *Plata v.*

11   *Schwarzenegger*, 2005 WL 2932253, at *31. The Court already has observed that "[t]he

12   amount of money that has been used or paid for in this litigation is astronomical." Doc.

13   4581 at 80; *see also* Doc. 3921 at 33 ("Defendants' failures regarding health care

14   performance measures have resulted in millions of dollars in fines and attorneys' fees.").

15   The costs of litigation can only be expected to continue if a receiver is not appointed.

16         With a receiver, resources will be properly invested into making the "substantial"

17   changes to systems needed to finally improve healthcare in the state prison system and,

18   ultimately, end this case. *See* Doc. 4410 at 4; *Plata v. Schwarzenegger*, 2005 WL 2932253,

19   at *33 ("It bears emphasizing that establishment of the Receivership, while absolutely

20   necessary, is intended as a temporary, not permanent, measure."); *Gordon v. Washington*,

21   295 U.S. 30, 37 (1935) ("A receivership is only a means to reach some legitimate end sought

22   through the exercise of the power of a court of equity. It is not an end in itself.").

23                  7.     A receiver is likely to provide a relatively quick and efficient remedy.

24         Finally, "the speed of reform must be judged relative to the scale of the project,"

25   which in this case is substantial. *Plata v. Schwarzenegger*, 2005 WL 2932253, at *31. As

26   in *Plata*, "steady progress here under the direction of a Receiver is possible, . . . gains in

27   patient care will be made along the way, and . . . this is far preferable to the current state of

28   paralysis." *Id.* Indeed, the Undersecretary of Health Care Services for the California prison

1    system testified last year that the *Plata* receiver "created an entire infrastructure and medical

2    care delivery system from the ground up," "has developed solid relationships across and

3    within State agencies that have enabled him to build consensus and implement effective and

4    lasting reforms," and has proven "to be a thoughtful, collaborative, and effective leader who

5    is eager to identify and address any systemic shortcomings." Specter Decl., Ex. 2 ¶ 5.[11]

6            **B.    The Relief of Receivership Meets the Requirements of the PLRA.**

7            Under the Prison Litigation Reform Act (PLRA), any "prospective relief" relating to

8    prison conditions must be narrowly drawn, extend no further than necessary to correct the

9    constitutional violations, and be the least intrusive means to correct them. 18 U.S.C.

10   § 3626(a)(1)(A). These requirements do not apply here because appointment of a receiver

11   is a "means of facilitating relief" rather than "relief itself." *See Coleman v. Wilson*, 933 F.

12   Supp. 954, 956-57 (E.D. Cal. 1996) (discussing appointment of a special master).

13   Nonetheless, in an abundance of caution, the Court should make PLRA findings, which

14   closely track the receivership factors.

15           Based on the record in this case, "anything less than a receivership" would not

16   remedy "the undisputed constitutional deficiencies in prisoners' health care." *Plata v.*

17   *Schwarzenegger*, 603 F.3d at 1097. The Ninth Circuit's analysis in *Plata* is instructive. The

18   Court there noted that, as here, the State had stipulated to "orders intended to remedy the

19   deficiencies," "later confessed its inability to carry out those orders," and "never suggested

20   how it could, through its own machinery, comply with those orders or otherwise rectify the

21   constitutional deficiencies in its prison health care." *Id.* For that reason, the Ninth Circuit

22   upheld appointment of a receiver:

23           The court imposed the receivership not because it wanted to, but because it
             had to. After attempting less drastic remedies, and after long periods of
24           working closely with State authorities to try to bring them into compliance

25   _____

26   [11] At various times Defendants have claimed that a receivership would be too costly,
     pointing to California as the example. The *Plata* receiver is responsible for a system that is
     three times the size of ADCRR; he provides care to over 90,000 patients in 31 prisons.
27   Specter Decl. ¶ 3 n.1. He has been able to regularly obtain funding from the legislature
     without the need for the court to intervene, and "no party has ever suggested that [the
28   receiver's] budget is excessive or that the funds are not being spent wisely." *Id.* ¶ 8, 12.

1
2

with the orders to which they had stipulated, the district court justifiably concluded that the State's personnel simply could not or would not bring the State into constitutional compliance in the foreseeable future.

3   *Id.* The same reasoning applies here.

