VANESSA HICKMAN[1]
ACTING ATTORNEY GENERAL
(Firm State Bar No. 14000)

Mary R. O'Grady, 011434
Andrew G. Pappas, 034432
John S. Bullock, 034950
Molly S. Walker, 038099
OSBORN MALEDON, P.A.
2929 North Central Avenue
Suite 2000
Phoenix, Arizona 85012-2793
(602) 640-9000
mogra024@omlaw.com
apappas@omlaw.com
jbullock@omlaw.com
mwalker@omlaw.com

Attorneys for Defendants

*Additional counsel listed on signature page*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| Shawn Jensen, et al., | No. CV 12-00601-PHX-ROS |
|---|---|
| Plaintiffs, | |
| vs. | **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR A RECEIVER** |
| Ryan Thornell, et al., | |
| Defendants. | |

**INTRODUCTION**

Plaintiffs' Motion for a Receiver (Doc. 4795) should be denied, because the extraordinary remedy Plaintiffs request is premature and otherwise unwarranted. It has been less than two years since the Court issued its injunction requiring the Arizona Department of Corrections, Rehabilitation and Reentry (the "Department") to overhaul the healthcare and custody services that it provides to the inmates in its care. (Doc. 4410) (the "Injunction"). The Department's current Director and healthcare provider have been

---

[1] Pursuant to a screen and with client consent, Division Chief Counsel Vanessa Hickman is presently designated as the Acting Attorney General for purposes of this matter and certain other matters.

on the job just over two years. And a finalized staffing plan for the roll-out of a critical component of the Injunction—the patient centered care model ("PCCM")—has not yet been issued. Appointing a receiver because the Department has not fully implemented the PCCM would be inappropriate, not least because a staffing and facilities plan to support the PCCM has not been finalized. The Department continues to make progress across all aspects of the Injunction, and the Department's work should be permitted to continue.

The Department's progress so far has been substantial. As detailed below, in the past two and a half years, the Department has increased staffing resources dramatically, including a 61% increase in healthcare Full Time Equivalent employees ("FTEs"). Further, targeted healthcare programs have already improved the conditions for inmates. The Department has also requested, and the Legislature and Governor have supplied, significant additional resources to fund these improvements.

At the same time, the Department acknowledges that there is more work to do and recognizes the Court's frustration that progress has not been faster. But Plaintiffs' assertion (at 28)[2] that the appointment of a receiver would result in "a relatively quick and efficient" remedy simply is not credible. Plaintiffs rely heavily on California's experience, arising out of *Plata v. Schwarzenegger*, 2005 WL 2932253 (C.D. Cal. Oct. 3, 2005). Yet the receiver was appointed there in 2006, and more than 19 years and several billion dollars later, the California Department of Corrections and Rehabilitation ("CDCR") still is under receivership and still is not in compliance with the injunction.[3]

Here, stripping the Department of its authority would be a step backwards for compliance. A receiver would dramatically increase the cost of compliance and cause further delay. The Department therefore asks for an opportunity to overcome existing barriers, implement the PCCM more broadly, and continue to improve the care provided to the prison population. The Court should deny the motion.

---

[2] Citations of Plaintiffs' Motion refer to the ECF pagination at the top of the document.
[3] *See* California Legislature Analyst's Office, Overview and Update on the Prison Receivership, Nov. 8, 2023, *available at* https://lao.ca.gov/Publications/Report/4813.

10694779

**BACKGROUND**

**I.    Factual and procedural background**

In April 2023, the Court issued the Injunction requiring the Department to transform the healthcare it provides to inmates, as well as make significant changes to custody requirements. (Doc. 4410.) The Injunction followed a decade of litigation and a stipulated injunction (the "Stipulation") (Doc. 1185). Since then, the Department has had significant leadership changes, including a new Director who took office in 2023 and is steadfastly committed to complying with the Injunction. (Ex. 1, Thornell Decl. ¶ 2, 7.) The Department's progress, which is substantial but incomplete, is summarized below.

**II.    The Department has made significant progress towards compliance.**

The Department begins with the progress that it has made in the provision of healthcare services and then addresses the challenges in the PCCM pilot program.

**a.  The Department has substantially increased overall healthcare spending and staffing levels.**

The Department's healthcare expenditures have grown substantially over the last several years as a result of its efforts to comply with the Injunction. In FY2022, the Department spent $220.40 million on inmate healthcare; in FY2023 (the year the Injunction was entered) the Department spent $278.7 million on inmate healthcare; in FY2024 the Department spent $382.06 million on inmate healthcare; and in the first seven months of FY2025, the Department already has spent $255.45 million. (*See* Ex. 4, Evitch Decl., Attachment A.) That is, through seven months in the current fiscal year, the Department has already spent more than it did in the *entire year* before the Injunction was entered. (*See id*.)

As a result, the Department has been able to increase overall staffing levels substantially. The Department has increased its overall healthcare FTEs by 61.5%, from 850.65 FTEs before NaphCare—the Department's current inmate healthcare provider— took over the contract, to 1382.6 FTEs today. (Ex. 2, Oddo Decl. ¶ 9.a–b.) For mental health staff, filled FTEs increased by 53%, from 147 in January 2023 to 253.1 today. (Ex.

3, Matheka Decl. ¶ 47.) The number of physicians increased by 46%, from 15.5 physicians (staff physicians plus medical directors) for the entire prison population (Doc. 4335 at 23:27-28), to 23.95 today (with a goal of 29.5). (Ex. 2, Oddo Decl. ¶ 9.b.) NaphCare continues to make substantial progress, and recently hired two additional physicians that have not started yet. (Ex. 5, Moore Decl. ¶ 15.)

NaphCare has provided competitive salaries for all these positions when compared with average market rates. (*Id.* ¶¶ 14–15.)

### b. The Department has made significant improvements to mental health care since the Injunction.

To support improved mental health care, the Department has undertaken a series of important reforms since the Injunction was entered, including the construction of new beds at many complexes across the State.

***Mental Health Residential Treatment Programs:*** The Department has increased its mental health residential treatment units' capacity from 656 to 862 beds, a 31% increase since May 2023. (Ex. 2, Oddo Decl., Attachment A ("January Monthly Progress Report") at 14.) The Department recently opened a newly renovated inpatient mental health facility for male inmates at ASPC-Lewis, Eagle Point. (Ex. 2, Oddo Decl. ¶ 10.a.) With that opening, the Department now has capacity for 172 inpatient mental health beds, a 22% increase at that facility. (*Id.*, Attachment A at 14.)

***Art of Our Soul:*** The ASPC-Lewis Eagle Point and ASPC-Perryville facilities have partnered with the Art of Our Soul program to offer patients an art and music therapy program. (Ex. 1, Thornell Decl. ¶ 5.d.)

