Jared G. Keenan (Bar No. 027068)
Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th St.
Phoenix, AZ 85006
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
          lbeall@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**DISABILITY RIGHTS ARIZONA**
5025 East Washington St., Ste. 202
Phoenix, AZ 85034
Telephone: (602) 274-6287
Email: adietrich@disabilityrightsaz.org

*Attorneys for Plaintiff Disability Rights Arizona*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Disability Rights Arizona,<br><br>Plaintiffs,<br><br>v.<br><br>Ryan Thornell, *et al.*, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-ROS<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A RECEIVER** |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 3

I.    Plaintiffs Face a Grave and Immediate Threat and Actuality of Harm .......... 3

II.   Current Leadership Has Had Ample Time to Implement Reforms ............... 8

III.  A Receiver Is Needed to Implement the Patient-Centered Care Model ...... 12

      A.    Defendants Have Proven Incapable of Implementing the PCCM .... 13

      B.    Defendants Have Not Hired the Staff Required by the Current Contract ................................................................................... 15

IV.   The Receiver in *Plata* Has Transformed the Prison Medical Care System ...................................................................................... 16

V.    The Court Should Order the Receiver to Evaluate State Laws Regarding Privatization and Reimbursement Rates .................................... 20

CONCLUSION ............................................................................................... 21

# TABLE OF AUTHORITIES

**Federal Cases**

*Balla v. Idaho*,
    29 F.4th 1019 (9th Cir. 2022) ................................................................... 3

*Brown v. Plata*,
    563 U.S. 493 (2011) .................................................................... 17, 18

*Coleman v. Newsom*,
    No. 2:90-CV-0520 KJM DB P, 2024 WL 3385911 (E.D. Cal. July 12, 2024) ............ 19

*Coleman v. Schwarzenegger*,
    922 F. Supp. 2d 882 (E.D. Cal./N.D. Cal. 2009) ........................................ 19

*Dixon v. Barry*,
    967 F. Supp. 535 (D.D.C. 1997) ........................................................ 2, 12

*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019) ............................................................... 3

*Parsons v. Ryan*,
    912 F.3d 486 (9th Cir. 2018) ............................................................... 3

*Plata v. Schwarzenegger*,
    No. C01-1351 TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ......... 2, 3, 8, 9, 17, 18

*Plata v. Schwarzenegger*,
    No. C01-1351 TEH, 2009 WL 799392 (N.D. Cal. Mar. 24, 2009) ........................ 20

*Rasho v. Jeffreys*,
    22 F.4th 703 (7th Cir. 2022) ............................................................... 3

*Simmons v. G. Arnett*,
    47 F.4th 927 (9th Cir. 2022) ............................................................... 3

*United States v. Hinds Cnty. Bd. of Supervisors*,
    128 F.4th 616 (5th Cir. 2025) .............................................................. 9


**State Cases**

*District of Columbia v. Jerry M.*,
    738 A.2d 1206 (D.C. 1999) .................................................................. 9

*Wayne Cnty. Jail Inmates v. Wayne Cnty. Chief Exec. Officer*,
    444 N.W.2d 549 (Mich. Ct. App. 1989) ................................................... 8, 9

**INTRODUCTION**

When the Court asked in July 2023 whether additional orders were necessary to ensure compliance with the Injunction, Plaintiffs counseled restraint to allow Defendants to make good on their promise that they could and would fully comply. Doc. 4445 at 2, 3; Doc. 4458 at 3-5. The Court voiced concern then about whether "only additional time will enable Defendants to fully comply with the Permanent Injunction." Doc. 4472 at 2. That concern has proven well founded. Defendants' own data establish their continued failure to achieve anything close to the "complete compliance" necessary to "ensure constitutional conditions" and "allow federal court involvement to cease." *See id.*

In response to Plaintiffs' motion, Defendants "deflect[] their failures," refuse "to acknowledge their shortcomings," and fail to "identify plausible paths to compliance"—the same conduct that led to the trial in 2021. *See* Doc. 3921 at 33. In an official statement, Defendants directly address lawmakers responsible for authorizing funds and suggest that this litigation wastes taxpayer money and that substantial reforms are not necessary:

> [Plaintiffs] wastefully devote what appears to be an endless amount of time, energy, and money, unnecessarily driving up the cost to Arizona taxpayers . . . .
>
> The question Arizona tax payers and lawmakers should ask themselves is, why does the State continue to allow the Plaintiffs to gloss over facts demonstrating the ADCRR system is revitalized, right in front of their watchful eyes, a shadow version of its former self? And, how much are we willing to allow these out-of-state influences to dictate what is good for our state? With a constantly moving goal, and by relying on outdated and biased reports, the Plaintiffs keep the State of Arizona and its hardworking citizens paying, at the expense of other needs; to what end?

Declaration of Rita Lomio, Ex. 3, ADCRR Response to Filing of Motion for Receivership (Feb. 13, 2025).[1] In court filings, Defendants turn on the independent experts they nominated and agreed to, accusing them of "animus," "bias," hyperbole, and incompetence. Doc. 4815 at 14, 17, 22, 25; Doc. 4818-1 at 43 ¶ 14 (describing experts as "out of touch").

---

[1] This statement appears to conflict with representations in court filings that NaphCare "guarantee[s] that the taxpayers will not bear the risks and liability associated with providing healthcare within the ADCRR prisons." Doc. 4818-1 at 87 (NaphCare Year 2 Progress Report); *see* Doc. 4507-1 at 46 (indemnification agreement for sanctions, costs, and attorneys' fees in *Jensen*).

Such *ad hominem* attacks are nothing new in this litigation. The Court has documented similar attacks throughout this case. *See, e.g.*, Doc. 2791 at 1 ("Amid Defendants' continuing failure to meet many of the requirements of the Stipulation, Defendants devote energy and time to an effort to remove the judge they chose to hold their feet to the fire. This is a meritless distraction."); Doc. 2902 at 7 n.5 ("Defendants, not for the first time, argue that Plaintiffs' counsel use these cases as 'cash cows' . . . . These sorts of ad hominem attacks are beneath the dignity of counsel and the Court.").

We cannot continue down this path. Stripped of its heated rhetoric, Defendants' argument against a receiver boils down to a request for more time based on declarations of good intentions. Doc. 4818-1 at 6 ¶ 7 (Director Thornell), 15 ¶ 15 (Deputy Director Oddo). At this late stage, that is not nearly enough. Defendants' own self-reported data demonstrate that the healthcare system is broken, that fundamental components remain profoundly out of compliance, and that patients remain at substantial risk of unnecessary suffering and death. Defendants offer no credible plan to address systemic failings and instead interpret their data based on the same theory of compliance the Court discredited in 2021 as "a sad illusion." *See* Doc. 3921 at 24. Defendants admit that their contractor has not met even the staffing requirements of the current contract and offer no plan to achieve the substantial increases anticipated in the final statewide staffing plan.

