*Jensen v. Thornell*
Experts' Analysis of Parties' Responses to Staffing Analysis and Plan
May 13, 2025

On April 16, the Court ordered the Monitors to submit a comprehensive report, to address, *inter alia*, the parties' responses to the Final Staffing Analysis and Plan (Doc. 4868). This report addresses that one component of the comprehensive report. It provides responses to concerns that the Defendants (Doc. 4869-1) and Plaintiffs (Doc. 4870) have raised regarding our report ADCRR Health Care Staffing Analysis and Plan ("Staffing Plan") submitted to the Court on March 31, 2025 (Doc. 4858) as well as responses to cross replies to those concerns provided by Defendants (Doc. 4894) and Plaintiffs (Doc. 4893) pursuant to the Court's Order (Doc. 4884). Where Defendants' and/or Plaintiffs' input resulted in our recommending a modification to our Staffing Plan, we have placed those modifications in bold font.

Defendants' Comments

Defendants raised the following concerns for which they request amendments to the Staffing Plan.

1. Collaboration Between Physicians and APPs (Advance Practice Practitioners, i.e., nurse practitioners and physician assistants)

The Staffing Plan adjusts the number of medical and psychiatric physician FTE to account for time they spend collaborating with APPs. The Defendants note that such "staffing ratios [ ] are unnecessarily restrictive and inconsistent with state law," impose restrictions on APPs' practice, and therefore should be removed.

In fact, the Staffing Plan conditions for physician/APP clinical collaboration do not set forth any requirements on the APPs; they support APPs consulting with physicians on an as-needed basis in accordance with state regulations. The adjustments in the Staffing Plan are intended to allow for the amount of time that physicians normally spend in collaborative consultation with APPs to assure that physician FTE are appropriate. They do not impose any conditions or requirements on APPs to meet with physicians or to bring cases to them. The adjustment is an empiric one based on data collected during the Pilot Project. During the project, we queried APPs at both pilot sites and found that in their normal course of clinical care, each APP routinely consulted with physicians at least two hours per week. Accordingly, the Staffing Plan allows for two hours of physician time per week for each APP. The time is applied to the total physician hours across the whole complex, allowing the FHA and FMD flexibility in physician staffing.

The Staffing Plan limitation that "no primary care physician may be assigned to clinically support more than three APPs" is intended to assure that each physician has at least

85% of his/her time available for direct patient care of his/her primary care panel. This provision does not add any physician time or positions.

The section of the Staffing Plan that refers to "ratio of physicians to APPs for clinical consultation" could be more appropriately labeled "physician time allocations for clinical collaboration/ consultation with APPs."  Other than that, we find the Defendants' concern that the Staffing Plan restricts medical and psychiatric APP scope beyond the Injunction and state regulation to be without merit.

### 2. Psychologists Supervision of Psychology Associates

The Staffing Plan states that a psychologist can supervise up to eight PAs (psychology associates; referred to as psychologist associates by Defendants) practicing in the outpatient setting, and up to six PAs practicing in the residential/inpatient setting. Defendants state that that "it is not clear what data supports this ratio, but it should be subject to review as the plan is implemented."

In designing the Staffing Plan, we noted that supervision of PAs is highly dependent on whether the PAs are licensed or not, the complexity of the patients, and the experience of the PA. On average, supervision of a PA requires about one hour per week. This metric was factored into the staffing for psychologists. The Pilot Project did not produce data on the ratios. However, we applied these limits (which were originally articulated in the Injunction, pending the outcome of the Staffing Plan) to ensure that the psychologists, who are far fewer in number and have many duties, are not overwhelmed with supervisory requirements. This did not result in an increase in the number of psychologists needed.  While we agree with the Defendants that the ratios should be subject to review, we believe this should be done as part of the routine post-implementation six-month staffing analyses, the Defendants' concern does not merit a change to the current Staffing Plan.

### 3. Psychologist Caseload Sizes

Defendants object to the Staffing Plan placing upper limits on psychologist caseload sizes that are not required by law or the Injunction.

