CV-12-00601-PHX-ROS

*Jensen v. Thornell*
Monitors' Third Interim Report to Court
July 16, 2025

### I. Introduction

In its Order (Doc. 4868), the Court asked us to provide it with a comprehensive report addressing material issues concerning the Plaintiffs' Motion for a Receiver to include consideration of all relevant findings, particularly those filed in response to the Monitors' Second Interim Report to Court (Doc. 4755) and Final Report – ADCRR Health Services Staffing Report ("Final Staffing Analysis and Plan") (Doc. 4761).

Because of the very different nature of these latter two documents and what they called for in a report, and in the interest of supporting the Court in expediting any action it intended to take on staffing, we separated our work into two reports, one addressing the Final Staffing Analysis and Plan, and one addressing the rest. We submitted the former report to the Court on May 13, 2025 (Experts' Analysis of Parties' Responses to Staffing Analysis and Plan, Doc 4900). It included responses to Defendants' Response to Monitor's Health Care Staffing Plan and Analysis (Doc. 4869) and Plaintiffs' Response to the Court Monitors' Final Staffing Analysis and Plan (Doc 4870). The Court has already taken action on this.

The present report, then, addresses the Defendants' Status Update and Response to Monitors' Second Interim Status Report (Doc. 4815) (Plaintiffs did not submit a response), the Plaintiffs' Motion for a Receiver (Doc. 4792), and the Defendants' Response to Plaintiffs' Motion for a Receiver (Doc. 4818) (which also contains some of Defendants' responses to Monitors' Second Interim Report to Court, Doc. 4755).

In brief, ADCRR is compliant with some of the requirements of the Injunction but remains non-compliant with the vast majority, with slow (or little) progress toward achieving substantial compliance. Section III of this report provides an overview of problems through the lens of mortality reviews. Sections IV through IX provide a discussion of issues brought up by Plaintiffs and/or Defendants in recent filings as well of some issues that touch multiple requirements of the Injunction. Sections X and XI address how we conceptualize and determine compliance. Issues related to individual requirements of the Injunction are discussed in Section XII Compliance with Provisions of the Injunction.

1

## II. Terminology, Abbreviations, and Conventions

Throughout the report, and depending on context, we use the following terms:

- "Injunction" refers to the Order and Permanent Injunction, Doc. 4410.
- "Provision," "section," and "requirement" refer to the numbered paragraphs of the Injunction.
- "Compliance" means substantial compliance.
- "MH Watch" (Mental Health Watch) refers to specialized cells into which MH patients are placed when they are at significant risk of suicide or psychiatric decompensation. When first placed on MH Watch, most patients are watched continuously (also sometimes referred to as one-on-one Watch) which means that a staff member (usually a correctional officer) is stationed outside the patient's cell with the sole duty of constantly observing that one patient. Eventually, when the risk of suicide is lower, the patient on MH Watch will be observed at random intervals of no more than 15 minutes.
- A "psychology associate" is a masters-level mental health clinician. Depending on context, we also use the term "therapist" to refer to a psychology associate, however, one should note that on rare occasions a psychologist – a doctoral-level clinician – may fill the role of therapist. "Primary Therapist" (PT) is a therapist (almost always a psychology associate, but again, on occasion could be a psychologist) who is assigned as the main therapist for a patient, and cares for them on a longitudinal basis. Every patient on the MH caseload should have a Primary Therapist assigned to their care, the identity of whom should appear in the patient's EHR.
- "APP" is an advanced practice practitioner. APPs are either nurse practitioners or physician assistants. While the term applies to medical and mental health care, in this report it usually appears in a discussion about medical care.
- "EHR" is the electronic health record. In ADCRR it is called TechCare.
- "IPC" (Inpatient Component) is an infirmary. There are multiple ones in ADCRR. They house the most medically ill patients who require close care and monitoring by practitioners and nurses.
- "SNU" (Special Needs Unit) is equivalent to assisted living or long-term care in the community. There are multiple ones in ADCRR. They house patients who need assistance with activities of daily living, such as bathing, dressing, and eating.
- "HNR" (Health Needs Request) is a paper or electronic communication from a patient to health care staff that is supposed to be used for a non-urgent health-related request. Most HNRs are requests to be seen for a clinical need. The remaining HNRs are administrative in nature, e.g., asking for a medication refill or a copy of medical records.
- "ICS" (Incident Command System), in the context of this report, is an emergency response to a health-related event. Typically it is triggered by a correctional officer who notices a resident in some kind of health-related distress.
- "ADCRR" (Arizona Department of Corrections, Rehabilitation, and Reentry) refers to the Defendants; the terms are used interchangeably.
- "HSD" (Health Services Division) refers to the division within ADCRR that is responsible for overseeing the provision of medical and mental health care, including oversight of the vendor (NaphCare) contracted to provide these services.
- "Monitors' Second Report" refers to the Monitors' Second Interim Report to Court, Doc. 4755.

- "Plaintiffs' Motion for a Receiver" refers to the submission by that name, Doc. 4792 and other documents submitted by the Plaintiffs in support of that motion.
- "Defendants' Response to Monitors' Second Report" refers to Defendants' Status Update and Response to Monitors' Second Interim Status Report, Doc. 4815.
- "Defendants' Response to Receivership" refers to Defendants' Response to Plaintiffs' Motion for a Receiver, Doc. 4818.
- To avoid confusion about identifying patients: (1) for patients mentioned in this report who appeared in previous reports, we have adopted the convention of naming them by the patient number we assigned in that document, along with the name of the document; (2) we begin numbering patients who appear for the first time in this report with the number 20.
- All dates are in 2025 unless otherwise specified.

### III. Capstone: Mortality Reviews

The lack of progress made by ADCRR in addressing the Court's main goal – reducing the significant risk of serious harm to which patients in ADCRR prisons are subjected – is best encapsulated in the following series of mortality reviews.

For this analysis, we reviewed the four **most recent** deaths (i.e., consecutive deaths, selected without bias) for which the requisite documents were available and which met our review criteria: The death was medical-related; ADCRR had completed its death review; and there was either a completed medical examiner's report or the medical examiner's report would not impact our findings.[1] We used these four cases first to show striking evidence of how multiple fundamental system level failings in ADCRR's health care operation persist and how preventable errors likely contributed to the deaths. Second, we used these same four recent cases to compare to the four **earliest** deaths in the history of the Injunction, i.e., from early 2023, using the same selection criteria (i.e., the death was medical-related, we were sent a copy of ADCRR's completed death review and medical examiner's report or the medical examiner's report would not impact our findings). We did this comparison to determine if ADCRR had improved its ability to recognize and fix system issues. For this comparison, we reviewed ADCRR's own contemporaneous reviews of the eight deaths. As required by the Injunction (section 2.1, and something ADCRR was doing even before the Injunction), ADCRR reviews every death, the intended purpose of which is to determine if any serious errors (acts or omissions) either contributed to the death or, even if they didn't contribute to this patient's death, have significant potential to contribute to another patient's death in the future. If an error is identified, after appropriate analysis of the cause of the death (which may require a root cause analysis), ADCRR is required by the Injunction (section 2.5.1) to incorporate that error into its statewide improvement plan. If remediation is called for, ADCRR is required to develop and execute an effective and sustainable remediation plan (section 2.1.1). A sustainable plan is one which outlives staff turnover and the limits of human memory from, say, a single training in which staff are simply instructed to avoid the error in the future. Based on the eight mortality reviews, we compared ADCRR's ability to recognize its own errors at the beginning of the Injunction and now. Review of these eight cases shows that when the Court intervened in 2023, ADCRR did not have the ability to reliably and consistently recognize and fix systems issues. Two years later it still does not have that ability.

This does not mean that ADCRR never identifies errors. As we point out in deaths number 7 and 8 below, ADCRR sometimes recognizes errors, however, it fails to recognize errors nearly often enough. Despite the fact that all eight deaths contained multiple serious errors, ADCRR recognized errors in only two of the four cases from 2023 and none of the four cases from 2025. Based on a review of all deaths for the 2-year period for which we have ADCRR's log of mortality reviews, ADCRR identified at least one error in only about 30% of the deaths.

---

[1] We also excluded a case of a patient who although they ultimately died at ASPC-Tucson, was sent there from one of ADCRR's private prisons solely for comfort care post-hospitalization, with the expectation he would die there soon after.

4

Further, as the examples of deaths number 7 and 8 below illustrate, even when it identifies an error, it rarely uses what was learned from that error to make effective and sustainable changes to the system that allowed the error to happen.

In her Declaration (in Defendants' Response to Receivership), Dr. Matheka, ADCRR's Mental Health Director, disagrees with similar findings we made in our earlier report and opines that ADCRR has a robust process for identifying deficiencies in mental health, citing examples. We are not asserting that ADCRR never identifies problems or attempts to address them. What we are asserting is that ADCRR does so far too infrequently, especially in light of the large number of serious problems it faces that put patient safety at risk. It is not a robust process.

In summary, these eight cases painfully demonstrate two core findings. The system changes required by the Injunction to protect human life and limb and prevent suffering are still broken, and ADCRR is still struggling to identify and prioritize the changes it needs to make, let alone actually make those changes.

2025 cases

Death 1
Patient 20[2] was a 78-year-old male who died on March 24. He had a history of multiple strokes resulting in left sided paralysis (wheelchair bound) and memory loss due to vascular dementia, seizure disorder, severe heart disease (history of multiple heart attacks, an enlarged heart, and heart failure), high blood pressure, high cholesterol, diabetes, chronic kidney disease, non-emptying bladder, Parkinson's disease, severe emphysema, gallstones, hypothyroidism, hearing loss, gastrointestinal reflux, and prostate enlargement. The patient was seen by a neurologist on July 11, 2023 for management of his stroke, memory loss, Parkinson's, and seizures. To control his seizures, the neurologist started him on an antiseizure medication.

The antiseizure medication worked. He had no more seizures after starting it. However, on February 20, his treatment changed. A physician (the Facility Medical Director) seeing the patient for the first time, and based solely on the patient telling him that he did not remember having a seizure, stopped the patient's seizure medicine. It was clear from the patient's health record – and therefore should have been clear to the physician – that the patient had had strokes, was known to have memory loss (likely from damage to blood vessels in the brain causing dementia), and thus was a poor historian. Yet there is no evidence that the physician reviewed the patient's medical history to determine the reason the patient was placed on the antiseizure medication and whether the patient's (erroneous) statement that he didn't have a seizure problem was correct or not. Instead, he simply discontinued the antiseizure medication.

Two weeks after stopping the medication, the patient suffered a prolonged seizure requiring intubation, placement on a ventilator, and a prolonged stay in the hospital intensive care unit. The patient never fully recovered. He was no longer able to take care of himself and needed help with bathing, dressing,

___
[2] The legend to patient numbers is contained in Attachment A.

toileting, transferring, etc. He returned to an ADCRR infirmary on March 20 and died four days later from what was presumed to be complications of his cardiovascular disease and diabetes. Although the patient had multiple co-morbidities which clearly also contributed to the patient's death, the physician's baseless decision to stop the patient's antiseizure medications hastened his death.

During our review, we noted multiple other instances of dangerous care which, though probably not causally related to his death, were clinically inappropriate and could cause or hasten death in other patients. The following is a non-exhaustive sampling of such care.

- The patient was inappropriately seen by a nurse acting independently (i.e., without the involvement of a practitioner) on multiple occasions, putting the patient at risk of serious harm (in violation of Injunction sections 1.20 and 7.4).

  o A nurse saw the patient on March 24, 2024 for shortness of breath, which in a patient as medically complex as this patient, can be an indication of a number of serious conditions. These symptoms are consistent with heart failure (i.e., a diagnosis and treatment beyond the scope of practice for a nurse). However, the nurse failed to appreciate this, thinking instead that the patient had an allergy. She failed to contact a practitioner, instead advising him to drink more fluid, an intervention that can exacerbate heart failure. Nothing further was done for the patient's condition until more than two weeks later.

  o A nurse saw the patient for shortness of breath on July 22, 2024 which, in someone with both cardiac and pulmonary disease and as medically complex as this patient, can be, as noted above, an indication of a number of serious conditions, most of which require emergent care. Instead, the nurse gave the patient a refill of his inhaler.

  o On September 1, 2024, the patient was seen by a nurse for low back pain. The nurse ignored the fact that he had an abnormally elevated heart rate. She obtained a urine sample and gave the patient acetaminophen for what was later diagnosed in the hospital two days later as a urinary tract infection. Not only did the nurse's failure to contact a practitioner result in a missed diagnosis of a urinary tract infection leading to an avoidable ER trip, but the untreated urinary infection could have become even more serious while left untreated for two days.

  o On January 19, a nursing assistant noted that the patient's linens needed to be changed due to vomiting. A practitioner, who did not examine the patient, noted that he had a low grade fever, and just ordered an antinausea medication and acetaminophen for the fever. The patient was seen by nurses, acting independently, on January 20, 24, February 2, and 3, for continuing nausea/vomiting. First, he was told to take sips of water, then he was told to increase fluids as he also had diarrhea, and on the third visit, to also eat bland foods. When the patient developed a cough and sore throat in addition to vomiting, the nurse gave him cough medicine as well as an antinausea pill, even though these new symptoms could have just been due to irritation from vomiting. None of these visits were

6

escalated to a practitioner, despite the fact that nausea can be sign of heart problems, especially in a patient with known severe heart disease.

- There were two errors involving the patient's identification. Proper patient identification is one of the most basic of patient safety issues.

  o On April 10, 2024, the patient was erroneously given another patient's medications.

  o On August 16, 2024, a pharmacy document from another patient was scanned into this patient's medical record.

- The patient was seen remotely by a practitioner at least 13 times, from June, 2024 to February 2025. Given the complexity of this patient's case, especially his diseased heart and lungs and the need to examine these organs (which could not be done because the visit was remote), visits by telehealth were dangerous because they led to incorrect conclusions that his conditions were stable.

- The patient experienced delays in care.

  o Another urgent cardiology consultation was requested on December 4, 2024 by the urologist to get surgical clearance for the insertion of a much needed catheter through his abdominal wall to drain his bladder. As "urgent," it should have been completed by January 3. Instead it was not scheduled until March 17, by which time the patient was already in the hospital.

  o A practitioner referred the patient for evaluation of sleep apnea on March 25, 2024. Evaluation for sleep apnea was important in this patient because it may worsen heart failure, a condition the patient had. The evaluation, which was ordered to be completed by May 24, 2024, was still being scheduled at the time the patient died one year later.

- There is evidence of falsification of records. On February 20, a physician checked boxes in the patient's health record indicating that the physician had educated the patient on smoking cessation (the patient hadn't smoked since 1987 per the same note) and hepatitis C and its treatment (the patient did not have hepatitis C).

- The report from the cardiology specialist to whom ADCRR sent the patient on September 16, 2024 was not scanned into the patient's EHR and available for review and action until November 22, 2024. Exacerbating the delay, no practitioner reviewed it until December 4, 2024.

- Infirmary admission orders on March 20 were dangerous. Among a number of other errors, the orders instructed nurses that the patient should be allowed to get out of bed on his own as he wished and without any special assistance or mobility devices, despite being paralyzed on his left side and requiring a wheelchair with help transferring.

Despite multiple serious errors in the care of this patient in the months prior to his death, including an error which very likely contributed to his death, ADCRR's after-death review did not identify a single error nor any room for improvement.

<u>Death 2</u>
Patient 21 was a 78-year-old male who died on March 24. He had a history of high blood pressure, high cholesterol, and a cardiac arrhythmia (atrial fibrillation and long QT interval). On February 9 he had a heart attack requiring placement of a stent in his main coronary artery.

We identified several issues of grave concern regarding ADCRR's management of his condition upon return from the hospital on February 14.

- He was discharged from the hospital on two new blood thinners and a medication to normalize his heart rhythm in addition to his multiple blood pressure medications. The hospital discharge report instructed ADCRR physicians to stop his aspirin given that he was started on two new blood thinners. The combination of these medications greatly increases the risk of serious if not fatal bleeding. Despite this, the patient was not told to stop the aspirin until February 26, 12 days later.

- Upon discharge, a practitioner referred him for specialty consultation with a cardiologist within one week (i.e., by February 21). Instead, ADCRR scheduled it for April 17 by which date the patient had been dead for almost a month.

- The patient developed a severe form of high blood pressure called malignant hypertension, a condition requiring emergent treatment, that was inappropriately managed at the facility. The patient's blood pressure was initially 130/80 on March 1. By March 3 it had increased to 146/64; the patient's blood pressure medications were increased. By March 7 the patient's blood pressure became dangerously high (200/86), especially in a patient who had a heart attack the month prior, the danger stemming from the extra workload placed on the heart. Despite this, the patient was not seen or managed emergently. He complained via an HNR that ever since his heart attack he was having difficulties breathing in the morning while laying down, a clear sign he was in heart failure and evidence his high blood pressure was causing damage to his organs. Despite the fact that the patient had malignant hypertension at this point, the patient was seen on March 8 by an RN, acting independently, who failed to recognize the urgency of the situation. On the morning of March 10, the patient's blood pressure remained critically high (210/94) and he continued to have symptoms of heart failure. A practitioner was falsely reassured when his blood pressure came down to 172/80 after his morning medications. The practitioner should have, but did not, examine the patient's heart and lungs. The physician also dismissed a very important symptom the patient reported – shortness of breath when lying down – as not a symptom at all. Despite the need for acute management of the malignant hypertension, most desirably in a hospital setting, the practitioner simply increased the dosage of one of the patient's blood pressure medications. Later that same day, he was seen by a nurse again for shortness of breath with exertion. His blood pressure was 189/93 and his heart rate was 49. Focused only on the

8

heart rate, the remote practitioner communicating with the nurse ordered to withhold one of the patient's blood pressure medications because a slow heart rate is a possible effect of the medication. This was very dangerous because doing so had a high likelihood of making his already very elevated blood pressure more elevated, placing him at great risk of worsening heart failure or a heart attack. On March 11, a practitioner ordered an additional blood pressure medication. The patient's blood pressure acutely decreased to 122/64 but by that evening, the patient presented in obvious distress. His blood pressure was significantly elevated again (168/100) and he was short of breath with extremely low levels of oxygen in his blood (71%; normal is greater than 95%). The patient was placed on oxygen and sent to the ER where he was found to be in heart failure with kidney dysfunction related to his inadequately treated malignant hypertension. He required intravenous medications to remove the excess fluid in his body that accumulated due to his heart and kidneys no longer working well, a result of the persistently high blood pressure. He returned to the facility on March 14. A water pill was ordered that day, an important treatment for his heart failure. However, ADCRR delayed beginning the medication for four days, until March 18. He was seen in follow-up on March 19 and continued to complain of shortness of breath in the afternoon. The patient was found dead on March 24.

In summary, very poor management of this patient's malignant hypertension and heart failure following a heart attack, by multiple professionals over multiple encounters, was likely the proximate cause of his death.

Despite multiple serious errors in the care of this patient in the weeks prior to his death, ADCRR's after-death review did not identify a single error nor any room for improvement.

<u>Death 3</u>
Patient 22 was a 48-year-old male who died on March 12. He had lung cancer, but it was not diagnosed until he had multiple metastases to the brain, at which point he was transitioned to comfort care. Although the errors committed by ADCRR while caring for this patient did not cause the patient's death, and if they hastened his death, it was by hours or days, these same errors will put other patients whose deaths are not as imminent, at significant risk of serious harm, including death or hastened death.

- On January 12, the patient's friend was so concerned about the patient's health that he accompanied him to medical to help advocate for him to get urgent help. He described his friend as being "off" as he was slow to respond, not as active, had loss of appetite, and no longer wanted to participate in daily tasks. The patient said he didn't know how to communicate this on his own. The friend said the patient had a mental health issue, so even though the patient was not on the mental health caseload, the nurse scheduled mental health follow-up per the friend's request. The nurse's referral to a mental health professional was a serious error. The Injunction specifically states that patients who are not yet on the mental health caseload and request mental health treatment should be seen first by a medical, not mental health, professional. The rationale for this requirement is simple and basic: For patients without an existing mental health diagnosis, changes in clinical behavior or mental status are very commonly the result of a physical, not mental condition, many of which require urgent if not emergent attention. In the case of this

patient's change in behavior, it was indeed the result of a metastatic lesion in his frontal lobe of his brain, impacting mood and behavior.

- On January 16, medical staff in the clinic witnessed that the patient had urinary incontinence. In a 48-year-old male with no similar history, this is a troubling medical symptom, the causes of which include serious medical problems such as a brain lesion or spinal cord damage requiring emergent treatment. Instead of pursuing this symptom, a medical practitioner ignored it, deeming the patient's physical exam normal; the patient proceeded to have an appointment with a psychiatric practitioner.

- The error of referring the patient to MH was compounded by the actions of the MH professional to whom the patient was referred. The psychiatric practitioner diagnosed the patient with *recurrent* major depressive disorder even though he had no mental health history and diagnosed him with adjustment disorder even though he had nothing new to which he was adjusting. Therefore, both diagnoses were nonsensical. Also illogically, his urinary incontinence was attributed to depression; if true – which it was not – urinary incontinence would be such an extreme symptom of depression that it should have resulted in immediate admission to a MH Inpatient Unit. Instead, the practitioner just started the patient on an antidepressant as an outpatient.

- While in the hospital, the patient was diagnosed with metastatic lung cancer to the brain and had had a surgical resection of one of the brain lesions. He was discharged back to the prison on January 12. On February 11 he was seen by a radiation oncologist who planned to obtain additional radiographic imaging in preparation for ablative radiation to the brain metastases. The imaging done a month later (March 10) showed a critical situation: his brain was expanding to the point it no longer could fit inside the skull and was about to destroy the brainstem by pushing it through the one opening at the base of the skull (impending herniation of the brain). His vital signs were also very abnormal, the most striking of which was a heart rate of 120 (normal less than 100). The radiologist documented that the radiology "critical results teams" was notifying ADCRR staff by phone. At this point, the patient required emergency surgery (within minutes to hours). Instead, ADCRR ignored this information and took no action that day. They took no action until March 12 when there was clinical evidence of actual herniation of the brain.

Despite these multiple serious errors in the care of this patient in the days prior to death – in addition to other errors we do not include here – ADCRR's after-death review did not identify a single error nor any room for improvement.

Death 4
Patient 23 was a 35-year-old male who died on March 21. He had a history of bipolar disorder. We identified several issues of grave concern regarding ADCRR's management of his case.

The patient was seen by a nurse acting independently (i.e., without the involvement of a practitioner) on February 12 for a four-day history of cough and sore throat. The amount of oxygen in his blood was low

for a 35-year-old otherwise-healthy man (93%, previously 100% in October, 2024; normal is greater than 95%), but the nurse ignored it. The nurse also failed to order any testing for viruses (i.e., influenza, COVID, RSV) and failed to arrange any follow-up. At this point, the patient was brewing the infection or infections that would lead to his death (influenza and *Streptococcus pneumoniae*). The Injunction prohibits nurses from providing such independent care. Had the patient been seen by a competent practitioner at this point, his death would likely have been prevented. Instead, the nurse determined the patient had a "common cold," ordered over-the-counter medications, and did not arrange any follow-up.

Further, the nurse's violation of the Injunction and good care are, by design, supported by the EHR. As seen in the screenshot from the patient's record, the nursing form allows referral to a practitioner ("provider") to be optional (because the nurse can opt to check or not check the "Consult provider…," "Refer to provider…," and "Provider contacted" boxes), in direct violation of the Injunction. And in this example, clearly none of those boxes were checked.



The patient was seen again by a nurse acting independently on February 18 for nausea. The patient declined a physical exam, including vitals, for unclear reasons and the patient was not referred to a provider.

By February 21, when seen cell-front by a nurse during medication administration, he was found to be in acute respiratory distress. The cell mate said he had been very ill for 3 to 4 days. He was pale, "almost gray," and his heart rate was fast (pulse 117). Oxygen levels in the bloodstream below 75-80% are considered critically low; his was 45%, also evident from the purple color of his nailbeds. Because minutes, if not seconds, count at this point, he required immediate evacuation to the hospital via ambulance. Instead, the patient was transported to the medical clinic. An ambulance was summoned some 30 minutes later. We could not determine with a reasonable degree of certainty if this 30 minute

delay contributed to his death. However, in another patient with critically low oxygen levels those lost minutes could mean the difference between life and death.

The patient died in the hospital on March 21 of severe pneumonia caused by the influenza virus and the bacteria *Streptococcus pneumoniae*.

In summary, a nine-day delay in the patient receiving appropriate care from ADCRR for a brewing pneumonia erased any chance he had to survive the infection.

Despite multiple serious errors in the care of this patient in the days prior to his death, ADCRR found no issues with the care provided and therefore made no recommendations for quality improvement.

<u>2023 Cases</u>

The following are the four earliest consecutive deaths since the Injunction was implemented that we identified, using the criteria described above. The focus of our review was to determine whether there were any errors in care, and if so, whether ADCRR was able to identify them, determine the reason for the error, incorporate those findings into their global improvement plan, and if appropriate, implement remediation.

<u>Death 5</u>
Patient 24 was a 48-year-old male who died on July 10, 2023 of pneumonia due to influenza B and the bacteria *Streptococcus pneumoniae*. We identified at least two significant errors in this patient's care; ADCRR identified none.

First, the patient was never offered influenza vaccination, in violation of the Injunction (section 11.4). His infection with *Streptococcus* was likely a complication of an initial infection with influenza, and given that at least a third of severe cases of influenza can be prevented by vaccination, failure to provide vaccination likely contributed to his death.

Second, the patient was evaluated by a nurse acting independently on July 6, 2023, in violation of the Injunction (section 7.4.7). Had the patient been evaluated instead by a competent practitioner, his death might have been avoidable.

Despite these two serious errors in care of this patient in the days prior to his death, ADCRR found no issues with the care provided and therefore made no recommendations for quality improvement.

<u>Death 6</u>
Patient 25 was a 60-year-old male who died on July 23, 2023 from metastatic liver cancer in the setting of end stage liver disease due to hepatitis C and alcohol. We identified at least three significant errors in this patient's care; ADCRR identified none.

First, as a patient with a known history of cirrhosis of the liver, he should have had screening tests for liver cancer every six months. Upon arrival at ADCRR on June 18, 2023, there was no record of him having been screened in the previous six months (if ever). Therefore ADCRR should have, but failed to perform a screening.

Second, the patient was seen by a practitioner on July 12, 2023 who inappropriately referred the patient for an urgent paracentesis (i.e., removal of fluid from the abdomen, a procedure not without risks such as infection) without first obtaining laboratory tests and increasing his diuretics (i.e., water pills, which, if successful would obviate the need for the risker paracentesis), in violation of the Injunction (section 1.1).

Third, the paracentesis was ordered on July 12, 2023 as "urgent," meaning it needed to be completed by August 11, 2023. Instead, it was not scheduled to take place until December 4, 2024, almost a year and a half later, long after the patient died, in violation of the Injunction (section 1.22).

Despite these three errors in care of this patient in the weeks prior to his death, ADCRR found no issues with the care provided and therefore made no recommendations for quality improvement.

This patient was admitted to ADCRR on June 18, 2023 and died a month later. It is likely his cancer was already so advanced at the time he was admitted that even if ADCRR had found the cancer sooner it would not have avoided his death. However, finding the cancer in another patient could certainly reduce the risk of death. Thus, identifying this error (failing to screen for liver cancer) and fixing the underlying system problem that allowed the error to occur, was necessary to reduce the risk of death for the next patient. In fact, subsequent deaths did occur. During a mortality review in December 2023, ADCRR recognized the failure to screen Patient 26 for liver cancer (although it was not considered contributory to his death). However, no sustainable change was implemented as a result of this awareness. Then in March 2024, Patient 27 died of liver cancer after a failure to conduct appropriate screening. It was only at that point that ADCRR implemented a centralized process to improve the number of patients with advanced liver disease screened for liver cancer in a timely manner.

Death 7
Patient 28 was a 69-year-old male who died on July 29, 2023 of a perforated stomach ulcer. We identified at least four significant errors in this patient's care; ADCRR identified none.

First, the patient had a low number of platelets in his blood, the cells responsible for clotting (112,000; normal is 150,000 to 450,000), initially noted on May 17, 2023. A low platelet count can result in bleeding and also can be a marker for serious diseases. Thus, there should have been, but was not, any explanation for the low count in the patient's EHR. In the absence of an explanation, a work-up to determine the cause should have been conducted.

Second, on June 23, 2023 the patient had repeat laboratory tests performed. In addition to a low platelet count, the tests showed that he was also now anemic (low number of red blood cells, the cells that carry oxygen). His hematocrit – a test for anemia – had dropped from 43 to 35.8 in just over a month, which

13

would raise concern that the patient had internal bleeding. The hematocrit results should have been reviewed within four days of receipt (by June 28). Instead, ADCRR did not review them until July 7 (at which point the patient was already in the hospital), in violation of the Injunction (section 4.4). In the evening of July 4, 2023, the patient was brought to the clinic by custody staff in a wheelchair for back pain. He was found to have low blood pressure, fast heart rate, fever, and low oxygen levels in his blood. He was sent to the hospital and was found to have internal bleeding. He was bleeding from a stomach ulcer. He underwent emergency surgery, but never recovered. Had a competent provider reviewed his blood test in a timely manner, he likely would not have died.

Third, starting in October 2022, the patient was prescribed naproxen twice daily, a non-steroidal anti-inflammatory drug (NSAID) that increases the risk for bleeding and stomach ulcers. It is especially dangerous in patients, such as this one, with low platelet counts and cirrhosis. Though the medication was prescribed prior to the beginning of the Injunction in April, 2023, after that date, practitioners had the ability and responsibility to discontinue it.[3] They did not.

In their review of this death, ADCRR failed to identify the first two errors above. ADCRR did identify the third error and recommended in their review that "patients with risk factors for gastrointestinal bleeding (e.g., cirrhosis and low platelets) should only be prescribed chronic NSAIDs when other treatment options have been explored and the patient has been provided with education about the risks and benefits of treatment. When chronic NSAIDs are prescribed, then appropriate treatment with gastro-protective medications (e.g., proton pump inhibitors) should be utilized." However, as explained in the introduction to this section, in violation of the Injunction (section 2.1.1 and 2.5.1), ADCRR failed to do anything more with this information to prevent another death, *to wit* analyze why the error occurred, (which may require a root cause analysis), incorporate addressing of the error into the statewide improvement plan, and if remediation is called for, develop and execute an effective and sustainable remediation plan. Instead, their remediation plan amounted to just wishful thinking.

Death 8

Patient 29 was a 40-year-old-male with a history of hepatitis, high blood pressure, opiate and alcohol use disorders, and seizure disorder who died on July 30, 2023 of complications after surgery for a bowel perforation due to focal colonic infection (i.e., diverticulitis).

ADCRR's review of this patient's death focused on the four days of January 1 to 4, 2023.[4] The patient was seen in the clinic five times (four times by RNs, once by an APP) for abdominal symptoms that began three days earlier, on December 29, 2022, including severe abdominal pain, nausea, vomiting, and blood in the stool. The RNs communicated with a remote practitioner by sending written messages back and forth through the EHR. At one point a practitioner ordered the patient to be given an injection of a

---

[3] It might be appropriate to continue NSAIDs if, after an analysis of the situation, there were no other alternative, in which case the patient should receive additional medication to help offset the bleeding risk. However, no such analysis took place, and based on the information in the chart, alternatives would have been possible.

[4] The failures in care identified by ADCRR all occurred before April 7, 2023 (when the Injunction was implemented) and are therefore themselves beyond the scope of our review. However, the ADCRR's *review* of that care occurred after April 7, 2023, and are appropriately within scope and the subject of these comments.

14

non-steroidal anti-inflammatory drug (NSAID) ketorolac (Toradol®). No practitioner actually examined the patient in person until the afternoon of January 3. It was not until the afternoon of January 4, after seven days of suffering severe abdominal pain that ADCRR failed to control, that ADCRR finally sent the patient to the ER. In the ER it was found that the patient had a perforation of the colon, a very serious condition similar to a ruptured appendix. Surgery was performed immediately.

It was highly likely that the patient's colon had ruptured hours to days before he was sent to the ER. The more time that passes from the time of a rupture until surgery, the greater the risk the surgery will not be successful. Thus ADCRR's delay in sending him to the ER greatly increased the risk of death to the patient. Simultaneously, because of the failure to effectively treat the patient's pain, he remained in severe pain for seven days. ADCRR appropriately recognized two problems with the patient's care during that short window as noted in the following screenshot of its recommendations:



Recommendations

1. With regard to the patient's presentation in January 2023, patients presenting with severe abdominal pain need an escalation to a higher level of care for evaluation and diagnostic studies.

2. With regard to the patient's presentation in January 2023, strong NSAIDs like Toradol should be used cautiously especially in patients with a higher risk of bleeding (e.g., hepatitis C patients), evidence of bleeding, and those with undiagnosed abdominal pain.

However, we could not find evidence that ADCRR effectively performed the other steps required by the Injunction (section 2.1.1 and 2.5.1), as explained in the introduction to this section, *to wit* analyze why the errors occurred (which probably required root cause analyses), incorporate addressing of the errors into the statewide improvement plan, and developing and executing an effective and sustainable remediation plan. Instead, their remediation plan amounted to wishful thinking.[5] As evidence of the uselessness of ADCRR's death review recommendations, three subsequent deaths contained the same recommendation (Patient 30 who died on September 17, 2023 and Patient 31 died on October 7, 2023, and Patient 32 who died on March 1, 2024) highlighting that the issue had not been adequately addressed (i.e., patients with severe acute abdominal pain were still not being escalated to a higher level of care).

---

[5] On August 14, 2023, without performing a root cause analysis to understand the underlying reason for the misuse of ketorolac, NaphCare removed ketorolac from the formulary, i.e., making it no longer available to clinicians to use without prior approval, a process that takes hours, if not days. Given that ketorolac is a unique and valuable medication for the immediate treatment of acute pain, this decision makes it nearly impossible to have it available for this purpose. There was no documentation of a plan to monitor the effect that this major formulary change would have not only on the number of patients experiencing gastrointestinal bleeds (the outcome they were trying to minimize), but also on acute pain management (a possible inadvertent negative outcome to this formulary change).

## IV. Previously Reviewed Deaths – Clarifications

In Defendants' Response to Monitors' Second Report and Defendants' Response to Receivership, Defendants cite a number of perceived weaknesses or errors in our detailed descriptions of preventable deaths in our Monitors' Second Interim Report, stating: "Unfortunately, the Monitors' suicide reviews do not tell the full story or include all information relevant to assessing the extent to which the patients' deaths were foreseeable and thus potentially preventable." and "The Monitors' non-suicide death reviews suffer from similar flaws."

We address (in italics) those concerns in the narratives below after providing the relevant excerpt (in quotation) of the Defendants' concern. The patient numbers correspond to the patient numbers used in the latter report. Many of ADCRR's disagreements with our analyses hinge on the issue of patient refusals, with ADCRR noting that patient refusals of certain interventions or treatments contributed to the deaths. We address the issue of refusals in more depth in its own section later in this report, but in brief, what ADCRR considers patient refusals are not; they are nothing more than meaningless signatures on a piece of paper.

Patient 1 in Monitors' *ad hoc* Report on Five Suicides, Doc. 4691
"Patient 1 was seen numerous times in January and February 2024, exceeding the requirements in the Injunction for residential treatment."

*The injunction does not set any such requirements; the type, frequency, and intensity of treatment should, instead, be driven by clinical need and established in the Treatment Plan. However, the patient's last four Treatment Plans (August 21, 2023, October 22, 2023, January 22, 2024, and February 14, 2024) were each done by a different Psychology Associate, were all completely identical, and did not even address the suicidal risk presented by the patient.*

*More importantly, it is the content and quality of the therapeutic encounters – not solely the number of them – that determines the effectiveness of treatment. The patient was seen by four different psychology associates for these meetings, none of whom were assigned as the patient's Primary Therapist. In those encounters, the patient was seen for an average of 10 minutes per encounter and more than half of them were conducted at cell-front. During the time period noted by the Defendants, the patient was placed on watch, reduced in watch levels, and discharged from watch with only cell-front encounters, which typically does not provide sufficient depth and quality of information to determine that discharge from MH Watch is safe.*

*Documentation in the patient's chart reveals a lack integration of clinical information sharing between disparate mental health clinicians and the absence of an assigned Primary Therapist (or someone functioning as the Primary Therapist), resulting in a diffusion of responsibility and a disruption in the continuity of care, which more likely than not contributed to the patient's death by suicide. Significant suicide risk factors were documented in some of the notes but were not probed or followed up on in any meaningful way. For example, on February 16, 2024 a*

*psychology associate saw the patient in response to a suicidal email intercepted by DOC, but his risk was not reassessed. Five days later, on February 21, 2024 a different psychology associate documented the patient's report of distress at having received a ticket for possession of buprenorphine and stated that the lack of visits with his family (about 2 years) was negatively impacting his mental health. There was no further assessment of these dynamic suicide risk factors, the number of which had been increasing over the previous several weeks, to include placement on MH Watch for suicidal and homicidal ideation with a plan only a week prior to the February 21, 2024 meeting.*

Patient 2 in Monitors' *ad hoc* Report on Five Suicides, Doc. 4691

"Patient 2 was noted to be future-oriented in her sessions."

*Future-orientation is one potential protective factor. A clinically adequate suicide risk assessment must weigh any protective factors against the risk factors, especially the dynamic risk factors (i.e., those which can change over time), to determine the level of overall suicide risk and take appropriate clinical action. As noted in the report, the patient expressed dozens of risk factors of increasing frequency and severity that were not explored, summarized, or synthesized to provide a meaningful understanding of the patient's suicide risk because no suicide risk assessment was ever completed.*

Patient 3 in Monitors' *ad hoc* Report on Five Suicides, Doc. 4691

"Patient 3 had discontinued his medications by his own choice, and his progress notes indicate that he was future oriented, with hopes of "changing his life around.""

*While the patient's choice to discontinue his medications may reflect an element of self-determination, it is not, in and of itself, a protective factor in terms of suicide risk. Patients stop taking medications for any number of reasons including but not limited to side effects, lack of efficacy, or stigma associated with taking mental health medications. In this patient's case it may have been an indicator of impaired judgment as indicated by the fact that on February 13, 2024, just over two weeks before his death by suicide, the patient was requesting to increase one antipsychotic medication (olanzapine) and restart another (haloperidol) because, according to a psychiatric practitioner "he took both combinations in the past for his [auditory and visual hallucinations] with good efficacy." The patient's vacillation back and forth between starting and stopping antipsychotic medications should have been, but was not, considered a risk factor for suicide. Further, as mentioned above, protective factors such as future orientation and "hopes of changing his life around" must be considered in the context of the existing (and in this case, increasing) risk factors.*

"Contrary to the Monitors' claim that NaphCare failed to perform an adequate initial assessment with Patient 3, the clinician reported spending 65 minutes with the patient and provided a detailed narrative of the session. (*Id*. ¶ 68.)"

*The 65-minute encounter referenced by the Defendants in their rebuttal is an Intake Assessment for Max Custody placement. As a progress note, it is clinically adequate, but it is not a comprehensive MH evaluation. The detailed narrative referred to by the Defendants is a collection of statements by the patient without any synthesis of the information gathered or conceptualization of the course of the patient's mental illness. In fact, there is no documentation in the record of a comprehensive mental health evaluation ever having been conducted. Further, Patient #3 was seen by no fewer than 15 different mental health staff in the month leading up to his death but did not have an assigned Primary Therapist in January or February 2024; the absence of an identified point of ultimate accountability for the patient (i.e., Primary Therapist) resulted in diffusion of responsibility for the patient's care with at least eight psychology associates interacting with the patient mostly at cell-front with no one individual being responsible for taking the lead in his care. Consequently, an adequate clinical understanding of this patient's mental health issues – and particularly his suicide risk – was neither well understood nor managed in a clinically appropriate manner.*

Patient 4 in Monitors' *ad hoc* Report on Five Suicides, Doc. 4691

"Patient 4 was noted to be functioning at baseline immediately prior to her death. (*Id.* ¶¶ 59–62.)"

*ADCRR appears to be presenting this information as if it is a protective factor; however, as we have noted several times in this report, a patient manifesting a single protective factor does not equate to an absence of risk for suicide. Mental health clinicians must weigh both the risk factors (static and dynamic) and protective factors when determining suicide risk and these factors must be considered in the overall context of the course and severity of the mental illness. ADCRR did not have a solid understanding of this patient's "baseline functioning" since she was only incarcerated for 39 days before her death and other than her 10-minute intake assessment by a psychology associate, she was seen only once by a clinician for a 5-minute encounter with a different psychology associate on December 26, 2023, nearly two weeks before her death by suicide on January 8, 2024.*

Patient 5 in Monitors' Second Interim Report to Court, Doc. 4755

"Although the patient was not scheduled to see the primary therapist for seven days, he was scheduled to see psychiatry the following day to address his medication concerns."

*A review of the Primary Therapist data from July and August 2024 revealed that the patient did not have an assigned Primary Therapist during those months (although one of the psychology associates saw him more often than the others.)*

*Clinical encounters with therapists and psychiatric practitioners serve different functions and should not be conflated. The meeting with a psychiatric practitioner was to address medication concerns while the meeting with mental health should have focused on addressing his increasing*

18

*anxiety and depression and completing a suicide risk assessment. As noted in the report, the patient had multiple risk factors identified during the weeks and months preceding his death including: medication non-adherence; withdrawal symptoms from abrupt self-discontinuation of his antidepressant and MOUD medication; facing a sentence of death and vacillating between "feeling nothing" and "feeling everything intensely;" recurrent depression; recurrent and increasing anxiety and panic potentially reflecting an undiagnosed anxiety disorder; sleep and appetite disturbance; suicidal thoughts; and staff observations of off-baseline behaviors significant enough to have non-mental health/custody staff refer the patient to mental health. However, these were not ever further explored in any formalized way as no Suicide Risk Assessment was completed.*

"Additionally, the primary therapist documented, 'Writer staffed patient with [Unit] Treatment Team; patient will be seen by psychiatric provider within 24 hours; Patient is in agreement with plan.' It is also worth noting that the primary therapist documented the following observation: 'Patient's anxiety appeared to reduce during the encounter as he was tracking the conversation and engaged, rubbing hands less, and endorsed [symptom] reduction.'"

*ADCRR uses the term "primary therapist." This is incorrect. The patient did not have a primary therapist assigned at the time. He was seen by another psychology associate who was not his primary therapist.*

*While the patient may have received some temporary relief during the session with the psychology associate, the therapeutic benefits of treatment have to be more lasting and generalize beyond the immediate treatment environment in order to have any lasting impact.*

"The primary therapist also documented multiple protective factors during this encounter, including the following: 'endorses getting along with peers in his building…[Patient] was observed socializing with peers prior to the encounter. [Patient] agreed to reduce his isolation by attending morning rec, engaging in stretching/yoga, listening to music, play games on tablet, email, and read a book… [Patient] has spoken to his family and brother who are supportive… Patient engages in the following to cope with mood sx's, maintain sobriety, and improve sleep quality: attends afternoon rec, works out, reads, visits and communicates with family, spends time with brother, and continues to have positive relationships in the housing unit.' During the August 14, 2024 visit, the psych associate reviewed grounding techniques, an evidence-based intervention for anxiety, with the patient.

While the patient was not referred to a higher level of care, he was seen by mental health at an increased frequency in response to his report of worsening mental health symptoms. Additionally, it is worth noting the length of the mental health sessions documented in the progress notes, as the use of the phrase "checking in with the patient" by the Monitors in the Second Status Report suggests only brief encounters. In actuality, the patient was documented to have been seen by a psych associate on the following days and for the following timeframes, which should have been evident in the Monitors' review of Techcare:

• 07/17/24: 30 minutes
• 08/14/24: 30 minutes
• 08/19/24: 35 minutes
• 08/21/24: 20 minutes
• 08/27/24: 43 minutes.”

*The phrase "checking in" reflects the content – not the length – of the encounters; the amount of time a session takes is not an accurate reflection of the quality of that interaction. In the encounters cited by the Defendants, the content of each of the interactions consisted of documenting the patient's complaints and reviewing coping skills that he increasingly reported to find ineffective, particularly during acute panic episodes, which occurred with increased frequency, intensity, and associated fear in the weeks leading up to his death. The patient clearly stated that these self-directed interventions were ineffective, stating that the "multiple coping skills that included breathing exercises, getting out of cell, and trying to go to recreation" were not helpful." He went on to state that his symptoms "continue to increase" and "I just sit there balled up and can't move" (August 27, 2024). Later that same day the patient reported to the psychiatric practitioner that "I tried" the coping skills discussed in that 10-minute encounter but found them to be ineffective and he complained that he continued to have increased panic.*

"Regarding Patient 5, the Second Interim Report does not discuss opioid withdrawal precipitating an acute worsening of mood and anxiety. (*Id.* ¶ 13.e.) Additionally, the Second Interim Report does not properly characterize the patient's own non-adherence with treatment to manage his opioid withdrawal symptoms, as well as his non-adherence with his venlafaxine, which may have contributed to his suicide attempt. (*Id.*)"

*As an initial matter, this patient suffered a suicide, not a suicide attempt.*

*This issue was discussed repeatedly in the report. In fact, the patient's non-adherence to his prescribed psychotropic and MOUD medications and the psychological and emotional distress he experienced as a result of his vacillating compliance was a reoccurring theme. The report documented the patient's stated concerns about the potential negative interactions of his antidepressant and the buprenorphine (Doc. 4755 at 64); his struggles with medication adherence and his abrupt discontinuation of his antidepressant which resulted in "withdrawal symptoms" (Doc. 4755 at 62); and noted his reported use of methamphetamine and opioids while in prison (Doc. 4755 at 63). The report actually highlighted an encounter on August 27, 2024 (4 days before the patient's death by suicide) in which he complained of "uncontrollable anxiety," that his "body was locked and rigid," that he "was curled up in (his) house and couldn't move," and feared that he was "going to die." Ironically, this encounter was brought to the attention of health care staff by a custody officer, documenting the patient's report of "increased anxiety, panic, and difficulty calming down" (Doc. 4755 at 66).*

*The patient was open and honest about his fears regarding medication effects, side-effects, and cross-effects and he was transparent about not taking his medications reliably for these reasons.*

20

*The Defendant's rebuttal seems to suggest that the patient's medication non-adherence was a singularly immutable character trait that doomed him to suicide rather than a dynamic factor that contributed to his overall suicidal risk and should have been incorporated into a conceptualization of the patient in a formal Suicide Risk Assessment. However, as noted in the report ADCRR did not conduct a Suicide Risk Assessment for this patient during this time.*

*Neither the Court's Monitors nor the patient failed to take into account the issues of unreliable medication adherence or withdrawal symptoms in the context of mental health and MOUD treatment when determining the patient's suicide risk. On the other hand, better accounting of these very issues should have been taken by the patient's care providers ante-mortem.*

Patient 1 in Monitors' Second Interim Report to Court, Doc. 4755

"With respect to Patient 1, there is no mention of his documented refusals of follow-up care, including at least three refusals to attend off-site specialty consults, such as cardiology, and failure to come to multiple onsite chronic care visits. (*Id.* ¶ 13.a.)"

*In fact, we specifically addressed this patient's "refusals" in several extensive passages in our report (Doc. 4755 at 31, 32, 33, and 34). Those passages explain, as we do elsewhere in this report, that a patient has not participated in an informed refusal just because there is a document in the EHR with the word "refusal" on it. There is extensive evidence in this case that most "refusals" are at best, meaningless documents and at worst, misleading, ranging from documentation of execution of "refusals" by staff who do not have the training or licensure to conduct them (e.g., LPNs, medical assistants, BHTs, and correctional officers), to documentation of events that did not happen.*

"There is no indication that he was not given appropriate education from providers and/or nursing on the importance of follow-up care, and the patient's non-compliance certainly contributed to his complete health picture. (*Id.*)"

*In the world of medical documentation, we do not know how to respond to the Defendants' assertion that there is "no indication that he was not given appropriate education" – we don't know what the documentation of something that didn't happen would look like. We do know that we looked for evidence of appropriate education from providers/nursing on the importance of follow-up care and did not find it. In fact, regardless of whether he missed some on-site chronic care clinic visits, he had a visit on November 22, 2023 at which time his valvular heart disease and recent surgery for it, one of the critical clinical issues at the time, was not addressed at all nor was his refusal to see the cardiologist. There was no plan to monitor or address his valvular disease after his cardiac surgery which would have been even more critical since he had no scheduled follow-up with a cardiologist.*

Patient 2 in Monitors' Second Interim Report to Court, Doc. 4755

"As to Patient 2, the Monitors suggest that the providers and staff in the IPC, where the patient was admitted after discharge from the hospital, were unable to provide appropriate follow-up care or education. (*Id.* ¶ 13.b.) To the contrary, the providers and staff are familiar with handling nephrostomy tubes and life vests, and this patient was provided primary education on post-surgical care by the hospital before discharge. (*Id.*)"

> *Being familiar with handling tubes and a life vest does not negate the need for nursing orders from a clinician for this particular patient, which were obviously needed since proper nursing care was not provided, as we documented. Education given to the patient is nice, but is irrelevant to providing proper nursing care and having a proper care plan in place.*

"While the Monitors claim that a nurse improperly wrote admission orders outside her scope, the subject orders in the patient's chart are from a nurse practitioner. (*Id.*)"

> *The fact that a nurse practitioner also wrote orders, does not negate that the nurse inappropriately did as well.*

"Finally, the Report does not tell the full story—that the patient was given access to all the specialists, medications, and treatments needed; however, the severity of his health complications and age were a factor in the overall outcome. (*Id.*)"

> *There is no evidence the patient's care met clinical standards. Quite the opposite. It put him at risk.*

Patient 3 in Monitors' Second Interim Report to Court, Doc. 4755

"Patient 3 denied and/or refused multiple exams and laboratory testing orders, which are not referenced in the Second Interim Report. (*Id.* ¶ 13.c.)"

> *As with Patient 1, in fact, we specifically addressed this patient's "refusals" of laboratory testing orders in an extensive passage in our report (Doc. 4755 at 48) (we found no refusals of "multiple exams" so did not comment on them). As explained in more detail for Patient 1, ADCRR did not conduct an informed refusal; the documents with the word "refusal" on them are meaningless and useless.*

"Additionally, the Report acknowledges the patient's condition, and that the patient was assessed and treated at the hospital, but does not recognize that the patient was *discharged* by the hospital, and the local jail, prior to transfer to a Department facility. (*Id.*)"

> *The Defendants are correct – the patient was discharged both from a hospital and a jail. However, we do not understand the relevance or impact of that observation. If the implication is that because of the discharge, any bad outcomes after discharge are automatically the fault of the releasing institution, that defies logic. Although the patient may have been stable enough to*

*safely discharge from the hospital, her stability was tenuous and required close follow-up as there was no guarantee that the patient's status would remain stable.*

Patient 4 in Monitors' Second Interim Report to Court, Doc. 4755

"Patient 4's documented refusal of follow-up bloodwork for an acute hepatitis panel, after initial work-up labs that were completed, caused the process for identification and treatment to be slower than it would have been if the patient had not refused. (*Id.* ¶ 13.d.) A patient's documented and numerous refusals can adversely affect overall outcomes, particularly for patients who have a chronic condition before being admitted to a Department facility. (*Id.*)"

> *As with Patients 1 and 3, in fact, we specifically addressed this patient's "refusals" of laboratory testing orders in an extensive passage in our Monitors' Second Report. As explained in more detail for Patient 1, ADCRR did not conduct an informed refusal; the documents with the word "refusal" on them are meaningless and useless.*

"Additionally, the Second Interim Report asserts that the radiologist read the CT imaging to be "suggestive of cancer," and therefore required more than a "routine" order for additional MRI imaging. (*Id.*) However, the Monitors cite no radiologist who found the CT imaging to be "suggestive of cancer," and this phrase is not in the board-certified radiologist's report that was in the patient's chart and reviewed to place the MRI order. (*Id.*)"

> *The Defendants are correct - the CT imaging did not explicitly say "suggestive of cancer." However, any minimally competent clinician would know that when a radiologist writes that a liver lesion is "indeterminate" the clinical concern is possible cancer, especially in a patient with hepatitis C and a liver lesion. Said another way, "indeterminate" means it is not possible to determine what the lesion is, but most importantly, not possible to determine if it is cancer. If the practitioner was not clear about the radiologist's report, he should have called the radiologist to ask for further explanation and why an MRI was being recommended. A minimally competent clinician should not order a test or imaging without knowing the reason for ordering it and what they are looking for. And, in fact, this clinician ordered the CT because of his suspicions for possible cancer.*

23

# V. Leadership

## Implementation of the Patient-Centered Primary Care Model

Plaintiffs assert that a receiver is needed to implement the PCCM statewide. In their response to the Plaintiffs' Motion for a Receiver, the Defendants stated, "[A] finalized staffing plan for the roll-out of a critical component of the Injunction—the patient centered care model ("PCCM")—has not yet been issued. Appointing a receiver because the Department has not fully implemented the PCCM would be inappropriate, not least because a staffing and facilities plan to support the PCCM has not been finalized."

Implementation of the PCCM is complex and requires significant internal ADCRR leadership. We offer the following observations. **First**, ADCRR mistakes the PCCM as a new concept. In fact, the PCCM is a tool for helping ADCRR implement many of the elements of the Injunction. Nearly none of the underlying elements of the PCCM are new; most of its components were already prescribed in the Injunction. Recommending the PCCM was necessary precisely because ADCRR had failed to implement key provisions of the Injunction. For example, a foundation of the PCCM is that patients are assigned to a single primary care practitioner (PCP) for their medical needs and a single primary therapist (PT) for their mental health needs. While patients have PCPs and PTs assigned, this assignment in most cases is in name only. **Second**, most of the high-level guidance for implementation of the PCCM pilot came from the Court's expert (Ms. Strugar-Fritsch). As noted in the Final Staffing Analysis and Plan Report (Doc. 4858), ADCRR still does not have the requisite leaders/project managers to "pick up the baton" from the expert for the statewide implementation, despite the expert's clear statement of the need for such leadership at least a year ago (Doc. 4599). **Third**, we have not seen evidence of the presence of leadership within ADCRR's HSD to implement the requirements of the Injunction related to the PCCM. Most notably, on March 30, Ms. Strugar-Fritsch and I submitted the final Staffing Analysis and Plan to the Court (Doc. 4858). We provided ADCRR with two additional key documents. One, sent on March 30, was an Excel file containing the underlying formulas and calculations we used in the Staffing Analysis and Plan. The other, sent on April 3, was the experts' recommended PCCM implementation schedule and guide. On May 15, some six weeks later, we received the first inquiry from ADCRR related to details in the calculations.

Consequently, thus far ADCRR has not demonstrated that it has the internal leadership capability requisite to implement the PCCM statewide.

## Assimilating Monitors' Feedback

ADCRR has not been able to assimilate much of the extensive feedback we have been providing them since 2023 on how to correctly collect and analyze the data needed to self-assess its level of performance of the requirements of the Injunction (which, for many requirements, is data that is essential to our monitoring as well). We have provided feedback and accompanying coaching to

ADCRR's HSD staff, more than once, and for several of the requirements, multiple times. Despite this, for at least 19 of these Injunction requirements, ADCRR continues to err in either the way it collects the data, or the way it analyzes it.

<u>Missed Early Opportunities to Comply with the Injunction</u>

Many requirements of the Injunction *could* have been implemented soon after the Injunction was issued, if not immediately. Of those, many with direct impacts on the risk of serious harm, were not. We provide three examples.

1.

The Injunction directed ADCRR to discontinue the practice of having RNs independently manage episodic patient problems (except for a limited number of conditions for which nursing protocols would have been approved by the Court). This provision of the Injunction was an important change driven by the recognition that independent primary care practice by nurses was posing a significant risk of serious harm to patients because such practice was beyond the safe capabilities of nurses. One of the signals to nurses indicating to them that it is acceptable for them to provide primary care without practitioner involvement is the electronic health record (EHR). Prior to the Injunction, the EHR contained some 45 protocols designed for independent practice by nurses. Access to these protocols could have been blocked for use by RNs within a few days of issuance of the Injunction. It was not and thus the protocols continue to be accessible – and used – by RNs. Examples of resultant harm are described throughout this report.

2.

Closely related to the first example, when using certain nursing protocols, the protocol gives the nurse the option to contact a practitioner, or not. That option could have been removed from the protocols, forcing nurses to contact a practitioner, but it was not. This is shown in the screenshot below from the EHR of Patient 23 ; the check-off box at the bottom – "Provider contacted" is giving the nurse the option to contact or not contact a practitioner ("provider").



ASSESSMENT: Cold Symptoms

PLAN:

Provider must be contacted for medication orders for any PREGNANT patients

☐ Consult provider for fever greater than 101; tonsillar exudate, coughing up blood or suspected peri-tonsillar

If no allergies or contraindications:

☐ Guaifenesin 400mg PO BID x5 days PRN for productive cough
☑ Guaituss-DM syrup 1 tbsp PO BID x3 PRN days for non-productive cough
☑ Chlorpheniramine 4mg PO BID x3 days PRN for nasal drainage
☑ Salt Water Gargles PO TID x3 days PRN
☑ Acetaminophen 325mg ii tablets bid po prn x 5 days
☐ Ibuprofen 200mg ii tablets bid prn x 5 days
☐ Refer to Provider for sick call if feverish/flushed

☐ Provider contacted

Patient 23 died in March, in part because a nurse was allowed and encouraged to manage a cold-like symptom (cough), contributing to an avoidable death.

While the Injunction allowed for RNs to independently manage a very small number of (approved) conditions, it wholly barred LPNs from any such activity. LPNs undergo significantly less training than RNs. Not only are they not capable of providing care independently, doing so is beyond their legal scope of practice. Similar to protocols for RNs, the EHR contained some 35 protocols designed for independent practice by LPNs. Access to these protocols could have been blocked for use by LPNs within a few days of issuance of the Injunction. It was not and thus the protocols continue to be accessible – and used – by LPNs. Examples of resultant harm are described throughout this report.

As a third example, identifying during a mortality review, any errors made in the care provided to the deceased patient, is critically important for improving the safety of patient care and does not require a large investment of resources. Mortality reviews (in fact two reviews, one done at the facility level by the vendor and one at the state level in conjunction with HSD) were already being done at the time of implementation of the Injunction. However, the reviews generally failed to identify errors. As we describe in detail in Section III Capstone: Mortality Reviews – they still do.

## VI. Insufficient staffing

ADCRR cannot provide constitutionally adequate health care if there is an insufficient number of appropriately qualified health care staff and an insufficient number of custody staff to support the health care operation. Plaintiffs provide some details supporting the claim that ADCRR still has an insufficient number of staff. Defendants assert that they are trying to add positions and have made improvements. There is some truth in both parties' claims. We will use the example of medical physicians to provide clarity.

Arguably medical physicians (medical directors and staff physicians) are among the most critically important personnel to ensure that patients receive constitutionally adequate care. ADCRR claims that "The number of physicians increased by 46%, from 15.5 physicians (staff physicians plus medical directors) for the entire prison population (Doc. 4335 at 23:27-28), to 23.95 today (with a goal of 29.5). (Ex. 2, Oddo Decl. ¶ 9.b.)" (Doc. 4818 page 4)

According to the most recent contract with NaphCare (and therefore the minimal level per the Injunction) ADCRR should have 18.8 FTE staff physicians and 9.0 FTE medical directors for a total of 27.8 FTE physicians.

Instead of 18.8 FTE staff physicians, ADCRR only has approximately 11.5 FTE, or approximately 61%, filled.[6] However this expression of "filled" does not tell the whole story. Of the 18 individual physicians who ADCRR reports[7] as filling those 11.5 FTE (there are more physicians than FTE because some work parttime), only 11 are board certified or board eligible in Internal Medicine or Family Medicine. Under the Injunction, only those 11 physicians may function as staff physicians in ADCRR. Thus, while there are incumbents in those positions, we only recognize approximately two thirds[8] of the "filled" positions as actually filled, meaning that actual fill level is significantly lower that the above-cited 61% "fill" level.

ADCRR has incumbents in all 9.0 medical director FTE. However, as with staff physicians, some of those incumbents are not board certified or board eligible. Calculating the actual fill level for medical directors is simpler than it is for staff physicians because each of the 9 physicians works 1.0 FTE. Only 6 of the incumbents is board certified/board eligible, meaning that only 66% of medical director FTE are currently filled.

Based on the same June report, the global staff fill level (excluding physicians) is 78%. While better than that for physicians, it is still markedly below what is needed to safely operate health care.

---

[6] These data come from ADCRR's Staffing Report to the Court for June. 10.95 FTE are reported on the second tab ("Response to 4(a)"). Another 0.6 FTE is filled according to oral communication with ADCRR on July 16.

[7] ADCRR's monthly self-assessment of performance on provision 6.4 of the Injunction for the month of May, the latest month reported

[8] Two thirds is an approximation because calculating fill rates is based on FTE, not individual physicians. Depending on the relative FTE of the 11 board certified/board eligible physicians compared to the FTE of the 7 non-board certified/board eligible physicians, the discounting of the 61% fill rate could be more or less than one third.

As part of its explanation for vacancies, ADCRR asserts in Defendants' Response to Receivership that "NaphCare has provided competitive salaries for all these positions when compared with average market rates." We explain the fallacy of this assertion in the last section of this report under Provision 1.16a.

Thus, ADCRR has increased staffing, however, the increase is woefully insufficient. We opined in previous reports, and repeat here, that some two years after the Court issued its Injunction, ADCRR still continues to have a significantly insufficient number of staff.

## VII. Refusals

In both of their response documents, Defendants often cite patient refusals of care as the explanation for poor outcomes. They posit that in those cases poor outcomes were therefore clinically unavoidable because they were the fault of the patient, not ADCRR. We strongly disagree with that rationale.

There is no question that patients (with decision-making capacity) have the right to refuse care. However, for that refusal to have validity – and by extension, for the responsibility for the outcome of that decision to belong to the patient, not ADCRR – the refusal must be informed. ADCRR staff overwhelmingly see a refusal as synonymous with a signature on a piece of paper. It is not. A refusal is more than getting a patient's signature. A refusal is a *process of communication* between a patient and a care provider. The patient's signature, in fact, is not the most important element of a refusal and for the purposes of the Injunction, is not always necessary. To underscore the subordinate role that signatures play to the refusal process itself, the Court included guidance in section 10.3.3 of the Injunction: "Signed refusals by the prisoner are not required."

The refusal communication process has six key elements. **First**, the patient needs to understand the care that is being proposed. **Second**, the patient must understand the risks of refusing the care. **Third**, the care provider must endeavor to understand the patient's reasons for refusing. This step is critically important, both to give the provider a starting point for exploring ways of addressing those reasons, including, the **fourth** step, which is to offer reasonable alternatives. The **fifth** step is documentation. Documentation may include a patient's signature, but more importantly it must include a record of the first four steps. The **sixth** element, overarching all the others, is that the person conducting the communication process must have the training, skill, and, at times, credentials, to do so.

Proper informed refusals, as required by the court, are critical so that patients can understand why a test/procedure/visit is needed as well as the consequences of their decision. It is the responsibility of the treating care providers to ensure patients are informed before allowing a patient to make such important decisions.

Also, refusals are not indefinite static decisions. They are made based on a risks/benefit balance at a single point in time. If a patient's clinical circumstances change (e.g., the risk of refusal increases), a patient's decision to refuse might reasonably change. Therefore, it is imperative for a clinician to re-engage a patient in a refusal conversation whenever there is a significant change in the patient's clinical status that would change the risk/benefit balance. For example, Patient 1 in Monitors' Second Interim Report to Court, Doc. 4755 refused a cardiology appointment for follow-up of his heart valve surgery soon after discharge from the hospital when he was feeling well. However, if at any point thereafter, he had been told that his worsening clinical symptoms were related to his underlying valvular disease, he may have been more than willing to go to a cardiology appointment. Unfortunately, we will never know, as prior to his death, he was never offered a cardiology appointment again, nor was his valvular disease discussed.

What ADCRR casts as patient refusals would not even pass muster as cursory informed refusal in the community and certainly do not conform with the requirements of the Injunction. At best, most of the "refusals" we reviewed amounted to little more than a perfunctory signing of a complicated legal form devoid of any meaningful explanation. At worst – and even more concerning to us – were refusals where what staff documented did not match what staff actually did.

For evidence that a patient's refusal was informed, ADCRR relies, in large part, on the stock verbiage printed on the forms patients sign, not on the communication that occurred between care provider and patient. It is well recognized that individuals in prison have lower health literacy[9] than individuals in the community. However, ADCRR's key form ignores that. Part of ADCRR's electronic refusal form contains the following key passage:

> I have decided NOT to accept/permit the recommended treatment listed above and understand that my failure to follow the advised recommended treatment may seriously affect my health, including the possibility of inadequate or incomplete treatment of my condition, delayed diagnosis of an acute or chronic disease process or complication of a current illness, and in some cases death, if continued refusals or alternate treatment is not requested and/or complied with fully.

Most individuals in prison in the U.S. cannot read beyond the elementary-school level. The average reading level in the community is a little higher (7th to 8th grade). The reading level of the above passage, according to Microsoft WORD's editor (Flesch-Kincaid Grade level) is grade 34, indicating that it is highly technical and would be best understood by a university graduate; its readability (on the Flesch Reading Ease scale, which assigns a score between 0 to 100, with higher scores indicating easier readability, and where scores of 60-70 are considered "plain English") is 0.[10]

We discovered two very common scenarios which ADCRR intends as, but are not, refusals. In the **first scenario**, the interaction involves health services staff but are not informed refusals. A large number of refusals of medications and care are obtained from the patient by a certified nursing assistant (CNA), LPN, or healthcare technician, none of whom can obtain an informed refusal as none of these licenses/certifications provide adequate training to be able to explain the clinical consequences of the refusal to the patient despite what the templated language on the refusal form may profess. It is for this reason the Injunction requires medication refusals be escalated to an RN or higher after a defined number of missed doses (as noted elsewhere in this report, ADCRR often fails to escalate medication refusals appropriately).

For example, Patient 33 stopped his medication for opiate use disorder. On April 22, an LPN and officer went to the patient's cell front and as confirmed by video, spent at most 11 seconds interacting with the patient cell-front to obtain his signature on the refusal form. Based on the fact that only an LPN spoke

[9] Health literacy is the skills needed to navigate the healthcare system and make informed health decisions.
[10] Because of this extremely low score, we subjected the text to two other validated tools. Using the Dale-Chall and the SMOG readability scales, the reading difficulty was "very difficult."

with the patient and for only a fleeting moment, he was never informed about the consequences of discontinuing buprenorphine/naloxone, placing him and others in a similar situation at ongoing high risk for relapse, overdose, and death.

In the **second scenario**, the interaction does not even involve anyone from health services, and the presence of medical staff is falsified or misleading on the refusal form. For example, Patient 43 had a chronic care visit scheduled for April 30. He thought he no longer had hepatitis C (the presumed reason for the chronic care visit), so he refused the visit. On video, we observed a custody officer slip a refusal form under his cell door at 10:07 AM, the patient signed it, and gave it back to the officer. The patient says the form was blank when he signed it, including the reason for the visit. He said that if someone had explained to him that he still had hepatitis C and that was the reason for the visit, he would have agreed to go to the medical appointment that day. A medical assistant (MA) signed the document in the space under the patient's signature 53 minutes later indicating that they were present to obtain the refusal from the patient. The officer signed as a witness, when in actuality they obtained the refusal (See form below). Not only was this documentation misleading, it also was not informed since an RN or practitioner never met with the patient within the 3-day window as required by the Injunction.

Arizona Department of Corrections
Rehabilitation and Reentry

Refusal to Submit to Treatment

| SERVICE BEING REFUSED | RELATED TO DIAGNOSIS OR PROCEDURE |
|---|---|
| ☐ Medication* | Bleeding or Coagulation |
| ☐ Diet** | Disorders, Cirrhosis or Fibrosis. |
| ☐ Lab | |
| ☐ Imaging Study | |
| ☐ Medical treatment/assessment | |
| ☐ Mental Health treatment/assessment | |
| ☐ Dental treatment/assessment | |
| ☒ Other (Describe) Chronic Care | |

I have been informed and understand that the consequences of my refusal, if any, could lead to increased pain, worsening of my condition, or other consequences, up to and including death. I assume full responsibility for the risks and consequences of this refusal and release the State of Arizona, the Arizona Department of Corrections Rehabilitation and Reentry, and all of its employees from any and all liability for these risks and consequences.

I also understand that this refusal does not prevent me from seeking the above treatment of services in the future.

| INMATE SIGNATURE | INITIALS | TIME 10:07 | DATE (mm/dd/yyyy) 4-30-25 |
|---|---|---|---|
| HEALTH STAFF NAME (Last, First M.I.) (Please print/Stamp) | | TITLE MA | |
| SIGNATURE | | TIME 110D | DATE (mm/dd/yyyy) 4-30-25 |

I hereby acknowledge that the above-named inmate refused the treatment/assessment/medication checked above in my presence and refused to sign this form.

| HEALTH STAFF NAME (Last, First M.I.) (Please print/Stamp) | TITLE |
|---|---|
| SIGNATURE | TIME | DATE (mm/dd/yyyy) |
| WITNESS NAME (Last, First M.I.) (Please print/Stamp) | TIME 1000 | DATE (mm/dd/yyyy) 04/30/25 |
| SIGNATURE (Health or Custody staff) | TIME 1030 | DATE (mm/dd/yyyy) 04/30/25 |

* AFTER THREE CONSECUTIVE DOSES OF ANY SPECIFIC MEDICATION ARE REFUSED, QHCP EDUCATION IS REQUIRED.
** AFTER A PRESCRIBED DIET IS REFUSED FOR THREE CONSECUTIVE DAYS, QHCP EDUCATION IS REQUIRED.

QHCP: Physicians, Physician Assistants, Dentists, Nurses, Nurse Practitioners, Mental Health Professionals, and others, who by virtue of their education, credentials/license, and experience are permitted by law to evaluate and care for patients.

| INMATE NAME (Last, First M.I.) (Please print) | ADCRR NUMBER |
|---|---|
| DATE OF BIRTH (mm/dd/yyyy) | INSTITUTION/UNIT |
| SECTION 3, CONSENTS/REFUSALS | ASPC-Tucson/Cimarron |

Similarly, Patient 34 had an off-site appointment scheduled with a gastroenterologist on April 23. When the officer came to his cell to get him, the patient understood the appointment to be for a "stomach" doctor based on his discussion with the officer. Since the patient did not have any problems with his stomach, he refused the appointment. However, the appointment was for a colonoscopy to screen for colon cancer, because his father had a history of colon cancer. Based on our conversation with the patient, had he known what the appointment was actually for, he would have agreed to go to it. The surveillance video we reviewed shows a nurse at the adjacent cell with the medication cart while an officer is talking to the patient and obtaining the refusal for the off-site trip (signed at 8:00 AM, see form below).

**Arizona Department of Corrections**
**Rehabilitation and Reentry**
**Refusal to Submit to Treatment**

RECEIVED APR 2 8 2025

| SERVICE BEING REFUSED | RELATED TO DIAGNOSIS OR PROCEDURE |
|---|---|
| ☐ Medication* | |
| ☐ Diet** | |
| ☐ Lab | |
| ☐ Imaging Study | |
| ☐ Medical treatment/assessment | |
| ☐ Mental Health treatment/assessment | |
| ☐ Dental treatment/assessment | |
| ☑ Other (Describe)   Gastroenterology | |

I have been informed and understand that the consequences of my refusal, if any, could lead to increased pain, worsening of my condition, or other consequences, up to and including death. I assume full responsibility for the risks and consequences of this refusal and release the State of Arizona, the Arizona Department of Corrections Rehabilitation and Reentry, and all of its employees from any and all liability for these risks and consequences.

I also understand that this refusal does not prevent me from seeking the above treatment of services in the future.

| INMATE SIGNATURE | TIME  8:00 | DATE (mm/dd/yyyy)  4-23-25 |
|---|---|---|
| HEALTH STAFF NAME (Last, First M.I.) (Please print/Stamp) | TITLE  MA | |
| SIGNATURE | TIME  13 17 pm | DATE (mm/dd/yyyy)  4-23-25 |

I hereby acknowledge that the above-named inmate refused the treatment/assessment/medication checked above in my presence and refused to sign this form.

| HEALTH STAFF NAME (Last, First M.I.) (Please print/Stamp) | TITLE | |
|---|---|---|
| SIGNATURE | TIME | DATE (mm/dd/yyyy) |
| WITNESS NAME (Last, First M.I.) (Please print/Stamp) | TIME | DATE (mm/dd/yyyy) |
| SIGNATURE (Health or Custody staff) | TIME | DATE (mm/dd/yyyy) |

*AFTER THREE CONSECUTIVE DOSES OF ANY SPECIFIC MEDICATION ARE REFUSED, QHCP EDUCATION IS REQUIRED.
** AFTER A PRESCRIBED DIET IS REFUSED FOR THREE CONSECUTIVE DAYS, QHCP EDUCATION IS REQUIRED.

QHCP: Physicians, Physician Assistants, Dentists, Nurses, Nurse Practitioners, Mental Health Professionals, and others, who by virtue of their education, credentials/license, and experience are permitted by law to evaluate and care for patients.

| INMATE NAME (Last, First M.I.) (Please print) | ADCRR NUMBER |
|---|---|
| DATE OF BIRTH (mm/dd/yyyy) | INSTITUTION/UNIT  ASPC-Tucson /Cimarron |

SECTION 3, CONSENTS/REFUSALS

1101-4
3/16/21

The officer hands the signed refusal form to the nurse who places it on the bottom of the medication cart. The nurse then goes to the patient's cell-front and appears to give medication to the patient. The nurse could not have had enough time in 15 seconds to engage in an informed refusal conversation, no less while also administering medications. The refusal form was then signed by neither the nurse nor the officer, but instead falsely by an MA more than 5 hours later who was neither present nor involved in obtaining the refusal from the patient.

Although not confirmed by video, several other patients described similar "refusal" processes that did not involve healthcare staff at all (e.g., Patient 35 and Patient 36). During interviews, patients commonly

33

reported interactions such as "You sign a blank piece of paper and they say they'll fill it out later" or "If you just sign the form, the officers say then you don't need to bother going to medical."

In a third scenario, the frequency of which we were not able to assess, refusals are just based on word of mouth from the officers (e.g., Patient 37 on August 2, 2024) without the use of a refusal form, which is the most dangerous of historical practices that the Injunction intended to eliminate.

Our concern with the veracity of documentation within patient records extends beyond refusal forms themselves. A frequent scenario involves counseling by MOUD practitioners. Almost every, if not every, note by an MOUD practitioner contains the following documentation of patient education:

1.  fully informed on risks and benefits of treatment with buprenorphine/naloxone
2.  made aware of risks of HIV and HCV, along w any personal risk factors & options for screening avail.
3.  counseled on diversion of meds & understands med options may be limited to non-opioid MAT if found diverting or misusing meds or illicit drugs.
4.  made aware of community resources for continuation of MAT upon release.
5.  educated to take medication as prescribe and increase fluids to avoid dehydration.
6.  Naloxone education

By using these templates, the documentation makes it appear that refusals of MOUD are fully informed, although patients claim that they are in fact not. For example, when Patient 38 requested to stop his MOUD (buprenorphine/naloxone), the MOUD practitioner documented all of the numbered bullets above which included "1. fully informed on risks and benefits of treatment with buprenorphine/naloxone." However, the patient told us that he was not even asked why he wanted to stop, he was not told the risks of stopping, and he was not offered any treatment alternatives. Other patients related similar scenarios to us (e.g., Patient 39).

When talking to other patients who have continued in the MOUD program, they reported to us that some or all of the above topics were not discussed during their most recent appointment. For example, during his appointment on March 17, Patient 12 in Monitors' Second Interim Report to Court, Doc. 4755 said he was not made aware of the risks of treatment, and screening opportunities for HIV and HCV, was not told about community resources in preparation for his release (of note, he is not scheduled to release for another 11 years in 2036), and he was not educated about naloxone or how to use it (of note, only staff have access to naloxone, the life-saving opiate reversal drug, within ADCRR facilities), all patient education that the MOUD practitioner documented providing. Although patients often said that one or two of the six items documented were discussed, not one patient we met with said all of the topics listed in their chart note were discussed during a single visit (e.g., Patient 40, Patient 41, and Patient 42).

We have provided feedback to ADCRR on its refusal process numerous times over the past two years. For example, this is feedback Dr. Strick provided in February 2024, more than a year ago:

Injunction provisions 1.21, 10.3, 1.1/1.21 all are related to refusals of some sort. As far as we can tell, ADCRR has not yet made the needed changes to the refusal process and documentation.

> o  1.21 Refusals of Patient-Initiated Visits: As noted in our feedback to ADCRR in previous months, it continues to be difficult to determine compliance with this QI. Given the only documentation of a refusal is often a refusal form, unless the form is signed by the patient themselves, it is often not possible to tell if the refusal was directly by the patient even if it was signed by healthcare staff +/- a witness. The injunction does not require a refusal form or specify any needed signatures but does require that the refusal comes directly from the patient and not via a non-medical staff member…

> o  10.3 Medication Refusal: ADCRR's current policy that requires the escalation to a higher authority if 3 consecutive doses are missed/refused of any medication is not in compliance with the injunction. As noted in previous months, clinically having a 3-day rule for ALL medications both under- and over-reports medication refusals. In addition, the current refusal process does not ensure that all refusals are informed refusals…

> o  1.1, 1.21 Refusals of Provider-initiated Visits: As previously noted, one element that is not always documented in the EHR is if the refusal was informed (i.e. the patient understood the consequences of their refusal). In addition, the refusal form is being inappropriately used as a resolution to a missed appointment which misdirects the blame to the patient. For example, [patient's] refusal on 12/27 was marked by the [ADCRR] monitors as in compliance with the injunction because it was filed within 3 days of the missed appointment, was communicated directly to NaphCare staff, and was obtained by an RN. However, the reason for the refusal documented by the patient is "Been here since 7:30 AM with no help so I went home." That is not a refusal of care, but an understandable frustration of the amount of time he had to wait for care given the form was filled out and signed at 13:06 when he left the clinic. I don't see anything in the chart to indicate the patient was rescheduled or that the delay in care was addressed beyond uploading the refusal form…"

Despite the feedback that has been given, the refusal process continues to be wholly inadequate throughout the system.

## VIII. Primary Care Practitioner (Medical) and Primary Therapist (Mental Health)

A core principle of the Injunction that permeates many of the provisions and helps ensure success with many others is that of continuity of care provider: minimally adequate care is supported by having patients cared for by the same clinician over time. While this model of care is important in all settings, it is particularly important in the prison setting for two reasons. **First**, patients in prison have a higher burden of disease – are sicker – than patients in the community. They have more substance use disorders, communicable diseases like HIV and hepatitis C, and non-communicable diseases like diabetes and high blood pressure. With such complexity, it is harder if not impossible for a clinician to fully comprehend a patient's case in the short amount of time they have for a visit, if this is the first and only time they have cared for the patient. And such lack of comprehension is dangerous because it can lead to incorrect diagnoses or treatments that are inappropriate for the particular patient. **Second**, patients in prison have more, and more severe, mental illness as well as histories of trauma (emotional, physical, and sexual). For a mentally ill patient to share their most intimate and painful thoughts, a critical component of effective therapy, requires trust. To some degree, the same is true of non-mentally ill patients cared for in medical clinic. That trust can only be earned over time after developing a patient-clinician therapeutic relationship. Most patients will simply not share these thoughts with a clinician who is "passing through." And in the absence of such sharing, there can be no treatment.

The Injunction therefore requires that all patients be assigned a primary care practitioner (PCP) for their medical needs, and requires that all patients on the MH caseload, i.e., those classified as MH-3, 4, and 5, be assigned a primary therapist (PT).

While ADCRR has successfully added a field in the EHR to now indicate a patient's PCP and, for MH patients, a PT, in the vast majority of cases, these assignments are in name only. We examined all scheduled therapy sessions that should have been conducted by the patient's PT among a randomly selected group of MH-3 patients (chosen because ADCRR would be likely to demonstrate the best performance on these patients compared to patients classified MH-4 and 5) over a 6-month period (December 15, 2024 to June 15, 2025). Only 45% of these sessions were conducted by the patient's PT. This indicates that more often than not, a patient is meeting with a psychology associate they don't know, who doesn't know them, and they may not see again. A similar examination of medical patients and visits with their PCP found much worse results and is discussed in more detail in the last section of this report under provision 6.2a/7.3.

The Injunction recognizes that PCPs and PTs are not omnipresent at their posts. They may not be available when urgencies or emergencies arise, and even for scheduled visits, clinicians may reasonably be expected to occasionally be on vacation or ill. However, the vast number of visits that do not occur with the patient's PCP or PT cannot be explained by these reasonable absences. For mental health visits, non-PT therapists often document that they are seeing the patient for that session "due to the primary therapist not being available at this time." As an occasional statement, this is the documentation we expect to find. However, as currently used, it means that more often than not, the patient does not have anyone functioning as their PT.

Finally, the degree to which ADCRR has a functioning primary care system in both medical and mental health is actually worse than the above metrics suggest. We counted as compliant any medical or mental health visit if the visit was conducted with the medical practitioner or therapist who was assigned as the PCP or PT, respectively, at the time of the visit. What we did not account for was the high rate of churn of assigned PCPs and PTs due to a patient being moved to a new housing location. To be clear, reassignment of PCP or PT may be necessary when a patient moves to a location not covered by their current PCP or PT, and is not in violation of the Injunction. However, it does exacerbate the excessive lack of continuity to which patients are already exposed.

## IX. Progress by Defendants

In their Plaintiffs' Motion for a Receiver, Plaintiffs assert that provision of health care services have not significantly improved. In Defendants' Response to Monitors' Second Report, Defendants represent that they have made "significant improvements to mental health care" (Doc 4818 at 2) and "targeted health care program" improvements in medical care (Doc 4818 at 5).

As Defendants note, and as we have mentioned in our reports, ADCRR has made some progress. Among its accomplishments, ADCRR moved severely mentally ill patients out of the Flamenco Unit, ASPC-Phoenix, to the Eagle Point Unit, ASPC-Lewis along with providing mental health crisis intervention training (CIT) for officers. The move, which required significant planning and coordination, occurred smoothly and safely. ADCRR also set up an impressive art and music therapy program – "Art of Our Soul" – at Eagle Point unit and at ASPC-Perryville for women. Another notable accomplishment is the Peer Comfort Program as ASPC-Tucson wherein peers housed in ADCRR provide assistance and companionship for 8 patients with dementia and similar mental limitations.

Two areas in which ADCRR has been trying to make improvements are treatment for patients with opioid use disorder (OUD) with the use of medications (MOUD) and treatment for hepatitis C virus infection (HCV). While there are successes, especially in the HCV program, and some key ones ahead of schedule in the MOUD program, the programs are not as robust as ADCRR reports and work remains to be done; Defendants' claim in Defendants' Response to Receivership Motion that "The Department also has come into compliance with the Hepatitis-C requirements of the Injunction" is not supported by the evidence, as explained in more detail in the last section of this report under the provisions related to hepatitis C (provisions 11.1.1, 11.1.4, 11.1.7, 11.1.5a, 11.1.5b, and 11.1.6).

The improvements described here, and others described by the Defendants, should be recognized. However, consistent with Defendants' use of the term "targeted," the improvements are a very small fraction of the improvements called for the Injunction, and for some of the targeted improvements, the degree of any improvement is not nearly as great as the Defendants represent. Taking into account the nature, number, and speed of improvements, our recognition of these improvements does not change our core findings in this report.

The following graph is a summary of the ADCRR's current compliance with individual provisions of the injunction presented in the next section of this report. While all provisions of the Injunction are important, they do not all pose equal risk of serious harm. Thus, caution must be used in interpreting the graph and what it reflects about progress. Most of the provisions where non-compliance poses the highest risk are in the red sector. Further, most of the provisions in the green sector are provisions with which ADCRR was substantially compliant at, or soon after, implementation of the Injunction.



Though we show in the last section of this report ADCRR's profound lack of compliance with the vast majority of individual elements of the Injunction two years after its implementation, even those individual assessments do not do justice to the daily risk to which patients are subjected and the lack of improvement since monitoring began. One begins to comprehend this reading individual patient health records. Reading health records is one of the core activities we perform as monitors. When we began reading records in April 2023, rarely, if ever, could we open a patient's health record in which there are not myriad errors, one error compounding another, error after error. It was painful for us to read patient medical records in April 2023. It remains equally painful in April 2025.

Defendants' own data shows their overall lack of improvement. In Defendants' Response to Monitors' Second Report, Defendants prepared a table showing their self-assessed performance over the past year. Even if ADCRR were performing as well as they state (which they are not), that table does not reflect any significant improvement over time as the percentage of provisions in each of their created categories (based on percent compliance) has remained stable over time. That said, the calculation of percentage compliance is not always sensical as discussed in more detail below.

## X. How We Assess Compliance

In our monitoring work thus far, including preparation of this report, the Monitors assess the degree to which patients at ADCRR are subject to a significant risk of harm due to ADCRR's medical and mental health care delivery system, by determining whether or not ADCRR is substantially compliant ("compliant") with each of the requirements of the Injunction.

In determining compliance, we focus on the core purpose of the requirement and its potential impact on patient safety, i.e., risk, and whether ADCRR has met that core purpose. We are acutely aware that in a prison health care system as large and complex as the one in Arizona, it will never be possible to be perfect at all things at all times. Thus, in assessing compliance, we strive to also make a determination of the "largeness" of significant risk when ADCRR's performance is very good, but imperfect, due to deviations from what is required. To do so we take into account several factors:

- How frequent are the deviations?
- What has been the pattern of deviations over time? For example, are deviations rare events? Has the level of performance been consistently getting better over time?
- What is the impact of a single deviation on risk of harm? For example, a glitch in interpreter services for a routine clinic visit of a non-Anglophone who speaks some English might not carry the same risk as discovering that critical resuscitation equipment is missing from the emergency response kit.

While the degree to which ADCRR has made an effort to be compliant is information that should be conveyed to the Court, it does not enter into our determination of compliance.

In communications with the Monitors and the Court about its own performance, ADCRR has ascribed considerable importance to the percentage to which it believes it complies with individual requirements of the Injunction, as well as the trend of those percentages over time.

For some of these performance requirements, expressing performance in terms of percentage compliance makes no sense. For example, the Injunction requires ADCRR to have sufficient space, equipment and supplies to deliver medical care services (provision 1.6). Compliance with this requirement cannot reasonably be measured as a percentage; what number would one enter in the numerator and denominator? Yet, ADCRR continues to report their level of performance with this provision as a percentage.

For other requirements, expressing performance in terms of percentage theoretically makes sense, but is technically impossible to calculate. For example, the Injunction requires that whenever a patient notifies a correctional officer of an immediate health care need, the officer must contact a health care staff member immediately (paragraph 1.20). There is no way of capturing all instances in which a patient contacts an officer (the denominator) upon which a percentage can be calculated. Yet again, ADCRR continues to report their compliance with this provision as a percentage.

For requirements for which a percentage performance can technically be calculated, while monitoring these metrics can certainly be of value to an agency for internal management purposes, the Monitors do not give these any weight *at this point* because doing so is at odds with the logic we describe above. For example, where ADCRR has stated that its current level of performance on a given requirement is 95%, that means that it fails to perform as the Court has directed 5% of the time. If, in this example, the denominator upon which that percentage is measured is the entire ADCRR population of 25,000 people, and if the risk posed by deviations from that requirement are significant (e.g., the list of diagnoses in a patient's health record – the "Problem List" – is not accurate, complete, and easily usable, making it difficult for a health care provider caring for the patient to be able to accurately know the patient's medical history; paragraph 4.3), then 1,250 individuals are exposed to significant risk on a daily basis. Similarly, where ADCRR has stated that its current level of performance has improved from month to month, while this is better than if the level were static or worsening, it is the absolute current level of performance that is relevant to judging risk of harm. Lastly, the level of performance calculated is greatly dependent on methodology being used, and for many provisions, the methodology ADCRR is still using is not correct or complete.

In her declaration (within Defendants' Response to Receivership), ADCRR's Mental Health Director, Dr. Matheka, argues that high percentages on level of performance are acceptable and that performance at the 100% level is unrealistic. We do not agree that this is universally true. As we explain in this report, whether or not a high level of performance is safe and acceptable depends on what care is being measured, i.e., the extent to which an error leads to serious harm, and how many individuals would be affected by such error. For example, there are certain errors in medicine that are referred to as "Never Events" because even one such event is considered egregious and requiring corrective action. Thus, for some provisions of the Injunction, what Dr. Matheka states is true, for others, it is not. We have, and will continue to, keep this principle in mind as we monitor. With regard to Dr. Matheka's second assertion, as we have stated before, we do not believe that perfection is achievable, nor is it the basis of our evaluations. Our benchmark is *substantial* compliance.

*At some point* it will make sense for the Court to give weight to ADCRR's level of performance on Injunction requirements (that are appropriately) expressed as percentages. That point in time will be heralded by two observations.

First, ADCRR will be in compliance with most requirements of the Injunction and closing in on compliance with the rest. The list of those for which ADCRR is in compliance will need to include those where non-compliance results in the most significant risk of harm, including but not limited to the suite of requirements that all health care provided and the documentation supporting that care is clinically appropriate and provided in a clinically appropriate timeframe (paragraphs 1.1 and 1.3).

Second, ADCRR will have demonstrated proficiency with the suite of requirements that center around ADCRR's self-evaluation and improvement apparatus (all paragraphs in Section 2). As we have stated in earlier reports, no non-heavenly system is perfect nor should the Court expect this of ADCRR before closing this case. However, to the extent that there are serious patient care errors or a system weakness

that create a significant risk of such errors, ADCRR needs to have a robust method to identify, analyze, prioritize, and remediate them, and monitor the success of remediation.

ADCRR is still light years from both of these endpoints.

Finally, even for those requirements of the Injunction for which a percentage performance can technically be calculated, ADCRR is self-measuring the percentage accurately, and the percentage is high, percentage performance is not our sole determinant of compliance. While percentage performance is a very important, monitoring compliance with many of the Injunction requirements involves additional examinations. Two of the most important additional examinations we perform are triangulation and high-risk case finding.

Triangulation is the scientific process by which one collects corroborating evidence that looks at the issue from one or more different angles or using different data sources. For example, the Injunction requires ADCRR to inform patients in a timely manner of diagnostic test results (provision 1.23). For self-evaluation purposes, ADCRR is expected to identify certain tests that were performed and then determine whether the patient was notified, by conducting a computer review of the EHR (i.e., find documentation of such notification in the patient records). Triangulation of the result of this examination would include patient interviews (focusing on patients with very recent notification to increase the reliability of their recall) to corroborate what is documented in the EHR. During the interview the monitor would ask patients if they actually received the results of their test and whether it was comprehensible.[11]

In high-risk case finding, the monitor looks for patients for whom the impact of non-compliance would pose the most significant risk of harm. For example, the Injunction requires ADCRR to confirm that patients are assigned a medical primary care practitioner (PCP; paragraph 7.3). Like the requirement above, the percentage performance for this requirement is calculated by computer, identifying first all individuals in ADCRR and then querying whether each has an assigned PCP. While all patients should have a PCP, the risk for harm from not having an assigned PCP is greatest for those with multiple complex health problems. Due to the number of young healthy individuals in ADCRR, the global percentage performance for this requirement yielded by the computer calculation could mask (dilute) deficiencies in assigning a PCP to the smaller number of much sicker patients for whom the deficiency poses a disproportionately large risk of harm. Thus, in addition to looking at the global percentage performance, the monitors need to identify a subset of sicker individuals and confirm that they, too, have an assigned PCP.

In summary, for many performance requirements of the Injunction, expressing performance as a percentage is inappropriate and/or meaningless. For the remaining performance requirements for which expressing performance as a percentage is appropriate and meaningful, that percentage tells much, but not all of the story; evidence from other methods, such as triangulation and high-risk case finding are

---

[11] For example, informing a patient that the result of their hemoglobin test was 10.5 g/dl is incomprehensible to a lay person without also informing the patient that the normal range for hemoglobin is 13.5-17.5 g/dl, or that their result is abnormally low.

necessary to provide the Court with a complete and accurate picture of the degree to which the health care being delivered at ADCRR is constitutionally adequate.

## XI. Methodology Used in Discussion of Compliance with Provisions in Section XII

We only provide the percentage level of performance reported by ADCRR if that percentage is 75% or greater. In those cases, we also report the Monitors' estimate of the performance level (as a percentage) for the same sample, but only if calculating a performance level in terms of a percentage makes sense for the provision at hand. In choosing the 75% threshold, we took our lead from ADCRR. In Defendants' Response to Monitors' Second Report, ADCRR prepared a number of tables focused on provisions for which it believes its performance is at or above the 75% level. We took that to mean that ADCRR believes that levels below 75% are less noteworthy.

We provide a patient example for provisions that deals with patient care directly and for which we found ADCRR non-compliant. For example, provision 1.8a ensures that emergency response equipment is available. A patient example is not relevant. For most provisions that deal with patient care directly there is a single example. The fact that we present only a single example should not be interpreted as meaning that only one example exists. Finally, for some provisions where ADCRR is not compliant, there are two or more ways in which ADCRR is not fulfilling the requirement of the provision. For example, a given provision may require clinicians to perform a certain intervention within a maximum timeframe. If ADCRR clinicians are not performing the intervention appropriately *and* are performing it late, there may be a patient example illustrating each error and its effect.

For some examples used to illustrate how a particular provision is not being followed, we include mention of violation of other provisions related to the patient's case in the example. The Court should not assume that the violations we mention are the only violations present in that patient's care, or even the only ones in the narrow tranche of the patient's case that we present. One of the challenges we encountered when reviewing almost every one of the patient cases we opened and tried to succinctly summarize for the court was the often overwhelming number of serious errors and deciding where to stop identifying them.

Much of our report is critical of the care delivered to patients at ADCRR. With rare exceptions (that we discuss), we want to be very clear that our report is critical of the care, not the care givers. As we said in our last report, we believe that front line care givers at ADCRR are doing their best within the constraints they deal with. There are too few of them, operating out of insufficient space, many without the ability to be in the patient's presence, many being asked to provide care beyond their training and expertise.

## XII. Compliance with Provisions of the Injunction

# Medical Services

### Operations

| Injunction Provision 1.1 and 1.3 | Non-compliant |
|---|---|

**Provision:**

All care and the documentation supporting that care, delivered during a medical encounter (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, report from a consultant, other external health record, shall be clinically appropriate including scheduled follow-up in an appropriate timeframe when applicable. Settings include, but are not limited to, those described in the subsections of these provisions below.

**Importance:**

The suite of provisions below flow from the Injunction's requirements set forth in sections 1.1 and 1.3. They describe the backbone of any health care system. In brief, they require that medical care be provided in a manner that is clinically appropriate and safe. Care that is not compliant with these provisions, by definition, places patients at significant risk of serious harm.

| Injunction Subprovision 1.1a | Non-compliant |
| --- | --- |

**Provision setting:**
Emergent care

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this requirement.

ADCRR's method of data collection to self-assess performance is flawed in two ways, leading to a marked over-estimate in their self-assessed performance level. The first flaw is including cases which should not be in the sample. ADCRR draws its sample from all cases for which an "ICS" was triggered. An ICS ("Incident Command System"; emergency response) is triggered for many issues that turn out to not be emergencies at all. Thus inclusion of these case biases the result toward better performance. The second flaw is that in an attempt to focus on the ICS visits that are just emergency care, ADCRR only evaluates patient cases that resulted in a patient going to the ER, excluding any case in which a decision was made to handle the case in-house. Some of these latter cases, however, might have been inappropriately managed, including those that should have been sent to the ER. Thus, exclusion of these cases also biases the result toward better performance. We gave ADCRR feedback about these errors as early as November, 2023 and have repeated the feedback since. The error remains.

**Example:**
Patient 44 has a history of coronary heart disease, high cholesterol, asthma, and gastric reflux disease. At 11:45 PM on February 19 he complained of acute, severe (7 to 10 out of 10) left-sided chest pain with left hand numbness, and initially accompanied by nausea. The pain began at rest. He reported that he plays a lot of sports. He was examined by an LPN. His initial blood pressure was 192/120, reducing to 182/120 (both dangerously elevated) and then 142/100, which is very high but not acutely dangerous. An EKG was done which showed an electrical abnormality (1st degree AV block). There was no prior EKG available for comparison, thus this abnormality needed to be considered new. The nurse listened to his heart but did not listen for extra heart sounds (a third or fourth heart sound in addition to the two omnipresent ones), which would be important indicators of a serious heart problem. The nurses noted that his skin color was not normal. His pain was reproducible with palpation. The LPN contacted a remote APP who did not talk to nor visualize the patient. The APP concluded that the patient's symptoms were not an emergency, not likely due to a heart problem, and recommended a single dose of a blood pressure medication, a prescription for a stomach medication, and a drug test in the morning.

The handing of this emergency was wholly inappropriate. Despite his young age, the new onset of severe left-sided chest pain with symptoms in the left arm, accompanied by nausea, dangerously high blood pressure, abnormal skin color, and a new abnormality in the heart's electrical system in a patient with an existing history of coronary heart disease and high cholesterol is the textbook description of a

46

patient who needs evaluation in an ER. Failure to arrange his immediate evacuation put the patient at significant risk of death from a heart attack.

| Injunction Subprovision 1.1b | Non-compliant |
|---|---|

**Provision setting:**
Urgent care

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance at 96%. Based on an evaluation of cases of urgent care we found, the performance is closer to 33%.

The sample ADCRR uses to calculate its performance is flawed. Most of the visits selected by ADCRR to analyze were not visits involving the need for urgent care at all (*viz.* intake evaluations or follow-up visits), and for which, as could be expected, no fault could be found with the quality of urgent care delivery, because there was none. As early as April, 2024 we gave ADCRR written feedback about this error. The error continues.

**Example:**
Patient 45 is a 71-year-old male with 21 problems on his problem list including asthma, hiatal hernia, gastric polyps, prediabetes, H. pylori infection, gastroesophageal reflux, traumatic brain injury, hyperlipidemia, seizure disorder, lumbar spine compression fracture for which he is on 12 medications. He had an acute episode of vomiting "coffee grounds" just past midnight on February 25. He was seen by an RN, acting independently using a non-allowed nursing protocol. Emesis described as coffee grounds is indicative of internal bleeding until proven otherwise and requires, at a minimum, close observation for the next several hours and an emergent blood test to check for bleeding (Complete Blood Count). Instead, the nurse ordered medication (without a legal physician's order) to stop the vomiting and ordered no further monitoring. He vomited again twice at 2 AM, and three times at 5 AM, and, absent any instructions from the nurse, staff did nothing in response to further vomiting. This care put the patient as significant risk of massive blood loss and possible death.

| Injunction Subprovision 1.1c | Non-compliant |
|---|---|

**Provision setting:**
Non-urgent, episodic care

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses it level of performance at 79%. The sample ADCRR uses to calculate its performance is flawed. Of the 25 cases ADCRR examined, 11 did not meet the criteria/intent of the provision, e.g., medication refill requests, clerical requests. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using only the appropriate portion of the same dataset, the performance level we calculated was approximately 35%.

**Example:**
Patient 46 is a 59-year-old male with schizophrenia, major depressive disorder, coronary heart disease, high cholesterol, a history of melanoma, invasive squamous cell and basal cell carcinoma, and, most notably, a history of requiring a catheter in the penis (foley catheter) because of an obstruction of urine flow in 2023. His case reflects 6 separate non-urgent encounters over a 6-month period that all demonstrated a failure of multiple different professionals to fulfill the requirements of this provision to provide clinically appropriate episodic care, ultimately leading to a potentially life-threatening complication.

1. On November 13, 2024 he was seen by an RN complaining that he was having trouble completely emptying his bladder and flank pain. He reminded the nurse that he had had prostate problems a year earlier requiring placement of a foley catheter. He also complained of burning while urinating. The nurse did not examine him for bladder distention, prostate swelling, or kidney tenderness. A urine test was mildly abnormal (small amount of white blood cells and trace blood). Given the patient's history of obstruction of the bladder, the current set of symptoms strongly suggested the possibility that his bladder was once again becoming obstructed and might be causing a serious kidney infection. This constitutes a medical urgency, requiring insertion of a catheter and further in-depth evaluation of the condition and functioning of the kidneys. Instead, a remote APP, communicating solely through writing with the nurse, only ordered antibiotics for a lower urinary tract infection. Unlike women, in whom urinary tract infections are common and usually benign, urinary infections in men are relatively rare and require further work-up to look for an underlying reason, like bladder obstruction, even when obvious symptoms of obstruction are not present.

2. On November 21, 2024, the patient reported to an RN that his symptoms were not improving despite the antibiotics. The patient was cared for by the RN acting independently (in violation of Injunction

section 7.4.7) using a non-allowed protocol (in violation of Injunction section 7.4.7), and again failing to examine the bladder, prostate, or kidneys. A remote APP reviewed the work of the nurse some six hours later, but despite the glaring deficiencies, did nothing.

3. On November 27, 2024, the patient was seen again by an RN for ongoing burning on urination as well as low back and flank pain. The RN treated the patient acting independently using the same non-allowed protocol, with the same attendant failures of examination and violations of the Injunction as above. Since the patient said his symptoms were a bit better, nothing more of consequence was done. On January 6 the patient was seen by his PCP who completely ignored his recent recurrent urinary problems and did not even bother to mention them in their note.

4. On March 12, the patient was seen again by an RN for urinary symptoms. Once again, practicing independently using a non-allowed protocol, there was no prostate, bladder or kidney exam, and without seeing the patient and communicating only via EHR notes, again inappropriately ordered antibiotics for 5 days without any follow-up.

5. On March 24, the patient complained of having incontinence and requested to be seen "ASAP." For the reasons explained earlier, this represented a clinical urgency for which the patient should have been seen by a practitioner that day. Instead, he was just given diapers by the nurse and scheduled to see a provider. This delay was dangerous: acute onset of incontinence has many causes, several of which can be emergent, like spread of his cancer to the spinal cord. He was seen not seen until 6 days later on March 31. He now had urinary incontinence for 2 weeks requiring the use of diapers nightly. His PCP, an APP (in violation of Injunction section 6.3 because a patient this complex should have been assigned to a physician as their PCP) failed to conduct a prostate, bladder, or kidney exam. Not recognizing the urgency of the situation, the provider ordered some blood tests scheduled for April 3, but not drawn until April 8 (in violation of Injunction section 1.22). Importantly, those tests failed to include tests of the patient's kidney function. The PCP did order an ultrasound of the patient's prostate, but that was not scheduled until May 30, which is an inappropriately long timeframe for this urgent issue.

6. By April 6 the patient was reporting the need for diapers during the day as well as the night. By April 7, he actually asked[12] for a foley catheter to be inserted in his penis due to the severity of incontinence, which if placed would have potentially prevented his subsequent hospitalization, but it wasn't. Instead, he was put on even more antibiotics for 10 days while awaiting a provider appointment scheduled for April 14.

7. On April 10, the patient exhibited acute changes in his mental status and was finally sent to the ER. His mental confusion was a result of urinary retention resulting in acute kidney failure complicated by potentially life-threatening blood electrolyte abnormalities (hyperkalemia, hyponatremia, and acidosis), and a urinary tract infection due to a multidrug resistant organism, potentially the result of the misuse of several antibiotics. Given the high degree of antibiotic resistance of this organism, infection prevention

---

[12] Insertion of a urinary catheter is not comfortable for patients, especially males. Thus, request from a patient for insertion typically reflects that the patient is already in considerable pain.

precautions should have been put in place upon return to ADCRR to prevent the spread of this very dangerous and difficult-to-treat organism to other sick patients, putting them at significant risk of serious harm. No such precautions were put into place.

| Injunction Subprovision 1.1d | Non-compliant |
|---|---|

**Provision setting:**
Chronic care

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its performance at 86%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 35%.

**Example:**
Patient 47 had a non-functioning bladder due to paralysis in addition to a bleeding/coagulation disorder, anemia, hernia, delusional disorder, major depressive disorder, and bipolar disorder. His kidney function significantly declined in the latter half of 2024 and both an ultrasound on November 20, 2024 and then a CT scan on December 31, 2024 showed severe back-up of urine into his kidneys (hydronephrosis). A minimally competent physician should recognize that new onset hydronephrosis with associated poor kidney function needs to be addressed urgently. His providers did not. He was not sent to the ER until a kidney specialist's visit on January 13. Due to the delay in clinically appropriate care, the patient now has irreversible kidney damage that the kidney specialist thinks will likely require hemodialysis. Despite the complexity of his case, the patient is assigned to an APP, instead of a physician (in violation of Injunction section 6.2 and 7.3). However, the assignment is meaningless because over the course of six primary care visits in nine months, the patient has never seen the assigned PCP, saw the same APP for only two of the visits, two different APPs for two other visits, a physician for one visit, and a different physician for a second visit.

| Injunction Subprovision 1.1e | Non-compliant |
|---|---|

**Provision setting:**
Inpatient care

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision. A theme we noticed in reviewing these cases, remediation of which might close some of the gaps in care, is that there is no one single location in the EHR for the admitting practitioner to place nursing orders. These orders are sometimes in various places, such as in a clinician note, on the problem list, or in the electronic Medication Administration Record (eMAR; even for orders that are not medication related).

In addition to the general problems with inpatient care described in the main example below, a recurrent error in inpatient care relates to setting the appropriate level of care (i.e., IPC Level 1; IPC Level 2). When the admitting practitioner sets the level of care, they are also automatically ordering how often nurses assess the patient. Unfortunately, patients who are quite complex and ill and are initially placed in Level 1 are often moved to Level 2 prematurely. For example, Patient 48 is a 38-year-old male with history of a gunshot wound to the abdomen in 2019 with an extensive complex surgical history that included a repair of a major vein in the abdomen (inferior vena cava) who was hospitalized for an abscess of a muscle in the back of the abdomen near the spine that also threatened to infect the vein repair site. He returned from the hospital on February 25 around 11:45 AM and was placed in Level 1. However, the following morning, a practitioner switched him to Level 2 despite the fact that the patient's condition required close monitoring to ensure stability. The patient was receiving 2 different antibiotics intravenously started only a week earlier for a very serious infection inside the abdomen in an attempt to save his vein repair. Coming out of his abdominal wall was a tube to drain the infection deep inside the abdomen. He was also recovering from two serious complications of his hospitalization: a blood clot in his leg (deep venous thrombosis) and acute kidney injury. This patient required several days (if not more) of nursing care and monitoring several times a day provided by Level 1 care to appropriately care for his active issues, like measuring the drainage of the abdominal infection via the drain, ensuring appropriate activity to prevent another clot, and close monitoring for symptoms of infection in case the patient was not responding to antibiotics as expected. Prematurely moving him to Level 2, wherein he would only get vital signs and nursing assessments 3 times a week, placed him at significant risk of the serious harms described above.

**Example:**
Patient 49[13] is a 48-year-old male with newly diagnosed diabetes, opiate use disorder, and intravenous drug use.

---

[13] This is a case that ADCRR (appropriately) chose for self-assessment of its performance in the month of February because the patient was still in the IPC in February, though some of the care described occurred before February.

On June 4, 2024 an ADCRR practitioner started him on low-dose buprenorphine, a medication to treat opioid use disorder (MOUD), with a plan to return in a month. Given the fact that the patient told the practitioner he had been using heroin for 5 years, last injecting it intravenously the day before, the care was clinically inappropriate and dangerous for two reasons. First, the dose was much too low to be effective for someone actively using and therefore tolerant to the medication. Second, the patient required follow-up much sooner than 1 month later to assess if the starting dose, assuming it was appropriately prescribed, was effective or needed to be increased. Both errors put the patient at high risk of relapse (i.e., continuing to use intravenous heroin) including the potential complications of intravenous drug use. That he did, indeed, relapse is almost certain as evidenced by the fact that he stopped taking his buprenorphine on June 14, 2024. However, the medication nurse failed to notify anyone of the refusals of buprenorphine, placing the patient at significant risk of harm regardless of the reason he stopped, but based on the series of events it was most likely ongoing heroin use (in violation of section 10.3).

Nothing happened until July 9, 2024 when the MOUD practitioner just discontinued buprenorphine when the patient did not come to the appointment. An LPN and correctional officer subsequently signed a "refusal" form on July 22, 2024 (in violation of Injunction section 1.21) which has no meaning nor value as neither actor is competent to conduct an informed refusal. Thus, despite the ongoing significant risk of overdose associated with his opioid use disorder, ADCRR failed to engage this patient.

The patient then presented on August 1, 2024 with acute urinary symptoms and was diagnosed with a kidney infection. Urine was collected for culture and he was started on antibiotics while awaiting the results. His urine also had large amounts of glucose and ketones consistent with diabetes and possibly ketoacidosis, a life-threatening and urgent complication of diabetes. His kidney infection and diabetes required an examination by a provider (e.g., to assess hydration status) and immediate blood testing to determine if, in fact an urgency existed. Instead, no practitioner saw the patient, no further testing was done, and he was just started on medications for diabetes and sent back to his living unit, ignoring the urgency of the situation.

In fact, an urgency did exist: On August 2, 2024, an emergency response ("ICS") was triggered because the patient had worsening abdominal pain. He was sent to the ER where he was found to have sepsis (an infection of the blood stream resulting in abnormal vital signs, in this case caused by the bacterium methicillin-resistant *Streptococcus aureus*; MRSA) that had resulted in the kidney infection (pyelonephritis) and uncontrolled diabetes. He was started on intravenous antibiotics but left the hospital against medical advice after two days. A blood infection from MRSA requires a minimum of 10 days of antibiotics (ideally intravenously) and without proper treatment often causes secondary infection in the body (e.g., heart valve, organs, bone).

The hospital failed to send records about the hospitalization. The remote ADCRR APP, charged with reviewing his condition immediately upon return to the facility on August 4, 2024, failed to seek any records about his hospital stay, and just scheduled him for follow-up with an on-site practitioner. ADCRR failed to obtain the needed information about the nature of the patient's refusal of care at the

hospital, whether it was an informed refusal, if whatever had caused the patient to refuse could be addressed on-site, or if there was an alternative clinically appropriate treatment plan to which the patient would be amenable. Given the seriousness of the patient's condition, getting more information about his stay was required to prevent serious harm. Instead ADCRR did not try to get complete records until almost two weeks later on August 14, 2024 (some records were sent by the hospital a few days after arrival, but neither these records nor the ones requested on August 14, 2024 were ever reviewed by an ADCRR clinician). Due to this information vacuum, ADCRR did not provide any effective antibiotics for his serious kidney and blood stream infection (he may have continued the antibiotic, Bactrim®, previously given to him, but his MRSA was resistant to it) and never addressed the ongoing risk of inadequate treatment of his life-threatening infection with the patient. His diabetes also remained out of control (blood glucose greater than 400, extremely elevated). Thus, he remained at ongoing risk of serious medical harm from both infection and diabetes.

An on-site practitioner finally saw the patient on August 23, 2024, almost 3 weeks after he left the hospital, but failed to address the patient's blood infection or high sugars, which were urgent clinical issues. A different practitioner started long-acting insulin without seeing the patient.

On September 1, 2024, the patient was first seen for neck pain by a nurse, and told he slept wrong. He was seen by nursing again on September 3 and 4, 2024 for ongoing neck pain and stiffness. Each of these visits, conducted by a nurse practicing independently, were clear violations of the Injunction (section 7.4.7) and caused harm, as his untreated infection had now invaded the bones of his spine and required urgent management, which the nurses did not provide. An on-site practitioner saw the patient on September 6, 2024, and just gave the patient muscle relaxants, warm compresses, and a referral to physical therapy. The practitioner noted needle marks on the patient's carotid veins, a sign he might still be using drugs intravenously, which increases his risk of re-infection of his blood, let alone his ongoing risk from his inadequately treated prior blood infection. The practitioner should have, but failed to, consider and evaluate the patient for serious infection based on his clinical history (in violation of Injunction section 1.1). Nurses, acting independently, again saw the patient for ongoing head and neck pain on September 17, 23, and 24, 2024, when he was finally referred back to a practitioner. He eventually had blood tests drawn September 26, 2024 which were reported back to ADCRR on September 28, 2024. However, no one reviewed them until October 7, 2024 (in violation of Injunction section 4.3). These laboratory results showed that the patient was ill, and likely were similarly abnormal and concerning in the weeks earlier when the nurses assumed the patient just had musculoskeletal aches and pains and did not refer to a practitioner to get laboratory tests ordered, illustrating the danger to which he was subjected by the independent nursing evaluations.

On September 28, 2024 the patient was finally sent emergently to the hospital due to headache, decreased level of consciousness, incontinence, lethargy, rocking in pain, and shivering. His MRSA infection, not unexpectedly, now involved his blood, heart valve, heart tissue, brain, and spine. The infection was so severe at this point, that it required not only intravenous antibiotics, but also antibiotics administered directly into the fluid around the brain.

A note on October 19, 2024 documented a call between the doctor in the hospital and an ADCRR practitioner in preparation for discharge that requested weekly labs results to be faxed to the hospital for review until the patient was predicted to be off intravenous antibiotics (November 20, 2024) and follow-up with a heart specialist and an infectious disease specialist around the time antibiotics were to be ending. Not one of these necessary measures occurred as requested (in violation of Injunction section 1.1).

Upon return from the hospital on October 22, 2024, ADCRR placed the patient in an IPC or SNU bed (we were unable to determine which it was due to contradictory documentation in the EHR, e.g., the patient's custody location in the EHR is listed as IPC, the patient has SNU admission orders by an RN, and IPC admission orders by a provider, some SNU progress notes, some IPC notes, and orders to transfer him to a SNU bed on December 15, 2024). Perhaps as a result of ADCRR staff's own confusion about whether the patient was at the higher level of care (IPC), where he should have been placed because of his very high level of complexity and acuity, or a lower level of care (SNU), the patient had vital signs and nursing assessments conducted at haphazardly spaced intervals, sometimes going days without any vital signs or a nursing assessment which was not clinically appropriate based on the patient's clinical acuity (in violation of Injunction section 7.6). Given his condition, this lack of adequate nursing care placed him at great risk for serious medical complications.

In light of the patient's known serious heart, brain, and spine infection in the setting of poorly controlled diabetes, he also required daily examinations by a practitioner upon admission back to ADCRR, if not more frequent examinations, especially when he started complaining of worsening neck pain and new urinary incontinence on November 6, 2024. Instead, from the date of discharge from the hospital (October 22, 2024) until December 7, 2024, practitioner care was provided only via telehealth using remote personnel and only on the following dates: October 22, 23, 25, November 6, 19, 21, 26, 29, and December 1, 2024. During this time period, he was never once examined by a provider for changes in his heart, brain, or spinal cord function, despite their highly vulnerable status. His antibiotics were discontinued on November 20, 2024 without any clinical reassessment by an onsite provider or outside specialist to determine if this was still clinically appropriate. This was extremely dangerous as it is important to ensure a serious infection is improving based on clinical signs/symptoms and laboratory tests before stopping a course of intravenous antibiotics and to establish a long-term treatment plan (in violation of section 1.1). In fact, this patient did not see an on-site provider until December 7, 2024, almost six weeks after his hospitalization, and only after going back to the hospital on December 1, 2024 for worsening symptoms. Due to the seriousness of the infection, even after completing a course of intravenous antibiotics, he was started on a year-long course of oral antibiotics at the hospital.

The patient was not scheduled with a neurosurgical specialist until March 7, despite discharge from the hospital on October 22, 2024 with instructions to wear a cervical collar at all times due to concern about the stability of the bones in his neck and compression of his spinal cord. The cardiology consultation that was supposed to occur in late November 2024 for his serious heart infection was not scheduled to take place until February 10, and then was rescheduled to April 17 due to insufficient ADCRR transportation resources. The infectious disease consultation to follow-up on the overall management of

his life-threatening infection that was also supposed to occur in late November is still not scheduled as of June 23.

In summary, multiple errors by multiple care providers put the patient at significant risk of multiple serious medical harms at multiple junctures.

| Injunction Subprovision 1.1f | Non-compliant |
|---|---|

**Provision setting:**
Off-site specialty referrals

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 96%.

ADCRR continues to use a flawed sample when calculating its performance. The intent of this provision is to ensure that ADCRR clinicians use reasonable clinical judgment in deciding when it is appropriate to refer a patient to a specialist, which specialty to engage, and how urgently to request the consultation. The set of all referrals to specialists includes a subset of referrals which were made at the behest of another specialist. For example, ADCRR refers a hypothetical patient with cancer to an oncologist. After evaluating the patient, the oncologist asks ADCRR to refer the patient to a radiation oncologist. When assessing ADCRR clinician decision-making, the first referral is the main one of interest, not the second because the second one involves little to no decision-making on part of the ADCRR clinician; in clinical practice in general, the default is for a clinician to follow the first specialist's recommendation (to whom we sent the patient because we respected their judgment) barring a compelling reason not to (which is addressed in provision 1.1g). Yet ADCRR continues to include the first and second types of referrals in the set of cases it reviews for this provision. We have provided ADCRR feedback multiple times that the latter subset should be excluded. ADCRR continues to include it.

With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using only the appropriate portion of the same dataset, the performance level we calculated was approximately 65%.

**Example:**
Patient 50 is a 41-year-old male with a number of serious conditions, including heart disease (three previous heart attacks, the most recent of which resulted in the implantation of an internal defibrillator, congestive heart failure, cardiac rhythm abnormalities), hyperlipidemia, hypertension, vitamin B deficiency, blood clots in the legs, asthma, emphysema, traumatic brain injury, seizure disorder, hepatitis C, bleeding/coagulation disease, opioid use disorder, and schizoaffective disorder. He was seen by an APP via telehealth in Chronic Care Clinic on February 19 complaining of intermittent chest pain and experiencing a discharge of the internal defibrillator two weeks ago.

The APP failed to obtain further essential history and examination though there is no reason the APP could not have obtained the further essential history via telehealth. On the other hand, the APP was

unable to perform the examination that she thought was needed but not possible, as shown in her documentation below:

> **Details and Other Findings:**
>
> Physical exam
> Limited examination due to use of telemedicine visit.

Despite this, she made no arrangements to have that examination conducted (in violation of Injunction section 1.4). In the absence of additional history and examination, this set of symptoms in such a patient could indicate a serious life threatening worsening of his heart condition and required urgent, if not emergent, referral to a cardiologist. Instead the APP ordered the referral as routine (i.e., within two months), placing the patient at significant risk of harm.

This case is also an example of ADCRR's failure to adhere to the Injunction requirement to assign patients to the appropriate practitioner as their PCP (section 7.3) and why such assignment is important. This highly complex patient should have been assigned to a physician rather than an APP as his PCP. Over the course of six months since his arrival in early January 2025, ADCRR has assigned him a new PCP 18 times.[14] Only 2 of those assignments were to physicians, and only for a total of 5 days; the rest were all APPs (or indeterminate). The visit described above was with yet a different APP who was not the patient's APP nor had ever been.

We present a second example to illustrate another effect of inappropriate specialty referrals. Patient 51 was found to have an abdominal aortic aneurysm during a hospitalization. This is an enlargement of the aorta and requires surgical repair to prevent it from tearing internally, often resulting in rapid death. On September 12, 2024 an APP referred the patient to a cardiologist instead of a cardiovascular surgeon. Given the lack of urgency with which the aneurysm needed to be repaired at that point, the erroneous referral was not in and of itself dangerous; when seeing the cardiologist, the cardiologist could be expected to inform ADCRR that there was nothing he or she could do for this patient and that the patient should be referred to a cardiovascular surgeon. However, especially in light of the great delays ADCRR is experiencing in getting patients to the specialists they need to see on time due, in part, to caps on daily custody transportations (see section 1.22d for further discussion), such inappropriate referrals exacerbate those delays, indirectly leading to a dangerous delay of more urgent and necessary consults.

---

[14] Some of those re-assignments were legitimately due to changes in housing assignment.

| Injunction Subprovision 1.1g | Non-compliant |
|---|---|

**Provision setting:**

(Additional reference 9.1) Action taken on post-hospital, post-emergency room, or specialist recommendations. This includes that the practitioner shall adopt and perform recommendations from outside providers unless a clinically appropriate basis exists to alter or forgo the off-site recommendations.

**Importance:**

See narrative in the umbrella of this provision above.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 84%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 10%. One source of ADCRR's mis-assessment is that ADCRR is only evaluating whether appropriate orders were placed, not whether they were carried out as ordered.

**Example:**

Patient 52 is a 44-year-old male with coronary artery disease, hypercholesterolemia, dormant tuberculosis, hypertension, diabetes, morbid obesity, gastro-esophageal reflux disease, mononeuropathy, and polysubstance use disorder, who was discovered, during a hospitalization for acute kidney injury and abnormal blood electrolytes, to have a very serious bone cancer (multiple myeloma). Upon discharge on February 20, hospital specialists recommended that he receive the next dose of chemotherapy the following day, and then see the oncologist two to three days hence. Instead, ADCRR did not reach out to the consultant to schedule the chemotherapy until March 6, and the actual visit did not occur until March 28, five weeks later. The visit with the oncologist, which the hospital specialist recommended occur by February 24, did not occur until March 14. In addition, despite the high complexity of his case, and therefore the critical need for the oncologist to have the patient's medical records during the March 14 visit, ADCRR failed to provide them. Multiple myeloma is a very serious cancer which can also causes life threatening complications (some of which were already manifest in this patient). Failure to arrange timely continuation of the chemotherapy to bring the cancer under control started in the hospital, put the patient at significant risk of serious harm.

| Injunction Provision 1.22 | (see individual subprovisions below) |
|---|---|

**Provision:**

Orders from health care staff in the outpatient and inpatient arenas shall be completed within the timeframe ordered. This includes, but is not limited to, those orders described in the subsections of this provision below.

**Importance:**

The requirements of the Injunction provision above – covering sections 1.1 and 1.3 – are, as stated, the backbone of any health care system without which patients are at significant risk of serious harm. If they are the backbone, the following suite of subprovisions flowing from section 1.22 are the arms by which those provisions are executed. Specifically, the care directed in subprovisions of sections 1.1 and 1.3 are the practitioners' diagnostic and treatment plans. They are useless if they are not executed and executed within the ordered timeframes. Thus, failure to adhere to provision 1.22 also places patients at significant risk of serious harm.

| Injunction Subprovision 1.22a | Non-compliant |
|---|---|

**Provision orders:**
On-site diagnostic tests

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR's method of self-assessment is also flawed. ADCRR limits the data it examines to tests that were scheduled to be completed in the monitored month. However, such limitation of the data excludes tests that were scheduled to be done earlier than the monitored month, but are still not completed. This limitation results in ADCRR overestimating its performance.

**Example:**
Patient 53 has Type 2 diabetes and is on insulin. He was ordered to have his blood glucose checked every morning, but the order expired on March 10 (see order with expiration date below).



As of the time of this writing, some 4 months after this order expired, nursing staff continue to take his blood for testing in the absence of a legal order, sometimes once a day (e.g., June 30), sometimes twice a day (e.g., April 19 to 22, not shown), sometimes not at all (e.g., June 25 to 28) (see log of testing from June 2025 below).

| Date | Recorded By | Result |
|------|-------------|--------|
| 07/01/2025 07:17 | ███████ | 99 |
| 06/30/2025 07:13 | ███████ | 108 |
| 06/29/2025 07:30 | ███████ | 105 |
| 06/24/2025 07:31 | ███████ | 101 |
| 06/23/2025 07:46 | ███████ | 98 |
| 06/22/2025 08:08 | ███████ | 179 |
| 06/17/2025 07:13 | ███████ | 102 |
| 06/16/2025 07:25 | ███████ | 90 |
| 06/15/2025 08:23 | ███████ | 96 |
| 06/10/2025 07:21 | ███████ | 102 |
| 06/09/2025 07:30 | ███████ | 167 |
| 06/08/2025 07:47 | ███████ | 96 |
| 06/03/2025 07:05 | ███████ | 101 |
| 06/01/2025 07:09 | ███████ | 101 |

It is important for patients on insulin to have their glucose monitored to adjust medications and identify if the patient has dangerously high or low glucose levels. Haphazard practices of checking glucose, as are happening in this case, are dangerous and can lead to harm. Further, in this particular patient who does not have Type 1 diabetes and is only on insulin once a day, checking of glucose levels twice a day, without a fixed relationship to meals, and in the absence of a plan from the patient's PCP of how this information would be used to adjust the patient's diabetes care, is devoid of clinical reasoning and subjecting the patient to the discomfort of unnecessary needle sticks.

This above continuing error in nursing care might have been noticed had the patient had a primary care practitioner and had been receiving chronic care for his diabetes. Instead, he was last seen on March 5 by an APP other than his assigned PCP (in violation of Injunction section 7.2) for diabetes. The APP's plan for management of the patient's diabetes was for him to return to clinic if the patient felt it was necessary or had any concerns about diabetes. There was a chronic care clinic appointment scheduled for June 16, but that date has come and gone without a visit (in violation of Injunction section 1.22c).

| Injunction Subprovision 1.22b | Non-compliant |
|---|---|

**Provision:**
Off-site diagnostic tests

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision. ADCRR's non-compliance with this provision also contributes to its lack of compliance with the provision in section 1.22d – timely off-site visits with specialists. Many of the diagnostic tests covered by this provision are tests upon which an off-site specialist will be reliant. When that is the case, ADCRR will not begin trying to schedule the off-site specialist visit until staff have all the requested diagnostic test results in hand. While to do otherwise (i.e., send the patient without the needed results) might result in a wasted visit to the specialist for the current scheduling process the one delay begets a second delay, in combination resulting in significant risk of serious harm.

**Example:**
Patient 54 had an MRI ordered in response to an urgent clinical concern of a possible spinal cord mass brought forward by a physical therapist on February 25. The APP ordered the MRI on February 27 to be done within 30 days, which is too long a timeframe for such an urgent issue because if the patient had a mass in the spinal cord causing his symptoms, the delay has a significant risk of causing irreversible paralysis.

The inappropriateness of the urgency aside, based on the order, the MRI should have been completed by March 26. Instead, ADCRR did not schedule it to be completed until April 4. The reason for the delay was lack of available custody transportation services as shown in the screenshot below.



Spoke to ████ from YRMC Scheduling department and patient has been scheduled for 4/04/2025 at 0800. An earlier date was offered however unable to take due to no ADCRR Transportation being available.

████ Medical Scheduler | 3/25/2025 7:55:22 AM | 2 months ago

The patient did go for the test on April 4. However – and through no fault of ADCRR – there was a technical problem with the procedure that required it to be aborted and rescheduled. Given the urgency, it should have been attempted again very soon. To that end, the radiology office offered ADCRR a sooner appointment, however, once again, ADCRR failed to schedule the patient for that earlier date because of the lack of custody transportation services, as shown in the screenshot below.

Spoke with ███████ from the YRMC Scheduling Department, who confirmed that the patient is scheduled for 5/09/2025 at 0800. An earlier appointment was offered however, it was declined due to the unavailability of ADCRR transportation.

████████ Medical Scheduler | 4/21/2025 9:03:15 AM | 2 months ago

The patient finally had the test completed successfully on May 9, more than 6 weeks after it was ordered to be done (again, recognizing that a few days of that delay were beyond ADCRR's control) and approximately 9 to 10 weeks after it needed to have been done to minimize risk of serious harm.

| Injunction Provision 1.22c | Non-compliant |
|---|---|

**Provision:**

On-site follow-up visits with nurses or practitioners

**Importance:**

See narrative in the umbrella of this provision above.

**Discussion:**

ADCRR continues to be non-compliant with this provision. The table below (produced from TechCare, as of May 11) shows backlogs for the 9 on-site appointment types with greatest number of extremely backlogged appointments.

| Days Overdue: | < 1 | 1+ | 3+ | 7+ | 14+ | 30+ |
|---|---|---|---|---|---|---|
| Triage - Pharmacy | 195 | 21589 | 20650 | 18953 | 16064 | 10585 |
| Triage - Mental Health | 145 | 16372 | 15687 | 14404 | 12015 | 7840 |
| Triage - Medical | 154 | 11274 | 10375 | 9463 | 7883 | 5313 |
| Triage - Dental | 179 | 9559 | 9129 | 8326 | 6980 | 4431 |
| Optometrist | 4 | 3447 | 3294 | 3086 | 2889 | 2617 |
| Psych Associate | 9 | 3170 | 2863 | 2313 | 1835 | 1204 |
| MAT - SUD Counselor | | 1692 | 1645 | 1498 | 1357 | 1129 |
| Medical Provider | 6 | 3063 | 2760 | 2158 | 1671 | 1076 |
| Medical Nurse - Immunization | 2 | 1372 | 1360 | 1278 | 1094 | 1030 |

So, for example, as of the report date, there were 3063 patients whose ordered appointment to see a medical practitioner ("medical provider") was overdue by at least a day, and for 1/3 of those patients (1076), the appointment was overdue by 30 days or more. Ignoring "Triage-Dental" because dental issues are outside the scope of the Injunction, and "Psych Associate" because they are not, strictly speaking, practitioners, and looking only at backlogs of a week or more (the last three columns), the total number of backlogged on-site appointments was 123,403. Although it is likely that some of these apparently backlogged appointments, are documentation errors in the EHR (e.g., the appointment took place on time, but was never properly posted in the patient's EHR), those errors cannot account for the tremendously large backlog. Plus, the backlog of 123,403 appointments only tells part of the story, as only the 7 most backlogged visit types are included in this table.

**Example:**

In the outpatient setting, Patient 55 is a 40-year-old male with HCV, and opioid use disorder who was seen by a nurse on February 6 for severe (9 out of a possible 10) back pain for a few months, needing further work-up. The nurse scheduled the visit to take place in 10 days, i.e., February 16. The patient was not seen by a practitioner until April 25. While back pain is often not of serious origin, in a 40 year old in prison with a substance use history, it can be due to serious conditions such as infection or cancer, diseases for which a delay can cause serious medical harm. Further, even if there were no serious

66

underlying cause, the patient was in severe pain, and thus pain management (beyond the nurse's 1-week plan) left the patient in severe untreated pain.

In the inpatient setting, Patient 56 was admitted to the IPC on February 8 after release from the hospital for a serious head injury. A practitioner ordered nurses to wake the patient every 2 hours for 24 hours for neurological checks. Nurses ignored this order from 10:44 PM on February 8 until 6:04 AM on February 9, missing several checks. Findings during a check could indicate that the patient is suffering complications of the head injury, such as bleeding in the brain, requiring emergency attention. Thus these misses put the patient at significant risk of brain injury.

| Injunction Subprovision 1.22d | Non-compliant |
|---|---|

**Provision:**
(Additional reference 8.1) Off-site visits with specialist

**Importance:**
Patients are sent off-site for consultations with specialists, e.g., cardiologist, neurosurgeon, because they have a medical condition which requires expertise beyond the expertise of the primary care practitioners at the prison. Failure to complete these visits in a timely manner can have dire consequences. See also narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision, both for patients referred on a routine basis as well as those who ADCRR has determined need consultation urgently.

This is a provision for which calculating a percentage compliance has some meaning (albeit is not solely determinative of compliance – see below). ADCRR's self-assesses its level of performance on this provision at 28%, i.e., 72% of all visits to specialists (1,656 visits) were not completed within the timeframe determined to be necessary by the ordering clinician.[15]

As poor as ADCRR's self-assessment appears, actual performance for this provision is likely much worse. According to the table below (based on the data presented in the Defendants' Supplemental Evidence to the Response to Receivership Motion Doc. 4872 Exhibit 2), early in 2024 (dark gray boxes to the left), ADCRR calculated its level of performance on this provision at 35%. Based on feedback from the Court Monitors, ADCRR changed its methodology to include not only referrals scheduled for the monitored month, but also referrals that were supposed to be completed in prior months, but never were. When including these referrals that were even more delayed, the level of performance on this provision fell below 10% (light gray boxes). However, starting in December 2024, ADCRR reverted to its prior methodology of only including referrals scheduled in the monitored month and as such, its compliance "improved" to 28% to 35% (dark gray boxes to the right).

| Feb 2024 | Mar 2024 | Apr 2024 | May 2024 | June 2024 | July 2024 | Aug 2024 | Sept 2024 | Oct 2024 | Nov 2024 | Dec 2024 | Jan 2025 | Feb 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35% | 35% | 9% | 15% | 6% | 5% | 3% | 3% | 3% | 3% | 35% | 28% | 28% |

While percentage performance is meaningful, it is not, by itself determinative of compliance. We discuss this in more depth in Section X How We Assess Compliance. The case of Patient 96 illustrates

---

[15] In Defendants' Response to Receivership, ADCRR asserted that the number of appointments it completes each month is increasing. We have not verified this because, whether or not it is increasing, the fact is irrelevant to analysis of compliance with this provision, which is about the timeliness of off-site visits, not the volume.

why other evidence – here, the length of the delay and nature of care that is delayed – must also be examined to determine compliance. The patient is a 58 year old man with known multiple myeloma (a cancer of the bone marrow) followed by an oncologist for surveillance of the status of his cancer. In November, 2023 the oncologist requested that ADCRR arrange for the patient to have lab tests and a follow-up appointment in 6 months, i.e., around May, 2024. Instead of arranging for the visit, as the oncologist requested, ADCRR did nothing until June 13, 2024, at which time a practitioner requested a referral as "urgent," i.e., by July 13, 2024. Even if this happened, the visit would already be delayed by two months. However, the visit did not happen by July, 2024. Instead, it was scheduled for June 5, 18 months after his last appointment and some 13 months late. Cancer surveillance in someone who has a known history of cancer is important to catch a recurrence quickly so that retreatment can be started. A delay of more than a year is not excusable and places the patient at significant risk of a hastened death.

The reasons for delays in off-site specialty consultations are multiple. While determining all the reasons was not our focus, two related ones – failure of ADCRR's contractor, NaphCare, to contract with specialists, and insufficient custody staff for transportation – illustrated by the following two cases, came to our attention and are instructive.

Patient 57's history is such that he is at increased risk of colon cancer. A practitioner ordered a colonoscopy on February 3 as "Routine," i.e., within 60 days, or by April 3. As of June 5, the colonoscopy had still not been scheduled. The reason the colonoscopy has not yet been scheduled is that NaphCare has still not negotiated a contract with the specialist, as shown below in a scheduler's documentation in the patient's EHR:

> As of April 25, 2025, Valley GI is still not accepting new patients. Joanna from Valley GI confirmed that providers and NaphCare have not yet reached an agreement on contract negotiations.
>
> █████  Medical Scheduler | 4/28/2025 1:40:00 PM | one month ago

Patient 58 was diagnosed with Hodgkin's Lymphoma in 2022. His case shows avoidable suffering due to inadequate pain management. The patient was last seen by an oncologist in July, 2024. Despite clinical evidence of possible cancer spread, and a recommendation from the oncologist that the patient needed to see an oncologist specializing in lymphoma, ADCRR has not arranged for him to see the specialist. A clinician entered an order for the patient to see the specialist on August 9, 2024 as routine, which means the consultation should have taken place by October 9, 2024 which was already not an acceptable timeframe. It has not happened yet. Some of the delay is due to multiple cancellations of his scheduled off-site appointments by ADCRR (e.g., November 20, 2024 ADCRR failed to transport him because he was on MH Watch. MH Watch is not a justification for failing to transport the patient, certainly not in the absence of compelling evidence, which there was not.; January 6 ADCRR failed to obtain the lab tests results the oncologist needed and requested for that day's appointment, so the oncologist refused to see him; February 20 the oncologist was out of the office for the scheduled

appointment, but scheduler indicated that ADCRR would have cancelled it anyway due to a "transportation cap")[16].

On January 3, during a primary care appointment with an APP (not his PCP) by telemedicine, the APP noted that the patient "Rates pain with mobility 7-8/10; Rates pain with rest 7-8/10; 'it's been really miserable' 'I've been crying myself to sleep'" and concluded that the current non-narcotic pain regimen (gabapentin, tramadol, duloxetine) was not working. Her plan was to wait for an oncology appointment that never happened. The patient expressed that he was "frustrated and scared" to the psychiatrist on March 17 because he had not had an oncology appointment in many months. The patient's pain was getting worse over time, likely due to worsening of his cancer. The patient continued to suffer due to untreated pain, cancer, and fear, until March 22 when he tried to commit suicide by overdosing on his blood pressure medication requiring admission to the intensive care unit at the hospital. As of the writing of this report, he has still not seen an oncologist; it is scheduled for July 31, which, if it actually takes place, will have been delayed by more than 8 months.

We recognize that to address the transportation issues that are a barrier to timely specialty consultations, ADCRR has been working to increase access specialty care via the use of telemedicine. We hope this effort bears fruit; so far it has not yet led to any appreciable improvement in timeliness.

**Example:**
This example illustrates how multiple violations of the Injunction, including the one that is the focus of this section, lead to delays of off-site specialty care and serious harm.

Patient 59 has HCV-related liver cancer. On September 20, 2024, a surgeon recommended that ADCRR refer him to a specialist (interventional radiologist) to ablate two cancerous lesions in the liver and then obtain an MRI four months hence. The practitioner who ordered the referral to the specialist was an APP. Not understanding the urgency of treating cancer of the liver quickly, the APP ordered the referral as "routine," i.e., within 2 months (in violation of the Injunction section 1.1) instead of ordering it as soon as possible within the next couple of weeks. The APP also ordered for the patient to "follow up" with his PCP. Despite the complex nature of this patient's case (in addition to the liver cancer, which by itself, warranted the patient to have a physician as his PCP, he also suffers from hypertension, emphysema/COPD, and prostate disease), the patient's assigned PCP was another APP (in violation of the Injunction, section 6.1-6.2). Regardless, the first APP's order was ignored (in violation of the Injunction, section 1.22) and he was not seen. The referral to remove the cancer, which, if completed as ordered, should have been completed by November 30, 2024. At first glance, was not completed until January 3, some four months after it needed to be completed, and five weeks after it was ordered (in violation of the current Injunction provision under discussion here regarding delays in specialty consultations). However, the consultation that was completed on January 3 was not what had originally been ordered. For a reason we could not determine, instead of a visit for removal of the cancer, ADCRR sent the patient on January 3 by mistake for another MRI. Though useless from a clinical standpoint, by

---

[16] Some of the delay is due to factors outside ADCRR's control, such as the specialist being out of the office twice, and patient being in the hospital. However, these extrinsic factors do not explain the more than 8-month delay.

now the MRI showed that the larger of the two cancers had grown by more than 50% from 42 mm to 66 mm. On January 23, an oncologist saw the patient and reiterated that the patient needed to be seen by the interventional radiologist STAT sending back a hand-written note with the patient shown below:



Due to his concern that the patient's care was not being addressed, he also followed up with a typed note containing the following (underlining added):

**Assessment:**
62 y.o.male with hx of HCC, multifocal.  Pt is s/p ablation to Seg III lesion.  Pt MRI personally reviewed.  Seg III mass w/o ev/o recurrent disease.  R lobe HCC x2.  One lesion is stable, the other lesion is growing.   Pt needs stat referral to IR for eval for TACE/TARE to larger lesion.  This was conveyed to the prison via notes, as well as, a phone call to the prison coordinator.

The handwritten note has been in the patient's chart since January 23 and as of the date of this writing, some four and a half months later, has still not been reviewed by a clinician (in violation of Injunction section 4.4.2 requiring review within four days). The "prison administrator" with whom the oncologist spoke does not appear to have taken any action. No one at ADCRR sought nor reviewed the type-written note either until May 21, when, for some reason, ADCRR requested the January 23 note and an APP reviewed it the same day.

On April 28 an APP who was not the patient's PCP saw the patient in a primary care visit (in violation of Injunction section 6.1/6.2 because this patient is too complicated to be assigned to an APP and in violation of Injunction section 6.3 because the patient was not seen for this important primary care visit by his PCP and no reason was given for failing to do this) did, however, note the need for an urgent visit with an interventional radiologist to ablate the cancer lesion in the liver and ordered it. However, despite having ordered it "urgent priority," which means, at latest, it should have been completed by May 28 (which would be within 30 days, the time limit for "urgent" referrals), it was not scheduled to take place until June 5 (in violation, again, of the provision of the Injunction here under discussion regarding delays in specialty consultations). We write "at latest" because the referral was ordered as "urgent priority." No such urgency category exists in ADCRR's policies nor has ADCRR informed the monitors of a new category (in violation of Injunction section 8.4 that requires ADCRR to notify us of such changes). We make the inference, however, that referrals ordered as "urgent priority" are supposed to be completed more quickly that those ordered as "urgent."

In summary, due to two separate violations of the requirement for referrals to specialists to be completed within the timeframe ordered (and numerous other violations of the Injunction), a patient with potentially curable liver cancer that was first identified on September 20, 2024, for whom removal of the cancer should have taken place by the end of September, 2024, did not have that treatment until June 5, more than nine months later. Knowing that the larger of the tumor masses grew by more than 50% from October 2024 to January 2025, it is likely it grew even further by June 5 creating significant – but avoidable – risk that the patient's cancer progressed from an intermediate size to a large size (greater than 50 mm) which is associated with lower rates of cure and, even without cure, decreased overall survival.

Finally, lest it be argued that the patient "refused" a visit with an APP (yet a different APP and, again, not the patient's PCP) on March 18 to discuss the result of an x-ray, and that this action by the patient contributed to the outcome in this case, based on our review of the event, it is highly unlikely that the piece of paper with the patient's signature that was scanned into the EHR constitutes an informed refusal, as required. We draw that inference based on three facts: (1) The clinician signed the refusal form well after the patient did. If there had actually been a conversation (required for there to have been informed consent), the signature times would have been contemporaneous. (2) The patient clearly has participated in the care of his cancer and there is no other evidence in the chart that he is suicidal or does not wish to have his cancer cured. Thus, if the visit were key to his health, and he knew that, it is highly unlikely he would have refused it. (3) If the APP believed this visit were key to the patient's health and failure to meet could contribute to a poor outcome such as incurable cancer, a reasonably competent APP would have documented in a progress note the content of their conversation, patient's reasons for refusing, and the APP's efforts to address those reasons and convince the patient otherwise.

| Injunction Provision 1.21a (a.k.a. "1.21") | Non-compliant |
|---|---|

**Provision:**

All cancellations of patient-initiated visits shall be made directly to a health care professional by telephone, tablet, video, face-to-face, or in writing by the patient. If a patient will not voluntarily displace, health care staff will go to the patient's location.

**Importance:**

This provision of the Injunction assures that encounters with a medical professional that were requested by a patient and appear to have been cancelled by the patient, were, in fact cancelled by the patient. In a prison setting, custody staff are usually the "middle man" between a patient and their access to health care staff. An unintentional dysfunction of the custody system or staff, or, rarely an intentional obstruction by staff, can result in health care staff being under the impression that a patient "didn't want to come" for a MH appointment when, in fact, the patient still wanted and needed the appointment. When that happens, depending on the nature of the patient's need, the lack of an appointment can put the patient at significant risk or serious harm. By requiring the patient's request to cancel their appointment to be communicated directly to a health care staff member, that risk is eliminated.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 76%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 60%.

ADCRR's method of self-assessing its level of performance is flawed in three ways. **First**, ADCRR only identified 70 cases of refusals of patient initiated appointments for the entire month of February. Based on our knowledge of the frequency with which refusals of patient-initiated visits occurs, which is likely several times greater than 70, the base data from which they measure is not credible. **Second**, ADCRR continues to rely solely on the presence or absence of a refusal form to determine compliance with this provision. However, the main purpose this provision is to determine whether the refusal came directly from the patient or not regardless of whether there is a refusal form filed. This means that there can be non-compliance even if a signed refusal form is in the chart, if the refusal was communicated by the patient to anyone other than health care staff, i.e., an officer. **Third**, even when patients sign the refusal form, they may not know what appointment they are asking to cancel. This can happen because the refusal form often just says something vague like "Nurse Line" or "Medical Triage" as shown in the screenshot below. While likely in response to an HNR the patient submitted, if the patient submitted the HNR several days earlier, or submitted more than one HNR, the patient may not remember what they asked for or, in the case of multiple HNRs, not be able to ascertain to which request the refusal applies.

Based on interviews with patients (e.g., Patient 35 and Patient 36), the form is often completely blank when they are asked to sign it by an officer. The nurses fill out the form later, but no health care professional speaks directly to the patient.



**Example:**

Patient 60 submitted an HNR on February 3 stating, "I recently fell from the top bunk directly on to my back. Not only was the wind completely knocked out of me, but I also may have dislocated a rib as I can't hardly move left to right, up & down. Struggling to climb to bunk." Though the patient only submitted 1 request, there are 3 separate entries closing out this request in the patient's EHR on February 7, 2 indicating that the appointment was cancelled and one that it was refused. There is absolutely no documentation supporting any of these entries nor, more importantly, that any health care staff member had a direct interaction with the patient to confirm that he no longer needed to be seen. In the absence of such evidence, it appears that the patient asked to be seen, was not seen, and ADCRR failed to assure that that was the product of the patient changing his mind as opposed to a system problem impairing his access to care – exactly what this provision was meant to prevent. Given the patient's report, he may have suffered a rib fracture (dislocations are uncommon, fractures are common).

| Injunction Provision 1.21b (a.k.a. "1.1,1.21a") | Non-compliant |
|---|---|

**Provision:**

All refusals of provider-initiated on-site medical visits are made by telephone, video, or face-to-face with an RN or practitioner, within three days after the appointment. If a patient will not voluntarily displace, health care staff will go to the patient's location.

**Importance:**

This provision is closely related to, but different from the one above. Underlying the provision above is the presumption that if a patient (presumed to have decision-making capacity) requests a visit, and then changes their mind (a "cancellation"), that the visit is presumed to be not medically necessary. However, when the visit is requested by health care staff, the presumption is that the visit is medically necessary. If the patient does not want to attend that visit (a "refusal"), the refusal should undergo the same practice as any other refusal of health care: an informed refusal needs to be executed. This provision ensures that (a) like for a cancellation, the patient actually expressed a desire not to have the visit (i.e., there wasn't a breakdown in communication through the custody system) and (b), unlike for a cancellation, there was an informed refusal. Depending on the nature of the reason for the visit, failure of either of these elements puts the patient at significant risk of serious harm.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

See Section VII Refusals for a discussion of the problems with how ADCRR conducts refusal conversations of provider-initiated visits.

**Example:**

Patient 61 had an appointment to see a practitioner as a follow-up to a visit with an orthopedic surgeon who recommended that the patient have surgery to repair a torn ligament in his knee. There is a document with the word "refusal" executed by a medical assistant who somehow heard from a correctional officer that the patient "did not want to come to medical." His visit was cancelled. This fully violated all the safety measures this provision was meant to ensure, both by relying on a statement by an officer, and execution by a medical assistant, and possibly another unnamed intermediary between the medical assistant and the officer. *Even* if the patient actually verbalized a refusal to someone, the purpose of informed refusal is to ensure that the patient understands what the visit is for, that qualified staff (which the medical assistant was not) fully understood the reasons for his refusal, made efforts to overcome the reasons, or failing that, was able to counsel the patient on alternatives. ADCRR's handling of this refusal put the patient at risk for not having needed surgery.

| Injunction Provision 1.21c (a.k.a. "1.1,1.21b) | Non-compliant |
|---|---|

**Provision:**

All refusals of off-site health visits are made by telephone, video, or face-to-face with an RN or higher at the time of the appointment. If a patient will not voluntarily displace, health care staff will go to the patient's location.

**Importance:**

This provision is very similar to the one above, except that it focuses on provider-initiated visits to an off-site specialist, as opposed to on-site health care services. The explanation of its importance is identical to that for the previous provision.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

ADCRR reported that no patients met the criteria for inclusion in the assessment of this provision in the months of January and February (Doc. 4872, Exhibit 2), reporting their level of performance as "N/A". It seems very unlikely that there were no refusals for any off-site visits during the entire months of January and February based on the number of refusals in prior months (i.e., greater than 100). We spoke with schedulers at ASPC-Lewis who estimated that at that facility alone there were at least 1-2 refusals of off-site appointments per week and they have never had a month without any refusals. The most recent credible data ADCRR produced on this provision was in was December 2024, when ADCRR self-assessed its level of performance at 68% compliant. Based on that data and the fact that ADCRR had never been close to compliance in any previous month (and consistent with other individual data points from medical records we reviewed and interviews we conducted described throughout this report), we concluded, that ADCRR is still not compliant.

See Section VII Refusals for a discussion of the problems with how ADCRR conducts patient refusals of provider-initiated visits.

**Example:**

Patient 62 was referred to see a cardiologist on February 12 due to an abnormal EKG that raised concerns that he might have blockages of arteries in the heart. There are *two* refusal forms for February 12 in the patient's chart. One refusal form (for this patient), indicates the patient is refusing a "med run" with the reason given, "don't need it." It was executed by an LPN. (The other refusal in his chart is by a different patient, erroneously uploaded into this patient's chart.) The referral to the cardiologist was cancelled by an unidentified party without explanation and without rescheduling. The patient met with a practitioner (but not his assigned primary care practitioner) for a primary care visit on February 25. The practitioner ignored the fact that the patient still needed to see a cardiologist. Thus, the patient has possible blockages in his heart, which, in the opinion of an ADCRR practitioner, needed evaluation by a cardiologist, and yet, as of the writing of this report, more than 4 months later, has not happened and is not scheduled to happen. There is no evidence the patient was engaged in an actual (informed) refusal of the event addressed in the document. *Even if* the document posted in his EHR is for the cardiology

consultation on February 12, and *even if* the patient understood that "med run" meant a cardiology appointment, an LPN does not have the ability to conduct a refusal conversation with a patient. Thus, the patient remains at significant risk of serious harm if indeed he does have blockages in his heart.

| Injunction Provision 1.23 | Non-compliant |
|---|---|

**Provision:**
Patients shall be informed in a timely manner of diagnostic test results.

**Importance:**
This provision ensures that patients are informed of the results of test results in a timely manner. This is important because it protects patients in two ways. **First**, it is a "failsafe" patient safety mechanism to ensure that the test was processed and reported back to ADCRR. If a patient has a test done, but does not hear of the results, they can be their own advocate and bring the lapse to the attention of health care staff. This is a good practice in the community, but an essential practice at ADCRR because of the very unreliability of the extant system for tracking such things, as we describe elsewhere in this report. **Second**, if the result is abnormal, once again, it provides a failsafe patient safety mechanism to help ensure that follow-up care is provided. If the patient is informed a test result is abnormal, but then does not receive further care or instructions, they can be their own advocate and bring the lapse to the attention of health care staff. As with the first possible lapse, as we describe elsewhere in this report, ADCRR's current systems cannot provide the necessary reliability that abnormal tests will be followed up or followed up in a timely manner. Generally diagnostic tests are only ordered to search for serious medical conditions, and therefore failure to ensure that they are completed and acted upon, which this provision helps prevent, puts patients at significant risk of serious harm from those medical conditions.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its performance at 88%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 76%. The disparity stems from errors in how ADCRR assesses compliance. One error is that ADCRR accepts as compliant cases in which sufficient credible evidence is lacking. We found cases self-assessed as compliant where the practitioner who reviewed the test results wrote "patient notified of results" on the laboratory report at the time it was reviewed. However, the patient's EHR lacked credible additional evidence (e.g., a copy of the electronic notification form that ADCRR uses for this purpose, a visit with the patient) that notification actually took place. We further verified this finding through interviews. We interviewed Patient 63, in whose chart a practitioner documented notifying the patient on April 23 of the results of laboratory tests conducted as part the work-up of his wrist swelling. The patient denied having been informed. We interviewed Patient 42 in whose chart a practitioner documented notifying the patient on February 11 of the results of laboratory tests. The patient denied having been informed.

Another error is that in some cases, ADCRR accepts as compliant cases in which the ADCRR's own reviewer clearly notes that the notification was not timely ("the next appointment is not always timely"). We found this pattern when the tests were part of a chronic care protocol and the reviewing practitioner documents "Will discuss at next chronic care visit." In some cases, doing so is clinically appropriate, especially if the abnormality is slight and/or the next scheduled visit is coming soon. However, when the

abnormal results are more significant and the time to next visit is long (e.g., 3 months later), it is not clinically appropriate. For example, Patient 64 was seen for management of his diabetes on February 20. During that visit, the practitioner reviewed with him the results of a diabetes-related test from December that was mild to moderately elevated (HgbA1c 8.8%, normal less than 5.7%). The practitioner did not modify medications but ordered the test to be repeated. The repeat test result returned on February 22 showing that his diabetes was now much more poorly controlled (HgbA1c 11.7%) than it had been in December and required changes to his medication regimen. The practitioner failed to review the result in a timely manner (in violation of Injunction section 4.4.2); the result was not reviewed until March 4 (almost 2 weeks after the test result was reported). When reviewing it, the practitioner wrote "Abnormal labs noted. Discuss at next [chronic care visit]." That next visit, however, was not scheduled to occur until April 22 which was too long to address his significantly abnormal results. The practitioner exacerbated this delay by declining to make any medication changes even then, because the patient would be releasing from ADCRR 2 weeks hence and could have medication changes made by the community practitioner. The community appointment, however, was not expected to occur until May 12. Thus, the patient had a very abnormal test result on February 22 that was not shared with the patient until April 22, not treated in the interim, and for which there was an intentional plan that the patient would not receive treatment until May 2, almost 3 months later (in violation of Injunction section 1.1). While providing treatment for his worsening diabetes was not an emergency, it was urgent, due to the short-term increased risk of developing potentially fatal electrolyte abnormalities with average blood sugars that high (i.e., diabetic ketoacidosis) and the longer a patient's diabetes is out of control, the greater are the risks of bad long-term outcomes which, interestingly, the practitioner was aware of and documented in the April 22 visit note: "risks of uncontrolled blood sugars-end organ damage, blindness, heart disease, kidney disease, dialysis, poor wound healing, amputation, stroke, death."

**Example:**
See examples embedded above.

| Injunction Provision 5.1 | Non-compliant |
|---|---|

**Provision:**

For patients with any medical conditions and identified treatment providers in the community, if the patient consents, health care staff shall send each provider relevant health care information prior to the patient's release. This includes, at a minimum, a problem list, list of active medications, current symptoms, functional impairments, a summary of relevant care provided during incarceration, any necessary care or follow-up care, one or more points of contact if a community provider requires further information. The patient's health record shall contain documentation of the above information that was provided, when, and to whom.

**Importance:**

This requirement is important because it assures seamless continuity of care when the patient re-enters the community. Science has shown that any transition of care, e.g., patient discharged from a community hospital to home, is a time of risk of serious harm to the patient because crucial information about the patient can fall through the cracks due to poor communication between the previous and future care provider. The transition between prison and the community is equally, if not more, risky. The Injunction requires ADCRR to share basic information with the health care provider who will be taking care of releasing patients to reduce that risk.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 96%. We estimated the level of performance to be approximately 20% by creating our own report in the EHR system of all patient who released in February and who were medically complex (i.e., Medical Level 2 or higher[17]). We were forced to rely on our own data set because ADCRR's method of collecting data for its self-assessment is flawed in two ways. **First**, the population of patients released in the monitored month from which ADCRR draws its sample, is markedly skewed in the direction of finding compliance. As with the corresponding provision for MH patients, ADCRR only gathers cases in which a release packet was prepared (and then examines the completeness of the release packet), ignoring cases in which no release packet was even prepared. **Second**, the cases ADCRR gathers do not include any patients who were medically complex (i.e., Medical Level 2 or higher) who the release planner failed to see prior to their release, so it is not possible to know if they had a community provider to which the patient wanted their records sent (e.g., Patient 65).

**Example:**

Patient 66 released on February 24 with a release plan for him to receive 7 days- worth of his MOUD (buprenorphine) but no corresponding concrete plan for when he would be seeing a community provider to continue the medication. The weeks after release from prison is a time of high risk of overdose from

---

[17] ADCRR classifies the medical complexity of residents using the following scale that ranges from most physically able (M-1) to least physically able (M-5):

opioids, and therefore it is imperative that patients receive enough MOUD to last until their follow-up appointment with a community practitioner. Failure to do so in this case put the patient at significant risk of death from opioid overdose.

| Injunction Provision 7.4.1 | Compliant |
| --- | --- |

**Provision:**

Patients shall be given on a daily basis an opportunity to indicate their need to be seen for a medical clinic appointment at the next available clinic by one of the following mechanisms, depending on their living situation, freedom of movement, and access to electronics: affixing their name to a time slot on a paper list maintained on the living unit or in the medical unit; affixing their name to a time slot on an electronic list via tablet or kiosk; informing the nurse who conducts daily (or more frequent) welfare checks on that unit; an effective paper-based system in the event of temporary non-functioning of the electronic system.

| Injunction Provision 7.4.2 | Unable to determine compliance |
|---|---|

**Provision:**
A reminder of the following rule is communicated via the medium the patients use to make requests (e.g., a statement placed on the paper or electronic sign-up list): Patients should only use the non-urgent system if they have a non-urgent need. Patients with urgent or emergent needs should notify a staff member.

**Importance:**
This provision was important to include in the Injunction because the Injunction called for a change in the way ADCRR would be handling patient requests for care, such that patients may have gotten accustomed to expecting that a nurse was going to review every written request, urgent or not, and that if the request appeared urgent, the patient would be contacted immediately. In the changed system, written requests are assumed to be non-urgent and therefore would not be reviewed and acted upon immediately (because a more effective and immediate system – asking an officer to contact medical staff – was in place). Thus this provision ensures that patients are aware of the change, to avoid harm by instructing patients not to submit urgent requests the old way.

**Discussion:**
A response to a request for information from ADCRR regarding this provision is pending.

Intake

| Injunction Provision 7.1 | Non-compliant |
|---|---|

**Provision:**

An RN or higher credentialed professional shall conduct an intake screening within four hours of a patient's arrival or, alternatively, a rapid screening shall be conducted immediately upon arrival, but the intake screening by an RN shall be conducted as soon as possible and before the patient proceeds to housing. If the rapid screening is conducted by a professional of lesser credential than an RN (e.g., LPN, certified medical or nursing assistant), then the screening shall not include a clinical assessment, and any abnormal response found by the LPN or similar staff shall result in immediate consultation with an RN (or higher credentialed professional).

**Importance:**

The moment of admission to ADCRR is a time of high health care risk, both because it is a transition of care between two venues and that – even in the community – is a time when important information or care can fall through the cracks, and because the transition to prison itself is a stressor to many individuals and increases the chances of stress-related health problems such as heart conditions and suicidality. It is important to note that not all individuals entering ADCRR are being transferred from a jail where, presumably, they were clinically "stable." Some individuals who violate the terms of their parole are brought directly to ADCRR from the street. These individuals are at particular risk of medical decompensation and death because they may have recently ingested drugs or may be in, or about to go through, withdrawal. For this reason, individuals need to be screened by health care staff soon after arrival. Under the Injunction, ADCRR may have the individual screened by an RN within four hours of arrival or may have the patient screened by a lesser trained person (e.g., LPN or certified medical or nursing assistant) ("rapid screen") in which case the RN screening can be deferred to be completed as soon as possible, but before the patient leaves the intake area. In the latter scenario, the lesser trained person must contact the RN immediately if they find any abnormalities upon screening.

**Discussion:**

ADCRR remains non-compliant with this provision. When conducting rapid screens, we found many instances in which the screening was either incomplete or the screener failed to immediately notify an RN of an abnormality.

ADCRR self-assesses its level of performance on this provision at 94%.

With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the appropriate portion of the same data, supplemented by inappropriately excluded data, the performance level we calculated was approximately 80%. We were forced to supplement the dataset because the sample ADCRR uses is flawed. It excludes individuals returning to ADCRR on a parole violation, who often return to a complex other than the main men's or women's reception center. Among those individuals, staff did not always complete a nurse screening within four hours of entry, sometimes days later.

**<u>Example:</u>**
Patient 67 was admitted to ADCRR (through ASPC-Lewis) on March 11. He did not receive a rapid screen or an RN screening at all.

| Injunction Provision 7.2 | Non-compliant |
|---|---|

**Provision:**
A medical practitioner shall complete a history and physical examination of each patient by the end of the second full day after a new patient arrives in ADCRR.

**Importance:**
For the same reasons explained in 7.1 above, following the nurse screening, it is important for patients to have a more comprehensive evaluation by a medical practitioner within two days of arrival.

**Discussion:**
ADCRR remains non-compliant with this provision.

ADCRR self-assesses its level of performance at 96%. We believe that is accurate. However, given that there are approximately 1,100 admissions per month, a 96% performance level means that 44 individuals did not have a safe reception process. There is also a flaw in ADCRR's data collection. In the past we gave ADCRR feedback that the intakes most likely to not to be seen timely by a clinician were individuals entering ADCRR via a facility that is not a reception center (typically individuals returning to prison on a parole violations). It appears those individuals are now being inappropriately excluded from the data that ADCRR examines.

**Example:**
Patient 68 was admitted on February 21 from the community. He has an extensive medical history including hepatitis C, cirrhosis of the liver, major depressive disorder, bipolar disorder, and substance use disorder. Despite this history and the attendant risks of drug withdrawal, he underwent no screening, neither a nurse screening (section 7.1) nor a practitioner screening. On February 23 an ICS was triggered for an abscess on his arm that required antibiotics and surgical drainage. Because he was never evaluated upon arrival, we have no way of knowing if that lesion was present at the time of admission. If it were, timely intake screening and/or practitioner assessment would likely have averted the emergency.

Non-Urgent/Non-Emergent Care

| Injunction Provision 7.4.6 | Non-compliant |
|---|---|

**Provision:**
All non-urgent/non-emergent care at the request of a patient shall be completed in a reasonable time.

**Importance:**
This provision ensures that episodic problems are addressed in a timely manner. Though these are labeled as "non-urgent/non-emergent," the label does not mean that they are unimportant. Many serious medical conditions present, initially as non-urgent/non-emergency symptoms. Failure to address them timely can lead to a problem becoming serious or a serious one becoming harder or impossible to resolve. For example, occasional blood in the stool typically presents as a non-urgent/non-emergent problem. However, it may be a symptom of colon cancer, which if not addressed, may convert from a curable to a terminal condition.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 86%: 86% of available non-urgent appointments are unused. This result makes no sense logically. It would mean that ADCRR is only using 14% of the applicable workforce's time which defies credibility. We provided written feedback on this to ADCRR on multiple occasions, but the monthly data ADCRR submits remains erroneous.

More fundamentally, at the core of this provision is the requirement that the care be "completed." Based on other requirements of the Injunction, with some limited exceptions, nurses cannot conduct – and therefore complete – such care. It must be done by a practitioner. The vast majority of these encounters, however, continue to be conducted by nurses. Therefore, by design, ADCRR is non-compliant.

**Example:**
Patient 49 is a 48-year-old male with newly diagnosed diabetes, opiate use disorder, and injection drug use, whose case is discussed in more detail under section 1.1e. In brief, starting on 9/1/2024, the patient was first seen for neck pain by a nurse, and told he slept wrong. He was seen by a nurse again on September 3 and 4, 2024 for ongoing neck pain and stiffness. Each of these visits, conducted by a nurse practicing independently, were clear violations of the Injunction (section 7.4.7) and caused harm, as his untreated infection had now invaded the bones of his spine and required urgent management, which the nurses did not provide. An on-site practitioner saw the patient on September 6, 2024. The delay from his request on September 1, 2024 until seen by a practitioner on September 6, 2024 was dangerous. Nurses, acting independently, again saw the patient for ongoing head and neck pain on September 17, 23, and 24, when he was finally referred back to a practitioner. Once again, the delay from his request on September 17, 2024 until seen by a practitioner on September 24, 2024 was dangerous because he had a life-threatening condition brewing, where time was of the essence. On September 28, 2024 the patient was finally sent emergently to the hospital due to headache, decreased level of consciousness,

incontinence, lethargy, rocking in pain, and shivering. He was found to continue to have MRSA infection, now involving his blood, heart valve, heart tissue, brain, and spine.

| Injunction Provision 7.4.7a/b | Non-compliant |
|---|---|

**Provision:**

The initial care for non-urgent/non-emergent care and chronic care shall be provided by the patient's primary care provider (PCP) with the exceptions noted below. (1) The care may be provided by another medical practitioner or health care practitioner as directed by the PCP as clinically appropriate. (2) If the PCP is not on the premises or conducting telehealth visits at the time, the care may be provided by another medical practitioner of the same or higher credential. (3) Pursuant to patient-specific direction provided by the medical practitioner, RN may provide initial care for a limited number of conditions that are simple, rarely serious, rarely confused with serious conditions, and appropriately treatable with self-care and/or over-the-counter medications provided that the RN operates under clinically appropriate protocols approved by the monitors.

**Importance:**

For reasons very similar to those explained above for section 7.4.6, it is important for requests from patients to be seen for non-urgent/non-emergent problems to be appropriately addressed, both in terms of timing as well as content. Two important factors that help make the care appropriate are that the care provider has the appropriate credential (physician vs. APP) and that the care provider has enough information about the patient. As discussed elsewhere, complex patients should only be cared for by physicians. To have enough information, the care provider should, with rare to occasional exceptions, be the patient's primary care provider. On those occasions when the PCP is not available, the person filling in needs to be able to glean enough information from the patient's EHR to be able to make good clinical decisions.

**Discussion:**

ADCRR continues to be non-compliant with this provision due to at least three system problems. **First**, as described in section 7.4.6, far too many instances of initial care for non-urgent/non-emergent problems are not even managed by a practitioner – any practitioner – but rather by nurses. The Injunction states that nurses may only provide the initial care for a limited number of conditions that are simple, rarely serious, rarely confused with serious conditions, and appropriately treatable with self-care and/or over the counter medications. In these cases, an RN must act under clinically appropriate protocols approved by the Court. ADCRR has never submitted any protocols to the Court for consideration. Despite this, ADCRR currently has 45 RN protocols available in the EHR that nurses continue to use. Most are to treat conditions that do not meet the Injunction criteria above (e.g., Abdominal Pain or Injuries, Acute Anxiety, Acute Respiratory Disease, Chest Pain (non-acute), Dehydration, Nausea and Vomiting, Urinary Complaints, Headache) in that they are not simple, have many possible causes, and can represent very serious illness. During the month of February, nurses used protocols 9424 times, as shown below in a report generated by the EHR system which is very dangerous.

| | | | | |
|---|---|---|---|---|
| ✅ ABDOMINAL P...OR INJURIES | 189 | | ✅ EAR PAIN | 176 |
| ✅ ACNE | 43 | | ✅ FEVER BLISTE...ANKER SORES | 4 |
| ✅ ACUTE ANXIETY | 55 | | ✅ GERD/GAS/HEARTBURN | 175 |
| ✅ ACUTE RESPI...DISEASE-ERO | 124 | | ✅ HEAD TRAUMA-ERO | 47 |
| ✅ ANAPHYLAXI...EACTION-ERO | 24 | | ✅ HEADACHE | 321 |
| ✅ ANXIETY | 33 | | ✅ HEAT STROKE...AUSTION-ERO | 2 |
| ✅ ATHLETE'S FOOT/JOCK ITCH | 107 | | ✅ HEMORRHOIDS | 54 |
| ✅ BACK PAIN | 268 | | ✅ HYPOGLYCEMIA | 22 |
| ✅ BEE STINGS | 10 | | ✅ LICE | 2 |
| ✅ BITES | 32 | | ✅ MENTAL HE...R PROTOCOL | 1,509 |
| ✅ BURNS | 18 | | ✅ MUSCULOS...PAIN/STRAIN | 1,671 |
| | | | | |
| ✅ CALLUS/BLIS.../LESION/BOIL | 239 | | ✅ NAUSEA AND VOMITING | 244 |
| ✅ CHEST PAIN (NON-ACUTE) | 238 | | ✅ OVERDOSE/P...ONING - ERO | 147 |
| ✅ CHEST PAIN...DISTRESS-ERO | 40 | | ✅ POST USE-OF-FORCE | 112 |
| ✅ COMMON COLD | 977 | | ✅ RASH/DRY SKIN | 480 |
| ✅ CONJUNCTIVITIS | 49 | | ✅ RINGWORM | 7 |
| ✅ CONSTIPATION | 316 | | ✅ SEASONAL ALLERGIES | 126 |
| ✅ DANDRUFF | 188 | | ✅ SEIZURE-ERO | 94 |
| ✅ DEHYDRATION | 18 | | ✅ SLEEP DISTURBANCE | 87 |
| ✅ DENTAL COMPLAINT | 730 | | ✅ SORE THROAT | 45 |
| ✅ DIARRHEA | 188 | | ✅ URINARY COMPLAINTS | 181 |
| ✅ DYSMENORRHEA | 2 | | ✅ VAGINAL YEAST INFECTION | 30 |

**Second**, as described in section 7.3, ADCRR's assignment of PCPs is still almost at random (physician vs. APP), i.e., without regard for the patient's complexity. **Third**, notwithstanding the appropriateness of that assignment, actually being seen by one's assigned PCP is also far too infrequent. As a result, patients are far too infrequently cared for by the properly credentialed practitioner who knows the patient. All three of these system errors result in the errors in care described in numerous examples throughout this report involving both significant morbidity and mortality. The current system of care across ADCRR is entirely episodic. Implementation of the Staffing Plan and the Patient Centered Care Model will provide the necessary system of care to support compliance.

ADCRR self-assesses its performance level on the part of this provision that it examined at 90%.

With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 10%, and below 40% on the part not examined by ADCRR.

**Example:**

Patient 69 is a 44-year-old female with high blood pressure who smokes. She came in on April 21 around 12:30 in the afternoon and was seen by an RN practicing independently for a two-day history of cough, using two disallowed nursing protocols. The patient felt short of breath when lying down. She was given a test for influenza, however, it is unclear if it was positive or not because the nurse documented in the nursing note that the test was negative, but in the Results section of the EHR, there is documentation that the test was positive for influenza type B. Her lungs were found to be clear. However, her breathing test results in the clinic (peak expiratory flow, a measure of airway constriction) were 200, 240, and 200 (normal 350-700). A remote APP who was not the patient's PCP and did not see the patient, gave the nurse a verbal order for an aerosolized breathing treatment to relieve the constriction. The post-treatment breathing test results were better, but still significantly below normal (300, 250, and 290). Despite the persistently low breathing test results, the nurse sent the patient back to her housing unit without treatment for the continued constriction of her airways, without seeing a practitioner, and without proper follow-up. Incomplete treatment, monitoring, and plan put the patient at significant risk of a serious worsening of her respiratory status. That this risk was real is evidenced by the fact that by April 24 the patient was suffering from wheezing, shortness of breath, chest tightness, coughing and pain when taking a deep breath. Failure of the nurse to isolate the patient for influenza put others at potential risk as well.

Unlike the simpler case above, the following case demonstrates failures of multiple different professionals to fulfill multiple requirements of the Injunction, exposing the patient to significant risk of serious harm.

Patient 70, a 21-year-old Spanish-speaking male, was initially seen by a nurse on February 1 at approximately 9:30 AM without an interpreter (in violation of Injunction section 3.1) for a complaint of constant right upper quadrant abdominal pain with nausea and vomiting 15 times, starting that day. The nurse saw the patient using the Abdominal Pain or Injuries Nursing Protocol. The patient was noted to be pale with abdominal pain on exam in the right upper quadrant. The nurse contacted a remote practitioner who decided that because the patient's vital signs were stable, it was okay to provide the patient fluids by vein and mouth, provide anti-nausea medications, and update the practitioner in 1 hour. There should have been, but were not, any subsequent vital signs measured or nursing assessments completed, nor did the nurse contact the remote practitioner in an hour, no less that day. The remote practitioner failed to contact the nurse when she heard nothing from the facility.

The patient returned with similar complaints the next day, February 2 around 12:30PM. He now complained of 9/10 abdominal pain and nausea. A nurse, practicing independently cared for the patient using a disallowed Abdominal Pain or Injuries Nursing Protocol (the nurse did, however, conduct the visit using a certified interpreter). Even with the aid of a protocol, the nurse failed to make an assessment or plan. Abdominal pain at the level of 9 out of 10 can be a symptom of a number of severe internal conditions and required further evaluation by a practitioner and possible testing. Neither happened.

The patient was seen again by an RN on February 3 for continuing nausea and a loose stool. At this point the patient had a low-grade fever of 100.9. His abdominal pain was now 10 out of 10. The nurse completed *three* protocols simultaneously as directed by the Abdominal Pain or Injuries protocol (the Nausea and Vomiting protocol and the Diarrhea protocol). The patient was on a bland diet and full liquid diet simultaneously and told to drink fluids and rest. He was given an antidiarrheal even though he said he only had one stool in the past 24 hours. The nurse obtained an order for acetaminophen from a practitioner since it was not available in commissary, but a provider still never saw the patient and it is not clear from the nurse's documentation[18] whether he discussed the case with the practitioner beyond asking for permission to use stock acetaminophen.

On February 5 the patient was seen by yet another nurse because he now had fever, chills, headache, and dizziness. Practicing independently, the nurse documented that the patient indeed had a fever. Given his history over the previous days as well as his presentation that day, he required an examination, vital signs, and evaluation by a practitioner to rule out a serious medical condition. Instead, none of this was done; the nurse simply told him come back to clinic if "any other [symptoms] return."

He was then seen again on February 6 for the sixth time by an RN. The patient said that he had intermittent right upper quadrant abdominal with chills all night. He had pain when his abdomen was pressed and a fever of 102.1. He was given acetaminophen and a practitioner ordered laboratory tests and an abdominal ultrasound without seeing the patient or sending the patient to the ER. The ultrasound was not done until the next day, February 7, resulting in the patient being sent immediately to the hospital due to a finding of acute inflammation of the gallbladder with a gallstone in the duct on ultrasound. He underwent urgent surgery. During the operation, the degree of inflammation present made the surgery difficult. The delay in care due to the repeated nurse visits could have led to sepsis and death. The delay in care likely did increase the patient's risk of surgical complications due to the amount of inflammation present. The poor judgement by the two clinicians on February 1 and February 6 are in violation of 1.1 as well.

---

[18] The confusion stems from the nurse documenting two conflicting things. In one part of the note the nurse documents talking to the practitioner about the medication, but in another part of the note documents that no practitioner was consulted.

| Injunction Provision 1.5 | Non-compliant |
|---|---|

**Provision:**
Emergency response and care provided by custody staff shall be appropriate given the skill level and knowledge expected of custody staff.

**Importance:**
Custody officers are usually the first responders to health care emergencies in a prison, thus the appropriateness of their response is critical to patient safety.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR's self-assesses its level of performance on this provision at 85%. This percentage is misleading, however, because a large number of the events from which they drew their sample did not require any medical intervention by custody. Including in its sample cases in which it would be impossible to judge the appropriateness of the care provided by custody because none was needed, artificially inflates ADCRR's percentage performance. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using only the appropriate portion of the same dataset, the performance level we calculated was approximately 50%.

**Example:**
An emergency response was triggered for Patient 71 following an assault on February 26. Medical staff did not arrive on the scene for about 10 minutes. It was noted that there was "excessive bleeding," enough to require blood spill clean-up. However, no first aid care had been provided by custody staff prior to their arrival, such as application of pressure to the wounds to stop the bleeding.

Urgent/Emergent Care

The Injunction requirements below address various operational elements that, as a whole, ensure that medical emergency response equipment, supplies, and medications, are available when needed in an emergency. In the absence of any of these elements, the most critically ill patients are at a significant risk of serious harm, including death.

| Injunction Provision 1.8a | Non-compliant |
|---|---|

**Provision:**
Emergency response equipment (Emergency Response Bag, Automated External Defibrillators ("AEDs"), oxygen) shall contain all items required by policy, all equipment shall be in working order, and all medications shall be unexpired.

**Importance:**
See introduction to Urgent/Emergent Care above.

**Discussion:**
Emergency response medical equipment, supplies, and/or medications were missing/broken/expired in 13 living or medical units, including living units at ASPCs-Tucson, Douglas, and Eyman. The last time ADCRR assigned a percentage performance for this provision, January 2025, it was 86%. There is no meaningful way to calculate a percentage performance for this provision because there is no appropriate unit of analysis. Percentage performance would vary widely depending on the unit of analysis chosen: as a percentage of complexes it would be 56%; as a percentage of units it would be 76%; etc.

| Injunction Provision 1.8b | Non-compliant |
|---|---|

**Provision:**

Emergency Response Bag checklists shall reflect the equipment was checked daily and inventoried monthly. The checklists shall also reflect medications are within their expiration date and equipment is operational.

**Importance:**

Provisions 1.8a and 1.8b measure the same thing, but two different ways. For 1.8a, ADCRR staff physically audit emergency equipment, supplies, and medication, maintained by their agent with whom they contract to provide health care, NaphCare. They check that all materials are in order: present, in working condition, and that medications are within their expiration date. For 1.8b, ADCRR audit staff review checklists which NaphCare fills out on a daily basis verifying that NaphCare staff have physically checked the same equipment, supplies, and medication. The purpose of the checklists is to ensure that emergency materials are always available; if anything is found missing during a check, it is supposed to be immediately replaced.

**Discussion:**

Audit of the checklists found that the contents of the emergency bag had not been verified and signed off on approximately 30 different days at different units. However, on all other days of the month at all the approximately 58 units (i.e., approximately 1,600 individual checks), the checklist indicated that the signing NaphCare staff member had personally examined and verified that all materials were in order.

However, the results of these two audits (provisions 1.8a and 1.8b) are clearly incompatible with each other. For example, NaphCare staff at the Bachman and Barchey Units, ASPC-Lewis signed off on their logs daily for the month of February, yet at the time of the audit of 1.8a by ADCRR audit staff on March 3 the emergency bags were found to be missing multiple supplies (i.e., nasopharyngeal airways to assist with artificial respiration during CPR, chest seals used to close gaping chest wounds, and bandages). Starting over a year ago, we brought this troubling disparity between the actual state of the materials in the Emergency Response Bag and NaphCare's documentation of the same issue to the attention of ADCRR following multiple monthly reviews. The problem continues. At this point, we ascribe no veracity to the checklists. Though ADCRR self-audit ascribed a 79% performance level to provision 1.8b, we find the checklists meaningless and therefore non-compliant with the Injunction.

| Injunction Provision 1.8c | Non-compliant |
|---|---|

**Provision:**

Staff shall complete and document all AED manufacturer recommended checks (e.g., daily, monthly, annual).

**Importance:**

See introduction to Health Records above.

**Discussion:**

ADCRR self-assessment found its performance level at 94%. As noted in provision 1.8a, housing units at ASPCs-Tucson, Douglas, and Eyman, should have, but do not have, automated external defibrillators (AED).

With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the limited sample of units that do have AED, we found 94% is a reasonable estimate.

| Injunction Provision 1.8d | Compliant |
|---|---|

**Provision:**
Naloxone (Narcan®) is required to be kept on every living unit or with every AED.

**Importance:**
See introduction to Urgent/Emergent Care above.

**Discussion:**
Only 1 living unit, ASPC-Tucson, Manzanita Unit, was missing usable naloxone; it was present, but had expired. Because the potency of naloxone does not fall precipitously on the day it expires or even likely for weeks/months thereafter, we did not consider this adverse finding to pose a risk to patients. Further, ADCRR has consistently performed well on this provision for most months in the past.

IPC (Inpatient Component; Infirmary)/SNU (Special Needs Unit)

| Injunction Provision 7.5 | Compliant |
|---|---|

**Provision:**
Build (or modify existing) living units to accommodate all patients requiring SNU housing, build the units with per-patient floor space consistent with Arizona's Medicaid agency (AHCCCS) requirements for similar populations, equip and staff the units to meet the assisted living needs of the SNU patients at the appropriate custody levels, and transfer all these patients to those beds. (Definition of SNU: elderly, physically disabled, or developmentally disabled, generally guided by the health/functional/physical needs criteria established by AHCCCS – see Pre-Admission Screening Tool)

**Importance:**
SNU beds accommodate patients: with an illness or diagnosis that may require monitoring, medication and/or therapy less frequently than in an IPC setting; who may require assistance with activities of daily living (ADL); whose health needs require a protective environment than in the general population housing areas; who often require cueing for some activities and medication administration; or who have limited physical capacity and stamina.

**Discussion:**
ADCRR is compliant with this provision.

ADCRR was required to build enough SNU beds to accommodate at least 200 patients by February, 2024 and then build enough additional beds to meet any remaining need by August, 2024. ADCRR completed the tasks as required. At present ADCRR has a capacity of 310 beds. As of July 16, there are a total of 6 patients statewide awaiting placement a SNU bed and adequate available space to accommodate them. Thus in terms of physical structure and accommodation of the number of individuals needing SNU support, ADCRR has done a very good job. Further, ADCRR's SNU bed capacity exceeds their current need by about 45%, which reflects planning for future need which is sure to come with an aging prison population.

We do have a concern, however, about the adequacy of staffing to support existing beds and patient need. Many patients placed in the SNU require hands-on assistance with their activities of daily living (i.e., toileting, showering, transfers, eating, etc.). During our tour of the Catalina Unit May, multiple patients mentioned that at times it took so long for someone to respond to a request for help that they often felt compelled to help each other with their physical needs suggesting that ADCRR does not have enough staff, especially certified nursing assistants (CNA) to attend to the needs of the patients in a timely manner. We do not believe, however, that we currently have sufficient reliable data, including exact staffing levels, staff-to-patient ratios relative to federal requirements[19] (or Arizona Health Care Cost Containment System requirements if more stringent), and risk of harm, to find ADCRR non-

---

[19] Medicare and Medicaid Programs - Minimum Staffing Standards for Long-Term Care Facilities and Medicaid Institutional Payment Transparency Reporting. https://www.federalregister.gov/documents/2024/05/10/2024-08273/medicare-and-medicaid-programs-minimum-staffing-standards-for-long-term-care-facilities-and-medicaid

compliant. We will continue to monitor compliance with this provision, including examining any data that emerges from the forthcoming staffing analysis of the SNUs ordered by the Court (Doc. 4916).

| Injunction Provision 7.6.1 | Non-compliant |
|---|---|

**Provision:**
A medical practitioner shall be contacted and collaborate on the creation of a care plan immediately upon a patient being admitted to the IPC.

**Importance:**
This and the following 3 provisions relate to care of patients admitted to an infirmary ("IPC"; Inpatient Component). Patients in the IPC are the most medically complex and vulnerable and require the highest level of medical care. The patients who are sickest or require the most care are designated Level 1. When less ill, they are designated Level 2. Each of the provisions below are essential components for keeping patients safe, requiring that they get the evaluation and attention from practitioners and nurses that their acuity demands. Failure of any one of these components puts patients at significant risk of serious harm from the myriad serious diseases that led to their placement in the IPC.

**Discussion:**
ADCRR remains non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 75%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 30%.

**Example:**
Patient 48 is a 38-year-old male with history of a gunshot wound to the abdomen in 2019 with an extensive complex surgical history that included a repair of a major vein in the abdomen (inferior vena cava) who was hospitalized for an abscess of a muscle in the rear of the abdomen near the spine that also threatened to infect the repair site of the vein (i.e., it was not certain that antibiotics would be curative and the potential need to remove the foreign material used to repair the vein remained an ongoing clinical concern that needed close monitoring). He was discharged late at night on February 25. At the time of discharge, the patient was receiving two different antibiotics intravenously started only a week earlier for a serious infection inside the abdomen in an attempt to save the vascular graft. Coming out of his abdominal wall was a tube to drain the infection deep inside the abdomen. He was also recovering from 2 serious complications of his hospitalization: a blood clot in his leg (deep venous thrombosis) and acute kidney injury. A remote practitioner (who did not interact with the patient), wrote temporizing orders to continue the intravenous antibiotics, but did not address the patient's other needs. Thus, although what the practitioner did would have met the requirements of timeliness for collaboration ("immediate"), their involvement did not nearly constitute an adequate care plan. The on-site IPC practitioner wrote additional orders, but those also did not meet the requirement of the Injunction for two reasons: having been written the next day, about 10 hours after admission they were not at all timely; and though they contained some additional orders, the orders were still wholly insufficient to adequately and safely meet the acute post-surgical needs of the patient. For example, there were no orders on how nurses should manage the post-surgical drain deep in the abdomen, how to care for the

100

site where the drain's tube emerged from the abdomen, or if, and how, to monitor the color and quantity of fluid draining from the abdomen into the drain bulb. Informing nurses about necessary device and wound management specific to this patient's condition and monitoring of drainage, were critically important to avoid a new wound infection, support healing, and detect signs of worsening of the deep abdominal infection early (i.e., monitoring the abdominal drain fluid was one of the crucial ways to determine the status of the patient's serious abdominal infection; absent such admission orders, there is no evidence in the EHR that it was done). The practitioner's failure to place the appropriate orders put the patient at significant risk of causing or failing to rapidly treat infection, both serious outcomes.

| Injunction Provision 7.6.2 | Non-compliant |
|---|---|

**Provision:**
An RN shall complete an admission nursing assessment immediately upon a patient arriving in the IPC.

**Importance:**
See 7.6.1 above

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of compliance at 75%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 65%.

**Example:**
Patient 72 is an 80-year-old male with coronary artery heart disease, congestive heart failure, high blood pressure, anemia, high cholesterol, and stroke who was admitted to the IPC upon discharge from the hospital around 10:30 PM on February 19 where he was treated for acute obstruction of urine. He should have had a nursing assessment immediately upon arrival. Instead, one was not done until the following evening around 5PM. Nursing care is a critical component of safe care for a patient in an infirmary. Without a nursing assessment, there can be no nursing care plan, which is of critical importance in the first 24 hours post-hospital discharge to prevent harm such as infection to the new tube running into his abdomen, or making sure that urine is draining adequately through the tube (urinary foley) to prevent obstruction and damage to the kidneys.

| Injunction Provision 7.6.3 | Non-compliant |
|---|---|

**Provision:**

A medical practitioner shall complete an admission history and physical within one calendar day of admission to the IPC for patients who are going to remain beyond 24 hours.

**Importance:**

Every patient admitted to the IPC needs a full history and physical by a practitioner, preferably a physician, to be able to adequately assess each of their ongoing medical issues and develop the ongoing plan and ensure the initial orders are correct and that there are no additional orders needed. This requires an on-site hands-on evaluation. See also 7.6.1 above.

**Discussion:**

ADCRR continues to be non-compliant with this provision. Occasionally there is an initial care plan written by a remote practitioner who often has not talked with or examined the patient. However, these are just holding orders and are not the equivalent of an admission history and physical examination. It is unacceptable that only half of all patients admitted to an ADCRR IPC have this important evaluation done in a timely manner. This places patients at high risk for harm from the myriad different serious diseases that led to their placement in the IPC.

**Example:**

Patient 73 is a 50-year-old male with coronary artery disease, high cholesterol, high blood pressure, and sleep apnea who was admitted to the IPC on February 28 after release from the hospital for a pulmonary embolism (blood clot that travels through the heart and lodges in the lungs, impairing the lung's ability to get oxygen and release carbon dioxide). The patient was not seen and evaluated by a practitioner until March 3. Pulmonary embolism is not only life threatening, but the clot can grow larger or the first episode can be followed by a second or third episode in the hours and days after the initial embolization. Thus failing to clinically evaluate this patient and create a treatment and monitoring plan in the event of worsening oxygen status placed the patient at significant risk of serious harm.

| Injunction Provision 7.6.4 | Non-compliant |
|---|---|

**Provision:**

An RN shall complete an assessment in the IPC at the frequency ordered. The spacing of the assessments shall be clinically appropriate.

**Importance:**

See 7.6.1 above

**Discussion:**

ADCRR continues to be non-compliant with this provision. Not only is the frequency of ordered nursing assessments not clinically appropriate in many cases, the nurses often fail to conduct assessments even at the frequency they are ordered. ADCRR only assessed the latter in determining their compliance with this provision.

**Example:**

Patient 74 is a 51-year-old female with metastatic lung cancer with metastases to the brain whose chemotherapy was paused on January 30 due to low blood counts. Upon return to ADCRR from her off-site appointment, she was admitted to the IPC for "neutropenic precautions." Neutropenic precautions are implemented when a patient has a very low white blood cell count rendering their immune system too weak to fight off infections. Infections in this situation can be very severe and often fatal if not diagnosed quickly. During this vulnerable window, then, it is important to monitor the patient's vital signs frequently (at least every shift) looking for the early signs of infection (fever, low blood pressure, fast heart rate). As such (and assuming that nurses in the IPC work 12-hour shifts), during her tenure in the IPC from January 30 to February 18 nurses should have measured the patient's vital signs at least 40 times.[20] Instead, nurses only checked them 11 times, sometimes going days at a stretch without measuring them.

---

[20] Vital signs are required to be measured every shift when a patient is classified as IPC Level 1. We were unable to find in the EHR if the patient was classified as IPC Level 1. But whether designated at this level or not, measurement of her vital signs every shift was clearly clinically required.

| Injunction Provision 7.6.5 | Non-compliant |
|---|---|

**Provision:**
The call buttons of all patients admitted to an IPC level bed are determined to be working on the day of admission and once per month. If a call button is not working health care staff shall perform a welfare check at least once per 30 minutes.

**Importance:**
The most acutely ill, incapacitated, or unstable patients are placed in the IPC. They are sometimes at or just below the level of acuity of patients in a community hospital. It is therefore important they are able to summon help immediately when help is needed. Absent such access, patients with an acute need are at significant risk of serious harm. A key tool to ensure that access is a call button. This provision ensures that the call buttons are working or, if not, that staff check on the patient every 30 minutes.

**Discussion:**
ADCRR has implemented an improved system – wearable call buttons – in some units. However, ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 88%. It was not possible for us to make an estimate of performance level using this data because of the frequency of careless or erroneous nursing documentation that brings into question the validity of all of the raw data itself. Of the 50 random charts selected for evaluation of performance, all of the boxes available to nursing staff regarding call lights were checked for 8 of the charts, meaning that the chart simultaneously said the call light was working AND that welfare checks would be done every 30 minutes until the call light is working, statements that are directly in conflict (see an example of such conflicting documentation in the screenshot below).

**Call Button:**

**Call light working?**
☑ Yes
☐ No

**Call light within reach?**
☑ Yes
☐ No

**Patient educated on how to use the call light?**
☑ Yes
☐ No

**Patient verbalized understanding on how to use the call light?**
☑ Yes
☐ No

**Patient demonstrated understanding on how to use the call light?**
☑ Yes
☐ No

**Initiated 30-minute welfare checks until call light working?**
☑ Yes
☐ No

Therefore, we could not ascertain if these call lights were actually working or not. Despite this documentation error, in its self-assessment, ADCRR counted all these cases as compliant. ADCRR also counted as compliant cases that were clearly not as illustrated in the example below.

**<u>Example:</u>**
Patient 75 was admitted to a room without a working call light. His case was self-assessed by ADCRR as compliant because in his EHR, the box was checked to initiate welfare checks every 30 minutes. However, admission to the IPC occurred on February 8 at 12:04 AM and in the 15 hours between then and 3:00 PM that afternoon, by which time nursing staff should have checked on the patient 30 times, they only checked on him 5 times. That he was at significant risk of harm during this general period is shown by the fact that at 12:00 PM he was found to be dehydrated requiring intravenous fluids, antibiotics, and then to be sent to the ER.

Specialty Care

| Injunction Provision 8.4 | Non-compliant |
|---|---|

**Provision:**
If Defendants or their healthcare vendor utilize categorical referral timeframes, e.g., "emergency," "urgent," "routine," for which it applies default timeframes for completion of the referral, Defendants shall notify the Court of those categories and timeframes and shall notify the Court within fourteen days if any of those categories or default timeframes change.

**Importance:**
This provision does not in and of itself ensure patient safety. Its purpose is to ensure that the Court Monitors are able to monitor relevant provisions of the Injunction appropriately and fairly.

**Discussion:**
Through routine review of health records for monitoring, we recently discovered that ADCRR appears to have added a category of referral timeframes, *viz.*, "Urgent Priority." ADCRR never notified the Court of this change or its meaning.

| Injunction Provision 8.7 | Non-compliant |
|---|---|

**Provision:**

If a practitioner orders, or informs a patient there will be an order for an off-site test or referral, but circumstances change and the order is modified or rescinded, the patient shall be informed within one month of the change.

**Importance:**

Similar to the reasoning explained in section 1.23 requiring patient notification of test results, notifying patients of a change in the diagnostic or treatment is necessary for the patient to be able to agree (i.e., consent) to the new plan, but also allows the patient to advocate for themselves, which, in any health care system, but especially one which has dysfunction like ADCRR, is an additional failsafe, e.g., so patients can help ensure that the modification or cancellation was not a clerical error.

**Discussion:**

ADCRR continues to be non-compliant with this provision. To its credit, in an effort to improve compliance and ease of auditing compliance, ADCRR introduced a new process, whereby clinicians use the form shown in the figure below to notify patients of modified or canceled tests or consultations.



A problem with the way the form is used, however, is that it does not inform the patient what test or referral was cancelled, as shown in the figure. When patients have multiple tests or consultations pending, they do now know which one the notification is about. They can, of course, submit a request to be told, though that creates additional workload for ADCRR staff.

ADCRR self-assesses its level of performance on this provision at 94%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 50%. The source of the disparity is that about half of the patients notified of "a" cancelation had two or more pending tests or consultations at the time they were notified, and thus, as explained before, the notification did not function as needed.

| Injunction Provision 9.2 | Non-compliant |
|---|---|

**Provision:**

Patients returning from a hospital stay or emergency room visit shall be evaluated by an RN or higher prior to returning to their living unit. A discharge summary, physician report, or documentation of this information received via phone shall be available for this evaluation.

**Importance:**

This provision ensures that when a patient returns from an ER visit or hospitalization, that before returning to their living unit they are evaluated by a nurse. The patients typically have significant medical problems. The purpose of this evaluation is two-fold. The first purpose is to make sure the patient is clinically stable. This is important because if they are not stable and go directly back to a general population living unit where there are no nurses to monitor (i.e., as opposed to being admitted to an IPC/SNU), their clinical status could deteriorate without being noticed. The second purpose is to make sure that any clinical care recommended by the community practitioner is started or continued without interruption. This is accomplished by reviewing the discharge paperwork that should accompany the patient. Depending on the recommended care, an interruption can put patients at a significant risk of significant harm.

**Discussion:**

ADCRR continues to be non-compliant with this provision. In some of the non-compliant cases, custody staff return some patients directly to their original living unit without bringing the patient to a nurse first. In almost all of the non-compliant cases, nurses did not review the discharge paperwork because none was sent with the patient. We were told by medical records staff at ASPC-Eyman that when patients return to ADCRR, after they are evaluated, the off-site visit gets placed into a queue for medical records staff to fax a records request to the community facility, which can be sent up to 7 days after returning. It can then take 10 days or more for records to arrive. While it is the responsibility of the discharging community clinician to send the patient back to the prison with discharge information (or call the receiving nurse and/or practitioner), their failure does not absolve ADCRR of responsibility. ADCRR has at least two tools available to it to remedy the community clinician's failure. First, ADCRR custody transportation officers can be trained to ask for (and insist upon receiving) discharge records before agreeing to transport the patient out of the hospital. Second, the receiving nurse and practitioner at ADCRR can attempt to contact their counterparts at the hospital upon the patient's arrival. We do not know if the first tool was used in any of the cases we reviewed. We do know that in none of the cases we reviewed did the nurse or practitioner actively attempt to contact the discharging hospital when the discharge paperwork was not available upon return.

ADCRR self-assesses its level of performance on this provision at 80%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately the same.

**Example:**

Patient 76, a patient in a MH Inpatient Unit, was sent to the ER after a methadone overdose requiring placement in the hospital intensive care unit overnight for intravenous naloxone to treat the overdose. According to custody records, he returned to facility housing on February 18 at 1:29 AM. No nurse evaluated him upon return. A nurse did not write a note and assumedly evaluate him until 3:30 PM, 14 hours after his return to the facility. The note had limited evaluation and said "No documentation is provided to medical at this time" and vitals were not input until 4:30 PM, long after he returned to his housing unit. A remote practitioner documented in the EHR at 3:36 PM after the nurse assessment but prior to the documentation of vitals. The practitioner confirmed that no discharge summary was available[21] about the patient and requested a MH assessment to determine whether the patient might need to be placed in a suicide MH Watch bed. If, in fact, the patient were suicidal[22] and required to be placed in suicide precautions, the 14-hour delay from the time of his arrival until this order was written could have been a fatal delay. Finally, this order for the patient to be seen by a MH clinician to evaluate him for suicidality never happened (in violation of Injunction section 1.22).

---

[21] There had, in fact been communication between the hospital and ADCRR prior to the patient's return. The day before the return a nurse and a practitioner at ADCRR received calls from medical staff at the hospital with some information about the patient and plans. However, due to lapses in internal ADCRR communication, the nurse and on-site practitioner and remote practitioner mentioned above who addressed the patient's return later on 2/18/25, did not know about these interactions. Even if they had, the information, while helpful, was not sufficient to satisfy the Injunction requirement because at the time of the patient's return, the information was more than a half day old. For a patient in the intensive care unit, a lot can change in a half day, and thus the information they had was potentially obsolete.

[22] Later in the month, ADCRR received the patient's hospital record which contained documentation that the patient had taken methadone, which he purchased within the prison, for pain.

Medications

| Injunction Provision 10.5.4 | Non-compliant |
|---|---|

**Provision:**
Patients with asthma who are at significant risk of serious respiratory impairment if they do not use their rescue inhaler immediately, shall be provided a rescue inhaler KOP. Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button. Exceptions may also be made for patients where the practitioner can document a significant and serious penological need to prohibit a particular patient from having such an inhaler. This exception must be patient-specific.

**Importance:**
This and the next two provisions ensure that patients with three specific conditions have access to certain medications. These three conditions – asthma, diabetes, and coronary artery disease – are addressed because they are conditions which can deteriorate rapidly leading to death, but for which there are effective medications which, if administered as soon as the patient has symptoms, can prevent or delay deterioration. Because of the need for rapid administration of the medications, i.e., without the delay that would happen if the patient first had to ask to see a nurse and wait for a nurse to arrive at their living unit, the provisions require that certain patients with these conditions be allowed to keep these emergency medications in their possession. Exceptions are allowed for certain situations. For example, patients living in the IPC, a unit where nurses are omnipresent and able to respond to a patient's bedside within seconds, do not need to have these medications in their possession.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
Patient 77 has asthma and emphysema with wheezing and poor lung function measurements (peak flow of 200, normal 400-700) on examination in clinic on February 8. He also required use of an inhaler occasionally for shortness of breath that he ordinarily kept on person. On February 20 he was placed on MH Watch for having made a suicidal statement out of frustration. Because the examining therapist felt his risk for actual suicidal attempt was low, rather than initially placing on constant observation, she placed him on the less restrictive schedule of 15-minute checks. However, despite the low risk of suicide and significant risk of needing an inhaler, his inhaler was removed without documentation explaining the rationale. While there appeared little to no risk of giving him his inhaler to keep on person, even if ADCRR clinical staff felt that there were, they could have ordered it to be kept just outside the cell, available to him on a moment's notice under direct supervision. They did not. It was not until staff sprayed him with pepper gas requiring emergency treatment for the resulting shortness of breath, that his inhaler was made available just outside the cell.

| Injunction Provision 10.5.5 | Non-compliant |
|---|---|

**Provision:**

Patients with diabetes who are at significant risk of hypoglycemia shall be provided a source of glucose KOP. Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button.

**Importance:**

See 10.5.4 above

**Discussion:**

ADCRR continues to be non-compliant with this provision.

**Example:**

Patient 78 is a 29-year-old male with Type 1 Diabetes on insulin. He has suffered 4 episodes of low blood sugar (hypoglycemia) each triggering an emergency response ("ICS") in the past year. Hypoglycemia is a medical emergency which can result in coma, brain damage, and death if not treated quickly (depending on the actual blood sugar level, within minutes to hours). Patients often are aware that they are becoming hypoglycemic before it becomes so severe that they become delirious. During that window, taking oral glucose can immediately reverse the situation. Despite clear evidence that this patient is at risk for becoming hypoglycemic, ADCRR still does not provide him oral glucose to keep in his possession. He only receives glucose once he becomes delirious or unconscious. This poses a significant risk of serious harm in more than one possible way. First, when he becomes unconscious, he can suffer a head injury if he falls and hits his head. Second, if he becomes unconscious, a delayed response of any cause may be long enough to cause permanent brain damage or death which is more likely if he happens to become unconscious when he is by himself.

| Injunction Provision 10.5.6 | Non-compliant |
|---|---|

**Provision:**

Patients prescribed rapid-delivery nitroglycerin for cardiac disease shall be provided the medication KOP. Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button.

**Importance:**
See 10.5.4 above

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 86%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using an appropriate *de novo* dataset, the performance level we calculated was approximately 83%.

**Example:**
Patient 79 is a 55-year-old male with an extensive history of coronary heart disease. Nitroglycerin is an important medication used to emergently treat chest pain in patients with such disease. It can minimize or prevent damage to the heart from a heart attack during an episode of chest pain. The quicker it is taken, the more effective it is. Having the medication in one's possession is the most reliable way of ensuring that it can be taken quickly. ADCRR fails to provide this patient nitroglycerin to keep on person. The risk of an episode of cardiac chest pain in this patient is real. For example, on February 19, he suffered an acute episode of chest pain. An emergency response ("ICS") was triggered. Upon arrival, a nurse gave him nitroglycerin. It is unknown how many minutes elapsed from the onset of chest pain until the nurse administered nitroglycerin, but whatever number of minutes it was, was avoidable, exposing him to significant risk of irreversible heart tissue damage or death.

Hepatitis C (HCV)

The following suite of provisions are all related to the diagnosis and treatment of hepatitis C infection (HCV). The provisions ensure that as many patients as possible are tested for infection and, if found, they are treated appropriately. HCV is a highly prevalent infection in prisons, including ADCRR. Untreated, HCV leads to serious medical complications, many of which increase the probability of death, including cirrhosis (scarring of the liver), liver failure, internal bleeding from enlarged veins in the esophagus, and liver cancer. Failure to identify patients who have HCV and offer curative treatment therefore exposes patients to a significant risk of serious harm as evidenced by the multitude of deaths in ADCRR (at least 18 since July 2023[23]) related to HCV infection that was either untreated or treated too late in the course of disease. Because of limited treatment resources, prioritization of treatment to those who are leaving ADCRR soon and those with the most advanced liver disease (i.e., cirrhosis), decreases risk of harm at a population level (in this context, *Jensen* class members), but is not sufficient, as treatment earlier in the disease course is necessary to prevent harm in the long-term.

| Injunction Provisions 11.1.1.1 & 11.1.8 | Non-compliant |
|---|---|

**Provision:**
All patients are offered a screening blood test for HCV under opt-out conditions within a month of arrival.

**Importance:**
See introduction to HCV above.

**Discussion:**
"Opt-out" testing describes the communication between the staff person offering the blood test for HCV and the patient. In opt-out testing, staff informs the patient that their blood will be tested and what it will be tested for as part of routine screening, but also informs the patient that they can decline (i.e., the patient is told that everyone is tested for HCV at entry to prison unless they choose to decline).[24]

ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 100%. Due to the nature of how this provision needs to be assessed (interview of patients and observation of the phlebotomist), it does not lend itself to calculation of a level of performance expressed solely as a percentage. We agree that most,

---

[23] Not all these deaths are necessarily attributable to deficiencies in care at ADCRR after implementation of the Injunction, and some may be attributable to poor care in the community. We highlight these deaths only to demonstrate that the risk of serious harm from poor care for HCV is significant.

[24] Opt-out testing is best understood in contrast to opt-in testing. In opt-in testing, the patient is asked if they would like to be tested for HCV and must agree. Opt-out testing for HCV is the standard of care because, psychologically, it conveys that having the test is recommended, normal, and the routine, and therefore significantly increases the chance that the patient will agree to be tested, which, in turn, increases the chances of treatment and prevention of serious outcomes, but unlike mandatory testing, still respects patient autonomy.

if not all patients entering ADCRR are screened for HCV, but not in an opt-out fashion as required by the injunction. I observed and interviewed a phlebotomist during a site visit and interviewed unselected (i.e., consecutive) patients immediately after they had their blood drawn at ASPC-Phoenix (Patient 80, Patient 81, and Patient 82). Based on that data we concluded that patients are not consistently being told they were being tested for HCV, or if they were, that they had the right to refuse (i.e., they understood all blood testing at intake to be mandatory).

| Injunction Provision 11.1.4 | Non-compliant |
|---|---|

**Provision:**

All patients with HCV infection shall be placed on a single list prioritized according to a scheme that considers degree of fibrosis, relevant comorbidities, likelihood of transmitting infection to others in the prison, and release date.

**Importance:**

See introduction to HCV above.

**Discussion:**

ADCRR continues to be non-compliant with this provision. We made a similar finding in our 2024 Second Interim Report (Doc. 4755). In their response to that report (Doc. 4815) ADCRR stated that our conclusion was incorrect, writing :

> With respect to the Monitors' criticisms regarding the prioritized list of patients in QI 11.1.4, a list of all patients with an active Hepatitis C flag and a Hepatitis C viral RNA lab result of at least 12 is generated from TechCare. The report includes release dates, FibroSure scores, and comorbidities such as HIV, Hepatitis B, and Opioid use disorder. Every two to three weeks, NaphCare's HCV treatment team reviews the list and changes prioritization based on new information, such as changing FibroSure score, comorbidities, and/or release date. The report has undergone revisions in November 2024 to improve its accuracy, and additional revisions are being requested. Accordingly, the Monitors' criticisms are unwarranted. An example of a recent list is included as Exhibit C.
>
> Once again, the Monitors' assertion of "significant shortcomings" is belied by objective evidence. The Monitors' main complaint is the alleged failure to maintain a single list of patients with HCV infection in order of priority for treatment. But it is difficult (and counterproductive) to treat patients according to the order of a single list where, as here, variables are changing rapidly, such as, most notably, a particular patient's release date. The Monitors also complain that some patients "lower" on the list are starting treatment before patients "higher" on the list. But those prioritizations can vacillate depending on whether the patient needs a hepatology referral, whether the patient refused initial workup labs resulting in a longer pretreatment period, whether fibrosis patients require additional workup (labs,

116

ultrasounds), movement by patients between facilities, and constantly changing release dates.

For the month of February 2025, consistent with its assessment captured above, ADCRR self-assesses its level of performance on this provision at 100%. ADCRR's offering of a level of performance expressed as a percentage does not make sense for this provision. The level of performance can only be described verbally, not mathematically.

We reviewed ADCRR's counter-analysis carefully. ADCRR correctly identified an error in our report. We stated that the prioritization list does not include comorbidities. As their Exhibit C shows, three morbidities (HIV infection, hepatitis B infection, and opioid use disorder) *are* cited for patients who have them. We also agree with ADCRR that the accuracy of this list has been improving over time as ADCRR works out the problems in the data. We do not agree with ADCRR's assertion that it is difficult to treat patients according to a list because prioritizations vacillate. That is precisely the reason to maintain a list. In the absence of a single reliable authority (the list) that is updated as patient information vacillates, ADCRR cannot ensure that patients are treated in an order that maximizes safe health care for all the patients. We recognize, as ADCRR points out, that the order on the list can "vacillate" as there are "changes [to the] prioritization based on new information." We thus would certainly expect that by the time ADCRR produces the list for us it may be outdated and no longer valid. However, it would have been current at some point; the list ADCRR produces, however, was valid at no point in time.

The prioritization list also still does not conform to the requirements of the Injunction in significant ways. We came to this conclusion based on two observations. **First**, the list only includes information about three comorbidities (HIV, hepatitis B, and opioid use disorder) that patients might have. While these are certainly relevant comorbidities, there are multiple other comorbidities which are relevant to prioritization and therefore need to be listed and considered. For example, knowing whether individuals suffer from liver damage due to other diseases, such as alcoholism, is also of critical importance in prioritizing patients for HCV treatment. ADCRR ignores all these other diseases. **Second**, even for the three comorbidities that ADCRR does identify on their list, they simply cite the comorbidities without incorporating them into the prioritization decision process. In other words, they ignore the comorbidities based on their placement on the list.[25] However, we have noticed that many patients with HIV and hepatitis B co-morbidities have been offered (and have received) treatment for HCV even when they are near the bottom of the list. We just cannot tell from the data provided (especially the list) whether

---

[25] One can discern this from an examination of the prioritization list ADCRR provided in Exhibit C. The first 306 patients on that list are those with the most advanced liver disease ("Fib" score greater than 0.58). These patients are listed in (priority) order of their Fib score (which ADCRR acknowledges in the legend attached to that list), from highest to lowest, without a single patient deviating from that order. If, in fact, ADCRR were basing priority on Fib score and other comorbidities, *a fortiori* there would be occasional, if not many, patients whose ranking on the list deviated from that order. ADCRR uses a very similar process for prioritizing the remaining 2,747 patients on the list who have less advanced liver disease. For these patients, even though many of the three comorbidities are cited, they are, again, ignored. The resultant list is ranked solely based on the patient's date of release.

117

ADCRR is doing so in a systematic and sustainable fashion, assuring that the patients most at risk will be treated quickly, as required by the Injunction.

In summary, nothing in ADCRR's analysis, including our error, leads us to reverse our conclusions. If ADCRR is using another systemic and sustainable method other than maintenance of a list to achieve the goals of the Injunction, we are amenable to reviewing that method, and if appropriate, be supportive of a motion from the Defendants to modify the wording of the Injunction. Though clearly ADCRR is treating more patients for HCV than it was two years ago, the list is still not where it should be and therefore patients at higher risk of complications from HCV if their treatment is delayed are at risk of being treated later than patients at lower risk.

| Injunction Provision 11.1.7 | Non-compliant |
|---|---|

**Provision:**
All patients with HCV shall be offered education about HCV, whether they receive treatment or not.

**Importance:**
See 10.5.4 above

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 87%. This assessment is based solely on patient interviews conducted monthly by ADCRR. Though this is a result that we cannot recalculate ourselves (without conducting independent interviews, something we may do when ADCRR is closer to full compliance) we have no reason, to question this result.

The assessment consists of just two yes/no questions: "Have you received education about HCV?" and "Do you feel the education provided was sufficient? If the answer to the second question is "no," unfortunately, the interviewers make no attempt to further explore the reasons (i.e., "What additional education do you think was needed?"). Therefore, the information to better meet the needs of the patients (i.e., provide the education the patients think is missing from the current educational process) and, in turn, better compliance with the Injunction, is not collected.

Instead, presumably to assist with tracking HCV education (i.e., as opposed to improving HCV education), ADCRR created a new form "Patient Acknowledgement of Receipt - Hepatitis C education." The veracity of that acknowledgment is questionable. Patient 83, for example, signed this form on February 11 agreeing that "I have been educated by the provider on my Hepatitis C illness, current status, and treatment plan." What is problematic is that he signed this form during the Intake process, the same day his HCV blood tests were drawn, results which were not reported back to ADCRR until 2 days later. It was therefore impossible for ADCRR to have done what it was asking the patient to attest to – provide the patient education about his HCV illness – given that, at the moment staff allegedly gave him that education, they did not even know if he had the illness.

| Injunction Provision 11.1.5a | Non-compliant |
| --- | --- |

**Provision:**
All patients with newly diagnosed HCV are tested to determine if they have more advanced hepatic disease.

**Importance:**
See 10.5.4 above.

**Discussion:**
Although ADCRR has shown considerable improvement in their performance, ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 88%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 96%.

In reviewing subsequent care for patients entering ADCRR in February, it appears that ADCRR has eliminated the inherent 6-month delay in completing the evaluation of patients with HCV. In addition, ADCRR is trying to catch up on the backlog of patients within ADCRR who had not yet been tested to determine their degree of liver scarring (i.e., advanced hepatic disease). As a result of these efforts, several patients whose care was not compliant with this provision when ADCRR conducted its self-assessment in February, have since been tested to determine if they have more advanced liver disease. In other words, those patients' care *is* compliant. Other patients' whose care ADCRR identified as non-compliant was actually already compliant with this provision at the time of the assessment because of a methodologic flaw in the way ADCRR analyzes its data.[26] It is for these two reasons, that we estimated ADCRR's level of performance higher than ADCRR did.

However, the rest of the patients failed to have a determination of the degree of liver scarring, even when the laboratory test was ordered. Patients who ADCRR reports having "refused" the testing in fact did not refuse, in that the refusals were meaningless signatures and not informed refusals (See Injunction provision 1.1, 1.21a above). For example, Patient 210 was diagnosed with HCV at least since 2018, which was confirmed by his intake laboratory testing in March, 2023. And yet, he was sent a notification on March 24, 2023 (the day *before* his intake laboratory tests were reported back to ADCRR) that read "your lab test(s) …that were drawn on 3/24/23 were within acceptable limits and not in need of further evaluation." Then two years later on March 31, and unbeknownst to the patient, an HCV practitioner conducted a chart review, determined that the patient likely has HCV, and ordered all of the needed laboratory testing, including testing to determine the degree of liver scarring. The patient was then

---

[26] ADCRR only assesses its performance acceptable if clinicians used one particular blood test (Fibrosure®) to determine if patients have advanced hepatic disease. However, another test that some ADCRR clinicians ordered (FibroTest®) is an acceptable alternative test.

summoned to have his blood drawn. Multiple electronic refusals (one for each blood test ordered, including a FibroSure®) were entered into the EHR on April 4 by an LPN. The reason for refusal is listed as "Lab," which is not a reason. They all refer the reader to a "paper refusal," which do not exist.

In sum, there is no evidence that the patient knew that the purpose of the blood tests was evaluation for HCV treatment and certainly no evidence that the refusal was informed. The patient remains at risk of the serious complications of untreated HCV.

| Injunction Provision 11.1.5b | Non-compliant |
| --- | --- |

**Provision:**
All patients with fibrosis scores of F3 or F4 will be offered treatment for HCV.

**Importance:**
See 10.5.4 above.

**Discussion:**
The degree of scarring (fibrosis) of the liver from HCV is graded from F0 (no fibrosis) to F4 (severe fibrosis; cirrhosis). There is more of an urgency to treat patients with stages F3 and F4 than milder stages, however this does not mean that one should wait until a patient has progressed to stages F3 and F4 to start treatment.

ADCRR continues to be non-compliant with this provision, though ADCRR is treating more patients with F3 and F4 than it was 2 years ago. ADCRR self-assesses its level of performance on this provision at 100%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 91%.

Although ADCRR is no longer delaying the identification of patients with fibrosis scores of F3 and F4 as noted above for provision 11.1.5a, we found a failure in treating patients at these stages, even when they have been identified. Patients ADCRR reports "refused" treatment in fact did not refuse, in that the refusals were not informed refusals (See Injunction provision 1.1, 1.21a above).

Patient 40 was treated for HCV in 2019 but was never informed that the treatment failed and that he still was infected (and required treatment). ADCRR claims that he refused an offer to be seen in clinic to restart treatment on November 7, 2024. When we interviewed this patient, he denied that the signature on the refusal form was his, but did recall that he refused a visit to the HCV clinic because the last he had been told, his HCV had been cured, so saw no reason to attend an HCV clinic appointment – he assumed it was a mistake. There is, indeed, no evidence in his EHR that anyone ever informed him of his recurrent HCV infection. Further, the "refusal" that ADCRR alleges he participated in, if it actually took place, was conducted and signed by an LPN. LPNs by licensure and the Injunction, are not capable of, nor permitted to conduct a refusal encounter for HCV treatment. The patient was not aware of his HCV infection until our interview and his need for retreatment. (We informed ADCRR of this information so that a practitioner could follow up with the patient).

**Example:**
See examples embedded above.

| Injunction Provision 11.1.5c | Compliant |
|---|---|

**Provision:**

At least the following number of patients will begin treatment for HCV monthly using the current standard of care medications: 110 patients plus 70% of the number of newly admitted patients who tested positive for HCV during the previous month.

**Importance:**

See 10.5.4 above

**Discussion:**

For at least a year, ADCRR has consistently met and slightly exceeded the monthly treatment requirement.

| Injunction Provision 11.1.6 | Non-compliant |
|---|---|

**Provision:**
No patient who is released on their planned release date shall release without having been screened for HCV and if positive and they accept treatment, without having completed treatment except for those patients with markedly reduced life expectancy who would not be expected to benefit from treatment, or patients who cannot complete treatment within the timeframe of their incarceration and linkage to care in the community for continuation of treatment cannot be established despite a good faith effort or there is a documented informed refusal.

**Importance:**
See 10.5.4 above.

**Discussion:**
At the end February 2025, ADCRR started using an automated report to self-assess its performance on this provision, and recognized that there are a lot of flaws in their methodology that need to be rectified. First, the report is unable to capture HCV screening results that were done by the previous health care contractor and appear only in that contractor's EHR. Second, the report identifies patients as being in custody even after they are released. Third, the report does not capture patients ADCRR failed to treat prior to release for whom ADCRR was able to arrange linkage to care in the community. We are unable to interpret the new data ADCRR provided to us because some columns have no headers and other columns have obviously erroneous headers, making it impossible to know what the data represents. However, ADCRR included a narrative with the results of their analysis. So, even though it is not possible to calculate an exact percentage of patients who released without being screened for and offered treatment for HCV, based on the data ADCRR reported from February 2025 (e.g., of the patients with known HCV, at least 54 patients had not yet completed treatment at the time of release and up to 958 patients may not have been screened) and the fact that ADCRR reported performance levels of 72% and 79% in November 2024 and January 2025 respectively, it is clear that ADCRR is still far from compliant with this provision; it is just not clear how far from compliant ADCRR is.

Tuberculosis (TB)

| Injunction Provision 11.2 | Compliant |
|---|---|

**Provision:**
All newly admitted patients shall have a completed test for tuberculosis (skin test, blood test, or chest x-ray) by the end of the seventh full day after admission into the ADCRR system, unless the patient refuses.

**Importance:**
This provision ensures that ADCRR is screening individuals for TB upon intake. Both active and latent TB are more common in the carceral setting compared to the community. About 1 in 10 individuals with latent TB (i.e., dormant infection) will develop active TB disease over their lifetime if it is not treated in the symptomatic dormant stage. Active TB disease is a serious medical condition often with serious symptoms that, if untreated, can lead to death. Many people with active TB are infectious and can transmit the organism to others through the air and therefore is particularly worrisome in congregate settings, like prisons, where it can much more easily spread to large numbers of people.

**Discussion:**
We find that ADCRR is compliant with the provision. TB testing is done within the specified timeframe at intake. Of the 664 intakes in February 2025, only 3 cases were not compliant (one patient had a prior test in jail but more than one-year had already passed since the testing date and therefore should have been, but was not, repeated; two patients were tested, 2 and 9 days beyond the seven-day time limit).

However, this provision is limited to the screening for TB and during our review of this provision, it became apparent that there were serious errors in the way ADCRR manages patients with LTBI and active TB subsequent to the screening at prison entry (in violation of section 1.1).

In Defendants' Response to Monitors' Second Report ADCRRs wrote: "[T]he Monitors claim without evidence that ADCRR "fails to routinely offer treatment to patients with latent disease, in violation of paragraph 1.1 of the Injunction, and placing the entire population (and staff) at risk of tuberculosis." (Id.) That assertion is patently false." We erred if we gave the impression that ADCRR does not provide any treatment. ADCRR does provide treatment to many patients. However, there are too many patients for whom ADCRR does *not* provide treatment, or the correct treatment, for LTBI or active TB. These failures place those patients (and, because TB is a contagious disease, other residents and staff of ADCRR) at significant risk of serious harm. These errors are described below.

1. Once identified as having LTBI, some patients are not offered timely treatment as part of the intake process or at the time of a new diagnosis (e.g., Patient 84).

2. Consideration for treatment of LTBI was often delayed, sometimes for many years after entering ADCRR (e.g. Patient 85, Patient 86, Patient 87) leaving the patients at risk for developing active TB and putting the rest of the prison population at risk as noted above.

3. Even when patients are being consistently followed over time for LTBI, treatment is not routinely offered at each visit. For example, Patient 88 was specifically seen for his diagnosis of LTBI on April 10 by a remote APP (not his physician PCP). During the visit, it was documented that the diagnosis of LTBI was made 10 years ago and that he was never treated. There is no indication that the topic of treatment ever came up during any appointment despite multiple visits to monitor his LTBI over the years. As noted above, delays in offering LTBI treatment places the rest of the prison population at significant risk of TB if a patient with known LTBI were to unknowingly develop active TB infection.

4. Clinicians failed to ensure that patients did not have active TB prior to the initiation of LTBI treatment a critically important step in the clinical evaluation of patients with LTBI. Because the treatment for LTBI and active TB are very different, mistakenly administering LTBI medications to a patient with active TB, not only delays cure, but can make the disease much harder to treat due to the development of multi-drug resistance (i.e., the first-line medications are rendered ineffective and more complicated and often more toxic medication regimens must be used). Thus, it is critical to first ensure that the patient does not have active TB prior to initiating treatment for LTBI. ADCRR clinicians failed at least three steps in making sure that patients they were about to treat for LTBI did not have active TB. **First**, a timely chest x-ray within days of the positive TB test and within a couple of months of starting treatment is crucial to evaluate for active pulmonary involvement. Some patients had had x-rays, but the x-ray was from years prior to the start of LTBI treatment, and therefore was no longer relevant (e.g., Patient 89). Some patients did not have an x-ray at all (e.g., Patient 90). **Second**, a comprehensive history is important to assess for symptoms of active TB disease. If a patient has concerning symptoms, then the treatment for LTBI should be delayed until there is further evaluation. Despite documenting potential symptoms of TB disease, some patients were not further evaluated to rule out active TB and therefore inappropriately started on LTBI treatment (e.g., Patient 91). **Third**, a physical exam is necessary, especially to evaluate the patient for extrapulmonary TB infection (i.e., TB involving parts of the body other than the lungs that cannot be evaluated with chest x-ray). None of the patients we reviewed had an exam that included evaluation of the lymph nodes, a common place for TB to spread, and many of the visits were inappropriately conducted via telemedicine, meaning no physical exam was done (e.g., Patient 92) (in violation of Injunction section 1.4).

5. When medications were prescribed, three patients were prescribed the wrong dose of medication. Two patients were underdosed (Patient 93 and Patient 91), and one patient was overdosed (Patient 87). Underdosing increases the risk for antibiotic resistance making it more difficult to treat the infection, and overdosing increases the risk of serious side effects, such as liver failure.

6. Even if the dose was correct, the medication was sometimes prescribed for the wrong duration (e.g., Patient 90.) Similar to underdosing, an incomplete regimen puts patients at risk for antibiotic resistance.

7. Finally, even more clinically concerning was that two patients who were diagnosed with active TB had their treatment either not appropriately continued (Patient 94) or prematurely discontinued (Patient 95). The Court Monitors informed ADCRR about the inappropriate duration for Patient 95 and his treatment was quickly restarted without any significant lapse.

126

Substance Use Disorder (SUD)

The suite of provisions below ensures that patients with SUD, especially those with opioid use disorder (OUD) and alcohol use disorder (AUD) are identified quickly, have their medications to treat these disorders (MOUD; Medications for Opioid Use Disorder; MAUD; Medications for Alcohol Use Disorder) continued if they were on them in the community, or started as clinically appropriate. Some individuals die while still in ADCRR from opioid overdoses, and it is well documented that the weeks after release from prison is a time of high risk of overdose and death from opioids. Appropriate treatment can help prevent these serious outcomes. Thus, failure to identify and treat places patients at a significant risk of serious outcomes, including, but not limited to, overdose and death.

| Injunction Provision 11.3.1 | Non-compliant |
|---|---|

**Provision:**
All newly admitted patients shall be screened for, and if indicated then evaluated for, substance use disorder. Screening shall include assessment as to a history of opioid overdose.

**Importance:**
See introduction to SUD above

**Discussion:**
ADCRR successfully performs the first part of the provision: all patients entering ADCRR reportedly are screened for SUD at intake. When patients undergo a MH Assessment they are also screened for a history of overdose at intake. However, ADCRR fails at the second part: to assure that all patients screening positive for SUD subsequently receive a clinically appropriate evaluation. Thus, overall, ADCRR continues to be non-compliant with this provision. The failure to assure that the evaluation takes place manifests in one of 5 errors:

1. When a patient screens positive for SUD, the screener offers a referral for evaluation, and if the patient refuses, the screener often takes no further action, i.e., fails to conduct an informed refusal. For example, Patient 96 screened positive for AUD at intake on February 27, with his last use having been about 5 weeks earlier. The practitioner diagnosed him with AUD and offered counseling and medication, which the patient declined. However, the practitioner failed to conduct an informed refusal, which, as explained elsewhere, includes exploring the reasons for the refusal, attempts to remove barriers based on those reasons, explaining the risks of refusal, and exploring other options. The practitioner documented that someone else would discuss medication options with the patient but failed to make any such referral.

2. Even when patients accept the referral, the referrals sometimes either take a dangerously long time to complete or are not completed at all. For example, Patient 97 screened positive for OUD during her initial screening on February 18. She did not see the SUD practitioner and begin treatment until July 1, more than a third of a year later.

3. Patients who screen positive for OUD and are referred for MOUD are sometimes allowed to transfer to a private prison that does not provide access to MOUD, for example, Patient 98.

4. Once seen by the MOUD practitioner, sometimes the practitioner misinterprets or ignores the referral for AUD, addressing only OUD. As an example of the former, Patient 99 screened positive for AUD and was referred to the MOUD practitioner. The practitioner failed to read the referral and assumed the patient had OUD. He offered the patient buprenorphine, which is used to treat OUD, not AUD, and is therefore not clinically appropriate. When the patient refused treatment (for a disease he didn't have), the practitioner discharged him from the program, failing to discuss treatment for the disease the patient did have - AUD. As an example of the latter, Patient 100 screened positive for both OUD and AUD and was referred to the MOUD practitioner. During her examination on March 31, the MOUD practitioner documented that the patient had both OUD and AUD, but ignored the AUD when devising the treatment plan.

5. Patients with SUDs other than OUD and AUD do not get proper counseling or treatment. Patient 101 screened positive for methamphetamine use during intake on February 27. As there is no well proven medication treatment for methamphetamine use disorder, referral to a practitioner, is not helpful. However, referral for counseling is clinically indicated. Instead, the patient was not scheduled with a counselor, but was scheduled with the MOUD practitioner. She was seen by this practitioner on April 23 who erroneously documented "Patient being evaluated today for induction on Medication Assisted Treatment for opioid substance use disorder. [Urine drug screen] negative for any substances; results discussed with patient. Denies withdrawals or acute [signs or symptoms]. Patient declines MAT treatment to include SUD counseling due to 'I do not have an opioid or alcohol abuse history.' MAT refusal form signed and in chart with assistance from onsite CNA [name redacted]. Patient was educated on submitting an HNR if in the future is interested on MAT services. Patient was educated on f/u with community MAT resources upon release." Similar to the previous example, when the patient refused treatment (for a disease she didn't have), the practitioner had her sign a refusal of treatment for a disease she didn't have, failing to refer her for counseling for a disease she did have.[27] Should the patient have accepted the offer of buprenorphine, a wholly inappropriate treatment for this patient, that practitioner would have placed the patient at significant risk of harm, including developing OUD.

Each of these errors results in a patient receiving treatment for SUD with a delay or not at all, both of which significantly increase the risk of serious harm such as overdose, infections and other complications from use of needles, and death.

ADCRR self-assesses it level of performance on this provision at 100% for completion of screenings and 94% for completion of evaluations. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately for former activity was also 100% and for the latter, approximately 70%.

---

[27] Though the practitioner's documentation states the patient refused referral for "SUD counseling" based on the context, it is clear that that counseling was specifically for OUD counseling.

**<u>Example:</u>**
See examples embedded above

| Injunction Provision 11.3.2 | Compliant |
|---|---|

**Provision:**
All newly admitted patients shall be offered to have current Medication for Opioid Use Disorder ("MOUD") (buprenorphine, naltrexone) continued.

**Importance:**
See introduction to SUD above.

**Discussion:**
We have seen rare cases where the continuation of pre-ADCRR treatment was not handled in a clinically appropriate manner. Patient 102, arrived from jail on March 5. His MOUD was stopped for fear that continuing it would trigger withdrawal, whereas the dosage should actually have been increased, and as of the writing of this report in July, he had still not been replaced on MOUD. Patient 103 arrived from jail on December 31, 2024 after having just started MOUD at the jail two days earlier on a low dose of medication (2 mg daily of buprenorphine). The dose should have been increased at ADCRR to a therapeutic dose (typically at least 16 mg daily), but was not. Nonetheless, globally, ADCRR is compliant with this provision.

| Injunction Provision 11.3.3 | Non-compliant |
|---|---|

**Provision:**
All pregnant or post-partum patients with diagnosed Opioid Use Disorder ("OUD") shall be offered to have current MOUD (buprenorphine, naltrexone, methadone) continued, or if not currently on MOUD, shall be offered to initiate treatment with buprenorphine or naltrexone.

**Importance:**
See introduction to SUD above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR reported that there were no pregnant women with OUD admitted in the month of February. However, on reviewing the four pregnant women admitted to ADCRR in February 2025, for at least two of them (see below), we could not determine if this was accurate due to the limited and, at times, contradictory documentation regarding OUD.

It is unclear if Patient 104 had OUD since there are two very different Intake Provider Health Assessments done on February 14, one at 10:57AM and another at 12:19PM. One cites that she has OUD and the other does not, but both OUD and SUD are listed on her problem list. There is no indication that she was offered MOUD at any time. The obstetric record for Patient 105 cites that she uses 5 "fen" [fentanyl] daily when describing her drug use and her transfer summary also mentions a history of fentanyl use. We were unable to find any further evaluation of the patient's opiate use (in violation of Injunction section 11.3.1) to determine if offering MOUD would be clinically appropriate.

In addition, based on our analysis of prior months where ADCRR has reported receiving pregnant women with OUD, those patients who are not already on it prior to arrival are not consistently offered MOUD. For example, in our review of September 2024, Patient 106 was admitted on September 10, 2024 with a diagnosis OUD, but it was never added to her Problem List so the case was not part of ADCRR's analysis for this QI. During the booking process, the patient reported that she last used fentanyl on April 6, 2024 and had received a single injection of long-acting MOUD (Sublocade®) around that time. Boxes checked on her Intake Provider Health Assessment indicated that she was "offered OUD counselling" and "declined OUD medication." However, there is no documentation of any discussion of risks and benefits both to her and the fetus, and alternatives, that would necessary components of an informed refusal. Thus, her declination is meaningless.

**Example:**
See examples embedded above.

| Injunction Provision 11.3.4 | Compliant |
|---|---|

**Provision:**

All patients who have a documented history of opioid overdose or who upon assessment are determined to be at imminent risk of an opioid overdose, shall be offered MOUD with methadone, buprenorphine or naltrexone.

**Importance:**

Patients with a history of opioid overdose – whether prior to incarceration or during incarceration – are at the highest risk of overdose and death, thus it is important to identify and offer treatment to these individuals. See also introduction to SUD above.

**Discussion:**

In February 2025, a single patient was identified for whom treatment was not offered. Given the fact that the underlying population of patients to whom this provision applies is small, and only a single patient was missed, we are finding ADCRR compliant with this provision at present. However, while we believe that ADCRR is doing reasonably well identifying individuals upon admission who have a history of overdose, we are not certain that ADCRR has a reliable mechanism to identify individuals already incarcerated who have a history of overdose. We will continue to monitor this closely.

Though it does not alter compliance with this particular provision, in reviewing the cases for this provision, we found that ADCRR erroneously considers patients to have made a valid informed refusal of MOUD treatment if it finds any document about a visit in the patient's EHR bearing the word "refusal" or "refused." Typically these document a momentary interaction (or no interaction) between the patient and an LPN or medical assistant. As we discuss elsewhere in this report, such documents are clinically meaningless and useless. For a refusal to have clinical validity (i.e., be an informed refusal), the interaction must be with a professional with the expertise and legal licensure to discuss the treatment being refused, explore the patient's reason(s) for refusing, explore potential solutions such as eliminating or reducing side effects that may be prompting the refusal, and offer reasonable alternative treatments. Very few of the "refusals" we observed had those elements. Given the danger of patients not being treated for OUD, and the several possible approaches to addressing their reasons for refusal, ADCRR's continued failure to execute informed refusals is dangerous.

| Injunction Provision 11.3.5 | Compliant |
|---|---|

**Provision:**
All patients offered treatment for HCV shall be evaluated for OUD and if found to have OUD, shall be offered MOUD with methadone, buprenorphine or naltrexone.

**Importance:**
See introduction to SUD above.

**Discussion:**
ADCRR is compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 66%. However, there are flaws in the cases it includes in its assessment. For example, 13 of the 50 cases reviewed had started the work-up for HCV, but had not yet been offered HCV treatment and therefore should not have been included in the denominator. Of the remaining 37 cases, there were a number of patients for whom ADCRR self-assessed its performance as poor, but where it did not violate the requirements of this provision, either because the patient did not have OUD (and therefore should not have, and were not, offered MOUD), or were offered (as required) but declined treatment.

Therefore, despite ADCRR's self-assessment of poor performance, we are finding it compliant. Our finding rests on the assumption that the specialized practitioners assigned to treating HCV, who are responsible for conducting the OUD evaluation, do the evaluation appropriately. There is reason to suspect the validity of that assumption based on some cases we reviewed. For example, during intake on November 29, 2024 Patient 107, SUD screening by the mental health professional revealed that the patient had a history of OUD and possible AUD (use of opioids, last used 3 weeks before admission, used daily with history of overdose, daily use of alcohol). The mental health professional failed to refer the patient for OUD or AUD evaluation (in violation of Injunction sections 11.3.4 and 11.3.6). Subsequent Intake screening by the medical practitioner also revealed this history (fortunately, this clinician did offer to refer the patient for evaluation, but the patient declined). Despite these clear screening results, the HCV practitioner who saw the patient for evaluation and treatment of HCV conducted no further questioning and wrote that the patient did not have opioid or alcohol use disorders.

We will continue to monitor the appropriateness of evaluations by HCV practitioners.

133

| Injunction Provision 11.3.6a/b | Non-Compliant |
|---|---|

**Provision:**

Patients with OUD will be offered MOUD, including counseling, if appropriate. The Department will take the necessary steps to ensure that any patient transferring to another facility will not experience an interruption in MOUD, counseling, or alcohol treatment.

**Importance:**

See introduction to SUD above

**Discussion:**

ADCRR continues to be non-compliant with this provision. ADCRR self-assesses its level of performance with regard to the first and second elements of the provision at 86% and 56%, respectively. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated for the first element was approximately 85%.[28]

ADCRR started prescribing MOUD in all public facilities by April, 2024, months ahead of the timing required. Although most patients with OUD are now offered MOUD including counseling if appropriate, there are a couple of problems with the follow-through of the treatment plan. **First**, although counseling is offered, patients deemed eligible for OUD counseling are placed on a waitlist, which is months if not over a year-long. For example, Patient 108 was referred to for SUD counseling at Intake on February 25. He was evaluated and placed on the waitlist for outpatient counseling on March 25 and is still waiting to start outpatient treatment. **Second**, as noted above for provision 11.3.1, patients who are offered MOUD are allowed to transfer to private facilities prior to the initiation of treatment. Although technically this does not violate the provision in that the patient did not experience an interruption in MOUD upon transfer, that is solely a result of not starting needed treatment due to the delay in being scheduled with the MOUD practitioner, meaning, it is in compliance with the letter, not the intent of the provision.

Unfortunately, although it is true that MOUD[29] is now more accessible within ADCRR than it was prior to 2023, the rollout was chaotic, not well thought out, and showed lack of necessary health services organizational leadership. The current status of the MOUD program is extremely concerning, as described below.

1. Leadership

Although someone was hired to oversee the MOUD rollout, they were not given the authority that was necessary to create the needed system changes and eventually quit. The totality of system problems

---

[28] We did not attempt to calculate it for the second element because ADCRR's self-assessed level of performance was below the 75% threshold.

[29] Unless otherwise specified, the specific MOUD medication at issue is buprenorphine.

described below reflect a lack of organizational know-how and leadership. Most, if not all, of the problems below were predictable or preventable.

2. Nurse staffing

No additional nurses were hired to accommodate the huge increase in medication distribution and required documentation for federally controlled substances. Staff at several facilities told us that they were having to forgo the distribution of all other medications at times during the initial months of the rollout of MOUD.

3. Custody staffing

Not enough custody staff were available to conduct mouth checks (i.e., looking in the patient's mouth to be sure the patient was not able to leave the area with residual medication in their mouth that they could then be removed and used as contraband).

4. Medication dosing

ADCRR prescribes the wrong initial dose of buprenorphine for many patients. At times the dose of medication being used for patients who have not used opiates in a long time and therefore are very sensitive to the medication ("intolerant") is too high (e.g., Patient 13 in Monitors' Second Interim Report to Court, Doc. 4755), and conversely, for patients who are currently using opioids (non-prescribed) and are very insensitive to the medication ("tolerant"), the dose of medication is too low, causing them to have ongoing cravings. Both situations, too high a dose and too low a dose, increase a patient's risk for relapse and overdose. We have given ADCRR feedback on their standard initial dosing of buprenorphine regardless of the patient's tolerance or clinical circumstances and the need to escalate the dose faster than over a 30-day period for many patients.

5. Follow-up scheduling

The follow-up of patients who are starting on buprenorphine is not clinically appropriate as the appointments are spaced too far apart for a patient who is not yet on a stable dose. Soon after ADCRR ramped up its MOUD program, we provided feedback that the frequency of follow-up in the MOUD protocol was not clinically appropriate to monitor for side effects or the need for dose adjustment when starting a patient on buprenorphine for OUD. The longer a patient is on an inadequate dose, the higher the risk that they will use non-prescribed opioids and suffer an overdose.

For example, Patient 109 was started on MOUD in 2023, regularly attended appointments, and was maintained on 16mg of buprenorphine. A note on April 2 just said the following: "Patient declined opportunity to engage in [MOUD] assessment. Reason unknown – pt notified of appointment." His medication was discontinued that day. On April 16, the patient was seen by an MOUD practitioner to restart his medication (buprenorphine) stating that he had been taken off on April 2 due to missed doses. He reported cravings and use of unprescribed buprenorphine. No one asked him how much he was using to calculate his current needs and tailor his therapy. Instead, the patient was automatically restarted on buprenorphine 4 mg for 7 days and then 8 mg for 30 days, with follow-up scheduled for 30 days to reassess his condition. Given his history, 8mg of buprenorphine was likely not a sufficient dose and

delaying reevaluation for 30 days put him at significant risk of taking unprescribed buprenorphine or other opiates, with the attendant risk of overdose.

6. Informed refusal

Not only are there still individuals with OUD who have not been offered MOUD, as mentioned in our prior report, many patients who were started on MOUD are tapering themselves off for unclear reasons as the "refusals" obtained by ADCRR are not informed refusals. One concern we have is that lacking informed refusals, based on our experience, staff are unaware if refusals stem from other residents strong-arming the patient to divert medication that the patient needs. If that is the case, failure to understand and address the motivation for refusal is placing patients at risk of overdose.

In Defendants' Response to Monitors' Second Report, ADCRR did not dispute that Patient 15 in Monitors' Second Interim Report to Court, Doc. 4755 and Patient 14 in Monitors' Second Interim Report to Court, Doc. 4755 were tapered on their medication without informed consent, however, they held that Patient 11 in Monitors' Second Interim Report to Court, Doc. 4755, Patient 12 in Monitors' Second Interim Report to Court, Doc. 4755, and Patient 13 in Monitors' Second Interim Report to Court, Doc. 4755 were properly informed. During our visit to ADCRR in May 2025, we spoke with both Patient 12 in Monitors' Second Interim Report to Court, Doc. 4755 and Patient 13 in Monitors' Second Interim Report to Court, Doc. 4755J and confirmed that their refusals were not informed.

Patient 12 in Monitors' Second Interim Report to Court, Doc. 4755 said he requested to be off MOUD as he wanted to get a prison job. He met with the practitioner who said they would stop MOUD, but failed to discuss the decision with him. Patient 13 in Monitors' Second Interim Report to Court, Doc. 4755 said prior to starting MOUD he did not know that he would be physically dependent on the medication. He said when he decided to quit, they just asked "if I was sure." The practitioner let him know about potential withdrawal symptoms, but did not counsel him about the risk of overdose or relapse and did not discuss a plan for his upcoming release.

ADCRR also did not dispute in their response that patients we described in our report are being terminated from the program without proper discussion with the patient or plan for treatment (e.g., Patient 16 in Monitors' Second Interim Report to Court, Doc. 4755, Patient 17 in Monitors' Second Interim Report to Court, Doc. 4755).

An example that highlights the importance of an informed refusal is Patient 37 who was nearly wrongly terminated from the MOUD program. The patient repeatedly begged to be on MOUD starting in October, 2023. On the waiting list, he finally was started on MOUD on March 8, 2024. Then on September 2, 2024, unbeknownst to the patient, the MOUD tele-practitioner wrote that the patient refused his MOUD appointment and on the next day cut his dose in half without any attempt to talk with the patient. On September 6, 2024 the patient sent an HNR stating that he was just informed that his MOUD dose was being tapered due to a missed appointment, denying that was his intent. The next day the MOUD practitioner documented "Reviewed [the HNR]. Responded to patient. Patient had refused his [MOUD] provider appointment and refused to come when called to medical. He is being tapered off his suboxone and patient is aware that he may submit an HNR for [MOUD] services as needed." Again,

the practitioner made no attempt to talk with the patient and chose to ignore the HNR she was responding to in which the patient was requesting MOUD treatment. The patient sent another HNR on September 9, 2024 requesting to stay in the program. The same day the practitioner wrote that she "Reviewed [the HNR]. Responded to patient. Please see progress note in chart pertaining to his [MOUD] appointment refusal. Will place patient back on the [MOUD] provider waiting list." The practitioner made no attempt to see the patient immediately and right the wrong, even though at this point it was patently clear that the patient never intended to refuse the MOUD appointment on September 2, 2024. Instead, the practitioner continued to be steadfast and punitive in her response, resulting in patient harm by unnecessarily putting him in withdrawal as well as at risk for relapse, overdose, and death. On September 9, 2024, the patient sent a complaint through the Court's complaint portal reiterating the harms done. He said that he was being accused of missing an appointment with the MOUD practitioner. He noted that he is reliant on custody staff who incorrectly notified him of the purpose of the appointment, and that he would never miss a MOUD appointment as it "has been successful at keeping me sober" and he is now "forced" to deal with the pain/discomfort of withdrawal from the medication. He correctly pointed out that although he "immediately reached out to medical they offered no relief but to restart the whole process, which entails a roughly 30- day wait." The patient did not get seen again by the MOUD practitioner until September 22, 2024 at which time he had already been tapered to 25% of his prior dose.


7. Gaps in treatment upon transfer

ADCRR has created a process to assess the availability of MOUD at the receiving facility prior to transfer to help ensure continuity of treatment. However, discontinuities still occur. Patient 110 was started on buprenorphine daily on February 2 and took it daily until February 6 when he was involved in an altercation and moved from the Cheyenne Unit to the La Paz Unit, both at ASPC-Yuma. It does not appear that his buprenorphine was given to the patient after February 6 despite an ongoing order. An MOUD practitioner attempted to see him for routine follow-up at La Paz Unit on March 4, but at that time he was in the Dakota Unit. He was never seen prior to his transfer to a private facility March 25, still off MOUD.


8. Overall effect of program deficiencies

The discontinuation of MOUD should be a very rare event as MOUD is meant to be a long-term chronic care medication. Yet based on ADCRR's data for provision 11.3.4, 24% of patients chose to go off MOUD after starting. Upon request, ADCRR supplied us with the number of individuals who were taken off MOUD in March 2025, whether by the prescriber or based on patient choice. There were more than 150 individuals who stopped MOUD while incarcerated just during the month of March. In response to the red flags this finding raises, during our May site visit, we interviewed several patients who were currently or previously on MOUD at Lewis, Eyman, and Tucson. Two patients (Patient 111 and Patient 35) were inappropriately and dangerously advised to stop their buprenorphine in order to start tramadol (an opioid) for pain control, highlighting the artificially created bifurcation and disconnect in the ADCRR system between medical and addiction services and lack of wholistic care, with the attendant risk of overdose from poorly controlled OUD. Many patients describe going off MOUD due to side effects that they were not counseled about prior to starting, including constipation (e.g., Patient 33 who stopped MOUD for a week prior to a custody officer having him sign a medical refusal on April

22), and mild withdrawal symptoms, especially nausea, in the morning prior to taking each dose (e.g., Patient 112). With proper timely follow-up, these side effects could have been effectively ameliorated which may have avoided the discontinuation of their needed OUD treatment.

| Injunction Provision 11.3.6c/d | Non-compliant |
|---|---|

**Provision:**

Patients with Alcohol Use Disorder will be offered medication treatment and counseling if appropriate. The Department will take the necessary steps to ensure that any patient transferring to another facility will not experience an interruption in medication or counseling.

**Importance:**

See introduction to SUD above

**Discussion:**

ADCRR continues to be non-compliant with this provision.

**Example:**

Patient 113 has OUD and AUD. He was seen by the MOUD practitioner on July 6, 2024 and started on buprenorphine for his OUD, but his AUD was not addressed at all during the visit. During a follow-up MOUD appointment on January 29 the practitioner noted that the patient has a history of "alcohol abuse," but failed to do any further assessment, and the plan ignores the AUD, not addressing whether medication for AUD was offered or if it was clinically indicated. Despite this, on April 6, another APP wrote "AUD RESOLVED- AS PER [MOUD] PROVIDER DOCUMENTATION, NO ALCOHOL USE DISORDER TREATMENT NEEDED. PT CURRENTLY ON MAT OUD AND ON SUBOXONE." This conclusion is wholly incorrect as the patient still has AUD. The same APP similarly inappropriately documented that Patient 114's "AUD and/or alcohol dependence" was resolved even though he has "alcoholic cirrhosis of the liver" as reflected in the EHR Problem List.

Immunizations

| Injunction Provision | Non-compliant |
|---|---|

**Provision:**
Patients shall be offered all immunizations recommended by the CDC's Advisory Committee on Immunization Practices.

**Importance:**
This provision ensures that patients are vaccinated in accordance with national guidelines. Failure to vaccinate can result in harm that ranges from recoverable illness lasting a few days (e.g., influenza) to death (e.g., pneumococcal pneumonia). Assessment of compliance with this provision involves examining whether ADCRR appropriately offered eligible patients 5 different vaccines (pneumococcal pneumonia, shingles, influenza, hepatitis B, and tetanus) or executed informed consent for those who declined.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
Patient 115 is a 54-year-old female with a history of thyroid cancer, emphysema, high blood pressure, high cholesterol, schizoaffective disorder, depression, and hypothyroidism. As of February, ADCRR has not vaccinated her for Covid 19, influenza, pneumococcal pneumonia, hepatitis A, hepatitis B, tetanus, and herpes zoster. In light of her underlying lung disease, she is at significant risk of serious lung infections, including pneumonia. Some of the vaccines she has failed to receive are effective in preventing these infections.

System Improvement – Preventing, Detecting, and Reducing Errors

| Injunction Provision 2.1.3 | Non-compliant |
|---|---|

**Provision:**
Following a medical-related death, if the medical examiner's report was unavailable, the plan shall be revisited and modified, if necessary, within one month of receipt of the report.

**Importance:**
Examining deaths after the fact – the worst possible of health care outcomes – for lessons learned and areas for potential improvement is of critical importance for eliminating avoidable deaths. Failure to do such examinations greatly increases the likelihood of repeating avoidable errors resulting in deaths. This provision focuses on the part of the examination that occurs after the medical examiner completes their report, which can sometimes be months after the death and initial examination.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

The medical examiner reports during the month of February 2025 did not reveal any diagnoses that were not known prior to the autopsy. However, several of the reports confirmed that multiple patients had pressure wounds of the sacrum at the time of death (e.g., Patient 116, Patient 117, Patient 118, and Patient 119). Sacral pressure wounds are an avoidable complication that is often a sign of inadequate equipment and nursing care. Patients who are no longer able to turn on their own accord, require special beds/mattresses as well as frequent turning to avoid this complication. These wounds can result in exposure of muscle and bone and lead to serious infections. Though ADCRR missed these findings during their initial mortality reviews, when the autopsy results were received describing these findings, it should have triggered a revision of the initial review that included developing quality improvement recommendations to prevent this type of complication in the future. It did not.

**Example:**
See embedded examples above.

| Injunction Provision 2.4.1 | Non-compliant |
|---|---|

**Provision:**

There needs to be a robust continuous quality improvement program to monitor the quality of clinical care. As part of this program, staff monitor the absolute number and trend of various parameters on a monthly basis. Where metrics or trends in metrics show room for improvement, staff make appropriate efforts to understand the underlying reason for deviation, take reasonable steps to effectuate improvement, evaluate the effectiveness of these steps in a reasonable time, and make adjustments to its improvement efforts as needed. At a minimum, ADCRR will monitor the following parameters:

- percentage of individuals (regardless of whether diagnosed with hypertension) whose systolic blood pressure exceeds 140 mmHg or diastolic blood pressure exceeds 90 mmHg;
- average hemoglobin A1C (regardless of whether diagnosed with diabetes);
- percentage of individuals taking ten or more prescribed medications;
- percentage of women receiving timely breast screening; percentage of women receiving timely cervical cancer screening;
- percentage of pregnant women who have the results of routine prenatal laboratory tests results as recommended in current national guidelines (e.g., Guidelines for Prenatal Care, 8th Edition, American Academy of Pediatrics and American College of Obstetricians and Gynecologist, Table 6-2) documented within one month of diagnosis of pregnancy;
- percentage of health care grievances which are appealed; percentage of health care grievance appeal replies that are appropriate;
- percentage of prisoners on antipsychotic medications receiving timely AIMS (abnormal involuntary movement scale) assessments;
- percentage of prisoners on antipsychotic medications receiving appropriate and timely metabolic assessments;
- percentage of prisoners receiving punishment for a rule violation, for whom a mental health intervention would have been more clinically appropriate than punishment; and percentage of prisoners arriving at ADCRR for whom intake screening by an RN (or higher credentialed professional) is completed more than four hours after arrival.

**Importance:**

At its core, the health care component of the Court's Injunction is about improving the system of care provided to individuals at ADCRR. This provision requires ADCRR to monitor specific domains (i.e., clinical parameters) at a population health level to improve system level health care delivery. With two exceptions, failure to provide adequate clinical care within each domain directly increases the risk of harm to patients.[30] For example, the first domain - blood pressure control - directly impacts major health risks, such as heart attack and stroke. Unlike the rest of the Injunction, this section of the Injunction does not require ADCRR to perform a particular clinical function at a particular level. For example, the expectation is not that ADCRR to maintain 100% of patient blood pressures in the normal range. The

---

[30] The exceptions – percentage of health care grievances which are appealed and percentage of health care grievance appeal replies that are appropriate – relate indirectly to risk of harm if they reveal unfavorable data, more investigation is required to determine if there is harm or potential harm.

reason is that performance is heavily influenced by patient participation and adherence to the treatment regimen, something that health care providers do not fully control. However, due to the clinical importance of these domains, it is still important to monitor performance from different angles (e.g., over time, facility to facility, by gender or age) to identify trends and system level barriers (which may require root cause analysis) that can be improved at a population level, not at a patient level. This provision, therefore, simply requires ADCRR to conduct this monitoring, assess its own performance, identify the areas in which it has control and its performance can be improved to decrease patient risk, if any, and make the necessary improvements, and then monitor the impact of the change.

**Discussion:**

ADCRR completely fails to meet the requirements of any of the 12 domains listed and has failed to do so consistently for the past two years. For one of the domains, it has have never even submitted data. For the rest, the data ADCRR submits reflects total miscomprehension of the Injunction's requirement. The Monitors have provided coaching feedback to ADCRR on multiple occasions in an attempt to help ADCRR understand the Injunction's requirement and be successful, to no avail.

| Injunction Provision 2.4.2 | Non-compliant |
|---|---|

**Provision:**

In addition to the parameters prescribed in 2.4.1, ADCRR will monitor other parameters as reasonably dictated by the other self-improvement activities described in the Injunction.

**Importance:**

The Injunction could predict some, but not all the care processes that could fail at ADCRR, putting patients at significant risk of serious harm. Thus, this provision ensures that, as such, dangerous care processes that were not foreseen by the Injunction, are discovered by ADCRR and there is a mechanism for remediating the risk.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

ADCRR has developed some quality improvement projects, but most, if not all, are severely lacking in discovering the underlying root cause of the failure, their ability to promote needed improvement and their monitoring of the effectiveness of the remediation.

One project, for example, was to ensure that first responders to the scene of an unresponsive patient don't fail to administer naloxone (Narcan®) and measure blood glucose level. Based on the data from the 3 facilities that participated in the study (we could find no explanation why only 3 facilities – and the specific 3 that were chosen – were participating in this project and not every facility) it appears that ADCRR conducted monthly monitoring of the outcome. However, there is no indication that ADCRR implemented a process change or sustainable intervention to improve the outcome.

Another project addresses patient falls. Falls are more common in older more medically compromised patients and can result in significant morbidity, such as head injuries and fractured hips. On ADCRRs Master Log of Errors and Problems, there is a tab entitled "Priority List" that lists 11 problems or system processes that ADCRR has prioritized for improvement. One of the problems on this priority list is "fall risk." To address the fact that practitioners were not routinely assessing fall-risk in patients, ADCRR decided to create a new form in the EHR to help clinicians conduct a standardized fall-risk assessment. This new form was created and rolled out some time in mid-Fall 2024. IPC/SNU staff were educated on the new form and its use, and facility staff were expected to "review any trends or opportunities to improve." In February, the issue was marked as "Completed...Continue to Monitor" in ADCRR's system improvement documents. Now, almost three quarters of a year later, we inquired of ADCRR's chief of the Health Services Division as to the current status of this improvement effort, including data supporting that. Her response, passed through from the health care vendor, indicates that the fall-risk assessment tool that was implemented last year is still in use. As to data, the vendor reported, "[Continuous Quality Improvement staff] will look for trends in IPC/SNU falls on the reported adverse event submissions tab (in the Master Log of Errors and Problems); NaphCare confirmed that they are continuing to monitor this."

There are several significant errors or deficiencies with ADCRR's attempt to address this priority problem with excess falls. **First**, their plan doesn't address some of the important risks that ADCRR itself cited as causes of falls: "provider may place order but no [Americans with Disabilities Act] beds or cells- on a waiting list/appropriate housing" meaning that patients who are more likely to fall, and should be housed in SNU beds, remain in general population beds because SNU beds are unavailable; and "medical age over 65 [standard] for assessment" meaning that anyone over the age of 65, wherever they are housed, should be automatically be assessed for risk of falling; and "call light in bathroom and showers." ADCRR's plan was to screen individuals who are already in SNU beds which does nothing to address these two causes because it ignores individuals who need a SNU bed or are over 65 and are currently living in general population, not SNU. **Second**, there is no evidence that ADCRR examined any data or conducted a root cause analysis in the first place to determine if the risks it had identified as needing to be reduced or eliminated were in fact the main cause(s) of falls. In other words, absent such a determination, attempted remedial efforts have a high likelihood of failing because one may be "fixing the wrong problem." **Third**, even assuming that using a new form to assess risk of fall in individuals in IPC and SNU beds was a necessary step towards correcting the problem, there's no evidence that care takers were instructed to do anything with the information gleaned from the form. And, in fact, upon our review of medical records, we found little evidence that anything was done once a patient was found to have a high score (high risk for fall). For example, Patient 120, fell in the SNU on February 5. Despite ADCRR having established the fall-risk-reduction program using a fall-risk assessment form in the Fall of 2024, and despite the patient having had a fall on February 5, no one used the form to assess his risk of falling until almost 2 months after his fall – March 26. The assessment score revealed he had a very high risk of falling (80 points, low risk = 0-24, high risk = greater than 51). As far as we can tell, no action was taken based on this high score. On March 28 he fell again, suffering head trauma. **Fourth**, ADCRR's report to us that "[Continuous Quality Improvement staff] will look for trends in IPC/SNU falls on the reported adverse event submissions tab (in the Master Log of Errors and Problems)" is untrue. As shown on the screenshot below from the Master Log as of May 2025, ADCRR stopped looking for trends in October 2024, around the time the project began.

| ADE Themes | Dec 23 Count | Jan Count | Feb Count | Mar Count | Apr Count | May Count | Jun Count | Jul Count* | Aug Count | Sept Count | Oct Count | Nov Count | Dec Count | Trend |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dose | 14 | 10 | 12 | 11 | 3 | 1 | 4 | 65 | 1 | 2 | 1 | | | |
| Wrong Dose | 4 | 3 | 7 | 1 | 0 | 0 | 1 | 2 | 5 | 0 | 1 | | | |
| Route | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | | | |
| Swallowed Obs | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | | | |
| Suspected Drug Use | 5 | 3 | 3 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | | | |
| Documentation | 9 | 5 | 5 | 5 | 1 | 1 | 0 | 0 | 1 | 1 | 7 | | | |
| Hand Off Com- paperwork | 2 | 2 | 2 | 2 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | | | |
| Hand Off Com- report | 7 | 1 | 3 | 0 | 0 | 3 | 0 | 5 | 8 | 1 | 4 | | | |
| Falls | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 42 | 4 | 0 | 0 | | | |

*July was an anomaly because the date source was pulled differently

**Fifth**, ADCRR's report to us (and similar documentation ADCRR's Master Log) that "NaphCare confirmed that they are continuing to monitor this" is also either untrue or the monitoring is so markedly incomplete as to effectively amount to no monitoring at all. ADCRR's count of the number of falls in the month of February 2025 ("ADE Counts" tab within the Master Log) indicates that there were zero

falls. With minimal effort (and only doing a partial search, so our effort was likely incomplete), we were able to identify 10 patients who fell in February:

- Patient 120, fall in SNU February 5 (died June 20)
- Patient 121, fall in SNU February 18
- Patient 122, fall in IPC February 3
- Patient 123, fall in SNU February 24
- Patient 124, fall in SNU February 9 and March 12
- Patient 125, fall in SNU February 27 and February 28
- Patient 126, fall in IPC February 17
- Patient 127, fall in general population February 13
- Patient 128, fall in SNU February 18 (died May 2)
- Patient 129, fall in IPC February 25.

In summary, with regard to systemic dangers to which patients are exposed and which have caused significant harm, ADCRR is unable to identify, examine, remediate in a manner that is lasting, and monitor the effectiveness of its remediation of these dangers.

**<u>Example:</u>**
See embedded examples above.

Staffing and Physical Space

| Injunction Provision 6.2a/7.3 | Non-compliant |
|---|---|

**Provision:**

All patients are assigned a Primary Care Practitioner (PCP). Patients are appropriately assigned to a physician or APP based on the patient's medical complexity.

**Importance:**

The staffing backbone of the Injunction for medical patients is that each patient is assigned a primary care practitioner (PCP) and that that practitioner be of an appropriate professional level based on the patient's clinical complexity. Assignment as the PCP means that that practitioner is the person who sees the patient for primary care visits. This fosters the development of a patient-practitioner relationship that serves several valuable functions. It increases patient trust leading to freer sharing of medical history and symptoms. It increases the practitioner's first-hand knowledge of the patient, their baseline condition, and how their particular diseases manifest, which increases diagnostic accuracy. Specifically, physicians should be the PCP for patients with multiple and/or complex medical problems, and APPs should be the PCP for less ill patients. APPs have two years of training beyond college as compared to board-certified physicians who have at least seven years. As a result, APPs have insufficient training and expertise to safely manage complicated patients.

**Discussion:**

Unfortunately, ADCRR's practice has changed little since trial. Evidence at trial and mountainous evidence collected over hundreds of patient cases we have reviewed in the past two years, clearly shows that APPs make poor decisions regarding the care of complex patients, creating significant risk of serious harm and causing serious harm, and despite that, ADCRR continues to inappropriately assign APPs as the PCP for complex patients.

In a random sample of 10 patients from among all medically complex patients requiring a physician as their PCP, two were assigned to physicians. Of the remaining eight who were not, seven were assigned to an APP and one with coronary artery disease of the heart, high cholesterol, high blood pressure, and cirrhosis of the liver, has not even been assigned a PCP at all.

Compounding the dangerous practice of assigning APPs as PCPs to patients who require a physician, even when a physician is "assigned" as the PCP for complex patients, that assignment is almost always in name only with no operational meaning. For example, Patient 130 is a medically complex patient with diagnoses of prostate enlargement, kidney stones with chronic kidney disease, secondary polycythemia (overproduction of red blood cells), high blood pressure, cirrhosis, and opiate use disorder, among others. His health record indicates that a physician is assigned as his PCP. However, in August of 2024, the patient had 10 primary care visits. For those visits he was seen by a parade of six different APPs and two nurses; not a single primary care visit was conducted by the assigned physician PCP. Among 10 of

the most medically complex patients in all of ADCRR[31], we found the same pattern. Although eight of these highly complex patients were assigned physicians as their PCP in the EHR (meaning that three were not; two were assigned to APPs and one does not have a PCP assigned), since October of 2024, across 61 primary care visits, not a single visit was conducted by the patient's PCP. Of further concern, with the exception of eight of the 61 visits, the rest were all conducted by APPs or nurses. Labeling an orange as an apple, doesn't make it an apple. ADCRR's affixing of the moniker "PCP" to a patient's record does not mean they have a practitioner who serves as their primary care practitioner.

Another practice at ADCRR that makes assignment of a PCP ineffective, is frequent changes of PCP. By definition, a PCP is the provider with whom the patient develops a long-term relationship. In the example of Patient 131 (see screenshot below), a complex patient with COPD/emphysema, diabetes, hepatitis C, high blood pressure, and a seizure disorder, who therefore required assignment of a physician as his PCP, over a seven-month period his PCP was changed 11 times (a change often every 1-2 weeks), 7 times inappropriately to an APP.

ADCRR self-assesses its performance on this requirement at 98-100%. Their assessment could not be further off the mark. Their performance is closer to 0%. ADCRR makes two serious errors in understanding what this provision means and in measuring how they are faring. First, they fail to appreciate the medical complexity of the patients in their charge, accepting assignment of APPs to patients who require a physician as their PCP. Second, if a PCP's name appears in the "assigned PCP" box of the EHR, they accept that as proof the patient actually has a PCP.

A stable primary care team with assignment of a PCP appropriate to the patient's conditions is also a fundamental component of the Staffing Plan, as ordered by the Court (Doc. 4916).

---

[31] This is based on a complexity algorithm developed by the experts the Court engaged to develop a staffing plan.



**Example:**

See example embedded above.

| Injunction Provision 6.2c | Non-compliant |
|---|---|

**Provision:**

Facility Medical Directors (FMD) at high intensity facilities shall be assigned up to 100 patients as the primary care provider and shall have no other scheduled patient care assignments including supervision of APPs or as the scheduled provider for specialized units such as Inpatient Component ("IPC") or Special Needs Unit ("SNU"). This does not limit FMDs from occasional unscheduled clinical supervision and care activities.

**Importance:**

Facility Medical Directors are the chief physicians at each complex. By design, high-intensity complexes have the sickest patients in ADCRR and the most complex medical operations. As such, it is critically important for the complex to have a FMD who oversees operations, including patient safety. Prior to implementation of the Injunction, due to staffing shortages, FMDs were assigned large patient loads. This is dangerous because it prevents them from performing their main patient safety function, risking significant serious harm to patients. For this reason, the Injunction required FMDs' patient load to be limited to 100 patients.

**Discussion:**

ADCRR continues to be non-compliant with this provision. At present, three of the six FMDs at high-intensity complexes have more than 100 patients assigned to them, the highest being 688 patients assigned to the FMD at the most populous complex in ADCRR. That assigned case size is so large that they could not provide quality care for that many complex patients even if they had no other duties as FMD.

| Injunction Provision 6.4 | Non-compliant |
|---|---|

**Provision:**

All medical physicians–at hiring and during employment–shall be board certified in Internal Medicine or Family Practice, or board eligible if within 7 years of their completion of an ACGME approved residency in one of these 2 specialties, with the following exceptions: medical directors, shall be board certified at hiring and during employment; physicians providing obstetric and gynecologic services shall be board certified or board eligible if within seven years of their completion of an ACGME approved residency in obstetrics and gynecology; and physicians who are currently employed and are not board eligible may remain employed for no longer than one year after issuance of this Order. They may also not possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. (Notify Court Monitors if there is a request for an exception)

**Importance:**

The Injunction requires primary care physicians to be board certified in the specialties of internal medicine or family medicine. These are the two medical specialties that train physicians in the primary care of adults. Board certification is granted after completion of a three-year residency (i.e., apprenticeship) and passing an examination within seven years of that residency. Physicians may legally practice medicine after completing one year of residency (the internship year) in any specialty and passing a more basic examination. Board certification is the community standard in Arizona and is associated with safer care.

**Discussion:**

ADCRR continues to be non-compliant with this requirement. The contractor, NaphCare, considers any licensed physician to be qualified to provide care under the Injunction, regardless of the type and length of training. For example, ADCRR has a physician who trained as a surgeon (and is not board certified in surgery) functioning as a PCP. A physician's specialty training is important. No rational patient would choose to have open heart surgery performed under the hands of a physician who trained as a family physician or did not complete their training. There is no reason to treat the opposite situation as any safer.

ADCRR self-assesses its performance in May at 64%. Percentage performance is a logical measure of compliance with this provision. We calculate ADCRR's performance at approximately the same.[32]

---

[32] This is based on a list of 27 physicians, provided to the Court as part of ADCRR's monthly staffing report for the month of May. On that list 17 physicians are board certified or board eligible in Internal Medicine or Family Medicine. These counts refer to individuals, not FTE. Using the individual as the unit of analysis yields a logical measure of compliance as long as all the individuals contribute approximately the same FTE. We make that assumption here. If that assumption is not true, a more logical measure of compliance (i.e., one that more accurately measures risk to patients) would be the total physician board certified or board eligible *FTE* as a fraction of all working physician *FTE*.

| Injunction Provision 1.11 | Non-compliant |
|---|---|

**Provision:**

Licensed Practical Nurse ("LPNs") shall practice within their scope of practice set forth in Arizona Administrative Code § 4-19-401 (not independently assess patients or initiate a plan of care or treatment).

**Importance:**

Both RNs and LPNs are nurses. However, RNs typically receive four years of training post-high school and have bachelor's degrees. They are trained to, and licensed to, make nursing assessments and implement nursing care plans based on those assessments. LPNs, however, typically receive only about 18 months of training post-high school and may have an associate degree. Under the scope of practice of their license, an LPN may collect the data needed for others to make an assessment and may implement a care plan developed by others, but may not independently assess or develop a care plan themselves. When LPNs provide care independently, they put patients at significant risk of serious harm since they do not have the proper training. The use of "nursing protocols" – lists of suggested questions to ask a patient, examinations to conduct, and possible treatments in about 40 different clinical scenarios – a practice that ADCRR's current contractor uses (as have previous contractors), does not negate these requirements. These protocols cannot safely serve as a substitute for the clinical knowledge and training of a medical practitioner, especially when they are used to evaluate symptoms that have multiple etiologies, including potentially fatal ones, in a complex setting that houses some of the sickest patients in the state.

**Discussion:**

ADCRR used LPNs to see patients independently for episodic problems and to provide primary care prior to implementation of the Injunction. That practice is unsafe, beyond LPNs' legal scope of practice, and yet continues. Therefore, ADCRR continues to be non-compliant with this provision.

Further, *by design*, the EHR still permits LPNs to use some 33 available nursing protocols independently. These protocols have LPNs make an assessment and choose a plan of care, which by definition is outside their scope of practice. For example, an ICS was called on February 26 after the use of pepper spray, because Patient 132 had an asthma exacerbation. He was seen by an LPN, acting independently, for wheezing. The LPN used a nursing protocol ("Acute Respiratory Disease"). The patient had a respiratory rate of 18 and had 97% blood oxygenation, both normal, but wheezing was heard in both lungs on exam. The LPN documented in the ICS note that an APP ordered a medicated inhaled breathing treatment (nebulized albuterol), although there is no medication order in the chart by any APP. After the nebulizer treatment, the LPN independently made an assessment that the patient was in "no acute distress" but failed to conduct a simple "peak flow" test to assess the degree of breathing difficulty and educated the patient to come back if symptoms got worse, drink fluids, and avoid precipitating factors. No provider follow-up was scheduled. An LPN does not have the ability to determine that a patient is no longer in acute distress; without proper treatment and follow-up, an asthma attack can easily lead to hospitalization. The LPN's incomplete care placed the patient at such risk.

LPNs used a nursing protocol like this one at least 36 times during the month of February as shown in the graphic below. Using the LPN protocols, one of these patients (arrow in graphic) was actually evaluated for a headache not by an LPN, but by a Certified Nursing Assistant (CNA) which is almost the same as having custody officer provide the care based on the small amount of training CNAs receive, even relative to LPNs.



| Patient ID | First Name | Last Name | Housing Location | Nursing Protocol | Date Time Completed | Completed By |
|---|---|---|---|---|---|---|
| | | | L29-CB2B-01U | ACUTE RESPIRATORY DISEASE-ERO | 2/26/2025 2:17:25 PM | LPN |
| | | | S01-1401-155B | ACUTE RESPIRATORY DISEASE-ERO | 2/16/2025 11:08:15 PM | Licensed Practical Nurse |
| | | | Y09-HU7D-05L | BACK PAIN | 2/3/2025 10:44:56 AM | Licensed Practical Nurse |
| | | | Y09-HU7A-38L | BACK PAIN | 2/17/2025 6:16:48 AM | LPN |
| | | | S01-1402-237B | CHEST PAIN (NON-ACUTE) | 2/19/2025 12:35:52 AM | Licensed Practical Nurse |
| | | | L68-D1-A06U | CHEST PAIN WITH ACUTE DISTRESS- | 2/9/2025 5:19:26 PM | LPN |
| | | | C34-HU-4C11B | COMMON COLD | 2/4/2025 9:08:21 PM | LPN |
| | | | Y02-204C-10L | COMMON COLD | 2/22/2025 6:17:47 AM | Non NaphCare LPN AB |
| | | | Y02-205A-15U | DENTAL COMPLAINT | 2/19/2025 1:49:06 PM | LPN |
| | | | L64-HU2B-10L | GERD/GAS/HEARTBURN | 2/4/2025 10:04:32 PM | LPN |
| | | | S09-IH09-A~1B | HEAD TRAUMA-ERO | 2/25/2025 3:26:05 PM | Licensed Practical Nurse |
| | | | L05-CDUA-03L | HEADACHE | 2/9/2025 6:29:38 PM | LPN |
| | | | L34-HUD4-A13U | HEADACHE | 2/16/2025 6:11:03 PM | Licensed Practical Nurse |
| | | | C34-HU05-B14B | HEADACHE | 2/18/2025 7:00:09 AM | Licensed Practical Nurse |
| | | | B42-*C21-*92L | HEADACHE | 2/5/2025 2:48:37 PM | LPN |
| | | | L29-CB3A-22U | HEADACHE | 2/9/2025 11:05:47 AM | LPN |
| | | | B42-*A31-*65L | HEADACHE | 2/26/2025 5:57:30 AM | Licensed Practical Nurse |
| | | | B42-*A31-*65L | HEADACHE | 2/3/2025 6:50:19 PM | Licensed Practical Nurse |
| | | | Y08-HU6E-02U | HEADACHE | 2/19/2025 1:00:24 PM | Certified Nursing Assistant ← |
| | | | L64-HU2B-09L | HEMORRHOIDS | 2/25/2025 8:20:43 PM | LPN |
| | | | B42-*A31-*65L | HYPOGLYCEMIA | 2/5/2025 7:23:21 AM | LPN |
| | | | B42-*A31-*65L | HYPOGLYCEMIA | 2/3/2025 7:30:02 AM | LPN |
| | | | L64-HU2C-23L | MUSCULOSKELETAL PAIN/STRAIN | 2/18/2025 8:55:25 PM | LPN |
| | | | Y01-3-AB-A02L | MUSCULOSKELETAL PAIN/STRAIN | 2/26/2025 2:46:19 PM | LPN |
| | | | S07-BLD1-026U | MUSCULOSKELETAL PAIN/STRAIN | 2/20/2025 5:19:21 PM | Licensed Practical Nurse |
| | | | S04-HS51-005B | MUSCULOSKELETAL PAIN/STRAIN | 2/23/2025 9:22:49 AM | Licensed Practical Nurse |
| | | | A44-06AB-A17U | MUSCULOSKELETAL PAIN/STRAIN | 2/28/2025 11:32:57 AM | LPN |
| | | | L32-HU3B-411L | MUSCULOSKELETAL PAIN/STRAIN | 2/13/2025 8:51:48 PM | LPN |
| | | | S04-HS44-003B | OVERDOSE/POISONING - ERO | 2/21/2025 6:03:10 PM | Licensed Practical Nurse |
| | | | L29-CB1A-17U | OVERDOSE/POISONING - ERO | 2/9/2025 10:58:53 AM | LPN |
| | | | A84-DRM4-D04L | OVERDOSE/POISONING - ERO | 2/5/2025 4:34:20 AM | Temporary LPN |
| | | | L32-HU1D-03U | OVERDOSE/POISONING - ERO | 2/23/2025 2:24:40 PM | LPN |
| | | | C37-HU4B-006U | OVERDOSE/POISONING - ERO | 2/28/2025 11:05:04 AM | Licensed Practical Nurse, FW |
| | | | L29-CB1A-02L | POST USE-OF-FORCE | 2/10/2025 4:22:28 PM | LPN |
| | | | S01-1408-818S | POST USE-OF-FORCE | 2/3/2025 7:27:43 PM | Licensed Practical Nurse |
| | | | S04-HS59-009B | SLEEP DISTURBANCE | 2/14/2025 6:59:54 AM | LPN |
| | | | W01-DM1C-03L | URINARY COMPLAINTS | 2/2/2025 6:09:44 PM | Licensed Practical Nurse |

nursing-protocol-usage-04-25-2025(1)

Beyond the issue of protocol use, there are other instances in which LPNs work outside their scope. Patient 133 was admitted to a SNU on August 27, 2024 and for the first 24 hours, her care appears to

have been completely managed by LPNs and CNAs. An LPN wrote the nursing admit note and failed to do an exam and inappropriately advised the patient it was OK to continue using a steroid cream on a stapled surgical incision that was infected and had surrounding redness. This was dangerous as this cream increases the risk of infection. Another LPN saw the patient on August 30, 2024 and noted "Skin red and irritated. Pain to touch and applied light pressure. Pus oozing out of staples. [Patient] reports 8/10 [pain,]" but a provider was not notified. On August 31, the same LPN saw the patient again and noted the patient was having increasing pain at the incision site, but again did not notify a practitioner. The patient was finally admitted to the hospital for a serious surgical wound infection on September 1, 2024 after an RN examined the wound and called the on-call practitioner for malodorous drainage, pockets of pus, and staples that were embedded in the patient's skin since they had been left in for a month at that point (although the timing of staple removal is up to the surgeon, abdominal staples rarely are kept in longer than two weeks).

ADCRR self-assesses its level of performance on this requirement at 100%. We were unable to estimate their level of performance from the data ADCRR reviews because ADCRR continues to make a critical logic error in its analysis despite repeated oral and written feedback. The error ADCRR makes in its analysis is choosing the wrong dataset to analyze. The random dataset it chooses includes mostly medication administration events conducted by LPNs, which by definition are within scope and allowed. By selecting this dataset, it is guaranteed that the estimated performance will appear perfect.

**Example:**
See examples embedded above.

| Injunction Provision 1.12 | Compliant |
|---|---|

**Provision:**

No one for whom a health professions license is required may possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility.

| Injunction Provision 1.9 | Non-compliant |
|---|---|

**Provision:**

Directors of Nursing (DON) at each complex may not spend more than 15% of their time providing scheduled or unscheduled patient care.

**Importance:**

Each complex has a DON. These are critically important managerial positions that help ensure patient safety. For example, the DON is responsible for implementing changes to nursing practice that are discovered during Mortality Reviews based on serious errors made by nurses that may have contributed to the death. DONs also provide proper clinical supervision and support to the other nurses in the prison complex to improve practice standards, daily operations, and ensure clinical competence. Historically, due to staffing shortages, ADCRR pulled these individuals away from their managerial roles to care for patients. When that happens more than occasionally, the DON's managerial activities to ensure patient safety suffer, putting patients in that complex at risk of harm.

**Discussion:**

ADCRR continues to be short-staffed and continues the practice of diverting DONs from their managerial responsibilities. In February, one DON (who, has in previous months consistently worked more than 15% of her time in patient care) spent 62% of her time in patient care, leaving only 38% of her time for managing, and ensuring the safety of, nursing practice at her complex.

ADCRR self-assesses it level of performance on this provision at 71% based on the number of DONs who exceeded the 15% time limitation. Calculating a percentage performance makes no sense because the risk is not based solely on the number of DONs who exceed the time limit but also the degree to which they exceed it and the size and function of the complex they manage.

156

| Injunction Provision 1.4 | Non-compliant |
| --- | --- |

**Provision:**
Telehealth for medical care may be used only when clinically appropriate.

**Importance:**
Telehealth is a valuable tool in medicine. Some care can effectively be provided remotely without the practitioner physically being in the room with the patient. However, the care that can be provided safely depends on the purpose of the encounter as well as the extent to which there are proxies or tools available to replace some of the practitioner's ability to see, touch, smell, and hear. For example, certain parts of the physical examination can be conducted by an assistant (e.g., RN), provided they are specifically trained for that role or by another practitioner summoned into the exam room. Other parts of the examination, such as listening to the heart, can be accomplished by the use of digital devices that deliver the live heart sounds to the remote practitioner.

**Discussion:**
ADCRR continues to use telehealth extensively, well beyond its safe limits and without the availability of the other proxies or tools mentioned. As such, far too many of the encounters we reviewed were not appropriate for a telehealth encounter, and posed a significant risk of serious harm due to their incompleteness. Practitioners who provided care remotely do not hide the incompleteness. They recognize and acknowledge the limitation to their being able to perform all the necessary parts of the encounter, and document as such as shown in the screenshot below from the EHR of Patient 134 during a visit on March 10 ("PE": Physical Examination).



Objective:
Telemedicine encounter -
Afebrile, Vital Signs Stable
Gen- A/O x 4, NAD

*PE limited due to Telemedicine visit.*

Labs/Diagnostics reviewed and discussed with patient.

As we note in the discussion of provision 11.2, several patients were started on treatment for dormant tuberculosis (LTBI) by telehealth and failed to undergo an adequate exam.

ADCRR's extensive use of telehealth for chronic care (part of primary care) coupled with the lack of having the same practitioner see the patient from one visit to the next, will make implementation of the Patient-Centered Primary Care model of care challenging.

**Example:**

157

Even complex patients in the SNU, like Patient 135, are inappropriately seen by telehealth. In fact, all of this patient's chronic care visits have been by telehealth over the past year (May 15, 2024, July 2, 2024, October 23, 2024, January 22, and April 15), and all but two of these visits have been by APPs, including the most recent visit on April 15 (in violation of Injunction section 7.3). This patient's active issues include high blood pressure, cirrhosis (i.e., severe liver scarring) due to untreated hepatitis C, diabetes complicated by painful nerve damage, dormant tuberculosis, kidney stones, coronary artery disease with multiple cardiac stents, an enlarged heart with significant heart failure, high cholesterol, peripheral arterial disease, osteoarthritis of the right knee, enlarged prostate, cervical stenosis that required spinal surgery (laminectomy), and the patient has been bed-bound for almost a year for unclear reasons since a fall (MRI only recently requested) and now with pressure ulcers on both heels (stage 3 decubiti). From mid-January 2025 until the beginning of May, he was only seen 3 times by on-site providers to address very specific issues (knee pain on February 4, acute blood in urine on February 14, and post-ER follow-up for the blood in urine on February 28). As part of the patient's chronic care he needs: his body fluid status (an important parameter to assess in patients with heart failure and severe liver disease) assessed by examining the amount of pressure in his neck veins, listening to his lungs, and assessing for swelling in the dependent parts of his body; his abdomen palpated for masses and fluid; a full skin assessment to look for breakdown and ensure his heel ulcers are healing; his distal pulses evaluated; and his muscle strength assessed. Absent the proxies or tools described above – which were absent – all of these assessments require an in-person examination.

| Injunction Provision 1.6 | Non-compliant |
|---|---|

**Provision:**
There is sufficient space, equipment (e.g., otoscopes, ophthalmoscopes), and supplies (e.g., dressings) to deliver medical care services appropriate to the location.

**Importance:**
ADCRR cannot possibly comply with almost any of the requirements of the Injunction in the absence of sufficient space, equipment, and supplies. These basic necessities are needed to provide a constitutional level of care.

**Discussion:**
ADCRR continues to be non-compliant with this provision. In its monthly report for February, ADCRR noted that several facilities do not have enough space to adequately see patients (e.g., Dakota Unit at ASPC-Yuma, Infirmary (IPC) at ASPC-Lewis IPC, San Carlos and Santa Cruz Units at ASPC-Perryville) and mention examples like having to stop seeing patients in medical on a daily basis at Perryville Santa Cruz when methadone is being giving out in clinic. In addition to space constraints, staff at multiple facilities complained of broken equipment (e.g. vitals machine, INR machine, digital camera, medication refrigerator). At least one person noted it takes weeks to get supplies.

ADCRR has accomplished some space expansions over the past two years (see Doc. 4815 at 8), including adding SNU beds, and it is in the process of constructing more. ADCRR added a number of clinical and administrative rooms at the site of the PCCM Pilot in Dakota Unit at ASPC-Yuma. Nonetheless, these increases are not nearly sufficient to meet the current needs nor the increased needs that result from the recent approval of the statewide Staffing Plan (Doc. 4916).

ADCRR self-assessed its performance at 83%. Performance related to this provision cannot logically be described by a percentage, thus we offer none.

**Example:**
Patient 136 was hospitalized in October 2024 for a Stage 4 pressure ulcer[33] on his sacrum that became necrotic and infected with methicillin-resistant *Staphylococcus aureus* ("MRSA"). Since the patient had not yet received the necessary supplies post-hospitalization, on 11/19/2024 an ADCRR physician ordered an air mattress and a special cushion for the patient's wheelchair to help prevent worsening of the pressure ulcer and promote healing.

1. Air mattress
On February18, the patient asked via an HNR when he would be receiving the air mattress that the doctor ordered. The nurse confirmed the next day (February 19) that the order was submitted and

---

[33] Pressure ulcers are also known as bed sores. They result from constant pressure on a part of the body in a patient who is unable to move themselves. They are avoidable by good nursing care, including proper bedding and scheduled moving of the patient so they are not resting constantly on the same area. State 4 is the most severe stage, characterized by a wound that penetrates all three layers of skin, exposing muscles, tendons and/or bones.

approved back in November 2024 and requested an update from the supplier. On April 8, 9, and 18, the patient once again asked for the update of his air mattress which had still not arrived. The patient finally received his air mattress April 30, 6 months after his hospitalization for a pressure related ulcer.

2. Wheelchair and cushion

On March 6, the physical therapist noted that the patient "presents in a wheelchair with significant hammocking and tearing to the seat and backrest. Submitted a medical request for a new wheelchair appropriate for [patient's] height." There was no mention of any special cushion in place. That same day, the physical therapist requested a wheelchair measuring 20 inches wide by 20 inches deep with standard seat height. However, on March 11 a nurse practitioner (not his PCP, who was a physician) removed the request from the queue, noting "[a]lready signed receipt for new standard [wheelchair] on 5/1/24." When the physical therapist saw the patient again on March 12, the patient arrived in a new wheelchair. "Wheelchair appears to be a very poor fit for patient.... [Patient's] wheelchair measures 18 x 15 despite this writer submitting a Medical Supply request for a 20 x 20 inch wheelchair. Patient [complaining of] current [wheelchair] being too tight at hips and cutting off the circulation in his legs and legs going numb from legs handing off unsupported on wheelchair seat." The therapist sent an email to get the correct size wheelchair. The next day (March 13), a nursing assistant cancelled the wheelchair cushion saying it was a duplicate request. On April 1 the therapist noted that the wheelchair was still too small. On April 9, the Associate Director of Nursing documented that the wheelchair request was in process. On April 18, 19, and 22, the patient asked about the status of his correctly sized wheelchair, as he was still having cramping and numbness in his legs due to having the wrong wheelchair. Instead, he was seen by a nurse for back pain and given acetaminophen. On May 5 the patient received another wrong wheelchair. On May 31 the patient had still not gotten the proper wheelchair and sent the following HNR:

| INMATE NAME/NOMBRE (Last, First M.I.) (Apellido, Nombre, Inicial) | | ADC NUMBER/NÚMERO DE ADC | DATE/FECHA (mm/dd/yyyy) 05-31-25 |
|---|---|---|---|
| CELL/BED NUMBER/CELDA/ NÚMERO DE CAMA | UNIT/UNIDAD CATALINA | P.O. BOX/APARTADO POSTAL 24409 | INSTITUTION/INSTALACIÓN: ADC TUCSON |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action. [Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria.]

SECTION/SECCIÓN II

AREA OF INTEREST (Check only one block below)/ÁREA DE INTERES (Marque Un Espacio Solamente)    ☒ Medical/Médico    ☐ Dental    ☐ FHA

☐ Pharmacy/Farmacia    ☐ Mental Health/Salud Mental    ☐ Eyes/Ojos    ☐ Other (specify)/Otros (especifíque)

PLEASE PRINT! Describe your medical/dental treatment issue need in the space below. Be clear and specific. NO ADDED PAGES. [POR FAVOR, ESCRIBA EN IMPRENTA! Describe su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramente y sea específico. ¡NO USE MAS HOJAS!]

I AM HAVING ADDITIONAL SEVERE BACK PAIN AND NUMBNESS AND PAIN OF MY LEGS DUE TO AN IMPROPER WHEELCHAIR. I ALSO HAVE HAD 2 PRESSURE SORES, WHICH ONE OF THEM RESULTED IN A 20 DAY HOSPITAL STAY. I NEED THE PROVIDER TO ORDER A FITTED WHEELCHAIR

Subsequent notes show continuing confusion among health care staff. As of the date of this writing, the patient has still not received the proper wheelchair nor a cushion for the wheelchair he has.

160

| Injunction Provision 3.5 | Compliant |
|---|---|

**Provision:**

The equipment used for interpretation shall allow for confidential communication in all medical health care circumstances (e.g., dual hand- or head-set device in locations where a speaker phone or computer can be seen or overheard by other patients or custody staff).

(As explained in more detail below in provision 1.7, the Injunction looks separately at whether, for this provision, ADCRR has the proper equipment to *allow for* confidential communication when interpretive services are needed. Whether or not that equipment is actually used to benefit is captured in provision 1.7.)

| Injunction Provision 1.7 | Non-compliant |
|---|---|

**Provision:**
There is auditory and visual confidentiality during medical encounters or encounters that are not strictly medical or MH (confidentiality during MH encounters is addressed in section 16.7). Breaches of confidentiality are limited to the measures required to ensure safety, and all staff shall maintain the confidentiality of any information they acquire as a result of the breach.

**Importance:**
This provision complements provision 1.6 (and 3.5). The component of 1.6 that addresses physical space focuses on whether the space exists; this provision focuses on whether that space is utilized when seeing patients to ensure their examinations occur in a therapeutic and confidential setting. Thus, it would be possible for ADCRR to be compliant with 1.6 and not with 1.7, but it would not be possible to be compliant with 1.7 unless it were compliant with 1.6. Provision 1.7 is also related to provision 16.7 that requires confidentiality in MH encounters. For ease of self-monitoring by ADCRR and monitoring by the court, we will use 1.7 to assess compliance in the medical realm (or any setting that is not strictly medical or MH) and 16.7 to assess compliance in the MH realm.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

Depending on their information source (*viz.* staff, patients, direct observation), ADCRR self-assessed its performance to be between 73% and 100%. Multiple patients reported lapses in confidentiality due to doors being left open during appointments, but even more concerning is that three patients from more than one facility out of the 45 patients interviewed reported that officers actually interfered with their medical visits (e.g. "security speaks for us, they don't let us speak for ourselves in appointments," "Security interjects and gives comments," "Officer is engaged in my medical issues"). During our onsite visit in May 2025, we witnessed a custody officer in the exam room while a patient was being seen by the nurse and based on the supervisor's reaction when asked about it, it was clear that it is common practice for officers to be in the room with patient's regardless of their custody level.

**Example:**
Patient 10 in Monitors' Second Interim Report to Court, Doc. 4755 submitted an HNR that was copied into the EHR in the following nursing note:



QUICK NOTE BY: ▮▮▮▮▮▮▮, Registered Nurse POSTED ON 6/18/2025 2:14:20 PM                                Type: NURSING | Action ⌄

Copied from paper HNR:
"A review of the camera system located inside 7B23 will support the fact that each time Nurse George issue me my morning chronic health care meds he "disclose" my medication to staff and inmates "In violation of my right to privacy," and thereby, causing me not to want to come out and get my meds. Please protect my right to "confidentiality." Supervisor notified

| Injunction Provision 1.10 | Compliant |
|---|---|

**<u>Provision:</u>**
All staff hired in clinical medical supervising positions must have at least two years clinical experience.

| Injunction Provision 1.13 | Non-compliant |
|---|---|

**Provision:**

Health care staff (Medical and Mental Health) responsible for direct patient care shall not be mandated to work beyond the following limits: more than 12 hours in any 24-hour period; less than 8 hours off between any two shifts; more than 60 hours in a calendar week defined as Sunday through Saturday. (1.14. The limits on overtime may be extended during emergency situations. Time spent on-call is not included in the time limits.)

**Importance:**

Patient safety science shows a direct correlation between excessive work time and patient care errors. The limits set here are based on that science.

**Discussion:**

ADCRR is currently non-compliant with this provision. In February 2025, at least 35 employees worked shifts beyond the prescribed limits. Of those 35 individuals, five individuals worked more than 300 hours in a month including an RN who worked 334 hours and one a physician who regularly works more than 240 hrs a month. Such lengthy work periods increase the risk of errors in patient care. Based on a flaw and an omission in the way ADCRR captures this data, the stated number of employees who work beyond the limits is likely an underestimate. The flaw is that ADCRR captures the total amount of time each employee worked over the course of the entire month. The limits (and the science) are based on the number of hours worked in *a week*. Thus, an employee who worked 10 hours over the limit during two weeks of the month, but then worked 10 fewer hours than the limit during the next two weeks would not be flagged as over-worked by the method used by ADCRR, yet the increased risk for error existed for two of the four weeks. The omission is that ADCRR only measures and provides us with data partially addressing only one part of the three requirements of the provision. ADCRR does not measure nor provide us with any data addressing whether employees work more than 12 hours in any 24-hour period or have at least 8 hours off between shifts.

# Mental Health

It is easy to describe the harm associated with poor medical care. Most medical harm is tangible, visible. A broken bone. Spreading cancer. Shortness of breath. While there is some harm that only the patient can sense – notably pain – that subjective outcome is often enough associated with objective tangible, visible, findings that we can focus on those latter findings to convey the quality of care. Describing harm associated with poor mental health care is harder. The ill effects are the opposite of those we see with medical care. Rarely – fortunately – we see the objective findings: a patient who is so depressed that they attempt suicide. A patient who is so gravely disabled from mania that they can't eat and smear stool on the wall. But the much more common manifestation of harm from mental illness is subjective. It is sensed only by the patient. It is internal psychic pain, sadness, angst tearing up one's insides, inability to focus or concentrate on life around them, hearing and seeing things that don't exist, intrusive thoughts, inability to maintain a relationship. These things cannot be measured. There is no blood test[34] (yet) or x-ray for harmful mental illness. Thus, in describing the harm cause by poorly managed mental health, we must rely more on a description of the processes of care than the outcomes. As we describe in places in this report and our previous ones, there are three essential processes in the care of patients with mental illness. **First**, a clinician must comprehensively evaluate the patient. Depending on the circumstance, evaluation includes reviewing previous records, interviewing the patient, observing the patient, and questioning family and friends. **Second**, based on that evaluation, the clinician – usually a psychology associate – must develop a treatment plan that specifically targets the concerns identified in the evaluation. Depending on the complexity of the patient, designing that plan may require involvement of other team members, such as a psychologist, psychiatric practitioner, and behavioral health technician. The treatment plan describes the treatment goals (until the next plan), and the tools the clinician plans to use to achieve the goals. Key among those tools is the content and frequency of therapy sessions. **Third**, the clinician, and sometimes other team members, must execute the plan which rests mostly on therapy sessions. For those sessions to be effective and meaningful, they must be conducted in a therapeutic environment (quiet, safe, confidential), be of sufficient length, concentrate on the goals set out in the treatment plan, be conducted almost exclusively, barring an urgent or emergent situation, by the same clinician. This last element is of great importance. For a mentally ill patient to share their most intimate and painful thoughts, a critical component of effective therapy, requires trust. That trust can only be earned over time after developing a patient-therapist therapeutic relationship. Most patients will simply not share these thoughts with a clinician who is "passing through." And in the absence of such sharing, there can be no treatment. Finally, at planned intervals, or when there is a major change in the patient's condition, the process must repeat: a new evaluation, a new treatment plan, and execution of the plan.

As the vast majority of requirements of the MH-specific part of the Injunction below rest on one or another aspect of these three essential processes of care, this explanation of harm will serve to describe the harm that is risked when any of those requirements is not met if we haven't articulated a provision-specific explanation of harm.

---

[34] As with every rule there are exceptions. For example, a clinician may need to check the blood level of certain psychotropic medications.

Operations

| Injunction Provision 1.1 | See subprovisions below |
|---|---|

**Provision:**
All care and the documentation supporting that care, delivered to patients during: a MH (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, other external health record, shall be clinically appropriate. Settings include, but are not limited to those described in the subprovisions of these provisions below.

**Importance:**
The suite of subprovisions below flow from the Injunction's requirements set forth in sections 1.1 and 1.3. They describe the backbone of any health care system. In brief, they require that medical care be provided in a manner that is clinically appropriate and safe. Care that is not compliant with these provisions, by definition, places patients at significant risk of serious harm. The intent of 1.1 is to ensure that the care delivered by MH clinicians to individuals with mental illness is clinically appropriate given the acuity and complexity of the patients. It is, arguably among the most important requirements of the Injunction. In the absence of such care patients are at a significant risk of serious harm. At a minimum a clinically appropriate encounter should (a) be conducted at the appropriate frequency, (b) in a confidential therapeutic setting (c) for a sufficient amount of time to adequately assess and/or treat the patient, (d) include sufficient documentation regarding the patient's mental health status and progress in treatment, and (e) should be with their Primary Therapist unless the situation is urgent or emergent and requires an immediate response. The documentation is necessary, not only because it is evidence of the care that was delivered, but also because it is the primary instrument for communication among the myriad health care professionals caring for the patient.

**Discussion:**
A key deficiency we note throughout this and previous reports is ADCRR's mental health staff's ongoing and arbitrary practice of "meeting" with and evaluating acutely mentally ill, suicidal or self-injurious patients in a non-confidential non-therapeutic environment (in violation of Injunction section 16.7). This increases the risk of harm by failing to adequately assess risk or self-harm, which not only places the patient in danger due to a lack of a more fully informed intervention strategy for reducing their risk of self-harm, but also results in prolonged suffering of the patient who tends to be kept in an unnecessarily restrictive (if not subjectively punitive) environment. The concerns about this issue have been raised on dozens of occasions since the implementation of the Injunction and the Monitors have been clear about the potential dangers of this practice repeatedly in meetings with ADCRR, but the practice persists, as does the risk. We have also repeatedly provided feedback and coaching to ADCRR's staff that conducts self-audits about the need to examine not only whether a clinician "met" with a patient, but to examine the actual clinical content of the encounter (informed, in part by the venue of the encounter – cell-front vs. confidential therapeutic setting). Unfortunately, ADCRR staff continues to not take this feedback into consideration. This explains the large difference between ADCRR's self-

assessed compliance with the Injunction and actual compliance that we describe in most of the individual requirements below.

| Injunction Subprovision 1.1a | Non-compliant |
|---|---|

**Subprovision setting:**
Emergent care

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assessed its level of performance on this provision at 80%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using only the relevant portion of the same dataset, the performance level we calculated was approximately 28%. One reason for the variance between our calculations is that ADCRR continues to include irrelevant cases in its sample (artificially inflating the percentage performance). These cases are emergency responses for altercations that had no mental health component identified. Mental Health had no role or expected response in these situations.

**Example:**
Patient 137 is a 34-year-old woman diagnosed with schizoaffective disorder-bipolar type, substance use disorder, and history of suicide attempt. On February 7 an emergency response was triggered at the prison due to suicidal statements made by the patient. The involvement by MH staff was clinically inadequate. The minimum requirements for responding to this emergency included (1) meeting with the patient in a confidential environment, (2) conducting a comprehensive Suicide Risk Assessment (SRA), and (3) recommending clinically appropriate follow-up in response to the assessment/evaluation of the patient's needs. Instead, (1) the responding therapist conducted their assessment (SRA) at cell-front, (2) the SRA lasted five minutes, a wholly insufficient period of time to conduct the complex assessment that was required, and (3) at the end of the SRA, the therapist determined the patient was at Low Suicide Risk. While one might anticipate that the assessment for a patient who is at low risk of suicide would not take as long as one who is at high risk, the risk is not known by the clinician unless the assessment adequately addresses all areas.

In addition to the shortcomings in ADCRR's management of the patient's emergency, the subsequent care was also inappropriate. The patient remained on MH Watch for five days before being discharged February 12 following another short encounter in a non-confidential non-therapeutic setting (10-minute cell-front interaction). If the patient were truly at Low Suicide Risk, as determined by the first therapist, five days in a restrictive environment was unnecessary. Conversely, if he was at high enough risk to require five days in MH Watch, then the original assessment was in error. In either case, six weeks later, the patient was placed back on Continuous MH Watch for self-harm resulting in her being pepper-sprayed and requiring injections of antipsychotic medications to stabilize her.

168

| Injunction Subprovision 1.1b | Non-compliant |
|---|---|

**Subprovision setting:**
Urgent care

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR has never collected the data required, thus we continue to be unable to establish compliance.

| Injunction Subprovision 1.1c | Non-compliant |
|---|---|

**Subprovision setting:**
Non-urgent

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
A delay in response to an HNR submitted by Patient 138 resulted in a significant use of force in which this patient was injured to the point of being sent out to the hospital emergently due to a suspected facial fracture. This patient had been admitted to the Behavior Management Unit on February 7 following increasing awareness of his highly volatile state. There had been episodes of head banging while on watch (January 31, February 1) as well as resisting directives from officers. On February 11 he refused directives, was tazed by officers, and transported to the medical unit in a restraint chair. On February 14 the BMU Treatment Team recognized how challenging he could be as they noted he had assaulted an officer on February 12. On February 20 a Mental Health HNR was received stating "I'm feeling stupid angry its my moms b-day tomorrow and I have no way to call her I feel like if I'm not able to call her IMA blow up please get a damn phone in i 20 thank you hope you'll be ready for tomorrow." Despite his known history for violence and poor behavioral control, this was triaged by a psychologist who was not his Primary Therapist, for the patient to be seen by a psychology associate in 5 business days. The following day the patient sent another HNR, this time with a request to see a psychiatric practitioner as he had stopped taking his medications. Records indicate he had been refusing his medication for at least the previous 5 days, without escalation of the refusal by the medication nurse to a higher clinical authority (in violation of Injunction section 10.3.1) and without any response from the psychiatric practitioner (in violation of Injunction section 1.1). The tone of this HNR was notably different (not as threatening) as the HNR from just the day before, indicating mood instability. This HNR was also triaged for the patient to be seen by a psychiatric practitioner in the routine 5 business days. On February 22 the patient was brought to medical following a use of force that resulted in two black eyes and the concern about a facial fracture mentioned above. If there had been a timelier response to his HNR, knowing his history, this might have been prevented. It is understandable that clinical staff may be cautious about reinforcing problematic and threatening behavior by being overly responsive. However, there are appropriate ways by which clinical staff could have assessed his risk for the threat he posed and let him know that his request was received and minimize perceived reinforcement for his demandingness.

| Injunction Subprovision 1.1d | Non-compliant |
|---|---|

**Subprovision setting:**
Care provided by psychology associates or psychologists in an outpatient setting (MH-3)

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
Patient 139 was diagnosed with PTSD, dysthymia, anxiety disorder, adjustment disorder, and antisocial personality disorder. Despite seeing many different therapists (i.e., not a single one his assigned Primary Therapist) across his appointments, he did share with one therapist the extreme conditions that lead to his PTSD and the severe symptoms he is experiencing as a result: He grew up in a war-torn country. He witnessed all his family members killed and then he was kidnapped and forced to work as a boy soldier from the age of 12 to 20. He asked for help to address his symptoms of PTSD, which included very frequent intrusive thoughts, social avoidance, and other symptoms. While this patient has had a Primary Therapist assigned to him periodically, he rarely met with his assigned therapist and currently does not have anyone assigned to provide him care. The torture this person experienced will continue to cause serious psychological harm including impairing his functioning – and contribute to criminogenic behaviors – without the treatment he needs but is not getting.

| Injunction Subprovision 1.1e | Non-compliant |
|---|---|

**Subprovision setting:**
Care provided by psychiatric practitioners in an outpatient setting (MH-3)

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assessed its performance level at 100%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 94%.

**Example:**
Patient 140 is a 51-year-old female with a history of bipolar disorder, anxiety disorder, and hypothyroidism, on two medications – an antidepressant (duloxetine) and an antiseizure medication (topiramate) – to treat the bipolar disorder. Upon review by the psychiatrist on ADCRR's self-assessment team, the psychiatrist provided the following observation and internal feedback: "Confirm diagnosis. If truly bipolar, taper and discontinue [duloxetine] and start a mood stabilizer. [Topiramate] is no more effective than a placebo for treating any psychiatric illness." The psychiatrist's feedback stems from the fact that if a patient has bipolar disorder (periods of depression and periods of mania) and is only treated with an antidepressant, periods of mania may be more likely to occur or be worse. A mood stabilizer is a medication that should be provided so that this does not happen. There is little good scientific evidence that topiramate works as a mood stabilizer (and it is not approved by the FDA for this purpose). Thus failing to provide the patient with a medication proven to be effective as a mood stabilizer placed her at significant risk of increased or worsened episodes of mania. Mania is a serious condition, and depending on how a patient behaves during these episodes, can be life-threaten, because patient behavior can be fearless and reckless. As of mid-June, the patient remains on topiramate.

| Injunction Subprovision 1.1g | Non-compliant |
|---|---|

**Subprovision setting:**
Care provided by a psychology associate or psychologist in a MH Residential Unit (MH-4)

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
Patient 141 is a 24-year-old male diagnosed with schizoaffective disorder-bipolar type and schizophrenia, on multiple psychotropic medications given involuntarily, who has been on MH Watch several times in the past 2 years. With regard to the second of the three essential processes of MH care – developing a treatment plan – this patient's care lacked any clinical thoughtfulness or depth. Despite the fact that his treatment plans were authored by 3 different therapists (two of whom were not his PT), all of this patient's treatment plans are identical, word for word (see table below).

| Date (Therapist) | Target Goal | Treatment Objective | Intervention | Progress |
|---|---|---|---|---|
| 7/3/24 (Therapist not PT) | Mental health stabilization | • Medication Compliance • Attend BHT group on a weekly basis | • Every three weeks for individual therapy with Primary PA or designee • Weekly therapy groups with primary PA or designee • Weekly education groups with BHTs • At least monthly visits with psych provider | Patient has extremely limited engagement with MH services, though will usually engage briefly for cell front encounters. While he continues to be grossly psychotic, he is stable and at baseline. Medication changes should be considered given chronic symptomology with current symptoms. |
| 8/28/24 (Therapist not PT) | Mental health stabilization | • Medication Compliance • Attend BHT group on a weekly basis | • Every three weeks for individual therapy with Primary PA or designee • Weekly therapy groups with primary PA or designee • Weekly education groups with BHTs • At least monthly visits with psych provider | Patient has extremely limited engagement with MH services, though will usually engage briefly for cell front encounters. While he continues to be grossly psychotic, he is stable and at baseline. Medication changes should be considered given chronic symptomology with current symptoms. |
| 11/26/24 (PT) | Mental health stabilization | • Medication Compliance • Attend BHT group on a weekly basis | • Every three weeks for individual therapy with Primary PA or designee • Weekly therapy groups with primary PA or designee • Weekly education groups with BHTs • At least monthly visits with psych provider | Patient has extremely limited engagement with MH services, though will usually engage briefly for cell front encounters. While he continues to be grossly psychotic, he is stable and at baseline. Medication changes should be considered given chronic symptomology with current symptoms. |
| 2/17/25 (PT) | Mental health stabilization | • Medication Compliance • Attend BHT group on a weekly basis | • Every three weeks for individual therapy with Primary PA or designee • Weekly therapy groups with primary PA or designee • Weekly education groups with BHTs • At least monthly visits with psych provider | Patient has extremely limited engagement with MH services, though will usually engage briefly for cell front encounters. While he continues to be grossly psychotic, he is stable and at baseline. Medication changes should be considered given chronic symptomology with current symptoms. |

Further, beyond the fact that they were cut and pasted from plan to plan, they describe non-specific problem areas, vague goals, and no description of mental health issues that have resulted in the patient being treated with involuntary antipsychotic medications. The patient's care lacked the third essential process of MH care: executing the treatment plan through meaningful encounters in a confidential therapeutic setting. Encounters with the patient were all at cell-front for no more than a few minutes. Not a single encounter with the patient's Primary Therapist occurred in a confidential environment over the three-month period from December 2024 through February 2025:

- December 09, 2024: 6-minute cell-front
- December 23, 2024: 6-minute cell-front
- January 9: 8-minute cell-front
- January 22: 7-minute cell-front
- February 03: 3-minute cell-front
- February 17: 6-minute cell-front

| Injunction Subprovision 1.1h | Non-compliant |
|---|---|

**Subprovision setting:**
Care provided by a psychiatric practitioner in a MH Residential Unit (MH-4). This includes the requirements in 16.4.5 that the encounters are as often as clinically indicated, but no less often than every 14 days.

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

In many of the encounters we reviewed, the psychiatric practitioner failed to obtain enough or any meaningful information about the patient's condition during visits with patients in MH Residential Care units, resulting in a clinically inappropriate encounter. In many of these instances, this likely resulted from the encounter having taken place at cell-front and/or having been of very short duration.

As also discussed in section 16.7 below, the ongoing and arbitrary practice of attempting to conduct a critically important clinical encounter at cell-front is inappropriate. It is inappropriate because the setting is non-confidential and non-therapeutic.[35] As a result, patients are both less likely to share key information and less likely to hear (literally, because of the noise) and assimilate the therapy provided. This places patients at a risk of harm because it is more difficult to adequately assess current suicidal risk and provide treatment to reduce the risk. Also, to the extent that the impaired communication that results from cell-front encounters delays care, the patient is subject to prolonged suffering because of the resultant delay in releasing them from the restrictive of MH Watch.

ADCRR self-assessed its performance on this provision at 93%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 50%. The main source of variance between our findings and ADCRR's self-assessment is due to ADCRR's limited focus on a very narrow component of the Court's requirement: that encounters occur no less often than every 14 days. While necessary, 14-day visit frequency is not sufficient to ensure safe care. We have provided coaching feedback to ADCRR on dozens of occasions since implementation of the Injunction, in an attempt to help ADCRR understand the Injunction's requirement both so that they could self-assess their performance and, more importantly, so that they could be

---

[35] While during many cell-front encounters the patient comes to the cell door and the clinician and patient, standing 1 or 2 feet from each other, talk across the bars or cuff-port opening, patients sometimes remain in their beds, making a poor clinical venue even worse because the patient and clinician are several feet away from each other and because they must talk loudly or yell to be heard. Even when the patient comes to the cell door, therapeutic communication can be further hampered if the door is a solid door with a cuff-port opening (as opposed to bars) because the cuff port is typically at waist height. Both parties are forced to stoop to the level of the opening to adequately hear each other without yelling. But even then, custody staff often admonish the mental health professional from doing so for safety reasons.

successful, to no avail. The practice of short, incomplete, often cell-front encounters, persists, as does the risk to patient safety.

**<u>Example:</u>**

Patient 142 is a 23-year-old female diagnosed with obsessive-compulsive disorder, generalized anxiety disorder, bipolar disorder, borderline personality disorder, PTSD, with a history of suicidality, living in a MH Residential Unit (MH-4). During the month of February 2025, this patient had 13 incidents of self-harm and was on MH Watch the entire month. Neither of the two therapists who saw her did so in a confidential environment. Psychiatric encounters were brief (2-10 minutes), and all occurred as cell-front interactions for the sole reason that the "patient is on watch." Being on watch is not a reason for conducting therapy sessions or clinical assessments at cell-front, and the practitioners did not document any safety or security concerns that would warrant restricting mental health or psychiatry interventions to occur exclusively at cell-front. As of the time of writing of this report, the patient had behaviors resulting in an additional 44 emergency responses. Over that time period, she had over a dozen encounters with a psychiatric practitioner, only one of which was completed in a confidential environment. The others were all cell-front interactions and the only reason ever stated for failing to meet with the patient in a confidential environment was that "the patient was on [suicide] watch." Being on MH Watch due to suicidality is not an excuse for failing to meet with the patient in a confidential environment. If anything, the opposite is true: the need for a confidential environment is magnified.

| Injunction Subprovision 1.1i | Non-compliant |
|---|---|

**Subprovision setting:**
Care provided by a psychology associate or psychologist in MH Inpatient Unit (MH-5)

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
Patient 143 is a 43-year-old living in a MH Inpatient Unit. The patient has an extensive history of psychotic, mood, and anxiety symptoms with accompanying behavioral disruption that have prevented him from living in a less restrictive setting for nearly three years. In particular, the patient frequently experiences suicidal ideation and almost continually engages in serious acts of self-harm that have not been well managed. In just the past year, the patient has had well over 100 ICS responses for self-harm incidents (cutting, reopening wounds, etc.), 16 of which were in the monitored month of February alone.

Despite this striking recent history, there is no mention of this in the patient's Annual Mental Health Evaluation, which is based almost entirely on the patient's self-report with only an occasional observation included by the mental health provider (who was not the patient's Primary Therapist) and the evaluation is woefully inadequate as a foundational source of clinical information for anyone responsible for providing care to the patient. It lacks specificity in several areas including goals for the patient, treatment interventions, and even criteria for discharge. The PA wrote that the patient's "Anticipated Length of Stay" was "5-7 days," indicating that the evaluation was not done by the patient's assigned inpatient Primary Therapist but rather by the Psychology Associate assigned to the Mental Health Watch area.

A MH evaluation is intended to be a useful and clinically meaningful summary of the patient's mental health issues. It should synthesize the patient's relevant developmental, psychosocial, medical, and psychological history with recent and current clinical presentations to allow current and future treatment providers to understand and treat the patient's illness. It should lay out the complex mental health and behavioral issues that have resulted in an individual like this one remaining in an inpatient mental health unit for over a year.

Instead, this patient's evaluation consists of little more than self-reported statements from the patient with virtually no elaboration, exploration, context, or assessment of the validity of the patient's report by the psychology associate. It lacks a clinical conceptualization of the patient's mental health issues or plan for curtailing his nearly constant self-harm incidents that have continued unabated for over a year.

The patient's poorly managed self-harm behaviors place him at significant risk of permanent injury or death (whether by accident or intent). Poor management has caused actual harm by preventing him from

living anywhere but the most restrictive of environments within the prison system. The patient was placed on MH Watch for over three months from March 12 to June 25. Over that time period, his condition has triggered 20 ICS responses called for self-harm behaviors, some of which were fairly severe (e.g., on March 11 he cut his right forearm with possible arterial involvement) and included three days in of restraint placement for self-harm.

Without a clinically meaningful conceptualization of the patient's mental illness, the patient will continue to experience emotional and behavioral instability in an endless cycle of ICS responses and MH Watch placements, and will limit opportunities for engaging in the full range of programming, employment, education, recreation, and socialization that would help him function more independently and prepare him for transitioning to the community.

| Injunction Subprovision 1.1j | Non-compliant |
|---|---|

**Subprovision setting:**
Care provided by a psychiatric practitioner in a MH Inpatient Unit (MH-5). This includes the requirement in 16.5.4 that a psychiatric practitioner shall conduct a clinical encounter as often as clinically indicated, but no less than once per week.

**Importance:**
See narrative in the umbrella of this provision above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

In close to two thirds of the cases we reviewed, the psychiatric practitioner failed to provide minimally necessary care by failing to fulfill one or more of the four requirements articulated in the narrative in the umbrella of this provision above. With regard to the first requirement (that care be provided at the appropriate frequency), in more than half the cases, the time between psychiatric encounters was greater than the minimum requirement of one week. While many were out of range by just a day (which, in the presence of otherwise safe care, we might advise the Court was substantially compliant with the Injunction's intent), several patients experienced gaps of 9, 10, or 11 days between visits (e.g., Patient 143, Patient 144, and Patient 145, respectively). One patient had a gap of 18 days between visits. Psychiatric practitioners frequently failed to adequately (or even minimally) document the reasons they did not see patients within the prescribed timeframe. They also often failed to document why the patient was not seen in a confidential therapeutic setting, or when they did, there were instances in which their only reason was "on [suicide] watch." In the absence of safety or security concerns, a patient being on suicide watch is not only not a valid reason for not seeing the patient in a confidential therapeutic setting, it greatly heightens the need for that setting.

ADCRR's self-assesses its level of performance on this provision at 88%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 36%. When self-assessing, despite ongoing feedback and coaching from the Monitors, ADCRR continues to miscomprehend the Injunction's requirements and how to examine compliance. Their audits suffer from two errors. First, ADCRR staff consider psychiatric practitioner compliant with this requirement if one of their visits was within a week of the previous visit, even if other visits were not. Second - an error which permeates ADCRR's self-assessment of many other requirements of the Injunction - ADCRR continues to limit their assessment to whether a clinical task was performed, ignoring whether the task was performed in a clinically appropriate manner. Thus, even when clinicians perform a clinical task in a manner that exposes patients to a significant risk of serious harm, as long as "the box was checked" (sometimes figuratively, sometimes literally), ADCRR considers the performance of the task was compliant with the Injunction.

**Example:**

180

Patient 137 classified in the most serious clinical level – MH-5 – was on MH Watch repeatedly for suicide risk over the course of several months including February. However, ADCRR conducted only two psychiatric encounters during the month of February. A psychiatric practitioner met with the patient at cell-front for 10 minutes on February 10. She was not seen in a private setting for any reason other than being "On Watch" and she remained on MH Watch. Nowhere in the encounter is there any indication whatsoever that any safety or security concerns existed that would preclude her from meeting with the practitioner in a confidential setting. A different practitioner saw the patient again on February 17 (within the required one-week timeframe). However, she was not seen again until March 6, 16 days later, well beyond the required one-week visit and missing 2 weekly visits.

Patients at the MH-5 level are the most seriously ill patients and are the most in need of close monitoring and treatment from the MH clinicians – psychiatric practitioners – with the highest level of training, and the only members of the MH team able to prescribe psychotropic medications. The unreasonable (and unexplained) lapse in psychiatric care for this patient during this period of critical illness placed this patient at significant risk of serious mental health harm by potentially lengthening the period of time she spent in crisis. Such a lapse would be akin to a patient being in a hospital intensive care unit and the attending physician failing to round on the patient for a couple of days. The patient's subsequent instability is demonstrated by the fact that she had to be placed back on continuous (one-on-one) MH Watch for suicidal ideation less than three weeks later.

181

| Injunction Provision 1.3 | Non-compliant |
|---|---|

**Provision:**

All patients with mental illness who require regular follow-up shall be designated on the mental health caseload.

**Importance:**

This provision ensures that individuals with MH needs that require care are identified, i.e., are "on the radar." Absent identification, such individuals do not receive MH care until there is a crisis. Thus crises are potentially avoidable by having patients receive non-crisis MH care. At best, MH crises cause psychological harm and at worst, death.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses it performance level at 100%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 88%.

**Example:**

Patient 147 is diagnosed with anxiety disorder, schizophrenia, bipolar disorder, and PTSD. She was reclassified from MH-3D (on MH caseload, outpatient) to MH-2 (non-active MH condition, not on MH caseload) on November 23, 2023. The rationale for this decision was that she declined services and requested to be taken off the MH caseload. The psychology associate making the change in MH classification did not actually assess the patient, due to the refusal. The patient's previous MH contact had been 5 months before (and 2 months later than the planned 3-month follow-up). It is not surprising that she would not want to engage in MH services at that point; she had no reason to rely on the support of mental health staff because the only time she had met with the same therapist on a regular basis was when she had been in detention. An overview of documentation in her EHR shows a person who is intermittently distressed and struggles with a range of symptoms common for someone with complex PTSD. People with this PTSD often struggle with trusting others. Thus having a stable (non-random) therapist is critically important. She tries medications for a short time, then stops, and then repeats this cycle. Had she had the opportunity to be predictably under the care of a single therapist (Primary Therapist) with whom she could develop a therapeutic alliance, she would have likely engaged in services, which, in turn, would have resulted in some relief from the morbidity of her condition. Once the psychology associate changed her classification to MH-2, that opportunity disappeared. This patient should have remained on the MH caseload (MH-3) in therapy. This situation was finally corrected on May 8 when the patient was returned to the MH caseload as a MH-3B. Unfortunately, she was unnecessarily subjected to a year and a half of potentially avoidable morbidity.

| Injunction Provision 1.22 | Non-compliant |
|---|---|

**Provision:**
Follow-up visits with MH professionals are completed within the timeframe ordered.

**Importance:**
This provision ensures that the third essential process of MH care – executing the Treatment Plan – actually happens.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
On January 20, Patient 148 was found in his housing unit under the influence of a substance, became unresponsive, and was taken to the medical unit for assessment. Following clearance by medical staff, the patient was placed on MH Watch due to concerns about his safety related to an overdose on his unit. He also stated that he was seeking MH housing and wanted to get back on medications to help him to stay off drugs. He later clarified that he was seeking MOUD treatment. He was discharged from MH Watch on January 27 only to be found unresponsive in his cell the following day. He was once again placed on MH Watch due to a significant overdose. On January 31 the patient was discharged for the second time from MH Watch. He should have received a follow-up appointment with a psychology associate 1 to 3 days following discharge (i.e. between February 1 and February 3), 7 to 10 days following discharge (i.e., between February 7 and February 10), and 21 to 24 days following discharge (i.e., between February 21 and February 24). The first follow-up appointment with MH staff following his discharge occurred on February 24, achieving only the final of the three target days for follow-up. For a patient who had been on MH Watch twice in a short period of time to have been forgotten and not received any follow-up care caused a very high risk for harm and possible death given the significance of his drug use. As evidence of the reality of that risk, the patient overdosed again on May 17 and 25.

| Injunction Provision 1.21a | Unable to determine compliance |
|---|---|

**Provision:**

All refusals of patient-initiated visits shall be made directly to a health care professional by telephone, video, or face-to-face. If a patient will not voluntarily displace health care staff go to the patient's location.

**Importance:**

This provision of the Injunction assures that encounters with a MH professional that were requested by a patient and appear to have been cancelled by the patient, were, in fact cancelled by the patient. In a prison setting, the correctional system, including correctional staff, are usually the "middle man" between a patient and their access to health care staff. An unintentional dysfunction of the correctional system or staff, or, rarely an intentional obstruction by staff, can result in health care staff being under the impression that a patient "didn't want to come" for a MH appointment when, in fact, the patient still wanted and needed the appointment. When that happens, depending on the nature of the patient's need, the lack of an appointment can put the patient at significant risk or serious harm. By requiring the patient's request to cancel their appointment to be communicated directly to a health care staff member, that risk is eliminated.

**Discussion:**

ADCRR self-assesses its level of performance on this provision at 80%. ADCRR uses a flawed dataset to assess performance. With rare exception, it identifies cases patient refusals of professional-initiated visits, not patient cancelations of appointments patients requested themselves ("patient-initiated"). ADCRR is aware of this flaw and has asked their vendor to correct it.

At this point, due to the lack of data, we are unable to determine if ADCRR is compliant with this provision.

| Injunction Provision 1.21b | Non-compliant |
|---|---|

**Provision:**
All refusals of a MH professional-initiated health visits are made by telephone, video, or face-to-face with an RN or practitioner for medical visits or a masters level therapist, psychologist, or psychiatric practitioner (psychiatrist, psychiatric nurse practitioner, psychiatric physician assistant) for mental health visits, within three days after the appointment. If a patient will not voluntarily displace health care staff go to the patient's location.

**Importance:**
This provision is closely related to, but different from the one above. Underlying the provision above is the presumption that if a patient (presumed to have decision-making capacity) requests a visit, and then changes their mind (a "cancellation"), that the visit is presumed to be not medically necessary. However, when the visit is requested by health care staff, the presumption is that the visit is medically necessary. If the patient does not want to attend that visit (a "refusal"), the refusal should undergo the same practice as any other refusal of health care: an informed refusal needs to be executed. This provision ensures that (a) like for a cancellation, the patient actually expressed a desire not to have the visit (i.e., there was not a breakdown in communication through the custody system) and (b), unlike for a cancellation, there was an informed refusal. Depending on the nature of the reason for the visit, failure of either of these elements puts the patient at significant risk of serious harm.

The Court's inclusion of the phrase "if a patient will not voluntarily displace, health care staff go to the patient's location" highlights the expectation that when an appointment is scheduled and the patient does not want to participate, they are expected to go to the MH clinic and participate in an informed refusal. If they do not go to the clinic, a masters level therapist, psychologist, or psychiatric practitioner (and in exceptional cases, a BHT) would go to their location and conduct the informed refusal there.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 88%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 60%.

One of the main deficiencies leading to ADCRR's non-compliance relates to the use of BHTs to conduct informed refusals. Temporarily, for a limited time after implementation of the Injunction, a BHT is allowed to conduct the informed refusal, but this flexibility was to be used exclusively at facilities without on-site mental health providers and, to help ensure patient safety, only when operating under the direct orders of a higher level MH professional. In February, nearly a third of refusals were conducted by BHTs at facilities that did not meet the above requirements.

The data from ADCRR indicate that the patients are not going to the clinic to refuse, but rather are being "offered" an appointment, which implies that it is unscheduled or opportunistic rather than planned.

**Example:**

Patient 149 is a 54-year-old male with major depressive disorder and anxiety disorder, being cared for by MH staff. The patient was transferred to ASPC-Lewis from ASPC-Eyman on February 11. He was scheduled to have his first visit with a therapist on February 18, consistent with section 16.4.4.1 requiring a visit with the patient's new PT within a week when transferred to a new location. This is an important visit as it establishes the patient's enrollment in the MH program of his new prison and sets the foundation of the patient-therapist relationship with his new PT and treatment plan. Unfortunately the visit was scheduled with someone other than his assigned PT (in violation of Injunction section 15.1). That point became moot, though, because according to a form scanned into the EHR (labeled as "Refusal to Submit to Treatment), he "refused to be seen." The form was signed by the patient and a BHT. In their progress note for the refused encounter, the psychology associate documented that she was completely aware that a BHT was taking the refusal. This patient had been in Max Custody at ASPC-Eyman for 13 months before the transfer. This would have been his first meeting with his new Primary Therapist after the move and the risk of harm of not conducting the meeting flows not only from the potential psychologic disruption that occurs for MH patient when transitioning from one facility to another, but also from the patient's continued placement in the most restrictive environment which increases the risks of ongoing psychologic deterioration due to isolation.

On February 25, one week after his February 18 refusal, the patient again refused a telehealth mental health encounter because it was "too early." This refusal was taken by an RN, not the PA; as with BHTs, RN may not conduct refusal conversations about MH visits. Additionally, though moot because the visit didn't happen, the visit had been scheduled, again, with someone other than his assigned PT (in violation of Injunction section 15.1).

The next scheduled MH encounter was for over a month later on March 31 and once again, he refused to attend the appointment. The refusal was taken by a BHT. The appointment was for his Annual Mental Health Assessment, which was not completed (even with collateral information) (in violation of Injunction section 16.3.1.3).

The cycle of refused appointments with someone other than the assigned PT, executed by unqualified staff, repeated a fourth time on May 31 and a fifth time on July 1, which was for his Annual MH Evaluation.

In summary, from June, 2024 to June, the patient did not have a single MH therapy encounter, including annual evaluations and treatment planning, and all unsuccessful attempts to have those visits ("refusals") were managed by staff who did not have the qualifications nor are permitted to, engage the patient in actual refusal. As evidence of the need to use only qualified staff to conduct refusal conversations, the first time a qualified therapist attempted to meet with the patient (on July 1), the patient was willing to engage.

186

| Injunction Provision 5.1 | Non-compliant |
|---|---|

**Provision:**

For patients on the MH caseload with identified treatment providers in the community, if the patient consents, health care staff shall send each provider relevant health care information prior to the patient's release. This includes, at a minimum, a problem list, list of active medications, current symptoms, functional impairments, a summary of relevant care provided during incarceration, any necessary care or follow-up care, one or more points of contact if a community provider requires further information, name and contact information of the primary therapist, an aftercare plan that reflects progress in treatment, and a current treatment plan. The patient's health record shall contain documentation of the above information that was provided, when, and to whom.

**Importance:**

This requirement is important because it assures seamless continuity of care when the patient re-enters the community. Science has shown that any transition of care, e.g., patient discharged from a community hospital to home, is a time of risk of serious harm to the patient because crucial information about the patient can fall through the cracks due to poor communication between the previous and future care provider. The transition between prison and the community is equally, if not more, risky. The Injunction requires ADCRR to share basic information with the health care provider who will be taking care of releasing patients to reduce that risk.

**Discussion:**

ADCRR continues to do this very poorly.

When ADCRR does provide information to the community provider, the packets themselves that it sends are overwhelmingly lacking in critical areas. In the vast majority of cases, the packets suffer from the following deficiencies: (1) the Problem List consists of inactive, duplicative, and/or mutually exclusive diagnoses; (2) the medication list is simply a combined collection of the active and inactive medications that the patient has been prescribed (sometimes comprising over 50 pages); (3) there is no cohesive description of the patient's illness, symptom presentation, functional impairment, or decompensation patterns; (4) there is no summary of the relevant care provided to the patient nor (5) an aftercare plan.

ADCRR's self-assesses its level of performance on this provision at 88%. It was difficult for us to calculate a performance level using the same dataset because of the second error below, but our rough estimate is that it would be less than 20%.

ADCRR makes two errors in assessing its performance. **First**, it erroneously concludes that the Continuity of Care Release Packets contain the essential elements based solely on the fact that checked boxes in the patient's EHR indicating that those elements were shared with the community provider in the release packer, or, if the this information is available at all, it is only incidentally documented in the packet in no cohesive, meaningful way, which leaves the recipient (e.g., community mental health providers) to reconstruct (or construct from scratch) their understanding of the patient by extracting

whatever bits and pieces of information happen to be included. **Second**, the population of patients released in the monitored month that ADCRR gathers, from which it draws its sample, is markedly skewed in the direction of finding compliance. As with the corresponding provision for medical patients, ADCRR only gathers cases in which a release packet was prepared (and then examines the completeness of the release packet), ignoring cases in which no release packet was even prepared.

**Example:**
Patient 150 was in a MH Residential Unit (MH-4) when she released from ADCRR on February 28. The Release Planning Continuity of Care Packet lacked the following required components: (1) a problem list; (2) a description of the patient's symptoms and functional impairments; (3) a summary of relevant MH treatment; and (4) an aftercare plan. The packet included a boiler plate treatment plan by a "secondary therapist due to primary therapist not available" (in violation of Injunction section 15.1). Neither the treatment plan nor any of the notes in the packet shed any meaningful light on the patient's mental health history, course of treatment, decompensation patterns, or risks. The psychiatric practitioner offered a rationale for the patient's diagnosis of schizophrenia that lacked any mention of symptoms or impairment: "Schizophrenia based on county transfer records and on Aristada which is FDA approved for Schizophrenia." In the weeks preceding her release, the patient was living in a residential MH treatment unit, and was prescribed an injectable antipsychotic medication. She had spent nearly a week on MH Watch due to suicidal ideation and was discharged back to her living unit only two weeks before her release. None of this information was included in the Continuity of Care Packet, which placed community mental health providers at a marked disadvantage in providing adequate safe care for the patient, significantly increasing the risk of mental decompensation (and recidivism). This potential risk manifest as a reality; the patient returned to prison only three weeks after her release on a parole violation. Upon her return she needed to be placed on continuous (one-on-one) MH Watch for "suicidal ideation and unstable behavior." At the time of this writing, she was still in prison with a release date of June 13.

| Injunction Provision 16.1 | Non-compliant |
|---|---|

**Provision:**
A psychology associate or psychologist conducts a mental health assessment of each patient within one business day of that patient first entering the ADCRR system. The intake mental health assessment shall identify and document sufficient relevant information regarding the presence and severity of mental health symptoms; current impact on functioning; past hospitalization/treatment including response to treatment; medications; suicide risk; behavioral observations of staff; and a preliminary designation of level of care.

**Importance:**
Patients with mental illness are particularly at risk for deterioration of their condition, including self-harm, in the first week after admission to prison. Thus there is a need for rapid and thorough MH assessment soon after arrival, as required here by the Injunction.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

While ADCRR staff are fairly timely in meeting with patients soon after arrival, far too often (approximately one third of the time), that assessment is clinically inadequate, leaving patients at significant risk of harm due to delayed diagnosis and treatment of serious mental illness.

**Example:**
Related to the timeliness of assessments, Patient 68 arrived at ADCRR on Friday, February 21, and should have been screened by Monday, February 24. Instead, he was not screened until Wednesday, February 26, five days later, and two days late. Before the screening - on Sunday, February 23 – the patient submitted the HNR below.

The HNR was not even triaged until February 27 (in violation of Injunction requirement 15.1 that it be triaged withing 24 hours), nearly a week after the patient's arrival and a full day after the patient was ultimately screened by mental health. The psychology associate documented the patient's request to restart his antipsychotic medication (which had been interrupted six weeks earlier when the patient was incarcerated in a jail), the patient's report of "mental health treatment for the past 25 years in prison," confirmed multiple diagnoses (major depressive disorder - recurrent, stimulant dependence with stimulant-induced psychotic disorder, anxiety disorder, alcohol dependence with withdrawal, opioid abuse, and psychoactive substance use with withdrawal), and noted the patient was currently having auditory hallucinations, a symptom of active psychosis. Despite this, instead of arranging for the patient to be referred rapidly to a psychiatric practitioner to restart his medication, which was clinically indicated, she requested the referral as "Routine" (within 60 days). On March 4, (11 days after his arrival, 9 days after submitting the HNR, and 6 days after his MH screening), the patient was seen by a psychiatric practitioner who documented: a history of psychosis as well as mood and anxiety disorder with present symptoms of derogatory auditory hallucinations; persistent low mood; possible paranoia; and that "the patient has made multiple attempts to request medication reinstatement since returning to incarceration on February 20. He describes an urgent need to restart Zyprexa, as he finds it effective and tolerable without causing restlessness." She immediately restarted his antipsychotic medication to prevent further decompensation given the "chronicity of his illness and his history of requiring antipsychotic treatment."

There was no explanation documented for either the delay in screening this patient for mental health issues at intake nor the delay in triaging and responding to requests to restart antipsychotic medications due to the worsening of his symptoms. Both failures caused the patient harm in delaying treatment of his psychosis.

Related to the adequacy of assessments, Patient 151 arrived at ADCRR on February 27. He did have an initial MH assessment on that day, i.e., it met the timeliness requirement, however, the content was wholly inadequate. The assessment failed to mention three incarcerations from 2013-2022 at which time he was diagnosed with other conditions missing from the assessment (depressive disorder, anxiety disorder, unspecified mood disorder, and hallucinations). He had also received treatment with other medications missing from the assessment (olanzapine (Zyprexa®), paroxetine (Paxil®), buspirone (Buspar®). Most importantly, though identifying that the patient had a significant history of substance use disorder (he had participated in inpatient drug treatment program; he responded "yes" to the question: "Have you ever experienced significant alcohol or drug withdrawal, including any history of withdrawal seizures?"; he had used fentanyl less the 2 months prior), the therapist failed to refer the patient for opioid or alcohol use disorder evaluation and treatment. These failures placed the patient at significant risk of having aspects of his mental health missed while incarcerated, having subsequent clinicians inappropriately treat the patient with medications that were used in the past and may have either not worked or caused side effects, and suffering complications of untreated opioid or alcohol use disorder.

That this latter risk was not theoretical, on March 15 he was found unconscious from an opioid overdose.

190

| Injunction Provision 15.8 | Non-compliant |
|---|---|

**Provision:**

For patients admitted to ADCRR on a psychotropic which is not on ADCRR's formulary, the medication shall be continued if, based on the patient's history, there is significant risk of worsening of the condition if a different medication is prescribed. If no such risk exists, the medication shall be continued long enough to allow a safe transition to a different medication or medications.

**Importance:**

This provision addresses the need to keep patients entering ADCRR on MH medications that have worked in the community, on those same medications, even if that medication is not on the list of medications ADCRR prefers to use ("Formulary"). Switching a patient from that medication to another medication without a clinical reason, creates a significant risk that the patient will decompensate psychologically. The consequence of decompensation depends on the underlying condition that was being treated, which can range from mild morbidity to death, e.g., from suicide.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its performance level on this provision at 96%. It is difficult to calculate a level of performance on this provision because we do not know what medications are on ADCRR's formulary. It would be, at best 96%, but may be lower. We requested a copy of ADCRR's formulary a year ago and have repeated the request at least once.

**Example:**

Patient 152 is a 46-year-old female with generalized anxiety disorder and mood disorder. She arrived in ADCRR on February 18. Her transfer summary included an active prescription for an antidepressant, venlafaxine. ADCRR physicians did not order for it to be continued upon admission. She was seen by a psychiatric practitioner on February 21 at which time the practitioner verified that she had been on venlafaxine while in county jail. However, the practitioner did not order it continued nor provide a clinical explanation for doing so. Instead, the patient was started on two other MH medications. Two weeks later, on March 4 the patient submitted an HNR complaining about worsening depressive symptoms and negative effects of her newly prescribed medication ("…making me feel very sad, upset, and something I don't want to be feeling like"). By not continuing her antidepressant upon admission, the patient experienced an unnecessary disruption in her care that led to a worsening of symptoms and a delay in getting her appropriately treated.

Non-Urgent Care

| Injunction Provision 15.3 | Non-compliant |
|---|---|

**Provision:**

Patients on the mental health caseload who believe they need mental health care shall submit HNRs. The primary therapist or, if necessary, another psychology associate shall triage HNRs within 24 hours of receipt. "Triage" in this context means determining whether the request requires immediate attention and resolution or whether the request can safely be deferred until the primary therapist can address it. Documenting the word "Triaged" is adequate evidence of triage. Primary therapists shall address the HNR within three business days of its submission. "Address" means evaluating the request, determining the clinical need, and if an action is required (e.g., face-to-face visit), planning that action to occur in a clinically appropriate timeframe. When the primary therapist is absent, another psychology associate or a psychologist completes these tasks in their stead within the same time.

**Importance:**

This provision, and the one below (15.4) are designed to ensure that patients on the mental health caseload (MH-3 and above) can communicate episodic concerns directly with their Primary Therapist so that unexpected or incidental issues that arise in between scheduled appointments can be attended to quickly. In the absence of such a system that ensures timely access to MH care, patients are at significant risk of serious harm because problems may go unaddressed until they become crises, such as a suicide attempt.

The process required by this provision also ensures that therapists are not seeing patients inappropriately, because based on the patient's treatment plan, access to their PT for minor issues outside of the scheduled interval would be counter-therapeutic. The greatest risks for harm with the current HNR triage and response process arise because the individuals making the decision to schedule a patient for an appointment are not the patient's PT, and because they are not, they are unfamiliar with that patient's baseline mental health needs, patterns of decompensation, or existing treatment expectations. Patients in this population frequently have low frustration tolerance, limited delay of gratification, and problems with maintaining appropriate boundaries. Scheduling appointments without this knowledge results in reinforcing maladaptive coping strategies in a population that already struggles with difficulty managing frustration, delaying gratification, and maintaining appropriate boundaries.

Failure to avoid these inappropriate visits (or those visits that are just unnecessary) puts other patients at risk because it ties up clinic slots, decreasing access to care.

Moreover, scheduling non-urgent and non-emergent issues with someone other than the Primary Therapist undermines the model of care that ADCRR is attempting to implement. It disrupts the continuity of care, interferes with rapport building, and can have an overall chilling effect on a patient's willingness to engage with mental health (now and in the future) if they have to repeat and reprocess their issues from scratch with each new clinician they see in mental health.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

In all but a few cases reviewed from February, the HNR was triaged by (and the patient usually seen by) someone other than the PT. Overall, the current practice does not fulfill the description of a good system described above, is wildly inefficient and appears to have been effective in maintaining ADCRR in an endless cycle of waiting for/responding to crises rather than relying on an organized system of triage that makes efficient and clinically prudent use of mental health and psychiatric resources by ensuring that the content of patient requests for MH assistance falls within the purview of mental health and contains sufficient information to allow the mental health staff triaging the request to determine the urgency of the request and schedule the patient appropriately.

ADCRR self-assesses its performance at 80%. If a percentage were to be calculated from their data, it would be around 50%. ADCRR does not routinely incorporate the patient's HNR into the patient's EHR (in violation of Injunction sections 1.1, 1.2, state record retention laws, and generally accepted medical practice). In the current sample, only one HNR was retained. Instead, the first clinical reviewer of the HNR transcribes the patient's complaint into a "Mental Health HNR Protocol" form. Additionally, the transcriber does not always transcribe the patient's entire complaint leaving the full text of the HNR to the imagination. This practice fails to convey the patient's concerns in their entirety, which not only limits the ability of the Primary Therapist to know what is going on with their own patient but also makes it difficult to assess the urgency of the request – not just for the Court Monitors – but for the mental health staff responding to the HNR. Because the transcription does not retain the date of submission or receipt, it was impossible for us to determine whether ADCRR met the timeliness requirement of this provision. This is illustrated in the example below which is a rare case in which ADCRR did retain a copy of the patient's HNR, allowing one to view the inadequacy of the Mental Health HNR Protocol transcription.

**Example:**

Patient 211 is a 49-year-old male with no history of mental illness upon entry to ADCRR in March, 2023 except for methamphetamine use up to 4 years before for which he received treatment. Thus he was appropriately classified as MH-2, meaning he had a history of mental illness, but did not need to be placed on the MH caseload nor receive ongoing MH care. Over the course of the next 2 years, he had 2 events with a change in mental status, in which it was thought that he may have ingested a substance. He received medical treatment. In February he submitted his first HNR asking for mental health help. The first screenshot below is the patient's original HNR. It shows that he submitted it on February 10 and it was received the same day. The second screenshot from the Mental Health HNR Protocol form only shows the date of February 13. In the absence of the original HNR it would have been impossible to ascertain the time that transpired between ADCRR's receipt of the HNR and when it was triaged. In this rare case where both documents were retained in the EHR, it is clear that ADCRR failed to triage the request within the required 24 hours (by February 11). Instead it was not triaged until February 13.

The February 13 action above was not a visit. It was a digital review of the patient's request resulting in the patient being scheduled to see a MH professional on February 20.

This example illustrates three errors in care, each a violation of the Injunction. **First**, because the patient was not on the MH caseload (because he did not have a history of mental illness other than distant substance use), his MH request needed to be handled through the medical, not MH, care system (Injunction section 15.5). The reason for this is simple: Most patients without a history of mental illness who present with new onset of mental illness-like symptoms have a medical, not MH illness. Further, those illnesses are often emergencies such as drug effects, blood electrolyte abnormalities, infections (such as meningitis), to name a few. Thus ADCRR's failure to properly direct this HNR put the patient at significant risk of serious harm.

**Second**, given that ADCRR channeled the request through the MH system, the handling of the request was delayed (in violation of the current Injunction provision, 15.3).

194

**Third**, the triage decision – to wait to schedule the patient to be seen 10 days after he reported the symptom – was dangerous (in violation of Injunction section 1.1b) for 2 more reasons: (1) The PA triaging the request had no idea what the nature of the auditory hallucinations were. Many hallucinations are benign. However, if the patient were hearing voices telling him to hurt himself or others, a 10 day delay put the patient or others around him at significant risk of bodily harm. (2) The patient had had 2 previous episodes of behavioral symptoms which were likely due to substance use. In recognition of the fact that past behavior is the best predictor of future behavior, the PA should have considered that this patient might be suffering from a similar episode, for which waiting 10 days could be harmful, depending on the substance.

| Injunction Provision 15.4 | Non-compliant |
|---|---|

**Provision:**
If a patient's PT determines a visit is clinically appropriate following submission of an HNR, the patient shall be seen by the PT or referred to another professional as directed by the PT.

**Importance:**
See 15.3 above

**Discussion:**
ADCRR is not compliant with provision based on lack of referral to the Primary Therapist when appropriate and failure to execute the follow-up care as ordered during the HNR review. See discussion in 15.3 above.

ADCRR self-assesses its performance at 80%. If a percentage were to be calculated from the same data, it would be around 50%.

**Example:**
Patient 153 is a 30-year-old male diagnosed with schizoaffective disorder, antisocial personality disorder, and SUD. On February 17, the patient submitted an HNR expressing concern about being around sex offenders who he believed were "housed secretly in these two programs" and were deliberately placed there by staff to "trigger" him. Despite being in a residential treatment unit, his Primary Therapist did not respond to the HNR "due to the primary therapist not being available at this time." The response to the HNR was to schedule an appointment with his primary therapist. However, no appointment occurred. Two days later, on February 19, the patient submitted another HNR which alleged being drugged, anesthetized, pulled out of his cell at night by undercover agents, and other bizarre statements. Once again, the HNR was triaged and addressed by someone other than his Primary Therapist because "the Primary Therapist was unavailable" and the response called for scheduling an appointment with his Primary Therapist. However, again no such appointment occurred. In fact, the only encounter the patient had with a MH therapist over the next four weeks was on March 14 for a 3-minute cell-front encounter with a psychology associate who was not his Primary Therapist.

On February 25, an ICS was activated when he was found in his cell with a towel around his neck: "ICS activated at 1750hrs for unresponsive inmate. [Patient] was found in his cell with a towel tied around his neck, leaning towards his door. [Patient] assisted to the floor by security and towel taken off from his neck. [Patient] is breathing, conscious, responding to verbal commands, states that there is something in his vent. [Patient] not providing any more details or answering any other questions appropriately, C-collar applied, pt transferred with transfer blanket." In an addendum to the ICS later in the day, an RN noted, "[Patient] states that there was some smoke in his cell that is why he had a towel around his neck. He also states that he works for the FBI and is going to sue everybody and this facility." He was placed on continuous MH Watch and on the following day (February 26) a psychology associate documented a "0-minute" cell-front Suicide Risk Assessment (SRA) encounter in which the patient refused to participate. The resulting Suicide Risk Assessment was missing information on nearly 20 risk factors,

which were identified on the form as "Unable to Assess." Moreover, the SRA did not include a summary of the risk factors that were considered in the determining that the patient was at Low Risk of suicide. His watch level was reduced to 15-minute checks but there was no record of a face-to-face encounter occurring to make this change. The following day (February 27), while on 15-minute checks, another ICS was activated because the patient was threatening to jump off his sink. Staff responded by spraying him with pepper spray after which he was placed back on continuous MH Watch. All of his clinical encounters while on MH Watch were at cell-front and nearly all were by different psychology associates, none of whom were his Primary Therapist.

| Injunction Provision 15.5 | Non-compliant |
|---|---|

**Provision:**
Patients who are not yet on the mental health caseload but request mental health treatment shall submit requests to be seen through the procedures for seeking medical care.

**Importance:**
The rationale for this requirement is simple and basic: For patients without an existing mental health diagnosis, changes in clinical behavior or mental status are very commonly the result of a physical, not mental condition, many of which require urgent if not emergent attention. Front-line MH professionals (psychology associates and psychologists) who are the ones who would assess these patients are not trained in physical medicine and therefore may not recognize that the patient has a medical, not MH problem. The time taken by their attempt to evaluate and treat the patient for what they think is a behavioral problem risks delaying access to the medical care the patient needs, a delay which can be life-threatening.

**Discussion:**
While we found a few cases in which ADCRR adhered to this provision, too often they did not and therefore we found ADCRR not compliant with this provision.

ADCRR's self-assessed performance is 100%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 25%.

**Example:**
See discussion of Patient 211 in section 15.3 above

| Injunction Provision 15.6 | Non-compliant |
|---|---|

**Provision:**

When custody staff, families, or any other concerned party refers a patient for mental health assessment, there is a timely response to the concern by mental health staff.

**Importance:**

This provision ensures that there is an effective system for custody staff, other prison staff (e.g., work supervisors, teachers), family members, other prison residents, or friends to alert mental health staff about an incarcerated individual when they believe that individual patient may be at risk of harm, and that MH staff respond in a timely manner. Individuals beyond the patient and their health care providers are sometimes the first individuals or only individuals to know that a patient is decompensating and at risk for psychologic harm or even death from self-harm. An early alert to MH staff allows staff to intervene before a potential mental health issue becomes urgent, emergent, or critical.

**Discussion:**

ADCRR continues to be non-compliant with this provision. While NaphCare maintains a "Friends and Family Line," ADCRR does not have a designated referral mechanism for reporting by the individuals who are typically the main source of valuable alerts: prison staff who are most familiar with the individual's day-to-day functioning and in a position to recognize changes in behavior. In addition to custody officers, these prison staff include other non-health care staff who interact with the patient, such as work supervisors and educational and programming staff.

ADCRR's method for assessing performance is also flawed. The majority of the cases reviewed for February 2025 relate to a family member inquiring about the status of an incarcerated individual rather than alerting staff to specific (new, developing, or worsening) mental health concerns being brought up. Many of the cases reviewed were not even about MH. We provided feedback to ADCRR regarding the deficiency of the alert program as well as the error in their method of analysis more than once, beginning in April of 2024. There have been no changes in the program.

**Example:**

Patient 154 is a 26-year-old patient with a history of major depressive disorder and PTSD. At 12:22 PM on February 07, his wife called the Third-Party Referral line and reported the following:

> states she has called Lewis concerned that he is [suicidal], she said she asked for a welfare check and the [officer] told her he was fine. [Officer] asked him in front of other inmates. He emailed me today asking me to listen to songs because that is how communicates. He has PTSD, SUD for opiates and meth, he's not receiving the meds he is supposed to. I've already called once to have something done. I'm worried that he will not make it home. I used to be a former employee so I am not able to visit right now. Educated her concerns would be forwarded to MH Team. [Inmate] said he was going to take everything he could to not wake up. [Inmate] states he is going to

have a mental breakdown. He is severely [suicidal] at this time. high priority
email sent to MH Team. MH responded at 1237

Upon receiving the concerns about the patient, ADCRR documented that, the

Lead Psychology Associate immediately notified MH staff to check on the
patient. MH lead coordinated with [custody] to also check on the patient as
the family member reported that the patient was endorsing [suicidal
ideation] and MH distress.

A behavioral health technician and mental health RN, saw the patient at 1:00 PM and documented the
following:

BHT and RN MH staff conducted welfare check on the patient around 1300
hours and explained the reason he is being assessed is because wife called
worried for him.

In the progress note, the patient was quoted as saying that his wife was "exaggerating everything I said
to her" and described the source of his distress as frustration at not being prescribed specific
medications. The RN documented that the patient did not appear to be in any apparent distress, and he
denied urgent medical or mental health concerns. No diagnosis was mentioned or offered. The RN's
plan was for the patient to "notify staff if he needs to see MH" and "MH next appointment with provider
to discuss medication."

This response to an urgent family call was problematic for 3 reasons. **First**, there is no indication that
the encounter occurred in a private, confidential setting. Given the statement by the patient's wife that an
officer had asked him about suicidality/safety in front of other incarcerated individuals, it would be
particularly important to ensure that any assessment occur in a confidential environment. **Second**, the
assessment was conducted by an RN. An RN – even a "mental health" RN is not qualified to conduct a
suicide risk assessment to determine whether or not a patient should be placed on suicide precautions.
**Third**, especially since the patient was assessed by an RN and was not placed on suicide precautions, it
was particularly important that the patient's PT meet with him as soon as possible. Instead, no therapist
met with the patient for almost 2 months after this incident. These 3 deficiencies put the patient at
significant risk of harm from suicide if indeed he were suicidal at the time, something which was not
assessed competently. To demonstrate that suicidality was not a remote theoretical possibility for this
patient, on May 23, the patient was placed on Mental Health Watch for suicidal ideation and had to
remain there for 9 days before being discharged.

Chronic Outpatient Care

| Injunction Provision 16.3.1.1 | Non-compliant |
|---|---|

**Provision:**
An MH-3 patient's assigned PT shall conduct an initial comprehensive mental health evaluation within one month of arriving at the assigned facility if not already completed when the patient first entered the prison system.

**Importance:**
See introduction to Mental Health section above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance of this provision at 100%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was close to 0%.

ADCRR considers the "Mental Health Assessment" that is conducted within one business day of admission to ADCRR to fulfill this requirement for a comprehensive mental health evaluation. It does not. The former is a brief conversation which typically takes about 10 minutes and is meant as a tool to quickly triage MH needs. It is wholly insufficient to accomplish the level of detail required in a diagnostic interview which is at the heart of a comprehensive mental health evaluation. It is only this comprehensive evaluation that can provide sufficient information about a person's needs to develop a meaningful treatment plan. We have provided feedback about this distinction to ADCRR and the need for MH patients to undergo both an initial Mental Health Assessment at intake and a comprehensive mental health evaluation afterwards, several times over the past two years.

**Example:**
Patient 155 is a 33-year-old female with diagnoses of schizophrenia, mood disorder, and traumatic brain injury. On January 18 she was readmitted to ADCRR on a parole violation after her most recent release on November 1, 2024.

Upon arrival, based on a nurse who described the patient as "erratic, impulsive, yelling and cursing at staff," she was placed on a constant MH Watch for "unstable behavior" and possible danger to herself. She was also withdrawing from methamphetamine and fentanyl, which complicated the ability of mental health staff to immediately evaluate her mental health needs, including inability to perform a comprehensive MH evaluation.

As she improved, she was taken off MH Watch and continued to undergo a withdrawal protocol. Her history of being diagnosed with schizophrenia and mood disorder were recognized by both a psychiatric

practitioner on January 21 who started medication for depression, and a therapist on January 21 (during her initial mental health reception screening; 15-minutes) and January 22.

On January 30, following release from MH Watch, but still without having performed a comprehensive evaluation, her Primary Therapist established a Treatment Plan. The focus of the plan was treatment of anger; the document documented her diagnoses of PTSD and depressive symptoms (though not the history of a mood disorder per se), but failed to recognize the diagnoses of schizophrenia and traumatic brain injury. The psychiatric practitioner, on the other hand, documented her diagnosis of schizophrenia, and PTSD, but not anger, or depression, but nonetheless prescribed continuation of an antidepressant. The patient continued to meet with therapists and psychiatric clinicians on a routine basis, though still without conducting a comprehensive MH evaluation.

On March 7 she became agitated on her housing unit after asking to change rooms due to symptoms of PTSD being triggered in her current location. A correctional officer brought her to the MH clinic urgently. She was seen by a therapist who concluded that the matter was resolved. A comprehensive MH evaluation had still not been conducted.

On March 13 she was transferred to an Inpatient MH Unit as she had "increasingly shown unstable behavior and [danger-to-others] behaviors. Patient has gotten into multiple fights recently, is labile, impulsive, and aggressive, requiring transfer to inpatient unit. Client presents labile with persecutory delusions, and limited insight/judgement into MH needs and behaviors." Once transferred to the unit, she was agitated and therefore placed on a MH Watch for a "cool down." At one point she escalated, throwing food toward the psychology associate prompting removal from the room in restraints. On March 13 and 18, a psychiatric practitioner prescribed a medication to help with anxiety and an antipsychotic medication, respectively.

The course of condition while in the MH Inpatient Unit consisted of periods of improvement and deterioration, including another crisis requiring placement on MH Watch again from March 26 to 29.

On April 10, more stable and functioning in a healthier manner, she was released from the Inpatient Unit. She was released from ADCRR the same day.

Having arrived on January 18, a comprehensive evaluation should have been conducted by February 17 at the latest, if not sooner given the complexity of her history. Instead, one was never conducted. Certainly for several days after she first arrived, it was legitimately impossible to conduct a meaningful evaluation. However, those days did not account for the entire 30 day window during which the evaluation could have been, but was not conducted. The comprehensive MH evaluation had the potential to impact her care and the outcomes, in a number of ways. For example, though clinicians recognized that she had a history of brain injury and even speculated about possible role played in her impulsiveness and agitation, the thought process ended there. Had ADCRR developed a better understanding of her trauma history, a more individualized and targeted treatment plan may have been developed that had a significant chance of preventing her instigating fights, and having restraints placed

on her, and supported her to remain in outpatient care, not having harmed others or been further traumatized herself.

In summary, failure to conduct the evaluation as required, significantly increased the risk that the serious psychological events described above, would in fact occur.

| Injunction Provision 16.3.1.2 | Non-compliant |
|---|---|

**Provision:**
An MH-3 patient's assigned PT shall conduct an evaluation whenever there is a change in MH level of care designation.

**Importance:**
See introduction to Mental Health section above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
Patient 156 is diagnosed with schizophrenia and SUD and had been housed in MH Inpatient care (MH-5) since November 13, 2024. On February 10 his therapist completed a MH Discharge Summary which was followed the next day by a Treatment Team meeting with all parties, including the patient, agreeing that the patient was ready to move to a general population setting. His MH classification was changed to MH-3A accordingly on February 14. He moved to a general population setting on March 4 but did not meet with MH mental health staff there until March 17, well beyond a safe timeframe or within the 7-days-of-transfer requirement of Injunction section 16.6.2. Making the transition from MH Inpatient care where a patient has ready access to MH staff, to general population, is a time of high risk of dysregulation for a such a patient. To support a patient's success and safety, meeting with the therapist soon after transfer is critically important. The Primary Therapist is required to begin to establish a therapeutic relationship as well as learn about their patient's current needs, through a comprehensive MH evaluation. For this meeting to have taken 2 weeks to happen is unacceptable. The patient even wrote an HNR asking to meet with a therapist, noting that he was accustomed (in the inpatient unit) to meeting with mental health staff daily. When the therapist did finally meet with the patient, there is no evidence the therapist informed themselves, and therefore was aware of, the patient's recent transfer from a higher level of care, nor his attempt to access care through an HNR. Further placing him at risk, the patient has not had a Treatment Plan constructed since December 23, 2024 (date of his booking), which was prior to his placement in Inpatient Mental Health and therefore obsolete. Since his return to general population there has been no determination of his treatment needs. Though his Primary Therapist has been reliable in meeting with the patient since his transfer to general population, the therapist's work should be, but is not, guided by a treatment plan, making it impossible to know if the patient's needs are being met. The absence of a comprehensive evaluation and resultant rudderless care places him at risk of decompensation of his schizophrenia which causes psychological harm.

| Injunction Provision 16.3.1.3 | Non-compliant |
|---|---|

**Provision:**
An MH-3 patient's assigned PT shall conduct an evaluation at least once per year.

**Importance:**
See introduction to Mental Health section above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
Patient 157 was admitted to ADCRR on December 20, 2022, diagnosed with schizophrenia, PTSD, and anxiety disorder, and placed in MH outpatient care (MH-3A). He was prescribed antipsychotic and antidepressant medications. Following his intake he was assigned to a private prison (ASP Red Rock). He met with his mental health provider there on the morning of August 11, 2023 during which time he requested protective custody consideration. This request initiated transfer back to ADCRR later that day. He was sent with a 112 page PDF file of medical records from Red Rock, however, there was no discharge summary (required in such a situation, but not the fault of the publicly operated prisons we monitor). Neither the receiving practitioner at ADCRR nor any other practitioner, ever since, reviewed those records (in violation of Injunction section 4.4.2). In a Mental Health Progress Note and Treatment Plan dated September 18, 2023 he reported that he had been transferred for having failed a drug test. The treatment plan developed at the time identified "Suicide Attempt" as the sole target for treatment despite his documented history of a range of depressive symptoms and report that he had not experienced any suicidal ideation in more than a year. While this encounter lasted 20 minutes, it was not a comprehensive mental health assessment and did not even include a review of previous records. During the time the patient had been at Red Rock, he met with his mental health provider 10 times, history which would have been very important to incorporate into the treatment plan developed when he arrived at Eyman, particularly as the patient had clearly identified his priority of addressing his anger as it relates to his depression. He is incarcerated for domestic violence and providing the requested treatment would improve the safety of the community upon his release.

This was a very high-risk time for the patient and a comprehensive assessment should have been done in the days, if not hours, after his arrival at the prison to thoroughly understand his mental status and develop a plan to reduce immediate and future risk. This was especially indicated given that at that point ADCRR MH staff thought the reason the patient had been transferred from Red Rock was recent drug use and suicide attempt. Instead, no assessment was done, annual or otherwise immediately, and as of this writing, almost 2 years after arriving at ADCRR, a comprehensive assessment of the patient's needs has yet to be done.

One might argue that the patient has been seen in the interim by MH staff and that those contacts might be considered sufficient to understand the patient's needs. However, from the time of his return to ADCRR to this writing, the patient has spent a total of 212 minutes with various therapists over the

205

course of 26 contacts (yielding an average time 8.15 minutes each meeting), only 3 of which were with an assigned Primary Therapist (2 of those sessions were with the same PT, the third session was with a new PT whom the patient has only met the one time). Changes in the patient's treatment plans have been based on momentary reports of symptoms, rather than an overall understanding of a patient's needs. In other words several visits with a PA – especially when at least 17 of the visits were with PAs other than his PT, do not – cannot – replace a comprehensive evaluation. Unfortunately, lack of a comprehensive treatment plan coupled with an ever rotating slate of therapists resulted in staff not comprehending nor addressing the need for treatment of his depression and the request he had made at Red Rock to work on his anger- the very issue that resulted in his incarceration. Thus, he remains at significant risk of serious harm to himself or others that can result from untreated anger.

| Injunction Provision 16.3.3 | Non-compliant |
|---|---|

**Provision:**

A treatment plan meeting shall be conducted with MH-3 patients and their assigned PT. The treatment plan meeting shall occur at least once per year. A psychologist or psychiatric practitioner shall also be present for complex cases and in all other cases shall provide input to the PT prior to the treatment plan meeting. At that meeting, the patient's treatment plan shall be reviewed and updated to determine adherence to treatment, efficacy of interventions, evaluation of the level of care needs, diagnostic impressions, progress to date in treatment, and steps taken toward moving to a less restrictive environment, if applicable. The timing of the treatment plan meetings should be based on the needs identified in the treatment plan, but no less often than once a year. The treatment plan shall include a date for next review based on the content of the plan. If no timeline is identified, a treatment plan meeting shall occur at least once per year.

**Importance:**

Treatment plans – the product of the treatment plan meetings – are the second of the three essential components of care for all patients with mental illness: evaluation, a treatment plan based on the evaluation, and provision of treatment according to the plan until the next time the plan is modified. Absent a clinically appropriate treatment plan, patients cannot receive the care they need, exposing them to a significant risk of serious harm.

See also introduction to Mental Health section above.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

In examining ADCRR's compliance with this requirement, we look to see not only if a treatment plan meeting was conducted in a timely manner and included the patient (and, if necessary, the supervising psychologist), but whether the plan was clinically appropriate. Instead, when self-assessing its performance on this requirement of the Injunction, ADCRR merely looks to see whether a document labeled as a "treatment plan" exists at the required time interval, regardless of whether it was created by the patient's primary therapist and regardless of its content. Using this inappropriate criterion, ADCRR continues to assess its performance level at 80-100%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 10%. We have provided feedback to ADCRR about how to correctly assess performance on multiple occasions over the past 2 years to no avail.

In our previous report (Doc. 4755 at 21) we wrote that treatment plans can be hard to find due to the poor design of the EHR. In their response to our report, Defendants took issue with that statement (Doc. 4815 at 21). Defendants are correct and our statement was in error. When they exist, treatment plans are easily searched, as noted by Defendants. The very low level of compliance with this provision that we

report now, however, is not reflective of difficulty finding the plan in the EHR, but where there is a treatment, a reflection of the poor quality of the treatment plan as described in the example below.

**<u>Example:</u>**

Patient 158 is diagnosed with bipolar disorder, adjustment disorder, alcohol dependence, and PTSD. He participated in three treatment planning meetings between April, 2023 and February. The treatment plans that emerged from these meetings were vacuous. The meetings were conducted by three different therapists, none of whom were his Primary Therapist, as required. All three of the plans were identical. It is virtually impossible for a patient's mental health condition, and therefore treatment needs, not to change one iota over a two year period. Failure to design a meaningful treatment plan significantly increases the risk that the patient's conditions will deteriorate.

| Injunction Provision 16.3.2 | Non-compliant |
| --- | --- |

**Provision:**
A psychiatric practitioner shall conduct an appropriate clinical encounter with all patients in an outpatient level of care (i.e., MH-3) on psychotropic medications as often as clinically required, no less often than every three months.

**Importance:**
See introduction to Mental Health section above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 100%. ADCRR's method of measuring its performance is flawed in that it uses the wrong the target population. The target population for this provision, by definition, is patients who are on psychotropic medications. However, one quarter of the patients ADCRR sampled were not on psychotropic medications. At least two patients had not been prescribed psychiatric medications for more than 18 months (Patient 159, and Patient 160). Additionally, ADCRR did not use the required size of sample. The requirement is to "Review 3 psychiatry contacts per prison complex unit for MH patients at each of the 4 different outpatient levels of care." That would require that 60 patients be reviewed. Instead, ADCRR only reviewed 16 cases.

**Example:**
Patient 161 was admitted to ADCRR on September 4, 2024. When admitted, 4 of the 5 medications he was on in the community were continued: an antipsychotic medication (aripiprazole), two antidepressant medications (trazodone and duloxetine) and a medication to address anxiety (hydroxyzine). A fifth medication for sleep (melatonin), was discontinued upon arrival and restarted some months later. The only diagnosis he carried when he arrived was "adjustment disorder with depressed mood" which was originally diagnosed on September 12, 2020 during a previous admission. Adjustment disorder is a diagnosis that applies when a person is struggling with adapting to a new situation and symptoms typically resolve within six months. If a person continues to experience symptoms beyond six months, the diagnosis is no longer valid because the symptoms are no longer associated with a new situation but rather are enduring. Examples of appropriate diagnoses at that point might include a mood disorder or an anxiety disorder, depending on the symptoms. Thus, by 2024, some 4 years after some new event that triggered an adjustment reaction, the diagnosis was no longer valid and required re-evaluation a new diagnosis if symptoms remained, or removal of the diagnosis if symptoms were resolved.[36] Instead, ADCRR maintain this diagnosis, and only this diagnosis, until the patient released on May 9. While he met regularly with MH staff and psychiatric practitioners, there is no evidence that the veracity of the

---

[36] One cannot argue that because the diagnosis was made in the community it was correct or could not be changed. It is the responsibility of every prescribing practitioner to assure that they are treating their patient for a disease they have, regardless of precedent. That reassurance does not necessarily require the prescriber to start from scratch, but especially when the current diagnosis no longer makes sense, requires the prescriber, at a minimum to comprehensively evaluate the patient's history and review old records and/or contact previous providers

diagnosis was ever even questioned or that anyone reconsidered his diagnosis or whether the treatment was still (or ever was) appropriate to his needs.

He reported no symptoms (other than some trouble sleeping), which could be interpreted in two ways: the medications are effective at treating true symptoms, or he does not need the medications. There are risks associated with taking any medication, more so with combinations of medications, particularly for an older person (the patient is 69 years old). The particular medications the patient was prescribed had a number of potential adverse effects:

- Aripiprazole

This medication can cause tardive dyskinesia (potentially irreversible, involuntary, dyskinetic movements), with the risk being the highest in the elderly. The package insert instructs:

> Given these considerations, ABILIFY should be prescribed in a manner that is most likely to minimize the occurrence of tardive dyskinesia. Chronic antipsychotic treatment should generally be reserved for patients who suffer from a chronic illness that (1) is known to respond to antipsychotic drugs and (2) for whom alternative, equally effective, but potentially less harmful treatments are not available or appropriate. In patients who do require chronic treatment, the smallest dose and the shortest duration of treatment producing a satisfactory clinical response should be sought. The need for continued treatment should be reassessed periodically.

ADCRR did not follow these safety guidelines. Further, this medication increases the risk of inability to regulate core temperature, of particular concern if the patient is exposed to high temperatures, a condition not unheard of in Arizona prisons.

- Duloxetine:

This medication can cause damage to the liver, serotonin syndrome (a potentially life-threatening condition seen with drugs in this class), and abnormal bleeding.

If duloxetine was medically necessary, ADCRR failed to provide it as prescribed: it was not administered on April 30, May 1, 2, and 3 because ADCRR had run out (in violation of Injunction sections 1.22 and 10.1)

- Trazodone:

Like duloxetine, this medication can also cause serotonin syndrome. The risk increases if a patient is on more than one medication in the serotonin class, as this patient was. The medication can also cause a potentially fatal abnormality of the heart's electrical system (prolonged QT syndrome). To help avoid this complication, the patient's electrical activity should be assessed with an EKG. This was not done.

- <u>Hydroxyzine:</u>
  Like trazodone, this medication can also cause prolonged QT syndrome and should be used with caution in patients who are on another QT-prolonging medication. The basic caution, which was not done, was checking an EKG.

ADCRR's failure at to consider these issues and, in partnership with the patient, make a risk-benefit analysis posed a significant risk to the patient of the potential side effects of his medications without commensurate benefits.

Residential Care (MH-4)

| Injunction Provision 16.4.1.1 | Non-compliant |
|---|---|

**Provision:**
An MH-4 patient's assigned PT shall conduct an evaluation whenever there is a significant change in the course of treatment, e.g., new type of treatment including medication, significant decompensation.

**Importance:**
MH evaluations are the first of the three essential components of care for all patients with mental illness: evaluation, a treatment plan based on the evaluation, and provision of treatment according to the plan until the next time the plan is modified. Absent a comprehensive clinically appropriate MH evaluation, patients cannot receive the care they need, exposing them to a significant risk of serious harm. This risk is especially great for individuals in MH Residential Units (MH-4) and MH Inpatient Units (MH-5).

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR's self-assesses its level of performance on this provision at 91%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using only the relevant portion of the same dataset, the performance level we calculated was approximately 30%.

When self-assessing, ADCRR still commits two errors: (1) it includes in its sample patients for whom the care could not possibly be found non-compliant, and (2) even among the patients who are appropriate for the sample, it fails to properly assess the care patients receive. This happens despite numerous coaching sessions with, and feedback from, our team ever since the inception of the Injunction.

With regard to error (2) the Injunction requires a comprehensive evaluation, designed to provide a detailed summary of the patient's needs and a rationale for the need for a different level of care or course of treatment. As has been discussed at length with ADCRR, a MH evaluation is a more than an encounter with a MH professional regardless of the content or quality of the encounter. However, ADCRR continues to inappropriately count as an evaluation any encounter with a mental health professional including brief cell-front encounters. We have provided ADCRR with feedback and coaching on several occasions including a discussion in April, 2024 regarding the distinction between routine encounters, brief assessments, and comprehensive evaluations, which was followed up by an email on May 6, 2024, that included reference material for the type of information that would be expected in a reasonable comprehensive MH evaluation. In August 2024, the MH Court Monitor and staff in ADCRR's Health Services Division specifically discussed the intent and process of a MH evaluation. The issue was discussed again in October 2024.

With regard to error (1) – an error which is less serious than error (2), but still can lead to a misleading conclusion – the Injunction requirement being measured applies only to individuals who have had a significant change in the court of treatment. This primarily occurs when there is a change in a patient's mental health code (e.g., from MH-3 to MH-4 or MH-5 to MH-3) or when a different class of medications is introduced due to the inefficacy of previous medications (e.g., adding an antipsychotic to a patient not previously diagnosed with or treated for a psychotic condition). Nevertheless, ADCRR continues to gather, interpret, and present data on individuals who have not had a significant change in their course of treatment. ADCRR inappropriately includes these patients in their self-assessment samples knowingly, as shown in the snippet below from ADCRR's monthly self-assessment records. The snippet shows results from ADCRR's assessment of 8 of the 50 cases ADCRR is required to select randomly from all the eligible cases that month. In that snippet, the first column contains the assessor's final determination of whether the randomly selected case demonstrated compliance with the provision of the Injunction. In the 8 cases shown, the assessor determined that the case was not applicable to the provision in question because the patient had not had a significant change in their course of treatment. The assessor was correct in skipping the case. However, as with any other statistical testing process, if a case that is randomly drawn is not applicable to the test, it should be discarded and replaced by another case that is relevant. Instead, the assessors discard the case, but do not replace it. The result for February's analysis of this provision was that 39 of the 50 cases were discarded. Of the remaining 11 relevant cases, 10 were handled in accordance with the provision, yielding the 91% performance level cited earlier. Thus ADCRR assessed their performance on a random sample of 11 rather than 50 cases.

| 16.4.1.1 Compliant PT shall conduct an evaluation whenever there is a change in course of tx | 16.4.1.1 Comments |
|---|---|
| N/A | No significant change in course of treatment |
| N/A | No significant change in course of treatment |
| N/A | No significant change in course of treatment |
| N/A | No significant change in course of treatment |
| N/A | No significant change in course of treatment |
| N/A | No significant change in course of treatment |
| N/A | No significant change in course of treatment |
| N/A | No significant change in course of treatment |
| N/A | No significant change in course of treatment |

**Example:**
Patient 162 is a 34-year-old male with a history of unspecified mood disorder, unspecified psychosis, substance use disorder, and suicidality. On January 17 the psychiatric practitioner noted that patient's condition was "Deteriorating," reporting decreased appetite, increased depression, and lower motivation

to tend to his ADLs (Activities of Daily Living, i.e., ability to independently bathe, get dressed, remain continent and toilet, eat, and transfer). The required "evaluation" by the PT took place on January 27. It was a six-minute cell-front encounter that was devoid of any actual MH evaluation or any mention in the documentation about a change in the course of treatment (e.g., starting a different class of medications due to a change in the intensity or quality). This failure to address the patient's needs places him at significant risk of continued deterioration which, given his conditions, can be serious.

| Injunction Provision 16.4.1.2 | Non-compliant |
|---|---|

**Provision:**
An MH-4 patient's assigned PT shall conduct an evaluation at least annually, documenting the patient's need for residential level of care.

**Importance:**
MH evaluations – are one of the three essential components of care for all patients with mental illness: evaluation, a treatment plan based on the evaluation, and provision of treatment according to the plan until the next time the plan is modified. Absent a complete clinically appropriate evaluation, patients cannot receive the care they need, exposing them to a significant risk of serious harm. This risk is especially great for individuals in MH Residential Units (MH-4) and MH Inpatient Units (MH-5). See also introduction to the Mental Health section above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
Patient 162 is a 21-year-old male diagnosed with schizoaffective disorder-bipolar type, anxiety disorder, mild intellectual disability, and major depressive disorder. He arrived in ADCRR on December 6, 2023 and was designated as an MH-2 (non-active MH condition, not on MH caseload) based on having a history of receiving mental health services and "30" lifetime suicide attempts. He was referred for further evaluation due to his "vulnerability, i.e., anxiety, hx of poor distress tolerance, # of [suicide] attempts, chronic [hearing voices], age, offense, first sentence, and suspicion of developmental delay." The error was corrected two days later when he was re-classified as MH-4.

Based on this assessment, the patient was housed temporarily at Alhambra Unit, ASPC-Phoenix and placed on the waitlist for Aspen Unit, ASPC-Phoenix, (which has a custody designation of "MH"). However, on January 23 the patient was instead transferred to Rincon Unit, ASPC-Tucson (which has a custody level of "Close"). No comprehensive mental health evaluation was completed prior to his transfer nor was one done after his arrival at Rincon Unit. As described elsewhere, the risk of harm from not having a comprehensive mental health evaluation is inadequate care wherein the patient's mental health issues are not well understood, resulting in non-specific interventions, generic treatment plans, delays in receiving actual care, and elevated risk of psychiatric decompensation. Further, prolonged placement of individuals, such as this patient, with intellectual and mental health disabilities, in close custody environments is contraindicated unless there are documented security reasons.

In this patient's case, he became distressed with the unexpected move. Subsequent to being moved to the close custody environment, he triggered three emergency responses (ICS) and was placed on MH Watch on two separate occasions, including one just a week before the Annual MH Evaluation. This most recent ICS was on December 3, 2024 ("IM not being able to get (sic) and not knowing where he is at"), presumably related to disorientation. Less than a week later, on December 8, 2024, he was placed on continuous MH Watch for suicidal ideation.

215

The patient finally had an Annual MH Evaluation on December 15, 2024. This was actually his first MH evaluation since admission to ADCRR, occurring 11 months late (in violation of Injunction section 16.3.1). It was also woefully inadequate. This patient had been described in various notes as having a childlike demeanor with difficulty articulating his needs at times. In addition, he is diagnosed with the multiple conditions listed above. However, none of this clinical information was included in the evaluation. There is almost no information in the evaluation at all, which consists largely of empty free-text fields or a single word or phrase with no elaboration, context, summarization, or synthesis.

The lack of even the most basic information leaves the patient's mental health providers without a solid understanding of the patient's mental health, cognitive, and behavior needs. This falls well below the standard of care and subjects the patients to the risk of further deterioration as well as prolonged retention in a more restrictive environment. He has remained in a restrictive close custody environment at Rincon Unit on a waitlist for the mental health unit at Aspen for more than a year and a half.

| Injunction Provision 16.4.2 | Non-compliant |
|---|---|

**Provision:**

Patients in residential level of care shall have face-to-face encounters with their assigned PTs as determined by the treatment plan.

**Importance:**

Therapy sessions ("face-to-face encounters") are the third of the three essential components of care for all patients with mental illness: evaluation, a treatment plan based on the evaluation, and provision of treatment according to the plan until the next time the plan is modified. Absent actual treatment, patients cannot get better and crises cannot be averted, both of which expose patients to a significant risk of serious harm. This risk is especially great for individuals in MH Residential Units (MH-4) and MH Inpatient Units (MH-5).

**Discussion:**

ADCRR continues to fail to provide clinically meaningful treatment to mentally ill patients. For this particular section of the Injunction, care fails in two ways. **First**, the patient's treatment plan often omits a plan for the frequency with which the patient needs to be seen. As such, at each subsequent therapy session, it is difficult for the therapist to know how often to plan to have the patient return. This difficulty is magnified currently due to the widespread lack of implementation of the primary therapist model. In other words, while a primary therapist might be able to infer a treatment frequency from their intimate knowledge of the patient's case, the multiple rotating therapists who only see the patient once before they are randomly switched to another therapist, cannot. **Second**, even when a treatment session takes place at the prescribed interval, it is too often devoid of clinically meaningful content. When self-assessing its performance on this requirement, though ADCRR auditors do recognize the first error, they continue to ignore the second. They count a therapy session as in compliance with the Injunction merely because it took place, i.e., the patient was "seen." The intention of "seeing" a patient is not simply to communicate with them briefly at cell front at an unscheduled time when they are neither aware that the meeting is to take place ahead of time nor prepared for the meeting. The intent behind "seeing" a patient is to meet with them in a clinically appropriate setting that affords them the opportunity to discuss their issues in a private, confidential, therapeutic environment with their Primary Mental Health Provider (Primary Therapist). In an unacceptably high number of cases, the meetings with the patients appear to be unscheduled and opportunistic, too short, in a non-confidential non-therapeutic setting, and/or with none of the therapy sessions conducted by a primary therapist.

**Example:**

Patient 141 is a 24-year-old male housed in a MH Residential Unit (MH-4) receiving psychotropic medications involuntary due to the severity of his mental illness. Not a single encounter with the patient's therapist occurred in a confidential therapeutic environment over the three-month period from late November 2024 through February. Encounters with were all at cell-front lasting for no more than a few minutes:

- November 26, 2024: 7-minute cell-front

- December 9, 2024: 6-minute cell-front
- December 23, 2024: 6-minute cell-front
- January 9: 8-minute cell-front
- January 22: 7-minute cell-front
- February 3: 3-minute cell-front
- February 17: 6-minute cell-front
- March 4: 6-minute cell-front.

On February 17 his condition was described, not unexpectedly, as "deteriorating." Not once did the therapist explore with the patient his reticence to meet in a clinically appropriate setting or whether this reticence is an element of his mental illness. Instead, it should be a focal point of treatment since no treatment interventions can effectively occur exclusively at cell-front. The involuntary medications alone have clearly not resulted in this patient coming out of his cell to meet with his therapist. Based on the information available, there is no reason to believe that this patient will ever be seen outside of cell front. Thus, unless something changes in the treatment approach, he will likely languish in his cell while his symptoms and impairment remain at an MH-4 level, and the patient remains at elevated risk of decompensation, all serious harm.

This lack of thoughtfulness in the patient's care is also reflected in vacuousness of his treatment plans. Their vacuousness is not surprising given that the above cited encounters of November 26 and February 17 were both designated for designing the next Treatment Plan. However, they lasted six to seven minutes in a noisy, non-confidential, non-therapeutic cell-front setting. The treatment plans are virtually identical, with mention of non-specific problem areas that needed to be addressed going forward, vague goals, and no description of mental health issues.

| Injunction Provision 16.4.3 | Non-compliant |
|---|---|

**Provision:**

Patients in residential level of care shall have their treatment plans reviewed and updated as clinically indicated but no less often than every three months when the full team meeting described in the next section is conducted.

**Importance:**

This provision ensures that individuals in a residential level of care have greater structure and more frequent monitoring of their mental health condition, which is done in part by having treatment plans completed on at least a quarterly basis (or sooner if indicated by clinical need).

**Discussion:**

ADCRR continues to be non-compliant with this provision. Non-compliance stems from two deficiencies. **First**, the treatment plans were of poor quality and wholly inadequate to safely meet the clinical needs of this highly ill population. Two factors contribute to this deficiency: (1) Many of the treatment plan visits were conducted standing at cell-front. Given the complexity and comprehensiveness of the interaction that must occur with a patient during a treatment plan visit, it is difficult if not impossible for it to be accomplished in the non-confidential non-therapeutic setting that is the cell-front.[37] (2) Almost half of the treatment plan visits were completed by someone other than the patient's Primary Therapist, "pinch-hitting" for them. **Second**, the treatment plans are conducted, on average, at intervals about double (approximately 180 days) what is required and safe (90 days).

In our previous report (Doc. 4755 at 21) we wrote that treatment plans can be hard to find due to the poor design of the EHR. In their response to our report, ADCRR took issue with that statement (Doc. 4815 at 21). ADCRR was correct and our statement was in error. When they exist, treatment plans are easily searched, as noted by ADCRR. The very low level of compliance we found with this provision is not reflective of difficulty finding the plan in the EHR, but where there is a treatment, a reflection of the poor quality of the treatment plan.

**Example:**

Patient 164 is a 41-year-old male diagnosed with schizoaffective disorder-bipolar type. He had been in the residential mental health unit since May, 2023 and had multiple placements on MH Watch. This patient was prescribed antipsychotic and antidepressant medication for schizoaffective disorder and his most recent treatment plan was completed on February 27. However, while there was a treatment plan form in the record, it was focused solely on substance use with no mention of mental illness. The only Target Symptoms or Behaviors documented were "Continued Abstinence from alcohol and drugs." The

---

[37] While during many cell-front encounters the patient comes to the cell door and the clinician and patient, standing 1 or 2 feet from each other, talk across the bars or cuff-port opening, patients sometimes remain in their beds, making a poor clinical venue even worse because the patient and clinician are several feet away from each other and because they must talk loudly or yell to be heard. Even when the patient comes to the cell door, therapeutic communication can be further hampered if the door is a solid door with a cuff-port opening (as opposed to bars) because the cuff port is typically at waist height. Both parties are forced to stoop to the level of the opening to adequately hear each other without yelling. But even then, custody staff often admonish the mental health professional from doing so for safety reasons.

Treatment Objective consisted only of "Engage in positive coping strategies and implement them into daily routine" and "Utilize MH therapy services." The Interventions listed were "Motivational Interviewing and Psychoeducation," "AA," and "1:1 therapy with PA-bi-weekly." This plan is inadequate and unlikely to result in MH improvement, in large part because the patient had refused psychoeducation groups every single week since mid-December 2024 and yet the therapist ignored this critically important fact in her plan. Absent recognition of this fact and a plan to either overcome his refusal or an alternative treatment strategy, the treatment plan is predictably of little therapeutic value.

Not only was the treatment plan vacuous and completed 8 months after the last one, it was overdue by 5 months and it was simply copied and pasted from the one done 8 months earlier. Thus, this is a treatment plan in name only and is not compliant. That failure to comply with this provision placed the patient at significant risk of serious harm, not a week after this "treatment plan" was constructed, the patient required placement on Continuous MH Watch for suicidal ideation with a plan to hang himself.

| Injunction Provision 16.4.4 | Non-compliant |
|---|---|

**Provision:**
A full Treatment Team meeting shall be conducted at least every 3 months by the primary therapist, psychologist, psychiatric practitioner, and any other staff as necessary. Patients shall be included in the meeting unless there is a clinical or legitimate and substantial safety and security concern documented in the custody record. The meeting discussion shall include determination of adherence to treatment, efficacy of interventions, evaluation of their level of care needs, rationale for the need for residential care, diagnostic impressions, progress to date in treatment, and steps taken toward moving to a less restrictive environment.

**Importance:**
This provision addresses quality of care and continuity of care among some of our most acutely and chronically mentally ill patients while they are being cared for in an Inpatient MH Unit and as they release back to a lower level of care. As explained elsewhere, periodic MH evaluations are one of the three cornerstones of MH care without which patient care cannot be safe. Failure to conduct discharge MH evaluations upon discharge to a lower level of care can cause disruption of care that increases the risk of mental decompensation because the new setting is less structured with less intensive mental health resources available. See also introduction to the Mental Health section above.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 91% for the frequency of meetings and 33% for the content of the meetings. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was close to ADCRR's calculation.

**Example:**
Patient 165 is a 44-year-old diagnosed with schizoaffective disorder-bipolar type and opioid use disorder. He frequently engaged in self-harm and was placed on suicide watch on a number of occasions. His Treatment Plans offer no insight into why he engaged in self-harm behaviors, why he experienced recurrent suicidal ideation, or what in particular had been done (or would be done) to address these issues. There is little offered regarding the type and frequency of treatment approaches other than vague, generic interventions such as "biweekly individual therapy with primary PA or designee unless clinically determined to occur more frequently, weekly psych group therapy with primary PA or designee, weekly psych education group with BHTs, Tier time twice a week with BHT's and at least monthly visits with psych provider. Patient is also able to file HNRs to obtain additional services."

For his Treatment Team meeting (March 05), neither the patient nor a psychologist was present. The PT noted "signifigant (sic) progress [as evidenced by] reducing [self injurious behavior]/Time on [MH

221

Watch]" and "re-engaging in coping skills." The PT further considered the patient to be "appropriate for step down in level of care." We were unable to determine the source of this information. His encounters from January 1, through February 28, consisted almost entirely of refusals or cell-front interactions:

- January 01: 11-minute cell-front refusal
- January 8: 60-minute face-to-face meeting focusing on case management and coping skills
- January 23: 22-minute cell-front
- February 06: 0-minute cell-front refusal
- February 19: 0-minute cell-front refusal

Despite his Primary Therapist's statements that "a combination of CBT, DBT, MI, BSFT and Narrative based interventions are used in an attempt to reach treatment goals," these "interventions" do not resemble anything approaching a course of treatment and amount to little more than buzzwords. There is certainly no documentation of a course of cognitive behavioral therapy (CBT), dialectical behavior therapy (DBT), brief strategic family therapy (BFST[38]), or narrative-based interventions employed in the Mental Health Progress Notes, and it is misleading to claim to be employing such methods.

That the risk of significant harm from an inadequate Treatment Plan is not theoretical is demonstrated by the fact that the patient required placement again on continuous MH Watch for suicidal ideation three weeks after the March 5 Treatment Team meeting. After discharge from this MH Watch on March 31, his PT sought to discharge him from care with the following rationalization: "Pt has been able to discontinue SIB and stabilize in this area. Pt has been able to identify his intent not to engage in this [behavior]. Pt has not engaged in self-harm since December of 2024. Pt's last day on a [MH Watch] was 12-29-25 (sic) for [self injurious behavior]."

---

[38] BFST is typically used to address mental and behavioral problems with youth aged 6-18. The patient was 44 years old at the time of this treatment team.

Inpatient Care

| Injunction Provision 16.5.1.1 | Non-compliant |
|---|---|

**Provision:**
The PT assigned to a patient in MH Inpatient care (MH-5) (or, if not already on the mental health caseload, the mental health provider assigned to the inpatient unit) shall conduct at least annually a comprehensive mental health evaluation reflecting the rationale for inpatient placement including but not limited to current symptoms and functional impairment, timing and pattern of decompensation, interventions attempted, diagnostic impressions (including potential substance-related impacts), progress in treatment to date, goals for treatment in the inpatient setting, anticipated length of stay, and criteria for discharge.

**Importance:**
This provision addresses quality of care and continuity of care among some of our most acutely and chronically mentally ill patients while they are being cared for in an Inpatient MH Unit. As explained elsewhere, periodic MH evaluations are one of the three cornerstones of MH care without which patient care cannot be safe.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
Patient 143 is a 43-year-old male with an extensive history of psychotic, mood, and anxiety symptoms with accompanying behavioral disruption that have prevented him from living in a less restrictive setting for nearly three years. In particular, the patient frequently experiences suicidal ideation and continually engages in serious acts of self-harm that have not been well managed. In just the past year, the patient has had 135 ICS responses for self-harm incidents (cutting, reopening wounds, etc.), 16 of which were in the month of February alone. However, there is no mention of this in the Annual Evaluation, which is based almost entirely on the patient's self-report with only an occasional observation included by the mental health provider. The evaluation is woefully inadequate as a foundational source of clinical information for anyone responsible for providing care to the patient.

Even ADCRR's monitor rated this case as non-compliant, highlighting in their feedback the lack of examples or the timing and pattern of decompensation of the patient's extensive and unremitting self-harm behaviors and suicide attempts. They pointed out the lack of specificity in several areas including goals for the patient, treatment interventions, and even criteria for discharge. They noted that the "Anticipated Length of Stay" identified in the report was "5-7 days," which they surmised indicated that the report was not done by the patient's assigned inpatient Primary Therapist but rather was completed by the Psychology Associate assigned to the Mental Health Watch area. This represents a fundamental misunderstanding of the purpose of the annual mental health evaluation, a misapplication of the primary therapist model, and a huge gap in the delivery of mental health services to this highly acute and chronically ill population.

The evaluation is intended to: (1) provide a useful and clinically meaningful summary of the patient's mental health issues that synthesizes the relevant developmental, psychosocial, medical, and psychological elements of the patient's history with their recent and current presentation and offers a clinically meaningful summary of the patient's mental health challenges; and (2) provide current and future treatment providers with a comprehensive summary of the complex mental health and behavioral issues that have resulted in an individual remaining in an inpatient mental health unit for over a year.

However, this patient's evaluation consists of little more than self-reported statements from the patient with virtually no elaboration, exploration, context, or assessment of the validity or reliability of the patient's report by the Psychology Associate. There is no clinical conceptualization of the patient's mental health issues or plan for curtailing the near constant self-harm incidents that have continued nearly unabated for over a year.

The patient's poorly managed self-harm behaviors place him at significant risk of permanent injury or death (whether by accident or intent). Poor management has caused actual harm by preventing him from living anywhere but the most restrictive of environments within the prison system. The patient was placed on MH Watch for over three months from March 12 to June 25. Over that time period, his condition has triggered 20 ICS responses called for self-harm behaviors, some of which were fairly severe (e.g., on March 11 he cut his right forearm with possible arterial involvement) and included three days in of restraint placement for self-harm.

Without a clinically meaningful conceptualization of the patient's mental illness, the patient will continue to experience emotional and behavioral instability in an endless cycle of ICS responses and MH Watch placements, and will limit opportunities for engaging in the full range of programming, employment, education, recreation, and socialization that would help him function more independently and prepare him for transitioning to the community.

| Injunction Provision 16.5.1.2 | Non-compliant |
| --- | --- |

**Provision:**
The PT assigned to a patient in MH Inpatient care (MH-5) (or, if not already on the mental health caseload, the mental health provider assigned to the inpatient unit) shall upon discharge from inpatient care, prepare a discharge summary.

**Importance:**
This provision addresses quality of care and continuity of care among some of our most acutely and chronically mentally ill patients as they release back to a lower level of care. As explained elsewhere, periodic MH evaluations are one of the three cornerstones of MH care without which patient care cannot be safe. Failure to conduct discharge MH evaluations upon discharge to a lower level of care can cause disruption of care that increases the risk of mental decompensation because the new setting is less structured with less intensive mental health resources available.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
Patient 166 is a 31-year-old male discharged from MH Inpatient care on February 10. In the discharge summary the PA only mentioned his diagnoses as alcohol or other psychoactive substances, omitting another key diagnosis: schizophrenia. The Discharge (from Inpatient care) Plan does not include sufficient information to discern a reason for his inpatient placement other than the global description of "patient admitted with psychotic behaviors" with no further explanation other than a passing mention of the patient reporting that his "[auditory hallucinations] have diminished to the point where they are no longer unmanageable." All sections of the Discharge Summary are too brief (1-2 phrases or sentence) and the aftercare/follow-up care is defined in terms that are too broad to be meaningful. For example, the section on Anticipated Treatment Needs consists entirely of the following boilerplate statement: "Continued med. compliance and individual therapy as determined by placement." There is no description of the psychotic symptoms that prompted the patient's placement in an inpatient unit and no mention of the patient's functional impairment other than the nebulous description by the patient that he had auditory hallucinations that had been "unmanageable." The Discharge Summary contains no mention of the risk factors for this patient moving forward nor warning signs for decompensation, which places the patient at significant risk for re-experiencing the same type of acute decline in mental health functioning that resulted in his inpatient placement originally. In addition, each cycle of such psychotic decompensation increases the risk for more severe and chronic mental illness.

| Injunction Provision 16.5.2 | Non-compliant |
|---|---|

**Provision:**

Patients in MH Inpatient care (MH-5) shall have a daily face-to-face encounter with their PT unless such an encounter would be clinically contraindicated. If the patient participates in the weekly treatment progress meeting described in Section 16.5.3, it may be counted as a daily face-to-face encounter.

**Importance:**

See introduction to Mental Health section above.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

**Example:**

Patient 167 is a 32-year-old male with schizoaffective disorder-bipolar type. He was admitted to ADCRR on January 31 (one day after having released from ADCRR) due to exhibiting psychotic symptoms when meeting with his parole officer. Upon his return to ADCRR, he exhibited labile mood, rambling speech, delusional thinking, and religious preoccupation. He had little to no insight into his symptoms and was placed on MH Watch on 15-minute checks. A therapist attempted to conduct the Initial Safety Assessment, but due to his condition, the therapist could not complete it at that time, marking more than 24 of the items as "unable to assess." He was discharged from MH Watch on February 4 in the morning, and placed back on MH Watch a few hours later for expressing suicidal intentions. On February 11 the patient was transferred from ASPC-Phoenix to ASPC-Lewis, still on MH Watch status. On February 19, the patient was placed on involuntary medications for "Danger to Others." He remained on Mental Health Watch for another week before being discharged to the MH Inpatient Unit on Wednesday, February 26. Upon his admission to the living unit, the patient should have met with his Primary Therapist within 1 business day (on Thursday, February 27). Instead, he met with a different therapist on that day. No therapist, neither his PT nor any other, met with him as required, on February 28, March 1, 2, or 3, at which point during this treatment void, he went into crisis and was placed back on MH Watch again. Failure of MH staff to meet with this patient on a daily basis as required placed him at significant risk of the MH crisis that occurred on March 3.

| Injunction Provision 16.5.3 | Non-compliant |
| --- | --- |

**Provision:**

Patients in MH Inpatient care (MH-5) shall have their treatment progress reviewed daily, and teams shall meet at least weekly with all providers (e.g., nursing, psychiatry, mental health, social work, custody/unit staff, behavioral health technicians) and providers from the prisoner's previously assigned unit whenever possible. Patients shall be included in the meeting unless there is a clinical or legitimate and substantial safety and security concern documented. At a minimum, the focus of treatment teams shall be to provide updates on patient progress, the type and efficacy of interventions used, treatment adherence, potential obstacles to recovery, and rationale for continued placement in the inpatient unit.

**Importance:**

See introduction to Mental Health section above.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

**Example:**

Patient 168 is a 40-year-old male diagnosed with schizoaffective disorder. He lives in an Inpatient MH Unit and is classified as MH-5. A weekly inpatient Treatment Team meeting was conducted on January 22. Subsequent meetings should have occurred on January 29 and February 5. None occurred until February 12. Failure to meet, confer, and plan care for this patient who is part of the cohort of patients who are the most seriously mentally ill in ADCRR placed him at significant risk of not receiving the care he needs and therefore remaining seriously ill longer than necessary. That this risk was not theoretical, after two weeks of not conducting inpatient Treatment Team meetings, on February 5 the patient experienced command auditory hallucinations telling him to harm himself or others, requiring him to be placed on MH Watch, in which he needed to remain for nearly a week.

The case also illustrates problems with ADCRR's compliance with language services and how this can affect communication when good communication is most critical. There were sufficient concerns with the patient's fluency in English that during the latter MH Watch, therapists used it on February 5, 7, 8, and 11, resulting in actual MH encounters lasting 25, 45, 20, and 19 minutes, respectively. However, on February 6, 8 and 9 the therapists failed to use the language line (documenting on the latter two days that the "patient demonstrates English proficiency") (in violation of Injunction section 3.3) with those attempts to treat the patient conducted at cell-front and resulting in "refusals." The importance of clear communication could not be greater than when a patient refuses (actually, was *suspected of* refusing) treatment, yet this was precisely when such communication was not provided.

Continuity of Care

| Injunction Provision 16.6.1 | Non-compliant |
|---|---|

**Provision:**
If a patient's treatment team changes due to a change in the patient's mental health level of care the "original" PT shall provide the "new" mental health team with the rationale for the change in mental health level and the anticipated treatment needs.

**Importance:**
In the introduction to the Mental Health section above, I explain the importance of the second of the essential MH care processes – an accurate Treatment Plan. In the interim between full updates to the Treatment Plan, the communication required in this provision ensures that the new treatment team has full knowledge of the interim changes that have taken place so that it can make needed adjustments to treatment. In other words, this communication assures that the patient is receiving the correct MH care from the new team.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 76%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 50%.

**Example:**
Patient 169 had been in residential care (MH-4) since August 2025 and was changed to outpatient care/general population (MH-3) on February 14. This change was not discussed with the patient nor was the patient prepared for this significant adjustment. On January 24 this patient met with a therapist and was noted to be deteriorating in his functioning. The therapist did not write a discharge summary or transfer of care note. Failure to prepare a patient on the MH caseload for such a major life change poses a significant risk of psychiatric deterioration.

| Injunction Provision 16.6.2 | Non-compliant |
|---|---|

**Provision:**
If a patient's treatment team changes due to a change in the patient's mental health level of care, if the transition is to anything other than to residential or inpatient, the "new" PT meets with the patient within seven calendar days;

**Importance:**
For patients with mental illness, transitions of any kind in their MH care creates a risk of deterioration in their mental health because of their reliance on consistency and trust (which is established over time). Thus it is important for the new PT to meet with the patient soon after transition both to assess whether the patient is remaining stable as well as to begin the relationship upon which trust will be established. Trust is a critical element of the patient-therapist relationship, without which most MH patients will not share and engage truthfully. See also Introduction to Mental Health section.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
See example in section 16.3.1.2.

| Injunction Provision 16.6.3 | Non-compliant |
|---|---|

**Provision:**

If a patient's treatment team changes due to a change in the patient's mental health level of care, if the transition is to residential or inpatient level of care, the PT meets with the patient as soon as possible, but no more than one business day after arrival, and the psychiatric practitioner is contacted and collaborates on the immediate care plan as soon as a patient is admitted.

**Importance:**

For patients with mental illness, transitions of any kind in their MH care creates a risk of deterioration in their mental health because of their reliance on consistency and trust (which is established over time). Thus it is important for the new PT to meet with the patient soon after transition both to assess whether the patient is remaining stable as well as to begin the relationship upon which trust will be established. Trust is a critical element of the patient-therapist relationship, without which most MH patients will not share and engage truthfully. See also Introduction to Mental Health section.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

**Example:**

Patient 170 is a 39-year-old male diagnosed with schizoaffective disorder, PTSD, depression, bipolar disorder, anxiety disorder, and substance use disorder. He was transferred to a MH Residential Treatment unit on Friday, February 24, and assigned his first Primary Therapist. His first Primary Therapist was assigned a total of 96 patients, with 51 of them being MH-4 and 5 being MH-5. This is substantially over any reasonably safe caseload size for a therapist with this number of high acuity patients. As a result, the therapist never met with the patient. His Primary Therapist was changed to a new Primary Therapist with a caseload size of 10, on March 8 (Saturday) and she met with him on March 11 (Tuesday) which would have been one business day from his assignment to her caseload. This significant delay of care (11 days after his arrival) for a high acuity patient posed a significant risk of MH decompensation during the gap. The delay was due to the assignment of a therapist who had no ability to follow the required processes because of her overburdensome caseload and is an illustration of the importance of maintaining manageable caseload sizes to meet the needs of patients with higher acuity.

| Injunction Provision 16.6.4.1 | Non-compliant |
|---|---|

**Provision:**
If a patient's PT changes without a change in mental health level of care, if the transition is to anything other than to residential or inpatient, the "new" PT meets with the patient within seven calendar days.

**Importance:**
For patients with mental illness, transitions of any kind in their MH care creates a risk of deterioration in their mental health because of their reliance on consistency and trust (which is established over time). Thus it is important for the new PT to meet with the patient soon after transition both to assess whether the patient is remaining stable as well as to begin the relationship upon which trust will be established. Trust is a critical element of the patient-therapist relationship, without which most MH patients will not share and engage truthfully. See also Introduction to Mental Health section.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
Patient 171 is a 27-year-old male diagnosed with mood disorder, adjustment disorder, anxiety disorder, psychotic disorder, delirium/dementia/amnestic/cognitive disorder, and schizophrenia and a history of self-injurious behavior (cutting himself). He was receiving regular contact with a psychology associate (who was not his assigned Primary Therapist) while residing at ASPC-Lewis. His last mental health contact at that location indicated a need for follow-up in 30 days. He was transferred from ASPC-Lewis to ASPC-Yuma on February 6. The individual listed in his EHR as his Primary Therapist continued to be designated as his assigned therapist at Lewis even though this therapist cannot possibly fill that role at a distant complex. He did not have a new Primary Therapist assigned to him until February 23, 2 ½ weeks after arrival at Yuma and 1 ½ weeks late. In the meantime, a therapist other than his Primary Therapist did meet with him briefly (17 minutes) on February 11, writing that the patient needed a follow-up session in 30 days. On February 23 a new Primary Therapist was formally assigned though changed the next day to a third Primary Therapist. This last change was likely due to an internal move within Yuma. This final Primary Therapist remained assigned to the patient throughout his stay at Yuma. Notwithstanding the assignment of Primary Therapists, other than the encounter on February 11, he received no further therapy during his stay at Yuma. In summary, during his 2 ½ months at Yuma from February 3 until transfer out on April 21, he met with a therapist only once, and never met with his Primary Therapist. Though this time period fortunately elapsed without patient decompensation, care was disrupted and fragmented care, placing him at significant risk of decompensation and a psychiatric crisis.

| Injunction Provision 16.6.4.2 | Non-compliant |
|---|---|

**Provision:**

If a patient's PT changes without a change in mental health level of care, because the patient is being moved but is remaining in residential or inpatient level of care, the "new" PT meets with the patient within one business day.

**Importance:**

For patients with mental illness, transitions of any kind in their MH care creates a risk of deterioration in their mental health because of their reliance on consistency and trust (which is established over time). Thus it is important for the new PT to meet with the patient soon after transition both to assess whether the patient is remaining stable as well as to begin the relationship upon which trust will be established. Trust is a critical element of the patient-therapist relationship, without which most MH patients will not share and engage truthfully. See also Introduction to Mental Health section.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

**Example:**

Patient 172 is a 39-year-old male diagnosed with schizoaffective disorder-bipolar type, opioid use disorder, alcohol use disorder, schizophrenia, bipolar disorder, PTSD, and suicide attempt. He was discharged from a MH Watch on February 10 to return to his residential treatment unit, and assigned a Primary Therapist with whom he had worked before he was on MH Watch. That therapist did not meet with him. Instead a different therapist met with the patient and erroneously identified herself as the Primary Therapist. The patient had briefly been assigned the first therapist for one week in November 2024. The patient did not meet with his true Primary Therapist before going back on MH Watch again (February 21). When the patient was discharged from this second watch (February 25) he was again assigned to his previous Primary Therapist. The patient did not have any contact with any therapist following this discharge, including not having a Post Watch Follow-up appointment with his Primary Therapist or anyone else. Failure to provide timely care upon his transitions (in this case, from MH Watch back to the residential treatment unit) significantly increased the risk that he would end up in crisis again (as he did, admitted to MH Watch on February 21), and lengthen the amount of time that he would be in a that crisis bed.

| Injunction Provision 18.1 | Non-compliant |
|---|---|

**Provision:**

Prior to release of any patient designated as Seriously Mental Ill ("SMI"), MH-4, or MH-5 who shall be released and who is presumptively eligible for federal or state assistance by virtue of their mental illness, ADCRR: (a) develops and documents an aftercare plan that reflects the patient's current symptoms and functional impairments, progress in treatment, and treatment plan; (b) facilitates evaluation for SMI designation and placement in the community, as clinically indicated; and (c) arranges follow-up care with an appropriate community provider where possible.

**Importance:**

This requirement is important because it assures seamless continuity of care when the most seriously ill and at-risk MH patients re-enter the community. Patient safety science has shown that transitions of care, e.g., patient discharged from a community hospital to home, is a time of risk of serious harm to the patient because crucial information about the patient can fall through the cracks due to poor communication between the previous and future care provider. The transition between prison and the community is equally, if not more, risky. The Injunction requires ADCRR to develop and deploy and aftercare plan in the community to reduce that risk.

**Discussion:**

ADCRR continues to do this very poorly. Its main failure is in the first and most critical element of the requirement: developing a meaningful plan. ADCRR does produce a "Release Planning Continuity of Care" packet that it sends to community providers prior to the release of eligible mental health patients. However, these packets – which range from 60 to 200 pages – rarely, if ever, provide information regarding the patient's diagnosis, symptoms, functional impairment, patterns or timing of decompensation, progress in treatment, or any meaningful or relevant clinical information. The packets contain an unorganized "data dump" of documents. The only information related to mental health issues or aftercare plans are presented in the form of checkboxes (see example below) with nothing in the free text areas, making the discharge packets "cookie-cutter" reports, indistinguishable from any other one.



Continuity of Care:

☑ Problem List
☑ List of Active Medications
☑ Patient's Current Symptoms and Functional Impairments
☑ Summary of Relevant Care Provided During Incarceration
☑ Any Necessary Follow-up Care
☑ Patient's Current Treatment Plan

233

## Reentry Goals and Progress Plan:

- ☑ Continue Stability While on Community Corrections, or Post-Release if they have no Supervision
- ☑ Continuing Treatment Goals
- ☑ Continuing Medications
- ☑ Counseling Treatments and Services
- ☑ Engaging in Community-Based Services

Comments:

n/a

ADCRR self-assesses its level of performance on this provision at 94%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 0%.

ADCRR's calculation is based solely on whether various boxes (of which the screenshot above is an example) are checked, not on whether the discharge packet includes actual relevant clinical information in each of these topics. Not a single discharge packet our team reviewed contained an aftercare plan that reflected the patient's symptoms, functional impairment, progress in treatment, or any clinically relevant information. What is included in nearly every packet is a list of "flags" that includes duplicative and mutually exclusive diagnoses; a list of medications, both past and present (in some cases, more than 50 pages-worth); and a few mental health and psychiatry progress notes that document individual encounters, many of which were brief cell-front interactions or patient refusals, hardly any of which were completed by the patient's assigned Primary Therapist, and almost all of which described the patient as functioning well and free of pathology. If symptoms were noted anywhere in the packet, their mention was incidental and most of the time the notes simply documented the patient's self-reported denial of symptoms (e.g., Patient 173 "Pt denies AH/VH and paranoia. Pt denies SI/HI and DTO/DTS. Pt denies unsteady mood"). When treatment plans were included in the packet, they were overwhelmingly boilerplate and generic, with vague, poorly defined target problems, goals, or interventions.

A recipient of one of these packets would be barely or no more informed about a patient's mental health issues after reading it than if they had not received a packet at all. In none of the cases we reviewed were we able to understand the patient's mental health needs, their pattern of decompensation, the types of treatments they had been offered, their response to interventions other than medications, or anything that would meaningfully assist in providing mental health care to seriously mentally ill patients releasing from prison, sometimes after several years.

234

**Example:**

Patient 173 is a 35-year-old male, Arizona State-designated SMI (Serious Mentally Ill) diagnosed with schizoaffective disorder-bipolar type, severe alcohol use disorder in early remission, and a history of suicidality who was released in February. His 65-page Release Planning Continuity of Care packet (dated February 7) was highly inadequate, consisting of: a document labeled "Discharge Plan" that contained little information other than a recommendation for a Referral for SMI Evaluation; a Treatment Plan developed during an 8-minute cell-front encounter containing generic boilerplate information written by someone other than the patient's Primary Therapist; a 2-page problem list containing mutually exclusive and duplicative diagnoses; and 51 sets of vital signs dating as far back as 13 years earlier which had little to no value in this patient. The packet contained no mental health information other than: a list of currently prescribed medications (which is appropriate and needed); two pages of duplicative and mutually exclusive flags; three psychiatric progress notes by three different providers (one of which was conducted at cell-front and another by telehealth); and a single 9-minute cell-front progress note by someone other than his Primary Therapist. The lack of a minimally adequate discharge packet placed the patient at significant risk that his serious mental illness would not be able to be managed well upon transfer to the community. That this risk was not theoretical, the patient returned to prison on March 28, just six weeks after his release and was placed on Continuous MH Watch only a week after that for suicidal ideation with intent and a plan.

The patient was released on June 30 from this more recent admission. The Release Planning Continuity of Care packet, now 89 pages, suffers the same deficiencies and marked disorganization as the previous one. Instead of a list of 48 largely useless vital signs dating as far back as 13 years, this packet contains 188 of them. More troubling, there is no clear and comprehensive summary in the packet of the patient's suicidality despite the fact that he spent nearly a third of his time during this most recent admission (36 out of 120 days) on suicide watch. The only mentions of the underlying suicidal plan is a quotation from the patient ("hang myself or slit my wrist") buried twice within notes on pages 52 and 66.

Suicide Prevention and Crisis Stabilization

| Injunction Provision 16.8.1 | Non-compliant |
| --- | --- |

**Provision:**
During normal business hours a patient who presents as a suicide risk shall have a formal in-person suicide risk assessment completed by a licensed psychology associate, psychologist, or psychiatric practitioner to determine the acute suicidal risk and the level of protection that is needed (e.g., return to current housing, placement in one-on-one observation, etc.). If the concerns are raised after normal business hours or on holidays, the on-duty mental health officer shall be consulted regarding the disposition of the patient (which may or may not include constant observation). If the patient is placed on suicide watch as a result of the concerns raised, they should be placed under constant observation until they are able to have an in-person assessment of suicide risk by a mental health professional.

**Importance:**
Suicide is among the most serious outcomes of mental illness. This provision ensures that patients for whom a concern about suicidality has been raised are promptly assessed by a qualified MH professional and, if acutely at risk, are placed in a safe environment.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 78%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 72%.

**Example:**
Patient 174 met with his PT via telehealth on February 11 (Tuesday, a normal business day) at 9:00 AM in response to an HNR. He was noted to be improving despite active psychotic symptoms; his MH classification score was changed from MH-2 (not on the MH caseload) to MH-E, indicating a need for greater MH care. By 12:00 PM he was reported to have an emergency, stating he was going to hurt himself. The Suicide Risk Assessment was attempted by his PT via telehealth in 4 minutes as he declined to continue to participate. While it is not preferable to complete a Suicide Risk Assessments via telehealth, at least there was effort to have his PT (someone familiar with him) assess his risk. When the patient declined to respond to the questions, however, the assessment had to be considered incomplete. Further attempts to complete the risk assessment should have been made, particularly in person, as this would be expected to increase willingness to participate in the assessment. While at the conclusion of the 4-minute meeting the PT defaulted to concluding that the patient was at high risk of suicide, because of the lack of information, this resulted in placement on a Continuous MH Watch with full restrictions (smock, safety blanket, no utensils). Such restrictions may have been determined to be unnecessary if an onsite assessment had been completed. Unnecessary time in the restrictive environment of MH Watch significantly increases the risk of two harms. First, it contributes to patients deliberately minimizing

236

their risk of self-harm when talking to the therapist in an effort to get out of the dehumanizing conditions that MH Watch is. Second, by increasing the time in this environment, it increases the psychological stress this environment causes.

| Injunction Provision 16.8.3 | Non-compliant |
|---|---|

**Provision:**

Upon recommendation from a psychologist or psychiatric practitioner that housing a patient on suicide watch (a.k.a. MH Watch) in the same room with other suicide watch patients ("cohorting") would be clinically safer than housing each patient in isolation, Defendants shall cohort such patients, provided that based on the patients' custody classification (determined based on factors other than the fact that the individual is on suicide watch) such cohorting would not be contraindicated.

**Importance:**

Most severely suicidal patients are depressed. Placement in a MH Watch cell, alone, isolated from others, leaves a person immersed in their own negative thoughts, which is countertherapeutic. Placing the patient, instead, in a cell with other individuals, increases social interaction, and decreases concentrating on one's own depressive thoughts, which increases patient safety by decreasing the likelihood of suicidal behavior and decreasing the amount of time a patient has to spend in a crisis-management bed before they can return to normal prison life.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

We found ADCRR non-compliant with this provision for two reasons. **First**, ADCRR's mental health professionals did not identify a single suicidal patient who would be safer if housed with other suicidal patients. This flies in the face of mental health science which would predict that most of the patients would be safer in and benefit from such placement. **Second**, even if a professional had recommended cohorting, there is no place in ADCRR to put the patient. At the inception of the Injunction, ADCRR did not have any cells which could accommodate more than one individual on MH Watch. As of the writing of this report, two years later, ADCRR has still not appropriated any spaces for this purpose. Thus a recommendation from a MH professional to place a patient in a cohort would be moot. As such, we found ADCRR non-compliant with this requirement.

ADCRR self-assesses its level of performance on this provision at 82%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was 0%.

ADCRR's assessment is flawed in two ways. First, the Injunction requires ADCRR to examine performance on at least 50 cases each month. Instead, ADCRR has never looked at more than 20 cases in a month. Second, ADCRR assessors erroneously concluded that cases in which cohorting would have been safer, but no such recommendation was made, were compliant with the provision.

**Example:**

Patient 175 was placed on MH Watch beginning February 14 after telling her cellmate she wanted to die. Initially the patient denied having made the statements but shortly thereafter admitted that her

intensely sad feelings about her sentence led her to make statements that she wanted to die by hanging herself. She was placed on a 15-minute watch with a suicide smock for clothing. These precautions were appropriate given her thoughts about hanging herself. Over the next eight days, the patient denied or minimized any suicidal ideation. She endorsed feeling very sad and missing her children a great deal. When she was discharged from watch on February 22, she reported feeling "anxious" because of "being in a cell by myself for the last week." This patient would have greatly benefitted from cohorting with another patient, which, according to documentation, had not even been considered by her treatment team. The trigger for placing her on suicide watch on February 14 had been her telling a cellmate about her thoughts and risks. Luckily, that cellmate passed the information to staff who were able to take steps to keep the patient safe.

Having a cellmate would have been an important protective factor[39] for this patient as evidenced by the fact that the patient had previously been more comfortable telling her cellmate of her suicidal thoughts than telling staff. It is reasonable to expect this would have continued to be the case while in MH Watch, confiding in a cohorted peer about continuing suicidal thoughts while telling staff that everything was okay. She herself stated she would have been better off with someone to talk with while on MH Watch. Her depression was related to missing her children and being socially isolated. Thus, having another person nearby to talk with and interact with likely would have been very beneficial for this patient, increased her safety, and may have reduced the total time she had to be in the restrictive environment which is MH Watch.

---

[39] Risk assessment and treatment planning in suicidal patients include examining and understanding two balancing forces: factors which increase risk of suicide and protective factors that can help prevent suicide. Treatment aims at reducing the former and bolstering the latter. When MH staff believe current protective factors significantly outweigh current risk factors, it is usually safe to return the patient to a less restrictive environment.

| Injunction Provision 16.9.2 | Non-compliant |
|---|---|

**Provision:**
Continued treatment in a crisis stabilization bed requires review and approval by a psychologist initially at seven days and every three days thereafter. Starting at ten days following placement in a Crisis Stabilization bed, the psychologist and or psychiatric prescriber shall document the justification for their continued assignment to the Crisis Stabilization bed rather than a Residential or Inpatient bed. (Additional reference 16.9.1)

**Importance:**
Review by a psychologist of the care of a patient in a Crisis Stabilization bed (typically MH Watch for risk or self-harm), and making a clinical determination of the necessity of the patient remaining (or not) on watch is a critical element to reducing risk associated with either premature discharge or delayed discharge from watch. If a patient is prematurely discharged, they may cause themselves harm while still in a psychiatric crisis. If a patient's discharge is unnecessarily delayed, they may be inhibited from reporting true suicidal ideation in the future, for fear of "being locked up" for too long. Both of these results cause serious harm. Thus, these decisions must be made by the psychologist after careful review of the patient's health record and consultation with the team of providers. If, instead, these decisions are "rubberstamped," the intent of the clinical review by a psychologist is completely defeated.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
Patient 176 was placed on MH Watch on February 19 due to erratic behavior with a suspicion of acute substance use. The following day the patient revealed his concern about returning to his housing unit because of a large debt owed to others. He did not feel safe. When the psychology associate suggested discharge from watch the following day, the patient exhibited increased symptoms on the proposed day of discharge. This cycle happened twice. Each time a psychologist entered a note documenting a review of the patient's circumstances and endorsing the plan for discharge. There was no follow-up documentation from the psychologist noting the deferral of the discharge on the two occasions. The patient was finally discharged, without exacerbation of symptoms, on February 26. That same day a psychologist (different from the earlier reviewer) documented a thorough review of the patient's care and noted his readiness for discharge. Five hours later, the same psychologist documented a review of the patient's care and endorsed that he remain on MH Watch. The patient had already left the watch area. The error of the psychologist to document completely contrary decisions on the same patient within hours is indicative of a complete lack of awareness of what they are doing. If the psychologist's latter conclusion had actually been the correct one, there would have been the potential for great risk to the patient. There is no other explanation than the latter note was an example of "rubberstamping" what she thought the treatment team wanted rather than a truly independent review of the clinical concerns of the patient, as required.

| Injunction Provision 16.9.3 | Non-compliant |
|---|---|

**Provision:**
Patients in a crisis stabilization bed shall be evaluated at least daily in person by their PT (or another psychology associate if they have not yet been assigned a PT or have transferred from another yard). Treatment providers shall document their intervention efforts, including but not limited to: assessing mental status; behavioral observations; documenting patient ability to independently care for activities of daily living; type(s) of treatment provided; response to interventions (including medication efficacy and compliance); anticipated length of stay; and criteria for discharge.

**Importance:**
This provision ensures that the third essential process of MH care – execution of a treatment plan – occurs for the patients at greatest risk of harm: those in a crisis stabilization bed, typically for suicidal ideation or attempt.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

Compliance with this provision is dependent not only on daily documentation of therapeutic contact but that the contact (as captured by documentation) is meaningful and contains required important information including, but not limited to, the patient's response to interventions, the anticipated length of stay and the criteria for discharge.

ADCRR staff are generally successful at making or attempting to make contact daily. The common reasons for failing to achieve compliance include: that the content of the contact does not qualify as an evaluation because of its brevity, having been conducted in a non-confidential non-therapeutic setting (cell-front); that the therapist did not establish (and share with the patient) an anticipated length of stay; and that the therapist did not establish the specific criteria for discharge from the crisis bed.

**Example:**
Patient 177 was on MH Watch from January 23 to March 10. The watch for this patient was initiated because he was exhibiting "bizarre" behaviors and "elevated mood" and was "unstable." His case illustrates numerous errors in care.

1. Erroneous reason for placement in MH Watch
Multiple different PAs met with the patient for daily contact, arriving at varying and changing reasons for the patient to have been on MH Watch despite the fact that there was no material change in the patient's condition or symptoms. In other words, the stated reason for the patient to be in watch should have remained the same. Initially the watch was a constant watch with a smock and suicide resistant blanket, but given that suicidal ideation was not the underlying reasons for his admission, the next day he was appropriately upgraded to a 15-minute watch with access to his own clothes which continued until his discharge. Despite the clear initial reasons for placement in MH Watch, various therapists documented the reason for placement as "Suicidal Ideation" (January 28 and 31, and March 8) and

241

"Suicidal Ideation" and "Homicidal Ideation" (January 29, February 3, and March 6). A therapist's accurate understanding of the reason a patient was placed on watch is critical to that therapist being able to address the relevant clinical needs during the watch which helps ensure a safe discharge from watch. This did not happen.

2. Failure to establish, and share with the patient, anticipated length of stay

There was little to no specificity offered when reporting on the patient's anticipated length of stay. A cut-and-paste boilerplate statement ("Patient's anticipated length of stay on watch is dependent on their ability to understand and implement positive behaviors to resolve the current mental health crisis and maintain their safety without needing the high level of interventions being on watch provides.") was used by many therapists both early in his stay as well as March 6, 4 days before his discharge. Not only important for planning purposes, a patient having a consistent goal in mind, reduces anxiety and hastens recovery.

3. Missing criteria for discharge

Similarly, therapists used a cut-and-paste boilerplate list of criteria for discharge ("Patient will be a candidate for discharge once it can be deemed that patient is not a danger to self or others, is deemed psychiatrically stable, has a safety plan and prompt follow up is scheduled. Patient will remain on 15" MHW for continued stabilization and observation.") whereas, appropriate care requires therapists to develop a much more patient-specific set of criteria. Without those criteria (analogous to the second essential process of MH care – the Treatment Plan), there cannot be meaningful treatment. This error is compounded by the lack of continuity of therapists seeing the patient.

4. Erroneous diagnosis leading to erroneous plan

As noted above, the discharge criteria documented by the care providers are not relevant for a patient who was admitted for bizarre behavior and never reported suicidal ideation.[40]

5. Delay in Beginning Involuntary Medications

The extreme length of this patient's stay on watch (5 ½ weeks) was attributable in large part to his refusal of medication. The decision to seek authority to medicate him involuntarily was delayed until February 24, more than a month into his crisis. Had there been lack of the confusion described above among his care givers about the reasons for his being on watch and therefore, what needed to be accomplished clinically to address those reasons, ADCRR would likely have reached the conclusion that he needed involuntary medications much sooner, reducing the length of the patient's stay in this very restrictive setting.

6. Lack of Care Coordination and Communication

There should have been one, or a small number of therapists treating the patient each day. Instead there were at least 9. Because there were so many different providers offering care to the patient, clarity in

---

[40] The entire plan was not erroneous. There were a few incidents during the patient's stay on MH Watch when his bizarre behavior resulted in charges of staff assault (spitting on one occasion and reaching through the cuff port to grab an officer on another). These could be interpreted as potentially dangerous to others and therefore the component of the discharge criteria associated with being safe around others was not unreasonable.

documentation was even more essential to provide even a modicum of continuity across sessions. Documentation, though, was not clear. When reading previous progress notes a provider must use that information in their contact with the patient and carry through on previous progress. They did not. When the simplest information, such as the reason for placement, is not consistently correct on every note, there is no possible way for the care to be organized and focused on the patient's true needs which is what is required to minimize the patient's stay in a restrictive environment such as a mental health watch.

In summary, this was a complicated patient who certainly was in crisis and needed to be in a MH Watch. However, the length of time he was in psychological crisis (and amount of time that he had to spend in a restrictive environment) – the harm in this case – likely could have been reduced if his care were appropriate. It was not.

| Injunction Provision 16.9.4 | Non-compliant |
|---|---|

**Provision:**
The patient shall be assessed by a psychiatric practitioner as soon after admission to a crisis stabilization bed as possible but no longer than one business day, in order to ensure there is not a medication issue or a question of medication appropriateness that contributed to suicidal ideation.

**Importance:**
Among MH professionals, only a psychiatric practitioner has the authority to prescribe mediations. As articulated in the provision itself, this provision ensures that medications are not the cause of the patient's crisis. Because some crises require medications to resolve, this provision also ensures that if that is the case, the medications are started as soon as possible, ameliorating or resolving the crisis and the risk of psychological and physical harm that can ensue.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 79%. If a percentage were to be calculated it would approximately 55%.

**Example:**
Patient 178 has PTSD, schizoaffective disorder - bipolar type, mood disorders, and opioid dependence. He was placed in a crisis stabilization bed (MH Watch) on Tuesday, February 18. He should have been seen by a psychiatric practitioner by Wednesday, February 19. Instead, he was not seen until Sunday, February 23. After her assessment, the prescriber concluded that changes in the patient's medications were not indicated. However, she did not know that ahead of time, and thus the delay put the patient at significant risk for the serious outcomes described above. Fortunately, those risks did not materialize in this patient, but could in another patient subjected to the same violation of the provision.

| Injunction Provision 16.9.5 | Non-compliant |
|---|---|

**Provision:**

For patients placed in a crisis stabilization bed for suicidal concerns, a suicide risk assessment (SRA) shall be completed upon admission that identifies risk and protective factors and items/privileges they are allowed (based on treatment needs) while in crisis care.

**Importance:**

This provision ensures fulfillment of a version of the first essential process of MH care – evaluation – for patients who are suicidal. Their sudden suicidality represents a change in their previous condition (as was described in their most recent comprehensive MH evaluation). Therefore, as that evaluation is no longer fully current, the SRA provides the necessary update to their changed condition, which can then be translated into a version of the second essential process of MH care – an updated Treatment Plan – to bring the crisis to a rapid close. There are two dangers to a poor or absent SRA. In the event the patient is not suicidal at all or at low risk of suicide, absent an SRA, the patient would remain in the restrictive environment that is MH Watch, longer than necessary. Placement in restrictive environments can, in and of itself be psychologically harmful to some patients with mental illness. Conversely, in the event the patient is highly suicidal, absent an SRA, the patient remains at risk of untreated suicidality, with the attendant risk of death.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

**Example:**

Patient 179 is a 38-year-old male with developmental/intellectual disability, mood disorder, and psychosis. He was discharged from MH Residential care to outpatient care on January 14. On January 22 he met with a PA (not his Primary Therapist, though she identified herself as such) for 13 minutes in a private, confidential setting. The patient reported significant anxiety and depression (10/10), endorsed auditory hallucinations resulting in poor sleep, and a history of a suicide attempt when he acted on voices. The plan was to follow-up in 30 days.

On February 2 the patient voiced suicidal and homicidal ideation with threats to cut himself, to a nurse. He was placed on a continuous watch with full restriction of property (smock, safety blanket, no utensils). The following day (February 3) he met with a PA at cell-front for 10 minutes. The report noted that the patient declined meeting in a private environment. In this public setting, the PA inquired about his status, but the patient engaged minimally. The PA appropriately ordered continuous MH Watch with full restrictions to be continued. In her documentation, the PA noted that the placement had been based on reported suicidal ideation and a plan to cut himself. However, she concluded that the patient was placed on watch due to "Unstable Behavior." This conclusion was not consistent with the clinical evidence and misleading to subsequent care givers. Further, the conclusion is incongruent with the treatment plan. Indeed, depending on the nature of "unstable behavior," placement in continuous MH Watch with full restrictions of property and clothing may or may not be necessary.

While it is understandable that the PA could not conduct a complete Suicide Risk Assessment that day, given the lack of engagement by the patient, efforts should have been made to complete this necessary risk assessment during the next contact. It was not.

On February 4 the patient seemed more willing to interact with the PA and respond to questions, though still declined to meet in a private setting. The patient continued to report suicidal ideation but no longer had a plan. Despite this, the PA continued to erroneously note that the patient had been placed on watch due to "Unstable Behavior." While not completely cooperative with the interaction, the patient was responsive enough to questions such that a Suicide Risk Assessment could have been attempted during this interaction. It was not.

On February 5 a different PA saw the patient. He still declined to leave his cell for the conversation. This PA noted that the patient's MH Watch placement was due to "Suicidal Ideation," "Homicidal Ideation," *and* "Unstable Behavior." Despite the fact that the patient was "talkative" and "engag[ed] during this encounter" that lasted 16 minutes, and therefore a thorough Suicide Risk Assessment could have finally been attempted, the PA did not conduct one. In fact, a Suicide Risk Assessment was not completed until the day of the patient's discharge from MH Watch, February 12, (also cell-front) when it was determined that the patient was at low risk and therefore ready for discharge from MH Watch.

In summary, this patient had discharged from Residential Treatment and was placed on MH Watch due to suicidal and homicidal ideation within 2 weeks of that discharge. The PAs monitoring his care while on MH Watch did not complete a Suicide Risk Assessment until the day of his discharge 10 days later. The PAs failed to factor into their assessment the patient's recent change in level of care as a potential contribution to his suicidal and homicidal ideation[41]. A comprehensive Suicide Risk Assessment may have helped to include that important information in the conceptualization of the patient's concerns and risks. Additionally, if the Suicide Risk Assessment had been completed in a timely manner, the length of the patient's watch may have been reduced, helping him to more quickly adapt to his new environment.

---

[41] For some unstable MH patients, a change MH housing, especially moving from a setting with more access to MH care to one with less, is destabilizing. Uncovering that as a factor for a given patient in crisis and then addressing it is critically important for preventing a recurrent crisis.

| Injunction Provision 16.9.6 | Non-compliant |
|---|---|

**Provision:**
A clinical note shall be entered whenever the level of suicide watch is changed.

**Importance:**
For a patient on suicide watch, the typical "change" referred to here is "promotion" from constant watch (a staff member assigned to sit in front of the cell and watch the patient constantly, 24 hours per day), to 15-minute checks. This change is ordered by a MH professional when, in their clinical opinion, the risk of the patient attempting suicide is markedly reduced. This is therefore a critical juncture in patient care because an error in the professional's judgement can result in a death. Thus it is important that the change in level result from a careful thoughtful evaluation and conclusion on the part of the MH professional. Further, as part of that change in level, the professional is expected to order appropriate changes in necessary protections, e.g., whether the patient still requires a safety smock or can wear clothes, whether the patient can be given eating utensils instead of eating with their fingers. While it may seem like maintaining maximum restrictions would always be the safest approach, doing so without clinical justification actually increases the risk of harm. It does so because the patient – and the population – quickly learns that if they are truthful about their suicidal thoughts, they will remain in harsh conditions longer. As a result, they are much more likely to lie, leading staff to reduce restrictions prematurely, in turn, increasing the risk of a suicide.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 96%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 17%.

ADCRR's error in calculation stems from considering that they are meeting the Court's requirement as long as a clinician entered a note in the patient's chart at the time of the change in suicide watch level, ignoring whether or not the note was clinically appropriate and justified the change in level as well as the accompanying precautions that should be continued. We have provided feedback on this error to ADCRR.

**Example:**
Patient 180 is a 34-year-old female with bipolar disorder, substance use disorder, and a history of suicidality. She was on suicide watch from February 16 to 20 after voicing suicidal ideation with a plan of cutting herself. She was initially placed on a continuous watch with full restrictions of property (smock, safety blanket, no utensils). The following day, after an assessment, a clinician changed her level to a 15-minute watch, but kept her property restrictions the same. The restriction was clinically inappropriate (and dangerous, for the reasons described above) because remaining in a smock does not lessen the risk of cutting. Being in a smock does, however, significantly inhibit a person – and this

patient specifically – from being willing to leave their cell to participate in mental health assessments. Indeed, the patient refused to exit her cell for her mental health assessments on each subsequent day (February 17, 18, 19, and 29), greatly limiting the mental health staff's ability to effectively assess her continuing suicide risk.

| Injunction Provision 16.9.7 | Non-compliant |
|---|---|

**Provision:**
Prior to being released from a crisis stabilization bed if placed there due to suicidal concerns, a discharge suicide risk assessment shall be completed which documents: the change/reduction in suicidal risk; the patient's identified protective factors; and plans for follow-up treatment, and aftercare including a safety plan developed in collaboration between the patient and treatment providers.

**Importance:**
The time after release from MH Watch is arguably one of the riskiest moments in the care of mentally ill patients. This provision ensures that implement two activities that correspond to the first two of the essential processes of MH care – evaluation and treatment plan. As described in the introduction to the Mental Health section, these processes are essential to ensuring patient safety.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

**Example:**
Patient 179 was placed on Continuous MH Watch on February 2 after reporting to a nurse that he was experiencing suicidal and homicidal ideation, and threatening to cut himself and others. While a psychology associate met with the patient each day while on watch, the interactions were superficial and ineffective at improving understanding of the factors that led to the patient's suicidal and homicidal thoughts. The interviews did not explore that important information. An "Initial Suicide Risk Assessment" was not completed until the last day of the patient's ten-day stay. The stated clinical objective of his stay on MH Watch had been to "become mentally stable." This poorly formulated goal was unrelated to the significant risk that brought him to be on watch. The discharge safety plan was for the patient was to "remain mentally stable" which is wholly inadequate as a plan. The care of this patient's needs was poor throughout his watch placement compounded by a lack of adequately assessing his risk of harm to self or others going forward, placing himself and others a significant risk of serious harm post-discharge.

| Injunction Provision 16.9.8 | Compliant |
|---|---|

**Provision:**

"Safety contracts" (forms signed by patients, agreeing not to hurt themselves) shall not be used.

| Injunction Provision 16.9.9 | Non-compliant |
|---|---|

**Provision:**

When possible and safe, attempt to provide stabilization at the complex at which the patient has been housed unless there is documented clinical justification for transfer based on the low likelihood of stabilization and/or clinical danger if the patient is maintained at the complex.

**Importance:**

Although necessary for the patient's safety, placement in a crisis stabilization bed, by itself, adds psychological stress to the patient's already tenuous psychological state. Moving the patient to another complex adds further stress due to both the fact that the patient may be in an unfamiliar environment as well as the transportation itself. Any stress has the potential to make the patient less stable, prolonging the crisis or exacerbating it. This provision is intended to limit transfers to other complexes to those that are clinically necessary for the patient's health and safety.

**Discussion:**

ADCRR continues to be non-compliant with this provision. Patients in crisis are transferred for other than health care needs.

ADCRR self-assesses its level of performance on this provision at 100%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 80%.

**Example:**

Patient 181 was at the Mohave Unit, ASPC-Douglas when, on February 10 correctional officers became concerned about his mental health and appropriately referred him for a mental health assessment. The officers noted a "significant display of depression- avoidant/isolative, head down, depressed affect." He met with his Primary Therapist (just assigned that day) on the same day through telehealth for an Initial Safety Assessment. The above-described depressed presentation continued during the 20-minute interview. The patient would not face the therapist, spoke in a soft tone and answered "no" before questions were finished being asked. The decision was made to place the patient on a continuous MH Watch for possible "[danger to others]/[danger to self]." Though there were no direct indicators of this risk, the patient also did not sufficiently respond to questions to rule out risk of harm to self. Despite being at a location that has MH Watch beds, the patient was transferred to Rincon Unit, ASPC-Tucson for the duration of his watch. The reason for the transfer was "The patient is being transferred while on watch as he is currently unable to be stabilized at his current facility and needs a higher level of care as evidenced by high risk for DTS." There had been no effort made to stabilize the patient at his home facility and it was an exaggeration to say that the patient was at "high" risk for self-harm. During the watch at the Rincon Unit he remained subdued and non-communicative. He declined to meet with psychiatric providers and stated that he did not need medications. He was screened for placement in a MH Watch room with others ("cohorting"), but it was decided that he would not benefit. Given his depressed, isolated state, and the absence of any evidence that cohorting him would be inappropriate, it

was clinically unreasonable to not cohort him so he could benefit psychologically from another person in his room (in violation of Injunction section 16.8.3). On February 14 the patient nodded when asked if he wanted to return to ASPC-Douglas. Psychology associates continued to monitor him until February 19 when he was discharged from watch, though little had changed about his presentation. He was returned to the Mohave Unit once discharged from watch. There were no services available or provided at ASPC-Tucson that this patient required or was offered that were not available at ASPC-Douglas. Thus, there was no clinical value in transferring the patient and transferring put him at risk for the psychological stressors and possible further complications from those stressors, of an unnecessary transfer. Though he did not appear to deteriorate while at Tucson, the risk existed.

| Injunction Provision 16.10 | Compliant |
|---|---|

**Provision:**

Restraints used by mental health clinicians for clinical purposes shall comply with the following 8 requirements: 1) Restraints shall be used only to prevent harm to oneself or to others and to ensure the safety and security of the staff and other patients. They shall not be used for punishment. 2) Restraints shall be ordered and reviewed only by a psychiatric practitioner or psychologist. 3) Restraints shall only be applied for the minimum amount of time necessary to accomplish the stated need (e.g., patient and staff safety, requisite transports, etc.). 4) Soft restraints shall be used whenever possible. 5) Restraints shall not be used for more than four hours at a time. Every effort shall be made to minimize the length of time in restraints. 6) Renewal of restraints beyond four hours shall be approved by the Facility Medical Director/designee and must be renewed at intervals no longer than four hours. If the Medical Director/designee are not available, a licensed mental health provider may approve continued use. The justification for continued use shall be documented in the patient's medical records. Renewals occurring after hours shall be done in collaboration with the Facility Medical Director/designee, a psychiatric practitioner, or a psychologist. 7) Patients shall be restrained only in settings that allow nurses sufficient access to perform wellness checks and provide necessary medical care. Nurses shall ensure that the restraints do not impair any essential health needs, such as breathing or circulation to the extremities. These checks shall be documented in the patient's medical records. 8) Patients in restraints shall be under direct observation at all times. If an observer notes any ill effects of the restraints, every effort shall be made to remedy the ill effects and a psychiatric or medical practitioner shall be notified immediately.

Staffing and Buildings

| Injunction Provision 13.2 | Compliant |
|---|---|

**Provision:**

A MH Duty Officer shall be available at all times when facility mental health staff are not available. The MH Duty Officer shall be a licensed psychology associate, psychologist, or psychiatric practitioner.

| Injunction Provision 14.1 | Compliant |
|---|---|

**Provision:**

All psychiatrists–at hiring and during employment–shall be board certified in psychiatry, or board eligible if within 7 years of their completion of an ACGME approved residency in psychiatry, with the following exceptions: 1) supervising psychiatrists shall be board certified at hiring and during employment; 2) psychiatrists who are currently employed and are not board eligible may remain employed for no longer than one year of issuance of this Order; they may also not possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. (Notify Court Monitors if there is a request for an exception.)

| Injunction Provision 14.2 | Compliant |
|---|---|

**<u>Provision:</u>**

All psychologists and psychiatric practitioners shall have the appropriate state licenses. All psychology associates shall be licensed or become licensed within one year of hiring or within one year of this Order, whichever is later, and may not possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility.

| Injunction Provision 1.10 | Compliant |
|---|---|

**<u>Provision:</u>**

All staff hired in clinical MH supervising positions must have at least two years clinical experience.

| Injunction Provision 1.11 | Compliant |
|---|---|

**<u>Provision:</u>**

Behavioral Health Technicians shall not independently assess patients or initiate a plan of care or treatment.

| Injunction Provision 1.12 | Compliant |
|---|---|

**Provision:**

No one for whom a health professions license is required may possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility.

| Injunction Provision 13.1 | Compliant |
|---|---|

**Provision:**

Outpatient psychologists supervise no more than eight psychology associates, and inpatient psychologists supervise no more than six psychology associates.

| Injunction Provision 15.1 | Non-compliant |
|---|---|

**Provision:**

Each patient on the mental health caseload, i.e., all patients in MH Levels 3, 4, and 5, are assigned a primary therapist (PT; psychology associate or psychologist) who serves as the single point of contact and coordination for providing care to all patients designated MH-3 and above. When a patient's assigned PT is unavailable, another psychology associate or psychologist acts on their behalf.

**Importance:**

The three essential processes of MH care, especially the third – executing the Treatment Plan – rely on the patient having a PT. Having an assigned PT serves two critical functions. On the therapist side, it ensures that the person seeing the patient knows them and their history. Prisons are the nation's mental illness asylums, housing a higher density of severely mentally ill individuals than the community. Due to their complexity, within the time constraints of a normal therapy encounter, it is not possible for a therapist just "passing through" to know enough about the patient to provide meaningful care. On the patient side, it ensures that the patient trusts the therapist. For treatment to occur, patients must share their deepest, scariest, and most intimate thoughts with the therapist. Most patients will not share with a stranger, which is what a therapist whom they have never seen before and may never see again is, making treatment next to impossible, which, in turn, places the patient at significant risk of the harm caused by their mental illness continuing unabated.

**Discussion:**

To be successful on this requirement, ADCRR has to first assign each patient on the MH caseload to a PT. That assignment only has value if that PT then actually performs the functions of a PT, serving as the primary source of care and care coordination for the patient. With the current reports generated by ADCRR, it is not yet possible to calculate an accurate count of the number of patients for whom this requirement has been met. However, we assessed compliance with this requirement in two ways. First, as part of monitoring of the other provisions of the Injunction, we reviewed hundreds of patient records. Second, we examined a random sample of MH-3 patients and examined whether or not a therapy session was conducted with the patient's PT. This is discussed in greater detail in Section VIII Primary Care Practitioner (Medical) and Primary Therapist (Mental Health). Only 45% of the sessions were conducted by the PT. Third, we evaluating the reasonableness of the caseload of the PTs statewide. A *sine qua non* of providing primary therapy is that each PT must have a manageable case load. In other words, a PT with a very large case load cannot, by definition, provide a minimally adequate level of care that satisfies this requirement. Based on both methods we find that ADCRR is still very far from meeting this basic Injunction requirement. As an example of the data that emerged from the second method, a PT at Tucson has 302 patients assigned to her caseload. Of that total patient load, 257 are identified as MH4, i.e., ill enough to require residential-level care. Patients of that level require considerable time from the PT such that a PT cannot reasonably provide care to more than 25 or so patients. Therefore none of her 302 patients can receive the level of care required by the Injunction. As an example of how this overload manifests at the patient level, since July 2024, Patient 182's therapy sessions were shuffled from one therapist to another 10 times (among eight different therapists, most of whom he had never met previously). The patient declined the last three meetings. It is impossible to provide meaningful safe MH

care under these conditions. The current status underscores the need for immediate implementation of the PCCM and staffing plan, which provides for a consistent PT and MH team and establishes case load sizes based on individual patient clinical acuity levels.

| Injunction Provision 15.2 | Non-compliant |
|---|---|

**Provision:**
A psychologist shall review the records of each patient who is added to, or discharged from, the mental health caseload after intake. The psychologist shall approve or deny the level of care assignment and take appropriate action.

**Importance:**
This provision ensures that patients whose mental health needs change during their time in ADCRR receive services commensurate with those needs, which could mean either increasing mental health services or reducing them. An increase in services is defined as a MH classification change from an MH-1 or MH-2 to an MH-3 or above, thereby placing them on the mental health caseload and setting into motion a number of clinical responsibilities for mental health (e.g., assignment of Primary Therapist, initial comprehensive mental health evaluation, treatment plan, etc.). Conversely, a decrease in services for this measure means changing the MH code from an MH3 or above to an MH1 or MH2, which effectively removes someone from the mental health caseload. The purpose of the psychologist's review is for the supervising psychologist to be able to make sure that all of the appropriate elements are in place (e.g., assignment of Primary Therapist, comprehensive mental health evaluation, discharge summary) for successful placement at the proposed location/level of care and to review those elements to assure that the change in assignment is clinically appropriate.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses its level of performance on this provision at 92%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, the performance level we calculated was approximately 30%. In none of the cases we reviewed (0%) was a mental health evaluation included in the record and in the majority of the cases reviewed (70%), there was insufficient information to support the proposed MH-code change. In other words, *a fortiori* the review by the psychologist could not have been meaningful. Notably, several cases involved a psychiatric provider changing an individual's code from MH-1 or 2 to MH-3 following an HNR request that bypassed the requisite meeting with a medical (not MH) practitioner as required by the Injunction (section 15.3, 15.4, and 15.5).

**Example:**
Patient 183 was changed from an MH-1 to an MH-3B on February 17 but there is no documented justification for the change. There is neither a mental health nor a psychiatric evaluation anywhere in the records. According to the available documentation, the patient was seen on February 17 by a psychiatric practitioner who noted in the narrative field of the Mental Health Score Form only that "patient is currently on med (sic)" as the reason for the change in score. The Psychiatric Progress Note from the same encounter (February 17) is entirely blank except for a few checkboxes indicating "Unable to Assess/Patient not Participating." However, despite the lack of any information at all, the practitioner

prescribed a small dose of psychotropic medication (hydroxyzine 25mg every night), though it was not clear what it was being prescribed for, as the encounter contained no clinical information to explain it.

Of greater concern is that the MH-classification change on February 17 failed to set in motion several processes that should have been implemented in managing the patient's care, most importantly the assignment of a Primary Therapist who would meet with him to establish the therapeutic relationship, orient him to mental health services, and function as the ultimate point of accountability in the patient's care. The Primary Therapist would complete a comprehensive mental health evaluation to gather/synthesize the relevant psychosocial, mental health, and criminogenic information to provide a sound clinical basis for the diagnoses being offered; and both the Primary Therapist and patient would develop a treatment plan to establish the expectations and structure of treatment. However, none of these things happened. The patient did not meet with any mental health clinician – Primary Therapist or otherwise – either before or after his code was changed. As a result, no one from mental health assumed responsibility for the patient's care and not unexpectedly, the patient did not have a comprehensive mental health evaluation nor did he take part in treatment planning, leaving any potential providers with no information about his actual mental health needs.

In summary, though a supervising psychologist reviewed the record and articulated a decision on the assignment of the patient to the MH caseload, it was a vacuous activity because the patient's chart did not contain nearly sufficient information to make that decision.

| Injunction Provision 1.4 | Non-compliant |
|---|---|

**Provision:**
Telehealth (video encounter with remotely located clinicians; TH) for mental health care may be used only when clinically appropriate.

**Importance:**
The three essential processes of MH care, especially the third – executing the Treatment Plan – rely on the patient having effective clinical encounters with MH professionals. TH can be an effective tool for accomplishing those encounters. However, there are two potential limitations when used for MH care. **First**, some patients with mental illness are more distrustful, if not paranoid, of settings that are unfamiliar to them. For many patients, sitting in a room with a television screen, speaking with someone who is hundreds or thousands of miles away is unfamiliar. Thus, they may not engage enough, limiting if not preventing any therapeutic value of the encounter. **Second**, at the extreme, some patients will simply not be willing to attend such a visit.

**Discussion:**
Despite our strong recommendations to the contrary, ADCRR continues to rely heavily on, if not has increased its reliance on, remote mental health clinicians providing chronic care in mental health via video. Although the Injunction does not prohibit ADCRR from using TH, it requires ADCRR to only use TH when clinically appropriate. Instead, ADCRR frequently uses TH when it is clinically inappropriate, and therefore dangerous. We have also noted a high rate of patients refusing visits with MH clinicians when scheduled for TH visits. This is not unexpected because it is more difficult for patients with significant mental illness in a prison environment to feel comfortable and safe establishing a clinician-patient relationship with a virtual image on a screen.

ADCRR self-assesses its level of performance on this provision at 88%. If a percent performance were to be calculated on the data they reviewed, it would be approximately the same.

**Example:**
Patient 184 has an established history of refusals of TH appointments with therapists and psychiatric practitioners (September 5, 2024, November 18, 2024, January 18, February 4). The appointment under review was scheduled for February 12, only one week after the previously refused TH appointment. The patient had not been adherent to his medications. His medication non-adherence and lack of meaningful involvement with MH clinicians likely resulted in serious injury to the patient. He was involved in four physical altercations during February 2025. The final altercation resulted in this patient having to go to the ER to be evaluated for head trauma.

| Injunction Provision 15.9 | Non-compliant |
|---|---|

**Provision:**

There is sufficient space, equipment (e.g., computer, furniture), and supplies (e.g., assessment and treatment materials) to deliver mental health care services. This includes, but is not limited to, areas for mentally ill patients to be housed, engage in programming, and receive treatment (both individual and group) in an environment commensurate with that unit/facility's designated level of care. There is auditory and visual confidentiality during MH encounters.

**Importance:**

ADCRR cannot possibly comply with almost any of the requirements of the Injunction in the absence of sufficient space, equipment, and supplies.

**Discussion:**

While we believe ADCRR has sufficient equipment and supplies to conduct business in the MH realm, it does not have sufficient physical space. The deficiency is seen in both office space for clinicians as well as space for clinical encounters. For example, the PCCM Pilot at the San Pedro Unit at ASPC-Perryville had to be aborted after only days due to insufficient rooms in which to see patients. ADCRR created some additional space within housing units to see MH patients at the PCCP Pilot at the Dakota Unit at ASPC-Yuma, which was helpful. ADCRR has created 24 additional exam rooms statewide over the past 13 months (Doc. 4815 at 7).

The shifting of MH Inpatient beds from Flamenco Unit at ASPC-Phoenix to the Eagle Point Unit at ASPC-Lewis was a critically necessary move that was very difficult and complicated, but one that *ADCRR orchestrated last year very smoothly*. However, the vast majority of MH care sites throughout the state remain hobbled by inadequate space.

**Example:**

Patient 185 was placed on watch due to suicidality on January 27. On January 29 the psychology associate met with him at cell-front because "no staff available for a private setting." This interaction was three minutes long. Later that day the patient was banging his head on the wall and only stopped when pepper spray was used. This may have been prevented with a more therapeutic, effective interaction in a private, confidential setting. Two days later, while still on MH Watch, the psychology associate met with the patient for 4 minutes at cell-front because "no private setting available." This interaction confirmed the patient's discharge from MH Watch, even though he had had an additional head banging event the previous day, leading to the use of pepper spray, placement in a restraint chair, and use of involuntary medications to reduce his agitation. Unfortunately, this insufficient discharge (there was no Discharge Suicide Risk Assessment) contributed to the patient's placement back on watch 3 days later. There are several ways by which corners were cut for this gentleman. He was clearly a danger to himself as his agitation repeatedly resulted in banging his head, sometime to the point of lacerating his forehead. Had greater effort been made to meet with him in a therapeutic manner, a more effective plan of care could have been established with the potential to reduce the harm he caused himself, due to his illness.

266

| Injunction Provision 16.7 | Non-compliant |
|---|---|

**Provision:**

All mental health encounters with all patients shall occur in a confidential, therapeutically appropriate setting unless there is a clinical or legitimate and substantial safety and security concern that is documented.

**Importance:**

This provision complements provision 15.9. The component of 15.9 that addresses physical space focuses on whether the space exists; this provision focuses on whether that existing space is utilized when seeing patients to ensure their examinations occur in a therapeutic and confidential setting. Thus it would be possible for ADCRR to be compliant with 15.9 and not with 16.7, but it would not be possible to be compliant with 16.7 unless it were compliant with 15.9. Provision 16.7 is also related to provision 1.7 that requires confidentiality throughout the health care operation - medical and MH. For ease of self-monitoring by ADCRR and monitoring by the court, we use 16.7 to assess compliance in the MH realms and 1.7 to assess compliance in the medical realm (or any setting that is not strictly medical or MH).

**Discussion:**

ADCRR continues to be non-compliant with this provision. In our Second Interim Monitors' Report we wrote:

> We recommended an "opt-out" approach whereby a custody officer (not the MH professional) informs the patient that they have come to escort the patient to a consultation with a health care professional. The patient can voice a refusal if they want (i.e., the patient is not forced to go). However, this approach conveys the impression that there is an expectation to go to the appointment (as would happen with any other health care appointment in the prison), and that that is the clinically better choice. "Opt-out" is an evidence-based health care tool that is recommended for a variety of interventions by the Centers for Disease Control (CDC) and others. ADCRR has concurred that the optout approach is preferable and would improve their compliance with the Injunction. However, although it may be happening sporadically in some complexes, to our knowledge, ADCRR has yet to enact a statewide change to policy and procedure.

Our finding remains unchanged.

**Example:**

Patient 185 was placed on MH Watch due to suicidality on January 27. On January 29 a psychology associate met with him at cell-front because "no staff available for a private setting." This interaction was 3 minutes long. Later that day the patient was banging their head on the wall and only stopped when pepper spray was deployed. This may have been prevented with a more therapeutic effective interaction in a private, confidential setting. Two days later, while still on MH Watch, the psychology associate met

with the patient for 4 minutes at cell-front because "no private setting available." This interaction confirmed the patient's discharge from watch, even though they had an additional head banging event the previous day, also leading to the use of OC, then placement in a restraint chair and use of involuntary medications to reduce his agitation. Unfortunately, this insufficient discharge (there was no Discharge Suicide Risk Assessment) contributed to the patient's placement back on watch 3 days later. There are several ways by which corners were cut for this gentleman. He was clearly a danger to himself as his agitation repeatedly resulted in banging his head, sometime to the point of lacerating his forehead. Had greater effort been made to meet with him in a therapeutic manner, a more effective plan of care could have been established with the potential to reduce the harm he caused himself, due to his illness.

# Medical and Mental Health Services
## Staffing

| Injunction Provision 1.15 | Non-compliant |
|---|---|

**Provision:**

There is a sufficient number of custody staff to support the functioning of the health care operation, including but not limited to: transporting patients to on-site and off-site clinical encounters and appointments; administration of medications; and providing security in the venues of health care operations. Exceptions may be made for a declared emergency (e.g., prison riot, natural disaster).

**Importance:**

Unlike the provision of health care services in a community health care venue, health care in a prison cannot be provided without the support of custody staff, thus the risk of significant harm to patients from lack of adequate custody staff support speaks for itself. There are three components to adequate custody support: (1) adequate number of custody staff; (2) functional, available custody systems of support; (3) individual officer cooperation.

**Discussion:**

We have seen no evidence of lack of individual custody officer cooperation with the delivery of health care services. In fact, if anything, based on our observations, the opposite is true. We see officers going out of their way to provide support to patients and health care staff. However, based on the evidence we collected from review of health records, data analysis, interviews with patients, and interviews with NaphCare staff, ADCRR does not currently have a sufficient number of custody staff nor custody systems that are reliably functioning enough to support ADCRR's obligation to provide adequate health care. These deficiencies manifest themselves in at least four ways that we have discovered.

**First**, the lack of custody staff impacts the ability to get patients their needed medications. For example, according to data from the EHR software, a total of 589 doses of medication were not administered during a 3 month period (January-March 2025) due to a lack of custody staff at Lumley Unit, ASPC-Perryville on February 4, and at Cimarron Unit, ASPC-Tucson on February 26 and March 11, and due to a statewide search team conducting searches at Cibola Unit, ASPC-Yuma on March 25 and 26.

**Second**, the lack of custody transport teams impacts the ability to transport patients to off-site specialist consultations, radiography, and treatment. Schedulers at one complex noted that cancellation of appointments due to lack of custody transportation surpasses the number of cancellations due to patient refusals. The EHR is unable to track these failed trips on a statewide level, however, schedulers often comment in individual patient records when an appointment is missed due to lack of custody to provide needed transportation. For example, on March 25, Patient 54 had an urgent MRI scheduled on a later date due to lack of transportation (See screenshot from EHR below.).

269



Though we have been informed in the past by ADCRR that it does not have a daily transportation "cap," documentation in patient records refutes that assertation. For example, Patient 186 had a cardiology appointment on February 12, rescheduled to March 31 due to a "cap."

Patient 187 had a CT scan ordered on August 26, 2024 for a mass of unknown type on his neck. Ordered "Routine," it needed to be completed in 60 day (by October 26, 2024). It was scheduled to be done October 17, 2024 but the trip was cancelled "due to transportation CAP restrictions" (See screenshot from EHR).



It was rescheduled for November 11, 2024, but that trip never took place for reasons that we could not discern in the EHR. The CT was finally completed on January 13, four and a half months after it had been ordered and two and half months late.

An important side effect of cancelations of specialty care appointments is that cancellations jeopardize ADCRR's relationship with specialists because of the difficult for the specialists to fill last-minute cancellations.

**Third**, the lack of custody staff impacts the ability to escort individuals who are at a higher custody level and therefore cannot walk by themselves, from their living unit to on-site health care appointments. For example Patient 188 was not seen by a practitioner for opioid use disorder on January 2 because "unable to pull [patient] due to security staffing/running out of time," Patient189 was not seen by a nurse on February 5 because of "Lack of custody to go and locate [patient] for screening," and Patient 43 was not brought to chronic care clinic 10 times in a row, from March 14 until April 30, because of custody operational reasons (see screenshot of EHR below, red marks indicating cancelled trips, added).

QUICK NOTE BY: ██████ Nurse Practitioner POSTED ON 4/30/2025 3:40:54 PM

Patient was scheduled for chronic care visit today. Because of multiple ICS and DOC operations patient was not brought to the clinic during clinic hours. Patient will remain scheduled for chronic care.

QUICK NOTE BY: ██████ Certified Medical Assistant POSTED ON 4/30/2025 8:00:11 AM

Patient received elastic stockings (Lg) on 04/07/2025 from medical assistant Tapia.

QUICK NOTE BY: ██████, Nurse Practitioner POSTED ON 4/29/2025 1:57:50 PM

Patient was scheduled for chronic care appointment today. Patient was not brought to clinic during clinic hours. This was related to DOC operations and a lockdown. See 25-c11-1503.

QUICK NOTE BY: ██████ Nurse Practitioner POSTED ON 4/16/2025 12:23:26 PM

Patient was scheduled for chronic care today. Full lockdown on yard. No patient's brought to the clinic. Refer to IR25-C11-1293. Patient will remain scheduled for chronic care clinic.

QUICK NOTE BY: ██████, Nurse Practitioner POSTED ON 4/15/2025 8:31:03 AM

Surveillance ultrasound is ordered

QUICK NOTE BY: ██████ Nurse Practitioner POSTED ON 4/14/2025 3:02:01 PM

Patient was scheduled for chronic care visit. Because of ICS and DOC operations (IR 25-E11-1269), patient was not able to be brought down to the clinic. Patient will remain scheduled for chronic care.

QUICK NOTE BY: ██████ Nurse Practitioner POSTED ON 4/11/2025 3:16:36 PM

Patient was scheduled for chronic care visit today. Because of multiple ICS's and DOC operations patient was not brought to the clinic during clinic hours. Patient will remain scheduled for chronic care visit.

QUICK NOTE BY: ██████ Nurse Practitioner POSTED ON 4/8/2025 2:43:33 PM

Patient was scheduled for chronic care visit. Patient was not brought to the clinic during clinic hours. This was related to Department of Corrections operations. Patient remains scheduled for chronic care.

QUICK NOTE BY: ██████ Temporary RN POSTED ON 4/5/2025 8:56:32 AM

IM aware you are currently on the provider line you will be called up the day of your appointment

QUICK NOTE BY: ██████, Behavioral Health Technician POSTED ON 4/4/2025 2:30:30 PM

Mental health welfare rounds were completed on 04/04/2025 between 1145-1202 in Cimarron housing unit 2. Writer asked patient if he had any mental health concerns, patient did not voice any mental health concerns at this time.

QUICK NOTE BY: ██████ Nurse Practitioner POSTED ON 4/2/2025 2:56:21 PM

Late entry for 4/1/25
Patient was scheduled for Chronic care visit. Patient did not arrive in the clinic to be seen. Patient will remain on schedule to be seen.

QUICK NOTE BY: ██████ ADCRR SUD Counselor Supervisor POSTED ON 4/2/2025 12:40:12 PM

Client seen for SUD screening for substance abuse groups. He is interested in attending. Will add to SUD wait list.

QUICK NOTE BY: ██████, Nurse Practitioner POSTED ON 3/27/2025 7:40:23 PM

Attempted to see patient today for his CCV. Due to DOC staffing shortages, he was not able to be brought to medical during office hours of 0700-1400. Appointment rescheduled for the next available appointment.

QUICK NOTE BY: ██████ Nurse Practitioner POSTED ON 3/18/2025 3:15:10 PM

Patient was gradual for provider visit today. Related to custody staffing and ICS, patient was not brought down to the clinic for the appointment. Patient will be scheduled.

QUICK NOTE BY: ██████ Nurse Practitioner POSTED ON 3/14/2025 3:04:34 PM

Patient was scheduled for chronic care visit today. Patient was not brought down during clinic time in order to be seen. Patient will remain on chronic care schedule.

**Fourth**, the lack of custody staff is a barrier to patient access of on-site urgent care. For example, a patient we interviewed (who did not give us permission to share his name) noted that in Meadows Building 5, residents cannot access officers for urgent problems at night because the roving officer only comes around once an hour. If there is an urgent medical issue at other times, residents can try yelling to get an officer's attention in the bubble, but sometimes that officer has to leave to go to another building.

**<u>Example:</u>**
See example embedded above.

| Injunction Provision 1.16a | Non-compliant |
|---|---|

**Provision:**

(Additional reference: Any Court orders related to staffing levels) All positions required by the current contract with the health care vendor including any modifications, addenda, or updates are filled. A filled position is one in which there is an incumbent receiving a salary for the full intended time commitment of the position and is not on long term leave, e.g., Family Medical Leave Act. An individual may not fill more than 1.0 FTE.

**Importance:**

 ADCRR cannot possibly fulfill the requirements of the Injunction without an adequate number of staff with the proper credentials working at ADCRR on a regular basis. This latter requirement is necessary because the ability of a health care worker to do their job effectively and safely depends on qualities that are transportable, such as their training, knowledge, and skill, and their knowledge of the workplace. Any health care venue, but especially ADCRR, is a complex environment with many policies and procedures (at ADCRR there are three sets: ADCRR's Department Orders, Health Services Division's Medical and Mental Health Technical Manuals, and NaphCare's Policies and Procedures). Even with normal orientation during on-boarding of a new hiree, hirees learn so much in the first weeks and months on the job, the likelihood of their making an error is higher during this learning phase than later when they have been consistently working in the environment. Staff who are in temporary positions and leave after a few weeks or months never achieve sufficient knowledge of the environment. In a safe workplace there are only a few new hires, and they generally are surrounded by mentors and supervisors who help them avoid errors until they have enough experience. If the workplace has an excess of new hires, that mentoring cannot happen. The result is a greater risk of errors in patient care, some of which can result in serious harm to patients.

**Discussion:**

ADCRR continues to be insufficiently staffed. To rely on data that puts ADCRR in the most favorable light, we use the most recent staffing report available at the time of writing (March 2025) rather than the February staffing report. We estimate that ADCRR's agent, NaphCare, currently has 83% - 88% of its positions filled.[42] NaphCare's calculation of their current staffing levels in that report (95%) includes staff in their Regional Office staff as well as staff they hope to hire ("pending hires"), which we excluded from our calculations. The percentages we calculated are based on ADCRRs current staffing contract as of Amendment 14 and does not account for the additional clinical positions necessary to provide constitutional care per the experts' Staffing Analysis and Plan (Doc. 4858) adopted by the Court. Therefore, the total positions needed to provide constitutionally adequate care has still not been implemented and would significantly decrease the percentage of filled positions we report here. It is difficult to compare staffing over time as the staffing matrix is constantly changing and ADCRR's

---

[42] The calculation for the lower end of the range is based on the following data. In its March, 2025 staffing report, NaphCare reports that the total FTE should be 1568.7. In Defendants' response to the Monitors' Second Interim Report, they inform the Court of the amount of money they have held back from NaphCare for NaphCare's failure to fill shifts ("empty shifts"). Based on the total number of dollars withheld for the last eight months, and an average annual salary of $70,000, Defendants estimated that there were 297 vacancies. This yields a vacancy rate of 17% (297/1568.7) or a fill rate of 83%.

contract with NaphCare still does not reflect the number of staff actually needed. Although there has been some improvement in staffing numbers since the Injunction was first implemented with approximately 196[43] additional staff in health services, not all these additional positions are frontline workers. In addition, since the inception of the Injunction, the ADCRR state facility population has increased 7% (1617 individuals), so the clinical value (and impact on patient safety) of increases in frontline staff is partially offset by the increase in the population size.

In their response to Plaintiffs' motion for a receiver, Defendants assert that their agent, "NaphCare has provided competitive salaries for all these positions when compared with average market rates." (Doc. 4818 at 4). There are two flaws in this assertion. **First**, this assertion only has meaning if the comparison is with the correct "market." We do not know with which market NaphCare compared its salaries. A market is very much affected by two key factors of importance in this discussion: work setting and geographic location. Working in a prison is not the same as working in a community doctor's office. Based on our experience, employers must pay a premium to attract health care professionals to work in a prison. According to a NaphCare executive, NaphCare uses a software package (Salary Assessor®, Economic Research Institute) as a tool to evaluate the salaries it offers. However, the Salary Assessor database cannot distinguish carceral from community work settings for physicians. Further, it cannot distinguish on-site from remote employment. ADCRR is in desperate need of on-site staff. With regard to geographic location, while the Salary Assessor database has information at the city level for some cities, most of ADCRR prisons are in remote locations for which the database likely has little or no comparative data. **Second**, and more importantly, while surveying the "market" is a reasonable starting point for determining salary, setting salary is an empiric process: one sets the salary that is necessary to fill the position. This Court did not order "Fill positions as much as possible paying market rates."; it ordered, in April, 2023: "No later than three months after issuance of this Order, Defendants shall fill all positions required by the current contract with the health care vendor including any modifications, addenda, or updates and the additional positions defined in sections 6.1 and 12.1." (Doc 4410 section 1.16). As we stated in our previous report (restating similar statements), "The most important step that needed to be taken to increase staff recruitment was increasing salaries. I made this observation/suggestion to ADCRR several times since the Injunction's inception in April, 2023, including suggestions to aggressively escalate salaries (e.g., 5% to 10%) as often as monthly based on constant and careful monitoring of responses to advertising and hiring. Despite this, NaphCare's efforts to increase salaries have been anemic, at best."

It will be impossible for ADCRR to emerge from this Injunction without NaphCare filling all necessary positions with competent professionals, who are, for the most part, located on-site.

---

[43] There were 1106 staff in January, 2023 per Doc. 4391 (1160-54 NaphCare Regional Office staff). There were 1301.8 staff as of March, 2025 (1385.55-83.75 NaphCare Regional Office staff). 1301.8 – 1106 = 196

| Injunction Provision 1.16b | Compliant |
|---|---|

**Provision:**
Up to 15% of staff described in 1.16a may be filled with registry staff.

Medications

| Injunction Provision 10.1 | Non-compliant |
|---|---|

**Provision:**

Prescribed medications intended for directly observed therapy ("DOT") administration shall be administered as ordered or there shall be documentation of a valid reason for non-administration.

**Importance:**

This provision applies to medications administered directly by nurses (DOT; Directly Observed Therapy; as opposed to medications where a month's supply is given to the patient to keep in their living unit to self-administer – Keep on Person, or KOP). The provision requires nurses to administer medications as ordered. Every time a nurse administers a dose of a medication the nurse is expected to make an entry in the eMAR (electronic Medication Administration Record) contained within the EHR indicating the time the medication was administered and the name and credential of the nurse. As described in more detail in the Injunction, "as ordered" encompasses numerous elements such as: the need to actually administer the medication as evidenced by a complete entry in the eMAR; disallowing of "no-show" as a reason for non-administration; the need to administer the medication within certain time parameters (e.g., regular insulin must be administered within 30 minutes of serving a meal. Administering it too soon before the meal places the patient at risk of hypoglycemic shock, including possible seizure or coma.); the need to address patients' refusal to take their medication according to a procedure (described in more detail in provision 10.3), that ensures that the missed dose does not put the patient's health at risk, or if it does, that the appropriate efforts have been made to educate the patient, encourage the patient to take the medication, and assure that the patient's decision is an informed one, i.e., an informed refusal. Depending on the medication and the number of doses missed or the delay in administration, failure to administer a medication puts patients at a significant risk of serious harm.

**Discussion:**

ADCRR continues to be non-compliant with this provision. In Defendants' Response to Receivership, a weakness that the Defendants identified with our Monitors' Second Report was that "To support their claim that the Department fails 'to reliably administer medications,' *the Monitors cite only a single example* of an inmate who did not receive his HIV medications for five days."[emphasis added]. Lest we leave the Court with the impression that our finding of non-compliance with the administration of medications was, and is, based on a single error, we provide evidence here that failure to comply with this provision occurred more than once.

During the month of February 2025, ADCRR failed to administer 7,558 doses of medications providing

non-justifiable reasons ("No-Show" 6,105; "Not Administered Lack of Custody" 211; "Other" 1,242)[44]. As explained in the footnote, this understates the total number of doses where administration did not meet the requirements of the Injunction. It also understates the total for two other reasons. (1) Some missed medications fail to have an entry in the eMAR at all and the dates are just missing from the chronological list of dates the medication was administered. (2) Some medications are not missed, but are administered dangerously outside the required timeframe. ADCRR's vendor has not yet developed a report that captures the number of non-compliant medication administrations due to these two latter reasons.

The "single example" cited above that we mentioned in our Monitors' Second Report who missed 5 daily doses of his HIV medication (November 12-26, 2024) was Patient 10 in Monitors' Second Interim Report to Court, Doc. 4755. In Defendants' Response to Receivership, Defendants attempted to explain this as follows, "On four of these days, there is a documented refusal of the medication. (Id.) Moreover, the Monitors' report does not address the full medication administration record on file for this patient and does not note his status—which is stable with a consistently undetectable viral load as supported by complete laboratory testing. (Ex. 6, Pacheco Decl. ¶ 7.)"

There were indeed four documents in the patient's EHR that contained the word "refused," but to consider those as actual refusals by the patient is incorrect. The patient submitted a complaint via the Court's Complaint Portal on November 27, 2024 making it clear he wanted his medications, but they were delayed by ADCRR's pharmacy between refills. The eMAR inappropriately documents the doses on November 22-25, 2024 as "Refused," and documentation regarding administration of the dose on November 26, 2024 is simply missing. The patient submitted an HNR on November 23 reiterating his concern and frustration at not receiving his medications, making it clear that he was not refusing his medications, but quite the opposite, desperately wanted to receive them (See screenshot below from EHR).

---

[44] We did not include in this calculation 2,790 medications which were not administered due to "Pending Pharmacy Delivery." This is a heterogeneous group of medications. Some of these medications were not yet administered for justifiable reasons, e.g., the medication is a new one that was just ordered for the patient, and was still within an allowable window of delay to administer the first dose, generally 3 days. Conversely, in our review of medical records, we have seen examples where this reason was given for failure to administer a medication that the patient had been on for a while, and for which there should not have been a gap. For similar reasons, we did not include in this calculation 1,024 medications which were not administered due to "Not Administered Out of Facility." The two most common reasons a patient is out of the facility at the time of a medication administration is that the patient is hospitalized or the patient is on a day-visit to an off-site specialist or test. The former would be a justifiable reason not to administer the medication (the patient is supposed to receive their medications from hospital staff); the latter is not (arrangements should be made to provide the medication while traveling or upon return, unless a practitioner writes an order allowing the medication to be skipped). Finally, we did not include in this calculation 10,670 medications which were not administered, explained as "Refused." As we discuss elsewhere, many of these were unsafe and were not, in fact, refusals. Because the data provided did not allow us to distinguish between justifiable and non-justifiable non-administration for medications in these three categories, excluding all 2,790 "Pending Pharmacy Delivery," all 1,024 "Not administered Out of Facility," and 10,670 "Refused," yields a more conservative estimate (i.e., 7,558), recognizing that the actual number is higher, but by an unknown amount.



And yet, on November 24, an LPN executed a refusal form for all the patient's HIV medications, indicating that the patient refused to sign the form and gave as a reason for refusal as "na."

> After careful examination of this event, we doubt the veracity of the LPN's documentation. Even if the LPN's documentation were a true recording of events, i.e., the patient had actually informed the LPN he refused to take the medications, given the significant risk of harm to the patient of missing HIV medications, the LPN had a responsibility to escalate the refusal to a higher authority. The LPN did not (in violation of the Injunction section 10.3.1). Despite our clear signaling of violations of the Injunction with regards to this particular patient in our previous report, problems have continued *with the same patient*. Patient 10 in Monitors' Second Interim Report to Court, Doc. 4755, lodged another complaint through the court's Complaint Portal on February 4 stating, "Medical has, again, including 2/4/2025, allowed my chronic Care Medication[45] to run out within a 30 days period! First they allowed my brown tablet to run out; then my blue capsule; and on 2/4/2025, at approximately 9:45am the med pass LPN [name redacted] informed me that my blue tablet chronic care med was out!" ADCRR's documentation in the eMAR is at odds with this very credible patient report. For February 4, the LPN documented that the patient refused all four of his HIV medications. On February 25 ADCRR failed to administer one of the HIV medications because "Pending pharmacy delivery." The fact that the missed medications thankfully did not lead to viral resistance or harm, does not negate the fact that the patient was placed at risk. Missing HIV medications placed the patient at significant risk of serious harm because this can lead to viral resistance, making it harder to control the HIV infection.

Finally, in addition to the account of inappropriately missed doses cited above, we provide additional examples below.

**Example:**
Patient 12 in Monitors' Second Interim Report to Court, Doc. 4755 is on daily treatment for hepatitis C virus infection (HCV). ADCRR maintains an electronic record of all medication administrations (eMAR). In addition, ADCRR maintains a manual log for expensive medications, such as the HCV

---

[45] The medications described by the patient are all HIV medications.

medication this patient was receiving. We reviewed both places of documentation and compiled the chart below. The chart shows ADCRR's contemporaneous records of administration of the HCV medication for the period from April 8 to April 30. Each row denotes a sequential date, beginning with April 8. The column on the left shows the dates the medication was administered according to the eMAR. The column on the right shows the dates the (same) medication was administered according to the manual log. Each blank space shows a date which one or the other (or both) contemporaneous records show that ADCRR failed to administer this important medication, i.e., April 10, 11, 12, 17, 19, 24, 25, and 26. On the dates that only one of the two records shows an administration, there is arguably uncertainty as to whether the medication was administered or not. On the dates that neither record shows an administration, however, there is little uncertainty that ADCRR failed to administer it.

| Administered per eMAR | Administered, per Log |
|---|---|
| Administered by ███████ for **04/08/2025 9:58 AM** documented at **04/08/2025 9:58 AM** | 4/8/2025 11:30 |
| Administered by ███████ for **04/09/2025 10:44 AM** documented at **04/09/2025 10:44 AM** | 4/9/2025 8:00 |
| | |
| | 4/12/2025 8:00 |
| Administered by ███████ for 04/13/2025 10:36 AM documented at 04/13/2025 10:36 AM | |
| Administered by ███████ for **04/14/2025 10:39 AM** documented at **04/14/2025 10:39 AM** | 4/14/2025 8:00 |
| Administered by ███████ for **04/15/2025 11:38 AM** documented at **04/15/2025 11:38 AM** | 4/15/2025 8:00 |
| Administered by ███████ for **04/16/2025 1:16 PM** documented at **04/16/2025 1:16 PM** | 4/16/2025 8:00 |
| Administered by ███████ for 04/18/2025 3:11 PM documented at 04/18/2025 3:11 PM | |
| Administered by ███████ for **04/20/2025 10:47 AM** documented at **04/20/2025 10:47 AM** | 4/20/2025 8:00 |
| Administered by ███████ for 04/21/2025 9:19 AM documented at 04/21/2025 9:19 AM | 4/21/2025 8:00 |
| Administered by ███████ for 04/22/2025 9:50 AM documented at 04/22/2025 9:50 AM | 4/22/2025 8:00 |
| Administered by ███████ for 04/23/2025 9:55 AM documented at 04/23/2025 9:55 AM | 4/23/2025 8:00 |
| Administered by ███████ re for **04/24/2025 3:03 AM** documented at **04/24/2025 3:03 AM** | |
| | |
| Administered by ███████ for 04/27/2025 9:52 AM documented at 04/27/2025 9:52 AM | 4/27/2025 8:00 |
| Administered by ███████ for 04/28/2025 9:29 AM documented at 04/28/2025 9:29 AM | 4/28/2025 8:00 |
| Administered by ███████ for 04/29/2025 9:11 AM documented at 04/29/2025 9:11 AM | 4/29/2025 8:00 |
| Administered by ███████ for **04/30/2025 12:44 PM** documented at **04/30/2025 12:44 PM** | 4/30/2025 8:00 |

When we questioned LPNs at this living unit about these gaps in medication administration, they posited that he simply did not show up. However, that theory was disproven by the fact that on those same days LPNs documented giving him other daily medications. Not only did the failure to administer HCV medications put the patient at risk of treatment failure, as with medications for HIV, it also placed the

patient at significant risk of harm from the development of viral resistance which makes it harder to re-treat the infection.

On February 4, Patient 190, Patient 191, and Patient 192 all missed their dose of buprenorphine (buprenorphine, used to treat opioid use disorder) due to lack of custody staff, placing them at risk for undergoing opioid withdrawal and increasing the risk of relapse.

Patient 193 was on an antidepressant which ADCRR failed to administer from January 30 to February 4 "Pending pharmacy delivery," and was then not administered from February 5 to February 15 with no reason given, resulting in a more than a two-week gap in treatment. Abrupt discontinuation of this medication can lead to antidepressant withdrawal syndrome which includes symptoms such as dizziness, nausea, headaches, irritability, crying, sleep disturbances, and brain fog.

| Injunction Provision 10.2a | Non-compliant |
|---|---|

**Provision:**

For a patient newly admitted to a facility (e.g., transfer from another facility, return from a hospital stay, admission from a jail) and already on a medication in their previous venue, the first dose of a medication shall be delivered keep-on-person ("KOP") or administered ("DOT") in time for their next regularly scheduled dose.

**Importance:**

Anytime a patient transfers one venue to another, there is a risk of a break in their timely receipt of medication. This provision ensures that patients receive their medications without interruption when being transferred from outside the institution. See 10.1 above for an explanation of the risk imparted by breaks in the receipt of medication.

**Discussion:**

ADCRR continues to be non-compliant with this provision. Too often, patients experience harmful breaks in the timely receipt of their medications when entering ADCRR. Late last year ADCRR added lack of compliance with this provision to their priority list of issues needing remediation and improvement.

**Example:**

Patient 194 is a patient on aripiprazole for schizoaffective disorder - bipolar type and depression, transferred from ASPC-Eyman to ASPC-Yuma on February 13. ADCRR failed to administer the medication upon transfer to Yuma on February 14, 15, 16, 17 (documenting on this day two cryptic notes in the eMAR: "administration cancelled" and "wrong chart"), and 18, placing him at risk of exacerbation of serious mental illness.

| Injunction Provision 10.2b | Non-compliant |
|---|---|

**Provision:**

The first dose of a newly ordered medication shall be delivered ("KOP") or administered ("DOT") within the timeframe ordered, or if no timeframe is specified, within twelve hours for antibiotics and pain medications, and within three days for all other medications.

**Importance:**

For reasons similar to those explained in 10.1 and 10.2 above, depending on the medication and the delay, failure to administer medications in a timely manner places patients at risk for serious harm. This provision addresses the issue upon prescribing of a new medication.

**Discussion:**

ADCRR continues to be non-compliant with this provision. We do note, however, that ADCRR improved timeliness of administration of one particular type of medication – anti-platelet agents, typically prescribed for certain heart problems – when patients return from the hospital.

**Example:**

It is critically important to administer antibiotics in a timely manner, because untreated the infection can become more severe and spread to other parts of the body. Patient 195 was seen by an APP on February 7 for frequent urination and pain in his lower abdomen. The APP ordered him to be placed on an antibiotic that day. However, the first time he was administered a dose was on February 10, three days after it was ordered.

| Injunction Provision 10.4.1 | Non-compliant |
|---|---|

**Provision:**

KOP medications shall be delivered to the patient before the medication runs out (based on the date of the previous fill). A KOP medication shall be delivered either by providing the patient with the KOP supply or by staff administering the medication from stock, dose by dose, to bridge the gap until the KOP supply is delivered. Additional medication need not be delivered before the previous fill runs out if a clinically appropriate and documented determination was made by a prescriber that the medication should not be continued, and the patient is so informed.

**Importance:**

For reasons similar to those explained in 10.1 and 10.2 above, depending on the medication and the delay, failure to provide a patient with their next monthly supply of medications before the previous month's supply runs out, places patients at risk for serious harm

**Discussion:**

ADCRR self-assesses its level of performance at 96%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, we calculated a similar percentage. However, as explained earlier in this report, one of the dangers of relying solely on percentage performance, even when a percentage can logically be calculated, is that doing so does not always capture the degree of harm caused but the deficiency. In this case, for the month of February, ADCRR's estimate of 96% (actually 96.3%) performance was in a random sample drawn from the 23,077 reports of KOP medications filled. Thus, approximately 817 patients (23,077 x 0.037) had gaps in their medications – some for many days – during the month of February.

**Example:**

Patient 196 did not receive his refill of a medication to treat his high blood pressure for two weeks, placing him a risk of uncontrolled blood pressure, which can cause short-term and long-term sequelae such as heart attack or stroke.

| Injunction Provision 10.3 | Non-compliant |
|---|---|

**Provision:**

When a patient refuses a medication (or classes of medication), based on the specific medication or class and the number and pattern of refusals, the medication administrator shall be triggered to escalate the case to a higher authority and within a specified amount of time (which may differ by medication or class). The decision rules described above should be incorporated into the medication administration software of the EHR such that the EHR automatically alerts the medication administrator when action is needed and what action is needed. When medication refusals require escalation, an RN or higher will obtain an INFORMED refusal.

**Importance:**

With rare exception (court order), patients with decision-making capacity have a right to refuse taking their medication. For the refusal to be meaningful, however, like any other decision patients make in a health care setting, depending on the medication and the number of times the patient refuses it, the refusal must be an informed refusal. Any other scenario resulting in the patient missing medication places patients at significant risk of harm, the nature and degree of harm depending on the medication and the condition it is treating.

**Discussion:**

ADCRR continues to be non-compliant with this provision. Unfortunately, far too many medication dose administrations marked by ADCRR nurses as "Refused" occur in scenarios other than an informed refusal and are therefore unacceptable. One scenario is that the nurse does not interact directly with the patient; rather an officer tells the nurse that the patient is refusing. A second scenario is that the patient interacts directly with the medication nurse (an LPN) and informs the nurse that he/she does not want to take the medication, but no further education, counseling, or effort to resolve the refusal is undertaken.

The Injunction (and, in some cases, state law) prohibits these practices. The first scenario is dangerous for a number of reasons, the most serious of which is that the patient was having a serious side effect of the medication and was too ill to present to the nurse, but, because conveyed through an intermediary (who may not even know the patient is having a symptom and/or a side effect), the nurse is remains unaware. The second scenario is called a "never event" in patient safety literature – an event that should simply never happen. In the third scenario nurses are instructed to inform a higher authority after a patient missed three consecutive days' worth of medication. This is dangerous because for some medications missing even a single dose can cause significant harm (e.g., insulin), and for other medications, missing doses intermittently (but never three days in a row) can lower the blood level of the drug to an ineffective level (e.g., antiseizure medication) or lead to viral resistance rendering the medication ineffective (e.g., medications for HIV or viral hepatitis). It is also wasteful of resources because for some medications, missing any number of days of medication might be acceptable (e.g., ibuprofen if the patient is not currently experiencing pain). The Injunction required, and the Monitors coached ADCRR staff a number of times, on a safe approach in which ADCRR developed a medication-specific algorithm, incorporated into the medication administration software, that alerted LPNs when a medication refusal required escalation to a higher clinical authority. In the encounter with the higher

clinical authority – an RN or practitioner – the clinician is expected to try to understand the reason for the patient's refusal, address the reason, if possible (e.g., if the patient is refusing the medication due to an intolerable side effect, explore switching to an alternative medication), and failing these efforts, assure that the patient understands the risks of their refusal. After two years, ADCRR has still not implemented the court-ordered practice triggering a clinical escalation.

**Example:**
Patient 197 is prescribed a medication (aripiprazole) for bipolar disorder. She refused the medication every day from February 1 to 12, 14 to 19, and 21. It is unlikely that there was enough of the medication in her blood stream to have much clinical effect. Despite the multiple refusals, not one of the nurses responsible for administering her medications ever escalated her case to a higher clinical authority as required. On February 20, an ICS was triggered because officers noted her to be aggressive towards others. She was brought to the medical unit in a wheelchair, stating she wished to be dead, and was responding to internal stimuli. She was placed on MH Watch. It is very possible that the failure to address her medication refusals and restore the patient's adherence to the medication resulted in this mental health crisis.

Urgent/Emergent Care

| Injunction Provision 1.20a/b | Non-compliant |
|---|---|

**Provision:**
When a patient notifies a correctional officer that he/she has a need for health care (medical or mental health), the officer may not inquire as to the nature of the need or symptoms. The officer's inquiry is limited to asking whether the need is immediate, if the patient can wait to sign up for the next scheduled clinic, or if the patient is thinking of harming themselves. (If the patient is thinking of harming themself, the officer shall immediately ensure the patient's safety and contact health care staff in accordance with Section 16.8.1.) For other needs that are immediate, the officer shall contact health care staff immediately. An RN shall then immediately triage the patient, either by seeing the patient, or talking to the patient directly over the phone. Based on triage results, the RN shall discuss the patient with a medical practitioner (i.e., physician or APP) or, if the patient is already on the mental health caseload (i.e., MH-3, 4, or 5), a mental health professional in a clinically appropriate timeframe, not to exceed four hours. In this context, the mental health professional shall be a psychology associate, psychologist, or psychiatric prescriber. Based on that interaction the professional who was contacted shall: see and treat the patient the same day; or instruct the RN on treatment to provide, and, if necessary, schedule the patient for further evaluation or treatment in a clinically appropriate timeframe; or determine the health care need is not urgent and that a reasonable patient would not have considered the health care need to be urgent, defer treatment, and instruct the patient to access non-urgent/non-emergent care for treatment.

**Importance:**
The purpose of this provision is to ensure that episodic problems which may seem benign to a lay person, but are not, are addressed immediately by qualified health care staff. For example, a heart attack may present as an upset stomach, and dealing with it as non-urgent can be fatal.

**Discussion:**
ADCRR continues to be non-compliant with this provision. Based on our interview of officers and patients, some officers in ADCRR are still attempting to triage episodic complaints brought to them by patients. While the officers are generally not trying to obstruct access to care, but rather trying to be helpful, the effect is still dangerous.

**Example:**
We interviewed a custody officer during our recent site visit and asked her what she does when a patient has a medical problem that they bring to her. She responded that if someone in the unit says they have a medical problem, she gives them an HNR and the only time she contacts the nurse is if there were any questions.

Improvement Programs

| Injunction Provision 2.1.1 | Non-compliant |
|---|---|

**Provision:**

Following any death or suicide attempt, identify all significant health care and custody errors (i.e., near misses as well as preventable adverse events). Based on prioritization of all errors identified, a root cause analysis shall be conducted if clinically appropriate, from which an effective and sustainable remedial plan shall be crafted and implemented within one month of the death. A sustainable plan is one which outlives staff memory from a single training after the review or staff turnover. Monitor the remedial plan for effectiveness and make appropriate and timely modifications to the plan based on the monitoring. [2.1.3.] For each death, the plan in this section shall be crafted and implemented within one month whether or not the medical examiner's report is available.

**Importance:**

Deaths are the most serious of possible harm to patients. When a death results from an error, it is critically important to identify the error, analyze it, and take corrective actions to prevent its recurrence. It is also an opportunity to address serious errors that were not directly related to the death but resulted in harm or potential harm to the patient.

**Discussion:**

ADCRR continues to be non-compliant with this provision. We describe in great detail in section III of this report (Capstone: Mortality Reviews) the extent to which, despite extensive feedback and coaching we have provided to ADCRR staff, both orally and in writing, little progress has been made by ADCRR to comply with this provision. If anything, compliance may have been better earlier in the life of the Injunction when ADCRR had a Medical Director. ADCRR self-assesses its performance at 100%. Performance cannot logically be expressed as a percentage, but in our opinion, ADCRR's compliance is very very low. With rare exception, ADCRR fails to identify and address the significant remediable errors in care of patients who die.

**Example:**

See the section III of this report (Capstone: Mortality Reviews).

286

| Injunction Provision 2.5.1 | Non-compliant |
|---|---|

**Provision:**

Staff capture errors, system problems, and possible system problems that come to their attention through sources, including but not limited to the near-miss and preventable adverse event reporting systems, mortality reviews, litigation filed by patients, grievances, the Court-appointed monitors, staff reports, continuous quality improvement, etc. Staff maintain an active log of all such errors and problems to assist in deciding which issues to address, when, and at what level (complex and/or statewide), and to monitor progress in resolution. Based on this prioritization, either at the complex or state level, root cause analysis shall be conducted as appropriate, from which an effective and sustainable remedial plan is implemented in a timely manner. Such plan is one which outlives staff memory from a single training after the review or staff turnover. The remedial plan shall be monitored for effectiveness. Appropriate and timely modifications shall be made to the plan based on the monitoring.

**Importance:**

This provision addresses the overall system improvement apparatus that ADCRR is required to have to identify, prioritize, analyze, remediate, and monitor the remediation efforts, for errors that it discovers through its various activities, and to carefully log that information. The purpose of prioritization is to assure that the most critical errors – the ones that post significant risk of serious harm to patients – are addressed first, and rapidly.

**Discussion:**

ADCRR continues to be non-compliant with this provision. It is extremely difficult for us to describe in clear prose ADCRR's non-compliance because of the chaotic nature of their work, documentation, and lack thereof. ADCRR is certainly doing work. It asks its contractor for Corrective Action Plans (CAP), and produces tables, charts, spreadsheet lists, and more lists. And it fines the contractor for certain breaches of contract. But the efforts are discoordinated, rudderless, and most importantly, not producing much improvement as measured by the totality of this status report.

**Example:**

To address the delay in sending patients to off-site specialists (Injunction section 1.22), in December, 2023, ADCRR notified its contractor, NaphCare, that it was failing to adhere to this requirement. NaphCare filed a CAP in December, 2023. The plan did not include the required root cause analysis but simply set a goal to reduce the delays in the absence of any specific steps. Multiple updated CAPs were was filed in April, June, and November 2024. Each was nearly identical to the prior, did not sufficiently analyze reasons for the delays, and set a review date for 30 days hence. In January 2025 there was finally a mention that there is a plan, within the upcoming 30 days, to try to discern the underlying reason for the delays. Unfortunately, though, as described in more detail elsewhere in this report (Injunction section 1.22d), appointments with specialists, a critically important element of health care delivery to diagnose and treat serious medical conditions, are still extremely backlogged and though

287

better than it was at the beginning of the Injunction, improving much too slowly, at a pace, if maintained, might bring ADCRR within compliance in the early 2030's at the earliest.[46, 47]

As an example of chaotic dysfunction of one component of the system improvement apparatus, ADCRR submitted a report from its Near Miss/Adverse Event database. ADCRR is required by the Injunction to capture "near misses" – events which cause no harm, but are critically important to capture and address because they have the potential to cause harm the next time they occur. An "adverse event" is one in which harm was done, and even though the patient did not die, the event should be reviewed similar to any mortality to help prevent similar adverse events. The report contained only 13 reports of near-misses/adverse events. Based on our experience and knowledge of this field, if there are only 13 items entered into the database statewide for an entire month, it is clear that this database is not being used regularly and is NOT capturing the events as intended. Indeed, when we asked front line staff about how they report near misses and adverse events, they were not familiar with either of these databases, were not sure what a near miss was, and did not know how to report errors they found other than emailing medication errors to a supervisor, which is not an adequate system.

The following cases are examples of near misses and adverse events we know of from other evidence, that should have been captured in ADCRR's database, but were not.

Patient 135 had an MRI ordered on the wrong leg on March 21, which was corrected before the imaging was completed, but was not reported as a near miss.

Patient 133 kidney ruptured because of the failure to immediately respond to her MRI that revealed complete urinary obstruction. This clinical case was not reported as an adverse event despite the fact that the outcome was avoidable if care was delivered appropriately.

The little data currently being collected from other sources is not leading to any meaningful evaluation or change and therefore is not currently serving any purpose. For example, ADCRR collects information from litigation filed by patients, grievances, staff reports, among others, but do not evaluate them in an organized or meaningful way. In ADCRRs Master Log there is a tab titled "priority list" that only includes 11 items. This prioritized list is not comprehensive of all errors, much of it is uninterpretable, and although it appears there are some efforts being made in the name of improvement, the efforts are often misguided, not always clinically appropriate, and many changes are not sustainable (i.e., "training of current staff," which is not sustainable because (1) the same staff do not remain in positions forever, and (2) even staff who remain in positions are human and forget training over time.).

Health Records

---

[46] This estimate assumes that the percentage of consultations completed on time when the Injunction was implemented was zero. To the extent it was higher than that, the time-to-compliance would be even longer.

[47] In Defendants' Response to Monitors' Second Report, ADCRR reports the number of off-site specialty appointments it completes is increasing. Though we did not review the underlying data, including the extent to which appointments were necessary, we have no reason to question that the number is increasing. However, caution should be used in applying that data to performance on this provision because that data does not tell us anything about the *timeliness* of those appointments.

288

The following provisions of the Injunction address the presence of usable external reports and results in the patient's EHR such as specialists' opinions and recommendations, hospital discharge reports including recommended plans for aftercare, laboratory test results, and results of x-rays and other imaging studies. The information within these documents is essential to providing safe care. The documents must therefore be present, readable, labeled correctly so clinicians know they are in the chart and can find them, scanned into the record soon after they are received, and most importantly, reviewed in a timely manner by the appropriate clinician. Failure to adhere to these requirements places patients at significant risk of not receiving necessary care, or receiving the wrong care, either of which can result in serious harm.

| Injunction Provision 4.4a/b | Compliant |
|---|---|

**Provision:**

Imported or scanned documents (including but not limited to diagnostic test results, consultation reports, and hospital discharge summaries) in the EHR: shall be filed in a clear and usable manner, are accurately labeled with meaningful titles/file names, are scanned right-side up, and are filed with an appropriate document date according to the following rules: Scanned documents are dated (and appear in any programmed or ad hoc list according to this date) based on the clinically relevant date of the document, not the date scanned. For example, the clinically relevant date of a lab test is the date the test was reported by the lab; discharge summary is the date of discharge; a prior health record is the date it was received at ADCRR; an imaging study is the date of study; documents are scanned in the correct orientation and labeled with the correct date. (This provision *only* addresses whether a relevant document is eventually scanned into the EHR in some form, regardless of the timeliness, accuracy of labeling, or readability.)

**Importance:**

See introduction to Health Records above.

| Injunction Provision 4.4c | Compliant |
|---|---|

**Provision:**
Fewer than 1% of files are labeled/titled with names beginning with "Miscellaneous" or "Other."

**Importance:**
See introduction to Health Records above.

| Injunction Provision 4.4d/e | Non-compliant |
|---|---|

**Provision:**

Documents (including but not limited to diagnostic tests, consultation reports, and hospital discharge summaries) which are supposed to be manually scanned into, or electronically attached to (after receipt via email) the EHR have this completed within 2 business days of receipt. All imported documents are reviewed by the medical provider (for medical documents), or primary therapist or psychiatric prescriber (for MH documents) within 4 business days of receipt.

**Importance:**

This provision ensures the timeliness with which external documents are scanned into the EHR and the timeliness with which they are reviewed by the appropriate clinician. ADCRR sends patients to external health care providers when there is a serious medical problem which exceeds ADCRR's ability to address without assistance. Absent a telephone call (a rare event), these documents are the mainstay of the communication back from those experts. If ADCRR clinicians don't see the documents, they can't act on them, which creates a significant risk of serious harm. See also introduction to Health Records above.

**Discussion:**

ADCRR continues to be non-compliant with this provision.

ADCRR self-assesses that it performed parts of the requirement at below 75% in February, but it self-assesses performance on review of imported documents that are transmitted electronically and therefore do not require manual scanning at 97%. However, ADCRR's method of analysis for this provision is seriously flawed in two ways: **First**, the sample includes the documented results of tests done on-site while the patient is in the prison clinic. The results of these point-of-care tests are reviewed "live" before they are even uploaded into the EHR and therefore are not relevant to this provision which is examining if and when documented results are reviewed *after* the results are reported. **Second**, the sample only includes tests for which results were reported in the month under review, excluding any tests results that were reported in previous months but were still not reviewed by a practitioner. Thus, if one were to calculate performance level it would be well below 97%. However, even if 97% were accurate, there is still considerable risk of harm. Based on the number of reports and tests generated in February, a 3% failure rate means that 432 reports or results were reviewed late, the delay for some was long.

In some cases, the error is limited to a delay in review of the document by the clinician. Patient 70 had an abdominal ultrasound reported to ADCRR on February 7 which was quickly uploaded into the EHR. However, the APP did not review the ultrasound report until February 13 (6 days later). It showed acute inflammation of the gallbladder requiring urgent surgery that was thus dangerously delayed.

Even when timely, the clinician's review of documents may be meaningless. Patient 198 had a thyroid test that returned on January 2 with a very abnormal result. The practitioner who reviewed the results inappropriately wrote to follow up at the next chronic care visit, which was not until April 9, a

292

dangerously long delay, indicating that the practitioner either did not really read the result or comprehend its significance.[48]

The above two examples involve results of ultrasound and blood tests, respectively. The following example involves review of a CT scan, which returns to ADCRR by a different route. Patient 47 had a non-functioning bladder due to paralysis. His kidney function significantly declined in the latter half of 2024. A CT scan on Tuesday, December 31, 2024 showed severe ballooning of both of the patient's kidneys and draining tubes (ureters) from blockage. The CT scan result was faxed to ADCRR on Friday, January 3. It was scanned into the EHR on Monday, January 6 (within the required 2 business days). It should have been reviewed by the patient's PCP by January 9. Instead, it was not reviewed until January 13, and by an APP who was not the patient's PCP. The blockage constituted an urgency, because the longer kidneys remain blocked with backup, the greater the risk of permanent damage to the kidneys. Instead of acting, the APP did nothing (in violation of Injunction section 1.1b). Fortunately, the patient happened to also have a scheduled visit the same day (January 13) with a kidney specialist who recognized the urgency, contacted ADCRR, triggering the patient being sent immediately to the ER. Due to the delay in reviewing (and acting on) the results of the CT scan, the patient now has irreversible kidney damage that the kidney specialist thinks will likely require hemodialysis.

**Example:**
See examples embedded above.

---

[48] As a post-script, at the April 9 visit, a practitioner ordered the thyroid test to be repeated "stat." Instead the blood sample was not drawn until the next day. As of May 9, the results had still not been reviewed leading a court monitor to alert ADCRR because of the clinical urgency.

| Injunction Provision 4.5 | Non-compliant |
|---|---|

**Provision:**
Staff provide patients access to their own medical records as follows, unless a practitioner documents in the patient's EHR how disclosure of such information would jeopardize the health, safety, security, custody or rehabilitation of the patient or others or the safety of any officer, employee or other person at the correctional institution or of a person who is responsible for transporting the patient: (a) read-only access to patients wishing to read a copy of their health record; (b) orally sharing with a patient information regarding their diagnosis or any other information about their health care; (c) providing paper copies at a fee consistent with the updated policy; or (d) as an alternative to a paper copy, if the patient agrees, staff may provide the requested records, free of charge, in an electronic medium that the patient is able to access.

**Importance:**
This provision focuses on assuring that patients have reasonable access to their health record.

**Discussion:**
Patients still have significant barriers to reviewing their health records. ADCRR self-assesses its level of performance on this provision at between 66% and 89%. With the caveat that percentage level of performance on the dataset collected by ADCRR is only one element factoring into a determination of compliance with the Injunction, using the same dataset, we calculated performance of approximately 60%.

**Example:**
On December 18, 2024 Patient 199 requested to view his health records, specifying interest in care from off-site specialists and follow-up care. On January 11 he submitted another request to review his health records, specifying interest in the MH part. He was provided access (unspecified) on February 14. Neither ADCRR, HSD, nor NaphCare policies specify how quickly patients must be provided access. NaphCare's policy states that patients can request access no more often than monthly. During their self-assessment interviews, NaphCare medical records staff informed the interviewers that their practice is to respond within 1, 7, 10, and 14 days, depending on the prison. Taking into account this information and what we consider reasonable response to a patient request for records, 2 months is an excessive amount of time to wait.

| Injunction Provision 4.3 | Non-compliant |
|---|---|

**Provision:**
The Problem List in a patient's health record shall have the following qualities: (1) It shall be accurate, complete, and easily usable. (2) Resolved or historical conditions or diagnoses are separated from current conditions. (3) The date of onset or resolution of resolved or historical conditions or diagnoses is indicated, if known. (4) Similar or identical diagnoses of current conditions are listed only once. For example, a Problem List should not simultaneously list "heart disease," "heart failure," and "congestive heart failure, not otherwise specified."

**Importance:**
A Problem List is an indispensable component of all medical records. Its purpose is to give the user of the medical record a rapid and accurate "thumb nail" overview of the patient's health care conditions. Though important for day-to-day care, it is especially needed during an emergency when trying to quickly determine relevant active issues. Not only does a Problem List need to contain relevant information, it also needs to be devoid of extraneous information that distract from its use. Without a clear, concise, and complete Problem List, it is much more difficult, if not nearly impossible sometimes, to safely care for a patient.

**Discussion:**
ADCRR continues to be non-compliant with this provision.

In the Monitors' Second Report we noted that "The Problem Lists contained within patient EHR records frequently are horrible." Using an example (Doc. 4755 at 45) we provided a detailed description of the inadequacies of the problem list of a patient who suffered a preventable death, enumerating them as: missing important diagnoses; entries which are not diagnoses at all, e.g., "Lower Bunk"; nonsense entries, e.g., "Special Notice"; entries which are no longer true, e.g., "Ace Wrap"; redundant entries, e.g., "Hypertension," "Unspecified Essential Hypertension," and "Essential (primary) hypertension"; and entries which require additional detail to be useful, e.g., "Other primary cardiomyopathies."

In a half a year, and despite our detailed feedback to ADCRR, nothing has changed – the patient Problem Lists are still horrible, continuing to pose a significant risk to patient safety, compounded by the fact that the majority of patient visits are still with practitioners who do not already know the patient well, making an accurate, usable Problem List that much more invaluable.

**Example:**
The Problem List in the EHR of Patient 50 is an example of the most serious deficiency: missing diagnoses. This is a complex patient with many key diagnoses missing from his Problem List, including: implantation of an internal defibrillator, congestive heart failure, asthma, traumatic brain injury, hepatitis C, and bleeding/coagulation disease.

The Problem List in the EHR of Patient 200, shown in the figure below, has a staggering 99 entries, including non-diagnoses (e.g., "Medically Cleared for Kitchen" in 2009, and "Insoles"), nonsense entries (e.g., "Screening of a Patient," "Plastic Bags," and "Extra Toilet Paper"), entries which are no longer true (e.g., "Athletic Support," and "Nausea with vomiting, unspecified), redundant entries (e.g., asthma is listed four times using different terms each time, hypertension is listed three time using different terms each time), and entries that require additional detail to be useful (e.g., "valvular disease" – this could refer to one or more of four different heart valves, each with very different clinical implications, vein valves, or lymphatic valves, "Cellulitis of other sites").

## Problems

View Problem History
### Add Another Problem

*Problem Identified on 3/31/2025*
Valvular Disease

*Problem Identified on 1/27/2025*
Other cirrhosis of liver

*Problem Identified on 1/27/2025*
DGN10 Z90.79 Acquired absence of other genital organ(s)

*Problem Identified on 11/20/2024*
Extra Toilet Paper

*Problem Identified on 11/18/2024*
Insoles

*Problem Identified on 11/18/2024*
Medical Shoes

*Problem Identified on 10/19/2024*
Pain in right hip

*Problem Identified on 10/19/2024*
Pain in left hip

*Problem Identified on 10/14/2024*
Pain in unspecified knee

*Problem Identified on 10/14/2024*
Bilateral primary osteoarthritis of hip

*Problem Identified on 10/14/2024*
Radiculopathy, lumbar region

*Problem Identified on 9/13/2024*
DGN10 Z79.01 Long term (current) use of anticoagulants

*Problem Identified on 9/13/2024*
Lower Tier

*Problem Identified on 9/13/2024*
Lower Bunk

*Problem Identified on 9/13/2024*
DGN10 I80.9 Phlebitis and thrombophlebitis of unspecified site

*Problem Identified on 9/13/2024*
DGN10 Z96.0 Presence of urogenital implants

*Problem Identified on 9/13/2024*
DGN10 N13.2 Hydronephrosis with renal and ureteral calculous obstruction

*Problem Identified on 9/13/2024*
DGN10 T50.915 Adverse effect of multiple unspecified drugs, medicaments and biological substances

*Problem Identified on 9/13/2024*
DGN10 I48.91 Unspecified atrial fibrillation

*Problem Identified on 9/13/2024*
CAD/Dyslipidemia

*Problem Identified on 9/13/2024*
Arrhythmia

*Problem Identified on 9/11/2024*
Plastic Bags

*Problem Identified on 8/8/2024*
DGN10 N30.01 Acute cystitis with hematuria

*Problem Identified on 6/18/2024*
Anxiety Disorder, Unspecified

*Problem Identified on 6/14/2024*
Other abdominal hernia

*Problem Identified on 5/28/2024*
Pain in hip

*Problem Identified on 4/30/2024*
Screening of a patient

*Problem Identified on 11/28/2023*
Quad Cane

*Problem Identified on 6/29/2023*
MED-HOLD

*Problem Identified on 6/27/2023*
Athletic Supporter

*Problem Identified on 6/6/2023*
Hernia Aid

*Problem Identified on 5/25/2023*
Cirrhosis or Fibrosis

*Problem Identified on 5/24/2023*
**MH-3E**

*Problem Identified on 3/3/2023*
**ASTHMA**

*Problem Identified on 2/20/2023*
**Hepatitis C - Post Treatment**

*Problem Identified on 2/10/2023*
**Fibrosis and cirrhosis of liver**

*Problem Identified on 11/28/2022*
**Asthma**

*Problem Identified on 11/28/2022*
**Hypertension**

*Problem Identified on 11/28/2022*
**Cirrhosis**

*Problem Identified on 11/28/2022*
**History of MI**

*Problem Identified on 7/29/2022*
**Other synovitis and tenosynovitis, left lower leg**

*Problem Identified on 7/26/2022*
**Abdominal Binder**

*Problem Identified on 7/18/2022*
**Unspecified abdominal hernia with obstruction, without gangrene**

*Problem Identified on 4/8/2022*
**Dermatitis, unspecified**

*Problem Identified on 11/25/2020*
**Allergic rhinitis, unspecified**

*Problem Identified on 11/25/2020*
**Headache**

*Problem Identified on 12/5/2019*
**Portal hypertension**

*Problem Identified on 11/17/2019*
**Nausea with vomiting, unspecified**

*Problem Identified on 11/17/2019*
**Constipation, unspecified**

*Problem Identified on 10/26/2019*
Hepatomegaly with splenomegaly, not elsewhere classified

*Problem Identified on 3/28/2019*
Epigastric abdominal tenderness

*Problem Identified on 3/28/2019*
Lumbago with sciatica, unspecified side

*Problem Identified on 3/7/2019*
Chest pain, unspecified

*Problem Identified on 7/10/2018*
Acute atopic conjunctivitis, unspecified eye

*Problem Identified on 6/1/2018*
Osteoarthritis of hip, unspecified

*Problem Identified on 5/2/2018*
Old myocardial infarction

*Problem Identified on 4/13/2018*
Pain in right foot

*Problem Identified on 3/30/2018*
Other secondary gout, right ankle and foot

*Problem Identified on 2/16/2018*
Pain in unspecified foot

*Problem Identified on 11/25/2017*
Retention of urine, unspecified

*Problem Identified on 11/25/2017*
Urinary tract infection, site not specified

*Problem Identified on 9/28/2017*
Umbilical hernia without obstruction or gangrene

*Problem Identified on 7/20/2017*
Adjustment disorder, unspecified

*Problem Identified on 7/10/2017*
Pain in left shoulder

*Problem Identified on 4/12/2017*
Hydrocele, unspecified

*Problem Identified on 3/13/2017*
Acute atopic conjunctivitis, bilateral

*Problem Identified on 3/2/2017*
Low back pain

*Problem Identified on 11/21/2016*
Psoriasis, unspecified

*Problem Identified on 10/20/2016*
Epididymo-orchitis

*Problem Identified on 10/11/2016*
Cellulitis of other sites

*Problem Identified on 10/11/2016*
Acute pain due to trauma

*Problem Identified on 10/11/2016*
Other seborrheic keratosis

*Problem Identified on 10/11/2016*
Solar urticaria

*Problem Identified on 9/13/2016*
Spermatocele of epididymis, unspecified

*Problem Identified on 6/9/2016*
Cyst of epididymis

*Problem Identified on 3/16/2016*
Pulpitis

*Problem Identified on 12/30/2015*
Hepatomegaly, not elsewhere classified

*Problem Identified on 12/30/2015*
Edema, unspecified

*Problem Identified on 12/30/2015*
Other ascites

*Problem Identified on 12/30/2015*
Unspecified cirrhosis of liver

*Problem Identified on 12/30/2015*
Moderate persistent asthma with (acute) exacerbation

*Problem Identified on 10/1/2015*
Essential (primary) hypertension

*Problem Identified on 10/1/2015*
Unspecified asthma, uncomplicated

*Problem Identified on 10/1/2015*
Benign prostatic hyperplasia without lower urinary tract symptoms

*Problem Identified on 10/1/2015*
Gastro-esophageal reflux disease without esophagitis

*Problem Identified on 10/1/2015*
Dorsalgia, unspecified

*Problem Identified on 10/1/2015*
Obesity, unspecified

*Problem Identified on 2/19/2015*
UNSPECIFIED ESSENTIAL HYPERTENSION

*Problem Identified on 2/19/2015*
ASTHMA UNSPECIFIED

*Problem Identified on 2/19/2015*
BENIGN LOCALIZED HYPERPLASIA OF PROSTATE WITHOUT URINARY
OBSTRUCTION AND OTHER LOWER URINARY TRACT SYMPTOMS (LUTS)

*Problem Identified on 2/19/2015*
ESOPHAGEAL REFLUX

*Problem Identified on 2/19/2015*
DEGENERATION OF INTERVERTEBRAL DISC SITE UNSPECIFIED

*Problem Identified on 2/19/2015*
BACKACHE UNSPECIFIED

*Problem Identified on 2/19/2015*
SCIATICA

*Problem Identified on 2/19/2015*
OBESITY UNSPECIFIED

*Problem Identified on 2/19/2015*
OTHER SPECIFIED ARTHROPATHY INVOLVING SHOULDER REGION

*Problem Identified on 2/19/2015*
SEBORRHEA

*Problem Identified on 11/20/2014*
Mental Health

*Problem Identified on 9/14/2009*
Medically Cleared for Kitchen

Language Interpretation

It is axiomatic in health care that for health care to be safe, patients need to be able to communicate with their health care provider. They need to provide answers to questions about their health history and symptoms, they need to be able to participate in decisions about their treatment, and they need to understand instructions that are given to them about treatment, such as how to take their medications and what side effects to be on the look-out for. The Injunction requirements below address various pieces that as a whole, ensure that patients are able to communicate with ADCRR clinicians.

| Injunction Provision 3.1 | Non-compliant |
|---|---|

**Provision:**
(Additional references: 3.2, 3.3, 3.4) The patient's preferred language is known, shown in all relevant screens of the EHR, and care is delivered in the language in which the patient is fluent at all times. For all individual and group health care encounters in all settings involving patients who are not fluent in English, interpretation shall be provided via: health care staff whose name appears on a list maintained by Defendants of people who, pursuant to written policies Defendants develop, is proficient in the language understood by the patient; or in-person or via video interpretation service (for sign language) or audio language interpretation service that is compliant with federal law and uses licensed interpreters, where required by state law. Exception is made when use of the above methods is not feasible due to emergency circumstances.

**Importance:**
See introduction to Language Interpretation above.

**Discussion:**
ADCRR still struggles to fulfill this requirement of the Injunction. Soon after implementation of the Injunction ADCRR did accomplish a necessary first step which was to reprogram the EHR to allow staff to enter a patient's preferred language and to have that information appear on relevant screens. However, implementing the rest of the requirement continues to be insufficient in three ways.

First, it is clear that the language entered in the EHR is not consistently the correct language – the patient's preferred language for health care purposes. We discovered this, in part, talking to patients who confirmed that the language listed is not necessarily their preferred language and does not reflect whether they need an interpreter. One reason the wrong language is sometimes listed is that instead of asking patients for their language for health care communications, the language listed in the EHR is digitally imported from ADCRR's custody database after it is entered by custody during the booking process. The use and accuracy of this database is problematic because custody staff enters a language if a language other than English can be spoken, which is not necessarily the person's preferred language for health care or indicative of whether the patient requires interpretation. Even if a patient can speak English, if their preferred language is not English, a certified interpreter should be used because discussing complex medical and mental health issues is often very nuanced.

Second, even when interpretation was provided in the appropriate language, it was often provided by individuals who are not qualified (nor allowed under the Injunction) to provide health-related interpretation, except in an emergency (e.g., other health services staff, custody staff, or other incarcerated individuals). The Injunction does allow ADCRR to opt to use its own health care staff as interpreters, provided it develops a formal process, approved by the Court, to assure the competency of such staff. ADCRR elected not to make use of that option and therefore, do not "certify" any staff to provide interpretation. Yet the EHR continues to have a check-off box that includes a "certified staff interpreter" as an option, and uses that box when staff interpret despite the fact that they are not certified (i.e., disallowed interpretations are provided). The screen shot below from Patient 201's chronic care appointment on February 6 is an example of a health care staff functioning as interpreters.



An example of custody staff interpreting is seen in the February 19 appointment of Patient 202 [257]

Lastly, regarding evidence that individuals who are incarcerated are used as interpreters, during our most recent site visit, we were informed by individuals living in the IPC that they were asked to translate for healthcare staff when they were speaking to Patient 203.

Third, while the check-off box shown above appears automatically in certain forms, it does not when notes are written free-form (i.e., Quick Notes and SOAP notes). As a result, most visits using these forms for documentation (e.g., urgent care visits) had no mention at all of what language was used, let alone if a translator was used.

In their calculations of performance, ADCRR excluded the visits during which patients "demonstrate[d] English fluency" and also considered translation by non-certified staff as compliant. However, when we interviewed Patient 198 during our May visit, it was clear that he was not fluent in English except for rudimentary conversation and yet it is documented for his April 9 chronic care visit that he demonstrated "English fluency" and a translator was not used.

ADCRR self-assesses its level of performance on this provision as 99.5% based solely on whether a language is listed in the EHR which is misleading. Although ADCRR interviews patients, both those whose language is listed as English and those whose language is listed as a non-English language, this

data is not incorporated into ADCRR's calculation of the level of performance. Although we agree that 99% of charts in the EHR list a language, the accuracy of that language is much lower based on interviews conducted by ADCRR and by us. The interviews revealed that: (1) The preferred language of English in the EHR is not always accurate (e.g., Patient 204 had English listed as her preferred language in the October 2024 ADCRR report even though the patient said she requires Spanish translation. Her language continues to be listed as English at the time of writing this report. (2) Several of the patients who had their preferred language listed as Spanish clearly stated that they did not need nor did they want an interpreter (e.g., Patient 205). (3) Those who did need an interpreter said that interpretation was routinely done by staff (e.g., Patient 206 in January 2025). (4) Many of the patients whose language is listed as Spanish, have a note in the EHR that says the patient "demonstrated English fluency." However, when we interviewed a subset of these patients, some stated their preferred language for medical issues was Spanish and they had never been offered interpretation (e.g., Patient 207, Patient 208, Patient 209).

**Example:**
See examples embedded above.

| Injunction Provision 3.6 | Non-compliant |
|---|---|

**Provision:**

Written available notification (such as a poster) shall be hung in all housing units and medical clinics in all prisons advising prisoners, in the ten most common languages in Arizona, of the availability of interpretation services and that they may inform healthcare staff orally in any language, in sign language, or in writing in any language that they are not fluent in English, if that is not already documented in their electronic health record.

**Importance:**

See introduction to Language Interpretation above.

**Discussion:**

Five living areas among 43, and 6 medical areas among 55 were missing the poster advising patients in the 10 most common languages in Arizona that interpretation services are available. ADCRR self-assessed its performance at 89% which is likely a reasonable estimate.

Respectfully submitted,

Marc F. Stern, MD, MPH
Lead Monitor,
On behalf of the Court Monitors
Dr. Bart Abplanalp, PhD
Mr. Scott Frakes
Dr. Karie Rainer, PhD
Dr. Lara Strick, MD, MS

306