1 Mary R. O'Grady, 011434
2 Andrew G. Pappas, 034432
   John S. Bullock, 034950
3 Molly S. Walker, 038099
   OSBORN MALEDON, P.A.
4 2929 North Central Avenue, Suite 2000
5 Phoenix, Arizona 85012-2793
   (602) 640-9000
6 mogrady@omlaw.com
   apappas@omlaw.com
7 jbullock@omlaw.com
8 mwalker@omlaw.com
9 Attorneys for Defendants
10
   [Additional counsel listed on signature page]
11



12          UNITED STATES DISTRICT COURT
13                DISTRICT OF ARIZONA

14 Shawn Jensen, et al.,              No. CV-12-00601-PHX-ROS

                    Plaintiffs,       **DEFENDANTS' RESPONSE TO**
15                                    **MONITOR'S THIRD INTERIM**
16 v.                                 **REPORT**

17 Ryan Thornell, et al.,
18                    Defendants.
19

20          **I.    INTRODUCTION**

21          Last April, the Court directed the Monitors to "prepare a comprehensive Report

22 addressing material issues concerning the [Plaintiffs'] Motion for a Receiver."

23 (Doc. 4868 at 1.)  The resulting Third Interim Report (Doc. 4968) provides a highly

24 critical overview of the Arizona Department of Corrections, Rehabilitation and Reentry's

25 (ADCRR) compliance with the Court's 2023 Injunction.  But the Report minimizes the

26 substantial progress the Defendants have made in correcting the very problems that led to

27 the Court's 2022 finding of unconstitutionality.  And the Report does not support the

28 appointment of a receiver—the extraordinary remedy Plaintiffs seek in this case.

On numerous metrics, the Department has taken major strides toward remedying the deficiencies the Court identified in its 2022 Order. Overall healthcare staffing has increased by 68% per inmate. The number of staff physicians has tripled, from 5.5 FTEs to 15.3 FTEs—a 300% increase per inmate. Medical midlevel providers have increased by 93% per inmate, and mental health staff by 40% per inmate. Healthcare expenditures have nearly doubled since the 2022 Order, from $220.4 million in FY2022 to $425.9 million in FY2025. They will increase again next year, to $458.1 million in FY2026.

The Department also has made major infrastructure improvements. ADCRR has opened 160 new Skilled Nursing Unit beds and 172 inpatient mental health care beds. The Department also continues to improve the delivery of care to inmates in its custody through disease-specific programs. And in recent months, the Department has implemented the Patient Centered Care Model (PCCM) at nine units across different complexes as part of the statewide roll out. The Department has done all of this while continuing the comprehensive compliance and assessment work the Injunction requires.

Yet the Report largely ignores the Department's hard work and the progress it has made. Instead, the Report focuses primarily on Defendants' compliance with particular Injunction provisions. Some of the Monitors' criticism is fair, and to the extent they offer constructive feedback on Injunction compliance, that is helpful to Defendants. In fact, Defendants would welcome more structured and constructive feedback from the Monitors. But imperfect compliance with the Injunction does not warrant a receiver. Neither does the Monitors' frustration that full compliance has not been achieved more quickly—frustration that Defendants feel too, but which has not diminished their commitment to reform in any way.

The reality is that overhauling the Department's healthcare programs and custody operations simultaneously is a massive undertaking that inevitably takes time. It has taken time here, where the Department has faced significant staff turnover and vacancies, including in the ADCRR Medical Director position, which has been vacant for a year

1    despite the Department's best recruitment efforts.  Yet the Department has navigated

2    around these challenges, and Defendants have forged ahead in their reform efforts.

3        Given the Defendants' substantial efforts and significant progress, a receiver is not

4    appropriate.  Nothing in the Report changes that.  Less extreme measures are available to

5    address concerns about progress toward compliance.  Defendants are acting in good faith,

6    are committed to compliance, and are continuing to work with the Monitors and Plaintiffs

7    toward that goal.  Resources are not being wasted by compliance efforts, and a receiver

8    would not provide a quick, efficient, or cost-effective path toward compliance, as other

9    jurisdictions' experiences show.  The extraordinary circumstances that would justify a

10   receiver do not exist here.

## II.    BACKGROUND

12       The Department houses 25,743 inmates at nine prison complexes spread across the

13   State.  Declaration of Stacey Crabtree (attached hereto as **Exhibit 1**) ¶ 4.  The complexes

14   vary greatly in size, with ASPC-Winslow housing 781 inmates and ASPC-Lewis housing

15   4,876 inmates.  *Id.* ¶ 5. The inmates also vary greatly, including in their healthcare needs,

16   the languages they speak, and the security issues they present.

17       The Department provides comprehensive medical and mental health services to all

18   the inmates in its custody.  The Department provides medications to those who need them;

19   conducts on-site and telehealth medical and mental health appointments with licensed

20   professionals;  provides  on-site  diagnostic  testing;  transports  inmates  to  off-site

21   appointments for tests and to see specialists when needed; transports inmates to off-site

22   emergency rooms when necessary; provides specialized care to those who are suicidal or

23   suffering from a particularly acute mental health crisis; provides outpatient, inpatient and

24   residential mental healthcare services; and provides inpatient and skilled nursing facilities

25   and services for individuals who require that level of care.  The Department also responds

26   to on-site emergencies that require mental health or medical intervention and provides

27   services to people with addictions, chronic illnesses, and serious mental illnesses.

28

Providing healthcare services in prisons is demanding and logistically complex. The Injunction, which the Court issued in 2023, covers in minute detail every aspect of the healthcare system for inmates in ADCRR facilities—from their assessment upon arrival all the way through discharge.  In the two years the Injunction has been in place, ADCRR has worked diligently to comply with it.  Defendants' compliance responsibilities involve both providing care that follows the Court's detailed requirements and assessing that work on an ongoing basis with hundreds of Quality Indicators, and thousands of individual data points.

**A.    The Court's 2022 Order.**

The Court previously reminded the parties that, "on June 30, 2022, the Court issued an order including substantial findings of fact which was the basis for holding Defendants were in serious violation of the Constitution.  Those findings of fact are the foundation or beginning for resolving the [Plaintiffs' Receivership] motion."  (Doc. 4853 at 1 (internal citations omitted).)  The Defendants therefore review the Court's findings from the 2022 Order as background for the Receivership Motion and the Monitors' related Report.

The Court's 2022 Order addressed issues with both medical care (Doc. 4335 at 16-69) and mental healthcare (*id.* at 70-96).  On medical care, the Court concluded that, "[t]he majority of medical care staff do not have necessary training or licensure to provide the type of care that is necessary to provide constitutionally adequate care" and that this created "a completely ineffective and toxic combination."  (*Id.* at 69.)  On mortality reviews specifically, the Court found "no evidence Defendants developed even one [corrective action plan] through reviewing mortality reviews."  (*Id.* at 43.)

Regarding mental healthcare, the Court found that, "[e]xcessively inadequate staffing pervades Defendants' lack of adequate mental health care treatment.  Every single complex is understaffed, except for two complexes which have only a single individual to address prisoners' needs."  (*Id.* at 95.)  The Court noted that "the consequences of this understaffing are dire, as reflected in the mortality reviews and psychological autopsies of prisoners who died by suicide."  (*Id.*)  The Court further found that failure to provide

adequate translation services and the online medical records system contributed to unconstitutional medical and mental healthcare.  (*Id.* at 96–105.)

The Court's core finding was that "staffing levels are so inadequate that the provision of constitutionally mandated care is impossible," and that "Defendants operate a system lacking sufficient numbers of qualified medical staff to provide prisoners with 'ready access to adequate medical care.'"  (*Id.* at 21, 107.)

The Court did not make specific findings about failure to protect the Plaintiffs from specific diseases or to provide specific medical devices.  The Court noted that "Plaintiffs did not establish" such failures.  (*Id.* at 106 n.35.)  So, although "Plaintiffs presented evidence regarding specific healthcare conditions like Hepatitis C or Medically Assisted Therapy," the Court clarified that "this case is not about particular diseases."  (*Id.*)

**B.    The Department's improvements since 2022.**

The Department has markedly improved the healthcare system since the Court's decision in 2022, directly addressing the core issues identified by the Court.  Because the Report disregards many of these improvements, Defendants summarize them below.

**1.    Staffing improvements.**

To begin, the Department has made significant progress in improving its overall staffing levels since the 2022 Order.  The Department has substantially increased the overall number of medical, mental health, dental, and administrative staff that it provides through its contracted provider, NaphCare.  A chart from the Court's 2022 Order found that the actual FTE for "medical, dental, and mental health staff as well as administrative staff" was 851.94.  Declaration of Joe Tapia (attached hereto as **Exhibit 2**) ¶ 10 (citing Doc. 4335 at 10)).  In July 2025, NaphCare employed 1332.1 FTEs,[1] a roughly 56% increase in overall healthcare staffing.[2]

---

[1] This reflects positions worked during the prior month, not contract or hired FTEs.

