Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th St.
Phoenix, AZ 85006
Telephone: (602) 650-1854
Email: lbeall@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**DISABILITY RIGHTS ARIZONA**
5025 East Washington St., Ste. 202
Phoenix, AZ 85034
Telephone: (602) 274-6287
Email: adietrich@disabilityrightsaz.org

*Attorneys for Plaintiff Disability Rights Arizona*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Disability Rights Arizona,

Plaintiffs,

v.

Ryan Thornell, *et al.*, in their official capacities,

Defendants.

No. CV 12-00601-PHX-ROS

**PLAINTIFFS' RESPONSE AND OBJECTIONS TO DEFENDANTS' CUSTODY STAFFING REMEDIAL PLAN (Doc. 4980-1)**

This Court found that Defendants have "continually failed to adequately staff Mandatory and Essential Posts at ASPC-Eyman and ASPC-Tucson." Doc. 4950 at 5.[1] The Mandatory Posts must be filled at all times because they have "assigned duties that *must* be performed every shift to ensure the safety, security, and well-being of the incarcerated person, staff, and the public." Doc. 4682 at 3 (emphasis in the original). Essential Posts are "posts with assigned duties that must be accomplished to support safety, security and well-being, but can be delayed for a short period of time, typically no more than 24 hours." *Id*. In the Custody Staffing Plan ("Staffing Plan"), the Essential Posts are the supervisors. *Id*. at 5, 8-28. By failing to adequately staff the Mandatory and Essential Posts at ASPC-Eyman ("Eyman") and ASPC-Tucson ("Tucson"), Defendants put the incarcerated population, their own staff, and the public at risk.

The Court ordered Defendants to submit a remedial plan for the posts at Eyman and Tucson to fill the posts for which they are non-compliant. Doc. 4950 at 10. Specifically, Defendants must fill the posts that were identified as non-compliant in the June Deviation Report: Floor Officers at Eyman and Tucson, Control Unit Officers at Eyman, and Recreation Officers and Supervisors at Tucson. *Id*.; Doc. 4937 at 4-55. Overall, Eyman failed to adequately staff Mandatory Posts every shift in June 2025, and staffed just 63% of all Mandatory Posts. Doc. 4937 at 4-33. Tucson failed in June to adequately staff Mandatory Posts on every day shift, and some night and graveyard shifts, and failed to adequately staff Essential Posts every week.[2] *Id*. at 34-55. At Tucson, 86% of Mandatory Posts and fewer than half the Essential Posts were filled. *Id*. at 34.

Defendants submitted a plan that fails to recognize the urgency of the staffing crisis – a crisis that has grown more severe at both Eyman and Tucson over the last year. In the time that Defendants were purportedly implementing the Staffing Plan, and while Defendants were arguing against the Plaintiffs' Motion to Enforce §§ 20.2.1 and 20.2.3 of

---

[1] All page citations to docket entries refer to the ECF pagination.
[2] The adequacy of Essential Post staffing is determined on a weekly basis. Doc. 4682 at 3.

the Injunction, Defendants lost Correctional Officers ("COs"), Correctional Corporals, and Sergeants at both Eyman and Tucson.[3]

Defendants' remedial plan consists largely of vague generalities, ordinary actions that any correctional department would take in the face of routine hiring needs, measures Defendants have been attempting for years, and placing Correctional Corporals instead Sergeants into supervisory positions, a measure that is not permissible under the Staffing Plan. There is one step Defendants claim to be taking that would clearly ameliorate the staffing shortage in isolation units: reducing the population in isolation and consolidating units. However, Defendants' reporting on the population in isolation units suggests that they are no longer reducing the isolated population. Indeed, after an initial sharp reduction in the immediate aftermath of the April 2023 Injunction, it appears that the isolated population may now be on the rise.

## I. Remedial Plan Monitoring and Reporting

Defendants state that they will monitor the success of their plan through monthly meetings and report their progress to the Court in March 2026. Doc. 4980-1 at 11.

