Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th St.
Phoenix, AZ 85006
Telephone: (602) 650-1854
Email: lbeall@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**DISABILITY RIGHTS ARIZONA**
5025 East Washington St., Ste. 202
Phoenix, AZ 85034
Telephone: (602) 274-6287
Email: adietrich@disabilityrightsaz.org

*Attorneys for Plaintiff Disability Rights Arizona*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Disability Rights Arizona, <br><br> Plaintiffs, <br><br> v. <br><br> Ryan Thornell, *et al.*, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **PLAINTIFFS' MOTION TO ENFORCE §§ 19.3, 29.2, 29.3 AND 30 OF THE INJUNCTION AND MEMORANDUM IN SUPPORT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.    INTRODUCTION ..................................................................................................... 1

II.   PROCEDURAL BACKGROUND ............................................................................. 2

    A.    Policy Development ......................................................................................... 2

    B.    Attempts to Resolve Issues Informally ........................................................... 3

III.  STATEMENT OF FACTS ......................................................................................... 3

    A.    Defendants Do Not Have a Functioning System to Facilitate the Return of
        People Who Have Been in Isolation for More than Two Months to Lower
        Levels of Custody (§19.3.) ............................................................................... 4

        1. The "Individualized Case Plans" do not describe the actions needed to
           progress to less restrictive housing  (§§ 19.3, 29.2.) ........................................ 4

        2. Monthly case plan meetings show that Defendants do not measure behavior
           against the case plans to determine if there is a basis to keep the person in
           isolation (§§ 19.3, 29.2.1.) .............................................................................. 8

        3. The 60-day review, the next step in Defendants' system to facilitate the
           return to less restrictive housing does little to facilitate movement out of
           isolation (§ 19.3.) ............................................................................................ 12

        4. There is no system to facilitate a return to less restrictive housing for people
           who have been in isolation for more than two months but less than six
           months. (§19.3.) .............................................................................................. 15

        5. The semi-annual classifications fail to meet the requirements of the
           Injunction (§§ 19.3, 29.2.2.) .......................................................................... 16

           a. The classifications do not consider progress under the case plan ..... 16

           b. The supervisory reviews of the semi-annual reclassifications do
               not comply with the Injunction ......................................................... 18

            c. The semi-annual classifications are frequently untimely .................. 20

    B.    For Many People in Isolation, Even the Failing System Described Above
        Does Not Apply .............................................................................................. 21

1.  Defendants' standard practice is to keep people in Maximum  Custody far longer than two months. (§19.3.).................................................... 22

2.  Defendants keep many people in isolation without any pathway out. (§19.3.)................................................................................................ 24

3.  Defendants keep people who are in fear for their lives – often  because they have opted out of gang involvement – in isolation for  extended periods. (§19.3.)................................................................................................ 31

C.    Defendants Routinely Delay Removal from Isolation for More than 10 Days (§§29.3, 30.)................................................................................................ 38

IV.   ARGUMENT ............................................................................................ 39

V.    RELIEF REQUESTED ............................................................................ 41

VI.   CONCLUSION ........................................................................................ 41

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Davis,*
    275 F.3d 849 (9th Cir. 2001) ........................................................................ 41

*Brown v. Plata,*
    563 U.S. 493 (2011) .................................................................................... 40

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991) ...................................................................................... 40

*Degen v. United States,*
    517 U.S. 820 (1996) .................................................................................... 40

*Farmer v. Brennan,*
    511 U.S. 825 (1994) .................................................................................... 25

*FTC v. Affordable Media LLC,*
    179 F.3d 1228 (9th Cir. 1999) .................................................................... 40

*Go–Video, Inc. v. Motion Picture Ass'n of Am.,*
    10 F.3d 693 (9th Cir.1993) ......................................................................... 40

*In re Crystal Palace Gambling Hall, Inc.,*
    817 F.2d 1361 (9th Cir.1987) ..................................................................... 40

*Jensen v. Shinn,*
    609 F. Supp. 3d 789 (D. Ariz. 2022) ..................................................... 1, 25

*Rhodes v. Chapman,*
    452 U.S. 337 (1981) .................................................................................... 25

*Shillitani v. United States,*
    384 U.S. 364 (1966) .................................................................................... 40

1    **I.    INTRODUCTION**

2        More than three years ago, this Court found that Defendants were violating the

3    constitutional rights of the people they keep in isolation. *Jensen v. Shinn*, 609 F. Supp. 3d

4    789, 905-912 (D. Ariz. 2022), amended, No. CV-12-00601-PHX-ROS, 2022 WL 2910835

5    (D. Ariz. July 18, 2022). More than two years ago, this Court issued an Injunction requiring

6    Defendants to remedy those violations. Doc. 4410. Unfortunately, Defendants have failed

7    to comply with several of the Injunction's requirements, including those that relate to

8    moving people out of isolation, §§ 19.3, 29.2, 29.3, and 30.

9        The Injunction requires Defendants to implement a system to facilitate the return to

10    lower levels of custody for those prisoners who have been in the subclass for longer than

11    two months. Doc. 4410 §19.3. The heart of the system is an "individualized case plan . . .

12    that describes the actions needed, as well as associated timeframes, to progress in their steps

13    in Maximum Custody and generally to gain more privileges and lower classification levels

14    (less restrictive housing)." *Id.* § 29.2. This case plan is required to be reviewed monthly

15    with the incarcerated person. *Id.* § 29.2.1. Defendants are required to have a classification

16    committee conduct a semi-annual classification review at which the presumption should be

17    in favor of releasing the person from isolation if he has met the terms of the case plan. *Id.* §

18    29.2.2. Defendants are not complying with these requirements:

19        1.  The case plans Defendants have created are largely unrelated to what people need

20            to do to get out of isolation.

21        2.  The monthly case plan meetings are rote exercises at which the case plans have

22            essentially no relevance, if the meetings even occur.

23        3.  The decisions about whether a person must remain in isolation are made without

24            consideration of the person's progress under the case plan or conduct in isolation.

25        4.  The decisions about whether a person must remain in isolation are made by the

26            Central Office rather than the classification committee.

27        5.  The decisions about whether a person must remain in isolation are often untimely.

28            Further, there are several groups of people who are particularly likely to be kept in

isolation for extraordinary lengths of time, regardless of their conduct in isolation. People in Maximum Custody nearly always remain in isolation far longer than two months. Also, among those in Maximum Custody, there are people who have remained in isolation for years or even a decade or more, whom Defendants keep in isolation for amorphous "safety and security" reasons. Finally, people who have agreed to live with people of any race get stuck in a loop of being assigned to a housing unit that is overrun by race-based gangs, being threatened or assaulted for having agreed to live with people of any race, declaring that they cannot live on that unit, and being sent to detention, only to be subjected to this process again in a month or two, repeatedly cycling in and out of detention.

Lastly, even when people are approved for movement out of the subclass, they often wait for weeks or even months to be moved to a less restrictive unit, contrary to the requirement that they be moved within 10 days. Doc. 4410 §§ 29.3, 30.

As detailed herein, Plaintiffs respectfully request that the Court issue an order finding Defendants in violation of §§ 19.3, 29.2, 29.3, and 30 of the Injunction and ordering the development of a detailed plan to reach compliance with these critical requirements.

## II.    PROCEDURAL BACKGROUND

The Court issued its Injunction on April 7, 2023. Doc. 4410. Each requirement discussed herein took effect immediately.

### A. Policy Development

Following the issuance of the Injunction, Defendants issued revised policies governing classification and Maximum Custody. Declaration of Maria V. Morris ("Morris Decl.") ¶¶ 7-15. The parties negotiated over the policies, resulting in changes that brought the policies closer to the requirements of the Injunction. *Id.*, Ex. 4. Defendants issued the current version of the classification policy, D.O. 801, in December 2023, and the current version of the Maximum Custody policy, D.O. 812, in January 2025. *Id.*, Exs. 6-7. In April 2024, Defendants created and began using a "Restrictive Housing Case Plan" to meet the "individualized case plan" requirement of the Injunction. *Id.*, ¶¶ 7-9.

**B. Attempts to Resolve Issues Informally**

Starting in the fall of 2023, people in detention units began notifying Plaintiffs' counsel that there was a problem regarding people who had signed into the Integrated Housing Program ("IHP"). Morris Decl. ¶ 16. People who have "signed IHP" have agreed to house with people of any race. *Id.*, Ex. 8. As discussed below at § III.B.3, when a person has signed IHP it is unsafe for them to house in a unit with people who have not signed IHP. *Id.* People who had signed IHP reported to Plaintiffs' counsel that they were being threatened or assaulted on non-IHP housing units, being moved to detention for protective custody or for refusing to house in the location where they were threatened or assaulted, then being moved to the same or another non-IHP housing unit, restarting the cycle. *Id.* Plaintiffs immediately raised this issue with Defendants in the fall of 2023, again in the summer of 2024, and again at the end of 2024. *Id.*, Ex. 9. Defendants responded that "[t]here are no IHP yards or non-IHP yards." *Id.*, Ex. 10. Defendants stated that "any inmates who are having issues related to IHP and who are feeling unsafe should contact any ADCRR staff member." *Id.* Defendants did not acknowledge that is precisely the problem: When people who have signed IHP are put into housing units with people who have not signed IHP and are threatened or assaulted, they report not being safe, and the response is for ADCRR to place them into isolation. Morris Decl. ¶ 16.

On June 17, 2025, Plaintiffs sent Defendants a letter detailing each of the issues discussed in this motion. *See* Morris Decl. Ex. 1. Plaintiffs asked Defendants to respond by July 17, 2025, explaining whether and how they were addressing each of the issues. *Id.* Despite Plaintiffs having re-iterated the request, to date Defendants have not provided a substantive response. Morris Decl. ¶ 6, Ex. 2.

**III. STATEMENT OF FACTS**

Defendants routinely violate the provisions of the Injunction relating to people being moved out of isolation, specifically §§ 19.3, 29.2, 29.3 and 30.

**A. Defendants Do Not Have a Functioning System to Facilitate the Return of People Who Have Been in Isolation for More than Two Months to Lower Levels of Custody ( § 19.3.)**

The Injunction requires Defendants to have "a system to facilitate the return to lower levels of custody for those prisoners who have been in the subclass for longer than two months, and document their efforts." Doc. 4410, § 19.3. Defendants' "system" for returning people to less restrictive housing consists of:

1. Individualized case plans;

2. Monthly meetings about the case plans;

3. Review of the person's continued placement in Maximum Custody or detention within 60 days of their placement into isolation;

4. Classification reviews after 180 days in isolation and every six months thereafter. Morris Decl. ¶ 5; *see also* Morris Decl. Ex. 6 at §11.0. The individualized case plans, monthly meetings, and semi-annual classification reviews are explicitly required by the Injunction. *See* Doc. 4410 at §§ 29.2.1, 29.2.2. The 60-day review is not specifically required by the Injunction, but it is an essential part of Defendants' system to facilitate the return to lower levels of custody for people who have been in isolation for longer than two months. *See* Morris Decl. Ex. 6 at §11.0; *see also* Doc. 4410 at § 19.3.

As implemented, Defendants' system for returning people to a lower level of custody is failing in multiple ways.

