*Jensen v. Thornell*
Monitors' Analysis of Parties' Response to Monitors' Third Interim Report to Court
October 4, 2025

The Court has asked us to provide it with an analysis of the parties' responses to the Monitors' Third Interim Report to Court (Doc. 4968; 3rd Interim Report) submitted to the Court by the Plaintiffs and the Defendants in writing initially (Doc. 4974 and Doc. 4973, respectively), orally during the hearing on September 10, 2025, or in writing subsequent to the hearing (Doc. 4997 and Doc. 4998, respectively).

The facts presented and endorsed by Plaintiffs are almost entirely drawn from our report and as they cite those facts accurately, we have no disagreement. It is not our role to offer any comments on Plaintiffs' legal arguments.

In the remainder of this analysis we address – either specifically or generally, as appropriate – facts set forth in our 3rd Interim Report with which Defendants disagree or new facts proffered by Defendants. If the Defendants disagreed with our methodology or findings in our 3rd Interim Report and we did not address that issue here, that connotes that there was no merit to Defendants' assertion. Generally, if we do address the issue here it is because further explanation of our methodology or findings is helpful and not already addressed in our 3rd Interim Report or because a correction of our 3rd Interim Report is in order. If Defendants expressed confusion or lack of understanding of our methodology, we generally do not address that in this document, but will continue to make ourselves available to meet with Defendants to answer questions, provide clarity, and discuss alternative approaches that Defendants would like to explore.

1. A core requirement of the Injunction (paragraph 7.4.7) is that, with rare exception (carefully articulated in the Injunction), "initial care shall be provided by a medical practitioner, or another health professional as directed by a physician or [nurse practitioner or physician assistant], as clinically appropriate. The initial care provider shall be the prisoner's primary care medical provider unless that provider is not on the premises or conducting telehealth visits at the time. Pursuant to prisoner-specific direction provided by the medical practitioner, [an] RN may provide initial care for a limited number of conditions that are simple, rarely serious, rarely confused with serious conditions, and appropriately treatable with self-care and/or over-the-counter medications provided that the RN operates under clinically appropriate protocols approved by the monitors. This paragraph does not have any impact on the protocols [licensed practical nurses] or RNs use in the first few minutes of an emergency while waiting for contact with a practitioner or arrival of emergency services."

In their written response, in direct contravention of the Injunction, Defendants represent that there is no problem with nurses continuing to provide most initial care (as they were doing prior to the Injunction) because "providers review and sign off on" these visits after the fact.

We have provided ADCRR extensive explicit feedback on this matter and have explained how such operation violates the Injunction. Continuing to intentionally use nurses in this manner is difficult to square with a good faith implementation of the Injunction.

2. Defendants stated that they implemented the Patient Centered Care Model (PCCM) at 9 units across different complexes, as ordered by the Court. This is not true. Defendants have *begun* implementation, but at most of the units that implementation is at its infancy, with critical components of implementation absent. Among those critical components that are not yet fully in place at all 9 facilities are:

- assigning a primary therapist (PT) and/or primary care provider (PCP) to every patient on the caseload
- when a PT is assigned, having the assigned PT function as such, and not assigned on paper only, with therapy visits being conducted by other – sometimes multiple – therapists
- establishing PCCMs teams as designed and ordered by the Court, to include
    - assigning nurses to the medical teams
    - assigning psychiatric nurses and behavioral health technicians to the mental health teams
- assigning complex medical patients to physicians, not nurse practitioners or physician assistants
- shifting the roles of the practitioner and nurse, instead of continuing to use nurses to manage triaging of requests from patients for new problems (HNR; Health Needs Request) and continuing to practice primary care independently (see paragraph 1 above)
- creating adequate clinical and office space
- hiring the staff required by the Court-ordered staffing model, to include front line staff as well as the full complement of ADCRR's Health Services Division (HSD) staff needed to lead implementation of the PCCM statewide.

3. The Court asked Defendants about financial sanctions it has imposed on its health care vendor, NaphCare, for failure to perform according to its contract. Defendants provided the Court with a list of all financial sanctions imposed on the vendor since the inception of the Injunction, as of their filing on September 22, 2025. Total sanctions were $1,424,900. Of this, $645,000 was for 4 errors in patient care and 1 failure in a patient care process. The remainder appears to be for vacancies in mental health staff and failed inventory audits. Despite vacancies in mental health staff that existed consistently during the 28 months in question, Defendants only sanctioned NaphCare for vacancies that existed during 9 of those 28 months. Defendants did not sanction NaphCare for vacancies in medical staff during any month.

