Mary R. O'Grady, 011434
Andrew G. Pappas, 034432
John S. Bullock, 034950
Kimberly I. Friday, 035369
Molly S. Walker, 038099
OSBORN MALEDON, P.A.
2929 North Central Avenue
Suite 2000
Phoenix, Arizona 85012-2793
(602) 640-9000
mogrady@omlaw.com
apappas@omlaw.com
jbullock@omlaw.com
kfriday@omlaw.com
mwalker@omlaw.com

Attorneys for Defendants

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, et al., | No. CV-12-00601-PHX-ROS |
| Plaintiffs, | |
| v. | **DEFENDANTS'** |
| | **MOTION TO MODIFY INJUNCTION SECTION 6.4** |
| Ryan Thornell, et al., | |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 60(b)(5) and the Prison Litigation Reform Act ("PLRA"), Defendants move to modify § 6.4 of the Court's April 7, 2023 Order and Permanent Injunction ("Injunction") (Doc. 4410). Specifically, § 6.4 should be modified to allow Defendants to (1) hire and employ physicians licensed in the State of Arizona who are not board-certified or board-eligible in the areas of Internal Medicine or Family Practice; and (2) retain three existing medical directors who are not board-certified in Internal Medicine or Family Practice.

As matters stand, § 6.4 requires (with limited exceptions) that "[a]ll medical physicians . . . shall be board certified in Internal Medicine or Family Practice, or board eligible if within 7 years of their completion of an ACGME approved residency in one of

these 2 specialties." (Doc. 4410 at 25, § 6.4.) This requirement makes it unnecessarily difficult for Defendants to hire and retain physicians and thus exacerbates the healthcare-delivery problem the Court's Injunction aimed to solve. Similarly, § 6.4.1 requires that "medical directors, shall be board certified [in Internal Medicine or Family Practice] at hiring and during employment." (*Id.*) Yet the Court made no specific factual findings to support § 6.4's requirements. And contrary to the PLRA, § 6.4 is neither the narrowest nor least intrusive means of remedying the Eighth Amendment violation the Court previously found.

Since April 2023, NaphCare has received applications from 62 physicians who were not board certified or board-eligible in Internal Medicine or Family Practice, but were otherwise qualified to serve as staff physicians or medical directors at Defendants' facilities. (Declaration of Donna Dowling attached hereto ("Dowling Decl.") at ¶ 14.) Nine applicants were board certified in Emergency Medicine. (*Id.* at ¶ 15.) Eight others were board certified in specialties other than Emergency Medicine. (*Id.* at ¶ 16.) Fifteen applicants had previous experience as medical directors or staff physicians in correctional facilities. (*Id.* at ¶ 17.) None of them were eligible for employment under § 6.4.

Although simply eliminating this requirement would be appropriate, Defendants instead ask that the Court modify § 6.4 to require that only 50% of the full-time equivalent (FTE) staff physicians be board-certified or board-eligible in Internal Medicine or Family Practice, and to permit the three existing medical directors and four existing staff physicians who are not board certified in Internal Medicine or Family Practice to remain in place. This modification should remedy the problems that § 6.4 currently causes insofar as it undermines efforts to hire or retain otherwise qualified physicians.

## BACKGROUND

In June 2022, the Court issued a post-trial order concluding that Defendants were violating the constitutional rights of prisoners in the custody of the Arizona Department of Corrections, Rehabilitation, and Reentry ("the Department"). (Doc. 4335.) In January 2023, the Court issued a Draft Injunction. (Doc. 4380.) The Draft Injunction required that

2

"[a]ll medical physicians–at hiring and during employment–shall be board certified in Internal Medicine or Family Practice, or board eligible if within 7 years of their completion of an ACGME approved residency in one of these 2 specialties, [with limited exceptions]." (*Id.* at 25.)

The Department's contracted healthcare provider, NaphCare, objected to the board-certification requirements in the Draft Injunction on the grounds that they would pose barriers to hiring and retaining additional staff physicians—a critical component of the Court's Injunction. (Doc. 4401 at 9–10.) Defendants do not dispute that all parties ultimately agreed to an Injunction that included board-certification requirements. However, the passage of time has shown that the board-certification requirements are unworkable. The Court-approved staffing plan required 33.9 physicians based on the January 2025 empanelment data. (Doc. 4963 at 9, 75.) As of December 31, 2025, NaphCare employed 14.75 staff physician FTEs. (Dowling Decl. ¶ 6.) With over 60 qualified applicants who were ineligible for employment due to lack of board certification, it has become clear that the board certification requirements are unduly hindering Defendants' attempts to staff their facilities as required under the Court's orders.

