**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, et al., | No. CV-12-00601-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| Ryan Thornell, et al., | |
| Defendants. | |

This litigation commenced almost 14 years ago. At the outset the Court engaged in a patient and comprehensive undertaking with the parties to find an agreed-upon solution to resolve the serious constitutional violations, which gave rise to the Joint 2014 Plaintiffs' and Defendants' Stipulated Agreement, also referred to as the 2014 Stipulation.[1] But within a short time, Defendants failed to abide by the Agreement. The violations persisted, and following a five-week trial in 2022, the Court issued extensive Findings of Fact and Conclusions of Law finding that there were pervasive and systemic unconstitutional violations in Defendants' provision of healthcare. Defendants chose not to appeal the Court's decision. Rather, they unreservedly agreed to abide by the terms and conditions of the Permanent Injunction jointly crafted by Defendants and Plaintiffs with the active participation of the Court and Court experts, who were selected and approved by Defendants, i.e., the Court Monitors (hereinafter referred to as "Monitors".)[2] Since

---

[1] The parties agreed to have the Honorable Magistrate Judge David Duncan preside over enforcement of the agreement.

[2] The Monitors include lead Monitor Dr. Marc Stern, board certified internist; Dr. Lara

agreeing to the injunction, Defendants have never been substantially compliant, have engaged in repeated, persistent violations, and the chronic unconstitutional prison healthcare has continued.

Before the Court is Plaintiffs' Motion for a Receiver (Doc. 4795.) All parties have submitted extensive briefing on the Motion. The Monitors provided comprehensive comments and opinions to which the parties fully responded. Oral argument was held on September 10, 2025.

To declare a government will not accept the constitutional responsibility to provide adequate healthcare is huge. Ordering the implementation of a receivership is extraordinary, and the Court has exercised caution and critical reflection in making the decision. But since the beginning of the case, the Court has forborne imposing the harshest penalties, opting instead to guide Defendants with the help of the Monitors towards comprehensive constitutional compliance. But now after nearly 14 years of litigation with Defendants having not gained compliance, or even a semblance of compliance with the Injunction and the Constitution, this approach has not only failed completely, but, if continued, would be nothing short of judicial indulgence of deeply entrenched unconstitutional conduct. Plainly, only the imposition of the extraordinary can bring an end to this litigation and the reasons it was brought. An end to unconstitutional preventable suicides. An end to unconstitutional preventable deaths. An end to unconstitutional failures to treat those in severe pain. The Motion for a Receiver will be granted.

## I. Background

Defendants operate ten prison complexes across Arizona. This action was filed in 2012 by a class consisting of all prisoners in Defendants' custody seeking healthcare and conditions of confinement in compliance with the Eighth Amendment of the United States Constitution. In March 2013, the Court certified the class of prisoners seeking injunctive relief in the form of constitutionally adequate medical, dental, and mental healthcare, and

---

Strick, board certified in Internal Medicine and Infectious Diseases; Dr. Bart Abplanalp, licensed clinical psychologist; Dr. Karie Rainer, licensed psychologist; and Donna Strugar-Fritsch, BSN, MPA, CCHP. *See* footnote 37 for further information.

a subclass of prisoners confined to their cells for more than 22 hours a day and subject to conditions including inadequate out-of-cell time, social isolation, inadequate nutrition, and inadequate mental health treatment.

In October 2014, the parties negotiated a settlement agreement, the Stipulated Agreement, which was approved by the Court in 2015 and was intended to resolve all claims. It contained 103 agreed upon healthcare and maximum custody requirements called Performance Measures, which, upon compliance, would free Defendants from monitoring and reporting (Doc. 1185) to establish the healthcare was constitutional.

However, what followed between 2015 and July 2021 were twelve motions, initiated by both the Court and Plaintiffs, to enforce the Stipulated Agreement, which were resolved against the Defendants. The Court held multiple, lengthy evidentiary hearings, status conferences, and issued dozens of Orders with clear guidance for mandating compliance with the Stipulation and the Constitution. Concomitantly, the Court issued three Orders to Show Cause why Defendants should not be held in contempt, appointed two investigative experts, and lengthy hearings were held to determine liability. Defendants were held in contempt twice, and ordered to pay millions of dollars in fines, which were upheld on appeal.[3]

Finally, after five years of refusals to comply; findings by the Court that Defendants' legal and factual theories were baseless; the imposition of substantial fines; threats of even more fees and sanctions; and the payment by Defendants of substantial attorney's fees, the Court rescinded the Stipulation and vacated the settlement under Rule 60(b) of the Federal Rules of Civil Procedure (Doc. 3921.) A fifteen-day bench trial followed (*See* Doc. 4335), and, in 2022, the Court issued a 200-page Order with Findings of Fact and Conclusions of

---

[3] "The Stipulation provides the district court the authority to 'enforce this Stipulation through all remedies provided by law,' subject to a few limitations. Ordering Defendants to comply with a specific subset of the Performance Measures they agreed to in the Stipulation is one such 'remed[y] provided by law,' namely, an Injunction requiring specific performance. We have previously upheld the district court's power to issue such Injunctions to enforce the Stipulation in this case." (Doc. 3577-1 at 15, Mandate of the Ninth Circuit Court of Appeals Case No. CV 18-16358 (alterations in original.))

Law identifying the same persistent, unconstitutional conduct by Defendants regarding healthcare, and housing certain prisoners in isolation. (*Id.*) The Court identified the overarching failures in the delivery of healthcare as seriously insufficient staffing, inappropriate use of nurses beyond the scope of their licensure, failure to manage complex patients or employ a differential diagnosis approach, substantially inadequate mental health treatment, and a deficient electronic health care record system. All these critical deficiencies were found to exist at every one of Defendants' complexes, rendering the healthcare delivery systemically unconstitutional.

Defendants chose not to appeal. Rather, they agreed to an Injunction that complied with the statutory limitations on injunctions addressing prison operations that was designed to end unconstitutional healthcare within Arizona's prisons. (Doc. 4335 at 180.) The parties proposed experts to assist with crafting the Injunction, and Dr. Marc Stern was strongly recommended by Defendants as "[dedicated] to the design, management, and operation of health services in corrections settings, [who would] provide this Court and the parties with valuable guidance in crafting an Injunction regarding the provision of medical care at ADCRR." (Doc. 4339 at 4.) It was uniformly agreed, and expressly by Defendants, that Dr. Stern's past work in this litigation uniquely qualified him to assist with drafting the Injunction requirements, and he was appointed.[4] (Doc. 4358 at 8.) Without objection, Dr. Stern's recommended additional experts for mental healthcare and custody conditions imposed on the subclass were also appointed.[5]

From January to March 2023, the Monitors, the Court, and Plaintiffs' and Defendants' counsel engaged in lengthy discussions; suggestions and objections were made and mutually resolved by both parties. (Doc. 4410 at 3.) Finally, a stipulated Injunction was filed with the Court by the parties with the tacit promise that compliance

---

[4] It is crucial to note Defendants recommended Dr. Stern despite his testimony in 2018 before Magistrate Judge Duncan reporting Defendants had serious problems that "precluded accurate monitoring" and that Defendants' poor compliance may actually "be worse" than what the experts found. (Doc. 3921 at 13.)

[5] The Court appointed Dr. Bart Abplanalp and John-Michael McGrath to assist Dr. Stern. (Doc. 4362.)

would bring an end to the system-wide unconstitutional healthcare and end the Court's involvement in the litigation. (Doc. 4402) The parties informed the Court:

> Since [the issuance of the draft Injunction], the parties have engaged in extensive negotiations with each other and the Court-appointed experts regarding the terms of the draft Injunction and **how best to expeditiously remedy the constitutional violations found at trial.** [*See* Doc. 4335.] **The parties are pleased to report that they have come to an agreement with each other and with the Court-appointed experts as to the terms of an Injunction.**[6]

(Doc. 4402 (emphasis added.)) On April 7, 2023, the Court signed the jointly agreed Injunction, stressing and underscoring the reasons that brought it about. (Doc. 4410 at 11-67.) The Court noted:

> **Defendants have fought every aspect of this case at every turn. Defendants entered into a settlement agreement where they claimed they would improve the care provided to prisoners. . . .Yet almost immediately Defendants failed to perform those obligations and continued in that failure.** Instead of acknowledging their failures, Defendants kept inaccurate records and unreasonably misread the settlement's requirements to their advantage. During trial, Defendants presented arguments and witnesses that were manifestly unreliable and unpersuasive. And on some aspects, Defendants presented no meaningful defense at all. . . . **[T]rial established Defendants blatantly had not made any serious effort to remedy the flaws highlighted by this litigation.**

(*Id.* at 4-5 (emphasis added.))

   To evaluate Defendants' performance throughout the Injunction, again with the mutual approval of the parties, the Court appointed the same experts to serve as neutral

---

[6] The parties agreed that "by filing this Stipulation [and if] the Court enters the Injunction attached as Exhibit A as an order of the Court, neither party will appeal the order, in whole or in part." (Doc. 4402 at 2.)

Monitors: Dr. Marc F. Stern[7] and Dr. Bart Abplanalp[8] (who had assisted in crafting the Injunction), Dr. Lara Strick,[9] and Mr. Scott Frakes.[10] The agreed fundamental imperative of the Injunction was that Defendants were required to monitor all elements of the Injunction on a monthly basis and make their findings available for inspection and analysis by the Monitors. (*Id.* at 7.) And, as also required by the Injunction, the Court appointed Dr. Stern and Ms. Donna Strugar-Fritsch to "conduct a staffing analysis and plan of health care positions at each location"[11] (*Id.* at 14.)

From the beginning, the mandate of the Injunction was that Defendants were to fill all required vacant staff positions. The Injunction expressly states, "increased salaries may be necessary to reach adequate staffing levels." (Doc. 4410.) Moreover, the Injunction anticipated the Staffing Plan would ultimately require hiring many more staff, and in particular, the Injunction required that vacant staff positions were to be filled no later than July 7, 2023. (Doc. 4445.) But on July 14, 2023, Dr. Stern sent a letter informing the Court that staffing as of July 7 was "markedly inadequate to meet the immediate requirements of the [Injunction]." (Doc. 4446 at 1.) This was a disturbing revelation in light of the June 2022 Findings of Fact Order in which the Court found one of the "core issues" was that

[7] Dr. Stern has been appointed as an expert pursuant to Rule 706 of the Federal Rules of Evidence to assist the Court in various aspects of this case since December 11, 2018. (*See, e.g.*, Docs. 3089, 3127, 3133, 4352.)

[8] Dr. Abplanalp has been appointed as an expert pursuant to Rule 706 of the Federal Rules of Evidence to assist Dr. Stern in addressing mental healthcare since May 30, 2019. (*See, e.g.*, Doc. 3269, 4362.) In April 2025, the parties stipulated to appoint Dr. Raner as a Rule 706 expert to assist with mental health monitoring. (Doc. 4859.)

[9] On March 17, 2023, the parties stipulated to appoint Dr. Lara Strick as a Rule 706 expert to assist the Court in monitoring Defendants' compliance with Injunction. (Docs. 4402, 4410.)

[10] On January 13, 2023, the Court appointed Scott Frakes as an expert pursuant to Rule 706 of the Federal Rules of Evidence to serve as an independent expert to the Court to address the maximum custody aspects of the Injunction, replacing former Rule 706 expert John Michael C. McGrath. (*See* Docs. 4381, 4362.)

[11] On May 9, 2023, Donna Strugar-Fritsch was appointed as a Rule 706 expert to assist in monitoring and performing a staffing analysis in compliance with the Injunction. (Doc. 4425.)

staffing levels "are so inadequate" that "the provision of constitutionally mandated care [was] impossible." (Doc. 4335.) In other words, within three months of the effective date, Defendants were already in violation of the Injunction. On July 20, 2023, the Court set an immediate hearing to develop a timeline for Defendants to achieve compliance, expressing alarm that "Defendants have been fully aware since at least January 9, 2023, they needed to begin hiring additional staff." (*Id.* at 1-2.)

On August 17, 2023, the Court held a status conference to address Defendants' staffing non-compliance, emphasizing, "there must be complete compliance with the Injunction to get the federal court out of the case." (Doc. 4469 at 4-5.) Plaintiffs pointedly expressed their concern regarding Defendants' failures but informed the Court they did not then intend to seek immediate sanctions. Plaintiffs reflected that Defendants appeared to be "making sincere" attempts to comply with the Injunction. (*Id.* at 5.) Defendants expressed solidarity with Plaintiffs, Dr. Stern, and his team, to reach compliance. However, it was also noted as very troubling that Defendants lacked, or at least failed to produce, critical information needed to discern exactly what staff existed and what was constitutionally required. (*See generally*, Doc. 4469.) However, it was clear, under any methodology, Defendants needed significantly more staff to achieve compliance with the Injunction and the Constitution.[12]

A follow-up status conference was held on December 1, 2023 (Doc 4510) where Plaintiffs' counsel repeated, without disagreement from Defense counsel, "I don't think there is any dispute about the fact that staffing in the prisons at the moment is grossly deficient."[13] (Doc. 4521 at 12.) Plaintiffs added their specific observations that while visiting Lewis Prison, it was obvious the significantly low staffing was impacting "patient care because there's no providers and not enough nurses to provide care." (*Id.* at 13-14.)

---

[12] Plaintiffs' counsel, the Monitors, and the Court also expressed strong concern about Defendants' excessive use of overtime and registry personnel in an attempt to meet staffing requirements, which were specifically prohibited by the Injunction. These temporary workers hired from healthcare employment agencies were specifically prohibited because of high turnover leading to significant risk to patients.

[13] Dr. Ryan Thornell, Director of ADCRR, was in attendance at this hearing.

Defendants provided a highly unacceptable response by first disavowing responsibility, repeatedly claiming the obligation for staffing was with the contractor, NaphCare. "We're not satisfied with the rate in which staffing has been increased. And we're continuing to put on---put on pressure on NaphCare to increase their hiring, to increase their salaries in order to successfully recruit and successfully retain good staff members."[14] (*Id.* at 8.) The most daunting revelation was Defendants' admission that existing staffing did not even meet the levels of the prior NaphCare contract, which required that at least 300 positions be immediately hired. This was appalling because the Court found in the June 2022 Findings of Fact that personnel at each of Defendants' facilities was "profoundly understaffed." (Doc. 4335 at 22.) Further, Defendants effectively admitted at trial in 2021 that their staffing levels were insufficient. (*Id.* at 24.) What is more, the evidence presented showed Defendants' former private contractor, Centurion, opined that even if all prisons were fully staffed under Defendants' calculation, such staffing would be insufficient to provide adequate healthcare. (Doc. 4335 at 22.)

Because of serious concerns about the nature and type of non-compliance with the Injunction, the Court ordered the Monitors to conduct an evaluation of Defendants' compliance and file a report early the next year. And on February 2, 2024, the Monitors filed the First Interim Report. Some very minor improvements in healthcare services were first noted, but otherwise the Monitors found Defendants "substantially noncompliant" and that Defendants' efforts to self-assess were totally "unreliable." The Monitors provided a written, detailed discussion of the specific deficiencies as they had done in response to the monthly reports and offered useful suggestions to Defendants for resolution. Of gravest concern, the report included comprehensive medical evaluations conducted by the Monitors of some patients, finding the patients had received very poor medical treatment, including a patient who committed suicide, which the Monitors deemed preventable and that occurred because of "wholly inadequate" care.[15] (Doc. 4539 at 15.)

---

[14] Precisely what pressure, if any, was ever brought to bear was never identified at the hearing or anytime thereafter.

[15] On February 2, at the joint urging of the parties because of the critical failure of staffing,

On February 16, 2024, Defendants filed a response to the Monitors report beginning with the astonishing complaint that "distinctively absent" was the Monitors' failure to provide Defendants with "a comprehensive plan of how to achieve compliance with the Injunction" or a "how-to guide." (Doc. 4553 at 2.) Such a bizarre undertaking by the Monitors was never contemplated by the Injunction or ordered by the Court.[16] Remarkably, despite having collaborated with the Monitors for well over a year, and having wholeheartedly recommended and approved them as highly competent, Defendants broadly and incomprehensively questioned whether the Monitors' opinions were too "subjective" and not "clinically appropriate." (*Id.* at 3-4.)

In contrast, Plaintiffs provided a very critical assessment of Defendants' quality of care: "Nearly one year after the courts issuance of the injunctive relief, and more than 18 months after it found the provision of medical and mental healthcare . . . violate the Constitution, the Court's monitoring team's Status report details widespread and substantial violations of the Injunction." (Doc. 4552 at 2.) Emphasizing the blatantly obvious, Plaintiffs added Defendants were already in violation of the Injunction:

> [The] failure to create a viable self-monitoring system, and inability to measure or demonstrate compliance, must be presumed to be noncompliance.

(Doc. 4552.)[17] Plaintiffs also declared Defendants did not deserve even the minor credit offered them by the Monitors.

---

the Court reluctantly granted the parties' Motion to Amend Section 1.16 of the Injunction to allow Defendants a very limited use of Registry and Agency staff to fill some portion of the full-time equivalent positions (FTE) in each job Category. (*Supra* footnote 12.)

[16] The total agreed upon fees and expenses paid to the Monitors for their work required by the Injunction is substantial. To date, the Monitors have cost in excess of $4 million on healthcare alone. Prior to agreeing to the specific parameters of the detailed Injunction, Defendants never indicated they required a tutorial as how they would comply. If the Monitors had also been ordered to undertake extensive tutoring to help Defendants achieve compliance, the cost to the Defendants would have skyrocketed. What is more, the Monitors informed the Court they readily offered oral or written training and assistance to Defendants, who expressed no interest in accepting it.

[17] Plaintiffs were specifically concerned: (1) Whether meaningful post-mortem plans were occurring; (2) that no English fluency assessments were being made; (3) with failures

- 9 -

In Reply, Defendants acknowledged the "excessive amount of time it has taken to obtain adequate healthcare staffing," but made the shocking argument that they should be excused because of Legislative "budget limitations," and offered "to submit a request for supplemental appropriation," but warned: "it might not be approved" and, worse yet, the "earliest the funds would be distributed (was) July 1, 2025," that is, one and a half years later. Finally, Defendants, in closing, made the startling request that the Court order non-party contractor, NaphCare, to increase salaries so Defendants could avoid "the necessity of engaging in the legislative budget approval process." (Doc. 4583 at 3-4.)[18]

On March 14, 2024, in advance of the next status hearing to assess compliance by the Defendants or to proceed with enforcing the Injunction, the Court, by Order, emphatically reminded Defendants that the Injunction had been in place for almost one year, and Defendants had not yet developed the fundamental and essential "mechanism for assessing compliance with 130 provisions." (Doc. 4570 at 1.) The Court categorically clarified the Monitors were never required to provide a "how-to guide" or train Defendants how to competently achieve compliance with the Injunction. And relying on the Monitors' reports and responses, the Court declared the healthcare system "remains fundamentally lacking, and the Monitor's report documents continued adverse outcomes that show

_____

regarding specialty care; and (4) with lack of evidence supporting that mental health patients were not being placed in restraints.

[18] The Injunction terms and requirements were drafted and agreed upon, and presumably negotiated, in good faith by the Defendants, and then approved and ordered by the Court on April 7, 2023. (Doc. 4410.) The Injunction expressly states, "increased salaries may be necessary for Defendants to reach adequate staffing levels." (Doc. 4410.) And, if so, those increases by contract with NaphCare were explicitly to be borne by Defendants. (Docs. 4555; 4566; 4583.) At no time prior to the effective date of the Injunction was the Court informed by Defendants they were unable to, or unwilling to, comply with all terms of the Injunction for any reason, and particularly because funds were not, or would not be, available to ensure compliance. (*See also* Docs. 4555; 4410; 4583.) Defendants have been constantly reminded orally and in writing for the almost 14 years of this litigation of Ninth Circuit authority mandating "lack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations." *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014.)

prisoners remain at risk." (*Id.*) Significantly, the Court made the express finding that Defendants were in violation of the Injunction because it mandated they "fill all positions required by the current contract with the healthcare vendor" no later than "July 7, 2023." (*Id.* at 2.) The Court voiced serious concern with Defendants' repeated ill-conceived requests that the Court engage in enforcing Defendants' contract with NaphCare by sanctioning NaphCare for not filling staff positions. Defendants were directed to the critical provision in the Injunction: "Defendants must comply with the Injunction and any disputes between Defendants and the private healthcare contractor are beyond the scope of the Injunction," and pointed to the very contract provisions with NaphCare that called for "staffing offsets/paybacks for unfilled hours of service" and the imposition of "monetary sanctions," and, of substantial significance, even "termination" of the contract if NaphCare failed to perform under the contract. (Doc. 4570 at 4.) This was to forcefully bring to Defendants' mind the abundant, viable contractual enforcement tools they had to force NaphCare's compliance with the Injunction and Constitution. And, most importantly, Defendants were warned if those remedies were not pursued, it would "be exceptionally difficult for Defendants to show they 'took *all* reasonable steps to comply with the [Permanent Injunction].'" *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016)."[19] (Doc. 4570 at 4.) Finally, the Court warned of an Order to Show Cause why Defendants should not be held in contempt. (*Id.* at 2.)

On March 15, 2024, the Court held another hearing to determine if Defendants had reached compliance with the Injunction, and, if not, whether they were prepared to face the consequences. (Doc. 4581.) The Monitors, who had spent hundreds of hours evaluating Defendants' performance and engaging with Defendants to assist them with compliance, testified Defendants were plainly not in compliance and the healthcare they were providing was constitutionally deficient. (*See generally id.*) Again, the Monitors' greatest concern was the persistent understaffing and the numerous temporary positions, resulting in a lack

---

[19] Critically, the contract explicitly states: "NaphCare must "meet all federal and state constitutional amendments [and] court orders." (Doc. 4570.)

of continuity of care, and that the care was not patient-centered and lacked follow-up, particularly for those too sick to advocate for themselves. (*Id.*) Specifically, the Monitors reported from their review of documents and their many interviews of staff and patients, overall (1) documentation of care was "poor," (2) the electronic medical record had not been repaired, (3) there was a failure to pursue the fundamental change in the model of care which mandates "a patient centered model," and (4) because the prisons continue to be poorly staffed, it was impossible to reach that goal. (*Id.*) The Monitors called attention to some specific individual cases that demonstrated grave danger to prisoners. One patient was locked in a room without one-to-one monitoring; the patient was never allowed to leave his room and was always "on a mattress on the floor of his cell." (*Id.* at 24.) In mental health, there were patients who were too delusional and schizophrenic to be able to seek help through the telemonitoring system and confidential communications with patients were "nearly impossible." (*Id.* at 29-31) One patient committed suicide that likely could have been avoided, who had a known history of self-harm, but was only seen monthly, "cell-side," with a simple inquiry: "Are you okay?" The Monitor stated the "lack of care, in [his] opinion, likely contributed to [the patient's] death." (*Id.* at 47-48.) And it was reported there was an alarming "spate of suicides within the past several months." (*Id.* at 40.)

Plaintiffs reported they spent numerous hours evaluating healthcare compliance through conversations with staff and prisoners. Plaintiffs learned of reported failures to diagnose "serious problems," including cancer. Female prisoners stated they put in healthcare requests describing serious medical and mental health problems and received delayed and inadequate responses, such as "just drink more water." (*Id.* at 55.) And Plaintiffs reported those who complained of mental health problems were not given care. Rather they were advised "to go on suicide watch" in order to receive any type of individual care. (*Id.* at 56.)

Director Thornell offered a promise to attempt to "pressure" NaphCare to ensure it provided adequate salaries and adequate staffing to comply with the Injunction and the Constitution.[20] The Court addressed Director Thornell:

> THE COURT: And you're going to hear this again as long as— until it's solved, and you've heard it before. Have you discussed or considered increasing staff, increasing salaries? As you know, that is the footprint we've had as a problem in this case. And you know that, Director Thornell. Right?"
>
> DIRECTOR: "Yes, Your Honor, and we discuss it."
>
> THE COURT: "So you've heard it. Focus on staff, salaries, either within the contract you have now or whatever you're going to do in the future."
>
> DIRECTOR: "Yes, Your Honor."
>
> THE COURT: "Have I made myself clear?"

(*Id.* at 80.)

Plaintiffs and the Court accepted the Director's promise, and the Court again resisted imposing contempt sanctions, but warned continued failures would prompt severe consequences. (*Id.*) The parties agreed to attempt to offer the Court a stipulated order mandating Defendants comply with the Constitution by forcing NaphCare to provide full staffing and higher salaries. But a joint stipulated order was never filed. Rather, Defendants again advanced the startling proposal, contrary to law, that the Court issue an order that expressly mandated the Defendants order NaphCare to "pay wages in accordance with the contract if vacancies continued."[21] The Court flatly rejected the unwarranted request.

---

[20] Again, no further details were ever provided to the Court as to what measures were taken to ensure NaphCare's compliance other than Director Thornell mentioning sending "multiple letters" to NaphCare. (Doc. 4602.)

[21] NaphCare filed a Motion to Intervene, boldly claiming it had "significantly improved the healthcare system." Because the Motion was untimely, it did not meet the procedural requirements, and NaphCare implied it had no obligation to comply with the Injunction and thereby the Constitution, it was denied without prejudice, and never refiled. Particularly appalling was that Defendants did not object to the motion despite NaphCare's claim that NaphCare had significantly improved the healthcare system and NaphCare's

On April 18, 2024, the Court issued another order regarding Defendants' failure to address the lack of adequate staffing and reminded Defendants of the obligation to determine if NaphCare was in violation of the contract and, if so, to proceed to enforce it. (Doc 4602.) On April 16, 2024, Dr. Stern and Ms. Strugar-Fritsch submitted the ADCRR Health Care Staffing Analysis and Plan required by the Injunction, definitively establishing the staffing necessary to comply with the contract and the law and calling for significant increases.[22]

On May 16, 2024, the Court held the final status conference of the year, where the proposed staffing plan was discussed[23] (Doc. 4634), and the Monitors recommended a Pilot Project to thoroughly test the findings, stating: "We proposed shifting from a hundred percent implementation [of the staffing plan.]" (Doc. 4634 at 27-28.) The Pilot Project was designed to allow Defendants to evaluate and report to the Court precisely how significant of a staffing increase was necessary, and what specifically would be required for the statewide implementation of staffing. (*Id.* at 107.) Plaintiffs favored and endorsed the Pilot, and Defendants tentatively agreed, but demurred, again, complaining of lack of funding. In particular, Defendants stated "we're operating at a significant deficit . . . . Because for this fiscal year they're already many millions of dollars over budget because of the Injunction and the healthcare and the NaphCare contract."[24] (*Id.* at 112.) At the close of the hearing, the Court declared that after a careful review of "all of the paragraphs of the Injunction, it is likely 75 percent of them have been violated . . . the State is already clearly

statement that though it did not intend to relitigate the Injunction, it fully intended to engage in "tinkering" with provisions of the Injunction such as "staffing levels" in clear violation of the Injunction.

[22] The Plan was developed after "extensive collaboration and coordination with the Monitoring team . . . site visits to three complexes, consultation with Plaintiffs and Defendants including extensive consultation with the ADCRR Health Services Division, and conversations with NaphCare Facility Health Administrators, providers, mental health leads, and others." (Doc. 4599.)

[23] Director Ryan Thornell was in attendance.

[24] Defendants continued: "Well, here's the problem, Your Honor, we don't have the money to do this. It would require a new contract with NaphCare. It would require approval of the JLBC." (Doc. 4634 at 118.)

in violation of the Injunction." (*Id.* at 123-24.) Defendants did not respond. However, the Court opted to forgo issuing an order to show cause until the Pilot was completed because of the parties' joint agreement to implement the Pilot.

On June 3, 2024, with the agreement of all parties, the Court ordered implementation of the Pilot Project, but expressed serious concerns regarding Defendants' ongoing failure to aggressively undertake the dramatic improvements required by the Injunction:

> Finally, the Court notes its concern that over one year after the Permanent Injunction was issued and two years since entry of the Court's Findings of Fact and Conclusions of Law, much of the briefing regarding the staffing plan reflected Defendants' continued resistance to meaningful efforts to increase staffing to achieve constitutional levels and avoid catastrophic outcomes. At this point, **Defendants have admitted more staff is necessary and it is difficult to view their behavior as anything other than attempts to delay issuance of a statewide staffing plan. The Court's patience has run out**. **Too many individuals are needlessly suffering while Defendants have deployed many delay tactics. Defendants shall immediately establish the Pilot program and in a subsequent Order, Defendants will be required to establish they have taken all reasonable steps to comply with the Permanent Injunction.**

(Doc. 4637 at 8 (emphasis added).) The Court also traced Arizona's decades long history with numerous private healthcare companies' failure to provide adequate staffing and healthcare in accordance with the Constitution. The Court stated the jointly agreed-upon Injunction was intended to resolve understaffing and incompetent staffing by requiring Defendants to immediately fill the positions and Defendants refused. However, both Plaintiffs and the Court decided against urgently pursuing sanctions because Defendants promised they were committed to filling positions and engaging in the Pilot in good faith. The Pilot was initiated at two units selected by Defendants.[25]

On September 25, 2024, the Monitors filed their first Pilot report, stating Defendants

[25] The Arizona State Prison Complex–Yuma, Dakota Unit (Dakota), and the Arizona State Prison Complex–Perryville, San Carlos Unit (San Carlos).

showed a lack of will and no commitment to success. (Doc. 4681.) On October 7, 2024, Plaintiffs specifically identified numerous failures by Defendants to comply with the Pilot, including the failure to hire any of the critical positions, and to backfill those borrowed for the Pilot, and the failure to provide sufficient space. Plaintiffs reluctantly recommended the Pilot continue, but requested the Court consider imposing severe financial sanctions against Defendants for their substantial violations of the Pilot, and order full briefing on other remedies, including appointment of a receiver and declaring unconstitutional the privatization of prison healthcare. On November 15, 2024, a second Pilot report from the Monitors showed Defendants continued to resist and plainly refused to engage in good faith implementation of the Pilot (Doc. 4700.)[26] The Court declared once the Pilot concluded, the Court would order comprehensive briefing on all possible sanctions and appropriate remedies against Defendants. (Doc. 4699.)

