Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th St.
Phoenix, AZ 85006
Telephone: (602) 650-1854
Email: lbeall@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**DISABILITY RIGHTS ARIZONA**
5025 East Washington St., Ste. 202
Phoenix, AZ 85034
Telephone: (602) 274-6287
Email: adietrich@disabilityrightsaz.org

*Attorneys for Plaintiff Disability Rights Arizona*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Disability Rights Arizona,<br><br>Plaintiffs,<br><br>v.<br><br>Ryan Thornell, *et al.*, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-ROS<br><br>**PLAINTIFFS' MOTION TO ENFORCE § 19.5 OF THE INJUNCTION (Doc. 4410) AND MEMORANDUM IN SUPPORT THEREOF** |

## I. INTRODUCTION

The Injunction prohibits Defendants from keeping people designated as having a serious mental illness ("SMI") in isolation: "[N]o prisoner designated as Seriously Mentally Ill ("SMI") shall be housed in maximum custody, detention, or close management, or otherwise kept in a cell for more than 22 hours each day." Doc. 4410 § 19.5. As recognized by this Court, people with mental illness are particularly "vulnerable to the pains and stresses of solitary confinement" and are at an elevated risk of harm. Doc. 4335 at 163, 166. Despite the prohibition and the risk, Defendants incarcerated people designated as SMI designation in housing locations that function as isolation units.

In one housing unit at ASPC-Lewis Rast ("Rast") holding mostly, if not solely, people designated as SMI, Defendants offer less than 1.5 hours of out-of-cell time on average each day. In two housing units at ASPC-Eyman Browning ("Browning") that hold primarily SMI class members, people are usually "offered" slightly more than 2 hours of out-of-cell time per day on average, but these are not legitimate offers of out-of-cell time. The current population at these units are 19 at Rast and 53 at Browning. The people in these two units face an extraordinary threat of violence by staff if they leave their cells, and they are routinely deemed to have refused recreation when, in fact, they have not done so.

To enforce the Injunction's prohibition on holding people with SMIs in isolation, Plaintiffs request that the Court issue an enforcement order requiring Defendants to develop a remedial plan to ensure the people designated as SMI are not held in isolation. Such a plan should include, at a minimum, the following provisions:

- A minimum of 4 hours of legitimately offered out-of-cell time every day for people designated as SMI;
- A system to track and report to Plaintiffs and the Court the out-of-cell time offered in all celled housing units where people designated as SMI are held;
- Two hours daily tier time (time to be out of cell in the pod with other people from the pod) for people designated as SMI held in celled housing units, as a component of the out-of-cell time;

- Required specialized training to all personnel working in the celled housing units holding primarily people designated as SMI; and
- Mandatory removal of staff from celled housing units holding primarily people designated as SMI in the event of staff misconduct toward incarcerated people assigned to the housing unit.

II. **ATTEMPTS TO RESOLVE ISSUES INFORMALLY**

During a monitoring tour in July 2025, Plaintiffs' counsel learned that Rast 3 Baker, purportedly a Close Custody housing unit, was functioning as an isolation unit. Declaration of Maria V. Morris ("Morris Decl.") at ¶ 2. Rast 3 Baker 5 is a pod that can house up to 20 people, to which people designated as SMI were assigned. *Id*. ¶¶ 3, 19. At the end of the tour, Plaintiffs' counsel informed Defendants that the Close Custody units appeared to be functioning as isolation units, including the designated Rast SMI unit, 3 Baker 5. *Id*. ¶ 4. Plaintiffs' counsel noted specifically that the manner in which that pod was operating violated the Injunction's prohibition on keeping people designated as SMI in isolation. *Id*.; *see also* Doc. 4410 § 19.5.[1]

Over the next few months, Plaintiffs' counsel obtained and reviewed documents reflecting the out-of-cell time in the Rast SMI Unit and two residential mental health units at Browning. Morris Decl. ¶¶ 5-14, Ex. 1.

On December 12, 2025, Plaintiffs requested a meet and confer regarding the issues set forth in this motion. Morris Decl. at ¶ 16. The parties met on January 12, 2026. *Id*. ¶ 17. Plaintiffs described the issue and proposed the remedies that are discussed herein. *Id*. Defendants indicated that they would try to provide a response the following week. *Id*. On February 6, 2026, not having heard back, Plaintiffs reached out for a response. *Id*. ¶ 18. The Parties met and conferred again on February 10, 2025. *Id.* Defendants have not agreed to

---

[1] ASPC-Lewis Rast 3-Baker-5, is generally referred to by facility staff and the people assigned to live there as the "Close SMI" or "Close Custody SMI" pod. Morris Decl. ¶ 19. Throughout this brief, this unit will be referred to as the "Rast SMI unit". The electronic medical records suggest that the Rast SMI unit has been moved from Rast 3 Baker 5 to Rast 3 Baker 1. *Id.* The pod change does not affect the contents of this motion.

