Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th Street
Phoenix, Arizona 85006
Telephone: (602) 650-1854
Email: lbeall@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**DISABILITY RIGHTS ARIZONA**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@disabilityrightsaz.org

*Attorneys for Plaintiff Disability Rights Arizona*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Disability Rights Arizona,<br><br>Plaintiffs,<br><br>v.<br><br>Ryan Thornell, *et al.*, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-ROS<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO MODIFY INJUNCTION SECTION 6.4 (Doc. 5107)** |

## TABLE OF CONTENTS

BACKGROUND ............................................................................................................ 3

ARGUMENT ................................................................................................................. 5

    I.     Defendants Fail to Demonstrate Modification is Warranted under Rule 60(b)(5). ...................................................................................................... 5

         a.  No Change in Fact or Law Supports Modification. ................................ 5

         b.  Defendants' Proposed Modification is Overbroad. ................................ 8

         c.  The Board Certification or Eligibility Requirement Remains Tailored to Address Constitutional Violations in ADCRR ........................................ 9

    II.    Defendants' Arguments under the Prison Litigation Reform Act (PLRA) Are Meritless. ..................................................................................... 12

CONCLUSION ........................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Agostini v. Felton*,
521 U.S. 203 (1997) ................................................................................................ 6

*Armstrong v. Schwarzenegger*,
622 F.3d 1058 (9th Cir. 2010) .............................................................................. 14

*Clark v. California*,
739 F. Supp. 2d 1168 (N.D. Cal. 2010) .................................................................. 8

*Coleman v. Brown*,
922 F. Supp. 2d 1004 (E.D. Cal. 2013) ................................................................ 13

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) .......................................................................... 12, 14

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) .............................................................................. 12

*N.Y. State Ass'n for Retarded Child., Inc. v. Carey*,
706 F.2d 956 (2d Cir. 1983) ................................................................................... 8

*Phila. Welfare Rts. Org. v. Shapp*,
602 F.2d 1114 (3d Cir. 1979) ................................................................................. 8

*Plata v. Schwarzenegger*,
603 F.3d 1088 (9th Cir. 2010) .............................................................................. 13

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) .................................................................................. 5, 6, 8, 9

*Sharp v. Weston*,
233 F.3d 1166 (9th Cir. 2000) .......................................................................... 5, 14

*Sys. Fed'n No. 91 Ry. Employees' Dep't v. Wright*,
364 U.S. 642 (1961) .............................................................................................. 13

*Toussaint v. McCarthy*,
801 F.2d 1080 (9th Cir. 1986) .............................................................................. 12

*United States v. Asarco Inc.*,
430 F.3d 972 (9th Cir. 2005) .................................................................................. 6

**Other Authorities**

H.R. Rep. No. 104–21 (1995) ................................................................................ 13

**BACKGROUND**

In 2022, this Court found that "Defendants' health care system is plainly grossly inadequate." Doc. 4335 at 2. "The core issue" was a profound and widespread lack of access to "qualified medical staff." *Id.* at 21, 107; *see also id.* at 29. The Court concluded that "[t]he majority of medical care staff do not have necessary training or licensure to provide the type of care that is necessary to provide constitutionally adequate care. This is a completely ineffective and toxic combination." *Id.* at 69. The Court rejected Defendants' position—"that access to any care, no matter how poor, satisfies their constitutional obligations"—and emphasized that "it is never enough to provide prisoners with serious medical needs access to health care staff who lack the training and authority to address their needs. Access to health care necessarily involves access to health care performed by competent staff." *Id.* at 29.

