Mary R. O'Grady, 011434
Andrew G. Pappas, 034432
John S. Bullock, 034950
Kimberly Friday, 035369
Molly S. Walker, 038099
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 640-9000
mogrady@omlaw.com
apappas@omlaw.com
jbullock@omlaw.com
kfriday@omlaw.com
mwalker@omlaw.com

Attorneys for Defendants

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| Shawn Jensen, et al., | No. CV-12-00601-PHX-ROS |
|---|---|
| Plaintiffs, | |
| v. | **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO MODIFY INJUNCTION SECTION 6.4** |
| Ryan Thornell, et al., | |
| Defendants. | |

This Court has anchored its holdings regarding unconstitutional healthcare delivery to class members in Arizona state prisons on two distinct but related factual findings: (1) that inadequate staffing levels represent a "core issue" preventing constitutional compliance; and (2) the resulting absence of higher-level providers forces nurses to diagnose and treat patients beyond the scope of their licenses. (*See, e.g.*, Doc. 4335 at 21 ("[t]he core issue is that staffing levels are so inadequate that the provision of constitutionally mandated care is impossible"); *id* at 44 ("[u]sing nurses as the first line, and often last line, for providing care is medically unacceptable," "using nurses in this way is driven by a lack of higher-level staffing"); Doc. 5123 at 4 (2022 findings of fact included "seriously insufficient staffing" and "inappropriate use of nurses beyond the scope of their licensure").)

Three years of implementation has made clear that Section 6.4's board-certification requirements are working against these goals.  Plaintiffs do not dispute that Arizona faces a serious primary physician shortage.  And Plaintiffs have no meaningful answer to the fact that over 50 otherwise-qualified physician applicants have been turned away because they lack board certification in Internal Medicine or Family Practice. (Doc. 5120-1 at 2.)  Plaintiffs instead conflate general awareness of the physician shortage with the specific, documented operational consequences that Section 6.4 has produced over three years of implementation. The factual record establishes that Section 6.4 has proven unworkable.  Modification is warranted under both Rule 60(b)(5) and the Prison Litigation Reform Act.

## DISCUSSION

### I.      Defendants Have Demonstrated a Significant Change in Factual Conditions.

Federal Rule of Civil Procedure 60(b)(5) provides a flexible standard, permitting a court to modify an injunction when "applying it prospectively is no longer equitable." As applied specifically to the institutional reform context, the Supreme Court has instructed district courts to "exercise flexibility in considering requests for modification" if (1) the party seeking modification establishes a significant change in factual conditions, and (2) the proposed modification is tailored to the changed circumstance. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992).  The Supreme Court also advised that modification is appropriate when "a decree proves to be unworkable because of unforeseen obstacles, or when enforcement of the decree without modification would be detrimental to the public interest." *Id.* at 384.

Plaintiffs do not dispute that a primary physician shortage exists.  Their argument is narrower: that the shortage was known in 2023, so it cannot constitute a change in factual conditions.  (Doc. 5170 at 5-6.)  But general awareness of a problem is not the same as knowledge of its specific operational consequences.  It is true that NaphCare expressed concern about potential hiring difficulties in 2023. What NaphCare did not

know in 2023 was the magnitude of the problem: that over the next three years it would receive over 50 applications from otherwise-qualified physicians who it could not hire solely because the physicians lacked board certification in Internal Medicine or Family Practice, including physicians board certified in Emergency Medicine and other specialties, and physicians with prior correctional experience  As detailed in Defendants' Motion, NaphCare employed only 14.75 staff physician FTEs as of December 31, 2025, against the Court's staffing plan's calculation of 33.9 physicians, a shortfall of 19.15 physician FTEs.  (*See* Doc. 5107 at 3.)  The existence of over 50 staff physician applicants is a specific data point demonstrating that Defendants could have reduced the physician staffing shortfall if the board-certification requirement were waived.

Plaintiffs' reliance on *Agostini v. Felton*, 521 U.S. 203, 215–16 (1997), is misplaced.  In *Agostini*, the Supreme Court rejected a claim of changed factual circumstances because the movant relied on costs that were foreseeable at the time of the decree.  Here, by contrast, the issue is not the general existence of a primary physician shortage in 2023, but the specific and demonstrated effect that Section 6.4 has had on Defendants' ability to hire enough physicians to satisfy the Court's requirements. The difference between general awareness of a potential difficulty and the documented inability to hire sufficient physicians over a three-year period is precisely the kind of "significant change . . . in factual conditions" that supports modification.  *See id*. at 215 (quoting *Rufo*, 502 U.S. at 384).

