Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th Street
Phoenix, Arizona 85006
Telephone: (602) 650-1854
Email: lbeall@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**DISABILITY RIGHTS ARIZONA**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@disabilityrightsaz.org

*Attorneys for Plaintiff Disability Rights Arizona*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Disability Rights Arizona,<br><br>Plaintiffs,<br><br>v.<br><br>Ryan Thornell, *et al.*, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-ROS<br><br>**PLAINTIFFS' RESPONSE TO MONITOR'S REPORT REGARDING PLAINTIFFS' MOTION TO ENFORCE 19.3, 29.2, 29.3, AND 30 OF THE INJUNCTION AND DEFENDANTS' REQUEST TO MODIFY THE CUSTODY STAFFING PLAN (Doc. 5203)** |

## I.   PLAINTIFFS' MOTION TO ENFORCE 19.3, 29.2, 29.3, AND 30 OF THE INJUNCTION

Plaintiffs generally agree with Monitor Scott Frakes's report (Doc. 5203) regarding Plaintiffs' Motion to Enforce 19.3, 29.2, 29.3, and 30 of the Injunction. Plaintiffs provide some additional context for the Court's consideration.

The number of people in Maximum Custody dropped dramatically shortly after the Injunction went into effect, and continued dropping for about a year. By June 2024, the Maximum Custody population had shrunk to just a quarter of what it was at the time of the Injunction. However, starting in the summer of 2024, the number of people in Maximum Custody started rising, and is now almost 2/3 of what it was at the time of the Injunction: Declaration of Maria V. Morris ("Morris Decl."), ¶ 2.[1]



There are three major drivers of this increase that Mr. Frakes does not address in detail. They are (1) Defendants' default practice of keeping people in Maximum Custody for at least 6 months, in violation of Injunction § 19.3's presumptive two month limit for

---

[1] Defendants did not produce information about the size of the isolation subclass population for August and September 2023, September 2024, July, September, October and November 2025, and January and February 2026. Morris Decl. ¶ 2.

isolation, (2) Defendants' continued use of isolation for people who have not engaged in any violent or aggressive conduct for a long time, and (3) Defendants' continued use of isolation to compensate for their failure to provide safe housing for people who have "signed IHP" – that is, stated that they are willing to house with people of any race. Doc. 5030 at 26-38.

Defendants do not dispute any of these systemic issues. They admit that their policy with regard to Maximum Custody is that "inmates may be moved out of maximum custody if it is safe for them to do so after six months, or they may remain in maximum custody for longer than that if it is not safe for them to do so." Doc. 5057 at 19. Indeed, Defendants admit that the average stay in Maximum Custody is nearly a year. *Id*. at 20.

Defendants also admit that people remain in isolated housing units despite lengthy periods without disciplinaries. *Id*. at 21-23; *see also infra* at 3 (discussing recent decisions to maintain people in Maximum Custody). And Defendants do not even address their practice of placing people in detention when they are threatened because they signed IHP. Doc. 5057 at 24. They simply claim that conditions in detention are not that bad. *Id*.

These undisputed, systemic violations of the Injunction are increasing the number of people locked in isolation conditions in ADCRR month after month.

**A. Sections 19.3, 29.2, 29.2.1, 29.2.2**

Defendants' system for facilitating the removal of people from isolated housing units consists of case plans, monthly case plan meetings, 60-day reviews, and semi-annual reclassifications.

Plaintiffs have nothing to add to the discussion in the Motion to Enforce, the Reply, and Mr. Frakes's report regarding the disconnect between the case plans and monthly meetings and a person's removal from isolated housing units.

Based on the movement of some people out of isolated housing units between two months and six months after placement, Mr. Frakes finds that the 60-day reviews "contribute to focusing staff on moving people from detention to an appropriate housing assignment." Doc. 5203 at 2-3. Plaintiffs note that the rate of releasing people drops every

month at a relatively even pace, suggesting that the 60-day reviews neither prevent people from being released from isolation, nor contribute to their release. *See* Doc. 5030 at 14. The Injunction requires Defendants to have a system to facilitate the removal from isolation for anyone who has been in isolation for more than two months. Doc. 4410 § 19.3. The decreasing numbers of people released after two months, after three months, after four months, and so on strongly suggests that there is no such system functioning between two months and the semi-annual classification process. *See* Doc. 5030 at 14.

As discussed by Mr. Frakes, a significant portion of the people who are not approved for removal from isolated housing units at their semi-annual classification are kept in isolation either due to a lack of housing options, or for past behavior without evidence of recent or on-going violent or aggressive behavior. Doc. 5203 at 3. In March 2026, the last month for which Defendants produced semi-annual classification documents for members of the isolation subclass, there were 58 reclassifications, 29 of which resulted in approvals for removal from isolation, and 29 of which resulted in a decision to keep the person in isolation. Morris Decl. ¶ 4. Of the 29 decisions to maintain a person in isolation, 7 were based on a lack of housing options. *Id*. ¶ 6, Ex. 2. There were 11 decisions to maintain a person in isolation based on misconduct six months or more in the past, including 4 such decisions where there was no violent or aggressive behavior noted for a year or more. *Id*. Seven people were kept in isolation due to misconduct that occurred about six months earlier; in six of the seven cases, the misconduct cited in the decision appeared to be the same misconduct that led to the initial placement in isolation. *Id*.

