Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th Street
Phoenix, Arizona 85006
Telephone: (602) 650-1854
Email: lbeall@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**DISABILITY RIGHTS ARIZONA**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@disabilityrightsaz.org

*Attorneys for Plaintiff Disability Rights Arizona*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Disability Rights Arizona,<br><br>Plaintiffs,<br><br>v.<br><br>Ryan Thornell, *et al.*, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-ROS<br><br>**DECLARATION OF MARIA V. MORRIS IN SUPPORT OF RESPONSE TO MONITOR'S REPORT (Doc. 5203)** |

I, MARIA V. MORRIS, declare:

1.    I am an attorney licensed to practice in the District of Columbia. I am Senior Counsel at the ACLU National Prison Project and an attorney of record to the Plaintiffs in this litigation. If called as a witness, I could and would testify competently to the facts stated herein, all of which are within my personal knowledge.

2.    Most months, Defendants produce to Plaintiffs a report of all the people in Detention and Maximum Custody for over 60 days as of the 15th of the prior month. From that data, I created the chart below, reflecting the numbers of people in Detention and Maximum Custody for over 60 days for each month for which the data was produced since June 2023:



Maximum Custody and Detention Populations
June 2023-April 2026
(People in the Subclass over 60 days)

Defendants did not produce this information for August and September 2023, September 2024, July, September, October and November 2025, and January and February 2026.

3.    Defendants produced documents to Plaintiffs reporting that there were 105 people in Detention and 366 people in Maximum Custody who had been in the Isolation Subclass for over 60 days as of March 15, 2026.

4.    The most recent month for which Defendants have produced semi-annual classification documents for people in the Isolation Subclass is March 2026. These are classification documents for reviews that started between March 3, 2026 and April 1, 2026,

and were completed between March 20, 2026 and April 15, 2026. There were 58 such reviews, 29 of which resulted in a decision to remove the person from isolation, and 29 of which resulted in a decision to retain the person in isolation.

5.      I have created charts reflecting some of the data described in this declaration. I have anonymized the people in each of the charts. A key identifying each of the individuals is attached hereto as **Exhibit 1**.

6.      Of the 29 decisions to maintain a person in isolation, 7 were based on a lack of housing options. There were 11 decisions to maintain a person in isolation based on misconduct six months or more in the past, including 4 such decisions where there was no violent or aggressive behavior noted for a year or more. For 6 of the 7 people who were kept in isolation due to misconduct six months earlier, the misconduct cited in the decision was or appeared to be the misconduct that led to the placement in isolation. Attached hereto as **Exhibit 2** is a chart I created from Defendants' data reflecting the decisions to keep people in isolation and identifying which of the decisions were based on a lack of housing, which were based on aggressive or violent behavior about six months or more earlier, and which were based on aggressive behavior that led to the placement.

7.      Based on my review of the classification documents, in 11 of the 29 decisions in March 2026 to keep a person in Maximum Custody, the Classification Officer did not believe that the person needed to remain in Maximum Custody, but the Central Office decided they did.

8.      For the March 2026 classification processes, the average time the review process took was 18 days, and it ranged from 8 days to 34 days. There were 33 reviews of people who were placed into isolation between June and October 2025 and who were, therefore, presumably receiving their first semi-annual classification in isolation. Of the 33, 29 reviews were late, finishing more than six reviews were completed after the individual had been in isolation for more than six months. Ten classification reviews were started more than six months after the person was placed into isolation. Attached hereto as **Exhibit 3** is a chart I created from Defendants' data reflecting the classification process for each person

who was placed into isolation between June and October 2025. I am making the assumption that each of these was the first semi-annual classification review for the specified individual.

9. Defendants occasionally produce to Plaintiffs what they refer to as QI Reports. I review these reports. In 2025, they produced QI Reports produced for January through May, July and November. They have not produced any QI Reports for 2026. For the months in 2025 for which they produced their reports, Defendants asserted that their compliance with the requirement to move people within 10 days of eligibility from Maximum Custody (§ 29.3) ranged from 81%-94%, and that their compliance with the requirement to move people within 10 days of eligibility from detention (§ 30) ranged from 53%-66%. Each of these months, they found themselves non-compliant with both provisions.

10. For November, their asserted compliance rate for § 29.3 was 82.5%. They reported: "For the month of November, 40 inmates were moved out of maximum custody; 7 were past the 10 day time frame."

11. Two of the 40 entries for people moved out of Maximum Custody in November 2025 were duplicates. The report shows that 38 people were moved out of Maximum Custody that month.

12. Attached hereto as **Exhibit 4** is a chart I created from the data provided by Defendants in support of the November 2025 QI Report and adding information about the reasons for removal from Maximum Custody and dates of the review process.

13. As shown on Exhibit 4, 12 of the 38 people were moved out of Maximum Custody when they were released from ADCRR custody, 7 were moved out of Maximum Custody when they were transferred out of ADCRR to court, 3 were moved out of Maximum Custody for medical or mental health reasons, not due to a determination that they were "eligible" for movement to a lower custody level, and one person moved from one Maximum Custody unit to a different Maximum Custody unit. There were just 15 people moved within ADCRR from a Maximum Custody unit to a lower security level.

14. Of those 15, Defendants asserted that 8 were moved within 10 days of

becoming eligible for removal from Maximum Custody.

15.    Of the 8 people moved to lower security levels who Defendants claim were timely moved, Defendants have produced 180-day classification documents for three people. For each of the three, Defendants asserted that they were moved the day they became eligible for movement. *See* Ex. 4. The 180-day classification documents for two of the three show that the individuals were approved for removal from Maximum Custody 28 days and 49 days prior to removal, respectively. *Id*. The third states that, about 2½ months before the individual was moved out of Maximum Custody, it was decided that he should remain in Maximum Custody. *Id*. Plaintiffs do not have any documentation as to when the decision that he could be moved was made.

16.    For the 7 people moved to lower levels of security that Defendants admit were not timely, 4 appear to be even more untimely than what Defendants acknowledge. For example, Defendants state that one person was eligible for removal on September 4, 2025, and was removed on November 5, 2025, 62 days later. But his 180-day classification documents show that he was approved for removal from Maximum Custody on April 16, 2025, and thus was removed 203 days after he became eligible. *Id*.

17.    Defendants' report on removals from Maximum Custody in March 2026 states that 79 people were moved out of Maximum Custody during the month. I determined by cross referencing them on their Electronic Medical Records that 19 of these people were removed from Maximum Custody when they were released from ADCRR custody, transferred to a court, or transferred to a medical or mental health unit. Defendants produced recent semi-annual classification documentation for 47 of the 60 people who were moved from Maximum Custody to a lower security level. On their report of removals, Defendants asserted that only five of the 47 were approved for removal more than 10 days before they were moved. However, the classification documents showed that 22 of the 47 people were approved to move out of isolation more than 10 days before they were moved.

18.    In discussions earlier this spring, Defendants agreed to produce all semi-annual classification documents for the isolation subclass. I do not know whether the 13

-4-

people who were moved from Maximum Custody in March 2026 for whom we did not receive classification documents did not have a classification, or if the documents were created but not produced.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of May, 2026 in Charlotte Amalie, St. Thomas, U.S. Virgin Islands.

/s/ *Maria V. Morris*
Maria V. Morris

-5-