# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, et al., | No. CV-12-00601-PHX-ROS |
| Plaintiffs, | |
| v. | **ORDER** |
| Ryan Thornell, et al., | |
| Defendants. | |

The Prison Litigation Reform Act ("PLRA") requires that any prospective relief granted or approved by the Court be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A).

In its June 11, 2025 Order (Doc. 4916), the Court adopted the Staffing Analysis and Plan required by Section 1.17 of the Permanent Injunction in this matter. The Staffing Analysis and Plan followed months of analysis, testing, and evaluation by the Monitors and exhaustive briefing by the parties. Defendants appealed and, on appeal, Defendants contend that the Court has not made the requisite PLRA findings as to the statewide Staffing Plan. Following oral argument, a panel of the Ninth Circuit Court of Appeals remanded for the Court to make further findings as necessary to ensure the Order's compliance with the PLRA. The Court of Appeals specifically noted that to the extent the Final Plan modified the Permanent Injunction, findings that assess the Order's conformity with the PLRA should be explicitly stated.

## I. Relevant Background

The background of this action and continued failures of the provision of constitutionally adequate health care to prisoners has been repeatedly detailed in the orders of this Court. Therefore, the Court only sets forth an abridged background directly relevant to the statewide Staffing Plan.

In 2022, following a decade of litigation and a five-week trial, the Court issued its Findings of Fact and Conclusions of Law identifying pervasive constitutional violations in the Arizona Department of Corrections, Rehabilitation, and Reentry's (ADCRR) provision of health care. (Doc. 4335.) Defendants chose not to appeal the Court's findings and conclusions. Rather, they chose to accept a stipulated Permanent Injunction, crafted with the assistance of the Court's experts, to address those profound violations. (Doc. 4410.)

Section 1.17 of the Permanent Injunction provides:

> 1.17. To determine the number of staff necessary to care for patients, the Court will appoint an expert to conduct a staffing analysis and plan of health care positions at each location. The parties shall attempt to reach agreement on the expert, but if no agreement is reached, the parties shall submit the names and qualifications of proposed experts within 14 days of this Order. The Court will appoint an expert from the lists provided by the parties, unless the Court finds the proposed expert unqualified. The appointed expert may appoint additional appropriately qualified and credentialed staff to assist the expert. The expert's services shall be paid by Defendants. The staffing analysis and plan shall be filed with the Court within six months from the date of this Order. The plan shall contain recommendations that shall be reviewed by the Court and, if approved, ordered by the Court. Any objections to the staffing plan and recommendations shall be filed by the parties within ten days and a response to the objections shall be filed within ten days thereafter.

The Permanent Injunction required the Staffing Analysis and Plan to be completed within six months from entry of the Permanent Injunction. But as the Court's Monitor pointed out at the August 17, 2023 Status Conference, Defendants had not yet made

sufficient changes to the delivery of health care to facilitate a useful Staffing Analysis and Plan:

> Before you can ask that question, you kind of have to have the operation going. And the Department's in the process of changing the operation. So that's why up until now it's been premature to say, this is how many positions we need, when the entire operation is changing.

(Doc. 4469 at 30:22-31:1.)

Thereafter, in the Monitors' February 1, 2024 Interim Report to the Court, the Monitors explained:

> Recognizing that even the staffing requirements set forth in its [Permanent] Injunction may not be sufficient to meet the needs of patients to ensure constitutionally adequate health care, the Court directed an expert, Ms. Donna Strugar-Fritsch, to complete a staffing analysis and plan for medical and MH positions by October 6, 2023. The validity and usefulness of any such plan is heavily dependent on drawing data from observations of current operations to the extent that the current model of operations is similar to model for which the plan is designed. For this reason, the staffing analysis and plan was delayed in anticipation of ADCRR piloting the primary care model of care ordered by the Court. Even though the primary care model has not yet been fully implemented, Ms. Strugar-Fritsch did not think further delay was justified and is moving forward developing a staff plan as best she can.

(Doc. 4539.)

