Mary R. O'Grady, 011434
Andrew G. Pappas, 034432
John S. Bullock, 034950
Kimberly Friday, 035369
Molly S. Walker, 038099
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2793
(602) 640-9000
mogrady@omlaw.com
apappas@omlaw.com
jbullock@omlaw.com
kfriday@omlaw.com
mwalker@omlaw.com

Attorneys for Defendants

*Additional counsel listed on signature page*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, et al., | No. CV-12-00601-PHX-ROS |
| Plaintiffs, | |
| vs. | **DEFENDANTS' MOTION FOR STAY OF ORDER APPOINTING A RECEIVER (DOC. 5307) PENDING APPEAL** |
| Ryan Thornell, et al., | |
| Defendants. | |

Defendants respectfully request that the Court stay its Order Appointing a Receiver (the "Order") pending appeal.  (Doc. 5307.)  Together with the order granting Plaintiffs' motion to appoint a receiver (Doc. 5123) (the "Receivership Order"), the Order imposes sweeping federal control over the provision of healthcare services in Arizona's state prisons for the next five years.  The Order should be stayed while Defendants seek review of this Court's extraordinary decision to take over this state function.[1]

Plaintiffs filed this lawsuit in 2012, but it was not until June 2022 that the Court found aspects of the Department's healthcare services to be unconstitutional, and it was not until April 2023 that an injunction was issued to remedy those constitutional violations.  Since 2023, the Department has more than doubled its healthcare spending, increased healthcare staffing by more than 50%, opened new healthcare facilities, improved existing facilities, increased access to specialty care, begun implementing a model of care that relies on primary care providers and primary therapists to provide needed services, improved its electronic healthcare record system, improved systems to provide language translation services for inmates when necessary, implemented a system for monitoring compliance with the injunction, and more.

The Receivership Order largely disregards this progress.  Instead, it emphasizes the Department's shortcomings regarding compliance.  But since 2023, the Court has not imposed remedies to improve compliance short of appointing a receiver.  And there is no evidence that a receiver would make faster progress than the Department.  Indeed, the Order itself imposes a receivership for at least five years—two years more than the Department had to comply with the Injunction.

To maintain the status quo while Defendants seek appellate review, the Court should stay its Order pending appeal.  The Department will, of course, continue to

---

[1] In the Receivership Order, the Court directed additional briefing regarding the receiver's powers and duties and who might serve as the receiver.  The Order addressed those issues. Defendants appealed from the Receivership Order, and that appeal has been stayed pending resolution of the issues that have now been addressed in the Order.  This approach permits consolidated appellate review of all orders concerning the receivership.

advance compliance with this Court's orders and remedy the constitutional deficiencies identified in the Court's 2022 order while the Order is stayed.

## I.      The Court should enter a stay pending appeal.

Courts analyze four factors when considering a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted). The Ninth Circuit employs a "sliding scale approach [] to the consideration of stays pending appeal," under which all elements "are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (citation omitted). The factors favor a stay of the Order.

### A.      Defendants have a reasonable probability of success on the merits.

The likelihood of success factor asks whether there is a "fair prospect" or a "reasonable probability" that the appellant will succeed on the merits, or whether the appeal raises "serious legal issues" demanding careful consideration. *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012) (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 967–68 (9th Cir. 2011) (per curiam)). Here, there is a reasonable probability that Defendants' appeal will succeed on the merits.

Because of the significant federalism concerns inherent in transferring control of a state institution to an agent of a federal court, a receivership is "warranted only by the most compelling circumstances." *D.C. v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. App. 1999) (citation omitted). A "[r]eceivership is typically the last resort after all other less intrusive remedies have been exhausted." *L.A. All. for Human Rights v. City of Los Angeles*, 792 F. Supp. 3d 1049, 1092 (C.D. Cal. 2025). The court must therefore exercise the utmost caution in imposing this "extreme and 'invasive equitable remedy.'" *Id.* (quoting *Melendres v. Skinner*, 113 F.4th 1126, 1136 (9th Cir. 2024)). This caution is reinforced by the PLRA, which Congress enacted "to limit the oversight of state prisons

by federal courts." *Parker v. Hooper*, 171 F.4th 736, 750 (5th Cir. 2026). Under the PLRA, any prospective relief must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A).

