Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th Street
Phoenix, Arizona 85006
Telephone: (602) 650-1854
Email: lbeall@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Dustin Brislan, Robert Gamez, Jonathan Gonzalez, Jason Johnson, Kendall Johnson, Joshua Polson, Laura Redmond, Sonia Rodriguez, Ronald Slavin, Jeremy Smith, and Christina Verduzco, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**DISABILITY RIGHTS ARIZONA**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@disabilityrightsaz.org

*Attorneys for Plaintiff Disability Rights Arizona*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Disability Rights Arizona,<br><br>Plaintiffs,<br><br>v.<br><br>Ryan Thornell, *et al.*, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-ROS<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR STAY OF ORDER PENDING APPEAL (Doc. 5315)** |

## TABLE OF CONTENTS

**INTRODUCTION** ..................................................................................................... 4

**ARGUMENT** ............................................................................................................ 4

I.    Defendants Are Not Entitled To a Stay of The Order Appointing a Receiver ............. 4

   A.    Defendants Will Not Be Irreparably Harmed ............................................................. 4

   B.    Defendants' Appeal is Unlikely to Succeed ................................................................ 7

      1.    Plaintiffs Face a Grave Threat of Actual Harm .................................................... 7

      2.    Less Extreme Measures Have Been Exhausted and Proven Futile ..................... 9

      3.    Defendants' Remaining Arguments Fall Flat ...................................................... 15

   C.    A Stay is Not in The Public Interest and Will Substantially Injure Plaintiffs ......... 19

**CONCLUSION** ...................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ....................................................................................... 4, 5

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) ........................................................................................... 5

*Coleman v. Newsom*,
2025 WL 2475040 (E.D. Cal. Aug. 27, 2025) ................................................................ 9

*Dixon v. Barry*,
967 F. Supp. 535 (D.D.C. 1997) ..................................................................................... 6

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020) ............................................................................... 5, 6, 20

*Hoffman v. Beer Drivers & Salesmens' Local No. 888*,
536 F.2d 1268 (9th Cir. 1976) ......................................................................................... 6

*Index Newspapers LLC v. US Marshals Serv.*,
977 F.3d 817 (9th Cir. 2020) ......................................................................................... 20

*Jensen v. Thornell*,
2026 WL 2043607 (9th Cir. June 5, 2026) .................................................................... 10

*Lab./Cmty. Strategy Ctr. v. Los Angeles Cnty. Met. Transp. Auth.*,
263 F.3d 1041 (9th Cir. 2001) ......................................................................................... 6

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) ................................................................................... 4, 5, 7

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ......................................................................................... 19

*Mercado v. Noem*,
800 F. Supp. 3d 526 (S.D.N.Y. 2025) ............................................................................. 5

*Newman v. Ala.*,
466 F. Supp. 628 (M.D. Ala. 1979) ......................................................................... 10, 20

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................................................. 4, 19

*Nuñez v. New York City Dep't of Correction*,
782 F. Supp. 3d 146 (S.D.N.Y. 2025) ........................................................................... 11

*Parker v. Hooper*,
171 F.4th 736 (5th Cir. 2026) ......................................................................................... 6

*Parker v. Hooper*,
95 F.4th 231 (5th Cir. 2024) (mem.) ............................................................................... 6

*Parsons v. Ryan*,
912 F.3d 486 (9th Cir. 2018)............................................................................................ 10

*Plata v. Schwarzenegger*,
2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ...................................................... 7, 8, 12, 15

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013)............................................................................................ 5

*Roe v. Critchfield*,
137 F.4th 921 (9th Cir. 2025) .......................................................................................... 19

*Shaw v. Allen*,
771 F. Supp. 760 (S.D. W. Va. 1990)................................................................................. 9

*Stone v. City & Cty. of San Francisco*,
968 F.2d 850 (9th Cir. 1992).............................................................................................. 6

*United States v. Hinds Cnty. Bd. of Supervisors*,
128 F.4th 616 (5th Cir. 2025) ..................................................................................... 7, 15

*United States v. Hinds Cnty. Bd. of Supervisors*,
No. 22-60203 (5th Cir. Dec. 28, 2022)............................................................................... 7

*Vasquez Perdomo v. Noem*,
148 F.4th 656 (9th Cir. 2025)............................................................................................. 4

*Wayne Cnty. Jail Inmates v. Wayne Cnty. Chief Exec. Officer*,
444 N.W.2d 549 (Mich. Ct. App. 1989) ..................................................................... 12, 15

3

**INTRODUCTION**

"A stay [pending appeal] is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009). Instead, it is "an exercise of judicial discretion and the propriety of its issue is dependent upon the circumstances of the particular case." *Id.* (cleaned up). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34. That burden is heavy. *E.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021) (asking a court for a stay pending appeal is an "extraordinary request"). Courts, in determining whether a party has met their burden, consider the four so-called *Nken* factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 426; *see Vasquez Perdomo v. Noem*, 148 F.4th 656, 678 (9th Cir. 2025).

