Mary R. O'Grady, 011434
Andrew G. Pappas, 034432
John S. Bullock, 034950
Kimberly Friday, 035369
Molly S. Walker, 038099
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 640-9000
mogrady@omlaw.com
apappas@omlaw.com
jbullock@omlaw.com
kfriday@omlaw.com
mwalker@omlaw.com

Attorneys for Defendants

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, et al., | No. CV-12-00601-PHX-ROS |
| Plaintiffs, | **REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR STAY OF ORDER PENDING APPEAL (DOC. 5307)** |
| v. | |
| Ryan Thornell, et al., | |
| Defendants. | |

Will a receivership achieve compliance more quickly and efficiently than the remedies already in place? Plaintiffs' opposition elides that question. The record shows that since the Injunction was entered in 2023, the Department has more than doubled its healthcare spending, increased healthcare staffing by more than 50%, expanded inpatient and residential capacity, and rolled out the Patient Centered Care Model ("PCCM") to 72% of its units.

Despite that progress, the Court did not attempt any intermediate remedies before transferring the Department's entire healthcare system to an agent of a federal court for a minimum of five years. The costs of getting that decision wrong fall entirely on the State, and they cannot be undone. The Order requires Defendants to bear "[a]ll costs incurred

during the Receivership," indemnify the receiver unconditionally, and cede their authority over the Department's entire healthcare budget. (Doc. 5307 at 7, 10, 12.) It also authorizes the receiver to seek waiver of Arizona statutes and to recommend modification of the Injunction itself. (*Id.* at 11.) Plaintiffs' answers to these significant costs—that contempt funds will cover the receiver's expenditures, and federalism concerns can be sorted out down the line—are wholly unsatisfactory. The Receivership Order (Doc. 5123) and the Order appointing a receiver (Doc. 5307) should be subjected to appellate review before this remedy of last resort is set in motion. The Court should stay the Order.

## I.      Irreparable Harm and Balance of Harms

Plaintiffs misstate the governing standard by asserting the Court "can begin and end its analysis" with irreparable harm and that no stay is warranted absent a strong showing on this factor alone. (Doc. 5325 at 4.) The Ninth Circuit employs a "sliding scale approach [] to the consideration of stays pending appeal" that balances all elements, "so that a stronger showing of one element may offset a weaker showing of another." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (citation omitted). And on its own terms, Plaintiffs' approach to irreparable harm turns on their view of the merits: they opine that Defendants will not suffer irreparable harm because a receivership "merely ends unconstitutional practices" (Doc. 5325 at 5),[1] which assumes that appointing a receiver is the most effective way to end any such practices. That will be a central question on appeal, not whether there are underlying compliance issues that still need to be addressed. *See Trump v. Casa*, 606 U.S. 831, 860 (2025) (explaining the *Nken* factors ask whether a stay applicant "is likely to prevail on the merits of the issue before us, not whether he is likely to prevail on the merits of the underlying suit").

---

[1] The case Plaintiffs rely on, *Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013), is inapt because it (1) was overruled by the Supreme Court in *Jennings v. Rodriguez*, 583 U.S. 281, 285 (2018); (2) does not involve an institutional-reform injunction; and (3) does not state the broad principle for which Plaintiffs cite it.

On the facts, Defendants have demonstrated irreparable harm. At the outset, Plaintiffs wrongly assert that unrecoverable economic harm does not qualify as irreparable. (Doc. 5325 at 5.) To the contrary, such harm is typically considered irreparable where the injured party will be unable to "recover monetary damages." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 678 (9th Cir. 2021).

Plaintiffs' principal response is that $2.2 million in contempt fines will be used to offset the State's economic injury. But that sum will not stretch far: in its first five years, the California receivership cost approximately $20 million, $51 million, $93 million, $12 million, and $11 million, respectively. (Doc. 4818 Ex. 9.) Moreover, the Order does not limit Defendants' financial exposure to the contempt funds. Rather, the Order provides that "[a]ll costs incurred during the Receivership shall be borne by Defendants, including all the costs for establishing and maintaining the Office of the Receiver," and provides only that the contempt funds "may be used as additional funding." (Doc. 5307 at 10.) Finally, even if the receiver's expenditures are initially covered by contempt funds, that would still cause irreparable harm. The underlying civil fines were coercive in nature, meaning that the State retains the ability to purge the fines through compliance. *See Int'l Union, UMWA v. Bagwell*, 512 U.S. 821, 829 (1994). If the contempt funds are spent and the Receivership Order is then reversed on appeal, the State will forfeit any opportunity to purge those fines.[2]