4
5

## II.    THIS COURT SHOULD SET FORTH CLEAR POWERS, DUTIES, AND RESPONSIBILITIES OF THE RECEIVER.

6       This Court should assign to the receiver all authority granted to the receiver in *Plata*,

7   given the success of the receiver in that case. *See Plata v. Schwarzenegger*, No. C01-1351

8   TEH, 2006 WL 8563430 (N.D. Cal. Feb. 14, 2006) (defining duties and powers of the

9   receiver). The parties in *Plata* recognized that the receiver created "a well-functioning

10  healthcare system and a path towards a durable remedy that will end that case." Specter

11  Decl., Ex. 1 at 2. In the State of California's request last year that the *Plata* receiver also be

12  appointed to oversee mental health care (in addition to medical care) in the state prisons,

13  the State noted that his "authority as receiver in [the mental health case] should mirror his

14  powers in *Plata* in order for him to be successful." *Id.* at 4. The State explained that "[t]his

15  means that he must 'have the duty to control, oversee, supervise, and direct all

16  administrative personnel, financial, accounting, contractual, legal, and other operational

17  functions of the [mental health] delivery component of the CDCR,'" and that his

18  appointment "not be limited to discrete issues or tasks." *Id.*

19      Of particular importance, the Court should provide that the receiver may request that

20  the Court waive a state law or contractual requirement that is preventing the receiver from

21  developing or implementing a constitutionally adequate healthcare system or otherwise

22  preventing the receiver from carrying out their duties. The authority to do so is clear. The

23  Court may modify or supersede state law that it concludes creates a significant barrier to

24  Defendants' compliance with the U.S. Constitution or remedies premised on violations of

25  federal law. 18 U.S.C. § 3626(a)(1)(B); *Hook v. Ariz. Dep't of Corrs.*, 107 F.3d 1397, 1402-

26  03 (9th Cir. 1997) (holding that an Arizona state law prohibiting the payment of a special

27  master appointed by this Court was preempted by the Supremacy Clause, where the special

28  master's appointment was necessary to vindicate prisoners' constitutional rights); *Stone v.*

1    *City & Cnty. of S.F.*, 968 F.2d 850, 862 (9th Cir. 1992) (holding that "state laws . . . cannot

2    stand in the way of a federal court's remedial scheme if the action is essential to enforce the

3    scheme"), *cert denied*, 506 U.S. 1081 (1993); Specter Decl. ¶ 8.

4        Dr. Stern has identified two state laws as barriers to compliance. First, he stated that

5    "it will be difficult, but more likely impossible, for ADCRR to emerge on the other side of

6    this Court's Injunction if it continues to outsource the provision of health care." Doc. 4755

7    at 26-27. He reached the same conclusion in 2019, explaining how privatization leads to

8    increased costs, lapses in care, lack of maneuverability, and recruitment challenges. Doc.

9    3379 at 104-08. As a result, the receiver may determine it is necessary to ask the Court to

10   waive state law requiring privatization of correctional health services. *See* H.B. 2010, 49th

11   Leg., 3d Spec. Sess. (Az. 2009); *see also* Doc. 2898 at 20 ("That goal of privatization cannot

12   be achieved at the expense of the health and safety of the sick and acutely ill inmates.").

13       Second, Dr. Stern found that "specialist compensation is an important factor in

14   ADCRR's failure to provide timely access to specialists" and that the state law "that

15   requires ADCRR to reimburse at a level that does not exceed the capped fee-for-service

16   schedule set by the Arizona Health Care Cost Containment System [AHCCCS], i.e., the

17   'Medicaid Rate,'" would be a barrier to compliance with the Injunction "[u]nder a non-

18   privatized model of health care." Doc. 4755 at 22 (citing Ariz. Rev. Stat. § 41-1608).[12] In

19   2019, Dr. Stern recommended that the state law be "rescinded or overridden," and that

20   ADCRR "should be allowed to pay community specialists at the rate necessary, based on

21   market forces, so that it can provide medically necessary care to its patients and provide

22   that care in a timely manner." Doc. 3379 at 102. At that time, Defendants took no position

23

24       [12] Dr. Stern in his most recent report documented Defendants' "extremely poor
     performance" in "complet[ing] off-site specialty referral within the timeframe ordered."
25   Doc. 4755 at 6. He emphasized that "[t]he serious impact on patient safety of delayed
     completion of specialty care referrals cannot be overstated" and "[t]he degree to which
     ADCRR is failing to comply with this requirement is hard to imagine." *Id.* This is not a new
26   issue. Delays in specialty care have been a problem identified since the beginning of this
     case. *See* Doc. 1 at 36-41 (Complaint); Doc. 1185-1 at 11 (Stipulation); Doc. 4410 at 29-31
27   (Injunction). Dr. Stern's recent findings were based on data for the month of September
     2024. Doc. 4755 at 6. The Court almost a year ago identified this as a problem based on
28   data from September 2023. Doc. 4570 at 2.