***Crisis Intervention Team Training for Correctional Officers:*** The Department's Healthcare Services Division ("HSD") has partnered with the Department's Training and Custody Staff to provide Crisis Intervention Team ("CIT") training developed by the National Institute of Corrections to the correctional officers at Eagle Point Unit. (Ex. 1, Thornell Decl. ¶ 5.e.) CIT training teaches officers how to identify signs of mental distress, work effectively with individuals with mental illness, de-escalate situations non-

4

violently, and appropriately connect inmates with their mental health counterparts and other supports. (*Id.*) CIT training began in March 2024, and 95 staff members have completed the training. (*Id.*)

**Peer Comfort Program:** In mid-December 2024, the Department launched the Peer Comfort Program, which consists of an eight-patient bay with six Peer Comfort Aides. (Ex. 2, Oddo Decl. ¶ 10.c.) The program provides assistance and companionship, and improves the quality of life for patients with dementia and other applicable mental health diseases. (*Id.*) Since its launch, dramatic improvements have been seen in the patients housed in the program. Patients who had not been feeding themselves, talking, or recreating are now doing so. (*Id.*).

**Licensure for Mental Health Practitioners:** All psychiatrists treating ADCRR patients are now board certified in compliance with Section 14.1 of the Injunction, with the exception of one board eligible registry Psychiatrist who is being replaced at the end of next month.  All psych associates who have been working at ADCRR for at least one year are licensed in compliance with Section 14.2. (Ex. 5 Moore Declaration ¶ 16)

**Suicide Prevention Task Force:** The Department and NaphCare have jointly established a Suicide Prevention Taskforce to develop and track the progress of suicide prevention initiatives, as more fully detailed in the response to the Monitors' Second Interim Report. (Ex. 2 Oddo Decl., Attachment A at 15; Doc. 4815 at 12.)

The Department also recently hired a new mental health director, who has substantial experience including in corrections. (Ex. 3, Matheka Decl. ¶¶ 1–3.)

### c.  The Department has made significant targeted improvements to health care, including in substance abuse treatment and Hepatitis-C treatment.

**SNU/IPC Beds and Other Medical Space Initiatives:** The Department continues to increase the number of special needs unit ("SNU") and inpatient care unit ("IPC") beds available for the inmate population. (Ex. 2, Oddo Decl. ¶ 11.a.) As of January 2025, there were 445 SNU and IPC beds statewide, reflecting a 66% increase in capacity since October 2023. (Ex. 2, Oddo Decl., Attachment A at 11.) Other space-related projects

10694779

include a remodel of the ASPC-Tucson, Rincon Unit West Medical (completed in February 2024); a remodel of the ASPC-Tucson, Central Unit Intake Processing ("CIP") for a medical room addition (completed in April 2024); and the purchase and installation of 250 hospital beds for ASPC-Tucson, Catalina Unit IPC/SNU (completed in May 2024). (Ex. 2, Oddo Decl. ¶ 11.a.) At ASPC-Yuma, Dakota Unit, one exam room and five offices were completed in December 2024 to accommodate the PCCM. (*Id.*) Additionally, ASPC-Safford, Graham Unit is undergoing a remodel of the medical and dental area; a remodel and addition of clinical and administrative space is currently underway at the ASPC-Perryville, San Pedro Unit; and a new SNU consisting of 68 beds is under construction at ASPC-Eyman, Cook Unit, with an anticipated completion date in March 2025. (*Id.*) An additional 136 SNU beds at ASPC-Eyman, Cook Unit are slated for completion in spring 2025. (*Id.*)

*Substance abuse: Medication Assisted Treatment ("MAT") Program:* The Department implemented the MAT program, which satisfies the Injunction's requirement that the Department offer Medication for Opioid Use Disorder ("MOUD") at all complexes statewide. (Ex. 1, Thornell Decl. ¶ 5.a.) NaphCare is now providing care for about 7,000 patients with opioid use disorder in the MAT program.[4] The Department currently has five prison complexes with Opioid Treatment Program certificates ("OTPs") issued by the Substance Abuse and Mental Health Services Administration—ASPC-Perryville, ASPC-Tucson, ASPC-Phoenix, ASPC-Eyman, and ASPC-Lewis. (*Id.*)

*Hepatitis-C Program:* The Department also has come into compliance with the Hepatitis-C requirements of the Injunction, and has spent more than $60 million doing so over the last two fiscal years. (Ex. 4, Evitch Decl., Attachment A.) Since October 1, 2023, more than 4,500 patients have been treated for Hepatitis C, with an average of 300 new starts per month and approximately 800 patients actively receiving treatment in any given month. (Ex. 1 Thornell Decl. ¶ 5.b) As of January 3, 2025, 648 inmates were receiving

---

[4] *See* Ex. 8, NaphCare Annual Report at 8.

treatment for Hepatitis C, and another 40 inmates had future orders to begin treatment. (Ex. 2, Oddo Decl., Attachment A at 11.) To accomplish this massive increase in screening and the provision of treatment, the Department and NaphCare signed Contract Amendment 9, which added 77 additional NaphCare positions and five additional department positions to oversee patient evaluations, diagnostic testing, prioritization of patients, and ordering of treatment for Hepatitis C. (Ex. 1 Thornell Decl. ¶ 5.b)

*Offsite Specialty Appointments Completed:* The Department and NaphCare continue to work together to increase the number of offsite specialty care appointments completed, as reflected in the following chart, which shows the number of offsite specialty appointments completed per fiscal year, often doubling each month year over year. (Ex. 2, Oddo Decl. 11.b.)



Note:  Fiscal Year begins July 1st of each year and ends June 30th of the following year.  FY 25 began on July 1, 2024. FY 24 is July 1, 2023 to June 30, 2024.
FY23 data is provided from October 2022 when NaphCare, the current CHP, began providing healthcare services with ADCRR.

### d. The Department's progress on custody issues demonstrates that it has strong, capable leadership.

Plaintiffs do not ask the Court to appoint a receiver to oversee the housing units encompassed by the isolation subclass (Doc. 4795 at 2 n.1), and for good reason. The Department has successfully integrated more than 1,000 inmates into the general population from maximum custody, including all SMI inmates and juveniles. (Ex. 1, Thornell Decl. ¶ 5.c) In January 2023, the maximum custody population was 1,356 inmates, and at the end of last year, there were 295, reflecting a 78% decrease in the

7

1    maximum-custody population. (*Id*.) As a result, the Department has been able to

2    consolidate and close entire housing units, including ASPC-Eyman, SMU-I Unit. (*Id*.)