This Court no longer can rely on Defendants' promises about what they "intend[] to do in the future." *Dixon v. Barry*, 967 F. Supp. 535, 553 (D.D.C. 1997) (appointing receiver to oversee mental health services). "The Court's role is to require immediate and full compliance such that federal involvement in Arizona's prison system can come to an expeditious end." Doc. 4445 at 2. The Court should appoint a receiver and retain oversight to ensure that the receivership puts in place a constitutional healthcare delivery system, is exercised in a fiscally responsible manner, and returns "control to the defendants, in the shortest time possible." *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *33 (N.D. Cal. Oct. 3, 2005).

1

**ARGUMENT**

2

**I.      Plaintiffs Face a Grave and Immediate Threat and Actuality of Harm.**

3          The first receivership factor is whether "there is a grave and immediate threat or

4    actuality of harm to plaintiffs." *Plata v. Schwarzenegger*, 2005 WL 2932253, at *23.

5    Defendants read into this factor a requirement that Plaintiffs show deliberate indifference

6    and ask the Court, in essence, to try this case again. Doc. 4818 at 10-16. The Court, however,

7    is "not required to make new findings of a constitutional violation before enforcing" a

8    previous order. *Parsons v. Ryan*, 912 F.3d 486, 499, 501 (9th Cir. 2018) (affirming order

9    requiring use of community providers "to ensure compliance with certain performance

10   measures" in the Stipulation).

11         None of the cases relied on by Defendants relate to the appointment of a receiver or

12   otherwise suggest that a deliberate indifference analysis is appropriate here. Two cases

13   involved initial determinations of liability. *See Simmons v. G. Arnett*, 47 F.4th 927 (9th Cir.

14   2022) (affirming denial of summary judgment); *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th

15   Cir. 2019) (affirming order directing surgery). In another, the parties expressly agreed to

16   "cabin the judge's authority to fashion relief" to enforce a settlement unless

17   "noncompliance causes an Eighth Amendment violation." *Rasho v. Jeffreys*, 22 F.4th 703,

18   707 (7th Cir. 2022). And in the final case, the court was deciding whether to terminate

19   prospective relief, an inquiry that requires evaluating whether there are "ongoing

20   constitutional violations." *Balla v. Idaho*, 29 F.4th 1019, 1025 (9th Cir. 2022). None of

21   those scenarios remotely resemble this one. This Court already has found constitutional

22   violations and found the Injunction necessary to correct those violations; it need not repeat

23   that exercise before appointing a receiver to spur compliance with the Injunction.

24         Regardless, the same facts that demonstrate grave and immediate harm abundantly

25   show Defendants' deliberate indifference. Although Defendants disagree with several of

26   the experts' findings or discount them as "anecdotal examples," *see* Doc. 4818 at 10, 12-

27   15, the Court need not resolve those disputes because even the uncontested evidence shows

28   abysmal compliance with core healthcare requirements of the Injunction and lack of

1    effective corrective action. *See* Doc. 4335 at 108 (finding deliberate indifference where

2    Defendants were aware of "conditions that present a substantial risk of serious harm" but

3    "have not taken effective actions to remedy those conditions").

4        For example, Defendants complain that the experts provide only one patient example

5    to support their finding that Defendants fail "to reliably administer medications." Doc. 4818

6    at 14 (quoting Doc. 4755 at 10). But Defendants' most recent data indicate that directly

7    observed therapy medications are administered as ordered, or there is documentation of a

8    valid reason for non-administration, only 20% of the time. Declaration of Gabriela Pelsinger

9    ¶ 49 (QI 10.1 scores); Doc. 4815-1 at 5 (QI 10.1 definition).[2] Defendants take issue with

10   the experts' concerns regarding use of telehealth, *see* Doc. 4818 at 13-14, but Defendants

11   themselves report only 8% compliance with the requirement that "[t]elehealth for medical

12   care may be used only when clinically appropriate." Pelsinger Decl. ¶ 20 (QI 1.4); Doc.

13   4815-1 at 3. Defendants say that the experts' "suicide reviews do not tell the full story,"

14   Doc. 4818 at 11-12, but their own data show disturbing noncompliance with critical suicide

15   prevention measures, including only 46% compliance with the requirement that a discharge

16   suicide risk assessment be completed before releasing a patient from a crisis stabilization

17   bed. *See* Pelsinger Decl. ¶ 98 (QI 16.9.7); Doc. 4815-1 at 10.[3]

18

19   ───────────────

20       [2] On February 27, 2025, Defendants filed their self-reported compliance scores for
     the months of January-November 2024. Doc. 4815 at 2-3; Doc. 4815-1. Defendants
21   separately produced compliance data for December 2024 and January 2025 to Plaintiffs and
     the experts. Pelsinger Decl. ¶ 2. Unless otherwise indicated, we rely on the January 2025
22   data, which is the most recent data available to Plaintiffs. The experts have raised concerns
     with the accuracy of Defendants' data. Doc. 4755 at 25-26. Plaintiffs share those concerns
23   and have identified continued problems in the December 2024 and January 2025 data with,
     for example, appropriate sampling and monitoring methodology. *See, e.g.*, Pelsinger Decl.
24   ¶¶ 56 (QI 10.4.1), 72 (QI 10.5.5a).
         [3] For example: QI 16.8.1 (62%) (requirements for initial suicide risk assessments),
25   QI 16.9.2 (74%) (psychologist review of crisis stabilization bed assignments lasting longer
     than seven days), QI 16.9.3 (64%) (daily evaluations of patients in crisis stabilization beds),
26   QI 16.9.4 (72%) (psychiatric practitioner assessments following admission to crisis
     stabilization bed), QI 16.9.5 (64%) (suicide risk assessments following admission to crisis
27   stabilization bed). Pelsinger Decl. ¶ 98 (QI scores); Doc. 4815-1 at 10 (QI definitions).
     Defendants say that QI 2.1.2, which relates to implementation of sustainable remedial plans
28   following suicides and suicide attempts, is "not measured" because it is "impracticable to
     automate." Doc. 4815-1 at 11; Doc. 4818-1 at 80-81 ¶ 9.

-4-

Defendants next fault the experts for "using a binary 'compliant' vs. 'non compliant' test, in which anything less than 100% on a particular Quality Indicator ('QI') is considered 'not compliant.'" Doc. 4818 at 11 (quoting Doc. 4755 at 3). Defendants argue that "[t]his Court should not appoint a receiver based on an unachievable standard" (100% compliance), *id.* at 18, repeating the experts' observation that "no non-heavenly system ever performs perfectly all the time." *Id.* (quoting Doc. 4755 at 3). But Defendants are nowhere close to perfect. Defendants revert to their discredited "overall theory of compliance" that aggregates percentages in the abstract, stating that 43% "of the healthcare QIs were at or above 80%." *Id.* at 15; *see* Doc. 3921 at 24. As an initial matter, 80% compliance is much too low a bar, and Defendants' failure to meet even that for over half the healthcare quality indicators is inexcusable. *See* Doc. 4335 at 94 ("Even if only 5% of mentally ill prisoners do not have access to care, that is unconstitutional.").[4] In any event, the Court already explained in 2021 why this "is a sad illusion": "Defendants' theory of compliance would require the Court view every performance measure as equally important." Doc. 3921 at 24.