That caseload sizes were not articulated in the Injunction was intentional. Based on the input of the parties during the drafting of the Injunction, the Court deferred any setting of caseload sizes to this Staffing Plan. In designing the Staffing Plan, we deliberately utilize psychologists to practice at the top of their licenses to provide care and perform tasks that no one else can: supervision of PAs, psychological testing, administrative oversight of the complex's mental health population, Level of Care determinations, and contributing to the treatment team of patients in residential and inpatient beds. Psychologists are more costly and harder to recruit than PAs. Thus, this approach is both clinically and fiscally responsible. The Staffing Plan allows for small, specialized caseloads. The Defendants' concern does not merit a change to the Staffing Plan. \

4. Adjustment of Medical Case Loads based on Mental Health Conditions

The Staffing Plan used the mental health level of patients as one of a number of factors to determine the complexity level of medical patients. That global complexity level then drove (a) whether medical patients should be assigned to an APP or physician as their primary care practitioner, and (b) the practitioner's panel size. Specifically, if a patient's mental health level was MH-3A or MH-3B, we escalated the medical complexity level of patients to the next higher medical complexity level. Defendants oppose using MH-3A and MH-3B classification to adjust medical panel sizes, claiming that there is no data on which to base this recommendation and that the issue was not addressed in the report on the Pilot Project.

Our recommendation was, in fact, based on data collected during the Pilot Project. We found that the panel sizes for the primary care (medical) APPs at both pilot sites were challenging to manage and that the physician panel at Yuma Dakota was smaller than the physician could manage. After the pilot, we discussed the possible reasons for this observation in depth with the Pilot site FHAs and NaphCare regional, mental health, and corporate leaders. The findings from these discussions led to the conclusion that patients designated MH-3A and MH-3B require a higher level of primary care. FHAs of the other high-intensity complexes validated the appropriateness of this conclusion. Therefore, Defendants' concern does not merit a change to the Staffing Plan.

5. FMD (Facility Medical Director) Caseloads at High-Intensity Facilities

The Injunction allows FMDs at high-intensity complexes to be assigned a patient panel of *up to* 100 primary care patients. The Staffing Plan calls for FMDs to only provide care to patients when their primary care practitioner is absent. Defendants note that this restricts the FMD's role beyond what the Injunction requires.

Under the PCCM (Patient-Centered Care Model), which underpins the Staffing Plan, assigning a primary care panel of 100 patients to an FMD is not feasible, because the FMD cannot be available for essential daily huddles and team-based population health activities of the PCCM. Doing so would significantly undermine the integrity of the PCCM. Instead, and aligned with the intent of the Injunction, the Staffing Plan calls for the FMD to provide care to patients needing primary care when their PCPs are absent. This need occurs daily and can be managed within the FMD's other duties. It covers an essential function of the PCCM without adding providers. This approach is consistent with the intent and letter (the Injunction states that FMDs can be assigned *up to* 100 patients) of the Injunction and supports a successful PCCM. The Defendants' concern does not merit a change to the Staffing Plan.

6. Practitioner After-Hours Coverage

Defendants currently provide after-hour practitioner coverage for urgent and emergency medical and mental health needs via remote access. The available practitioners are all APPs. In our Staffing Plan we noted that while the current number of staff available after hours is sufficient, the absence of any physicians (medical and mental health), is not. Therefore, we recommended there should be at least one medical physician and one

psychiatrist available at all times to manage complex situations beyond the expertise of APPs. Defendants propose that, since they are not aware of any problems that have arisen based on the current staffing of all after-hours care with APPs, our recommendation should not be implemented.

This proposal directly conflicts with an underlying premise of the Injunction that some clinical situations call for physician-level care.  The Defendants' concern does not merit a change to the Staffing Plan.

### 7. Creation of a Data Dashboard

The Staffing Plan recommends that various operational and clinical metrics must be evaluated by managerial staff, together in a dashboard format, not in isolation of each other, in order to discover pressure points in the system of care and inform analysis of staffing adequacy. ADCRR contends that it tracks the individual metrics we recommend be used to evaluate the adequacy of health care staffing and is "exploring" our recommendation for a dashboard, but should not be required to use one.

The fact that ADCRR has the data and *does not* array it in a dashboard is the problem. We suspect that ADCRR may be envisioning a more complex version of a dashboard than is necessary. A dashboard does not have to be an electronic tableau created automatically from digitally stored data. It can be a simple manually created document, cut-and-pasted from existing reports. However it is created and viewed, though, having all the current operational and clinical metrics in one place at one time for review by managers is essential to the success of the Staffing Plan. The Defendants' concern does not merit a change to the Staffing Plan.

### 8. Custody Staffing in Support of Health Care Operations

The Staffing Plan observes that there are currently insufficient custody staff to support minimally necessary clinical activities, giving as an example, the current situation at the Meadows Unit; we identified the need for ADCRR to provide sufficient custody staff to meet these needs. Defendants state they have not identified any issues with Custody staffing at Meadows Unit or systemically that would impact full implementation of the PCCM.