[2] The Department's previous healthcare contractor testified that "to perform adequately under the contract," it "would need to increase the FTEs by 161.5 for a total of 1214.25 FTEs."  Doc. 4335 at 22.  NaphCare currently exceeds that by more than 100 FTEs.

1      The improvements to the highest credentialed staff are even more dramatic.  At

2  the time of the Court's 2022 Order, the Department had 5.5 FTE staff physicians

3  providing care to the prison population.  In its July 2025 staffing report, the Department

4  reported 15.3 FTEs staff physicians—nearly tripling the number of FTEs from 2022.[3]  On

5  a per-inmate basis, the number of staff physicians has in fact tripled.

6      The Department has also significantly increased the number of midlevel providers.

7  In 2022, there were 47.15 midlevel providers.  (Doc. 4335 at 23.)  As of July 2025, the

8  Department had 84.5 FTEs for medical midlevel providers—which represents a 93% per

9  inmate increase.[4]  This is important because midlevel providers, who include nurse

10  practitioners and physicians' assistants, can function as primary care providers for many

11  patients under the Injunction.  (Doc. 4410 at 24 (defining "APP" as nurse practitioner or

12  physician assistant); *id.* at 25, § 6.3 (stating that APPs can provide care for non-complex

13  patients).)  In fact, the Department already has hired the required number of FTE midlevel

14  providers under the recently adopted staffing plan.  *Compare* Doc. 4858 at 74 (staffing

15  plan requiring 81.1 midlevel providers), *with* Tapia Decl. ¶ 6b & Ex. 1 (84.5 FTE

16  midlevel providers).

17      Mental health staffing has also increased substantially.  In 2022, the Department

18  had 149.55 mental health FTEs.  (Doc. 4335 at 72.)  As of July 2025, that number is up

19  to 194.45 FTEs—a 30% increase overall, or 40% when adjusted per inmate.  Tapia Decl.

20  ¶¶ 7a, 17.  These increases support the Primary Therapist model.

21      The Monitors discount this progress, stating that "since the inception of the

22  Injunction, the ADCRR state facility population has increased 7% (1617 individuals), so

23  the clinical value . . . is partially offset by the increase in the population size."  (Doc. 4968

24  at 273.)  The Monitors are wrong about that.  The correct baseline for the improvements

---

[3] All 11 NaphCare medical director positions are filled, of which nine provide direct care to patients.

[4] This per inmate number is calculated by comparing the number of FTEs per inmate in 2022 (2022 Order FTEs/2022 inmate population) with the current number of FTEs per inmate in 2025 (2025 FTEs/ 2025inmate population.)

the Department has made is the Court's 2022 Order. Since that time, the population **decreased** by more than 7 percent, from 27,794 to 25,743 inmates. *Compare* (Doc. 4335 at 10 (chart with prison population of 27,794); *with* Crabtree Decl. ¶ 4. This population reduction **increased** the clinical value of the new workers when compared with the system in 2022.

The Monitors also discount the Department's progress on staffing because some of the staff physicians and medical directors are not board certified in internal or family medicine. (Doc. 4968 at 27–28.) The Court did not make specific findings about board certification in its 2022 Order, and a lack of board certification does not equate to unconstitutional care.[5] Regardless, staffing has improved significantly since 2022, and there are unquestionably more qualified persons providing care now than before. The Monitors assert that staffing remains "woefully inadequate" (*id.* at 153), even though the Department's healthcare staffing is vastly improved over the staffing levels that provided the basis for the Court's 2022 order.

The Department may need to hire additional staff as it rolls out the PCCM, and it is actively seeking additional funds for more staffing through the legislative process. Declaration of Richard Evitch (attached hereto as **Exhibit 3**) ¶¶ 5–9. Nonetheless, as discussed next, the Department is currently implementing the PCCM with the resources available to it.

### 2. PCCM implementation.

On June 11, 2025, the Court ordered that the "Final Staffing Analysis and Plan (Doc. 4858) is approved as modified by the Experts Analysis of Parties' Responses to Staffing Analysis and Plan," and that the plan "be implemented immediately by ADCRR." (Doc. 4916 at 2.) The Department's progress this year on the PCCM has been significant. In addition to the pilot unit at ASPC-Yuma, Dakota Unit, the Department has

---

[5] ADCRR is concerned that the Injunction requirement (§ 6.4) that physicians be either board-certified or board-eligible in family practice or internal medicine prevents qualified, licensed physicians from working in ADCRR. ADCRR may seek modification of this requirement. But that is an issue for another day.

1    rolled out the PCCM at eight different units in eight different complexes over the last few

2    months: ASPC-Perryville, San Pedro Unit; ASPC-Douglas, Eggers Unit; ASPC-Safford,

3    Tonto Unit; ASPC-Phoenix, Aspen Unit; ASPC-Winslow, Apache Unit; ASPC-Lewis,

4    Eagle Point Unit; ASPC-Eyman, Meadows Unit; and ASPC-Tucson, Winchester Unit.

5    Declaration of Shari Beauregard (attached hereto as **Exhibit 4**) ¶ 11.  The Department

6    has therefore met the Plan's recommendation that it roll out the PCCM at one unit in each

7    complex within three months.   (Doc. 4858 at 29 ("We recommend that within three

8    months of the Court's order for the staffing plan, each complex would begin

9    implementation in at least one unit").)[6]

10       **3.    Infrastructure improvements.**

11       The Department has also made significant infrastructure improvements since

12    2022.  This includes the construction of 160 new beds in SNU units, which house inmates

13    who are elderly, physically disabled, or developmentally disabled and whose needs are

14    not met by the support normally provided to those in the general population.  (Doc. 4818-

15    1 at 27 (chart showing 160 new SNU beds since 2023); Doc. 4410 at 28, § 7.5.3.)  The

16    latest SNU to be completed is in the Cook Unit at ASPC-Eyman, which was completed

17    in June 2025 and has a total of 204 SNU beds in three different buildings.  Declaration of

18    Scott Mundell (attached hereto as **Exhibit 5**) ¶ 4.c.

19       The Monitors acknowledge this progress, finding the Department compliant with

20    Injunction § 7.5 and stating that, "in terms of physical structure and accommodation of

21    the number of individuals needing SNU support, ADCRR has done a very good job."

22    (Doc. 4968 at 98.)  The Monitors further acknowledge that "ADCRR's SNU bed capacity

23    exceeds their current need by about 45%, which reflects planning for future need which

24    is sure to come with an aging prison population."  (Doc. 4968 at 98.)

25       The Department has improved the medical space throughout the state at various

26    complexes since 2022, including several improvements in 2025, as summarized below.

27    Mundell Decl. ¶¶ 3–6.

28    _____

[6] The Defendants' appeal of the staffing plan is pending, but there is no stay in place.

1        **ASPC-Perryville.**  During 2025, the Department completed improvements to the

2    medical facilities at ASPC-Perryville, including the Lumley Unit in March 2025, which

3    now features two nurse offices, two provider offices, and four mental health offices

4    equipped with mini-split air conditioning systems and medical sinks.  *Id.* ¶ 4.a.  The

5    Department also completed Santa Cruz Unit improvements in June 2025, which included

6    improvements to two nurse offices, two provider offices, and two mental health offices,

7    along with comprehensive data infrastructure improvements for electronic medical

8    records.  *Id.*

9        **ASPC-Lewis.**    The Eagle Point Unit at ASPC-Lewis underwent extensive

10    renovations that were completed in June 2025.  *Id.* ¶ 4.b.  These modifications included

11    the addition of medical and mental health spaces, new housing units, fence installations

12    for enhanced security, sidewalk construction for improved accessibility, and yard access

13    improvements that enhance both safety and functionality of the facility.  *Id.*

14        **ASPC-Safford.**  The Graham Unit at ASPC-Safford underwent a major medical

15    and dental facility renovation that was completed in June 2025.  This project included the

16    installation of state-of-the-art dental and medical equipment, creating modern healthcare

17    facilities that significantly enhance ADCRR's ability to provide comprehensive medical

18    and dental services to the inmate population.  *Id.* ¶ 4.d.

19        **ASPC-Yuma.**  At the Cibola Unit at ASPC-Yuma, the medication-pass windows

20    were modified in June 2025 in an effort to reduce the time it takes to provide medications.

21    When it is determined whether these changes have a positive impact on medication

22    distribution, similar changes may be made at the La Paz Unit.  *Id.* ¶ 4.f.