Plaintiffs object strenuously to Defendants' proposed timeline for reporting. Defendants have long been aware of the need to significantly increase their staffing. *See Jensen v. Shinn*, 609 F. Supp. 3d 789, 891 (D. Ariz. 2022), amended, No. CV-12-00601-PHX-ROS, 2022 WL 2910835 (D. Ariz. July 18, 2022); *see also* Pls. Trial Ex. 2174 (September 17, 2020 Letter from D. Ducey to Hon. D. Gowan regarding FY 2021 Correctional Officer Staffing Report). Defendants worked with Court Monitor Scott Frakes during the first six months the Injunction was in place to develop the staffing plan that was submitted on October 6, 2023. Doc. 4489. Following Defendants' input and further negotiations that significantly reduced the number of staff required by the plan, Mr. Frakes submitted a revised Staffing Plan to the Court on September 26, 2024. Doc. 4682. Defendants did not object to the revised Staffing Plan, and this Court ordered them to

---

[3] Under the Staffing Plan, COs or Correctional Corporals staff the Mandatory Posts, and Sergeants staff the Essential Posts. Doc. 4682 at 8-28.

implement it in full. Doc. 4693.[4] In February 2025, in response to Plaintiffs' Motion to Enforce §§20.2.1 and 20.2.3 of the Injunction (Doc. 4764), Defendants stated that they "recognize[d] the seriousness of these shortages in staffing for the subclass" at Eyman and Tucson. Doc. 4788 at 2, 5. Defendants also assured the Court that they were "continu[ing] to work to address these issues." *Id*. at 2.

Despite Defendants' purported awareness of the seriousness of the staffing shortage, and their "work to address" them, staffing shortages at the two locations have significantly worsened over the last year. According to Defendants' filings, staffing at the two locations has dropped as follows:

| | Overall Staffing Total | Overall Vacancy Rate | Overall Vacancy Rate Excluding Posts in Closed Units | Total COs | Total Corporals | Total Sergeants | Docket No. |
|---|---|---|---|---|---|---|---|
| **ASPC-Eyman** | | | | | | | |
| Sept. 30, 2024 | 1008.5 | 26.5% | 13.4% | 755.3 | 16 | 109 | 4684-1 |
| Sept. 26, 2025 | 962.5 | 29.2% | 16.8% | 744.5 | 11 | 94 | 5015-1 |
| **ASPC-Tucson** | | | | | | | |
| Sept. 30, 2024 | 1020.3 | 23.6% | N/A | 781.3 | 22 | 93 | 4684-1 |
| Sept. 26, 2025 | 980.0 | 27.7% | N/A | 748.0 | 20 | 91 | 5015-1 |

*See* Declaration of Maria V. Morris ("Morris Decl.") ¶ 2.

Further, Defendants' reports on deviations from the Staffing Plan show that they continue to fail to meet the requirements of the Staffing Plan at levels similar to those that prompted Plaintiffs to bring the enforcement motion in January 2025. In August 2025, the most recent month for which the monthly deviation report has been filed, Defendants failed to staff the Mandatory Posts at Eyman every single shift. Doc. 4985 at 3-43. Defendants had at least seven unstaffed Mandatory Posts on every single day shift in August 2025 at Eyman, and at least four unstaffed Mandatory Posts on every night shift. *Id*. Tucson fared little better. There was not a single day in August 2025 when every Mandatory Post at Tucson was staffed. *Id*. at 43-102. There was not a single week in August when Defendants

[4] Defendants did not appeal the Court's order, nor seek a stay.

filled all the Essential Posts at Tucson 75% of the time. *Id*.