**1.    The "Individualized Case Plans" do not describe the actions needed to progress to less restrictive housing  (§§ 19.3, 29.2.)**

For each person in Maximum Custody or detention, Defendants must create an "individualized case plan … that describes the actions needed, as well as associated timeframes, to progress in their steps in Maximum Custody and generally to gain more privileges and lower classification levels (less restrictive housing)." Doc. 4410 at § 29.2. According to both the Injunction and Defendants' policies, the case plan is central to the system for facilitating the return to less restrictive housing. *Id*. at §§ 29.2, 29.2.1, 29.2.2; Morris Decl. Ex. 6 at §§ 11.1.1.1, 12.1.2; Ex. 7 at §§ 2.1, 2.2, 4.3, 4.4.1.2, and Attachments

1    A and B.

2         Starting in April 2024, Defendants rolled out case plans for people in detention and

3    Maximum Custody, purportedly to comply with the requirements of § 29.2 of the

4    Injunction. Morris Decl. ¶¶ 7-9. The plans do not set out "the actions needed" or the

5    "associated timeframes" for moving to less restrictive housing. *See, e.g.*, Morris Decl. Ex.

6    12.

7         The case plans start with a block that gives a general reason for placement into

8    detention or Maximum Custody:

9

10   | Case Plan Type | (check one) | | | Reason for Placement | MM/DD/YY |
     | --- | --- | --- | --- | --- | --- |
     | Initial | ☑ | | | Primary Factor | |
     | Subsequent Review | ☐ | | | Avoidance / Preservation | |
     | Period reviewed: | 02/26/25 To 01/26/25 | | | Secondary Factor (if applicable) | |
     | | From MM/DD/YY To MM/DD/YY | | | Disruptive / Assaultive Behavior | |

14   Morris Decl. Ex. 11.

15        The next section of the case plan is the only part that seems at all connected to what

16   people need to do to get out of detention of Maximum Custody, but it is boilerplate

17   language. It is not individualized and does not include any timeframes:

18

19   | |
     | --- |
     | The purpose of this case plan is to discuss goals, time frames and expected behaviors to return to a less restrictive housing environment. |
     | Expected behaviors include: respectful interactions with staff and your peers, the following of all ADCRR policies and procedures, completing goals chosen from the menus below, remaining disciplinary free, attending and appropriately participating in any assigned programming. |
     | You will have frequent contact with your case manager and MDPT team. You are expected to speak with them regarding progress towards your goals, suggestions for returning to a lower custody housing area and to ask any questions about goals or expectations you are unsure about. |

23   *Id.*

24        The next section of the plan is the "goals" and related "tasks". The goals are

25   somewhat individualized and provide some indication of how long the staff expects the

26   person in isolation to work at each goal – but the goals themselves have no connection

27   whatsoever with people being removed from isolation. All people are given a "journaling"

28   goal. *Id.* The other goals include such things as:

-5-

- Increase eye contact with others. Morris Decl. Exs. 11, 18.

- Positively acknowledge verbal compliments from others. Morris Decl. Exs. 11, 17, 20.

- Form realistic, appropriate, and attainable goals for self in various areas of life. Morris Decl. Exs. 12, 13, 14, 19.

- Identify accomplishments that would improve self-image and verbalize a plan to achieve those goals. Morris Decl. Exs. 13, 16.

- Identify positive traits and talents about self. Morris Decl. Exs. 14, 16.

- Increase the frequency of speaking up with confidence in social situations. Morris Decl. Ex. 15.

- Identify, challenge and replace biased negative self talk with positive, realistic and empowering talk. Morris Decl. Exs. 16, 18, 21.

- Increase insight into the historical and current sources of low self-esteem. Morris Decl. Ex. 21.

- Increase awareness of anger expression patterns. Morris Decl. Ex. 22.

- Write a letter of forgiveness. Morris Decl. Exs. 18, 23.

- Engage in direct expression and assertiveness, three times daily. Morris Decl. Ex. 24.

It is implausible that these are the "actions needed" to progress to lower levels of restrictions.[1] And many of these actions, such as increasing eye contact and speaking up in social situations, are not even possible for people living in isolation.

Further, the people living in isolation know that the goals set out in the case plans are not the actions needed to be removed from isolation:

- "***The case plans are not helpful because they do not tell us what we need to do to get out of detention. It is not really a 'plan.' ...The case plans are not meant to get you out of here***. For example, if your points are high, there is no program where DOC staff informs you that if you take this class, it will lower your points and help you get back to the yard. The case plan staff just come to your cell, tell you to 'stay ticket free,' and leave. ***There are no meaningful ways for me to actually meet my case plan goals, even though I am willing and readily participate in case plan meetings. My case plan has no effect on***

---

[1] Plaintiffs recognize the value of many of these goals, and acknowledge that they may indeed help the people in their interactions once they are out of isolation, but the case plan meeting notes, the 60-day reviews, and the semi-annual classification reviews demonstrate that achieving the goals is unrelated to being removed from isolation. *See below*, §§ III.A.2-III.B.

-6-

*my ability to get out of detention. There is no actual system to get back on the yard*." Morris Decl. Ex. 26 at ¶¶ 17-21.[2]

- "***The goals [in the case plan] have nothing to do with how I get out of detention.*** There is nothing I can do to get out of detention. I just have to wait." *Id*., Ex. 27 at ¶ 14.

- "Staff tried to give me a case plan, but it included many things that were not true. It had goals that they had not discussed with me and that I do not think applied to me. ***The goals have nothing to do with whether I can leave maximum custody***." *Id*., Ex. 28 at ¶¶ 5-6.

- "***I don't believe that working on the goals affects my ability to get out of detention.*** I did 6 months in Max without a ticket and I was not ever moved, then another 6 months, and still did not get moved. I was at Step 3 for a year." *Id*., Ex. 29 at ¶ 11.

- "***The plan does not seem to have anything to do with what I need to do to get out of*** maximum custody***. I do not know what I need to do to get out of maximum custody***." *Id*., Ex. 30 at ¶ 15.

- "I have a case plan. ***The goals in my case plan aren't related to getting out of detention***." *Id*., Ex. 31 at ¶ 8.

- "I have a case plan here [in ASPC Tucson Winchester Detention Unit]. ***The goals have no connection whatsoever with getting out of detention***." *Id*., Ex. 32 at ¶ 9.

- "I have a case plan. ***The goals on the case plan don't have anything to do with what I need to do to get out of detention***." *Id*., Ex. 33 at ¶ 25.

- "***The goals in the case plan don't have anything to do with getting out of detention***." *Id*., Ex. 34 at ¶ 7.

- "While I was in detention, I had a case plan and was given goals…. ***The goals didn't have anything to do with getting out of detention***." *Id*., Ex. 46 at ¶ 14.

Many people in isolation report that they have not been told what they need to do to move from isolation units to less restrictive units. *See, e.g.*, Morris Decl. Exs. 26 at ¶ 24; 30 at ¶ 15; 35 at ¶ 9; 36 at ¶¶ 11-12; 37 at ¶ 12; 38 at ¶ 5; 39 at ¶ 8; 40 at ¶ 12; 41 at ¶ 6.

The disconnect between the goals (the "actions needed", as required by § 29.2 of the Injunction) laid out in the case plans and getting out of isolation is even more extreme for people in the subclass due to safety concerns. For people who are in isolation because they asked for protective custody or refused to house on a particular unit due to fear that they

---

[2] Emphasis added herein, unless otherwise noted.

would be assaulted or killed, there is nothing to do to get out of isolation but wait or agree to go back to a housing unit where it is unsafe.[3] As explained by one man: "The staff chose the goals on the case plan. They do not reflect my goals. The case plan seems to be aimed at putting me back on the same yard where I was having problems. I don't want to be involved in prison politics.[4] During the case plan meeting they said I was in the 805 process, but did not say anything about what was happening in the 805 process."[5] Morris Decl. Ex. 42 at ¶¶ 6-8.

The "actions" described in the case plans are plainly not what a person needs to do to get out of isolation. The inadequate case plans violate the Injunction and also violate the requirement that Defendants have a system to facilitate moving people out of isolation. Doc. 4410 at §§29.2.1. and 19.3.

### 2.    Monthly case plan meetings show that Defendants do not measure behavior against the case plans to determine if there is a basis to keep the person in isolation (§§ 19.3, 29.2.1.)

Every month, Defendants are required to "conduct and document an evaluation of each prisoner's progress under [the] individualized plan." *Id. at* § 29.2.1. This evaluation must "address the extent to which the prisoner's behavior, measured against the plan, reasonably justifies the need to maintain, increase, or decrease the level of controls and restrictions in place at the time of evaluation; and recommend full classification review when appropriate." *Id.* But Defendants do not measure the person's behavior against the plan every month as required.

---

[3] From January through June of this year, more than half the people given 60-day reviews were in isolation because of having requested protective custody or having refused to house. Morris Decl. ¶ 118.

[4] "Prison politics" refers to gang hierarchies and activity. Morris Decl. Exs. 27 at ¶ 6; 33 at ¶ 2.

[5] The protective custody policy is D.O. 805. Protective custody is often referred to simply as "805".

The final section of the case plan includes comments by the person held in isolation and staff from the case plan meetings, and includes boxes for "detailed, specific reasoning" for maintaining or changing the degree of restrictions and for whether or not the staff is recommending a classification review:



**Additional comments, thoughts and questions from inmate**
8/26/2024- Inmate ███ participated in the Case Plan. He actively asked questions. He did inquire about IHP, and some concerns he did. 09/25/2024 inmate stated he is using journal to teach himself how to write again, stated he needs a new one. 10/23/2024 inmate didn't wish to participate at this time, pro-social at cell front. 12/17/2024 Inmate didn't have any new questions at this time. 01/28/2025 Inmate wnated to know when next reclass is. 02/26/2025 Inmate had no new questions at this time.

**MDPT comments regarding the inmate's questions and behavior during case plan (include state of mental health)**
8/26/2024- MDPT Team met and spoke with Inmate ███ and advised him the purpose of the case plan. It was brought up that we would look into the IHP concerns, at a different time or at the next classification. 09/25/2024 MDPT stated inmate was very patient and respectful. 10/23/2024 inmate didn't wish to participate at this time, pro-social at cell front. 12/17/2024 MDPT wants to see progress on assessments. 01/28/2025 MDPT stated inmate is coming up on his 180 day review.

**Detailed, specific reasoning for increasing, decreasing or maintaining current privileges and/or step**
8/26/2024- Inmate is phase 1/step 1. Inmate will advance to step 2 on 9/5/2024, which is 30 days since he arrived at Browning. He has no disciplinary. COIV is looking into his phase 2, due to signing IHP. 09/25/2024 inmate is currently phase2/Step1 recommend inmate to increase in step, has been disciplinary free since arrival. 10/23/2024 inmate is currently Phase2/Step2 recommend to increase in step due to being disciplinary free for more than a month. 12/17/2024 inmate is currently Phase2/Step3 recommend to decrease step due disciplinary violation on 11/13/2024. 01/28/2025 Recommend to increase step due to being disciplinary free for more then a month. 02/26/2025 Recommend to stay at current step due to being disciplinary free for more then a month.

**Detailed, specific reasoning for recommending or not recommending a classification review**
8/26/2024- Inmate's initial max custody placement was finalized on 8/8/24, he is not due for another rvw until his 60 day. His 60 day rvw in approximately 3 weeks. Entered sublass on 8/5/2024. 09/25/2024 inmate is due for 60 day review. 10/23/2024 inmate 60 day review was completed on 09/26/2024. 12/17/2024 Inmate has been at current step for 105 days. 01/28/2025 will be working on 180 day review. 02/26/2025 Inmate has been at current phase for 174 days.