The following is a partial list of monetary sanctions that ADCRR *can* impose on NaphCare (Solicitation Amendment No. 20).

| | |
|---|---|
| Failure to provide comprehensive healthcare services coverage twenty-four (24) hours per day, seven days per week at each Arizona State Prison Complex, excluding a declared state of emergency recognized by the Department. | $100,000 per occurrence. |
| Non-compliance identified or discovered, during an audit or any other monitoring activity, whose gravity or severity cannot be mitigated by the Contractor's ability to bring its performance back into compliance at a future date. | $10,000 per occurrence, not to exceed $250,000 per finding of non-compliance per day. |
| Misrepresentation or falsification of information provided to the Department or NCCHC. | $10,000 per occurrence, not to exceed $250,000 per finding of non-compliance per day. |
| Failure to comply with any other contract requirements or NCCHC Standards not identified elsewhere in this exhibit. | $10,000 per occurrence, not to exceed $250,000 per finding of non-compliance per day. |

Based on this list and our analyses of health care provided to ADCRR patients under the NaphCare contract (as captured in our 3 interim reports to the Court), the 5 errors for which Defendants have sanctioned NaphCare amount to a small percentage of the errors for which monetary sanctions could have been levied. As such, we estimate that the $1.4 million in monetary sanctions is a small fraction of the monetary sanctions that ADCRR *could have* imposed on NaphCare for failures to provide comprehensive healthcare services, misrepresentation or falsification of information in the EHR, or other non-compliance with contractually required (and, by extension, Injunction-required) performance.

4. Defendants highlighted that they have increased staffing levels. They have. There are two flaws in their characterization of that increase, however. First, at least one of the data points they report – staff physician FTE – is incorrect. Defendants report that they currently engage 15.3 FTE staff physicians. In fact they only engage no more than 11 FTE. Second, Defendants focus on informing the Court where they *are* compared to where they *were*. We believe that the focus should be on where they *are* compared to where they *should be*. It is this latter comparison which is much more determinative of patient safety and led us to the conclusion that staffing remains dangerously inadequate.

5. Defendants addressed the issue of board certification of physicians. The Injunction requires that all medical physicians be board certified or board eligible in Family Medicine or Internal Medicine. Many of the non-board certified or eligible physicians currently employed at ADCRR do not have adequate training to safely practice at the level of a physician caring for complex patients. Defendants disagree with this requirement of the Injunction, but do not refute our findings that are based on it. They state that the requirement "prevents qualified, licensed physicians from working in ADCRR." We agree with Defendants that it is possible that from time to time physicians might exist who do not meet the letter of the Injunction

requirements but who meet the intent and therefore merit consideration by the Court on a case-by-case basis. For this reason, when approached by ADCRR about two such physicians last year, we agreed to examine the work of those physicians and, if found acceptable, support a motion by Defendants to allow an exception to the requirement. We did conduct such examinations after which we provided feedback and instructions to ADCRR on next steps. We await further action from ADCRR.

6. Defendants submitted a copy of a consultant's (Falcon) report from April, 2024 along with a description of changes they have enacted since receiving that report. ADCRR should be proud of the improvements they made. However, most of the consultant's recommendations and attendant improvements, while worthwhile, do not relate to the Court's Injunction regarding health care, or do so in a very indirect manner.[1]

7. Defendants reiterated the successes they have accomplished in 3 disease-specific areas, *viz.,* Substance Use Disorders (SUD), Hepatitis C, and Tuberculosis (TB). We have already analyzed these areas in our 3rd Interim Report, recognizing ADCRR's accomplishments as well as their limitations. We will not reprise that discussion here, other than to note again that Defendants' discussion ignores the significant shortcomings of these programs that we have described. For example, their description of their SUD program as "another success story" belies the fact that Defendants are compliant with only 3 of 7 requirements of the Injunction and have made little progress (and in fact may have regressed) in the treatment of Alcohol Use Disorder. (See further discussion of problems within the opioid component of the SUD program in paragraph 8 below.) As another example, while the Defendants are correct in stating that we found them compliant with the sole Injunction provision related to TB (that newly admitted residents are screened for TB), in our discussion of that provision in our 3rd Interim Report, we described 7 ways in which treatment of TB at ADCRR remains unsafe and dangerous.

8. In our 3rd Interim Report we found the Defendants are not compliant with the Injunction's requirement to provide medications to treat opioid use disorder. Defendants took issue with 2 of the 8 concerns that we articulated about the treatment program.

One of those concerns was that some patients are started on the wrong dose of medication, which can be dangerous. Patients who are not current taking illicit opioids at the time they start treatment require lower doses of medication to prevent side effects because they are more sensitive to (i.e., less tolerant of) the medication, whereas patients who are currently taking

---

[1] For example, ADCRR reported: "ADCRR provides targeted support for its staff members who are in the military and return to work from deployment. ADCRR has re-established the Military Liaison program, and we are currently re-vamping policy related to our military staff, including having an assigned military liaison with expansive knowledge of community resources and the unique needs of our military staff." and "[ADCRR's Strategy, Sustainability, and Research Division] produces public-facing reports such as the Monthly Data Report and End of Monthly Interactive Demographics Dashboard (see https:/corrections.az.gov/datareports). These reports utilize data from agency systems on our population, programming, medical and mental health, restrictive housing, and other areas of interest to stakeholders."

illicit opioids, and are therefore less sensitive to the medication, require higher doses for it to be effective. In his declaration, Dr. Daniel Pacheco, NaphCare's Regional Medical Director for the ADCRR contract, confirmed that they are, instead, using the same starting dose for all patients, regardless of patient need. Their justification for a "one-size-fits-all" treatment approach is, in essence, that they have to treat a large number of patients. The size of the population at ADCRR needing treatment for opioid use disorder is not a reasonable justification for inappropriate care for the disorder…nor would it be for diabetes, seizure disorder, or any other chronic disease. Not only is ADCRR's practice, as described by Dr. Pacheco, unsafe and not consistent with the standard of care, it patently violates ADCRR's own policy regarding medication dosing for opioid use disorder.[2]

Another of our concerns was that many of the events that ADCRR documents as "refusals" of treatment for opioid use disorder are, in fact, not. We discussed ADCRR's failure to obtain informed consent at length in our 3rd Interim Report; Defendants provide no information in their response to alter our findings.