As issued, the Injunction forbids the Department's contractor NaphCare from employing physicians or medical directors who are not board-certified or board-eligible in Internal Medicine or Family Practice:

> **6.4.** All medical physicians–at hiring and during employment–shall be board certified in Internal Medicine or Family Practice, or board eligible if within 7 years of their completion of an ACGME approved residency in one of these 2 specialties, with the following exceptions …

> **6.4.1.** medical directors, shall be board certified at hiring and during employment;

> **6.4.3.** physicians who are currently employed and are not board eligible may remain employed for no longer than one year after issuance of this Order.

(Doc. 4410 at 25.)

Since the Court issued the Injunction in 2023, this provision has posed a barrier to hiring. As detailed below, there have not been enough board-certified or board-eligible

3

physicians to meet the Department's need. (Dowling Decl. ¶ 18.) And, if fully enforced, NaphCare would be forced to fire three staff physicians and three medical directors that it currently employs who are licensed to practice in Arizona but do not meet this requirement.[1] (*Id.* ¶¶ 7-8.) Doing so would have a detrimental effect on the Department's ability to provide patient care. (*Id.* ¶ 9.)

At the same time, the Court's findings do not support the board-certification or board-eligibility requirements in the Injunction. Although the Court found that the Injunction as a whole "is narrowly drawn, extends no further than necessary to correct the violation of the constitutional rights of the Plaintiff class and subclass, and is the least intrusive means necessary to correct the violation of the constitutional rights" (Doc. 4410 at 67, § 32), it made no specific factual findings supporting the requirements in § 6.4.

Defendants now move to modify § 6.4 so that: (1) only 50% of the full-time equivalent (FTE) physicians employed by NaphCare must be board-certified or board-eligible in Internal Medicine or Family Practice, and (2) it is permitted to retain three existing medical directors who are not board-certified in Internal Medicine or Family Practice.

## LEGAL STANDARD

Rule 60 allows a court to relieve a party from an order if "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). This is a "flexible" standard, and the Ninth Circuit has directed courts "to take all the circumstances into account in determining whether to modify or vacate a prior injunction or consent decree." *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1256 (9th Cir.1999). "A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order." *Brown v. Plata*, 563 U.S. 493, 542 (2011). Consistent with

---

[1] One of the four staff physicians is board-certified in OB-GYN and works at Perryville. He would not need to be fired, but would not be permitted to continue working as a staff physician.

Rule 60, the Injunction (Doc. 4410 at 9) permits the parties to "petition the Court to modify or annul requirements."

Additionally, the PLRA permits modification of prospective relief before the relief is terminable if it "would otherwise be legally permissible." 18 U.S.C. § 3626(b)(4). Courts "shall promptly rule on any motion to modify . . . prospective relief in a civil action with respect to prison conditions." *Id.* § 3626(e)(1).

<strong>ARGUMENT</strong>

**I.    Section 6.4 is unworkable and impedes efforts to remedy the constitutional violation at issue in this case.**

The Injunction's board-certification and -eligibility provisions have made it more difficult for the Department and NaphCare to hire enough physicians, and thus undermine the Injunction's broader goal of improving the healthcare Defendants deliver to inmates.

"[I]t is appropriate to grant a Rule 60(b)(5) motion when the party seeking relief from an injunction or consent decree can show 'a significant change either in factual conditions or in law.'" *Agostini v. Felton*, 521 U.S. 203, 215 (1997) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). Although shifts "in fact or in law afford the clearest bases for altering an injunction, the power of equity has repeatedly been recognized as extending also to cases where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes." *King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 418 F.2d 31, 35 (2d. Cir. 1969).