In early October 2024, Monitor Dr. Abplanalp informed the Court of an investigation of a cluster of suicides and filed a report on October 17, 2024, revealing staggering deficiencies in Defendants' mental healthcare delivery. Not only were numerous specific Quality Indicators of the Injunction violated, but Dr. Abplanalp concluded if Defendants had adhered to the requirements in the Injunction, "it would have decreased the probability of, if not prevented, these deaths." (Doc. 4691.) Further, he emphasized the flaws were the same as those he had frequently observed since his evaluation began in April of 2023.[27] Defendants attempted to refute the Monitor's evaluation with the

---

[26] In particular, the Patient Centered Care Model ("PCCM") Pilot operations were indefinitely suspended at San Carlos; in short, Defendants unilaterally abandoned the Pilot at San Carlos. (*Id.*) The experts noted the project required additional space to be successful, and that allocating this space was the "highest priority," but Defendants refused. (Doc. 4800.)

[27] It was reported that one suicide patient had auditory hallucinations that did not prompt Defendants to consider undertaking a prompt comprehensive evaluation. Another patient's father called the day before the suicide and informed Defendants his son was not receiving medication and was in distress, but no action was taken. A third suicide patient had previous diagnoses of schizophrenia, antisocial personality disorder, psychosis, and anxiety disorder, but no record of a comprehensive mental health evaluation existed.

dismissive comment "they do not tell the full story," and offered beyond-the-pale excuses for their failures to comply with the Quality Indicators required by the Injunction that were designed to save lives. (Doc. 4818 at 11-12.)

On January 7, 2024, the Monitors filed the Second Interim Report dated December 20, 2024, reflecting evidence gleaned and analyzed since their work began on April 7, 2023. (Doc. 4755.)[28] The Monitors acknowledged improvements in the conditions of confinement for the subclass, but found the delivery of all healthcare was "poor" with little improvement since the Injunction became effective, placing prisoners at "significant risk of serious harm, including death." (*Id.* at 2.) And in fundamental violation of the core principle of the Injunction, they found advance practice practitioners—nurse practitioners and physician assistants—were still caring for the complex and emergency medical patients that mandate care by physicians. Further, there were numerous mentally ill patients still not receiving treatment necessary to ensure their safety. And still, over 100 positions that were compelled by the prior and existing contract with NaphCare had not been filled, reflecting lack of fundamental compliance with the Injunction. The Electronic Health Records ("EHR") were still "poorly adapted," thousands of consultations with off-site specialists were delayed, and "virtual visits [were] rampant." The report concluded in summary: "And patients are dying." (*See generally id.*)

In addition to the cluster of five suicides Monitor Dr. Abplanalp reported in October 2024, another, more recent suicide was identified and determined to have been "likely avoidable" because the patient had received incompetent care. And the Monitors identified four recent, newly discovered non-suicide related deaths that were determined to have been caused by "serious and pervasive systemic health care delivery failures." The report

---

[28] Significant reliance by the Monitors was always placed on Defendants' self-evaluations, Defendants' documents, including electronic health records, complaints by prisoners, concerns submitted by everyone involved, conversations with staff and Plaintiffs' attorneys, and site visits. Generously, the Monitors made mention of the efforts and devotion of the front-line and supervisory staff. The "systems are broken" but "they try hard" and have been "asked to do something beyond their capabilities or outside their expertise." (Doc 4755 at 1.)

concluded these deaths likely could have been avoided if there had been compliance with the Injunction. (Doc. 4755 at 2.)

Regarding Defendants' claim that "they are closing in on 100%" compliance, the Monitors found this patently false because Defendants' method of measuring compliance was wrong. (*Id.* at 3.) For example, Defendants alleged their mental health evaluations are "comprehensive" whereas the Monitors found Defendants' performance measure is "closer to 0%." (*Id.*) Regarding off-site specialist referrals, Defendants readily admitted from their self-evaluations the care provided "is often not clinically appropriate" (*id.* at 5), and in violation of the Injunction. And the Monitors emphasized the "degree to which [Defendants are] failing to comply . . . is hard to imagine." (*Id.* at 6.) For example, only 3% of the referrals outside the prisons were timely, meaning a shocking "7,140" or 97% of these critical, life and death referrals were "not timely" or never occurred at all. (*Id.*)

The mortality reviews have always been of vital significance, and the Monitors reported Defendants "missed critically important errors." (Doc. 4755 at 7.) The Monitors stated they repeatedly brought the overuse of nurses and LPNs in violation of the Injunction to the attention of Defendants, which in fact contributed to the cause of one patient's death. But when this failure was brought to the attention of Defendants, they flatly responded that it was a "one-off." (Doc. 4755 at 7.) As poor as the mortality reports were, the Monitors found, "almost all other reviews . . . were worse."[29] (Doc. 4755 at 8.) Despite the monitoring team having provided repeated feedback, there had not been systemic improvements through the "implementation of a sustainable remedial plan as required by

---

[29] The failures to correct mortality review reports is of great concern because when deficiencies were brought to Defendants' attention by the Plaintiffs in March 2024, Defendants first denied any problems, but also claimed they were aggressively making improvements: "[Defendants'] Medical Director, Dr. Phillips, is currently in the process of revamping the entire mortality review process to provide a greater transparency and ownership regarding the care provided. [Defendants] will work with NaphCare to ensure that the improved process is robust and thoughtful." (Doc. 4566 at 10.) The Court finds the mortality reports reviewed by the Monitors do not support that a review process was meaningfully completed.

the Injunction." (*Id.* at 71)[30]

The Monitors discovered medications had been maladministered, placing patients at serious risk of harm. The poor mental health treatment included one patient who "spent 15 minutes banging his head on a wall" that required an emergency response. Again, the fundamental underpinning of the Injunction for establishing a minimally safe mental health system has been substantially unmet because of the use of nurses and LPNs as first line healthcare, "over- and mis-use of telehealth" and the electronic health record was described as a "sprawling, disorganized warehouse."[31] (*Id.* at 15.) Fundamental to the Injunction has been Defendants' failure to fill critical staff positions in that there continue to be a dearth of physicians "medical APPs," and "nurses," and Defendants' recruitment remains poor.

One of the most urgent concerns expressed by the Monitors was that Defendants were still unable to accurately analyze Injunction-related data. The Monitors reported they have spent "hundreds of hours" providing detailed feedback, orally and in writing, and mentoring to Defendants regarding errors, analyses, and interpretation of the Injunction to assist them in first understanding and then reaching compliance. In fact, Dr. Strick specifically offered on more than one occasion to provide mentoring to nurses and others "to no avail." (Doc. 4755 at 96.) Initially after the Injunction, the Monitors reviewed Defendants' monthly reports and provided objections, comments, and instructions. The Monitors would meet with Defendants to enhance improvements. Over time, the meetings ceased because Defendants showed no interest in accepting advice from the Monitors.

---

[30] The Monitors reported in December 2024 they alerted Defendants more than a year earlier that the reports indicated significant medical equipment was available, but the inspection showed it "was missing," raising the possibility of "false documentation." (Doc.4755 at 9-10) Not until this same issue was raised again in the Monitors' Third Interim Report in August 2025 did Defendants provide any response. Their explanation, while alleviating the concern regarding false documentation, raised the issue that "emergency response bags are sealed without confirming that they are complete." (Doc. 5040 at 11.)

[31] The Monitoring Team in their evaluation "spent hours on individual patient records" to understand what were the "conditions and treatment." But even assuming a clinician would be better informed than the Monitors, the Monitors were "unable to piece together" necessary information that would allow for the safe care of a patient. (Doc. 4755 at 17.)

Finally, the Monitors expressed dismay about the leadership available in order to reach and maintain compliance with the Injunction. The primary reason was Defendants, through their leadership, maintain the system that embraces using nurses as the primary care givers supplemented by LPNs.[32]

Defendants offered objections to the Monitors' report, and the Monitors provided a detailed response on October 4, 2025, (Doc. 5040), emphasizing the essence of the violations.[33] Defendants still contend "there is no problem" with nurses providing "most of the care" in clear violation of the foundation of the Injunction. In fact, the Monitors reported Defendants have failed abysmally, emphasizing the failure of Defendants to aggressively enforce the contract with NaphCare by refusing to impose any of the numerous potential sanctions available, which is inexcusable. In fact, few sanctions have been imposed against NaphCare for healthcare violations.

The Monitors reflected on Defendants' false claim that the Monitors, for the first time in the report, provided them a detailed and understandable review of the Injunction requirements and methodology, which is startling and absurd. The Monitors have given significant feedback, which has been ignored or refused by Defendants. Remarkably, only since the Motion for Receiver was filed have Defendants, for the first time, offered, through declarations, detailed, specific comments, criticisms, and complaints concerning each requirement of the Injunction, the Quality Indicators. Regarding Defendants' response concerning a hypertensive patient, the Monitors correctly concluded the healthcare management was still "dangerously inadequate." (Doc. 5040 at 3.) Regarding another patient's death, the excuse offered by Defendants only strengthened the Monitors' conclusion that the mortality review process has failed. Regarding Defendants' attempt to excuse other mortalities, the Monitors found they remain inexcusable because they involve

---

[32] The Monitors found that Defendants do not have and, more importantly, have no system-wide imminent plan to acquire the space necessary to provide constitutional healthcare.

[33] For example, the Monitors addressed a correction to their calculation of backlogged appointments; Defendants were correct that the number of medical appointment backlogs is 61,479 rather than the initially reported 123,403, but the Monitors found this number still inexcusable and dangerous.

avoidable delays in care, care not consistent with required standards of care, failure to timely review tests, and gross mismanagement by nurses of a patient's condition. And concerning one particular patient identified by the Monitors: "If not for [Defendants'] mismanagement of the patient . . . [the patient] likely would not have needed the elective surgery . . . from which he died." Finally, the Monitors stated, "the specific problems with clinical care that led to one patient's death had still not been analyzed and remedied." (*Id.* at 16.)

In conclusion, the Monitors stated Defendants' remarks do not change "our conclusion that [Defendants'] mortality review process is flawed," which was supported by the Monitors' analysis of "three . . . deaths in 2023 and 2024 associated with the *same* clinical mismanagement." (*Id.* at 17 (emphasis in original).)

On January 3, 2025, the Monitors submitted the final report on the Pilot, referencing the fundamental requirement of the Injunction set forth in section 1.17 that mandates a "Patient Centered Care Model," that was to be achieved by the Pilot. (Doc. 4761 at 1.) But the Monitors reported Defendants "disagreed in writing with each of these assumptions at various times throughout the Pilot." (*Id.* at 3.) Consequently, the Pilot failed: it was never fully implemented at either location and operated for only 8 days at one of two locations. (*Id.* at 3-4.)[34]

On February 12, 2025, Plaintiffs filed the Motion for a Receiver. (Doc. 4795.) Defendants responded (Doc. 4818), and Plaintiffs replied. (Doc. 4878.) In combination with the Third Interim Report to the Court, the Monitors provided their response to the Motion (Doc. 4968.) On June 11, 2025, the Court ordered implementation of the Final Staffing Analysis and Plan (Doc. 4858) as modified by the Experts' Analysis of Parties' Responses to Staffing Analysis and Plan (Docs. 4900, 4916.)[35]

---

[34] The Monitors detailed repeated, direct violations of specific Court Orders without notice to them or the Court. In particular, the Pilot healthcare staff were to be permanent, but Defendants failed to ensure NaphCare complied with the requirements of the Pilot. (*See,* Doc. 4761 at 7.)

[35] Defendants appealed that Order on July 9, 2025 (Doc. 4935), which remains pending, but this Court's Order directing implementation has not been stayed.

On July 17, 2025, the Monitors filed their Third Interim Report (Doc. 4942; 4968 (revised)) and, on October 4, 2025, the Monitors filed their Analysis of Parties' Response to Monitors' Third Interim Report to Court (Doc. 5040.)

## II. Plaintiffs' Motion to Appoint a Receiver

Plaintiffs argue that given the systemic constitutional violations from the inception of the Injunction to the current day, the lack of substantive progress, and Defendants' obvious inability to recognize and remediate their mistakes, the least intrusive means of assuring prisoners within Arizona prisons receive constitutionally adequate healthcare is to appoint a receiver. (Doc. 4795.)

In Response, Defendants claim they have continued "to make progress across all aspects of the Injunction," (Doc. 4818 at 2), and argue a receiver is premature because the Injunction has been in place for less than two years, the current director has only been in place for two years, there have been additions to the numbers of full time equivalent employees (FTEs), NaphCare has only been contracted for the past two years, and Defendants have expended additional funds on healthcare, have made some improvements on certain types of healthcare in certain facilities, and have had success in the opioid use disorder program and Hepatitis-C treatment. Finally, Defendants claim NaphCare "has steadily increased staffing since the start of the Injunction." (Doc. 4818 at 15.)

In Reply, Plaintiffs argue that Defendants' argument against a receiver boils down to a meritless request for more time based on declarations of alleged virtuous good intentions. Defendants admit their contractor has not met even the staffing requirements of the current contract and offer no plan to achieve the necessary enormous increases anticipated in the final statewide staffing plan. Finally, Plaintiffs maintain Defendants' anecdotal examples of improvements are overcome by the ongoing, substantial noncompliance with the Injunction allowing systemic unconstitutional violations to persist for over 10 years.

### A. Legal Standard

"[A]ll prospective judicial relief (necessarily including the appointment of receivers) must be accompanied by findings that the relief is 'narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.'" *Plata v. Schwarzenegger*, 603 F.3d 1088, 1095 (9th Cir. 2010.)

"Receiverships are recognized equitable tools available to the courts to remedy otherwise uncorrectable violations of the Constitution or laws." *Id.* at 1093-94. A receiver is "appointed by the court to take over the day-to-day management of a prison system or a segment of it" "where unconstitutional conditions persist despite repeated orders to remediate." *Id.* at 1094; *United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 636 (5th Cir. 2025) (A receivership appointment is an appropriate sanction when necessary to remedy a prison's repeated failures to ensure constitutional prison conditions).

In determining whether appointment of a receiver is appropriate, the Court must consider (1) whether there is a grave and immediate threat or actuality of harm to plaintiffs; (2) whether the use of less extreme measures of remediation have been exhausted or would prove futile; (3) whether continued insistence on compliance with the Court's orders would lead only to confrontation and delay; (4) whether there is a lack of leadership to turn the tide within a reasonable period of time; (5) whether there is bad faith *or* repeated failure to implement changes; (6) whether resources are being wasted; and (7) whether a receiver is likely to provide a relatively quick and efficient remedy. *Hinds Cnty.*, 128 F.4th at 637; *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005.) The district court should consider each factor, but "the first two . . . are given predominant weight." *Plata*, 2005 WL 2932253 at *23.

## B.    Discussion

Ordering a receivership is a drastic remedy. The Court has sought and received extensive briefing and has carefully considered the law, arguments, and evidence presented by the parties and experts. The Court asked the Monitors to opine on Plaintiffs' request that a receiver be appointed. The Monitors filed a 306-page report (Doc. 4968) chronicling

Defendants' failure to comply with the Injunction and enumerating the ongoing unconstitutional medical care within the entire prison system, concluding: "The system changes required by the Injunction to protect human life and limb and prevent suffering are still broken." (Doc. 4968 at 5.) The Monitors posit this finding is brought to bear by the reality that Defendants are "still struggling to identify and prioritize the changes [they] need[] to make, let alone actually make those changes." (*Id.* at 5.)

Great weight has been placed on the factually well-supported, reliable opinions of the Monitors. "[T]he most important question a court must consider when deciding whether to appoint a neutral expert witness is whether doing so will promote accurate fact finding." *Gordon v Todd*, 793 F. Supp.2d 1171, 1179 (E.D. Cal. 2011.) Here, the Court appointed the Monitors as "its own experts to serve as neutral monitors to evaluate Defendants performance" under the Injunction (Doc. 4410 at 6.) And it is impossible to exaggerate the importance of Defendants' enthusiastic choice of the Monitors as revered experts, to assist in first drafting the elements of the Injunction, and then to function as Monitors to ensure Defendants' compliance. And it is particularly noteworthy that despite Dr. Stern's previous criticisms of Defendants' healthcare when he testified in this case as a witness in 2018, the Defendants nonetheless welcomed his selection as the Monitor. (Doc. 3921.)

The Injunction required Defendants to provide a monthly report on their compliance with all elements of the Injunction that were then thoroughly analyzed by the Monitors to determine Defendants' performance, and where Defendants specifically failed. As discussed above, the Monitors offered lessons and suggestions for improvement. In the beginning the Defendants were receptive to conversations and meetings with the Monitors, but, after a few months, Defendants refused the Monitors' overtures and rejected or ignored most of the Monitors' recommendations without providing explicit reasons. Now that the appointment of a receiver looms large, Defendants have become highly critical of the qualifications, expertise, and opinions of the Monitors, even proffering the astonishing position that the Monitors' qualifications and opinions fall far short of the requirements of

Federal Rule of Evidence 702.[36] Either the Defendants are amnestic, or duplicitous, or both. The Monitors' reports are thorough, amply supported, and their reasoning is fully explained. Defendants' contentions to the contrary border on bad faith.

---

[36] Dr. Stern is a board-certified internist with 25 years' experience as a correctional physician in a variety of settings, including as a jail medical director, a regional medical director for a state DOC, a regional medical director for a for-profit prison health care vendor, and as assistant secretary/medical director for the Washington State Department of Corrections. He has provided consultation and assistance on correctional health care to a variety of organizations and agencies including DHS, USDOJ, Bureau of Justice Statistics, Bureau of Justice Assistance, National Institute of Corrections, California Attorney General, Human Rights Watch, ACLU National Prison Project, Federal courts, and the Namibian Correctional Service, and currently serves as medical advisor to the American Jail Association and National Sheriffs' Association. Dr. Stern also conducts research and teaches at the University of Washington School of Public Health, serves on the editorial board of the Journal of Correctional Medicine, and is past chair of the education committees of the American College of Correctional Physicians and the Academic Consortium on Criminal Justice Health.

Dr. Strick is board certified in Internal Medicine and Infectious Diseases with almost 20 years' experience working in carceral settings. Her roles in the Washington State Department of Corrections have included Statewide Infectious Disease Physician, Chair of Infection Prevention, and Hepatitis C Director. She also established a reentry program to transition patients with HIV back to the community. She is the Carceral Director for the Mountain West AIDS Education & Training Center and travels throughout the 9-state Mountain West region to do education and technical assistance for carceral and community providers to improve the care of individuals in jails and prisons. Dr. Strick is also a Clinical Associate Professor at the University of Washington where she sees patients, conducts research, and teaches medical students and residents about the carceral healthcare system.

Dr. Abplanalp is a licensed clinical psychologist with over two decades of experience in carceral settings. He received his Ph.D. in Clinical Psychology from the University of Texas at Austin and completed postdoctoral forensic work at Court Diagnostic and Treatment Center in Toledo, Ohio and Dorothea Dix Forensic Hospital in Raleigh, North Carolina. He began working for the Washington State Department of Corrections as both a psychologist and clinical supervisor in 2001 and, in 2011, he became the first Chief Psychologist of the Department. During his tenure, he has worked as a clinician, supervisor, and educator and he developed the statewide curriculum for Suicide Prevention and Mental Illness, which he presented to health services, custody, and front-line staff in over 300 trainings. In the wake of Hurricanes Maria and Irma in 2017, Dr. Abplanalp was deployed as part of an Emergency Management Assistance Compact to assist in rebuilding and fortifying the mental health infrastructure in the U.S. Virgin Islands. He has also served on

The substantial evidence in the record and the factors required to be established strongly support granting the Motion for Receiver.

### 1. Grave and Immediate Threat of Continuing Harm and Actuality of Harm

There can be no credible disagreement by Defendants that this litigation was initiated because of a seriously inadequate healthcare system that imperiled the lives of the prisoners. If not immediately apparent to Defendants at the outset of the case, Defendants effectively conceded the healthcare was in need of substantial improvement because they jointly stipulated in 2014 to comply with the numerous terms and requirements (Performance Measures) of the Stipulated Agreement in response to Plaintiffs' compelling allegations of unconstitutional healthcare. And those requirements were strikingly similar

---

the Crisis Negotiation Team, has been involved in high-risk extraditions with specialized security teams, and is certified in performing Psychological Autopsies. Over the past decade, Dr. Abplanalp has been intensely involved in the development, implementation, monitoring, and improvement of a coordinated system of integrated mental health and medical care within the Washington Department of Corrections and has worked as a Correctional Mental Health Consultant in a variety of carceral settings, including prisons, jails, community mental health agencies, and ICE detention centers. Dr. Abplanalp also serves as the Mental Health Advisor on the Board of Directors of the American Jail Association.

Dr. Rainer has been licensed in Washington State as a psychologist for 32 years. She has worked 26 years as a correctional Psychologist in both direct care and leadership roles, to include the Director of Behavioral Health and Chief of Psychology. She consults with correctional agencies committed to improving the care delivered to incarcerated people.

Donna Strugar-Fritsch has more than 30 years of health care policy, administration, program development, research and evaluation and clinical nursing experience. As a consultant, she built a strong national consulting capacity in correctional health care over more than 20 years, and is a nationally recognized expert in the interface of the Affordable Care Act, Medicaid, and correctional settings; design and implementation of innovative models for staffing and delivering correctional health care services; and comprehensive addiction treatment including all FDA-approved forms of Medications for Addiction Treatment in prisons and jails. She has a deep understanding of health care staffing and operations in correctional health systems and has helped many prisons and jails improve access to care and vendor contracting for correctional health services.

to the requirements of the Injunction, i.e., the Quality Indicators. But as early as 2016, Defendants largely failed to perform across all Performance Measures and those violations uncannily resemble the same violations of the Injunction.[37] Defendants resolutely denied violating the Stipulated Agreement, just as they now deny violating the Injunction. And Defendants' excuses in 2016 mirror the same excuses they offer in response to their violations of the Injunction.[38]

The appalling healthcare conditions culminated in a two-week trial in 2021 where the dire threat of harm to prisoners was established. The Court found the healthcare "grossly inadequate" and held it "placed patients at a substantial risk of serious harm," staffing was incompetent, and the poor treatment and indifference to patients was "pervasive," and in some cases inhumane. (Doc. 4335 at 19-20, 69.)[39]

Instead of appealing, Defendants engaged with Plaintiffs, the Court, and the Monitors to devise an Injunction that would end "the unconstitutional substantial risk of serious harm to Plaintiffs." The Court declared because of Defendants' chronic defiance, the Injunction was Defendants' last resort to comply with the Constitution. (Doc. 4637 at 8.) And to maximize success, strict adherence was mandated. The Court stated, "The Court's patience has run out," (*Id.*) and it is clear the Court "cannot impose an injunction that is even minutely ambiguousb because Defendants have proven they will exploit any ambiguity to the maximum extent possible." (Doc. 4410 at 5). The Court demanded the "changes necessary to redress [Defendants'] failings be substantial." (Doc. 4410 at 4-5.)

---

[37] Those failures then included deficiencies in prescription medication, the medical record system, reviewing medical records, diagnostic and chronic care visits, mortality reviews, and failures regarding overall delays in providing access to care.

[38] Between 2016 and 2021, Defendants claimed they "barely missed compliance," "noncompliance was based on a technical violation," violations were "due to third parties'" "inaction or omissions," and Defendants claimed their overall compliance with the Stipulation was allegedly "77-94%." But the overall administration of healthcare was demonstrated in numerous hearings as extremely poor. (Doc. 3921 at 24.)

[39] "The Mortality reviews demonstrated that despite ten years of litigation, [Defendants have] never created . . . a policy to [find] systemic issues identified in mortality reviews and ha[ve] not taken steps to remedy them" and "this constitutes systemic, conscious disregard of the risk prisoners face." (Doc. 4335 at 3.)

Now almost three years after the effective date of the Injunction, Defendants have continuously violated the Injunction, perpetuating the same unconstitutional risk of grave harm to the prisoners that has persisted since the outset of the litigation.

The Monitors expressly found Defendants were non-compliant with 131 of 154 Quality Indicators relating to healthcare.[40] Corroborating the Monitors' opinions, Plaintiffs' investigators analyzed Defendants' self-compliance using their database, based on a recent two-month sample (December 2024 and January 2025), that substantiates the Monitors' compliance findings and methodology. (Doc. 4838.) And using Defendants' database, Plaintiffs' investigator found substantial support for the Monitors' conclusions and methodology regarding the percentage of Defendants' compliance. (*Id.*)

Defendants admit violating a number of the Quality Indicators, and, for many where they differ with the Monitor's findings of violations, Defendants often (a) acknowledge the Monitors may be correct; or (b) commit to investigate to determine if the Monitors are correct; or (c) claim it is impossible to comprehend what the Monitors contend, despite that the Quality Indicators were drafted by the Defendants and have been in existence since 2023; or (d) assert the objectives and problems identified by the Monitors will likely be resolved when the PCCM required by the Injunction is finally established, which is unimaginable because Defendants are nowhere close to attaining it; or (e) commit to continuing resolving issues with NaphCare.[41]

---

[40] The Court relies on the Monitors' Third Interim Report for the number of Quality Indicators. (Doc. 4968.)

[41] Defendants filed the Declaration of Micaela McLane, Director of Nursing, who has been assigned since April 2025, and who has the lead responsibility to ensure monthly Quality Indicator assessments align with all requirements and to recommend improvements, and the Declaration of Raymonda Matheka, who has been the Mental Health Director since 2024. Some examples of their comments in their declarations include:

§ 1.1 Medical acknowledges Monitors "disagreement of selection of cases and commits to following up with physicians responsible for the assessments."

§ 1.1(f) Regarding Monitors' findings that Defendants continue to use favored samples, Defendants "will determine if functionality can be improved and discuss issues with physician reviewed."

§ 1.22 Acknowledge Monitors' report says tests are not performed because of transportation issues. Defendants will "follow up" and this is a "priority project."

- 28 -

The Court finds the overwhelming evidence establishes Defendants are in violation of the Injunction perpetuating the grave and immediate threat of actual harm to prisoners.

The Monitors, in reaching their analysis, used information from a variety of sources. Pursuant to the Injunction, the Monitors were given substantial authority to investigate, evaluate, and verify compliance through access to the electronic health records, conducting visits, and analyzing the data collected by Defendants and their agents. The Monitors were permitted to use information from a variety of sources, including interviews of prisoners, Defendants' staff and contractors, complaints from prisoners and all other persons, Plaintiffs' counsel, random or purposive view of health records, clinical observations, site visits, papers, and videos. And Defendants were mandated to cooperate with the Monitors in data collection.

---

§ 1.22(d) Defendants acknowledge the error that offsite referrals have included those not completed and "will improve this."

§ 1.21(a) Defendants acknowledge Monitors' report questions the number of refusals and claims Defendants are "reviewing the process" and will "look whether improvements are feasible."

§ 7.4.7 Defendants recognize assessments of the Patient Center Care Model "has not captured all of the issues encompassed in the Quality Indicators," particularly the "role of PCCM."

§ 11.16 (testing and treatment) Defendants promise to collaborate to improve the testing.

§ 2.4.1 Regarding mental health: Significant work has been completed very recently in 2025 that "may address Monitors' concerns."

§ 6.2 and § 7.3, which criticize failure to assign a mental health therapist: Defendants state the "issue may change when PCCM is implemented."

§ 1.1 Regarding necessary Tech Care modifications, Defendants promise they "will work with NaphCare."

§ 1.1(b) Regarding urgent care and whether Defendants have not collected required data, Defendants admit they have "not successfully implemented the methodology to date and it is a priority."

§ 1.21(a) Regarding suicide prevention Defendants state they are "addressing the issue and anticipate improvements."

§ 3.4 Language interpretation: Defendants admit it "needs improvement."

§ 16.3.1 Comprehensive mental health evaluation "to the extent the Monitors are correct that the assessments are relying on initial assessment . . . rather than more comprehensive evaluations their criticism is well taken."