-2-

any of the relief requested in this motion. *Id.*

**III. STATEMENT OF FACTS**

Defendants are categorically barred from housing people designated as SMI in isolation. Doc. 4410 at § 19.5. People who are restricted to their cells for more than 22 hours each day are in isolation, regardless of what the housing unit is called. *Id.* at 51.

**A. Defendants violate the Injunction by operating the Rast SMI unit as an isolation unit (§ 19.5)**

According to the Correctional Service Journals, Defendants offer people in the Rast SMI unit very little of the out-of-cell time required by the Injunction. Doc. 4410 at § 27.3. Defendants have provided Correctional Service Journals for the Rast SMI unit for one week in each of five months in 2025. Morris Decl. ¶ 23.[2] During the weeks for which the journals were provided, Defendants provided people in the Rast SMI Unit the following amount of out-of-cell time:

| Week | Total Weekly Out-of-Cell Time | Average Daily Out-of-Cell Time[3] | Out-of-Cell Activities |
|---|---|---|---|
| 4/19/25-4/25/25 | 6:57 | 0:59 | 2 recreation periods; 1 shower |
| 5/3/25-5/9/25 | 6:11 | 0:53 | 2 recreation periods |
| 6/21/25-6/27/25 | 6:54[4] | 0:59 | 2 recreation periods, 2 showers |
| 7/12/25-7/18/25 | 4:30 | 0:38 | 1 recreation period, 2 showers |
| 10/18/25-10/24/25 | 8:41 | 1:14 | 3 recreation periods; 1 religious service; 3 showers |

Morris Decl. ¶ 31, Ex. 2.

Additionally, people living in the Rast SMI unit confirm that they receive very little

---

[2] Correctional Service Journals record all the activities in a housing unit, including each time people leave or return to their cells or when people enter or leave the unit.

[3] This average is calculated for each seven-day week for which Plaintiffs requested data. The data provided is the record Defendants maintain of the out-of-cell time they offer, and therefore, Plaintiffs have assumed that the out-of-cell time shown on the documents is the out-of-cell time for the seven-day weeks. Morris Decl. ¶ 31, Ex. 2.
All weeks provided except the week of October 18, 2025 lacked data for one or two days. Averaging the out-of-cell time only for the days for which legible data was provided results in less than 1.5 hours per day for each week. *Id.*

[4] This is the out-of-cell time for the lower tier; the upper tier had slightly less. *Id.*

-3-

out-of-cell time.[5] According to the people in the unit, recreation is scheduled for 2.5 or 3 hours of recreation two or three days a week, with one week having recreation on Tuesday and Thursday and the following week having recreation on Monday, Wednesday, and Friday. Morris Decl. Exs. 3 at ¶ 2; 4 at ¶ 3; 5 at ¶ 3; 6 at ¶ 3; 7 at ¶ 2; *see also* Ex. 8 at ¶ 3 (stating he had been offered recreation twice in the eight days he had been in the unit), Ex. 9 at ¶¶ 2-3 (stating that in the two weeks he had been in the unit, he had had recreation twice a week for 3 hours each time), Ex. 10 at ¶ 4 (stating that she was usually offered recreation every two or three days for about two or three hours). The frequency and duration described by the people in the Rast SMI unit are consistent with, and confirmed by, the Correctional Service Journals. Morris Decl. ¶¶ 25-26, Ex. 2.

Further, recreation is frequently cancelled, usually due to a lack of staff. *Id.,* Exs. 4 at ¶ 3; 11 at ¶ 5; 12 at ¶ 5; 13 at ¶ 3; 14 at ¶ 7; 15 at ¶ 2; 7 at ¶ 2; 10 at ¶ 3; 16 at ¶¶ 3, 5; *see also* Exs. 6 at ¶ 3; 3 at ¶ 2; 17 at ¶ 5.