The Court's 200 pages of findings of fact are replete with examples of disastrous care provided by primary care practitioners—both mid-levels and physicians. *See, e.g.*, Doc. 4335 at 45–47 (nurse practitioner and physician failed to provide necessary exams to identify and treat patient's multiple sclerosis); *id.* at 48–49 (nurse practitioner treating patient for back pain failed to perform standard physical exams and assessments, and failed to recognize lab results signifying infection in patient who was ultimately diagnosed with an epidural abscess); *id.* at 49 (physician missed "obvious warning signs for cancer"); *id.* at 51 (physician's assistant's notes regarding a patient with end-stage cancer "made no sense"); *id.* at 52 (physician prescribed ibuprofen to patient who "previously had a life-threatening GI bleed from NSAIDs"); *id.* at 55–58 (patient died of testicular cancer after nurse practitioner determined lab values were normal, when they were "astronomically elevated," contributing to treatment delays that ultimately resulted in the unnecessary and painful death of a 30-year-old man). The Court concluded: "these outcomes show that if a prisoner develops a serious health condition while in ADCRR custody, he or she is at substantial risk of grievous harm or death due to medical personnel's inability to accurately assess and diagnose such conditions." *Id.* at 58.

The Court stated that it would "employ an expert to assist with crafting an injunction that remedies the constitutional violations—no more and no less." *Id.* at 179. At Defendants' request, Doc. 4339 at 3, the Court appointed Dr. Marc Stern to serve as the Court's expert, as well as additional experts to assist him, Doc. 4352; Doc. 4362. The Court Monitors "spent close to 500 hours investigating and identifying the appropriate solutions to the unconstitutional findings outlined in the Court's Findings of Fact." Doc. 4410 at 2-3. Defendants collaborated extensively with the Monitors on the development of the injunction. *See id.* "Over the approximately four-month period of the experts' work, the parties . . . had ample opportunity to explain . . . why particular solutions were not feasible or why the experts should recommend some solutions over others." *Id.* at 3.

The Court shared a draft injunction with the parties in January 2023. Doc. 4380. Unsurprisingly, the draft injunction contained specific mandates designed to end the dangerous and unconstitutional practice of unqualified staff managing patient care. As is relevant to Defendants' motion, the draft injunction required both that "prisoners with multiple or complex medical conditions are only assigned to physician caseloads" and that "[a]ll medical physicians–at hiring and during employment–shall be board certified in Internal Medicine or Family Practice, or board eligible if within 7 years of their completion of an ACGME approved residency in one of these 2 specialties," with limited exceptions. Doc. 4380 at 25, §§ 6.5, 6.6.

The parties engaged in extensive discussions about the draft injunction and potential modifications needed to remedy the constitutional violations found at trial. Doc. 4402 at 2; Doc. 4410 at 3–4. Ultimately, neither party filed objections. Instead, the parties jointly filed a stipulation, agreeing to the draft injunction, with a few modifications. Doc. 4402; *see also* Doc. 4405; Doc. 4408. The board certification and eligibility provisions were essentially unchanged. *Compare* Doc. 4380 at 25, §§ 6.5, 6.6 *with* Doc. 4410 at 25, §§ 6.3, 6.4. The parties also explicitly agreed that the final injunction "is narrowly drawn, extends no further than necessary to correct the violation of the constitutional rights of the Plaintiff class and subclass, and is the least intrusive means necessary to correct the violation of the

4

constitutional rights." *See* Doc. 4402 at 2; Doc. 4402-1 at 68. In April 2023, the Court issued the Permanent Injunction requested by the parties. Doc. 4410. Neither party appealed.

## ARGUMENT

Defendants now claim the board certification or eligibility requirements they agreed to in the Injunction are "unworkable" and complain they are untethered to the constitutional violations found at trial. Doc. 5107 at 3–4. Defendants ask this Court to modify the Injunction, to require that only 50% of physicians working in ADCRR meet the board certification or eligibility requirements, and to allow existing medical directors and staff physicians who are not board-certified or eligible to remain in place. *Id.* at 4. The Court should deny this belated and unwarranted motion.

**I.    Defendants Fail to Demonstrate Modification is Warranted under Rule 60(b)(5).**

Federal Rule of Civil Procedure 60(b)(5) permits a party to move to modify an injunctive order if "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). Specifically, under Rule 60(b)(5), the party seeking relief bears the burden of demonstrating that: (1) there has been "a significant change either in factual conditions or in law," and (2) "the proposed modification is suitably tailored to the changed circumstance[s]." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992); *see also Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000). Defendants fall far short of meeting this standard.