## II.    Defendants Have Acted in Good Faith to Comply with Section 6.4.

Plaintiffs argue that Defendants have not demonstrated "good faith" because (in their view) physician salaries have not increased sufficiently to attract board-certified candidates.  (Doc. 5170 at 7-9.)  This argument misunderstands the barrier.  Salary increases address the question of whether qualified physicians are willing to work in correctional settings. The board-certification requirement addresses a separate question: whether physicians who are already willing to work in a correctional setting are eligible to do so. The fifty-plus rejected applicants were willing to work at NaphCare's posted

salaries. Plaintiffs do not dispute that NaphCare had to turn away over 50 applicants who were willing to work at Arizona state prisons for the posted salary offered but who were rejected because they could not clear a categorical eligibility bar. Nor do Plaintiffs argue that NaphCare's recruitment efforts, as detailed in the Declaration of Donna Dowling (Doc. 5107-2 at 3) are inadequate.[1]

*New York State Association for Retarded Children, Inc. v. Carey*, 706 F.2d 956 (2d Cir. 1983), and *Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114 (3d Cir. 1979), support modification. In both cases, courts modified injunctions where compliance efforts were frustrated by circumstances that the parties had not fully anticipated—just as Defendants did not fully anticipate how the primary physician shortage would frustrate their efforts to find, hire, and retain physicians who are board-certified in Family Practice or Internal Medicine. In 2023, the parties assumed that the board certification requirement was "realistically achievable." *Phila. Welfare Rights. Org.*, 602 F.2d at 1120-21. Three years has shown that it is not. Such a circumstance warrants modification of the requirement. *See id.*

The board certification requirement is also detrimental to the public interest, because it is exacerbating the physician staffing shortfall. The undisputed facts are clear: given the over 50 applicants who have been turned away, the number of physicians working at Arizona state prisons will increase if Defendants are given flexibility to hire physicians who are not board-certified or board-eligible in Family Practice or Internal Medicine. Because the Injunction's overarching focus is on increasing staffing levels and eliminating "nurse-driven" care, the Court should not "allow[] one provision of the [Injunction] . . . to override the more comprehensive goal" of securing enough licensed physicians to provide adequate medical care. *See N.Y. State Ass'n*, 706 F.2d at 967.

---

[1] Defendants do not concede that the physician compensation currently offered is inadequate to attract qualified applicants. Defendants' healthcare expenditures have consistently increased since 2023, and NaphCare's median rate for staff physicians is above the Economic Research Institute's 75th percentile. (*See* Doc. 4818-1 at 61; Doc. 4818-1 at 66.)

### III.    Defendants' Proposed Modification is Appropriately Tailored.

*Rufo* requires the proposed modification to be "tailored to the changed circumstance." *Rufo*, 502 U.S. at 383.  Plaintiffs assert that Defendants' proposed modification is "overbroad." (Doc. 5170 at 9-10.)  It is not.

Defendants' first request is narrow by definition.  It covers only specific individuals who are current employees and seeks a waiver of the board certification requirement in light of these individuals' specific work history at Arizona's state prisons.  It would be difficult to fathom a more targeted form of relief.[2]

Defendants' other request is equally measured.  It does not eliminate Section 6.4. Instead, Defendants propose a modification that retains the board certification requirement for at least 50% of full-time equivalent staff.  This is a measured adjustment that preserves the "essential features" of the Injunction while revising a provision that has proven unworkable. *See Phila. Welfare Rights. Org.*, 602 F.2d at 1120.

Physicians who would be hired or retained under Defendants' proposed modification do not lack "any other qualifications," as Plaintiffs assert.  (Doc. 5170 at 10.) All physicians practicing in Arizona must hold a valid Arizona medical license, which requires completion of medical school, at least one year of residency, biennial license renewals, and ongoing medical education.  A.R.S. § 32-1422, 32-1430; A.A.C. R4-16-102.  Under Arizona law, "[a] physician who meets the qualifications for licensure . . . has an unlimited scope of practice."  (Doc. 5107 at 10-11); *see* A.R.S. § 32-1422.