Mr. Frakes also notes that Defendants' semi-annual reclassification process does not comply with the Injunction. Doc. 5203 at 3. The discrepancy between the process required by the Injunction and that followed by Defendants leads to people staying in Maximum Custody longer than they would if the staff who interact with them on a regular basis and who, according to the Injunction, are supposed to make the decisions, were in fact making the decisions. In 11 of the 29 decisions in March 2026 to keep a person in Maximum Custody, the Classification Officer did not believe that the person needed to remain in

Maximum Custody, but the Central Office overruled the Classification Officer and kept the person in Maximum Custody. Morris Decl. ¶ 7.

Another result of Defendants' non-compliant process is that the classification review process takes a significant amount of time. In March, the duration of the process ranged from 8 days to 34 days, averaging about 2.5 weeks to complete. Morris Decl. ¶ 8, Ex. 3. Because Defendants do not start the process early enough, the majority of reviews are completed late. In March, 33 of the reviews were for people who, based on the date of their placement into isolation, were presumably having their first semi-annual classification review. *Id*. Of those, nearly all (29) were completed late. *Id*.

### B.    Sections 29.3 and 30

As noted by Mr. Frakes, Defendants continue to confine people in isolation housing units more than 10 days after they are approved for release from isolation, in violation of the requirement set forth in §§ 29.3 and 30 of the Injunction. Doc. 5203 at 4.

In their response to Plaintiffs' motion, Defendants admitted that they were not compliant with § 30, the provision that relates to removing people from detention. Docs. 5057 at 24; 5057-1 (Declaration of Erica Altigieri) at ¶ 45 (stating that in August 2025, 56.6% of the people who (1) were deemed eligible for removal from detention and (2) were removed, were removed within 10 days).

Defendants asserted that they were compliant with § 29.3, the provision that relates to removing people from Maximum Custody. Docs. 5057 at 24; 5057-1 at ¶ 44 (claiming that in August 2025, 84.6% of the people who (1) were deemed eligible for removal from Maximum Custody and (2) were removed, were removed within 10 days). There are two significant problems with this assertion of compliance. First, violating the rights of 15% of the people approved for removal from Maximum Custody is not compliance. *See Withrow v. Concannon*, 942 F.2d 1385, 1387 (9th Cir. 1991) (noting that "it is no comfort" for the people whose rights are violated "to be told" that most people's rights are not violated); *see also Jensen v. Shinn*, 609 F. Supp. 3d 789, 857 (D. Ariz. 2022) ("Even if only 5% of mentally ill prisoners do not have access to care, that is unconstitutional."). Indeed, in their

QI Reports, Defendants find themselves non-compliant with § 29.3 where they find that they moved 90% or more of the people approved for removal from isolation within ten days. Morris Decl. ¶ 9.

Nor do Defendants explain how they determined that 84.6% of the removals from Maximum Custody were timely. *See* Docs. 5057 at 24; 5057-1 at ¶ 44. It is likely that this number comes from their self-monitoring process documented in their "QI Reports," as it is roughly consistent with the QI Reports for other months that Defendants have produced.[2] The most recent month for which Defendants have produced a QI Report is November 2025. Morris Decl. ¶ 9. Analysis of the November QI report shows that Defendants grossly overstate their compliance.

In November, Defendants asserted a compliance rate of 82.5%, stating: "For the month of November, 40 inmates were moved out of maximum custody; 7 were past the 10 day time frame." *Id*. ¶ 10. According to the QI Report, only 38 people were moved out of Maximum Custody – two of the removals were duplicates. *Id*. ¶ 11. Of the 38 people, 12 were moved out of Maximum Custody when they were released from ADCRR custody, 7 were moved out of Maximum Custody when they were transferred out of ADCRR to court, 3 were moved out of Maximum Custody for medical or mental health reasons (not due to a determination that they were "eligible" for movement to a different classification level), and one person was moved from one Maximum Custody unit to a different Maximum Custody unit. *Id*. ¶ 13, Ex. 4. There were just 15 people moved from a Maximum Custody unit to a lower security level. *Id*.

Of those 15, Defendants asserted that 8 were moved within 10 days of becoming eligible for removal from Maximum Custody. *Id*. ¶ 14, Ex. 4. Thus, for the people Defendants moved out of Maximum Custody to a lower security level in November, their assertion is that 53.3% were timely.

---

[2] Defendants did not produce the QI Report for August 2025 to Plaintiffs. Morris Decl. ¶ 9. The only QI Report that they have produced since July 2025 is the report for November 2025. *Id*.