On April 16, 2024, Dr. Stern and Ms. Strugar-Fritsch, the Court's experts, submitted a 43-page ADCRR Health Care Staffing Analysis and Plan advising of necessary staffing to comply with the injunction after "extensive collaboration and coordination with the Monitoring team . . . site visits to three complexes, consultation with Plaintiffs and Defendants including extensive consultation with the ADCRR Health Services Division, and conversations with NaphCare Facility Health Administrators, providers, mental health leads, and others." (Doc. 4599.) In an April 18, 2024 Order, the Court discussed the Monitors' report detailing lack of adequate staffing, Defendants' representations to the

Court regarding lack of staffing during the March 15, 2024 hearing, and the apparent inability of the ADCRR to enforce its own contract with NaphCare to ensure constitutionally adequate staffing. (Doc. 4602.) The Court ordered the parties to brief these ongoing issues. (*Id.*)

On May 16, 2024, the Court held a status conference. (Doc. 4634.) At that status conference, Dr. Stern and Ms. Strugar-Fritsch discussed their staffing recommendations. (*Id.*) Ms. Strugar-Fritsch discussed her evidence-based methodology and experience in response to some of Defendants' objections, and Dr. Stern reminded the Court that the Court appointed Ms. Strugar-Fritsch at the recommendation of the parties. (*Id.*) Dr. Stern also addressed Defendants' other objections to a Staffing Pilot Project, which was a significant part of implementing the staffing recommendations (Doc. 4599 at 37-38), stating:

> [W]hen we were drafting the report, initially we were going to recommend to the Court implementing the entire staffing plan. Based on our discussions with the department of corrections, it became clear that that would be very difficult for them to do for fiscal reasons. Hiring all the—all the positions that we described at this point in time would be—would be impossible.
>
> And so in a late stage of preparation of the report, we proposed shifting from a hundred percent implementation to the two pilot sites. And, in essence, that cut down the impact of this staffing plan from a hundred percent of the population to approximately eight percent of the population. And I would— I would say not only eight percent of the population, but approximately eight percent of the staffing requirements that were in—that are in the full report, if we were to go a hundred percent.

(Doc. 4634 at 27-28.) During the status conference, the experts—Dr. Stern, Dr. Abplanalp, and Ms. Strugar-Fritsch—explained the methodology behind the staffing report and both parties and an attorney for NaphCare had the opportunity to question the experts and be heard by the Court. (*Id.*) Of particular emphasis was the proposed pilot project as a method of evaluating and gaining more information for the staffing plan. Dr. Stern described the pilot project as "implementing a change in the model of care at two facilities within two

complexes, affecting a total of about 2,000 residents, and operating for a period of about six months. It includes preparation, planning, training, changes in roles of individuals, measurement, and ultimately, at the end of the six months, the ability to come back to the court with a better understanding of what changes are required statewide in staffing." (*Id.* at 107.)

On June 3, 2024, the Court issued an Order directing implementation of the Staffing Pilot Project. (Doc. 4637.) In that Order, after detailing Defendants' actions in this litigation, the Court stated:

> Finally, the Court notes its concern that over one year after the Permanent Injunction was issued and two years since entry of the Court's Findings of Fact and Conclusions of Law, much of the briefing regarding the staffing plan reflected Defendants continued resistance to meaningful efforts to increase staffing to achieve constitutional levels and avoid catastrophic outcomes. At this point, Defendants have admitted more staff is necessary and it is difficult to view their behavior as anything other than attempts to delay issuance of a statewide staffing plan. The Court's patience has run out. Too many individuals are needlessly suffering while Defendants have deployed many delay tactics. Defendants shall immediately establish the Pilot program and in a subsequent Order, Defendants will be required to establish they have taken all reasonable steps to comply with the Permanent Injunction.

(Doc. 4637 at 8.) In a June 20, 2024 Order, the Court granted Defendants' unopposed motion to modify certain pilot requirements. (Doc. 4643.) The Staffing Pilot Project was implemented at two units chosen by Defendants: the Arizona State Prison Complex–Yuma, Dakota Unit (Dakota), and Arizona State Prison Complex–Perryville, San Carlos Unit (San Carlos).