In deciding whether to appoint a receiver, courts consider multiple factors. *See, e.g.*, *Plata v. Schwarzenegger*, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005). Even in the face of serious, ongoing harm, a receivership is not warranted where elected state officials are already implementing significant changes to prevent future harm. *L.A. All. for Human Rights*, 792 F. Supp. 3d at 1092 (declining to appoint receiver to address constitutional violations related to homelessness). A district court's failure to give weight to "important criteria" can warrant reversal. *Jerry M.*, 738 A.2d at 1214.

### 1. Pre-Injunction history does not justify bypassing intermediate measures to achieve compliance.

To conclude that less extreme measures have been exhausted, the Receivership Order incorrectly focused on events between 2014 and 2022—before the 2022 finding of unconstitutionality, before the 2023 Injunction, and before the current leadership assumed responsibility at the Department. (Doc. 5123 at 54–56.) The Receivership Order's reliance on pre-Injunction issues presents a serious legal question on appeal.

In 2014, former state officers and Plaintiffs stipulated to improve the healthcare services and other aspects of the operations of Arizona's prisons. (*See* Doc. 1185.) In entering the stipulation, the Defendants did not acknowledge any wrongdoing (*id.* ¶ 5), and the parties agreed that nobody would move to terminate it for four years "[t]o allow time for the remedial measures . . . to be fully implemented." (*Id.* ¶ 37.) That stipulation failed and resulted in frequent disputes between former state officials and Plaintiffs, along with sanctions for noncompliance, as described by the Court. (Doc. 5123 at 3.)

But the Court did not enter findings of constitutional deficiencies until 2022. (Doc. 4335.) That 2022 order moved the litigation into a new phase, resulting in the 2023 Injunction, which is now in effect. This Injunction dictates how the Department should

fix the constitutional problems identified in the Court's 2022 order in healthcare and other areas. The reforms ordered by the Injunction affect more than 25,000 inmates in prisons throughout the state with varied healthcare issues and different security challenges, and the changes must be implemented by thousands of healthcare and custody staff responsible for those inmates' care. As the monitors noted in January 2025, implementing the Patient Centered Care Model ("PCCM") alone is a "massive" project, and "[i]t is difficult to overstate the complexity of this roll-out." (Doc. 4761 at 11.)

Yet the Court's patience had "run out" by June 3, 2024 (Doc. 4637 at 8), just over a year after the Injunction was entered. And Plaintiffs moved for a receiver in February 2025, less than two years after the Injunction was entered. Plaintiffs did not seek less drastic measures to promote compliance before seeking this "remedy of last resort," despite the new Injunction and the new Department leadership.

Skipping all intermediate remedies is inappropriate before taking over a core state function through a receivership.[2] *See, e.g.*, *United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 624 (5th Cir. 2025) (affirming receivership where the district court had twice before held the county defendant in contempt); *Coleman v. Newsom*, 2024 WL 3385911, at *5 (E.D. Cal. July 12, 2024) ("Now that the court has found defendants in contempt and imposed fines with respect to part of the staffing remedy, there is no indication defendants are motivated as [a] result to focus their efforts on coming into compliance."); *Nunez v. N.Y.C. Dep't of Corr.*, 782 F. Supp. 3d 146, 156 (S.D.N.Y. 2025) (imposing receivership only after contempt orders to comply proved insufficient); *Shaw v. Allen*, 771 F. Supp. 760, 763 (S.D.W. Va. 1990) (discussing three prior contempt proceedings that were "to no avail"); *Plata*, 2005 WL 2932253, at *28 (approving receivership only where the defendants did not oppose receivership, proposed no alternative remedies, and agreed they were incapable of curing constitutional violations).

---

[2] Failing to attempt less drastic remedies before seeking a receiver over healthcare is also striking because Plaintiffs filed targeted motions to enforce and sought remedial plans on the custody aspects of the Injunction. *E.g.*, Docs. 4764, 5032.

The failure to use alternative remedies to address the Injunction requirements related to healthcare compliance before ordering the appointment of a receiver was error.