Defendants do not meet their heavy burden. They provide no evidence of irreparable harm absent a stay, nor have they shown that they are likely to prevail on the merits of the appeal. By contrast, the harm to the Plaintiff class members and the public interest would be substantial if Defendants' request were granted. This Court should deny the Motion for a Stay.

**ARGUMENT**

**I.    Defendants Are Not Entitled To a Stay of The Order Appointing a Receiver.**

**A.    Defendants Will Not Be Irreparably Harmed.**

This Court can begin and end its analysis with the second *Nken* factor: Whether Defendants "will be irreparably injured absent a stay." *Nken*, 556 U.S. at 434. That is because unless Defendants have "made a certain threshold showing regarding irreparable harm . . . then a stay may not issue," regardless of their showing on the other factors. *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011). There must be more than just "some possibility" of irreparable injury. *Nken*, 556 U.S. at 434 (cleaned up). Rather, it must be

4

"the more probable or likely outcome," *Leiva-Perez*, 640 F.3d at 968, and it must be "likely to occur during the period before the appeal is likely to be decided," *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (cleaned up). Defendants fall far short of that high hurdle.

To start, a party "suffers no harm from an injunction that merely ends unconstitutional practices or ensures that constitutional standards are implemented," "however inconvenient compliance may be." *Mercado v. Noem*, 800 F. Supp. 3d 526, 579 (S.D.N.Y. 2025) (citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). This litigation began nearly fifteen years ago with the purpose of resolving "serious constitutional violations," including the provision of "chronic unconstitutional healthcare" in Arizona prisons. Doc. 5123 at 1-2. This Court's Order Granting Plaintiffs' Motion for a Receiver makes clear that these violations continue unabated. *See id*. at 3-21. This Court found the remedy of a receivership to be the only way to bring an end to "unconstitutional preventable suicides," "unconstitutional preventable deaths," and "unconstitutional failures to treat those in severe pain." *Id*. at 2.

Defendants complain that "[w]ithout a stay, an agent of the federal court will assume control of a core state function and will expend substantial state funds that cannot be recovered if the Order is reversed on appeal." Doc. 5315 at 15-16. Those arguments fail on both the law and the facts.

Critically, "economic harm is not generally considered irreparable." *E. Bay Sanctuary Covenant*, 993 F.3d at 677; *Doe #1 v. Trump*, 957 F.3d 1050, 1060 (9th Cir. 2020) ("Monetary injury is not normally considered irreparable." (cleaned up)). Moreover, Defendants ignore that pursuant to the parties' agreement, the Court ordered the previously-collected $2.2 million of contempt fines be used "to support the Receiver in the execution of her duties." Doc. 5307 at 10. Those funds have already been collected and are not at issue in Defendants' appeal. Any economic harm Defendants experience during the pendency of this appeal can be offset by the use of those contempt funds. Finally, if the Receiver were to require the expenditure of "substantial state funds" while the appeal is

pending, Defendants aren't without recourse—they can challenge this before this Court. *See Hoffman v. Beer Drivers & Salesmens' Local No. 888*, 536 F.2d 1268, 1276 (9th Cir. 1976) ("[W]here the court supervises a continuing course of conduct and where . . . additional supervisory action by the court is required, an appeal from the supervisory order does not divest the district court of jurisdiction to continue its supervision.").

Defendants' federalism argument also falls flat. Doc 5315 at 3, 17. To be sure, there are "federalism concerns in institutional reform litigation involving correctional facilities," but they "do not automatically trump the powers of the federal courts to enforce the Constitution or a consent decree." *Lab./Cmty. Strategy Ctr. v. Los Angeles Cnty. Met. Transp. Auth.*, 263 F.3d 1041, 1050 (9th Cir. 2001) (cleaned up). And critically, "state policy must give way when it operates to hinder vindication of federal constitutional guarantees." *Stone v. City & Cty. of San Francisco*, 968 F.2d 850, 862 (9th Cir. 1992) (cleaned up); *see also Dixon v. Barry*, 967 F. Supp. 535, 551 (D.D.C. 1997) ("[W]hen dire facts justify the use of the receivership power, considerations of federalism and comity do not warrant withholding a necessary remedy."). Here, the facts are dire: the risk to the health and lives of patients incarcerated in Arizona is as extraordinary as it is longstanding. Moreover, Defendants' federalism concern can "be resolved at the merits stage of this case." *Doe #1*, 957 F.3d at 1059. That harm thus "is not irreparable, because the government may yet pursue and vindicate its interests in the full course of this litigation." *Id.* (cleaned up).