Plaintiffs dismiss Defendants' irreparable federalism injury on grounds that it can simply "be resolved at the merits stage of this case." (Doc. 5325 at 6.) This misapprehends the harm. Absent a stay, a federal agent will take control of core state functions while the merits of the receivership itself are at issue on appeal. An eventual reversal of the

---

[2] Plaintiffs suggest Defendants "aren't without recourse" because they "can challenge" a substantial expenditure before this Court. (Doc. 5325 at 6.) That does not alter the Order's terms, which make Defendants liable for all the receiver's expenses without qualification. (Doc. 5307 at 10.) And Plaintiffs' proposal of litigating, expenditure by expenditure, how hundreds of millions of dollars in state healthcare funds should be spent—before the same court whose remedial decision is on appeal—is not a workable solution.

receivership by the Ninth Circuit or Supreme Court will not erase the interval during which the Court or receiver would abrogate the State's constitutional power. This federalism concern is well recognized: "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). Here, the intrusion is more severe still: rather than temporarily enjoining state officials from enforcing their enacted policies, the receivership displaces the officials' authority altogether. *See CASA*, 606 U.S. at 859 (holding a court causes irreparable harm when it wrongly "prevents the Government from enforcing its policies").

Plaintiffs' efforts to distinguish away stays granted in similar contexts are similarly unpersuasive. In two recent cases, a federal court stayed prospective relief ordered against a state corrections system until the appeal concluded. *See Parker v. Hooper*, 95 F.4th 231 (5th Cir. 2024) (mem.); *United States v. Hinds Cnty. Bd. of Supervisors*, No. 22-60203 (5th Cir. Dec. 28, 2022). That the *Hinds County* receivership was later affirmed just proves the value: no undue harm to the State occurred, and the receivership was implemented once appellate review was complete.

These significant harms that the State will suffer without a stay outweigh the uncertain harms that Plaintiffs raise. The Order installs a receivership that "shall extend for five years" at a minimum—two years longer than the current Defendants were given to comply with the Injunction—and allows for extensions "as necessary." (Doc. 5307 at 12.) Against that timeline, the only countervailing harm Plaintiffs identify is the risk of continuing harm. (Doc. 5325 at 19.) But that possibility is present regardless whether the receivership is stayed. Plaintiffs' speculation that a receiver will improve healthcare more quickly than Defendants underscores a central issue on appeal: there is no evidence that this "remedy of last resort" is the only way to reach full compliance. *D.C. v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. App. 1999). Because the likely success of other remedies is a

4

necessary factor, the Receivership Order's inattention to this issue heavily favors preserving the status quo.

Defendants have "acknowledge[d] the remaining compliance gaps." (Doc. 5315 at 13.) But the mere fact of noncompliance and the related potential for harm does not determine how that harm will be most quickly addressed. *See L.A. All. for Human Rights v. City of Los Angeles*, 792 F. Supp. 3d 1049, 1092 (C.D. Cal. 2025). Where the Department has made significant progress since 2023 and even the Court has decided that compliance will require *at least* five more years to achieve, the transfer of a core state function to a federal agent should await appellate review. The Court should grant a stay pending appeal, during which time Defendants will continue striving to improve healthcare services.

## II.    Success on the Merits

Defendants are reasonably likely to succeed on the merits, and at minimum the appeal raises serious legal questions. Although Defendants have made substantial progress since the Injunction was entered in 2023, the Receivership Order gave little attention to that progress but instead focused on the Department's inability to achieve compliance in that timeframe. But that progress speaks directly to whether this "remedy of last resort" was "absolutely necessary." *Jerry M.*, 738 A.2d at 1213. The Department's improvements over the past three years are material given the Injunction's wide scope: wholesale reform affecting tens of thousands of prisoners across nine complexes, performed by thousands of staff members. Given the size of the task at hand, the Court's own recognition that full compliance will take at least another five years, and the Department's steady but incomplete progress over the past three years, Defendants are reasonably likely to show that it was an abuse of discretion to appoint a receiver.

### A.    The Department has made substantial improvements throughout the life of the Injunction.

Defendants have worked steadily to improve conditions and to achieve compliance over the past three years. Plaintiffs' attempts to dismiss that progress are unpersuasive.