1   on the matter. *Id.* Over four years later, Defendants acknowledge state law is a barrier to

2   compliance but continue to sit on their heels and wait for someone else to act. Specter Decl.,

3   Ex. 3 at 1 (October 25, 2024 letter from Deputy Director of ADCRR to Plaintiffs' counsel

4   noting the "challenges associated with finding providers willing to accept the

5   reimbursement rates required by state law"); Attorney General's Brief, Doc. 4625 at 7 (May

6   15, 2024) (waiting for Plaintiffs to "tee up the issue" in a "formal way"). As a result, this

7   Court should order the receiver to evaluate whether a waiver of state law is necessary.

8                                  **CONCLUSION**

9        The Court should appoint a receiver to oversee healthcare in the Arizona state-run

10  prisons and assign to the receiver all authority granted to the receiver in *Plata*.

11

12  Dated:  February 11, 2025          By:  s/ Rita K. Lomio
                                       Donald Specter (Cal. 83925)*
13                                     Alison Hardy (Cal. 135966)*
                                       Rita K. Lomio (Cal. 254501)*
14                                     Sophie Hart (Cal. 321663)*
                                       **PRISON LAW OFFICE**
15                                     1917 Fifth St.
                                       Berkeley, CA 94710
16                                     Telephone: (510) 280-2621
                                       Email:    dspecter@prisonlaw.com
17                                               ahardy@prisonlaw.com
                                                 rlomio@prisonlaw.com
18                                               sophieh@prisonlaw.com

19                                     Corene T. Kendrick (Cal. 226642)*
                                       **ACLU NATIONAL PRISON**
20                                     **PROJECT**
                                       425 California St., Ste. 700
21                                     San Francisco, CA 94104
                                       Telephone: (202) 393-4930
22                                     Email:    ckendrick@aclu.org

23                                     David C. Fathi (Wash. 24893)**
                                       Maria V. Morris (D.C. 1697904)*
24                                     Eunice Hyunhye Cho (D.C. 1708073)*
                                       **ACLU NATIONAL PRISON**
25                                     **PROJECT**
                                       915 15th Street N.W., 7th Floor
26                                     Washington, DC 20005
                                       Telephone: (202) 393-4930
27                                     Email:    dfathi@aclu.org
                                                 mmorris@aclu.org
28                                               echo@aclu.org

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jared G. Keenan (Bar No. 027068)
Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th St.
Phoenix, AZ 85006
Telephone: (602) 650-1854
Email:    jkeenan@acluaz.org
              lbeall@aclu.org

*Admitted *pro hac vice*
**Admitted *pro hac vice*. Not admitted in
DC; practice limited to federal courts.

*Attorneys for Plaintiffs Shawn Jensen, Dustin
Brislan, Robert Gamez, Jonathan Gonzalez,
Jason Johnson, Kendall Johnson, Joshua
Polson, Laura Redmond, Sonia Rodriguez,
Ronald Slavin, Jeremy Smith, and Christina
Verduzco, on behalf of themselves and all
others similarly situated*

**DISABILITY RIGHTS ARIZONA**

By:   s/ Maya Abela
        Asim Dietrich (Bar No. 027927)
        5025 East Washington St., Ste. 202
        Phoenix, AZ 85034
        Telephone: (602) 274-6287
        Email:    adietrich@disabilityrightsaz.org

        Rose A. Daly-Rooney (Bar No. 015690)
        Maya Abela (Bar No. 027232)
        **DISABILITY RIGHTS ARIZONA**
        4539 E. Fort Lowell Rd.
        Tucson, AZ 85712
        Telephone:  (520) 327-9547
        Email:
            rdalyrooney@disabilityrightsaz.org
            mabela@disabilityrightsaz.org.org

*Attorneys for Disability Rights Arizona*

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on February 11, 2025, I electronically transmitted the above

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to the following CM/ECF registrants:

5

6

Gregory Honig
Joshua Bendor

7

Luci Davis
Lucy M. Rand

8

Assistant Arizona Attorneys General
Gregory.Honig@azag.gov

9

Joshua.Bendor@azag.gov
Luci.Davis@azag.gov

10

Lucy.Rand@azag.gov

11

Daniel P. Struck

12

Rachel Love
Timothy J. Bojanowski

13

Nicholas D. Acedo
Ashlee B. Hesman

14

Jacob B. Lee
STRUCK LOVE BOJANOWSKI & ACEDO, PLC

15

dstruck@strucklove.com
rlove@strucklove.com

16

tbojanowski@strucklove.com
nacedo@strucklove.com

17

ahesman@strucklove.com
jlee@strucklove.com

18

19

*Attorneys for Defendants*

20

s/ Rita Lomio

21

22

23

24

25

26

27

28