3    This progress, again, further demonstrates the Department's commitment to reform and

4    tangible actions to fulfill the Injunction's requirements.

5          **e.  The Department has and will continue to make progress on the PCCM
      following staffing plan adoption.**

6

7          The Department's progress on the PCCM has been more measured. The Final Pilot

8    Report correctly observes that "[t]he scale of statewide implementation" for the PCCM

9    "is massive" and "[i]t is difficult to overstate the complexity of this roll-out and the

10   resources that will be required to plan and execute it." (Doc. 4761 at 11.) This systemwide

11   change in the delivery of health care is one of the Injunction's most challenging aspects.

12         The Monitor's final report from the Pilot identified significant challenges ahead in

13   rolling out the PCCM statewide. (Doc. 4755.) The Department's leadership remains

14   committed to implementing the program, but acknowledges the challenges involved,

15   which include staffing levels, space needs, patient scheduling, and other aspects of

16   tending to patient healthcare needs. (Ex. 2, Oddo Decl. ¶ 13.) The Department is working

17   with NaphCare on strategies for rolling out the PCCM, subject to the development and

18   approval of a final staffing plan. (*Id.*) But even before the plan is adopted, the Department

19   has begun identifying the next housing unit to implement the PCCM within each prison

20   complex, keeping in mind patient needs, space considerations, and staffing.  (*Id.*) The

21   completion of the PCCM implementation is likely the most significant hurdle in

22   compliance with the Injunction.

23                             **ARGUMENT**

24   **I.    Legal standards.**

25         Plaintiffs seek an extraordinary remedy: the appointment of a receiver to take over

26   the role and authority of state officials. But any remedy in this case must satisfy the

27   PLRA's "needs-narrowness-intrusiveness standard," so that it extends "no further than

28   necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs"

and is "the least intrusive means necessary to correct the violation of the Federal right." *Balla v. Idaho*, 29 F.4th 1019, 1024 (9th Cir. 2022) (citations omitted); *see also United States v. Hinds Cnty. Bd. of Supervisors*, --- F.4th ---, 2025 WL 470194, at *13 (5th Cir. Feb. 12, 2025) ("The PLRA's requirement of need-narrowness-intrusiveness findings applies to any prospective relief, which would include a receivership appointment."); 18 U.S.C. § 3626(a)(1)(A).

The appointment of a receiver is justified only where "anything less than a receivership" would not remedy the underlying constitutional violation. *Plata v. Schwarzenegger*, 603 F.3d 1088, 1097 (9th Cir. 2010); *Dist. of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. App. 1999) ("[Receivership] is the remedy of last resort, and therefore, should be undertaken only when absolutely necessary.").

Whether a receiver is justified turns on the analysis of seven factors:

(1) Whether there is a grave and immediate threat or actuality of harm to plaintiffs;

(2) Whether the use of less extreme measures of remediation have been exhausted or prove futile;

(3) Whether continued insistence for compliance with the Court's orders would lead only to confrontation and delay;

(4) Whether there is a lack of leadership to turn the tide within a reasonable period of time;

(5) Whether there is bad faith;

(6) Whether resources are being wasted; and

(7) Whether a receiver is likely to provide a relatively quick and efficient remedy.

*Plata v. Schwarzenegger*, 2005 WL 2932253, at *23 (N.D. Cal. 2005). Each factor is important—reliance on one is not enough. *Jerry M.*, 738 A.2d at 1214 ("We conclude that the trial court abused its discretion in appointing a receiver because several important criteria were omitted from the trial court's consideration in this case.").

Plaintiffs' Motion fails to make that showing, and the appointment of a receiver is unwarranted and premature.

10694779

1    **II.    None of the factors weighs in favor of appointing a receiver.**

2        None of the seven factors favors the appointment of a receiver in this case.

3        **a.  There is no grave or immediate threat or actuality of harm that justifies**

4            **the appointment of a receiver.**

5        The first factor is whether there is a "grave and immediate threat of actuality of

6 harm to plaintiffs" if drastic steps, like the appointment of a receiver, are not taken. *Plata*,

7 2005 WL 2932253, at *24. In the context of inmate medical care, this requires a "gross

8 and extreme departure from the standard of care," *id.*—that is, "the deprivation [of

9 medical care] was serious enough to constitute cruel and unusual punishment" resulting

10 from "deliberate indifference," *Balla*, 29 F.4th at 1025–26 (citation omitted). Deliberate

11 indifference turns on both "the seriousness of the prisoner's medical need and the nature

12 of the defendant's response to that need." *Id.* (citation omitted); *see also Simmons v. G.*

13 *Arnett*, 47 F.4th 927, 933–34 (9th Cir. 2022) ("To sustain his inadequate medical

14 care/deliberate indifference claim . . . [plaintiff] must show among other things, that

15 [defendant] purposefully ignored or failed to respond to [plaintiff's] pain or possible

16 medical need. Under this standard, an inadvertent failure to provide adequate medical

17 care, differences of opinion in medical treatment, and harmless delays in treatment are

18 not enough to sustain an Eighth Amendment claim." (citation, emphasis, and alterations

19 omitted)).

20        Here, this factor weighs against appointment of a receiver for at least two reasons:

21 (1) Plaintiffs have not demonstrated a grave and immediate threat of actuality of harm,

22 and (2) the Department continues to respond proactively to ongoing challenges.

23        ***Lack of grave and immediate threat of actual harm.*** Plaintiffs rely heavily on the

24 Monitors' Second Interim Report (Doc. 4755), which—like the Monitors' Interim Report

25 (Doc. 4539) and Monitors' ad hoc Report on Five Suicides, 2024 (Doc. 4691)—largely

26 ignores the efforts the Department and NaphCare continue to make to improve the

27 delivery of medical and mental health care, and instead focuses on anecdotal examples of

28

1  alleged non-compliance that, according to the Monitors, show the entire system is

2  "broken." (Ex. 3, Matheka Decl. ¶¶ 8, 31–44, 54–56, 74–77; Doc. 4553; Doc. 4815.)