Here, as in 2021, quality indicators related to "some of the most fundamental and critical aspects of health care that formed the basis of this lawsuit in 2012" remain starkly out of compliance. *See* Doc. 3921 at 24. For example, the Court found in 2022 that "the very foundation of the health care delivery system—the medical records—does not allow for comprehensive care." Doc. 4335 at 97 (internal quotation marks omitted). The Court ordered that "[t]he problem list in a prisoner's health record shall be accurate, complete, and easily usable." Doc. 4410 at 22 § 4.3. Defendants' self-reported compliance with this requirement is awful (see table on next page).

---

[4] Defendants also fault the experts for not identifying examples where a patient "had a bad outcome as a result" of noncompliance with the Injunction's requirements. *See* Doc. 4818 at 11 (discussing noncompliance with requirement to provide initial mental health assessments); *id.* 14 (asserting that patient who did not receive HIV medication as prescribed was "stable"). That approach is inconsistent with the law and sound correctional administration, which look at reducing substantial *risk* of harm.

| QI 4.3 | The problem list in a patient's health record: shall be accurate, complete, and easily usable; resolved or historical conditions or diagnoses are separated from current conditions; the date of onset or resolution of resolved or historical conditions or diagnoses is indicated, if known; similar or identical diagnoses of current conditions are listed only once. For example, a problem list would not simultaneously list "heart disease," "heart failure," and "congestive heart failure, not otherwise specified." | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Jan 2024** | **Feb** | **Mar** | **Apr** | **May** | **June** | **July** | **Aug** | **Sept** | **Oct** | **Nov** | **Dec** | **Jan 2025** |
| Medical | 28% | 20% | 0% | 4% | 0% | 0% | 4% | 4% | 0% | 4% | 0% | 0% | 0% |
| Mental Health | 43% | 43% | 47% | 63% | 43% | 60% | 36% | 41% | 50% | 57% | 43% | 47% | 63% |

Doc. 4815-1 at 4, 8; Pelsinger Decl. ¶ 37.

In addition, Defendants do not dispute that their own September 2024 data showed that only three percent (3%) of off-site specialty care referrals were completed within the ordered timeframe. *See* Doc. 4795 at 18-19 (citing Doc. 4755 at 6). Their compliance with that requirement continues to languish (see QI 1.22d in the table below). Defendants' compliance with requirements related to diagnostic tests and follow-up visits with nurses or practitioners also are out of compliance by a wide margin.

| QI 1.22 | | Orders from health care staff in the outpatient and inpatient arenas shall be completed within the timeframe ordered. This includes, but is not limited to: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **Jan 2024** | **Feb** | **Mar** | **Apr** | **May** | **June** | **July** | **Aug** | **Sept** | **Oct** | **Nov** | **Dec** | **Jan 2025** |
| a | on-site diagnostic tests | 74% | 84% | 72% | 80% | 58% | 62% | 67% | 68% | 90% | 52% | 62% | * | ** |
| b | off-site diagnostic tests | 50% | 50% | 52% | 18% | 26% | 11% | 10% | 9% | 8% | 10% | 6% | 23% | 30% |
| c | follow-up visits with nurses or practitioners | 49% | 49% | 44% | 41% | 25% | 42% | 42% | 43% | 48% | 49% | 46% | 50% | 45% |
| d | off-site referrals | 33% | 35% | 35% | 9% | 15% | 6% | 5% | 3% | 3% | 3% | 3% | 35% | 28% |

\*      Defendants report their compliance as "56% of appointments completed on a date other than the scheduled date were clinically appropriate."

\*\*     Defendants report their compliance as "54% of appointments completed on a date other than the scheduled date were clinically appropriate."

Doc. 4815-1 at 4; Pelsinger Decl. ¶ 25.

//

//

These are not isolated examples. Based on their own data, Defendants have not fully complied with quality indicators regarding mental health care in residential care and inpatient units.[5] Defendants also have not fully complied with quality indicators regarding clinically appropriate urgent and emergent care.[6] Defendants have not fully complied with quality indicators regarding medical care in the inpatient care units (IPCs), which house "the patients who need the highest level of care."[7] R.T. 11/18/21 at 2888:2-14. Nor have Defendants fully complied with quality indicators regarding medication administration.[8] And Defendants report only 33% compliance with the quality indicator requiring interpretation services be provided to patients not fluent in English. Pelsinger Decl. ¶ 30 (QI 3.3); Doc. 4815-1 at 3.

---

[5] QI 16.4.1.1 (55%) (evaluations for MH-4 patients following significant changes in the course of treatment), QI 16.4.1.2 (12%) (annual evaluations for MH-4 patients), QI 16.4.2 (75%) (face-to-face encounters with assigned primary therapists (PTs) for patients in residential level of care), QI 16.4.3 (70%) (treatment plan reviews for patients in residential level of care), QI 16.4.4 (62%) (treatment team meetings every three months), QI 16.4.5a (73%) (psychiatric clinical encounters for patients in residential level of care no less than every 14 days), QI 16.4.5b (76%) (clinical encounters with psychiatric practitioners for patients in residential level of care as indicated), QI 16.5.1.1 (13%) (annual comprehensive mental health evaluations for MH-5 patients), QI 16.5.1.2 (83%) (discharge summary for MH-5 patients when discharging from inpatient care), QI 16.5.2 (32%) (daily face-to-face encounters with assigned PTs for patients in inpatient level of care), QI 16.5.3 (18%) (daily and weekly reviews of treatment progress for patients in inpatient level of care), QI 16.5.4 (68%) (clinical encounters with psychiatric practitioners for patients in inpatient level of care no less than once per week). Pelsinger Decl. ¶ 85; Doc. 4815-1 at 9.

[6] QI 1.1(a) (56%) (clinically appropriate medical care during emergent encounters), QI 1.1(b) (84%) (clinically appropriate medical care during urgent encounters), QI 1.2 (52%) (process for responding when patient notifies correctional officer of need for healthcare). *See* Pelsinger Decl. ¶¶ 6, 15; Doc. 4815-1 at 2, 4.

[7] QI 7.6.1 (42%) (care plans for patients admitted to the IPC), QI 7.6.2 (56%) (nursing assessments for patients arriving to the IPC), QI 7.6.3 (44%) (timely admission history and physicals for patients who will remain in IPC for more than 24 hours), QI 7.6.4 (60%) (clinically appropriate nursing assessments for IPC patients), QI 7.6.5 (73%) (functional call buttons or timely welfare checks for IPC patients). Pelsinger Decl. ¶ 43; Doc. 4815-1 at 5.