With regard to the Meadows unit, as part of the Pilot Project, on January 30, 2025, we interviewed the FHA of the Eyman Complex (where Meadows Unit is located). ADCRR staff participated in that meeting. The FHA reported that four MH treatment rooms had been identified for use in the Meadows housing area since October, 2025, but remained idle, unused for clinical encounters, because there were no custody officers available to assure staff safety. ADCRR NaphCare leaders were also at that meeting and did not dispute the FHA's report.

With regard to operations statewide, the Monitors noted in "Monitors' Second Interim Report to Court" (Doc. 4755, Attachment C, page 1) that ADCRR was not compliant with the Injunction requirement that "Defendants shall ensure there is a sufficient

number of custody staff to support the functioning of the health care operation…" (Section 1.15). In their response to the report, Defendants did not refute that finding.

Given the substantive increases in health care providers called for in the Staffing Plan who will certainly generate a substantive increase in patient health care appointments, the insufficiency of custody staffing can only be expected to deepen. The Defendants did not request any specific modification to the Staffing Plan and none is indicated.

### 9. Backlogged Appointments for On-site Patient Visits

The Staffing Plan notes that there are thousands of backlogged visits across the system and that ADCRR will need to conduct a "blitz" to eliminate the backlogs before implementing the PCCM. ADCRR states that many of the backlogged appointments we reference are not "real" backlogs but rather improper documentation. While most of the real backlogs were reported to us by on-site operational leaders – the FHAs – it is possible, as asserted by Defendants, that some of the backlogs are only documentation errors. In either case, we simply recommended in the Staffing Plan that all backlogs, regardless of their number and nature, be resolved prior to implementing the PCCM at any unit. No modification to our recommendation is necessary.

### 10. Clinical Space

The Staffing Plan notes that ADCRR must provide sufficient clinical space or else they will not be able to implement the Staffing Plan nor provide safe patient care. Defendants state "Adjustments to clinical space in specific locations may require both time and funding. If lack of space becomes an impediment to timely implementation of the PCCM at a unit, ADCRR will advise the Court, the Monitors, and the parties and describe the efforts to provide constitutional patient care despite the space issues."

It is important for the Court to appreciate that insufficient space is not a possible discovery in the future, but a current reality (and the impetus for the Injunction's requirement for adequate space, Section 1.6). The abrupt termination of the Pilot Project at the San Carlos Unit after eight days of operation was the direct result of insufficient space. During interviews with FHAs at high-intensity complexes, there was widespread concurrence that space constraints would impair successful implementation of the Staffing Plan. The implementation guidance we provided upon completion of the Pilot to ADCRR, with a copy to Plaintiffs (not filed on the Docket) allows FHAs and others to identify all clinical space issues at each complex, by unit, immediately following issuance of the anticipated order to implement the Staffing Plan, and to stage implementation to allow for space modifications within our recommended eight-month implementation period. Though the Defendants did not request any specific modification to the Staffing Plan, implicit in their response is they may not be able to implement the Staffing Plan within the eight-month time frame we recommend. A modification to the Staffing Plan is not indicated.

### 11. Timing of Staffing Plan Implementation

We recommended that the Staffing Plan be fully implemented within eight months of the anticipated Court order. Defendants object to this timeline, stating that it will likely take longer and that budgetary matters may further impede implementation.

As noted in the implementation guidance provided to ADCRR, active continuous implementation of the PCCM and Primary Therapist model and staffing across ADCRR is essential. Managing two models of care – the old model of line-based care and the new PCCM – is inefficient, chaotic, extremely confusing to patients and staff, and delays compliance with the Injunction. Coupled with the Court's previous clear expectation for ADCRR to address associated budgetary concerns and ADCRR's awareness of the basic tenets of this Staffing Plan as early as the end of the Pilot Project in January, 2025, we believe that a time horizon of full implementation eight months after the Court issues its Order to implement the plan is both necessary and reasonable. While the Court may issue its Order later, even if its Order were issued this month (May 2025), setting the eight-month completion deadline for January, 2026, the *de facto* implementation horizon would be a year (i.e., from January, 2025, when ADCRR had enough information to begin the preliminary steps of implementation). We are not in support of modifying our recommended timeline for implementation.

Plaintiffs' Comments

Plaintiffs raised the following concerns for which they request amendments to the Staffing Plan.