23        **4.    Disease-specific programs.**

24        The Department also has implemented disease-specific programs that have

25    improved the delivery of healthcare.  Although the Court did not make specific findings

26    that the Department failed to protect inmates from specific diseases, the Injunction

27    includes disease-specific reforms, and ADCRR has made significant progress in these

28    areas since 2023, as detailed below.  The Report acknowledges some progress in these

1    areas, and the Department has analyzed the Monitors' recommendations and criticisms to

2    continue improving its healthcare services and comply with this Court's requirements.

3    *See generally* Declaration of Micaela McLane (attached hereto as **Exhibit 6**) ¶¶ 67–86.

4         ***Hepatitis-C.***    The overall success of the Department's vastly improved,

5    comprehensive Hepatitis-C treatment program is lost in the details of the Monitors'

6    analysis.  The Monitors acknowledge that the Department is in compliance with some of

7    the Injunction's provisions relating to Hepatitis-C, including §§ 11.1.1.1 and 11.1.5c.

8    (Doc. 4968 at 114–15 ("We agree that most, if not all patients entering ADCRR are

9    screened for HCV, but not in an opt-out fashion as required by the injunction.").)  They

10   also acknowledge that "ADCRR is treating more patients for HCV than it was two years

11   ago."  (*Id.* at 118.)  And for other QIs, the Monitors agree that the Department has a high

12   percentage of compliance, even if it is not 100%.  (*See, e.g.*, *id.* at 119 (the Department

13   "self-assesses its level of performance on this provision at 87%" and "we have no reason,

14   to question this result."); *id.* at 120 (the Monitors calculate 96% compliance for 11.1.5a,

15   but still do not find the Department in compliance).)

16        Regarding § 11.1.4, the Monitors' Second Interim Report erroneously found that

17   the Department was out of compliance because "the [priority] list does not include

18   comorbid conditions."  (Doc. 4755 at 11.)  The Monitors now acknowledge that "ADCRR

19   correctly identified an error in [the earlier] report."  (Doc. 4968 at 117.)  And the Monitors

20   correctly  acknowledge  that  HIV,  Hepatitis B,  and  Opioid Use Disorder  are  all

21   comorbidities on ADCRR's priority list.  (*Id.* at 117.)

22        The Monitors now assert that the Department does not use enough comorbidities

23   to comply with the Injunction.  (*Id.*)  The Injunction requires a priority list that considers

24   various factors including "relevant comorbidities," but there is no specified list.  (Doc.

25   4410 at 36).  The Department is once again taking the Monitors' feedback into account

26   but also believes it is fulfilling the Injunction requirement's purpose.  *See* McLane Decl.

27   ¶¶ 70–71; *see also generally* Declaration of Amy Rust (attached hereto as **Exhibit 7**).

28

1    ***Substance Abuse Disorder.***  Defendants' response to Plaintiffs' Receivership
2    Motion described Defendants' significant efforts to improve treatment for substance
3    abuse, including that NaphCare is providing ongoing care for about 7,000 inmates with
4    Opioid use Disorder in the Medication Assisted Treatment (MAT) program.  (*See* Doc.
5    4818 at 6.)   The Monitors acknowledge compliance with many of the Injunction's
6    provisions relating to substance abuse disorder, such as the requirements to (a) offer to
7    continue newly admitted prisoners' current Medication for Opioid use Disorder (MOUD)
8    (§ 11.3.2), (b) offer prisoners with a history of overdose or who are determined to be "at
9    imminent risk of an overdose" MOUD (§ 11.3.4), and (c) evaluate for Opioid Use
10   disorder all inmates being treated for HCV and offer them MOUD if found to have opioid
11   use disorder (§ 11.3.5).  This is another success story, even if there remains room for
12   improvement.  McLane Decl. ¶¶ 79–86; Declaration of Daniel Pacheco, M.D. (attached
13   hereto as **Exhibit 8**) ¶¶ 24–26; *see also* Doc. 4818 at 6, 14–15 (summarizing MOUD
14   progress); Doc. 4818-1 at 27-28 (same.)

15       ***Tuberculosis (TB)***.  The Monitors found that the Department is complying with
16   the sole Injunction provision relating to TB screening.  (Doc. 4968 at 125; McLane Decl.
17   ¶ 78.)

18       The foregoing are representative examples of the work that is being done to
19   improve care and comply with the Court's Injunction regarding disease-specific issues.

20   **C.    Resource investment and process improvements.**

21       The Department's progress to date reflects a unanimous commitment to reform
22   and lays the foundation for the Department's work moving forward.

23       **1.    State leadership commitment.**

24       The Department's leadership and all involved with the compliance work remain
25   committed to improving care and complying with the Injunction.  (Doc. 4818-1 at 6
26   [Thornell Decl.] ¶ 7; *id.* at 14–15 [Oddo Decl.] ¶¶ 13, 16.)  To that end, the Department
27   has hired numerous personnel to assist with its implementation of the Injunction over the
28   last year.  The Department is continuing to search for a medical director but in the

11

meantime has contracted with physicians to assist with the quality indicator reviews and mortality reviews.  (Doc. 4872-1 at 4–5, ¶¶ 4–7.).  Other staff in the Health Services Division have stepped up to take an expanded role to lead special projects, such as the methodology review and continuous quality improvement projects.  *E.g.*, McLane Decl. ¶ 8 (methodology review); Beauregard Decl. ¶ 15 (CQIs).

The Legislature and Governor likewise continue to support reform efforts, including through substantial increases in healthcare appropriations to the Department. Evitch Decl., Ex. 1 (updated spreadsheet detailing funding increases from FY2022 to FY2026).

The increase in funds has been substantial.  In FY2022, the year before the Court's 2022 order, the Department spent $220.4 million on inmate healthcare expenditures. Evitch Decl., Ex. 1 at C:19.  Last year, in FY2025, the Department spent an additional $200 million, bringing the total annual expenditure to $425.9 million.  Evitch Decl., Ex. 1 at F:19.  And in FY2026, the Department's budget is $458.1 million—that is more than double what the Department spent on healthcare in the year leading up to the Court's 2022 order.  Evitch Decl., Ex. 1 at H:19.

**2.    Processes to support compliance and quality healthcare services.**

The Department also has implemented new processes to support compliance with the Injunction and improved healthcare services, including:

***QI methodology reviews.***  The Department reevaluates assessment methodologies on an ongoing basis to ensure that monthly QI assessments align with all requirements and to recommend improvements.  McLane Decl. ¶ 8.  This has been an iterative process, and in early April 2025, the Health Services Division refocused its efforts related to QI methodology.  Led by the Director of Nursing, the team compares their current processes against the QI and Safety Monitoring Guide, identifying compliance gaps and requesting report revisions where needed.  *Id.* ¶ 9.  The Department is using this team to review the Report's feedback on methodology and make changes based on that feedback.  *Id.* ¶ 10.

*Continuous quality improvement.*  As required by Injunction § 2.4.1, ADCRR has been monitoring various health and other metrics on a regular basis.  It selected four metrics as continuous quality improvement (CQI) projects to improve clinical care.  The four projects address (1) blood pressure, (2) hemoglobin/AlC, (3) individuals taking ten or more prescribed medications, and (4) intake screening.  *See* Beauregard Decl. ¶ 15.  Likewise, NaphCare identifies and leads CQI projects aimed at particular issues to improve patient care.  Pacheco Decl. ¶ 19; McLane Decl. ¶ 95.

*Improved coordination of input regarding healthcare issues*.  Partly because of the systems the Injunction established—mortality or suicide attempt reviews (§ 2.1); near-miss reporting (§ 2.2); preventable adverse event reporting (§ 2.3); and input from families, friends, employees, inmates, plaintiffs, and the Monitors (Doc. 4410 at 8)—ADCRR receives voluminous information that highlights areas for improvement and provides insight into potential problems.  The Department has centralized this information over the past several months to provide opportunities for coordinated analysis and action.  McLane Decl. ¶ 88–89.

*Frequent check-in meetings regarding targeted QIs*.  The Department conducts biweekly and monthly check-ins to focus on compliance for selected QIs and monitor improvements to those specific QIs over time.  This effort includes personnel from throughout ADCRR who have responsibilities related to compliance, including health services and operations, as well as leadership from ADCRR's healthcare contractor, NaphCare.  *See* Doc. 4818-1 at 5 [Thornell Decl.] ¶ 6; *id.* at 10–11 [Oddo Decl.] ¶ 7; Pacheco Decl. ¶ 29.

**D.    The Monitors' negative view of ADCRR's progress.**

Despite the Department's significant work and resulting improvements, the Third Interim Report is decidedly negative.  The Monitors apply a highly subjective conception of Injunction compliance, under which they deem anything less than perfect compliance as non-compliance—except when the Monitors think that non-compliance is offset by other factors.  At all events, the Report provides for the first time a detailed review of

13

1  healthcare Injunction requirements, the methodology for determining compliance, and a
2  critique of ADCRR's performance on each.