Defendants' overall non-compliance with the requirements for Mandatory Posts at Eyman has lessened a bit, going from 60% in January 2025 to a still abysmal 68% in August 2025. *Compare* Doc. 4790 at 2 *with* Doc. 4985 at 2. And meanwhile during the same period, the self-reported overall compliance with the requirements for Mandatory Posts at Tucson declined steeply, from 94% to 69%. *Compare* Doc. 4790 at 36 *with* Doc. 4985 at 43.

Defendants should not be permitted to wait another six months to "update" the Court on their "progress." Defendants should be required to treat this issue with the urgency that it demands.

Plaintiffs propose that Defendants be ordered to reach full compliance with the staffing plan requirements for Eyman and Tucson, without degrading the level of compliance at other housing units, by December 2025. They should report their compliance figures to the Court, its expert, and Plaintiffs' counsel no later than January 10, 2026.

## II. Defendants' Remedial Plan

To staff the Mandatory and Essential Posts at Eyman and Tucson, Defendants state that they need to hire and retain 43 and 16 additional COs, respectively, at the two prisons. Doc. 4980-1 at 2. Although it is a lack of Sergeants that results in Tucson's failure to adequately staff Essential Posts, Defendants do not propose promoting, hiring or retaining supervisors. *Id*.

To address the staffing deficiencies, Defendants identify six strategies for filling the needed positions. Plaintiffs address each strategy below.

### 1. Expanding Recruitment Efforts for Entry-Level COs at Eyman and Tucson

Defendants state that they "will expand" recruitment efforts for Eyman and Tucson. Doc. 4980-1 at 4. Many of the steps they state they will take are the standard efforts one would expect they have been taking for years to recruit entry-level correctional officers (CO IIs in ADCRR), such as posting online advertisements through job boards and social media, attending career fairs, and working with Arizona employment offices. *Id*. at 6.

Further, it is clear that some of the recruitment efforts described in Defendants' plan are not at all new. For example, Defendants identify a 10% "'geographical stipend' every pay period to COIIs at ASPC-Eyman." Doc. 4980-1 at 6. But CO IIs at Eyman have been receiving this stipend since June 2018. Morris Decl., Ex. A. Similarly, Defendants state that they are offering a $5,000 hiring bonus for all new CO II hires. Doc. 4980-1 at 6. But Defendants have been offering the same bonus since, at the latest, December 2022. Morris Decl. Ex. B.

For several of the recruitment efforts described in the remedial plan, Defendants give no context to demonstrate that they are in fact "expanding" their efforts. For example, they state the number of cadets in the Correctional Officer Training Academy, but give no information about whether this is an increase from the past. Doc. 4980-1 at 7. They state that they have attended more than 200 community events (county fairs, seasonal events, parades and career fairs) in 2025, but do not state how that compares to previous years.[5] *Id.* at 6. They state that they use "search algorithms [to] target[] individuals relocating to Arizona" and "a 'Drip Email Marketing Campaign' sent out monthly to retarget applicants," but do not say whether these efforts are new. *Id.* To the extent Defendants are using the same hiring tactics to increase staffing going forward that they have been using in the past without success, these efforts should not be expected to ameliorate the current staffing crisis.

Finally, it is questionable whether the efforts they are undertaking are sufficient. Defendants list efforts to obtain stipends and a pay increase. *Id.* at 7-8. The only recent pay increase already in effect to which Defendants cite is boosting the High-Risk Assignment Pay from $0.95 to $2.00 per hour in May 2025. Doc. 4980-1 at 7. During the time that this increase has been in effect, the level of compliance with Mandatory Posts at Eyman has increased (from 63% to 68%) while it has decreased at Tucson (from 86% to

---

[5] Defendants identify "future events" in which they plan to participate, all of which happened months ago. Doc. 4980-1 at 6. This calls into question whether they actually participated, and whether there are any future events actually planned.