Morris Decl. Ex. 11. The "reasoning" consistently demonstrates the lack of connection between progress under the case plan goals and getting out of isolation.

As seen in the screenshot above, the "detailed, specific reasoning" for changing or maintaining the level of restrictions relates to disciplinaries, whether the person is "respectful," and the amount of time the person has been at a step or phase. This is consistent across case plans. Morris Decl. ¶ 19; Exs. 11-25. This "reasoning" rarely if ever addresses whether the person has fulfilled the "goals" set out in the case plan. *Id.*[6] Indeed, some of the ADCRR staff comments clearly indicate that the purpose of the goals is unrelated to getting out of isolation:

- "The team hopes that he will choose to work on the goals at some point. These goals will help him cope at the next yard he goes to."[7] Morris Decl. Ex. 16.

- "The team talked about the importance of working in the goals, as a way to

---

[6] One of these case plans notes that the person advances from Step 1 to Step 2 and then from Step 2 to Step 3 of Maximum Custody when he completes "in-cell programing." Morris Decl. Ex. 23. In-cell programming may refer to tasks listed in the case plan.

[7] It is Plaintiffs' understanding that "yard" refers to a non-isolation housing unit.

cope with various issues on the yard." *Id*. Ex. 19.

- "Committee agrees this [goal] would be beneficial for ████ while he waits for alternative housing." *Id*. Ex. 15.

Other case plans reflect that the person completed the "goals" but there is no mention of that in the "detailed, specific reasoning" about whether to move the person to less restrictive housing or recommend reclassification. For example, ████████ was in detention and Maximum Custody at ASPC-Eyman Browning ("Browning") from March 15, 2024 through May 5, 2025 – just under 14 months. Morris Decl. ¶ 25, Ex. 17. In September 2024, staff noted on his case plan that he had "completed prior months goals and will continue to work on current goals." *Id*. The reasoning regarding how restrictive his conditions were and whether he should be recommended for reclassification does not mention the goals. *Id.* Another person, ████████, was in detention at Browning from February 6, 2025 to July 25, 2025 while he was awaiting evaluation by Defendants for protective custody. Morris Decl. ¶ 23, Ex. 15. At his second case plan meeting on March 12, 2025, it was noted that he had "completed previous goal. Stated he would like new goals." Morris Decl. Ex. 15. The entirety of the "detailed, specific reasoning" for changing or maintaining his level of restrictions was: "Currently phase 2 and not on LOP [Loss of Privileges]". *Id.* The entirety of the "detailed, specific reasoning" for whether to recommend him for reclassification was "MDPT [Multi-Disciplinary Program Team] agreed inmate is appropriately classified at this time." *Id.*

Moreover, people in isolation report that many of the case plan meetings do not actually take place as required and do not address what people need to do to move from isolation to less restrictive units housing units:

- "DOC staff will briefly go door to door asking people about their case plan. They write down things like "he's achieving his goals" just so they do not have to take me out of my cell and so things can go quicker. ***These meetings have no effect on my ability to get out of detention***." Morris Decl. Ex. 44 at ¶¶ 18-19;

- "I have a copy of my case plan. The goals were chosen prior to my coming to the very first meeting. ***The meeting is like they are reading from a script.*** I

tried to meet the goals of the plan set out at the first two meetings. At the third meeting I said that I did not want to work on the plan anymore. I go to all the classes and programs they assign me to. The goals in the plan seem pointless. The staff do not talk with me about what my goals and needs are. If they did, the plan might be more useful." *Id.*, Ex. 30 at ¶ 9-14;

- "I have not met with DOC staff to create a case plan. DOC staff come by the door of my cell and ask if I want to do a case plan. When I agree, they never come back. Since arriving in detention, DOC staff has done this to me twice (once about every 30 days). They have never come back to do my case plan after asking if I was interested, nor have they pulled me out of my cell to do a case plan." *Id.*, Ex. 36 at ¶¶ 4-6;

- "***I have met with staff to create a case plan, but they make the case plan seem like it does not matter. Staff will come around and ask me with a nonchalant attitude "do you want to talk about this?" but do not actually do much.*** Staff gave me a journal and a composition notebook with some workbooks. They told me I did not have to do it. These "resources" are just busy work. The DOC staff does not read what we write. When we do the assignments, it does not change anything. I believe the case plans are all for show. I do not have a copy of my case plan. I do not have case plan meetings every 30 days." *Id.*, Ex. 37 at ¶¶ 5-11;

- "I have been at Step 3 for 9 months. I have not met with DOC staff to create a case plan. ***DOC staff will ask me if I want to create a case plan, I will say yes, but they never come back to take me out of my cell and do the actual case plan. They just never show up. DOC staff does this every month and never come back.*** As a result, I do not have a case plan. I have no idea what I need to do to get out of Maximum Custody." *Id.*, Ex. 45 at ¶¶ 6-11;

- "***My case plan meetings feel like DOC staff are just trying to check off boxes. These meetings are not helpful and very brief.*** The case plans are not meant to get you out of here. For example, if your points are high, there is no program where DOC staff informs you that if you take this class, it will lower your points and help you get back to the yard. The case plan staff just come to your cell, tell you to 'stay ticket free,' and leave." *Id.*, Ex. 26 at ¶¶ 18-19.

The case plans are unrelated to what people in isolation need to do to get out of isolation. Given that disconnect, it is unsurprising that, during the case plan meetings, Defendants do not evaluate the isolation subclass members' behavior against their case plans to determine if they should increase, maintain or decrease the subclass members' levels of control and restrictions. As a result, the monthly case plan meetings violate the Injunction. Doc. 4410 at § 29.2.2. Additionally, as they are part of the system to facilitate the return to lower levels of custody, they also violate § 19.3 of the Injunction. Doc. 4410 at § 19.3.

**3.    The 60-day review, the next step in Defendants' system to facilitate the return to less restrictive housing does little to facilitate movement out of isolation (§ 19.3.)**

Defendants have created a review process for people who have been in isolation for 60 days.[8] Morris Decl. ¶¶ 5, 10-12. This is part of Defendants' system for returning people who have been in isolation for longer than two months to lower levels of custody. *Id.*; *see also* Doc. 4410 at § 19.3. As implemented, it does not appear to facilitate the return to a lower level of custody.

Defendants' classification policy, D.O. 801, was revised in response to the Injunction. Morris Decl. ¶¶ 10-12, Ex. 6. Defendants added the 60-day review to the policy. *Id.* The policy provides that "[a]n inmate shall remain in Maximum Custody or detention only if extraordinary, legitimate security and safety concerns exist." *Id.*, Ex. 6 at § 11.1. This language tracks the language in the Injunction: "No prisoner shall be confined in a cell for 22 hours or more each day for more than two months unless there are extraordinary documented legitimate penological interests." Doc. 4410 at § 19.3. D.O. 801 further provides that the 60-day review includes an in-person interview and that "[r]eturning to a lower custody level, or less restrictive environment, should be the primary focus of the interview." Morris Decl. Ex. 6 at § 11.1.1. Staff are to "discuss the reason for placement in Maximum Custody or detention, the individualized Corrections Plan, programming requirements, and behavior expectations[ and] the inmate's progress towards the individualized plan to include programming."[9] *Id.* at § 11.1.1.1.

Most people going through a 60-day review are in detention, rather than Maximum Custody. Morris Decl. ¶ 57. The reviews are essentially styled as classifications: The outcome of the review is a decision that the person can be assigned to a particular custody

---

[8] Defendants' policy requires that 60-day reviews be started when a person has been in isolation for 50 days, and completed by the time the person has been in isolation for 60 days. Morris Decl. Ex. 6 at § 11.1. Often the 60-day reviews are completed days or weeks late. Morris Decl. ¶ 56, Ex. 47.

[9] As discussed above, at the time the policy was drafted, Defendants were still using the "Corrections Plan," rather than the case plans that were subsequently created. *See* § II.A.

level, often the custody level the person had prior to coming into detention. *Id.*, ¶ 65, Exs. 48, 49, 50, 51, 52, 53, 54. The reviews say nothing about whether the person should remain in detention. *Id.*, Exs. 48, 49, 50, 51, 52, 53, 54   Many of the people going through the 60-day reviews have already been approved for movement out of detention and are just waiting to be moved. *Id.*, Exs. 48, 49, 50, 51, 53, 54.

People who are recommended for a custody level other than Maximum Custody may be moved out of isolation shortly after the 60-day review, or they may not. Morris Decl. ¶¶ 65-71, Ex. 57. For example, ███████████, ██████ was assigned to a Close Custody unit when he refused to house on January 21, 2025, and was placed into detention. *Id.*, ¶ 65, Ex. 55. His 60-day review was finalized 83 days later on April 14, 2025. *Id.* The Central Office decided he could continue to be housed in a Close Custody unit. *Id.* Nonetheless, he remained in detention until his release from ADCRR custody on July 25, 2025, 185 days after being placed into isolation. Morris Decl. ¶ 65.

Similarly, ███████████, ██████ was assigned to ASPC-Yuma Dakota, a Close Custody unit, in December 2024. Morris Decl. ¶ 67. On February 23, 2025, he was placed into detention after he asked for protective custody or "805" status. *Id.* His 60-day review was finalized 83 days later on May 16, 2025. *Id.*, Ex. 56. At the time of his 60-day review, he had had "open travel orders" – the orders saying he could be moved to his next housing unit – for 37 days. *Id.* The Central Office decided that he could continue to be assigned to a Close Custody unit. *Id.* He remained in detention (and mental health watch) until July 30, 2025, 157 days after being placed into isolation. Morris Decl. ¶ 67.

The number of people removed from isolation around the 60-day point also suggests that the 60-day reviews have little bearing on removal from isolation. Defendants have provided information on the dates of 5,066 removals from the subclass during the first eight months of 2025. Morris Decl. ¶ 72. Of those, just 298 were removed from isolation between 61 and 70 days after placement into isolation, the period during which it is most likely a

person would be removed as a result of the 60-day review.[10] *Id*. ¶ 73. As seen in the chart below, showing the distribution by length of stay in isolation for people removed from isolation during the first six months of 2025 according to Defendants' records, the 60-day reviews have little if any impact on release from isolation:



Morris Decl. ¶ 74. If the 60-day reviews were facilitating the return to lower levels of restrictions, there would be an increase in the number of people leaving isolation immediately after those reviews. There is not.

The 60-day reviews are just one more failing part of a failing system that is not satisfying the requirement of the Injunction to facilitate moving people out of living in isolation. *See* Doc. 4410 at § 19.3. There does not appear to be much, if any, connection between the 60-day reviews and moving people out of isolation, nor do these reviews serve to inform subclass members of what they need to do to leave isolation.

---

[10] Under the Injunction, Defendants have 10 days to remove people from isolation once Defendants decide the people can be removed. ECF No. 4410 at §§ 29.3, 30. This suggests that people removed from isolation at 61 and 70 days after placement are removed pursuant to the 60-day review.