9. The Injunction (paragraph 2.4.1) specifies 12 parameters of health care that ADCRR must monitor as part of their continuous quality improvement programs and that they should have been monitoring for the last 2 years. Defendants stated that they have begun monitoring 4 of these 12 parameters. As we discussed in our 3rd Interim Report, despite repeated feedback to ADCRR, no data that ADCRR has shared with the monitor reveals that it is conducting any meaningful continuous quality improvement on even these 4 parameters, no less the other 8.

10. The Defendants stated that our 3rd Interim Report "provides for the first time a detailed review of healthcare Injunction requirements, the methodology for determining compliance, and a critique of ADCRR's performance on each." This statement is patently incorrect. We have been providing such feedback, heavily, in formal reports, in informal documents, and – over hundreds of hours – orally, since the inception of the Injunction (if not before). We have also offered numerous additional meetings with HSD staff to assist ADCRR with reviewing and understanding the requirements of the Injunction and our methodology, but have had those offers declined.

11. In response to our findings regarding mortality reviews, Defendants noted that "In 2025 alone, the Mortality Review Committee (MRC) has made several recommendations for corrective action; some have already been implemented and others are still in progress. Pacheco Decl. ¶¶ 9–11." In his declaration, Dr. Pacheco listed the 5 recommendations that the MRC generated in 2025 (Pacheco Decl., paragraphs 9(a) through 9(e)). We discuss each below.

---

[2] "Patients with a tolerance to opioids may start at 4mg/1mg once daily, then increase to 8mg/2mg as clinically indicated. Patients who no longer have a tolerance to opioids should start at a lower dose (e.g., 2mg once daily)." (ADCRR Clinical Practice Guidelines, Chapter 1100, Department Order 1101 at 63)

5

9(a) The MRC recommended that (1) patients with high-risk cardiac events or acute complications of chronic diseases should be immediately referred to higher levels of care and (2) emergency department follow-up recommendations must be consistently implemented. We agree with these recommendations as starting points. However, the review and improvement plans that should have flowed from these recommendations were wholly inadequate, and, as demonstrated by ADCRR's own history, resulted in being useless:

- Much of the remediation consisted solely of a series of staff trainings, which as noted in the Injunction, is not a sustainable change.
- The remediation still relies on nurses to recognize when someone is at high risk, rather than ensuring the involvement of practitioners for ALL cases of chest pain and having the practitioner also be responsible to ask about high risk-factors when reviewing emergent cases.
- The initial improvement project was only conducted at ASPC Eyman. There was no explanation for limiting the project to that complex, while there is every reason to believe the factors leading to the errors exist at multiple complexes. Indeed, a similar issue arose at Perryville 2 months later.
- The improvement project failed to collect any data to show if the project was resulting in any improvement. As we have counseled ADCRR on multiple occasions, monitoring a remedial plan is of critical importance for assessing whether the plan worked or needs to be retooled.
- Finally, recommendations related to this *same* issue were made in response to deaths in January, March, and July of 2024. Despite this, the same errors were identified in a death in January, 2025, demonstrating the lack of usefulness of the previous mortality reviews and resultant recommendations and remedial plans.

As to the second part of the recommendation – that emergency department recommendations should be implemented – this cannot reasonably be considered a new finding emerging from a 2025 mortality review. Indeed, it merely repeats a requirement of the Injunction: "9.1. Defendants shall adopt and perform off-site orders from outside providers as soon as the records are available, unless a clinically appropriate basis exists to alter or forgo the off-site orders."

9(b) The MRC recommended development of a procedure for initiating anticoagulation (blood thinning) medications. However, based on the documentation provided to us by ADCRR, Defendants subsequently decided a procedure was not needed.

9(c) "The [MRC] determined that practitioner orders must be recognized as controlling orders, not merely authorization requests. All follow-up recommendations from off-site appointments, ER visits, hospital discharges and other off-site medical

6

care are reviewed immediately upon return and orders placed and documented." As with one of the findings in 9(a) above, this recommendation cannot reasonably be considered a new finding first "determined" in 2025 following a death as it merely repeats a requirement that existed in the Injunction since its inception in April, 2023: "8.6: The ordering practitioner's order is the controlling order and is not merely a request for authorization."

9(d) Dr. Pacheco stated that "The [MRC] made recommendations that discussion of resuscitation status, end-of-life wishes, and durable power of attorney should be documented for all patients admitted to Skilled nursing unit (SNU) or Infirmary (IPC). Annual physical examinations should include documentation of advance directive discussions, with enhanced protocols for patients in dementia and aging populations regarding care preferences." These recommendations can indeed result in practices that improve health care. Although changes were made to the electronic medical record to identify a patient's Do-Not-Resuscitate status, ADCRR has not made any other changes to policy to implement these recommendations.