Accordingly, modification is appropriate "when [an injunction] proves to be unworkable because of unforeseen obstacles." *Rufo*, 502 U.S. at 384. The Supreme Court in *Rufo* approvingly cited two such examples: *New York State Ass'n for Retarded Child., Inc. v. Carey*, 706 F.2d 956 (2d Cir. 1983), and *Philadelphia Welfare Rts. Org. v. Shapp*, 602 F.2d 1114 (3d Cir. 1979). *Id.*

In *New York State Association*, the district court issued a consent judgment that sought to remedy the living conditions of patients at an overcrowded and understaffed

state-supported facility. 706 F.2d at 958–59. To clear out the facility, the judgment ordered that most of the patients be transferred to certain types of small community residences, as defined in the judgment. *Id.* at 959. The defendants struggled to identify enough such residences to house all the patients that required transferring, and thus the court eventually found the defendants noncompliant with the judgment. *Id.* at 959–60. The defendants moved for a modification of the judgment that would let them transfer patients to larger community residences, and they provided evidence that such a modification would allow them to expeditiously relocate the remaining patients to places that offered better care. *Id.* at 965. The district court refused. *Id.* On appeal, the Second Circuit reversed, finding that district court erred by "allow[ing] one provision of the Consent Judgment . . . to override the more comprehensive goal of transferring the population of [the facility]." *Id.* at 967.

Similarly, in *Philadelphia Welfare Rights*, the district court issued an injunction directing the state's department of public welfare to refrain from depriving eligible persons of medical screenings, diagnoses, and treatments required by the Social Security Act. 602 F.2d at 1116–17. The injunction required the defendants to perform a certain number of screenings in each of the following years. *Id.* at 1117. After about a year, the defendants moved to modify the order on the basis that they were not going to be able to perform the required number of screenings because many eligible participants refused screenings or failed to show up to scheduled appointments and there was a shortfall of participating doctors. *Id.* The court granted the defendants' Rule 60(b) motion and entered a modified decree that eliminated the numerical requirements. *Id.* at 1119.

On appeal, the Third Circuit affirmed, explaining that "it is undisputed that the court has the power to modify a decree when . . . the decree if unmodified could become for the future 'an instrument of wrong.'" *Id.* at 1120 (quoting *United States v. Swift*, 286 U.S. 106, 115, 119 (1932)). The appellate court noted that the district court had "modif[ied] the decree while preserving its essential features," and acknowledged that the evidence in the record supported the district court's finding of good faith. *Id.* at 1120. The court then explained that "[a]ny injunction imposing mandatory affirmative duties for the

future involves elements of prediction . . . . [which] will always be speculative to some degree. This is particularly the case when the defendants' ability to achieve compliance depends upon the receptivity of . . . third parties not formally before the court." *Id.* In sum, the court held that modification is warranted "[w]here an affirmative obligation is imposed by court order on the assumption that it is realistically achievable, the court finds that the defendants have made a good faith effort to achieve the object by the contemplated means, and the object nevertheless has not been fully achieved." *Id.* at 1120–21.

Here, as in *New York State Association* and *Philadelphia Welfare Rights*, the Department (through NaphCare) has attempted to comply with the Injunction, but § 6.4's board-certification and -eligibility requirements have proven impracticable. Even before the Court issued the Injunction, NaphCare was "gravely concerned that there may not be enough Board-Certified Internal Medicine and Family Medicine physicians, who wish to leave their current practice and work in a prison setting, to quickly increase physician staffing as envisioned." (Doc. 4401 at 9.) NaphCare's recruiting efforts have borne out these concerns, as it has received 62 staff physician applications since April 2023 from otherwise-qualified physicians who did not satisfy the board-certification requirement. (*See* Dowling Decl. ¶ 15.)

This difficulty is exacerbated by the physician shortage that Arizona is facing. According to figures from the Health Resources and Services Administration, over 3 million Arizonans reside in Primary Care Health Professional Shortage Areas (HPSAs), and Arizona would need 605 additional FTE primary care physicians (PCPs) to remove those HPSA designations. *See* University of Arizona College of Medicine, *Arizona Primary Care Physician Workforce Summit Report* (2025), *available at* https://phoenixmed.arizona.edu/sites/default/files/depts/fcpm/primary-care-physician-workforce-summit-2025.pdf (attached as Exhibit 1 to Declaration of Kimberly Friday ("Friday Decl.")). "The Arizona Center for Rural Health estimates that 14 of Arizona's 15 counties qualify as partial or complete primary care shortage areas . . . Arizona may face a deficit of more than 1,900 FTE primary care physicians by 2035." (*Id.* at 2, citing