Apart from establishing serious non-compliance, the Monitors identify the substantive effects of non-compliance. Attached is a chart demonstrating where Defendants are non-compliant based on the Monitors' reliable assessments.[i]

The Monitors determined Defendants were non-compliant with the core of the Injunction at sections 1.1 and 1.3, which "describe the backbone of any health care system," and are inextricably included in the Injunction. *Id.* at 45-47. Section1.1 requires all healthcare and documentation thereof be clinically appropriate, "including, where relevant to the circumstance and professional's credential, but not limited to, the conducting of the history and physical examination, forming and testing a differential diagnosis, arriving at a diagnosis, and ordering treatment for that diagnosis." (Doc. 4410 at 11.) Section 1.3 provides "all prisoners with physical or mental illness that require regular follow-up shall be designated on the medical or mental health caseload and shall be seen in clinically appropriate timeframes." (*Id.*) Care that is non-compliant with these provisions "by definition places patients at significant risk of serious harm." (Doc. 4968 at 45-47.)[42]

The Monitors noted, according to the most recent contract with NaphCare, Defendants were required to have 18.8 full-time employee staff physicians and 9.0 full-time employed medical directors, for a total of 27.8 full-time employed physicians. (Doc. 4968 at 27.) Defendants' reporting and response to the Motion for Receiver demonstrate

---

[42] *See* Doc. 4968 at 48 (Defendants self-assess 96% compliance with urgent care provision in sub provisions 1.1b of Injunction, but Monitors assess as closer to 33%); *id.* at 49 (Defendants self-assess 79% compliance with non-urgent, episodic care in subprovision 1.1c of Injunction, but Monitors calculate 35% compliance); (*id.* at 52 (Defendants self-assess 86% compliance with chronic care provision in section 1.1d of Injunction, but Monitors assess closer to 35%); *id.* at 53-57 (Monitors assess noncompliance with inpatient care provision in 1.1e, but find percentage is inappropriate methodology); *id.* at 58-59 (Monitors assess non-compliance with off-site specialty referrals provision in section 1.1f of Injunction and that percentages do not fully capture methodology, Defendants self-assess at 96% compliance, but Monitors assess 65% compliance.); *id.* at 60 (Defendants self-assess 84% compliance with 1.1g of Injunction regarding action taken on post-hospital, post-emergency room, or specialist recommendations and that percentages do not fully capture methodology, Defendants self-assess at 96% compliance, but Monitors assess 10% compliance).

an inability to recognize their own failures and incompetence. Defendants have what they consider to be 11.5 FTE staff physicians positions filled by 18 physicians (approximately 61% filled), but only 11 of those physicians are board certified or board eligible as required by the Injunction. (*Id.*)[43] Likewise, although Defendants contend all 9 of the medical director positions are filled, because only 6 of the 9 physicians are board certified or board eligible, only 66% are actually filled. (*Id.*) And Defendants claim NaphCare is offering competitive salaries, but this is wrong. The Monitors correctly found the increase is "woefully insufficient,"[44] and continues despite the constant entreaties by the Court in the presence of the Director and his staff that this must be immediately cured. (*Id.* at 28, 273.)[45]

And it cannot be overemphasized that Defendants have been frequently told by the Court that their incompetent and inadequate staffing of healthcare is unconstitutional. When the case was filed, the Class certification order "identified longstanding staffing deficiencies." Then in May 2017, Magistrate Judge Duncan found a "a mere seven staff physicians and five psychiatrists for the entire ADC prisoner population" was seriously inadequate. Concomitantly, Defendants heard the shocking testimony of Defendant Richard Pratt, Interim Director of the Health Services Division, expressing the flagrant indifference of Corizon, the then-contractor, that: "[The contractor] may well have decided to pay a fine rather than fill staff positions." (Doc. 2071 at 85.) Then during the two-week

---

[43] These numbers have changed slightly while the Motion has been pending, but the underlying issue remains. (*See, e.g.*, Doc. 5040 at 3 (Monitors assert that "Defendants report that they currently engage 15.3 FTE staff physicians. In fact they only engage no more than 11 FTE. Second, Defendants focus on informing the Court where they are compared to where they were. We believe that the focus should be on where they are compared to where they should be. It is this latter comparison which is much more determinative of patient safety and led us to the conclusion that staffing remains dangerously inadequate.")).

[44] The Monitors state "based on [their] experience, employers must pay a premium to attract health care professionals to work in a prison" and point out that the software used to evaluate NaphCare's salaries cannot distinguish prison-based from community work settings or on-site from remote employment, and likely has little comparative data for the remote locations where ADCRR prisons are situated.

[45] The Director attended all hearings in 2023-2024 where the Court brought poor staffing to his specific attention.

trial in 2022, Defendants effectively agreed their current staffing levels were insufficient, and acknowledged their then-contractor, Centurion, admitted that "if [the contractually required] staffing levels could be obtained," it "would be insufficient" to meet healthcare standards. (Doc. 4335 at 22.) Finally, only three months after the effective date of the Injunction, the Court was compelled to order Defendants to immediately hire new staff because they were already in violation of the Injunction, but Defendants failed to comply with the Court's order. For Defendants to now suggest they be absolved of their staffing violations and even exalted with praise because today only 100 contract positions remain unfilled is preposterous and sustains that they are oblivious to their constitutional obligations.

The Monitors documented critical deficiencies in implementing the Injunction requirements relating to patient refusals and informed consent despite the Monitors' feedback on making relatively simple changes to the refusal process and documentation. (Doc. 4968 at 29-35.) The Monitors' investigation found these failures have resulted in dangerously misinformed refusals of treatment. (*See id.*)

Defendants, despite the Monitors' findings, claim there is no grave and immediate threat, or actuality of harm to the Plaintiff class. In making this assertion, they challenge the Monitors' methodologies and state they have a "difference of opinion" of what is appropriate prison healthcare, without offering a scientifically valid basis. And Defendants suggest that meeting a high percentage of the Quality Indicators is sufficient compliance. But it is unimaginable Defendants would disagree that delivery of clinically required healthcare in prison often presents emergencies and life and death situations for which a percentage of compliance is consistently inadequate.[46]

---

[46] For the most recent publication by the Bureau of Justice Statistics on inmate medical and mental health problems, *see* Laura M. Maruschak, Jennifer Bronson & Mariel Alper, *Survey of Prison Inmates: 2016: Medical Problems Reported by Prisoners* (2021) and Laura M. Maruschak, Jennifer Bronson & Mariel Alper, *Survey of Prison Inmates: 2016: Indicators of Mental Health Problems Reported by Prisoners* (2021); *see also* Jill Curran, Brendan Saloner, Tyler N.A. Winkelman & G. Caleb Alexander, *Estimated Use of Prescription Medications among Individuals Incarcerated in Jails and State Prisons in the US*, JAMA Health Forum (Apr. 14, 2023), doi:10.1001/jamahealthforum.2023.0482.

Moreover, the model of care established by the Injunction with all Quality Indicators, after months of negotiations, was jointly drafted by the Court, Defendants, Plaintiffs, and the Monitors. It was to be strictly enforced by the Court. (Doc. 4637 at 8.) Accordingly, nowhere in the language of the Injunction, or the Court's approval of it, is there the slightest implication that partial compliance, *i.e.*, a percentage, would be tolerated. And describing the Monitors' findings and analysis, which are supported by voluminous evidence, as a "difference of opinion" does not overcome their factually reliable evaluations and conclusions.[47]

Consistent with the Court's 2022 Findings (Doc. 4335), these violations were not then, and are not now, abstract. They are brought to life—or death—by the individuals who experienced profound delays in receiving treatment or who failed to receive treatment at all. The Findings included evaluations of fourteen mortality reviews that highlighted the deficiencies in the care the prisoners received. Those mortality reviews were appalling in their illustration of the callous, inhumane indifference displayed on a regular basis. But more than that, the Findings revealed not just that the care received was shocking but, in many instances, Defendants demonstrated they did not believe the care was in any way deficient. And it is this belief of Defendants that creates the catastrophic risk of harm to Plaintiffs.

The Court's finding that Defendants are in violation of the Injunction establishes a grave and immediate threat of harm to prisoners, but the same threat of harm is also independently manifested by the eight deaths reported in the mortality reports occurring in 2023 and 2025. Moreover, the grave continuing harm to the prisoners is separately demonstrated by the Monitors' identification in the 300-page report of numerous recent incidents of Defendants' maladministration of medical care, including inhumane treatment.

The Monitors evaluated Defendants' four most recent deaths (as of the date their report was drafted) and compared those deaths to Defendants' first four deaths following

---

[47] Again, it is inexcusable for Defendants to now falsely claim the Monitors, for the first time, provided them with "a detailed review of the healthcare Injunction requirements . . . for determining compliance and a critique of [Defendants'] performance."

issuance of the Injunction. The Monitors believe this comparison sheds light on whether progress has been made in the delivery of constitutional healthcare and whether Defendants have implemented the critically necessary self-review process required both by the Injunction and as necessary to identify problems and correct them so they do not recur.

The relevant facts are below and establish the prisoners experienced "a lack of timely access to appropriate care by the appropriately skilled professionals." (Doc. 4335 at 30.)[48]

### a.      Death 1

Patient 20 died on March 24, 2025 at the age of 78. He had a history of multiple stroke and seizure disorder (in addition to other serious issues.) He was seen by a neurologist on July 11, 2023, and was prescribed an antiseizure medication that improved his seizures. But on February 20, 2025, the Facility Medical Director saw Patient 20 and discontinued his seizure medication. The provider failed to review Patient 20's medical history because, if he had, the provider would have immediately identified Patient 20 had an ongoing seizure disorder. Two weeks after discontinuation of the medication, Patient 20 suffered a prolonged seizure requiring intubation and placement in the hospital intensive care unit. He eventually returned to the prison, and died four days later.

The Monitors acknowledged his co-morbidities contributed to his death, but the critical failure to review Patient 20's medical history and his removal from antiseizure medication "hastened his death" and the Monitors also noted numerous other deficiencies in Patient 20's care. Yet, Defendants' own mortality review "did not identify a single error nor any room for improvement." (Doc. 4968 at 8.)

### b.      Death 2

[48] The Monitors outlined their analysis of the eight patients. (Doc. 4968.) In their response, Defendants submitted the declaration of Dr. Embrey, the Corporate Medical Director for NaphCare, who disputed some of the Monitors' factual assertions regarding the patients' care. (Doc. 4973, Ex. 12.) The Monitors then submitted a supplemental response to Defendants' response. (Doc. 5040.) In relevant factual recitations, the comments and disagreements from Dr. Embrey and the Monitors' responses are included where relevant.

Patient 21 was a 78-year-old male who also died on March 24, 2025. He had a history of cardiac issues, including high blood pressure, high cholesterol, and a cardiac arrhythmia. On February 9, 2025, he suffered a heart attack that required placement of a stent in his main coronary artery.

The Monitors "identified several issues of grave concern regarding Defendants' management of his condition upon return from the hospital." Specifically, Patient 21 was prescribed two new blood thinners and was instructed to discontinue his aspirin as the combination of the medications "greatly increases the risk of serious if not fatal bleeding." Yet Patient 21 continued to receive aspirin for an additional 10 days. Second, Patient 21 was referred for a specialty consultation with a cardiologist within one week (by February 21.) It was not scheduled to occur until April 17, at which time Patient 21 had been dead for nearly one month. Finally, Patient 21 experienced a hypertensive emergency, which requires emergent treatment, but that treatment was "inappropriately managed at the facility." By March 7, Patient 21's blood pressure had increased to 200/86, which, according to the Monitors, required emergency intervention. Instead, he was "seen on March 8 by an RN, acting independently, who failed to recognize the urgency of the situation."

Despite the serious errors in Patient 21's care, Defendants' mortality review "did not identify a single error nor any room for improvement." (Doc. 4968 at 9.)

### c. Death 3

Patient 22 was a 48-year-old male who died on March 12, 2025. He developed lung cancer, which was not diagnosed until it metastasized to the brain.

Patient 22's friend "was so concerned about the patient's health that he accompanied him to medical to help advocate for him to get urgent help." The friend communicated the symptoms to the nurse, that his symptoms were urgent, and that Patient 22 said he did not know how to communicate his symptoms on his own. When Patient 22's friend mentioned a possible mental health issue, the nurse—despite that Patient 22 was not on the mental health caseload—scheduled Patient 22 for a mental health follow-up. The Monitors

identify this as a "serious error" because the Permanent Injunction explicitly states patients not on the mental health caseload are required to see a medical provider before placement on the mental health caseload. The reasoning is straightforward: patients experiencing clinical symptoms who do not have a mental health diagnosis are frequently experiencing a physical condition. And here, the change in behavior experienced by Patient 22 was the result of metastatic brain lesions.

Thereafter, on January 16, medical staff witnessed Patient 22 experience urinary incontinence. The Monitors point out, this symptom in a 48-year-old male with no history of incontinence is alarming and suggestive of "a brain lesion or spinal cord damage requiring emergent treatment." Instead, the symptom was ignored and Patient 22's physical exam was deemed normal.

Patient 22 then received the appointment with the psychiatric provider, who diagnosed Patient 22 as experiencing "recurrent major depressive disorder" and "adjustment disorder" despite having had no mental health history and no new circumstances to which he was adjusting. The Monitors found both diagnoses were "nonsensical." The provider also attributed Patient 22's incontinence to his depression. The Monitors explained even if Patient 22's incontinence were attributable to a mental health condition (that he did not have), it "would be such an extreme symptom of depression that it should have resulted in immediate admission to a MH Inpatient Unit." But, instead, the practitioner gave Patient 22 an antidepressant.

Thereafter, while in the hospital, Patient 22 was diagnosed with metastatic lung cancer and had one brain lesion surgically resected. He was discharged back to the facility. Patient 22 was seen by a radiation oncologist on February 11, 2025, and additional imaging was ordered to prepare for ablative radiation to his brain metastases. The imaging done on March 10 revealed a "critical situation": patient 22's brain was swelling and was "about to destroy the brainstem." At that point, Patient 22's vital signs were "very abnormal," including a rapid heart rate of 120. The radiologist documented that the radiologist's "critical results team[]" attempted to notify Defendants by phone of Patient 22's status but

despite seven attempts, none were successful. According to the Monitors, Patient 22 needed emergency surgery—i.e. "within minutes to hours." And the "clinical results team" sent a fax to Defendants, which was reviewed, but Defendants took no action that day or the next day. They took no action until March 12, when "there was clinical evidence of actual herniation of the brain."

Despite the errors in Patient 22's care prior to his death, Defendants' mortality review "did not identify a single error nor any room for improvement." (Doc. 4968 at 10.)

### d.    Death 4

Patient 23 was a 35-year-old male who died on March 21, 2025. Patient 23 had a history of bipolar disorder. The Monitors "identified several issues of grave concern regarding [Defendants'] management of his case." Patient 23 was seen by a nurse (acting independently) on February 12 for a cough and sore throat that lasted for four days. Patient 23's oxygen was low—93%—but the nurse ignored it. The nurse also did not do any testing or arrange for follow-up.

The Monitors explain Patient 23 was "brewing the infection or infections that would lead to his death . . . .[And] [h]ad the patient been seen by a competent practitioner at this point, his death would likely have been prevented." Instead, the nurse ordered over-the-counter medication and nothing else.

Patient 23 was seen again by a nurse (acting independently) on February 18. Patient 23 declined a physical exam, and he was not referred to a provider. Thereafter, on February 21, when seen at his cell-front for medication distribution, he was found in "acute respiratory distress." His cellmate reported Patient 23 had been "very ill for 3 to 4 days." Patient 23 "was pale, 'almost gray,' and his heart rate was fast (pulse 117.)" Patient 23's pulse oxygen was 45%; the Monitors explain levels below 75-80% are considered "critically low." The Monitors opine Patient 23 required "immediate evacuation to the hospital." But Patient 23 was sent to the medical clinic. Patient 23 died in the hospital of severe pneumonia. The Monitors conclude the "nine-day delay in the patient receiving appropriate care from Defendants for a brewing pneumonia erased any chance he had to

survive the infection."

Again, despite the errors in Patient 23's (a 35-year-old) care, Defendants' mortality review "did not identify a single error nor any room for improvement." (Doc. 4968 at 10.)

### e.     Death 5

Patient 24 was a 48-year-old male who died on July 10, 2023 from pneumonia. The Monitors identified "at least two significant errors in this patient's care." The first was Defendants' failure to offer an influenza vaccination, in violation of section 11.4 of the Permanent Injunction. Because "at least a third of severe cases of influenza can be prevented by vaccination, failure to provide vaccination likely contributed to his death."

The second failure was Patient 24 was evaluated by a nurse acting independently on July 6, 2023. The Monitors further opine that if Patient 24 had been evaluated by a competent practitioner, his death might have been avoidable.

Despite these two errors, Defendants did not identify any errors or opportunities for improvement. (Doc. 4968 at 12.)

### f.     Death 6

Patient 25 was a 60-year-old male who died on July 23, 2023 from metastatic liver cancer as a result of end stage liver failure due to hepatitis C and alcohol abuse. The Monitors identified at least three significant failures in Patient 25's care.

Despite a history of cirrhosis of the liver, Patient 25 was not appropriately screened for liver cancer. The second error occurred when a provider that saw Patient 25 on July 12, 2023 inappropriately referred him for an urgent paracentesis (procedure to remove excess fluid) without doing necessary laboratory testing first. This is dangerous according to the Monitors because of the risks associated with paracentesis without attempting to eliminate fluid in the abdomen through other means. Finally, the paracentesis was ordered on July 12, 2023 as "urgent," meaning it needed to take place within one month. But the electronic health record reflected it was not scheduled to take place until December 4, 2024, almost 18-months later and long after Patient 25 died. This erroneous entry reflected a software error when the original request was cancelled because Patient 25 died.

Defendants did not identify any errors in Patient 25's care. (Doc. 4968 at 12-13.)

### g.  Death 7

Patient 28 was a 69-year-old male who died on July 29, 2023 from a perforated stomach ulcer. The Monitors identified at least four significant errors in Patient 28's care.

Patient 28's platelet count was noted to be low (112,000; normal range is 150,000-450,000) on May 17, 2023. A low platelet count can result in bleeding and is concerning because of the possibility of serious disease. The Monitors noted that because there was nothing in Patient 28's electronic health record to explain this low platelet count, a workup should have been conducted to determine the cause, but it was not. Patient 28 did have repeat lab work on June 23, 2023. The low platelet count was still present, and in addition, Patient 28 was now anemic; his hematocrit dropped from 43 to 35.8 in approximately one month. According to the Monitors this "would raise concern the patient had internal bleeding." Moreover, the June 23 test results should have been reviewed within four days but were not reviewed until July 7, in violation of section 4.4 of the Permanent Injunction.

On the evening of July 4, 2023, Patient 28 was brought to the medical unit by custody staff. He presented with "low blood pressure, fast heart rate, fever, and low oxygen levels." He was sent to the hospital and discovered to have internal bleeding from a stomach ulcer. He underwent emergency surgery but did not recover. The Monitors also discovered that, starting in October 2022, Patient 28 was prescribed naproxen twice daily. Patient 28 had low platelets and cirrhosis, which means NSAIDs (like naproxen) are contraindicated unless absolutely necessary.

Defendants did not identify the first two errors but did identify the third. Their recommendation was that "patients with risk factors for gastrointestinal bleeding (e.g., cirrhosis and low platelets) should only be prescribed chronic NSAIDs when other treatment options have been explored and the patient has been provided with education about the risks and benefits of treatment. When chronic NSAIDs are prescribed, then appropriate treatment with gastro-protective medications (e.g., proton pump inhibitors) should be utilized." But the Monitors pointed out that Defendants did not take any action

with this recommendation; i.e. "analyze why the error occurred," "incorporate addressing of the error into the statewide improvement plan, and if remediation is called for, develop and execute an effective and sustainable remediation plan. Instead, their remediation plan amounted to just wishful thinking." (Doc. 4968 at 13-14.)

### h. Death 8

Patient 29 was a 40-year-old male who died on July 30, 2023, from complications following surgery for a bowel perforation due to diverticulitis. Patient 29 was seen in the medical unit five times (four times by a nurse and one time by an advanced practice provider) for abdominal symptoms that began on December 29, 2022, including "severe abdominal pain, nausea, vomiting, and blood in the stool." No practitioner physically examined Patient 29 until January 3, 2023, and it was not until the afternoon of January 4, "after seven days of suffering severe abdominal pain that [Defendants] failed to control, that [Defendants] finally sent [Patient 29] to the hospital." Upon arrival at the hospital, Patient 29 had a perforated colon and surgery was performed immediately.

The Monitors opine that Patient 29's colon perforated hours or days before he was sent to the hospital, thereby greatly increasing the risk that surgery was not successful. This is on top of Defendants' failure to treat the severe pain Patient 29 experienced.

Defendants identified two errors in Patient 29's care: that severe abdominal pain should be escalated to a higher level of care and NSAIDs should be used cautiously in patients in a high risk of bleeding. But, like Patient 28, Defendants did not take any action with respect to the identified errors. And the Monitors determined three subsequent deaths contained the same recommendation regarding escalation of care for prisoners experiencing severe abdominal pain, thereby "highlighting that the issue had not been adequately addressed." (Doc. 4968 at 14-15.)

### i. Conclusions from Recent Mortality Reviews

In the Court's 2022 Findings of Fact following the trial (Doc. 4335), the Court concluded from the mortality reviews:

The mortality reviews illustrate the harm that routinely befalls prisoners

because they do not receive timely and adequate health care. The common theme is nurses repeatedly are unable to properly diagnose health care issues and fail to refer prisoners to a provider.

\*\*\*

The deaths outlined above, some very recent, were not aberrations or corrective action would have been implemented. No such evidence was introduced because it does not exist. Defendants' failure to take any action in response to such obvious deficiencies up to the date of trial is evidence Defendants are content to continue using nurses

\*\*\*

Using nurses as the first line, and often last line, for providing care is medically unacceptable. While using nurses in this way is driven by a lack of higher-level staffing, that does not excuse Defendants from adopting a system that leads to preventable deaths.

(Doc. 4335 at 41-44.)

The Monitors' reviews of the deaths in 2023 and 2025 show not only has that practice continued unabated but, when performing mortality reviews, Defendants continue to fail to identify serious failures or take any action to prevent their recurrence. Moreover, Defendants have shown a complete inability or unwillingness, or both, to recognize and correct their failures, exacerbating the grave and continuing threat of harm and actual harm suffered by inmates. Further, it is important to note that in contrast to the numerous mortality reports presented as evidence at the 2021 trial, which were some of the most egregious examples of failures, the Monitors restricted their selection to a very few in 2023 and 2025. Notably, however, all eight selected demonstrated poor analysis and review. And it deserves repeating, Defendants represented to the Court in March 2024 that Dr. Phillips intended to "aggressively make improvements in the mortality reports." (*See, supra*, footnote 29.) Clearly Dr. Phillips was unsuccessful as four of the deaths reported in the Monitors' recent analysis occurred in 2025.[49]

---

[49] Defendants, in response to the Motion for Receiver, noted that the Mortality Review Committee has very recently made "several recommendations for corrective action" of poor treatment of patients, which is painfully overdue. (*See* Doc. 4973 at 15.)

In addition, the Monitors have pinpointed systemic failures that directly violate the Injunction and place prisoners at grave risk of imminent harm.[50] In evaluating whether prisoners are given enough information for informed refusals of medical care, the Monitors found common situations where prisoners' refusals were not informed in violation of the Injunction. This was exemplified by Patient 33, who decided to stop his medication to treat his opiate use disorder after an 11 *second* interaction with an LPN at his cell front in April 2025. (Doc. 4968 at 30.)  The Monitors concluded there was no chance Patient 33 could have been informed of the serious harmful consequences of discontinuing medication for opiate use disorder during the 11-second interaction. Similarly, Patient 43 had a chronic care visit scheduled for April 30, 2025, but because he incorrectly believed he no longer had hepatitis-C, he signed a blank refusal form that was slipped under his cell door, which he signed at 10:07 a.m.; a medical assistant signed the document in the space under the patient's signature 53 minutes later *falsely* indicating that they were present to obtain the refusal from the patient, but at no point within the 3-day window required by the Injunction did any practitioner meet with Patient 43 to explain to him that he still had hepatitis-C or the consequence of refusing his visit for hepatitis-C treatment. (*Id.* at 31.)

Additionally, Patient 34 had an off-site appointment scheduled with a gastroenterologist on April 23, 2025 for a colonoscopy due to his familial history of colon cancer; Patient 34 was not told why he was being sent to a "stomach doctor" and when he refused the appointment, a nurse spent 15 *seconds* at his cell administering medication and the Monitors concluded she could not have obtained informed consent for the refusal while administering medication in that short period of time. (*Id.* at 33.) The refusal form was again signed 5 hours later by a medical assistant *falsely* indicating that the assistant was present to obtain refusal from the patient. (*Id.*)

In August 2024, Patient 37 reported to the Monitors that refusals are sometimes just

---

[50] Although the Court highlights some examples here, the Monitors have documented numerous examples of violations of the Injunction and the serious risks of harm posed to prisoners as a result of the noncompliance, as set forth in their Reports, in addition to their statistical analysis of non-compliance with the Injunction.

based on "word of mouth" from officers. (*Id.* at 34.) Patient 60 submitted an HNR on February 3 stating, "I recently fell from the top bunk directly on to my back. Not only was the wind completely knocked out of me, but I also may have dislocated a rib as I can't hardly move left to right, up & down. Struggling to climb to bunk." Though the patient only submitted one request, there are 3 separate entries closing out this request in the patient's EHR on February 7, two indicating that the appointment was cancelled and one that it was refused, but there is no evidence that he actually refused or that any health care staff member had a direct interaction with the patient to confirm he no longer needed to be seen. (*Id.* at 74.)

Patient 61 had an appointment to see a practitioner as a follow-up to a visit with an orthopedic surgeon who recommended the patient have surgery to repair a torn ligament in his knee. There is a document with the word "refusal" executed by a medical assistant who somehow heard from a correctional officer that the patient "did not want to come to medical." His visit was cancelled in direct violation of Injunction provision 1.21b. (*Id.* at 75.)

Patient 62 was referred to see a cardiologist on February 12, 2025 due to an abnormal EKG that raised concerns that he might have blockages of arteries in his heart. A refusal form indicates that the patient is refusing a "med run" with the reason given, "don't need it" and was signed by an LPN. The refusal does not address cardiology, but the referral to the cardiologist was cancelled by an unidentified person without explanation and without rescheduling in direct violation of Injunction provision 1.21c. (*Id.* at 76.)

Likewise, in evaluating whether emergent and urgent care is given in compliance with the Injunction, the Monitors noted examples of seriously deficient emergent and urgent care, in violation of the Injunction posing an obvious risk to the prisoner's health and safety.

Patient 44 has a history of coronary heart disease, high cholesterol, asthma, and gastric reflux disease. At 11:45 PM on February 19, 2025, he complained of acute, severe (7 to 10 out of 10) left-sided chest pain with left hand numbness, and initially accompanied

by nausea. Despite two dangerously high blood pressure readings, an EKG showing an electrical abnormality, abnormal skin color, and pain reproducible with palpation, a practitioner who neither saw or examined the patient made the decision to give a single dose of a blood pressure medication, a prescription for a stomach medication, and a drug test in the morning. (*Id.* at 46.) The Monitors concluded that "[f]ailure to arrange [the patient's] immediate evacuation put the patient at significant risk of death from a heart attack." (*Id.* at 47.)

Patient 45 is a 71-year-old male with 21 problems on his problem list, including asthma, hiatal hernia, gastric polyps, prediabetes, H. pylori infection, gastroesophageal reflux, traumatic brain injury, hyperlipidemia, seizure disorder, and a lumbar spine compression fracture for which he is on 12 medications. He had an acute episode of vomiting "coffee grounds" just past midnight on February 25, 2025, and was seen by an RN, acting independently, using a nursing protocol prohibited by the Injunction. The nurse ordered medication (without a legal physician's order) to stop the vomiting and ordered no further monitoring, and although the patient vomited again 5 more times, absent any instructions from the nurse, staff did nothing in response to additional vomiting. The Monitors concluded that "[t]his care put the patient as significant risk of massive blood loss and possible death" given that emesis described as coffee grounds is indicative of internal bleeding until proven otherwise requires, at a minimum, close observation for the next several hours and an emergent blood test to check for bleeding. (*Id.* at 48.)

The Monitors also detailed examples regarding non-urgent, episodic care creating grave harm to patients.