People in the unit report being offered showers between one and four times per week, or even less. *Id.,* Exs. 19 at ¶ 5; 3 at ¶ 4; 4 at ¶ 5; 8 at ¶ 3; 9 at ¶ 4; 12 at ¶ 5; 13 at ¶ 4; 5 at ¶ 4; 14 at ¶ 11; 6 at ¶ 5; 15 at ¶ 4; 17 at ¶ 6; 7 at ¶ 4; 10 at ¶ 9; 18 at ¶ 7. When ADCRR does not offer showers as expected, staff state that it is due to being short staffed. *Id.,* Exs. 9 at ¶ 4; 13 at ¶ 4; 5 at ¶ 4; 10 at ¶ 9; 17 at ¶ 6; *see also* Ex. 8 at ¶ 3 ("We are only offered showers every other day or when there is enough staff working. Today we were not offered showers because there were not enough staff to run the showers."). This, too, is consistent with the Correctional Service Journals, which show people in the Rast SMI Unit being offered between zero and three showers a week, depending on the week. Morris Decl. Ex. 2.

Mental health programming would count toward the required out-of-cell time, if it were provided. Doc. 4410 at § 27.1. But it is not. The people in the Rast SMI unit, all of whom have been found to have a serious mental illness, are receiving no mental health

---

[5] All the declarants discussed in this subsection have been designated by ADCRR as SMI. Morris Decl. ¶¶ 36-52.

programming. Morris Decl. Exs. 19 at ¶ 6; 3 at ¶ 5; 4 at ¶ 6; 11 at ¶ 7; 9 at ¶ 4; 12 at ¶ 3, 6 at ¶ 6; 15 at ¶ 5; 17 at ¶ 4; 7 at ¶ 5; 10 at ¶ 11; 16 at ¶ 7. They are offered little if any confidential mental health care, and report other violations of the Injunction's requirements related to mental health care. *See* Doc. 4410 at §§ 1.7, 15.9, 16.7. For example, people incarcerated in the Rast SMI unit report:

- "Two weeks ago, mental health started coming twice per week. Nobody has ever offered me to talk confidentially." Morris Decl.*,* Ex. 3 at ¶ 6.
- "Sometimes mental health staff walk through the pod and will only ask us at the cell door if we are okay." *Id*., Ex. 12 at ¶ 3.
- "Mental health staff have never offered to pull me out of my cell to talk with me in a private area; all of my interactions with mental health staff have been at cell front." *Id*., Ex. 6 at ¶ 6.
- "The mental health staff walk by our cell door and ask if we are okay or want to hurt ourselves, but that is it." *Id*., Ex. 11 at ¶ 7.
- "[M]ental health has come to talk to us about every other day. They just talk to us at our cell front. Nobody has offered me to talk somewhere confidentially. We usually talk for about 2-3 minutes. They ask a few questions and I feel like they are rushing me to finish." *Id*., Ex. 15 at ¶ 6.
- "The mental health staff will only come to the cell door and ask us if we are okay." *Id*., Ex. 16 at ¶ 7.
- "I have not had any sessions with mental health staff since I've been here." *Id*., Ex. 10 at ¶ 12.
- "There is …no therapy." *Id.,* Ex. 17 at ¶ 4.

The lack of programming and counseling is corroborated by the Correctional Service Journals. The five weeks of Correctional Service Journals provided do not reflect a single instance of people from this unit having mental health programming or going to individual counseling. Morris Decl. ¶ 29; Ex.2.

There is no other regularly scheduled out-of-cell time in the Rast SMI unit. *Id.,* Exs.

19 at ¶ 6; 4 at ¶ 6; 9 at ¶ 4; 13 at ¶ 4; 5 at ¶ 4; 6 at ¶ 6. The only other out-of-cell time that appears in the five weeks of Correctional Service Journals is a single religious service during the week in October for which the Journals were produced. Morris Decl. ¶ 28, Ex.2.

**B. Defendants violate the Injunction by operating the Browning BMU and RMHP as isolation units (§ 19.5)**

At ASPC-Eyman Browning, there are two housing units holding primarily people designated as SMI that are functioning as isolation units: the Behavioral Management Unit or "BMU" and the Residential Mental Health Program or "RMHP".

Until roughly the end of 2024, the BMU and RMHP were in the A and D Blocks at Browning. In late December 2024, the people assigned to these housing units were moved to I Block. Currently, the BMU is in I Block, Pods 1-3 (cells 01-30), and holds 24 people, and the RMHP is in I Block, Pods 4-6 (cells 31-60), and holds 29 people. Morris Decl. ¶ 53. When Defendants moved the BMU and RMHP to I Block in early 2025, they stopped producing the data showing precisely how much out-of-cell time the people in the BMU and RMHP are offered. *Id*. ¶ 54.