**a.    No Change in Fact or Law Supports Modification.**

Defendants do not claim any change in the law supports modification. Rather, Defendants argue section 6.4 has proven to be "unworkable because of unforeseen obstacles." Doc. 5107 at 5 (quoting *Rufo*, 502 U.S. at 384.). But a general shortage of primary care providers in Arizona was not "unforeseen" by the parties in 2023, and "modification should not be granted where a party relies upon events that actually were

5

anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 385. Indeed, Defendants expressly rely on data regarding primary care availability in Arizona in 2022 and 2023 to support their motion. *See* Doc. 5107 at 7–8; Doc. 5107-3 at 11, 20. This condition thus plainly existed when Defendants stipulated to the Injunction in 2023. And as Defendants note, "[t]he Department's contracted healthcare provider, NaphCare, objected to the board-certification requirements in the Draft Injunction on the grounds that they would pose barriers to hiring and retaining additional staff physicians." Doc. 5107 at 3. Defendants cannot claim these purported hiring barriers were "unforeseen" when they stipulated to the Injunction. *See Agostini v. Felton*, 521 U.S. 203, 215–16 (1997) (rejecting a claim of changed factual circumstances based on the "exorbitant costs of complying" with the injunction, because both parties were "aware that additional costs would be incurred" due to the injunction); *see also* Doc. 4637 at 6 (summarizing Defendants' assertions that they could not implement a pilot of the staffing plan due to lack of funds, and noting that "[i]nvoking the lack of resources as an excuse strongly suggests Defendants' agreement to the terms of the Permanent Injunction were in bad faith").

"If it is clear that [Defendants] anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, [Defendants] would [then] have to satisfy a heavy burden to convince a court that [they] agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Rufo*, 502 U.S. at 385; *see also United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005) (describing this as "the heavy burden standard"). Defendants' motion fails to satisfy this heavy burden—Defendants cannot demonstrate they have made a good faith, reasonable effort to hire board-certified physicians.

The Injunction clearly states that "increased salaries may be necessary to reach adequate staffing levels," Doc. 4410 at 55, and the Court Monitors have repeatedly advised Defendants that salaries must be increased to address the shortage of health care staff, including, critically and specifically, for physicians. As this Court found in granting

6

Plaintiffs' Motion for a Receiver on February 19, 2026, "Defendants claim NaphCare is offering competitive salaries, but this is wrong.  The Monitors correctly found the increase is 'woefully insufficient,' and continues despite the constant entreaties by the Court in the presence of the Director and his staff that this must be immediately cured."  Doc. 5123 at 31 & n.44.  The Monitors' findings and recommendations in this regard have been clear and unequivocal:

- "[T]here is a severe dearth of physicians at ADCRR, yet NaphCare offered a paltry $2 (1.5%) per hour increase to physician salaries between December, 2023 and July, 2024 and has made none since."  Doc. 4755 at 25.

- "The most important step that needed to be taken to increase staff recruitment was increasing salaries.  I made this observation/suggestion to ADCRR several times since the Injunction's inception in April, 2023, including suggestions to aggressively escalate salaries (e.g., five to 10%) as often as monthly based on constant and careful monitoring of responses to advertising and hiring. […] In my expert opinion, NaphCare will not be able to recruit qualified professionals to fill the positions ordered by the Court until it adequately addresses salaries in a much more aggressive manner than it has so far."  Doc. 4755 at 24–25.

- "NaphCare's efforts to increase salaries have been anemic, at best."  Doc. 4755 at 25; Doc. 4968 at 273.

- "We have not witnessed evidence of aggressive increase of compensation offered by NaphCare to conclude that staffing challenges are insurmountable."  Doc. 4761 at 20.

Defendants now ask this Court to conclude that they "have put forth a good faith effort to hire board certified or board-eligible physicians," Doc. 5107 at 9, and that the Injunction's requirements are "unworkable," *id.* at 5, without offering any response whatsoever to these findings by the neutral Court Monitors.  Defendants do not claim to have attempted raising salaries at all in order to recruit physicians.