Plaintiffs also suggest that Defendants should instead seek approval for exceptions through the Court Monitors.  (Doc. 5170 at 10.)  That is not a workable alternative.  The Court Monitors do not have the authority to waive Section 6.4's board certification requirement.  And even if they did, a piecemeal, applicant-by-applicant process provides no certainty to prospective physician applicants or to NaphCare's recruitment efforts.

---

[2] Although Plaintiffs argue that Defendants' motion should be denied, they do not appear to argue that the current employees should be fired.  Their Response does not address this request for relief in detail.

Modification of the provision is appropriate and expressly contemplated by the Injunction, which permits the parties to "petition the Court to modify or annul requirements." (Doc. 4410 at 9.)

**IV.    Section 6.4 Should Be Modified Pursuant to the PLRA.**

A.    Defendants may request modification of Section 6.4 under the PLRA.

Defendants agreed to the Injunction in a good-faith effort to remedy the constitutional violations identified by the Court.  Plaintiffs now seek to weaponize that cooperation by asserting that Defendants are estopped from arguing that the board certification requirement extends further than necessary to correct the constitutional violations.  (Doc. 5170 at 14.)  But the PLRA expressly provides that relief may be modified before it is terminable if the modification "would otherwise be legally permissible." 18 U.S.C. § 3626(b)(4).  Plaintiffs seek to put Defendants in a classic Catch-22: if they contest a proposed remedy, they are obstructive, but if they agree to a proposed remedy, they lose all right to request its modification.  That rule would perversely incentivize defendants to contest every injunction provision, lest they be found to have waived the right to seek modification if that provision proves not to be the least restrictive means of addressing a constitutional problem.  Defendants should not be punished for agreeing to the Injunction's language in 2023 when the passage of time has revealed that the board certification requirement is impeding progress.  The entire purpose of permitting modifications is to allow for adjustments when experience demonstrates that a requirement is not functioning as intended.  *See Horne v. Flores*, 557 U.S. 433, 452-53 (2009) (rejecting lower court's refusal to conduct substantive Rule 60 analysis because of Defendants' agreement to initial order, noting that the *Rufo* analysis "makes no reference to the presence or absence of a timely appeal.").

Plaintiffs' reliance on *Plata v. Schwarzenegger*, 603 F.3d 1088, 1097 (9th Cir. 2010), and *Coleman v. Brown*, 922 F. Supp. 2d 1004, 1031 (E.D. Cal. 2013), is misplaced. In *Plata*, the Ninth Circuit expressed concern that the State had failed to challenge the receivership at the outset and had not raised changed circumstances before the trial court.

603 F.3d at 1097.  But the Court reached the merits of both challenges anyway.  *See id.* ("[T]he record simply does not support the State's contention that anything less than a receivership would have remedied the undisputed constitutional deficiencies in prisoners' health care at the time the receivership was imposed. "); *id.* at 1098 (concluding that "nothing in the record supports the State's contention regarding the current necessity for a receivership").  The Court should do the same here.  In *Coleman*, defendants sought "complete vacatur" of a prison reduction order and proposed "no *new* remedies."  922 F.Supp.2d at 1021, 1032.  Here, in contrast, Defendants do not request that the Injunction be vacated.  Instead, they seek only targeted modification of one provision that has proved unworkable, which is a procedural right that both the PLRA and the Injunction explicitly afford.

Plaintiffs argue that the PLRA does not require provision-by-provision findings, and Defendants agree.  *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070–71 (9th Cir. 2010); (Doc. 5170 at 15).  But this principle cuts in Defendants' favor: because the Court made no specific findings supporting the board certification requirement, there is no basis in the record for concluding that Section 6.4 is the "least intrusive means necessary" to correct the systemic constitutional violations identified by the Court.  18 U.S.C. § 3626(a)(1)(A).  And although Plaintiffs' response excerpts instances of poor care by physicians detailed in the Court's 2022 findings, *see* Doc. 5170 at 3, Plaintiffs do not contest that the Court never tied poor care to a lack of board certification by these physicians.