But even that appears to grossly overstate Defendants' compliance with § 29.3. Of the 8 people moved to lower security levels whom Defendants claim were timely moved, Defendants have produced semi-annual classification documents for three people. *Id*. ¶ 15, Ex. 4. For each of the three, Defendants asserted that they were moved the day they became eligible for movement. *Id*. But the semi-annual classification documents for two of the three contradict these assertions, and show that the individuals were approved for removal from Maximum Custody 28 days and 49 days prior to removal, respectively.[3] *Id*.

For the 7 removals to lower levels of security that Defendants admit were not timely, 4 appear to be even more untimely than what Defendants acknowledge. For example, Defendants state that one person was eligible for removal on September 4, 2025, and was removed on November 5, 2025, 62 days later. But his semi-annual classification documents show that he was approved for removal from Maximum Custody on April 16, 2025, and thus was removed ***203 days*** after Defendants deemed him eligible to move to a lower security level. *Id*.

The problem continues. Defendants informed Plaintiffs of 79 releases from Maximum Custody in March 2026. *Id*. ¶ 17. Of those, 19 were removed from Maximum Custody when they were released from ADCRR to the community, transferred to county jails for court proceedings, or transferred to a medical or mental health unit. *Id*. Of the other 60 people moved from Maximum Custody to a lower security level, Defendants produced the most recent 180-day classification review for 47 people.[4] *Id*. Of those 47 removals, Defendants claimed that just 5 (10%) were untimely. However, when compared to the date of the Classification Administration Decision on the classification documents, 22 – 47% –

---

[3] The third states that, about 2½ months before the individual was moved out of Maximum Custody, it was decided that he should remain in Maximum Custody. Morris Decl. ¶ 15, Ex. 4. Plaintiffs do not have any documentation of the timing of the decision that he could be moved.

[4] Defendants have agreed to produce all semi-annual classification documents to Plaintiffs. Morris Decl. ¶ 18. Plaintiffs do not know if the 13 people for whom classification documents were not provided were somehow determined to be eligible without a semi-annual classification, or if Defendants have simply failed to produce all the classification documents.

were untimely. *Id.*

In short, Defendants' self-reported compliance rates simply cannot be trusted.

### C. Mr. Frakes's Recommendations

Plaintiffs, like Mr. Frakes, believe that Defendants should be ordered to develop a plan that would bring them into full compliance with §§ 19.3, 29.2, 29.2.1, 29.2.2, 29.3, and 30 of the Injunction. Such a plan should include clear timelines, metrics, and reporting requirements. After comment by Mr. Frakes and Plaintiffs, Defendants should be ordered to implement their plan or an alternative plan approved by the Court.

### II. DEFENDANTS' REQUEST TO MODIFY THE CUSTODY STAFFING PLAN

Plaintiffs fully endorse Mr. Frakes's report and recommendations regarding Defendants' request to modify the custody staffing plan.

Dated: May 14, 2026

ACLU NATIONAL PRISON PROJECT

By: s/ Maria V. Morris

David C. Fathi (Wash. 24893)**
Maria V. Morris (D.C. 1697904)*
915 15th Street N.W., 7th Floor
Washington, DC 20005
Telephone: (202) 393-4930
Email:    dfathi@aclu.org
          mmorris@aclu.org

Corene T. Kendrick (Cal. 226642)*
**ACLU NATIONAL PRISON PROJECT**
425 California St., Ste. 700
San Francisco, CA 94104
Telephone: (202) 393-4930
Email:    ckendrick@aclu.org

*Admitted *pro hac vice*
**Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.

Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th Street
Phoenix, Arizona 85006
Telephone: (602) 650-1854
Email:    lbeall@aclu.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sophie Hart (Cal. 321663)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          sophieh@prisonlaw.com

*Admitted *pro hac vice*
**Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**DISABILITY RIGHTS ARIZONA**

By:   s/ Maya Abela
        Asim Dietrich (Bar No. 027927)
        5025 East Washington Street, Suite 202
        Phoenix, Arizona 85034
        Telephone: (602) 274-6287
        Email:    adietrich@disabilityrightsaz.org

        Rose A. Daly-Rooney (Bar No. 015690)
        Maya Abela (Bar No. 027232)
        **DISABILITY RIGHTS ARIZONA**
        4539 East Fort Lowell Road
        Tucson, Arizona 85712
        Telephone:  (520) 327-9547
        Email:
          rdalyrooney@disabilityrightsaz.org
          mabela@disabilityrightsaz.org.org

*Attorneys for Disability Rights Arizona*

-8-

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2026, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Gregory Honig
Joshua Bendor
Luci Davis
Lucy M. Rand
Assistant Arizona Attorneys General
gregory.honig@azag.gov
joshua.bendor@azag.gov
luci.davis@azag.gov
lucy.rand@azag.gov

Mary R. O'Grady
Andrew G. Pappas
John S. Bullock
Molly S. Walker
Kimberly Friday
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
mogrady@omlaw.com
apappas@omlaw.com
jbullock@omlaw.com
mwalker@omlaw.com
kfriday@omlaw.com

*Attorneys for Defendants*

s/ J. Carns

-9-