On September 25, 2024, the Monitors filed their first report regarding the Staffing Pilot Project. (Doc. 4681.) That report provided significant detail as to how full implementation of the Pilot Project was hindered. (*Id.*) On November 15, 2024, the experts submitted a second report regarding the Staffing Pilot Project. (Doc. 4700.) That report demonstrated extremely poor compliance with the Court's instructions to implement the

Pilot Project, including noting that (1) the Patient Centered Care Model pilot operations were indefinitely suspended at San Carlos and (2) despite the Court Order, Defendants unilaterally abandoned the Pilot Project at San Carlos. (*Id.*) The experts noted that additional space was necessary for the success of the project and was the "highest priority." (*Id.*)

On January 3, 2025, the experts submitted their final report on the Staffing Pilot Project. (Doc. 4761.) In it, the experts detailed the history of the Staffing Plan, which was created to implement Section 1.17 of the injunction. (*Id.*) The experts reiterated that the Permanent Injunction and, therefore, the Staffing Plan requires shifting the ADCRR to the "Patient Centered Care Model [which] incorporates evidence-based, patient-centered care practices widely known to deliver efficient, quality primary care and mental health services to correctional populations and complex populations in the community. If properly and fully implemented, it supports most health care-related elements of the Injunction, improves and expedites patient care, and has the potential to reduce health care and custody staffing needs over time." (*Id.* at 1.) The experts noted that the Pilot Project included three key objectives:

> 1. It would test staffing assumptions and recommended panel sizes for primary care team members and caseload sizes for mental health team members. This would inform revisions to the final staffing plan.

> 2. The staffing plan and model of care involve extensive changes to many processes of care, clinical roles, and workflows. The Pilot would test training materials and methods and test the type and degree of primary care and mental health team support needed to help teams launch and operate effectively and with fidelity to the model's principles. It also would build and test technical tools to: empanel patients onto care teams; optimize patient primary care visits; and modify the self-scheduling module to fit the new model. These resources are key to effectively implementing the model across ADCRR.

3. The Pilot would build essential capacity within ADCRR's Health Services Division (HSD)[1] to introduce, manage implementation of, and ultimately sustain the staffing plan and model of care statewide, ensuring fidelity to its principles and the required positions. This requires a dedicated team of administrative and clinical staff with appropriate expertise, understanding of the PCCM model, project management capacity, and ability to support ongoing PCCM health services operations. Based on our team's experience with large-scale clinical change in corrections and with this model of care, we built a detailed plan to train, mentor, and coach a permanent HSD team to whom we could hand off the management of the statewide implementation at the end of the Pilot.

(*Id.* at 2.) The experts noted that although the Court had ordered compliance with requirements fundamental to the Pilot's success, "ADCRR has disagreed in writing with each of these assumptions at various times throughout the Pilot." (*Id.* at 3.) The experts detailed how at San Carlos, the Pilot operated for just 8 days and the Dakota Unit never fully implemented the requirements of the Pilot and reassigned escort officers to the pilot without ensuring that their regular positions were staffed in direct violation of this Court's Orders. (*Id.* at 3-4.) The experts detailed that when the PCCM was implemented, it resulted in "[i]mproved continuity of patient care," [m]ore effective and robust primary care visits," [r]educed number of needed primary care visits because of visit optimizing," "[e]fficiencies and improved diagnosis and treatment through operating as a team," and [e]nhanced job satisfaction." (*Id.* at 5.) The experts detailed repeated direct violations of specific Court Orders without notice to the experts or the Court. *See, e.g.*, *id.* at 7 ("the Court gave specific instructions requiring that Pilot health care staff be permanent NaphCare employees unless the monitors granted waivers on a case-by-case basis. NaphCare did not follow this order.").

After obtaining the parties' comments on the Final Staffing Analysis and Plan and the experts' evaluation of those comments, the Court ordered implementation of the Final

---

[1] HSD is responsible for overseeing the provision of medical and mental health care, including oversight of the vendor (NaphCare) contracted to provide these services. (Doc. 4968 at 2.)