This aspect of the receivership analysis takes on added significance because the Injunction itself left specific staffing requirements unresolved.  The Receivership Order characterizes staffing as a "core issue," and Defendants do not dispute that.  Yet beyond requiring that contract requirements be filled, the Injunction did not set specific staffing levels.  Rather, the Court directed the appointment of "an expert to conduct a staffing analysis and plan" that would "contain recommendations" to the Court.  (Doc. 4410 § 1.17.)  The PCCM Staffing Plan's requirements were not finalized and approved until June 2025[3]—just eight months before the Court imposed a receivership, and four months after Plaintiffs filed their motion asking that a receiver be appointed.  (*See* Doc. 4916.) This compressed timeline, together with the Department's substantial staffing increases before the Plan's approval, presents a serious question for appellate review of whether less intrusive remedies were exhausted before appointing a receiver.

### 2.  The Receivership Order's analysis of staffing and salary data was flawed.

Several aspects of the Receivership Order's analysis of staffing and compensation are at odds with the record evidence.  The Department presented evidence showing that by July 2025 overall healthcare staffing had increased significantly over the numbers reflected in the Court's 2022 order.  (Doc. 4973 at 5–6.)  Overall healthcare staffing increased by 56%, the number of mental health staff by more than 40%, full-time physicians by 46%, and midlevel providers (who serve as primary care providers) were up 93%.  *Id*. at 5–6.  Although the Department has not yet achieved the levels set by the June 2025 staffing plan, these increases nevertheless factor against a receiver.  *See Parker*, 171 F.4th at 757–58 (rejecting prospective relief that "fail[ed] to incorporate

---

[3] This June 2025 Staffing Plan did not cover Special Needs Units or Inpatient Components.  The monitors filed their proposed staffing plan for those areas in March 2026, and the Court approved the plan on May 15, 2026 (Doc. 5230).

significant medical care improvements"). As even Plaintiffs' filing reflects, Defendants have met and exceeded the Medical Midlevel, Mental Health Midlevel, and CNA/MA requirements in the June 2025 Staffing Plan. (*See* Doc. 5211 at 4.) Defendants acknowledge that the Court's staffing plan approved in June 2025 will require additional staff in other categories, and they have attempted to obtain and will continue to advocate for the necessary funding for those positions.[4] But the fact that more work remains to be done does not alter that staffing progress since the 2022 order has been significant.

The Receivership Order also concludes that NaphCare's salaries are "woefully insufficient." (Doc. 5123 at 31.) But the evidence shows that NaphCare has continually raised new-hire rates and pays above the 75th percentile across medical positions. (Doc. 4818 Ex. 5 ¶¶ 12–14 (Decl. of Susanne Moore).) Further, the Receivership Order's salary discussion wrongly relies on March 2024 data (Doc. 5123 at 67 n.54 (citing Doc. 4566)), rather than the more current figures the Department submitted in March 2025. (*See* Doc. 4818 Ex. 5 ¶ 14.)[5]

### 3. The Receivership Order does not account for the Department's substantial progress toward compliance.

The Department's significant progress since 2023 is also relevant to whether "less extreme measures of remediation" are futile and whether allowing Defendants to continue working towards compliance "would lead only to confrontation and delay." *Plata*, 2005 WL 2932253, at *23. Since 2023, the Department's budget for healthcare has more than

---

[4]The Department determined that the Staffing Plan would require an initial $100 million, and the Executive's proposed budget for FY 2027 included $118.3 million for injunction-related staffing requirements. (Doc. 5209 at 4.) The Legislature appropriated additional funding for FY 2027 for staffing but did not approve the full amount requested. 2026 Ariz. Sess. Laws, Ch. 126 § 23 at 32.

[5] The Receivership Order also criticizes the Department for not taking more contract actions against NaphCare for failing to comply with the contract. (Doc. 5123 at 20.) But the Department had imposed 33 sanctions through November 2025 (Doc. 4998 at 5), and since then has imposed sanctions for an additional 22 contract violations demonstrating ongoing compliance efforts. *See* Oddo Decl. ¶ 4 (attached as **Exhibit A**).

doubled, staffing numbers have increased substantially, and the Department has made numerous overhauls of its programs and systems. The Receivership Order, however, largely disregards these improvements and instead focuses on the Department's failure to achieve compliance within three years of the Injunction. The Court's failure to appropriately consider the Department's progress favors reversal.