The Fifth Circuit caselaw Defendants cite changes nothing here. First, they point to an out-of-circuit memorandum decision staying, without any reasoning, a remedial order entered against a state prison. Doc. 5315 at 16 (citing *Parker v. Hooper*, 95 F.4th 231 (5th Cir. 2024) (mem.)). Defendants make no effort to analogize that case with this one, but any such effort would undoubtedly fail. *See Parker v. Hooper*, 171 F.4th 736, 742 (5th Cir. 2026) (explaining plaintiffs conceded that the order at issue violated the PLRA in myriad ways). Second, Defendants point to an unpublished Fifth Circuit order granting a stay in a case with issues beyond receivership—the parties had not only cross-appealed, but the Fifth Circuit had also determined that it was necessary to remand for the lower court to clarify

that its Injunction comported with the PLRA. Doc. 5315 at 16 (citing *United States v. Hinds Cnty. Bd. of Supervisors*, No. 22-60203 (5th Cir. Dec. 28, 2022)). Notably, Defendants fail to acknowledge that the receivership appointment in that case was ultimately upheld on appeal, notwithstanding purported federalism concerns. *See United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 637 (5th Cir. 2025). Without a showing of irreparable injury, this Court may end its analysis here and deny the stay. *See Leiva-Perez*, 640 F.3d at 965.

**B.      Defendants' Appeal is Unlikely to Succeed.**

The remaining *Nken* factors weigh against a stay. To satisfy the first *Nken* factor— that the appeal is likely to succeed—"the requesting party must show, at a minimum, that [they have] a substantial case for relief on the merits." *Leiva-Perez*, 640 F.3d at 967-68. This Court's 83-page order was comprehensive, meticulously detailed, and supported by the well-researched and thorough opinions of the neutral, Court-appointed expert monitoring team. Defendants are very unlikely to succeed in demonstrating this Court's order was an abuse of discretion. *See Plata v. Schwarzenegger*, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005) ("The decision whether to appoint a receiver is a function of the court's discretion in evaluating what is reasonable under the particular circumstances of the case."); *see also Hinds Cnty.*, 128 F.4th at 637 (decision to appoint receiver was "not an abuse of discretion").

**1.      Plaintiffs Face A Grave Threat of Actual Harm.**

To start, this Court detailed in nearly 30 pages the "overwhelming evidence" showing that Defendants are perpetuating a grave and immediate threat of actual harm to classmembers by failing to "deliver[] clinically required healthcare"—including fourteen "appalling" mortality reviews illustrating "callous, inhumane indifference displayed on a regular basis." Doc. 5123 at 29, 32-33. This included evidence of numerous patients dying after experiencing serious delays in accessing specialty care, being denied higher levels of care, or receiving incompetent treatment. *See id.*; *see also id*. at 34-41 (detailing circumstances of patient deaths and finding that "Defendants have shown a complete

inability or unwillingness, or both, to recognize and correct their failures"); *id*. at 42-54 (recounting over a dozen examples of seriously deficient care identified by the Monitors and finding those examples reflect that "prisoners still remain exposed to an intolerable grave and immediate threat of continuing harm and suffering").

Defendants do not dispute this evidence. Instead, they take aim at this Court's analysis, saying it granted too much weight to isolated incidents of harm. Doc. 5315 at 13-14. Defendants' position finds no support in the order, the evidence, or the law. This Court did not base its harm findings solely on isolated anecdotes. In fact, it began by considering statistical and quantitative data, including staffing ratios and Defendants' own self-reported compliance data, which established that "Defendants are in violation of the Injunction." Doc. 5123 at 29, 30-32. It was only after reviewing, among other things, *Defendants' own self-reported noncompliance data*, that the Court went on to conclude that Defendants' violations of the 2023 Injunction "are brought to life—or death—by the individuals who experienced profound delays in receiving treatment or who failed to receive treatment at all." *Id*. at 33. And when the Court did review specific instances of harm, its conclusions were undergirded by the "factually well-supported, reliable opinions" of the neutral, court-appointed Monitors. *Id*. at 24; *see Plata*, 2005 WL 2932253, at *3 ("The extensive and disturbing findings of the Expert's reports are essentially uncontested, and the Court finds that they accurately describe an extreme crisis in CDCR's medical delivery system."). Finally, as this Court previously and correctly noted, the premise of Defendants' arguments is faulty: "[H]ealthy patients are not an indicator of a system's capabilities. . . . If the issue is whether prisoners are provided adequate medical care, it makes sense to look to prisoners with serious needs and, in particular, those who suffer adverse outcomes, not those prisoners who have no contact with the medical system." Doc. 4335 at 59.

There can be no serious question that the evidence recounted by the Court demonstrates people incarcerated in Arizona's state-run prisons "remain exposed to an intolerable grave and immediate threat of continuing harm and suffering because the systemic deficiencies pervade the administration of health care." Doc. 5123 at 54.

Defendants' persistence in denying this crisis only underscores the necessity of appointing a receiver.