5

Plaintiffs first assert that the Department's increased expenditures are irrelevant. (Doc. 5325 at 12.) But the Supreme Court has treated a State's failure to commit resources as supporting escalation of prospective relief in prison healthcare cases. See *Brown v. Plata*, 563 U.S. 493, 528 (2011). The converse follows: a state's commitment of substantial new resources bears on whether it is committed to compliance and whether less intrusive measures can succeed. Here, healthcare spending has more than doubled since the Injunction was entered. (Doc. 4818 at 3; Doc. 4973 at 2.) Unlike the receivership in *Plata*, where the state had spent over a billion dollars annually without effecting any meaningful changes, here the increased funding has produced documented change. (*See* Doc. 5315 at 7–10.)

Plaintiffs wrongly claim that Defendants "do not assert the Court made any factual error in its assessment" of staffing and "simply wish the Court had found those facts more compelling." (Doc. 5325 at 12.) That is inaccurate. The stay motion discusses multiple ways in which the Receivership Order's staffing and salary analysis does not reflect the record evidence. The stay motion questions the Court's finding that NaphCare's salaries are "woefully insufficient" where the evidence showed NaphCare has continually raised new-hire rates and paid above the 75th percentile, and objects to the Court's reliance on March 2024 salary data rather than the improved March 2025 figures. (Doc. 5315 at 6–7 (citing Doc. 4818 Ex. 5 ¶¶ 12–14).) The stay motion likewise identifies staffing data the Receivership Order did not acknowledge: that overall healthcare staffing was up 56%, mental health staffing up more than 40%, full-time physicians up 46%, and midlevel providers up 93%. (Doc. 4973 at 5–6; Doc. 4818 at 4.) The stay motion explicitly asserts that the Receivership Order's analysis was "at odds with th[is] record evidence," not that it was merely mistaken. (Doc. 5315 at 6.)

Plaintiffs also emphasize that Defendants "admitted that NaphCare had not filled all positions required by the current contract." (Doc. 5325 at 12.) But that argument misses the point: the Department has moved far past where it was in 2022, when the Court entered its finding of unconstitutionality, and this forward progress speaks directly to

whether less extreme measures can be effective. That NaphCare has not yet fully complied with the Staffing Plan does not change that its staffing has dramatically improved since 2023, when the Injunction was entered—indeed, even 25 years of a receivership has not achieved full staffing for California's prisons. (Doc. 5315 at 14–15.)

Next, Plaintiffs mischaracterize the Department's improvements as "a handful of discrete" changes. (Doc. 5325 at 14.) Since 2023, among other improvements, the Department has completed construction and renovations at five facilities to support delivery of care and PCCM implementation; increased special needs unit and inpatient beds by 66%; increased residential mental health capacity by 31%; treated roughly 7,000 patients for opioid use disorder; spent more than $60 million treating over 4,500 patients for Hepatitis C; significantly increased offsite specialty care; ensured all Department psychiatrists are board certified; established a Suicide Prevention Taskforce; introduced programs to reduce self-injurious behavior; improved its electronic health record and language-translation systems; and built a compliance monitoring system. (Doc. 5315 at 2, 7–9.) These are significant changes, yet Plaintiffs discuss only two of them.

Plaintiffs also contend the PCCM rollout is too slow and that Defendants' report of implementation at 31 of 43 units is "misleading." (Doc. 5325 at 14.) Defendants have not claimed the PCCM is fully implemented and have acknowledged that there have been problems—including in the actual use of assigned primary care providers and primary therapists. Steps have been taken to resolve those issues. (Doc. 5315 at 9.) But implementing the PCCM was never going to be quick or easy: this is a "massive" project with many complexities. (*See id.* at 5.) What matters is that the Department *is* implementing the model and making tangible progress, moving from a two-site pilot in 2025 to 72% of units now, with statewide rollout anticipated by the end of 2026. That the PCCM is still being implemented shows only that work remains to be done; it does not show that a receiver is the best way to complete the project.

The Department has made substantial changes since the Injunction was entered and will continue working toward full compliance. Defendants are reasonably likely to

7

show that it was an abuse of discretion to impose the most intrusive remedy available under these circumstances.