3         For example, the Monitors observe that while 97% of new arrivals in September

4  2024 received an initial mental health assessment within one business day (as required by

5  Section 16.1 of the Injunction), 3% did not. (Doc. 4755 at 4.) The Monitors contend this

6  is "dangerous." (*Id.*) To be sure, all new arrivals ideally would be assessed within one

7  business day. (Ex. 3, Matheka Decl. ¶ 11.) But as the Monitors themselves concede, "no

8  non-heavenly system ever performs perfectly all the time." (Doc. 4755 at 3.) Even so, the

9  Monitors continue to insist on measuring compliance with the Injunction using a binary

10  "compliant" vs. "not compliant" test, in which anything less than 100% on a particular

11  Quality Indicator ("QI") is considered "not compliant." (*Id.*)[5] Under that rubric, the

12  Monitors still consider the Department to be non-compliant. (Doc. 4815-01 at 8.) That is

13  so despite the Department's efforts to improve the timeliness of initial mental health

14  assessments, which resulted in a 99% finding for QI 16.1a in December 2024. (*Id.*)

15  Moreover, although the Monitors claim that anything less than 100% compliance is

16  "dangerous," they have not identified instances in which any of the 3% of inmates who

17  did not receive a timely assessment had a bad outcome as a result. (Doc. 4755 at 4; Ex. 3,

18  Matheka Decl. ¶ 13.)

19         In addition, the Monitors' analysis does not adequately account for the inevitable

20  challenges in operationalizing and delivering mental health care in a correctional setting,

21  as their commentary regarding suicide reflects. (Ex. 3, Matheka Decl. ¶ 14.) Suicidality

22  is a complex psychological state that does not always come with obvious warning signs,

23  and research and clinical experience show that some of the highest-risk individuals

24  intentionally conceal their intent, making detection and prevention particularly

25  challenging. (*Id.* ¶¶ 16–17.) Unfortunately, the Monitors' suicide reviews do not tell the

26

27

28  [5] The Monitors make exceptions for a few QIs for which the Monitors refer to ADCRR's self-reported compliance percentages. (*See e.g.*, Doc. 4755 at 3–4, 18.)

11

full story or include all information relevant to assessing the extent to which the patients' deaths were foreseeable and thus potentially preventable. (*Id.* ¶ 58.)

For example, Patient 1 was seen numerous times in January and February 2024, exceeding the requirements in the Injunction for residential treatment; Patient 2 was noted to be future-oriented in her sessions; Patient 3 had discontinued his medications by his own choice, and his progress notes indicate that he was future oriented, with hopes of "changing his life around"; and Patient 4 was noted to be functioning at baseline immediately prior to her death. (*Id.* ¶¶ 59–62.) Further, contrary to the Monitors' claim that NaphCare failed to perform an adequate initial assessment with Patient 3, the clinician reported spending 65 minutes with the patient and provided a detailed narrative of the session. (*Id.* ¶ 68.)

The Monitors' non-suicide death reviews suffer from similar flaws. For example, of the five patient summaries starting on page 31 of the Second Interim Report, all are missing information necessary to understand the care provided. (Ex. 6, Pacheco Decl. ¶ 13.) With respect to Patient 1, there is no mention of his documented refusals of follow-up care, including at least three refusals to attend offsite specialty consults, such as cardiology, and failure to come to multiple onsite chronic care visits. (*Id.* ¶ 13.a.) There is no indication that he was not given appropriate education from providers and/or nursing on the importance of follow-up care, and the patient's non-compliance certainly contributed to his complete health picture. (*Id.*)

As to Patient 2, the Monitors suggest that the providers and staff in the IPC, where the patient was admitted after discharge from the hospital, were unable to provide appropriate follow-up care or education. (*Id.* ¶ 13.b.) To the contrary, the providers and staff are familiar with handling nephrostomy tubes and life vests, and this patient was provided primary education on post-surgical care by the hospital before discharge. (*Id.*) While the Monitors claim that a nurse improperly wrote admission orders outside her scope, the subject orders in the patient's chart are from a nurse practitioner. (*Id.*) Finally, the Report does not tell the full story—that the patient was given access to all the

specialists, medications, and treatments needed; however, the severity of his health complications and age were a factor in the overall outcome. (*Id.*)

Patient 3 denied and/or refused multiple exams and laboratory testing orders, which are not referenced in the Second Interim Report. (*Id.* ¶ 13.c.) Additionally, the Report acknowledges the patient's condition, and that the patient was assessed and treated at the hospital, but does not recognize that the patient was *discharged* by the hospital, and the local jail, prior to transfer to a Department facility. (*Id.*)

Patient 4's documented refusal of follow-up bloodwork for an acute hepatitis panel, after initial work-up labs that were completed, caused the process for identification and treatment to be slower than it would have been if the patient had not refused. (*Id.* ¶ 13.d.) A patient's documented and numerous refusals can adversely affect overall outcomes, particularly for patients who have a chronic condition before being admitted to a Department facility. (*Id.*) Additionally, the Second Interim Report asserts that the radiologist read the CT imaging to be "suggestive of cancer," and therefore required more than a "routine" order for additional MRI imaging. (*Id.*) However, the Monitors cite no radiologist who found the CT imaging to be "suggestive of cancer," and this phrase is not in the board-certified radiologist's report that was in the patient's chart and reviewed to place the MRI order. (*Id.*)

Regarding Patient 5, the Second Interim Report does not discuss opioid withdrawal precipitating an acute worsening of mood and anxiety. (*Id.* ¶ 13.e.) Additionally, the Second Interim Report does not properly characterize the patient's own non-adherence with treatment to manage his opioid withdrawal symptoms, as well as his non-adherence with his venlafaxine, which may have contributed to his suicide attempt. (*Id.*)

Plaintiffs also quote snippets from the Second Interim Report that they contend are evidence of a broken system. (Doc. 4795 at 14.) They are not. Several quotations reflect a difference of opinion between the Monitors, the Department, and NaphCare over what is clinically appropriate. For example, the Monitors assert that the use of telehealth is inappropriate on grounds that the Department's telehealth units must have digital

equipment to allow the remote provider to conduct an examination remotely, or the Department must have "special[ly] train[ed]" nurses or technicians to "function as the 'hands' of the practitioner." (Doc. 4755 at 16.) However, the Monitors have not explained what special training is necessary to take vital signs or perform basic examinations beyond what is already taught in nursing programs.

To support their claim that the Department fails "to reliably administer medications," the Monitors cite only a single example of an inmate who did not receive his HIV medications for five days. (Doc. 4755 at 10.) On four of these days, there is a documented refusal of the medication. (*Id*.) Moreover, the Monitors' report does not address the full medication administration record on file for this patient, and does not note his status—which is stable with a consistently undetectable viral load as supported by complete laboratory testing. (Ex. 6, Pacheco Decl. ¶ 7.)