[8] QI 10.1 (20%) (administering directly observed therapy medications as ordered), QI 10.2a (46%) (timely provision of medications to patients newly admitted to a facility and already on medications), QI 10.2b (40%) (timely provision of newly ordered medications), QI 10.3 (14%) (process for responding to medication refusals), QI 10.4.1 (93%) (prohibiting lapses in provision of keep-on-person (KOP) medications), QI 10.5.4 (33%) (providing KOP rescue inhalers to patients with asthma at significant risk of serious respiratory impairment), QI 10.5.5 (7%) (providing KOP glucose to patients with diabetes at significant risk of hypoglycemia), QI 10.5.6 (88%) (providing rapid-delivery nitroglycerin to patients with cardiac disease KOP). Pelsinger Decl. ¶ 49; Doc. 4815-1 at 2, 5, 6.

1        Put simply, Defendants' own data demonstrate the first receivership factor; the

2   "numbers establish, with rare exceptions, a complete failure to make, or even begin, the

3   systemic changes required by the Permanent Injunction." *See* Doc. 4570 at 1 (citing Doc.

4   4539 at 1 (discussing data from September 2023)). Defendants argue that "the Department's

5   procurement of substantial *additional* resources should support its showing that it is not

6   acting with deliberate indifference." Doc. 4818 at 16 n.6. But that shows only that

7   Defendants have vastly underspent on their healthcare system for over a decade. The

8   outcomes shown by their data demonstrate either that they still have not allocated sufficient

9   resources or that those resources are not being managed in such a way to comply fully with

10  all requirements of the Injunction.[9] *See Plata v. Schwarzenegger*, 2005 WL 2932253, at *31

11  (appointing receiver where prison medical system "too often neglects, mistreats, and at

12  times literally kills those it is intended to serve" even though defendants spent over $1

13  billion annually on health care, noting that the existing system "is a massive waste of money

14  and, more importantly, life"); *Wayne Cnty. Jail Inmates v. Wayne Cnty. Chief Exec. Officer*,

15  444 N.W.2d 549, 561 (Mich. Ct. App. 1989) (finding no error in court's determination "that

16  more expenditures by the sheriff would not produce adequate compliance with the final

17  judgment").

18  **II.    Current Leadership Has Had Ample Time to Implement Reforms.**

19       Defendants next contend that a receivership is "premature" because new leadership

20  has "been on the job just over two years." Doc. 4818 at 1-2; *see id.* at 17 (discussing second

21  receivership factor); *id.* at 19-20 (fourth receivership factor); *id.* at 20 (fifth receivership

22  factor). Defendants identify two "new" leaders: Director Thornell and his contractor. Doc.

23  4818 at 1-2, 17. NaphCare has provided services since October 2022, and Director Thornell

24  ───────────────────

25      [9] Defendants state that, "in the past two years, the Department has obtained more than $90 million in annual additional healthcare funding." Doc. 4818 at 15. Over $60

26  million of those funds in FY 2024 and FY 2025 (through January 31, 2025) appear to come from the Opioid Remediation Fund and are limited to substance use and hepatitis C treatment. Doc. 4818-1 at 61. That Fund is not unlimited; the State had awarded $92 million

27  as of June 30, 2024, including to ADCRR, and anticipated total allocations of $494 million over 18 years. Lomio Decl., Ex. 5 at 1. While some of the remaining allocations may fund

28  substance use and hepatitis C treatment in prison, that is not guaranteed.

assumed his position in January 2023. Doc. 4818-1 at 3 ¶ 2; Doc. 4377 at 2. That is no reason to delay relief in the face of unnecessary suffering and death. Director Thornell negotiated the Injunction and agreed to its requirements and deadlines; NaphCare provided input and assurances throughout. Doc. 4410 at 2-3; Doc. 4401; Doc. 4402. Since then, there has been ample time for Defendants to develop and implement necessary reforms. Courts have appointed receivers based on failures to comply with court orders within a similar period of time. *See Wayne Cnty. Jail Inmates*, 178 Mich. App. at 638-42 (affirming appointment of receiver over a county jail system less than two years after final judgment and stipulated remedial order where the county failed to comply with more than a decade of prior orders); *Plata v. Schwarzenegger*, 2005 WL 2932253, at *3, 19 (appointing receiver to oversee medical care in California prisons three years after stipulated injunction); *United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 623-25 (5th Cir. 2025) (affirming appointment of receiver over detention center less than three years after stipulated order).

Defendants are wrong to rely on *Jerry M.* to argue that "new leadership must be given an opportunity to 'turn the tide' before additional relief could be warranted." Doc. 4818 at 17 (quoting *District of Columbia v. Jerry M.*, 738 A.2d 1206, 1214 (D.C. 1999)). In *Jerry M.*, plaintiffs moved for a receiver just months after a complete restructuring of leadership. 738 A.2d at 1210, 1213-14. That is a far cry from this case, where current leaders have been in place years, not months. Moreover, in *Jerry M.*, responsibility for the specific detention center at issue had been transferred to a government agency that had a proven track record of complying with the consent decree at another facility and that had been given specific authority and powers necessary for reform. *Id.* at 1208-211. Here, Defendants did not overhaul the failed leadership structures that landed them in this position, but simply put new faces in the same positions and continued to use a for-profit contractor. Plaintiffs have given these officials ample opportunity to "turn the tide," going so far as to urge judicial restraint when, three months after the Injunction was issued, the Court asked the parties "what actions should be urgently taken" to ensure full compliance. Doc. 4445 at 2, 3; *see* Doc. 4458 at 3-5 (advising that a receiver and sanctions were not necessary because,

1  in Plaintiffs' view at that time, "Defendants currently are making sincere efforts to
2  comply").

3      Defendants also do not account for frequent turnover in key leadership positions. It
4  cannot be that any time Defendants change someone in a leadership position, the
5  compliance clock restarts and Plaintiffs must wait years for relief.[10] Defendants in this case
6  are, in their official capacities, the Director of ADCRR and the Assistant Director of
7  ADCRR's Medical Services Contract Monitoring Bureau. Doc. 4335 at 3; Doc. 1 at 15.
8  Over the course of this 13-year litigation, there have been at least five people in those
9  positions, as well as four healthcare contractors. Doc. 4309 at 13, 17, 39 (Directors Ryan
10  and Shinn, Assistant Directors Pratt and Gann, and contractors Wexford, Corizon, and
11  Centurion); Doc. 4818 at 17 (Director Thornell); Doc. 4377 (NaphCare). As of at least last
12  month, Assistant Director Gann no longer is with the Department. Lomio Decl. ¶ 2. Other
13  critical leadership roles are or recently have been vacant. Doc. 4795 at 21 n.6 (ADCRR
14  Medical Director, ADCRR Mental Health Director, and PCCM project leaders); Doc. 4814
15  at 7. For example, in March 2024, Defendants assured the Court that their Medical Director
16  would fix the broken mortality review process. Doc. 4795 at 21. The ADCRR Medical
17  Director position now has been vacant since August 2024, and Defendants do not dispute
18  the experts' findings that the mortality review process remains profoundly broken. Doc.
19  4818-1 at 15 ¶ 14(a); Doc. 4795 at 21.[11]

20      If Defendants acknowledged the magnitude of the problem, took ownership of their
21  system's failures, and offered a credible and comprehensive path to full compliance, that