### 1. Speed with which to Hire New Staff

Plaintiffs call for rapid filling of all recommended positions. This is not desirable or feasible. In the implementation guidance provided to ADCRR we recommend sequential hiring over time as individual units prepare to become operational. Plaintiffs' recommendation does not merit modification of the Staffing Plan.

### 2. Monthly Staffing Progress Reports

Plaintiffs ask the Court to require Defendants to make a number of modifications to monthly staffing reports that they currently submit pursuant to the order at Doc. 4472, until all positions in the staffing plan are filled. The modifications fall into three broad categories: (a) the status of staffing positions called for in the Staffing Plan by complex; (b) an explanation of why unfilled positions are unfilled and steps that are being taken to fill them; and (c) a description of global steps Defendants are taking to remedy staffing deficiencies relative to the population, either by affecting the "supply" side (increasing funding) or the "demand" side (decrease population). Defendants object to these modifications for a number of reasons.

With regard to (b), we believe the Staffing Plan sets out measurable expectations for performance by ADCRR and that this will provide the Court and Monitors with sufficient information to monitor Defendants' compliance with anticipated orders. We therefore take no position on Plaintiffs' recommendation that the Court require Defendants to report *how* they plan to meet the Court's expectations.

With regard to (c), once again, we believe our Staffing Plan clearly sets out *what* Defendants are expected to do and take no position on whether the Court should require Defendants to explain *how* they plan to meet these expectations. While decreasing the prison population would impact staffing , space, and custody needs, we believe opining on prison population size is beyond the scope of our role in producing a staffing plan.

With regard to (a) we support the underlying concept of Plaintiffs' recommendation for more granular information about the status of staffing positions called for in the Staffing Plan than is currently called for in the monthly reports Defendants generate pursuant to the Order at Doc. 4472. **We recommend that the monthly report be supplemented by indicating the status of each position called for in the Staffing Plan by complex and unit for each primary care and mental health team. Because Defendants will activate teams sequentially over the course of the eight-month implementation timeline, they may limit reporting the supplemental information for only those teams that are active.**[1] We do not support Plaintiffs' recommendation for the supplemental information to indicate whether a staff member works for QualCare, **but it should indicate if the staff member provides care on site or remotely.** We also do not support Plaintiffs' recommendation that the supplemental information indicate the employment status (e.g., registry, PRN, locum tenens) of each staff member because Defendants already provide this information at a global level.

3. Administrative and Supervisory Personnel

Plaintiffs note that the Staffing Plan "does not address other staff required to support healthcare operations, including administrative staff such as clinical coordinators, schedulers, and medical records staff, and additional supervisory staff to support the increased direct care staffing levels" and recommends that the Court order us to supplement the Staffing Plan to address these personnel.

We did not address non-clinical support staff in our Staffing Plan because it is too difficult to predict the impact of the proposed staffing changes and changes to the model of care on support staff workload. For example, the number of off-site consultations (arranged by schedulers) might increase due to more comprehensive patient care resulting in the finding of latent disease. However, consultations might decrease due to the shifting of complex patients (who drive many of the consultations) from APPs to physicians, who are able to manage these issues without external consultation. Thus,

---

[1] To compensate for the additional workload this supplementation causes, the Defendants may elect to discontinue enriching the current monthly reports with information beyond that required by the Order at 4472.

the Plaintiffs' concern does not merit a modification to the Staffing Plan. **However, where we recommend in our Staffing Plan "that the current plan be subject to review and adjustment six months after its implementation is completed and every six months thereafter," it should be modified to reflect that those reviews and adjustments also address non-clinical support staff.**

We did not address clinical supervisors because our analysis focused on direct care positions. Unlike non-clinical support staffing, supervisory staffing is easier to plan. **We recommend that the Court order ADCRR to adjust supervisory staffing levels under the Staffing Plan to mirror current supervisory ratios.** Because supervisory needs decrease under team-based care, ADCRR should adjust those ratios pursuant to the periodic reviews described elsewhere.

4. Patients on Wait List for Residential and Inpatient Mental Health Care

There are patients at ADCRR with serious mental health conditions waiting for admission to a residential (MH-4) or inpatient (MH-5) unit. Plaintiffs propose that we supplement the Staffing Plan to address these patients.

Quantifying and tracking these patients is not part of the staffing process and as such is beyond the scope of a staffing plan. Instead, we believe this falls under the purview of the Court's Monitors as part of their monitoring the appropriateness of care provided to such patients. The Plaintiffs' concern does not merit a change to the Staffing Plan.