3      ADCRR disagrees with many of the Monitors' comments or conclusions, and it
4  strongly disagrees with the Report's overall findings, which overstate risks and minimize
5  progress.  Yet ADCRR appreciates the Monitors' review of the Injunction's healthcare
6  requirements and the related QIs.  The attached Declarations of Micaela McClane,
7  ADCRR's Director of Nursing and leader of its methodology review team, and
8  Dr. Raymonda Matheka, ADCRR's Director of Mental Health (**Exhibit 9**), attempt to
9  provide a similarly comprehensive overview of various healthcare QIs and address issues
10  the Monitors raised.  Other declarations responding to issues raised in the Monitors'
11  Report and providing information on aspects of ADCRR's health care services are also
12  attached.  *See* Pacheco Decl. (NaphCare Regional Medical Director, addresses various
13  issues related to medical services at ADCRR facilities); Beauregard Decl. (ADCRR
14  Nurse Practitioner, discusses PCCM implementation and continuous quality
15  improvement projects); Declaration of Alecia Douglas (attached as **Exhibit 10**)
16  (NaphCare Associate Regional Mental Health Director, discusses programs to reduce
17  self-injurious behavior, backlog reductions); and Declaration of Erica Altigieri (attached
18  as **Exhibit 11**) (ADCRR Restrictive Housing Administrator, discusses transportation and
19  custody staffing).

20      In the paragraphs below, Defendants briefly address some of the general topics the
21  Monitors addressed in their Report.

22      ***Mortality reviews.***  The Injunction establishes requirements for reviews after an
23  inmate dies or attempts suicide.  (Doc. 4410 at 16-17, § 2.1.).  These examinations[7] aim
24  to identify errors that help develop "an effective and sustainable remedial plan."  (*Id.*)

25  _____

26  [7] Mortality reviews are done throughout the healthcare field in order to improve patient
   care.  *See*, *e.g.*, the Patient Safety Act, 42 U.S.C. §§ 299b-21–b-26.  Unlike the mortality
27  reviews the Injunction requires, such processes normally are privileged and confidential
   to encourage the free sharing of information among providers to ensure for quality
28  improvements and the best possible patient outcomes.  *See id.* at § 299b-22.

1     The reviews involve physicians from NaphCare and ADCRR who were not involved

2     previously, as well as medical staff and others from the prison where the death occurred.

3     The work involves independent reviews of the medical information about the cases under

4     review, followed by discussions.  The result is a report of findings and recommendations

5     from the review.  As noted previously, information from the mortality reviews is

6     coordinated with information about healthcare concerns to help identify problems and

7     make appropriate plans to address them.  In 2025 alone, the Mortality Review Committee

8     has made several recommendations for corrective action; some have already been

9     implemented and others are still in progress.  Pacheco Decl. ¶¶ 9–11.

10          The Monitors strongly criticize the reviews of four recent deaths for failing to

11    identify problems in the care the inmates received.  (Doc. 4968 at 5–12.)  Yet the

12    Monitors' analysis of those reviews has its own flaws, as detailed below at pages 23–26,

13    and as explained in the attached declaration of Dr. Richard Embrey, a physician who

14    works for NaphCare but was not involved with the mortality reviews.  *See generally*

15    Declaration of Richard Embrey (attached hereto as **Exhibit 12**).  Further, although the

16    internal reviews of the deaths the Monitors reviewed did not identify problems, many

17    other reviews did and resulted in recommended improvements to care.  Pacheco Decl.

18    ¶ 9.  These actions include (1) improved escalation of high-risk cardiac events and the

19    corresponding referral process, (2) a variety of clinical protocol improvements, including

20    standardized procedures for medication management in elderly patients,

21    (3) improvements to how practitioner order recommendations are handled, (4) changes to

22    end-of-care life planning, and (5) changes to coordination between medical and mental

23    health providers.  *Id.*  Doctors involved with the review process have reviewed the

24    Monitor's criticism.  *Id.* ¶ 12.  They understand their role and will continue to perform to

25    the best of their ability.  *Id.*  The mortality review process now includes a new doctor who

26    did not participate in the reviews the Monitor cited as examples.  *Id.* ¶ 13.  The Report

27    correctly identified mistakes in the care provided to inmates, the Department is refining

28    the mortality review process in light of the Monitors' criticisms.

1    **Refusals.**  The Report also criticizes the Department's procedures related to patient

2    refusals.  This issue affects numerous aspects of healthcare, including inmates' refusal to

3    take prescribed medication or to attend different healthcare consultations and tests.  The

4    Department's policy conforms with the Injunction's requirements.  (*See* e.g., Medical and

5    Dental Services Technical Manual (MDSTM) (Oct. 1, 2024) excerpts attached hereto as

6    **Exhibit 13**; Mental Health Technical Manual (MHTM) (Feb. 2025) excerpts attached

7    hereto as **Exhibit 14.**  The Department trains correctional officers regarding their

8    responsibilities to notify healthcare personnel when these issues arise, consistent with the

9    Injunction and Department policy.  Healthcare personnel likewise receive training

10    regarding their responsibilities regarding refusals.  Pacheco Decl. ¶ 21.  Additional

11    training to reinforce the Injunction's requirements is planned.  *Id.*

12    Department policy requires inmate refusals to be documented in writing.  *E.g.*,

13    Exhibit. 13 at 190.  The Monitors say that forms signed by patients indicating that they

14    are declining treatment are "meaningless signatures on a piece of paper."  (Doc. 4942 at

15    16; *see also id.* at 131.)  That is incorrect.  Although the refusal process involves more

16    than a signed piece of paper, a signed refusal is not meaningless.  To the contrary, a signed

17    refusal is evidence of a patient's intent regarding his or her own care.  To be sure, proper

18    documentation of appropriate counseling should accompany a signed refusal. And the

19    Department is reviewing the Monitors' criticism to improve its processes and compliance

20    on that score.  But a lack of accompanying documentation does not necessarily signal a

21    failure of care or any patient danger.  In any event, the Injunction does not require signed

22    refusals.  Rather, Defendants employ that practice in order to keep an accurate record of

23    the education provided to the patient about his or her specific refusal.

24    **The Monitors' subjective approach to compliance.**  ADCRR previously

25    expressed concerns about the Monitors' binary yet inconsistent approach to assessing the

26    Department's compliance with the Injunction.  (Doc. 4815 at 2.)  Defendants will not

27    repeat those comments here.  But the Monitors' concept of compliance remains vague.

28    The Monitors say that ADCRR can be 94% compliant and yet still be out of compliance.

1    (*E.g.*, Doc. 4968 at 172.)  They insist that "percentage level of performance . . . is only

2    one element factoring into a determination of compliance with the Injunction." (*E.g.*, *id.*

3    at 49.)  Yet they do not explain, for any specific QI, what ADCRR must do to comply

4    short of attaining perfection.  The Monitors identify some factors they consider beyond

5    percentage, including frequency of deviation, pattern of deviations over time, and risk of

6    harm.  (*Id.* at 40.)  But their approach is largely subjective and therefore difficult for the

7    Department to operationalize.

8         A receiver, of course, would face the exact same challenges.  A receiver could

9    make the exact same progress that ADCRR is making but deemed "non-compliant" until

10   achieving perfect compliance according to a vague and ever-changing rubric—a

11   demoralizing and ultimately counterproductive exercise.

12        ***Discrepancies between the Second and Third Interim Reports:*** Unexplained

13   differences between the Monitors' Second and Third Interim Reports illustrate the

14   problem.  On numerous quality indicators, the Monitors found the Department to be in

15   compliance in the Second Interim Report but out of compliance in the Third Interim

16   Report.  Yet the Monitors give little or no explanation for these reversals, or even

17   acknowledge the contradictions in their Third Interim Report.  These discrepancies raise

18   serious questions about the reliability and objectivity of their assessment methodology.

19        **QI 15.8.**  The Monitors' approach to QI 15.8 is one example of many puzzling

20   reversals.  In January 2025, the Monitors found the Department compliant with this

21   provision.  (Doc. 4755 at 85.)  Yet in the Third Interim Report, they claim that "ADCRR

22   *continues* to be non-compliant with this provision" and say "[i]t is difficult to calculate

23   the level of performance on this provision because we do not know what medications are

24   on ADCRR's formulary."  (Doc. 4968 at 191 (emphasis added).)  The Monitors do not

25   explain how they could deem ADCRR compliant in January but claim now that they

26   cannot even measure compliance.  Nor do they explain how ADCRR could "continue[]

27   to be non-compliant" today even though the Monitors themselves found ADCRR

28   compliant in January.  (*Id.*)

1    **QI 11.3.6c–d.**  Similarly, in the Second Interim Report, the Monitors found the

2   Department in compliance with this provision.  (Doc. 4755 at 79.)  Yet in the Third

3   Interim Report, the Monitors state that "ADCRR *continues* to be non-compliant with this

4   provision," without explaining what (if anything) changed between January and July.