69%). *Compare* Doc. 4937 at 4, 34 *with* Doc. 4985 at 2, 43. Plaintiffs hope that this and other efforts to increase pay will help with recruiting and retention. More is almost certainly needed; according to Ziprecruiter.com, "Arizona ranks number 50 out of 50 states nationwide for Correctional Officer salaries." Morris Decl. Ex. C.

**2. Adjusting Prioritization of Staffing at Eyman-Browning from Among Eyman staff**

Defendants state that they will no longer allow people who are staffing Eyman-Browning posts to be moved to non-subclass units at Eyman except if "serious prison emergencies, or statutorily required needs arise at other units. Doc. 4980-1 at 9.

Plaintiffs welcome Defendants' recognition of the need to keep the required staff in the subclass units.

**3. Using Correctional Corporals in a Supervisory Capacity**

Defendants state that they have "reclassified [their] Correctional Corporals to serve in a supervisory capacity." *Id*. This does not comply with the requirements of the Staffing Plan. First, the Plan specifies that the supervision be provided by Sergeants. Doc. 4682-1 at 5, 8-28. As explained in the Staffing Plan, "[d]irect supervision of staff is needed to ensure the quantitative and qualitative requirements identified in the Order are met. The correctional sergeant job series will provide the oversight, direction, and training needed for the officers assigned to carry out the day-to-day work." Doc. 4682 at 5. Defendants' unilateral decision to ignore the Court-ordered Staffing Plan's requirements and declare that Correctional Corporals are now the supervisors does nothing to ensure that these officers have the training, experience or authority to fill the supervisor position and perform the required functions.

Further, much of the reasoning Defendants give for making this change is, essentially, that they object to the Staffing Plan's requirement.[6] The Sergeant roles in the

---

[6] If Defendants had objections to the Staffing Plan, they were required to make them within 10 days after the Staffing Plan was filed with the Court. Doc. 4410 at § 20.1. Instead, they failed to staff according to the Staffing Plan and, once found to be non-compliant, tried to justify the change they had unilaterally made to the requirements of the Staffing Plan.

Staffing Plan are required for 8 hours per day, 7 days per week, with a requirement that they be filled 75% of the time on a weekly basis. Doc. 4682-1 at 5, 8-28. Defendants state that the Correctional Sergeant position does not have a shift relief factor, meaning that they are funded for 5 days per week. Doc. 4980-1 at 9. Defendants do not provide any explanation as to why they cannot create more Sergeant positions, or assign the Sergeant positions a shift relief factor to address this issue. *Id.*

Further, the Staffing Plan provides that the Mandatory Posts are to be filled by officers or corporals. Doc. 4682 at 8-28. If Corporals are working as supervisors, they cannot be filling the Mandatory Posts. Thus, this proposal would merely shuffle around the posts that are non-compliant; it would not resolve them.

Lastly, Defendants state that "[t]raditionally, the supervision of these subclass locations falls within the purview of the unit shift commander (sergeant or above)." Doc. 4980-1 at 9. But the Court found Defendants to be violating the Eighth Amendment in multiple ways relating to the subclass. *Jensen*, 609 F. Supp. 3d at 907-12. The staffing analysis, resulting Staffing Plan, and the requirement of implementing the Staffing Plan are remedial measures to address the rights Defendants have "traditionally" violated.[7]

**4. Recruiting and Filling Vacancies in Subclass Locations at Tucson**

Defendants acknowledge that they have twelve vacancies for allocated Mandatory Posts at Tucson. They also state that they need four additional Correctional Officers to fill

---

*See* Docs. 4950 at 5, 4980-1 at 9. Moreover, when Defendants asked for modifications to the Staffing Plan in January 2025, they did not propose changing the requirement for supervisors from Sergeants to Corporals. Doc. 4772.