**4.    There is no system to facilitate a return to less restrictive housing for people who have been in isolation for more than two months but less than six months. (§19.3.)**

Defendants are required to have "a system to facilitate the return to lower levels of custody for those prisoners who have been in the subclass for longer than two months." Doc. 4410 at §19.3. But Defendants instead have created a system – faulty though it is – to facilitate the return to lower levels of custody for people who have been in the subclass for two months, and a system for those who have been in the subclass for six months. Defendants have no system to facilitate the return to less restrictive housing for people who have been in isolation for more than two months until they have been living in isolation for six months. The only actions routinely taken during that four-month period are the monthly case plan meetings, which, as discussed above, have little relation to getting out of isolation.

The lack of a system for facilitating the return to less restrictive housing during those four months of isolation is clear from the numbers of people removed from isolation during that period.

As discussed above, during the first eight months of 2025, Defendants released a total of 5,066 people from isolation. Morris Decl. ¶ 72. Most were released within 60 days of placement into isolation, with the numbers dwindling rapidly for anyone not released during the first two months[11]:

| Length of Time in Isolation | Number of Releases |
| --- | --- |
| 0-30 days | 2,330 |
| 31-60 days | 1,249 |
| 61-90 days | 694 |
| 91-120 days | 328 |
| 121-150 days | 143 |
| 151-180 days | 82 |

---

[11] Plaintiffs applaud the efforts to get people out of isolation in shorter times. However, these removals do not seem to be the result of any of the steps in Defendants' system for moving people out of isolation.

-15-

1   Morris Decl. ¶ 72.

2       A total of 3,877 people were removed from isolation within 70 days of placement

3   into isolation (*i.e.*, by 10 days after a 60-day review, if not before the review). Morris Decl.

4   ¶ 73. After the 70-day point, relatively few people are released from isolation.[12] *Id.* The

5   number of people removed from isolation between the 60-day review and the first semi-

6   annual classification keeps dwindling, roughly halving each month, with relatively few

7   people being released during this four-month period.

8       There is no functioning system in place to facilitate the return to less restrictive

9   custody for people in isolation for more than two months but less than six, in violation of §

10  19.3 of the Injunction.

11          **5.    The semi-annual classifications fail to meet the requirements of the**
            **Injunction (§§ 19.3, 29.2.2.)**
12

13      The final step of Defendants' system to facilitate the return to less restrictive custody

14  is the semi-annual classification review for people in isolation 180 days or more.

15  Defendants' process for conducting these reviews violates the Injunction in several ways.

16              **a.   The classifications do not consider progress under the case plan**

17      The Injunction requires that Defendants conduct a classification review of each

18  person in isolation every six months. Doc. 4410 at § 29.2.2. In doing this review, they are

19  required to determine "whether the prisoner's progress toward compliance with the

20  individual case plan or other circumstances warrant a reduction of restrictions, increased

21  programming, or a move to a lower level of custody." *Id.* If the person "has met the terms

22  of the individual case plan, there should be a presumption in favor of releasing the prisoner

23  from Maximum Custody." *Id.*

24      However, the semi-annual classification reviews reflect no connection whatsoever

25  ─────────────────

26      [12] As discussed above, some of the 60-day reviews are completed when people have
    been in isolation for more than 60 days. *See* Morris Decl., ¶ 56. Also, many people are held
27  in isolation beyond the ten days after they are deemed eligible to leave isolation. *See id.*¶¶
    66-71, Ex. 57. Therefore, a significant number of the people who are removed from
    isolation after between 71 and 180 days in isolation are likely removed pursuant to the 60-
28  day review.

between the case plans and the decisions about whether the person should remain in isolation. Morris Decl. ¶¶ 77-82, Ex. 68. Very few classification reviews even mention the case plans. *Id.* Of the handful that do, they generally note only whether the individual has been "participating" with the case plans or the case plan meetings, not how they are progressing under the case plans. *Id.* Of all the semi-annual reclassification reviews produced to Plaintiffs for March through June 2025, 150 in total, just 24 mentioned the case plan at all. *Id.* Only four discussed how a person was progressing under the plan. *Id.*

The few classification reviews that discussed progress under the case plan show that Defendants are not more likely to remove people from isolation if they are progressing under their case plan. Three of those whose progress on their goals was discussed were described as working on their goals. Morris Decl. ¶¶ 77-80, Exs. 58, 59, 60, 68. They were all determined to be eligible to leave isolation between May 23 and May 27, 2025. *Id.* One left isolation on July 15, 2025, a month and a half after the review. Morris Decl. ¶ 80. Another left isolation on September 9, 2025, more than three months later. *Id.* The third was released from ADCRR custody directly from isolation on September 23, 2025. Morris Decl. ¶ 81. The fourth person whose case plan progress was discussed had been approved for movement out of isolation 120 days before the 180-day classification process started. Morris Decl. ¶ 82, Ex. 61. ADCRR staff noted that he was "not working on the case plan goals because he is not interested… All he wants to do is get moved to his next unit." *Id.* He was moved three days later, before the reclassification was finalized.[13] *Id.*

There does not appear to be any relationship between progress under the case plan and removal from isolation in the semi-annual classification process, let alone a presumption of getting out of isolation for those people who have complied with the case plan. This violates § 29.2.2. of the Injunction.[14]

---

[13] This is in no way an objection to this person being removed from isolation when he was not progressing under his case plan. To the contrary, this individual should have been removed from the Isolation Subclass by December 5, 2024 at the latest. Morris Decl. Ex. 61.

[14] The Injunction provides that during the semi-annual classification review, "it shall be determined whether the prisoner's progress toward compliance with the individual case

### b. The supervisory reviews of the semi-annual reclassifications do not comply with the Injunction

The Injunction sets out a review process for the semi-annual reclassifications in which the classification committee makes the determination of whether a person remains in isolation. Doc. 4410 at § 29.2.2. It provides for the deputy warden or warden to review the classification committee's decision only if the classification committee decides that the person should remain in isolation. *Id.* Then, only if there is a disagreement between the deputy warden or warden and the classification committee, the decision goes to the Regional Operations Director. *Id.*

Defendants' review process is not what is required by the Injunction. It also results in more people remaining in isolation for longer periods than would be the case if Defendants followed the Injunction's required review process.

Defendants' semi-annual classification process is as follows:

1. The Classification Committee conducts the review. By policy, the Committee consists of a CO III, a security staff member and a mental health staff member for prisoners with a mental health score of 3 or above. Morris Decl. ¶ 84, Ex. 6 at § 12.1.1.[15]

2. The policy does not provide for review by the deputy warden or warden, but in practice both review every classification decision. *Id.*; *see also, e.g.*, Exs. 64, 66.

3. According to policy and practice, the "Central Office" is the final approving

---

plan or other circumstances warrant a reduction of restrictions, increased programming, or a move to a lower level of custody." ECF No. 4410 at § 29.2.2. In ADCRR, the circumstance that has traditionally led to a reduction of restrictions for people in Maximum Custody is progression from Step 1 through to Step 3. It appears that there is also little consideration of the person's step at the semi-annual reclassification. Of the 131 semi-annual classification reviews for people in Maximum Custody produced for March through June, only 42 – less than a third – even mention the person's step. Morris Decl. ¶ 83. Of the 34 people noted as being at Step 3, just 15 of them – less than half – were approved for removal from isolation. *Id.*

[15] It is the CO III that fills out the review forms. Morris Decl. ¶ 84, Exs. 58, 59. On some forms this person is referred to as the CO III and on others as the Classification Officer. *Id.* For simplicity and consistency, this person is referred to herein as the Classification Officer.

authority for removal from Maximum Custody in all classification reviews. Morris Decl. ¶ 84, Ex. 6 at § 12.2.; *see also, e.g.*, Exs. 58-67.[16]

Defendants' process makes the Central Office the decision maker on whether a person stays in isolation, as opposed to the Classification Committee, as required by the Injunction. This undermines the process set forth in the Injunction in several ways.

First, unlike the Classification Committee, staff in the Central Office do not have direct personal experience with the person in isolation and how they are behaving. While the Injunction requires that the review process determine whether "the prisoner's progress toward compliance with the individual case plan or other circumstances warrant a reduction of restrictions" (Doc. 4410 at § 29.2.2), the reasons given by the Central Office for its decisions are generally focused on some immutable past act or acts (usually the incident that resulted in placement into isolation), or on the lack of housing options.

For example, in the recent classification review for ██████████, ██████ the Classification Officer at the prison facility recommended that Mr. ██████ be released from Maximum Custody. Morris Decl. ¶ 87, Ex. 66. The Classification Officer stated that Mr. ██████ had been in isolation since October 2024, when he had assaulted another incarcerated person, but that he had not had any disciplinaries since that time, and had had no disciplinaries for a year prior to the assault. *Id.* He also said Mr. ██████ was at Step 3 and was "actively programming." *Id.* The Deputy Warden and Warden of the prison both agreed with the recommendation. *Id.* The Central Office, however, decided to keep Mr. ██████ in Maximum Custody, stating only: "Maximum Custody based on violent/aggressive behaviors." *Id.* In another recent classification review, the Classification Officer, Deputy Warden and Warden at the prison level all agreed that ██████████, ██████ should be assigned to Medium Custody, but the Central Office decided to keep him

---

[16] On the forms relating to semi-annual classification, the person making this decision is the "Classification Administrator." Morris Decl. ¶ 85, Exs. 58-61, 64, 66-67. Per policy and in conversation, the decision maker is referred to as the "Central Office." Morris Decl. ¶¶ 84-85; Ex. 6 at § 12.2; *see also* Ex. 52 at 4, Ex. 43 at ¶ 9. For simplicity and consistency, the decision maker is referred to herein as the Central Office.

in Maximum Custody "based on lack of housing options at lower custody."  Morris Decl. ¶ 88, Ex. 64.

Second, while the Classification Officer's recommendation and the decision by the Central Office are often the same, when they are not, the decision of the Central Office is almost always to keep the individual in more restrictive conditions than the Classification Officer would. In 41 of the 150 semi-annual classifications that Defendants produced for March through June 2025, the reviewers were not in complete agreement. Morris Decl. ¶ 89, Ex. 69. In 28 – about two-thirds – of the disagreements, the Classification Officer recommended that the person be assigned to Close or Minimum Custody but the Central Office decided the person should remain in Maximum Custody. *Id.*, Ex. 69. In just three instances, the Central Office decided that the person required a less restrictive housing assignment than the Classification Officer recommended. *Id.*

Finally, the additional steps in the process involving Central Office take, on average, 16 days.[17]  *Id.* Thus, in a context where the semi-annual classifications are usually late (*see below*) and Defendants only have 10 days to move the person out of isolation once they are deemed eligible to leave, by using this multi-level decision-making process instead of the one laid out in the Injunction, Defendants are delaying the determination that the person can leave by weeks or more. *Id.*

Defendants' failure to abide by the classification review process laid out in the Injunction violates § 29.2.2.

### c.  The semi-annual classifications are frequently untimely.

Defendants violate the Injunction's requirement that they conduct a full classification review for each person in isolation "at intervals not to exceed six months." Doc. 4410 at § 29.2.2.

---

[17] If the reviews were complete at the time the Classification Officer made a decision, instead of always going through three layers of review, 80 of the 150 reviews in March-June 2025 would have been timely. Morris Decl. ¶ 91. Instead, only 22 of the reviews were timely. *Id. at* ¶ 90.