9(e) Dr. Pacheco stated that "The [MRC] recommended that medical and mental health evaluations should be conducted prior to detention or alternative placement decisions, with improved coordination between medical staff, emergency services, and external healthcare providers, and enhanced quality of care referral processes for external
facilities." Dr. Pacheco indicated that "Transition-of-care protocols with emergency medical services were developed." This is good, but addresses only a part of the MRC's recommendations; he provided no evidence that the other parts of the recommendation have been addressed.

12. In our 3rd Interim Report, we stated that the forms that "ADCRR considers patient refusals are not; they are nothing more than meaningless signatures on a piece of paper." Defendants took issue with this, arguing that "a signed refusal is evidence of a patient's intent regarding his or her own care."

Defendants misinterpreted our statement and the 7-page explanation that accompanied it. Their argument applies correctly to a patient signature on a refusal form if that was obtained at the culmination of a properly executed interaction between the patient and their health care provider. In those cases, of course the signature is evidence of the patient's intent. But when the signature appears, absent such an interaction (and at times the patient not even aware what was being refused) – as happens too often at ADCRR – the signature is meaningless, if not also falsified or misleading.

13. Defendants are critical of our approach to monitoring for at least the following reasons: that it is "subjective," that our findings are "binary," and that we expect "perfection."

We agree that some of our methodology is subjective. But "subjective" is not a shameful word. Every judicial decision is subjective. Many of the paragraphs of the Injunction require – by design – subjective decisions. Further, it is an approach that the parties agreed to. "Subjective" is *not*, however, synonymous with "biased." Subjective determinations can still be made using scientific criteria, which is what we strive to do.

We also agree that our findings are binary. That is exactly how this and every other carceral health care injunction we aware of is structured: Compliant/Non-compliant. It is, by design, binary.

Finally, we do not agree that we expect perfection. In fact, we specifically stated just the opposite in our 3rd Interim Report:

> In determining compliance, we focus on the core purpose of the requirement and its potential impact on patient safety, i.e., risk, and whether ADCRR has met that core purpose. We are acutely aware that in a prison health care system as large and complex as the one in Arizona, *it will never be possible to be perfect at all things at all times*. Thus, in assessing compliance, we strive to also make a determination of the "largeness" of significant risk when ADCRR's performance is very good, but imperfect, due to deviations from what is required. To do so we take into account several factors:
>
> - How frequent are the deviations?
> - What has been the pattern of deviations over time? For example, are deviations rare events? Has the level of performance been consistently getting better over time?
> - What is the impact of a single deviation on risk of harm? For example, a glitch in interpreter services for a routine clinic visit of a non-Anglophone who speaks some English might not carry the same risk as discovering that critical resuscitation equipment is missing from the emergency response kit.

(emphasis added).

14. Defendants noted that on certain requirements of the Injunction there are differences in our findings of compliance between our 2nd and 3rd Interim Reports. They characterize these differences as "discrepancies" or "contradictions." This characterization would make sense if compliance/non-compliance were a static concept (i.e., once compliance is achieved, Defendants are deemed to be compliant for all time). It is not. Compliance is dynamic, describing performance at a point in time. Our statement of ADCRR's compliance or non-compliance with a given requirement is a statement of how Defendants were doing *at the point in time* we assessed it.

Having provided this general explanation for month-to-month (and report-to-report) differences in compliance levels, we address some of the specific Injunction requirements cited by Defendants.

8

Paragraph 15.8 of the Injunction addresses the continuation of non-formulary[3] psychotropic medications that a patient was on in the community upon admission to ADCRR. Defendants did not understand how they could be found compliant in our 2nd Interim Report and non-compliant in our 3rd Interim Report. They also did not understand how we could state that they "continue" to be non-compliant as of the 3rd Interim Report given our finding of compliance in the 2nd Interim Report.

Our ability to determine compliance with this requirement rests on perusal of the formulary. We had requested a copy of the formulary just prior to producing the 2nd Interim Report but had not yet received it by publication date. Given the short amount of time we had given ADCRR to provide a copy of the formulary, we felt it was fairer to give ADCRR the benefit of the doubt by endorsing ADCRR's internal audit that found that ADCRR was performing well. Thus our 2nd Interim Report found ADCRR compliant. However, when still not having received the formulary during preparation of the 3rd Interim Report, and unable to make a determination of compliance, we found them non-compliant.[4]

While our stating that the Defendants were compliant with this requirement in our 2nd Interim Report was therefore generous, because we did so then and stated in our 3rd Interim Report that they are non-compliant, we agree with Defendants that our use of the term "continues" ("continues to be non-compliant") was confusing. It would have been better to state in our 3rd Interim Report that Defendants' compliance with this requirement of the Injunction deteriorated.