University of Arizona, Arizona Center for Rural Health, *Primary care workforce in Arizona* (2023), *available at* https://crh.arizona.edu/sites/default/files/2023-05/230531_PCHPSA_Brief.pdf and attached as Friday Decl. Ex. 2.) According to the Arizona Center for Rural Health's analysis of federal data from the Health Resources and Services Administration, "Arizona meets just 39.21% of its PCP need" and "ranks 42nd of 50 states in total active PCPs." (Friday Decl. Ex. 2 at 1.) And these numbers are based on the federal regulation relating to the counting of primary care practitioners, which counts "[a]ll non-Federal doctors of medicine (M.D.) and doctors of osteopathy (D.O.) providing direct patient care who practice principally in one of the four primary care specialties— general or family practice, general internal medicine, pediatrics, and obstetrics and gynecology," without regard to whether the practitioners are board-certified or board-eligible in their specialty. *See* 42 C.F.R. part 5, Appendix A, at § B.3(a).

NaphCare has attempted to recruit physicians with a multi-faceted approach, using healthcare-specific job boards, talent-acquisition professionals, third-party vendors, and search engine marketing and advertising. (Dowling Decl. ¶ 11.) But the restrictions in § 6.4 have resulted in fewer hirable candidates for physician positions. (*Id.* ¶ 13.)

Section 6.4.3 of the Injunction also precludes the Department from retaining employed physicians who are not board-certified or board-eligible. (Doc. 4410 at 25.) These physicians have decades of experience in corrections but would have to be fired under the Injunction, leaving a staffing gap that NaphCare cannot readily fill. (Dowling Decl. ¶¶ 7, 9.) As a result, in February 2024, NaphCare notified the Department that it intended to retain the noncompliant physicians to continue providing quality care and achieve broader compliance with the Injunction. (*Id.* ¶ 10.)

Modifying the Injunction to permit these physicians to continue working for NaphCare and the Department is a sensible approach; surely it is better to fill these positions with licensed, non-board-certified physicians rather than with no physicians at all. That is especially so given the Court's earlier finding that "[t]he core issue is that

staffing levels are so inadequate that the provision of constitutionally mandated care is impossible." (Doc. 4335 at 21.)

In sum, Defendants have attempted to hire more physicians while complying with § 6.4's board-certification requirements, but they have not been able to meet the staffing needs related to the Injunction. Defendants have put forth a good faith effort to hire board-certified or board-eligible physicians but cannot "achieve compliance [based] upon the receptivity of . . . third parties not formally before the court," *Phila. Welfare Rts.*, 602 F.2d at 1120—that is, the physicians whom NaphCare has tried but been unable to hire. The Injunction's board-certification and -eligibility requirements in § 6.4 have "prove[n] to be unworkable." *See Rufo*, 502 U.S. at 384. Defendants anticipate that they could hire high quality non-board-certified or -eligible physicians to help address the staffing needs if given the opportunity. The Court should not "allow[ ] one provision of the [Injunction] . . . to override the more comprehensive goal" of securing enough licensed physicians to provide adequate medical care. *See N.Y. State Ass'n*, 706 F.2d at 967. Modification of the Injunction is thus warranted.

**II.    Section 6.4 exceeds what is necessary to remedy the constitutional harm.**

The PLRA governs remedies for civil actions with respect to prison conditions. 18 U.S.C. § 3626. Under the PLRA, "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* § 3626(a)(1)(A); *see also id.* § 3626(b) (governing termination and modification). These requirements apply to the Injunction.

The violation at issue here is Defendants' failure to provide constitutionally adequate medical care under the Eighth Amendment. (Doc. 4335 at 2.) The Ninth Circuit has explained that "[t]o establish an Eighth Amendment violation, [plaintiffs] must satisfy both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Balla v.*

*Idaho*, 29 F.4th 1019, 1025 (9th Cir. 2022) (quotation omitted). And as this Court has explained, although inmates "have a basic right to health care and humane conditions of confinement protected by the Eighth Amendment," their "Eighth Amendment rights do not require the highest quality of health care, the community standard of health care, or the most pleasant accommodations possible." (Doc. 4335 at 1.)

It follows that the Eighth Amendment does not require that physicians who work in the prisons be board-certified or board-eligible in Internal Medicine or Family Practice. According to the American Medical Association, "[m]edical licensure sets the minimum competency requirements to diagnose and treat patients . . . . Board certification, on the other hand, demonstrates a physician's exceptional expertise in a particular specialty and/or subspecialty of medical practice."[2] The same is true under Arizona law. "A physician who meets the qualifications for licensure [in Arizona] has an unlimited scope of practice,"[3] and a physician may meet those qualifications without being board-certified or board-eligible. A.R.S. § 32-1422; *see generally id.* § § 32-1421 to -1439.