Patient 46 had 6 separate non-urgent encounters over a 6-month period starting in November 2024 that "all demonstrated a failure of multiple different professionals to fulfill the requirements of this provision to provide clinically appropriate episodic care, ultimately leading to a potentially life-threatening complication." (*Id.* at 49.) In his first visit, despite showing symptoms of a bladder obstruction, a practitioner, without seeing Patient 46 simply ordered antibiotics for a bladder infection, even though the patient's complaints

indicated a need for urgent treatment. In his second visit, a week later, Patient 46 reported his symptoms had not improved with the antibiotics and an RN acting independently (in direct violation of the Injunction) failed to examine the bladder, prostate, or kidneys. A week later, the patient was seen again by an RN reporting burning while urinating and back and flank pain; the RN again directly violated the Injunction and repeated the failures of the week before. Four months later, the patient was again seen by an RN for urinary symptoms, and the RN practicing independently (in violation of the Injunction) did not examine the prostate, bladder, or kidney and inappropriately ordered antibiotics. About two weeks later, the Patient reported incontinence and requested to be seen ASAP, but despite the emergent nature of his complaint, he was not seen until six days later; at which point, he had urinary incontinence for two weeks and a non-physician practitioner, in violation of the Injunction, who treated Plaintiff, did not conduct a prostate, bladder, or kidney exam, failed to appreciate the urgency of the situation, and instead ordered non-urgent blood tests, without including a blood test measuring kidney function, and ordered a non-urgent ultrasound of the patient's prostate, despite the urgency of the symptoms.

A week later, the patient was still incontinent, asked for the insertion of a foley catheter despite that the patient knew insertion of such catheter is extremely painful, which would have prevented future hospitalization, but the patient was instead placed on more antibiotics. Four days later, the patient exhibited acute changes in his mental status and was finally sent to the emergency room with the findings: "His mental confusion was a result of urinary retention resulting in acute kidney failure complicated by potentially life-threatening blood electrolyte abnormalities (hyperkalemia, hyponatremia, and acidosis), and a urinary tract infection due to a multidrug resistant organism, potentially the result of the misuse of several antibiotics." "Given the high degree of antibiotic resistance of this organism, infection prevention precautions should have been put in place upon return to ADCRR to prevent the spread of this very dangerous and difficult-to-treat organism to other sick patients, putting them at significant risk of serious harm. No such precautions were put into place." (*Id.* at 50-51.)

Patient 47 also suffered a kidney function that significantly declined in the latter half of 2024 and both an ultrasound on November 20, 2024 and then a CT scan on December 31, 2024 showed severe back-up of urine into his kidneys (hydronephrosis), but his providers failed to recognize the urgency of the problem, and "[d]ue to the delay in clinically appropriate care, the patient now has irreversible kidney damage that the kidney specialist thinks will likely require hemodialysis." "Despite the complexity of his case, the patient is assigned to an APP, instead of a physician (in violation of Injunction sections 6.2 and 7.3.) However, the assignment is meaningless because over the course of six primary care visits in nine months, the patient has never seen the assigned PCP, saw the same APP for only two of the visits, two different APPs for two other visits, a physician for one visit, and a different physician for a second visit." (*Id.* at 52.)

Patient 49 was undergoing treatment for opioid use disorder, and although a relapse was indicated from the inappropriate care he received in June 2024, in July 2024, a MOUD practitioner wrongly discontinued buprenorphine when the patient did not come to the appointment and an LPN and correctional officer subsequently signed a "refusal" form on July 22, 2024 (in violation of Injunction section 1.21) "which has no meaning nor value as neither actor is competent to conduct an informed refusal." "Thus, despite the ongoing significant risk of overdose associated with his opioid use disorder, ADCRR failed to engage this patient." On August 1, 2024, the patient presented with acute urinary symptoms and was diagnosed with a kidney infection, but though his urine also showed large amounts of glucose and ketones consistent with diabetes and possibly ketoacidosis, a life-threatening and urgent complication of diabetes and his kidney infection and diabetes required an examination by a provider and immediate blood testing, no further testing was done, and he was merely started on medications for diabetes and sent back to his living unit. On August 2, 2024, an ICS was triggered because the patient had worsening abdominal pain, he was sent to the ER and diagnosed with sepsis that had resulted in the kidney infection (pyelonephritis) and uncontrolled diabetes and he was started on intravenous antibiotics, but left the hospital against medical advice after two days. A blood

infection from MRSA requires a minimum of 10 days of antibiotics (ideally intravenously) and without proper treatment often causes secondary infection in the body (e.g., heart valve, organs, bone.) The remote APP, charged with reviewing his condition immediately upon return to the facility on August 4, 2024, failed to seek any records regarding his hospital stay until almost two weeks later on August 14, 2024. Due to this information vacuum, Defendants did not provide any effective antibiotics for his serious kidney and blood stream infection and never addressed with this patient the ongoing risk of inadequate treatment of his life-threatening infection. His diabetes also remained out of control (blood glucose greater than 400, extremely elevated.) Thus, he remained at ongoing risk of serious medical harm from both infection and diabetes. An on-site practitioner saw the patient on August 23, 2024, almost 3 weeks after he left the hospital, but failed to address the patient's blood infection or high sugars, which were urgent clinical issues. A different practitioner started long-acting insulin without seeing the patient. On September 1, 2024, the patient was first seen for neck pain by a nurse and told he was sleeping wrong. He was seen by nursing again on September 3 and 4, 2024 for ongoing neck pain and stiffness.

Each of these visits, conducted by a nurse practicing independently, were clear violations of the Injunction (section 7.4.7) and caused harm, as his untreated infection had now invaded the bones of his spine and required urgent management. An on-site practitioner saw the patient on September 6, 2024, and gave him muscle relaxants, warm compresses, and a referral to physical therapy. The practitioner noted needle marks on the patient's carotid veins, a sign he might still be using drugs intravenously, which increases his risk of re-infection of his blood and the ongoing risk from his inadequately treated prior blood infection. The practitioner should have, but did not, consider and evaluate the patient for serious infection based on his clinical history (in violation of Injunction section 1.1.) Nurses, acting independently, again saw the patient for ongoing head and neck pain on September 17, 23, and 24, 2024, when he was finally referred back to a practitioner. He eventually had blood tests drawn on September 26, 2024, which were reported back to Defendants on September 28, 2024, but were not reviewed until October 7, 2024 (in

violation of Injunction section 4.3.) On September 28, 2024 the patient was finally sent emergently to the hospital due to headache, decreased level of consciousness, incontinence, lethargy, rocking in pain, and shivering. His MRSA infection now involved his blood, heart valve, heart tissue, brain, and spine. The infection was so severe at this point, that it required not only intravenous antibiotics, but also antibiotics administered directly into the fluid around the brain. A note on October 19, 2024 documented a call between the doctor in the hospital and a practitioner at the prison in preparation for discharge that requested weekly labs results be faxed to the hospital for review until the patient was predicted to be off intravenous antibiotics (November 20, 2024) and follow-up with a heart specialist and an infectious disease specialist around the time antibiotics were to be ending. None of these necessary measures occurred as requested (in violation of Injunction section 1.1.)

Upon return from the hospital on October 22, 2024, Defendants placed the patient in an IPC or SNU bed (the medical records contain contradicting statements.) The patient had vital signs and nursing assessments conducted at haphazardly spaced intervals, sometimes going days without any vital signs or a nursing assessment which was not clinically appropriate based on the patient's clinical acuity (in violation of Injunction section 7.6.)

> Given his condition, this lack of adequate nursing care placed him at great risk for serious medical complications. In light of the patient's known serious heart, brain, and spine infection in the setting of poorly controlled diabetes, he also required daily examinations by a practitioner upon admission back to [Defendants], if not more frequent examinations, especially when he started complaining of worsening neck pain and new urinary incontinence on November 6, 2024. Instead, from the date of discharge from the hospital (October 22, 2024) until December 7, 2024, practitioner care was provided only via telehealth using remote personnel and only on the following dates: October 22, 23, 25, November 6, 19, 21, 26, 29, and December 1, 2024. During this time period, he was never once examined by a provider for changes in his heart, brain, or spinal cord function, despite their highly vulnerable status. His antibiotics were discontinued on November 20, 2024 without any clinical reassessment by an onsite provider

or outside specialist to determine if this was still clinically appropriate. This was extremely dangerous as it is important to ensure a serious infection is improving based on clinical signs/symptoms and laboratory tests before stopping a course of intravenous antibiotics and to establish a long-term treatment plan (in violation of section 1.1.) In fact, this patient did not see an on-site provider until December 7, 2024, almost six weeks after his hospitalization, and only after going back to the hospital on December 1, 2024 for worsening symptoms. Due to the seriousness of the infection, even after completing a course of intravenous antibiotics, he was started on a year-long course of oral antibiotics at the hospital. The patient was not scheduled with a neurosurgical specialist until March 7, despite discharge from the hospital on October 22, 2024 with instructions to wear a cervical collar at all times due to concern about the stability of the bones in his neck and compression of his spinal cord. The cardiology consultation that was supposed to occur in late November 2024 for his serious heart infection was not scheduled to take place until February 10, and then was rescheduled to April 17 due to insufficient ADCRR transportation resources. The infectious disease consultation to follow-up on the overall management his life-threatening infection that was also supposed to occur in late November is still not scheduled as of June 23.

(*Id.* at 53-57.)

Patient 50 is a 41-year-old male with a number of serious conditions, including heart disease, was seen on February 19, 2025 complaining of intermittent chest pain and experiencing a discharge of the internal defibrillator. The APP did not obtain further essential history and examination and noted she was unable to conduct a physical exam due to telemedicine, but made no effort to have a physical examination scheduled. Despite that these symptoms required urgent or emergency referral to a cardiologist, the APP ordered a routine referral. This was the first time this patient saw this APP and over the course of six months since his arrival in early January 2025, Defendants assigned him a new PCP 18 times, only 2 of those assignments were to physicians, and only for a total of 5 days; the rest were all APPs (or indeterminate.)

Patient 51 was found to have an abdominal aortic aneurysm during a hospitalization

and incorrectly referred to a cardiologist rather than a cardiovascular surgeon. The Monitors concluded that "in light of the great delays ADCRR is experiencing in getting patients to the specialists they need to see on time due, in part, to caps on daily custody transportations . . . such inappropriate referrals exacerbate those delays, indirectly leading to a dangerous delay of more urgent and necessary consults." (*Id.* at 58-59.)

Patient 52 was diagnosed with multiple myeloma, a serious blood cancer, during a hospitalization, and upon discharge on February 20, 2025, hospital specialists recommended that he receive the next dose of chemotherapy the following day, and then see the oncologist two to three days later, but the patient did not have the chemotherapy for 5 weeks, and did not see the oncologist until March 14, and Defendants did not provide the oncologist the medical records. The Monitors opined that "[f]ailure to arrange timely continuation of the chemotherapy to bring the cancer under control started in the hospital, put the patient at significant risk of serious harm." (*Id.* at 60.)

Patient 53 has Type 2 diabetes and is on insulin; the order to have his blood glucose checked every morning expired on March 10, 2025 and, since then, he has received inconsistent blood tests. The Monitors conclude "This above continuing error in nursing care might have been noticed had the patient had a primary care practitioner and had been receiving chronic care for his diabetes. Instead, he was last seen on March 5 by an APP other than his assigned PCP (in violation of Injunction section 7.2) for diabetes. The APP's plan for management of the patient's diabetes was for him to return to the clinic if the patient felt it was necessary or had any concerns about diabetes. There was a chronic care clinic appointment scheduled for June 16, but that date has come and gone without a visit (in violation of Injunction section 1.22c.)" (*Id.* at 62-63.)

Patient 54 had an MRI ordered in response to a concern about a spinal cord mass on February 25, 2025. Defendants did not schedule the MRI to be completed until April 4, in part because of a failure to treat the situation with sufficient urgency and in part due to transportation being unavailable, which risked irreparable harm because a mass on the spinal cord could cause irreversible paralysis. The April 4, 2025 MRI did not occur;

although this was not the fault of the Defendants, it was not rescheduled immediately and was not completed until May 9, 2025. The Monitors opine that the 9-10 week delay posed a serious risk of harm to Patient 54. (*Id.* at 64-65.)

Patient 58 has Hodgkin's Lymphoma and was last seen by an oncologist in July 2024. Despite evidence of possible cancer spread and a recommendation from the oncologist that the patient see an oncologist specializing in lymphoma, the appointment was not made for more than 8 months, which caused "avoidable suffering due to inadequate pain management." (Doc. 4968 at 69-70.)[51]

Patient 59 has HCV-related liver cancer. On September 20, 2024, a surgeon recommended that Defendants refer him to an interventional radiologist to ablate two cancerous lesions in the liver and then obtain an MRI four months hence. The APP ordered the referral as "routine," i.e., within 2 months (in violation of the Injunction section 1.1.) The patient's assigned PCP was another APP (in violation of the Injunction, section 6.1-6.2.) The first APP's order was ignored (in violation of the Injunction, section 1.22) and he was not seen. The referral to remove the cancer, which, if completed as ordered, should have been completed by November 30, 2024 was not scheduled until January 3 (in violation of the Injunction, section 1.22d), but the removal of the cancer did not occur on this date, and instead, the patient was mistakenly sent for another MRI, which MRI showed the larger of the two cancers had grown by more than 50% from 42 mm to 66 mm. On January 23, an oncologist saw the patient and reiterated that the patient needed to be seen by the interventional radiologist STAT sending back a hand-written note with the patient. Due to his concern that the patient's care was not being addressed, he also followed up with a typed note containing the need for a STAT referral and stating "This was conveyed to the prison via notes, as well as, a phone call to the prison coordinator."

The handwritten note has been in the patient's chart since January 23, 2025, and as of July 2025 had not been reviewed by a clinician (in violation of Injunction section 4.4.2 requiring review within four days.) On April 28, 2025, an APP who was not the patient's

---

[51] This Patient had not yet been seen by the specialist at the time of the Monitor's report.

1  PCP saw the patient in a primary care visit (in violation of Injunction section 6.1/6.2 and
2  in violation of Injunction section 6.3), noted the need for an urgent visit with an
3  interventional radiologist to ablate the cancer lesion in the liver and ordered it with urgent
4  priority, but it was not scheduled to take place until June 5 (in violation of the Injunction,
5  section 1.22d.)

6      The Monitors opine that as a result of these numerous violations of the Injunction,
7  a patient with potentially curable liver cancer that was first identified on September 20,
8  2024, for whom removal of the cancer should have taken place by the end of September,
9  2024, did not have that treatment until June 5, 2025 more than nine months later, resulting
10  in progression of cancer, and decreased overall rate of survival. (*Id.* at 70-72.)

11      Patient 64 was seen for management of his diabetes on February 20, 2025. During
12  the visit, it was noted a diabetes-related test from December was mild to moderately
13  elevated; the practitioner ordered a repeat test, which was returned on February 22, 2025
14  showing that his diabetes was now much more poorly controlled. The practitioner did not
15  review the result in a timely manner (in violation of Injunction section 4.4.2.) As a result,
16  the patient had a very abnormal test result on February 22 that was not shared with the
17  patient until April 22, not treated in the interim, and for which there was an intentional plan
18  that the patient would not receive treatment until May 2, almost 3 months later (in violation
19  of Injunction section 1.1) placing the patient at risk of serious harm. (*Id.* at 79.)

20      Patient 70, a 21-year-old Spanish-speaking male, was initially seen by a nurse on
21  February 1, 2025 at approximately 9:30 a.m. without an interpreter (in violation of
22  Injunction section 3.1) for a complaint of constant right upper quadrant abdominal pain
23  with nausea and vomiting 15 times, starting that day. The patient was noted to be pale with
24  abdominal pain on exam in the right upper quadrant. A remote practitioner prescribed
25  fluids by vein and mouth and ordered anti-nausea medications, and directed the
26  practitioner be updated in one hour, but no one ever did any follow up. The patient returned
27  the next day with 9/10 abdominal pain and nausea. A nurse, practicing independently, cared
28  for the patient using a disallowed Abdominal Pain or Injuries Nursing Protocol. The patient

was seen again by an RN on February 3, 2025 for continuing nausea and a loose stool, low-grade fever of 100.9, and abdominal pain 10 out of 10. The patient was put on a bland diet and full liquid diet simultaneously and told to drink fluids and rest, was given an antidiarrheal even though he said he only had one stool in the past 24 hours, and the nurse obtained an order for acetaminophen from a practitioner since it was not available in commissary, but a provider still never saw the patient and there is no indication that the nurse discussed the case with the practitioner beyond asking for permission to use stock acetaminophen.

On February 5, 2025, the patient was seen by yet another nurse because he now had fever, chills, headache, and dizziness. Although he had a fever, the nurse told him to come back if "any other [symptoms] return." On February 6, 2025, he was seen for the sixth time with intermittent right upper quadrant abdominal with chills all night, pain when his abdomen was pressed and a fever of 102. He was given acetaminophen and a practitioner ordered laboratory tests and an abdominal ultrasound without seeing the patient or sending the patient to the ER. The ultrasound was not done until the next day, February 7, resulting in the patient being sent immediately to the hospital due to a finding of acute inflammation of the gallbladder with a gallstone in the duct on ultrasound. He underwent urgent surgery. During the operation, the degree of inflammation present made the surgery difficult. The Monitors opine that the delay in care due to the repeated nurse visits could have led to sepsis and death, and likely increased the patient's risk of surgical complications due to the amount of inflammation present. There were numerous violations of section 1.1 of the Injunction throughout this patient's care. (*Id.* at 91-92.)

Patient 78 is a 29-year-old male with Type 1 Diabetes on insulin and has suffered 4 episodes of low blood sugar, only receiving insulin once he becomes delirious or unconscious, which could have been avoided by allowing him to have oral glucose in his possession in violation of Injunction provision 10.5.5. Allowing low blood sugar to the point of unconsciousness in Patient 78 presents a risk of permanent brain damage or death. (*Id.* at 112.)

All of the above examples identified by the Monitors in their report echo the same unconstitutional care presented during the 2021 trial. And they reflect, despite Defendants' promises to address them by strictly adhering to the requirements of the Injunction, prisoners still remain exposed to an intolerable grave and immediate threat of continuing harm and suffering because the systemic deficiencies pervade the administration of health care.

Accordingly, the first factor supports the appointment of a receiver. *See United States v. Hinds Cnty.*, No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925, at *12 (S.D. Miss. Jan. 30, 2023) (first *Plata* factor favors the appointment of a receiver where "the conditions have not improved, nor has the situation become any less unconstitutional since [defendant] was last directed to remedy the problems.") (internal quotations and citation omitted); *Nunez v. New York City Dep't of Correction*, 782 F. Supp. 3d 146, 161–62 (S.D.N.Y. 2025), *reconsideration denied,* No. 11-CV-5845-LTS-RWL, 2025 WL 2939046 (S.D.N.Y. Oct. 16, 2025) (same.)

## 2. Exhaustion or Futility of Less Extreme Measures

Since this litigation commenced, rather than imposing the most punitive sanctions, the Court has painstakingly sought to and imposed the least restrictive measures and requirements on Defendants to incentivize compliance with the Constitution. Magistrate Judge David Duncan was devoted to tirelessly working with both parties to design an agreement that created medical Performance Measures that Defendants unreservedly agreed to fulfill.

But between 2016 and July 2021, Plaintiffs, frustrated with Defendants' persistent unconstitutional conduct, filed twelve motions to enforce the Stipulation, followed by multiple evidentiary hearings and status conferences which resulted in dozens of orders with detailed directions mandating Defendants comply with the 2014 Stipulation. What followed was three Orders to Show Cause why Defendants should not be held in contempt, which required the Court appoint experts, resulting in Defendants being held in contempt twice. They were fined millions of dollars upheld on appeal. (*See, e.g.*, Docs. 2898, 3861.)

Finally, an exasperated Court found Defendants had blatantly refused to comply with the Stipulation, having offered baseless legal and factual reasons. The substantial fines, and threats of more, proved worthless as an attempt to bring Defendants into constitutional compliance. (Doc. 4335 at 4.)

The Court appointed many experts and held a bench trial in 2021, which disclosed even more shocking, unconstitutional healthcare, including what can only be described as cruelty. One prisoner suffering extreme pain at the end of life was refused palliative care by the private contractor, Centurion, because he had been designated "Do Not Resuscitate," which, as a matter of simple common sense, is irrelevant to palliative care. Consequently, "his cachectic body was racked with pain, and he wasted away with no reasonable assistance from medical science in the form of comfort or compassionate pain control." (Doc. 4335 at 53.)

The 200-page 2022 Order containing Findings of Fact identified with graphic detail that if Defendants had ever intended to abide by the 2014 Joint Agreement, they abjectly failed. Thus, the long and difficult history of Defendants' noncompliance throughout the litigation informed the Court that robust, stringent, firm barriers and requirements were necessary to compel Defendants to constitutional compliance. Thus, the uniformly agreed upon 2023 Injunction emphasized it was inspired by the many years of Defendants' recalcitrance and resistance to change such that the Court would demand strict compliance. The Court stated, "the changes necessary to redress the failures will be substantial." (Doc. 4410 at 4.) And "significant detail regarding medical care [and] mental healthcare" will be clearly articulated. (*Id.*)

Defendants offer the appropriate period for consideration for this motion is the time since the April 2023 entry of the Injunction because the Injunction "dramatically altered what the Department is required to do." (Doc. 4818 at 18.) This reflects Defendants' profound misunderstanding of the law and facts of this litigation. The alleged unconstitutional violations by the Defendants in the complaint are the same unconstitutional violations that have occurred throughout the long history of this litigation.

From the beginning, Defendants were alleged to have failed to provide medical and mental health care as required by the Constitution, and the Injunction, which Defendants helped draft and to which they stipulated in 2023, reflects the exact same violations that have persisted throughout this litigation. The preamble to the Injunction reads the "unusual scope of this Injunction is informed by Defendants' actions throughout the case . . . the Court cannot impose an Injunction that is even minutely ambiguous because Defendants have proven they will exploit any ambiguity to the maximum extent possible." And the breadth of the Injunction is not a "dramatic" alteration of Defendants' obligations. Rather, it is a comprehensive elucidation of what has always been required of the Defendants. And the obligations of the Injunction are the same as those required of Defendants in the 2014 Joint Stipulation.

The 2023 Injunction—a much less extreme measure than receivership—was ordered with the manifest goal of offering Defendants a hoped-for final opportunity to remedy their constitutional violations. This less restrictive sanction designed to invite Defendants' compliance has failed again. (*See* Doc. 4410 at 2 n.1 ("The decision not to appoint a receiver was based on the Court's expectation that Defendants appeared willing "to cooperate" and "act in good faith" in monitoring their performance under an Injunction. . . . Any failure to act in good faith **or to meaningfully comply** with this Injunction will revive consideration of appointing a receiver.") (emphasis added).) The history of the Injunction bears briefly repeating.

As noted above, since entry of the Injunction, Defendants' paltry efforts to remedy the constitutional violations in the provision of healthcare have been in substantial conformity with their behavior throughout the litigation. Within three months of the effective date of the Injunction, in July 2023, Defendants were in fundamental violation because of serious lack of critical staffing. A series of lengthy hearings, attended by Director Thornell, were held from August 2023 to May 2024 to prompt Defendants into compliance. Plaintiffs and the Court refrained, at each of those hearings, from initiating immediate contempt sanctions and Defendants were repeatedly urged by the Court to find

ways to meet the requirements of the Injunction. Instead, Defendants, in violation of the Injunction and law, repeatedly placed the entire blame on the contractor, NaphCare. The Court emphasized to Director Thornell at the March 2024 hearing that compliance, including increasing staff, was essential. The Court inquired what he planned to which he responded: "[w]e discuss it" and he has "sent letters."

Also of significance is Defendants' startling response in 2024 to the Monitors' opinions in which Defendants stated that the Monitors failed to provide a "how-to" plan to achieve compliance, which was never contemplated by the Injunction. And Defendants have repeatedly attempted to excuse their conduct by arguing funds are not available and the legislative process to seek more funds is impractical, unworkable, and essentially nonfunctioning. In particular, regarding attempted funding of the Pilot project, the Defendants initially resisted and informed the Court the problem was not with Defendants but because of the "NaphCare contract" and the "healthcare" generally. Defendants stated: "Because for this fiscal year they're already millions of dollars over budget because of the Injunction and the healthcare and the NaphCare contract." (Doc. 4634 at 112.) Defendants added, "we don't have the money . . . . It would require a new contract with NaphCare. It would require approval of the JLBC." The mutually agreed upon Pilot was ordered to assist Defendants in shifting to the PCCM and to allow for a smaller initial implementation by Defendants, rather than requiring implementation of the entire, much larger staffing plan across all facilities. However, Defendants' participation was so deficient that it completely undermined any confidence in their ability to ever implement the PCCM and more widely.

Again, Defendants are non-compliant with 131 of 154 Quality Indicators of the Injunction. (*See* endnote 1.) Defendants have failed to accept the feedback, instruction, and coaching from the neutral Monitors. Although Defendants chose the Monitors, who "have been providing such feedback, heavily, in formal reports, in informal documents, and— over hundreds of hours—orally, since the inception of the Injunction (if not before), [and] have also offered numerous additional meetings with the Health Services Division staff to assist Defendants with reviewing and understanding the requirements of the Injunction and

[the Monitors'] methodology," Defendants "declined" "those offers." (Doc. 5040 at 5.) Defendants have nonsensically claimed that hiring "an individual or individuals with significant health care management experience to help Defendants reform the current system," though less extreme than a receivership, would be duplicative and unnecessary given their intent to receive recommendations from a consulting firm. (Docs. 4552 at 15; 4566 at 6-7.) Defendants never explained how this would accomplish something different or better than what the Monitors have already provided. Moreover, the consulting firm's eventual report produced no discernible change.

Defendants suggest a special master would be preferable to a receiver, but "[a] special master is primarily useful for conducting hearings and making recommended findings of fact [and Defendants have] not raised any factual issues to be addressed in such hearings, and [have] not asked for those hearings." *Plata*, 603 F.3d at 1098. Moreover, Defendants were already effectively provided a very well-qualified dedicated special master that they proceeded to squander. Magistrate Judge David Duncan, for six years, worked tirelessly, sometimes weekly, with Defendants and Plaintiffs to identify ways, and to design an acceptable plan, to allow Defendants to remediate the unconstitutional healthcare. It failed because Defendants chose to completely resist the terms and requirements of the Stipulation. There is no justifiable basis for a special master that would serve any purpose beyond that already fulfilled by the Court's Rule 702 experts and Monitors.

The Court's efforts have proven to be an exercise in futility. To date, and despite the repeated offers of assistance and advice from the Monitors, Defendants offer no concrete plan to achieve compliance other than to limp along with their continuing failure to comply with the Injunction. Accordingly, the second factor favors appointment of a receiver. *See Coleman v. Newsom*, No. 2:90-CV- 0520 KJM SCR P, 2025 WL 2475040, at *10 (E.D. Cal. Aug. 27, 2025) ("Notwithstanding the court's substantial effort, . . . the work is unfinished, the progress too slow and no end in sight if the current framework remains in place."); *Nunez*, 782 F. Supp. 3d at 162–63 ("The DOC has repeatedly failed to

incorporate the Monitoring Team's thoughtful recommendations, which are backed by years of expertise, experience and research, and 'has taken few concrete actions to adopt these recommendations (or devise reasonable alternatives)' to come into compliance with the Contempt Provisions . . . .This pattern has been well documented by the Monitoring Team for years . . . .There is no doubt that these less extreme measures have proven futile.".)

### 3. Effectiveness of Continued Insistence on Compliance

In issuing the Injunction, the Court stated:

> **Moreover, the unusual scope of this Injunction is informed by Defendants' actions throughout this case. Despite their agreement and promise to the Court to do otherwise, Defendants have fought every aspect of this case at every turn.** Defendants entered into a settlement agreement where they claimed they would improve the care provided to prisoners and improve the conditions of confinement for the subclass. Yet almost immediately Defendants failed to perform those obligations and continued in that failure. Instead of acknowledging their failures, Defendants kept inaccurate records and unreasonably misread the settlement's requirements to their advantage. During trial, Defendants presented arguments and witnesses that were manifestly unreliable and unpersuasive. And on some aspects, Defendants presented no meaningful defense at all…Most importantly, trial established **Defendants blatantly had not made any serious effort to remedy the flaws highlighted by this litigation. Given this history, the Court cannot impose an Injunction that is even minutely ambiguous because Defendants have proven they will exploit any ambiguity to the maximum extent possible.**

(Doc. 4410 at 4-5 (emphasis added).) Despite this finding of continuous resistance throughout this litigation, Defendants appear oblivious to the ongoing harm caused by their actions. Defendants persist in challenging the Injunction they approved. Many examples of Defendants' non-compliance with the Court's Orders and the Injunction have been mentioned, but some very recent instances particularly demonstrate the ineffectiveness of continued insistence on compliance with the Injunction.