The documents produced for the last two months before Defendants stopped producing the information regarding the out-of-cell time for people in the BMU and RMHP show offers of out-cell time (OOCT) as follows:

|  | 11/9/24-11/15/24 | | 12/14/24-12/20/24 | |
|---|---|---|---|---|
|  | Total Average Weekly OOCT | Average Daily OOCT | Total Average Weekly OOCT | Average Daily OOCT |
| BMU | 10:47 | 1:29 | 9:02 | 1:26 |
| RMHP | 11:13 | 1:37 | 7:42 | 1:06 |

Morris Decl. ¶¶ 54-56, Ex. 20. Only one or two people were out of their cell more than two hours per day on average in these units. Morris Decl. ¶¶ 57 -60, Ex. 20.

After Plaintiffs asked Defendants to re-start providing the information necessary to calculate the out-of-cell time for people in the BMU and RMHP, Defendants began

-6-

producing it again, starting with September 6-12, 2025. Since then, Defendants have produced this information for the BMU and RMHP for one week in each of four recent months: October 4-10, 2025, November 15-21, 2025, December 27, 2025-January 2, 2026, and January 24-30, 2026. Morris Decl. ¶ 61.

The reports reflect that Defendants were "offering" more out-of-cell time in the fall of 2025 than they were in late 2024. *Id*. ¶ 62. Specifically, Defendants claim to be offering recreation six or seven days per week in these units. However, it appears that these offers of recreation are not legitimate offers of out-of-cell time.

Numerous people in these units report that people do not go to recreation because they are afraid of the "Rec Team" – the officers that escort people to and from recreation. *See* Doc. 5086-2 at Exs. 4 ¶¶ 18-19, 5 ¶¶ 3-4, 6 ¶¶ 3-4; Doc. 5086-4 at Exs. 33 ¶¶ 12-14, 34 ¶ 8. In November 2025, one man reported:

> [A]bout two or three months ago, I came out to line up for rec. I wasn't facing the wall as quickly as they wanted me to. They told me to go back to my cell. I went back to my cell, then I turned around and started to come back out. They closed the door and caught my foot in the door. They left the door like that, with my foot in it, for about half an hour.

Doc. 5086-2 at Ex. 4 ¶ 18. The man's medical records corroborate this. Morris Decl. ¶ 63. They show that he was taken to medical on August 13, 2025, about three months prior to the date of his declaration. *Id*. The medical record states there was an ICS[6] "for an inmate acting aggressive towards staff." *Id*. The record states that the man's "foot was assessed," he was given ibuprofen and a bag of ice and he was told to "take it easy on the toe the next few days." *Id*. Notably, although medical staff, who were not present during the incident, stated that this was the result of the man allegedly being "aggressive towards staff," he did not receive a disciplinary ticket for the incident. *Id*.

The violence of the Rec Team is further corroborated by the sworn statements of other people held in Browning describing assaults. *See* Docs. 5068-1 at ¶¶ 7-8; 5068-3 at

---

[6] ICS is the Incident Command System, the system used to "prepare for, prevent, respond to, recover from, and mitigate incidents and emergencies." ADCRR DO 706, *available at* https://corrections.az.gov/sites/default/files/documents/policies/700/0706-general-eff_07-13-23.pdf.

-7-

¶¶ 11-12; 5068-5 at ¶¶ 3-6; 5068-6 at ¶ 9; 5068-7 at ¶¶ 7, 12; 5068-8 at ¶¶ 6-14; 5068-13 at ¶ 4; 5086 at 1-8; 5086-2 at Ex. 2 at ¶¶ 3-6, 9, 11; 5086-2 at Ex. 3 at ¶¶ 6, 9.

People in the BMU and RMHP also report that officers do not bring them out to recreation even if they say they want to go, and find reasons to say they are not permitted to come out for recreation. *See* Doc. 5086-2 at Exs. 4 ¶ 20, 5 ¶ 3; Doc. 5086-3 at Ex. 19 ¶¶ 5-9. One person reports:

> I [ ] was recently put on "recreation restriction" for a whole week for bringing kool-aid mix and peanut butter to recreation. I was not aware we could not bring food to recreation, we always had been able to in the past without a problem. I was not allowed to go out for rec for a whole week after the "recreation restriction."

Doc. 5086-2 at Ex. 5 ¶ 3.

Others report staff actively discouraging people from going to recreation. One person reports that "[s]ometimes staff tell people 'it's too hot, you don't want to go out there' or offer extra trays of food if they refuse recreation." Morris Decl. Ex. 10 at ¶ 7. Another person reports that officers appear to be "trying to get [him] to say no [to recreation]." Doc. 5086-4 at Ex. 34 ¶ 5. He reports that some officers ask 3 or 4 times if he is "really sure" he wants to go to recreation, and seem relieved if he does say no. *Id*.