Defendants' failure to take appropriate, reasonable steps to address these known barriers to compliance clearly distinguishes this situation from the out-of-circuit decisions in *New York State Association for Retarded Children, Inc. v. Carey*, 706 F.2d 956 (2d Cir. 1983), and *Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114 (3d Cir. 1979), on which Defendants rely heavily in their motion. In *Philadelphia Welfare Rights*, the Third Circuit repeatedly emphasized Defendants' "good faith effort at compliance," and attributed Defendants' failure to achieve compliance to "circumstances largely beyond the defendants' control and not contemplated by the court or the parties." 602 F.2d at 1121. Similarly, in *New York State Association*, the Second Circuit found defendants had "offered substantial evidence that . . . the modification was essential" to achieving compliance. 706 F.2d at 969. Not so here: the Court and its experts have repeatedly recommended a path to compliance, which Defendants have persistently ignored. In sum, "Defendants have offered no change in law or fact that provides a credible basis for [modification of the Injunction]." *Clark v. California*, 739 F. Supp. 2d 1168, 1233 (N.D. Cal. 2010).

### b. Defendants' Proposed Modification is Overbroad.

Even if Defendants had met their heavy burden to demonstrate some modification was warranted, Defendants' motion should be denied, as the proposed remedy is overbroad. "Once a moving party has met its burden of establishing either a change in fact or in law warranting modification of a consent decree, the district court should determine whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 391. In *Rufo*, the Supreme Court instructed:

> A proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor. Once a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances. A court should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires. **The court should not "turn aside to inquire whether some of [the provisions of the decree] upon separate as distinguished from joint action could have been opposed with success if the defendants had offered opposition."**

8

*Id*. at 391–92 (emphasis added).

Defendants urge this court to do exactly what the Supreme Court forbade in *Rufo*: interrogate whether section 6.4 "upon separate as distinguished from joint action could have been opposed with success if the defendants had offered opposition." *Id*.; *see* Doc. 5107 at 10 (arguing that "the Eighth Amendment does not require that physicians who work in the prisons be board-certified or board-eligible in Internal Medicine or Family Practice").

Defendants also fail to demonstrate that their proposed modification is tailored to the changed circumstances. They do not, for example, seek to replace the board certification or eligibility requirements with any other qualifications. They simply ask the Court to nullify the requirement for half of all physician positions. That is not a "suitably tailored" modification. Those physicians would oversee the care of thousands of medically-complex classmembers, and Defendants' proposal offers no means of ensuring those providers are appropriately qualified to do so.

Finally, Defendants fail to explain why the solution repeatedly offered by the Court Monitors is insufficient to address their concerns. Defendants complain they are missing out on candidates who do not meet the board certification requirements, but have other suitable training and experience. But the Monitors have repeatedly, in writing advised Defendants that they could "[n]otify Court Monitors if there is a request for an exception" to the board certification requirements in section 6.4. *See* Doc. 4539 at 40; Doc. 4755 at 73; Doc. 4968 at 151. Defendants' motion does not acknowledge this fact, or explain why that process cannot address the purported changed circumstances.

### c. The Board Certification or Eligibility Requirement Remains Tailored to Address Constitutional Violations in ADCRR.

Since the issuance of the Injunction, the Court and its experts have continued to emphasize the critical importance—and profound lack—of access to appropriately qualified health care staff in ADCRR. *See* Doc. 5123 at 31 ("[I]t cannot be overemphasized that Defendants have been frequently told by the Court that their incompetent and inadequate staffing of healthcare is unconstitutional."); Doc. 4539 at 16 (describing "a sufficient