B.    <u>Section 6.4 exceeds what is necessary under the PLRA to remedy the constitutional violations.</u>

The Eighth Amendment does not require care to be provided by physicians who are board certified or board-eligible in Internal Medicine or Family Practice, even here, where the structure of the remedy anticipates that physicians will be treating medically complex patients. The Eighth Amendment "do[es] not require the highest quality of health care, the community standard of health care, or the most pleasant accommodations

possible." (Doc. 4335 at 1.) As Defendants explained, medical licensure sets the minimum competency requirements to diagnose and treat patients, and board certification represents "exceptional expertise" beyond what licensure requires. (Doc. 5107 at 10.) Plaintiffs do not credibly argue otherwise. Their expert, Dr. Barnett, speaks in terms of the ideal: what is "reasonable and prudent" (Doc. 5170-1 at 3, ¶ 11) rather than the constitutional minimum. That board certification may be "reasonable and prudent" does not mean that it is constitutionally required, and the PLRA demands that the Court's relief extend "no further than necessary" to correct the constitutional violation. 18 U.S.C. § 3626(a)(1)(A). As Defendants have noted, other correctional facilities in Arizona, including the federal Bureau of Prisons, do not categorically require board certification in Internal Medicine or Family Practice. (Doc. 5107 at 11; Doc. 5107-3 at 32; Doc. 5107-4 at 2.) The relevant question is not whether board-certified physicians are *more qualified* to treat medically complex patients, but whether non-board-certified, Arizona-licensed physicians are *unqualified* to provide constitutionally adequate care.

Plaintiffs also continue to confuse California law with Arizona law, including through use of an expert with experience in the California corrections system who is not licensed to practice in Arizona and has no demonstrated experience in Arizona. Relying on their expert, Plaintiffs argue that "[a]dequately supervising nurse practitioners and physician assistants also requires sufficient training and experience," and that "'[b]oard certification or eligibility in internal medicine or family practice is a strong indicator that a physician has that requisite expertise,' and is thus 'essential' for physicians in ADCRR, given how the physician role is scoped." (Doc. 5170 at 12, quoting Decl. of Bruce Barnett, M.D., Doc. 5170-1 at 4, ¶¶ 14-15.) But unlike California, in Arizona nurse practitioners and experienced physician assistants are permitted to practice independently, without the supervision of a physician. *See, e.g.*, A.R.S. § 32-2531(A) ("a physician assistant may provide any legal medical service for which the physician assistant has been prepared;" "a physician assistant who has at least eight thousand hours of clinical practice certified by the board pursuant to § 32-2536 is not required to practice pursuant to a supervision

agreement") *Id.* at (B); A.R.S. § 32-1601(23) (setting out scope of practice for registered nurse practitioners); Ariz. Admin. Code R4-19-101 (noting under definition of "Collaborate" that "[s]upervision of the activities of a registered nurse practitioner by the collaborating physician is not required").  The assertion that staff physicians must have the "requisite expertise" in internal medicine or family practice in order to supervise nurse practitioners and physician assistants in Arizona reflects unfamiliarity with Arizona's scope of practice and community standard of care for advanced practice providers.  Plaintiffs' expert also opines that board certification in internal medicine or family practice is the community standard for primary care physicians in Arizona, apparently based solely on his perusal of five job postings by large private healthcare systems. (Doc. 5170-1 at 5, ¶ 18.)  That testimony should be rejected. [3]

## CONCLUSION

Section 6.4's board-certification requirement was designed to ensure that class members receive care from competent physicians.  Three years of implementation have shown Section 6.4 has undermined that intended effect by excluding qualified physicians and created a barrier to fixing the staffing crisis this Court identified as the core constitutional problem.  Defendants' motion to modify Injunction Section 6.4 should be granted.

DATED this 7th day of April, 2026.

OSBORN MALEDON, P.A.


By  s/*Kimberly Friday*
   Mary R. O'Grady
   Andrew G. Pappas
   John S. Bullock
   Kimberly Friday
   Molly S. Walker

---

[3] Plaintiffs' expert also states that the California Department of Corrections and Rehabilitation requires physicians to be board-eligible or board-certified in internal medicine or family practice. (Doc. 5170-1 at 5, ¶ 19.)  As Defendants have previously pointed out, significant healthcare staffing shortages persist in California prisons, including a 20% vacancy rate for primary care physicians. (Doc. 4818 at 24.)

2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012

KRISTIN K. MAYES
ATTORNEY GENERAL
Joshua D. Bendor, 031908
Gregory Honig, 018804
Lucy M. Rand, 026919
Luci D. Davis, 035347
Assistant Attorneys General
2005 North Central Avenue
Phoenix, Arizona 85004-1592
joshua.bendor@azag.gov
gregory.honig@azag.gov
lucy.rand@azag.gov
luci.davis@azag.gov
ACL@azag.gov

Attorneys for Defendants

10