Staffing Analysis and Plan (Doc. 4858) as modified by the Experts' Analysis of parties' Responses to Staffing Analysis and Plan (Doc. 4900). (Doc. 4916.) Defendants appealed that Order on July 9, 2025. (Doc. 4935.) Defendants argue that the Court summarily approved the experts' recommendations without making the required PLRA findings.

## II. Discussion

What Defendants refer to as summary approval is rather the result of years of litigation, detailed factual findings from a weeks-long trial, extensive expert guidance and reports, and a Pilot Project during which Defendants had every opportunity to challenge the assumptions and dictates of the Staffing Plan or demonstrate that they were themselves capable of remedying the severe constitutional violations found by the Court. Rather than making such a demonstration, Defendants instead showed no interest in engaging with the experts to improve the outcomes for the prisoners in ADCRR custody. Instead, Defendants stonewalled the experts and unilaterally aborted the pilot project, a key part of the stipulated injunction designed to allow Defendants to *show* that there were less intrusive alternatives to full compliance with the experts' recommendations. Through their actions, therefore, Defendants demonstrated a complete lack of capability of improving one of the most important factors identified by the Court as a source of constitutional violations—their overall staffing and use of staff. To argue now that the Court's Order was not the least intrusive means necessary to correct the constitutional violations ignores the many opportunities Defendants have been given throughout this years-long litigation to themselves institute less intrusive means of remedying the outcomes for prisoners in their care. Given the Court's careful consideration of this entire history and the Parties' briefing, the Court necessarily found that the Final Staffing Analysis and Plan is narrowly drawn, extends no further than necessary to correct the constitutional violations and is the least intrusive means necessary to correct the violations. Nevertheless, the Court will discuss each of Defendants' objections in turn.

. . . .

. . . .

**A. Defendants' Objection—APP/Physician**

The Staffing Plan provides "[n]o primary care physician may be assigned to clinically support more than three APPs" and requires an increase in physicians "for collaboration with every APP employed in the complex, including those who are seeing patients for episodic non-urgent care during the transition period." (Doc. 4858 at 12.)

Defendants assert that this provision violates the PLRA because, under Arizona law, nurse practitioners may practice without the involvement by physicians. (Doc. 4869 at 3-4 (citing Arizona regulations).) With regard to physician assistants, Defendants assert state law allows a supervising physician to supervise six physician assistants at the same time, which, Defendants contend is different from the "collaboration" envisioned by the injunction. Defendants request that the 3:1 APP-to-physician ratio at least be changed to 6:1 to be consistent with state law. Defendants assert that state law does not require nurse practitioners to collaborate with or be supervised by physicians, and "nothing in state law supports a required ratio of three psychiatric APPs to one physician."

In Response to Defendants' objections, the experts stated:

> [T]he Staffing Plan conditions for physician/APP clinical collaboration do not set forth any requirements on the APPs; they support APPs consulting with physicians on an as-needed basis in accordance with state regulations. The adjustments in the Staffing Plan are intended to allow for the amount of time that physicians normally spend in collaborative consultation with APPs to assure that physician FTE are appropriate. They do not impose any conditions or requirements on APPs to meet with physicians or to bring cases to them. The adjustment is an empiric one based on data collected during the Pilot Project. During the project, we queried APPs at both pilot sites and found that in their normal course of clinical care, each APP routinely consulted with physicians at least two hours per week. Accordingly, the Staffing Plan allows for two hours of physician time per week for each APP. The time is applied to the total physician hours across the whole complex, allowing the FHA and FMD flexibility in physician staffing.
>
> The Staffing Plan limitation that "no primary care physician may be assigned to clinically support more than three APPs" is

> intended to assure that each physician has at least 85% of his/her time available for direct patient care of his/her primary care panel. This provision does not add any physician time or positions.
>
> The section of the Staffing Plan that refers to "ratio of physicians to APPs for clinical consultation" could be more appropriately labeled "physician time allocations for clinical collaboration/ consultation with APPs." Other than that, we find the Defendants' concern that the Staffing Plan restricts medical and psychiatric APP scope beyond the Injunction and state regulation to be without merit.