Healthcare at Arizona's state prisons has changed substantially since the Injunction was entered in 2023. The Department's healthcare spending has increased by more than $200 million. Docs. 4818 at 3, 4973 at 2. And this increased funding has translated into real improvements. (Doc. 4998 at 103.) In addition to increasing staffing, the Department increased the number of beds in its special needs unit and inpatient components by 66% since October 2023. (Doc. 4818 at 5.) The Department has completed new construction and renovations at five of its correctional facilities to improve the delivery of medical care and implement the PCCM. (*Id.* at 5–6.) The Department also has implemented a treatment program for roughly 7,000 inmates with Opioid Use Disorder, and it spent over $60 million providing Hepatitis C treatments to over 4,500 inmates. (*Id.* at 6–7.) Offsite specialty-care appointments have also increased significantly. (*Id.* at 7.)

Additionally, since 2023 the Department has increased capacity for residential mental health treatment by 31%; created an assistance and companionship program for inmates suffering from dementia or similar illnesses; ensured that all psychiatrists working for the Department are board certified; established a Suicide Prevention Taskforce to develop and track suicide prevention efforts; and introduced programs to reduce self-injurious behaviors. *Id.* at 4–5.

Importantly, the Department has made progress toward implementing the PCCM statewide, which significantly changes the delivery of healthcare services throughout the system. The PCCM involves shifting patient-care responsibilities to primary care providers, assigned based on patient complexity, and provides for increased collaboration between medical and mental healthcare providers. After the limited pilot was completed,

a statewide rollout began in 2025. By November 3, 2025, the Department had rolled out the PCCM at 13 units, including one at each of the nine prison complexes. (Doc. 5052 at 3; Doc. 4998 at 4; Doc. 4998-3 ¶¶ 54–58; Doc. 4793-4 ¶ 11.) As of July 22, 2026, the PCCM had been rolled out at 31 of 43 units (72%), with the aim of rolling out the model at all units by the end of 2026. *See* Decl. of S. Beauregard ¶¶ 3–4 (attached as **Exhibit B**). As part of the ongoing oversight of PCCM implementation, issues have been identified as to the actual use of assigned primary care providers and primary therapists and reassigning providers when inmates move to different complexes or when there are staffing changes. Steps have been taken to resolve those issues. *Id*. ¶ 6. In addition, the rollout has not been implemented with the benefit of full staffing levels, but progress is being made in hiring and retention and additional funding is available through FY 2027 appropriations, although it is less than needed for full staffing under the Plan. Issues with healthcare facilities and technology are being identified and addressed systematically by the Department and NaphCare.[6] The Department and NaphCare collaborated on an updated empanelment of all PCCM units in early 2026 based on updated complexity scores. *Id.* And NaphCare and the Department are continuing to oversee and implement the PCCM rollout plan.[7] *Id.* ¶¶ 5–7.

The Receivership Order acknowledged that the Department has "expended additional funds on healthcare, [] made some improvements on certain types of healthcare in certain facilities, and [] had success in the opioid use disorder program and Hepatitis-C treatment." (Doc. 5123 at 22.) But the analysis largely disregards the scale of the documented improvements, which should be highly material to the Court's consideration

---

[6]It is not clear what space deficiencies the Receivership Order references. (*See* Doc. 5123 at 20 n.32.) The Department addresses issues concerning facilities and technology on an ongoing basis. (*See* Ex. A ¶ 5.)

[7] In addition to the concern about PCCM implementation, the Receivership Order (at 74) expresses compliance concerns about nurse-led care and nurse protocols. The Department has directed NaphCare to discontinue the use of several nurse protocols and established related sanctions for their continued use. Ex. A ¶ 3. Others are under review to improve compliance with this aspect of the Injunction. *Id.*

of "the necessity for this remedy of last resort." *Jerry M.*, 738 A.2d at 1214 (remanding where the court did not give "proper consideration" to "several important criteria"). For example, it disregards all information about new mental health programs and related training for custody staff. (*See generally* Doc. 4998-3 ¶¶ 16–22, 32–35.) It does not mention the efforts to support NaphCare's hiring efforts. (*E.g.*, *id.* ¶¶ 41–43.) It disregards the Department's significant ongoing work to monitor compliance and improve those processes, focusing on only the monitors' criticisms. And it disregards the significant healthcare staffing increases as insufficient.