### 2.    Less Extreme Measures Have Been Exhausted and Proven Futile.

As for exhaustion or futility of less extreme measures, as this Court observed, "[s]ince this litigation commenced, rather than imposing the most punitive sanctions, the Court has painstakingly sought to and imposed the least restrictive measures and requirements on Defendants to incentivize compliance with the Constitution." Doc. 5123 at 54. In brief, those efforts included: multiple orders to enforce the parties' 2015 Stipulation, appointment of Rule 706 experts, more than $2 million in contempt sanctions, rescission of the parties' Stipulation, a 15-day bench trial, and the appointment of experts to aid the Court and the parties in crafting the 2023 Injunction, which "offer[ed] Defendants a hoped-for final opportunity to remedy their constitutional violations." *Id*. at 54-56; *see also* Doc. 4335 at 2, 4-5. As this Court put it, "[t]he Court's efforts have proven to be an exercise in futility." Doc. 5123 at 58.

Given Defendants' blatant failure to rectify the provision of unconstitutional healthcare after nearly 15 years, this Court's appointment of a receiver is hardly an abuse of discretion. *See Coleman v. Newsom*, 2025 WL 2475040, at \*10 (E.D. Cal. Aug. 27, 2025) ("Notwithstanding the court's substantial effort, . . . the work is unfinished, the progress too slow and no end in sight if the current framework remains in place."); *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990) ("Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances a court acting within its equitable powers is justified, particularly in aid of an outstanding injunction, in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate."); *Newman v. Ala.*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) ("When the usual remedies are inadequate, a court is justified in resorting to a receivership, particularly when it acts in aid of an outstanding injunction.").

**a)      Defendants' Prior Noncompliance is Plainly Relevant.**

Defendants do not take issue with this Court's conclusion that the myriad less extreme measures attempted before the 2023 Injunction were futile.  Instead, they insist that this Court incorrectly focused on Defendants' conduct prior to the 2023 Injunction, and accuse the Court of "[s]kipping all intermediate remedies . . . before taking over a core state function through a receivership."  Doc. 5315 at 4-6.

Defendants' position is outrageous.  The efficacy of the Court's prior efforts to spur Defendants to provide constitutionally-adequate healthcare is plainly relevant to the Court's inquiry into whether other remediation efforts would achieve that goal.  Defendants' insistence that the Court ignore Defendants' "long and regrettable history of delays, noncompliance, and contempt," *Jensen v. Thornell*, 2026 WL 2043607, at *2 (9th Cir. June 5, 2026), has no support in the law.  The Court has already, and rightly, rejected this argument as reflecting a "profound misunderstanding of the law and facts of this litigation."  Doc. 5123 at 55.  As this Court explained, the 2023 Injunction "is a comprehensive elucidation of what has always been required of the Defendants.  And the obligations of the Injunction are the same as those required of Defendants in the 2014 Joint Stipulation."  Doc. 5123 at 56.  The 2023 Injunction provides additional detail to guard against Defendants' history of exploiting ambiguity, Doc. 4410 at 5-6, but the Injunction did not fundamentally alter what the Department is required to do.  Defendants attempt to distinguish the 2023 Injunction from prior remediation efforts on the basis that "the Court did not enter findings of constitutional deficiencies until 2022."  Doc. 5315 at 4.  This is wrong.  This Court in 2015 found the Stipulation was "necessary to correct" and "the least intrusive means necessary to correct the violations of the Federal right of the Plaintiffs."  Doc. 1458 at 6; *see also Parsons v. Ryan*, 912 F.3d 486, 501 (9th Cir. 2018) (holding that this finding "necessarily required a finding of a constitutional violation").

Moreover, the Court did not confine its analysis to Defendants' conduct before 2022.  The Court acknowledged "that alone, a historical failure to fully comply may not warrant the extraordinary remedy of a receivership," Doc. 5123 at 81, and assessed Defendants'

compliance with the 2023 Injunction. The Court found "since entry of the Injunction, Defendants' paltry efforts to remedy the constitutional violations in the provision of healthcare have been in substantial conformity with their behavior throughout the litigation" and that "[t]o date, and despite the repeated offers of assistance and advice from the Monitors, Defendants offer no concrete plan to achieve compliance other than to limp along with their continuing failure to comply with the Injunction." *Id.* at 56, 58; *see also id*. at 81 ("The Court has exercised restraint for much of this litigation, to the point that any more tolerance of unconstitutional healthcare becomes judicial indulgence.").

The Court's conclusions were supported by a detailed, 15-page account of Defendants' failure to implement the 2023 Injunction, despite exhaustive efforts of the Court and the Monitors. *Id.* at 6-21, 56-58. These efforts included multiple status conferences, the issuance of six reports by the Monitors, the Monitors' dedication of "hundreds of hours evaluating Defendants' performance and engaging with Defendants to assist them with compliance," and the Monitors' and the Court's active management of the PCCM Pilot. *Id.*; *see Nuñez v. New York City Dep't of Correction*, 782 F. Supp. 3d 146, 162-63 (S.D.N.Y. 2025) (finding less extreme measures had proven futile where the Defendant "repeatedly failed to incorporate the Monitoring Team's thoughtful recommendations"). Defendants' claim that the Court "fail[ed] to use alternative remedies to address the Injunction requirements related to healthcare compliance before ordering the appointment of a receiver" is meritless. Doc. 5315 at 2.