### B.    The possibility of ongoing harm does not establish that a receivership is the best way to address such harm.

Plaintiffs defend the Receivership Order's harm analysis on the ground that the Court "did not base its harm findings solely on isolated anecdotes," but "began by considering statistical and quantitative data, including staffing ratios and Defendants' own self-reported compliance data, which established that Defendants are in violation of the Injunction." (Doc. 5325 at 8.) This is the tail wagging the dog. There is no debate that Defendants have not achieved full compliance. If noncompliance were a sufficient condition to find ongoing harm justifying a receivership, this "remedy of last resort" would be appropriate in every remedial phase. But that is not the law. The question is not whether there is full compliance, but whether a receivership will improve compliance more quickly and effectively than the alternatives—whether it is "absolutely necessary." *Jerry M.*, 738 A.2d at 1213. Again, there is zero evidence that it will.

Plaintiffs also invoke the Court's observation that "healthy patients are not an indicator of a system's capabilities." (Doc. 5325 at 8 (quoting Doc. 4335 at 59).) Under this logic, neither are the sickest patients, viewed in isolation. The Receivership Order's harm analysis rests substantially on the monitors' review of eight mortality reviews (Doc. 5123 at 33–41)—cases selected precisely because they involved an adverse outcome. (*See* Doc. 4973 at 25.) Evaluating a system serving 25,000 patients by reference to its worst outcomes will inevitably overstate systemwide risk. If that method were sound, any time inadequate medical care is provided in a correctional setting, the entire corrections system would be exposed to court-managed institutional reform. The law is otherwise: relief must be tailored to constitutional issues existing in the system at large, not just in worst-case scenarios. *See Lewis v. Casey*, 518 U.S. 343, 357–60 (1996); 18 U.S.C. § 3626(a)(1)(A).

8

**C.    History from the stipulation period has little relevance because the Injunction is broader in scope and based on constitutional findings.**

Plaintiffs also assert that "the obligations of the Injunction are the same as those" set by the stipulation. (Doc. 5325 at 10 (quoting Doc. 5123 at 56).) That is false. A basic examination of both orders shows that they are significantly different. *Compare* Doc. 1185 (21-page stipulated agreement containing 103 performance measures, which "does not constitute and shall not be construed or interpreted as an admission of any wrongdoing or liability by any party"), *with* Doc. 4410 (67-page injunction imposing approximately 130 substantive provisions governing staffing, models of care, mortality review, and compliance monitoring, based on the 2022 constitutional findings). The Injunction replaced a stipulation negotiated in the early phase of litigation with a longer, more prescriptive regime that followed a trial and the Court's 2022 constitutional findings.

Defendants acknowledge that the stipulation period was unsuccessful. But the pre-Injunction history does not establish that the stipulation was based on constitutional findings, or that the current Defendants—different officials, operating under a different remedial framework—are not committed to compliance. The Department's progress to date shows the opposite.

Plaintiffs respond that this Court in 2015 found the stipulation was "the least intrusive means necessary to correct the violations of the Federal right of the Plaintiffs" (Doc. 1458 at 6), and that under *Parsons v. Ryan*, 912 F.3d 486, 501 (9th Cir. 2018), that finding "necessarily required a finding of a constitutional violation." But if that is so, where are those constitutional findings? The stipulation certainly does not contain such findings. In fact, it specifies that "Defendants deny all the allegations in the Complaint filed in this case" and disclaims any admission of wrongdoing or liability. (Doc. 1185 ¶ 5.) Indeed, when approving the stipulation, the Court specified that it could not "foresee what would have happened at trial," and "in this greatly contested battle there [is] litigation risk on both sides." (Doc. 1458 at 38.) And if such findings were made in 2015, it is difficult to explain why the Court conducted a 15-day bench trial and then issued

extensive findings of fact and conclusions of law in June 2022. (Doc. 4335.) That order was the first adjudication of Defendants' constitutional violations, and the 2023 Injunction the first remedy based on those findings.

Finally, Plaintiffs point to the measures the Court has employed since 2022: status conferences, monitor reports, the monitors' "hundreds of hours evaluating Defendants' performance," and the Court's management of the PCCM pilot. (Doc. 5325 at 11.) Those roles of the monitor and the Court were all contemplated by the Injunction; it is incorrect to characterize them as intermediate remedial measures imposed to increase compliance. Since it made its constitutional findings, the Court has not attempted to improve compliance through any intermediate measures, such as remedial plans or sanctions. Moreover, the Court's efforts to date have worked. Since 2022, the Department more than doubled its healthcare spending, increased staffing by more than half, expanded capacity, and moved the PCCM from a two-site pilot to nearly three-quarters of its units. Jumping from the current tools that are yielding measurable results to the Receivership Order's "remedy of last resort," before employing *any* intermediate measures, is an abuse of discretion.