Other quotations from the Second Interim Report appear to reflect the Monitors' difficulty navigating the electronic health record (called TechCare) that NaphCare uses. For example, the Monitors say (at 14) that NaphCare does not provide treatment for latent tuberculosis ("latent TB"). In fact, 18 patients are currently receiving treatment for latent TB, 140 were treated for latent TB in the past year, NaphCare's formulary includes the most common treatment options (Rifampin and Isoniazid) for latent TB, and all patients with latent TB are tracked with a flag for monitoring. (Ex. 6, Pacheco Decl. ¶ 9.) The Monitors also claim that treatment plans are difficult to locate within TechCare, yet there is an easy-to-use filter tool that can be used to identify treatment plans. (Doc. 4815 at 21.) This in no way rises to the level of a systemic failure or deliberate indifference. NaphCare remains willing to assist the monitors with training on the TechCare platform and will pull any documentation they may need. (Ex. 7, Quince Decl. ¶ 12.)

Additionally, the Monitors claim (at 10) that Defendants fail to screen for substance use disorder upon intake, which they contend leaves the patient at risk for overdose, but the Mental Health Assessment form used during intake specifically inquires about a history of overdose. (Ex. 6, Pacheco Decl. ¶ 10.) Regardless of a history of

14

overdose, all patients with a history of opioid substance abuse disorder are offered initiation of MAT/MOUD, and intake providers have been trained to start buprenorphine and refer to the MAT team for follow-up. (*Id.*)

Plaintiffs also cite the Monitors' criticism that the Department has not filled all healthcare staff positions and their contention that "it is simply impossible to provide safe health care with insufficient staff." (Doc. 4755 at 21.) In fact, NaphCare has steadily increased staffing throughout its tenure. As of the latest monthly report, NaphCare was 88% staffed—its highest fill rate since the start of the Injunction. (Doc. 4815 at 14.)

Additionally, Plaintiffs (at 19) cite the Monitors' Second Interim Report to argue that the Department self-reported non-compliance with 153 of 178 healthcare QIs measured. Not so. The Department self-reports percentages for each QI. For the latest month of data available, 27 (or 15%) of the healthcare QIs were 100% compliant; 25 (or 14%) scored between 90 and 99%; and 25 (or 14%) scored between 80 and 89%. (Doc. 4815-02 at 1.) Thus, 77 (or 43%) of the healthcare QIs were at or above 80%. The Monitors are critical that four QIs cannot be measured "because ADCRR or NaphCare is simply still unable to capture the relevant data." (Doc. 4755 at 25.) But a review of those QIs reveals that they are not readily susceptible of automated reporting (QIs 15.9a, 2.1.2, 2.4.11), are impracticable (QI 2.1.2), or are highly subjective (QI 2.4.11). (Ex. 7, Quince Decl. ¶ 9.)

In sum, Plaintiffs have failed to show that the Department's inmate population faces a grave and immediate threat of actuality of harm.

***The Department's responses to ongoing challenges.*** Actions taken by the Department's new leadership likewise show that this factor strongly points against the appointment of a receiver. To reiterate, in the past two years, the Department has obtained more than $90 million in annual additional healthcare funding, has increased the number of physicians on staff by more than 45%, and has increased the number of FTEs working in health care by more than 61%. (*See supra* § II.a.) The Department has rolled out the more targeted programs mandated by the Injunction. And the Department remains fully

15

1   committed to rolling out the PCCM where and when it can, as detailed in the declaration

2   of Deputy Director Oddo. (Ex. 2, Oddo Declaration ¶¶ 13a.–f.)

3          Taken together, these actions demonstrate an absence of deliberate indifference.

4   Deliberate indifference requires showing that an official "chose [a] course in conscious

5   disregard of an excessive risk to plaintiff's health." *Edmo v. Corizon, Inc.*, 935 F.3d 757,

6   786 (9th Cir. 2019) (citation omitted). The opposite is true here, where the Department is

7   taking steps to reform and improve the medical care it provides. Even if instances of

8   "inadvertent or negligent failure[s] to provide adequate medical care" exist, *id.*, and even

9   they amounted to "malpractice or gross negligence," *Balla*, 29 F.4th at 1026, they do not

10  rise to the level of immediate threat justifying the appointment of a receiver. *See also*

11  *Rasho v. Jeffreys*, 22 F.4th 703, 711 (7th Cir. 2022) ("Evidence that the 'defendant

12  responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the

13  harm, negates an assertion of deliberate indifference.'" (citation omitted)).[6]

14         Far from being deliberately indifferent to inmates' healthcare needs, the

15  Department is striving to comply with the Court's Orders and improve medical care. It is

16  a top priority. Appointing a receiver, then, would do nothing to assist in avoiding a grave

17  or immediate threat of harm because the Department is already taking those actions. This

18  factor weighs against the appointment of a receiver.

19         **b.  The extreme remedy of a receiver is not necessary to ensure compliance.**

20         The next factor that guides whether a receiver is necessary is whether the use of

21  less intrusive means of enforcing compliance with court orders has failed or would be

22  futile. *Plata*, 2005 WL 2932253, at *23. This factor favors appointing a receiver only

23  where defendants are "unwilling or incapable" or "have refused or been unable to take

24  the steps necessary" to institute court-ordered reforms. *Id.* at *26. A receiver is warranted

25  _____

26  [6] The Ninth Circuit has observed that a "[l]ack of resources is not a defense to a claim for
    prospective relief because prison officials may be compelled to expand the pool of
    existing resources in order to remedy continuing Eighth Amendment violations." *Peralta*
27  *v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc). Here, the Department's
    procurement of substantial *additional* resources should support its showing that it is not
28  acting with deliberate indifference.

only if defendants show "not only shown no capacity to implement" reforms, and "are no longer willing or able to even" try. *Id.* at *27.

In *Plata*, for example, the defendants "recognized that they need an immediate infusion of clinical and administrative staff, yet" took "no measures to overcome the substantial barriers" to hiring that staff. *Id.* at *26. The defendants had "not only shown no capacity to implement corrective plans previously submitted, but also that they either [were] no longer willing or able to even devise remedial programs." *Id.* at *27. Even in the face of "specific achievable measures" and "innumerable informal suggestions," the defendants in that case did not so much as "submit a single proposed order" when requested by the court so that it could "empower them" to achieve compliance. *Id.* at *26.