22  _____

23  [10] Defendants also reference Ashley Oddo, who served as a "Compliance Advisor"
   on *Jensen* since April 2023, became general counsel in July 2023, and now is one of the
24  deputy directors. Doc. 4818 at 17; Doc. 4818-1 at 9 ¶¶ 2-3, 4. Defendants do not explain
   why changing the person who fills any of those roles should reset the compliance clock. *See*
25  Doc. 2905 at 1-2 (ordering relief where Defendants provided "no information about how
   hiring one new person could constitute a remediation plan or would solve the previous
   year's non-compliance").
26  [11] The ADCRR Medical Director also is responsible for ensuring "high quality
   comprehensive medical care," overseeing "medical treatment services provided by the
27  contractor," monitoring specialty care, preparing mortality reviews, ensuring effective
   corrective action plans are put in place, and developing "utilization review process and
28  assessment tools." Doc. 4309 at 136, 183, 195, 197; Lomio Decl., Ex. 2 at 2.

would support a different outcome. But Defendants offer only more of the same. Defendants bristle at any suggestion that the system needs substantial reform and characterize their progress only as "incomplete." Doc. 4818 at 3; *see, e.g.*, Lomio Decl., Ex. 3. Defendants offer general assurances that they are "working hard" and "remain[] committed to complying with the injunction." Doc. 4818 at 17, 20. That commitment, Defendants say, is "demonstrated by their significant progress to date." *Id.* at 20.

Defendants list a handful of measures as evidence of "significant improvements." Doc. 4818 at 4-7. Admirable as they may be, these improvements fall far short of a comprehensive plan to achieve "complete compliance with the Permanent Injunction." *See* Doc. 4472 at 2. The "peer comfort program" will help only eight patients, "art and music therapy" does not replace a functional mental healthcare system, and an increase of beds alone does not ensure adequate healthcare to the people placed in them. Doc. 4818 at 4-7. Defendants' bar graph purporting to show they exceeded an undefined "Target" for offsite specialty appointments in October 2024 is hard to square with their data that showed only 3% compliance that month with the Injunction's requirement that offsite specialty appointments be completed within ordered timeframes. *See id.* at 7; Doc. 4818-1 at 29; page 6, above. To be sure, Defendants have improved substance use and hepatitis C treatment, almost entirely funded by the Opioid Remediation Fund that limits use of funds to those areas, *see* note 9, above, but even there compliance remains incomplete and, regardless, the Court has explained that the healthcare system may be "fundamentally lacking" even if there have been "some improvements in particular areas, such as treatment for hepatitis C." Doc. 4570 at 1 (citing Doc. 4539 at 19); *see* Doc. 4815-1 at 6.

Beyond highlighting these few improvements, Director Thornell points to "meetings every other week on the indicators from the Injunction," "a separate full-time evaluation team," and crisis intervention training. Doc. 4818-1 at 5 ¶¶ 5(e), 6. Deputy Director Oddo adds "weekly meetings" with the contractor, staffing offsets, and vendor performance reports. Doc. 4818-1 at 13-14 ¶ 12. For its part, NaphCare offers colorful promotional material. Doc. 4818-1 at 83-102. Those are the same measures that were in place at the time

of trial in 2021 and that failed to remedy the constitutional violations. *See, e.g.*, R.T. 11/17/21 a.m. at 2431:2-2432:13 (weekly meetings); Doc. 4309 at 310-11, 318 (crisis intervention training); R.T. 11/16/21 p.m. at 2330:3-7 (staffing offsets); R.T. 11/17/21 a.m. at 2428:17-2430:4 (vendor performance reports); Doc. 4335 at 116 (corrective action plans) (finding that "ADCRR simply repeated the already-failed 'solutions' for months or years"). At this late stage, that is not enough. The Court can no longer "take [Defendants] on faith" and "rely on [their] assurances of improvement." *See Dixon*, 967 F. Supp. at 553 (appointing receiver over community based mental health system).

Finally, Defendants argue that "[t]he April 2023 Injunction should be the starting point for the analysis here because it dramatically altered what the Department is required to do." Doc. 4818 at 18. As illustrated by the cases above, even assuming that were true, this case is ripe for receivership. Regardless, Defendants' premise is faulty; the Stipulation and Injunction both demanded substantial changes to the same healthcare areas to resolve the claims in the 2012 complaint. Doc. 1185; Doc. 1185-1; Doc. 3921 at 24, 30; Doc. 4335 at 179-180. The Injunction provides additional detail to guard against Defendants' history of "exploit[ing] any ambiguity" and requires qualitative measures because even when the Stipulation's quantitative measures were met, "the quality of the underlying care often was abysmal" and "enormous endemic structural problems" remained. Doc. 4410 at 5-6 & n.3. That, of course, does not alter the fact that Defendants have been on notice for over a decade that their healthcare system requires substantial reform and have not taken adequate action.

## III.   A Receiver Is Needed to Implement the Patient-Centered Care Model.

Defendants also request more time because "the pilot program and related staffing plans must be considered." Doc. 4818 at 18 (discussing second receivership factor); *see also id.* at 20 (fourth receivership factor). Both weigh strongly in favor of appointing a receiver now. The Court made clear "that the pilot program does not provide Defendants a respite from complying with any other aspect of the Permanent Injunction." Doc. 4643 at 1. The pilot itself demonstrated that, even with step-by-step instructions from the Court and its experts, Defendants are incapable of implementing the Patient-Centered Care Model

(PCCM) for even 8% of the patients in their custody. And Defendants' failure to meet even short-term staffing requirements leaves no confidence that they will be able to meet the substantial staff increases that soon will be required under the final staffing plan.

### A.    Defendants Have Proven Incapable of Implementing the PCCM.

A receiver is urgently needed to implement the PCCM statewide to provide relief to the plaintiff class and to build experience and capacity at ADCRR, with the goal of returning authority back to Defendants as soon as possible. The alternative is no solution at all; it would require the Court to micromanage the PCCM into existence through increasingly specific orders and vigorous oversight. That approach did not work for the pilot.

The relevant facts are undisputed. Defendants admit they "were not able to secure staffing for all positions needed to fully implement the Pilot." Doc. 4814 at 7. Defendants admit that they did not run the pilot fully at either site and that the pilot was cancelled at one site after only eight days because of insufficient space—even though Defendants themselves had selected the pilot sites and had been on notice of the inadequacy of space at that site since at least July 2024. Doc. 4814 at 2, 4, 6, 8; Doc. 4599 at 3, 37.

Over the course of the pilot, Defendants both refused to comply with valid orders and refused to implement necessary measures because they were not expressly ordered. For example, Defendants say that the pilot "underscored the importance of addressing space issues as part of a further roll out of the PCCM." Doc. 4814 at 6. That should have been obvious. The Injunction requires "sufficient space" for healthcare delivery, as the experts repeatedly explained. Doc. 4410 at 11-12 §§ 1.6-1.7; Doc. 4681 at 14-15; Doc. 4700 at 10; Doc. 4761 at 2-4, 12-13 (noting that Defendants "disagreed in writing" that they "must provide sufficient, confidential clinical space"). Defendants also do not dispute that they violated the Court's orders related to staffing, including that they obtain approval for certain staffing deviations. *See* Doc. 4642 at 3, 4-5; Doc. 4643 at 1; Doc. 4795 at 14-15 (citing Doc. 4761 at 2-7); Doc. 4699 at 2 ("The Court made clear by order that Defendants are to comply with the Pilot, including all deadlines for staffing requirements.").