5. Tracking the Volume of HNRs (Health Need Request)

Plaintiffs propose that we supplement the Staffing Plan to specifically address the tracking of HNRs. We believe that the Staffing Plan already addresses this issue, instructing ADCRR to collaborate with NaphCare to establish a reliable and accurate methodology to identify, count, and track HNRs and make staffing adjustments as indicated. Thus, Plaintiffs' concern does not merit a change to the Staffing Plan.

6. Telehealth Facilitators for Specialty Care

Every medical telehealth visit with an off-site specialist requires on-site staffing by a nurse, nurse's aide, medical assistant, or clerk to facilitate the visit. Plaintiffs propose that we supplement the Staffing Plan to address the number of facilitators for off-site specialist visits.

Because off-site specialty practitioners are not captured on NaphCare's schedule, and because the number of off-site specialists changes over time, we did not enumerate the corresponding facilitators in the Staffing Plan. However, we explicitly recommended that ADCRR provide telehealth facilitators for telehealth visits with specialists at the ratio of 0.75 FTE for each 1.0 FTE specialist, above and beyond the number of facilitators specified in the Staffing Plan.

For these reasons explained above, Plaintiffs' recommendation, as stated, does not merit modification of the Staffing Plan. However, **we would recommend a**

**modification requiring ADCRR to augment their current monthly staffing report to the Court to include the total off-site specialty FTE (imputed from the number of hours of off-site specialty telehealth visits) and corresponding facilitator FTE.**

<u>7. Comprehensive Plan for Space and Custody Staffing</u>

Plaintiffs call for the Court to require ADCRR to file, within 30 days, a comprehensive plan to ensure sufficient clinical space and custody staff. As the Staffing Plan illustrates, health care service delivery conditions – such as health care space in housing and therefore custody needs – vary widely across complexes and are rapidly changing in many units. The implementation guidance we provided to ADCRR has a realistic and useful approach to assessing custody and space needs in every unit and creating complex-specific sequences to address them within the eight-month implementation timeframe. It is more practical and feasible than what the Plaintiffs propose. We believe the Staffing Plan sets out measurable expectations for performance by ADCRR. We take no position on Plaintiffs' recommendation that the Court require Defendants to report *how* they plan to meet the Court's expectations.

Experts' Comments

<u>1. HSD (Health Services Division of ADCRR) Support of PCCM Implementation</u>

In April, 2024, in our original Staffing Plan, we wrote that for successful implementation of the staffing plan in a PCCM, specialized members of the HSD were needed to provide structure, training, and assistance with testing of processes, brainstorming and problem solving. There must be a dedicated team for the duration of the pilot and it must include a physician, an APP, a registered nurse, and a psychology associate, in addition to others determined by the HSD (Doc. 4599, Appendix 1, page 37). Later, in September, 2024, in our first report on the Pilot Project, we stated "The pilot is also intended to … train and support a cadre of clinicians from ADCRR's Health Services Division (HSD) to be able to train and support other units throughout ADCRR complexes as they implement the new model" (Doc. 4681, page 1). We also stated that "HSD was charged with hiring a permanent physician, APP, RN, and Psychology Associate by August 30 [2024] with the plan for our team to train and support their development on a rolling basis as they were hired. This HSD team would support further roll out of the Patient Centered Care Model (PCCM) after the pilot is complete" (Doc. 4681, page 4).

Though not explicitly restated in our final report on the Pilot Project (Doc. 4858) these previous comments make it clear that ADCRR must hire a capable and complete HSD team to lead implementation of the Staffing Plan and underlying PCCM, developing the capacity to empanel patients to PCP teams and mental health caseloads, and addressing the custody and space concerns. **We recommend that the Court reiterate this expectation in its anticipated order implementing the Staffing Plan.**

2. Comparison of Current vs. Staffing Plan-Recommended FTE

Plaintiffs present a table comparing current contractually required staffing levels with those if our Staffing Plan is implemented. In interpreting that table it is important to note that the column showing the experts' final staffing plan FTE (but not the currently contracted FTE) is exclusive of all direct care staff in IPCs (Inpatient Component; infirmary) and SNUs (Special Needs Unit; assisted living/nursing home) and therefore understates the total direct care FTE needed.


Respectfully Submitted,

*[signature]*  *[signature]*

Donna Strugar-Fritsch, BSN, MPA, CCHP        Marc F. Stern, MD, MPH