5   (Doc. 4968 at 139 (emphasis added).)

6    **QI 2.1.3.**  So too for QI 2.1.3.  The Monitors found the Department in compliance

7   in January.  (Doc. 4755 at 80.)  But in the Third Interim declared "ADCRR continues to

8   be non-compliant with this provision" in July.  (Doc. 4968 at 141.)  Why?

9    **Further examples.**  Further examples of these unexplained reversals include QI

10   15.5, on which the Department was compliant in January (Doc. 4755 at 85) but "not

11   compliant" in July (Doc. 4968 at 198); and QI 16.9.9, on which the Department was in

12   compliance in January (Doc. 4755 at 89), but somehow "continues to be non-compliant"

13   in July (Doc. 4968 at 251).  Similarly, for QI 1.3, the Monitors found compliance in

14   January (Doc. 4755 at 84) but non-compliance in July (Doc. 4968 at 182).

15    **Inconsistent grouping of QIs:**  The Monitors' approach to Injunction § 16.1

16   further illustrates the inconsistency in their methodology.  Although they found the

17   Department out of compliance with this provision in their Second Interim Report (Doc.

18   4755 at 85), in the Third Interim Report the Monitors grouped QI 16.1a (mental health

19   assessment within one business day) with QI 16.1b (mental health assessment

20   documentation) and declared the Department wholly out of compliance with both

21   provisions (Doc. 4968 at 189).  The Monitors do so even though they acknowledge that

22   "ADCRR staff are fairly timely in meeting with patients soon after arrival."  (*Id.*)

23    The Monitors fail to explain whether these shifts in compliance determinations

24   result from changes in their methodology, changes in ADCRR's performance, or other

25   factors.  This lack of transparency and consistency undermines their oversight function

26   and risks creating an environment in which standards are arbitrary and unpredictable.  It

27   also makes the Monitors' assessments more difficult to convert into action.

28

18

***Use of Percentages.***  The same inconsistency characterizes the Monitors' approach to compliance percentages.  The Monitors criticize ADCRR's use of percentages for its compliance assessments, but at the same time they recognize that percentages "can certainly be of value to an agency for internal management purposes."  (*Id.* at 41.)  And that is true:  percentages are valuable to ADCRR as objective measures of performance.  Percentages may not work for every Injunction requirement, but they work for the vast majority and provide objective measures that can be tracked over time.

Yet inexplicably, the Monitors do not even note the fact that, by the Monitors' own analysis, the Department came into compliance on eight different QIs in the months between the Second and Third Interim Report:

| QI | Second Interim Report | Third Interim Report |
|---|---|---|
| 4.4a<br>4.4 b<br>4.4c | Non-compliant (Doc. 4755 at 71) | Compliant (Doc. 4968 at 290–91) |
| 7.4.1 | Non-compliant (Doc. 4755 at 76) | Compliant (Doc. 4968 at 82) |
| 1.8d | Non-compliant (Doc. 4755 at 77) | Compliant (Doc. 4968 at 97) |
| 11.3.2<br>11.3.4 | Non-compliant (Doc. 4755 at 79) | Compliant (Doc. 4968 at 130, 132) |
| 16.9.8 | Non-compliant (Doc. 4755 at 89) | Compliant (Doc. 4968 at 250) |

These positive changes demonstrate the Department's progress across a wide range of compliance areas, from maintenance of electronic medical records, the MOUD program, widespread distribution of Narcan, and the elimination of safety contracts.  Yet the Report does not highlight or even acknowledge these improvements as such.

The Monitors' reluctance to acknowledge this progress is counterproductive.  Just a few years ago, U.S. Attorney General Merrick Garland urged third-party monitors to "be sure to highlight . . . successes just as quickly as they discuss work that remains."  , Memorandum from Attorney General Merrick Garland, *Review of the Use of Monitors in*

1  *Civil Settlement Agreements and Consent Decrees Involving State and Local Government*

2  (Sept. 13, 2021) at 8 (attached as **Exhibit 15**).  The Attorney General recognized that

3  "[i]mplementing the type of institutional reform that is required by a consent decree

4  demands a substantial and sustained commitment from the entire community," and this

5  "commitment risks turning into frustration" unless "the community is . . . aware of the

6  progress that is being made."  *Id.*

7         The same is true of the Injunction here.  All parties should be "forthright about the

8  work left to do."  *Id.*  The Department knows full well that significant work remains, and

9  the Department would welcome the Monitors' help to support its ongoing reform

10 efforts—including through candid, constructive criticism.  But the Monitors' present,

11 subjective approach to compliance is difficult to incorporate, and their reluctance to

12 acknowledge progress is counterproductive.  The Monitors' comment that ADCRR is

13 "light years" from demonstrating proficiency, for example, is gratuitous and unhelpful.

14 (Doc. 4968 at 42.)

15                          **III.    ARGUMENT**

16        Because the Court requested the Monitors' Report in the context of the Plaintiffs'

17 pending Motion for Receiver, the Department analyzes the Report's implications based

18 on the standards that apply to the appointment of a receiver.  The Report does not support

19 granting Plaintiffs' Motion.

20 **A.    Legal standards for court-appointed expert testimony.**

21        As appointed experts under Rule 706 of the Federal Rules of Evidence, the

22 Monitors must comply with the other evidentiary rules, including Rules 702 and 703.

23 Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6303 (2d ed.) ("[T]he court may not

24 receive testimony from its own expert unless the requirements of Rule 702, as well as

25 other rules regulating admissibility, are satisfied.").

26        Under Rule 702, "before admitting expert testimony, the district court must

27 perform a gatekeeping role to ensure that the [proffered] testimony is both relevant and

28 reliable." *United States v. Valencia-Lopez*, 971 F.3d 891, 897–98 (9th Cir. 2020).  Expert

1    testimony is admissible only if "(a) the expert's scientific, technical, or other specialized
2    knowledge will help the trier of fact to understand the evidence or to determine a fact in
3    issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product
4    of reliable principles and methods; and (d) the expert has reliably applied the principles
5    and methods to the facts of the case." Fed. R. Evid. 702.

6          The Ninth Circuit recently clarified how these standards apply in the context of
7    expert testimony on causation of specific medical conditions.  The court explained that
8    "when an expert establishes causation based on a differential [etiology], the expert may
9    rely on his or her extensive clinical experience as a basis for ruling out a potential cause
10   of the disease." *Engilis v. Monsanto Co.*, --- F.4th ----, 2025 WL 2315898, at *9 (9th Cir.
11   Aug. 12, 2025) (citation and quotation marks omitted).  But the expert cannot rely solely
12   on his or her clinical experience.  Rather, the general rules regarding experts still apply:
13   "an expert must provide reasons for rejecting alternative hypotheses using scientific
14   methods and procedures and must rely on more than subjective beliefs or unsupported
15   speculation." *Id*. (quotations omitted).  Where "the expert report . . . does not describe
16   the details of its author's clinical experience" or "include an assessment of the existing
17   literature," the report's opinions should be given limited weight or excluded.  *Id*. at *10.

18         Here, to the extent that Plaintiffs want to rely on the Monitors' Report, they must
19   establish that it is "more likely than not" that the report meets each of the factors outlined
20   in Rule 702.  *Id.* at *5 (quoting Fed. R. Evid. 702).  That will be difficult to do, because
21   the Monitors also often opine on areas that appear to be outside their expertise, such as
22   leadership.  (*See* Doc. 4352 at 1 (appointing Dr. Stern as an expert in this matter "to assist
23   the Court with crafting the medical care aspects of the injunction"); Doc. 4410 at 6
24   (discussing appointment of monitors to help monitor compliance.).)  To the extent the
25   Report exceeds the Monitors' expertise, the Court should not rely on their non-expert
26   opinions in the receivership analysis.

27   …

28   …

21

1

**B.      Legal standards for a receivership.**

2          The appointment of a receiver is justified only where "anything less" would not

3   remedy the underlying constitutional violation. *Plata v. Schwarzenegger*, 603 F.3d 1088,

4   1097 (9th Cir. 2010); *Dist. of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. App.

5   1999) ("[Receivership] is the remedy of last resort, and therefore, should be undertaken

6   only when absolutely necessary.").

7          In deciding whether to appoint a receiver, the Court must consider seven factors,

8   "the first two of which are given predominant weight:

9          (1) Whether there is a grave and immediate threat or actuality of harm to plaintiffs;

10         (2) Whether the use of less extreme measures of remediation have been exhausted
                or prove futile;

11

12         (3) Whether continued insistence for compliance with the Court's orders would
                lead only to confrontation and delay;

13         (4) Whether there is a lack of leadership to turn the tide within a reasonable period
14              of time;

15         (5) Whether there is bad faith;

16         (6) Whether resources are being wasted; and

17         (7) Whether a receiver is likely to provide a relatively quick and efficient remedy."