[7] Defendants also state that "the Injunction prohibits the subclass supervisor from having other ancillary duties outside of the subclass." Doc. 4980-1 at 9. The Staffing Plan requires a Sergeant for each subclass unit, and the Injunction requires compliance with the Staffing Plan, but the Injunction itself says nothing about a "subclass supervisor." *See* Doc. 4410. To the extent Defendants are referencing the "Classification Monitor" – a post required for each "individual unit housing [subclass members]" that is to have "no other collateral duties" besides "ensur[ing] all classification reviews, step progression (up or down) and movements to an appropriate new housing location are processed and completed within ten days," (*see id.* at § 29.1), Defendants are also failing to meet this requirement. Defendants are instead assigning one Classification Monitor to each prison, not each individual unit housing subclass members as required by the Injunction. *See* Morris Decl. ¶ 6.

the essential posts at the levels required by the staffing plan. Doc. 4980-1 at 2, 9. As with Eyman, Defendants state that they will no longer allow people who are staffing subclass locations to be moved to non-subclass locations at Tucson unless "serious prison emergencies, or statutorily required needs arise at other prison locations." *Id*. at 9.

Defendants first cite the number of additional staff needed in a paragraph discussing the compliance levels in June 2025. Doc. 4980-1 at 2. However, since June, Tucson has lost 16.3 FTE[8] COs. *Compare* Doc. 4928-1 *with* Doc. 5015-1. Plaintiffs do not know if the COs that have left Tucson would have been assigned to the isolation units, but the rate of compliance for the Mandatory Posts – posts that would be staffed by COs – plummeted during this period from 86% to 69%, suggesting the loss of COs is affecting compliance with the Staffing Plan. *Compare* Doc. 4937 at 34 *with* Doc. 4985 at 43. It is unclear whether the stated need for 16 additional COs is based on staffing and compliance levels in June or at the end of August.

Finally, the remedial plan says nothing about the need to hire or train and promote Sergeants. *See* Doc. 4980-1. The Staffing Plan requires a Sergeant in each location seven days a week. Doc. 4682 at 13, 14, 22, and 28. There are four subclass units, so 5.6 Sergeants are required. *Id*. Defendants have been unable to staff these posts at anywhere near the required level since the Court ordered Defendants to implement the Staffing Plan. *See* Doc. 4950 at 5. Remediation of staffing deficiencies must include the hiring or training and promotion of Sergeants.

**5. Assessing Subclass Population and Consolidating Subunits**

Defendants state they "will continue to assess subclass population locations and overall bed management utilization." Doc. 4980-1 at 10. Defendants assert they "reduced and consolidated the size of the subclass population housed at ASPC-Eyman, Browning Unit from 552 at the end of November 2024 to 509 at the end of August, 2025." *Id*.

---

[8] FTE means "Full Time Equivalent". This is, essentially, enough staff to do a full-time job. One FTE can be filled with a single full-time employee, or multiple part-time employees.

Plaintiffs applaud the dramatic reduction in the subclass population during the first year and a half the Injunction was in effect. The statement regarding Defendants' intent moving forward is unclear, but to the extent they are planning to further reduce the number of people living in isolation, Plaintiffs welcome that.

However, Plaintiffs are concerned that the number of people in isolation has in fact stopped decreasing and may be increasing. Over the course of the past year, Defendants have reported the following number of people in isolation for 60 days or more each month on the 15th of the month[9]:

| Month | Total in Isolation More than 60 days |
|---|---|
| August 2024 | 446 |
| September 2024 | 393 |
| October 2024 | 520 |
| December 2024 | 447 |
| January 2025 | 462 |
| February 2025 | 484 |
| March 2025 | 474 |
| April 2025 | 474 |
| May 2025 | 471 |
| June 2025 | 524 |
| August 2025 | 509 |

Morris Decl. ¶ 7. As of the end of July 2025, Defendants report a total of 1051 people in detention or Maximum Custody. Morris Decl. ¶ 8.