Of the 150 semi-annual classification reviews Defendants produced for March through June 2025, just 22 were completed within six months of the placement into isolation or a previous classification.[18] Morris Decl. ¶ 90, Ex. 70. Many of the late classifications were only days or weeks late, but 40 were at least a month late. *Id.* Nine people had not had a classification review for over a year, and one person had not had a review in two years. *Id.*

In these three distinct ways – content, reviewer, and timeliness – Defendants' semi-annual classification process violates the Injunction. Doc. 4410 at § 29.2.2. Additionally, as the semi-annual classification process is part of the system to facilitate the return to lower levels of custody, it also violates § 19.3 of the Injunction. Doc. 4410 at § 19.3.

## B. For Many People in Isolation, Even the Failing System Described Above Does Not Apply

As discussed above, the procedures in Defendants' system for facilitating the removal from isolation are failing. But there are also three groups of people living in isolation who do not benefit even from these failing procedures. First, Defendants appear to have a default policy and practice of keeping people in Maximum Custody for far more than two months. Second, there are people for whom Defendants simply have not identified a pathway out of isolation. Finally, Defendants have created a correctional system where racial gangs run the general population housing units or "yards," and if people opt out of the gang-run system, they are unsafe in the general population yards. People who do not want to be involved with gangs and sign IHP cycle between unsafe yards and detention, often spending weeks or months in detention, then are sent by Defendants to a yard for hours or days until they are threatened or attacked, and then Defendants send them back to detention. Because they briefly left detention, Defendants consider them as "new" to isolation and do not count them as being in long-term detention.

---

[18] Plaintiffs have requested that all semi-annual classification reviews be produced. Morris Decl. ¶ 76. Defendants have not objected to this request. Plaintiffs therefore assume that semi-annual classification reviews that have been produced are all the reviews.

1.     **Defendants' standard practice is to keep people in Maximum Custody far longer than two months. (§19.3.)**

Although the Injunction requires a system to facilitate the return to lower levels of custody for all people who have been in isolation for more than two months, Defendants' standard practice is to keep people in Maximum Custody for far longer than that, with very few exceptions.

In June and August 2025, Defendants reportedly removed a total of 828 people from isolation, of which 50 were removals from Maximum Custody. Morris Decl. ¶¶ 93-95.[19] Of the 50, 17 were reported as being removed from Maximum Custody less than six months after they entered the subclass. *Id.* However, this dramatically overstates how many people Defendants decided to remove from Maximum Custody after less than six months. Six of the 17 were reported as being removed from Maximum Custody because they left ADCRR to go to court. *Id.* Another three were reported as being removed from Maximum Custody because they were released from custody at the end of their sentence. *Id.* Two people were moved from one Maximum Custody unit to another, and described as having been removed from isolation. *Id.* Just six people in Maximum Custody were removed from Maximum Custody into a housing unit not designated as a Maximum Custody housing unit after less than six months.[20] *Id.*

Further evidence of the lengthy stays in Maximum Custody comes from 60-day review documents. Of the 147 60-day reviews for April, May and June 2025, just one person in Maximum Custody was approved for movement out of isolation. Morris Decl. ¶ 96. He was not removed from Maximum Custody until 44 days after his transfer out of isolation was approved, nearly four months after he entered isolation. *Id.*

---

[19] Most months, it is not feasible to determine how many of the people removed from isolation were in Maximum Custody. Morris Decl. ¶ 93.

[20] Five of the six were moved to ASPC-Lewis Buckley Close Custody. Morris Decl. ¶¶ 94-95 nn.5, 6. Based on Plaintiffs' recent monitoring tour of ASPC-Lewis, people in this housing unit are receiving considerably less than two hours of out-of-cell time per day. *Id.* Thus, these individuals were not actually removed from isolation. This issue will be addressed in a separate motion.

Finally, the reasoning in the semi-annual reclassification reviews, minimal though it is, demonstrates that most people who go into Maximum Custody will spend well over six months in isolation. For example, ███████, ██████ was placed into detention on June 3, 2024 for an "Assault on Staff that Did Not Involve Serious Injury" and "Possession of a Weapon." Morris Decl. ¶ 101, Ex. 72. He was moved to Maximum Custody on June 25, 2024.[21] Morris Decl. ¶ 101. He has remained in Maximum Custody since that time, other than three placements on mental health watch. *Id.* He has been at Step 3 since no later than August 21, 2024. *Id.* ¶ 101, Ex. 71. He had his first semi-annual classification review in January 2025. The Classification Officer recommended that he should remain in Maximum Custody "due to the severity of the incident." *Id.* ¶ 101, Ex. 72. There was no mention of his behavior in Maximum Custody since his placement into isolation, other than a tacit acknowledgement that he had not received any disciplinaries in the time he had been there. *Id.* By the time of his second semi-annual classification review in June and July 2025, the Classification Officer stated that Mr. ████ had not had a major disciplinary in over a year, and that he "has been pro social and accepts case plan assignments." *Id.* ¶ 101, Ex. 73. The Classification Officer recommended that he be moved to Close Custody, and the Deputy Warden and Warden at the prison agreed. *Id.* The Central Office nonetheless decided that Mr. ████ should remain in Maximum Custody "based on the severity of the staff assault." Morris Decl. ¶ 101, Ex. 74.

Another example is ████████, ██████ who was placed in detention on December 21, 2024, and then into Maximum Custody on March 6, 2025, where he remains. Morris Decl. ¶ 103. He had several disciplinaries in 2024, including two December 20, 2024 disciplinaries for Fighting and Assault on Staff that Did Not Involve Serious Injury. Morris Decl. ¶ 103, Ex. 75. At the initial semi-annual classification review in June 2025, the Classification Officer stated that Mr. ████ had been disciplinary-free since the disciplinaries that resulted in his placement into isolation, that he had been "actively

---

[21] Throughout this brief, Plaintiffs have verified that the people listed as remaining in isolation were in isolation as of the morning of September 29, 2025. Morris Decl. ¶ 2.

programming and [wa]s currently a Step 2." *Id.* The Classification Officer recommended that Mr. ███████ be classified as Close Custody and the Deputy Warden and Warden agreed. *Id.* The Central Office decided that he should remain in Maximum Custody "based on I/M's [inmate's] continued inability to adjust to lower custody. I/M continues to receive Disc[iplinaries]." *Id.*

███████, ███████ discussed above at page 19, provides another example of a person being kept in Maximum Custody for a long time based solely on the conduct that got him into Maximum Custody. He was placed in Maximum Custody for "punching" and "kicking" another incarcerated person in October 2024. Morris Decl. ¶ 104, Ex. 67. At the time of his semi-annual reclassification review in April 2025, he had been disciplinary-free since the October incident and for a year prior to that incident. *Id.* He was a Step 3 at the time of the review and all facility-based reviewers believed he could be housed at Close Custody. *Id.* However, the Central Office decided he would remain in Maximum Custody "based on violent/aggressive behaviors." Morris Decl. ¶ 104, Ex. 66. He remains in Maximum Custody. *Id.*

Despite the obligation to have a system to facilitate the return to lower levels of custody for all people in isolation over two months, Defendants' standard practice for people in Maximum Custody is to keep them in isolation for six months or longer.

**2.    Defendants keep many people in isolation without any pathway out. (§19.3.)**

For many of the people in long-term isolation in ADCRR, Defendants have no system at all in place to facilitate their return to less restrictive housing. The most common reason for the lack of a pathway out is that ADCRR has safety concerns about placing the person at lower custody.[22]

---

[22] Plaintiffs do not assert that any specific individual would be safe if moved out of isolation and are not arguing that any specific individual should be moved out of isolation. Defendants have far greater knowledge of the risks posed by or to the people in their custody. Rather, Defendants must address the safety issues within their prisons, or find a way not to punish individuals who are not engaging in misconduct just because Defendants

Keeping people in custody safe from assault is, without question, critically important, and indeed, required by the Constitution. *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'") (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). However, this Court found that Defendants' practice of "depriv[ing people] of effectively all social contact for an indeterminate amount of time, up to years and decades" also violates the Constitution. 609 F. Supp. 3d at 910. Defendants cannot be permitted to violate the Constitution by keeping people in isolation for "years and decades" to avoid a different constitutional violation, the failure to keep people safe in ADCRR prisons. Defendants must comply with the Eighth Amendment as a whole.

Defendants have left the following people, among others, languishing in isolation with no ability to move to less restrictive housing:

1. ███████████, ██████ has been in Maximum Custody since 2005 – twenty years. Morris Decl. ¶ 106, Ex. 77. At the time of his most recent semi-annual reclassification in February 2025, he had had a single disciplinary in the past three years. *Id.* This was a disciplinary for fighting. *Id.* He was at Step 3. *Id.* The Classification Officer, Deputy Warden and Warden all recommended him for Close Custody. *Id.* The Central Office decided he would remain in Maximum Custody "based on security/safety concerns." *Id.* Mr. ██████ remains in Maximum Custody. Morris Decl. ¶ 106.

2. ████████, ██████ was in Maximum Custody from 2013 until his release from ADCRR custody in June 2025 – twelve years. Morris Decl. ¶ 107, Ex. 78. At the time of his February 2025 semi-annual classification, he had been disciplinary-free for 7 years, was scoring as Medium Custody, was at Phase3/Step 3, had positive behavior and no current STG activity.[23] *Id.* The

_____

are failing to maintain control of the prisons.

[23] STG means Security Threat Group and generally refers to gangs. Morris Decl. Ex. 6 at § 3.2.5.

1  Classification Officer, Deputy Warden and Warden all recommended him
2  for Close Custody, as they had in at least the most recent reclassification
3  before that. *Id.* The Central Office decided he would remain in Maximum
4  Custody "due to safety/security concerns." *Id.* He re-entered the community
5  straight from his twelve years of solitary confinement. *Id.*

6     3.  ████████, ████ has been in Maximum Custody since January 30,
7  2014 – more than eleven years, with the exception of a single day. Morris
8  Decl. ¶ 108. His only disciplinary since 2015 was for a refusal of urinalysis
9  in 2021. *Id.* He has been diagnosed with an unquestionably serious mental
10  illness (schizophrenia) but not designated seriously mentally ill.[24] *Id.* In his
11  semi-annual reclassification on August 7, 2024, the Classification Officer
12  listed numerous reasons he should be housed at lower custody: he had been
13  disciplinary-free for 39 months, he was Phase3/Step 3, programming,
14  showing positive behavior, and scoring Medium Custody. *Id.* Ex. 79. The
15  Deputy Warden and Warden agreed. *Id.* The Central Office decided he would
16  remain in Maximum Custody "based on significant staff assault"- the
17  January 2014 assault over a decade earlier that was the reason for his
18  placement into Maximum Custody. *Id.* At the next semi-annual classification
19  review in January 2025, he was finally approved to leave Maximum Custody.
20  Morris Decl. ¶ 108, Ex. 80. He was out of Maximum Custody for a single
21  day in January 2025. Morris Decl. ¶ 108. The day after he left Maximum
22  Custody, he was placed back into detention. *Id.* In early March, he went back
23  into Maximum Custody. *Id.* According to his semi-annual classification
24  review in August 2025, he was scoring for Medium Custody. *Id.*, Ex. 81. The
25  Classification Officer noted that he had been disciplinary-free for four years

26
27  ───────────────────

28     [24] If he were designated as seriously mentally ill, it would not be permissible under the Injunction to keep him in isolation. Doc. 4410 at § 19.5.