Paragraph 2.1.3 of the Injunction addresses the need to make changes to any initial post-mortem quality improvement plans, if, based on the subsequently received medical examiner's report, changes are necessary. Similar to paragraph 15.8, Defendants did not understand how they could be found compliant in our 2nd Interim Report and non-compliant in our 3rd Interim Report. As noted above, compliance is a point-in-time determination. In months in which the medical examiner reports that were received do not contain any unexpected or additional findings that would warrant any changes to the initial mortality review, we would find them compliant by default. That was the case for the month of September, 2024 (captured in our 2nd Interim Report), but not February, 2024 (captured in our 3rd Interim Report).

Paragraph 11.3.6c/d of the Injunction addresses provision of medication treatment for Alcohol Use Disorder and continuity of such treatment if a patient transfers to a new facility. We found Defendants compliant in our 2nd Interim Report and non-compliant in the 3rd Interim Report. Similar to paragraph 15.8, Defendants did not understand how compliance could change. Defendants' confusion is due, in part, to an error on our part. In fact, Defendants were not compliant at the time of our 2nd Interim Report, but we reported them as compliant due to a clerical error.

---

[3] The formulary is the list of medications practitioners can prescribe without obtaining prior approval.
[4] Since then Defendants have provided us with a copy of the formulary.

> Paragraphs 1.3, 15.5, and 16.9.9 of the Injunction address timeliness of mental health follow-up appointments, initial medical evaluation of patients who are not on the mental health caseload but present with mental health symptoms, and when possible avoiding transferring patients out of their facility when they suffer a mental health crisis, respectively. Defendants were confused by our characterization of their fulfillment of these requirements as "continu[ing] to be non-compliant" when comparing our findings in our 2nd Interim Report (when all 3 were rated as compliant) with our findings in our 3rd Interim Report (when all 3 were rated as non-compliant). Defendants are correct. If one limits the comparison between only those two points in time, it would have been better to state in our 3rd Interim Report that Defendants' compliance with these 3 requirements of the Injunction deteriorated.

15. Defendants are critical of our grouping of certain requirements in our 3rd Interim Report because it is not identical to the grouping in our 2nd Interim Report and that these changes in grouping reflect lack of transparency.

Defendants are correct that some groupings have changed. In our monitoring work and design of the self-monitoring tools for ADCRR, we have strived to make it as easy as possible for ADCRR to self-measure and to be successful with fulfillment of the Court's requirements. That sometimes leads us to parse out a given requirement into subsidiary components. As ADCRR gains experience with the tools, it makes sense to reunite those components back into the single original Injunction requirement to provide a simpler and clearer picture of compliance.

We disagree that any change in grouping makes the process opaque. In fact, in the example they provide in their critique (Injunction paragraph 16.1), Defendants provided clear evidence that we were indeed transparent. Paragraph 16.1 requires timely and complete mental health assessments for new patients entering ADCRR. In the past we had reported the 2 components separately[5]. In our 3rd Interim Report we reported a single finding (non-compliant). Reflecting our transparency, Defendants wrote "The Monitors [declared the Department wholly out of compliance with both provisions] even though they acknowledge that 'ADCRR staff are fairly timely in meeting with patients soon after arrival.'"

Ultimately, a change in grouping has no impact on actual compliance nor does it impact Defendants' ability to operationalize the Injunction; it is just a way to display the results in the clearest manner at the moment.

---

[5] Logically, this should be reported as a single finding. In our previous report we reported the 2 components separately (16.1a: timeliness of the encounter; 16.1b: clinical completeness of the encounter) to give ADCRR the benefit of the doubt that they were using the intake mental health encounter as only a screening and not counting it as the comprehensive mental health evaluation required in other parts of the Injunction (e.g., 16.3.1.1). By parsing the requirement into its 2 components, we were able to give ADCRR credit for being compliant with at least one of the components, i.e., 16.1a, timeliness. However, ADCRR has continued to use this initial brief screening as evidence that they have met the criteria for other provisions requiring the full evaluation. As a result, ADCRR having had more than enough time and feedback to correct this issue and not having done so, it was no longer logical for us to continue parsing 16.1 into 2 components. Indeed, for us to report to the Court that the wrong encounter is being done on time is not useful information. Thus our 3rd Interim Report provides a single metric for ADCRR's compliance with Injunction paragraph 16.1.

16. In our 3rd Interim Report we found Defendants not compliant with Injunction paragraph 1.1a that addresses the appropriateness of emergency care for medical problems. We also noted that Defendants' data collection methods for assessing this requirement were incomplete, i.e., failed to identify relevant cases of emergency care. Defendants believed we were incorrect and that their methods are complete. We appreciate the Defendants' comment and will review Defendants' methods with them. However, even if our notation about methodology in the report is incorrect, it has no bearing on our finding of non-compliance; according to Defendants' own results using their current data collection methodology, about half of all emergency medical care is inappropriate.

17. In assessing Defendants' compliance with Injunction paragraph 1.22c that addresses timeliness of follow-up care, Defendants asserted that we made an error when calculating the number of patient appointments with nurses or practitioners that were backlogged a week or more. Defendants are correct. We miscalculated that 123,403 appointments were backlogged; the correct number is 61,479. This correction of our error, however, does not alter our findings. Such a tremendous backlog is still dangerous.