Arizona's laws and regulations do not require physicians to be board-certified or board-eligible to practice medicine in this State. Instead, Arizona has established several other requirements, including that the applicant graduate from "an approved school of medicine or receive a medical education that the [medical] board deems to be of equivalent quality," "successfully complete an approved twelve-month hospital internship, residency or clinical fellowship program," and "have a professional record that indicates the applicant has not committed any act or engaged in any conduct that would constitute grounds for disciplinary action against a licensee . . . ." A.R.S. § 32-1422(A) (1) (2), (4);

[2] Brendan Murphy, *Licensing and Board Certification*, American Medical Association (April 8, 2025), *available at* https://www.ama-assn.org/medical-residents/transition-resident-attending/licensing-and-board-certification-what-residents#:~:text=Getting%20doctor%20board%20certification,American%20Board%2 0of%20Medical%20Specialties.com, attached as Friday Decl. Ex. 3.

[3] Arizona Medical Board, *Scope of Practice Guidelines* (last visited December 1, 2025), available at https://www.azmd.gov/FormsIndex/FormsIndex, attached as Friday Decl. Ex. 4.

10

(*see also* Third Declaration of Daniel Pacheco ("Pacheco Decl.") ¶ 6 (detailing requirements to maintain license in Arizona)). State law also requires license renewals every other year and ongoing continuing medical education. A.R.S. § 32-1430; A.A.C. R4-16-102.

Further, most other corrections entities—including the federal Bureau of Prisons and private facilities that operate in Arizona—do not require board certification for employment. (Pacheco Decl. ¶¶ 8-11; *see also* Friday Decl. Ex. 5 (Bureau of Prisons required qualifications for physicians); Ex. 6 (CoreCivic job listing for physician).) Other government entities that provide healthcare, such as the federal Department of Veterans Affairs, likewise do not categorically require board certification. *See* Department of Veteran Affairs, VA Handbook 5005/113 (April 2020), Friday Decl. Ex. 7, at 3 ("Physicians are generally not required to be board-certified for employment in VA [with limited exceptions].") NaphCare has turned down applicants for employment who were actively working in another corrections facility but were not board-certified. (Pacheco Decl. ¶ 12.)

Although the Injunction includes board-certification and -eligibility requirements, the Court did not make factual findings supporting the conclusion that either is necessary to achieve constitutionally adequate medical care. Plaintiffs did not include any such proposed findings in their post-trial findings of fact (Doc. 4308), and the Court made no such findings in its post-trial order (Doc. 4335). Further, although the Court found the Injunction's requirements as a whole were necessary to correct the constitutional violations (Doc. 4410 at 67, § 32), the Injunction includes no factual findings to support the board-certification or board-eligibility requirements specifically.

The Department understands that the board-certification requirements are included based on the assumption that board-certified/board-eligible doctors are generally better trained and higher quality doctors. But under the PLRA, the relevant question is not whether board-certified or board-eligible physicians are *more* qualified to provide medical care. The question is whether non-board-certified or non-board-eligible physicians are

*categorically unqualified* to provide constitutionally adequate care. The Court has not made this finding. And the physicians who are currently working as staff physicians and medical directors but who lack board certification in Internal Medicine or Family Practice are satisfactorily fulfilling all of their required responsibilities. (Pacheco Decl. ¶¶ 14-18.)

Similarly, the Court has not made findings that board certification reflects the community standard of care. Moreover, even if board certification reflected the community standard of care, while the community standard of care is relevant, it exceeds what the Eighth Amendment requires. *Balla*, 29 F.4th at 1025–26; *see also* (Doc. 4335 at 1) (recognizing that Eighth Amendment does not require the community standard of care).

The Patient-Centered Care Model ("PCCM") and Court-approved staffing plan contemplate that patients with certain complex conditions and diagnoses will be assigned to physicians. (*See, e.g.,* Doc. 4963 at 71 (listing diagnoses requiring physician care).) However, many of these conditions—such as cancer, HIV, end stage kidney disease, multiple sclerosis, and others—require off-site specialty care and not solely care by the on-site staff physician.  There is no record support for the notion that only physicians who are board-certified in Internal Medicine or Family Practice are qualified to coordinate care among specialized providers for complex patients.