During the staffing Pilot, Defendants' Health Services Division (HSD) PCCM Team, Pilot Front-Line Staff Teams, and Court Experts were required "to provide coaching to the front-line Pilot clinical teams, identify emerging issues and needs, and to build the HSD PCCM Team's experience with coaching, distilling team experience and applying it to other teams." (Doc. 4761 at 9.) Although the meetings should have begun on October 8, Defendants instructed the Monitors to not have any contact with the Pilot team staff without HSD and were told to only schedule these meetings with HSD. (*Id.*) Despite numerous requests from the Monitors, HSD ignored all of them with the exception of one meeting in November. (*Id.*) As a result, at the end of the Pilot, front-line teams, "reported needing far more hands-on support, especially during their early weeks of the Pilot," and the failure to schedule these meetings meant "the teams . . . did not receive support in using process improvement cycles, developing open scheduling, developing RN roles, strengthening daily huddles, . . . did not experience coaching and their skill set did not grow as intended, [and] did not gain experience with many of the components of the PCCM and are therefore not able at this time to serve as 'ambassadors' to other units and complexes on these components during the statewide implementation of the PCCM." (*Id* at 9-10.) This also meant the Monitors were left to try to gain data necessary to evaluate the Pilot from other sources. (*Id.* at 10.)

Again and throughout, Defendants repeatedly attempt to defend their behavior by claiming lack of resources—money, space, and the NaphCare contract. And they have repeatedly been reminded of binding authority[52] that money and space is required to be utilized to bring healthcare to prisoners into constitutional compliance.

The Pilot Program was designed to provide Defendants a significant opportunity to demonstrate they could comply with the Injunction on a smaller scale. Despite the Court's clear, specific orders, Defendants "were not able to secure staffing for all positions needed to fully implement the Pilot." (Doc. 4814 at 7.) As noted above, Defendants did not run the Pilot fully at either site, and it was terminated at one site after only eight days. The

---

[52] *See Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014.)

termination was attributed to insufficient space, even though Defendants had specifically selected the pilot sites, and had been on notice of the inadequacy of space at that site since at least July 2024.

Similarly, complex-wide communication about the Pilot was necessary "to build anticipation about the PCCM and staffing plan, quell rumors, and give staff a venue for asking questions." (Doc. 4761 at 11.) Despite the Court's instructions, the fact that Defendants' Facility Health Administrators welcomed and sought such communication as they were barraged with questions and rumors, and the Monitors "described a number of venues through which this could occur including newsletters, reports at staff meetings, email blasts, FAQs, discussion groups, staff and patient testimonials, and more," Defendants did not comply. (*Id.*) Indeed, the Court "required communication across the rest of the ADCRR complexes beginning in late September and continuing throughout December to prepare the other seven complexes for the statewide rollout of the PCCM and staffing plan." (*Id.*) Defendants did not do any of it; instead they created an unmonitored email address, which did not accomplish any goals. (*Id.*) Defendants did not implement any of the communications and failed to inform health care and custody staff at the other complexes of the PCCM or staffing plan. (*Id.*)

Defendants still have no plan to fully implement the PCCM and related staffing and space provisions of the Injunction, even though the Monitors "have been providing such feedback, heavily, in formal reports, in informal documents, and—over hundreds of hours—orally, since the inception of the Injunction (if not before) [and] have also offered numerous additional meetings with HSD staff to assist Defendants with reviewing and understanding the requirements of the Injunction and [the Monitors'] methodology, but have had those offers declined." (*Id.* at 5.)

Defendants offer and exalt heavy reliance on some improvements and promises of more as if they should be praised, not sanctioned. The Monitors readily credit Defendants where appropriate, but find Defendants significantly overrepresent their success in substance use treatment and HCV treatment. (*Id.*) In fact, the improvements are a small fraction of the Injunction and "taking into account the nature, number, and speed of

improvements, does not change [the] core findings" that non-compliance with the Injunction persists and poses serious risks of harm to the prisoners. (*Id.* at 38.)

Of equal concern is the substantial undermining tension between Defendants and NaphCare. Defendant Thornell, as Director, is tasked with providing constitutionally adequate healthcare to those in his custody. As noted above, the Court has repeatedly inquired of Director Thornell what provisions he has incorporated into the contract to ensure NaphCare provides constitutionally adequate healthcare in compliance with the Injunction and what sanctions have been implemented when NaphCare repeatedly breaches the contract. Despite the many years this action has been pending, four years since the trial, almost three years since the effective date of the Injunction, and the new leadership who claim to be committed to achieving constitutionally adequate care, the answers to these questions either do not exist or are unavailing. When the Court inquired, Defendants blamed the "NaphCare contract," the "cost of providing healthcare," and "the Injunction" as reasons they were unable to fully engage in the Pilot. (Doc. 4634.) Although the Court has, pursuant to the express terms of the contract, often inquired of Defendants about sanctioning their healthcare provider, Defendants have shown no cognizable interest in imposing sanctions that would result in actual change. Based upon a list provided by Defendants, as of September 22, 2025, Defendants have imposed $1,424,900 in sanctions since the inception of the Injunction.[53] Indeed, the CEO of NaphCare averred that "sanctions . . . have not in any way incentivized or influenced NaphCare's performance or compliance." (Doc. 4616-1 at 25 ¶ 10.) Although there is evidence in the record that Defendants' inability to directly control NaphCare interferes with implementation of the Injunction, the Director has never contended that he is unable to comply with the Injunction due to NaphCare's involvement in prisoner healthcare and, as the Court has previously

---

[53] "Of this, $645,000 was for 4 errors in patient care and 1 failure in a patient care process. The remainder appears to be for vacancies in mental health staff and failed inventory audits. Despite vacancies in mental health staff that existed consistently during the 28 months in question, Defendants only sanctioned NaphCare for vacancies that existed during 9 of those 28 months. Defendants did not sanction NaphCare for vacancies in medical staff during any month." (Doc. 5040 at 2.)

noted, Defendants have a non-delegable duty to provide constitutional healthcare to prisoners. (*See* Doc. 2898 at 16.)

Moreover, the Monitors document Defendants' unwillingness or inability to prepare NaphCare for implementation of the Injunction. (*See* Doc. 4761 at 11 (the Monitors "do not believe that any steps have been taken by [Defendants] to discuss the need to empanel and assign patients with NaphCare, to teach NaphCare how to run the empanelment program, or to otherwise plan to execute this first step in implementing the staffing model statewide.") Finally, as noted above and of substantial significance, Defendants did not object, or much less, even respond to NaphCare's Motion to Intervene despite NaphCare's bold assertion it had "significantly improved the healthcare system." Although NaphCare claimed it did not intend to relitigate the Injunction, NaphCare also stated in the Motion to Intervene it fully intended, in violation of the contract, to "tinker" with the Injunction provisions such as "staffing levels." It is not surprising NaphCare would be concerned about efforts to increase staff and raise their salaries because increasing staff might affect profits negotiated in the contract.

It is indeed "resoundingly clear" that rather than genuinely attempting to comply with the Court's orders and the Injunction or set forth any concrete plan of compliance, Defendants will continue to object to and fight each aspect of the Court orders, keep inaccurate records, unreasonably misread the Injunction's requirements to their advantage, offer unacceptable excuses for violations, and exploit any ambiguity to the maximum extent possible. *Plata*, 2005 WL 2932253 at *29; s*ee supra* at 37-38. It now falls to the Court to ensure that the Constitution is upheld.

The third factor supports the appointment of a receiver. *See Coleman*, 2025 WL 2475040, at *10 ("Even if there are finally a few signs of progress with respect to staffing, defendants do not appear close to achieving completion of the staffing remedy, let alone durably. . . . And staffing is but one aspect of the remedy long unfulfilled. Particularly if the court must continue to rely on contempt proceedings to obtain compliance with its orders, there is no indication defendants' reflexive practice of appealing the court's orders will cease."); *Nunez*, 782 F. Supp. 3d at 163 (finding that a persistent pattern of slow

compliance with Court Orders "despite support and guidance from the Monitoring Team reinforces the Court's conclusion that continued insistence on Defendants' proactive compliance with Court orders would only lead to further delay" and supports the third factor of receivership.)

### 4. Lack of Leadership.

Defendants assert the Department's leaders are committed to complying with the Injunction and making progress toward that goal and contend they should be allowed to continue these efforts, perhaps forever. However, the Monitors' reports reveal a stark lack of leadership able to effectively implement the requirements of the Injunction.

An additional, very recent example is instructive. In the wake of the staffing Pilot's abysmal conclusion, the Monitors opined that "[Defendants do] not have a plan for, nor the leadership expertise to, implement patient empanelment beyond the Pilot sites." (Doc. 4761 at 16.) HSD ignored the Monitor's repeated emphatic recommendation to designate a project manager, resulting in lack of organizational project management, revealing "[Defendants do] not have the project management capacity to roll the PCCM out statewide and implement the statewide staffing plan," or the "capacity to manage the schedule, marshal all assignments and deliverables, assign resources, track progress, effectively engage other ADCRR resources, and effectively interface with NaphCare." (Doc. 4761 at 13-14.) The Monitors further concluded that Defendants lack the technical expertise or tools to calculate the staffing of patient primary care or mental health teams based on panels and caseloads, or to modify staffing at some point in the future when patient complexity changes and Defendants have no mental health or medical leaders who have experienced or been trained in the PCCM model. (Doc. 4761 at 16.)

Defendants dismiss the grim performance of the staffing Pilot and its introduction of the PCCM as insignificant and not indicative of their leadership or seriousness. But Defendants either do not understand or have chosen to ignore the purposes of the Pilot and the importance of the PCCM, which is fundamental to the Injunction. The Pilot was a vital step toward constitutionally adequate care because adequately trained staffing is a

prerequisite for "successful fulfillment of the health care-related requirements of the Injunction" (Doc. 4539 at 16), and was, in many ways, the perfect opportunity for Defendants to demonstrate their willingness and ability to comply with the requirements of an Injunction. Defendants' abject failure to implement it at only two sites they themselves selected, comprising only 8% of ADCRR's inmate population, is clearly demonstrative of their inability to achieve full compliance.

Plaintiffs also point out that in March 2024, Defendants assured the Court that their Medical Director would fix the broken mortality review process (Doc. 4795 at 21), but the Medical Director position remained vacant from August 2024 until January 8, 2026, and, as noted above, the experts amply support their opinion that the mortality review process is still woefully insufficient. (*See, e.g.*, Doc. 5040 at 13-17 ("none of this changes [the Monitors'] conclusion that [Defendants'] Mortality Review process is flawed.").)

Furthermore, Defendants have consistently demonstrated a marked imbalance of priorities. (Doc. 4761 at 15-16 (finding that HSD leadership focused on "monitoring and enforcing standards that are not applicable to the staffing plan and are inappropriate when introducing large-scale clinical change.").) At every hearing for the last almost three years, Defendants have touted improvements with Hepatitis-C and opioid use disorder. As noted, there is some evidence that Defendants overrepresent their successes in these areas. The Monitors assert that Defendants present their treatment of opioid/substance use disorder as a success story, but "Defendants are compliant with only 3 of 7 requirements of the Injunction and have made little progress (and in fact may have regressed) in the treatment of Alcohol Use Disorder" and there are "seven ways in which treatment of TB at ADCRR remains unsafe and dangerous." (Doc. 5040 at 4.)

While any improvements are desirable, the continual emphasis on these few improvements presents two significant problems. First, simply improving in two areas does not ensure constitutional health care and mental healthcare for a substantial portion of the prison population. Additionally, it is extremely concerning that these are among the only improvements the Department continues to emphasize after pointing to these

improvements years ago. Indeed, the Court explained to the parties in its findings that "this case is not about particular diseases. Rather the focus must be on the overall provision of health and mental health care and whether there is a substantial risk of serious harm." Defendants tout their accomplishments with Hepatitis C and MOUD treatment but those were included in the Permanent Injunction at Defendants' behest and not because they related to the Court's findings. At the March 15, 2024 status conference, Director Thornell extolled the "progress" Defendants had made by commenting on MOUD and Hepatitis C treatments, unspecified progress in "the way that [Defendants are] approaching accountability," and a partnership with "external experts" at a consulting firm. (Doc. 4581.) As the Monitors note in their supplemental October 4 Report, "most of the consultant's recommendations and attendant improvements, while worthwhile, do not relate to the Court's Injunction regarding health care, or do so in a very indirect manner." (Doc. 5040.)

In contrast, the Monitors point to three areas with direct impacts on the prisoner population that could have been implemented soon after the Injunction was issued, but still have not been implemented. (Doc. 4968 at 25-26.) The Monitors demonstrate this in the 300-page report and, as reflected in the analysis of the mortality reports and many examples of systemic healthcare failures identified in this Order, the Monitors also establish Defendants have not discontinued the dangerous practice of having RNs independently manage episodic patient problems and the practice has not only continued, but is supported, by the EHR system that contains 45 protocols designed for independent practice by nurses, demonstrating to the RNs that is still acceptable for them to provide primary care. (*Id.*) Likewise, while the Injunction allowed RNs to independently manage a very small number of approved conditions, LPNs were wholly barred by the Injunction from any independent management, and yet the EHR still contains 35 protocols designed for independent practice by LPNs. (*Id.*) The Monitors make clear after the Injunction issued, it would have been relatively simple (and Defendants were advised and coached) to: (1) discontinue use of the protocols within the EHR that allowed RNs and LPNs to manage patients independently of provider involvement; (2) remove from the EHR the option of letting the nurse choose

an option not to contact a provider; and (3) identify errors in care of a deceased patient during mortality reviews. (*Id.*)

Defendants have demonstrated a pronounced tendency to actively avoid leadership and responsibility. There is ample evidence in the record that Defendants deflect responsibility to their vendor, "saying essentially, 'not me,'" in an "exercise of accountability hot potato." *Hinds County*, 2023 WL 1186925, at *11-*12 (finding lack of leadership in those circumstances.) This was consistent throughout the Pilot, when Defendants "would imply that certain tasks were NaphCare's responsibility, but did not require that NaphCare act on them." (Doc. 4761 at 13.) This behavior "contribut[ed] to the failure to fully implement the Pilot." (*Id.*) In the opinion of the Monitors, there is a "marked lack of clarity" regarding the responsibilities of Defendants and NaphCare and although the Monitors raised this as critical to the success of the Pilot, their entreaties were ignored by Defendants implying "that certain tasks were NaphCare's responsibility, but did not require that NaphCare act on them." (*Id.* at 13.) The Monitors assert "[a]s a result of these vagaries, multiple steps in implementation were skipped or dropped, contributing to the failure to fully implement the Pilot." (*Id.*) Despite the Court's emphasis at multiple hearings and in orders that increasing salaries was critical to fill positions, Defendants repeatedly contended "[Defendants are] currently paying wages over the average wages provided in the contract to get staffing levels to the appropriate level," but NaphCare "is not paying these wages." (Doc. 4566 at 3.)[54] It bears repeating, Defendants were in violation of the Injunction three months after it became effective, which begs the question of whether Defendants negotiated the terms of the Injunction in good faith.[55]

---

[54] *See* Doc. 4566 at 3 ("Defendants provide an example that the current contract requires certain mid-level providers be paid approximately $106.33 per hour, but NaphCare is paying these providers "between $80.00 and $95.51 per hour.").

[55] The Court expressly brought this to the attention of Director Thornell at many hearings and, in March 2024, the Director promised to engage in solving it. But at the end of 2024, 100 contract positions still had not been filled. Amazingly, Defendants appeared to seek praise in their subsequent filings for having only an additional 100 positions remaining. This shows an abject lack of foresight because the staffing report approved by the Court will require hiring significantly more staff.

When the Monitors taught HSD to convert a patient panel into primary care and mental health staffing using the staffing model tools, HSD indicated that "this should be NaphCare's responsibility," but made no efforts to discuss this with NaphCare, to have the Monitors work with NaphCare, or to otherwise "execute this first step in implementing the staffing model statewide." (Doc. 4761 at 12) Even when Defendants' staff person "developed an excellent program" for empanelment (assigning patients to providers), Defendants "indicated that empanelment 'should be NaphCare's responsibility,'" but took no steps "to discuss the need to empanel and assign patients with NaphCare, to teach NaphCare how to run the empanelment program, or to otherwise plan to execute this first step in implementing the staffing model statewide." (*Id.*) All the while, Defendants persist in using NaphCare as an excuse for delay. (*See, e.g.*, Doc. 4553 at 7 ("[Defendants have] moved as quickly as [they] could given the challenges associated with having to effect changes through third-party vendors.").)

Closely tied to Defendants' tendency to shrug and insinuate the problem is their private healthcare contractor is their apparent need for constant micromanagement. In fact, as noted above, rather than proactively taking steps to enforce their contract with NaphCare, Defendants insisted the Court "enter an order intended to get [NaphCare] to increase health care salaries within the bounds of the current contract," including ordering Defendants to order NaphCare to comply with their contract obligations. (Doc. 4566 at 3-4.) The Court was bewildered by such a suggestion, and at a March 15, 2024, status conference informed Defendants their relationship with NaphCare "is a contractual matter. If they have breached that contract, and you have made every effort to have them comply with the contract, then you can take the actions. You don't need the Court for that. This is basic common law contract law, not something that I need to get involved with." (Doc. 4581 at 61.) Despite Defendants' averment that they have sanctioned NaphCare through offsets from the contracted payment, as noted elsewhere in this Order, such efforts have been tepid and obviously ineffectual, [56] and their proposal that the Court violate the law

---

[56] The Monitors write that "the 5 errors for which Defendants have sanctioned NaphCare

and intervene by ordering sanctions reflects a continued outsourcing of responsibility and refusal to act independently.

It bears repeating that Defendants' Response to the Monitors' first Interim Report complained the report did not provide "a 'how-to-guide,' much less a comprehensive plan, on how [Defendants could] achieve compliance with the Injunction" and in particular, did not provide "detailed guidance on how to achieve compliance." (Doc. 4553 at 2.) Sadly, this suggests that when Defendants agreed to the terms of the Injunction, they had no knowledge of what was required. And the joint agreement was only reached after three intense months of negotiation. It is apparent Defendants chose not to take any initiative to independently maintain compliance with the Injunction. Rather, Defendants apparently secretly hoped for guidance and instructions from the Court. Such an undertaking would have required substantial briefing, additional work and effort by the Court and Court Monitors, and numerous status conferences, resulting in nothing other than a waste of time and resources rendering the implementation of the Injunction nearly impossible.

At Oral Argument on September 10, 2025, Defendants repeatedly asserted their "progress" and "commitment." (Doc. 4995.) But their focus on progress and commitment disavows their substantial failures and pervasive violations that persisted nearly four years after trial in 2021, and three-and-a-half years after the Court's Findings in 2022, and almost three years after entry of the Injunction. If the alleged progress had been made, prisoners would not still be suffering the adverse outcomes reflected in the Monitors' reports and the Court's Orders. If progress had truly been made, the PCCM would have been implemented immediately after issuance of the Injunction and not remain "at its infancy" as it is today. (Doc. 5040 at 2.) And the many additional hours to implement the staffing plan would be in place.

---

amount to a small percentage of the errors for which monetary sanctions could have been levied. As such, we estimate that the $1.4 million in monetary sanctions is a small fraction of the monetary sanctions that ADCRR *could have* imposed on NaphCare for failures to provide comprehensive healthcare services, misrepresentation or falsification of information in the EHR, or other non-compliance with contractually required (and, by extension, Injunction-required) performance." (Doc. 5040 at 3.)

In short, even if Defendants have some commitment to forthwith enforcing the Injunction, the record is rife with examples of their willful inability to institute constitutionally adequate healthcare in compliance with the Injunction. This factor favors receivership. *See Coleman*, 2025 WL 2475040, at *11 (where receiver-nominee identified multiple failures of leadership including not clearly identifying "who is ultimately responsible for delivery of constitutionally adequate mental health services"; "poor communication and lack of information" about what is required by the established remedies in this action; and "no uniform . . . mechanism for sharing best practices and lessons learned across institutions," this factor weighed in favor of finding a receiver); *Nunez*, 782 F. Supp. 3d at 163–65 (Although the Monitoring Team praised the relatively new DOC commissioner for working actively with the Monitors and providing some basis for hope of future sustained change, such change was not sufficient to tip this factor against the appointment of a receiver because "even a strong Commissioner with sound intentions can only make limited progress where, as here, the 'dedicated team' of competent senior leadership required for reform has been lacking for years" and "dangerous and unsafe conditions in the jails have persisted well into the second year of the Commissioner's tenure.").

### 5. Bad Faith or Repeated Failure to Implement Changes

Defendants assert there is no bad faith displayed by their current leadership and maintain they are committed to achieving compliance with the Injunction and delivery of constitutionally adequate healthcare.

However, instead of actually engaging with the Monitors; embracing and implementing their recommendations and complying with Court rulings, Defendants have spent most of their time attacking the Monitors and their methodologies, with no evidence—just a "difference of opinion"—to support their ad hominem attacks.[57] Again, it

---

[57] For example, when the Monitors requested the appointment of Ms. Donna Strugar-Fritsch as a Monitor to assist in the implementation of the staffing plan, Defendants sought to prevent her appointment and argued, in spite of her years of experience in health care, corrections, government agencies, and the implementation of organizational changes in

cannot be overstated that Monitor Dr. Marc Stern was the same expert who testified in hearings before Magistrate Judge David Duncan with criticisms of Defendants' healthcare, but Defendants welcomed his appointment as an expert to help draft and monitor the Injunction. Moreover, not until the Motion for Receiver was filed did Defendants officially or unofficially provide the Monitors or the Court in writing, or otherwise, with specific, detailed objections to the Monitors' opinions and direction. Now, however, Defendants have offered abundant disagreements, differences of medical opinions, and criticisms of the Monitors. This is entirely inconsistent with the Court's experiences with the Monitors, who have consistently and patiently explained their methodologies and have shown ample latitude and understanding in their recommendations, acknowledging the difficult hurdles faced by Defendants in making the changes required by the Injunction. The experts, like the Court, have without exception demonstrated that the main concern is that the prisoners in the custody of the State of Arizona receive constitutional healthcare. It is alarming that instead of sharing that concern and working with the Monitors, Defendants have engaged in unproductive and distracting litigation tactics.

The Monitors' purpose as defined by the parties and the Court was to monitor Defendants' compliance with the Injunction: the data and methodology that support their opinions are consistent with that purpose. The parties agreed "reports from the experts will help speed the remedial process by acknowledging areas of compliance with the Injunction and by bringing attention to areas in need of improvement," and "the experts' opinions are critical because they are independent, neutral, and are based on expertise that the parties themselves lack." (Doc. 4507 at 5-6.) Thus, Defendants' arguments in opposition to the Monitors' comments, opinions, and direction, made for the most part for the first time and after the Motion for Receiver was filed, reflect significantly their disagreement and dissatisfaction with the requirements of the Injunction. Further, Defendants' objections to the staffing plan submitted by Ms. Strugar-Fritsch largely amount to objections to the

medical operations and her key role in developing the staffing plan, Ms. Strugar-Fritsch lacked the "multi-faceted expertise . . . to play the most constructive role possible." (Doc. 4976.)

Injunction. After years of litigation, to quarrel so fixedly with the Injunction, which they helped draft, and to which they steadfastly agreed casts serious doubt on Defendants' averments of good faith. And it reflects a profound misunderstanding of the harm their conduct has caused over the past decade.

The staffing Pilot provides a particularly salient example: The Court declared in the Injunction "the core issue is that staffing levels are so inadequate that the provision of constitutionally mandated care is impossible." (Doc. 4335 at 21.) Despite Defendants' acknowledgement that "the pilot is necessary to provide important refining information for the staffing model and new model of care being developed" (Doc. 4686 at 2), their participation in the Pilot vanished after it was approved. Throughout the Pilot, Defendants argued with the requirements,[58] failed to comply with the necessary staffing provisions, provided minimal and inaccurate data, and implemented fewer than half of the enumerated steps and activities necessary for the Pilot. (*See generally* Doc. 4761.)

As noted above, the Pilot was to be implemented at two sites, housing only 8% of Defendants' prisoner population, but Defendants unilaterally ended the pilot at one of the two sites. Plaintiffs point out that "[t]he issue of space to accommodate new clinical staff and their patients was raised at the very first pilot meeting on July 8," and again in September, "HSD reported that space modifications had been approved, budgeted, and would be complete within 90 days," but Defendants, in their response to a draft of the report, disavowed knowledge of those comments and wrongly asserted "[t]he pilot never contemplated building additional space and should not be contingent on building additional space," despite the Injunction's requirement that Defendants "provide sufficient space" for healthcare delivery. (Doc. 4410 at 11-12 §§ 1.6-1.7.)

The HSD PCCM Team did not hire the required psychology associate, and the HSD Mental Health Director left during the Pilot. During three leadership meetings, the Monitors conveyed an urgent need for the Monitors to teach HSD's newly hired mental

---

[58] (*See, e.g.*, Doc. 4761 at 7 ("in its feedback to a draft of this report, with regard to requirements about the use of registry staff for the pilot, Defendants noted, 'These were impractical requirements from the beginning.'").)

health director about the Primary Therapist model, new clinical expectations for mental health care, and the staffing model for the mental health care Pilot, but they received no response from HSD. (Doc. 4761 at 12.) The Monitors noted that "HSD leaders' participation in Pilot activities waned throughout the pilot and [they] did not see any evidence of HSD leaders' attempting to invigorate the HSD PCCM Team to meet the work plan objectives or hold them to any expectations or accountability for doing so." (Doc. 4761 at 15-16.)

Despite the Injunction's terms as ordered by the Court that the staffing plan be implemented statewide after the Pilot, Defendants treated the Pilot as an incidental, insignificant, optional activity and the subsequent implementation of the plan as an unlikely potentiality. Although Defendants know that the PCCM must be implemented at all complexes (in 45 units of 9 complexes) pursuant to the Injunction, Defendants' HSD refused to respond to the Monitors' "numerous attempts to remind them that they must begin this work in order to comply with the Injunction and the Court's orders." (*Id.* at 11.) This failure is inexplicable and damning.

The Monitors reported that, in response to a draft of the Monitors' first Interim Report, Defendants suggested changing the phrase "experience from the pilot will inform amendments to the final staffing plan that will improve the outcomes of the model as it is implemented across ADCRR" with "experience from the pilot will inform amendments to the final staffing plan that will improve the outcomes of the model *if* it is implemented across ACDRR" and to adjust the statement that the Pilot is also intended to enable HSD clinicians to "train and support other units throughout ADCRR complexes as they implement the new model" to say that the pilot is intended to enable HSD clinicians to "train and support other units . . . *if* they implement the new model *in the future*." (Doc. 4681 at 1.) In short, Defendants were exclusively in control of implementing this vital part of the Injunction and made no effort, or refused, to do so, causing significant repercussions, not only in the implementation of the Pilot, but for a state-wide implementation of the Pilot.

Defendants' regular overstatement of their "progress," intransigence regarding key

aspects of compliance, and reporting of inaccurate data[59] reinforces the finding of bad faith and repeated failure to implement changes. In their Response to the Monitor's Third Interim Report, Defendants assert "the Department has implemented the Patient Centered Care Model (PCCM) at nine units across different complexes as part of the statewide roll out." This is flat wrong in that "at most units, that implementation is [in] its infancy," and critical components of the PCCM are not yet in place at all facilities, including assigning a primary therapist and/or primary care provider to every patient on the caseload and having the primary therapist or provider actually function as such. (Doc. 5040 at 2.) Defendants emphasize some modest successes in disease-specific areas, such as substance use disorders and treatment of tuberculosis, and yet "Defendants are compliant with only 3 of 7 requirements of the Injunction . . . in the treatment of Alcohol Use Disorder" and the Monitors have identified seven "ways in which treatment of TB at ADCRR remains unsafe"

Finally, as required by the Injunction and by the Court, and in countless other instances, by the Monitors, Defendants have been urged, ordered, advised, and coached to end the practice of nurse-driven care. (*See, e.g.* Doc. 4410 § 1.11, 7.4.7 ("LPNs and Behavioral Health technicians shall not independently assess prisoners or initiate a plan of care or treatment," "The initial care provider shall be the prisoner's primary care medical provider," "Pursuant to prisoner-specific direction provided by the medical practitioner, RN may provide initial care for a limited number of conditions")); (Doc. 4637 at 5 ("Let the Court emphasize what is obvious, nurse-driven care is over.")); (Doc. 4335 at 44 ("Using nurses as the first line, and often last line, for providing care is medically unacceptable.").) Despite this oft-repeated refrain, Defendants continue the practice. Indeed, Defendants assert that this alarming, continued use of RNs to provide initial care is acceptable because in the end "providers review and sign off on nursing protocols." (Doc. 4973-8 at 7.) This reads as if Defendants are bereft of an understanding of the

---

[59] *See supra* note 44 (noting "Defendants report that they currently engage 15.3 FTE staff physicians. In fact they only engage no more than 11 FTE.")

requirements of the Injunction, which they jointly drafted, requiring implementation of the PCCM. And it does not reflect a good faith effort to reach the minimum requirements of constitutionally adequate healthcare.

It is plain that conditions remain unconstitutional after "years of supervision and support." *See Hinds County*, 2023 WL 1186925 at *12. Regardless of assurances of good faith, Defendants have repeatedly failed to implement necessary changes as directed by the Court and the Monitors, both throughout the lengthy history of this case and since the issuance of the Injunction. Accordingly, this factor favors receivership. *See, e.g.*, *Nunez*, 782 F. Supp. 3d at 165 (the key question in deciding this factor is whether the unconstitutional conditions fall below the constitutional minimum despite years of supervision and support by the Monitor and his team.") (internal quotation omitted.)