Other than the pervasive violence of the Rec Team, these are the same types of reasons for denying recreation that the Court previously held showed the recreation offers were not legitimate offers. Doc. 4335 at 154-55. Staff violence and intimidation is an additional reason to find that the offers are not legitimate.

Further, as the Court previously held, high rates of refusals "make it more likely than not the recreation offers were never given or offered on unacceptable terms." Doc. 4335 at 155. Defendants' data show that the BMU and RMHP have extremely high rates of "refusals" of recreation for the last four months as follows:

//
//
//
//

**Recreation Refusal Rates (%)**

| Month | BMU | RMHP |
|---|---|---|
| September | 83 | 72 |
| October | 89 | 70 |
| November | 63 | 80 |
| December | 65 | 75 |
| January | 63 | 83 |
| Average | 73 | 76 |

Morris Decl. ¶ 64, Ex. 21. These refusal rates are slightly higher than the refusal rates that led the Court to find that the offers of recreation were not "legitimate offers." Doc. 4335 at 154-56; Morris Decl. ¶ 64.

The overall refusal rate, while itself greatly concerning, obscures the likelihood that fear of the Rec Team is an important reason for the refusals. A few people – presumably those who are not "intimidated" by the Rec Team (*see* Doc. 5086-2 at Ex. 4 ¶ 18) – go to recreation regularly. Morris Decl. Ex. 21. This is generally about a quarter or less of the population of these units. *Id*. But many of the people in the BMU and RMHP – well over half most months – rarely go to recreation:

**People Not Attending Recreation or Attending Only Once During the Week**

|  | BMU | | | | RMHP | | | |
|---|---|---|---|---|---|---|---|---|
|  | Total Pop | Did not go to Rec | Went to Rec once | % who did not go to Rec or went once | Total Pop | Did not go to Rec | Went to Rec once | % who did not go to Rec or went once |
| Sept | 23 | 14 | 3 | 74 | 30 | 15 | 6 | 70 |
| Oct | 21 | 15 | 4 | 90 | 28 | 15 | 3 | 64 |
| Nov | 25 | 9 | 4 | 52 | 29 | 17 | 3 | 69 |
| Dec | 22 | 10 | 2 | 55 | 27 | 16 | 0 | 59 |
| Jan | 20 | 8 | 1 | 45 | 28 | 19 | 2 | 75 |

*Id*.

The high number of refusals is an issue relating specifically to recreation, not out-of-cell activities generally. Many people in the BMU and RMHP who purportedly refuse all or nearly all their recreation time accept the other opportunities for out-of-cell time – showers, programs and porter jobs. Morris Decl. ¶ 65, Ex. 22. The refusal rates for out-of-

-9-

cell time opportunities other than recreation are less than half the refusal rate for recreation:

**Refusal Rates for Recreation and Other Out-of-Cell Activities (%)**

|  | BMU | | RMHP | |
| --- | --- | --- | --- | --- |
|  | Recreation | Other | Recreation | Other |
| Sept | 83 | 34 | 72 | 47 |
| Oct | 89 | 36 | 70 | 29 |
| Nov | 63 | 17 | 80 | 36 |
| Dec | 65 | 18 | 75 | 32 |
| Jan | 63 | 37 | 83 | 43 |
| Average | 73 | 28 | 76 | 37 |

*Id*. The combined overall refusal rate for out-of-cell activities other than recreation was 33% during this period, less than half the refusal rate for recreation. *Id*.

Given the extremely high levels of refusal of recreation, and the reasons consistently given by the people in the BMU and RMHP for the refusals – violence at the hands of the Rec Team and denials of recreation falsely described as refusals – the offers of recreation should not be considered legitimate offers of out-of-cell time.

The non-recreation out-of-cell time for people in the BMU and RMHP is minimal. During the four weeks for which information has been produced since September 2025 in the BMU and RMHP, people were offered, on average per week, fewer than 2 programs, and fewer than 2 showers. On average, fewer than three in ten people worked once a week as a porter, fewer than three in ten people had a mental health consult each week, and about one in ten people had an outside visitor each week. Morris Decl. ¶ 67, Exs. 23, 24.

In violation of the Injunction, people designated as having a serious mental illness are being held in housing units that function as isolation. *Cf*. Doc. 4410 at § 19.5.

**C. Defendants Are Not Complying with the Injunction's Protections for People in Isolation for the People in the Rast SMI Unit, the BMU and the RMHP**

As discussed above, people designated as SMI in the Rast SMI Unit, the BMU and the RMHP are in isolation, although that is prohibited by the Injunction. Doc. 4410 at § 19.5. In addition to keeping these individuals in isolation in violation of the Injunction,

1  Defendants are also failing to comply with Injunction's protections for people in isolation
for people in these housing units.