number of appropriately qualified and trained employed medical and mental health professionals" as "[t]he cornerstone of ADCRR's successful fulfillment of the health care-related requirements of the Injunction"); Doc. 4968 at 27–28 (concluding that ADCRR staffing increases have been "woefully insufficient").  The Court and the Court Monitors have also continued to document plainly inadequate care by medical providers, including physicians, resulting in serious harm.  *See, e.g.*, Doc. 5123 at 34 (medical director's "critical failure to review Patient 20's medical history and his removal from antiseizure medication 'hastened his death'" (citing Doc. 4968 at 8)); Doc. 4539 at 24 (noting that "the physician needed to evaluate the status of the [72-year-old] patient's chronic conditions and describe a plan of care," but "[t]he physician failed to do any of these tasks"); Doc. 4968 at 52 ("A minimally competent physician should recognize that new onset hydronephrosis with associated poor kidney function needs to be addressed urgently.  His providers did not.").

And the Monitors have continued to emphasize the need for board-certified or board-eligible physicians.  In their Third Interim Report, the Monitors explained:

> The Injunction requires primary care physicians to be board certified in the specialties of internal medicine or family medicine. These are the two medical specialties that train physicians in the primary care of adults. Board certification is granted after completion of a three-year residency (i.e., apprenticeship) and passing an examination within seven years of that residency.  Physicians may legally practice medicine after completing one year of residency (the internship year) in any specialty and passing a more basic examination. Board certification is the community standard in Arizona and is associated with safer care. [. . .] A physician's specialty training is important.  No rational patient would choose to have open heart surgery performed under the hands of a physician who trained as a family physician or did not complete their training.  There is no reason to treat the opposite situation as any safer.

Doc. 4968 at 151; *see also* Doc. 4755 at 22 ("[Lack of board certification] impacts, at a minimum, the quality of the consultation they can provide to APPs during the latter's decision-making prior to making a specialty referral.").

10

Indeed, the need for competent, qualified staff physicians has been made even more apparent by the issuance of the Final Staffing Plan. The Staffing Plan makes clear that all licensed staff should "work at the top of their licenses," and thus appropriately calls for the use of physicians only when necessary: to provide care to complex patients and supervision to less experienced providers. *See* Doc. 4963 at 7. Specifically, staff physicians in ADCRR should be assigned to handle the most complex patients in the system. *Id.* at 4, 71. Staff physicians should also collaborate with and provide clinical support for providers with less training (including nurse practitioners and physician assistants). *Id.* at 4.

"Safely diagnosing and managing medically-complex patients requires significant experience and expertise." Declaration of Bruce Barnett, M.D., ¶ 15. Adequately supervising nurse practitioners and physician assistants also requires sufficient training and experience. *Id.* "Board certification or eligibility in internal medicine or family practice is a strong indicator that a physician has that requisite expertise," and is thus "essential" for physicians in ADCRR, given how the physician role is scoped. *Id.*, ¶¶ 12, 15.

Board certification entails a multi-step process overseen by the American Board of Family Medicine. *Id.*, ¶ 8. First, the physician must successfully complete an accredited family medicine residency program, which typically lasts three years. *Id.* During that time, the physician receives consistent supervision and training across a range of clinical settings relevant to primary care. *Id.* After the residency program, the physician must pass a comprehensive board certification examination. *Id.*, ¶ 9. To maintain board certification, the physician then must participate in continuing medical education, periodic assessments, and quality improvement initiatives, demonstrating a sustained commitment to quality patient care. *Id.*, ¶ 10. Board certification thus "demonstrates that a physician has the level of education and experience necessary to provide adequate primary care in a correctional setting." *Id.*, ¶ 11.

Defendants attempt to minimize the role a physician plays in treating medically-complex patients, claiming that they merely "coordinate care among specialized providers." Doc. 5107 at 12. But the patient's physician must have sufficient training and expertise to

11

identify the need for a specialist consult in the first instance, and to refer the patient to the appropriate specialist. *See* Barnett Dec., ¶ 16. They also maintain primary responsibility for managing care—including managing medications, determining if a patient requires a higher level of care, and ordering the appropriate tests and diagnostics—before, during, and after the specialist's treatment. *Id.* Moreover, in ADCRR, like many other carceral settings, "the onsite physician must review specialists' recommendations and write appropriate orders." *Id.*, ¶ 17. The physician's role as the patient's primary care provider thus "is not abrogated by the referral" to a specialist. *Id.*