(Doc. 4900 at 1.)

The primary flaw in Defendants' objection is that it appears they believe the PLRA need-narrowness-intrusiveness requirements must mirror relevant state laws and provide a ceiling on what requirements the Court may impose to remedy the constitutional violations at issue in this case. Not so. As an initial matter, Defendants utterly fail to cite any authority for this novel proposition. More importantly, it dismisses the grave risk of harm facing ADCRR's prisoners.

Defendants' argument assumes facts not in evidence, namely, that the prison health care system operates the same way as other health care provided in Arizona. Here, however, the experts, based on site visits and extensive research, collaboration with ADCRR's Health Services Division and NaphCare, and findings from the Pilot Project to develop the initial staffing plan, made a specific recommendation based on what they learned, namely that there be enough physicians to support APPs for the amount of time that is necessary *within the prison system under the facts of this case* and that the physicians still devote the majority of their time to their clinical practice (a provision that added no staffing). Moreover, Defendants, in their arguments, do not argue that this is overly burdensome and do not contest the underlying facts regarding how much time it is normally necessary for APPs to consult physicians in this setting with the particular demographic of prisoners and their health care needs; they simply argue that they should be held to a ceiling that is inapplicable to the facts of this case. This is nonsensical. The Court did not simply

blindly adopt this provision, but gave Defendants an opportunity to object, and the objection was conclusory and not based on case-specific facts in contrast to the experts' thorough, reasoned response to why this provision is appropriate for the injunction under the facts of this case. In light of this, the Court finds that this provision is narrowly drawn, extends no further than necessary to correct the violations the Injunction identified, and is the least intrusive means necessary to correct those violations.

### B. Defendants' Objection Regarding Psychiatric APPs

The Staffing Plan provides that psychiatrists may be assigned to "clinically collaborate" with no more than three psychiatric APPs, and increases the number of psychiatrist Full Time Equivalents (FTEs) because "clinical collaboration with every psychiatric APP employed in the complex" is required. (Doc. 4858 at 21.)

Defendants assert that this provision is inconsistent with the PLRA because state law does not require nurse practitioners to collaborate with or be supervised by physicians and psychiatric nurse practitioners should not be subject to collaboration or supervision requirements and nothing in state law supports a required ratio of three psychiatric APPs to one physician.

In Response to Defendants' objections, the experts stated:

> The Staffing Plan states that a psychologist can supervise up to eight PAs (psychology associates; referred to as psychologist associates by Defendants) practicing in the outpatient setting, and up to six PAs practicing in the residential/inpatient setting. Defendants state that that "it is not clear what data supports this ratio, but it should be subject to review as the plan is implemented."

> In designing the Staffing Plan, we noted that supervision of PAs is highly dependent on whether the PAs are licensed or not, the complexity of the patients, and the experience of the PA. On average, supervision of a PA requires about one hour per week. This metric was factored into the staffing for psychologists. The Pilot Project did not produce data on the ratios. However, we applied these limits (which were originally articulated in the Injunction, pending the outcome of the Staffing Plan) to ensure that the psychologists, who are far

> fewer in number and have many duties, are not overwhelmed with supervisory requirements. This did not result in an increase in the number of psychologists needed. While we agree with the Defendants that the ratios should be subject to review, we believe this should be done as part of the routine postimplementation six-month staffing analyses, the Defendants' concern does not merit a change to the current Staffing Plan.

(Doc. 4900 at 2.)

Defendants' objection, once again, is based on a faulty premise that Arizona state law is a ceiling to requirements that the Court may impose, but despite their framing, the injunction does not require Defendants or the providers to violate Arizona law. Rather, the injunction proposes ratios appropriate given the facts and evidence in this case, and based on the experts' extensive research given that the status quo within the medical system in the prison is unconstitutional. There can be no serious dispute that the mental health care needs of many of the prisoners in ADCRR's care are profound and the Court's findings and conclusions spelled out overwhelming deficiencies in providing treatment by qualified providers. As detailed in Dr. Abplanalp's 2024 ad hoc Report of Five Suicides (Doc. 4691), those deficiencies persist.