The Injunction mandates massive change in most every aspect of healthcare delivery. Although the Department has made major changes in the few years since the Injunction was entered, the Court did not attempt less extreme measures to secure speedier compliance. The Department's progress and ongoing efforts rebut the finding that continued "insistence [on] compliance with the Court's orders would lead only to confrontation and delay." *Plata*, 2005 WL 2932253, at *23. The process since 2023 has yielded and is yielding marked improvements in the healthcare system at Arizona's state prisons. Achieving compliance will take time, as even the Order acknowledges by imposing a minimum length of five years for the receivership. (Doc. 5307 at 12.) Because the Department has made objective improvements and continues to move toward full compliance, Defendants are reasonably likely to succeed on the merits of their appeal. *See Parker*, 171 F.4th at 757–58 (holding a district court abused its discretion under the PLRA when it "fail[ed] to incorporate significant medical care improvements" before ordering prospective relief).

**4.    The Receivership Order's analysis of bad faith is flawed.**

The Receivership Order found that Defendants had acted in bad faith because the Department objected to some of the monitors' findings and recommendations and because the Department had not yet achieved full compliance with the Injunction. Neither ground supports the finding of bad faith under the fifth receivership factor.

First, the Court incorrectly concluded that the Department's criticism of the monitors' recommendations evinced bad faith. (Doc. 5123 at 70.) The Department has acknowledged that "[s]ome of the Monitors' criticism is fair," welcomed the monitors' constructive feedback as "helpful," and expressed its commitment to "work[ing] with the Monitors and Plaintiffs toward [the] goal" of full compliance. (Doc. 4973 at 2–3.) But Defendants have made good faith objections to the monitors' substantive findings when they believed it was appropriate. (*See generally* Doc. 4815 at 4–31 (identifying multiple issues with the monitors' second interim report); *id.* Exs. A & B (responding to the monitors' analysis of the Quality Indicators); Doc. 4973 (responding to the monitors' third interim report).) The Court, of course, can disagree with Defendants' arguments, but presenting arguments and evidence contrary to the monitors is not bad faith.

The Court also criticized Defendants for arguing that the monitors should not be allowed to opine on matters outside their areas of expertise, stating that "Defendants' contentions" against the monitors' opinions "border[ed] on bad faith." (Doc. 5123 at 24–25.) Again, questioning the monitors' conclusions cannot by itself suggest bad faith. Court-appointed experts' recommendations are "subject to review by the district court." *Armstrong v. Brown*, 768 F.3d 975, 987 (9th Cir. 2014); *see also* Robert E. Buckholz, Jr. et al., *The Remedial Process in Institutional Reform Litigation*, 78 Colum. L. Rev. 784, 829 (1978) ("Lacking procedural safeguards, the results of monitoring should not enjoy presumption of legal validity."). Just as a party may object to conclusions by a special master, *see* Fed. R. Civ. P. 53(f), so too can "a party dissatisfied with the [court-appointed] expert's recommendations [] obtain district court review of that recommendation," *Armstrong*, 768 F.3d at 988. Defendants have not found another decision treating substantive objections to monitor findings as evidence of "bad faith" under the receivership analysis. Defendants had the right to object to the monitors' recommendations and conclusions, and exercising that right is not an act of bad faith.

The Department's lack of full compliance with the Injunction likewise does not establish bad faith. Noncompliance is relevant to other receivership factors, but courts

do not equate it with bad faith in the institutional-reform context. *See United States v. Hinds Cnty.*, 2023 WL 1186925, at *12 (S.D. Miss. Jan. 30, 2023) (declining to find bad faith despite years of noncompliance); *Nunez*, 782 F. Supp. 3d at 165 (declining to find the defendants had acted in bad faith despite their noncompliance).  Noncompliance likewise provides no basis to find bad faith here.