### b)      Defendants Oversell Their Post-2023 "Progress."

Defendants ignore these facts, and claim that recent improvements demonstrate that less extreme measures of remediation would be successful. Doc. 5315 at 7-10. Not so. The changes touted by Defendants have failed to address the constitutional violations, and fall far short of a comprehensive plan to achieve "complete compliance with the Permanent Injunction." Doc. 4472 at 2.

11

First, Defendants point to their increased expenditures. Doc. 5315 at 8. But the Monitors' comprehensive evaluations and Defendants' own data demonstrate either that Defendants still have not allocated sufficient resources or that those resources are not being managed in such a way to comply with the requirements of the Injunction. Again, the evidence of harm was overwhelming and was largely unrebutted by Defendants. *See Plata*, 2005 WL 2932253, at *31 (appointing receiver even though defendants spent over $1 billion annually on health care, noting that the existing system "is a massive waste of money and, more importantly, life"); *Wayne Cnty. Jail Inmates v. Wayne Cnty. Chief Exec. Officer*, 444 N.W.2d 549, 561 (Mich. Ct. App. 1989) (finding no error in court's determination "that more expenditures by the sheriff would not produce adequate compliance with the final judgment").

Next, Defendants claim the Court failed to appropriately credit their recent increases to healthcare staffing. Doc. 5315 at 6-8. But Defendants do not assert the Court made any factual error in its assessment; rather, Defendants simply wish the Court had found those facts more compelling. There is ample support for the Court's conclusion that "[f]or Defendants to now suggest they be absolved of their staffing violations and even exalted with praise because today only 100 contract positions remain unfilled is preposterous and sustains that they are oblivious to their constitutional obligations." Doc. 5123 at 32. When the motion was briefed, Defendants admitted that NaphCare had not filled all positions required by the current contract. Doc. 4818 at 15. This remains the case—the most recent staffing report (for June 2026) confirms there are still nearly 100 vacant contract positions statewide. Declaration of Gabriela Pelsinger, Ex. 1. Indeed, Defendants have never managed to provide the staffing required by the contract.[1] Moreover, the current contract

[1]   *See, e.g.*, Doc. 4871-1 at 31 (documenting approximately 85 vacant healthcare staff positions, as of March 2025); Doc. 4968 at 27-28 (The Monitors' July 2025 findings that "ADCRR still continues to have a significantly insufficient number of staff," including that only 61% of contracted staff physician positions were filled and only 78% of the remaining healthcare staff positions were filled, as of the June 2025 staffing report); Doc. 4755 at 20-21 (The Monitors' December 2024 findings that "ADCRR continues to fail to

is itself inadequate and does not reflect the significant increases ordered by the Court in June 2025. When using the Court-ordered staffing plan as the benchmark, the vacancies are astounding—one-third of all positions are vacant. *Id.* ¶ 5.

At the same time, Defendants complain that "[t]he PCCM's Staffing Plan Requirements were not finalized and approved until June 2025," and argue that the Court should have given them more time to comply with that plan. Doc. 5315 at 6. Defendants' position only underscores the necessity of a receiver. Again, ADCRR and NaphCare have failed to fill the vacancies in the current, inadequate contract. Nor were Defendants able to hire even the minimal staff necessary to implement the PCCM pilot ordered in 2024. Doc. 4814 at 7-8 ("Defendants were not able to secure staffing for all positions needed to fully implement the Pilot."). These threshold failures cast serious doubt on Defendants' ability to implement the June 2025 staffing plan.

Moreover, Defendants were on notice that they would be required to significantly increase staffing when they stipulated to the Injunction in 2023. Doc. 5123 at 6. The Court Experts issued their staffing analysis in April 2024, establishing the staffing required to comply with the Injunction and calling for significant increases. Doc. 4599. The Experts warned in November 2024 that "hiring staff for statewide implementation must begin now." Doc. 4700 at 9 ("[I]t is unlikely the staffing numbers [in the final plan] will deviate by more than 15% in either direction."). Nevertheless, Defendants did not make any effort to obtain funding for these positions until the budget cycle for Fiscal Year 2027. Doc. 5315 at 7. Given Defendants' track record, the Court was under no obligation to adopt a wait-and-see approach and hope that Defendants might finally address this longstanding, critical deficiency. Doc. 5123 at 31 ("[I]t cannot be overemphasized that Defendants have been

---

fill health care staffing positions as required by paragraph 1.6 of the Injunction. As of the most recent report (November, 2024), ADCRR still had 104 FTE vacancies."); Doc. 4539 at 16-17 (The Monitors' February 2024 findings that "On the day the Injunction went into effect, April 7, 2023, NaphCare's staffing level was well below the minimal level required by the Court, i.e., dangerously low, and now, some eight months later, it remains so.").