**D.    The Department's leadership is acting in good faith and capable of reaching full compliance.**

Plaintiffs defend the bad-faith finding by asserting that "[t]his Court pointed to specific instances in which Defendants had hurdled ad hominem attacks at the Monitors." (Doc. 5325 at 16 (citing Doc. 5123 at 70–71 & n.57).) The Receivership Order identifies no such attacks. An ad hominem argument is one "attacking an opponent's character, [] in lieu of a rational response to the opponent's stand or statement." *Ad Hominem*, *Black's Law Dictionary* (12th ed. 2024). The sole example given in the Receivership Order (Doc. 5123 at 70 n.57) was Defendants' opposition to a monitor's appointment, which argued in part for a broader search for someone with the "multi-faceted expertise . . . to play the most constructive role possible" in monitoring the staffing plan. (Doc. 4976 at 2). That is not an attack on character. The Court's remaining criticisms confirm the point: it faulted

Defendants for their "disagreements, differences of medical opinions, and criticisms of the Monitors." (*Id.* at 71.) But Defendants are entitled to present substantive objections. *See Armstrong v. Brown*, 768 F.3d 975, 987–88 (9th Cir. 2014). Moreover, Defendants welcomed Dr. Stern's appointment and have frequently acknowledged when "the Monitors' criticism is fair." (Doc. 4973 at 2.) Disagreements, even vigorous disagreements, are not the same as "ad hominem" attacks.

Plaintiffs' arguments against the Department's leadership fail for similar reasons. This inquiry is forward-looking: whether current leadership can "turn the tide within a reasonable period of time," *Plata*, 2005 WL 2932253, at \*23, which focuses on leadership's capacity rather than past performance, *Jerry M.*, 738 A.2d at 1213–14. Again, Defendants are not the same actors who agreed to and administered the stipulation. They have been in place roughly three years—less time than the five years given to the receiver—and in that period produced the changes described above. Their progress on the Injunction's custody provisions, which the receivership does not reach, is further evidence of capacity. (Doc. 5307 at 11.) The question is not how far the Department must still go, but whether it is moving in the right direction. It is.

**III.    The Public's Interest**

The public interest supports staying the Order pending appeal. The public has a substantial interest in ensuring that accountable state officials are not divested of authority over a core state function until an appellate court has determined that such a step was lawful. *See CASA*, 606 U.S. at 859–60. The Director was appointed by the Governor and confirmed by the Arizona Senate, whereas the receiver answers to the Court alone. The Receivership Order brushes past three years of documented improvement, emphasizes pre-Injunction history, and does not grapple with whether a receivership is the quickest and most efficient path to compliance. A receivership is "warranted only by the most compelling circumstances," *Jerry M.*, 738 A.2d at 1213; the public interest lies in confirming those circumstances exist before a receiver is put in place, not after.

California's experience underscores the point. That receivership has run for over two decades, has not produced full compliance, and has not eliminated persistent staffing shortages; its annual healthcare budget rose 353% even as the prison population was cut by half. (Doc. 4818 at 21–24.) Plaintiffs' response to this point is telling: progress under the California receiver was initially slow and became "swift" only after the Supreme Court sustained an order reducing the prison population. (Doc. 5325 at 18.) If the lesson of California is that a receivership becomes effective only when paired with a prisoner release order, that is a reason for caution rather than confidence. Defendants seek something more durable: a sustainable system, operated by accountable state officials, that delivers constitutionally adequate care. They should be permitted to continue working toward that goal while the appeal is pending.

**CONCLUSION**

For these reasons, the Court should stay the Order (Doc. 5307) pending appeal.

DATED this 31st day of July, 2026.

OSBORN MALEDON, P.A.


By  s/ Mary R. O'Grady
Mary R. O'Grady
Andrew G. Pappas
John S. Bullock
Kimberly Friday
Molly S. Walker
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012

KRISTIN K. MAYES
ATTORNEY GENERAL
Joshua D. Bendor, 031908
Gregory Honig, 018804
Lucy M. Rand, 026919
Luci D. Davis, 035347
Assistant Attorneys General
2005 North Central Avenue
Phoenix, Arizona 85004-1592
joshua.bendor@azag.gov
gregory.honig@azag.gov
lucy.rand@azag.gov
luci.davis@azag.gov

12

ACL@azag.gov

Attorneys for Defendants