The facts here are very different. The Department has been operating under the Injunction for less than two years, and a pilot program under the Injunction just concluded. (Doc. 4761.) Likewise, the Department's current leadership has been at the helm for only a couple years—Director Thornell was appointed in January 2023, and Deputy Director Ashley Oddo joined the Department in July 2023 as general counsel. (Ex. 1, Thornell Decl. ¶ 2; Ex. 2, Oddo Decl. ¶¶ 2–3.) Under their leadership, the Department has been working hard to comply with the Injunction and is making concrete progress toward implementing its requirements. This progress demonstrates that the Department is capable and willing to implement reforms. That the progress is incomplete does not change the analysis—even a "failure to comply fully with the court's requirements" does not warrant the extreme remedy of appointing a receiver. *See Jerry M.*, 738 A.2d at 1213 (recognizing that failure to fully comply not sufficient to justify receiver). The Department's new leadership must be given an opportunity to "turn the tide" before additional relief could be warranted. *Id.* at 1214. Focusing on what has occurred in the past is an "insufficient basis" to justify the "extraordinary" remedy of appointing a receiver. *Id.*

Plaintiffs (at 15–16) nonetheless attempt to rely on the Department's prior failure to comply with the Stipulation as evidence that "less extreme measures of remediation"

would be futile. They are wrong for several reasons. The April 2023 Injunction should be the starting point for the analysis here because it dramatically altered what the Department is required to do. And Plaintiffs do not identify any remedial measures that have been taken since the Injunction that would warrant a receivership now. Because Plaintiffs focus primarily on the challenges implementing the PCCM, the proper timeframe for the Court to consider is the 20 months since the Injunction was entered; the timing of the pilot program and related staffing plans must be considered, as well as the overall work that the Department has undertaken to comply with the Injunction.

Plaintiffs also argue (at 21–22) that a receiver is needed because the Department has not achieved full compliance with the Injunction despite assistance from the Monitors. They are incorrect. The Department takes the Monitors' input seriously and will continue to do so, but even the Monitors recognize that "no non-heavenly system ever performs perfectly all the time" (Doc. 4755 at 3), meaning that perfect compliance is impossible. This Court should not appoint a receiver based on an unachievable standard.

At bottom, the remedy Plaintiffs seek is both unnecessary and counterproductive. No further remedial measures are necessary, and even if they were, less intrusive means should be explored. This factor weighs against the appointment of a receiver.

### c.  Insistence on compliance with the Court's current Injunction will not lead only to confrontation or additional delay.

The next factor—whether continued insistence on compliance with the Court's Injunction will lead to confrontation or additional delay—also weighs against the appointment of a receiver. Because a receiver is a "remedy of last resort" that "should be undertaken only when absolutely necessary," *Jerry M.*, 738 A.2d at 1213, this factor supports the appointment of a receiver only when defendants have made it "resoundingly clear" that they will not attempt to comply with the court's orders, *Plata*, 2005 WL 2932253, at *29.

This is not the case here—far from it. As explained in the previous sections, the Department's leaders are committed to complying with the Injunction, they are making

progress toward that goal, and they will continue their efforts to come into full compliance. They should be allowed to continue these efforts. Appointing a receiver would risk greater delay.

Again, the Department already has come into compliance with important provisions from the Injunction, including provisions regarding Hepatitis-C and substance abuse, on which the Department has spent more than $70 million.

These efforts should leave no doubt that the Department is working toward compliance with the Injunction. Even in the "brief time that the new" leadership has "had to act," they have come into compliance with significant portions of the Court's Orders. *Jerry M.*, 738 A.2d at 1214. This demonstrates that a receivership is not "absolutely necessary," *id.* at 1213, and the Court should not conclude that "insistence on . . . compliance with the Court's orders would lead to nothing but further delay." *Plata*, 2005 WL 2932253, at *29.

Plaintiffs argue otherwise (at 23) based on litigation before the Injunction was entered and issues related to PCCM implementation. Pre-Injunction issues are irrelevant to whether a receiver is needed today. And struggles with the PCCM implementation—which the Monitors acknowledge is a challenging process—do not suggest that continued compliance efforts will lead only to further delay. By its nature, a pilot program is intended to identify challenges to full implementation. The pilot here ended only recently; the work toward compliance continues, and that work should proceed.

### d. There is no lack of leadership, and new leadership is bringing the department into compliance.

The next factor—whether there is a lack of leadership to bring the Department into compliance within a reasonable time—also cuts against the appointment of a receiver. "[T]he availability of new leadership" drives the analysis of this factor, and where, as here, new leadership is taking steps to come into compliance with the Court's Orders, a receiver is inappropriate. *Jerry M.*, 738 A.2d at 1214.

10694779

The Department's leadership remains committed to complying with the injunction, as demonstrated by their significant progress to date. (Ex. 1, Thornell Decl. ¶ 7; Ex. 2, Oddo Decl. ¶ 16.)

Plaintiffs' complaint (at 17) about the progress on implementing these measures omits critical context—namely that a pilot was required for the PCCM, which was only recently completed. The Monitor proposed the staffing plan for the pilot less than a year ago (in April 2024) (Doc. 4599), and it was approved by the Court nine months ago (in June 2024) (Doc. 4637). The pilot was only recently completed, and the final staffing plan based on the information learned in the pilot is not yet finalized. (Doc. 4761.) Again, a pilot program by its nature contemplates that a comprehensive rollout of the program that is the subject of the pilot (here, the PCCM) would occur after the pilot's completion. And pilot programs are designed to identify shortcomings and fashion workable solutions. A "reasonable period of time" has not passed that justifies usurping the Department leadership's authority and appointing a receiver. *Plata*, 2005 WL 2932253 at *23.

### e.  There is no bad faith; current leadership is acting in good faith.

The efforts of the Department's new leadership also demonstrate good-faith efforts in coming into compliance with the Court's Injunction. Although bad faith may favor the appointment of a receiver, *Plata*, 2005 WL 2932253, at *30, the Department's good faith efforts weigh against the appointment of a receiver, *Jerry M.*, 738 A.2d at 1214.

Again, Department leadership is committed to complying with the Injunction. (Ex. 1, Thornell Decl. ¶ 7; Ex. 2, Oddo Decl. ¶ 16.) Plaintiffs cite (at 28) the Court's 2021 finding that *prior* leadership had not acted in good faith. But that history says nothing about the Department's *current* leadership. Plaintiffs also cite (at 18) the Court's strong criticism of the Department's arguments against the proposed staffing plan for the pilot. The Department acknowledges that criticism—and has learned from it—but it is not a basis for a finding of bad faith in the overall context of the work that has been done since the Injunction was approved in 2023.

**f.  Resources would be wasted if a receiver is appointed.**

The next factor asks "[w]hether resources are being wasted." *Plata*, 2005 WL 2932253, at *23. They are not—as shown above, the Department is devoting substantial resources to complying with the Injunction and is achieving measurable success.