On the flip side, Defendants defend their refusal to assign a project manager to the pilot because "the Injunction does not specify that the HSD PCCM team is required to include a project manager." Doc. 4815 at 26. But the need for project management was obvious, especially after Defendants failed to meet Court-ordered benchmarks and the experts urgently recommended a project manager. *See* Doc. 4795 at 8-15 & 21 n.6 (Defendants hired only half of the PCCM project leaders required). Defendants' continued tendency to narrowly construe their obligations under the Injunction is apparent in other areas as well. *See* Doc. 4814 at 9-10 (admitting that "[p]atient education is critical for many reasons," but attempting to excuse their failures in that area because "[u]nfortunately, the importance of patient education was not addressed at all in the Monitor's pilot project implementation plan"); Doc. 4815 at 19 ("While shifting to an opt-out approach could result in more inmates electing to participate in mental health encounters in a confidential setting, it bears noting that this approach is not required by the Injunction.").

Simply put, Defendants have demonstrated that they still lack the will and capacity to implement the PCCM anywhere, much less statewide. The parties and experts agree that the scale of statewide implementation "is massive" and that "[i]t is difficult to overstate the complexity of this roll-out and the resources that will be required to plan and execute it." Doc. 4761 at 11; Doc. 4818 at 8. What implementation requires is a competent, experienced administrator who understands and takes ownership over the PCCM and is capable of marshalling the resources, staff, and workflows necessary for its success. Defendants commit the Department to implement the PCCM only "where and when it can." Doc. 4818 at 16. In June 2024, the Court overruled as "preposterous" Defendants' objections to the PCCM, which the Court noted "is required by the Permanent Injunction" and was agreed to by Defendants in 2023. Doc. 4637 at 5. Defendants state in response to Plaintiffs' motion that the Department "acknowledges the criticism—and has learned from it," Doc. 4818 at 20 (Mar. 4, 2025), but just five days earlier continued to attack the PCCM as "experimental" and a "model that does not account for all challenges unique to a correctional setting." Doc. 4814 at 2 (Feb. 27, 2025); *see also id.* at 6 (describing the PCCM as "the model of care that

the Monitors are creating") (internal quotation marks and citation omitted). Defendants set forth no comprehensive plan for implementation, stating only that they have "begun identifying the next housing unit to implement the PCCM within each prison complex." Doc. 4818 at 8. That is not nearly enough.

### B. Defendants Have Not Hired the Staff Required by the Current Contract.

A receiver also is needed to ensure timely implementation of the final staffing plan. Defendants admit that NaphCare still has not filled all positions required by the current contract. Doc. 4818 at 15 ("As of the latest monthly report, NaphCare was 88% staffed"). Defendants also admit that they were not able to hire the staff required to implement the pilot. Doc. 4814 at 7-8 ("Defendants agree with the Final Pilot Report's descriptions of the staff that ADCRR and NaphCare were able to secure for the Pilot.").

Defendants' inability to meet even those preliminary staffing requirements strongly suggests that they will not be able to meet the requirements of the final statewide staffing plan, which the Court has explained is expected to "recommend substantial increases in staffing beyond the current level required by the contract." Doc. 4570 at 3 (observing that Defendants would be understaffed even if they met "current contract levels"); *see* Doc. 4815 at 25. Troublingly, Defendants do not appear to recognize the gravity of the issue. They praise their contractor's progress as "substantial" and "tremendous," present data in such a way to obscure the issue, and offer no explanation for how they will substantially increase staffing. Doc. 4818 at 3-4; Doc. 4815 at 14.

Consider, for example, Defendants' representations related to critical physician positions. Defendants state that there are now 23.95 physicians statewide. Doc. 4818 at 4. But Defendants combine medical directors and staff physicians in this number. *Id.* The Court already explained that "medical directors are ill-equipped to provide anything close to full time direct patient care." Doc. 4335 at 24 (rejecting Defendants' argument that medical directors "increase the number of physicians providing direct patient care"). The current contract requires 11 medical directors and 18.8 staff physicians. Lomio Dec., Ex. 1

at 1. Only 13 of the 18.8 staff physician positions are filled. Doc. 4818-1 at 67 ¶ 15 (noting that an additional 1.6 have been hired but not yet started).[12]

That means that, since trial in 2021, Defendants have filled only an additional 7.5 staff physician positions. *See* Doc. 4335 at 23-24 (finding 5.5 staff physicians at time of trial). The experts' initial staffing report recommended 33.1 total staff physicians. Doc. 4599 at 43. Defendants provide no explanation for how they will scale up to this level and do not appear to have tried, notwithstanding the experts' warning in November 2024 that "hiring staff for statewide implementation must begin now." Doc. 4700 at 9 (noting that "it is unlikely the staffing numbers [in the final plan] will deviate by more than 15% in either direction"). Instead, Defendants say that their "goal" remains the current contract levels and that they "will determine appropriate next steps" to ensure "adequate staffing" only after "the staffing plan is finalized." Doc. 4818 at 3-4; Doc. 4818-1 at 15 ¶ 13(f).[13]

## IV.    The Receiver in *Plata* Has Transformed the Prison Medical Care System.

To argue against the sixth and seventh receivership factors (waste of resources and quick and efficient remedy), Defendants attempt to distract the Court from their lack of a credible plan to reform their healthcare delivery system by attacking the receivership in *Plata*. Doc. 4818 at 21-25. Defendants blithely assert that "California inmates are not better off under a receiver." *Id.* at 24. That could not be farther from the truth. It is undeniable that the *Plata* receivership has successfully transformed medical care in a prison system many times larger and more complex than ADCRR. Doc. 4795 at 28-29. When a receiver was

---

[12] It is not clear that all current staff physicians meet the requirements of section 6.4 of the Injunction, which requires that medical physicians be board certified or board eligible in certain specialties. Doc. 4410 at 25. Defendants report only 82% compliance with QI 6.4. Doc. 4815 at 22; Doc. 4815-1 at 3; *see* Pelsinger Decl. ¶ 4 (four staff physicians listed as noncompliant with QI 6.4 in January 2025 compliance data).

[13] In a separate filing, Defendants reference a "nationwide shortage of medical and mental health practitioners, reluctance of qualified practitioners to work with an incarcerated population, and the remote location of many ADCRR complexes." Doc. 4815 at 24. Defendants nowhere explain how they will overcome these challenges. They would not accept those excuses from their contractor, and they should not expect the Court to accept such excuses from them. *See* Doc. 4614-1 at 2, Letter from Director Thornell to NaphCare CEO (Nov. 29, 2023) ("Market difficulties in hiring is a challenge, but it is not an excuse.").