18  *Plata v. Schwarzenegger*, 2005 WL 2932253, at *23 (N.D. Cal. 2005).  The Court must

19  consider each factor. *Jerry M.*, 738 A.2d at 1214 ("We conclude that the trial court abused

20  its discretion in appointing a receiver because several important criteria were omitted

21  from the trial court's consideration in this case.").

22  **C.      The Report does not establish a receiver is warranted.**

23         The Monitors' Report does not consider all seven factors, and none of the factors

24  favors the appointment of a receiver in any event.

25         **1.      No grave or immediate threat of harm.**

26         The first factor is whether there is a "grave and immediate threat or actuality of

27  harm to plaintiffs" if drastic steps, like the appointment of a receiver, are not taken. *Plata*,

28  2005 WL 2932253, at *23.    This requires a demonstration of a constitutionally

22

1    impermissible risk of harm that is a "gross and extreme departure from the standard of

2    care," *id.*—that is, "the deprivation [of medical care] was serious enough to constitute

3    cruel and unusual punishment" resulting from "deliberate indifference," *Balla v. Idaho*,

4    29 F.4th 1019, 1025–26 (9th Cir. 2022) (citation omitted).

5        The Report concludes (at 38–39) that the Department has failed to make progress

6    towards reducing Plaintiffs' risk of harm.  Not so.

7        ***Methodological flaws.***  For starters, the Report is beset by methodological flaws

8    that undermine its conclusions.  For example, the Report notes (at 40) that "the Monitors

9    assess the degree to which patients at ADCRR are subject to a significant risk of harm

10   due to ADCRR's medical and mental health care delivery system, by determining whether

11   or not ADCRR is substantially compliant ('compliant') with each of the requirements of

12   the Injunction."  The Report also notes (at 41) that the Injunction's requirements that "all

13   health care provided and the documentation supporting that care is clinically appropriate

14   and provided in a clinically appropriate timeframe (paragraphs 1.1 and 1.3)" are some of

15   the requirements for which "non-compliance results in the most significant risk of harm

16   . . . ."  But the Monitors do not explain further how they determined whether any given

17   instance of non-compliance creates a serious risk of harm.

18       The Monitors also do not appear to analyze whether there is a serious risk of harm

19   to *all* Plaintiffs; instead, they seem to analyze whether there is a serious risk of harm for

20   a *subset* of patients who have pre-existing conditions that place them at the highest risk.

21   (*See, e.g.*, Doc. 4968 at 42 (noting that "monitor looks for patients for whom the impact

22   of non-compliance would pose the most significant risk of harm.").); *see Plata*, 2005 WL

23   2932253, at *23 (first factor is "[w]hether there is a grave and immediate threat or

24   actuality of harm *to plaintiffs*") (emphasis added.)  Regarding the requirement that an

25   inmate have an assigned primary care provider, for example, the Monitors say "the risk

26   for harm from not having an assigned PCP is greatest for those with multiple complex

27   health problems"—i.e. those patients who are already at a higher risk of an adverse

28   outcome—regardless of the care that the Department and NaphCare provide.  The

1    Monitors accordingly "identify a subset of sicker individuals and confirm that they, too,

2    have an assigned PCP." (Doc. 4968 at 42.) The Monitors assert that this type of "high

3    risk case finding" is "necessary to provide the Court with a complete and accurate picture

4    of the degree to which the healthcare being delivered at ADCRR is constitutionally

5    adequate." (Doc. 4968 at 43.) But the Monitors fail to explain how this analysis of the

6    risk to *particular* inmates is relevant to whether Plaintiffs *generally* are subject to a grave

7    and immediate risk of harm.

8        Moreover, any meaningful assessment requires appropriate benchmarks for

9    measurement. But the Report fails to provide such benchmarks. As Dr. Embry explains,

10   "[t]he monitors make no attempt to benchmark the rate of errors and resultant adverse

11   events. Rather, by not identifying nor discussing rates of errors, the monitors seek to

12   leave the reader with the belief that a zero-error rate is the norm and any errors found are

13   indicative of overall poor care." Embrey Decl. ¶ 8.

14       In fact, a zero-error rate is not the norm. On the contrary, as Dr. Embry explains,

15       Retrospective chart reviews as employed by the monitors are known to find
16       a very high number of errors and adverse events, even when applied to the
         best of providers. A 2011 study found more than one-third of patients in
17       three tertiary referral hospitals had adverse events when medical charts were
         reviewed retrospectively.

18   *Id.* (citation omitted). Without proper benchmarking, the Monitors' findings cannot

19   establish that care at ADCRR departs from community standards, much less the "gross

20   and extreme departure" required to meet the first receivership factor. (Doc. 4435 at 21

21   n.14 "[t]he community standard of care outside of the prison context is highly relevant in

22   determining what care is medically acceptable and unacceptable" (citing *Balla*, 29 F.4th

23   at 1026).)

24       ***Mortality review errors.*** The Monitors' Report asserts that "[t]he lack of progress

25   made by ADCRR in addressing the Court's main goal—reducing the significant risk of

26   serious harm to which patients in ADCRR prisons are subjected—is best encapsulated in

27   [a] series of mortality reviews." (Doc. 4968 at 4.) Although the Monitors' mortality

28   reviews correctly identified some issues with the care that inmates received, they do not

establish that there is a grave and immediate risk of harm to the Plaintiffs generally—or even to a subset of higher risk patients.

As Dr. Embrey explains, "[t]he monitors have failed in meeting their primary charge to 'assess the degree to which patients at ADCRR are subject to a significant risk of harm' by employing incorrect methodology." Embrey Decl. ¶ 7. Specifically, because the Monitors only examine cases with an adverse outcome, "the monitors' review methodology guarantees that they will find . . . that the ADCRR medical and mental health delivery system is dangerous and has failed to improve during the study period." *Id.* Reviewing only instances in which a patient died lacks critical comparative context and "is analogous to condemning air travel as unsafe because of pilot errors leading to a fatal crash while ignoring the 14 trillion passenger miles flown without an accident in the 16 years prior to that accident." *Id.*

The Monitors' analysis also departs from typical principles of medical quality review. "The monitors have chosen to use a highly biased narrative approach to discussing the errors that are discovered through their chart reviews. This approach will always put the medical care in the worst possible light, often inaccurately." Embrey Decl. ¶ 9. In contrast, "[i]t is common practice in healthcare outcomes research to utilize an error or adverse event rating system (such as the National Coordinating Council for Medication Error Reporting and Prevention Index for Categorizing Errors)." *Id.* The Monitors' "failure to follow generally accepted principles of medical quality review is a serious shortcoming that brings into question the validity of their conclusions." *Id.*

These methodological flaws also afflict the Monitors' individual case reviews, which "demonstrate failure to conduct thorough record review, misapplication of clinical standards, and inappropriate causal attribution." Embrey Decl. ¶ 10. Regarding **Death 1**, for example, the Monitors incorrectly assert that the patient's "antiseizure medication worked. He had no more seizures after starting it." (Doc. 4968 at 5.) In fact, "[t]he patient had two episodes suggestive of a post-ictal state from breakthrough seizures on May 1, 2024 and May 26, 2024 despite being on the same dose of Keppra." Embrey

1    Decl. ¶ 12.  Dr. Embrey's analysis demonstrates that "the patient's death was not directly
2    related to his seizure disorder."  *Id.* ¶ 14.

3           Similarly, regarding **Death 2**, the Monitors claim that ADCRR failed to
4    discontinue aspirin for 12 days despite hospital discharge instructions.  (Doc. 4968 at 8.)
5    However, the electronic medication administration record shows "a discontinuation order
6    for aspirin 81mg entered on February 15, 2025, with the discontinuation reason given as
7    'On Plavix and Eliquis,'" and that "staff correctly identified the hospital's order and
8    discontinued the current aspirin order immediately upon the patient's return from the
9    hospital."  Embrey Decl. ¶ 16.  The Monitors also characterize the patient's condition as
10   "malignant hypertension" requiring "emergent treatment."  (Doc. 4696 at 8.)  As Dr.
11   Embry explains, however, "'[m]alignant hypertension' is an archaic term that is no longer
12   used," and the patient actually "had hypertensive urgency rather than hypertensive
13   emergency," for which "[t]here is no indication in the guidelines for referral to the
14   emergency department."  Embrey Decl. ¶¶ 17–18 (citing Journal of the American College
15   of Cardiology, Vol. 71, No. 19, 2018 at e194-e195).