As discussed in Plaintiffs' Motion to Enforce §§ 19.3, 29.2, 29.3, and 30 (Doc. 5010), Defendants' deficient practices regarding reviewing people living in isolation for movement out of isolation and delays in moving people out of isolation significantly increase the number of people living in isolation. For example, in August 2025, at least 159 of the 375 people moved out of isolation were moved more than ten days after they were deemed eligible for movement, in violation of the Injunction's unambiguous requirement

[9] Defendants did not provide the list of people in the subclass for more than 60 days as of the 15th of the month in November 2024 and July 2025. Morris Decl. ¶ 7.

that they be moved within ten days (citation). Morris Decl. ¶ 9. Of those, 106 were people who were approved for movement out of the subclass by July 20, 2025, meaning that, had they been timely moved, they would not have been in the subclass as of the end of July 2025. *Id*. Thus, just by complying with the requirement in the Injunction to move people out of isolation within ten days would have reduced the population in isolation by 10% as of the end of July.

Promptly moving people out of isolation when they are deemed eligible to leave isolation, finding ways to keep people in the prisons safe without placing them in isolation, and creating ways the people who are in isolation can work their way out would all serve to lower the population in isolation units. *See generally*, Doc. 5010. By meaningfully reducing the isolated population, Defendants would be able to continue to consolidate housing units, thereby lessening the demand for staff for the isolation units.

**6. Using the "Lean Management System" to Solve Problems**

Defendants state that they have "engaged an embedded Lean Coach" to assist in "problem-solving" and "determining the root cause of the staffing issue" at Eyman. Doc. 4980-1 at 10. Defendants do not explain how engaging this "Lean Coach" will "fill the positions" Defendants have been unable to staff. *Id*; *see also* Doc. 4950 at 10.

## CONCLUSION

Defendants' proposed remedial plan demonstrates that they have not yet recognized the need to act with the necessary urgency to staff the isolation units. Although Plaintiffs previously moved the Court to order Defendants to develop a plan to fill the positions, it does not appear that such an order is sufficient to shake Defendants out of their complacency about the chronic staffing shortages. Plaintiffs ask the Court to order Defendants to staff all isolation units in use at Eyman and Tucson in accordance with the Staffing Plan starting no later than the month of December 2025, without degrading the staffing levels at other units.

Dated: October 6, 2025

**ACLU NATIONAL PRISON PROJECT**

By: *s/ Maria V. Morris*

Maria V. Morris (D.C. 1697904)*
David C. Fathi (Wash. 24893)**
Eunice Hyunhye Cho (D.C. 1708073)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, DC 20005
Telephone: (202) 393-4930
Email: dfathi@aclu.org
mmorris@aclu.org
echo@aclu.org

Corene T. Kendrick (Cal. 226642)*
425 California St., Ste. 700
San Francisco, CA 94104
Telephone: (202)393-4930
Email: ckendrick@aclu.org

*Admitted *pro hac vice*
**Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.

Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th St.
Phoenix, AZ 85006
Telephone: (602) 650-1854
Email: lbeall@aclu.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sophie Hart (Cal. 321663)*
**PRISON LAW OFFICE**
1917 Fifth St.
Berkeley, CA 94710
Telephone: (510) 280-2621
Email: dspecter@prisonlaw.com
ahardy@prisonlaw.com
sophieh@prisonlaw.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**DISABILITY RIGHTS ARIZONA**

By: s/ Maya Abela

Asim Dietrich (Bar No. 027927)
5025 East Washington St., Ste. 202
Phoenix, AZ 85034
Telephone: (602) 274-6287
Email: adietrich@disabilityrightsaz.org

Rose A. Daly-Rooney (Bar No. 015690)
Maya Abela (Bar No. 027232)
**DISABILITY RIGHTS ARIZONA**
4539 E. Fort Lowell Rd.
Tucson, AZ 85712
Telephone: (520) 327-9547
Email:
rdalyrooney@disabilityrightsaz.org
mabela@disabilityrightsaz.org.org

*Attorneys for Disability Rights Arizona*