-26-

(since the urinalysis refusal) and that he had an "OSB hold."[25] *Id.* The Classification Officer, Deputy Warden and Warden all recommended that he remain in Maximum Custody. *Id.* The Central Office decided to keep him in Maximum Custody "based on his disciplinary history and inability to house at lower custody." *Id.* Mr. ████ remains in Maximum Custody. Morris Decl. ¶ 108.

4. ████, ████ has been in Maximum Custody since January 5, 2015 – more than ten years. At the time of his most recent semi-annual classification in August 2024, He was Phase 3/Step 3, was programming and had positive behavior, and worked as a pod porter. Morris Decl. ¶ 109, Ex. 82. The Classification Officer, Deputy Warden and Warden all recommended him for Close Custody, as they had in at least the most recent classification before that. *Id.* The Central Office decided he would remain in Maximum Custody "based on security concerns. Per SSU, IM's [inmate's] validated status and ideology continues to pose a threat."[26] *Id.* Mr. ████ remains in Maximum Custody. Morris Decl. ¶ 109.

5. ████, ████ was in Maximum Custody May 4, 2020 through his release from ADCRR custody on January 31, 2025. Morris Decl. ¶ 110, Ex. 83. According to the Maximum Custody Packet completed on September 17, 2024, he was Phase 3/Step 3, programming, and exhibited positive behavior. *Id.* All facility-based reviewers recommended Close Custody. *Id.* The Central Office decided he would remain in Maximum Custody "based on an inability to safely house at lower custody; likely to be assaulted at lower custody". *Id.* He re-entered the community straight from more than four and a half years of solitary confinement. *Id.*

---

[25] It is Plaintiffs' understanding that OSB refers to the Central Office.
[26] "SSU" is the Special Security Unit. The SSU is the unit of ADCRR that makes the decision on whether an incarcerated person is a validated gang member and assesses the level of STG activity and threat. *See* Morris Decl. Ex. 6 at § 3.2.5.

6. ████████, ████ who scores for Medium Custody in the classification system, has been in isolation since May 19, 2022, when he refused to house in his assigned housing unit. Morris Decl. ¶ 111, Ex. 84. He has not had a disciplinary since his refusal to house in 2022. *Id.* He remains in isolation "due to a lack of housing options." *Id.*

7. ████████, ████ has been in Maximum Custody since August 15, 2022. Morris Decl. ¶ 112. His first semi-annual classification was completed on January 16, 2024. *Id.*, Ex. 85. At that time, he had been disciplinary-free for a year and a half. *Id.* All the facility-based reviewers believed he could be managed at lower custody, and the Classification Officer noted that there were available housing options at a Close Custody protective custody yard. *Id.* However, the Central Office decided that Mr. ████ would stay in Maximum Custody because "I/M [inmate] not safe to house at lower custody". *Id.* His second semi-annual classification review occurred a year and a half later, in July 2025. Morris Decl. ¶ 112, Ex. 86. At that time, he had been disciplinary-free for 2 years and 8 months. *Id.* However, due to his frustration at not being able to get out of isolation, he had barricaded himself in his cell, and been subjected to forcible medication by the mental health staff. Morris Decl. ¶ 112, Exs. 43, 86. This clear sign of the deterioration of his mental health in isolation was given as the reason for keeping him in Maximum Custody even longer. *Id.* He remains in Maximum Custody to date. Morris Decl. ¶ 112.

8. ████████, ████ has been in Maximum Custody since March 23, 2023 when he refused to house, except for four trips to the hospital. Morris Decl. ¶ 113. He has had no disciplinaries since that refusal to house. *Id.* When he goes to the hospital, Defendants count him as being removed from isolation; when he returns from the hospital to Maximum Custody, Defendants count his time in isolation as starting anew. *Id.* Thus, according to Defendants, he

1    has been in Maximum Custody only since April 15, 2025, the date of his last
2    return from the hospital. *Id.* His two semi-annual classifications (February
3    and September 2024) indicate that he was at Step 3. *Id.*, Exs. 87, 88. In
4    February 2024, the Warden recommended that he be moved to Close
5    Custody,[27] the Classification Officer and Deputy Warden both recommended
6    Maximum Custody until "lower custody housing" or "suitable housing"
7    could be found, and the Central Office decided on Maximum Custody
8    without explanation. Morris Decl. Ex. 87. In his September 2024 semi-
9    annual classification review, all the facility-based staff thought he could be
10   housed in Close Custody, but the Central Office decided he must stay in
11   Maximum Custody "based on security/safety concerns ███████ refused to
12   house and investigation revealed significant safety concerns due to validated
13   status." Morris Decl. Ex. 88. He remains in Maximum Custody. Morris Decl.
14   ¶ 113.

15   9.    ███████, ███████ has been in Maximum Custody since August 3, 2022,
16   other than two periods of being out to court. Morris Decl. ¶ 114. Defendants
17   count the time he has been in Maximum Custody as starting on December 4,
18   2024, his most recent return from court. *Id.* His last disciplinary offense was
19   in May 2023. *Id.* In October 2023, the Classification Officer, Deputy Warden
20   and Warden all recommended that he be moved to Close Custody. Morris
21   Decl. ¶ 114, Ex. 89. At the time, he was Step 3, had no gang-related activity
22   for at least 24 months, and had had only one major disciplinary in the
23   previous three years, the May 2023 disciplinary.[28] *Id.* The Central Office
24   decided to keep Mr. ███████ in Maximum Custody, and provided no

---

[27] The recommendation was for High Custody. Morris Decl. Ex. 87. At that time, ADCRR used the terms High Custody and Close Custody interchangeably. Morris Decl., ¶ 113 n. 7. Now, ADCRR uses primarily the term Close Custody. *Id.* For simplicity and consistency, the term Close Custody is used throughout this brief.

[28] The classification documents state that he had no "STG" activity for the past 24 months. Morris Decl. Ex. 87.

explanation at all. *Id.* According to his May 20, 2025 Case Plan, he had been Phase 3/Step 3 since at latest January 21, 2025. Morris Decl. ¶ 114, Ex. 90. In April 2025, he was "denied to go anywhere to the yards. He will remain in Browning [in Maximum Custody] and per committee he will remain in pod." *Id.* He remains in Maximum Custody. Morris Decl. ¶ 114.

10. ███████████, ███████ has been in Maximum Custody since March 21, 2023. Morris Decl. ¶ 115. In the semi-annual classification review completed in September 2024, the Classification Officer noted that Mr. ███████ had had no disciplinaries since 2012, was programming and exhibiting positive behavior, was Phase 3 and Step 3. Morris Decl. ¶ 115, Ex. 91. At the time, Mr. ███████ was scoring as Medium Custody. *Id.* The Classification Officer recommended Close Custody, and the Deputy Warden and Warden agreed. *Id.* The Central Office decided Mr. ███████ should remain in Maximum Custody "based on an inability to safely house at lower custody; likely to be assaulted at lower custody." *Id.* Mr. ███████ remains in Maximum Custody. Morris Decl. ¶ 115. He has not had a semi-annual classification since September 2024. *Id.*

11. ███████, ███████ was in detention and Maximum Custody from May 23, 2024 through his release from ADCRR custody on August 30, 2025. Morris Decl. ¶ 116. He remained in isolation not because of behavior, but due to "lack of suitable housing options at lower custody." Morris Decl. ¶ 116, Ex. 92.

Finally, Defendants have only one non-isolation housing unit where they assign people condemned to death. There are three people who have been condemned to death who have not had disciplinaries for years, but remain in Maximum Custody because they cannot be assigned to the non-isolation death row unit. Morris Decl. ¶ 117.

Defendants have no system to facilitate the return to lower levels of custody for these individuals. The men listed above have no pathway out of isolation, other than reaching the

end of their sentence. They are just stuck. This violates § 19.3 of the Injunction, as there is no system for facilitating their removal from isolation. It also violates § 29.2.2, which establishes a presumption that people should be released from isolation when they meet the terms of their case plan.

> **3.    Defendants keep people who are in fear for their lives – often because they have opted out of gang involvement – in isolation for extended periods. (§19.3.)**

A large portion of the people living in isolation, especially in detention, are there due to safety concerns. Morris Decl. ¶ 118. There are two main ways that this is reflected in Defendants' records: either the person is being considered for protective custody (also called "805") or the person has "refused to house".

For example, ██████ was placed into isolation on February 24, 2025. Morris Decl. ¶ 119, Ex. 42 at ¶ 2. He had been housed at ASPC-Eyman Meadows and was assaulted. *Id.* As a result, he was placed into the 805/protective custody process. *Id.* Ex. 42 at ¶ 3. The 805 process was completed sometime before May 14, 2025, but Mr. ███ nevertheless remained in isolation until his release from ADCRR custody on June 17, 2025. Morris Decl. ¶ 119, Ex. 93.

Similarly, █████, ████ entered detention and started the protective custody process in early March 2024 after being threatened. Morris Decl. ¶ 120, Ex. 94. He remained in detention until late April 2024. Morris Decl. ¶ 120. He was moved to a general population yard where he stayed for just a few days, before he was again threatened. Morris Decl. ¶ 120, Ex. 94. He told staff he was unsafe and the protective custody process began again. *Id.* He moved back to detention on April 29, 2024. The protective custody process was completed and his travel orders requested by May 16, 2024. Morris Decl. ¶ 120, Ex. 95. He did not move out of detention until nearly seven months later, on December 11, 2024. Morris Decl. ¶ 120.

Many of the people in isolation for safety reasons have "signed IHP," thereby stating that they are willing to house with people of any race. Morris Decl. Exs. 31 at ¶ 2; 33 at ¶ 2; 34 at ¶ 2. Defendants encourage people to sign IHP by offering incentives to do so. Morris

Decl. Ex. 8 at § 4.0.

Much of the gang activity in ADCRR is racially based. Morris Decl. ¶ 128, Exs. 33 at ¶ 2; 27 at ¶ 6. By signing IHP, a person effectively opts out of gang activity or following gang orders. Morris Decl. ¶ 128, Exs. 33 at ¶ 2; 97 at ¶ 2; 98 at ¶ 4.

Housing units in ADCRR are known to both incarcerated people and ADCRR staff as "IHP yards" or "general population yards." Morris Decl. ¶ 129; Exs. 27 at ¶¶ 5, 9-11; 33 at ¶¶ 8-12; 97 at ¶¶ 3-11; 52; 96. It is unsafe for a person who has signed IHP to be in a general population yard. Morris Decl. ¶ 130, Exs. 27 at ¶¶ 7, 16; 31 at ¶¶ 6-7; 33 at ¶¶ 8-12; 34 at ¶¶ 3-4, 10; 39 at ¶ 9; 40 at ¶¶ 3-4; 41 at ¶ 3; 97 at ¶ 5; 98 at ¶ 4; 99 at ¶¶ 3-6; 100 at ¶ 7. But Defendants routinely place people who have signed IHP into general population yards, putting their lives in danger. Morris Decl. ¶ 130, Exs. 31 at ¶¶ 3-7; 33 at ¶¶ 3-24; 34 at ¶¶ 3-5; 97 at ¶¶ 3-21; 99 at ¶¶ 4-12; 101 at ¶ 3-4.