18. Injunction paragraph 1.8 requires (among other elements) that (1) all equipment, supplies, and medications in the bags used for emergency responses are available and in order and that (2) there is a log that reflects that this is checked daily. We have been monitoring element (1) by reviewing on-site inspections conducted by HSD staff. We have been monitoring element (2) by reviewing the daily log filled out NaphCare staff attesting to the completeness of the bags. When initially recognized that there was a mismatch between records of element (1) and (2), we informed ADCRR in writing and by phone of our serious concern. We interpreted the records as showing that while NaphCare staff, on a daily basis, were documenting that everything was in order, when HSD staff actually checked the physical materials themselves, everything was not in order, suggesting the troubling possibility that NaphCare documentation was misleading.

We discussed our concern regarding the veracity of NaphCare's documentation in our 2nd Interim Report (December, 2024) where we also documented having raised this concern with ADCRR more than a year earlier. In their September, 2025 comments on our 3rd Interim Report, Defendants inform us – for the first time – that element (2) does not consist of a physical check of the contents of emergency response bags, but rather simply a check that the bags are present and locked with a tamper-proof seal.

While this is information that ADCRR should have provided to us when we raised this concern almost 2 years ago, based on the information, it is appropriate for us now to retract our concern about the veracity of NaphCare documentation as expressed in our 3rd Interim Report.

However, this information raises a new concern. ADCRR does not have an effective procedure to assure that emergency response bags are complete at all times: Bags are sealed without first confirming that they are complete.

Finally, regardless of our now-resolved concerns about documentation, nothing in this entire discussion alters the finding in our report that Defendants remain non-compliant with the important Injunction requirement that staff have available to them, at all times, the equipment, supplies, and medications they need to respond to medical emergencies.

19. Injunction paragraph 4.4 includes a requirement that when ADCRR receives patient test results and reports, clinicians review these within 4 business days of receipt. One of our criticisms of ADCRR's methodology in self-assessing this requirement was their failure to include any reports received prior to the monitored month. Defendants disagreed with that criticism, asserting that they were only required to review reports that were received during the monitored month. Defendants are correct. While it is important to review reports received in previous months[6] – something we review as part of our monitoring – we have not, up to this point, directed Defendants to do so. We therefore retract that criticism from our report. Regardless of this retraction, however, our finding of non-compliance is unchanged.

20. In our 3rd Interim Report we discussed the death of Patient 21 ("Death 2"). Upon discharge from the hospital, the hospital specialists instructed ADCRR physicians to discontinue the patient's aspirin because they had started the patient on 2 other blood thinners. The reasoning behind such an instruction is that the combination of these 3 blood thinners, all taken at the same time, dangerously increases the risk of bleeding. Upon return to ADCRR, ADCRR continued to administer aspirin to the patient for another 10 days, when it was finally discontinued.

In our 3rd Interim Report we criticized ADCRR for the above serious error in care. We also criticized ADCRR because during the Mortality Review that was conducted following Patient 21's death, the Mortality Review Committee (MRC) failed to notice this obvious and serious error. As a result, ADCRR also failed to investigate why it happened or develop a remedial plan that would prevent the next patient from being exposed to this significant risk of harm.

In the Defendants' response to our 3rd Interim Report, Dr. Embrey, the corporate medical director for NaphCare, disagreed with our report on two grounds. **First**, he stated that staff *did* make an attempt to stop the aspirin, but due to another error in care (such that the attempt did not reach the patient), he agreed that the patient received a "short course" of aspirin. Dr. Embrey thus confirmed that the aspirin was not stopped as intended. Further, notwithstanding Dr. Embrey's labeling this as a "short course," the patient was at significant risk for the 10 days he was receiving aspirin plus several more days until the effect of the aspirin wore off. **Second,** Dr. Embrey argued that aspirin does not actually increase the risk of serious bleeding. We find this argument unpersuasive for three reasons: (1) Discontinuation of aspirin was the recommendation of the specialist to whom Dr. Embrey's team referred the patient, i.e., the recommendation came from someone Dr. Embrey's team considered to have expertise beyond the expertise of the team. (2) Dr. Embrey's own physicians eventually discontinued the aspirin, meaning that they believed discontinuation was clinically necessary. (3) Dr. Embrey supported his argument with reference to an article in the medical literature.

---

[6] Arguably it is even more important to review such reports because if one of these reports has not yet been reviewed by the clinician, the delay is, by definition, even longer than for reports from the current month and therefore poses an even greater risk to patient safety.

Unfortunately, the article he cited is not on point with the issue at hand and therefore is not relevant to the argument. The article addresses different clinical scenarios than the scenario of Patient 21[7].

In summary, our conclusions remain the same.

21. In our discussion of the same Patient 21, we criticized ADCRR for failing to appropriately manage the patient's dangerously elevated blood pressure (typically requiring immediate hospitalization), an elevation that we labeled as "malignant hypertension." Dr. Embrey argued that (1) "hypertensive emergency" is a more up-to-date term for malignant hypertension, and that (2) Patient 21 did not have a hypertensive emergency, but rather a less severe form of hypertension called a hypertensive urgency, for which hospitalization is not necessary and for which the patient received appropriate care.

With regard to (1), we agree with Dr. Embrey that hypertensive emergency is a more commonly used term and stand corrected.