At bottom, § 6.4's requirement that physicians be board-certified or board-eligible in Internal Medicine or Family Practice is inconsistent with Arizona's laws and regulations, and extends far beyond what is necessary to remedy the constitutional harm at issue. It has also been in place for two years, and, as noted previously, it has impeded efforts to hire more physicians to work in Arizona's prisons. The PLRA therefore supports modifying § 6.4. 18 U.S.C. § 3626(b)(1)(A)(i), (4).

### REQUEST FOR JUDICIAL NOTICE

Defendants respectfully request that, in assessing the Motion to Modify Injunction Section 6.4, the Court take judicial notice of the following documents, which are attached to the Declaration of Kimberly Friday:

1. Exhibit 1, which consists of a true and correct copy of a report titled *Arizona Primary Care Physician Workforce Summit Report*, published by the University of Arizona College of Medicine in January 2025.

2. Exhibit 2, which consists of a true and correct copy of a report titled *Primary care workforce in Arizona,* published by the University of Arizona's Arizona Center for Rural Health in 2023.

3. Exhibit 3, which consists of a true and correct copy of a printout of an article published on the American Medical Association's website in April 2025 titled *Licensing and Board Certification*.

4. Exhibit 4, which consists of a true and correct copy of the *Scope of Practice Guidelines* issued by the Arizona Medical Board.

5. Exhibit 5, which consists of a true and correct copy of a printout from the federal Bureau of Prisons website that provides the qualifications to be hired as a physician for the federal Bureau of Prisons.

6. Exhibit 6, which consists of a true and correct copy of a printout from the website of CoreCivic, a company that operates private prisons and detention centers. The printout reflects a job posting for a physician position in CoreCivic's facility in Florence, Arizona.

7. Exhibit 7, which consists of a true and correct copy of the Department of Veterans Affairs, VA Handbook 5005/113 Transmittal Sheet, issued April 1, 2020.

Federal Rule of Evidence 201 provides that a court "may judicially notice a fact that is not subject to reasonable dispute" when it "is generally known within the trial court's territorial jurisdiction" or when "[it] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Although a court may take judicial notice on its own, it "must take judicial notice if a party requests it and the court is supplied with the necessary information." *Id.* (c)(2). All seven exhibits are publicly available, their sources are reputable, and their contents are not subject to

reasonable dispute. Exhibits 1 and 2 were published by the University of Arizona and utilize data published by a federal agency, the Health Resources and Services Administration. Exhibits 5 and 7 were also published by federal government agencies. Exhibit 4 was published by the Arizona Medical Board, the entity responsible for licensing physicians in Arizona. Exhibits 3 and 6 are printouts from publicly available websites. "In general, websites and their contents may be judicially noticed." *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020); *see also ACI L. Grp. PLLC v. ACI L. Grp. PC*, No. CV-21-00098-PHX-DWL, 2021 WL 4263692, at *11 (D. Ariz. Sept. 20, 2021) (judicially noticing publicly available websites).

## CONCLUSION

For these reasons, Defendants respectfully request that the Court modify § 6.4 of the Injunction so that: (1) no more than 50% of the full-time equivalent (FTE) physicians are required to be board-certified or board-eligible in the areas of Internal Medicine or Family Practice, and (2) the three medical directors who are not board certified in Internal Medicine or Family Practice are permitted to remain employed as medical directors.

Respectfully submitted this 28th day of January, 2026.

OSBORN MALEDON, P.A.


By: /s *Kimberly Friday*
Mary R. O'Grady, 011434
Andrew G. Pappas, 034432
John S. Bullock, 034950
Kimberly Friday, 035369
Molly S. Walker, 038099
2929 North Central Avenue, Suite 2000
Phoenix, Arizona  85012-2793
(602) 640-9000
mogrady@omlaw.com
apappas@omlaw.com
jbullock@omlaw.com
mwalker@omlaw.com

14

KRISTIN K. MAYES
ATTORNEY GENERAL

Joshua Bendor (Bar No. 031908)
Gregory Honig (Bar No. 18804)
Lucy M. Rand (Bar No. 026919)
Luci D. Davis (Bar No. 035347)
Assistant Attorneys General
2005 N. Central Avenue
Phoenix, Arizona 85004
Joshua.Bendor@azag.gov
Gregory.Honig@azag.gov
Lucy.Rand@azag.gov
Luci.Davis@azag.gov
*Attorneys for Defendants*

15