### 6.    Waste of Resources

Plaintiffs assert, as the Court has previously observed, the amount spent on this litigation is astronomical, and argue with a receiver, resources will be properly invested into making changes needed to improve healthcare and, ultimately end this case.

In Response, Defendants assert that they are "devoting substantial resources to complying with the Injunction and . . . achieving measurable success." (Doc. 4818 at 21.) Conversely, at the same time, for almost three years, they have complained they do not have the resources to fully engage in complying with the Injunction. Defendants assert that the appointment of a receiver will waste resources, pointing to the increase in the California Department of Corrections' spending and decline in prisoner population and the cost of the *Plata* receivership.

Defendants' argument is conclusory as Defendants do not proffer an estimated cost of a receiver. There will be costs for improvements to the healthcare system, but the entire point of almost 14 years of litigation and the remedy for many years of constitutional violations is to improve the healthcare system. As such, Defendants cannot use the cost of improvements already required under the Injunction to oppose the appointment of a receiver on the grounds of expense.

Moreover, Defendants' arguments based on the California Department of Corrections receivership are unavailing and ignore key facts: there, the Receiver has delegated oversight of the medical program at 31 of 35 institutions back to the Secretary as of August 2025, the decline in prisoner population was necessary for achievement of a remedy, and healthcare has been significantly improved under the receiver. *California Correctional Healthcare Services Fact Sheet*, at https://cchcs.ca.gov/factsheet/, permalink, https://perma.cc/T7ED-ZPJY; Gabriel Petek, Legislative Analyst's Office, *Overview and Update on the Prison Receivership* (Nov. 2023), at https://lao.ca.gov/Publications/Report/4813.

Defendants have not demonstrated that a receivership would be a waste of resources, but there is certainly evidence that resources will continue to be wasted in the absence of a receiver. Defendants spend more than $1 billion per year, and millions of dollars towards inmate healthcare. Defendants have proven completely incapable of reaching constitutional compliance, resulting in more than a decade of litigation without appreciable effect on the provision of healthcare. Allowing this to continue would waste enormous sums of money in compounded costs of ineffective care and litigation costs that do nothing to improve healthcare conditions.[60] And Defendants contract with NaphCare to provide healthcare to inmates, paying upwards of $300 million a year, but it makes little effort to enforce NaphCare's obligations.[61] As noted, the sanctions that have been imposed are sparse, in the form of "offsets" from the contractual amount and have totaled approximately

___

[60] Defendants have been ordered to pay $3,192,448.38 in attorneys' fees and costs, $2,545,000,00.00 in contempt sanctions, $4,186,940.00 in payments for the Monitors' work, and $9,140.00 in appellate filing fees. (See, e.g., Docs. 2902, 3245, 3576, 3841, 2898, 3861, 537, 1817, 1932, 1953, 2444, 2838, 2935, 2936, 2937, 2944, 2957, 3106, 3272, 3338.) Moreover, the attorneys' costs and fees of both Parties are in addition to the fees and costs reflected on the Court's docket and the Court's time and resources. In short, the cost to taxpayers has been enormous.

[61] The contract provides for sanctions "including but not limited to monetary sanctions, suspension, refusal to renew, or termination of the contract" and explicitly states Defendants may impose immediate monetary sanctions, "cure notice" monetary sanctions, and performance offsets for violations of contractual Performance Measures. (Doc. 4507-1 at 41.)

$1,424,900. Absent the drastic measure of imposing a receivership, Defendants will continue to expend funds on inefficient and unconstitutional care.

The evidence before the Court shows that if the healthcare system is brought into compliance with the Injunction, the healthcare system will run more efficiently and waste less resources. Throughout this litigation, the Monitors have documented how denying prisoners a constitutional level of care not only harms the prisoners but is ultimately a massive waste of resources within the prison and to the State of Arizona. In discussing deaths that were, at least, contributed to by violations of the Injunction, the Monitors document numerous instances where appropriate healthcare would have saved practitioner time and money. (*See, e.g.*, Doc. 4968 at 6, 12 (proper diagnosis of a urinary tract infection would have saved patient from emergency trip to the hospital; telehealth visits and nurse-led triage led to dangerous treatment of patient with complicated medical history and allowed his unstable heart condition to be seen as stable; urgent request for catheter ignored for three months until patient was already hospitalized; sleep apnea evaluation delayed for a year when the patient ultimately died; delay of review of specialist medical records for months; patient never offered a flu shot in violation of Injunction and developed flu that likely contributed to his death.).)

Defendants also do not take accountability for these failures, instead arguing that certain *parts* of the Injunction were complied with, showing a deliberate misunderstanding of the vision of the Injunction. (*See, e.g.*, Doc. 4968 at 16 (Defendants argued that patient who committed suicide was seen multiple times, but the Monitors note that those sessions were conducted by different psychology associates, no primary therapist was assigned, more than half occurred at cell-front, and despite clear signs of suicide risk, none of the four psychology associates assessed dynamic suicide risk factors); *id.* at 18 (Defendants argued that a 65-minute encounter constituted an adequate initial health assessment when the encounter was actually an Intake Assessment for Max Custody Placement); *id.* at 18-19 (Defendants' arguments demonstrate confusion in difference between psychiatrist and therapist.).)

Additionally, in mid-2024, Plaintiffs requested the Court order Defendants to hire an individual or individuals with significant health care management experience to assist Defendants in reforming the current system, but Defendants claimed such an order would be "duplicative and unnecessary" because Defendants "already engaged . . . a nationwide correctional consulting and management firm" and anticipated the firm's recommendations for "system-wide improvement." (Doc. 4998 at 4.) Director Thornell asserts that this report was necessary "for a comprehensive, systemwide review of ADCRR's programs and systems as part of [his] vision for redefining and implementing modern correctional policies and practices in Arizona, and also to address the constitutional deficiencies identified in this Court's 2022 order." (Doc. 4998-3 at 17.) The Monitors opine that "most of the consultant's recommendations and attendant improvements, while worthwhile, do not relate to the Court's Injunction regarding health care, or do so in a very indirect manner." (Doc. 5040 at 4.) This undermines Defendants' initial contention that providing Defendants with help from an individual with significant health care management experience to assist Defendants in reforming the current system was duplicative and unnecessary. Indeed, the Monitors were already providing ample recommendations for "system-wide improvement" to no avail, making engagement of the consulting firm itself the "duplicative and unnecessary" expense. (Doc. 4998 at 4.)

In short, Defendants' continued violations of the Injunction and their conduct throughout this litigation are contributing to a waste of resources and there is no showing that appointment of a receiver would result in waste of resources. *See Coleman*, 2025 WL 2475040, at *11–12 ("It cannot reasonably be disputed that the amount of money being spent on the contentious litigation that has plagued remediation in this action for more than a decade is a significant waste of public resources, given that the litigation has not effected any material change in the court-ordered remedy but rather only served to delay implementation and the end of federal court oversight.").

### 7. Relatively Quick and Efficient Remedy

Defendants argue that appointment of a receiver would not be quick and efficient and would "dramatically increase the cost of compliance and cause further delay" (Doc. 4818 at 2.) Defendants also cite the appointment of a receiver in the California Department of Corrections as an example of a receivership that was purportedly inappropriate and not quick or efficient. However, as noted above, and in contrast to Defendants' purported efforts, the receivership in California has had marked success.[62]

This factor does not ask the Court to consider whether appointment of a receiver would be quick and efficient, but whether appointment would be *relatively* quick and efficient. This determination must be evaluated against the backdrop of this case. *See, e.g.*, *Plata*, 2005 WL 2932253, at *31 ("the speed of reform must be judged relative to the scale of the project.".) Defendants first promised to achieve constitutional compliance in October 2014. As amply detailed in this Order, Defendants continue to argue about the underlying requirements of the Injunction rather than bringing the medical and mental healthcare systems into constitutional compliance.

Even since the issuance of the Injunction, Defendants have failed for more than two years to implement relatively simple solutions.[63] Here, given more than 11 years of delays and the same arguments and non-compliance, the Court finds that appointing a receiver that is willing to implement the recommendations of the neutral experts would be relatively quick and efficient. *See Coleman*, 2025 WL 2475040, at *12 (finding "quick and efficient remedy" factor favored receivership because estimated 5-7 year receivership must be evaluated against "long-running remedial phase of th[e] case" "with some progress . . . but

---

[62] Progress was initially slow under the receiver in California. In 2011, the Supreme Court found that unless overcrowding was addressed, the receiver would be unable to achieve a remedy. Once the CDCR reduced the state prison population to acceptable levels in 2015, progress moved much more quickly. Between 2015 and 2017, the receiver returned authority over 16 prisons to the state. *See California Correctional Healthcare Services Fact Sheet*, (Aug. 2025), https://cchcs.ca.gov/factsheet/, permalink, https://perma.cc/T7ED-ZPJY).

[63] *See generally supra* (Noting relatively simple measures that could have been taken and to resolve issues with the refusal process and to make the shift away from inappropriate nurse-driven care, but were not).

no durable end otherwise in sight."); *Nunez*, 782 F. Supp. 3d at 165 (in evaluating quick and efficient remedy, finding in favor of receivership because "steady and much more rapid progress is possible under the guidance of a well-structured receivership.").

### 8. Balance of Factors

It is an unavoidable conclusion that the balance of factors favors a receivership in this action. The Court is cognizant that the appointment of a receiver is an extraordinary remedy that should be reserved for the most extreme circumstances. From the evidence compiled over the past decade, the Court is convinced the situation at ADCRR is such an extremity.

In their opposition to the appointment of a receiver, Defendants emphasize *District of Columbia v. Jerry M.*, a case in which the District of Columbia Court of Appeals reviewed the appointment of a receiver over the education system at the Oak Hill center for detained and committed children. The court concluded that "while the District's history of compliance with the orders of the court leaves much to be desired, we are not persuaded that the record reveals a sufficient basis for the imposition of this remedy of last resort under the circumstances existing at the time of the entry of the order."

*Jerry M.* presents a factual situation markedly different from that existing here. There, a receiver was appointed "just eight weeks after" the newly appointed superintendent of the District of Columbia Public Schools had agreed to take responsibility for education at the Oak Hill School and just days into the new school year, with "no notice that [the Court] intended to judge [the Superintendent] based on conditions during the first week of school." *Jerry M.* at 1212. DCPS had developed and presented a plan for running the facility in compliance with requirements. *Id.* at 1210. A new governmental body, the District of Columbia Financial Responsibility and Management Assistance Authority, had been created and issued a Directive taking various steps to address problems with public schools. *Id.* at 1210, 1213.

Here, Defendants argue that "the Department's current leadership has been at the helm for only a couple years" and, like the newly appointed Superintendent in *Jerry M.*,

"must be given an opportunity to 'turn the tide' before additional relief could be warranted" (Doc. 4818 at 17), but this opportunity has been given and proved fruitless. Here, the long history of this case has made evident that ADCRR's healthcare is deeply, systemically flawed. New leadership already in place for two years has failed to make headway in rooting out systemic issues or offer any concrete plan for achieving compliance.

Defendants are correct that alone, a historical failure to fully comply may not warrant the extraordinary remedy of a receivership. In reversing the order granting a receivership in *Jerry M.*, the court explained "the trial court relied principally upon only one of the factors essential for a reasonable exercise of its discretion" when it "focused upon the history of the District's failure to comply fully with the court's requirements." *Jerry M.* at 1213. This historical failure was "a compelling consideration," but could not be "the only factor for consideration." But here, the Court has not relied solely, or predominantly, on any one factor, but rather has conducted a holistic review.

The Court has exercised restraint for much of this litigation, to the point that anymore tolerance of unconstitutional healthcare becomes judicial indulgence. Defendants' healthcare delivery system continues to cause and threaten grave harm; the Court has attempted to resolve the issues through less extreme measures; Defendants have consistently dragged their feet, delayed, exploited ambiguity, and fought compliance at every turn, making continued insistence on compliance ineffective; Defendants lack the leadership capacity to complete the necessary systemic changes to achieve compliance; Defendants' repeated failures, repeated attacks upon the Injunction and the Monitors, and need for constant micromanagement undermine their avowals of commitment and good faith; resources are being wasted; and after fourteen years of litigation with little to change, continuing to employ the same approach would be wildly inefficient with no indication that improvement will accelerate. The Court finds no lesser measure will suffice to remedy the pervasive constitutional violations present in Defendants' healthcare delivery system.

## III.     NARROWNESS OF THE REMEDY

As in its issuance of the Permanent Injunction in 2023, the Court embraces the rule that the remedy imposed must be narrowly drawn, extend no further than necessary to correct Defendants' ongoing violations of Plaintiffs' constitutional rights, and be the least intrusive means necessary to correct and prevent violations. 18 U.S.C. § 3626(a)(1)(A.) The Court finds the appointment of a receiver over Defendants' healthcare and mental healthcare system is such a remedy.

IV.     **SCOPE OF ORDER:**

Plaintiffs request that the Court "assign to the receiver all authority granted to the receiver in *Plata*, given the success of the receiver in that case." (Doc. 4795 at 30.) In Response, Defendants assert that the relief requested by Plaintiffs is too expansive "particularly considering a lack of history of the Department's current leadership being unwilling to institute change." (Doc. 4818 at 25-26.)

In determining the scope of a receiver's powers, the Court should ensure that the receiver's powers "cover only the scope of the constitutional violations" and should give necessary explanation and justification to support the scope of those powers. *Hinds Cnty.*, 128 F.4th at 639.

Although the Court is inclined to propose that the Receiver be given powers consistent with the Receiver in *Plata*, the Court will allow the parties and the Monitors to weigh in on the proposed powers before issuing a final order as to the powers of the receiver. Both the parties and Monitors must address whether the proposed powers cover only the scope of the constitutional violations

**IT IS ORDERED** Plaintiffs' Motion for a Receiver (Doc. 4795) is **GRANTED**.

**IT IS FURTHER ORDERED** within 60 days of the date of this Order, the parties and the Monitors shall submit a list of up to five candidates each to serve as the Receiver over medical and mental health care in Arizona state prisons. Objections shall be filed no more than fourteen days later, and responses shall be filed no later than seven days thereafter.

1  **IT IS FURTHER ORDERED** within thirty days of the date of this Order, the

2 Parties shall simultaneously file Motions setting forth the proposed duties, powers, and

3 authorities of the Receiver, addressing how each proposal will extend as far as but no

4 further than necessary to correct Defendants' constitutional violations.

5  Dated this 19th day of February, 2026.

6

7

8               _____
             Honorable Roslyn O. Silver

9             Senior United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Section | Provision | Status | Description | Compliance |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.1 and 1.3 | **Non-compliant** | All care and the documentation supporting that care, delivered during a medical encounter (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, report from a consultant, other external health record, shall be clinically appropriate including scheduled follow-up in an appropriate timeframe when applicable. Settings include, but are not limited to, those described in the subsections of these provisions below. | |
| Medical Services | Injunction Subprovision 1.1a | **Non-compliant** | Emergent care | Doc. 4968 at 46 (Defendants using flawed methodology even though Monitors consistently provide feedback since November 2023 that data collection is flawed.) |
| Medical Services | Injunction Subprovision 1.1b | **Non-compliant** | Urgent care | Doc. 4968 at 48 (Defendants self-assess 96% compliance with urgent care provision in sub provisions 1.1b of Injunction, but Monitors assess as closer to 33%); |
| Medical Services | Injunction Subprovision 1.1c | **Non-compliant** | Non-urgent, episodic care | Doc. 4968 at 49 (Defendants self-assess 79% compliance with non-urgent, episodic care in subprovision 1.1c of Injunction, but Monitors calculate 35% compliance) |

| Medical Services | Injunction Subprovision 1.1d | **Non-compliant** | Chronic care | Doc. 4968 at 52 (Defendants self-assess 86% compliance with chronic care provision in section 1.1d of Injunction, but Monitors assess closer to 35%) |
|---|---|---|---|---|
| Medical Services | Injunction Subprovision 1.1e | **Non-compliant** | Inpatient care | Doc. 4968 at 53-57 (Monitors assess noncompliance with inpatient care provision in 1.1e, but find percentage is inappropriate methodology) |
| Medical Services | Injunction Subprovision 1.1f | **Non-compliant** | Off-site specialty referrals | Doc. 4968 at 58-59 (Monitors assess non-compliance with off-site specialty referrals provision in section 1.1f of Injunction and that percentages do not fully capture methodology, Defendants self-assess at 96% compliance, but Monitors assess 65% compliance.); |
| Medical Services | Injunction Subprovision 1.1g | **Non-compliant** | (Additional reference 9.1) Action taken on post-hospital, post-emergency room, or specialist recommendations. This includes that the practitioner shall adopt and perform recommendations from outside providers unless a clinically appropriate basis exists to alter or forgo the off-site recommendations. | Doc. 4968 at 60 (Defendants self-assess 84% compliance with 1.1g of Injunction regarding action taken on post-hospital, post-emergency room, or specialist recommendations and that percentages do not fully capture methodology, Defendants self-assess at 96% compliance, but Monitors assess 10% compliance.) |

| Medical Services | Injunction Provision 1.22 | (see individual sub-provisions below) | Orders from health care staff in the outpatient and inpatient arenas shall be completed within the timeframe ordered. This includes, but is not limited to, those orders described in the subsections of this provision below. | |
|---|---|---|---|---|
| Medical Services | Injunction Subprovision 1.22a | **Non-compliant** | On-site diagnostic tests | See Doc. 4968 at 62-63 (Monitors find non-compliance with on-site diagnostic tests provisions in section 1.22a of the Injunction and that Defendants use improper methodology regarding compliance) |
| Medical Services | Injunction Subprovision 1.22b | **Non-compliant** | Off-site diagnostic tests | Doc. 4968 at 64-65 (Monitors find non-compliance with off-site diagnostic tests provisions in section 1.22b of the Injunction) |
| Medical Services | Injunction Subprovision 1.22c | **Non-compliant** | On-site follow-up visits with nurses or practitioners | Doc. 4968 at 66-67 (Monitors find non-compliance with on-site follow-up visits with nurses or practitioners provision in section 1.22c of the Injunction and include backlog chart showing extremely back-logged appointments) |

| Medical Services | Injunction Subprovision 1.22d | **Non-compliant** | (Additional reference 8.1) Off-site visits with specialist | Doc. 4968 at 68-72 (Defendants self-assess 28% compliance with 1.22d of Injunction regarding offsite visits with specialists, but Monitors assess probably much worse given certain data manipulation. Monitors also address substantive issues outside of percentages) |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.21a (a.k.a. "1.21") | **Non-compliant** | All cancellations of patient-initiated visits shall be made directly to a health care professional by telephone, tablet, video, face-to-face, or in writing by the patient. If a patient will not voluntarily displace, health care staff will go to the patient's location. | Doc. 4968 at 73-74 (Defendants self-assess 76% compliance with 1.21a of the Injunction regarding cancellation of patient-initiated, but Monitors assess 60% compliance) |
| Medical Services | Injunction Provision 1.21b (a.k.a. "1.1,1.21a") | **Non-compliant** | All refusals of provider-initiated on-site medical visits are made by telephone, video, or face-to-face with an RN or practitioner, within three days after the appointment. If a patient will not voluntarily displace, health care staff will go to the patient's location. | Doc. 4968 at 75 (Monitors find non-compliance with refusals of provider-initiated on-site medical visits in section 1.21b of the Injunction) |
| Medical Services | Injunction Provision 1.21c (a.k.a. "1.1,1.21b") | Non-compliant | All refusals of off-site health visits are made by telephone, video, or face-to-face with an RN or higher at the time of the appointment. If a patient will not voluntarily displace, health care staff will go to the patient's location. | Doc. 4968 at 76-77 (Monitors find non-compliance with off-site health visits in section 1.21c of the Injunction) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.23 | **Non-compliant** | Patients shall be informed in a timely manner of diagnostic test results. | Doc. 4968 at 78-79 (Defendants self-assess 88% compliance with 1.23 of the Injunction regarding timely conveyance of diagnostic test results, but Monitors assess 76% compliance) |
| Medical Services | Injunction Provision 5.1 | **Non-compliant** | For patients with any medical conditions and identified treatment providers in the community, if the patient consents, health care staff shall send each provider relevant health care information prior to the patient's release. This includes, at a minimum, a problem list, list of active medications, current symptoms, functional impairments, a summary of relevant care provided during incarceration, any necessary care or follow-up care, one or more points of contact if a community provider requires further information. The patient's health record shall contain documentation of the above information that was provided, when, and to whom. | Doc. 4968 at 80-81 (Defendants self-assess 96% compliance with 5.1 of the Injunction regarding healthcare information, but Monitors assess 20% compliance) |
| Medical Services | Injunction Provision 7.4.1 | **Compliant** | Patients shall be given on a daily basis an opportunity to indicate their need to be seen for a medicalclinic appointment at the next available clinic by one of the following mechanisms, depending on theirliving situation, freedom of movement, and access to electronics: affixing their name to a time slot on apaper list maintained on the living unit or in the medical unit; affixing their name to a time slot on anelectronic list via tablet or kiosk; informing the nurse who conducts daily (or more frequent) welfarechecks on that unit; an effective paper-based system in the event of temporary non-functioning of theelectronic system. | |
| Medical Services | Injunction Provision 7.4.2 | Unable to determine compliance | A reminder of the following rule is communicated via the medium the patients use to make requests (e.g., a statement placed on the paper or electronic sign-up list): Patients should only use the non-urgent system if they have a non-urgent need. Patients with urgent or emergent needs should notify a staff member. | |

| Medical Services | Injunction Provision 7.1 | **Non-compliant** | An RN or higher credentialed professional shall conduct an intake screening within four hours of a patient's arrival or, alternatively, a rapid screening shall be conducted immediately upon arrival, but the intake screening by an RN shall be conducted as soon as possible and before the patient proceeds to housing. If the rapid screening is conducted by a professional of lesser credential than an RN (e.g., LPN, certified medical or nursing assistant), then the screening shall not include a clinical assessment, and any abnormal response found by the LPN or similar staff shall result in immediate consultation with an RN (or higher credentialed professional.) | Doc. 4968 at 84-85 (Monitors find non-compliance with timely intake screening in section 7.1 of the Injunction) |
|---|---|---|---|---|
| Medical Services | Injunction Provision 7.2 | **Non-compliant** | A medical practitioner shall complete a history and physical examination of each patient by the end of the second full day after a new patient arrives in ADCRR. | Doc. 4968 at 86 (although Monitors agree with 96% compliance with 7.2 of the Injunction regarding complete history and physical exam, not achieving full compliance is dangerous and may be errors in data) |
| Medical Services | Injunction Provision 7.4.6 | **Non-compliant** | All non-urgent/non-emergent care at the request of a patient shall be completed in a reasonable time. | Doc. 4968 at 87-88 (Monitors find non-compliance with all timely non-urgent/non-emergent in section 7.4.6 of the Injunction noting that the data is erroneous, and Defendants are not performing this part of the Injunction properly) |

| Medical Services | Injunction Provision 7.4.7a/b | **Non-compliant** | The initial care for non-urgent/non-emergent care and chronic care shall be provided by the patient's primary care provider (PCP) with the exceptions noted below. (1) The care may be provided by another medical practitioner or health care practitioner as directed by the PCP as clinically appropriate. (2) If the PCP is not on the premises or conducting telehealth visits at the time, the care may be provided by another medical practitioner of the same or higher credential. (3) Pursuant to patient-specific direction provided by the medical practitioner, RN may provide initial care for a limited number of conditions that are simple, rarely serious, rarely confused with serious conditions, and appropriately treatable with self-care and/or over-the-counter medications provided that the RN operates under clinically appropriate protocols approved by the Monitors. | Doc. 4968 at 89-92 (Monitors find non-compliance with PCP initial care in section 7.4.7a/b due to three systemic problems) |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.5 | **Non-compliant** | Emergency response and care provided by custody staff shall be appropriate given the skill level and knowledge expected of custody staff. | Doc. 4968 at 93 (Defendants self-assess 85% compliance with 1.5 of the Injunction regarding emergency response and care by custody staff, but Monitors assess 50% compliance) |
| Medical Services | Injunction Provision 1.8a | **Non-compliant** | Emergency response equipment (Emergency Response Bag, Automated External Defibrillators ("AEDs"), oxygen) shall contain all items required by policy, all equipment shall be in working order, and all medications shall be unexpired. | Doc. 4968 at 94 (Defendants self-assess 86% compliance with 1.8a of the Injunction regarding emergency response equipment, but Monitors say there is no meaningful way to calculate a percentage performance, and there is evidence of non-compliance in 13 units) |

| Medical Services | Injunction Provision 1.8b | **Non-compliant** | Emergency Response Bag checklists shall reflect the equipment was checked daily and inventoried monthly. The checklists shall also reflect medications are within their expiration date and equipment is operational. | Doc. 4968 at 95 (Defendants self-assess 79% compliance with 1.8b of the Injunction regarding emergency response bag checklists, but Monitors say there is no meaningful way to calculate a percentage performance, but Monitors found that checklists were inaccurate and therefore non-compliant) |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.8c | **Non-compliant** | Staff shall complete and document all AED manufacturer recommended checks (e.g., daily, monthly, annual.) | Doc. 4968 at 96 (Defendants self-assess 94% compliance with 1.8c of the Injunction regarding AED manufacturer checks, but Monitors found that they were 94% compliant only where a few units actually have AED) |
| Medical Services | Injunction Provision 1.8d | **Compliant** | Naloxone (Narcan®) is required to be kept on every living unit or with every AED. | |
| Medical Services | Injunction Provision 7.5 | **Compliant** | Build (or modify existing) living units to accommodate all patients requiring SNU housing, build the units with per-patient floor space consistent with Arizona's Medicaid agency (AHCCCS) requirements for similar populations, equip and staff the units to meet the assisted living needs of the SNU patients at the appropriate custody levels, and transfer all these patients to those beds. (Definition of SNU: elderly, physically disabled, or developmentally disabled, generally guided by the health/functional/physical needs criteria established by AHCCCS – see Pre-Admission Screening Tool) | |

| Medical Services | Injunction Provision 7.6.1 | **Non-compliant** | A medical practitioner shall be contacted and collaborate on the creation of a care plan immediately upon a patient being admitted to the IPC. | Doc. 4968 at 100-01 (Defendants self-assess 75% compliance with 7.6.1 of the Injunction regarding collaboration of medical provider for IPC patients, but Monitors assess 30% compliance) |
|---|---|---|---|---|
| Medical Services | Injunction Provision 7.6.2 | **Non-compliant** | An RN shall complete an admission nursing assessment immediately upon a patient arriving in the IPC. | Doc. 4968 at 102 (Defendants self-assess 75% compliance with 7.6.2 of the Injunction regarding nursing assessment upon arrival in IPC, but Monitors assess 65% compliance) |
| Medical Services | Injunction Provision 7.6.3 | **Non-compliant** | A medical practitioner shall complete an admission history and physical within one calendar day of admission to the IPC for patients who are going to remain beyond 24 hours. | Doc. 4968 at 103 (Monitors assert no more than occasional compliance with 7.6.3 of the Injunction regarding completion of admission history and physical within one day of IPC admission) |
| Medical Services | Injunction Provision 7.6.4 | **Non-compliant** | An RN shall complete an assessment in the IPC at the frequency ordered. The spacing of the assessments shall be clinically appropriate. | Doc. 4968 at 104 (Monitors assert non-compliance with 7.6.4 of the Injunction regarding RN completing an assessment in the IPC at the frequency ordered) |

| Medical Services | Injunction Provision 7.6.5 | **Non-compliant** | The call buttons of all patients admitted to an IPC level bed are determined to be working on the day of admission and once per month. If a call button is not working health care staff shall perform a welfare check at least once per 30 minutes. | Doc. 4968 at 105-06 (Defendants self-assess 88% compliance with 7.6.5 of the Injunction regarding working call buttons on IPC beds, but Monitors could not perform assessment based on "frequency of careless or erroneous nursing documentation") |
|---|---|---|---|---|
| Medical Services | Injunction Provision 8.4 | **Non-compliant** | If Defendants or their healthcare vendor utilize categorical referral timeframes, e.g., "emergency," "urgent," "routine," for which it applies default timeframes for completion of the referral, Defendants shall notify the Court of those categories and timeframes and shall notify the Court within fourteen days if any of those categories or default timeframes change. | Doc. 4968 at 107 (Monitors assert that Defendants added a category of referral time frames, but never notified the Court of this change or its meaning, even though this provision of the Injunction requires notification to the Court) |
| Medical Services | Injunction Provision 8.7 | **Non-compliant** | If a practitioner orders, or informs a patient there will be an order for an off-site test or referral, but circumstances change and the order is modified or rescinded, the patient shall be informed within one month of the change. | Doc. 4968 at 108 (Monitors assess non-compliance with 8.7 of the Injunction requiring that patient be informed within one month of change to order for an off-site test or referral because form does not tell patients what was cancelled); Defendants self-assessed 94% compliance, but Monitors assessed 50% compliance) |