Defendants do not have a system to facilitate the return to lower levels of custody for these individuals if they have been in isolation for longer than two months. *Cf. Id.*, § 19.3. They do not create individualized case plans for the people in these housing units, as required by § 29.2. of the Injunction. Morris Decl. ¶ 68, Ex. 16 at ¶ 8. They do not conduct monthly evaluations of each person's progress under the plans as required by § 29.2.1. of the Injunction. Morris Decl. ¶ 68. They do not conduct the 60-day reviews that they conduct for people in Maximum Custody or detention. *Id.* Given that there are no individualized case plans, Defendants do not conduct semi-annual classification reviews at which it is determined whether the person's progress toward compliance with the individual case plan warrants a reduction of restrictions, increased programming, or a move to a lower level of custody, as required by § 29.2.2. of the Injunction.

Defendants do not consistently offer people in the Rast SMI Unit, the BMU and the RMHP three showers per week with no more than three days between showers, as required by § 27.2. of the Injunction. As discussed above in § III.A., many people in the Rast SMI Unit reported being offered far fewer showers than three per week. In the BMU and RMHP, Defendants' own records show the average number of showers offered each week per person in recent months is as follows:

|         | BMU | RMHP |
|---------|-----|------|
| Sept    | 0.1 | 0.7  |
| Oct     | 3.1 | 2.6  |
| Nov     | 3.1 | 3.9  |
| Dec     | 1.0 | 1.0  |
| Jan     | 1.2 | 1.0  |
| Average | 1.7 | 1.8  |

Morris Decl. ¶¶ 66-67, Exs. 23, 24.[7]

---

[7] Notably, the only week people in both the BMU and the RMHP were offered three or more showers per week was the week during which Plaintiffs' counsel visited the prison.

-11-

Because Defendants did not identify or consider the Rast SMI Unit, the BMU and the RMHP as isolation units housing subclass members, the Court Expert did not develop a custody staffing analysis and plan specifically for these units. *See* Doc. 4682 (Sept. 25, 2024 Report to the Court by Scott R. Frakes, Staffing Analysis and Plan). However, Defendants report on staffing in the BMU and the RMHP, treating them like the Browning Detention and Maximum Custody units. *See, e.g.*, Doc. 5098 at 3. In October, Defendants were missing both mandatory floor officers on 8 shifts in the BMU and RMHP and one mandatory floor officer on another 15 shifts. Doc. 5060 at 3-25. In November, Defendants were missing both mandatory floor officers on 14 shifts in the BMU and RMHP and one mandatory floor officer on another 15 shifts. Doc. 5077 at 3-31. In December, the BMU and RMHP were missing one of the two mandatory floor officers on 15 shifts. Doc. 5098 at 3-28. Like Browning generally, the BMU and RMHP are chronically understaffed. *See* Doc. 4950.

Defendants do not report on the staffing of the Rast SMI Unit, but it appears this unit is also understaffed. One man in the unit reported: "There are not many custody officers working through here, so it is normally like a ghost town here. The officers can go up to three hours without walking through our pod." Morris Decl. Ex. 12 at ¶ 4. The people held in the Rast SMI unit report that understaffing results in missed recreation (Morris Decl. Exs. 4 at ¶ 3, 11 at ¶ 5, 12 at ¶ 5, 13 at ¶ 3, 14 at ¶ 7, 15 at ¶ 2, 7 at ¶ 2, 10 at ¶ 4), showers (*id.*, Exs. 8 at ¶ 3, 9 at ¶ 4, 13 at ¶ 4, 5 at ¶ 4, 17 at ¶ 6), and trips to the chow hall (*id.*, Ex. 4 at ¶ 4).

**IV. ARGUMENT**

The Injunction provides more protections for people designated as SMI in isolation, than for the subclass as a whole. Defendants are not permitted to place these individuals in isolation at all. Doc. 4410 at § 19.5. However, as set forth above, Defendants keep people designated as SMI in isolation. And, even beyond violating the absolute prohibition on isolation for these individuals, Defendants also fail to comply with Injunction requirements that apply to the entire subclass in the housing units where they are keeping people

designated as SMI.

The Court has the inherent authority to enforce its orders, including through a finding of contempt. *Degen v. United States*, 517 U.S. 820, 827 (1996), *superseded by statute on other grounds by* 28 U.S.C. § 2466 (2026); *Shillitani v. United States*, 384 U.S. 364, 370 (1966). "The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." *FTC v. Affordable Media LLC,* 179 F.3d 1228, 1239 (9th Cir. 1999) (citations omitted). A party's actions "'need not be willful' and there is no good faith exception to the requirement of obedience to a court order." *Go–Video, Inc. v. Motion Picture Ass'n of Am.,* 10 F.3d 693, 695 (9th Cir. 1993) (quoting *In re Crystal Palace Gambling Hall, Inc*., 817 F.2d 1361, 1365 (9th Cir. 1987)).