Requiring board certification/eligibility is standard practice in primary care settings in the community, including in Arizona. *See* Doc. 4968 at 151; Barnett Dec., ¶ 18; *Edmo v. Corizon, Inc.*, 935 F.3d 757, 786 (9th Cir. 2019) ("Accepted standards of care and practice within the medical community are highly relevant in determining what care is medically acceptable and unacceptable."). Board certification/eligibility has also long been required in the California prison system. *See* Barnett Dec., ¶ 19. Defendants assert that "most other corrections entities" do not require board certification. Doc. 5107 at 11. But in support of this conclusion, Defendants only cite practices in the federal Bureau of Prisons and in CoreCivic, a for-profit prison company. *See id.* Whether or not board certification is required for physicians in those two systems, there is ample evidence that this provision was and remains tailored to address constitutional violations in ADCRR. *See Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Conner,* 515 U.S. 472 (1995) (A court may order "relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation."); *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (summarizing cases).

## II. Defendants' Arguments under the Prison Litigation Reform Act (PLRA) Are Meritless.

Next, Defendants argue that modification is warranted under the PLRA. Doc. 5107 at 5. Specifically, Defendants argue that "§ 6.4 is neither the narrowest nor least intrusive

means of remedying the Eighth Amendment violation the Court previously found." *Id.* at 2.

In 2023, the Defendants explicitly agreed that the Injunction complied with the PLRA. *See* Doc. 4402-1 at 68. Thus, "as a matter of equity, if not estoppel, the State is in a poor position to assert this objection." *Plata v. Schwarzenegger*, 603 F.3d 1088, 1097 (9th Cir. 2010) (discussing defendants' argument that the Receivership should be terminated because the District Court failed to make adequate PLRA findings when appointing the Receiver more than three years earlier); *see also* Doc. 5123 at 10, n.18 ("At no time prior to the effective date of the Injunction was the Court informed by Defendants they were unable to, or unwilling to, comply with all terms of the Injunction for any reason . . . ."). Permitting Defendants to challenge this legal conclusion now "would undo fundamental principles of res judicata." *Coleman v. Brown*, 922 F. Supp. 2d 1004, 1031 (E.D. Cal. 2013); *see also Sys. Fed'n No. 91 Ry. Employees' Dep't v. Wright*, 364 U.S. 642, 647 (1961) ("Firmness and stability must no doubt be attributed to continuing injunctive relief based on adjudicated facts and law, and neither the plaintiff nor the court should be subjected to the unnecessary burden of re-establishing what has once been decided.").

Defendants cite to the PLRA's termination and modification provisions to justify their belated legal challenge. Doc. 5107 at 9 (citing 18 U.S.C. § 3626(a)(1)(A) & (b)). But those provisions of the PLRA were "intended by Congress to enable defendants who have dutifully complied with a court order to obtain relief and thus 'guard against court-ordered caps dragging on and on, with nothing but the whims of federal judges sustaining them.'" *Coleman*, 922 F. Supp. 2d at 1025 n.23 (quoting H.R. Rep. No. 104–21, at 8 (1995)). Here, "defendants are not in compliance" and granting a modification "would reward intransigence by Defendants, not police against overly intrusive federal courts." *Id.*

In any event, Defendants' objections under the PLRA are meritless. Defendants claim section 6.4 violates the PLRA because "although the Court found the Injunction's requirements as a whole were necessary to correct the constitutional violations (Doc. 4410 at 67, § 32), the Injunction includes no factual findings to support the board-certification or