The experts also noted that should different data emerge based on the facts and evidence available *in this case*, the ratios can be reconsidered. Because the experts' analysis is based on the actual facts in this case and not on conclusory assertions that the provisions are somehow violative of Arizona law, the Court properly relies on the experts' well-supported opinions and finds that this provision is narrowly drawn, extends no further than necessary to correct the violations the Injunction identified, and is the least intrusive means necessary to correct those violations.

## C. Defendants' Objection Regarding Psychologist Caseload

Under the Staffing Plan, psychologists are "typically not assigned patient caseloads (or manage very small, specialist caseloads)." (Doc. 4858 at 16.) The Staffing Plan limits a psychologist's caseload to five patients in the outpatient setting. (*Id.* at 17 n.11.)

Psychologist Associates would generally serve as the Primary Therapist for all patients in the outpatient setting. (*Id.* at 17.)

Defendants assert that these provisions violate the PLRA because the Staffing Plan should maintain flexibility, and its restriction on using psychologists as primary therapists should be eliminated because it is not required by state law and unnecessarily restricts the Department.

In Response to Defendants' objections, the experts stated:

> That caseload sizes were not articulated in the Injunction was intentional. Based on the input of the parties during the drafting of the Injunction, the Court deferred any setting of caseload sizes to this Staffing Plan. In designing the Staffing Plan, we deliberately utilize psychologists to practice at the top of their licenses to provide care and perform tasks that no one else can: supervision of PAs, psychological testing, administrative oversight of the complex's mental health population, Level of Care determinations, and contributing to the treatment team of patients in residential and inpatient beds. Psychologists are more costly and harder to recruit than PAs. Thus, this approach is both clinically and fiscally responsible. The Staffing Plan allows for small, specialized caseloads. The Defendants' concern does not merit a change to the Staffing Plan.

(Doc. 4900 at 2.) As with the other objections, here Defendants have made generalized, conclusory objections that state law does not impose identical requirements as contained in the Staffing Plan. Again, there is absolutely no legitimate argument that the Court's Order violates state law. The logical conclusion to Defendants' argument would be that an injunction cannot encompass anything that state law does not already regulate, but such contention is nonsensical at best. Here, again, the experts have made a recommendation based on the facts and circumstances of the health care system within the ADCRR, and have taken an approach that balances both fiscal and clinical responsibility. Defendants have not refuted that approach in any meaningful way. Accordingly, the Court finds that this provision is narrowly drawn, extends no further than necessary to correct the violations the Injunction identified, and is the least intrusive means necessary to correct those violations.

### D. Defendants' Objection Regarding Mental Health Levels

The Staffing Plan moves patients designated as MH Levels 3B and 3A to "the next higher level of medical complexity." (Doc. 4858 at 9.) This change "results in a smaller panel size for the primary care team. It also moves some patients from APP-led teams to physician-led teams." (*Id.*)

Defendants assert that they are aware of no data to support this change and do not believe it is the least restrictive approach to remedying the constitutional defects in medical care that were identified in this Court's 2022 decision.

In Response to Defendants' objections, the experts stated:

> The Staffing Plan used the mental health level of patients as one of a number of factors to determine the complexity level of medical patients. That global complexity level then drove (a) whether medical patients should be assigned to an APP or physician as their primary care practitioner, and (b) the practitioner's panel size. Specifically, if a patient's mental health level was MH-3A or MH-3B, we escalated the medical complexity level of patients to the next higher medical complexity level. Defendants oppose using MH-3A and MH-3B classification to adjust medical panel sizes, claiming that there is no data on which to base this recommendation and that the issue was not addressed in the report on the Pilot Project.