It is also incorrect to treat Defendants' objections to the monitors' recommendations in the Staffing Plan as objections to the Injunction. (Doc. 5123 at 71–72.)  None of the objections to the Final PCCM Staffing Plan criticized the Injunction itself; indeed, Defendants criticized the Staffing Plan in part for deviating from the Injunction's requirements. (Doc. 4869 at 6–8.)  In short, it was diligence, not bad faith, for Defendants to object to recommendations that were in tension with the Injunction or that would make it more difficult to fill healthcare positions.

**5.    The Department's leadership is able to improve conditions.**

The factor concerning whether current leadership can "turn the tide within a reasonable period of time," *Plata*, 2005 WL 2932253, at *23, also favors a stay pending appeal.  This analysis focuses on present leadership's capacity going forward rather than "past performance." *See Jerry M.*, 738 A.2d at 1214.  Here, the Court's conclusion that current state leadership cannot achieve compliance presents a serious question for appellate review. *See Horne v. Flores*, 557 U.S. 433, 455 (2009) (cautioning against "substitut[ing] . . . policy judgments for those of the state and local officials to whom such decisions are properly entrusted").  The Department's leadership had been in place for roughly three years when the Court ordered a receivership.  In that time, the Department made significant changes in funding, staffing, inmate housing, and inmate services, as discussed above.  Complying with the Injunction is not a simple task—reforming Arizona's prison system to ensure "[t]he provision of adequate medical care . . . presents a classic example of a polycentric problem . . . with a number of subsidiary problem centers, each of which is related to the others, such that the solution to each depends on the solution to all the others." *Plata*, 2005 WL 2932253, at *25 (cleaned up).  The Court

acknowledged that compliance will take time by appointing the receiver for a minimum period of five years.  (Doc. 5307 at 12.)

Although the Department's leaders have made meaningful progress since 2023, the Court's orders disregard that progress and incorrectly focus only on areas where more work remains to meet the demands of the Injunction.  Defendants agree there is more work to be done.  Yet the Department's progress since 2023 rebuts the Court's conclusion that the Department's leadership is incapable of turning the tide.  In addition, the significant progress on the custody aspects of the Injunction—which are not subject to a receiver—shows current leadership's ability to effect meaningful change.

###### 6. The Court's analysis of the threat of harm relied too heavily on isolated adverse outcomes.

Another receivership factor asks "[w]hether there is a grave and immediate threat or actuality of harm to plaintiffs."  *Plata*, 2005 WL 2932253, at *25.  The Receivership Order finds that the Department's failure to achieve full compliance with the Injunction is "perpetuating the grave and immediate threat of actual harm to prisoners."  (Doc. 5123 at 29.)  Defendants acknowledge the remaining compliance gaps.  (*See, e.g.*, Doc. 4973 at 2.)  But this factor alone does not warrant a receiver where the Department has demonstrated improvements and a sustained commitment to compliance.  *See L.A. All. for Human Rights*, 792 F. Supp. 3d at 1092 (finding it was premature to appoint a receiver even where preventable harms were ongoing).  Instead, the "most significant factor in the propriety of appointing a receiver is whether any other remedy is likely to be successful." *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997).  The Court's emphasis on the threat of harm thus raises serious questions for appellate review.

Again, conditions have demonstrably improved since the Injunction, unlike other cases in which a receiver was appointed.  *See, e.g.*, *Nunez*, 782 F. Supp. 3d at 161 (finding that violence, "self-harm, and deaths in custody [were] demonstrably worse than when the Consent Judgment went into effect" ten years prior); *Hinds Cnty.*, 2023 WL 1186925,

13

at *5, *7 (receivership warranted in a prison "where terror reigns" and with staffing "getting worse"). But the Court's orders largely overlook the improvements.

Instead, the Receivership Order discusses the Department's mortality review process at length (Doc. 5123 at 33–41), drawing on the monitors' analysis of eight specific mortality reviews. (Doc. 4968 at 4–15.) Defendants had identified corrective actions the Department had taken as a result of the mortality-review process, raised concerns about the monitors' analysis of those eight reviews, and shown the Department has implemented recommendations stemming from mortality reviews. (Doc. 4973 at 15, 23–26, Ex. 8 ¶¶ 2–17.) More broadly though, the Department noted that focusing on mortality reviews—by definition, "cases with an adverse outcome," (*id.* at 25)—does not accurately reflect whether there is a systemwide risk of grave and immediate threat to the tens of thousands of inmates under Defendants' care. (*Id.* & Ex. 12 ¶¶ 7–10.) On appeal, the Ninth Circuit will need to consider whether the monitors' anecdotal analysis of the worst examples of care could establish ongoing, systemwide deficiencies presenting a grave and immediate threat to the thousands of inmates at different locations being treated by different providers. *Id.* at 15 & Ex. 9 (discussing successful implementation); *see Parker*, 171 F.4th at 757–58 (it is error to ignore objective improvements).