13

frequently told by the Court that their incompetent and inadequate staffing of healthcare is unconstitutional.").[2]

Defendants also point to a handful of discrete improvements, and describe them as "significant changes." Doc. 5315 at 12. But the Court considered these—including specifically "improvements with Hepatitis-C and opioid use disorder"—and correctly noted that, however admirable, "simply improving in two areas does not ensure constitutional health care and mental healthcare for a substantial portion of the prison population." Doc. 5123 at 65. The Court also found it "extremely concerning that these are among the only improvements the Department continues to emphasize" "for the last almost three years." *Id.* at 65-66. That concern is borne out by the Monitors' reports, which "make clear" that after the 2023 Injunction issued, Defendants did not even have the leadership necessary to make three "relatively simple" changes (that they were advised and coached on) to help achieve compliance and improve healthcare delivery. *Id.* at 66.

Finally, Defendants proclaim that "[a]s of July 22, 2026, the PCCM had been rolled out at 31 of 43 units (72%), with the aim of rolling out the model at all units by the end of 2026." Doc. 5315 at 9. This is misleading. As the Court found when evaluating Defendants' claim to have implemented the PCCM at multiple units by late 2025, "[t]his is flat wrong in that 'at most units, that implementation is [in] its infancy,' and critical components of the PCCM are not yet in place at all facilities, including assigning a primary therapist and/or primary care provider to every patient on the caseload and having the primary therapist or provider actually function as such." Doc. 5123 at 74. These same problems persist: during recent monitoring visits, Plaintiffs' counsel found no evidence that

---

[2]    Defendants also disagree with the Court's conclusion that NaphCare had not adequately raised salaries, and claim the Court disregarded testimony they submitted from a NaphCare executive, describing its process for evaluating salaries. But the Court's conclusion was based on the opinion of the neutral, Court-appointed Monitors. As the Court noted, the Monitors considered and found NaphCare's process for evaluating salaries to be fundamentally flawed. Doc. 5123 at 31 & n.44.

the two most critical aspects of the PCCM were functioning as required by the Injunction. *See* Declaration of Sophie Hart ¶¶ 3-20.

There has been ample time for Defendants to develop and implement necessary reforms, and the record is clear that their efforts have failed. Courts have appointed receivers based on failures to comply with court orders within a similar period of time. *See Wayne Cnty. Jail Inmates*, 444 N.W.2d at 638-42 (affirming appointment of receiver over a county jail system less than two years after final judgment and stipulated remedial order where the county failed to comply with more than a decade of prior orders); *Plata*, 2005 WL 2932253 at *3, 19 (appointing receiver to oversee medical care in California prisons three years after stipulated injunction); *Hinds Cnty. Bd. of Supervisors*, 128 F.4th at 623-25 (affirming appointment of receiver over detention center less than three years after stipulated order). The Court did not err in concluding this factor favored appointment of a receiver. Doc. 5123 at 58.

### 3. Defendants' Remaining Arguments Fall Flat.

#### a) Defendants Lack Necessary Leadership.

The Court found Defendants displayed "a stark lack of leadership able to effectively implement the requirements of the Injunction." Doc. 5123 at 64-70. That lack of leadership was evinced in part by Defendants recent "grim performance" in implementing the staffing pilot, *id*. at 64, Defendants' tendency to "deflect responsibility to their [healthcare] vendor" and "actively avoid leadership and responsibility" regarding the provision of healthcare to patients, *id*. at 67, as well as "their apparent need for constant micromanagement" "rather than proactively taking steps to enforce their [healthcare] contract with [their vendor]," *id*. at 68.

Defendants do little to challenge those findings. Instead, they essentially argue that their hoped-for leadership capacity *moving forward* is what counts. Doc. 5315 at 12-13. They also say current leadership has been in place for three years and, in that time, has made significant changes. *Id*. at 13. But as described above, current leadership has failed to

implement the necessary reforms. Defendants' continued promises about what they "intend[] to do in the future" are not sufficient to tilt the balance of factors in their favor. *Dixon*, 967 F. Supp. at 553 ("The Court is respectful of the District's attempt to effectuate real change in its mental health system. Unfortunately, this is a song that the District has sung many times before."). Defendants also omit the critical fact that they have been unable to fill a key leadership position—the statewide Medical Director position was vacant for sixteen months (from August 2024 until January 8, 2026), Doc. 5123 at 65, was briefly filled for a little over four months (until May 19, 2026), Doc. 5239, and remains vacant today.

There is thus ample support for the Court's conclusion that "even if Defendants have some commitment to forthwith enforcing the Injunction, the record is rife with examples of their willful inability to institute constitutionally adequate healthcare in compliance with the Injunction." Doc. 5123 at 70.

### b) The Court's Bad Faith Finding Was Well Supported.

Evidence of Defendants' bad faith, this Court explained, is pervasive and includes the "particularly salient example" of the failed staffing Pilot, as well as "Defendants' regular overstatement of their 'progress,' intransigence regarding key aspects of compliance, and reporting of inaccurate data." Doc. 5123 at 70-75; *see id.* at 72 ("Throughout the Pilot, Defendants argued with the requirements, failed to comply with the necessary staffing provisions, provided minimal and inaccurate data, and implemented fewer than half of the enumerated steps and activities necessary for the Pilot.").