The appointment of a receiver will likely waste resources. Plaintiffs point to California's receivership as a success story. (Doc. 4793 at 2, ¶ 4.) But it is not, fiscally or otherwise. For example, the California legislature enacted legislation to significantly reduce that state's inmate population. *See* A.B. 109, 2011 Leg., Reg. Sess. (Cal. 2011) ("2011 Realignment Legislation addressing public safety"). And over the past decade, the inmate population there has declined by nearly one-half (from 162,400 to 90,866), and the parolee population has declined by nearly two-thirds (from 90,800 to 34,613).[7] Yet the CDCR's total spending has ***increased by over $3 billion*** (or more than one-third).[8]

Relatedly, the annual cost to incarcerate a single inmate California has increased by more than 90% in the past decade to $132,860.[9] Since the appointment of the receiver in 2006, California's annual inmate healthcare budget has skyrocketed from $882 million to $4 billion in 2024–25, a 353.5% increase.[10] The current California inmate healthcare

---

[7] *See* Gabriel Petek, *State Correctional Spending Increased Despite Significant Population Reductions*, Legislative Analyst's Office 1 (Feb. 2020), https://lao.ca.gov/reports/2020/4145/correctional-spending-020420.pdf; Cal. Dep't of Corr. & Rehab., Report #: SOMS-TPOP-1, *Weekly Report of Population As of Midnight February 26, 2025*, 1 (Feb. 26, 2025) https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2025/02/Tpop1d250226.pdf.

[8] *See* Patek, *supra* note 7.

[9] *See* Kristen Hwang and Nigel Duara, *As California closes prisons, the cost of locking someone up hits new record at $132,860*, CAL MATTERS (Jan. 23, 2024), https://calmatters.org/justice/2024/01/california-prison-cost-per-inmate/.

[10] *See* Mac Taylor, *The 2010-11 Budget: Prison Receivership Proposals Pose Significant Financial Risks*, Legislative Analyst 2 (Mar. 16, 2010), www.lao.ca.gov/analysis/2020/crim_justice/receiver/receiver_031610.pdf; California State Budget Enacted Budget Summary, 2024-25 - Criminal Justice and Judicial Branch, https://ebudget.ca.gov/2024-25/pdf/Enacted/BudgetSummary/CriminalJusticeandJudicialBranch.pdf.

21

budget alone is $41,314 per inmate annually.[11] To put that in context, the Department expended $378 million in the last full fiscal year. If Arizona were to match the per capita rate from California, the Department's healthcare budget would have to nearly triple to $1.06 billion per year.

The amounts paid to the *Plata* receiver and his team, counsel for the plaintiffs, and various appointed experts also have been astronomical. Since 2006, expenditures for the Office of the Receiver have totaled more than $222 million. (*See* Ex. 9, Table of *Plata* Receivership Expenditures.) For fiscal year 2022–23, the plaintiffs' counsel in *Plata* billed the State of California $1,077,328—despite the avowal of Plaintiffs' counsel here (Doc. 4793 at 4, ¶ 9) that there has been virtually no adversarial litigation there, and the last motion filed in the case was four years ago.[12]

Those numbers are staggering all by themselves. But they are even more startling when measured against the fact that, after nearly 20 years in receivership, California still has not come into compliance with the injunction there. For example, California's inmate death rates have increased by 163% since the appointment of the receiver in 2006, and are not significantly better than national average rates for state incarcerated populations, as shown in the following chart:[13]

---

[11] *See* Legislative Analyst's Office, *How much does it cost to incarcerate a person?*, https://www.lao.ca.gov/PolicyAreas/CJ/6_cj_inmatecost (last visited Mar. 3, 2025) (citing California's 2024–25 enacted budget).

[12] CDCR Office of Legal Affairs, *Class Action Capital Outlay Annual Legislative Report*, Fiscal year 22/23 at 5, https://www.cdcr.ca.gov/blog/class-action-capital-outlayannual-legislative-reportfiscal-year-22-23/.

[13] *See* Kent Imai, *Analysis of 2022 California Correctional Health Care Services Inmate Mortality Reviews,* at PDF p. 15 (Apr. 22, 2024), https://cchcs.ca.gov/wp-content/uploads/sites/60/CCHCS-2022-Mortality-Review-Analysis.pdf (hereinafter "CCHCS Mortality Reviews").

| YEAR | CCHCS Number of Deaths | CCHCS Number of Inmates | Death Rate per 100,000 Inmates | |
|---|---|---|---|---|
| | | | CCHCS | U.S. State Prisons* |
| 2006 | 424 | 171,310 | 248 | 249 |
| 2007 | 395 | 170,786 | 231 | 258 |
| 2008 | 369 | 170,022 | 217 | 261 |
| 2009 | 393 | 169,459 | 232 | 259 |
| 2010 | 415 | 166,700 | 249 | 246 |
| 2011 | 388 | 161,843 | 240 | 260 |
| 2012 | 362 | 134,929 | 268 | 266 |
| 2013 | 366 | 133,297 | 275 | 274 |
| 2014 | 319 | 135,225 | 236 | 276 |
| 2015 | 355 | 128,824 | 276 | 298 |
| 2016 | 334 | 128,705 | 260 | 304 |
| 2017 | 388 | 130,807 | 297 | 327 |
| 2018 | 452 | 128,875 | 351 | 347 |
| 2019 | 399 | 125,270 | 319 | 330 |
| 2020 | (all) 492 (COVID-19) 141 (non-COVID-19) 351 | 107,347 | 458 131 327 | 525 |
| 2021 | (all) 392 (COVID-19) 90 (non-COVID-19) 302 | 98,077 | 400 92 308 | 443 |
| 2022 | 389 (COVID-19) 13 (non-COVID-19) 376 | 96,341 | 404 13 390 | 422 |

For Fiscal Year 2023-2024, California's mortality rate was 393.3 deaths per 100,000 inmates,[14] significantly higher than Arizona's mortality rate of 310.2 deaths per 100,000 inmates.[15]

///

---

[14] *See* SB601 | Tableau Public.
[15] *Id.*

23

10694779

California's overdose rates have also increased substantially and compare unfavorably to national rates, as shown in the following chart:[16]

| Year | CCHCS Drug Overdoses | CCHCS Rate/100,000 | U.S. State Prison Rate/100,000 |
|------|---------------------|--------------------|--------------------------------|
| 2012 | 15 | 11 | 3 |
| 2013 | 24 | 18 | 4 |
| 2014 | 19 | 14 | 4 |
| 2015 | 19 | 15 | 7 |
| 2016 | 29 | 23 | 8 |
| 2017 | 40 | 31 | 17 |
| 2018 | 62 | 48 | 21 |
| 2019 | 64 | 51 | 22 |
| 2020 | 23 | 21 | NA |
| 2021 | 24 | 25 | NA |
| 2022 | 53 | 55 | NA |

Table 8. Numbers and Rates of Overdose Deaths, CCHCS 2012–2022, and U.S. State Prisons 2012–2019.

Additionally, significant healthcare staffing shortages persist in California. The vacancy rate for psychiatrists exceeds 50% at some prisons, and 20% of primary care physician positions are unfilled.[17] In short, despite the enormous outlay of resources over the course of the receivership, California inmates are not better off under a receiver.