1    appointed in *Plata*, California housed approximately 164,000 people in 33 prisons and spent

2    $1 billion annually on healthcare. *Plata v. Schwarzenegger*, 2005 WL 2932253, at *3.[14] The

3    parties in *Plata* agree that the receiver now has created "a well-functioning healthcare

4    system and a path towards a durable remedy that will end that case." Doc. 4793-1 at 4.

5        Defendants' arguments to the contrary amount to little more than scare tactics and

6    sophistry, cobbled together from online newspaper articles and reports. Defendants'

7    concern about the duration of the *Plata* receivership is badly misplaced. The receiver was

8    substantially limited in what he could do for years because of factors beyond his control. In

9    2011, the Supreme Court affirmed a population-reduction order, finding that the three-judge

10    court did not err in concluding that "absent a population reduction, continued efforts by the

11    Receiver . . . would not achieve a remedy." *Brown v. Plata*, 563 U.S. 493, 529 (2011). The

12    State reduced its population sufficiently to comply with the order in 2015. Declaration of

13    Donald Specter, Ex. B at 2. That same year, the *Plata* receiver achieved "a significant

14    reduction in definitely preventable deaths and a similar reduction in possibly preventable

15    deaths." Doc. 4793 at 2-3 ¶¶ 4-5 (quoting Doc. 3432-1 at 26). Between 2015 and 2017, the

16    receiver delegated authority over 15 prisons back to the State. Specter Decl., Ex. D at 7. As

17    of today, the *Plata* receiver has "created an entire infrastructure and medical care delivery

18    system from the ground up" and has returned authority over almost every prison back to the

19    State. Doc. 4793-1 at 23 ¶ 5; Doc. 4793 at 3 ¶ 5. During the same period of time, *Jensen*

20    has seen no such returns; the Arizona prison healthcare system remains deeply broken and

21    patients remain daily in danger. *See* Doc. 1 (Mar. 22, 2012); Doc. 4795 at 6-11.

22        Defendants throw out different figures related to costs in the California prison

23    system, but without necessary context that amounts to little more than fearmongering. Doc.

24    4818 at 21-22.[15] What was needed in California may not be what is needed here. California

25    ————————————

26    [14] By contrast, Defendants house only 25,700 people in nine state-run prisons. Lomio Decl., Ex. 4 at 4 (as of January 31, 2025).

27    [15] Defendants suggest that the *Plata* receiver was not effective because total spending increased while the population decreased. Doc. 4818 at 21. But it can be (and is) true that

28    the California prison system was both in need of additional funds and a decrease in population. *See Brown v. Plata*, 563 U.S. at 529 (noting that receiver explained that

was (and is) a much larger and more complex system with its own set of challenges based on its unique population and infrastructure needs. The receiver had to account for the fact that the prison system was badly mismanaged, lacked critical infrastructure, and had accumulated millions of dollars in unpaid bills; the substantial construction projects and capital outlays needed in California may not be needed in Arizona. *See, e.g.*, *Brown v. Plata*, 563 U.S. at 504 (finding that California had "only half the clinical space needed to treat the current population"); Specter Decl., Ex. A at 5 (unpaid bills); *id.*, Ex. D at 2-3 (billions of dollars in construction and operation of healthcare facilities, much in lease revenue bonds).

Defendants suggest that the *Plata* receiver has been fiscally irresponsible. Doc. 4818 at 21-22. But "no party has ever suggested that [the receiver]'s budget is excessive or that the funds are not being spent wisely." Doc. 4793 at 4 ¶ 12. Both the state legislature and the district court in *Plata* have retained oversight over the receiver's budget and actions. *Plata v. Schwarzenegger*, 2005 WL 2932253, at *33; Specter Decl., Ex. D at 2 (explaining that "the creation of the Receivership did not change the Legislature's role of authorizing positions and appropriating funds for, enacting legislation related to, or exercising oversight of prison medical care").

Defendants next invite the Court to compare mortality rates (through 2022) and overdose rates (through 2019) in California prisons with national averages, as well as with what Defendants assert without citation is the mortality rate in Arizona prisons. Doc. 4818 at 23-24. Defendants made this same argument at trial in an attempt to avoid liability. *See* Doc. 4309 at 181-82 ¶¶ 881-82. The Court properly disregarded the argument then and

---

achieving a remedy without population reduction would "all but bankrupt" the State). In Arizona, the annual healthcare budget has tripled since the start of this litigation while the prison population has decreased by around 8,000 patients. Doc. 1 at 47 ¶ 82; Doc. 4815 at 14; Lomio Decl., Ex. 4 at 4.

In addition, Defendants' apparent belief that overall costs should go down in proportion to population reduction reflects a naïve view of correctional administration. Even if the population within a prison is reduced, it still costs a significant amount of money to run and maintain the prison, including costs related to infrastructure, staff, and services. Although the California prison population has decreased substantially, a similar proportion of prisons has not closed; at the time the receiver was appointed, there were 33 prisons, and now there are 31. Doc. 4793 at 2 ¶ 3 n.1.

should do so again now. There are many factors that affect mortality and overdose rates that are not in the control of the *Plata* receiver, including population demographics (most importantly age), suicide prevention measures, levels of violence in the prisons, and measures to prevent introduction of drugs and drug trafficking. *See Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 942 (E.D. Cal./N.D. Cal. 2009) (finding that statistics for average mortality rates "failed to control for demographics of each state's inmate population" and therefore are "of limited value in comparing states"); Specter Decl., Ex. F at i, 77-78 (audit finding "operational weaknesses within the department's drug interdiction program" between 2019 and 2022 and directing recommendations to California prison director).

Defendants also argue that the *Plata* receiver has been ineffective because the "vacancy rate for psychiatrists exceeds 50% at some prisons, and 20% of primary care physician positions are unfilled." Doc. 4818 at 24. That is absurd. The *Plata* receiver oversees medical care, not mental health care, and is not responsible for hiring psychiatrists. Doc. 4795 at 5-6. In fact, the court in a separate lawsuit cited "unconstitutionally low mental health staffing levels" in California prisons as a reason why a receiver may be necessary to ensure constitutional mental health care. *Coleman v. Newsom*, No. 2:90-CV-0520 KJM DB P, 2024 WL 3385911, at *2 (E.D. Cal. July 12, 2024). The parties in that case "strongly and independently" recommended last year that the *Plata* receiver be appointed as receiver over mental health care given his successes transforming the California medical care system. Doc. 4793-1 at 5.[16] As to vacant physician positions, Defendants' use of percentages masks a dramatic difference in scale. Defendants have been unable to fill even the 18.8 staff physician positions required under the current contract. Lomio Dec., Ex. 1 at 1. Although there still is work to do, the *Plata* receiver has filled 215.4 staff physician positions with civil service employees. Specter Decl. ¶ 7.