16          The Monitors' analysis of **Death 4** further illustrates the flaws in their approach.
17   The Monitors note the patient "died in the hospital on March 21 of severe pneumonia
18   caused by the influenza virus and the bacteria Streptococcus pneumoniae," and fault
19   ADCRR for failing to conduct appropriate viral testing and follow-up.  (Doc. 4968 at 12);
20   Embry Decl. ¶¶ 27–29.  But this characterization is incorrect.  As Dr. Embry explains,
21   "[t]he proximate cause of the patient's death was bleeding and hemorrhagic shock
22   complicating an attempted thoracoscopic decortication.  His death was due to a surgical
23   complication rather than his underlying pneumonia."  Embrey Decl. ¶ 30.  At the time of
24   the surgical procedure, "the patient was improving and had an excellent chance of
25   recovery given his young age and general good health."  *Id*.

26          The Monitors' analysis of each of these deaths reflects an inadequate review of the
27   factual record and a misapplication of clinical standards. These methodological flaws

28

1    render the Report's conclusions unreliable and insufficient to establish the "grave and

2    immediate threat of actuality of harm" necessary to justify a receivership.

3      ***Quality indicator reviews***:    The Report also equates non-compliance with

4    Injunction §§ 1.1 and 1.2 with a serious risk of harm.  For example**,** the Monitors assert

5    that "failure to provide adequate clinical care within each domain directly increases the

6    risk of harm to patients." (Doc. 4968 at 142.)  But the "grave and immediate risk of harm"

7    that would justify a receiver cannot be demonstrated by simple deviations from the

8    standard of care or simple medical malpractice.  *Balla*, 29 F.4th at 1026 (noting Eighth

9    Amendment liability must be predicated on something "beyond malpractice").

10      The Monitors admit that some deviations from the Injunction create varying

11    degrees of a risk of harm.  For example, regarding deviations from administering

12    prescribed medications, the Monitors say that a "patient missing medication places

13    patients at significant risk of harm," but they acknowledge that "the nature and degree of

14    harm depend[s] on the medication and the condition it is treating." (Doc. 4968 at 283.)

15    The Monitors nonetheless gloss over these important distinctions and fail to quantify the

16    comparative risks of harm for different aspects of compliance.

17      ***Patient examples***:    The Monitors also claim that several specific patients were

18    subjected to a serious risk of harm.  But the Monitors do not identify the patient sample

19    size they examined before identifying the examples in their Report, nor do they analyze

20    how common those types of errors are in the community.

21      ***Risk of harm associated with refusals and cancellations***:    The Monitors also

22    assert that the Department's purported failure to conduct informed refusals of care creates

23    a serious risk of harm.  This conclusion is speculative, requires several causal leaps, and

24    relies on assumptions that (1) the inmate would not have refused or cancelled if the

25    interaction had been performed correctly, (2) the inmate has a high-risk characteristic that

26    would be remedied by the appointment, and (3) the appointment would in fact remedy

27    the high risk of harm.  The Monitors claim, for example, that the cancellation of

28    appointments creates a risk of harm.  (Doc. 4968 at 75.)  But even they acknowledge that

1    this risk depends "on the nature of the reason for the visit . . . ." (*Id.*)  The Monitors also

2    acknowledge that the risk of an improper cancellation "depend[s] on the nature of the

3    patient's need."  (*Id.* at 73.)  The Department takes the Monitors' feedback on refusals

4    and cancellations seriously, but those aspects of the Report do not warrant a finding of a

5    grave and immediate risk of harm.

6        ***Comparison to 2022:***   The Court's previous finding that the Department's

7    provision of healthcare fell below constitutional minima focused on the fact that "staff

8    levels [were] so inadequate that the provision of constitutionally mandated care [was]

9    impossible," and credited expert testimony that "staffing is the root of the ADCRR's

10    healthcare deficiencies." (Doc. 4335 at 21.)  The Department's significant improvements

11    in staffing—including a 68% overall increase in healthcare FTEs per-inmate, Tapia Decl.

12    ¶ 14—therefore represents a significant area of improvement towards constitutional care.

13    The Monitors' refusal to acknowledge this progress undermines their analysis.

14        The Court also found that the Department's "failure to undertake meaningful

15    remedial action when their own mortality reviews reflect preventable deaths, and failure

16    to take any meaningful follow up actions to ensure" a previous healthcare contractor's

17    "compliance" reflected "conscious disregard of harm prisoners face." (Doc. 4335 at 122.)

18    The Department and its current healthcare contractor, NaphCare, have made significant

19    progress in this regard and implemented several recommended changes from the

20    Mortality Review Committee in 2025 alone.  Pacheco Decl. ¶ 9–11.  By analyzing only a

21    handful of recent mortality reviews, the Monitors overlooked the recommendations

22    ADCRR and NaphCare implemented, which have significantly improved the system

23    since 2022.  This too undermines the credibility and utility of the Monitors' analysis

24    regarding the risk of harm.

25        **2.    The Department has effective leadership in place.**

26        The Report also does not support a finding that the Department lacks the leadership

27    necessary to bring the Department into compliance within a reasonable time—still

28    another receivership factor.   Here, the Monitors' criticism of leadership is largely

1    anecdotal and inexplicably disregards the Department's progress on Injunction

2    compliance, including the PCCM rollout. [8]

3        ***Leadership Relating to PCCM Rollout***:  For example, the Report criticizes the

4    Department's efforts to date regarding the rollout of the Patient Centered Care Model,

5    and concludes that, "thus far ADCRR has not demonstrated that it has the internal

6    leadership capability requisite to implement the PCCM statewide."  (Doc. 4968 at 24.)

7    But the Report does not even mention the Department's recent success in rolling out the

8    PCCM at eight units across different complexes.

9        As already noted, the Department is diligently implementing the PCCM.  The

10   Department has hired new staff to oversee the work and has begun implementation

11   beyond the pilot sites.  (Doc. 4818-1 at 42 ¶ 3); Beauregard Decl. ¶¶ 5, 11–12.  ADCRR

12   anticipates facing resource issues down the road, because full implementation of the

13   staffing plan is estimated to require more than $100 million.  Evitch Decl. ¶ 9.  But

14   leadership has already begun confronting anticipated resource challenges by seeking

15   additional funding.  *Id.* ¶¶ 6–9.  The Department deserves the opportunity to succeed.

16       The Monitors cite a May 15 conversation regarding staffing plan calculations as

17   the "most notabl[e]" example of a leadership void regarding the PCCM.  The Monitors

18   claim that leadership was lacking because ADCRR did not reach out to the Court's

19   experts until some six weeks after receiving the experts' information about the staffing

20   plan.  (Doc. 4968 at 24.)  During this timeframe, the Department had lodged objections

21   to the staffing plan but was still working on rolling out the PCCM.  *See* Beauregard Decl.

22   ¶¶ 5–10.  The Department had started weekly meetings with NaphCare about the rollout.

23   *Id.* ¶¶ 6–7.  And the staffing plan was not approved by the Court until June 11, 2025.

24   (Doc. 4916.)

25       In mid-May, the Department was focused on figuring out how the details of rolling

26   out the program before it was ordered by the Court.  When the Department had questions

27

28   _____

     [8] Defendants addressed the Department's overall commitment to compliance and
     leadership efforts in its Response to the Motion for a Receiver.  (Doc. 4818 at 19–20.)

1    about how staff should be allocated among different units at each complex, it was logical

2    to seek clarification from the Monitors—who developed the plan.  Using that inquiry

3    against the Department's leadership is a disappointing response from the monitoring

4    team.  Seeking answers to questions is part of solving problems and implementing

5    change; it is a hallmark of responsible leadership, not a deficiency.

6         ***Missed early opportunities***:  The Monitors also cite "missed early opportunities to

7    comply with the injunction" as another leadership failure.  (Doc. 4968 at 25.)  Two of the

8    Monitors' three examples involve modifications of the electronic health record (EHR)

9    that the Monitors think could have effectively limited the ability of RNs to operate

10   independently—one of the problems addressed by the Injunction.  (Doc. 4968 at 25–26.)

11   TechCare is a documentation tool, not an authorization to do something independently

12   that is beyond a person's scope of practice.  McLane Decl. ¶ 100.  In practice, physicians

13   sign off on nursing protocols that are used.  Pacheco Decl. ¶ 22.  NaphCare and ADCRR

14   can explore whether there are modifications that may address the Monitors' concerns.  To

15   the extent TechCare could be modified to address the Monitors' concern, HSD will work

16   with NaphCare on those issues.  McLane Decl. ¶ 100.

17        ***MOUD review.***  The Monitors' third example concerns the quality of MOUD

18   review, which is addressed in the Declarations of Dr. Pacheco (¶¶ 24–26) and

19   Ms. McLane (¶¶ 80–88).

20        The Department deserves a reasonable opportunity to finish its work.  It has been

21   **two years** since the Injunction was entered, **14 months** since a staffing plan was

22   submitted with the pilot project (Doc. 4599), and **two months** since the Court ordered the

23   final staffing plan (Doc. 4916).  A "reasonable period of time" has not yet passed that

24   would justify usurping the Department leadership's authority and appointing a receiver.