As a result, many people who have signed IHP – a pro-social decision that ADCRR officially encourages – end up in a cycle of being placed into a general population yard, being threatened or assaulted, telling staff that they cannot stay on that unit, being placed into detention, and then being placed into another (or sometimes the same) general population yard to start the cycle over, often returning to detention within hours or days.

For example, ███████████, ████████ entered ADCRR custody in July 2023. For the first part of his term, he was assigned to ASPC-Yuma Cheyenne, a Medium Custody general population unit. Morris Decl. ¶ 131, Ex. 76 at ¶ 2. In April 2024, he was told by another incarcerated person that he had to fight someone. *Id.* He refused, and asked staff to move him out of the unit. *Id.* He was moved to ASPC-Yuma Cibola, Medium Custody another general population unit, on April 17, 2024. Morris Decl. ¶ 131. Shortly after arriving there, he was assaulted by five people. *Id.*, Ex. 76 at ¶ 2. After the assault, he was told by other incarcerated people that he had to leave the unit. *Id.* Because of the assault and the threat, he told staff that he was refusing to house at Cibola, and Defendants moved him into detention at ASPC-Yuma Dakota on April 27, 2024, and then transferred him to the ASPC-Eyman Browning detention unit on May 18, 2024. *Id.* A Classification Officer in the

detention unit told Mr. ███ that he would get out of detention faster if he signed IHP, which he did. *Id.*, Ex. 76 at ¶ 3. Despite having signed IHP, Mr. ███ was moved out of detention on May 24, 2024 to ASPC-Tucson Winchester unit, a Medium Custody general population unit. *Id.* Custody staff told him that he had to go onto the Winchester yard, even though it was dangerous for him. *Id.* He remained there for two days, then was sent to ASPC-Tucson Santa Rita ("Santa Rita"). *Id.*, Ex. 76 at ¶¶ 3-4. He was on Santa Rita until December 9, 2024, when he was extorted and assaulted by six people, resulting in a fractured orbital bone and stitches. *Id.*, Ex. 76 at ¶ 4. After returning from the hospital, he began the protective custody process, and was moved to the Winchester detention unit, and then moved to the Tucson Rincon detention unit, where he stayed until March 28, 2025. *Id.*, Ex. 76 at ¶¶ 4-6. He was out of detention for a single day before being moved back into detention at Yuma Dakota on March 29, 2025. Morris Decl. ¶ 131. He was moved out of detention on April 15, 2025, and stayed out until July 11, when he went back to detention for the last three days of his incarceration. *Id.*

Another example is ████████, ████ Mr. ███ has signed IHP. Morris Decl. ¶ 132, Ex. 98 at ¶ 4. He has not had any disciplinaries since January 2023. Morris Decl. ¶ 132. He was placed into detention on July 2, 2024. *Id.* He left detention on July 26, 2024, and returned to detention on July 29, 2024. *Id.* He was sent to Winchester on August 19, 2024. *Id.* He was told his life was in danger because he was IHP. *Id.*, Ex. 98 at ¶ 4. On September 1, 2024, he was placed into the Tucson Complex Detention Unit. Morris Decl. ¶ 132. He remained in detention until December 16, 2024. *Id.* He was out of detention for about six months, returning to detention on June 21, 2025. *Id.* He remained in detention until July 13, 2025, and then, on July 30 was again placed into Winchester, the unit where he had been threatened in July 2024. *Id.* He requested protective custody on August 1, 2025 and went back into detention until August 20, 2025. *Id.*

████████, ████ also went through this cycle. Mr. ███ signed IHP in 2018. Morris Decl. ¶ 133, Ex. 33 at ¶ 2. He has not had a disciplinary since 2021. Morris Decl. ¶ 133. In September 2024, he was living in Santa Rita, an IHP unit, and he had a problem

with another person in the unit. *Id.*, Ex. 33 at ¶ 3. The staff placed him into the Tucson Complex Detention Unit and started the protective custody process. *Id.* He remained there for a couple days, then was moved to the Tucson Cimarron Detention Unit. *Id.*, Ex. 33 at ¶ 4. Several weeks later, he was moved to the ASP-La Palma transition unit, where he remained in isolation. *Id.*, Ex. 33 at ¶¶ 6-7. After about five days, on November 5, 2024, staff attempted to house Mr. ███ and several other people who had signed IHP in the ASPC-Eyman Rynning unit, a general population unit. *Id.*, Ex. 33 at ¶ 8. Upon his arrival to Eyman Rynning, the staff there recognized that the men who had signed IHP could not be placed in the general population unit, and placed them all in detention at Eyman Rynning. *Id.*, Ex. 33 at ¶ 10. He remained there about three weeks. *Id.* From there, he was transferred to Winchester, a general population unit. *Id.*, Ex. 33 at ¶ 12. On arrival, he told staff that he could not go into that unit, and the staff agreed, saying he would "get [his] ass beat" if he went into the unit. *Id.* Mr. ███ and a couple other people were placed into the Tucson Cimarron Transitory Unit. *Id.*, Ex. 33 at ¶ 13. He was in the Transitory unit for about four days and was not allowed to leave his cell at all during those four days. *Id.*, Ex. 33 at ¶¶ 14-20. From the Transitory unit, he was moved to the Tucson Complex Detention Unit, for two days and then to the Tucson Manzanita Detention Unit. *Id.*, Ex. 33 at ¶ 21. He remained in detention until January 2, 2025. Morris Decl. ¶ 133. He stayed out of detention for the next four months, but on May 1, 2025, he asked for protective custody and returned to detention at ASP-La Palma. *Id.* He was removed from detention on August 6, 2025. *Id.*

Many people are going through this cycle of detention, placement into a dangerous unit, getting threatened or assaulted, and going back to detention. Morris Decl. ¶ 134. The following people all cycled in and out of detention, without any disciplinary charges other than Resisting or Disobeying a Verbal or Written Order or Aggravated Refusal of an Assignment, the disciplinaries that are given when a person refuses to house in the assigned unit:

- ███████ ███████
  - ██ 22 – April 6, 2024
  - April 7, 2024 – April 30, 2024

- May 6, 2024 – July 16, 2024
- December 31, 2024 – March 31, 2025
- May 1, 2025 – July 21, 2025
- August 6, 2025 – August 25, 2025[29]

- ███████████, ██████
  - ███████████4███████ – March 11, 2025
  - March 11, 2025 – June 18, 2025
  - July 10, 2025 – September 25, 2025

- ███████████████, ███████
  - ████████3█████4 – April 1, 2025
  - April 2, 2025 – April 18, 2025
  - April 21, 2025 – May 30, 2025
  - May 30, 2025 – August 10, 2025[30]

- ███████████, ██████
  - ███████2,██████ – April 2, 2024
  - April 3, 2024 – April 30, 2024
  - May 2, 2024 – August 5, 2024
  - January 24, 2025 – March 24, 2025

- ██████████████, ███████
  - ███████20███████pril 24, 2025
  - April 25, 2025 – present

- █████████████, ██████
  - ████████,█2█████ December 16, 2024
  - December 28, 2024 – April 1, 2025

- ███████████, ██████
  - ████████be████24 – April 3, 2025
  - April 5, 2025 – May 14, 2025[31]

- ███████████, ██████
  - ████████30███████ – April 15, 2025
  - April 16, 2025 – present

- █████████████, ██████
  - ████████2███████ January 23, 2024
  - January 24, 2024 – April 3, 2024
  - April 4, 2024 – April 26, 2024
  - April 27, 2024 – August 26, 2024
  - September 21, 2024 – December 12, 2024
  - July 31, 2025 – August 11, 2025

---

[29] Mr. ██████ was moved from detention to mental health watch and then to a mental health unit, w████████ remains. Morris Decl. ¶ 134 n. 9.

[30] Mr. ████████ was released from ADCRR custody from detention on August 10, 2025. Morris ████ 134 n. 9.

[31] Mr. ██████ was moved out of detention into Close Custody at ASPC-Lewis. Morris Decl. ¶ 134 n ██ As discussed above in footnote 20, people in Close Custody at ASPC-Lewis are receiving less than two hours of out-of-cell time per day.

-35-

- ██████████, ███████
  - er ██ 3 – September 27, 2023
  - September 28, 2023 – October 20, 2023
  - October 20, 2023 – January 12, 2024
  - February 1, 2024 – March 5, 2024
  - March 5, 2024 – April 5, 2024
  - April 6, 2024 – May 1, 2024
  - May 1, 2024 – December 4, 2024

- ████████████ ██████
  - ██ 2 ████ April 1, 2024
  - April 2, 2024 – April 24, 2024
  - April 24, 2024 – May 16, 2024
  - May 20, 2024 – September 16, 2024
  - September 17, 2024 – October 17, 2024
  - October 18, 2024 – October 23, 2024

- ████████, █████
  - 1 ████ 4 – August 28, 2024
  - August 29, 2024 – November 5, 2024[32]
  - April 10, 2025 – July 5, 2025
  - July 7, 2025 – July 30, 2025

- ███████████, ████
  - 4 ████████ 23, 2024*
  - May 23, 2024 – September 17, 2024*
  - September 17, 2024 – October 28, 2024[33]

- ██████████, ██████
  - A ████, 2023
  - May 5, 2023 – June 16, 2023
  - August 7, 2023 – August 31, 2023
  - August 31, 2023 – October 24, 2023
  - October 24, 2023 – November 22, 2023[34]
  - November 22, 2023 – January 24, 2024
  - January 24, 2024 – February 15, 2024
  - February 15, 2024 – March 8, 2024
  - March 12, 2024 – July 11, 2024
  - July 13, 2024 – October 30, 2024[35]

---

[32] Mr. ██████ was released from ADCRR custody on November 5, 2024, and returned to AD████ tody on December 26, 2024. Morris Decl. ¶ 134 n.11.

[33] Mr. ████████ was released from ADCRR custody on October 28, 2024. Morris Decl. ¶ 134 n.

[34] The documents Defendants produced to Plaintiffs state that Mr. ███████████ was removed from isolation on October 24, 2023 and reentered isolation ██████ 2023. His medical record states that he was in a unit with the locator code ██ the detention unit at ASP-La Palma, during this period. There are several instances for ot██ people where there is a similar pattern. However, for the others, the medical records also include notes of "segregation rounds" during the period when the medical record says the person was in isolation but Defendants have not recorded the person as being in isolation. In this instance, there were no █████████ otes during this period. Morris Decl. ¶ 134 n.13.

[35] Mr. █████████ has been on watch or in a residential mental health unit most of the time sin███████, 2024. Morris Decl. ¶ 134 n.14.