We do not agree with Dr. Embrey's second argument for a very simple reason. The only way for clinicians to have determined that the patient was only experiencing a hypertensive urgency, not emergency, at that moment, would have been by doing further examination and testing. No such examination or testing was conducted. Thus the patient was having a hypertensive emergency (unless or until proven otherwise), for which ADCRR's management was dangerously inadequate.

In summary, nothing in Dr. Embrey's analysis of this issue would lead us to change our conclusion other than using a newer term for the condition at hand.

22. In our 3rd Interim Report we discussed the death of Patient 22 ("Death 3") from metastatic lung cancer. At a certain point an x-ray showed that patient had a cancerous lesion in the brain that was expanding and that required emergency surgery. We criticized ADCRR for the serious error in care of failing to appreciate the urgency of this situation as soon as a clinician reviewed the written x-ray report or received communication by phone call and fax from the radiologist.[8] We also criticized ADCRR because during the Mortality Review that was conducted following Patient 22's death, the MRC failed to notice this obvious and serious error.

In the Defendants' response to our 3rd Interim Report, Dr. Embrey disagreed with our report on two grounds. **First**, he argued that no phone or fax communication was received from the radiologists' office and in the absence of such notification there would be no reason for a provider to immediately review the report of an x-ray that had been ordered as a "routine" test. Dr. Embrey is partially correct. The radiologists' critical results team made 7 attempts to reach someone at ADCRR using the contact information ADCRR provided to the radiologist

---

[7] The article referenced by Dr. Embrey deals with patients on 2 blood thinners, not 3, which is quite a different clinical scenario with different (lower) risk of bleeding.
[8] According to the radiologist's written x-ray report, in addition to the x-ray report, the radiologists' "critical results team" was going to notify ADCRR staff by phone and fax of the serious x-ray finding.

in the referral, but was unable reach anyone at ADCRR. The critical results team did send a fax. And Dr. Embrey is also correct in stating that there would be no reason for a provider to rush to review the results of a routine test. However, a clinician *did* review it; an ADCRR clinician documented having reviewed the radiologist's consultation note the day after the patient returned, but the clinician failed to take appropriate (emergent) action. **Second**, Dr. Embrey argued that we were incorrect in stating that the patient required emergency surgery as evidenced by the fact that when he finally was sent to the hospital, non-surgical care was provided. The logic flaw in this argument is that the fact that the patient *received* non-surgical treatment does not mean that emergency surgery was not the appropriate first treatment, nor that an emergency did not exist. The patient was offered emergency surgery, but chose non-surgical care instead (which was delivered emergently).

In summary, nothing in Dr. Embrey's analysis of this issue would lead us to change our conclusion. If anything, his analysis strengthens our conclusion that the ADCRR's Mortality Review process failed: The Committee should have uncovered – and should have been highly concerned that – the radiologists' critical response team never reached a clinician at ADCRR despite 7 attempts. This, in turn, should have led ADCRR to fix any gaps in its communication process such that an error like this would not happen again.

23. In our 3rd Interim Report we discussed the death of Patient 23 ("Death 4"). Dr. Embrey asserts a number of disagreements with our findings, including a disagreement about the cause of death. We did not find merit to any of his arguments, but even if we did, none of the points would alter our conclusions that there were avoidable delays in the care of the patient, that those delays erased any chance he had to survive, and that despite multiple errors in care, ADCRR's MRC failed to identify any of them.

24. In our 3rd Interim Report we discussed the death of Patient 24 ("Death 5") who died in July, 2023, in part due to an influenza infection. We identified two errors in care, one of which was ADCRR's failure to offer the patient vaccination for influenza months prior to his death, compounded by the MRC's failure to identify and attempt to remedy either error.

Dr. Embrey argued that because the patient was admitted to ADCRR in February, 2023 (before the Injunction was initiated in April, 2023), (1) the case is out of scope of *Jensen,* and (2) it would have been dangerous to administer influenza vaccine to him in February when he arrived, or in April when the Injunction was implemented, because the vaccine was outdated at that point.

With regard to his first argument, although we agree that the patient entered the system prior to the implementation of the Injunction, the MRC meeting that examined his death occurred after the Injunction was in place; it is that review process that we assessed. Thus it rightfully fell within the purview of the Court.

With regard to his second argument, February, March, and April are *not* outside the window for administration of seasonal flu vaccine. According to CDC guidance, vaccination can continue as late as May.

Our conclusions remain the same.

25. In our 3rd Interim Report we discussed the death of Patient 25 ("Death 6") who died from metastatic liver cancer in the setting of advanced liver disease from hepatitis C and alcohol use. We identified 3 errors in care, 2 clinical and 1 administrative, all of which were ignored by ADCRR's MRC. Dr. Embrey argued on clinical grounds that the first 2 errors were in fact not errors but appropriate care. We did not find merit to his arguments.

The first clinical error we identified was that ADCRR failed to screen the patient for liver cancer, despite his high risk for it. Dr. Embrey pointed out that he believed the patient *was* screened for liver cancer because he underwent a CT scan without contrast[9].