| Medical Services | Injunction Provision 9.2 | **Non-compliant** | Patients returning from a hospital stay or emergency room visit shall be evaluated by an RN or higher prior to returning to their living unit. A discharge summary, physician report, or documentation of this information received via phone shall be available for this evaluation. | Doc. 4968 at 109-10 (Defendants self-assess 80% compliance with 9.2 of the Injunction with requirements for patients returning from ER and Monitors agree Monitors suggest tools to remedy ongoing violations) |
|---|---|---|---|---|
| Medical Services | Injunction Provision 10.5.4 | **Non-compliant** | Patients with asthma who are at significant risk of serious respiratory impairment if they do not use their rescue inhaler immediately, shall be provided a rescue inhaler KOP. Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button. Exceptions may also be made for patients where the practitioner can document a significant and serious penological need to prohibit a particular patient from having such an inhaler. This exception must be patient-specific. | Doc. 4968 at 111 (Monitors find Defendants non-compliant with 10.5.4 of the Injunction requiring rescue inhalers) |
| Medical Services | Injunction Provision 10.5.5 | **Non-compliant** | Patients with diabetes who are at significant risk of hypoglycemia shall be provided a source of glucose KOP. Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button. | Doc. 4968 at 112 (Monitors find Defendants non-compliant with 10.5.5 of the Injunction requiring KOP glucose for hypoglycemic prisoners) |
| Medical Services | Injunction Provision 10.5.6 | **Non-compliant** | Patients prescribed rapid-delivery nitroglycerin for cardiac disease shall be provided the medication KOP. Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button. | Doc. 4968 at 113 (Defendants self-assess 86% compliance with 10.5.6 of the Injunction regarding KOP nitroglycerin for patients with cardiac disease, but Monitors assess 83% compliance) |

| Medical Services | Injunction Provisions 11.1.1.1 & 11.1.8 | **Non-compliant** | All patients are offered a screening blood test for HCV under opt-out conditions within a month of arrival. | Doc. 4968 at 114-15 (Defendants self-assess 100% compliance with HCV testing and opt-out in 11.1.1.1 & 11.1.8, but Monitors found that opt-out is not being enforced) |
|---|---|---|---|---|
| Medical Services | Injunction Provision 11.1.4 | **Non-compliant** | All patients with HCV infection shall be placed on a single list prioritized according to a scheme that considers degree of fibrosis, relevant comorbidities, likelihood of transmitting infection to others in the prison, and release date. | Doc. 4968 at 116-18 (Defendants self-assess 100% compliance with 11.1.4 regarding prioritized list for HCV infections, but Monitors find that list is not being maintained in accordance with Injunction "in significant ways" and this continues despite that Monitors have identified these problems previously) |
| Medical Services | Injunction Provision 11.1.7 | **Non-compliant** | All patients with HCV shall be offered education about HCV, whether they receive treatment or not. | Doc. 4968 at 119 (Monitors find non-compliance with 11.1.7 requiring HCV education for prisoners with HCV; Defendants self-assess 87% compliance) |
| Medical Services | Injunction Provision 11.1.5a | **Non-compliant** | All patients with newly diagnosed HCV are tested to determine if they have more advanced hepatic disease | Doc. 4968 at 120-21 (Monitors found greater compliance (96%) with 11.1.5a, requiring that HCV patients be tested for more advance hepatic disease, than Defendants self-assessed 88% compliance, but noted ongoing issues with informed consent for denial of treatment) |

| Medical Services | Injunction Provision 11.1.5b | **Non-compliant** | All patients with fibrosis scores of F3 or F4 will be offered treatment for HCV. | Doc. 4968 at 122-23 (Defendants self-assess 100% compliance with 11.1.5b requiring that patients with F3 or F4 fibrosis scores be offered treatment for HCV, but Monitors assess 91% compliance) |
|---|---|---|---|---|
| Medical Services | Injunction Provision 11.1.5c | **Compliant** | At least the following number of patients will begin treatment for HCV monthly using the current standard of care medications: 110 patients plus 70% of the number of newly admitted patients who tested positive for HCV during the previous month. | |
| Medical Services | Injunction Provision 11.1.6 | **Non-compliant** | No patient who is released on their planned release date shall release without having been screened for HCV and if positive and they accept treatment, without having completed treatment except for those patients with markedly reduced life expectancy who would not be expected to benefit from treatment, or patients who cannot complete treatment within the timeframe of their incarceration and linkage to care in the community for continuation of treatment cannot be established despite a good faith effort or there is a documented informed refusal. | Doc. 4968 at 124 (Defendants self-assess 79% compliance with 11.1.6 regarding treatment for prisoners with HCV released during ongoing treatment, but there are significant, recognized errors in methodology) |
| Medical Services | Injunction Provision 11.2 | **Compliant** | All newly admitted patients shall have a completed test for tuberculosis (skin test, blood test, or chest x-ray) by the end of the seventh full day after admission into the ADCRR system, unless the patient refuses. | |

| Medical Services | Injunction Provision 11.3.1 | Non-compliant | All newly admitted patients shall be screened for, and if indicated then evaluated for, substance use disorder. Screening shall include assessment as to a history of opioid overdose. | Doc. 4968 at 127-29 (regarding 11.3.1 clinically appropriate evaluation after intake screening for substance use disorder (OUD), Monitors and Defendants agree on 100% compliance for screening, but Defendants self-assess 100% compliance with evaluations while Monitors assess 70% compliance due to five errors) |
|---|---|---|---|---|
| Medical Services | Injunction Provision 11.3.2 | Compliant | All newly admitted patients shall be offered to have current Medication for Opioid Use Disorder ("MOUD") (buprenorphine, naltrexone) continued. | |
| Medical Services | Injunction Provision 11.3.3 | Non-compliant | All pregnant or post-partum patients with diagnosed Opioid Use Disorder ("OUD") shall be offered to have current MOUD (buprenorphine, naltrexone, methadone) continued, or if not currently on MOUD, shall be offered to initiate treatment with buprenorphine or naltrexone. | Doc. 4968 at 131 (Monitors found Defendants non-compliant with 11.3.3 regarding treatment for pregnant or post-partem patients with OUD) |
| Medical Services | Injunction Provision 11.3.4 | Compliant | All patients who have a documented history of opioid overdose or who upon assessment are determined to be at imminent risk of an opioid overdose, shall be offered MOUD with methadone, buprenorphine or naltrexone. | |
| Medical Services | Injunction Provision 11.3.5 | Compliant | All patients offered treatment for HCV shall be evaluated for OUD and if found to have OUD, shall be offered MOUD with methadone, buprenorphine or naltrexone. | |
| Medical Services | Injunction Provision 11.3.6a/b | Non-compliant | Patients with OUD will be offered MOUD, including counseling, if appropriate. The Department will take the necessary steps to ensure that any patient transferring to another facility will not experience an interruption in MOUD, counseling, or alcohol treatment. | Doc. 4968 at 134-38 (Monitors find noncompliance with 11.3.6a/b requiring medication for patients with OUD and detail lack of leadership in roll-out) |

| Medical Services | Injunction Provision 11.3.6c/d | **Non-compliant** | Patients with Alcohol Use Disorder will be offered medication treatment and counseling if appropriate. The Department will take the necessary steps to ensure that any patient transferring to another facility will not experience an interruption in medication or counseling. | Doc. 4968 at 139 (Monitors find non-compliance with 11.3.6c/d requiring medication and counseling for patients with alcohol use disorder) |
|---|---|---|---|---|
| Medical Services | Injunction Provision 11.4 | **Non-compliant** | Patients shall be offered all immunizations recommended by the CDC's Advisory Committee on Immunization Practices. | Doc. 4968 at 140 (Monitors find non-compliance with 11.4 requiring offering vaccinations) |
| Medical Services | Injunction Provision 2.1.3 | **Non-compliant** | Following a medical-related death, if the medical examiner's report was unavailable, the plan shall be revisited and modified, if necessary, within one month of receipt of the report. | Doc. 4968 at 141 (Monitors find non-compliance with 2.1.3 requiring follow-up after deaths) |

| Medical Services | Injunction Provision 2.4.1 | **Non-compliant** | There needs to be a robust continuous quality improvement program to monitor the quality of clinicalcare. As part of this program, staff monitor the absolute number and trend of various parameters on amonthly basis. Where metrics or trends in metrics show room for improvement, staff make appropriateefforts to understand the underlying reason for deviation, take reasonable steps to effectuateimprovement, evaluate the effectiveness of these steps in a reasonable time, and make adjustments to itsimprovement efforts as needed. At a minimum, ADCRR will monitor the following parameters: • percentage of individuals (regardless of whether diagnosed with hypertension) whosesystolic blood pressure exceeds 140 mmHg or diastolic blood pressure exceeds 90mmHg; • average hemoglobin A1C (regardless of whether diagnosed with diabetes); • percentage of individuals taking ten or more prescribed medications; • percentage of women receiving timely breast screening; percentage of women receivingtimely cervical cancer screening; • percentage of pregnant women who have the results of routine prenatal laboratory testsresults as recommended in current national guidelines (e.g., Guidelines for Prenatal Care,8th Edition, American Academy of Pediatrics and American College of Obstetricians andGynecologist, Table 6-2) documented within one month of diagnosis of pregnancy; • percentage of health care grievances which are appealed; percentage of health caregrievance appeal replies that are appropriate; • percentage of prisoners on antipsychotic medications receiving timely AIMS (abnormalinvoluntary movement scale) assessments; • percentage of prisoners on antipsychotic medications receiving appropriate and timelymetabolic assessments; • percentage of prisoners receiving punishment for a rule violation, for whom a mental health intervention would have been more clinically appropriate than punishment; andpercentage of prisoners arriving at ADCRR for whom intake screening by an RN (orhigher credentialed professional) is completed more than four hours after arrival. | Doc. 4968 at 142-43 (Monitors find that Defendants have "completely failed to meet the requirements of any of the 12 domains listed" in 2.4.1 regarding a quality improvement plan and "and has failed to do so consistently for the past two years," which "increases the risk of harm to patients") |

| Medical Services | Injunction Provision 2.4.2 | **Non-compliant** | In addition to the parameters prescribed in 2.4.1, ADCRR will monitor other parameters as reasonably dictated by the other self-improvement activities described in the Injunction. | Doc. 4968 at 144-46 (Monitors find noncompliance with 2.4.2 regarding monitoring other parameters and "with regarding to systemic dangers to which patients are exposed and which have caused serious harm, Defendants are unable to identify, examine, remediate in a manner that is lasting, and monitor the effectiveness of its remediation of these dangers") |
|---|---|---|---|---|
| Medical Services | Injunction Provision 6.2a/7.3 | **Non-compliant** | All patients are assigned a Primary Care Practitioner (PCP.) Patients are appropriately assigned to a physician or APP based on the patient's medical complexity. | Doc. 4968 at 147-49 (Monitors find that "Defendants' practice regarding [6.2a/7.3 requiring that patients be assigned a primary care practitioner] has changed little since trial, causing a "significant risk of serious harm and causing serious harm") |
| Medical Services | Injunction Provision 6.2c | **Non-compliant** | Facility Medical Directors (FMD) at high intensity facilities shall be assigned up to 100 patients as the primary care provider and shall have no other scheduled patient care assignments including supervision of APPs or as the scheduled provider for specialized units such as Inpatient Component ("IPC") or Special Needs Unit ("SNU".) This does not limit FMDs from occasional unscheduled clinical supervision and care activities. | Doc. 4968 at 150 (Monitors find Defendants' non-compliance with 6.2c requiring that Facility Medical Directors (FMD) at high intensity facilities be assigned up to 100 patients and have no other scheduled patient care assignment, finding that one FMD has over 600 patients) |

| Medical Services | Injunction Provision 6.4 | Non-compliant | All medical physicians–at hiring and during employment–shall be board certified in Internal Medicineor Family Practice, or board eligible if within 7 years of their completion of an ACGME approvedresidency in one of these 2 specialties, with the following exceptions: medical directors, shall be boardcertified at hiring and during employment; physicians providing obstetric and gynecologic services shallbe board certified or board eligible if within seven years of their completion of an ACGME approvedresidency in obstetrics and gynecology; and physicians who are currently employed and are not boardeligible may remain employed for no longer than one year after issuance of this Order. They may alsonot possess a restricted license if the restriction is related to clinical competency or is restricted topractice in a correctional facility. (Notify Court Monitors if there is a request for an exception) | Doc. 4968 at 151 (Defendants and Monitors agree with 64% compliance with 6.4 requiring certain qualifications for medical physicians, and Monitors note that NaphCare disagrees with the necessary qualifications set forth in the Injunction) |
| --- | --- | --- | --- | --- |

| Medical Services | Injunction Provision 1.11 | **Non-compliant** | Licensed Practical Nurse ("LPNs") shall practice within their scope of practice set forth in Arizona Administrative Code § 4-19-401 (not independently assess patients or initiate a plan of care or treatment.) | Doc. 4968 at 152-54 (although Defendants self-assess at 100% compliance with 1.11 regarding practice limitations for LPNs consistent with Arizona law, Monitors find that Defendants are non-compliant finding that ADCRR allows LPNs to see patients independently and the EHR encourages this practice, while Defendants "make[s] a critical logic error in its analysis [of its compliance with this factor] despite repeated oral and written feedback") |
| --- | --- | --- | --- | --- |
| Medical Services | Injunction Provision 1.12 | **Compliant** | No one for whom a health professions license is required may possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. | |
| Medical Services | Injunction Provision 1.9 | **Non-compliant** | Directors of Nursing (DON) at each complex may not spend more than 15% of their time providing scheduled or unscheduled patient care. | Doc. 4968 at 156 (although Defendants assert 71% compliance with 1.9 regarding Directors of Nursing spending no more than 15% of their time providing scheduled or unscheduled patient care, Monitors assert that Defendants remain non-compliant due to understaffing and a percentage is not an effective way of determining compliance) |

| Medical Services | Injunction Provision 1.4 | **Non-compliant** | Telehealth for medical care may be used only when clinically appropriate. | Doc. 4968 at 157-58 (Monitors find Defendants noncompliant with 1.4 regarding telehealth when clinically appropriate because Defendants use telehealth "well beyond its safe limits and without the availability of other proxies") |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.6 | **Non-compliant** | There is sufficient space, equipment (e.g., otoscopes, ophthalmoscopes), and supplies (e.g., dressings) to deliver medical care services appropriate to the location. | Doc. 4968 at 159-61 (Defendants self-assessed 83% compliance with 1.6 requiring sufficient space, equipment, and supplies to deliver medical care services appropriate to the location, but Monitors assert "performance . . . cannot logically be described by percentage" and noting that Defendants notes in its own monthly report that several facilities do not have enough space to adequately see patients) |
| Medical Services | Injunction Provision 3.5 | **Compliant** | The equipment used for interpretation shall allow for confidential communication in all medical health care circumstances (e.g., dual hand- or head-set device in locations where a speaker phone or computer can be seen or overheard by other patients or custody staff.)(As explained in more detail below in provision 1.7, the Injunction looks separately at whether, for this provision, ADCRR has the proper equipment to allow for confidential communication when interpretive services are needed. Whether or not that equipment is actually used to benefit is captured in provision 1.7.) | |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.7 | **Non-compliant** | There is auditory and visual confidentiality during medical encounters or encounters that are not strictly medical or MH (confidentiality during MH encounters is addressed in section 16.7.) Breaches of confidentiality are limited to the measures required to ensure safety, and all staff shall maintain the confidentiality of any information they acquire as a result of the breach. | Doc. 4968 at 162-63 (Defendants self-assessed its compliance with 1.7 regarding auditory and visual confidentiality during medical encounters or encounters that are not strictly medical or MH as 73-100%, but Monitors assessed noncompliance and systemic failure) |
| Medical Services | Injunction Provision 1.10 | **Compliant** | All staff hired in clinical medical supervising positions must have at least two years clinical experience. | |
| Medical Services | Injunction Provision 1.13 | **Non-compliant** | Health care staff (Medical and Mental Health) responsible for direct patient care shall not be mandated to work beyond the following limits: more than 12 hours in any 24-hour period; less than 8 hours off between any two shifts; more than 60 hours in a calendar week defined as Sunday through Saturday.(1.14. The limits on overtime may be extended during emergency situations. Time spent on-call is not included in the time limits.) | Doc. 4968 at 164 (Monitors assess non-compliance with 1.13 limiting hours for healthcare staff) |
| Mental Health | Injunction Provision 1.1 | See subprovisions below | All care and the documentation supporting that care, delivered to patients during: a MH (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, other external health record, shall be clinically appropriate. Settings include, but are not limited to those described in the subprovisions of these provisions below. | Doc. 4968 at 165 (Monitors assess noncompliance with 1.1 requiring clinically appropriate care for mental health encounters despite Monitors repeatedly highlighting the deficiencies) |
| Mental Health | Injunction Subprovision 1.1a | **Non-compliant** | Emergent care | Doc. 4968 at 168 (Defendants self-assess 80% compliance with 1.1a regarding emergent care, but Monitors assess 28% compliance) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Subprovision 1.1b | **Non-compliant** | Urgent care | |
| Mental Health | Injunction Subprovision 1.1c | **Non-compliant** | Non-urgent | Doc. 4968 at 170 (Monitors assess non-compliance with 1.1c regarding non-urgent care) |
| Mental Health | Injunction Subprovision 1.1d | **Non-compliant** | Care provided by psychology associates or psychologists in an outpatient setting (MH-3) | Doc. 4968 at 171 (Monitors assess noncompliance with 1.1d regarding care provided by psychology associates or psychologists in outpatient setting) |
| Mental Health | Injunction Subprovision 1.1e | **Non-compliant** | Care provided by psychiatric practitioners in an outpatient setting (MH-3) | Doc. 4968 at 172 (Defendants assess 100% compliance with 1,1e regarding care provided by psychiatric practitioners in outpatient setting, but Monitors assess only 94% compliance when using Defendants' dataset and noting that dataset is only one element in determining compliance) |
| Mental Health | Injunction Subprovision 1.1g | **Non-compliant** | Care provided by a psychology associate or psychologist in a MH Residential Unit (MH-4) | Doc. 4968 at 173-75 (Monitors assess Defendants noncompliant with 1.1g regarding care provided by psychology associate or psychologist in Mental Health Residential Unit) |

| Mental Health | Injunction Subprovision 1.1h | **Non-compliant** | Care provided by a psychiatric practitioner in a MH Residential Unit (MH-4.) This includes the requirements in 16.4.5 that the encounters are as often as clinically indicated, but no less often than every 14 days. | Doc. 4968 at 176-77 (Defendants self-assessed 93% compliance with 1.1h regarding care provided by psychiatric practitioner in Mental Health Residential Unit, Monitors found 50% compliance when using Defendants' dataset and noting that dataset is only one element in determining compliance) |
|---|---|---|---|---|
| Mental Health | Injunction Subprovision 1.1i | **Non-compliant** | Care provided by a psychology associate or psychologist in MH Inpatient Unit (MH-5) | Doc. 4968 at 178-79 (Monitors assess noncompliance with 1.1i regarding care provided by psychology associate or psychologist in mental health in patient unit) |
| Mental Health | Injunction Subprovision 1.1j | **Non-compliant** | Care provided by a psychiatric practitioner in a MH Inpatient Unit (MH-5.) This includes the requirement in 16.5.4 that a psychiatric practitioner shall conduct a clinical encounter as often as clinically indicated, but no less than once per week. | Doc. 4968 at 180-81 (Monitors assess noncompliance with 1.1j regarding care provided by psychiatric practitioner in mental health inpatient unit, noting that in 2/3rds of reviewed cases, psychiatric practitioner "failed to provide minimally necessary care." Defendants assess 88% compliance, but using the same dataset, the Monitors assessed 36% compliance "despite ongoing feedback and coaching from the Monitors") |

| Mental Health | Injunction Provision 1.3 | **Non-compliant** | All patients with mental illness who require regular follow-up shall be designated on the mental health caseload. | (Doc. 4968 at 182 (Defendants self-assess compliance with 1.3 regarding follow-up for patients with mental illness as 100%, but experts assess 88% using the same dataset and noting that dataset is only one element in determining compliance) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 1.22 | **Non-compliant** | Follow-up visits with MH professionals are completed within the timeframe ordered. | Doc. 4968 at 183 (Monitors assert Defendants noncompliant with 1.22 regarding timely follow-up with mental health professionals) |
| Mental Health | Injunction Provision 1.21a | Unable to determine compliance | All refusals of patient-initiated visits shall be made directly to a health care professional by telephone, video, or face-to-face. If a patient will not voluntarily displace health care staff go to the patient's location. | Doc. 4968 at 184 (Defendants self-assess 80% compliance with 1.21a regarding handling of refusals of patient-initiated visits, but Monitors unable to assess due to flawed dataset) |
| Mental Health | Injunction Provision 1.21b | **Non-compliant** | All refusals of a MH professional-initiated health visits are made by telephone, video, or face-to-face with an RN or practitioner for medical visits or a masters level therapist, psychologist, or psychiatric practitioner (psychiatrist, psychiatric nurse practitioner, psychiatric physician assistant) for mental health visits, within three days after the appointment. If a patient will not voluntarily displace health care staff go to the patient's location. | Doc. 4968 at 185-86 (Defendants self-assess 80% compliance with 1.21b regarding handling of refusals for mental health professional-initiated health visits, but Monitors assess 60% compliance using same dataset and point to overuse of BHTs) |

| Mental Health | Injunction Provision 5.1 | **Non-compliant** | For patients on the MH caseload with identified treatment providers in the community, if the patient consents, health care staff shall send each provider relevant health care information prior to the patient's release. This includes, at a minimum, a problem list, list of active medications, current symptoms, functional impairments, a summary of relevant care provided during incarceration, any necessary care or follow-up care, one or more points of contact if a community provider requires further information, name and contact information of the primary therapist, an aftercare plan that reflects progress in treatment, and a current treatment plan. The patient's health record shall contain documentation of the above information that was provided, when, and to whom. | Doc. 4968 at 187-88 (Defendants self-assess compliance at 88% with 5.1 regarding sending community provider relevant mental health information with patient consent, but Monitors estimate 20% and note two errors in assessment of performance) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.1 | **Non-compliant** | A psychology associate or psychologist conducts a mental health assessment of each patient within one business day of that patient first entering the ADCRR system. The intake mental health assessment shall identify and document sufficient relevant information regarding the presence and severity of mental health symptoms; current impact on functioning; past hospitalization/treatment including response to treatment; medications; suicide risk; behavioral observations of staff; and a preliminary designation of level of care. | Doc. 4968 at 189-90 (Monitors find Defendants noncompliant with 16.1 regarding psychology associate or psychologist conducting intake assessments because in one-third of patients, assessments are clinically inadequate) |
| Mental Health | Injunction Provision 15.8 | **Non-compliant** | For patients admitted to ADCRR on a psychotropic which is not on ADCRR's formulary, the medication shall be continued if, based on the patient's history, there is significant risk of worsening of the condition if a different medication is prescribed. If no such risk exists, the medication shall be continued long enough to allow a safe transition to a different medication or medications. | Doc. 4968 at 191 (Defendants self-assess compliance with 15.8 regarding non-formulary psychotropics as 96% and Monitors assert it may be 96%, but could be lower and Defendants will not produce formulary despite Monitors' request for it) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 15.3 | **Non-compliant** | Patients on the mental health caseload who believe they need mental health care shall submit HNRs. Theprimary therapist or, if necessary, another psychology associate shall triage HNRs within 24 hours ofreceipt. "Triage" in this context means determining whether the request requires immediate attention andresolution or whether the request can safely be deferred until the primary therapist can address it.Documenting the word "Triaged" is adequate evidence of triage. Primary therapists shall address theHNR within three business days of its submission. "Address" means evaluating the request, determiningthe clinical need, and if an action is required (e.g., face-to-face visit), planning that action to occur in aclinically appropriate timeframe. When the primary therapist is absent, another psychology associate ora psychologist completes these tasks in their stead within the same time. | Doc. 4968 at 192-95 (Defendants self-assess compliance with 15.3 regarding handling of mental health HNRs at 80%, but Monitors assess it at 50% using same data and Monitors identify issues with data) |
| Mental Health | Injunction Provision 15.4 | **Non-compliant** | If a patient's PT determines a visit is clinically appropriate following submission of an HNR, the patient shall be seen by the PT or referred to another professional as directed by the PT. | Doc. 4968 at 196-97(Defendants self-assess 80% compliance with 15.4 regarding PT visits after submission of HNR, but using same data, Monitors assess 50% compliance) |
| Mental Health | Injunction Provision 15.5 | **Non-compliant** | Patients who are not yet on the mental health caseload but request mental health treatment shall submit requests to be seen through the procedures for seeking medical care. | Doc. 4968 at 198 (Defendants self-assessed compliance with 15.5 regarding seeking initial mental health treatment as 100%, but using same data, Monitors found 25% compliance) |

| Mental Health | Injunction Provision 15.6 | **Non-compliant** | When custody staff, families, or any other concerned party refers a patient for mental health assessment, there is a timely response to the concern by mental health staff. | Doc. 4968 at 199-200 (Monitors find non-compliance with 15.6 regarding responses of mental health staff to reports made by parties other than patient and that Defendants' methodology is flawed) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.3.1.1 | **Non-compliant** | An MH-3 patient's assigned PT shall conduct an initial comprehensive mental health evaluation within one month of arriving at the assigned facility if not already completed when the patient first entered the prison system. | Doc. 4968 at 201-203 (Defendants self-assess compliance with 16.3.1.1 regarding initial comprehensive mental health evaluation for MH-3 as 100%, Monitors found performance level to be close to 0%) |
| Mental Health | Injunction Provision 16.3.1.2 | **Non-compliant** | An MH-3 patient's assigned PT shall conduct an evaluation whenever there is a change in MH level of care designation. | Doc. 4968 at 204 (Monitors find Defendants noncompliant with 16.3.1.2 regarding PT assessment of MH-3 when there is a change in MH level) |
| Mental Health | Injunction Provision 16.3.1.3 | **Non-compliant** | An MH-3 patient's assigned PT shall conduct an evaluation at least once per year. | Doc. 4968 at 205-206 (Monitors find Defendants noncompliant with 16.3.1.3 regarding MH-3 PT evaluation once per year) |

| Mental Health | Injunction Provision 16.3.3 | **Non-compliant** | A treatment plan meeting shall be conducted with MH-3 patients and their assigned PT. The treatment plan meeting shall occur at least once per year. A psychologist or psychiatric practitioner shall also be present for complex cases and in all other cases shall provide input to the PT prior to the treatment plan meeting. At that meeting, the patient's treatment plan shall be reviewed and updated to determine adherence to treatment, efficacy of interventions, evaluation of the level of care needs, diagnostic impressions, progress to date in treatment, and steps taken toward moving to a less restrictive environment, if applicable. The timing of the treatment plan meetings should be based on the needs identified in the treatment plan, but no less often than once a year. The treatment plan shall include adate for next review based on the content of the plan. If no timeline is identified, a treatment plan meeting shall occur at least once per year. | Doc. 4968 at 207-208 (Monitors find Defendants noncompliant with 16.3.3 regarding treatment plan meetings with MH-3 patients focusing on low-quality of treatment plans) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.3.2 | **Non-compliant** | A psychiatric practitioner shall conduct an appropriate clinical encounter with all patients in anoutpatient level of care (i.e., MH-3) on psychotropic medications as often as clinically required, no less often than every three months. | Doc. 4968 at 209 (Defendants self-assess compliance with 16.3.2 regarding outpatient-care patients on psychotropic medications encounters with psychiatric practitioners as 100%, but Monitors find methodology to be flawed and that Defendants' failure to make a risk-benefit analysis "posed a significant risk to the patient of the potential side effects of his medications without commensurate benefits) |

| Mental Health | Injunction Provision 16.4.1.1 | **Non-compliant** | An MH-4 patient's assigned PT shall conduct an evaluation whenever there is a significant change in the course of treatment, e.g., new type of treatment including medication, significant decompensation. | Doc. 4968 at 212-14 (Defendants self-assess compliance with 16.4.1.1 regarding PT evaluation when significant change in course of treatment for MH-4 patient as 91%, but Monitors assess at 30% with same dataset and note percentage is only element in measuring Injunction compliance) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.4.1.2 | **Non-compliant** | An MH-4 patient's assigned PT shall conduct an evaluation at least annually, documenting the patient's need for residential level of care. | Doc. 4968 at 215-16 (Monitors find Defendants noncompliant with 16.4.1.2 regarding mental health evaluations, and noting that treatment can fall well below standard of care without compliance) |
| Mental Health | Injunction Provision 16.4.2 | **Non-compliant** | Patients in residential level of care shall have face-to-face encounters with their assigned PTs as determined by the treatment plan. | Doc. 4968 at 217-18 (Monitors assess that "Defendants continue to fail to provide clinically meaningful treatment to mentally ill patients" and are non-compliant with 16.4.2 regarding face-to-face encounters with PTs for patients in residential level of care) |