However, the Court's inherent powers should "be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). "Consequently, [a] 'less severe sanction'. . . is undoubtedly within a court's inherent power as well." *Id.* at 45 (citation omitted). A court's inherent powers include the power to order a non-compliant party to develop remedial plans to achieve compliance and to direct the party to include certain tasks and deadlines in the plan, because the court "retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion." *Brown v. Plata*, 563 U.S. 493, 542 (2011); *see also* Doc. 4950 at 3-4.

Although Defendants hold people designated as SMI in isolation in the Rast SMI unit, the BMU and the RMHP in violation of a specific and definite order of the Court, Plaintiffs do not at this time seek an order to show cause why Defendants should not be held in contempt. At this time, Plaintiffs reserve their right to seek an order to show cause related to contempt, but now seek only an order enforcing the prohibition on isolation for people designated as SMI by requiring Defendants to develop and implement a plan to ensure that people designated as SMI are not kept in isolation.

In issuing such an enforcement order, "the court is entitled to give some guidance . . . and set some deadlines for compliance." *Armstrong v. Davis*, 275 F.3d 849, 873 (9th Cir. 2001). With the inclusion of instructions as to what elements need to be in a remedial plan the "district judge [does] not attempt to 'micro manage' the [party's] activities, but rather to set clear objectives for it to attempt to attain, and, in most circumstances, general methods whereby it would attain them." *Id.* Where, as here, an "enjoined party has a 'history of noncompliance with prior orders,'" and the Court has "years of experience with the case at hand," the Court has "a great deal of flexibility and discretion in choosing the remedy best suited to curing the violation." *Melendres v. Maricopa Cnty.*, 897 F.3d 1217, 1221 (9th Cir. 2018) (citations omitted); *see also Parsons v. Ryan*, 912 F.3d 486, 499-501 (9th Cir. 2018) (affirming district court's entry of enforcement order in this case).

The elements of an enforcement order that Plaintiffs propose are as follows:

**1. Offer at least four hours of out-of-cell time daily to people designated as SMI who are assigned to celled housing units.**

Currently, Defendants' policies require that people in Maximum Custody and Detention are provided a minimum of 2.5 hours of out-of-cell time daily.[8] Not being in isolation should be different than being in isolation as, otherwise, the entirety of the portion of the Injunction relating to isolation is illusory. Further, given the likelihood of cancellations, having some additional out-of-cell time built into the schedule will help prevent people designated as SMI being confined to their cells as much as they would be if they were in Maximum Custody or Detention.

---

[8] Defendants' policy on Detention provides: "No inmate shall be confined to a cell for more than 21.5 hours a day." D.O. 804 § 1.2.13, available at https://corrections.az.gov/sites/default/files/documents/policies/800/0804%20-%20Amend%20-%209-1-25%20-%20(G).pdf. Defendants' policy on Maximum Custody provides for a "[m]inimum of 2.5 hours" daily. D.O. 812, Attachments B and C, available at https://corrections.az.gov/sites/default/files/2025-01/DO%20812%20-%20Eff.%201-19-25.pdf.

-14-

## 2. Track and report on the amount of out-of-cell time in each celled housing unit populated primarily with people designated as SMI

Tracking and reporting on the out-of-cell time is necessary to ensure that people designated as SMI are not being kept in isolated housing units, as they have been up until now.

## 3. Offer at least two hours of daily tier time

As discussed above, it is practices around recreation, particularly the conduct of the Rec Team, that results in the effective denial of out-of-cell time. Allowing people out into the common area of the pods for two hours each day would increase their out-of-cell time and increase the ability to have social interactions. It would be out-of-cell time that does not require the process of lining people up and taking them out of the unit to the recreation area, which appears to be the point when much of the staff violence occurs.

## 4. Require specialized training for all correctional staff working in celled housing units populated primarily with people designated as SMI

To reduce the level of violence, Plaintiffs propose that correctional staff working in units primarily populated with people designated as SMI receive training on mental illness, engaging with people with mental illness and de-escalation techniques. This is something that the Court heard at trial would be helpful for staff and incarcerated people alike. *See* Nov. 5, 2021 AM Tran. at 1041:3-9 (former Centurion Regional Director of Mental Health Dr. Stefanie Platt testifying that she "very much" thought that custody staff working in units with mentally ill or developmentally disabled people should receive specialized training relative to those populations).