13

board-eligibility requirements specifically." Doc. 5107 at 11. This framing misstates the PLRA and the Ninth Circuit's caselaw. The Ninth Circuit has clearly instructed that district courts do not need to make need-narrowness-intrusiveness findings for "each isolated provision of a remedial order." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070-71 (9th Cir. 2010) (holding that "the language of the PLRA does not suggest that Congress intended a provision-by-provision explanation of a district court's findings, and there is no practical reason we should read such an obligation into the statute"). Rather, "overall statements . . . that the need-narrowness-intrusiveness standard has been met"—precisely like the one agreed to by the parties and issued by the Court here—are "sufficient." *Id.* at 1071. The Ninth Circuit has explained that "[p]rospective relief for institutions as complex as prisons is a necessarily aggregate endeavor, composed of multiple elements that work together to redress violations of the law." *Id.* at 1070. Thus, in these types of complex cases, "the necessity of any individual provision cannot be evaluated in isolation." *Id.* at 1071; *see also Edmo*, 935 F.3d at 783 ("District courts must make need-narrowness-intrusiveness 'findings sufficient to allow a "clear understanding" of the ruling,' but they need not 'make such findings on a paragraph by paragraph, or even sentence by sentence, basis.'" (quoting *Armstrong*, 622 F.3d at 1070)).

The record also belies Defendants' assertion that the requirements in section 6.4 are divorced from this Court's factual findings. In issuing the draft injunction in 2023, the Court explained it had "attempted to ensure each provision of the proposed injunction is directly linked to a constitutional violation proven at trial." Doc. 4380 at 1–2. And as described above, this Court's 2022 Findings of Fact and Conclusions of Law included extensive findings that people in ADCRR prisons have received disastrous medical care from providers, including physicians, in violation of the Eighth Amendment. The board-certification requirement was an appropriate component of the remedy to address this crisis. *See Sharp*, 233 F.3d at 1173 ("[A]ppellants argue from the proposition that each individual remedy prescribed in the 1998 order must, *by itself*, be constitutionally required. This is

simply not the case.  Once a constitutional violation has been found, a district court has broad powers to fashion a remedy.").

Finally, Defendants' argument fails because under 18 U.S.C. § 3626(b), relief is not terminable if it remains necessary to correct a constitutional violation.  As described above, the record makes clear that the provisions in the Injunction aimed to ensure access to competent and qualified medical staff, including section 6.4, remain urgently needed.

<b>CONCLUSION</b>

The Court should deny Defendants' Motion to Modify the Injunction.

Dated:  March 31, 2026

By:  *s/ Sophie Hart*

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sophie Hart (Cal. 321663)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          sophieh@prisonlaw.com

Corene T. Kendrick (Cal. 226642)*
**ACLU NATIONAL PRISON PROJECT**
425 California Street, Suite 700
San Francisco, California 94104
Telephone: (202) 393-4930
Email:    ckendrick@aclu.org

David C. Fathi (Wash. 24893)**
Maria V. Morris (D.C. 1697904)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 393-4930
Email:    dfathi@aclu.org
          mmorris@aclu.org

Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th Street
Phoenix, Arizona 85006
Telephone: (602) 650-1854
Email:   lbeall@aclu.org


*Admitted *pro hac vice*
**Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*
**DISABILITY RIGHTS ARIZONA**

By:  *s/ Maya Abela*
Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email:   adietrich@disabilityrightsaz.org

Rose A. Daly-Rooney (Bar No. 015690)
Maya Abela (Bar No. 027232)
**DISABILITY RIGHTS ARIZONA**
4539 East Fort Lowell Road
Tucson, Arizona 85712
Telephone:  (520) 327-9547
Email:
   rdalyrooney@disabilityrightsaz.org
   mabela@disabilityrightsaz.org.org

*Attorneys for Disability Rights Arizona*

16

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2026, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Gregory Honig
Joshua Bendor
Luci Davis
Lucy M. Rand
Assistant Arizona Attorneys General
gregory.honig@azag.gov
joshua.bendor@azag.gov
luci.davis@azag.gov
lucy.rand@azag.gov

Mary R. O'Grady
Andrew G. Pappas
John S. Bullock
Molly S. Walker
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
mogrady@omlaw.com
apappas@omlaw.com
jbullock@omlaw.com
mwalker@omlaw.com

*Attorneys for Defendants*

*s/ Sophie Hart*

17