> Our recommendation was, in fact, based on data collected during the Pilot Project. We found that the panel sizes for the primary care (medical) APPs at both pilot sites were challenging to manage and that the physician panel at Yuma Dakota was smaller than the physician could manage. After the pilot, we discussed the possible reasons for this observation in depth with the Pilot site FHAs and NaphCare regional, mental health, and corporate leaders. The findings from these discussions led to the conclusion that patients designated MH-3A and MH-3B require a higher level of primary care. FHAs of the other high-intensity complexes validated the appropriateness of this conclusion. Therefore, Defendants' concern does not merit a change to the Staffing Plan.

(Doc. 4900 at 3.) Again, the experts' explanation about this requirement is thoroughly explained, tied to the facts of this case and the findings during the Pilot, and is narrowly

drawn, extends no further than necessary to correct the violations the Injunction identified, and is the least intrusive means necessary to correct those violations.

### E. Defendants' Objection to Patient Load of FMD

The Staffing Plan does not permit the FMD at high intensity facilities to be assigned to any patients because "the PCCM team-based approach does not accommodate an FMD patient panel assignment in [high intensity] complexes, given the need for the physician to participate in daily huddles and other team interactions." (Doc. 4858 at 7.) For low-intensity facilities, the Staffing Plan indicates that "ADCRR will need to craft customized practitioner solutions for each low-intensity complex." (*Id.* at 8.)

Defendants assert that this provision violates the PLRA because it is inconsistent with the Permanent Injunction. Defendants recommend that the Staffing Plan be modified to require ADCRR to "craft customized practitioner solutions" consistent with the Permanent Injunction for high-intensity facilities.

In Response to Defendants' objections, the experts stated:

> The Injunction allows FMDs at high-intensity complexes to be assigned a patient panel of up to 100 primary care patients. The Staffing Plan calls for FMDs to only provide care to patients when their primary care practitioner is absent. Defendants note that this restricts the FMD's role beyond what the Injunction requires.

> Under the PCCM (Patient-Centered Care Model), which underpins the Staffing Plan, assigning a primary care panel of 100 patients to an FMD is not feasible, because the FMD cannot be available for essential daily huddles and team-based population health activities of the PCCM. Doing so would significantly undermine the integrity of the PCCM. Instead, and aligned with the intent of the Injunction, the Staffing Plan calls for the FMD to provide care to patients needing primary care when their PCPs are absent. This need occurs daily and can be managed within the FMD's other duties. It covers an essential function of the PCCM without adding providers. This approach is consistent with the intent and letter (the Injunction states that FMDs can be assigned up to 100 patients) of the Injunction and supports a successful PCCM. The Defendants' concern does not merit a change to the Staffing Plan.

(Doc. 4900 at 3.)

Defendants have not presented any fact-based evidence that an FMD can be available for essential daily huddles and team-based population health activities and will have the ability and time to provide care when the PCPs are absent while also carrying a caseload. The experts, on the other hand, provide their expert opinion that such a requirement is necessary for the success of the PCCM. This is further supported by the FFCOL that specifically addressed how "it is inconceivable that each site medical director could provide anything close to full-time direct patient care while supervising a staff of 20-100 and performing administrative responsibilities." (Doc. 4335 at 24.) Accordingly, the Court finds that this provision is narrowly drawn, extends no further than necessary to correct the violations the Injunction identified, and is the least intrusive means necessary to correct those violations.

### F.   Defendants' Objection to Availability of Physician and Psychiatrist

The Staffing Plan provides "There should be at least one physician and one psychiatrist available through QualCare at all times to whom complex clinical situations can be referred." (Doc. 4858 at 25.)

Defendants argue that this provision is inconsistent with the PLRA because the Department is not aware of any problems that have arisen based on the current staffing with APPs.

In Response to Defendants' objections, the experts stated:

> Defendants currently provide after-hour practitioner coverage for urgent and emergency medical and mental health needs via remote access. The available practitioners are all APPs. In our Staffing Plan we noted that while the current number of staff available after hours is sufficient, the absence of any physicians (medical and mental health), is not. Therefore, we recommended there should be at least one medical physician and one psychiatrist available at all times to manage complex situations beyond the expertise of APPs. Defendants propose that, since they are not aware of any problems that have arisen based on the current staffing of all after-hours care with APPs, our recommendation should not be implemented.