**7.    A receiver is unlikely to provide a relatively quick and efficient remedy.**

"The most significant factor in the propriety of appointing a receiver is whether any other remedy is likely to be successful." *Dixon*, 967 F. Supp. at 550. This factor raises serious questions for appeal.

Defendants presented evidence that the decades-long receivership over California's prisons illustrates the difficulty of using a receivership to deliver quick or efficient reform. (Doc. 4818 at 25.) Just the opposite has happened in California. While California's total inmate population dropped by half while under receivership, California's annual inmate healthcare budget has increased 353%. (*Id.* at 21.)

14

The Receivership Order nonetheless characterizes the California receivership as ultimately successful, noting that by August 2025 the receiver had returned oversight to the state "at 31 of 35 institutions" and that the overall provision of healthcare has "significantly improved."  (Doc. 5123 at 76.)   After twenty years of receivership, however, California *still* has not achieved full compliance (Doc. 4818 at 22), and significant staffing shortages *still* persist there.  (*Id.* at 24.)  The record in that case does not support the conclusion that a receivership addressing prison healthcare "is likely to provide a relatively quick and efficient remedy."  *Plata*, 2005 WL 2932253, at *23.

A receiver entering this case will necessarily require time and resources to learn what Department staff already know about the Injunction's many requirements and the practical challenges of implementation.  (*See, e.g.*, Doc. 4973 at 5–33 (detailed substantive objections to the Third Interim Report demonstrating institutional knowledge).)  Where the Department has made significant progress over the past three years and remains "committed to complying with the Injunction" (Doc. 4818 at 20), a receivership is not warranted and will only waste the State's resources.  Unlike other cases involving the appointment of receivers, it simply is not true that the Department's efforts toward compliance have "not effected any material change in the court-ordered remedy." *Coleman v. Newsom*, 2025 WL 2475040, at *11 (E.D. Cal. Aug. 27, 2025).  There is no evidence that a receiver would or even could accelerate compliance.  That the Court appointed the receiver for five years—two more than the Defendants have had under the Injunction—just underscores the point.

*     *     *

Defendants are reasonably likely to prevail on appeal.  At a minimum, the appeal raises serious questions about the appropriateness of a receiver.  This factor favors a stay.

**B.      Absent a stay, the Department will suffer irreparable harm.**

A stay is also appropriate because "irreparable injury is likely in the absence of an injunction."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  Without a stay, an agent of the federal court will assume control of a core state function and will expend

15

substantial state funds that cannot be recovered if the Order is reversed on appeal. The State will therefore suffer irreparable constitutional harm, as the Order strikes at the heart of state authority, as well as irreparable fiscal harm.

*First*, important federalism interests are at stake. When a federal court appoints a receiver to control a state's correctional healthcare system, "[p]rinciples of federalism and separation of powers impose stringent limitations." *Lewis v. Casey*, 518 U.S. 343, 385 (1996) (Thomas, J., concurring). These concerns are "heightened" here because the Order "has the effect of dictating state or local budget priorities" by requiring the Legislature to fund a receiver and by transferring to a receiver the role of directing compliance with the Court's Injunction, which necessarily impacts funding. *Horne*, 557 U.S. at 448.

A receivership is reserved for "the most compelling circumstances," *Jerry M.*, 738 A.2d at 1213, and represents an assertion of federal control over an "inordinately difficult undertaking that requires expertise, planning, and the commitment of resources." *Turner v. Safley*, 482 U.S. 78, 85 (1987). A receiver should not assume control of this core state function before the Ninth Circuit has had the opportunity to review the issues on appeal. *See, e.g.*, *Parker v. Hooper*, 95 F.4th 231, 231 (5th Cir. 2024) (mem.) (staying an injunction entered against a state prison); *United States v. Hinds Cnty. Bd. of Supervisors.*, No. 22-60203 (5th Cir. Dec. 28, 2022) (staying an order appointing a receiver).