In arguing this Court's analysis of bad faith is flawed, Defendants mischaracterize this Court's findings. Doc. 5315 at 10-11. They say this Court found Defendants "had acted in bad faith because the Department objected to some of the monitors' findings and recommendations and because the Department had not yet achieved full compliance with the Injunction." *Id.* at 10. This is wrong. This Court pointed to specific instances in which Defendants had hurdled ad hominem attacks at the Monitors. Doc. 5123 at 70-71, n.57. It noted specifically that many of Defendants' arguments in opposition to the Monitors'

16

findings and their objections to a staffing plan boiled down to belated objections to the 2023 Injunction—an Injunction they helped draft and "steadfastly agreed" to—and this behavior was thus evidence of bad faith. *Id*. at 71-72. It found Defendants' abandonment of the Pilot after agreeing it was necessary to the provision of healthcare also evinced bad faith. *Id*. at 72. And it noted that, "[r]egardless of assurances of good faith, Defendants have repeatedly failed to implement necessary changes as directed by the Court and the Monitors, both throughout the lengthy history of this case and since the issuance of the Injunction." *Id*. at 75. That is not just an issue with "the Department's lack of full compliance with the Injunction," Doc. 5315 at 11, it is an issue with the Departments failure to implement even the simplest recommended changes in attempt to achieve any sort of compliance. Those findings are specific and well-supported by the record.

**c)      A Receiver is Likely to Produce a Relatively Quick and Efficient Remedy.**

As for whether appointing a receiver would be a relatively quick and efficient remedy, the Court pointed to the fact that receivership in cases involving the provision of healthcare to incarcerated people had been successful in California. Doc. 5123 at 79; *see Brown v. Plata*, 563 U.S. 493, 507-08, 511 (2011) (explaining courts "must consider a range of available options, including appointment of . . . receivers" to fix prison healthcare systems that are "broken beyond repair, resulting in an unconscionable degree of suffering and death" (cleaned up)). And in evaluating the appointment of a receiver against the backdrop of this case, where Defendants had been given years to implement relatively simple solutions, the Court reasonably concluded that a court-appointed receiver "willing to implement the recommendations of the neutral experts would be relatively quick and efficient." Doc. 5123 at 79.

Defendants disagree, arguing that this Court was wrong in "characterize[ing] the California receivership as ultimately successful." Doc. 5315 at 14-15. They also say that, because the Department has made significant progress and is committed to complying with the Injunction, a receiver would "only waste the State's resources." *Id*. at 15. But this Court

17

already addressed those arguments, noting they are not only unavailing, but they also ignore key facts. Doc. 5123 at 76, 79-80. First, this Court explained that, although progress was initially slow under the receiver in California, once the Supreme Court made a key finding on prisoner population reduction progress was swift, with "significantly improved [healthcare] under the receiver" and the delegation of oversight of the medical program at 31 of 35 prisons back to the State. *Id*. at 76, 79 n.62. In fact, the receiver has been so successful that the State of California requested that the *Plata* receiver also be appointed to oversee mental health care (in addition to medical care) in the state prisons. Doc. 4793-1 at 5. Second, this Court pointed out that Defendants' argument about a receivership wasting resources was "conclusory." Doc. 5123 at 75. It further noted that of course there will be associate costs for "improvements to the healthcare system," but that "Defendants cannot use the cost of improvements already required under the Injunction to oppose the appointment of a receiver on the grounds of expense." *Id*. at 75. Defendants have made no effort in their present motion to expand on that "conclusory" argument. And Defendants' position that a receivership is unnecessary and therefore a waste because of the "significant progress" the Department has made is untenable, as explained above.

+ + +

Even assuming some of Defendants' arguments hold water, they seem to forget that the determination whether to appoint a receiver requires *balancing* the above factors. After its "holistic review" of the receivership factors, the Court reached the "unavoidable conclusion that the balance of factors favors a receivership in this action." Doc. 5123 at 80, 81. At bottom, the evidentiary record that supports the appointment of a receiver is voluminous and unequivocal, and the law is straightforward. Having failed to rebut the mountain of evidence that undergirds the Court's Order, Defendants' do not make any "strong showing that [they are] likely to succeed on the merits." *Nken*, 556 U.S. at 426 (citation omitted). Because Defendants cannot show any likelihood of victory on appeal, their stay motion must be denied.

**C.** **A Stay is Not in The Public Interest and Will Substantially Injure Plaintiffs.**

The third and fourth *Nken* factors—the balance of hardships and the public interest—"merge when the Government is the opposing party." *Roe v. Critchfield*, 137 F.4th 921, 922 (9th Cir. 2025) (quoting *Nken*, 556 U.S. at 435).  Analysis of these factors begins with a foundational point that Defendant ignores: "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted).