Here, in contrast, the Department and its current leadership, with help from the Legislature and the Governor, have proactively increased its healthcare budget by 33% and healthcare staffing required under its healthcare vendor's contract by 49%. (Ex. 2, Oddo Decl. ¶ 9.a. (noting 1052.75 FTEs required under contract in 2022, now 1572.4 FTEs required).) This money has been spent judiciously to (1) implement new programs (e.g., Medication Assisted Treatment, Hepatitis-C) that represent a sea change in the provision of healthcare to Arizona inmates; (2) construct new IPC, SNU, and mental

---

[16] CCHCS Mortality Review at PDF p. 25.

[17] Kristen Hwang, *California's Prison Doctors Union Authorizes Strike Despite Six-Figure Salaries*, California Local, https://californialocal.com/localnews/statewide/ca/article/show/50439-some-of-californias-best-paid-public-employees-say-theyre-ready-to-strike-h/.

10694779

health residential treatment and inpatient units to house the Department's most vulnerable populations; (3) partner with community organizations to bring in innovative new programs and services; and (4) invest in developing and credentialing inmates to serve as supports to their peers (and simultaneously develop marketable skills they can employ upon release from custody). (Doc. 4815 at 5–13.) The Department remains committed to improving the delivery of healthcare to all of its inmates and using the funds entrusted to them to make the greatest possible impact. Following California's example and appointing a receiver would not ensure improved outcomes for Arizona's inmates or constitute an efficient use of public resources.

### g. A receiver would not be a quick or efficient remedy.

Because the appointment of a receiver is the "remedy of last resort," it turns on "the prospects for the receiver . . . providing a speedy remedy." *Jerry M.*, 738 A.2d at 1214. Nothing in this case suggests that a receiver will provide a speedy remedy. And on this point too, California offers a cautionary tale. There, the receiver has been in place for nearly two decades—with little to show for it, as detailed above.

Here, again, the Department's leadership is already working hard to comply with the Injunction and making measurable progress, including on substance abuse treatment, Hepatitis-C treatment, custody issues, and more, as described above.

Interrupting these efforts midstream by appointing a receiver, who would necessarily need substantial time to onboard, would slow, rather than accelerate, the progress that is being made. The appointment of a receiver would only serve to slow the implementation of these reforms.

### h. Plaintiffs' proposed powers for the receiver are excessive and unnecessary.

Although a receiver should not be appointed, the breadth of authority that Plaintiffs request for that receiver is also inappropriate. The remedy may be only "what is absolutely necessary," but Plaintiff's requested relief is expansive, particularly considering a lack of

10694779

1    history of the Department's current leadership being unwilling to institute change.

2    *LaShawn A. by Moore v. Barry*, 144 F.3d 847, 854 (D.C. Cir. 1998) (citation omitted).

3          For example, Plaintiffs' requested relief would specifically authorize the receiver

4    to ask the Court to "waive" state law. (Doc. 4795 at 30.) Plaintiffs focus on two specific

5    requirements: (1) the statute requiring privatization of health care at the prisons, which

6    Monitor Dr. Stern has consistently criticized; and (2) the reimbursement fee under the

7    Arizona Health Care Cost Containment System. (*Id.* at 31.) They ask the Court to order a

8    receiver to "evaluate whether a waiver of state law is necessary." (*Id.* at 32.) But

9    "[d]isregarding local law . . . is a grave step and should not be taken unless *absolutely*

10   necessary." *Barry*, 144 F.3d at 854 (emphasis added). For that to be the case, state law

11   would have to specifically preclude enforcement of the injunction. *Id.* In other words, it

12   is not enough that a conflict might arise; rather, overriding that conflict must be

13   "necessary to enforce the terms of the consent decree." *Id.* If a party believes that relief

14   from state law is necessary for compliance with the Injunction, that issue can be presented

15   to the Court for consideration. But it need not be part of an order appointing a receiver,

16   because Plaintiffs have not made the showing that state law precludes compliance with

17   the Injunction.

18         Likewise, Plaintiffs ask that a receiver be given authority to ask the Court to waive

19   contractual requirements that are preventing compliance with the Injunction. Again, if

20   this is an issue that requires the Court's attention, then any party may seek relief from the

21   Court now. It need not be part of an order appointing a receiver.

22         These requests have no place in a receivership order. If they are legitimate

23   concerns, they can be raised with the Court with an opportunity for full briefing and

24   inclusion of all necessary stakeholders.

25                                  **CONCLUSION**

26   The Court should deny Plaintiffs' motion for a receiver.

27

28

                                              26

1    Respectfully submitted this 4th day of March, 2025.

2                                        **OSBORN MALEDON, P.A.**

3
                                         By: s/ John S. Bullock
4                                             Mary R. O'Grady, 011434
                                              Andrew G. Pappas, 034432
5                                             John S. Bullock, 034950
                                              Molly S. Walker, 038099
6                                             2929 North Central Avenue, Suite 2000
                                              Phoenix, Arizona  85012-2793
7                                             (602) 640-9000
8                                             mogrady@omlaw.com
                                              apappas@omlaw.com
9                                             jbullock@omlaw.com
                                              mwalker@omlaw.com
10

11                                       **STRUCK LOVE BOJANOWSKI &**
                                         **ACEDO, PLC**
12                                            Daniel P. Struck (Bar No. 012377)
                                              Rachel Love (Bar No. 019881)
13                                            Timothy J. Bojanowski (Bar No.
                                              022126)
14                                            Nicholas D. Acedo (Bar No. 021644)
                                              3100 W. Ray Road, Suite 300
15                                            Chandler, Arizona 85226
                                              Telephone: (480) 420-1600
16                                            dstruck@strucklove.com
                                              rlove@strucklove.com
17                                            tbojanowski@strucklove.com
                                              nacedo@strucklove.com
18

19                                       **VANESSA HICKMAN**
                                         **ACTING ATTORNEY GENERAL**
20                                       **OFFICE OF THE ARIZONA**
                                         **ATTORNEY GENERAL**
21                                            Joshua Bendor (Bar No. 031908)
                                              Gregory Honig (Bar No. 18804)
22                                            Lucy M. Rand (Bar No. 026919)
                                              Luci D. Davis (Bar No. 035347)
23                                            Assistant Attorneys General
                                              2005 N. Central Avenue
24                                            Phoenix, Arizona 85004
                                              Joshua.Bendor@azag.gov

                                         27

10694779

Gregory.Honig@azag.gov
Lucy.Rand@azag.gov
Luci.Davis@azag.gov
*Attorneys for Defendants*

10694779