---

[16] The *Plata* receiver declined to serve in that position. Specter Decl. ¶ 10. The court in *Coleman* issued an order on March 19, 2025, indicating its intent to appoint a receiver and directing its nominee for that position to file a Receiver Action Plan within four months. *Id.*, Ex. G.

Setting aside Defendants' uninformed attacks on the *Plata* receiver, the fact remains that after appointing a receiver, this Court would retain oversight over the receivership and both parties would be able to challenge any action by the receiver. *See Plata v. Schwarzenegger*, No. C01-1351 TEH, 2009 WL 799392, at *12, 15 (N.D. Cal. Mar. 24, 2009) (explaining that defendants can "object to any elements that the Receiver proposes" and that the receiver cannot take certain action "without other orders from this Court"), *aff'd in part, dismissed in part*, 603 F.3d 1088 (9th Cir. 2010). The legislature's role in appropriating funds would serve as an additional safeguard.

## V.    The Court Should Order the Receiver to Evaluate State Laws Regarding Privatization and Reimbursement Rates.

Finally, Defendants contend that "the breadth of authority that Plaintiffs request for [the] receiver is also inappropriate." Doc. 4818 at 25. Defendants do not explain why, other than to suggest it would be improper for the Court to ask the receiver to evaluate the impact of two state laws that repeatedly have been identified by an independent expert as substantial barriers to compliance, one related to reimbursement rates for specialty care and one related to privatization of healthcare. *Id.* at 25-26; *see* Doc. 4795 at 31-32.

Defendants' argument further demonstrates why a receiver is necessary. Defendants say only that "if this is an issue that requires the Court's attention, then any party may seek relief from the Court now." Doc. 4818 at 26. Defendants thus remain content to use the state laws as excuses for noncompliance, ignore the independent expert's cogent analysis, and wait for Plaintiffs to force the issue through litigation.[17] Such passivity and inaction is why a receiver is needed to do what Defendants apparently have and will not: conduct a robust

---

[17] *See* Doc. 4793-1 at 27, Letter from Deputy Director Oddo to Plaintiffs' Counsel (Oct. 25, 2024) (referencing "the challenges associated with finding providers willing to accept the reimbursement rates required by state law"); Doc. 4614-2 at 3, Letter from Director Thornell to NaphCare CEO (Mar. 8, 2024) ("To reiterate, the Court and the Plaintiffs believe that privatized healthcare is the reason why the healthcare provisions in the Injunction are not being met. NaphCare's propensity to keep, as profit, the extra money that ADCRR is paying to ensure that staffing levels are met rather than pass this money along as adequate wages . . . supports this notion . . . and has led to non-compliance with certain provisions of the Injunction.").

1  inquiry into what has led to their noncompliance and actively seek assistance from the Court

2  to dismantle barriers and reach full compliance.

3  **CONCLUSION**

4       The Court should appoint a receiver to oversee healthcare in Arizona's state-run

5  prisons and assign to the receiver all authority granted to the receiver in *Plata*. The Court

6  should direct the receiver to evaluate whether state laws related to privatization and

7  reimbursement rates pose substantial barriers to compliance with the Permanent Injunction

8  and, if so, to propose and implement solutions.

9

10  Dated:  March 20, 2025              By:   s/ Rita K. Lomio

11                                          Donald Specter (Cal. 83925)*
                                            Alison Hardy (Cal. 135966)*

12                                          Rita K. Lomio (Cal. 254501)*
                                            Sophie Hart (Cal. 321663)*

13                                          **PRISON LAW OFFICE**
                                            1917 Fifth St.

14                                          Berkeley, CA 94710
                                            Telephone: (510) 280-2621

15                                          Email:    dspecter@prisonlaw.com
                                                      ahardy@prisonlaw.com

16                                                    rlomio@prisonlaw.com
                                                      sophieh@prisonlaw.com

17                                          Corene T. Kendrick (Cal. 226642)*

18                                          **ACLU NATIONAL PRISON
                                            PROJECT**

19                                          425 California St., Ste. 700
                                            San Francisco, CA 94104

20                                          Telephone: (202) 393-4930
                                            Email:    ckendrick@aclu.org

21                                          David C. Fathi (Wash. 24893)**

22                                          Maria V. Morris (D.C. 1697904)*
                                            Eunice Hyunhye Cho (D.C. 1708073)*

23                                          **ACLU NATIONAL PRISON
                                            PROJECT**

24                                          915 15th Street N.W., 7th Floor
                                            Washington, DC 20005

25                                          Telephone: (202) 393-4930
                                            Email:    dfathi@aclu.org

26                                                    mmorris@aclu.org
                                                      echo@aclu.org

27

28

Jared G. Keenan (Bar No. 027068)
Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th St.
Phoenix, AZ 85006
Telephone: (602) 650-1854
Email:    jkeenan@acluaz.org
                lbeall@aclu.org

*Admitted *pro hac vice*
**Admitted *pro hac vice*. Not admitted in
DC; practice limited to federal courts.

*Attorneys for Plaintiffs Shawn Jensen, Dustin
Brislan, Robert Gamez, Jonathan Gonzalez,
Jason Johnson, Kendall Johnson, Joshua
Polson, Laura Redmond, Sonia Rodriguez,
Ronald Slavin, Jeremy Smith, and Christina
Verduzco, on behalf of themselves and all
others similarly situated*

By:  s/ Maya Abela
        Asim Dietrich (Bar No. 027927)
        5025 East Washington St., Ste. 202
        Phoenix, AZ 85034
        Telephone: (602) 274-6287
        Email:    adietrich@disabilityrightsaz.org

        Rose A. Daly-Rooney (Bar No. 015690)
        Maya Abela (Bar No. 027232)
        **DISABILITY RIGHTS ARIZONA**
        4539 E. Fort Lowell Rd.
        Tucson, AZ 85712
        Telephone:  (520) 327-9547
        Email:
          rdalyrooney@disabilityrightsaz.org
          mabela@disabilityrightsaz.org.org

*Attorneys for Disability Rights Arizona*

1    **CERTIFICATE OF SERVICE**

2        I hereby certify that on March 20, 2025, I electronically transmitted the above

3    document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4    Notice of Electronic Filing to the following CM/ECF registrants:

5

6                          Gregory Honig
                           Joshua Bendor
7                           Luci Davis
                           Lucy M. Rand
8            Assistant Arizona Attorneys General
                     Gregory.Honig@azag.gov
9                    Joshua.Bendor@azag.gov
                      Luci.Davis@azag.gov
10                     Lucy.Rand@azag.gov

11

12                        Daniel P. Struck
                          Rachel Love
13                     Timothy J. Bojanowski
                        Nicholas D. Acedo
14                       Ashlee B. Hesman
                          Jacob B. Lee
15       STRUCK LOVE BOJANOWSKI & ACEDO, PLC
                     dstruck@strucklove.com
16                    rlove@strucklove.com
                   tbojanowski@strucklove.com
17                    nacedo@strucklove.com
                     ahesman@strucklove.com
18                     jlee@strucklove.com

19                  *Attorneys for Defendants*

20                                s/ Rita Lomio
21

22

23

24

25

26

27

28