25   *See Plata*, 2005 WL 2932253, at *23; *Newman v. State of Ala.*, 466 F. Supp. 628, 634

26   (M.D. Ala. 1979) (appointing a receiver **six years** after finding of unconstitutional

27   medical care); *Shaw v. Allen*, 771 F. Supp. 760, 760-63 (S.D.W. Va. 1990) (appointing a

28   receiver after **eight years** of non-compliance, three prior contempt proceedings, and

1   attempted less intrusive means); *Wayne Cnty. Jail Inmates v. Wayne Cnty. Chief Exec.*

2   *Officer*, 178 Mich. App. 634, 642 (Mich. App. 1989) (appointing receiver **18 years** after

3   finding of unconstitutionality).

4   **3.   Insistence on compliance will not lead only to confrontation or delay.**

5   The Monitors' Report also does not support a finding that insistence on compliance

6   with the Injunction will lead only to confrontation or delay—another receivership factor.

7   In *Plata*, the court concluded this factor favored the appointment of a receiver where the

8   "State [saw] itself as incapable of handling this crisis, and [the court found that] no degree

9   of support or coercion is likely to help."  2005 WL 2932253, at *29.

10  Nothing in the Report would support similar findings here.  For example, the

11  Monitors criticize ADCRR's ability "to assimilate much of the extensive feedback [they]

12  have been providing since 2023 on how to correctly collect and analyze the data needed

13  to self-assess its level of performance of requirements of the Injunction."  (Doc. 4942 at

14  24).[9]  But the Monitors do not suggest that the Department has been uncooperative or

15  obstructionist in that regard (or any other).

16  In any event, ADCRR disagrees with the Monitors' assertion that it is unable to

17  assimilate feedback or conduct accurate self-assessments.  On some QIs in the Report

18  alone, the Monitors agree with the Department's self-assessments.  (*E.g.*, Monitor Report

19  at 96 (ADCRR's assessment of 94% was "a reasonable estimate"), *id.* at 282 (Monitors

20  calculated "a similar percentage" to ADCRR's 96% compliance percentage).)  ADCRR

21  also has modified its processes in response to feedback from Monitors.  (*E.g.*, Report at

22  68 ("Based on feedback from the Court Monitors, ADCRR changed its methodology";

23  *see also* McLane Decl.¶ 28 (explaining correction of error in assessment)).

24

25  _____

26  [9] Unlike here, many injunctions place initial responsibility for assessment fully on the
    monitor, and the government entity's self-assessment responsibilities are phased in later.

27  *See, e.g.*, Attorney General Memo at 8–9 (explaining the key principle that "Monitoring
    must be structured to efficiently move jurisdictions into compliance," which includes

28  "transition[ing] monitoring responsibilities to jurisdiction *over time*" (emphasis added).)

1    ADCRR has also undertaken structural improvements to better ensure that the

2    Monitors' recommendations are conveyed to the right decisionmakers.  As indicated

3    above, since the Injunction was entered in 2023, ADCRR has made iterative process

4    changes in response to the Monitors' expectations and periodic feedback.  And it is

5    proceeding with its comprehensive methodology review.  These improvements have

6    already enhanced implementation and accountability.

7    **D.     The remaining factors all weigh against receivership.**

8         **1.     The Court has not exhausted all other possible measures.**

9    A significant factor that guides whether a receiver is necessary is whether the use

10   of less intrusive means of enforcing compliance with court orders has failed or would be

11   futile.  *Plata*, 2005 WL 2932253, at *23.  Courts apply this factor cautiously, recognizing

12   that a receiver is appropriate only where defendants are "unwilling or incapable" or "have

13   refused or been unable to take the steps necessary" to institute court-ordered reforms.  *Id.*

14   at *26.  A receiver is warranted only where the record shows "no capacity to implement"

15   reforms *and* that defendants "are no longer willing or able to even" try.  *Id.* at *27.

16   Here, several alternatives exist and should be tested before appointing a receiver.

17   Indeed, there are ample intermediate steps available to promote compliance.  The Court's

18   recent order requiring ADCRR to submit a remedial plan regarding certain custody

19   staffing requirements supplies one example of such an intermediate step.  (Doc. 4950.)

20   And there are others.  Other types of injunctive relief under the PLRA could support

21   compliance with the existing requirements, for example.  The Monitors' role could be

22   modified to better meet the needs of the case.  A special master could evaluate and report

23   on potential legal or operational barriers to compliance, including any concerns arising

24   from state law to help inform potential further relief.  *Cf. Plata*, 2005 WL 2932253 at *27

25   (considering but declining to appoint a special master where, unlike here, "defendants'

26   professed inability to take adequate measures to cure the constitutional violations even

27   with the extraordinary guidance of the Court Experts and mandates of the Court's orders,

28   [would make this] an exercise in futility").

If the Court deems it necessary to employ options like these, it would not be futile to do so. Again, only two years have passed since the Injunction was entered. (Doc. 4410.) That period has included the time needed to develop and approve a staffing plan, which was first submitted with a pilot project in April 2024 (Doc. 4599), and to initiate implantation of the final staffing plan (Doc. 4858), which the Court ordered in June of this year (Doc. 4916). Effectuating such complex, systemic reform orders takes time. This is particularly true in a large, state-run correctional system, which requires sustained and coordinated effort given the scale of operations, security considerations, and complexity of providing services in a custodial setting. Given the short time since implementation began, the record does not support concluding that compliance efforts have failed or are unlikely to succeed.

**2.    The Department is acting in good faith.**

The Department's leadership is making good-faith efforts to comply with the Injunction, which weigh against the appointment of a receiver. *Jerry M.*, 738 A.2d at 1214. Neither Plaintiffs nor the Monitors allege bad faith.

**3.    Resources would be wasted if a receiver were appointed.**

Another factor asks "[w]hether resources are being wasted." *Plata*, 2005 WL 2932253, at *23. They are not. As illustrated above, the Department's use of resources has led to measurable improvements, particularly in staffing.

The Monitors do not assert that resources are being wasted, with one odd exception. On medication administration, the Monitors make a passing comment that missing medications "is also wasteful of resources because for some medications, missing any number of days of medication might be acceptable (e.g., ibuprofen if the patient is not currently experiencing pain)." (Doc. 4968 at 283.) This vague comment does not suggest that a receiver is needed to avoid wasting resources. Extensive Department resources are required simply to keep up with the task of monitoring compliance with the Injunction, in addition to the work to comply with its requirements.

33

1    Conversely, history confirms that the appointment of a receiver will waste
2    resources. Defendants' response to the Receivership Motion already explained that
3    California's experience with a receiver has been extremely expensive, with little to show
4    for it. (Doc. 4818 at 21–25.) Defendants will not repeat that history here.

5    **4.    A receiver would not be a quick or efficient remedy.**

6    Because the appointment of a receiver is the "remedy of last resort," it turns on
7    whether "the prospects for the receiver . . . provid[e] a speedy remedy." *Jerry M.*, 738
8    A.2d at 1214. History also shows that appointment of a receiver is not likely to provide
9    a speedy remedy. Defendants already discussed the 19 years that have passed since the
10   Court in *Plata* appointed a receiver. (*See* Doc. 4818 at 22.) But other jurisdictions'
11   experience confirm that a receivership does not typically result in speedy compliance.
12   *See, e.g.*, *Newman v. State of Alabama*, Civ. A. No. 3501-N (M.D. Ala. Dec. 14, 1988)
13   (order ending receivership nine years after appointment); *Harper v. Bennet*, No. 1:04-cv-
14   01416 (N.D. Ga.), Doc. 24 (July 7, 2004 consent order appointing receiver); *id*. Doc. 368
15   (May 12, 2015 order granting motion to terminate prospective relief).

16   **CONCLUSION**

17   Only two years have passed since the Court entered the Injunction. Defendants
18   have made progress and continue to work hard on coming into compliance. The Court
19   should deny Plaintiffs' Motion for a Receiver and allow the Department's compliance
20   work to proceed.

21   DATED this 25th day of August, 2025.

22   OSBORN MALEDON, P.A.

23

24   By  s/ Mary R. O'Grady
         Mary R. O'Grady
25       Andrew G. Pappas
         John S. Bullock
26       Molly S. Walker
         2929 North Central Avenue, Suite 2000
27       Phoenix, Arizona 85012-2793

28

34

KRISTIN K. MAYES
ATTORNEY GENERAL
Joshua D. Bendor, 031908
Gregory Honig, 018804
Lucy M. Rand, 026919
Luci D. Davis, 035347
Assistant Attorneys General
2005 North Central Avenue
Phoenix, Arizona 85004-1592
joshua.bendor@azag.gov
gregory.honig@azag.gov
lucy.rand@azag.gov
luci.davis@azag.gov
ACL@azag.gov

Attorneys for Defendants

12012514