1
     o  November 5, 2024 – November 21, 2024

2
  • ██████████, ███████
     o  ██, April 11, 2024

3
     o  April 12, 2024 – May 6, 2024
     o  May 9, 2024 – August 15, 2024

4

5
  • █████████, ██████
     o  5, ██ – January 22, 2024
     o  January 24, 2024 – February 16, 2024

6
     o  February 16, 2024 – March 15, 2024
     o  March 16, 2024 – April 3, 2024

7
     o  April 4, 2024 – April 23, 2024

8
  • █████████
     o  18 ██ – January 26, 2024

9
     o  January 31, 2024 – February 7, 2024
     o  March 30, 2024 – April 23, 2024

10
     o  April 23, 2024 – May 13, 2024

11
  • ██████████, ███
     o  , 2 ██ January 19, 2024

12
     o  January 19, 2024 – March 7, 2024
     o  March 7, 2024 – March 26, 2024

13
     o  March 26, 2024 – May 2, 2024
     o  May 17, 2024 – May 24, 2024

14
     o  May 24, 2024 – July 31, 2024

15
  • █████████, ████
     o  y ██ 4 – March 15, 2024

16
     o  March 16, 2024 – March 29, 2024
     o  March 30, 2024 – May 7, 2024

17
     o  May 7, 2024 – August 23, 2024

18
  • ████████, █████
     o  ry ██ 4 – February 15, 2024

19
     o  February 15, 2024 – March 5
     o  April 3, 2024 – April 9, 2024

20
     o  April 10, 2024 – May 2, 2024

21
  • ████████████, █████
     o  2, ██ – October 31, 2023

22
     o  November 29, 2023 – January 25, 2024
     o  February 14, 2024 – March 4, 2024

23
     o  March 4, 2024 – March 22, 2024
     o  March 22, 2024 – April 3, 2024

24
     o  April 4, 2024 – June 7, 2024

25
     o  September 3, 2024 – September 16, 2024 (cycling between detention and mental health watch) [36]

26

27
     [36] Mr. ██████ was designated as seriously mentally ill (SMI) in October 2024, and was in mental ██████ units most of the time from then until his release from custody in May

28
2025. Morris Decl. ¶ 134 n.16.

- ██████████, ████████
  - ██ ██ March 28, 2024
  - March 29, 2024 – May 7, 2024
  - May 7, 2024 – July 5, 2024
  - July 26, 2024 – October 9, 2024
  - November 17, 2024 – November 30, 2024

- ██████████, ████████
  - ██ February 8, 2024
  - February 9, 2024 – March 18, 2024
  - March 18, 2024 – March 29, 2024
  - March 30, 2024 – April 23, 2024
  - July 24, 2024 – August 20, 2024
  - September 9, 2024 – September 19, 2024
  - September 20, 2024 – October 5, 2024

- ██████████, ██████
  - 20 ovember 4, 2024
  - November 25, 2024 – January 22, 2025

- ██████████, ██████
  - 20 ugust 12, 2024
  - August 13, 2024 – December 24, 2024
  - March 25, 2025 – September 3, 2025[37]

- ██████████, ██████
  - 20 pril 16, 2024
  - April 16, 2024 – July 18, 2024
  - January 7, 2025 – February 20, 2025

- ████████████, ██████
  - 24 ruary 9, 2024
  - February 14, 2024 – March 28, 2024
  - March 28, 2024 – May 1, 2024
  - May 11, 2024 – September 12, 2024

Morris Decl. ¶ 134. The medical records for many of these individuals indicate that they were being assessed for protective custody during some or all of the periods they were cycling in and out of detention. *Id*. And a number of them were assaulted during the brief periods they were not in detention. *Id*.

**C. Defendants Routinely Delay Removal from Isolation for More than 10 Days (§§ 29.3, 30.)**

The Injunction requires that all persons determined to be eligible to leave isolation be removed from isolation within 10 days. Doc. 4410 at §§ 29.3 (Maximum Custody), 30

---

[37] Mr. ████ was released from ADCRR custody from detention on September 3, 2025. Morris Decl. ██ 34 n.17.

-38-

(detention). Defendants frequently fail to comply with this requirement.

Defendants have provided information on the dates of 4,994 approvals for removal and removals from isolation during the first eight months of 2025. [38] Morris Decl. ¶¶ 136-137. Of these, 1,866 people – 37% – were held in isolation more than 10 days after they were deemed eligible to leave; 1,062 people – 21% – were held in isolation for a month or more after they were deemed eligible to leave; 205 people were held in isolation for three months or more after they were deemed eligible to leave, including 25 people with overstays in isolation of six months or more. Morris Decl. ¶ 138.

Similarly, 23 of the 56 semi-annual classification reviews produced to Plaintiffs for May and June 2025 resulted in a decision that the person could leave isolation. Morris Decl. ¶ 139. Just 4 of the 23 were moved out of isolation within 10 days. *Id.* Four of the 23 remain in isolation, including one whose classification was completed more than four months ago and two whose classifications were completed more than three months ago. *Id.* Three of the 23 people remained in isolation until their release from ADCRR custody following the classification review. *Id.* One had spent an additional 30 days in Maximum Custody, another had spent an additional 53 days in detention, and the third had spent an additional 119 days in isolation (in detention and mental health watch). Morris Decl. ¶¶ 81, 139.

Defendants routinely violate this requirement that they remove people from isolation within 10 days of their eligibility to move to less restrictive housing. Doc. 4410 at §§ 29.3, 30.

## IV. ARGUMENT

Given the overwhelming evidence set forth above and in the documents filed with this Motion, this Court should find that Defendants are violating §§ 19.3, 29.2, 29.3 and 30 of the Injunction.

The Court has the inherent authority to enforce its orders, including through a finding

---

[38] Defendants reported on 5,066 removals during this period. Morris Decl. ¶ 136. However, it is not possible to determine the date the person was approved for removal on 72 of the entries. *Id.* These removals have not been counted in this analysis.

of contempt. *Degen v. United States*, 517 U.S. 820, 827 (1996), *superseded by statute on other grounds by* 28 U.S.C. § 2466; *Shillitani v. United States*, 384 U.S. 364, 370 (1966). "The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." *FTC v. Affordable Media LLC,* 179 F.3d 1228, 1239 (9th Cir. 1999) (citations omitted). A party's actions "'need not be willful' and there is no good faith exception to the requirement of obedience to a court order." *Go–Video, Inc. v. Motion Picture Ass'n of Am.,* 10 F.3d 693, 695 (9th Cir.1993) (quoting *In re Crystal Palace Gambling Hall, Inc*., 817 F.2d 1361, 1365 (9th Cir.1987)).

However, the Court's inherent powers should "be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). "Consequently, [a] 'less severe sanction'. . . is undoubtedly within a court's inherent power as well." *Id.* at 45 (citation omitted). A court's inherent powers include the power to order a non-compliant party to develop remedial plans to achieve compliance and to direct the party to include certain tasks and deadlines in the plan, because the court "retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion." *Brown v. Plata*, 563 U.S. 493, 542 (2011); *see also* Doc. 4950 at 3-4.

Although Defendants' policies and practices regarding the system for removing people from isolation violate a specific and definite order of the Court, Plaintiffs do not at this time seek an order to show cause why Defendants should not be held in contempt. At this time, Plaintiffs reserve their right to seek an order to show cause related to contempt, but seek only an order enforcing the four Injunction provisions at issue and requiring Defendants to develop a remedial plan to promptly come into compliance with these requirements.

In issuing such an enforcement order, "the court is entitled to give some guidance . . . and set some deadlines for compliance." *Armstrong v. Davis*, 275 F.3d 849, 873 (9th Cir.

-40-

2001). With the inclusion of instructions as to what elements need to be in a remedial plan the "district judge [does] not attempt to 'micro manage' the [party's] activities, but rather to set clear objectives for it to attempt to attain, and, in most circumstances, general methods whereby it would attain them." *Id.*

## V.    RELIEF REQUESTED

Plaintiffs request that the Court issue an order:

1. Finding Defendants non-compliant with §§ 19.3, 29.2, 29.3, and 30 of the Injunction (Doc. 4410);

2. Ordering the development of a compliance plan through the following process:

   a. Defendants submit a plan within 30 days detailing how they will come into compliance with §§ 19.3, 29.2, 29.3, and 30 of the Injunction, including dates for intermediate benchmarks and for full compliance and the ways in which they will demonstrate compliance;

   b. Plaintiffs and the Court Monitors have 30 days to respond to Defendants' proposal; and

   c. The Court orders a final plan, following a hearing if necessary;

3. Ordering Defendants to report monthly to the Court Monitors and Plaintiffs on their progress toward intermediate benchmarks and compliance, including providing all documents and data upon which their reporting is based.

## VI.    CONCLUSION

For the last two years, Defendants have failed to comply with §§ 19.3, 29.2, 29.3, and 30 of the Injunction (Doc. 4410). These provisions relating to the system for reviewing whether people should remain in isolation and removing them from isolation are at the very center of the relief for people in the Isolation Subclass. Defendants must now be required to come into compliance with these provisions on a quick and definite schedule.

1   Dated: September 29, 2025          **ACLU NATIONAL PRISON PROJECT**

2                                      By:   s/ Maria V. Morris
3                                            Maria V. Morris (D.C. 1697904)*
                                             David C. Fathi (Wash. 24893)**
                                             Eunice Hyunhye Cho (D.C. 1708073)*
4                                            **ACLU NATIONAL PRISON**
                                             **PROJECT**
5                                            915 15th Street N.W., 7th Floor
                                             Washington, DC 20005
6                                            Telephone: (202) 393-4930
                                             Email:    dfathi@aclu.org
7                                                      mmorris@aclu.org
                                                       echo@aclu.org
8
                                             Corene T. Kendrick (Cal. 226642)*
9                                            425 California St., Ste. 700
                                             San Francisco, CA 94104
10                                           Telephone: (202)393-4930
                                             Email:    ckendrick@aclu.org
11
12                                           *Admitted *pro hac vice*
                                             **Admitted *pro hac vice*. Not admitted in
13                                           DC; practice limited to federal courts.
14                                           Lauren K. Beall (Bar No. 035147)
                                             **ACLU FOUNDATION OF ARIZONA**
15                                           2712 North 7th St.
                                             Phoenix, AZ 85006
16                                           Telephone: (602) 650-1854
                                             Email:    lbeall@aclu.org
17
18                                           Donald Specter (Cal. 83925)*
                                             Alison Hardy (Cal. 135966)*
19                                           Rita K. Lomio (Cal. 254501)*
                                             Sophie Hart (Cal. 321663)*
20                                           **PRISON LAW OFFICE**
                                             1917 Fifth St.
21                                           Berkeley, CA 94710
                                             Telephone: (510) 280-2621
22                                           Email:    dspecter@prisonlaw.com
                                                       ahardy@prisonlaw.com
23                                                     rlomio@prisonlaw.com
                                                       sophieh@prisonlaw.com
24
                                             *Admitted *pro hac vice*
25

26

27

28

1      *Attorneys for Plaintiffs Shawn Jensen, Dustin*
       *Brislan, Robert Gamez, Jonathan Gonzalez,*
2      *Jason Johnson, Kendall Johnson, Joshua*
       *Polson, Laura Redmond, Sonia Rodriguez,*
3      *Ronald Slavin, Jeremy Smith, and Christina*
       *Verduzco, on behalf of themselves and all*
4      *others similarly situated*

5      **DISABILITY RIGHTS ARIZONA**

6      By: _s/ Maya Abela_____
           Asim Dietrich (Bar No. 027927)
7          5025 East Washington St., Ste. 202
           Phoenix, AZ 85034
8          Telephone: (602) 274-6287
           Email:    adietrich@disabilityrightsaz.org
9
           Rose A. Daly-Rooney (Bar No. 015690)
10         Maya Abela (Bar No. 027232)
           **DISABILITY RIGHTS ARIZONA**
11         4539 E. Fort Lowell Rd.
           Tucson, AZ 85712
12         Telephone:  (520) 327-9547
           Email:
13           rdalyrooney@disabilityrightsaz.org
             mabela@disabilityrightsaz.org.org
14
       *Attorneys for Disability Rights Arizona*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

-43-