While we agree that the patient underwent a CT scan without contrast, this test is not an adequate screening test for liver cancer and as such could (and very possibly did) miss the growing cancer.

The second clinic error we identified was that a non-physician practitioner inappropriately referred the patient on an "urgent" basis (i.e., within 30 days) for a procedure to remove the fluid (ascites) that had accumulated in his abdomen due to cirrhosis, via a needle through the abdominal wall (paracentesis). Dr. Embrey disagreed with our assertion because by the time the patient was evaluated, he had a tense abdomen from the large volume of fluid and that removal via a needle was required.

Dr. Embrey's analysis is in error and not consistent with the current standard of care. Our assertion was that because paracentesis is not without risks (such as infection), the procedure should only be done after maximal efforts to reduce the fluid collection using oral medications and diet have failed. ADCRR had not yet provided those maximal non-invasive efforts.[10,11]

The administrative error we identified was that the paracentesis was ordered on July 12, 2023 as urgent (i.e., to be complete within 30 days) appeared in the patient's medical record to be scheduled to take place on December 4, 2024, more than a year and a half later (after the patient's death on July 23, 3023). Dr. Embrey pointed out that the test was completed timely (not in response to the order but in the course of treatment while he was an inpatient in the hospital). The appointment for December 4, 2024 appears to be a glitch in the electronic

---

[9] A CT scan is a type of x-ray. It can be performed on a patient as they are ("without contrast"), or as they are, and then after intravenous injection of a dye that highlights blood vessels ("with and without contrast").
[10] Most notably the patient was only on 40 mg of one of the medications used to reduce his abdominal fluid (furosemide, maximal dose 160 mg) and 50 mg of the other medication used for that purpose (spironolactone, maximal dose 400 mg), without any evidence of side effects. The doses of these medications can be increased as often as every 3 to 4 days.
[11] If we misunderstood and Dr. Embrey was instead arguing that the practitioner was correct in ordering an "urgent" paracentesis on July 12 because the patient was too uncomfortable from the accumulation of fluid and there was not enough time to wait for increases in medication to take effect, then his argument is still flawed. If time was of the essence, then the practitioner should have ordered the paracentesis to be performed within the next few days, not within a month.

15

health record scheduling system that resulted when the original request was cancelled because the patient was no longer in custody.

We accept Dr. Embrey's explanation that there was a different error than the one we described in our report. However, the MRC should still have identified the actual error (in this case an error with scheduling software) and have planned a remedy. It did not.

Our conclusions remain the same.

26. In our 3rd Interim Report we discussed the death of Patient 28 ("Death 7"). We asserted that the patient died from bleeding due to a perforated stomach ulcer. One of our criticisms of the care provided by ADCRR was that there was evidence of bleeding (according to a blood test that showed an abnormally low blood count) in the days before his terminal hospitalization, that was missed by staff, and that had a competent provider reviewed his blood test in a timely manner, the patient likely would not have died.

Dr. Embrey disagreed with our assertion, asserting instead that the patient died of other complications of the perforated stomach ulcer (infection and shock).

Dr. Embrey is correct and we stand corrected. We erred in our determination of the patient's cause of death, which also means that whether or not a provider had reviewed the blood test in a timely manner would likely not have impacted the outcome.

However, our conclusion – that ADCRR's Mortality Review process is flawed – remains unchanged. While the failure of ADCRR to review the blood test in a timely manner did not play a role in this patient's death, it might in another patient's case, putting that patient at significant risk. Thus, it should have been identified by the MRC as an error so that it could be analyzed and remediated. It was not.

27. In our 3rd Interim Report we discussed the death of Patient 29 ("Death 8") who died from complications of surgery in July, 2023. The patient suffered a ruptured diverticulum of the colon in January, 2023. He had been experiencing signs and symptoms consistent with this serious problem with the colon, but was grossly mismanaged by ADCRR nurses and practitioners. He underwent surgery during which a colostomy was created (a diversion of the colon to a bag worn on the abdomen). In July, 2023 he underwent an elective procedure to remove the bag and reconnect his colon to its original functioning. He died during that elective procedure.

Dr. Embrey argued that surgical treatment of diverticulitis is a common procedure and results of treatment are excellent with low mortality rates. From this information he concluded that the delay in sending the patient to the hospital in January had no impact on the patient's death.

Unfortunately, Dr. Embrey misses the point of our discussion of the case: If not for ADCRR's mismanagement of the patient in January, he likely would not have needed the elective surgery in July from which he died.

In any case, none of this changes our conclusion that ADCRR's Mortality Review process is flawed. The Committee did find that the patient's symptoms in January were not managed properly, but failed to take any meaningful steps to remedy the cause(s) of that mismanagement. That the Mortality Review process is flawed is further shown by 3 subsequent deaths in 2023 and 2024 associated with the *same* clinical mismanagement. In other words, the specific problems with clinical care that led to Patient 29's death had still not been analyzed and remedied.

Respectfully submitted,

Marc F. Stern, MD, MPH
Lead Monitor,
On behalf of the Court Monitors
Dr. Bart Abplanalp, PhD
Mr. Scott Frakes
Dr. Karie Rainer, PhD
Dr. Lara Strick, MD, MS