| Mental Health | Injunction Provision 16.4.3 | **Non-compliant** | Patients in residential level of care shall have their treatment plans reviewed and updated as clinically indicated but no less often than every three months when the full team meeting described in the next section is conducted. | Doc. 4968 at 219-20 (Monitors find two deficiencies prevent compliance with 16.4.3 regarding review of treatment plans for patients in residential level of care) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.4.4 | **Non-compliant** | A full Treatment Team meeting shall be conducted at least every 3 months by the primary therapist,psychologist, psychiatric practitioner, and any other staff as necessary. Patients shall be included in themeeting unless there is a clinical or legitimate and substantial safety and security concern documented inthe custody record. The meeting discussion shall include determination of adherence to treatment,efficacy of interventions, evaluation of their level of care needs, rationale for the need for residentialcare, diagnostic impressions, progress to date in treatment, and steps taken toward moving to a lessrestrictive environment. | Doc. 4968 at 221-22 (Defendants self-assess 91% compliance with 16.4.4. regarding full treatment team meetings for mental health patients, but Monitors note 33% compliance and that compliance is not fully reflected by percentage; experts note "risk of significant harm from inadequate Treatment Plans) |
| Mental Health | Injunction Provision 16.5.1.1 | **Non-compliant** | The PT assigned to a patient in MH Inpatient care (MH-5) (or, if not already on the mental health caseload, the mental health provider assigned to the inpatient unit) shall conduct at least annually a comprehensive mental health evaluation reflecting the rationale for inpatient placement including but not limited to current symptoms and functional impairment, timing and pattern of decompensation, interventions attempted, diagnostic impressions (including potential substance-related impacts), progress in treatment to date, goals for treatment in the inpatient setting, anticipated length of stay, and criteria for discharge. | Doc. 4968 at 223-24 (Monitors find Defendants noncompliant with 16.5.1.1 regarding annual comprehensive mental health evaluation for MH-5 patients) |
| Mental Health | Injunction Provision 16.5.1.2 | **Non-compliant** | The PT assigned to a patient in MH Inpatient care (MH-5) (or, if not already on the mental health caseload, the mental health provider assigned to the inpatient unit) shall upon discharge from inpatient care, prepare a discharge summary. | Doc. 4968 at 225 (Monitors find Defendants noncompliant with 16.5.1.2 regarding PT assignment to MH-5 patients) |

| Mental Health | Injunction Provision 16.5.2 | **Non-compliant** | Patients in MH Inpatient care (MH-5) shall have a daily face-to-face encounter with their PT unless such an encounter would be clinically contraindicated. If the patient participates in the weekly treatment progress meeting described in Section 16.5.3, it may be counted as a daily face-to-face encounter. | Doc. 4968 at 226 (Monitors find Defendants noncompliant with 16.5.2 regarding MH-5 daily face-to-face encounters with PT) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.5.3 | **Non-compliant** | Patients in MH Inpatient care (MH-5) shall have their treatment progress reviewed daily, and teams shall meet at least weekly with all providers (e.g., nursing, psychiatry, mental health, social work, custody/unit staff, behavioral health technicians) and providers from the prisoner's previously assigned unit whenever possible. Patients shall be included in the meeting unless there is a clinical or legitimate and substantial safety and security concern documented. At a minimum, the focus of treatment teams shall be to provide updates on patient progress, the type and efficacy of interventions used, treatment adherence, potential obstacles to recovery, and rationale for continued placement in the inpatient unit. | Doc. 4968 at 227 (Monitors find Defendants noncompliant with 16.5.3 regarding treatment teams for MH-5 patients) |
| Mental Health | Injunction Provision 16.6.1 | **Non-compliant** | If a patient's treatment team changes due to a change in the patient's mental health level of care the "original" PT shall provide the "new" mental health team with the rationale for the change in mental health level and the anticipated treatment needs. | Doc. 4968 at 228 (Defendants self-assess 76% compliance with 16.6.1 regarding changes in treatment team, but Monitors assess 50% and that compliance is not fully reflected in percentage) |
| Mental Health | Injunction Provision 16.6.2 | **Non-compliant** | If a patient's treatment team changes due to a change in the patient's mental health level of care, if the transition is to anything other than to residential or inpatient, the "new" PT meets with the patient within seven calendar days; | Doc. 4968 at 229 (Monitors find Defendants noncompliant with 16.6.2 regarding timing of new PT after treatment plan change) |
| Mental Health | Injunction Provision 16.6.3 | **Non-compliant** | If a patient's treatment team changes due to a change in the patient's mental health level of care, if the transition is to residential or inpatient level of care, the PT meets with the patient as soon as possible, but no more than one business day after arrival, and the psychiatric practitioner is contacted and collaborates on the immediate care plan as soon as a patient is admitted. | Doc. 4968 at 230 (Monitors find Defendants noncompliant with 16.6.3 regarding timing of new PT and psychiatric practitioner with treatment team change) |

| Mental Health | Injunction Provision 16.6.4.1 | **Non-compliant** | If a patient's PT changes without a change in mental health level of care, if the transition is to anything other than to residential or inpatient, the "new" PT meets with the patient within seven calendar days. | Doc. 4968 at 231 (Monitors find Defendants noncompliant with 16.6.4.1 regarding timing of PT when PT changes without a change in mental health level of care) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.6.4.2 | **Non-compliant** | If a patient's PT changes without a change in mental health level of care, because the patient is being moved but is remaining in residential or inpatient level of care, the "new" PT meets with the patient within one business day. | Doc. 4968 at 232 (Monitors find Defendants noncompliant with 16.6.4.2 regarding timing of new PT after transitions in mental healthcare) |
| Mental Health | Injunction Provision 18.1 | **Non-compliant** | Prior to release of any patient designated as Seriously Mental Ill ("SMI"), MH-4, or MH-5 who shall be released and who is presumptively eligible for federal or state assistance by virtue of their mental illness, ADCRR: (a) develops and documents an aftercare plan that reflects the patient's current symptoms and functional impairments, progress in treatment, and treatment plan; (b) facilitates evaluation for SMI designation and placement in the community, as clinically indicated; and (c) arranges follow-up care with an appropriate community provider where possible. | Doc. 4968 at 233-35 (Defendants self-assess compliance with 18.1 regarding procedures for release of MH-4 and MH-5 patients as 94%, but Monitors assess as close to 0% using same dataset) |
| Mental Health | Injunction Provision 16.8.1 | **Non-compliant** | During normal business hours a patient who presents as a suicide risk shall have a formal in-person suicide risk assessment completed by a licensed psychology associate, psychologist, or psychiatric practitioner to determine the acute suicidal risk and the level of protection that is needed (e.g., return to current housing, placement in one-on-one observation, etc.) If the concerns are raised after normal business hours or on holidays, the on-duty mental health officer shall be consulted regarding the disposition of the patient (which may or may not include constant observation.) If the patient is placed on suicide watch as a result of the concerns raised, they should be placed under constant observation until they are able to have an in-person assessment of suicide risk by a mental health professional. | Doc. 4968 at 236-37 (Defendants self-assess compliance with 16.8.1 regarding suicide risk assessments as 78%, and Monitors assess at 72% using same dataset) |

| Mental Health | Injunction Provision 16.8.3 | **Non-compliant** | Upon recommendation from a psychologist or psychiatric practitioner that housing a patient on suicide watch (a.k.a. MH Watch) in the same room with other suicide watch patients ("cohorting") would be clinically safer than housing each patient in isolation, Defendants shall cohort such patients, provided that based on the patients' custody classification (determined based on factors other than the fact that the individual is on suicide watch) such cohorting would not be contraindicated. | Doc. 4968 at 238-39 (Defendants self-assess compliance with 16.8.3 regarding cohorting of suicide risk patients as 82%, while Monitors assess compliance using same dataset as close to 0% identifying two flaws in ADCRR assessment) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.9.2 | **Non-compliant** | Continued treatment in a crisis stabilization bed requires review and approval by a psychologist initially at seven days and every three days thereafter. Starting at ten days following placement in a Crisis Stabilization bed, the psychologist and or psychiatric prescriber shall document the justification for their continued assignment to the Crisis Stabilization bed rather than a Residential or Inpatient bed. (Additional reference 16.9.1) | Doc. 4968 at 240-43 (Monitors find Defendants noncompliant with 16.9.2 regarding continued treatment in Crisis Stabilization bed) |
| Mental Health | Injunction Provision 16.9.3 | **Non-compliant** | Patients in a crisis stabilization bed shall be evaluated at least daily in person by their PT (or another psychology associate if they have not yet been assigned a PT or have transferred from another yard.) Treatment providers shall document their intervention efforts, including but not limited to: assessing mental status; behavioral observations; documenting patient ability to independently care for activities of daily living; type(s) of treatment provided; response to interventions (including medication efficacy and compliance); anticipated length of stay; and criteria for discharge. | Doc. 4968 at 241-43 (Monitors find Defendants noncompliant with 16.9.3 regarding daily evaluation by PT and treatment plans for patients in Crisis Stabilization beds) |
| Mental Health | Injunction Provision 16.9.4 | **Non-compliant** | The patient shall be assessed by a psychiatric practitioner as soon after admission to a crisis stabilization bed as possible but no longer than one business day, in order to ensure there is not a medication issue or a question of medication appropriateness that contributed to suicidal ideation. | Doc. 4968 at 244 (Defendants self-assess compliance with 16.9.4 regarding assessment by psychiatric practitioner when placed in Crisis Stabilization bed at 79%, but Monitors assess compliance at 55%) |

| Mental Health | Injunction Provision 16.9.5 | **Non-compliant** | For patients placed in a crisis stabilization bed for suicidal concerns, a suicide risk assessment (SRA) shall be completed upon admission that identifies risk and protective factors and items/privileges they are allowed (based on treatment needs) while in crisis care. | Doc. 4968 at 245-46 (Monitors find Defendants noncompliant with 16.9.5 regarding suicide risk assessments for patients in Crisis Stabilization beds) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.9.6 | **Non-compliant** | A clinical note shall be entered whenever the level of suicide watch is changed. | Doc. 4968 at 247-48 (Defendants self-assess compliance with 16.9.6 regarding clinical notes when level of suicide watch changed as 96%, but Monitors assess 17% compliance using same dataset and note that they have explained to ADCRR the error in the procedure) |
| Mental Health | Injunction Provision 16.9.7 | **Non-compliant** | Prior to being released from a crisis stabilization bed if placed there due to suicidal concerns, a discharge suicide risk assessment shall be completed which documents: the change/reduction in suicidal risk; the patient's identified protective factors; and plans for follow-up treatment, and aftercare including a safety plan developed in collaboration between the patient and treatment providers. | Doc. 4968 at 249 (Monitors find Defendants noncompliant with 16.9.7 regarding discharge suicide risk assessment on release from Crisis Stabilization bed) |
| Mental Health | Injunction Provision 16.9.8 | **Compliant** | "Safety contracts" (forms signed by patients, agreeing not to hurt themselves) shall not be used. | |
| Mental Health | Injunction Provision 16.9.9 | **Non-compliant** | When possible and safe, attempt to provide stabilization at the complex at which the patient has been housed unless there is documented clinical justification for transfer based on the low likelihood of stabilization and/or clinical danger if the patient is maintained at the complex. | Doc. 4968 at 251-52 (Defendants self-assess compliance with 16.9.9 regarding stabilization at complex where patient is housed as 100%, but Monitors calculate 80% compliance with |

| | | | | same dataset) |
|---|---|---|---|---|
| | | <span style="color:red">■</span> | | |
| Mental Health | Injunction Provision 16.10 | **Compliant** | Restraints used by mental health clinicians for clinical purposes shall comply with the following 8 requirements: 1) Restraints shall be used only to prevent harm to oneself or to others and to ensure the | |
| | | | safety and security of the staff and other patients. They shall not be used for punishment. 2) Restraints shall be ordered and reviewed only by a psychiatric practitioner or psychologist. 3) Restraints shall only be applied for the minimum amount of time necessary to accomplish the stated need (e.g., patient and | |
| | | | staff safety, requisite transports, etc..) 4) Soft restraints shall be used whenever possible. 5) Restraints shall not be used for more than four hours at a time. Every effort shall be made to minimize the length of time in restraints. 6) Renewal of restraints beyond four hours shall be approved by the Facility Medical Director/designee and must be renewed at intervals no longer than four hours. If the Medical Director/designee are not available, a licensed mental health provider may approve continued use. The | |

| | | | justification for continued use shall be documented in the patient's medical records. Renewals occurring after hours shall be done in collaboration with the Facility Medical Director/designee, a psychiatric practitioner, or a psychologist. 7) Patients shall be restrained only in settings that allow nurses sufficient access to perform wellness checks and provide necessary medical care. Nurses shall ensure that the restraints do not impair any essential health needs, such as breathing or circulation to the extremities. These checks shall be documented in the patient's medical records. 8) Patients in restraints shall be under direct observation at all times. If an observer notes any ill effects of the restraints, every effort shall be made to remedy the ill effects and a psychiatric or medical practitioner shall be notified immediately. | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 13.2 | **Compliant** | A MH Duty Officer shall be available at all times when facility mental health staff are not available. The MH Duty Officer shall be a licensed psychology associate, psychologist, or psychiatric practitioner. | |
| Mental Health | Injunction Provision 14.1 | **Compliant** | All psychiatrists–at hiring and during employment–shall be board certified in psychiatry, or board eligible if within 7 years of their completion of an ACGME approved residency in psychiatry, with the following exceptions: 1) supervising psychiatrists shall be board certified at hiring and during employment; 2) psychiatrists who are currently employed and are not board eligible may remain employed for no longer than one year of issuance of this Order; they may also not possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. (Notify Court Monitors if there is a request for an exception.) | |
| Mental Health | Injunction Provision 14.2 | **Compliant** | All psychologists and psychiatric practitioners shall have the appropriate state licenses. All psychology associates shall be licensed or become licensed within one year of hiring or within one year of this Order, whichever is later, and may not possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. | |

| Mental Health | Injunction Provision 1.10 | **Compliant** | All staff hired in clinical MH supervising positions must have at least two years clinical experience. | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 1.11 | **Compliant** | Behavioral Health Technicians shall not independently assess patients or initiate a plan of care or treatment. | |
| Mental Health | Injunction Provision 1.12 | **Compliant** | No one for whom a health professions license is required may possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. | |
| Mental Health | Injunction Provision 13.1 | **Compliant** | Outpatient psychologists supervise no more than eight psychology associates, and inpatient psychologists supervise no more than six psychology associates. | |
| Mental Health | Injunction Provision 15.1 | **Non-compliant** | Each patient on the mental health caseload, i.e., all patients in MH Levels 3, 4, and 5, are assigned a primary therapist (PT; psychology associate or psychologist) who serves as the single point of contact and coordination for providing care to all patients designated MH-3 and above. When a patient's assigned PT is unavailable, another psychology associate or psychologist acts on their behalf. | Doc. 4968 at 261-62 (Monitors state "[w]ith the current reports generated by Defendants, it is not yet possible to calculate an accurate count of the number of patients for whom [15.1 regarding assignment of PT to patients on mental health caseload] has been met," but that current conditions make it "impossible to provide meaningful safe MH care," which "underscores the need for immediate implementation of the PCCM and staffing plan.") |

| Mental Health | Injunction Provision 15.2 | **Non-compliant** | A psychologist shall review the records of each patient who is added to, or discharged from, the mental health caseload after intake. The psychologist shall approve or deny the level of care assignment and take appropriate action. | Doc. 4968 at 263-64 (Defendants self-assess 92% compliance with 15.2 regarding psychologist review of records after mental health intake, but Monitors assess approximately 30% compliance with same dataset) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 1.4 | **Non-compliant** | Telehealth (video encounter with remotely located clinicians; TH) for mental health care may be used only when clinically appropriate. | Doc. 4968 at 264 (Defendants' compliance with 1.4 regarding telehealth for mental healthcare as 88%, but Monitors assert that "[d]espite our strong recommendations to the contrary, Defendants continue to rely heavily on, if not has increased its reliance on, remote mental health clinicians providing chronic care in mental health via video.") |
| Mental Health | Injunction Provision 15.9 | **Non-compliant** | There is sufficient space, equipment (e.g., computer, furniture), and supplies (e.g., assessment and treatment materials) to deliver mental health care services. This includes, but is not limited to, areas for mentally ill patients to be housed, engage in programming, and receive treatment (both individual and group) in an environment commensurate with that unit/facility's designated level of care. There is auditory and visual confidentiality during MH encounters. | Doc. 4968 at 266 (With regard to 15.9 regarding sufficient space, equipment, and supplies to deliver mental health services, Monitors state "Defendants cannot possibly comply with almost any of the requirements of the Injunction in the absence of sufficient space, equipment, and supplies.") |

| Mental Health | Injunction Provision 16.7 | **Non-compliant** | All mental health encounters with all patients shall occur in a confidential, therapeutically appropriate setting unless there is a clinical or legitimate and substantial safety and security concern that is documented. | Doc. 4968 at 267-68 (Monitors find Defendants noncompliant with 16.7 regarding conducting MH encounters in confidentially, therapeutically appropriate setting despite Monitors' previous documentation of these issues in their Second Interim Monitors' Report) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 1.15 | **Non-compliant** | There is a sufficient number of custody staff to support the functioning of the health care operation, including but not limited to: transporting patients to on-site and off-site clinical encounters and appointments; administration of medications; and providing security in the venues of health care operations. Exceptions may be made for a declared emergency (e.g., prison riot, natural disaster.) | Doc. 4968 at 270-71 (Monitors find non-compliance with 1.15 regarding sufficient number of custody staff to support healthcare due to insufficient number of custody staff while noting that existing custody staff attempts to comply) |
| Mental Health | Injunction Provision 1.16a | **Non-compliant** | (Additional reference: Any Court orders related to staffing levels) All positions required by the current contract with the health care vendor including any modifications, addenda, or updates are filled. A filled position is one in which there is an incumbent receiving a salary for the full intended time commitment of the position and is not on long term leave, e.g., Family Medical Leave Act. An individual may not fill more than 1.0 FTE. | Doc. 4968 (Monitors find that "Defendants cannot possible fulfill the requirements of" 1.16a regarding staffing levels under current contract due to inadequate number of staff with proper credentials working at Defendants on a daily basis, and noting errors in staffing numbers and competitive salary compensation calculations) |

| Mental Health | Injunction Provision 1.16b | **Compliant** | Up to 15% of staff described in 1.16a may be filled with registry staff. | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 10.1 | **Non-compliant** | Prescribed medications intended for directly observed therapy ("DOT") administration shall be administered as ordered or there shall be documentation of a valid reason for non-administration. | Doc. 4968 at 275-79 (Monitors find Defendants noncompliant with 10.1 regarding prescribed medications for direct observation therapy (DOT)) |
| Mental Health | Injunction Provision 10.2a | **Non-compliant** | For a patient newly admitted to a facility (e.g., transfer from another facility, return from a hospital stay, admission from a jail) and already on a medication in their previous venue, the first dose of a medication shall be delivered keep-on-person ("KOP") or administered ("DOT") in time for their next regularly scheduled dose. | Doc. 4968 at 280 (Monitors find Defendants noncompliant 10.2a regarding medication administration for newly admitted patients) |
| Mental Health | Injunction Provision 10.2b | **Non-compliant** | The first dose of a newly ordered medication shall be delivered ("KOP") or administered ("DOT") within the timeframe ordered, or if no timeframe is specified, within twelve hours for antibiotics and pain medications, and within three days for all other medications. | Doc. 4968 at 281 (Monitors find Defendants noncompliant with 10.2b regarding administration of newly ordered medications) |
| Mental Health | Injunction Provision 10.4.1 | **Non-compliant** | KOP medications shall be delivered to the patient before the medication runs out (based on the date of the previous fill.) A KOP medication shall be delivered either by providing the patient with the KOP supply or by staff administering the medication from stock, dose by dose, to bridge the gap until the KOP supply is delivered. Additional medication need not be delivered before the previous fill runs out if a clinically appropriate and documented determination was made by a prescriber that the medication should not be continued, and the patient is so informed. | Doc. 4968 at 282 (Defendants self-assess its compliance with 10.4.1 regarding refills of KOP medications at 96% and Monitors agree, but note a high degree of harm from any deficiency in this area) |

| Mental Health | Injunction Provision 10.3 | Non-compliant | When a patient refuses a medication (or classes of medication), based on the specific medication or class and the number and pattern of refusals, the medication administrator shall be triggered to escalate thecase to a higher authority and within a specified amount of time (which may differ by medication or class.) The decision rules described above should be incorporated into the medication administrationsoftware of the EHR such that the EHR automatically alerts the medication administrator when action isneeded and what action is needed. When medication refusals require escalation, an RN or higher willobtain an INFORMED refusal. | Doc. 4968 at 283-84 (Monitors find Defendants non-compliant with 10.3 regarding procedures for medication refusals due to uninformed refusals) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 1.20a/b | Non-compliant | When a patient notifies a correctional officer that he/she has a need for health care (medical or mental health), the officer may not inquire as to the nature of the need or symptoms. The officer's inquiry is limited to asking whether the need is immediate, if the patient can wait to sign up for the next scheduled clinic, or if the patient is thinking of harming themselves. (If the patient is thinking of harming themself,the officer shall immediately ensure the patient's safety and contact health care staff in accordance with Section 16.8.1.) For other needs that are immediate, the officer shall contact health care staff immediately. An RN shall then immediately triage the patient, either by seeing the patient, or talking to the patient directly over the phone. Based on triage results, the RN shall discuss the patient with a medical practitioner (i.e., physician or APP) or, if the patient is already on the mental health caseload (i.e., MH-3, 4, or 5), a mental health professional in a clinically appropriate timeframe, not to exceed four hours. In this context, the mental health professional shall be a psychology associate, psychologist, or psychiatric prescriber. Based on that interaction the professional who was contacted shall: see and treat the patient the same day; or instruct the RN on treatment to provide, and, if necessary, schedule the patient for further evaluation or treatment in a clinically appropriate timeframe; or determine the health care need is not urgent and that a reasonable patient would not have considered the health care need to be urgent, defer treatment, and instruct the patient to access non-urgent/non-emergent care for treatment. | Doc. 4968 at 285 (Monitors find Defendants noncompliant with 1.20a/b regarding correctional officer information regarding healthcare needs noting that correctional officers "are still attempting to triage episodic complaints brought to them by patients," resulting in dangerous conditions) |

| Mental Health | Injunction Provision 2.1.1 | Non-compliant | Following any death or suicide attempt, identify all significant health care and custody errors (i.e., near misses as well as preventable adverse events.) Based on prioritization of all errors identified, a root cause analysis shall be conducted if clinically appropriate, from which an effective and sustainable remedial plan shall be crafted and implemented within one month of the death. A sustainable plan is one which outlives staff memory from a single training after the review or staff turnover. Monitor the | Doc. 4968 at 286 (Monitors find that "despite extensive feedback and coaching we have provided to Defendants' staff, both orally and in writing, little progress has been made by Defendants to comply" with 2.1.1 regarding identification of significant healthcare and custody errors following any death or suicide attempt) |
|---|---|---|---|---|
| | | | remedial plan for effectiveness and make appropriate and timely modifications to the plan based on the monitoring. [2.1.3.] For each death, the plan in this section shall be crafted and implemented within one month whether or not the medical examiner's report is available. | |
| Mental Health | Injunction Provision 2.5.1 | Non-compliant | Staff capture errors, system problems, and possible system problems that come to their attention through sources, including but not limited to the near-miss and preventable adverse event reporting systems, mortality reviews, litigation filed by patients, grievances, the Court-appointed Monitors, staff reports, continuous quality improvement, etc. Staff maintain an active log of all such errors and problems to assist in deciding which issues to address, when, and at what level (complex and/or statewide), and to monitor progress in resolution. Based on this prioritization, either at the complex or state level, root cause analysis shall be conducted as appropriate, from which an effective and sustainable remedial plan is implemented in a timely manner. Such plan is one which outlives staff memory from a single training after the review or staff turnover. The remedial plan shall be monitored for effectiveness. Appropriate and timely modifications shall be made to the plan based on the monitoring. | Doc. 4968 at 287-89 (Monitors find Defendants noncompliant with 2.5.1 regarding staff capture of errors and problems stating that "[i]t is extremely difficult for us to describe in clear prose Defendants' non-compliance because of the chaotic nature of their work, documentation, and lack thereof.") |

| Mental Health | Injunction Provision 4.4a/b | **Compliant** | Imported or scanned documents (including but not limited to diagnostic test results, consultation reports, and hospital discharge summaries) in the EHR: shall be filed in a clear and usable manner, areaccurately labeled with meaningful titles/file names, are scanned right-side up, and are filed with anappropriate document date according to the following rules: Scanned documents are dated (and appearin any programmed or ad hoc list according to this date) based on the clinically relevant date of thedocument, not the date scanned. For example, the clinically relevant date of a lab test is the date the testwas reported by the lab; discharge summary is the date of discharge; a prior health record is the date it was received at ADCRR; an imaging study is the date of study; documents are scanned in the correctorientation and labeled with the correct date. (This provision only addresses whether a relevantdocument is eventually scanned into the EHR in some form, regardless of the timeliness, accuracy oflabeling, or readability.) | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 4.4c | **Compliant** | Fewer than 1% of files are labeled/titled with names beginning with "Miscellaneous" or "Other." | |
| Mental Health | Injunction Provision 4.4d/e | **Non-compliant** | Documents (including but not limited to diagnostic tests, consultation reports, and hospital discharge summaries) which are supposed to be manually scanned into, or electronically attached to (after receipt via email) the EHR have this completed within 2 business days of receipt. All imported documents are reviewed by the medical provider (for medical documents), or primary therapist or psychiatric prescriber (for MH documents) within 4 business days of receipt. | Doc. 4968 at 292-93 (Defendants self-assess its compliance with 4.4d/e regarding documents scanned or electronically attached to EHR 97%, but Monitors find errors in the samples, and that performance would be well below 97%, but even at 97% presents a considerable risk of harm) |

| Mental Health | Injunction Provision 4.5 | Non-compliant | Staff provide patients access to their own medical records as follows, unless a practitioner documents in the patient's EHR how disclosure of such information would jeopardize the health, safety, security, custody or rehabilitation of the patient or others or the safety of any officer, employee or other person at the correctional institution or of a person who is responsible for transporting the patient: (a) read-only access to patients wishing to read a copy of their health record; (b) orally sharing with a patient information regarding their diagnosis or any other information about their health care; (c) providing paper copies at a fee consistent with the updated policy; or (d) as an alternative to a paper copy, if the patient agrees, staff may provide the requested records, free of charge, in an electronic medium that the patient is able to access. | Doc. 4968 at 294 (Defendants self-assess compliance with 4.5 regarding providing patients access to their own medical records as 66-89%, and using same dataset Monitors assess at 60%) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 4.3 | Non-compliant | The Problem List in a patient's health record shall have the following qualities: (1) It shall be accurate, complete, and easily usable. (2) Resolved or historical conditions or diagnoses are separated from current conditions. (3) The date of onset or resolution of resolved or historical conditions or diagnoses is indicated, if known. (4) Similar or identical diagnoses of current conditions are listed only once. For example, a Problem List should not simultaneously list "heart disease," "heart failure," and "congestive heart failure, not otherwise specified." | Doc. 4968 at 295-302 (finding noncompliance with 4.3 regarding problem lists in health record and stating "In a half a year, and despite our detailed feedback to Defendants, nothing has changed – the patient Problem Lists are still horrible, continuing to pose a significant risk to patient safety, compounded by the fact that the majority of patient visits are still with practitioners who do not already know the patient well, making an accurate, usable Problem List that much more invaluable.") |

| Mental Health | Injunction Provision 3.1 | Non-compliant | (Additional references: 3.2, 3.3, 3.4) The patient's preferred language is known, shown in all relevant screens of the EHR, and care is delivered in the language in which the patient is fluent at all times. For all individual and group health care encounters in all settings involving patients who are not fluent in English, interpretation shall be provided via: health care staff whose name appears on a list maintained by Defendants of people who, pursuant to written policies Defendants develop, is proficient in the language understood by the patient; or in-person or via video interpretation service (for sign language) or audio language interpretation service that is compliant with federal law and uses licensed interpreters, where required by state law. Exception is made when use of the above methods is not feasible due to emergency circumstances. | Doc. 4968 at 303-305 (Defendants self-assess compliance with 3.1 regarding care and records in patient's preferred language as 99.5%, but Monitors note significant errors) |
|---|---|---|---|---|
| Mental Health | Injunction Provision 3.6 | Non-compliant | Written available notification (such as a poster) shall be hung in all housing units and medical clinics inall prisons advising prisoners, in the ten most common languages in Arizona, of the availability ofinterpretation services and that they may inform healthcare staff orally in any language, in sign language, or in writing in any language that they are not fluent in English, if that is not alreadydocumented in their electronic health record. | Doc. 4968 at 306 (Defendants self-assessed compliance with 3.6 regarding posting of availability of interpretation services in ten most common languages as 89%) Monitors note that 5/43 living areas and 6/55 medical areas were missing the poster.) |