## 5. Require mandatory removal of staff found to have engaged in misconduct from celled housing units populated primarily with people designated as SMI

Plaintiffs propose that, in celled housing units populated primarily with people designated as SMI, if there is a credible allegation of misconduct by staff relating to interactions with incarcerated people, Defendants maintain all video recordings of the incident, investigate the incident without delay, and, if the allegation is found to be

-15-

substantiated, remove the correctional officer from any further assignments to such units housing people designated as having a serious mental illness.

**V.　RELIEF REQUESTED**

Plaintiffs request that the Court issue an order:

1. Finding Defendants non-compliant with §§ 19.5 of the Injunction (Doc. 4410);
2. Ordering the development of a compliance plan that contains, at a minimum, the following provisions to ensure that people designated as SMI are not kept in isolation:
    a. A minimum of 4 hours of legitimately offered out-of-cell time every day for people designated as SMI;
    b. A system to track and report to Plaintiffs and the Court the out-of-cell time offered in all celled housing units where people designated as SMI are held;
    c. Two hours of daily tier time for people designated as SMI held in celled housing units;
    d. Required specialized training to all personnel working in the celled housing units holding primarily people designated as SMI; and
    e. Mandatory removal of staff from celled housing units holding primarily people designated as SMI in the event of staff misconduct.
3. Ordering the following process for development of the compliance plan:
    a. Defendants submit a plan within 30 days detailing how they will ensure the people designated as SMI are excluded from isolation, as required by § 19.5 of the Injunction, including dates for reaching full compliance and the ways in which they will demonstrate compliance;
    b. Plaintiffs and the Court Monitors have 30 days to respond to Defendants' proposal; and
    c. The Court orders a final plan, following a hearing if necessary;
4. Ordering Defendants to report monthly to the Court Monitors and Plaintiffs on their progress toward compliance, including providing all documents and data upon which

their reporting is based.

## VI. CONCLUSION

Defendants manage three housing units holding primarily people designated as SMI as isolation units in violation of § 19.5 of the Injunction (Doc. 4410). Defendants must be required to establish safeguards to ensure that this particularly vulnerable group of people are not held in isolation.

Dated: March 2, 2026

**ACLU NATIONAL PRISON PROJECT**

By: s/ Maria V. Morris

David C. Fathi (Wash. 24893)**
Maria V. Morris (D.C. 1697904)*
915 15th Street N.W., 7th Floor
Washington, DC 20005
Telephone: (202) 393-4930
Email: dfathi@aclu.org
mmorris@aclu.org

Corene T. Kendrick (Cal. 226642)*
425 California St., Ste. 700
**ACLU NATIONAL PRISON PROJECT**
San Francisco, CA 94104
Telephone: (202) 393-4930
Email: ckendrick@aclu.org

*Admitted *pro hac vice*
**Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.

Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th St.
Phoenix, AZ 85006
Telephone: (602) 650-1854
Email: lbeall@aclu.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sophie Hart (Cal. 321663)*
**PRISON LAW OFFICE**
1917 Fifth St.
Berkeley, CA 94710
Telephone: (510) 280-2621
Email:   dspecter@prisonlaw.com
         ahardy@prisonlaw.com
         sophieh@prisonlaw.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**DISABILITY RIGHTS ARIZONA**

By:  s/ Maya Abela
     Asim Dietrich (Bar No. 027927)
     5025 East Washington St., Ste. 202
     Phoenix, AZ 85034
     Telephone: (602) 274-6287
     Email:   adietrich@disabilityrightsaz.org

     Rose A. Daly-Rooney (Bar No. 015690)
     Maya Abela (Bar No. 027232)
     **DISABILITY RIGHTS ARIZONA**
     4539 E. Fort Lowell Rd.
     Tucson, AZ 85712
     Telephone:  (520) 327-9547
     Email:
       rdalyrooney@disabilityrightsaz.org
       mabela@disabilityrightsaz.org.org

*Attorneys for Disability Rights Arizona*

# CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2026, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Gregory Honig
Lucy M. Rand
Assistant Arizona Attorneys General
Gregory.Honig@azag.gov
Lucy.Rand@azag.gov

Mary R. O'Grady
Andrew G. Pappas
John S. Bullock
Kimberly I. Friday
Molly S. Walker
OSBORN MALEDON, P.A.
mogrady@omlaw.com
apappas@omlaw.com
jbullock@omlaw.com
kfriday@omlaw.com
mwalker@omlaw.com

*Attorneys for Defendants*

s/ J. Carns