> This proposal directly conflicts with an underlying premise of the Injunction that some clinical situations call for physician-level care. The Defendants' concern does not merit a change to the Staffing Plan.

(Doc. 4900 at 3-4.)

In its FFCOL, the Court articulated in great detail that one of the primary problems, if not the primary problem, with the current health care provided by Defendants is that there is either inadequate staff or staff are tasked with obligations outside their expertise without any oversight by an experienced practitioner. (Doc. 4335 at 27-44.) Given this history, the request that a *single* medical physician and a *single* psychiatrist be available at all times to manage complex situations beyond the experience of APPs is narrowly drawn, extends no further than necessary to correct the violations the Injunction identified, and is the least intrusive means necessary to correct those violations.

### G. Defendants' Objection to Managerial Dashboard

The Staffing Plan recommends metrics for a "managerial dashboard to evaluate the adequacy of health care staffing." (Doc. 4858 at 27.)

Defendants assert that this provision violates the PLRA because it should be a recommendation, not a mandate. In Response to Defendants' objections, the experts stated:

> The Staffing Plan recommends that various operational and clinical metrics must be evaluated by managerial staff, together in a dashboard format, not in isolation of each other, in order to discover pressure points in the system of care and inform analysis of staffing adequacy. ADCRR contends that it tracks the individual metrics we recommend be used to evaluate the adequacy of health care staffing and is "exploring" our recommendation for a dashboard, but should not be required to use one.
>
> The fact that ADCRR has the data and does not array it in a dashboard is the problem. We suspect that ADCRR may be envisioning a more complex version of a dashboard than is necessary. A dashboard does not have to be an electronic tableau created automatically from digitally stored data. It can be a simple manually created document, cut-and-pasted from existing reports. However it is created and viewed, though, having all the current operational and clinical metrics in one

> place at one time for review by managers is essential to the success of the Staffing Plan. The Defendants' concern does not merit a change to the Staffing Plan.

(Doc. 4900 at 4.) Here, the Staffing Plan requires the Department to keep information organized so that it can be properly evaluated as a whole, which the experts opine is "essential to the success of the Staffing Plan." As illustrated by the experts' response, the Staffing Plan does not specify how this be done, but simply requires that it should be done. Defendants have not demonstrated that organizing information that is necessary for the evaluation of proper health care practices is overly burdensome. For the foregoing reasons, this provision is narrowly drawn, extends no further than necessary to correct the violations the Injunction identified, and is the least intrusive means necessary to correct those violations.[2]

**IT IS ORDERED:**

(1) The Court's June 11, 2025 Order (Doc. 4916) is **amended** to add the findings made herein.

---

[2] Perhaps to clarify the record, Defendants objected to a portion of the Staffing Plan that observes "'insufficient custody staffing to support clinical activities' is a 'severe deficit[]' that harms health care operations." (Doc. 4869-1 at 6-7.) The experts provided a full response to this contention (Doc. 4900 at 4-5.) The experts correctly note that "Defendants did not request any specific modification to the Staffing Plan." (Doc. 4900 at 5.) Because there is no proposed modification to the Staffing Plan, the Court does not further address this observation in this Order.

Likewise, Defendants assert that many appointments that are "backlogged" are actually just appointments that the provider did not properly close out. (Doc. 4869-1 at 7.) The experts do not dispute that some backlogged appointments are simply record-keeping errors, but suggest that Defendants properly fix their records or substantively address backlogs as needed prior to implementation of the PCCM. (Doc. 4900 at 5.) Again, Defendants do not request any specific modifications to the Staffing Plan, and the Court will not further address this issue in this Order.

Similarly, Defendants' discussion of space and time (Doc. 4869-1 at 7-8) seeks no modification and is fully addressed by the experts (Doc. 4900 at 5-6.) As such, this issue will not be further addressed by this Order.

(2) The Clerk of the Court must immediately transmit this Order to the Ninth Circuit Court of Appeals for filing in Case Number 25-4365.

Dated this 16th day of June, 2026.

Honorable Roslyn O. Silver
Senior United States District Judge