*Second*, the costs of a receivership are not recoverable. If a receiver assumes authority, Arizona will incur substantial expenses paying for the receiver, the receiver's staff, and its operations. As stated in the Order, "[a]ll costs incurred during the Receivership shall be borne by Defendants, including all the costs for establishing and maintaining the Office of the Receiver." (Doc. 5307 at 10.) The State likely will not be able to recover any funds paid to the receiver if the Order is reversed on appeal. Consequently, allowing the receiver to assume control while the appeal is pending will cause significant fiscal harm to the State. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (holding that economic harm is irreparable if the movant "will not be able to recover monetary damages"). This fiscal concern is amplified because of the scope of the

16

receiver's powers.  The receiver has full authority to direct all the Department's expenditures relating to healthcare—hundreds of millions of dollars in state funds.  The State is obligated to indemnify the receiver for all of her actions.  The fiscal impact of the receiver's broad authority merits a stay.

### C.     The balance of harms and the public interest favor a stay.

The third and fourth *Nken* factors merge when the government seeks a stay.  *See Nken*, 556 U.S. at 435 (a court's assessment of competing harms and the public's interest may merge in cases involving the government); *Golden Gate Rest. Ass'n v. City of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008).  They favor a stay in this case.

The public interest generally "lies with maintaining the *status quo* while the appeal is pending." *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020).  The Department's leadership is directly accountable to the public, as Director Thornell was appointed by Governor Hobbs and confirmed by the State Senate.  Transferring control of a core state function away from these state officials to a federal receiver before appellate review contravenes the public's interest in democratic accountability.  *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)).

The balance of harms also favors Defendants.  As noted above, Defendants will be irreparably harmed if the Order is not stayed pending appeal.  Core federalism concerns support granting a stay because "federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." *Golden Gate Rest. Ass'n*, 512 F.3d at 1127 (citation omitted).  Where a federal court order "interfere[s] with a core constitutional power" retained by the State, reversal on appeal will not undo the "irreparable injury to the interests of the government and the public." *Immigrant Defs. Law Ctr. v. Noem*, 145 F.4th 972, 994 (9th Cir. 2025).  Additionally, denial of a stay may require the Arizona Legislature to appropriate funds to support the receiver's work.

On the other hand, Plaintiffs face the risk that the Defendants will not improve healthcare as quickly as a receiver would, but such speculation does not outweigh the concrete, irreparable harms to Arizona's federalism and financial interests absent a stay. Tangible progress is being made toward compliance without a receiver. *See generally* Exs. A and B. The minimum of five years for the receivership shows that immediate compliance with the Injunction is not realistic. Moreover, the five-year minimum for the receiver to accomplish her work, and the 180-day planning period, show that there is nothing time-sensitive that prevents appellate review of the receivership decision before the receiver takes over responsibility for healthcare at Arizona's state prisons and assumes sole authority to direct the expenditure of hundreds of millions of dollars in state funds.

**CONCLUSION**

In sum, all factors support a stay pending appeal. Defendants respectfully ask the Court to enter a stay pending appellate review of the important issues in this case.

DATED this 24th day of July, 2026.

OSBORN MALEDON, P.A.

By s/ Mary R. O'Grady
    Mary R. O'Grady
    Andrew G. Pappas
    John S. Bullock
    Molly S. Walker
    2929 North Central Avenue, Suite 2000
    Phoenix, Arizona 85012-2793

KRISTIN K. MAYES
ATTORNEY GENERAL

Joshua D. Bendor, Bar No. 031908
Gregory Honig, Bar No. 018804
Lucy M. Rand, Bar No. 026919
Luci D. Davis, Bar No. 035347
Assistant Attorneys General
2005 North Central Avenue
Phoenix, AZ 85004-1592
Joshua.Bendor@azag.gov
Gregory.Honig@azag.gov
Lucy.Rand@azag.gov
Luci.Davis@azag.gov
ACL@azag.gov

*Counsel for the Defendants*

18