Defendants complain that it is Defendants, not Plaintiffs, that will be harmed—economically and by having a state function assumed by the Receiver—while Plaintiffs merely "face the risk that Defendants will not improve healthcare as quickly as a receiver would." Doc. 5315 at 17-18.  This grievously minimizes Plaintiffs' risk of harm.  Plaintiffs face the risk of injury up to and including death—harm that is happening *now*, and has been ongoing for over a decade precisely because of Defendants' demonstrated inability to make meaningful improvement to their healthcare program.  Doc. 5123 at 17 (pointing to Monitor finding that "healthcare was 'poor' with little improvement since the Injunction became effective," including unqualified providers caring for complex patients and thousands of consultations with off-site specialists delayed; the report concluded: "And patients are dying."); *id*. at 17-18 (noting five suicide deaths "likely could have been avoided if there had been compliance with the Injunction"); *id*. at 34-40 (detailing numerous deaths from "a lack of timely access to appropriate medical care by the appropriately skilled professionals," including a patient with a seizure disorder who died after his removal from antiseizure medication).  Even if Defendants are correct that they will be harmed economically and by having a core function delegated, those "harms" pale in comparison the imminent, life-threatening harm Plaintiffs face.  *See*, *e.g.*, *Index Newspapers LLC v. US Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) (finding that it is "incorrect to suggest that a showing of harm to the government commands the conclusion that the public interest weighs entirely in favor of whichever outcome the government seeks," and that even where a government's

interest is a "very important public interest," "it is always in the public interest to prevent the violation of a party's constitutional rights").

The public interest, Defendants add, "lies with maintaining the *status quo* while the appeal is pending." Doc. 5315 at 17 (citing *Doe #1*, 957 F.3d at 1068). But, as was already explained, the *status quo* here is severely harmful—even deadly—to Plaintiffs. And when the risk of delay may be injury or loss of life, the swiftest possible remedy is justified, even if it is intrusive. In *Newman v. Alabama*, for example, the court emphasized that when the risk to plaintiffs is extreme, there should not be delay in action by the court. *See Newman*, 466 F. Supp. at 635 (holding that "inadequate care that poses a threat to life" is "a state of emergency demanding decisive action"). As in *Newman*, the Court here did not mince words when it explained that an extraordinary remedy was necessary to bring an end to "unconstitutional preventable suicides," "unconstitutional preventable deaths," and "unconstitutional failures to treat those in severe pain." Doc. 5123 at 2. Absent this Courts' ordered remedy, Plaintiffs will continue to suffer extreme harm.

The balance of harms and the public interest strongly favor declining to stay an order designed to spur Defendants into compliance with the constitution.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Stay should be denied.

Dated:  July 29, 2026

By:  *s/ Sophie Hart*

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sophie Hart (Cal. 321663)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          sophieh@prisonlaw.com

Corene T. Kendrick (Cal. 226642)*
**ACLU NATIONAL PRISON
PROJECT**
425 California Street, Suite 700
San Francisco, California 94104
Telephone: (202) 393-4930
Email:    ckendrick@aclu.org

David C. Fathi (Wash. 24893)**
Maria V. Morris (D.C. 1697904)*
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 393-4930
Email:    dfathi@aclu.org
          mmorris@aclu.org
Lauren K. Beall (Bar No. 035147)
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th Street
Phoenix, Arizona 85006
Telephone: (602) 650-1854
Email:    lbeall@aclu.org


*Admitted *pro hac vice*
**Admitted *pro hac vice*. Not admitted in
DC; practice limited to federal courts.

*Attorneys for Plaintiffs Shawn Jensen, Dustin
Brislan, Robert Gamez, Jonathan Gonzalez,
Jason Johnson, Kendall Johnson, Joshua
Polson, Laura Redmond, Sonia Rodriguez,
Ronald Slavin, Jeremy Smith, and Christina
Verduzco, on behalf of themselves and all
others similarly situated*

21

**DISABILITY RIGHTS ARIZONA**

By:  *s/ Maya Abela*

Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email:    adietrich@disabilityrightsaz.org

Rose A. Daly-Rooney (Bar No. 015690)
Maya Abela (Bar No. 027232)
**DISABILITY RIGHTS ARIZONA**
4539 East Fort Lowell Road
Tucson, Arizona 85712
Telephone:  (520) 327-9547
Email:
  rdalyrooney@disabilityrightsaz.org
  mabela@disabilityrightsaz.org.org

*Attorneys for Disability Rights Arizona*

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2026, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Gregory Honig
Joshua Bendor
Luci Davis
Lucy M. Rand
Assistant Arizona Attorneys General
gregory.honig@azag.gov
joshua.bendor@azag.gov
luci.davis@azag.gov
lucy.rand@azag.gov

Mary R. O'Grady
Andrew G. Pappas
John S. Bullock
Molly S. Walker
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
mogrady@omlaw.com
apappas@omlaw.com
jbullock@omlaw.com
mwalker@omlaw.com

*Attorneys for Defendants*

_s/ Sophie Hart_